**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE**

---

**JESSICA JONES, MICHELLE VELOTTA, and
CHRISTINA LORENZEN on Behalf of
Themselves and All Others Similarly Situated,**

                **Plaintiffs,**

    **v.**

**VARSITY BRANDS, LLC, VARSITY SPIRIT,
LLC, VARSITY SPIRIT FASHION &
SUPPLIES, LLC, U.S. ALL STAR
FEDERATION, INC., JEFF WEBB,
CHARLESBANK CAPITAL PARTNERS LLC,
and BAIN CAPITAL PRIVATE EQUITY,**

                **Defendants.**

**Case No. 2:20-cv-02892-SHL-cgc**

---

**<u>MEMORANDUM OF LAW IN SUPPORT OF JEFF WEBB'S MOTION TO DISMISS</u>**

## INTRODUCTION

Plaintiffs' Complaint Class Action (the "Complaint" or "CCA") is the second case in this Court seeking to punish Defendant Jeff Webb for his role as an innovator who revolutionized cheerleading, transforming it into a competitive activity requiring high degrees of skill and athleticism. Today, that innovation benefits millions of young people and their families. With few references to, and even fewer substantive allegations relating to Mr. Webb, the indirect purchaser Plaintiffs make clear that their sole basis for naming Mr. Webb in this lawsuit arises out of his role as the founder and former CEO of Defendant Varsity.[1] Such a basis is insufficient and, by bringing claims against Mr. Webb, Plaintiffs have cast their net too wide. The Court should dismiss all claims against Mr. Webb.

## FACTUAL ALLEGATIONS

### A.    Mr. Webb Revolutionized Cheerleading.

After graduating from the University of Oklahoma, where he was a cheerleader, Mr. Webb began working at the National Cheerleaders Association ("NCA"). (CCA ¶ 78). In 1974, Mr. Webb embarked on his mission to expand and transform traditional "sideline cheerleading" when he founded the Universal Cheerleaders Association ("UCA") with, as Plaintiffs allege, a "focus on gymnastics-like skills and new tournaments created solely for cheer squads. (*Id.* at ¶ 79). UCA eventually became Varsity, and revolutionized cheerleading.   (*Id.* at ¶ 80). Under Mr. Webb's leadership, Varsity facilitated cheerleading's growth into a competitive activity to the point where Varsity now "produces over 600 Cheer Competitions in the United States annually," providing opportunities for more than 900,000 young people to participate. (*Id.* at ¶ 71). Varsity also

---

[1] For the purposes of this memorandum, "Varsity" refers to Defendants Varsity Brands, LLC, Varsity Spirit, LLC, and Varsity Spirit Fashions & Supplies, LLC. Defendant United States All Star Federation is referred to as USASF.

produces the largest number of cheer camps, attracting approximately 330,000 participants each year. (*Id.* at ¶¶ 71, 74).

With Mr. Webb at the helm, Varsity, along with the USASF, offered ambitious cheerleaders the opportunity to compete in high-level competitions. In 2004, Varsity and USASF founded "Worlds," which is held annually at Walt Disney World and is a competition "for the best All Star teams." (CCA ¶¶ 123, 126). "Bids" to Worlds are given to teams that perform well at specific USASF-sanctioned events, including events produced by Varsity's competitors. (*Id.* at ¶¶ 125-26). Varsity also created two other high-level championship competitions, called "the Summit" and the "U.S. Finals." (*Id.* at ¶ 127). As the sole owner of these events, Varsity selects participants for the Summit and U.S. Finals from participants in its other competitions. (*Id.*).

As Varsity grew, and competitive cheerleading grew along with it, Varsity acquired and merged with other companies, including competitors, in the cheerleading industry, and other industries. Plaintiffs list many acquisitions, without explaining how such acquisitions affected competition in any particular market. (CCA *generally*). Plaintiffs do not allege any facts demonstrating that any of these acquisitions were hostile or otherwise conducted under threat.

### B.    Cheerleading's Regulatory Bodies.

In 2003, Varsity, along with "other promoters" helped found USASF. (CCA ¶ 104). With Varsity's support, USASF furthered the growth of competitive cheer by "publish[ing] uniform rules and judging standards for Cheer Competitions." (*Id.* at ¶ 180).

Plaintiffs allege that Varsity "controlled USASF from its inception." (*Id.* at ¶ 105). Plaintiffs allege that Varsity helped form USASF in response to the emergence of a separate organization, the National All Star Cheerleading Coaches Congress ("NACCC"). (*Id.* at ¶ 103). USASF acquired NACCC in 2005, with the NACCC becoming the USASF's "rules committee."

(*Id.* at ¶ 107).  Plaintiffs suggest that the agreement for USASF to acquire NACCC was formed during a meeting that was allegedly "run by Jeff Webb in his boardroom in Memphis with no other USASF board members present."  (*Id.*).  Plaintiffs do not allege what Mr. Webb did during the meeting or how he exercised any influence over any decisions that were made.

Varsity continued to work toward promoting safety in cheer when, in 2007, Varsity established USA Cheer, to "help grow and develop interest and participation in cheer" and "promote safety and safety education for cheer."  (CCA ¶ 114).

