**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| JESSICA JONES et al., | |
| Plaintiffs, | |
| v. | **Civ. Action No. 2:20-cv-02892** |
| VARSITY BRANDS, LLC et al., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**VARSITY DEFENDANTS' MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS ....................................................................................................1

      A.     Varsity Creates and Grows Competitive Cheerleading............................................1

      B.     Varsity Builds a Cheer Apparel Business.................................................................2

      C.     Varsity Provides Discounts to Gyms and Supports Schools....................................3

ARGUMENT .........................................................................................................................3

I.     A Complaint Must Be Supported by Plausible Factual Allegations .................................3

II.    Plaintiffs' Shotgun Pleading Should Be Dismissed .........................................................4

III.   Plaintiffs Fail to Allege an Antitrust Violation.................................................................4

      A.     Plaintiffs' Cherry-Picked Products Make Their Market Definitions
             Implausible..............................................................................................................5

            1.     "Cheer Apparel" Is Not a Plausible Relevant Market................................6

            2.     "Cheer Competitions" Is Not a Plausible Relevant Market......................6

            3.     "All Cheer Camps" Is Not a Plausible Relevant Market ...........................8

      B.     Attacking Success as "Anticompetitive" Is Improper .............................................9

      C.     Plaintiffs' Allegations of Anticompetitive Conduct In All Star Cheer Fail............10

            1.     Plaintiffs Do Not Allege Illegal Exclusive Dealing ..................................10

            2.     Plaintiffs Do Not Allege Illegal Discounting.............................................12

            3.     Deciding Which Teams Can Compete in One's Own
                 Championship Events Is Not an Antitrust Violation..................................13

            4.     Offering Choreography Camps Is Not Anticompetitive ............................14

            5.     Offering Competing Events Is Procompetitive, Not
                 Anticompetitive.........................................................................................14

            6.     Setting Rules of Competition Is Not an Antitrust Violation .....................15

            7.     The USASF's Insurance Requirement Is Not Anticompetitive ................15

|  |  | 8. | Plaintiffs' Allegations About Apparel Fail ................................................16 |
|  | D. | Scholastic Cheer ..................................................................................................17 |
|  | E. | Acquisitions ..........................................................................................................18 |
| IV. |  | Plaintiffs Fail to Allege Any Agreement in Restraint of Trade ...........................................18 |
| V. |  | Plaintiffs' State Law Claims Should Be Dismissed For Additional Reasons ...................20 |
| VI. |  | Plaintiffs' Claim for "Declaratory Relief" Should Be Dismissed ....................................20 |
|  |  | CONCLUSION...........................................................................................................................20 |

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...................................................................................10

*Atl. Richfield Co. v. USA Petroleum Co.,*
    495 U.S. 328 (1990)...................................................................................12

*B&H Med., L.L.C. v. ABP Admin., Inc.,*
    526 F.3d 257 (6th Cir. 2008).....................................................................11

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).....................................................................................3

*Brookins v. Int'l Motor Contest Ass'n,*
    219 F.3d 849 (8th Cir. 2000)............................................................... 15-16

*Cascade Health Sols. v. PeaceHealth,*
    515 F.3d 883 (9th Cir. 2008)............................................................... 12-13

*Century Oil Tool, Inc. v. Prod. Specialties, Inc.,*
    737 F.2d 1316 (5th Cir. 1984)...................................................................19

*Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n,*
    95 F.3d 593 (7th Cir. 1996).......................................................................14

*Collins Inkjet Corp. v. Eastman Kodak Co.,*
    781 F.3d 264 (6th Cir. 2015).....................................................................12

*Concord Assoc., L.P. v. Ent. Props. Trust,*
    817 F.3d 46 (2d Cir. 2016)..........................................................................8

*Copperweld Corp. v. Indep. Tube Corp.,*
    467 U.S. 752 (1984)............................................................................. 18-19

*Eastman v. Quest Diagnostics Inc.,*
    724 F. App'x 556 (9th Cir. 2018)..........................................................12, 18

*Est. of Smith ex rel. Richardson v. United States,*
    509 F. App'x 436 (6th Cir. 2012)................................................................3

*Feitelson v. Google Inc.*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) ........................................................................12

*Fraser v. Major League Soccer, L.L.C.*,
    284 F.3d 47 (1st Cir. 2002) ...............................................................................10, 16

*Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*,
    407 F.3d 1027 (9th Cir. 2005) ..................................................................................19

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
    588 F. 3d 908 (6th Cir. 2009) ....................................................................................5

*Magluta v. Samples*,
    256 F.3d 1282 (11th Cir. 2001) ................................................................................4

*Midwest Agency Servs., Inc. v. J.P. Morgan Chase Bank, N.A.*,
    No. 09-165, 2010 WL 935450 (E.D. Ky. Mar. 11, 2010) ........................................11

*Nicolosi Distrib., Inc. v. FinishMaster, Inc.*,
    No. 18-CV-03587, 2019 WL 1560460 (N.D. Cal. Apr. 10, 2019) .......................8, 12

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007) ..................................................................................14

*Pineda Transp., LLC v. FleetOne Factoring, LLC*,
    No. 18-cv-0089, 2018 WL 2137760 (M.D. Tenn. May 9, 2018) .............................20

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) ..................................................................................5-7

