# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| **JESSICA JONES, MICHELLE VELOTTA,** and **CHRISTINA LORENZEN** on Behalf of Themselves and All Others Similarly Situated, | Case No. 2:20-cv-02892-SHL-cgc |
| **Plaintiffs,** | **JURY DEMAND** |
| v. | |
| **VARSITY BRANDS, LLC; VARSITY SPIRIT, LLC; VARSITY SPIRIT FASHION & SUPPLIES, LLC; U.S. ALL STAR FEDERATION, INC.; JEFF WEBB; CHARLESBANK CAPITAL PARTNERS LLC; and BAIN CAPITAL PRIVATE EQUITY,** | |
| **Defendants.** | |

## PLAINTIFFS' OPPOSITION TO VARSITY DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

I.   INTRODUCTION AND SUMMARY OF ALLEGATIONS .................................................1

II.   LEGAL STANDARD..........................................................................................................3

III.   ARGUMENT ......................................................................................................................4

    A.   Plaintiffs have Adequately Alleged Monopoly Power in the Relevant Markets. ..................................................................................................................4

    B.   Plaintiffs Plausibly Allege a National Geographic Market for Cheer. .......................9

    C.   Plaintiffs Plausibly Allege Anticompetitive Conduct in Connection with Defendants' Anticompetitive Scheme. ....................................................................10

    D.   Plaintiffs Plausibly Allege Anticompetitive Exclusive Agreements as Part of the Scheme. ............................................................................................................13

    E.   Varsity and USASF Can Conspire as a Matter of Law and Plaintiffs Plausibly Allege They Did Conspire as a Matter of Law. ........................................19

    F.   Plaintiffs' State Claims Are Proper..........................................................................19

    G.   Plaintiffs' Request for Declaratory Relief is Not Duplicative. ................................20

IV.   CONCLUSION..................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                                    **Page(s)**

*Am. Tobacco Co. v. United States*,
    147 F.2d 93 (6th Cir. 1944), *aff'd*, 328 U.S. 781 (1946) ............................................12

*Arandell Corp. v. Centerpoint Energy Servs., Inc.*,
    900 F.3d 623 (9th Cir. 2018) ..................................................................................19

*Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*,
    917 F.2d 1413 (6th Cir. 1990) ................................................................................18

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................................3

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ....................................................................................10, 11, 12

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................................3

*Byars v. Bluff City News Co.*,
    609 F.2d 843 (6th Cir. 1979) ...................................................................................4

*City of Mishawaka v. American Elec. Power Co.*,
    616 F.2d 976 (7th Cir. 1980) .................................................................................12

*Clarett v. Nat'l Football League*,
    306 F. Supp. 2d 379 (S.D.N.Y. 2004) .....................................................................8

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ...............................................................................................12

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
    290 F.3d 768 (6th Cir. 2002) ..................................................................... *passim*

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984) ...............................................................................................19

*Dolgencorp, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh Pennsylvania*,
    No. 3:18-CV-0529, 2018 WL 3753157 (M.D. Tenn. Aug. 8, 2018)......................20

*E.I. du Pont de Nemours & Co. v. Kolon, Indus., Inc.*,
    637 F.3d 435 (4th Cir. 2011) ...................................................................13, 15, 16

*Eastman v. Quest Diagnostics Inc.*,
    724 F. Appx. 556 (9th Cir. 2018) ..........................................................................18

*Feitelson v. Google Inc.*,
   80 F. Supp. 3d 1019 (N.D. Cal. 2015) ........................................................................14

*General Indus. Corp. v. Hartz Mountain Corp.*,
   810 F.2d 795 (8th Cir. 1987) .......................................................................................7

*Image Technical Servs. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) .....................................................................................7

*In re Cardizem CD Antitrust Litig.*,
   332 F.3d 896 (6th Cir. 2003) .......................................................................................2

*In re Polyurethane Foam Antitrust Litig.*,
   314 F.R.D. 226 (N.D. Ohio 2014) ...............................................................................3

*In re Qualcomm Antitrust Litig.*,
   292 F. Supp. 3d 948 (N.D. Cal. 2017) .......................................................................16

*In re Se. Milk Antitrust Litig.*,
   555 F. Supp. 2d 934 (E.D. Tenn. 2008) .....................................................................13

*In re Southeastern Milk Antitrust Litig.*,
   739 F.3d 262 (6th Cir. 2014) ...................................................................................5, 6

*Int'l Boxing Club of N.Y., Inc. v. U.S.*,
   358 U.S. 242 (1959) .....................................................................................................8

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997) ...................................................................................................18

*Kolon Industries Inc. v. E.I. DuPont de Nemours & Co.*,
   748 F.3d 160 (4th Cir. 2014) .....................................................................................12

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*,
   507 U.S. 163 (1993) .....................................................................................................3

*LePage's Inc. v 3M*,
   324 F.3d 141,152 (3d Cir. 2003) ..........................................................................16, 17

*Michaels Bldg. Co. v. Ameritrust Co.*,
   848 F.2d 674 (6th Cir. 1988) .......................................................................................3

*Midwest Agency Servs., Inc. v. JP Morgan Chase Bank*, N.A.
   No. 2:09–165, 2010 WL935450, at *6 (E.D. Ky. Mar. 11, 2010) ...........................14

*Nicolosi Distrib., Inc. v. FinishMaster, Inc.*,
   No. 18-CV-03587, 2019 WL 1560460 (N.D. Cal. Apr. 10, 2019) ...........................14

PLAINTIFFS' OPPOSITION TO VARSITY DEFENDANTS' MOTION TO DISMISS

*Ohio Willow Wood Co. v. Alps S. LLC*,
No. 2:05-CV-1039, 2011 WL 1237582 (S.D. Ohio Mar. 29, 2011)..........................................3

*Phila. World Hockey Club, Inc. v. Phila. Hockey Club, Inc.*,
351 F. Supp. 462 (E.D. Pa. 1972) ...........................................................................................8

PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty.
Dev. Corp.
387 S.W.3d 525 (Tenn. Ct. App. 2012). ...................................................................................3

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
173 F.3d 995 (6th Cir. 1999) ..................................................................................................4

