# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TENNESSEE

FUSION ELITE ALL STARS, et al.,

               Plaintiffs,

v.

VARSITY BRANDS, LLC, et al.,

               Defendants.

Case No. 2:20-cv-02600-SHL-cgc
**JURY TRIAL DEMANDED**

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT U.S. ALL STAR FEDERATION, INC.'S MOTION FOR PROTECTIVE ORDER

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

II.  LEGAL STANDARD ........................................................................................ 6

III.  ARGUMENT .................................................................................................... 7

      A.  USASF's Refusal to Produce Agreed-Upon Documents ....................... 7

      B.  The Proportionality of the Documents and ESI Sought ....................... 11

      C.  Plaintiffs' Requests Are Not Unduly Burdensome ............................... 15

      D.  USASF's Cost-Sharing Proposal Is Unmerited .................................... 17

IV.  CONCLUSION ................................................................................................ 20

CERTIFICATE OF SERVICE ................................................................................ 24

Plaintiffs Fusion Elite All Stars, Spirit Factor LLC d/b/a Fuel Athletics, Stars and Stripes Gymnastics Academy Inc. d/b/a Stars and Stripes Kids Activity Center, Kathryn Anne Radek, Lauren Hayes, and Janine Cherasaro (collectively, "Plaintiffs"),[1] individually on behalf of themselves and on behalf of all others similarly situated, hereby file this Memorandum of Law in Opposition to Defendant U.S. All Star Federation, Inc.'s ("USASF") Motion for Protective Order (the "Motion").

## I.     INTRODUCTION

All Star Cheer is an elite, competitive, and distinctive type of cheerleading. Dkt. 56 ("Compl."), ¶3. This is an antitrust class action on behalf of All Star Gyms and parents of All Star cheerleaders against the dominant producer of All Star Competitions and All Star Apparel, Varsity, and the main regulatory body for the sport, USASF.[2] Plaintiffs seek to represent a proposed class of entities and natural persons that directly paid Varsity for: (a) registration, entrance, spectator, or other fees and expenses associated with participation in one or more All Star Competitions or (b) All Star Apparel. *Id.* ¶40.

Plaintiffs allege that USASF conspired with Varsity, a multi-billion dollar organization that raised $185 million in new capital in less than 10 days during the pandemic last year, to cause Varsity to maintain and enhance Varsity's monopoly power in the All Star Apparel and All Star Competition Markets (collectively, the "Relevant Markets"), in violation of Section 2 of the

---

[1] Plaintiffs are three All Star Gyms and three parents of current and former All Star Cheerleaders (collectively, "Plaintiffs"). Compl., Dkt. 56 ¶¶29-39.

[2] Unless otherwise indicated, capitalized terms have the same meaning as those used in the Consolidated Class Action Complaint. *See generally* Compl.

Sherman Act, 15 U.S.C. §2.[3] Compl., Dkt. 56 ¶¶9, 38, 53, 59. USASF attempts in its Motion to cast itself as a hapless bystander with no resources and no information relevant to this dispute. But the unlawful conduct of which it is accused is significant and broad both in time and scope. Plaintiffs' Complaint encompasses events going back to 2003, the year Varsity created USASF to use in its domination of the Relevant Markets. *Id.* ¶¶71, 73, 168, 197. USASF has been captive to Varsity since ever since, with Varsity providing significant funding and controlling USASF's board of directors. *Id.* ¶¶73, 197, 199, 201. USASF employees have worked at Varsity's headquarters, USASF's office is still only miles away, and Defendants' finances are intermingled with Varsity paying USASF's employees. *Id.* ¶¶73, 76.

USASF's position as the supposedly-neutral regulatory body for All Star Cheer is instrumental to Defendants' conspiracy to maintain and enhance Varsity's monopoly power. █

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████ Ex. 1 at -990.[4] The conspiracy between Defendants includes, *inter alia*: USASF's promulgation of rules that favor Varsity over its All Star Apparel rivals, *id.* ¶¶106, 140-142, 154; restricting competition by limiting which All Star Competition producers can award Bids to Worlds and allocating those Bids primarily to Varsity, *id.* ¶¶93, 136;[5] allowing or

---

[3] USASF's co-defendants and alleged co-conspirators are Varsity Brands, LLC; Varsity Spirit, LLC; Varsity Spirit Fashions & Supplies, LLC (collectively, "Varsity") (USASF and Varsity together, "Defendants").

[4] Exhibits are attached to the Declaration of Victoria Sims, filed contemporaneously herewith.

[5] All Star Teams attend a limited number of All Star Competitions per season and generally set their event schedule with the goal of maximizing their chances to earn a Bid to one or more of three recognized championships: USASF's Worlds and Varsity's The Summit and the U.S. Finals (collectively, "Championships"). Dkt. 56 ¶¶85-101. Bids are formal invitations to compete in these Championships and are obtained only by attending and succeeding at particular All Star

instructing judges to "advantage All Star Teams that wear Varsity apparel," *id*. ¶¶107, 154; refusing non-member Independent Event Producers ("IEPs"), Varsity's competitors, access to its rules, claiming they are subject to trademark and copyright protections, *id*. ¶135; and pressuring All Star Gyms with a variety of tactics to only attend USASF-sanctioned, events, many of which are Varsity-owned. *Id*. ¶¶137-138. USASF's tactics have provided enormous economic benefit to Varsity, ████████████████████████████████████████████████

████████████████████████████████ *Id*. ¶38; Ex. 2 at -295.

