# ATTACHMENT A

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| **FUSION ELITE ALL STARS**, et al.,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>**VARSITY BRANDS, LLC**, et al.,<br><br>　　　　　Defendants. | Case No. 2:20-cv-02600-SHL-cgc<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
MOTION TO COMPEL DISCOVERY RESPONSES FROM
DEFENDANTS VARSITY BRANDS, LLC; VARSITY SPIRIT, LLC;
AND VARSITY SPIRIT FASHIONS & SUPPLIES, LLC**

Plaintiffs allege that Varsity conspired to and did monopolize two markets worth billions, of dollars. The discovery Plaintiffs seek is directly relevant to their claims, and Varsity's attempt to obfuscate the issues should be rejected.

## I.     RELEVANT TIME PERIOD FOR TRANSACTIONAL DATA

Plaintiffs seek transactional data for the period of January 2011 through December 2014 because, in an antitrust case such as this, data from *before* key portions of the alleged anticompetitive conduct took place is required to show the effects of the anticompetitive conduct. *See* Ex. 1, Decl. of Hal J. Singer, Ph.D. ("Singer Decl.").[1] Varsity refuses to produce data pre-dating 2015 but makes no burden arguments—nor could it. The extraction of pre-2015 data is no more burdensome than the extraction Varsity already performed to produce its pre-2015 data.

Transactional data reflects the prices, discounts, and other service costs relating to the sales of Varsity's products in the Competition and Apparel Markets (the "Relevant Markets") to members of the proposed Class. Transactional data is key in an antitrust class action like this. Singer Decl. ¶¶1, 12. Plaintiffs' economic experts will use it to evaluate the effects of the alleged anticompetitive scheme—involving acquisitions of rivals, exclusionary pricing arrangements, and a conspiracy with the self-regulatory body (co-Defendant USASF)—on prices paid by members of the proposed Class. *Id*. ¶¶1, 12-14, 17-19.

As Dr. Singer, who has over 20 years of experience testifying as an economist in antitrust cases, makes clear, "To assess antitrust impact during the Class Period, Plaintiffs' economists plan to rely upon data that materially *pre-date* key portions of the anticompetitive conduct, in order to have a relatively Clean Period for comparison." *Id*. ¶1. Critically, Varsity's market share and related "foreclosure share" (namely, the share of the Relevant Markets that Varsity cut off from

---

[1] All exhibits are attached to the Declaration of Victoria Sims ("Sims Decl."), filed concurrently.

competition due to its alleged misconduct) flow from what Plaintiffs allege are a series of anticompetitive acts that were already occurring in 2015. *Id.* Transactional data *materially* pre-dating this period is necessary to analyze the economic effects of Defendants' alleged misconduct. Dr. Singer summarizes the problem with not having this data in the following way:

> [O]mission of transaction data (a) reflecting a substantial period pre-dating key portions of the anticompetitive conduct, and (b) reflecting the effect of changes in Defendants' conduct as alleged in the Complaint on prices over time, would materially impede Plaintiffs' economists' ability to develop a standard and reliable econometric model demonstrating the impact of the challenged conduct on the relevant markets, . . . the proposed Class, and quantifying damages to that Class.

*Id*. Dr. Singer further explains, "Data from the time period before which . . . [Varsity's] acquisitions took place would . . . demonstrate how Varsity operated—and the effects of that conduct on prices—before it removed its main competitors in the Competition market, in comparison with how it behaved—and its prices—after doing so." *Id.* ¶16. "[I]t is important that Plaintiffs' economists have access to information regarding the state of prices in the Relevant Markets during the period when Varsity's monopoly power was lower so that a comparison can be made of those prices to pricing during a period when Varsity's alleged monopoly power was higher, controlling for other factors affecting price." *Id.* at ¶17.

Data from 2011 to 2014 is needed so that there is a balance between the data during the Class Period, on the one hand, and data pre-dating the key anticompetitive conduct, on the other:

> Due to the potential for significant variation as described above with regard to market power, and alleged exclusionary conduct present in the Relevant Markets during the time period between 2015 and the Class Period, transactional data beginning at least in January 2011 is important for pre-Class Period data. Varsity has agreed to provide data for 2015-2020; in order to create a balanced panel dataset, with approximately half of the observations in the period of time during which Varsity's market share and market power were relatively diminished, Plaintiffs' economists need data from 2011-2014.

