# EXHIBIT A

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

## for the

Western District of Tennessee ▾

| | | |
|---|---|---|
| Fusion Elite All Stars, et al. v. Varsity Brands LLC, et al. | ) | Civil Action No.   2:20-cv-02600-SHL |
| _Plaintiff_                           _Defendant_ | ) | |
| | ) | |
| | ) | |
| Jones, et al. v. Bain Capital Private Equity, et al. | ) | Civil Action No.   2:20-cv-02892-SHL |
| _Plaintiff_                           _Defendant_ | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:          Marlene Cota, 1248 East Crestwood Drive, Memphis, TN 38119

_(Name of person to whom this subpoena is directed)_

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: Veritext Court Reporting Service Center, 236 Adams Avenue, The Alpha House, Memphis, TN 38101 | Date and Time: 01/11/2022 9:00 am and continuing from day to day thereafter until completed |
|---|---|

The deposition will be recorded by this method:   Real-time videographic and stenographic recording

☐ _Production:_  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    11/3/2021

| _CLERK OF COURT_ | OR | |
|---|---|---|
| | | s/ Katherine Van Dyck |
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_   Plaintiffs
, who issues or requests this subpoena, are:

Katherine Van Dyck, Cuneo Gilbert & LaDuca LLP, 4725 Wisconsin Ave NW, Ste 200, Washington, DC 20016, 202-789-3960, kvandyck@cuneolaw.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 2:20-cv-02600-SHL

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of Tennessee

| | | | |
|---|---|---|---|
| Fusion Elite All Stars, et al. v. Varsity Brands LLC, et al. | ) | Civil Action No. | 2:20-cv-2600-SHL |
| _____Plaintiff_____Defendant_____ | ) | | |
| | ) | | |
| | ) | | |
| Jones, et al. v. Bain Capital Private Equity, et al. | ) | Civil Action No. | 2:20-cv-02892-SHL |
| _____Plaintiff_____Defendant_____ | ) | | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:          Marlene Cota, 1248 East Crestwood Drive, Memphis, TN 38119

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

          See attached Schedule A

| Place: Veritext Court Reporting Service Center, 236 Adams Avenue, The Alpha House, Memphis, TN 38101 | Date and Time:<br><br>12/03/2021 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

          The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    11/03/2021

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | _s/ Katherine Van Dyck_____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Plaintiffs
_____ , who issues or requests this subpoena, are:

Katherine Van Dyck, Cuneo Gilbert & LaDuca LLP, 4725 Wisconsin Ave NW, Ste 200, Washington, DC 20016, 202-789-3960, kvandyck@cuneolaw.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 2:20-cv-2600-SHL

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c)  Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d)  Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e)  Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g)  Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

Pursuant to the Federal Rules of Civil Procedure, this will serve as a request for the

Subpoenaed Party, Marlene Cota, to produce the following Documents in the time period

required by the attached subpoena:

## DEFINITIONS

1.      The term "All Star" cheerleading means the discipline of cheerleading that

involves athletes performing routines composed of tumbling, stunting, pyramids, and dance. It is

distinct from traditional school cheerleading (sideline cheering) in that its primary purpose is

competition, while school cheer primarily involves crowd leading and other roles associated with

generating school spirit.

2.      The term "All Star Apparel" means the clothing (including uniforms), shoes,

accessories, or equipment purchased for use by All Star Team athletes at Events and during

practices and training.

3.      The term "All Star Competition" or "Competition" means an All Star

cheerleading competition, including Championships.

4.      The term "All Star Gym" or "Gym" means a cheerleading gym whose members

are athletes on All Star cheerleading Teams.

5.      The term "All Star Team" or "Team" means a cheerleading squad that competes

in All Star Competitions.

6.      The terms "any," "and," and "or" shall be construed either disjunctively or

conjunctively as necessary to bring within the scope of the discovery all responses which might

otherwise be construed to be outside its scope. Each of the following words includes the meaning

of every other word: "each," "every," "all," and any." The present tense shall be construed to

include the past tense, and the past tense shall be construed to include the present tense.

1

7.      The term "Apparel" means the clothing (including uniforms), shoes, accessories, or equipment purchased for use by All Star cheerleaders at Competitions or during practices and training.

8.      The term "Championship" means one of three nationally recognized All Star cheerleading championship competitions in the United States: the Cheerleading Worlds, the Summit, and the U.S. Finals.

9.      The terms "Communication" and "Communications" are used in the broadest possible sense and mean every conceivable manner or means of disclosure, transfer or exchange of oral or written information between one or more persons or entities and shall include, without limitation, notes, letters, memoranda, e-mails, texts, instant messages, social media posts, social media messages, facsimiles, reports, briefings, telegrams, telexes, or by oral contact by such means as face to face meetings and telephone conversations, or any form of transmittal of information in the form of facts, ideas, inquiries or otherwise. The term "communicate" means to exchange, transfer, or disseminate facts or information, regardless of the means by which it is accomplished.

10.     The term "Complaint" means the Consolidated Class Action Complaint, attached as **Exhibit 1**, or any future amended complaint(s) filed in *Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al.*, Case No. 2:20-cv-02600-SHL-cgc (W.D. Tenn.).

11.     The terms "concerning," "reflecting," "regarding," and "relating to" are used in the broadest possible sense and mean, in whole or in part, addressing, analyzing, constituting, containing, commenting, in connection with, dealing with, discussing, describing, embodying, evidencing, identifying, pertaining to, referring to, reporting, stating, or summarizing.

12.     The term "Contract" means any contract, arrangement, or understanding, formal or informal, oral or written, between two or more persons, together with all modifications or amendments thereto.

13.     The term "Defendants" means Varsity Brands, LLC, Varsity Spirit, LLC, and Varsity Spirit Fashion & Supplies, LLC, and U.S. All Star Federation, Inc.

14.     The terms "Document" and "Documents" are used in the broadest sense allowable under Rule 45 of the Federal Rules of Civil Procedure, including any written, printed, typed, photocopied, photographed, recorded or otherwise reproduced or store communication or representation, whether comprised of letters, words, numbers, data, pictures, sounds or symbols, or any combination thereof. It includes notes, letters, memoranda, e-mails, texts, instant messages, social media posts, facsimiles, reports, briefings, telegrams, telexes, records, envelopes, messages, studies, analyses, contracts, agreements, working papers, accounts, analytical records, reports and/or summaries of investigations, press releases, comparisons, books, calendars, diaries, articles, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, questionnaires, surveys, drawings, diagrams, instructions, notes of meetings or communications, questionnaires, surveys, charts, graphs, photographs, films, tapes, disks, data cells, print-outs of information store or maintained by electronic data processing or work processing equipment, all other data compilations from which information can be obtained including without limitation optical storage media such as CDs, DVDs, memory sticks, floppy disks, hard disks, and magnetic tapes. The term "Document" also means every copy of a Document where such copy is not an identical duplicate of the original.

15.     The term "Employee" means, without limitation, any current or former officer, director, executive, manager, board member, secretary, staff member, consultant, messenger, or agent.

16.     The term "including" means including but not limited to.

17.     The term "Independent Event Producers" or "IEPs" means All Star Competition producers not wholly or partially owned by Varsity or USASF.

18.     The term "Plaintiffs" means Fusion Elite All Stars, Spirit Factor LLC d/b/a Fuel Athletics, Stars and Stripes Gymnastics Academy Inc. d/b/a Stars and Stripes Kids Activity Center, Kathryn Anne Radek, Lauren Hayes, and Janine Cherasaro.

19.     The term "USASF" means defendant U.S. All Star Federation, Inc., its predecessor and successor entities, its officers, directors, shareholders, parent and subsidiary companies (whether direct or indirect), divisions, Employees, agents, attorneys, representatives, and other persons acting or authorized to act on its behalf.

20.     The terms "Varsity" or "Varsity Defendants" mean Defendants Varsity Brands, LLC, Varsity Spirit, LLC, and Varsity Spirit Fashion & Supplies, LLC, each of their predecessor and successor entities, officers, directors, shareholders, parent and subsidiary companies (whether direct or indirect), divisions, Employees, agents, attorneys, representatives, and other persons acting or authorized to act on their behalf.

21.     The terms "You," "Your," or "Your Company" means the persons or entities upon whom these Requests for Productions were served; for an entity, each of its predecessors, successors, parents, divisions, subsidiaries, and affiliates, each other entity directly or indirectly, wholly or in part, owned or controlled by it, and each partnership or joint venture to which any of

them is a party; and all present and former directors, officers, Employees, agents, consultants, or other persons acting for or on behalf of any of them.

<u>**INSTRUCTIONS**</u>

1.      The Definitions above are provided only for purposes of discovery, in conformance with Rule 45 of the Federal Rules of Civil Procedure and are not intended to be used for any purpose other than discovery. Plaintiffs reserve the right to modify these Definitions or utilize different Definitions for any other purpose.

2.      The terms defined above and the individual requests for production and inspection are to be construed broadly to the fullest extent of their meaning in a good faith effort to comply with the Federal Rules of Civil Procedure.

3.      All words not defined in the Definitions shall be construed using their plain and ordinary meaning. If more than one meaning can be ascribed to a word, the meaning that would make a Document be covered by the requests for production should be used, unless You provide written notice of the specific ambiguity and state the definition of the word used to exclude the Document from the scope of the request.

4.      In answering and responding to these requests, You shall furnish such information and Documents in Your possession, custody or control, including information that is in the possession, custody or control of Your agents, consultants, accountants, investigators, and (subject to any otherwise applicable privileges) attorneys.

5.      Each request herein shall be construed independently. No request shall be construed by reference to any other request for the purpose of limiting the scope of the answers to such request.

6.      All headings set forth within the numbered requests below are for continuity only and shall not be deemed to control or affect the meaning or construction of any request.

7.      Where the context in a request makes it appropriate, each singular word shall include its plural and each plural word shall include its singular.

8.      Your obligation to respond to these requests is a continuing one. If, after responding to these requests, You obtain or become aware of any new or additional information pertaining to a request contained herein, You must supplement Your answer in accordance with Federal Rules of Civil Procedure 26 and 34.

9.      You are to produce entire Documents including all attachments, cover letters, memoranda, and appendices, as well as the file, folder tabs, and labels appended to or containing any Documents. Copies which differ from the original (because, by way of example only, handwritten or printed notations have been added) should be produced separately. Each Document requested herein must be produced in its entirety and without deletion, abbreviation, redaction, expurgation, or excisions, regardless of whether You consider the entire Document to be relevant or responsive. The use or disclosure of Documents produced in response to these requests is subject to the limitations set forth in the Stipulated Protective Order, attached as **Exhibit 2**, and the Stipulation Regarding Production of Electronically Stored Information ("ESI Protocol"), attached as **Exhibit 3**. Accordingly, redaction of Documents to preserve confidentiality is unnecessary and production of Documents that have been redacted for purposes of production in response to these requests will not constitute compliance with these requests. If any part of a Document is responsive to any request, the whole Document is to be produced.

10.     You are requested to produce any and all electronically stored information in the manner required by the ESI Protocol. Unless otherwise limited by the ESI Protocol, pursuant to Federal Rules of Civil Procedure 45 electronically stored information should be produced in native format (including metadata) whenever possible.

11.     Documents and other things not otherwise responsive to a request shall be produced if such materials mention, discuss, refer to, or explain the materials called for by a request, or if such materials are attached to materials called for by a request and constitute (e.g., routing slips, transmittal emails, transmittal memoranda, letters, cover letters, comments, evaluations, or similar materials). This includes Documents sufficient to explain the meaning of any data responsive to any of the below requests, including all record layouts, data dictionaries, field codes, and other codes or descriptions.

12.     Any alteration of a responsive Document, including any marginal notes, handwritten notes, underlining, date stamps, received stamps, endorsed or filed stamps, drafts, revisions, modifications and other versions of a final Document is a separate and distinct Document and it must be produced.

13.     If there are no Documents or other things responsive to any particular request, Your response shall state so in writing.

14.     If any Document is withheld, in whole or in part, due to a claim of privilege of any kind, provide a privilege log that sets forth separately with respect to each Document: (a) the nature of the privilege or ground of confidentiality claimed; (b) the author(s) of the Document (designating which, if any, are attorneys); (c) the title of the Documents (or subject line if the Document in an email); (d) the recipient(s) of the Document, including all persons who received copies of the Document (designating which, if any, are attorneys); (e) a description of the Document (or redacted portion of the Document) as set forth in Rule 26(b)(5)(A)(ii) of the Federal Rules of Civil Procedure; (f) the Bates range of the Document; and (g) the privilege log reference number. Any privilege log or list is to be produced in an Excel spreadsheet or other format capable of electronic sorting.

7

15.     Unless otherwise noted herein, the relevant time period for these Requests is January 1, 2011 to the present (the "Relevant Time Period"). These Requests seek all responsive Documents created or generated during the Relevant Time Period, as well as responsive Documents created or generated outside the Relevant Time Period, but which contain information concerning the Relevant Time Period.

16.     To the extent that You contend that Documents responsive to a particular request were previously produced to the Federal Trade Commission, Securities and Exchange Commission, Department of Justice, a state attorney general, or any other governmental agency, or as part of any other litigation, identify the specific request in any particular request for Documents, in response to which You produced such Documents and explain how You searched for Documents and produced them in response to such request for Documents, including by producing a list of the search terms used to identify Documents responsive to the applicable request for Documents, the relevant time period searched, and the custodians whose files were searched.

17.     In the event that any Document or other thing responsive to these requests has been lost, discarded, or destroyed, that Document or other thing is to be identified by stating as completely as possible: (a) the authors or creators of the material, (b) all persons who received copies of the material, including any indicated and blind copy recipients, (c) the present custodian of the material, (d) the date of the material, (e) the material's date of destruction or discard, manner of destruction or discard, and the reason for destruction or discard, and (f) the persons authorizing and carrying out such destruction or discard.

18.     If You have any good faith objections to any request or any part thereof, the specific nature of the objection and whether it applies to the entire request or to a part of the

request shall be stated in accordance with Rule 45 of the Federal Rules of Civil Procedure. If there is an objection to any part of a request, then the part objected to should be identified and Documents and other things responsive to the remaining unobjectionable part should be timely produced. Further, if You object to part of a request, You must state the basis of Your objections in accordance with Rule 45.

19.     Each production shall be submitted with a transmittal letter that includes the case caption; production volume name; encryption method/software used; and passwords for any password protected files.

## REQUESTS FOR PRODUCTION

**REQUEST NO. 1:**    All Documents or Communications reflecting, relating to, or concerning Varsity.

**REQUEST NO. 2:**    All Documents reflecting, relating, relating to or concerning Your employment by Varsity Defendants, and your termination, separation, or severance from Varsity.

**REQUEST NO. 3:**    All Documents or Communications relating to or concerning All Star Competitions or All Star Apparel.

**REQUEST NO. 4:**    All Documents or Communications reflecting, relating to, or concerning current or former Varsity employees, including but not limited to Brian Elza and Tres LeTars.

**REQUEST NO. 5:**    All Documents or Communications reflecting, relating to, or concerning the U.S. All Star Federation.

**REQUEST NO. 6:**    All Documents or Communications reflecting, relating to, or concerning contracts or sales arrangements or proposals known in sum or substance as the Family Plan, Network Agreement, or Varsity Bucks, discussed at Paragraphs 170 to 185 of the Complaint.

9

**REQUEST NO. 7:**    All Documents or Communications reflecting, relating to, or concerning acquisitions by Varsity of Independent Event Producers, Apparel manufacturers, Gyms, and any other entities.

**REQUEST NO. 8:**    All Documents or Communications reflecting, relating to, or concerning sexual abuse, predation, harassment, misconduct or any other sex crimes against or related to All Star cheerleaders, whether occurring at All Star Competitions or elsewhere, as discussed at Paragraphs 237 to 241 of the Complaint.

## SCHEDULE A

Pursuant to the Federal Rules of Civil Procedure, this will serve as a request for the

Subpoenaed Party, Marlene Cota, to produce the following Documents in the time period

required by the attached subpoena:

## DEFINITIONS

1.       The term "All Star" cheerleading means the discipline of cheerleading that

involves athletes performing routines composed of tumbling, stunting, pyramids, and dance. It is

distinct from traditional school cheerleading (sideline cheering) in that its primary purpose is

competition, while school cheer primarily involves crowd leading and other roles associated with

generating school spirit.

2.       The term "All Star Apparel" means the clothing (including uniforms), shoes,

accessories, or equipment purchased for use by All Star Team athletes at Events and during

practices and training.

3.       The term "All Star Competition" or "Competition" means an All Star

cheerleading competition, including Championships.

4.       The term "All Star Gym" or "Gym" means a cheerleading gym whose members

are athletes on All Star cheerleading Teams.

5.       The term "All Star Team" or "Team" means a cheerleading squad that competes

in All Star Competitions.

6.       The terms "any," "and," and "or" shall be construed either disjunctively or

conjunctively as necessary to bring within the scope of the discovery all responses which might

otherwise be construed to be outside its scope. Each of the following words includes the meaning

of every other word: "each," "every," "all," and any." The present tense shall be construed to

include the past tense, and the past tense shall be construed to include the present tense.

1

7.     The term "Apparel" means the clothing (including uniforms), shoes, accessories, or equipment purchased for use by All Star cheerleaders at Competitions or during practices and training.

8.     "Camp" means any camp at which athletes and teams practice competitive cheer or dance skills and develop cheerleading or dance routines for School Cheer or All-Star cheerleading.

9.     The term "Championship" means one of three nationally recognized All Star cheerleading championship competitions in the United States: the Cheerleading Worlds, the Summit, and the U.S. Finals.

10.    The terms "Communication" and "Communications" are used in the broadest possible sense and mean every conceivable manner or means of disclosure, transfer or exchange of oral or written information between one or more persons or entities and shall include, without limitation, notes, letters, memoranda, e-mails, texts, instant messages, social media posts, social media messages, facsimiles, reports, briefings, telegrams, telexes, or by oral contact by such means as face to face meetings and telephone conversations, or any form of transmittal of information in the form of facts, ideas, inquiries or otherwise. The term "communicate" means to exchange, transfer, or disseminate facts or information, regardless of the means by which it is accomplished.

11.    The term "*Fusion* Complaint" means the Consolidated Class Action Complaint, attached as **Exhibit 1**, or any future amended complaint(s) filed in *Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al.*, Case No. 2:20-cv-02600-SHL-cgc (W.D. Tenn.).

12.    The term "*Jones* Complaint" means the Consolidated Class Action Complaint, attached as Exhibit 2, or any future complaint(s) filed in *Jones et al. v. Varsity Brands LLC et al.*, Case No. 2:20-cv-02892-SHL-cgc (W.D. Tenn.).

13.     The terms "concerning," "reflecting," "regarding," and "relating to" are used in the broadest possible sense and mean, in whole or in part, addressing, analyzing, constituting, containing, commenting, in connection with, dealing with, discussing, describing, embodying, evidencing, identifying, pertaining to, referring to, reporting, stating, or summarizing.

14.     The term "Contract" means any contract, arrangement, or understanding, formal or informal, oral or written, between two or more persons, together with all modifications or amendments thereto.

15.     The term "Defendants" means Varsity Brands, LLC, Varsity Spirit, LLC, and Varsity Spirit Fashion & Supplies, LLC, and U.S. All Star Federation, Inc.

16.     The terms "Document" and "Documents" are used in the broadest sense allowable under Rule 45 of the Federal Rules of Civil Procedure, including any written, printed, typed, photocopied, photographed, recorded or otherwise reproduced or store communication or representation, whether comprised of letters, words, numbers, data, pictures, sounds or symbols, or any combination thereof. It includes notes, letters, memoranda, e-mails, texts, instant messages, social media posts, facsimiles, reports, briefings, telegrams, telexes, records, envelopes, messages, studies, analyses, contracts, agreements, working papers, accounts, analytical records, reports and/or summaries of investigations, press releases, comparisons, books, calendars, diaries, articles, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, questionnaires, surveys, drawings, diagrams, instructions, notes of meetings or communications, questionnaires, surveys, charts, graphs, photographs, films, tapes, disks, data cells, print-outs of information store or maintained by electronic data processing or work processing equipment, all other data compilations from which information can be obtained including without limitation optical storage media such as CDs, DVDs, memory sticks, floppy

3

disks, hard disks, and magnetic tapes. The term "Document" also means every copy of a

Document where such copy is not an identical duplicate of the original.

17.     The term "Employee" means, without limitation, any current or former officer,

director, executive, manager, board member, secretary, staff member, consultant, messenger, or

agent.

18.     The term "including" means including but not limited to.

19.     The term "Independent Event Producers" or "IEPs" means All Star Competition

producers not wholly or partially owned by Varsity or USASF.

20.     The term "Plaintiffs" means Fusion Elite All Stars, Spirit Factor LLC d/b/a Fuel

Athletics, Stars and Stripes Gymnastics Academy Inc. d/b/a Stars and Stripes Kids Activity

Center, Kathryn Anne Radek, Lauren Hayes, and Janine Cherasaro.

21.     "School" means any public or private junior high, high school, college, or

university, including school districts and state government entities that oversee the high school,

college, or university system, together with all present and former officers, employees, agents,

representatives, or any persons acting or authorized to act on their behalf.

22.     "School Cheer" means a discipline of cheerleading in which routines composed of

tumbling, stunting, pyramids, dance, and elements of traditional sideline cheer such as band chants,

fight songs, and motivational cheers are performed by teams of athletes affiliated with Schools.

23.     "School Cheer Apparel" means the clothing (including uniforms), shoes,

accessories, or equipment purchased for use by School Cheer athletes at Competitions, Camps,

and during practices and training.

24.     "School Cheer Competition" means nationally recognized School Cheer

competitions in the United States, including but not limited to: UCA National High School

Cheerleading Championship; UCA National College Championship; UDA National College Championship; NCA National High School Cheerleading Championship; NCA College National Championship; and NDA College National Championship.

25.     "School Partnership Program" means any Varsity or Varsity brand partnership with a School, including but not limited to the "IMPACT Program" or "VIP Branding" or "New School Construction Program."

26.     The term "USASF" means defendant U.S. All Star Federation, Inc., its predecessor and successor entities, its officers, directors, shareholders, parent and subsidiary companies (whether direct or indirect), divisions, Employees, agents, attorneys, representatives, and other persons acting or authorized to act on its behalf.

27.     The terms "Varsity" or "Varsity Defendants" mean Defendants Varsity Brands, LLC, Varsity Spirit, LLC, and Varsity Spirit Fashion & Supplies, LLC, each of their predecessor and successor entities, officers, directors, shareholders, parent and subsidiary companies (whether direct or indirect), divisions, Employees, agents, attorneys, representatives, and other persons acting or authorized to act on their behalf.

28.     The terms "You," "Your," or "Your Company" means the persons or entities upon whom these Requests for Productions were served; for an entity, each of its predecessors, successors, parents, divisions, subsidiaries, and affiliates, each other entity directly or indirectly, wholly or in part, owned or controlled by it, and each partnership or joint venture to which any of them is a party; and all present and former directors, officers, Employees, agents, consultants, or other persons acting for or on behalf of any of them.

## <u>INSTRUCTIONS</u>

1.     The Definitions above are provided only for purposes of discovery, in conformance with Rule 45 of the Federal Rules of Civil Procedure and are not intended to be

used for any purpose other than discovery. Plaintiffs reserve the right to modify these Definitions or utilize different Definitions for any other purpose.

2. The terms defined above and the individual requests for production and inspection are to be construed broadly to the fullest extent of their meaning in a good faith effort to comply with the Federal Rules of Civil Procedure.

3. All words not defined in the Definitions shall be construed using their plain and ordinary meaning. If more than one meaning can be ascribed to a word, the meaning that would make a Document be covered by the requests for production should be used, unless You provide written notice of the specific ambiguity and state the definition of the word used to exclude the Document from the scope of the request.

4. In answering and responding to these requests, You shall furnish such information and Documents in Your possession, custody or control, including information that is in the possession, custody or control of Your agents, consultants, accountants, investigators, and (subject to any otherwise applicable privileges) attorneys.

5. Each request herein shall be construed independently. No request shall be construed by reference to any other request for the purpose of limiting the scope of the answers to such request.

6. All headings set forth within the numbered requests below are for continuity only and shall not be deemed to control or affect the meaning or construction of any request.

7. Where the context in a request makes it appropriate, each singular word shall include its plural and each plural word shall include its singular.

8. Your obligation to respond to these requests is a continuing one. If, after responding to these requests, You obtain or become aware of any new or additional information

pertaining to a request contained herein, You must supplement Your answer in accordance with

Federal Rules of Civil Procedure 26 and 34.

9.      You are to produce entire Documents including all attachments, cover letters,

memoranda, and appendices, as well as the file, folder tabs, and labels appended to or containing

any Documents. Copies which differ from the original (because, by way of example only,

handwritten or printed notations have been added) should be produced separately. Each

Document requested herein must be produced in its entirety and without deletion, abbreviation,

redaction, expurgation, or excisions, regardless of whether You consider the entire Document to

be relevant or responsive. The use or disclosure of Documents produced in response to these

requests is subject to the limitations set forth in the Stipulated Protective Order, attached as

**Exhibit 3**, and the Stipulation Regarding Production of Electronically Stored Information ("ESI

Protocol"), attached as **Exhibit 4**. Accordingly, redaction of Documents to preserve

confidentiality is unnecessary and production of Documents that have been redacted for purposes

of production in response to these requests will not constitute compliance with these requests. If

any part of a Document is responsive to any request, the whole Document is to be produced.

10.     You are requested to produce any and all electronically stored information in the

manner required by the ESI Protocol. Unless otherwise limited by the ESI Protocol, pursuant to

Federal Rules of Civil Procedure 45 electronically stored information should be produced in

native format (including metadata) whenever possible.

11.     Documents and other things not otherwise responsive to a request shall be

produced if such materials mention, discuss, refer to, or explain the materials called for by a

request, or if such materials are attached to materials called for by a request and constitute (e.g.,

routing slips, transmittal emails, transmittal memoranda, letters, cover letters, comments,

7

evaluations, or similar materials). This includes Documents sufficient to explain the meaning of
any data responsive to any of the below requests, including all record layouts, data dictionaries,
field codes, and other codes or descriptions.

      12.     Any alteration of a responsive Document, including any marginal notes,
handwritten notes, underlining, date stamps, received stamps, endorsed or filed stamps, drafts,
revisions, modifications and other versions of a final Document is a separate and distinct
Document and it must be produced.

      13.     If there are no Documents or other things responsive to any particular request,
Your response shall state so in writing.

      14.     If any Document is withheld, in whole or in part, due to a claim of privilege of
any kind, provide a privilege log that sets forth separately with respect to each Document: (a) the
nature of the privilege or ground of confidentiality claimed; (b) the author(s) of the Document
(designating which, if any, are attorneys); (c) the title of the Documents (or subject line if the
Document in an email); (d) the recipient(s) of the Document, including all persons who received
copies of the Document (designating which, if any, are attorneys); (e) a description of the
Document (or redacted portion of the Document) as set forth in Rule 26(b)(5)(A)(ii) of the
Federal Rules of Civil Procedure; (f) the Bates range of the Document; and (g) the privilege log
reference number. Any privilege log or list is to be produced in an Excel spreadsheet or other
format capable of electronic sorting.

      15.     Unless otherwise noted herein, the relevant time period for these Requests is
January 1, 2011 to the present (the "Relevant Time Period"). These Requests seek all responsive
Documents created or generated during the Relevant Time Period, as well as responsive

Documents created or generated outside the Relevant Time Period, but which contain

information concerning the Relevant Time Period.

16.     To the extent that You contend that Documents responsive to a particular request

were previously produced to the Federal Trade Commission, Securities and Exchange

Commission, Department of Justice, a state attorney general, or any other governmental agency,

or as part of any other litigation, identify the specific request in any particular request for

Documents, in response to which You produced such Documents and explain how You searched

for Documents and produced them in response to such request for Documents, including by

producing a list of the search terms used to identify Documents responsive to the applicable

request for Documents, the relevant time period searched, and the custodians whose files were

searched.

17.     In the event that any Document or other thing responsive to these requests has

been lost, discarded, or destroyed, that Document or other thing is to be identified by stating as

completely as possible: (a) the authors or creators of the material, (b) all persons who received

copies of the material, including any indicated and blind copy recipients, (c) the present

custodian of the material, (d) the date of the material, (e) the material's date of destruction or

discard, manner of destruction or discard, and the reason for destruction or discard, and (f) the

persons authorizing and carrying out such destruction or discard.

18.     If You have any good faith objections to any request or any part thereof, the

specific nature of the objection and whether it applies to the entire request or to a part of the

request shall be stated in accordance with Rule 45 of the Federal Rules of Civil Procedure. If

there is an objection to any part of a request, then the part objected to should be identified and

Documents and other things responsive to the remaining unobjectionable part should be timely

produced. Further, if You object to part of a request, You must state the basis of Your objections in accordance with Rule 45.

19.      Each production shall be submitted with a transmittal letter that includes the case caption; production volume name; encryption method/software used; and passwords for any password protected files.

## REQUESTS FOR PRODUCTION

**REQUEST NO. 1:**    All Documents or Communications reflecting, relating to, or concerning Varsity.

**REQUEST NO. 2:**    All Documents reflecting, relating to or concerning Your employment by Varsity Defendants, and your termination, separation, or severance from Varsity.

**REQUEST NO. 3:**    All Documents or Communications relating to or concerning All Star Competitions or All Star Apparel.

**REQUEST NO. 4:**    All Documents or Communications reflecting, relating to, or concerning current or former Varsity employees, including but not limited to Brian Elza and Tres LeTard.

**REQUEST NO. 5:**    All Documents or Communications reflecting, relating to, or concerning the U.S. All Star Federation.

**REQUEST NO. 6:**    All Documents or Communications reflecting, relating to, or concerning contracts or sales arrangements or proposals known in sum or substance as the Family Plan, Network Agreement, or Varsity Bucks, or other rebate or discount programs discussed at Paragraphs 170 to 185 of the *Fusion* Complaint and Paragraphs 141 to 152 of the *Jones* Complaint.

**REQUEST NO. 7:**   All Documents or Communications reflecting, relating to, or concerning acquisitions by Varsity of Independent Event Producers, Apparel manufacturers, Gyms, Camps, and any other entities.

**REQUEST NO. 8:**   All Documents or Communications reflecting, relating to, or concerning sexual abuse, predation, harassment, misconduct or any other sex crimes against or related to All Star cheerleaders, whether occurring at All Star Competitions or elsewhere, as discussed at Paragraphs 237 to 241 of the *Fusion* Complaint.

**REQUEST NO. 9:**   All Documents or Communications reflecting, relating to, or concerning Varsity's School Partnership Program, including but not limited to contracts or sales arrangements or proposals.

**REQUEST NO. 10:**   All Documents or Communications reflecting, relating to, or concerning School Cheer, School Cheer Competitions, or School Cheer Apparel.

**REQUEST NO. 11:**   All Documents or Communications reflecting, relating to, or concerning Camps.

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| FUSION ELITE ALL STARS, et al., | |
| Plaintiffs, | Case No. 2:20-cv-02600-SHL-cgc |
| v. | Judge Sheryl H. Lipman |
| | Magistrate Judge Charmiane G. Claxton |
| VARSITY BRANDS, LLC, et al., | |
| | **CONSOLIDATED COMPLAINT** |
| Defendants. | **CLASS ACTION** |
| | **JURY TRIAL DEMANDED** |

# EXHIBIT 1

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ...................................................................................1

II.     JURISDICTION AND VENUE ..............................................................................8

III.    PARTIES ................................................................................................................9

IV.     CLASS ALLEGATIONS .......................................................................................13

V.      AGENTS & CO-CONSPIRATORS .......................................................................16

VI.     INTERSTATE TRADE & COMMERCE ...............................................................17

VII.    FACTUAL ALLEGATIONS ..................................................................................18

        A.      History & Background...............................................................................18

        B.      All Star Cheer's "Governing" Bodies .......................................................21

        C.      All Star Competitions ................................................................................23

        D.      All Star Championships .............................................................................25

                1.      The Worlds......................................................................................25

                2.      The Summit......................................................................................26

                3.      The U.S. Finals ...............................................................................27

        E.      All Star Apparel ........................................................................................27

        F.      Varsity's Monopoly Power in the Two Relevant Antitrust Markets ...................29

                1.      Monopoly Power in the All Star Competition Market (the Primary
                        Market)............................................................................................29

                        a.      The Relevant All Star Competition Market ..................................29

                        b.      The Relevant Geographic Market ..................................................33

                        c.      Varsity Has Monopoly Power as a Dominant Supplier in
                                the All Star Competition Market..................................................33

                        d.      Barriers to Entry ..........................................................................34

                                i.      Natural Barriers to Entry.................................................35

                                ii.     Barriers Created by the Exclusionary Scheme.................35

2.     Monopoly Power in the All Star Apparel Market (the Ancillary Market) ..................................................................................36

    a.     The Relevant All Star Apparel Market ...........................................36

    b.     The Relevant Geographic Market ...................................................37

    c.     Varsity Has Monopoly Power with Respect to Sales of All Star Apparel ...............................................................................37

    d.     Barriers to Entry ............................................................................38

        i.     Natural Barriers to Entry ....................................................38

        ii.     Barriers to Entry Imposed Through the Exclusionary Scheme ..........................................................38

G.     Varsity's Continuing Exclusionary Scheme to Maintain and Enhance Monopoly Power in the Primary and Ancillary Relevant Markets .......................39

    1.     Acquisitions of Rivals ...............................................................................39

        a.     Varsity Acquired The JAM Brands ...............................................40

        b.     Varsity Acquired Spirit Celebrations .............................................41

        c.     Varsity Acquired Epic Brands .......................................................42

        d.     Varsity Solidified Its Control .........................................................42

    2.     Varsity Leverages Its Monopoly Power to Impose Exclusionary Contracts and Anticompetitive Loyalty Programs on All Star Gyms ........43

        a.     The Network Agreement Is an Exclusionary Contract ..................44

        b.     The Family Plan Is an Anticompetitive Loyalty Rebate Program ..........................................................................................45

    3.     Varsity Leverages Its Monopoly Power in the All Star Competition Market to Control the All Star Apparel Market ........................................46

    4.     Varsity's Use and Control of Governing Bodies ......................................49

        a.     Varsity Controls the USASF ..........................................................49

        b.     Defendant USASF Limits Which All Star Competition Producers Can Award Bids to All Star Championships ...............51

c.      USASF and Varsity Use and Create Rules to Foreclose Rivals .................................................................................. 53

d.      Varsity Leverages Its Control of Defendant USASF to Exert Control Over All Star Teams' Competition Schedules ........ 53

H.      The Exclusionary Scheme Foreclosed Competition in the Primary and Ancillary Relevant Markets ................................................. 56

I.       The Exclusionary Scheme Caused Plaintiffs and Members of the Class to Suffer Antitrust Injury and Damages .............................. 57

J.       The Exclusionary Scheme Caused Anticompetitive Effects in Both Relevant Markets with No Offsetting Procompetitive Efficiencies ....... 57

VIII.   CLAIMS FOR RELIEF ................................................................... 59

        COUNT I MONOPOLIZATION 15 U.S.C. § 2 (On Behalf of Plaintiffs and the Class and Against Varsity) .......................................................... 59

        COUNT II CONSPIRACY TO MONOPOLIZE  15 U.S.C. § 2 (On Behalf of Plaintiffs and the Class and Against Varsity and USASF) ..................... 60

IX.     JURY TRIAL DEMANDED ............................................................ 62

        PRAYER FOR RELIEF ................................................................... 62

Plaintiffs Fusion Elite All Stars, Spirit Factor LLC d/b/a Fuel Athletics, Stars and Stripes Gymnastics Academy Inc. d/b/a Stars and Stripes Kids Activity Center, Kathryn Anne Radek, Lauren Hayes, and Janine Cherasaro (collectively, "Plaintiffs") file this action, individually on behalf of themselves and as a class action on behalf of all others similarly situated, against Defendants Varsity Brands, LLC ("Varsity Brands"), Varsity Spirit, LLC ("Varsity Spirit"), Varsity Spirit Fashion & Supplies, LLC ("Varsity Fashion") (collectively, "Varsity"),[1] and Defendant U.S. All Star Federation, Inc. ("USASF") (Varsity and USASF together, "Defendants") for damages, injunctive relief, and any and all other relief that is available pursuant to federal antitrust laws.

Plaintiffs' allegations are based on personal knowledge as to Plaintiffs and Plaintiffs' own actions and upon facts emanating from the investigation conducted by and under the supervision of the undersigned counsel.

Plaintiffs demand a trial by jury on all issues so triable and complain and allege as follows:

## I. NATURE OF THE ACTION

1. Cheerleading is a multi-billion-dollar sport with over 4 million participating child and student athletes nationwide.

2. Varsity was founded by Jeffrey Webb in 1974. It has—through an anticompetitive scheme consisting of a series of intentional and methodical business maneuvers implemented in combination with the USASF—gained and maintained significant control of every aspect of "All Star Cheer," a specialized form of competitive cheerleading.

3. All Star Cheer is an elite, competitive type of cheerleading. The USA Federation for Sport Cheering ("USA Cheer"), the national governing body for cheerleading in the United States,[2] defines "All Star Cheer" as follows:

---

[1] Varsity Brands is the parent company of Varsity Spirit and Varsity Fashion. Though these defendants are three separate corporate entities, they share a single corporate headquarters and hold themselves out to the public as a single entity.

[2] https://www.usacheer.org/about.

All Star Cheer is a discipline of cheer that involves athletes performing a 2 1/2 minute routine composed of tumbling, stunting, pyramids, [and] dance.

All Star Cheer differs from traditional school cheerleading [sideline cheering] in that its primary purpose is competition, while school cheer involves crowd leading and other school roles as well as the option for competition. All Star cheer teams are most often organized and based out of a club and have teams who are open to all area athletes.[3]

4.      All Star Cheer is distinct from "sideline cheerleading." Whereas in sideline cheerleading, the cheerleaders cheer to support a team playing another sport—football or basketball, most commonly—the sole focus of All Star Cheer is cheerleading itself, particularly the gymnastic and acrobatic elements of cheerleading; there is no other sporting event happening on the field. "All Star Teams" are cheerleading squads that compete in All Star Cheer.

5.      All Star Cheer is a notoriously expensive team sport. A single season costs between $3,000 and $6,000 per All Star Team member.

6.      All Star Teams are fielded through privately owned and operated businesses ("All Star Gyms" or "Gyms") that organize training and practices. All Star Team membership is not conditioned on or related to enrollment in any particular school. All Star Gyms coordinate the All Star Teams' participation in "All Star Competitions"[4]—paying registration fees, organizing schedules and logistics, and purchasing their All Star Apparel.[5] All Star Team members ("All Star Cheerleaders") are highly skilled athletes who perform difficult and potentially dangerous gymnastic and acrobatic stunts. Team membership is highly coveted and competitive.

7.      All Star Competitions are events produced and promoted specifically for the All Star Teams and their spectators. Competitions are extremely important to success in All Star Cheer. For athletes, winning competitions is the goal: it is the gateway to championships, glory,

---

[3] https://www.usacheer.org/allstar.

[4] "All Star Competitions" are events at which several All Star Teams compete against each other—above the "recreational" level—in the choreographed performance of routines comprised of combinations of stunts, pyramids, dismounts, tosses, and/or tumbling.

[5] "All Star Apparel" includes clothing, shoes, accessories, and equipment purchased for use by All Star Cheerleaders at All Star Competitions and during All Star Team practices and training.

and university scholarships. For All Star Gyms, athlete recruitment and retention depend on their ability to win All Star Competitions. For event producers, team attendance at their All Star Competitions is how the producers earn revenues. For Varsity, control of the All Star Competition Market allows it to extract monopoly rents from members of the Class in many ways.

8. Plaintiffs claim that the conduct described herein violated, and continues to violate, Section 2 of the Sherman Antitrust Act, and that they and the members of the proposed Class were injured, and continue to be injured, by paying artificially inflated prices directly to Varsity for All Star Competitions and All Star Apparel. Plaintiffs seek equitable relief to stop Defendants' continuing anticompetitive conduct and money damages for injuries they incurred by paying artificially inflated prices to Varsity as a result of the anticompetitive conduct as alleged herein.

9. Over the past 15 years, Varsity has, in combination with USASF, acquired, enhanced, and maintained monopoly power in the All Star Competition Market (the "primary market") and the All Star Apparel Market (the "ancillary market") (collectively, the "Relevant Markets") in the United States through an unlawful scheme (the "Scheme," the "Exclusionary Scheme," or the "Challenged Conduct") consisting of exploiting its substantial market power in the Relevant Markets to, without limitation:

(a) impair and then buy up any actual or potential rivals that could possibly threaten Varsity's dominance in the Relevant Markets, including acquisitions of Varsity's biggest All Star Competition Market competitors (and many of its smaller rivals) as well as several All Star Apparel Market competitors;

(b) deploy its monopoly power in the primary All Star Competition Market to impose exclusionary agreements or terms on All Star Gyms, causing Gyms to agree, on their own behalf and on behalf of their members, to patronize Varsity exclusively (or nearly exclusively) in the primary All Star Competition Market as well as in the ancillary All Star Apparel Market. These agreements or terms (i) directly require the largest, highest sale volume All Star Gyms with the top Cheerleaders and Teams—necessary to put on successful All Star Competitions—to purchase All Star Apparel exclusively from Varsity

and to fill the limited number of events comprising their competition seasons with Varsity's All Star Competitions, to the exclusion of other All Star Competition and All Star Apparel companies; and (ii) condition the avoidance of paying penalty prices for goods and services in the All Star Competition and All Star Apparel Markets on exclusive or near exclusive patronage of Varsity in both Relevant Markets; and

      (c)      leverage its control of All Star Cheer's governing bodies, including USASF, to use the supposedly neutral rules and regulations of the sport as a pretext to impair actual and potential rivals directly in the primary market and indirectly in the ancillary market, forcing many potential rivals out of business or relegating them to "B-league" status.

10.     Varsity's systematic and continuing acquisition of All Star Competition rivals, combined with the other anticompetitive conduct alleged herein, has allowed it to acquire, maintain, and enhance control over all three national championships of consequence in competitive cheer—the Cheerleading World Championships ("Worlds"), The Summit, and the U.S. Finals (collectively, "All Star Championships").

11.     Varsity has used its control of the primary All Star Competition Market to acquire, enhance, and maintain monopoly power in the ancillary All Star Apparel Market by impairing and/or excluding actual and potential All Star Apparel rivals through the Exclusionary Scheme alleged herein. The All Star Cheer Competitions are, in part, market-dominant trade shows, and Varsity forbids or severely restricts would-be All Star Apparel competitors from displaying wares in those events' "showrooms." Moreover, Varsity rewards All Star Gyms that purchase Varsity's All Star Apparel for their All Star Cheerleaders to use in Varsity's market-dominant All Star Competitions, with extra points awarded at All Star Competitions.

12.     Given that Varsity's competitions are the dominant events and comprise the majority of an All Star Team's schedule, and that it would be prohibitively expensive for most participants to purchase multiple competition uniforms for a season, Varsity's exclusion of competing sellers of All Star Apparel has a powerful exclusionary effect. Varsity's conduct blocks

rivals from a key marketing channel that comprises the main, if not only reason, All Star Gyms buy All Star Apparel in the first place—for use at All Star Competitions.

13.     Varsity employs two types of exclusionary contracts with All Star Gyms, which it calls the "Network Agreement" and the "Family Plan," to maintain its dominance in the All Star Competition Market and to acquire, enhance, and maintain monopoly power in the All Star Apparel Market. Varsity focuses its exclusionary conduct on All Star Gyms because these Gyms recruit, train, organize, and maintain All Star Teams. All Star Gyms also select the All Star Competitions to attend and make purchasing decisions regarding the All Star Apparel to be used by their Teams. As such, All Star Gyms are a key input for producing a successful All Star Competition and the primary and necessary distribution channel for All Star Apparel.

14.     Varsity imposes its most exclusionary contracts, called Network Agreements, on the big-money and most prestigious All Star Gyms whose attendance is critical to putting on successful All Star Events and a key distribution channel for All Star Apparel. Under these Network Agreements, All Star Gyms are required to commit to near exclusive attendance at Varsity's All Star Competitions and completely exclusive patronage by the Gyms and their Team members of Varsity's All Star Apparel.

15.     Varsity also imposes restrictive terms on all of the other All Star Gyms through the Family Plan, which makes access to non-penalty prices on All Star Competitions and All Star Apparel contingent on All Star Gyms attending Varsity All Star Competitions for the vast majority of their seasons, and purchasing the vast majority of their and their members' All Star Apparel requirements from Varsity.

16.     During the Class Period (defined below), Varsity collectively controlled approximately 90% of the All Star Competition Market and 80% of the All Star Apparel Market. Varsity has used its dominant market power in the Relevant Markets to substantially foreclose competition in both markets and thereby maintain and enhance its dominance in both markets. In so doing, Varsity's Exclusionary Scheme has led to reduced output, supracompetitive prices, and reduced choice in both Relevant Markets. During the period relevant to this case, for instance, the

number and variety of All Star Competitions have fallen, the number of rivals in both Relevant Markets has dropped, prices in both markets have risen, and quality has diminished.

17.    Varsity has transformed "from its humble beginning to the global powerhouse organization it is today."[6] Currently, Varsity describes itself as "the worldwide leader" in "cheerleading . . . apparel, educational camps and competitions"[7] and "a leader in uniform innovation, as well as educational camps, clinics and competitions, impacting more than a million athletes each year."[8] Varsity's founder spun its dominant market position as follows:

> "[W]e were positioning ourselves to provide all the products and services that that affinity group [All Star Cheer participants] utilized. Not only did we have the number one position in those three segments [competitions, apparel, and camps], but then we developed a cross-marketing model where we could promote [the segments within each other] and to be honest with you, it took off."[9]

18.    Now firmly in control of the All Star Competition Market, Varsity dictates all aspects of it, including, *inter alia*:

      (a)    who can film and distribute video taken at competitions;

      (b)    what music can be used during routines;

      (c)    who can judge competitions;

      (d)    who can coach teams at competitions (by requiring a USASF certification);

      (e)    who can sell apparel at competitions;

      (f)    what apparel can be worn by All-Star Teams at competitions;

      (g)    which hotels teams can stay at when they travel to competitions;

      (h)    which competitions can offer bids to the year-end championships; and

---

[6] *See* "Varsity Legends," Varsity, https://www.varsity.com/about/legends/ (last accessed Aug. 25, 2020).

[7] https://www.varsity.com/about/.

[8] https://www.varsitybrands.com/spirit.

[9] Varsity Brands Founder On The Big Business Of Cheerleading, *Chief Executive Magazine* (Oct. 29, 2018), *available at* https://chiefexecutive.net/varsity-brands-big-business-cheerleading/.

(i)      which competition producers can use the USASF-sanctioned and copyrighted scorebook.

19.      As one person with knowledge of the industry stated, "Varsity is not just one thing . . . it's the whole kit and caboodle. There is no doubt about it, Varsity controls cheerleading."[10] Even the President of Varsity Spirit, Bill Seely, was forced to acknowledge that he "understand[s]" the observation that Varsity controls cheerleading.[11] With each hook into another aspect of All Star Cheer, Varsity has further entrenched its monopoly position in at least two relevant markets and its ability to extract additional monopoly rents from members of the Class.

20.      There is not a corner of the All Star Cheer industry that Varsity does not currently control or has not set out to seize. And the President of Varsity Spirit brazenly stated, "I don't apologize for what we do."[12] The consequence has been reduced competition in the Relevant Markets as well as overcharges to Plaintiffs, and members of the Class.

21.      Defendants' Exclusionary Scheme had the intended purpose and effect of unreasonably restraining and injuring competition. But for Defendants' illegal conduct, there would have been increased competition in the Relevant Markets, leading to lower prices for All Star Competitions, All Star Apparel, and related goods; more events; and higher quality, including, in all likelihood, better oversight to eliminate the sexual predation and harassment that have been allowed to persist in this industry for far too long. As a direct and proximate result of Varsity's unlawful and anticompetitive Exclusionary Scheme, Plaintiffs and the Class (defined below) have paid higher prices for All Star Competitions, All Star Apparel, and related goods and services bought directly from Varsity than they would have paid in a competitive marketplace absent the Exclusionary Scheme, and have thereby suffered, and continue to suffer, antitrust injury.

---

[10] *See* Natalie Adams, co-author of <u>Cheerleader! An American Icon</u>, *Cheer* (Netflix 2020).

[11] *See Cheer* (Netflix 2020).

[12] *See* Bill Seely, *Cheer* (Netflix 2020).

## II.    JURISDICTION AND VENUE

22.    Plaintiffs and the Class bring this action against Defendants under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, seeking equitable and injunctive relief and actual and exemplary damages against Varsity for violating Section 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiffs and the Class also seek attorneys' fees, costs, and all other expenses allowed under federal law.

23.    This Court has jurisdiction over the subject matter of this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), Section 2 of the Sherman Act (15 U.S.C. § 2), and 28 U.S.C. §§ 1331 and 1337.

24.    Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. §§ 1391 (b), (c), and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and Defendants are licensed to do business in, have their principal places of business in, are doing business in, had agents in, or are found or transact business in this District.

25.    This Court has *in personam* jurisdiction over Defendants because they, either directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly sold or marketed goods and services in the Relevant Markets throughout the United States as a whole, including in this District; (c) had substantial aggregate contacts within the United States, including in this District; or (d) engaged in an illegal scheme to maintain and enhance monopoly power that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States. Furthermore, Defendants each have their principal places of business in this District.

26.     Defendants engaged in conduct inside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

27.     Defendants' activities were within the flow of, and were intended to and did have a substantial effect on, interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

28.     By reason of the unlawful activities hereinafter alleged, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and the geographically dispersed Class members. Defendants, directly and through their agents, engaged in activities affecting all states to obtain and maintain monopolistic power in the Relevant Markets and charge supracompetitive prices to Plaintiffs and the Class for All Star Competitions and All Star Apparel, unreasonably restrained trade, and adversely affected the above-described markets.

### III.   PARTIES

29.     Plaintiff Fusion Elite All Stars ("Fusion") is incorporated in the State of California and has its primary place of business in Hollister, California. Plaintiff Fusion is, and at all relevant times hereto has been, an All Star Gym sponsoring an All Star Team. Plaintiff Fusion directly and repeatedly purchased All Star Apparel manufactured and sold by Varsity during the Class Period (defined below). Plaintiff Fusion directly and repeatedly paid Varsity for enrollment in All Star Competitions during the Class Period. Plaintiff Fusion paid artificially inflated prices for goods and services purchased directly from Varsity in both of the Relevant Markets during the Class Period, and thus has suffered, and will continue to suffer, economic harm and damages as a direct and proximate result of Varsity's unlawful conduct.

30.     Plaintiff Spirit Factor LLC d/b/a Fuel Athletics ("Spirit Factor") is incorporated in the State of Florida and has its primary place of business in Altamonte Springs, Florida. Plaintiff Spirit Factor is, and at all relevant times hereto has been, an All Star Gym sponsoring an All Star Team. Plaintiff Spirit Factor directly and repeatedly purchased All Star Apparel manufactured and

9

sold by Varsity during the Class Period (defined below). Plaintiff Spirit Factor directly and repeatedly paid Varsity for enrollment in All Star Competitions during the Class Period. Plaintiff Spirit Factor paid artificially inflated prices for goods and services purchased directly from Varsity in both of the Relevant Markets during the Class Period, and thus has suffered and will continue to suffer economic harm and damages as a direct and proximate result of Defendants' unlawful conduct.

31.    Plaintiff Stars and Stripes Gymnastics Academy, Inc. d/b/a Stars and Stripes Kids Activity Center ("Stars & Stripes") is incorporated in Michigan and has its primary place of business in Clarkston, Michigan. Plaintiff Stars & Stripes directly and repeatedly purchased All Star Apparel manufactured and sold by Varsity during the Class Period (defined below). Plaintiff Stars & Stripes directly and repeatedly paid Varsity for enrollment in All Star Competitions during the Class Period. Plaintiff Stars & Stripes paid artificially inflated prices for goods and services purchased directly from Varsity in both of the Relevant Markets during the Class Period, and thus has suffered economic harm and damages as a direct and proximate result of Defendants' unlawful conduct.

32.    Plaintiff Kathryn Anne Radek is a natural person and citizen of the state of Illinois and a resident of Lexington, Illinois. Plaintiff Radek is the parent of a former All Star Cheerleader who, during the Class Period (as defined below), participated in All Star Competitions. Plaintiff Radek's son was a member of the Premier Athletics All Star Gym in Murfreesboro, Tennessee from 2018 to 2019. During that time period, Plaintiff Radek's son competed in multiple Varsity-owned All Star Competitions, including The JAM Brands, COA Cheer & Dance, One Up, and Spirit Festival events. As the parent of an All Star Cheerleader, Plaintiff Radek directly paid Varsity in the form of fees to watch her son compete during the Class Period. Plaintiff Radek paid artificially inflated prices directly to Varsity and thus has suffered economic harm and damages during the Class Period as a direct and proximate result of Defendants' conduct.

33.    Plaintiff Lauren Hayes is a natural person and citizen of the state of Pennsylvania and a resident of Milford, Pennsylvania. Plaintiff Hayes is the parent of an All Star Cheerleader

who, during the Class Period (as defined below) and continuing presently, participated in All Star Competitions. Plaintiff Hayes's daughter has been an All Star Cheerleader since approximately 2016, as a member of both the World Cup All Stars gym in Olyphant, Pennsylvania and the Cheer Factory All Star Gym in Milford, Pennsylvania. Plaintiff Hayes's daughter competed in multiple Varsity-owned All Star Competitions during the Class Period. As the parent of an All Star Cheerleader, Plaintiff Hayes directly paid Varsity in the form of fees to watch her daughter compete during the Class Period. Plaintiff Hayes paid artificially inflated prices for goods and services purchased directly from Varsity, and thus has suffered economic harm and damages, and continues to suffer economic harm and damages, as a direct and proximate result of Defendants' conduct.

34.     Plaintiff Janine Cherasaro is a natural person and citizen of the state of Pennsylvania and a resident of Shohola, Pennsylvania. Plaintiff Cherasaro is the parent of an All Star Cheerleader who, during the Class Period (as defined below), participated in All Star Competitions. Plaintiff Cherasaro's daughter has been, and continues to be, an All Star Cheerleader since 2017, as a member of both the World Cup All Stars gym in Olyphant, Pennsylvania and the Quest Athletics All Star Gym in Pine Bush, New York. Plaintiff Cherasaro's daughter competed in multiple Varsity-owned All Star Competitions. As the parent of an All Star Cheerleader, Plaintiff Cherasaro directly paid Varsity in the form of fees to watch her daughter compete during the Class Period. Plaintiff Cherasaro paid artificially inflated prices directly to Varsity, and will continue to do so, and thus has suffered economic harm and damages, and will continue to suffer economic harm and damages, as a direct and proximate result of Defendants' conduct.

35.     Defendant Varsity Brands—formally known as Varsity Brands, Inc.—is a Delaware corporation with its principal place of business in Memphis, Tennessee. It is the parent company of Defendants Varsity Spirit and Varsity Fashion. Varsity Brands—directly and/or through its affiliates, which it wholly owned and/or controlled—organized, promoted, produced, and/or managed All Star Competitions throughout the United States, including in this District, at

all times relevant to this Complaint. Varsity Brands—directly and/or through its affiliates, which it wholly owned and/or controlled—manufactured, distributed, marketed, and/or sold All Star Apparel that was sold and purchased throughout the United States, including in this District, at all times relevant to this Complaint.

36.    Defendant Varsity Spirit—formally known as Varsity Spirit Corp.—is a Tennessee corporation with its principal place of business in Memphis, Tennessee. Varsity Spirit markets cheerleader and dance team uniforms and accessories to the youth, junior high, high school and college markets, and offers cheerleader and dance team camps, conducts televised cheerleading and dance team championships, organizes domestic and international travel tours and sponsors special events for school spirit groups. Varsity Spirit—directly and/or through its affiliates, which it wholly owned and/or controlled—organized, promoted, produced, and/or managed All Star Competitions throughout the United States, including in this District, at all times relevant to this Complaint. Varsity Spirit—directly and/or through its affiliates, which it wholly owned and/or controlled—manufactured, distributed, marketed, and/or sold All Star Apparel that was sold and purchased throughout the United States, including in this District, at all times relevant to this Complaint.

37.    Defendant Varsity Fashion—formally known as Varsity Spirit Fashion & Supplies, Inc.—is a Minnesota corporation with its principal place of business in Memphis, Tennessee. Varsity Fashion designs and markets sweaters, sweatshirts, jumpers, vests, skirts, warm-up suits, t-shirts, shorts, pompons, socks, jackets, pins, and gloves. Varsity Fashion—directly and/or through its affiliates, which it wholly owned and/or controlled—manufactured, distributed, marketed, and/or sold All Star Apparel that was sold and purchased throughout the United States, including in this District at all times relevant to this Complaint.

38.    Varsity has been privately held since 2003. It was acquired by its current owner, Bain Capital, LP, in 2018 for approximately $2.5 billion.

39.    Defendant USASF is a Tennessee non-profit corporation with its principal place of business in Memphis, Tennessee. USASF—directly and/or through its affiliates, which it wholly

owns and/or controls—has promulgated and/or enforced rules governing All Star Competitions and, more broadly, the sport of All Star Cheer throughout the United States, including in this District, at all times relevant to this Complaint. USASF—directly and/or through its affiliates, which it wholly owns and/or controls—organized, promoted, produced, and/or managed All Star Competitions throughout the United States, including in this District, at all times relevant to this Complaint.

## IV.    CLASS ALLEGATIONS

40.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief, as well as damages, on behalf of the following class (the "Class"):

> All natural persons or entities in the United States that directly paid Varsity or any wholly or partially owned Varsity subsidiary from May 26, 2016 until the continuing Exclusionary Scheme alleged herein ends (the "Class Period") for: (a) registration, entrance, or other fees and expenses associated with participation by an All Star Team or Cheerleader in one or more All Star Competitions; and/or (b) All Star Apparel.

41.    Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, franchisees, officers, executives, and employees; any entity that is or has been partially or wholly owned by one or more Defendants or their respective subsidiaries; States and their subdivisions, agencies and instrumentalities; and any judicial officer presiding over this matter and his or her staff.

42.    While Plaintiffs do not know the exact number of Class members, there are (at least) thousands of members in the proposed Class, who are geographically dispersed throughout the United States.

43.    Common questions of law and fact exist as to all members of the Class. Defendants' anticompetitive Exclusionary Scheme was commonly implicated and was generally applicable to all of the Class members, thereby making class-wide adjudication and relief appropriate. Such questions of law and fact common to the Class include, but are not limited to:

(j)       whether the All Star Competition and All Star Apparel Markets are appropriate relevant markets for analyzing the claims in this case;

(k)       whether the relevant geographic market is the United States;

(l)       whether Varsity possesses monopoly power in one or both of the Relevant Markets;

(m)      whether Varsity willfully acquired, maintained, and/or enhanced monopoly power in the Relevant Markets;

(n)      whether Varsity and USASF conspired to assist Varsity in maintaining and/or enhancing monopoly power in one or both of the Relevant Markets;

(o)      whether Varsity and USASF engaged in overt acts furthering their conspiracy to maintain and enhance Varsity's dominance in one or both of the Relevant Markets;

(p)      whether Defendants engaged in unlawful exclusionary conduct to impair the opportunities of actual or potential rivals in one or both of the Relevant Markets, and thereby substantially foreclosed competition in one or both of those markets;

(q)      whether Defendants' Exclusionary Scheme maintained or enhanced Varsity's monopoly power in one or both of the Relevant Markets;

(r)      whether Defendants' Exclusionary Scheme violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

(s)      whether Defendants' Exclusionary Scheme had anticompetitive effects in one or both of the Relevant Markets;

(t)      whether Defendants' actions alleged herein caused injury to Plaintiffs and the Class members by causing them to pay artificially inflated prices in one or both of the Relevant Markets during the Class Period;

(u)      the appropriate measure of damages; and

(v)      the propriety and scope of declaratory and/or injunctive relief.

44.     The Class members are so numerous and geographically dispersed that joinder of all members is impracticable. Although the precise number of such individuals, organizations, and businesses is currently unknown, Plaintiffs believe that the number of Class members is, at minimum, in the thousands, and that the members reside or are located throughout the United States, including in this District.

45.     Plaintiffs' claims are typical of those of the Class they seek to represent. Plaintiffs, like all other Class members, have been injured by Defendants' Exclusionary Scheme and Varsity's illegally obtained monopoly power that resulted in artificially inflated prices in the Relevant Markets.

46.     Plaintiffs are more than adequate representatives of the Class, and their chosen class counsel (the undersigned) are more than adequate attorneys. Plaintiffs have the incentive and commitment to prosecute this action for the benefit of the Class. Plaintiffs have no interests that are antagonistic to those of the Class. Plaintiffs have retained counsel highly experienced in antitrust and class action litigation.

47.     This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Defendants have acted and refused to act on grounds that apply generally to the Class, and final injunctive and declaratory relief is appropriate, and necessary, with respect to the Class as a whole.

48.     This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons, organizations, and businesses to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to

litigate an antitrust claim such as that asserted in this Complaint. Plaintiffs are aware of no difficulties that would render this case unmanageable.

49.     Plaintiffs and the members of the Class have all suffered antitrust injury and damages as a result of Defendants' Exclusionary Scheme and Varsity's acquisition, enhancement, or maintenance of monopoly power in the Relevant Markets. Such antitrust injuries and damages are ongoing.

50.     Plaintiffs are not suing as part of this case, on behalf of themselves or any proposed Class member, to enforce any rights or provisions in any particular contracts they had with Varsity or USASF. Nor are Plaintiffs in this matter claiming, as part of this case, on behalf of themselves or any proposed Class member, that any of their Varsity or USASF contracts, standing alone, violates or violated the antitrust laws. Rather, Plaintiffs allege that the Varsity contracts with All Star Gyms—and one or more of the exclusionary provisions therein—taken together form part of Defendants' Exclusionary Scheme to impair actual or potential rivals and enhance Varsity's monopoly power in both Relevant Markets. Cumulatively, the exclusionary contractual provisions, together with other aspects of the Scheme, deprived Varsity's would-be rivals of access to critical inputs and to customers in both Relevant Markets, and thereby foreclosed competition, and caused anticompetitive effects in both markets.

## V.     AGENTS & CO-CONSPIRATORS

51.     The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' business or affairs.

52.     Various persons and/or firms not named as defendants herein may have participated as co-conspirators in the Exclusionary Scheme alleged herein and may have performed acts and made statements in furtherance thereof. Plaintiffs reserve the right to name some or all of these persons as defendants at a later date.

53.     At all times relevant to this Complaint, Varsity and USASF conspired to facilitate Varsity's monopolization of the Relevant Markets.

54.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

55.     Each Defendant acted as the principal, agent, or joint venturer of, or for, other defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.

56.     Individuals alleged to have engaged in misconduct in violation of the federal laws listed herein are alleged to have done so on behalf of all members of their corporate family, *i.e.*, Varsity. Individuals within the companies and customers did not know or did not distinguish between the corporate affiliations of different individuals. Varsity Brands, Varsity Spirit, and Varsity Fashion all affirmatively and collectively represent themselves as one corporate family, rather than separate subsidiaries and parents. For instance, and without limitation, the Varsity Brands website states "WE ARE . . . Varsity Spirit."

## VI.     INTERSTATE TRADE & COMMERCE

57.     Defendants' anticompetitive and unlawful conduct as alleged herein has taken place in and substantially affected the continuous flow of interstate trade and commerce in the United States by:

(a)     organizing, promoting, and managing All Star Competitions throughout the United States; and

(b)     manufacturing, distributing, marketing, and selling All Star Apparel throughout the United States.

58.     The Challenged Conduct alleged herein affected billions of dollars of commerce. During the Class Period, Varsity collectively controlled approximately 90% of the commerce in the All Star Competition Market and 80% of the commerce in the All Star Apparel Market in the United States. Plaintiffs and the proposed Class members collectively paid hundreds of millions of dollars directly to Varsity for All Star Competitions and Apparel. Defendants have inflicted

antitrust injury by foreclosing competition by actual and potential rivals and artificially inflating prices paid by Plaintiffs and the Class members, all of whom have been engaged in commerce, in both Relevant Markets, during the Class Period.

## VII.    FACTUAL ALLEGATIONS

### A.    History & Background

59.    Cheerleading is not just a sideshow—it is a competitive sport with roughly four million athletes on thousands of teams, from 70 countries, that generates billions of dollars a year in revenue. Cheerleading is so lucrative, and Varsity so powerful, that even during the COVID-19 worldwide pandemic, with its own competitions on hold, Varsity has been able to generate money, raising approximately $185 million in new capital in less than a 10-day period in late spring 2020.[13]

60.    Between 100,000 and 450,000 athletes participate in All Star Cheer.[14] All Star Cheer is athletically rigorous and technically challenging. It requires a significant amount of strength, flexibility, endurance, effort, coordination, and cooperative teamwork.

61.    All Star Cheer routines involve two types of tumbling—running tumbling and standing tumbling. Both types involve gymnastic-like skills, such as back handsprings and back tucks. In a tumbling section, most passes are performed by multiple athletes, if not by the entire team, at the same time. Only the athletes with the most difficult passes will tumble without a partner in a running tumbling section.

62.    Stunting involves up to four athletes, known as bases, backers, and front spots, elevating another cheerleader, known as the flyer, in the air. One popular type of stunt is a basket toss, where the bases release the flyer by tossing her high into the air so she can perform mid-air

---

[13] *See* Natalie Walters, "Cheerleading giant Varsity Brands gets $185 million in new capital to power through pandemic," The Dallas Morning News, June 22, 2020, https://www.dallasnews.com/business/local-companies/2020/06/22/cheerleading-giant-varsity-brands-gets-185-million-in-new-capital-to-power-through-pandemic/ (last accessed Aug. 25, 2020).

[14] USA Cheer STUNT NCAA Proposal 2011 at 43, *available at* https://files.varsity.com/uploads/pdfs/USACheer_STUNT_videolinkSM.pdf.

tricks, such as twists, before landing. Together, these athletes form what is known as a "stunt group," and multiple stunt groups can connect to form a pyramid.

63.    Dance in an All Star Cheer routine is high-energy, drill style and may involve typical cheerleading movements such as "high-V's," a motion executed by lifting the arms to resemble the letter "V;" "low-V's," a motion executed by slightly raising the arms to resemble an upside-down letter "V;" "T's," a motion executed by lifting the arms to resemble the letter "T;" and "touchdowns," a motion executed by raising the arms by the ears.

64.    All of these skills are necessary to excel in All Star Competitions. "Anyone can tumble from corner to corner, but it's the routines with perfect sync, creative formations and precise execution that stand out to the judges."[15]

65.    Lawrence Herkimer, known as the father of modern cheerleading, founded the National Cheerleaders Association ("NCA") in 1948. Herkimer patented the pom-pom and created the "Herkie jump," one of the earliest athletic components added to cheer, while attending Southern Methodist University. Under Herkimer, the NCA ran cheer camps and sold sweaters and skirts. At the time, there were no cheerleading competitions, nor did All Star Cheer exist.[16]

66.    Jeff Webb, Varsity's founder and former CEO, went to work at the NCA after completing his cheerleading career at the University of Oklahoma in the late 1960s. Webb quickly rose up the ranks, but his view of cheerleading's future differed from Herkimer's. While Herkimer explained to Sports Illustrated in 1991 that "[o]ur people are teachers, not showoffs," Webb "hired hot dogs." In 1974, Webb left the NCA and took some of Herkimer's top employees with him to form his own cheerleading business, the Universal Cheerleaders Association ("UCA"), which was

---

[15] *See* "Tumbling Passes to Watch from the Summit," Varsity, Jan. 4, 2017, https://www.varsity.com/news/tumbling-passes-to-watch-from-the-summit/ (last accessed Aug. 25, 2020).

[16] https://www.houstonpress.com/news/varsity-brands-owns-cheerleading-and-fights-to-keep-it-from-becoming-an-official-sport-7606297.

similar to the NCA but with Webb's own added twists: more focus on gymnastics-like skills and new tournaments created solely for cheer squads.[17]

67.     During the early 1980s, a number of cheerleading squads not associated with a school or a sports league, whose main objective was competition, began to emerge. The first organization to call its participants "All Stars" and go to competitions was the Q94 Rockers from Richmond, Virginia, founded in 1982. Prior to 1987, the NCA placed All Star Teams into the same divisions as teams that represented schools and sports leagues.

68.     In 1986, the NCA created a separate division for teams lacking a sponsoring school or athletic association, calling it the All Star Division and debuting it at its 1987 cheer competitions. As the popularity of this type of "All Star" team grew, more and more of them were formed, attending competitions sponsored by many different organizations and companies, each using its own set of rules, regulations, and divisions.[18] Today, the NCA-produced All Star Competition NCA All Star Nationals is a prestigious All Star Competition that hosts over 25,000 participants and 38,000 spectators each year.

69.     Webb's new business, the UCA, ultimately became Varsity, and soon outgrew its only rival, Herkimer's NCA. The UCA is currently the largest cheerleading camp company in the world. The UCA trains over 180,000 cheerleaders, mostly high schoolers, every summer at over 3,200 sessions across the United States. The UCA's registered trademark is "WE ARE CHEERLEADING®."[19]

70.     In 2004, Varsity bought the National Spirit Group, thereby acquiring ownership and control of Herkimer's NCA.[20]

---

[17] *Id.*

[18] Smith, Jennifer Renèe, "The All Star Chronicles," American Cheerleader, 13 (1): 40-42 (Feb. 2007).

[19] *See* "About Universal Cheerleaders Association," Varsity, https://www.varsity.com/uca/about/ (last accessed Aug. 25, 2020).

### B. All Star Cheer's "Governing" Bodies

71.     In 2003, cheerleading coaches formed an independent 501(c)(3) organization, called the National All Star Cheerleading Coaches Congress ("NACCC"), to establish uniform rules for All Star Cheer. In 2004, Varsity—along with the NCA, CheerSport, and America's Best—created the USASF with the same goal of setting uniform rules and judging standards for All Star Competitions.[21] Defendant USASF acquired NACCC in 2005.

72.     USASF proudly holds itself out as "the national authority for All Star."[22] What USASF does not advertise, though, is how it is inextricably tied to and controlled by Varsity.

73.     USASF has always been captive to Varsity. Varsity funded the USASF at its inception in 2003 with an interest-free $1.8 million loan. Indeed, USASF's financial statements acknowledged, "[p]erhaps the most significant news for the organization in 2013 was the repayment to Varsity Spirit Corporation of the startup loan that funded the USASF launch in 2003."[23] Until recently, USASF employees worked at Varsity's headquarters in Tennessee, and USASF's office is currently still mere miles away from Varsity's headquarters.

74.     Additionally, Varsity submitted the original trademark application for the marks "U.S. All Star Federation" and "USASF," listing itself as owner; USASF employees used their Varsity e-mail addresses for official USASF business; USASF employees were paid directly by Varsity; Varsity cashed checks issued to USASF; and Varsity owned the URL at which USASF's website is located, though it now tries to conceal that connection through the registration of "PERFECT PRIVACY, LLC."[24]

---

[21] Varsity was operating as the UCA when it founded USASF. Since USASF's formation, Varsity has acquired all of USASF's founders—NCA, CheerSport, and America's Best.

[22] *See* "U.S. All Star Federation," USASF, https://www.usasf.net/ (last accessed Aug. 25, 2020).

[23] *See* "USASF 2013 Annual Report," USASF, https://usasfmain.s3.amazonaws.com/Organization/docs/annual/USASF_AnnualReport_2013.pdf (last accessed Aug. 25, 2020).

[24] *See* "Who REALLY has the power in USASF??," Cheergyms, https://cheergyms.activeboard.com/t5660100/who-really-has-the-power-in-usasf/ (last accessed July 21, 2020).

75.     Moreover, for years, USASF's offices were located at Varsity's corporate address, with Varsity providing office services to USASF. Indeed, USASF's bylaws actually require that it be located in Memphis, Tennessee—also the home of Varsity's headquarters:

> Article I – Name and Location The name of this organization is the U.S. All Star Federation, Inc. ("the Corporation"). The principal office of the Corporation shall be at such place, as the Board of Directors shall determine within the City of Memphis, Shelby County, Tennessee.[25]

76.     For at least some period of time, USASF's and Varsity's finances were intermingled such that USASF employees received their paychecks from Varsity. In accordance with the explicit bylaws of USASF, a permanent majority of USASF's voting board members are allocated to seven All Star Competition brands (UCA, CheerSport, NCA, USA, American Cheerleaders Association, Universal Dance Association, and JAMFest). Varsity currently owns *all* of these brands.

77.     USASF is a "member" of USA Cheer.[26] USA Cheer is the national governing body for cheerleading in the United States. It was founded in 2007 and has three primary objectives: to help grow and develop interest and participation in cheer throughout the United States; promote safety and safety education for cheer in the United States; and represent the United States of America in international cheer competitions.

78.     USA Cheer and the American Association of Cheerleading Coaches and Administrators ("AACCA") merged in 2018. The AACCA was founded by Webb in 1987.

79.     USA Cheer shares its address and telephone number with Varsity and does not have any employees. Instead, it contracts with Varsity Spirit to use Varsity's employees as needed. The USA Cheer President, Bill Seely, is also the President of Varsity Spirit. Two of the three USASF Vice Presidents and the Executive Director are current and former Varsity employees.

---

[25] *See id.*

[26] https://www.usacheer.org/allstar.

80. According to USA Cheer, "most" All Star Gyms, All Star Teams, and All Star Competitions "are under the umbrella of" USASF,[27] meaning that USASF rules govern most All Star Gyms, All Star Teams, and All Star Competitions. USASF uses that control to require that All Star Gyms, All Star Cheerleaders, and All Star Team coaches join USASF and pay annual membership dues to participate in USASF-sanctioned All Star Competitions, primarily those owned and produced by Varsity.

### C.  All Star Competitions

81. All Star Teams compete against one another at one- or two-day All-Star Competitions, often travelling great distances depending on the event. All Star Cheerleaders practice for multiple hours a week, all year long, to perfect their performances for about half a dozen of these events each year.

82. According to Varsity:

> At a typical cheerleading competition, teams perform a 2 and a half minute routine with music that includes stunts, jumps, tumbling. Teams are judged by a panel of cheerleading experts on difficulty and execution. The winner in each division gets a trophy and bragging rights.[28]

83. But at these competitions, much more than bragging rights are at stake. When colleges consider recruiting athletes for their cheerleading teams, they look to All Star Gyms before looking at high schools in search of potential team members. All Star Cheer Athletes may also be awarded scholarships. For instance, the Varsity-owned COA Cheer & Dance competition provides athletes with the opportunity to win a $1,000 scholarship through the Shirley A. Wedge National Cheer and Dance Scholarship Fund. This is one reason All Star Gyms need to be as successful as possible—that is how they attract the best athletes.

84. There are hundreds of All Star Competitions across the nation annually. Varsity alone puts on over 600 regional and national events, which it brands under over 50 unique banners,

---

[27] *Id.*

[28] *See* "What is Competitive Cheerleading?," Varsity, Feb. 20, 2018, https://www.varsity.com/news/what-is-competitive-cheerleading/ (last accessed Aug. 25, 2020).

thereby hiding from the average person that, in fact, each of these events is a Varsity event. Varsity's All Star Competitions attract 900,000 athletes overall. Some of the larger All Star Competitions may each attract tens of thousands of athletes and have over 1,000 All Star Teams competing. Varsity hosts one event in Myrtle Beach, for example, that brings in 500 teams annually. Two-day events tend to have more teams than one-day events, which typically have between 50 and 100 teams. The maximum number of All Star Cheer Athletes that can participate on one All Star Team at a competition depends on the division and age group but can be as high as 38 people.

85.     Most All Star Teams attend a limited number of All Star Competitions per season, usually between five and eight (and only sometimes as high as ten). The business model for All Star Competitions depends on teams attending, paying entrance fees, and bringing their families along with them.

86.     All Star Teams set their competition event schedule with the goal of maximizing their chances to earn a Bid to one or more of the three recognized championships for All Star Cheerleading: Worlds, The Summit, and the U.S. Finals, as described further below. Competitions that offer Bids to an All Star Championship event are therefore much more attractive to All Star Teams.

87.     "Bids" are highly coveted formal invitations to compete in these All Star Championships. All Star Teams cannot attend the All Star Championships without one. Thus, earning Bids to All Star Championships (particularly Worlds), and ultimately succeeding at those All Star Championships, is the primary goal of All Star Teams. All Star Teams earn these Bids by attending and succeeding at All Star Competitions that have the ability to offer Bids.

88.     Bids can be Fully Paid, which, as the name implies, means the All Star Competition producer pays the All Star Team's entry fees and all travel and hotel costs; Partially Paid, meaning the All Star Competition producer pays only a partial amount (typically covering entry fees but not travel or hotel costs); or At-Large, meaning the All Star Team can compete but must pay its own way. All Star Competition producers with the rights to confer the Bids determine how those

24

Bids are awarded. Typically, Fully Paid Bids are awarded to first place winners of major USASF-sanctioned All Star Competitions. Partially Paid and At-Large Bids are earned by All Star Teams at other USASF-sanctioned All Star Competitions. Because an All Star Team cannot attend an All Star Championship without a Bid, the limited number of Bids makes them highly coveted and prestigious.

### D.  All Star Championships

89.    As noted above, there are three All Star Championships: The Worlds, The Summit, and the U.S. Finals. USASF owns The Worlds, while Varsity owns The Summit and the U.S. Finals, as depicted here:



### 1.  The Worlds

90.    The Worlds is owned, produced, and promoted by Varsity-controlled USASF and the International All Star Federation ("IASF"). The IASF, which provides rules, credentialing, and opportunities in cheer and dance, was a part of the USASF until 2016.

91.    The Worlds began in 2004 with two divisions. Today, it includes over 20 divisions and hosts hundreds of teams and thousands of athletes each year at Walt Disney World's ESPN Wide World of Sports in Orlando, Florida. It is the final end-of-season event for senior level elite

All Star teams. Out of six "levels" of athletes, only Levels 5 and 6—the highest and most advanced levels—were historically eligible to compete at Worlds. Beginning in 2020, a seventh level was added, and now Levels 5-7 are eligible to compete.

92.     To attend Worlds, an All Star Team must receive a Bid from a qualifying All Star Competitions with the right to award Worlds Bids. USASF, under the control of Varsity, decides which All Star Competitions have the right to award Bids to Worlds. According to USASF rules, only "Tier 1" All Star Competition producers can offer Fully Paid Bids to Worlds.

93.     Varsity and USASF severely restrict competition in the All Star Competition Market by limiting the number of All Star Competitions that can produce Bids to Worlds at 42. Varsity owns 33 of the All Star Competitions with the right to award Bids to Worlds. USASF also allocates the *number* of Bids that each of those 42 All Star Competitions may award, and each All Star Competition may award two to eight Bids. USASF has awarded Varsity the vast majority, so Varsity controls more than 80% of Worlds' Bids.

94.     Perhaps unsurprisingly, given Varsity's control over USASF, despite not officially being a Varsity-produced event, Worlds looks and feels and is run exactly like a Varsity event, and participants think of it as a Varsity event.

### 2.     The Summit

95.     Varsity owns, produces, and promotes The Summit, which it founded in 2013.

96.     The Summit hosts 1,500 All Star Teams in over 35 divisions. It is designed as a high-caliber event open to all levels, so athletes may range from Levels 1-6. This makes it the elite event for All Star Teams that cannot otherwise qualify for Worlds. Like Worlds, it is held each year at Disney's ESPN Wide World of Sports.

97.     All Star Teams must receive a Bid to attend The Summit. As the event producer of The Summit, Varsity unilaterally decides which All Star Competitions have the authority to award Bids to The Summit and the U.S. Finals. Varsity uses its market dominance to restrict competition by allocating 100% of The Summit Bids to the All Star Competitions it owns and operates.

98.     In the 2019-20 season, there were 301 All Star Competitions, all owned by Varsity, that had the right to award Bids to The Summit.

### 3.     The U.S. Finals

99.     Finally, the U.S. Finals, founded in 2009, is also owned, produced, and promoted by Varsity.

100.     The U.S. Finals takes place in multiple locations and then the scores from the various locations are compared. In the 2020-21 season, for instance, the U.S. Finals are scheduled to be hosted in Myrtle Beach, South Carolina; Sevierville, Tennessee; Grapevine, Texas; Louisville, Kentucky; Pensacola, Florida; Anaheim, California; Worcester, Massachusetts; Kansas City, Missouri; and Virginia Beach, Virginia. Over 1,000 All Star Teams, ranging from Levels 1-6 participate.

101.     In order to participate in a U.S. Finals event, an All Star Team must receive a Bid. Varsity decides which All Star Competitions have the authority to award Bids to the U.S. Finals.

### E.     All Star Apparel

102.     All Star Apparel includes clothing, shoes, accessories, and equipment purchased for use by All Star Cheerleaders at All Star Competitions and during All Star Team practices and training.

103.     For practices, All Star Cheerleaders wear lightweight, breathable athletic wear typically made of spandex, microfiber, or cotton materials. To travel to and from practice, athletes may have team sweatshirts or jackets, and team sweatpants. Athletes may store this outerwear in a backpack or duffle bag. During practice, athletes wear shorts or leggings, and a t-shirt, tank top, or long-sleeved shirt. Female athletes also wear sports bras and may wear that in lieu of another type of top. Since female athletes typically fulfill the role of the flyer during stunting, female practice All Star Apparel will usually be skin-tight, so that the athletes catching her on the ground do not get caught in it. Finally, all athletes wear sneakers during practices.

104.    Each individual piece of this All Star Apparel, including the backpack or duffle bag, may be team- or gym-branded. An All Star Gym may require all athletes on an All Star Team to match during any given practice. Athletes must therefore always be prepared with several sets of clothing.

105.    For All Star Competitions, athletes wear entirely matching sets of All Star Apparel. This includes warms up outfits (jackets, sweatshirts, and sweatpants), hair bows for female athletes, and uniforms. For male athletes, a uniform consists of pants and a top. For female athletes, a uniform consists of a skirt, briefs, and either a crop top or a crop top and "shell" top over it. These clothes may be carried in a backpack or duffle bag.

106.    All Star Apparel is an important aspect of All Star Competitions. USASF rules govern every detail of what All Star Cheerleaders may wear in a competition.[29] Soft-soled shoes—like those Varsity manufactures and sells—are required. Skirts, briefs, and shorts must meet inseam guidelines. Exposed midriffs are forbidden for certain age groups, and tops must be secured over at least one shoulder. Bows cannot be "excessive size," jewelry is forbidden, and makeup must be "uniform and appropriate."

107.    Varsity entered the All Star Apparel Market in 1980. Since then, Varsity has, through its Exclusionary Scheme, gained and maintained an 80% share of the All Star Apparel Market. As part of the Scheme, Varsity has used its monopoly power in the All Star Competition Market to: (a) cause All Star Gyms to enter into exclusive dealing agreements and rebate programs—including Varsity's Family Plan and Network Agreements—which make buying from non-Varsity All Star Apparel competitors prohibitively expensive; (b) exclude All Star Apparel competitors from the merchandise showrooms at their All Star Competitions; (c) acquire (and often

---

[29] http://rules.usasfmembers.net/wp-content/uploads/2019/08/USASF_Cheer_Rules_Overview_19-20.pdf?__hstc=138832364.efed7d8f1c830aa60b7954df8534ed2a.1587669506683.15876695066 83.1587746180666.2&__hssc=138832364.3.1587746180666&__hsfp=612696179.

dissolve) All Star Apparel competitors; and (d) through its influence with the captured USASF, cause the judges to advantage All Star Teams that wear Varsity apparel.

108. As one article described, "Thanks to an aggressive campaign of acquisitions, rebate plans that make it expensive for gym owners to switch suppliers, and other strategies, Varsity Spirit, the corporation's cheer division, commands north of 80 percent of the uniform market, as estimated by competitors. The company also wields outsize influence in virtually every aspect of the industry, including the camps and—most important—the competitions, which also serve as merchandise showrooms for apparel vendors."[30]

109. Indeed, Varsity brags that its All Star Apparel "has defined cheerleading for generations."[31]

110. Varsity prevents other apparel manufacturers from showcasing their apparel at Varsity's All Star Competitions, thereby foreclosing them from 90% of the important All Star Competition marketing channel. For instance, during the Class Period, Varsity forbade Rebel Athletic, an independent cheerleading apparel company, from having a booth or set up at Varsity competitions, causing Rebel Athletic to be locked out of partnering with 90% of All Star Competitions.

**F.    Varsity's Monopoly Power in the Two Relevant Antitrust Markets**

    **1.    Monopoly Power in the All Star Competition Market (the Primary Market)**

        **a.    The Relevant All Star Competition Market**

111. All Star Competitions are events at which All Star Teams perform time-limited routines composed of tumbling, stunting, pyramids, and dance segments. Tumbling involves gymnastic skills like cartwheels and back handsprings. Stunting refers to a group of two or more

---

[30] https://slate.com/business/2016/02/rebel-wants-to-disrupt-the-surprisingly-entrenched-cheerleader-uniform-industry.html.

[31] *See* "Why Choose Varsity All Star Fashion," Varsity, https://www.varsity.com/All Star/All Star-fashion/why-choose-varsity/ (last accessed Aug. 25, 2020).

individuals that elevate another cheerleader in the air. Pyramids are a form of interconnected stunting that involve a large group. Dance is a portion of a routine that consists of choreographed high energy dance moves. The routines are performed and scored against other All Star Teams at various local, regional, and national competitions.[32]

112.    All Star Competitions involve All Star Teams with participants from a wide variety of age groups, from preschool through college and beyond. But, importantly, All Star Competitions do not involve sideline cheerleading, and they are not sponsored by, or associated with, particular schools or school associations (like the NCAA). All Star Competitions, instead, are organized by All Star Gyms, which are central to the sport. The participants typically compete in divisions defined by the USASF.

113.    Suppliers in the All Star Competition Market are All Star Competition producers. Varsity is the primary supplier in the All Star Competition Market. According to the Varsity website, it offers "over 40 brands" of All Star Competitions and "over 500 regional, national, and end-of-season events."[33] Varsity's All Star Competitions are all sanctioned by USASF.

114.    All Star Gyms directly pay All Star Competition producers, either Varsity or IEPs, registration fees to enter All Star Competitions leading up to All Star Championships. From the perspective of All Star Gyms, All Star Competitions lack close economic substitutes that could constrain their pricing, for, *e.g.*, entry fees and other associated costs, to competitive levels.

115.    All Star Cheerleaders train vigorously for All Star Competitions that showcase their unique combination of talents, which draw from cheerleading, dance, and gymnastic routines. All Star Gyms and their All Star Teams would not redeploy their talents to competitive gymnastics, sideline cheer, dance, or any other sport or pastime, in response to a small but significant non-transitory increase in the price of attending All Star Competitions. Thus, a hypothetical monopoly seller or producer of All Star Competitions would not need to control gymnastics, dance events,

---

[32] https://usasf.net.ismmedia.com/ISM2/ParentsActionCommittee/Cheer_Parents_101.pdf.

[33] https://www.varsity.com/all-star/competitions/why-varsity-competitions/.

other kinds of cheer events (including, *e.g.*, sideline cheerleading), or other pastimes, to raise the registration fees and other associated costs for attending All Star Competitions profitably above competitive levels by a small but significant degree.

116.     The USASF—controlled by Varsity—serves as the governing body that recommends and implements rules and regulations for All Star Competitions. According to USASF rules, All Star Competitions are segmented into levels and divisions. Levels are based purely based on skill, not on age.[34]

117.     Sideline cheerleading is not a functional or economic substitute for All Star Competitions. The main difference between sideline cheerleading and All Star Competitions is that a sideline cheerleading squad's primary purpose is to support a school's sports team and keep the crowd excited. Membership on a sideline team is conditioned on enrollment at the school with which it is affiliated. All Star Teams do not cheer for games or for other teams. The sideline team competitions are also separate and distinct from All Star Competitions. They typically take place on a non-spring-loaded floor, often on the sidelines of hardwood basketball courts or football fields, rather than the open spring-loaded floors used by All Star Teams and involve fewer stunts and less rigorous tumbling, so the skill set required for All Star Competitions is much more advanced than that required for sideline cheerleading.[35] There is also a crowd-leading component to sideline cheer not present at All Star Competitions.

118.     Other recreational cheerleading programs such as Pop Warner and Bill George Youth Football are not functionally or economically substitutable with All Star Competitions. Cheerleaders in these other programs are taught the basics of cheer and compete only occasionally against other recreation teams within the same program. Often, the more talented cheerleaders "graduate" from these programs to an All Star Team in search of a more challenging cheer

---

[34] https://usasf.net.ismmedia.com/ISM2//Member%20Documents%2009_10_Age_Grid.pdf.

[35] https://usasf.net.ismmedia.com/ISM2/ParentsActionCommittee/Cheer_Parents_101.pdf.

environment that focuses more on their skills and accomplishments, rather than the standing of their respective football teams.[36]

119.    Dance and gymnastic competitions are not functional or economic substitutes for All Star Competitions. All Star Competitions involve multiple athletes performing synchronized movements in a confined area that limits the types of movements that can be performed by participants, requiring an emphasis on different skills than gymnastics. All Star Competition routines involve multiple athletes performing synchronized movements in precise, drill-like style, whereas dance competition routines may involve as little as one person, and may include a range of looser styles such as hip hop, jazz, lyrical, contemporary, tap, or ballet. All Star Competition routines also involve floor tumbling, whereas gymnastics competition routines involve a combination of floor tumbling, vault, bars, and beam. Thus, the skill set required to be part of these other teams is different. In addition, All Star Teams consist of various body types and have different positions that require different skill sets, such as the base, the flyer, the spotter, and the tumbler. Most athletes will be taller than the average gymnast—providing opportunities to compete for individuals who do not possess classic gymnast bodies.[37]

120.    Although Varsity has opposed efforts to designate cheerleading as an official sport, it has supported the creation of NCAA-sanctioned college-level competitive dance and acrobatic events, such as Varsity-backed STUNT and Acrobatics & Tumbling, backed by the National Collegiate Acrobatics and Tumbling Association ("NCATA"). These are not functional or economic substitutes for All Star Competitions. Varsity and NCATA have identified such college-level competitive dance and acrobatic events as complements to All Star Competitions rather than substitutes. As one USA Cheer publication explained, "STUNT should grow the total number of young people participating in all forms of Cheer . . . once STUNT is fully adopted as an NCAA sport, the number of collegiate scholarships available to Cheer athletes should increase more than

---

[36] *Id.*

[37] https://usagym.org/pages/home/publications/technique/2002/7/cheergymnastics.pdf.

tenfold. This will potentially create huge interest in skill development and competitive experience, and All Star Gyms have a tremendous opportunity to provide these services." In addition, unlike All Star Cheer, STUNT and Acrobatics & Tumbling only involve female athletes as they are both "Emerging Sports" seeking full protection under Title IX.

121.    In addition, STUNT is essentially owned by Varsity. It was started in 2011, funded by Varsity, and is run by USA Cheer—another Varsity-controlled organization.

### b.    The Relevant Geographic Market

122.    The relevant geographic market is the United States. All Star Teams compete nationwide to receive Bids to attend All Star Championships.

123.    All Star Gyms in the United States do not regularly send teams to All Star Competitions abroad, in part due to the expense of international travel. When All Star Gyms do compete internationally, it is not a part of the regular season, but rather, a special event put on to give children and young adults an opportunity to travel (similar to an exchange program).

124.    International cheer competitions are also subject to different rules than U.S. competitions, making U.S. All Star Teams far less likely to attend them.

125.    International cheer competitions are not functional or economic substitutes for U.S. All Star Competitions. A small but significant and non-transitory increase in the price of participating in U.S. All Star Competitions would not cause participants to seek out international competitions.

### c.    Varsity Has Monopoly Power as a Dominant Supplier in the All Star Competition Market

126.    Varsity has, at all relevant times, possessed monopoly power in the market for the production of All Star Competitions.

127.    Varsity has maintained and enhanced its monopoly power in the market for the production of All Star Competitions through the anticompetitive conduct alleged herein. Varsity possesses the ability to control, maintain, and increase prices associated with the production of All Star Competitions above competitive levels and the ability to impair and exclude competitors from

33

producing All Star Competitions. Varsity has elevated prices charged for registering for and attending Varsity All Star Competitions substantially above competitive levels, and restricted output in the All Star Competition Market, during the Class Period. Varsity has the ability to foreclose, and has in fact foreclosed, actual and would-be rivals from competing in the market for producing All Star Competitions.

128.    In 2010, Varsity controlled approximately 50% of the revenues in the All Star Competition Market.[38] After Varsity acquired The JAM Brands in 2015, and continued to engage in the other anticompetitive conduct alleged herein, it gained control of approximately 90% of the revenues in that market for All Star Competitions in the United States. As detailed in the magazine *Inc.*, prior to the merger, "JAM Brands ran most of the high-profile competitions that Varsity doesn't own. Together, they control roughly 90 percent of the major events, say competitors."

129.    In addition, Varsity controls two of the three All Star Championships in the United States. It also controls the USASF board that decides how Bids are awarded to the third All Star Championship, Worlds. All Star Teams from the top All Star Gyms seek coveted Bids to these All Star Championship events, and Varsity controls the vast majority of the All Star Competition producers that have been granted rights by the USASF to disburse such Bids and also controls the vast majority of Bids.

130.    Varsity's tag line illustrates its dominance: "We are cheerleading."[39]

### d.    Barriers to Entry

131.    The All Star Competition Market has high barriers to entry that were reinforced and bolstered by the Exclusionary Scheme as alleged herein.

---

[38] Webb testimony in *Biediger vs. Quinnipiac*, June 22, 2010.

[39] "The Business of Cheer," Fortune (Dec. 21, 2012).

### i.       Natural Barriers to Entry

132.    An All Star Competition event producer must have access to capital in order to rent venues, perform adequate marketing, and pay employees, travel costs, and the variety of other expenses associated with the All Star Competition business.

133.    An All Star Competition producer must also have access to a critical mass of All Star Teams, particularly the best All Star Teams, as All Star Cheerleaders desire the challenge and recognition that comes with competing against the best in the sport.

134.    All Star Competition producers must also have access to judges, in order to hold their competitions, and advertising, in order to carry out all of their other functions.

### ii.      Barriers Created by the Exclusionary Scheme

135.    As alleged herein, Varsity has used the Exclusionary Scheme to erect insurmountable barriers to entry which, together with the natural barriers, insulate Varsity from competition. To enter the All Star Competition Market, event producers must have access to the uniform set of rules used by other competitions in the league, as no All Star team wants to learn a new set of rules to compete in just one competition. However, USASF refuses non-member IEPs, Varsity's competitors, from having access to its rules, claiming as a pretext that the rules are subject to trademark and copyright protections.

136.    To be viable in the All Star Competition Market, event producers must also be able to offer Bids to the All Star Championships. However, USASF and Varsity have conspired to limit the number of All Star Competitions that can award these Bids. Varsity owns and controls 33 of the 42 All Star Competitions that can award Bids to Worlds and all of the All Star Competitions that can award Bids to The Summit and U.S. Finals. As a result, a new competitor in the All Star Competition Market is unlikely to be able to offer Bids and thus would immediately be rendered competitively irrelevant.

137.    All Star Gyms must be members of the USASF in order to compete in USASF-sponsored All Star Competitions. This accreditation carries with it a requirement that the All Star

Gyms report all events they attend to USASF. Varsity and USASF representatives then pressure the All Star Gyms to go only to USASF-sanctioned events.

138.     The access of any IEP to All Star Gyms is further restricted by the USASF-preferred insurer, K&K, which charges All Star Gyms thousands of dollars more, per year, for its insurance, if Gyms attend non-USASF events. In addition, K&K requires covered All Star Gyms to be USASF members. The rates for USASF member Gyms are between $19 and $24.55 per All Star Cheerleader, but they increase to $34 per Cheerleader if the All Star Gym enters its All Star Team in even a single competition that is not sanctioned by USASF.

139.     As alleged further below, IEP access to All Star Gyms is further limited by the Network Agreement and Family Plan, which require Gyms to devote a large share of their allotted competitive season to Varsity's All Star Competitions and also to spend a certain sum (usually tens of thousands of dollars) on Varsity All Star Apparel each year to qualify for non-penalty prices on Varsity competitions and apparel.

### 2.     Monopoly Power in the All Star Apparel Market (the Ancillary Market)

#### a.     The Relevant All Star Apparel Market

140.     All Star Cheerleaders are required to wear specialized apparel and use specialized equipment in order to compete in All Star Competitions. USASF rules govern every detail of this apparel, including minutia such as what direction hair bows must face and how large those bows can be.

141.     All Star Cheerleaders also require specialized apparel and equipment for practice, and All Star Gyms require specialized apparel and equipment for membership on their All Star Teams.

142.     The All Star Apparel Market is restricted to specialized clothing such as uniforms, warm-up outfits, and team jerseys; and specialized accessories such as hair bows and headbands; and specialized equipment such as backpacks and shoes. Because All Star Competitions require that participants dress and accessorize in accordance with USASF rules, All Star Gyms and their

associated All Star Team members could not shift to more generic athletic apparel in response to a small but significant and non-transitory increase in the price of All Star Apparel. Thus, a hypothetical monopoly supplier of All Star Apparel would not need to control any suppliers of non-All Star Apparel in order to increase the price of All Star Apparel substantially above competitive levels profitably.

### b.     The Relevant Geographic Market

143.    The relevant geographic market is the United States. All performances in the primary market occur within the United States and are regulated by USASF standards set in the United States. As such, nearly all of the targeted customers for All Star Apparel reside in the United States.

### c.     Varsity Has Monopoly Power with Respect to Sales of All Star Apparel

144.    Varsity has, at all relevant times, possessed monopoly power in the market for All Star Apparel. Varsity has maintained and enhanced, and continues to maintain and enhance, its monopoly power in this market through the Challenged Conduct (as alleged in this Consolidated Complaint). Varsity possesses the ability to control, maintain, and increase prices in the All Star Apparel Market substantially above competitive levels profitably, and the ability to impair and exclude competitors from this Relevant Market. Varsity has in fact inflated prices of its All Star Apparel substantially above competitive levels during the Class Period. Varsity has the ability to foreclose, and has in fact foreclosed, would-be rivals from the All Star Apparel Market.

145.    Varsity has assembled at least 200 copyrights on uniform design, which create a barrier to entry by subjecting potential entrants in the All Star Apparel market to the threat of copyright lawsuits. Varsity aggressively enforces its copyrights against actual and potential rivals through trademark litigation.

146.    Varsity also maintains an opaque scoring system, where judges complete score sheets and submit them to Varsity employees for review. On information and belief, Varsity instructs judges at its competitions to reward All Star Teams fielded by "High-Dollar" All Star

Gyms with higher scores for spending more money on Varsity's All Star Competitions and Apparel.

147.    Varsity has gained and maintained at least an 80% share of the All Star Apparel Market through acquisitions, exclusive dealing arrangements, and other anticompetitive and exclusionary conduct that is part of the Exclusionary Scheme alleged herein.

### d.    Barriers to Entry

148.    There are a number of barriers to entry into the All Star Apparel Market, including many barriers imposed and reinforced as part of the Exclusionary Scheme.

### i.    Natural Barriers to Entry

149.    Apparel-manufacturing and marketing facilities require significant investments of capital to design, manufacture, and promote their shoes, clothing, and accessories. Equipment needed to manufacture this apparel and warehousing needed to store and distribute it are both extremely expensive and require a significant amount of sunk costs.

150.    Manufacture and sale of All Star Apparel also requires an established distribution chain, which, if it does not already exist, takes a significant amount of time to get up and running.

151.    Designs for All Star Apparel are specific to that market and require specially-trained designers to create and specialty equipment to manufacture.

152.    Intellectual property provides another barrier. Any designer of All Star Apparel must take care not to infringe the designs of any competitors who hold copyrights or trademarks, or else risk litigation. Varsity has assembled almost 200 copyrights protecting its designs and aggressively enforces those rights against actual and potential rivals.

### ii.    Barriers to Entry Imposed Through the Exclusionary Scheme

153.    All Star Apparel manufacturers must have a venue to showcase and sell their apparel. In the All Star Apparel Market, the main and critical venue is All Star Competitions. However, Varsity denies its actual and potential competitors access to the showrooms at its market-dominant All Star Competitions, depriving them of this necessary distribution venue.

154.    All Star Apparel manufacturers must also have the ability to sell apparel that complies with All Star Competition rules. However, the USASF tailors its rules to allow the type of apparel Varsity manufactures and sells, to the exclusion of competitors' apparel. Further, USASF judges often award extra points to All Star Teams wearing Varsity apparel, thus discouraging them from wearing the apparel of competitors.

155.    As alleged further below, Varsity's Exclusionary Scheme includes restrictive contracts with the largest-dollar volume and most prestigious All Star Gyms that require such gyms to exclusively purchase All Star Apparel from Varsity, foreclosing access by apparel rivals to these important customers and their All Star Team members—who comprise a significant share of market sales. Varsity also provides terms for all other All Star Gyms that make it economically unfeasible for most of them to purchase All Star Apparel from potential rivals.

### G.    Varsity's Continuing Exclusionary Scheme to Maintain and Enhance Monopoly Power in the Primary and Ancillary Relevant Markets

#### 1.    Acquisitions of Rivals

156.    Varsity has engaged in a pattern of acquiring and then either integrating or dissolving its competitors in the Relevant Markets for decades. Varsity has acquired company after company as part of its rampage through the All Star Cheer world. As one insider stated, Varsity has "been very successful in squelching other competitors."[40]

157.    During the Class Period, as defined below, Varsity has taken over or driven out of business its rivals in the All Star Competition and All Star Apparel markets. And as the number of rivals in both Relevant Markets has dropped, prices have risen.

158.    Varsity's acquisitions have bolstered its control over the All Star Competition market as well as over significant organizations like USA Cheer and USASF that regulate All Star Competitions. As an open letter dated June 30, 2019 from an organization of independent gyms and coaches explained:

---

[40] *See* Natalie Adams, co-author of <u>Cheerleader! An American Icon</u>, *Cheer* (Netflix 2020).

The governing body [the USASF] didn't immediately turn south but it wasn't long after the formation that the biggest EP [Event Producer] started gobbling up smaller companies that had limited power in the industry. And with the companies they gobbled up, the more power they got within the governing body. Then the 2nd biggest EP [JAM Brands] started gobbling up companies to compete against the biggest EP [Varsity]. Then the 3rd biggest EP [Epic Brands] started gobbling up companies to compete against the 2nd biggest EP. Then #2 was gobbled up by #1. Then #3 was gobbled up by #1. All the while, any sense of independence and control that governing body had was gone. One company held all the cards.

### a.   Varsity Acquired The JAM Brands

159.   Prior to 2016, The JAM Brands was an IEP in the United States and Varsity's chief competitor. The JAM Brands produced All Star Competitions that included divisions for high school, college, and All-Star Teams, as well as recreational divisions. The JAM Brands owned Cheerleaders of America ("COA"), a major IEP in Ohio. The JAM Brands also owned America's Best, an IEP in Texas.

160.   The JAM Brands produced many of the largest and most popular All Star Competitions in the United States, including The MAJORS and The U.S. Finals, one of the most coveted All Star Championships. It also owned All Star Competitions that awarded 24 of the Bids to Worlds. Moreover, The JAM Brands produced an All Star Competition branded as "JAMFest Cheer Super Nationals," at which over 550 All Star Teams competed. In addition, The JAM Brands was a disruptive and aggressive competitor, introducing new event concepts that competed directly with Varsity's All Star Competitions. Prior to Varsity's acquisition of it, The JAM Brands generally offered free admission to event spectators, many of whom are the parents and other family members of the Cheerleaders.

161.   Varsity and The JAM Brands announced their pending merger in November 2015. In a letter to All Star Gym owners, Varsity assured them, "For you as a customer, nothing will change." Plaintiffs and the Class in fact saw increases in All Star Competitions registration fees a year later. The JAM Brands began charging spectators admission to its events for the first time only after it was acquired by Varsity.

162.    In addition, with the acquisition of The JAM Brands, Varsity also gained control over The JAM Brands' board seats on the USASF and the IASF, solidifying Varsity's control over the major sanctioning bodies that regulate competitive All Star Cheerleader, and allowing Varsity to use those regulating bodies to foreclose competitors from the Relevant Markets, as discussed below.

163.    Varsity's acquisition of The JAM Brands gave Varsity more control over both the All Star Competition Market and the All Star Apparel Market. One article described the situation as follows:

> The Alliance's birth coincided with one of Varsity's most audacious moves—and for [rival All Star Apparel manufacturer] Rebel, its most shattering. In October, Varsity—in a deal widely criticized on industry chat boards—acquired JAM Brands, the second-largest event producer and by far Rebel's most important marketing partner. Just a few months earlier, JAM Brands co-owner Dan Kessler had explained why his company had chosen Rebel to be its exclusive uniform sponsor. "They were edgy. The look was real," said Kessler. "We felt there was some good synergy there."
>
> That synergy vanished last fall, while Rebel was negotiating to renew the partnership. "Suddenly those talks just fell apart," says Noseff Aldridge. A few weeks later, Varsity and JAM Brands announced their union. JAM Brands ran most of the high-profile competitions that Varsity doesn't own. Together, they control roughly 90 percent of the major events, say competitors.[41]

#### b.    Varsity Acquired Spirit Celebrations

164.    Spirit Celebrations was an IEP that produced the second largest All Star Competition in Texas, called the Dallas Cowboys Cheerleader Championship.

165.    Varsity acquired Spirit Celebrations in late 2016 or 2017. After Varsity acquired Spirit Celebrations, Varsity increased registration fees substantially. As a result of those increased fees, participation in the Dallas Cowboys Cheerleader Championships dropped from 400 teams to 150 teams.

---

[41] https://slate.com/business/2016/02/rebel-wants-to-disrupt-the-surprisingly-entrenched-cheerleader-uniform-industry.html.

### c.    Varsity Acquired Epic Brands

166.    Varsity acquired Epic Brands, the second largest IEP in the U.S., in January 2018.
Epic had the largest presence in Chicago and the Northeast. Epic also had the right to distribute 12
Bids to the Worlds. After the acquisition, Varsity now controlled Epic's 12 Worlds' Bids.

### d.    Varsity Solidified Its Control

167.    Prior to Varsity's spate of All Star Competition acquisitions, there were still a
number of "independent" All Star Competition producers, known as "Independent Event
Producers" or "IEPs," left in the All Star Competition Market, including: All Star Challenge;
Aloha Productions; America Cheer Express; American Spirit Championships; Cheer America;
Cheer Ltd.; CheerSport; Cheer Tech; COA Cheer & Dance; Connecticut Spirit Association;
Golden State Spirit Association; JAMZ Cheer and Dance; Mardi Gras Spirit Events; Nation's Best;
Pac West Spirit Group; Spirit Cheer; Universal Spirit; UPA; US Spirit; Valley of the Sun; WCA;
Worldwide Spirit Association; and Xtreme Spirit.

168.    Varsity, as a result of its Exclusionary Scheme, systematically acquired 12 of these
once-independent competitions: All Star (2008); Pac West (2011); CheerSport and Universal Spirit
(2012); Cheer Ltd (2014); COA Cheer & Dance (2015); Aloha Productions and Golden State Spirit
Association (2016); Mardi Gras Spirit Events and Spirit Celebrations (2017); Epic Brands (2018);
and Spirit Cheer. Seven out of the 12 Varsity-owned All Star Competitions have the ability to offer
Worlds Bids, whereas only one of the events that remained independent is a qualifying event for
Worlds. None of the remaining independent events offers participants the ability to qualify for The
Summit.

169.    Due to Varsity's Exclusionary Scheme, the few remaining IEPs have been relegated
to "B League" status, rendering the remaining potential rivals in the All Star Competition Market
incapable of challenging Varsity's dominance.

2.      **Varsity Leverages Its Monopoly Power to Impose Exclusionary
Contracts and Anticompetitive Loyalty Programs on All Star
Gyms**

170.    Varsity uses its dominance of the All Star Competition Market to maintain and
enhance its control over the All Star Competition Market as well as to acquire, enhance, and
maintain its monopoly power in the All Star Apparel Market.

171.    One of the primary means by which Varsity maintained and enhanced its monopoly
power in the Relevant Markets is by imposing exclusionary contracts and anticompetitive loyalty
programs on All Star Gyms.

172.    Varsity employs two types of agreements with All Star Gyms, the "Network
Agreement" and the "Family Plan," to maintain its dominance in the All Star Competition Market
and to acquire, enhance, and maintain monopoly power in the All Star Apparel Market. Varsity
imposes its exclusionary contracts on All Star Gyms because collectively they are the key
distribution channel through which All Star Competition producers and All Star Apparel suppliers
promote and sell their goods and services, and they are the key input for a successful All Star
Event. All Star Gyms recruit, train, organize, and maintain All Star Teams. They choose which
All Star Competitions their All Star Teams attend. They also select the All Star Apparel that their
All Star Teams purchase. As such, All Star Gyms are a key input for producing a successful All
Star Competition and the primary and necessary distribution channel for All Star Apparel.

173.    Moreover, there are certain All Star Gyms that, because of their reputations and
size, are more significant players in the All Star Cheer industry than others. Varsity knew that by
inducing All Star Gyms to agree to buy from Varsity exclusively or nearly so, Varsity could lock
up the All Star Gym distribution channel, and thereby maintain monopoly power in the All Star
Competition Market and the All Star Apparel Market. Varsity also knew that, if it could induce
the top, most successful All Star Gyms to enter into long-term exclusive deals, it would be able to
erect an impenetrable barrier to entry and substantially foreclose competition in both Relevant
Markets.

### a.       The Network Agreement Is an Exclusionary Contract

174.     Varsity economically induces the most significant and big-money All Star Gyms, which are necessary to put on successful All Star Competitions and collectively comprise the most important All Star Apparel distribution channel, to exclusionary three-year Network Agreements. These Network Agreements require Gyms to register their All Star Teams for at least five Varsity-produced All Star Competitions per season and spend at least $30,000 on registration fees for Varsity events.

175.     Varsity's Network Agreements provide increasing rebate percentages for Gyms that spend above $30,000 per year on Varsity registration fees. Given that All Star Gyms typically attend only between five and eight All Star Competitions per season, Varsity's contractual requirements make it extremely difficult if not impossible for these All Star Gyms to attend IEPs' All Star events, and thus effectively impose exclusive dealing.

176.     The Network Agreements contain additional provisions structured to cause All Star Gyms to shun rival event producers. For instance, All Star Gyms that meet the Network Agreement requirements and attend the required five Varsity events per season are effectively locked in to attending only Varsity events. Every dollar All Star Gyms spend on registration fees above the required $30,000 minimum annual expenditure increases the discount for attending additional Varsity events in that season. Thus, once an All Star Gym has spent the required threshold amount, it becomes economically and practically infeasible for such Gyms to attend non-Varsity events. Further, the Network Agreements explicitly require all of these big-money and most prominent All Star Gyms to purchase and use Varsity All Star Apparel exclusively, foreclosing a key distribution channel and critical group of customers from being accessed by All Star Apparel rivals.

177.     Because the Network Agreement is offered to the largest and most successful All Star Gyms, the All Star Gyms with the most talented All Star Cheerleaders are guaranteed to attend Varsity's All Star Competitions and wear Varsity's All Star Apparel. This, in turn, draws the

smaller All Star Gyms into attending Varsity's All Star Competitions and wearing Varsity's All
Star Apparel.

178.    Ultimately, IEPs and competitor All Star Apparel manufacturers are foreclosed
from access to All Star Gyms that participate in the Network Agreement. This essentially deprives
IEPs and competitor All Star Apparel manufacturers of having the best talent participate in their
events or wear their apparel. At the same time, the prices that All Star Gyms had to pay to be part
of a Network are likewise inflated as a direct and foreseeable result of Defendants' anticompetitive
conduct.

### b.    The Family Plan Is an Anticompetitive Loyalty Rebate Program

179.    For All Star Gyms that are not induced to execute Network Agreements, Varsity
offers a modified version of the Network Agreement called the "Family Plan." Varsity offers the
Family Plan to every All Star Gym in the country, meaning that Varsity has the potential to engage
100% of the All Star Gyms in the Market in its exclusionary programs.

180.    The Family Plan requires that an All Star Gym pay registration fees for a certain
number of Varsity's All Star Competitions in one year in order to obtain a small amount of relief
from Varsity's penalty pricing on All Star Apparel and All Star Competitions. Mere attendance at
All Star Championships does not count toward the requirement. Transportation, ticket cost, and
other event costs also do not count toward the requirement—only the actual registration fee is
credited.

181.    Under the Family Plan, Gyms must attend at least six Varsity All Star Competitions
per year. Because All-Star Teams typically attend only between five and eight All-Star
Competitions in a season (excluding The Summit and U.S. Finals), All-Star Gyms must devote all
or the vast majority of their All-Star Competition season to Varsity events to obtain relief from
Varsity's penalty pricing. The amounts All-Star Gyms must spend to obtain a particular percentage
of monetary relief from Varsity's penalty pricing has increased over the years, as Varsity's
contracts have become more and more exclusionary.

182.     Varsity incentivizes All Star Gyms to have their teams attend more than six Varsity All Star Competitions (i.e., effectively, all or nearly all of the competitions Gyms will attend in a season) by increasing the reward percentages per each additional event attended.

183.     All Star Gyms seeking to participate in the Family Plan are also incentivized to purchase their athletes' All Star Apparel exclusively from Varsity.[42]

184.     The Family Plan provides rebates referred to as "Varsity Fashion Dollars." These Varsity Fashion Dollars may only be used on future purchases from Varsity. As a result, the All Star Gyms are trapped in an endless cycle with Varsity, as foregoing these future rebates and doing business with Varsity's competitors becomes prohibitively expensive the more they patronize Varsity events and purchase Varsity apparel.

185.     Varsity, as alleged above, uses its control of the All Star Championship Bids, and loyalty contracts, to coerce All Star Gyms to attend Varsity events exclusively. Taken together with the fact that All Star Teams generally only attend five to eight competitions per year, this structure all but excludes the possibility of competition from IEPs in the Relevant Market by effectively punishing All Star Gyms for attending non-Varsity All Star Competitions.

### 3.     Varsity Leverages Its Monopoly Power in the All Star Competition Market to Control the All Star Apparel Market

186.     Varsity has also leveraged its monopoly power in the All Star Competition market to acquire, maintain, and enhance its monopoly power in the All Star Apparel market.

---

[42] *See* Matt Stoller, "The Coming Collapse of a Cheerleading Monopolist," May 27, 2020, https://mattstoller.substack.com/p/the-coming-collapse-of-a-cheerleading (last accessed Aug. 25, 2020).

187.    Varsity has assembled at least 200 copyrights on uniform design. Varsity uniform and apparel designs can be identified by a "V" logo on the bottom left of every top or skirt (as depicted below).

  

188.    For the critical big-money All Star Gyms participating in its Network Agreement, Varsity requires exclusive purchasing of Varsity's All Star Apparel. As a result, no All Star Apparel rival could possibly compete with Varsity without also dominating the All Star Competition Market. Moreover, Varsity ties availability of non-penalty prices on Varsity's All Star Apparel to attendance at Varsity All Star Competitions, such that All Star Gyms must both spend a minimum amount annually on Varsity's All Star Competitions and attend a minimum number of Varsity's All Star Competitions annually to qualify for non-penalty prices on Varsity's All Star Apparel.

189.    Varsity also bars competing All Star Apparel manufacturers from selling their All Star Apparel at Varsity All Star Competitions. Varsity controls access to the showrooms at its All Star Competitions. It forbids the display and sale of non-Varsity All Star Apparel at those All Star Competition showrooms. With Varsity controlling 90% of All Star Competitions, this practice has as a significant exclusionary effect by depriving other All Star Apparel manufacturers of a key distribution channel and the associated revenue.

47

190.     Rival All Star Apparel manufacturer Rebel had previously displayed and sold All Star Apparel at JAM Brands' events. Its contract with The JAM Brands was terminated when Varsity acquired The JAM Brands, and Varsity excluded Rebel from all subsequent JAM Brands events. As one article observed, quoting Rebel's founder:

> The JAM Brands competitions had been Rebel's most effective platform for marketing to elite cheer teams. "Not partnering with an event company is one thing," says Noseff Aldridge [founder of Rebel Athletic]. "But being locked out of partnering with an event company—knowing that a competitor is now going to be in your booth space showing its product—it's a double whammy."[43]

191.     Likewise, Nfinity, another All Star Apparel brand, has also been prohibited from selling its products at once-independent All Star Competitions that were acquired by Varsity, including CheerSport's numerous competitions and Battle Under the Big Top.

192.     Further, as mentioned above, certain of Varsity's contracts and terms with All Star Gyms combine rebates for attending Varsity's All Star Competitions with agreements requiring All Star Gyms to purchase their All Star Apparel exclusively from Varsity. Thus, All Star Gyms bound by the Network Agreement cannot access non-penalty prices for All Star Competitions unless they also agree to exclusively buy their All Star Apparel from Varsity.

193.     The rules governing USASF and Varsity All Star Competitions regarding All Star Apparel are frequently written to favor Varsity's latest All Star Apparel designs. These practices make the wearing of Varsity All Star Apparel an important element for success at All Star Competitions, further impairing the ability of rival All Star Apparel manufacturers to gain significant sales.

194.     Beyond this exclusionary conduct, there is another dark side of Varsity's conduct in the All Star Apparel space. In light of the fact that 90% of All Star Competitions are Varsity-produced—with Varsity not only setting the rules for those competitions but also paying the judges to judge those competitions—rumors have long circulated that All Star Teams outfitted in Varsity

---

[43] https://www.inc.com/magazine/201603/leigh-buchanan/rebel-athletic-custom-cheerleading-uniforms-startup.html.

apparel (which is identifiable by the "V" logo) are rewarded with higher scores for their routines.
As one industry participant put it, "you've gotta be Varsity, bow to toe" in order to maximize point
awards at All Star Competitions.[44] This further discourages All Star Teams from buying All Star
Apparel from anyone other than Varsity.

### 4.      Varsity's Use and Control of Governing Bodies

195.    Defendant USASF is a governing body that sanctions All Star Competitions and
provides a set of rules and regulations to govern those events. The organization credentials
coaches, certifies safety judges, sanctions events, and maintains safety guidelines.

196.    USASF also own, produces, sanctions, and promotes the Worlds All Star
Championship. When it first established the Worlds, the USASF offered Varsity a no-contest bid
to produce the event, and it did not allow any other IEPs to compete for the right to produce the
event. While All Star Gyms are not technically required to belong to the USASF, a USASF
membership is required to compete for Bids to the All-Star Championships, so All Star Gyms have
no choice but to join the USASF if they wish to be viewed as high-quality organizations.[45]

### a.      Varsity Controls the USASF

197.    Varsity founded the USASF in 2003 and funded this effort by extending an interest-
free $1.8 million loan to the USASF. Varsity submitted the original trademark application for the
marks "U.S. All Star Federation" and "USASF," listing itself as owner.

198.    For at least the first 15 years of its existence, the USASF's offices were located at
Varsity's corporate address, and a Varsity representative answered the phone for the USASF.

---

[44] *See* Jason Watson, Comments Section, May 27, 2020, https://mattstoller.substack.com/p/the-coming-collapse-of-a-cheerleading/comments#comment-232780 (last accessed Aug. 25, 2020).
[45] https://usasf.net.ismmedia.com/ISM2/ParentsActionCommittee/Cheer_Parents_101.pdf.

199.    According to a Varsity spokesperson, Varsity currently pays the salaries of at least two top employees at USASF, including the President Jim Chadwick and the Vice President of Events/Corporate Alliances Steve Peterson.[46]

200.    USASF is a "member" of USA Cheer. According to recent reports, USA Cheer has no employees of its own, but it does have six staff members, including an executive director, who are Varsity employees contracted to work for the regulatory body.[47]

201.    Varsity controls the USASF board of directors. The USASF board is empowered to set policy for the USASF. The board is composed of 13 voting members, one seat each for the seven All Star Competition producers that started the USASF, the USASF Chairman, a senior USASF staff member, and four program owner members, including the Chairman of the National All Stars Connection.[48] Two USASF board seats are permanent and are held by representatives named by the Chairman of the USASF.[49]

202.    As Varsity has acquired more and more of the USASF's founding event producers, it has continued to build its presence on the USASF board. Pursuant to USASF's 2015 Bylaws, "The Board of Directors is made up of representatives from Competition Event Producers, gym owners/coaches, and the USASF."[50] With regard to the "Competition Event Producers" seats, those are to be filled with "representatives named by each of the following Competition Event Producers: Universal Cheerleaders Association, CheerSport, National Cheerleaders Association,

---

[46] https://www.usatoday.com/in-depth/news/2020/09/18/cheer-empire-profit-company-created-cheerleading-regulators-pays-salaries/3468551001/.

[47] https://www.usatoday.com/in-depth/news/2020/09/18/cheer-empire-profit-company-created-cheerleading-regulators-pays-salaries/3468551001/.

[48] http://www.usasf.net/organization/bod/bod_overview/.

[49] http://www.usasf.net/organization/about/bylaws/.

[50] *See* "About the USASF," USASF, Sept. 1, 2005, https://www.usasf.net/about (last accessed Aug. 25, 2020).

United Spirit Association, American Cheerleaders Association, Universal Dance Association, and JAMfest."[51] ***Every single one*** of those event producers is owned by Varsity.

203.    With regard to the two gym owner/coach Board seats that rotate every two years, those are filled by candidates nominated by the Nominating Committee and must be approved unanimously by the Board.[52] The fact that a Varsity-majority board has the mandate to appoint these seats not only ensures that two theoretically "independent" seats are filled with people friendly to Varsity, it also provides a further incentive to gym owners and coaches to remain loyal to Varsity so that they might be seen as good candidates for the seats. With the acquisition of The JAM Brands and Epic Brands, Varsity has direct control over 75% of the USASF board seats.

204.    The personnel connections between Varsity and USASF extend beyond the Board. Two of the three USASF Vice Presidents as well as the USASF Executive Director are either current or former Varsity employees.

205.    The USASF's website is located at www.usasf.net, a URL owned by Varsity— although Varsity now seeks to conceal its ownership and control of the URL behind the registration of "PERFECT PRIVACY, LLC."[53]

> **b.    Defendant USASF Limits Which All Star Competition Producers Can Award Bids to All Star Championships**

206.    Varsity has used its control over USASF, and conspired with USASF, to foreclose and impair rival IEPs from getting traction in the Relevant Markets. Varsity used its control of USASF to limit the number of coveted All Star Championship Bids that All Star Competition producers can award to All Star Teams.

207.    USASF controls the All Star Competitions producers that can provide Bids to these high-profile All Star Championships. According to USASF rules, only "Tier 1" All Star

---

[51] *See id.*

[52] *See id.*

[53] https://cheergyms.activeboard.com/t5660100/who-really-has-the-power-in-usasf/.

Competition producers can offer Fully Paid Bids to Worlds. USASF rules also limit the number of Tier 1 All Star Competition producers to 42.

208.    Prior to its acquisition of The JAM Brands and Epic Brands, Varsity owned 21 of the 42 All Star Competitions permitted to offer Fully Paid Bids to Worlds. Today, Varsity owns 33 of the 42 Tier 1 All Star Competitions. Conversely, only 9 of the 54 IEPs credentialed by USASF can offer Bids to Worlds.

209.    In addition, while the number of Tier 1 All Star Competitions is fixed, the number of Bids, Fully Paid and otherwise, that any one of those All Star Competition producers may distribute can be changed by Varsity and USASF. And Varsity consistently uses its control of USASF to increase the number of Bids available at its own All Star Competitions after Varsity acquires them. Varsity controls and allocates well over 80% of all Worlds Bids.

210.    Access to Tier 1 status and the ability to offer Fully Paid Bids to Worlds is critical for an IEP to gain sufficient traction in the All Star Competition Market and seriously challenge Varsity's monopoly power. That is because the primary goal of most All Star Teams is to win All Star Competitions to gain Fully Paid or Partially Paid Bids to All Star Championships such as Worlds. If an IEP cannot offer such Bids, it cannot attract participation from the most successful All Star Gyms, which will reduce the IEP's appeal, reach, and prestige.

211.    Furthermore, with Varsity's input and direction, USASF prohibits All Star Competition producers from holding Bid-qualifying All Star Competitions within 500 miles of another Bid-qualifying competition. This makes it nearly impossible for an IEP to expand and compete further with Varsity, which already holds competitions nationwide in most major metropolitan areas. The ultimate result is that the only way for an All Star Competition producer to gain additional Bids to Worlds is to acquire an existing All Star Competition producer that controls such Bids. Since Varsity's acquisition of Epic Brands in January 2018, there are few such producers left outside of Varsity's hands.

52

### c. USASF and Varsity Use and Create Rules to Foreclose Rivals

212.   USASF and Varsity are the only two organizations with the power to enact rules affecting 90% of All Star Competitions in the United States.

213.   Varsity and USASF use their rule-making "authority" to prevent potential rival sanctioning organizations from creating their own All Star Championships that could undermine Varsity's dominance. For example, in October 2011, USASF and IASF—both of which are controlled by Varsity, as described above—issued a joint letter to member All Star Gyms, All Star Competitions, and All Star Team coaches stating that it is:

> the policy of the USASF/IASF that no athlete, coach, judge, or official is permitted to participate in any way in any event that claims to be a World or International Championship, other than the ICU [International Cheer Union] World Championships for National teams, or the USASF/IASF Worlds for All Star teams. This stipulation applies to any regional international championship affiliated with an organization claiming to operate a World Championship, other than the ICU and USASF/IASF. Failure to comply with this rule is grounds for disqualifying any athlete, coach, judge, or official from participating in the ICU and USASF/IASF World Championships.[54]

### d. Varsity Leverages Its Control of Defendant USASF to Exert Control Over All Star Teams' Competition Schedules

214.   All Varsity-sponsored events are USASF-sanctioned. To enter All Star Teams in USASF-sanctioned events, All Star Gyms, All Star Cheerleaders, and All Star Team coaches must all become USASF members and pay annual membership dues to USASF. Judges at USASF-sanctioned All Star Competitions must also be certified by USASF.

215.   Membership dues are USASF's primary revenue source, and it collected over $5 million in membership dues in 2017.[55] The following chart shows the growth in USASF's revenue

---

[54] *See* "USASF/IASF: WORLDS POLICY UPDATE", Spirit Company, Oct. 18, 2011, https://spiritcompany.com/2011/10/usasfiasf-worlds-policy-update/ (last accessed Aug. 25, 2020).

[55] https://usasfmain.s3.amazonaws.com/Organization/docs/annual/USASF_AnnualReport_2017.pdf.

from membership dues from 2008 to 2017. In particular, it shows a dramatic spike in revenue between 2014 and 2015, right when USASF instituted its membership dues policy:[56]



216.    Though USASF does not contractually bar its members from participating in non-USASF events, it does require its member Gyms to report their full competition schedules for the year, including USASF-sanctioned and non-sanctioned, Varsity and IEP. USASF shares this information with Varsity, and both Varsity and USASF representatives then pressure the All Star Gyms to go only to USASF-sanctioned events.

217.    USASF also copyrighted its All Star Competition rules in 2016, and it forbids All Star Competition producers that have not paid USASF membership dues from using those rules at their events. Since Varsity's dominance in the All Star Competition Market ensures that all or almost all All Star Teams will fill the majority of their schedules with USASF-sanctioned events, USASF's refusal to allow non-USASF IEPs to use the same rules provides a strong disincentive for All Star Teams to include such IEPs in their schedules. After all, if competing at an IEP

---

[56] *See* "Annual Report & Financials," USASF, https://www.usasf.net/about (last accessed Aug. 20, 2020).

competition requires an All Star Gym to learn an entirely new set of rules, they are less likely to do so. Plus, given that 90% of all All Star Competitions are Varsity-owned, the All Star Teams' routines would have been developed to ensure compliance with the USASF rules, not those used by an IEP, further disincentivizing an All Star Gym from sending its teams to non-USASF IEPs' competitions. USASF aggressively enforces this scheme through the threat of copyright litigation.

218.    USASF also uses its competition rules to assist Varsity in maintaining and enhancing its dominance in the All Star Apparel Market. USASF rules governing apparel are drafted to favor the newest All Star Apparel designs being marketed and sold by Varsity.

219.    Bids to Worlds and The Summit are also not awarded at non-USASF events, further discouraging All Star Teams from putting these IEPs on their limited competition schedules. In any event, there are not enough IEPs for an All Star Team to plan a full season around non-USASF events without also attending Varsity (and thus USASF-sanctioned) events.

220.    USASF also requires member All Star Gyms to have and report their liability insurance. USASF encourages All Star Gyms to purchase insurance from a particular insurance carrier—K&K Insurance—and, on occasion, will deny All Star Gyms' attempts to use other insurance carriers. K&K both (i) requires All Star Gyms to be USASF members before it will provide them coverage, and (ii) charges significantly higher annual premiums to All Star Gyms that enter their All Star Teams in even a single All Star Competition that is not sanctioned by USASF.

221.    All Star Gyms pay K&K between $19 and $24.55 per All Star Cheerleader, but those rates increase to $34 per Cheerleader if the All Star Gym enters its All Star Team in even a single competition that is not sanctioned by USASF. For one small All Star Gym, that amounts to a $2,300 difference in annual insurance premiums. This insurance arrangement dissuades All Star Gyms from attending non-USASF-sanctioned All Star Competitions. Most All Star Gyms have K&K insurance, and they are afraid that scheduling non-USASF-sanctioned All Star Competitions will lead either to higher premiums or to being considered out of compliance and thus having a coverage lapse.

222.    The USASF membership rules specify that members are not permitted to affiliate, partner with, or own non-USASF-sanctioned IEPs, and that every All Star Gym that wishes to attend USASF events must become a USASF member. Thus, All Star Gyms that attend at least one USASF event per year agree to these exclusionary terms.

### H.    The Exclusionary Scheme Foreclosed Competition in the Primary and Ancillary Relevant Markets

223.    Varsity's Exclusionary Scheme has successfully impaired and foreclosed a substantial share of each of the Relevant Markets from competitors. The Exclusionary Scheme has also created significant entry barriers for would be competitors in the Relevant Markets. As a direct and proximate result, Varsity collectively controls approximately 90% of the All-Star Competition Market and 80% of All-Star Apparel Market in the United States.

224.    Varsity has foreclosed competitors in both Relevant Markets from access to the most significant All-Star Gyms in its exclusionary Network Agreements. Varsity's "Network" Gyms collectively comprise a critical source of top-level talent and fees for its All-Star Competitions and the most important distribution channel for its All-Star Apparel.

225.    The remainder of the All-Star Gyms are offered the Family Plan, which as set forth above, impairs the ability of actual and potential rivals in both Relevant Markets to get access to the vast majority of customers in both Relevant Markets. These exclusionary agreements, together with the other conduct alleged to be part of the Exclusionary Scheme, have blocked and impaired rivals from accessing the vast majority of the participants and customers in both Relevant Markets.

226.    Varsity, together with the USASF, has also substantially foreclosed competition in both Relevant Markets by, *inter alia*, restricting access to the ability to award coveted Bids to Worlds and other All-Star Championship Bids, requiring adherence to restrictive rules and exclusionary insurance requirements, and other conduct alleged to be part of the Exclusionary Scheme in this Complaint.

**I.      The Exclusionary Scheme Caused Plaintiffs and Members of the
Class to Suffer Antitrust Injury and Damages**

227.      As a direct and proximate result of Varsity's Exclusionary Scheme, as alleged
herein, Plaintiffs and the Class members have suffered antitrust injury in that they paid artificially
inflated prices for goods and services that they purchased directly from Varsity in one or both of
the Relevant Markets during the Class Period. The full amount of such damages Plaintiffs and the
Class suffered will be calculated after discovery and upon proof at trial.

228.      The conduct comprising Varsity's Exclusionary Scheme is continuing and so are
the injuries and damages suffered by Class members.

**J.      The Exclusionary Scheme Caused Anticompetitive Effects in Both
Relevant Markets with No Offsetting Procompetitive Efficiencies**

229.      Defendants' Exclusionary Scheme has substantially foreclosed competition in the
Relevant Markets and allowed Varsity to obtain, maintain, and/or enhance monopoly power in
both of the Relevant Markets. As a result of the Exclusionary Scheme, prices in both Relevant
Markets have been artificially inflated substantially above competitive levels, output in each of the
Relevant Markets has fallen below competitive levels, All Star Gyms and All Star Cheerleaders
have less choice in both Relevant Markets, and quality of competitions and products has been
diminished.

230.      **Higher Prices**: Due to the Exclusionary Scheme, Varsity has raised prices
associated with All Star Competitions and for All Star Apparel above competitive levels. For
instance, participation fees for Varsity All Star Competitions have increased substantially over the
Class Period. Varsity also began charging spectator admission fees to legacy-JAM Brands events
in 2016. Varsity has steadily increased those admission fees during the Class Period. In events
such as JAMFest Bam JAM, admission fees for adults doubled between late 2016 and 2019.

231.      Varsity has further exploited its monopoly power by steadily increasing the number
of "Stay-to-Play" events. At a "Stay-to-Play" event, each All Star Team member is required to

book lodging and stay at a Varsity-approved "Housing Partner" hotel.[57] These "stay-to-play" hotels generally charge substantially more than the competitive rate charged to other guests, since the All Star Cheerleaders are a captive audience. Varsity makes significant supracompetitive profits from its Stay-to-Play program by either working with the hotels to pass a mark-up to the All Star Team members and then taking a kick-back, or using Stay-to-Play to get discounted or free venues for hosting its All Star Competitions. If an All Star Competition participant stays at a hotel outside the "Stay-to-Play" consortium, that participant's All Star Team is barred from participating in the All Star Competition. If Varsity learns of this rule violation after the All Star Competition, it fines the All Star Gym that fielded that participant's All Star Team for the violation.

232.    Varsity also used the monopoly power gained and maintained through the Scheme to charge supracompetitive prices to Plaintiffs and the Class members for All Star Apparel.

233.    Plaintiffs and members of the Class have suffered antitrust injury because they pay supracompetitive prices for goods and services that they purchased directly from Varsity in the Relevant Markets during the Class Period. Those injuries are directly and proximately caused by Defendants' anticompetitive conduct. And they are ongoing.

234.    **Lower Output**: The Exclusionary Scheme has eliminated and impaired rivals in the Relevant Markets and blocked the entry and growth of others potential rivals. As a result, the number, size, and significance of All Star Apparel manufacturers and All Star Competition producers have been reduced, and fewer people participate as All Star Cheerleaders. At least 35 All Star Gyms closed in 2019 as compared to a normal rate of 5 to 10 such closings in previous years.

235.    During the Class Period, Varsity shut down many of its own All Star Competitions in addition to eliminating rival IEPs and these rivals' events.

236.    There are no legitimate procompetitive justifications or efficiencies for the conduct alleged as part of the Exclusionary Scheme.

---

[57] https://www.varsity.com/home/stay-smart/.

237.   **Lower Quality:** The Exclusionary Scheme has allowed Varsity and USASF to resist the demand to prevent sexual abuse in the industry, thereby providing a lower quality cheerleading experience to gym owners, parents, and children.

238.   A recent article in USA Today alleges that 140 people who continue to work unrestricted in the All Star cheerleading industry have been convicted of sex crimes against minors, 74 of whom are registered sex offenders.[58]

239.   USASF has a system for checking the backgrounds of coaches and gym owners, but its system only flagged 21 people before USA Today reporters began their investigation. Furthermore, USASF only banned these 21 people from going "backstage" at USASF events— they could still work in the industry.

240.   USASF previously fielded complaints from its customers regarding sex offenders within the cheerleading industry, but it refused to take comprehensive action in response to those complaints.

241.   Varsity, through USASF, refused to take action because its market share and lack of effective competition allowed it to resist calls for a more rigid, restrictive, and expensive background check system. Participants in the cheerleading industry were powerless to demand reform without a realistic threat to take their business elsewhere.

## VIII.   CLAIMS FOR RELIEF

**COUNT I**
**MONOPOLIZATION**
**15 U.S.C. § 2**
**(On Behalf of Plaintiffs and the Class and Against Varsity)**

242.   Plaintiffs incorporate by reference all of the factual averments in the preceding and ensuing paragraphs as if fully alleged herein.

243.   The Relevant Markets are the markets for All Star Competitions and All Star Apparel in the United States.

---

[58] https://www.usatoday.com/in-depth/news/investigations/2020/09/18/cheerleading-cheer-investigation-sexual-misconduct-sex-offender-banned-list/3377622001/.

244.    Varsity controls 90% of the All Star Competition Market and 80% of the All Star Apparel Market, and it possesses monopoly power in the Relevant Markets. Varsity has obtained, enhanced, and maintained monopoly power in the Relevant Markets through the Exclusionary Scheme alleged herein, which conduct is continuing. Varsity has substantially foreclosed competition and has abused and continues to abuse its power to maintain and enhance its market dominance in the Relevant Markets through its Exclusionary Scheme.

245.    As a direct and proximate result of this continuing violation of Section 2 of the Sherman Act, Plaintiffs and the Class members have suffered injury and damages in the form of artificially inflated prices paid directly to Varsity for All Star Competitions and All Star Apparel.

246.    Plaintiffs, on behalf of themselves and other Class members, seek monetary damages from Varsity for these violations. Varsity Brands, Varsity Spirit, and Varsity Fashion are jointly and severally liable for the full amount of the damages. Damages will be quantified on a class-wide basis. Plaintiffs' and Class Members' injuries are of the type the antitrust laws were designed to prevent and flow directly from Varsity's unlawful conduct as alleged herein.

247.    Plaintiffs, on behalf of themselves and the Class, seek injunctive relief barring Varsity from engaging in the anticompetitive Scheme alleged herein. The violations set forth above, and the effects thereof, are continuing and will continue unless injunctive relief is granted.

### COUNT II
### CONSPIRACY TO MONOPOLIZE
### 15 U.S.C. § 2
### (On Behalf of Plaintiffs and the Class and Against Varsity and USASF)

248.    Plaintiffs incorporate by reference all of the factual averments in the preceding paragraphs as if fully alleged herein.

249.    The Relevant Markets are the All Star Competition Market and the All Star Apparel Market in the United States.

250.    Varsity controls 90% of the All Star Competition Market and 80% of the All Star Apparel Market, and it has monopoly power in both Relevant Markets.

251.     USASF has knowingly conspired with Varsity to assist Varsity in maintaining and enhancing dominance in the Relevant Markets through the Exclusionary Scheme alleged herein, which conduct is continuing.

252.     Defendants use USASF rules governing All Star Competitions to require and reward use of Varsity's All Star Apparel.

253.     The USASF requires All Star Gyms, All Star Cheerleaders, and All Star Team coaches who enter USASF All Star Competitions, including those owned and produced by Varsity, to be USASF members.

254.     Defendants limit All Star Competitions through which Bids can be obtained to the Worlds All Star Championship, with the vast majority of such All Star Competitions being Varsity owned.

255.     USASF prevents competing non-member IEPs from using the USASF rules, at times with threats of litigation. Competitors are often unable or unwilling to learn multiple sets of rules, and are therefore disincentivized from attending non-USASF All Star Competitions.

256.     USASF also creates rules governing All Star Apparel that align with Varsity's latest All Star Apparel designs, disincentivizing All Star Teams from purchasing non-Varsity All Star Apparel.

257.     Defendants have abused and continue to abuse their power to maintain and enhance Varsity's market dominance in the Relevant Markets, and enrich USASF, through Varsity's Exclusionary Scheme.

258.     USASF and Varsity have each knowingly and willingly engaged in overt acts as part of their conspiracy for Varsity to gain, enhance, and maintain monopoly power in the Relevant Markets. By engaging in one or more of the overt acts alleged herein, USASF and Varsity intentionally and knowingly facilitated Varsity's Exclusionary Scheme. At the same time, USASF and Varsity drove increasing numbers of All Star Gyms, All Star Cheerleaders, and All Star Team coaches to pay membership fees to USASF in order to participate in Varsity's All Star

Competitions. USASF has used the Exclusionary Scheme to collect more than $5 million in membership dues annually from All Star Gyms, All Star Cheerleaders, and All Star Team coaches.

259.   As a direct and proximate result of this continuing violation of Section 2 of the Sherman Act, Plaintiffs and the Class members have suffered injury and damages in the form of artificially inflated prices paid directly to Varsity for All Star Competitions and All Star Apparel.

260.   Plaintiffs, on behalf of themselves and other Class members, seek money damages from Defendants for these violations. Defendants are jointly and severally liable for the full amount of the damages. Damages will be quantified on a class-wide basis for the Class. Plaintiffs' and Class members' injuries are of the type the antitrust laws were designed to prevent and flow directly from Defendants' unlawful conduct.

261.   Plaintiffs, on behalf of themselves and the Class, seek injunctive relief barring Defendants from engaging in the anticompetitive scheme alleged herein. The violations set forth above, and the effects thereof, are continuing and will continue unless injunctive relief is granted.

## IX.   JURY TRIAL DEMANDED

262.   Pursuant to Fed. R. Civ. P. 38(c), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully ask the Court for a judgment that:

(a)   Certifies the Class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3), and directs that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declares Plaintiffs as representatives of the Class;

(b)   Enters joint and several judgments against Defendants and in favor of Plaintiffs and the Class;

(c)   Appoints Plaintiffs and their attorneys as class representatives and class counsel, respectively

      (d)     Awards Plaintiffs and the Class treble the amount of damages actually sustained by reason of the antitrust violations alleged herein, plus the reasonable costs of this action including attorneys' fees;

      (e)     Orders such equitable and injunctive relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct;

      (f)     Awards Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees as provided by law;

      (g)     Enters judgment against Defendants, holding them jointly and severally liable for the antitrust violations alleged herein; and

      (h)     Directs such further relief as it may deem just and proper.

Dated: October 2, 2020

Respectfully submitted,

s/ J. Gerard Stranch, IV
J. Gerard Stranch, IV (TN BPR #23045)
Benjamin A. Gastel (TN BPR #28699)
**BRANSTETTER, STRANCH &
JENNINGS, PLLC**
223 Rosa Parks Ave. Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
gerards@bsjfirm.com
beng@bsjfirm.com

*Liaison Counsel for Plaintiffs and the Proposed
Direct Purchaser Class*

H. Laddie Montague, Jr.*
Eric L. Cramer*
Mark R. Suter*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19106
Tel: (215) 875-3000
hlmontague@bm.net
ecramer@bm.net
msuter@bm.net

Jonathan W. Cuneo***
Katherine Van Dyck***
Victoria Sims*
**CUNEO GILBERT & LADUCA LLP**
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Tel: (202) 789-3960
jonc@cuneolaw.com
kvandyc@cuneolaw.com
vicky@cuneolaw.com

Gregory S. Asciolla*
Karin E. Garvey*
Veronica Bosco*
Ethan H. Kaminsky*
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700

gasciolla@labaton.com
kgarvey@labaton.com
vbosco@labaton.com
ekaminsky@labaton.com

*Interim Co-Lead Counsel for the Proposed
Direct Purchaser Class*

Benjamin D. Elga***
**JUSTICE CATALYST LAW, INC.**
81 Prospect Street
Brooklyn, NY 11201
Tel: (518) 732-6703
belga@justicecatalyst.org

Brian Shearer***
Craig L. Briskin***
**JUSTICE CATALYST LAW, INC.**
718 7th Street NW
Washington, DC 20001
Tel: (518) 732-6703
brianshearer@justicecatalyst.org
cbriskin@justicecatalyst.org

Roberta D. Liebenberg***
Jeffrey S. Istvan***
Mary L. Russell*
**FINE KAPLAN AND BLACK, R.P.C**
One South Broad St., 23rd Floor
Philadelphia PA 19107
Tel: (215) 567-6565
rliebenberg@finekaplan.com
jistvan@finekaplan.com
mrussell@finekaplan.com

Nathan A. Bicks (TN BPR #10903)
Frank B. Thacher III (TN BPR #23925)
**BURCH, PORTER, & JOHNSON, PLLC**
130 North Court Ave.
Memphis, TN 38103
Telephone: (901) 524-5000
nbicks@bpjlaw.com
fthacher@bpjlaw.com

Aubrey B. Harwell, Jr. (TN BPR #002559)
Charles Barrett (TN BPR #020627)
Aubrey B. Harwell III (TN BPR #017394)

65

**NEAL & HARWELL, PLC**
1201 Demonbreun St., Suite 1000
Nashville, TN 37203
Telephone: (615) 244-1713
aharwell@nealharwell.com
cbarrett@nealharwell.com
tharwell@nealharwell.com

* Admitted pro hac vice
** Pro hac vice application pending
*** Pro hac vice application forthcoming

*Additional Counsel for Plaintiffs and the Proposed Direct Purchaser Class*

# CERTIFICATE OF SERVICE

The undersigned certifies the foregoing document was filed with the Court's Case Management/Electronic Case Filing System, this 2nd day of October, 2020, and served upon the following counsel:

George S. Cary
Steven J. Kaiser
Alexis Collins
Mark W Nelson
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
2112 Pennsylvania Ave., NW
Washington, DC 20037
Tel: (202) 974-1500
gcary@cgsh.com
skaiser@cgsh.com
alcollins@cgsh.com
mnelson@cgsh.com

*Attorneys for Defendants Varsity Brands,*
*LLC, Varsity Spirit, LLC,*
*and Varsity Spirit Fashion & Supplies, LLC*

Grady Garrison
Nicole D. Berkowitz
Adam S. Baldridge
Matthew Sinon Mulqueen
**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**
165 Madison Ave., Suite 2000
Memphis, TN 38103
Tel: (901) 577-8166
ggarrison@bakerdonelson.com
nberkowitz@bakerdonelson.com
abaldridge@bakerdonelson.com
mmulqueen@bakerdonelson.com

*Attorney for U.S. All Star Federation, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| **JESSICA JONES**, **MICHELLE VELOTTA**, and **CHRISTINA LORENZEN** on Behalf of Themselves and All Others Similarly Situated, | Case No. |
| **Plaintiffs,** | COMPLAINT CLASS ACTION |
| v. | **JURY DEMAND** |
| **VARSITY BRANDS, LLC; VARSITY SPIRIT, LLC; VARSITY SPIRIT FASHION & SUPPLIES, LLC; U.S. ALL STAR FEDERATION, INC.; JEFF WEBB; CHARLESBANK CAPITAL PARTNERS LLC; and BAIN CAPITAL PRIVATE EQUITY,** | |
| **Defendants.** | |

# EXHIBIT 2
COMPLAINT CLASS ACTION

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ......................................................................1

II.     JURISDICTION AND VENUE..................................................................2

III.    PARTIES ...................................................................................................3

IV.     AGENTS & CO-CONSPIRATORS ............................................................6

V.      CLASS ALLEGATIONS ............................................................................7

VI.     INTERSTATE TRADE & COMMERCE..................................................10

VII.    FACTUAL ALLEGATIONS.....................................................................11

        A.      Background ....................................................................................11

                1.      About Competitive Cheer ...................................................11

                2.      Cheer Apparel ....................................................................14

                3.      Cheer Camp........................................................................15

                4.      Varsity ................................................................................16

        B.      Varsity Engaged in a Scheme to Exclude Rivals and Acquire, Enhance,
                and Maintain Monopoly Power in the Relevant Markets. ...................................24

                1.      Elements of Varsity's Exclusionary Scheme............................................25

                2.      Varsity and USASF Created Competition Rules That Deny
                        Potential Competitors a Foothold in the Industry. .................................27

                3.      Varsity Uses Exclusive Agreements with All-Star Gyms and
                        Schools to Foreclose Access to the Relevant Markets.............................29

                4.      Varsity Forecloses Access to the Cheer Apparel Market. .......................32

                5.      Varsity Leverages Its Monopoly Power in the Cheer
                        Competition Market to Foreclose Competition in the Cheer
                        Camp Market........................................................................33

                6.      Varsity Counter-Programmed Rivals' Competitions.............................34

        C.      Varsity's Monopoly Power in the Relevant Markets .........................................35

                1.      Monopoly Power in the Cheer Competition Market (the
                        Primary Market)........................................................................35

                2.      Monopoly Power in the Cheer Apparel Market (Related
                        Market)....................................................................................40

                3.      Monopoly Power in the Cheer Camp Market (Related Market).............42

VIII.   PLAINTIFFS HAVE BEEN HARMED AND SUFFERED ANTITRUST INJURY AS A DIRECT AND PROXIMATE RESULT OF DEFENDANTS' UNLAWFUL ACTIONS. ....................................................................................................................45

    A.   Varsity Charges Parents Monopoly Rents in Related Markets. ..........................45

    B.   The Exclusionary Scheme Caused Anticompetitive Effects in the Relevant Markets Without Procompetitive Benefits. ...........................................47

IX.   CLAIMS FOR RELIEF ...................................................................................................48

Plaintiffs Jessica Jones, Michelle Velotta, and Christina Lorenzen ("Plaintiffs"), on behalf of

themselves and all others similarly situated, bring this Class Action Complaint against Defendants

Varsity Brands, LLC ("Varsity Brands"); Varsity Spirit, LLC ("Varsity Spirit"); Varsity Spirit Fashion

& Supplies, LLC ("Varsity Spirit Fashion") (collectively with Varsity Brands and Varsity Spirit,

"Varsity"); U.S. All Star Federation, Inc. ("USASF"); Jeff Webb; Charlesbank Capital Partners LLC

("Charlesbank"); and Bain Capital Private Equity ("Bain") (together with Varsity, USASF, Jeff Webb,

and Charlesbank, "Defendants") and allege as follows:

## I.   NATURE OF THE ACTION

1.      Acting in concert, Defendants Varsity, USASF, Jeff Webb, Bain, Charlesbank and their

co-conspirators conspired to raise, fix and stabilize the prices charged associated with Competitive

Cheer. Defendants did so by forming a scheme to create an illegal monopoly and to dominate

Competitive Cheer in the United States (the "Scheme," "Exclusionary Scheme," or "Challenged

Conduct"). Defendants accomplished this through the acts detailed below. The Scheme continues today.

As a result, cheer athletes, together with their parents, friends, and family have been overcharged by

Defendants. Defendants have obtained millions of dollars in supracompetitive illegal profits.

2.      Competitive Cheer is a sport in which teams of athletes develop routines combining

tumbling, stunting, pyramids, and dance. The teams are typically affiliated with a private gym or with a

school. Teams compete against one another in Cheer Competitions. Rule-making organizations such as

USASF set the rules and regulations for Cheer Competitions, including rules about the apparel athletes

can wear in Cheer Competitions.

3.      Varsity has monopoly power in the market for Cheer Competitions, and it controls the

USASF and all other rule-making organizations governing the sport of Competitive Cheer. Varsity

acquired its monopoly through a systematic program of acquiring its rivals and using its dominant

market position and its control of the rule-making organizations to create barriers to foreclose

competition in the Cheer Competition Market.

4.      Varsity also manufactures and sells the apparel, accessories, and equipment athletes are

required to use in Cheer Competitions and at practices. Varsity has acquired its largest competitors in

the Cheer Apparel Market and leveraged its dominant position in the Cheer Competition Market to acquire, enhance, and maintain monopoly power in the Cheer Apparel Market.

5.      Competitive Cheer is a year-round sport. After a competition season that roughly corresponds with the school year, cheer teams attend camps where they work on their skills and develop their routines. Here again, Varsity has leveraged its power in the Cheer Competition Market to acquire, enhance, and maintain monopoly power in the Cheer Camp Market.

6.      As a direct and proximate result of Varsity's unlawful and anticompetitive Exclusionary Scheme, Plaintiffs and the members of the Classes (defined below) have indirectly paid higher prices for Cheer Competitions, Cheer Apparel, and Cheer Camps, as well as related goods and services, than they would have paid in a competitive marketplace absent the Exclusionary Scheme, and have thereby suffered, and continue to suffer, antitrust injury.

## II.    JURISDICTION AND VENUE

7.      The Court has jurisdiction over Plaintiffs' claim for injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), 1337(a), and 1367.

8.      This Court has personal jurisdiction over Defendants because they purposefully directed their business activities toward this jurisdiction and had substantial contacts with this jurisdiction, and because Plaintiffs' claims for relief arise from and relate to illegal acts committed by Defendants within this jurisdiction. Plaintiffs paid unlawful overcharges to Varsity and suffered antitrust injury within this jurisdiction.

9.      Venue is appropriate within this District under 28 U.S.C. §1391 because, at all relevant times, Defendants transacted business within this District, and the interstate trade and commerce described hereinafter was and is carried out, in substantial part, in this District.

10.     Defendants engaged in conduct inside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

11.     Defendants' activities were within the flow of, and were intended to and did have a substantial effect on, interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

12.     By reason of the unlawful activities hereinafter alleged, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and the geographically dispersed Class members. Defendants, directly and through their agents, engaged in activities affecting all states, to obtain and maintain monopolistic power in the Relevant Markets and charge supracompetitive prices to Plaintiffs and the Classes for Cheer Competitions, Cheer Apparel and Cheer Camps, unreasonably restrained trade, and adversely affected the above-described markets.

III.    **PARTIES**

13.     Plaintiff Jessica Jones is the parent of two Competitive Cheer Athletes who were members of All-Star Gyms. During the Class Period, Ms. Jones indirectly paid Varsity for enrollment in Cheer Competitions and indirectly purchased Cheer Apparel manufactured and sold by Varsity. Ms. Jones paid artificially inflated prices for goods and services purchased indirectly from Varsity in the Relevant Markets, and thus has suffered economic harm and damages as a direct and proximate result of Defendants' unlawful conduct. At all times relevant to this litigation, Ms. Jones was and is a citizen and resident of the United States, currently residing in Wichita, Kansas.

14.     Plaintiff Michelle Velotta is the parent of a Competitive Cheer Athlete who was a member of a school team. During the Class Period, Ms. Velotta indirectly paid Varsity for enrollment in Varsity School Competitions and Varsity Cheer Camps, and indirectly purchased Cheer Apparel manufactured and sold by Varsity. Ms. Velotta paid artificially inflated prices for goods and services purchased indirectly from Varsity in the Relevant Markets, and thus has suffered economic harm and damages as a direct and proximate result of Defendants' unlawful conduct. At all times relevant to this litigation, Ms. Velotta was and is a citizen and resident of the United States, currently residing in San Jacinta, California.

15.     Plaintiff Christina Lorenzen is the parent of a Competitive Cheer Athlete who was a member of a school team. During the Class Period, Ms. Lorenzen indirectly paid Varsity for enrollment in Varsity School Competitions and indirectly purchased Cheer Apparel manufactured and sold by

Varsity. Ms. Lorenzen paid artificially inflated prices for goods and services purchased indirectly from Varsity in the Relevant Markets, and thus has suffered economic harm and damages as a direct and proximate result of Defendants' unlawful conduct. At all times relevant to this litigation, Ms. Lorenzen was and is a citizen and resident of Berthoud, Colorado.

16.     Defendant Varsity Brands, LLC—formerly known as Varsity Brands, Inc.— is a Delaware corporation with its principal place of business in Memphis, Tennessee. It is the corporate parent company of Defendants Varsity Spirit, LLC and Varsity Spirit Fashion & Supplies, LLC. At all times relevant to this Complaint, either directly or through the affiliates it wholly owns and/or controls, Varsity Brands (a) organized, promoted, produced, and/or managed Cheer Competitions throughout the United States, including in this District; (b) manufactured, distributed, marketed, and/or sold Cheer Apparel that was sold and purchased throughout the United States, including in this District; and (c) organized, operated, and managed Cheer Camps attended by Competitive Cheer Athletes throughout the United States, including in this District.

17.     Defendant Varsity Spirit LLC—formerly known as Varsity Spirit Corporation—is a Tennessee corporation with its principal place of business in Memphis, Tennessee. At all times relevant to this Complaint, either directly or through the affiliates it wholly owns and/or controls (including Universal Cheerleading Association ("UCA") and National Cheerleading Association ("NCA"), among others), Varsity Brands (a) organized, promoted, produced, and/or managed Cheer Competitions throughout the United States, including in this District; (b) manufactured, distributed, marketed, and/or sold Cheer Apparel that was sold and purchased throughout the United States, including in this District; and (c) organized, operated, and managed Cheer Camps attended by Competitive Cheer Athletes throughout the United States, including in this District.

18.     Defendant Varsity Spirit Fashion & Supplies Inc. ("Varsity Spirit Fashion") is a Minnesota corporation with its principal place of business in Memphis, Tennessee. At all times relevant to this Complaint, either directly or through the affiliates it wholly owns and/or controls, Varsity Brands: (a) organized, promoted, produced, and/or managed Cheer Competitions throughout the United States, including in this District; and (b) manufactured, distributed, marketed, and/or sold Cheer Apparel that was sold and purchased throughout the United States, including in this District.

19.      Defendant U.S. All Star Federation, Inc. ("USASF") is a Tennessee non-profit corporation with its principal place of business in Memphis, Tennessee. At all times relevant to this Complaint, USASF, either directly and/or through its affiliates, which it wholly owns and/or controls has: (a) promulgated and/or enforced rules governing Cheer Competitions and, more broadly, Competitive Cheer throughout the United States, including in this District; and (b) organized, promoted, produced, and/or managed Cheer Competitions throughout the United States, including in this District and furthered the goals and purposes of the conspiracy and other anticompetitive activity as set forth herein.

20.      Defendant Jeff Webb, a resident of Memphis, Tennessee, is the founder and Chairman of the board of directors of Varsity Brands, LLC. He was Varsity's president until 2017. At all times relevant to this complaint, Mr. Webb exercised control over all decisions about: (a) acquisitions of rival cheerleading event producers, apparel manufacturers and cheer camp providers throughout the United States, including this District; (b) pricing and policies for Cheer Competitions, Cheer Apparel, and Cheer Camps throughout the United States, including this District; and (c) investing in and conspiring with Cheer Competition rule-making organizations throughout the United States, including this District. Through these and other acts Mr. Webb played a key role in the conception and execution of the alleged unlawful conspiracy as set forth herein.

21.      Defendant Charlesbank Capital Partners LLC ("Charlesbank") is a Massachusetts Limited Partnership with its principal place of business in Boston, Massachusetts. Charlesbank wholly owned Varsity Brands LLC from 2014 to 2018. Charlesbank conspired with Varsity Brands LLC and Jeff Webb to acquire rival cheerleading event producers, cheer apparel manufacturers, and cheer camp providers throughout the United States, including this District. Charlesbank provided funding to enhance, extend, and ensure Varsity Brand's monopoly power and obtained financial rewards from having done so and continues to do so as set forth herein.

22.      Bain Capital Private Equity ("Bain" or "Bain Capital") is a Massachusetts Limited Partnership, with its principal place of business in Boston, Massachusetts. Bain purchased defendant Varsity Brands, LLC in 2018, which it invested in to obtain the benefits of Varsity brand's monopoly power in the Cheer Competitions, Cheer Apparel, and Cheer Camps throughout the United States, and

in this District. Bain Capital provided funding to enhance, extend, and ensure Varsity Brands'
monopoly power and obtained financial rewards and benefits from having done so and continue to do
so as forth herein.

**IV.     AGENTS & CO-CONSPIRATORS**

23.     The anticompetitive and unlawful acts alleged against Defendants in this Complaint
were authorized, ordered, or performed by their officers, agents, employees, representatives, or
shareholders while actively engaged in the management, direction or control of Defendants' business or
affairs.

24.     The officers, agents, employees, representatives, or shareholders operated under the
explicit and apparent authority of their principals.

25.     Each Defendant, and its respective subsidiaries, affiliates and agents operated as a single
unified entity.

26.     Whenever in this Complaint reference is made to any act, deed, or transaction of any
corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or
through its officers, directors, agents, employees, or representatives while they were actively engaged
in the management, direction, control, or transaction of the corporation's business or affairs.

27.     Individuals alleged to have engaged in misconduct in violation of the laws listed herein
are alleged to have done so on behalf of all members of their corporate family, i.e., Varsity. Individuals
within the companies and customers did not know or did not distinguish between the corporate
affiliations of different individuals. Varsity Brands, Varsity Spirit, and Varsity Spirit Fashion all
affirmatively and collectively represent themselves as one corporate family, rather than separate
subsidiaries and parents. For instance, and without limitation, the Varsity Brands website states "WE
ARE…Varsity Spirit."

28.     Various persons, businesses, or fictitious persons not named as Defendants herein
participated as co-conspirators in the Exclusionary Scheme alleged herein and may have performed acts
and made statements in furtherance thereof. For example, various businesses, through the aid or
assistance of Varsity, promoted Varsity-affiliated activities and earned substantial income from such

activities, with the knowledge, support and encouragement of Varsity and other co-conspirators.

Plaintiffs reserve the right to name some or all of these persons as defendants at a later date.

## V.   CLASS ALLEGATIONS

29.     Plaintiffs bring this action on behalf of themselves, under Federal Rule of Civil

Procedure 23(a), (b)(1), and (b)(2), as representatives of a class of indirect purchasers seeking

injunctive relief ("Injunctive Relief Class") defined as follows:

> All natural persons and entities in the United States that indirectly paid
> Varsity or any Varsity subsidiary or affiliate, from December 10, 2016,
> until the continuing Exclusionary Scheme alleged herein ends (the "Class
> Period") for: (a) registration, entrance, or other fees and expenses
> associated with participation in one or more Varsity Cheer Competitions,
> including registration fees to USASF; (b) Varsity Cheer Apparel;
> (c) Varsity Cheer Camp Fees; or (d) accommodations at one or more
> Varsity Cheer Competitions, including registration fees to USASF;
> (b) Varsity Cheer Apparel; or (c) Varsity Cheer Camp Fees.

30.     Plaintiffs also bring this action under Federal Rules of Civil Procedure 23(a) and (b)(3),

as representatives of a nationwide class seeking damages for violations of Tenn. Code Ann. §§ 47-25-

101, *et seq*., ("Nationwide Damages Class") defined as follows:

> All natural persons and entities in the United States that indirectly paid
> Varsity or any Varsity subsidiary or affiliate, from December 10, 2016,
> until the continuing Exclusionary Scheme alleged herein ends (the "Class
> Period") for: (a) registration, entrance, or other fees and expenses
> associated with participation in one or more Varsity Cheer Competitions;
> (b) Varsity Cheer Apparel; (c) Varsity Cheer Camp Fees; or
> (d) accommodations at one or more Varsity Cheer Competitions.

31.     In the alternative, Plaintiffs also bring this action under Federal Rules of Civil Procedure

23(a) and (b)(3), as representatives of a class seeking damages for violations of various state antitrust

and consumer protection laws ("State Law Damages Class") defined as follows:

> All natural persons and entities in the United States that indirectly paid
> Varsity or any Varsity subsidiary or affiliate, from December 10, 2016,
> until the continuing Exclusionary Scheme alleged herein ends (the "Class
> Period") for: (a) registration, entrance, or other fees and expenses
> associated with participation in one or more Varsity Cheer Competitions;
> (b) Varsity Cheer Apparel; (c) Varsity Cheer Camp Fees; or
> (d) accommodations at one or more Varsity Cheer Competitions, in
> Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut,
> the District of Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas,
> Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi,

Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, Washington, West Virginia, and Wisconsin.

32.     Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, officers, executives, and employees; defendants' attorneys in this case, federal government entities and instrumentalities, states or their subdivisions, and all judges and jurors assigned to this case.

33.     The members of the Classes are so numerous and geographically dispersed throughout the United States that joinder of all members is impracticable. Moreover, given the costs of complex antitrust litigation, it would be uneconomical for many plaintiffs to join their individual claims.

34.     Plaintiffs' claims are typical of the members of the Classes. Plaintiffs and all members of the Classes were injured by the same wrongful conduct by Defendants. Defendants' anticompetitive conduct deprived the members of the Classes of the benefits of competition from less expensive competitions, apparel, equipment, camps, insurance and accommodations, causing them to pay artificially-inflate supracompetitive prices in the Relevant Markets. Although the precise number of such individuals is unknown to Plaintiffs, Plaintiffs believe that the number of Class members is, at minimum, in the thousands, and that the members reside or are located throughout the United States, including in this District.

35.     Plaintiffs will fairly and adequately protect and represent the interests of the Classes. The interests of the Plaintiffs are aligned with, and not antagonistic to, those of the other Class members.

36.     Common questions of law and fact exist as to all members of the Classes. Defendants' anticompetitive Exclusionary Scheme commonly implicated and was generally applicable to all the Class members, thereby making class-wide adjudication and relief appropriate. Such questions of law and fact common to the Class include, but are not limited to:

(a)     whether Defendants engaged in a conspiracy in violation of the antitrust laws;

(b)     whether the markets for Cheer Competitions, Cheer Apparel, and Cheer Camps are appropriate relevant markets for analyzing the claims in this case;

(c)     whether the relevant geographic market is the United States;

(d)      whether Varsity possesses monopoly power in the Relevant Markets;

(e)      whether Varsity willfully acquired, maintained, and/or enhanced monopoly power in the Relevant Markets;

(f)      whether Varsity and USASF conspired to assist Varsity in maintaining and/or enhancing dominance in the Relevant Markets;

(g)      whether Varsity and USASF engaged in overt acts furthering their conspiracy to maintain and enhance Varsity's dominance in the Relevant Markets;

(h)      whether Defendants engaged in unlawful exclusionary conduct to impair the opportunities of actual or potential rivals in the Relevant Markets and thereby foreclosed substantial competition in those markets;

(i)      whether Defendants' Exclusionary Scheme maintained or enhanced Varsity's monopoly power in one or more of the Relevant Markets;

(j)      whether Defendants engaged in unfair methods of competition, and unfair and deceptive acts, in violation of state consumer protection laws;

(k)      whether Defendants' Exclusionary Scheme had anticompetitive effects in one or more of the Relevant Markets;

(l)      whether Defendants' actions alleged herein caused injury to Plaintiffs and the Class members by causing them to pay artificially inflated prices in the Relevant Markets during the Class Period;

(m)    the appropriate measure of damages; and

(n)    the propriety of declaratory and injunctive relief.

37.    Plaintiffs are more than adequate representatives of the Classes, and their chosen class counsel (the undersigned) are more than adequate attorneys. Plaintiffs have the incentive, and are committed to prosecuting this action, for the benefit of the Classes. Plaintiffs have no interests that are antagonistic to those of the Classes. Plaintiffs have retained counsel highly experienced in antitrust and class action litigation.

38.    Class action treatment is a superior method for the fair and efficient adjudication

of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

39.     Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VI.   INTERSTATE TRADE & COMMERCE

40.     Defendants' anticompetitive and unlawful conduct as alleged herein has taken place in and affected the continuous flow of interstate trade and commerce in the United States by:

(a)     organizing, promoting, and managing Varsity Cheer Competitions throughout the United States; and

(b)     manufacturing, distributing, marketing, and selling Varsity Cheer Apparel throughout the United States;

(c)     organizing, promoting and managing Varsity Cheer Camps throughout the United States.

41.     The Challenged Conduct alleged herein affected billions of dollars of commerce during the relevant period. During the Class Period, Varsity controlled approximately 80% of the Cheer Competition Market; 80% of the Cheer Apparel Market and 75% of the Cheer Camp Market. Plaintiffs and the proposed Class members collectively paid billions of dollars to Varsity for All-Star Cheer and School Cheer Competitions, USASF registration fees, Cheer Apparel, and Cheer Camps as well for goods and services in related markets like lodging and insurance. Defendants have inflicted antitrust injury by foreclosing competition by actual and potential rivals and artificially inflating prices paid by Plaintiffs and the Class members, all of whom have been engaged in commerce, in the Relevant Markets, within the Class Period.

## VII.   FACTUAL ALLEGATIONS

### A.   Background

#### 1.   About Competitive Cheer

42.   Competitive Cheer is an activity in which teams of athletes perform routines lasting 2 minutes and 30 seconds that incorporate elements of tumbling, stunting, pyramids, and synchronized dance, set to music. In some competitions, the routines also integrate elements of traditional sideline cheerleading, such as fight songs and motivational cheers. Competitive Cheer is athletically rigorous and technically challenging. It requires a significant amount of strength, flexibility, endurance, effort, coordination, focus, and cooperative teamwork.

43.   Unlike traditional sideline cheer, in which the participants perform on the sidelines in support of another sport, in Competitive Cheer, the athletes performing the routines are themselves the main event. Competitive Cheer frequently requires a year-round commitment from athletes and their families, with training beginning in the Fall, competitions running through the Winter and Spring, and camps in the Summer.

44.   About 4 million athletes participate in Competitive Cheer. It is an expensive sport. A single season costs between $3,000 and $7,000 per team member. These prices can rise to $20,000 per family, including costs for transportation, lodging, and attendance at Cheer Competitions and Cheer Camps. Competitive Cheer Athletes frequently attend six or more competitions a year.

45.   Competitive Cheer Athletes form teams that participate in Cheer Competitions with other teams. Cheer Competitions take the form of organized tournaments or similar events where teams are judged against one another. Cheer Competitions can be local, regional, or national in scope. For example, there are national tournaments in which teams from across the United States participate. These include the Varsity sponsored UCA, NCA and USA Championships. These are conducted under the auspices of the USASF.

46.   Cheer Competitions are typically one-day or two-day events hosted on weekends, although national championships such as The Summit or the Worlds typically last three to four days. Teams often travel great distances, either regionally or nationally, depending on the event. Competitive

Cheer Athletes practice for multiple hours a week, all year long, to perfect their performances for about six of these events each year.

47.     The number of teams that participate in Cheer Competitions can vary from 50 to 500 teams. Varsity alone puts on over 600 Cheer Competitions across the country annually. The events attract some 900,000 participants, including hundreds of teams in the All-Star and School Cheer divisions. Since approximately 1995, Varsity has partnered with Disney and holds at least seven major Varsity events at Walt Disney World Resort attended by nearly 200,000 Competitive Cheer Athletes and spectators annually. Two-day events tend to have more teams than one-day events, which typically have between 50 and 100 teams. The maximum number of Competitive Cheer Athletes that can participate on one Competitive Cheer Team at a competition depends on the division and age group but can be as high as 38 people.

48.     There are three different Competitive Cheer divisions: (1) All-Star Cheer, in which teams are affiliated with private gyms; (2) School Cheer, in which teams are affiliated with middle schools, high schools, or colleges; and (3) Youth & Recreation Cheer, in which teams are affiliated with a recreational organization such as the YMCA, or have no affiliation at all.[1]

### a.     All-Star Cheer

49.     In the All-Star Cheer division, athletes join teams that are usually affiliated with a private gym. In All-Star Cheer, athletes' families typically pay monthly or annual fees to the gym, which in turn pays Varsity for entry fees to competitions, uniforms, and other related fees. Varsity controls 90% of the All-Star Cheer Competition Market.

50.     All-Star Cheer Competitions are events at which All-Star Cheer Teams perform time-limited routines composed of tumbling, stunting, pyramids, and synchronized dance, set to music. Tumbling involves gymnastic skills like cartwheels and back handsprings. Stunting refers to a group of two or more individuals that elevate another cheerleader in the air. Pyramids are a form of interconnected stunting that involve a large group. Dance is a portion of a routine that consists of choreographed high-energy dance moves. The routines are performed and scored against other All-Star

---

[1] Varsity controls only 10% of the Youth and Recreation Cheer market. Thus, Plaintiffs are not including the Youth and Recreation Cheer market in this class action.

Cheer Teams at various local, regional, national, and worldwide competitions. All-Star Cheer Competitions involve All-Star Cheer Teams with participants from a wide variety of age groups, from preschool through college.

51.     All-Star Cheer Competitions do not involve sideline cheerleading. They are not sponsored by, or associated with, particular schools, intercollegiate athletics (like the National Collegiate Athletic Association), athletic conferences or similar organizations associated with college sports or amateur athletics. All-Star Cheer Competitions, instead, are organized by All-Star Gyms, which are central to the business. Participants typically compete in divisions defined by the USASF. Participants pay to compete, including fees for events, USASF registration fees, music licensing and insurance. Participants pay substantial sums to Varsity for associated goods and services, as set forth herein.

### b.     School Cheer

52.     In Varsity's School Cheer division, athletes join a team affiliated with middle school, high school, or college. Athletes' families pay participation fees to the school, which in turn pays entry fees and purchases uniforms and equipment from Varsity, among other charges. Varsity controls 70% of the School Cheer Competition Market.

53.     According to parents' associations, School Cheer is "a discipline of cheer that involves athletes in a School setting who cheer in support of other sports, most often football and basketball." According to USA Cheer, the national governing body for competitive cheerleading, school teams perform 2 minute and 30 seconds routines composed of tumbling, stunting, pyramids, and synchronized dance, in addition to elements of traditional sideline cheer such as band chants, fight songs, and motivational cheers. School teams can also compete in sideline Cheer Competitions, where they are judged on their ability to present cheers related to fictitious game situations and on the clarity and energy of their routines.

54.     National Cheerleading Association and Universal Cheer Association, both owned by Varsity, promote School Competitions, Cheer Camps, and national tournaments and championships. Most college teams now attend either NCA or UCA Championships. UCA and NCA also hold the largest middle and high school Nationals in the country.

55.     The costs for School Cheer are also high. Participants—in fact their parents, families and others—must pay for cheer apparel, practice clothes, camps, competitions, which together frequently exceeds several thousands of dollars per year, not including costs for transportation to and lodging at competitions, which parents also have to pay for separately. Varsity earns substantial income and supracompetitive profits as an intended and foreseeable result.

56.     Varsity exercises near complete control over the organizations that regulate the School Cheer Competition Market. Varsity founded USA Cheer and acquired control of AACCA and has been deeply involved with NFHS, the governing bodies for School Cheer. Varsity owns and controls the preeminent School national championships in NCA and UCA. Varsity founder Jeff Webb, when interviewed, has said that "the idea there was . . . for us to take achievement and spirit and sport, come together and become an extracurricular partner to the schools so that we not only sell products, we use the entrée with the cheerleading and graduation to go in and rebrand the school, help them redefine their mission, to modernize so that more kids are involved."

57.     Many students participate in both All-Star and School Cheer. They participate in School Cheer from August to November. They then participate in All-Star Cheer from November until May after The Summit, Worlds, and UCA and NCA School and All-Star Championships. Some students participate in both School and All-Star Cheer simultaneously.

58.     In 2017, Varsity created the Impact Program to sell rebranding in uniforms and cheer and dance to Junior Highs, High Schools, and Colleges, as well as VIP branding to sell additional products to schools. Under the Impact Program, Varsity supplies schools with signage and other branding merchandise, in exchange for an agreement by the school to attend Varsity Cheer Competitions and purchase Varsity Cheer Apparel.

### 2.     Cheer Apparel

59.     Cheer Apparel is an important requirement of Cheer Competitions. USASF rules govern virtually every detail of what All-Star Cheer Athletes may wear in a competition. Soft-soled shoes— which Varsity manufactures and sells—are required. Skirts, briefs, and shorts must meet inseam guidelines. Exposed midriffs are forbidden for certain age groups, and tops must be secured over at

least one shoulder. Bows cannot be of "excessive size," jewelry is forbidden, and makeup must be "uniform and appropriate."

60.     Varsity-promoted events operate as a showroom and sales platform for Cheer Apparel. Varsity entered the Cheer Apparel Market in 1980. Since then, Varsity has, through its Scheme, gained an 80% share of the Cheer Apparel Market, beginning with its acquisition in 1989 of Varsity Spirit Fashions and Supplies. As part of the Scheme, Varsity has used its monopoly power in the Cheer Competition Market to: (a) cause All-Star Cheer Gyms to enter into exclusive dealing agreements and rebate programs— including Varsity's Family Plan and Network Agreements—which make buying from non-Varsity Cheer Apparel competitors prohibitively expensive; (b) cause School Cheer programs to enter into exclusive agreements with Varsity through its Impact and VIP Branding programs; (c) exclude Cheer Apparel competitors from the merchandise showrooms at their Cheer Competitions; (d) acquire (and often dissolve) Cheer Apparel competitors; and (e) through its influence with the captured USASF, cause the judges to advantage Competitive Cheer Teams that wear Varsity Cheer Apparel.

61.     As one recent article states, "Thanks to an aggressive campaign of acquisitions, rebate plans that make it expensive for gym owners to switch suppliers, and other strategies, Varsity Spirit, the corporation's cheer division, commands north of 80 percent of the uniform market, as estimated by competitors. The company also wields outsize influence in virtually every aspect of the industry, including the camps and—most important—the competitions, which also serve as merchandise showrooms for apparel vendors."

### 3.     Cheer Camp

62.     Regardless of the level at which they participate, Cheer Athletes participate in multi-day overnight "camps" where Cheer Athletes practice Competitive Cheer skills, develop routines and purchase Cheer Apparel ("Cheer Camps"). Cheer Camps, by and large, occur during the Summer. Cheer Athletes pay to participate in Cheer Camp.

63.     Summer Cheer Camps are an integral part of All-Star and School Cheer and Varsity is the dominant player in the market. Varsity's Cheer Camp division is one of its most profitable. Varsity-

promoted Cheer Camps operate as a showroom and sales platform for Cheer Apparel and other income streams of the anticompetitive Scheme.

64.     Through its Scheme, Varsity has acquired and maintained control over 75% of the Cheer Camp Market. Varsity is the largest Cheer Camp operator in the world. About 330,000 team athletes attend 4,000 Varsity Cheer Camps each summer. Varsity Brands offers Cheer Camps for all age groups but most prominently for high school and college age athletes.

65.     Varsity offers School, All-Star, and Youth and Rec Cheer Camps, in large part during the Summer months, through its affiliates and assumed names, including: UCA, NCA, United Spirit Association, Cheerleading Techniques Camps, American Cheerleaders Association, Spirit Xpress Cheerleading, American Cheer Power, V!ROC, and Spirit Cheer.

66.     Varsity controls the premier Cheer Camps in the country. When Jeff Webb left NCA and started UCA, Cheer Camps were a large part of its portfolio. Varsity then set about acquiring or driving out its largest competitors, eventually acquiring monopoly power in the Cheer Camp Market.

67.     Varsity acquired United Spirit Association (USA) Cheer Camps in 1994. USA is the largest Summer Cheer Camp promoter in the Western United States, conducting camps primarily in Arizona, Arkansas, California, Colorado, Hawaii, Idaho, Montana, New Mexico, Nevada, Oregon, Texas, Utah, Washington, and Wyoming.

68.     In 1996, Varsity acquired United Special Events, a large California camp promoter.

69.     In 2004, Varsity acquired NCA and its portfolio of camps, which are held across the country.

**4.     Varsity**

70.     Defendant Varsity was founded by Jeffrey Webb in 1974.

71.     Today, Varsity produces over 600 Cheer Competitions in the United States annually in which approximately 900,000 athletes participate each year. Varsity produces the largest and most prestigious tournaments, including several national tournaments that attract more than 20,000 athletes at a time. Varsity is also the largest producer of Cheer Camps in the United States.

72.     Varsity controls 90% of the All-Star Cheer Competition Market and 70% of the School Cheer Competition Market. Varsity is a monopolist that has possessed and continues to possess monopoly power.

73.     Varsity manufactures and sells clothing, shoes, accessories like bows, and equipment (such as backpacks, pom poms, and megaphones) specifically intended for Cheer Athletes to wear and use at practice and in competitions ("Cheer Apparel"). Varsity acquired its monopoly power in the Cheer Apparel and Cheer Competition Markets by acquiring other Cheer Apparel manufacturers, by leveraging its monopoly power and by creating incentives—in the form of rebates for All-Star Gyms and free branding merchandise for schools—to sign exclusive contracts with Varsity. Under these contracts, All-Star Gyms and schools agree to purchase Varsity Cheer Apparel exclusively. Additionally, Varsity has created artificial barriers to entry in the form of competition rules that favor Varsity Cheer Apparel. Varsity Founder Jeff Webb has admitted that competition judges have awarded more points to teams that used Varsity equipment as props. Varsity holds an 80% market share in the Cheer Apparel Market.

74.     Varsity organizes and operates Cheer Camps, which are a requirement to enter most if not all competitions. Approximately 330,000 Cheer Athletes attend Varsity Cheer Camps every year. Varsity is a dominant producer of Cheer Camps. Varsity controls 75% of the Cheer Camp Market.

75.     For Competitive Cheer Athletes and their parents, All-Star Gyms and schools act as gateways to the sport of Competitive Cheer. Parents pay fees and other costs to the All-Star Gyms or schools with which their children's teams are affiliated, and the All-Star Gyms or schools use those fees to set up the teams, select the competitions they will compete in, register and pay entrance fees for the competitions, purchase uniforms and equipment for the athletes, and frequently select the camps the athletes will attend, among other things. Thus, the parents' fees to the All-Star Gyms and schools indirectly pay for Varsity's artificially inflated prices for general competition fees, USASF registration fees, apparel, camps, lodging and insurance. Varsity earns substantial income and supracompetitive profits as an intended and foreseeable result.

76.     For Varsity and its co-conspirators, on the other hand, All-Star Gyms and schools are the conduits that Varsity uses to gain access to the parents of Competitive Cheer Athletes and to funnel

them into the Varsity monopoly. The goal is to obtain the hard-earned money the parents devote to their children's activities and to obtain it at supracompetitive prices. By establishing exclusive relationships with All-Star Gyms and schools, Varsity and its co-conspirators obtain exclusive access to the parents that provide the funding for the income produced in the Relevant Markets.

a.    **A Brief History of Varsity**

77.    In 1948, Lawrence Herkimer, a former cheerleader at Southern Methodist University, founded a cheerleading business that he named the National Cheerleaders Association ("NCA"). Herkimer was instrumental in modern day cheer, Herkimer patented pom-poms and created the "Herkie Jump." Under Herkimer, the NCA ran cheer camps and sold sweaters and skirts. At the time, there were no Cheer Competitions, nor did Competitive Cheer exist.

78.    In the late 1960's Jeff Webb, Varsity's founder and former CEO, went to work at the NCA after completing his cheerleading career at the University of Oklahoma. Webb quickly rose the ranks. His view of cheerleading's future differed from Herkimer's. Herkimer explained to Sports Illustrated in 1991 that "[o]ur people are teachers, not showoffs," but Webb "hired hot dogs."

79.    In 1974, Webb left the NCA and took some of Herkimer's top employees with him to form his own cheerleading business, the Universal Cheerleaders Association ("UCA"), which was similar to the NCA but with Webb's own added twists: more focus on gymnastics-like skills and new tournaments created solely for cheer squads.

80.    In 1983, Webb changed the business's name from Universal Cheerleaders Association to Varsity Spirit, Inc. Varsity owns and operates UCA, which continues to be one of Varsity Brands' subsidiaries to this day.

81.    In June 1997, Riddell acquired Varsity Spirit, Inc. and its subsidiaries for $91 million. Jeff Webb, at that time the President and CEO of Varsity, became Vice Chair of the Board of Directors.

82.    Varsity was a publicly traded company between 2001 and 2003.

83.    In 2003, Leonard Green and Partners took Varsity private in a deal valued at $131 million, and changed the name to Varsity Brands, Inc.

84.     In 2014, Charlesbank Capital Partners acquired Varsity, including Varsity Brands, Inc.
and Varsity Spirit, Inc. for $1.5 billion. That year, Charlesbank converted both Varsity Brands, Inc. and
Varsity Spirit, Inc. to limited liability companies owned and controlled by Charlesbank.

85.     In 2018, Varsity was acquired by its current owner, Bain Capital, LP, for approximately
$2.5 billion.

86.     In 2018, Varsity agreed with ESPN Wide World of Sports at Walt Disney World Resort
to create a venue specially designed for cheerleading and dance competitions. The 8,000 seat, 286,000-
square-foot Competitive Cheer complex opened in January 2018, hosting the UCA and UDA College
Cheerleading and Dance Team National Championship on January 12-14, 2018. Referring to the new
Competitive Cheer facility, Jeff Webb said, "Varsity Spirit invented the modern-day cheerleading and
dance competition and we are proud to be the force behind this project, which represents our
commitment to providing the very best and safest environment in the world for our athletes and
coaches."

> **b.      Varsity Has Acquired Monopoly Power in the Cheer Competition
> Market by Acquiring or Impairing Rival Promoters.**

87.     Varsity did not obtain its market dominance through skill, innovation, or good fortune.
For more than fifteen years, and at all times relevant to this litigation, Varsity has pursued an aggressive
strategy of acquiring its competitors, with a near-obsessive focus on consolidating market power and
acquiring or impairing any potential rivals, resulting in a dominant market share in the Cheer
Competition Market. Several times during Varsity's history, it has purchased its largest rivals in the
Cheer Competition Market. As one former competitor whose apparel business was acquired by Varsity
in 2010—only to be subsequently shut down—put it, "I just think Jeff [Webb] is very driven . . . . There
is enough out there for all of us [i.e., Varsity's competitors]. Why make it so difficult? It's like he has to
have 100 percent. He can't be happy with just 95 percent."

88.     In 2004, Varsity acquired National Spirit Group, its largest rival at the time. Through the
transaction, Varsity acquired Herkimer's National Cheerleaders Association ("NCA"), the Universal
Dance Association ("UDA"), and Cheerleader & Danz Apparel. After the merger, Varsity's revenue
grew to $244 million that year.

89.     In 2011, Varsity acquired Spirit Festival, another rival that organized the very popular Spirit Fest and Cheer.

90.     In 2012, Varsity acquired Spirit Holdings, which owned CHEERSPORT, CheerLogistics, and Universal Spirit (collectively "Spirit"). At the time. Spirit was one of Varsity's largest competitors—promoting over 30 competitions a year—and CHEERSPORT held a National event in Atlanta that attracted over 900 cheerleading and dance teams from around the United States.

91.     In 2014, Varsity acquired Cheer Limited, one of Varsity's largest rivals. At the time, Cheer Limited produced more than 25 competitions each year, including the Cheer Ltd. Nationals at CANAM and the NCHSAA State High School Cheerleading Championship.

92.     In November 2015, Varsity acquired its largest remaining competitor, The JAM Brands. As one article described it, Varsity's acquisition of The Jam Brands, then "the second-largest event producer[,]" was "one of Varsity's most audacious moves . . . . JAM Brands ran most of the high-profile competitions that Varsity doesn't own. Together, they control roughly 90 percent of the major events, say competitors."

93.     Prior to the acquisition, The JAM Brands was an Independent Event Producer ("IEP") and Varsity's chief competitor. The JAM Brands produced Cheer Competitions that included divisions for high school, college, and All-Star Cheer Teams, as well as recreational divisions. The JAM Brands owned Cheerleaders of America ("COA"), a major IEP in Ohio, and America's Best, an IEP in Texas.

94.     The JAM Brands produced many of the largest and most popular Cheer Competitions in the United States, including The MAJORS, the very popular U.S. Finals, and the JAMFest Cheer Super Nationals, at which over 550 Competitive Cheer Teams competed. Prior to its acquisition, The JAM Brands was a disruptive, aggressive and innovative competitor, introducing new event concepts that competed directly with Varsity's Cheer Competitions and had the potential of challenging Varsity's dominance. Prior to its acquisition by Varsity, The JAM Brands generally offered free admission to event spectators, many of whom are the parents and other family members of the event participants.

95.     In addition, with the acquisition of The JAM Brands, Varsity also gained control over The JAM Brands' board seats on the USASF and the International All Star Federation ("IASF"), solidifying Varsity's control over one of the major sanctioning bodies with respect to Competitive

Cheer. As noted below, Varsity used its control over regulating bodies to erect barriers to entry and to foreclose competition in the Relevant Markets.

96.     Soon after acquiring The Jam Brands, Varsity sent a letter to All-Star Gym owners, assuring them, "For you as a customer, nothing will change." Yet Varsity increased its registration fees for Cheer Competitions within a year.

97.     In 2016-2017, following its acquisition of The JAM brands, Varsity continued to acquire actual or potential competitors in the Cheer Competition Market, including Aloha Productions, Spirit Celebrations, Mardi Gras Spirit, and Team Epic Brands.

> **c.     Varsity Has Acquired Monopoly Power in the Cheer Apparel Market by Acquiring or Impairing Rival Promoters.**

98.     In 2010, Varsity acquired Just Briefs, a cheerleading apparel company and hired its CEO, Tish Reynolds. Soon thereafter, Varsity closed the company. Reynolds admitted that, "[b]asically he [i.e. Jeff Webb] wanted me out the market."

99.     In 2012, Varsity acquired BSN for $460 million. At the time, BSN was the largest provider of team uniforms, including those used by participants in Competitive Cheer in the United States. At the time, BSN had a sales staff of over 800 employees. After the transaction, BSN became a wholly owned subsidiary of Varsity. Through this acquisition Varsity became the largest "K-through-Colleges" sales force of Cheer Apparel in the United States.

100.    In late 2015, Varsity extended its reach in the Cheer Apparel Market with its purchase of Allgoods, LLC, an apparel company based in Texas that has generated more than $38 million selling custom clothing for thousands of schools and other programs.

101.    Varsity prohibits other Cheer Apparel manufacturers from displaying their merchandise at Varsity Cheer Competitions. As alleged herein, Varsity operates the largest and most prestigious Cheer Competitions in the United States. These events function as market-dominant trade shows, providing a crucial marketing platform for manufacturers of Cheer Apparel with the goal of reaching Cheer Athletes, their target audience. By foreclosing rivals' access to these competitions, Varsity impedes would-be rivals' ability to compete in the Cheer Apparel Market.

> **d.** **Varsity Enhances Its Market Dominance by Exercising Near-Complete Control over the Organizations That Set the Rules.**

102.    Varsity pursued a deliberate strategy of controlling the Competitive Cheer industry

through its control of organizations that administer and govern Competitive Cheer. Varsity provides

those organizations with funding, staffing, and office space. When independent organizations have

sprung up, Varsity has acted quickly to bring them under its control either by acquiring them outright or

by putting its own executives into positions of power within the organizations.

> **i.** **USASF**

103.    In 2003, a group of cheerleading coaches formed an independent 501(c)(3) organization,

called the National All-Star Cheerleading Coaches Congress (NACCC), to establish uniform rules for

All-Star Cheer. The organization was open to all event producers, coaches and gyms. Through the

NACCC, the initial set of universal All-Star cheerleading rules was established.

104.    Sensing a threat to its business and monopoly power, Varsity joined with other

promoters to create the USASF in 2003. Varsity provided initial capital to USASF in the form of a $1.8

million interest free loan.

105.    Varsity controlled USASF from its inception. Varsity submitted the original trademark

application for the marks "U.S. All Star Federation" and "USASF," listing itself as owner. For at least

the first 15 years of its existence, the USASF's offices were located at Varsity's corporate address, a

Varsity representative answered the phone for the USASF, USASF employees were paid directly by

Varsity, and Varsity cashed checks issued to the USASF. For the USASF events held at Walt Disney

World, all event costs would be billed to Varsity.

106.    Varsity owned the USASF trademarks until 2017. USASF published uniform rules and

judging standards for Cheer Competitions. Varsity used the USASF as a means to neutralize the

NACCC and extend its control over the Competitive Cheer industry.

107.    In 2005, USASF acquired the NACCC. Under the agreement, NACCC was to become

the "rules committee" of USASF in perpetuity. The meeting was run by Jeff Webb in his boardroom in

Memphis with no other USASF board members present. Within a few years, Varsity dissolved

NACCC. After the demise of NACCC, Varsity, through the USASF controlled rules changes and other decisions.

108.    While USASF was a separate legal entity, USASF was the cat's paw of Varsity: the USASF employees shared offices with Varsity at Varsity's headquarters in Tennessee for many years during the relevant period. Also, during the relevant period, Varsity paid USASF employees.

109.    USASF's bylaws provided, among other things, that a permanent majority of USASF's voting board members are allocated to seven Cheer Competition brands (UCA, CheerSport, NCA, USA, American Cheerleaders Association, Universal Dance Association, and JAMFest). Varsity currently owns all of these brands.

110.    Varsity controls the USASF Board of Directors. The USASF board is empowered to set policy for the USASF. The Board is composed of 13 voting members, one seat each for the seven Cheer Competition producers that started the USASF, the USASF Chairman, a senior USASF staff member, and four program owner members, including the Chairman of the National All Stars Connection. Two USASF board seats are permanent and are held by representatives named by the Chairman of the USASF. As Varsity has acquired more and more of the USASF's founding event producers, it has continued to expand its control of the USASF Board. Since the acquisition of The JAM Brands and Epic Brands, Varsity has control of 75% of the seats on the Board of Directors. The seats that Varsity does not control do not have voting rights.

111.    In addition, as Varsity has acquired additional Independent Event Producers ("IEPs"), it has gained control of additional seats on the USASF board. By the time it completed its acquisition of Epic Brands in January 2018, the vast majority of the USASF Board of Directors was affiliated with Varsity, more than enough for Varsity to dictate USASF policy.

112.    The USASF's website is located at www.usasf.net, a URL owned by Varsity. Varsity now seeks to conceal its ownership and control of the URL behind the registration of "PERFECT PRIVACY, LLC."

### ii.    Other Regulatory Organizations

113.    In 2003, Varsity entered into an arrangement with the National Federation of State High School Associations ("NFHS"), which sets the rules for many high school sports throughout the United

States. Varsity paid approximately $3 million dollars for seven years until 2010 in exchange for the endorsement by NFHS of Varsity's cheerleading and dance championships. Varsity pays NFHS contingent fees based on American Association of Cheerleading Coaches and Administrators ("AACCA") membership and participant increases over an established base level.

114.    In 2007, Varsity established USA Cheer (USA Federation for Sport Cheering) as a nonprofit 501(c)(3) organization. USA Cheer serves All-Star and School Cheer programs. Its objectives are to, "help grow and develop interest and participation in cheer throughout the United States; promote safety and safety education for cheer in the United States; and represent the United States of America in international Cheer Competitions." In 2018, Varsity transferred trademark rights to AACCA and brought it under USA Cheer's umbrella.

115.    By installing itself in the leadership of these and other rule-making organizations, Varsity has been able to exercise control over the Competitive Cheer industry and enhance and maintain its monopoly power in the Relevant Markets.

116.    For example, in 2011, USASF issued a letter to all its 1,200 members informing them that they are not to attend any non-Varsity competition that purports to be a "World/International" or "Worlds" competition except those that are run by ICU or sponsored by Varsity. ICU then issued letters to all of their 101-member federation banning them from entering International Federation of Cheer ("IFC") competitions.

**B.      Varsity Engaged in a Scheme to Exclude Rivals and Acquire, Enhance, and Maintain Monopoly Power in the Relevant Markets.**

117.    Over the past 15 years, Varsity, under the leadership of Jeff Webb, Charlesbank, Bain Capital, in combination with USASF and other rule-making organizations it controls, has acquired, enhanced, and maintained monopoly power in the Competitive Cheer Market (the "primary market") and the Cheer Apparel Market and Cheer Camp Market (the "related markets"), (collectively with the primary market, the "Relevant Markets") in the United States through an unlawful scheme (the "Scheme," the "Exclusionary Scheme," or the "Challenged Conduct") set forth below.

118.    Jeff Webb is the founder of Varsity and has been actively involved in decisions to acquire rival event producers, apparel manufacturers, and camp providers. Webb was an early investor

in cheer governing bodies and played an integral role in setting the policies for cheerleading. Webb has always presented himself as the face of Varsity Brands.

119.    Charlesbank acquired Varsity in 2014 for $1.4 billion, and with that acquisition and funding, Charlesbank extended and ensured Varsity's monopoly power. After the acquisition, Charlesbank conspired with Varsity and Webb to consolidate Varsity's market power by acquiring its biggest rivals. As a consequence, Charlesbank has obtained financial rewards and benefits, in the amount of $1 billion, when it sold Varsity to Bain for $2.5 billion in 2018. Charlesbank maintains a seat of Varsity's Board of Directors, and continues to be actively involved in the alleged anticompetitive scheme through this position of power.

120.    Bain acquired Varsity in 2018. Bain is actively involved in the alleged anticompetitive scheme through its seat on Varsity's Board of Directors and its funding of Varsity's acquisition of its rivals. In conspiring with Varsity and Webb, Bain has helped Varsity maintain and enhance its monopoly, and ensured that it continues. Bain has obtained financial rewards and benefits from its involvement in the exclusionary scheme.

        1.    **Elements of Varsity's Exclusionary Scheme**

           a.    **Varsity and USASF Created a System of Bids for Admission to National Tournaments as a Means to Funnel Athletes to Its Local and Regional Tournaments.**

121.    To compete in one of Varsity's major Cheer Competitions, teams must receive a Bid, the vast majority of which can only be awarded by a competition that is owned or controlled by Varsity. The end-of-season competitions are not just the pinnacle of Competitive Cheer: they are also huge cheer festivals typically held at attractive locations such as Walt Disney World. Competitive Cheer Teams aspire to attend one of Varsity's most popular competitions and, as part of the Scheme, are encouraged to choose Varsity Competitions over those of Varsity's rivals to improve their chance of getting a Bid. This creates a significant barrier to entry for rival promoters or new promoters trying to enter the industry.

122.    The monopoly that Varsity has obtained in competitions, provides the company the power and leverage to ensure that new and returning families are paying supracompetitive prices to Varsity in other related markets as well, thus damaging the indirect purchaser class.

123.     In 2004, Varsity introduced the Bid system, through Varsity-controlled USASF. In 2004, USASF hosted the "Worlds" for the first time. At the time, Varsity and USASF agreed that USASF would provide fully paid trips for certain gyms to attend as a method of securing USASF authority and dominance of the Varsity-promoted events.

124.     Under the rules agreed to by Varsity and USASF, Cheer teams must receive a Varsity Bid in order to attend most of Varsity or USASF's Championship competitions. Thus, securing Bids to one of these Varsity-promoted championships and a chance to vie for a "National" title is a primary goal of Competitive Cheer Teams. Teams earn these Bids by attending and succeeding at Varsity owned and operated competitions.

125.     Bids can be fully paid which, as the name implies, means the Competition producer pays the Team's entry fees and all travel and hotel costs. Bids can also be partially paid, which means the Cheer Competition producer pays only a partial amount—typically covering entry fees but not travel or hotel costs. Bids can also be "at-large," which means the team can compete but must pay its own way. Varsity provides local event producers and promoters with the rights to determine how those Bids are awarded. Typically, fully paid are awarded to first place winners of major USASF-sanctioned Cheer Competitions, and partially paid and at-large Bids are awarded to other prominent teams, even if they did not "win" local or regional tournaments.

126.     With respect to World Championships, Varsity and USASF agreed on how participants can gain entry to the tournament to restrict competition and to exclude rivals. Varsity and USASF severely restrict competition in the Cheer Competition Market by limiting the number of Cheer Competitions entitled to provide Bids to Worlds. Of the 42 events providing Bids to the World Championships, Varsity owns 33. USASF also allocates the number of Bids that each of those 42 Cheer Competitions may award. Through its control of USASF, Varsity event participants receive the vast majority. Varsity controls 80% of Worlds' Bids.

127.     Similarly, Varsity decides which Cheer Competitions may award Bids to The Summit and the U.S. Finals, other important tournaments. Varsity uses its market dominance to restrict competition and to exclude rivals by allocating 100% of The Summit and U.S. Finals Bids to the Cheer Competitions it owns and operates. Varsity holds The Summit a week after The Worlds at Walt Disney

World Florida in order to give them the prestige of The Worlds. The Summit is a vehicle to entice parents and gyms to attend Varsity Cheer Competitions in order to have an end of the year championship.

128.    USA Cheer and NFHS govern High School cheer and USA Cheer and the AACCA govern College cheer. Each are controlled by Varsity. Varsity's UCA and NCA hold high school and college championships. Varsity decides which high school and college competitions award Bids to the NCA and UCA National Championships. Where Bids are not a requirement, attendance at Varsity Cheer Camps is. Varsity leverages its market dominance in the School Cheer Competition Market to enhance and maintain its market power in the Cheer Camp Market.

129.    Varsity uses its dominance of the Cheer Competition Market, its control of USASF, and its control of Bids to national championships and other tournaments, combined with the other conduct that is part of the Scheme, to ensure that Competitive Cheer teams will attend Varsity's entry-level Cheer Competitions rather than those owned and produced by Varsity's competitors.

### 2.    Varsity and USASF Created Competition Rules That Deny Potential Competitors a Foothold in the Industry.

130.    As set forth above, for more than fifteen years, Varsity has pursued acquisition of its actual or would-be competitors and created or gained control of the rule-making organizations. *See* §§ VII.B.2 & 4, *supra*. Varsity has exploited and continues to exploit its control of the Cheer Competition Market to exclude competitors from the market.

131.    For example, in 2008, Varsity adopted rules that prohibited participants in its events from participating in events promoted by other rival promoters. Varsity prohibited Cheer teams that competed in Varsity's NDA/NCA College Championships from participating in any other event promoted as a cheer or dance "national championship." This ban had the purpose and effect of impairing rival promoters' ability to compete with Varsity.

132.    In 2010, Varsity Brands prohibited college-level participants from entering into events following the format of the National Collegiate Acrobatic & Tumbling Association (NCATA). Varsity forbade such participants from attending and competing at Varsity-owned or Varsity-sponsored events, like national tournaments, thereby thwarting any potential competitive threat from NCATA.

133.    In 2013, Varsity created The Summit to provide a national championship for lower level teams. Only teams that compete at Varsity Cheer Competitions can qualify for The Summit championships, creating another barrier to entry for other promoters whose competitions cannot qualify a team for The Summit.

134.    Varsity requires All-Star Gyms to be members of the USASF in order to compete in USASF-sponsored Cheer Competitions. This accreditation carries with it a requirement that the All-Star Gyms report all events they attend to USASF. Varsity and USASF representatives then pressure the All-Star Gyms to go only to USASF-sanctioned events, 42% of which are produced by Varsity.

135.    The access of any IEP to All-Star Gyms is further restricted by the USASF-preferred insurer, K&K, which charges All-Star Gyms thousands of dollars in insurance premiums if All-Star Gyms attend non-USASF events. In addition, K&K requires covered All-Star Gyms to be USASF members. The rates for USASF member All-Star Gyms are between $19 and $24.55 per Cheer Athlete, but they increase to $34 per Cheer Athlete if the All-Star Gym enters its Competitive Cheer Team in even a single competition that is not sanctioned by USASF.

136.    Further, the USASF will not permit a Cheer Competition producer to hold a Bid-qualifying Cheer Competition within 500 miles of another Bid-qualifying competition. This makes it difficult—if not impossible—for an IEP to expand and compete further with Varsity. The ultimate result is that the only way for a Cheer Competition producer to gain additional Bids to Worlds would be to acquire an existing Cheer Competition producer that controls such Bids. Since Varsity's acquisition of Epic Brands in January 2018, there are few producers left outside of Varsity's ownership or control.

137.    All Varsity-sponsored events are USASF-sanctioned. To enter Competitive Cheer Teams in USASF-sanctioned events, All-Star Gyms, All-Star Cheer Athletes, and Competitive Cheer Team coaches must become USASF members and pay annual membership dues to USASF. These membership dues are USASF's primary outside revenue source. For example, USASF collected over $5 million in membership dues in 2017.

138.    USASF also copyrighted its Cheer Competition rules in 2016, which forbids Cheer Competition producers that have not paid USASF membership dues from using those rules at their events. Since Varsity's dominance in the Cheer Competition Market ensures that all or almost all

Competitive Cheer Teams fill the majority of their schedules with USASF-sanctioned events, USASF's refusal to allow non-USASF IEPs to use the same rules provides a strong disincentive for Competitive Cheer Teams to include such IEPs in their schedules. Doing so would require Competitive Cheer Teams to learn and compete by a different set of rules for a small share of their yearly competitions. USASF aggressively enforces these limitations through the threat of intellectual property litigation.

139.    Varsity also takes steps to prevent rival sanctioning organizations from creating non-Varsity-controlled Competitive Cheer Championships that could undermine Varsity's dominance. For example, in October 2011, the USASF and IASF wrote a joint letter to member All-Star Gyms, Cheer Competitions, and Competitive Cheer Team coaches stating that it is "the policy of the USASF/IASF that no athlete, coach, judge, or official is permitted to participate in any way in any event that claims to be a World or International Championship, other than the ICU [International Cheer Union] World Championships for National teams, or the USASF/IASF Worlds for Competitive Cheer Teams. This stipulation applies to any regional international championship affiliated with an organization claiming to operate a World Championship, other than the ICU and USASF/IASF. Failure to comply with this rule is grounds for disqualifying any athlete, coach, judge, or official from participating in the ICU and USASF/IASF World Championships."

140.    USASF membership rules specify that members are not permitted to affiliate, partner with, or own non-USASF-sanctioned IEPs, and that every All-Star Gym that wishes to attend USASF events must become a USASF member. Thus, all All-Star Gyms that attend at least one USASF event per year agree to these exclusionary terms.

### 3.    Varsity Uses Exclusive Agreements with All-Star Gyms and Schools to Foreclose Access to the Relevant Markets.

141.    Varsity also provides financial incentives designed to further enhance and secure its monopoly power and to exclude potential competitors and rivals. These take the form of rebates or free services to All-Star Gyms and cash-strapped schools to encourage their participation. In exchange for these inducements, All-Star Gyms and schools sign exclusionary agreements under which they agree to attend Varsity competitions and purchase Varsity Cheer Apparel. Though the cost of the rebates and services is low from Varsity's perspective, they have an asymmetric effect on the budgets of gyms and

schools, providing a crucial influx of cash that gyms rely on to survive slow periods, or valuable improvements for cash-strapped schools, creating a strong inducement to steer their business—and parents' money—to Varsity. Thus, Varsity and its co-conspirators reap hundreds of millions of dollars each year from the parents and others bearing the economic cost of participation by Competitive Cheer Athletes.

142.    Varsity offers rebates to All-Star Gyms that sign agreements under which the All-Star Gyms agree to attend a certain number of Varsity Cheer Competitions and purchase Varsity Cheer Apparel. Varsity induces larger and more prestigious All-Star Gyms, whose attendance is critical to putting on successful All-Star Events and who provide a key distribution channel for Cheer Apparel, to sign Network Agreements, under which All-Star Gyms are required to commit to essentially exclusive attendance at Cheer Competitions and purchase of Cheer Apparel, and attendance at Cheer Camps. In return for this commitment, the All-Star Gyms receive rebates from Varsity. Varsity encourages All-Star Gyms to participate in Varsity produced events through its rebate program. The more Varsity Competitions an All-Star Gym attends, and the more Varsity Cheer Apparel an All-Star Gym purchases, the larger the rebate to that All-Star Gym.

143.    Network Agreements require All-Star Gyms to have their Competitive Cheer Teams attend at least five Varsity-produced Cheer Competitions per season and spend at least $30,000 on registration fees for Varsity events. Moreover, Varsity's Network Agreements provide increasing rebate percentages for All-Star Gyms that spend above $30,000 per year on Varsity registration fees. Given that All-Star Gyms often attend only six Cheer Competitions per season, Varsity's contractual requirements make it extremely difficult, if not impossible, for these All-Star Gyms to attend IEPs' All-Star events, and thus effectively require exclusive dealing.

144.    The Network Agreement also provides additional relief from the non-Network penalty registration fees it charges for every dollar an All-Star Gym spends on Varsity Cheer Competition registration fees over and above the required $30,000 minimum. Thus, once an All-Star Gym has spent the required threshold amount, it becomes economically and practically infeasible for such All-Star Gyms to attend non-Varsity events. Further, the Network Agreements explicitly require the largest and

most prominent All-Star Gyms to purchase and use Varsity Cheer Apparel exclusively, foreclosing a key distribution channel and critical group of customers from being accessed by Cheer Apparel rivals.

145.    Because the Network Agreement is offered to the largest and most successful All-Star Gyms, the All-Star Gyms with the most talented All-Star Cheer Athletes are guaranteed to attend Varsity Cheer Competitions and wear Varsity Cheer Apparel. This, in turn, draws the smaller All-Star Gyms into attending Varsity Cheer Competitions and wearing Varsity Cheer Apparel.

146.    For All-Star Gyms that are not induced to execute Network Agreements, Varsity offers terms under its "Family Plan." The Family Plan is offered to every All-Star Gym in the country, meaning that Varsity has the potential to engage 100% of the All-Star Gyms in the Market in its exclusionary programs.

147.    The Family Plan requires that an All-Star Gym attend a certain number of Varsity Cheer Competitions in one year in order to obtain a small amount of relief from Varsity's penalty pricing on Cheer Apparel and Cheer Competitions. Under the Family Plan, All-Star Gyms must go to at least six Varsity events per year. Because Competitive Cheer Teams often attend only six Cheer Competitions in a season (excluding The Summit and U.S. Finals), All-Star Gyms must devote all or the vast majority of their Cheer Competition season on Varsity events to obtain relief from Varsity's penalty pricing. The amounts All-Star Gyms must spend to obtain a particular percentage of monetary relief from Varsity's penalty pricing has increased over the years.

148.    The Family Plan rebates typically involve providing rebates referred to as "Varsity Fashion Dollars." These Varsity Fashion Dollars may only be used on future purchases from Varsity. As a result, the All-Star Gyms are trapped in an endless cycle with Varsity, as foregoing these future rebates and doing business with Varsity's competitors becomes prohibitively expensive the more they patronize Varsity events and purchase Varsity Cheer Apparel.

149.    Varsity's rebates to All-Star Gyms provide substantial financial incentives to the All-Star Gyms to steer their teams to attend Varsity Cheer Competitions and purchase Varsity Cheer Apparel. The amount of rebates derives from how many Varsity Cheer Competitions the All-Star Gyms enter, how many Varsity Cheer Camps they attend, and how much Varsity Cheer Apparel they purchase; Varsity will pay the All-Star Gyms cash rebates, which start in the thousands and can go into the

hundreds of thousands of dollars a year for large All-Star Gyms. The All-Star Gyms rely on the rebate money to hold them over during slow periods, providing a strong incentive to the All-Star Gyms to participate in as many Varsity events as possible for their teams.

150.    The parents whose fees indirectly pay Varsity's competition registration fees and purchase Varsity Cheer Apparel do not receive the benefit of rebate payments Varsity provides to the All-Star Gyms.

151.    Varsity also offers inducements to schools to sign exclusive agreements with Varsity. Through its Impact and VIP Branding programs, Varsity offers schools branding opportunities under which Varsity helps the schools develops a sports identity by "bring[ing] professional design and products to school campuses," creating a sports identity and logo for the schools and supplying wall murals, window branding, mascot costumes, banners, flags, and signs displaying the school's identity and logo. In exchange for these payments, schools sign VIP Agreements under which the schools agree to purchase their uniforms, apparel, and equipment from Varsity and to compete in Varsity Cheer Competitions. Parents who pay for their children to compete on Competitive School Cheer teams end up paying Varsity's supracompetitive monopoly prices.

152.    Through these inducements, Varsity imposes exclusive dealing arrangements on both the primary Cheer Competition Market and the related Cheer Apparel Market, foreclosing competition from other competition producers and apparel manufacturers.

### 4.    Varsity Forecloses Access to the Cheer Apparel Market.

153.    Varsity prohibits other Cheer Apparel manufacturers from displaying their products at Varsity's events, denying would-be rivals a major marketing opportunity with their target customers. All-Star Cheer Competitions are, in part, market-dominant trade shows, and Varsity forbids or severely restricts its Cheer Apparel rivals from displaying wares in those events' "showrooms." By denying rivals access to its market-dominant competitions, Varsity is leveraging its monopoly power in the Cheer Competition Market to vertically foreclose rivals in the Cheer Apparel Market. For example, rival Cheer Apparel manufacturer Rebel had previously displayed and sold Cheer Apparel at JAM Brands' events. Its contract with The JAM

Brands was terminated when Varsity acquired The JAM Brands, and Varsity excluded Rebel

from all subsequent JAM Brands events. As one article observed, quoting Rebel's founder:

> The JAM Brands competitions had been Rebel's most effective platform
> for marketing to elite cheer teams. 'Not partnering with an event company
> is one thing,' says Noseff Aldridge [founder of Rebel Athletic]. 'But being
> locked out of partnering with an event company—knowing that a
> competitor is now going to be in your booth space showing its product—
> it's a double whammy.'

154.    Further, as mentioned above, certain Varsity contracts and terms with All-Star Gyms

combine rebates for attending Varsity Cheer Competitions with agreements requiring All-Star Gyms to

purchase their Cheer Apparel exclusively from Varsity. Thus, All-Star Gyms bound by the Network

Agreement cannot access non-penalty prices for Cheer Competitions unless they also agree to

exclusively buy their Cheer Apparel from Varsity.

155.    Judges at Varsity Cheer Competitions have been known to award more points to

Competitive Cheer Teams wearing Varsity Cheer Apparel, and the rules governing USASF and Varsity

Cheer Competitions regarding Cheer Apparel are frequently written to favor Varsity's latest Cheer

Apparel designs. These practices make the wearing of Varsity Cheer Apparel an important element for

success at Cheer Competitions, further impairing the ability of rival Cheer Apparel manufacturers from

gaining significant sales.

### 5.    Varsity Leverages Its Monopoly Power in the Cheer Competition Market to Foreclose Competition in the Cheer Camp Market.

156.    Varsity has leveraged and continues to leverage its monopoly power in the market for

Cheer Competitions to acquire, enhance, and maintain monopoly power in the market for Cheer

Camps. All-Star Gyms and schools decide which camps the teams are going to attend. Varsity offers

these programs rebates if they choose Varsity V!ROC choreography camps. The more teams and

athletes that an All-Star Gym sends to Varsity V!ROC camps, the larger the rebate. V!ROC offers

choreography training for both All-Star and Gameday (which incorporates elements of traditional

sideline cheer).

157.    Attending V!ROC camps gives teams an edge over other teams because the V!ROC

choreographers are knowledgeable about Varsity's competitions and rules and can and do train teams to

gear their routines to score points with Varsity Cheer Competition judges. Non-Varsity camps cannot offer the same advantages, so they cannot compete with Varsity's camps. By exercising this competitive advantage, Varsity creates a barrier to entry for rival cheer camp producers.

158.    Another way Varsity leverages its monopoly power in the Cheer Competition Market is to require Competitive Cheer Athletes to attend Varsity Cheer Camps as a mandatory prerequisite to competing in some Varsity Cheer Competitions. Indeed, many Varsity Cheer Competitions—including the NCA High School National Championship and the UCA National High School Cheerleading Championship, in which a combined total of 45,000 athletes participate, as well as the USA Championships—require 75% of a team's athletes to attend a Varsity Cheer Camp during the preceding summer or fall as a mandatory prerequisite to the team registering for the event. UCA and NCA Cheer Camps are designed for skilled cheerleading squads that operate at a competitive level. Students can attend either day or overnight Cheer Camps that run up to four days, with skill training lasting from morning to night.

159.    Varsity also provides Bids to some of its national competitions at its Cheer Camps, creating another strong incentive for teams to attend Varsity Cheer Camps, and a barrier to entry for other cheer camp producers, who cannot offer Bids to Varsity's premier events.

### 6.    Varsity Counter-Programmed Rivals' Competitions.

160.    In order to compete at the "Worlds," a team must compete at a qualifying event. The USASF set the number of event producers that can hold Worlds qualifying events at 42. For an event producer, the ability to hold a Worlds qualifying event is very prestigious and profitable. A Worlds event producer can bring in over $300,000 in registration fees, spectator admission fees, and merchandise sold at the event.

161.    According to USASF bylaws, a qualifying event must have 125 teams competing. If an event does not attract 125 teams, it is put on probation. If it fails to reach 125 teams a second time, that event will no longer be a Worlds Bid qualifying event.

162.    Plaintiffs are informed and believe that, to impair its potential rivals, Varsity would hold non-Worlds qualifying events in the same geographic area at the same time as an established Tier 1 independent Bid qualifying event, in contravention of USASF rules. Varsity's event would draw teams

away from the IEP event, causing them to fail to attract the requisite 125 teams. This would cause the IEP to take in less money from the event, and eventually lose the privilege of hosting such events. An IEP thus deprived of revenue streams would be less likely to threaten Varsity's market position, and would likely become an acquisition target for Varsity.

163.     Plaintiffs contend that Varsity's actions violated, and continue to violate, federal and state antitrust laws and state consumer protection laws, including Sections 1 and 2 of the Sherman Act, and Tenn. Code Ann. §§ 47-25-101, *et seq*., and that they and the members of the proposed Classes were injured and continue to be injured by paying artificially inflated prices indirectly to Varsity for Varsity Cheer Competitions, Varsity Cheer Apparel, Varsity Cheer Camps, and other charges. Plaintiffs seek equitable relief to stop Defendants' continuing anticompetitive conduct and to recover money damages for injuries in the form of artificially inflated prices Plaintiffs indirectly paid to Varsity, incurred as a result of Defendants' anticompetitive conduct alleged herein.

164.     Varsity can charge artificially inflated prices for all of these products and services because it has unlawfully acquired monopolies in the markets for Cheer Competitions, Cheer Apparel, and Cheer Camps. Taken together, these inflated prices add up to millions of dollars in unlawful overcharges indirectly paid to Varsity by the families of athletes that participate in Competitive Cheer.

**C.      Varsity's Monopoly Power in the Relevant Markets**

**1.      Monopoly Power in the Cheer Competition Market (the Primary Market)**

**a.      The Relevant Cheer Competition Market**

165.     The Cheer Competition Market is a single, nation-wide market. Varsity competitions host All-Star and School Cheer Teams, frequently in the same competitions. At all times relevant to this litigation, Varsity has held monopoly power in the Cheer Competition Market. Varsity is the primary supplier in the All-Star Cheer Competition Market.

166.     All-Star Gyms and schools serve as the gateways through which athletes and their families gain access to the sport of Competitive Cheer, and Varsity gains access to the athletes and their families. Families pay fees to the gyms and schools which are used to indirectly pay registration fees for USASF and for Varsity Cheer Competitions, as well as Varsity Cheer Apparel and Varsity Cheer Camps.

167.    Thus, parents indirectly pay the costs of registration in Varsity's All-Star Cheer Competitions.

### i.        There Are No Substitutes for Competitive Cheer.

168.    Varsity Cheer Competitions lack close economic substitutes that could constrain their pricing, for, e.g., entry fees and other associated costs, USASF registration, to competitive levels.

169.    Competitive Cheer Athletes train vigorously for Cheer Competitions that showcase their unique combination of talents, which draw from cheerleading, dance, and gymnastic routines. Competitive Cheer Athletes would not redeploy their talents to competitive gymnastics, dance, or any other sport or pastime, in response to a small but significant non-transitory increase in the price of attending Cheer Competitions. Thus, a hypothetical monopoly seller or producer of Cheer Competitions would not need to control gymnastics, dance events, or other pastimes, to raise the registration fees and other associated costs for attending Cheer Competitions profitably above competitive levels.

170.    Traditional sideline cheerleading is not a functional or economic substitute for Cheer Competitions. Sideline cheerleaders play a secondary role, supporting a local school's sports team and keeping the crowd excited. In contrast, Cheer Competitions are contests between Cheer Teams: Cheer Teams themselves are the athletes, and their routines are the main event. Traditional sideline cheer typically does not involve the stunts, pyramids, and gymnastics Competitive Cheer incorporates.

171.    Gymnastic competitions are not functional or economic substitutes for Cheer Competitions, which involve multiple athletes performing synchronized movements in a confined area that limits the types of movements that can be performed by participants, requiring an emphasis on different skills than gymnastics. In addition, Competitive Cheer Teams consist of various body types and have different positions that require different skill sets, such as the base, the flyer, the spotter, and the tumbler. Most athletes will be taller than the average gymnast—providing opportunities to compete for individuals who do not possess classic gymnast bodies.

172.    College-level competitive dance and acrobatic events, such as Varsity-backed STUNT and NCATA-backed Acrobatics & Tumbling, are not functional or economic substitutes for Cheer Competitions. By seeking to create NCAA-sanctioned sports, Varsity and the National Collegiate Acrobatics and Tumbling Association ("NCATA") have identified such college-level competitive dance

and acrobatic events as complements to Cheer Competitions rather than substitutes. As one USA Cheer publication explained, "STUNT should grow the total number of young people participating in all forms of Cheer…once STUNT is fully adopted as an NCAA sport, the number of collegiate scholarships available to Cheer athletes should increase more than tenfold. This will potentially create huge interest in skill development and competitive experience, and All-Star Gyms have a tremendous opportunity to provide these services." In addition, unlike Competitive Cheer, STUNT and Acrobatics & Tumbling only involve female athletes as they are both "Emerging Sports" seeking full protection under Title IX.

### b.     The Relevant Geographic Market

173.     The relevant geographic market is the United States. Competitive Cheer Teams compete nationwide to receive Bids to attend Competitive Cheer Championships. Of course, there is a regional aspect to competitions: teams emphasize attendance to competitions that maximize their chances of winning Bids to the end-of-season events. From Varsity's perspective, however, these events are administered at a national level, the governing bodies are the same across the country, events are subject to the same set of rules and the allocation of bids responds to a centralized system. It is Varsity's monopoly power that has allowed it to "nationalize" what otherwise may have been more regional competitions or qualifying events.

174.     International Cheer Competitions are not functional or economic substitutes for U.S. Cheer Competitions. Although there is an international division in USASF that can produce Bids to Worlds, U.S. All-Star Gyms and schools do not regularly send teams to Cheer Competitions abroad, in part due to the expense of international travel. International Cheer Competitions are also subject to different rules than U.S. competitions, making United States Competitive Cheer Athletes far less likely to attend them.

175.     A small but significant and non-transitory increase in the price of participating in U.S. Cheer Competitions would not cause participants to seek out international competitions.

c.   **Varsity Has Monopoly Power as a Dominant Supplier in the Cheer Competition Market.**

176.   Varsity has, at all relevant times, possessed monopoly power in the market for the production of Cheer Competitions. Varsity owns, produces, and promotes the vast majority of Cheer Competitions in the United States.

177.   Varsity has maintained and enhanced its monopoly power in the market for the production of Cheer Competitions through the anticompetitive conduct alleged herein. Varsity possesses the ability to control, maintain, and increase prices associated with the production of Cheer Competitions above competitive levels and the ability to impair and exclude competitors from producing Cheer Competitions. Varsity has elevated prices charged for registering for and attending Varsity Cheer Competitions substantially above competitive levels, and restricted output in the Cheer Competition Market, during the Class Period. Varsity has the ability to foreclose, and has in fact foreclosed, actual and would-be rivals from competing in the market for producing Cheer Competitions.

178.   Varsity's monopoly in Cheer Competitions has allowed it to impose exclusionary contracts and vertically foreclose competition in other related, but separate markets. Varsity knows that schools and All-Star Gyms are a crucial funnel through which they can access new and returning athletes to force families into all of their profit-making streams.

d.   **Barriers to Entry**

179.   The Cheer Competition Market has high barriers to entry that were reinforced and bolstered by the Exclusionary Scheme as alleged herein.

i.   **Natural Barriers to Entry**

180.   A Cheer Competition event producer must have access to capital in order to rent venues, perform adequate marketing, and pay employees, travel costs, and the variety of other expenses associated with the Cheer Competition business.

181.   A Cheer Competition producer must also have access to a critical mass of Competitive Cheer teams, as Competitive Cheer Athletes desire the challenge and recognition that comes with competing against the best in the sport.

182.     Cheer Competition producers must also have access to credible judges, in order to hold their competitions, advertising, and in order to carry out all of its other functions.

### ii.     Barriers Created by the Exclusionary Scheme

183.     As alleged herein, Varsity has used the Exclusionary Scheme to erect insurmountable barriers to entry which, together with the natural barriers, insulate Varsity from competition. To enter the Cheer Competition Market, event producers must have access to the uniform set of rules used by other competitions in the league, as no Competitive Cheer Team wants to learn a new set of rules to compete in just one competition. However, USASF refuses non-member Independent Event Producers ("IEPs"), Varsity's competitors, from having access to its rules, claiming as a pretext that the rules are subject to trademark and copyright protections.

184.     To be viable in the Cheer Competition Market, event producers must also be able to offer Bids to the Cheer Championships. However, USASF and Varsity have conspired to limit the number of Cheer Competitions that can award these Bids. Varsity owns and controls 33 of the 42 Cheer Competitions that can award Bids to Worlds and all of the Cheer Competitions that can award Bids to The Summit and U.S. Finals. And it offers Bids to its national School Competitions at its Cheer Camps. As a result, a new competitor in the Cheer Competition Market is unlikely to be able to offer Bids and will immediately be rendered competitively irrelevant.

185.     IEP access to All-Star Gyms is further limited by Varsity's Network Agreements and Family Plan Agreements. Varsity uses rebates to induce All-Star Gyms to sign exclusive Network or Family Plan agreements that commit the All-Star Gyms teams to attending a minimum number of Varsity Cheer Competitions and to purchasing their Cheer Apparel from Varsity. All-Star Gyms that fail to register for the minimum number of Varsity Cheer Competitions pay penalty prices on Varsity Cheer Competitions and Cheer Apparel.

186.     Similarly, IEP access to schools is limited by Varsity's Impact and VIP Branding programs, which provide free murals and signage to schools in exchange for an agreement to attend a minimum number of Varsity Cheer Competitions and purchase Varsity Cheer Apparel. Varsity's New School Construction program goes even further, providing professional design guidance to schools to design school facilities from the ground up, and providing equipment including bleachers, weight

equipment, and scoreboards, in exchange for the schools' commitment to Varsity Cheer Competitions and Varsity Cheer Apparel.

        **2.**      **Monopoly Power in the Cheer Apparel Market (Related Market)**

        **a.**      **The Relevant Cheer Apparel Market**

187.    Competitive Cheer Athletes are required to wear specialized apparel and use specialized equipment in order to compete in Cheer Competitions. USASF rules govern every detail of this apparel, including minutia, such as what direction hair bows must face and how large those bows can be.

188.    Competitive Cheer Athletes also require specialized apparel and equipment for practice, and All-Star Gyms require specialized apparel and equipment for membership on their Competitive Cheer Teams.

189.    There is a relevant Cheer Apparel Market that is restricted to specialized clothing such as uniforms, warm-up outfits, team jerseys and practice gear; and specialized accessories such as hair bows and headbands; and specialized equipment such as backpacks and shoes. Because Varsity Cheer Competitions require that participants dress and accessorize in accordance with USASF rules, Competitive Cheer Athletes could not shift to more generic athletic apparel in response to a small but significant and non-transitory increase in the price of Cheer Apparel. Thus, a hypothetical monopoly supplier of Cheer Apparel would not need to control any suppliers of non-Cheer Apparel in order to increase the price of Cheer Apparel substantially above competitive levels profitably.

190.    Moreover, All-Star Gyms and schools serve as the gateway to Competitive Cheer for athletes and their families. Because Varsity induces All-Star Gyms and schools to sign exclusive agreements with Varsity through the use of back-end rebates and free improvements to school facilities, the payments that families of Competitive Cheer Athletes make to the All-Star Gyms and schools to purchase Cheer Apparel are steered to Varsity. IEPs cannot break through this artificial barrier to entry.

        **b.**      **The Relevant Geographic Market**

191.    The relevant geographic market is the United States. All performances in the primary market occur within the United States and are regulated by standards set in the United States by regulatory organizations that are controlled by Varsity, including the USASF, USA CHEER, the American Association of Cheerleading Coaches and Administrators, and the National Federation of

State High School Associations. As such, nearly all of the targeted customers for Cheer Apparel reside

in the United States. Apparel is also sold online, thus emphasizing this market as a nation-wide one,

since no location depends exclusively on having a brick and mortar store to purchase apparel.

### c. Varsity Has Monopoly Power with Respect to Sales of Cheer Apparel.

192.    Varsity has, at all relevant times, possessed monopoly power in the market for Cheer

Apparel. Varsity has maintained and enhanced, and continues to maintain and enhance, its monopoly

power in this market through the Challenged Conduct (as alleged herein). Varsity possesses the ability

to control, maintain, and increase prices in the Cheer Apparel Market above competitive levels

profitably, and the ability to impair and exclude competitors from this Relevant Market. Varsity has, in

fact, inflated prices of its Cheer Apparel above competitive levels during the Class Period. Varsity has

the ability to foreclose, and has in fact foreclosed, would-be rivals from the Cheer Apparel Market.

193.    Varsity has assembled at least 200 copyrights on uniform design, which create a barrier

to entry by subjecting potential entrants in the Cheer Apparel Market to the threat of copyright lawsuits.

Varsity aggressively enforces its copyrights against actual and potential rivals through trademark

litigation.

194.    Varsity has gained and maintained at least an 80% share of the Cheer Apparel Market

through acquisitions, exclusive dealing arrangements, and other anticompetitive and exclusionary

conduct that is part of the Exclusionary Scheme alleged herein.

### d. Barriers to Entry

195.    There are a number of barriers to entry into the Cheer Apparel Market, including many

barriers imposed and reinforced as part of the Exclusionary Scheme.

### i. Natural Barriers to Entry

196.    Apparel-manufacturing and marketing facilities require significant investments of

capital to design and manufacture shoes, clothing, and accessories. Additionally, retail companies need

significant investments in warehouses, inventory management and distribution chains to serve demand.

197.    Designs for the Cheer Apparel are specific to that market and require specially-trained

designers to create and specialty equipment to manufacture.

198.     Intellectual property provides another barrier. Any designer of Cheer Apparel must take care not to infringe the designs of any competitors who hold copyrights or trademarks, or else risk litigation. Varsity has assembled almost 200 copyrights protecting its designs and aggressively enforces those rights against actual and potential rivals.

### ii.     Barriers to Entry Imposed Through the Exclusionary Scheme

199.     Cheer Apparel manufacturers must have a venue to showcase and sell their apparel. In the Cheer Apparel Market, the main and critical venue is Cheer Competitions. However, Varsity denies its actual and potential competitors access to the showrooms at its market-dominant Cheer Competitions, depriving them of this necessary distribution venue.

200.     Cheer Apparel manufacturers must also have the ability to sell apparel that complies with Cheer Competition rules (the primary venue for such apparel). However, the USASF tailors its rules to allow the type of apparel Varsity manufactures and sells, to the exclusion of competitors' apparel. Further, USASF judges have awarded extra points to Competitive Cheer Teams wearing Varsity Cheer Apparel, thus discouraging them from wearing the apparel of Varsity's competitors.

201.     Varsity's Exclusionary Scheme includes restrictive contracts with All-Star Gyms and schools that require such gyms and schools to exclusively purchase Cheer Apparel from Varsity, foreclosing access by apparel rivals to these important customers and their Competitive Cheer Team members—who comprise a significant share of market sales. Varsity also provides terms for all other All-Star Gyms that make it economically unfeasible for most of them to purchase Cheer Apparel from potential rivals (for instance, Rebel).

### 3.     Monopoly Power in the Cheer Camp Market (Related Market)

### a.     The Relevant Cheer Camp Market

202.     The Cheer Camp Market includes All-Star and School Cheer Camps. Through acquisitions and design Varsity controls the Cheer Camp Market. Cheer Camp is instrumental for teams if it they want to compete at the championship level. At Cheer Camps, they learn new techniques, skills, and routines.

203.    Varsity produces and promotes camps both for School Cheer and All-Star Cheer Teams. At the High School and College level, Varsity controls the market with USA, NCA, and UCA Cheer Camps.

204.    Varsity controls the largest cheerleading championships in the country for the School Cheer Competition Market under the UCA and the NCA. Teams cannot compete at the UCA or the NCA unless they attend UCA and NCA Cheer Camps.

### b.      The Relevant Geographic Market

205.    The relevant geographic market is the United States. All performances in the primary market occur within the United States and are regulated by USASF standards set in the United States. As such, nearly all the targeted customers for Cheer Camp reside in the United States. Even though, for teams, there may be a regional sense of camps they would realistically attend, similarly to competitions, Varsity's monopoly has allowed it to govern, manage, produce and design camps at a national level.

### c.      Varsity Has Monopoly Power in the Production, Ownership and Sales of Cheer Camps.

206.    Varsity has maintained and enhanced its monopoly power in the market for Cheer Camps through the anticompetitive conduct alleged herein. Varsity possesses the ability to control, maintain, and increase prices associated in the Cheer Camp Market above competitive levels and the ability to impair and exclude competitors from producing Cheer Camps. Varsity has elevated prices charged for attending Cheer Camps substantially above competitive levels, and restricted output in the All-Star Cheer Camp Market, during the Class Period. Varsity has the ability to foreclose, and has in fact foreclosed, actual and would-be rivals from competing in the market for Cheer Camps.

207.    Through Varsity's exclusionary scheme with All-Star Gyms, owners choose Varsity Cheer Camps and choreographers because they get further rebates and an inside track to what Varsity Cheer Competition judges are looking for.

208.    In addition to control over USASF, Varsity has control over the governing bodies for High Schools and Colleges through USA Cheer, AACCA, and NFHS.

209.     High School and College cheer coaches choose which Cheer Camps the school is going to attend. Varsity spends a lot of money on donating equipment and rebranding services for schools which in exchange purchase Varsity Cheer Apparel and attend Varsity Cheer Competitions and Varsity Cheer Camps.

210.     Varsity's control of the regulatory bodies and the national championships has foreclosed on rival camp providers from either entering or maintaining a position in the market.

211.     Varsity has over 4,000 Cheer Camps throughout the United States with over 330,000 participants attending their camps.

### d.     Barriers to Entry

212.     There are a number of barriers to entry into the Cheer Camp Market, including many barriers imposed and reinforced as part of the Exclusionary Scheme.

### i.   Natural Barriers to Entry

213.     Cheer Camps require a significant up-front investment. To put on a successful camp, producers need to procure facilities to host the camps, including lodging and dining facilities for overnight camps; experienced instructors, including coaches, assistants, and choreographers; support staff; medical staff; equipment for stunts; liability insurance; and marketing and access networks to recruit campers.

### ii.      Barriers to Entry Imposed Through the Exclusionary Scheme

214.     Varsity provides bids to some of its national competitions through its Cheer Camps. Thus, teams hoping to attend these national championships must attend Varsity Cheer Camps in order to vie for a Bid. This puts other producers of Cheer Camps, who cannot offer such Bids, at a competitive disadvantage.

215.     Varsity also requires 75% of the members of any team hoping to compete in UCA, NCA, or USA national competitions to attend UCA/NCA/USA Cheer Camps. Like the bids Varsity offers for some of its national competitions through its Cheer Camps, the 75% requirement creates a barrier to entry for other prospective Cheer Camp producers.

216.     Athletes also choose NDA, UCA, and USA Cheer Camps also because they know that the Cheer Camp coaches and judges will also be at the NCA, UCA, and USA state and national

championships. The Cheer Camps offer teams an opportunity to showcase new routines and receive

feedback from judges. Rival providers cannot offer an equivalent advantage to Cheer Camp attendees.

## VIII.   PLAINTIFFS HAVE BEEN HARMED AND SUFFERED ANTITRUST INJURY AS A DIRECT AND PROXIMATE RESULT OF DEFENDANTS' UNLAWFUL ACTIONS.

217.    As a direct and proximate result of Varsity's Exclusionary Scheme, as alleged herein,

Plaintiffs and the members of the Classes have suffered antitrust injury in that they indirectly paid

artificially inflated prices for goods and services that they purchased indirectly from Varsity, through

All-Star Gyms and schools, in the Relevant Markets during the Class Period. The full amount of such

damages Plaintiffs and the Classes suffered will be calculated after discovery and upon proof at trial.

218.    The conduct comprising Varsity's Exclusionary Scheme is continuing, as are the injuries

and damages suffered by the members of the Classes as a direct and foreseeable result.

### A.    Varsity Charges Parents Monopoly Rents in Related Markets.

219.    In addition to charging artificially high supracompetitive prices for Varsity's

competitions, apparel, and camps, as alleged above, Varsity leverages its monopoly in the primary

Cheer Competition Market to force parents to pay inflated prices for other related charges.

220.    For example, athletes and their families attending Varsity Cheer Competitions are

required to stay at Varsity-approved "Housing Partner" hotels. This is frequently referred to as "Stay-to-

Play." "Stay-to-Play" hotels generally charge substantially more than the competitive rate charged to

other guests. For example, under Varsity's NCA "Team Placement Program, "[a]ll performers, coaches

and spectators attending NCA All-Star Nationals are required to stay through our housing programs." If

a Competitive Cheer Athlete were to stay at a hotel outside the "Stay-to-Play" consortium, that athlete's

All-Star Cheer Team is barred from participating in the Competition. If Varsity learns of a rule violation

after an All-Star Cheer Competition, it fines the All-Star Gym that fielded that participant's All-Star

Cheer Team for the violation. Even athletes and families that choose not to stay in one of Varsity's pre-

approved hotels must pay a "Commuter Participant Fee" that can run as high as $365 for some Varsity

Cheer Competitions. Although Varsity refers to this fee as a "participant registration fee," this fee is

separate from the competition registration fee paid for by the team. Additionally, the policy makes it

difficult for families hoping not to pay the inflated prices by staying with relatives. Plaintiffs are

informed and believe that Varsity and/or its affiliates or partners receive a certain percentage of the inflated prices. Through this practice, Varsity effectively restricts competition that would exist between hotel and motels during an event, that would provide parents with lower prices and better deals.

221.    Admission to Varsity Cheer Competitions is expensive. In contrast to other promoters that do not charge admission to tournaments or other events, Varsity requires families that wish to see their athletes perform to pay as much as $40 per day to gain admission to Varsity events.

222.    Families that want to watch their children participate without physically attending events must pay $30 per month or $219 per year to watch the events on Varsity TV. Recording or streaming Varsity events, even for private usage, is strictly forbidden. Varsity actively enforces this ban on private recording or streaming, leaving family members no choice but to pay Varsity's inflated prices.

223.    Thus, Varsity exploits its market power in the primary Cheer Competition Market to overcharge the families of participants in competitive cheer in multiple ways. Parents indirectly pay unlawfully inflated prices to Varsity for: (a) registration and entry fees for tournaments in which the All-Star Gyms enroll; (b) registration fees for USASF; (c) uniforms and equipment the All-Star Gyms purchase for use in practices and competitions; (d) All-Star Gyms' Cheer Camps; (e) hotels Varsity requires the athletes and their families to patronize during Varsity Cheer Competitions; (f) admission fees at Varsity Cheer Competitions; and (g) fees for Varsity TV.

224.    Plaintiffs and the member of the Classes are further harmed because Varsity's unlawful scheme has thwarted innovation, particularly with regard to safety issues. Competitive Cheer is a notoriously dangerous sport. One recent study recently found that Competitive Cheer was the 16th most dangerous sport in the United States, while another found that, "cheerleading is the most dangerous sport for females because of the high risk for concussions and "catastrophic" injuries, which are classified as injuries that result in long-term medical conditions, permanent disabilities or a shorter lifespan." More than 30,000 cheerleaders go to the hospital each year for cheer-related injuries, including concussions. Sources state that "Some schools have actually seen more concussions on the cheerleading squads than football or soccer teams."

225.    In a competitive market, parents and athletes could reasonably expect that producers would vie for their business by innovating to make the sport safer. But because Varsity has such a

stranglehold on the industry, and in particular on the rule-making organizations, Competitive Cheer remains among the most dangerous sports in the country.

**B.    The Exclusionary Scheme Caused Anticompetitive Effects in the Relevant Markets Without Procompetitive Benefits.**

226.    Defendants' Exclusionary Scheme has substantially foreclosed competition in the Relevant Markets and allowed Varsity to obtain, maintain, and/or enhance monopoly power in the Relevant Markets. As a result of the Exclusionary Scheme, prices in the Relevant Markets have been artificially inflated above competitive levels, output in each of the Relevant Markets has fallen below competitive levels, and the athletes and their parents have less choice in all of the Relevant Markets.

227.    Due to the Exclusionary Scheme, Varsity has raised prices associated with Cheer Competitions and for Cheer Apparel and Cheer Camps above competitive levels. For instance, participation fees for Varsity Cheer Competitions have increased substantially over the Class Period. Varsity also began charging spectator admission fees to legacy-JAM Brands events in 2016. Varsity has steadily increased those admission fees during the Class Period. In events such as JAMFest Bam JAM, admission fees for adults have doubled between late 2016 and 2019, and each parent now pays a $20 spectator fee to watch his or her child perform a two- or three-minute routine.

228.    The Exclusionary Scheme has eliminated and impaired rivals in the Relevant Markets and blocked the entry and growth of others potential rivals. As a result, the number, size, and significance of Cheer Apparel manufacturers and Cheer Competition producers have been reduced, and fewer people participate as All-Star Cheer Athletes. At least 35 All-Star Gyms closed in 2019 as compared to a normal rate of 5 to 10 such closings in previous years.

229.    During the Class Period, Varsity shut down many of its own Cheer Competitions in addition to eliminating rival IEPs and these rivals' events.

230.    There are no legitimate procompetitive justifications or efficiencies for the conduct alleged as part of the Exclusionary Scheme. Any arguable procompetitive justifications or efficiencies are far outweighed by the anticompetitive effects of the Scheme.

## IX.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### For Injunctive Relief Under Section 16 of the Clayton Act for
### Violations of Sections 1, 2 and 3 of the Sherman Act, 15 U.S.C. §§ 1-3
### (On Behalf of Plaintiffs and the Injunctive Relief Class)

231.    Plaintiffs incorporate the above paragraphs by reference.

232.    The Relevant Markets are the markets for Cheer Competitions, Cheer Apparel, and Cheer Camps in the United States.

233.    Varsity controls approximately 80% of the Cheer Competition Market, 80% of the Cheer Apparel Market, and 75% of the Cheer Camp Market.

234.    Varsity, acting in concert with USASF, has obtained, enhanced, and maintained monopoly power in the Relevant Markets through the Exclusionary Scheme alleged herein, which conduct is continuing. Varsity and USASF have substantially foreclosed competition and have abused and continue to abuse their power to maintain and enhance its market dominance in the Relevant Markets through its Exclusionary Scheme, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

235.    During the Class period Varsity engaged in a continuing Exclusionary scheme with respect to the Relevant Markets in an unreasonable restraint of trade and commerce, with the purpose and effect of acquiring, enhancing, and maintaining monopoly power in the Relevant Markets, in violation of the Sherman Act, 15 U.S.C. §2.

236.    As a direct and proximate result of this continuing violation of Sections 1 and 2 of the Sherman Act, Plaintiffs and the members of the Injunctive Relief Class have suffered and continue to suffer injury and damages in that they have paid and continue to pay artificially inflated prices indirectly to Varsity for Cheer Competitions, Cheer Apparel, Cheer Camps, and other ancillary charges including stay-to-play accommodation charges at Varsity Cheer Competitions and insurance.

237.    Plaintiffs and members of the Injunctive Relief Class will continue to suffer injury, in the form of paying artificially inflated prices indirectly to Varsity for Cheer Competitions, Cheer Apparel, Cheer Camps, and accommodations at Varsity Cheer Competitions, if Varsity's unlawful conduct is not enjoined.

238.    Plaintiffs and the members of the Injunctive Relief Class therefore seek equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws, to correct for the anticompetitive market effects caused by Varsity's unlawful conduct, and to assure that similar anticompetitive conduct and effects do not continue or reoccur in the future.

### SECOND CLAIM FOR RELIEF
### Violation of Tennessee Antitrust Law
### (On Behalf of Plaintiffs and the Nationwide Damages Class)

239.    Plaintiffs incorporate the above paragraphs by reference.

240.    In addition to violating Sections 1 and 2 of the Sherman Act and Section 16 of the Clayton Act, Varsity violated Tennessee Code Ann. §§ 47-25-101, *et seq*. when it intentionally and wrongfully acquired, enhanced, and maintained monopoly power in the relevant markets through its ongoing exclusionary scheme.

241.    Defendants' illegal scheme and conspiracy was conceived and implemented in Tennessee. The core Defendants—including Mr. Webb, Varsity Brands, Varsity Spirit, Varsity Spirit Fashion, and USASF—are residents of Tennessee and have committed overt acts in Tennessee, including directing the Scheme. Varsity Brands and Varsity Spirit are Tennessee corporations and USASF is a Tennessee non-profit corporation. All, along with Varsity Spirit Fashion, have their principal place of business in Memphis, Tennessee. Accordingly, the State of Tennessee has a recognized and compelling interest in the enforcement of its antitrust, consumer protection and common law with respect to the violations of law alleged in this Complaint.

242.    By engaging the conduct alleged herein, Defendants intentionally and wrongfully engaged in conduct, a combination, or conspiracy in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq*.

243.    As a direct and proximate result of Defendants unlawful scheme, Plaintiffs have been harmed in that they paid artificially inflated prices for Varsity's Cheer Competitions, Cheer Apparel, Cheer Camps, accommodations at Varsity Cheer Competitions, and other related fees and charges. Because Plaintiffs and the members of the Nationwide Damages Class were harmed by Defendants' unlawful actions, which were conceived and executed within Tennessee's borders by persons and

corporations that are residents of Tennessee, the state has a significant aggregation of contacts to the claims asserted by each member of the plaintiff class.

244.    The injuries suffered by Plaintiffs and the members of the Nationwide Damages Class are of the type that Tenn. Code Ann. §§ 47-25-101, *et seq*. are intended to prevent, and flow from that which makes Defendant's conduct unlawful.

245.    Plaintiffs and the members of the Nationwide Damages Class therefore seek money damages under Tenn. Code Ann. §§ 47-25-101, *et seq*., to correct for the anticompetitive market effects caused by Varsity's unlawful conduct, and compensate the Plaintiffs and the members of the Nationwide Damages Class for the harm they have suffered as a result of defendants' unlawful scheme.

**THIRD CLAIM FOR RELIEF**
**Violation of State Antitrust Law**
**(On Behalf of Plaintiffs and the State Law Damages Class)**

246.    Plaintiffs incorporate the above paragraphs by reference.

247.    In addition to violating Sections 1 and 2 of the Sherman Act and Section 16 of the Clayton Act, Varsity intentionally and wrongfully maintained monopoly power in the Relevant Markets through its ongoing exclusionary scheme.

248.    By engaging the foregoing conduct, Varsity intentionally and wrongfully engaged in conduct, a combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

A.      Ala. Code §§ 8-10-1, *et seq*., and Ala. Code § 6-5-60(a) with respect to purchases of Defendants' products and services in Alabama by Class members and/or by Alabama residents.

B.      Alaska Stat. §§ 45.50.562, *et seq*., with respect to purchases of Defendants' products and services in Alaska by Class Members and/or by Alaska residents.

C.      Ariz. Rev. Stat. §§ 44-1402, *et seq*., with respect to purchases of Defendants' products and services in Arizona by Class members and/or by Arizona residents.

D.      Ark. Code Ann. §§ 4-75-309, *et seq*., with respect to purchases of Defendants' products and services in Arkansas by Class members and/or by Arkansas residents.

E.      Cal. Bus. and Prof. Code §§ 16720, *et seq*., with respect to purchases of Defendants' products and services in California by Class members and/or by California residents.

F.      Colo. Rev. Stat. §§ 6-4-104, *et seq*., with respect to purchases of Defendants' products and services in Colorado by Class members and/or by Colorado residents.

G.      D.C. Code §§ 28-4502, *et seq*., with respect to purchases of Defendants' products and services in the District of Columbia by Class members and/or by District of Columbia residents.

H.      Haw. Rev. Stat §§ 480-1, *et seq*., with respect to purchases of Defendants' products and services in Hawaii by Class members and/or by Hawaii residents.

I.      Idaho Code §§ 48-104, *et seq*., with respect to purchases of Defendants' products and services in Idaho by Class members and/or Idaho residents.

J.      740 Ill. Comp. Stat. 10/3, *et seq*., with respect to purchases of Defendants' products and services in Illinois by Class members and/or by Illinois residents

K.      Iowa Code §§ 553.4, *et seq*., with respect to purchases of Defendants' products and services in Iowa by Class members and/or by Iowa residents.

L.      Kan. Stat. Ann. §§ 50-101, *et seq*., with respect to purchases of Defendants' products and services in Kansas by Class members and/or by Kansas residents.

M.      Me. Stat. tit. 10 §§ 1101, *et seq*., with respect to purchases of Defendants' products and services in Maine by Class members and/or by Maine residents.

N.      Md. Code, Com Law, Section 11-204, *et seq*., with respect to purchases of Defendants' products and services in Maryland by Class members and/or by Maryland residents.

O.      Mich. Comp. Laws §§ 445.772, *et seq*., with respect to purchases of Defendants' products and services in Michigan by Class members and/or by Michigan residents.

P.      Minn. Stat. §§ 325D.49, *et seq*., with respect to purchases of Defendants' products and services in Minnesota by Class members and/or by Minnesota residents.

Q.      Miss. Code Ann. §§ 75-21-3, *et seq*., with respect to purchases of Defendants' products and services in Mississippi by Class members and/or by Mississippi residents.

R.      Neb. Rev. Stat. §§ 59-801, *et seq*., with respect to purchases of Defendants' products and services in Nebraska by Class members and/or by Nebraska residents.

S.      Nev. Rev. Stat. §§ 598A.060, *et seq*., with respect to purchases of Defendants' products and services in Nevada by Class members and/or by Nevada residents.

T.     N.H. Rev. Stat. Ann. §§ 356:2, *et seq*., with respect to purchases of Defendants' products and services in New Hampshire by Class members and/or by New Hampshire residents.

U.     N.M. Stat. Ann. §§ 57-1-1, *et seq*., with respect to purchases of Defendants' products and services in New Mexico by Class members and/or by New Mexico residents.

V.     N.Y. Gen. Bus. Law §§ 340, *et seq*., with respect to purchases of Defendants' products and services in New York by Class members and/or by New York residents.

W.     N.C. Gen. Stat. §§ 75-1, *et seq*., with respect to purchases of Defendants' products and services in North Carolina by Class members and/or by North Carolina residents.

X.     N.D. Cent. Code §§ 51-08.1-02, *et seq*., with respect to purchases of Defendants' products and services in North Dakota by Class members and/or by North Dakota residents.

Y.     Or. Rev. Stat. §§ 646.725, *et seq*., with respect to purchases of Defendants' products and services in Oregon by Class members and/or by Oregon residents.

Z.     R.I. Gen. Laws §§ 6-36-4, *et seq*., with respect to purchases of Defendants' products and services in Rhode Island by Class members and/or by Rhode Island residents.

AA.     S.D. Codified Laws §§ 37-1-3.1, *et seq*., with respect to purchases of Defendants' products and services in South Dakota by Class members and/or by South Dakota residents.

BB.     Tenn. Code Ann. §§ 47-25-101, *et seq*., with respect to purchases of Defendants' products and services in Tennessee by Class members and/or by Tennessee residents.

CC.     Utah Code Ann. §§ 76-10-3104, *et seq*., with respect to purchases of Defendants' products and services in Utah by Class members and/or by Utah residents.

DD.     W. Va. Code §§ 47-18-1, *et seq*., with respect to purchases of Defendants' products and services in West Virginia by Class members and/or by West Virginia residents.

EE.     Wis. Stat. §§ 133.03, *et seq*., with respect to purchases of Defendants' products and services in Wisconsin by Class members and/or by Wisconsin residents.

249.     Plaintiffs and members of the State Law Damages Class have been injured by reason of Defendants' antitrust violations alleged in this Claim. Their injuries consist of paying higher prices for Cheer Competitions, Cheer Apparel, Cheer Camps, accommodations at Varsity Cheer Competitions, and other related fees and charges, than they would have paid in the absence of Defendants' conduct.

These injuries are of the type that the foregoing laws are intended to prevent, and flow from that which makes Defendant's conduct unlawful.

250.    Plaintiffs and the State Law Damages Class seek damages and multiple damages as permitted by law for their injuries by Defendants' violations of the aforementioned statutes.

**FOURTH CLAIM FOR RELIEF**
**Unfair Methods of Competition, and Unfair and Deceptive Acts, in Violation of State Consumer Protection Law**
**(On Behalf of Plaintiffs and the State Law Damages Class)**

251.    Plaintiffs incorporate the above paragraphs by reference.

252.    Varsity engaged in unlawful and unfair acts and practices to willfully and wrongfully obtain, enhance, and maintain its monopoly in the markets for Cheer Competitions, Cheer Apparel, and Cheer Camps. These unlawful and unfair acts included: (a) offering rebates to gyms and schools that entice the gyms and schools to favor Varsity's Cheer Competition and Cheer Apparel over those of other promoters, at the expense of Plaintiffs and members of the State Law Damages Class; (b) concealing the existence of its exclusionary agreements with All-Star Gyms and schools from Plaintiffs and the members of the class, thereby fraudulently concealing the extent of its exclusionary scheme and the effect of that scheme on Plaintiffs and the members of the State Law Damages Class; (c) exploiting its control over USASF and other rule-making organizations to create rules that unfairly favored Varsity by assigning the power to offer bids to the three recognized championship competitions for Competitive Cheer almost exclusively to Varsity owned or controlled Cheer Competitions; (d) counterprogramming would-be rivals Cheer Competitions, thus impairing their ability to compete, and depriving Plaintiffs and the State Law Damages Class of the ability to seek the best value in a competitive market. These unlawful actions had the purpose and effect of channeling Competitive Cheer Athletes and teams to Varsity's Cheer Competitions, Cheer Apparel, and Cheer Camps, all of which put other promoters of Cheer Competitions and manufacturers of Cheer Apparel at a competitive disadvantage by effectively locking them out of the Relevant Markets.

253.    As a direct and proximate result of Varsity's unlawful and unfair business practices, Plaintiffs and members of the State Law Damages Class were denied the opportunity to shop for competitively priced Cheer competitions, Cheer Apparel, and Cheer Camps that they would have had

access to in a properly functioning competitive market. Plaintiffs and members of the State Law Damages Class were forced to pay artificially inflated prices for Varsity's products, and lost money or property as a result.

254.    The gravity of harm from Defendants' wrongful conduct significantly outweighs any conceivable utility from that conduct. Plaintiffs and class members could not reasonably have avoided injury from Defendants' wrongful conduct.

255.    By engaging in such conduct, Defendants violated the following state consumer protection laws:

A.    Ariz. Rev. Stat. Ann. §§ 44-1521, *et seq.*, with respect to purchases of Defendants' products and services in Arizona by Class members and/or by Arizona residents.

B.    Ark. Code §§ 4-88-101, *et seq.*, with respect to purchases of Defendants' products and services in Arkansas by Class members and/or by Arkansas residents.

C.    Cal. Bus. & Prof Code §§ 17200, *et seq.*, with respect to purchases of Defendants' products and services in California by Class members and/or by California residents.

D.    Colo. Rev. Stat. §§ 6-1-101, *et seq.*, with respect to purchases of Defendants' products and services in Colorado by Class members and/or by Colorado residents.

E.    Conn. Gen. Stat. §§ 42-110b, *et seq.*, with respect to purchases of Defendants' products and services in Connecticut by Class members and/or by Connecticut residents.

F.    D.C. Code §§ 28-3901, *et seq.*, with respect to purchases of Defendants' products and services in the District of Columbia by Class members and/or by District of Columbia residents.

G.    Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases of Defendants' products and services in Florida by Class members and/or by Florida residents.

H.    Haw. Rev. Stat. §§ 481-1, et seq., with respect to purchases of Defendants' products and services in Hawaii by Class members and/or by Hawaii residents.

I.    Idaho Code Ann. §§ 48-601, *et seq.*, with respect to purchases of Defendants' products and services in Idaho by Class members and/or by Idaho residents.

J.    815 Ill. Comp. Stat. 505/1, *et seq.*, with respect to purchases of Defendants' products and services in Illinois by Class members and/or by Illinois residents.

K.      Kan. Stat. Ann. §§ 50-623, *et seq*., with respect to purchases of Defendants' products and services in Kansas by Class members and/or by Kansas residents.

L.      Me. Stat. tit. 5, §§ 207, *et seq*., with respect to purchases of Defendants' products and services in Maine by Class members and/or by Maine residents.

M.      Mass. Gen. Laws ch. 93A, §§ 1, *et seq*., with respect to purchases of Defendants' products and services in Massachusetts by Class members and/or by Massachusetts residents.

N.      Mich. Comp. Laws §§ 445.901, *et seq*., with respect to purchases of Defendants' products and services in Michigan by Class members and/or by Michigan residents.

O.      Minn. Stat. §§ 325F.68, *et seq*., and Minn. Stat. § 8.31, *et seq*., with respect to purchases of Defendants' products and services in Minnesota by Class members and/or by Minnesota residents.

P.      Mo. Rev. Stat. §§ 407.010, *et seq*., with respect to purchases of Defendants' products and services in Missouri by Class members and/or by Missouri residents.

Q.      Mont. Code Ann. §§ 30-14-103, *et seq.*, with respect to purchases of Defendants' products and services in Montana by Class members and/or by Montana residents.

R.      Neb. Rev. Stat. §§ 59-1601, *et seq*., with respect to purchases of Defendants' products and services in Nebraska by Class members and/or by Nebraska residents.

S.      Nev. Rev. Stat. Ann. §§ 598.0903, *et seq*., with respect to purchases of Defendants' products and services in Nevada by Class members and/or by Nevada residents.

T.      N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq*., with respect to purchases of Defendants' products and services in New Hampshire by Class members and/or by New Hampshire residents.

U.      N.M. Stat. Ann. §§ 57-12-1, *et seq*., with respect to purchases of Defendants' products and services in New Mexico by Class members and/or by New Mexico residents.

V.      N.Y. Gen. Bus. Law §§ 349, *et seq*., with respect to purchases of Defendants' products and services in New York by Class members and/or by New York residents.

W.      N.C. Gen. Stat. §§ 75-1.1, *et seq*., with respect to purchases of Defendants' products and services in North Carolina by Class members and/or by North Carolina residents.

X.      Or. Rev. Stat. §§ 646.605, *et seq*., with respect to purchases of Defendants' products and services in Oregon by Class members and/or by Oregon residents.

Y.      R.I. Gen. Laws §§ 6-13.1-1, *et seq*., with respect to purchases of Defendants' products
and services in Rhode Island by Class members and/or by Rhode Island residents.

Z.      S.D. Codified Laws §§ 37-24-6, *et seq*., with respect to purchases of Defendants'
products and services in South Dakota by Class members and/or by South Dakota residents.

AA.     Tenn. Code Ann. §§ 47-18-101, *et seq*., with respect to purchases of Defendants'
products and services in Tennessee by Class members and/or by Tennessee residents.

BB.     Utah Code Ann. §§ 13-11-1, *et seq*., with respect to purchases of Defendants' products
and services in Utah by Class members and/or by Utah residents.

CC.     Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*, with respect to purchases of Defendants' products
and services in Vermont by Class members and/or by Vermont residents.

DD.     W. Va. Code §§ 46A-6-101, *et seq*., with respect to purchases of Defendants' products
and services in West Virginia by Class members and/or by West Virginia residents.

EE.     Wis. Stat. § 100.20, *et seq*., with respect to purchases of Defendants' products and
services in Wisconsin by Class members and/or by Wisconsin residents.

256.    On behalf of themselves and the State Law Damages Class, Plaintiffs seek all
appropriate relief provided for under the foregoing statutes.

## FIFTH CLAIM FOR RELIEF
### Unjust Enrichment Under Tennessee Law
### (On Behalf of Plaintiffs and the Nationwide Damages Class)

257.    Plaintiffs incorporate the above paragraphs by reference.

258.    This claim is pleaded in the alternative to the other claims in this Complaint.

259.    Defendants have reaped and retained substantial benefits in the form of higher profits due to their unjust scheme to monopolize the markets for Cheer Competitions and for Cheer Apparel.

260.    The financial benefits to Defendants from their wrongful conduct are traceable to overpayments for Cheer Competition registration fees, Cheer Apparel, Cheer Camps, and other ancillary charges including stay-to-play charges for accommodations at Varsity Cheer Competitions by Plaintiffs and members of the Nationwide Damages Class.

261.    Plaintiffs and members of the Nationwide Damages Class have conferred upon Defendants an economic benefit—its profits stemming from anticompetitive overcharges. Plaintiffs and members of the Nationwide Damages Classpaid those monopoly overcharges to their substantial economic detriment.

262.    It would be futile for Plaintiffs and members of the Nationwide Damages Class to seek relief against any party with whom they have privity of contract, including the gyms and schools to which they indirectly paid Varsity's artificially inflated prices, because the gyms and schools did not retain the full benefit of Varsity's unlawfully inflated prices.

263.    The financial benefits that Varsity derived by charging supracompetitive prices for its Cheer Competition registration fees, Cheer Apparel, Cheer Camps, and other ancillary charges including stay-to-play charges for accommodations at Varsity Cheer Competitions directly and proximately resulted from Varsity's unjust practices described herein. Those benefits rightfully belong to Plaintiffs and the members of the Nationwide Damages Class.

264.    It would be wrong and inequitable for Varsity to be permitted to retain any of the ill-gotten gains from its wrongful monopolization scheme.

265.    The benefits conferred upon Varsity are measurable, in that the revenue Varsity has earned due to its unlawful overcharges for Cheer Competition registration fees, Cheer Apparel, Cheer

Camps, and other ancillary charges including stay-to-play charges for accommodations at Varsity Cheer

Competitions is ascertainable by review of sales records.

266.    Varsity should be compelled to disgorge in a common fund for the benefit of Plaintiffs

and the class all proceeds that it inequitably derived from its scheme, and a constructive trust should be

imposed upon such sums.

**SIXTH CLAIM FOR RELIEF**
**For Declaratory Relief Under 28 U.S.C. § 2201 for Violations of**
**Sections 1, 2, and 3 of the Sherman Act, 15 U.S.C. §§ 1–3**
**(On Behalf of Plaintiffs and the Injunctive Relief Class)**

267.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though

fully set forth herein.

268.    Plaintiffs and the members of the Injunctive Relief Class, pursuant to Fed. R. Civ. P. 57

and 28 U.S.C. § 2201, hereby seek a declaratory judgment that Defendant's conduct in seeking to

prevent competition as described herein violates Section 2 of the Sherman Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes, pray for judgment

against Varsity as follows:

A.    Determining that this action may be maintained as a class action pursuant to Rules 23(a),

23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this

action, as provided by Rule 23(c)(2), be given to the members of the Classes, and appoint the Plaintiffs

as the named representatives of the Classes;

B.    Awarding Plaintiffs and the Class treble damages in an amount to be determined in trial,

plus interest in accordance with law;

C.    Entering joint several judgments against Varsity in favor of Plaintiffs and the Classes;

D.    Granting Plaintiffs and the Classes equitable relief in the form of disgorgement or

restitution, and creation of a constructive trust to remedy Varsity's unjust enrichment;

E.    Awards Plaintiffs and the Classes their costs of suit, including reasonable attorneys' fees

as provided by law; and

F.      Awarding such further and additional relief as the case may require and the Court may

deem just and proper under the circumstances.

### JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(c), Plaintiffs demand a trial by jury on all issues so triable.

Dated: December 10, 2020

Van Turner (TN Bar No. 22603)
Katrice Feild (TN Bar No. 31263)
BRUCE TURNER, PLLC
2650 Thousand Oaks Blvd., Suite 2325
Memphis, Tennessee 38118
Telephone:  (901) 290-6610
Facsimile:  (901) 290-6611
Email:        vturner@bruceturnerlaw.net
                katrice@bruceturnerlaw.net


By: _/s/ Van Turner_____
        Van Turner


Joseph R. Saveri
Steven N. Williams
Kevin E. Rayhill
Elissa A. Buchanan
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile:   (415) 395-9940
Email:  jsaveri@saverilawfirm.com
            swilliams@saverilawfirm.com
            krayhill@saverilawfirm.com
            eabuchanan@saverilawfirm.com


By:_____/s/ Joseph R. Saveri_____
        Joseph R. Saveri


Daniel E. Gustafson
Daniel C. Hedlund
Daniel J. Nordin
Ling S. Wang
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone:  (612) 333-8844
Facsimile:   (612) 339-6622
Email:        dgustafson@gustafsongluek.com
                dhedlund@gustafsongluek.com
                dnordin@gustafsongluek.com
                lwang@gustafsongluek.com

Richard M. Paul III
Sean R. Cooper
PAUL LLP
601 Walnut, Suite 300
Kansas City, Missouri 64106
Telephone:  (816) 984-8100
Email:       rick@paulllp.com
             sean@paulllp.com

*Attorneys for Individual and Representative Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| FUSION ELITE ALL STARS, et al., | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2:20-cv-2600-SHL-cgc |
| | ) | |
| VARSITY BRANDS, LLC, et al., | ) | |
| Defendants. | ) | |
| | ) | |

---

## PROTECTIVE ORDER

---

The parties have submitted a proposed protective order. The Court construes this submission to be a Joint Motion for a Protective Order. Finding good cause, the Court **GRANTS** the Motion.

This Protective Order is issued to facilitate document disclosure and production. Unless modified pursuant to the terms contained in this Order, this Order shall remain in effect throughout and after this litigation.

## I.     PURPOSES AND LIMITATIONS

Discovery requests and subpoenas served in the Action may call for the production or disclosure of trade secret or other confidential research, development, or commercial information within the meaning of Fed. R. Civ. P. 26(c), or other private or competitively sensitive information for which protection from public disclosure and from use for any purpose other than prosecuting this Action is warranted. Accordingly, the Court enters the following Stipulated Protective Order ("Order") pursuant to Fed. R. Civ. P. 26(c) and Fed. R. Evid. 502(d).

# EXHIBIT 3

## II.     DEFINITIONS

2.1     Action: the above-captioned action, and any and all cases consolidated or coordinated with it.

2.2     Party: any party to the Action, including all of its officers, directors, and employees.

2.3     Non-Party:  any natural person or entity that is not a named Party to the Action.

2.4     Discovery Material:  all items or information, regardless of the medium or manner generated, stored, or maintained, including, among other things, documents, testimony, interrogatory responses, transcripts, depositions and deposition exhibits, responses to requests to admit, recorded or graphic matter, electronically stored information, tangible things, and/or other information produced, given, exchanged by, or obtained from any Party or Non-Party during discovery in this Action.

2.5     Confidential Material:  any Producing Party (as defined below) may, subject to the provisions of this Order, designate as "Confidential" any Discovery Material that the Producing Party reasonably and in good faith believes constitutes or reveals: (i) confidential trade secrets; (ii) proprietary business information; or (iii) non-public personal, client, or customer information concerning individuals or other entities. Confidential Material includes information that requires the equivalent of "Confidential" treatment based on applicable law, foreign or domestic.

2.6     Privileged Material: Discovery Material protected from disclosure under the attorney-client privilege, work product doctrine, United States or foreign bank disclosure laws or regulations, and/or any other applicable United States or foreign statute, law, regulation, privilege, or immunity from disclosure.

2.7     Highly Confidential Material:  any Producing Party may, subject to the provisions of this Order, designate any Discovery Material as "Highly Confidential," if the Producing Party

2

reasonably and in good faith believes the Discovery Material contains: (i) current trade secrets or other information that the Party reasonably believes the unauthorized disclosure of which would result in imminent competitive, commercial or financial harm to the Producing Party or its personnel, clients, or customers; or (ii) any non-public personal, client, or customer information concerning minors.

2.8     Producing Party:  any Party or Non-Party that produces Discovery Material in this Action.

2.9     Receiving Party:  any Party or Non-Party that receives Discovery Material from a Producing Party.

2.10    Designating Party:  any Party or Non-Party that designates Discovery Material as "Confidential" or "Highly Confidential."

2.11    Protected Material:  any Discovery Material that is designated as "Confidential" or "Highly Confidential," provided, however, that "Protected Material" does not include information that is publicly available or that becomes publicly available (except information that became publicly available as a result of a breach of this Order or any other confidentiality agreement or undertaking).

2.12    Outside Counsel: attorneys, along with their paralegals and other support personnel assisting them with this Action (including temporary or contract staff), who are not employees of a Party but who have been retained to represent or advise a Party in connection with this Action.

2.13    In House Counsel:  attorneys and other personnel employed by a Party to perform or support legal functions, to whom disclosure of Discovery Material is reasonably necessary in connection with this Action.

3

2.14    Counsel (without qualifier):  Outside Counsel and In House Counsel.

2.15    Expert and/or Consultant:  a person with specialized knowledge or experience in a matter pertinent to this Action, along with his or her employees and support personnel, who has been retained by a Party or its Counsel to serve as an expert witness or as a consultant in this Action, and who is not currently an employee of a Party and who, at the time of retention, is not anticipated to become an employee of a Party.  This definition includes a professional jury or trial consultant retained in connection with this Action.

2.16    Professional Vendors:  persons or entities that provide litigation support services (e.g., photocopying; videotaping; translating; preparing exhibits or demonstrations; organizing, storing, or processing data in any form or medium) and their employees and subcontractors.

## III.    SCOPE

3.1    The protections conferred by this Order and the limitations on the use of information obtained during the course of discovery in this matter as set forth in this Order cover not only Discovery Material (as defined above) but also any information copied or extracted therefrom, as well as all copies, excerpts, summaries, or compilations thereof, plus testimony, conversations, or presentations by Parties or counsel in settings that might reveal Protected Material.  However, except as set forth in Section 12.2, this Order shall not be construed to cause any Counsel to produce, return, destroy, and/or sequester their own attorney work product, or the work product of their co-counsel, created in anticipation of or in connection with this Action.

## IV.    DURATION

The confidentiality obligations imposed by this Order shall remain in effect until the Designating Party agrees otherwise in writing or this Court orders otherwise.

## V.     DESIGNATING PROTECTED MATERIAL

5.1     Manner and Timing of Designations: Except as otherwise provided in this Order, or as otherwise stipulated or ordered, material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced. Designation in conformity with this Order requires:

(a)     For information in non-native documentary form (including transcripts of depositions taken in other proceedings), that the Producing Party affix the legend "Confidential" or "Highly Confidential" on the document and include the applicable designation in the metadata produced for such document.

(b)     For deposition transcripts and/or exhibits in this Action, that the Designating Party designate any portion of the testimony as "Confidential" or "Highly Confidential" in writing on or before the later of (i) thirty (30) calendar days after receipt of the final transcript, or (ii) the date by which any review by the witness and statement of changes to the transcript are to be completed under Fed. R. Civ. P. 30(e).  Only those portions of the testimony that are designated for protection in accordance with the preceding sentence shall be Protected Material under the provisions of this Order.  The entire testimony shall be deemed to have been designated Highly Confidential until the time within which the transcript may be designated has elapsed.  If testimony is not designated within the prescribed time period, then such testimony shall not be deemed Confidential or Highly Confidential except as ordered by the Court or as provided in Section 5.2 (Inadvertent Failures to Designate).  If all or a part of a videotaped deposition is designated as "Confidential" or "Highly Confidential," the DVD, plus any container, shall be so labeled.

(c)     For information produced in electronic, audio, or video format, and for any other tangible items, that the Producing Party affix the legend "Confidential" or "Highly

Confidential" in a prominent place on the item itself or exterior of the container or containers in which the information or item is stored, and/or in the electronic file name, in any suitable and readily viewable manner. Whenever a Receiving Party to whom electronically stored discovery material so designated is produced reduces such information to hard copy form, to the extent such pages have not previously been marked by the Producing Party, such Receiving Party shall mark the hard copy by affixing the designation "Confidential" or "Highly Confidential" to each page of such document.

(d)     For documents produced in native format, that the Producing Party include the confidentiality designation "Confidential" or "Highly Confidential" in the metadata produced for such documents and on the placeholder page.

(e)     For interrogatory answers and responses to requests to admit, and the information contained therein, that the Producing Party affix the legend "Confidential" or "Highly Confidential" in a prominent place on each page of such document prior to production.

(f)     For reports created by an expert or consultant relying on or incorporating Protected Material in whole or in part, that the Party responsible for its creation include the confidentiality designation "Confidential" or "Highly Confidential" on the report.

5.2     Inadvertent Failures to Designate: If a Producing Party discovers that it produced material that was not designated as Protected Material or that it produced material that was designated as Protected Material but had designated that Protected Material in the incorrect category of Protected Material, the Producing Party may promptly notify all Receiving Parties, in writing, of the error and identify (by production number) the affected material and its new designation or re-designation. Thereafter, the material so designated or re-designated shall be treated as Protected Material in conformity with the new designation or re-designation. Promptly

6

after providing such notice, the Producing Party shall provide re-labeled copies of the material to each Receiving Party reflecting the change in designation.  Each Receiving Party shall make reasonable efforts to delete and replace the incorrectly designated material, and all copies thereof, with the newly designated material and to destroy the incorrectly designated material.  To the extent such information may have been disclosed to anyone not authorized to receive Confidential or Highly Confidential Discovery Material under the terms of this Order, the Receiving Party shall make reasonable efforts to retrieve the Discovery Material promptly and to avoid any further disclosure.  If corrected, an inadvertent failure to designate qualified information or items as "Confidential" or "Highly Confidential" does not waive the Producing Party's right to secure protection under this Order for such material.  If material is re-designated "Confidential" or "Highly Confidential" after the material was initially produced, each Receiving Party, upon notification of the designation, must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

5.3      In the event that more than one Designating Party designates the same Protected Material with different levels of treatment or confidentiality, all copies of the Protected Material shall by treated as having the lowest level of confidentiality designated by any Designating Party.

5.4      Upward Designation of Information or Items Produced by Other Parties or Non-Parties: A Party may upward designate (i.e., change any Discovery Material produced without a designation of Confidential or Highly Confidential or change any Discovery Material produced as Confidential to a designation of Highly Confidential) any Discovery Material produced by another Party or non-Party, provided that said Discovery Material contains the upward designating Party's own trade secrets or other confidential research, development, financial, personal or commercially sensitive information, or otherwise is entitled to protective treatment under Federal Rule of Civil

Procedure 26(c) or other law, foreign or domestic, such that the upward designation is appropriate under the terms of this Order. Upward designation shall be accomplished by providing written notice to all Parties identifying (by Bates number or other individually identifiable information) the Discovery Material to be re-designated within thirty (30) days of production by the disclosing Party. Failure to upward designate within thirty (30) days of production, alone, will not prevent a Party from obtaining the agreement of all Parties to upward designate certain Discovery Material or from moving the Court for such relief. Any Party may object to the upward designation of Discovery Material pursuant to the procedures set forth in paragraph 6 regarding challenging designations.

## VI.    CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1    Meet and Confer: If a Party elects to challenge a Designating Party's confidentiality designation, it must do so in good faith and must begin the process by notifying the Designating Party in writing of its challenge and identifying the challenged material with as much specificity as reasonably practical, including for example, by production number, and by providing a basis for the challenge. The objecting Party and the Designating Party shall, within ten (10) business days after service of the written objections, meet and confer concerning the objection, unless otherwise agreed.

6.2    Judicial Intervention: If the Parties are not able to resolve a dispute about a confidentiality designation during the meet and confer process set forth in Section 6.1, the Party challenging the designation may seek relief promptly from the Court in accordance with its rules and procedures. Until the Court rules on the dispute, all Parties shall continue to afford the material in question the level of protection to which it is entitled under the Designating Party's designation. In the event the Court rules that the challenged material's designation should be changed, the

Designating Party shall reproduce copies of all materials with their designations removed or changed in accordance with the ruling within ten (10) business days of the ruling.

## VII. ACCESS TO AND USE OF DISCOVERY MATERIAL

7.1     Subject to any other written agreement among or between Producing Parties and/or Receiving Parties, a Receiving Party may access or use Discovery Material that is disclosed or produced by a Producing Party only in connection with the prosecution of, defense of, appeal of, attempted settlement of, or the enforcement of insurance rights with respect to this Action. Except as required by law, Discovery Material may not be used for any other purpose, including, without limitation, any business or commercial purpose, contractual demands, any purpose related to any other investigation or proceeding, or evaluation of other potential claims not asserted in the Action. Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. Following the termination of this Action, each Receiving Party must comply with the provisions of Section 10, below.

7.2     The recipient of any Protected Material shall maintain such material in a secure and safe area and shall exercise a standard of due and proper care with respect to the storage, custody, use, and/or dissemination sufficient under all applicable laws to safeguard against unauthorized or inadvertent disclosure of such material. Protected Material shall not be copied, reproduced, extracted, or abstracted, except to the extent that such copying, reproduction, extraction, or abstraction is reasonably necessary for the conduct of this Action. All such copies, reproductions, extractions, and abstractions shall be subject to the terms of this Order and labeled in the same manner as the designated material on which they are based.

7.3     Disclosure of Confidential Material: Unless otherwise ordered by the Court or permitted in writing by the Designating Party, material designated "Confidential" may be disclosed by a Receiving Party only to the following persons:

9

(a)     the Receiving Party's Counsel to whom it is reasonably necessary to disclose the information in connection with this Action;

(b)     in addition to In House Counsel, and to the extent that such disclosure is reasonably necessary for the Action, current officers, directors, or employees of each Receiving Party who have signed the "Agreement to Be Bound by Protective Order" (Exhibit A);

(c)     Experts and/or Consultants retained by a Party or its Counsel to serve as an expert witness or as a consultant in this Action and who have signed the "Agreement to Be Bound by Protective Order" (Exhibit A), provided that Counsel, in good faith, requires their assistance in connection with this Action; and provided further that any part of a report created by such expert or consultant incorporating Protected Material in whole or in part shall be designated appropriately by the Party responsible for its creation; and provided further that experts or consultants may not use Protected Material for any purpose that does not relate to this Action;

(d)     the Court and its personnel, subject to the requirements of Section 9, below;

(e)     special masters, mediators, or other third parties who are appointed by the Court or retained by the Parties for settlement purposes or resolution of discovery or other disputes and their necessary personnel and, in the case of persons retained by the Parties, who have signed the "Agreement to Be Bound by Protective Order" (Exhibit A);

(f)     court reporters and/or videographers, their staffs, and Professional Vendors to the extent that such disclosure is reasonably necessary for this Action;

(g)     the author, addressees, or recipients of the document, or any other natural person who reviewed or had access to such document during his or her employment as a result of the substantive nature of his or her employment position, or who is specifically identified in the document or its accompanying metadata, provided, however, that (i) the disclosure is made for the

10

purpose of advancing the disclosing Party's claims or defenses, and for no other purposes; (ii) the witness is not permitted to retain copies of the Protected Material after the witness is examined regarding the Protected Material; and (iii) the witness is explicitly informed by the disclosing Party's Outside Counsel that this Protective Order forbids him or her to disclose the Protected Material except as permitted under this Protective Order and that he or she is subject to the Court's jurisdiction for the purposes of enforcing this Protective Order;

(h)      a witness who has been subpoenaed or noticed for deposition, trial testimony, or other court proceeding in the Action not otherwise authorized to view the Protected Material in question, during that witness' testimony at a deposition, hearing, or trial in the Action, or in preparation for the same, provided that (i) the disclosure is made for the purpose of advancing the disclosing Party's claims or defenses, and for no other purposes; (ii) the witness is not permitted to retain the Protected Material after the witnesses is examined regarding the Protected Material; (iii) the disclosing Party's Outside Counsel advises the witness, in advance of any disclosure, that this Protective Order forbids him or her to disclose the Protected Material except as permitted under this Protective Order and that he or she is subject to the Court's jurisdiction for the purposes of enforcing this Protective Order; and (iv) the disclosing Party's Outside Counsel maintains a record that he or she has so advised the witness and states on the record at a deposition or other court proceeding in which the witness testifies that he or she has so advised the witness;

(i)      relevant employees of any insurer to a Party to the extent that such disclosure is reasonably necessary for the defense of that Party in this Action and who have signed the "Agreement to Be Bound by Protective Order" (Exhibit A);

(j)      any other person agreed to by the Designating Party in writing; and

(k)      any other person to whom the Court compels disclosure of the Confidential Material or to whom disclosure is required by law, subject to the requirements of Section 15 below.

Any disclosure permitted by this section may be only made to the extent reasonably necessary to prosecute or defend this Action.

7.4      Disclosure of Highly Confidential Material: Unless otherwise ordered by the Court or permitted in writing by the Designating Party, material designated "Highly Confidential" may be disclosed by a Receiving Party only to the following persons:

(a)      The Receiving Party's Outside Counsel to whom it is reasonably necessary to disclose the information in connection with this Action;

(b)      Experts and/or Consultants retained by a Party or its Counsel to serve as an expert witness or as a consultant in this Action and who have signed the "Agreement To Be Bound By Protective Order" (Exhibit A), provided that Counsel, in good faith, requires their assistance in connection with this Action; and provided further that any part of a report created by such expert or consultant incorporating Protected Material in whole or in part shall be designated appropriately by the Party responsible for its creation; and provided further that experts or consultants may not use Protected Material for any purpose that does not relate to this Action;

(c)      the Court and its personnel, subject to the requirements of Section 9, below;

(d)      special masters, mediators, or other third parties who are appointed by the Court or retained by the Parties for settlement purposes or resolution of discovery or other disputes and their necessary personnel and, in the case of persons retained by the Parties, who have signed the "Agreement to Be Bound by Protective Order" (Exhibit A);

(e)      court reporters and/or videographers, their staffs, and Professional Vendors to the extent that such disclosure is reasonably necessary for this Action;

(f)    the author, addressees, custodians or recipients of the document; or, any other natural person who is specifically identified in the document or its accompanying metadata, or, on the record at a deposition, current or former employees, officers or directors of the Producing Party who have knowledge of the specific matters set forth in the highly confidential material, provided, however, that (i) the disclosure is made for the purpose of advancing the disclosing Party's claims or defenses, and for no other purposes; (ii) the witness is not permitted to retain the Protected Material after the witnesses is examined regarding the Protected Material; and (iii) the witness is explicitly informed by the disclosing Party's Outside Counsel that this Protective Order forbids him or her to disclose the Protected Material except as permitted under this Protective Order and that he or she is subject to the Court's jurisdiction for the purposes of enforcing this Protective Order;

(g)    relevant employees of any insurer to a Party to the extent that such disclosure is reasonably necessary for the defense of that Party in this Action and who have signed the "Agreement to Be Bound by Protective Order" (Exhibit A);

(h)    any other person agreed to by the Designating Party in writing; and

(i)    any other person to whom the Court compels disclosure of the Confidential Material or to whom disclosure is required by law, subject to the requirements of Section 15 below.

Any disclosure permitted by this section may be only made to the extent reasonably necessary to prosecute or defend this Action.

7.5    Retention of Exhibit A:  Counsel for the Party that obtains the signed "Agreement to Be Bound by Protective Order" (Exhibit A), as required above, shall retain them for six (6) months following the final termination of this Action, including any appeals, and shall make them available to other Parties or the Court upon good cause shown.

13

7.6     Retention of Protected Material: Unless otherwise agreed to by the Producing Party in writing or ordered by the Court, persons described in Sections 7.3 (g), (h), and (j), who have been shown Confidential Material shall not retain copies thereof longer than reasonably necessary in light of the purpose for which the Confidential Material was disclosed. Persons described in Sections 7.4 (f), (g), and (i) who have been shown Highly Confidential Material shall not retain copies thereof longer than reasonably necessary in light of the purpose for which the Highly Confidential Material was disclosed.

## VIII.   UNAUTHORIZED DISCLOSURE

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Order, the Receiving Party must, as soon as practicable, but in any event, not longer than five (5) business days after discovery of the disclosure by Counsel, (a) notify in writing the Designating Party of the unauthorized disclosures, (b) make commercially reasonable efforts to retrieve all copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Agreement to Be Bound by Protective Order" (Exhibit A).

## IX.   FILING PROTECTED MATERIAL

In the event that Counsel for any Party determines to file or submit in writing to the Clerk of Court's office or file on ECF any Protected Material, or any papers containing or making reference to the substance of such material or information, such documents or portions thereof containing or making reference to such material or information shall be filed in redacted form or under seal in accordance with the rules of the Court. The Parties will attempt to resolve any disputes regarding confidentiality designations in advance of any such filing or submission to the extent possible.  Where a dispute remains regarding confidentiality designations in advance of any

14

such filing or submission, or where the Parties are unable to confer in advance of the filing or submission, Counsel for the filing Party shall file any Protected Material under seal and shall file in redacted form or under seal any documents or portions containing or making reference to such material.

Filing under seal shall be without prejudice to any Party's right to argue to the Court that such document is not Confidential Material or Highly Confidential Material and need not be preserved under seal.

## X. FINAL DISPOSITION

10.1 In the event that: (i) all Parties to the Action reach a settlement resolving all of the then pending claims among them; or (ii) any court enters an order resolving all of the then pending claims among the Parties, except as provided below, the provisions of this Stipulated Protective Order restricting the use of "Confidential" and "Highly Confidential" information shall continue to be binding unless otherwise agreed or ordered by the Court. Upon entry of final judgment either by reason of settlement or court order, each Receiving Party shall undertake commercially reasonable efforts to prevent anyone acting on its behalf from accessing, reviewing, copying, summarizing, or making any other use of a Producing Party's Discovery Material, including but not limited to directing the Receiving Party's discovery vendor(s) to take data offline or to take other steps to prevent access to the Discovery Material. Notwithstanding this provision, as to those Discovery Materials that constitute Counsel's work product, and pleadings, motion papers, deposition transcripts, and exhibits thereto, legal memoranda, and correspondence that were served in this Action, or filed with this Court, Counsel may continue to access and make use of such material for purposes of this Action pending the final termination of this Action, provided, however, that these materials remain subject to this Order. Each Receiving Party shall document its compliance with the terms of this subparagraph and notify Producing Parties of such

15

compliance within 30 days of final termination of this action either by reason of settlement or court order, including any appeals.

10.2    Except as provided by law or other regulatory authority or unless otherwise ordered or agreed in writing by the Producing Party, within sixty (60) calendar days after the final termination of this Action, including any appeals, each Receiving Party shall undertake commercially reasonable efforts to return to the Producing Party all Protected Material or, at the option of the Receiving Party, to destroy all Protected Material. In either case, the Receiving Party shall, upon request, provide the Designating Party with a certification stating that it has taken commercially reasonable efforts to destroy or return the Confidential or Highly Confidential documents, except for (i) such information or material that was transmitted electronically and whose removal or destruction from a Party's electronic systems would violate applicable federal or state law, rule, or regulation, or policies and procedures reasonably designed to ensure compliance with such law, rule, or regulation, and that (ii) information saved on backup media in an electronically stored format will be certified to have complied with the 60-day destruction period if the Party has a data destruction policy for the backup media resulting in the eventual destruction or overwriting of the electronically stored information, provided, however, that these materials will continue to be subject to the terms of this Order.

10.3    If a Receiving Party takes the position that it cannot comply with the return or destruction provisions of this section within the 60-day destruction period, and that it must instead retain documents for a longer period of time pursuant to the "[e]xcept as provided by law or other regulatory authority" provision of this section, then it must, in its certification, (i) state the law or other regulatory authority it believes requires it to retain those documents, and (ii) describe the documents it intends to retain pursuant to that law or regulatory authority.  Notwithstanding this

provision, as to those materials designated as Confidential or Highly Confidential that constitute Counsel's work product, and pleadings, motion papers, deposition transcripts, and exhibits thereto, legal memoranda, and correspondence that were served in this Action, or filed with this Court, Counsel may retain such documents, even if such materials contain Confidential or Highly Confidential Material, if such Counsel otherwise comply with this Order with respect to such retained material. Any such archival copies that have been designated Confidential or Highly Confidential remain subject to this Order until the Producing Party agrees otherwise in writing or this Court orders otherwise.

10.4    This Order shall survive the termination of this Action, and this Court shall have continuing jurisdiction for enforcement of its provisions following termination of this Action.  No part of the restrictions imposed by this Order may be waived or terminated, except by written stipulation executed by Counsel for each Designating Party or by an Order of the Court for good cause shown.

## XI.    A DESIGNATING OR PRODUCING PARTY'S USE OF ITS OWN DOCUMENTS

Nothing in this Order shall be construed to limit in any way any Producing Party's, Receiving Party's, or any other person's use of its own documents, including documents obtained independently and lawfully from sources other than a Producing Party, nor shall it affect any Producing Party's, Receiving Party's, or any other person's subsequent waiver of its own prior designation with respect to its own Confidential Material or Highly Confidential Material.

## XII.    CLAW BACK OF PRIVILEGED MATERIAL

12.1    In order to claw back Privileged Material that was produced inadvertently, within seven (7) days of discovery such an inadvertent production, the Producing Party must provide

notice in writing to the Receiving Party specifying the production number of the Discovery Material it wishes to claw back, and the basis of the claim that it is Privileged Material.

12.2    Upon notice that a Producing Party wishes to claw back Discovery Material protected as Privileged Material that was produced inadvertently, the Receiving Party shall promptly undertake commercially reasonable efforts to return to the Producing Party or destroy all summaries or copies of such Privileged Material (notwithstanding the final sentence of Section 3 regarding a Receiving Party's own work product that reflects the Protected Material referred to in this Section), shall provide notice in writing that the Receiving Party has undertaken reasonable efforts to return and destroy such Privileged Material, and shall not use such items for any purpose until further order of the Court or agreement of the parties.  In all events, such return, destruction, and certification must occur within ten (10) business days of receipt of the request, unless the Receiving Party provides notice of its intent to challenge the assertion of a claim of protection under Fed. R. Civ. P. 26(b)(5) (the "Challenge Notice"), in which event the Receiving Party may retain no more copies (the "Retained Copies") of the disclosed material than are sufficient to prosecute its challenge to the assertion of protection.  Having provided a Challenge Notice, the Receiving Party must raise a challenge with the Court within thirty (30) days of that Challenge Notice, or otherwise return or destroy the Retained Copies within that period.  Moreover, in the event a Challenge Notice is provided, the Receiving Party shall make no use of the Discovery Material subject to the request for return other than in connection with the Receiving Party's prosecution of its challenge to the assertion of privilege, until the Challenge is resolved.  However, the Receiving Party may request an extension of the deadline for the return or destruction of Retained Copies, and such extension shall not be unreasonably withheld.  For the avoidance of doubt, nothing in this paragraph shall be construed as restricting the right of any Party to challenge

a claim of privilege at any time permissible under the Federal Rules of Civil Procedure and other relevant laws after return or destruction of the Retained Copies and the Receiving Party's retention of Retained Copies shall not be construed in this or any other action as a waiver by the Producing Party.  If the Producing Party has already produced a privilege log with respect to its production of documents, within ten (10) business days of the notification that reasonable efforts have been taken to return or destroy the Privileged Material, the Producing Party shall supplement that privilege log with respect to the Privileged Material, otherwise the Producing Party shall include the Privileged Material on its privilege log when that log is initially produced.  The return of any Discovery Material to the Producing Party shall not in any way preclude the Receiving Party from moving the Court for a ruling that the disclosed information is not privileged or that such privilege has been waived; however, the Receiving Party may not assert as a basis for the relief it seeks the fact or circumstance that such privileged documents have already been produced.  Alleged Privileged Material shall remain protected against disclosure and use during the pendency of any dispute over their status.

12.3    If, during a deposition, a Party claims that a document being used in the deposition (e.g., marked as an exhibit, shown to the witness, or made the subject of examination) contains Privileged Material, it may at its sole election (a) allow the document to be used in the deposition without waiver of its claim of privilege or other protection or (b) instruct the witness not to answer questions concerning the document pending a prompt resolution of any disagreement concerning the document's privileged or work-product protected status.  If the Party allows the examination concerning the document to proceed on a non-waiver basis, the Parties shall sequester all copies of the purportedly privileged or work-product protected document.  Immediately following the deposition, the Parties will commence the procedure outlined in the preceding paragraphs to

address the claim of privilege or other protection, including the notice requirement set forth in Section 12.1.  Until the dispute is resolved, all Parties and any other persons who have access to the transcript of such deposition shall treat that transcript as Confidential Material.  If any Party instructs the witness not to answer questions concerning the document, and any Party wishes to have the issue resolved by the Court, the Parties will then cooperate in promptly submitting the issue of the document's status to the Court.  If the document is ultimately determined not to be privileged or subject to other protection, the Party or entity asserting the claim of privilege will be responsible for ensuring that the deposing Party is given an opportunity to depose the witness about the document, which in the case of Party-witnesses (or their current employees) or any former employees of a Party who are represented by Counsel for such Party shall be within thirty (30) calendar days of said determination, and in the case of other non-Party witnesses shall be within fourteen (14) calendar days of the determination.

12.4    Pursuant to Fed. R. Evid. 502(d), if a Party at any time notifies any other Party that it, for any reason, disclosed documents, testimony, information, and/or things that are protected as Privileged Material, or the Receiving Party discovers such disclosure (in which case the Receiving Party shall give the Producing Party prompt notice), the disclosure alone, pursuant to Rule 502(d), shall not be deemed a waiver—in the Action or in any other proceeding, including in federal or state proceedings—of any applicable privilege or protection.

## XIII.   USE OF DESIGNATED MATERIAL AT TRIAL

The undersigned agree to meet and confer concerning the use of any Protected Material at the trial of this Action during preparation of the Joint Pretrial Order to be submitted in accordance with the Court's Individual Rules and Practices and Fed. R. Civ. P. 26(a)(3).  The use of Protected Material at trial shall not cause such Protected Material to lose its status as Protected Material.

## XIV.   ATTORNEY RENDERING ADVICE

Nothing in this Order will bar or otherwise restrict an attorney from rendering advice to his or her client or from relying upon or generally referring to Protected Material in rendering such advice, provided, however, that, in rendering such advice or in otherwise communicating with his or her client, the attorney shall not reveal or disclose the specific content of Protected Material if such disclosure is not otherwise permitted under this Order.

## XV.   LEGAL PROCESS

If a Receiving Party is served with a discovery request, subpoena, or an order issued in other litigation, or receives some other form of legal process or request from any court, federal or state regulatory or administrative body or agency, legislative body, self-regulatory organization, or other person or entity purporting to have authority to require the production thereof, that seeks disclosure of any information or items designated in this Action as "Confidential" or "Highly Confidential," the Receiving Party must notify, to the extent permitted by law and the rules, requirements, or requests of any relevant governmental or self-regulatory organization, the Designating Party, in writing (by fax or electronic mail, if possible), and include with that notice a copy of the discovery request, subpoena, order, or other form of legal process as soon as reasonably practicable and in any event no later than ten (10) business days after receipt unless production is required earlier, in which case the notice must be made in time for the Designating Party to take steps as set forth below.  The Receiving Party also must promptly inform the party that caused the discovery request, subpoena, order, or other form of legal process or request to issue that some or all of the material covered by the subpoena or order is the subject of this Order. In addition, the Receiving Party must deliver a copy of this Order promptly to the party in the other matter that caused the discovery request, subpoena, order, or other form of legal process or request to issue.  To the extent consistent with the rules, requirements, or requests of any relevant

governmental or self-regulatory organization, the Receiving Party shall not produce the requested Protected Material unless and until a court of competent jurisdiction so directs, except if the Designating Party (a) consents, or (b) fails to file a motion to quash or fails to notify the Receiving Party in writing of its intention to contest the production of the Protected Material prior to the date designated for production of the Protected Material, in which event the Receiving Party may produce on the production date, but no earlier.  In connection with any production of Confidential or Highly Confidential Material subject to this Order, the Receiving Party shall request confidential treatment for the Confidential or Highly Confidential Material.  The purpose of imposing these duties is, to the extent consistent with the rules, requirements, or requests of any relevant governmental or self-regulatory organization, or otherwise permitted by law, to alert the interested parties to the existence of this Order and to afford the Designating Party an opportunity to try to protect its confidentiality interest in the matter or proceeding in connection with which the discovery request, subpoena, or order is issued.  The Designating Party shall bear the burdens and the expenses of seeking protection in that matter or proceeding of its Protected Material.  Nothing in these provisions should be construed as authorizing, requiring, or encouraging a Receiving Party to disobey, or to risk contempt of, a lawful directive from another court.  In the event that Discovery Material is produced to a Non-Party as a result of a discovery request, subpoena, or an order issued in other litigation, or some other form of legal process from any court, federal or state regulatory or administrative body or agency, legislative body, or other person or entity, such Discovery Material shall continue to be treated in this Action in accordance with any designation as Protected Material.

## XVI.   NON-PARTIES

Any Party, in conducting discovery from Non-Parties in connection with this Action, shall provide any Non-Party from which it seeks discovery with a copy of this Order so as to inform

22

each such Non-Party of his, her, or its rights herein.  If a Non-Party provides discovery to any Party in connection with this Action, the provisions of this Order shall apply to such discovery as if such discovery were being provided by a Party. Under such circumstances, the Non-Party shall have the same rights and obligations under the Order as held by the Parties to this Action.  Any Non-Party producing Discovery Material or giving deposition testimony in this Action may avail herself, himself, or itself of the provisions of this Protective Order available to "Parties" for her, his, or its testimony and Discovery Material by executing Exhibit A to this Order and informing the Party that served the subpoena of the same.

## XVII.  NOTICES

All notices required by this Order must be provided in writing to Counsel of record for each Party and, if applicable, in writing to a Non-Party, with email communication being sufficient.  Any of the notice requirements herein may be waived in whole or in part, but only in writing by an attorney for the Designating Party.

## XVIII. AMENDMENT OF ORDER

Nothing herein shall preclude any Party from seeking to amend this Order in writing for good cause shown.  Nor shall anything herein preclude any Party or Non-Party from seeking additional or different protections on a case-by-case basis under the standards set forth in Fed. R. Civ. P. 26(c).  The deadlines set forth in this Order may be modified in particular circumstances by agreement of the Parties without the involvement of the Court.

## XIX.  MISCELLANEOUS

19.1    Right to Assert Other Objections: By stipulating to the entry of this Order, no Producing Party waives any right it otherwise might have to object to disclosing or producing any information or item on any ground, including confidentiality.  Similarly, no Producing Party

23

waives any right to object on any ground to the admissibility or use in evidence of any of the material covered by this Order.

19.2    Execution: This Stipulation and Order may be executed in counterparts. This Stipulation and Order shall become effective as a stipulation as among the executing Parties immediately upon its execution by such executing Parties, subject to any subsequent modifications ordered by the Court.

**IT IS SO ORDERED,** this 16th day of November, 2020.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| FUSION ELITE ALL STARS, et al., | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2:20-cv-2600-SHL-cgc |
| | ) | |
| VARSITY BRANDS, LLC, et al., | ) | |
| Defendants. | ) | |

## PROTOCOL FOR THE DISCOVERY OF ELECTRONICALLY STORED INFORMATION AND HARD COPY DOCUMENTS

The Parties have stipulated to this Joint Stipulated Protocol for Discovery of Electronically Stored Information and Hard Copy Documents ("ESI Protocol" or "Protocol") to facilitate discovery in this litigation.

The parties shall make good-faith efforts to comply with and resolve any differences concerning compliance with this ESI Protocol. If a Producing Party, notwithstanding its good-faith efforts, is unable to reasonably comply with any material aspect of this ESI Protocol, such party shall inform the Receiving Party in writing a reasonable time before the date of production as to why compliance with the ESI Protocol is unreasonable. All productions in this litigation are subject to the confidentiality order separately entered by the Court in this litigation. Nothing herein is intended to alter the parties' rights and obligations under the Federal Rules of Civil Procedure and applicable law. The parties specifically reserve all of their rights and objections to any discovery that may be served upon them in this matter.

# EXHIBIT 4

## I.    DEFINITIONS

1.  A reference to "document(s)" shall include both ESI and hard-copy documents, as defined herein.

2.  **"Document Family"** refers to a group of related ESI that includes parent and child documents as maintained in the ordinary course of business (e.g., a parent email and any attachments thereto).

3.  **"Electronically stored information"** or **"ESI,"** as used herein, means, as referenced in the Federal Rules of Civil Procedure, information that is stored electronically, regardless of the media or whether it is in the original format in which it was created, as opposed to stored in hard copy (i.e., on paper).

4.  **"Extracted Text"** means the text extracted from an electronic document and includes all header, footer and document body information when reasonably available.

5.   **"Hard Copy Document"** means a document collected from physical files (paper) and not from electronic sources.

6.   **"Media"** means an object or device, real or virtual, including but not limited to a disc, tape, computer or other device on which data is or was stored.

7.  **"Metadata"** is used to describe the structural information of a file that contains data about the file, as opposed to describing the content of a file. The Metadata fields to be produced are listed in Exhibit 1.

2

8. **"Native" or "Native Format"** means and refers to the format of ESI in the application in which it was originally created and/or as used by the Producing Party in the usual course of its business and in its regularly conducted activities.

9. **"OCR text"** means text generated through Optical Character Recognition Process of image/bitmap picture representation of the documents.

10. **"Producing Party"** means or refers to any party in the litigation from which production of ESI or hard copy documents are sought.

11. **"Receiving Party"** means or refers to any party in the litigation seeking production of ESI or hard copy documents.

## II.    E-DISCOVERY LIAISONS

Each party will identify an E-discovery Liaison who will be primarily responsible for meeting and conferring concerning ESI. Each E-discovery Liaison will: (1) be knowledgeable about the party's e-discovery efforts; (2) be familiar with the party's electronic systems and capabilities in order to explain those systems and answer relevant questions, or have reasonable access to those who are; and (3) be knowledgeable about the technical aspects of e-discovery—including electronic document storage, organization, and format issues, and relevant information retrieval technology, including search methodology—or have reasonable access to those who are. Each party shall designate its ESI Liaison within 10 days after entry of this Order. Each party will provide written notice to the other parties of any changes of its designated E-discovery Liaison.

## III. PRESERVATION

The parties have taken and will continue to take reasonable steps to preserve reasonably accessible documents and data from custodians and non-custodial sources they have identified as potentially possessing relevant information that could be subject to discovery. To the extent that a party wishes to exclude a category of documents from production on the basis of proportionality or undue burden, the responding party will disclose said document category.

## IV. IDENTIFICATION AND COLLECTION OF DOCUMENTS

To the extent a discovery request calls for the production of ESI, prior to any production the parties anticipate discussing: (i) the identity and role of custodians from which documents will be obtained for the production; (ii) the identity, scope and format of custodial and non-custodial sources from which documents will be considered for production. In addition, the Producing Party shall disclose any relevant existing document retention polices and/or any document destruction schedules that may be applicable to the sources of data collected.

The Receiving Party may propose additional custodians or non-custodial sources. The Producing Party will consider in good faith such requests. If the Producing Party chooses to use search terms to filter documents for review in response to any discovery request, the Producing Party will disclose the list of search terms, date filters, or other culling methods that it intends to use. The Receiving Party may propose additional terms or culling parameters. The Producing Party will consider in good faith such requests and the burden they would impose on it. The parties will confer regarding testing of search terms.

If the Producing Party plans to use TAR, including "predictive coding," to identify or cull documents to be reviewed or produced, the Producing Party will notify the Receiving Party and will

provide information on the TAR review technology, process, and validation, including: (1) the Custodial Data Sources and Non-Custodial Data Sources against which TAR will be run; (2) the TAR or advanced analytics methodology being deployed; (3) the quality control measures used to validate the results of the TAR methodology or similar advanced analytics, including a validation process, (4) any Documents, Document types, file types or other categories that the Producing Party proposes to exclude from the TAR process and the method of identifying such Documents to be excluded, (5) other disclosures that are reasonably necessary for the Requesting Party to evaluate the proposed TAR process, as well as information on date filters and other culling methods. The Receiving Party may propose additional search terms or culling parameters. The Producing Party will consider in good faith any such proposals.

The Producing Party will disclose methodology for analysis of ESI or Hardcopy Documents which are reasonably believed to be responsive to discovery requests but for which text-based search technologies may be ineffective.

## V.    FORM OF ESI PRODUCTIONS

**Images.** TIFF Images. All responsive ESI and Hardcopy documents, except that ESI which is produced in native format pursuant to paragraph 2 of this Section, shall be produced as black and white, single-page, 300 DPI, Group IV TIFF files. Each TIFF file should be assigned a unique name matching the Bates number of the corresponding image. Bates numbers and confidentiality designations should be electronically branded on each produced TIFF image. These TIFF images should be provided in a separate folder and the number of TIFF files per folder should be limited to 1,000 files. All TIFF images shall be processed to show and reveal track changes, comments, and hidden content in Word documents and speaker notes and hidden content in PowerPoint files.

In scanning Hardcopy documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). If documents were scanned previous to this case, however, and are not logically unitized, they may be produced in the format in which they were maintained. In the case of an organized compilation of separate documents (for example, a binder containing several separate documents behind numbered tabs), the document behind each tab should be scanned separately. The parties will make their best efforts to unitize the documents correctly and to correct any unitization failures.

Documents containing color may, but do not need to, be produced in single-page color JPEG format. If an original document contains color necessary to understand the meaning or content of the document, the Producing Party shall honor reasonable requests for a color image and/or native file of the document.

**Natives.** Responsive spreadsheets, audio/visual/multimedia, and other files that are not conducive to production in image format shall be produced in native format, except where such files are redacted. The parties agree to meet and confer regarding producing other files in native format, if necessary and appropriate. Responsive ESI produced in native format shall be produced with Metadata described in Exhibit 1 that is contained in or associated with that file to the extent extraction of metadata is reasonably possible. Each file produced in native format shall be assigned a unique Bates number, and for each a single page placeholder TIFF image stamped with this unique Bates number, a phrase indicating that the file has been produced in native format, and the corresponding confidentiality designation under the Confidentiality Order will be produced. To the extent extracted text is available, the original document text shall be provided in a document-level

UTF-8 text file; otherwise the text contained on the slipsheet language shall be provided in the *.txt file.  The relative file path to the native file in the document production shall be included in the NativePath metadata field in the *.dat file as outlined in Exhibit 1.

**Non-English Documents**.  To the extent that documents are produced that contain languages other than English, in whole or in part, the Producing Party shall produce each such document in the original language or languages in which it was written and collected.  The Producing Party has no obligation to create a translation of the documents or any portion thereof, but a Producing Party must produce any identified English translation of Non-English documents of which it is actually aware other than translations made at the request of counsel.

**Load File Formats**. ESI will be produced with a standard Concordance (*.dat) metadata load file format and an image load file that is in .OPT format.  The Concordance (*.dat) load file shall be provided with UTF-8 encoding.

**Metadata to be Produced**. The metadata fields detailed in Exhibit 1 will be produced for each document to the extent that such information is reasonably available and extractable, except that if a field contains privileged information or information otherwise protected from disclosure under order of Court, that information may be redacted and privileged information may be noted in a corresponding privilege log.

**Extracted Text and OCR.**  Each document, whether produced in Native or in TIFF format, and whether originally existing in electronic or in hard copy, shall be produced with extracted text or OCR, as described herein:

     i.   Extracted Text (Emails, Unredacted Native ESI, and Natively Redacted

Spreadsheets).  All email, un-redacted ESI, and natively redacted spreadsheets produced as native files, should be provided with complete document-level extracted text files.  Extracted text shall include all comments, track changes, and hidden content in Word documents and speaker's notes and hidden content in PowerPoint files.

ii.  OCR (Redacted Native ESI, Hard Copy Documents). In the event a document, other than natively redacted spreadsheets, contains text that is to be redacted, OCR text files should be provided for the entire document after the redaction has been applied. Document-level OCR text files should also be provided for Hardcopy documents, PDFs that do not have embedded text, and images that the Producing Party determines are likely to contain text.

iii.  Format of Extracted Text and OCR. The extracted full text and/or OCR text for all deliverables should be in separate document-level, UTF-8 TXT files provided in a separate folder.  The number of TXT files per folder should be limited to 1,000 files.

**VI.**  **De-duplication**. Global de-duplication (de-duplication both within a custodian's documents and across all custodians' documents) is to be executed at the document family level.  De-duplication shall be done on exact duplicate documents using family level hash values derived from industry standard hashing algorithms, such as MD5 or SHA-1 algorithms (or a reasonably equivalent alternative).

1. The parties will meet and confer regarding deduplication of paper documents across custodians.

2. No party shall remove near-duplicate documents.

3. Standalone documents shall not be de-duplicated against email attachments.

4. For exact duplicate documents, the Producing Party will produce the metadata described in Exhibit 1 for the single production copy to the extent available. If more than one custodian possesses a duplicate, the Producing Party shall populate a field of data that identifies each custodian who had a copy of the produced document (the "All Custodians" field).

5. In the event of a rolling production of documents or ESI items, to the extent the Producing Party de-duplicates across custodians the Producing Party shall, on at least two occasions during discovery, provide overlay load files with updated Custodian and AllCustodians Metadata fields, as appropriate, to indicate custodians for any duplicate copy of a document that was not produced. The first will be made the first business day following the middle of the scheduled discovery period and these fields will be updated 30 days before the end of the discovery period, if further productions have rendered them outdated.

6. Any document containing handwritten notes, highlighting, alterations, or markings would not be considered a duplicate of another version and if responsive must be produced as an original document.

7. If during the course of its review, a Producing Party identifies a large number of duplicate documents the Parties may confer regarding a custom deduplication protocol.

## VII.   **Email Threading**.

Email thread suppression may be applied in production so long as portions of the thread containing unique content are not suppressed. This unique content includes thread members with BCC metadata, attachments, or edits to body of the text. If email thread suppression is used, the producing party must produce the most inclusive email thread that contains all of the prior or lesser-included emails and attachments, including each branch of the email thread.  If the most inclusive email thread does not show any differences to the thread such as changes in recipients (e.g., side threads, subject line changes), dates, selective deletion of previous thread content by sender, etc., then the emails containing such changes shall be individually produced.

## VIII.   **Embedded Files**.

Except for de minimis images embedded in ESI which, to the extent reasonably feasible should either not be extracted or should be suppressed from production (e.g., logo images), embedded files are to be extracted and produced as family groups.  Embedded files should be assigned Bates numbers that directly follow the Bates numbers on the documents within which they are embedded.

## IX.   **Databases, Structured, Aggregated or Application Data**.

The parties will meet and confer to address the production and production format of any responsive data contained in a database or other structured or aggregated data source, including Enterprise Resource Planning databases, and Microsoft Access and Excel-based databases.

10

Productions from such databases are not subject to this protocol.

**X.    Parent-Child Relationships.**

For email families, the parent-child relationships (the association between emails and attachments) shall be preserved.  All email attachments should be consecutively produced with the parent email record. To the extent a non-ordinary course-of-business email was used to transfer over twenty-five attachments, solely for the non-substantive purpose of moving data, those attachments shall be considered standalone documents.

**XI.    Time Zone**.

The time zone in which the data was processed will be disclosed by the Producing Party.

**XII.    Bates Numbering**.

Bates numbering should be consistent across the production, contain no special characters, and be numerically sequential within a given document.  If a Bates number or set of Bates numbers is skipped, the skipped number, or set of numbers, should be noted with a placeholder.  All attachments to documents will be assigned Bates numbers that directly follow the Bates numbers on the documents to which they were attached.  In addition, each TIFF image will have its assigned Bates number electronically "burned" onto the image.

**XIII.    Excluded File Types**.

Absent good cause shown, the parties agree that there is no need to collect ESI from the following sources:

1. Deleted, slack, fragmented, or other data only accessible by forensics

2. Random access memory (RAM), temporary files, or other data difficult to preserve without disabling the operating system;

3. On-line access data such as temporary internet files, history, cache, cookies, and the like;

4. ESI data stored in a backup system for the purpose of system recovery or information restoration, including but not limited to disaster recovery backup tapes, continuity of operations systems, or data or system mirrors or shadows that is duplicative of data produced from other sources.

5. Server, system, or network logs.

## XIV.    **Redactions**.

A Producing Party may use redactions to protect any material that is legally privileged, otherwise exempt from disclosure by law, or is non-public personal information that the Producing Party contends does not need to be disclosed.[1]  Nothing herein, however, shall be deemed to be an agreement that any particular material may properly be redacted. To the extent parties seek to redact information other than what is listed in this paragraph, they may meet and confer prior to production.  Any redactions shall be clearly indicated on the face of the document, with each

---

[1] As used herein, "non-public personal information" ("NPPI") constitutes individuals' birthdates, Social Security numbers, taxpayer identification numbers, driver's license numbers, incomes, credit card numbers, financial account numbers, banking, and any other financial information and the names and addresses of minors.

redacted portion of the document stating that it has been redacted and, unless the redaction is for

NPPI, the basis for that redaction, and a metadata field shall indicate that the document contains

redactions.  Where a responsive family of documents contains both redacted and non-redacted

content, or both produced and withheld documents, the parties shall produce the remainder of the

non-redacted portions of the family of documents as TIFFs rather than natives, except for Excel

spreadsheets, which may be redacted in native form, and with the text/OCR corresponding to the

non-redacted portions. The Producing party shall produce a field in the DAT file denoting which

documents contain redactions. Email header information (e.g., date, subject line, etc.) should not be

redacted unless it is in its own right privileged.  If the documents to be redacted and partially

withheld from production are Microsoft Excel–type spreadsheets or other ESI that would otherwise

be produced in native format in accordance with this ESI Protocol, but must be produced in TIFF

format in order to effectuate the redactions, the entire Document shall be produced in TIFF format,

including all unprivileged pages, hidden fields, and other information that does not print when

opened as last saved by the custodian or end-user.  For Microsoft Excel–type spreadsheets, this

shall include, but is not limited to, hidden rows and columns, all cell values, annotations and notes.

The producing party shall also make reasonable efforts to ensure that any spreadsheets produced

only as TIFF images are formatted to be legible.  For example, column widths should be formatted

so that the numbers in the column will display rather than "##########."  If the receiving party

finds that the TIFF images of the Microsoft Excel–type file is illegible or formatted in such a way

that the document does not resemble how it was kept in the usual course of business or requires

formulas to be shown, the Parties shall meet and confer.  If the items redacted and partially

withheld from production are audio/visual files, the producing party shall provide the unprivileged

13

portions of the content.  If the content is a voice recording, the Parties shall meet and confer to discuss the appropriate manner for the producing party to produce the unprivileged portion of the content.  The production of a document in a redacted form does not affect the producing party's obligation to timely assert and substantiate the assertion of privilege over the content in a privilege log.

## XV.     Encryption.

To maximize the security of information in transit, any media or file sharing electronic document repository on which documents are produced shall be encrypted.  Production deliverables provided via File Transfer Protocol ("FTP") shall be made available on a secured FTP connection. In such cases, the parties shall transmit the encryption key or password to a Receiving Party, under separate cover, contemporaneously with sending the encrypted media, or correspondence indicating the availability of the encrypted FTP deliverables.

## XVI.    Exception Files.

The parties will use reasonable efforts and standard industry practices to address documents that present imaging or form production problems (including encrypted and/or protected files identified during the processing of ESI where the document appears to contain relevant content). To the extent encrypted or password-protected documents are successfully processed, the Parties have no duty to identify further the prior encrypted status of such documents.  To the extent security protection for such Documents and ESI that appear to be responsive to a requesting party's request cannot be successfully processed despite reasonable efforts, the producing party shall notify the requesting party about such documents.

**XVII.    Logs.**

Documents or information that are withheld from production, in whole or in part, on the basis of privilege must be disclosed on a privilege log in compliance with the requirements of Federal Rule of Civil Procedure 26(b)(5), identifying, at a minimum, to the extent such information is available in metadata:

(a) the name of the document author;

(b) the names of the document's recipients;

(c) the names of the persons to whom copies were sent;

(d) the dates the document was created, sent, and received;

(e) the custodian of the document;

(f) the type of document (email, spreadsheet, PowerPoint, etc.);

(g) a brief description of the nature and subject matter of the document

(h) a statement of the privilege asserted and each basis upon which a privilege is claimed or on which the document is withheld;

(i) an indication of whether the Document or ESI has been redacted and produced or withheld in its entirety;

(j) the Bates number or other identifier for the document; and

(k) whether the document stands alone or was an attachment.

If the forgoing information is not contained in metadata, the following information must be logged manually, to the extent reasonably available: (i) the privileged document's beginning and ending Bates or unique identifying number; (ii) an indication of whether the document or ESI has been redacted or withheld in its entirety; (iii) the custodian from whom the document was collected; (iv)

15

the document's author; (v) all recipients of the document; (vi) the date the document was modified
or sent; (vii) the type of document (email, spreadsheet, PowerPoint, etc.); (viii) the subject matter of
the material claimed and (ix) the basis for the privilege(s) and protection(s) claimed. Parties will
also identify which of the individuals listed as authors or recipients are attorneys, to the extent
relevant to assess the privilege claim.

The parties agree to provide privilege logs as soon as practicable, but in any event, in at
least three installments 1) no later than 60 days after the Producing Party's first production (i.e., 135
days after service of Requests for Production), 2) ninety days thereafter; and 3) 90 days before the
court-ordered fact discovery cutoff, on which date all privilege logs must be complete.  Privilege
logs for each agreed (or court-ordered) custodian must be complete 10 days before the custodian's
deposition.

Documents presumptively not to be logged on a privilege log include: (a)  Communications
exclusively between a party or its representative(s) and its trial counsel after the commencement of
this litigation; and/or (b) Work product created by counsel or at the direction of counsel after
commencement of this litigation.

## XVIII.    Hard Copy Documents

In addition to ESI addressed by this stipulation, the Producing Party shall perform a
reasonable and diligent search to locate relevant non-ESI (i.e., paper documents, devices,
prototypes, etc.) for the identified custodians and other relevant non-custodial sources, where
appropriate, following a reasonable and diligent investigation.

## XIX.     Miscellaneous Provisions

1.      **Effect of Order**. The parties' agreement to this Protocol is without prejudice to the right of any party to seek an order from this Court to rescind or amend this order for good cause shown.  Nothing in this Protocol abridges the rights of any person to seek judicial review or to pursue other appropriate judicial action with respect to any discovery ruling made by the Court in this matter.

2.      **Effect on Discovery.** Nothing herein constitutes an admission by any party that any particular category of discovery is appropriate in this matter or that there exists producible ESI.

**IT IS SO ORDERED,** this 29th day of October, 2020.

s/ Sheryl H. Lipman                                 
SHERYL H. LIPMAN
UNITED STATES DISTRICT JUDGE