1

1    IN THE UNITED STATES DISTRICT

2    FOR THE WESTERN DISTRICT OF TENNESSEE

3    WESTERN DIVISION

4    ========================================================

5    JESSICA JONES, MICHELLE VELOTTA,
     and CHRISTINA LORENZEN on behalf
6    of Themselves and All Others
     Similarly Situated,

7
               Plaintiffs,
8
     vs.                                NO. 2:20-cv-02892
9
     VARSITY BRANDS, LLC; VARSITY
10   SPIRIT, LLC; VARSITY SPIRIT
     FASHIONS & SUPPLIES, LLC;
11   U.S. ALL STAR FEDERATION, INC.;
     JEFF WEBB; CHARLESBANK CAPITAL
12   PARTNERS, LLC; and BAIN
     CAPITAL PRIVATE EQUITY,
13
               Defendants.
14   _____

15

16

17             EXPEDITED TRANSCRIPTION

18              VIA FTR RECORDING

19       BEFORE THE HONORABLE TU PHAM

20      UNITED STATES MAGISTRATE JUDGE

21

22

23
            CANDACE S. COVEY, RDR, CRR
24               OFFICIAL REPORTER
          FOURTH FLOOR FEDERAL BUILDING
25         MEMPHIS, TENNESSEE 38103


            UNREDACTED TRANSCRIPT

1              A P P E A R A N C E S

2

          Appearing on behalf of the Plaintiffs:
3
                KATHARINE MALONE, ESQ.
4               RONNIE SPIEGEL, ESQ.
                JOSEPH SAVERI LAW FIRM, INC.
5               601 California Street
                Suite 1000
6               San Francisco, CA 94108

7               SEAN COOPER, ESQ.
                PAUL LLP
8               601 Walnut Street
                Suite 300
9               Kansas City, KS 64106

10

11

12        Appearing on behalf of the Defendants:

13              STEVEN KAISER, ESQ.
                CLEARY GOTTILEB STEEN & HAMILTON LLP
14              2112 Pennsylvania Avenue, NW
                Suite 1000
15              Washington, DC 20037

16               MATTHEW MULQUEEN, ESQ.
                BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ
17              165 Madison Avenue
                Suite 2000
18              Memphis, TN 38103

19

20

21

22

23

24

25

                    UNREDACTED TRANSCRIPT

1                          -----------------------

2

3

4              THE COURT:  All right.  I think it's recording

5    now.  Good afternoon everyone.  I'm Judge Pham.  We're here

6    in the Jones versus Charlesbank and Bain matter.  That has

7    been referred to me for resolution of the motion to compel,

8    and I apologize to delay.  I know there are a lot of

9    attorneys who are scheduled this afternoon, and I got an

10   e-mail right at noon that there was a COVID contact issue

11   which required me to leave the office and go home.  So here I

12   am.  So I wanted to build in some delay time so I can drive

13   home and start up this hearing.  But I did want to keep it on

14   the calendar because I know the parties were preparing for

15   it.

16              So let me have a roll call at this time, first on

17   behalf of the plaintiff.

18              MS. MALONE:  Good afternoon, Your Honor.

19   Katharine Malone for the Jones plaintiffs.  I'm with the

20   Joseph Saveri Law Firm.

21              THE COURT:  Okay.  Next?

22              MR. COOPER:  Good afternoon, Your Honor.  Sean

23   Cooper from Paul LLP, also on behalf of the Jones plaintiffs.

24              THE COURT:  Okay.

25              MS. SPIEGEL:  Ronnie Spiegel with Joseph Saveri

                         UNREDACTED TRANSCRIPT

4

```
 1   Law Firm, also on behalf of the Jones plaintiffs.

 2              THE COURT:  All right.  Anyone else?

 3              Okay.  For the defendants?

 4              MR. KAISER:  Good afternoon, Your Honor.  This is

 5   Steve Kaiser on behalf of Charlesbank and Bain, and Matt

 6   Mulqueen from Baker Donelson in Memphis is with me as well.

 7   He can introduce himself.

 8              MR. MULQUEEN:  Good afternoon, Your Honor.

 9              THE COURT:  Hello.  Okay.  Anyone else for the

10   Bain or Charlesbank defendants?  Like I said we have several

11   other people here who I assume are on related cases

12   representing different parties.  I don't think we need to go

13   through that list.

14              Okay.  So I did get the e-mail from the parties.

15   Although it doesn't appear, unless I'm missing something,

16   that there really had been any progress from where you all

17   were before.  So I guess we'll start from square one.  Let me

18   hear just brief opening comments from the plaintiff and then

19   defendants, and then we'll get into the parties' positions as

20   to the discovery requests, scope of discovery and all those

21   issues.  On behalf of plaintiffs?

22              MS. MALONE:  Thank you, Your Honor.

23              Good afternoon.  We're here today because we have

24   a philosophical difference with Charlesbank and Bain

25   regarding their party discovery obligations.  The banks have
```

UNREDACTED TRANSCRIPT

1    taken the position that because they believe they'll win

2    their pending motions to dismiss, they shouldn't have to

3    participate in discovery.  We, however, agree with Judge

4    Lipman who stated in the Fusion case when this argument was

5    made over a year ago that discovery should go forward even in

6    the face of pending motions to dismiss.

7            Her words were, "I am not inclined to stay

8    anything pending a motion to dismiss.  It's not the way I

9    view my role as the Judge in pushing cases and moving people

10   toward resolution.  I hate doing it.  I only do it when

11   basically the law tells me I have to in qualified immunity

12   cases or, you know, arbitration clauses from time to time

13   force me to do that.  But otherwise, I'm just not inclined to

14   do it.  I don't think it's appropriate.  I think setting

15   aside time where the Court is dealing with the motion to

16   dismiss just frankly, I think, takes lawyers off the hook,

17   and I'm not inclined to do that."

18           So how did we get here?  The Jones plaintiffs

19   served narrowly tailored document requests back in May.

20   Since then we have diligently met and conferred with the

21   defendants in good faith to try and narrow them and reach an

22   agreement.  During that process we've reached agreement on

23   several of the requests, search terms and three custodians.

24           So the dispute here today is over the appropriate

25   custodians for ten outstanding requests.  Three requests

UNREDACTED TRANSCRIPT

1   themselves and the relevant time period for Charlesbank.

2   We've run into an impasse there, again and again, and we're

3   just not making any progress.

4           To date defendants have produced a handful of

5   insurance policies in this litigation and zero documents

6   responsive to our requests.  So we filed motions to compel on

7   September 18th.  We've continued to meet and confer since

8   then but have made no progress.  And any attempts to identify

9   interim productions that defendants would agree to make has

10  been unsuccessful.  So the requests have been sitting out

11  there for months.  The window of discovery is closing, and we

12  need a ruling from this Court to move forward.

13          The defendants are arguing that the burden here

14  is unreasonable.  And it's not.  You know, as I just

15  explained, there's no actual burden to date.  They have

16  produced 23 insurance documents and, you know, made a handful

17  of documents produced in the Fusion litigation, which were

18  basically just highly redacted noncustodial PowerPoints

19  without metadata.

20          What we're asking for here isn't unduly

21  burdensome, given the highly relevant nature of the materials

22  we're asking for.  We're not asking to run broad searches on

23  the entire company.  We're only asking to apply the narrow

24  search terms the defendants have already agreed to.  Just a

25  few more custodians.  Specifically six from Charlesbank and

1  eight from Bain.  We're not asking for the moon, just

2  documents responsive to the party requests that have been

3  narrowed as much as they can, given the information that we

4  have available.

5          I don't want to launch into, you know, request by

6  request and custodian by custodian in defendant unless the

7  Court would like me to at this point.

8          THE COURT:  Let me let the defendant respond

9  first, and then we'll get started with that.

