# **<u>EXHIBIT G</u>**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| **FUSION ELITE ALL STARS**, et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>**VARSITY BRANDS, LLC**, et al.,<br><br>        Defendants. | Case No. 2:20-cv-02600-SHL-tmp<br><br>**JURY TRIAL DEMANDED** |
| **JONES**, et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>**BAIN CAPITAL PRIVATE EQUITY,** et al.,<br><br>        Defendants. | Case No. 2:20-cv-02892-SHL-tmp<br><br>**JURY TRIAL DEMANDED** |
| **AMERICAN SPIRIT AND CHEER ESSENTIALS, INC.**, et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>**VARSITY BRANDS, LLC**, et al,<br><br>        Defendants. | Case No. 2:20-cv-2782-SHL-tmp<br><br>**JURY TRIAL DEMANDED** |

<u>**NOTICE OF DEPOSITION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(B)(6) OF DEFENDANTS VARSITY BRANDS, LLC, VARSITY SPIRIT, LLC, AND VARSITY SPIRIT FASHION & SUPPLIES, LLC**</u>

PLEASE TAKE NOTICE, that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiffs in the above-captioned matters will take the deposition of Defendants Varsity Brands, LLC, Varsity Spirit, LLC, and Varsity Spirit Fashion & Supplies, LLC (collectively "Varsity Defendants") at such date, time, and place as is mutually agreed upon. The deposition will be taken by stenographic and/or videographic means before a notary public or other person duly authorized to administer oaths and will be continued until completed. You are invited to attend and participate as authorized by law.

Rule 30(b)(6) requires the Varsity Defendants to produce one or more witnesses at the agreed date, location and time who is or are aware of and prepared to testify about the Varsity Defendants' knowledge of the topics set forth below. If the designated representative or representatives do not have such knowledge, he, she, or they are required to acquire it through a reasonable investigation.

**I.      <u>Definitions</u>**

1.      The term "Athletic Equipment" means any equipment used to participate in any sport.

2.      The term "All Star" cheerleading or "All Star Cheer" means the discipline or sport of cheerleading that involves athletes performing routines composed of tumbling, stunting, pyramids, and dance. It is distinct from traditional school cheerleading (sideline cheering) in that its primary purpose is competition, while school cheer primarily involves crowd leading and other roles associated with generating school spirit.

3.      The term "All Star Apparel" means the clothing (including uniforms), shoes, accessories, or equipment purchased for use by All Star cheerleading athletes at Competitions and during practices and training.

4.      The term "All Star Championship" means one of three nationally recognized All Star cheerleading championship competitions in the United States: the Cheerleading Worlds, The Summit, and the U.S. Finals.

5.      The term "All Star Cheer Event Producer" means any entity or person who finances, operates, organizes, or advertises an event related to All Star Cheer.

6.      The term "All Star Competition" means an All Star cheerleading competition, including All Star Championships.

7.      The term "All Star Gym" or "Gym" means a cheerleading gym whose members are athletes on All Star cheerleading teams.

8.      The term "Bid" means an official offer from a Competition inviting an All Star team to attend an All Star Championship competition.

9.      The terms "any," "and," and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery all responses which might otherwise be construed to be outside its scope. Each of the following words includes the meaning of every other word: "each," "every," "all," and any." The present tense shall be construed to include the past tense, and the past tense shall be construed to include the present tense.

10.      The term "Camp" means any camp at which athletes and teams practice All Star Cheer, School Cheer, or dance skills and develop cheerleading or dance routines for School Cheer or All Star Cheer.

11.     The term "Camp Producer" means any entity or person who finances, operates, organizes, or advertises Camps for All Star Cheer athletes or School Cheer athletes.

12.     The terms "concerning," "reflecting," and "relating to" are used in the broadest possible sense and mean, in whole or in part, addressing, analyzing, constituting, containing, commenting, in connection with, dealing with, discussing, describing, embodying, evidencing, identifying, pertaining to, referring to, reporting, stating, or summarizing.

13.     The term "Contract" means any contract, arrangement, or understanding, formal or informal, oral or written, between two or more persons, together with all modifications or amendments thereto.

14.     The term "Defendants" means any Defendant named in any complaint or amended complaint filed in any of the above-captioned actions.

15.     The term "employee" means, without limitation, any current or former employee, officer, director, executive, manager, board member, secretary, staff member, consultant, messenger, or agent.

16.     The term "including" means including but not limited to.

17.     The term "Graduation Regalia" shall include class rings, graduation announcements and caps and gowns or any items associated with graduation from high school or college.

18.     The term "NFHS" means National Federation of State High Schools Association and all predecessors, successors, subsidiaries, departments, divisions, and/or affiliates, including without limitation any organization or entity which they manage or control, together with all present and former directors, members, officers, employees, agents, representatives, or any persons acting or authorized to act on their behalf.

19.     The term "offer" means any offer, arrangement, or understanding, formal or informal, oral or written, between two or more persons, together with all modifications or amendments thereto, to sell goods or services, including offers to sell goods or services involving discounts or rebates.

20.     The term "price" means the sum or amount of money or its equivalent for which anything is bought sold, or offered for sale as well as monetary values or rates, price increases or decreases, retail prices, wholesale prices, transfer prices, exchange prices, markups, profit margins, discounts, rebates, promotions, or promotional allowances, and all related costs or charges.

