

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

|                                      |   |                          |
|--------------------------------------|---|--------------------------|
|                                      | ) |                          |
| FUSION ELITE ALL STARS, et al.,      | ) |                          |
|                                      | ) |                          |
|     Movants,                         | ) |                          |
|                                      | ) |                          |
| v.                                   | ) | No. 21-mc-00028-SHL-tmp |
|                                      | ) |                          |
| REBEL ATHLETIC INC.,                 | ) | RELATED CASE:            |
|                                      | ) | 20-cv-2600-SHL-tmp       |
|     Respondent.                      | ) |                          |

_____

**ORDER GRANTING IN PART AND DENYING IN PART MOVANTS' MOTION TO
COMPEL AND GRANTING IN PART AND DENYING IN PART RESPONDENT'S
CROSS-MOTION TO QUASH**

_____

Before the court by order of reference is movants' Motion to Compel Rebel Athletic Inc. to Comply with Subpoena Duces Tecum and Rebel's Cross-Motion to Quash Subpoena, filed on July 9, 2021, and July 30, 2021, respectively. (ECF Nos. 1, 6.) The motions were originally filed in the Northern District of Texas and were transferred to this district on December 6, 2021. (ECF No. 21.) The undersigned finds that a hearing is unnecessary and that the motions can be resolved on the briefs. For the reasons below, both motions are GRANTED in part and DENIED in part.

## I.   BACKGROUND

The present case relates to a complex antitrust lawsuit brought by movants against Varsity Brands, LLC, its affiliated brands and companies, and the United States All Star Federation

("USASF").[1] In brief, the movants allege that Varsity and USASF conspired to and did in fact form a monopoly over the cheerleading industry in the United States.

As part of discovery in that lawsuit, the movants issued a subpoena duces tecum to Rebel on November 17, 2020.[2] (ECF No. 3-1 at 146.) Rebel is an athletic apparel manufacturer and supplier that focuses on cheerleading apparel, (ECF No. 8 at 5-6), and according to Rebel's founder and CEO, "has maintained a greater share of that market than Varsity since at least 2019." (Id. at 6.) However, "Varsity remains Rebel's most powerful competitor." (Id.) The subpoena contained thirty-seven document requests seeking various business records from Rebel including sales data, cost data, and transaction records.[3] (ECF No. 3-1 at 6-29.) The parties agreed to extend Rebel's response deadline to February 26,

---

[1]Fusion Elite All Stars v. Varsity Brands, LLC, 2:20-cv-2600-SHL-tmp (W.D. Tenn. Aug. 13, 2020) ("Fusion Elite"). Two other related cases brought against Varsity and its prior and present owners are currently proceeding before presiding U.S. District Judge Sheryl Lipman: American Spirit and Cheer Essentials Inc. v. Varsity Brands, LLC, 2:20-cv-02782-SHL-tmp (W.D. Tenn. Jul. 24, 2020) and Jones v. Bain Capital Private Equity, 2:20-cv-2892-SHL-tmp (W.D. Tenn. Dec. 10, 2020).

[2]Much of the factual background is taken from the declaration of Fusion Elite's counsel. Rebel did not dispute the negotiation history except where expressly noted.

[3]The undersigned previously considered a motion to compel regarding a similar subpoena seeking substantially the same information as to another third party competitor of Varsity. Fusion Elite All Stars v. Nfinity Athletic LLC, No. 22-cv-2226-SHL-tmp (W.D. Tenn. Apr. 20, 2022) (ECF No. 17).

2021, after multiple requests by Rebel. (Id. at 146-47.) Rebel responded on that day. (Id. at 32.) Rebel lodged substantially the same objections to every single request, with those objections reading as follows:

> Rebel objects to this request as overly broad and seeking information and documents outside the scope of discovery as neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Rebel further objects to the request as unduly burdensome and to the subpoenaing party's failure to take reasonable steps to avoid imposing an undue burden or expense on non-party Rebel. Rebel further objects to the request as not proportional to the needs of the case and placing a burden on non-party Rebel that outweighs its likely benefit. Rebel further objects to the request on the basis that it fails to seek information, documents, or things with reasonable particularity. Rebel further objects to this request as invading constitutional and property rights and seeking disclosure of proprietary and/or confidential business information of non-party Rebel.

