# Exhibit H

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of Tennessee  ▼

| | |
|---|---|
| Fusion Elite All Stars, et al. | ) |
| *Plaintiff* | ) |
| v. | ) |
| Varsity Brands, LLC, et al. | ) |
| *Defendant* | ) |

Civil Action No. 2:20-cv-02600-SHL-cgc

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:           Bain Capital, LP, 632 Broadway, New York, NY 10012

*(Name of person to whom this subpoena is directed)*

☛ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:   See Schedule A

| Place: Labaton Sucharow LLP<br>140 Broadway, New York, NY 10005 | Date and Time:<br>12/2/2020 9:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

        The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    11/2/2020

| *CLERK OF COURT* | OR | /s Eric L. Cramer |
|---|---|---|
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Fusion Elite All Stars
_____ , who issues or requests this subpoena, are:
Eric L. Cramer, Berger Montague PC, 1818 Market St., Suite 3600, Philadelphia, PA 19103; ecramer@bm.net;
215-875-3009

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 2:20-cv-02600-SHL-cgc

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

Pursuant to the Federal Rules of Civil Procedure, this will serve as a request for the Subpoenaed Party, Bain Capital, LP, to produce the following Documents in the time period required by the attached subpoena:

## DEFINITIONS

1.      The term "Acquisition" means the acquisition of Varsity or some or all of its assets by Bain Capital on or about June 19, 2018. *See* https://www.baincapital.com/news/varsity-brands-leader-elevating-student-experiences-sports-spirit-and-achievement-be-acquired.

2.      The term "All Star" cheerleading means the discipline of cheerleading that involves athletes performing routines composed of tumbling, stunting, pyramids, and dance. It is distinct from traditional school cheerleading (sideline cheering) in that its primary purpose is competition, while school cheer primarily involves crowd leading and other roles associated with generating school spirit.

3.      The term "All Star Apparel" means the clothing (including uniforms), shoes, accessories, or equipment purchased for use by All Star Team athletes at Events and during practices and training.

4.      The term "All Star Athlete" means a cheerleader who is a member of an All Star Team, and includes the parent(s) and/or legal guardian(s) of same.

5.      The term "All Star Event" means an All Star cheerleading competition, including Championships.

6.      The term "All Star Gym" means a cheerleading Gym whose members are Athletes on All Star cheerleading Teams.

7.      The term "All Star Spectator" means a person who attends an All Star Event to watch an All Star Athlete perform.

1

8.      The term "All Star Team" means a cheerleading squad that competes in All Star cheerleading competitions.

9.      The terms "any," "and," and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery all responses which might otherwise be construed to be outside its scope. Each of the following words includes the meaning of every other word: "each," "every," "all," and any." The present tense shall be construed to include the past tense, and the past tense shall be construed to include the present tense.

10.     The term "Apparel" means the clothing (including uniforms), shoes, accessories, or equipment purchased for use by Athletes (whether considered All Star or not) at Events (whether considered All Star or not) and during practices and training.

11.     The term "Ares Capital" means Ares Capital Corporation and its predecessor and successor entities, its officers, directors, shareholders, parent and subsidiary companies (whether direct or indirect), divisions, Employees, agents, attorneys, representatives, and other persons acting or authorized to act on its behalf.

12.     The term "Athlete" means a cheerleader who is a member of an All Star or any other cheerleading Team, and includes the parent(s) and/or legal guardian(s) of same.

13.     The term "Bain" means Bain Capital, LP, its predecessor and successor entities, its officers, directors, shareholders, parent and subsidiary companies (whether direct or indirect), divisions, Employees, agents, attorneys, representatives, and other persons acting or authorized to act on its behalf.

14.     The term "Barclays" means Barclays plc and its predecessor and successor entities, its officers, directors, shareholders, parent and subsidiary companies (whether direct or

2

indirect), divisions, Employees, agents, attorneys, representatives, and other persons acting or authorized to act on its behalf.

15. The term "Championship" means one of three nationally recognized All Star cheerleading championship competitions in the United States: the Cheerleading Worlds, the Summit, and the U.S. Finals.

16. The term "Charlesbank" means Charlesbank Capital Partners and its predecessor and successor entities, its officers, directors, shareholders, parent and subsidiary companies (whether direct or indirect), divisions, Employees, agents, attorneys, representatives, and other persons acting or authorized to act on its behalf.

17. The terms "Communication" and "Communications" are used in the broadest possible sense and mean every conceivable manner or means of disclosure, transfer or exchange of oral or written information between one or more persons or entities and shall include, without limitation, notes, letters, memoranda, e-mails, texts, instant messages, social media posts, social media messages, facsimiles, reports, briefings, telegrams, telexes, or by oral contact by such means as face to face meetings and telephone conversations, or any form of transmittal of information in the form of facts, ideas, inquiries or otherwise. The term "communicate" means to exchange, transfer, or disseminate facts or information, regardless of the means by which it is accomplished.

18. The term "Complaint" means the Consolidated Class Action Complaint, attached as **Exhibit 1**, or any future amended complaint(s) filed in *Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al.*, Case No. 2:20-cv-02600-SHL-cgc (W.D. Tenn.).

19. The terms "concerning," "reflecting," "regarding," and "relating to" are used in the broadest possible sense and mean, in whole or in part, addressing, analyzing, constituting,

3

containing, commenting, in connection with, dealing with, discussing, describing, embodying,

evidencing, identifying, pertaining to, referring to, reporting, stating, or summarizing.

20.     The term "Contract" means any contract, arrangement, or understanding, formal

or informal, oral or written, between two or more persons, together with all modifications or

amendments thereto.

21.     The term "Crescent Mezzanine" means Crescent Capital Group LP and its

predecessor and successor entities, its officers, directors, shareholders, parent and subsidiary

companies (whether direct or indirect), divisions, Employees, agents, attorneys, representatives,

and other persons acting or authorized to act on its behalf.

22.     The term "Defendants" means Varsity Brands, LLC, Varsity Spirit, LLC, and

Varsity Spirit Fashion & Supplies, LLC, and U.S. All Star Federation, Inc.

23.     The terms "Document" and "Documents" are used in the broadest sense allowable

under Rule 45 of the Federal Rules of Civil Procedure, including any written, printed, typed,

photocopied, photographed, recorded or otherwise reproduced or store communication or

representation, whether comprised of letters, words, numbers, data, pictures, sounds or symbols,

or any combination thereof. It includes notes, letters, memoranda, e-mails, texts, instant

messages, social media posts, facsimiles, reports, briefings, telegrams, telexes, records,

envelopes, messages, studies, analyses, contracts, agreements, working papers, accounts,

analytical records, reports and/or summaries of investigations, press releases, comparisons,

books, calendars, diaries, articles, magazines, newspapers, booklets, brochures, pamphlets,

circulars, bulletins, notices, questionnaires, surveys, drawings, diagrams, instructions, notes of

meetings or communications, questionnaires, surveys, charts, graphs, photographs, films, tapes,

disks, data cells, print-outs of information store or maintained by electronic data processing or

work processing equipment, all other data compilations from which information can be obtained including without limitation optical storage media such as CDs, DVDs, memory sticks, floppy disks, hard disks, and magnetic tapes. The term "Document" also means every copy of a Document where such copy is not an identical duplicate of the original.

24.     The term "Due Diligence" means any appraisals and/or analyses undertaken to establish the assets, liabilities, and commercial potential of a firm, corporation, or entity.

25.     The term "Employee" means, without limitation, any current or former officer, director, executive, manager, board member, secretary, staff member, consultant, messenger, or agent.

26.     The term "Event" means a cheerleading competition whether considered All Star cheerleading or not.

27.     The term "Goldman Sachs" means The Goldman Sachs Group, Inc., its predecessor and successor entities, its officers, directors, shareholders, parent and subsidiary companies (whether direct or indirect), divisions, Employees, agents, attorneys, representatives, and other persons acting or authorized to act on its behalf.

28.     The term "Goodwin Procter" means Goodwin Procter LLP, its predecessor and successor entities, its officers, directors, shareholders, parent and subsidiary companies (whether direct or indirect), divisions, Employees, agents, attorneys, representatives, and other persons acting or authorized to act on its behalf.

29.     The term "Gym" means a cheerleading Gym whose members are Athletes on cheerleading Teams whether considered All Star or not.

30.     The term "including" means including but not limited to.

31.     The term "Independent Event Producers" or "IEPs" means producers not wholly or partially owned by Varsity or USASF.

32.     The term "Jefferies" means Jefferies LLC, its predecessor and successor entities, its officers, directors, shareholders, parent and subsidiary companies (whether direct or indirect), divisions, Employees, agents, attorneys, representatives, and other persons acting or authorized to act on its behalf.

33.     The term "Kirkland & Ellis" means Kirkland & Ellis LLP, its predecessor and successor entities, its officers, directors, shareholders, parent and subsidiary companies (whether direct or indirect), divisions, Employees, agents, attorneys, representatives, and other persons acting or authorized to act on its behalf.

34.     The term "Offer" means (i) any proposal or expression of interest concerning any acquisition, merger, consolidation, share exchange, business combination, or other similar transaction or series of related transactions involving, in part, Varsity or any subsidiary of Varsity, or (ii) any offer to purchase, tender offer, exchange offer, or any similar transaction or series of related transactions made by any person involving 5% or more of the outstanding shares of any class of Varsity stock or securities.

35.     The term "Partners Group" means Partners Group AG and its predecessor and successor entities, its officers, directors, shareholders, parent and subsidiary companies (whether direct or indirect), divisions, Employees, agents, attorneys, representatives, and other persons acting or authorized to act on its behalf.

36.     The term "PJ Solomon" means PJ Solomon, its predecessor and successor entities, its officers, directors, shareholders, parent and subsidiary companies (whether direct or

6

indirect), divisions, Employees, agents, attorneys, representatives, and other persons acting or
authorized to act on its behalf.

37.    The term "Plaintiffs" means Fusion Elite All Stars, Spirit Factor LLC d/b/a Fuel
Athletics, Stars and Stripes Gymnastics Academy Inc. d/b/a Stars and Stripes Kids Activity
Center, Kathryn Anne Radek, Lauren Hayes, and Janine Cherasaro.

38.    The term "price" means the sum or amount of money or its equivalent for which
anything is bought sold, or offered for sale as well as monetary values or rates, price increases or
decreases, retail prices, wholesale prices, transfer prices, exchange prices, markups, profit
margins, discounts, rebates, promotions, or promotional allowances, and all related costs or
charges.

39.    The term "PricewaterhouseCoopers" or "PwC" means PricewaterhouseCoopers
International Limited, its predecessor and successor entities, its officers, directors, shareholders,
parent and subsidiary companies (whether direct or indirect), divisions, Employees, agents,
attorneys, representatives, and other persons acting or authorized to act on its behalf.

40.    The term "Spectator" means a person who attends a cheerleading Event to watch
the Athletes perform whether considered All Star or not.

41.    The term "Team" means a cheerleading squad that competes in cheerleading
competitions whether considered All Star or not.

42.    The term "USA Cheer" means the USA Federation for Sport Cheering, its
predecessor and successor entities, its officers, directors, shareholders, parent and subsidiary
companies (whether direct or indirect), divisions, Employees, agents, attorneys, representatives,
and other persons acting or authorized to act on its behalf.

7

43.     The term "USASF" means defendant U.S. All Star Federation, Inc., its predecessor and successor entities, its officers, directors, shareholders, parent and subsidiary companies (whether direct or indirect), divisions, Employees, agents, attorneys, representatives, and other persons acting or authorized to act on its behalf.

44.     The terms "Varsity" or "Varsity Defendants" mean Defendants Varsity Brands, LLC, Varsity Spirit, LLC, and Varsity Spirit Fashion & Supplies, LLC, each of their predecessor and successor entities, officers, directors, shareholders, parent and subsidiary companies (whether direct or indirect), divisions, Employees, agents, attorneys, representatives, and other persons acting or authorized to act on their behalf.

45.     The terms "You," "Your," or "Your Company" means the persons or entities upon whom these Requests for Productions were served; for an entity, each of its predecessors, successors, parents, divisions, subsidiaries, and affiliates, each other entity directly or indirectly, wholly or in part, owned or controlled by it, and each partnership or joint venture to which any of them is a party; and all present and former directors, officers, Employees, agents, consultants, or other persons acting for or on behalf of any of them.

## **INSTRUCTIONS**

1.     The Definitions above are provided only for purposes of discovery, in conformance with Rule 45 of the Federal Rules of Civil Procedure and are not intended to be used for any purpose other than discovery. Plaintiffs reserve the right to modify these Definitions or utilize different Definitions for any other purpose.

2.     The terms defined above and the individual requests for production and inspection are to be construed broadly to the fullest extent of their meaning in a good faith effort to comply with the Federal Rules of Civil Procedure.

8

3.      All words not defined in the Definitions shall be construed using their plain and ordinary meaning. If more than one meaning can be ascribed to a word, the meaning that would make a Document be covered by the requests for production should be used, unless You provide written notice of the specific ambiguity and state the definition of the word used to exclude the Document from the scope of the request.

4.      In answering and responding to these requests, You shall furnish such information and Documents in Your possession, custody or control, including information that is in the possession, custody or control of Your agents, consultants, accountants, investigators, and (subject to any otherwise applicable privileges) attorneys.

5.      Each request herein shall be construed independently. No request shall be construed by reference to any other request for the purpose of limiting the scope of the answers to such request.

6.      All headings set forth within the numbered requests below are for continuity only and shall not be deemed to control or affect the meaning or construction of any request.

7.      Where the context in a request makes it appropriate, each singular word shall include its plural and each plural word shall include its singular.

8.      Your obligation to respond to these requests is a continuing one. If, after responding to these requests, You obtain or become aware of any new or additional information pertaining to a request contained herein, You must supplement Your answer in accordance with Federal Rules of Civil Procedure 26 and 34.

9.      You are to produce entire Documents including all attachments, cover letters, memoranda, and appendices, as well as the file, folder tabs, and labels appended to or containing any Documents. Copies which differ from the original (because, by way of example only,

handwritten or printed notations have been added) should be produced separately. Each

Document requested herein must be produced in its entirety and without deletion, abbreviation,

redaction, expurgation, or excisions, regardless of whether You consider the entire Document to

be relevant or responsive. The use or disclosure of Documents produced in response to these

requests is subject to the limitations set forth in the Stipulated Protective Order, attached as

**Exhibit 2**, and the Stipulation Regarding Production of Electronically Stored Information ("ESI

Protocol"), attached as **Exhibit 3**. Accordingly, redaction of Documents to preserve

confidentiality is unnecessary and production of Documents that have been redacted for purposes

of production in response to these requests will not constitute compliance with these requests. If

any part of a Document is responsive to any request, the whole Document is to be produced.

10.     You are requested to produce any and all electronically stored information in the

manner required by the ESI Protocol. Unless otherwise limited by the ESI Protocol, pursuant to

Federal Rules of Civil Procedure 45 electronically stored information should be produced in

native format (including metadata) whenever possible.

11.     Documents and other things not otherwise responsive to a request shall be

produced if such materials mention, discuss, refer to, or explain the materials called for by a

request, or if such materials are attached to materials called for by a request and constitute (e.g.,

routing slips, transmittal emails, transmittal memoranda, letters, cover letters, comments,

evaluations, or similar materials). This includes Documents sufficient to explain the meaning of

any data responsive to any of the below requests, including all record layouts, data dictionaries,

field codes, and other codes or descriptions.

12.     Any alteration of a responsive Document, including any marginal notes,

handwritten notes, underlining, date stamps, received stamps, endorsed or filed stamps, drafts,

revisions, modifications and other versions of a final Document is a separate and distinct

Document and it must be produced.

13.     If there are no Documents or other things responsive to any particular request,

Your response shall state so in writing.

14.     If any Document is withheld, in whole or in part, due to a claim of privilege of

any kind, provide a privilege log that sets forth separately with respect to each Document: (a) the

nature of the privilege or ground of confidentiality claimed; (b) the author(s) of the Document

(designating which, if any, are attorneys); (c) the title of the Documents (or subject line if the

Document in an email); (d) the recipient(s) of the Document, including all persons who received

copies of the Document (designating which, if any, are attorneys); (e) a description of the

Document (or redacted portion of the Document) as set forth in Rule 26(b)(5)(A)(ii) of the

Federal Rules of Civil Procedure; (f) the Bates range of the Document; and (g) the privilege log

reference number. Any privilege log or list is to be produced in an Excel spreadsheet or other

format capable of electronic sorting.

15.     Unless otherwise noted herein, the relevant time period for these Requests is June

19, 2014 to the present (the "Relevant Time Period"). These Requests seek all responsive

Documents created or generated during the Relevant Time Period, as well as responsive

Documents created or generated outside the Relevant Time Period, but which contain

information concerning the Relevant Time Period.

16.     To the extent that You contend that Documents responsive to a particular request

were previously produced to the Federal Trade Commission, Securities and Exchange

Commission, Department of Justice, a state attorney general, or any other governmental agency,

or as part of any other litigation, identify the specific request in any particular request for

Documents, in response to which You produced such Documents and explain how You searched for Documents and produced them in response to such request for Documents, including by producing a list of the search terms used to identify Documents responsive to the applicable request for Documents, the relevant time period searched, and the custodians whose files were searched.

17.    In the event that any Document or other thing responsive to these requests has been lost, discarded, or destroyed, that Document or other thing is to be identified by stating as completely as possible: (a) the authors or creators of the material, (b) all persons who received copies of the material, including any indicated and blind copy recipients, (c) the present custodian of the material, (d) the date of the material, (e) the material's date of destruction or discard, manner of destruction or discard, and the reason for destruction or discard, and (f) the persons authorizing and carrying out such destruction or discard.

18.    If You have any good faith objections to any request or any part thereof, the specific nature of the objection and whether it applies to the entire request or to a part of the request shall be stated in accordance with Rule 45 of the Federal Rules of Civil Procedure. If there is an objection to any part of a request, then the part objected to should be identified and Documents and other things responsive to the remaining unobjectionable part should be timely produced. Further, if You object to part of a request, You must state the basis of Your objections in accordance with Rule 45.

19.    Each production shall be submitted with a transmittal letter that includes the case caption; production volume name; encryption method/software used; and passwords for any password protected files.

## REQUESTS FOR PRODUCTION

### I.   BAIN'S ACQUISITION OF VARSITY

**REQUEST NO. 1:**   All Documents reflecting Communications regarding any Offer (including, without limitation, the Acquisition) or any efforts which could result in an Offer, including between and among You, Charlesbank, Partners Group, Ares Capital, Barclays, Crescent Mezzanine, Goldman Sachs, Goodwin Procter, Jefferies, Kirkland & Ellis, PJ Solomon, PwC, Varsity, and/or anyone else.

**REQUEST NO. 2:**   All Documents created or sent by You or by or on behalf of Varsity, Charlesbank, or Partners Group, or received by You from any other person or entity, regarding any actual or potential Offer (including, without limitation, the Acquisition) or any efforts which You believe could have resulted in an Offer.

**REQUEST NO. 3:**   All Documents reflecting or relating to any agreements or Contracts entered into by You, Charlesbank, Partners Group, and/or Varsity regarding any actual or potential Offer (including, without limitation, the Acquisition), including Documents reflecting or relating to (a) the negotiations preceding such agreements, (b) Communications regarding such agreements, and (c) any draft or final Contracts, written agreements, or memoranda of understanding between Bain, Charlesbank, Partners Group, and/or Varsity.

**REQUEST NO. 4:**   All Documents referencing or relating to any other agreements or Contracts (and any amendments thereto) entered into between (a) You and Varsity, and (b) You and any Varsity Employees, agents, shareholders, executives, equity holders, or debt holders.

**REQUEST NO. 5:**   Documents sufficient to Identify each of Your Employees or agents involved in approving or negotiating the terms of any agreement produced in response to Request Nos. 3 or 4.

**REQUEST NO. 6:**    All Documents regarding any presentations made by, on behalf of, or to any potential acquirer, financial advisor, financial institution, accounting firm, investment banking firm, appraiser, tax advisor, law firm, consultant, advisor or accountant concerning any Offer (including, without limitation, the Acquisition).

**REQUEST NO. 7:**    All Documents given to or otherwise made available to potential purchasers or acquirers of Varsity regarding the purchase or sale of some or all of Varsity (including any and all bankers' presentation books and any and all documents included in a data room, whether real or virtual).

**REQUEST NO. 8:**    All financial Due Diligence Documents regarding any actual or potential Offer (including, without limitation, the Acquisition), including any Due Diligence requests made by You to Charlesbank, Partners Group, Varsity, USASF, and/or USA Cheer concerning any actual or potential Offer (including, but not limited to, the Acquisition) and any Documents discussing or relating to such requests or the responses received thereto. Responsive Documents include all Documents reflecting or relating to financial data, summaries, financial, SWOT or other analyses, white papers, slide decks, or other Due Diligence files regarding any actual or potential Offer as well as Documents discussing, referring to, or describing the methodology used by Bain, or any advisor or accountant acting on behalf of Bain, when conducting its Due Diligence review of Varsity, USASF, and/or USA Cheer.

## II.    VARSITY'S BUSINESS AND FINANCIALS

**REQUEST NO. 9:**    All appraisals, analyses, opinions, reviews, statements, financial analysts' reports and rating agencies' reports, including all drafts thereof, or other Documents relating to the business of Varsity, USASF, and/or USA Cheer.

14

**REQUEST NO. 10:**  All Documents reflecting or relating to valuations, estimates of value, or projections of potential value for Varsity, USASF, and/or USA Cheer prepared by, for, or on behalf of Bain.

**REQUEST NO. 11:**  Documents and data in as granular form as it is maintained, including by transaction or receipt, broken down by Gym, Team, Spectator, and Athlete, and itemized by relevant categories (price, item code, applicable rebates or discounts, amount purchased, basis for rebate or discount), including date, reflecting all sales of all products and services by Varsity, USASF, and/or USA Cheer.

**REQUEST NO. 12:**  All historical and current budgets and projections, including sales projections, and cost of sales, relating to Varsity, USASF, and/or USA Cheer, including all Documents reflecting assumptions underlying any financial analyses or projections concerning Varsity, USASF, and/or USA Cheer.

**REQUEST NO. 13:**  All Documents reflecting or relating to Varsity's historical, current, and future revenues, costs, losses, and profitability, including all financial statements relating to Varsity, USASF, and/or USA Cheer.

**REQUEST NO. 14:**  All Documents reflecting, relating to, or concerning contracts or sales arrangements or proposals known in sum or substance as the Family Plan or Network Agreement, discussed at Paragraphs 170 to 185 of the Complaint, including all Documents reflecting, relating to, or concerning studies, analyses, memoranda, slide decks, white papers, or other Documents referencing or relating to the effects of the Network Agreement, Family Plan, or pricing more generally on:

      a.   Varsity's profitability;

b.   Varsity's ability to compete with Independent Event Producers, sellers of

Apparel, or any other persons or entities;

c.   Varsity's ability to attract Gyms or Athletes to attend Varsity Events or to buy

your Apparel or to purchase any other product or service from Varsity;

d.   Varsity's prices, fees, rebates, discounts, or other terms of sale; or

e.   Any actual or potential competitor and that competitor's ability to compete with

Varsity in producing Events or selling Apparel or engaging in any other line of

business.

**REQUEST NO. 15:**   All Documents, including those concerning any corporate practice,

policy or strategy regarding acquisitions by Varsity of Independent Event Producers, Apparel

manufacturers, Gyms, and any other entities, relating to actual or contemplated acquisitions by

You and/or Varsity of Independent Event Producers, including the JAM Brands, Apparel

manufacturers and sellers, Gyms, and/or other cheerleading related entities, including the

National Spirit Group or the National All Star Cheerleading Coaches Congress (NACCC),

including all Documents reflecting Your analyses of the effects of Varsity acquisitions on

Varsity's alleged competitors, prices or fees for goods or services that Varsity sells or provides,

and the sales and revenues of Varsity and those entities with which Varsity competes.

**REQUEST NO. 16:**   Documents sufficient to show the effect of Varsity's acquisition of

Independent Event Producers, Apparel manufacturers, Gyms, and any other entities on prices or

fees for Varsity's Events, Apparel, or other goods or services Varsity sells.

**REQUEST NO. 17:**   All Documents created, produced, published or issued by Bain or

third party analysts or consultants regarding Varsity and the All Star industry, including without

limitation, reports that analyze or project demand, revenues, income, profits or market share

16

derived from or relating to All Star or other cheerleading competitions, and All Star or other cheerleading Apparel.

**REQUEST NO. 18:**  Documents sufficient to Identify each person or entity You consider to be, or considered to have been, an actual or potential competitor of Varsity in in producing Events, selling Apparel, or in any other line of Varsity's business, including:

      a.  All Documents analyzing, discussing, or relating to the competitive strengths or weaknesses of Varsity's actual or potential competitors;

      b.  For each year in the Relevant Time Period, Documents sufficient to identify, for Varsity and each of its actual or potential competitors in each market in which Varsity competes, the market shares of each, measured as a percentage of total sales in dollars;

      c.  All Documents and data referencing or relating to the determination of prices and fees charged by Varsity or its competitors for: (i) attendance or participation at Events; (ii) sale of Apparel; or (iii) any other good or service provided by Varsity; and

      d.  All Documents discussing the business models or other aspects of actual or potential competitors of Varsity in all markets in which Varsity competes, including any Documents reflecting comparisons of prices or fees charged by Varsity relative to actual or potential competitors, marketing strategies, or sponsorship.

