# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TENNESSEE

|  |  |
|---|---|
| JESSICA JONES et al., | |
| Plaintiffs, | **Civ. Action No. 2:20-cv-02892** |
| v. | |
| VARSITY BRANDS, LLC et al., | |
| Defendants. | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' PROFFERED EXPERT JANET S. NETZ, PHD

**TABLE OF CONTENTS**

INTRODUCTION ..........................................................................................................1

ARGUMENT .............................................................................................................1

I.  DR. NETZ'S MARKET DEFINITION ANALYSIS FAILED TO CONSIDER
    NARROWER MARKETS AND IS THEREFORE UNRELIABLE. ................................2

    A.  Dr. Netz Failed to Properly Apply the Hypothetical Monopolist Test in
    Defining the Relevant Product Markets..........................................................3

        1.  Dr. Netz's Cheer Competitions Market is Seriously Flawed. .....................3

        2.  Dr. Netz's Gerrymandered Cheer Apparel Market is Illogical. ..................6

        3.  Dr. Netz's Analysis of the Cheer Camp Market is Incomplete. ..................8

    B.  Dr. Netz Failed to Apply Any Reliable Methodology in Defining a
    Relevant Geographic Market. .......................................................................10

II. THE VAST MAJORITY OF DR. NETZ'S OPINIONS ARE FACTUAL NARRATIVE
    BASED ON AN INCOMPLETE REVIEW OF THE EVIDENCE AND IMPROPERLY
    USURP THE JURY'S ROLE AS FACTFINDER. ...........................................12

    A.  Each of Dr. Netz's Opinions Regarding Varsity's Market Power are
    Inappropriate Factual Narratives and Argument.......................................13

    B.  Dr. Netz's Opinion Regarding Varsity's Supposed Conspiracy With
    USASF Is Simply Plaintiffs' Spin on the Facts. ......................................15

    C.  Dr. Netz's Attempt to Cast Varsity's Safety Requirement as an
    Anticompetitive Tie is Pure Conjecture......................................................15

    D.  Dr. Netz's Opinion Regarding Acquisitions Is Similarly An Impermissible
    Attempt to Use An Expert to Hijack Factfinding.......................................17

    E.  Dr. Netz's Opinion Regarding Rebate Foreclosure Is Likewise
    Inappropriate. ...............................................................................................19

CONCLUSION...........................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ask Chems., LP v. Comput. Packages, Inc.*,
    593 F. App'x 506 (6th Cir. 2014) ...............................................................10, 12, 16

*B & H Med., L.L.C. v. ABP Admin., Inc.*,
    526 F.3d 257 (6th Cir. 2008) .............................................................................16, 19

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
    752 F.3d 82 (1st Cir. 2014) ......................................................................................11

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ...................................................................................................4

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ................................................................................................1, 2

*In re Davol, Inc./C.R. Bard, Inc. Polypropylene Hernia Mesh Prods. Liab. Litig.*,
    546 F. Supp. 3d 666 (S.D. Ohio 2021) ...............................................................12, 19

*In re: LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018) ............................................................14, 15, 17

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ...................................................................................................2

*Heller v. Shaw Indus., Inc.*,
    167 F.3d 146 (3d Cir. 1999) .......................................................................................1

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
    588 F.3d 908 (6th Cir. 2009) ...................................................................................8, 9

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ...................................................................................................1

*Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.*,
    358 F. App'x 643 (6th Cir. 2009) ...............................................................................5

*Newell Rubbermaid, Inc. v. Raymond Corp.*,
    676 F.3d 521 (6th Cir. 2012) .....................................................................................2

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007) (en banc) ...................................................................19

*Queen City Pizza, Inc. v. Domino's Pizza Inc.*,
   124 F.3d 430 (3d Cir. 1997)..................................................................................7

*Rose v. Matrixx Initiatives, Inc.*,
   No. 07-2404-JPM/tmp, 2009 WL 902311 (W.D. Tenn. Mar. 31, 2009)...................................1

*Thomas v. City of Chattanooga*,
   398 F.3d 426 (6th Cir. 2005) ..................................................................................2

*United States v. Rios*,
   830 F.3d 403 (6th Cir. 2016) ..................................................................................12

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004)..............................................................................................18

*Yancey v. Carson*,
   Nos. 3:04-CV-556, 3:04-CV-620, 2007 WL 3088232 (E.D. Tenn. Oct. 19,
   2007) ................................................................................................................10

**Other Authorities**

Fed. R. Evid. 403 ......................................................................................................12

Fed. R. Evid. 702 ........................................................................................................1

Fed. R. Evid. 703 ......................................................................................................12

## INTRODUCTION

The Court should exclude the testimony of Dr. Netz in its entirety. Despite making sweeping conclusions about the relevant market and the alleged conduct, Dr. Netz admittedly performed absolutely no quantitative analysis. Instead, Dr. Netz's opinions are based on a cherry-picked version of the facts that she even referred to as anecdotal and to which she applied her "experience." That alone merits exclusion. Further, in the absence of any appropriately applied scientific methodology, Dr. Netz's opinions are nothing more than a biased summary of record evidence, which, if admitted, would permit her to improperly stand in the place of the factfinder. Dr. Netz's opinions have previously been excluded for her biased interpretations of cherry-picked documents and the Court should not hesitate to exclude them again here.

