# Exhibit 1

## FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| **JESSICA JONES, et al.,** | Case No. 2:20-cv-02892-SHL-tmp |
| Plaintiffs, | |
| v. | |
| **VARSITY BRANDS, LLC, et al.** | |
| Defendants. | **JURY DEMAND** |

**EXPERT REPORT OF JANET S. NETZ, PH.D.**

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 3 of 149
PageID 10525
Highly Confidential    **Expert Report of Janet S. Netz, Ph.D.**    i of iii

I.    Introduction .................................................................................................................. 1

   A.    Qualifications ......................................................................................................... 1

   B.    Summary of Plaintiffs' allegations ....................................................................... 1

   C.    Assignment ............................................................................................................ 2

   D.    Executive Summary ............................................................................................... 3

II.    Defendants ................................................................................................................... 5

   A.    Varsity ................................................................................................................... 5

   B.    USASF ................................................................................................................... 6

   C.    Jeff Webb ............................................................................................................... 7

   D.    Charlesbank and Bain ........................................................................................... 7

III.    Industry characteristics that inform the economic analysis ..................................... 11

   A.    Competitive Cheer is a distinct sport .................................................................. 11

      1.    *Competitive Cheer grew out of traditional sideline cheer* ..................... 12

      2.    *Competitive Cheer today* ....................................................................... 12

      3.    *The season ends with year-end national competitions* .......................... 16

         a)    There are several year-end competitions for All Star Cheer .......... 16

         b)    There are several year-end competitions for School Cheer .......... 18

   B.    A variety of sanctioning bodies oversees the rules of the sport .......................... 18

      1.    *National All Star Cheerleading Coaches' Congress standardized competition rules 2003-2005* .................................................................. 18

      2.    *Varsity created the USASF as a response to the creation of the NACCC* ................... 19

      3.    *Varsity founded the ICU to be the international governing body of cheerleading in 2004* ................................................................................ 22

      4.    *Varsity spun The International All Star Federation out of the USASF to govern All Star Cheerleading outside the U.S.* ........................................ 23

      5.    *Varsity created USA Cheer as a national governing body* ..................... 24

      6.    *The NFHS is the rulemaking body for School Cheer* ............................ 24

      7.    *Varsity established the AACCA in 1987 to develop safety standards* .......... 25

   C.    Competitive Cheer athletes purchase three types of products .......................... 26

      1.    *Cheer Competitions* ............................................................................... 26

      2.    *Cheer Apparel* ....................................................................................... 27

      3.    *Cheer Camps* ......................................................................................... 32

   D.    Athletes join teams sponsored by gyms and schools .......................................... 33

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 4 of 149
PageID 10526
Highly Confidential        **Expert Report of Janet S. Netz, Ph.D.**        ii of iii

E.   History of Varsity Brands ................................................................ 35

IV.  Varsity has the market power necessary to raise price ............................ 37

A.   Varsity possesses and exercises market power over Cheer Competitions ...................... 41

1.   *Cheer Competitions is a relevant product market for antitrust purposes* ................. 41

2.   *The evidence shows that Varsity possesses and exercises market power over Cheer Competitions* ................................................................ 45

B.   Varsity possesses and exercises market power over Cheer Apparel .............................. 55

1.   *Cheer Apparel is a relevant product market for antitrust purposes* ........................... 55

2.   *The evidence shows that Varsity possesses and exercises market power over Cheer Apparel* ................................................................ 56

C.   Varsity possesses and exercises market power over Cheer Camps .............................. 60

1.   *Cheer Camps is a relevant product market for antitrust purposes* ............................. 60

2.   *The evidence shows that Varsity possesses and exercises market power over Cheer Camps* ................................................................ 61

V.   Varsity's conduct harmed competition ......................................................... 62

A.   Varsity's conduct created an ecosystem that enabled it to acquire and maintain market power across all three relevant markets ........................ 62

B.   Varsity and the USASF conspired to exclude and disadvantage rivals .......................... 65

1.   *Varsity and USASF controlled and manipulated the event sanctioning and bid system to disadvantage rivals* ................................................................ 69

a)   Varsity and the USASF controlled and manipulated the event sanctioning rules .... 69

b)   Varsity undercut events hosted by rival event producers .......................... 73

c)   Varsity targeted nascent competitors ...................................... 78

d)   Varsity's anticompetitive strategy was effective ...................................... 81

2.   *Varsity and USASF conspired to prohibit USASF members from participating in rivals' events* ................................................................ 85

3.   *Varsity and USASF conspired to prohibit members from partnering with rival sanctioning bodies* ................................................................ 87

4.   *The conspiracy between Varsity and USASF harmed competition* .............................. 89

C.   Varsity ties Cheer Camps and School Cheer Competitions, leveraging market power in competitions to the camp market .................................... 89

D.   Varsity acquired and maintained market power over Cheer Competitions through mergers and acquisitions ................................................................ 92

1.   *Varsity acquired its largest competitor, JAM Brands, in 2015* .................................... 94

2.   *Varsity acquired competitor Aloha Productions in 2016* .......................................... 96

Case 2:20-cv-02892-SHL-tmp     Document 389-2     Filed 02/10/23     Page 5 of 149
PageID 10527
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          iii of iii

    *3.    Varsity acquired Spirit Celebration in 2017*............................................. 97

    *4.    Varsity acquired Jam Spirit Group (DBA Team Champion) in 2017*......................... 97

    *5.    Varsity again acquired its largest competitor, EPIC Brands, in 2018*....................... 98

    *6.    Varsity acquired a number of other competing event producers*................................. 98

    *7.    Varsity's acquisition strategy harmed competition for Cheer Competitions*.............. 99

        a)    The market for Cheer Competitions is now very concentrated ................................ 99

        b)    Varsity increased its control of sanctioning bodies via its acquisitions, enhancing its market power over competitions................................................................. 100

        c)    Varsity directly harmed competition by reducing output and quality and increasing in price ....................................................................................... 102

        d)    Varsity's acquisition also reduced competition in the market for Cheer Apparel.. 104

  E.    Varsity pays rebates to All Star gyms that foreclose competitors ................................... 104

  F.    But-for Varsity's anticompetitive conduct, the markets would have been more competitive, and athletes would have benefits from increased competition ............. 113

VI.  Summary.................................................................................................................. 115

# I. Introduction

## A. Qualifications

I, Janet S. Netz, am a founding partner of applEcon, LLC. I have been a tenured Associate Professor of Economics at Purdue University and a Visiting Associate Professor at the University of Michigan. I received a B.A. (1986) from the University of California, Berkeley, cum laude, and an M.A. (1990) and Ph.D. (1992) from the University of Michigan, all in Economics. My doctoral fields of study were Industrial Organization – the study of firm interaction and market performance – and International Trade and Finance.

I have taught Industrial Organization at the undergraduate and doctoral level; Antitrust and Regulation at the undergraduate level; Microeconomic Theory at the undergraduate and master's level; and International Economics at the undergraduate and master's level. My research has focused on competitive interactions of firms and strategies firms can use to increase profits as well as the resulting impact on firms and the market. I have published in peer-reviewed scholarly journals and have presented my research at many conferences and seminars. I provide my academic employment and publication histories in my curriculum vitae, which is attached as Exhibit A.

I have testified at trial and by affidavit or declaration in both named plaintiff and class action matters related to antitrust, consumer protection, and business practices, especially with regard to the economic impact of conduct, for over fifteen years. I provide a complete list of the cases on which I have testified and consulted in my curriculum vitae, which is attached as Exhibit A.

applEcon bills my work on this case at the rate of $800 per hour. My and applEcon's compensation is independent of my opinions or the outcome of the case.

## B. Summary of Plaintiffs' allegations

Plaintiffs define three classes of indirect purchasers[1] to include natural persons who indirectly paid Varsity for (a) registration, entrance, or other fees and expenses associated with

---

[1] Each of the three classes are defined below. The distinctions between these classes are not relevant to my opinions; my conclusions are equally applicable to each of the classes.

- Injunctive Relief Class: All natural persons and entities in the United States that indirectly paid Varsity or any Varsity subsidiary or affiliate, from December 10, 2016, until the continuing Exclusionary Scheme alleged herein ends (the "Class Period") for: (a) registration, entrance, or other fees and expenses associated with participation in one or more Varsity Cheer Competitions, including registration fees to USASF; (b) Varsity Cheer Apparel; (c) Varsity Cheer Camp Fees; or (d) accommodations at one or more Varsity Cheer Competitions, including registration fees to USASF.

- Nationwide Damages Class: All natural persons and entities in the United States that indirectly paid Varsity or any Varsity subsidiary or affiliate, from December 10, 2016, until the continuing Exclusionary Scheme alleged herein ends (the "Class Period") for: (a) registration, entrance, or other fees and expenses associated with participation in one or more Varsity Cheer Competitions; (b) Varsity Cheer Apparel; (c) Varsity Cheer Camp Fees; or (d) accommodations at one or more Varsity Cheer Competitions.

- State Law Damages Class: All natural persons and entities in the United States that indirectly paid Varsity or any Varsity subsidiary or affiliate, from December 10, 2016, until the continuing Exclusionary Scheme alleged herein ends (the "Class Period") for: (a) registration, entrance, or other fees and expenses associated with participation in one or more Varsity Cheer Competitions; (b) Varsity Cheer Apparel; (c) Varsity Cheer

participation in one or more Varsity Cheer Competitions, including registration fees to USASF; (b) Varsity Cheer Apparel; and (c) Varsity Cheer Camp Fees. The class period for all three classes is December 10, 2016 through the present.

Plaintiffs allege that Defendants (collectively "Varsity"[2]) have violated various state and federal antitrust laws, and various state unfair competition, consumer deception, and consumer protection laws. Broadly, Plaintiffs allege that Varsity engaged in an anticompetitive scheme to exclude rivals and acquire, enhance, and maintain monopoly power in the relevant markets for Cheer Competitions, Cheer Apparel, and Cheer Camps, so that they could charge supra-competitive prices.

Plaintiffs seek damages and/or injunctive and declaratory relief for the following claims: (1) violation of Sections 1, 2, and 3 of the Sherman Act, 15 U.S.C. §§ 1—3; (2) violation of Tennessee antitrust laws, Tenn. Code Ann. §§ 47-25-101, *et seq.*; (3) violation of numerous states' antitrust laws; (4) violation of numerous states' consumer protection laws, including unfair methods of competition and unfair and deceptive acts; and (5) unjust enrichment under Tennessee Law.[3]

### C. Assignment

I was asked by Counsel for Plaintiffs to provide my opinion on the following questions:

1. What are the relevant markets?

2. Did Varsity possess market power in the relevant markets?

3. Did the challenged conduct allow Varsity to acquire or maintain its monopoly power?

4. Evaluate any anticompetitive effects of the challenged conduct.

To reach the conclusions I put forward in this report, I have applied standard antitrust economic principles to the facts of this case. This includes economic analyses of business practices, market conditions, and business economic data.

I reviewed the anticompetitive conduct in which Defendants engaged by using economic research/doctrine typically applied to monopolies and antitrust conspiracies.

In Exhibits B and C, I provide a list of all confidential and public documents that my staff and I have relied on. All of my conclusions are based on the information available to me and may change as new information becomes available. I reserve the right to amend, supplement and/or revise my analysis, findings, and opinions if new evidence becomes available, if the scope of

---

Camp Fees; or (d) accommodations at one or more Varsity Cheer Competitions, in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, Washington, West Virginia, and Wisconsin.

10 December 2020, Complaint Class Action, *Jessica Jones, et al., v. Varsity Brands, LLC, et al.*, No. 2:20-cv-02892-SHL-tmp (W.D. Tenn.)), at ¶¶ 29-31 (hereinafter "Complaint").

[2] By Varsity, I generally mean all Varsity entities and its related defendant entities (Jeff Webb, Charlesbank Capital Partners LLC, and Bain Capital Private Equity). I specify individual defendants when appropriate.

[3] Complaint, at ¶¶231-268.

discovery or the causes of action change in any material way, or in response to any attempt to rebut my opinions or conclusions.

For reference, I present a list of acronyms and a glossary of terms commonly used in Exhibit 1.

### D. Executive Summary

In this section, I briefly summarize the issues and state my conclusions. The basis for these conclusions is explained in detail throughout the rest of the report.

Competitive Cheer is a distinct sport for teams associated with gyms and schools. Unlike traditional sideline cheerleading, Competitive Cheer teams compete head-to-head against each other in events with unique, choreographed, and highly acrobatic routines that last two and a half minutes. The season culminates in national championship events which teams endeavor to attend. Competitive Cheer is overseen by a variety of sanctioning bodies, including the U.S. All Star Federation (hereinafter, "USASF"), which was created by Varsity in 2003.

The Defendants—Varsity, USASF, Jeff Webb, Charlesbank Capital Partners LLC (hereinafter, "Charlesbank"), and Bain Capital Private Equity (hereinafter, "Bain")—acted cooperatively to acquire, enhance, and maintain Varsity's market power. Defendants' anticompetitive conduct is the result of a deliberate strategy, expressly articulated in contemporaneous business documents and presentations, to preclude entry by new competitors and force out existing competitors.

Market power is the ability to raise prices, reduce output or product quality, or exclude competitors. The first step in assessing market power is to define the relevant market, which is the narrowest set of products and geographies over which a single firm could exercise market power. The most common framework for defining the relevant markets is the Hypothetical Monopolist Test. I apply this test and conclude that there exist relevant antitrust product markets for Cheer Competitions; Cheer Apparel; and Cheer Camps. The geographic boundary of each market is no larger than the U.S. Varsity's market share is dominant not only nationally for these products, but also dominant regionally.

Cheer Competitions is the market for competitions in the sport of Competitive Cheer. Cheer Apparel is the market for uniforms and apparel worn by the athletes in Competitive Cheer. Cheer Camps is the market for Competitive Cheer training camps in which Competitive Cheer athletes and teams improve their Competitive Cheer skills and routines.

Even though defining relevant markets is useful, when there is direct evidence of market power, economists consider this to be sufficient proof of the presence of anticompetitive conduct and its effects. Indeed, I have found that this is the case here.[4]

Varsity has directly demonstrated its market power in each of the relevant markets. In the market for Cheer Competitions, it has reduced output by canceling recently acquired events and increased prices. In the market for Cheer Apparel, Varsity has consistently demonstrated the ability to charge higher prices than its competitors despite providing similar or even inferior quality. In the market for Cheer Camps, Varsity has excluded rivals via its anticompetitive tying policy which requires School Cheer teams to attend its Cheer Camps in order to compete in its

---

[4] When reliable direct evidence of monopoly power is present, courts have deemed that sufficient for purposes of defining markets. See Footnote 180. Despite the presence of significant direct evidence of Varsity's market power, I conduct a full market definition analysis. See Section IV.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 9 of 149
PageID 10531
Highly Confidential        **Expert Report of Janet S. Netz, Ph.D.**                    4 of 115

championships. Such direct evidence is by itself sufficient to prove that Varsity possesses and has exercised market power in each of the relevant markets.

Varsity's market power is also evident indirectly by its high market shares in each of the relevant markets, in conjunction with barriers to entry, which indicate the absence of competition in each of the relevant markets.

A barrier to entry is a feature of a market that prevents new firms from entering the market, or small firms from expanding, despite an established firm earning high profits. Barriers to entry can be natural (e.g., technology requiring large scale to achieve low costs) or artificial (e.g., an economic tie forcing an entrant to enter two markets simultaneously). Varsity has created a number of artificial barriers to entry, further protecting it from competition from new rivals.

Varsity has dominated all aspects of Competitive Cheer, allowing it to establish a self-described ecosystem that encompasses competitions and events (Cheer Competitions); training and education (Cheer Camps); and uniforms and accessories (Cheer Apparel). This ecosystem is protected by governing bodies, safety organizations, and strategic partners. Varsity's dominance of each component of this ecosystem enables it to dominate the entire ecosystem. Varsity and Defendants have protected this ecosystem using anticompetitive means, and their conduct in each of the relevant markets enhanced and maintained Varsity's market power in each of the other relevant markets.

Varsity established the USASF as a governing body of Cheer Competitions, and, until recently, has operated the USASF through Varsity-paid employees. Varsity's control of the USASF allows it to promulgate rulings that favor Varsity over its rival Cheer Competition producers. Varsity and the USASF engaged in coordinated conduct to disadvantage and eliminate rival Cheer Competition producers. The conduct included providing Varsity with information not provided to rivals, enforcing rules selectively against Varsity's rivals, controlling the date and location of Cheer Competitions awarding "Worlds" bids, prohibiting USASF members from working with rival sanctioning bodies, and targeting rivals' events by offering a Varsity event in a close vicinity and around the same time to take away customer from competitors.

Varsity leveraged its market power over Cheer Competitions into Cheer Camps by tying participation in its end-of-season school championship competitions to attendance at its Cheer Camps. Teams that hope to qualify for season-ending championships were required to participate in Varsity's camps, preventing many teams from attending other camps and foreclosing rival Cheer Camp providers from a substantial share of the market. There is no legitimate business reason for Varsity's tying policy.

Varsity embarked on an aggressive strategy to acquire rival Cheer Competition firms, both to eliminate competition and to gain control of the USASF Sanctioning Body. Varsity has acquired substantially all of its top competitors. Post-acquisition of its rival competitors, Varsity has canceled events, raised prices, and reduced the quality of its event. And because Cheer Competitions are a natural and significant marketing platform for Cheer Apparel, Varsity's acquisitions of Cheer Competition firms have also negatively impacted Varsity's competitors in the Cheer Apparel market, as Varsity excludes Cheer Apparel rivals from promoting their competing apparel at Varsity events. As Varsity's share of Cheer Competitions increased, the number of marketing opportunities available to non-Varsity Cheer Apparel manufacturers has shrunk.

Varsity designed rebate programs with the intent and effect of foreclosing Cheer Competition and Cheer Apparel rivals. Varsity's rebates differ from standard discount programs in several ways. Varsity's rebates function as de facto exclusive dealing arrangements, leverage market power from one market to another, and include "first-dollar discounts" which condition large rebates on marginal purchasing decisions—once the customer reaches the spending threshold for the discount, the rebate applies to all of the customer's spending retroactively. Together, these features create large incentives for customers to buy exclusively from Varsity, incentives that even an equally-efficient competitor would be unable to match due to Varsity's market dominance. Competitors are thereby excluded from a significant share of the relevant markets.

But for its anticompetitive conduct, Varsity's market power in the relevant markets would have been constrained by competition. The environment in which this competition would take place—the but-for world—is characterized by the absence of the challenged conduct. In my analysis, all other aspects of the but-for world are identical to the actual world.

In the but-for world, Varsity would not conspire with or control the USASF. Instead, the USASF would act as an independent sanctioning body in the best interests of the sport as a whole, on behalf of all event producers, apparel providers, camp providers, coaches, and athletes.

In the but-for world, Varsity would cease tying participation in its School Cheer Competitions to attendance at its Cheer Camps. Instead, Varsity would market and operate these two products separately, as is the common practice in the industry.

In the but-for world, Varsity would not have used mergers and acquisitions to eliminate competition in the Cheer Competition market.

In the but-for world, Varsity would not have developed anticompetitive rebate programs that leveraged its market power from one market to another or functioned as de facto exclusive dealing arrangements. Instead, any Varsity customer loyalty or rebate programs would drop exclusivity provisions, first dollar discounts, and provisions that impact competition in unrelated markets.

The but-for would be characterized by a more competitive cheer ecosystem, instead of the monopolized Varsity ecosystem. But-for Varsity's anticompetitive conduct, the markets for Cheer Competitions, Cheer Apparel, and Cheer Camps would have more providers and more competition.

Varsity's exclusionary conduct has harmed competition: it has eliminated competitors; it has foreclosed competitors; it has reduced choices for athletes; and it has increased overall participation costs.

## II. Defendants

### A. Varsity

Varsity Brands is the corporate parent of Defendants Varsity Spirit, LLC and Varsity Spirit Fashion & Supplies, LLC. Varsity Brands consists of three divisions—BSN Sports, Herff Jones, and Varsity Spirit—but only Varsity Spirit offers products and services that are relevant to this

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 11 of 149
PageID 10533
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**                    6 of 115

matter.[5] Varsity Spirit and Varsity Spirit Fashion & Supplies focus on Competitive Cheer-related events and products; the former is an event producer of competitions and camps and the latter provides Cheer Apparel. I collectively refer to these entities as Varsity, but where appropriate and necessary specify which products and specific entities are involved. In Section III.E, I discuss the history of Varsity in more detail as it pertains to the allegations in this matter. Varsity operates under many different brand names; Exhibit 2 is a list of Varsity's current brands.

## B.  USASF

The USASF is a not-for-profit corporation founded in 2003. It is the governing body for Competitive Cheer that establishes rules and competition standards, and promotes itself as independent.[6] Although purportedly independent, the USASF was created by Varsity and was operated by Varsity-paid employees since its inception until recently;[7] for many years, the USASF shared Varsity's office space.[8] Since 2015, Varsity has been the sole event producer on

---

[5] BSN Sports provides uniforms, apparel, and equipment for team sports; Herff Jones provides "achievement products" such as yearbooks, class and championship rings, cap and gown sets, announcements, diplomas, and other accessories. Varsity Brands, May 2018, Varsity Brands Management Presentation, BAIN00003374 - BAIN00003505, at 3401, 3429.

[6] See, e.g.,

- The USASF mission is: "To support and enrich the lives of our All Star athletes and members. We provide consistent rules, strive for a safe environment for our athletes, drive competitive excellence, and promote a positive image for the sport." U.S. All Star Federation, 2022, About the USASF, https://www.USASF.net/about, accessed 05 May 2022, at 1.

- "The US All Star Federation (USASF) was founded in 2003 with the core principle of making All Star a safer sport by establishing fair and consistent rules and competition standards. The organization credentials coaches, certifies safety judges, sanctions events and maintains and adjusts (as needed) safety guidelines, all with the goal of providing the safest possible environment for cheer and dance athletes to train and compete. We are a not for profit corporation established in Tennessee and are governed by Bylaws, officers, a Board of Directors, and 15 standing committees. The day to day operation of the USASF is handled by full time, part time, and volunteer staff." U.S. All Star Federation, 2022, About the USASF, https://www.USASF.net/about, accessed 05 May 2022, at 1.

[7] For example, Steve Peterson, the USASF Vice President of Events and Corporate Alliances, has worked at the USASF since 2004, but was technically a Varsity employee until 2020. "Q. Now, you've been employed by USASF since 2004; is that correct? A.Yes, sir. Q. And during that period of time, have you been a salaried employee of USASF? A. Yes, sir. Q. And during that period until today, have you been continuously employed by USASF? A. No, but my legal employment was with Varsity up until February 2020. Q. Okay. So let me make sure I understand that. From 2004 to 2020, you were an employee of Varsity; is that correct? A. Correct." 09 March 2022, Videotaped 30(b)(6) Deposition of U.S. All Star Federation (Steven H. Peterson), 09 March 2022, at 275:1-10. The deposition testimony referred to herein was entered in one or more of the related actions: *Fusion Elite All Stars, et. al. v. Varsity Brands, LLC*, et al, No. 2:20-cv-02600-SHL-tmp, *Jessica Jones, et al. v. Varsity Brands, LLC, et al.*, No. 2:20-cv-02892-SHL-tmp (W.D. Tenn.); or *American Spirit and Cheer Essentials, Inc. et al. v. Varsity Brands, LLC, et al.*, 2:20-cv-02782-SHL-TMP (W.D. Tenn.). For purposes of simplicity in this report, I cite to them in short format.

[8] See, e.g.,

- Varsity provided a $1.8 million dollar interest-free loan to the USASF soon after it was formed: "After USASF was formed, Varsity provided an interest free line of credit to the USASF. At its peak, the loan balance was $1.8M. As of December 31, 2012, the balance on the loan was $565K. Varsity has allowed the USASF to have complete flexibility with our repayment schedule. The loan has been completely interest free to the USASF. This has been an incredible benefit to our organization and members, and it would have

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 12 of 149
PageID 10534
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**                    7 of 115

the USASF Board of Directors, and Varsity employees currently have six of thirteen votes. Varsity employees also currently have a majority of the USASF Sanctioning Committee seats. Details on Varsity's control over the USASF Board of Directors and Sanctioning Committee are provide in Section V.D.7.b).

In Section III.B.2 below, I further discuss the history of the USASF and Varsity's enduring control of the organization.

### C. Jeff Webb

Jeff Webb is the founder and former CEO of Varsity Brands, LLC. Mr. Webb was also the Vice Chair of the Board of Directors of Varsity until he stepped down in 2016, but he remained as Chairman of Varsity Spirit through 2020. Mr. Webb is also the founder and current president of the International Cheer Union, the international governing body of cheerleading.[9] Through his roles at Varsity, Mr. Webb has also been involved with establishing several other cheerleading-related entities, including the Universal Cheerleaders Association (hereinafter "UCA"), the National Cheerleaders Association (hereinafter, "NCA"), the United Spirit Association (hereinafter, "USA"), and the USASF. He was also instrumental in the founding of the American Association of Cheerleading Coaches and Administrators (hereinafter, "AACCA"). Mr. Webb has also been a frequent expert commentator on ESPN cheer broadcasts.[10]

### D. Charlesbank and Bain

The Complaint lists two additional Defendants: Charlesbank and Bain. Charlesbank and Bain are private equity investment firms.[11] Private equity investment firms are groups of individuals that work together to pursue investments using both their own money as well as funds they raise from

---

been impossible for the USASF to survive without it. Varsity has also continued to guarantee a substantial 'rainy day' fund to insure USASF could withstand any type of unforeseen natural or financial disaster such as having to cancel Worlds one year. There has been no 'co-mingling of funds' or any other impropriety. Just as any lending institution would do, Varsity secures the loan by retaining certain rights to the USASF trademark and intellectual property." U.S. All Star Federation, 2013, An Open Letter to Our Membership:, VAR00351488 - VAR00351491, at 1489.

- Varsity provided office space and other support: "The no-interest start up loan, along with the necessary office support, provided by Varsity was the foundation that allowed the USASF to establish and develop our mission." U.S. All Star Federation, 2014, 2014 USASF Annual Report, USASF_00032540 - USASF_00032545, at 2541.

- Deposition of Brian Todd Elza, 16 November 2021, at 150:19-156:3.

[9] USA Cheer, 20 July 2021, USA Cheer welcomes International Olympic Committee's full recognition of the International Cheer Union, https://www.USACHEER.org/usa-cheer-welcomes-international-olympic-committees-full-recognition-of-the-international-cheer-union, accessed 05 May 2022.

[10] Webb, Jeff, 07 May 2010, Report of Jeff Webb, *Biediger et al. v. Quinnipiac University*, Case No. 3:09-CV-6211(SRU) (D. Conn.), Webb Dep. Exhibit 2.

[11] Although I provide a high-level description of private equity firms and how they function, Plaintiffs' counsel has asked James H. Aronoff to provide testimony more specifically focused on these types of firms. Aronoff, James H., 20 June 2022, Expert Report of James H. Aronoff, *Jessica Jones, et al., v. Varsity Brands, LLC, et al.*, No. 2:20-cv-02892-SHL-tmp (W.D.Tenn.).

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 13 of 149
PageID 10535
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**                    8 of 115

others, usually institutional investors and wealthy individuals.[12] Private equity investing involves the investment of capital in private companies, and the fundamental goal of private equity firms is to increase the value of that investment by ultimately increasing the value of the company and the private equity group,[13] usually within a three to five year period.[14] Prior to making an investment in a company, private equity firms do considerable amounts of research and due diligence to thoroughly understand the market and industry as well as the workings of the target company.[15] Private equity is unlike individual investing where one, for example, purchases

---

[12] See, e.g.,

- "Private equity firms are groups of individuals who come together to pursue private equity investments. While almost all private equity professionals invest a portion of their own money, private equity firms today primarily deploy capital on behalf of others. These firms tend to be partnerships, similar in form to other private professional services firms, like law firms, for example. A private equity firm today might range in size from two people and a secretary to hundreds of investment professionals." Snow, David, Undated, Private Equity: A Brief Overview, PEIMEDIA.com, https://www.law.du.edu/documents/registrar/adv-assign/Yoost_PrivateEquity%20Seminar_PEI%20Media's%20Private%20Equity%20-%20A%20Brief%20Overview_318.pdf, accessed 14 June 2022 (Hereinafter "Private Equity: A Brief Overview"), at 7.

- "Limited partners to private equity funds are overwhelmingly institutional investors and wealthy individuals. LPs include public and corporate pension plans, banks, insurance companies, sovereign investment funds, endowments, foundations, funds of funds (more about these below) and the professionally managed investment offices of wealthy families." Private Equity: A Brief Overview, at 7.

[13] See, e.g.,

- "The business model of a private equity firm is as follows – raise capital from external sources, invest the capital in a series of private equity deals, sell (or 'exit') those investments (often many years later), and return the proceeds from these exits to the external capital partners while holding back 20 percent of the total profits for the partners of the private equity firm. This 20 percent take is called carried interest. Carried interest is the gravitational pull at the center of the private equity universe. The general partners also earn substantial income from other fees, such as management fees and transaction fees." Private Equity: A Brief Overview, at 2.

- "Who are the general partners? They tend to be individuals who have been able to convince investors that they will be skilled at investing capital in private companies, adding value to those companies, and exiting the investments in a time and fashion that maximizes profits for the investors. The skills needed by GPs are highly specialized. They can be thought of as a set of competencies, not all of which are necessarily possessed by single individuals." Private Equity: A Brief Overview, at 3.

[14] "The time between a private equity group (PEG) buying a business and selling it again is typically referred to as the holding period. Most people think of a private equity holding period as between 3 and 5 years, given that a PEG typically has limited partners (investors) who want to see their money returned to them, with capital appreciation, and within a reasonable period of time." ClearRidge, 2022, How long does a Private Equity Group wait before selling your Company again?, https://clearridgecapital.com/articles/how-long-does-a-private-equity-group-wait-before-selling-your-company-again/, accessed 14 June 2022, at 1.

[15] "Research and due diligence – Before agreeing to do a deal, general partners must painstakingly form a view on the future of a given industry or market, and then on the potential of a particular company within that market. The GPs must be able to deeply understand the inner workings of a potential portfolio company and, based on that, determine the right price to be paid for the company. Private equity GPs typically build elaborate models that tell them how their investment in a company will fare, given a range of assumptions about the future performance of the company." Private Equity: A Brief Overview, at 3-4.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 14 of 149
PageID 10536
Highly Confidential              **Expert Report of Janet S. Netz, Ph.D.**              9 of 115

shares of mutual funds or publicly traded companies and is a passive investor; private equity investors usually take an active role in the management of the companies in which they invest.[16]

Charlesbank purchased Varsity Brands in 2014 for roughly $1.5 billion and sold it to Bain in 2018 for approximately $2.5 billion.[17] When Charlesbank sold Varsity to Bain, it invested a small stake in the company and held a board seat;[18] Bain currently owns Varsity[19] and holds a board seat as well.[20]

Prior to being acquired by Charlesbank, Varsity Spirit was an employee-owned company.[21] After entering into a definitive purchase agreement with Varsity in November 2014, Charlesbank stated that the transaction represented the "culmination of a deliberate and comprehensive process overseen by the Board of Directors to help ensure that Varsity Brands has the capital structure, resources, and financial flexibility to build on its presence in these markets."[22] In December 2014, Charlesbank completed the acquisition for $1.5 billion, including both Varsity Brands, Inc. and Varsity Spirit, Inc.,[23] which Charlesbank subsequently converted to LLCs

---

[16] "Operating skills – Once a private equity firm has made an investment in a company, the GPs are charged with adding value to the company, or at least monitoring it to ensure that its performance does not deteriorate. Many firms include operating partners – executives who have experience running a company in a particular sector. For example, a private equity firm that acquires a chemicals company will often appoint a former CEO of another chemicals company to run or oversee the new portfolio company. These operating partners may simply be there to support the incumbent management of the portfolio company, or they may entirely restructure the company, starting with the firing of the incumbent management team. They may also add new products, close factories, sell divisions and acquire new divisions. A GP with purely investment banking-style financial engineering skills may not have the wherewithal to effectively change the operations of a portfolio company. Likewise, someone who, for example, was a senior executive at a chemicals company for many years, may nevertheless not have the financial engineering skills needed to structure the best investment result." Private Equity: A Brief Overview, at 4.

[17] See, e.g.,

- Charlesbank, Undated, Case Study: Varsity Brands, https://www.charlesbank.com/portfolio/case-studies/varsity-brands/, accessed 05 May 2022.
- Hirsch, Lauren, 19 June 2018, Bain to acquire Varsity Brands, a top maker of cheerleader uniforms and school spirit items, for roughly $2.5 billion, CNBC, https://www.cnbc.com/2018/06/19/bain-nears-2-point-5-billion-deal-for-cheer-uniform-leader-varsity-brands.html, accessed 05 May 2022.

[18] Charlesbank, Undated, Case Study: Varsity Brands, https://www.charlesbank.com/portfolio/case-studies/varsity-brands/, accessed 05 May 2022.

[19] Bain Capital, LP, 2022, Our Portfolio, https://www.baincapitalprivateequity.com/portfolio#getTop702, accessed 20 May 2022.

[20] In October 2018, after Bain acquired Varsity, Josh Bekenstein, Managing Director of Bain, attended a Board of Directors meeting. The meeting report lists Mr. Bekenstein as one of the directors present and participating in person. Bain Capital, 11 December 2018, General Counsel and Secretary's Report, BAIN00117944 - BAIN00117954, at 7945.

[21] See Brink, Ben, 15 April 2018, Varsity University MBA 705 - Final Capstone, VAR00118582 - VAR00118608, at 8583.

[22] Charlesbank Capital Partners, 03 November 2014, Varsity Brands Enters Into Definitive Agreement To Be Acquired By Charlesbank Capital Partners, https://www.charlesbank.com/news/2014/varsity-brands-enters-definitive-agreement-acquired-charlesbank-capital-partners/, accessed 14 June 2022.

[23] Charlesbank, 15 December 2014, Charlesbank Capital Partners Completes Acquisition of Varsity Brands, https://www.charlesbank.com/news/2014/charlesbank-capital-partners-completes-acquisition-varsity-brands/, accessed 01 June 2022.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 15 of 149
PageID 10537
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**                    10 of 115

owned and controlled by Charlesbank. Charlesbank wholly owned Varsity from 2014 through 2018, and during that period Varsity grew considerably by merging with or acquiring several other companies. See Section V.D for a discussion of acquisitions. Documents produced in this litigation show that both prior to and after purchasing Varsity, Charlesbank did due diligence regarding the entirety of Varsity's business. Discovery materials also demonstrate that Charlesbank requested information from Varsity specifically related to any acquisitions Varsity was contemplating and that Charlesbank ultimately approved these transactions as well.[24] This evidence is consistent with Charlesbank's claims that it maintains "intense and regular involvement in each portfolio company."[25] Charlesbank's acquisition of Varsity provided funding that allowed Varsity to acquire and maintain its market power, among other things. In 2016, Charlesbank replaced Mr. Webb as CEO of Varsity Brands with Matthew Rubel.[26] In April 2017, Charlesbank replaced Mr. Rubel with Adam Blumenfeld.[27]

On June 19, 2018, a definitive agreement was reached for Bain to purchase Varsity from Charlesbank for approximately $2.5 billion. Bain is a private investment firm that focuses on private equity, venture capital, credit, public equity, impact investing, life sciences, and real estate.[28] Bain takes a "consulting-based approach to private equity investing, partnering closely with management teams to offer the insights that challenge conventional thinking, build great businesses and improve operations."[29] Prior to acquiring Varsity, Bain conducted a substantial amount of due diligence including extensive presentations where Varsity employees provided information and answered Bain's questions.[30] Prior to the Bain acquisition, Varsity created a

---

[24] See, e.g.,

- Craft, Landon, 01 October 2017, Email: RE: Bridges/Org vs. NonOrganic Growth, VAR00130255 - VAR00130256.

- Brian Elza, former Co-General Manager and Vice President of Sales at Varsity All Star, testified that Charlesbank had to ultimately approve the acquisitions and mergers. Deposition of Brian Todd Elza, 16 November 2021, at 322:5-13.

- A Varsity presentation indicates that Charlesbank must approve any acquisition over $2.5 million. Varsity Brands, 16 February 2017, Growth Through Acquisition, CB00000188 - CB00000202, at 0169.

[25] Ahearn, Kristen, 15 May 2017, Email: Fwd: ILPA DDQ, CB00044502 - CB00044552, at 4517.

[26] See, e.g.,

- In January 2016, Charlesbank personnel discussed meeting Mr. Webb in New York to terminate his position as CEO: "He [Mr. Webb] is going to be very on edge that we have summoned him to New York alone to fire him." Beer, Josh, 05 January 2016, Email: RE: TALKING POINTS, CB00271540 - CB00271544, at 1541.

- Varsity Spirit, 19 October 2016, Varsity All Star Special Ops Meeting, VAR00367634 - VAR00367662, at 7635, 7638.

[27] Varsity Brands, 10 April 2017, Varsity Brands Announce Appointment Of Adam Blumenfeld As CEO, https://www.varsitybrands.com/varsity-brands/varsity-brands-announces-appointment-adam-blumenfeld-ceo, accessed 15 June 2022.

[28] Bain Capital, LP, 2022, About Us, https://www.BainCapital.com/about-us, accessed 14 June 2022.

[29] Bain Capital, LP, 2022, About Us, https://www.BainCapital.com/about-us, accessed 14 June 2022.

[30] Mr. Elza testified that Bain "did a lot of due diligence prior to acquiring our company, and they hired companies to dig in and try to figure out all they could… they worked with the directors of strategy to try to come up with these numbers." Deposition of Brian Todd Elza, 16 November 2021, at 104:6-10.

presentation titled "Varsity Brands, Elevating Student Experience, Varsity Spirit Divisional Presentation, May 2018" which provided a detailed overview of the company and was to be presented to high-level executives at Bain.[31] Through these presentations, Bain was informed about the history of Varsity, including specifically its mergers and acquisitions strategy prior to purchasing the company. After purchasing Varsity, Bain was actively involved in Varsity's day-to-day operations, including changing the leadership at the Varsity Brands' level.[32] Bain was also informed of any potential acquisitions of competing event producers by Varsity before the acquisition, and Bain had to approve these transactions.[33] Bain participated in Varsity Board of Directors' meetings and provided strategic advice to Varsity including, for example, how to restructure its customer rebate programs as described in Section V.E below.[34] This evidence is consistent with Bain's statement that "[b]y heritage, we approach investing as strategists with an 'operator's mindset,' and we believe this differentiated approach has been a key driver of our strong investment track record. Our investment philosophy has always been centered on backing industry leaders with differential competitive advantages seeking to drive growth in complex, dynamic environments."[35]

## III.  Industry characteristics that inform the economic analysis

Below I present an overview of the industry. This information is provided as background facts necessary to inform and understand the economic analyses.

### A.  Competitive Cheer is a distinct sport

Competitive Cheer is a sport in which teams of athletes compete at tournament-like competitions or events. Teams perform unique, choreographed, and highly acrobatic routines that last two and a half minutes.[36] Teams are judged on their performance. Competitive Cheer is related to traditional sideline cheer, but is distinct in several important respects, most notably that Competitive Cheer teams compete against one another for the benefit of spectators rather than leading spectator cheers in support of other sports teams that are competing.[37] Competitive Cheer athletes purchase specialized apparel and attend camps to train for Cheer Competitions. Competitions, apparel, and camps are recognized as distinct lines of business by Varsity and

---

[31] See, e.g.,

- Deposition of Brian Todd Elza, 16 November 2021, at 273:17-274:23.

- Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366.

[32] For example, Varsity replaced many Varsity employees who were former cheerleaders with Bain personnel. Deposition of Brian Todd Elza, 16 November 2021, at 264:20-265:5.

[33] Mr. Elza testified that presentations regarding each acquisition were shown to Bain for final approval. Deposition of Brian Todd Elza, 16 November 2021, at 39:17-40:12.

[34] Deposition of Brian Todd Elza, 16 November 2021, at 38:11-17, 43:14-44:19.

[35] Bain Capital Private Equity, LP, 11 June 2018, Project IMPACT Refresh Proposals, JEFF00225986 - JEFF00226027, at 5993.

[36] Varsity Spirit, 20 February 2018, What is Competitive Cheerleading, https://www.varsity.com/news/what-is-competitive-cheerleading/, accessed 09 May 2022.

[37] U.S. All Star Federation, April 2021, ESPN Wide World of Sports Complex Registration Information Competition Guidelines, USASF_00002243 - USASF_00002267.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 17 of 149
PageID 10539
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          12 of 115

other industry participants. Competitions, apparel and camps are also the three main types of costs incurred by athletes and their families.[38]

### 1. Competitive Cheer grew out of traditional sideline cheer

Competitive Cheer developed from traditional sideline cheer, its closest possible substitute. In 1948, the NCA was established by Lawrence Herkimer, an influential figure in traditional sideline cheer. The NCA offered cheer camps, sold apparel, and otherwise promoted traditional sideline cheer. In the late 1960s, Defendant Jeff Webb worked for the NCA, but by 1974 he left to found his own company, the UCA. The UCA promoted a distinct version of cheer that involved more acrobatic, gymnastics-inspired skills and stunts that would be performed in a completely different format: tournaments created exclusively for cheerleading teams to compete head-to-head with one another. Through the UCA competitions, the sport of Competitive Cheer was born and it has continued to evolve into a distinct activity from traditional sideline cheer.

Today there are many differences between Competitive Cheer and traditional sideline cheer, including:

- Competitive Cheer athletes perform timed routines as the main event for spectators, while traditional sideline cheer is intended to entertain and lead spectators watching another sport and to provide support for school teams or other events.[39]

- Competitive Cheer teams compete head-to-head in a tournament format at events and competitions. In contrast, traditional sideline cheerleaders do not compete against each other, but rather they "support groups at school to cheer on teams on the sidelines: football, basketball, and volleyball."[40] Whereas a traditional sideline cheer team might occasionally participate in a Competitive Cheer Competition, their primary focus is to attend and support other teams that are competing.

- Competitive Cheer teams work for months to develop a two-and-a-half-minute routine to be performed at events and competitions. In contrast, traditional sideline cheer teams perform a series of shorter, individual cheers, many of which involve spectator participation. Competitive Cheer routines are choreographed and include highly acrobatic routines requiring a high degree of athleticism and training.

- Competitive Cheer is judged and scored according to a set of common rules. Traditional sideline cheer has no set rules or scoring.

### 2. Competitive Cheer today

---

[38] See, e.g.,

- Varsity Spirit, 02 October 2014, Varsity Spirit Meeting Agenda, VAR00341580 - VAR00341583.

- Varsity Brands, May 2018, Management Presentation, VAR00008463 - VAR00008587, at 8543-8547.

- Varsity Brands, 2018, Confidential Information Presentation, FEAS-Ares00075739 - FEAS-Ares00075850, at 75803.

[39] Bain & Company, February 2018, Varsity Brands growth assessment, CB00485513 - CB00485640, at 5546.

[40] Deposition of Brian Todd Elza, 16 November 2021, at 59:13-16.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 18 of 149
PageID 10540
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          13 of 115

Competitive Cheer teams are typically affiliated with a school, a private gym, or a youth and recreation program. The teams affiliated with private gyms that are dedicated to Competitive Cheer are called "All Star Cheer"; School Cheer consists of Competitive Cheer teams affiliated with middle schools, high schools, or colleges (as distinct from a school's traditional sideline cheer); and Youth and Recreation Cheer consists of teams affiliated with recreational organizations.[41]

Competitive Cheer is essentially a year-round commitment for teams, athletes, and families.[42] The average cost per season to a team member's family is approximately $4,000 for All Star Cheer, including uniforms, apparel, travel, and camps. However, the total cost to families can be much higher when including lodging, spectator fees, and other related expenses.[43] Varsity estimates that the total annual cost ranges from $1,000 per "basic" athlete to $10,000 per "elite"

---

[41] See, e.g.,

- U.S. All Star Federation, August 2018, USASF Club Cheer & Dance Teams 2018-2019 Age Grid, VAR00029065 - VAR00029078, at 9068.

- Universal Cheerleaders Association, Universal Dance Association, 2018, 2019 College Cheerleading & Dance Team National Championship, VAR00485296 - VAR00485327, at 5303.

- Varsity Brands, May 2018, Management Presentation, VAR00008463 - VAR00008587, at 8542.

- Youth and Recreation Cheer includes organizations such as the YMCA. Youth and Recreation Cheer participants are not class members in this matter; therefore, I do not focus on these events or participants. Complaint, at ¶1.

- "Varsity serves two main disciplines of cheer and dance: [bullet] School: School athletic teams; participate in summer camps and typically participate in competitions [bullet] All Star/Club: Travel competitive teams not associated with a school; practice through All Star gyms." Varsity Brands, 2018, Confidential Information Presentation, FEAS-Ares00075739 - FEAS-Ares00075850, at 5800.

- A Bain presentation states: "There are two main customer segments, in-school and All Star; individual cheerleaders compete in one or both segments with varying levels of intensity and competitiveness." Sideline cheer alone is non-competitive. Bain & Company, February 2018, Varsity Brands growth assessment, CB00485513 - CB00485640, at 5544-5546.

[42] See, e.g.,

- For teams in the All Star discipline, tryouts usually begin in May and June and the Cheer Competition season runs from October through the following May, culminating in one of several year-end, national events. Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9324.

- School tryouts can happen anytime from late winter to early spring for the following school year. Varsity, 2018, Want To Be A Cheerleader - High School Cheerleading, https://www.varsity.com/wp-content/uploads/2018/02/highschool.pdf, accessed 15 June 2022, at 2.

[43] See, e.g.,

- Bain & Company, February 2018, Varsity Brands growth assessment, CB00485513 - CB00485640, at 5547-5548.

- "Costs can exceed $10,000/season, primarily driven by travel." Hansen, Jessica, 11 July 2017, Email: Deck Mark-up from Wayne, VAR00584153 - VAR00584185, at 4161.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 19 of 149
PageID 10541
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          14 of 115

athlete [44] School Cheer is less expensive; the average cost is approximately $1,600 per athlete, including uniforms, apparel, competition, camps, and travel.[45] Over time, total participation costs have increased for both All Star and School athletes as a result of rising prices, but All Star costs are increasing further due to higher travel costs and fees associated with the increasing number of competitions many teams are attending.[46]

As of 2016, Varsity estimated there were over one million Competitive Cheer athletes, with approximately 150,000-160,000 athletes participating in All Star Competitive Cheer and 900,000 with Schools Competitive Cheer.[47] Varsity estimates that schools account for approximately 70% of its revenues and All Star gyms accounts for approximately 30%.[48] Varsity claims that School Cheer participation is growing, but All Star participation is not due to the higher costs and increasing levels of athletic difficulty.[49]

Competitive Cheer teams wear clothing that is specifically designed for the sport. There are rules specifying what apparel can and cannot be worn.

Competitive Cheer teams also attend cheer-specific camps where they receive specialized instruction to prepare and train for Cheer Competitions. For some school athletes, Cheer Camp is mandatory in order to attend one of the year-end competitions. I explain how Varsity tied attendance at Varsity Cheer Camps to entry certain Cheer Competitions in Section V.C.

There are multiple governing organizations for Competitive Cheer, including the AACCA, which first developed safety standards and rules. The USASF, one of the Defendants, also sets rules and regulations, including apparel guidelines, for All Star gym competitions among other things. The National Federation of State High School Associations (hereinafter, "NFHS") is the rulemaking body for School Cheer. The International Cheer Union (hereinafter, "ICU") is the global governing body that recently received provisional recognition by the International Olympic Committee (hereinafter, "IOC"). The USA Federation for Sport Cheering (hereinafter, "USA Cheer") is the national governing body for the U.S. recognized by the ICU.[50] In addition to its ownership of USASF, Varsity was involved in the establishment of several of these

---

[44] There is no formal definition for "basic" and "elite" participants, rather this refers to those participants that spend the bare minimum and those that spend at the top of the range by attending more competitions, purchasing more apparel including elaborate uniforms. Elza, Brian, 22 October 2018, Email: Draft Agenda for Bain, VAR00309426 - VAR00309502, at 9460

[45] Sadlow, John, 12 February 2018, Email: CONFIDENTIAL: Review, VAR00304733 - VAR00304778, at 4739.

[46] Bain & Company, February 2018, Varsity Brands growth assessment, CB00485513 - CB00485640.

[47] 09 September 2016, Market Opportunity and Market Share, VAR00402942, Elza, Brian, 17 February 2020, Email: Updated - Attachments: What is Varsity All Star_Feb 20.pptx, VAR00078751 - VAR00078770, at 8768.

[48] Sadlow, John, 12 February 2018, Email: CONFIDENTIAL: Review, VAR00304733 - VAR0030477, at 4735.

[49] Bain & Company, February 2018, Varsity Brands growth assessment, CB00485513 - CB00485640, at 5547.

[50] See, e.g.,

- Varsity states that "USA Cheer is the recognized national governing body in the US by the ICU." Elza, Brian, 22 October 2018, Email: Draft Agenda for Bain, VAR00309426 - VAR00309502, at 9491-9495.

- Rothschild and Jefferies, January 2011, Varsity Information Memorandum, VAR00424538 - VAR00424610, at 4563.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 20 of 149
PageID 10542
Highly Confidential    **Expert Report of Janet S. Netz, Ph.D.**    15 of 115

entities. See Section III.B below for a full discussion of the relevant governing and sanctioning bodies.

Throughout this report, I refer to Competitive Cheer athletes and the decisions they make. Many of these athletes, however, are minors and their parents or guardians may be making decisions on their behalf. For expositional clarity, though, I simply refer to the athletes as the decision makers. Similarly, I recognize that many different people at gyms and schools may be making decisions, but for expositional clarity, I simply refer to the gym owners and athletic directors as the relevant decision makers for gyms and schools, respectively.

Varsity hosts over two hundred local, regional, state, and national competitions each year for School teams. Competitions for School teams are primarily focused on middle school, high school, and college cheerleading teams.

There are at least three organizations that promote School Cheer Competitions and Camps: NCA, UCA, and the USA. Varsity owns and controls all three.[51]

The All Star program was originally created as an alternative for athletes who were not on Competitive Cheer School teams.[52] All Star athletes are on teams affiliated with a local gym that travels to compete.[53] All Star gyms typically have multiple teams broken down by ability level

---

[51] See, e.g.,

- "Founded in 1948 by Lawrence 'Herkie' Herkimer, NCA was the first cheerleading company and credited with many other 'firsts' – the first cheerleading camp, spirit stick, pompom, cheerleading uniform company, All Star National Championship, and more." National Cheerleading Association, 2022, National Cheerleaders Association - The Work Is Worth It, https://www.varsity.com/nca/, accessed 06 May 2022, at 3.

- "Universal Cheerleaders Association was founded in 1974 by Jeff Webb to provide the best educational training for cheerleaders with the goal of incorporating high-level skills with traditional crowd leading. It was Jeff's vision that would transform cheerleading into the dynamic, athletic combination of high energy entertainment and school leadership that is loved by so many." Universal Cheerleaders Association, 2022, Universal Cheerleaders Association (UCA) - Home, https://www.varsity.com/uca/, accessed 06 May 2022, at 2.

- The NCA, UCA, and USA comprise Varsity's "core camps and national championships" revenue over the 2004-2013 period. Bain Capital, July 2018, Project Impact Diligence Summary, FEAS-Ares00075986 - FEAS-Ares00076033, at 6010.

- Varsity has five cheer and dance camp brands: "Our brands - UCA, NCA, USA, UDA, and NDA are the leaders in cheer and dance training. We have the strongest, most recognized, and highest quality brands in this space." Varsity Spirit, Undated, the importance of Camp, VAR00006767 - VAR00006784, at 6773.

- "Today, as a part of the Varsity Spirit Corporation, the USA actively promotes the values, ideals and vision of the Olmsteads [the family of Robert Olmstead whose California Specialty Camp established USA] while working to reach students now and in the future. The USA is the largest summer camp and special event organization of its kind in the western United States, conducting camps primarily in Arizona, California, Colorado, Idaho, Nevada, Oregon, Utah and Washington. Through its 'Home' camps and Special Events/Competitions, the USA reaches students and performers nationwide." Varsity Spirit and United Spirit Association, Undated, About USA, https://www.varsity.com/usa/about/, accessed 09 May 2022, at 1.

[52] Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9323.

[53] Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9323.

and age, ranging from very young up to 21 years.[54] Level 6 and 7 are the most advanced levels.[55] All Star teams attend an average of seven to nine competitions each season.[56] All Star teams compete with the goal of attending one of the end-of-season events, such as The Summit (hosted by Varsity) or The Cheerleading Worlds (hosted by the USASF).[57]

### 3.  The season ends with year-end national competitions

Similar to other sports, teams compete in competitions, and seek to earn placement or "bids" into prestigious year-end national competitions. There are several such competitions for both All Star and School Cheer. I briefly describe some of them below.

#### a)  There are several year-end competitions for All Star Cheer

The Cheerleading Worlds, hosted by the USASF, is the most prestigious end-of-year competition for the most advanced and skilled All Star athletes and teams. Teams qualify for The Worlds by performing well at other USASF-sanctioned competitions, held by one of the 42 event companies that can distribute Worlds bids, which are known as Tier 1 event companies. Over time, Varsity acquired a number of Tier 1 companies. As of early 2020, Varsity owned 34 of the 42 Tier 1 companies;[58] and as of the end of 2020, Varsity owned 36 of the 46 Tier 1

---

[54] See, e.g.,

- Deposition of Brian Todd Elza, 16 November 2021, at 60:11-21.

- U.S. All Star Federation, August 2018, USASF Club Cheer & Dance Teams 2018-2019 Age Grid, VAR00029065 - VAR00029078.

[55] "And the larger gyms have multiple teams at different skill levels, correct? A. Some do. Q. And from at least until 2020, the levels ran from 1 to 6; is that right? A. I believe that's right. Q. And then at some point in 2020, there was a Level 7 that was created; is that right? A. I believe tha"s correct. Q. And in general, the higher the number, the more skilled the team. Is that fair? A. That's – that's fair. The more – the more difficult – the more difficult the skills, yes." Deposition of Jeff Webb, 12 May 2022, at 89:19-90:10.

[56] See, e.g.,

- Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9324.

- Hansen, Jessica, 11 July 2017, Email: Deck Mark-up from Wayne, VAR00584153 - VAR00584185, at 4161.

- Most gyms have multiple teams and some gyms attend as many as fourteen events per year with different teams. A 2019/2020 Varsity spreadsheet lists the number of events each gym attended. Both "Cheer Extreme – Chicago" and "Cheer Legendz" attended 14 events. Varsity, 2020, VFP Estimates and VFP Summary, VAR00005294, at tab "VFP Summary."

[57] The Cheerleading Worlds is a USASF-sanctioned event. Over 10,500 athletes and 500 teams participated in the 26 different divisions of the 2022 Cheerleading Worlds; since 2004 it has taken place at Walt Disney World in Orlando, Florida. The event is described as: "More than 120 USASF/IASF member event producers across the U.S. and in over 40 countries around the world qualify top teams at their premier national championships to compete at The Worlds. This international event brings together more than 9000 cheer and 3500 dance athletes to vie for world champion titles in senior and international club divisions and categories. The first Cheerleading Worlds was held in 2004 and the first Dance Worlds in 2007." U.S. All Star Federation, 2020, The Cheerleading Worlds, https://thecheerleadingworlds.net/, accessed 13 May 2022, at 3.

[58] See, e.g.,

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 22 of 149
PageID 10544
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**              17 of 115

companies.[59] USASF rules specify where and when events offering Worlds bids can be held and preference is given to event promoters based on how long they have been USASF members. The USASF also has restrictions on changing the date or location of existing Worlds bids events, and again, preference is given to the event producers with seniority based on their USASF membership dates.[60]

Varsity owns three end-of-season events: The Summit, The D2 Summit, and the U.S. Finals. Varsity created The Summit in 2014, and subsequently introduced The D2 Summit in 2015 for smaller gyms with 125 or fewer athletes, to provide an experience similar to the Worlds for levels 1-4.[61] The Summit is held at Disney World and Varsity describes it as the "All Star cheerleading grand finale."[62] Teams can earn a bid only by attending at least one regular season Varsity event; Varsity created The Summit to drive All Star teams away from other producers' events during the regular season.[63] Approximately 25% of All Star teams receive an invitation (bid) to The Summit.[64] The D2 Summit is also held at Disney World and follows the structure of The Summit. Athletes attend qualifying year-round events in order to receive an "invitation by bid or qualification only."[65] Although these are all USASF-sanctioned events, the USASF does not have any control over the date or location of any these events like they do for events that offer Worlds bids as explained above.

---

- By 2020, "Varsity owns 34 of the 42 Tier 1 Event companies." Elza, Brian, 17 February 2020, Email: Updated - Attachments: What is Varsity All Star_Feb 20.pptx, VAR00078751 - VAR00078770, at 8761.

- In response to a question about its "M & A strategy for All Star events" in 2018, Varsity wrote: "Typical players are mostly regional event companies who have deep ties into their specific markets. We look to acquire all the Tier I event companies (brands such as American Championships, Athletic Championships) that give bids to the cheerleading and dance Worlds. There are only 42 Tier I event companies. Varsity now owns 32 of those Tier I companies in all of the best markets." Varsity Spirit, Undated, All Star Overview, VAR00310631 - VAR00310666, at 0664, emphasis added.

[59] 30(b)(6) Deposition of U.S. All Star Federation (Steven H. Peterson), 09 March 2022, at 263:20-23.

[60] See footnotes277 277 and 279279279.

[61] Varsity Spirit, Undated, All Star Overview, VAR00310631 - VAR00310666, at 0631 and 0664.

[62] See, e.g.,

- Varsity Spirit, Undated, All Star Overview, VAR00310631 - VAR00310666, at 0631.

- Varsity contracts with Disney specify which All Star competitions are held at Disney and the terms of those agreements. Disney and Varsity Spirit, 22 February 2012, Agreement between Disney Destinations, LLC and Varsity Spirit Corporation [Signed], FEAS-Ares00039879 - FEAS-Ares00039952.

[63] A Varsity document responding to questions from Bain states: "Development and ramp of The Summit competitions [bullet] In an effort to create a strong 'post season' event our team created The Summit. The goal was to create an event that you had to obtain a bid by attending one of our other Varsity All Star events. By doing this it helped drive customers to more of our regular season events and away from our competitors." Elza, Brian, 30 May 2018, Email: Re: Answers, VAR00182584 - VAR00182588, at 2584.

[64] In 2018, 26% of teams registered in the USASF database attended The Summit. Elza, Brian, 24 April 2018, Email: Impact, VAR00183218 - VAR00183221, at 3219.

[65] Varsity Spirit, Undated, All Star Overview, VAR00310631 - VAR00310666, at 0631, 0664.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 23 of 149
PageID 10545
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**                    18 of 115

Varsity also hosts the U.S. Finals end-of-year championship. Varsity assumed ownership of this through its acquisitions of JAM Brands and EPIC Brands.[66] The U.S. Finals is an invitation-only event; to qualify, teams must be one of the top three finishers in one of eight Varsity championships across the country.[67] Other year-end national competitions for All Star teams have existed over the years as well.

> b) There are several year-end competitions for School Cheer

Similar to All Star, the School season culminates with national championships. Approximately 35,000 athletes attend School national championship events at Disney, and Varsity identifies these events as key drivers of revenue and profit.[68] Varsity has three school competition brands, UCA, NCA, and USA, all of which hold year-end championships for high school and college athletes.[69]

In order to qualify for national championships, high school cheer teams first must qualify by performing well in a regional event.[70] College teams can register for national competitions by attending a Varsity camp or via video qualification.[71] Other year year-end national competitions have existed for School Cheer teams over the years as well.

## B. A variety of sanctioning bodies oversees the rules of the sport

A variety of sanctioning bodies have been established to oversee safety and rules for All Star and School Cheer within the U.S. and internationally. I describe these bodies below. Varsity has been able to obtain and maintain its market power through its control of many of these bodies. Descriptions of the various entities are shown graphically in Exhibit 3.

### 1. National All Star Cheerleading Coaches' Congress standardized competition rules 2003-2005

---

[66] Varsity acquired a 70% interest in the U.S. Finals Championship through its 2015 JAM Brands acquisition. Varsity gained the remaining 30% of U.S. Finals ownership from its 2018 EPIC Brands acquisition, Sadlow, John, 20 April 2018, Email: FW: Data room document feedback, VAR00415061 - VAR00415076, at 5064, 5076.

[67] Elza, Brian, 17 February 2020, Email: Updated - Attachments: What is Varsity All Star_Feb 20.pptx, VAR00078751 - VAR00078770, at 8764.

[68] Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9334.

[69] See, e.g.,

- Universal Cheerleaders Association, 2022, Universal Cheerleaders Association (UCA) - Home, https://www.varsity.com/uca/, accessed 06 May 2022.

- National Cheerleaders Association, 2022, National Cheerleaders Association - The Work Is Worth It, https://www.varsity.com/nca/, accessed 06 May 2022.

- Varsity Spirit and United Spirit Association, Undated, About USA, https://www.varsity.com/usa/about/, accessed 09 May 2022.

[70] The UCA website explains that teams that do not attend a Varsity Spirit camp can compete at a local UCA competition "but they will not be eligible to receive a bid to the NHSCC [National High School Cheerleading Championship]." Varsity, Undated, Squad Credentialing FAQ, https://www.varsity.com/uca/wp-content/uploads/2020/07/21_uca_squadcredfaq.pdf, accessed 24 May 2022.

[71] National Cheerleaders Association, Undated, NCA & NDA College Nationals, https://www.varsity.com/nca/school/competitions/college-nationals/, accessed 15 June 2022.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 24 of 149
PageID 10546
Highly Confidential        **Expert Report of Janet S. Netz, Ph.D.**                19 of 115

The National All Star Cheerleading Coaches' Congress (hereinafter, "NACCC") was founded in 2003 by five coaches in order to establish standardized rules for All Star Cheerleading.[72] In 2005 the USASF acquired the NACCC, transforming it into the rules committee of the USASF. Approximately two years later, the USASF dissolved the NACCC and replaced it with a new USASF rules committee.[73]

### 2.   Varsity created the USASF as a response to the creation of the NACCC

Varsity and a second event producer, Cheersport (which was later acquired by Varsity in 2012), created the USASF, less than a week after the NACCC's first meeting.[74] The stated objective of

---

[72] See e.g.,

- One of its founders, Jamie Parrish, talks about the creation of the NACCC: "What is your relationship to NACCC? A. NACCC is founded by myself, Elaine Pascale, and Victor Rosario back in the day. Before USASF we were – we invited all of the coaches across the country to come to Atlanta to be part of the first ever national All Star cheerleading coaches congress. We modeled it after gymnastics because gymnastics has a similar thing called the gymnastics coaches congress, and we thought it would be a good idea for the coaches to come and conglomerate all of our rules. And we gathered together in a democratic fashion and we had a voting procedure in Robert's Rules of Order and we constructed the first-ever set of unified All Star rules, and we invited not only Varsity and all the other companies but also cheerleading coaches across the country." Deposition of Jamie J. Parrish, Volume II, 17 March 2022, at 564:8 - 565:2.

- The NACCC was created to standardize All Star Cheerleading rules: "Q. Let me shift gears a little bit. Speaking of NACCC in 2004, you said there was frustration with the rules? Is that a fair characterization of things? A. At that point there were probably over 40 competition venues and every single one of those venues had a different set of rules. So when you would compete one week, you might get called on a legality that was legal the week before based off of the rules. So it got to be very frustrating and very unsafe for the athletes to be changing routines during one practice from one weekend to the next. So we all had a meeting and decided that we should try to conglomerate the rules. But that was back when there were over 40 competition companies before Varsity virtually bought all of them." Deposition of Jamie J. Parrish, Volume II, 17 March 2022, at 608:17 - 609:10.

[73] See, e.g.,

- "So when we founded the NACCC we put in place term limits so we would all be voted off of the NACCC over time. But it only took Varsity, I think, two years after that to get rid of the NACCC all together, even though the verbal spirit of the merger was NACCC would always be around and that we would have lifetime appointments to the rules committee. And we were not afforded that luxury and we also – NACCC was replaced by the USASF rules committee after the board, which was mainly majority Varsity people, voted to get rid of it." Deposition of Jamie J. Parrish, Volume II, 17 March 2022, at 612:13 - 25.

- Karen Wilson, a USASF employee, mentions that the NACCC became a committee within the USASF: "Q. Okay. Okay. And does the NACCC exist today? A. Not that I'm aware of, no. Q. Okay. Do you know – do you know what happened to the NACCC? MS. BERKOWITZ: Objection. A. My understanding is that it was – there was a partnership with USASF to make sure that those – those voices were being heard. And at some point, it just – they just didn't have as many concerns because the rules were more stabilized. Q. Okay. So at some point, the NACCC dissolved; is that right? A. I don't know if it dissolved. The NACCC group merged into the Connection Group, which is what we have now, so it's gym owners and coaches working together. But they are not the voice of the coaches, though; it is a working committee. Q. Okay. And you said the NACCC is now part of a connection, which is part of USASF? A. It's a committee within the USASF, yes. Q. Okay. Okay. Understood." Deposition of Karen Wilson, 14 April 2022, at 36:16-37:19.

[74] Jamie Parrish, one of the founders of the NACCC, testifies that the USASF was founded as a reaction to the NACCC: "That really set Varsity off, like in a big, big, big way. They didn't like us taking part and defining our own destiny as coaches, and they – they quickly rallied their troops and said, 'Hey, I know you guys are working on

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 25 of 149
PageID 10547
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**                    20 of 115

the USASF was the same as the NACCC – setting standard rules for All Star Cheerleading.[75]
According to one of the founders of the NACCC, Jamie Parrish, the first set of rules that the
USASF adopted was virtually the same as the NACCC's.[76]

Varsity provided the USASF with financial assistance, including a $1.8 million interest-free loan
and a guaranteed "rainy day" fund.[77] The USASF stated that Varsity "secures the loan" by
retaining the rights to the USASF trademark and intellectual property."[78] The USASF repaid the
loan in 2013.[79] Varsity and the USASF were enmeshed in other ways as well. For example, the

---

[N]ACCC.' This was – this was brought to us by Kevin Brubaker at the time, and said, 'But we are also working on
something very similar called the USASF, and it's just – it's going to be a 'coaches, for the coaches, by the coaches'
movement, but it's going to be done – you know, you guys don't have the money to – to do your own organization.
We have money that we'll put into this and make it the proper, you know, governing body of cheerleading. You
guys don't need to worry with this.' And that's how the USASF was born, as a response to what we were doing."
Deposition of Jamie J. Parrish, Volume I, 03 March 2022, at 32:12 - 33:3.

[75] In 2004, Varsity and CheerSport founded the USASF to create a cheer sanctioning body with a standard set of
rules: "USASF was founded in 2004 by Varsity and CheerSport. At that time, both companies believed that there
needed to be an organization that could bring stability to the sport and serve the athletes and coaches by
standardizing rules, promoting safety and providing sanctioning standards." U.S. All Star Federation, 2013, An
Open Letter to Our Membership, VAR00351488 - VAR00351491, at 1488.

[76] Jamie Parrish comments on the fact that the first set of rules that the USASF adopted was practically the same as
the NACCC set of rules: "So then USASF created uniform rules; is that correct? A. USASF, I think the very first
rules that they published were the rules that were adopted by the NACCC, if I'm not mistaken. Q. So the rules that
you and your colleagues at the NACCC came up with became the original rules of USASF; is that correct? A. I
would have to look back and make sure that my statement is correct. And it may have had some changes, but the
general conglomeration of rules that we had written, I think, are still the rules that are in place today except for the
average change every single year. Like, you know, there's a few rules that change each year, depending."
Deposition of Jamie J. Parrish, Volume II, 17 March 2022, at 609:12 - 610:3.

[77] See, e.g.,

- "After USASF was formed, Varsity provided an interest free line of credit to the USASF. At its peak, the
  loan balance was $1.8M. As of December 31, 2012, the balance on the loan was $565K. Varsity has
  allowed the USASF to have complete flexibility with our repayment schedule. The loan has been
  completely interest free to the USASF. This has been an incredible benefit to our organization and
  members, and it would have been impossible for the USASF to survive without it. Varsity has also
  continued to guarantee a substantial 'rainy day' fund to insure USASF could withstand any type of
  unforeseen natural or financial disaster such as having to cancel Worlds one year. There has been no 'co-
  mingling of funds' or any other impropriety. Just as any lending institution would do, Varsity secures the
  loan by retaining certain rights to the USASF trademark and intellectual property." U.S. All Star
  Federation, 2013, An Open Letter to Our Membership, VAR00351488 - VAR00351491, at 1489.

- Varsity's startup loan was essential for the creation of the USASF: "The no-interest start up loan, along
  with the necessary office support, provided by Varsity was the foundation that allowed the USASF to
  establish and develop our mission." U.S. All Star Federation, 2014, 2014 USASF Annual Report,
  USASF_00032540 - USASF_00032545, at 2541.

[78] "Just as any lending institution would do, Varsity secures the loan by retaining certain rights to the USASF
trademark and intellectual property." U.S. All Star Federation, 2013, An Open Letter to Our Membership,
VAR00351488 - VAR00351491, at 1489.

[79] "Perhaps the most significant news for the organization in 2013 was the repayment to Varsity Spirit Corporation
of the startup loan that funded the USASF launch in 2003." U.S. All Star Federation, 2013, USASF 2013 Annual
Report, USASF_00032535 – USASF_00032539, at 2536.

USASF offices were located within Varsity's offices,[80] and through 2015, USASF employees were employees of Varsity and were paid by Varsity, which was then reimbursed by USASF.[81] USASF staff also participated in Varsity's employee stock option plan.[82]

The USASF is governed by a Board of Directors. At its founding, the board had nine voting members, with three seats filled by Varsity employees.[83,84] The number of voting members increased to thirteen in 2005.[85] Several cheer brands have permanent voting seats on the USASF Board of Directors. Over time, Varsity acquired all of the competing rival event producers on the USASF Board of Directors, with the last acquisition (JAM Brands) coming in 2015. See Section

---

[80] The USASF offices were located within Varsity's offices for some period of time: "Although USASF recently moved, it had been in the same building and suite as Varsity and AACCA." Suskin, Steven P., 31 July 2015, RE: Varsity Brands/Houston Press, VAR00460483 - VAR00460488, at 0485.

[81] 26 December 2015, U.S. All Star Federation Inc. Financial Statements, USASF_00002888 - USASF_00002898, at 2897.

[82] See, e.g.,

- "Q. Okay. And so prior to the time Charlesbank had acquired its interest in Varsity, you had participated in an Employee Stock Option Plan; is that correct? A. Yes. If that's what the ESOP program is." 30(b)(6) Deposition of U.S. All Star Federation (Steven H. Peterson), 09 March 2022, at 281:22-282:4.

- Mr. Peterson was also included on a 2015 Varsity email regarding the ESOP distribution presentation. Aldridge, Coy, 14 January 2015, Email: ESOP Distribution Presentation - January 20 - 22, USASF_00011614 - USASF_00011616.

[83] "The Board agreed to increase the number of voting Board members from 9 to 13, to invite NCA to replace Steve Peterson as their Board representative (who they did with Karen Halterman), to move Steve [Peterson] to a Board seat representing the USASF, to invite Jeff Miller (Pro Spirit, Dallas), Robbie Messer (Orlando Flames), and Roger Schonder (Stingray Cheer Co, Atlanta) to 2 year Board terms, and to leave a Board seat vacant to use as needed in the future." U.S. All Star Federation, 24 January 2005, USASF Board of Directors Meeting Minutes, USASF_00027858 - USASF_00027861, at 7858.

[84] A USASF record of membership for the Board of Directors lists seven voting members in 2004, including three Varsity employees—Bill Seely, Mike Burgess, and Lance Wagers, plus two USASF representatives—Jim Chadwick and Steve Peterson. Chadwick, James, 2021, USASF Board Member History with email addresses UPDATED, USASF_00032444 - USASF_00032446, at 2444. While this document lists only seven voting members, the Board had nine seats at this time. It is possible that the other two seats were empty or one was empty and the other had a rotating member who was not listed. See,

- "Frankie Conklin has accepted a new role with the USASF as Special Advisor to the Board. This will free up his Board seat to begin the 2 year rotation cycle in 2005." U.S. All Star Federation, 16 November 2004, USASF Board Meeting November 16, 2004 Minutes, USASF_00027870 - USASF_00027873, at 7871.

- In 2005, there was an empty seat so it is possible that in 2004 there was an additional empty seat: "The Board agreed to […] leave a Board seat vacant to use as needed in the future." U.S. All Star Federation, 24 January 2005, USASF Board of Directors Meeting Minutes, USASF_00027858 - USASF_00027861, at 7858.

- There are also some rotating seats at the USASF Board of Directors: "We agreed the current company Board seats are permanent and gym Board members and new company Board members will rotate with staggered 2 year terms, the same as committee members." U.S. All Star Federation, 16 November 2004, USASF Board Meeting November 16, 2004 Minutes, USASF_00027870 - USASF_00027873, at 7871.

[85] Starting in 2005, the USASF Board of Directors had 13 seats. Before 2005, it had only 9 seats. See footnote 83.

V.D.1 for a discussion of the JAM Brands acquisition. Currently, six of the thirteen USASF board seats are filled by permanent member brands, all of which are Varsity brands.[86]

The USASF also established a Sanctioning Committee to oversee USASF membership and the allocation of bids to the season-ending Worlds competition. The Sanctioning Committee determines which event producers are able to award Worlds bids as well as the date and location of Worlds bid events. The ability to award Worlds bids is valuable because customer demand for Worlds bids is high and the number of Tier 1 events is capped by the Sanctioning Committee. Each Tier 1 event producer is given a vote on the Sanctioning Committee. When a Tier 1 event producer is acquired by another, the World bid event and Sanctioning Committee vote are transferred to the new owner.

Varsity initially lacked full control of the Sanctioning Committee and as late as 2015, Varsity lacked a majority of votes on the USASF Sanctioning Committee.[87] When Varsity acquired JAM Brands in late 2015, it gained control of its seats on the Sanctioning Committee, giving it a permanent majority.

### 3. Varsity founded the ICU to be the international governing body of cheerleading in 2004

---

[86] See e.g.,

- U.S. All Star Federation, 2022, Board Members, https://www.USASF.net/committee-board, accessed 14 June 2022.

- Deposition of Jeffrey Lee Fowlkes, 05 April 2022, at 48:9 - 52: 23.

[87] Varsity lacked a majority of votes on the USASF Sanctioning Committee as of early 2015: "There are 35 EPs on the Committee and 16 of them are Varsity." Peterson, Steve, 07 January 2015, Email: Re: Varsity Events-PA Convention Center-Follow up, USASF_00019064 - USASF_00019072, at 9064.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 28 of 149
PageID 10550
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**              23 of 115

Varsity founded the ICU in 2004 to be the international governing body of all cheerleading disciplines.[88] Varsity's founder, Jeff Webb has been the President of the ICU since its inception, and several Varsity employees also staff the ICU.[89]

The ICU was provisionally recognized by the IOC in 2016 and received full recognition in 2021.[90]

### 4. Varsity spun The International All Star Federation out of the USASF to govern All Star Cheerleading outside the U.S.

---

[88] See, e.g.,

- International Cheer Union, 2022, ICU Governing Council, https://cheerunion.org/about/about/, accessed 20 May 2022.

- Jeff Webb founded the ICU: "The president and founder of the ICU, Jeff Webb, addressed the crowd and deemed the championship underway as athletes representing the countries attending the event took the stage." Varsity TV, 27 April 2018, 2018 ICU World Championship Results & Recap, https://tv.varsity.com/articles/6191089-2018-icu-world-championship-results-recap, accessed 24 May 2022, at 1.

- According to Sheila Noone, former Varsity public relations representative, Varsity provided the initial support needed to establish the ICU: "International Cheer Union: 'Varsity Spirit believed in the mission of the ICU and provided the initial support for launch … it also continues to cover the deficits of the still growing organization.' Noone email to HP." Suskin, Steven P., 31 July 2015, RE: Varsity Brands/Houston Press, VAR00460483 - VAR00460488, at 0484.

- Jamie Parrish states that USA Cheer and the ICU were created by Varsity: "A. Well, for many years the USASF was touted as the governing body and then the business of them being a for-profit organization came to – came to public knowledge. So that's when Varsity kind of pivoted and decided that USASF and IASF were not going to be the governing bodies and they invented, out of thin, blue air, the USA Cheer and the IA – the – it's – I'm sorry, the ICU, International Cheer Union." Deposition of Jamie J. Parrish, Volume II, 17 March 2022, at 567:2 - 11.

[89] See, e.g.,

- International Cheer Union, 2022, ICU Governing Council, https://cheerunion.org/about/council/, accessed 20 May 2022.

- "Also, Karl Olson, ICU's Sec. General, describes himself as 'Varsity Vice President' on his Linkedin page. In an email to HP, Olson said that Varsity 'donates the many volunteers who are also Varsity employees' to the ICU. Finally, Varsity owns the trademark for ICU. Accordingly, it appears that ICU is funded and staffed by Varsity, and its name is actually owned by Varsity." Suskin, Steven P., 31 July 2015, RE: Varsity Brands/Houston Press, VAR00460483 - VAR00460488, at 0484.

- "Finally, Varsity, AACCA and ICU also share Ms. Noone as PR director." Suskin, Steven P., 31 July 2015, RE: Varsity Brands/Houston Press, VAR00460483 - VAR00460488, at 0485.

[90] See, e.g.,

- International Olympic Committee, 06 December 2016, IOC Executive Board wraps-up first day of meetings, https://olympics.com/ioc/news/ioc-executive-board-wraps-up-first-day-of-meetings, accessed 20 May 2022.

- Webb, Jeffrey G., 20 July 2021, Letter, Re: ICU receives Full Recognition Status by the International Olympic Committee, https://cheerunion.org.ismmedia.com/ISM3/std-content/repos/Top/olympics/docs/ICU_IOC_Full-Recognition.pdf, accessed 20 May 2022.

The International All Star Federation (hereinafter, "IASF") is the international sanctioning body for All Star Cheer. It was initially a part of the USASF and was spun off in 2016.[91] The IASF Executive Board of Directors included several Varsity employees, a USASF representative, and no other event producers.[92] According to Steve Peterson (USASF Vice President of Events and Corporate Alliances) when the IASF was initially created Varsity had ownership interest in this organization.[93]

The IASF and USASF jointly produce The Cheerleading Worlds competitions.

### 5. Varsity created USA Cheer as a national governing body

In 2007 Varsity created USA Cheer as a self-appointed national governing body for all disciplines of sport cheer.[94]

From its creation, USA Cheer was run by a Varsity employee, and Varsity progressively passed responsibilities from the USASF to USA Cheer, which according to Jamie Parrish is a "much tighter" organization and allows for "much more control."[95]

USA Cheer doesn't have any individual members, and its Board of Directors includes a number of Varsity employees.[96]

### 6. The NFHS is the rulemaking body for School Cheer

---

[91] Varsity Spirit, 17 December 2015, 2016 Budget Presentation, CB00014752 - CB00014789, at 4781.

[92] "The IASF Executive Board of Directors will consist of: Jim Chadwick: USASF Liz Rifino: US Dance Dan Kessler: USA [Varsity employee] John Nichols: USASF Fiona Collumb: Ireland Diana Becker: Germany" U.S. All Star Federation, 17 February 2016, IASF press release, VAR00313469 - VAR00313470, at 3469.

[93] "Q. And does Varsity or Varsity-affiliated companies have ownership interest in ICU or IASF? A. Initially, yes. I do not know anymore. Q. Okay. When you say 'initially,' what time period did – did you have in mind? A. I really don't remember when ICU and the ISF [sic] – the ICF started as part of the USASF that separated out about six, seven years ago, but I don't know when ICU was started. Q. Okay. How about IASF? A. Very early years. I just don't remember when we started including international teams to Worlds." 30(b)(6) Deposition of U.S. All Star Federation (Steven H. Peterson), 09 March 2022, at 308:9-23, objections omitted.

[94] USA Cheer, Undated, About USA Cheer, https://www.USACHEER.org/about, accessed 22 May 2022, at 2.

[95] Jamie Parrish explains how USA Cheer was created: "And it just kind of happened where USA Cheer was developed, a Varsity employee, Laurie Harris was put into the position of running it, and there has been a definitive, definitive kind of fade out of the USASF over the last three years. And the reason why is because it came to fruition and everybody understood that Varsity owned USASF. And so now, they can't have the crazies running the crazy house, so they had to go over and start inventing a new governing body called USA Cheer. And that's where they're headed now in order to – because they know they're not going to be able to keep stacking the board at USASF and doing everything that they want to do there. They're – they're going to have to pivot, and USA Cheer is much tighter, much more control, and that's what they're going to try to run the Olympic effort to." Deposition of Jamie J. Parrish, 03 March 2022, at 51:5 - 15.

[96] Varsity employees on the USA Cheer Board of Directors include Bill Seely, Buffy Duhon, Jesa Herman, Justin Carrier, Melanie Berry and Mike Burgess. USA Cheer, 2022, Current Board of Directors & Officers, https://www.USACHEER.org/about/board-of-directors, accessed 22 May 2022.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 30 of 149
PageID 10552
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          25 of 115

The NFHS is the rulemaking body for most high school sports in the U.S., including School Cheer.[97]

Varsity has an agreement with the NFHS in which it pays $345,000 annually to be an NFHS Corporate Partner.[98] The NFHS enforces Varsity's squad credentialling program, which requires high school cheer athletes to attend Varsity overnight Cheer Camps in order to be eligible for national Cheer Competitions. See Section V.C for a discussion of this tying conduct.

### 7.  Varsity established the AACCA in 1987 to develop safety standards

Varsity established the AACCA in 1987.[99] The AACCA was tasked with developing coach and athlete safety standards and rules, and it has published several editions of the "Cheerleading Safety Manual."[100] The NFHS has published the AACCA Cheerleading Course since 2009.[101]

The AACCA Board of Directors had nine members, four of which are Varsity employees, and Jeff Webb was the AACCA president.[102] Jim Lord, executive director of the AACCA, was a Varsity Brands employee and the AACCA shared office space with Varsity.[103]

---

[97] See,

- National Federation of State High School Associations, 2022, About Us, https://www.NFHS.org/who-we-are/aboutus, accessed 20 May 2022.

- It was founded in 1920. National Federation of State High School Associations, 2022, The NFHS Celebrates 100 Years, https://www.NFHS.org/100years, accessed 13 June 2022.

[98] Seely, Bill, 06 January 2015, Email: Deal Points for NFHS, VAR00429874 - VAR00429875.

[99] Jim Lord, executive director of the AACCA, says that the AACCA was created in 1987 by the UCA (which Varsity owns): "Q. I understand. When was AACCA created? A. 1987. Q. And by whom? A. It was initially formed by UCA and -- I guess that's it." 08 June 2010, Deposition of Jim Lord, *Stephanie Biediger, Kayla Lawler, et al. v. Qunnipiac University*, 3:09-CV-00621 (SRU) (In the United States District Court of Connecticut), at 14:10 - 14.

[100] USA Cheer, Undated, AACCA is now USA Cheer!, https://www.USACHEER.org/aacca-is-now-usa-cheer, accessed 20 May 2022.

[101] USA Cheer, Undated, AACCA is now USA Cheer!, https://www.USACHEER.org/aacca-is-now-usa-cheer, accessed 20 May 2022

[102] The AACCA is virtually controlled by Varsity: "American Association of Cheerleading Coaches and Administrators (AACCA) a registered 501 (c)6 in TN. is the only safety organization within the cheer industry. No bylaws or list of active AACCA board of directors can be found. Several court cases listing AACCA as a defendant have used, "John Doe" as listed responsible party for AACCA. IRS tax documents list nine (9) members on the board, four are Varsity employees and President is Jeff Webb, founder of Varsity Brands Inc." Undated, Cheerleading: What the future Holds for 3.9 million U.S. Children How Public Exposure Reporting Can Help, Webb_AS_00000443 - Webb_AS_00000482, at 0453.

[103] See, e.g.,

- "Q. Okay. Are you employed by AACCA? A. Yes. I am the executive director. Q. Okay. And are you also employed by Varsity Brands? A. Yes. Q. And what is your position at Varsity Brands? A. I don't have a position at Varsity Brands. I'm employed by Varsity Brands for AACCA in order to get the benefits packages that would come with being an employee. Q. Okay. So are you is your salary paid by AACCA, or is it paid by Varsity Brands? A. It's paid by Varsity Brands in order to get the benefits." 08 June 2010, Deposition of Jim Lord, Stephanie Biediger, Kayla Lawler, et al. v. Qunnipiac University, 3:09-CV-00621 (SRU) (In the United States District Court of Connecticut), at 13:21 - 14:9.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 31 of 149
PageID 10553
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          26 of 115

The AACCA merged with USA Cheer in 2018.[104]

### C.  Competitive Cheer athletes purchase three types of products

There are three related products that go into Competitive Cheer: Cheer Competitions, Cheer Apparel, and Cheer Camps. These products, along with their primary suppliers, are described below. I focus mostly on the current suppliers, but also provide some historical context. Varsity has acquired many competing firms in each of these markets, particularly in the last decade in the Cheer Competitions market; see Section V.D below for a more complete discussion of these acquisitions.

### 1.  Cheer Competitions

A Competitive Cheer team typically works on a routine for several months before performing it at a competition in front of spectators and judges who score teams based on a common set of rules. Competitions can be local, regional, or national in scope and usually last one or two days over a weekend, but the larger year-end, national events last three to four days. Competitions are hosted by producers, including both Varsity and non-Varsity producers known as Independent Event Producers or "IEPs."

Currently, Varsity is the dominant producer of Cheer Competitions; see Section IV.A.2. for more details. Varsity Spirit holds approximately 600 regional and local competitions per year with over 900,000 athletes and over 1.4 million spectators.

Varsity Spirit began a partnership with the Walt Disney World Resort in 1995, and today, over 300,000 Varsity athletes and their families attend Disney World competitions each year.[105] Seven Varsity events are nationally televised by either ESPN or CBS Sports Network broadcast.[106]

Varsity operates events under many different brand names, including Athletic Championships, Cheersport, Cheer Ltd., JAMfest, Aloha Spirit Productions, Spirit Celebration, ATC Skillz

---

- Suskin, Steven P., 31 July 2015, RE: Varsity Brands/Houston Press, VAR00460483 - VAR00460488, at 0485.

[104] USA Cheer, 18 April 2018, USA Cheer and AACCA Combine Forces, Strengthening Safety for Participants, https://www.USACHEER.org/usa-cheer-aacca-combine-forces-strengthening-safety-participants, accessed 17 May 2022.

[105] See, e.g.,

- "Varsity Spirit has partnered with the Walt Disney World® Resort in creating unforgettable National Championship experiences since 1995." Varsity Spirit, Undated, Why Varsity Spirit Competitions, https://www.varsity.com/school/competitions/why-varsity-competitions/, accessed 27 April 2022, at 3 - 4.

- Varsity Spirit is Disney's largest customer. Varsity Brands, 2018, Confidential Information Presentation, FEAS-Ares00075739 - FEAS-Ares00075850, at 5805.

- Varsity Spirit, Undated, Corporate Partnerships, https://www.varsity.com/about/partners/, accessed 27 April 2022, at 14.

[106] See, e.g.,

- Varsity Spirit, Undated, Why Varsity Spirit Competitions, https://www.varsity.com/school/competitions/why-varsity-competitions/, accessed 27 April 2022, at 3 - 4.

- Varsity Spirit, Undated, Corporate Partnerships, https://www.varsity.com/about/partners/, accessed 27 April 2022, at 11.

Camps, Jam Spirit Group (DBA Team Champion), Sea To Sky, Epic Spirit, Coastal Corporation, and PacWest. Many of these different Varsity brands are former IEPs, now part of Varsity following Varsity's acquisition.[107] See Section V.D for a more complete discussion of the firms that Varsity acquired.

As of September 2016, Varsity considered the following independent event producers to be among its largest competition competitors: EPIC Brands, GSSA/Aloha, Spirit Celebration, Jam Spirit Group (DBA Team Champion), WSA, and JAMZ. At that time, none of those firms had more than 6% share of events in terms of total revenue. Also in September 2016, Varsity identified at least 70 other, smaller IEPs that promote a small number of events.[108] These other 70 IEPs collectively account for only approximately 11% of the total event revenue. Many of these smaller producers only host a single event. After the above-referenced document was authored in 2016, Varsity acquired three of the largest of these IEPs—EPIC Brands, Aloha, and Spirit Celebration—further increasing Varsity's market share.[109]

## 2.  Cheer Apparel

Cheer Apparel is specialized clothing, accessories, and shoes designed specifically for Competitive Cheer. The clothing is designed to meet the demands of the athlete (e.g., tops are flexible enough to allow the highly acrobatic maneuvers), but there are safety-related requirements (e.g., shoes must be rubber-soled) as well.[110] Cheer Apparel is also designed to

---

[107] Varsity acquired several event brands (including Cheer Ltd., Jamfest, Aloha Spirit Productions, Spirit Celebration, ATC Skillz Camps, Jam Spirit Group (DBA Team Champion), Sea To Sky, and EPIC Brands) but did not convert them to a "Varsity" brand: "Varsity strategically does not convert brands from existing name to a 'Varsity' brand after acquisitions because: [bullet] The brands have recognition in the market place and represent unique experiences that keep customers attending [bullet] The world bids are attached to brand names and those are protected geographically and by date ranges; these events are historically our largest, most established and highest profit events [bullet] Acquired entities have powerful brand value that Varsity Spirit does not want to disrupt [bullet] Each event provides participants with a unique experience that helps keep customers going to multiple competitions per year." Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9325.

[108] See, e.g.,

- A 2016 Varsity document lists all "Varsity All Star Events" as hosting 75% of the All Star events and lists the following IEPs and event shares: EPIC Brands (6%), GSSA/Aloha (2%), Spirit Celebration (2%), Champion Spirit Group [Jam Spirit Group (DBA Team Champion)] (2%), WSA (1%), JAMZ (1%), and all others (over 70 different IEPs) as having 11% combined. LeTard, Tres, 2016, Varsity All Star Market Share est. - 2016, VAR00101102.

- The above spreadsheet was attached to a September 16, 2016 email from Tres LeTard, former General Manager and Vice President of Operations at Varsity All Star, stating "Here is our 'best guess' at Market Share by Revenue." LeTard, Tres, 16 September 2016, Email: RE: Recap from Yesterday and Next Steps, VAR00101100 - VAR00101101.

[109] Undated, Acquisition Dates, VAR00129039 - VAR00129042, at 9041-9042.

[110] See, e.g.,

- Regarding All Star gyms, Varsity states: "Apparel style is performance and skills oriented with an emphasis on complementing a team's routine and representing their unique gym name/brand." Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9323.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 33 of 149
PageID 10555
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          28 of 115

provide a particular appearance, including design attributes such as sequins. The cost for Competitive Cheer uniforms is usually between $200-$450; many teams, especially All Star teams, purchase elaborate competition uniforms that are one-of-a-kind custom designs with elaborate sewing or beads; this process can include prototype uniforms to tweak the designs and custom fitting for each team member once finalized.[111]

There are several other categories of Cheer Apparel in addition to the uniforms. Varsity groups its products into the following five apparel categories: uniforms, shoes, accessories, warm-ups,

- Regarding school gyms, Varsity states: "collegiate, athletic, with a strong focus on the school's brand." Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9332.

[111] See, e.g.,

- "Q. Did the uniforms cost Stars & Stripes exactly $450 always? A. No. [Objection omitted] Q. Sometimes it cost more than 450? A. And sometimes -- well, it cost less too. Q. Regardless of what it cost Stars & Stripes, the charge to the cheerleading participants was $450, though, right? A. Yes, sir." Deposition of Rebecca Kathryn Foster, 21 December 2021, at 86:1-10.

- "A typical uniform can cost between $250 and $400." Rothschild and Jefferies, January 2011, Varsity Information Memorandum, VAR00424538 - VAR00424610, at 4561.

- "The average price of an All-Star uniform is between $200 and $300." Buchanan, Leigh, 22 February 2016, The Battle for the Cheerleading-Uniform Industry Is Surprisingly Cutthroat and Appropriately Glittery, SLATE, https://slate.com/business/2016/02/rebel-wants-to-disrupt-the-surprisingly-entrenched-cheerleader-uniform-industry.html, accessed 18 April 2022 (Hereinafter "The Battle for the Cheerleading-Uniform Industry Is Surprisingly Cutthroat and Appropriately Glittery"), at 5.

- "'If you have $340 or more to spend, you are going to get your freakin' dream uniform,' says Noseff Aldridge. Couture customers–who make up 40 percent of Rebel's business–speak in person or via Skype with a designer. They exchange images and ideas until the customer is satisfied. At that point Rebel creates a prototype for customer approval, makes adjustments, and sends out a rep or a fit kit to collect measurements for every team member. 'We bring that concept to life one time for your team, and then it is buried and never done again,' says Noseff Aldridge. Rebel employs 13 creative designers and is hiring more. All are fashion school graduates who experiment lavishly with crystal mold shapes and dyeing processes. The company has created a number of proprietary fabrics, as well as innovations like the 'bodyskort,' a one-piece, fitted uniform with a skirt in front and shorts in back; and the 'locked skirt,' with panels that prevent the garment from flipping upside down when its wearer does." The Battle for the Cheerleading-Uniform Industry Is Surprisingly Cutthroat and Appropriately Glittery, at 6.

- Varsity has a "20+ member design and development team" that provides "customized, one-of-a-kind products [that] meet distinct needs of cheerleaders or squads." Varsity owns one of its own facilities and works with six other independent apparel manufacturers. Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9305.

- Varsity describes its apparel as being "unique, highly-customizable products that meet distinct needs of cheerleaders and dancers." Varsity Brands, March 2018, Confidential Information Presentation [DRAFT 03/05/2018], JEFF00141901 - JEFF00142004, at 1945.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 34 of 149
PageID 10556
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**                    29 of 115

and camp wear.[112] Approximately one-third of Varsity's customers buy products from all of these categories.[113]

There are specific USASF rules regarding what apparel can be worn by athletes. For example, there are guidelines for the length of skirts and shorts, only athletes in the Senior category can expose their midriffs, bows must be a certain size, makeup must be "uniform and appropriate,"

---

[112] A Varsity document defines the following types of Cheer Apparel as follows:

- Uniforms: Shell tops, skirts, pants and bodyliners available in multiple innovative, proprietary fabrics that can be completely customized and personalized.

- Accessories: Wide range of outerwear, poms, bows, socks, undergear, bags and game day apparel.

- Camp wear: T-shirts, tanks, polos, athletic shorts, skirts, skorts and practice wear.

- Warm-ups: Jackets, pants and other apparel that keeps teams warm and looking sharp no matter the weather.

- Shoes: Exclusive Varsity branded cheer and dance shoes including custom offerings.

Varsity Brands, March 2018, Confidential Information Presentation [DRAFT 03/05/2018], JEFF00141901 - JEFF00142004, at 1952.

[113] This document also includes the lettering category, which is not one of the product categories at-issue in this matter. Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9312.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 35 of 149
PageID 10557
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          30 of 115

and jewelry is not allowed at all.[114] The NFHS apparel rules for School Cheer are minimal – no jewelry or exposed midriffs, no glitter, and athletic shoes are required.[115]

Cheer Apparel is typically made to order on an annual production cycle beginning with product design.[116] The start date of the production cycle is driven by the timing of competition season, which differs for All Star and School teams.[117] For School teams, the annual Varsity production cycle begins in the fall with uniform pattern design. In January, catalogs are distributed to customers. Between January and March, Varsity Spirit representatives consult with schools on camp and apparel selection. Apparel fittings take place later in Spring with Varsity

---

[114] See, e.g.,

- USASF guidelines on uniform skirts/shorts: "When a skirt is worn as part of the uniform, briefs under the skirt are required. The skirt must fully cover the hips. The skirt must completely cover the briefs and must fall at least 1 inch below briefs (regular and boy cut briefs). When shorts are worn as part of the uniform, there must be a minimum of a 2" inseam." USASF, Undated, USASF Image Policy, https://usasf.net.ismmedia.com/ISM3/std-content/repos/Top/2013%20Website/Rules/image/USASF_ImageAppearance-9-21-12_mod-15-05-26.pdf, accessed 04 April 2022 (Hereinafter "USASF Image Policy"), at 2.

- USASF guidelines on uniform tops: "Uniform tops may not include an exposed midriff (crop top) except when worn by athletes competing in Senior divisions. Uniform tops must be secured by straps or material over at least one shoulder or around the neck (tube tops are not allowed)." USASF Image Policy, accessed 04 April 2022, at 2.

- USASF guidelines on bows: "Bows should not be excessive in size (acceptable bows are generally no more than 3" in width) and shouldn't be a distraction to the performance. Bows should be worn in a manner to minimize risk for the participants, should be adequately secured and should not fall over the forehead into the participants' eyes or block the view of the participant while performing." USASF Image Policy, at 1.

- USASF guidelines on makeup: "Makeup should be uniform and appropriate for both the performance and the age of the athletes. Face/Eyelid Rhinestones are not allowed. False eyelashes are allowed but may not be decorated in rhinestones or additional jewelry." USASF Image Policy, accessed 04 April 2022, at 1.

- Additional documents produced through discovery present similar rules throughout the class period. See, e.g.,

    o  28 August 2019, 2019-2020 USASF Cheer Rules, VAR00247460 - VAR00247503.

    o  U.S. All Star Federation, 31 August 2016, 2016-2017 USASF Cheer Safety Rules, VAR00001346 - VAR00001402.

    o  Undated, Acquisition Dates, VAR00129039 - VAR00129042.

[115] National Federation of State High School Associations, 28 June 2021, 2021-22 NFHS Spirit Rules Book.

[116] See, e.g.,

- "Varsity Spirit also sells uniforms and accessories that combine athletic performance with industry-leading fashion. Every uniform is made-to-order for the team and each member in order to ensure proper fit, style, and color." Goldman Sachs, Barclays, and Jefferies, 20 November 2014, First Lien Credit Facilities USD $755 million, 7-year Senior Secured First Lien Term Loan, JEFF00050123 - JEFF00050191, at 0152.

- "The uniform production process traditionally begins with the Company designing patterns for its uniforms in the fall." Rothschild and Jefferies, January 2011, Varsity Information Memorandum, VAR00424538 - VAR00424610, at 4578, 4579.

[117] The All Star season runs approximately from May/June to April/May of the following year. The School season runs approximately from January/March to February of the following year. See Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9324, 9333.

representatives. Uniforms are produced during the spring and summer so they can be shipped before school starts in the fall. Custom orders are typically delivered within 4-5 weeks. At the start of the school year, Varsity representatives consult with teams again regarding any back-to-school apparel.[118] The steps in the cycle are similar for All Star gyms, but the start period is shifted to account for the different competition season.

Varsity began making Cheer Apparel in 1980.[119] Currently, Varsity is the dominant supplier of Cheer Apparel.[120] According to Varsity, "participants typically enter the Varsity Spirit ecosystem through apparel," meaning their first purchases of Varsity products tends to be apparel.[121]

A 2014 Varsity document lists the following competing apparel providers: GTM, GK Elite, Team Cheer, Omni, Soffe, Motionwear, TeamLeader, Nfinity, and Mee Sports. The same document lists Varsity's share of the apparel market as approximately 60% of uniforms and 20% of the remaining apparel products.[122]

Varsity documents from 2017 and 2018 list GK Elite, Nfinity, and Rebel as the primary competing firms providing apparel to All Star gyms.[123] The 2017 document states that trends in

---

[118] Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9307 and 9333.

[119] See, e.g.,

- Varsity, Undated, Why Choose Varsity Spirit Fashion, https://www.varsity.com/school/spirit-fashion/why-choose-varsity/, accessed 15 June 2022, at 3.
- Varsity Brands, September 2014, Management Presentation, FEAS-Ares00000062 - FEAS-Ares00000164, at 0068.

[120] "Each year, Varsity Spirit sells over 500,000 uniforms and hosts over 5,300 camps with 320,000 participants." Goldman Sachs, Barclays, and Jefferies, 20 November 2014, First Lien Credit Facilities USD $755 million, 7-year Senior Secured First Lien Term Loan, JEFF00050123 - JEFF00050191, at 0158.

[121] Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9337.

[122] Varsity Spirit, 02 October 2014, Varsity Spirit Meeting Agenda, VAR00341580 - VAR00341583, at 1581-1582.

[123] See, e.g.,

- The 2017 document discusses each of the primary competitors: Rebel, Nfinity, and GK.
  - Rebel: "Manufacturing in China in a family-owned plant has made them a very real competitor. Their sales team is growing, as is their position within the All Star space. Most recently they have made a move toward the school market. Their current position in All Star has been very cutthroat, cutting margins to a zero profit in order to gain market share. Long haul sales goals, loss leaders, and free product has [sic] made them quickly emerge as a real threat to VASF [Varsity All Star Fashion]. Sales teams are disparaging Varsity as a 'luxury' brand, and making the customer associate us with expensive goods that have little to no markup for coaches."
  - Nfinity: "Nfinity is the leader in the shoe space. Their positioning is to use the Family Plan merchandise rebate to make Varsity look like a bully, and to assert that we 'force' kids to wear our product. Their social media strategy has resonated with kids. Their 'Teen girl voice' and snarky positioning has made them appear as a rebellious force that challenges the machine that is Varsity."
  - GK: "Rosewood Capital has positioned GK to quickly dominate the gymnastics space. It is very apparent that the five year plan was to capture gymnastics first, and now they have turned marketing toward cheer. As of late, all ad collateral has been of premium grade, price point has

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 37 of 149
PageID 10559
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**                    32 of 115

All Star apparel "define the fashions and trends in the school market. As goes All Stars, so will the school markets. It is imperative that we maintain a tight control of the All Star fashion market. Over the last year companies like GK, Nfinity, and Rebel have positioned themselves as the underdog. They try to make us look like we control our customers and force them to buy our goods through the Varsity Family Plan."[124]

### 3. Cheer Camps

In addition to attending competitions, Competitive Cheer teams at all levels also attend overnight camps where they receive Cheer-specific instruction and can develop and refine their routines. Cheer Camps are typically held during the summer months, and nearly all camp athletes come from school teams that would otherwise have a break in their season. Schools are the primary attendees of Cheer Camps[125] and they generated nearly $80 million in revenues for Varsity in 2019; see Exhibit 4. Varsity promotes its Cheer Camps. According to Varsity, Cheer Camps provide the "best instructional talent," are "led by top instructors with formal, industry leading training,"[126] are the gateway to Cheer Competition and provide an opportunity for Varsity to cross-sell its other products,[127] and are used to "build brand loyalty."[128]

---

        remained very competitive, and the sales team is all organically connected to the market. Very few sales people were not cheerleaders themselves. They are quieter than the others in their approach, but have managed to reach a larger market over the last two years. With Rosewood Capital behind them now, they pose a larger threat than at first glance."

    Parrish, Jamie, 21 August 2017, Email: 2020 Slides, VAR00255570 - VAR00255616, at 5594-5596.

- All of the apparel providers listed in the 2014 document (cited in footnote 122) but not in the later documents (cited in this footnote) (GTM, Omni, Soffe, TeamLeader, Mee Sports, and Motionwear) except for one (Team Cheer) appear to still be operating, but Varsity no longer lists them as primary competitors.

- The 2018 document also lists Omni, GTM, Team Leader, Motionwear, Cheerleading Company, and Adidas as firms that also provide apparel, but primarily for school teams. Elza, Brian, 22 October 2018, Email: Draft Agenda for Bain, VAR00309426 - VAR00309502, at 9433.

[124] Parrish, Jamie, 21 August 2017, Email: 2020 Slides, VAR00255570 - VAR00255616, at 5594-5596.

[125] A May 2018 Varsity presentation indicates that 8,048 high schools attended Varsity Cheer Camps spending an average of $7,100 per school. Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9337.

[126] Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9334.

[127] See, e.g.,

- "Participants typically enter the Varsity ecosystem through apparel; camps are the gateway to events." Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9337.

- "Instructors serve as valuable advocates who cross-sell Varsity Spirit products and services, including new apparel designs and branded shoes." Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9334.

[128] Rothschild and Jefferies, January 2011, Varsity Information Memorandum, VAR00424538 - VAR00424610, at 4570.

Currently, Varsity is the dominant supplier of Cheer Camps, with greater than 80% market share according to Varsity documents.[129] Cheer Camps are often held at gyms and schools, and Varsity is the largest supplier of Cheer Camps in the U.S., as described in Section IV.C.2. In 2017, Varsity hosted over 5,600 camps attended by 20,000 teams and over 320,000 athletes in locations throughout the U.S.[130]

Varsity offers camps under several different Varsity brand names, including: UCA, NCA, USA,[131] Cheerleading Techniques Camps, American Cheerleaders Association, Spirit Xpress Cheerleading, American Cheer Power, V!ROC, and Spirit Cheer.

A 2018 Varsity documents lists two local All Star gyms, Twisted Choreography, and Action Spirit as competing firms providing Cheer Camps to All Star gyms; the same document lists local All Star gyms, local schools, The Spirit Consultants, B2 Cheer & Dance, ACE gym, Cheer Ohio, Super CDA, and Pro Action Dance as firms that also provide Cheer Camps to school teams.[132]

### D. Athletes join teams sponsored by gyms and schools

Class members are Competitive Cheer athletes who have indirectly paid Varsity for Cheer Competitions, Cheer Apparel, or Cheer Camps, as discussed below. The direct purchasers of these products are All Star gym owners and school administrators, which Varsity recognizes as the decision makers in deciding which competitions and camps to attend and which apparel to purchase.[133]

---

[129] See, e.g.,

- "Varsity Spirit is the largest camp operator in the world, and our camps are run by the leaders and experts in the industry. Varsity was founded on the commitment to provide the highest quality training camps and this remains our promise to you today." Varsity Spirit, Undated, Our Camp Brands, https://www.varsity.com/school/camps/brands/#::text=Universal%20Cheerleaders%20Association,-Founded%20in%201974&text=Today%20it%20is%20the%20largest,locations%20of%20any%20camp%20company, accessed 09 May 2022, at 1.

- Varsity claims to have the "Largest Footprint of Dance and Cheer Camps in [the] U.S." Elza, Brian, 22 October 2018, Email: Draft Agenda for Bain, VAR00309426 - VAR00309502, at 9470.

[130] Varsity Brands, May 2018, Management Presentation, VAR00008463 - VAR00008587, at 8545.

[131] "The USA is the largest summer camp and special event organization of its kind in the western United States, conducting camps primarily in Arizona, California, Colorado, Idaho, Nevada, Oregon, Utah and Washington. Through its "Home" camps and Special Events/Competitions, the USA reaches students and performers nationwide." Varsity Spirit and United Spirit Association, Undated, About USA, https://www.varsity.com/usa/about/, accessed 09 May 2022, at 1.

[132] Elza, Brian, 22 October 2018, Email: Draft Agenda for Bain, VAR00309426 - VAR00309502, at 9433.

[133] See, e.g.,

- A Varsity All Star presentation states that All Star gym owners are the main "decision makers" and "usually the decision makers on events and uniforms." LeTard, Tres, 20 February 2015, Email: more presentations, VAR00100694 - VAR00100716, at 0697 - 0702.

- A Varsity document depicts schools and All Star gyms as its "customer segments" when presenting "significant cross-selling opportunity" across product markets. Elza, Brian, 22 October 2018, Email: Draft Agenda for Bain, VAR00309426 - VAR00309502.

All Star gyms typically charge athletes a fee for the entire season, which includes all practices at the gym, team uniforms and apparel, and a predetermined number of competitions. External camps or additional gym clinics are typically not included in the annual fee.[134] All Star gyms usually break this annual fee into monthly payments for athletes and their families.[135] The cost of travel, lodging, and other peripheral expenses such as spectator fees are often not included in the annual fees charged by All Star gyms; however, for some events, particularly the larger end-of-season events such as The Summit, packages are offered to athletes that include hotel accommodations and other amenities.[136] Because teams must qualify for end-of-season events, the cost to attend the end-of-season events is usually additional to the annual cost All Star gyms

---

- A Bain presentation slide on Varsity's growth states: "There are three archetypes for purchaser decision-making in high school team sports." The "[k]ey decision-maker" is either the athletic director, the coach, or a hybrid of "sometimes coach, sometimes AD." Bain & Company, February 2018, Varsity Brands growth assessment, CB00485513 - CB00485640, at 5606.

- "Cheer coaches are the key decision maker for most categories of cheerleading spend." Bain & Company, February 2018, Varsity Brands growth assessment, CB00485513 - CB00485640, at 5622.

- Varsity holds education and training conferences for gym owners and coaches. Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9324.

- A document discussing aspects of the Varsity Brands platform states that Varsity has "[i]nsulation from price pressure and competition as purchase decision makers (coaches, etc.) remain distinct from purchasers (athletes, etc.)" Varsity Brands, 2018, Confidential Information Presentation, FEAS-Ares00075739 - FEAS-Ares00075850, at 5757.

[134] See e.g.,

- Fusion Elite All Star offers an "All Inclusive Monthly Pricing" that doesn't include any Cheer Camps. Fusion Elite All Stars, Undated, 2019-2020 All Star Cheer Team Information, FUSIONELI000000236 - FUSIONELI000000247, at 0239.

- A table listing all fees for the Titan Elite All Star gym does not include Cheer Camp fees. Titan Elite LLC, 2020, PACKET 2020-2021 PREP, LAURHAYES000000046 - LAURHAYES000000052, at 0048.

- Monthly tuition and fees at Fuel Athletics (All Star gym) does not include Cheer Camps: "Monthly tuition includes: Team Practices, Competition Registration Fees, Team Tumbling Classes, Showcase Fee, Choreography & Team Music." Fuel Athletics, 01 June 2018, Fuel 2018-2019 Registration Packet, SPIRITFAC000001329 - SPIRITFAC000001338, at 1331.

[135] See, e.g.,

- The Fusion Elite All Star Team Information packet for 2019-2020 indicates they offer "All Inclusive Monthly Pricing" that covers registration fees, USASF membership fees, monthly tuition, competition fees, choreography, team music, uniforms, shoes, bows and other accessories. Inclusive in those fees are a predetermined number of regional and national events. These fees do not cover additional year end events including specifically The Summit." Fusion Elite All Stars, Undated, 2019-2020 All Star Cheer Team Information, FUSIONELI000000236 - FUSIONELI000000247, at 0239-0241.

- Rebecca Foster, owner of Stars & Stripes Gymnastics Academy (aka Stars & Stripes Kids Activity Center) in Michigan stated they set prices for athletes of their Liberty Cheer team at the beginning of the season and charged a monthly fee. If teams qualified for additional end-of-season events the parents were charged for those incremental costs. Deposition of Rebecca Kathryn Foster, 21 December 2021, at 77:12-92:14.

[136] A Varsity document providing and overview of The Summit states: "In admission [sic] to entrance to the main event, Summit packages include hotel accommodation at a Disney report, Disney World admissions passes, and pre-arranged transportation. Teams typically choose between 2-4 night packages with prices ranging from $500-$1,300 per person." Varsity Spirit, Undated, All Star Overview, VAR00310631 - VAR00310666, at 0631.

Case 2:20-cv-02892-SHL-tmp   Document 389-2   Filed 02/10/23   Page 40 of 149
PageID 10562
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          35 of 115

charge. For all of these costs, though, the athletes pay the All Star gym which, in turn, pays the event producer or apparel provider.[137]

The arrangements are similar for athletes on School Cheer teams: the school is the direct purchaser that pays event producers and apparel providers; athletes pay the schools for these products.[138] Similar to All Star gym owners, there are points of contact at the schools that Varsity and other event and apparel providers work with, typically the athletic director, team coach, or principal.

Over the last ten years, there has been considerable consolidation in all three relevant markets and Varsity has become the dominant supplier in each market. See Section V.D for a more detailed discussion of Varsity's acquisitions.

### E.  History of Varsity Brands

Varsity Spirit began in 1974 when Jeff Webb left the NCA to establish the UCA with the intention of creating a related, but distinct, sport from the traditional sideline cheer promoted by the NCA. In 1983, the UCA was renamed to Varsity Spirit with Mr. Webb acting as President and CEO. In 1997, Varsity Spirit was acquired by Riddell for $91 million and Mr. Webb became Vice Chair of the Board of Directors until he stepped down in 2016. Varsity Spirit was a publicly traded company between 2001-2003, at which time the company was taken private again and renamed Varsity Brands, Inc.[139] In 2011, Herff Jones merged with Varsity Spirit and in 2013 the company acquired BSN Sports; in 2014, the company rebranded itself under the Varsity Brands name, with Herff Jones, BSN Sports, and Varsity Spirit becoming subsidiaries.[140] Varsity was acquired by Charlesbank in 2014 and by Bain in 2018. Charlesbank replaced Mr. Webb as CEO of Varsity Brands in 2016, replacing him with Matthew Rubel.[141] On April 10, 2017 Adam Blumenfeld was appointed the CEO of Varsity Brands and he holds that position presently.[142]

---

[137] In fact, Varsity's Network Agreements with the larger All Star gyms specifically state that the gyms are acting as distributors of Varsity's products. The Network agreement with American Cheer Extreme reads: "WHEREAS, Buyer sells Uniforms through its athletic training facility; members of teams from Buyer's athletic training facility ('Team Members') attend Events..." Varsity Brands, Inc. and American Cheer Xtreme, 01 October 2008, Rebate Agreement between Varsity Brands, Inc. and American Cheer Xtreme [Signed], VAR00017932 - VAR00017942, at 7932.

[138] Varsity Brands, 2018, Confidential Information Presentation, FEAS-Ares00075739 - FEAS-Ares00075850, at 5759-5760.

[139] A Varsity document notes that "Leonard Green & Partners [bought] Varsity from Riddell Sports, Inc. [on] 4/21/2003," leading to "Varsity going private [on] 9/23/03." Undated, Acquisition Dates, VAR00129039 - VAR00129042, at 9039.

[140] Sheffield, Michael, 03 June 2014, Rebranding spreads Varsity name around, Memphis Business Journal, https://www.bizjournals.com/memphis/news/2014/06/03/rebranding-spreads-varsity-name-around.html, accessed 10 May 2022.

[141] Varsity Spirit, 19 October 2016, Varsity All Star Special Ops Meeting, VAR00367634 - VAR00367662, at 7635 and 7638.

[142] Varsity Brands, 10 April 2017, Varsity Brands Announce Appointment Of Adam Blumenfeld As CEO, https://www.varsitybrands.com/varsity-brands/varsity-brands-announces-appointment-adam-blumenfeld-ceo, accessed 15 June 2022.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 41 of 149
PageID 10563
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**                    36 of 115

Currently, Mr. Webb is the President of the ICU; see Section III.B.3 for a discussion of the
ICU.[143]

In 2018, Varsity collaborated with ESPN Wide World of Sports and Walt Disney World Resort
to complete an 8,000-seat venue designed at Disney World specifically to host cheer and dance
events.[144] During approximately the last decade, Varsity has engaged in an aggressive growth
strategy and by at least 2018 considered itself to have the "number 1" market position in apparel,
events, and camps.[145] Since 2015, Varsity has been the sole event producer on the USASF Board
of Directors, and Varsity employees currently have 6 of 13 votes. Varsity employees also
currently have a majority of the USASF Sanctioning Committee seats. See Section V.D.7.b) for
details on Varsity's acquisition of the Board of Directors seats and its control of the Sanctioning
Committee. Varsity revenues for All Star events alone increased from approximately $54 million
in 2014 to over $133 million in 2019.[146]

By 2018, Varsity described itself as the "leading provider of cheerleading uniforms and apparel,
events, competitions and educational training camps for school and all star (club) teams" and

---

[143] The ICU domain name and trademark are owned by Varsity Brands. "International Cheer Union (ICU), an
organization registered, domain name and trademark owned by Varsity Brands has Texas state filed bylaws stating
501(c)3 tax exemption. However, the IRS shows ICU is a registered mutual trade 501(c)6 organization. This is
important as ICU has submitted a proposal to SportAccord, sister organization to the International Olympic
Committee (IOC) to become the international governing body over all things cheer. There is no other sport in the
Olympics, the NCAA or any other amateur sports body that has a tax structure of anything other than 501(c)3 or its
international equivalent. Varsity and ICU is misleading one of the highest ranked sports organizations, SportAccord,
with a conflicting tax structure." Undated, Cheerleading: What the future Holds for 3.9 million U.S. Children How
Public Exposure Reporting Can Help, Webb_AS_00000443 - Webb_AS_00000482, at 0454.

[144] See, e.g.,

- Varsity's website states: "A new state-of-the-art facility at the Walt Disney World® Resort was designed
  specifically for cheerleading and dance with Varsity Spirit's expertise and guidance." Varsity Spirit,
  Undated, Why Varsity Spirit Competitions, https://www.varsity.com/school/competitions/why-varsity-
  competitions/, accessed 27 April 2022, at 3.

- The venue is 286,000 square feet and seats 8,000. Roen, Terry, 01 February 2017, New Cheer and dance
  venue to open at ESPN Wide World of Sports, Theme Park Tribune,
  https://www.themeparktribune.com/new-cheer-and-dance-venue-to-open-at-espn-wide-world-of-sports/,
  accessed 10 May 2022, at 1.

- A January 12, 2018 Varsity press release reads: "Varsity Spirit Kicks Off Championship With Opening Of
  The New Venue! Finally, the moment the cheer and dance community has been waiting for: the new venue
  custom-built for Varsity Spirit competitions is finally open!" Varsity Spirit, 12 January 2018, Varsity Spirit
  Kicks Off Championship With Opening Of The New Venue!, https://www.varsity.com/news/varsity-spirit-
  kicks-off-championship-with-opening-of-the-new-venue/, accessed 10 May 2022, at 1.

[145] See, e.g.,

- A Varsity document describing the "History of All Star" by year states: "Y2017 and 18 - Varsity complete
  [sic] multiple acquisitions including EPIC Brands." Elza, Brian, 17 February 2020, Email: Updated -
  Attachments: What is Varsity All Star_Feb 20.pptx, VAR00078751 - VAR00078770, at 8754.

- Seely, Bill, 19 October 2018, Email: Draft Agenda For Bain, VAR00371189 - VAR00371320, at 1196.

[146] Elza, Brian, 17 February 2020, Email: Updated - Attachments: What is Varsity All Star_Feb 20.pptx,
VAR00078751 - VAR00078770, at 8762.

stated it had created a "Fully-integrated ecosystem with apparel, camps and competitions."[147] Varsity also stated that it "drive[s] the viability and development of cheerleading through an approach that is unique in all of sports (no other company has been able to replicate in the US)."[148] In 2018, Varsity was sold to Bain for $2.5 billion.

## IV.    Varsity has the market power necessary to raise price

Plaintiffs allege that Varsity possesses market power in the markets for Cheer Competitions, Cheer Apparel, and Cheer Camps. A firm with market power is one that can profitably increase its price above (or, equivalently, reduce quantity below) the competitive level for a sustained period of time.[149,150] Market power can derive from either (1) "willful acquisition or

---

[147] Elza, Brian, 22 October 2018, Email: Draft Agenda for Bain, VAR00309426 - VAR00309502, at 9431.

[148] Varsity Brands, 24 October 2017, Q4 Board of Directors Meeting, CB00025330 - CB00025449, at 5394.

[149] See, e.g.,

- "Economists often define market power as the ability of a firm or group of firms within a market to profitably charge prices above the competitive level for a sustained period of time." American Bar Association, 2005, Market Power Handbook: Competition Law and Economic Foundations, Second Edition, ABA Book Publishing, Chicago, IL, at 1.

- "A simple economic meaning of the term 'market power' is the ability to set price above marginal cost." Landes, Williams M. and Posner, Richard A., March 1981, Market Power in Antitrust Cases, Harvard Law Review, Vol. 94, No. 5, 937-996, at 937.

- "The term 'market power' refers to the ability of a firm (or a group of firms, acting jointly) to raise price above the competitive level without losing so many sales so rapidly that the price increase is unprofitable and must be rescinded." Landes, Williams M. and Posner, Richard A., March 1981, Market Power in Antitrust Cases, Harvard Law Review, Vol. 94, No. 5, 937-996, at 937.

- Areeda, Phillip E., Hovenkamp, Herbert, and John L. Solow, 1995, Antitrust Law: An Analysis of Antitrust Principles and Their Application, Volume IIA, Little, Brown & Company: Boston, at 85, ¶501.

[150] Note that Plaintiffs allege monopoly power, but I use the term market power. Although these terms have slightly different meanings depending on the context (i.e., legal versus economic), monopoly power generally refers to a high degree of market power.

- "While the Supreme Court has discussed the requirement in Section 2 cases as 'monopoly power,' both courts and commentators have used the term 'market power' interchangeably at times…Consistent with the economic principles discussed in Chapter II, courts have generally defined market power as 'the ability to raise prices above those that would be charged in a competitive market' for some period of time. Monopoly power, however, has been defined as 'the power to control prices or exclude competition,' a concept now generally understood to mean a high degree of durable market power." U.S. Department of Justice, 18 March 2022, Competition and Monopoly: Single-Firm Conduct Under Section 2 of The Sherman Act: Chapter 2, https://www.justice.gov/archives/atr/competition-and-monopoly-single-firm-conduct-under-section-2-sherman-act-chapter-2, accessed 14 June 2022, at 1.

- "Monopoly power is defined as 'power to control price or the power to exclude competition.' As the D.C. Circuit in U.S. v. Microsoft points out, this can be shown directly by demonstrating that, in fact, a firm has raised price substantially above competitive levels, or indirectly by structural analysis that includes showing a sufficiently high and stable market share in a well-defined market." Edlin, Aaron S., and Rubinfeld, Daniel L., 2004, Exclusion or Efficient Pricing: The "Big Deal" Bundling of Academic Journals, Antitrust Law Journal, 72(1), 128-159, at 145.

maintenance" or from (2) "a superior product, business acumen, or historic accident."[151] The former is anticompetitive, the latter is not.[152] To evaluate plaintiffs' claims, I first determine whether Varsity has market power in any of the alleged markets. If so, I then assess whether Varsity acquired and/or maintained its market power through anticompetitive conduct.

In order to conduct an analysis of market power and possible anticompetitive conduct, economists can examine both direct and indirect evidence. Direct evidence directly demonstrates a firm's ability to exclude competitors, raise prices above the competitive level, restrict output, diminish quality, or reduce innovation.[153] Among other things, Plaintiffs allege that Varsity increased the prices of athlete entry fees for Cheer Competitions above the competitive level. If true, that would be direct evidence that Varsity possessed and exercised market power in the Competitive Cheer market.

Economists also examine indirect evidence to determine whether a defendant can raise prices or exclude competition. The most common form of indirect evidence of market power is a large market share that is protected by barriers to entry.[154] When a single firm has a large market share, its customers are likely to have few options in the short run if it increases prices above the competitive level. If it is relatively easy for new competitors to enter the market, the firm will not be able maintain these higher prices for very long. For this reason, high market shares coupled with significant entry barriers are considered indirect evidence of market power.

---

- Economists often use the terms "market power" and "monopoly power" interchangeably. For example, "The terms monopoly power and market power typically are used interchangeably to mean the ability to profitably set price above competitive levels (marginal cost) ..." Carlton, Dennis W., and Jeffrey M. Perloff, 2005, Modern Industrial Organization, Fourth Edition, Addison Wesley, at 93.

[151] *United States v. Grinnell Corp., 384 U.S. 563* (1966).

[152] See, e.g.,

- "At its core, section 2 makes it illegal to acquire or maintain monopoly power through improper means. The long-standing requirement for monopolization is both '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" U.S. Department of Justice Archives, 11 May 2009, Competition and Monopoly: Single -firm Conduct Under Section 2 of the Sherman Act: Chapter 1, https://www.justice.gov/archives/atr/competition-and-monopoly-single-firm-conduct-under-section-2-sherman-act-chapter-1, accessed 18 May 2022, at 1.
- *United States v. Grinnell Corp., 384 U.S. 563* (1966).

[153] See, e.g., American Bar Association, 2021, Monopolization and Dominance Handbook, Second Edition, ABA Book Publishing: Chicago, IL, at 64 of PDF.

[154] See, e.g.,

- American Bar Association, 2021, Monopolization and Dominance Handbook, Second Edition, ABA Book Publishing: Chicago, IL, at 64 of PDF.
- To demonstrate market power circumstantially, a plaintiff must: "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Rebel Oil Co., Inc. v. Atlantic Richfield Co., 51 F.3d 1421, 1434* (9th Cir. 1995), at 7.
- "In many cases . . . courts have eschewed examination of the ostensible monopolist's actual degree of control over prices or competition, and have relied solely on statistical data concerning the accused firm's share of the market." *MCI Communications Corp. v. AT&T Co., 708 F.2d 1801* (7th Cir. 1983), at 19.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 44 of 149
PageID 10566
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**                    39 of 115

To analyze the indirect evidence, economists first identify a relevant product and geographic market. The purpose of defining relevant markets is instrumental: the ultimate goal is to ascertain whether Varsity has sufficient market power to set supracompetitive prices for the at-issue products, reduce output, reduce innovation, or otherwise harm consumers.

Antitrust markets are used to specify the line of commerce and geography in which the competitive concern occurs and to identify market participants, market shares, and market concentration.[155] Antitrust markets are defined in terms of reasonably substitutable or interchangeable products.[156] Although multiple reasonable antitrust markets may exist and there are typically not "precise metes and bounds" when defining antitrust markets, the focus is primarily on demand substitution and the goal is to is to identify the products and locations between which buyers can reasonably substitute.[157]

One common and widely-accepted framework for market definition analysis is the hypothetical monopolist test, which examines whether a proposed set of products (and geographies) is such that, if a hypothetical monopolist over those products increased price by a small but significant, non-transitory amount (SSNIP), would demand respond sufficiently to make that change unprofitable?[158] In this test, the relevant market is defined as the smallest set of products a

---

[155] U.S. Department of Justice and the Federal Trade Commission, 19 August 2010, Horizontal Merger Guidelines (Hereinafter "2010 Horizontal Merger Guidelines"), at 7.

[156] See, e.g.,

- Defining the relevant product market requires an examination of the reasonable interchangeability of products: "[the] market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." American Bar Association, 2021, Monopolization and Dominance Handbook, Second Edition, ABA Book Publishing: Chicago, IL, at 66 of PDF.

- This approach is consistent with the economic principles enumerated in the *du Pont* case. *United States v. E.I. Du Pont De Nemours & Co., 351 U.S. 377* (1956).

[157] See, e.g.,

- "Customers often confront a range of possible substitutes for the products of the merging firms. Some substitutes may be closer, and others more distant, either geographically or in terms of product attributes and perceptions. Additionally, customers may assess the proximity of different products differently. When products or suppliers in different geographic areas are substitutes for one another to varying degrees, defining a market to include some substitutes and exclude others is inevitably a simplification that cannot capture the full variation in the extent to which different products compete against each other. The principles of market definition outlined below seek to make this inevitable simplification as useful and informative as is practically possible. Relevant markets need not have precise metes and bounds." 2010 Horizontal Merger Guidelines, at 7.

- "Market definition focuses solely on demand substitution factors, i.e., on customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service. The responsive actions of suppliers are also important in competitive analysis. They are considered in these Guidelines in the sections addressing the identification of market participants, the measurement of market shares, the analysis of competitive effects, and entry." 2010 Horizontal Merger Guidelines, at 7.

[158] See, e.g.,

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 45 of 149
PageID 10567
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          40 of 115

hypothetical monopolist would need to sell to be able to profitably increase price above the competitive level by a small but significant and non-transitory amount, generally 5-10% for a year or longer.[159]

The analysis is iterative, beginning with a narrowly defined candidate market that includes only the product of interest. Then one determines whether a hypothetical firm that was the only supplier of products in that candidate market could profitably increase price by 5-10% above the competitive level. If the candidate market is defined so narrowly that it excludes products that a large number of buyers consider reasonable substitutes, then the hypothetical monopolist would not be able to raise prices. Instead of paying the higher prices for the products in the candidate market, buyers would purchase substitute products, thereby making the monopolist's price increase unprofitable. In that case, the set of products is too narrow to be a relevant antitrust market and potential substitute products should be added until the monopolist controls enough of the substitute products to profitably exercise market power.[160] In this manner, the candidate market definition is expanded to include the closest substitute product, and the analysis is repeated as necessary. Once the candidate market has been expanded to include all products to which consumers would reasonably substitute, the hypothetical monopolist would find the price increase profitable. This set of products is the relevant product market. Typically, to avoid underestimating competitive effects, the smallest market satisfying the horizontal monopolist test is used.[161]

Geographic markets are defined as the area where customers would likely turn to buy the goods or services in the product market.[162] Geographic markets generally can be defined either based on the location of suppliers or the location of customers; the latter is only applicable, though, if customers receive goods or services at the suppliers' locations.[163] Geographic market definition

---

- "The Department of Justice Merger Guidelines are a major step in the direction of sanity here... This approach is plainly the right one." Fisher, Franklin M., 1987, Horizontal Mergers: Triage and Treatment, The Journal of Economic Perspectives, Vol. 1, No. 2, 23-40, at 28.

- "There also seems to be widespread agreement [among knowledgeable economists] that the...Merger Guidelines provide a useful framework" for defining markets. Schmalensee, Richard, 1987, Horizontal Merger Policy: Problems and Changes, Economic Perspectives, Vol. 1, No. 2, 41-54, at 41.

[159] See, e.g.,

- The small but significant, non-transitory increase in price gives the hypothetical monopolist test its alternative name, the SSNIP test. 2010 Horizontal Merger Guidelines, at 10-11.

- The "hypothetical monopolist test" is the main conceptual tool used by the DOJ and FTC when defining markets. The hypothetical monopolist test does not lead to a single market definition, and it can implemented qualitatively or quantitatively. 2010 Horizontal Merger Guidelines, at 8-12.

[160] 2010 Horizontal Merger Guidelines, at 8-9.

[161] 2010 Horizontal Merger Guidelines, at 10.

[162] "Competition may be limited to a small area because of the time or expense involved in buying a lower-cost product elsewhere." Federal Trade Commission, Undated, Markets, https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/mergers/markets, accessed 31 May 2022, at 1.

[163] "Competitors in the market are firms with relevant production, sales, or service facilities in that region. Some customers who buy from these firms may be located outside the boundaries of the geographic market…When the geographic market is defined based on supplier locations, sales made by suppliers located in the geographic market

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 46 of 149
PageID 10568
Highly Confidential        **Expert Report of Janet S. Netz, Ph.D.**        41 of 115

proceeds similarly, with the relevant geographic market defined as the geographic area in which a hypothetical monopolist could profitably raise price by 5-10% without customers buying from suppliers outside that area.[164]

It is often difficult to quantitatively implement the hypothetical monopolist test with mathematical precision, because doing so would require detailed data sufficient to estimate buyers' substitution patterns, and such data are often unavailable. However, even when it is not possible to implement the test quantitatively to mathematical certainty, it is a useful conceptual framework for antitrust market definition.[165] Additional types of evidence on market definition can be relevant and informative when assessing the reasonableness of substitutability when defining markets. Specifically, the following "practical indicia" are considered by economists: (1) industry or public recognition of separate markets; (2) the products' characteristics and uses; (3) unique production facilities; (4) distinct customers; (5) distinct prices; (6) sensitivity to price changes; and (7) specialized vendors.[166]

Below I analyze each of the alleged markets to determine whether it constitutes a relevant product market and, if so, whether Varsity has market power in each of them.

### A. Varsity possesses and exercises market power over Cheer Competitions

#### 1. Cheer Competitions is a relevant product market for antitrust purposes

In Sections III.A and III.C.1 above, I describe Competitive Cheer and the competitions in which athletes compete. Competitive Cheer is similar to other activities. Most notably, traditional sideline cheer, gymnastics, and competitive dance are all similar activities. However, none of those sports have events or competitions that are reasonable substitutes to constrain Varsity's pricing for Cheer Competitions.

The narrowest possible product market is for All Star competitions or for School competitions. All Star gyms and Schools determine which Cheer Competitions the team will attend. Because All Star teams cannot participate in School competitions, All Star teams will not attend School competitions if a putative monopolist that controlled all All Star competitions raised price by 5-10% for a year. Similarly, because School teams cannot participate in All Star competitions, School teams will not attend All Star competitions if a putative monopolist that controlled all School competitions raised price by 5-10% for a year. Thus, it is possible that there are two

---

are counted, regardless of the location of the customer making the purchase." 2010 Horizontal Merger Guidelines, at 14.

[164] Specifically, "a hypothetical profit-maximizing firm that was the only present or future producer of the relevant product(s) located in the region would impose at least a SSNIP [small but significant non-transitory increase in price] from at least one location [or on some customers], including at least one location of one of the merging firms." 2010 Horizontal Merger Guidelines, at 13.

[165] "Even when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to customer substitution and to market definition." 2010 Horizontal Merger Guidelines, at 12.

[166] These "practical indicia" are known as the "Brown Shoe" factors; specifically, markets may "be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." See *Brown Shoe Co. v. United States, 370 U.S. 294* (1962), at 4.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 47 of 149
PageID 10569
Highly Confidential        **Expert Report of Janet S. Netz, Ph.D.**        42 of 115

relevant antitrust markets, one for All Star Cheer Competitions and one for School Cheer Competitions.[167]

Varsity's documents and other evidence indicate that All Star Cheer Competitions and School Cheer Competitions are competitively distinct activities; teams do not participate in the same competitions or events.[168] In addition, Varsity views these two types of competitions as separate markets in terms of its strategies and pricing decisions. In addition, the cost to participate in these two activities is distinct. Annual costs for All Star Cheer are significantly more than the annual costs incurred in School Cheer.[169]

However, while All Star gym owners and School athletic directors decide which competitions a team will attend each year, ultimately their decisions reflect the decisions of the individual athletes. If a putative monopolist that controlled all All Star competitions raised price by 5-10% for a year, athletes may choose to leave an All Star team and join a School team. Similarly, if a putative monopolist that controlled all School competitions raised price by 5-10% for a year, athletes may choose to leave a School team and join an All Star team. If there is sufficient substitution from one type of team to the other to make a price increase for one type of competition unprofitable, the candidate relevant antitrust market would be for Cheer Competitions, including both All Star and School competitions.

Assuming athletes would switch from School cheer to All Star cheer or vice versa in response to a hypothetical monopolist raising prices by 5-10% for a year, the next step in the analysis then becomes: would a putative monopolist over all Cheer Competitions be able to profitably raise the price by 5-10% for a year? That question is answered by analyzing the closest Competitive Cheer substitutes, which are sideline cheer, gymnastics, and competitive dance.

However, Competitive Cheer athletes do not consider traditional sideline cheer to be a substitute for Competitive Cheer.[170] Varsity documents consider Competitive Cheer to be a unique and distinct activity from traditional sideline cheer.[171]

---

[167] Varsity documents indicate that All Star and School Cheer are distinct disciplines or segments of Competitive Cheer. See e.g.,

- "There are two main customer segments, in-school and All Star." Bain & Company, February 2018, Varsity Brands growth assessment, CB00485513 - CB00485640, at 5544.

- A Varsity document states that the "two main disciplines" are "School" and "All Star/Club." Varsity Brands, 2018, Confidential Information Presentation, FEAS-Ares00075739 - FEAS-Ares00075850, at 5800.

[168] Bain & Company, February 2018, Varsity Brands growth assessment, CB00485513 - CB00485640.

[169] See e.g.,

- Varsity Brands, May 2018, Management Presentation, VAR00008463 - VAR00008587, at 8544.

- Bain & Company, February 2018, Varsity Brands growth assessment, CB00485513 - CB00485640, at 5548.

[170] "Q. Would it be fair to say that an All Star athlete, in your understanding, would not view sideline cheer as the same activity as All Star cheer? A. That is correct." Deposition of Brian Todd Elza, 16 November 2021, at 61:7-10.

[171] Sworn testimony from Jeff Webb clearly delineates Competitive Cheer from sideline cheer. Attached to his written testimony are materials supporting his opinions, including public articles he has written and evidence that

Gymnastics, like traditional sideline cheer, shares some features with Competitive Cheer, but it is also a distinct sport and athletes do not consider them substitutes; Varsity considers Competitive Cheer to be a unique and distinct activity from gymnastics.[172] Furthermore, Varsity does not consider event producers of those other sports to be competitors.[173]

Similarly, while competitive dance shares various skills with Competitive Cheer, these again are distinct products. Although competitive dance involves choreographed routines, it does not involve any of the acrobatic maneuvers that are central to Competitive Cheer, and athletes do not consider competitive dance to be a substitute for Competitive Cheer.[174]

Although some athletes may choose to participate in sideline cheer, gymnastics, or competitive dance rather than, or in addition to, Competitive Cheer, that does not mean there is sufficient substitution for these activities to be considered in the same market such that they would discipline monopolistic prices in the manner explained above. The focus is on demand substitution and the goal is to identify the set of products and locations between which buyers can reasonably substitute. None of these other activities are reasonable substitutes for these purposes. The data necessary to implement the hypothetical monopolist test has not been made available through discovery. But applying the test qualitatively indicates that a hypothetical monopolist in the Cheer Competition market would be able to increase price (or reduced output, quality, or innovation) by a small but significant, non-transitory amount, without losing a sufficient number of athletes to make the price increase unprofitable.[175]

Based on the analysis above, I conclude that the relevant product market is no wider than Cheer Competitions. Much of Varsity's conduct is equally applicable to both All Star Cheer and School Cheer, and it has a similar dominant share of both disciplines.

The relevant geographic market for Cheer Competitions is no larger than the entire U.S. While it's possible that Varsity has somewhat different degrees of market power in different geographic areas, it has so thoroughly eliminated the competition nationally that there is no area in which it lacks market power. As explained above, antitrust markets are defined in terms of reasonably

---

insurance policies are different for Competitive Cheer than other sports (e.g., sideline cheer policies do not cover Competitive Cheer events). Webb, Jeff, 07 May 2010, Report of Jeff Webb, *Biediger et al. v. Quinnipiac University*, Case No. 3:09-CV-6211(SRU) (U.S. District Court, District of Connecticut), Webb Dep Exhibit 2.

[172] "Q. And an All Star athlete would not view gymnastics as the same sport as All Star cheer; is that right? A. That is correct." Deposition of Brian Todd Elza, 16 November 2021, at 61:16-19.

[173] For example, as of September 2016, Varsity considered the following event producers to be among its larger competitors: EPIC Brands, GSSA/Aloha, Spirit Celebration, Jam Spirit Group (DBA Team Champion), WSA, and JAMZ; however, none of those firms host any gymnastics competitions.

[174] Deposition of Brian Todd Elza, 16 November 2021, at 61:12-15.

[175] See, e.g.,

- In the hypothetical monopolist test, the relevant market is defined as the smallest set of products a hypothetical monopolist would need to sell to be able to profitably increase their price by a small but significant and non-transitory amount, generally 5-10% for a year or longer. The small but significant, non-transitory increase in price gives the hypothetical monopolist test its alternative name, the SSNIP test. 2010 Horizontal Merger Guidelines, at 10.

- The "hypothetical monopolist test" is the main conceptual tool used by the DOJ and FTC when defining markets. It does not lead to a single market definition and can underly qualitative or quantitative implementations. 2010 Horizontal Merger Guidelines, at 8.

substitutable or interchangeable products; the focus is primarily on demand substitution, and the goal is to is to identify the set of products and locations between which buyers can reasonably substitute. The relevant geographic market is defined as the geographic area in which a hypothetical monopolist could profitably raise price by 5-10% without customers buying from suppliers outside that area.

Varsity documents indicate that Varsity's sales organization is divided into eight geographic areas.[176] Most gyms compete throughout the year with the intention of attending a national, end-of-season event, but Varsity states that gyms typically compete in competitions that are closer to the gym to earn bids to those end-of-year events.[177] Although these documents establish regions for Varsity's business purposes or coaches' planning purposes, for geographic market definition purposes the focus is whether athletes can readily substitute competitions in one geographic area for competitions in another. Here, the evidence suggests that teams can, in fact, substitute between different geographies. For example, a team may be located equidistant between events in two different competitions and there is nothing precluding it from attending either or both of those competitions. If a hypothetical monopolist in one part of the country were to raise price by 5-10%, at least some customers would likely switch to attending competitions in adjacent geographic areas.

The evidence indicating that the relevant geographic markets is no larger than the U.S. includes the fact that most teams compete with the intention of attending a national, year-end event such as The Worlds or The Summit. To qualify for these year-end events, Cheer Competitions are administered on a national level, by the same governing bodies, using the same rules and bid allocation system. There is no distinction between competitions in different geographic regions. For example, All Star teams compete throughout the U.S. at USASF sanctioned events using a common set of rules with the intention of earning a bid to Worlds. Furthermore, unlike some sports, there is nothing restricting teams from competing outside any specific region. For example, sports leagues are commonly structured with divisions or regions in which teams compete. In those sports leagues, teams will compete primarily or exclusively within a specific division during the regular season and only compete against teams from other divisions during post-season tournaments. These types of geographic restrictions do not exist in Competitive Cheer Competitions.

---

[176] See, e.g.,

- Varsity Spirit, 2019, 2019 Region Wrap Up, VAR00006500 - VAR00006633, at 6502.

- 10 October 2018, Camp Daily Enrollment Report, VAR00009004 - VAR00009086, at 9008-9014.

- Other Varsity documents identify fewer regions. For example, five "Cheer Regions" are identified in a "Varsity Spirit Structure" document: West, Southwest, Central, Northeast, and Southeast. The same document lists six "All Star Regions": West, Southwest, Southeast, Mid-Atlantic, Northeast, and Midwest. The regions may vary for different purposes within Varsity or they may have changed over time; however, the number of regions does not alter any of my conclusions regarding the geographic market definition. Varsity Spirit, Undated, Varsity Spirit Structure, VAR00009486 - VAR00009500, at 9492, 9499.

[177] "Varsity All Star is ready to deliver your season, your way in 2021-2022! When we released our competition dates earlier this spring, we also introduced our new Event Types. Now, you can quickly see the benefits and options of each Event Type and build your regional schedule to match your teams' unique needs throughout the year." Varsity, Undated, Our Competition Brands, https://www.varsity.com/all-star/competitions/brands/#the-dance-summit, accessed 29 April 2022, at 2.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 50 of 149
PageID 10572
Highly Confidential        **Expert Report of Janet S. Netz, Ph.D.**        45 of 115

Furthermore, contemporaneous business documents between Varsity and several of the independent event producers they acquired specifically show that the entire United States is the geographic area over which they compete. For example, the December 2016 purchase agreement between Varsity and Aloha Productions includes a non-compete agreement that applies to the entire U.S. because "The parties specifically agree that this geographic area is consistent with the area currently potentially serviced by Seller and the Business."[178] Similar language is found in the purchase agreements for Jam Spirit Group (DBA Team Champion), ATC, Mardi Gras, and EPIC Brands.[179] The relevant geographic market is no larger than the U.S. because events outside the outside the U.S. are not viable substitutes: U.S.-based teams rarely attend those events outside the U.S. and the rules for non-U.S. competitions are different.

Based on the evidence presented above, I conclude that relevant antitrust market is no broader than Cheer Competitions in the entire U.S.

### 2. The evidence shows that Varsity possesses and exercises market power over Cheer Competitions

Evidence that market power has been exercised is direct evidence of the possession of market power. Direct evidence of market power provides an alternative to market definition as outlined below.[180] Direct evidence indicates that Varsity raised fees and other costs associated with Cheer

---

[178] Varsity Spirit, LLC, Aloha Spirit Productions, LLC, 15 December 2016, Purchase Agreement for Sale of Business Assets [signed], VAR00362133 - VAR00362241, at 2137.

[179] See, e.g.,

- Jam Spirit Group (DBA Team Champion): "The parties specifically agree that this geographic area is consistent with the area currently potentially serviced by Seller and the Business." Varsity Spirit, LLC, Jam Spirit Group, Inc., 15 November 2017, Purchase Agreement for Sale of Business Assets [signed], BAIN00147958 - BAIN00147995, at 7965.

- ATC: "The parties specifically agree that this geographic area is consistent with the area currently potentially serviced by Sellers and the Business." Varsity Spirit, LLC, ATC Skillz Camps, LLC, 21 April 2017, Purchase Agreement for Sale of Business Assets [signed], BAIN00147996 - BAIN00148021, at 8004.

- Mardi Gras: "The parties specifically agree that this geographic area is consistent with the area currently potentially serviced by Seller and the Business." Varsity Spirit, LLC, Mardi Gras Nationals, Inc., 01 December 2017, Purchase Agreement for Sale of Business Assets [signed], BAIN00148097 - BAIN00148121, at 8104-8105.

- EPIC Brands: "The parties specifically agree that this geographic area is consistent with the area currently potentially serviced by Sellers and the Business." Varsity Spirit, LLC, Epic Spirit Ventures, Inc., 19 January 2018, Purchase Agreement for Sale of Business Assets [signed], VAR00453158 - VAR00453203, at 3175-3176.

[180] See, e.g.,

- Since market power cannot be exercised when the product in question has readily available substitutes, when one finds sufficient evidence of a firm's ability to harm consumers by raising prices, limiting choice, or forcing them to make choices they would not make in a competitive market, then one can conclude that the relevant market for antitrust analysis is no larger than the products over which market power has been exercised. In an *Antitrust Law Journal* article, Rubinfeld and Edlin explain that the fundamental economic question in monopolization is market *power*, not market definition, and that when there is *direct* evidence of market power it isn't necessary to carefully define the market to reach a scientifically sound conclusion.

Competitions and has reduced the number of events. Both of these changes harm consumers and are direct evidence of market power.

Varsity documents indicate that they are protected from the usual pricing competition because the people paying for its products (athletes and parents) are not necessarily the same people making decisions about what products to purchase (gym owners, school athletic directors and coaches). Varsity states they are "insulated from price pressure and competition as purchase decision makers (coaches, etc.) remain distinct from purchasers (athletes, etc.)."[181] As a result, Varsity notes that customers do not respond to price increases.[182] Varsity documents show the intent of many of its acquisitions was to raise prices for events. See Section V.D. For example, after Varsity acquired Jam Spirit Group (DBA Team Champion), a competing event producer, in 2017, Varsity stated it would increase pricing.[183] Varsity introduced and/or increased spectator fees for many of its events after it acquired JAM Brands (another event producer that is distinct from Jam Spirit Group (DBA Team Champion)). For example, prior to the acquisition by Varsity in 2015, JAM Brands typically offered free admission to event spectators, but Varsity introduced admission fees for spectators.[184]

---

They point out that the courts have been endorsing this view. For example, the Court in *Indiana Dentists* stated, "'proof of actual detrimental effects, such as reduction of output', can obviate the need for an inquiry into market power." Edlin, Aaron S., and Rubinfeld, Daniel L., 2004, Exclusion or Efficient Pricing? The "Big Deal" Bundling of Academic Journals, Antitrust Law Journal.

- American Bar Association, 2021, Monopolization and Dominance Handbook, Second Edition, ABA Book Publishing: Chicago, IL, at 64 of PDF.

[181] Varsity Brands, 2018, Confidential Information Presentation, FEAS-Ares00075739 - FEAS-Ares00075850, at 5757.

[182] "Camps/Competitions: preliminary analysis shows no correlation between event participant growth and prince increases." Varsity, 22 October 2018, Varsity Brands: Commercial Excellence Diagnostic, VAR00345315 - VAR00345412, at 5360.

[183] See e.g.,

- Varsity acquired Jam Spirit Group (DBA Team Champion) in 2017. The Financial Projections section of the Transaction Summary created by Varsity indicates that in the first year "Varsity will not be able to change data, locations, or pricing materially in year one" but in the second year it projected increased profits in part because by then they would have "Optimized [increased] pricing, sales efforts, and improved event planning." Team Champion, October 2017, Jam Spirit Group (DBA Team Champion) Transaction Summary, VAR00081770 - VAR00081775, at 1775.

- A Varsity Spirit "pricing overview" document states that Varsity "rarely reduce prices unless the event type of offering changes." Varsity Spirit, Undated, Varsity Spirit Pricing Overview, VAR00101122 - VAR00101126, at 1126.

[184] See, e.g.,

- Tara Harris, an event representative for Varsity's brand JAM Brands, stated about JAMfest: "We added admission to all of our JAMfest Nationals events this season…" Harris, Tara, 15 February 2016, Email: Re: JAM Events - need assistance, VAR00100076 - VAR00100083, 0079.

- A Varsity document summarizing its rationale for JAM Brands acquisition lists "spectator fees" under the subheading of "financial value": "[bullet] Spectator admission - The majority of JamBrands events do not charge spectator admission." Sadlow, John, 20 April 2018, Email: FW: Data room document feedback, VAR00415061 - VAR00415076, at 5065.

Notes from a 2018 meeting of west coast gym owners and coaches describe a lack of non-Varsity events in their region allowing Varsity price increases; attendees also complained of increasing costs and decreased quality of Varsity competitions stating: "Lack of non-Varsity events in our area—big monopoly (Jamz is the only event and its [sic] only a one day). Lack of competition is hindering the market and allowing rising prices."[185] A 2018 document in which Bain poses questions to Varsity about its business indicates Varsity is able to both increase price and drive customers to its higher margin events for both All Star and School competitions.[186] A Varsity data diagnostic team analysis showed that the numbers of participants for camps and competitions were unaffected by price increases.[187]

In addition to increasing prices, Varsity also reduced output. Varsity's intent to do so is summarized in a Varsity document describing a strategy to "Dissolve and Conquer" which states: "By reducing brands, driving customer traffic to other brands, we increase profitability through lower production costs. Coaches will not go to fewer competitions, and those taking advantage of the Family Plan will not stray away from Varsity…Elimination would be based on

---

[185] This meeting was attended by 23 gym owners from Oregon and Washington. Additional comments include:

- "ADDRESS COST OF EVENTS. They are too high, we are getting less for our money, and is (sic) is causing a barrier or (sic) entry in our sport. Costs have continued to rise for competitors, crossovers, prep, coaches and parent entry."

- "Owners feel like they are constantly apologizing for pricing because it is so readily available for parents to see and they deconstruct cost of events and is SO expensive." Emphasis in original.

- "According to one gym owner, Varsity cut their judging pay this year and yet we continue to have increased pricing. The overall feel is that overall quality is going down, not enough care is going into the judges, and yet we continue to pay higher premiums."

Wilson, Karen, 10 December 2018, Email: Fwd: Fw: PORTLAND WEST COAST Gym Owners/Coaches Meeting Notes, USASF_00007472 - USASF_00007478, at 7474.

[186] See, e.g.,

- Bain posed the question, "Discuss customer price sensitivity and room for continued price increase going forward?" To which Varsity responded: "In general, customers are sensitive to prices, however, we have been successful in implementing prices increases at Disney events and in our State and Local competitions…Additionally, since the introduction of the Summit, customer spend has shifted towards our more expensive events. This was strategically driven though the design of our Summit bid allocation at regular season events. We feel the market position and perceived value of the Summit will continue to protect our events from price sensitivity and allow for responsible price increases in the future." Elza, Brian, 30 May 2018, Email: Re: Answers, VAR00182584 - VAR00182588, at 2586-2587.

- "Participation per team and teams per event has trended downward over the past few years. Most of our acquisitions had a market that was comprised of smaller gyms and in smaller markets that hosted typically smaller events. As we acquired those companies the averages have dropped. Revenue and EBITDA per participant in that same time frame has increased as we have driven folks to our larger, higher margin events and had steady increase in our pricing strategy." Elza, Brian, 30 May 2018, Email: Re: Answers, VAR00182584 - VAR00182588, at 2584.

[187] The "Pricing enablers and outcomes" section of this document reads: "Camps/Competitions: preliminary analysis shows no correlation between event participation growth and price increases." Varsity, 22 October 2018, Varsity Brands: Commercial Excellence Diagnostic, VAR00345315 - VAR00345412.

profitability and Varsity's need to secure venue date windows."[188] This strategy was borne out: after the JAM Brands acquisition, Varsity discontinued multiple JAM Brands events, a strategy that Varsity's Vice President of Sales Brian Elza testified was common. See the evidence discussed in Section V.D.7.c).

Varsity's market power is further demonstrated by its "Stay to Play" policy. This policy, introduced at some point prior to 2014,[189] mandated that participant teams must stay at official hotels preselected by Varsity despite the fact many teams preferred to stay elsewhere.[190] Varsity

---

[188] "By reducing [Varsity] brands, driving customer traffic to other [Varsity] brands, we increase profitability through lower production costs. Coaches will not go to fewer competitions, and those taking advantage of the Family Plan will not stray away from Varsity." Parrish, Jamie, 21 August 2017, Email: 2020 Slides, VAR00255570 - VAR00255616, at 5580.

[189] See, e.g.,

- There are customer complaints dating back to at least 2014. Fowlkes, Jeff, 16 October 2014, Email: RE: ASGA Thread on STP, VAR00318739 - VAR00318748, at 8740-8748.

- Alexa Bray, a former employee of an All Star gym (Star & Stripes), comments that after Varsity acquired JAM Brands (2015), they introduced the "stay to play" policy to the former JAM Brands events. "Q. Did you attend JAM Brands events before and after Varsity acquired the company? A. Yes. Q. Were there any differences – or were there any changes in the events after the acquisition? A. I know Liberty Cheer certainly had more options in order to get Summit Bids. Q. Anything else? A. As for our travel competitions were concerned, the concept of stay-to-play was introduced. That was a big difference. Q. What is 'stay-to-play'? A. Stay-to-play was – in order to compete at a certain event, we were forced to use a hotel, basically, of Varsity's choosing. Q. And how did that affect your travel? A. Prices rose significantly. Q. And that was the case – was that the case with JAM Brands events after the acquisition? A. Yes." Deposition of Alexa Bray, 11 January 2022, at 99:20 - 100:16.

[190] See e.g.,

- Customer Melissa Mark Torres complains about higher hotel rates in "stay to play": "I made my life easier this year and decided not to do stay to play competitions. I have one that is tentative but the only hotels available through housing are 20 miles away yet I have parents who can book through hotel directly within walking distance. They also are receiving lower rates then quoted through housing company." McCallister, Tabbi, Quick, Daniel, et al., Undated, Facebook Questions to Varsity, VAR00075254, at 5254.

- Coaches complains about the "stay to play" policy: "Prior to the event, the stay-to-play situation was a disaster. We were not able to secure a team room block, and the only hotels on the stay-to-play were 15 miles away from the venue. If stay to play is going to be required, there must be more options nearby. I found it very hard to force single mothers with multiple children to stay 15 miles away from the venue. Also, the representatives for the stay-to-play company were rude and non-responsive. I had very many angry and distraught families." Varsity, 07 September 2018, 2017-2018 Coaches Competition Survey, VAR00210664 – VAR00210817, at 0682.

- Coaches complains about the "stay to play" policy: "Although I responded in the affirmative when asked if we'd return, I truly believe it will be difficult to get my parents to agree to return to Myrtle Beach if we can't stay in the Breakers Hotel. I don't mind saying that this was my favorite competition, until this year. I've never had a worst experience at a competition in my entire life, all because of the Stay to Play policy." Varsity, 07 September 2018, 2017-2018 Coaches Competition Survey, VAR00210664 - VAR00210817, at 0794.

- Parent of cheer athletes, Nina Asadoorian, complains about higher hotel rates and other costs associated with the "stay to play" policy: "Stay to Play has added a huge expense to our travel fees. Often room block rates are higher than the hotel's regular rates and are higher than other local hotels that are not in the room block, as well as requiring 3-night minimums for athletes who otherwise would return home on Sunday."

received payments for rooms booked through the Stay to Play program.[191] For some events Varsity offered exemptions to the Stay-to-Play-policy, but those exemptions were often denied without cause or explanation.[192] If teams did not stay at the official hotel, they risked

---

13 February 2019, Email: Re: An Important message from Parents of All Star Cheerleaders, VAR00197598 - VAR00197601, at 7600.

[191] See, e.g.,

- An agreement between Varsity Spirit and third party hotel provider Team Travel Source (TTS) about hotel costs and rebates for cheer event reads: "TTS agrees to work directly with VS to secure room blocks for the event by negotiating comp rooms and a $20 rebate per consumed room per night. TTS will collect a $20 rebate per consumed room per night for all events and will notify and work with VS on any extenuating situation where a hotel may not agree to the $20 rebate. All rebates secured for VS events will be tracked and collected from each hotel by TTS. TTS will issue a rebate check within 60 days of each event to VS." The hotel rebate seems to be passed on to Varsity." Varsity, Undated, 2019 - 2020 Event Dates, VAR00309744 - VAR00309864, at 9756.

- An internal Varsity email reads: "This is to update you on our on-going discussions with Connections Housing and to seek guidance as to how to move forward … our current CHEERSPOT contract requires Connections to pay us 30% of their commission to us in addition to the rebate we get from the hotels." Fowlkes, Jeff, 14 October 2016, Email: Connections Housing Negotiation Update, VAR00233932 - VAR00233933, at 3932.

- A Varsity document reads "This is because we are partnering with Hotels to give us Commissions. In 2018 we are projecting receiving Commissions income in the range ~$4.0M range (sic). This is because we already have an initiative called 'Stay to Play' that requires our cheerleaders to stay in the hotel of our selection." Elza, Brian, 05 November 2018, Email: Re: Final McKinsey Update to Steering Committee - pre-read document attached, VAR00418061 - VAR00418065, at 8063.

[192] See, e.g.,

- Jessica Jones, the parent of two All Star athletes, testified that her exemption requests were always denied for NCA All Star National championships: "Q. And were you requesting exception – requesting an exception to the stay-to-play policy for the 2020 NCA competition? A. Correct. Q. And was this – was this the NCA competition you listed in Attachment B? (Witness reviewing document.) A. Yes. Q. And do you see where it says – and this is about halfway down the page under the gray box. It says: 'In response to your request for an exception for [redacted] and [redacted] Jones for the upcoming 2020 NCA All-Star National Championship, per national Cheerleaders Association, the only exception requests we are honoring include reservations booked with hotel branded points or military rates or staying with family members that live in the immediate area.' Do you see that? A. I do. Q. What – are the redactions in that first paragraph, your children's names? A. Yes. Q. And on which basis were you requesting an exception? A. Military. Q. And did you meet that exception, the requirements of it? A. Yes. Q. And if you look at the gray box, it says, 'Your request has been denied,' and then there's a note that says, 'Invalid or corrupt document.' Do you see that? A. Yes. Q. Was that why your request for an exception was denied? A. I do not remember why they denied it that particular time. Q. You say 'that particular time.' Did they deny it more than once? A. Yes. Q. When was that other time they denied it? A. It was for the same competition, but every time I requested it, no matter what I submitted, they denied it, and so I gave up and just booked the hotel through them. They wasted too much of my time. My time is valuable." Deposition of Jessica Jones, 10 February 2022, at 129:7-131:6.

- Jessica Jones the parent of two All Star athletes testified that her exemption requests were sometimes denied without explanation: "Q. What did you talk to them about? A. Why my stay-to-play was denied. Q. What was the outcome of that call? A. My stay-to-play was still denied. Q. Did they say why? A. No. Q. They didn't give you an explanation as to why they were denying it; they just said it was denied? A. It was denied. It was passed on to somebody else. I would have to wait for somebody else to contact me, but nobody was ever able to give me an answer. Q. So they said somebody else would contact you, and then

disqualification from the competition.[193] Varsity knew this policy was unpopulir with gym owners, athletes, and athlete families and in 2018 introduced a revamped program called "Stay Smart" purportedly intended to alleviate customer complaints.[194] However, a 2019 document stated Varsity merely renamed the program and in their own words "put lipstick on a pig" and continued to force participant teams to stay at preselected hotels.[195] Varsity's ability to reduce the lodging choices of the teams attending its competitions by forcing them to stay in preselected hotels from which Varsity receives payments demonstrates its market power.

In Section V.B below, I present additional direct evidence that Varsity impaired and excluded rivals and potential rivals. In Section V.D.7.c) I present additional evidence that Varsity reduced output, raised price and lowered the quality of events.

Indirect evidence in the form of Varsity's market dominance in the presence of entry barriers also indicates that Varsity possesses market power over Cheer Competitions. Contemporaneous Varsity business documents routinely distinguish three distinct markets—events, apparel, and camps; these and other documents show Varsity possessed and maintained a dominant position with respect to each of these markets.[196] Additional documents make similar claims, including:[197]

---

they didn't contact you; is that what happened? A. Correct." Deposition of Jessica Jones, 10 February 2022, at 131:22-132:13.

[193] Fusion Elite All Stars, Undated, 2019-2020 All Star Cheer Team Information, FUSIONELI000000236 - FUSIONELI000000247, at 0241.

[194] In a December 2018 letter intended for gym owners, Jamie Parrish described the same "Stay To Play" policy changes very differently: "We are very happy to roll out our new housing policy, aptly named, Stay Smart. Stay Smart will revolutionize your travel needs…Stay Smart will be a much-needed breath of fresh air when traveling during the competition season.' Parrish, Jamie, 11 December 2018, Email: First Draft of Humanization Efforts, VAR00230096 - VAR00230098, at 0096-0097.

[195] A 2019 internal Varsity strategy presentation authored by Jamie Parrish and Tina Sexton reads: "To steer away from the forceful 'negative' connotation of Stay to Play, we rebranded our housing services Stay Smart. We repackaged the existing Stay to Play benefits into a friendlier Stay Smart Umbrella, and basically put lipstick on a pig. It worked to a degree, but still much to be done on this topic." Sexton, Tina, Parrish, Jamie, 2019, Strategy Communication Experience, VAR00176406 - VAR00176445, at 6415.

[196] See, e.g.,

- A slide titled "Market Share & Key Competition" that Varsity presented to Bain shows Varsity with a "#1" market position in apparel, events, and camps. Seely, Bill, 19 October 2018, Email: Draft Agenda For Bain, VAR00371189 - VAR00371320, at 1196.

- An internal Varsity document states: "Varsity Spirit has managed to become the total market leader in all things cheer. But with that market share comes a responsibility to manage the position as a global leader in our space. The key is to maintain market share, avoid being viewed as a monopoly, and respond directly and firmly to all competitors in the space. It is imperative that Varsity recognize that just being the market leader is not enough. To maintain a position of dominance we must develop a graceful appearance, and humanize our brand." Undated, Increase Humanization and Personalization of The Varsity Brand - Change to all star participation growth through scoring, image, and communication [*sic*], VAR00094550 - VAR00094552, at 4550.

[197] There many more documents making similar statement. See, e.g.,

- A Varsity presentation slide entitled "We Are Cheerleading" includes: "[bullet] Leading provider of cheerleading uniforms and apparel, events, competitions and educational training camps for school and All

- "Varsity Spirit has managed to become the total market leader in all things cheer. But with that market share comes a responsibility to manage the position as a global leader in our space. The key is to maintain market share, avoid being viewed as a monopoly, and respond directly and firmly to all competitors in the space." The document continues with a slide titled "THE ELEPHANT IN ROOM" that reads: "The success of UCA, the subsequent acquisitions, and the general practices of Varsity Spirit, have put the company in a very successful, dominant position."[198]

- "Varsity Spirit created the modern cheerleading industry and remains the leading player in the market. The business holds a number one position in uniforms, camps, and competitions and its prominent brand name is synonymous with cheerleading. Varsity Spirit's next largest competitor is less than one tenth the size of Varsity Spirit based on revenue."[199]

---

Star (club) teams." Varsity Brands, May 2018, Management Presentation, VAR00008463 - VAR00008587, at 8540.

- A lender presentation slide entitled "Leading Brands with Prominent Market Positions" states that Varsity Spirit is the "#1" player in the school spirit industry. The text lists: "Varsity Spirit [bullet] Created Modern Cheerleading [bullet] #1 position in all categories [bullet] Over 10x sales of nearest competitor." Varsity Brands, November 2014, Lender Presentation, BARC_00000008 – BARC_00000053, at 0024.

- A lender presentation slide entitled "Market Leader Across Three Segments" lists Varsity as "#1" across uniforms, competitions and events, and camps. Varsity Brands, November 2014, Lender Presentation, BARC_00000008 - BARC_00000053, at 0040.

- An executive summary of Varsity's business shows Varsity as having a "1" market position for cheerleading uniforms, camps, and competitions. The document overview states: "Varsity is the leading marketer and manufacturer of branded products and services to the school spirit industry. Over the past 36 years, the Company and its management team have transformed and evolved modern cheerleading by building the preeminent lifestyle brand and business model for uniforms, educational camps and competitions." The text continues: "The Company's dominant market platform allows it to continually expand the sector through Varsity's leading organizations and brands within the cheerleading industry." Rothschild and Jefferies, January 2011, Varsity Information Memorandum, VAR00424538 - VAR00424610, at 4544.

- A Varsity presentation depicts Varsity as having a "#1 Market Position" in uniforms, camps, and competition. A slide entitled "Today We Are the Market Leader" states: "Varsity is the Source For All Things Related to Cheerleading and Dance [bullet] Innovative global leader comprised of the top spirit brands and organizations around the world [bullet] Integration of company's businesses creates 'one-stop shop' for cheerleading [bullet] Dominant market position in all segments." Varsity Brands, March 2011, Management Presentation, VAR00452199 - VAR00452263, at 2211.

[198] Parrish, Jamie, 21 August 2017, Email: 2020 Slides, VAR00255570 - VAR00255616, at 5574-5575. Emphasis in original.

[199] This document was prepared by Jefferies Investment Banking Division, Barclays, and Goldman Sachs for potential investors in Varsity. Goldman Sachs, Barclays, and Jefferies, 20 November 2014, First Lien Credit Facilities USD $755 million, 7-year Senior Secured First Lien Term Loan, JEFF00050123 - JEFF00050191, at 0158.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 57 of 149
PageID 10579
Highly Confidential            **Expert Report of Janet S. Netz, Ph.D.**            52 of 115

- A 2018 Jefferies document lists questions that were asked by potential co-investors prior to Charlesbank acquiring Varsity: "In terms of competitions overall, seems like Varsity has monopoly but are there other competitors hosting competitions?"[200]

The available market share figures are consistent with the statements found in these documents. A document from the 2012-2013 season estimates Varsity's revenue market share for "Competitions in All Star Competition Market" as 42%.[201] During the 2013-2014 season, Varsity estimated its revenue market share to be approximately 50% among all event producers; JAM Brands was next with 30%.[202] By 2016, after Varsity acquired JAM Brands, it calculated its market share as 75%; EPIC Brands was the next largest with 6%.[203] By 2018, Marlene Cota, former Varsity VP of corporate alliances and business development, testified that Varsity's market share was between 80 and 85% in 2018.[204] Varsity, Charlesbank, and Bain relied on these market share estimates and others in the ordinary course of business when making business decisions, including identifying competitive threats, acquisition targets and, in the case of the private equity firms, decisions about valuing Varsity's business.

Varsity's high and persistent market share in Competitive Cheer is protected by several barriers to entry, both natural and artificial. Natural barriers include the fact that event producers need a critical mass of teams and a sufficient number of qualified judges for competitions. Varsity has erected many strategic barriers as well, including its existing relationships with schools and gym owners: Varsity has longstanding relationships with the key purchasing decision makers at both All Star gyms and schools.[205] Varsity has relationships with over 19,000 middle and high schools, 1,000 college programs, and 2,500 gyms.[206] These recurring customer relationships

---

[200] Mills, Matthew, 12 May 2018, Email: CDPQ/ GIC MP Questions, CB00311204 - CB00311206, at 1205.

[201] The document estimates Varsity's revenues from All Star competitions as $29 million of the $69 million total. Varsity, 01 June 2012, Business Plan 2012-2013, VAR00346980 - VAR00346991, at 6985.

[202] Varsity All Star, Undated, gyms | coaches | athletes | parents | fans, VAR00323451 - VAR00323515, at 3456.

[203] LeTard, Tres, 2016, Varsity All Star Market Share est. - 2016, VAR00101102.

[204] "Q. And do you know what the market share – Varsity's market share in competitive cheer market for All Star was in 2018, at the time you left? A. At the time that I left, I would say conservatively, 80 percent, 85 percent." Deposition of Marlene Cota, Volume I, 06 April 2022, at 53:15 – 21, objection omitted.

[205] See, e.g.,

- A Jefferies document describing Varsity for potential investors states: "For Varsity Spirit, the key decision maker is the school teacher in charge of cheerleading activities (or the club owner in the case of club activities), but the cost is borne by the parents….To succeed in this environment, the Company must have a close relationship with the decision maker, the trust of the principal, and ability to engage directly with the final spending decision maker, the parents and athletic directors. While challenging, this model creates a significant barrier to entry for competitors." Goldman Sachs, Barclays, and Jefferies, 20 November 2014, First Lien Credit Facilities USD $755 million, 7-year Senior Secured First Lien Term Loan, JEFF00050123 - JEFF00050191, at 0161.

- A Varsity presentation to Charlesbank indicates Varsity has a "Unique, Difficult-to-Replicate National Sales Force with Deeply Entrenched Customer Relationships…Loyal customer base of key decision makers, with high customer retention rates" and that "Entrenched relationships create meaningful barriers to entry." Varsity Brands, November 2017, Lender Presentation, CB00514715 - CB00514749, at 4732.

[206] See, e.g.,

make it difficult for entrants to gain new business.[207] Varsity reinforces these relationships through its various customer loyalty and rebate plans, such as the Family Plan and Varsity Network Program described in Section V.E below. As part of these programs, Varsity signs exclusive agreements—some as long as three years—with the largest and most influential All Star gyms and Schools, thereby precluding a significant portion of the market from potential competitors.

Both All Star and School Competitive Cheer teams compete with the intention of attending an end-of-season competition, such as The Cheerleading Worlds for All Star gyms. However, by 2020, through its aggressive acquisition strategy, Varsity controlled 36 of the 46 events that are permitted by the USASF to grant bids to The Worlds, as described in Section V.D.7.b) below. Varsity, in coordination with the USASF, also restricts competing event producers' access to All Star gyms in several ways, including prohibiting gyms and school teams from competing in rivals' events (discussed further in Section V.B.2) and from partnering with competing event producers (discussed further in Section V.B.3).

The USASF also requires its members to maintain comprehensive general liability and automotive liability insurance.[208] Since at least 2005, the USASF's preferred provider for its gym member insurance plan has been K&K Insurance Group, Inc.[209] Although USASF does not mandate that its members obtain insurance from K&K, it developed a gym insurance program with K&K[210] that it promotes to its members.[211] The K&K coverage only applies to USASF-

---

- Varsity Brands, May 2018, Management Presentation, VAR00008463 - VAR00008587, at 8540.

- In total, "2,300,000 athletes and spectators" attend Varsity competitions. Varsity Spirit, Undated, Corporate Partnerships, https://www.varsity.com/about/partners/, accessed 27 April 2022, at 11.

[207] A Jefferies document describing Varsity for potential investors states: "Varsity Brands benefits from long-term, sticky customer relationships with strong customer retention rates that drive recurring revenues. BSN servers over 100,000 schools with an estimated revenue retention rates of 90%" Goldman Sachs, Barclays, and Jefferies, 20 November 2014, First Lien Credit Facilities USD $755 million, 7-year Senior Secured First Lien Term Loan, JEFF00050123 - JEFF00050191, at 0159.

[208] See, e.g.,

- Tiers 1-2: U.S. All Star Federation, 01 May 2019, 2019-2020 USASF Company Member Agreement [Unsigned], USASF_00001982 - USASF_00001996.

- Tier 3: U.S. All Star Federation, 01 May 2020, USASF Company Member Agreement [Unsigned], USASF_00001977 - USASF_00001981.

- Tier 4: U.S. All Star Federation, Inc., 01 May 2020, USASF Company Member Agreement between USASF and U.S. All Star Federation, Inc. [Unsigned], USASF_00001971 - USASF_00001976.

[209] The program from the "The 6th Annual Varsity All Star Gym Owners Conference" held on May 31-June 2, 2015 reads: "In 2005, working in conjunction with K&K Insurance, Joe and his team developed the USASF Cheer Insurance Program." Varsity, 2015, The 6th Annual Varsity All Star Gym Owners Conference, VAR00391182 - VAR00391259, at 1188.

[210] See, e.g.,

- Nationwide, January 2008, Policyholder Disclosure, SPIRITFAC000000081 - SPIRITFAC000000161.

- Nationwide, January 2008, Policyholder Disclosure, FUSIONELI000000082 - FUSIONELI000000162.

[211] See, e.g.,

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 59 of 149
PageID 10581
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          54 of 115

sanctioned events[212] and premiums are 38% to 47% higher for any gyms that attend any non-USASF events.[213] Jim Chadwick, the President of the USASF, stated the insurance program was used as a "stick" with which to "combat" or "limit the success of" non-sanctioned events.[214] The insurance program is an effective barrier for potential new entrants since it increases the cost to host non-USASF sanctioned events. Either the event producer or the gym will have to obtain additional insurance coverage for the athletes to attend these events.

A Varsity presentation targeted to potential investors indicates that Varsity has erected "significant barriers to entry" citing many of those described above as well as "the company's comprehensive products and services offering allows it to benefit from cross-selling." For example, in order to attend one of Varsity's end of season events, such as The Summit, teams must first attend one of Varsity's qualifying events.[215] Varsity is also significantly larger than its nearest competitors and therefore enjoys economies of scale—it "benefits from volume and critical mass efficiencies, namely spreading of fixed costs, negotiating power with suppliers, and an improved production process."[216]

Collectively there are significant barriers to entry, most of which are artificial barriers created by Varsity. Varsity acknowledges many of these same barriers in its documents stating its "Unique Capabilities Create a Strong Sustainable Moat." Varsity's description of the "Competitive Moat" lists many of the same barriers discussed above, suggesting that Varsity recognizes these barriers as means to thwart competition.[217]

---

- K&K Insurance, 2009, Welcome USASF Cheer Gym Members, https://www.kandkinsurance.com/sites/USASF/Pages/Home.aspx, accessed 13 June 2022.

- Joe Evens, the administrator of the USASF/K&K insurance programs, conducted a sales presentation at "The 6th Annual Varsity All Star Gym Owners Conference." Varsity, 2015, The 6th Annual Varsity All Star Gym Owners Conference, VAR00391182 - VAR00391259, at 1188-1194.

[212] "This insurance applies only to … USASF Sanctioned meets, competitions, or events hosted by you under your direct supervision or organized by you." Nationwide, January 2008, Policyholder Disclosure, SPIRITFAC000000081 - SPIRITFAC000000161, 0088. *See also,* Nationwide, January 2008, Policyholder Disclosure, FUSIONELI000000082 - FUSIONELI000000162, at 0089.

[213] The current rate for gyms that exclusively attend USASF-sanctioned events is either $25.21 or $26.91 per student/member depending on the level of coverage. The rate for gyms that attend any competition or event that is not USASF-sanctioned is $37.15 per student/member (38% to 47% higher). K&K Insurance, 2009, Welcome USASF Cheer Gym Members, https://www.kandkinsurance.com/sites/USASF/Pages/Home.aspx, accessed 13 June 2022.

[214] On August 8, 2016, the USASF's Cheer National Advisory Board met to discuss, among other topics, how to "limit the success of" or "combat" non-sanctioned events. When a member of the board suggested using a "carrot or stick" approach, Mr. Chadwick stated that "there's already a stick" because "the athlete insurance is only good at sanctioned events." U.S. All Star Federation, 2016, 2016 Planning Week, USASF_00028264 - USASF_00028271, at 8265.

[215] Rothschild and Jefferies, January 2011, Varsity Information Memorandum, VAR00424538 - VAR00424610, at 4552.

[216] Rothschild and Jefferies, January 2011, Varsity Information Memorandum, VAR00424538 - VAR00424610, at 4552.

[217] See, e.g.,

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 60 of 149
PageID 10582
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          55 of 115

Despite these barriers to entry, there does exist a competitive fringe in the market for Cheer Competitions. That is, Varsity does not have a market share of 100%. Dozens of small IEPs stage events that compete with Varsity. In recent years, several IEPs have even collaborated to establish an alternative, non-Varsity season-ending All Star championship, the Open Championship Series, which enjoyed some success during 2020 and 2021 when Varsity's events were disrupted by the Covid-19 pandemic.[218]

In sum, a variety of direct and indirect evidence shows that Varsity possesses and exercises market power over Cheer Competitions.

### B.  Varsity possesses and exercises market power over Cheer Apparel

#### 1.  Cheer Apparel is a relevant product market for antitrust purposes

In Section III.C.2 above, I describe Competitive Cheer Apparel and the rules related to apparel. The apparel needed for Competitive Cheer includes uniforms, shoes, accessories, warm-ups, and camp wear, all of which are often purchased in a season. The same types of apparel are purchased by both All Star teams and School teams and to the extent there are specific rules for either of these two types of teams, Varsity supplies apparel that meets the regulations for both.

There are distinct characteristics of Cheer Apparel such that apparel designed for other activities are not reasonable substitutes to constrain Cheer Apparel pricing in the manner explained above. For example, gymnasts wear similarly tight-fitting clothing which is designed to be flexible while participants perform acrobatic maneuvers, but gymnastics uniforms are otherwise not good substitutes because they typically are not customized in the same elaborate manner as Competitive Cheer uniforms nor are they a similar format (female Competitive Cheer athletes wear skirts, whereas gymnasts wear leotards). The rules of Competitive Cheer dictate what apparel can and cannot be worn, which precludes, for example, skirts that are designed for other activities but do not comply with the Competitive Cheer rules.[219]

---

- "How can we create a sustainable, defensible business (deep moat)?" Varsity Spirit, February 2017, Varsity Spirit Strategy Meeting #2, VAR00272414 - VAR00272501, at 2496.

- A 2017 Varsity presentation slide states: "[The] Varsity Spirit ecosystem strategy combines personalized products and services to create a deep moat and sets [the] foundation for our 2020 strategy." Hansen, Jessica, 11 July 2017, Email: Deck Mark-up from Wayne, VAR00584153 - VAR00584185, at 4154.

- Varsity Brands, May 2018, Management Presentation, VAR00008463 - VAR00008587, at 8477.

- "Operating across all three businesses provides a deep competitive moat." Varsity Spirit, October 2018, Varsity Spirit Overview, VAR00345222 - VAR00345244, at 5224.

[218] Libit, Daniel, 24 May 2022, Varsity's Antitrust Plaintiffs Ramp Up Battles on Cheerleading Stage, Sportico, https://www.sportico.com/leagues/other-sports/2022/cheerleading-all-star-independents-1234675754/, accessed 14 June 2022.

[219] USASF guidelines on uniform skirts/shorts: "When a skirt is worn as part of the uniform, briefs under the skirt are required. The skirt must fully cover the hips. The skirt must completely cover the briefs and must fall at least 1 inch below briefs (regular and boy cut briefs). When shorts are worn as part of the uniform, there must be a minimum of a 2" inseam." USASF Image Policy, at 2.

Case 2:20-cv-02892-SHL-tmp   Document 389-2   Filed 02/10/23   Page 61 of 149
PageID 10583
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          56 of 115

Cheer apparel is custom designed to reflect the personality and tastes of individual gyms; even shoes are custom designed to include logos.[220] As such, off-the-rack athletic gear or uniforms will not substitute for Cheer Apparel. Cheer Apparel includes at least shoes, accessories, warm-ups, and camp wear. Teams prefer that each of these components match and complement the other components of the uniform. As such, there is an advantage for suppliers of Cheer Apparel that provide as many—or all—of these categories, particularly if the supplier can customize all of these components.[221]

Because of these differences, Competitive Cheer athletes are generally not able to substitute general athletic gear or apparel designed for different activities with Cheer Apparel. Varsity documents consider Cheer Apparel to be a unique and distinct product as well.[222]

Applying the hypothetical monopolist test qualitatively indicates that a hypothetical monopolist in the Cheer Apparel market would be able to increase price (or reduced output, quality, or innovation) by a small but significant, non-transitory amount, without losing significant number of athletes to make the price increase unprofitable.

The relevant geographic market for Cheer Apparel is the U.S. Although some apparel is sold at traditional brick-and-mortar locations, most of the apparel is offered and sold online. Varsity, for example, publishes catalogues for both All Star and School Cheer teams and those same products are offered to all its customers within the U.S. Varsity, and other apparel suppliers, provide the same design and fitting services to all customers within the U.S. During the class period, nearly all of the targeted customers reside within the U.S. as well.

### 2. The evidence shows that Varsity possesses and exercises market power over Cheer Apparel

Evidence shows that Varsity's prices for Cheer Apparel were above the competitive level. As noted above, evidence of the maintenance of supracompetitive prices over time is direct proof of

---

[220] See, e.g.,

- "Traditional white shoes can now be replaced with completely custom shoes." Seely, Bill, 19 October 2018, Email: Draft Agenda For Bain, VAR00371189 - VAR00371320, at 1208.

- A Varsity presentation slide states: "Market leading Varsity-branded footwear enhanced by latest technology [bullet] Design features such as breathable mesh and shock resistant memory foam [bullet] Ability to leverage Team Art Locker data in the future to increase customizable options across footwear, accessories and other products." Seely, Bill, 19 October 2018, Email: Draft Agenda For Bain, VAR00371189 - VAR00371320, at 1219.

[221] Customers rank "the ability to customize products" in the top eight reasons to purchase apparel from Varsity, according to the Big S Customer Survey of 2018. Bain & Company, 06 November 2018, Operation Catapult: Strategic Foundation, BAIN00000352 - BAIN00000507, at 0401.

[222] See, e.g.,

- A Varsity presentation discusses its "Unmatched Design and Production Model." It lists aspects of both its "Unique Uniform Design and Production Processes" and its ability to deliver "Differentiated Results." Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9305.

- Varsity states that its apparel line provides "[c]ustomized, one-of-a kind products meet distinct needs of individual cheerleaders or squads." Seely, Bill, 19 October 2018, Email: Draft Agenda For Bain, VAR00371189 - VAR00371320, at 1204.

market power. In response to the following question from potential investors, "How do we price relative to competitors?" Varsity responded "Based on VSF [Varsity Spirit Fashion] catalog pricing we are consistently higher priced than our competitors in all major product categories."[223]

Examining the entry experience of Varsity's main competitor in the Cheer Apparel market, Rebel Athletic, is illustrative of Varsity's supracompetitive prices. Rebel was established in 2012 after its founder, Karen Noseff Aldridge, met with Billy Smith, the owner of Spirit Celebration, an independent event producer that was subsequently acquired by Varsity. Mr. Smith showed Ms. Aldridge the apparel he needed—thousands of jackets decorated with embroidery and crystals—and Ms. Aldridge realized she could make higher quality apparel at a lower price.[224] Ms. Aldridge was right: shortly after Rebel entered the Cheer Apparel market, Varsity began losing customers to Rebel.[225] A Varsity document states that lower-priced uniforms were the main reason customers were choosing Rebel,[226] and a Bain presentation on future strategy for the Varsity brand notes that Varsity Spirit "underperforms in product delivery and price/value." The document lists several "detractor" customer survey responses and their reasoning. One customer response indicates: "Primarily cost. Varsity is expensive when compared to other vendors. They [Varsity] pretty much have a monopoly over the industry…we have little choice." [227]

Despite providing higher quality products[228] at lower prices than Varsity, Rebel has still struggled to take market share away from Varsity due to the barriers erected by Varsity, as discussed above, including its rebate programs (see Section V.E below for a discussion of the rebate programs) and Varsity's restrictions against displaying products inside Varsity event venues.[229] Varsity also created a policy that disallowed apparel representatives from judging at

---

[223] Varsity Spirit, Undated, All Star Overview, VAR00310631 - VAR00310666, at 0663.

[224] Ms. Aldridge had considerable experience in the apparel business prior to entering the Cheer Apparel market: she founded Fortune Denim, a premium jeans brand for women; she designed and manufactured private label apparel for companies such as Neiman Marcus and Abercrombie & Fitch; she had existing manufacturing contacts in both the United States and China. The Battle for the Cheerleading-Uniform Industry Is Surprisingly Cutthroat and Appropriately Glittery, at 3-4.

[225] After the introduction of Rebel's first uniforms at the 2013 World's event, Ms. Aldridge states "Overnight everybody knew who we were….Following the reveal of that uniform at Worlds, we took in over $600,000 in 72 hours." The Battle for the Cheerleading-Uniform Industry Is Surprisingly Cutthroat and Appropriately Glittery, at 2.

[226] A Varsity document summarizes states "The #1 reason gyms go with them [Rebel] is price and free uniforms." Webb, Jeff, 14 September 2016, Email: Fwd: Rebel, VAR00110235 - VAR00110238, at 0237.

[227] Bain & Company, 19 November 2018, Operation Catapult: Bain Capital Update [Draft], BAIN00065145 - BAIN00065209, at 5180-5181.

[228] There are numerous instances of Varsity apparel customers complaining about poor quality products and/or customer service from Varsity including: "Unfortunately, we did not have a very good experience with the process of ordering, sizing and receiving our apparel. We received a sizing kit that was nothing like the actual apparel we ordered so when our apparel came in, it did not fit correctly—especially on the young athletes. We have to fit athletes with what we received and go to a local outside source to get sizes and a fit that would work with our young athletes, essentially paying even more…Our overall experience with Varsity apparel last season was unfortunately very slow and very expensive. We actually had numerous athletes (20-30 families) leave our gym over apparel—we didn't get it until half the year was over, what we got was 'sub par' to the competing all-stay [sic] gyms in our area and the new uniform was incredibly uncomfortable and the rhinestones would fall off." LeTard, Tres, 04 December 2015, Email: RE: Charlotte Allstars rebate, VAR00102182 - VAR00102185, at 2183-2184.

[229] See, e.g.,

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 63 of 149
PageID 10585
Highly Confidential        **Expert Report of Janet S. Netz, Ph.D.**        58 of 115

Varsity competitions; this policy applied to all other competing manufacturers and was specifically instituted because Mr. Webb was "hot on taking down Rebel right now and not looking to play nice."[230]

Indirect evidence also indicates Varsity's market power over Cheer Apparel. In Section IV I cite to Varsity documents that identify three distinct markets— apparel, competitions, and camps— and show that Varsity holds a dominant position in each of these markets. The available market share figures for the Cheer Apparel market are consistent with the statements found in these documents. A 2013 Varsity document estimates Varsity's revenue market share as 73% for Cheer Apparel purchased by "High School & College" customers and 40% for apparel purchases by All Star gyms.[231] A 2014 document estimates Varsity has a 60% share of uniforms and 20% share of other apparel for schools and All Star gyms combined.[232] By 2017, Varsity's apparel market shares were approximately 60%.[233]

Varsity's high and persistent market share in Cheer Apparel is protected by several barriers to entry. Varsity's rebate programs—the Varsity Family Plan and Network Agreements, discussed in more detail in Section V.E below—act as a barrier to entry. Through these programs Varsity leverages its dominance in the Cheer Competition market to disadvantage Cheer Apparel providers. Specifically, these programs discourage schools and All Star gyms from switching apparel from one year to the next because apparel rebates earned in one season are not paid until the following season. These programs also include multi-year agreements in which schools and All Star gyms agree to exclusively purchase Varsity Cheer Apparel. These programs also

---

- "But even as Rebel generates buzz and profits, a mighty opponent wants to swat it down. Varsity Brands is a $1.2 billion company owned by the $3.5 billion private-equity firm Charlesbank Capital Partners. Thanks to an aggressive campaign of acquisitions, rebate plans that make it expensive for gym owners to switch suppliers, and other strategies, Varsity Spirit, the corporation's cheer division, commands north of 80 percent of the uniform market, as estimated by competitors." The Battle for the Cheerleading-Uniform Industry Is Surprisingly Cutthroat and Appropriately Glittery, at 2.

- "Varsity's hardball tactics are structured to keep Rebel and other rivals off the playing field…Teams appearing in Varsity competitions can wear whatever uniforms they want. But rival apparel makers can't show their wares at those events, which are important showrooms for cheer merchandise…The events are also critical to Varsity's rebate program, Rebels biggest obstacle. Gyms collect fees from cheerleaders to participate in competitions. Varsity typically signs gyms to two- or three-year agreements that provide a cash rebate to Varsity competitions their teams attend, which helps the gyms' bottom lines. That rebate extends to Varsity apparel. Noseff Aldridge [Rebel's founder] estimates that gyms get anywhere from $1,000 to more than $20,000 back of they buy uniforms and practice wear exclusively from Varsity." The Battle for the Cheerleading-Uniform Industry Is Surprisingly Cutthroat and Appropriately Glittery, at 11-12.

[230] "Jeff is hot on taking down Rebel right now and not looking to play nice. I feel like we should rethink letting those Rebel reps Judge for us. I can already hear it…'why in the hell would we give them access to our events!' I don't want to be on the receiving end of that conversation." Carrier, Justin, 16 September 2016, Email: Re: Rebel, VAR00438032 - VAR00438036, at 8033.

[231] Varsity, 01 June 2012, Business Plan 2012-2013, VAR00346980 - VAR00346991, at 6982-6984.

[232] Varsity Spirit, 02 October 2014, Varsity Spirit Meeting Agenda, VAR00341580 - VAR00341583, at 1581.

[233] Bain & Company, 06 November 2018, Operation Catapult: Strategic Foundation, BAIN00000352 - BAIN00000507, at 0397.

encourage cross selling of products across multiple markets, which presents barriers for competing suppliers operating in only one of those markets.[234]

As discussed above, Varsity's longstanding relationships with purchasing decision makers and recurring, sticky customer relationships make it difficult for entrants to gain new business in the Cheer Competition market, as discussed in Section IV.A.2. These same barriers are effective in the Cheer Apparel market as well.[235] Additionally, barriers in the Cheer Apparel market include Varsity's large, entrenched salesforces[236] and the fact that Varsity also holds over 200 design copyrights for Cheer Apparel.[237]

The Varsity policy of precluding rival Cheer Apparel providers from displaying products at Varsity Cheer Competitions is another barrier to entry. Prior to being acquired by Varsity, JAM Brands and Rebel had an ongoing partnership that allowed Rebel to display its products at JAM Brands events; after acquiring JAM Brands, Varsity ended this arrangement. Varsity precluded Rebel and other apparel manufacturers from displaying products inside any Varsity event venues, including the specific JAM Brands events that Varsity took over.[238]

For the All Star discipline, there are rules that specify which apparel can be worn by athletes. See footnote 114. These rules are established by the USASF, but Varsity personnel have input into proposed rules changes and are also given early access to any changes in the rules that are

---

[234] Varsity describes its cross selling across businesses and products as follows: "The Varsity Family Plan and Network customer loyalty programs encourage cross-selling of fashion and events. The Varsity All Star Advisors (event sales team) and Varsity All Star Fashion Specialist (fashion sales team) collaborate and coordinate their sales efforts. We regular [sic] identify who is spending on fashion but not on events and vice versa, then coordinate our sales approach." Undated, Diligence Q&A, VAR00249924 - VAR00249927, at 9926.

[235] In the "Apparel" section of a due diligence document prepared by Charlesbank, Varsity was asked to "Describe the-to-market strategy and cross selling across businesses and products." Varsity responded that "For school market, the sales rep is the primary contact from an experiential nature; providing consult, design selection and fitting. Additionally, the sales rep recruits and registers customers for camps & competitions. Because of this 'sticky' relationship, the rep sees/ (talks with) the customer multiple times per year…" Varsity Spirit, Undated, All Star Overview, VAR00310631 - VAR00310666, at 0661.

[236] In the "Apparel" section of a due diligence document prepared by Charlesbank, Varsity wrote: "Additionally, Varsity Brands' entrenched sales force creates a meaningful barrier to entry…" Goldman Sachs, Barclays, and Jefferies, 20 November 2014, First Lien Credit Facilities USD $755 million, 7-year Senior Secured First Lien Term Loan, JEFF00050123 - JEFF00050191, at 0154.

[237] Lander, Todd, 23 March 2017, Apparel copyright owners cheer ruling, Daily Journal, https://ffslaw.com/wp-content/uploads/2018/07/TML_DJ_Apparel-Copyright-Owners-Cheer_.pdf, accessed 16 June 2022.

[238] See, e.g.,

- "The JAM Brands competitions has been Rebel's most effective platform for marketing to elite cheer teams. 'Not partnering with an event company is one thing,' says Noseff Aldridge [Rebel's founder]. 'But being locked out of partnering with an event company—knowing that a competitor is now going to be in your booth space showing its product—it's a double whammy." The Battle for the Cheerleading-Uniform Industry Is Surprisingly Cutthroat and Appropriately Glittery, at 6.

- At Varsity's larger events, the Varsity Spirit Shop division of Varsity Spirit sells and displays merchandise. At its smaller events, Varsity uses external vendors and receives a percentage of sales. Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9329.

established compared to other Cheer Apparel providers.[239] This control of the apparel rules advantages Varsity and presents a barrier to entry for rival apparel manufacturers.

Collectively, the barriers to entry in the Cheer Apparel market are so significant that "some small competitors just throw up their hands" and exit the Cheer Apparel market.[240]

### C. Varsity possesses and exercises market power over Cheer Camps

#### 1. Cheer Camps is a relevant product market for antitrust purposes

Cheer Camps are described in Section III.C.3, including that nearly all camp participants are school teams that would otherwise have a break in their season during the summer when Cheer Camps are usually held. All Star gyms do not have a similar break during the summer and, therefore, have less of a need or availability to attend Cheer Camps. Cheer Camps provide a unique opportunity to receive specialized coaching from skilled instructors with extensive Competitive Cheer experience. There are no functional substitutes for Cheer Camps, which provide teams with dedicated cheer skills training for athletes and coaches, as well as team bonding. A school team seeking a similar experience has no other option.

There are many other sports camps, including competitive dance and gymnastics camps, but none of those types of camps are reasonable substitutes to constrain Varsity's Cheer Camp pricing. This is true for the same reasons that those sports are not reasonable substitutes as explained in Section III.A above. If those sports are not reasonable substitutes, camps specializing in coaching those same sports cannot be substitutes either. Cheer Camps are also unique in that many offer feedback on teams' routines from experienced judges; other types of camps cannot offer this feedback.

Because of these differences, Competitive Cheer athletes do not consider other types of camps to be substitutes for Cheer Camps. Applying the hypothetical monopolist test qualitatively indicates that a hypothetical monopolist in the Cheer Camp market would be able to increase price by a small but significant, non-transitory amount, without losing a significant number of athletes to make the price increase unprofitable.

---

[239] Jim Chadwick, the former USASF President, sent an email to Mr. Webb summarizing updated apparel and other guidelines including proposed penalties for violations: "Jeff, When we spoke I was focused on the process and probably unclear about the overall structure. The plan would be as follows: a. Hair, make up, bows – 2019-20 warning then penalty USASF b. Choreography and music – 2010-20 warning then penalty – EPs c. Uniform look – 2019-2020 voluntary, 2020-21 – warning then penalty – purchase cycle considered." Mr. Webb forwarded this email to several Varsity employees including the following text" "CONFIDENTIAL Let's discuss." Elza, Brian, 03 March 2020, Email: Uniform Discussion from Webb, VAR00270286 - VAR00270287, at 0286-0287.

[240] In response to Varsity's tactics, "Some small competitors just throw up their hands. Tish Reynolds launched Just Briefs, a maker of cheerleading practice wear, in 2005, and grew the business to $3 million. But 'Varsity kept telling [customers] you've got to buy your uniforms from us,' says Reynolds. Varsity acquired Just Briefs in 2010 and closed it, even though it hired Reynolds as part of the deal. She recently left to start Just Briefs Apparel. Like virtually everyone interviews for this article, Reynolds praised Varsity for its contributions to the industry and says it sells high-quality products. 'I just think Jeff [Webb] is very driven,' says Reynolds. 'There is enough out there for all of us. Why make it so difficult? It's like he had to have 100 percent. He can't be happy with just 95 percent.'" The Battle for the Cheerleading-Uniform Industry Is Surprisingly Cutthroat and Appropriately Glittery, at 5.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 66 of 149
PageID 10588
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          61 of 115

The relevant geographic market for Competitive Cheer Competitions is the U.S. Varsity and other camp providers provide camps throughout the entire U.S.[241] and nearly all Cheer Camp athletes reside within the U.S.

### 2. The evidence shows that Varsity possesses and exercises market power over Cheer Camps

There is direct evidence that Varsity was able to exclude competitors in the Cheer Camps market. Varsity restricts competitors' access to a significant portion of the Cheer Camps market via its policy of tying Cheer Camps and Cheer Competitions for School teams. Varsity and its co-conspirators tie attendance at Varsity Cheer Camps to entrance into the NCA and UCA national championship competitions: in order for School teams to qualify for Varsity's high school national championship competitions, at least 75% of the team members must have attended a Varsity Cheer Camp within the prior twelve months. See Section V.C below for a more detailed description of this policy and its anticompetitive effects. School teams are the primary participants in Cheer Camps and because School teams all strive to attend the national championship events, this policy disadvantages non-Varsity suppliers of Cheer Camps. This policy effectively precludes competing suppliers of Cheer Camps from a significant portion of the market.

As discussed above in Section IV, Varsity documents identify three distinct markets—Cheer Competitions, Cheer Apparel, and Cheer Camps—and show that Varsity holds a dominant position in each of these markets. The available market share figures for the Cheer Camp market are consistent with the statements found in these documents. Marlene Cota, former Varsity VP of corporate alliances and business development for Varsity, testified that Varsity's market share for Cheer Camps in 2012 was 85%[242] and that Varsity's market share remained constant between 2012-2018.[243] Consistent with Ms. Cota's testimony, a 2014 Varsity document estimates Varsity has 80% to 85% share of all camps.[244]

Varsity documents state that "Varsity Spirit is the largest camp operator in the world" and that they have the "Largest Footprint of Dance and Cheer Camps in the U.S."[245]

---

[241] A Varsity document shows a map of Varsity camps showing they are held throughout the entire U.S. Varsity Brands, May 2018, Management Presentation, VAR00008463 - VAR00008587, at 8545.

[242] "Q. And what about the camp market, do you know what Varsity's market share would have been in the market cheer camps in or around 2012? A. 85 percent. Q. And Ms. Cota, what are these numbers based on? What are these numbers based on? A. Well, in my role in making presentations to corporate sponsors and selling through corporate sponsorships, I had to present market share figures in order to get corporate sponsors. So I'm basing those numbers on what I would present in my own documents and presentations to potential corporate sponsors on what our market share was at that time." Deposition of Marlene Cota, Volume I, at 50:18 - 51:12, objection omitted.

[243] "Q. And what about camps for - did that remain the same as well between 2012 and 2018, to your knowledge? A. Well, now you're back on school. All Stars don't have camps. So, yes, it did remain consistent for camps." Deposition of Marlene Cota, Volume I, at 54:15 - 20.

[244] Varsity Spirit, 02 October 2014, Varsity Spirit Meeting Agenda, VAR00341580 - VAR00341583, at 1581.

[245] See, e.g.,

- "Varsity Spirit is the largest camp operator in the world, and our camps are run by the leaders and experts in the industry. Varsity was founded on the commitment to provide the highest quality training camps and this remains our promise to you today." Varsity Spirit, Undated, Our Camp Brands,

Varsity's high and persistent market share in Cheer Camps is protected by multiple barriers to entry, including its policy of tying Cheer Camps and Cheer Competitions for School teams as explained above. Similarly, Varsity awards bids to some of its national competitions at Cheer Camps,[246] which also disadvantages non-Varsity Cheer Camps.[247]

# V. Varsity's conduct harmed competition

### A. Varsity's conduct created an ecosystem that enabled it to acquire and maintain market power across all three relevant markets

Varsity not only possesses market power, but Varsity's market power in each of the relevant markets was created or maintained through its anticompetitive scheme. In the following sections, I explain how Varsity's conduct has excluded rivals and caused it to acquire, enhance, and maintain market power in each of the relevant markets.

Varsity's anticompetitive scheme encompasses a number of interrelated actions impacting each relevant market. Taken together, this concerted course of conduct allowed Varsity to create what its employees and documents routinely refer to as the "Varsity Spirit Ecosystem." Varsity describes its entire Varsity Spirit division as a "fully integrated ecosystem with apparel, camps,

---

https://www.varsity.com/school/camps/brands/#::text=Universal%20Cheerleaders%20Association,-Founded%20in%201974&text=Today%20it%20is%20the%20largest,locations%20of%20any%20camp%20company, accessed 09 May 2022, at 1.

- Varsity claims to have the "Largest Footprint of Dance and Cheer Camps in the U.S." Elza, Brian, 22 October 2018, Email: Draft Agenda for Bain, VAR00309426 - VAR00309502, at 9470.

- A Bain survey stated that "Varsity cheer camps are the majority of the market." Bain & Company, 07 January 2015, Diligence highlights & strategy discussion, CB00000212 - CB00000274, at 0231.

[246] Jamie Parrish, former Director of Strategy and Special Projects at Varsity All Star, testified that Varsity gives out bids at Cheer Camps: "Q. Did Varsity use its market share in camps, in competitions, in uniforms together as parts of a unified business strategy at Varsity? A. Absolutely. Q. And how did Varsity do that? A. Well, if you -- if you look just simply at high school cheerleading. One of the ways that you get to the high school national championships, is that you go to camp and qualify with an evaluation, home team evaluation, that will give you a green light to then go to the national championship for high school national championship. Now, mind you, the high school national championship is protected by Varsity, yet it is not a public office, public -- you -- if you think of the high school football championship or the high school baseball championship, those are normally some conglomeration of the National Federation of High School Sports and it's in conjunction with a not-for-profit public school administered ultimate championship of each sport. In cheerleading, the national high school championships is not, in fact, a culmination of all of the state associations coming together to have the pinnacle competition in the sport of cheerleading. It is a for-profit owned-by-Varsity competition. And so we don't enjoy what other sports enjoy. We have a Varsity-owned high school competition ran [sic] by Varsity. Well, if you are going to camp at Varsity, you will get a bid, quote/unquote, to go to this national high school competition if you're a high school and who doesn't want to go to Disney World. So the answer to your question is yes, they do combine their different verticals to make a more enticing product." Deposition of Jamie J. Parrish, Volume II, 17 March 2022, at 435:23-437:3.

[247] See, e.g.,

- Varsity, 2017, 2018 Key Selling Points - College Camps Nationals, VAR00074133.

- Varsity, 2019, NCA & NDA College Nationals Key Points, VAR00074486 - VAR00074490.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 68 of 149
PageID 10590
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**                    63 of 115

and competitions."[248] Indeed, the existence of this ecosystem is featured prominently in the materials Varsity disseminated to potential buyers or investors in Varsity. The Varsity Spirit Ecosystem was featured in discussions when Charlesbank purchased Varsity for $1.5 billion, as well as when Charlesbank sold Varsity to Bain for $2.5 billion in 2018.

The Varsity ecosystem is comprised of the interrelated products and services that Varsity offers including the three core components: competitions and events; uniforms and accessories; and training and education (including camps and clinics). Surrounding these core components are three external types of organizations that are essential to Varsity maintaining control of the entire ecosystem: governing bodies, safety organizations, and strategic partners. At the core of the ecosystem is digital and social interaction which Varsity claims creates a connected culture. In short, the Varsity ecosystem has three core components—competitions, camps, and apparel—that are connected via digital and social interactions and that it protects via its control of external organizations. See Exhibit 5 for a pictorial of the ecosystem as described by Varsity documents. Varsity documents describe this structure as establishing a competitive moat: "[The] Varsity Spirit ecosystem strategy combines personalized products and services to create a deep moat."[249]

Varsity's ecosystem spans the relevant markets and its control over each of those markets allows it to dominate the entire ecosystem. Varsity documents repeatedly refer to its dominance of both individual markets and its entire ecosystem. See Section IV for a discussion of Varsity's market

---

[248] See, e.g.,

- Seely, Bill, 19 October 2018, Email: Draft Agenda For Bain, VAR00371189 - VAR00371320, at 1228.

- Varsity Brands, 24 October 2017, Q4 Board of Directors Meeting, CB00025330 - CB00025449, at 5379 - 5385.

- Varsity Brands, 13 June 2017, ELT Strategy Offsite, VAR00313085 - VAR00313306, at 3135.

[249] See, e.g.,

- "How can we create a sustainable, defensible business (deep moat)?" Varsity Spirit, February 2017, Varsity Spirit Strategy Meeting #2, VAR00272414 - VAR00272501, at 2496.

- A 2017 Varsity presentation slide states: "[The] Varsity Spirit ecosystem strategy combines personalized products and services to create a deep moat and sets [the] foundation for our 2020 strategy." Hansen, Jessica, 11 July 2017, Email: Deck Mark-up from Wayne, VAR00584153 - VAR00584185, at 4154.

- Varsity Brands, May 2018, Management Presentation, VAR00008463 - VAR00008587, at 8477.

- "Operating across all three businesses provides a deep competitive moat." Varsity Spirit, October 2018, Varsity Spirit Overview, VAR00345222 - VAR00345244, at 5224.

power. In Varsity's own terms, Varsity is "All Things Cheer,"[250] "We are Cheerleading,"[251] and "Varsity is Cheerleading in the US." [252]

In order to understand how Varsity became "All Things Cheer" in the U.S., and to assess whether any of that conduct was anticompetitive, it is informative to review Varsity's more recent strategy for international expansion. Varsity documents establish that they are using the blueprint that was effective in the U.S. as a roadmap for its international expansion strategy. Varsity documents that provide useful context for my subsequent analysis of its anticompetitive conduct in the U.S. are described below.

The "International Update" section of the 2017 Varsity Brands Board of Directors Meeting presentation states: "Varsity's Success in All Star provides an analogous strategy to what we are trying to accomplish in the International space."[253] Varsity cites two factors explaining its success in the U.S.—governance and commercial growth. Regarding governance, it states:

- "Varsity was instrumental in the creation of the All Star governing body (USASF) which enabled policies beneficial to growth of the overall All Star market <u>and Varsity</u>.

- USASF set the rules of engagement for athletes, coaches, gyms and event producers (including Varsity and non-Varsity parties)."[254]

Simultaneous to controlling the governing bodies in the U.S., Varsity aggressively grew its events and competitions to "roll-up the All Star market."[255] The same document states that "In

---

[250] Varsity frequently uses this tagline, which is actually the name of one of the businesses it acquired. "All Things Cheer (ATC) is a Varsity brand that focuses on high quality cheerleading competitions throughout North America. ATC is a brand created and run by people who love this sport! ATC is dedicated to the development of athletes and is committed to inspiring excellence to continue raising industry standards!" Varsity Spirit, 2022, All Things Cheer, Varsity Brands, https://www.varsity.com/atc/, accessed 25 April 2022, at 2.

[251] See, e.g.,

- A Varsity document specifically addresses its use of this phrase in a series of slides with the title "We Are Cheerleading." The document reads: "All things to all people. Sounds easy right? When Varsity launched the 'We are Cheerleading' campaign, the overall position was attractive. We are, in fact, cheerleading. <u>But it didn't take long for our competitors to take this idea and use it against us</u>. By using our assertion that we ARE cheerleading, we are now portrayed as market bullies by our competitors. Negative media posts are launched onto social channels such as ASGA [the All Star Gym Association web page], and the overall message is not good for the Varsity image. Outsider positioning statements include: if you pose a threat to Varsity, you will be acquired, and, if you have success in the market, Varsity will, well, squish you like a bug." Parrish, Jamie, 21 August 2017, Email: 2020 Slides, VAR00255570 - VAR00255616, at 5576-5577. Emphasis in original.

- Elza, Brian, 22 October 2018, Email: Draft Agenda for Bain, VAR00309426 - VAR00309502, at 9431.

[252] Varsity Brands, 24 October 2017, Q4 Board of Directors Meeting, CB00025330 - CB00025449, at 5394.

[253] Varsity Brands, 24 October 2017, Q4 Board of Directors Meeting, CB00025330 - CB00025449, at 5396.

[254] Varsity Brands, 24 October 2017, Q4 Board of Directors Meeting, CB00025330 - CB00025449, at 5396, emphasis added.

[255] "Commercial Growth [bullet] Simultaneously, we built national event coverage through aggressive organic growth and acquisitions to roll-up the All Star market and create a sustainable position [bullet] Strategy took millions of investment over 12 years to accomplish, but has eventually become a key driver of revenue and EBITDA growth over the last 5 years." Varsity Brands, 24 October 2017, Q4 Board of Directors Meeting, CB00025330 - CB00025449, at 5396.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 70 of 149
PageID 10592
Highly Confidential        **Expert Report of Janet S. Netz, Ph.D.**        65 of 115

the world of sports, he who makes the rules, rules,"[256] demonstrating Varsity's awareness that controlling the governing body was essential to creating the ecosystem Varsity dominates as "All Things Cheer" in the U.S. By controlling the governing body, the USASF, Varsity was able to build the foundation for the three core components of its ecosystem while simultaneously building its competitive moat and excluding competitors.

Varsity acknowledges it must control any new international sanctioning body in order to maintain its control of its U.S. ecosystem: "Another International Federation adding cheerleading poses a significant threat to the US market…If we did not gain control of cheer International Federation [referencing a potential international sanctioning body] we risked eventually losing the All Star market in the US."[257] Consistent with its successful U.S. strategy, Varsity engaged in a multi-year strategy to persuade the IOC to recognize the ICU—a Varsity-created and Varsity-controlled entity—as the international sanctioning body. Varsity's efforts were successful—the IOC recognized the ICU in 2021.[258] According to Varsity, the goals for the ICU are to "Protect disruption in the cheer market domestically from an external entity" and "Promote global expansion of cheer and set the foundation for a commercial ecosystem down the road,"[259] including pursuing an aggressive acquisition strategy similar to what it achieved domestically.[260] Varsity's international strategy provides a unique retrospective insight into its success in the U.S., which was driven in large part by its control of the USASF. Below I explain how Varsity used its control over the USASF to harm competition in the U.S.

### B.  Varsity and the USASF conspired to exclude and disadvantage rivals

---

[256] Varsity Brands, 24 October 2017, Q4 Board of Directors Meeting, CB00025330 - CB00025449, at 5399.

[257] Varsity elaborates on this threat, stating: "USASF World Championship would be at risk which has a trickle down impact on local, regional and national championships that build to this event in the US [bullet] Competition Rules that govern All Star in the US could be overwritten by an international body and could disadvantageously alter the All Star event market [bullet] Rules for uniforms and equipment could also disadvantage cheer providers as many sports require simple, standard uniform designs (e.g. name only on front) [bullet] In many other countries there is a strong bias for only non-profit entities in education and competition activities for sports reducing our ability to operate." Varsity Brands, 24 October 2017, Q4 Board of Directors Meeting, CB00025330 - CB00025449, at 5399.

[258] Webb, Jeffrey G., 20 July 2021, Re: ICU Receives Full Recognition Status by the International Olympic Committee, International Cheer Union, https://cheerunion.org.ismmedia.com/ISM3/std-content/repos/Top/olympics/docs/ICU_IOC_Full-Recognition.pdf, accessed 12 April 2022.

[259] Varsity Brands, 24 October 2017, Q4 Board of Directors Meeting, CB00025330 - CB00025449, at 5401.

[260] See, e.g.,

- "In addition to the defensive benefits, Varsity is poised to build cheerleading globally and bring commercial benefits to Varsity." Varsity Brands, 24 October 2017, Q4 Board of Directors Meeting, CB00025330 - CB00025449, at 5402.

- Varsity lists seven companies as being in its "International Acquisition Pipeline." Varsity Brands, 24 October 2017, Q4 Board of Directors Meeting, CB00025330 - CB00025449, at 5404.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 71 of 149
PageID 10593
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**                    66 of 115

Varsity and the governing body for All Star Competitive Cheer, the USASF, conspired to exclude and disadvantage Varsity's rivals. This conduct operates as an artificial barrier to entry, and economists consider this ability to exclude rivals to be a hallmark of market power.[261]

Varsity obtained this power by establishing the USASF and stacking its decision-making bodies with Varsity employees and others dependent on Varsity, including USASF employees, as described in Section III.B.2. Over time, Varsity tightened its control over the USASF by acquiring competing USASF member firms, as described in Section V.D. The Varsity statement that "In the world of sports, he who makes the rules, rules"[262] explains why it sought control over the USASF. Below I describe how Varsity and the USASF disadvantaged its rivals.

The USASF is the governing body for All Star Competitive Cheer and is responsible for sanctioning All Star Competitive Cheer events. The USASF was established in 2003 as a distinct legal entity from Varsity, but it was created by Varsity and has been operated by employees that are compensated by Varsity including through Varsity stock options and other incentive programs.[263] Below I describe the extent to which Varsity and the USASF have been intertwined since the inception of the USASF as well as how Varsity leverages that control to disadvantage its rivals.

Over time, Varsity has obtained control over the sanctioning bodies for Competitive Cheer, including the AACCA, ICU, NACCC, USA Cheer, and USASF, through various means.[264] Despite legally being a separate corporate entity from Varsity, the USASF has been run by Varsity employees since being founded. Currently, Varsity employees serve as the USASF's President and Vice President of Events and Corporate Alliances.[265] For example, Section

---

[261] See, e.g.,

- Carlton, Dennis W., and Jeffrey M. Perloff, 2005, Modern Industrial Organization, Fourth Edition, Addison Wesley, at 76-77.

- Viscusi, W. Kip, Harrington, Jr., Joseph E., et al., 2005, Economics of Regulation and Antitrust, Fourth Edition, The MIT Press: Cambridge, MA, at 168.

[262] See footnote 256.

[263] Varsity documents indicate that "USASF was created as a Varsity strategy." Varsity All Star, Undated, Varsity All Star Advisor & Sales Training, VAR00199104 - VAR00199153, at 9106.

[264] See, e.g.,

- A Varsity Spirit presentation draft explains its role in establishing the AACCA, USASF, ICU, and USA CHEER governing bodies to regulate cheer across the School, All Star, international, and overall U.S. cheer: "To lead and shape the market, Varsity was instrumental in the creation of several cheer governing bodies to set the rules of engagement for athletes, coaches, gyms and event producers…These governing bodies enabled policies beneficial to further growth of the overall cheer and dance markets." Seely, Bill, 19 October 2018, Email: Draft Agenda For Bain, VAR00371189 - VAR00371320, at 1265.

- Varsity attributes its "[s]uccess in All Star" to USASF policies, stating that "Varsity was instrumental in the creation of the All Star governing body (USASF) which enabled policies beneficial to growth of the overall All Star market and Varsity." Varsity Brands, 24 October 2017, Q4 Board of Directors Meeting, CB00025330 - CB00025449, at 5396, emphasis added.

[265] Connolly, Daniel, 18 September 2020, CHEER EMPIRE: for-profit company built competitive cheer, pays people who make its rules, Commercial Appeal, https://www.commercialappeal.com/in-depth/news/2020/09/18/cheer-empire-profit-company-created-cheerleading-regulators-pays-salaries/3468551001/, accessed 18 April 2022.

V.D.7.b), describes Varsity's control of the USASF Board of Directors and Sanctioning Committee; by the end of 2015, Varsity controlled a permanent majority of the USASF Sanctioning Committee seats. This control was achieved in large part through its anticompetitive acquisition strategy described in Section V.D.

The USASF Sanctioning Committee has the power to determine the location and date of USASF-sanctioned bid events and also which event producers are permitted to award bids to The Worlds competition. For example, the annual All Star Tier 1 approval process requires that event producers apply each year to hold each of their events and the Sanctioning Committee votes yes or no to approve the events. Varsity intentionally sought control of the USASF Sanctioning Committee in an effort to "change the dynamics of how the USASF permits its Worlds Bid distribution."[266] Varsity controlled a majority of the seats on the Sanctioning Committee and voted in a block, as demonstrated by the following email from Steve Peterson of the USASF to three Varsity employees: "I just wanted to let you know I only sent this [the 2018-2019 Tier 1 voting form] to you guys from Varsity [instead of all of the individual Varsity sanctioning committee members]. It's pretty cut and dry this year. Thanks to Varsity owning 33 of the 42 Tier 1s. [smiley emoji] Let me know if you want me to send this out to the other Varsity Sanctioning Committee Members, or if you will handle internally and then get back to me with one vote for all Varsity brands."[267]

The extent to which Varsity controlled the USASF is demonstrated by the following:

- A 2015 Varsity email from Jeff Webb, Chairman and CEO of Varsity Brands, to other Varsity employees discusses making significant changes to the USASF, including removing and replacing two USASF board members and moving them to different positions within USASF as well as several other management reporting changes within the USASF. Mr. Webb also proposes creating USASF bylaws defining what it can and cannot do; Mr. Webb then provides a list of those bylaws.[268]

- A letter and related presentations authored by Varsity with the USASF as the intended audience explicitly states what Varsity believes the USASF should and should not be

---

[266] Varsity documents discuss its intent to acquire other event producers so that Varsity can gain greater control of The Worlds' bid process. Varsity discussed acquiring three IEPs, Aloha, Spirit Celebration, and All Things Cheer (ATC); collectively these acquisitions would provide Varsity with five more Worlds bid events, and thus five more seats in the Sanctioning Committee. See, e.g.,

- "I know the plan is to change the way that the USASF distributes bids to eliminate this opportunity of buying these Tier 1 or Tier 3 companies. Prior to this happening I think we should explore a couple of acquisitions quickly in regions that make the most sense first." Webb, Jeff, 08 September 2016, Email: Re: Safe Acquisitions, VAR00272846 - VAR00272848.

- "My assumption is that we would have to pay a high premium for EPIC since they know the multiple we paid for JAM. If we were to acquire Aloha, SC [Spirit Celebration], and ATC [All Things Cheer] we would acquire 5 new Worlds bid events for a very reasonable price, and then change the dynamics of how the USASF permits Worlds Bid distribution." Webb, Jeff, 08 September 2016, Email: Re: Safe Acquisitions, VAR00272846 - VAR00272848, at 2847.

[267] Peterson, Steve, 16 February 2018, Email: FYI...VOTE NEEDED: 2018-2019 Tier 1 Approval Process, USASF_00018385 - USASF_00018387, at 8385.

[268] Burton, Brillhart, 02 April 2015, Email: Re: USASF-Confidential, VAR00274129 - VAR00274131.

focused on. Varsity argues that USASF should eliminate all sponsorships[269] because "Varsity invests hundreds of thousands of dollars in support of USASF only to find some 'sponsor' get a higher profile at an event based on a $10K scholarship. It makes no sense for us to help create an environment for other vendors to market to our customers." Varsity also claims that "Varsity needs to take over complete operational control of Worlds. We have obviously been very involved but have deferred to USASF on many issues. We need to take full responsibility. We would expect to be paid to cover our costs plus a reasonable profit margin." Varsity makes additional demands related to USASF's financials and ultimately advises USASF to "integrate this information into a business plan that addresses our [Varsity's] issues," indicating that "If Business Plan is not agreed to, Varsity will no longer require athlete [USASF] membership which will significantly reduce USASF's funding."[270]

- Steve Peterson, the USASF Vice President of Events and Corporate Alliances, was legally a Varsity employee for part of the period between 2004-2020. Mr. Peterson, despite being a USASF Vice President, received large payments each time Varsity was acquired: from the Charlesbank acquisition, he received between $250,000-$276,000 for his "phantom shares" in Varsity; from the Bain acquisition, he received $200,000 from an employee stock option plan.[271]

- Jeff Fowlkes, then Manager at Varsity Spirit, sent an email to Varsity employees summarizing his communications with USASF employees in which Varsity made four demands of the USASF to change its rules and policies. Mr. Fowlkes stated "We have had extensive discussions with USASF senior management and they have essentially agreed to all of these points. However, they are very concerned about following the proper process…Please keep this information and discussion confidential. The USASF is rightfully paranoid about the 'Varsity runs everything' discussion. We are in a good place right now with the USASF and are accomplishing goals in a co-operative spirit. We will jeopardize that if these 'behind the scenes' discussions were made public."[272]

- Jim Hill, former National Director of Sales at Varsity All Star, testified that Varsity received preferential treatment from USASF and was provided access to information not

---

[269] "Sponsorships" appear to be any non-Varsity advertising or promotions affiliates at USASF events.

[270] See, e.g.,

- These documents were attached to an internal Varsity email that discusses changing the USASF bylaws to increase Varsity's "ability to control Chadwick." Chadwick refers to Jim Chadwick, the former USASF President. Nichols, John, 12 May 2016, Email: FW: USASF, VAR00272981 - VAR00273003.

- Other documents indicate Varsity's belief that USASF should give preference to Varsity over rival firms. An email from Brian Elza, General Manager and Vice President of Sales at Varsity All Star, to other Varsity employees with the subject "Competitors at USASF" reads: "Gentlemen: We need to do something about our competitors–specifically REBEL at the USASF regional meetings. They are treated on equal playing field as Varsity Brands who contributes millions of dollars a year in paid USASF bids." Elza, Brian, 02 August 2017, Email: Competitors at USASF, VAR00308422.

[271] 30(b)(6) Deposition of U.S. All Star Federation (Steven H. Peterson), 09 March 2022, at 278-306.

[272] Symons, Regina, 19 April 2017, Email: RE: Future Growth of All Star Cheer Discussion Continued-Confidential, VAR00327453 - VAR00327456, at 7455.

provided to other event producers: "I think there was a handful of things that—that we had access to that non-Varsity folks did not."[273]

- Notes from Les Stella, Executive Director of USASF Rules, Safety and Judging, indicate that "Varsity placed a number of their people on the Board for the USASF…Varsity put up a million dollars to create the startup of the USASF. This included everything from hiring new employees to paying for the first Worlds…In addition to the initial million, Varsity has continued to pay salaries, capital expenditures, travel expenses, etc…for the USASF for ten years…Varsity has given us support staff with legal, accounting, shipping, etc…This list could go on and on."[274]

- Jeff Fowlkes, Manager at Varsity Spirit, discussed modifying the Worlds bid process for the 2018-2019 season. Recognizing that Steve Peterson, the USASF Vice President of Events and Corporate Alliances, was hesitant to make this change, Mr. Fowlkes wrote: "He [Mr. Peterson] believes a change like we [Varsity] proposed will cause all the non Varsity companies to leave the USASF. I know they won't like it but I don't know if they will leave or not. We need to decide if the potential benefit is worth the risk. If y'all think it is, I will contact Peterson and tell him he need to set up a call with the Sanctioning Committee who would have to approve a change. We control that committee so obviously we can do whatever y'all decide."[275]

Varsity's control of the USASF and the many inherent conflicts of interests between the two organizations are evident. Below I explain how Varsity and the USASF acted in concert to harm competition.

### 1. Varsity and USASF controlled and manipulated the event sanctioning and bid system to disadvantage rivals

#### a) Varsity and the USASF controlled and manipulated the event sanctioning rules

USASF Tier 1 member event producers are those that can give out bids to the USASF's premier year-end event, The Cheerleading Worlds.[276] Historically, there were 42 Tier 1 bid events, but

---

[273] "Q. In your experience, was there a time when Varsity was treated better than competitors at USASF regional meetings? MR. KAISER: Objection. A. I mean – so, I mean, I think that there was a handful of things that – that we had access to that non-Varsity folks did not. It's not – or we knew – 'we,' as Varsity knew where to go and who to ask and whatever it may be. I mean, if they were – you know, this was not necessarily public knowledge, but, you know, it was – it was well-known with – well, not well-known. It was not public, but it was known inside our organization that if something – if an initiative need to get – needed to get started with the USASF from Varsity, Jeff Fowlkes was the guy to start it with, at the time, Jim Chadwick or whoever it may be for various – I mean, and that could have been anything." Deposition of Jim Hill, 21 March 2022, at 177:2-177:21.

[274] Stella, Les, 15 October 2012, Email: Rough start, VAR00351288 - VAR00351290, at 1290.

[275] Fowlkes, Jeff, 11 December 2017, Email: RE: IMPORTANT: Tier 1 Event Producer Application Process 2018 - 2019, VAR00081408 - VAR00081410, at 1408.

[276] See, e.g.,

- Event producers award Worlds bids to the winning teams at their events. The bids allow those teams to attend The Cheerleading Worlds competition hosted by the USASF and IASF. There are two types of Worlds bids: "fully paid," which provide a set amount of money per athlete to attend The Worlds; and "at

that was increased to 46 in November 2020; seniority is given to members based on how long they have been a member of the USASF and provides preference for event locations and dates.[277]

---

large," which allow the team to attend but provides no money. The 2016-2017 USASF Member Guidelines explain how the number of each type of bids are determined: "1. May award one fully 'Paid' Worlds bid (up to a maximum of $650 per athlete times the number on the floor where bid was awarded, plus 2 coaches) at their 'national championship' on the basis of one bid per 100 all star cheer teams at the same prior year competition. May round up to the nearest 100. Example: If an event producer had 122 all star teams participating at the same prior year competition, they may offer two fully paid Bids. 2. May award two At Large Bids for each fully paid bid at the same 'national championship' where the fully 'Paid' bid(s) are awarded. 3. May award their approved 'Paid' and 'At Large' Bids in any of The Cheerleading Worlds Club Divisions and/or 'International' divisions offered at their bid qualifying event." U.S. All Star Federation, Undated, USASF Tier 1 Membership 2016-2017, USASF_00001219 - USASF_00001221, at 1220.

- There are four USASF event producer membership tiers:

  o Tier 1 members can award Cheerleading Worlds bids. They can award a combination of "fully paid" bids and "at large" bids. Peterson, Steve, 05 January 2016, Email: Fwd: REMINDER: 2015-2016 Tier 3 & 4 Membership Application, USASF_00019495 - USASF_00019771, at 9761-9762.

  o Tier 2 members are currently for dance applicants only, but prior to the 2016-2017 season they could award "partial paid" Cheerleading Worlds bids. Peterson, Steve, 05 January 2016, Email: Fwd: REMINDER: 2015-2016 Tier 3 & 4 Membership Application, USASF_00019495 - USASF_00019771, at 9761-9762.

  o Tier 3 members hold USASF Sanctioned Events but cannot award Worlds bids, but they can apply to designate one of their events as a qualifying national championship in the USASF "Cheerleading Worlds Cup Race." Each Worlds Cup Race event offers Level 6 and Level 7 teams "points" based on scoring. The USASF then awards the teams with the most points at the end of the season either a "Paid" or "At Large" bid to The Cheerleading Worlds. U.S. All Star Federation, Undated, USASF Cheerleading Worlds Cup Race 2019-2020, USASF_00012722 - USASF_00012723, at 2722.

  o Tier 4 members cannot award Cheerleading Worlds bids. They are "Gym Members or organizations that produce one (1) competition a year, as a fund raiser." A Tier 4 member may hold a USASF Sanctioned Event and/or a USASF Sanctioned "Showcase Event" as a non-competitive audience performance. U.S. All Star Federation, Undated, USASF Event Producer Tier 3 & 4 Memberships 2016-2017, USASF_00002946 - USASF_00002948.

  o A Tier 1 member risks falling to Tier 3 standing if the event producer's "national championship" competition fails to meet Tier 1 requirements: "Current Tier 1 member event producers that fail to comply with the required membership criteria for an applied tier level, will have a one year probation to meet all requirements before having their championship tier reduced to the level justified by the tier criteria." Peterson, Steve, 12 December 2016, Email: IMPORTANT: Tier 1 Event Producer Application Process 2017-2018, USASF_00011692 - USASF_00011743, at 1717.

[277] See, e.g.,

- The 2015-2016 USASF Event Producer Membership General Guidelines criteria for awarding Worlds bids includes: "The decision to approve USASF Event Producers to award World bids will be based on the criteria below. The goal is to not over saturate [sic] any given market with Worlds bids such that the competitive value of the bids is diminished. At a minimum, qualifying competitions must provide two performances such as a prelims and finals, or two performances combining scores at least for Worlds qualifying divisions. In addition the Sanctioning Committee will consider the other following criteria. [bullet] The date the event producer became a member of the USASF, [bullet] The location of the competition at which the member desires to give bids, [bullet] The number of bids being given by other companies in that market, [bullet] The date of the bid qualifying event, [bullet] There will be a maximum of 42 Cheerleading Worlds Bid qualifying events in the USA." Peterson, Steve, 05 January 2016, Email:

Also, seniority of existing events gets priority (in terms of approving the location, date, number and type of bids allocated to other event producers) when newly sanctioned events are considered and approved. Event producer members of the USASF need permission from the USASF Sanctioning Committee to either move an event more than 200 miles or change the date if it is located too close to an existing member's bid event that had seniority.[278] In other words, event promoters with earlier USASF membership dates are afforded protections for their events from possible new events being hosted in a similar area or date range. Event promoters with earlier USASF membership dates are also given preference when any news Worlds bid events become available. Each year, the USASF Sanctioning Committee members select at which event producers and competitions will be permitted to give out Worlds bids based on the established criteria. As part of that process, event producers apply to be a Tier 1 member each year and propose event dates and locations. In the event of a conflict, the USASF guidelines give priority to the event producer that has been a USASF member the longest. New Tier 1 members are only added if an existing event falls below a certain threshold of participating teams. According to the USASF, this system "recogniz[es] the contribution made by the early USASF supporters whose financial support made the Worlds possible initially."[279]

As explained above, there has been a limited number of bids to The Cheerleading Worlds and these bids were allocated to event producers based on seniority. Despite the seniority precedent described above, the USASF introduced a new rule for the 2016-2017 season that mandated event producers must have at least 125 level five teams attend a competition to continue giving out bids in future years. If the event producer is unable to attract 125 teams in one year they are put on probation; if they are unable to attract 125 teams for the following year, they lose Worlds bids, which makes the event far less attractive to participants in the following years.[280] The new

---

Fwd: REMINDER: 2015-2016 Tier 3 & 4 Membership Application, USASF_00019495 - USASF_00019771, at 9498.

- Peterson, Steve, 17 April 2014, Email: IASF and USASF EP Membership Docs, USASF_00084334 - USASF_00084346, at 4341-4344.

[278] Peterson, Steve, 12 December 2016, Email: IMPORTANT: Tier 1 Event Producer Application Process 2017-2018, USASF_00011692 - USASF_00011743, at 1716.

[279] Peterson, Steve, 17 April 2014, Email: IASF and USASF EP Membership Docs, USASF_00084334 - USASF_00084346, at 4344.

[280] See, e.g.,

- The 2016-2017 USASF Member Guidelines read: "NEW ... all event producers applying to award 2017 Cheerleading Worlds Bids will only be approved as a Tier 1 who must have a minimum of 125 All Star 'cheer' teams participating at the same prior year's competition to qualify for this tier. Tier 2 will no longer be a USASF Membership Tier Level starting in 2016 - 2017 and Partial Paid Bids will no longer be awarded to the Cheerleading Worlds." U.S. All Star Federation, Undated, USASF Tier 1 Membership 2016-2017, USASF_00001219 - USASF_00001221, at 1219.

- Notes from a 2015 USASF Board of Directors Meeting discuss introducing the rule: "Steve [Peterson, Vice President of Events and Corporate Alliances at USASF] provided a review of the qualifications for each level of Tier membership, and reminded the Board that cheer event producers must apply for Tier 1 status in order to award Worlds Bids and must maintain a minimum of 125 All Star teams at their bid event in order to qualify to award Bids. If a Tier 1 company does not maintain 125 teams at their bid event, they will be placed on probation. If they are not successful in raising attendance to 125 teams, they will no longer be eligible to award Worlds Bids. Teams must be in legitimate divisions on the USASF age grid and must

125-team minimum applies to all Tier 1 applicants, regardless of membership date. Prior to this rule being established, a Tier 1 event producer with a USASF membership date during or before the 2007-08 season only had to meet a 100-team minimum to continue offering Worlds bids.[281] Therefore, if an event producer had a membership date as early as 2007 and previously was able to meet the 100-team minimum, it would now have to raise participation to 125 teams to continuing offering Worlds bids. The probationary period also appears to have been introduced in 2016-2017; prior to this rule being established an event producer would immediately lose its bids if it failed to meet the 100-team minimum. However, by putting teams on probation—and sharing that information with Varsity—it allows Varsity to both identify possible acquisition targets and/or sabotage those events that were struggling to meet the minimums. When Varsity acquires any of these event producers, Varsity is allowed to use the acquired event producer's existing membership date for purposes of seniority, including bid approvals, waiting lists, and event move requests. This information allows Varsity to selectively target the event promoters and events that are most likely to result in Varsity obtaining additional Worlds bids. For example, Varsity could target existing Worlds bids events with the intention of acquiring that event promoter after it is placed on probation but before it loses its Worlds bid event. Alternately, Varsity could target existing Worlds bids events with the intention of forcing that event promoter on probation and to lose their Worlds bids event knowing that Varsity was well positioned to receive the forfeited Worlds bids based on its own USASF membership date. The 125-team rule provided the mechanism through which Varsity targeted specific event producers as described below.[282]

Varsity repeatedly discussed altering the USASF rules contrary to the precedent of prioritizing event producers with membership seniority. For example, in conflict with the USASF's rationale, Varsity proposed manipulating the bid process to preclude small event producers from distributing bids regardless of their history with USASF.[283] The same document shows Varsity's intent for proposing changes to the bid structure: "He [Mr. Webb] believes, and I agree (for whatever that's worth), that in some cases the ability to give Worlds Bids is keeping these companies viable and certainly driving up their value if we decide to acquire them."[284] Varsity, in coordination with USASF, established the new 125 team threshold rule and created the

---

have received a ranking and results." Chadwick, Jim, 09 December 2015, Email: Fwd: Notes and Meeting Update Request, USASF_00004956 - USASF_00004966, at 4960.

[281] "Tier 1 requirements for USASF members approved in 2007-08 or earlier are reduced from 125 to 100 all star cheer teams. All members approved after the 2007-08 season, and new applicants, must meet the 125 all star team standard." Peterson, Steve, 17 April 2014, Email: IASF and USASF EP Membership Docs, USASF_00084334 - USASF_00084346, at 4336.

[282] Varsity documents routinely discuss using the USASF to advantage Varsity. A strategy document authored by John Newby, the Executive Vice President of Impact and VIP Branding at Varsity Brands, discussing the future of All Star Cheer states: "Redefine All Star market (alongside the USASF) to accelerate growth by redefining and broadening the market (underway and several idea have been identified) [bullet] Determine long-term strategy with USASF and assess need/benefit/role of USASF that benefits Varsity, including funding of Worlds bids and cost savings for Varsity… Varsity Spirit Camps – Education and Training (Seely and team)..Explore more aggressive pricing strategies." Newby, John, Undated, Varsity Spirit Future, VAR00250013 - VAR00250092, at 0022.

[283] A Varsity emails states "As you know, Jeff W. [Webb] wants the USASF Worlds Bids process changed to prevent small competitors from being allowed to offer Worlds Bids." Fowlkes, Jeff, 22 September 2017, Email: Worlds Bids, VAR00244139 - VAR00244140, at 4139.

[284] Fowlkes, Jeff, 22 September 2017, Email: Worlds Bids, VAR00244139 - VAR00244140, at 4139.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 78 of 149
PageID 10600
Highly Confidential        **Expert Report of Janet S. Netz, Ph.D.**        73 of 115

probationary period. These changes in the rules forced an increased number of independent event producers into a probation period, most likely the smaller event producers consistent with Mr. Webb's statement above. The probationary period provided Varsity with additional information on which events to target and the effectiveness of those efforts. These new rules enabled Varsity to target and kill off competitors' events and assume their World bid events often via acquisition. When Varsity acquired targeted events, they would then cease their counterprogramming efforts against that event. Absent Varsity's market power and its control of the USASF, these efforts would neither be possible nor effective. The long run result of these efforts is reduced competition in at least the Cheer Competition market. To the extent there appears to be any increase in competition as a result of Varsity's efforts, that increase is temporary. Varsity stated its goal was to acquire all Worlds bids events, consistent with its goal that they "look to acquire all the Tier 1 event companies that give bids to the cheerleading and dance Worlds."[285]

> b) Varsity undercut events hosted by rival event producers

After successfully implementing the 125-team minimum rule, Varsity pursued a strategy of targeting specific events and event producers. Varsity, often with the aid of information provided by the USASF, identified events that were in jeopardy of not meeting the 125-team minimum and then pursued a course of conduct to sabotage those and other events.

For example, Varsity requested information from the USASF on the total number of Worlds paid bids allocated to rival event producers. Steve Peterson, USASF Vice President of Events and Corporate Alliances, responded with a one-word email—"Confidential"—that included an attachment with a spreadsheet listing all the events for the season and the following information for each: Company Name, Event Name, Venue Name, City, State, Event Date, and the number of paid and at large bids.[286] This information allowed Varsity to identify the events with the greatest number of World bids. Similarly, Varsity directly requested information from the USASF on which event producers were on probation for a given year, which will be on probation for the following year, and which producers were next in line to be awarded The Worlds bids of any producer that loses them. In response to this request from Tres LeTard, the former Co-General Manager and Vice President of Operations at Varsity All Star, Steve Peterson, the USASF Vice President of Events and Corporate Alliances, wrote: "The only one on probation this season was Spirit Unlimited and they blew it out this year. So far, in 19-20 we have Cheer Tech and ASC on probation. If you guys [Varsity] can put the squeeze on them next season, that would be great."[287]

Varsity did, in fact, "put the squeeze" on various event producers by scheduling Varsity-branded events in direct competition with its rivals' events. While the USASF Sanctioning Committee has to approve dates and locations of events awarding Worlds bids, Varsity is free to schedule

---

[285] See Footnote 58.

[286] See e.g.,

- Peterson, Steve, 27 November 2017, Email: Re: Proposal: 2018-2019 Full Paid Bids Increase, USASF_00017144 - USASF_00017146.

-  U.S. All Star Federation, Undated, Cheerleading Worlds Bid Qualifiers, USASF_00017147.

[287] LeTard, Tres, 11 March 2019, Email: Re: VOTE NEEDED: 2019-2020 Tier 1 Approval Process, VAR00365110 - VAR00365117.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 79 of 149
PageID 10601
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          74 of 115

other events at will. The intent and purpose of this counterprogramming strategy was to impede its rivals' ability to meet the newly instituted USASF 125-team minimum required to maintain Worlds bids. After successfully impeding these events, Varsity would likely be awarded the forfeited Worlds bids because of its USASF membership seniority. Varsity also used this strategy to devalue rival event producers that it considered viable acquisition targets. Absent the market power that was obtained and maintained via its acquisition strategy, Varsity's counterprogramming strategy would not have been effective.

Testimony from Mr. Parrish, the former Director of Strategy and Special Projects at Varsity All Star, summarizes this strategy. He testified that Varsity monitored other event producers' registration numbers and when they approached the 125-team threshold, the Varsity "strategy would be to put a Family Plan event on either side of them on the weekend before and the weekend after, and then we would call our sales team and say, 'Hey, try to poach teams off of that – that event.'"[288] As part of this strategy, the Varsity sales team then offered incentives for those teams: "if you come over to this [Varsity] competition we'll give you [free registration for] three or four athletes, or we'll give you some Varsity credits, or we'll give you some uniform credits if you will come over here. And the goal being to pull teams from our competitors in an effort to get their number of participation [sic] underneath that requirement set by the USASF to give a Worlds bids. And then once you – once they – and, you know, a competition company within Varsity could then make an appeal to the USASF Board that that particular company had lost its USASF Worlds bid requirement by not having 'X' amount of teams, and then that – then the Worlds bid gets taken, and then puff, there goes that competition. If their [sic], puff, there goes that competition, then that opens them up for various things like, you know, buying them out, or they just go away. Q. And did that actually happen, the situation you just described with Varsity planting its own event and driving down numbers at – A. It was common practice."[289]

Below are examples of the type of conduct described above:

- A September 2016 Varsity document indicates they targeted EPIC Brands Worlds bid events: "I've asked Kevin [Brubaker, National Sales Director of New Development at Varsity] to look into all of the EPIC Worlds bid events to see which of their events we can drop a two day nationals into the same market and load it up with Summit Bids."[290]

---

[288] Deposition of Jamie J. Parrish, Volume I, 03 March 2022, at119:12-21.

[289] Deposition of Jamie J. Parrish, Volume I, 03 March 2022, at 126:20-127:17.

[290] See, e.g.,

- This same document discusses the Varsity "Target" list which includes all Varsity competitor events that have 2, 3, or 4 paid bids. According to the author, Kevin Brubaker, the National Sales Director of New Development at Varsity, the list is "what I made to look at daily to target our competitors during their World bid events." Elza, Brian, Brubaker, Kevin, 27 September 2016, Email: New or Moving Two Day Events for Next Season - Worlds Bid Competitions, VAR00083797 - VAR00083798 at 3797.

- A document from January 2018, the same month Varsity acquired EPIC Brands, indicates Varsity scheduled two weekends of events in one region that were head-to-head with EPIC Brands. "Below are all the events that Varsity currently has in the Northeast for this season of 2018-2019. Only 2 different weekends have head-to-head events and they are both because of the addition of Epic Brands." Varsity, Undated, 2019 - 2020 Event Dates, VAR00309744 - VAR00309864, at 9766.

Varsity acquired EPIC Brands in January 2018; the acquisition is described in Section V.D.5.

- o   An email from Tres LeTard indicates that Jeff Webb "strongly recommends" that Varsity target EPIC Brands, a rival event producer, by scheduling Varsity events near EPIC Brands events and on "similar weekends." Mr. LeTard suggests adding paid bids and "load[ing] it with twice as many At Large bids"; another Varsity employee suggests "treat[ing] it like a world bid event."[291]

- o   After successfully devaluing competitors' events so it could acquire the event producer, Varsity would change its future schedule to avoid continued counterprogramming. For example, a few months before Varsity acquired EPIC Brands, Varsity employees discussed "what events we [Varsity] would keep and cancel" post-acquisition and concluded: "There are 2 in green I think we need to keep but we need to get the dates off our current events so they're not head to head."[292]

- When Varsity learned that Cheer Derby, an event producer, was partnering with the apparel company GK Elite, Varsity targeted multiple Cheer Derby events. Brian Elza, the former Co-General Manager and Vice President of Sales at Varsity All Star, wrote "Will you make sure we have events on top of these Cheer Derby events" to which Kevin Brubaker replied, "I wanted to give you some data about our current Varsity events that we have near or head-to-head with the 3 Cheer Derby events…Below are the Varsity events that we currently have lined up that are around the same dates and regional location as the 3 Cheer Derby competitions…Please notice that the [four] highlighted Varsity events are currently on the same weekend and going head-to-head with Cheer Derby."[293] Varsity placed some of its events as close as one mile away from the Cheer Derby events and on the same weekend. In addition to directly targeting Cheer Derby's competitions, the purpose of this counterprogramming was also to limit GK Elite's access to athletes as well.[294]

- Heather Petz, the owner of the event producer Champion Cheer Central, an independent event producer, informed Mr. Peterson, the USASF Vice President of Events and Corporate Alliances, that she was concerned about attracting enough teams to be able to

---

[291] "I had an interesting conversation with Jeff Webb on the way down to Orlando. We were discussing competitors and who is still relevant. I mentioned EPIC and he asked what we could do to apply pressure to them. I said we have Summit Bids and some events near them on similar weekends, but could do more at ASC – Baltimore if needed (and explained the new bid strategy). He strongly recommended that we do all we can." LeTard, Tres, 24 April 2017, Email: RE: All Star Challenge Baltimore Summit Bids, VAR00104422 - VAR00104424, at 4423.

[292] Elza, Brian, 18 August 2017, Email: FW: EPIC Overlay, VAR00330170 - VAR00330171.

[293] Brubaker, Kevin, 14 September 2017, Email: Varsity vs. Cheer Derby Competitions, VAR00375328 - VAR00375330, at 5328-5329.

[294] Jim Hill, former National Director of Sales at Varsity All Star, testified that "You got Rebel, Nfinity, GK. And they would—they would partner with non-Varsity events to gain access to customers to try to expand their—their brand, the uniform, so to speak…obviously, we couldn't prevent them from partnering with Cheer Derby. But, you know, if customers aren't going to their [Cheer Derby's] event; you know, it kind of limit[s] their access…this has as much to do with maintaining fashion business or affecting a fashion company competitor's business as much as it did event business." Deposition of Jim Hill, 21 March 2022, at 149:14-151:13.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 81 of 149
PageID 10603
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          76 of 115

award Worlds bids. She writes "My numbers are down this year for our upcoming bid event due to mergers, small gyms going out of business, a lot of bids in Kentucky and Varsity putting a Summit Bid qualifier in the same building two weeks prior to my event."[295]

- Varsity considered JAMZ, a rival event producer, two-day event in Las Vegas a "strong staple event." This event offered four paid Worlds bids, large cash prizes, prizes for all participants, and did not force participants to stay in specific hotels.[296] Regarding this event, Varsity discussed planting a new event as a "Great opportunity for us and will help hurt a competitor, with Paid Bids" and that "we need to do whatever it takes for it to be planted somewhere to compete against Jamz. We are trying to box that event in with as many events as we can on the same weekend."[297] Varsity's strategy was effective, as demonstrated by the following documents:

  o As early as 2016, Varsity targeted specific JAMZ events. After Kevin Brubaker, Varsity National Sales Director of New Development, informed multiple Varsity employees how many teams were expected to attend the 2017 JAMZ Las Vegas competition, Jim Hill, then National Director of Sales at Varsity All Star, responded that they would identify the specific teams that were registered and "go ahead with an attack strategy for those All Star teams."[298]

  o Varsity strategically placed a new event (Encore Las Vegas) to compete with the JAMZ Las Vegas Nationals event. Varsity identified those All Star teams that registered for the JAMZ event but not for the Varsity event and followed up with each to encourage them to attend the Varsity event.[299]

  o In February 2020, an email from Brian Elza, Co-General Manager and Vice President of Sales at Varsity All Star, summarized the impact of this effort: "If

---

[295] Mr. Peterson replies to Ms. Petz that "You are correct on your numbers. If you only get 122 [teams] this season then you will be on probation in 2017-2018 but you will still be able to award 2 Paid bids." Peterson, Steve, 21 December 2016, Email: Re IMPORTANT: Tier 1 Event Producer Application Process 2017-2018, USASF_00014260 - USASF_00014261, at 4260.

[296] See, e.g.,

- Varsity brands considered putting paid The Summit bids events in proximity to and on the same February 17-18, 2018 weekend as the JAMZ Las Vegas Worlds bids event: "Arizona needs some paid bids and that weekend we go head to head with Jamz and their Vegas events. They hand out 4 paid Worlds bids. Now they are marketing a $10,000 cash prize D2 Nationals (see attachment). Having DI and D2 Paid bids in town that weekend would really give us fire power to take on a strong staple event like Jamz. I say D1 and D2 paid bids so we can appeal to ALL of the gyms in the southwest." Rayam, Jameel, 09 May 2017, Email: February date conflicts in Phoenix ATC/GSSA, VAR00331301 - VAR00331302, at 1301.

- The flyer for the JAMZ 2018 Las Vegas two-day event indicated there was $10,000 in cash prizes and also there were "Prizes & Benefits for ALL DII/Small Gyms" and "JAMZ is NEVER Stay to Play!" JAMZ, 16 February 2018, JAMZ DII All Star Nationals, VAR00331303.

[297] Stott, Cole, 09 May 2018, FW: Encore San Diego, VAR00119257 - VAR00119259.

[298] Mr. Hill wrote "Thanks for this [list of teams registered for JAMZ event] Kevin! Carrie let's get this tracked in Salesforce ASAP so we can go ahead with an attack strategy for those All Star teams." Seller, Carrie, 21 December 2016, Email: RE: Jamz Vegas Schedule, VAR00103154 - VAR00103157, at 3156.

[299] Melancon, Lacey, 27 February 2019, Email: RE: JAMZ Nationals - Las Vegas, VAR00227908 - VAR00227911.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 82 of 149
PageID 10604
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          77 of 115

you recall, a few years ago we set out to 'put a hurting' on the JAMZ Worlds Bid
event which had been growing at an unprecedented amount year after year. In
order to achieve this, we added a new two-day event in Las Vegas market under
the Encore brand. Last year the events were one week apart—this season we
actually went head to head on the same weekend as their event. Over the course of
those two years we have stripped away nearly 100 of their teams while growing a
strong brand in the Vegas market with ENCORE and 217 teams this past
weekend."[300] Mr. Elza continues by describing both the USASF's involvement in
this strategy and the impact on competition more generally: "Tres and I also met
with Steve Peterson [USASF Vice President of Events and Corporate Alliances]
on Thursday to discuss a few of the 'on Probation' Worlds bids events. So far this
season there are 3 non Varsity events that are in danger of losing their Worlds
Bids due to low attendance. One of which already happened—with 98 teams. The
two happen over the next few weeks. Our increased focus on dates and locations
from a strategic point of view is continuing to pay off. None of this would be
possible without a team effort and targeted approach on when and where to put
the Varsity All Star events."[301]

- The JAMfest Super Nationals was formerly a JAM Brands event that Varsity targeted
  with their MW Classic event; after Varsity acquired JAM Brands, it realized its
  counterprogramming efforts were now harming its own event. After Varsity acquired
  JAMfest, Varsity documents show that MW Classicwas "getting killed by JamFest Super
  Nationals that's up over 250 teams. [The MW Classic] event was placed in the location
  and time that it was to combat Jam Brands, but now that we own them it's hurting us."[302]

- A Varsity email indicates that it targeted the Mardi Gras, an independent event producer,
  world bid event: "As you know we often put events on other events to hurt our
  competitors. This past season we decided to put a JAM event in Baton Rouge to go head
  to head with MARDI GRAS world bid Event in New Orleans on Jan 14 weekend.
  Strategy worked and now Mardi Gras is sitting around 60ish teams and JAM at 70. If
  MARDI GRAS doesn't hit 125 teams they lose their Tier 1 Status."[303]

  o Jim Hill, former National Director of Sales at Varsity All Star, testified that the
    Mardi Gras Worlds bid event "was, obviously, an event that we attacked…we put
    other events around it for the sole purpose of—of, you know, trying to attack
    it."[304] Varsity monitored attendance at the Mardi Gras event and acquired Mardi
    Gras after it was placed on probation by the USASF for not meeting the 125 team

[300] Elza, Brian, 24 February 2020, Email: JAMZ All Star vs Encore Vegas vs The Quest, VAR00118899 -
VAR00118900.

[301] Elza, Brian, 24 February 2020, Email: JAMZ All Star vs Encore Vegas vs The Quest, VAR00118899 -
VAR00118900.

[302] Seely, Bill, 15 November 2016, Email: FW: Week 45 NCA NDA Championship Enrollment, VAR00340093 -
VAR00340094.

[303] Elza, Brian, 07 December 2017, Email: MARDI GRAS, VAR00081435.

[304] Deposition of Jim Hill, 21 March 2022, at 158:12-18.

minimum.[305] According to Mr. Hill, this was "probably one of our better attacks to shut down a more—I mean, honestly, had we not acquired them…they would have probably gone out of business, lost their Tier 1 status."[306]

- Varsity documents from December 2017 demonstrate its strategy and dominance in Texas: "VAS [Varsity] has an incredible hold on the major markets of Texas and continues to apply pressure to the IEPs [independent event producers that are USASF member] and Non-Sanctioned EPs [independent event producers that are not USASF members]."[307] Despite having an "incredible hold" on the major markets, Varsity continues to identify and target existing and nascent competitions. Varsity's strategy was effective: by December 2018 two independent event producers had been "pushed out of Texas," another had "been pushed out of the Dallas and Houston markets," and "Cheer America (CA) has continued to be our last and only true competitor."[308]

Varsity was able to successfully implement the anticompetitive conduct described above because of its control of the rules-making process and the ongoing cooperation of the USASF.

### c)  Varsity targeted nascent competitors

The conduct described above primarily, but not exclusively, targeted established Tier 1 event producers. Varsity also monitored and targeted nascent event producers including Tier 3 event producers aspiring to offer Worlds bids. Although the specific conduct described below may

---

[305] Mr. Hill testified that Varsity tracked which event producers were on probation, including Mardi Gras. See, e.g.,

- "And – and one of the – one of the issues, like specific here with Mardi Gras is, you know, we had – at this time, we had already started, you know, with The Summit and all the other things, you know, we had started attacking all these events and we were doing a really good job at it. And for whatever reason, the decision was made to acquire this brand despite its – you know, 'cause you go on probation before you lose your Tier status. Like you got – you got a year to get your numbers back up. Like, if you fall below, then you go on probation; and if you miss it again, then – then you fall out. And that's – in this specific event, that's where Mardi Gras was: they were about to fall off. They had not hit their numbers – or were not going to hit their numbers after – you know, at this point." Deposition of Jim Hill, 21 March 2022, at 163:11 - 164:2

- "So would you have tracked, whether – by placing an attack event, a head-to-head competition on top of an IEP event, whether you believe you could push them below the 125 team limit? A. Yeah. I mean, that's – that's what we did with Mardi Gras. Q. And then, if you were able to get the IEP below 125 and they got put on probation, would you make an effort to place another attack event the following year so that they would be – so that they would lose their – their bid? A. Not necessarily another event, but it –you know, it would be known. We – I mean, we knew who was on probation and who wasn't…So, like, if we knew somebody was on probation, I mean, yeah, we would – we might – I mean, there were discussions where maybe we would throw – we would add some more Summit bids in this time frame to a specific event that we knew was already affecting the event to encourage more attendance presumably away from the other non-Varsity event." Deposition of Jim Hill, 21 March 2022, at 164:23 - 165:21.

[306] Deposition of Jim Hill, 21 March 2022, at 160:9-17.

[307] Varsity claims it "owns" or has "pushed out competitors" from multiple cities. For example, regarding the North Texas area, Varsity states, "We have officially pushed all competitors out of this market on this weekend" and "VAS [Varsity] owns this market on this weekend and continues to push out IEPs." Brubaker, Kevin, 19 December 2017, Email: RE: Texas Analysis/Competitor Tracking, VAR00242461 - VAR00242465, at 2462, and 2463.

[308] Hill, Jim, 19 December 2018, Email: Re: Texas Competitor Update FALL 2018, VAR00097339 - VAR00097340, at 7339-7340.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 84 of 149
PageID 10606
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          79 of 115

have differed from that described above, the goal of these Varsity strategies was the same: to preclude non-Varsity event producers from hosting events.

For example, when Varsity learned that an investment group was interested in acquiring Cheer Athletics, a large All Star gym that partnered with the Rebel clothing brand, and growing it rapidly, Varsity contemplated two options: purchase Cheer Athletics or restrict them from competing at Varsity events. The goal for both options was the same, to keep Cheer Athletics from growing and possibly hosting its own events.[309] Similarly, when Tammy Van Vleet, an independent event producer, announced she was launching the Spirit Championships for the 2019-2020 season, Varsity immediately began creating a plan to counterprogram against those events, even though none were scheduled head-to-head with Varsity. Varsity personnel noted that "The west coast really likes Tammy on the personal level and her recent announcements are gaining a lot of support and traction with gym owners and coaches—especially those excited for another Non-Varsity option."[310] The Spirit Championships promised several advantages over Varsity events, including: not charging coaches fees, not charging cross over fees (fees charged for athletes that participate in more than one event at a competition), and a rebate program for coaches. The Spirit Championships were focused primarily on the west coast and Varsity intended to "crush her" before she "really gets wings and creates more issues for our other territories."[311] Another Varsity email regarding the announcement of the Spirit Championships states "The goal for us is simple…We need to stop this train before it starts. If there is anything

---

[309] Brian Elza wrote an email stating "…apparently they [Cheer Athletics] have an investment group that has approached them that wants to take them CA name and grow at a very, very fast pace. Brad, Angela, and Jody [the owners of Cheer Athletics] think they could have 20+ Cheer Athletics [gyms], but don't want to take on the risk on their own at this point in their careers. Said that with either that investment group or Varsity behind them they would grow the brand. Last thing we want is 25 Cheer Athletics wearing REBEL and promoting our competitors like they currently do." John Nichols responded to that email considering Varsity's options if they do not acquire Cheer Athletics: "Then the question is can they grow that fast as a competitor if we restrict them competing at Varsity events. A big gym that everyone hates that cannot compete in the marque events is not going to grow. If they start their own competition company they still have the same issue with the other gyms or even compete at competitions owned by the investment company [sic]." Nichols, John, 17 August 2017, Email: RE: 1100 Teams, VAR00266077 - VAR00266089, at 6077.

[310] A Varsity email states "Tammy is back in business with The Spirit Championships after January 1st with multiple one-day and two-day events on her event schedule. The west coast really likes Tammy on the personal level and her recent announcements are gaining a lot of support and traction with gym owners and coaches—especially those excited for another non-Varsity local option…I'd like to have a game-plan in place to The Spirit Championships on the west coast (as we know is their home-base and Step 1 in their growth plan) before it really gets wings and creates more issues for other territories. We will see direct head to head competition in All Star events (one-day, two day, and EOS events), Apparel and Coaches Conferences – and with our history with Tammy, we know that she has been waiting for pull the trigger on her comeback and will be back with a vengeance." Subsequent emails indicate the Varsity strategy is to "crush" her. Elza, Brian, 19 December 2019, Email: Re: West Coast Competitor "The Spirit Championships," VAR00078910 - VAR00078913, 8910-8912.

[311] John Sadlow, the Senior Vice President of Strategy & School Sales at Varsity responded to Mr. Elza's email offering to assist with the plan to counter the Spirit Championship. Mr. Elza asked "assuming you are offering…to support strategy to crush her??" to which Mr. Sadlow responded "correct." Elza, Brian, 19 December 2019, Email: Re: West Coast Competitor "The Spirit Championships," VAR00078910 - VAR00078913, 8910-8912.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 85 of 149
PageID 10607
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          80 of 115

you feel you need from me to help accomplish that goal please never hesitate to reach out to me at any time."[312]

Varsity employed a similar strategy after Nfinity, a Cheer Apparel manufacturer, announced it was beginning to host Cheer Competitions. An internal Varsity email states that "I hate to be the bearer of bad news, but this is NOT good news for Varsity. This Nfinity schedule is actually pretty good, well planned and unfortunately mostly not Head-to-Head or Back-to-Back with hardly any other current Varsity competitions. In my opinion, unless we throw some extra Summit bids at a couple of our closer events or actually move some of our current Varsity All Star competitions to be near theirs, then I am afraid that Nfinity will have some success with their competitions this upcoming 2019-2020 season."[313] Varsity employees discussed multiple options consistent with Brian Elza's, Co-General Manager and Vice President of Sales at Varsity All Star, directive: "Whatever we need to do to make sure they are not successful."[314]

Varsity used a similar strategy in Texas after Cheer America and Fun Cheer, two independent event producers, introduced new competitions. Varsity's response was to add events to the same weekends "and try to get teams away from Fun Cheer to go to CS [Varsity's competition] with an additional Summit bid."[315]

In addition to counterprogramming, Varsity also signed exclusive and non-compete agreements with various venues in an effort to block competing event producers from hosting events.[316] Mr. Parrish, the former Director of Strategy and Special Projects at Varsity All Star, testified that cheerleading competitions have very specific venue requirements, such as 40-foot ceilings and a 54 by 40 foot competition floor space, which few venues can accommodate. Varsity would host multiple events at these venues and insist that no other event producer be able to use that venue

---

[312] Passalacqua, Cheryl, 16 January 2020, Email: RE: The Spirit Network Call Notes (Tammy Van Vleet & Kevin Jones), VAR00447690 - VAR00447691, at 7691.

[313] LeTard, Tres, 21 March 2019, Email: RE: Nfinity events compared to Varsity, VAR00078030 - VAR00078037, at 8030.

[314] Varsity contemplated the following options:

- "What if we put a one day right on top of theirs on the same weekend, and we could sell it as an event to get ready for NCA with some Summit bids?"

- "2-day with normal summit bids both D1 and D2 would/should shut it down pretty quickly in the charlotte market IMO. Honestly, [if we] added a single extra to that event for good measure could go a long way."

LeTard, Tres, 21 March 2019, Email: RE: Nfinity events compared to Varsity, VAR00078030 - VAR00078037, at 8030, 8032, 8034.

[315] Brubaker, Kevin, 19 December 2017, Email: RE: Texas Analysis/Competitor Tracking, VAR00242461 - VAR00242465, at 2464.

[316] A representative from the Chula Vista Resort, with which Varsity has a non-compete agreement, asked if hosting an event for Xtreme Spirit, a non-Varsity event producer, would violate that agreement. Brian Elza responds in an internal discussion that "He [the owner of Xtreme Spirit] is a competitor and somewhat of a jerk. We may be interested in running an event there. I have copied Kevin Brubaker as he can look into the venue to see what we could do to block him out." Davis, Craig, 01 May 2017, Email: Re: xtreme spirit, VAR00141441 - VAR00141445, at 1443-1445.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 86 of 149
PageID 10608
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          81 of 115

in exchange.[317] Emails from Tres LeTard, at the time Vice President of Sales and Development at Varsity, show that Varsity tried to block Billy Smith of Spirit Celebration, an independent event producer, from hosting events in Atlanta by denying him access to venues: "We need to use all resources available (venue contacts, CVB relationships, etc.) to hinder his expansion into these new markets."[318]

The goal of this conduct was to preclude rival event producers from hosting events at desired locations and times.

<h4 style="text-align:center">d)  Varsity's anticompetitive strategy was effective</h4>

Varsity's strategy of squeezing out competitors was effective and the USASF was complicit in this conduct as demonstrated by the following evidence.

- In response to an August 2015 email from Billy Smith of Spirit Celebration, an independent event producer, suggesting event producers that are precluded from offering Worlds bids could defect from the USASF, Brian Elza, Co-General Manager and Vice President of Sales, writes to his colleagues at Varsity: "The firestorm is coming. Obviously this is an effort to combat the Summit, and if I were in their shoes I would be trying to do something similar. Truth be known the Summit has destroyed our competitors and will continue to worsen with the D2 Summit. With our control of the BOD [Board of Directors] of the USASF we are clearly in the drivers [sic] seat."[319] Varsity acquired Spirit Celebration in February 2017; the acquisition is discussed in Section V.D.3.

- Notes from the December 2018 West Coast Regional meeting of coaches and independent gym owners echo Mr. Elza's statements above. One section of the notes read "ADDRESS THE EFFECT OF SUMMIT ON OUR INDUSTRY. This was the biggest topic of conversation brought up first and immediately when the forum was open for discussion. Owners are very stressed out about the cost, the location, and what it is doing to our industry overall. This was perhaps the biggest concern of the gym owners in this

---

[317] "You also have to have a ceiling that's like 40-foot high because the kids get thrown over 25-30 feet sometimes. So when you take into consideration the competition floor is 54-by-40, and you take into consideration there are very few buildings in Atlanta who can accommodate the beam span, the crowd, and the configuration, then you're talking about very few facilities. [para] There's, like, the international convention center here; there's, like, the World Congress Center here; there's – you know, a couple. [Para] So, so in the past, what we did is we would go in and say, 'Okay, we want to come and bring CheerSport Detroit, one of our biggest competitions, to you. We'll rent out your entire, you know, space; you know, all of your readily available space. We're also going to put a CheerSport regional here in, say, December, and we're going to put one more competition here, say, an American Cheer Power.' Whatever. Whatever competition we wanted to put. 'So we're going to give you three cheerleading competitions. So if anybody – but we want blackouts from December to April. You can't have another competition here for cheerleading.' And that takes up that venue for the entire season. [para] So if you were a competitor and you wanted to have a competition and you came to Atlanta between the few venues that you could have it in, Varsity has events at most all of them. So that – that kind of keeps you from entering the marketplace as – as a competitor, as a competition director or a competition company." Deposition of Jamie J. Parrish, Volume I, 03 March 2022, at 124:5-124:12

[318] Mr. LeTard continues to ask Varsity employees to contact at least four different venues to see if they will deny Mr. Smith use of their facilities. LeTard, Tres, 10 December 2012, Email: RE: FW: Sc & Amazing Schedule for 2013-14, VAR00320890 - VAR00320894, at 0891.

[319] Elza, Brian, 07 August 2015, Email: Fwd: All Level Championship Concept, VAR00273953 - VAR00273955.

region." Additional bullet points from the notes include the following: There is a "lack of non-Varsity events in our area—big monopoly (JAMZ is the only event and its [sic] only a one day). Lack of competition is hindering the market and allowing rising prices"; "Summit is destroying our industry"; and "USASF is run by Varsity so its [sic] totally biased."[320]

- Heather Petz, the owner of Champion Cheer Central, an independent event producer, reported that Varsity's conduct is making it difficult for her to reach the 125-team minimum to give Worlds bids. She states, "My numbers are down this year for our upcoming bid event due to mergers, small gyms going out of business, a lot of bids in Kentucky and Varsity putting a Summit Bid qualifier in the same building two weeks prior to my event."[321]

- Emails from Diane Ringer, the Director of Events at SHOUT! Cheer & Dance, an independent event producer, summarize the impact of this conduct on Tier 3 event producers. Ms. Ringer informed Mr. Peterson, the USASF Vice President of Events and Corporate Alliances, that one of her events attracted 142 teams during the 2015-2016 season but dropped to 88 the following year: "Two years ago, we had 142 teams at our largest event. Last season, that same event drew 88 teams. Why? Because Varsity now has an event in direct competition with our 5 yr. old event offering WORLDS bids."[322] The following year, Ms. Ringer's event dropped from 88 to only 30 teams: "Our company is dealing with another EP in our area that is a Tier 1 [Varsity]. They [Varsity] moved their National event to last weekend to directly compete with us. A large majority of our customers also compete with them. With their change in date, bids to Cheer and Dance WORLDS plus numerous bids to another end of year event, our registrations went from 88 teams last year to 30 this year!"[323] Ms. Ringer explained how the sanctioning and bid system made it nearly impossible for non-Varsity event producers to obtain Worlds bids: "How will we ever be considered for WORLDS bids when current Tier 1 producers are syphoning off our customers with the bids they are already privileged to have? Man[y] of the Tier 3 producers are saying they are closing after this year. We are not the only company in jeopardy of closing our doors. There appears to be no way we will ever

---

[320] These notes also report that "Gym owners in this region feel like they have no choices" and "USASF and Varsity are not clear on their policies. Policies are made when people don't understand how it actually affects the gym owners and coaches. Implementing things on a whim is incredibly difficult for us to work with." Wilson, Karen, 10 December 2018, Email: Fwd: Fw: PORTLAND WEST COAST Gym Owners/Coaches Meeting Notes, USASF_00007472 - USASF_00007478, at 7475.

[321] Peterson, Steve, 21 December 2016, Email: Re IMPORTANT: Tier 1 Event Producer Application Process 2017-2018, USASF_00014260 - USASF_00014261, at 4260.

[322] "…I'm concerned about the future my company has with USASF, We [sic] are struggling, as many EP's [sic] are. Not having the opportunity to offer WORLDS bids adversely affects our business. We consistently lose clients year after year to other EP's [sic] that have the ability to offer WORLDS bids. Two years ago, we had 142 teams at our largest event. Last season, that same event drew 88 teams. Why? Because Varsity now has an event in direct competition with our 5 yr. old event offering WORLDS bids. We believe in the USASF and what is stands for. Currently Tier 3 members rarely, if ever, are able to move up to Tier 1 status. As Varsity Brands continue to grow and acquire other companies, non UCA EP's [sic] continue to lose business. How can we ever hope to reach Worlds requirements when we are consistently losing business to the Varsity machine?" Peterson, Steve, 04 August 2017, Email: Re: Worlds Cup Race, USASF_00016147 - USASF_00016148, at 6147.

[323] Peterson, Steve, 13 February 2018, Email: Fwd: Worlds Cup Race, VAR00334153 - VAR00334155, at 4153.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 88 of 149
PageID 10610
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**                    83 of 115

achieve Tier 1 status."[324] As of February 2018, when Ms. Ringer wrote that email, Varsity controlled 33 of the 42 total Tier 1 events approved to offer Worlds bids.[325] Ms. Ringer also states, "Currently Tier 3 members rarely, if ever, are able to move up to Tier 1 status. As Varsity Brands continue to grow and acquire other companies, non UCA EP's [sic] continue to lose business. How can we ever hope to reach Worlds requirements when we are consistently losing business to the Varsity machine?"[326]

An April 2020 email from Christina Archer, of the NW SilverStars gym, summarizes the impact of Varsity's conduct on its customers: "So many coaches feel trapped as a Varsity customer (we have to because it is the only major EP and they hold all the cards)."[327]

Absent Varsity's control over the USASF and the rules-making process, Varsity would not have been able to implement the conduct described above. Discovery materials demonstrate that the USASF was both aware of and complicit in Varsity's anticompetitive conduct. For example, there are multiple instances of event producers being put on probation by the USASF followed by communications between the USASF and Varsity. For example, in March 2019 Steve Peterson, the USASF Vice President of Events and Corporate Alliances, emailed Tres LeTard, who at the time was the Co-General Manager and Vice President of Operations at Varsity All Star, to inform him that WSA, an independent event producer, would be on probation the following season: "WSA did not make 125. That is 3! [thumbs up emoji]." Mr. LeTard replied that it is "Getting hard out there" and Mr. Peterson completed the exchange with, "You guys are knocking them off! [smiley emoticon]."[328]

Above I describe an email conversation between Ms. Ringer of SHOUT! Cheer & Dance, an independent event producer, and Mr. Peterson, the USASF Vice President of Events and Corporate Alliances, in which Ms. Ringer lists several reasons why "There appears to be no way we will ever achieve Tier 1 status." Mr. Peterson forwarded the entire email exchange to Varsity employees (Brian Elza and Tres LeTard) adding the following text "FYI…it's working [smiley emoticon]."[329]

USASF personnel were not only aware that Varsity's strategy was working, they also encouraged Varsity to target specific event producers as demonstrated in the exchange described above that culminated with Mr. Peterson writing to Mr. LeTard: "The only one [independent event producer] on probation this season was Spirit Unlimited and they blew it out this year. So far, in 19-20 we have Cheer Tech and ASC on probation. If you guys [Varsity] can put the

---

[324] Peterson, Steve, 13 February 2018, Email: Fwd: Worlds Cup Race, VAR00334153 - VAR00334155, at 4153.

[325] "Q: so as of February 16, 2018, Varsity was the owner of 33 of the 42 Tier 1 approved events, correct? A. Correct." 30(b)(6) Deposition of U.S. All Star Federation (Steven H. Peterson), 09 March 2022, at 242:21 - 24.

[326] Peterson, Steve, 04 August 2017, Email: Re: Worlds Cup Race, USASF_00016147 - USASF_00016148, at 6147.

[327] Albee, Damianne, 29 April 2020, Email: RE: Thanks for listening! This is long...sorry! :), VAR00013180 - VAR00013182 at 3182.

[328] Peterson, Steve, 22 March 2019, Email: Re: Another EP on Probation next season, USASF_00076431, at 6431.

[329] Peterson, Steve, 13 February 2018, Email: Fwd: Worlds Cup Race, VAR00334153 - VAR00334155, at 4153.

squeeze on them next season, that would be great."[330] Similarly, Mr. Peterson received emails from Brian Elza and Tres LeTard informing him that Varsity had acquired the independent event producer Amazing Champions, to which Mr. Peterson replied "Congratulations again guys….Now 27 Varsity Brands of the 42 Tier 1's. Any chance you will have all 42 on day? [smiley emoticon]."[331]

As of April 2020, there were two new open positions for event producers to offer Worlds bids, both of which were allocated to Varsity brands.[332] At that time Varsity informed Mr. Peterson that The Summit would start accepting level 6 and 7 teams, putting it in direct competition with the USASF Worlds competition. Brian Elza writes to Mr. Peterson: "Now is probably the time to let you know that we are allowing levels 6 and 7 to The Summit this year and now plan to next year…Might be an opportunity to bring you over to work with The Summit as we see this as being a more viable option than the USASF Worlds."[333] Despite being aware of the impact of The Summit on the USASF member event producers and being told that Varsity intends to compete directly with the USASF Worlds competition, further undermining the USASF mission, Mr. Peterson replies that "Confidentially, I will be happy to assist."[334]

The conduct described above is consistent with Varsity's stated goal that they "look to acquire all the Tier 1 event companies (brands such as American Championships, Athletic Championships) that give bids to the cheerleading and dance Worlds;" this conduct also helps explain Varsity's success in acquiring other event producers: "There are only 42 Tier 1 event companies. Varsity now owns 32 of those Tier 1 companies in all of the best markets."[335]

---

[330] Seely, Bill, 15 November 2016, Email: FW: Week 45 NCA NDA Championship Enrollment, VAR00340093 - VAR00340094.

[331] Peterson, Steve, 28 February 2017, Email: Re: An Important Announcement from Varsity All Star, USASF_00015124 - USASF_00015125, at 5124.

[332] The two open positions were the result of independent event promoters being put on probation and ultimately losing their Worlds bid events. Both seats were allocated to Varsity based on seniority; Varsity obtained that seniority as a result of its 2017 acquisition of Jam Spirit Group (DBA Team Champion) and its 2018 acquisition of EPIC Brands. See, e.g.,

- Regarding the 2018 acquisition, Steve Peterson, USASF Vice President of Events and Corporate Alliances, wrote to Varsity employees stating "Another game changer for the IEPs. [smiley emoticon] They are going to freak. Congratulations guys!!!" Peterson, Steve, 19 January 2018, Email: Fwd: An Important Announcement from Varsity All Star, USASF_00017975 - USASF_00017976, at 7975.

- Brian Elza, the former General Manager and Vice President of Sales at Varsity All Star, wrote to Mr. Peterson: "We will gladly accept the two Tier 1 bids that were both part of a multi million dollar acquisition strategy." Peterson, Steve, 28 April 2020, Email: Re: New Tier 1 EPs, USASF_00019027 - USASF_00019029, at 9027.

[333] Peterson, Steve, 28 April 2020, Email: Re: New Tier 1 EPs, USASF_00019027 - USASF_00019029, at 9027.

[334] Peterson, Steve, 28 April 2020, Email: Re: New Tier 1 EPs, USASF_00019027 - USASF_00019029, at 9027.

[335] Undated, Increase in EBITDA happened around 2011 because a lot of the early acquisition earn outs were ending, VAR00183219 - VAR00183221, at 8220.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 90 of 149
PageID 10612
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          85 of 115

## 2.  Varsity and USASF conspired to prohibit USASF members from participating in rivals' events

Varsity and the USASF forbid its member athletes, judges, gyms, and event producers from attending and hosting events that could undermine Varsity's dominance. The purpose and effect of these restrictions is to maintain Varsity's market power by foreclosing competing event producers from essential inputs, such as athletes and judges. Competing event producers have no viable alternatives and because these restrictions apply to all USASF members—the vast majority of Competitive Cheer athletes and event producers—these restrictions bar a substantial number of rivals and severely restrict competition.

For example, USASF policy precludes any USASF member athletes, coaches, or judges from attending any year-end competitions that purport to be either "World/International" or "Worlds" competitions unless they are run either by Varsity or the ICU.[336] These restrictions were conveyed to USASF members in a letter from Jim Chadwick of the USASF.[337] The letter provided few details and little rationalization for this prohibition other than the USASF and IASF are "endorsed by and belong to the International Cheer Union," the ICU is a "widely-recognized international governing body for Cheer," and the ICU holds a World Championship ("Worlds") for national teams which the USASF and IASF recognize as the official All Star Cheer World Championship.[338] The letter states specifically states the following restrictions:[339]

> "As a member of the International Cheer Union, the USASF/IASF is committed to growing and supporting our sport both in the USA and around the world. In order to achieve these objectives, it is essential that there be a unified and coordinated effort to properly govern and support Cheer. It is therefore the policy of the USASF/IASF that no athlete, coach, judge, or official is permitted to participate in any way in any event that claims to be a World or International Championship, other than the ICU or World Championships for National teams, or the USASF/IASF Worlds for All Star or Club teams. This stipulation applies to any regional international championship affiliated with an organization claiming to operate a World Championship, other than the ICU and USASF/IASF."

---

[336] See Section III.B.3 for a discussion of Varsity's involvement with and control of the ICU.

[337] This letter is affiliated with both Jim Chadwick and Steve Peterson of the USASF. Chadwick, Jim, U.S. All Star Federation, et al., 18 October 2011, USASF/IASF: Worlds Policy Update, Spirit Post, https://spiritpost.com/2011/10/usasfiasf-worlds-policy-update/, accessed 12 April 2022 (Hereinafter "USASF/IASF: Worlds Policy Update").

[338] "The ICU has traditionally conducted its World Championships for National Teams (like USA Cheer) representing its member countries immediately prior to the USASF/IASF Worlds. This year's ICU World Championship will include teams from 60 countries. The ICU recognizes the USASF/IASF Worlds as the official World Championship for 'Club' (All Star) Cheer." USASF/IASF: Worlds Policy Update, at 1.

[339] USASF/IASF: Worlds Policy Update, at 1-2.

The letter states that disobeying these prohibitions will result in disqualification from participating in Worlds,[340] and there is evidence that this policy was being enforced at least as late as 2019.[341]

Varsity and the USASF also prevent rival sanctioning bodies from creating and hosting year-end championship events that could undermine Varsity's dominance. For example, the USASF membership agreement for event producers include stipulations precluding them from hosting or recruiting teams for any "World" championship event that is hosted by a third party. Rival event producers cannot use the term "world champion" to market any events nor can they conduct or participate in any other events on the same weekend as the USASF Worlds competition.[342]

The policies described above protect and enhance Varsity's market power and foreclose competitors in the Cheer Competition market. There are no counterbalancing procompetitive

---

[340] "Failure to comply with this rule is grounds for disqualifying any athlete, coach, judge, or official from participating in the ICU and USASF/IASF World Championships. Therefore, it is critical that you clearly communicate this stipulation to all your participants, athletes, and coaches in order to insure [sic] compliance and to insure [sic] that their eligibility for Worlds is protected." USASF/IASF: Worlds Policy Update, at 1-2.

[341] A 2019 email thread between representatives of ICU, USASF, and USA Cheer discusses repercussions for a team that attended a 2017 event in Japan which violated the USASF policy regarding "world" events. USA Cheer and the ICU requested the USASF ban the team from an upcoming USASF-sanctioned Varsity event and also pursued legal action against the offending gym. Olsen, Karl, 04 December 2019, Email: Re: IFC Japan Event, USASF_00039898 - USASF_00039901, at 9898.

[342] Examples of the specific USASF clauses are below. See, e.g.,

- 2017:
  - "8. Company agrees to follow all Levels 5 and 6 guidelines as they relate to 'end of season, multi-brand events' and to observe the following restrictions: a. Maintain the current restrictions regarding how the 'year end multi-brand events' are marketed. Phrases such as 'world champion' are strictly prohibited. b. Restrict teams that compete at The Worlds from competing at any 'year end multi-brand events.' c. Not allow any 'year end multi-brand events' on The Worlds weekend." U.S. All Star Federation, 2017, USASF Company Member Agreement, AMSPIR033 - AMSPIR037, at 034.

- 2017-2018 standard clauses:
  - 4. Company agrees that all competitions sponsored or conducted by Company or its Affiliates that include 'All Star' cheer and/or dance divisions/categories shall be sanctioned by USASF and meet USASF Sanctioning Standards.
  - 7. During the Term, Company agrees that it shall not produce, or recruit teams for a cheerleading or dance 'World' championship event, or participate in, or sponsor a cheerleading or dance 'World' championship event conducted by a third party.

  U.S. All Star Federation, 01 May 2017, USASF Company Member Agreement, AMSPIR033 - AMSPIR037, at 033-034.

- 2018-2019:
  - "(a) Maintain the current restrictions regarding how the 'year end multi-brand events' are marketed. Phrases such as 'world champion' are strictly prohibited. (b) Restrict gyms from sending teams to compete in the same division at The Cheerleading Worlds and a 2018 year-end, multi-brand event. (c) Not conduct and/or participate in any year-end multi-brand events on The Worlds weekend." Peterson, Steve, 11 December 2017, Email: IMPORTANT: Tier 1 Event Producer Application Process 2018-2019, USASF_00012040 - USASF_00012109, at 2045 - 2046.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 92 of 149
PageID 10614
Highly Confidential            **Expert Report of Janet S. Netz, Ph.D.**            87 of 115

benefits to these policies. The USASF justifies these restrictions by noting the USASF is affiliated with the ICU which hosts a world championship event, but they provide no explanation for why its members are not be permitted to either select which "world championship" event they prefer to attend or why they cannot attend more than one such event.

### 3. Varsity and USASF conspired to prohibit members from partnering with rival sanctioning bodies

Varsity and the USASF forbid its members from partnering with rival sanctioning bodies or hosting events that could undermine Varsity's dominance. The purpose and effect of these restrictions is to maintain Varsity's market power by foreclosing competing event producers from essential inputs as explained in Section V.B.2 above; furthermore, these restrictions also preclude entry from viable new independent event producers including specifically large All Star gyms that are well-suited to hosting events.

The USASF membership agreements discussed above also specifically preclude event producers from partnering with any non-USASF sanctioning bodies.[343] A letter from Steve Peterson to USASF member event producers enforcing this rule reads: "Dear EPs, Offering divisions in the area of All Star or Club Cheer, even if not defined as 'All Star' but are in essence All Star offerings is a breach of your member agreement. This includes AAU and the Global League...The Global League has been created as an ALTERNATIVE to USASF."[344,345] This policy effectively restricted event producers from partnering with non-USASF sanctioning bodies.[346]

---

[343] The 2017-2018 USASF membership agreements reads: "Company agrees that all competitions sponsored or conducted by Company or its Affiliates that include 'All Star' cheer and/or dance divisions/categories shall be sanctioned by USASF and meet USASF Sanctioning Standards." U.S. All Star Federation, 01 May 2017, USASF Company Member Agreement, AMSPIR033 - AMSPIR037, at 033.

[344] The letter continues: "They have stated on their website, in their mission: The League is for everyone! Inspired by gym owners and coaches. The League was created to promote participant growth, and include every athlete at every level. The League will provide a safe & rewarding competitive cheer experience that allows flexibility in divisions and scoring, while celebrating athleticism and sportsmanship." Owens, David, 07 June 2019, Email: Re: USA Cheer Safety Update & Recommendation for Event Producers, AMSPIR278 - AMSPIR282, at 279.

[345] The "Global League" refers to Global Cheer and Dance. The AAU and Global Cheer and Dance were sanctioning bodies that offered Cheer Competitions. The AAU no longer offers Cheer events, but the Global League does. See, e.g.,

- The Amateur Athletic Union (AAU) is a large, non-profit, multi-sport event organization that has international reach: "One of the largest, non-profit, volunteer, multi-sport event organizations in the world, the AAU is dedicated exclusively to the promotion and development of amateur sports and physical fitness programs." The Amateur Athletic Union, Undated, About the Amateur Athletic Union, https://aausports.org/page.php?page_id=99844, accessed 15 June 2022.

- Global Cheer and Dance considers itself "a standard in the cheer and dance industry." In addition to competitions, they offer "insurance solutions, background checks, training, judges reviews, community opportunities, scoring, and industry support to cheerleading programs and dance studios." Global Cheer and Dance, Undated, Global Cheer & Dance, https://globalcheerdance.org/, accessed 15 June 2022.

[346] David Owens, the Owner and CEO of Rockstar Championships, a rival event producer, sent a letter to the USASF objecting to the policy and asking how to file a formal grievance. Owens, David, 07 June 2019, Email: Re: USA Cheer Safety Update & Recommendation for Event Producers, AMSPIR278 - AMSPIR282.

This same policy effectively precludes entry into the Cheer Competition market by All Star gyms, many of which are otherwise well suited to host competitions. Specifically, some of the larger All Star gyms are viable entrants into the Cheer Competition market, but these gyms are precluded because they also attend USASF All Star competitions. Athletes and gyms that attend any single USASF competition must be members of the USASF; as such, they are bound by the USASF membership agreement that precludes them from hosting any non-USASF events.[347]

These policies are designed to foreclose rival event producers and All Star gyms from hosting events. Varsity documents demonstrate it considers each of these options a threat to its dominance in the Cheer Competition market. For example, a Varsity email proposes replacing the existing bid system with a "points system" which would allow Varsity more control over what events athletes and gyms attend. Specifically, Varsity was concerned that the existing bid system allowed teams to "bid shop," which refers to the practice of teams selecting specific events where they think they will have the greatest likelihood of earning a Worlds bid and then skipping other Varsity events. This was particularly concerning to Varsity when teams would select events early in the season and earn a bid because there is less incentive for them to attend Varsity events later in the season. They were concerned that gyms "could then take those empty opportunities to develop something else (who knows what)." The solution they proposed in an email exchange was a points system that would not only force teams to continue attending competitions until they earned enough points to get a bid, but it also precluded gyms from "doing something else" which they clarified included hosting events:

> "Why a points race? Because planning for a cheer routine takes months and months ahead of time to pull off. If you know that you can skip events in Jan and Feb because in Mar there are just too many bids to give out and bad teams get them then you can save significant amounts of money just planning on going to events in March. <u>Now you have time to start doing things on your own. You could create your own events, or go to events held by other regional gyms where you as a gym owner can keep most of the money through profit sharing (think SEC network).</u> But if V[arsity] controls the keys to the thing all parents want, to compete at the Summit, then you just make competing at other events that aren't V[arsity] 'dumb.'"[348] [emphasis added]

Another Varsity employee responded:

> "If I am being 100% transparent and honest, <u>I believe the threat of another EP popping up and being backed by gyms is a very real possibility. They don't have to be successful to hurt us. I believe we are very vulnerable in this aspect because gym owners want to make more money and are assembling already</u>. I realize many of our network gyms are so heavily incentivized that they will still attend many of our events, but the threat of all of them cutting 1 event to hold their own, likely hurts us in a very real way. Especially if gyms that are only getting a small percent back are all of a sudden being offered 40% of

---

[347] "Athletes participating at USASF sanctioned events must be registered members of the USASF for the current season." U.S. All Star Federation, August 2018, USASF Club Cheer & Dance Teams 2018-2019 Age Grid, VAR00029065 - VAR00029078, at 9066.

[348] Harrison, King, 23 January 2019, Email: Re: Thought of the evening, VAR00095101 - VAR00095107, at 5107.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 94 of 149
PageID 10616
Highly Confidential        **Expert Report of Janet S. Netz, Ph.D.**        89 of 115

their money back from these Independent events. A point system gives us the flexibility when we need it IMO."[349] [emphasis added]

The policies described above are designed to protect and enhance Varsity's market power and foreclose competitors in the Cheer Competition market, including the threat of All Star gyms hosting Cheer Competitions or partnering with rival event producers to do the same. There are no counterbalancing procompetitive benefits to these policies.

### 4.  The conspiracy between Varsity and USASF harmed competition

Varsity and the USASF have been intertwined since the inception of the USASF and Varsity uses its control over the USASF to disadvantage its rivals. The conspiracy between Varsity and the USASF enabled Varsity to obtain and maintain market power, exclude competitors, and disadvantage its rivals. The conduct described above impacted a significant portion of the market without counterbalancing benefits.

The exclusionary policies described above precluded non-Varsity producers of essential inputs necessary to host Cheer Competitions. Specifically, those restrictions foreclosed independent event producers from essential inputs, such as athletes and judges, and there are no viable alternatives to those inputs. These policies also precluded entry from viable new competitors including, specifically, the large All Star gyms that are well-suited to hosting events. These restrictions apply to all USASF members, which includes the vast majority of Competitive Cheer athletes and event producers and, therefore, bar a substantial number of rivals and severely restrict competition.[350] As described in Section IV above, Varsity has a dominant position in each of the relevant markets and the probable effect of the conduct described above is to substantially lessen competition.

### C.  Varsity ties Cheer Camps and School Cheer Competitions, leveraging market power in competitions to the camp market

Varsity and its co-conspirators required School Cheer teams to participate in Varsity-brand Cheer Camp in order to participate in certain Cheer Competitions. This is an example of an economic tie, when a seller requires the buyer to purchase a good or service (the tied good) in order to purchase second good or service (the tying good).

Tying can be benign (as when an auto manufacturer sells new cars and tires as a package) but tying can also harm competition and lead to monopolization under certain circumstances. Harm to competition is likely when 1) the tied good (Cheer Camp) and tying good (Cheer Competition)

---

[349] Harrison, King, 23 January 2019, Email: Re: Thought of the evening, VAR00095101 - VAR00095107, at 5101-5102.

[350] There is no consensus as to what constitutes substantial foreclosure, but courts have provided some guidance. See, e.g.,

- "Generally, courts require foreclosure of at least 30 to 40 percent of the market to impose liability."

- "When examining foreclosure of competition, the Third Circuit has applied the 'substantial foreclosure' test from Dentsply where the inquiry is 'whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit.'"

American Bar Association, 2021, Monopolization and Dominance Handbook, Second Edition, ABA Book Publishing: Chicago, IL, at 145 of PDF.

Case 2:20-cv-02892-SHL-tmp   Document 389-2   Filed 02/10/23   Page 95 of 149
PageID 10617
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          90 of 115

are separate products, 2) the seller has market power in the tying good, 3) the seller requires the purchase of the tied good in order to purchase the tying good, and 4) the tie forecloses a significant amount of commerce.[351] Because all four of these elements are met and Varsity recognizes the anticompetitive effects of its tying policy, I conclude that Varsity's tying policy allowed it to leverage its market power in Cheer Competitions to harm competition and protect and enhance its market power in the relevant market for Cheer Camps.

Varsity and its co-conspirators tied attendance at Varsity Cheer Camps to entry into the NCA, UCA, and USA national championship competitions. In order for a cheer team to qualify for Varsity's high school national championship competitions, at least 75% of team members must attend one of Varsity's Cheer Camps in the preceding 12 months.[352] Varsity's camp attendance policy ties the chance to qualify for the national championship with attendance at a Varsity Cheer Camp.

Cheer Camps and Cheer Competitions are separate products and there is no legitimate business justification for Varsity's tying policy. Participation in sports camps is generally not a requirement to participate in other scholastic sports competitions, and, for most sports, athletic competitions and camps are almost always provided separately. Varsity itself provides Cheer Competitions and Cheer Camps separately.

Varsity allows teams to attend other competitions without a camp requirement. Varsity does not require camp attendance for its regional scholastic competitions;[353] however, School teams cannot qualify for a bid to the national championship without camp attendance. Varsity offers Cheer Camps for college and All Star Cheer teams, but does not require camp attendance to participate the NCA or UCA college national championships or its All Star events.[354]

---

[351] U.S. Department of Justice, 25 June 2015, Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition, Chapter 5: Antitrust Issues in the Tying And Bundling of Intellectual Property Rights, https://www.justice.gov/atr/chapter-5-antitrust-issues-tying-and-bundling-intellectual-property-rights, accessed 15 June 2022.

[352] The requirement began in 2017 for the UCA National High School Cheerleading Championship, in January 2018 for the NCA Junior and Senior High School National Championship, and in the 2020-21 season for the United Spirit Association's Spirit Nationals. See, e.g.,

- Seely, Bill, 2017, Credentialing Letter to Employees 2017-Final, VAR00160802.

- Duhon, Buffy, 20 September 2019, Email: RE: NFHS, VAR00160726 - VAR00160729, at 0727.

[353] The UCA website explains that teams that do not attend a Varsity Spirit camp can compete at a local UCA competition "but they will not be eligible to receive a bid to the NHSCC [National High School Cheerleading Championship]." Varsity, Undated, Squad Credentialing FAQ, https://www.varsity.com/uca/wp-content/uploads/2020/07/21_uca_squadcredfaq.pdf, accessed 24 May 2022.

[354] College teams that attend Varsity camps can receive bids to the NCA College National Championship competitions. College teams that placed highly in the 2022 UCA College National Championship competition are awarded paid bids to the 2023 UCA College National Championship, provided they attend a Varsity camp with at least 18 participants. See, e.g.,

- Varsity, Undated, Cheer Bid Distribution, https://www.varsity.com/nca/wp-content/uploads/2019/07/NCA_College_Bid_Distribution.pdf, accessed 24 May 2022.

- Varsity Spirit, 25 February 2022, UCA/UDA College Cheerleading and Dance Team National Championship 2023 Tier Paid Bids, https://www.varsity.com/uca/wp-content/uploads/2022/03/23-College-Bid-Allocations-v2.pdf, accessed 25 May 2022.

Highly Confidential        **Expert Report of Janet S. Netz, Ph.D.**        91 of 115

Independent event producers do not require camp attendance to participate in Cheer Competitions. For example, JAMZ, Worldwide Spirit Association, and Cheer America do not require teams to attend Cheer Camp in order to participate in Cheer Competitions.[355] Notably, The Cheerleading Worlds event does not have a camp requirement. Varsity's tying policy is an outlier – it is specific to Varsity's national School Cheer championships, and applies only to certain types of School Cheer teams.

For these reasons, I conclude that Cheer Camps and Cheer Competitions are separate products for the purpose of economic analysis.

Athletes in Varsity's high school Cheer Camps undergo the "NFHS Squad Credentialing program." The UCA website explains, "We partnered with the National Federation of State High School Associations (NFHS) to create the Squad Credentialing program with a goal to elevate the profile of cheerleaders, whether on campus, at a game or in the community. It is our hope that by completing the program, cheerleaders will understand the honor and responsibility they have of creating a strong sense of school pride through five key roles – crowd leader, spirit raiser, ambassador, athlete and entertainer along with safety and leadership."[356]

Bill Seely, president of Varsity, explained in a 2015 email that the arrangement with the NFHS was "geared towards driving summer camp enrollment" and, in exchange, Varsity agreed to pay NFHS $345,000 per year.[357]

Teams attending Varsity's Cheer Camps spend far more money with Varsity than teams that do not attend its Cheer Camps.[358] This suggests Varsity possessed a strong incentive to leverage its market power in the relevant market for competitions (discussed in Section IV.A.1) into the market for Cheer Camps (discussed in Section IV.C.1).

The tying policy affects a substantial volume of commerce. Varsity produced data on Cheer Camp revenues for 2015-2019. In 2015, it earned $65.9 million in Cheer Camp revenue from school teams. Varsity's revenue grew every year thereafter, reaching $79.3 million in 2019. See Exhibit 4.

The UCA, NCA, and USA national championships are popular season-ending events. Varsity estimates that approximately 35,000 athletes participate in its year-end school championships,

---

[355] See, e.g.,

- JAMZ Cheer & Dance, 2021, JAMZ Cheer & Dance 2022-23 Season, https://www.jamz.com/, accessed 24 May 2022.

- Worldwide Spirit Association, 2020, Worldwide Spirit Association - Experience Our National Cheerleading Events, https://www.wsacheer.com/, accessed 24 May 2022.

- Cheer America Championships, 2021, Cheer America Championships, https://cachampionships.com/, accessed 24 May 2022.

[356] Varsity, Undated, Squad Credentialing FAQ, https://www.varsity.com/uca/wp-content/uploads/2020/07/21_uca_squadcredfaq.pdf, accessed 24 May 2022.

[357] Seely, Bill, 06 January 2015, Email: Deal Points for NFHS, VAR00429874 - VAR00429875.

[358] "90% of camp customers buy apparel. And teams who attend camp spend 3.5 times more! That is huge. When we lose teams at camp, they become high risk customers for apparel. 50% of non-returning camp customers don't buy apparel the following year." Varsity Spirit, Undated, the importance of Camp, VAR00006767 - VAR00006784, at 6770.

Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          92 of 115

and it hosts over 220 qualifying and national events each year.[359] In 2022, at least 739 high school teams attended UCA nationals, at least 180 attended NCA nationals, and at least 221 attended USA Spirit Nationals.[360] A large number of high school teams have expressed interest in attending Varsity's national championships, as demonstrated by School teams attending those championships or attempting to qualify. Due to cost and time constraints, high school teams are unlikely to attend more than one camp. The tying policy ensures that any team interested in attending Varsity's national championships will attend a Varsity camp. Because teams attend one camp at most, this forecloses competing camp providers, enhancing and maintaining Varsity's market power.

Contemporaneous business documents and the testimony of current and former Varsity employees confirm the tying policy's impact on competition in the cheer market. When Varsity expanded the tying policy to its USA brand, Buffy Duhon, then the general manager of NCA, expected that Varsity's tying policy would grow Varsity's summer camp business.[361] Marlene Cota, former Varsity VP of corporate alliances and business development, testified that Varsity leverages its market power in the Cheer Competition market to enhance and maintain its market power in the Cheer Camp market.[362]

### D. Varsity acquired and maintained market power over Cheer Competitions through mergers and acquisitions

---

[359] Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9334.

[360] See,

- For 2022 UCA nationals, I summed the total number of high school teams that participated in the following categories: "Junior Varsity," "Non Tumbling," "Non Building," "Varsity & Varsity Coed," "Game Day & Game Day Live" (I excluded "Recreation," "Junior High," and "World School" categories). Varsity TV, 11 February 2022, 2022 UCA National High School Cheerleading Championship, https://tv.varsity.com/events/7150814-2022-uca-national-high-school-cheerleading-championship/results?filter=31663, accessed 14 June 2022.

- For 2022 NCA nationals, I summed up the total number of high school teams that participated in all categories. Varsity TV, 22 January 2022, 2022 NCA High School Nationals, https://tv.varsity.com/events/7150747-2022-nca-high-school-nationals/results?filter=31254, accessed 14 June 2022.

- For 2022 USA nationals, I summed up the total number of high school teams that participated in all categories. Varsity TV, 25 February 2022, 2022 USA Nationals, https://tv.varsity.com/events/7150840-2022-usa-nationals-spiritcollegejunior/results?filter=31880, accessed 14 June 2022.

[361] See, e.g.,

- Ms. Duhon wrote in a 2019 email, "My guess is that we won't get a lot of push this fall because it's not required for 2020, but it will grow summer camp business and fall 2020 since it will be required." Duhon, Buffy, 20 September 2019, Email: RE: NFHS, VAR00160726 - VAR00160729, at 0727.

- Ms. Duhon later explained the meaning of her 2019 email, "That teams that had wanted to come to nationals that may not have attended camps in the past, would learn about the programs because we would be reaching out to them to let them know about the credentialing program, that they would then sign up for camp, for the camp experience and the ability to come to nationals." Deposition of Buffy Duhon, 25 March 2022, at 110:3 - 25.

[362] Deposition of Marlene Cota, Volume I, 06 April 2022, at 223:11 - 17.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 98 of 149
PageID 10620
Highly Confidential    **Expert Report of Janet S. Netz, Ph.D.**    93 of 115

Section 7 of the Clayton Act prohibits mergers and acquisitions when they are likely to lessen competition or tend to create a monopoly. This is especially likely to be the case when a dominant firm, like Varsity, acquires its largest direct competitors in the same market.[363] When a merger has been consummated, as here, economists can look at the actual competitive effects of the merger to determine whether it harmed competition via higher prices or reduced output and product quality.[364] Varsity's acquisition strategy substantially increased its share of the Cheer Competition market, and prevented any single competitor from achieving similar scale to Varsity. Post-acquisition, Varsity exercised its market power by reducing output and event quality, while raising prices. Varsity's acquisitions also gave it greater control over the USASF, which it used to further disadvantage rivals, as described in Section V.D.

Varsity has engaged in a long-term strategy to acquire competitors in the market for Cheer Competitions.

> "In 2003, Varsity started an acquisition strategy to gain a leadership position in the All Star market and with the acquisition of the National Spirit Group and the NCA brand, one of the clear and proven leaders in the All Star space. By 2009, seven of the largest and best All Star cheerleading competition companies had been acquired by Varsity. In 2009, a consolidated business unit called Varsity All Star was created. This organization of brands now holds a significant and leading share of the all star market."[365]

In 2004, Varsity acquired National Spirit Group, its largest competitor.[366] By 2012, Varsity estimated its share of the All Star competition market to be 42%, with competitor JAM Brands at 30.4% and a number of smaller rivals accounting for 1-10% each. See Exhibit 6 for market shares in 2012. Other sources put Varsity's market share in this time period at around 40-50%.[367]

In 2013, Jeff Webb said "acquisitions are better viewed as tactical and used for roll ups…or to eliminate competitors."[368] In 2014, Varsity identified the following event producers as its main competitors in the Cheer Competition market: JAM Brands, EPIC Brands, Aloha, Spirit Celebration, Jam Spirit Group (DBA Team Champion), Cheer America, Spirit Unlimited, JAMZ, and WSA.[369]

---

[363] 2010 Horizontal Merger Guidelines, at 3.

[364] 2010 Horizontal Merger Guidelines, at 3.

[365] Varsity, 01 June 2012, Business Plan 2012-2013, VAR00346980 - VAR00346991, at 6986.

[366] Varsity Brands, March 2011, Management Presentation, JEFF00047202 - JEFF00047266, at 7212.

[367] See, e.g.,

- Varsity's estimated market share in 2013 was 50%. Varsity All Star, 2013, gyms | coaches | athletes | parents | fans, VAR00323451 - VAR00323515, at 3456.

- Another document lists All Star market share at 42%. Varsity, 01 June 2012, Business Plan 2012-2013, VAR00346980 - VAR00346991, at 6985.

- A 2014 document estimates 40% of "comps." Varsity Spirit, 02 October 2014, Varsity Spirit Meeting Agenda, VAR00341580 - VAR00341583, at 1581.

[368] Webb, Jeff, 22 January 2013, Email: Throw it on the wall .... Strategy session, VAR00351376.

[369] Varsity Spirit, 02 October 2014, Varsity Spirit Meeting Agenda, VAR00341580 - VAR00341583, at 1581.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 99 of 149
PageID 10621
Highly Confidential        **Expert Report of Janet S. Netz, Ph.D.**        94 of 115

In 2014, Charlesbank purchased Varsity.[370] Varsity would soon acquire almost all of its significant competitors, with Charlesbank's approval.[371] Varsity acquired its largest competitor, JAM Brands, in 2015. The following year, Varsity estimated that it had a 75% share of the All Star Cheer Competition market, with EPIC Brands (6%), Aloha (2%), Spirit Celebration (2%), and Jam Spirit Group (DBA Team Champion) (2%) the next largest competitors.[372] Over the next three years Varsity would acquire all four of its largest competitors—EPIC Brands, Aloha, Spirit Celebration, and Champion—as well as a handful smaller event producers.[373] See Exhibit 7 for a list of Varsity acquisitions from 2015 to the present.

Varsity consistently described its motivations for the acquisitions as 1) immediate expansion of market share, 2) the ability to eliminate events produced by the acquired firm, 3) the ability to increase prices post-acquisition, and 4) the acquisition of strategically important Tier 1 events that held Worlds bids.[374] Tier 1 events are valuable to Varsity and other event producers because customers' demand for Worlds bids is high and the number of bids is capped, which allows event producers to charge higher registration fees for such events. Each Tier 1 event producer is also accorded a vote on the USASF Sanctioning Committee, which governs issues of membership and the allocation of Worlds bids.

Below I describe each acquisition of a Cheer Competitions competitor, including the competitive impact.

### 1. Varsity acquired its largest competitor, JAM Brands, in 2015

In November 2015, Varsity made its most significant acquisition when it purchased its largest competitor, JAM Brands, for $34.9 million.[375] JAM Brands produced over 100 cheer and dance

---

[370] Charlesbank, 15 December 2014, Charlesbank Capital Partners Completes Acquisition of Varsity Brands, https://www.charlesbank.com/news/2014/charlesbank-capital-partners-completes-acquisition-varsity-brands/, accessed 01 June 2022.

[371] Brian Elza, former General Manager and Vice President of Sales at Varsity All Star, testified that Charlesbank had to ultimately approve the acquisitions and mergers. Deposition of Brian Todd Elza, 16 November 2021, at 322:5-13.

[372] LeTard, Tres, 2016, Varsity All Star Market Share est. - 2016, VAR00101102, at 1102.

[373] Seely, Bill, 19 October 2018, Email: Draft Agenda For Bain, VAR00371189 - VAR00371320, at 1271.

[374] See, e.g.,

- Varsity Brands, 09 October 2015, JamBrands Transaction Summary, CB00382194 - CB00382262, at 2197.

- Sadlow, John, 20 April 2018, Email: FW: Data room document feedback, VAR00415061 - VAR00415076, at 5061, 5065, 5068, and 5072 - 5074.

- "We look to acquire all the Tier I event companies (brands such as American Championships, Athletic Championships) that give bids to the cheerleading and dance Worlds. There are only 42 Tier I event companies. Varsity now owns 32 of those Tier I companies in all of the best markets." Varsity Spirit, Undated, All Star Overview, VAR00310631 - VAR00310666, at VAR00310664.

[375] See, e.g.,

- Seely, Bill, 19 October 2018, Email: Draft Agenda For Bain, VAR00371189 - VAR00371320, at 1271.

- Sadlow, John, 20 April 2018, Email: FW: Data room document feedback, VAR00415061 - VAR00415076, at 5065.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 100 of 149
PageID 10622
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**                    95 of 115

competitions each year through seven different brands, include five Worlds bids events and a 70% interest in the U.S. Finals season-end championship.[376]

Varsity had several motivations for acquiring JAM Brands. First was the "immediate expansion of market share"; Varsity estimated JAM Brands market share at around 30%.[377] Combined with Varsity's existing 40-50% share, the JAM Brands acquisition gave Varsity a dominant share of the Cheer Competition market.

Varsity also sought to acquire JAM Brands' "strategically important USASF board seat," which would "secure[] a unified presence within the USASF."[378] Prior to the acquisition, Varsity's direct employees held five of thirteen voting seats on the USASF Board of Directors, with another two seats held by USASF employees.[379] Following the acquisition of JAM Brands and after Brian Elza became a voting member sometime between 2014 and early 2016,[380] Varsity employees held seven seats.[381] Another two seats were held by USASF employees and the

---

[376] Varsity Brands, 09 October 2015, JamBrands Transaction Summary, CB00382194 - CB00382262, at 2197.

[377] See, e.g.,

- Varsity Brands, 09 October 2015, JamBrands Transaction Summary, CB00382194 – CB00382262, at 2197.

- Varsity All Star, Undated, gyms | coaches | athletes | parents | fans, VAR00323451 – VAR00323515, at 3456.

[378] Varsity Brands, 09 October 2015, JamBrands Transaction Summary, CB00382194 - CB00382262, at 2197.

[379] A USASF document listing the members of the USASF Board of Directors at different years shows that in 2014 Varsity controlled at least 5 of the 13 voting seats. The list includes the following Varsity-affiliated individuals: John Newby (Varsity employee at the time), John Nichols (Varsity employee at the time), Justin Carrier (Varsity employee at the time), Jeff Fowlkes (Cheersport representative, but by 2014 Varsity already acquired Cheersport in 2012), Mike Burgess (USA representative, but by 2014 Varsity already acquired the USA in 1994). See, e.g.,

- Chadwick, James, 2021, USASF Board Member History with email addresses UPDATED, USASF_00032444 - USASF_00032446, at 2444 - 2445.

- U.S. All Star Federation, 21 October 2014, U.S. All Star Federation Board Members, https://web.archive.org/web/20141021185445/http:/usasf.net:80/organization/bod/bod_members/, accessed 14 June 2022.

[380] A USASF document listing the members of the USASF Board of Directors at different years shows that in 2014 Brian Elza (Varsity employee at the time) was a nonvoting board member. However, the same document indicates that in 2016 Brian Elza had a voting seat on the USASF Board of Directors. Chadwick, James, 2021, USASF Board Member History with email addresses UPDATED, USASF_00032444 - USASF_00032446, at 2444 - 2445.

[381] A USASF document listing the members of the USASF Board of Directors at different years shows that in 2016 Varsity employees held seven of the thirteen voting seats. The list includes the following Varsity affiliated individuals: Brian Elza (at the time General Manager, VP of Sales at Varsity All Star), Dan Kessler (representative of JAMfest, a Varsity brand), Jeff Fowlkes (representative of Cheersport, a Varsity brand), Justin Carrier (at the time Vice President at Varsity All Star), Mike Burgess (representative of USA, a Varsity brand), John Newby (at the time Varsity/Herff Jones division president), John Nichols (at the time Executive Vice President and General Manager/Senior Advisor at Varsity Spirit LLC). See,

- Chadwick, James, 2021, USASF Board Member History with email addresses UPDATED, USASF_00032444 - USASF_00032446, at 2445.

- U.S. All Star Federation, 13 March 2016, U.S. All Star Federation Board Members, https://web.archive.org/web/20160313050527/http://www.USASF.net/organization/bod/bod_members/, accessed 14 June 2022.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 101 of 149
PageID 10623
Highly Confidential         **Expert Report of Janet S. Netz, Ph.D.**                96 of 115

remaining seats were held by gym owners. No other event producer had a Board vote. With this acquisition, Varsity achieved implicit control of the Board of Directors of the USASF.

The Sanctioning Committee, which is of crucial importance because of its power to allocate Worlds bids and approve the dates and locations of Worlds bid events, is composed of Tier 1 event producers that have Worlds bid events, with representation in proportion to the number of Worlds bid events. Prior to the JAM Brands acquisition, Varsity held 16 of 35 seats on the USASF Sanctioning Committee.[382] By adding JAM Brands' five seats on the Sanctioning Committee, Varsity gained a majority control that it has maintained until today. This gave Varsity the ability to use the Sanctioning Committee to disadvantage its rivals, as described in Section V.B.

The JAM Brands acquisition was motivated, at least in part, by Varsity's plans to reduce output and increase price post-acquisition. Varsity planned to eliminate forty JAM Brands events or merge them with existing Varsity events and in fact did so.[383] Varsity also sought to increase increased spectator fees at a higher set of JAM Brands events. This change alone was estimated to bring in $500,000.[384]

## 2. Varsity acquired competitor Aloha Productions in 2016

In December 2016, Varsity purchased Aloha Productions for $3.25 million.[385] Aloha produced approximately thirty annual events, including three Worlds bid events, across three brands in eleven states. Varsity estimated that Aloha's market share was 2%.[386] Varsity described Aloha as "our strongest competitor on the West Coast" and noted that Aloha had recently acquired an event producer with a Worlds bid event in the Mid Atlantic market.[387]

Varsity had several motivations for acquiring Aloha. First was the "immediate expansion of market share, notably on the West Coast" and an increase in Varsity's West Coast events from

---

[382] "There are 35 EPs on the Committee and 16 of them are Varsity. Question is, can you pick up at least 2 more votes out of the other 19 to support you?" Peterson, Steve, 07 January 2015, Email: Re: Varsity Events-PA Convention Center-Follow up, USASF_00019064 - USASF_00019072, at 9064.

[383] "There are around 40 opportunities to eliminate or merge Varsity and JamBrands events. By restructuring our portfolio of events, we could increase EBITDA." Sadlow, John, 20 April 2018, Email: FW: Data room document feedback, VAR00415061 - VAR00415076, at 5065. Also, see Section V.D.7.c) discussing Varsity's cancellation of JAM Brands events.

[384] "By strategically restructuring our portfolio of events, we could increase EBTTDA by approximately $500K." Varsity Brands, 09 October 2015, JamBrands Transaction Summary, CB00382194 - CB00382262, at 2197.

[385] The terms of the acquisition also provided for a one-year earnout of up to $500,000 and a three-year employment contract for Aloha's owner at $175,000 annually. Sadlow, John, 20 April 2018, Email: FW: Data room document feedback, VAR00415061 - VAR00415076, at 5062

Varsity acquisition agreements typically included an "earnout" in which the seller would receive a conditional payment that was a function of attendance or revenue from the acquired events in the following years. See, e.g., Sadlow, John, 20 April 2018, Email: FW: Data room document feedback, VAR00415061 - VAR00415076.

[386] LeTard, Tres, 2016, Varsity All Star Market Share est. - 2016, VAR00101102, at 1102.

[387] Sadlow, John, 20 April 2018, Email: FW: Data room document feedback, VAR00415061 - VAR00415076, at 5061.

40 to 62.[388] Varsity also sought to eliminate Aloha's season-ending competition—the Cali Finale, which competed directly against Varsity's season-end events, the U.S. Finals and The Summit—thereby increasing Varsity's profits from its season-end events.[389] Varsity did cancel several Aloha events post-acquisition, as described in Section V.D.7.c). Finally, Varsity planned to increase prices at the newly-acquired Aloha's events, which it believed were too low.[390]

### 3. Varsity acquired Spirit Celebration in 2017

In February 2017, Varsity purchased Spirit Celebration for $2.1 million.[391] Spirit produced thirteen annual events, including one Worlds bid event, primarily in Texas. Varsity estimated Spirit Celebration's market share at 2%.[392] Varsity described Spirit Celebration as a producer of "high quality" competitions that competed directly with Varsity – "the majority of customers in this market split their spending between Varsity and Spirit Celebration."[393]

Varsity identified "immediate expansion of market share in the Southwest" and the opportunity to increase prices as motivations for its acquisition of Spirit Celebration.[394]

### 4. Varsity acquired Jam Spirit Group (DBA Team Champion) in 2017

In November 2017, Varsity purchased Jam Spirit Group (DBA Team Champion) for $1.5 million.[395] Jam Spirit Group (DBA Team Champion) produced thirty cheer and dance events, including two Worlds bid events, primarily in the Midwest. Varsity estimated Jam Spirit Group (DBA Team Champion) had a 2% market share.[396]

---

[388] Sadlow, John, 20 April 2018, Email: FW: Data room document feedback, VAR00415061 - VAR00415076, at 5061.

[389] "Cali Finale – Aloha currently operates the Cali Finale which competes against our end-of-the-season events, US Finals and Summit. Opportunity to consolidate these events resulting in increased overall profitability." Sadlow, John, 20 April 2018, Email: FW: Data room document feedback, VAR00415061 - VAR00415076, at 5061.

[390] "Price optimization - Aloha current price point would be considered value pricing. Opportunity for price optimization at specific events." Sadlow, John, 20 April 2018, Email: FW: Data room document feedback, VAR00415061 - VAR00415076, at 5061.

[391] The terms of the acquisition also provided for a one-year earnout of up to $357,500. Sadlow, John, 20 April 2018, Email: FW: Data room document feedback, VAR00415061 - VAR00415076, at 5068.

[392] LeTard, Tres, 2016, Varsity All Star Market Share est. - 2016, VAR00101102, at 1102.

[393] Sadlow, John, 20 April 2018, Email: FW: Data room document feedback, VAR00415061 - VAR00415076, at 5068.

[394] "Spirit Celebration current price point would be considered value pricing. Opportunity for price optimization at specific events." Sadlow, John, 20 April 2018, Email: FW: Data room document feedback, VAR00415061 - VAR00415076, at 5068.

[395] Sadlow, John, 20 April 2018, Email: FW: Data room document feedback, VAR00415061 - VAR00415076, at 5072.

[396] LeTard, Tres, 2016, Varsity All Star Market Share est. - 2016, VAR00101102, at 1102.

Case 2:20-cv-02892-SHL-tmp   Document 389-2   Filed 02/10/23   Page 103 of 149
PageID 10625
Highly Confidential          Expert Report of Janet S. Netz, Ph.D.          98 of 115

Varsity identified "immediate expansion of market share in the Midwest" and the opportunity to increase prices as motivations for its acquisition of Jam Spirit Group (DBA Team Champion).[397]

### 5.  Varsity again acquired its largest competitor, EPIC Brands, in 2018

In January 2018, Varsity made another large acquisition, purchasing EPIC Brands for $14.9 million.[398] Prior to the acquisition, EPIC Brands competed with Varsity in both the Cheer Competition and Cheer Apparel markets. Varsity estimated EPIC Brands' competition market share at 6%.[399]

EPIC Brands produced approximately 76 events during the 2016-17 season, including two Worlds bid events and was part-owner of the U.S. Finals event that Varsity had previously acquired from JAM Brands.[400] Prior to acquiring EPIC Brands, Varsity indicated that it would eliminate the majority of EPIC Brands' events post-acquisition because they competed directly with Varsity's existing events.[401]

### 6.  Varsity acquired a number of other competing event producers

In addition to the large event acquisitions listed above, Varsity purchased a number of smaller event producers:[402]

- All Things Cheer & Dance (ATC), purchased in April 2017 for $160,000;

- Mardi Gras Nationals, purchased in December 2017 for $900,000;

- International Cheer Alliance (DBA Sea to Sky), purchased in December 2017 for CAD $1,269,000.[403]

---

[397] "[JAM Spirit Group DBA] Team Champion current price point would be considered value pricing. Opportunity for price optimization at specific events." Sadlow, John, 20 April 2018, Email: FW: Data room document feedback, VAR00415061 - VAR00415076, at 5072.

[398] Sadlow, John, 20 April 2018, Email: FW: Data room document feedback, VAR00415061 - VAR00415076, at 5076.

[399] LeTard, Tres, 2016, Varsity All Star Market Share est. - 2016, VAR00101102, at 1102.

[400] See, e.g.,

- Varsity Spirit, December 2017, EPIC Transaction Summary, VAR00128737 - VAR00128750, at 8740.

- Varsity Spirit, December 2017, EPIC Transaction Summary, VAR00128737 - VAR00128750, at 8738.

- Undated, 2017-12 EPIC Financial Diligence v0.7, VAR00005310.

[401] "With EPIC brands they have a lot of events that compete with ours in the Mid Atlantic, and if there was an acquisition we would probably see the same thing – customer choosing to attend EPIC events and removing existing Varsity events off of their schedule. When valuing the companies on the East coast it is challenging to find value in the bulk of their one day events. In most cases we would want to cancel the majority of them since we have events already in those regions on the same weekend. The value to me is on their Worlds bid giving events." Webb, Jeff, 08 September 2016, Email: Re: Safe Acquisitions, VAR00272846 - VAR00272848, at 2846.

[402] Sadlow, John, 20 April 2018, Email: FW: Data room document feedback, VAR00415061 - VAR00415076, at 5070-5074.

[403] Sea to Sky was a Canadian event producer. "The acquisition of STS will complement our current portfolio of events in Canada and provide a year-end event option for Canadian teams not travelling to the US." Varsity Spirit, Undated, Internal Acquisition Memos for time period 2015-2018, CB00075991 - CB00076004, at 6002.

Each of these acquisitions came with a Worlds bid event.

### 7. Varsity's acquisition strategy harmed competition for Cheer Competitions

Varsity's acquisition strategy has eliminated its strongest competitors, resulted in a highly concentrated market, gave it control over cheer sanctioning bodies, and allowed it to reduce output and increase prices.

### a) The market for Cheer Competitions is now very concentrated

Varsity has purchased all of its strongest competitors. On at least three occasions, Varsity has acquired its largest competitor at the time – National Spirit Group in 2004, JAM Brands in 2015, and EPIC Brands in 2018. Varsity ultimately acquired all four of the firms it identified as its top competitors in 2016.

Two measures are useful in describing the degree of competition (or lack thereof). The first is the market share of the largest firm. During the class period, Varsity's market share in the market for Cheer Competitions increased significantly, due in large part to its acquisition strategy. After acquiring JAM Brands, Varsity's market share increased from 40-50% to 70-80%. Subsequent acquisitions of firms with individual market shares of 2-10% have maintained Varsity's market share in the 75-85% range.[404]

---

[404] See, e.g.,

- In 2016, Varsity estimated its share of the All Star market at 75% and the next largest competitor, EPIC Brands, at 6%. LeTard, Tres, 2016, Varsity All Star Market Share est. - 2016, VAR00101102.

- Brian Elza, former General Manager and Vice President of Sales at Varsity All Star, testified, "Q. Okay. We can talk about that in a bit. So let me ask you this: In 2016, Varsity had 75 percent of the All Star event market, and then Varsity, over the course of 2016 to 2018, acquired Epic, GSSA, Aloha, Spirit Celebration, and Champion Spirit Group [Jam Spirit Group (DBA Team Champion)]; is that right? A. Yes. Q. So between 2016 and 2018, Varsity purchased its second, third, fourth, and fifth largest competitors in the All Star event market, right? A. Based on this chart, the answer is yes. Q. And it went from – based on this chart, it went from 75 percent of the All Star event market to 86 percent of the All Star event market; is that right? A. Yes. Q. So Varsity bought its way to dominance, correct? A. Some people would say that. Q. Would you say that? A. I don't really know the answer. Repeat that. Would I say what now? Q. That Varsity bought its way to dominance in the All Star event market. A. Yes." Deposition of Brian Todd Elza, 16 November 2021, at 80:18-82:3, objections omitted.

- Marlene Cota, Varsity's former Vice President of corporate alliances and business development, testified, "Q. My first question is the All Star. So has Varsity's market share in the competitive cheer market for All Star, not schools, has that changed throughout the years from 2012 to 2018? A. It has increased. Q. And do you know what the market share – Varsity's market share in competitive cheer market for All Star was in 2018, at the time you left? A. At the time that I left, I would say conservatively, 80 percent, 85 percent." Deposition of Marlene Cota, Volume I, 06 April 2022, at 53:7-21, objections omitted.

- Ms. Cota also testified that Varsity's share of school competitions was at least as high as its share in All Star competitions. "A. Well, in my role in making presentations to corporate sponsors and selling through corporate sponsorships, I had to present market share figures in order to get corporate sponsors. So I'm basing those numbers on what I would present in my own documents and presentations to potential corporate sponsors on what our market share was at that time. Q. Okay. And in 2012, do you know what Varsity's market share in this market for school cheer may have been? A. Are we talking competitions, camps, or school overall? Q. Let's start with school competitions. A. 85 percent." Deposition of Marlene Cota, Volume I, 06 April 2022, at 51:3-22, objections omitted.

The other measure of the degree of competition is concentration – the degree to which the market is in the hands of a few firms. A common measure of market concentration is the Herfindahl-Hirschman Index (HHI), which is equal to the sum of the squared individual market shares of all market participants. Its value ranges from 0 (a large number of very small firms) to 10,000 (a single firm monopolizing the market).

The HHI for the Cheer Competition market in 2015 was at least 2,500,[405] a level which is generally considered "highly concentrated."[406] Varsity's acquisition of JAM Brands increased market concentration significantly, with the HHI increasing by at least 2,400. Mergers in highly concentrated industries that further increase concentration by 200 are presumed to enhance market power.[407] Varsity and its advisors recognized the dominance of Varsity and JAM Brands at the time of the acquisition.[408]

> b)  Varsity increased its control of sanctioning bodies via its acquisitions, enhancing its market power over competitions

Varsity's acquisitions also served strategic purposes that enhanced its market power. It sought to acquire Tier 1 event producers, which held Worlds bid events and voting seats on the USASF Sanctioning Committee. Varsity also sought to purchase Tier 3[409] event producers that were next in line to be promoted to Tier 1 producers when a current Tier 1 producer was demoted.[410]

---

[405] There is some uncertainty about Varsity's market share at the time, with some sources indicating it was closer to 40% and others 50%. Using the 40% share estimate for Varsity and a 30% share for JAM Brands would imply that the pre-merger HHI was at least 2,500 and the post-merger HHI was 4,900, an increase of 2,400. Using the 50% estimate for Varsity's share, the pre-merger HHI was at least 3,400 and the post-merger HHI was 6,400, an increase of 3,000. Under either assumption, the market was highly concentrated. 2010 Horizontal Merger Guidelines, at 19.

[406] 2010 Horizontal Merger Guidelines, at 19.

[407] "Mergers resulting in highly concentrated markets that involve an increase in the HHI of more than 200 points will be presumed to be likely to enhance market power." 2010 Horizontal Merger Guidelines, at 19.

[408] "Within the cheerleading and dance competition space, JAM and Varsity are the two primary market participants and produce the majority of the premier events. While there are many other companies that put on cheerleading and dance competitions, the market is highly fragmented and composed of much smaller event organizers who produce only a few events each Competition Season. As a result of JAM and Varsity's dominance in the industry there has been significant competition between these two companies in recent years to take customers from the other, as well as to sign up new gyms. JAM has historically had the second largest market share in the industry, behind Varsity." The BVA Group, LLC, 16 March 2016, Valuation Analysis Regarding the Fair Value of Certain Tangible and Intangible Assets of Jam Brands, Inc. As of November 2, 2015, VAR00127376 - VAR00127445, at 7382.

[409] Starting with the 2016-17 season, the USASF recognized only two tiers of Competitive Cheer event producers. Each Tier 1 producer held one of a limited number of Worlds bid events and Tier 3 producers only held non-Worlds bid events. Tier 1 event producers could lose the right to produce a Worlds bid event, e.g., by failing to meet minimum attendance at their events. A Tier 3 event producer could then apply to fill the Tier 1 vacancy. Applications would be approved based on seniority, i.e., which Tier 3 event producer had been a USASF member first. Peterson, Steve, 14 January 2016, Email: CRITICAL: Tier 1 Event Producer Application Process 2016-2017, USASF_00019739 - USASF_00019778.

[410] For example, Varsity explained one motivation for its acquisition of Jam Spirit Group (DBA Team Champion) was, "There is also additional un-modelled upside due to the fact that Jam Spirit Group [DBA Team Champion] is first in line for the next World Bid event if an existing event producer fails to meet minimum event requirements. This additional World Bid event could be reallocated in the next 2-3 years and is not reflected in EBITDA or purchase price, potentially offering another World Bid event at no additional cost in the future." Sadlow, John, 20 April 2018, Email: FW: Data room document feedback, VAR00415061 - VAR00415076, at 5072.

Varsity actively sought to weaken rival Tier 1 event producers via counterprogramming, with the goal of promoting its own Tier 3 events to Tier 1 events. See Section V.B for a description of Varity's counterprogramming conduct.

With its 2015 acquisition of JAM Brands, Varsity gained JAM Brands' seat on the USASF Board of Directors, its five Worlds bid events, and the associated seats on the USASF Sanctioning Committee.[411] Post-acquisition, Varsity employees held seven of thirteen voting seats on the Board of Directors and 21 of 36 votes on the Sanctioning Committee, cementing its full control of both bodies.[412,413]

Varsity further consolidated its control of the USASF with acquisitions of other Tier 1 event producers including Aloha (three Worlds bid events), Spirit Celebration (one Worlds bid events), All Things Cheer (one Worlds bid events), Jam Spirit Group (DBA Team Champion) (two Worlds bid events), Mardis Gras (one Worlds bid event) and EPIC Brands (two Worlds bid events). By 2020, Varsity owned 36 of 46 Worlds bid events.[414] Each Worlds bid comes with a seat on the USASF sanctioning body, so by 2020 Varsity had 36 of 46 seats on the sanctioning body.

In a 2018 email, Steve Peterson, the USASF Vice President of Events and Corporate Alliances, acknowledged that Varsity controlled the USASF Sanctioning Committee.[415] Varsity, the USASF, and other industry participants have repeatedly recognized that Varsity's permanent majority on the Sanctioning Committee gives it complete control over how Worlds bids are awarded.[416]

---

[411] Varsity Brands, 09 October 2015, JamBrands Transaction Summary, CB00382194 - CB00382262, at 2194.

[412] An USASF document listing the members of the USASF Board of Directors at different years shows that in 2016 Varsity employees held seven of the thirteen voting seats. The list includes the following Varsity affiliated individuals: Brian Elza (at the time General Manager, VP of Sales at Varsity All Star), Dan Kessler (representative of JAMfest, a Varsity brand), Jeff Fowlkes (representative of Cheersport, a Varsity brand), Justin Carrier (at the time Vice President at Varsity All Star), Mike Burgess (representative of USA, a Varsity brand), John Newby (at the time Varsity/Herff Jones division president), John Nichols (at the time Executive Vice President and General Manager/Senior Advisor at Varsity Spirit LLC). See,

- Chadwick, James, 2021, USASF Board Member History with email addresses UPDATED, USASF_00032444 - USASF_00032446, at 2445.

- U.S. All Star Federation, 13 March 2016, U.S. All Star Federation Board Members, https://web.archive.org/web/20160313050527/http://www.USASF.net/organization/bod/bod_members/, accessed 14 June 2022.

[413] "Varsity has 21 Tier 1 (Cheer Sanctioning Committee) Votes. There are 15 other Tier 1 EPs on the Committee." Peterson, Steve, 10 February 2016, Email: Re: REMINDER: VOTE NEEDED: 2016-2017 Tier 1 Approval Process, USASF_00020227 – USASF_00020228, at 0227.

[414] 30(b)(6) Deposition of U.S. All Star Federation (Steven H. Peterson), 09 March 2022, at 263:20-23.

[415] "To take this move to the Sanctioning Committee, knowing quite well Varsity controls it, will create a firestorm from the IEP. Things are already very sensitive with them. Keep me posted on other options." Peterson, Steve, 17 January 2018, Re: PAST DUE: Tier 1 Event Producer Application Process 2018- 2019, USASF_00017938 - USASF _00017941, at 7938.

[416] See, e.g.,

Case 2:20-cv-02892-SHL-tmp   Document 389-2   Filed 02/10/23   Page 107 of 149
PageID 10629
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**                        102 of 115

c) Varsity directly harmed competition by reducing output and quality
and increasing in price

Varsity's acquisitions led to reduced output, lower quality events, and higher prices to
consumers, all of which are the hallmarks of harm to competition. Varsity routinely acquired
independent event producers with the intention of either cancelling events or increasing the
prices charged to participating teams, athletes, and their families.

For example, prior to its acquisition by Varsity in 2015, JAM Brands produced over one hundred
events.[417] Varsity stated that one motive for the acquisition was its plan to eliminate
approximately forty of these events or merge them with existing Varsity events post-
acquisition.[418] Post-acquisition, the number of JAM Brands branded events fell from 115 in the
2014-15 season to 78 in 2017-18, in line with Varsity's pre-acquisition plan.[419]

Varsity canceled these events because JAM Brands and Varsity events competed directly with
each other.[420] Varsity's Vice President of Sales Brian Elza explained that Varsity "often"

---

- In a 2016 email, Steve Peterson tells Jeff Fowlkes that Varsity has a majority of votes on the USASF
  Sanctioning Committee: "Varsity has 21 Tier 1 (Cheer Sanctioning Committee) Votes. There are 15 other
  Tier 1 EPs on the Committee." Peterson, Steve, 10 February 2016, Email: Re: REMINDER: VOTE
  NEEDED: 2016-2017 Tier 1 Approval Process, USASF_00020227 – USASF_00020228, at 0227.

- In early 2016, the majority of the USASF Sanctioning Committee is made up of Varsity Brands: "However,
  since it did not impact the majority vote, it was not an issue. Now, we are in a different situation with the
  majority of the Sanctioning Committee made up of Varsity Brands." Peterson, Steve, 11 February 2016,
  Email: Re: Tier 1 Application, USASF_00020257 – USASF_00020258, at 0257.

- In a 2016 email, Steve Peterson messages other event producers and mentions that Varsity controls the bid
  process approval (i.e., Varsity controls the USASF Sanctioning Committee) and it will not approve two
  cheer event moves: "The Varsity Brands are not going to approve the Bid List based on the two new
  applicant's moves in the Ohio area. Since they are 21 out of the 36 seats now, the applicant list will not be
  approved." Peterson, Steve, 18 February 2016, Email: Re: Update - All Star Championships,
  USASF_00020397 - USASF_00020399, at 0397.

- An independent event producer representative recognizes that Varsity virtually controls the USASF
  Sanctioning Committee in a 2016 email: "There is no point in the vote going out to everyone else if Varsity
  won't approve the change." Koster, Amber, 19 February 2016, Email: Re: All Star Championship,
  USASF_00002366 - USASF_00002367, at 2366.

[417] A Varsity spreadsheet lists 118 JAM Brands events in the 2013-14 season and 115 events in the 2014-15 season.
Varsity Spirit, 07 October 2015, JAM 2016 vs 15 Event Comparison, VAR00309179.

[418] "There are around 40 opportunities to eliminate or merge Varsity and JamBrands events. By restructuring our
portfolio of events, we could increase EBITDA." Varsity Brands, 09 October 2015, JamBrands Transaction
Summary, CB00382194 - CB00382262, at 2197.

[419] See, e.g.,

- Varsity Spirit, 07 October 2015, JAM 2016 vs 15 Event Comparison, VAR00309179.

- A Varsity spreadsheet lists 78 JAM Brands events in 2017-18 including the America's Best, COA, Coastal,
  GLCC, JamFest and U.S. Finals brands. U.S. All Star Federation, 03 July 2018, Legality Official Rebate
  2017-2018 (for Angela M), VAR00127715.

[420] See, e.g.,

- "With the Jambrands acquisition - revenue could be done for the Fall 2016 events as we will possibly
  cancel several events in October, November, and December. Reason being is that Varsity and Jam have

canceled competing events post-acquisition and that this was done in an effort to "drive more people" to "higher price" events.[421]

Furthermore, the JAM Brands acquisition allowed Varsity to produce events with lower production values—without competition from JAM Brands, consumers no longer had an option for high-production value events.[422]

Aloha Productions produced 25-30 events each year prior to its acquisition in December 2016.[423] The following season, Varsity produced just fifteen Aloha events.[424] Varsity planned similar reductions in output when it acquired EPIC Brands,[425] as described in Section V.D.5. The elimination of acquired events was sufficiently common that Varsity had a policy in place to compensate owners of the acquired firms, who would otherwise lose their earnout.[426]

Varsity has consistently demonstrated its ability to raise prices for its events. Varsity executives understand that it is "insulated from price pressure and competition" which allows Varsity to increase prices for events, including spectator fees. Varsity's customers agree that they have few

---

several events on top of each other in same or similar markets. Strategy for a possible cancellation would be to try to get many of those teams to attend a more profitable event which would add to bottom line of those events." LeTard, Tres, 10 December 2015, Email: Re: 2016 Risks and Opportunities, VAR00102150 - VAR00102152, at 2151.

- Deposition of Francis Xavier LeTard, III, 22 November 2021, at 261:5-12.

[421] "Q. And you're saying that after the JAM Brands acquisition, Varsity would likely cancel certain events; is that right? A. Yes. We did that often. Q. Explain why you canceled events after you acquired an event company. A. It would be in a similar market; similar time of year. One event would be more prestigious, higher price point, and the desire to drive more people to that event would be, you know, for the obvious reasons." Deposition of Brian Todd Elza, 16 November 2021, at 230:23-231:9, objection omitted.

[422] Deposition of Francis Xavier LeTard, III, 22 November 2021, at 263:1-264:7.

[423] See, e.g.,

- A USASF spreadsheet lists 29 Aloha Spirit Productions events in the 2016-17 season, including Aloha, GSSA and Mid-Atlantic branded events. U.S. All Star Federation, 18 April 2017, usasf_events_16-17_17-04-18, VAR00360675.
- Prior to the acquisition, Varsity said Aloha produced approximately 30 events. LeTard, Tres, 2016, Varsity All Star Market Share est. - 2016, VAR00101102.

[424] A USASF spreadsheet lists 16 Aloha Spirit Championships brand events, including Aloha, GSSA and Mid-Atlantic branded events in 2017-18. U.S. All Star Federation, 03 July 2018, Legality Official Rebate 2017-2018 (for Angela M), VAR00127715.

[425] See, e.g.,

- "With some of our smaller acquisitions we will continue to consolidate their events into existing offices." Elza, Brian, 24 April 2018, Email: Impact, VAR00183218 - VAR00183221, at 3219.
- A list of sixteen canceled events for the 2018-19 season includes a number of events produced by the recently acquired EPIC Brands or Varsity events that went head-to-head or back-to-back with EPIC Brands events. Undated, Canceled Varsity All Star Events from 2018-2019 Season, VAR00095213 - VAR00095215.

[426] Concerning the Spirit Celebration acquisition, Tres LeTard wrote, "Yes, this is the way we've handled this with previous acquisitions. If we cancel an event, he'll get credit for the door amount from the previous year." Timmons, Kirby, 26 February 2017, Email: RE: [FWD: Final APA and Employment Contracts for Spirit Celebration], VAR00194754 - VAR00194757, at 4755.

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 109 of 149
PageID 10631
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          104 of 115

non-Varsity options, which allows Varsity to raise prices. See Section IV.A.2 for a more detailed discussion of Varsity's market power.

For consumers, the result of Varsity's acquisitions has been fewer events, lower quality events, and higher prices.

> d) Varsity's acquisition also reduced competition in the market for Cheer Apparel

Varsity's acquisition of event producers also harmed competition for Cheer Apparel.

Cheer Competitions bring together hundreds or even thousands of cheer teams, coaches, gym owners, athletes, and parents. Such events are an ideal venue to market and sell Cheer Apparel to both new and existing customers. Varsity generally does not allow rival apparel makers access to its events.

Prior to its acquisition, JAM Brands was the most important marketing partner for Rebel, an emerging rival to Varsity in the apparel market. Varsity's acquisition of JAM Brands meant that not only did Rebel lose its most effective marketing partner, but it was replaced at JAM Brands events by Varsity, as described in Section IV.B.2.

In 2016, Varsity instituted a "zero tolerance" policy in which employees of rival apparel makers would not be allowed any access to Varsity events, even to attend as an event judge.[427] This policy not only prevented rival Cheer Apparel makers from directly marketing to potential customers at Varsity events, it also prevented them from attending for networking or research purposes.

As Varsity's share of cheer events increased, the share of events at which competing apparel makers could market and sell their products shrank. The effect was to foreclose an important marketing platform for Varsity's rivals in the Cheer Apparel market.

### E. Varsity pays rebates to All Star gyms that foreclose competitors

Varsity offers rebate programs to owners of All Star gyms. While the rebate programs reduce the net prices direct purchasers pay to Varsity in the short run, they also function as anticompetitive exclusive dealing arrangements harming competition in the long run. Varsity's rebate programs create strong financial incentives for firms to buy exclusively from Varsity and leverage Varsity's market power from one relevant market to another, foreclosing Varsity's rivals in the relevant markets for Cheer Competitions and Cheer Apparel.

Varsity offers rebate programs to owners of All Star gyms: the Varsity Family Plan is offered to all All Star gyms and the Varsity Network Program is offered to the largest All Star gyms. Although these programs are intended for different groups of Varsity customers they function similarly: Varsity pays increasing rebates based on the number of Varsity events a gym attends

---

[427] Tres LeTard, General Manager of Varsity All Star, emailed, "Jeff is hot on taking down Rebel right now and not looking to play nice. I feel like we should rethink letting those Rebel reps Judge for us. I can already hear it…'why in the hell would we give them access to our events!' I don't want to be on the receiving end of that conversation... not worth it for a few judges. Leslie mentions below that part of Rebel's strategy is "trying to find access at our events ...." to which Justin Carrier, VP of NCA, NDA and ACA, responded, "We can definitely continue moving forward with our new zero tolerance for bringing on new judges who work for uniform competitors." Carrier, Justin, 16 September 2016, Email: Re: Rebel, VAR00438032 - VAR00438036, at 8033. Emphasis in original.

and the total amount of money the gym spends on Varsity competitions and apparel. Both of these programs a) discourage gyms from attending any non-Varsity events, competitions, or camps; b) discourage gyms from purchasing any non-Varsity apparel; and c) lock gyms into the Varsity ecosystem from one season to the next.

When the Varsity Family Plan was first launched in 2007, the rebates were paid entirely in the form of cash,[428] but that has evolved over time to include some combination of cash, credit for Varsity Fashion apparel, and other benefits.[429] A Varsity employee testified that at least some of this evolution was driven by Bain personnel who provided strategic advice and input on the Family Plan.[430] Any All Star gym can participate in the plan as long as it attends the minimum

---

[428] See, e.g.,

- "As we have grown our market share we have continued to make adjustments to the Varsity Family Plan such as required number of regular season events and 100% cash rebate. Last year we introduced a 75/25 split [between cash and credit for Varsity apparel and are leaning toward a 60/40 split over the next few years." Varsity Spirit, Undated, All Star Overview, VAR00310631 - VAR00310666, at 0664.

- Tres LeTard, who helped develop the Varsity Family Plan in 2007, stated that by 2010, the program was "distributing over 3 million dollars in rebates annually." LeTard, Tres, 01 February 2018, Email: Bio/Resume, VAR00103337 - VAR00103342, at 3338.

- By 2017 the program paid out $8.3 million in rebates. Elza, Brian, 25 October 2018, Email: Final One Tres, VAR00097495 - VAR00097521, at 7513.

[429] See, e.g.,

- A document describing the 2016/2017 Varsity Family Plan states: "Reward Distribution 65% redeemed in the form of a cash rebate 35% redeemed in the form of Varsity Fashion Dollars Additional 10% Varsity Fashion Dollars rewards will be earned on all uniform and accessory purchases…How it Works: Attend 6 or more Varsity events to qualify. At events in which hotels, transportation, theme park/sporting event tickets, etc. are included, only the actual registration fee will be credited towards your rebate. Only All Star team registrations apply. After your last Varsity Family Plan Event, fax or email your completed W9 to All Star advisor. Allow 6-8 weeks for Processing. Varsity Fashion Dollars must be used by August 1." Elza, Brian, 25 October 2018, Email: Final One Tres, VAR00097495 - VAR00097521, at 7512-13.

- A document describing the 2016/2017 Varsity Family Plan states "The Varsity Family Plan is a revenue-sharing program that provides gym owners the ability to reinvest a portion of their event registration fees back into their business as well as earn Varsity Dollars to be used for Varsity Fashion purchases…Rewards will be distributed in the form of rebates and Varsity Fashion Dollars. 75% can be redeemed in the form of a cash rebates and 25% will be in the form of Varsity Fashion dollars. Varsity Fashion Dollars can be used for everything from uniforms to practice wear to shoes. Additional 10% Varsity Fashion Dollars rewards will be earned on all uniform and accessory purchases." In order to qualify, an All Star gym has to attend at least five Varsity events. Varsity, Undated, The Varsity Family Plan, VAR00020214.

- A 2018 Platinum Network agreement (a Platinum Network agreement is a Varsity Network Program reserved for the very largest gyms that signed three-year exclusive agreements with Varsity) lists an appendix of "Additional Benefits" and the estimated total benefit of each. Benefits include certain "Priority" and "Early Bird" specials such as "Priority Event Check-in," "Priority Design Session," "Early Bird Registration Prices," "Early Bird Practice Space," and "1st Choice Hotel Rooms," among others. Varsity Brands, Inc. and American Cheer Xtreme, 01 October 2008, Rebate Agreement between Varsity Brands, Inc. and American Cheer Xtreme [Signed], VAR00017932 - VAR00017942, at 7941.

[430] See, e.g.,

- Mr. Elza, former General Manager and Vice President of Sales at Varsity All Star, testified that the Family Plan "was a very rich plan, and it was created for all the right reasons, I will say that. But, of course, over

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 111 of 149
PageID 10633
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**                    106 of 115

number of Varsity events in a given season. For the 2016/2017 season, Varsity increased the minimum number of events to qualify from four to five,[431] leaving very few non-Varsity events a team could attend given that teams attend, on average, only seven to nine events per year.[432] For the 2018/2019 season, Varsity again increased the minimum number of events to qualify from five to six events per year. Varsity also decreased the cash rebate from 75% to 65% and increased the Fashion Dollars rebate from 25% to 35%.[433] The effect of both changes was to tie gyms to Varsity for both competitions and apparel.

Through these rebate programs, Varsity leverages its market power in the market for Competitive Cheer Events into the market for Cheer Apparel.[434] Furthermore, because the Fashion dollars earned in a given season cannot be used until the following season, Varsity makes it more costly for gyms to switch away from Varsity.[435]

---

time, we realized that we had to find a way to eventually adapt that plan. So it was a strategy to eventually try to eliminate at least the cash portion of the Varsity Family Plan." Deposition of Brian Todd Elza, 16 November 2021, at 56:13-18.

- Mr. Elza testified that the strategic advice Varsity received from Bain: "from all levels was that we needed to make adjustments to keep the dollars flowing into Varsity. For example, rebate money that's paid out in cash dollars, wouldn't it make more sense to provide products in return for that, or discounted products to the customers, to keep that money inside our wheelhouse." Deposition of Brian Todd Elza, 16 November 2021, at 57:5-12.

[431] A 2016/2017 Family Plan modification requirements document lists the "current state" of categories starting at four events per rebate program, and then states the requirement to "Modify Number of Events per Tier Network" starting at five events. Varsity Spirit, 07 July 2016, VAS - 2016/2017 Family Plan Rebate Modifications: Business Requirements Document, VAR00020257 - VAR00020259, at 0257-58.

[432] Average for the 2017/2018 season. Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9324.

[433] Varsity knew these changes in benefits would not be welcomed by its customers. Tres LeTard, General Manager and Vice President of Operations at Varsity All Star, wrote an email to other Varsity employees regarding these changes stating: "The goal should be to highlight all the new acquisitions and event opportunities, thus more opportunities for Family Plan Rewards…We do not want to bring light to the changes or make it easy for them to compare to the previous [award] grid." LeTard, Tres, 12 June 2018, Email: 18-19 Family Plan Announcement, VAR00079196 - VAR00079198, at 9196.

[434] See, e.g.,

- A 2017 Varsity business strategy presentation states its intention in the apparel market is to "Leverage Family Plan and Network agreements to drive All Star event customers into VSF [Varsity] apparel and footwear." Varsity Spirit, February 2017, Varsity Spirit Strategy Meeting #2, VAR00272414 - VAR00272501, at 2444 and 2451.

- "The Varsity Family Plan and Network customer loyalty programs encourage cross-selling of fashion and events. The Varsity All Star Advisors (event sales team) and Varsity All Star Fashion Specialist (fashion sales team) collaborate and coordinate their sales efforts. We regularly identify who is spending on fashion but not on events and vice versa, then coordinate our sales approach." Varsity Spirit, Undated, All Star Overview, VAR00310631 - VAR00310666, at 0664.

[435] See, e.g.,

- Rebates are earned throughout the season, but only paid after a gym has attended its last Varsity Family Plan event. The cash rebates are typically paid within 6-8 weeks, but the fashion dollars cannot be used

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 112 of 149
PageID 10634
Highly Confidential            **Expert Report of Janet S. Netz, Ph.D.**            107 of 115

These programs are distinguished from standard loyalty programs that are offered in many industries (e.g., airline frequent flier programs) in that the purpose is not just to reward loyal customers; Varsity's stated goal was to preclude gyms from attending any other producer's events or purchasing non-Varsity apparel. Varsity's rebate programs are also unlike other loyalty programs because competition exists in other markets that have loyalty programs. For example, consumers can switch from one airline and its frequent flier program to another airline and its program; however, Varsity has monopolized all of the relevant markets in this matter. The agenda of a meeting attended by several high-level Varsity employees titled "Varsity Family Plan 2.0" illustrates this goal. The agenda included the following topics, among others:

- For every IEP they support, drop a% point [that is, the rebate percentage is lowered for each non-Varsity event attended]

- Slightly higher% back if they do 50%/50% cash/fashion dollars vs 65%/35% [that is, a higher rebate percentage if the gym takes a higher proportion of the rebate in the form of fashion dollars]

- Full Varsity only schedule gets additional benefits [that is, maximize rebate by only attending Varsity events]
  - We request their checks first so they get their rebate sooner
  - Higher% if all-in with their schedule (no IEPs)

- Force post-season participation

- All-in with Varsity perks like if they are all in, then they can get 100% cash back

- Only allow programs to achieve the top level of VFP [Varsity Family Plan] if they are exclusive to Varsity

- Get rid of any competitors, make it so that teams couldn't go to IEP[436]

Regarding this specific document and the provisions in general, Jamie Parrish, the former Director of Strategy and Special Projects at Varsity All Star, testified that these provisions were intended to:

---

until the next season and must be redeemed by August 1 of the following season. Varsity, Undated, The Varsity Family Plan, VAR00020214.

- The typical All Star season runs from May-June when tryouts are held through April-May of the following year when the end of season national events are held. Competition registrations begin in August and competition season is October through May. Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9324.

- The typical School season runs from January-March when Varsity representatives begin working with schools on camp and apparel purchases through February of the following year when the end of season national events are held. Camps are held June through August and teams attend competitions September through January. Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9333.

[436] The Family Plan 2.0 was a proposal but I have not found evidence that it was actually enacted exactly as described in this document; however, it does provide insight into how the Varsity intended the program to function. Elza, Brian, 21 April 2020, Email: Last Meeting, VAR00199568 - VAR00199572, at 9570.

Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**                    108 of 115

- Make sure gyms did not attend IEP events.[437]

- Make it impossible for existing IEPs to offer a competing product, ultimately putting them out of business.[438]

- Preclude any new IEPs from hosting competitions.[439]

In furtherance of its exclusionary scheme, Varsity routinely provided additional benefits beyond those specified in the Family Plan documents. Varsity sales representatives were given discretion to provide these benefits to gyms in order to induce certain behavior and disadvantage its competitors. For example, Varsity would regularly increase the rebate tier for gyms by, for example, crediting them with an additional Varsity event if they were willing to remove a competing IEP's event from their schedule and replace it with a Varsity event.[440] Other

---

[437] See, e.g.,

- Q. "Okay. But were those intended – so, here, so looking at No. 5, 'For every IEP they support, drop a [percentage] point,' and I believe you testified that that means they would get less in the way of rebates for each IEP they attended; is that correct? A. Yes. Q. Okay. Was the goal of a provision like that to make sure both that a gym went to a Varsity event and that the gym did not go to an independent event? A. Yes." Deposition of Jamie J. Parrish, Volume I, 03 March 2022, at 171:1-171:14.

- Elza, Brian, 21 April 2020, Email: Last Meeting, VAR00199568 - VAR00199572, at 9569-9540.

- A Varsity document indicates the increasing the minimum event attendance requirements for gyms from four to five will "likely force some brands [gyms] to choose between us and Jam Brands – we think we can be successful over Jam. (many brands go to 4 of our events and 3 Jam brands events—get rebate from both)." 27 September 2010, All Brands Meeting, VAR00195425 - VAR00195440, at 5431.

[438] "Q. So, right, right about the words 'New Requirements,' it says – do you see the bullet that says: 'Get rid of any competitors, make it so that teams couldn't go to IEP'? Do you see that? A. Yes. Q. What does that mean? A. Exactly what it sounds like. That, at all costs, get rid of IEPs. Make it so teams can't go – make it physically, just absolutely, if you can't get a World bid, and you can get a Summit bid, and you – and it's going to cost you way more and we're going to make it…You know when you have – when you're that big, you can price things so strategically that if teams – I mean, if you're going to pay me \$500 to go to a Varsity competition or pay me nothing to go to an IEP, I'm going to go to the Varsity competition. That's how to get rid of IEPS. Q. And when you – A. Because it's – Q. Go ahead. Sorry. A. It just makes it too hard for a competitor to offer a competitive, a competitive good or service. Q. And when you say 'get rid of them,' did you mean put them out of business? A. Yes." Deposition of Jamie J. Parrish, Volume I, 03 March 2022, at 177:4-178:6.

[439] "Q. And when you were the director of strategy for Varsity, did you understand that that was a goal of Varsity's? MR. KAISER: Objection. A. It was commonplace in our executive team, in and out of the office, on the phone, all the time, we were very very determined to make sure that Varsity – we didn't want IEPs coming into the market. It's just like any other company. No other company, you know wants it. Now, how – how you go about doing that, you know some people will just say, 'Provide a superior product at a better price.' But I think some of the levels that we went to to achieve this were a bit questionable." Deposition of Jamie J. Parrish, Volume I, 03 March 2022, at 178:8-22.

[440] "Q. Okay. So is the idea that if the gyms spent those various amounts of money and went to the various numbers of events that are listed in the subsequent columns, they would receive rebates of the amounts indicated in that chart? A. Yes. Q. And over time, some of these details changed; is that correct? A. Well, the – like I said before, the sales reps had carte blanche to change this as they needed to. So if you had a customer that was looking at attending an IEP, and they had five events on their schedule and they were in the zero-to-\$40,000 bracket range, and they were thinking about going to the five events to do their Family Plan and get that taken care of so that they got their 4 percent rebate check, a sales rep may go in and say, 'Okay, if you take this IEP off and you go six events with us, I might – I'm going to – I'm going to get you bumped up to the 8 percent,' which you would have gotten if you went

additional benefits offered by Varsity to those gyms willing to drop non-Varsity events from their schedules included free uniforms, free apparel, free registrations, priority hotel reservations (including early or guaranteed booking, lower rates, or better rooms), and waiving one registration fee for athletes competing on two teams.[441]

Although the Family Plan was available to any All Star gym that met the minimum requirements, Varsity offered additional benefits above and beyond the published Family Plan rebates to its largest customers—those that spent in the highest tier of the Family Plan or above. This program, called Varsity All Star Network Agreements or Varsity All Star Platinum Network Agreements, offered a range of additional benefits for the most important gyms who were "all-in" with Varsity; these "mega gyms" signed exclusive three-year agreements with Varsity which effectively precluded them from attending any non-Varsity events and explicitly forbid them from purchasing any non-Varsity apparel.[442] These agreements targeted the largest gyms, giving

---

to seven events as an incentive. Q. Okay. A. Or they may say, 'If you drop that IEP, you're going to hit the Family Plan at 4 percent, but I'm going to throw in shoes for your entire team for Worlds.' Or, in many cases, we gave free Worlds uniforms to big-name programs to incentivize them to drop certain competitions or whatever." Deposition of Jamie J. Parrish, Volume I, 03 March 2022, at 213:16 – 214:19.

[441] See, e.g.,

- "A. Or they may say, 'If you drop that IEP, you're going to hit the Family Plan at 4 percent, but I'm going to throw in shoes for your entire team for Worlds.' Or, in many cases, we gave free Worlds uniforms to big-name programs to incentivize them to drop certain competitions or whatever. [Objection omitted.] Q. So Mr. Parrish, Just to restate what I had ask you. In fact, over time, there were some changes made to the dollar amounts required, the number of events required, and what exactly would come back to the gyms as a result of their spend; is that correct? [Objection omitted.] Q. So Mr. Parrish, just to restate what I had asked you. In fact, over time, there were some changes made to the dollar amounts required, the number of events required, and what exactly would come back to the gyms as a result of their spend; is that correct? A. Yes. But it was a private kind of thing. This is – this is – what you're seeing is pretty much a public document. Q. Okay. A. But there were other private negotiations also. A. Okay. And were the private negotiations between Varsity sales reps and their individual gym customers? A. Yes." Deposition of Jamie J. Parrish, Volume I, 03 March 2022, at 214:14-215:14.

- "Q. Can you give me some examples of those private negotiations? A. Free crossovers; free uniforms; free registrations; priority hotel accommodations; getting to stay in the venue hotel that you – instead of getting – having --- instead of having to have transportation take you from 30 minutes away from the competition venue, you might get a better hotel bill; you might get priority registration; you might get better rooms at Worlds. You—there's a lot of things that you could get as – as—if you work with your sales rep: free shoes, free practice wear, free Worlds uniforms. [Objection omitted.] Q. And those are all examples that I asked you about regarding prior negotiations between the Varsity sales reps and their customers? MR. KAISER: Objection. A. Yes. Q. And when you say 'crossover,' what are you referring to? A. If your child competes on more than one team, traditionally, you would have to pay two registration fees for two performances. And in some cases, like in the case of Courtney Smith Pope at Cheer Xtreme, she is given free crossovers, so she doesn't have to pay for crossovers, but the gym down the street has to pay for free – both crossovers." Deposition of Jamie J. Parrish, Volume I, 03 March 2022, at 215:15-20.

[442] See, e.g.,

- "Varsity All Star Network How it Works: 8 Varsity All Star Event Minimum [bullet] $150,000 Minimum Spend [bullet] Purchase Varsity All Star Fashion Uniforms [bullet] Purchase Varsity All Star Fashion Shoes [bullet] Purchase a 3rd Varsity All Star Fashion Category [sub-bullet] Bags, Warm Ups, Practice Wear, Accessory's [sic], etc. [bullet] Not advertised to public." Elza, Brian, 25 October 2018, Email: Final One Tres, VAR00097495 - VAR00097521, at 7515.

event discounts as high as 32%, apparel discounts as high as 52%, and a range of additional benefits for gyms including: The Summit coaches' passes, preferred hotel rooms, priority event check-in, preferred event practice space, priority apparel design sessions, marketing and brand building (including print advertising and segments on Varsity TV), free Varsity University conference fees, free Disney "Park Hopper" passes, free hotel room, guaranteed discount pricing at all events, and free apparel.[443] Varsity was aware of the magnitude of these discounts and as of 2019 made efforts to conceal the total value of the rebates paid through its loyalty programs for fear that other industry participants would realize how large Varsity had become.[444]

---

- Barsh, Lisa, 30 July 2018, Email: RE: FW: SVC All Stars - Varsity (Flag: Follow up), VAR00105228 - VAR00105229.

- Kirichkow, Tannaz, Cali All Stars, 03 March 2020, Email: Re: Network Agreement Renegotiation, VAR00110649 - VAR00110652.

- Note that there are "Premier" level gyms within the Varsity Family Plan; these are distinct from the Platinum agreements discussed here. "Premier Athletics" is the company name of large multi-location gym customer across camps, competition, and apparel. The Premier Varsity Family Plan is exclusively for the approximately nine Premier Athletics gyms. It is one of Varsity's top three customers, alongside two of the platinum network agreement gyms. Premier gyms play a significant role in driving attendance to Varsity competitions and camps along with apparel spend. See, e.g.,

  - A Varsity Family Plan spreadsheet categorizes customers by rebate plan: "Old Network," "New Network," "Premier," and "Standard VFP." Premier gyms are gyms that are part of the Premier Athletics family of gyms." LeTard, Tres, Undated, 18-19 VFP Estimate Analysis v15, VAR00278313.

  - "Premier spent about $1.3M on apparel and our competitions. That puts them in line with California All Stars and Cheer Extreme as one of our top 3 overall spenders. The key difference is that we don't have to discount or negotiate as we do with those other larger programs. In addition to the all star piece – they also train about 150 school teams that also support Varsity with uniforms, shoes, etc. Probably the largest home run is the support they offer to HS Nationals where they took 51 teams last year to NHSCC this past year. She [Stacy Rowe, Vice President of Premier Athletics] also left out how many of the Premier high school teams also support UCA summer camps." Seely, Bill, 27 February 2019, Email: RE: Premier Athletics Impact to Varsity, VAR00269968 - VAR00269969, at 9968.

[443] See, e.g.,

- A Varsity document contains network agreements for seven of the largest All Star gyms, including American Cheer Xtreme, Bay State All Stars, CheerForce All Stars, GymTyme All Stars, ACE Cheer Company, Cheer Extreme, and World Cup All Stars. Varsity Brands, Inc. and American Cheer Xtreme, 01 October 2008, Rebate Agreement between Varsity Brands, Inc. and American Cheer Xtreme [Signed], VAR00017932 - VAR00017942.

- Appendices A and B to the Cheer Extreme Platinum Network Agreement covering the period 19 March 2018 – 1 June 2021 delineate the specific benefits provided by Varsity to Cheer Extreme under the agreement. Varsity Brands, Inc. and American Cheer Xtreme, 01 October 2008, Rebate Agreement between Varsity Brands, Inc. and American Cheer Xtreme [Signed], VAR00017932 - VAR00017942, at 7939-7942.

[444] A proposed Varsity press release from August 2019 summarizes how much they paid in rebates that year alone ($8 million) and in total since inception in 2007 ($50 million). A Varsity employee responds to the document with concern: "I'm honestly torn on how much we want to promote the $$$ amounts we are giving back. I def [sic] would take out the 50 million amount, it points towards how big VAS [Varsity] really is and I honestly think the majority of the industry has no clue. Internally, Stacy has become extremely upset with me for sharing event

Case 2:20-cv-02892-SHL-tmp    Document 389-2    Filed 02/10/23    Page 116 of 149
PageID 10638
Highly Confidential         **Expert Report of Janet S. Netz, Ph.D.**         111 of 115

All of these rebates were paid directly to gym owners and never to the indirect purchaser athletes and families who are class member in this matter.[445] These rebate programs were intended to exclude competitors,[446] and the evidence shows Varsity's plan was effective, including using the Family Plan to force its customers to remain in the Varsity ecosystem[447] and making offers to gyms that its competitors could not match without losing money.[448]

---

numbers at company events in front of gyms." Stott, Cole, 14 August 2019, Email: Re: Thoughts - Do not share, VAR00177295 - VAR00177297, at 7295.

[445] "What I never really quite understood was the fact that these parents pay into the competition for a published rate on the Varsity website. So any parent can go to the Varsity website and see the price that they pay for a competition. And they pay the gym owner, right, many good faith that the gym owner will then forward their money to Varsity. What the parent – what the end consumer and parent doesn't understand is that that gym owner is going to then get a check or a rebate check of their money back to them personally, to the gym owner personally for them to spend however they see fit." Deposition of Jamie J. Parrish, Volume I, 03 March 2022, at 175:16- 176:5.

[446] See footnotes 437-439.

[447] See, e.g.,

- "Q. So in terms of, though, of forcing things to wear their product, what did that refer to? A. If – if you are a competitor of Varsity, you would hear things like, 'I'm so sorry, I can't wear your shoe, the Varsity rep forced me to do this,' or – you know, or there were going to be financial consequences with the Family Plan. Q. Okay. A. I mean, that's – you would hear that. Q. And, indeed, did the Varsity sales reps convey that message to customers? A. They would say things, you know, 'we want to make you a better deal. We want to make you a deal – you know, we will extend your Family Plan to XYZ, or we'll make you a deal where we'll take care of your, you know, travel, or we'll do this, or we'll do that, I mean year, in order to get them not to wear that shoe or go to GK for a uniform.'" Deposition of Jamie J. Parrish, Volume I, 03 March 2022, at 200:25-201:21, objections omitted.

- Network agreements typically include a "VSF/VASF [Varsity] Dealing/Discount" clause:

  o A 2018 Platinum Network Agreement with Cheer Xtreme states: "During the Term Member will exclusively purchase and Member will insure [sic[ that Member's All Star Team customers will exclusively wear uniforms and manufactured/custom practice wear (excluding T-shirts)." Varsity Brands, Inc. and American Cheer Xtreme, 01 October 2008, Rebate Agreement between Varsity Brands, Inc. and American Cheer Xtreme [Signed], VAR00017932 - VAR00017942, at 7939.

  o The 2018 Platinum Network Agreement with Cheer Xtreme states that any member gym's franchisees that also wish to receive a rebate are bound to wear Varsity apparel as well: "Franchise Gym must exclusively purchase and Franchise Gym will insure [sic] that Franchise Gym's All Star Team customers will exclusively wear uniforms. jackets, manufactured/custom practice wear (excluding T-shirts), and offer shoes sold by Varsity Spirit Fashions ('VSF') and/or Varsity All Star Fashions ('VASF')." Varsity Brands, Inc. and American Cheer Xtreme, 01 October 2008, Rebate Agreement between Varsity Brands, Inc. and American Cheer Xtreme [Signed], VAR00017932 - VAR00017942, at 7939.

  o A 2014-2017 season Network Agreement with World Cup All Stars includes a "VSF/VASF [Varsity] Dealing/Discount" provision which states: "During the term of this Agreement, Member will exclusively purchase and wear Varsity uniforms and Varsity shoes. Varsity will offer all apparel and accessories to Member at a fifteen percent (15%) discount from catalog prices." Varsity Brands, Inc. and American Cheer Xtreme, 01 October 2008, Rebate Agreement between Varsity Brands, Inc. and American Cheer Xtreme [Signed], VAR00017932 - VAR00017942, at 7942.

[448] See, e.g.,

Case 2:20-cv-02892-SHL-tmp   Document 389-2   Filed 02/10/23   Page 117 of 149
PageID 10639
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          112 of 115

The rebates leverage Varsity's market power in the relevant market for Cheer Competitions into the market for Cheer Apparel. A 2018 Varsity presentation illustrates the strong incentive the Network agreement provided gym owners to purchase Cheer Apparel exclusively from Varsity.[449] Varsity had previously entered a Network Agreement with the owner of the California All Stars gym, who was approached by a competing Cheer Apparel vendor offering to sell practice wear sets at a 55% discount compared to Varsity's pricing, $54 per athlete versus $120 for a similar product.[450] The gym had approximately 1,300 athletes, meaning the competitor's Cheer Apparel would cost $70,200 compared to $156,000 for Varsity's.

Absent Varsity's Network Agreement, the competitor's proposal clearly offered superior value to the gym owner. However, purchasing practice wear from the competitor would break the Network Agreement, costing the gym $136,078.[451] Even if the rival apparel vendor gave the practice wear to the gym for free, it still couldn't compete with the exclusivity provision of the Network Agreement. That is, the opportunity cost of forgoing the rebate of $136,078 was higher than the value of the free apparel, $70,200.

Varsity's rebate programs are an example of "all unit" or "first dollar" discounts–once the customer reaches the spending threshold for the discount, the rebate applies to all of the customer's spending retroactively. This is in contrast to typical volume discounts, in which the discount applies prospectively to spending above the threshold. First dollar discounts are more likely than other types of loyalty discounts to harm competition.[452]

- "And I think that's when Nfinity started, you know getting some of that market share. But, you know, if we could go in behind them with our sales rep and push things with the Family Plan and make them deals that they couldn't, you know, refuse, then take – then Nfinity would – you know, they would lose almost every time because we could position other things. We would give them, you know, free registration or we could give them a cut on uniforms or whatever." Deposition of Jamie Parris, Volume I, 03 march 2022, at 200:15-200:24.205:16-206:1.

- In a discussion of Family Plan rebate scenarios, Jim Hill, National Director of Sales at Varsity All Star, states: "All, I understand the production concern with all the potential new revenue that could be gained from the proposed 'All-In' VFP option. However, would it be too much to recommend we do something with our shoes? Do we have the same production issues with those? Something to the effect, if a customer's [sic] purchases $5000 in shoes or 50% of the program they get an additional % bump? Obviously we could play with those minimum requirements I just really feel like we're missing an opportunity not only from an overall revenue standpoint but also a way to take business from our competitors." Wright, Leslie, 11 June 2018, Email: FW: VFP Scenarios without "All-In," VAR00278310 - VAR00278312, at 8312.

[449] Varsity Spirit, Undated, All Star Value Segment Opportunity, VAR00310796 - VAR00310875, at 0815-0821.

[450] Varsity Spirit, Undated, All Star Value Segment Opportunity, VAR00310796 - VAR00310875, at 0819.

[451] Varsity calculated the gym's 2016-17 rebate under the Network Agreement at $337,084.98. If the gym had purchased the competitor's Cheer Apparel, it would no longer qualify for the Network Agreement, only the Varsity Family Plan and would receive a maximum rebate of $201,006.66, a loss of at least $136,078. Varsity Spirit, Undated, All Star Value Segment Opportunity, VAR00310796 - VAR00310875, at 0820.

[452] See, e.g.,

- "[S]ingle-product loyalty discounts may be anticompetitive in certain circumstances, such as where the resulting price of all units sold to a customer is below an appropriate measure of cost. Further, commentators and panelists generally agree that even where a single-product loyalty discount is above cost when measured against all units, such a discount may in theory produce anticompetitive effects, especially if customers 'must carry a certain percentage of the leading firm's products' and the discount is structured

For example, during the 2014-15 season, the gym Louisiana Spirit paid Varsity $60,747 to attend four Cheer Competitions (an average of $15,187 per event) and another $78,060 for Cheer Apparel. By attending four Cheer Competitions and spending over $100,000 for registrations and apparel, Louisiana Spirit qualified for the 15% Varsity Family Plan rebate tier, and received a rebate of $20,920 from Varsity.[453] If Louisiana Spirit had only attended three Varsity Cheer Competitions, it would not have qualified for the Family Plan incentives, costing it $20,920, an amount greater than its average spending per Cheer Competition. This incentive is sufficiently large that it virtually guarantees that the gym would attend at least four Varsity Cheer Competitions. In order to compete on price with Varsity, an equally efficient event producer would need to pay Louisiana Spirit to attend its Cheer Competition.

Varsity's rebate programs thus ensure that customers attend few non-Varsity events and are more likely to purchase Cheer Apparel exclusively from Varsity.

### F.  But-for Varsity's anticompetitive conduct, the markets would have been more competitive, and athletes would have benefits from increased competition

But for Varsity's anticompetitive conduct, Varsity's market power in all three relevant markets would have been constrained by competition from rival Cheer Competition producers, Cheer Apparel makers, and Cheer Camp providers. The environment in which this competition would take place–the but-for world–is characterized by the absence of the challenged conduct. All other aspects of the but-for world are identical to the actual world.

In the actual world, Varsity and the sanctioning bodies it controlled conspired to increase and maintain Varsity's market power in the relevant markets. In the but-for world, the sanctioning bodies for Competitive Cheer would have been independent of Varsity's control.

In the actual world, Varsity's and the Varsity-controlled sanctioning bodies' incentives were to act in the best interests of Varsity. An independent sanctioning body would face different incentives. An independent sanctioning body would be free to act in the best interests of all stakeholders including Competitive Cheer athletes, Varsity's competitors, and the broader cheer community. Such an independent sanctioning body would be expected to implement different policies than those of the Varsity-controlled sanctioning bodies in the actual world.

One important policy difference would be the structure of the qualifying bid system. In the but-for world, bids to season-ending championships would be awarded by a body acting in the

---

to induce purchasers to buy all or nearly all needs beyond that 'uncontestable' percentage from the leading firm. Some noted that 'if the financial benefits of a market-share discount are effectively concentrated on the decision whether to buy a relatively small number of marginal units, even prices that technically are 'above cost' on average effectively may be below cost as to those marginal units.' These discounts may effectively foreclose such a large portion of available business that competitors cannot achieve efficient scale, thereby enabling the dominant firm to acquire or maintain monopoly power." U.S. Department of Justice, 18 March 2022, Competition and Monopoly: Single-Firm conduct Under Section 2 of the Sherman Act: Chapter 6, https://www.justice.gov/archives/atr/competition-and-monopoly-single-firm-conduct-under-section-2-sherman-act-chapter-6, accessed 14 June 2022, at 6. Footnote omitted.

- Tom, Willard K., Balton, David A., et al., 2000, Anticompetitive Aspects of Market-Share Discounts and Other Incentives to Exclusive Dealing, Antitrust Law Journal, Vol. 67, No. 3, 615-639.

[453] Varsity records indicate that Louisiana Spirit received a $8,942 rebate attributed to Cheer Competitions and a $11,978 discount on Cheer Apparel. Varsity, Undated, 14-15 Top Spender for Varsity with event count-3-16-16.xlsx, VAR00370054.

Case 2:20-cv-02892-SHL-tmp   Document 389-2   Filed 02/10/23   Page 119 of 149
PageID 10641
Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**          114 of 115

interests of a broader set of stakeholders than just Varsity. For example, an independent sanctioning body may have awarded bids to events based on the decisions of an independent governing board composed of a representative cross-section of event producers, gyms, coaches, and athletes. Alternatively, bids may have been awarded in a manner that maximized the number of participants, subject to certain constraints, e.g., athlete safety.

Varsity recognizes that its control of the USASF and its qualifying bid system for the World championships was crucial to maintaining its market power. Without Varsity's control the "USASF World Championship would be at risk which has trickle down impact on local, regional and national championships that build to this event in the US."[454]

An independent sanctioning body would place no limitations on All Star gyms and school teams with regard to entering non-Varsity competitions. Teams would be free to enter rival IEPs' events, regardless of whether the events were characterized as "national" or "international" competitions.

In the actual world, Varsity leveraged its market power in the Cheer Competition market by tying attendance to certain events to attendance at its Cheer Camps. In the but-for world, Varsity would not have such a policy and Cheer teams seeking to earn bids to Varsity's season-ending events would be free to attend any Cheer Camp of their choosing, or none at all. Rival Cheer Camp providers would experience greater demand for their camps.

In the actual world, Varsity engaged in a long-term strategy to acquire rivals in the Cheer Competitions market. Varsity repeatedly purchased its strongest rivals, which increased and protected Varsity's market share, gave it a commanding majority of World Bid events and control of the USASF Board of Directors and the USASF Sanctioning Committee. In the but-for world, Varsity would not have used mergers and acquisitions to eliminate competition in the relevant markets. Varsity's rivals would produce a greater share of World Bid events and would have greater representation in the USASF than in the actual world.

In the actual world, Varsity implemented rebate programs that foreclosed competitors from the Cheer Competition and Cheer Apparel markets. In the but-for world Varsity would not have implemented anticompetitive rebates. Varsity's discount programs would not have featured first dollar discounts and would have been structured such that they did not leverage market power from one market to another.

In the actual world, Varsity engaged in a concerted course of conduct that harmed competition and foreclosed competitors in all three relevant markets. One effect was to deny competitors in the Cheer Competition market the scale necessary to compete with Varsity on a national basis, particularly for its season-ending competitions. Varsity sought to keep its rivals small, and if they grew large enough to pose a competitive threat it simply acquired them. Without any large-scale competition, Varsity's end-of-season events face little real competition. In the but-for world Varsity's rivals in the Cheer Competition market would have achieved greater scale and would better constrain Varsity's market power.

---

[454] Varsity Brands, 24 October 2017, Q4 Board of Directors Meeting, CB00025330 - CB00025449, at 5399.

Highly Confidential          **Expert Report of Janet S. Netz, Ph.D.**                    115 of 115

## VI.  Summary

Based on the analyses and evidence described above, I come to the following conclusions to the issues Plaintiffs' counsel asked me to consider.

- There are relevant antitrust markets for Cheer Competitions, Cheer Apparel, and Cheer Camps.

- Varsity possesses and exercises market power in all three of these relevant markets.

- Varsity has engaged in anticompetitive conduct that has allowed it to acquire and maintain its monopoly power in these markets. The anticompetitive conduct was designed to reinforce market power in each and across the markets.

- Varsity's anticompetitive conduct foreclosed rivals and harmed competition in the form of higher prices, reduced output, reduced choice.

Dated: June 20, 2022

By: _____
JANET S. NETZ



# Dr. Janet S. Netz

**Contact Information**

applEcon LLC            Office:   (734) 214-2213 (direct)
617 E. Huron Street     Fax:      (734) 213-1935
Ann Arbor, MI 48104     E-mail:  netz@applEcon.com
                        Web:     www.applEcon.com

**Education**

Ph.D. Economics, University of Michigan, 1992
M.A. Economics, University of Michigan, 1990
B.A. Economics, University of California at Berkeley, 1986, *cum laude*

**Employment**

Founder and Partner, applEcon, May 2001 to present
Visiting Associate Professor, University of Michigan, Fall 2001, Fall 2002, Fall 2003
Associate Professor, Purdue University, Fall 2001 to January 2003
Visiting Assistant Professor, University of Michigan, Winter 2001
Assistant Professor, Purdue University, Fall 1994 to Spring 2001
Assistant Professor, University of Delaware, Fall 1992 to Summer 1994

**Courses Taught**

Industrial Organization (undergraduate and doctoral)
Antitrust and Regulation (undergraduate)
Intermediate Microeconomics (undergraduate and master's)
Microeconomic Principles (undergraduate)
International Economics (undergraduate and master's)

**Honors and Awards**

Outstanding Antitrust Litigation Achievement in Economics, awarded by the American Antitrust
Institute, for work In re TFT-LCD Antitrust Litigation, 2013.

Outstanding Economics Professor of the Year, Economics Club, Purdue University, 1999.

## Publications

"Are All Men's College Basketball Players Exploited?", with Erin Lane and Juan Nagel, *Journal of Sports Economics*, 15(3), June 2014, 237-262.

"Price Regulation: Theory and Performance", in *Regulation and Economics*, Roger J. Van den Bergh and Alessio M. Pacces, eds., Edward Elgar Publishing, 2011.

"Sports Trivia: A Review of The Economics of Intercollegiate Sports by Randy R. Grant, John Leadley, and Zenon Zygmont", *Journal of Economic Literature*, 47(2), June 2009, 485-489.

"One-Way Standards as an Anti-Competitive Strategy", with Jeffrey K. MacKie-Mason, in *Standards and Public Policy*, Shane Greenstein and Victor Stango, eds., Cambridge Press, 2007.

"International Integration and Growth:  A Further Investigation on Developing Countries", with Claire Economidou and Vivian Lei, *International Advances in Economic Research*, 12(4), November 2006, 435-448.

"Maximum or Minimum Differentiation?  An Empirical Investigation into the Location of Firms", with Beck A. Taylor, *Review of Economics and Statistics*, 84(1), February 2002, 162-175.

"International Integration and Growth: A Survey and Empirical Investigation", with Vivian Lei and Jon D. Haveman, *Review of Development Economics*, 5(2), June 2001, 289-311.

"Price Regulation: A (Non-Technical) Overview", in *Encyclopedia of Law and Economics*, Boudewijn Bouckaert and Gerrit De Geest, eds, Edward Elgar and University of Ghent, 2000.

"Exercising Market Power in Proprietary Aftermarkets," with Severin Borenstein and Jeffrey K. MacKie-Mason, *Journal of Economic and Management Strategy*, 9(2), Summer 2000, 157-188.

"All in the Family:  Family, Income, and Labor Force Attachment", with Jon D. Haveman, *Feminist Economics*, 5(3), November 1999, 85-106.

"Why Do All Flights Leave at 8am?:  Competition and Departure-Time Differentiation in Airline Markets", with Severin Borenstein, *International Journal of Industrial Organization*, 17(5), July 1999, 611-640.

"An Empirical Test of the Effect of Basis Risk on Cash Market Positions", *Journal of Futures Markets*, 16(3), May 1996, 289-312.

"The Effect of Futures Markets and Corners on Storage and Spot Price Variability", *American Journal of Agricultural Economics*, 77(1), February 1995, 182-193.

"Antitrust Policy in Aftermarkets", with Severin Borenstein and Jeffrey K. MacKie-Mason, *Antitrust Law Journal*, 63(2), Winter 1995, 455-482.

"The Economics of Customer Lock-In and Market Power in Services", with Severin Borenstein and Jeffrey K. MacKie-Mason, in *The Service Productivity and Quality Challenge*, Patrick T. Harker, ed., Kluwer Academic, 1994.

## Working Papers and Work in Progress

"LCDs and Antitrust: Does Crime Pay?", with Nick Navitski and Josh Palmer

"Fantasy Football Points as a Measure of Performance", with Erin Lane and Juan Nagel

"Non-Profits and Price-Fixing: The Case of the Ivy League"

"The End of Collusion? Competition after Justice and the Ivy League and MIT Settle"

"Basis and Exchange Rate Risks and their Impact on Storage and Exports"

**Research Grants**

"Product Customization and Product-Space Positioning", Dauch Center for the Management of Manufacturing Enterprises, Summer 2000.

"Trade Barriers, Trade Blocs, Growth, and Convergence", Purdue Research Foundation, 1998-1999. "Effects of Informational Asymmetry on Competition in the Residential Long Distance Calling Market", Purdue Research Foundation, 1997-1998.

"Basis and Exchange Rate Risks and their Impact on Storage and Exports", Center for International Business and Economic Research, Summer 1997.

Global Initiative Faculty Grant (Course Development), "Industrial Organization in an International Marketplace", Purdue University, Summer 1997.

"Trade, Not Aid", Purdue Research Foundation, Summer 1996.

"Trade, Not Aid", Center for International Business and Economic Research, Summer 1996.

"The Effect of Price-Fixing by Institutions of Higher Education", Purdue Research Foundation, Summer 1995.

"Applied Microeconomics/International Workshop", Purdue University, Spring 1995.

"The Market Structure of Higher Education", University of Delaware, Summer 1993.

Research Associate, Center for the Study of Futures Markets, Columbia University, 1991.

Rackham Merit Fellowship, University of Michigan, 1987-1989.

Chancellor's Scholar, University of California at Berkeley, 1983-1986.

**Referee**

American Economic Review
Contemporary Economic Policy
Economics Bulletin
Feminist Economics
International Journal of the Economics of Business
International Journal of Industrial Organization
Journal of Economic Education
Journal of Economic and Management Strategy
Journal of Family and Economic Issues
Journal of Futures Markets
Journal of Industrial Economics
Journal of Law and Economics
Journal of Law, Economics, and Organization
Management Science
Review of Economics and Statistics
Scandinavian Journal of Economics

Telecommunications Systems

**Conference and Workshop Presentations**

Panel participant, "*Apple v. Pepper*: SCOTUS Clarifies Application of *Illinois Brick*", ABA Section of Antitrust Law, May 2019.

Panel participant, "Is 'Direct' Really Correct? Bricks, Tix, Kicks, and Apps after Apple v. Pepper", ABA Section of Antitrust Law, Pricing Conduct and Civil Practice and Procedure Committees Program, October 2018.

Panel participant, "Will Apple's App Store Lead to the end of Illinois Brick", CLA Antitrust, UCL & Privacy Law Section and ABA Antitrust Section's Global Private Litigation Committee program, San Francisco, CA, July 2018.

Guest lecturer, Antitrust Law, University of San Francisco Law School, April 2017 and 2018.

Panel participant, "The Challenge of Circumstantial Proof of Cartel Behavior and of Presenting Economic Issues and Concepts to Judges and Juries", American Antitrust Institute, 10th Annual Private Enforcement Conference, Washington, DC, November 2016.

Panel participant, "Winning or Losing: Class Certification Post-Comcast", American Bar Association, 62nd Antitrust Law Spring Meeting, Washington, DC, March 2014.

Panel participant, "Preparing Early and Often", State-of-the-Art Strategies for Managing Class Action Experts, American Bar Association, 16th Annual National Institute on Class Actions, Chicago, IL, October 2012.

Panel participant, "Hot Topics Involving Experts in Antitrust Litigation", New York State Bar Association, Antitrust Law Section, Annual Meeting, New York, NY, January 2011.

Guest lecturer, Alternative Dispute Resolution Practicum, University of Michigan Law School, April 2008.

"The Economics of Indirect Purchaser Cases", State Bar of Arizona Annual Conference, Phoenix, AZ, June 2004.

"Manipulating Interface Standards as an Anti-Competitive Strategy", Standards and Public Policy Conference, Federal Reserve Bank of Chicago, Chicago, Il, May 2004.

"One-Way Standards as an Anti-Competitive Strategy", Telecommunications Policy Research Conference, Alexandria, VA, September 2002.

"Product Proliferation and Product Space Location", Econometric Society Meetings, New Orleans, January 2001.

"The End of Collusion? Competition after Justice and the Ivy League and MIT Settle", American Economics Association Meetings, New Orleans, January 2001.

"The End of Collusion? Competition after Justice and the Ivy League and MIT Settle", Indiana University-Purdue University Indianapolis, November 2000.

"Maximum or Minimum Differentiation? An Empirical Investigation into the Location of Firms", University of British Columbia, March 2000.

"Non-Profits and Price-Fixing: The Case of the Ivy League", University of Illinois, October 1999.

"The End of Collusion? Competition after Justice and the Ivy League and MIT Settle", Baylor University, September 1999.

"The End of Collusion? Competition after Justice and the Ivy League and MIT Settle", Western Economic Association Meetings, San Diego, July 1999.

"Non-Profits and Price-Fixing: The Case of the Ivy League", University of Chicago, April 1999.

"Non-Profits and Price-Fixing: The Case of the Ivy League", Indiana University, December 1998.

"International Integration and Growth: A Survey and Empirical Investigation", Dynamics, Economic Growth, and International Trade, III, Taiwan, August 1998.

Discussant ("Fiscal Policy and International Demand Spillovers"), Dynamics, Economic Growth, and International Trade, III, An International Conference, Taiwan, August 1998.

"International Integration and Growth", Workshop on Empirical Research in International Trade and Investment, Copenhagen, June 1998.

Discussant ("Factor Endowments and the Pattern of Affiliate Production by Multinational Enterprises," by Karolina Ekholm), Workshop on Empirical Research in International Trade and Investment, Copenhagen, June 1998.

"Non-Profits and Price-Fixing: The Case of the Ivy League", Department of Justice Antitrust Division, April 1998.

"Non-Profits and Price-Fixing: The Case of the Ivy League", American Economics Association Meetings, Chicago, January 1998.

Discussant ("Equilibrium under Satisficing," by Ralph W. Pfouts), International Atlantic Economics Society, ASSA Meetings, Chicago, January 1998.

Discussant ("Overseas Investments and Firm Exports," by Keith Head and John Ries), Fourth Annual Empirical Investigations in International Trade conference, Purdue University, November 1997.

"Maximum or Minimum Differentiation? An Empirical Investigation into the Location of Firms", International Atlantic Economic Association Conference, Philadelphia, October 1997.

Discussant ("Antidumping Enforcement in a Reciprocal Model of Dumping: Theory and Evidence," Taiji Furusawa and Thomas J. Prusa) and session chair, Third Annual Empirical Investigations in International Trade conference, Purdue University, November 1996.

"The Effect of Price-Fixing by Institutions of Higher Education", Indiana University-Purdue University Indianapolis, April 1996.

"Exercising Market Power in Proprietary Aftermarkets", with Severin Borenstein and Jeffrey K. MacKie-Mason, Indiana University - Purdue University - IUPUI First Tri-School Conference, March 1996.

"All in the Family: Family, Income, and Labor Force Attachment", with Jon D. Haveman, American Economic Association Meetings, San Francisco, January 1996.

"Family Matters: Unemployment, Wage Changes, and Mobility", with Jon D. Haveman, Southern Economics Association Meetings, New Orleans, November 1995.

Discussant and session chair, Second Annual Empirical Investigations in International
Trade conference, Purdue University, November 1995.

"Competition and Anti-Competitive Behavior", ICLE (The State Bar of Michigan)
Conference on Antitrust and Intellectual Property, July 1995.

"Price-Fixing, Tuition, and Financial Aid", Midwest Economics Association Meetings,
Cincinnati, April 1995.

"Family Matters: Unemployment, Wage Changes, and Mobility," Midwest Economics
Association Meetings, Cincinnati, April 1995.

Discussant and session chair, "Customer Discrimination, Entrepreneurial Decisions, and
Investment", Midwest Economics Association Meetings, April 1995.

"An Empirical Test of the Effect of Basis Risk on Cash Market Positions", University of
Illinois, Urbana-Champaign, February 1995.

Discussant and session chair, First Annual Empirical Investigations in International Trade
conference, Purdue University, November 1994.

"Antitrust Policy in Aftermarkets", with Severin Borenstein and Jeffrey K. MacKie-Mason,
FTC/DOJ/ABA Conference on Post-Chicago Economics, Washington, D.C., May 1994.

"The Effect of Price-Fixing by Institutions of Higher Education, University of Delaware,
May 1994.

"The Effect of Futures Markets and Corners on Storage and Spot Price Variability", Purdue
University, February 1994.

"An Empirical Test of the Effect of Basis Risk on Cash Market Positions", University of
California at Davis, February 1993.

Discussant, Econometrics Association, Anaheim, 1992 Annual Meetings.

"Testing the Principle of Minimum Differentiation: Airline Departure-Time Crowding", Econometrics
Association, Washington, D.C., 1990 Annual Meetings.

**Consulting and Testifying**

Vanzant, et al. v. Hill's Pet Nutrition, Inc., and PetSmart, Inc., 2022-
*United States District Court Northern District of Illinois Eastern Division*, No. 1:17-cv-2535
Testifying expert for plaintiffs

Automobile Antitrust Cases I and II, 2021-
*Superior Court of California County of San Francisco Unlimited Jurisdiction*, No. CJC-03-004298 and
CJC-03-004303
Testifying expert for plaintiffs
Deposed September 2021

Contant v. Bank of America, 2019-
*United States District Court, Southern District of New York*, No. 17-cv-3139-LGS
Testifying expert for plaintiffs

Barroqueiro, et al. v. Qualcomm Incorporated, et al., 2019-
*Supreme Court of British Columbia*, VLC-S-S1410987
Testifying expert for plaintiffs

Confidential client, 2018-
Antitrust analysis regarding pharmaceutical products

In re Malden Transportation, Inc. et al., v. Uber Technologies, Inc., 2018-2019
*United States District Court, District of Massachusetts*, No. 1:16-cv-12538-NGM
Testifying expert for plaintiffs
Deposed January 2019

Confidential client, 2017-2018
Antitrust analysis regarding various cellular phone components

In re Automotive Parts Antitrust Litigation
*United States District Court, Eastern District of Michigan Southern Division*, No. 2:12-cv-02311
Testifying expert for plaintiffs
- In re Occupant Safety Systems, No. 2:12-cv-00603, 2018-
- In re Heater Control Panels, No. 2:12-cv-00403, 2018-
- In re Anti-Vibrational Rubber Parts, No. 2:13-cv-00803-MOB-MKM, 2016-
- In re Bearings, No. 2:12-cv-00500, 2016-
- In re Automotive Wire Harness Systems Antitrust Litigation, No.12-md-00101, 2012-
- In re Shock Absorbers Cases, No. 2:16-cv-0332, 2015-

Alarm Detection Systems, Inc. v. Orland Fire Protection District, et al., 2016-2019
*United States District Court, Northern District of Illinois*, No. 14-cv-00876
Testifying expert for plaintiff
Deposed May 2017
Testified at trial May 2017

In re LIBOR-Based Financial Instruments Antitrust Litigation, 2016-
*United States District Court, Southern District of New York*, No. 1:11-md-02262-NRB
Testifying expert for plaintiffs
Deposed March 2017, June 2017

Stacey Pierce-Nunes, on behalf of herself and all others similarly situated, v. Toshiba American
Information Systems, 2015-2016
*United States District Court, Central District of California,* No. 3:14-CV-00796 JST
Testifying expert for plaintiffs
Deposed April 2016

John Moseley v. Toshiba America Information Systems, Inc., 2015-2016
Judicial Arbitration and Mediation Services No. 1200049482
Testifying expert for claimant
Deposed July 2015

In re Cathode Ray Tube (CRT) Antitrust Litigation, 2008-
*United States District Court, Northern District of California, San Francisco Division,* No. CV-07-5944-SC
Testifying expert for plaintiffs
Deposed November 2012, March 2013, June 2014, September 2014, October 2014, June 2022

In re Photochromic Lens Antitrust Litigation, 2010-2012
*United States District Court Middle District of Florida, Tampa Division*, No. 8:10-md-02173-JDW-EAJ
Testifying expert for plaintiffs
Deposed August 2012

Datel Holdings and Datel Design and Development v. Microsoft, 2010-2011
*United States District Court, Northern District of California, San Francisco Division,* No. 09-cv-05535
Testifying expert for plaintiffs
Deposed October 2011

In re Prefilled Propane Tank Marketing and Sales Practices Litigation, 2010-2011
*United States District Court, Western District of Missouri, Western Division*, No. 4:09-cv-00465
Testifying expert for plaintiffs

In re Florida Cement and Concrete Antitrust Litigation, 2010
*United States District Court, Southern District of Florida, Miami Division*, No. 1:09-cv-23493-CMA
Consulting expert for plaintiffs

Altair Engineering v. MSC Software, 2009-2010
*United States District Court, Eastern District of Michigan, Southern Division,* No. 2:07-cv-12807
Testifying expert for plaintiff
Deposed May 2010

In re Optical Disk Drive products Antitrust Litigation, 2009-2010
*United States District Court, Northern District of California, San Francisco Division,* No. M:2010-cv-02143
Consulting expert for plaintiffs

In re Flash Memory Antitrust Litigation, 2008-2011
*United States District Court, Northern District of California, Oakland Division,* No. C-07-0086-SBA
Testifying expert for plaintiffs
Deposed August 2009

Valassis Communications, Inc. v. News America, Inc., 2008-2009
*United States District Court, Eastern District of Michigan, Southern Division,* No. 2:06-cv-10240
*Circuit Court of the State of Michigan, County of Wayne,* No. 07-0706645-CZ
Consulting expert for plaintiff

In re TFT-LCD (Flat Panel) Antitrust Litigation, 2008-2012
*United States District Court, Northern District of California, San Francisco Division,* No. M:07-cv-01827
Testifying expert for plaintiffs
Deposed July 2009, June 2011, August 2011

Houston Baptist University v. NCAA, 2008-2009
*United States District Court in and for the Southern District of Texas, Houston Division*
Testifying expert for plaintiff

Seoul Semiconductor Co. v. Nichia Corp., 2008
*United States District Court, Northern District of California,* No. 3:08-cv-04932-PJH
Testifying expert for plaintiffs

Albert Andy Cohn v. Office Depot, 2008
*Superior Court of the State of California, County of Los Angeles, Central District, No. BC 372449*
Testifying expert for defendant

In re Graphics Processing Units Antitrust Litigation, 2007-2008
*United States District Court Northern District of California,* No. M:07-CV-01826-WHA
Testifying expert for plaintiffs
Deposed June 2008

Pro-Sys Consultants Ltd. and Neil Godfrey v. Microsoft, 2007-2018
*Supreme Court of British Columbia, No. L043175, Vancouver Registry*
Testifying expert for plaintiffs
Deposed December 2008

In re Dynamic Random Access Memory (DRAM) Antitrust Litigation, 2007
*United States District Court, Northern District of California,* No. 02-cv-01486
Consulting expert for plaintiffs

Jason White et al. v. NCAA, 2006-2008
*United States District Court Central District of California, No. CV 06-0999 RGK (MANx)*
Testifying expert for plaintiffs
Deposed October 2007

In re Reformulated Gasoline (RFG) Antitrust and Patent Litigation, 2004-2008
*United States District Court Central District of California, No. 05-1671 CAS*
Testifying expert for plaintiffs
Deposed December 2006

Carlisle, settlement negotiations with Crompton, EPDM price-fixing cartel, 2005-2007
Consulting expert

Caterpillar and Carlisle, settlement negotiations with DuPont-Dow Elastomers, PCP (or CR) and
EPDM price-fixing cartels, 2004-2005
Consulting expert

City and County of San Francisco et al. v. Microsoft, 2004-2007
*United States District Court for the District of Maryland,* No. 1332
Testifying expert for plaintiffs

The Service Source v. Office Depot, 2004-2005
*United States District Court Eastern District of Michigan Southern Division,* No. 02-73361
Project director

Joe Comes et al. v. Microsoft, 2002-2008
*Iowa District Court for Polk County,* No. CL82311
Testifying expert for plaintiffs
Deposed July 2006, November 2006

Charles Cox et al. v. Microsoft, 2002-2006
*Supreme Court of the State of New York County of New York,* No. 105193/00
Testifying expert for plaintiffs

Daniel Gordon et al. v. Microsoft, 2002-2004
*State of Minnesota District Court County of Hennepin Fourth Judicial District,* No. 00-5994
Testifying expert for plaintiffs
Deposed September 2003

Morelock Enterprises, Inc. v. Weyerhaeuser Co., 2004-2008
*United States District Court District of Oregon,* No. 3:04-cv-00583-PA
Testifying expert for plaintiffs
Deposed October 2004, April 2005, October 2007
Testified in trial April 2008

Compuware v. IBM, 2002-2005
*United States District Court for the Eastern District of Michigan, No. 02-70906*
Project director

In re New Mexico Indirect Purchaser Microsoft Corp. Antitrust Litigation, 2002-2004
*State of New Mexico First Judicial District,* No. D-0101-CV-2000-1697
Testifying expert for plaintiffs

Charles Friedman et al. v. Microsoft, 2002-2004
*Superior Court of the State of Arizona in and for the County of Maricopa,* No. CV2000-000722 /
CV2000-005872
Testifying expert for plaintiffs
Deposed September 2003

In re Massachusetts Consumer Protection Litigation, 2003-2004
*Commonwealth of Massachusetts, Superior Court Department of the Trial Court Middlesex Division,*
No. 00-2456
Consulting expert

Olson v. Microsoft, 2002
*Montana First Judicial District Court Lewis & Clark County, No. CDV-2000-219*
Consulting expert

Covad v. Bell Atlantic (Verizon), 2001-2004
*United District Court for the District of Columbia, No. 99-1046*
Project director

AMD, 2000-2004
Project director

Leckrone, et al. v. Premark International, Inc., et al., 2001
Testifying expert for plaintiffs

Ren, et al. v. EMI Music Distribution, Inc., 2001
*State of Michigan in the Circuit Court of the County of Macomb,* No. 00-2383-CZ
Testifying expert for plaintiffs

SBC, 2000
Staff economist

Lingo et al. v. Microsoft, 1999-2004
*Superior Court of the State of California City and County of San Francisco,* J.C.C.P. No. 4106
Project director

Gravity et al. v. Microsoft, 1999-2003
*United States District Court for the District of Columbia,* No. 1:99CV00363
Staff economist

City and County of San Francisco, 1999
Staff economist

Intergraph v. Intel, 1998-2001
*United States District Court Appeals for the Federal District,* No. 98-1308
Staff economist

Comm-Tract v. Northern Telecom, 1991-1997
*United States District Court District of Massachusetts,* No. 90-13088-WF
Project director

Systemcare, Inc. v. Wang Computer, 1991-1993
*United States District Court for the District of Colorado,* No. 89-B-1778
Staff economist

International Travel Arrangers v. Northwest Airlines, 1988-1989
Staff economist


applEcon bills my work on this case at the rate of $800 per hour.

# Exhibit B: Documents Relied Upon in the Expert Report of Janet S. Netz, Ph.D.
## Part 1: Bates Numbered Documents

| | | |
|---|---|---|
| AMSPIR033 | JEFF00050123 | USASF_00019064 |
| AMSPIR278 | JEFF00141901 | USASF_00019495 |
| BAIN00000352 | JEFF00225986 | USASF_00019739 |
| BAIN00003374 | JEFF00264646 | USASF_00020227 |
| BAIN00007702 | LAURHAYES000000046 | USASF_00020257 |
| BAIN00065145 | SPIRITFAC000000081 | USASF_00020397 |
| BAIN00117944 | SPIRITFAC000001329 | USASF_00027858 |
| BAIN00147958 | USASF_00001219 | USASF_00028264 |
| BAIN00147996 | USASF_00001971 | USASF_00032444 |
| BAIN00148047 | USASF_00001977 | USASF_00032535 |
| BAIN00148097 | USASF_00001982 | USASF_00032540 |
| BARC_00000008 | USASF_00002243 | USASF_00039898 |
| CB00000188 | USASF_00002366 | USASF_00076431 |
| CB00000212 | USASF_00002888 | USASF_00084334 |
| CB00014752 | USASF_00002946 | VAR00001346 |
| CB00025330 | USASF_00004956 | VAR00005294 |
| CB00044502 | USASF_00007472 | VAR00005310 |
| CB00075991 | USASF_00011614 | VAR00006500 |
| CB00271540 | USASF_00011692 | VAR00006767 |
| CB00311204 | USASF_00012040 | VAR00008463 |
| CB00382194 | USASF_00012722 | VAR00009004 |
| CB00485513 | USASF_00014260 | VAR00009293 |
| CB00514715 | USASF_00015124 | VAR00009486 |
| FEAS-Ares00000062 | USASF_00016147 | VAR00013180 |
| FEAS-Ares00039879 | USASF_00017144 | VAR00017932 |
| FEAS-Ares00075739 | USASF_00017147 | VAR00020214 |
| FEAS-Ares00075986 | USASF_00017938 | VAR00020257 |
| FUSIONELI000000082 | USASF_00017975 | VAR00029065 |
| FUSIONELI000000236 | USASF_00018385 | VAR00074133 |
| JEFF00047202 | USASF_00019027 | VAR00074486 |

# Exhibit B: Documents Relied Upon in the Expert Report of Janet S. Netz, Ph.D.
## Part 1: Bates Numbered Documents

| | | |
|---|---|---|
| VAR00075254 | VAR00123090 | VAR00266077 |
| VAR00078030 | VAR00127376 | VAR00269968 |
| VAR00078751 | VAR00127715 | VAR00270286 |
| VAR00078910 | VAR00128737 | VAR00272414 |
| VAR00079196 | VAR00129039 | VAR00272846 |
| VAR00081408 | VAR00130255 | VAR00272981 |
| VAR00081435 | VAR00141441 | VAR00273953 |
| VAR00081770 | VAR00160726 | VAR00274129 |
| VAR00083797 | VAR00160802 | VAR00278310 |
| VAR00094550 | VAR00176406 | VAR00278313 |
| VAR00095101 | VAR00177295 | VAR00304733 |
| VAR00095213 | VAR00182584 | VAR00308422 |
| VAR00097339 | VAR00183218 | VAR00309179 |
| VAR00097495 | VAR00183219 | VAR00309426 |
| VAR00100076 | VAR00194754 | VAR00309744 |
| VAR00100694 | VAR00195425 | VAR00310631 |
| VAR00101100 | VAR00197598 | VAR00310796 |
| VAR00101102 | VAR00199104 | VAR00313085 |
| VAR00101122 | VAR00199568 | VAR00313469 |
| VAR00102150 | VAR00210664 | VAR00318739 |
| VAR00102182 | VAR00227908 | VAR00320890 |
| VAR00103154 | VAR00230096 | VAR00323451 |
| VAR00103337 | VAR00233932 | VAR00327453 |
| VAR00104422 | VAR00236674 | VAR00330170 |
| VAR00105228 | VAR00242461 | VAR00331301 |
| VAR00110235 | VAR00244139 | VAR00331303 |
| VAR00110649 | VAR00247460 | VAR00332326 |
| VAR00118582 | VAR00249924 | VAR00334153 |
| VAR00118899 | VAR00250013 | VAR00340093 |
| VAR00119257 | VAR00255570 | VAR00341580 |

# Exhibit B: Documents Relied Upon in the Expert Report of Janet S. Netz, Ph.D.
## Part 1: Bates Numbered Documents

VAR00345222                          Webb_AS_00000443

VAR00345315

VAR00346980

VAR00351288

VAR00351376

VAR00351488

VAR00360675

VAR00362133

VAR00365110

VAR00367634

VAR00370054

VAR00371189

VAR00375328

VAR00391182

VAR00415061

VAR00418061

VAR00424538

VAR00429874

VAR00438032

VAR00447690

VAR00452199

VAR00453158

VAR00460483

VAR00462074

VAR00462075

VAR00462076

VAR00462077

VAR00462078

VAR00485296

VAR00584153

# Exhibit B: Documents Relied Upon in the Expert Report of Janet S. Netz, Ph.D.
## Part 2: Confidential Documents without Bates Numbers

08 June 2010, Deposition of Jim Lord, Stephanie Biediger, Kayla Lawler, et al. v. Qunnipiac University, 3:09-CV-00621 (SRU) (In the United States District Court of Connecticut).

Aronoff, James H., 20 June 2022, Expert Report of James H. Aronoff, Jessica Jones, et al., v. Varsity Brands, LLC, et al., No. 2:20-cv-02892-SHL-tmp (W.D.Tenn.).

Deposition of Alexa Bray, 11 January 2022.

Deposition of Brian Todd Elza, 16 November 2021.

Deposition of Buffy Duhon, 25 March 2022.

Deposition of Francis Xavier LeTard, III, 22 November 2021.

Deposition of Jamie J. Parrish, 03 March 2022.

Deposition of Jamie J. Parrish, Volume II, 17 March 2022.

Deposition of Jeff Webb, 12 May 2022.

Deposition of Jeffrey Lee Fowlkes, 05 April 2022.

Deposition of Jessica Jones, 10 February 2022.

Deposition of Jim Hill, 21 March 2022.

Deposition of Karen Wilson, 14 April 2022.

Deposition of Marlene Cota, Volume I, 06 April 2022.

Deposition of Rebecca Kathryn Foster, 21 December 2021.

Deposition of U.S. All Star Federation (Steve H. Peterson), 09 March 2022.

Webb, Jeff, 07 May 2010, Report of Jeff Webb, Biediger et al. v. Quinnipiac University, Case No. 3:09-CV-6211(SRU) (U.S. District Court, District of Connecticut), Webb Dep Exhibit 2.

The deposition testimony referred to herein was entered in one or more of the related actions: Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp, Jessica Jones, et al. v. Varsity Brands, LLC, et al., No. 2:20-cv-02892-SHL-tmp (W.D. Tenn.); or American Spirit and Cheer Essentials, Inc. et al. v. Varsity Brands, LLC, et al., 2:20-cv-02782-SHL-TMP (W.D. Tenn.). For purposes of simplicity in this report, I cite to them in short format.

# Exhibit C: Public Documents Relied Upon in the Expert Report of Janet S. Netz, Ph.D.

10 December 2020, Complaint Class Action, Jessica Jones, et al., v. Varsity Brands, LLC, et al., No. 2:20-cv-02892-SHL-cgc (In the United States District Court for the Western District of Tennessee Western Division).

19 January 2013, The Groove Experience, https://www.yumpu.com/en/document/read/8031161/gsp4dgms/3, accessed 16 June 2022.

American Bar Association, 2005, Market Power Handbook: Competition Law and Economic Foundations, Second Edition, ABA Book Publishing, Chicago, IL.

American Bar Association, 2021, Monopolization and Dominance Handbook, Second Edition, ABA Book Publishing: Chicago, IL.

Areeda, Phillip E., Hovenkamp, Herbert, and John L. Solow, 1995, Antitrust Law: An Analysis of Antitrust Principles and Their Application, Volume IIA, Little, Brown & Company: Boston, MA.

Bain Capital, LP, 2022, About Us, https://www.BainCapital.com/about-us, accessed 14 June 2022.

Bain Capital, LP, 2022, Our Portfolio, https://www.baincapitalprivateequity.com/portfolio#getTop702, accessed 20 May 2022.

Brown Shoe Co. v. United States, 370 U.S. 294 (1962).

Buchanan, Leigh, 22 February 2016, The Battle for the Cheerleading-Uniform Industry Is Surprisingly Cutthroat and Appropriately Glittery, SLATE, https://slate.com/business/2016/02/rebel-wants-to-disrupt-the-surprisingly-entrenched-cheerleader-uniform-industry.html, accessed 18 April 2022.

Carlton, Dennis W., and Jeffrey M. Perloff, 2005, Modern Industrial Organization, Fourth Edition, Addison Wesley.

Chadwick, Jim, U.S. All Star Federation, et al., 18 October 2011, USASF/IASF: Worlds Policy Update, Spirit Post, https://spiritpost.com/2011/10/usasfiasf-worlds-policy-update/, accessed 12 April 2022.

Charlesbank Capital Partners, 03 November 2014, Varsity Brands Enters Into Definitive Agreement To Be Acquired By Charlesbank Capital Partners, https://www.charlesbank.com/news/2014/varsity-brands-enters-definitive-agreement-acquired-charlesbank-capital-partners/, accessed 14 June 2022.

Charlesbank, 15 December 2014, Charlesbank Capital Partners Completes Acquisition of Varsity Brands, https://www.charlesbank.com/news/2014/charlesbank-capital-partners-completes-acquisition-varsity-brands/, accessed 01 June 2022.

Charlesbank, Undated, Case Study: Varsity Brands, https://www.charlesbank.com/portfolio/case-studies/varsity-brands/, accessed 05 May 2022.

Cheer America Championships, 2021, Cheer America Championships, https://cachampionships.com/, accessed 24 May 2022.

ClearRidge, 2022, How long does a Private Equity Group wait before selling your Company again?, https://clearridgecapital.com/articles/how-long-does-a-private-equity-group-wait-before-selling-your-company-again/, accessed 14 June 2022.

Connolly, Daniel, 18 September 2020, CHEER EMPIRE:  for-profit company built competitive cheer, pays people who make its rules, Commercial Appeal, https://www.commercialappeal.com/in-depth/news/2020/09/18/cheer-empire-profit-company-created-cheerleading-regulators-pays-salaries/3468551001/, accessed 18 April 2022.

Edlin, Aaron S. and Rubinfeld, Daniel L., 2004, Exclusion or Efficient Pricing: The "Big Deal" Bundling of Academic Journals, Antitrust LJ, Vol. 72, No.1, 128-159.

Exhibit C
Page 1 of 6

# Exhibit C: Public Documents Relied Upon in the Expert Report of Janet S. Netz, Ph.D.

Federal Trade Commission, Undated, Markets, https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/mergers/markets, accessed 31 May 2022.

Fisher, Franklin M., 1987, Horizontal Mergers: Triage and Treatment, The Journal of Economic Perspectives, Vol. 1, No. 2, 23-40.

Global Cheer and Dance, Undated, Global Cheer & Dance, https://globalcheerdance.org/, accessed 15 June 2022.

Hirsch, Lauren, 19 June 2018, Bain to acquire Varsity Brands, a top maker of cheerleader uniforms and school spirit items, for roughly $2.5 billion, CNBC, https://www.cnbc.com/2018/06/19/bain-nears-2-point-5-billion-deal-for-cheer-uniform-leader-varsity-brands.html, accessed 05 May 2022.

International Cheer Union, 2022, ICU Governing Council, https://cheerunion.org/about/council/, accessed 20 May 2022.

International Olympic Committee, 06 December 2016, IOC Executive Board wraps-up first day of meetings, https://olympics.com/ioc/news/ioc-executive-board-wraps-up-first-day-of-meetings, accessed 20 May 2022.

JAMZ Cheer & Dance, 2021, JAMZ Cheer & Dance 2022-23 Season, https://www.jamz.com/, accessed 24 May 2022.

K&K Insurance, 2009, Welcome USASF Cheer Gym Members, https://www.kandkinsurance.com/sites/USASF/Pages/Home.aspx, accessed 13 June 2022.

Lander, Todd, 23 March 2017, Apparel copyright owners cheer ruling, Daily Journal, https://ffslaw.com/wp-content/uploads/2018/07/TML_DJ_Apparel-Copyright-Owners-Cheer_.pdf, accessed 16 June 2022.

Landes, Williams M. and Posner, Richard A., March 1981, Market Power in Antitrust Cases, Harvard Law Review, Vol. 94, No. 5, 937-996.

Libit, Daniel, 24 May 2022, Varsity's Antitrust Plaintiffs Ramp Up Battles on Cheerleading Stage, Sportico, https://www.sportico.com/leagues/other-sports/2022/cheerleading-all-star-independents-1234675754/, accessed 14 June 2022.

MCI Communications Corp. v. AT&T Co., 708 F.2d 1801 (7th Cir. 1983).

Memphis Business Journal, 06 April 2005, Varsity Brands acquires Athletic Championships and Premier Athletics, Memphis Business Journal, https://www.bizjournals.com/memphis/stories/2005/07/04/daily16.html, accessed 15 June 2022.

National Cheerleaders Association, 2022, National Cheerleaders Association - The Work Is Worth It, https://www.varsity.com/nca/, accessed 06 May 2022.

National Cheerleaders Association, Undated, NCA & NDA College Nationals, https://www.varsity.com/nca/school/competitions/college-nationals/, accessed 15 June 2022.

National Federation of State High School Associations, 2022, About Us, https://www.NFHS.org/who-we-are/aboutus, accessed 20 May 2022.

National Federation of State High School Associations, 2022, The NFHS Celebrates 100 Years, https://www.NFHS.org/100years, accessed 13 June 2022.

National Federation of State High School Associations, 28 June 2021, 2021-22 NFHS Spirit Rules Book.

Exhibit C
Page 2 of 6

# Exhibit C: Public Documents Relied Upon in the Expert Report of Janet S. Netz, Ph.D.

PR Newswire, 23 December 2015, Varsity Brands Announces Acquisition Of Allgoods, LLC, https://www.prnewswire.com/news-releases/varsity-brands-announces-acquisition-of-allgoods-llc-300196819.html, accessed 09 May 2022.

PRWeb, 16 October 2012, Cheer and Dance Event Producer American Cheer and Dance Academy (ACDA) Boasts a Brand New Website, https://www.prweb.com/releases/2012/10/prweb10019584.htm, accessed 16 June 2022.

Rebel Oil Co., Inc. v. Atlantic Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1995).

Roen, Terry, 01 February 2017, New Cheer and dance venue to open at ESPN Wide World of Sports, Theme Park Tribune, https://www.themeparktribune.com/new-cheer-and-dance-venue-to-open-at-espn-wide-world-of-sports/, accessed 10 May 2022.

Schmalensee, Richard, 1987, Horizontal Merger Policy: Problems and Changes, Economic Perspectives, Vol. 1, No. 2, 41-54.

Sheffield, Michael, 03 June 2014, Rebranding spreads Varsity name around, Memphis Business Journal, https://www.bizjournals.com/memphis/news/2014/06/03/rebranding-spreads-varsity-name-around.html, accessed 10 May 2022.

Snow, David, Undated, Private Equity: A Brief Overview, PEIMEDIA.com, https://www.law.du.edu/documents/registrar/adv-assign/Yoost_PrivateEquity%20Seminar_PEI%20Media's%20Private%20Equity%20-%20A%20Brief%20Overview_318.pdf, accessed 14 June 2022.

Sports Camp Connection, Undated, American Cheerleading Association in Denton, Texas 2022, https://www.sportscampconnection.com/camp/ACA-American-Cheerleading-Association-3826, accessed 16 June 2022.

The Amateur Athletic Union, Undated, About the Amateur Athletic Union, https://aausports.org/page.php?page_id=99844, accessed 15 June 2022.

Tom, Willard K., Balton, David A., et al., 2000, Anticompetitive Aspects of Market-Share Discounts and Other Incentives to Exclusive Dealing, Antitrust Law Journal, Vol. 67, No. 3, 615-639.

U.S. All Star Federation, 13 March 2016, U.S. All Star Federation Board Members, https://web.archive.org/web/20160313050527/http://www.USASF.net/organization/bod/bod_members/, accessed 14 June 2022.

U.S. All Star Federation, 2020, The Cheerleading Worlds, https://thecheerleadingworlds.net/, accessed 13 May 2022.

U.S. All Star Federation, 2022, About the USASF, https://www.USASF.net/about, accessed 05 May 2022.

U.S. All Star Federation, 2022, Board Members, https://www.USASF.net/committee-board, accessed 14 June 2022.

U.S. All Star Federation, 21 October 2014, U.S. All Star Federation Board Members, https://web.archive.org/web/20141021185445/http:/usasf.net:80/organization/bod/bod_members/, accessed 14 June 2022.

U.S. Department of Justice and the Federal Trade Commission, 19 August 2010, Horizontal Merger Guidelines.

Exhibit C
Page 3 of 6

# Exhibit C: Public Documents Relied Upon in the Expert Report of Janet S. Netz, Ph.D.

U.S. Department of Justice Archives, 11 May 2009, Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act: Chapter 1, https://www.justice.gov/archives/atr/competition-and-monopoly-single-firm-conduct-under-section-2-sherman-act-chapter-1#::text=Section%202%20of%20the%20Sherman%20Act%20makes%20it%20unlawful%20for,foreign%20nations%20.%20.%20.%20.%20.%22, accessed 18 May 2022.

U.S. Department of Justice, 18 March 2022, Competition and Monopoly: Single-Firm Conduct Under Section 2 of The Sherman Act: Chapter 2, https://www.justice.gov/archives/atr/competition-and-monopoly-single-firm-conduct-under-section-2-sherman-act-chapter-2, accessed 14 June 2022.

U.S. Department of Justice, 18 March 2022, Competition and Monopoly: Single-Firm conduct Under Section 2 of the Sherman Act: Chapter 6, https://www.justice.gov/archives/atr/competition-and-monopoly-single-firm-conduct-under-section-2-sherman-act-chapter-6, accessed 14 June 2022.

U.S. Department of Justice, 25 June 2015, Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition, Chapter 5: Antitrust Issues in the Tying And Bundling of Intellectual Property Rights, https://www.justice.gov/atr/chapter-5-antitrust-issues-tying-and-bundling-intellectual-property-rights, accessed 15 June 2022.

United States v. E.I. Du Pont De Nemours & Co., 351 U.S. 377 (1956).

United States v. Grinnell Corp., 384 U.S. 563 (1996).

Universal Cheerleaders Association, 2022, Universal Cheerleaders Association (UCA) - Home, https://www.varsity.com/uca/, accessed 06 May 2022.

USA Cheer, 18 April 2018, USA Cheer and AACCA Combine Forces, Strengthening Safety for Participants, https://www.USACheer.org/usa-cheer-aacca-combine-forces-strengthening-safety-participants, accessed 17 May 2022.

USA Cheer, 20 July 2021, USA Cheer welcomes International Olympic Committee's full recognition of the International Cheer Union, <https://www.USACheer.org/usa-cheer-welcomes-international-olympic-committees-full-recognition-of-the-international-cheer-union>, accessed 05 May 2022.

USA Cheer, 2022, Current Board of Directors & Officers, https://www.USACheer.org/about/board-of-directors, accessed 22 May 2022.

USA Cheer, Undated, AACCA is now USA Cheer!, https://www.USACheer.org/aacca-is-now-usa-cheer, accessed 20 May 2022.

USA Cheer, Undated, About USA Cheer, https://www.USACheer.org/about, accessed 22 May 2022.

USASF, Undated, USASF Image Policy, https://usasf.net.ismmedia.com/ISM3/std-content/repos/Top/2013%20Website/Rules/image/USASF_ImageAppearance-9-21-12_mod-15-05-26.pdf, accessed 04 April 2022.

Varsity Brands, 10 April 2017, Varsity Brands Announce Appointment Of Adam Blumenfeld As CEO, https://www.varsitybrands.com/varsity-brands/varsity-brands-announces-appointment-adam-blumenfeld-ceo, accessed 15 June 2022.

Varsity Spirit and United Spirit Association, Undated, About USA, https://www.varsity.com/usa/about/, accessed 09 May 2022.

Exhibit C
Page 4 of 6

# Exhibit C: Public Documents Relied Upon in the Expert Report of Janet S. Netz, Ph.D.

Varsity Spirit, 12 January 2018, Varsity Spirit Kicks Off Championship With Opening Of The New Venue!, https://www.varsity.com/news/varsity-spirit-kicks-off-championship-with-opening-of-the-new-venue/, accessed 10 May 2022.

Varsity Spirit, 20 February 2018, What is Competitive Cheerleading, https://www.varsity.com/news/what-is-competitive-cheerleading/, accessed 09 May 2022.

Varsity Spirit, 2022, All Things Cheer, Varsity Brands, https://www.varsity.com/atc/, accessed 25 April 2022.

Varsity Spirit, 25 February 2022, UCA/UDA College Cheerleading and Dance Team National Championship 2023 Tier Paid bids, https://www.varsity.com/uca/wp-content/uploads/2022/03/23-College-Bid-Allocations-v2.pdf, accessed 25 May 2022.

Varsity Spirit, Undated, Corporate Partnerships, https://www.varsity.com/about/partners/, accessed 27 April 2022.

Varsity Spirit, Undated, Our Camp Brands, https://www.varsity.com/school/camps/brands/#::text=Universal%20Cheerleaders%20Association,-Founded%20in%201974&text=Today%20it%20is%20the%20largest,locations%20of%20any%20camp%20company, accessed 09 May 2022.

Varsity Spirit, Undated, Our Camp Brands, https://www.varsity.com/school/camps/brands/, accessed 08 June 2022.

Varsity Spirit, Undated, Our Competition Brands, https://www.varsity.com/school/competitions/brands/, accessed 08 June 2022.

Varsity Spirit, Undated, Why Varsity Spirit Competitions, https://www.varsity.com/school/competitions/why-varsity-competitions/, accessed 27 April 2022.

Varsity TV, 11 February 2022, 2022 UCA National High School Cheerleading Championship, https://tv.varsity.com/events/7150814-2022-uca-national-high-school-cheerleading-championship/results?filter=31663, accessed 14 June 2022.

Varsity TV, 22 January 2022, 2022 NCA High School Nationals, https://tv.varsity.com/events/7150747-2022-nca-high-school-nationals/results?filter=31254, accessed 14 June 2022.

Varsity TV, 25 February 2022, 2022 USA Nationals, https://tv.varsity.com/events/7150840-2022-usa-nationals-spiritcollegejunior/results?filter=31880, accessed 14 June 2022.

Varsity TV, 27 April 2018, 2018 ICU World Championship Results & Recap, https://tv.varsity.com/articles/6191089-2018-icu-world-championship-results-recap, accessed 24 May 2022.

Varsity, 2018, Want To Be A Cheerleader - High School Cheerleading, https://www.varsity.com/wp-content/uploads/2018/02/highschool.pdf, accessed 15 June 2022.

Varsity, Undated, Cheer Bid Distribution, https://www.varsity.com/nca/wp-content/uploads/2019/07/NCA_College_Bid_Distribution.pdf, accessed 24 May 2022.

Varsity, Undated, Our Competition Brands, https://www.varsity.com/all-star/competitions/brands/#the-dance-summit, accessed 29 April 2022.

Varsity, Undated, Squad Credentialing FAQ, https://www.varsity.com/uca/wp-content/uploads/2020/07/21_uca_squadcredfaq.pdf, accessed 24 May 2022.

Varsity, Undated, Why Choose Varsity Spirit Fashion, https://www.varsity.com/school/spirit-fashion/why-choose-varsity/, accessed 15 June 2022.

Exhibit C
Page 5 of 6

# Exhibit C: Public Documents Relied Upon in the Expert Report of Janet S. Netz, Ph.D.

Viscusi, W. Kip, Harrington, Jr., Joseph E., et al., 2005, Economics of Regulation and Antitrust, Fourth Edition, The MIT Press: Cambridge, MA.

Webb, Jeffrey G., 20 July 2021, Letter, Re: ICU receives Full Recognition Status by the International Olympic Committee, https://cheerunion.org.ismmedia.com/ISM3/std-content/repos/Top/olympics/docs/ICU_IOC_Full-Recognition.pdf, accessed 20 May 2022.

Webb, Jeffrey G., 20 July 2021, Re: ICU Receives Full Recognition Status by the International Olympic Committee, International Cheer Union, https://cheerunion.org.ismmedia.com/ISM3/std-content/repos/Top/olympics/docs/ICU_IOC_Full-Recognition.pdf, accessed 12 April 2022.

Worldwide Spirit Association, 2020, Worldwide Spirit Association - Experience Our National Cheerleading Events, https://www.wsacheer.com/, accessed 24 May 2022.

Exhibit C
Page 6 of 6

# Glossary of Acronyms and Commonly Used Terms

| Acronym / Term | Definition |
|---|---|
| AACCA* | American Association of Cheerleading Coaches and Administrators. AACCA governed College Cheer until it merged with USA Cheer in 2018. |
| COA* | Cheerleaders of America. COA was an IEP in Ohio owned by JAM Brands; Varsity acquired JAM Brands in 2015. |
| IASF* | International All Star Federation. International sanctioning body for All Star Cheer, spun off from USASF in 2016. |
| ICU* | International Cheer Union. International governing body of all cheerleading disciplines. Established by Varsity. |
| IEP | Independent Event Producer. |
| IFC | International Federation of Cheerleading. The IFC sponsors a variety of international cheerleading competitions. |
| IOC | International Olympic Committee. The authority responsible for organizing the Olympic Games. |
| NACCC* | National All Star Cheerleading Coaches' Congress. An independent organization created by cheerleading coaches in 2003 to establish uniform rules for All Star Cheer. NACCC established the initial set of universal All Star Cheer rules. In 2005, USASF acquired NACCC. Within a few years, Varsity dissolved NACCC. After the demise of NACCC, Varsity (through the USASF) controlled rules changes and other decisions. |
| NCA* | National Cheerleaders Association. Founded by Lawrence Herkimer in 1948. Now owned by Varsity (promotes School Competitions, Cheer Camps, and national tournaments and championships). Most college teams now attend either NCA or UCA Championships. |
| NDA* | National Dance Alliance. |
| NCATA | National Collegiate Acrobatics and Tumbling Association. |
| NFHS | National Federation of State High School Associations, a governing body for School Cheer. |
| UCA* | Universal Cheerleaders Association. Founded by Jeff Webb (Varsity's founder and former CEO) in 1974 after he left the NCA. In 1983, Webb changed the business's name from Universal Cheerleaders Association to Varsity Spirit, Inc. Varsity owns and operates UCA as one of Varsity Brands' subsidiaries. UCA promotes Cheer Competitions, Cheer Camps, and national tournaments and championships. Most college teams now attend either NCA or UCA Championships. |
| UDA* | Universal Dance Association. |
| USA* | United Spirit Association, large summer Cheer Camp promoter acquired by Varsity in 1994. |
| USASF* | U.S. All Star Federation. Varsity created the USASF with other cheer producers in 2003 in response to the creation of the NACCC. Eventually acquired NACCC. |
| USA Cheer* | USA Federation for Sport Cheering. A non-profit organization established by Varsity in 2007. USA Cheer serves All Star and School Cheer programs. Its objectives are to "help grow and develop interest and participation in cheer throughout the United States; promote safety and safety education for cheer in the United States; and represent the United States of America in international Cheer Competitions". USA Cheer governs high school and college cheer. |
| V!ROC* | Varsity's choreography camps. Varsity offers program rebates if All Star gyms and schools choose Varsity V!ROC choreography camps. |

Note(s):     All of the above are cited/explained in the body of the report. Entities currently owned or controlled by Varsity are followed by an asterisk.

Exhibit 1

HIGHLY CONFIDENTIAL

## Varsity's Current Brands

| | | | | |
|---|---|---|---|---|
| **All Star Competitions** | ACDA Spirit* | | **Camps** | National Cheerleaders Association (NCA)* |
| | All Star Challenge* | | | National Dance Alliance (NDA)* |
| | All Star Championships* | | | The Urban Cheerleading Experience |
| | All Things Cheer and Dance* | | | United Spirit Association (USA)* |
| | Aloha Spirit Championships* | | | Universal Cheerleaders Association (UCA) |
| | American Cheer Power* | | | Universal Dance Association (UDA) |
| | American Cheerleaders Association (ACA)* | | | V!ROC |
| | America's Best* | | **School Competitions** | National Cheerleaders Association (NCA)* |
| | Athletic Championships* | | | National Dance Alliance (NDA)* |
| | Champion Cheer & Dance* | | | United Spirit Association (USA)* |
| | Champion Spirit Group* | | | Universal Cheerleaders Association (UCA) |
| | Cheer Ltd* | | | Universal Dance Association (UDA) |
| | Cheersport* | | **Apparel** | Varsity All Star Fashion |
| | COA Cheer and Dance* | | | Varsity Spirit Fashion |
| | Coastal Cheer & Dance* | | | |
| | DanceFest* | | | |
| | Encore | | | |
| | Feel The Power* | | | |
| | GLCC Events* | | | |
| | Golden State Spirit Association* | | | |
| | JAMfest Events* | | | |
| | Just Dance | | | |
| | Mardi Gras Spirit Events* | | | |
| | Mid Atlantic Championships* | | | |
| | National Cheerleaders Association (NCA)* | | | |
| | National Dance Alliance (NDA)* | | | |
| | Nation's Choice* | | | |
| | One Up | | | |
| | Pac West* | | | |
| | Pacific All-Star Championships* | | | |
| | Sea to Sky Cheerleading Championship* | | | |
| | Spirit Celebration* | | | |
| | Spirit Cheer* | | | |
| | Spirit Festival* | | | |
| | Spirit Sports* | | | |
| | Spirit Unlimited Cheer & Dance* | | | |
| | Spirit Xpress Cheerleading* | | | |
| | The American Championships | | | |
| | The D2 Summit | | | |
| | The Dance Summit | | | |
| | The Groove Experience* | | | |
| | The Summit | | | |
| | The U.S. Finals* | | | |
| | United Spirit Association (USA)* | | | |
| | Universal Cheerleaders Association (UCA) | | | |
| | Universal Dance Association (UDA) | | | |
| | Universal Spirit* | | | |
| | World Spirit Federation* | | | |

Note(s):    Brands followed by an asterisk are brands that I was able to confirm were acquired by Varsity after 1994.

Data Source(s):    Camps:
Varsity Spirit, Undated, Our Camp Brands, https://www.varsity.com/school/camps/brands/, accessed 08 June 2022; Memphis Business Journal, 06 April 2005,
Varsity Brands acquires Athletic Championships and Premier Athletics, Memphis Business Journal,
https://www.bizjournals.com/memphis/stories/2005/07/04/daily16.html, accessed 15 June 2022.
School Competitions:
Varsity Spirit, Undated, Our Competition Brands, https://www.varsity.com/school/competitions/brands/, accessed 08 June 2022.
All Star Competitions:
19 January 2013, The Groove Experience, https://www.yumpu.com/en/document/read/8031161/gsp4dgms/3, accessed 16 June 2022; BAIN00147958:
BAIN00148047; JEFF00264646, at 4681; Memphis Business Journal, 06 April 2005, Varsity Brands acquires Athletic Championships and Premier Athletics,
Memphis Business Journal, https://www.bizjournals.com/memphis/stories/2005/07/04/daily16.html, accessed 15 June 2022. VAR00371189, at 1271; PRWeb, 16
October 2012, Cheer and Dance Event Producer American Cheer and Dance Academy (ACDA) Boasts a Brand New Website,
https://www.prweb.com/releases/2012/10/prweb10019584.htm, accessed 16 June 2022;  Sports Camp Connection, Undated, American Cheerleading Association
in Denton, Texas 2022, https://www.sportscampconnection.com/camp/ACA-American-Cheerleading-Association-3826, accessed 16 June 2022; VAR00129039;
VAR00123090, at 3092 - 3093; VAR00127376; VAR00236674; Varsity, Undated, Our Competition Brands, https://www.varsity.com/all-
star/competitions/brands/#the-dance-summit, accessed 29 April 2022.
Apparel:
BAIN00007702

Exhibit 2

# Varsity Controls Most Sanctioning Bodies



Note(s):   Blue boxes represent independently-established bodies. Red boxes represent Varsity-established bodies. Mergers and acquisitions are represented by an outline and solid arrow. A dashed arrow represents a body that was spun off.

Data Source(s):   National Federation of State High School Associations, 2022, The NFHS Celebrates 100 Years, https://www.NFHS.org/100years, accessed 13 June 2022; 08 June 2010, Deposition of Jim Lord, Stephanie Biediger, Kayla Lawler, et al. v. Qunnipiac University, 3:09-CV-00621 (SRU) (In the United States District Court of Connecticut), at 13:10-14:14; Deposition of Jamie J. Parrish, Volume II, 17 March 2022, at 564:8-565:2, 567:2-11, 608:17-609:10, and 612:13-25; Deposition of Jamie J. Parrish, Volume I, 03 March 2022, at 32:12-33:3; International Cheer Union, 2022, ICU Governing Council, https://cheerunion.org/about/about/, accessed 20 May 2022; USA Cheer, Undated, About USA Cheer, https://www.USACHEER.org/about, accessed 22 May 2022, at 2; USA Cheer, 18 April 2018, USA Cheer and AACCA Combine Forces, Strengthening Safety for Participants, https://www.USACHEER.org/usa-cheer-aacca-combine-forces-strengthening-safety-participants, accessed 17 May 2022; VAR00460483, at 0484; CB00014752, at 4781.

Source File(s):   Governing Bodies.xlsx; Varsity Timeline.tmv

Exhibit 3

HIGHLY CONFIDENTIAL

## Varsity Earns Substantial Revenues from Cheer Camps

| 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|------|------|------|------|------|-------|
| $65,893,620 | $68,693,236 | $72,164,273 | $75,775,346 | $79,328,984 | $361,855,458 |

Note(s):      Varsity calculates "Net Revenue" as the sum of transaction-level net revenue by calendar year. A *de minimis* amount of revenue can be attributed to non-School All Star Cheer Camps.

Data Source(s):      VAR00462074-VAR00462078, at tabs "Camp Transaction Detail(s)".

Exhibit 4

# The Varsity Spirit Ecosystem



VAR00008543

Note(s):     This graphic is a screenshot from Varsity Brands' May 2018 management presentation.

Data Source(s):   VAR00008463, at 8543.

Exhibit 5

HIGHLY CONFIDENTIAL

**Varsity Dominated the Market for All Star Cheer Competitions in 2012**

| Entity | Revenue | Market Share |
|---|---:|---:|
| Varsity Brands | $29,000,000 | 42.0% |
| JAM Brands | $21,000,000 | 30.4% |
| Cheersport / Universal Spirit | $6,000,000 | 8.7% |
| Spirit Brands | $1,900,000 | 2.8% |
| Americheer | $1,600,000 | 2.3% |
| WSA | $1,500,000 | 2.2% |
| JAMZ | $1,300,000 | 1.9% |
| Jam Spirit Group (DBA Team Champion) | $1,300,000 | 1.9% |
| Spirit Celebration | $700,000 | 1.0% |
| Cheer America | $700,000 | 1.0% |
| Others | $4,000,000 | 5.8% |
| Total | $69,000,000 | 100.0% |

Note(s):        In 2012, Varsity Brands included: UCA, NCA, USA, ACA,  and V!ROC, among others.

Data Source(s):   VAR00346980, at 6985.

Exhibit 6

# Varsity's Acquisitions 2015 - Present



Note(s):    Blue boxes represent entities in the Cheer Competitions market. Red boxes represent entities in the Cheer Apparel market.

Data Source(s): PR Newswire, 23 December 2015, Varsity Brands Announces Acquisition Of Allgoods, LLC, https://www.prnewswire.com/news-releases/varsity-brands-announces-acquisition-of-allgoods-llc-300196819.html, accessed 09 May 2022; VAR00129039, at 9041 - 9042; VAR00332326.

Source File(s):  Varsity's Acquisitions.xlsx; Varsity's Acquisitions.tmv

Exhibit 7