### C.      Expansion into the Apparel Business and Other Businesses.

In 1980, Varsity entered the apparel business, launching and designing its own apparel and equipment specifically for cheerleaders.  (CCA ¶ 60).  This apparel included shoes, uniforms, warm-ups, bows, and backpacks.  (*Id.* at ¶ 4).  Generally, Varsity exclusively sells its own apparel and equipment at Varsity's own competitions.  (*Id.* at ¶ 199).  Plaintiffs do not allege that Varsity prevents other producers of apparel from selling their apparel and equipment at competitions that Varsity does not own, or that Varsity prevents other manufacturers from selling their apparel and equipment through other distribution channels.  Nor do Plaintiffs allege that Varsity apparel is required for participation in Varsity-produced events or that cheerleading gyms cannot sell apparel made by Varsity's competitors.

### D.      Alleged Exclusive Contracts

Varsity offers gyms discounts based on participation in Varsity events, which Plaintiffs also improperly characterize as "effectively require[ing] exclusive dealing."  (*Id.* at ¶ 142-44, 146-49).  These discounts are known as the Family Plan and Network Plan.  (*Id.*).  Any gym may join Varsity's Family Plan, under which that gym commits to attendance at certain Varsity events and receives discounts on its entry fees and any apparel it chooses to purchase from Varsity.  (*Id.* at

¶ 147).  Varsity invites a limited number of gyms—allegedly the "larger and more prestigious All Star gyms"—to participate in its Network Agreements, which constitute another rebate program. (*Id.* at ¶ 142).

Varsity also supports schools by providing them with branding through its Impact Program. (*Id.* at ¶¶ 58, 151).  Through the Impact Program, schools that "purchase their uniforms, apparel, and equipment from Varsity" receive branding services from Varsity, which "helps the schools develop a sports identity." (*Id.* at ¶ 151).  The Complaint allegedly quotes Mr. Webb extolling the virtues of Varsity's efforts "to take achievement and spirit and sport, come together and become an extracurricular partner to schools so that we not only sell products, we use the entrée with the cheerleading and graduation to go in and rebrand the school, help them redefine their mission, to modernize so that more kids are involved." (*Id.* at 56).  Plaintiffs label these programs that help modernize schools and increase child involvement, as "exclusive," but do not allege how many schools participate in the programs.  (*Id.*at ¶ 151).

## ARGUMENT

## I.    Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558–59, 570 (2009)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient.  *Id.*  It is particularly important "to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed" in antitrust cases, where the discovery is often "enormous."  *Twombly*, 550 U.S. at 558-59 (internal quotations omitted).  Plaintiffs "must allege sufficient facts to support a cause of action under the antitrust

laws.  Conclusory allegations that the defendant violated those laws are insufficient." *TV Comm'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022 (10th Cir. 1992).

## II.    Plaintiffs' Claim for Injunctive Relief Under Section 16 of the Clayton Act Fails as a Matter of Law.

Plaintiffs' claim against Mr. Webb for injunctive relief under the Clayton Act fails as a matter of law because there is no threat of any future antitrust violations by Mr. Webb.  Section 16 of the Clayton Act permits a plaintiff to sue for injunctive relief against "threatened loss or damage by violation of the antitrust laws."  15 U.S.C. § 26.  To claim that they are entitled to injunctive relief, Plaintiffs allege that they "will continue to suffer injury, in the form of paying artificially inflated prices . . . if Varsity's conduct is not enjoined."  (CCA at ¶ 237).

As an initial matter, Plaintiffs have failed to state a claim against Mr. Webb for any antitrust injury.  *See infra* Part III.  As such, Plaintiffs are not entitled to injunctive relief to prevent alleged injury for which they are not otherwise entitled to relief.  *Static Control Components, Inc. v. Lexmark Intern., Inc.*, 697 F.3d 387, 409 (6th Cir. 2012) ("The Clayton Act does not 'authorize a private plaintiff to secure an injunction against a threatened injury for which he would not be entitled to compensation if the injury actually occurred.'") (quoting *Cargill Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 112 (1986)).

Moreover, Plaintiffs cannot pursue injunctive relief against Mr. Webb because there is no threat of a continuing injury.  As Plaintiffs allege in the Complaint, Mr. Webb is the *former* President of Varsity Brands.  Moreover, Mr. Webb retired from his role as Founder and Chairman of Varsity Spirit.  Press Release, Varsity Spirit, Varsity Spirit Founder and Chairman Jeff Webb Transitions to Focus on the Global Development of Cheer (December 10, 2020) (available at https://www.varsity.com/about/press/varsity-spirit-founder-and-chairman-jeff-webb-transitions-

to-focus-on-the-global-development-of-cheer/) (last visited March 12, 2021).[2]  Because Mr. Webb

is no longer a Varsity officer or employee, Plaintiffs cannot plausibly allege that there is any threat

that Mr. Webb will cause them antitrust injury.  Consequently, Plaintiffs' claim against Mr. Webb

for injunctive relief must be dismissed.

## III.   Plaintiffs Antitrust Claims Fail.[3]

### A.   Plaintiffs' Failure to Allege Facts Supporting a Claim under the Sherman Act is Fatal to their State Antitrust Claims, which are Interpreted in Parallel to the Sherman Act.