*Richter Concrete Corp. v. Hilltop Concrete Corp.*,
    691 F.2d 818 (6th Cir. 1982) ....................................................................................4

*Rick-Mik Enters., Inc. v. Equilon Enters., LLC*,
    532 F.3d 963 (9th Cir. 2008) ....................................................................................4

*SPX Corp. v. Mastercool, U.S.A., Inc.*,
    No. 10 CV 1266, 2011 WL 3610094 (N.D. Ohio Aug. 17, 2011) ...........................11

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ...........................................................................................5, 11

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross and Blue Shield*,
    552 F.3d 430 (6th Cir. 2008) ....................................................................................5

*TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*,
   964 F.2d 1022 (10th Cir. 1992) ................................................................5

*United States v. Phila. Nat'l Bank*,
   374 U.S. 321 (1963) ......................................................................6, 9

*United States v. Syufy Enters.*,
   903 F.2d 659 (9th Cir. 1990) ..............................................................18

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) .......................................................... 4, 9-10, 14, 16

*Z Techs. Corp. v. Lubrizol Corp.*,
   753 F.3d 594 (6th Cir. 2014) ..............................................................18

## INTRODUCTION

This is the third of three cases that are before this Court relating to Varsity and cheerleading.[1]  This case is brought by three individuals (and class action counsel) seeking to represent so-called "indirect purchasers" of Varsity's cheer competitions, cheer camps, cheer apparel, or "accommodations" at a Varsity cheer competition.  Like the other two cases, this case should be dismissed.

Indeed, for the most part the Complaint merely copies the Consolidated Complaint in *Fusion Elite*, often lifting allegations word-for-word.  In an effort to expand the scope of the case and thus the pool of potential damages, Plaintiffs for no justifiable reason replace "All Star cheer" with "Competitive Cheer," which if allowed would expand the scope of the case (and discovery) into scholastic cheerleading.

## STATEMENT OF FACTS

Varsity and USAF have not impeded the growth of cheerleading, but instead have fueled that growth to the benefit of thousands of gyms and millions of participants.  Varsity has also enriched and fueled the growth of scholastic competitive cheerleading.

### A.    Varsity Creates and Grows Competitive Cheerleading

As the Complaint recounts, beginning with its founding in 1974, Varsity vastly expanded cheerleading from "sideline cheerleading" to an activity in which "about 4 million athletes participate."  (Compl. ¶¶ 44, 70.)  Varsity's founder and former chief executive officer Jeff Webb brought numerous innovations to cheerleading, including "more focus on gymnastics-like skills and new tournaments created solely for cheer squads."  (*Id.* ¶ 79.)  One set of competitions is

---

[1] As used herein, "Varsity" refers to Defendants Varsity Brands, LLC, Varsity Spirit, LLC, and Varsity Spirit Fashions & Supplies, LLC.  U.S. All Star Federation is referred to as USASF.

known as "All Star" competitions and participating teams are referred to as "All Star" teams.

In 2003, Varsity founded the USASF.  (Compl. ¶ 104.)  According to the Complaint, Varsity has "controlled USASF from its inception.  (*Id.* ¶ 105.)  With Varsity's support, USASF has expanded All Star cheer by "publish[ing] uniform rules and judging standards for Cheer Competitions."  (*Id.* ¶ 106.)

Not surprisingly, the best teams and cheerleaders "desire the challenge and recognition that comes with competing against the best." (Compl. ¶ 181.)  To meet this demand, in 2004 Varsity and USASF together created an event called "Worlds," which is held every year at Walt Disney World.  To make this event an opportunity to compete against "elite" teams, Varsity and USASF enable participants in certain USASF-sanctioned events *not* produced by Varsity to be eligible, including events produced by Varsity's competitors.  (*Id.* ¶¶ 123-26.)  Varsity also produces two other championship-style meets, called "The Summit" and "U.S. Finals," and selects the teams for these meets from among the participants in its other competitions.  (*Id.* ¶ 127.)  Varsity has similarly fueled a huge growth in scholastic cheerleading by, among other things, creating the "preeminent School national championships."  (*Id.* ¶ 56.)

### B.    Varsity Builds a Cheer Apparel Business

Varsity's vision for a new and energetic cheerleading included an exciting and updated look, conducive to the athleticism of the activity.  In 1980, Varsity launched a line of apparel and equipment for cheerleaders, including such things as shoes, uniforms, warm-ups, bows, and backpacks.  (Compl. ¶¶ 4, 60.)  Not surprisingly, Varsity does generally exclusively sell its own apparel at its *own* competitions.  (*Id*. ¶ 199.)  There are no allegations, however, that other manufacturers cannot sell apparel at other competitions or, as is far more common, directly though gyms that sponsor All Star teams or through myriad other distribution channels.

### C.      Varsity Provides Discounts to Gyms and Supports Schools

Varsity offers discounts to gyms based on participation in Varsity events.  (Compl.

¶¶ 142-44, 146-49.)  For example, any gym may join Varsity's Family Plan.  (*Id.* ¶ 146.)  Under

the Family Plan, a gym that is willing to commit to attend six Varsity competitions a year

receives discounts on its entry fees and any apparel that it chooses to purchase from Varsity.  (*Id.*

¶ 147.)  Also, Varsity invites a limited number of gyms to participate in its separate Network

Agreements.  (*Id.* ¶ 142.)  As with any endorsement model, Varsity offers these extra discounts in

an effort to have its apparel worn by the cheerleaders from the "larger and more prestigious All-

Star Gyms" (*id.*) so as to "draw[] the smaller All-Star gyms into attending Varsity Cheer

Competitions and wearing Varsity All-Star Apparel."  (*Id.* ¶ 145.)