*Rock v. Nat'l Collegiate Athletic Ass'n*,
No. 1:12–cv–1019, 2013 WL 4479815 (S.D. Ind. Aug. 16, 2013)............................................8

*Smith v. Pro Football*,
420 F. Supp. 738 (D.C. Cir. 1978)...........................................................................................10

*SPX Corp. v. Mastercool, U.S.A., Inc.*,
No. 3:10 CV 1266, 2011 WL 3610094 (N.D. Ohio Aug. 17, 2011) .......................................14

*Standard Oil Co. of Cal. v. U.S.*,
377 U.S. 293 (1949)............................................................................................................15, 16

*Tampa Elec. v. Nashville Coal, Co.*,
365 U.S. 320 (1961)............................................................................................................12, 16

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001).....................................................................................................6

*TYR Sport Inc. v. Warnaco Swimwear Inc.*,
679 F. Supp. 2d 1120 (C.D. Cal. 2009) ..................................................................................10

*United States v. E. I. Du Pont de Nemours & Co.*,
353 U.S. 586 (1957)...................................................................................................................7

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966)......................................................................................................6, 7, 9, 12

*United States v. Phila. Nat'l Bank*,
374 U.S. 321 (1963)...................................................................................................................9

*United States v. Phillipsburg Nat'l Bank & Trust Co.*,
399 U.S. 350 (1970)...................................................................................................................7

*United States v. Syufy Enterprises*,
903 F.2d 659 (9th Cir. 1990) ..................................................................................................18

**Statutes**

Clayton Act Section 16, 15 U.S.C. § 26 ...........................................................................4

Fed. R. Civ. P.
    8...........................................................................................................................3
    12.........................................................................................................................3

Sherman Act, 15 U.S.C.
    § 1................................................................................................................18, 19
    § 2................................................................................................................18, 19

## I.      INTRODUCTION AND SUMMARY OF ALLEGATIONS

Plaintiffs allege that Varsity Brands, LLC ("Varsity Brands"); Varsity Spirit, LLC

("Varsity Spirit"); Varsity Spirit Fashion & Supplies, LLC ("Varsity Spirit Fashion")

(collectively, "Varsity"), acting in concert with the U.S. All Star Federation, Inc. ("USASF") and

others, conspired to raise, fix, and stabilize the prices charged associated with Competitive

Cheer. Compl. ¶ 1. Competitive Cheer is an athletic activity in which teams of athletes perform

routines combining tumbling, stunting, pyramids, and dance. Plaintiffs' Complaint "Compl." ¶ 2.

Teams compete against one another in Cheer Competitions, of which Varsity has a 90% market

share. Compl. ¶¶ 2, 72 They are typically affiliated with a private gym or with a school. *Id.*

USASF set the rules and regulations for Cheer Competitions, including rules about the apparel

athletes can wear in Cheer Competitions. Compl. ¶ 2. The Defendants together formed a scheme

to create an illegal monopoly, to foreclose rivals and to dominate Competitive Cheer in the

United States. *Id.* As a result, cheer athletes and their parents, friends, and family have indirectly

paid higher prices for Cheer Competitions, Cheer Apparel, and Cheer Camps than they would

have paid in a competitive marketplace absent the anticompetitive Exclusionary Scheme. Compl.

¶ 227.

Defendants conspired to raise, fix and stabilize the prices charged associated with

Competitive Cheer. Defendants did so by forming a scheme to create an illegal monopoly in

order to dominate competitive cheer in the United States. Compl. ¶ 1. Plaintiffs assert a claim for

injunctive relief under the federal antitrust laws. Plaintiffs seek claims for damages and other

monetary relief under state law, including state antitrust law, state consumer protection law, the

law of Tennessee and under equitable principles of unjust enrichment.

Generally, to state a claim for monopolization, plaintiffs must plausibly allege: (1)

possession of monopoly power in the relevant market, (2) willful acquisition, maintenance, or

use of that power by anticompetitive or exclusionary means as opposed to growth or development resulting from superior product, business acumen, or historic accident and (3) injury caused by the exclusionary and anticompetitive conduct. *See Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782, 788 (6th Cir. 2002).[1] Varsity's Motion to Dismiss ("VMTD", Dkt. 59-1) does not challenge the possession of monopoly power by Varsity or injury to Plaintiffs caused by Varsity's anticompetitive Exclusionary Scheme. Instead, Varsity asks the Court to dismiss Plaintiffs' Complaint on the basis that Plaintiffs' alleged primary market, Cheer Competitions, and related markets, Cheer Apparel and Cheer Camps, are "cherry picked" and implausible. VMTD at 5-9. Varsity further argues that Plaintiffs do not allege anticompetitive conduct and that it, a for-profit entity that dominates the Cheer Competitions, Cheer Apparel, and Cheer Camp markets, and USASF, a nonprofit entity that was created for the supposed purpose of establishing fair and consistent rules and competition standards, are one in the same and thus legally incapable of conspiring. VMTD at 10-19.

Varsity's Motion to Dismiss is without merit. Plaintiffs' Complaint plausibly alleges facts setting forth the relevant markets. Plaintiffs do so directly by alleging with particularity facts plausibly suggesting Varsity's monopoly power in the Relevant Market. Alternatively, Plaintiffs allege facts defining the markets and showing Varsity's dominant share within them. Furthermore, as detailed below, Plaintiffs have alleged a plausible anticompetitive Exclusionary Scheme, including a multiyear strategy of acquisitions, exclusive contracts, instituting rules funneling participants to Varsity owned or controlled entities and foreclosing rivals, and other

---

[1] State antitrust law follows federal antitrust precedent. *See In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 906 n.10 (6th Cir. 2003) ("It is undisputed that the state antitrust statutes at issue either follow federal Sherman Act precedent or find federal case law persuasive").

exclusionary practices, all with the purpose and effect of raising the prices charged to Plaintiffs. Compl. ¶¶ 87-116, 21-164.