The documents that USASF declines to produce directly implicate USASF's control of its members and the All Star Competitions it allows them to attend, a key to Defendants' conspiracy and Varsity's monopoly power. USASF only permits "Tier 1" All Star Competition producers to award Fully Paid Bids to its Worlds event, of which Varsity owns more than half. *Id*. ¶¶207-208. USASF is also responsible for the geographic restrictions that have reinforced Varsity's market power, "prohibit[ing] All Star Competition producers from holding Bid-qualifying All Star Competitions within 500 miles of another Bid-qualifying competition." *Id*. ¶211. And USASF "use[s] [its] rule-making 'authority' to prevent potential rival sanctioning organizations from creating their own All Star Championships that could undermine Varsity's dominance." *Id*. ¶213. Finally, "USASF membership rules specify that members are not permitted to affiliate, partner with, or own non-USASF-sanctioned IEPs, and that every All Star Gym that wishes to attend USASF events must become a USASF member." *Id*. ¶222. As a result, USASF has control over every All Star Gym that has attended an USASF-sanctioned event. *Id*.

---

Competitions. *Id.* ¶87. Because an All Star Team cannot attend a Championship without a Bid, the limited number of Bids and Bid-qualifying events make them a coveted, prestigious, and distinctive part of this sport. *Id.* ¶88.

On October 19, 2020, Plaintiffs served requests for production on USASF (the "Requests"). The Requests at issue seek documents, including electronically stored information ("ESI"), related to these allegations. Plaintiffs have engaged in lengthy conferences with USASF in an attempt to reach agreement on search terms and custodians. *See infra* Section III.A. But USASF's initial offer to only collect "hundreds of documents" and run 35 search terms across the email data of five custodians and Google Drive data of only three of those custodians, in a case alleging monopolization of a billion dollar industry impacting hundreds of thousands of gyms, cheerleaders, and their parents, is plainly insufficient. Plaintiffs have attempted to compromise by narrowing their requested search terms and reducing their requested custodians, and have offered, for the custodians still being sought, to limit collections to emails and specific documents in their Google Drives. *See infra* Section III.A. USASF has rejected these offers.

Ironically, USASF itself describes at length why the three custodians for whom it proposed to search both email and Google Drive data are vital to the case. Memo ISO Mot. For PO, Dkt. 104 at 2. USASF further admits the importance of the other two custodians it proposed but whose Google Drives it refuses to search, Lynn Singer and Alison Stangle. *Id*. Of course, if their email is relevant to the case—as USASF has acknowledged by proposing her as a custodian—their non-email ESI is relevant to the case as well.

USASF also makes veiled references to the seven other custodians who remain in dispute. These include USASF's Associate Director of Rules and Safety, Dana Fielding; its Senior Member Support Specialist and former Manager of Credentialing and Club Membership, Angela Bruno; and its Senior Regional Director and Regional Directors, Karen Wilson, Glenda Broderick, Robin Galik, Kinshasa Garrett, and Shauna Holm. The importance of these custodians' ESI is detailed in Plaintiffs' motion to compel discovery from USASF. Dkt. 102-1 at 14-15. And the importance of

their ESI has been reinforced by documents found in the narrow production already provided. █



Ex. 3 at -292.

*Id.*

█ [6] *Id.* Similarly, in a letter to an event producer member which has not yet been produced in this litigation but was recently published by a journalist, one of the disputed custodians, USASF's Senior Regional Director Karen Wilson, reprimands a Competition owner for affiliating with an end-of-season championship All Star event put on by an independent (non-USASF) event producer seeking to compete with Worlds and states that "USASF will only consider you an eligible USASF Member Event Producer" if it discontinues its affiliation with the independent event producer. Ex.4. Clearly, each Regional Director plays an important role in the conspiracy alleged by Plaintiffs and possesses relevant information and documents in their e-mail and Google drives that must be produced.

    USASF stands accused of conspiring to monopolize, for Varsity's benefit, a billion-dollar industry for a significant time period. The documents and information Plaintiffs seek are highly

---

[6] This email communication was produced by Varsity, and only portions of the relevant email communication preceding it appear in the USASF production.  USASF_00005131-32.

relevant to these allegations, and the costs associated with the discovery are proportional to the issues at stake and the amount in controversy. USASF's Motion should be denied.

## II.   LEGAL STANDARD

Rule 26 provides that, if a party resists discovery, it may move the court, for good cause shown, for an order of protection from "annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). To show good cause, USASF must "articulate specific facts showing clearly defined and serious injury resulting from the discovery sought and cannot rely on mere conclusory statements." *Fenney v. Wal-Mart Stores E., LP*, 2018 WL 6492967, at *1 (W.D. Tenn. Nov. 5, 2018) (citation and quotations omitted). Courts should only consider limiting discovery after analyzing proportionality, taking into account "the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." *Siriano v. Goodman Mfg. Co., L.P.*, 2015 WL 8259548, at *5 (S.D. Ohio Dec. 9, 2015) (citing Fed. R. Civ. P. 26(b)(1)). "Merely because production of otherwise relevant information or documents may perhaps be burdensome in the view of the responding party does not make the requested discovery automatically disproportionate for the purposes of Rule 26(b)(1)." *Brown*, 2016 WL 10788070, at *9. Thus, a protective order appropriate *only* "when compliance would prove *unduly* burdensome, not merely expensive or time-consuming." *Barnes v. Midland Credit Mgmt.*, 2020 WL 6778013, at *3 (N.D. Ohio Nov. 17, 2020) (quoting *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007)) (emphasis added). Notably, "the party resisting discovery . . . bears the burden to show that the discovery sought is disproportionate." *Brown v. Tax Ease Lien Servicing, LLC*, 2016 WL 10788070, at *8 (W.D. Ky. Oct. 11, 2016).