*Id.* ¶19. Contrary to Varsity's contention, Plaintiffs do not seek this data to extend the limitations period but rather to measure the impact and damages of Defendants' alleged misconduct *during*

2

the statutory period. Plaintiffs will compare the data from the period with less competition foreclosure to pricing during the Class Period, when Varsity had completed more elements of its scheme. Thus, Varsity's argument that Plaintiffs cannot recover damages from before the Class Period misses the point, and the cases Varsity cites in support are inapposite. "[C]ourts allow discovery to extend to events before and after the period of actual liability so as to provide context." *Hatamian v. Advanced Micro Devices, Inc.*, No. 14-cv-00226, 2015 WL 7180662, at *2 (N.D. Cal. Nov. 16, 2015); *Gottesman v. Santana*, No. 16-cv-2902, 2017 WL 5889765, at *5 (S.D. Cal. Nov. 29, 2017); *B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*, No. 01-2410, 2003 WL 21939019, at *3 (D. Kan. 2003).

Varsity argues that Plaintiffs point to pre-2015 events in the Competition, but not the Apparel, Market, to justify a pre-2015 data production for both Markets. Critically, Varsity has leveraged its dominance in the Competition Market to dominate the Apparel Market. Dkt. 56 ¶¶170, 186. Indeed, Varsity has tied products in one market to those in the other by requiring Gyms' attendance at a certain number of Competitions to obtain non-penalty prices for Apparel (the Family Plan) and requiring Gyms to exclusively purchase Varsity Apparel to receive discounts on Competition fees (the Network Agreement). *Id*. ¶¶176, 180. Thus, conduct in the Competition Market is relevant to effects in the Apparel Market.

Varsity's argument that it "cannot produce what it does not have" refers only to its pre-2013 General Ledger ("Ledger") data. Varsity *does* have, and should produce, its transactional data back to 2011, which is located in different databases that its Ledger. Counsel for Varsity indicated that it would produce the transactional data Plaintiffs requested back to 2011 on the condition that parties in the *Jones* and *American Spirit* cases would agree to not seek a more expanded set of data. After Plaintiffs obtained this agreement, Varsity went back on its offer. Sims

3

Decl. ¶4, Ex. 2. Varsity also inaccurately claims Plaintiffs take no issue with the data it produced. Plaintiffs notified Varsity of a number of deficiencies on April 23. Sims. Decl. ¶5, Ex. 2.

## II.   REQUESTS FOR PRODUCTION

**RFP No. 20:** Varsity argues for the first time that—despite the fact that the parties have always discussed event-specific profit and loss statements ("P&Ls") in the context of this Request (Ex. 3)—it does not cover them. Regardless of whether they are responsive to Request 20 or one of the other Requests (*see* Ex. 4), the event-specific P&Ls will show whether prices and profits increased or decreased after Varsity's acquisitions of certain events. And the Ledger Varsity has produced from 2015 forward does not provide information grouped by events, compare a particular event's profits to its costs, or include information for Competitions acquired before 2015.

**RFP No. 56:** Varsity argues, without authority, that Plaintiffs must first produce evidence of its misconduct in order to obtain such evidence. Not so. Plaintiffs alleged, based on their investigation, that Varsity's scoring is influenced by Gyms' purchases from Varsity. Varsity's former Chairman acknowledged this bias in a similar market: "[Sideline] cheerleading teams are awarded points for using props, such as pom poms, sold by Varsity Brands." *Biediger v. Quinnipiac Univ.*, 728 F. Supp. 2d 62, 80 (D. Conn. 2010). Plaintiffs' allegations are made in good faith. Plaintiffs are entitled to evidence of whether Varsity is biased in its scoring.

**RFP No. 62:** Varsity's only opposition to producing agreements with its ticket vendors is that they are not located in one place—which is not a recognized objection. Its proposal that Plaintiffs depose each ticket vendor (without providing their names) to determine whether title passed from Varsity to the vendor is a far more convoluted approach that would require legal opinions from lay witnesses. The question is best answered by the contracts themselves. And if Varsity does not produce its ticket vendor agreements, its argument that those vendors (rather than the Class Members) were the direct purchasers of its tickets should be deemed waived.