10          MR. KAISER:  Good afternoon, Your Honor.

11  Ms. Malone just said some incredible things, one of which is

12  that the requests are narrowly tailored.  One of the requests

13  literally says all documents and communications referring or

14  relating to ownership and operation of Varsity.  If that's

15  narrowly tailored, I guess there's nothing that's not

16  narrowly tailored because that is literally everything under

17  the sun.  And I would add that when we asked them just even

18  as recently as last Monday to narrow that to something that

19  we could actually deal with, something specific that they

20  think they don't have, they basically refused to engage.

21  Essentially hung up on us.

22          So to say it's narrowly tailored is wrong, and I

23  think that's where it all starts.  It all starts with -- and

24  this has been going on in this case not just with this issue.

25  There are third parties all over the country that are saying

1  the same thing to courts all over the country about how these

2  requests are impossible to deal with.  You know, the requests

3  that everyone is facing, these everything about everything

4  requests that these plaintiffs keep issuing, and we find

5  ourselves in the same spot.

6          Now, not only do they want everything about

7  Varsity, they also want it from 17 custodians.  Now, just to

8  put that in context, the 14 plus the three that they say we

9  agreed to, which isn't really true, but there's 17 total

10 custodians at issue here.  To put that in context, the entire

11 number of Varsity custodians, in other words, the company

12 that actually is alleged to have done something in this case

13 who have produced documents, including under agreement with

14 these plaintiffs is 20.  So 17 from owners who have been

15 dismissed from the parallel case.  17 custodians.  20 from

16 the actual party that actually is alleged to have done

17 something in this case.

18         So clearly it's breathtakingly disproportionate

19 to what the needs of the case, which is what the federal

20 rules require it not to be.  In other words, it has to be

21 proportionate.  There is no proportion here.  This is

22 completely disproportionate.

23         As far as what's been produced, what Ms. Malone,

24 I think, was alluding to, was a subpoena that their

25 co-plaintiffs Fusion Elite issued.  We responded to that.  It

1    was the same broad request, but we worked with them to -- we

2    put our responses in, and they accepted what we produced,

3    which was presentations made by our two Varsity by -- well,

4    by Varsity or to Varsity from the Bain or Charlesbank, as the

5    case may be.  As well as third party presentations, which is

6    well in line with the allegations in this case.

7            And let me just say one thing about those

8    allegations.  What they allege in this case is that Bain and

9    Charlesbank owned Varsity.  That's their basic allegation.

10   And that's true.  It's not disputed.  But Judge Lipman looked

11   at that and said that's not enough to have a claim against

12   Bain and Charlesbank.  So what does that mean?  It doesn't

13   mean staying discovery.  But what it does mean is that their

14   discovery has to be tailored to what might be relevant to the

15   claims that are going to remain in this case.  Not to some

16   other claims that they have and they're not going to be able

17   to sustain.

18           So it's incumbent upon them to show relevance in

19   all respects.  They failed to do that.  When we try to get

20   them to narrow it to relevant things, to get it in line, to

21   take account of what they've already received, to tell us

22   what you're missing, tell us what you think you need, they've

23   just refused to engage.  Now, that's their right.  They can

24   bring this issue to the Court.  That's fine.  But that's the

25   history and the back story that gets us to here.

UNREDACTED TRANSCRIPT

1          And one really needs to look no further than

2     Request 5, which, despite being called narrowly tailored,

3     even today, asks for all documents and communications

4     referring or relating to your ownership and operation of

5     Varsity, which is everything.  There is no tailoring at all

6     of that.

7          So that's where things stand.  We think again

8     that the Court should set this aside like Judge Claxton said

9     she would do and let the motion to dismiss play out.  But if

10    not that, then the Court should look at our objections

11    request by request.  See what's left.  And then we can either

12    discuss with the plaintiffs, or the Court can rule on their

13    extraordinarily broad requests for sources and things of that

14    nature, which is kind of the secondary question.  In other

15    words, custodians and other things of that nature.

16          THE COURT:  Well, as I mentioned at the last

17    hearing, there's not an order to stay discovery as it relates

18    to these two parties, and there's not even a motion to stay

19    that's been filed.  So there's not really a option, as I see

20    it, for the Court at this time.  Now, in reviewing the

21    transcript when you all had the hearing, motion hearing

22    before Judge Claxton, seemed like there were several motions

23    that were on the table at the time.  And it had seemed like

24    from the comments from her hearing that she had set aside the

25    bank and -- sorry -- the Bain and the Charlesbank related

11

1  motions in that there are other motions that she was having

2  to deal with.  And also the Order of Judge Lipman dismissing

3  these two parties from the other matter had just come out.

4         All that to say is that as I referenced before,

5  unless there's an order staying discovery as to these

6  parties, I'm not inclined to stay discovery.  And the portion

7  of the conference before Judge Lipman that Ms. Malone read

8  would -- as I mentioned before, would be consistent with my

9  interpretation of not just Judge Lipman but all of our trial

10  judges insofar as their approach to discovery is that the

11  general practice has been to move forward with discovery.

12         Now, I don't disagree with Mr. Kaiser that there

13  is an order in the somewhat related case which these two

14  defendants have been dismissed.  And that may or may not be

15  the outcome in this case.  But until that order comes out,

16  they're still parties in the case.  And assuming that it

17  comes out the way that Mr. Kaiser believes it will, it's

18  still part of the case.  And the case would have to proceed

19  with discovery.

20         So I saw that mentioned several times in the

21  e-mail that I received on Friday from the parties as being

22  one potential hangup.  But I don't really see that as being

23  an obstacle to moving forward with the motion to compel.  And

24  I guess I was still -- I was surprised that that apparently

25  was still an issue with the parties even after our conference

1  from last time, that somehow that was still an obstacle to

2  moving forward with the discussions.

3          MR. COOPER:  I mean, Your Honor, I don't think

4  it's an obstacle at all.  I think we recognized what you

5  said, and we respect it, of course.  But what we would say is

6  that putting that aside, just forget about it.  Never mention

7  it again.  The fact is we're facing a request for

8  17 custodians times a topic that's all documents and

9  communications referring and relating to your ownership and

10  operation of Varsity.

11          So we're fully prepared and would very much like

12  to go through these requests, talk about what's appropriate

13  under the federal rules for parties, given the allegations,

14  the limited allegations against Bain and Charlesbank and what

15  is really appropriate.  And given the massive amount of

16  discovery that's already taken place in this case.  So there

17  should be no impediment to that.  And we tried to have that

18  conversation with them a week ago, and they weren't

19  interested, which is fine, but that's where we are.

20          THE COURT:  All right.  Then with that, let's

21  move forward with I'll go to -- I think it's easier just to

22  refer to the parties' e-mail.  Although where appropriate, we

23  can refer back to the underlying motion and the attachments.

24  But as to the initial requests, Request Numbers 2, 3 and 4,

25  then there's a disagreement, an ongoing disagreement about

1   who the custodians should be as to these requests.  I'll hear

2   from the plaintiffs.

3           MS. MALONE:  Yes, Your Honor.  You know, the

4   defendants keep referring to 17 custodians.  Actually, at

5   Bain it's nine.  And we -- yeah.  They tell us that, you

6   know, we have the wrong people but won't tell us who those

7   people are.  We've asked for documents sufficient to identify

8   the people who were involved, you know, in the acquisition

9   analysis and the operational management to Varsity, you know,

10  who sat on the board.  Like, I mean, the people who were

11  involved in critical decision making and who were doing, you

12  know, the front line analysis.  And they've just refused to

13  provide it.  We've asked for it informally.

14          You know, we are interested in getting

15  information from, you know, relevant custodians, you know,

16  who -- or custodians who will have relevant information in

17  their files.  And so we don't want to go on a wild goose

18  chase either.  And so identifying the exact people who would

19  have responsive information seems like an entirely justified

20  set of requests.