21.     The term "Scholastic Items" or "Scholastic Sales" shall include competition rings, band uniforms, color guard uniforms and paraphernalia, Athletic Equipment, sports uniforms, and apparel.

22.     The term "School" means public or private junior high, high school, college, or university, including school districts and state government entities that own or oversee the high school, college, or university system, together with all present and former officers, employees, agents, representatives, or any persons acting or authorized to act on the School's behalf.

23.     The term "School Cheer" means a discipline or sport of cheerleading in which routines composed of tumbling, stunting, pyramids, dance, and elements of traditional sideline cheer such as band chants, fight songs, and motivational cheers are performed by teams of athletes affiliated with Schools.

24.     The term "School Cheer Apparel" means the clothing (including uniforms), shoes, accessories, or equipment purchased for use by School Cheer athletes at School Cheer Competitions, Camps, and/or during practices and training.

25.     The term "School Cheer Championship" means nationally recognized School cheerleading championship competitions in the United States, including and not limited to: UCA National High School Cheerleading Championship; UCA National College Championship; UDA National College Championship; NCA National High School Cheerleading Championship; NCA College National Championship; and NDA College National Championship.

26.     The term "School Cheer Competition" means nationally recognized School Cheer competitions in the United States, including but not limited to: UCA National High School Cheerleading Championship; UCA National College Championship; UDA National College Championship; NCA National High School Cheerleading Championship; NCA College National Championship; and NDA College National Championship.

27.     The term "School Cheer Event Producer" means any entity or person who finances, operates, organizes, or advertises an event related to School Cheer.

28.     The term "School Partnership Program" means any Varsity or Varsity Brand partnership with a School, including but not limited to the "IMPACT Program" or "VIP Branding" or "New School Construction Program."

29.     The term "UCA" means Universal Cheerleading Association, and all predecessors, successors, subsidiaries, departments, divisions, and/or affiliates, including without limitation any organization or entity which they manage or control, together with all present and former directors, members, officers, employees, agents, representatives, or any persons acting or authorized to act on their behalf.

30.     The term "USA Cheer" means the USA Federation for Sport Cheering, its predecessor and successor entities, its officers, directors, shareholders, parent and subsidiary

6

companies (whether direct or indirect), divisions, employees, agents, attorneys, representatives, and other persons acting or authorized to act on its behalf.

31.     The term "USASF" means Defendant U.S. All Star Federation, Inc., its predecessor and successor entities, its officers, directors, shareholders, parent and subsidiary companies (whether direct or indirect), divisions, employees, agents, attorneys, representatives, and other persons acting or authorized to act on its behalf.

32.     The terms "Varsity" or "Varsity Defendants" mean Defendants Varsity Brands, LLC, Varsity Spirit, LLC, and Varsity Spirit Fashion & Supplies, LLC, each of their predecessor and successor entities, officers, directors, shareholders, parent and subsidiary companies (whether direct or indirect), divisions, employees, agents, attorneys, representatives, and other persons acting or authorized to act on their behalf.

33.     The terms "You" or "Your" means the persons or entities upon whom this Notice was served; for an entity, each of its predecessors, successors, parents, divisions, subsidiaries, and affiliates, each other entity directly or indirectly, wholly or in part, owned or controlled by it, and each partnership or joint venture to which any of them is a party; and all present and former directors, officers, employees, agents, consultants, or other persons acting for or on behalf of any of them.

## II.     <u>Instructions</u>

1.     The Definitions above are provided only for purposes of discovery, in conformance with Rule 34(a) of the Federal Rules of Civil Procedure and are not intended to be used for any purpose other than discovery. Plaintiffs reserve the right to modify these Definitions or utilize different Definitions for any other purpose.

2.      The terms defined above are to be construed broadly to the fullest extent of their meaning in a good faith effort to comply with the Federal Rules of Civil Procedure.

3.      All words not defined in the Definitions shall be construed using their plain and ordinary meaning.

4.      Each topic shall be construed independently, and no topic shall be viewed as limiting the scope of any other topic.

5.      The terms defined above and in each individual topic should be construed broadly and to the fullest extent of their meaning to comply with the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

6.      If You object to a portion or aspect of a deposition topic, state the grounds for Your objection with specificity.

## III.    Relevant Time Period

The Relevant Time Period for these Topics is January 1, 2011 to the present.

## IV.    Subject Matter of Testimony ("Topics")

### A.      All Star Cheer

1.      For each year during the Relevant Time Period, Varsity Defendants' All Star Competitions and Varsity Defendants' All Star Competition brands, including:

    a.  Total number of Varsity All Star Competitions per year;

    b.  Geographic regions or divisions within the United States according to which Varsity tracks and/or organizes All Star Competitions;

    c.  To the extent Varsity tracks All Star Competitions by geographic region, total number of Varsity All Star Competitions in each geographic region per year; and

      d.   Identity of all Varsity All Star Competition brands, including the number of All Star Competitions each brand produces annually, the geographic regions in which each brand produces All Star Competitions, and whether each brand is a "Tier 1" or "Tier 2" All Star Competition brand.