(Id. at 34.) At no point did Rebel agree to produce any documents. However, on March 2, 2021, Rebel produced fifty-seven pages, which consisted of five emails and a "37-page chart listing job descriptions with what appear to be employee[s'] ages." (Id. at 147.) On March 8, 2021, the parties discussed the production over the phone. (Id.) During that call, Fusion Elite "agreed to submit a proposal narrowing the scope of the subpoena, and Rebel agreed to reconsider the objections it previously raised." (Id.) This narrowed proposal was submitted on April 28, 2021. (Id.) Rebel and Fusion Elite did not discuss the narrowed proposal until June 9, 2021. (Id.) A second discussion took place on June 16, 2021, where

"Plaintiffs were informed that Rebel would not produce any documents beyond the 57 pages that Rebel previously produced." (Id. at 148.) Rebel's CEO, Karen Aldridge, also agreed to a "two-hour 'informal interview'." (Id.) Fusion Elite found this to be insufficient and stated that if Rebel did not make any further efforts to comply with the subpoena they would file a motion to compel. (Id.) The call ended at 11:40 a.m. EST.

Approximately fifty minutes after this call, Kellie Cady-Varga, Rebel's Vice President of Sales called Sarah Minzghor, the owner and president of Fusion Elite.[4] (Id.; ECF No. 8 at 37.) The two parties offer extremely different accounts of this call in competing sworn declarations. Minzghor states that Cady-Varga "indicated that she was calling to obtain the business of my gym" but that once Minzghor quickly declined any sales interest, Cady-Varga began complaining about the subpoena. Specifically, Minzghor states that Cady-Varga took issue with the attorney's fees associated with responding to the subpoena, expressed fear that any documents Rebel turned over would be given to Varsity, told Minzghor to "call off" her lawyers, and stated that "you don't mess with Karen Aldridge. She's a cutthroat business woman, and she's not going to help your case at all." (Id. at 151.) Cady-Varga states that she called Minzghor "to inquire about a previous

---

[4]Cady-Varga also sits on defendant USASF's Athletic Performance Standards Committee. (ECF No. 3-1 at 148.)

Fusion order left open from 2020, as well as Fusion's interest in resuming business with Rebel more generally." (ECF No. 8 at 38.) She denies harassing or threatening Minzghor and instead states that Minzghor talked for the majority of the call and brought up the lawsuit unprompted. (Id.)

On July 7, 2021, the movants filed the present motion seeking to compel production and responses, to varying degrees, to thirty-one of the original thirty-seven requests. (ECF No. 1.) Rebel responded in opposition with a Cross-Motion to Quash Subpoena and for Protection on July 30, 2021.[5] (ECF No. 6.) The movants also filed a Motion to Transfer the dispute, which had originally been filed in the Northern District of Texas, to the Western District of Tennessee. (ECF No. 4.) Although Rebel opposed this motion, it was granted on December 3, 2021, and the case was transferred on December 6, 2021. (ECF Nos. 20-21.)

The movants' motion seeks to compel production according to the narrowed proposal previously presented to Rebel. (ECF No. 2 at

---

[5]Both parties also filed replies, with Fusion Elite's filed on August 13, 2021, and Rebel's filed on August 27, 2021. (ECF Nos. 9, 12.) Fusion Elite later filed a Motion to Strike Rebel's reply, due to it allegedly raising new arguments, moving for sanctions for the first time, and for violations of the Local Rules of the Northern District of Texas. (ECF No. 14.) Most of these arguments, and the arguments presented in the reply itself, have been mooted by both the transfer of the case and developments in the underlying litigation. To the extent Rebel's reply is still relevant, it largely restates arguments presented in their response. The Motion to Strike is denied.

12.) In their response to the subpoena, Rebel objected to all these requests. Fusion Elite has organized the requests into eight categories. The first category, and the focus of most of the briefing, seeks Rebel's "(1) transactional sales data for Apparel; (2) Apparel cost data; and (3) data relating to prices, fees, rebates, discounts, terms of sale, or any other financial arrangement regarding Apparel" and are supported as relevant by a sworn declaration from Fusion Elite's expert, Dr. Hal Singer, a microeconomist who states that he will use this data to determine any effects of Varsity's allegedly anticompetitive conduct on the market. These requests (specifically Request Nos. 7, 21, 22, 23, 24, 25, and 26) are quoted in pertinent part below so as to summarize the information they seek:

> **REQUEST NO. 7:** All Documents reflecting studies, analyses, and Communications referencing or relating to the following: a. Rebel's prices, fees, rebates, discounts, or other terms of sale for Apparel; b. Rebel's costs, sales, revenues, and profits regarding Apparel; or c. Rebel's Apparel products and other goods it sells.