## III.   MISCELLANEOUS

**REQUEST NO. 19:**  All Documents reflecting or relating to analyses, studies, or risk assessments of insurance or insurance policies relating to coverage for allegations or litigation

related to sexual misconduct involving Varsity, USASF, and/or USA Cheer or antitrust violations

by You, Varsity, USASF, and/or USA Cheer.

**REQUEST NO. 20:**  All promotional Documents, public statements, announcements,

disclosures, or press releases issued by Bain relating to Varsity, USASF, and/or USA Cheer.

**REQUEST NO. 21:**  All Documents reflecting Communications between Bain's current

and/or former Employees and agents and any of Charlesbank's, Partners Group's, Varsity's,

USASF's, and/or USA Cheers' Employees or agents.

**REQUEST NO. 22:**  Irrespective of time period, all Documents related to or provided

by You to the Federal Trade Commission, Securities and Exchange Commission, Department of

Justice, a state attorney general, or any other governmental agency regarding Varsity, USASF,

and/or USA Cheer, as well as all such requests that prompted the provision by You of those

Documents.

**REQUEST NO. 23:**  Irrespective of time period, all Documents and Communications

received or sent by Bain's current and/or former Employees or agents related to investigations by

the Federal Trade Commission, Securities and Exchange Commission, Department of Justice, a

state attorney general, or any other governmental agency regarding Varsity, USASF, and/or USA

Cheer.

**REQUEST NO. 24:**  All Documents reflecting or relating to Your policies, practices,

guidelines, and training directed to compliance with the antitrust or competition laws of the

United States, of any state of the United States, the District of Columbia, or any foreign country,

including all Documents concerning the creation of such policies, and any statements signed by

Your Employees or agents acknowledging their receipt of or compliance with Your antitrust

compliance policies.

18

**REQUEST NO. 25:**  Documents sufficient to reveal Bain's policy or practice

concerning the retention, destruction, disposal, or preservation of Documents.

Dated: November 2, 2020                 By:   /s Eric L. Cramer

                                    H. Laddie Montague, Jr.*
                                    Eric L. Cramer*
                                    Mark R. Suter*
                                    **BERGER MONTAGUE PC**
                                    1818 Market Street, Suite 3600
                                    Philadelphia, PA 19106
                                    Telephone: (215) 875-3000
                                    hlmontague@bm.net
                                    ecramer@bm.net
                                    msuter@bm.net

                                    Jonathan W. Cuneo*
                                    Katherine Van Dyck*
                                    Victoria Sims*
                                    **CUNEO GILBERT & LADUCA LLP**
                                    4725 Wisconsin Avenue NW, Suite 200
                                    Washington, DC 20016
                                    Tel: (202) 789-3960
                                    jonc@cuneolaw.com
                                    kvandyc@cuneolaw.com
                                    vicky@cuneolaw.com

                                    Gregory S. Asciolla*
                                    Karin E. Garvey*
                                    Veronica Bosco*
                                    Ethan H. Kaminsky*
                                    **LABATON SUCHAROW LLP**
                                    140 Broadway
                                    New York, NY 10005
                                    Telephone: (212) 907-0700
                                    gasciolla@labaton.com
                                    kgarvey@labaton.com
                                    vbosco@labaton.com
                                    ekaminsky@labaton.com

                                    *Interim Co-Lead Counsel for the Proposed
                                    Direct Purchaser Class*

19

J. Gerard Stranch, IV (TN BPR #23045)
Benjamin A. Gastel (TN BPR #28699)
**BRANSTETTER, STRANCH & JENNINGS, PLLC**
223 Rosa Parks Ave. Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
gerards@bsjfirm.com
beng@bsjfirm.com

*Liaison Counsel for Plaintiffs and the Proposed Direct Purchaser Class*

Benjamin D. Elga**
**JUSTICE CATALYST LAW, INC.**
81 Prospect Street
Brooklyn, NY 11201
Tel: (518) 732-6703
belga@justicecatalyst.org

Brian Shearer**
Craig L. Briskin**
**JUSTICE CATALYST LAW, INC.**
718 7th Street NW
Washington, DC 20001
Tel: (518) 732-6703
brianshearer@justicecatalyst.org
cbriskin@justicecatalyst.org

Roberta D. Liebenberg**
Jeffrey S. Istvan**
Mary L. Russell*
**FINE KAPLAN AND BLACK, R.P.C**
One South Broad St., 23rd Floor
Philadelphia PA 19107
Tel: (215) 567-6565
rliebenberg@finekaplan.com
jistvan@finekaplan.com
mrussell@finekaplan.com

Nathan A. Bicks (TN BPR #10903)
Frank B. Thacher III (TN BPR #23925)
**BURCH, PORTER, & JOHNSON, PLLC**
130 North Court Ave.
Memphis, TN 38103
Telephone: (901) 524-5000

nbicks@bpjlaw.com
fthacher@bpjlaw.com

Aubrey B. Harwell, Jr. (TN BPR #002559)
Charles Barrett (TN BPR #020627)
Aubrey B. Harwell III (TN BPR #017394)
**NEAL & HARWELL, PLC**
1201 Demonbreun St., Suite 1000
Nashville, TN 37203
Telephone: (615) 244-1713
aharwell@nealharwell.com
cbarrett@nealharwell.com
tharwell@nealharwell.com

*Additional Counsel for Plaintiffs and the
Proposed Direct Purchaser Class*

\* Admitted pro hac vice
\*\* Pro hac vice application forthcoming

# Exhibit 1

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE

FUSION ELITE ALL STARS, et al.,

                        Plaintiffs,

v.

VARSITY BRANDS, LLC, et al.,

                        Defendants.

Case No. 2:20-cv-02600-SHL-cgc

Judge Sheryl H. Lipman
Magistrate Judge Charmiane G. Claxton

**CONSOLIDATED COMPLAINT
CLASS ACTION**

**JURY TRIAL DEMANDED**

## <u>TABLE OF CONTENTS</u>

I.     NATURE OF THE ACTION ........................................................................1

II.    JURISDICTION AND VENUE ................................................................8

III.   PARTIES ..................................................................................................9

IV.   CLASS ALLEGATIONS .......................................................................13

V.    AGENTS & CO-CONSPIRATORS .......................................................16

VI.   INTERSTATE TRADE & COMMERCE .................................................17

VII.  FACTUAL ALLEGATIONS ...................................................................18

     A.    History & Background..................................................................18

     B.    All Star Cheer's "Governing" Bodies .........................................21

     C.    All Star Competitions ..................................................................23

     D.    All Star Championships ...............................................................25

          1.    The Worlds...................................................................25

          2.    The Summit..................................................................26

          3.    The U.S. Finals ...........................................................27

     E.    All Star Apparel ..........................................................................27

     F.    Varsity's Monopoly Power in the Two Relevant Antitrust Markets ...................29

          1.    Monopoly Power in the All Star Competition Market (the Primary Market)...................................................29

              a.    The Relevant All Star Competition Market ...................29

              b.    The Relevant Geographic Market...................................33

              c.    Varsity Has Monopoly Power as a Dominant Supplier in the All Star Competition Market...................................33

              d.    Barriers to Entry............................................................34

                    i.    Natural Barriers to Entry...................................35

                    ii.    Barriers Created by the Exclusionary Scheme..................35

2. Monopoly Power in the All Star Apparel Market (the Ancillary Market)...................................................................................36

    a. The Relevant All Star Apparel Market .........................................36

    b. The Relevant Geographic Market .................................................37

    c. Varsity Has Monopoly Power with Respect to Sales of All Star Apparel .............................................................................37

    d. Barriers to Entry.............................................................................38

        i. Natural Barriers to Entry...................................................38

        ii. Barriers to Entry Imposed Through the Exclusionary Scheme........................................................38

G. Varsity's Continuing Exclusionary Scheme to Maintain and Enhance Monopoly Power in the Primary and Ancillary Relevant Markets.......................39

    1. Acquisitions of Rivals.................................................................................39

        a. Varsity Acquired The JAM Brands ...............................................40

        b. Varsity Acquired Spirit Celebrations.............................................41

        c. Varsity Acquired Epic Brands .......................................................42

        d. Varsity Solidified Its Control.........................................................42

    2. Varsity Leverages Its Monopoly Power to Impose Exclusionary Contracts and Anticompetitive Loyalty Programs on All Star Gyms........43

        a. The Network Agreement Is an Exclusionary Contract .................44

        b. The Family Plan Is an Anticompetitive Loyalty Rebate Program...........................................................................45

    3. Varsity Leverages Its Monopoly Power in the All Star Competition Market to Control the All Star Apparel Market.......................................46

    4. Varsity's Use and Control of Governing Bodies .....................................49

        a. Varsity Controls the USASF..........................................................49

        b. Defendant USASF Limits Which All Star Competition Producers Can Award Bids to All Star Championships ...............51

c.     USASF and Varsity Use and Create Rules to Foreclose Rivals ........................................................................53

d.     Varsity Leverages Its Control of Defendant USASF to Exert Control Over All Star Teams' Competition Schedules ........53

H.    The Exclusionary Scheme Foreclosed Competition in the Primary and Ancillary Relevant Markets ........................................................56

I.    The Exclusionary Scheme Caused Plaintiffs and Members of the Class to Suffer Antitrust Injury and Damages ..................................57

J.    The Exclusionary Scheme Caused Anticompetitive Effects in Both Relevant Markets with No Offsetting Procompetitive Efficiencies .......57

VIII.   CLAIMS FOR RELIEF ..............................................................59

COUNT I MONOPOLIZATION 15 U.S.C. § 2 (On Behalf of Plaintiffs and the Class and Against Varsity) ......................................................59

COUNT II CONSPIRACY TO MONOPOLIZE 15 U.S.C. § 2 (On Behalf of Plaintiffs and the Class and Against Varsity and USASF) .................60

IX.    JURY TRIAL DEMANDED .......................................................62

PRAYER FOR RELIEF ..........................................................62

Plaintiffs Fusion Elite All Stars, Spirit Factor LLC d/b/a Fuel Athletics, Stars and Stripes Gymnastics Academy Inc. d/b/a Stars and Stripes Kids Activity Center, Kathryn Anne Radek, Lauren Hayes, and Janine Cherasaro (collectively, "Plaintiffs") file this action, individually on behalf of themselves and as a class action on behalf of all others similarly situated, against Defendants Varsity Brands, LLC ("Varsity Brands"), Varsity Spirit, LLC ("Varsity Spirit"), Varsity Spirit Fashion & Supplies, LLC ("Varsity Fashion") (collectively, "Varsity"),[1] and Defendant U.S. All Star Federation, Inc. ("USASF") (Varsity and USASF together, "Defendants") for damages, injunctive relief, and any and all other relief that is available pursuant to federal antitrust laws.

Plaintiffs' allegations are based on personal knowledge as to Plaintiffs and Plaintiffs' own actions and upon facts emanating from the investigation conducted by and under the supervision of the undersigned counsel.

Plaintiffs demand a trial by jury on all issues so triable and complain and allege as follows:

## I.     NATURE OF THE ACTION

1.      Cheerleading is a multi-billion-dollar sport with over 4 million participating child and student athletes nationwide.

2.      Varsity was founded by Jeffrey Webb in 1974. It has—through an anticompetitive scheme consisting of a series of intentional and methodical business maneuvers implemented in combination with the USASF—gained and maintained significant control of every aspect of "All Star Cheer," a specialized form of competitive cheerleading.

3.      All Star Cheer is an elite, competitive type of cheerleading. The USA Federation for Sport Cheering ("USA Cheer"), the national governing body for cheerleading in the United States,[2] defines "All Star Cheer" as follows:

---

[1] Varsity Brands is the parent company of Varsity Spirit and Varsity Fashion. Though these defendants are three separate corporate entities, they share a single corporate headquarters and hold themselves out to the public as a single entity.

[2] https://www.usacheer.org/about.

1

All Star Cheer is a discipline of cheer that involves athletes performing a 2 1/2 minute routine composed of tumbling, stunting, pyramids, [and] dance.

All Star Cheer differs from traditional school cheerleading [sideline cheering] in that its primary purpose is competition, while school cheer involves crowd leading and other school roles as well as the option for competition. All Star cheer teams are most often organized and based out of a club and have teams who are open to all area athletes.[3]

4.      All Star Cheer is distinct from "sideline cheerleading." Whereas in sideline cheerleading, the cheerleaders cheer to support a team playing another sport—football or basketball, most commonly—the sole focus of All Star Cheer is cheerleading itself, particularly the gymnastic and acrobatic elements of cheerleading; there is no other sporting event happening on the field. "All Star Teams" are cheerleading squads that compete in All Star Cheer.

5.      All Star Cheer is a notoriously expensive team sport. A single season costs between $3,000 and $6,000 per All Star Team member.

6.      All Star Teams are fielded through privately owned and operated businesses ("All Star Gyms" or "Gyms") that organize training and practices. All Star Team membership is not conditioned on or related to enrollment in any particular school. All Star Gyms coordinate the All Star Teams' participation in "All Star Competitions"[4]—paying registration fees, organizing schedules and logistics, and purchasing their All Star Apparel.[5] All Star Team members ("All Star Cheerleaders") are highly skilled athletes who perform difficult and potentially dangerous gymnastic and acrobatic stunts. Team membership is highly coveted and competitive.

7.      All Star Competitions are events produced and promoted specifically for the All Star Teams and their spectators. Competitions are extremely important to success in All Star Cheer. For athletes, winning competitions is the goal: it is the gateway to championships, glory,

---

[3] https://www.usacheer.org/allstar.

[4] "All Star Competitions" are events at which several All Star Teams compete against each other—above the "recreational" level—in the choreographed performance of routines comprised of combinations of stunts, pyramids, dismounts, tosses, and/or tumbling.

[5] "All Star Apparel" includes clothing, shoes, accessories, and equipment purchased for use by All Star Cheerleaders at All Star Competitions and during All Star Team practices and training.

and university scholarships. For All Star Gyms, athlete recruitment and retention depend on their ability to win All Star Competitions. For event producers, team attendance at their All Star Competitions is how the producers earn revenues. For Varsity, control of the All Star Competition Market allows it to extract monopoly rents from members of the Class in many ways.

8.     Plaintiffs claim that the conduct described herein violated, and continues to violate, Section 2 of the Sherman Antitrust Act, and that they and the members of the proposed Class were injured, and continue to be injured, by paying artificially inflated prices directly to Varsity for All Star Competitions and All Star Apparel. Plaintiffs seek equitable relief to stop Defendants' continuing anticompetitive conduct and money damages for injuries they incurred by paying artificially inflated prices to Varsity as a result of the anticompetitive conduct as alleged herein.

9.     Over the past 15 years, Varsity has, in combination with USASF, acquired, enhanced, and maintained monopoly power in the All Star Competition Market (the "primary market") and the All Star Apparel Market (the "ancillary market") (collectively, the "Relevant Markets") in the United States through an unlawful scheme (the "Scheme," the "Exclusionary Scheme," or the "Challenged Conduct") consisting of exploiting its substantial market power in the Relevant Markets to, without limitation:

(a)     impair and then buy up any actual or potential rivals that could possibly threaten Varsity's dominance in the Relevant Markets, including acquisitions of Varsity's biggest All Star Competition Market competitors (and many of its smaller rivals) as well as several All Star Apparel Market competitors;

(b)     deploy its monopoly power in the primary All Star Competition Market to impose exclusionary agreements or terms on All Star Gyms, causing Gyms to agree, on their own behalf and on behalf of their members, to patronize Varsity exclusively (or nearly exclusively) in the primary All Star Competition Market as well as in the ancillary All Star Apparel Market. These agreements or terms (i) directly require the largest, highest sale volume All Star Gyms with the top Cheerleaders and Teams—necessary to put on successful All Star Competitions—to purchase All Star Apparel exclusively from Varsity

3

and to fill the limited number of events comprising their competition seasons with Varsity's All Star Competitions, to the exclusion of other All Star Competition and All Star Apparel companies; and (ii) condition the avoidance of paying penalty prices for goods and services in the All Star Competition and All Star Apparel Markets on exclusive or near exclusive patronage of Varsity in both Relevant Markets; and

(c)     leverage its control of All Star Cheer's governing bodies, including USASF, to use the supposedly neutral rules and regulations of the sport as a pretext to impair actual and potential rivals directly in the primary market and indirectly in the ancillary market, forcing many potential rivals out of business or relegating them to "B-league" status.

10.     Varsity's systematic and continuing acquisition of All Star Competition rivals, combined with the other anticompetitive conduct alleged herein, has allowed it to acquire, maintain, and enhance control over all three national championships of consequence in competitive cheer—the Cheerleading World Championships ("Worlds"), The Summit, and the U.S. Finals (collectively, "All Star Championships").

11.     Varsity has used its control of the primary All Star Competition Market to acquire, enhance, and maintain monopoly power in the ancillary All Star Apparel Market by impairing and/or excluding actual and potential All Star Apparel rivals through the Exclusionary Scheme alleged herein. The All Star Cheer Competitions are, in part, market-dominant trade shows, and Varsity forbids or severely restricts would-be All Star Apparel competitors from displaying wares in those events' "showrooms." Moreover, Varsity rewards All Star Gyms that purchase Varsity's All Star Apparel for their All Star Cheerleaders to use in Varsity's market-dominant All Star Competitions, with extra points awarded at All Star Competitions.

12.     Given that Varsity's competitions are the dominant events and comprise the majority of an All Star Team's schedule, and that it would be prohibitively expensive for most participants to purchase multiple competition uniforms for a season, Varsity's exclusion of competing sellers of All Star Apparel has a powerful exclusionary effect. Varsity's conduct blocks

rivals from a key marketing channel that comprises the main, if not only reason, All Star Gyms buy All Star Apparel in the first place—for use at All Star Competitions.

13.     Varsity employs two types of exclusionary contracts with All Star Gyms, which it calls the "Network Agreement" and the "Family Plan," to maintain its dominance in the All Star Competition Market and to acquire, enhance, and maintain monopoly power in the All Star Apparel Market. Varsity focuses its exclusionary conduct on All Star Gyms because these Gyms recruit, train, organize, and maintain All Star Teams. All Star Gyms also select the All Star Competitions to attend and make purchasing decisions regarding the All Star Apparel to be used by their Teams. As such, All Star Gyms are a key input for producing a successful All Star Competition and the primary and necessary distribution channel for All Star Apparel.

14.     Varsity imposes its most exclusionary contracts, called Network Agreements, on the big-money and most prestigious All Star Gyms whose attendance is critical to putting on successful All Star Events and a key distribution channel for All Star Apparel. Under these Network Agreements, All Star Gyms are required to commit to near exclusive attendance at Varsity's All Star Competitions and completely exclusive patronage by the Gyms and their Team members of Varsity's All Star Apparel.

15.     Varsity also imposes restrictive terms on all of the other All Star Gyms through the Family Plan, which makes access to non-penalty prices on All Star Competitions and All Star Apparel contingent on All Star Gyms attending Varsity All Star Competitions for the vast majority of their seasons, and purchasing the vast majority of their and their members' All Star Apparel requirements from Varsity.

16.     During the Class Period (defined below), Varsity collectively controlled approximately 90% of the All Star Competition Market and 80% of the All Star Apparel Market. Varsity has used its dominant market power in the Relevant Markets to substantially foreclose competition in both markets and thereby maintain and enhance its dominance in both markets. In so doing, Varsity's Exclusionary Scheme has led to reduced output, supracompetitive prices, and reduced choice in both Relevant Markets. During the period relevant to this case, for instance, the

number and variety of All Star Competitions have fallen, the number of rivals in both Relevant Markets has dropped, prices in both markets have risen, and quality has diminished.

17.     Varsity has transformed "from its humble beginning to the global powerhouse organization it is today."[6] Currently, Varsity describes itself as "the worldwide leader" in "cheerleading . . . apparel, educational camps and competitions"[7] and "a leader in uniform innovation, as well as educational camps, clinics and competitions, impacting more than a million athletes each year."[8] Varsity's founder spun its dominant market position as follows:

> "[W]e were positioning ourselves to provide all the products and services that that affinity group [All Star Cheer participants] utilized. Not only did we have the number one position in those three segments [competitions, apparel, and camps], but then we developed a cross-marketing model where we could promote [the segments within each other] and to be honest with you, it took off."[9]

18.     Now firmly in control of the All Star Competition Market, Varsity dictates all aspects of it, including, *inter alia*:

       (a)     who can film and distribute video taken at competitions;

       (b)     what music can be used during routines;

       (c)     who can judge competitions;

       (d)     who can coach teams at competitions (by requiring a USASF certification);

       (e)     who can sell apparel at competitions;

       (f)     what apparel can be worn by All-Star Teams at competitions;

       (g)     which hotels teams can stay at when they travel to competitions;

       (h)     which competitions can offer bids to the year-end championships; and

---

[6] *See* "Varsity Legends," Varsity, https://www.varsity.com/about/legends/ (last accessed Aug. 25, 2020).

[7] https://www.varsity.com/about/.

[8] https://www.varsitybrands.com/spirit.

[9] Varsity Brands Founder On The Big Business Of Cheerleading, *Chief Executive Magazine* (Oct. 29, 2018), *available at* https://chiefexecutive.net/varsity-brands-big-business-cheerleading/.

(i)     which competition producers can use the USASF-sanctioned and copyrighted scorebook.

19.     As one person with knowledge of the industry stated, "Varsity is not just one thing . . . it's the whole kit and caboodle. There is no doubt about it, Varsity controls cheerleading."[10] Even the President of Varsity Spirit, Bill Seely, was forced to acknowledge that he "understand[s]" the observation that Varsity controls cheerleading.[11] With each hook into another aspect of All Star Cheer, Varsity has further entrenched its monopoly position in at least two relevant markets and its ability to extract additional monopoly rents from members of the Class.

20.     There is not a corner of the All Star Cheer industry that Varsity does not currently control or has not set out to seize. And the President of Varsity Spirit brazenly stated, "I don't apologize for what we do."[12] The consequence has been reduced competition in the Relevant Markets as well as overcharges to Plaintiffs, and members of the Class.

21.     Defendants' Exclusionary Scheme had the intended purpose and effect of unreasonably restraining and injuring competition. But for Defendants' illegal conduct, there would have been increased competition in the Relevant Markets, leading to lower prices for All Star Competitions, All Star Apparel, and related goods; more events; and higher quality, including, in all likelihood, better oversight to eliminate the sexual predation and harassment that have been allowed to persist in this industry for far too long. As a direct and proximate result of Varsity's unlawful and anticompetitive Exclusionary Scheme, Plaintiffs and the Class (defined below) have paid higher prices for All Star Competitions, All Star Apparel, and related goods and services bought directly from Varsity than they would have paid in a competitive marketplace absent the Exclusionary Scheme, and have thereby suffered, and continue to suffer, antitrust injury.

---

[10] *See* Natalie Adams, co-author of <u>Cheerleader! An American Icon</u>, *Cheer* (Netflix 2020).

[11] *See Cheer* (Netflix 2020).

[12] *See* Bill Seely, *Cheer* (Netflix 2020).

## II.     JURISDICTION AND VENUE

22.     Plaintiffs and the Class bring this action against Defendants under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, seeking equitable and injunctive relief and actual and exemplary damages against Varsity for violating Section 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiffs and the Class also seek attorneys' fees, costs, and all other expenses allowed under federal law.

23.     This Court has jurisdiction over the subject matter of this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), Section 2 of the Sherman Act (15 U.S.C. § 2), and 28 U.S.C. §§ 1331 and 1337.

24.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. §§ 1391 (b), (c), and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and Defendants are licensed to do business in, have their principal places of business in, are doing business in, had agents in, or are found or transact business in this District.

25.     This Court has *in personam* jurisdiction over Defendants because they, either directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly sold or marketed goods and services in the Relevant Markets throughout the United States as a whole, including in this District; (c) had substantial aggregate contacts within the United States, including in this District; or (d) engaged in an illegal scheme to maintain and enhance monopoly power that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States. Furthermore, Defendants each have their principal places of business in this District.

26.     Defendants engaged in conduct inside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

27.     Defendants' activities were within the flow of, and were intended to and did have a substantial effect on, interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

28.     By reason of the unlawful activities hereinafter alleged, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and the geographically dispersed Class members. Defendants, directly and through their agents, engaged in activities affecting all states to obtain and maintain monopolistic power in the Relevant Markets and charge supracompetitive prices to Plaintiffs and the Class for All Star Competitions and All Star Apparel, unreasonably restrained trade, and adversely affected the above-described markets.

## III.     PARTIES

29.     Plaintiff Fusion Elite All Stars ("Fusion") is incorporated in the State of California and has its primary place of business in Hollister, California. Plaintiff Fusion is, and at all relevant times hereto has been, an All Star Gym sponsoring an All Star Team. Plaintiff Fusion directly and repeatedly purchased All Star Apparel manufactured and sold by Varsity during the Class Period (defined below). Plaintiff Fusion directly and repeatedly paid Varsity for enrollment in All Star Competitions during the Class Period. Plaintiff Fusion paid artificially inflated prices for goods and services purchased directly from Varsity in both of the Relevant Markets during the Class Period, and thus has suffered, and will continue to suffer, economic harm and damages as a direct and proximate result of Varsity's unlawful conduct.

30.     Plaintiff Spirit Factor LLC d/b/a Fuel Athletics ("Spirit Factor") is incorporated in the State of Florida and has its primary place of business in Altamonte Springs, Florida. Plaintiff Spirit Factor is, and at all relevant times hereto has been, an All Star Gym sponsoring an All Star Team. Plaintiff Spirit Factor directly and repeatedly purchased All Star Apparel manufactured and

sold by Varsity during the Class Period (defined below). Plaintiff Spirit Factor directly and repeatedly paid Varsity for enrollment in All Star Competitions during the Class Period. Plaintiff Spirit Factor paid artificially inflated prices for goods and services purchased directly from Varsity in both of the Relevant Markets during the Class Period, and thus has suffered and will continue to suffer economic harm and damages as a direct and proximate result of Defendants' unlawful conduct.