## ARGUMENT

The Court has a "gatekeeping obligation" to ensure that any expert testimony "is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 589 (1993). Because Rule 702 of the Federal Rules of Evidence allows a "witness who is qualified as an expert by knowledge, skill, experience, training, or education [to] testify in the form of opinion or otherwise" only in certain limited circumstances, the Court's obligation "applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999). As a result, the Court must examine each part of an expert's analysis, because any unreliable step "renders the expert's testimony inadmissible." *Rose v. Matrixx Initiatives, Inc.*, 2009 WL 902311, at *10 (W.D. Tenn. Mar. 31, 2009) (citation omitted). Thus, for expert testimony to be admissible, it must be based on "reasoning or methodology underlying the testimony [that] is scientifically valid and … properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 600. For a court

1

to make that assessment, "at the outset" as *Daubert* requires, *id.* at 592, the reasoning or methodology must be identified.  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005) ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'") (citation omitted).  Even if a scientifically valid methodology is identified, courts must look for "[r]ed flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity."  *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012).  Dr. Netz's opinions fail on each and every one of these criteria— her market definition opinions are based on an improper application of methodology rigged to validate Plaintiffs' Complaint, and Dr. Netz's remaining opinions on Varsity's market power and alleged conduct are thinly veiled factual narratives that merely provide her spin on a curated slice of record evidence.

## I.   DR. NETZ'S MARKET DEFINITION ANALYSIS FAILED TO CONSIDER NARROWER MARKETS AND IS THEREFORE UNRELIABLE.

Dr. Netz defines the relevant markets as Cheer Competitions, Cheer Apparel, and Cheer Camps, all spanning the United States, by misapplying her chosen methodology and by disregarding substantial evidence that undermines her conclusions.  (Ex. A[1], Netz Rep. at 41-60.)

Dr. Netz adopted the DOJ and FTC's Horizontal Merger Guidelines methodology for defining the relevant antitrust market—the hypothetical monopolist test.  (Ex. A, Netz Rep. at

---

[1] References herein to "Ex. __" refer to the corresponding Exhibit in the Kaiser Declaration, which is submitted herewith.

39-40.) (Horizontal Merger Guidelines ("HMGs") at 1, 8-9.)[2]  This test considers whether a hypothetical monopolist of a candidate set of products could impose a small but significant non-transitory increase in price ("SSNIP") —typically 5% or 10%—on at least one of the products without losing so many customers to an alternative product outside of the candidate market such that the price increase would be unprofitable.  (HMGs at 9.)  If one conducts the hypothetical monopolist test and finds that such diversion occurs, the alternative product must be considered part of the relevant market and the test repeated until there is a candidate market in which the imposition of a SSNIP is profitable.  (Ex. C, Netz Dep. 51:1-13.)  As Dr. Netz acknowledges, one must start with the *narrowest* set of products and only expand as needed to satisfy the test.  (Ex. A, Netz Rep. at 3; Ex. C, Netz Dep. 51:1-13.)  But, she failed to do this both for her product and geographic markets, rendering the resulting market definition inaccurate, unreliable, and thus inadmissible.

### A.    Dr. Netz Failed to Properly Apply the Hypothetical Monopolist Test in Defining the Relevant Product Markets.

#### 1.    Dr. Netz's Cheer Competitions Market is Seriously Flawed.

Dr. Netz agrees that using the hypothetical monopolist test requires starting with the narrowest possible market.  But her claim that "the narrowest possible product market is for All Star competitions or for school competitions," (Ex. A, Netz Rep. at 41.), is insufficient to meet this requirement because 1) she fails to meaningfully consider distinctions between the two and 2) those markets are not the narrowest possible product markets for competitions.

First, Dr. Netz finds a single product market of "Cheer Competitions" comprised of *both*

---

[2] U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (Aug. 19, 2010), available at
https://www.ftc.gov/system/files/documents/public_statements/804291/100819hmg.pdf

All Star competitions and "school cheer"[3] competitions, even though she readily acknowledges numerous material differences between All Star and "school cheer" that preclude such a finding. Specifically, she concedes that record evidence indicates that: Varsity views both All Star and "school cheer" as separate disciplines (Ex. A, Netz Rep. at 42; Ex. C, Netz Dep. 74:3-24); All Star and "school" teams attend different competitions and compete in separate divisions (Ex. C, Netz Dep. 62:7-23); All Star competitions are far more expensive than "school" competitions (*id.* 73:1-8); All Star and "school" cheerleading athletes use different equipment (*id*. 85:8-86:25); and rules for All Star and "school" competitions are issued by separate sanctioning organizations (*id.* 66:4-25.)  As Dr. Netz herself acknowledges, each of these distinctions are relevant and informative evidence regarding market definition and each of which she ignored without basis.[4]

Instead, Dr. Netz concludes, without any quantitative or qualitative evidence to support it, that the relevant product market is "Cheer Competitions, including both All Star and School competitions," because individual athletes "may choose to leave an All Star team and join a School team" if All Star prices were raised by 5-10% and vice-versa.  (Ex. A, Netz Rep. at 42; Ex. C, Netz Dep. 95:14-96:9 ("Q. I see. They may switch. Not that they would switch? A. Correct. Q. And you couldn't conclude that they would switch because you didn't do any quantitative analysis regarding that question; right? A. Well, quantitative analysis would not be required, but I also did not have qualitative evidence that that would happen. Q. So you had

---

[3] Dr. Netz draws an artificial distinction between sideline cheer and scholastic competitive cheer, referring to only the latter as "school cheer." *See* Ex. B, Netz Rebuttal Rep. at 17.  Because Dr. Netz's distinction does not entirely reflect reality, Defendants use the term "scholastic cheer" to refer to all cheer teams affiliated with a school.