Plaintiffs base all of their antitrust causes of action upon what they characterize as

anticompetitive conduct.  It is black letter law that indirect purchasers do not have standing to

bring federal antitrust claims.  *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977).  To

circumvent the *Illinois Brick* prohibition on indirect purchaser actions, Plaintiffs seek injunctive

relief under federal law and assert antitrust claims under thirty-one (31) state laws.  However,

"state law antitrust claims are derivative of the federal law claims."  *Rick-Mik Enters., Inc. v.

Equilon Enters., LLC*, 532 F.3d 963, 976 n.5 (9th Cir. 2008).  Indeed, each of the thirty-one (31)

states under which Plaintiffs assert antitrust claims take guidance from, or interpret their antitrust

claims in parallel with or more narrowly than, the federal law.[4]  Because Plaintiffs have not alleged

facts to support claims of violations of federal antitrust laws, each of their state antitrust claims

---

[2] Pursuant to Local Rule 7.2(i), a copy of the referenced Press Release is attached hereto as **Exhibit A**.  *See also Ley v. Visteon Corp.*, 543 F.3d 801, 805 (6th Cir. 2008) ("[T]he court may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice.").

[3] In addition to the reasons stated herein, Plaintiffs' antitrust claims also fail due to their failure to identify a relevant market.  To avoid duplicative briefing on the issue, Mr. Webb incorporates by reference the arguments in Part III.A of Varsity's Memorandum of Law in Support of its Motion to Dismiss.

[4] The attached **Exhibit B** lists authorities demonstrating that each state takes guidance from, or interpret their antitrust claims in parallel with or more narrowly than, the federal law.

fail.  *See Rick-Mik Enters., Inc.* ("Because the federal [antitrust] law claims fail, the state law claims fail.").

> 1.   *Plaintiffs' vague and conclusory allegations against Mr. Webb cannot support an antitrust claim against him.*

Plaintiffs must allege that Mr. Webb actually participated in an allegedly wrongful act. "Individual liability under the antitrust laws can be imposed only where corporate agents are actively and knowingly engaged in a scheme designed to achieve anticompetitive ends, . . . [and] the evidence must demonstrate that a defendant exerted his influence so as to shape corporate intentions." *Brown v. Donco Enters., Inc.*, 783 F.2d 644, 646 (6th Cir. 1986).  The Complaint is devoid of any allegations indicating that Mr. Webb participated in any wrongful act, much less that he did so actively and knowingly with the aim to achieve anticompetitive ends.

Plaintiffs' Complaint references Mr. Webb in only twenty-one (21) of the 267 paragraphs of the Complaint.  Many of those references are biographical in nature and provide no factual basis for Mr. Webb's liability.  The non-biographical references to Mr. Webb fail to meet the standard required to hold Mr. Webb liable for antitrust violations.  Those references include the following allegations, all of which lack further factual substantiation:

- "Mr. Webb exercised control over all decisions about: (a) acquisitions of rival[s] . . . (b) pricing and policies . . . and (c) investing in and conspiring with Cheer Competition rule-making organizations . . ."  (CCA at ¶ 20).

- Mr. Webb's alleged statement "'the idea there was . . . for us to take achievement and spirit and sport, come together and become an extracurricular partner to the schools so that we not only sell products, we use the entrée with the cheerleading and graduation to go in and rebrand the school, help them redefine their mission, to modernize so that more kids are involved.'"  (*Id.* at ¶ 56).

- The allegation that Mr. Webb "admitted that competition judges have awarded more points to teams that used Varsity equipment as props." (*Id.* at ¶ 155).

- "In 2005, USASF acquired the NACCC.  Under the agreement, NACCC was to become the "rules committee" of USASF in perpetuity.  The meeting was run by Jeff Webb in his boardroom in Memphis with no other USASF board members present.  Within a

few years, Varsity dissolved the NACCC."  (*Id.* at ¶ 107).

- "Over the past 15 years, Varsity, under the leadership of Jeff Webb, Charlesbank, Bain Capital, in combination with USASF and other rule-making organizations it controls, has acquired enhanced, and maintained monopoly power in the Competitive Cheer Market . . . and the Cheer Apparel Market and Cheer Camp Market."  (*Id.* at ¶ 117).

- "Jeff Webb is the founder of Varsity and has been actively involved in decisions to acquire rival event producers, apparel manufacturers, and camp providers.  Webb was an early investor in cheer governing bodies and played an integral role in setting the policies for cheerleading.  Webb has always presented himself as the face of Varsity Brands."  (*Id.* at ¶ 118).

- After acquiring Varsity, "Charlesbank conspired with Varsity and Webb to consolidate Varsity's market power by acquiring its biggest rivals."  (*Id.* at ¶ 119).

- "In conspiring with Varsity and Webb, Bain has helped Varsity maintain and enhance its monopoly, and ensured that it continues."  (*Id.* at ¶ 120).

- "Defendants' illegal scheme and conspiracy was conceived and implemented in Tennessee.  The core Defendants—including Mr. Webb . . . are residents of Tennessee and have committed overt acts in Tennessee."  (*Id.* at ¶ 241).

- Two opinions of a competitor Varsity acquired that Mr. Webb wanted to make the market difficult for competitors and wanted her out of the market.  (*Id.* at ¶¶ 92, 98).