Varsity also provides support to schools that choose to buy its products or use its services,

such as by supplying "signage and other branding merchandise."  (*Id.* ¶ 58.)  Plaintiffs say that

these deals are "exclusive" (*id.* ¶ 151), which is false, but in any event, there are no allegations

suggesting that a significant number of the tens of thousands of schools in the United States have

entered into such agreements (they have not).

### ARGUMENT

### I.      A Complaint Must Be Supported by Plausible Factual Allegations

"For a complaint to survive a motion to dismiss, the non-conclusory 'factual content' and

the reasonable inferences from that content, must be 'plausibly suggestive' of a claim entitling a

plaintiff to relief."  *Est. of Smith ex rel. Richardson v. United States*, 509 F. App'x 436, 439 (6th

Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009)).  A complaint that does not plead

facts, as distinct from mere legal conclusions, to show that the claim is "plausible on its face"

must be dismissed.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-59, 570 (2007).

Plaintiffs seek to assert claims under the federal antitrust laws and under various state-law

analogs.  Because, as outlined in detail below, they have failed to state any claim under the federal antitrust laws, they have likewise failed to state any claim under the state laws that they have identified, or under the principles of unjust enrichment.  *See Rick-Mik Enters., Inc. v. Equilon Enters., LLC,* 532 F.3d 963, 976 n.5 (9th Cir. 2008) ("[S]tate law antitrust claims are derivative of the federal law claims. Because the federal claims fail, the state law claims fail.").

## II.    Plaintiffs' Shotgun Pleading Should Be Dismissed

Plaintiffs assert six "claims for relief," all centered on what they describe as violations of the antitrust laws of the United States and various states.  Plaintiffs do not explain what conduct violated which statutes but rather leave it to Defendants and the Court to try to figure it out.  This alone is reason to dismiss the complaint.  *See, e.g.*, *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001).

## III.    Plaintiffs Fail to Allege an Antitrust Violation

Although Plaintiffs do not set forth what conduct support any one of their claims, they identify Section 2 of the Sherman Act as a statute that they say Varsity and apparently the other Defendants have violated.  To sustain a claim of monopolization, a complaint must contain plausible factual allegations that the defendant "possess[es] . . . monopoly power in [a] relevant market" and the "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP,* 540 U.S. 398, 407 (2004).  To sustain a claim of conspiracy to monopolize, a complaint must contain plausible factual allegations of (1) the "existence of conspiracy" and (2) the "specific intent to monopolize." *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 827 (6th Cir. 1982).

A.    **Plaintiffs' Cherry-Picked Products Make Their Market Definitions Implausible**

"The Supreme Court requires plaintiffs to identify the relevant product and geographic markets so the district court can assess what the area of competition is, and whether the alleged unlawful acts have anticompetitive effects in that market." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) (internal quotation marks omitted) (affirming dismissal of complaint based on lack of proper relevant market allegations). "The essential test for ascertaining the relevant product market" is the "reasonable interchangeability standard." *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F. 3d 908, 917 (6th Cir. 2009) (quotation marks omitted). "Reasonable interchangeability is assessed by considering (1) product uses (whether substitute products can perform the same function) and/or (2) consumer response (also known as 'cross-elasticity'), defined as consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service." *Id*. (quotation marks omitted). The relevant geographic market is the area "in which the seller operates, and to which the purchaser can practically turn for supplies." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).

"Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (affirming dismissal on this basis); *see also TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992) (same).

### 1.   "Cheer Apparel" Is Not a Plausible Relevant Market

Plaintiffs' alleged market includes "uniforms, warm-up outfits, team jerseys and practice gear; and specialized accessories such as hair bows and headbands; and specialized equipment such as backpacks and shoes."  (Compl. ¶ 189.)  The alleged market thus includes products that are not reasonably interchangeable with each other (*e.g.*, pom poms and shoes), while creating an artificial distinction between apparel, such as warm-up gear, used by competitive cheer teams, and the functionally identical apparel used for other athletic endeavors.  It therefore fails to satisfy the requirements that a relevant product market must include all substitutes and exclude non-substitutes.  *See, e.g.*, *Queen City Pizza*, 124 F.3d at 436-37 (requiring products within a product market to be "reasonably interchangeable").

As to geographic market, Plaintiffs provide only two sentences in support of their assertion that the market is the entire United States:  "All performances in the primary market [the All Star Competition market] occur within the United States and are regulated by . . . USASF, USA Cheer, the American Association of Cheerleading Coaches and Administrators, and the National Federation of State High School Associations.  As such, nearly all of the targeted customers for Cheer Apparel reside in the United States."  (Compl. ¶ 191.)  But the geographic scope of customers of a particular product (or, here, a myriad of products) does not define a geographic market.  Plaintiffs make no allegations of where geographically gyms could turn to acquire apparel, which are required to sustain a viable geographic market.  *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 359 (1963).  For example, there is no basis to exclude the rest of the world from the relevant market, particularly given apparel is often manufactured overseas.