## II.      LEGAL STANDARD

To withstand a Rule 12(b)(6) motion to dismiss, a plaintiff must only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). No special pleading standards apply to antitrust claims. *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993) (courts may not apply a heightened pleading standard "more stringent than the usual pleading requirements of Rule 8(a)"). Pleading an antitrust conspiracy only "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made," and "to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556–57. Non-conclusory allegations are taken as true. If the allegations directly satisfy an element of the claim, no inference is necessary. If an inference is necessary, the inference must be plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). Motions to dismiss a complaint are not favored and are rarely granted in light of the liberal pleading standards contained in the rules of civil procedure. Rules Civ.Proc., Rule 12.02(6). *PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525 (Tenn. Ct. App. 2012).

"In an antitrust case, where the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Michaels Bldg. Co. v. Ameritrust Co.,* 848 F.2d 674, 681 (6th Cir. 1988) (citations and quotations omitted); *accord Ohio Willow Wood Co. v. Alps S. LLC*, No. 2:05-CV-1039, 2011 WL 1237582, at *4 (S.D. Ohio Mar. 29, 2011). When analyzing allegations of conspiracy, "defendants may not recast plaintiffs' allegations regarding the nature of the conspiracy." *In re*

*Polyurethane Foam Antitrust Litig*., 314 F.R.D. 226, 257 (N.D. Ohio 2014) (quoting *In re TFT-LCD (Flat Panel) Antitrust Litig.,* 267 F.R.D. 583, 607 (N.D. Cal. 2010)).

## III.   ARGUMENT

### A.   Plaintiffs have Adequately Alleged Monopoly Power in the Relevant Markets.

With respect to Plaintiffs' claims under Section 16 of the Clayton Act, 15 U.S.C. § 26, Varsity primarily challenges the sufficiency of the allegations regarding monopoly power in the relevant markets. Varsity fails for a number of reasons.

First, Varsity ignores Plaintiffs' well-pleaded allegations that plausibly suggest that Varsity had monopoly power as evidenced by prices raised above competitive levels and by excluding competition. *Conwood*, 290 F.3d at 782 (monopoly power consists of the "the power to control prices or exclude competition"). It is a basic principle of economics that if monopoly power exists, supra-competitive prices can be charged, or other anticompetitive effects can result. *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir. 1999) (monopoly power may be proved "by presenting direct evidence 'showing the exercise of actual control over prices or the actual exclusion of competitors.'") (quoting *Byars v. Bluff City News Co.*, 609 F.2d 843, 850 (6th Cir. 1979)). Defendants concede this. As Plaintiffs allege, Varsity, together with its co-conspirators, raised prices above competitive levels and Plaintiffs paid higher prices as a result. *See* Compl. ¶¶ 1, 6, 217-225. Plaintiffs also allege that Varsity, acting in concert with the other Defendants, foreclosed rivals. This is sufficient. *See Byars*, 609 F.2d at 850 (plaintiffs may show monopoly power directly through "evidence showing the exercise of actual control over prices or the actual exclusion of competitors").

Second, Plaintiff's allegations of fact constituting indirect or circumstantial proof of monopoly power are also sufficient. *Re/Max*, 173 F.3d at 1016 (monopoly power, required to

support monopolization claim, can be established by not only direct evidence showing exercise of actual control over prices or actual exclusion of competitors but also by circumstantial evidence of high market share within defined market). Plaintiffs define the relevant markets and Varsity's control over them. *See* Compl. ¶ 233 ("Varsity controls approximately 80% of the Cheer Competitions Market, 80% of the Cheer Apparel Market, and 75% of the Cheer Camp Market."). Plaintiffs also plausibly allege facts defining the Cheer Competition Market, as well as the Cheer Apparel market and the Cheer Camp Market. *See* Compl. ¶¶ 49-58.

With respect to circumstantial proof, under Sixth Circuit law, goods or services are considered to be within a single antitrust market if plaintiffs show "reasonable interchangeability." VMTD at 5 (quoting *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc*., 588 F. 3d 908, 917 (6th Cir. 2009)) (quotation marks omitted). Goods or services are reasonably interchangeable for antitrust purposes if a sufficient number of purchasers would switch from one to the other to render anticompetitive conduct unprofitable. *See In re Southeastern Milk Antitrust Litig.* ("*Milk 2*"), 739 F.3d 262, 282-83 (6th Cir. 2014). It is a basic principle of economics that one would not generally observe direct evidence of supra-competitive prices or other anticompetitive effects unless the other goods or services are not reasonably interchangeable within an antitrust market. *Id*. Courts have recognized that an antitrust product market can be defined—and proven circumstantially—through application of the method commonly referred to as the Small but Significant Non-Transitory Increase in Price (or "SSNIP") Test. *Milk 2*, 739 at 278-83. If, in the face of a SSNIP, buyers would shift and instead purchase other products in sufficient amounts to make the price increase unprofitable for the hypothetical monopolist, then the other products are to be included in the relevant product market. *See Milk 2*, 739 F.3d at 278.

Varsity quarrels with Plaintiffs' allegations regarding the relevant markets, asserting that these products are not functionally interchangeable. *See* VMTD at 6 (objecting to the inclusion of poms poms and shoes in the Cheer Apparel Market), at 7 (objecting to the inclusion of both Scholastic Cheer and All-Star Cheer within the Cheer Competitions Market), and at 8-9 (objecting to the inclusion of day and overnight camps within the Cheer Camp Market).

This argument fails. First, the Sixth Circuit, as well as multiple sister courts, have held that market definition is a question of fact that is better left for a jury to decide. *Milk 2*, 739 F.3d at 282-83 ("Multiple courts of appeal have held that market definition is a question of fact . . . . that [] is better left for a jury to decide.") (internal citations omitted); *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.") (citations omitted).