## III.     ARGUMENT

### A.     USASF's Refusal to Produce Agreed-Upon Documents

For many of the Requests below, USASF and Plaintiffs had reached agreements—agreements which Plaintiffs relied on during the parties' meet and confers—on which USASF now seeks to renege. Not only does that run afoul of the spirit of compromise with which Plaintiffs had approached the parties' meet and confers, but on a substantive level, USASF fails to explain why any of the specific Requests to which it now objects are irrelevant; it simply makes a blanket statement that none of them pertain to the claims against Varsity and USASF. But "[r]elevance is to be broadly construed and encompasses any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Monsanto Co. v. Ralph*, 2001 WL 35957201, at *2 (W.D. Tenn. May 10, 2001) (citations and quotations removed). The Requests below meet this standard. With respect to all of the below-described documents and information that USASF previously agreed to produce, Plaintiffs seek the agreed-to production.

**Request No. 10 (USASF's programs and initiatives):**[7] USASF uses a variety of programs and initiatives to influence and control the coaches and Gym owners who are Varsity's customers. For instance, USASF has programs to aid Gyms in developing business plans and budgets (significant portions of which are allocated to Apparel and Competitions, including Varsity's) and develop routines for Competitions (including Varsity's). These programs and initiatives are clearly relevant to establishing USASF's control over All Star Gyms, which USASF influences to purchase Varsity's Apparel and attend Varsity's Competitions at the expense of Varsity's rivals. In an attempt at compromise, Plaintiffs asked USASF for a list of USASF's

---

[7] With respect to Requests Nos. 10 and 15, Plaintiffs understand that USASF's Motion deals only with the portions of these Requests that are in dispute, not the entire requests.

programs and initiatives, so that Plaintiffs could select the ones relevant to this case and limit their request to those particular selections. USASF accepted and provided Plaintiffs a list of 25 programs and initiatives, from which Plaintiffs selected twelve programs and initiatives. Dec. of Victoria Sims ("Sims Dec.") ¶3.

**Request No. 12 (Requirements for Becoming an Affiliate Member):** USASF's affiliate members are its sponsors. Plaintiffs seek to understand conditions under which an entity, such as Varsity, is permitted to become a member and financial supporter of USASF. Documents produced in response to this Request bear directly on USASF's claim (disputed by Plaintiffs) that it is a neutral governing body of All Star Cheer. USASF asserted last month that "USASF will produce its affiliate membership and registration forms, which will show the requirements for affiliate members." Ex. 5. It now appears to walk back this compromise.

**Request No. 13 (USASF's National Meeting):** USASF's National Meeting is a key forum for USASF to discuss with its members (including Gyms) its policies and regulations, a number of which have been created to favor Varsity and disfavor Varsity's competitors. USASF has in prior years, sought to incentivize attendance at its National Meeting, by providing early copies of its Cheer and Dance Rules for that season to meeting attendees. The meeting involves discussions of a variety of relevant topics, including credentialling of Gyms and coaches and the USASF rules dictating All Star Team conduct and dress at Competitions. USASF previously agreed to produce National Meeting programs, handouts, and presentations from the files of agreed custodian Amy Clark and figures showing how many attendees were present at the National Meeting from 2015 to 2020 but now refuses to abide by that agreement. Sims Dec. ¶4.

**Request No. 15 (Offers to Sell Goods or Services to Gyms, Teams, and Athletes):** Plaintiffs allege that USASF exists to bolster Varsity's dominance of All Star Cheer and that

Varsity uses USASF-sanctioned Competitions (most of which are Varsity-owned) and USASF membership to exclude and impair All Star Competitions put on by Varsity's competitors. Membership offers explaining why an All Star Gym would want to join USASF and offers to attend Competitions are plainly relevant to these issues. For instance, to the extent offers to attend a given Competition were tied to attendance at other USASF (largely Varsity-owned) Competitions or denigrated Competitions put on by Varsity's rivals, such offers would demonstrate that USASF engages in the conduct Plaintiffs allege. The same is true of documents relating to USASF membership, including USASF's annual email promoting its membership. Those emails will almost certainly discuss why a gym or athlete would choose to attend USASF competitions (to the exclusion of other competitions). This is yet another request in response to which USASF agreed to produce documents, including its annual email promoting its membership and offers to attend Worlds, provided the parties could develop search terms to locate responsive documents.[8] USASF now appears to walk back this agreement as well. Sims Dec. ¶5.

**Request No. 49 (Member Attendance at Non-USASF Events):** Documents concerning All Star Gyms' attendance at the All Star Competitions produced by Varsity's competitors go to the heart of the case. Realizing this, USASF led Plaintiffs to understand, as they noted in correspondence last month, that it would produce any responsive documents it located. *See* Ex. 6 at 11 (memorializing the parties' understanding that "USASF agrees to produce what is requested subject to its custodian and search term parameters."). It should be held to this agreement.