4

**Requests Nos. 77 and 78:** Varsity states there is no one document detailing payments between Varsity and USASF but admits that it has a Ledger from which it already produced certain payment information. Varsity can produce the requested payments from its Ledger, just like its other Ledger entries. Varsity's claim that the parties had agreement on these Requests is inaccurate. Varsity made an inadequate proposal to produce the amount it initially advanced on behalf of USASF, which Plaintiffs rejected, Sims Decl. ¶7, as Plaintiffs have alleged that Varsity supported and controlled USASF throughout the 2012-2020 time period. At issue are payments made to All Star Cheer's regulatory body by a member that it purportedly regulates. Such payments are crucial.

**Request No. 82:** Though it does not deny that it paid USASF's employees before 2015, Varsity refuses to produce any of the relevant salary information from before 2015 despite the fact that "all employees of USASF were Varsity employees" (meaning Varsity paid all USASF employees) "prior to January 31, 2015." Dkt. 105-3. Payment of USASF employees' salaries is clearly relevant to Varsity's control and use of USASF to dominate All Star Cheer, and with a 2015 cut-off, the majority of the responsive documents and information would be withheld.

**Requests Nos. 92-103:** Plaintiffs incorporate their Reply in support of their Motion to Compel production from USASF, at 4-5, concerning the same Requests to USASF.

### III.   CUSTODIANS

Varsity refuses to add two custodians (Parrish and Hill) claiming they are "lower-level." But such employees will likely have drafts of documents showing Varsity's thought process in implementing its policies, and communications with customers, as confirmed in Hill's case. Lower-and upper-level employees have different functions. Plaintiffs need documents from both.

### IV.   CONCLUSION

For all of the reasons stated above and in Plaintiffs' Motion, Plaintiffs respectfully request that the Court grant their Motion to Compel.

5

Dated: May 26, 2021                          Respectfully submitted,


                                              By: */s/ Victoria Sims*
Jonathan W. Cuneo\*
Katherine Van Dyck\*
Victoria Sims\*
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
jonc@cuneolaw.com
kvandyc@cuneolaw.com
vicky@cuneolaw.com

H. Laddie Montague, Jr.\*
Eric L. Cramer\*
Mark R. Suter\*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19106
Telephone: (215) 875-3000
hlmontague@bm.net
ecramer@bm.net
msuter@bm.net

Gregory S. Asciolla\*
Karin E. Garvey\*
Veronica Bosco\*
**LABATON SUCHAROW LLP**
140 Broadway New York, NY 10005
Telephone: (212) 907-0700
gasciolla@labaton.com
kgarvey@labaton.com
vbosco@labaton.comInterim

*Co-Lead Counsel for the Proposed Direct Purchaser Class*
J. Gerard Stranch, IV (TN BPR #23045)
Benjamin A. Gastel (TN BPR #28699)
**BRANSTETTER, STRANCH & JENNINGS, PLLC**
223 Rosa Parks Ave. Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
gerards@bsjfirm.com
beng@bsjfirm.com

*Liaison Counsel for the Proposed Direct Purchaser Class*

Benjamin D. Elga*
**JUSTICE CATALYST LAW, INC.**
81 Prospect Street Brooklyn, NY 11201
Telephone: (518) 732-6703
belga@justicecatalyst.org

Craig L. Briskin*
**JUSTICE CATALYST LAW, INC.**
718 7th Street NW Washington, DC 20001
Telephone: (518) 732-6703
cbriskin@justicecatalyst.org

Roberta D. Liebenberg*
Jeffrey S. Istvan*
Mary L. Russell*
**FINE KAPLAN AND BLACK, R.P.C.**
One South Broad St., 23rd Floor
Philadelphia, PA 19107
Telephone: (215) 567-6565
rliebenberg@finekaplan.com
jistvan@finekaplan.com
mrussell@finekaplan.com

Nathan A. Bicks (TN BPR #10903)
Frank B. Thacher III (TN BPR #23925)
**BURCH, PORTER, & JOHNSON, PLLC**
130 North Court Ave.
Memphis, TN 38103
Telephone: (901) 524-5000
nbicks@bpjlaw.com
fthacher@bpjlaw.com

Aubrey B. Harwell, Jr. (TN BPR #002559)
Charles Barrett (TN BPR #020627)
Aubrey B. Harwell III (TN BPR #017394)
**NEAL & HARWELL, PLC**
1201 Demonbreun St., Suite 1000 Nashville, TN 37203
Telephone: (615) 244-1713
aharwell@nealharwell.com
cbarrett@nealharwell.com
tharwell@nealharwell.com

*Admitted pro hac vice

*Counsel for the Proposed Direct Purchaser Class*

8