21          THE COURT:  All right.  Well, who are the three

22  people that you think -- although it sounds like Mr. Kaiser

23  may not agree with this.  The three people that you all think

24  are custodians as to this defendant Bain and these requests.

25          MS. MALONE:  So for Bain, Your Honor, it's the

UNREDACTED TRANSCRIPT

1   only custodian that the defendants, you know, have agreed or

2   engaged in any discussions with is Ryan Cotton, who is the

3   head of Bain.

4        THE COURT:  Okay.  So were there two others?

5   Maybe I misunderstood then what you said and Mr. Kaiser's

6   response.

7        MS. MALONE:  Yes, Your Honor.  So Mr. Beer and

8   Mr. Janower are also high level directors at Charlesbank, and

9   they were agreed to or, you know, but yes, tentatively agreed

10  to as custodians.

11       THE COURT:  So this is for defendant Charlesbank,

12  not for Bain?

13       MS. MALONE:  Well, so Charlesbank has a list or

14  published a list of, you know, key team members for Varsity

15  on their website.  And so between that, you know, other

16  public information, you know, an analysis and review of the

17  third party productions that have been made.  That's how we

18  came up with the list of people that we think, you know,

19  would contain relevant information.  You know, they sat on

20  the board.  We know that they were involved, you know, again,

21  from e-mails.  You know, going outside of the banks, but they

22  were involved in operational management.  So that's for

23  Charlesbank.

24       But for Bain we don't have that, you know,

25  identified list from them.  So you know, it's from the same

UNREDACTED TRANSCRIPT

1   sources.  It's, you know, the publicly available (inaudibly)

2   under third party productions.  So you know, we would like

3   the defendants to identify the individuals that they think

4   have responsive information.  If it's not the list that we've

5   put together.

6           THE COURT:  Well, okay.  I'll let Mr. Kaiser

7   respond.  But so did y'all have this conversation before?

8   Like here's my list.  Here's what I'm basing it on to which

9   the other side would say well, I think your list is

10  overbroad.  I think it should be just these four because

11  these other two -- I mean, did you have that conversation?

12          MS. MALONE:  Yes, Your Honor, we did.  And --

13  yes.

14          THE COURT:  That should result in something, I

15  would think, right?  Something besides diametrically opposed

16  positions as it would appear from your e-mail.

17          MS. MALONE:  You would think, but no.

18  Defendant's position as far as I understand is that, you

19  know, there may be some duplicative documents between, you

20  know, the various custodians at each bank, which, you know,

21  is to be expected, you know, when you're working on a team

22  and people are copied, but it ignores the reality of e-mail

23  threads where people are dropped and added and, you know, the

24  way that documents are revised and instructions are given.

25  So yeah, there's been no explanation beyond we think that

16

```
1   some of the documents may be duplicative between files given

2   to us.

3              THE COURT:  Okay.  So you all agree on Ryan

4   Cotton so far is the only one that you agree on.

5              MR. KAISER:  Your Honor, could I be heard on this

6   because I think we're heading off in a very incorrect

7   direction here?

8              THE COURT:  Okay.  Correct me, Mr. Kaiser, as to

9   what you think the right approach is because evident from the

10  e-mail between the parties that was submitted to me late

11  Friday, there doesn't seem to be much direction here.

12             MR. KAISER:  Well, we have Requests 2, 3 and 4,

13  and they've characterized them to the Court as we're supposed

14  to give them documents sufficient to show who are the key

15  people at Bain and Charlesbank.  That's how they've described

16  their requests, which I assume is what they're after here.

17  We've given them a sworn declaration about who was the key

18  person at Bain, which is Ryan Cotton.

19             And that -- so when they say we've never engaged

20  with them, I know Ms. Malone wasn't involved in this case

21  until a few weeks ago.  But we've been talking to these folks

22  for months and months.  And Ryan Cotton's been known about

23  for months and months.  He issued to this Court sworn

24  testimony that they don't dispute that says he was involved

25  in all or nearly all of the substantive communications at
```

1   Bain involving Varsity's cheerleading business from the time

2   of Bain's due diligence exercise in the Varsity acquisition

3   forward.

4           So you know, they're asking for who the key

5   employee is, and they're saying we're not telling them.  But

6   yet we've submitted to the Court a declaration that says this

7   is -- I mean, essentially it says this is the key employee.

8           We asked them on Monday what they mean by key,

9   and they wouldn't engage in that.  They wouldn't even tell us

10  what they meant.  Now, she said a little bit more today.

11  What I heard today was well, anybody that had anything to do

12  with Varsity.  But that seems completely overbroad and over

13  the top, considering all that Bain is alleged to have done is

14  own Varsity.  And there's no allegations that they did

15  anything else.

16          So for us to try to go down and try to figure out

17  every single person who ever touched Varsity while at Bain is

18  expensive.  It's disproportionate, and it's unnecessary.  And

19  in any event, you know, if they're talking about the key

20  person, that's Ryan Cotton, as we've said to the Court, as

21  they've known for months and months.

22          So that's why I say it doesn't seem -- these

23  Requests 2, 3 and 4 don't seem to be going down the right

24  road because this isn't a question of who might have material

25  about Varsity.  Now, that could be another question.  But the

UNREDACTED TRANSCRIPT

1    question that they put before the Court is who are the key

2    people.  The key people at Bain and Charlesbank, and those

3    people have been identified a long time ago.

4              THE COURT:  All right.

5              Response, Ms. Malone?

6              MS. MALONE:  Yes.  So a couple points.  First of

7    all, you know, key people means, I mean, it's a pretty

8    well -- pretty frequently used word.  I mean, yeah.  These

9    are the people who were involved in, you know, decision

10   making and, you know, operational management.  And who are

11   on, you know, the board of records.  I mean, we've described

12   this.  I don't think it's a, you know, confusing verbiage.

13             But, I mean, also key doesn't mean single person.

14   Key doesn't mean, you know, the one individual, you know, who

15   may have been highest ranking or, you know, the only person

16   directing things.  I mean, even the statement that was just

17   made.  You know, he was involved in nearly all of the

18   substantive communications sort of necessarily implies that

19   there was substantive communications that, you know, he may

20   not have been on.  And, you know, documents that he may not

21   have in his custodial file that will absolutely be responsive

22   and relevant to, you know, investigating the claims here.  So

23   I think, you know, the suggestion that, you know, all of the

24   relevant information and the totality of relevant documents

25   is going to run through one person.  It's just not realistic.

```
 1              THE COURT:  Let's talk -- we'll take this one at
 2    a time.  Josh Bekenstein.  Am I pronouncing that right?
 3              MS. MALONE:  Uh-huh.
 4              THE COURT:  All right.  Ms. Malone, what is the
 5    plaintiff's position as to why you believe that he may be a
 6    key person and whose records may be pertinent so far as one
 7    of more of these document requests?
 8              MS. MALONE:  All right.  So Josh Bekenstein, you
 9    know, was a key player in, you know, the consumer and retail
10    businesses of which Varsity was one.  So he would have all
11    sorts of knowledge about, you know, the verticals there and,
12    you know, the analysis of, you know, why Varsity would be a
13    good acquisition.  You know, the ways in which, you know, the
14    company could continue to, you know, leverage the market
15    power and market share that they had and increase profit
16    margins, I mean, and which go to the center of our
17    allegations, right?  We've alleged that Bain, you know,
18    conspired and, you know, used the market power that Varsity
19    had by 2018 to raise, stabilize and fix prices.  So he'll
20    absolutely know about that.
21              MR. KAISER:  Can I respond to Josh Bekenstein,
22    Your Honor?
23              THE COURT:  Ms. Malone, were you done?
24              MR. KAISER:  I'm sorry.  I thought she was moving
25    on.
```

1          THE COURT:  Ms. Malone?

2          MS. MALONE:  No.  I don't -- I mean, I...

3          THE COURT:  Were you finished?

4          MS. MALONE:  Yes.  Yes, Your Honor.

5          THE COURT:  Okay.

6          You may respond.

7          MR. KAISER:  So Your Honor, again, before the

8     Court is sworn testimony or a sworn declaration that

9     Mr. Bekenstein's only involvement really with Bain was to

10    attend board meetings, which Mr. Cotton also attended as a

11    board member.  Otherwise, he was just a high level advisor

12    during the time of Bain's acquisition and is not involved in

13    the day-to-day aspects of Bain's ownership of Varsity.