2.     For each year during the Relevant Time Period, Varsity Defendants' All Star Competition customers (Gyms, teams, parents, spectators, and individual athletes), including the average and median expenditure per season for participation in All Star Competitions by Gym, team, and individual athlete and the average and median number of All Star Competitions attended per season by Gym, team, and individual athlete.

3.     For each year during the Relevant Time Period, Varsity Defendants' actual and potential competitors in the production of All Star Competitions, including:

      a.   Geographic regions in which such competitors operate or have operated;

      b.   Their respective market shares;

      c.   Types of information that Varsity maintains regarding such actual or potential competitors (*e.g.*, event revenues, total revenues, number of events; number of Tier 1 events, number of events by region); and

      d.   Varsity Defendants' strategies for limiting actual or potential competitors' ability to take market share and/or customers from Varsity.

4.     For each year during the Relevant Time Period, Varsity's share of the number of All Star Competitions produced annually in the United States and Varsity's share of the revenues derived from those Competitions.

5.      The metrics by which Varsity evaluates its market position with regard to All Star Competitions (*e.g.*, revenues, number of events, number of Tier 1 events, number of events by region, etc.).

6.      Varsity's internal discussions of its competitive strengths relative to alternate suppliers in the production of All Star Competitions.

7.      All Star Championships, *i.e.*, Worlds, The Summit, and the U.S. Finals.

8.      Bids to the Cheerleading Worlds, The Summit, and the U.S. Finals, including: (i) the different types of Bids (*e.g.*, paid versus at-large), (ii) the number of Bids available to Cheerleading Worlds, The Summit, and the U.S. Finals, (iii) the number of Bids offered at Varsity All Star Competitions and how that has changed over time, (iv) which Competitions are eligible to award Bids, (v) any rules surrounding the awarding of Bids by Competitions to Gyms, and (vi) the process by which Bids are distributed.

9.      Processes and methods by which prices for attendance and participation in Varsity All Star Competitions, including registration and spectator fees, are determined.

10.      Processes and methods by which Varsity's prices, discounts, rebates, or other sales incentives for its All Star Competitions are determined and any changes over time.

11.      Varsity's implementation of spectator fees at its All Star Competitions.

12.      Prices charged by Varsity for registration and spectator admission for Varsity's All Star Competitions, including how such prices have changed over time.

13.      Varsity's method of calculation and payment of sales taxes due on all-cash sales.

14.      The person(s) responsible for ensuring Varsity accurately calculates and pays sales taxes due on all-cash sales.

15.      The processes by which Varsity calculates scores at its All Star Competitions.

16.     For each year during the Relevant Time Period, the average and median All Star Apparel amount in dollars paid to Varsity and/or Varsity's All Star Apparel rivals per season by Gym, team, parent, spectator, and individual athlete.

17.     For each year during the Relevant Time Period, Varsity Defendants' actual and potential competitors in the manufacture and sale of All Star Apparel, including their respective market shares over time, and Varsity Defendants' strategies for limiting the ability of actual or potential rivals from taking sales and/or market share from Varsity.

18.     For each year during the Relevant Time Period, Varsity's share of the revenue derived from the sale of All Star Apparel in the United States.

19.     Varsity's agreements with All Star Apparel vendors for the ability to sell or showcase merchandise at Varsity All Star Competitions.

20.     How Varsity determines what All Star Apparel is sold at its All Star Competitions.

21.     Processes and methods by which Varsity's prices, discounts, rebates, or other sales incentives for All Star Apparel are determined and any changes over time.

22.     Varsity's considerations of USASF Cheer Rules in designing its All Star Apparel.

23.     The features of All Star Apparel.

24.     Varsity's internal discussions of its competitive strengths relative to alternate suppliers in the sale of All Star Apparel.

**B.     <u>School Cheer</u>**

25.     For each year during the Relevant Time Period, Varsity Defendants' School Cheer Competitions and Varsity Defendants' School Cheer Competition brands, including:

a.   Total number of School Cheer athletes per year; and

b.  Total number of School Cheer teams per year.

26.     For each year during the Relevant Time Period, Varsity Defendants' School Cheer Competitions and Varsity Defendants' School Cheer Competition brands, including:

a.  Total number of School Cheer Competitions per year; and

b.  Identity of all Varsity School Competition brands, including the number of School Cheer Competitions each brand produces annually.

27.     For each year during the Relevant Time Period, Varsity's School Cheer customers (School, teams, parents, spectators, and individual athletes), including the average and median expenditure per season for participation in School Cheer Competitions by School, team, and individual athlete and the average and median number of School Cheer Competitions attended per season by School, Gym, team, and individual athlete.

28.     For each year during the Relevant Time Period, Varsity's actual and potential competitors in the production of School Cheer Competitions, including:

a.  The respective market shares of such competitors;

b.  Types of information that Varsity maintains regarding such actual or potential competitors (*e.g.*, event revenues, total revenues, number of events, etc.); and

c.  Varsity Defendants' strategies for limiting actual or potential competitors' ability to take market share and/or customers from Varsity.

29.     For each year during the Relevant Time Period, Varsity's share of the number of School Cheer Competitions produced annually in the United States and Varsity's share of the revenues derived from those Competitions.