> **REQUEST NO. 21:** For each year of the Relevant Time Period, all financial statements, equity valuations, asset appraisals, financial models, budgets (proposed or otherwise), projections, investor presentations, pro formas, and similar financial documents relating to Rebel and/or Rebel's sale of Apparel.

> **REQUEST NO. 22:** All of Your monthly, quarterly, and annual audited and unaudited financial statements and related data, including profit and loss statements, balance sheets, cash flow statements, income statements, regulatory filings, issuance of equity or debit, loans, and money owed or receivable.

-6-

**REQUEST NO. 23:** Documents sufficient to show sales, revenues, profits or losses, in as granular form as the information is maintained, for (a) all Apparel sold by Rebel, and (b) any and all other goods or services sold by Rebel.

**REQUEST NO. 24:** Documents and data (in machine-readable format such as *.csv, *.txt or other native flat file format) sufficient to show Your actual costs, in as granular form as the information is maintained, associated with all of Your Apparel, on a monthly basis and in electronic format[.]

**REQUEST NO. 25:** Documents and data (in machine-readable format such as *.csv, *.txt or other native flat file format), in as granular form as the information is maintained, itemized on a purchaser by purchaser basis, including for each customer or purchaser, at minimum, name, address, phone number, email address, customer number, and main contact person or persons, including date, in electronic format[.]

**REQUEST NO. 26:** Documents and data (in machine-readable format such as *.csv, *.txt or other native flat file format), in as granular form as the information is maintained, including by transaction or receipt, broken down by purchaser, including at minimum for each purchaser the name, address, phone number, email address, customer number, and main contact person or persons, itemized by product code, number of items sold, description of product, price, date, check, or other payment method, and transaction[.]

(ECF No. 3-1 at 36, 41-44.)

The second category of requests (Request Nos. 1 and 4) seeks "to identify witnesses and custodians with relevant documents and knowledge related to Rebel's business operations," which Fusion Elite states would be resolved with a declaration identifying Rebel's corporate hierarchy and relevant Rebel personnel who negotiated with Varsity and other customers. (ECF No. 2 at 15.) The third category is only Request No. 8, and seeks documents

sufficient to identify Rebel's competitors, assessment of those competitors, pricing strategy, and market share. (Id. at 15-16.) The fourth category (Request Nos. 3, 5 and 6) seeks all contracts between Rebel and its Apparel customers as well as contracts relating to the marketing and sale of Apparel. (Id. at 16.) The fifth category (Request Nos. 12, 27, 28, 29, 32, and 33) "target[s] documents related to Rebel's ability to compete in the All Star Apparel Market and its relationship with Defendants" and seeks internal and external communications regarding Varsity and USASF. (Id. at 16-17.) The sixth category (Request Nos. 13, 14, 15, 16, 17, 18, 19, and 20) seeks documents to identify All Star Competitions that Rebel has participated in and contracts reflecting that participation; however, Fusion Elite has stated the request would be satisfied by producing documents related solely to the previous relationship between Rebel and The JAM Brands. (Id. at 17-18.) The seventh category (Request Nos. 9, 30, and 31) relate to Varsity's Network Agreements and Family Plans, and Fusion Elite would consider the request satisfied with the use of two search terms on custodians identified by Rebel.[6] (Id. at 18.) The last category is only Request No. 37 and seeks documents and communications referencing plaintiffs, and Fusion Elite would

---

[6]The proposed search terms are "Network Agreement" and "Family Plan." (ECF No. 2 at 18.)

consider the request satisfied with the use of six search terms on custodians identified by Rebel.[7] (Id. at 18.)