31.     Plaintiff Stars and Stripes Gymnastics Academy, Inc. d/b/a Stars and Stripes Kids Activity Center ("Stars & Stripes") is incorporated in Michigan and has its primary place of business in Clarkston, Michigan. Plaintiff Stars & Stripes directly and repeatedly purchased All Star Apparel manufactured and sold by Varsity during the Class Period (defined below). Plaintiff Stars & Stripes directly and repeatedly paid Varsity for enrollment in All Star Competitions during the Class Period. Plaintiff Stars & Stripes paid artificially inflated prices for goods and services purchased directly from Varsity in both of the Relevant Markets during the Class Period, and thus has suffered economic harm and damages as a direct and proximate result of Defendants' unlawful conduct.

32.     Plaintiff Kathryn Anne Radek is a natural person and citizen of the state of Illinois and a resident of Lexington, Illinois. Plaintiff Radek is the parent of a former All Star Cheerleader who, during the Class Period (as defined below), participated in All Star Competitions. Plaintiff Radek's son was a member of the Premier Athletics All Star Gym in Murfreesboro, Tennessee from 2018 to 2019. During that time period, Plaintiff Radek's son competed in multiple Varsity-owned All Star Competitions, including The JAM Brands, COA Cheer & Dance, One Up, and Spirit Festival events. As the parent of an All Star Cheerleader, Plaintiff Radek directly paid Varsity in the form of fees to watch her son compete during the Class Period. Plaintiff Radek paid artificially inflated prices directly to Varsity and thus has suffered economic harm and damages during the Class Period as a direct and proximate result of Defendants' conduct.

33.     Plaintiff Lauren Hayes is a natural person and citizen of the state of Pennsylvania and a resident of Milford, Pennsylvania. Plaintiff Hayes is the parent of an All Star Cheerleader

who, during the Class Period (as defined below) and continuing presently, participated in All Star Competitions. Plaintiff Hayes's daughter has been an All Star Cheerleader since approximately 2016, as a member of both the World Cup All Stars gym in Olyphant, Pennsylvania and the Cheer Factory All Star Gym in Milford, Pennsylvania. Plaintiff Hayes's daughter competed in multiple Varsity-owned All Star Competitions during the Class Period. As the parent of an All Star Cheerleader, Plaintiff Hayes directly paid Varsity in the form of fees to watch her daughter compete during the Class Period. Plaintiff Hayes paid artificially inflated prices for goods and services purchased directly from Varsity, and thus has suffered economic harm and damages, and continues to suffer economic harm and damages, as a direct and proximate result of Defendants' conduct.

34.     Plaintiff Janine Cherasaro is a natural person and citizen of the state of Pennsylvania and a resident of Shohola, Pennsylvania. Plaintiff Cherasaro is the parent of an All Star Cheerleader who, during the Class Period (as defined below), participated in All Star Competitions. Plaintiff Cherasaro's daughter has been, and continues to be, an All Star Cheerleader since 2017, as a member of both the World Cup All Stars gym in Olyphant, Pennsylvania and the Quest Athletics All Star Gym in Pine Bush, New York. Plaintiff Cherasaro's daughter competed in multiple Varsity-owned All Star Competitions. As the parent of an All Star Cheerleader, Plaintiff Cherasaro directly paid Varsity in the form of fees to watch her daughter compete during the Class Period. Plaintiff Cherasaro paid artificially inflated prices directly to Varsity, and will continue to do so, and thus has suffered economic harm and damages, and will continue to suffer economic harm and damages, as a direct and proximate result of Defendants' conduct.

35.     Defendant Varsity Brands—formally known as Varsity Brands, Inc.—is a Delaware corporation with its principal place of business in Memphis, Tennessee. It is the parent company of Defendants Varsity Spirit and Varsity Fashion. Varsity Brands—directly and/or through its affiliates, which it wholly owned and/or controlled—organized, promoted, produced, and/or managed All Star Competitions throughout the United States, including in this District, at

all times relevant to this Complaint. Varsity Brands—directly and/or through its affiliates, which it wholly owned and/or controlled—manufactured, distributed, marketed, and/or sold All Star Apparel that was sold and purchased throughout the United States, including in this District, at all times relevant to this Complaint.

36.     Defendant Varsity Spirit—formally known as Varsity Spirit Corp.—is a Tennessee corporation with its principal place of business in Memphis, Tennessee. Varsity Spirit markets cheerleader and dance team uniforms and accessories to the youth, junior high, high school and college markets, and offers cheerleader and dance team camps, conducts televised cheerleading and dance team championships, organizes domestic and international travel tours and sponsors special events for school spirit groups. Varsity Spirit—directly and/or through its affiliates, which it wholly owned and/or controlled—organized, promoted, produced, and/or managed All Star Competitions throughout the United States, including in this District, at all times relevant to this Complaint. Varsity Spirit—directly and/or through its affiliates, which it wholly owned and/or controlled—manufactured, distributed, marketed, and/or sold All Star Apparel that was sold and purchased throughout the United States, including in this District, at all times relevant to this Complaint.

37.     Defendant Varsity Fashion—formally known as Varsity Spirit Fashion & Supplies, Inc.—is a Minnesota corporation with its principal place of business in Memphis, Tennessee. Varsity Fashion designs and markets sweaters, sweatshirts, jumpers, vests, skirts, warm-up suits, t-shirts, shorts, pompons, socks, jackets, pins, and gloves. Varsity Fashion—directly and/or through its affiliates, which it wholly owned and/or controlled—manufactured, distributed, marketed, and/or sold All Star Apparel that was sold and purchased throughout the United States, including in this District at all times relevant to this Complaint.

38.     Varsity has been privately held since 2003. It was acquired by its current owner, Bain Capital, LP, in 2018 for approximately $2.5 billion.

39.     Defendant USASF is a Tennessee non-profit corporation with its principal place of business in Memphis, Tennessee. USASF—directly and/or through its affiliates, which it wholly

owns and/or controls—has promulgated and/or enforced rules governing All Star Competitions and, more broadly, the sport of All Star Cheer throughout the United States, including in this District, at all times relevant to this Complaint. USASF—directly and/or through its affiliates, which it wholly owns and/or controls—organized, promoted, produced, and/or managed All Star Competitions throughout the United States, including in this District, at all times relevant to this Complaint.

## IV.    CLASS ALLEGATIONS

40.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief, as well as damages, on behalf of the following class (the "Class"):

> All natural persons or entities in the United States that directly paid Varsity or any wholly or partially owned Varsity subsidiary from May 26, 2016 until the continuing Exclusionary Scheme alleged herein ends (the "Class Period") for: (a) registration, entrance, or other fees and expenses associated with participation by an All Star Team or Cheerleader in one or more All Star Competitions; and/or (b) All Star Apparel.

41.    Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, franchisees, officers, executives, and employees; any entity that is or has been partially or wholly owned by one or more Defendants or their respective subsidiaries; States and their subdivisions, agencies and instrumentalities; and any judicial officer presiding over this matter and his or her staff.

42.    While Plaintiffs do not know the exact number of Class members, there are (at least) thousands of members in the proposed Class, who are geographically dispersed throughout the United States.

43.    Common questions of law and fact exist as to all members of the Class. Defendants' anticompetitive Exclusionary Scheme was commonly implicated and was generally applicable to all of the Class members, thereby making class-wide adjudication and relief appropriate. Such questions of law and fact common to the Class include, but are not limited to:

(j)     whether the All Star Competition and All Star Apparel Markets are appropriate relevant markets for analyzing the claims in this case;

(k)     whether the relevant geographic market is the United States;

(l)     whether Varsity possesses monopoly power in one or both of the Relevant Markets;

(m)     whether Varsity willfully acquired, maintained, and/or enhanced monopoly power in the Relevant Markets;

(n)     whether Varsity and USASF conspired to assist Varsity in maintaining and/or enhancing monopoly power in one or both of the Relevant Markets;

(o)     whether Varsity and USASF engaged in overt acts furthering their conspiracy to maintain and enhance Varsity's dominance in one or both of the Relevant Markets;

(p)     whether Defendants engaged in unlawful exclusionary conduct to impair the opportunities of actual or potential rivals in one or both of the Relevant Markets, and thereby substantially foreclosed competition in one or both of those markets;

(q)     whether Defendants' Exclusionary Scheme maintained or enhanced Varsity's monopoly power in one or both of the Relevant Markets;

(r)     whether Defendants' Exclusionary Scheme violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

(s)     whether Defendants' Exclusionary Scheme had anticompetitive effects in one or both of the Relevant Markets;

(t)     whether Defendants' actions alleged herein caused injury to Plaintiffs and the Class members by causing them to pay artificially inflated prices in one or both of the Relevant Markets during the Class Period;

(u)     the appropriate measure of damages; and

(v)     the propriety and scope of declaratory and/or injunctive relief.

44.     The Class members are so numerous and geographically dispersed that joinder of all members is impracticable. Although the precise number of such individuals, organizations, and businesses is currently unknown, Plaintiffs believe that the number of Class members is, at minimum, in the thousands, and that the members reside or are located throughout the United States, including in this District.

45.     Plaintiffs' claims are typical of those of the Class they seek to represent. Plaintiffs, like all other Class members, have been injured by Defendants' Exclusionary Scheme and Varsity's illegally obtained monopoly power that resulted in artificially inflated prices in the Relevant Markets.

46.     Plaintiffs are more than adequate representatives of the Class, and their chosen class counsel (the undersigned) are more than adequate attorneys. Plaintiffs have the incentive and commitment to prosecute this action for the benefit of the Class. Plaintiffs have no interests that are antagonistic to those of the Class. Plaintiffs have retained counsel highly experienced in antitrust and class action litigation.

47.     This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Defendants have acted and refused to act on grounds that apply generally to the Class, and final injunctive and declaratory relief is appropriate, and necessary, with respect to the Class as a whole.

48.     This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons, organizations, and businesses to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to

litigate an antitrust claim such as that asserted in this Complaint. Plaintiffs are aware of no difficulties that would render this case unmanageable.

49.     Plaintiffs and the members of the Class have all suffered antitrust injury and damages as a result of Defendants' Exclusionary Scheme and Varsity's acquisition, enhancement, or maintenance of monopoly power in the Relevant Markets. Such antitrust injuries and damages are ongoing.

50.     Plaintiffs are not suing as part of this case, on behalf of themselves or any proposed Class member, to enforce any rights or provisions in any particular contracts they had with Varsity or USASF. Nor are Plaintiffs in this matter claiming, as part of this case, on behalf of themselves or any proposed Class member, that any of their Varsity or USASF contracts, standing alone, violates or violated the antitrust laws. Rather, Plaintiffs allege that the Varsity contracts with All Star Gyms—and one or more of the exclusionary provisions therein—taken together form part of Defendants' Exclusionary Scheme to impair actual or potential rivals and enhance Varsity's monopoly power in both Relevant Markets. Cumulatively, the exclusionary contractual provisions, together with other aspects of the Scheme, deprived Varsity's would-be rivals of access to critical inputs and to customers in both Relevant Markets, and thereby foreclosed competition, and caused anticompetitive effects in both markets.

## V.     AGENTS & CO-CONSPIRATORS

51.     The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' business or affairs.

52.     Various persons and/or firms not named as defendants herein may have participated as co-conspirators in the Exclusionary Scheme alleged herein and may have performed acts and made statements in furtherance thereof. Plaintiffs reserve the right to name some or all of these persons as defendants at a later date.

53.     At all times relevant to this Complaint, Varsity and USASF conspired to facilitate Varsity's monopolization of the Relevant Markets.

16

54.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

55.     Each Defendant acted as the principal, agent, or joint venturer of, or for, other defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.

56.     Individuals alleged to have engaged in misconduct in violation of the federal laws listed herein are alleged to have done so on behalf of all members of their corporate family, *i.e.*, Varsity. Individuals within the companies and customers did not know or did not distinguish between the corporate affiliations of different individuals. Varsity Brands, Varsity Spirit, and Varsity Fashion all affirmatively and collectively represent themselves as one corporate family, rather than separate subsidiaries and parents. For instance, and without limitation, the Varsity Brands website states "WE ARE . . . Varsity Spirit."

## VI.    INTERSTATE TRADE & COMMERCE

57.     Defendants' anticompetitive and unlawful conduct as alleged herein has taken place in and substantially affected the continuous flow of interstate trade and commerce in the United States by:

(a)     organizing, promoting, and managing All Star Competitions throughout the United States; and

(b)     manufacturing, distributing, marketing, and selling All Star Apparel throughout the United States.

58.     The Challenged Conduct alleged herein affected billions of dollars of commerce. During the Class Period, Varsity collectively controlled approximately 90% of the commerce in the All Star Competition Market and 80% of the commerce in the All Star Apparel Market in the United States. Plaintiffs and the proposed Class members collectively paid hundreds of millions of dollars directly to Varsity for All Star Competitions and Apparel. Defendants have inflicted

antitrust injury by foreclosing competition by actual and potential rivals and artificially inflating prices paid by Plaintiffs and the Class members, all of whom have been engaged in commerce, in both Relevant Markets, during the Class Period.

## VII.    FACTUAL ALLEGATIONS

### A.    History & Background

59.    Cheerleading is not just a sideshow—it is a competitive sport with roughly four million athletes on thousands of teams, from 70 countries, that generates billions of dollars a year in revenue. Cheerleading is so lucrative, and Varsity so powerful, that even during the COVID-19 worldwide pandemic, with its own competitions on hold, Varsity has been able to generate money, raising approximately $185 million in new capital in less than a 10-day period in late spring 2020.[13]

60.    Between 100,000 and 450,000 athletes participate in All Star Cheer.[14] All Star Cheer is athletically rigorous and technically challenging. It requires a significant amount of strength, flexibility, endurance, effort, coordination, and cooperative teamwork.

61.    All Star Cheer routines involve two types of tumbling—running tumbling and standing tumbling. Both types involve gymnastic-like skills, such as back handsprings and back tucks. In a tumbling section, most passes are performed by multiple athletes, if not by the entire team, at the same time. Only the athletes with the most difficult passes will tumble without a partner in a running tumbling section.

62.    Stunting involves up to four athletes, known as bases, backers, and front spots, elevating another cheerleader, known as the flyer, in the air. One popular type of stunt is a basket toss, where the bases release the flyer by tossing her high into the air so she can perform mid-air

---

[13] *See* Natalie Walters, "Cheerleading giant Varsity Brands gets $185 million in new capital to power through pandemic," The Dallas Morning News, June 22, 2020, https://www.dallasnews.com/business/local-companies/2020/06/22/cheerleading-giant-varsity-brands-gets-185-million-in-new-capital-to-power-through-pandemic/ (last accessed Aug. 25, 2020).

[14] USA Cheer STUNT NCAA Proposal 2011 at 43, *available at* https://files.varsity.com/uploads/pdfs/USACheer_STUNT_videolinkSM.pdf.

tricks, such as twists, before landing. Together, these athletes form what is known as a "stunt group," and multiple stunt groups can connect to form a pyramid.

63.     Dance in an All Star Cheer routine is high-energy, drill style and may involve typical cheerleading movements such as "high-V's," a motion executed by lifting the arms to resemble the letter "V;" "low-V's," a motion executed by slightly raising the arms to resemble an upside-down letter "V;" "T's," a motion executed by lifting the arms to resemble the letter "T;" and "touchdowns," a motion executed by raising the arms by the ears.

64.     All of these skills are necessary to excel in All Star Competitions. "Anyone can tumble from corner to corner, but it's the routines with perfect sync, creative formations and precise execution that stand out to the judges."[15]

65.     Lawrence Herkimer, known as the father of modern cheerleading, founded the National Cheerleaders Association ("NCA") in 1948. Herkimer patented the pom-pom and created the "Herkie jump," one of the earliest athletic components added to cheer, while attending Southern Methodist University. Under Herkimer, the NCA ran cheer camps and sold sweaters and skirts. At the time, there were no cheerleading competitions, nor did All Star Cheer exist.[16]

66.     Jeff Webb, Varsity's founder and former CEO, went to work at the NCA after completing his cheerleading career at the University of Oklahoma in the late 1960s. Webb quickly rose up the ranks, but his view of cheerleading's future differed from Herkimer's. While Herkimer explained to Sports Illustrated in 1991 that "[o]ur people are teachers, not showoffs," Webb "hired hot dogs." In 1974, Webb left the NCA and took some of Herkimer's top employees with him to form his own cheerleading business, the Universal Cheerleaders Association ("UCA"), which was

---

[15] *See* "Tumbling Passes to Watch from the Summit," Varsity, Jan. 4, 2017, https://www.varsity.com/news/tumbling-passes-to-watch-from-the-summit/ (last accessed Aug. 25, 2020).

[16] https://www.houstonpress.com/news/varsity-brands-owns-cheerleading-and-fights-to-keep-it-from-becoming-an-official-sport-7606297.

similar to the NCA but with Webb's own added twists: more focus on gymnastics-like skills and new tournaments created solely for cheer squads.[17]

67.     During the early 1980s, a number of cheerleading squads not associated with a school or a sports league, whose main objective was competition, began to emerge. The first organization to call its participants "All Stars" and go to competitions was the Q94 Rockers from Richmond, Virginia, founded in 1982. Prior to 1987, the NCA placed All Star Teams into the same divisions as teams that represented schools and sports leagues.

68.     In 1986, the NCA created a separate division for teams lacking a sponsoring school or athletic association, calling it the All Star Division and debuting it at its 1987 cheer competitions. As the popularity of this type of "All Star" team grew, more and more of them were formed, attending competitions sponsored by many different organizations and companies, each using its own set of rules, regulations, and divisions.[18] Today, the NCA-produced All Star Competition NCA All Star Nationals is a prestigious All Star Competition that hosts over 25,000 participants and 38,000 spectators each year.

69.     Webb's new business, the UCA, ultimately became Varsity, and soon outgrew its only rival, Herkimer's NCA. The UCA is currently the largest cheerleading camp company in the world. The UCA trains over 180,000 cheerleaders, mostly high schoolers, every summer at over 3,200 sessions across the United States. The UCA's registered trademark is "WE ARE CHEERLEADING®."[19]

70.     In 2004, Varsity bought the National Spirit Group, thereby acquiring ownership and control of Herkimer's NCA.[20]

---

[17] *Id.*

[18] Smith, Jennifer Renèe, "The All Star Chronicles," American Cheerleader, 13 (1): 40-42 (Feb. 2007).

[19] *See* "About Universal Cheerleaders Association," Varsity, https://www.varsity.com/uca/about/ (last accessed Aug. 25, 2020).

## B. All Star Cheer's "Governing" Bodies

71. In 2003, cheerleading coaches formed an independent 501(c)(3) organization, called the National All Star Cheerleading Coaches Congress ("NACCC"), to establish uniform rules for All Star Cheer. In 2004, Varsity—along with the NCA, CheerSport, and America's Best—created the USASF with the same goal of setting uniform rules and judging standards for All Star Competitions.[21] Defendant USASF acquired NACCC in 2005.

72. USASF proudly holds itself out as "the national authority for All Star."[22] What USASF does not advertise, though, is how it is inextricably tied to and controlled by Varsity.

73. USASF has always been captive to Varsity. Varsity funded the USASF at its inception in 2003 with an interest-free $1.8 million loan. Indeed, USASF's financial statements acknowledged, "[p]erhaps the most significant news for the organization in 2013 was the repayment to Varsity Spirit Corporation of the startup loan that funded the USASF launch in 2003."[23] Until recently, USASF employees worked at Varsity's headquarters in Tennessee, and USASF's office is currently still mere miles away from Varsity's headquarters.

74. Additionally, Varsity submitted the original trademark application for the marks "U.S. All Star Federation" and "USASF," listing itself as owner; USASF employees used their Varsity e-mail addresses for official USASF business; USASF employees were paid directly by Varsity; Varsity cashed checks issued to USASF; and Varsity owned the URL at which USASF's website is located, though it now tries to conceal that connection through the registration of "PERFECT PRIVACY, LLC."[24]

---

[21] Varsity was operating as the UCA when it founded USASF. Since USASF's formation, Varsity has acquired all of USASF's founders—NCA, CheerSport, and America's Best.

[22] *See* "U.S. All Star Federation," USASF, https://www.usasf.net/ (last accessed Aug. 25, 2020).

[23] *See* "USASF 2013 Annual Report," USASF, https://usasfmain.s3.amazonaws.com/Organization/docs/annual/USASF_AnnualReport_2013.pdf (last accessed Aug. 25, 2020).

[24] *See* "Who REALLY has the power in USASF??," Cheergyms, https://cheergyms.activeboard.com/t5660100/who-really-has-the-power-in-usasf/ (last accessed July 21, 2020).

75. Moreover, for years, USASF's offices were located at Varsity's corporate address, with Varsity providing office services to USASF. Indeed, USASF's bylaws actually require that it be located in Memphis, Tennessee—also the home of Varsity's headquarters:

> Article I – Name and Location The name of this organization is the U.S. All Star Federation, Inc. ("the Corporation"). The principal office of the Corporation shall be at such place, as the Board of Directors shall determine within the City of Memphis, Shelby County, Tennessee.[25]

76. For at least some period of time, USASF's and Varsity's finances were intermingled such that USASF employees received their paychecks from Varsity. In accordance with the explicit bylaws of USASF, a permanent majority of USASF's voting board members are allocated to seven All Star Competition brands (UCA, CheerSport, NCA, USA, American Cheerleaders Association, Universal Dance Association, and JAMFest). Varsity currently owns *all* of these brands.

77. USASF is a "member" of USA Cheer.[26] USA Cheer is the national governing body for cheerleading in the United States. It was founded in 2007 and has three primary objectives: to help grow and develop interest and participation in cheer throughout the United States; promote safety and safety education for cheer in the United States; and represent the United States of America in international cheer competitions.

78. USA Cheer and the American Association of Cheerleading Coaches and Administrators ("AACCA") merged in 2018. The AACCA was founded by Webb in 1987.

79. USA Cheer shares its address and telephone number with Varsity and does not have any employees. Instead, it contracts with Varsity Spirit to use Varsity's employees as needed. The USA Cheer President, Bill Seely, is also the President of Varsity Spirit. Two of the three USASF Vice Presidents and the Executive Director are current and former Varsity employees.

---

[25] *See id.*

[26] https://www.usacheer.org/allstar.

80. According to USA Cheer, "most" All Star Gyms, All Star Teams, and All Star Competitions "are under the umbrella of" USASF,[27] meaning that USASF rules govern most All Star Gyms, All Star Teams, and All Star Competitions. USASF uses that control to require that All Star Gyms, All Star Cheerleaders, and All Star Team coaches join USASF and pay annual membership dues to participate in USASF-sanctioned All Star Competitions, primarily those owned and produced by Varsity.

### C.     All Star Competitions

81. All Star Teams compete against one another at one- or two-day All-Star Competitions, often travelling great distances depending on the event. All Star Cheerleaders practice for multiple hours a week, all year long, to perfect their performances for about half a dozen of these events each year.

82. According to Varsity:

> At a typical cheerleading competition, teams perform a 2 and a half minute routine with music that includes stunts, jumps, tumbling. Teams are judged by a panel of cheerleading experts on difficulty and execution. The winner in each division gets a trophy and bragging rights.[28]

83. But at these competitions, much more than bragging rights are at stake. When colleges consider recruiting athletes for their cheerleading teams, they look to All Star Gyms before looking at high schools in search of potential team members. All Star Cheer Athletes may also be awarded scholarships. For instance, the Varsity-owned COA Cheer & Dance competition provides athletes with the opportunity to win a $1,000 scholarship through the Shirley A. Wedge National Cheer and Dance Scholarship Fund. This is one reason All Star Gyms need to be as successful as possible—that is how they attract the best athletes.

84. There are hundreds of All Star Competitions across the nation annually. Varsity alone puts on over 600 regional and national events, which it brands under over 50 unique banners,

---

[27] *Id*.

[28] *See* "What is Competitive Cheerleading?," Varsity, Feb. 20, 2018, https://www.varsity.com/news/what-is-competitive-cheerleading/ (last accessed Aug. 25, 2020).

thereby hiding from the average person that, in fact, each of these events is a Varsity event. Varsity's All Star Competitions attract 900,000 athletes overall. Some of the larger All Star Competitions may each attract tens of thousands of athletes and have over 1,000 All Star Teams competing. Varsity hosts one event in Myrtle Beach, for example, that brings in 500 teams annually. Two-day events tend to have more teams than one-day events, which typically have between 50 and 100 teams. The maximum number of All Star Cheer Athletes that can participate on one All Star Team at a competition depends on the division and age group but can be as high as 38 people.

85.    Most All Star Teams attend a limited number of All Star Competitions per season, usually between five and eight (and only sometimes as high as ten). The business model for All Star Competitions depends on teams attending, paying entrance fees, and bringing their families along with them.

86.    All Star Teams set their competition event schedule with the goal of maximizing their chances to earn a Bid to one or more of the three recognized championships for All Star Cheerleading: Worlds, The Summit, and the U.S. Finals, as described further below. Competitions that offer Bids to an All Star Championship event are therefore much more attractive to All Star Teams.

87.    "Bids" are highly coveted formal invitations to compete in these All Star Championships. All Star Teams cannot attend the All Star Championships without one. Thus, earning Bids to All Star Championships (particularly Worlds), and ultimately succeeding at those All Star Championships, is the primary goal of All Star Teams. All Star Teams earn these Bids by attending and succeeding at All Star Competitions that have the ability to offer Bids.