[4] *See* Ex. A, Netz Rep. at 41 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), at 4); Ex. C, Netz Dep. 74:4-75:4 ("Q. Varsity considers All Star and School Cheer different disciplines; correct? A. Correct… Q. And you agree that, under *Brown Shoe*, one of the practical indicia that can be considered is industry recognition of separate markets; right? A. Correct.").

neither quantitative nor qualitative analysis that that would happen? A. Correct.").)  Dr. Netz approvingly cites testimony to support her opinion that the relevant market is "no wider than Cheer Competitions," so as not to encompass gymnastics or competitive dance, because "[n]one… are reasonable substitutes."  (Ex. A, Netz Rep. at 43.)  But she fails to explain why her "methodology" excludes testimony denying the substitutability of All Star and scholastic competitions.[5]  Dr. Netz's opinion on the relevant product market should be excluded because, by her own admission, it is not based on any evidence.  *See Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.*, 358 F. App'x 643, 654 (6th Cir. 2009) ("Experts may not assume facts without some support for those assumptions in their expert report or elsewhere in the record.")

Second, Dr. Netz failed to conduct any analysis as to potentially *narrower* markets.  (Ex. C, Netz Dep. 96:10-97:13.)  Because the hypothetical monopolist test will never reveal if the candidate product market is too broad, Dr. Netz's analysis provides no insight as to whether any narrower markets are appropriate.  (Ex. D, Murphy Rep. ¶¶ 78, 207; *accord* Ex. A, Netz Rep. at 40-41.)  According to Dr. Netz's chosen methodology, the HMGs, and as acknowledged by Dr. Netz in her report, a relevant market is made up of products that are reasonably interchangeable for one another.  (HMGs at 8-9.)  (Ex. A, Netz Rep. at 40.)  But the record shows that (1) a market for all Cheer Competitions is too broad given the above-noted distinctions and (2) even separate markets for All Star and scholastic competitions include products that are not reasonably interchangeable and between which consumers are unlikely to substitute in response to modest price increases.  Within All Star Cheer, regular season and end-of-season All Star events are not reasonably interchangeable—not only because end-of-season events are more expensive than regular season events and, as the name suggests, only take place at the end of the season, but

---

[5] *See, e.g.*, Ex. E, Minzghor Dep. 223:2-7; Ex. F, L. Gurske Dep. 318:6-15.

more significantly because many end-of-season events, such as the Summit and Worlds, require

bids to compete.  (Ex. A, Netz Rep. at 44; Ex. C, Netz Dep. 103:8-104:11.)  As Dr. Netz admits,

a gym cannot simply decide, in the event of a price increase at a regular season event, to attend

the Summit or Worlds instead—they must earn the ability to compete at that end-of-season event.

(Ex. C, Netz Dep. 106:3-107:8.)  Additionally, Dr. Netz fails to consider significant pricing

differences between one-day and two-day events.  (*See* Ex. D, Murphy Rep. ¶ 166, Ex. 23.)  It is

illogical that consumers, in the face of a 5-10% price increase of a particular one-day event—just

a few dollars—would switch to a twice as expensive two-day event rather than a different one-

day event.[6]  Dr. Netz acknowledged but failed to consider any of these distinctions and thus did

not properly test the narrowest possible product market as required by her own methodology,

rendering her opinions unreliable.

## 2.    Dr. Netz's Gerrymandered Cheer Apparel Market is Illogical.

Dr. Netz's definition of a single product market for "Cheer Apparel" defies law,

economics, and the record because: (1) it includes products that are not reasonably

interchangeable with each other both across and within product categories; (2) it artificially

excludes identical products not specifically marketed for cheer; and (3) it results from an

unreliable application of the hypothetical monopolist test.

Dr. Netz proposes that the Cheer Apparel market includes "uniforms, shoes, accessories,

warmups, and camp wear" worn by both All Star and by "school" cheerleaders.  (Ex. A, Netz

---

[6] During her deposition, Dr. Netz opined that if a hypothetical monopolist of one-day events
were to raise the price of all one-day events from $60 to $63 (i.e., a 10% increase), enough
customers would switch from one-day events to $100 two-day events to make the price increase
unprofitable.  Dr. Netz did not base this opinion on any data or evidence and testified that she did
not have "nearly enough information" to reach the same opinion if the price of one-day events
were raised from $60 to only $62.  *See* Ex. C, Netz Dep. 98:10-100:16.

Rep. at 55.)  Such a market definition is patently at odds with the facts of this case, and fails to include all substitutes and exclude non-substitutes as required by law.  *See, e.g., Queen City Pizza, Inc. v. Domino's Pizza Inc.*, 124 F.3d 430, 436-37 (3d Cir. 1997).  The proposed market is overinclusive because it includes products that Dr. Netz admitted are not substitutable with each other, like hair bows and shoes.  (Ex. C, Netz Dep. 210:16-21.)  During her deposition, Dr. Netz tried to defend her product market definition by giving an example of fountain pens and briefcases being found to be in the same market for graduation gifts because their purpose was interchangeable from the consumer perspective of giving a gift such that the price of one would influence the price of the other.[7]  (Ex. C, Netz Dep. 53:15-54:14.)  Because, as Dr. Netz admits, this analysis was based on the customer's purpose (i.e., giving a gift) her strained analogy quickly crumbles.  (*Id.* 56:25-57:4.)  Unlike expensive pens and briefcases, consumers purchase shoes and hair bows for distinct purposes.  Her market definition further fails to exclude non-substitutes because All Star and scholastic teams require and use different apparel for different functions.  Dr. Netz asserts that "the same types of apparel are purchased by both All Star teams and School teams."  (Ex. A, Netz Rep. at 55.)  But as Dr. Netz acknowledged during her deposition, apparel differs across disciplines.  For example, shoes for scholastic cheerleaders are designed to be worn both indoors and outdoors, whereas shoes for All Star cheerleaders are made specifically for indoor use.  (Ex. C, Netz Dep. 85:8-17.)  Dr. Netz also admitted that camp wear is not needed by All Star cheerleaders, who rarely attend camp, and modified her opinion to reflect this. (*Id.* 89:6-11.)