Unsubstantiated and conclusory allegations of Mr. Webb "exercising control" and "leadership," and being "actively involved in decisions" are insufficient to show that Mr. Webb was "actively or knowingly engaged in a scheme" or "exerted his influence" to achieve anticompetitive ends in violation of the Sherman or Clayton Acts.  *See Brown*, 783 F.2d at 646.  As such, Plaintiffs' antitrust claims against Mr. Webb should be dismissed.  *See Downing v. Ford Motor Co.*, No. 18-1335, 2018 WL 4621955, at **2–3 (6th Cir. 2018) (explaining conclusory allegations and suspicions are not sufficient to state a claim for a conspiracy under the Sherman Act); *see also Carruth v. Bentley*, 932 F.3d 1047, 1056 (11th Cir. 2019) (discarding as conclusory, allegations that defendants "ordered" or "directed" an allegedly wrongful action) (citing *Iqbal*, 556 U.S. at 680–81).

2.      *The Complaint does not allege Mr. Webb's involvement in any anticompetitive conduct.*

Not only are the allegations concerning Mr. Webb vague and conclusory, but many of them are wholly unrelated to any of the purported anticompetitive conduct. Those few allegations concerning Mr. Webb that can arguably be associated with some specific conduct of which Plaintiffs complain do so in a conclusory manner and relate to alleged conduct for which antitrust liability cannot attach, including acquisitions, discount programs, and the establishment and support of rule-making bodies.

Plaintiffs allege that Mr. Webb "exercised control over" and was "actively involved in decisions" regarding "acquisitions" of competitors. Plaintiffs do not allege any facts demonstrating that Mr. Webb exercised control over or was actively involved in acquisition decisions. Moreover, the Complaint does not include any factual allegations suggesting that any acquisitions were anticompetitive. Such allegations are essential for an antitrust claim. *See United States v. Syufy Enters.*, 903 F.2d 659, 673 (9th Cir. 1990) ("[I]n a competitive market, buying out competitors is not merely permissible, it contributes to market stability and promotes the efficient allocation of resources.").

Plaintiffs' allegation that Mr. Webb "exercised control over" pricing decisions is similarly unsubstantiated. Plaintiffs do not even identify the pricing decisions to which they refer. To the extent Plaintiffs refer to Varsity's discount programs (the Network Agreement and Family Plan), the Complaint is devoid of any allegations demonstrating the nature of Mr. Webb's involvement in those programs. Moreover, courts have found that such bundled discount programs are not unlawful because they serve the same interests that antitrust laws promote. *Cascade Health Sols. v. PeaceHealth*, 502 F.3d 895, 905-06 (9th Cir. 2008) ("Bundled discounts are pervasive, and . . . generally benefit buyers because the discounts allow the buyer to get more for less."); *see also*

9

*Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 272-74 (6th Cir. 2015); (endorsing *PeaceHealth*'s approach to bundled discounts and applying the reasoning to a tying arrangement). Bundled discounts violate the antitrust laws only when they "result in prices that are below an appropriate measure of a defendant's cost." *PeaceHealth*, 502 F.3d at 903. Plaintiffs have not alleged any such below cost pricing.

Nor does Plaintiffs' allegation regarding Mr. Webb's role in running a meeting for the USASF support any antitrust claims. As an initial matter, that meeting occurred in 2005, well outside the four-year statute of limitations for antitrust claims. Moreover, Plaintiffs do not explain how running a meeting, in which two different parties allegedly reached a merger agreement, constitutes active involvement in anticompetitive conduct. Indeed, the establishment of rules for a competition does not state an antitrust claim. *See Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 854 (8th Cir. 2000) ("so long as IMCA made game-defining rules decisions based upon its purposes as a sports organization, an antitrust court need not be concerned with the rationality or fairness of those decisions.").

Plaintiffs' allegation that Mr. Webb "admitted that competition judges have awarded more points to teams that used Varsity equipment as props" is wholly unsubstantiated. (CCA at ¶ 155). Plaintiffs do not identify when Mr. Webb purportedly "admitted" to this practice, to whom he did so, or the circumstances surrounding him doing so. Nor do Plaintiffs identify a single example of this practice actually occurring, much less anyone purchasing Varsity equipment or props because of this supposed practice. Significantly, even if this improper awarding of points had occurred, it does not constitute an antitrust violation. Instead, such a practice is more likely to spur competition. *See, e.g.*, *Brookins*, 219 F.3d at 854 ("Irrational decisions and unfair treatment of suppliers will result in an unpopular game, and players and spectators will take their entertainment

dollars from elsewhere.").

> 3.    *Plaintiffs cannot maintain a monopolization claim against Mr. Webb under Section 2 of the Sherman Act or any State Antitrust Laws.*

To maintain a claim under Section 2 of the Sherman Act, Plaintiffs must prove "(1) possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident."  *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 402 (6th Cir. 2012).  As Varsity explains in its brief, Plaintiffs have failed to allege facts supporting a monopolization claim in violation of Section 2 against Varsity.  For those same reasons, Plaintiffs fail to state a claim against Mr. Webb.  Additionally, Plaintiffs' Section 2 claim fails as to Mr. Webb because they do not allege that he possesses monopoly power.