### 2.   "Cheer Competitions" Is Not a Plausible Relevant Market

Plaintiffs assert that there are three "divisions" of what Plaintiffs call "Competitive Cheer," namely "All-Star Cheer," "School Cheer," and "Youth & Recreational Cheer."  (Compl.

¶ 48.)  Unlike the Plaintiffs in *Fusion Elite*, who allege that the market for competitions is "All-Star Cheer," Plaintiffs here include "School Cheer" competitions.  The Complaint provides no basis, however, on which to combine AllStar competitions, which involve teams of club athletes, and scholastic competitions, which involve school teams.  (Compl. ¶¶ 48, 165.)  There are no allegations that an AllStar team would consider a scholastic competition to be a substitute for an All Star competition or vice versa, or even that an All Star team would even be allowed to enter a scholastic competition or vice versa.  *See, e.g.*, *Queen City Pizza*, 124 F.3d at 437 (holding that products not alleged to be reasonably interchangeable are not in the same product market).

The Court need look no further than the contrasting and unrelated allegations about All Star competitions and scholastic competitions to confirm they are not in the same market.  Like the *Fusion Elite* Plaintiffs, Plaintiffs here assert that the need for bids to three particular Varsity-run All Star cheer competitions, "Worlds," "The Summit," and "U.S. Finals" is a "barrier[] to entry."  (Compl. ¶¶ 183-84.)  Those competitions, however, are alleged to be strictly for All Star teams, not scholastic teams.  Similarly, Plaintiffs allege that Varsity's Network Agreements and Family Plans limit event producers' "access to All-Star Gyms" (*Id.* ¶ 185), not access to scholastic teams.  By contrast, Plaintiffs allege that Varsity awards bids to its "national School Competitions at its Cheer Camps."  (*Id.* ¶ 184.)  Plaintiffs further allege (incorrectly) that Varsity provides services to schools if they commit to attend a certain number of Varsity's scholastic cheer competitions.  (*Id.* ¶ 186.)  There is no connection between All Star on the one hand, and scholastic cheerleading on the other.

Meanwhile, further confirming that Plaintiffs have cherry-picked products for their alleged market to increase Varsity's share, Plaintiffs *exclude* "Youth & Recreational Cheer" simply because "Varsity controls only 10% of" those competitions.  (Compl. ¶ 48 n.1.)  Yet, the

Complaint confirms that "youth and recreational cheer" is a much closer substitute for All Star cheer.  In contrast to School Cheer, both are after-school, competitive cheerleading activities where the teams are "affiliated with" non-school organizations like "private gyms" and other "recreational organization[s] like the YMCA."  (*Id.* ¶ 48.)  The teams in School Cheer, by contrast, "are affiliated with middle schools, high schools, or colleges."  (*Id.*)

Plaintiffs' assertion that the relevant geographic market for meets is national likewise makes no sense.  Plaintiffs allege that "Competitive Cheer Teams compete nationwide to receive Bids to attend Competitive Cheer Championships," (Compl. ¶ 173), which is to say that teams are dispersed around the country.  But Plaintiffs do not allege that price differences between competitions in different areas of the country would attract teams from outside an area where lower prices prevail.  Without such allegations, there is no basis to credit Plaintiffs' nationwide geographic market for competitions.  *See, e.g.*, *Concord Assoc., L.P. v. Ent. Props. Trust*, 817 F.3d 46, 53 (2d Cir. 2016) (affirming dismissal of Section 2 case because the plaintiffs' geographic market was implausible); *Nicolosi Distrib., Inc. v. FinishMaster, Inc.*, No. 18-CV-03587, 2019 WL 1560460, at *5-6 (N.D. Cal. Apr. 10, 2019) (rejecting geographic market definition on motion to dismiss).

### 3.      "All Cheer Camps" Is Not a Plausible Relevant Market

To the extent the Complaint contains allegations at all about substitutability as it pertains to the alleged "Cheer Camp" market, those allegations confirm at a minimum that a market that includes all such camps is not tenable.  For example, the Complaint states that "[r]egardless of the level at which they participate, Cheer Athletes participate in multi-day overnight 'camps.'" (Compl. ¶ 62.)  The Complaint further alleges that "Varsity offers School, All-Star, and Youth and Rec Cheer Camps" (*id.* ¶ 65) and that "[s]tudents can attend either day or overnight Cheer Camps that run up to four days."  (*Id.* ¶ 158.)  At some camps, bids to "some of [Varsity's]

national competitions" are awarded.  (*Id.* ¶ 159.)  The only inference that can be drawn from these allegations is that camps are offered at various levels and camps at one level are not substitutes for camps at another level.  Plaintiffs' premise that all cheer camps are substitutable, regardless of whether they are for high-level teams or low-level teams, are for older kids or younger kids, or run for one day or for four days, fails as a matter of law.

Plaintiffs' assertion that the geographic market for its "all cheer camps" market is the entire United States (*id.* ¶ 205) fails as well.  Indeed, Plaintiffs admit that "for teams, there may be a regional sense of camps they would realistically attend."  (*Id.*).  This means that the market is, by Plaintiffs' own admission, *not* national.  *See, e.g.*, *Phila. Nat'l Bank*, 374 U.S. at 359 (holding that the geographic market "must be charted by careful selection of the market area in which the seller operates, *and to which the purchaser can practicably turn for supplies*") (emphasis added) (internal quotation marks omitted)).