Second, Varsity's position is incorrect as a matter of law. Varsity's interpretation of "reasonable interchangeability" has been rejected on numerous occasions, including by the *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966). In *Grinnell*, the defendants—like Varsity here—asserted that the relevant market as alleged by plaintiffs included burglar alarm systems and fire alarm systems. Defendants argued that said products were too different, could not be considered interchangeable, and therefore were not part of the same relevant market. *See id.* at 571-72. The Court rejected this argument, concluding that where there is a cluster of services, such that they comprise a "distinct line of commerce," each of the services can be considered part of a single market. *Id.* at 573. Indeed, the Court focused on the commercial realities of the provision and consumption of such services, in particular, whether the different

PLAINTIFFS' OPPOSITION TO VARSITY DEFENDANTS' MOTION TO DISMISS

products and services are ordinarily combined. *Id.*[2] As such, *Grinnell* stands for the proposition that each service or product within a relevant market need not be the exact functional equivalent if it is a distinct line of commerce. Plaintiffs here have adequately pled three distinct, separate lines of commerce: (1) Cheer Competitions, Compl. ¶¶ 165-186; Cheer Apparel, Compl. ¶¶ 187-201; and Cheer Camps, Compl. ¶¶ 202-216, as these markets reflect commercial realities. Per *Grinnell* and the litany of case precedent, Plaintiffs need not show that each product and service within the three lines of commerce are the functional equivalent.

Varsity disputes these facts, asserting that there are other types of cheer that should be included in the Cheer Competitions Market. VMTD at 6-7. Varsity is factually incorrect. Recreational Cheer is not functionally or economically substitutable with All-Star or School Competitions. Cheerleaders in recreational programs are taught the basics of cheer and compete only occasionally against other recreation teams within the same program. It is not as competitive or physically demanding, nor is it structured towards events that culminate in end of season competitions. It does not operate on the same level of competition or have the same prestige as All-Star or School Competitions. Indeed, courts in sports antitrust cases routinely recognize that markets may be limited not only to a single sport but to particular divisions and

---

[2] *See also U.S. v. E. I. Du Pont de Nemours & Co.*, 353 U.S. 586, 595 (1957) (upholding relevant market consisting of automotive finishes and fabrics); *Image Technical Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202-07 (9th Cir. 1997) (finding relevant market in photocopier parts and rejecting argument that each part is its own market because it is not interchangeable in use with any other part); *General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 805-06 (8th Cir. 1987) (affirming relevant market of "pet supplies," consisting of non-interchangeable goods, as "pragmatic and realistic description of the level at which [antitrust defendant's products and plaintiff's products] were in competition"); *U.S. v. Phillipsburg Nat'l Bank & Trust Co.*, 399 U.S. 350, 360 (1970) (holding that "it is the cluster of products and services that full-service banks offer that as a matter of trade reality makes commercial banking a distinct line of commerce").

other groupings *within sports* such as "majors" vs. "minors."[3] Moreover, the Competitive Cheer

Competitions Market as defined by Plaintiffs passes the SSNIP test as it is, at minimum,

plausible that a significant increase in the price of All-Star Competitions would cause enough

cheerleaders and their families to switch from All-Star Cheer Competitions to exclusively

participating in School Cheer Competitions to make such a price increase unprofitable.

Additionally, cheerleaders could switch from All-Star teams to School teams depending on their

family budget and preferences over time. Similarly, it is perfectly plausible that a SSNIP in

overnight Cheer Camps would cause enough families to switch from overnight Cheer Camps to

day Cheer Camps to make such a price increase unprofitable. Furthermore, Competitive Cheer is

a year-round activity, so athletes could plausibly attend both types of camps or alternate between

them given changing conditions (budget, teams' strategy, proximity to home, etc.).

In the Apparel Market, there are no close or sufficient substitutes. Compl. ¶ 189.

Competitive Cheer Athletes are required to wear specialized apparel and use specialized

equipment to compete in Cheer Competitions. USASF rules govern every detail of this apparel,

including minutia, such as what direction hair bows must face and how large those bows can be.

Compl. ¶ 187. Competitive Cheer Athletes also require specialized apparel and equipment for

practice, and All-Star Gyms require specialized apparel and equipment for membership on their

Competitive Cheer Teams. Compl. ¶ 188. Because Varsity Cheer Competitions require that

---

[3] *See, e.g., Int'l Boxing Club of N.Y., Inc. v. U.S.*, 358 U.S. 242, 250-52 (1959) (market limited to "championship" boxing contests); *Rock v. Nat'l Collegiate Athletic Ass'n*, No. 1:12–cv–1019, 2013 WL 4479815, at *10-13 (S.D. Ind. Aug. 16, 2013) (distinguishing Division I football from Division II and Division III); *Clarett v. Nat'l Football League*, 306 F. Supp. 2d 379, 383-84, 403 (S.D.N.Y. 2004) (NFL is separate market from other professional football leagues, such as Arena Football), *rev'd on other grounds*, 369 F.3d 124 (2d Cir. 2004); *Phila. World Hockey Club, Inc. v. Phila. Hockey Club, Inc.*, 351 F. Supp. 462, 501 (E.D. Pa. 1972) (the National Hockey League is a major hockey league, a separate market from semi-professional and amateur hockey leagues).

participants dress and accessorize in accordance with USASF rules, Competitive Cheer Athletes could not shift to more generic athletic apparel in response to a small but significant and non-transitory increase in the price of Cheer Apparel. Compl. ¶ 189. Moreover, in reality, athletes and their families are required to purchase entire uniforms from their school or All-Star Gym such that the commercial reality does not permit piecemeal purchase of the required apparel. The analysis that is relevant to this case is not whether a pom pom is a functional substitute for a bow, but rather whether a Cheer uniform is a substitute for a soccer or basketball uniform (it is not). Varsity confuses functional interchangeability with the relevant standard of economic substitutability.

### B.       Plaintiffs Plausibly Allege a National Geographic Market for Cheer.

Varsity also disputes the relevant geographic market. VMTD at 6-9. This argument fares no better. Varsity's argument flies in the face of *Grinnell*. There, as here, Defendants argued that the relevant market was a series of local markets because consumers could not or would not travel the country looking for burglar or fire alarms. The Court rejected that approach, instead looking at it from the perspective of the "broader national market that reflects the reality of the way in which they built and conduct their business." *Grinnell*, 384 U.S. at 576.[4] Here, as the complaint alleges, Varsity developed and pursued a national strategy. Compl. ¶ 173. A primary example is its national structure of competition, prominently promoting its national championships. Varsity's local or regional competitions lead up to and culminate in the national championships. Competitive Cheer Teams compete nationwide to receive Bids to attend national

---

[4] Varsity cites to *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 358 (1963) which was decided three years prior to and discussed in *Grinnell.* Nonetheless, *United States v. Phila. Nat'l Bank* also makes it clear that the relevant geographic market should be considered from the perspective of the seller of the goods and services and the realities of doing business in the market and, as such, supports Plaintiffs' definition of the relevant geographic market as national.