**Request No. 64 (USASF Members):** Plaintiffs allege that Varsity has dominated All Star Cheer by creating USASF and causing USASF create conditions that require Gyms and athletes

---

[8] USASF also challenges Request No. 22. Based on the information provided by USASF, Plaintiffs will reserve their rights and refrain from seeking documents pursuant to this Request at this time.

to join USASF and follow its rules and restrictions, if they want to survive. Plaintiffs therefore need to determine which Gyms are or have been members, which event producers are or have been affiliated with USASF, whether there are successful or significant Gyms or event producers that are not members, or in the alternative, if there were Gyms or event producers who left USASF and were forced to close. Plaintiffs also must investigate USASF's membership numbers over the years to determine whether membership rose or fell as Varsity captured more of the All Star Competition market. As of May 3, two days before USASF filed the instant Motion, Plaintiffs and USASF had agreement on this Request. Sims Dec. ¶6. USASF agreed to produce the names and locations of all All Star Gyms and the names of all All Star Competition producers who were members for each year from 2016 (for Competition Producers) and 2017 (for Gyms) to 2020 (and back to 2015, if available) and the number of coach, Athlete, Gym, and Competition producer members for each year from 2015 to 2020. *Id*. This is readily available information that there is no burden to compile and USASF should be required to compile it, as promised.

**Request No. 77 (Communications Concerning Apparel):** Having alleged that Varsity uses USASF to aid its domination of the All Star Apparel market, Plaintiffs seek USASF's communications regarding Apparel. For instance, communications recommending teams wear Varsity's Apparel, if they wish to prevail at competitions, or communications denigrating a competitor's Apparel are clearly relevant. USASF previously agreed to produce these communications and should still be required to do so.[9]

**Request Nos. 98 to 111 (Misconduct and Background Checks):** Plaintiffs allege that Varsity's monopolization of the Relevant Markets resulted in a decrease in quality, including a

---

[9] *See* Ex. 6 at 15 (memorializing the understanding that "USASF agrees to produce what is requested subject to its custodian and search term parameters, including those [communications] concerning Varsity and other manufacturers' apparel").

lack of regulation and reporting of sexual misconduct and inadequate background checks. Dkt. 56 ¶¶237-241; *see Nilavar v. Mercy Health Sys. W. Ohio,* 142 F. Supp. 2d 859, 874 (S.D. Ohio 2000) (allegations of "lower quality services . . . constitute the kind of injuries that the antitrust laws were enacted to prevent"). These documents therefore relate directly to the alleged consequences of Varsity's monopolization and must be produced.

### B.    The Proportionality of the Documents and ESI Sought

"[T]he party resisting discovery . . . bears the burden to show that the discovery sought is disproportionate." *Brown,* 2016 WL 10788070, at *8. "Merely because production of otherwise relevant information or documents may perhaps be burdensome in the view of the responding party does not make the requested discovery automatically disproportionate for the purposes of Rule 26(b)(1)." *Id*. at *9. USASF's analysis of proportionality veers into topics irrelevant to Rule 26(b)(1). The factors this Court must consider weigh in favor of the discovery Plaintiffs seek.[10]

USASF overlooks the first proportionality factor, "the significance of the substantive issues [at stake in the litigation], as measured in philosophic, social, or institutional terms." *In re Haynes*, 577 B.R. 711, 727 (Bankr. E.D. Tenn. 2017) (citation omitted). Plaintiffs allege monopolization of an industry that generates hundreds of millions of dollars in profit for Varsity and impacts thousands of gyms and hundreds of thousands of cheerleaders and their parents. Dkt. 56 ¶¶9, 38, 59-60. This factor weighs in Plaintiffs' favor.

USASF begins its proportionality argument with a discussion of the costs of the discovery sought by Plaintiffs, arguing that less than $181,000 in collection costs and $4 million in attorneys'

---

[10] Plaintiffs fully addressed the proportionality factors in their motion to compel the same discovery that is the subject of USASF's motion for protective order. Dkt. 102-1 at 17-20. They will address the specific points and examples of disproportionality raised by USASF here.

fees for document review are excessive.[11] Dkt. 104 at 9-10. But these costs are not reviewed in a vacuum; they are compared to the amount in controversy. *Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*, 322 F.R.D. 1, 7 (D.D.C. 2017). The amount in controversy here is substantial.

All Star Cheer is notoriously expensive, with a single season costing between $3,000 and $6,000 per All Star Team member and an estimated 100,000 to 450,000 athletes participating in the sport each year. *Id.* ¶¶5, 60. ███████████████████████████████████████ ████████████████████████████████ Ex. 2 at -295. And Defendants, including USASF, face joint and several liability for the conspiracy that generates these profits under a statute that requires treble damages. 15 U.S.C. § 15(a). Thus, while "[a] response to a discovery request costing $100,000 sounds (and is) costly, [] in a case potentially worth [hundreds of] millions of dollars [or more], the cost of responding may not be unduly burdensome." *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 321 (S.D.N.Y. 2003).[12] USASF fails to offer a single decision to the contrary.

USASF also makes an unfounded claim that its employees would have to "spend numerous hours manually downloading thousands of documents from their Google Drive." Dkt. 104 at 10. In fact, downloading data from one's Google account, including a Google Drive, is a

---

[11] Attorneys' fees are ordinarily not included within the terms "costs," *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 759 (1980), and are not properly part of this Court's proportionality analysis.