14          So everything Ms. Malone just speculated and

15    guessed about is just not correct based on the sworn

16    testimony.  And then also Mr. Cotton says, "I believe I would

17    have received any substantive documents regarding Varsity's

18    cheerleading business that Mr. Bekenstein authored or

19    received."  So there's no -- you know, the evidence is

20    there's no cause for Mr. Bekenstein to be involved in this.

21    I mean, we can speculate forever that people have things or

22    whatever, but this is the evidence before the Court.

23          THE COURT:  And if you can remind me, I know

24    there are a lot of moving parts in all these cases.  Has

25    Mr. Cotton been deposed, or has there been a 30(b)(6)

```
1   deposition yet as it relates to this issue of custodians and
2   people who might have relevant documents?  And I guess in
3   particular his declaration whether Mr. Cotton's been
4   questioned about a declaration.
5              MS. MALONE:  No, Your Honor.  No.  I mean, since
6   we haven't received any, you know, responsive documents to
7   our requests, it would be a challenge to sufficiently depose
8   someone in the absence of, you know, materials.
9              THE COURT:  Right.  Well, so he has not been
10  deposed on declaration?
11             MS. MALONE:  No, not yet.
12             THE COURT:  Okay.  In which case, the question is
13  to be asked of him regarding these other individuals and what
14  information they may have that hasn't been asked, correct?
15             MS. MALONE:  Yes.
16             THE COURT:  Okay.  All right.  Anything further
17  regarding Mr. Bekenstein?
18             MS. MALONE:  Well, Your Honor, just that, you
19  know, we -- I don't want to veer into protected material.
20  You know, we are aware that he was involved in, you know,
21  operational management and, you know, was copied on e-mails.
22  So this isn't just wild speculation.  It's, you know,
23  grounded in fact and substance.
24             MR. KAISER:  Your Honor, to the extent they
25  brought those e-mails to the Court's attention, they were all
```

1    e-mails that Mr. Cotton was copied on.  So it just is

2    completely inconsistent with what he said in Mr. Cotton's

3    declaration.

4              THE COURT:  Well, just because Mr. Cotton would

5    have been copied on e-mails, along with other individuals

6    doesn't necessarily preclude a party from obtaining those

7    e-mails to -- even to the extent they're identical, of other

8    people who have gotten those e-mails, Mr. Kaiser.  Now,

9    that's a factor, right?  I mean, we don't want the parties to

10   engage in unnecessary discovery when all the relevant

11   documents or most of them would be with one or two

12   custodians, but the fact that someone else has been copied on

13   it by -- well, first of all, by itself is not evidence that

14   that person would not have other e-mails and other

15   information.  But it's not the -- that doesn't conclusively

16   demonstrate that that person, those other custodians

17   shouldn't have their files subject to search.

18             MR. KAISER:  I would agree with that in the

19   abstract, but here we also have sworn testimony from

20   Mr. Cotton himself saying that he, that he, Mr. Cotton,

21   received any substantive documents regarding Varsity's

22   cheerleading business that Mr. Bekenstein authored or

23   received.  And the reason for that is is Mr. Bekenstein was

24   very tangential to this whole thing.  And therein lies the

25   issue.  Mr. Cotton is the person -- I mean, first of all,

1  bear in mind that Bain has only owned this company for a

2  couple years.  And Mr. Cotton has been the person from day

3  one.  He's been on the board from day one.  He's been the

4  guy.

5           So he's telling this Court under oath, under

6  sworn testimony, under penalty of perjury that he has the

7  documents.  And again, I don't think this, you know,

8  personally I think when the request is all documents relating

9  to Varsity, and the response is well, he could have a

10  document relating to Varsity, Mr. Bekenstein or one of these

11  other people, I can't say that's not correct.  It's

12  undoubtedly true.  But at the same token, that's not a proper

13  scope of discovery in the first place.  This discovery should

14  be very narrow to the allegations in the complaint, and we're

15  not even in the neighborhood of that.

16          But in any event, as far as Mr. Bekenstein is

17  concerned, I can only say what the record is before the

18  Court, which is what Mr. Cotton said and was the fact that

19  all they've put before the Court is completely inconsistent

20  with that, which is a few documents which he was copied on

21  with Mr. Cotton that are not specific to Mr. Bekenstein, as I

22  recall.  I think they were both copies of board distributions

23  or something like that.  But I do take your point, for sure.

24          THE COURT:  All right.  Jay Corrigan.

25          MS. MALONE:  Jay Corrigan was the CFO.  He was an

1    authorized signatory on any agreement with, you know,

2    Varsity's -- the holding company associated with Varsity.

3    And so, you know, we believe that he would have documents,

4    you know, reflecting Bain's view of Varsity's competitive

5    position and valuation prior to the acquisition as well as,

6    you know, documents reflecting Bain's influence over

7    Varsity's operations.

8            MR. KAISER:  Your Honor, as for Mr. Corrigan,

9    again, sworn testimony before the Court is that he was not

10   part of the deal team for Bain's acquisition of Varsity.  As

11   an officer of Bain, he may have signed a deal agreement at

12   the end of the day, but the acquisition of Varsity by Bain is

13   not alleged to be illegal.  It's not really an issue before

14   this Court.

15           So to try to sweep the CFO of Bain -- not the CFO

16   of Varsity, the CFO of Bain into this case on such a thin

17   basis, it's just, again, disproportionate.  There's been no

18   showing that he's going to have much of anything in the way

19   of even responsive documents, even in that really broad

20   request that they have.  But the evidence is that he's not --

21   he's far out on the tangent, even worser than Mr. Bekenstein.

22           THE COURT:  All right.  Ms. Malone, just going

23   through your filing and the specifics, I mean, I have it in

24   front of me.  I've read it.  I'm rereading it again.  Is

25   there anything that you want to add on behalf of the

1    plaintiffs that go outside or supplement what was submitted

2    to the Court regarding each of these custodians that you

3    believes files should be subject to some amount of search?

4                    MS. MALONE:  Yes, Your Honor.  You know, I think

5    the matter has been briefed pretty fully, but, you know, I

6    think it's important to just recognize, you know, that third

7    party productions have been made by other banks in the Fusion

8    matter.  And Charlesbank and Bain have made third party

9    productions in that action as well.  But it's literally a

10   handful of like highly redacted PowerPoints without any

11   metadata and any information, you know, beyond just an image.

12                   You know, the only group of documents that hasn't

13   been produced in this litigation is the internal bank

14   discussions, you know, that would have related to valuation.

15   About whether or not it made sense to make the investment.

16   You know, the goals of the investments.  You know, how the

17   banks understood, you know, their role, you know, in guiding

18   or operating Varsity.  You know, what their plans were for

19   acquired market share and how they were going to do that.

20   When they knew about, you know, Varsity's, you know, intent

21   to acquire all of its rivals.