30.     The metrics by which Varsity evaluates its market position with regards to School Cheer Competitions (*e.g.*, revenues, number of events, number of events by region, etc.).

31.     For each year during the Relevant Time Period, School Cheer Championships.

32.     For each year during the Relevant Time Period, Bids to the UCA National High School Cheerleading Championship, including: (i) the different types of Bids (*e.g.*, paid versus at-large); (ii) the number of Bids available to School Cheer teams; (iii) the number of Bids offered at School Cheer Competitions and how that has changed over time; (iv) which Competitions are eligible to award Bids; (v) any rules surrounding the awarding of Bids by Competitions to Schools; and (vi) the process by which Bids are distributed.

33.     Processes and methods by which prices for attendance and participation in Varsity School Cheer Competitions, including registration and spectator fees, are determined.

34.     Prices charged by Varsity for registration and spectator admission for Varsity's School Cheer Competitions, including how such prices have changed over time.

35.     The processes by which Varsity calculates scores at its School Cheer Competitions.

C.     **Camps**

36.     For each year during the Relevant Time Period, information regarding Varsity's Camps and Camp brands, including:

    a.  Total number of Camps per year;

    b.  Total number of Gyms, teams, Schools, and individual athletes who participate in Camps per year; and

    c.  Identity of all Varsity Camp brands, including the number of Camps each brand produces annually.

37.     For each year during the Relevant Time Period, Varsity Defendants' Camp customers (Gyms, teams, Schools, families, and individual athletes), the average and median

expenditure per season for participation in Camps by Gym, team, School, and individual athlete and the average and median number of Camps attended per season by Gym, team, School, and individual athletes.

38.  For each year during the Relevant Time Period, Varsity's actual and potential competitors in the Camps market, including:

    a.  Market shares;

    b.  Types of information that Varsity maintains regarding such actual or potential competitors (*e.g.*, revenues (by Camp and total), number of Camps; number of Camps by region); and

    c.  Varsity Defendants' strategies for limiting actual or potential competitors' ability to take market share and/or customers from Varsity in the Camps market.

39.  For each year during the Relevant Time Period, Varsity's share of the total number of Camps produced annually in the United States and Varsity's share of the revenues derived from those Camps.

40.  The metrics by which Varsity evaluates its market position with regards to Camps (*e.g.*, revenues, number of events, number of participants, etc.).

41.  All communications with persons or entities outside of Varsity regarding the acquisition of Camps or Camp Producers.

42.  Processes and methods by which prices for attendance and participation in Varsity Camps, including registration and spectator fees, are determined.

43.  Prices charged by Varsity for registration and attendance at Varsity's All Star Cheer and School Cheer Camps, including how such prices have changed over time.

44.     The relationship between Camp attendance by Gyms, Schools, teams, or individual athletes and Bids and/or scoring at All Star Competitions and/or School Cheer Competitions.

45.     Varsity's formal or informal policies or practices concerning Camps, including:

    a.  Requirements to attend a minimum number of Competitions to participate in a Camp;

    b.  Requirements to purchase All Star Apparel or School Cheer Apparel to participate in a Camp;

    c.  How Bids are impacted by Camp participation; and

    d.  Requirements to stay at designated hotels or accommodations as a requirement to participate in a Camp.

**D.     <u>Acquisitions</u>**

46.     For each  All Star Competition or School Cheer Competition Producer that Varsity acquired in whole or part during the Relevant Time Period, including, but not limited to, Spirit Festival, LLC; Pac West Spirit Group; Spirit Innovations, LLC; Cheersport; Cheerlogistics; Universal Spirit; Spirit Holdings, Inc.; Cheer Ltd.; COA Cheer & Dance; JamBrands, Inc.; Golden State Spirit Association; Aloha Productions, LLC; Mid Atlantic Cheer; Spirit Celebration, LLC; All Things Cheer & Dance (ATC); Jam Spirit Group, Inc. d/b/a Team Champion; Mardi Gras Nationals, Inc.; Sea to Sky (STS); and Epic Spirit Ventures:

    a.  Identity of the All Star Competition or School Cheer Competition Producer;

    b.  Date of the acquisition;

    c.  Cost of the acquisition;

    d.  Rationale for the acquisition;

e.   Geographic region of the acquired entity;

f.   Number of All Star Competitions or School Cheer Competitions produced, pre-acquisition, by each acquired All Star Competition Producer or School Cheer Competition Producer;

g.   Number of Bids offered, pre-acquisition, by the each All Star Competition or School Cheer Competition Producer;

h.   Effect of the acquisition on the ability of rival All Star Competition Producers or School Cheer Competition Producers to compete effectively against Varsity,

i.   Effect of the acquisition on Varsity's share in units and/or dollars of revenues from All Star Competitions and School Cheer Competitions; and

j.   Any changes implemented following the acquisition of any All Star Competition Producer or School Cheer Competition Producer, including:

    i.   Changes in the fees or prices charged by Varsity for registration or spectator admission;

    ii.   Changes in number of All Star Competitions and School Cheer Competition produced;

    iii.   Changes in number or types of Bids offered; or

    iv.   Changes in partnerships with All Star Competition Producers, School Cheer Competition Producers or apparel manufacturers.