## II. ANALYSIS

### A. Legal Standards

Federal Rule of Civil Procedure 45 allows parties to issue subpoenas directing non-parties to produce documents relevant to a litigation. "A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to a subpoena." Fed. R. Civ. P. 45(d)(1). Subpoenas thus have "the same scope as provided in [Federal Rule of Civil Procedure] 26(b)." Fed. R. Civ. P. 45, Advisory Committee Note to Subdivision(d), 1946 Amendment; see also Boodram v. Coomes, No. 1:12CV-00057-JHM, 2016 WL 11333773, at *3 (W.D. Ky. Jan. 5, 2016).

Federal Rule of Civil Procedure 26(b)(1) governs the scope of discovery and provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). The party seeking discovery is obligated to demonstrate relevance. Johnson v. CoreCivic, Inc., No. 18-CV-1051-STA-tmp, 2019 WL 5089086, at *2 (W.D. Tenn. Oct. 10, 2019).

---

[7]The proposed search terms are "Fusion Elite," "Spirit Factor," "Stars and Stripes" or "Stars & Stripes," "Radek," "Hayes," and "Cherasaro."

Upon a showing of relevance, the burden shifts to the party opposing discovery to show, with specificity, why the requested discovery is not proportional to the needs of the case. William Powell Co. v. Nat'l Indem. Co., No. 1:14-CV-00807, 2017 WL 1326504, at *5 (S.D. Ohio Apr. 11, 2017), aff'd sub nom. 2017 WL 3927525 (S.D. Ohio June 21, 2017), and modified on reconsideration, 2017 WL 4315059 (S.D. Ohio Sept. 26, 2017). Six factors are relevant to proportionality: (1) "the importance of the issues at stake in the action;" (2) "the amount in controversy;" (3) "the parties' relative access to relevant information;" (4) "the parties' resources;" (5) "the importance of the discovery in resolving the issues;" and (6) "whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Where a subpoena has been issued under Rule 45, courts should also "balance the need for the discovery against the burden imposed on the person ordered to produce documents, and that person's status as a nonparty is a factor weighing against disclosure." Arclin USA, LLC v. Vits Tech. GmbH, 2:20-mc-48, 2020 WL 6882600, at *2 (S.D. Ohio Nov. 24, 2020).

**B. Requests**

    1.   Request Nos. 7 and 21-26

Fusion Elite states that Request Nos. 7 and 21-26 seek "(1) transactional sales data for Apparel; (2) Apparel cost data; and (3) data relating to prices, fees, rebates, discounts, terms of

-10-

sale, or any other financial arrangement regarding Apparel." (ECF No. 2 at 12.) They support the relevance of these requests with a declaration from Hal Singer, Ph.D., a microeconomist with experience testifying as an economic expert in antitrust cases. (ECF No. 3-1 at 129-133.) Singer's declaration states that "transactional data is the lifeblood of economic analyses presented in all or almost all antitrust cases," and that plaintiffs require the exact data sought in these requests in order to help him in "analyzing the impact of [Varsity's] conduct on prices over time and to quantify the aggregate damages of the proposed Class of Gyms and parents." (Id. at 132.) Fusion Elite's brief uses Singer's exact description of the data he requires to perform his analysis as the description of the data sought in Request Nos. 7 and 21-26, referring to it generally as "transactional data." Compare (ECF No. 3-1 at 129) with (ECF No. 2 at 12.) Rebel makes six arguments as to why the transactional data should not be produced, but the arguments follow three general lines.[8] First, Rebel argues that the underlying protective order in this case is "unavailing and meaningless" and will not adequately protect the confidential business information the subpoena seeks. Second, they argue that the subpoena seeks irrelevant or disproportionate amounts of information. Third, they

---

[8]Rebel also applied these arguments to Request Nos. 3, 5, 6, 8, and 9.

argue that the burden of complying with the subpoena is extreme and expensive. (ECF No. 7 at 12-16.)