88.    Bids can be Fully Paid, which, as the name implies, means the All Star Competition producer pays the All Star Team's entry fees and all travel and hotel costs; Partially Paid, meaning the All Star Competition producer pays only a partial amount (typically covering entry fees but not travel or hotel costs); or At-Large, meaning the All Star Team can compete but must pay its own way. All Star Competition producers with the rights to confer the Bids determine how those

24

Bids are awarded. Typically, Fully Paid Bids are awarded to first place winners of major USASF-sanctioned All Star Competitions. Partially Paid and At-Large Bids are earned by All Star Teams at other USASF-sanctioned All Star Competitions. Because an All Star Team cannot attend an All Star Championship without a Bid, the limited number of Bids makes them highly coveted and prestigious.

### D. All Star Championships

89.     As noted above, there are three All Star Championships: The Worlds, The Summit, and the U.S. Finals. USASF owns The Worlds, while Varsity owns The Summit and the U.S. Finals, as depicted here:



### 1. The Worlds

90.     The Worlds is owned, produced, and promoted by Varsity-controlled USASF and the International All Star Federation ("IASF"). The IASF, which provides rules, credentialing, and opportunities in cheer and dance, was a part of the USASF until 2016.

91.     The Worlds began in 2004 with two divisions. Today, it includes over 20 divisions and hosts hundreds of teams and thousands of athletes each year at Walt Disney World's ESPN Wide World of Sports in Orlando, Florida. It is the final end-of-season event for senior level elite

All Star teams. Out of six "levels" of athletes, only Levels 5 and 6—the highest and most advanced levels—were historically eligible to compete at Worlds. Beginning in 2020, a seventh level was added, and now Levels 5-7 are eligible to compete.

92.     To attend Worlds, an All Star Team must receive a Bid from a qualifying All Star Competitions with the right to award Worlds Bids. USASF, under the control of Varsity, decides which All Star Competitions have the right to award Bids to Worlds. According to USASF rules, only "Tier 1" All Star Competition producers can offer Fully Paid Bids to Worlds.

93.     Varsity and USASF severely restrict competition in the All Star Competition Market by limiting the number of All Star Competitions that can produce Bids to Worlds at 42. Varsity owns 33 of the All Star Competitions with the right to award Bids to Worlds. USASF also allocates the *number* of Bids that each of those 42 All Star Competitions may award, and each All Star Competition may award two to eight Bids. USASF has awarded Varsity the vast majority, so Varsity controls more than 80% of Worlds' Bids.

94.     Perhaps unsurprisingly, given Varsity's control over USASF, despite not officially being a Varsity-produced event, Worlds looks and feels and is run exactly like a Varsity event, and participants think of it as a Varsity event.

## 2.     The Summit

95.     Varsity owns, produces, and promotes The Summit, which it founded in 2013.

96.     The Summit hosts 1,500 All Star Teams in over 35 divisions. It is designed as a high-caliber event open to all levels, so athletes may range from Levels 1-6. This makes it the elite event for All Star Teams that cannot otherwise qualify for Worlds. Like Worlds, it is held each year at Disney's ESPN Wide World of Sports.

97.     All Star Teams must receive a Bid to attend The Summit. As the event producer of The Summit, Varsity unilaterally decides which All Star Competitions have the authority to award Bids to The Summit and the U.S. Finals. Varsity uses its market dominance to restrict competition by allocating 100% of The Summit Bids to the All Star Competitions it owns and operates.

26

98. In the 2019-20 season, there were 301 All Star Competitions, all owned by Varsity, that had the right to award Bids to The Summit.

### 3. The U.S. Finals

99. Finally, the U.S. Finals, founded in 2009, is also owned, produced, and promoted by Varsity.

100. The U.S. Finals takes place in multiple locations and then the scores from the various locations are compared. In the 2020-21 season, for instance, the U.S. Finals are scheduled to be hosted in Myrtle Beach, South Carolina; Sevierville, Tennessee; Grapevine, Texas, Louisville, Kentucky; Pensacola, Florida; Anaheim, California; Worcester, Massachusetts; Kansas City, Missouri; and Virginia Beach, Virginia. Over 1,000 All Star Teams, ranging from Levels 1-6 participate.

101. In order to participate in a U.S. Finals event, an All Star Team must receive a Bid. Varsity decides which All Star Competitions have the authority to award Bids to the U.S. Finals.

### E. All Star Apparel

102. All Star Apparel includes clothing, shoes, accessories, and equipment purchased for use by All Star Cheerleaders at All Star Competitions and during All Star Team practices and training.

103. For practices, All Star Cheerleaders wear lightweight, breathable athletic wear typically made of spandex, microfiber, or cotton materials. To travel to and from practice, athletes may have team sweatshirts or jackets, and team sweatpants. Athletes may store this outerwear in a backpack or duffle bag. During practice, athletes wear shorts or leggings, and a t-shirt, tank top, or long-sleeved shirt. Female athletes also wear sports bras and may wear that in lieu of another type of top. Since female athletes typically fulfill the role of the flyer during stunting, female practice All Star Apparel will usually be skin-tight, so that the athletes catching her on the ground do not get caught in it. Finally, all athletes wear sneakers during practices.

104.     Each individual piece of this All Star Apparel, including the backpack or duffle bag, may be team- or gym-branded. An All Star Gym may require all athletes on an All Star Team to match during any given practice. Athletes must therefore always be prepared with several sets of clothing.

105.     For All Star Competitions, athletes wear entirely matching sets of All Star Apparel. This includes warms up outfits (jackets, sweatshirts, and sweatpants), hair bows for female athletes, and uniforms. For male athletes, a uniform consists of pants and a top. For female athletes, a uniform consists of a skirt, briefs, and either a crop top or a crop top and "shell" top over it. These clothes may be carried in a backpack or duffle bag.

106.     All Star Apparel is an important aspect of All Star Competitions. USASF rules govern every detail of what All Star Cheerleaders may wear in a competition.[29] Soft-soled shoes— like those Varsity manufactures and sells—are required. Skirts, briefs, and shorts must meet inseam guidelines. Exposed midriffs are forbidden for certain age groups, and tops must be secured over at least one shoulder. Bows cannot be "excessive size," jewelry is forbidden, and makeup must be "uniform and appropriate."

107.     Varsity entered the All Star Apparel Market in 1980. Since then, Varsity has, through its Exclusionary Scheme, gained and maintained an 80% share of the All Star Apparel Market. As part of the Scheme, Varsity has used its monopoly power in the All Star Competition Market to: (a) cause All Star Gyms to enter into exclusive dealing agreements and rebate programs—including Varsity's Family Plan and Network Agreements—which make buying from non-Varsity All Star Apparel competitors prohibitively expensive; (b) exclude All Star Apparel competitors from the merchandise showrooms at their All Star Competitions; (c) acquire (and often

---

[29] http://rules.usasfmembers.net/wp-content/uploads/2019/08/USASF_Cheer_Rules_Overview_19-20.pdf?__hstc=138832364.efed7d8f1c830aa60b7954df8534ed2a.1587669506683.15876695066 83.1587746180666.2&__hssc=138832364.3.1587746180666&__hsfp=612696179.

dissolve) All Star Apparel competitors; and (d) through its influence with the captured USASF, cause the judges to advantage All Star Teams that wear Varsity apparel.

108.    As one article described, "Thanks to an aggressive campaign of acquisitions, rebate plans that make it expensive for gym owners to switch suppliers, and other strategies, Varsity Spirit, the corporation's cheer division, commands north of 80 percent of the uniform market, as estimated by competitors. The company also wields outsize influence in virtually every aspect of the industry, including the camps and—most important—the competitions, which also serve as merchandise showrooms for apparel vendors."[30]

109.    Indeed, Varsity brags that its All Star Apparel "has defined cheerleading for generations."[31]

110.    Varsity prevents other apparel manufacturers from showcasing their apparel at Varsity's All Star Competitions, thereby foreclosing them from 90% of the important All Star Competition marketing channel. For instance, during the Class Period, Varsity forbade Rebel Athletic, an independent cheerleading apparel company, from having a booth or set up at Varsity competitions, causing Rebel Athletic to be locked out of partnering with 90% of All Star Competitions.

     **F.      Varsity's Monopoly Power in the Two Relevant Antitrust Markets**

          **1.      Monopoly Power in the All Star Competition Market (the Primary Market)**

               **a.      The Relevant All Star Competition Market**

111.    All Star Competitions are events at which All Star Teams perform time-limited routines composed of tumbling, stunting, pyramids, and dance segments. Tumbling involves gymnastic skills like cartwheels and back handsprings. Stunting refers to a group of two or more

---

[30] https://slate.com/business/2016/02/rebel-wants-to-disrupt-the-surprisingly-entrenched-cheerleader-uniform-industry.html.

[31] *See* "Why Choose Varsity All Star Fashion," Varsity, https://www.varsity.com/All Star/All Star-fashion/why-choose-varsity/ (last accessed Aug. 25, 2020).

individuals that elevate another cheerleader in the air. Pyramids are a form of interconnected stunting that involve a large group. Dance is a portion of a routine that consists of choreographed high energy dance moves. The routines are performed and scored against other All Star Teams at various local, regional, and national competitions.[32]

112.  All Star Competitions involve All Star Teams with participants from a wide variety of age groups, from preschool through college and beyond. But, importantly, All Star Competitions do not involve sideline cheerleading, and they are not sponsored by, or associated with, particular schools or school associations (like the NCAA). All Star Competitions, instead, are organized by All Star Gyms, which are central to the sport. The participants typically compete in divisions defined by the USASF.

113.  Suppliers in the All Star Competition Market are All Star Competition producers. Varsity is the primary supplier in the All Star Competition Market. According to the Varsity website, it offers "over 40 brands" of All Star Competitions and "over 500 regional, national, and end-of-season events."[33] Varsity's All Star Competitions are all sanctioned by USASF.

114.  All Star Gyms directly pay All Star Competition producers, either Varsity or IEPs, registration fees to enter All Star Competitions leading up to All Star Championships. From the perspective of All Star Gyms, All Star Competitions lack close economic substitutes that could constrain their pricing, for, *e.g.*, entry fees and other associated costs, to competitive levels.

115.  All Star Cheerleaders train vigorously for All Star Competitions that showcase their unique combination of talents, which draw from cheerleading, dance, and gymnastic routines. All Star Gyms and their All Star Teams would not redeploy their talents to competitive gymnastics, sideline cheer, dance, or any other sport or pastime, in response to a small but significant non-transitory increase in the price of attending All Star Competitions. Thus, a hypothetical monopoly seller or producer of All Star Competitions would not need to control gymnastics, dance events,

---

[32] https://usasf.net.ismmedia.com/ISM2/ParentsActionCommittee/Cheer_Parents_101.pdf.

[33] https://www.varsity.com/all-star/competitions/why-varsity-competitions/.

other kinds of cheer events (including, *e.g.*, sideline cheerleading), or other pastimes, to raise the registration fees and other associated costs for attending All Star Competitions profitably above competitive levels by a small but significant degree.

116.    The USASF—controlled by Varsity—serves as the governing body that recommends and implements rules and regulations for All Star Competitions. According to USASF rules, All Star Competitions are segmented into levels and divisions. Levels are based purely based on skill, not on age.[34]

117.    Sideline cheerleading is not a functional or economic substitute for All Star Competitions. The main difference between sideline cheerleading and All Star Competitions is that a sideline cheerleading squad's primary purpose is to support a school's sports team and keep the crowd excited. Membership on a sideline team is conditioned on enrollment at the school with which it is affiliated. All Star Teams do not cheer for games or for other teams. The sideline team competitions are also separate and distinct from All Star Competitions. They typically take place on a non-spring-loaded floor, often on the sidelines of hardwood basketball courts or football fields, rather than the open spring-loaded floors used by All Star Teams and involve fewer stunts and less rigorous tumbling, so the skill set required for All Star Competitions is much more advanced than that required for sideline cheerleading.[35] There is also a crowd-leading component to sideline cheer not present at All Star Competitions.

118.    Other recreational cheerleading programs such as Pop Warner and Bill George Youth Football are not functionally or economically substitutable with All Star Competitions. Cheerleaders in these other programs are taught the basics of cheer and compete only occasionally against other recreation teams within the same program. Often, the more talented cheerleaders "graduate" from these programs to an All Star Team in search of a more challenging cheer

---

[34] https://usasf.net.ismmedia.com/ISM2//Member%20Documents%2009_10_Age_Grid.pdf.

[35] https://usasf.net.ismmedia.com/ISM2/ParentsActionCommittee/Cheer_Parents_101.pdf.

environment that focuses more on their skills and accomplishments, rather than the standing of their respective football teams.[36]

119.    Dance and gymnastic competitions are not functional or economic substitutes for All Star Competitions. All Star Competitions involve multiple athletes performing synchronized movements in a confined area that limits the types of movements that can be performed by participants, requiring an emphasis on different skills than gymnastics. All Star Competition routines involve multiple athletes performing synchronized movements in precise, drill-like style, whereas dance competition routines may involve as little as one person, and may include a range of looser styles such as hip hop, jazz, lyrical, contemporary, tap, or ballet. All Star Competition routines also involve floor tumbling, whereas gymnastics competition routines involve a combination of floor tumbling, vault, bars, and beam. Thus, the skill set required to be part of these other teams is different. In addition, All Star Teams consist of various body types and have different positions that require different skill sets, such as the base, the flyer, the spotter, and the tumbler. Most athletes will be taller than the average gymnast—providing opportunities to compete for individuals who do not possess classic gymnast bodies.[37]

120.    Although Varsity has opposed efforts to designate cheerleading as an official sport, it has supported the creation of NCAA-sanctioned college-level competitive dance and acrobatic events, such as Varsity-backed STUNT and Acrobatics & Tumbling, backed by the National Collegiate Acrobatics and Tumbling Association ("NCATA"). These are not functional or economic substitutes for All Star Competitions. Varsity and NCATA have identified such college-level competitive dance and acrobatic events as complements to All Star Competitions rather than substitutes. As one USA Cheer publication explained, "STUNT should grow the total number of young people participating in all forms of Cheer . . . once STUNT is fully adopted as an NCAA sport, the number of collegiate scholarships available to Cheer athletes should increase more than

---

[36] *Id.*

[37] https://usagym.org/pages/home/publications/technique/2002/7/cheergymnastics.pdf.

32

tenfold. This will potentially create huge interest in skill development and competitive experience, and All Star Gyms have a tremendous opportunity to provide these services." In addition, unlike All Star Cheer, STUNT and Acrobatics & Tumbling only involve female athletes as they are both "Emerging Sports" seeking full protection under Title IX.

121.    In addition, STUNT is essentially owned by Varsity. It was started in 2011, funded by Varsity, and is run by USA Cheer—another Varsity-controlled organization.

### b.    The Relevant Geographic Market

122.    The relevant geographic market is the United States. All Star Teams compete nationwide to receive Bids to attend All Star Championships.

123.    All Star Gyms in the United States do not regularly send teams to All Star Competitions abroad, in part due to the expense of international travel. When All Star Gyms do compete internationally, it is not a part of the regular season, but rather, a special event put on to give children and young adults an opportunity to travel (similar to an exchange program).

124.    International cheer competitions are also subject to different rules than U.S. competitions, making U.S. All Star Teams far less likely to attend them.

125.    International cheer competitions are not functional or economic substitutes for U.S. All Star Competitions. A small but significant and non-transitory increase in the price of participating in U.S. All Star Competitions would not cause participants to seek out international competitions.

### c.    Varsity Has Monopoly Power as a Dominant Supplier in the All Star Competition Market

126.    Varsity has, at all relevant times, possessed monopoly power in the market for the production of All Star Competitions.

127.    Varsity has maintained and enhanced its monopoly power in the market for the production of All Star Competitions through the anticompetitive conduct alleged herein. Varsity possesses the ability to control, maintain, and increase prices associated with the production of All Star Competitions above competitive levels and the ability to impair and exclude competitors from

producing All Star Competitions. Varsity has elevated prices charged for registering for and attending Varsity All Star Competitions substantially above competitive levels, and restricted output in the All Star Competition Market, during the Class Period. Varsity has the ability to foreclose, and has in fact foreclosed, actual and would-be rivals from competing in the market for producing All Star Competitions.

128. In 2010, Varsity controlled approximately 50% of the revenues in the All Star Competition Market.[38] After Varsity acquired The JAM Brands in 2015, and continued to engage in the other anticompetitive conduct alleged herein, it gained control of approximately 90% of the revenues in that market for All Star Competitions in the United States. As detailed in the magazine *Inc.*, prior to the merger, "JAM Brands ran most of the high-profile competitions that Varsity doesn't own. Together, they control roughly 90 percent of the major events, say competitors."

129. In addition, Varsity controls two of the three All Star Championships in the United States. It also controls the USASF board that decides how Bids are awarded to the third All Star Championship, Worlds. All Star Teams from the top All Star Gyms seek coveted Bids to these All Star Championship events, and Varsity controls the vast majority of the All Star Competition producers that have been granted rights by the USASF to disburse such Bids and also controls the vast majority of Bids.

130. Varsity's tag line illustrates its dominance: "We are cheerleading."[39]

### d. Barriers to Entry

131. The All Star Competition Market has high barriers to entry that were reinforced and bolstered by the Exclusionary Scheme as alleged herein.

---

[38] Webb testimony in *Biediger vs. Quinnipiac*, June 22, 2010.

[39] "The Business of Cheer," Fortune (Dec. 21, 2012).

### i.      Natural Barriers to Entry

132.    An All Star Competition event producer must have access to capital in order to rent venues, perform adequate marketing, and pay employees, travel costs, and the variety of other expenses associated with the All Star Competition business.

133.    An All Star Competition producer must also have access to a critical mass of All Star Teams, particularly the best All Star Teams, as All Star Cheerleaders desire the challenge and recognition that comes with competing against the best in the sport.

134.    All Star Competition producers must also have access to judges, in order to hold their competitions, and advertising, in order to carry out all of their other functions.

### ii.      Barriers Created by the Exclusionary Scheme

135.    As alleged herein, Varsity has used the Exclusionary Scheme to erect insurmountable barriers to entry which, together with the natural barriers, insulate Varsity from competition. To enter the All Star Competition Market, event producers must have access to the uniform set of rules used by other competitions in the league, as no All Star team wants to learn a new set of rules to compete in just one competition. However, USASF refuses non-member IEPs, Varsity's competitors, from having access to its rules, claiming as a pretext that the rules are subject to trademark and copyright protections.

136.    To be viable in the All Star Competition Market, event producers must also be able to offer Bids to the All Star Championships. However, USASF and Varsity have conspired to limit the number of All Star Competitions that can award these Bids. Varsity owns and controls 33 of the 42 All Star Competitions that can award Bids to Worlds and all of the All Star Competitions that can award Bids to The Summit and U.S. Finals. As a result, a new competitor in the All Star Competition Market is unlikely to be able to offer Bids and thus would immediately be rendered competitively irrelevant.

137.    All Star Gyms must be members of the USASF in order to compete in USASF-sponsored All Star Competitions. This accreditation carries with it a requirement that the All Star

Gyms report all events they attend to USASF. Varsity and USASF representatives then pressure the All Star Gyms to go only to USASF-sanctioned events.

138.    The access of any IEP to All Star Gyms is further restricted by the USASF-preferred insurer, K&K, which charges All Star Gyms thousands of dollars more, per year, for its insurance, if Gyms attend non-USASF events. In addition, K&K requires covered All Star Gyms to be USASF members. The rates for USASF member Gyms are between $19 and $24.55 per All Star Cheerleader, but they increase to $34 per Cheerleader if the All Star Gym enters its All Star Team in even a single competition that is not sanctioned by USASF.

139.    As alleged further below, IEP access to All Star Gyms is further limited by the Network Agreement and Family Plan, which require Gyms to devote a large share of their allotted competitive season to Varsity's All Star Competitions and also to spend a certain sum (usually tens of thousands of dollars) on Varsity All Star Apparel each year to qualify for non-penalty prices on Varsity competitions and apparel.

### 2.    Monopoly Power in the All Star Apparel Market (the Ancillary Market)

#### a.    The Relevant All Star Apparel Market

140.    All Star Cheerleaders are required to wear specialized apparel and use specialized equipment in order to compete in All Star Competitions. USASF rules govern every detail of this apparel, including minutia such as what direction hair bows must face and how large those bows can be.

141.    All Star Cheerleaders also require specialized apparel and equipment for practice, and All Star Gyms require specialized apparel and equipment for membership on their All Star Teams.

142.    The All Star Apparel Market is restricted to specialized clothing such as uniforms, warm-up outfits, and team jerseys; and specialized accessories such as hair bows and headbands; and specialized equipment such as backpacks and shoes. Because All Star Competitions require that participants dress and accessorize in accordance with USASF rules, All Star Gyms and their

associated All Star Team members could not shift to more generic athletic apparel in response to a small but significant and non-transitory increase in the price of All Star Apparel. Thus, a hypothetical monopoly supplier of All Star Apparel would not need to control any suppliers of non-All Star Apparel in order to increase the price of All Star Apparel substantially above competitive levels profitably.

### b.   The Relevant Geographic Market

143.   The relevant geographic market is the United States. All performances in the primary market occur within the United States and are regulated by USASF standards set in the United States. As such, nearly all of the targeted customers for All Star Apparel reside in the United States.

### c.   Varsity Has Monopoly Power with Respect to Sales of All Star Apparel

144.   Varsity has, at all relevant times, possessed monopoly power in the market for All Star Apparel. Varsity has maintained and enhanced, and continues to maintain and enhance, its monopoly power in this market through the Challenged Conduct (as alleged in this Consolidated Complaint). Varsity possesses the ability to control, maintain, and increase prices in the All Star Apparel Market substantially above competitive levels profitably, and the ability to impair and exclude competitors from this Relevant Market. Varsity has in fact inflated prices of its All Star Apparel substantially above competitive levels during the Class Period. Varsity has the ability to foreclose, and has in fact foreclosed, would-be rivals from the All Star Apparel Market.

145.   Varsity has assembled at least 200 copyrights on uniform design, which create a barrier to entry by subjecting potential entrants in the All Star Apparel market to the threat of copyright lawsuits. Varsity aggressively enforces its copyrights against actual and potential rivals through trademark litigation.

146.   Varsity also maintains an opaque scoring system, where judges complete score sheets and submit them to Varsity employees for review. On information and belief, Varsity instructs judges at its competitions to reward All Star Teams fielded by "High-Dollar" All Star

Gyms with higher scores for spending more money on Varsity's All Star Competitions and Apparel.

147.    Varsity has gained and maintained at least an 80% share of the All Star Apparel Market through acquisitions, exclusive dealing arrangements, and other anticompetitive and exclusionary conduct that is part of the Exclusionary Scheme alleged herein.

### d.    Barriers to Entry

148.    There are a number of barriers to entry into the All Star Apparel Market, including many barriers imposed and reinforced as part of the Exclusionary Scheme.

### i.    Natural Barriers to Entry

149.    Apparel-manufacturing and marketing facilities require significant investments of capital to design, manufacture, and promote their shoes, clothing, and accessories. Equipment needed to manufacture this apparel and warehousing needed to store and distribute it are both extremely expensive and require a significant amount of sunk costs.

150.    Manufacture and sale of All Star Apparel also requires an established distribution chain, which, if it does not already exist, takes a significant amount of time to get up and running.

151.    Designs for All Star Apparel are specific to that market and require specially-trained designers to create and specialty equipment to manufacture.

152.    Intellectual property provides another barrier. Any designer of All Star Apparel must take care not to infringe the designs of any competitors who hold copyrights or trademarks, or else risk litigation. Varsity has assembled almost 200 copyrights protecting its designs and aggressively enforces those rights against actual and potential rivals.

### ii.    Barriers to Entry Imposed Through the Exclusionary Scheme

153.    All Star Apparel manufacturers must have a venue to showcase and sell their apparel. In the All Star Apparel Market, the main and critical venue is All Star Competitions. However, Varsity denies its actual and potential competitors access to the showrooms at its market-dominant All Star Competitions, depriving them of this necessary distribution venue.

154.    All Star Apparel manufacturers must also have the ability to sell apparel that complies with All Star Competition rules. However, the USASF tailors its rules to allow the type of apparel Varsity manufactures and sells, to the exclusion of competitors' apparel. Further, USASF judges often award extra points to All Star Teams wearing Varsity apparel, thus discouraging them from wearing the apparel of competitors.

155.    As alleged further below, Varsity's Exclusionary Scheme includes restrictive contracts with the largest-dollar volume and most prestigious All Star Gyms that require such gyms to exclusively purchase All Star Apparel from Varsity, foreclosing access by apparel rivals to these important customers and their All Star Team members—who comprise a significant share of market sales. Varsity also provides terms for all other All Star Gyms that make it economically unfeasible for most of them to purchase All Star Apparel from potential rivals.

G.    **Varsity's Continuing Exclusionary Scheme to Maintain and Enhance Monopoly Power in the Primary and Ancillary Relevant Markets**

1.    **Acquisitions of Rivals**

156.    Varsity has engaged in a pattern of acquiring and then either integrating or dissolving its competitors in the Relevant Markets for decades. Varsity has acquired company after company as part of its rampage through the All Star Cheer world. As one insider stated, Varsity has "been very successful in squelching other competitors."[40]

157.    During the Class Period, as defined below, Varsity has taken over or driven out of business its rivals in the All Star Competition and All Star Apparel markets. And as the number of rivals in both Relevant Markets has dropped, prices have risen.