At the same time, Dr. Netz's Cheer Apparel market is underinclusive because it creates an artificial distinction between apparel used by competitive cheer teams and the same apparel

---

[7] Dr. Netz did not try to analyze whether the price of bows influences the price of cheer shoes.

when used for other athletic activities.  According to Dr. Netz, because "the rules of Competitive
Cheer dictate what apparel can and cannot be worn, off-the-rack athletic gear cannot substitute
for Cheer Apparel."  (Ex. A, Netz Rep. at 55-56.)  While the USASF, for example, has certain
(albeit fairly general) rules for what may comprise an All Star cheerleader's competition
uniform, neither the USASF nor the NFHS[8] dictate what athletes may wear for training, and
cheerleaders routinely use "off-the-rack" athletic gear.  (*See* Ex. G, Bray Dep. 40:1-41:11.)

Dr. Netz reaches this thoroughly unsupported market definition through an unreliable and
made-for-litigation methodology.  Without any quantitative evidence to support Plaintiffs'
preferred product market, Dr. Netz again purports to apply the hypothetical monopolist test
"qualitatively" by assessing just three Varsity documents.  (Ex. A, Netz Rep. at 56.)  Ignoring the
narrowest possible market, Dr. Netz uses the alleged market in Plaintiffs' Complaint as a starting
point and simply concludes that a 5-10% price increase would be profitable.  Because the
hypothetical monopolist framework can never demonstrate the candidate market is too broad, Dr.
Netz's decision to begin with this broader market reveals an uncritical acceptance of Plaintiffs'
Complaint.  Using Plaintiffs' litigation goals to direct her work is disqualifying, and this failure
alone renders Dr. Netz's opinion unreliable.  *See, e.g.*, *Kentucky Speedway, LLC v. Nat'l Ass'n of
Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918 (6th Cir. 2009) (excluding an expert witness's
"own version" of the SSNIP test "produced solely" for litigation) (quotations omitted).

### 3. Dr. Netz's Analysis of the Cheer Camp Market is Incomplete.

The Cheer Camp product market definition section of Dr. Netz's opening report consists
of three paragraphs without a single citation.  (Ex. A, Netz Rep. at 60.)  Dr. Netz does not even

---

[8] The National Federation of State High School Associations ("NFHS") is the governing body for
high school athletics in the United States.  *See* "About Us," National Federation of State High
School Associations, available at: https://www.nfhs.org/who-we-are/aboutus.

acknowledge differences among the various types of cheer camps available and how these could

affect substitution in response to small price increases.  Instead, Dr. Netz acts as a mouthpiece for

counsel's arguments, which the federal rules do not permit, and uncritically states that a

hypothetical monopolist could profitably increase prices over all Cheer Camps.  (*Id.*)

        In fact, there is significant differentiation among cheer camps.  Varsity's camps have

several formats that differ greatly in terms of location, pricing, and size.  (Ex. C, Netz Dep.

177:7-20.)  Home camps are typically held for a single team at their school and thus do not

require travel or an overnight stay, and their average attendance is about ███████.  (Ex. D,

Murphy Rep. at Ex. 14.)  In contrast, Varsity's resort and hotel camps average over ███

███████, require travel with overnight stays, and often include additional recreational

activities unique to the destination.  (Ex. D, Murphy Rep. at Ex. 15; Ex. C, Netz Dep. 188:24-

189:5.)  As such, Varsity's resort and hotel camps are ████████████████ home

camps.  Further, neither type of camp is so uncommon as to not impact market definition—home

camps account for between ████████ of total camp registrations each season, and resort and

hotel camps account for about ███.  (Ex. D, Murphy Rep. at ¶ 182.)  Dr. Netz's analysis, or lack

thereof,[9] provides the Court with no way to assess her conclusion that such distinct offerings

belong in a single market.  Her analysis is incomplete and fatally flawed because she does not

even consider, much less test, whether there are distinct product markets for different types of

camps—Dr. Netz simply presumes the broadest possible market and asks the Court to take her

word for it.  *See Kentucky Speedway, LLC*, 588 F.3d at 918.

---

[9] Dr. Netz testified that she did not do any analysis to understand whether one-day day camps
were reasonably interchangeable with multi-day resort camps.  *See* Netz. Dep. 179:3-9.

**B.    Dr. Netz Failed to Apply Any Reliable Methodology in Defining a Relevant Geographic Market.**

Dr. Netz's geographic market analyses suffer the same defects and her opinions are so thoroughly unsupported that not even Plaintiffs' other economics expert, Dr. Randall Heeb, agrees with her.  For each product market, Dr. Netz conclusions in her initial report that the markets are national are exclusively based on an analysis of anecdotal documents and testimony that she admits are often contradictory.  (Ex. A, Netz Rep. at 44-45, 56, 61.)  For example, Dr. Netz notes that "Varsity documents indicate that Varsity's sales organization is divided into eight geographic areas," but handwaves these documents away in favor of others that she contends support a national market because the unfavorable documents only "establish regions for Varsity's business purposes or coaches' planning purposes." (*Id.* at 44.)  While Dr. Netz's "methodology" for deeming certain business documents informative is of questionable reliability, it is also improper.  *See Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 510 (6th Cir. 2014); *Yancey v. Carson,* 2007 WL 3088232, at *4 (E.D. Tenn. Oct. 19, 2007) (excluding expert testimony on basis that expert "essentially marshaled the facts in the record which support the plaintiff's position.")