In the rare instances in which plaintiffs have asserted Section 2 monopolization claims against individual officers of a company, courts have held that an individual cannot be liable unless the individual possesses monopoly power.  *See ES Dev., Inc. v. RWM Enters., Inc.* 939 F.2d 547, 554 (8th Cir. 1991) ("[T]he Sherman Act does not impart liability for actions by an individual, regardless of their anticompetitive motive or effect, unless the individual possess monopoly power."); *Carpet Grp. Int'l v. Oriental Rug Imps. Ass'n*, 256 F. Supp. 2d 249, 284–85 (D.N.J. 2003) ("[The individual defendant] is not in the business of importing oriental rugs and therefore has no market share whatsoever . . . [the defendant] as an individual possesses no power to prevent newcomers from entering the market.").  In *Carpet Grp.*, the court noted that the plaintiffs "*do not contend that [the individual defendant,] separate from [the company,] possesses market power*," and, accordingly, the monopoly claim failed.  *Id.* at 284–85 (emphasis added).  Thus, if a Section 2 claim against an individual fails to allege monopoly power, it must be dismissed.  *See Appraisers*

*Coal. v. Appraisal Inst.*, 845 F. Supp. 592, 602–03 (N.D. Ill. 1994) (dismissing monopolization claim against individual defendants).

The Complaint lacks any allegations that Mr. Webb, separate from Varsity, possesses any monopoly power or any market share, in any relevant market. Consequently, because Plaintiffs have not alleged that Mr. Webb possesses monopoly power, Plaintiffs' state antitrust claims, all of which allege monopolization, fail as a matter of law and must be dismissed.

> 4. *Plaintiffs cannot allege that Mr. Webb participated in any conspiracy in violation of the Sherman Act.*

Plaintiffs allege on several occasions that Mr. Webb conspired with Defendants Varsity, Charlesbank, and Bain Capital. *See* (CCA at ¶¶ 117, 119-20). However, Plaintiffs cannot plausibly allege such a conspiracy because it is well-established that an officer cannot agree or conspire with his employer to give rise to antitrust liability. *Smith v. N. Michigan Hospitals, Inc.*, 703 F.2d 942, 951 (6th Cir. 1983). Moreover, given that Plaintiffs repeatedly claim that Varsity and USASF are indistinguishable from one another, it naturally follows that Mr. Webb could not conspire with USASF. *See* (CCA at ¶¶ 60, 104, 105, 108, 110). Consequently, Plaintiffs cannot maintain any claim against Mr. Webb based upon an alleged conspiracy.

## B. Plaintiffs' Claim for Violations of the Tennessee Antitrust Law Fails in its own Right.

Plaintiffs allege that the Defendants violated the Tennessee Trade Practices Act ("TTPA"), which makes unlawful "[a]ll arrangements, contracts, agreements, trusts, or combinations . . . which tend to lessen full and free competition . . . in the manufacture or sale of articles of domestic growth or of domestic raw material, . . . or which tend to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article." TENN. CODE ANN. § 47-25-101. Because Plaintiffs fail to allege that Mr. Webb was knowingly or actively involved in any anticompetitive conduct in violation of federal antitrust laws, their TTPA cause of action fails for

the reasons stated *supra*, Part III.  *See Spahr v. Leegin Creative Leather Prods.*, No. 2:07-CV-187, 2008 WL 3914461, at \*12-14 (E.D. Tenn. Aug. 20, 2008) (accepting that the interpretation of the TTPA has relied heavily on Sherman Act precedent, and analyzing a TTPA claim accordingly).

Plaintiffs' claim under the TTPA fails for the independent reason that Plaintiffs have not alleged that any purportedly anticompetitive conduct affected Tennessee trade or commerce to a substantial degree.  The Tennessee Supreme Court has held that, for a claim to fall within the scope of the TTPA, Plaintiffs must allege "anticompetitive conduct [that] affects Tennessee trade or commerce to a substantial degree."  *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W. 512, 519 (Tenn. 2005).  In *Freeman*, an indirect purchaser in New York asserted claims against a Tennessee-based manufacturer and several international companies alleging a nationwide price-fixing scheme in violation of the TTPA.  *Id.* at 516.  The court held that the plaintiff failed to state a claim under the TTPA where the plaintiff alleged that the Tennessee manufacturer met and communicated with its alleged co-conspirators in Tennessee, set its anticompetitive price schedules in Tennessee, and sold product in Tennessee.  *Id.* at 524.  The court reasoned that application of the TTPA does not depend upon the location of the allegedly anticompetitive conduct, but rather "on the *effects* of the conduct on Tennessee commerce."  *Id.* (emphasis in original).  The court found that the plaintiff's "bare allegations" that the defendant took orders and made sales from Tennessee, and that the defendant's conduct caused the out-of-state plaintiff to pay higher prices, was insufficient to "establish how the defendant's anticompetitive conduct affected Tennessee commerce to a substantial degree."  *Id.*

Plaintiffs' Tennessee-specific allegations, particularly with respect to Mr. Webb, do not demonstrate any effect on Tennessee commerce, much less an effect to a "substantial degree." Instead, those allegations solely relate to the location of the alleged anticompetitive conduct.

Plaintiffs merely allege that the purported "scheme and conspiracy was conceived and implemented in Tennessee;" that Mr. Webb is a Tennessee resident; that Varsity is a Tennessee corporation; that USASF is a Tennessee non-profit; and that each entity has its principal place of business in Tennessee. (CCA at ¶ 241). These allegations do not support a claim under the TTPA and should be dismissed.