### B.    Attacking Success as "Anticompetitive" Is Improper

In addition to failing to allege plausible relevant markets as required to state an antitrust claim, Plaintiffs fail to allege anticompetitive conduct, which is an independent reason why Plaintiffs' antitrust claims must be dismissed.  *See, e.g.*, *Trinko*, 540 U.S. at 407 ("To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*.").  In *Trinko*, the Supreme Court cautioned courts to be wary of antitrust claims in cases like this, where the claim is based on criticism of a defendant's success:

> Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers.  Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities.  Enforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of

dealing—a role for which they are ill-suited.

*Id.* at 407-08.

The Supreme Court's admonition is particularly apt here.  Varsity vastly expanded cheerleading.  It created an All Star ecosystem where, through the USASF sanctioning process, participants can be assured that events—even those not run by Varsity—will meet appropriate standards.  It created events for the best teams to satisfy the cheerleaders' "desire … [to] "compet[e] against the best in the sport."  (Compl. ¶ 181.)  It launched an apparel business that has been hugely successful by elevating cheer attire beyond the staid tradition of sideline cheering to a contemporary fashion statement attractive to competitors and gyms.  Ultimately, Plaintiffs think that Varsity is not running its business in the way that Plaintiffs would like, but that is exactly the concept against which the Supreme Court cautioned in affirming dismissal in *Trinko*.

Plaintiffs set forth what they assert is Varsity's "scheme" from paragraph 117 to 164 of their Complaint, with the "elements" of the alleged scheme set out therein.  As demonstrated below, none of their allegations, taken individually or collectively, amount to an antitrust violation.  As the Supreme Court admonished in *Trinko*, merely labelling business practices "exclusionary" is not enough to survive a motion to dismiss.  *See also Iqbal*, 556 U.S. at 678 (holding that a complaint "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do'") (quoting *Twombly*, 550 U.S. at 555).

## C.  Plaintiffs' Allegations of Anticompetitive Conduct In All Star Cheer Fail

### 1.  Plaintiffs Do Not Allege Illegal Exclusive Dealing

Plaintiffs' vague assertions of exclusive dealing do not withstand scrutiny.  Even a monopolist may have exclusive contracts with customers or suppliers.  *See, e.g.*, *Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 68 (1st Cir. 2002).  Only in the limited circumstances where

a significant portion of the market is bound in exclusive deals for a significant period of time are such contracts even *potentially* suspect from an antitrust perspective. *Tampa Elec. Co.*, 365 U.S. at 327 (holding that exclusive dealing contract is only actionable under Section 2 if it is probable that "the contract will foreclose competition in a substantial share" of the relevant market). "[F]oreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent." *B&H Med., L.L.C. v. ABP Admin., Inc.*, 526 F.3d 257, 266 (6th Cir. 2008).

Plaintiffs make no such allegations.  Rather, they assert that Varsity "induces larger and more prestigious All-Star gyms … to sign Network Agreements, under which All-Star Gyms are required to commit to essentially exclusive attendance at Cheer Competitions and purchase of Cheer Apparel, and attendance at Cheer Camps."  (Compl. ¶ 142.)  The sly use of the word "essentially" bespeaks the fact that these agreements are not even alleged to be exclusive. Rather, they are discount agreements, by which gyms agree to "attend at least five Varsity-produced Cheer Competitions per season and spend at least $30,000 on registration fees for Varsity events" and receive "increasing rebate percentages [for spending] above $30,000 per year on Varsity registration fees."  (*Id.* ¶ 143.)

In addition, nowhere do Plaintiffs allege how many gyms have a Network Agreement or what percentage of the alleged market these gyms represent, which allegations are required to avoid dismissal.  *See, e.g.*, *SPX Corp. v. Mastercool, U.S.A., Inc.*, No. 10 CV 1266, 2011 WL 3610094, at *2 (N.D. Ohio Aug. 17, 2011) (on motion for reconsideration, affirming dismissal because, like here, "[plaintiff] does not allege [defendant] has exclusivity arrangements with all its distributors, or even a majority of them"); *Midwest Agency Servs., Inc. v. J.P. Morgan Chase Bank, N.A.*, No. 09-165, 2010 WL 935450, at *6 (E.D. Ky. Mar. 11, 2010) (dismissing complaint where plaintiff alleged only that a substantial amount of commerce was foreclosed and failed to

provide "percentages or other evidence supporting this statement"); *see also Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556, 559 (9th Cir. 2018) (affirming dismissal of Section 2 claim based on exclusive dealing because plaintiffs failed to allege the "particular portion of the [relevant] market [that] was foreclosed as a result of exclusive dealing"); *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1031-32 (N.D. Cal. 2015) (holding that exclusive-dealing foreclosure allegations limited to a portion of the market were insufficient to survive motion to dismiss); *Nicolosi Distrib.*, 2019 WL 1560460, at *6 (dismissing exclusive dealing claim because plaintiff failed, among other things, to "provide any details concerning … what proportion of [defendant's] sales are as a result of such agreements").