Competitive Cheer Championships. *Id.* Regional competitions are promoted to qualify for a bid

for national competitions. *Id.*, ¶ 123. The primary goal of each Competitive Cheer team is the

chance to vie and hopefully win a national title. Compl. ¶ 124.

Moreover, all Cheer Competition performances occur within the United States and are

regulated by standards set by regulatory organizations in the United States controlled by Varsity,

including USASF. Compl. ¶ 191. As such, nearly all of the targeted customers for Cheer Apparel

reside in the United States. *Id.* Further, attendance at Varsity's Cheer Camp is often a

prerequisite to competing in certain Competitions and thus increasing the chance to compete at

the National level. Compl. ¶ 158. Varsity also provides Bids to some of its national competitions

at its Cheer Camps, creating another strong incentive for teams to attend Varsity Cheer Camps,

and a barrier to entry for other cheer camp producers, who cannot offer Bids to Varsity's premier

events. Compl. ¶ 159. All Cheer Camps are held within the United States and all of the targeted

customers, particularly those who strive to compete at the National level, reside within the

United States. Compl. ¶ 205. Further, Plaintiffs' national market is consistent with the prior case

law limiting the relevant market in sport antitrust cases as national.[5]

### C. Plaintiffs Plausibly Allege Anticompetitive Conduct in Connection with Defendants' Anticompetitive Scheme.

Consistent with settled case law, Plaintiffs allege an anticompetitive exclusionary

scheme, the purpose and effect of which was to raise prices and to exclude competition. *See*

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 595-96 (1985); *Conwood*, 290

---

[5] *See*, *e.g.*, *Smith v. Pro Football*, 420 F. Supp. 738, 741 n.1 (D.C. Cir. 1978) (upholding trial judgment that "the relevant market for this action is professional major league football in the United States;" finding that the employment in the Canadian Football League was not reasonably interchangeable with the NFL); *see also supra* n.13 (citing cases); *TYR Sport Inc. v. Warnaco Swimwear Inc.*, 679 F. Supp. 2d 1120, 1130 (C.D. Cal. 2009) (approving U.S. market where "industry participants. . . recognize the United States as a distinct geographic market for competitive swimwear").

F.3d at 782. Plaintiffs allege that Varsity engaged in a scheme to acquire, enhance and maintain monopoly power.

Conduct is anticompetitive when it impairs rivals, restricts competition on the merits or excludes competitors in an unnecessarily restrictive way. *Aspen Skiing,* 472 U.S. at 596-97; *Conwood*, 290 F.3d at 783. Conduct that eliminates competitors or prevents the entrance of competitors leads to higher prices to consumers. Allegations of anticompetitive conduct abound. Varsity, acting in concert with other Defendants:

- Acquired Independent Event Producers ("IEPs") (Compl. ¶¶ 92,93 and 111);

- Acquired control of the USASF Board of Directors and through that control created rules favoring Varsity and disfavoring rivals (Compl. ¶ 111);

- Instituted a system of bids for admission to national tournaments as a means to induce and funnel athletes to its local and regional tournaments (Compl. ¶¶ 117-129);

- Created competition rules that deny potential competitors a foothold in the industry (Compl. ¶¶ 130-140);

- Entered into exclusive agreements for gyms and schools that excluded potential rivals from the relevant markets (Compl. ¶¶ 141-152);

- Acquired businesses in the apparel market (Compl. ¶¶ 98-101);

- Adopted policies forbidding competitors from selling their products at Varsity events (Compl. ¶¶ 153-155);

- Leveraged its monopoly power in the Cheer Competitions market to foreclose competition in the Camps market (Compl. ¶¶ 156-159);

- Held competitions with qualifying bids at the same time and in the same geographic region as its competitors to deprive them of revenue and protect its monopoly (Compl. ¶ 162); and

- Provided rebates and free improvements to school facilities, so the payments that families of Competitive Cheer Athletes make to the All-Star Gyms and schools to purchase Cheer Apparel are steered to Varsity (Compl. ¶ 190).

Each of these, standing alone, constitute classic exclusionary conduct, long adjudged as anticompetitive. *See, e.g.*, *Grinnell*, 384 U.S. at 576 (acquisitions of competitors is anticompetitive exclusionary conduct); *Tampa Elec. v. Nashville Coal, Co.,* 365 U.S. 320, 328 (1961) (confirming exclusive dealing is a violation of the antitrust law); *Kolon Industries Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 175 (4th Cir. 2014) (exclusive dealing agreements that foreclosed competitors from a substantial portion of the market). Taken together, they constitute a virulent and anticompetitive scheme.

In response, Varsity ignores the well-pleaded facts and disputes the anticompetitive conduct alleged. The Supreme Court rejected this approach long ago. It is settled that antitrust schemes are not to be considered piece by piece. Rather they are to be considered as a whole. *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699 (1962) ("the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole"); *accord Am. Tobacco Co. v. United States*, 147 F.2d 93, 106 (6th Cir. 1944), *aff'd*, 328 U.S. 781 (1946). Indeed, it is "the mix of the various ingredients of . . . behavior in a monopoly broth that produces the unsavory flavor." *City of Mishawaka v. American Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980).