[12] *See also Am. Mun. Power, Inc. v. Voith Hydro, Inc.*, 2019 WL 6251339, at *13 (S.D. Ohio Nov. 22, 2019) (finding $100,000 cost of search 2 TB of data and producing ESI for 15 custodians and 33 search terms, in addition to $1.1 million for other ESI services, was proportional to alleged $40 million loss); *John B. v. Goetz*, 879 F. Supp. 2d 787, 882 (M.D. Tenn. 2010) (finding $10 million cost for 50 search terms, 50 custodians and 493 gigabytes of data proportional to $7 billion at issue); *ProCom Heating, Inc. v. GHP Grp., Inc.*, 2016 WL 8203221, at *5 (W.D. Ky. July 8, 2016) (defendant failed to demonstrate that estimated $55,000 to $120,000 cost for ESI searches were "disproportionate to the value of the information"); *Oxbow*, 322 F.R.D. at 8 ($140,000 cost of ESI was not excessive compared to $150,000,000 damages claim); *Xpedior Creditor Tr. v. Credit Suisse First Bos. (USA), Inc.*, 309 F. Supp. 2d 459, 466 (S.D.N.Y. 2003) ($400,000 cost of production was "relatively insignificant in comparison" to damages claim of $68.7 million).

straightforward and expeditious process. One need only go to http://takeout.google.com, select the data to include (in this case, a Google Drive account), specify which types of files and folders within the Google Drive to include in the export, choose the destination (*e.g.*, a link sent via email or adding the data to a Dropbox account), choose the delivery method, and click the "Create export" button. Ex. 7, at 1-2, 6. The Google Drive owner will receive an email when the export is complete, and the .zip drive can be accessed immediately. *Id*. at 7. This takes less than 10 clicks and only a few minutes and is not a basis for relieving USASF of its discovery obligations.

The third factor, access to relevant information, looks at "information asymmetry—a circumstance in which one party has very little discoverable information while the other party has vast amounts of discoverable information." *Oxbow*, 322 F.R.D. at 8. USASF argues, without any authority or evidence, that Plaintiffs will receive most of the information they seek through documents and information produced by Varsity. Dkt. 104 at 12. It also ignores that Plaintiffs have had to file a motion to compel relevant discovery from Varsity. Dkt. 105. Under USASF's theory, the only relevant documents related to the conspiracy are communications with its co-conspirator. Dkt. 104 at 12. This claim is not based in logic or law. "[T]he heart of any American antitrust case is the discovery of business documents. Without them, there is virtually no case." *In re Uranium Antitrust Litig.*, 480 F. Supp. 1138, 1155 (N.D. Ill. 1979). However, "the proof is largely in the hands of the alleged conspirators," here Varsity and USASF. *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 95 (3d Cir. 1988). "Broad discovery is permitted because direct evidence of an anticompetitive conspiracy is often difficult to obtain, and the existence of a conspiracy frequently can be established only through circumstantial evidence, such as business documents and other records." *In re Urethane Antitrust Litig.*, 261 F.R.D. 570, 573 (D. Kan. 2009) (citation and quotations omitted); *Callahan v. A.E.V., Inc.*, 947 F. Supp. 175, 179 (W.D. Pa. 1996).

The fourth factor looks at the parties' resources. USASF points to its non-profit status but skirts the fact that it is largely bankrolled by Varsity. "Varsity founded the USASF in 2003 and funded this effort by extending an interest-free $1.8 million loan to the USASF." Dkt. 56 ¶197. Until March of this year, Varsity paid the salaries of USASF's president and vice president, and it controls the USASF board of directors. *Id*. ¶199, 201. Thus, while USASF may have incurred net losses in recent years, it is not without significant resources. And it is certainly not excused from joint and several liability for its anticompetitive and unlawful behavior.

The fifth factor asks "whether [t]he issues at stake are at the very heart of [the] litigation." *Oxbow*, 322 F.R.D. at 8. USASF does not dispute that it possesses documents relevant to this litigation. It instead asserts that it has already agreed to broad search terms "with an eye toward the key issues in the case." Dkt. 104 at 10. In fact, it has only agreed to use 16 of the 183 terms that Plaintiffs proposed: "Copyright registration", "eligibility standards", "Fusion Elite", "K&K Insurance", "legality rules", "membership guidelines", "Professional Responsibility Code", "sanctioning standards", "trademark registration", "U.S. Copyright Office", "U.S. Patent and Trademark Office", "USPTO", "warmup requirements", "warm-up requirements", "Cherasaro", and "Radek". Dkt. 102-6; Dkt. 102-5 at 24. None of these terms would capture documents related to how USASF allocates Bids among All Star Competitions, how USASF's business dealings with Varsity compare to its business dealings with other All Star Apparel manufacturers, or whether USASF exerts pressure on Gyms to attend only Varsity's All Star Competitions. Nor do the terms USASF proposes have any relevance to whether USASF promulgated and enforced rules or trained judges in a manner that favored Varsity over its competitors in the Relevant Markets. USASF's proposed terms are woefully insufficient in light of the anticompetitive conduct of which USASF stands accused.

USASF also claims that the search terms Plaintiffs propose would only yield documents cumulative of what it and Varsity have already produced but does not explain why. Dkt. 104 at 11. The categories of agreed productions it describes do not include any internal or external USASF communications; information or documents related to USASF's Affiliate Membership, Corporate Sponsor, and Official Sponsor programs, which provide significant benefits in the Relevant Markets for companies that participate, Dkt. 102-1 at 6-7, Dkt. 102-8; or documents and information related to how Bids to Worlds are allocated, Dkt. 56 ¶254. These are glaring holes in the discovery USASF offers, and it—not Varsity—is the keeper of the keys. More importantly, the discovery Plaintiffs seek goes to the heart of whether Varsity and USASF conspired to monopolize the Relevant Markets. Even accepting USASF's argument that the requests are broad, "broad discovery may be needed to uncover evidence of invidious design, pattern, or intent." *Urethane*, 261 F.R.D. at 573 (citations and quotations omitted); *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2014 WL 5462496, at *8 (N.D. Cal. Oct. 23, 2014) (same); *United States v. Dentsply Int'l., Inc.*, 2000 WL 654286, at *5 (D. Del. May 10, 2000) (same). And given the scope of this class action and the amount of money involved, "[t]he public policy implications in this matter favor extremely broad discovery." *United States v. Blue Cross Blue Shield of Mich.*, 2012 WL 4513600, at *3 (E.D. Mich. Oct. 1, 2012).