22                   I mean, there are key questions that really go to

23   the heart of this case that are only available in this

24   tranche of documents.  And, you know, the individuals that

25   we've identified, you know, look, it's entirely possible that

```
1    more people at, you know, either Charlesbank or Bain, you

2    know, have responsive documents.  We're not asking for a

3    search of the entire company.  It's just these individuals

4    that, you know, we have a reasonable and well-founded belief.

5            You know, were substantially involved in this and

6    have, you know, relevant knowledge and relevant files and

7    responsive content as custodians.  And so, you know, we're

8    sort of being asked to piece together, you know, a puzzle and

9    like asked which pieces were missing without even having

10   opened the box.

11           And so we just -- getting the intrabank

12   communications is necessary.  And, you know, the

13   communications, I mean, will necessarily involve a group of

14   people, some of whom, you know, will be subordinate and

15   report to others.  But those will be the people who are

16   doing, you know, front line analysis and, you know, the

17   initial drafts of documents and reports, and, you know,

18   charting that evolution is also key to proving our claims,

19   so...

20           THE COURT:  Okay.  Well, I guess, again, I go

21   back to my question it doesn't sound like, though, that

22   there's anything you want to add.  I don't want to go through

23   each of these.  I have the briefing.  And I have the party's

24   position on the key individuals.  And it's obvious y'all

25   don't see eye to eye.  That's fine.
```

UNREDACTED TRANSCRIPT

1          Then I'll step in and I'll decide whose files to

2    be searched.  If you can't -- have y'all even agreed on the

3    search terms as it relates to each -- what the protocol would

4    be so far as how you would search whenever you decide who

5    these key individuals are, I mean, the custodians, how you

6    would -- what search term to use?

7          MS. MALONE:  My understanding, Your Honor, is

8    that we have agreed to a limited set of search terms.  So I

9    don't know if Mr. Kaiser disagreed but misunderstood that

10   earlier.  But my understanding is that yes, we have.

11         THE COURT:  Okay.

12         MR. KAISER:  Your Honor --

13         THE COURT:  Is there someone else who was

14   involved in developing the search term protocol?

15         MS. MALONE:  Yes.  I mean, I've reviewed the

16   correspondence, and I believe we ran it to ground.  But yeah,

17   I wasn't involved in the search term protocol but, you know,

18   my review of the correspondence and, you know, based on

19   conversations with those individuals, yeah.  We have settled

20   on a set of search terms.

21         THE COURT:  All right.

22         I'll let Mr. Kaiser respond.  My follow-up

23   questions were going to be well, what are those search terms?

24   Have y'all agreed to conduct a global search term approach

25   where it would hit on all or at least various categories of

1    these requests, or are they specific to each request?  There

2    are different ways that the parties have handled this.  And I

3    don't know what you all have agreed, if there is agreement,

4    as to how that is approached on these discovery requests.

5              Anyone?  Mr. Kaiser?

6              MR. KAISER:  Yeah.  So as far as search terms are

7    concerned, in an effort to accommodate the plaintiffs, they

8    did propose some search terms.  We proposed some search

9    terms.  And we did reach a point, at least with respect to

10   Mr. Cotton that if we were to reach an agreement as to end

11   this entire ordeal of, you know, these discovery requests by

12   doing Mr. Cotton for the period of time we had proposed, we

13   would use search terms that we agreed on.  In other words, we

14   agreed to that extent on search terms.

15             Now, if we're going to be, you know, multiplying

16   this by a factor of six or seven, I think we would seriously

17   need to reconsider that because obviously when you multiply

18   that by so many, it's going to be a lot of additional

19   documents.  Not additional responsive documents, I don't

20   think.  Just additional nonresponsive documents because the

21   terms were pretty broad.

22             With Cotton we were willing to do it in an effort

23   to resolve this whole thing.  They've not really been

24   interested in resolving this whole thing.  So I don't know

25   that that would be appropriate for the other -- for any

1    others.  And obviously, I don't think there should be any

2    others.  But if there were, I think we would need to

3    reconsider that issue.

4            THE COURT:  Well, the search terms that

5    apparently have been agreed on regarding Ryan Cotton, were

6    they directed to specific discovery requests and how that

7    would be produced in response to requests, or would it be a

8    global production in which maybe a term search could be

9    conducted within the medium that it's produced in?

10           MR. KAISER:  Yeah.  That's a fair question.  In

11   this particular instance because Request 5 basically subsumes

12   every other one of the requests, this request for every

13   document about Varsity.  There really wasn't a whole lot of

14   purpose to doing a request by request set of search terms

15   because we were again trying to reach an agreement that would

16   have put an end to all this, and in that context, we were

17   willing to do it their way.

18           But if Request 5 were modified to something

19   sensible or that actually covered some of the things that

20   Ms. Malone just mentioned, as opposed to just every single

21   scrap of paper about Varsity, then, of course, you know, we

22   would have to consider search terms and whether they're still

23   appropriate.  I may be speaking slightly out of turn here.

24   My sense is we could probably reach a conclusion on that

25   without troubling the Court anymore.  But I can't say that if

UNREDACTED TRANSCRIPT

 1   we have to do, you know, Request 5 as written times

 2   17 custodians that we would be content with the search terms

 3   that we had discussed with the plaintiffs before.

 4              THE COURT:  And I do want -- I typically do, upon

 5   ruling on a motion to compel, direct the parties to meet and

 6   confer regarding search terms once the scope of discovery is

 7   set by the Court.  I'm concerned, though, that given the lack

 8   of progress so far on this particular case and that the clock

 9   is ticking and I know last time we talked, there were a bunch

10   of depositions that were trying to be scheduled and so many

11   parties on the case, that I may just set the search terms,

12   and let the chips fall where they may, in which case if it

13   ends up costing a lot, then it costs a lot.  If it ends up

14   missing a lot, then it misses, but I've given the parties

15   more than a fair chance to work it out.

16              And just to be clear, that's usually my MO is I

17   do want the parties to work it out, but when they've shown

18   that they're, for whatever reason, haven't been able to do

19   that, then I just step in and I decide it, and that's that.

20   And, you know, if it ends up getting way too much, and it's

21   overinclusive, then so be it.  If it turns out that my

22   decisions on search terms is under inclusive and it misses

23   smoking guns, so be it.  That's the way that ESI will work

24   once it gets to this late stage.

25              MS. MALONE:  Your Honor, actually if I can just

1    add, I actually believe that Mr. Kaiser misspoke.  We have

2    paired search terms with each request.  The dispute is just

3    over the number of custodians.

4              THE COURT:  Well, that's not what he just said.

5              MS. MALONE:  Yeah.

6              THE COURT:  So I think he just said that it was

7    actually agreed upon with the understanding that it would be,

8    at least from his perspective, and I'll let Mr. Kaiser

9    respond, but I heard that it was an understanding that would

10   really be limited to Mr. Cotton, which is a far cry from

11   where you're at right now with all these other custodians.

12   And that his position is that if it is expanded to beyond

13   what his client's position is regarding who should be the

14   relevant custodians, then it might not still be a viable

15   option.

16             MS. MALONE:  Right.  So if I may respond to that.

17   So it is true that the search terms that were agreed to were

18   for Mr. Cotton.  However, they were tailored to each request.

19   So it's not, you know, global set of searches that run across

20   each request.  And, you know, certainly if defendants want to

21   run a search report and present us with it we, you know, we

22   too are not interested in, you know, reviewing a bunch of

23   unnecessary, nonresponsive documents and would happily work

24   with them to narrow that so that they're only producing

25   things that hit and are useful to everyone.

```
1              THE COURT:  Well, I mean --

2              MR. KAISER:  The question is for every --

3              THE COURT:  I'll let you respond in just a

4    second, Mr. Kaiser.

5              MR. KAISER:  Sorry.

6              THE COURT:  I'm concerned that that will result

7    in further delay.  You know, these other cases have moved.

8    And I know that isn't necessarily the determining factor, but

9    it's important here.  I think we've got a lot of attorneys

10   involved and a lot of moving parts, and my concern is that

11   this case is going to fall behind.  It has a little bit

12   already.

13             I know there's been a motion as it relates to the

14   current defendants, and I haven't lost sight of that.  But I

15   don't want this case to move much slower than it already has

16   and as it relates to the other parties.  And so I'm concerned

17   that once I rule on this, and it's based upon what's occurred

18   so far, I'm not going to be ruling from the bench.  I would

19   normally do that, but that's -- this is not progressing in a

20   way that I had hoped.

21             So I'm going to rule on this.  And if I rule on

22   that, then I don't know if it makes sense for me to have

23   another meet and confer and say okay, well, now in light of

24   this, agree with the search terms and come back.  And before

25   we know it, we're into January, and we're still fighting over
```

UNREDACTED TRANSCRIPT

1   this.  And I don't want that to happen.