47.   For each All Star Apparel and School Cheer Apparel manufacturer that Varsity acquired during the Relevant Time Period:

a.   Identity of the manufacturer;

b.   Date of the acquisition;

    c.  Cost of the acquisition;

    d.  Rationale for the acquisition;

    e.  Effect of the acquisition on the ability of rival All Star Apparel or School Cheer Apparel manufacturers to compete effectively against Varsity; and

    f.  Effect of the acquisition on Varsity's share in units or dollars of sales of All Star Apparel or School Cheer Apparel.

    g.  Changes in Varsity's All Star Apparel or School Cheer Apparel following the acquisition, including:

        i.  Changes in the fees or prices charged by Varsity;

        ii.  Changes in Varsity's manufacturing processes;

        iii.  Changes in delivery or shipment; and

        iv.  Changes to materials used to manufacture Varsity's All Star Apparel or School Cheer Apparel.

48.    For each Scholastic Item manufacturer or reseller that Varsity merged with or acquired in whole or part during the Relevant Time Period:

    a.  Identity of the Scholastic Item manufacturer or reseller;

    b.  Date of the acquisition;

    c.  Cost of the acquisition;

    d.  Rationale for the acquisition; and

    e.  Geographic region of the acquired entity.

49.    For each Graduation Regalia manufacturer or reseller that Varsity merged with or acquired in whole or part during the Relevant Time Period:

    a.  Identity of the Graduation Regalia manufacturer or reseller;

b.   Date of the acquisition;

c.   Cost of the acquisition;

d.   Rationale for the acquisition; and

e.   Geographic region of the acquired entity.

50.     The identity of any contemplated or prospective, but unconsummated, acquisitions of All Star Competition Producer, School Cheer Competition Producer, All Star Apparel manufacturer, School Cheer Apparel manufacturer, Camp Producer, Scholastic Item manufacturer or reseller, or Graduation Regalia manufacturer or reseller during the Relevant Time Period, including communications with potential acquisition targets relating to possible acquisition or merger.

51.     The relationship, if any, between Varsity's acquisitions of All Star Competition Producers or School Cheer Competition Producers and changes made to the requirements or terms of Varsity's Family Plan or Network Agreements.

52.     Varsity Defendants' formal or informal policies or practices concerning acquisitions in the All Star Competition, All Star Apparel, School Cheer Competition, School Cheer Apparel, Camp, Scholastic Item, and Graduation Regalia markets, including identification and tracking of potential acquisition targets and due diligence processes.

### E.   Loyalty Programs and Contracts

53.     Origins and rationale for creation and continued promulgation and enforcement of Varsity's Family Plan, Varsity's Network Agreements, and other loyalty programs promulgated by Varsity or any of its acquired entities throughout the Relevant Time Period.

54.     The terms and conditions for participation by Gyms in Varsity's Family Plan and/or Network Agreement, including, *inter alia*, the number of attended events required to

18

qualify, the necessary level of event or apparel expenditure, and the rebate amount, percentage, or form given.

55.     Any and all changes to the terms of Varsity's Family Plan over time:

   a.   the nature and timing of the relevant change(s);

   b.   the rationale for the change(s);

   c.   the person(s) responsible for determining or implementing the change(s); and

   d.   the effect of the change(s) upon: (i) Varsity's sales, revenues, or the ability of rival All Star Apparel manufacturers and rival All Star Competition Producers to compete effectively against Varsity, (ii) Varsity's share in units and dollars of sales of All Star Apparel in the United States, and (iii) Varsity's share in units and dollars of all revenues from All Star Competitions in the United States.

56.     Any and all formal or informal policies, principles, procedures, processes, or practices regarding Varsity's Family Plan or Network Agreements, including the methods by which Varsity tracks Gyms' participation and calculates and processes rebates to Gyms.

57.     The identity of all Gyms that have signed a Network Agreement with Varsity during the Relevant Time Period and the names of the people who signed on behalf of both the Gyms and Varsity.

58.     Any formal or informal policies, principles, procedures, processes, or practices regarding Varsity's use and/or negotiation of Network Agreements, including the identity of any form templates or standard versions, whether of entire contracts or particular contractual provisions, used as part of the creation or negotiation of Network Agreements, and the time periods for which various respective standard versions of form templates or versions were in use.

59.     For each year during the Relevant Time Period, the terms and conditions for

participation by Gyms in Varsity's Network Agreements, including, *inter alia*, exclusive

purchase of Varsity's products or exclusive attendance at Varsity's All Star Competitions, the

different product categories for which Varsity required such terms, the number of attended

events required to qualify, the necessary level of event or apparel expenditure, and the rebate

amount, percentage, or form given (*i.e.*, front-end discount, cash rebate, or Varsity Fashion

Dollars).

60.     Any changes to the terms of Varsity's Network Agreements over time, including:

   a.   the nature and timing of the relevant change(s);

   b.   the rationale for the change(s);

   c.   the person(s) responsible for determining or implementing the change(s); and

   d.   the effect of the change(s) upon: (i) Varsity's sales, revenues, or the ability of

        rival All Star Apparel manufacturers and rival All Star Competition Producers to

        compete effectively against Varsity, (ii) Varsity's share in units and dollars of

        sales of All Star Apparel in the United States, and (iii) Varsity's share in units and

        dollars of all revenues from All Star Competitions in the United States.