a.  Confidentiality

The court may modify a third-party subpoena if it requires "disclosing a trade secret or other confidential research, development, or commercial information." Fed. R. Civ. P. 45(d)(3)(B)(i). Parties seeking to quash a subpoena must "first establish that the information sought is a trade secret and then demonstrate that its disclosure might be harmful." Direct Purchaser Class Plaintiffs v. Apotex Corp., Case No. 16-62492-MC-ZLOCH, 2017 WL 4230124, at *2 (S.D. Fla. May 15, 2017) (quoting Centurion Indus., Inc. v. Warren Steurer and Assocs., 665 F.2d 323, 325 (10th Cir. 1981)). If that burden is met, then the burden shifts to the party seeking the information to establish that it is relevant and necessary, and the court must balance the potential harm against the demonstrated need. Fanning v. Honeywell Aerospace, No. 3-14-1650, 2016 WL 11652957, at *1 (M.D. Tenn. Aug. 12, 2016) (citing Dow Corning Corp. v. JIE XIAO, 283 F.R.D. 353, 354 (E.D. Mich. 2012)); see also Duracell Inc. v. SW Consultants, Inc., 126 F.R.D. 576, 578-79 (N.D. Ga. 1989). "[C]ourts have presumed that disclosure to a competitor is more harmful than disclosure to a noncompetitor." Laborers Pension Trust Fund-Detroit and Vicinity v. CRS Poured Concrete Walls, Inc., No. 04-CV-74714-DT, 2006 WL 3804912, at *7 (E.D. Mich. Dec. 22, 2006)

-12-

(quoting Am. Standard, Inc. v. Pfizer, Inc., 828 F.2d 734, 741 (Fed. Cir. 1987)). In this balancing test, harm is "not the injury that would be caused by public disclosure, but the injury that would result from disclosure under an appropriate protective order." Coca Cola Bottling Co. v. The Coca Cola Co., 107 F.R.D. 288, 293 (D. Del. 1985).

Rebel has shown that the transactional data sought here constitutes highly confidential business information. The declaration of Karen Aldridge, Rebel's founder and CEO, states that the company keeps the transactional data sought in these requests confidential as a matter of course. (ECF No. 8 at 8-9.) Disclosing this information "will undercut Rebel's negotiations and deals with customers and suppliers, and will put Rebel at a severe disadvantage against Varsity[.]" (Id. at 9.) For their part, Fusion Elite agrees that the transactional data is confidential. (ECF No. 9 at 11) (discussing how the transactional data would be produced under the existing Protective Order). However, they note that "no absolute privilege for confidential information or trade secrets exists" and argue that the Protective Order entered in the underlying litigation obviates the risk of harm. (ECF No. 9 at 12) (quoting Monitronics Int'l, Inc. v. Skyline Sec. Mgmt., Inc., No. 16-cv-2716, 2017 WL 7520612, at *3 (N.D. Tex. Oct. 30, 2017)). The Protective Order allows trade secrets or other confidential business information to be designated "Highly Confidential," which

-13-

limits its disclosure to outside counsel, experts who have signed an agreement to be bound by the order, the court, or special masters/third parties who have also agreed to be bound. (ECF No. 77 at 12-13.) Rebel argues that the Protective Order is deficient for two reasons. First, they state that the Protective Order would do nothing to prevent the disclosure of this information at trial. (ECF No. 7 at 22.) Second, they argue that "Rebel has specific and proven reasons to believe that disclosure of Rebel's confidential and sensitive business information to Varsity and [Fusion Elite] will place Rebel at an extreme competitive disadvantage and cause it real, great, and lasting competitive harm." (Id.)

First, Rebel cites cases in which the failure of a Protective Order to cover use at trial played a part in granting a motion to quash. See Duoline Techs. LLC v. Polymer Instrumentation, MO-12-MC-061, 2012 WL 12871906, at *4-5 (W.D. Tex. Nov. 26, 2012); Mannington Mills Inc. v. Armstrong World Indus. Inc., 206 F.R.D. 525, 529 (D. Del. 2002). In those cases, however, the information sought was either also deemed not relevant, Armstrong, 206 F.R.D. at 531-32, or was sought by a direct competitor, Duoline, 2012 WL 12871906, at *5.[9] While Rebel argues that Fusion Elite is their direct competitor, this claim is not supported by the record. The

---

[9]Further, the terms of the Protective Order in Duoline were never stated, making it difficult to assess the protections it did or did not offer.