158.    Varsity's acquisitions have bolstered its control over the All Star Competition market as well as over significant organizations like USA Cheer and USASF that regulate All Star Competitions. As an open letter dated June 30, 2019 from an organization of independent gyms and coaches explained:

---

[40] *See* Natalie Adams, co-author of <u>Cheerleader! An American Icon</u>, *Cheer* (Netflix 2020).

The governing body [the USASF] didn't immediately turn south but it wasn't long after the formation that the biggest EP [Event Producer] started gobbling up smaller companies that had limited power in the industry. And with the companies they gobbled up, the more power they got within the governing body. Then the 2nd biggest EP [JAM Brands] started gobbling up companies to compete against the biggest EP [Varsity]. Then the 3rd biggest EP [Epic Brands] started gobbling up companies to compete against the 2nd biggest EP. Then #2 was gobbled up by #1. Then #3 was gobbled up by #1. All the while, any sense of independence and control that governing body had was gone. One company held all the cards.

### a.    Varsity Acquired The JAM Brands

159.    Prior to 2016, The JAM Brands was an IEP in the United States and Varsity's chief competitor. The JAM Brands produced All Star Competitions that included divisions for high school, college, and All-Star Teams, as well as recreational divisions. The JAM Brands owned Cheerleaders of America ("COA"), a major IEP in Ohio. The JAM Brands also owned America's Best, an IEP in Texas.

160.    The JAM Brands produced many of the largest and most popular All Star Competitions in the United States, including The MAJORS and The U.S. Finals, one of the most coveted All Star Championships. It also owned All Star Competitions that awarded 24 of the Bids to Worlds. Moreover, The JAM Brands produced an All Star Competition branded as "JAMFest Cheer Super Nationals," at which over 550 All Star Teams competed. In addition, The JAM Brands was a disruptive and aggressive competitor, introducing new event concepts that competed directly with Varsity's All Star Competitions. Prior to Varsity's acquisition of it, The JAM Brands generally offered free admission to event spectators, many of whom are the parents and other family members of the Cheerleaders.

161.    Varsity and The JAM Brands announced their pending merger in November 2015. In a letter to All Star Gym owners, Varsity assured them, "For you as a customer, nothing will change." Plaintiffs and the Class in fact saw increases in All Star Competitions registration fees a year later. The JAM Brands began charging spectators admission to its events for the first time only after it was acquired by Varsity.

162.     In addition, with the acquisition of The JAM Brands, Varsity also gained control over The JAM Brands' board seats on the USASF and the IASF, solidifying Varsity's control over the major sanctioning bodies that regulate competitive All Star Cheerleader, and allowing Varsity to use those regulating bodies to foreclose competitors from the Relevant Markets, as discussed below.

163.     Varsity's acquisition of The JAM Brands gave Varsity more control over both the All Star Competition Market and the All Star Apparel Market. One article described the situation as follows:

> The Alliance's birth coincided with one of Varsity's most audacious moves—and for [rival All Star Apparel manufacturer] Rebel, its most shattering. In October, Varsity—in a deal widely criticized on industry chat boards—acquired JAM Brands, the second-largest event producer and by far Rebel's most important marketing partner. Just a few months earlier, JAM Brands co-owner Dan Kessler had explained why his company had chosen Rebel to be its exclusive uniform sponsor. "They were edgy. The look was real," said Kessler. "We felt there was some good synergy there."

> That synergy vanished last fall, while Rebel was negotiating to renew the partnership. "Suddenly those talks just fell apart," says Noseff Aldridge. A few weeks later, Varsity and JAM Brands announced their union. JAM Brands ran most of the high-profile competitions that Varsity doesn't own. Together, they control roughly 90 percent of the major events, say competitors.[41]

### b.     Varsity Acquired Spirit Celebrations

164.     Spirit Celebrations was an IEP that produced the second largest All Star Competition in Texas, called the Dallas Cowboys Cheerleader Championship.

165.     Varsity acquired Spirit Celebrations in late 2016 or 2017. After Varsity acquired Spirit Celebrations, Varsity increased registration fees substantially. As a result of those increased fees, participation in the Dallas Cowboys Cheerleader Championships dropped from 400 teams to 150 teams.

---

[41] https://slate.com/business/2016/02/rebel-wants-to-disrupt-the-surprisingly-entrenched-cheerleader-uniform-industry.html.

###### c.   Varsity Acquired Epic Brands

166.    Varsity acquired Epic Brands, the second largest IEP in the U.S., in January 2018.
Epic had the largest presence in Chicago and the Northeast. Epic also had the right to distribute 12
Bids to the Worlds. After the acquisition, Varsity now controlled Epic's 12 Worlds' Bids.

###### d.   Varsity Solidified Its Control

167.    Prior to Varsity's spate of All Star Competition acquisitions, there were still a
number of "independent" All Star Competition producers, known as "Independent Event
Producers" or "IEPs," left in the All Star Competition Market, including: All Star Challenge;
Aloha Productions; America Cheer Express; American Spirit Championships; Cheer America;
Cheer Ltd.; CheerSport; Cheer Tech; COA Cheer & Dance; Connecticut Spirit Association;
Golden State Spirit Association; JAMZ Cheer and Dance; Mardi Gras Spirit Events; Nation's Best;
Pac West Spirit Group; Spirit Cheer; Universal Spirit; UPA; US Spirit; Valley of the Sun; WCA;
Worldwide Spirit Association; and Xtreme Spirit.

168.    Varsity, as a result of its Exclusionary Scheme, systematically acquired 12 of these
once-independent competitions: All Star (2008); Pac West (2011); CheerSport and Universal Spirit
(2012); Cheer Ltd (2014); COA Cheer & Dance (2015); Aloha Productions and Golden State Spirit
Association (2016); Mardi Gras Spirit Events and Spirit Celebrations (2017); Epic Brands (2018);
and Spirit Cheer. Seven out of the 12 Varsity-owned All Star Competitions have the ability to offer
Worlds Bids, whereas only one of the events that remained independent is a qualifying event for
Worlds. None of the remaining independent events offers participants the ability to qualify for The
Summit.

169.    Due to Varsity's Exclusionary Scheme, the few remaining IEPs have been relegated
to "B League" status, rendering the remaining potential rivals in the All Star Competition Market
incapable of challenging Varsity's dominance.

**2.    Varsity Leverages Its Monopoly Power to Impose Exclusionary Contracts and Anticompetitive Loyalty Programs on All Star Gyms**

170.    Varsity uses its dominance of the All Star Competition Market to maintain and enhance its control over the All Star Competition Market as well as to acquire, enhance, and maintain its monopoly power in the All Star Apparel Market.

171.    One of the primary means by which Varsity maintained and enhanced its monopoly power in the Relevant Markets is by imposing exclusionary contracts and anticompetitive loyalty programs on All Star Gyms.

172.    Varsity employs two types of agreements with All Star Gyms, the "Network Agreement" and the "Family Plan," to maintain its dominance in the All Star Competition Market and to acquire, enhance, and maintain monopoly power in the All Star Apparel Market. Varsity imposes its exclusionary contracts on All Star Gyms because collectively they are the key distribution channel through which All Star Competition producers and All Star Apparel suppliers promote and sell their goods and services, and they are the key input for a successful All Star Event. All Star Gyms recruit, train, organize, and maintain All Star Teams. They choose which All Star Competitions their All Star Teams attend. They also select the All Star Apparel that their All Star Teams purchase. As such, All Star Gyms are a key input for producing a successful All Star Competition and the primary and necessary distribution channel for All Star Apparel.

173.    Moreover, there are certain All Star Gyms that, because of their reputations and size, are more significant players in the All Star Cheer industry than others. Varsity knew that by inducing All Star Gyms to agree to buy from Varsity exclusively or nearly so, Varsity could lock up the All Star Gym distribution channel, and thereby maintain monopoly power in the All Star Competition Market and the All Star Apparel Market. Varsity also knew that, if it could induce the top, most successful All Star Gyms to enter into long-term exclusive deals, it would be able to erect an impenetrable barrier to entry and substantially foreclose competition in both Relevant Markets.

43

### a. The Network Agreement Is an Exclusionary Contract

174.     Varsity economically induces the most significant and big-money All Star Gyms, which are necessary to put on successful All Star Competitions and collectively comprise the most important All Star Apparel distribution channel, to exclusionary three-year Network Agreements. These Network Agreements require Gyms to register their All Star Teams for at least five Varsity-produced All Star Competitions per season and spend at least $30,000 on registration fees for Varsity events.

175.     Varsity's Network Agreements provide increasing rebate percentages for Gyms that spend above $30,000 per year on Varsity registration fees. Given that All Star Gyms typically attend only between five and eight All Star Competitions per season, Varsity's contractual requirements make it extremely difficult if not impossible for these All Star Gyms to attend IEPs' All Star events, and thus effectively impose exclusive dealing.

176.     The Network Agreements contain additional provisions structured to cause All Star Gyms to shun rival event producers. For instance, All Star Gyms that meet the Network Agreement requirements and attend the required five Varsity events per season are effectively locked in to attending only Varsity events. Every dollar All Star Gyms spend on registration fees above the required $30,000 minimum annual expenditure increases the discount for attending additional Varsity events in that season. Thus, once an All Star Gym has spent the required threshold amount, it becomes economically and practically infeasible for such Gyms to attend non-Varsity events. Further, the Network Agreements explicitly require all of these big-money and most prominent All Star Gyms to purchase and use Varsity All Star Apparel exclusively, foreclosing a key distribution channel and critical group of customers from being accessed by All Star Apparel rivals.

177.     Because the Network Agreement is offered to the largest and most successful All Star Gyms, the All Star Gyms with the most talented All Star Cheerleaders are guaranteed to attend Varsity's All Star Competitions and wear Varsity's All Star Apparel. This, in turn, draws the

smaller All Star Gyms into attending Varsity's All Star Competitions and wearing Varsity's All Star Apparel.

178.    Ultimately, IEPs and competitor All Star Apparel manufacturers are foreclosed from access to All Star Gyms that participate in the Network Agreement. This essentially deprives IEPs and competitor All Star Apparel manufacturers of having the best talent participate in their events or wear their apparel. At the same time, the prices that All Star Gyms had to pay to be part of a Network are likewise inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

**b.    The Family Plan Is an Anticompetitive Loyalty Rebate Program**

179.    For All Star Gyms that are not induced to execute Network Agreements, Varsity offers a modified version of the Network Agreement called the "Family Plan." Varsity offers the Family Plan to every All Star Gym in the country, meaning that Varsity has the potential to engage 100% of the All Star Gyms in the Market in its exclusionary programs.

180.    The Family Plan requires that an All Star Gym pay registration fees for a certain number of Varsity's All Star Competitions in one year in order to obtain a small amount of relief from Varsity's penalty pricing on All Star Apparel and All Star Competitions. Mere attendance at All Star Championships does not count toward the requirement. Transportation, ticket cost, and other event costs also do not count toward the requirement—only the actual registration fee is credited.

181.    Under the Family Plan, Gyms must attend at least six Varsity All Star Competitions per year. Because All-Star Teams typically attend only between five and eight All-Star Competitions in a season (excluding The Summit and U.S. Finals), All-Star Gyms must devote all or the vast majority of their All-Star Competition season to Varsity events to obtain relief from Varsity's penalty pricing. The amounts All-Star Gyms must spend to obtain a particular percentage of monetary relief from Varsity's penalty pricing has increased over the years, as Varsity's contracts have become more and more exclusionary.

45

182.     Varsity incentivizes All Star Gyms to have their teams attend more than six Varsity All Star Competitions (i.e., effectively, all or nearly all of the competitions Gyms will attend in a season) by increasing the reward percentages per each additional event attended.

183.     All Star Gyms seeking to participate in the Family Plan are also incentivized to purchase their athletes' All Star Apparel exclusively from Varsity.[42]

184.     The Family Plan provides rebates referred to as "Varsity Fashion Dollars." These Varsity Fashion Dollars may only be used on future purchases from Varsity. As a result, the All Star Gyms are trapped in an endless cycle with Varsity, as foregoing these future rebates and doing business with Varsity's competitors becomes prohibitively expensive the more they patronize Varsity events and purchase Varsity apparel.

185.     Varsity, as alleged above, uses its control of the All Star Championship Bids, and loyalty contracts, to coerce All Star Gyms to attend Varsity events exclusively. Taken together with the fact that All Star Teams generally only attend five to eight competitions per year, this structure all but excludes the possibility of competition from IEPs in the Relevant Market by effectively punishing All Star Gyms for attending non-Varsity All Star Competitions.

### 3.     Varsity Leverages Its Monopoly Power in the All Star Competition Market to Control the All Star Apparel Market

186.     Varsity has also leveraged its monopoly power in the All Star Competition market to acquire, maintain, and enhance its monopoly power in the All Star Apparel market.

---

[42] *See* Matt Stoller, "The Coming Collapse of a Cheerleading Monopolist," May 27, 2020, https://mattstoller.substack.com/p/the-coming-collapse-of-a-cheerleading (last accessed Aug. 25, 2020).

187.     Varsity has assembled at least 200 copyrights on uniform design. Varsity uniform and apparel designs can be identified by a "V" logo on the bottom left of every top or skirt (as depicted below).

  

188.     For the critical big-money All Star Gyms participating in its Network Agreement, Varsity requires exclusive purchasing of Varsity's All Star Apparel. As a result, no All Star Apparel rival could possibly compete with Varsity without also dominating the All Star Competition Market. Moreover, Varsity ties availability of non-penalty prices on Varsity's All Star Apparel to attendance at Varsity All Star Competitions, such that All Star Gyms must both spend a minimum amount annually on Varsity's All Star Competitions and attend a minimum number of Varsity's All Star Competitions annually to qualify for non-penalty prices on Varsity's All Star Apparel.

189.     Varsity also bars competing All Star Apparel manufacturers from selling their All Star Apparel at Varsity All Star Competitions. Varsity controls access to the showrooms at its All Star Competitions. It forbids the display and sale of non-Varsity All Star Apparel at those All Star Competition showrooms. With Varsity controlling 90% of All Star Competitions, this practice has as a significant exclusionary effect by depriving other All Star Apparel manufacturers of a key distribution channel and the associated revenue.

190.     Rival All Star Apparel manufacturer Rebel had previously displayed and sold All Star Apparel at JAM Brands' events. Its contract with The JAM Brands was terminated when Varsity acquired The JAM Brands, and Varsity excluded Rebel from all subsequent JAM Brands events. As one article observed, quoting Rebel's founder:

> The JAM Brands competitions had been Rebel's most effective platform for marketing to elite cheer teams. "Not partnering with an event company is one thing," says Noseff Aldridge [founder of Rebel Athletic]. "But being locked out of partnering with an event company—knowing that a competitor is now going to be in your booth space showing its product—it's a double whammy."[43]

191.     Likewise, Nfinity, another All Star Apparel brand, has also been prohibited from selling its products at once-independent All Star Competitions that were acquired by Varsity, including CheerSport's numerous competitions and Battle Under the Big Top.

192.     Further, as mentioned above, certain of Varsity's contracts and terms with All Star Gyms combine rebates for attending Varsity's All Star Competitions with agreements requiring All Star Gyms to purchase their All Star Apparel exclusively from Varsity. Thus, All Star Gyms bound by the Network Agreement cannot access non-penalty prices for All Star Competitions unless they also agree to exclusively buy their All Star Apparel from Varsity.

193.     The rules governing USASF and Varsity All Star Competitions regarding All Star Apparel are frequently written to favor Varsity's latest All Star Apparel designs. These practices make the wearing of Varsity All Star Apparel an important element for success at All Star Competitions, further impairing the ability of rival All Star Apparel manufacturers to gain significant sales.

194.     Beyond this exclusionary conduct, there is another dark side of Varsity's conduct in the All Star Apparel space. In light of the fact that 90% of All Star Competitions are Varsity-produced—with Varsity not only setting the rules for those competitions but also paying the judges to judge those competitions—rumors have long circulated that All Star Teams outfitted in Varsity

---

[43] https://www.inc.com/magazine/201603/leigh-buchanan/rebel-athletic-custom-cheerleading-uniforms-startup.html.

apparel (which is identifiable by the "V" logo) are rewarded with higher scores for their routines. As one industry participant put it, "you've gotta be Varsity, bow to toe" in order to maximize point awards at All Star Competitions.[44] This further discourages All Star Teams from buying All Star Apparel from anyone other than Varsity.

### 4. Varsity's Use and Control of Governing Bodies

195. Defendant USASF is a governing body that sanctions All Star Competitions and provides a set of rules and regulations to govern those events. The organization credentials coaches, certifies safety judges, sanctions events, and maintains safety guidelines.

196. USASF also own, produces, sanctions, and promotes the Worlds All Star Championship. When it first established the Worlds, the USASF offered Varsity a no-contest bid to produce the event, and it did not allow any other IEPs to compete for the right to produce the event. While All Star Gyms are not technically required to belong to the USASF, a USASF membership is required to compete for Bids to the All-Star Championships, so All Star Gyms have no choice but to join the USASF if they wish to be viewed as high-quality organizations.[45]

### a. Varsity Controls the USASF

197. Varsity founded the USASF in 2003 and funded this effort by extending an interest-free $1.8 million loan to the USASF. Varsity submitted the original trademark application for the marks "U.S. All Star Federation" and "USASF," listing itself as owner.

198. For at least the first 15 years of its existence, the USASF's offices were located at Varsity's corporate address, and a Varsity representative answered the phone for the USASF.

---

[44] *See* Jason Watson, Comments Section, May 27, 2020, https://mattstoller.substack.com/p/the-coming-collapse-of-a-cheerleading/comments#comment-232780 (last accessed Aug. 25, 2020).

[45] https://usasf.net.ismmedia.com/ISM2/ParentsActionCommittee/Cheer_Parents_101.pdf.

199.     According to a Varsity spokesperson, Varsity currently pays the salaries of at least two top employees at USASF, including the President Jim Chadwick and the Vice President of Events/Corporate Alliances Steve Peterson.[46]

200.     USASF is a "member" of USA Cheer. According to recent reports, USA Cheer has no employees of its own, but it does have six staff members, including an executive director, who are Varsity employees contracted to work for the regulatory body.[47]

201.     Varsity controls the USASF board of directors. The USASF board is empowered to set policy for the USASF. The board is composed of 13 voting members, one seat each for the seven All Star Competition producers that started the USASF, the USASF Chairman, a senior USASF staff member, and four program owner members, including the Chairman of the National All Stars Connection.[48] Two USASF board seats are permanent and are held by representatives named by the Chairman of the USASF.[49]

202.     As Varsity has acquired more and more of the USASF's founding event producers, it has continued to build its presence on the USASF board. Pursuant to USASF's 2015 Bylaws, "The Board of Directors is made up of representatives from Competition Event Producers, gym owners/coaches, and the USASF."[50] With regard to the "Competition Event Producers" seats, those are to be filled with "representatives named by each of the following Competition Event Producers: Universal Cheerleaders Association, CheerSport, National Cheerleaders Association,

---

[46] https://www.usatoday.com/in-depth/news/2020/09/18/cheer-empire-profit-company-created-cheerleading-regulators-pays-salaries/3468551001/.

[47] https://www.usatoday.com/in-depth/news/2020/09/18/cheer-empire-profit-company-created-cheerleading-regulators-pays-salaries/3468551001/.

[48] http://www.usasf.net/organization/bod/bod_overview/.

[49] http://www.usasf.net/organization/about/bylaws/.

[50] *See* "About the USASF," USASF, Sept. 1, 2005, https://www.usasf.net/about (last accessed Aug. 25, 2020).

United Spirit Association, American Cheerleaders Association, Universal Dance Association, and JAMfest."[51] *Every single one* of those event producers is owned by Varsity.

203.    With regard to the two gym owner/coach Board seats that rotate every two years, those are filled by candidates nominated by the Nominating Committee and must be approved unanimously by the Board.[52] The fact that a Varsity-majority board has the mandate to appoint these seats not only ensures that two theoretically "independent" seats are filled with people friendly to Varsity, it also provides a further incentive to gym owners and coaches to remain loyal to Varsity so that they might be seen as good candidates for the seats. With the acquisition of The JAM Brands and Epic Brands, Varsity has direct control over 75% of the USASF board seats.

204.    The personnel connections between Varsity and USASF extend beyond the Board. Two of the three USASF Vice Presidents as well as the USASF Executive Director are either current or former Varsity employees.

205.    The USASF's website is located at www.usasf.net, a URL owned by Varsity—although Varsity now seeks to conceal its ownership and control of the URL behind the registration of "PERFECT PRIVACY, LLC."[53]

### b.    Defendant USASF Limits Which All Star Competition Producers Can Award Bids to All Star Championships

206.    Varsity has used its control over USASF, and conspired with USASF, to foreclose and impair rival IEPs from getting traction in the Relevant Markets. Varsity used its control of USASF to limit the number of coveted All Star Championship Bids that All Star Competition producers can award to All Star Teams.

207.    USASF controls the All Star Competitions producers that can provide Bids to these high-profile All Star Championships. According to USASF rules, only "Tier 1" All Star

---

[51] *See id.*

[52] *See id.*

[53] https://cheergyms.activeboard.com/t5660100/who-really-has-the-power-in-usasf/.

Competition producers can offer Fully Paid Bids to Worlds. USASF rules also limit the number of Tier 1 All Star Competition producers to 42.

208.    Prior to its acquisition of The JAM Brands and Epic Brands, Varsity owned 21 of the 42 All Star Competitions permitted to offer Fully Paid Bids to Worlds. Today, Varsity owns 33 of the 42 Tier 1 All Star Competitions. Conversely, only 9 of the 54 IEPs credentialed by USASF can offer Bids to Worlds.

209.    In addition, while the number of Tier 1 All Star Competitions is fixed, the number of Bids, Fully Paid and otherwise, that any one of those All Star Competition producers may distribute can be changed by Varsity and USASF. And Varsity consistently uses its control of USASF to increase the number of Bids available at its own All Star Competitions after Varsity acquires them. Varsity controls and allocates well over 80% of all Worlds Bids.

210.    Access to Tier 1 status and the ability to offer Fully Paid Bids to Worlds is critical for an IEP to gain sufficient traction in the All Star Competition Market and seriously challenge Varsity's monopoly power. That is because the primary goal of most All Star Teams is to win All Star Competitions to gain Fully Paid or Partially Paid Bids to All Star Championships such as Worlds. If an IEP cannot offer such Bids, it cannot attract participation from the most successful All Star Gyms, which will reduce the IEP's appeal, reach, and prestige.

211.    Furthermore, with Varsity's input and direction, USASF prohibits All Star Competition producers from holding Bid-qualifying All Star Competitions within 500 miles of another Bid-qualifying competition. This makes it nearly impossible for an IEP to expand and compete further with Varsity, which already holds competitions nationwide in most major metropolitan areas. The ultimate result is that the only way for an All Star Competition producer to gain additional Bids to Worlds is to acquire an existing All Star Competition producer that controls such Bids. Since Varsity's acquisition of Epic Brands in January 2018, there are few such producers left outside of Varsity's hands.

###### c.   USASF and Varsity Use and Create Rules to Foreclose Rivals

212.   USASF and Varsity are the only two organizations with the power to enact rules affecting 90% of All Star Competitions in the United States.

213.   Varsity and USASF use their rule-making "authority" to prevent potential rival sanctioning organizations from creating their own All Star Championships that could undermine Varsity's dominance. For example, in October 2011, USASF and IASF—both of which are controlled by Varsity, as described above—issued a joint letter to member All Star Gyms, All Star Competitions, and All Star Team coaches stating that it is:

> the policy of the USASF/IASF that no athlete, coach, judge, or official is permitted to participate in any way in any event that claims to be a World or International Championship, other than the ICU [International Cheer Union] World Championships for National teams, or the USASF/IASF Worlds for All Star teams. This stipulation applies to any regional international championship affiliated with an organization claiming to operate a World Championship, other than the ICU and USASF/IASF. Failure to comply with this rule is grounds for disqualifying any athlete, coach, judge, or official from participating in the ICU and USASF/IASF World Championships.[54]

###### d.   Varsity Leverages Its Control of Defendant USASF to Exert Control Over All Star Teams' Competition Schedules

214.   All Varsity-sponsored events are USASF-sanctioned. To enter All Star Teams in USASF-sanctioned events, All Star Gyms, All Star Cheerleaders, and All Star Team coaches must all become USASF members and pay annual membership dues to USASF. Judges at USASF-sanctioned All Star Competitions must also be certified by USASF.

215.   Membership dues are USASF's primary revenue source, and it collected over $5 million in membership dues in 2017.[55] The following chart shows the growth in USASF's revenue

---

[54] *See* "USASF/IASF: WORLDS POLICY UPDATE", Spirit Company, Oct. 18, 2011, https://spiritcompany.com/2011/10/usasfiasf-worlds-policy-update/ (last accessed Aug. 25, 2020).

[55] https://usasfmain.s3.amazonaws.com/Organization/docs/annual/USASF_AnnualReport_2017.pdf.

from membership dues from 2008 to 2017. In particular, it shows a dramatic spike in revenue between 2014 and 2015, right when USASF instituted its membership dues policy:[56]



216.    Though USASF does not contractually bar its members from participating in non-USASF events, it does require its member Gyms to report their full competition schedules for the year, including USASF-sanctioned and non-sanctioned, Varsity and IEP. USASF shares this information with Varsity, and both Varsity and USASF representatives then pressure the All Star Gyms to go only to USASF-sanctioned events.