While Dr. Netz's reliance on a questionable qualitative methodology to support her geographic market definition is improper, her failure to do any quantitative analysis is all the more shocking given that the data to do so was readily available (and, indeed, used by one of Plaintiffs' other experts, Dr. Heeb, to find regional geographic markets).  Perhaps tellingly as to why Dr. Netz did not review this data, Professor Murphy did show the travel patterns of gyms and schools to determine how far teams actually travel to attend competitions and camps.  (Ex. D, Murphy Rep. ¶¶ 186, 197, 199.)  Professor Murphy found (and Dr. Netz does not dispute) that about 90% of gyms typically travel under 150 miles to one-day events and under 300 miles to

two-day events, whereas 94% of schools traveled under 200 miles to one-day events and 93% traveled less than 400 miles for two-day events.  (*Id.* ¶¶ 186, 197.)  The distances camp customers traveled depended on the type of camp of they attended and whether they stayed overnight.  Almost all home camp participants (███████████████████████████) traveled under 25 miles.  (*Id.* at ¶ 199.)  This demonstrates that markets for competitions and camps are local or regional and not national, as Dr. Netz claimed without support.

When confronted with Professor Murphy's results, Dr. Netz in her rebuttal report performs various "analyses" based on the *maximum* distances traveled by certain gyms or schools to certain events.  (Ex. B, Netz Rebuttal Rep. at 45-46, Ex. 8-11.)  But, Dr. Netz's selection of the maximum distance as the more relevant criteria and end-of-season events as the more relevant sample for determining geographic market was clearly chosen solely to support her conclusion and lacks any reliable explanation.  Dr. Netz knows that teams compete for bids to attend end-of-season events and travel further to attend them.  And even her analysis of regular season events is clearly cherry-picked.  For example, Dr. Netz simply critiques Professor Murphy's calculation that All Star teams travel an average of 140 miles to attend regular season competitions by pointing out that teams travelled longer distances for a *specific* Varsity marquee event—the 2018 NCA All-Star National Championship.  (*Id.* at 46, Ex. 8.)  It is of course obvious that teams may travel farther to certain national championship events than they do hundreds of other events.  Dr. Netz does not explain why her analysis of a single event is informative of travel patterns overall, nor does she explain why she selected to unpack this sole event.  Such a cherry-picked analysis of events should be excluded.  *See Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 92 (1st Cir. 2014) (excluding opinion because expert "cherry-picked," event dates based on unreliable criteria).

Dr. Netz's other rebuttal "analysis" regarding the geographic market for Cheer Camps is similarly cherry-picked and based on unreliable methodologies.  In order to defend her national market for Cheer Camps against Professor Murphy's analysis, Dr. Netz "measured" the distances travelled by customers of Varsity's "10 Largest Hotel Resort Camps" for the 2017-2018 season.  (Ex. B, Netz Rebuttal Rep. at Ex. 17.)  But, Dr. Netz admitted that the camps she selected "only make up a fraction of the camps Varsity offers," and agreed that "teams would probably not be willing or able to travel as far for a day camp as they would for an overnight camp."  (Ex. C, Netz Dep. 183:19-184:15.)  Thus, Dr. Netz's rebuttal analysis neither supports a national market for Cheer Camps nor rebuts Professor Murphy's opinion that the markets are local or regional.

## II.     THE VAST MAJORITY OF DR. NETZ'S OPINIONS ARE FACTUAL NARRATIVE BASED ON AN INCOMPLETE REVIEW OF THE EVIDENCE AND IMPROPERLY USURP THE JURY'S ROLE AS FACTFINDER.

Dr. Netz reaches a number of conclusions based on what she calls a "qualitative" analysis of record evidence.  These opinions are barely disguised interpretations of biasedly curated portions of record evidence rather than a reliable methodology.  As Dr. Netz herself testified, "I've been calling it "qualitative" when it's been anecdotal."  (Ex. C, Netz Dep. 158:23-24.)  An expert is not permitted to usurp the jury's role as fact finder and Dr. Netz's so-called economist "gloss" will not aid the jury in interpreting the documents and deposition testimony she relies on almost exclusively to support her opinions about Varsity's challenged conduct.  *See In re Davol, Inc./C.R. Bard, Inc. Polypropylene Hernia Mesh Prods. Liab. Litig.*, 546 F. Supp. 3d 666, 677 (S.D. Ohio 2021) ("A history without any expert analysis or other application of the expert's expertise is simply a factual narrative that should be presented to the jury directly.").  Such opinions are routinely excluded under Rules 703 and 403.  *See Ask Chems., LP*, 593 F. App'x at 510 ("Where an expert merely offers his client's opinion as his own, that opinion may be excluded.");  *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016) (relevance depends on

"whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.") (quotation omitted).

A.    **Each of Dr. Netz's Opinions Regarding Varsity's Market Power are Inappropriate Factual Narratives and Argument.**

Dr. Netz concludes there is proof that Varsity possesses market power in each relevant product market based on her selective interpretation of anecdotal evidence. (Ex. A, Netz Rep. at 45-55, 56-60, 61-62; Ex. C, Netz Dep. 25:20-24.) Across all three of her market power opinions Dr. Netz relied on a single deposition of a Varsity employee—Marlene Cota—████████