### C.   Plaintiffs' Other State Antitrust Claims Fail for Various Reasons.

As explained *supra*, Plaintiffs have failed to state any viable claims for antitrust violations against Mr. Webb. Many of Plaintiffs' state antitrust law claims also fail for independent reasons, separate and apart from their substantive failings.

#### 1.   Plaintiffs Fail to Allege an Intrastate Effect.

At least ten (10) of the state or territory antitrust laws under which Plaintiffs purport to assert claims require Plaintiffs to allege a nexus between the alleged antitrust violation and the state or territory. With respect to Alabama, Arizona, the District of Columbia, Mississippi, Nevada, New York, North Carolina, South Dakota, West Virginia, and Wisconsin, Plaintiffs fail to allege any connection between the supposedly anticompetitive conduct and the jurisdiction. Plaintiffs' claims under each state antitrust law fail as a matter of law and must be dismissed.

Alabama, Arizona, Mississippi, South Dakota, and West Virginia antitrust laws all require a plaintiff to demonstrate that anticompetitive conduct actually occurred within the state.[5]

---

[5] *See, e.g.*, *Archer Daniels Midland Co. v. Seven Up Bottling Co. of Jasper, Inc.*, 746 So.2d 966, 989-90 (Ala. 1999) (holding that the Alabama antitrust statutes "regulate monopolistic activities that 'occur within this state'—within the geographic boundaries of [Alabama]."); ARIZ. REV. STAT. § 44-1402 (making unlawful any contract or conspiracy to monopolize or in restraint of trade "any part of which is *within this state*.") (emphasis added); *California v. Infineon Techs. AG.*, 531 F. Supp. 2d 1124, 1169 (N.D. Cal. 2007) (interpreting Mississippi's antitrust statute to require "allegations of at least some activity or conduct occurring in intrastate commerce or trade."); S.D. CODIFIED LAWS, § 37-1-3.1 (requiring anticompetitive conduct to occur in South Dakota by making unlawful "restraint of trade or commerce any part of which is *within this state*") (emphasis

Plaintiffs do not allege a single fact showing that any purportedly anticompetitive conduct occurred within the states of Alabama, Arizona, Mississippi, South Dakota or West Virginia. Consequently, Plaintiffs' claims under each state's antitrust law must be dismissed.

Similarly, the District of Columbia, Nevada, New York, and Wisconsin require, at minimum, that the alleged anticompetitive conduct have a connection to, or "substantial effect" on, the jurisdiction.[6] Plaintiffs do not allege any anticompetitive conduct that occurred in these states or had a substantial effect on those states. Thus, Plaintiffs' claims under the antitrust statutes in the District of Columbia, Nevada, New York, North Carolina, and Wisconsin must be dismissed.

> 2. *Plaintiffs' claims under Alaska, Arkansas, Colorado, Illinois, and Utah antitrust laws fail because those states limit Plaintiffs' right to bring causes of action under the statutes.*

Other states, including Alaska, Arkansas, Colorado, Illinois, and Utah limit the ability of

---

added); and *State ex rel. Palumbo v. Graley's Body Shop, Inc.*, 425 S.E.2d 177, 183 n.11 (W. Va. 1992) (holding that "West Virginia's antitrust law is directed toward *intrastate* commerce.").

[6] *See, e.g.*, *GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27, 45 (D.D.C. 1998) (requiring a plaintiff to allege a "connection within th[e] jurisdiction" to maintain a claim under the District of Columbia's antitrust law); *In re Aut. Parts Antitrust Litig.*, 50 F. Supp. 3d 869, 889 (E.D. Mich. 2014) (explaining that Nevada's antitrust law "prohibits conduct that is part of a conspiracy in restraint of trade *in Nevada*." (emphasis added); *In re Magnesium Oxide Antitrust Litig.*, Civ. No. 10–5943 (DRD), 2011 WL 5008090, at *8 (D.N.J. Oct. 20, 2011) (dismissing Nevada antitrust claim where plaintiffs failed to allege "a causal connection between [their] injuries and the conduct prohibited by the laws of those states, which require a showing that such conduct occurred, or whose effect was felt, in state."); *Conergy AG v. MEMC Elec. Materials, Inc.*, 651 F. Supp. 2d 51, 61 (S.D.N.Y. 2009) (holding that New York's antitrust law also "makes clear that it applies to contracts in restraint of trade relating to the conduct of any business, trade, or commerce or in the furnishing of any service *in this state* . . .") (emphasis in original); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 540 (E.D. Pa. 2010) (finding that North Carolina's antitrust law requires that plaintiffs allege injuries with a "'substantial in-state effect on North Carolina trade or commerce.'") (citing *Lawrence v. UMLIC-Five Corp.*, No. 06 CVS 20643, 2007 WL 2570256, at *5 (N.C. Super. Ct., June 18, 2007); and *Olstad v. Microsoft Corp.*, 700 N.W.2d 139, 141 (Wisc. 2005) (holding that to maintain a claim under the Wisconsin antitrust statute, the plaintiff must allege either "actionable conduct, such as the formation of a combination or conspiracy, occurred within [the] state," or the allegedly anticompetitive conduct "substantially affects" the people of Wisconsin).

private citizens, or those residing outside the state to bring private causes of action for violation of

their state antitrust laws.  As described below, those limitations prevent Plaintiffs from bringing

claims under those statutes, and such claims must be dismissed.