### 2.     Plaintiffs Do Not Allege Illegal Discounting

Plaintiffs' allegations about Varsity's discount programs, in particular the Varsity Family Plan and the discounts made available through its Network Agreements, fail as well.  Contrary to Plaintiffs' suggestion, bundled discounts do *not* violate the antitrust laws; far from it: "Bundled discounts are pervasive, and examples abound. … Bundled discounts generally benefit buyers because the discounts allow the buyer to get more for less."  *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894-95 (9th Cir. 2008).  "Price cutting is a practice the antitrust laws aim to promote."  *Id*. at 896; *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990) ("Low prices benefit consumers regardless of how prices are set, and so long as they are above predatory levels, they do not threaten competition.").  Because of this, rebates do not violate the antitrust laws unless the defendant's products are priced below cost.  *Collins Inkjet Corp. v. Eastman Kodak Co.,* 781 F.3d 264, 272-74 (6th Cir. 2015); *accord Cascade*, 515 F.3d at 903 ("[T]he exclusionary conduct element of a claim arising under § 2 of the Sherman Act cannot be satisfied by reference to bundled discounts unless the discounts result in prices that are below an appropriate measure of the defendant's costs.").  Any other rule "would chill the very

conduct the antitrust laws are designed to protect." *Cascade*, 515 F.3d at 903 (quoting

*Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co.*, 549 U.S. 312, 319 (2007)).

Here, Plaintiffs do not allege that the bundles that Varsity offers are below its costs in any

sense, nor could they.  Quite the opposite, they allege that Varsity "has raised prices associated

with Competitions and for Cheer Apparel and Cheer Camps *above* competitive levels."  (Compl.

¶ 227 (emphasis added).)

### 3. Deciding Which Teams Can Compete in One's Own Championship Events Is Not an Antitrust Violation

Plaintiffs' efforts to twist how Varsity determines who may compete in the higher-level

competitions (*i.e.*, Worlds, The Summit, and U.S. Finals) (Compl. ¶¶ 121-29) likewise does not

withstand scrutiny.  Under Plaintiffs' rubric, an event producer would not have the ability to

decide who could compete in its *own* events.  (*See, e.g.*, *id.* ¶ 133 ("Varsity created The Summit

to provide a national championship for lower level teams.  Only teams that compete at Varsity

Cheer Competitions can qualify for The Summit Championships.").)  That is no antitrust

violation—there must be some mechanism to award bids to Varsity's higher-level competitions

to determine what teams qualify to compete in those meets.  Similarly, Plaintiffs point to a

USASF rule that allegedly limits competitions that carry bids to Worlds (not the hundreds of

competitions that are held each year in general) from being held within 500 miles of each other

(*Id.* ¶ 136), which merely ensures an adequate number of teams attend to have an actual

competition for the Worlds bid.

The antitrust laws do not dictate how Varsity/USASF sets up the qualification process for

its own competition.  Plaintiffs concede that these Varsity-created events are "popular" and held

at "attractive locations such as Walt Disney World" and that, working with Disney, Varsity has

created a "a venue specially designed for cheerleading and dance competitions."  (Compl. ¶¶ 86,

121.)  Having acknowledged Varsity's innovation and business acumen, Plaintiffs in essence ask this Court to intervene and force Varsity to share the fruits of its labors, which is precisely what the Supreme Court warned against in *Trinko*.

### 4.    Offering Choreography Camps Is Not Anticompetitive

Plaintiffs' allegation that Varsity offers popular choreography camps in violation of the antitrust laws (Compl. ¶¶ 156-57) likewise is merely a challenge to Varsity's innovation and business acumen.  Plaintiffs assert that the choreographers are "knowledgeable about Varsity's competitions and rules" (*id.* ¶ 157), but those allegations are unremarkable given the "rules" are USASF's rules and are available to all USASF members (*id.* ¶ 138), and Varsity publishes its competition schedule well in advance.  Nor are there any allegations that a single specific rule change or schedule issue was ever revealed to choreography camp participants that ever made any difference at any competition.  Plaintiffs' conclusory assertions are insufficient to state an antitrust claim.  In any event, the antitrust laws do not require Varsity to structure its offerings to suit its competitors.

### 5.    Offering Competing Events Is Procompetitive, Not Anticompetitive

One of Plaintiffs' more curious allegations is that Varsity "would hold non-Worlds qualifying events in the same geographic area at the same time as an established Tier 1 independent Bid qualifying event" (Compl. ¶ 162)—in other words Varsity has expanded output by offering more opportunities to compete.  This cannot violate the antitrust laws.  *See, e.g.*, *Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996) ("The core question in antitrust is output.  [Without a] reduc[tion in] output in some market, to the detriment of consumers, there is no antitrust problem.).  The antitrust laws encourage increased competition, not, as Plaintiffs would have it, forbid it to protect particular competitors.  *See, e.g.*, *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 451 (6th Cir. 2007) ("[T]he antitrust laws … were

14

enacted for the protection of *competition*, not *competitors*.") (internal quotation marks omitted).

### 6.      Setting Rules of Competition Is Not an Antitrust Violation

Similarly, Plaintiffs' allegations about the rules that Varsity/USASF has created does not give rise to an antitrust claim.  Most of those allegations do not even concern All Star cheerleading.  (*See, e.g.*, Compl. ¶¶ 131-32 (regarding college cheerleading).)  Others are plainly not illegal or actionable under the antitrust laws, such as USASF's copyrighting its rules.  (*Id.* ¶ 138.)  Others relate to alleged rules or policies from a decade or more ago, with no allegations of any effect during the statute of limitations period.  (*See, e.g.*, *id.* ¶¶ 131-32, 139.)  Ultimately, griping about the rules that govern athletic competitions does not state an antitrust claim.  *See, e.g.*, *Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 854 (8th Cir. 2000) ("So long as IMCA made game-defining rules decisions based upon its purposes as a sports organization, an antitrust court need not be concerned with the rationality or fairness of those decisions.").