It is likewise settled that conduct is anticompetitive when it impairs rivals, restricts competition on the merits or does so in an unnecessarily restrictive way. *Aspen Skiing*, 472 U.S. at 596-97; *Conwood*, 290 F.3d at 783. Conduct that eliminates competitors or prevents the entrance of competitors leads to higher prices to consumers. Prohibited conduct can take myriad forms and is frequently found in combination. "'Anticompetitive conduct' can come in many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Conwood*, 290 F.3d at 784 (quoting *Caribbean Broad Sys. Ltd. v.*

*Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998)). The fact that some of the conduct might not be anticompetitive or independently justified is of no moment in considering the sufficiency of the totality of the allegations. *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943 (E.D. Tenn. 2008) (allegations viewed in isolation may appear to have legitimate business justification, but allegations viewed as a whole support plausible inference of conspiracy). For this reason, well-pleaded allegations of fact are not well-suited for resolution on a motion to dismiss and should be resolved on the merits, after the development of an evidentiary record. *See E.I. du Pont de Nemours & Co. v. Kolon, Indus., Inc.*, 637 F.3d 435, 452 n.12 (4th Cir. 2011) ("it would be problematic to reject [a monopolization claim]", with extensive factual allegations solely allegations solely upon that basis).

   **D.    Plaintiffs Plausibly Allege Anticompetitive Exclusive Agreements as Part of the Scheme.**

   Varsity contends that Plaintiffs' allegations of exclusive agreements are vague and do not allege the amount of the market foreclosed by such contracts. Both arguments are incorrect.

   Plaintiffs allege the exclusive agreements with specificity. Varsity induces All-Star Gyms and schools to sign exclusionary agreements under which they agree to attend Varsity competitions and purchase Varsity Cheer Apparel. Compl. ¶ 141. In addition, Varsity employs two other exclusive agreements with All-Star Gyms: Network Agreements and Family Plans. *See* Compl. ¶¶ 143, 147. Network Agreements require All-Star Gyms to have their Competitive Cheer Teams attend at least five Varsity-produced Cheer Competitions per season and spend at least $30,000 on registration fees for Varsity events. Compl. ¶ 143. Moreover, Varsity's Network Agreements provide increasing rebate percentages for All-Star Gyms that spend above $30,000 per year on Varsity registration fees. Compl. ¶ 144.

The Family Plan requires that an All-Star Gym attend six Varsity Cheer Competitions in one year in order to obtain a small amount of relief from Varsity's penalty pricing on Cheer Apparel and Cheer Competitions. Because Competitive Cheer Teams often attend only six Cheer Competitions in a season (excluding The Summit and U.S. Finals), All-Star Gyms must devote all or the vast majority of their Cheer Competition season on Varsity events to obtain relief from Varsity's penalty pricing. Compl. ¶¶ 146-147. Under the Family Plan, Gyms are provided "Varsity Fashion Dollars" that can only be used on Varsity purchases. Compl. ¶ 148.

Varsity's suggestion that Plaintiffs have failed to allege substantial foreclosure misses the mark.[6] First, Defendants ignore the cumulative effect of the exclusive contracts. As in *Conwood*, the cumulative effect of the conduct was to "further enhance and secure its monopoly power . . . to exclude potential competitors and rivals, and thus to restrict competition, limit competitive entry and inflate prices above competitive levels." Compl. ¶ 141. *See Conwood*, 290 F.3d at 788-89.[7] Particularly, given that All-Star Gyms often attend only six Cheer Competitions per season, Varsity's contractual requirements make it extremely difficult, if not impossible, for All-Star Gyms to attend IEPs' All-Star events, and thus effectively require exclusive dealing. Compl. ¶

---

[6] Varsity cites to cases that do not support their position that in the context of an exclusionary scheme, Plaintiffs must allege the exact percentage of market that is foreclosed. *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1032 (N.D. Cal. 2015) (VTMD at 12) (plaintiffs alleged substantial foreclosure of only a sub-market, not of the relevant market); *SPX Corp. v. Mastercool, U.S.A., Inc.*, No. 3:10 CV 1266, 2011 WL 3610094, at *1-2 (N.D. Ohio Aug. 17, 2011) (VTMD at 11) (concluding that the exclusionary clauses *alone* were insufficient to establish an antitrust injury when the subject at-will contracts did not apply to most of the market and without any allegations of anticompetitive harm) (emphasis added); *Midwest Agency Servs., Inc. v. JP Morgan Chase Bank*, N.A., No. 2:09–165, 2010 WL935450, at *6 (E.D. Ky. Mar. 11, 2010) (VMTD at 11) (plaintiffs' allegation of substantial foreclosure was unsupported by percentages "*or other evidence*" and plaintiffs had not alleged contracts were exclusive) (emphasis added); *Nicolosi Distrib., Inc. v. FinishMaster, Inc.*, No. 18-CV-03587, 2019 WL 1560460 (N.D. Cal. Apr. 10, 2019) (VMTD at 12) (plaintiffs alleged at most a 30% share and did not allege anticompetitive harm).

[7] In *Conwood*, the plaintiffs did not attempt to establish the amount by which the market was foreclosed.

---

143. Network Agreements explicitly require the most prominent and successful All-Star Gyms to purchase and use Varsity Cheer Apparel exclusively, which in turn draws the smaller All-Star Gyms into attending Varsity Cheer Competitions and wearing Varsity Cheer Apparel. Compl ¶¶ 144-145. In combination with the Family Plan, the All-Star Gyms are trapped in an endless cycle with Varsity, as foregoing these future rebates and doing business with Varsity's competitors becomes prohibitively expensive the more they patronize Varsity events and purchase Varsity Cheer Apparel. *Id.* At this stage, no further specificity is required. *Conwood*, 290 F.3d at 788.[8]

Varsity also offers inducements to schools to sign exclusive agreements with Varsity. Through its Impact and VIP Branding programs, Varsity offers schools branding opportunities under which Varsity helps the schools develop a sports identity by "bring[ing] professional design and products to school campuses," creating a sports identity and logo for the schools and supplying wall murals, window branding, mascot costumes, banners, flags, and signs displaying the school's identity and logo. Compl. ¶ 151. In exchange for these payments, schools sign VIP Agreements under which the schools agree to purchase their uniforms, apparel, and equipment from Varsity and to compete in Varsity Cheer Competitions. *Id*. The result of this anticompetitive conduct is a limitation of the market share of any competitor, inflation of prices above competitive levels, and a limitation of consumer choice. Compl. ¶¶ 141, 150-152. Thus, Varsity forecloses "competition from other competition producers and apparel manufacturers." Compl. ¶ 152.[9]

---

[8] *See also Standard Oil Co. of Cal. v. U.S.,* 377 U.S. 293, 305 (1949) (accepting inferential evidence of substantial foreclosure); *E.I. du Pont de Nemours*, 637 F.3d at 452 n.12 ("it would be problematic to reject [a monopolization claim], with its extensive factual allegations, solely on that basis at the pre-discovery, motion-to-dismiss stage, when [the plaintiff] likely has insufficient information to calculate a precise number").