### C.     Plaintiffs' Requests Are Not Unduly Burdensome

The sixth and final factor of the proportionality test looks at whether the burden and expense of the discovery sought outweighs its likely benefit. USASF posits that "the additional discovery sought . . . is expected to cost [it] . . . between $1.3 million and $4.2 million to collect, process, search, and review, plus numerous hours of manpower to manually download thousands of Google Drive documents." Dkt. 104 at 14. Plaintiffs have established that Google Drive data is

easily accessible and can be retrieved in minutes. Ex. 7. And the costs are far less when attorneys' fees are removed from the equation, amounting to only $181,000. Dkt. 104-1 ¶¶8, 13.

This litigation involves a multi-billion-dollar business, hundreds of millions in commerce between Varsity and members of the class, and treble damages incurred by small businesses and parents since at least 2016. The costs identified by USASF are but a small fraction of that and are "not so unreasonably high as to warrant rejecting [Plaintiffs'] request out of hand." *Oxbow*, 322 F.R.D. at 9. In fact, parties in litigation across the country involving similar stakes have expended significantly larger sums on discovery.[13] Similarly, neither the number of hits generated by Plaintiffs' proposed search terms (104,814 documents)[14] nor the number of custodians (9 additional USASF employees) is inordinately high when compared to the scope of this litigation and the amount at issue. Dkt. 102-5 at 24 (I186). Plaintiffs seek far fewer custodians than in matters of comparable scope.[15]

---

[13] *See, e.g., Goetz*, 879 F. Supp. 2d at 882 (rejecting burden argument where defendant claimed expense of $10 million in 2010 to run a 50-word search for 50 custodians); *Oxbow*, 322 F.R.D. at 9 ($142,000 cost of was not unreasonably high); *Zubulake*, 217 F.R.D. at 321 ("in a [2003] case potentially worth millions of dollars, the [$100,000] cost of responding may not be unduly burdensome"); *Xpedior Creditor Tr.*, 309 F. Supp. 2d at 466, 467 ($400,000 cost was not unduly burdensome in 2003).

[14] The term "hits" refers to the number of unique documents returned by a search term for the time period of 2012 to June 30, 2020. This metric will permit the Court to evaluate the reasonableness of each of the Disputed Search Term in isolation. The hit reports do not reflect any deduplication or spam filters, which will reduce the total numbers if the Disputed Search Terms are employed.

[15] *See, e.g., Goetz*, 879 F. Supp. 2d at 882, n.42 (permitting search of 50 search terms, 50 custodians, and 493 gigabytes in a case involving $7 billion of federal funds); *Am. Mun. Power*, 2019 WL 6251339, at *13 (finding $100,000 cost of searching two terabytes of data and producing ESI for 15 custodians and 33 search terms, in addition to $1.1 million for other ESI services, was proportional to alleged $40 million loss); *ProCom Heating*, 2016 WL 8203221, at *5 (defendant failed to demonstrate that estimated $55,000 to $120,000 cost for ESI searches were "disproportionate to the value of the information"); *Cary v. Ne. Ill. Reg'l Commuter R.R. Corp*, 2021 WL 678872, at *1 (N.D. Ill. Feb. 22, 2021) (finding proposed limit of eight custodians arbitrary and requiring search of 27 custodians' files).

USASF's burden argument also ignores other more effective methods of streamlining its expenses. For example, cost shifting is not the first line of defense against the expense of privilege review. "Courts recognize that scanning of vast amounts of ESI utilizing key words to identify privileged information can significantly reduce the costs of a privilege review." *Goetz*, 879 F. Supp. 2d at 883. This can include key word searches for the names of counsel and the words "privileged" and "confidential." *Id*. Thus, USASF's estimate of over $4 million in attorneys' fees seems greatly exaggerated, and its claim of undue burden fails.[16]

### D.   USASF's Cost-Sharing Proposal Is Unmerited

USASF proposes that Plaintiffs' counsel bear the cost of reviewing and producing anything beyond 45,000 documents. Dkt. 104 at 17. "Ordinarily, a party must bear the expense of complying with discovery requests." *Cason-Merenda v. Detroit Med. Ctr.*, 2008 WL 2714239, at *3 (E.D. Mich. July 7, 2008) (citing *Zubulake*, 217 F.R.D. at 324). "For data that is kept in an accessible format, the usual rules of discovery apply: the responding party should pay the costs of producing responsive data." *Goetz*, 879 F. Supp. 2d at 882 n.39. USASF's argument "that an undue burden or expense may arise simply because electronic evidence is involved . . . makes no sense." *Id*. at 318. "Electronic evidence is frequently cheaper and easier to produce than paper evidence because it can be searched automatically, key words can be run for privilege checks, and the production can be made in electronic form obviating the need for mass photocopying." *Id*. Thus, "it would be wholly inappropriate *to even consider cost-shifting*" unless the ESI sought is somehow inaccessible. *Zubulake*, 217 F.R.D. at 320 (emphasis added); *Cason-Merenda*, 2008 WL 2714239,