2          So at some point when the Court has to get

3   involved with actually determining the search terms, which I

4   will say can get messy, and that's just because it is what it

5   is.  Then but I think that I have to weigh that against the

6   need for this case to move.

7          MR. KAISER:  Your Honor, I might suggest this on

8   search terms.  Frankly, we're at a loss because, you know,

9   we've presented evidence.  We've talked to the plaintiffs.

10  We know who the three guys are.  I don't know why they

11  continue to ask for more.  These companies did not have that

12  much involvement in the case as alleged in the complaint and

13  as a matter of fact.  And then, you know, I guess they see

14  them as deep pockets or whatever.  It's obviously their right

15  to do what they want.

16         But at the same time again, 20 custodians for

17  Varsity, which was the actual entity that did the things that

18  are alleged in the complaint.  Or not they didn't do them,

19  but they're alleged to have done them.  And then, you know,

20  17 custodians for their owners over the years, which just

21  seems completely out of proportion, and something is wrong

22  with that.

23         As far as the search terms, in particular though,

24  I believe that chances are we would do the search terms for

25  any custodians, the search terms we discussed, but we have to

```
 1   have a little bit of a safety valve if something goes haywire
 2   because we are getting in, you know, beyond the three, we're
 3   into people who really didn't have a whole lot to do with
 4   Bain -- with Varsity rather.  So any hit is almost invariably
 5   going to be a false hit.  So it's going to be, you know, a
 6   pretty big waste of time.

 7           Now, but I don't want to put you to that task,
 8   and I don't -- you know, not being familiar -- not having --
 9   having the obvious not familiarity with all the details of
10   the case, I agree with you that that could lead to problems
11   one way or the other for one side or the other or maybe for
12   both sides.  So I would suggest that, you know, you give us a
13   very limited amount of time to fish or cut bait on search
14   terms after you rule on the rest of the motion.  And if we
15   can't do it, you know, we'll then -- then I guess it will be
16   up to the Court.  But I believe we will be able to resolve
17   that particular issue.

18           THE COURT:  Okay.  Let me then allow the parties
19   to develop whatever record they want to beyond the briefing
20   as it relates to whatever categories set forth in the e-mail.
21   And I'll allow brief argument.  Yeah.  I'll allow brief
22   argument as to each of the remaining categories.

23           Ms. Malone, go ahead on the financial analyst
24   reports and drafts.

25           MS. MALONE:  Of course.  So actually, can I just
```

UNREDACTED TRANSCRIPT

1  circle back real quick to the question of search terms?  You

2  know, just given the way that this case has proceeded, I do

3  think it makes sense to get a definitive ruling because as

4  you pointed out, we'll just wind up in front of you again

5  making the same arguments, you know, briefing, and everybody

6  has to do this, you know, iteratively.  And it just -- we

7  would be happy with whatever you would like to order.

8          So the -- all right.  So the next set of

9  documents that Bain and Charlesbank have both outright

10  refused to produce is the financial analyst reports and

11  drafts thereof.  You know, first they said that, you know,

12  they weren't sure they existed, then they would do a

13  reasonable search.  But they, you know, reserved the right to

14  refuse to produce any drafts.

15          You know, we believe that, you know, draft

16  documents are highly relevant to the allegations.  Well,

17  first of all, the documents themselves are highly relevant to

18  the allegations.  And, you know, will show the evolution of

19  analysis of Varsity's value.  So they're, you know, probative

20  and I mean -- yeah.  The additional production burden is

21  almost zero, so it's warranted.

22          THE COURT:  Response?

23          MR. KAISER:  Yeah.  So she's referring to

24  Request 12 to Bain and Request 13 to Charlesbank.  And we've

25  told them that we don't have any documents, at least as

1   they've described them.  These are third party Moody and S&P,

2   Standard and Poor's, analysis.  This is not a public company.

3   We've done a reasonable search as we said we would.  And we

4   don't -- Bain and Charlesbank don't think they have these

5   documents, so there's really nothing to this one.

6           THE COURT:  Does that include drafts as well as

7   final versions?

8           MR. KAISER:  They don't believe they have any of

9   them.  And, you know, beyond that, if they did exist in Bain

10  and Charlesbank's files, they would be in the name in the

11  people we've talked about, not these 15 other people.  But

12  they don't believe they have them.  They don't believe they

13  exist, or if they do exist, they don't have them.  They could

14  also go to the source, which is Standard and Poor's and

15  Moody's if they don't believe us.  But again, we've done the

16  search, and we don't believe we have them.

17          THE COURT:  Was there a discovery response

18  specific on that point, Mr. Kaiser, beyond what was in your

19  e-mails?

20          MR. KAISER:  I don't think we've -- we have not

21  formally amended the request responses.  And we could

22  certainly do that if that would make for a better record and

23  be the preference.

24          THE COURT:  I think that would be required.

25  Okay.

UNREDACTED TRANSCRIPT

1          Ms. Malone, would you be satisfied with a

2     document response -- request response detailing what

3     Mr. Kaiser has represented in his e-mail and what he said

4     today?

5          MS. MALONE:  Yes, Your Honor.  Yeah.  A verified

6     response confirming that those documents don't exist under

7     Bain or Charlesbank's possession, custody or control.  Yeah.

8     I mean, what else can you do?  Yeah.

9          THE COURT:  All right.  Let's move on then to

10    the -- well, it's a settled issue, it sounds like.  Joint

11    defense, joint sharing agreements.  It looks like they also

12    said that there isn't a -- Bain's position is there's not

13    one?

14         MS. MALONE:  Again, I mean, if there isn't -- you

15    can't produce a document that doesn't exist.  So, you know,

16    if we get verified responses that, you know, state that the

17    documents don't exist, we'll be satisfied with those.

18    Otherwise, you know, it's our belief that, you know, we

19    allege a conspiracy, and the joint defense agreements are

20    needed to determine the amount of coordination -- I'm

21    sorry -- the amount of coordination between defendants, you

22    know, who otherwise have conflicted interests.  You know,

23    that's, again, highly relevant to the allegations that are

24    made here.  And those agreements have been produced in cases

25    where, you know, the terms go beyond mere boilerplate.  So

UNREDACTED TRANSCRIPT

1   yeah.  If they don't exist, great.  If they do, you know, we

2   would like to take a look.

3          MR. KAISER:  Your Honor, there are two things

4   they put in here.  Joint sharing, which I think they mean

5   judgment sharing.  I'm not sure what -- if it's something

6   else, they should speak up.  And they've been told there's no

7   judgment sharing agreement.  So I think that's a moot point.

8          As far as joint defense agreements, I just cannot

9   reject more strongly what Ms. Malone just said.  Basically

10  what she's saying is that despite the First Amendment to the

11  Constitution, our right to defend ourselves, they have an

12  entitlement to dig into our defense strategy, what we're

13  doing with the codefendants.  That's just totally wrong.

14  Just totally wrong.

15         And by the way, the case that they cite to the

16  Court denied the very thing they're asking for, which is the

17  production of the joint defense agreement.  So they have

18  brought nothing to this Court to justify ordering us to

19  produce a joint defense agreement.  And it really strikes me

20  and that she would say that this is a -- that jointly

21  defending ourselves in a court proceeding is a conspiracy

22  under the antitrust laws.  I mean, that's absurd, that really

23  is absurd.