61.     Varsity's understanding of Gyms' reasons for (a) seeking to qualify for the

Family Plan, (b) executing a Network Agreement, and (c) Gyms switching from Varsity's

Family Plan to Network Agreements, and vice-versa.

62.     Varsity's explanations of the Family Plan and the Network Agreement to Gyms,

including the reasons for participating in each.

63.     Varsity's discussion with Gyms who breached or failed to comply with the

Family Plan or Network Agreement.

64.     Varsity's reasons for offering or not offering a Network Agreement to a particular Gym.

65.     The methods by which Gyms are chosen to participate in Network Agreements.

66.     The share of Varsity All Star Competition and Apparel revenue derived annually from (a) Gyms in Network Agreements and (b) Gyms meeting the minimum requirements for participation in Varsity's Family Plan.

67.     Regarding any loyalty program involving Scholastic Items or Graduation Regalia purchasers in any Varsity loyalty program:

    a.   The identity of the entities taking part;

    b.   The substance of the loyalty program;

    c.   The development and evolution of the program;

    d.   Varsity's rationale for implementing the loyalty program; and

    e.   Quantifiable results of the loyalty program (sales increases or decreases).

**F.**     **Cheerleading Governing Bodies**

68.     The origins of and motivations for forming USASF.

69.     The relationship between Varsity and USASF, including but not limited to: (i) Varsity employees who served as board members of USASF; (ii) USASF employees who were paid by Varsity and/or employees of Varsity; (iii) any payments from Varsity to USASF and vice versa; (iv) the location of Varsity and USASF offices; (v) the registration for the USASF trademark and any licenses of that trademark; (vi) Varsity's role in the promotion of Worlds; and (vii) the Varsity employees responsible for interfacing with USASF.

70.     For each year during the Relevant Time Period, the number of board seats allotted to or occupied by Varsity employees or regarding which Varsity has the ability to control, and how that has changed over time.

71.     The methods and processes the USASF Nominating Committee use to determine who will fill USASF's gym owner/coach Board seats.

72.     USASF's Cheer Rules, including but not limited to (i) the identity of persons who drafted the Rules; (ii) any copyright protection for the Rules; (iii) any amendments to the Rules over time; and (iv) any involvement by Varsity in drafting or amending the Rules.

73.     USASF's Rule prohibiting All Star Competition Producers or School Cheer Competition Producers from holding Bid-qualifying events within a certain distance of another Bid-qualifying event and the rationale for its existence.

74.     Information related to IASF, its formation, and its relationship to Varsity.

75.     Information related to the International Cheer Union (ICU), its formation, and its relationship to Varsity.

76.     The origins of and motivations for forming USA Cheer.

77.     The relationship between Varsity and USA Cheer, including but not limited to: (i) Varsity employees who served as board members of USA Cheer; (ii) USA Cheer employees who were paid by Varsity; (iii) any payments from Varsity to USA Cheer and vice versa; (iv) the location of Varsity and USA Cheer offices; (v) the registration for the USA Cheer trademark and any licenses of that trademark; and (vi) the Varsity employees responsible for interfacing with USA Cheer.

**G.      Acquisitions of Varsity by Outside Buyers**

78.     Formation and corporate organization of Varsity Defendants.

22

79.     Merger of Varsity with Herff Jones, Inc.

80.     Acquisition of Varsity by Charlesbank Capital Partners LP ("Charlesbank") and Partners Group AG ("Partners").

81.     Acquisition of Varsity by Bain Capital, LP ("Bain").

82.     The valuation of Varsity or its assets for the purposes of facilitating the acquisition of Varsity or any of its assets by outside buyers.

83.     Varsity's competitive strengths, as discussed with or presented to Charlesbank, Partners, and/or Bain.

84.     The time periods during which Bain and Charlesbank's due diligence of Varsity took place, and the types of items or data assessed during such due diligence periods.

85.     The names and roles of those involved from Bain or Charlesbank who Varsity interacted with regarding due diligence, and Bain or Charlesbank's acquisition of Varsity.

86.     Discussions with persons or entities outside of Varsity, including without limitation potential purchasers (regardless whether they expressed an interest in purchasing Varsity or its assets or were identified as potential purchasers by other means), financial institutions, agents, brokers, rating agencies, regulatory agencies at the federal or state level, athletic commissions, consultants, business advisors, law firms or journalists, regarding acquisition of Varsity or its assets.

87.     The identity of any person(s) who at any time during the Relevant Time Period were (a) responsible for researching, maintaining or compiling information regarding the acquisition of Varsity or its assets, (b) responsible for calculating the valuation of Varsity or its assets, (c) responsible for drafting any documents, spreadsheets or presentations regarding the acquisition of Varsity or its assets, (d) responsible for reviewing, approving, authorizing or

23

signing any documents, spreadsheets or presentations regarding the acquisition of Varsity or its

assets, or (e) responsible for communicating with persons or entities outside of Varsity regarding

the valuation of Varsity or its assets.

### H.      School Partnership and Branding Programs

88.      For each year during the Relevant Time Period, Varsity's revenue derived from

Varsity and Varsity Brands' School Partnership Programs, including but not limited to Varsity's

IMPACT Program, VIP Branding, and New School Construction Program.