argument appears to be that Fusion Elite are competitors in the Apparel market simply because they also buy apparel. (ECF No. 12 at 9) ("the subpoenaing/lead Plaintiff admits to recently becoming a player in the "All Star" apparel market who is eager to share with "All Star" gyms her knowledge regarding independent sourcing from China.") However, the declaration Rebel cites for Fusion Elite's supposed admission merely states that Fusion Elite's founder sources some of Fusion Elite's apparel from Chinese manufacturers and has shared their source with others. (ECF No. 10 at 16-17.) Clearly, in this situation, the Chinese manufacturer is the competitor of Rebel, and Fusion Elite is the (potential) customer. To the extent Rebel is concerned about the potential use of confidential business information at trial, the court will ensure that steps will be taken to protect Rebel's as well as other third parties' confidential business records, including for example anonymizing any potential use of this data at trial. Jochims v. Isuzu Motors, Ltd., 151 F.R.D. 338, 341-42 (S.D. Iowa Sept. 16, 1993) (noting that "discovery, often a contentious and difficult process in complex cases, would become even more contentious and expensive, if there was no assurance of continued protection for confidential business information.") (citing Seattle Times Co. v. Rhinehart, 467 U.S. 20, 34 (1984)); see also Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1002 (1984) (public

disclosure of confidential information extinguishes property rights, which works against the public good).

Second, Rebel accuses Fusion Elite of having "misappropriated protected and confidential business information belonging to Rebel, used it in its business, and shared it with Varsity." (ECF No. 7 at 22.) Specifically, Rebel states that they had previously supplied Fusion Elite's uniforms, but that Fusion Elite improperly provided one of their uniform prototypes to Varsity, who developed a uniform based on the prototype's design. (Id.) Fusion Elite disputes this version of events, instead noting that both Rebel's prototype and Varsity's eventual designs were merely based on "the same design inspirations that [they] initially sent Rebel" and that "Varsity never saw or had access to the prototypes delivered by Rebel." (ECF No. 10 at 17.) Regardless of the veracity of these competing allegations, Highly Confidential information cannot be seen by the parties themselves and practically functions as an "Attorney's Eyes Only" designation, which courts have routinely found to be adequate to protect confidential business information subpoenaed in antitrust actions. See In re Novartis & Par Antitrust Litig., No. 2:19-mc-00149, 2019 WL 5722055, at *10 (E.D. Penn. Nov. 5, 2019) (collecting cases). Since the parties will be unable to view or access this data, any concern stemming from these allegations should be assuaged. Given the undersigned's finding that the data sought constitutes highly confidential business

-16-

information, any production ordered would be produced as Highly Confidential. The undersigned finds that the existing Protective Order's Highly Confidential designation is adequate to protect Rebel's transactional data.

### b. Relevance and Necessity

Next, the court must determine if Fusion Elite has shown that the transactional data is sufficiently relevant and necessary to overcome the risk of harm from producing the transactional data as Highly Confidential under the existing Protective Order. See Fanning, 2016 WL 11652957, at *1. "Disclosure of the evidence is considered necessary when the information is required for the movant to prepare its case for trial, which includes proving its theories and rebutting its opponent's theories." Cash Today of Texas, Inc. v. Greenberg, No. Civ.A. 02-MC-77-GMS, 2002 WL 31414138, at *3 (D. Del. Oct. 23, 2002) (quoting Coca Cola, 107 F.R.D. at 293)). Where a party demonstrates relevance and necessity, "discovery is virtually always ordered[.]" Coca Cola, 107 F.R.D. at 293 (collecting cases); see also Apotex Corp., 2017 WL 4230124, at *4 ("Courts faced with analogous situations typically favor limited disclosure.") (collecting cases).

The undersigned finds that Fusion Elite has shown that Rebel's transactional data is both relevant and necessary. Fusion Elite's expert declares that "it is common practice for Plaintiffs in large antitrust cases such as this one to subpoena and receive detailed