217.    USASF also copyrighted its All Star Competition rules in 2016, and it forbids All Star Competition producers that have not paid USASF membership dues from using those rules at their events. Since Varsity's dominance in the All Star Competition Market ensures that all or almost all All Star Teams will fill the majority of their schedules with USASF-sanctioned events, USASF's refusal to allow non-USASF IEPs to use the same rules provides a strong disincentive for All Star Teams to include such IEPs in their schedules. After all, if competing at an IEP

---

[56] *See* "Annual Report & Financials," USASF, https://www.usasf.net/about (last accessed Aug. 20, 2020).

competition requires an All Star Gym to learn an entirely new set of rules, they are less likely to do so. Plus, given that 90% of all All Star Competitions are Varsity-owned, the All Star Teams' routines would have been developed to ensure compliance with the USASF rules, not those used by an IEP, further disincentivizing an All Star Gym from sending its teams to non-USASF IEPs' competitions. USASF aggressively enforces this scheme through the threat of copyright litigation.

218.    USASF also uses its competition rules to assist Varsity in maintaining and enhancing its dominance in the All Star Apparel Market. USASF rules governing apparel are drafted to favor the newest All Star Apparel designs being marketed and sold by Varsity.

219.    Bids to Worlds and The Summit are also not awarded at non-USASF events, further discouraging All Star Teams from putting these IEPs on their limited competition schedules. In any event, there are not enough IEPs for an All Star Team to plan a full season around non-USASF events without also attending Varsity (and thus USASF-sanctioned) events.

220.    USASF also requires member All Star Gyms to have and report their liability insurance. USASF encourages All Star Gyms to purchase insurance from a particular insurance carrier—K&K Insurance—and, on occasion, will deny All Star Gyms' attempts to use other insurance carriers. K&K both (i) requires All Star Gyms to be USASF members before it will provide them coverage, and (ii) charges significantly higher annual premiums to All Star Gyms that enter their All Star Teams in even a single All Star Competition that is not sanctioned by USASF.

221.    All Star Gyms pay K&K between $19 and $24.55 per All Star Cheerleader, but those rates increase to $34 per Cheerleader if the All Star Gym enters its All Star Team in even a single competition that is not sanctioned by USASF. For one small All Star Gym, that amounts to a $2,300 difference in annual insurance premiums. This insurance arrangement dissuades All Star Gyms from attending non-USASF-sanctioned All Star Competitions. Most All Star Gyms have K&K insurance, and they are afraid that scheduling non-USASF-sanctioned All Star Competitions will lead either to higher premiums or to being considered out of compliance and thus having a coverage lapse.

222.     The USASF membership rules specify that members are not permitted to affiliate, partner with, or own non-USASF-sanctioned IEPs, and that every All Star Gym that wishes to attend USASF events must become a USASF member. Thus, All Star Gyms that attend at least one USASF event per year agree to these exclusionary terms.

### H.     The Exclusionary Scheme Foreclosed Competition in the Primary and Ancillary Relevant Markets

223.     Varsity's Exclusionary Scheme has successfully impaired and foreclosed a substantial share of each of the Relevant Markets from competitors. The Exclusionary Scheme has also created significant entry barriers for would be competitors in the Relevant Markets. As a direct and proximate result, Varsity collectively controls approximately 90% of the All-Star Competition Market and 80% of All-Star Apparel Market in the United States.

224.     Varsity has foreclosed competitors in both Relevant Markets from access to the most significant All-Star Gyms in its exclusionary Network Agreements. Varsity's "Network" Gyms collectively comprise a critical source of top-level talent and fees for its All-Star Competitions and the most important distribution channel for its All-Star Apparel.

225.     The remainder of the All-Star Gyms are offered the Family Plan, which as set forth above, impairs the ability of actual and potential rivals in both Relevant Markets to get access to the vast majority of customers in both Relevant Markets. These exclusionary agreements, together with the other conduct alleged to be part of the Exclusionary Scheme, have blocked and impaired rivals from accessing the vast majority of the participants and customers in both Relevant Markets.

226.     Varsity, together with the USASF, has also substantially foreclosed competition in both Relevant Markets by, *inter alia*, restricting access to the ability to award coveted Bids to Worlds and other All-Star Championship Bids, requiring adherence to restrictive rules and exclusionary insurance requirements, and other conduct alleged to be part of the Exclusionary Scheme in this Complaint.

## I. The Exclusionary Scheme Caused Plaintiffs and Members of the Class to Suffer Antitrust Injury and Damages

227.    As a direct and proximate result of Varsity's Exclusionary Scheme, as alleged herein, Plaintiffs and the Class members have suffered antitrust injury in that they paid artificially inflated prices for goods and services that they purchased directly from Varsity in one or both of the Relevant Markets during the Class Period. The full amount of such damages Plaintiffs and the Class suffered will be calculated after discovery and upon proof at trial.

228.    The conduct comprising Varsity's Exclusionary Scheme is continuing and so are the injuries and damages suffered by Class members.

## J. The Exclusionary Scheme Caused Anticompetitive Effects in Both Relevant Markets with No Offsetting Procompetitive Efficiencies

229.    Defendants' Exclusionary Scheme has substantially foreclosed competition in the Relevant Markets and allowed Varsity to obtain, maintain, and/or enhance monopoly power in both of the Relevant Markets. As a result of the Exclusionary Scheme, prices in both Relevant Markets have been artificially inflated substantially above competitive levels, output in each of the Relevant Markets has fallen below competitive levels, All Star Gyms and All Star Cheerleaders have less choice in both Relevant Markets, and quality of competitions and products has been diminished.

230.    **Higher Prices**: Due to the Exclusionary Scheme, Varsity has raised prices associated with All Star Competitions and for All Star Apparel above competitive levels. For instance, participation fees for Varsity All Star Competitions have increased substantially over the Class Period. Varsity also began charging spectator admission fees to legacy-JAM Brands events in 2016. Varsity has steadily increased those admission fees during the Class Period. In events such as JAMFest Bam JAM, admission fees for adults doubled between late 2016 and 2019.

231.    Varsity has further exploited its monopoly power by steadily increasing the number of "Stay-to-Play" events. At a "Stay-to-Play" event, each All Star Team member is required to

book lodging and stay at a Varsity-approved "Housing Partner" hotel.[57] These "stay-to-play" hotels generally charge substantially more than the competitive rate charged to other guests, since the All Star Cheerleaders are a captive audience. Varsity makes significant supracompetitive profits from its Stay-to-Play program by either working with the hotels to pass a mark-up to the All Star Team members and then taking a kick-back, or using Stay-to-Play to get discounted or free venues for hosting its All Star Competitions. If an All Star Competition participant stays at a hotel outside the "Stay-to-Play" consortium, that participant's All Star Team is barred from participating in the All Star Competition. If Varsity learns of this rule violation after the All Star Competition, it fines the All Star Gym that fielded that participant's All Star Team for the violation.

232.    Varsity also used the monopoly power gained and maintained through the Scheme to charge supracompetitive prices to Plaintiffs and the Class members for All Star Apparel.

233.    Plaintiffs and members of the Class have suffered antitrust injury because they pay supracompetitive prices for goods and services that they purchased directly from Varsity in the Relevant Markets during the Class Period. Those injuries are directly and proximately caused by Defendants' anticompetitive conduct. And they are ongoing.

234.    **Lower Output**: The Exclusionary Scheme has eliminated and impaired rivals in the Relevant Markets and blocked the entry and growth of others potential rivals. As a result, the number, size, and significance of All Star Apparel manufacturers and All Star Competition producers have been reduced, and fewer people participate as All Star Cheerleaders. At least 35 All Star Gyms closed in 2019 as compared to a normal rate of 5 to 10 such closings in previous years.

235.    During the Class Period, Varsity shut down many of its own All Star Competitions in addition to eliminating rival IEPs and these rivals' events.

236.    There are no legitimate procompetitive justifications or efficiencies for the conduct alleged as part of the Exclusionary Scheme.

---

[57] https://www.varsity.com/home/stay-smart/.

237. **Lower Quality:** The Exclusionary Scheme has allowed Varsity and USASF to resist the demand to prevent sexual abuse in the industry, thereby providing a lower quality cheerleading experience to gym owners, parents, and children.

238. A recent article in USA Today alleges that 140 people who continue to work unrestricted in the All Star cheerleading industry have been convicted of sex crimes against minors, 74 of whom are registered sex offenders.[58]

239. USASF has a system for checking the backgrounds of coaches and gym owners, but its system only flagged 21 people before USA Today reporters began their investigation. Furthermore, USASF only banned these 21 people from going "backstage" at USASF events—they could still work in the industry.

240. USASF previously fielded complaints from its customers regarding sex offenders within the cheerleading industry, but it refused to take comprehensive action in response to those complaints.

241. Varsity, through USASF, refused to take action because its market share and lack of effective competition allowed it to resist calls for a more rigid, restrictive, and expensive background check system. Participants in the cheerleading industry were powerless to demand reform without a realistic threat to take their business elsewhere.

## VIII. CLAIMS FOR RELIEF

**COUNT I**
**MONOPOLIZATION**
**15 U.S.C. § 2**
**(On Behalf of Plaintiffs and the Class and Against Varsity)**

242. Plaintiffs incorporate by reference all of the factual averments in the preceding and ensuing paragraphs as if fully alleged herein.

243. The Relevant Markets are the markets for All Star Competitions and All Star Apparel in the United States.

---

[58] https://www.usatoday.com/in-depth/news/investigations/2020/09/18/cheerleading-cheer-investigation-sexual-misconduct-sex-offender-banned-list/3377622001/.

244.     Varsity controls 90% of the All Star Competition Market and 80% of the All Star Apparel Market, and it possesses monopoly power in the Relevant Markets. Varsity has obtained, enhanced, and maintained monopoly power in the Relevant Markets through the Exclusionary Scheme alleged herein, which conduct is continuing. Varsity has substantially foreclosed competition and has abused and continues to abuse its power to maintain and enhance its market dominance in the Relevant Markets through its Exclusionary Scheme.

245.     As a direct and proximate result of this continuing violation of Section 2 of the Sherman Act, Plaintiffs and the Class members have suffered injury and damages in the form of artificially inflated prices paid directly to Varsity for All Star Competitions and All Star Apparel.

246.     Plaintiffs, on behalf of themselves and other Class members, seek monetary damages from Varsity for these violations. Varsity Brands, Varsity Spirit, and Varsity Fashion are jointly and severally liable for the full amount of the damages. Damages will be quantified on a class-wide basis. Plaintiffs' and Class Members' injuries are of the type the antitrust laws were designed to prevent and flow directly from Varsity's unlawful conduct as alleged herein.

247.     Plaintiffs, on behalf of themselves and the Class, seek injunctive relief barring Varsity from engaging in the anticompetitive Scheme alleged herein. The violations set forth above, and the effects thereof, are continuing and will continue unless injunctive relief is granted.

**COUNT II**
**CONSPIRACY TO MONOPOLIZE**
**15 U.S.C. § 2**
**(On Behalf of Plaintiffs and the Class and Against Varsity and USASF)**

248.     Plaintiffs incorporate by reference all of the factual averments in the preceding paragraphs as if fully alleged herein.

249.     The Relevant Markets are the All Star Competition Market and the All Star Apparel Market in the United States.

250.     Varsity controls 90% of the All Star Competition Market and 80% of the All Star Apparel Market, and it has monopoly power in both Relevant Markets.

251.     USASF has knowingly conspired with Varsity to assist Varsity in maintaining and enhancing dominance in the Relevant Markets through the Exclusionary Scheme alleged herein, which conduct is continuing.

252.     Defendants use USASF rules governing All Star Competitions to require and reward use of Varsity's All Star Apparel.

253.     The USASF requires All Star Gyms, All Star Cheerleaders, and All Star Team coaches who enter USASF All Star Competitions, including those owned and produced by Varsity, to be USASF members.

254.     Defendants limit All Star Competitions through which Bids can be obtained to the Worlds All Star Championship, with the vast majority of such All Star Competitions being Varsity owned.

255.     USASF prevents competing non-member IEPs from using the USASF rules, at times with threats of litigation. Competitors are often unable or unwilling to learn multiple sets of rules, and are therefore disincentivized from attending non-USASF All Star Competitions.

256.     USASF also creates rules governing All Star Apparel that align with Varsity's latest All Star Apparel designs, disincentivizing All Star Teams from purchasing non-Varsity All Star Apparel.

257.     Defendants have abused and continue to abuse their power to maintain and enhance Varsity's market dominance in the Relevant Markets, and enrich USASF, through Varsity's Exclusionary Scheme.

258.     USASF and Varsity have each knowingly and willingly engaged in overt acts as part of their conspiracy for Varsity to gain, enhance, and maintain monopoly power in the Relevant Markets. By engaging in one or more of the overt acts alleged herein, USASF and Varsity intentionally and knowingly facilitated Varsity's Exclusionary Scheme. At the same time, USASF and Varsity drove increasing numbers of All Star Gyms, All Star Cheerleaders, and All Star Team coaches to pay membership fees to USASF in order to participate in Varsity's All Star

Competitions. USASF has used the Exclusionary Scheme to collect more than $5 million in membership dues annually from All Star Gyms, All Star Cheerleaders, and All Star Team coaches.

259.    As a direct and proximate result of this continuing violation of Section 2 of the Sherman Act, Plaintiffs and the Class members have suffered injury and damages in the form of artificially inflated prices paid directly to Varsity for All Star Competitions and All Star Apparel.

260.    Plaintiffs, on behalf of themselves and other Class members, seek money damages from Defendants for these violations. Defendants are jointly and severally liable for the full amount of the damages. Damages will be quantified on a class-wide basis for the Class. Plaintiffs' and Class members' injuries are of the type the antitrust laws were designed to prevent and flow directly from Defendants' unlawful conduct.

261.    Plaintiffs, on behalf of themselves and the Class, seek injunctive relief barring Defendants from engaging in the anticompetitive scheme alleged herein. The violations set forth above, and the effects thereof, are continuing and will continue unless injunctive relief is granted.

## IX.    JURY TRIAL DEMANDED

262.    Pursuant to Fed. R. Civ. P. 38(c), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully ask the Court for a judgment that:

(a)    Certifies the Class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3), and directs that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declares Plaintiffs as representatives of the Class;

(b)    Enters joint and several judgments against Defendants and in favor of Plaintiffs and the Class;

(c)    Appoints Plaintiffs and their attorneys as class representatives and class counsel, respectively

(d)    Awards Plaintiffs and the Class treble the amount of damages actually sustained by reason of the antitrust violations alleged herein, plus the reasonable costs of this action including attorneys' fees;

(e)    Orders such equitable and injunctive relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct;

(f)    Awards Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees as provided by law;

(g)    Enters judgment against Defendants, holding them jointly and severally liable for the antitrust violations alleged herein; and

(h)    Directs such further relief as it may deem just and proper.

Dated: October 2, 2020

Respectfully submitted,

*s/ J. Gerard Stranch, IV*

J. Gerard Stranch, IV (TN BPR #23045)
Benjamin A. Gastel (TN BPR #28699)
**BRANSTETTER, STRANCH &
JENNINGS, PLLC**
223 Rosa Parks Ave. Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
gerards@bsjfirm.com
beng@bsjfirm.com

*Liaison Counsel for Plaintiffs and the Proposed
Direct Purchaser Class*

H. Laddie Montague, Jr.*
Eric L. Cramer*
Mark R. Suter*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19106
Tel: (215) 875-3000
hlmontague@bm.net
ecramer@bm.net
msuter@bm.net

Jonathan W. Cuneo***
Katherine Van Dyck***
Victoria Sims*
**CUNEO GILBERT & LADUCA LLP**
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Tel: (202) 789-3960
jonc@cuneolaw.com
kvandyc@cuneolaw.com
vicky@cuneolaw.com

Gregory S. Asciolla*
Karin E. Garvey*
Veronica Bosco*
Ethan H. Kaminsky*
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700

gasciolla@labaton.com
kgarvey@labaton.com
vbosco@labaton.com
ekaminsky@labaton.com

*Interim Co-Lead Counsel for the Proposed
Direct Purchaser Class*

Benjamin D. Elga\*\*\*
**JUSTICE CATALYST LAW, INC.**
81 Prospect Street
Brooklyn, NY 11201
Tel: (518) 732-6703
belga@justicecatalyst.org

Brian Shearer\*\*\*
Craig L. Briskin\*\*\*
**JUSTICE CATALYST LAW, INC.**
718 7th Street NW
Washington, DC 20001
Tel: (518) 732-6703
brianshearer@justicecatalyst.org
cbriskin@justicecatalyst.org

Roberta D. Liebenberg\*\*\*
Jeffrey S. Istvan\*\*\*
Mary L. Russell\*
**FINE KAPLAN AND BLACK, R.P.C**
One South Broad St., 23rd Floor
Philadelphia PA 19107
Tel: (215) 567-6565
rliebenberg@finekaplan.com
jistvan@finekaplan.com
mrussell@finekaplan.com

Nathan A. Bicks (TN BPR #10903)
Frank B. Thacher III (TN BPR #23925)
**BURCH, PORTER, & JOHNSON, PLLC**
130 North Court Ave.
Memphis, TN 38103
Telephone: (901) 524-5000
nbicks@bpjlaw.com
fthacher@bpjlaw.com

Aubrey B. Harwell, Jr. (TN BPR #002559)
Charles Barrett (TN BPR #020627)
Aubrey B. Harwell III (TN BPR #017394)

**NEAL & HARWELL, PLC**
1201 Demonbreun St., Suite 1000
Nashville, TN 37203
Telephone: (615) 244-1713
aharwell@nealharwell.com
cbarrett@nealharwell.com
tharwell@nealharwell.com

\* Admitted pro hac vice
\*\* Pro hac vice application pending
\*\*\* Pro hac vice application forthcoming

*Additional Counsel for Plaintiffs and the
Proposed Direct Purchaser Class*

# CERTIFICATE OF SERVICE

The undersigned certifies the foregoing document was filed with the Court's Case Management/Electronic Case Filing System, this 2nd day of October, 2020, and served upon the following counsel:

George S. Cary
Steven J. Kaiser
Alexis Collins
Mark W Nelson
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
2112 Pennsylvania Ave., NW
Washington, DC 20037
Tel: (202) 974-1500
gcary@cgsh.com
skaiser@cgsh.com
alcollins@cgsh.com
mnelson@cgsh.com

*Attorneys for Defendants Varsity Brands,*
*LLC, Varsity Spirit, LLC,*
*and Varsity Spirit Fashion & Supplies, LLC*

Grady Garrison
Nicole D. Berkowitz
Adam S. Baldridge
Matthew Sinon Mulqueen
**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**
165 Madison Ave., Suite 2000
Memphis, TN 38103
Tel: (901) 577-8166
ggarrison@bakerdonelson.com
nberkowitz@bakerdonelson.com
abaldridge@bakerdonelson.com
mmulqueen@bakerdonelson.com

*Attorney for U.S. All Star Federation, Inc.*

# Exhibit 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| FUSION ELITE ALL STARS, et al.,<br><br>          Plaintiffs,<br>     v.<br><br>VARSITY BRANDS, LLC, et al.,<br><br>          Defendants. | Case No. 2:20-cv-02600-SHL-cgc<br><br>**Jury Trial Demanded** |

## STIPULATED [PROPOSED] PROTECTIVE ORDER

## I.    PURPOSES AND LIMITATIONS

Discovery requests and subpoenas served in the Action may call for the production or disclosure of trade secret or other confidential research, development, or commercial information within the meaning of Fed. R. Civ. P. 26(c), or other private or competitively sensitive information for which protection from public disclosure and from use for any purpose other than prosecuting this Action is warranted.  Accordingly, the Parties hereby stipulate to and petition the Court to enter the following Stipulated Protective Order ("Order") pursuant to Fed. R. Civ. P. 26(c) and Fed. R. Evid. 502(d).

## II.    DEFINITIONS

2.1     Action: the above-captioned action, and any and all cases consolidated or coordinated with it.

2.2     Party: any party to the Action, including all of its officers, directors, and employees.

2.3     Non-Party:  any natural person or entity that is not a named Party to the Action.

2.4     Discovery Material:  all items or information, regardless of the medium or manner generated, stored, or maintained, including, among other things, documents, testimony, interrogatory responses, transcripts, depositions and deposition exhibits, responses to requests to admit, recorded or graphic matter, electronically stored information, tangible things, and/or other information produced, given, exchanged by, or obtained from any Party or Non-Party during discovery in this Action.

2.5     Confidential Material:  any Producing Party (as defined below) may, subject to the provisions of this Order, designate as "Confidential" any Discovery Material that the Producing Party reasonably and in good faith believes constitutes or reveals: (i) confidential trade secrets; (ii) proprietary business information; or (iii) non-public personal, client, or customer information

concerning individuals or other entities. Confidential Material includes information of which applicable law—foreign or domestic—requires the equivalent of "Confidential" treatment as set forth in this Order.

2.6     Privileged Material: Discovery Material protected from disclosure under the attorney-client privilege, work product doctrine, United States or foreign bank disclosure laws or regulations, and/or any other applicable United States or foreign statute, law, regulation, privilege, or immunity from disclosure.

2.7     Highly Confidential Material:  any Producing Party may, subject to the provisions of this Order, designate any Discovery Material as "Highly Confidential," if the Producing Party reasonably and in good faith believes the Discovery Material contains: (i) current trade secrets or other information that the Party reasonably believes the unauthorized disclosure of which would result in imminent competitive, commercial or financial harm to the Producing Party or its personnel, clients, or customers; or (ii) any non-public personal, client, or customer information concerning minors.

2.8     Producing Party:  any Party or Non-Party that produces Discovery Material in this Action.

2.9     Receiving Party:  any Party or Non-Party that receives Discovery Material from a Producing Party.

2.10     Designating Party:  any Party or Non-Party that designates Discovery Material as "Confidential" or "Highly Confidential."

2.11     Protected Material:  any Discovery Material that is designated as "Confidential" or "Highly Confidential," provided, however, that "Protected Material" does not include information that is publicly available or that becomes publicly available (except information that became

publicly available as a result of a breach of this Order or any other confidentiality agreement or undertaking).

2.12    Outside Counsel: attorneys, along with their paralegals and other support personnel assisting them with this Action (including temporary or contract staff), who are not employees of a Party but who have been retained to represent or advise a Party in connection with this Action.

2.13    In House Counsel:  attorneys and other personnel employed by a Party to perform or support legal functions, to whom disclosure of Discovery Material is reasonably necessary in connection with this Action.

2.14    Counsel (without qualifier):  Outside Counsel and In House Counsel.

2.15    Expert and/or Consultant:  a person with specialized knowledge or experience in a matter pertinent to this Action, along with his or her employees and support personnel, who has been retained by a Party or its Counsel to serve as an expert witness or as a consultant in this Action, and who is not currently an employee of a Party and who, at the time of retention, is not anticipated to become an employee of a Party. This definition includes a professional jury or trial consultant retained in connection with this Action.

2.16    Professional Vendors:  persons or entities that provide litigation support services (*e.g.*, photocopying; videotaping; translating; preparing exhibits or demonstrations; organizing, storing, or processing data in any form or medium) and their employees and subcontractors.

## III.    SCOPE

3.1    The protections conferred by this Order and the limitations on the use of information obtained during the course of discovery in this matter as set forth in this Order cover not only Discovery Material (as defined above) but also any information copied or extracted therefrom, as well as all copies, excerpts, summaries, or compilations thereof, plus testimony,

conversations, or presentations by Parties or counsel in settings that might reveal Protected Material. However, except as set forth in Section 12.2, this Order shall not be construed to cause any Counsel to produce, return, destroy, and/or sequester their own attorney work product, or the work product of their co-counsel, created in anticipation of or in connection with this Action.

## IV.   DURATION

The confidentiality obligations imposed by this Order shall remain in effect until the Designating Party agrees otherwise in writing or this Court orders otherwise.

## V.   DESIGNATING PROTECTED MATERIAL

5.1   Manner and Timing of Designations: Except as otherwise provided in this Order, or as otherwise stipulated or ordered, material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced. Designation in conformity with this Order requires:

(a)   For information in non-native documentary form (including transcripts of depositions taken in other proceedings), that the Producing Party affix the legend "Confidential" or "Highly Confidential" on the document, and include the applicable designation in the metadata produced for such document.

(b)   For deposition transcripts and/or exhibits in this Action, that the Designating Party designate any portion of the testimony as "Confidential" or "Highly Confidential" in writing on or before the later of (i) thirty (30) calendar days after receipt of the final transcript, or (ii) the date by which any review by the witness and statement of changes to the transcript are to be completed under Fed. R. Civ. P. 30(e). Only those portions of the testimony that are designated for protection in accordance with the preceding sentence shall be Protected Material under the provisions of this Order. The entire testimony shall be deemed to have been designated Highly Confidential until the time within which the transcript may be designated has

elapsed. If testimony is not designated within the prescribed time period, then such testimony shall not be deemed Confidential or Highly Confidential except as ordered by the Court or as provided in Section 5.2 (Inadvertent Failures to Designate). If all or a part of a videotaped deposition is designated as "Confidential" or "Highly Confidential," the DVD, plus any container, shall be so labeled.

        (c)     For information produced in electronic, audio, or video format, and for any other tangible items, that the Producing Party affix the legend "Confidential" or "Highly Confidential" in a prominent place on the item itself or exterior of the container or containers in which the information or item is stored, and/or in the electronic file name, in any suitable and readily viewable manner. Whenever a Receiving Party to whom electronically stored discovery material so designated is produced reduces such information to hard copy form, to the extent such pages have not previously been marked by the Producing Party, such Receiving Party shall mark the hard copy by affixing the designation "Confidential" or "Highly Confidential" to each page of such document.