████████. (Ex. C, Netz Dep. 135:1-136:14.) Dr. Netz never cited the depositions of senior executives on Varsity's leadership team like Bill Seely (Varsity Spirit's President) or John Newby (Executive Vice President and General Manager of Varsity All Star); she testified that she did not know who they were, and "could not recall" whether Mr. Seely was even deposed. (*Id.* 32:7-12; 34:1-8.) Instead, Dr. Netz supports these opinions with citations to anecdotal documents and emails from mostly former Varsity employees. For example, she concludes that Varsity has a high market share in competitions based solely on Varsity's internal estimates gleaned from corporate documents and Ms. Cota's testimony. (Ex. A, Netz Rep. at 52, 99.) Dr. Netz did not examine the assumptions or data sources underlying the documents, nor did she review the deposition testimony of those who prepared them. (Ex. C, Netz Dep. 131:3-20; 134:18-22; 37:19-22.) This is a critical omission because, as Dr. Netz acknowledged, "when a business person uses the word "market," that doesn't necessarily mean they're using it in the way someone—like an economist would in an antitrust context." (*Id.* 134:11-22.) The remainder of Dr. Netz's "proof" of Varsity's market power is also based on selective quotes from the record without any real analysis. Dr. Netz opines that Varsity's "high and persistent market share" is

protected by "several barriers to entry," like Varsity's ability to grant bids to its own end-of-season events, pre-existing relationships with suppliers and gyms, and Varsity's rebates. (Ex. A, Netz Rep. at 52-55.)  She supports this conclusion with, for example, a quote from a 2014 Varsity presentation to investment bankers that describes the trust that principals and athletic directors place in Varsity as a barrier to entry.  (*Id.* at 52 n.205.)  Besides being impermissible factfinding masquerading as an expert opinion, the fact that Varsity produces a product that customers like and generates loyalty is not a "barrier to entry."

Dr. Netz's interpretation of documents has previously led to exclusion of her testimony. *See In re: LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 490 (S.D.N.Y. 2018).  There, the Court found that Dr. Netz's reading of communications to conclude that market manipulation occurred was improper because the documents were "clear on their face" and addressed issues of fact that "[the trier of fact] is capable of understanding" without expert testimony.  *Id.*  So too here.  But Dr. Netz goes further, interpreting these documents to baselessly opine on Varsity's motives.  For example, Dr. Netz ascribes intent from certain documents to conclude that "Varsity recognizes these barriers as means to thwart competition," and infers from others that Varsity's loyalty plans are intended "to take market share away" from an apparel competitor.  (Ex. A, Netz Rep. at 55, 57.)  This is, again, what resulted in the exclusion of her testimony in *In re LIBOR*, where the court excluded as impermissible "any opinions on the traders' actual motives and states of mind" based on Dr. Netz's document review, and the Court expressed "heightened" concern at the lack of explanation for how communications were selected for review.  299 F. Supp. at 490.  Similarly here, Dr. Netz's report does not explain her methodology for choosing the documents, the testimony she selectively quotes or why her

opinions require scientific expertise.[10]

**B.      Dr. Netz's Opinion Regarding Varsity's Supposed Conspiracy With USASF Is
Simply Plaintiffs' Spin on the Facts.**

Next, Dr. Netz rehashes Plaintiffs' allegations of Varsity and USASF conduct that harmed

competition.  Once again, without explaining her selection methodology, Dr. Netz relies

exclusively on select documents and testimony to reach this conclusion, this time opening with a

lengthy factual narrative quoting entire emails.  (Ex. A, Netz Rep. at 66-69.)  Dr. Netz then

asserts that Varsity and USASF "conspired to exclude and disadvantage Varsity's rivals" by,

among other things, "manipulating" the Worlds bid system through a "counterprogramming

strategy."  (*Id*. at 66, 72, 74.)  Based on only her "expert" review of emails, Dr. Netz concludes

that this strategy was "effective" and that USASF was "complicit."  (*Id*. at 81.)

This is merely another attempt to marshal counsels' arguments into the record.  Dr. Netz

ascribes anticompetitive intent to USASF policies that predate the Class Period while ignoring

any evidence of procompetitive justifications, concluding that such policies "are designed to

foreclose rival event producers." (*Id.* at 88.)  Meanwhile, Dr. Netz performs no analysis to show

the effect of the alleged collusion and analyzes no voting records to understand Varsity's role in

those rule changes.  As with Dr. Netz's other interpretations of the record, Dr. Netz's opinions

here should be excluded as improper.  *See In re LIBOR*, 299 F. Supp. 3d 430 at 490.

**C.      Dr. Netz's Attempt to Cast Varsity's Safety Requirement as an
Anticompetitive Tie is Pure Conjecture.**

Dr. Netz opines that Varsity's Squad Credentialing Program amounts to an

anticompetitive tie, but she merely recasts Plaintiffs' allegations among a recitation of documents

---

[10] Dr. Netz's own testimony reveals that she did not look for additional documents that would
provide context for the documents she relied upon.  *See* Ex. C, Netz Dep. 42:12-20.

and emails.  (Ex. A, Netz Rep. at 89-92.)  Varsity maintains a credentialing program for high

school teams that wish to attend certain Varsity end-of-season events, the purpose of which is to

promote safe practices in cheer routines and develop leadership skills.[11]  Dr. Netz ignores these

motivations and baselessly labels the Program as an anticompetitive tie.  She offers no analysis

to support her conclusion that the Credentialing Program drove increases in camp attendance or

that it foreclosed non-Varsity camps.  This further justifies exclusion.  *See Ask Chems.*, 593 F.

App'x at 510.

       Dr. Netz had access to the data that would have enabled her to quantitatively assess the

impact of the Credentialing Program, but she chose not to use it.  In contrast, Professor Murphy

analyzed the share of Varsity's cheer camp attendees that also attended one of the "tied" end-of-

season events.  Over 90% of Varsity's camp participants in the 2017/2018 and 2018/2019

seasons did not attend an event that required the credential yet attended a Varsity camp satisfying

the requirement anyway.  (Ex. D, Murphy Rep. ¶ 383.)  Further, attendance at these camps by

Varsity's school cheer customers grew by only 0.3% over the two years since the credentialing

requirement first went into effect.  (*Id.* ¶ 384.)  Thus, no data supports Dr. Netz's assertion that

customers are being "coerced" to attend Varsity's camps.  And because less than 10% of Varsity's

camp participants attend these "tied" competitions, Dr. Netz fails as a matter of law to

demonstrate substantial foreclosure.  *See B & H Med., L.L.C. v. ABP Admin., Inc*., 526 F.3d 257,

266 (6th Cir. 2008) (Courts regularly recognize that even exclusive agreements that result in

foreclosure of 40% or potentially more are lawful).