In Alaska, Arkansas, and Colorado, indirect purchasers cannot maintain private causes of

action under those states' antitrust laws.  Instead, only the attorney general of each state may bring

actions on behalf of indirect purchasers under each state's antitrust laws.  *See, e.g.*, ALASKA STAT.

§ 45.50.577 ("[O]nly the attorney general . . . may seek monetary relief for injury indirectly

sustained for a violation of [Alaska's antitrust statute]"); ARK. CODE ANN. § 4-75-315; *In re Cast

Iron Soil Pipe and Fittings Antitrust Litig.*, No. 1:14-md-2508, 2015 WL 5166014, at *22 (E.D.

Tenn. June 24, 2015) (dismissing indirect purchaser claims under the Arkansas antitrust statute

because it "does not provide for a private individual to bring an action and only permits actions by

the Attorney General"); COLO. REV. STAT. § 6-4-111 (providing the attorney general with the

authority to pursue indirect purchaser actions under Colorado's antitrust law); *Pomerantz v.

Microsoft Corp.*, 50 P.3d 929, 933 (Colo. App. 2002) (finding the plaintiff lacked standing as an

indirect purchaser to bring a claim under Colorado's antitrust law).  Consequently, Plaintiffs'

claims for violation of the Alaska, Arkansas, and Colorado antitrust statutes must be dismissed.

While Illinois' antitrust statute allows for a private right of action, it does not allow private

persons to bring a class action lawsuit on behalf of indirect purchasers.  Instead, under the Illinois

antitrust act, only the Illinois attorney general can bring a class action on behalf of indirect

purchasers.  740 ILCS 10/7(2).  Courts have refused to allow private indirect purchaser class

actions to proceed under the Illinois antitrust act on the grounds that only the Illinois attorney

general can bring class actions under the statute.  *See, e.g.*, *In re Opana ER Antitrust Litig.*, 162 F.

Supp. 3d 704, 723 (N.D. Ill. 2016) (dismissing indirect purchaser class action brought under

Illinois law because only the Illinois attorney general can bring class action suits under Illinois antitrust law); *In re Nexium Antitrust Litig.*, 968 F. Supp. 2d 367, 408-09 (D. Mass. 2013) (same); *In re Flonase*, 692 F. Supp. 2d at 539 (E.D. Pa. 2010) (same).

Finally, Utah's antitrust statute provides that only "[a] person who is a citizen of this state or a resident of this state" may bring a private cause of action under the statute. UTAH CODE ANN. § 76-10-3109. Although Plaintiffs purport to assert claims on behalf of residents of the State of Utah, none of the Plaintiffs claim to be citizens or residents of Utah. (CCA at ¶¶ 13-15). Consequently, Plaintiffs' claim for violation of the Utah antitrust statute must be dismissed. *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d at 725.

## IV.   Plaintiffs' State Consumer Protection Claims Fail.

Plaintiffs attempt to assert causes of action for violation of the consumer protection statutes for thirty-one (31) states—the same states for which Plaintiffs asserted antitrust claims. However, Plaintiffs fail to plead any facts supporting these claims. Instead, Plaintiffs recast the same allegations upon which they rely for their antitrust claims and allege that Defendants violated thirty-one (31) consumer protection statutes. In doing so, Plaintiffs fail to satisfy Rule 8's pleading requirements. *See In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 255 (D. Conn. 2015) (dismissing consumer protection claims where plaintiffs "have *listed* claims under very many state laws, but they have not truly *pleaded* claims under those laws sufficient to show their entitlement to recovery under them, as required by Rule 8.") (emphasis in original).

In *Aggrenox*, the court explained that plaintiffs "have pleaded federal antitrust claims and the factual foundation for them . . . [but] merely allege that those claims are also actionable under general consumer protection laws and unjust enrichment." *Id.* The court rejected the plaintiffs' "copy-and-paste form" of pleading that "fail[ed] not only to account for any consequential

17

differences that may exist among the undifferentiated state-law claims, but . . . fail[ed] to show that any but the antitrust laws entitle plaintiffs to relief from antitrust violations." *Id.* In dismissing the state law claims, the court concluded that "[t]he bald assertion that the alleged antitrust conduct violates dozens of non-antitrust laws, or the implication that there are no consequential differences between those laws is not entitled to deference, because 'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). Here, Plaintiffs' consumer protection claims are similarly defective and should be dismissed.

Like Plaintiffs' other claims, their consumer protection claims are particularly deficient with respect to any allegations against Mr. Webb. Indeed, in failing to even mention Mr. Webb in asserting those claims, the Complaint concedes he is not responsible for any relevant conduct. Plaintiffs specifically allege that "*Varsity* engaged in unlawful and unfair acts and practices …," their damages are a "direct and proximate result of *Varsity's* unlawful and unfair business practices …," and Plaintiffs were "forced to pay artificially inflated prices for *Varsity's* products." (CCA ¶¶ 252-53.)