### 7.      The USASF's Insurance Requirement Is Not Anticompetitive

Plaintiffs assert that the insurer, K&K, charges more to gyms that choose to compete in non-USASF-sanctioned events (Compl. ¶ 135), but even if true it would not support an antitrust claim against Varsity.  First, Plaintiffs do not allege that USASF requires its members to acquire insurance from K&K.  (*Id.* (alleging only that K&K is USASF's "preferred insurer").)  Second, the obvious explanation for any higher rates is that K&K perceives the risk at non-USASF sanctioned events to be higher, presumably because USASF requires adherence to well-defined safety requirements that might not be followed at non-USASF-sanctioned events.  The fact that Varsity and USASF have provided safer competitions as reflected in lower insurance rates is hardly anticompetitive.  In any event, there are no allegations that either Varsity or USASF require the purchase of insurance from K&K and what K&K charges for insurance is irrelevant.

### 8.    Plaintiffs' Allegations About Apparel Fail

Plaintiffs' allegation that Varsity does not permit other apparel manufacturers to sell apparel at Varsity's meets (Compl. ¶ 153) does not support Plaintiffs' monopolization claim. Varsity has no duty to allow its competitors to sell their goods at its events, any more than the Grizzlies are required to allow competing vendors of caps to sell inside the Fedex Forum.  *See, e.g.*, *Trinko*, 540 U.S. at 407-08 (rejecting duty to facilitate competition with competitors).

Moreover, Plaintiffs do not allege the share of apparel that is sold at these meets or otherwise explain why sales at these meets, which it conclusorily refers to as "market-dominant trade shows" (Compl. ¶ 153), are particularly important.  Plaintiffs make no allegations that other manufacturers do not have numerous other channels to reach gyms and competitors, including through retail stores, online outlets, sales through gyms, and other trade shows and events held proximate to Varsity's competitions.  Indeed, directly contradicting the importance of sales at Varsity meets, Plaintiffs affirmatively allege that the gyms, not the athletes, buy the needed apparel for their athletes from the manufacturers.  (*Id*. ¶ 75.)  There is no allegation that gyms purchase apparel at meets or that other apparel vendors do not have access to gyms.

Plaintiffs' sensational allegation that "Judges at Varsity Cheer Competitions have been known to award more points to Competitive Cheer Teams wearing Varsity Cheer Apparel" (Compl. ¶ 155) is unsupported by a single specific example.  Such unfounded allegation, transparently intended to cast aspersions, do not constitute monopolization.  To the contrary, if true, it would create an opportunity for rivals to hold their own unbiased competitions.  *See, e.g.*, *Brookins*, 219 F.3d at 854 ("Irrational decisions and unfair treatment of suppliers will result in an unpopular game, and players and spectators will take their entertainment dollars elsewhere."); *Fraser*, 284 F.3d at 61 (a league's using its monopoly power to underpay its players "ought to spur, rather than impair, competition from rival leagues").  The antitrust laws are not the way to

remedy perceived unfairness in sports competitions.  There is also no allegation that anyone has ever purchased Varsity apparel because of this supposed issue, much less that so many did so as to render competitors including Nike and Under Armour unable to compete as would be required at a minimum to potentially convert this commercial complaint into an antitrust issue.  The same is true of Plaintiffs' conclusory assertion that USASF tilts its rules to favor Varsity (Compl. ¶ 155), which notably is not supported by a single actual example of this ever occurring let alone that it occurs with such regularity as to debilitate competition.

### D.      Scholastic Cheer

Plaintiffs devote one paragraph to allegations that Varsity "offers inducements to schools to sign exclusive agreements with Varsity," citing Varsity's "Impact and VIP Branding programs." (Compl. ¶ 151.)  Putting aside that those allegations are false as a matter of fact, Plaintiffs fail to allege anything regarding the duration of those allegedly "exclusive" agreements or what portion of schools in the United States have entered into such agreements.  As discussed above, in the absence of those allegations, any claim based on exclusive dealing must be dismissed.  (*See supra* Section III.C.1.)  As to rebates, Plaintiffs simply assert that Varsity provides rebates to schools (Compl. ¶ 141) and provides "improvements to school facilities" (Compl. ¶ 190); there are no allegations of below-cost pricing, which are required to state a potential claim.  (*See supra* Section III.C.2.)  Improving schools is not an antitrust violation.

Plaintiffs' other allegations about scholastic cheerleading fail as well.  As with All Star cheerleading, Plaintiffs allege that Varsity controls who can come to its own "high school and college championships" (Compl. ¶ 128), but as discussed above, determining what teams compete in a championship event is not an antitrust issue.  Its other allegations are ancient, for example, isolated communications in 2008 and 2010, with no allegations that those communications actually had any specific effect, much less during the purported class period.

(Compl. ¶¶ 131-32.)