[9] Varsity also falsely claims that Plaintiffs have not alleged substantial foreclosure in the Cheer Competition and Cheer Apparel markets. *See* VMTD at 11-12. As Varsity concedes, foreclosure

Varsity quibbles that Plaintiffs used the word "essentially" in describing the real-world effect of the agreements. *See* VMTD at 11 (citing Compl. ¶ 173). This is nonsense.[10] There is no formula—either in words or structure—for an exclusive contract or for a contract to be considered exclusionary under the antitrust law. *See Tampa Elec*, 365 U.S. at 326 ("[E]ven though a contract does not contain specific agreements not to use the [goods] of a competitor, if the practical effect . . . is to prevent such use, it comes with the condition of the section as to exclusivity.").

Varsity attacks other specific allegations. None of the attacks has merit.

**Discounting**. Varsity misconstrues Plaintiffs' allegations when they argue that Plaintiffs are pursuing some sort of "bundled discount" claim. VMTD at 12. Together with the other terms discussed above, the practical effect of the discounts alleged is to promote and secure an exclusive contractual arrangement, and thereby to exclude competitors and as such qualifies as exclusive dealing. *See Tampa Elec*., 365 U.S. at 326.

**Eligibility Rules**. Varsity's assertion that it has unbridled authority to exclude or include participation in the tournaments it organizes is wrong. *See LePage's Inc. v. 3M*, 324 F.3d 141,

---

of 30-40% of a market qualifies as substantial. *Id.* (quoting *B&H Med., L.L.C. v. ABP Admin., Inc.*, 526 F.3d 257, 266 (6th Cir. 2008)). Other courts have held market foreclosure as low as 6.7% sufficient. *See Standard Oil Co. of Cal*., 337 U.S. at 305 (1949) (6.7% market foreclosure sufficient). Here, Plaintiffs have alleged that all Gyms are subject to exclusionary contracts—either Network Agreements or Family Plans—and that Varsity offers inducements to Schools to sign exclusive agreements with Varsity through its Impact and VIP Branding programs. Compl. ¶¶ 141-149, 151-152. Given that Varsity controls approximately 80% of the Cheer Competition Market and 80% of the Cheer Apparel Market, the exclusionary contracts cover 80% of the Competitions market and 80% of the Apparel market—more than double the minimum percentage. Compl. at ¶ 233.

[10] *In re Qualcomm Antitrust Litig.,* 292 F. Supp. 3d 948, 972 (N.D. Cal. 2017) is on all fours with the instant case. There, plaintiffs challenged agreements with rebate programs as part of an exclusionary scheme. *Id.* at 972. The court denied the motion to dismiss, explicitly rebuking defendants for taking plaintiffs to task for the accuracy of the of the term "essentially." The court concluded that it must not "focus[] on one aspect of Plaintiffs' theory of the exclusivity arrangement without acknowledging the overall nature of the arrangement." *Id.*

151-52 (3d Cir. 2003) ("a monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take because there is no market constraint on a monopolist's behavior."). As Plaintiffs allege, the tournaments create a significant barrier to entry for rival promoters and provides Varsity with leverage to charge supracompetitive prices in the Competitive Cheer Market and related markets as well. Compl. ¶¶ 121, 122.

**Cheer Camps**. Plaintiffs allege that participants in Cheer Camps receive benefits that others do not, thus creating an additional barrier to entry. Varsity also requires that athletes participate in Cheer Camps as a prerequisite for national championships and providing bids to national competitions that are not otherwise available at competitions. *See* Compl. ¶¶ 157-159.

**Competing Events**. Plaintiffs allege that as part of Defendants' anticompetitive Exclusionary Scheme and in furtherance of maintaining its monopoly power, Varsity would hold non-Worlds qualifying events in the same geographic area at the same time as an established Tier 1 independent Bid qualifying event, in contravention of USASF rules. Compl. ¶ 162. Varsity's event would draw teams away from the IEP event, causing them to fail to attract the requisite 125 teams. *Id*. This would cause the IEP to take in less money from the event and eventually lose the privilege of hosting such events. *Id*. As such, although holding competing events could possibly be pro-competitive if taken by a non-monopolist, it does not remain so done by a monopolist within the context of an Exclusionary Scheme as is the case here. *See LePage's Inc.*, 324 F.3d at 151-52.

**Control of Rule-Making Bodies, Including Insurance**. Varsity has influenced and controlled USASF, which adopts rules and other procedures that constitute an additional barrier to entry. Varsity and USASF have adopted rules that prohibit participation by athletes who participate in events organized by rival promotors. Compl. ¶¶ 131-133. Varsity also requires that

All-Star Gyms be members of USASF. Compl. ¶ 134. The access of any IEP to All-Star Gyms is further restricted by the USASF-preferred insurer, K&K, which charges All-Star Gyms thousands of dollars in insurance premiums if All-Star Gyms attend non-USASF events. Compl. ¶ 135.

**Acquisitions**. Varsity and its co-conspirators pursued a scheme of acquiring and impairing its competitors and rivals within the Cheer Competitions and Related Cheer Camp and Cheer Apparel Markets. Compl. ¶¶ 87-102. Through this aspect of the scheme, Varsity was able to clear the field of rivals, leaving essentially none standing to fight. The effect is higher prices and elimination of actual and potential rivals. Compl. ¶¶ 41, 228; *see also Arthur S. Langenderfer, Inc. v. S.E. Johnson Co*., 917 F.2d 1413, 1443 (6th Cir. 1990) ("acquisitions by defendants of quarry sites coupled with the use of lengthy non-competition agreements and other circumstances did foreclose production and efficient use of such quarries and limestone by [plaintiff] and others as competitors of defendants").