---

[16] The review USASF proposes also ignores both the clawback provision in the Protective Order entered by this Court, Dkt. 77 at 17-20, and that Rule 26 "expressly contemplate[s] a clawback protection for ESI discovery to address post-production privilege issues and to avoid any finding of waiver by the producing party in any other litigation." *Id*. at 891; Fed. R. Civ. P. 26(b)(5)(B).

at *3 (E.D. Mich. July 7, 2008) (citations and quotations omitted); *Goetz*, 879 F. Supp. 2d at 882, n.39. The only data USASF even suggests is potentially difficult to access is that contained on its custodians' Google Drives. But as Plaintiffs explain in Section III.C, this assertion has no merit; retrieving Google Drive data takes minutes. Nor have Plaintiffs asked USASF to retrieve backup tapes or deleted or fragmented files. Thus, in the absence of any evidence that the ESI sought is inaccessible, cost shifting should not be considered, and USASF must bear its own costs. *Zubulake*, 217 F.R.D. at 320; *Goetz*, 879 F. Supp. 2d at 882; *Cason-Merenda*, 2008 WL 2714239, at *3.

Even if USASF's documents were less accessible than most ESI (though there is no reason to believe that to be the case), the factors enumerated in Local Rule 26.1(e)(9) do not support cost shifting. These factors were first enumerated by the Southern District of New York in *Zubulake* and should be considered "in descending order of importance." 217 F.R.D. at 322. "The first two factors—comprising the marginal utility test—are the most important." *Id*. at 323. "The more likely it is that the [discovery sought] contains information that is relevant to a claim or defense, the fairer it is that the [responding party] search at its own expense." *Id*. (citation omitted). USASF claims Plaintiffs' requests are overbroad and that the documents sought are cumulative of those that will be produced by Varsity. Dkt. 104 at 16. As discussed, this argument ignores a number of truths. First, USASF is the only keeper of internal communications between and among its employees and board members. It is also the only keeper of documents describing how its policies, rules, and regulations related to All Star Cheer are promulgated and enforced. Finally, it is the only keeper of documents related to its dealings with Varsity's competitors in the Relevant Markets.

USASF's vague assertion that Plaintiffs are seeking cumulative discovery is also premature. To date, Varsity has only produced 25,913 documents, USASF has only produced 5,300 documents. Sims Dec. ¶7. Plaintiffs have moved to compel proper productions from both.

Dkts. 102, 105. It is impossible for Plaintiffs to discern what, among the thousands of unproduced documents, is cumulative. Indeed, in the cases USASF relies on, the responding party had already produced hundreds of thousands of documents. *See Schweinfurth v. Motorola, Inc.*, 2008 WL 4449081, at *2 (N.D. Ohio Sept. 30, 2008) (defendant produced over 200,000 pages of documents and plaintiff was seeking over one million more); *Boeynaems v. LA Fitness Int'l*, LLC, 285 F.R.D. 331, 340 (E.D. Pa. 2012) (defendant "reviewed (1) over 500,000 Member Notes from five states for 30 months looking for certain terms, (2) over 1,000 boxes of cancellation requests, of which Plaintiffs reviewed only 70 boxes, (3) over 19,000 pages of documents, and (4) an electronic search of over 32,000 E-mails, maintained by five custodians"). They are factually distinct. *See Cochran v. Caldera Med., Inc.*, 2014 WL 1608664, at *3 n.3 (E.D. Pa. Apr. 22, 2014) (distinguishing *Boeynaems* where "defendant ha[d] produced no discovery to date").

USASF's argument that there are diminishing returns in the discovery sought also imposes a burden on Plaintiffs that does not exist. "The suggestion that a plaintiff must not only demonstrate that probative evidence exists, but also prove that electronic discovery will yield a 'gold mine,' is contrary to the plain language of Rule 26(b)(1), which permits discovery of 'any matter' that is 'relevant to [a] claim or defense.'"[17] *Zubulake*, 217 F.R.D. at 323; *Goetz*, 879 F. Supp. 2d at 867 n.36. As Plaintiffs have set forth, the discovery sought is highly relevant to their claims. Thus, the marginal utility test—the most important factor in this analysis—weighs against cost shifting.

---

[17] Where the data sought is inaccessible, some courts have required the responding party to perform a sample restoration of its backup tapes, so "'the entire cost-shifting analysis can be grounded in fact rather than guesswork.'" *Goetz*, 879 F. Supp. 2d at 883 (quoting *Zubulake*, 217 F.R.D. at 324). Should the Court find USASF's claim of burden compelling, this would be the "sensible approach" before ruling that cost shifting is required. *Id*. at 882 n.39 (quoting *Zubulake*, 217 F.R.D. at 324).

"The second group of factors addresses cost issues: 'How expensive will this production be?' and, 'Who can handle that expense?'." *Zubulake*, 217 F.R.D. at 323. These topics are discussed in Sections III.B and III.C *supra* and weigh against cost shifting.