24         So I would urge the Court, both for this case and

25  for all cases, to reject this just incongruous invasion of

1    the rights of the parties.  And there's no cause for this.

2    There's no relevance to this.  There's no one that says this

3    joint defense agreement is part of a conspiracy.  That's

4    ridiculous.

5                 THE COURT:  Well, Mr. Kaiser --

6                 MR. KAISER:  I just have to say I think it's

7    irrelevant.  It should be rejected.

8                 THE COURT:  Mr. Kaiser, just so I understand what

9    your response is so I don't misunderstand what you've said

10   and what you've written here in the e-mail.  That what is it

11   that you say your clients don't have versus what is it that

12   you say your clients may or may not have but object to

13   producing if they did have it?

14                MR. KAISER:  Yeah.  So this thing called a joint

15   sharing agreement, which I think it's like a judgment sharing

16   agreement, I think is what they're getting at, which is where

17   the parties through litigation might say that if, you know,

18   there's a judgment, you'll pay 10 percent, I'll pay

19   20 percent or you'll pay zero percent, I'll pay a hundred

20   percent, whatever.  That would be one thing.  That doesn't

21   exist.  So that's a moot -- that's moot.

22                You know, perhaps you could make the argument

23   that somehow that's relevant to what they're doing.  Not for

24   the reasons that Ms. Malone said, but I could understand for

25   other reasons.  But that's irrelevant because it doesn't

                          UNREDACTED TRANSCRIPT

1  exist.  Irrelevant to this discussion.  As far as a joint

2  defense agreement where the parties to a case memorialize

3  that they're going to be working together on defending

4  themselves against claims brought against them, which by the

5  way, are joint and several liability claims, that may or may

6  not exist, but I don't think it's at all relevant.  If it

7  does exist, shouldn't be ordered to be produced.

8           I also add that, you know, this request -- I

9  don't know if they now are just back to just wanting copies

10  of an agreement or if they want every document about the

11  agreement, which was the original request.  Obviously, that's

12  just going straight into privileged documents across the

13  board, which is just incredibly expensive to deal with

14  requests like that.  Outside counsel communications and

15  whatnot.

16          So to answer your question, no judgment sharing

17  agreement.  May or may not be a joint defense agreement.  I

18  mean, there is a joint defense agreement.  I'm not going to

19  say -- I'm not going to be coy about it.  There absolutely

20  is.  And we are entitled to do that.  They are not entitled

21  to see that.  We're not using it to keep them from any

22  discovery or anything.  And until we use it in that way, at a

23  minimum, it's just irrelevant.

24          THE COURT:  Ms. Malone, response?

25          MS. MALONE:  Well, so yes.  To clarify, we were

UNREDACTED TRANSCRIPT

1  speaking about it, you know, the judgment sharing agreement.

2  And again, you know, if we get a verified response that's

3  updated or amended to state that that doesn't exist, you

4  know, we'll be satisfied with that.

5            You know, as to the joint defense agreement, I

6  understand that Mr. Kaiser, you know, and his clients don't

7  want to produce that, but, you know, the fact remains that,

8  you know, courts have ordered the production of those

9  agreements when they go beyond mere boilerplate.  We, you

10 know, won't know what it says until we see it.  So they're

11 asking us to sort of just take their word for it.  And, you

12 know, it bears on key issues here about the conspiracy.  So,

13 you know, I would say, you know, prioritywise it's probably

14 on the lower end of what we're seeking.  But, you know, we do

15 think it's relevant.

16           THE COURT:  All right.  Let's move on then to

17 your next request.  Well, there's several of them:  5, 6, 7,

18 9, 10, 11, 12, 15 and 20; is that right?

19           MS. MALONE:  Yeah.

20           THE COURT:  Go ahead.

21           MS. MALONE:  Yes.  So I mean, the numbering is

22 slightly off between Bain and Charlesbank but, yes.

23 Essentially all of those requests, you know, relate to

24 financial information such as valuation analyses, profit and

25 loss statements, you know, documents relating to, you know,

1   acquisition analysis, due diligence, sale documents.  You

2   know, they're all just related to the costs and the amount of

3   money that was made through this in which, you know, the

4   operational management exercised by both Charlesbank and

5   Bain, you know, bear on that.

6           So, you know, the arguments between all of them

7   are the same.  That, you know, it's highly relevant to the

8   allegations that we're making here.  That the individuals

9   we've identified, you know, would have this and would have

10  drafts, would have communications about it within their

11  custodial files.  And so, I mean, I can go through them one

12  by one, but I don't want to waste your time with, you know,

13  making the same argument seven times.

14          THE COURT:  Yeah.  That's not necessary.

15          Response, Mr. Kaiser?

16          MR. KAISER:  Well, we can only go with what's on

17  the page.  She can say that they're all the same, which is

18  interesting in its own right because if they're all the same,

19  why are there seven of them?  But Number 5 for both Bain and

20  Charlesbank, again, is all documents, communications

21  referring or relating to ownership and operation of Varsity.

22  That's not limited in the way she just said by a long shot.

23  That's every scrap of paper.

24          We don't think that's appropriate.  We think it's

25  disproportionate.  We think it's a lot of irrelevant

1   information, which means it's overbroad.  And it's a pain in

2   the neck to put that all together.  It's going to be a lot of

3   privileged information.  One of the custodians that they're

4   pushing for is a lawyer at Bain for some reason that I still

5   can't fathom.  So when you start with Request Number 5, you

6   know, it should just be thrown out as overly broad and unduly

7   burdensome and just then inappropriate, disproportionate.

8          When you get into some of the other requests,

9   again, they suffer from a lot of the same issues, but they

10  also start to veer into serious relevance issues.  When you

11  look at, you know, and we can do that.  I mean, Request 6 is

12  all due diligence documents.  So anything that Bain may have

13  received in due diligence when they bought Varsity.

14         Well, again, the acquisition of Varsity by Bain

15  or the acquisition of Varsity by Charlesbank, that's not

16  alleged to be illegal.  There's nothing said to be illegal

17  about that in this case.  There's no allegations there.  So

18  under what basis could we be put to the burden of having to

19  gather up all due diligence documents and communications

20  referring or relating to your acquisition of any interest in

21  Varsity regardless of whether documents were created by you

22  or by third parties, including without limitation and a long

23  list of things.  It's just completely, again, overly broad,

24  unduly burdensome.  It's just disproportionate.

25         And, you know, just to finish -- well, to go

1    through a few of the other ones.  Request 7 has to do with

2    board materials.  Well, we've said there is no board at

3    Charlesbank or Varsity, and that's been submitted to them

4    under oath in these proceedings.  So those requests are moot.

5    There's no such thing as a board at either of the two

6    entities.

7           Request 9 has to do with acquisitions of

8    interests and camp producer.  Well, now we're getting into

9    something that might be a little bit more in the line of

10   conceivably relevant, but again, we were dealing with

11   Request 5.  If we're dealing with Request 9, that's a

12   different animal.

13          But on the subject of camp producers, they don't

14   allege a single camp producer acquisition in their case,

15   certainly not since Varsity was acquired by Bain.  So for

16   Bain to go off and go to, you know, however many custodians,

17   nine custodians and look for documents regarding acquisitions

18   of camp producers when they didn't even allege one as being

19   illegal in their complaint is just kind of indicative of what

20   we're dealing with here.  And it's just very disproportionate

21   and overly burdensome.

22          We did research, by the way, whether there were

23   any camp producers because we were trying to work with them

24   to kind of narrow this down a little bit.  And there was one

25   camp producer that's been acquired since Bain owned Varsity.