89.      For each year during the Relevant Time Period, Varsity Defendants' School

Partnership Program customers, including the average and median expenditure per school fiscal

year for participation in the School Partnership Programs.

90.      The history of Varsity's School Partnership Programs, including the strategic

goals behind their development.

91.      For each year during the Relevant Time Period, Varsity's formal or informal

policies related to Varsity and Varsity Brands' School Partnership Programs.

92.      For each year during the Relevant Time Period, Varsity's share of the number of

School Partnership Programs agreed to annually in the United States and Varsity's share of the

revenues derived from those partnerships.

93.      The metrics by which Varsity evaluates its market position with regards to School

Partnership Programs (*e.g.*, revenues, total number of Schools participating, number of Schools

by region, etc.).

### I.      Graduation Regalia and Scholastic Items

94.      Information regarding the advertisement or sale of goods by any Varsity Brand

company (including Stanbury, LLC, Herff Jones, LLC, BSN Sports, LLC, Varsity Spirit Fashion

& Supplies, and Varsity Intropa Tours) to or through any institution of higher learning (including any high school, college, or university).

95.     For each year during the Relevant Time Period:

a.   Total number of students (K-12 together with collegiate) served per year; and

b.   Total number of schools served (K-12 together with collegiate).

96.     For each year during the Relevant Time Period, Varsity Defendants' actual and potential competitors in the sale of Graduation Regalia or Scholastic Items, including:

a.   Geographic regions in which such competitors operate or have operated;

b.   Their respective market shares;

c.   Types of information that Varsity maintains regarding such actual or potential competitors; and

d.   Varsity Defendants' strategies for limiting actual or potential competitors' ability to take market share and/or customers from Varsity.

**J.     Other**

97.     The features of All Star Cheer, School Cheer, STUNT, dance, and gymnastics competitions.

98.     Varsity's "Stay-to-Play" program, including any formal and informal policies regarding the designation of specific hotels as the official accommodations of an All Star Competition or School Cheer Competition or Camp, and making it a condition of participation in the All Star Competition or School Cheer Competition or Camp athletes to stay in those hotels.

99.     Varsity's partnership with Disney and Disney World Resort.

100.   Information regarding All Star Cheer or School Cheer events held at Disney World, and the costs for such events, including but not limited to the Summit.

101.     Information regarding Varsity's agreement with ESPN Wide World of Sports at Disney World Resort to create a venue for cheerleading and dance competitions.

102.     Information related to Stay-to-Play at Disney-owned hotels.

103.     Information regarding Varsity TV, including but not limited to, and fees or prices paid by athletes or families of athletes related to obtaining, watching or viewing All Star Cheer or School Cheer Competitions.

104.     The ability by athletes or spectators to record or stream All Star Cheer or School Cheer Competitions by ways other than using Varsity TV, including any policies or prohibitions relating to recording or streaming through services or methods other than Varsity TV.

105.     Anything mentioned in any complaint or discovery request directed to any Defendant in the *American Spirit* action.

Dated: November 15, 2021        By: */s/* Eric Cramer          

H. Laddie Montague, Jr.*
Eric L. Cramer*
Michael J. Kane*
Mark R. Suter*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19106
Telephone: (215) 875-3000
hlmontague@bm.net
ecramer@bm.net
mkane@bm.net
msuter@bm.net

Jonathan W. Cuneo*
Katherine Van Dyck*
Victoria Sims*
**CUNEO GILBERT & LADUCA LLP**
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Tel: (202) 789-3960
jonc@cuneolaw.com
kvandyc@cuneolaw.com
vicky@cuneolaw.com

Gregory S. Asciolla*
Karin E. Garvey*
Veronica Bosco*
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
gasciolla@labaton.com
kgarvey@labaton.com
vbosco@labaton.com

* Admitted pro hac vice
** Pro hac vice application pending
*** Pro hac vice application forthcoming

*Interim Co-Lead Counsel for the Proposed Direct Purchaser Class*

J. Gerard Stranch, IV (TN BPR #23045)
Benjamin A. Gastel (TN BPR #28699)
**BRANSTETTER, STRANCH &
JENNINGS, PLLC**
223 Rosa Parks Ave. Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
gerards@bsjfirm.com
beng@bsjfirm.com

*Liaison Counsel for Plaintiffs and the
Proposed Direct Purchaser Class*

Benjamin D. Elga*
**JUSTICE CATALYST LAW, INC.**
81 Prospect Street
Brooklyn, NY 11201
Tel: (518) 732-6703
belga@justicecatalyst.org

Craig L. Briskin*
**JUSTICE CATALYST LAW, INC.**
718 7th Street NW
Washington, DC 20001
Tel: (518) 732-6703
brianshearer@justicecatalyst.org
cbriskin@justicecatalyst.org

Roberta D. Liebenberg*
Jeffrey S. Istvan*
Mary L. Russell*
**FINE KAPLAN AND BLACK, R.P.C**
One South Broad St., 23rd Floor
Philadelphia PA 19107
Tel: (215) 567-6565
rliebenberg@finekaplan.com
jistvan@finekaplan.com
mrussell@finekaplan.com