-17-

transactional data from third parties to better inform their expert's economic analyses," a statement supported by his CV and a review of the case law. (ECF No. 3-1 at 133); see Novartis, 2019 WL 5722055, at *2-3 (granting discovery of third party transactional data to allow for experts to conduct a "before and after" pricing analysis); Seegert v. Rexall Sundown, Inc., No. 17-cv-01243-JAH(JLB), 2019 WL 12044514, at *8 n.6 (S.D. Cal. Mar. 26, 2019) (noting that plaintiffs had served multiple third party subpoenas searching for sales data in order to establish class damages); Apotex Corp., 2017 WL 4230124, at *2 (granting discovery of third party transactional data to determine effects of defendant's conduct on pricing). Varsity itself has produced transactional data, and Fusion Elite's comparative analyses, necessary to prove damages, require data of similar detail. As Singer notes, "it would *not* be appropriate to receive aggregated or average data over the relevant periods" as this would harm "Plaintiffs' ability to accurately compare prices for like goods over time." (ECF No. 3-1 at 137.) In the next paragraph, Singer states the need clearly: "Plaintiffs' economists' ability to develop an econometric model demonstrating Varsity's impact in the Apparel market depends in part on the availability of high quality, third-party data that was uncontaminated by the challenged conduct." (Id. at 6.)

Rebel admits that they compete in the All Star Apparel market and describes Varsity as their "most powerful competitor." (ECF No. 8 at 9.) Rebel further states that they have had a "greater share of that market than Varsity since at least 2019." (Id. at 6.) As Rebel implicitly concedes in their brief, data demonstrating that Rebel possesses a larger share of the Apparel market is highly relevant to Fusion Elite's claims that Varsity has managed to monopolize that market. (ECF No. 7 at 15) (citing U.S. Dep't of Justice Guide/Report, Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act, 2008 WL 4606679 (2008) (noting that "as a practical matter, a market share greater than fifty percent has been necessary for courts to find the existence of monopoly power.")). Not only does Rebel's transactional data allow Singer to perform his analyses of potential damages, but it could prove to be almost dispositive as to Fusion Elite's claim regarding the Apparel market. Given the significance of the issues in the action, the large amount in controversy, the difficulty in obtaining comparable sales data, and the centrality of the information to an entire subset of Fusion Elite's claims, the undersigned finds that Fusion Elite has demonstrated that the requested transactional data is relevant and necessary, and outweighs the risk of harm in producing this data as "Highly Confidential" under the Protective Order.

Based on the above, the undersigned hereby ORDERS that Rebel produce their transactional data as requested in Request Nos. 23, 24, 25, and 26 as to All Star Apparel goods only. Request Nos. 7, 21, and 22 reach beyond the scope of transactional data, and they are DENIED. All data produced shall be limited to the time period of January 1, 2013 to December 31, 2020, and shall be produced as "Highly Confidential" under the Protective Order.[10] Fusion Elite must take great care in protecting the confidentiality of this information. Rebel and Fusion Elite should work closely together in order to limit costs and produce this data in an efficient manner. At many points in their motion, Fusion Elite expressed a willingness to narrow, modify, or limit their requests based on clarifications or guidance from Rebel regarding how their data is stored, and this production is ordered with that spirit in mind.

Finally, the court orders that the production be completed within twenty-eight days of the entry of this order. This order *does not* extend any other deadlines in this case, including the expert disclosure deadline. Unlike the similar motion filed by

---

[10]This time period matches the start date sought by Fusion Elite and runs until the end of the time period for which Varsity produced their transactional data. This will limit the data produced to that which can be directly compared to Varsity's and will further limit the potential harm from disclosing such data. See In re Mushroom, 2012 WL 298480, at *5 ("BFI provides no explanation as to how the information requested, now between four and fourteen years old, might, in today's marketplace, be used to BFI's detriment by the identified party-competitors.")

movants' against third party Nfinity, the movants' were diligent in filing the present motion against Rebel. However, any requests to extend the expert disclosure deadline would need to be raised through a separate motion.

> 2. Remaining Requests

Fusion Elite's subpoena requests more than just transactional data. See Supra Sec. I. As these requests are unrelated to transactional data, the justification offered by Singer's declaration is inapplicable. Fusion Elite offers little, if any, justification in their motion for these requests, most of which appear to seek documents that would provide Rebel's internal communications and strategies for competing with Varsity. (See e.g., ECF No. 3-1 at 51) ("We would like you to produce, from 2012 through the present, communications: (a) between Rebel and any other entity or person - — such as gym, team, athlete, or IEP - - discussing Varsity and/or USASF[.]"); (ECF No. 3-1 at 52) ("We would like you to produce documents sufficient to identify (a) entities that Rebel considers to be its actual or potential competitors as well as the strengths and weaknesses of those competitors[.])