        (d)     For documents produced in native format, that the Producing Party include the confidentiality designation "Confidential" or "Highly Confidential" in the metadata produced for such documents and on the placeholder page.

        (e)     For interrogatory answers and responses to requests to admit, and the information contained therein, that the Producing Party affix the legend "Confidential" or "Highly Confidential" in a prominent place on each page of such document prior to production.

        (f)     For reports created by an expert or consultant relying on or incorporating Protected Material in whole or in part, that the Party responsible for its creation include the confidentiality designation "Confidential" or "Highly Confidential" on the report.

5.2     Inadvertent Failures to Designate:  If a Producing Party discovers that it produced material that was not designated as Protected Material or that it produced material that was designated as Protected Material but had designated that Protected Material in the incorrect category of Protected Material, the Producing Party may promptly notify all Receiving Parties, in writing, of the error and identify (by production number) the affected material and its new designation or re-designation.  Thereafter, the material so designated or re-designated shall be treated as Protected Material in conformity with the new designation or re-designation. Promptly after providing such notice, the Producing Party shall provide re-labeled copies of the material to each Receiving Party reflecting the change in designation.  Each Receiving Party shall make reasonable efforts to delete and replace the incorrectly designated material, and all copies thereof, with the newly designated material and to destroy the incorrectly designated material.  To the extent such information may have been disclosed to anyone not authorized to receive Confidential or Highly Confidential Discovery Material under the terms of this Order, the Receiving Party shall make reasonable efforts to retrieve the Discovery Material promptly and to avoid any further disclosure.  If corrected, an inadvertent failure to designate qualified information or items as "Confidential" or "Highly Confidential" does not waive the Producing Party's right to secure protection under this Order for such material.  If material is re-designated "Confidential" or "Highly Confidential" after the material was initially produced, each Receiving Party, upon notification of the designation, must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

5.3     In the event that more than one Designating Party designates the same Protected Material with different levels of treatment or confidentiality, all copies of the Protected Material shall by treated as having the lowest level of confidentiality designated by any Designating Party.

5.4     Upward Designation of Information or Items Produced by Other Parties or Non-Parties: A Party may upward designate (*i.e.*, change any Discovery Material produced without a designation of Confidential or Highly Confidential or change any Discovery Material produced as Confidential to a designation of Highly Confidential) any Discovery Material produced by another Party or non-Party, provided that said Discovery Material contains the upward designating Party's own trade secrets or other confidential research, development, financial, personal or commercially sensitive information, or otherwise is entitled to protective treatment under Federal Rule of Civil Procedure 26(c) or other law, foreign or domestic, such that the upward designation is appropriate under the terms of this Order.  Upward designation shall be accomplished by providing written notice to all Parties identifying (by Bates number or other individually identifiable information) the Discovery Material to be re-designated within thirty (30) days of production by the disclosing Party. Failure to upward designate within thirty (30) days of production, alone, will not prevent a Party from obtaining the agreement of all Parties to upward designate certain Discovery Material or from moving the Court for such relief.  Any Party may object to the upward designation of Discovery Material pursuant to the procedures set forth in paragraph 6 regarding challenging designations.

## VI.     CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1     Meet and Confer: If a Party elects to challenge a Designating Party's confidentiality designation, it must do so in good faith and must begin the process by notifying the Designating Party in writing of its challenge and identifying the challenged material with as much specificity as reasonably practical, including for example, by production number, and by providing a basis for the challenge.  The objecting Party and the Designating Party shall, within ten (10) business days after service of the written objections, meet and confer concerning the objection, unless otherwise agreed.

- 7 -

6.2     Judicial Intervention: If the Parties are not able to resolve a dispute about a confidentiality designation during the meet and confer process set forth in Section 6.1, above, the Party challenging the designation may seek relief promptly from the Court in accordance with its rules and procedures. Until the Court rules on the dispute, all Parties shall continue to afford the material in question the level of protection to which it is entitled under the Designating Party's designation.  In the event the Court rules that the challenged material's designation should be changed, the Designating Party shall reproduce copies of all materials with their designations removed or changed in accordance with the ruling within ten (10) business days of the ruling.

## VII.    ACCESS TO AND USE OF DISCOVERY MATERIAL

7.1     Subject to any other written agreement among or between Producing Parties and/or Receiving Parties, a Receiving Party may access or use Discovery Material that is disclosed or produced by a Producing Party only in connection with the prosecution of, defense of, appeal of, attempted settlement of, or the enforcement of insurance rights with respect to this Action.  Except as required by law, Discovery Material may not be used for any other purpose, including, without limitation, any business or commercial purpose, contractual demands, any purpose related to any other investigation or proceeding, or evaluation of other potential claims not asserted in the Action. Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order.  Following the termination of this Action, each Receiving Party must comply with the provisions of Section 10, below.

7.2     The recipient of any Protected Material shall maintain such material in a secure and safe area and shall exercise a standard of due and proper care with respect to the storage, custody, use, and/or dissemination sufficient under all applicable laws to safeguard against unauthorized or inadvertent disclosure of such material.  Protected Material shall not be copied, reproduced, extracted, or abstracted, except to the extent that such copying, reproduction, extraction, or

abstraction is reasonably necessary for the conduct of this Action.  All such copies, reproductions, extractions, and abstractions shall be subject to the terms of this Order and labeled in the same manner as the designated material on which they are based.

      7.3     Disclosure of Confidential Material: Unless otherwise ordered by the Court or permitted in writing by the Designating Party, material designated "Confidential" may be disclosed by a Receiving Party only to the following persons:

      (a)     the Receiving Party's Counsel to whom it is reasonably necessary to disclose the information in connection with this Action;

      (b)     in addition to In House Counsel, and to the extent that such disclosure is reasonably necessary for the Action, current officers, directors, or employees of each Receiving Party who have signed the "Agreement To Be Bound By Protective Order" (Exhibit A);

      (c)     Experts and/or Consultants retained by a Party or its Counsel to serve as an expert witness or as a consultant in this Action and who have signed the "Agreement To Be Bound By Protective Order" (Exhibit A), provided that Counsel, in good faith, requires their assistance in connection with this Action; and provided further that any part of a report created by such expert or consultant incorporating Protected Material in whole or in part shall be designated appropriately by the Party responsible for its creation; and provided further that experts or consultants may not use Protected Material for any purpose that does not relate to this Action;

      (d)     the Court and its personnel, subject to the requirements of Section 9, below;

      (e)     special masters, mediators, or other third parties who are appointed by the Court or retained by the Parties for settlement purposes or resolution of discovery or other disputes and their necessary personnel and, in the case of persons retained by the Parties, who have signed the "Agreement To Be Bound by Protective Order" (Exhibit A);

(f)      court reporters and/or videographers, their staffs, and Professional Vendors to the extent that such disclosure is reasonably necessary for this Action;

(g)      the author, addressees, or recipients of the document, or any other natural person who reviewed or had access to such document during his or her employment as a result of the substantive nature of his or her employment position, or who is specifically identified in the document or its accompanying metadata, provided, however, that (i) the disclosure is made for the purpose of advancing the disclosing Party's claims or defenses, and for no other purposes; (ii) the witness is not permitted to retain copies of the Protected Material after the witness is examined regarding the Protected Material; and (iii) the witness is explicitly informed by the disclosing Party's Outside Counsel that this Protective Order forbids him or her to disclose the Protected Material except as permitted under this Protective Order and that he or she is subject to the Court's jurisdiction for the purposes of enforcing this Protective Order;

(h)      a witness who has been subpoenaed or noticed for deposition, trial testimony, or other court proceeding in the Action not otherwise authorized to view the Protected Material in question, during that witness' testimony at a deposition, hearing, or trial in the Action, or in preparation for the same, provided that (i) the disclosure is made for the purpose of advancing the disclosing Party's claims or defenses, and for no other purposes; (ii) the witness is not permitted to retain the Protected Material after the witnesses is examined regarding the Protected Material; (iii) the disclosing Party's Outside Counsel advises the witness, in advance of any disclosure, that this Protective Order forbids him or her to disclose the Protected Material except as permitted under this Protective Order and that he or she is subject to the Court's jurisdiction for the purposes of enforcing this Protective Order; and (iv) the disclosing Party's Outside Counsel

maintains a record that he or she has so advised the witness and states on the record at a deposition or other court proceeding in which the witness testifies that he or she has so advised the witness;

(i)     relevant employees of any insurer to a Party to the extent that such disclosure is reasonably necessary for the defense of that Party in this Action and who have signed the "Agreement To Be Bound By Protective Order" (Exhibit A);

(j)     any other person agreed to by the Designating Party in writing; and

(k)     any other person to whom the Court compels disclosure of the Confidential Material or to whom disclosure is required by law, subject to the requirements of Section 15 below.

Any disclosure permitted by this section may be only made to the extent reasonably necessary to prosecute or defend this Action.

7.4     Disclosure of Highly Confidential Material: Unless otherwise ordered by the Court or permitted in writing by the Designating Party, material designated "Highly Confidential" may be disclosed by a Receiving Party only to the following persons:

(a)     The Receiving Party's Outside Counsel to whom it is reasonably necessary to disclose the information in connection with this Action;

(b)     Experts and/or Consultants retained by a Party or its Counsel to serve as an expert witness or as a consultant in this Action and who have signed the "Agreement To Be Bound By Protective Order" (Exhibit A), provided that Counsel, in good faith, requires their assistance in connection with this Action; and provided further that any part of a report created by such expert or consultant incorporating Protected Material in whole or in part shall be designated appropriately by the Party responsible for its creation; and provided further that experts or consultants may not use Protected Material for any purpose that does not relate to this Action;

(c)     the Court and its personnel, subject to the requirements of Section 9, below;

(d)     special masters, mediators, or other third parties who are appointed by the Court or retained by the Parties for settlement purposes or resolution of discovery or other disputes and their necessary personnel and, in the case of persons retained by the Parties, who have signed the "Agreement To Be Bound by Protective Order" (Exhibit A);

(e)     court reporters and/or videographers, their staffs, and Professional Vendors to the extent that such disclosure is reasonably necessary for this Action;

(f)     the author, addressees, custodians or recipients of the document; or, any other natural person who is specifically identified in the document or its accompanying metadata, or, on the record at a deposition, current or former employees, officers or directors of the Producing Party who have knowledge of the specific matters set forth in the highly confidential material, provided, however, that (i) the disclosure is made for the purpose of advancing the disclosing Party's claims or defenses, and for no other purposes; (ii) the witness is not permitted to retain the Protected Material after the witnesses is examined regarding the Protected Material; and (iii) the witness is explicitly informed by the disclosing Party's Outside Counsel that this Protective Order forbids him or her to disclose the Protected Material except as permitted under this Protective Order and that he or she is subject to the Court's jurisdiction for the purposes of enforcing this Protective Order;

(g)     relevant employees of any insurer to a Party to the extent that such disclosure is reasonably necessary for the defense of that Party in this Action and who have signed the "Agreement To Be Bound By Protective Order" (Exhibit A);

(h)     any other person agreed to by the Designating Party in writing; and

(i)     any other person to whom the Court compels disclosure of the Confidential Material or to whom disclosure is required by law, subject to the requirements of Section 15 below.

- 12 -

Any disclosure permitted by this section may be only made to the extent reasonably necessary to prosecute or defend this Action.

7.5     Retention of Exhibit A:  Counsel for the Party that obtains the signed "Agreement to Be Bound by Protective Order" (Exhibit A), as required above, shall retain them for six (6) months following the final termination of this Action, including any appeals, and shall make them available to other Parties or the Court upon good cause shown.

7.6     Retention of Protected Material: Unless otherwise agreed to by the Producing Party in writing or ordered by the Court, persons described in Sections 7.3 (g), (h), and (j), who have been shown Confidential Material shall not retain copies thereof longer than reasonably necessary in light of the purpose for which the Confidential Material was disclosed. Persons described in Sections 7.4 (f), (g), and (i) who have been shown Highly Confidential Material shall not retain copies thereof longer than reasonably necessary in light of the purpose for which the Highly Confidential Material was disclosed.

## VIII.   UNAUTHORIZED DISCLOSURE

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Order, the Receiving Party must, as soon as practicable, but in any event, not longer than five (5) business days after discovery of the disclosure by Counsel, (a) notify in writing the Designating Party of the unauthorized disclosures, (b) make commercially reasonable efforts to retrieve all copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Agreement to Be Bound by Protective Order" (Exhibit A).

## IX.    FILING PROTECTED MATERIAL

In the event that Counsel for any Party determines to file or submit in writing to the Clerk of Court's office or file on ECF any Protected Material, or any papers containing or making reference to the substance of such material or information, such documents or portions thereof containing or making reference to such material or information shall be filed in redacted form or under seal in accordance with the rules of the Court. The Parties will attempt to resolve any disputes regarding confidentiality designations in advance of any such filing or submission to the extent possible.  Where a dispute remains regarding confidentiality designations in advance of any such filing or submission, or where the Parties are unable to confer in advance of the filing or submission, Counsel for the filing Party shall file any Protected Material under seal and shall file in redacted form or under seal any documents or portions containing or making reference to such material.

Filing under seal shall be without prejudice to any Party's right to argue to the Court that such document is not Confidential Material or Highly Confidential Material and need not be preserved under seal.

## X.    FINAL DISPOSITION

10.1    In the event that: (i) all Parties to the Action reach a settlement resolving all of the then pending claims among them; or (ii) any court enters an order resolving all of the then pending claims among the Parties, except as provided below, the provisions of this Stipulated Protective Order restricting the use of "Confidential" and "Highly Confidential" information shall continue to be binding unless otherwise agreed or ordered by the Court. Upon entry of final judgment either by reason of settlement or court order, each Receiving Party shall undertake commercially reasonable efforts to prevent anyone acting on its behalf from accessing, reviewing, copying, summarizing, or making any other use of a Producing Party's Discovery Material, including but

not limited to directing the Receiving Party's discovery vendor(s) to take data offline or to take other steps to prevent access to the Discovery Material. Notwithstanding this provision, as to those Discovery Materials that constitute Counsel's work product, and pleadings, motion papers, deposition transcripts, and exhibits thereto, legal memoranda, and correspondence that were served in this Action, or filed with this Court, Counsel may continue to access and make use of such material for purposes of this Action pending the final termination of this Action, provided, however, that these materials remain subject to this Order. Each Receiving Party shall document its compliance with the terms of this subparagraph and notify Producing Parties of such compliance within 30 days of final termination of this action either by reason of settlement or court order, including any appeals.

      10.2    Except as provided by law or other regulatory authority or unless otherwise ordered or agreed in writing by the Producing Party, within sixty (60) calendar days after the final termination of this Action, including any appeals, each Receiving Party shall undertake commercially reasonable efforts to return to the Producing Party all Protected Material or, at the option of the Receiving Party, to destroy all Protected Material. In either case, the Receiving Party shall, upon request, provide the Designating Party with a certification stating that it has taken commercially reasonable efforts to destroy or return the Confidential or Highly Confidential documents, except for (i) such information or material that was transmitted electronically and whose removal or destruction from a Party's electronic systems would violate applicable federal or state law, rule, or regulation, or policies and procedures reasonably designed to ensure compliance with such law, rule, or regulation, and that (ii) information saved on backup media in an electronically stored format will be certified to have complied with the 60-day destruction period if the Party has a data destruction policy for the backup media resulting in the eventual

destruction or overwriting of the electronically stored information, provided, however, that these materials will continue to be subject to the terms of this Order.

      10.3    If a Receiving Party takes the position that it cannot comply with the return or destruction provisions of this section within the 60-day destruction period, and that it must instead retain documents for a longer period of time pursuant to the "[e]xcept as provided by law or other regulatory authority" provision of this section, then it must, in its certification, (i) state the law or other regulatory authority it believes requires it to retain those documents, and (ii) describe the documents it intends to retain pursuant to that law or regulatory authority. Notwithstanding this provision, as to those materials designated as Confidential or Highly Confidential that constitute Counsel's work product, and pleadings, motion papers, deposition transcripts, and exhibits thereto, legal memoranda, and correspondence that were served in this Action, or filed with this Court, Counsel may retain such documents, even if such materials contain Confidential or Highly Confidential Material, if such Counsel otherwise comply with this Order with respect to such retained material. Any such archival copies that have been designated Confidential or Highly Confidential remain subject to this Order until the Producing Party agrees otherwise in writing or this Court orders otherwise.

      10.4    This Order shall survive the termination of this Action, and this Court shall have continuing jurisdiction for enforcement of its provisions following termination of this Action. No part of the restrictions imposed by this Order may be waived or terminated, except by written stipulation executed by Counsel for each Designating Party or by an Order of the Court for good cause shown.

## XI.   A DESIGNATING OR PRODUCING PARTY'S USE OF ITS OWN DOCUMENTS

Nothing in this Order shall be construed to limit in any way any Producing Party's, Receiving Party's, or any other person's use of its own documents, including documents obtained independently and lawfully from sources other than a Producing Party, nor shall it affect any Producing Party's, Receiving Party's, or any other person's subsequent waiver of its own prior designation with respect to its own Confidential Material or Highly Confidential Material.

## XII.   CLAW BACK OF PRIVILEGED MATERIAL

12.1   In order to claw back Privileged Material that was produced inadvertently, within seven (7) days of discovery such an inadvertent production, the Producing Party must provide notice in writing to the Receiving Party specifying the production number of the Discovery Material it wishes to claw back, and the basis of the claim that it is Privileged Material.

12.2   Upon notice that a Producing Party wishes to claw back Discovery Material protected as Privileged Material that was produced inadvertently, the Receiving Party shall promptly undertake commercially reasonable efforts to return to the Producing Party or destroy all summaries or copies of such Privileged Material (notwithstanding the final sentence of Section 3 regarding a Receiving Party's own work product that reflects the Protected Material referred to in this Section), shall provide notice in writing that the Receiving Party has undertaken reasonable efforts to return and destroy such Privileged Material, and shall not use such items for any purpose until further order of the Court or agreement of the parties.  In all events, such return, destruction, and certification must occur within ten (10) business days of receipt of the request, unless the Receiving Party provides notice of its intent to challenge the assertion of a claim of protection under Fed. R. Civ. P. 26(b)(5) (the "Challenge Notice"), in which event the Receiving Party may retain no more copies (the "Retained Copies") of the disclosed material than are sufficient to

prosecute its challenge to the assertion of protection.  Having provided a Challenge Notice, the Receiving Party must raise a challenge with the Court within thirty (30) days of that Challenge Notice, or otherwise return or destroy the Retained Copies within that period.  Moreover, in the event a Challenge Notice is provided, the Receiving Party shall make no use of the Discovery Material subject to the request for return other than in connection with the Receiving Party's prosecution of its challenge to the assertion of privilege, until the Challenge is resolved.  However, the Receiving Party may request an extension of the deadline for the return or destruction of Retained Copies, and such extension shall not be unreasonably withheld.  For the avoidance of doubt, nothing in this paragraph shall be construed as restricting the right of any Party to challenge a claim of privilege at any time permissible under the Federal Rules of Civil Procedure and other relevant laws after return or destruction of the Retained Copies and the Receiving Party's retention of Retained Copies shall not be construed in this or any other action as a waiver by the Producing Party.  If the Producing Party has already produced a privilege log with respect to its production of documents, within ten (10) business days of the notification that reasonable efforts have been taken to return or destroy the Privileged Material, the Producing Party shall supplement that privilege log with respect to the Privileged Material, otherwise the Producing Party shall include the Privileged Material on its privilege log when that log is initially produced.  The return of any Discovery Material to the Producing Party shall not in any way preclude the Receiving Party from moving the Court for a ruling that the disclosed information is not privileged or that such privilege has been waived; however, the Receiving Party may not assert as a basis for the relief it seeks the fact or circumstance that such privileged documents have already been produced.  Alleged Privileged Material shall remain protected against disclosure and use during the pendency of any dispute over their status.

12.3    If, during a deposition, a Party claims that a document being used in the deposition (*e.g.*, marked as an exhibit, shown to the witness, or made the subject of examination) contains Privileged Material, it may at its sole election (a) allow the document to be used in the deposition without waiver of its claim of privilege or other protection or (b) instruct the witness not to answer questions concerning the document pending a prompt resolution of any disagreement concerning the document's privileged or work-product protected status.  If the Party allows the examination concerning the document to proceed on a non-waiver basis, the Parties shall sequester all copies of the purportedly privileged or work-product protected document.  Immediately following the deposition, the Parties will commence the procedure outlined in the preceding paragraphs to address the claim of privilege or other protection, including the notice requirement set forth in Section 12.1.  Until the dispute is resolved, all Parties and any other persons who have access to the transcript of such deposition shall treat that transcript as Confidential Material.  If any Party instructs the witness not to answer questions concerning the document, and any Party wishes to have the issue resolved by the Court, the Parties will then cooperate in promptly submitting the issue of the document's status to the Court.  If the document is ultimately determined not to be privileged or subject to other protection, the Party or entity asserting the claim of privilege will be responsible for ensuring that the deposing Party is given an opportunity to depose the witness about the document, which in the case of Party-witnesses (or their current employees) or any former employees of a Party who are represented by Counsel for such Party shall be within thirty (30) calendar days of said determination, and in the case of other non-Party witnesses shall be within fourteen (14) calendar days of the determination.

12.4    Pursuant to Fed. R. Evid. 502(d), if a Party at any time notifies any other Party that it, for any reason, disclosed documents, testimony, information, and/or things that are protected as

Privileged Material, or the Receiving Party discovers such disclosure (in which case the Receiving

Party shall give the Producing Party prompt notice), the disclosure alone, pursuant to Rule 502(d),

shall not be deemed a waiver – in the Action or in any other proceeding, including in federal or

state proceedings – of any applicable privilege or protection.

## XIII.   USE OF DESIGNATED MATERIAL AT TRIAL

The undersigned agree to meet and confer concerning the use of any Protected Material at

the trial of this Action during preparation of the Joint Pretrial Order to be submitted in accordance

with the Court's Individual Rules and Practices and Fed. R. Civ. P. 26(a)(3).  The use of Protected

Material at trial shall not cause such Protected Material to lose its status as Protected Material.

## XIV.   ATTORNEY RENDERING ADVICE

Nothing in this Order will bar or otherwise restrict an attorney from rendering advice to his

or her client or from relying upon or generally referring to Protected Material in rendering such

advice, provided, however, that, in rendering such advice or in otherwise communicating with his

or her client, the attorney shall not reveal or disclose the specific content of Protected Material if

such disclosure is not otherwise permitted under this Order.

## XV.        LEGAL PROCESS

If a Receiving Party is served with a discovery request, subpoena, or an order issued in

other litigation, or receives some other form of legal process or request from any court, federal or

state regulatory or administrative body or agency, legislative body, self-regulatory organization,

or other person or entity purporting to have authority to require the production thereof, that seeks

disclosure of any information or items designated in this Action as "Confidential" or "Highly

Confidential," the Receiving Party must notify, to the extent permitted by law and the rules,

requirements, or requests of any relevant governmental or self-regulatory organization, the

Designating Party, in writing (by fax or electronic mail, if possible), and include with that notice

a copy of the discovery request, subpoena, order, or other form of legal process as soon as reasonably practicable and in any event no later than ten (10) business days after receipt unless production is required earlier, in which case the notice must be made in time for the Designating Party to take steps as set forth below.  The Receiving Party also must promptly inform the party that caused the discovery request, subpoena, order, or other form of legal process or request to issue that some or all of the material covered by the subpoena or order is the subject of this Order.  In addition, the Receiving Party must deliver a copy of this Order promptly to the party in the other matter that caused the discovery request, subpoena, order, or other form of legal process or request to issue.  To the extent consistent with the rules, requirements, or requests of any relevant governmental or self-regulatory organization, the Receiving Party shall not produce the requested Protected Material unless and until a court of competent jurisdiction so directs, except if the Designating Party (a) consents, or (b) fails to file a motion to quash or fails to notify the Receiving Party in writing of its intention to contest the production of the Protected Material prior to the date designated for production of the Protected Material, in which event the Receiving Party may produce on the production date, but no earlier.  In connection with any production of Confidential or Highly Confidential Material subject to this Order, the Receiving Party shall request confidential treatment for the Confidential or Highly Confidential Material.  The purpose of imposing these duties is, to the extent consistent with the rules, requirements, or requests of any relevant governmental or self-regulatory organization, or otherwise permitted by law, to alert the interested parties to the existence of this Order and to afford the Designating Party an opportunity to try to protect its confidentiality interest in the matter or proceeding in connection with which the discovery request, subpoena, or order is issued.  The Designating Party shall bear the burdens and the expenses of seeking protection in that matter or proceeding of its Protected Material.

Nothing in these provisions should be construed as authorizing, requiring, or encouraging a Receiving Party to disobey, or to risk contempt of, a lawful directive from another court. In the event that Discovery Material is produced to a Non-Party as a result of a discovery request, subpoena, or an order issued in other litigation, or some other form of legal process from any court, federal or state regulatory or administrative body or agency, legislative body, or other person or entity, such Discovery Material shall continue to be treated in this Action in accordance with any designation as Protected Material.

## XVI.   NON-PARTIES

Any Party, in conducting discovery from Non-Parties in connection with this Action, shall provide any Non-Party from which it seeks discovery with a copy of this Order so as to inform each such Non-Party of his, her, or its rights herein. If a Non-Party provides discovery to any Party in connection with this Action, the provisions of this Order shall apply to such discovery as if such discovery were being provided by a Party. Under such circumstances, the Non-Party shall have the same rights and obligations under the Order as held by the Parties to this Action. Any Non-Party producing Discovery Material or giving deposition testimony in this Action may avail herself, himself, or itself of the provisions of this Protective Order available to "Parties" for her, his, or its testimony and Discovery Material by executing Exhibit A to this Order and informing the Party that served the subpoena of the same.