---

[11] Netz acknowledges as much in her opening report.  Ex. A, Netz Rep. at 91.

### D.     Dr. Netz's Opinion Regarding Acquisitions Is Similarly An Impermissible Attempt to Use An Expert to Hijack Factfinding.

Next, Dr. Netz cloaks a timeline of Varsity's acquisitions in the guise of an expert opinion.  (Ex. A, Netz Rep. 92-104.)  Again, she merely recites a pre-selected portion of the record to conclude that Varsity increased its market share by acquiring All Star event producers for purposes that she deemed anticompetitive.  Dr. Netz performs no quantitative analysis and merely pieces together disparate internal estimates.  (Ex. C, Netz Dep. 131:3-20.)  As with her other opinions, the Court should exclude Dr. Netz's self-serving factual narrative and the conclusions she derives.  *See In re LIBOR*, 299 F. Supp. 3d at 490.

From the narrative she constructs, Dr. Netz opines that Varsity's acquisitions "increased its control" of USASF's Board of Directors and Sanctioning Committee, giving Varsity "complete control over how Worlds bids are awarded."  (Netz. Rep. at 100-01.)  Notably, Dr. Netz does not identify a single change to any rule governing the ability to give Worlds bids occurring after Varsity acquired "complete control" of USASF's Sanctioning Committee in late 2015.  This is because the rules governing the selection of events that can distribute Worlds bids have remained largely unchanged since 2005.  (*See* Ex. H, Elza Dep. (Vol. I) 118:13-119:1.)

Dr. Netz also asserts that Varsity's acquisitions "led to reduced output, lower quality events, and higher prices to consumers," (Ex. A, Netz Rep. at 102), but none of these opinions are based on anything other than anecdotal evidence.  Her claim that Varsity reduced output is based on a comparison of two event brands—one of which was acquired by Varsity prior to the statute of limitations.  (*Id.* at 102-3.)  Without more, a cursory review of the number of events produced by two brands before and after their acquisition says nothing about whether output was in fact reduced.  In contrast, Professor Murphy analyzed the effect of event closures and Varsity's acquisitions during the Class Period (with data Dr. Netz has access to but again chose not to use)

and found that participation actually increased.  (Ex. D, Murphy Rep. ¶ 295, Ex. 45.)

Similarly, Dr. Netz's opinion on the effect of Varsity's acquisitions on event quality is based on a single deposition excerpt from a disgruntled former Varsity employee.  (Ex. A, Netz Rep. at 103 n.422.)  But, the increased participation at acquired events suggests Varsity actually increased quality.[12]  In any case, this opinion is not a product of her expertise and the trier of fact is equally capable of assessing the value of a single page of a deposition transcript.  Dr. Netz's conclusion that the acquisitions led to higher prices is similarly supported only by her recitation of anecdotal evidence rather than a meaningful analysis of prices.  (*Id.* at 103.)

Finally, Dr. Netz asserts that Varsity's acquisitions of event producers harmed competition in the market for Cheer Apparel.  (*Id.* at 104.)  Dr. Netz does not identify any acquisitions of *apparel* companies that purportedly harmed this market.  Instead, she tries to connect Plaintiffs' allegation that Varsity doesn't allow its competitors to sell their products at its own events to a tortured foreclosure claim.  Dr. Netz reasons that, because Varsity doesn't allow rivals to sell their products at its events, Varsity increasingly foreclosed these rivals from crucial "marketing" outlets by acquiring more events.  (*Id.*)  In addition to being a blatant exercise in improper fact-finding, her opinion here is suspect because, as this Court has acknowledged, such a claim may not be "actionable under the antitrust laws."  (ECF No. 141 at PageID 2257 n.3.)  Indeed, Varsity has no duty to allow its competitors to sell their goods at its events.  *See Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (2004).  Also, the fact is that apparel providers make few sales at events, and gyms rarely, if ever, purchase apparel at competitions, something Dr. Netz never tangles with.[13]  Dr. Netz's opinion is supported solely by

---

[12] Teams and athletes generally prefer larger events.  *See* Ex. I, Hallmark Dep. 144:14-145:9.

[13] *See, e.g.,* Ex. E, Minzghor Dep. 136:17-20.

anecdotal evidence that Rebel, a competing manufacturer of cheer apparel, was harmed by Varsity's policy.  (Ex. A, Netz Rep. at 104.)  The evidence Dr. Netz cites was not provided by Rebel—which was subject to third-party discovery.  And she ignores a sworn declaration by Rebel's CEO which states "Rebel has maintained a greater market share of the [All Star apparel] market than Varsity since at least 2019." (*Rebel* ECF No. 8 at PageID 337.)  This opinion should be excluded because it attempts to marshal Plaintiffs' counsels' arguments into the record.

### E.      Dr. Netz's Opinion Regarding Rebate Foreclosure Is Likewise Inappropriate.

As with her other opinions regarding Varsity's challenged conduct, Dr. Netz's opinions on Varsity's loyalty programs should be excluded as an improper exercise in fact-finding based solely on her selective interpretation of documents and testimony.  The minimal actual analysis Dr. Netz conducts here is based on cherry-picked data, an unreliable methodology, and directly contradicts uncontroverted facts.