Plaintiffs claim further that the state consumer protection laws were violated "with respect to purchases of Defendants' products and services." However, nowhere in the Complaint is it alleged that Mr. Webb himself offers products or services. The factual allegations of the Complaint do not support a plausible claim for "unfair methods of competition, and unfair and deceptive acts, in violation of state consumer protection law" against Mr. Webb, and accordingly these claims against him should be dismissed.

Finally, claims for violation of state consumer protection laws suffer from the same fatal flaws as their antitrust claims. Where, as here, "consumer protection claims are premised wholly

on the same underlying alleged anticompetitive behavior and antitrust injury" that forms the basis for antitrust claims, those consumer protection claims should suffer the same fate. *In re Plavix Indirect Purchaser Antitrust Litig.*, No. 1:06-cv-226, 2011 WL 335034, at *5 (S.D. Ohio Jan. 31, 2011). Because Plaintiffs antitrust claims must be dismissed, so too must their state consumer protection claims that are based upon the same allegedly anticompetitive conduct. *See id.* (dismissing state consumer protection law claims because antitrust claims based upon the same underlying conduct also failed); *In re Tamoxifen Antitrust Litig.*, 277 F. Supp. 2d 121, 139 (E.D.N.Y. 2003) (dismissing unfair competition and consumer protection claims where the allegations "track entirely the allegations underlying the antitrust claims").

## V.    Plaintiffs' Unjust Enrichment Claim Fails and Must be Dismissed.

Plaintiffs allege that their payments were derived *by Varsity* through payments for its events, apparel, etc. (CCA at ¶¶ 263, 265). Plaintiffs allege the benefit is retained *by Varsity*. (*Id.* at ¶ 264). Notably, Plaintiffs seek disgorgement of proceeds only *from Varsity*. (*Id.* at ¶ 266). These allegations cause Plaintiffs' claim for unjust enrichment against Mr. Webb to fail for a number of reasons.

The elements of an unjust enrichment claim in Tennessee are: (1) a benefit conferred by the plaintiff on the defendant; (2) defendant's appreciation of the benefit; and (3) acceptance of the benefit under such circumstances that it would be inequitable for the defendant to retain the benefit without payment of the value of the benefit. *Freeman Indus., LLC v. Eastman Chemical Co.*, 172 S.W.3d 512, 525 (Tenn. 2005). "A benefit is any form of advantage that has a measurable value including the advantage of being saved from an expense or loss." *Id.* "The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust." *Id.*

Plaintiffs do not allege that they conferred any benefit on Mr. Webb. Although a benefit

19

may be conferred indirectly, the allegations still do not show how Mr. Webb retained any benefit whatsoever from Plaintiffs. Per Plaintiffs' allegations, Varsity reaped any alleged benefit. The alleged connection between Plaintiffs and Mr. Webb is far too remote to plausibly support a claim for unjust enrichment against him. *See Abriq v. Hall*, 295 F. Supp. 3d 874, 882-83 (M.D. Tenn. Feb. 26, 2018) (granting motion to dismiss unjust enrichment claim because alleged connection between plaintiff and defendant was too attenuated). The Complaint concedes the only measurable value conferred was derived by Varsity and is retained by Varsity. *See* (CCA at ¶¶ 263-266). The claim should be dismissed because there are no allegations to support the assessment of an alleged benefit unjustly held by Mr. Webb. *See Chase Manhattan Bank, N.A. v. CVE, Inc.*, 206 F. Supp. 2d 900, 909-910 (M.D. Tenn. 2002) (explaining an unjust enrichment claim must be dismissed where the facts do no support an assessment of damages that is not merely highly speculative).

## VI.    Plaintiffs Claim for Declaratory Relief Fails

In their sixth and final "claim for relief," Plaintiffs seek declaratory relief for violations of Sections 1-3 of the Sherman Act. As explained above, Plaintiffs have not stated a claim for violations of the Sherman Act and, therefore, are not entitled to the requested declaratory relief. Moreover, Plaintiffs' claim for declaratory relief is unnecessary and should be dismissed as superfluous. *See Pineda Transportation, LLC v. FleetOne Factoring, LLC*, 2018 WL 2137760, at *7 (M.D. Tenn. May 9, 2018) (dismissing claim for declaratory relief because "[a] declaration of rights as requested could clarify the rights and relations of the parties, but so could a ruling on Plaintiffs' other claims.").

## CONCLUSION

For the foregoing reasons, Mr. Webb respectfully requests that the Court dismiss all claims against him.

Dated:  March 12, 2021

By: /s/ *Paul E. Coggins*

Paul Coggins* (TX Bar #04504700)
Brendan Gaffney* (TX Bar #24074239)
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Phone: (214) 740-8000
Fax: (214) 740-8800
pcoggins@lockelord.com
bgaffney@lockelord.com

Talis C. Trevino* (GA Bar #181896)
LOCKE LORD LLP
Terminus 200, Suite 1200
3333 Piedmont Road NE
Atlanta, GA 30305
Phone: (404) 870-4600
Fax: (404) 872-5547 (fax)
talis.trevino@lockelord.com

* Admitted *pro hac vice*

Edward L. Stanton III (TN Bar #018904)
BUTLER SNOW LLP
6075 Poplar Avenue, Suite 500
Memphis, Tennessee 38119
Telephone: (901) 680-7336
Facsimile: (901) 680-7201
Edward.Stanton@butlersnow.com

**ATTORNEYS FOR JEFF WEBB**