> ### E.    Acquisitions

Plaintiffs recount that Varsity made some acquisitions but those acquisitions provide no basis for an antitrust claim.  First, virtually all of the acquisitions mentioned in the Complaint are alleged to have occurred outside the four-year statute of limitations and thus cannot be challenged in this case.  *See Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 599 (6th Cir. 2014) (affirming dismissal on pleadings on statute of limitation grounds of antitrust claims under Section 2 of the Sherman Act and Section 7 of the Clayton Act as to two acquisitions consummated more than four years prior to the commencement).  Second, there are no allegations about the few acquisitions within the limitations period from which it could plausibly be concluded that any were anticompetitive.  (*See* Compl. ¶ 97.)  Such allegations are essential to state a claim.  *See, e.g.*, *United States v. Syufy Enters.*, 903 F.2d 659, 673 (9th Cir. 1990) (holding that, "in a competitive market, buying out competitors is not merely permissible, it contributes to market stability and promotes the efficient allocation of resources"); *see also Eastman*, 724 F. App'x at 559 (upholding dismissal of Section 2 claim based on exclusive dealing and competitor acquisition where the acquisitions "were both relatively insubstantial").

## IV.    Plaintiffs Fail to Allege Any Agreement in Restraint of Trade

Plaintiffs do not specify what agreement or agreements violated the Sherman Act or the analogous provisions of state laws.  To the extent Plaintiffs mean to assert a claim based on a "conspiracy" involving Varsity and USASF, such a claim would fail.  Plaintiffs allege that Varsity and USASF are essentially one and the same and, taking those allegations as true, they are therefore not legally capable of conspiring with one another.  *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984).  Among other things, Plaintiffs allege that Varsity: "create[d] the USASF in 2003" (Compl. ¶ 104); "controlled USASF from its inception" (*id.* ¶ 105);

"provided initial capital to USASF in the form of a $1.8 million interest free loan" (*id.* ¶ 104); "submitted the original trademark application for the marks 'U.S. All Star Federation' and 'USASF,' listing itself owner" (*id.* ¶ 105); "answered the phone for the USASF" (*id.*); shared offices with USASF (*id.*); "controls the USASF Board of Directors" (*id.* ¶ 110); and has "captured USASF" (*id.* ¶ 60).

As is evident from these allegations, according to Plaintiffs, USASF is completely captive to Varsity and always has been, does not compete with Varsity and never has, and has no independent decision-making or economic purpose. USASF is therefore incapable of conspiring with Varsity under *Copperweld*. *See also Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1035 & n.15 (9th Cir. 2005) (holding that *Copperweld* applied to national breed club and dog registry and its regional affiliates that, although not under common ownership, had an "identical economic interest"). The only thing that plausibly can be inferred from Plaintiffs' allegations is that Varsity and USASF are not and never have been "separate economic actors pursuing separate economic interests" and therefore "agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals." *Copperweld*, 467 U.S. at 769; *Century Oil Tool, Inc. v. Prod. Specialties, Inc.*, 737 F.2d 1316, 1317 (5th Cir. 1984) (holding that *Copperweld* applied to two corporations under common control as "a contract between them [would] not join formerly distinct economic units" because, "[i]n reality, they have always had 'a unity of purpose or a common design'") (quoting *Copperweld*, 467 U.S. at 771).

To the extent Plaintiffs mean to assert other agreements were in "restraint of trade," such arguments would fail for the same reasons discussed above in respect of claims under Section 2.

**V.      Plaintiffs' State Law Claims Should Be Dismissed For Additional Reasons**

Many of Plaintiffs state-law claims should be dismissed for the additional reasons set forth in Sections III.B, III.C and IV of the brief of Jeff Webb, which Varsity joins and incorporates by reference.

**VI.     Plaintiffs' Claim for "Declaratory Relief" Should Be Dismissed**

Plaintiffs' claim for declaratory relief adds nothing to the case and should be dismissed as superfluous.  Declaratory relief is inappropriate when it would be duplicative of the other substantive claims. *See, e.g.*, *Pineda Transp., LLC v. FleetOne Factoring, LLC*, No. 18-cv-0089, 2018 WL 2137760, at *7 (M.D. Tenn. May 9, 2018) (dismissing a claim for declaratory relief because "[a] declaration of rights as requested could clarify the rights and relations of the parties, but so could a ruling on Plaintiffs' other claims.").  That is the case here.

**CONCLUSION**

For the foregoing reasons, the Varsity Defendants respectfully request that the Court dismiss the claims against them in their entirety.

Dated: March 12, 2021

Respectfully submitted,

/s Matthew S. Mulqueen

George S. Cary*
Mark W. Nelson*
Alexis Collins*
Steven J. Kaiser*
CLEARY GOTTLIEB STEEN & HAMILTON
LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Phone: (202) 974-1500
Fax: (202) 974-1999
gcary@cgsh.com
mnelson@cgsh.com
alcollins@cgsh.com
skaiser@cgsh.com

* Admitted *pro hac vice*

Matthew S. Mulqueen (TN #28418)
Adam S. Baldridge (TN #23488)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ
165 Madison Avenue, Suite 2000
Memphis, TN 38103
Phone: (901) 526-2000
Fax: (901) 577-0866
mmulqueen@bakerdonelson.com
abaldridge@bakerdonelson.com

*Attorneys for Defendants Varsity Brands, LLC,
Varsity Spirit, LLC, and Varsity Spirit
Fashions & Supplies, LLC*