Varsity's claim that Plaintiffs may not rely on evidence of such conduct before the four-year limitations period is wrong. Claims under Section 2 of the Sherman Act can be based on conduct that occurred prior to the four-year statute of limitations period. *Klehr v. A.O. Smith Corp*., 521 U.S. 179, 189 (1997). Indeed, as here, the accretion of monopoly power may take considerably longer than four years.[11]

---

[11] Defendant cites to inapposite cases in support of their contention that Plaintiffs' acquisition allegations are not anticompetitive. In *United States v. Syufy Enterprises*, 903 F.2d 659, 661 (9th Cir. 1990) the court held that defendant's actions did not injure competition because, as conceded by plaintiff, there were no barriers to entry and defendant did not have the power to control prices or exclude the competition. That is not the case here, as Plaintiffs' Complaint details significant barriers of entry both natural and imposed by Defendants' Exclusionary Scheme as well as the power to control or exclude competition. Compl. ¶¶ 179-86, 195-201, 212-16. Similarly distinguishable, *Eastman v. Quest Diagnostics Inc.*, 724 F. Appx. 556, 559 (9th Cir. 2018) the court held that plaintiffs failed to plausibly establish a § 2 violation based on the

E.   **Varsity and USASF Can Conspire as a Matter of Law and Plaintiffs Plausibly Allege They Did Conspire as a Matter of Law.**

Varsity next asserts that Plaintiffs have failed to allege an unlawful agreement because of the relationship between Varsity and USASF.

Varsity relies on the Supreme Court decision in *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984), which held that "a parent corporation and its wholly owned subsidiary were not legally capable of conspiring with each other under Section 1 one of the Sherman Act." As discussed within Plaintiffs' Opposition to USASF's Motion to Dismiss, Section II. B, and Plaintiffs' Opposition to Charlesbank and Bain's Motion to Dismiss, Section II.B (3), and incorporated herein by reference, *Copperweld* and the subsequent cases interpreting it stand for the proposition that where there was substantial common ownership, individual firms function as an economic unit and are generally treated as a single entity, liable under antitrust law. *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 630 (9th Cir. 2018). As Plaintiffs do not allege that USASF is substantially owned by Varsity, Defendant's claim that Varsity and USASF are incapable of conspiring are without merit.

F.   **Plaintiffs' State Claims Are Proper.**

Varsity incorporates by reference Sections III.B, III.C, and IV of the brief of Jeff Webb in support of its position that, "many of Plaintiffs' state-law claims should be dismissed for

---

acquisitions of three competitions when acquisition of one competitor was approved only after it divested certain assets, which created a new significant competitor, and other two mergers increased laboratory's market share by only 6.6%. Accordingly, the court held that plaintiffs failed to plead facts sufficient to support the inference that the exclusive dealing arrangements had some appreciable impact on the market. Here on the other hand, Plaintiffs allege multiple acquisitions of Varsity's largest rivals and competitors, none of which created a significant competitor. Compl. ¶¶ 88-95. Furthermore, Plaintiffs allege specific acquisitions of cheerleading apparel companies including the $460 million acquisition of BSN, the largest provider of team uniforms (including cheer) at the time. *See* Compl. ¶¶ 98-100.

additional reasons." VMTD at 20. Accordingly, Plaintiffs incorporate by reference its Opposition to Jeff Web's Motion to Dismiss sections in response.

### G.   Plaintiffs' Request for Declaratory Relief is Not Duplicative.

Varsity contends that Plaintiffs' Request for Declaratory Relief should be denied because it is duplicative without any discussion as to what claim is duplicative or even what makes it duplicative. Nonetheless, Plaintiffs' declaratory claim is not duplicative, as a decree from the Court would control and clarify the proper standard for Varsity's *future* business dealings and not merely resolve Plaintiffs' past claims. *Dolgencorp, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh Pennsylvania*, No. 3:18-CV-0529, 2018 WL 3753157, at *2 (M.D. Tenn. Aug. 8, 2018) (although the claim for declaratory relief overlaps with Plaintiff's breach of contract and bad faith claims, clarification of whether Plaintiff fulfilled its responsibilities under the insurance contracts, in light of the normal course of dealing between the parties, will affect future relations and actions by the parties) (emphasis added).

## IV.   CONCLUSION

Varsity's Motion to Dismiss should be denied for the foregoing reasons. Alternatively, should the Court find any claim to be insufficiently pled at this juncture, Plaintiffs respectfully request leave to amend. *See, e.g.*, Fed. R. Civ. P. 15(a)(2) (leave to amend should be freely given "where justice so requires."); *Rikos v. Procter & Gamble Co.*, No. 11-cv-226, 2012 WL 641946, at *3 (S.D. Ohio Feb. 28, 2012) (granting leave to amend); *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 991 (N.D. Cal. 2009) (same).

Dated: April 15, 2021               By:_____/s/ Joseph R. Saveri_____
                                         Joseph R. Saveri

Joseph R. Saveri*
Steven N. Williams*
Kevin E. Rayhill*
Elissa A. Buchanan*
Anna-Patrice Harris*
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile:   (415) 395-9940
Email:  jsaveri@saverilawfirm.com
        swilliams@saverilawfirm.com
        krayhill@saverilawfirm.com
        eabuchanan@saverilawfirm.com
        aharris@saverilawfirm.com


Van Turner (TN Bar No. 22603)
**BRUCE TURNER, PLLC**
2650 Thousand Oaks Blvd., Suite 2325
Memphis, Tennessee 38118
Telephone: (901) 290-6610
Facsimile: (901) 290-6611
Email: vturner@bruceturnerlaw.net


Daniel E. Gustafson
Daniel C. Hedlund
Daniel J. Nordin
Ling S. Wang
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
Email: dgustafson@gustafsongluek.com
        dhedlund@gustafsongluek.com
        dnordin@gustafsongluek.com
        lwang@gustafsongluek.com

Richard M. Paul III*
Sean R. Cooper*
**PAUL LLP**
601 Walnut, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Email: rick@paulllp.com
        sean@paulllp.com

*Admitted pro hac vice*

*Attorneys for Individual and Representative Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

Dated: April 15, 2021          By: _____ */s/ Joseph R. Saveri* _____
                                    Joseph R. Saveri