"The third 'group'—[ ] the importance of the litigation itself—stands alone, and as noted earlier will only rarely come into play. But where it does, this factor has the potential to predominate over the others." *Zubulake*, 217 F.R.D. at 323. The thousands of putative class members on whose behalf Plaintiffs bring this case have suffered significant damages. A single season costs between $3,000 and $6,000 per All Star Team member. Dkt. 56 ¶5. And Defendants' conduct has spanned at least 15 years and earned Varsity hundreds of millions of dollars in revenue and a nearly $3 billion buyout. *Id*. ¶¶9, 38. Prices in the Relevant Markets have risen, and quality has diminished:

> But for Defendants' illegal conduct, there would have been increased competition in the Relevant Markets, leading to lower prices for All Star Competitions, All Star Apparel, and related goods; more events; and higher quality, *including, in all likelihood, better oversight to eliminate the sexual predation and harassment that have been allowed to persist in this industry for far too long*.

*Id*. ¶¶16, 21 (emphasis added). Thus, the importance of this litigation—which will impact not just Plaintiffs and the putative class members, but also the nearly one million athletes that attend Varsity's All Star Competitions—cannot be overstated. Nor is USASF's role in the conspiracy minor, and the importance of the discovery it, and no one else, possesses is critical to these issues. To assert that USASF's role is *de minimis* and "then refuse to permit full discovery to test that assertion is unfair." *Goetz*, 879 F. Supp. 2d at 888. Thus, the importance of this litigation and the discovery sought weighs heavily against cost shifting.

## IV.     CONCLUSION

For these and the foregoing reasons, Plaintiffs respectfully request that this Court deny USASF's Motion for a Protective Order.

Dated: May 19, 2021                    Respectfully submitted,

By: */s/ Katherine Van Dyck*
Jonathan W. Cuneo*
Katherine Van Dyck*
Victoria Sims*
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
jonc@cuneolaw.com
kvandyc@cuneolaw.com
vicky@cuneolaw.com

H. Laddie Montague, Jr.*
Eric L. Cramer*
Mark R. Suter*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19106
Telephone: (215) 875-3000
hlmontague@bm.net
ecramer@bm.net
msuter@bm.net

Gregory S. Asciolla*
Karin E. Garvey*
Veronica Bosco*
**LABATON SUCHAROW LLP**
140 Broadway New York, NY 10005
Telephone: (212) 907-0700
gasciolla@labaton.com
kgarvey@labaton.com
vbosco@labaton.com

*Interim Co-Lead Counsel for the Proposed Direct Purchaser Class*

J. Gerard Stranch, IV (TN BPR #23045)
Benjamin A. Gastel (TN BPR #28699)
**BRANSTETTER, STRANCH & JENNINGS, PLLC**
223 Rosa Parks Ave. Suite 200
Nashville, TN 37203

21

Telephone: (615) 254-8801
gerards@bsjfirm.com
beng@bsjfirm.com

*Liaison Counsel for the Proposed Direct Purchaser Class*

Benjamin D. Elga*
**JUSTICE CATALYST LAW, INC.**
81 Prospect Street Brooklyn, NY 11201
Telephone: (518) 732-6703
belga@justicecatalyst.org

Craig L. Briskin*
**JUSTICE CATALYST LAW, INC.**
718 7th Street NW Washington, DC 20001
Telephone: (518) 732-6703
cbriskin@justicecatalyst.org

Roberta D. Liebenberg*
Jeffrey S. Istvan*
Mary L. Russell*
**FINE KAPLAN AND BLACK, R.P.C.**
One South Broad St., 23rd Floor
Philadelphia, PA 19107
Telephone: (215) 567-6565
rliebenberg@finekaplan.com
jistvan@finekaplan.com
mrussell@finekaplan.com

Nathan A. Bicks (TN BPR #10903)
Frank B. Thacher III (TN BPR #23925)
**BURCH, PORTER, & JOHNSON, PLLC**
130 North Court Ave.
Memphis, TN 38103
Telephone: (901) 524-5000
nbicks@bpjlaw.com
fthacher@bpjlaw.com

Aubrey B. Harwell, Jr. (TN BPR #002559)
Charles Barrett (TN BPR #020627)
Aubrey B. Harwell III (TN BPR #017394)
**NEAL & HARWELL, PLC**
1201 Demonbreun St., Suite 1000 Nashville, TN 37203
Telephone: (615) 244-1713
aharwell@nealharwell.com

22

cbarrett@nealharwell.com
tharwell@nealharwell.com

*Admitted pro hac vice

*Counsel for the Proposed Direct Purchaser Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 19, 2021, the foregoing was served via ECF processing upon the following:

Adam S. Baldridge
Matthew S. Mulqueen
BAKER DONELSON BEARMANN
CALDWELL & BERKOWITZ
165 Madison Ave Ste 2000
Memphis, TN 38103
Tel: 901-526-2000
abaldridge@bakerdonelson.com
mmulqueen@bakerdonelson.com

Grady M. Garrison
Nicole D. Berkowitz
BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, P.C.
165 Madison Ave. Ste. 2000
Memphis, TN 38103
Tel: 901-526-2000
ggarrison@bakerdonelson.com
nberkowitz@bakerdonelson.com

George S. Cary
Mark W. Nelson
Alexis Collins
Steven J. Kaiser
CLEARY GOTTILEB STEEN &
HAMILTON LLP
2112 Pennsylvania Avenue NW Ste 1000
Washington, DC 20037
Tel: 202-974-1500
gcary@cgsh.com
mnelson@cgsh.com
alcollins@cgsh.com
skaiser@cgsh.com

*Attorneys for Defendant U.S. All Star
Federation, Inc.*

*Attorneys for Defendants Varsity Brands,
LLC, Varsity Spirit Fashions & Supplies, Inc.,
and Varsity Spirit, LLC*

*/s/ Katherine Van Dyck*
Katherine Van Dyck