1    It's a company called B2.  That acquisition was for $350,000

2    in 2019.  And, you know, they didn't put that in their

3    complaint.  They apparently didn't know about it or didn't

4    feel the need to allege it.  Although they alleged a lot of

5    other stuff.  But it just goes to show that rifling around in

6    Bain's files or documents about B2, a $350,000 acquisition.

7    Again, very expensive.  Disproportionate.

8            Now, Varsity is the one who made that

9    acquisition.  Varsity is the one who has the documents about

10   that acquisition.  And Varsity has produced a ton of

11   documents about that acquisition.  So anything they want to

12   know about that acquisition, they certainly have in their

13   possession already from the Varsity production.

14           Now, can I say that there is no document in Bain

15   that may be slightly different from a document that Varsity

16   produced?  Look, I can't.  I'm not going to sit here and play

17   that game.  But the reality is that $350,000 acquisition is

18   extremely well covered and doesn't need to be going any

19   further.

20           Now, there's a couple of requests.  One is about

21   loans and financing.  Again, loans and financing of Varsity

22   have really essentially nothing to do with this case.

23   There's no allegation that Varsity did something illegal in

24   getting a loan or getting financing.  I mean, they're a

25   company.  They have to finance themselves, of course.  But

1   why would we be going off and getting all documents and

2   communications at Bain, by the way, not at Varsity, but at

3   Bain.  Referring our way into any loan or credit provided to

4   Varsity and then again, the same thing as respect to any

5   document about financing of Varsity.

6           So again, over the top.  Very if -- I can't even

7   see the relevance, and that's their burden to establish

8   relevance.  But even if it is relevant, the effort that would

9   need to be undertaken to do this is just so disproportionate

10  to the needs of the case.

11          There's another request, 15, which is

12  Charlesbank.  16, 15 to Bain.  All documents referred or

13  relating to the valuation of any interest in Varsity.  What's

14  the relevance of someone thinking about what Varsity is

15  worth?  That's not what this case is about.  This case is

16  about competition in the cheerleading space.

17          Varsity owns several other businesses besides

18  cheerleading, and to say that digging around and finding all

19  documents referring or relating to the valuation of any

20  interest in Varsity would be relevant to this case, at least

21  not overly broad and disproportionate to the case.  Again, we

22  say to the Court that's not relevant, and they have to

23  establish relevance.

24          And then finally, one of the more curious ones

25  that went to both of them is Request 20, Charlesbank 21,

1    which seeks all documents and communications referring or

2    relating to compensation or remuneration paid to anyone at

3    Varsity.  So again, this is just the utmost in fishing

4    expeditions.  There's no allegations about this in the

5    complaint.  You know, why we need to dig into the HSGHR files

6    or HR information at Bain they may have about Varsity people,

7    you know, based on really the compensation.

8             It really just beggars the mind what they think

9    we should be doing here.  And, you know, they're asking us to

10   go into our HR files and all over Bain to look for these

11   things and at Charlesbank.  And that just -- I don't see the

12   relevance, and even if it was tangentially relevant, again,

13   there's a proportionality standard in the federal rules now,

14   and this just doesn't even come close to meeting it.

15            And just to finish the thought.  Request 10 to

16   Charlesbank, which is what causes the numbering not to be the

17   same is the request for all documents and communications

18   relating to your, that is Charlesbank's, sale of Varsity.  So

19   now we're, again, not alleged to be illegal as to sale to

20   Bain.  Not alleged to be illegal in any sense.  And, you

21   know, this is just a very broad and strong request.  It could

22   be many privileged documents regarding negotiating,

23   acquisition and sale agreements.  You know, this alone is a

24   multihundreds of thousands of dollars of useless exercise in

25   getting to the bottom of that.

1          Now look, we've told them if they have something

2     that they don't think they have that they actually think is

3     pertinent to the case and that they need, we're all ears, but

4     we can't deal with these just outrageously broad requests,

5     particularly when you start getting into, you know, multiple,

6     multiple, multiple custodians.  So at a very minimum, we need

7     these things to be tailored.  And they just -- we've tried to

8     get them to do that for months and months and months, and

9     they just have not been willing to engage on that topic.  So

10    we are here today because of them.

11         MS. MALONE:  Your Honor, may I respond?  Looks

12    like I need to go point by point after all.

13         THE COURT:  You can.  Although, as I mentioned

14    earlier, that I'll be deciding this on the papers.  When I

15    got the parties' e-mail as of Friday, reviewed it this

16    weekend, I realized that there had -- there was no common

17    ground at all.  And with that, that makes a hearing

18    definitely less helpful to me.  And I even considered maybe

19    canceling the hearing today in light of that e-mail, but I

20    figured everyone had it on their calendar.  I wanted to give

21    all parties an opportunity to be heard and make their record.

22    But I'll allow you to do that, Ms. Malone, but I'll probably

23    be wrapping up this hearing here shortly in the next few

24    minutes.

25         MS. MALONE:  Okay.  I will be brief, I promise.

UNREDACTED TRANSCRIPT

1              So first of all, just as a general point, you
2    know, discovery isn't limited to, you know, exclusively
3    criminal, you know, and civilly liable acts.  You know, the
4    scope of discovery is broad.  And, you know, it's all
5    information that would lead to relevant discovery.  So the
6    fact that, you know, conducting due diligence or acquiring a
7    company in and of itself isn't necessarily, you know, giving
8    rise to liabilities just, you know, based on that specific
9    act.  It's not illegal.  That doesn't mean that you can't
10   conduct discovery about it.
11             You know, as to the allegations that aren't in
12   the complaint, again, that's how discovery works.  You make
13   it from, you know, allegations on information and belief and,
14   you know, conduct discovery that fully investigate those
15   claims and see if they hold water.
16             We know that Charlesbank and Bain were involved
17   in acquisitions, so the, you know, the requests that go to
18   accountant producers and other things are absolutely
19   relevant.  The request about the sale, you know, documents
20   are central to our claims.  I mean, that's how Bain got
21   involved.  And, you know, there was a billion dollar profit
22   that was made over four years.  So it's relevant.
23             You know, as to the valuations, you know, that's
24   necessarily based on the market share that a company has and,
25   you know, if it's big enough, its ability to, you know, raise

1   prices or throw its weight around, you know, as the 800-pound

2   gorilla.  Finally, you know, the HR payments, I certainly

3   hope for Bain's sake that their HR files aren't all around

4   the company.  But, you know, again, the burden there, you

5   know, is justified because, you know, the payment by, you

6   know, again Charlesbank, you know, to employees of Varsity,

7   it just -- yeah, it goes to the center of the conspiracy

8   claims.

9           You know, lastly, just the position that

10  defendants have taken where they're requiring us to identify

11  deficiencies in a production that doesn't exist in order to

12  talk about that production, it's -- I mean, it's iteratively

13  tautological.  It requires a mind reader, not a lawyer.  I

14  can't tell you what documents we don't have until I get at

15  least a set of documents.  And we have received not a single

16  document responsive to our document requests, so...

17          THE COURT:  All right.  Okay.  Well, I think that

18  pretty much wraps up the hearing for today.  I'll take the

19  matter under advisement.  I'll issue a written order on the

20  motions, and we'll go from there.

21          MS. MALONE:  Okay.

22          THE COURT:  All right.

23          (Adjournment.)

24

25

UNREDACTED TRANSCRIPT

51

1                    **C E R T I F I C A T E**

2

3

4          I, CANDACE S. COVEY, do hereby certify that the

5    foregoing 51 pages are, to the best of my knowledge, skill

6    and abilities, a true and accurate transcript from my

7    stenotype notes of the FTR recording on the 6th day of

8    December, 2021,, in the matter of:

9

10

11   Jones, et al.

12   vs.

13   Charlesbank and Bain, et al.

14

15   Dated this 11th day of March, 2022.

16

17

18

19                         _____S/Candace S. Covey_____

20                         CANDACE S. COVEY, LCR, RDR, CRR
                           Official Court Reporter
21                         United States District Court
                           Western District of Tennessee
22

23

24

25

                           UNREDACTED TRANSCRIPT