* Admitted pro hac vice

28

Nathan A. Bicks (TN BPR #10903)
Frank B. Thacher III (TN BPR #23925)
**BURCH, PORTER, & JOHNSON, PLLC**
130 North Court Ave.
Memphis, TN 38103
Telephone: (901) 524-5000
nbicks@bpjlaw.com
fthacher@bpjlaw.com

Aubrey B. Harwell, Jr. (TN BPR #002559)
Charles Barrett (TN BPR #020627)
Aubrey B. Harwell III (TN BPR #017394)
**NEAL & HARWELL, PLC**
1201 Demonbreun St., Suite 1000
Nashville, TN 37203
Telephone: (615) 244-1713
aharwell@nealharwell.com
cbarrett@nealharwell.com
tharwell@nealharwell.com

*Additional Counsel for Plaintiffs and the Proposed Direct Purchaser Class*

Joseph R. Saveri*
Steven N. Williams*
Ronnie Seidel Spiegel*
Kevin E. Rayhill*
Elissa A. Buchanan*
Anna-Patrice Harris*
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile:   (415) 395-9940
Email:  jsaveri@saverilawfirm.com
        swilliams@saverilawfirm.com
        rspiegel@saverilawfirm.com
        krayhill@saverilawfirm.com
        eabuchanan@saverilawfirm.com
        aharris@saverilawfirm.com

Van Turner (TN Bar No. 22603)
**BRUCE TURNER, PLLC**
2650 Thousand Oaks Blvd., Suite 2325
Memphis, Tennessee 38118
Telephone: (901) 290-6610
Facsimile: (901) 290-6611
Email: vturner@bruceturnerlaw.net

Daniel E. Gustafson
Daniel C. Hedlund
Daniel J. Nordin
Ling S. Wang
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
Email: dgustafson@gustafsongluek.com
        dhedlund@gustafsongluek.com
        dnordin@gustafsongluek.com
        lwang@gustafsongluek.com

Richard M. Paul III*
Sean R. Cooper*
**PAUL LLP**
601 Walnut, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Email: rick@paulllp.com
        sean@paulllp.com

Jason S. Hartley*
**HARTLEY LLP**
101 West Broadway, Suite 820
San Diego, CA 92101
Telephone: (619) 400-5822
Email: hartley@hartleyllp.com

*Attorneys in the Jones Action for Individual and Representative Plaintiffs*

Robert A. Falanga*
Kobelah Svensen Bennah*
**LAW OFFICES**
**FALANGA & CHALKER**
11200 Atlantis Pl #C
Alpharetta, GA 30022
Phone: (770) 955-0006
Fax: (770) 955-2123

*Interim Lead Class Counsel in the American Spirit Action for the Proposed Independent Event Production Class, the Competitive Recreational, College, High School or Junior High School Student Parent Class, the Apparel, Athletic Equipment and Merchandise Class, and the Cheer Camp Market Class*

* Admitted pro hac vice

## CERTIFICATE OF SERVICE

      I hereby certify that on this 15th day of November, 2021, I served a copy of the foregoing NOTICE OF DEPOSITION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(B)(6) OF DEFENDANTS VARSITY BRANDS, LLC, VARSITY SPIRIT, LLC, AND VARSITY SPIRIT FASHION & SUPPLIES, LLC via electronic mail upon the below Counsel:

Adam S. Baldridge
Matthew Sinon Mulqueen
**BAKER DONELSON BEARMANN
CALDWELL & BERKOWITZ**
165 Madison Ave
Ste 2000
Memphis, TN 38103
Tel: 901-526-2000
Tel: 901-577-8234
abaldridge@bakerdonelson.com
mmulqueen@bakerdonelson.com

George Cary
Alexis Collins
Steven Kaiser
**CLEARY GOTTILEB STEEN &
HAMILTON LLP**
2112 Pennsylvania Avenue NW
Ste 1000
Washington, DC 20037
Tel: 202-974-1554
Tel: 202-974-1519
Tel: 202-974-1920
Tel: 202-974-1500
gcary@cgsh.com
alcollins@cgsh.com
skaiser@cgsh.com

*Attorneys for Defendants Varsity Brands,
LLC; Varsity Spirit Fashions & Supplies,
Inc.; Varsity Spirit, LLC; Varsity Brands
Holding Co., Inc.; Varsity Intropia Tours,
LLC; Bain Capital Private Equity; Bain
Capital, LP; Charlesbank Capital Partners,
LLC; BSN Sports, LLC; Stanbury, LLC; and
Herff Jones, LLC;*

*/s/* Victoria Sims_____
Victoria Sims

Grady M. Garrison
Nicole D. Berkowitz
**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, P.C.**
165 Madison Ave.
Ste. 2000
Memphis, TN 38103
Tel: 901-526-2000
Tel: 901-577-8166
Fax: 901-577-2303
ggarrison@bakerdonelson.com
nberkowitz@bakerdonelson.com

*Attorneys for Defendant U.S. All Star
Federation, Inc. and USA Federation for
Sport Cheering*

Paul Coggins
Brendan Gaffney
**LOCKE LORD LLP**
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
pcoggins@lockelord.com
bgaffney@lockelord.com

*Attorneys for Defendant Jeff Webb*