However, the movants have not explained in their briefing how this type of information is relevant and necessary to proving their antitrust case. For most of these request categories, Fusion Elite merely describes the documents sought and states that "Rebel is

-21-

the sole custodian of these documents, and Plaintiffs are unable to tailor the requests further" due to Rebel's refusal to negotiate. (ECF No. 2 at 12.) In their reply, Fusion Elite merely states that "Documents relating to this lawsuit, discussing topics such as market share in the Apparel Market, Varsity's treatment of rivals such as Rebel, and the connections between the Competition and Apparel markets, are obviously relevant," while focusing the rest of the briefing on the transactional data. (ECF No. 9 at 8.) Conclusory statements such as these do not provide enough justification for imposing such an immense burden of production on a non-party like Rebel. Given the alleged cost of producing the transactional data and lack of justification for these other categories of documents, the court finds that the burden of producing these documents outweighs any benefit they may have to the movants.[11] The remainder of the requests are DENIED.

## C. Costs

Federal Rule of Civil Procedure 45(d)(3)(C)(ii) allows the court to ensure that a subpoenaed party be "reasonably compensated" where a subpoena requires disclosing trade secrets or other

---

[11] In the undersigned's order regarding a similar subpoena in the Nfinity case, the undersigned ordered that documents responsive to some of these requests, unrelated to the transactional data, be produced. Fusion Elite All Stars v. Nfinity Athletic LLC, No. 22-cv-2226-SHL-tmp (W.D. Tenn. Apr. 20, 2022) (ECF No. 17 at 18.) This was largely due to the parties' prior agreement regarding the production of those documents.

confidential business information. Similarly, Rule 45(d)(2)(B)(ii)
requires that any order granting a motion to compel production
from a nonparty protect that nonparty "from significant expense
resulting from compliance." Courts have held that determining who
should bear the costs of a non-party subpoena must be "an
individualized consideration rather than a generalization," so
that it may be determined whether "the cost involved in complying
with the summons in question exceed[s] that which the respondent
may reasonably be expected to bear as a cost of doing business."
E.E.O.C. v. Kronos Inc., 694 F.3d 351, 371 (3d Cir. 2012) (quoting
United States v. Friedman, 532 F.2d 928, 936 (3d Cir. 1976)
(internal quotation marks omitted)). However, "the Advisory
Committee's Notes, commentaries, and the small universe of
decisions applying the Rule appear to intimate" that the party
issuing the subpoena should typically bear the total cost of
compliance. Georgia-Pacific LLC v. American Intern. Specialty
Lines Ins. Co., 278 F.R.D. 187, 190 (S.D. Ohio 2010) (quoting In
re First American Corp., 184 F.R.D. 234, 241 (S.D.N.Y. 1998)).
Factors that courts should consider when determining how to
allocate costs include "whether the nonparty has an interest in
the outcome of the case, whether the nonparty can more readily
bear the costs than the requesting party, and whether the
litigation is of public importance." Linder v. Calero-
Portocarrero, 180 F.R.D. 168, 177 (D.D.C. 1998) (citing In re Exxon

-23-

<u>Valdez</u>, 142 F.R.D. 380, 383 (D.D.C. 1992)). Costs may also include a non-party's legal fees, in order to protect nonparties from being "forced to subsidize an unreasonable share of the costs of a litigation to which they are not a party." <u>In re Automotive Refinishing Paint</u>, 229 F.R.D. 482, 496-97 (E.D. Penn. 2005).

The parties here did not extensively discuss costs or cost shifting in the present motions. Rebel attached a declaration asserting that the cost of compliance would be approximately $100,000, but this figure appears to represent the cost of complying with the entire subpoena rather than the narrower production ordered here. (ECF No. 6-3 at 3.) Under the Federal Rules, the court has a duty to address this issue. The court will decide the exact allocation of costs once the production is complete and after Rebel files a motion with supporting records. Fusion Elite is on notice that the undersigned believes requiring the moving party to shoulder the fees and costs of the production is appropriate given the volume of documents requested and non-party status of Rebel. The parties are advised to act prudently and expeditiously throughout the production process.

### III. CONCLUSION

For the above reasons, Fusion Elite's Motion to Compel is GRANTED in part and DENIED in part and Rebel's Cross-Motion to Quash is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

-24-

s/ Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

April 28, 2022
Date