## XVII.  NOTICES

All notices required by this Order must be provided in writing to Counsel of record for each Party and, if applicable, in writing to a Non-Party, with email communication being sufficient. Any of the notice requirements herein may be waived in whole or in part, but only in writing by an attorney for the Designating Party.

- 22 -

## XVIII. AMENDMENT OF ORDER

Nothing herein shall preclude any Party from seeking to amend this Order in writing for good cause shown.  Nor shall anything herein preclude any Party or Non-Party from seeking additional or different protections on a case-by-case basis under the standards set forth in Fed. R. Civ. P. 26(c).  The deadlines set forth in this Order may be modified in particular circumstances by agreement of the Parties without the involvement of the Court.

## XIX.  MISCELLANEOUS

19.1    Right to Assert Other Objections: By stipulating to the entry of this Order, no Producing Party waives any right it otherwise might have to object to disclosing or producing any information or item on any ground, including confidentiality.  Similarly, no Producing Party waives any right to object on any ground to the admissibility or use in evidence of any of the material covered by this Order.

19.2    Execution: This Stipulation and Order may be executed in counterparts. This Stipulation and Order shall become effective as a stipulation as among the executing Parties immediately upon its execution by such executing Parties, subject to any subsequent modifications if and when so-ordered by the Court.

**EXHIBIT A**

**Agreement to Be Bound by Protective Order**

I, _____, have been informed that on

_____, the U.S. District Court for the Western District of Tennessee

entered a protective order in the *Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al.*, No.

2:20-cv-02600-SHL-cgc (W.D. Tenn.). I have read the protective order, I agree to abide by the

obligations of the protective order as they apply to me, and I voluntarily submit to the jurisdiction

of the U.S. District Court for the Western District of Tennessee for purposes of any proceeding

related to the protective order, including my receipt or review of information that has been

designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL."


Dated: _____        By: _____

                                       Printed Name: _____

# Exhibit 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| FUSION ELITE ALL STARS, et al., | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2:20-cv-2600-SHL-cgc |
| | ) | |
| VARSITY BRANDS, LLC, et al., | ) | |
| Defendants. | ) | |
| | ) | |

## PROTOCOL FOR THE DISCOVERY OF ELECTRONICALLY STORED INFORMATION AND HARD COPY DOCUMENTS

The Parties have stipulated to this Joint Stipulated Protocol for Discovery of Electronically Stored Information and Hard Copy Documents ("ESI Protocol" or "Protocol") to facilitate discovery in this litigation.

The parties shall make good-faith efforts to comply with and resolve any differences concerning compliance with this ESI Protocol. If a Producing Party, notwithstanding its good-faith efforts, is unable to reasonably comply with any material aspect of this ESI Protocol, such party shall inform the Receiving Party in writing a reasonable time before the date of production as to why compliance with the ESI Protocol is unreasonable. All productions in this litigation are subject to the confidentiality order separately entered by the Court in this litigation. Nothing herein is intended to alter the parties' rights and obligations under the Federal Rules of Civil Procedure and applicable law. The parties specifically reserve all of their rights and objections to any discovery that may be served upon them in this matter.

## I.    DEFINITIONS

1. A reference to "document(s)" shall include both ESI and hard-copy documents, as defined herein.

2. **"Document Family"** refers to a group of related ESI that includes parent and child documents as maintained in the ordinary course of business (e.g., a parent email and any attachments thereto).

3. **"Electronically stored information"** or **"ESI,"** as used herein, means, as referenced in the Federal Rules of Civil Procedure, information that is stored electronically, regardless of the media or whether it is in the original format in which it was created, as opposed to stored in hard copy (i.e., on paper).

4. **"Extracted Text"** means the text extracted from an electronic document and includes all header, footer and document body information when reasonably available.

5. **"Hard Copy Document"** means a document collected from physical files (paper) and not from electronic sources.

6. **"Media"** means an object or device, real or virtual, including but not limited to a disc, tape, computer or other device on which data is or was stored.

7. **"Metadata"** is used to describe the structural information of a file that contains data about the file, as opposed to describing the content of a file. The Metadata fields to be produced are listed in Exhibit 1.

8. **"Native" or "Native Format"** means and refers to the format of ESI in the application in which it was originally created and/or as used by the Producing Party in the usual course of its business and in its regularly conducted activities.

9. **"OCR text"** means text generated through Optical Character Recognition Process of image/bitmap picture representation of the documents.

10. **"Producing Party"** means or refers to any party in the litigation from which production of ESI or hard copy documents are sought.

11. **"Receiving Party"** means or refers to any party in the litigation seeking production of ESI or hard copy documents.

## II.   E-DISCOVERY LIAISONS

Each party will identify an E-discovery Liaison who will be primarily responsible for meeting and conferring concerning ESI.  Each E-discovery Liaison will:  (1) be knowledgeable about the party's e-discovery efforts; (2) be familiar with the party's electronic systems and capabilities in order to explain those systems and answer relevant questions, or have reasonable access to those who are; and (3) be knowledgeable about the technical aspects of e-discovery—including electronic document storage, organization, and format issues, and relevant information retrieval technology, including search methodology—or have reasonable access to those who are.  Each party shall designate its ESI Liaison within 10 days after entry of this Order.  Each party will provide written notice to the other parties of any changes of its designated E-discovery Liaison.

## III.    PRESERVATION

The parties have taken and will continue to take reasonable steps to preserve reasonably accessible documents and data from custodians and non-custodial sources they have identified as potentially possessing relevant information that could be subject to discovery.  To the extent that a party wishes to exclude a category of documents from production on the basis of proportionality or undue burden, the responding party will disclose said document category.

## IV.    IDENTIFICATION AND COLLECTION OF DOCUMENTS

To the extent a discovery request calls for the production of ESI, prior to any production the parties anticipate discussing: (i) the identity and role of custodians from which documents will be obtained for the production; (ii) the identity, scope and format of custodial and non-custodial sources from which documents will be considered for production.  In addition, the Producing Party shall disclose any relevant existing document retention polices and/or any document destruction schedules that may be applicable to the sources of data collected.

The Receiving Party may propose additional custodians or non-custodial sources. The Producing Party will consider in good faith such requests.  If the Producing Party chooses to use search terms to filter documents for review in response to any discovery request, the Producing Party will disclose the list of search terms, date filters, or other culling methods that it intends to use.  The Receiving Party may propose additional terms or culling parameters.  The Producing Party will consider in good faith such requests and the burden they would impose on it.  The parties will confer regarding testing of search terms.

If the Producing Party plans to use TAR, including "predictive coding," to identify or cull documents to be reviewed or produced, the Producing Party will notify the Receiving Party and will

4

provide information on the TAR review technology, process, and validation, including: (1) the Custodial Data Sources and Non-Custodial Data Sources against which TAR will be run; (2) the TAR or advanced analytics methodology being deployed; (3) the quality control measures used to validate the results of the TAR methodology or similar advanced analytics, including a validation process, (4) any Documents, Document types, file types or other categories that the Producing Party proposes to exclude from the TAR process and the method of identifying such Documents to be excluded, (5) other disclosures that are reasonably necessary for the Requesting Party to evaluate the proposed TAR process, as well as information on date filters and other culling methods. The Receiving Party may propose additional search terms or culling parameters. The Producing Party will consider in good faith any such proposals.

The Producing Party will disclose methodology for analysis of ESI or Hardcopy Documents which are reasonably believed to be responsive to discovery requests but for which text-based search technologies may be ineffective.

## V.    FORM OF ESI PRODUCTIONS

**Images.** TIFF Images. All responsive ESI and Hardcopy documents, except that ESI which is produced in native format pursuant to paragraph 2 of this Section, shall be produced as black and white, single-page, 300 DPI, Group IV TIFF files. Each TIFF file should be assigned a unique name matching the Bates number of the corresponding image. Bates numbers and confidentiality designations should be electronically branded on each produced TIFF image. These TIFF images should be provided in a separate folder and the number of TIFF files per folder should be limited to 1,000 files. All TIFF images shall be processed to show and reveal track changes, comments, and hidden content in Word documents and speaker notes and hidden content in PowerPoint files.

5

In scanning Hardcopy documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). If documents were scanned previous to this case, however, and are not logically unitized, they may be produced in the format in which they were maintained. In the case of an organized compilation of separate documents (for example, a binder containing several separate documents behind numbered tabs), the document behind each tab should be scanned separately. The parties will make their best efforts to unitize the documents correctly and to correct any unitization failures.

Documents containing color may, but do not need to, be produced in single-page color JPEG format. If an original document contains color necessary to understand the meaning or content of the document, the Producing Party shall honor reasonable requests for a color image and/or native file of the document.

**Natives.** Responsive spreadsheets, audio/visual/multimedia, and other files that are not conducive to production in image format shall be produced in native format, except where such files are redacted. The parties agree to meet and confer regarding producing other files in native format, if necessary and appropriate. Responsive ESI produced in native format shall be produced with Metadata described in Exhibit 1 that is contained in or associated with that file to the extent extraction of metadata is reasonably possible. Each file produced in native format shall be assigned a unique Bates number, and for each a single page placeholder TIFF image stamped with this unique Bates number, a phrase indicating that the file has been produced in native format, and the corresponding confidentiality designation under the Confidentiality Order will be produced. To the extent extracted text is available, the original document text shall be provided in a document-level

UTF-8 text file; otherwise the text contained on the slipsheet language shall be provided in the *.txt file. The relative file path to the native file in the document production shall be included in the NativePath metadata field in the *.dat file as outlined in Exhibit 1.

**Non-English Documents**. To the extent that documents are produced that contain languages other than English, in whole or in part, the Producing Party shall produce each such document in the original language or languages in which it was written and collected. The Producing Party has no obligation to create a translation of the documents or any portion thereof, but a Producing Party must produce any identified English translation of Non-English documents of which it is actually aware other than translations made at the request of counsel.

**Load File Formats**. ESI will be produced with a standard Concordance (*.dat) metadata load file format and an image load file that is in .OPT format. The Concordance (*.dat) load file shall be provided with UTF-8 encoding.

**Metadata to be Produced**. The metadata fields detailed in Exhibit 1 will be produced for each document to the extent that such information is reasonably available and extractable, except that if a field contains privileged information or information otherwise protected from disclosure under order of Court, that information may be redacted and privileged information may be noted in a corresponding privilege log.

**Extracted Text and OCR.** Each document, whether produced in Native or in TIFF format, and whether originally existing in electronic or in hard copy, shall be produced with extracted text or OCR, as described herein:

    i. <u>Extracted Text (Emails, Unredacted Native ESI, and Natively Redacted</u>

Spreadsheets).  All email, un-redacted ESI, and natively redacted spreadsheets produced as native files, should be provided with complete document-level extracted text files.  Extracted text shall include all comments, track changes, and hidden content in Word documents and speaker's notes and hidden content in PowerPoint files.

ii.  <u>OCR (Redacted Native ESI, Hard Copy Documents</u>). In the event a document, other than natively redacted spreadsheets, contains text that is to be redacted, OCR text files should be provided for the entire document after the redaction has been applied. Document-level OCR text files should also be provided for Hardcopy documents, PDFs that do not have embedded text, and images that the Producing Party determines are likely to contain text.

iii.  <u>Format of Extracted Text and OCR</u>. The extracted full text and/or OCR text for all deliverables should be in separate document-level, UTF-8 TXT files provided in a separate folder.  The number of TXT files per folder should be limited to 1,000 files.

**VI.**  **De-duplication**. Global de-duplication (de-duplication both within a custodian's documents and across all custodians' documents) is to be executed at the document family level.  De-duplication shall be done on exact duplicate documents using family level hash values derived from industry standard hashing algorithms, such as MD5 or SHA-1 algorithms (or a reasonably equivalent alternative).

1. The parties will meet and confer regarding deduplication of paper documents across custodians.

2. No party shall remove near-duplicate documents.

3. Standalone documents shall not be de-duplicated against email attachments.

4. For exact duplicate documents, the Producing Party will produce the metadata described in Exhibit 1 for the single production copy to the extent available.  If more than one custodian possesses a duplicate, the Producing Party shall populate a field of data that identifies each custodian who had a copy of the produced document (the "All Custodians" field).

5. In the event of a rolling production of documents or ESI items, to the extent the Producing Party de-duplicates across custodians the Producing Party shall, on at least two occasions during discovery, provide overlay load files with updated Custodian and AllCustodians Metadata fields, as appropriate, to indicate custodians for any duplicate copy of a document that was not produced.  The first will be made the first business day following the middle of the scheduled discovery period and these fields will be updated 30 days before the end of the discovery period, if further productions have rendered them outdated.

6. Any document containing handwritten notes, highlighting, alterations, or markings would not be considered a duplicate of another version and if responsive must be produced as an original document.

7. If during the course of its review, a Producing Party identifies a large number of duplicate documents the Parties may confer regarding a custom deduplication protocol.

## VII.  **Email Threading**.

Email thread suppression may be applied in production so long as portions of the thread containing unique content are not suppressed. This unique content includes thread members with BCC metadata, attachments, or edits to body of the text. If email thread suppression is used, the producing party must produce the most inclusive email thread that contains all of the prior or lesser-included emails and attachments, including each branch of the email thread.  If the most inclusive email thread does not show any differences to the thread such as changes in recipients (e.g., side threads, subject line changes), dates, selective deletion of previous thread content by sender, etc., then the emails containing such changes shall be individually produced.

## VIII.  **Embedded Files**.

Except for de minimis images embedded in ESI which, to the extent reasonably feasible should either not be extracted or should be suppressed from production (e.g., logo images), embedded files are to be extracted and produced as family groups.  Embedded files should be assigned Bates numbers that directly follow the Bates numbers on the documents within which they are embedded.

## IX.  **Databases, Structured, Aggregated or Application Data**.

The parties will meet and confer to address the production and production format of any responsive data contained in a database or other structured or aggregated data source, including Enterprise Resource Planning databases, and Microsoft Access and Excel-based databases.

10

Productions from such databases are not subject to this protocol.

## X.    Parent-Child Relationships.

For email families, the parent-child relationships (the association between emails and attachments) shall be preserved. All email attachments should be consecutively produced with the parent email record. To the extent a non-ordinary course-of-business email was used to transfer over twenty-five attachments, solely for the non-substantive purpose of moving data, those attachments shall be considered standalone documents.

## XI.    Time Zone.

The time zone in which the data was processed will be disclosed by the Producing Party.

## XII.    Bates Numbering.

Bates numbering should be consistent across the production, contain no special characters, and be numerically sequential within a given document. If a Bates number or set of Bates numbers is skipped, the skipped number, or set of numbers, should be noted with a placeholder. All attachments to documents will be assigned Bates numbers that directly follow the Bates numbers on the documents to which they were attached. In addition, each TIFF image will have its assigned Bates number electronically "burned" onto the image.

## XIII.    Excluded File Types.

Absent good cause shown, the parties agree that there is no need to collect ESI from the following sources:

1.  Deleted, slack, fragmented, or other data only accessible by forensics

2.  Random access memory (RAM), temporary files, or other data difficult to preserve without disabling the operating system;

3.  On-line access data such as temporary internet files, history, cache, cookies, and the like;

4.  ESI data stored in a backup system for the purpose of system recovery or information restoration, including but not limited to disaster recovery backup tapes, continuity of operations systems, or data or system mirrors or shadows that is duplicative of data produced from other sources.

5.  Server, system, or network logs.

**XIV.    Redactions**.

A Producing Party may use redactions to protect any material that is legally privileged, otherwise exempt from disclosure by law, or is non-public personal information that the Producing Party contends does not need to be disclosed.[1]  Nothing herein, however, shall be deemed to be an agreement that any particular material may properly be redacted. To the extent parties seek to redact information other than what is listed in this paragraph, they may meet and confer prior to production.  Any redactions shall be clearly indicated on the face of the document, with each

---

[1] As used herein, "non-public personal information" ("NPPI") constitutes individuals' birthdates, Social Security numbers, taxpayer identification numbers, driver's license numbers, incomes, credit card numbers, financial account numbers, banking, and any other financial information and the names and addresses of minors.

redacted portion of the document stating that it has been redacted and, unless the redaction is for NPPI, the basis for that redaction, and a metadata field shall indicate that the document contains redactions.  Where a responsive family of documents contains both redacted and non-redacted content, or both produced and withheld documents, the parties shall produce the remainder of the non-redacted portions of the family of documents as TIFFs rather than natives, except for Excel spreadsheets, which may be redacted in native form, and with the text/OCR corresponding to the non-redacted portions. The Producing party shall produce a field in the DAT file denoting which documents contain redactions. Email header information (e.g., date, subject line, etc.) should not be redacted unless it is in its own right privileged.  If the documents to be redacted and partially withheld from production are Microsoft Excel–type spreadsheets or other ESI that would otherwise be produced in native format in accordance with this ESI Protocol, but must be produced in TIFF format in order to effectuate the redactions, the entire Document shall be produced in TIFF format, including all unprivileged pages, hidden fields, and other information that does not print when opened as last saved by the custodian or end-user.  For Microsoft Excel–type spreadsheets, this shall include, but is not limited to, hidden rows and columns, all cell values, annotations and notes. The producing party shall also make reasonable efforts to ensure that any spreadsheets produced only as TIFF images are formatted to be legible.  For example, column widths should be formatted so that the numbers in the column will display rather than "##########."  If the receiving party finds that the TIFF images of the Microsoft Excel–type file is illegible or formatted in such a way that the document does not resemble how it was kept in the usual course of business or requires formulas to be shown, the Parties shall meet and confer.  If the items redacted and partially withheld from production are audio/visual files, the producing party shall provide the unprivileged

13

portions of the content.  If the content is a voice recording, the Parties shall meet and confer to discuss the appropriate manner for the producing party to produce the unprivileged portion of the content.  The production of a document in a redacted form does not affect the producing party's obligation to timely assert and substantiate the assertion of privilege over the content in a privilege log.

## XV.    Encryption.

To maximize the security of information in transit, any media or file sharing electronic document repository on which documents are produced shall be encrypted.  Production deliverables provided via File Transfer Protocol ("FTP") shall be made available on a secured FTP connection. In such cases, the parties shall transmit the encryption key or password to a Receiving Party, under separate cover, contemporaneously with sending the encrypted media, or correspondence indicating the availability of the encrypted FTP deliverables.

## XVI.    Exception Files.

The parties will use reasonable efforts and standard industry practices to address documents that present imaging or form production problems (including encrypted and/or protected files identified during the processing of ESI where the document appears to contain relevant content). To the extent encrypted or password-protected documents are successfully processed, the Parties have no duty to identify further the prior encrypted status of such documents.  To the extent security protection for such Documents and ESI that appear to be responsive to a requesting party's request cannot be successfully processed despite reasonable efforts, the producing party shall notify the requesting party about such documents.

**XVII.    Logs.**

Documents or information that are withheld from production, in whole or in part, on the basis of privilege must be disclosed on a privilege log in compliance with the requirements of Federal Rule of Civil Procedure 26(b)(5), identifying, at a minimum, to the extent such information is available in metadata:

(a) the name of the document author;

(b) the names of the document's recipients;

(c) the names of the persons to whom copies were sent;

(d) the dates the document was created, sent, and received;

(e) the custodian of the document;

(f) the type of document (email, spreadsheet, PowerPoint, etc.);

(g) a brief description of the nature and subject matter of the document

(h) a statement of the privilege asserted and each basis upon which a privilege is claimed or on which the document is withheld;

(i) an indication of whether the Document or ESI has been redacted and produced or withheld in its entirety;

(j) the Bates number or other identifier for the document; and

(k) whether the document stands alone or was an attachment.

If the forgoing information is not contained in metadata, the following information must be logged manually, to the extent reasonably available: (i) the privileged document's beginning and ending Bates or unique identifying number; (ii) an indication of whether the document or ESI has been redacted or withheld in its entirety; (iii) the custodian from whom the document was collected; (iv)

15

the document's author; (v) all recipients of the document; (vi) the date the document was modified or sent; (vii) the type of document (email, spreadsheet, PowerPoint, etc.); (viii) the subject matter of the material claimed and (ix) the basis for the privilege(s) and protection(s) claimed. Parties will also identify which of the individuals listed as authors or recipients are attorneys, to the extent relevant to assess the privilege claim.

The parties agree to provide privilege logs as soon as practicable, but in any event, in at least three installments 1) no later than 60 days after the Producing Party's first production (i.e., 135 days after service of Requests for Production), 2) ninety days thereafter; and 3) 90 days before the court-ordered fact discovery cutoff, on which date all privilege logs must be complete. Privilege logs for each agreed (or court-ordered) custodian must be complete 10 days before the custodian's deposition.

Documents presumptively not to be logged on a privilege log include: (a) Communications exclusively between a party or its representative(s) and its trial counsel after the commencement of this litigation; and/or (b) Work product created by counsel or at the direction of counsel after commencement of this litigation.

## XVIII. Hard Copy Documents

In addition to ESI addressed by this stipulation, the Producing Party shall perform a reasonable and diligent search to locate relevant non-ESI (i.e., paper documents, devices, prototypes, etc.) for the identified custodians and other relevant non-custodial sources, where appropriate, following a reasonable and diligent investigation.

## XIX.    Miscellaneous Provisions

1.    **Effect of Order**. The parties' agreement to this Protocol is without prejudice to the right of any party to seek an order from this Court to rescind or amend this order for good cause shown.  Nothing in this Protocol abridges the rights of any person to seek judicial review or to pursue other appropriate judicial action with respect to any discovery ruling made by the Court in this matter.

2.    **Effect on Discovery.** Nothing herein constitutes an admission by any party that any particular category of discovery is appropriate in this matter or that there exists producible ESI.

**IT IS SO ORDERED,** this 29th day of October, 2020.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
UNITED STATES DISTRICT JUDGE

17

# EXHIBIT 1

## FIELDS and METADATA TO BE PRODUCED

The load files accompanying scanned paper documents will include the following objective coding fields, to the extent applicable:

| Field | Category of Document for Population | Field Description |
|---|---|---|
| BEGBATES | All documents | First Bates identifier of item |
| ENDBATES | All documents | Last Bates identifier of item |
| BEGATTACH | All documents | Starting Bates number of a document family |
| ENDATTACH | All documents | Ending Bates number of a document family |
| PAGES | All documents | Number of pages |
| ATTACHCOUNT | All documents | Number of attachments embedded in a document |
| APPLICATION | Email; Edocs | Type of application used to generate the document |
| DOCTYPE | Email; Edocs | The type of document |
| FILEPATH | Email; Edocs | The file path from which the document was collected |
| FILEEXT | Email; Edocs | The file extension of the document |
| REDACTED | All documents | (Y/N) field that identifies whether the document is redacted |
| TIMEZONE | Email; Edocs | The time zone in which the documents were processed |
| CUSTODIAN | All documents | Name of the original person from whose data the file is produced. |
| ALLCUSTODIANS | All documents | Name(s) of the person(s), in addition to the Custodian from whose data the file is produced. |
| CONFIDENTIALITY | All documents | Confidentiality designation applied in accordance with the Protective/Confidentiality Order |
| AUTHOR | eDocs | Document author from properties |
| FROM | Email | Sender of message |
| TO | Email | Recipient(s) of message |
| CC | Email | Copied recipient(s) of message |
| BCC | Email | Blind copied recipient(s) of message |
| SUBJECT | Email | Subject of message |
| DATESENT | Email | The sent date and time of the message in the format MM/DD/YYYY HH:MM |
| DATERECEIVED | Email | The received date and time of the message in the format MM/DD/YYYY HH:MM |
| FILENAME | Email; Edocs | Contents of this metadata field, or an equivalent |
| FILESIZE | Email; Edocs | Size of the file in bytes |
| HASH | Email; Edocs | Hash value of the document |
| MESSAGEID | Email | Unique message id |
| NATIVEPATH | Email; Edocs | Link to native file (if any) |

| TEXTPATH | All documents | Link to text file for the document |
|---|---|---|
| **Field** | **Category of Document for Population** | **Field Description** |
| TITLE | eDocs | Title from the Metadata of the Native File |
| DATECREATED | eDocs | Date and time file was created; MM/DD/YYYY HH:MM |
| DATEMODIFIED | eDocs | Date and time file was last modified; MM/DD/YYYY HH:MM |
| LASTMODBY | eDocs | Information in Last Saved by, Last Modified by, or Last Author in loose file documents or email attachments. |
| PREVMESSAGEID | Email | The MessageID of the previous message in the email thread (the message that was replied to or forwarded). |
| TWITTERHASHTAG | eDocs | Values/text following # in tweets and replies. |
| STARTDATE | eDocs | Start date of chat/appointment. |
| STARTTIME | eDocs | Start time of chat/appointment. |
| ENDDATE | eDocs | End date of chat/appointment. |
| ENDTIME | eDocs | End time of chat/appointment. |
| SIBLINGID | eDocs, Email | Group ID of text/message. |
| MOBILEORIGIN | eDocs | Sent or received info. |

Metadata field values, other than field values such as bates fields or custodian fields that by their nature require calculation or population rather than extraction, will be extracted from the native file where produced to the extent available at the time of collection and processing, except that they may be redacted if privileged or if the metadata field values contain information protected by law or Court order. Other than for fields that by their nature require calculation or population rather than extraction, this list of fields does not create any obligation to create or manually code fields that are not automatically generated by the processing of ESI, that do not exist as part of the original metadata of the document, or that would be burdensome or costly to obtain.