First, Dr. Netz introduces Varsity's Family Plan and Network Agreements with a factual history of changes to the programs over time, all while ascribing to Varsity an intent to develop and use these programs to "exclude competitors" and "foreclose" the market.  (Ex. A, Netz Rep. at 104-111.)  From this narrative, Dr. Netz baselessly concludes that this "strategy" was effective in foreclosing competition.  As explained above, such history is an improper use of expert testimony and forbidden by the federal rules.  *See In re Davol, Inc.*, 546 F. Supp. 3d at 677. Further, Dr. Netz challenges conduct that the antitrust laws are designed to *encourage*—lowering prices benefits consumers.  Even exclusive rebate arrangements are presumptively legal due to their procompetitive benefits.  *See NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 454 (6th Cir. 2007) (en banc); *B & H Med., L.L.C.*, 526 F.3d at 266 (exclusive agreements that result in foreclosure of 40% or potentially more are lawful).  The Family Plan is non-exclusive while the Network Agreements at their peak only involved about █████████ gyms out of thousands, and thus could

not possibly result in any meaningful foreclosure.  (Ex. D, Murphy Rep. ¶ 358.)

As evidence of the Family Plan's supposed foreclosure, Dr. Netz assesses the rebates received by a single gym eight years ago.  (Ex. A, Netz Rep. at 113.)  Dr. Netz does not explain how she cherry-picked this particular gym during this specific season, but, her questionable methodology aside, Dr. Netz's analysis is rife with errors.  First, she calculates that the gym qualified for a ▮▮▮ Family Plan rebate by spending a combined ▮▮▮▮▮▮▮▮ event registrations "and *apparel*."  (*Id.*)  However, a gym's apparel spending does not, and has never, contributed to the Family Plan's rebate thresholds.[14]  Based on this mistake, Dr. Netz calculates that the gym received a rebate of about ▮▮▮▮.  (*Id.*)  Because the gym would not have qualified for the Family Plan rebate without attending its ▮▮▮ competition, Dr. Netz reasons that an equally efficient competitor would need to pay the gym in order to incentivize it to forego its ▮▮▮ Varsity event (and thus forego the ▮▮▮ rebate—which she notes is greater than the gym's average event spend of ▮▮▮▮).  Dr. Netz's analysis is entirely wrong.  Varsity's rebate data (which Dr. Netz had access to) confirms that the gym received a rebate of ▮▮▮▮—not ▮▮▮▮—for spending about ▮▮▮▮▮▮ event registrations.  This would put the gym's average event spend around ▮▮▮▮—more than its ▮▮▮ rebate—and thus Dr. Netz's conclusion completely falls apart.  In sum, Dr. Netz's rebate foreclosure opinion should be excluded because she provides factual narrative, and the only actual analysis is both factually wrong and based on a cherry-picked anecdote.

## CONCLUSION

The Court should exclude the testimony of Dr. Netz in its entirety.

---

[14] This fact is uncontroverted and has never been at issue in this case, aside from Plaintiffs' other experts who also make Dr. Netz's error.  Dr. Netz does not—and cannot—cite to anything in the record to support this.  *See* Ex. A, Netz Rep. at 104-05.

Dated: February 10, 2023

Respectfully submitted,

/s Matthew S. Mulqueen

George S. Cary*
Steven J. Kaiser*
Linden Bernhardt*
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Phone: (202) 974-1500
Fax: (202) 974-1999
gcary@cgsh.com
skaiser@cgsh.com
lbernhardt@cgsh.com

Jennifer Kennedy Park*
Heather Nyong'o*
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
1841 Page Mill Road, Suite 250
Palo Alto, CA 94304
Phone: (650) 815-4100
Fax: (202) 974-1999
jkpark@cgsh.com
hnyongo@cgsh.com

* Admitted *pro hac vice*

Matthew S. Mulqueen (TN #28418)
Adam S. Baldridge (TN #23488)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ
165 Madison Avenue, Suite 2000
Memphis, TN 38103
Phone: (901) 526-2000
Fax: (901) 577-0866
mmulqueen@bakerdonelson.com
abaldridge@bakerdonelson.com

*Attorneys for Defendants Varsity Brands,
LLC; Varsity Spirit, LLC; Varsity Spirit
Fashions & Supplies, LLC; Charlesbank
Capital Partners, LLC; and Bain Capital
Private Equity LP*

21

s/ Nicole Berkowitz Riccio
Grady Garrison (TN #008097)
Nicole Berkowitz Riccio (TN #35046)
James Andrew Roach (TN #37934)
Karen Lott Glover (TN #38714)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ
165 Madison Avenue, Suite 2000
Memphis, TN 38103
Phone: (901) 526-2000
Fax: (901) 577-0866
ggarrison@bakerdonelson.com
nriccio@bakerdonelson.com
aroach@bakerdonelson.com
kglover@bakerdonelson.com

*Attorneys for U.S. All Star Federation, Inc. and USA Sport Cheering, d/b/a USA Cheer*

s/ Brendan P. Gaffney
Paul E. Coggins*
Brendan P. Gaffney*
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Phone: (214) 740-8000
Fax: (214) 740-8800
pcoggins@lockelord.com
bgaffney@lockelord.com

* Admitted *pro hac vice*

Edward L. Stanton III (TN #018904)
S. Keenan Carter (TN #023386)
BUTLER SNOW LLP
6075 Poplar Avenue, Suite 500
Memphis, Tennessee 38119
Phone: (901) 680-7336
Fax: (901) 680-7201
Edward.Stanton@butlersnow.com
Keenan.Carter@butlersnow.com

*Attorneys for Jeff Webb*