# Exhibit 2

## FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| **JESSICA JONES, et al.,** | Case No. 2:20-cv-02892-SHL-tmp |
| Plaintiffs, | |
| v. | |
| **VARSITY BRANDS, LLC, et al.** | |
| Defendants. | |
| | **JURY DEMAND** |

## EXPERT REBUTTAL REPORT OF JANET S. NETZ, PH.D.

Highly Confidential Pursuant to Protective Order

I.    Introduction ........................................................................................................ 1

  A.   Qualifications ............................................................................................... 1

  B.   Restatement of my assignment and opinions from my Opening Report ........................... 1

  C.   Defendants' economic experts' assignment and conclusions ............................................. 4

  D.   My current assignment ................................................................................................ 5

  E.   My conclusions are unchanged ................................................................................... 5

II.   Defendants' experts and I appear to agree on a number of topics ................................... 5

  A.   Cheer products are differentiated ................................................................................ 6

  B.   The geographic market for end-of-season competitions is national .................................. 6

  C.   The geographic market for Cheer Apparel is national ..................................................... 6

  D.   There are other event producers than Varsity ............................................................... 6

  E.   Sanctioning bodies are not inherently anticompetitive ................................................... 7

  F.   Varsity has a majority of votes on the USASF Board of Directors and Sanctioning
       Committee ................................................................................................................ 7

  G.   Varsity created the USASF and has been inextricably involved in its operation ............... 7

  H.   The USASF's mission is to promote the sport of Competitive Cheer .............................. 7

  I.    Cheer Camps are attended by School Cheer teams ....................................................... 8

III.  Defendants' experts mischaracterize my testimony ............................................................. 8

IV.   Prof. Murphy presents misleading empirical analyses that are inconsistent with the record
      evidence ............................................................................................................................. 10

V.    Defendants' experts dismiss evidence that contradicts their findings .................................. 13

VI.   Prof. Murphy's criticisms regarding market definition are without merit ............................. 15

  A.   The relevant product markets are not narrower than described in my Opening Report ... 16

    1.   *Cheer Competitions* ............................................................................................ *16*

      a)   All Star and School Cheer Competitions ............................................................. 17

      b)   Regular and end-of-season competitions are in the same relevant market .............. 20

      c)   The other differences in Cheer Competitions cited by Prof. Murphy's do not
           necessitate separate product markets ................................................................. 25

      d)   The existence of other event producers is irrelevant to market definition ............... 30

      e)   Prof. Murphy's argument that markets are narrower than I claim is counterintuitive
           ................................................................................................................... 34

    2.   *Cheer Apparel* ...................................................................................................... *35*

    *3. Cheer Camps* ................................................................................. *37*

 B. The relevant geographic markets are not narrower than described in my Opening Report
    ................................................................................................................. 39

   *1. Cheer Competitions* ..................................................................... *39*

    a) The record evidence establishes the market is national ............................... 40

    b) Prof. Murphy's travel distance analysis is misguided and uninformative .............. 45

    c) Prof. Murphy's geographic markets overlap ........................................ 47

    d) Prof. Murphy's switching analysis is unreliable and does not support his conclusions
      that the geographic market is regional ............................................ 50

    e) Prof. Murphy's regression analysis is unreliable and does not support his
      conclusions that the geographic market is narrower ................................ 53

   *2. Cheer Camps* ................................................................................. *54*

VII. Varsity exercises market power over all three relevant markets ........................... 55

 A. Varsity possesses and exercises market power over Cheer Competitions ...................... 56

   *1. Varsity dominates the Cheer Competition market, despite the existence of a competitive
     fringe* ................................................................................. *56*

   *2. The Cheer Competitions market is protected by barriers to entry* ............................. *61*

 B. Varsity possesses and exercises market power over Cheer Apparel .............................. 66

   *1. Varsity dominates the Cheer Apparel market, despite the existence of a competitive
     fringe* ................................................................................. *67*

   *2. The Cheer Apparel market is protected by barriers to entry* ............................ *68*

 C. Varsity possesses and exercises market power over Cheer Camps .............................. 69

   *1. Varsity dominates the Cheer Camp market, despite the existence of a competitive
     fringe* ................................................................................. *69*

   *2. The Cheer Camp market is protected by barriers to entry* ............................ *70*

VIII. Varsity's conduct harmed competition ...................................................... 71

 A. Varsity's control of and coordination with the USASF harmed competition ................... 71

   *1. Defendants' experts misconstrue the founding and mission of USASF* ....................... *72*

   *2. Varsity has controlled USASF since its inception, and its control has only increased*  *72*

   *3. Varsity and USASF actively coordinated to benefit Varsity* ........................... *73*

    a) Varsity and USASF actively coordinated to choose which event producers could
      grant Worlds bids ................................................................... 73

Case 2:20-cv-02892-SHL-tmp    Document 389-3    Filed 02/10/23    Page 5 of 131
PageID 10676
Highly Confidential Pursuant to Protective Order

Expert Rebuttal Report of Janet S. Netz, Ph.D.                                                    iii of iii

b)    Varsity and USASF actively coordinated to grant Varsity the power to unilaterally take away a Worlds bid event from a rival event producer ................................... 74

c)    Varsity and USASF actively coordinated to kill at least two proposals in order to protect Varsity's Summit event .......................................................................... 74

d)    USASF's rules protect incumbent event producers, chiefly Varsity ....................... 75

e)    Varsity's targeting of other event producers was enabled by USASF..................... 78

f)    In coordination with Varsity, the USASF failed to make procompetitive rule changes and ensure its independence.............................................................................. 83

B.    Varsity ties Cheer Camps and School Cheer Competitions, leveraging market power in competitions to the camp market ......................................................................... 84

C.    Varsity's acquisition strategy harmed competition for Cheer Competitions................... 85

D.    Varsity's rebate programs foreclose competitors ............................................................ 89

E.    Structural reforms can be procompetitive ........................................................................ 90

IX.    Summary ................................................................................................................................ 90

Highly Confidential Pursuant to Protective Order

## I. Introduction

### A. Qualifications

I, Janet S. Netz, am a founding partner of applEcon, LLC. I have been a tenured Associate Professor of Economics at Purdue University and a Visiting Associate Professor at the University of Michigan. I received a B.A. (1986) from the University of California, Berkeley, cum laude, and an M.A. (1990) and Ph.D. (1992) from the University of Michigan, all in Economics. My doctoral fields of study were Industrial Organization – the study of firm interaction and market performance – and International Trade and Finance.

I have taught Industrial Organization at the undergraduate and doctoral level; Antitrust and Regulation at the undergraduate level; Microeconomic Theory at the undergraduate and master's level; and International Economics at the undergraduate and master's level. My research has focused on competitive interactions of firms and strategies firms can use to increase profits as well as the resulting impact on firms and the market. I have published in peer-reviewed scholarly journals and have presented my research at many conferences and seminars. I provide my academic employment and publication histories in my curriculum vitae, which is attached as Exhibit A.

I have testified at trial and by affidavit or declaration in both named plaintiff and class action matters related to antitrust, consumer protection, and business practices, especially with regard to the economic impact of conduct, for over fifteen years. I provide a complete list of the cases on which I have testified and consulted in my curriculum vitae, which is attached as Exhibit A.

applEcon bills my work on this case at the rate of $800 per hour. My and applEcon's compensation is independent of my opinions or the outcome of the case.

### B. Restatement of my assignment and opinions from my Opening Report

In my Opening Report, I was asked by Counsel for Plaintiffs to provide my opinion on the following questions:

- What are the relevant markets?

- Did Varsity possess market power in the relevant markets?

- Did the challenged conduct allow Varsity to acquire or maintain its monopoly power?

- Evaluate any anticompetitive effects of the challenged conduct.

Briefly, I presented the following conclusions in my Opening Report:

- There exist relevant antitrust product markets for Cheer Competitions; Cheer Apparel; and Cheer Camps.[1] The geographic boundary of each market is no larger than the U.S.

---

[1] Cheer Competitions is the market for competitions in the sport of Competitive Cheer. Cheer Apparel is the market for uniforms and apparel worn by the athletes in Competitive Cheer. Cheer Camps is the market for Competitive Cheer training camps in which Competitive Cheer athletes and teams improve their Competitive Cheer skills and routines.

Highly Confidential Pursuant to Protective Order

- There is indirect evidence of Varsity's market power in the form of its high market shares in each of the relevant markets, in conjunction with barriers to entry. Varsity's market share is dominant for these products.

- Varsity has directly demonstrated its market power in each of the relevant markets. In the market for Cheer Competitions, it has reduced output by canceling recently acquired events and increasing prices. In the market for Cheer Apparel, Varsity has consistently demonstrated the ability to charge higher prices than its competitors, despite providing similar or even inferior quality. In the market for Cheer Camps, Varsity has excluded rivals via its anticompetitive tying policy, which requires School Cheer teams to attend its Cheer Camps in order to compete in its championships. Such direct evidence is by itself sufficient to prove that Varsity possesses and has exercised market power in each of the relevant markets.

- The Defendants[2] acted cooperatively to acquire, enhance, and maintain Varsity's market power. Defendants' anticompetitive conduct is part of a deliberate strategy to preclude entry by new competitors and force out existing competitors.

- Varsity's control of the USASF allows it to promulgate rulings that favor Varsity over its rival Cheer Competition producers. Varsity and the USASF engaged in coordinated conduct to disadvantage and eliminate rival Cheer Competition producers. The conduct included providing Varsity with information not provided to rivals, enforcing rules selectively against Varsity's rivals, controlling the date and location of Cheer Competitions awarding "Worlds" bids, prohibiting USASF members from working with rival sanctioning bodies, and targeting rivals' events by offering a Varsity event in a close vicinity and around the same time to take away customers from competitors.

- Varsity leveraged its market power over Cheer Competitions into Cheer Camps by tying participation in its end-of-season school championship competitions to attendance at its Cheer Camps. This policy foreclosed rival Cheer Camp providers from a substantial share of the market. There is no legitimate business reason for Varsity's tying policy.

- Varsity embarked on an aggressive strategy to acquire rival Cheer Competition producers, both to eliminate competition and to gain control of the USASF Sanctioning Body. Varsity has acquired substantially all of its top competitors and has subsequently canceled events, raised prices, and reduced the quality of its events.[3]

- Varsity designed rebate programs with the intent and effect of foreclosing Cheer Competition and Cheer Apparel rivals. Varsity's rebates differ from standard discount

---

[2] The Defendants include: Varsity (Varsity Brands, Varsity Spirit, and Varsity Spirit Fashion), USASF, Jeff Webb, Charlesbank Capital Partners LLC (hereinafter, "Charlesbank"), and Bain Capital Private Equity (hereinafter, "Bain").

[3] Varsity's acquisitions of Cheer Competition firms have also negatively impacted Varsity's competitors in the Cheer Apparel market because Varsity excludes Cheer Apparel rivals from promoting their competing apparel at Varsity events.

Highly Confidential Pursuant to Protective Order

programs in several ways. Varsity's rebates function as de facto exclusive dealing arrangements, leverage market power from one market to another, and include "first-dollar discounts" which condition large rebates on marginal purchasing decisions—i.e., once the customer reaches the spending threshold for the discount, the rebate applies to all of the customer's spending retroactively. The rebate programs create large incentives for customers to buy exclusively from Varsity—incentives that even an equally efficient competitor would be unable to match due to Varsity's market dominance. Competitors are thereby excluded from a significant share of the relevant markets.

- Varsity has created a number of artificial barriers to entry, further protecting it from competition from new rivals.

- Varsity has dominated all aspects of Competitive Cheer, allowing it to establish a self-described ecosystem that encompasses competitions and events (Cheer Competitions); training and education (Cheer Camps); and uniforms and accessories (Cheer Apparel). This ecosystem is protected by governing bodies, safety organizations, and strategic partners. Varsity's dominance of each component of this ecosystem enables it to dominate the entire ecosystem.

- Varsity and Defendants have protected this ecosystem using anticompetitive means, and their conduct in each of the relevant markets enhanced and maintained Varsity's market power in each of the other relevant markets.

- Varsity's exclusionary conduct has harmed competition: it has eliminated competitors; it has foreclosed competitors; it has reduced choices for athletes; and it has increased overall participation costs.

- But for its anticompetitive conduct, Varsity's market power in the relevant markets would have been constrained by competition. In the but-for world:

  o Varsity would not conspire with or control the USASF. Instead, the USASF would act as an independent sanctioning body in the best interests of the sport as a whole, on behalf of all event producers, apparel providers, camp providers, coaches, and athletes.

  o Varsity would cease tying participation in its School Cheer Competitions to attendance at its Cheer Camps. Instead, Varsity would market and operate these two products separately, as is the common practice in the industry.

  o Varsity would not have used mergers and acquisitions to eliminate competition in the Cheer Competition market.

  o Varsity would not have developed anticompetitive rebate programs. Specifically, Varsity's rebate programs would not have leveraged its market power from one market to another or functioned as de facto exclusive dealing arrangements. Instead, any Varsity customer loyalty or rebate programs would drop exclusivity provisions, first dollar discounts, and provisions that impact competition in unrelated markets.

Highly Confidential Pursuant to Protective Order

o  The markets for Cheer Competitions, Cheer Apparel, and Cheer Camps would have more providers and more competition, giving athletes more options at competitive prices.

### C. Defendants' economic experts' assignment and conclusions

Prof. Murphy was asked to "to provide economic analysis and expert opinions in the areas of market definition, market power, conduct, anticompetitive harm, class certification issues, and damages, as these areas relate to claims brought by the Plaintiffs or assertions by Plaintiffs' experts."[4,5] Prof. Murphy asserts that relevant markets are smaller than those I propose;[6] that Varsity does not have monopoly power in the relevant markets;[7] and that Defendants' conduct did not harm competition.[8,9]

Mr. Orszag was asked to "to review and assess" "The opinions and analyses in Dr. Netz's report as they relate to the role of USASF as a sanctioning organization for All Star Cheer and to the alleged conspiracy with Varsity."[10] Because the USASF is the sanctioning body for All Star Cheer but not for School Cheer, Mr. Orszag's opinions are not applicable to anything beyond All Star teams, All Star Competitions, and any rules related to the apparel All Star athletes can wear. Mr. Orszag concludes that he has "found the conduct by USASF challenged by Plaintiffs' experts to be consistent with legitimate, non-conspiratorial behavior for a sanctioning organization, and I have found nothing in USASF's rules and regulations that provides Varsity with an anticompetitive advantage over what Varsity can or has obtained by itself."[11]

---

[4] Murphy, Kevin, 23 September 2022, Expert Report of Kevin Murphy, Jessica Jones, et al., v. Varsity Brands, LLC, et al., No. 2:20-cv-02892-SHL-tmp (In the United States District Court for the Western District of Tennessee Western Division) (Hereinafter "Murphy Report"), at ¶8.

[5] Prof. Murphy is testifying on behalf of Varsity Brands, Varsity Spirit, Varsity Spirit Fashion and Supplies, Bain Capital Private Equity, and Charlesbank Capital Partners.

[6] Murphy Report, at ¶¶11-12.

[7] Murphy Report, at ¶13.

[8] Murphy Report, at ¶¶15-23.

[9] Prof. Murphy makes a variety of conclusions on other topics (e.g., common impact and quantification of damages) that are outside the scope of my report. I therefore do not address Prof. Murphy's arguments, analyses, and conclusions regarding these other topics.

[10] Orszag, Jonathan, 23 September 2022, Expert Report of Jonathan M. Orszag, Jessica Jones, et al., v. Varsity Brands, LLC, et al., No. 2:20-cv-02892-SHL-cgc (In the United States District Court for the Western District of Tennessee Western Division) (Hereinafter "Orszag Report"), at ¶11. Mr. Orszag was also asked to review claims made by Drs. Heeb, Maki, and Mr. Aronoff. These claims are outside the scope of my report, so I do not address these topics.

[11] Orszag Report, at ¶11.

### D. My current assignment

I have been asked to evaluate Defendants' economic experts' critiques of my Expert Report and to reconsider my earlier conclusions in light of these critiques. I have reviewed their reports, including appendices and exhibits, as well as their deposition testimony.

I have reviewed Defendants' experts' rebuttal arguments and the underlying data and work product. I list all confidential and public documents that my staff or I have relied on since submitting my Opening Report in Exhibits B and C, respectively. I reserve the right to revise my conclusions and opinions as more information comes to light. All of my conclusions are based on the information available to me and may change as new information becomes available. I reserve the right to amend, supplement and/or revise my analysis, findings, and opinions if new evidence becomes available, if the scope of discovery or the causes of action change in any material way, or in response to any attempt to rebut my opinions or conclusions.

For reference, I present a list of acronyms and a glossary of terms commonly used in Exhibit 1.[12]

### E. My conclusions are unchanged

After reviewing the critiques from Defendants' experts, my conclusions are unchanged from those I summarize above in Section I.B. Specifically, Defendants cooperated to acquire, enhance, and maintain Varsity's market power. This anticompetitive conduct is the result of a deliberate strategy to preclude entry by new competitors and force out existing competitors. Varsity's exclusionary conduct has harmed competition by eliminating competitors, foreclosing competitors, reducing choices for athletes, and increasing overall participation costs.

To reach the conclusions presented in my opening and rebuttal reports, I have applied standard antitrust economic principles to the facts of this case. This includes economic analyses of business practices, market conditions, and business economic data. I reviewed the anticompetitive conduct in which Defendants engaged by using economic principles typically applied to monopolies and antitrust conspiracies.

### II. Defendants' experts and I appear to agree on a number of topics

Before addressing disagreements between Defendants' experts and me, it is worth noting that there are a number of topics on which we appear to agree.

---

[12] Exhibits updated from my Opening Report retain the same exhibit number, but have the prefix "RR-". New exhibits are numbered sequentially starting from the last exhibit number in my Opening Report. Therefore, references to exhibit numbers in this report may not be in sequential order.

Highly Confidential Pursuant to Protective Order

### A. Cheer products are differentiated

Prof. Murphy discusses the ways in which Cheer Competitions, Cheer Camps, and Cheer Apparel are differentiated.[13] I likewise discussed the differentiated nature of these products.[14] Economists have long studied markets for differentiated products.[15]

### B. The geographic market for end-of-season competitions is national

While Prof. Murphy and I disagree about whether there are separate relevant markets for All Star Cheer Competitions and School Cheer Competitions and then separate relevant markets for regular and end-of-season events within those categories, Prof. Murphy apparently agrees that the geographic extent of the market for end-of-season events is national. I infer this based on the fact that his discussion of his claim that the relevant geographic markets are narrower than national markets addresses only regular season All Star Competitions and School Competitions.[16]

### C. The geographic market for Cheer Apparel is national

I conclude that the geographic market for Cheer Apparel is national.[17] While Prof. Murphy does not address the geographic market for Cheer Apparel, he explicitly disagrees with my conclusion that the geographic scope of the market for regular season Cheer Competitions and Cheer Camps is national.[18] I infer that Prof. Murphy does not disagree that the geographic market for Cheer Apparel is national since he does not discuss it.

### D. There are other event producers than Varsity

Prof. Murphy and I agree that there are other event producers besides Varsity.[19] In general, I refer to these non-Varsity event producers as IEPs or Independent Event Producers.

---

[13] Murphy Report, at §§IV.E and IV.F.

[14] Netz, Janet, Undated, Expert Report of Janet S. Netz, Ph.D., Jessica Jones, et al., v. Varsity Brands, LLC, et al., No. 2:20-cv-02892-SHL-tmp (In the United States District Court for the Western District of Tennessee Western Division) (Hereinafter "Netz Opening Report"), at §III.C.

[15] See, e.g.,

- Eaton, Curtis B. and Richard G. Lipsey, 11 September 1989, Chapter 12: Product differentiation, in Handbook of Industrial Organization, Volume 1, First Edition, Richard Schmalensee and Robert Willig (Eds.), North-Holland.

- Gandhi, Amit and Aviv Nevo, 06 December 2021, Chapter 2: Empirical models of demand and supply in differentiated products industries, in Handbook of Industrial Organization, Volume 4, First Edition, Kate Ho, Ali Hortacsu and Alessandro Lizzeri (Eds.), North-Holland.

[16] Murphy Report, §§IV.F.8.a) and IV.F.8.b).

[17] Netz Opening Report, at 56.

[18] Murphy Report, at §IV.F.8.

[19] Murphy Report, at §IV.F.4. and Netz Opening Report, at §III.C.1.

Highly Confidential Pursuant to Protective Order

### E.  Sanctioning bodies are not inherently anticompetitive

Prof. Murphy, Mr. Orszag, and I agree that sanctioning bodies are not inherently anticompetitive even though they can limit competition in some respects.[20] We also agree that sanctioning bodies, by nature, restrict competition. We also agree that they are sometimes necessary to form an industry (basically, that they are also pro-competitive).

### F.  Varsity has a majority of votes on the USASF Board of Directors and Sanctioning Committee

Prof. Murphy and Mr. Orszag both acknowledge that Varsity has a majority of votes on the USASF Board of Directors and the Sanctioning Committee.[21]

### G.  Varsity created the USASF and has been inextricably involved in its operation

Varsity created the USASF and since its inception has been inextricably involved in its operation.[22]

### H.  The USASF's mission is to promote the sport of Competitive Cheer

Prof. Murphy, Mr. Orszag, and I all agree that the USASF is the governing body for Competitive Cheer responsible for establishing rules and competition standards.[23] The USASF promotes itself as an independent body, and since its inception and throughout the entire class period, the USASF's mission has been to protect and grow the sport of Competitive Cheer.[24]

---

[20] See, e.g.,

- Netz Opening Report, at §III.B.

- Murphy Report, at ¶¶260-266.

- Orszag Report, at ¶25.

[21] Murphy Report, at 280, and Orszag Report, at 55.

[22] See, e.g.,

- Netz Opening Report, at 6.

- Murphy Report, at ¶54.

- Orszag Report, at ¶42.

[23] See, e.g.,

- Netz Opening Report, at 6.

- Murphy Report, at ¶55.

- Orszag Report, at §III.B.

[24] U.S. All Star Federation, 2022, About the USASF, https://www.USASF.net/about, accessed 05 May 2022, at 1.

Highly Confidential Pursuant to Protective Order

## I. Cheer Camps are attended by School Cheer teams

In my Opening Report, I established that School Cheer teams are the primary attendees of Cheer Camps as opposed to All Star teams.[25] Prof. Murphy agrees.[26]

## III. Defendants' experts mischaracterize my testimony

Defendants' experts frequently mischaracterize the testimony I presented in my Opening Report and present rebuttals to conclusions that I have not made. Below I list some, but not all, instances in which this occurs. Because these are mischaracterizations and strawmen arguments, I do not rebut Defendants' experts but rather restate my original testimony to illustrate how it has been distorted.

- Prof. Murphy states that to establish Varsity's market share in the Cheer Competitions market I "rely solely" on business documents "without examining the assumptions (including the scope of the market considered) or data sources underlying those estimates."[27] It is not clear how Prof. Murphy infers that I do not examine the assumptions and data sources underlying the cited documents. He does not offer a single example of a document I misinterpreted by not considering its assumptions or data sources. I discussed the scope of the markets considered and cite documents produced by Varsity and other Defendants as supporting evidence.[28] I not only cited internal Varsity documents and external documents prepared by investment banking firms interested in acquiring Varsity, but I also cited deposition testimony of Varsity employees, including deponents repeatedly cited by Prof. Murphy in his report.[29] All of these different sources provide consistent market share estimates. Notably, Prof. Murphy provides no market share estimates whatsoever in his report.

- Prof. Murphy states that, although I acknowledge the existence of many independent event producers (IEPs), I fail to explain how Varsity could have monopolized the market while these IEPs continue to host Cheer Competitions.[30] This is false. In my opening report I demonstrated how Varsity controls end-of-season competitions, which substantially impedes the size and scope that IEPs can grow their events. I directly addressed the existence of a competitive fringe and explained that Varsity does not have a market share of 100%.[31] I discussed at least 70 IEPs that Varsity identified as competitors

---

[25] Netz Opening Report, at 32.

[26] "Camps are almost exclusively attended by scholastic (as opposed to All Star) teams." Murphy Report, at ¶132.

[27] Murphy Report, at ¶227.

[28] Netz Opening Report, at 50-52.

[29] Netz Opening Report, at footnote 404.

[30] Murphy Report, at ¶229.

[31] Netz Opening Report, at 55.

Highly Confidential Pursuant to Protective Order

and explained that many of them host only a single event. Using Varsity data, I calculated that these 70 IEPs collectively only account for approximately 11% of total All Star event revenue in 2016, which is insufficient to constrain Varsity's market power.[32] I have not only acknowledged the existence of these IEPs, but also demonstrated how Varsity managed to monopolize the market despite their existence.

- Prof. Murphy states that "Dr. Netz also claims the availability of qualified judges constitutes a barrier to entry, but neither does she provide support for this claim."[33] This is false: in my report I describe USASF rules that preclude its member judges from officiating in certain events that may undermine Varsity's dominance.[34] In Section VII.A.2 below, I further explain how the availability of qualified judges constitutes a barrier to entry in the Cheer Competitions market.

- Prof. Murphy claims that "Plaintiffs' experts do not explain how discounts through Fashion Dollar awards would be different from coupons or other discounts that are used in many industries and are generally considered to benefit consumers."[35] I directly addressed this issue in my Opening Report:

> "These programs [Varsity's rebate programs, including specifically Fashion Dollars] <u>are distinguished from standard loyalty programs</u> that are offered in many industries (e.g., airline frequent flier programs) in that the purpose is not just to reward loyal customers; Varsity's stated goal was to preclude gyms from attending any other producer's events or purchasing non-Varsity apparel. <u>Varsity's rebate programs are also unlike other loyalty programs because competition exists in other markets that have loyalty programs.</u> For example, consumers can switch from one airline and its frequent flier program to another airline and its program; however, Varsity has monopolized all of the relevant markets in this matter."[36]

I discussed additional aspects of Varsity's rebates that are unlike those offered in other industries, including: how these rebates allow Varsity to leverage its market power in the market for Competitive Cheer Events into the market for Cheer Apparel[37] and how Varsity's "first dollar" discounts are different from volume discounts that are used in many industries.[38]

---

[32] Netz Opening Report, at 27.

[33] Murphy Report, at ¶241.

[34] Netz Opening Report, at 85.

[35] Murphy Report, at ¶374.

[36] I continue by citing Varsity documents that support these claims. Netz Opening Report, at 107-108, emphasis added.

[37] Netz Opening Report, at 106.

[38] Netz Opening Report, at 112-113.

- Regarding Varsity's rebate program, Prof. Murphy states that I claimed "in essence" that Varsity's pricing was too low.[39] I do not argue that Varsity's pricing is too low, but rather that the design of Varsity's rebate program constrains consumers' choices and forecloses competition.[40]

- Prof. Murphy claims that I ignored the limitations on the scope of the Cheer Camp attendance requirement for some types of Cheer participants.[41] This is false. First, I clearly stated that these restrictions only apply to school teams—the heading of the section discussing these policies reads, "Varsity ties Cheer Camps and School Cheer Competitions, leveraging market power in competitions to the camp market."[42] Second, I clearly stated which types of competitions do and do not require attendance at a camp.[43]

- Mr. Orszag says I "assert that the alleged conspiracy between USASF and Varsity created anticompetitive effects in markets related to 'competitive cheer,' which they [Dr. Netz and Dr. Heeb] claim include participants from both All Star gyms and school teams."[44] I did not claim that USASF's conduct had a direct impact on School Cheer.

- Mr. Orszag says plaintiffs "claim that USASF changed its governance structure to advantage Varsity."[45] I made no such claim. Varsity and USASF created, enforced, and refused to change USASF's rules, which enabled Varsity to acquire and maintain its dominant position in the industry.

## IV. Prof. Murphy presents misleading empirical analyses that are inconsistent with the record evidence

Many of the conclusions proffered by Prof. Murphy are based on misleading, erroneous, or uninformative empirical analyses. For example, in the first 67 pages of his report, Prof. Murphy presents no economic conclusions; rather, he provides background facts in the first 34 pages followed by another 33 pages (and 19 exhibits) dedicated to outlining what Prof. Murphy describes as "The Characteristics of All Star and Scholastic Cheer Customers" and "The Characteristics of All Star and Scholastic Cheer Competitions, Cheer Camps, and Cheer Apparel." In the remainder of his report, Prof. Murphy repeatedly refers to the evidence created

---

[39] Murphy Report, at ¶18.

[40] Netz Opening Report, at 104-113.

[41] "I understand that there is no credentialing requirement for the USA Junior Nationals championship, for any of the collegiate-level nationals, or for any of Varsity's regional scholastic competitions. Likewise, there is no camp-based credentialing requirement for any All Star competition. Plaintiffs and their experts ignore these limitations on the scope of the requirement in claiming that it drove camp attendance." Murphy Report, at ¶374.

[42] Netz Opening Report, at 89.

[43] "Varsity offers Cheer Camps for college and All Star Cheer teams, but does not require camp attendance to participate the NCA or UCA college national championships or its All Star events" but they are required for "entry into the NCA, UCA, and USA national championship competitions." Netz Opening Report, at 90.

[44] Orszag Report, at ¶52.

[45] Orszag Report, at §V.A.

Highly Confidential Pursuant to Protective Order

in these 33 pages and uses this information as the foundation for his subsequent analyses and conclusions. He has, in essence, created an alternate record of facts on which he relies. The results of these analyses and the subsequent conclusions are frequently contradicted by the record evidence, yet Prof. Murphy neither acknowledges nor explains the discrepancies.

Here I highlight some of the flaws in his empirical analyses that, when corrected, do not support Prof. Murphy's conclusions. Throughout this report I point out instances in which Prof. Murphy's alternate record is based on faulty and misleading data analyses; I also point out that the alternate record he creates conflicts with the actual record evidence.

The first conceptual contradiction that permeates Prof. Murphy's empirical analyses of "Scholastic" competitions, camps, and apparel is the inclusion of both School Cheer teams and traditional sideline cheer teams in his analyses. Sideline cheer teams are distinct from School Cheer teams, a fact acknowledged by Jeffrey Webb and Varsity since the inception of Competitive Cheer.[46] Prof. Murphy acknowledges the same distinctions between School Cheer and traditional sideline cheer that I identify,[47] yet he insists that both types are part of what he defines as "Scholastic" cheer teams, even though traditional, sideline teams do not compete. This inclusion of traditional, sideline teams is a significant decision that drives many of his conclusions regarding "Scholastic" teams. There is no support for combining these two distinct activities, and this decision is contradicted by Prof. Murphy's own clients, based on considerable evidence—much of which was produced by Varsity.

The magnitude of this conceptual error in Prof. Murphy's subsequent empirical analyses can be illustrated using evidence presented by Prof. Murphy. Prof. Murphy acknowledges that "not every school has a cheer team, and among those that do, many choose not to participate in Varsity competitions." This is notable for two reasons. First, any teams that do not participate in competitions are, by definition, not competitive School Cheer teams; that is, these are sideline teams. Second, Prof. Murphy estimates that only 19.5% of the "cheer" teams in his "Scholastic" data attend Varsity competitions and "the other 80.5% of Varsity scholastic customers either chose not to participate in regular season competitions or attended only non-Varsity cheer competitions."[48] This is significant because the evidence shows Varsity controls 100% of School Cheer Competitions,[49] meaning that these teams are not, in fact, attending other, non-Varsity

---

[46] See Section VI.A.1.a) below.

[47] Murphy Report, at footnotes 18 and 36.

[48] Murphy Report, at ¶94 and Exhibit 7.

[49] See, e.g.,

- A 2014 Bain presentation claimed that "Varsity is the undisputed leader in cheerleading uniforms, competitions, and camps" and included a chart illustrating that 100% of the U.S. market for School Cheer Competitions belonged to UCA, NCA, and USA—all Varsity-owned brands—in 2013. Bain Capital, 17 October 2014, Project Hercules Interim IC, BAIN00055587 - BAIN00055646, at 5631.

- A 2018 Bain presentation included a similar chart illustrating that 100% of the U.S. market for School Cheer Competitions still belonged to UCA, NCA, and USA in 2017. Bain Capital, July 2018, Project Impact Diligence Summary, FEAS-Ares00075986 - FEAS-Ares00076033, at 6023.

Highly Confidential Pursuant to Protective Order

Competitive Cheer Competitions. In other words, 80.5% of the "cheer" teams in Prof. Murphy's data are either traditional sideline teams or some other school-related entities that happened to purchase something from Varsity (see the discussion immediately below); they are not, in fact, the Competitive Cheer teams that are affiliated with those schools.

Prof. Murphy's identification of "Scholastic" customers is drastically overinclusive. Specifically, Prof. Murphy includes all school-related entities that "Varsity had contact with through any of its main scholastic business lines (apparel, camps, regular season competitions, and national competitions) during each season from 2015/2016 to 2018/2019."[50] Examining his data reveals there are many entities that do not purchase anything whatsoever related to Competitive Cheer. For example, he includes Varsity customers that are categorized as "Booster Programs"; it is unclear why these entities would be included since the proposed class includes Cheer athletes. Similarly, there are many entities in the data that are categorized as schools, but do not buy any of the products at-issue in this matter. The data for apparel sales provides a brief description of the item purchased, and Prof. Murphy makes no effort to exclude items that are, for example, clearly intended for traditional, sideline cheerleaders. For example, Prof. Murphy includes customers that only purchased the following types of products: megaphone/sound system, break through banners, and parade accessories.[51] Based on these transactions, these entities are not involved in any activity related to Competitive Cheer, but Prof. Murphy does not exclude them from his analyses. Furthermore, the majority of apparel transactions in these data include clothing that have no clear identifiers suggesting they were purchased by Competitive Cheer teams or even by traditional, sideline teams. Because schools buy a wide range of Varsity apparel—much of which has nothing to do with any type of cheerleading—Prof. Murphy has no basis to assume these purchases originate from school-based Competitive Cheer Teams or even from traditional, sideline cheer teams; however, his Exhibit 7 operates under the assumption all of the purchases are from "Scholastic" programs.

Given these significant errors, the resulting differences among "Scholastic" teams that Prof. Murphy identifies are misleading because he often compares true competitive School Cheer teams with entities such as booster clubs or sideline teams. It follows that many of his conclusions regarding "schools" are erroneous or misleading. For example, Prof. Murphy's Exhibit 7 reports that only 8% of "schools" participated in Nationals in 2015/2016. However, this is based on the fact that 1,469 school teams attended Nationals and 16,486 entities purchased apparel from Varsity. The correct analysis compares the number of schools that went to Nationals (1,469) to the number of schools that participated in Varsity competitions (3,269), which indicates that 45% of School Cheer teams attended Nationals. In his Exhibit 7, Prof.

---

[50] Prof. Murphy's universe of "Scholastic" customers are presented in his Exhibit 7, which he describes as follows: "The exhibit tabulates the number of scholastic customers that Varsity had contact with through any of its main scholastic business lines (apparel, camps, regular season competitions, and national competitions) during each season from 2015/2016 to 2018/2019." Murphy Report, at ¶94.

[51] For example, Spring Creek, a high school with customer number 34960592, only purchased a mascot costume over the period 2015-2019. Grambling State University, customer number 20317500, only purchased from the category megaphone/sound system from 2015-2019.

Murphy drastically overstates the number of schools that participate in Cheer Camps, as he includes camps unrelated to Competitive Cheer. While it is difficult to distinguish between Competitive Cheer Camps and traditional, sideline Cheer Camps in the data, Prof. Murphy makes no attempt to do so. More troubling is his failure to remove dance camps. This is an especially glaring oversight given that the data identify team types, allowing one to remove dance teams easily.[52] Similarly, the data contain camp brand codes making it simple to identify and remove camps produced by entities such as the National Dance Alliance and Universal Dance Association that produce dance—not Competitive Cheer—camps.

Given the facts above, whenever referring to Prof. Murphy's overinclusive definition I use his term "Scholastic." When referring to the school-affiliated Competitive Cheer teams that are class members in this matter, I use the same term I introduced in my Opening Report: School Cheer.

Prof. Murphy excludes certain types of events from some of his data analyses. These exclusions are sometimes appropriate, but not always. For example, when comparing the registration fees for regular season and end-of-season events (see Prof. Murphy's Exhibits 9, 12, and 23), he excludes certain regular season events because he identifies them as "packaged" events in his data; presumably, this indicates that events were sold as part of a bundle including the event registration fee as well as hotel stays, park passes, and other ancillary products. He also excludes the same bundled events in his travel distance analysis and when calculating the attendance at Worlds bid events, but he provides no explanation for this exclusion and why, for example, it is appropriate to exclude Worlds bid events when he is specifically calculating the attendance at Worlds bid events.

Prof. Murphy's calculations of the total number of teams competing at Worlds are misleading because for some years, he includes international teams, but for other years, he excludes them. For example, in his Exhibit 12, Prof. Murphy reports the total participants at Worlds over four seasons. For the first season, 2015/2016, he excludes international teams from his total number of participants, but for all subsequent seasons, he includes them. This error mistakenly reports a significant increase in Worlds attendance.

## V. Defendants' experts dismiss evidence that contradicts their findings

Proper economic analysis requires reviewing all of the available sources of evidence and at least understanding why various pieces of evidence may not be aligned, but Defendants' experts do not do this.[53] Instead, they offer little documentary evidence to support their conclusions and instead largely rely on various data analyses, many of which are irrelevant to the appropriate questions or inconsistent with the facts.

---

[52] In Prof. Murphy's backup file for this work, "ex_pt7", there is no code that filters camp registrations by the "team.type" variable, which includes both "Cheer" and "Dance" types.

[53] I acknowledge that documents produced in the ordinary course of business can have different economic meanings and, as such, a properly conducted economic analyses may not comport with these documents. However, most of the evidence I presented are not nuanced business documents or terms of art with different business and economic meanings.

Highly Confidential Pursuant to Protective Order

For the most part, Prof. Murphy ignores discrepancies and dismisses documentary evidence as business documents that have different meanings than those used by economists.[54]

Similarly, Mr. Orszag ignores evidence that contradicts his conclusions and provides no competing documentary evidence to support his conclusions. When asked about these discrepancies, Mr. Orszag testified that he relied solely on quantitative analyses and dismisses the contradictory evidence.[55] This position is problematic for at least two reasons: first, sound

---

[54] See, Murphy Report, at ¶163 and ¶413. Testimony from Prof. Murphy is consistent in dismissing business documents as evidence:

- "Q. But you're aware, Dr. Murphy, that Varsity and other entities, including defendants in this case, performed their own calculations of market shares with respect to Varsity's business; right? A. I know they do refer to market shares. I think they were subject to many of the same limitations in terms of what other data was actually available. For my purposes, as a professional economist, I didn't think the data I had was sufficient to be able to calculate reliable market shares." 04 November 2022, Videotaped Deposition of Kevin Murphy, Ph.D., Jessica Jones, et al., v. Varsity Brands, LLC, et al., No. 2:20-cv-02892-SHL-tmp (In the United States District Court for the Western District of Tennessee Western Division) (Hereinafter "Deposition of Kevin Murphy, 04 November 2022"), at 139:12-21.

- "Q. Well, you did, in the course of your work, come across documents where Varsity and others did at least describe market share calculations that they had performed; is that fair? A. Yeah. I mean, my impression – and, again, this is not an opinion that I have. But my impression based on those is they were based on the kind of evidence that I wouldn't rely on, because it wasn't sufficiently broad. And, you know, when you're in business, you might do that. That doesn't make it appropriate for an economist to do that." Deposition of Kevin Murphy, 04 November 2022, at 141:2-12.

[55] See, e.g.,

- "Q. Okay. Well, let me – let me – let me make sure I ask my question. Did you look for evidence of agreements between Varsity and USASF that favored Varsity over other competitors? [Objection omitted] [A.] I can't. I don't know how to answer it because it may be that there's a provision that the entire USASF board agreed to, that all members voted for, including independent event producers, that in the end benefited Varsity more than, say, someone else." 15 November 2022, Deposition of Jonathan M. Orszag, Jessica Jones, et al., v. Varsity Brands, LLC, et al., No. 2:20-cv-02892-SHL-tmp (In the United States District Court for the Western District of Tennessee Western Division) ("Hereinafter, "Deposition of Jonathan Orszag, 15 November 2022"), at 339:3-13.

- "Q. Further down in paragraph 12 [of your report], you say that – you have concluded, 'That the economic evidence in this case is not consistent with Plaintiffs' allegations of a conspiracy by which USASF coordinated with Varsity to harm competition.' … What is the difference, in your mind, between the – the economic evidence in this case and the factual discovery record? A. The factual discovery record doesn't take into account, for example, the other data and – or other information that I bring to bear on this, which are, for example, the documents I rely upon, the third-party literature, the academic literature, et. cetera, that helped to inform the claims put forward by the experts that you retained in this matter." Deposition of Jonathan Orszag, 15 November 2022, at 349:25-350:20.

- Mr. Orszag's testimony suggests that a Varsity document granting the USASF's Steve Peterson a stock option plan for Varsity employees does not matter in his analyses without support from data: "Q. Okay. And as an economist, when you're evaluating whether or not there was a conspiracy or collusion, would the fact of whether this [Phantom Unit stock option plan] agreement was – was disclosed or not disclosed

Highly Confidential Pursuant to Protective Order

economic analysis requires considering all sources and types of evidence, including evidence
that may contradict an expert's opinion; second, Mr. Orszag's insistence that he relied on data
analysis is puzzling since he conducted at most one quantitative analysis.

## VI. Prof. Murphy's criticisms regarding market definition are without merit

In my Opening Report, I presented documentary evidence—including a significant amount from
Varsity's own documents—and deposition testimony supporting my conclusion that there are
three distinct relevant markets: Cheer Competitions, Cheer Camps, and Cheer Apparel.[56] Cheer
Competitions is the market for competitions in the sport of Competitive Cheer. Cheer Apparel is
the market for uniforms and apparel worn by the athletes in Competitive Cheer. Cheer Camps is
the market for Competitive Cheer training camps in which Competitive Cheer athletes and teams
improve their Competitive Cheer skills and routines. After reviewing Defendants' experts'
critiques, my conclusions regarding market definition are unchanged for the reasons explained
below.

Although Prof. Murphy does not explicitly define any relevant products markets, he suggests the
product markets may be narrower based on differentiation of the products.[57] His claims are
supported neither by the record evidence provided by Varsity nor any other source in this matter;
in fact, the record evidence contradicts many of these claims. Prof. Murphy largely identifies
dimensions over which products are differentiated. Ultimately, Prof. Murphy fails to explain why
product differentiation would necessitate different relevant product markets.

Prof. Murphy asserts that the geographic market boundaries for Cheer Competitions and Cheer
Camps are regional. He bases his conclusions on misleading data analyses that inappropriately
include participants and products that are not viable substitutes.

Below I explain why his criticisms and analyses are misplaced and do not cause me to change
my opinions.

---

be a factor in determining whether or not there was a conspiracy or collusion? [Objection omitted] [A.]
Okay. I'm going to give you the same answer I've given multiple times to the same question, which is:
Disclosure, or lack thereof, is something that needs to be considered, but whether it matters or not is an
empirical question, and again, here, the data don't support that it mattered..." Deposition of Jonathan
Orszag, 15 November 2022, at 417:18-418:7.

[56] Netz Opening Report, at §§IC.A - IV.C.

[57] See, e.g.,

- Prof. Murphy concludes that All Star Competitions and "Scholastic" competitions are not in the same
  market; All Star regular season and end-of-season competitions are not in the same market; and
  "Scholastic" regional and end-of-season competitions are not in the same market. He then describes other
  characteristics of competitions (e.g., whether they are 1-day or 2-day or occur in the fall or the spring), but
  he never makes a conclusion as to whether these differences result in even narrower relevant markets.
  Murphy report, at §IV.F.1-5.

- Mr. Orszag does not address market definition in his report.

Highly Confidential Pursuant to Protective Order

## A.  The relevant product markets are not narrower than described in my Opening Report

As explained above, Prof. Murphy spends considerable effort discussing the product characteristics of Cheer Competitions, Cheer Apparel, and Cheer Camps. For the most part the distinctions he identifies are based on his data analyses, many of which are flawed, misguided, and often irrelevant. Ultimately, Prof. Murphy concludes that the relevant markets are narrower than I describe. After reviewing Prof. Murphy's arguments, my conclusions are unchanged. Whereas Prof. Murphy has identified some pertinent distinctions between certain products, none of those differences are significant enough to constitute different relevant product markets.[58] On the contrary, Prof. Murphy has merely provided extensive and redundant examples of product differentiation, despite the fact that differentiated products can be in the same product market. In the sections that follow, I address Prof. Murphy's claims regarding each of the relevant product markets and explain why those claims are either misleading, misguided, or both. I also present additional record evidence consistent with my conclusions that there are three distinct product markets: Cheer Competitions, Cheer Apparel, and Cheer Camps.[59]

### 1.  Cheer Competitions

Prof. Murphy spends considerable effort identifying differences between Cheer Competitions, ultimately concluding that All Star and School Cheer Competitions are not in the same relevant market. Similarly, he claims that regular season Cheer Competitions are not in the same relevant market as end-of-season competitions; he makes this claim separately regarding both All Star and "Scholastic" Cheer Competitions. To support these claims, he identifies various distinctions between the aforementioned types of competitions and claims they are significant enough that participants are highly unlikely to substitute between them and, therefore, they must be in different product markets.[60] Prof. Murphy identifies several other characteristics of Cheer Competitions (e.g., some are 1-day, some are 2-day; some are in the spring, some are in the fall; they are located in different places) and again claims these differences underscore why the markets I have defined are too broad.

---

[58] Prof. Murphy himself acknowledged that products need not be identical to be in the same relevant market: "Q. Is it your opinion that one-day and two-day cheer competitions are in different relevant markets from one another? A. I don't have the opinion that they are in different relevant markets. They – it's conceivable they could be. I don't make that distinction. We do see people substituting between one- and two-day competitions, particularly on the All Star side. It doesn't mean that they're identical. But things don't have to be identical to be in the same market. So I think for purposes of my analysis, the market that included one-day and two-day was a suitable market." Deposition of Kevin Murphy, 04 November 2022, at 115:12-23.

[59] I present evidence on these topics in §§IV.A – IV.C of my Opening Report,.

[60] For example, regarding All Star and "Scholastic" Cheer he writes, "These first order differences in objectives, particularly All Star's focus on competition relative to other activities, is one reason why participants are highly unlikely to substitute from All Star cheer to scholastic cheer (or vice-versa) in response to modest price changes." Murphy Report, at ¶148.

Highly Confidential Pursuant to Protective Order

I do not dispute that Cheer Competition events differ, including in the length of the event, the location of the event, and the date of the event. However, none of these distinctions change my original conclusion that Cheer Competitions constitute a relevant antitrust market.

### a) All Star and School Cheer Competitions

Prof. Murphy's argument that All Star and School Cheer Competitions are in separate relevant markets rests largely on his definition of what constitutes a "Scholastic" team. Prof. Murphy writes that, "The primary role of most scholastic cheer teams continues to be sideline cheer to represent and support another school athletic team and school spirit activities."[61] This definition is problematic for two primary reasons: first, it contradicts the record evidence that traditional sideline cheer is a distinct activity from Competitive Cheer; second, Prof. Murphy argues that the product markets are narrower than I claim, yet his "Scholastic" definition increases the number of school-affiliated teams fivefold. As I explain below, the differences that Prof. Murphy identifies between All Star and "Scholastic" Cheer Competitions are driven largely by his inclusion of traditional, sideline cheer teams in what he collectively refers to as "Scholastic" cheer.

In my Opening Report, I clearly delineate Competitive Cheer from traditional, sideline cheer and present a significant amount of evidence to support that distinction.[62] The salient differences between the two activities include:

- Competitive Cheer athletes perform timed routines as the main event for spectators; traditional sideline cheer athletes entertain and lead spectators who are watching non-cheer teams compete.

- Competitive Cheer teams compete head-to-head in a tournament format at competitions; traditional sideline cheerleaders do not compete against each other, but rather they primarily support other teams that are competing against each other, such as football, basketball, and volleyball.

- Competitive Cheer teams perform highly choreographed, athletic, two-and-a-half-minute routines; traditional sideline cheer teams perform a series of shorter, individual cheers, many of which involve spectator participation.

- Competitive Cheer is judged and scored according to a set of common rules; traditional sideline cheer has no set rules or scoring.[63]

There is considerable evidence from Varsity distinguishing Competitive Cheer and traditional sideline cheer which directly contradicts Prof. Murphy's arguments. This evidence includes the fact that Competitive Cheer was initially established as a distinct sport. If, as Prof. Murphy claims, these two activities are reasonable substitutes, there would have been no reason to

---

[61] Murphy Report, at ¶144.

[62] Netz Opening Report, at 11-12 and 41-42.

[63] Netz Opening Report, at 12.

Highly Confidential Pursuant to Protective Order

establish Competitive Cheer in the first place. More recently, Mr. Webb, the founder of Varsity and creator of Competitive Cheer, testified that the two activities are distinct: "Q. Now, allstar [sic] cheer teams don't do any sideline cheerleading, do they? A. That is correct. Q. And all they do is compete and train to compete? A. That is correct."[64] Testimony from other Varsity employees is consistent with Mr. Webb's, including from Mr. Elza, the former Co-General Manager and Vice President of Sales at Varsity All Star, who distinguished Competitive Cheer as being "100% competition focused," [65] and from Mr. LeTard, former General Manager and Vice President of Operations at Varsity All Star, who stated that "…an All Star athlete … would not view sideline cheer as the same activity as All Star cheer."[66] Similarly, John Newby, the Executive Vice President of Impact and VIP Branding at Varsity Brands, testified that traditional sideline cheer is distinct from Competitive Cheer, they are not the same activity, and the purpose of each is different.[67]

Prof. Murphy does not discuss the evidence I presented establishing that traditional sideline cheer is a distinct activity from School Cheer and that participants do not view them as substitutes. Instead, he includes traditional sideline teams in his definition of "Scholastic" cheer

---

[64] Webb, Jeff, 07 May 2010, Report of Jeff Webb, Biediger et al. v. Quinnipiac University, Case No. 3:09-CV-6211(SRU) (U.S. District Court, District of Connecticut), Webb Dep Exhibit 2, at 443:14-18.

[65] "Q. How is All Star cheer different from sideline cheerleading? A. Sideline cheering is traditionally invented for support groups at school to cheer on the teams on the sidelines: football, basketball, and volleyball. All Star cheer is strictly competition, two-and-a-half minutes of a routine that they compete eight to ten times a year, versus on the school side, one comp -- one to two conditions a year, and it was just a bunch of cheer games. So it's a hundred percent competitive-focused." 16 November 2021, Videotaped Oral Deposition of Brian Todd Elza, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee) (Hereinafter "Deposition of Brian Elza, 16 November 2021"), at 59:11-22.

[66] "Q. And would it be fair to say that an All Star athlete would not view sideline cheer as the -- reasonably the same activity as All Star cheer? … Q. You... participated in sideline cheer, didn't you? A. In college. Q. In college? A. Yeah. Q. And you understand that there's a difference between sideline cheer, that you participated in, and All Star cheer, correct? … A. Yes. Q. And they're not ... not the same activity, correct? A. No. They involve similar skills, but ... the purpose of the activity is different. … Q. … All Star cheer is not the same activity ...as dance, correct? A. Correct. Q. And even competitive dance, All Star cheer is different, correct? A. Correct. Q. And All Star cheer is different than gymnastics, correct? A. Correct. Q. If ... an athlete wants to participate in All Star cheer, its only choice is to go to an All Star gym and go to All Star events, correct? A. Correct." 22 November 2021, Videotaped Oral Deposition of Francis Xavier LeTard, III, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee) (Hereinafter "Deposition of Francis Xavier LeTard, III, 22 November 2021"), at 80:11-82:1.

[67] "Q. And an All Star athlete, in your view, would not see sideline cheer as the same activity at All Star cheer, correct? … A. They would view them as two different activities. Q. And an All Star athlete, cheer athlete, would likely not view competitive dance as the same sport or activity as All Star cheer, correct? … A. ... [T]here are differences between All Star dance and All Star cheer. Q. And those differences are significant, one person would need to train differently for All Star dance as opposed to All Star cheer, correct? … A. Yes." 23 March 2022, Videotaped Oral 30(b)(6) Deposition of Varsity Brands LLC and Varsity Spirit and Individual (John Newby), Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee) (Hereinafter "Deposition of Varsity (John Newby), 23 March 2022"), at 85:17-87:12.

Highly Confidential Pursuant to Protective Order

teams. Because of this conflation, many of the characteristics of "Scholastic" cheer that he identifies are, in fact, not representative of the School Cheer teams and athletes that are class members in this matter. As a result, many of Prof. Murphy's conclusions are based on misleading data analyses and thus are erroneous and uninformative. The magnitude of this oversight is significant. For example, in his Exhibit 7, Prof. Murphy reports "Customer Participation in Varsity Product Areas." Prof. Murphy identifies "Scholastic" customers as all school-related entities that either purchased apparel from Varsity, attended a Varsity camp, participated in competitions, or competed at Nationals. He then claims that of these 18,457 unique entities only 17.7% (3,269) of all "Scholastic" customers compete in Varsity competitions. These 3,269 customers are the relevant customers for purposes of this matter because they are the only teams that attend Varsity competitions, which is the defining feature of Competitive Cheer teams. Varsity documents establish that Varsity owns all School Cheer Competitions through its three brands (UCA, NCA, and USA), so it is not possible that some of these other entities are, in fact, Competitive Cheer teams that are attending non-Varsity competitions.[68] In other words, by definition the remaining 15,188 customers are not Competitive Cheer teams affiliated with schools. Notably, Prof. Murphy agrees that sideline cheer is distinct from All Star Cheer; specifically, he testified that All Star and "Scholastic" Cheer are not substitutes for one another.[69] By that same logic, Prof. Murphy should exclude these traditional, sideline cheer teams from his analyses of "Scholastic" teams, but he does not. As a result, Prof. Murphy examines the characteristics of 15,188 additional customers that presumably consist largely of sideline teams, although his over-inclusive definition is so vast that it also includes many other entities that are entirely irrelevant.[70] Prof. Murphy makes no attempt to distinguish or isolate any of these non-competitive teams or entities and as a result makes false

---

[68] See, e.g.,

- A 2017 Bain Capital document examines Varsity's market share in several markets including School Cheer Competitions. The document shows Varsity's brands collectively account for 100% of the market. Bain Capital, July 2018, Project Impact Diligence Summary, FEAS-Ares00075986 - FEAS-Ares00076033, at 6023.

- A similar 2014 Bain Capital document also examines Varsity's market share in School Cheer Competitions, showing that Varsity's brands collectively account for 100% of the market. Bain Capital, 17 October 2014, Project Hercules Interim IC, BAIN00055587 - BAIN00055646, at 5631.

[69] "Would you agree that All Star Cheer is a form of cheerleading that is separate and distinct from school and sideline cheerleading? A. I would say if you're talking about like an economic matter for sort of market definition type issues, which rely mostly on are these things good substitutes for consumers for one another, I would say yeah, they're not close substitutes for one another." 03 November 2022, Videotaped Deposition of Kevin Murphy, Ph.D., Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee) (Hereinafter "Deposition of Kevin Murphy, 03 November 2022"), at 33:1-8.

[70] For example, Spring Creek, a high school with customer number 34960592, only purchased a mascot costume over the period 2015-2019. Grambling State University, customer number 20317500, only purchased from the category megaphone/sound system from 2015-2019.

Highly Confidential Pursuant to Protective Order

and misleading conclusions about the 3,269 School Cheer teams that do compete based on the characteristics of these other entities that taint his data.

Prof. Murphy concludes that there are two distinct product markets for Cheer Competitions: one for All Star Cheer Competitions and one for School Cheer Competitions.[71] One cannot evaluate whether Cheer Competitions are in two separate relevant markets—based on substitution by athletes—without a correct definition of School Cheer. Prof. Murphy's discussion of the reasons why athletes would consider All Star and "Scholastic" cheer as different focuses on differences between All Star Cheer and sideline cheer. Once you eliminate sideline cheer from consideration, the differences between All Star Cheer and School Cheer Competitions are minor.

The reasons that Prof. Murphy gives as to why an athlete would not substitute from All Star to "Scholastic" cheer are based on differences between All Star and traditional, sideline cheer. When properly considering All Star Cheer versus School Cheer, it seems clear that athletes may well substitute across the two.[72] I continue to conclude that the relevant market is for Cheer Competitions, while acknowledging that substitution between All Star and School teams may take enough time that there might be separate relevant antitrust markets for All Star Cheer Competitions and School Cheer Competitions. Defining the market too broadly would tend to understate the degree of market power Varsity has, which is conservative. As I discuss below in Section VII.A, the evidence shows that Varsity has market power over Cheer Competitions, whether one defines one or two relevant markets.

> b) Regular and end-of-season competitions are in the same relevant market

Prof. Murphy spends a considerable amount of effort identifying different characteristics of Cheer Competitions and ultimately concludes the relevant markets must be narrower than I conclude based on these differences. I generally do not disagree with the product variations he identifies; in fact, most are obvious (e.g., some events are one-day and some are multi-day). However, the conclusions he draws from these variations are unfounded and unsupported by economic theory. Prof. Murphy asserts that these product variations necessitate individual

---

[71] Murphy Report, at §IV.F.1.

[72] See, e.g.,

- "There are two main customer segments, in-school and All Star; individual cheerleaders compete in one or both segments with varying levels of intensity and competitiveness[.]" Bain & Company, February 2018, Varsity Brands growth assessment [preliminary draft], CB00485513 - CB00485640, at 5544.

- A Charlesbank presentation indicates that some cheerleaders compete in both School and All Star Cheer Competitions. There are students who "[w]ill compete at some local competitions with [their] school team during the winter season" and also "practic[e] and compet[e] with [their] All Star team". Bain & Company, February 2018, Varsity Brands growth assessment [preliminary draft], CB00485513 - CB00485640, at 5546.

Highly Confidential Pursuant to Protective Order

product markets, which is incorrect. It is well understood by economists that differentiated products can be in the same product market.[73]

Prof. Murphy's assertion that differences in the characteristics of Cheer Competitions—such as the duration of the event, the registration fee, or whether the competition is bundled with other goods—is comparable to arguing there are different product markets at restaurants based on what each customer orders. For example, some customers order only a main course, while others also order an appetizer. Some customers order drinks, while others do not; some order dessert, while others do not. Some order less expensive meals, while others order the most expensive item on the menu. Some diners eat quickly, while others languish for hours. The characteristics of Cheer Competitions that Prof. Murphy exhaustively identifies are comparable to these variations in dining at the same restaurant, and based on his logic, there are different product markets not only for each type of distinct product (e.g., appetizers, main course) but also for each unique combination of distinct products.

Below I specifically address Prof. Murphy's argument that regular season and end-of-season competitions are not in the same relevant product market. He makes this claim separately for All Star competitions and "Scholastic" competitions; because his arguments are redundant, I address them together below. First, as explained above, Prof. Murphy is merely pointing out yet another dimension by which Cheer Competitions are differentiated. In other words, he is arguing that dessert is in a different product market from the main course. Prof. Murphy cites no evidence from Varsity or other industry participants distinguishing regular season events from end-of-season events in the manner he does. In contrast, there is considerable evidence from Varsity distinguishing Competitive Cheer from other products that are, in fact, in different product markets, such as traditional sideline cheer, dance, and gymnastics.[74]

Furthermore, regular season and end-of-season competitions are inextricably linked in many respects, and it defies common sense and economic theory to argue they are in distinct markets. In order to attend many end-of-season competitions, a team must qualify by earning a bid at a

---

[73] See, e.g.,

- "To a greater or lesser degree, virtually all markets involve some element of product differentiation." Shapiro, Carl, 1996, Mergers with Differentiated Products, American Bar Association, Spring 1996, pp. 23-30, at 24.

- The case of *State of New York v. Kraft General Foods, Inc.* provides a useful case study into how differentiated products can fall within the same market: "Demand elasticities played an especially important role in *Kraft*. The State of New York used them to support a relevant market containing only Adult cereals, which included the two significant merging products, Post Grape Nuts and Nabisco Shredded Wheat. I argued that the relevant market should be all ready-to-eat cereals, in part based on evidence of relatively high cross-price elasticities between specific Adult cereals and Kid cereals. ... After reviewing a range of methodological issues and attempting to relate the demand elasticities to the evidence from marketing studies, the court eventually chose to define the market to include all RTE cereals, rather than the smaller set of Adult cereals." Rubinfeld, Daniel L., 2000, Market Definition with Differentiated Products: The Post/Nabisco Cereal Merger, Antitrust Law Journal, Vol. 68(1), 163-185, at 168 - 169.

[74] Netz Opening Report, at 42-43.

Highly Confidential Pursuant to Protective Order

regular season competition. In other words, a team cannot attend many end-of-season competitions without first attending a regular season competition. For example, the goal of most All Star teams is to attend Worlds, and a team's regular season competition calendar is dictated in large part by the opportunity to earn Worlds bids. A Bain presentation reports that All Star "Coaches indicate chance to win bids is a key decision criteria [sic]" in determining which regular season events to attend.[75] Similarly, a Varsity document indicates that Worlds bids drive demand for regular season events: "…we have been able to drive demand to our events with our bid distribution model to Worlds and the Summit events. The more bids we give any particular event the higher the price we can command."[76] A 2017 Varsity Board of Directors meeting packet indicates that, "USASF World Championship would be at risk which has a trickle down impact on local, regional and national championships that build to this event in the US."[77] Brian Elza, the former Co-General Manager and Vice President of Sales at Varsity All Star, testified that teams compete throughout the regular season with the goal of earning bids to end of year events:

> "Q. And is it fair to say that many, if not most, All Star teams and gyms set their competition event schedule with the goal of maximizing their chances to earn what are called "bids" to these end-of-season Championship events? A. Yes. Q. And bids are also in many ways the main goal for many participants and teams in the competition season, getting bids to these end-of-year events; is that right? … A. Yes, that's correct."[78]

> "Q. And bids are also in many ways the main goal for many participants and teams in the competition season, getting bids to these end-of-year events; is that right? … A. Yes, that's correct."[79]

Testimony from Mr. LeTard, former Co-General Manager and Vice President of Operations at Varsity All Star, is similar: "Q…you testified earlier today that one of the main goals of gyms is to get bids to the year-end events like The Summit and Worlds, correct? A. Correct."[80] All of these sources describe the interaction between regular season and end-of-season events as end-of-season events being the culmination of the entire season.

Prof. Murphy asserts without any supporting evidence that end-of-season events are "less singularly focused on the competition element of the event."[81] He cites the fact that there are other components to the experience, such as hotel theme parks, but this distinction is dubious at

---

[75] Bain & Company, Varsity Brands growth assessment: Spirit, Feb. 8, 2018. See, Sadlow, John, 12 February 2018, Email: CONFIDENTIAL: Review, VAR00304733 - VAR00304778, at 4753.

[76] 06 June 2018, Onex - All Star Segment: Market Dynamics, VAR00253877 - VAR00253881, at 3877.

[77] Varsity Brands, 24 October 2017, Q4 Board of Directors Meeting, CB00025330 - CB00025449, at 5399.

[78] Deposition of Brian Elza, 16 November 2021, at 93:2-13.

[79] Deposition of Brian Elza, 16 November 2021, at 105:20-25.

[80] Deposition of Francis Xavier LeTard, III, 22 November 2021, at 204:4-8.

[81] Murphy Report, at ¶152.

Highly Confidential Pursuant to Protective Order

best. First, there are regular season events that also include hotel stays and theme parks,[82] so that distinction does not differentiate between regular and end-of-season competitions. Second, there is no support to the claim that participants at end-of-season events are somehow less focused on the actual competition; in fact, the opposite is likely true.[83] For both All Star and School Cheer teams, end-of-season competitions are often the focus and goal of an entire season; teams refine their routines all year long with the specific goal of performing at these competitions. The fact that there are additional entertainment options does not minimize the focus and importance of the competition. Prof. Murphy's claims are analogous to claiming college athletes are less interested in competing during the NCAA basketball finals because of all the accompanying pageantry.

Prof. Murphy argues that there is considerable variation in how far All Star and "Scholastic" teams travel to attend regular season competitions and how far they travel for end-of-season competitions.[84] He relies largely on his calculations of the <u>average</u> distance that teams travel, but this is the incorrect measure—as I explain in Section VI.B.1.b) below—and his conclusions based on this misguided metric are unfounded. Not only does his use of the incorrect measure render his travel analyses fatally flawed, but it is also uninformative because there are glaring exceptions to his claims. For example, Prof. Murphy calculates 140 miles as the average distance that teams travel for regular season All Star events and claims this is very different from the average distance travelled for Worlds (981 miles), The Summit (1,008 miles), or The D2 Summit (996 miles).[85] He also calculates the distance travelled for other end-of-season events, such as the U.S. Finals Competitions; the average distance travelled for those competitions ranges from 151 miles (U.S. Finals—Kansas City) to 569 miles (U.S. Finals—Las Vegas). In other words, the average travel distances for some of his end-of-season All Star events are very close to the average travel distance for regular season All Star events (140 miles).

Similar, but less drastic, discrepancies exist in Prof. Murphy's comparison of the average travel distances for regular and end-of-season "Scholastic" competitions. For example, in his Exhibit 21 he reports 102 miles as the average distance travelled for regular season "Scholastic"

---

[82] Many regular season events also took place at theme parks and resorts, such as the D1 and D2 Bid Championships at Gaylord Texan Resort in Grapevine, Texas; the Very Scary Challenge and Rock 'N Roll Hall of Fame National Championship at Kalahari Resort in Sandusky, Ohio; the ULTIMATE Nationals at Gaylord Palms Resort in Sydney, Florida; and the UCA International All Star Championship at Walt Disney World in Orlando, Florida. All of these offered bids to end-of-season events. Varsity All Star, 19 April 2017, 2018 Bids to Brands, VAR00366698.

[83] The travel section of a 2019/2020 "All Start Team Information" packet for the Fusion Elite gym states, "Competitions/events are the first priority of the athletes on Fusion Elite while traveling. Although we compete in fun locations, vacationing and leisure activities cannot conflict with the needs of the team." Fusion Elite All Stars, Undated, 2019-2020 All Star Cheer Team Information, FUSIONELI000000236 - FUSIONELI000000247, at 0241.

[84] Murphy Report, at ¶¶155-156, ¶¶158-161, and Exhibits 20 and 21.

[85] There is a notable error in how Prof. Murphy's calculates the 140-mile average distance travelled for regular season All Star events. Specifically, he drops several regular season events that are sold as a bundle with hotel stays and park passes. Whereas this exclusion may be appropriate for some purposes (e.g., calculating standalone registration fees), it is wholly inappropriate and misleading here. In fact, the regular season events that are sold as a bundle are typically large, marquee events for which teams are likely to travel further than for other regular season events.

Highly Confidential Pursuant to Protective Order

competitions, which he contrasts with end-of-season "Scholastic" competitions for which teams travel, on average, between 195 miles for the USA Junior Nationals to 955 miles for the UCA College Nationals. In his example, there is a difference of 93 miles in the average distance travelled between the USA Junior Nationals (an end-of-season competition) and the average distance travelled for all regular season "Scholastic" competitions (195 − 102 = 93); however, there is a far larger difference in the average distance travelled between his end-of-season "Scholastic" competitions. For example, there is a 753-mile difference between the USA Junior Nationals (195-mile average) and the UCA College Nationals (955-mile average). If, as Prof. Murphy claims, there is a meaningful distinction between the distances travelled for regular and end-of-season All Star competitions, he fails to explain why these exceptions for "Scholastic" competitions are not problematic.

Finally, Prof. Murphy's distinctions between regular and end-of-season events cannot be valid because they are internally inconsistent. For example, he cites the differences in average net revenue per person between regular and end-of-season events as evidence they are in separate markets.[86] First, as explained above, product differentiation can occur in many dimensions—including prices—and it does not necessarily indicate products are in different relevant markets. Regardless, even if examining this metric was appropriate, he makes an unexplained exception for the U.S. Finals: although these are end-of-season All Star Cheer Competitions, the average net revenue (i.e., price) he reports for these events on his Exhibit 12 is drastically lower than all other end-of-season events. In fact, the figures are consistent with prices for regular season events. Similar discrepancies are reported for "Scholastic" cheer events on his Exhibit 13. Furthermore, if price were actually a meaningful distinction between regular season and end-of-season events, Prof. Murphy fails to explain why there is as much variation among prices for both All Star and "Scholastic" end-of-season events. For example, the 2018/2019 price for The Summit is $1,059.17, which is 40% higher than the price for Worlds ($755.17) in the same year. Prof. Murphy also fails to acknowledge that some teams earn "paid" bids, meaning the cost for those teams to attend, for example, the Worlds or The Summit is $0. Similarly, the prices for "Scholastic" end-of-season events vary even more in Prof. Murphy's Exhibit 13.

The inextricable relationship of regular season and end-of-season competitions is succinctly summarized in the following email sent by Jim Thorpe, a Regional General Manager at Varsity, to John Newby, the Executive Vice President of Impact and VIP Branding at Varsity Brands: "if we can figure a way to get Athlete [USASF] Membership widely accepted and endorsed by the customers, then when the USASF decides to put the kabash [sic] on all non USASF end of the year events, the customer base will accept that as well. I do agree with whoever said: whoever controls the end of the season, ultimately has control."[87] Clearly, Varsity does not consider regular season and end-of-season competitions to be in separate markets.

---

[86] "The significant difference in the cost of regular-season competitions and end-of-season events further limits the extent to which they are likely to be viewed as close substitutes." Murphy Report, at ¶154.

[87] Webb. Jeff, 15 February 2011, Email: Fw: USASF Athlete Membership, VAR00350748 - VAR00350752, at 0749.

Highly Confidential Pursuant to Protective Order

c) The other differences in Cheer Competitions cited by Prof. Murphy's
do not necessitate separate product markets

Prof. Murphy identifies additional Cheer Competition product characteristics that vary,
including: the duration of events (e.g., some are 1-day, some are multi-day); the season within
the full competition season (i.e., fall versus spring); and the distance teams travel for various
events.[88] As with the examples discussed in the preceding sections, these are examples of
product differentiation that do not indicate these products are in different relevant markets.
Furthermore, many of the differences that Prof. Murphy asserts are the result of the misleading
analyses he presents; when I correct these analyses, those differences are considerably
minimized if they do not disappear altogether. Below I address each of Prof. Murphy claims.

Prof. Murphy notes that "Varsity 1-day regular-season competitions tend to have significantly
lower registration fees than 2-day regular season competitions."[89] He presents several examples
of different registration fees in his Exhibit 23, nearly all of which show that registration fees for
2-day competitions are very close to twice the registration fee for a 1-day competition. For
example, in 2015/2016 his 1-day registration fee is $47.43, and the 2-day fee is $94.55. A sound
economic analysis would examine the <u>cost-per-day</u> which results in a nearly identical registration
fee for each—his per-day cost for 1-day competitions is $47.43 and his per-day cost for 2-day
competitions is $47.28 (= $94.55/2). The per-day difference is $0.16, which is insignificant.
Similar results are evident in other years as well.[90] Prof. Murphy presents similar calculations for
"Scholastic" competitions. For example, in his Exhibit 23, Prof. Murphy reports in 2016/2017
the 1-day registration fee is $30.42 and the 2-day fee is $58.17; the per-day difference is only
$1.33. Prof. Murphy provides no economic rationale for why one would expect the cost to attend
a 2-day event to be the same as a 1-day event when, for example, the event producer must rent
space, pay judges, and incur other costs that will increase the longer the competition lasts.

It is well established that that differentiated products within the same relevant market can have
different prices.[91] In fact, Prof. Murphy appears to acknowledge this same principle when he
claims that participants are willing to pay more for Varsity events because he claims they are
higher quality.[92] Unless he is arguing that Varsity events are in a distinct product market, his
claims regarding event pricing are misleading and uninformative.

---

[88] "Cheer competitions vary considerably in the number of participants, the event length, cost, and a variety of other
factors." Murphy Report, at ¶166.

[89] Murphy Report, at ¶166.

[90] In 2017/2018 the registration fees for 1- and 2-day competitions are $50.99 and $101.20, respectively; the per-day
costs are $50.99 and $50.60, respectively. The per-day difference is $0.39.

[91] Bottled water, for example, is an example of a differentiated product. The authors of one study wrote, "Results
show that bottled water is highly differentiated and its retail price is mainly affected by extrinsic characteristics."
Carlucci, Domenico, De Gennaro, Bernado, and Roselli, Luigi, 2016, Competitive Strategies of Italian Bottle Water
Industry: Evidence from a Hedonic Analysis, Rivista di Economia Agraria, Anno LXXI, No. 1 (Supplemento).

[92] Murphy Report, at ¶¶294, 313-315, and 323.

Highly Confidential Pursuant to Protective Order

In Section VI.A.1.b) above, I addressed Prof. Murphy's false assertion that regular season and end-of-season events are in different relevant markets, but he recycles the same argument regarding event registration fees regarding these events as well. He claims that "Both 1-day and 2-day competitions have substantially lower registration fees than end-of-season events" and "the average net fees for end-of-season events (other than the U.S. Finals competitions) are several times greater than the average registration fees for regular-season All Star competitions."[93] Prof. Murphy is again relying on false comparisons as well as making unexplained exceptions to his conclusions. First, Prof. Murphy is comparing apples to oranges when he claims, "As can be seen by comparing Exhibits 9 and 12, the average net fees for end-of-season events (other than the U.S. Finals competitions) are several times greater than the average registration fees for regular-season All Star competitions."[94] As he acknowledges, the registration fees for many end-of-season events includes payments for more than just the competition entry (e.g., hotel stays, park passes), so comparing registration fees for regular season events that do not include these additional products with end-of-season events that do is entirely uninformative.[95] The analysis is misleading because Prof. Murphy's Exhibit 12 does, in fact, provide an example of an end-of-season event that is not sold as a bundle with hotel stays and park passes; specifically, The D2 Summit in 2015/2016.[96] The registration fee for the 2015/2016 D2 Summit was $110.94, which is far more comparable to the average spring registration fee ($99.03) he reports in his Exhibit 23 for regular season 2-day events in that same season, which is the closest and best comparison possible.

Although Prof. Murphy spends a considerable amount of effort presenting various measures of registration fees, he never provides any evidence to demonstrate how important registration fees are to team decision making. Whereas registration fees are certainly part of gyms' decision-making process, Varsity documents indicate that registration costs are not a primary determinant of which competitions to attend; they state, for example, "The more bids we [Varsity] give any particular event the higher the price we can command" and "The primary drive of event selection and schedule—which is made by the gym owner—is location, date and bid offering. I would say price is a distant 4th in that process."[97] This evidence suggests Prof. Murphy's focus on registration fees is inconsistent the record evidence.

Prof. Murphy repeats similar arguments with respect to whether the event was held in the "fall" or the "spring". These distinctions are arbitrary and created by Prof. Murphy; he presents no

---

[93] Murphy Report, at ¶¶154 and 166.

[94] Murphy Report, at ¶154.

[95] Murphy Report, at ¶¶152 and 158.

[96] "The 2015/2016 season was the first in which the D2 Summit was held. During this season, the D2 Summit was held at the Tampa Convention Center, rather than at Disney World, as in subsequent seasons. Registration was not packaged with hotels or park passes this first season for the D2 Summit, so Average Net Revenue per Participant and Total Revenue reflect only registration fees, whereas they reflect packages with hotel fees and park pass fees in subsequent seasons." Murphy Report, at Exhibit 12.

[97] 06 June 2018, Onex – All Star Segment: Market Dynamics, VAR00106134 - VAR00106137, at 6134.

Highly Confidential Pursuant to Protective Order

evidence from Varsity or any other industry participants supporting the conclusion that the
USASF, Varsity, IEPs, gyms, teams, or any other industry participants that make any meaningful
distinctions between "fall" and "spring" events. He also provides no explanation for his arbitrary
distinction that, for example, "fall" All Star Cheer Competitions are those that take place
between October and December, and "spring" events take place between January and April.
These distinctions are driven by the fact that Prof. Murphy divides the calendar year into two
periods: January through June and July through December. Events in the first half of the year are
"spring" events, those in the latter half are "fall" events.[98] The All Star Cheer Competition
season runs from October through the following May, culminating in several year-end events,[99]
but I am aware of no intra-season distinctions separating the "fall" from the "spring" events. Like
most sports seasons, there is a progression from the beginning to the end of the season, but there
is no meaningful distinction between these periods as Prof. Murphy asserts. In professional
sports, e.g., hockey, late-season games may attract more attention because of immediate
postseason implications, even though early-season games carry just as much weight for playoff
seeding.[100] Similarly, Cheer teams compete in different events throughout the duration of the
season, but the majority of All Star teams share the common goal of earning a bid to Worlds.
Similarly, School Cheer teams compete throughout the season with the goal of competing in end-
of-season competitions.[101]

Prof. Murphy analyzes some general, and largely meaningless, distinctions between various
phases of a typical season. This is demonstrated in his Exhibit 23, where he shows that both 1-
and 2-day "spring" competitions attract more participants and generally have slightly higher
registration fees than similar competitions in the "fall."[102] For example, during the 2015/2016
season, an average of 214 teams attended "spring" 2-day competitions compared to 152 teams
for "fall" 2-day competitions; "spring" 2-day registration fees were $99.03 and "fall" 2-day
registration fees were $94.55. As I explained previously, products can be differentiated along
many dimensions, including price, and there is nothing in the economic literature suggesting
products are in different relevant markets based on that information nor does Prof. Murphy
present any such support either.

---

[98] Prof. Murphy creates the "spring" or "fall" categories in the programming code he provides in his backup
materials.

[99] Netz Opening Report, at footnote 42.

[100] "Teams are awarded two points for each win [and] one point for each overtime or shootout loss. … [T]he
standings are determined by total points." LiveAbout, 21 July 2018, How to Read the NHL Standings,
https://www.liveabout.com/nhl-standings-explained-2778913, accessed 05 December 2022, at 2-3.

[101] Netz Opening Report, at §III.A.3.

[102] Prof. Murphy presents several different measures of participants, including gyms, teams, L1-4 teams, and L1-5
teams. These measures are redundant and unnecessarily confusing, particularly given that all teams of all levels from
individual gyms typically attend the same competitions.

Highly Confidential Pursuant to Protective Order

Moreover, there is nothing surprising or informative about, for example, Prof. Murphy's conclusion that "Spring competitions tend to have somewhat higher registration fees,"[103] and this fact is entirely consistent with the record evidence, economic theory, and common sense. Specifically, many of the large marquee Cheer Competitions are held towards the end of the regular season. These events tend to attract more and better teams, most of which are "chasing" bids to Worlds or even chasing "paid" bids to Worlds.[104] Varsity readily acknowledges that they can charge more for events with more bids.[105] There is also evidence that Varsity intentionally offers fewer bids at the fall competitions compared to spring competitions to intentionally keep teams chasing bids and attending more events.[106] This evidence is all consistent with testimony from Mr. Elza, the former Co-General Manager and Vice President of Sales at Varsity All Star, who, after agreeing that the All Star Cheer Competition season generally runs from October to May, stated that teams are "…really firing on all cylinders through December, January, February and March. And April is traditionally just your end-of-season events."[107]

Aside from the overall progression of the All Star season that places the large, marquee events towards the end of the regular season when teams have refined their routines, there are obvious and practical reasons why there are more, larger events in Prof. Murphy's "spring" period. For example, there are fewer weekends available during the "fall" period to hold these events due to the greater number of significant holidays they have to work around (e.g., Rosh Hashanah, Yom Kippur, Thanksgiving, Christmas, New Year's). Furthermore, Prof. Murphy's distinction of "fall" events taking place between July and December and "spring" events taking place between January and June places a larger share of the regular season competitions for both All Star and School Cheer in the "spring."[108]

The record evidence suggests Prof. Murphy's distinctions are inconsistent with how teams operate. For example, All Star gyms typically have a set budget for the entire season. Often, these budgets are derived from charging a set annual fee to All Star athletes, which is often paid in monthly installments.[109] The annual fee typically covers all participation expenses, such as coaching and event registration fees. If, for example, a hypothetical monopolist were to increase

---

[103] Murphy Report, at ¶166.

[104] See footnotes 78 and 79.

[105] 06 June 2018, Onex - All Star Segment: Market Dynamics, VAR00253877 - VAR00253881, at 3877.

[106] "We saw our events increase participation through the season because people were bid chasing. As we added more events and teams got bids earlier in the season, we started seeing the drop off. This is because they are not having to chase the bids. If we were to drop the number of bids [early in the season] - we would keep and/or increase the demand again and potentially be able to increase participation again in March and April events again and get the percentage of usage up for The Summit again. Its [sic] simple supply and demand concept." Albee, Damianne, 13 September 2019, Email: RE: Adding Bids in April, VAR00095347 - VAR00095349, at 5347.

[107] Deposition of Brian Elza, 16 November 2021, at 335:20-23.

[108] The All Star regular season generally begins in October and ends in April; the School Cheer regular season generally begins in December and ends in February.

[109] Netz Opening Report, at 34.

Highly Confidential Pursuant to Protective Order

the price of 1-day events, presumably a gym could substitute a single 2-day event for two 1-day events; similarly, if the price for "fall" events increased, gyms could instead attend more "spring" events, including one of the large, marquee events that are held in the spring.[110] This is consistent with the fact that gyms typically charge a set, annual fee and do not earmark any of those funds for specific types of events, such as events in specific locations or regular versus end-of-season events.[111]

The fact that gyms can substitute across the different types of events that Prof. Murphy identifies is consistent with these events being in the same relevant product market. Prof. Murphy presents an analysis of "potential switching" between 1-day and 2- day All Star competitions and between "fall" and "spring" All Star competitions; similarly, he presents an analysis of "potential switching" between 1-day and 2- day "Scholastic" competitions.[112] Despite identifying distinctions between "fall" and "spring" competitions for "Scholastic" competitions, Prof. Murphy does not present a "potential switching" analysis for these competitions. Prof. Murphy demonstrates that All Star gyms and athletes do switch between 1-day and 2-day events and between fall and spring events, and that "Scholastic" teams switch between 1-day and 2-day events. Prof. Murphy seemingly ignores this substitution.

Taken together, Prof. Murphy presents a wide range of possible dimensions over which Cheer Competitions are differentiated. If each of his claims were correct, there would be a plethora of relevant product markets, each extremely narrow and specific. For example, there would be a distinct product market for regular season, 1-day, All Star competitions that take place in the "fall" and a separate product market for regular season, 2-day, All Star competitions that take place in the "fall." Similarly, there would be a distinct product market for regular season, 1-day, All Star competitions that take place in the "fall" and a separate product market for regular season, 1-day, All Star competitions that take place in the "spring." It is notable that Prof. Murphy does not actually define any product markets, but rather merely proposes an abundance of possibilities based on arbitrary delineations that he creates. These distinctions are at odds with economic theory and common sense, and they are unsupported by the record evidence. If anything, Prof. Murphy has merely established there is a spectrum over which Cheer Competitions can be differentiated across multiple dimensions.

---

[110] A Varsity presentation notes large All Star events in February and March which involve travel accommodations beyond registration: "All Star Cheer Large Marquee Regular Season Events (NCA All Star Nationals, CHEERSPORT, UCA)". Varsity Brands, May 2018, Varsity Spirit Divisional Presentation, VAR00009293 - VAR00009366, at 9324.

[111] See, e.g.,

- Prof. Murphy acknowledges that gyms tend to charge a set monthly or annual membership fee that includes coaching, facilities fees, and event registration fees. Murphy Report, at ¶87.

- Prof. Murphy also acknowledges that gyms do not earmark specific funds for regular season events versus end-of-season events. Deposition of Kevin Murphy, 03 November 2022, at 47:9-17.

[112] Murphy Report, at ¶¶170-176, 179 and Exhibits 25-26 and 29.

Case 2:20-cv-02892-SHL-tmp    Document 389-3    Filed 02/10/23    Page 35 of 131
PageID 10706
Highly Confidential Pursuant to Protective Order

Expert Rebuttal Report of Janet S. Netz, Ph.D.                    30 of 91

d) The existence of other event producers is irrelevant to market definition

Prof. Murphy has a subsection in the market definition section of his report titled "Varsity Customers Attend Competitions Held by Event Producers Other than Varsity."[113] First, it is unclear how this section supports his claims that the relevant market for Cheer Competitions is "narrower that plaintiffs allege."[114] Instead, he presents evidence that there are non-Varsity event producers and that Varsity customers attend some competitions hosted by these non-Varsity event producers. These facts are unremarkable and uncontested: I acknowledge the same in my Opening Report,[115] and the commonly used term "IEPs" refers to these exact entities.

Prof. Murphy does introduce an unrelated and misleading claim in this section. Specifically, he writes: "Exhibit 5 shows that a [sic] least 40% of Varsity's gym customers attended no more than three Varsity regular-season competitions in each season from 2015/2016 to 2018/2019. If Plaintiffs' expert's contention that gyms generally attend at least six regular-season competitions each season is correct, then these customers generally must also be attending competitions held by other event producers."[116] First, as I demonstrate below, my claim that "gyms generally attend at least six regular-season competitions each season" is, in fact, correct; this fact is supported both by the record evidence and by Prof. Murphy's own calculations when I correct them. Second, Prof. Murphy's calculations and his related claim that "customers generally must also be attending competitions held by other event producers" are misleading.

In my Opening Report, I explained that by the 2018/2019 season the Varsity Family Plan required that teams attend at least six events per year to qualify, which left very little room for non-Varsity events since teams attend, on average, seven to nine events per year.[117] Prof. Murphy apparently takes no position on the number of events a team attends per year, but

---

[113] This section is a subsection to Prof. Murphy's §IV.F titled "F. The Relevant Antitrust Markets are Narrower than Plaintiffs Allege." Murphy Report, at §IV.F.4.

[114] Murphy Report, at §IV.F.

[115] Netz Opening Report, at 26.

[116] Murphy Report, at ¶164.

Prof. Murphy repeats this misleading claim elsewhere in his report too, including: "If Plaintiffs' expert's claim that All Star gyms generally attend at least six regular-season competitions per season is accurate, it suggests that many gyms may attend multiple non-Varsity events each season as the majority of Varsity gym customers only attend three or fewer Varsity events per season. As shown in Exhibit 5, in each season from 2015/2016 to 2018/2019, less than half of gyms attended four or more regular season competitions. The majority of gyms attending Varsity regular-season events are either attending fewer competitions than Plaintiffs' expert assumes or are attending non-Varsity competitions (or both)." Murphy Report, at ¶92.

[117] Netz Opening Report, at 16 and 106.

Highly Confidential Pursuant to Protective Order

additional Varsity documents[118] and testimony from gym owners and a Varsity general manager[119] confirm the averages and the evidence I presented to support those figures.

The calculations Prof. Murphy presents in his Exhibit 5 underestimate the number of regular season competitions that athletes attend per season, as he fails to account for the number of teams from each gym that register for each event. His calculations misleadingly treat all gyms

---

[118] See, e.g.,

- A February 2018 Bain & Company Varsity Brands Growth Assessment of Varsity Spirit states that All Star Gyms "will compete 7-9 times per year nationally". Sadlow, John, 12 February 2018, Email: CONFIDENTIAL: Review, VAR00304733 - VAR00304778, at 4737.

- A 2015 Varsity All Star presentation describes the "Competition Landscape" of All Star customers: "[bullet] Gyms on average compete 5-8 times a year between October and April. [bullet] Select events in April/May". LeTard, Tres, 20 February 2015, Email: more presentations, VAR00100694 - VAR00100716, at 0698.

- A January 2011 Varsity Information Memorandum states "All-Star cheerleaders train year-round in gyms preparing to compete from October to April in six to seven competitions per year." Prasad, Kiran, 11 August 2014, Email: Attachments: Project Cheer - Redacted CIM (02.16.11).pdf, VAR00424537 - VAR00424610, at 4572.

- A 2014 Varsity Brands Confidential Information Memorandum states "All-Star cheerleaders train year-round in gyms preparing to compete from October to April in six to seven competitions per year." Goldman Sachs Bank USA, Barclays Bank PLC, et al., 20 November 2014, Confidential Information Memorandum, JEFF00049646 - JEFF00049714, at 9698.

- A 2018 Varsity Spirit Divisional Presentation depicts the timeline of an All Star season, with October-May listed as "Competition Season (7-9 events)," including end-of-season events occurring in April-May. Newby, John, 23 May 2018, Email: FW: Project IMPACT | VS Divisional Presentation, VAR00304497 - VAR00304614, at 4531.

[119] See, e.g.,

- Varsity Knoxville General Manager Cole Stott testified on the length of the All Star competition season: "Q. …The All Star competition season is generally October to May; is that correct? A. Correct. Q. During the All Star season, gyms attend a limited number of All Star competitions; is that correct? [Objection omitted] A. Correct. …Q. On average, would you say gyms attend around seven to nine All Star competitions in a season? [Objection omitted] A. Yes." 13 April 2022, Hybrid Videotaped Deposition of Cole Stott, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee), at 169:3-24.

- Joshua Quintero, who owns an All Star gym in Oklahoma and worked as an advisor to Varsity, testified on the length of the All Star competition season: "Q. …And in total, including Varsity competitions and non-Varsity competitions, how many events would you say that a typical All Star gym attends during the course of an All Star season? …A. -- I would say anywhere between six to eight. …Q. And so when you said that All Star gyms typically attend between six and eight events per season, did that include end-of-season championship events? [Objection omitted] A. Usually the end-of-season championships is added on to that. So it would be the -- it would be an extra added event." 29 March 2022, Videotaped Oral Deposition of Joshua O. Quintero, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee), at 139:19-141:21.

Highly Confidential Pursuant to Protective Order

the same, regardless of the number of teams or participants that they register for each event. For example, his calculations treat the following two entities as a single gym:

- FAS Athletics from Houston Texas (Customer.Number = 34370014): in the entire 2016/2017 season they registered only one All Star team of level L1 with only six total participants.

- The Stingray All Stars from Marietta Georgia (Customer.Number = 93441600): the gym has 33 different teams which they registered a total of 113 times in the 2016/2017 season.

Because small gyms tend to compete very few times per season while large gyms tend to compete more times per season and register many teams at each event,[120] Prof. Murphy's calculations yield averages that are misleadingly low. He then uses these calculations to support his claim that "customers generally must also be attending competitions held by other event producers." Examining Prof. Murphy's Exhibit 4 demonstrates the problem with this claim. Specifically, it shows that of the 3,111 gyms listed, 1,204 attended 1-2 competitions; however, despite representing 33% of the gyms listed, these 1,204 gyms combined only represented 2.6% of the total event registrations. Similarly, another 683 gyms attend 2-3 competitions; despite representing 22% of the total gyms listed, they only represented 4.5% of the total registrations. Combined these gyms represent 55% of the total gyms listed, but only 7.1% of total event registrations. When examining the number of registrations, it is evident that over 70% of total registrations are for a minimum of seven regular season competitions based on Prof. Murphy's categories. This evidence contradicts Prof. Murphy's claim customers must also be attending non-Varsity competitions held by other event producers. The difference is that he is treating all

---

[120] See, e.g.,

- Most gyms have multiple teams and some gyms attend as many as fourteen events per year with different teams. A 2019/2020 Varsity spreadsheet indicates that two gyms, "Cheer Extreme – Chicago" and "Cheer Legendz", each attended fourteen events in that season. Varsity, 2020, VFP Estimates and VFP Summary, VAR00005294, at tab "VFP Summary."

- The data Prof. Murphy used also includes gyms that are not primarily focused on All Star, but rather are focused on dance and youth groups, which he retains in his calculations. The decision is not necessarily incorrect, but giving these types of gyms, which are far less likely that All Star-focused gyms to attend Competitive Cheer Competitions, equal weight in his calculations biases his averages downward. The USASF publication "Cheer Parents 101 Everything You Wanted to Know as a Parent of an All Star Cheerleader" illustrates these points: "Pop Warner and BGYF (Bill George Youth Football) are also cheerleading programs like All Star. Cheerleaders in these programs are taught the basics of cheer and compete only occasionally against other recreation teams with the same program. Often the more talented cheerleaders in the programs 'graduate' to All Star in search of a more challenging cheer environment that focuses more in their skills and accomplishments rather than the standing of their relative football teams. Most All Star Cheerleading teams are affiliated with a local gym. These gyms may also house gymnastics, dance, or other related sports. In addition they may have one location or multiple locations across several states. Likewise the number of cheerleaders at each gym can be as little as 25 to over 800." Parent Action Committee, Undated, Cheer Parents 101: Everything you wanted to know as a Parent of an All Star Cheerleader, U.S. All Star Federation, https://www.yumpu.com/en/document/read/27245738/usasf-cheer-parents-101, accessed 29 November 2022, at 3.

Highly Confidential Pursuant to Protective Order

gyms the same—regardless of the size or the number of teams and participants at each gym. The correct approach for this purpose would be to examine the number of registrations, which is indicative of the number of participants.

Focusing on registrations or participants is consistent with how Varsity perceives its customers as well. Varsity does not view all gyms as identical; instead, Varsity cares about the number of teams and participants that attend an event, not the unique number of gyms that attend. This rationale underscores why Prof. Murphy's approach is misleading and inconsistent with how industry participants, including Varsity, calculate the same figures. Varsity recognizes the relative importance of large gyms, as evidenced by the fact they repeatedly identify the largest gyms in terms of total spending. A Varsity presentation by Bill Seeley shows that the "Top 5% of Gyms (130) [account for] 40% of Total Spend" and the "Top 20% of Gyms (520) [account for] 75% of total spend." The presentation also states that the "All Star market is more concentrated than the school market with large and mega-gym customers making up a large slice of revenue."[121] Prof. Murphy's calculations obscure the importance of these large, mega-gym customers and provide misleading results. The opinions I presented in my Opening Report regarding the number of events teams attend are consistent with the record evidence, including materials produced by Varsity.

Prof. Murphy also cites the fact that Varsity customers attend competitions hosted by other event producers to support his claim the market for Cheer Competitions is narrower than I argue. In his Exhibit 10, Prof. Murphy lists 48 non-Varsity event producers that he claims collectively hosted 350 USASF sanctioned competitions in 2018/2019. Prof. Murphy's figures again contradict evidence provided by Varsity. In my Opening Report I explained that there are many IEPs identified by Varsity as competitors, but that as of 2016 they collectively represented a small share of total event revenue based on Varsity data.[122] Examining the underlying data demonstrates that the figures presented in his Exhibit 10 are the result of inconsistent, careless, and misleading analyses. Specifically, many of the events he counts are not, in fact, All Star Cheer Competitions. The source data relied upon by Prof. Murphy do not identify which events are and are not Competitive Cheer Competitions; instead, the data only include general event information such as event name, producer, location, and date. Even with the information that is available, Prof. Murphy fails to make a reasonable attempt to exclude non-All Star competitions. For example, many events were held at middle or high schools, which are unlikely to meet the space and technical requirements necessary to host an All Star Cheer event and, as such, are indicative of dance events.[123] An example of this error includes the Indy Cheer and Dance

---

[121] Seely, Bill, May 2017, Seely President Presentation, Varsity Spirit, VAR00009167 - VAR00009185, at 9185.

[122] Netz Opening Report, at 27.

[123] Competitive Cheer Competitions typically require venues with significant space and accommodating building designs for athletes to perform: "Because cheerleading competitions have to have high ceilings; they have to have spaces for huge floors that don't have beams. Most architect – architectural buildings don't have 54-foot beams, beam standards when the – when it's built. So that takes a lot of buildings and a lot of opportunities and a lot of spaces out of play when you're talking about a cheerleading competition. You also have to have a ceiling that's like

Highly Confidential Pursuant to Protective Order

Challenge produced by Champions Cup Series/XDX and held on November 4, 2018, in the Franklin Community Middle School.[124] Prof. Murphy acknowledges that filtering dance competitions is important for other analyses but fails to do so here. Specifically, in his backup materials underlying his Exhibit 9, which reports "Characteristics of Regular-Season Varsity Competitions," he explicitly excludes Varsity competitions that only offer dance components, but he makes no such effort for Exhibit 10.[125] Prof. Murphy provides no explanation for this inconsistency. As a result, his Exhibit 10 is overinclusive and includes Varsity events that were appropriately excluded from his Exhibit 9.[126] Prof. Murphy overstates the competitions produced by non-Varsity event producers by using data without the necessary information to adequately determine which events offer All Star components. This fact, combined with the different approach Prof. Murphy takes in his Exhibit 9, undermines any meaningful conclusions based on his Exhibit 10.

  e)  Prof. Murphy's argument that markets are narrower than I claim is counterintuitive

Prof. Murphy argues that the product markets I define are too broad. For example, regarding Cheer Competitions he claims that the markets should be narrower, arguing there should at least be separate product markets for All Star and "Scholastic Cheer," each further separated based on whether or not the competition is held during the regular season or at the end of the season. As Prof. Murphy recognizes, the correct implementation of the hypothetical monopolist test begins with narrowly defined candidate markets and expands the market until the point where a hypothetical monopolist over all products in the candidate market could profitably raise price above the competitive level.[127] This test is iterative and expands from the smallest possible

---

40-foot high because the kids get thrown over 25-30 feet sometimes." 03 March 2022, Videotaped Oral Deposition of Jamie J. Parrish, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-cgc (In the United States District Court for the Western District of Tennessee) (Hereinafter "Deposition of Jamie J. Parrish, 03 March 2022"), at 123:21-124:7.

[124] See row 34 in the file USASF_00008564 provided with Prof. Murphy's backup materials for this analysis. Undated, 18-19Events.xlsx, USASF_00008564.

[125] See Murphy backup file "ex_pt_1" at line 29, which excludes all dance registrations and therefore removes events that only contain dance components.

[126] For example, the USA Rocky Mountain Classic is a Varsity event that was held on November 3, 2018. This event was filtered out in lines 28-30 in ex_pt_1 and listed in row 28 in USASF_00008564. Undated, 18-19Events.xlsx, USASF_00008564.

[127] Specifically, the relevant market is defined as the smallest set of products a hypothetical monopolist would need to sell to be able to profitably increase price above the competitive level by a small but significant and non-transitory amount, generally 5-10% for a year or longer. U.S. Department of Justice and the Federal Trade Commission, 19 August 2010, Horizontal Merger Guidelines (Hereinafter "2010 Horizontal Merger Guidelines"), at 8-12.

Highly Confidential Pursuant to Protective Order

product market—the implicit concern is that beginning with a market that is too broad risks understating the market power of the firm in question.[128]

To the extent Prof. Murphy is correct that the relevant product markets are defined too broadly, the results I present are conservative. That is, to the extent my relevant product market includes products that it should not, I am understating Varsity's market power and the competitive effects of its conduct. Testing this proposition is simple. Prof. Murphy's claims that All Star and School Cheer are in separate product markets. I estimate that Varsity had a market share of 75% in 2016 and between 80-85% by 2018 in the Cheer Competitions market which includes both All Star and School Cheer teams.[129] However, if Prof. Murphy is correct and School Cheer Competitions are, in fact, in a separate relevant product market, then Varsity's market share increases because, according to Varsity documents, Varsity controls all of the School Competitive Cheer Competitions; see footnote 68.

The purpose of defining relevant markets is instrumental, and the ultimate goal is to determine whether Varsity has sufficient market power to set supracompetitive prices for the at-issue products, reduce output, reduce innovation, reduce choice, or otherwise harm consumers. To the extent the relevant markets I define are too broad, the results are conservative and understate Varsity's actual market power and the competitive effects flowing from its conduct.

## 2. Cheer Apparel

Prof. Murphy argues that the various types of Cheer Apparel are not in the same relevant market.[130] To support this claim, he relies largely on the alternate record that he creates, relying blindly on the data despite the inconsistencies I describe below.

In my Opening Report I describe the set of apparel products typically purchased by All Star and School Cheer athletes, including uniforms, shoes, accessories, warm-ups, and camp wear.[131] I explained the following: why other products, such as gymnastics apparel, are not reasonable substitutes; Competitive Cheer rules dictate what apparel can be worn;[132] and uniforms are often highly customized and teams like to have other apparel match and complement their uniforms.

Prof. Murphy claims the relevant product market must be narrower, but his criticisms largely rely on his flawed data analysis. As explained above in Section IV, Prof. Murphy's Exhibits 17, 18,

---

[128] "Defining a market broadly to include relatively distant product or geographic substitutes can lead to misleading market shares. This is because the competitive significance of distant substitutes is unlikely to be commensurate with their shares in a broad market. Although excluding more distant substitutes from the market inevitably understates their competitive significance to some degree, doing so often provides a more accurate indicator of the competitive effects of the merger than would the alternative of including them and overstating their competitive significance as proportional to their shares in an expanded market." 2010 Horizontal Merger Guidelines, at 7.

[129] The figures apply to my definition of School Cheer, which includes Competitive Cheer teams affiliated with schools.

[130] Murphy Report, at §IV.F.10.

[131] Netz Opening Report, at 55-56.

[132] The rules for All Star Cheer are more specific than for School Cheer. See Netz Opening Report, at 28-29.

Highly Confidential Pursuant to Protective Order

and 19 include purchases by over 13,000 youth and other non-All Star teams in his analyses.[133] As a result, his conclusions regarding gyms are misleading and not representative of the All Star gyms in which we are interested; rather, the analysis in his exhibits is more representative of the teams in which we are not interested. As evidence of the questionable nature of these data, Prof. Murphy reports that 18.6% of "Gyms with L5-L7 Teams" purchase "campwear" in his Exhibit 19; however, Prof. Murphy asserts that that "Camps are almost exclusively attended by scholastic (as opposed to All Star) teams."[134] Prof. Murphy provides no explanation why 18.6% of All Star teams purchase campwear, despite not attending Cheer Camps. Regardless of these flaws, in his Exhibit 19, Prof. Murphy reports that 80.0% of All Star "Gyms with L5-L7 Teams" purchase some apparel from Varsity and that 60.6% of these same teams purchase uniforms. Given that Prof. Murphy's data include many other teams that are less likely to purchase Varsity uniforms, these are lower bounds of the apparel purchases from these gyms.[135]

Similarly, and as explained above in Section IV, Prof. Murphy includes the incorrect entities in his definition of "Scholastic" teams. Specifically, he includes any school-related entity that purchased any apparel product from Varsity; this decision includes many school-related entities such as traditional sideline cheer in his Exhibits 17, 18, and 19. As a result, many of the apparel purchasing patterns he examines are not representative of the Competitive Cheer teams affiliated with schools in which we are interested. This is demonstrated by examining his Exhibit 17, which reports that over $80 million of the total $140.5 million in "Scholastic" apparel purchases were from school-related entities "Not Attending Varsity Competitions." In other words, 57% of his observations examine the wrong type of school-related entities. The only group in his exhibit that is relevant is the "Schools Attending Varsity Competition" category, which shows that 77.5% of all these teams purchase something from Varsity, 70.9% purchase uniforms, and 69.1% purchase accessories from Varsity.

Prof. Murphy acknowledges the fact that many of the entities in his data that also attend competitions do not purchase any apparel from Varsity,[136] but he fails to understand its implications. For example, his data include registrations for Varsity events that are not for the categories of Competitive Cheer in which we are interested. Specifically, youth group participants are not part of the proposed class and, because they are youth groups and are

---

[133] In Prof. Murphy's Exhibit 17, he excludes "products in the dance category", yet for his Exhibits 18 and 19 he includes gyms that primarily identify as "Dance" or "Youth Group" as long as they entered at least one L1-L7 team at a Varsity competition. As a result, he includes all purchases from an entire dance gym which may have many dance teams as long as they have a single team that entered into an All Star event at the L1 level. He provides no explanation for this discrepancy between exhibits or why including purchased by these dance teams is appropriate.

[134] Murphy Report, at ¶132.

[135] Prof. Murphy's category is "Gyms with L5-L7 Teams" which likely include many other levels and types of teams as well.

[136] "As shown in the exhibit [Exhibit 19], for each apparel category, there is a material portion of Varsity's All Star and scholastic competition customers (i.e., gyms or schools that attended at least one Varsity competition during the period) that did not purchase apparel in that category at any point during the 2015/2016 to 2018/2019 period." Murphy Report, at ¶142.

Case 2:20-cv-02892-SHL-tmp    Document 389-3    Filed 02/10/23    Page 42 of 131
PageID 10713
Highly Confidential Pursuant to Protective Order

Expert Rebuttal Report of Janet S. Netz, Ph.D.                    37 of 91

generally less invested in cheer than, say, the top tiers of All Star teams, they are less likely to purchase apparel than participants in the proposed class.[137] Thus, the fact that these entities do not purchase any apparel at all is not surprising. For the same reason, drawing any conclusions regarding the All Star teams of interest based on these youth group participants is uninformative.

### 3. Cheer Camps

Prof. Murphy identifies various characteristics of Cheer Camps while establishing his alternative record, but again he ultimately fails to define any relevant product markets and merely claims "There is Significant Differentiation among Cheer Camps."[138] Prof. Murphy has simply provided examples of product differentiation, but differentiated products can be in the same product market, as I have already established.

As an initial matter, camps are attended almost exclusively by School Cheer teams, not All Star teams.[139] As explained earlier, Prof. Murphy's definition of "Scholastic" teams is problematic because it contains traditional, sideline cheer teams. Prof. Murphy acknowledges that only 10,330 of his 16,486 "Scholastic" teams participate in camps and only 3,269 of those "Scholastic" teams participate in competitions.[140] Prof. Murphy's analysis of the characteristics of camps examines all 10,330 teams that participated in camps, but 7,061 of those teams are not Competitive Cheer teams; they are traditional sideline teams or some other teams that both attended some type of Varsity camp and purchased Varsity apparel. Prof. Murphy could have removed at least some of these camps from his data based on which entity produced the camp, but he did not.[141] As a result, any conclusions he draws from these data are not representative of the camps and teams in which we are interested—the 3,269 Competitive Cheer teams that participated in competitions and also attended camps.

Prof. Murphy argues that the many ways in which he claims Cheer Camps are differentiated (e.g., some last one day, while others are longer; some are held at resorts, while some are held at hotels) suggests they are not all in the same relevant product market.[142] However, the fact that some Cheer Camps cost more—because they last, for example, one day versus multiple days, or that the camp registration fee also includes ancillary products such as hotel stays or resort access—does not indicate the products are in different markets. Prof. Murphy repeats the same arguments he presented regarding Cheer Competitions and the same rationale I present above

---

[137] Youth groups often consist of very young children and athletes just starting cheer. They are less likely to have, for example, fancy matching/custom uniforms, matching shoes, accessories, etc.

[138] Murphy Report, at §IV.F.7.

[139] See Section II.I.

[140] Murphy Report, at Exhibit 7.

[141] As discussed in Section IV52, these data contain camp brand codes making it simple to identify and remove camps produced by entities such as the National Dance Alliance and Universal Dance Association that produce dance, not Competitive Cheer, camps.

[142] Murphy Report, at §IV.2.E.

Highly Confidential Pursuant to Protective Order

explaining why these distinctions are not informative applies here as well: differentiated products can be within the same relevant market and can have different prices.

Notably missing from Prof. Murphy's many distinctions among Cheer Camps is the actual curriculum for the camps. For example, the National Cheer Association (NCA) and National Dance Association (NDA) standardized the basic structure for some one-day camps. According to former NCA and NDA General Manager Buffy Duhon, the "host" schools for day camps would provide the facility for the teams in the area attending the camp, while the NCA or NDA would provide "the instructional staff, the curriculum, and all of the supplies."[143] Further, a 2016 NCA pamphlet for one-day stunt clinics indicates that they were run according to "NCA's creative stunt curriculum," while the more specialized "Ultimate/Innovative Speed Stunt Clinic" was also "taught by the NCA Speed staff."[144]

Similarly, all camps lasting two days or longer appear to provide the same basic instruction centered around a program called Squad Credentialing. Squad Credentialing is a program that Varsity and NFHS created to ensure that cheerleaders and coaches understand the role of the cheerleader and the importance of safety. Documents indicate that the same Squad Credentialing program is conducted at the majority of Varsity's camps.[145] The program emphasizes five "key pillars to a successful school spirit program," which included crowd leading, spirit raising, ambassadorship, athleticism, and entertainment.[146] Squad Credentialing was added as a requirement to participate in the UCA National Championships in 2017 and the NCA National Championships in 2018 and is required for junior and senior high school students only.[147] In effect, Squad Credentialing dictated the curricula for all multi-day camps. One Varsity document contained schedules for each variety of multi-day camp, as well as a "credentialing grid," which listed the five pillars referenced above and the different camp activities relating to each pillar. For example, under the "Entertainer" heading, the credentialing grid lists "Spirit Dance,"

---

[143] From Ms. Duhon's testimony: "The host provides the facility, and NCA or NDA would provide the instructional staff, the curriculum, and all of the supplies." 25 March 2022, Videotaped Oral Deposition of Buffy Duhon, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-TMP (In the United States District Court for the Western District of Tennessee), at 66:4-6.

[144] National Cheerleaders Association, 2016, 2016 NCA One Day Clinics, VAR00499445.

[145] United Spirit Association, 13 November 2019, Q&A: Varsity Spirit/NFHS Squad Credentialing Program, https://www.varsity.com/usa/wp-content/uploads/2020/07/NFHS.USA_.FAQ_.2021.02.pdf, accessed 06 December 2022.

[146] Varsity Senior Vice President and General Manager Buffy Duhon wrote to gym owners about the Squad Credentialing program: "This program will once again be offered at all two day or longer Varsity Spirit camps and will focus on two areas: the importance of SAFETY and the FIVE KEY PILLARS to a successful school spirit program that include: 1. Crowd Leading 2. Spirit Raising 3. Ambassadorship 4. Athleticism 5. Entertainment." Duhon, Buffy, 2017, 2017 NFHS Squad Credentialing, VAR00160801, at 0801.

[147] Squad Credentialing was a requirement for participation in national championships: "Because this is so important to us, the Squad Credentialing program will be a requirement for participation in the following competitions: • NCA Junior & Senior High School National Championship in January 2018 • National High School Cheerleading Championship (NHSCC) with UCA - requirement began in 2017." Seely, Bill, 2017, Credentialing Letter to Employees 2017-Final, VAR00160802, at 0802.

Highly Confidential Pursuant to Protective Order

"Specialty Classes," and "Evaluations," all three of which are activities included in the different camp schedules below the grid.[148] Varsity states the same Squad Credentialing program is available at all overnight camps, resort camps, home camps, choreography camps, and day camps that are at least two days long.[149] This evidence directly contradicts Prof. Murphy's claims that there is significant differentiation among Cheer Camps according to where the camp is located.

I do not dispute that Cheer Camps differ, including in the length of the camps, the location of camps, and the number of camp attendees. However, none of these distinctions change my original conclusion that Cheer Camps constitute a relevant antitrust market.

### B. The relevant geographic markets are not narrower than described in my Opening Report

In my Opening Report I conclude that the geographic boundary of each market is no larger than the entire U.S. Varsity's market share is dominant not only nationally for these products, but also dominant regionally.[150] Prof. Murphy claims that geographic boundaries are narrower than the U.S. After reviewing Prof. Murphy's critiques, my conclusions are unchanged. I conclude that Prof. Murphy's conclusions are unsupported by and inconsistent with the record evidence, including materials provided by Varsity. In the sections that follow, I address Prof. Murphy's claims regarding each of the relevant geographic markets and explain why those claims are misleading, misguided, or both. I also present additional record evidence consistent with my conclusions that the relevant geographic boundary of each market is no larger than the U.S.

### 1. Cheer Competitions

Below I address Prof. Murphy's claims regarding the relevant geographic markets for Cheer Competitions. Prof. Murphy addresses All Star and "Scholastic" Cheer Competitions separately; because his arguments are essentially the same, I respond to both together below to avoid redundancy.

Defining antitrust markets primarily focuses on demand substitution, with the goal of identifying the set of products and locations between which buyers can reasonably substitute when faced with a price increase. The relevant geographic market is the geographic area in which a hypothetical monopolist could profitably raise price by 5-10% without customers buying from suppliers outside that area. As I explained in my Opening Report and discuss further in Section VI.B.1.b) below, the evidence shows that teams can and do substitute between events in different geographies throughout the entire U.S. For example, if a team is located equidistant between events in two different locations, there is nothing precluding the team from attending either or both of those competitions. For example, during the 2017/2018 season the gym World Class

---

[148] National Cheerleaders Association, 2018, NCA Spirit Book, VAR00073393 - VAR00073456, at 3395-3399.

[149] United Spirit Association, 13 November 2019, Q&A: Varsity Spirit/NFHS Squad Credentialing Program, https://www.varsity.com/usa/wp-content/uploads/2020/07/NFHS.USA_.FAQ_.2021.02.pdf, accessed 06 December 2022.

[150] Netz Opening Report, at 43-45, 56, and 60-61.

Highly Confidential Pursuant to Protective Order

Athletics (located in Panama City Beach, Florida; Varsity Customer Number 27720005) attended the "Battle Under the Big Top" event in Atlanta that was 251.1 miles away and also attended the "MG Extravaganza National" in New Orleans that was 253.0 miles away. In that same season, there were twelve other All Star events that were within 253 miles of their location.

If a hypothetical monopolist in one part of the country were to raise price by 5-10%, at least some customers would likely switch to attending competitions in adjacent geographic areas. This fact is consistent with the record evidence discussed in Section VI.B.1.a) below. I based my conclusion that the relevant geographic market is no larger than the entire U.S. on this type of evidence that implicitly examines narrower alternatives.

### a) The record evidence establishes the market is national

In my Opening Report I presented evidence that Varsity and other industry participants recognized the market for Cheer Competitions to be national.[151] This evidence includes contemporaneous business documents clearly stating that the geographic area over which they compete is the entire U.S.: "The parties specifically agree that this geographic area [the entire U.S.] is consistent with the area currently potentially serviced by Seller and the Business."[152] In spite of the evidence presented by these documents, Prof. Murphy claims these very same "acquired event producers had geographic areas of focus (e.g., Aloha on the West Coast, Spirit

---

[151] Netz Opening Report, at 44-45.

[152] See, e.g.,

- Varsity-produced business documents between Varsity and independent event producers they acquired specifically show that the entire United States is the geographic area over which they compete. Varsity Spirit, LLC, Aloha Spirit Productions, LLC, 15 December 2016, Purchase Agreement for Sale of Business Assets [signed], VAR00362133 - VAR00362241, at 2137.

- Additional examples involving Varsity and Jam Spirit Group (DBA Team Champion), ATC, Mardi Gras, and EPIC Brands are:

  o Jam Spirit Group (DBA Team Champion): "The parties specifically agree that this geographic area is consistent with the area currently potentially serviced by Seller and the Business." Varsity Spirit, LLC, and Jam Spirit Group, Inc., 15 November 2017, Purchase Agreement for Sale of Business Assets [signed], BAIN00147958 – BAIN0047995, at 7965.

  o ATC: "The parties specifically agree that this geographic area is consistent with the area currently potentially serviced by Sellers and the Business." Varsity Spirit, LLC, and ATC Skillz Camps, LLC, 21 April 2017, Purchase Agreement for Sale of Business Assets [signed], BAIN00147996 – BAIN00148021, at 8004.

  o Mardi Gras: "The parties specifically agree that this geographic area is consistent with the area currently potentially serviced by Sellers and the Business." Varsity Spirit, LLC, and Mardi Gras Nationals, Inc., 01 December 2017, Purchase Agreement for Sale of Business Assets [signed], BAIN00148097 – BAIN00148121, at 8104-8105.

  o EPIC Brands: "The parties specifically agree that this geographic area is consistent with the area currently potentially serviced by Sellers and the Business." Varsity Spirit, LLC, and Epic Spirit Ventures, Inc., 19 January 2018, Purchase Agreement of Sale of Business Assets [signed], VAR00453158 – VAR00453203, at 3175-3176.

Highly Confidential Pursuant to Protective Order

Celebration primarily in Texas)."[153] Put another way, using Prof. Murphy's understanding, The Summit has a "geographic area of focus" of Orlando, Florida despite the fact it attracts participants from the entire country.

I also explained that most teams compete with the intention of attending a national, year-end event; to qualify for these year-end events, Cheer Competitions throughout the entire season are administered on a national level, by the same governing bodies, using the same rules and bid allocation system; there is no distinction between competitions in different geographic regions; and there are no restrictions on competing outside of any regions.[154]

The evidence I presented previously is consistent with additional evidence I have gathered, including the fact that Varsity considers itself to be "national in scope" according to Mr. Elza, the former Co-General Manager and Vice President of Sales at Varsity All Star.[155] Referring to both All Star and School Cheer, Varsity documents indicate that "Varsity hosts over 300 regional and national annual competitions" and that Varsity's direct sales force has "a presence in all 50 states."[156]

Similarly, the record evidence establishes that teams travel throughout the country to attend Cheer Competitions. Testimony from Varsity founder Jeff Webb and USASF Vice President of Events and Corporate Alliances Steve Peterson establishes that All Star teams travel to compete throughout the entire U.S.[157] Several Varsity employees testified that this is true for end-of-

---

[153] Murphy Report, at ¶202.

[154] Netz Opening Report, at 44.

[155] "Is it fair to say that some of Varsity's competitors at the time had kind of a regional presence and some had a more national presence? Is that right? A. Yes. Q. So JAM Brands, for instance, had a national presence; is that right? A. Yes. Q. Varsity had a national presence; is that right? A. Yes. Q. Did any other event producer, All Star event producer at this time have a national presence? A. No. Q. So Varsity purchased its only other national presence competitor; is that right? [Objection Omitted] A. Yes." Deposition of Brian Elza, 16 November 2021, at 72:3-21.

[156] Varsity Brands, March 2011, Management Presentation, JEFF00047202 - JEFF00047266, at 7229 and 7241.

[157] See, e.g.,

- "Q. And to your knowledge, are the All Star gyms located around the country? A. Yes, sir. Q. And I just want to make sure I understand this. So All Star teams compete against other All Star teams at All Star competitions around the country, correct? [Objection omitted] A. Yeah." 09 March 2022, Videotaped Oral 30(b)(6) Deposition of U.S. All Star Federation (Steve H. Peterson), Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee) (Hereinafter "Deposition of USASF (Steve H. Peterson), 09 March 2022"), at 33:18-34:2.

- "Q. Varsity puts on some events that attract teams from all across the country, correct? A. Yes." 12 May 2022, Hybrid Videotaped Deposition of Jeff Webb, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee), at 95:13-16.

Highly Confidential Pursuant to Protective Order

season All Star competitions[158] as well as for regular season All Star competitions.[159] Documents produced by Varsity and deposition testimony from Varsity employees demonstrate that School Cheer teams also travel throughout the country.[160]

---

[158] See, e.g.,

- "Q. And is it also fair to say that at the end of the annual All Star season, teams that qualify will compete against other All Star teams around the country at certain post-season events; is that right? … A. Yes. Oh. Yes. Q. Let me ...rephrase it. Teams from around the country will compete against each other at certain centrally located end-of-year Championship events; is that right? ... A. Yes, that's correct." Deposition of Brian Elza, 16 November 2021, at 92:13-93:1.

- "Q. And at the end of the All Star season, qualifying teams will compete against other All Star teams from around the nation at certain postseason events; is that fair? A. Yes." Deposition of Francis Xavier LeTard, III, 22 November 2021, at 85:6-10

- "Q. So the Worlds is held in Florida; is that right? A. Yes. Q. And teams travel from all over the country to go to Worlds; is that right? A. Yes. Q. And The Summit is also held in Florida; is that right? A. Yes. Q. And teams travel from all over the country to go to The Summit, correct? A. Yes." Deposition of Francis Xavier LeTard, III, 22 November 2021, at 115:15-116:1.

- "Q. And then at the end of an All Star season, typically in April and May, qualifying teams will compete against other All Star teams from around the nation at certain postseason events. Is that fair? A. Yes." Deposition of Francis Xavier LeTard, III, 22 November 2021, at 145:14-20

- "Q. There are certain post-season championship events at the end of each All Star season that teams from around the country compete against each other at; is that right? A. Yes, sir." 13 April 2022, Videotaped Videoconference 30(b)(6) Deposition of Defendants Varsity Brands, LLC, Varsity Spirit, LLC, and Varsity Spirit Fashion & Supplies, LLC, By: William Hopping Seely IV and 30(b)(1) Deposition of William Hopping Seely IV, Volume I, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee) (Hereinafter "Deposition of Varsity (William Hopping Seely IV), Volume I, 13 April 2022"), at 232:14-18.

- "Q. All right. We talked a little bit about Worlds. That's a national event that the USASF holds at Disney World each year; is that right? A. Yes, sir. Q. And it draws teams from all around the country; is that correct? A. Actually, around the world. Q. Fair enough. And another year end championship event, The Summit; is that right? A. That's a Varsity end-of-season event. Yes, sir. Q. And that's owned and run by Varsity, The Summit; is that right? A. Yes, sir. Q. And it's a national event at Disney World; is that right? A. Yes, sir. Q. And it draws from All Star gyms around the country and the world; is that right? A. Yes, sir." Deposition of Varsity (William Hopping Seely IV), Volume I, 13 April 2022, at 233:12-234:7.

- "Q. Okay. And All Star teams travel from across the United States and the world to compete at The Summit; right? A. Yes, sir." Deposition of Varsity (William Hopping Seely IV), Volume I, 13 April 2022, at 245:21-24.

[159] See, e.g.,

- Mr. Elza testified that many of the seven to nine events a team attends per year "would be regional in their state or close by, followed up with a few out-of-state events." Deposition of Brian Elza, 16 November 2021, at 108:1-19.

- Mr. Elza testified that teams travel nationally for both regular and end-of-season events: "Q. And your point is some of those events will be regional and some of those events they'll travel for, and they'll be out

Highly Confidential Pursuant to Protective Order

of state; is that fair? A. Yes. Q. For example, the national championship is in Florida, so if you're in California, you have to travel across the country to get there, right? A. If you choose to go to that event, yes. Q. If you choose to go to Worlds, for example, you have to travel to Florida, right? A. Yes. Q. And a lot of teams do that, right? A. Correct. Q. And some teams even travel outside of their region for non year-end Championship events, correct? ... A. Yes." Deposition of Brian Elza, 16 November 2021, at 108:1-12

- "Q. Some gyms travel across the country from various different - across states to go to events. I mean, Indianapolis and Atlantic City are pretty far apart, correct? … A. That's correct. Q. And so if you moved an event from Indianapolis to Atlantic City, you could still attract at least some of the same customers; is that fair? ... A. Yes. That – that's our sales strategy across the board." Deposition of Brian Elza, 16 November 2021, at 305:12-24.

- "Q. And some All Star events produced by Varsity or even other event producers attract All Star gyms and participants from around the country; is that right? A. Yes. That's correct. Q. And some All Star teams sometimes travel great distances to attend All Star events; is that fair? A. That's fair. Sometimes. Q. They might go from California to Walt Disney World to attend an All Star event, right? A. That is a possibility, yes. Q. In fact, many teams do that every year, correct? A. Yes. Some teams do that every year. Q. And All Star teams travel both regionally and nationally to All Star events during a typical All Star event season, correct? ... A. Very generally, I think it depends. Some All Star gyms prefer to stay closer to home due to travel expenses. Q. But some travel regionally, and then some travel long distances, correct? A. Some do both." Deposition of Varsity (John Newby), 23 March 2022, at 91:18-92:25.

- "Q. And it's fair to say that some All Star teams and gyms travel a great distance across the country to attend All Star events; is that fair? A. Yes." Deposition of Francis Xavier LeTard, III, 22 November 2021, at 84:24-85:2.

- "Q. So separate and apart from gyms traveling to Florida for the Worlds or The Summit, gyms would go to one to two events a year outside of their region; is that fair? A. Yes." Deposition of Francis Xavier LeTard, III, 22 November 2021, at 126:11-15.

- "Q. You would agree that Varsity organizes and produces All Star competitions throughout the United States; right? A. Yes, sir. Q. And you would also agree that some All Star events produced by Varsity or other event producers attract All Star gyms from all over the United States; correct? …A. Around – there's teams that come from around the world to the events. Q. From around the world? And around the country; is that right? A. And around the country, yes, sir, including the United States. Q. You would agree that All Star teams sometimes travel great distances to attend All Star events; correct? A. Yes, sir. Q. And All Star teams both travel regionally to attend All Star events and nationally to attend All Star events; correct? A. And internationally. Yes, sir." Deposition of Varsity (William Hopping Seely IV), Volume I, 13 April 2022, at 54:4-55:3.

[160] See, e.g.,

- Nicole Lauchaire, current Senior Vice President of Corporate Marketing and Alliances at Varsity Spirit, testified that she authored a document describing the significance of the 2:30 minute routine national championships to School Cheer athletes: "Q. And the last bullet there, the fifth bullet, says this: 'The practice of preparation. Most teams practice for eight months just once for 2:30.' 2, colon, 30. Do you see that? A. Yes. Q. What does that line mean? A. That's referencing school cheerleaders who may compete once at a national championship, and they spend the majority of the year practicing for that one moment." 09 December 2021, Videotaped Deposition of Nicole Lauchaire, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee), at 72:23-73:10.

The fact that Varsity moved events from one location to another while retaining many of the same customers further supports the conclusion that the relevant geographic market is national. Mr. Elza, the former Co-General Manager and Vice President of Sales at Varsity All Star, testified that Varsity could not only move events large distances while still attracting many of the same customers, but he also stated this practice was consistent with Varsity's "sales strategy across the board." Mr. Elza provided an example of an event Varsity moved from Atlantic City to Indianapolis—a change of about 700 miles—that still retained many of the same teams. Mr. Elza testified that Varsity was able to do this because competitions located far apart were competing for the same customers: "We had an Atlantic City event that was always on MLK weekend. While that seems a long distance from Indianapolis, it was still competing for the same customer base. So we moved that event to a couple weekends earlier [in Indianapolis]."[161] The fact that Varsity can move an event roughly 700 miles yet attract the same participants directly contradicts Prof. Murphy's claim that the geographic market for Cheer Competitions are "typically local or regional."[162]

Varsity documents provide similarly compelling evidence that All Star customers view events that are far apart as substitutes. Specifically, Varsity documents state that "Aloha currently operates the Cali Finale which competes against our end-of-the-season events, U.S. Finals and Summit. Opportunity to consolidate these events resulting in increased overall profitability."[163] The Cali Finale is in Los Angeles, California, while The Summit is located in Orlando, Florida, a distance of approximately 2,500 miles, yet Varsity acknowledged these two events compete for

---

- A Missouri university's head cheer and dance coach, who registered her teams for the NCA College Nationals and finalized flight and travel arrangements, relayed to Varsity's Registrations Director that her teams are "excited to compete at Nationals in Dayton, FL." Michele, 21 February 2020, Email: RE: NCA/NDA Registration Paperwork Update, VAR00158255 - VAR00158258, at 8258.

[161] "Q. And after the acquisition of JAM, Varsity didn't need those events anymore; is that right? A. We would – some of those events, we just moved to different weekends. We had an Atlantic City event that was always on MLK weekend. While that seems a long distance from Indianapolis, it was still competing for the same customer base. So we moved that event to a couple weekends earlier. Q. So it's fair to say that some gyms might decide to go to Indianapolis or Atlantic City on a – on any given weekend; is that fair? [Objection Omitted] A. That would be fair. Oh – Q. Some gyms travel across the country from various different – across states to go to events. I mean, Indianapolis and Atlantic City are pretty far apart, correct? [Objection Omitted.] A. That's correct. Q. And so if you moved an event from Indianapolis to Atlantic City, you could still attract at least some of the same customers; is that fair? [Objection Omitted] A. Yes. That – that's our sales strategy across the board." Deposition of Brian Elza, 16 November 2021, at 304:23-305:24.

[162] Murphy Report, at §IV.F.8.

[163] See, e.g.,

- Aloha Productions, LLC., 08 November 2016, Aloha Productions Transaction Summary, VAR00579319 - VAR00579325, at 9321.

- This evidence is supported by testimony from Tammy Van Vleet, the former owner of Aloha. 03 June 2022, Declaration of Tamra Van Vleet, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee).

Highly Confidential Pursuant to Protective Order

the same participants. This evidence further contradicts Prof. Murphy's claim that the geographic market for Cheer Competitions is "typically local or regional."[164]

A USASF publication, "Cheer Parents 101 Everything You Wanted to Know as a Parent of an All Star Cheerleader" succinctly summarizes the fact that there is variation among teams and competitions, but it also clearly states that teams travel throughout the country to compete. In the "What about Competitions?" section, the publication reads: "These events [All Star Competitions] can be local, regional, national, and worldwide. In addition, some competitions hold more prestige in winning than others. Your All Star team may only compete in your state, in the surrounding states, or travel nationwide. Often this is determined by the amount of competition in your area and the level of your teams."[165]

        b)  Prof. Murphy's travel distance analysis is misguided and uninformative

As explained above, the relevant geographic market is the geographic area in which a hypothetical monopolist could profitably raise price by 5-10% without customers buying from suppliers outside that area. The evidence shows that teams can and do substitute between events in different geographies throughout the entire country. Prof. Murphy's travel distance analysis, specifically his measure of average distance travelled by teams attending competitions, does not address the relevant question. For example, the average distance travelled for a given event may be 500 miles, but that measure says nothing about the alternative events available to a team that travelled, say, 800 miles to attend that competition. Presumably, if a hypothetical monopolist raised price, the example team could at least substitute to all other events within the 800 miles it travelled to attend the given event. Prof. Murphy's average distance analysis says nothing about this demand substitution.

To illustrate why the maximum, not average, distance traveled is the appropriate measure, consider an extension to the restaurant example presented in Section VI.A.1.b) above that incorporates prices. In that example, some patrons ordered less expensive meals, while others ordered more expensive meals. Assume four patrons at that restaurant ordered meals that ranged from $30 to $50, with an average price of $40. Now assume a new restaurant opens in the same vicinity. It is reasonable to infer that it can charge up to $50 and compete for at least one of the initial restaurant's customers. This same logic applies to an individual person as well: if one person dines at a restaurant four times and pays between $30 and $50 for those meals, it is reasonable to infer the new restaurant will compete for this person's business. This is true because in each scenario, the patrons have demonstrated a willingness to pay up to $50. The same logic applies to a teams' willingness to travel: knowing the average distance travelled is not

---

[164] Murphy Report, at §IV.F.8.

[165] Parent Action Committee, Undated, Cheer Parents 101: Everything you wanted to know as a Parent of an All Star Cheerleader, U.S. All Star Federation, https://www.yumpu.com/en/document/read/27245738/usasf-cheer-parents-101, accessed 29 November 2022, at 7.

informative for event producers who are competing for as many teams as possible to attend their events; rather, knowing how far teams are willing to travel for some events is more informative.

Although Prof. Murphy never specifically defines any relevant geographic markets in his report, regarding Cheer Competitions he claims that the relevant geographic markets are "typically local or regional."[166] His vague conclusions rest largely on his alternate record, specifically the many different calculations of the average distances travelled by teams attending competitions. Below I explain why this measure is incorrect and uninformative for purposes of defining geographic markets.

Prof. Murphy presents many different measures of the average distance travelled by teams, including for regular season competitions and end-of-season competitions. He presents these calculations for both All Star and "Scholastic" Cheer Competitions as well as separately for individual end-of-season events.[167] Prof. Murphy acknowledges that geographic markets "are based on the extent to which the pricing behavior of suppliers located within a particular geographic area is disciplined by the threat that customers would defect to suppliers located outside the local area in response to price increases by the suppliers located within the region."[168] Below I present examples that demonstrate why Prof. Murphy's claims that rely on his average distance calculations are misguided.

Prof. Murphy calculates that All Star teams travel an average of 140 miles to attend regular season competitions, but this average masks that some teams travel further to attend regular season competitions. In fact, examining the actual travel patterns for specific events shows that many customers travel significant distances to attend competitions, as illustrated in Exhibit 8. This exhibit shows that gyms travelled from all over the country to attend the Varsity All Star Competition held on February 23, 2018, in Dallas, Texas.[169] This regular season event is held in an area that has a significant number of Competitive Cheer teams, so many of them do not have to travel far to attend. However, the event draws teams from well beyond 140 miles, including a team from Hawaii and another from Alaska.

Similar results are shown when examining travel patterns for specific gyms as shown in Exhibit 9, which shows the travel patterns of a sample 200 All Star gyms that competed in six to nine events during the 2017/2018 season.[170] The exhibit shows All Star gyms (red dots) traveling considerably further than 140 miles to attend competitions (blue dots) and also demonstrates the

[166] Murphy Report, at §IV.F.8.

[167] Murphy Report, at Exhibits 20-21.

[168] Murphy Report, at ¶185.

[169] Prof. Murphy excludes this specific event from his calculation of the 140-mile average distance travelled for regular season events, without explanation. For his pricing analyses he excluded events that were sold as a package with hotel stays and park passes, but he provides no explanation for why these events were excluded from his travel distance analysis.

[170] I use a sample of 200 All Star teams because it is sufficient to show the travel patterns, and including more teams results in too many overlapping lines such that travel patterns cannot be discerned.

Highly Confidential Pursuant to Protective Order

number of alternative events available to All Star gyms both within and outside of that 140-mile radius.

For "Scholastic" teams, Prof. Murphy calculates 102 miles as the average distance travelled for "regional" (i.e., regular season events) competitions.[171] In Exhibit 10 I report the travel patterns for a sample of 500 "Scholastic" teams that competed in only one event during the 2017/2018 season.[172] Most of these teams traveled much farther than 102 miles. Prof. Murphy reports the average distance traveled to each end-of-season School Competition; his average for the National High School Cheerleading Championship is 871 miles. In Exhibit 11, I show the travel patterns for teams attending the NHSCC in Orlando, Florida. Again, quite a few teams are traveling much farther than 871 miles; one team came from Hawaii.

With regard to "Scholastic" Cheer, Prof. Murphy's travel analysis is inapt because Varsity controls all School Cheer Competitions[173] and, as such, the distance travelled is not informative because the only options—in a particular region or nationally—are Varsity competitions.

These maps demonstrate that the area over which event producers compete for teams—both All Star and "Scholastic"—is far greater than Prof. Murphy's average distance calculations show. Many teams travel much further to attend competitions and, in doing so, bypass many other competitions. This evidence is more consistent with a geographic market that is no larger than the U.S. than Prof. Murphy's vague assertion that the geographic market is "typically local or regional".

c) Prof. Murphy's geographic markets overlap

Prof. Murphy's flawed average distances calculations conceal another fundamental flaw in his analysis. Specifically, consider his calculation that teams on average travel 1,008 miles to attend The Summit. Even if the average distance traveled were the appropriate measure—which it is not—the 1,008 miles only represents the radius from which teams travel to attend The Summit, but it says nothing about the other options for those teams that are, for example, located approximately 1,000 miles away. If a team is willing to travel 1,000 miles in one direction to

---

[171] Murphy Report, at Exhibit 21. Prof. Murphy also calculates different travel distances for regular and end-of-season competitions (for both All Star and "Scholastic"), but I have already explained why that distinction is irrelevant for defining relevant product markets. Therefore, I do not present such a comparison here.

[172] I use a sample of 500 "Scholastic" teams because it is sufficient to show the travel patterns, and including more teams results in so many overlapping lines that patterns cannot be discerned. I use more teams for "Scholastic" than All Star because individual All Star teams travel more frequently, on average, than "Scholastic" teams.

[173] See, e.g.,

- A 2014 Bain presentation claimed that "Varsity is the undisputed leader in cheerleading uniforms, competitions, and camps" and included a chart illustrating that 100% of the U.S. market for School Cheer Competitions belonged to UCA, NCA, and USA—all Varsity-owned brands—in 2013. Bain Capital, 17 October 2014, Project Hercules Interim IC, BAIN00055587 - BAIN00055646, at 5631, emphasis added.

- A 2018 Bain presentation included a similar chart illustrating that 100% of the U.S. market for School Cheer Competitions still belonged to UCA, NCA, and USA in 2017. Bain Capital, July 2018, Project Impact Diligence Summary, FEAS-Ares00075986 - FEAS-Ares00076033, at 6023, emphasis added.

Highly Confidential Pursuant to Protective Order

attend The Summit, there is no reason it would not be willing to travel 1,000 miles in the opposite direction to attend a competing event if The Summit registration price increased. This example demonstrates that the area over which teams are willing to travel—and over which event producers are competing for participants—is actually twice the distance, or 2,016 miles using Prof. Murphy's calculations. This evidence is more consistent with a national market. Furthermore, if one were to consider the appropriate measure—the maximum distance—the evidence is even more compelling, clearly covering the entire country.

The previous simple example only illustrates half of the story. Consider an example of two regular season competitions that are 700 miles apart and that teams located equidistant between the competitions are indifferent between driving 350 miles in either direction. As with the prior example, this suggests the area over which the event producers compete is at least 700 miles; however, each of those two events is also drawing participants from the *opposite* direction as well, and the same incentives are in place for teams that are located 350 miles away from those events. As such, the area over which the events are competing for teams necessarily doubles again; that is, based on a teams' willingness to travel 350 miles, event producers are competing for teams over an area that is at least four times that distance, or 1,400 miles.

Exhibit 12 illustrates how the areas over which teams attract participants intersect. This exhibit shows four hypothetical events, each with a 500-mile radius around it, representing the distance hypothetical teams are willing to travel to attend the competition. The exhibit demonstrates how events located far apart from each other still compete for the same participants. Graphically, this is shown simply on the exhibit: each of the events competes for participants within the entire area covered by its own 500-mile radius circle, as well as within much of the area covered by any circles that intersect that 500-mile radius. This simple example illustrates why average travel distances are misleading and uninformative to determining the geographic boundaries over which event producers are competing for participants.

Extending the above illustrative examples to actual team travel patterns and actual Varsity event locations is informative to understanding the many event options available to teams within the area they have demonstrated a willingness to travel. Exhibit 13 shows only Varsity Worlds bid events that were held in 2017/2018 and draws 500-mile circles around each, which represents the 89th percentile of the distance Prof. Murphy claims teams travelled to Varsity Worlds Bid Cheer Competitions.[174] As explained above, individual events are competing not only with all other events within the 500-mile radius circles around each event, but also with events that are in adjacent areas in all directions as well. Graphically this is indicated by the darkness of the blue. The darker the coverage over a gym's location, the more Worlds bid events are competing for that gym. This evidence is consistent with national markets since large portions of the country are covered by adjacent intersecting circles as shown in Exhibit 13.

This evidence is also consistent with the record evidence provided by Varsity. For example, earlier I explained that Varsity moved an event from Atlantic City to Indianapolis without losing

---

[174] I only include Worlds bid events to make the point. Putting on all regular season All Star events would lead to a massive "blob".

Highly Confidential Pursuant to Protective Order

some customers; that distance is easily covered by many different combinations of adjacent intersecting circles. Similarly, Varsity stated that the Cali Finale (in Los Angeles) competed with The Summit (in Orlando), an even further distance, but again that area is covered by many different combinations of three intersecting circles.

Similar results are apparent when examining different types of events as well. Exhibit 14 shows 2-day All Star events that took place only during the month of March during the 2017/2018 season. Again, looking only at this type of event during a single month of the season shows similar results—large portions of the country are covered even when using a smaller, 300-mile radius.[175] The evidence of team travel patterns and the fact that many events are in reasonably close proximity to others, it is clear that events compete for teams in an area that is consistent with a national market.

When analyzing All Star team travel patterns, one must recognize that All Star gyms decide which individual Cheer Competitions to attend with the intention of attending some regular season competitions that are relatively close to home, some which require moderate travel, and some that require significant travel—often national, as demonstrated by Exhibit 9. Additionally, All Star gyms throughout the country compete all season with the common goal of earning bids to the Worlds (or other year-end events that usually require bids to qualify, such as The Summit), which requires national travel for many teams. The fact that teams attend a mix of different types of events in different locations does not negate the fact that over the course of the season teams intend to and do travel nationally, including the common goal of competing at Worlds.

There is considerable evidence that teams "chase" Worlds bids and structure their season travel accordingly, including the willingness to travel further to competitions that award bids to the Worlds or The Summit.[176] As such, event producers are competing for teams from any location to attend their events. The fact that some competitions are attended largely by teams within close proximity does not negate the fact that some teams travel long distances to attend that same competition. The fact that many of the large competitions are located in regions of the country that require less travel (e.g., Orlando, Atlanta) because many Competitive Cheer teams are located in the vicinity is merely common sense and does not negate that fact that those competitions also draw a significant number of competitors from throughout the entire country.

The record evidence indicates not only do All Star gyms select which Cheer Competitions to attend as described above, but also that All Star gyms typically have a set budget for the entire season. Often these budgets are derived from charging a set annual fee to All Star athletes which

---

[175] Each circle is 300 miles in radius and represents the 88th percentile for travel distance to 2-day competitions as reported by Prof. Murphy. Murphy Report, at Exhibit 32.

[176] See, e.g.,

- Netz Opening Report, at 44.

- "The majority of competitive programs travel to 4-5 overnight events per season (often to acquire Summit or World [sic] bids)". Varsity Brands, 26 July 2017, Strategic Plan (2017 to 2020), VAR00335468 - VAR00335661, at 5534.

Highly Confidential Pursuant to Protective Order

is often paid in monthly installments.[177] The annual fee typically covers all participation expenses such as coaching and event registration fees. If, for example, a hypothetical monopolist increases the cost of events in a specific area, All Star gyms could substitute events in another area. The same principle holds for event types as well; if a hypothetical monopolist were to increase the price of 1-day events, presumably a gym could substitute a single 2-day event for two 1-day events; similarly, if the price for year-end events increased, gyms could instead attend more regular season events such as one of the large, marquee events that are held in the spring.[178] This is consistent with the fact that gyms typically charge a set, annual fee and do not earmark any of those funds for events in specific locations, specific types of events, or regular versus end-of-season events.[179] The fact that gyms can substitute different events from different locations—some of which are far apart—is consistent with a national market definition; by the same rationale, the fact that gyms can substitute regular season and end-of-season events suggests they are in the same relevant product market as well.

Prof. Murphy's travel distance analyses are similar to his product market arguments in which he identifies several dimensions over which Cheer Competitions are differentiated, but they ultimately fail to prove they are in different relevant markets. Regarding the relevant geographic market, he has merely shown that during the course of a season, the typical team attends a range of different events in different locations—some of which are close to home, while others are far away—all with the intention of attending a year end-event that attracts teams from throughout the U.S.

Participants clearly travel long distances to attend competitions, which is informative in determining the area over which events are competing for the same teams. When appropriately assessing these distances, it is clear that individual events are competing over much larger areas than Prof. Murphy's average distance calculations or catchment area analysis demonstrate. The evidence is consistent with the conclusion I presented in my Opening Report: the relevant geographic markets for Cheer Competitions are no larger than the entire U.S.

> d)  Prof. Murphy's switching analysis is unreliable and does not support his conclusions that the geographic market is regional

Prof. Murphy presents an analysis of customer switching among regular season Varsity All Star competitions of different types (1-day competitions, 2-day competitions other than Worlds bid competitions, and 2-day Worlds bid competitions) in different locations.[180] Prof. Murphy

---

[177] Netz Opening Report, at 34.

[178] See footnote 110.

[179] See, e.g.,

- Prof. Murphy acknowledges that gyms tend to charge a set monthly or annual membership fee that includes coaching, facilities fees, and event registration fees. Murphy Report, at ¶87.

- Prof. Murphy also acknowledges that gyms do not earmark specific funds for regular season events versus end-of-season events. Deposition of Kevin Murphy, 03 November 2022, at 47:9-17.

[180] Murphy Report, at Exhibits 33-38.

Highly Confidential Pursuant to Protective Order

characterizes each customer at an event into one of five categories: repeaters, opt-ins, opt-outs, switch-ins, or switch-outs. Repeat customers attended the event the previous season; opt-ins did not attend the event the previous season; opt-outs attended the previous season but not this season; switch-ins attended the event this year in place of another Varsity event; and switch-outs attended the event the previous season but this season attend another Varsity event.[181] Based on this analysis, Prof. Murphy defines geographic markets based on what he refers to as "catchment areas."[182] Prof. Murphy concludes that the "relevant geographic markets for regular-season competitions are local."[183] Prof. Murphy's switching analysis is fundamentally flawed and meaningless.

The analyses are flawed for at least the following reasons. Prof. Murphy does not present a similar switching analysis for his "Scholastic" teams, claiming it is unnecessary to support his claim that "the geographic markets for these competitions are limited."[184] He provides no explanation for why the same analysis is not necessary for "Scholastic" teams. Prof. Murphy only includes Varsity events in his analysis, despite his claim that other producers host at least 350 competing events.[185] Customers that he characterizes as opt-ins or opt-outs may be switching between Varsity and non-Varsity events; Prof. Murphy has no data on the distance between these two events that the customer apparently considers to be substitutes. It is not clear how Prof. Murphy deals with repeat observations; that is, a customer that switches from Varsity 1-day event X to Varsity 1-day event Y will be characterized as a switch-out from event X and a switch-in to event Y. Customers opting in or opting out will be observed only once. Prof. Murphy does not account for switches between event types (e.g., from a 1-day event to a 2-day event), despite the fact that his own analysis shows such switching occurs.[186] For his analysis regarding "alternative events", he only has information on locations of the new and old events for switch-ins and switch-outs.[187] For repeat, opt-in, and opt-out customers, Prof Murphy assumes what the alternative event under consideration was.[188] Prof. Murphy does not examine why gyms may or may not attend the same competitions from one year to the next. Finally, Prof. Murphy does not account for changes in event offerings from season to season. He does not account for the fact that many changes in event schedules are not due to price changes but to an event no longer being available.

Many of these gyms had no choice but to "Opt-In" or "Switch-In." For example, the record evidence shows that Varsity targeted EPIC Brands, a rival event producer, by placing Varsity

---

[181] Murphy Report, at footnote 313 and ¶171.

[182] Murphy Report, at ¶192.

[183] Murphy Report, at ¶186.

[184] Murphy Report, at ¶198.

[185] Murphy Report, at Exhibit 10.

[186] Murphy Report, at Exhibit 25.

[187] Murphy Report, at ¶190.

[188] Murphy Report, at ¶190.

Highly Confidential Pursuant to Protective Order

events near as many of EPIC's Worlds bids events as possible.[189] Varsity scheduled new Varsity events near EPIC Brands events and on "similar weekends"; Varsity added paid Summit bids to these new events and "load[ed] it with twice as many At Large bids"; another Varsity employee suggested "treat[ing] it like a world [sic] bid event."[190] This effort ultimately devalued EPIC, and Varsity acquired EPIC in January 2018.[191]

After the acquisition, Varsity immediately began discussing which EPIC and Varsity events to keep on its schedule, stating, "There are 2 [competitions] in green I think we need to keep but we need to get the dates off our current events so they're not head to head."[192] Prof. Murphy's analysis assumes gyms willingly switch between events, but that is not necessarily the case. Using Prof. Murphy's terms, the gyms that stopped attending the EPIC events that were cancelled and replaced them with Varsity events are "Opt-Ins" because they switched from a non-Varsity event to a Varsity event. However, they made that switch because Varsity cancelled the non-Varsity event. Similarly, gyms that stopped attending Varsity events that were cancelled and replaced them with other Varsity events are "Switch-Ins" because they switched from a (cancelled) Varsity event to another Varsity event. Again, they made that switch because Varsity cancelled a Varsity event.

Similar conduct by Varsity led to the demise of many other events hosted by IEPs, which resulted in fewer choices for gyms.[193] Similarly, Varsity both cancelled and moved its own events after various acquisitions.[194]

Prof. Murphy's analysis of travel distances and catchment areas does little more than explain the obvious: many competitions are located in the same general areas as many All Star gyms. As a result, many teams do not have to travel a significant distance to attend many Cheer Competitions. However, as I have already established, teams do travel great distances to attend competitions. The fact that not all teams travel a long distance does not indicate that the relevant geographic markets are local.

Prof. Murphy's assertion that geographic markets are local or regional contradicts the record evidence. For example, Varsity has indicated that it was able to move events from one location to another—as far as 700 miles—while still retaining many of the same customers, as described in

---

[189] Netz Opening Report, at 74-75.

[190] An email string between Tres LeTard and other Varsity employees reads, "I had an interesting conversation with Jeff Webb on the way down to Orlando. We were discussing competitors and who is still relevant. I mentioned EPIC and he asked what we could do to apply pressure to them. I said we have Summit Bids and some events near them on similar weekends, but could do more at ASC – Baltimore [a Varsity All Star Challenge "ASC" event in Baltimore which awards Summit bids] if needed (and explained the new bid strategy). He strongly recommended that we do all we can." LeTard, Tres, 24 April 2017, Email: RE: All Star Challenge Baltimore Summit Bids, VAR00104422 - VAR00104424, at 4423.

[191] See Netz Opening Report, at §V.D.5.

[192] Elza, Brian, 18 August 2017, Email: FW: EPIC Overlay, VAR00330170 - VAR00330171.

[193] Netz Opening Report, at §V.B.1.b).

[194] Netz Opening Report, at §V.D.7.c).

Highly Confidential Pursuant to Protective Order

Section VI.B.1. Similarly, Varsity indicated that the Cali Final, a non-Varsity event held in Los Angeles, competed with The Summit, a Varsity event held in Orlando, approximately 2,500 miles away. Both of these distances are well outside the distance that Prof. Murphy asserts represents a conservative measure of the relevant geographic markets around each event.

Prof. Murphy's switching and catchment area analysis does not accurately represent the locations over which All Star gyms would reasonably substitute when faced with a small, but significant price increase from a hypothetical monopolist. Prof. Murphy does not implement this analysis for "Scholastic" competition and thus this analysis is not informative for determining the geographic market limitations for "Scholastic" competitions.

> e)  Prof. Murphy's regression analysis is unreliable and does not support his conclusions that the geographic market is narrower

Prof. Murphy's regression analysis does not support his conclusion regarding geographic market definition. He regresses the price of an event on the average price of all events within his "catchment area" during the entire season and claims that a positive and statistically significant estimated coefficient on the price variable is consistent with his definition of the geographic market.[195]

Prof. Murphy claims that his regression tests "whether an event's price tends to change contemporaneously with the prices of other events in the same geographic area."[196] However, he regresses price for a given event held at a given point in time on the average price for all events in the entire season that are in the "catchment area". Thus, his regression in no way accounts for the date of events, a factor which Prof. Murphy claims "cannot be ignored."[197] An event held in October is unlikely to be a reasonable substitute for an event in February.

I correct his analysis by estimating a regression with the average price calculated for events within in the catchment area and in the same month. The coefficient on price is statistically no different from zero. That is, when Prof. Murphy's analysis is corrected to perform the way he intends, it does not support his conclusion concerning the proper geographic market.

In addition, Prof. Murphy's regression demonstrates that the average price of events within his "catchment areas" explains virtually none of the variation in event prices. Dropping the "catchment area" price from the regression leaves the explanatory power of the regression unchanged. This can be seen in Exhibit 15; when the regression includes the "catchment area" price, it explains 97-98% of the variation in prices, when the "catchment area" price is excluded, the regression explains 97%.[198] That is, the average price of other events in the catchment area are not an important determinant of prices after controlling for event fixed effects.

---

[195] Murphy Report, ¶195 and Exhibit 39.

[196] Murphy Report, at ¶195, emphasis added.

[197] Murphy Report, at ¶97.

[198] Also see Murphy Report, at Exhibit 39.

Highly Confidential Pursuant to Protective Order

## 2. Cheer Camps

Prof. Murphy's argument regarding the relevant geographic market for Cheer Camps can be summarized as: teams travel short distances to attend camps.[199] His conclusions are uninformative for the following reasons.

As an initial matter, as explained in Section VI.A.3 above, Prof. Murphy includes traditional, sideline cheer teams in his definition of "Scholastic" teams. Nearly 70% of the participants he examines in his travel distances analysis are traditional, sideline teams or some other teams that both attended Varsity camps and purchased Varsity apparel. As a result, any conclusions he draws from these data are not representative of the Competitive Cheer Camps or the travel patterns of the "Scholastic" teams that we are interested in—the Competitive Cheer teams that participated in competitions and also attended camps.

Prof. Murphy also fails to recognize that instructors, coaches, and choreographers commonly travel to attend camps, rather than teams traveling to attend camps. As a result, Prof. Murphy's analysis of the distance traveled by teams is not dispositive regarding geographic market definition: when suppliers deliver products or services to customers' locations, the relevant geographic market is based on the locations of the customers, not the suppliers, and the market boundaries encompass the entire area serviced by the supplier.[200]

Varsity provides camp services to its customers throughout the country as demonstrated by the data provided by Prof. Murphy; see Exhibit 16. Furthermore, Varsity documents demonstrate that its employees travel to conduct camps. Employment contracts that Varsity/NCA issued to camp instructors includes terminology for travel allowances, including for international travel.[201] A 2017 NCA/Varsity camp brochure also shows that instructors travel. The brochure lists tiered rates for different choreography camps led by highly sought-after "gold" and "platinum" NCA choreographers, with lower rates for sideline and regional routines and higher rates for state and national routines. The brochure also illustrates the value of experienced choreographers; platinum choreographers charged a minimum of $4,000 for a two-day camp and $4,500 for a three-day camp in 2017.[202] The choreographers all travel to the site of the Home Camp. Another NCA/Varsity document lists similar tiered rates for camps, explicitly stating that "[a]ll Choreographer's expenses (meals, hotel, travel) is included" for each tier.[203] This same

---

[199] Murphy Report, at ¶199.

[200] "When the hypothetical monopolist could discriminate based on customer location, the Agencies may define geographic markets based on the locations of targeted customers. Geographic markets of this type often apply when suppliers deliver their products or services to customers' locations. Geographic markets of this type encompass the region into which sales are made." 2010 Horizontal Merger Guidelines, at 14.

[201] Varsity Spirit Corporation, March 2015, Instructor Employment Agreement, VAR00072545 - VAR00072550, at 2548-2549.

[202] National Cheerleaders Association, 2017, Choreography Home Camps, VAR00074687, at 4687.

[203] From a 2019 NCA choreography camp price list: "Any Instructor requests requiring flight/rental will be at the cost of the CUSTOMER for any level choreography." National Cheerleaders Association, 2019, NCA Tiered Choreography Pricing 2019, VAR00072652, at 2652.

Highly Confidential Pursuant to Protective Order

document indicates that if specific instructors are requested, there will be additional charges for flights and that "[i]f Original Choreography is requested, then flight will be ADDED to cost of camp". Similarly, Varsity employees travel great distances to work at specialized camps, such as what Varsity refers to as "Ultimate" or "Innovative" Speed Camps. Instructors for these camps are especially scarce—a 2011 internal Varsity memo notes that just one full-time employee and 37 summer seasonal employees worked at Varsity's Ultimate Speed Camps.[204] A 2018 NCA handbook also indicates that Speed Camp instructors often travel, as it included guidelines for securing flights, car rentals, and hotel accommodations.[205]

The evidence presented by Prof. Murphy relies on the alternative record he creates, which again contradicts the record evidence and does not support his conclusion that "the consumer travel patterns for camps imply limited geographic markets."[206] Rather, the evidence is consistent with my conclusion in my Opening Report that the relevant geographic market for Cheer Camps is the entire U.S. This is consistent with the record evidence, including documents from Varsity that state Varsity has the "largest footprint of Dance and Cheer Camps in the U.S.," showing camp locations spread throughout the entire country.[207] Prof. Murphy's data also show Varsity camps located throughout the entire U.S., as shown in Exhibit 16. Examining a small number of hotel and resort camps also demonstrates that, in addition to Varsity instructors traveling throughout the country to coach camps, School Cheer teams travel long distances to attend camps as well. In Exhibit 17, I show the travel patterns for teams attending the ten largest resort or hotel camps during the 2017/2018 season. Gyms travel a wide variety of distances.

## VII.    Varsity exercises market power over all three relevant markets

In my Opening Report, I presented evidence demonstrating that there are three distinct product markets, and that Varsity has market power in each of them.[208] In Section V above, I explain the importance of this evidence and why sound economic analysis requires examining all sources of evidence and understanding any discrepancies between them. There is an overwhelming amount of evidence created by Varsity alone establishing that Varsity is "All Things Cheer."

> "Varsity Spirit has managed to become the total market leader in all things cheer. But with that market share comes a responsibility to manage the position as a global leader in our space. The key is to maintain market share, avoid being viewed as a monopoly, and respond directly and firmly to all competitors in the space. It is imperative that Varsity recognize that just being the market leader

---

[204] Rothschild and Jefferies, January 2011, Varsity Information Memorandum, VAR00424538 - VAR00424610, at 4581.

[205] National Cheerleaders Association, 2018, Speed Manual, VAR00170654 - VAR00170744, at 0683.

[206] Murphy Report, at ¶198.

[207] Varsity Brands, May 2018, Management Presentation, VAR00008463 - VAR00008587, at 8545.

[208] Netz Opening Report, at §§IV.A – IV.C.

Highly Confidential Pursuant to Protective Order

is not enough. To maintain a position of dominance we must develop a graceful appearance, and humanize our brand."[209]

In the sections that follow, I respond to Prof, Murphy's claims, including presenting additional record evidence demonstrating that Varsity exercises market power in each of the relevant product markets that I properly defined in my Opening Report. I largely let the documents speak for themselves—contrary to Prof. Murphy's claims, these are not terms-of-art or "course-of-business" documents that I misunderstand or misinterpret.[210] Rather, this evidence is straightforward and conclusive with commonly understood implications. For example, Mr. Webb admitted that he "ran a near monopoly" when he still owned the company, which requires no interpretation.[211]

### A. Varsity possesses and exercises market power over Cheer Competitions

Prof. Murphy argues that Varsity does not have market power over Cheer Competitions. He largely ignores the evidence I presented in my Opening Report, claims that I cite unreliable market share figures, and claims that I ignore the presence of competing event producers.[212] I respond to each of his claims below.

#### 1. Varsity dominates the Cheer Competition market, despite the existence of a competitive fringe

Regarding my market share figures, Prof. Murphy erroneously claims that I "rely solely" on business documents "without examining the assumptions (including the scope of the market considered) or data sources underlying those estimates."[213] In Section III above, I explain why this is incorrect and that the figures I present are, in fact, accurate. I present market share figures from multiple sources, all of which consistently show that Varsity had a market share of at least 80% in the Cheer Competitions market by 2018.[214]

---

[209] Undated, Increase Humanization and Personalization of The Varsity Brand – Change to all star participation growth through scoring, image, and communication [sic], VAR00094550 - VAR00094552, at 4550.

[210] Murphy Report, at ¶236.

[211] This admission is in an email exchange between Mr. Webb and an associate who was discussing Mr, Webb's 2021 book, *American Restoration: How to Unshackle the Great Middle Class*. Hamachek, Brent, 08 April 2020, Email: book update, VAR00275774.

[212] Murphy Report, at ¶¶227-228.

[213] Murphy Report, at ¶227.

[214] From Netz Opening Report, at footnote 404:

- In 2016, Varsity estimated its share of the All Star market at 75% and the next largest competitor, EPIC Brands, at 6%. LeTard, Tres, 2016, Varsity All Star Market Share est. - 2016, VAR00101102.

- Brian Elza, former General Manager and Vice President of Sales at Varsity All Star, testified, "Q. Okay. We can talk about that in a bit. So let me ask you this: In 2016, Varsity had 75 percent of the All Star event market, and then Varsity, over the course of 2016 to 2018, acquired Epic, GSSA, Aloha, Spirit Celebration, and Champion Spirit Group [Jam Spirit Group (DBA Team Champion)]; is that right? A. Yes. Q. So

Highly Confidential Pursuant to Protective Order

Prof. Murphy claims the existence of any non-Varsity event producers indicates that Varsity does not have a monopoly.[215] While factually true that Varsity does not have a pure monopoly, the implication is not that Varsity therefore cannot have market power, which is the ability to increase price above the competitive level. Market power does not necessitate a pure monopoly in which there are no other competitive alternatives whatsoever.[216] A firm with market power can profitably increase its price above the competitive level for a sustained period of time.[217]

---

- between 2016 and 2018, Varsity purchased its second, third, fourth, and fifth largest competitors in the All Star event market, right? A. Based on this chart, the answer is yes. Q. And it went from – based on this chart, it went from 75 percent of the All Star event market to 86 percent of the All Star event market; is that right? A. Yes. Q. So Varsity bought its way to dominance, correct? A. Some people would say that. Q. Would you say that? A. I don't really know the answer. Repeat that. Would I say what now? Q. That Varsity bought its way to dominance in the All Star event market. A. Yes." Deposition of Brian Elza, 16 November 2021, at 80:18-82:3, objections omitted.

- Marlene Cota, Varsity's former Vice President of corporate alliances and business development, testified, "Q. My first question is the All Star. So has Varsity's market share in the competitive cheer market for All Star, not schools, has that changed throughout the years from 2012 to 2018? A. It has increased. Q. And do you know what the market share – Varsity's market share in competitive cheer market for All Star was in 2018, at the time you left? A. At the time that I left, I would say conservatively, 80 percent, 85 percent." 06 April 2022, Remote Videotaped Deposition of Marlene Cota, Volume I, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee) (Hereinafter "Deposition of Marlene Cota, Volume I, 06 April 2022"), at 53:7-21, objections omitted.

- Ms. Cota also testified that Varsity's share of school competitions was at least as high as its share in All Star competitions. "A. Well, in my role in making presentations to corporate sponsors and selling through corporate sponsorships, I had to present market share figures in order to get corporate sponsors. So I'm basing those numbers on what I would present in my own documents and presentations to potential corporate sponsors on what our market share was at that time. Q. Okay. And in 2012, do you know what Varsity's market share in this market for school cheer may have been? A. Are we talking competitions, camps, or school overall? Q. Let's start with school competitions. A. 85 percent." Deposition of Marlene Cota, Volume I, 06 April 2022, at 51:3-22, objections omitted.

[215] "Again, Plaintiffs' experts fail to establish any monopoly, as this would imply a lack of competitive alternatives." Murphy Report, at ¶238.

[216] Prof. Murphy at other points in his report distinguishes between a firm with a high market share and a "pure monopolist with 100% share of the market." Murphy Report, at ¶237.

[217] See, e.g.,

- "Economists often define market power as the ability of a firm or group of firms within a market to profitably charge prices above the competitive level for a sustained period of time." American Bar Association, 2005, Market Power Handbook: Competition Law and Economic Foundations, Second Edition, ABA Book Publishing, Chicago, IL, at 1.

- "A simple economic meaning of the term 'market power' is the ability to set price above marginal cost." Landes, Williams M. and Posner, Richard A., March 1981, Market Power in Antitrust Cases, Harvard Law Review, Vol. 94, No. 5, 937-996, at 937.

- "The term 'market power' refers to the ability of a firm (or a group of firms, acting jointly) to raise price above the competitive level without losing so many sales so rapidly that the price increase is unprofitable

Highly Confidential Pursuant to Protective Order

Economists and the courts understand that there are nuanced differences between the terms monopoly power and market power: monopoly power generally refers to a firm having a high degree of market power, but it is not necessary for a firm to have a pure monopoly to have either market or monopoly power.[218]

With respect to All Star Competitions, Prof. Murphy claims that Varsity faces competition from other event producers and that I fail to explain how Varsity could have monopolized the market while these IEPs continue to host Cheer Competitions. In my Opening Report, I noted that the seventy IEPs Varsity identified collectively accounted for approximately 11% of total event revenue in 2016, which is insufficient to constrain Varsity's market power.[219] By the 2018/2019 season, Prof. Murphy only identifies 48 IEPs,[220] down from the 70 identified in 2016. I have not

---

and must be rescinded." Landes, Williams M. and Posner, Richard A., March 1981, Market Power in Antitrust Cases, Harvard Law Review, Vol. 94, No. 5, 937-996, at 937.

- Areeda, Phillip E., Hovenkamp, Herbert, and John L. Solow, 1995, Antitrust Law: An Analysis of Antitrust Principles and Their Application, Volume IIA, Little, Brown & Company: Boston, at 85, ¶501.

[218] See, e.g.,

- "While the Supreme Court has discussed the requirement in Section 2 cases as 'monopoly power,' both courts and commentators have used the term 'market power' interchangeably at times…Consistent with the economic principles discussed in Chapter II, courts have generally defined market power as 'the ability to raise prices above those that would be charged in a competitive market' for some period of time. Monopoly power, however, has been defined as 'the power to control prices or exclude competition,' a concept now generally understood to mean a high degree of durable market power." U.S. Department of Justice, 18 March 2022, Competition and Monopoly: Single-Firm Conduct Under Section 2 of The Sherman Act: Chapter 2, https://www.justice.gov/archives/atr/competition-and-monopoly-single-firm-conduct-undersection- 2-sherman-act-chapter-2, accessed 14 June 2022, at 1.

- "Monopoly power is defined as 'power to control price or the power to exclude competition.' As the D.C. Circuit in U.S. v. Microsoft points out, this can be shown directly by demonstrating that, in fact, a firm has raised price substantially above competitive levels, or indirectly by structural analysis that includes showing a sufficiently high and stable market share in a well-defined market." Edlin, Aaron S., and Rubinfeld, Daniel L., 2004, Exclusion or Efficient Pricing: The "Big Deal" Bundling of Academic Journals, Antitrust Law Journal, 72(1), 128-159, at 145.

[219] See, e.g.,

- A 2016 Varsity document lists all "Varsity All Star Events" as hosting 75% of the All Star events and lists the following IEPs and event shares: EPIC Brands (6%), GSSA/Aloha (2%), Spirit Celebration (2%), Champion Spirit Group [Jam Spirit Group (DBA Team Champion)] (2%), WSA (1%), JAMZ (1%), and all others (over 70 different IEPs) as having 11% combined. LeTard, Tres, 2016, Varsity All Star Market Share est. - 2016, VAR00101102.

- The above spreadsheet was attached to a September 16, 2016, email from Tres LeTard, former General Manager and Vice President of Operations at Varsity All Star, stating "Here is our 'best guess' at Market Share by Revenue." LeTard, Tres, 16 September 2016, Email: RE: Recap from Yesterday and Next Steps, VAR00101100 - VAR00101101.

[220] Murphy Report, at Exhibit 10.

Highly Confidential Pursuant to Protective Order

only acknowledged the existence of these IEPs, but also demonstrated how Varsity managed to monopolize the market despite their existence.[221]

Prof. Murphy infers that are many other competing event producers based on his analysis of Varsity's registration data in conjunction with my claim that All Star teams typically attend six to nine competitions each season.[222] Prof. Murphy claims that All Star Cheer teams attend no more than three Varsity regular season competitions per season and that, therefore, these same teams must be attending several events per season that are hosted by non-Varsity event producers. In Section III above, I respond to this claim, which I summarize here: my statement that "gyms generally attend at least six regular-season competitions each season" is accurate and supported by the record evidence.

Prof. Murphy cites The Open Championship Series, as a non-USASF sanctioned event with which Varsity competes.[223] He claims The Open Championship Series "alone features over 300 events hosted by numerous event producers".[224] That figure is grossly inflated because many of the Open Championship Series events are not Competitive Cheer events, but rather focus on dance, youth, and recreational teams.[225] A cursory review of the Open Championship Series events listed on its website demonstrate that many are clearly not Competitive Cheer events. For example, there are at least seventeen events hosted by the event producer "Dance Team Union", but the Dance Team Union is, as the name suggests, a producer of dance events, not Competitive Cheer events.[226] The evidence cited by Prof. Murphy is misleading and does not support his claim that there are 300 Open Championship Series events competing with Varsity Competitive Cheer Competitions.

---

[221] In my Opening Report, I acknowledged the competitive fringe; see Netz Opening Report, §IV.A.2. In §V of my Opening Report, I explained how Varsity has monopolized the market for Cheer Competitions. I expand on that discussion in Section VII below.

[222] Netz Opening Report, at 106.

[223] Murphy Report, at ¶228.

[224] Murphy Report, at ¶228.

[225] The Open Championship Series publishes separate rules and scoring guidelines for the following different disciplines: "All Star novice, prep, and Elite", "Competitive Rec", "School Teams", and "Dance." The Open Championships, Undated, Scoring and Rules, https://openchampionshipseries.com/scoring-and-rules/, accessed 02 December 2022.

[226] See, e.g.,

- Dance Team Union, Undated, About Dance Team Union, https://www.danceteamunion, accessed 02 December 2022.

- Examining the specific divisions offered at one of these events, the Dance Team Union Baton Rouge Regional, lists many different divisions (e.g., Varsity Kick, Junior Varsity Pom, Middle School Hip-Hop, Middle School Lyrical), none of which are Competitive Cheer. Dance Team Union, Undated, Baton Rouge Regional, https://www.danceteamunion.com/_files/ugd/8d9ab7_8b76d2e40d7e4aac83e500ff2a5faa17.pdf, accessed 02 December 2022.

Highly Confidential Pursuant to Protective Order

With respect to "Scholastic" Competitions, Prof. Murphy cites deposition evidence that claims there are competing "Scholastic" event producers.[227] The event producers he mentions—JAMZ, Pop Warner Football, and the Fellowship of Christian Athletics—produce events for youth and/or recreation teams that are not at-issue in this matter.[228] As I described in Section IV, documents produced by Varsity indicate that Varsity controlled 100% of the School Cheer Competitions through its three brands, UCA, NCA, and USA.[229]

As noted earlier, Prof. Murphy ignores the evidence I presented to support my claims that Varsity has market power in the Cheer Competitions market. He presents little, if any, reliable record evidence to support his claims that Varsity faces significant competition. Additional evidence consistent with that I have already presented in my Opening Report includes:

- A 2018 Varsity document titled "Varsity Spirit Overview" shows Varsity with a market share of approximately 80% in All Star Cheer Competitions, further corroborating the figures I presented previously. This document also notes there are "other small competitors" as well.[230]

- A July 2018 Bain Capital presentation titled "Project Impact Diligence Summary" shows Varsity with a market share of approximately 78% for "Competitions—All Star". This

---

[227] Murphy Report, at footnote 376.

[228] See, e.g.,

- Pop Warner only includes youth, sideline cheer. "Pop Warner Spirit teams have participated for several decades on the football sidelines (Pep Squads, Majorettes, etc.)…Pop Warner has established one set of spirit rules along with JAMZ, the Pop Warner Education Development Partner and the original developer of the Youth Cheer and Dance Alliance (YCADA)." Pop Warner Little Scholars, Undated, Cheer & Dance Review, https://www.popwarner.com/CheerDance, accessed 02 December 2022, at 1.

- Fellowship of Christian Athletics only includes youth, sideline cheer. FCA Cheerleading, Undated, 2022 FCA Cheer All American Event, https://www.fcacheer.org/, accessed 02 December 2022.

- JAMZ produces events for schools, but they are focused on traditional, sideline cheer. JAMZ, Undated, 2022-23 JAMZ Cheer & Dance, https://www.jamz.com/rules-and-scoring, accessed 02 December 2022 and JAMS, 2022, School Cheer Categories, https://drive.google.com/file/d/1FQdkJX6PKnmvDBhe864H4OUSh3iybCSS/view, accessed 02 December 2022.

[229] See, e.g.,

- A 2014 Bain presentation claims that "Varsity is the undisputed leader in cheerleading uniforms, competitions, and camps" and included a chart illustrating that 100% of the U.S. market for School Cheer Competitions belonged to UCA, NCA, and USA—all Varsity-owned brands—in 2013. Bain Capital, 17 October 2014, Project Hercules Interim IC, BAIN00055587 - BAIN00055646, at 5631.

- A 2018 Bain presentation includes a similar chart illustrating that 100% of the U.S. market for School Cheer Competitions still belonged to UCA, NCA, and USA in 2017. Bain Capital, July 2018, Project Impact Diligence Summary, FEAS-Ares00075986 - FEAS-Ares00076033, at 6023.

[230] Varsity Spirit, October 2018, Varsity Spirit Overview, VAR00345222 - VAR00345244, at 5236.

Highly Confidential Pursuant to Protective Order

document indicates that thirteen IEPs account for roughly half of the non-Varsity market, and an undetermined number of smaller event producers account for the remainder.[231]

- Brian Elza, the former Co-General Manager and Vice President of Sales at Varsity All Star, testified that after acquiring JAM Brands, Varsity's market share increased to 86% of the All Star Competition market.[232] Moreover, Mr. Elza testified to the reliability of these figures, indicating that it was important for Varsity to get these figures correct and that these figures are generally reliable given that Varsity often had access to competing firms' financials as part of the acquisition process.[233]

## 2. The Cheer Competitions market is protected by barriers to entry

High market share alone does not necessarily ensure a firm has market power. If there are no barriers to entry, any attempt to raise price above the competitive level would induce enough entry to compete away the supracompetitive price.[234] Prof. Murphy claims that there are not significant barriers to entry to Cheer Competitions.[235] If claim were correct, economic theory suggests one would expect to see considerable entry and a reduction in profit margins for event producers. The record evidence shows otherwise. On the contrary, Varsity's market share has grown considerably[236] and there has been little entry by competing event producers; together this suggests that Varsity is protected by high barriers to entry.

Prof. Murphy does cite two recent entrants that produce All Star Cheer Competitions—Liberty Spirit and Freedom Spirit—neither of which is a viable competitor to Varsity. For example, Mr. Elza, the former Co-General Manager and Vice President of Sales at Varsity All Star, is the owner of Liberty Spirit, and he testified that his events cannot compete with Varsity for many reasons, including the fact he cannot offer bids to Worlds or The Summit. Despite charging

---

[231] Bain Capital, July 2018, Project Impact Diligence Summary, FEAS-Ares00075986 - FEAS-Ares00076033, at 6023.

[232] Deposition of Brian Elza, 16 November 2021, at 81:6-11.

[233] Mr. Elza testified that Varsity felt it was important to accurately estimate competitors' market shares and used their financials to do so: "Q. And at the time, you thought it was important to estimate the market share of competitors, correct? [objection omitted] A. Yes. Q. Yes? A. Yes. Q. And it was important for your business to be as accurate as possible in these estimates; is that right? [objection omitted] A. Yes. I'm pretty much [sic] we had the financial documents on most of those companies, because this is right before we purchased the next four. Q. I see. So when you're about to purchase – is it fair to say that when you were about to purchase a company, you – that company will share their financials with you; is that right? A. Yes. As part of the due diligence. Q. So you would have access to their financials and, thus, be able to estimate their annual revenues in the All Star event market based on their own financials; is that right? A. Yes. Q. And so you attempted to do that in creating this chart; is that right? A. Yes." Deposition of Brian Elza, 16 November 2021, at 76:16-77:18.

[234] "If many identical firms are capable of entering the market and producing, no firm is able to earn more than the normal level of profits in the long run." Carlton, Dennis W., and Jeffrey M. Perloff, 2005, Modern Industrial Organization, Fourth Edition, Addison Wesley, at 76.

[235] Murphy Report, at ¶238.

[236] Varsity's market share increased from approximately 50% during the 2013/2014 season to between 80 and 85% in 2018. Netz Opening Report, at 52.

Highly Confidential Pursuant to Protective Order

registration fees that are at least 30% less than Varsity's, his events attract few fewer participants: in one location where his event is competing with a Varsity event, Varsity attracted between 250-300 teams with 5-6,000 participants, whereas his event had 18 teams and approximately 300 athletes.[237] When asked about trying to compete with existing Varsity events that offer Worlds or Summit bids, Mr. Elza testified, "In markets where there are other events that offer those, that can very much make your event irrelevant."[238] Mr. Elza also testified that as of May 2022, neither Liberty Spirit or Freedom Spirit had actually held an All Star event and that most new event producers fail:

> "Q. …You were asked some questions by Mr. Garrison and Mr. Kaiser about Liberty Spirit and Freedom Spirit. First question is, has either of those companies ever held an actual All Star event? A. No. Q. These are both startup companies, is that right? A. Yes. Q. And it's fair to say during the course of your many years in the All Star event business, you've seen many All Star event companies and startups that started and then failed, isn't that right? A. You would have to loosely define failed. Q. Went out of business or disappeared. A. Yeah, absolutely, yes."[239]

Prof. Murphy's examples do not support his claim that barriers to entry are low. Specifically, these examples do not demonstrate "successful recent entrants, corroborating the lack of barriers to entry."[240] If anything, the examples demonstrate that Varsity is protected by significant barriers to entry that nascent competitors are unlikely to surmount.

This example also directly contradicts Prof. Murphy's argument that the ability to award bids to Worlds or The Summit are not barriers to entry.[241] All Star teams compete throughout the year to earn bids to these end-of-season events. Prof. Murphy acknowledges that All Star teams travel farther on average for these events than for events that do not offer bids.[242] There is considerable evidence that teams value Worlds bid and Summit bid events above other events that cannot offer bids to either.[243] It is undisputed that Varsity controls the majority of events that offer

---

[237] 17 November 2021, Remote Videotaped Deposition of Brian Elza, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee) (Hereinafter, "Deposition of Brian Elza, 17 November 2021"), at 102:25-103:8.

[238] Deposition of Brian Elza, 17 November 2021, at 46:2-4.

[239] Deposition of Brian Elza, 17 November 2021, at 96:11-97:7.

[240] Murphy Report, at ¶237.

[241] Murphy Report, at ¶244.

[242] Murphy Report, at Exhibit 32.

[243] See, e.g.,

- "Q. You would agree with me that bids to attend Worlds are highly coveted by certain All Star gyms and certain All Star teams? [Objection omitted] A. Generally speaking, yes. Q. And because gyms and teams covet them, event producers often seek to be able to offer bids to Worlds at those events, at their events,

Worlds bids[244] and that a new entrant is unlikely to acquire a Worlds bid event due to USASF rules.[245] Varsity owns 100% of the events that offer bids to The Summit.[246] Given these facts, teams have less incentive to attend Cheer Competitions hosted by non-Varsity event producers that cannot offer Worlds or Summit bids.

Varsity's events are protected by USASF rules and actions, which creates an additional barrier for competing event producers. For example, non-Varsity event producers requested additional divisions for lower-level teams (e.g., L1-L4) be added to Worlds, which presumably would open up opportunities for more event producers to offer Worlds bids. This proposal was killed by the USASF board because it would negatively impact The Summit.[247]

---

correct? [Objection omitted] A. Generally speaking, that – that would be true, if you meet the guidelines and the criteria that's set within the USASF. Q. Event producers use bids to Worlds as a – one means to attract gyms, teams, and athletes to their events, correct? A. I mean, all of these events existed prior to giving Worlds bids. And, you know, size and time in the industry is one of the qualifications; so...But, yeah, bids are a consideration when gyms select certain events." Deposition of Varsity (John Newby), 23 March 2022, at 191:13-192:9.

- In the "Summit" portion of a Q&A document between Platinum (a potential acquirer of Varsity) and Varsity All Star, Varsity describes participation growth in The Summit: "Generally speaking, All Star Gyms will compete during the regular season and aspire to win a Bid to attend competitions at Disney." Varsity Spirit, 04 June 2018, Responses to Questions from Platinum.docx, VAR00335462 - VAR00335466, at 5464.

[244] See,

- Netz Opening Report, at footnotes 58 and 59.
- Orszag Report, at footnote 113.

[245] As explained in my Opening Report, USASF rules give priority to events and event producers based on seniority. Events are protected by geographic and time restrictions. Event producers with earlier USASF membership dates are given protections from possible new events being hosted in a similar area or date range as their existing events. If any new Worlds bids become available, event producers with earlier USASF membership dates are also given preference. The USASF Sanctioning Committee members annually select which event producers and competitions will be permitted to give out Worlds bids based on the established criteria. As part of that process, event producers apply to be a Tier 1 member each year and propose event dates and locations. In the event of a conflict, the USASF guidelines give priority to the event producer that has been a USASF member the longest. New Tier 1 members are only added if an existing event falls below a certain threshold of participating teams. USASF Tier 1 member event producers are those that can give out bids to the Worlds. Netz Opening Report, at 69-73.

[246] Netz Opening Report, at 17.

[247] See, e.g.

- An email from Jeff Fowlkes, former Manager at Varsity Spirit, to John Newby, the Executive Vice President of Impact and VIP Branding at Varsity Brands, describes the proposal and the plan to have two USASF employees and board members, Jim Chadwick (President of the USASF) and Steve Peterson (USASF Vice President of Events and Corporate Alliances) immediately derail the plan: "Today's USASF Board call should be uneventful. The only potential controversial issue is Joelle's proposal to add Jr.s [sic] to Worlds. This is obviously not something we would want for a number of reasons including that it would

Highly Confidential Pursuant to Protective Order

Not being able to offer bids to Worlds or The Summit is a barrier to entry for non-Varsity event producers, particularly given the evidence that the USASF protects Varsity's events to the detriment of other event producers.

Prof. Murphy argues that entry barriers must be asymmetric for purposes of competitive analysis; that is, the entrant must face substantially higher costs or set of costs than the incumbent.[248] Several of the barriers to entry I discuss satisfy this claim.

Prof. Murphy argues that startup costs are low for new entrants because they do not have to, for example, construct facilities but instead can rent facilities, many of which also provide necessary services, such as concessions and ticketing.[249] While true, venues for Cheer Competitions must satisfy very specific requirements—such as 40-foot ceilings and a 54 by 40 foot competition floor space—to be able to host a Cheer Competition, and few venues can meet these requirements.[250] Varsity attempted to lock up as many of these venues as possible by scheduling as many of the available dates as possible and also insisting on exclusive and non-compete agreements to foreclose competing event producers from holding events in venues used by Varsity.[251] These are not costs that are symmetric; in fact, Varsity is intentionally imposing asymmetric costs on its competitors.

Testimony from Mr. Parrish, the former Director of Strategy and Special Projects at Varsity All Star, demonstrates the intent and effect of this strategy:

> "'So we're going to give you three cheerleading competitions.…but we want blackouts from December to April. You can't have another competition here for cheerleading.' And that takes up that venue for the entire season. So if you were a competitor and you wanted to have a competition and you came to Atlanta between the few venues that you could have it in, Varsity has events at most all of them. So that that kind of keeps you from entering the marketplace as—as [sic] a competitor, as a competition director or a competition company."[252]

Varsity erected similar asymmetric barriers in an effort to preclude Billy Smith of Spirit Celebration from hosting events in Atlanta. Varsity contacted at least four venues in an attempt

---

negatively impact the Summit. Chadwick has agreed to have Peterson jump in after Joelle's presentation and state he will add it to the World Advisory Committee meeting this summer. It will die there without us having to publicly oppose it." Newby, John, 01 June 2017, Email: Re: This Morning's USASF Call, VAR00250643.

- "Joelle" in the document above refers to Joelle Antico, the owner of the World Cup All Star gym in New Jersey. Deposition of Varsity (John Newby), 23 March 2022, at 234:8-10.

[248] Murphy Report, at ¶219.

[249] Murphy Report, at ¶¶238-239.

[250] Netz Opening Report, at 80.

[251] Netz Opening Report, at 80-81.

[252] Deposition of Jamie J. Parrish, 03 March 2022, at 124:25-125:12.

Highly Confidential Pursuant to Protective Order

to deny Mr. Smith use of the venue; Mr. LeTard, Vice President of Sales and Development at Varsity, wrote, "We need to use all resources available (venue contacts, CVB [Convention and Visitors Bureau] relationships, etc.) to hinder his expansion into these new markets."[253]

Prof. Murphy claims that having a sufficient number of qualified judges for competitions does not constitute a barrier to entry for event producers, writing, "Nothing prevents judges who work at Varsity competitions from judging at other All Star competitions."[254] The record evidence directly contradicts this claim. Specifically, there is evidence that Mr. Webb discourages judges from participating in non-Varsity competitions.[255] Mr. Parrish confirmed that there was pushback from Varsity, including judges being threatened for judging non-Varsity competitions.[256] Again, this is not only a barrier to entry, but also one that would not be experienced by an incumbent supplier.

Prof. Murphy claims that event producers do not need a critical mass of teams for its events, another entry barrier that I identified,[257] based on empirical analyses in his Exhibits 23 and 27. Prof. Murphy includes many teams in his analysis that are not All Star or School Cheer teams and, as a result, the examples he cites of regular season All Star and "Scholastic" competitions having "fewer than two dozen gyms" in attendance are inapt.[258] Mr. Elza, the former Co-General Manager and Vice President of Sales at Varsity All Star, testified that his Liberty Spirit events would "need at least 75 teams to break even."[259]

---

[253] LeTard, Tres, 10 December 2012, Email: RE: FW: Sc & Amazing Schedule for 2013-14, VAR00320890 – VAR00320894, at 0891.

[254] Murphy Report, at ¶241.

[255] In an internal email, Tres LeTard of Varsity writes, "Jeff [Webb] is hot on taking down Rebel right now and not looking to play nice. I feel like we should rethink letting those Rebel reps Judge for us. I can already hear it…'why…would we give them access to our events!'" Carrier, Justin, 16 September 2016, Email: Re: Rebel, VAR00438032 – VAR00438036, at 8033.

[256] "A. There are some crossovers, but there are also some – there's also pushback. If you judge outside of Varsity, there's pushback; you get phone calls. Q. Pushbacks and phone calls from whom? A. Justin Carrier [Vice President at Varsity Spirit]. Q. Oh, Varsity pushes back? A. Yes. Q. Just to make sure I have this right. Is it your testimony that judges who choose to judge for Varsity as well non-Varsity competitions get pushback from Varsity for judging non-Varsity competitions? A. Yes. Absolutely. My friend – my good friend Frank Middleton and my good friend Amy Tyler were very seasoned judges within the Varsity framework. They went to a lot of competitions. Another friend of mine, Tanya Bowles, was also a very, very seasoned judge with many, many amazing Varsity, you know, events, all – you know, NCA, Battle in the Arena, Battle in the Big Top. I mean, lots of – strike 'Battle in the Arena.' Battle in the Arena is not what I meant to say. I meant to say 'Battle Under the Big Top.' I'm sorry. But then Frank and Amy decided that they wanted to go out and start their own judging company, and there was some severe pushback. And I don't know how that worked out. But I do know that they were called and, you know, reprimanded. And, you know, 'We put you in this business,' and, you know, 'You won't ever judge for us,' and blah, blah, blah. I mean, there were – there was [sic] some definite threats to Frank and Tanya and Amy Tyler." Deposition of Jamie J. Parrish, 03 March 2022, at 110:3-111:11.

[257] Netz Opening Report, at 52.

[258] Murphy Report, at ¶242.

[259] Deposition of Brian Elza, 17 November 2021, at 98:25-99:1.

Highly Confidential Pursuant to Protective Order

Prof. Murphy asserts that Varsity's rebate programs do not constitute barriers to entry because he claims these programs did not foreclose a large enough share of the market; I address this claim in full below in Section VIII.D, where I explain these programs work in conjunction with Varsity's other anticompetitive conduct to foreclose competitors. These programs preclude gyms from attending non-Varsity events, further entrenching Varsity's monopoly. The evidence demonstrates that Varsity focuses its efforts on the largest gyms; to the extent Varsity can lock these gyms into rebates programs—some of which require exclusivity with Varsity—competing event producers are disadvantaged.[260]

Prof. Murphy asserts that Varsity's relationships with over 19,000 middle and high schools and 1,000 college programs does not constitute a barrier to entry because the schools "like" Varsity's products: "The fact that Varsity produces a product that customers like and which generates loyalty is not a barrier to entry as economists use the term, notwithstanding that this makes it harder for others to compete. If the firm starts to act anticompetitively, for example by raising prices, formerly loyal customers will look for alternatives, providing an opportunity for new entrants."[261] He is correct as a matter of basic economics; that is, he accurately describes how properly functioning markets work. However, the record evidence in this matter demonstrates that though customers are dissatisfied with Varsity's products and prices,[262] there are few, if any, viable alternatives because Varsity has a stranglehold on the Cheer Competition market. In particular, Varsity controls 100% of the School Cheer Competitions.[263]

### B. Varsity possesses and exercises market power over Cheer Apparel

Prof. Murphy claims I fail to show Varsity possesses market power in the Cheer Apparel market, arguing there are alternative suppliers and low barriers to entry.

---

[260] Varsity documents often identify the largest individual customers, as well as noting that a small share of gyms represent a disproportionate amount of spending. For, example a 2016 Varsity presentation includes a slide listing the largest All Star gym customers, noting that the "Top 5% of Gyms (130): 40% of Total Spend" and the "Top 20% of Gyms (520): 75% of total spend." Seely, Bill, May 2017, Seely President Presentation, Varsity Spirit, VAR00009167 – VAR00009185, at 9185.

[261] Murphy Report, at ¶242.

[262] Netz Opening Report, at 47-50.

[263] See, e.g.,

- A 2014 Bain presentation claims that "Varsity is the undisputed leader in cheerleading uniforms, competitions, and camps" and included a chart illustrating that 100% of the U.S. market for School Cheer Competitions belonged to UCA, NCA, and USA—all Varsity-owned brands—in 2013. Bain Capital, 17 October 2014, Project Hercules Interim IC, BAIN00055587 - BAIN00055646, at 5631.

- A 2018 Bain presentation includes a similar chart illustrating that 100% of the U.S. market for School Cheer Competitions still belonged to UCA, NCA, and USA in 2017. Bain Capital, July 2018, Project Impact Diligence Summary, FEAS-Ares00075986 - FEAS-Ares00076033, at 6023.

Highly Confidential Pursuant to Protective Order

### 1.  Varsity dominates the Cheer Apparel market, despite the existence of a competitive fringe

Prof. Murphy relies on his analysis of All Star and "Scholastic" apparel purchasing patterns to demonstrate that athletes must be purchasing from non-Varsity suppliers. As I explained in Section VI.A.2 above, these calculations are flawed because he includes entities that are neither All Star Competitive Cheer nor School Cheer athletes and, therefore, do not represent the purchasing patterns of the class members in this matter.

Regarding the specific alternative suppliers he mentions,[264] he cites a declaration from Karen Noseff Aldridge, the Founder and President of Rebel Athletic Inc., suggesting Rebel has a larger share of the "All Star" apparel market than Varsity.[265] I do not define an "All Star" apparel market, nor does Prof. Murphy. In my Opening Report, I showed that Rebel struggled to gain market share in part because Varsity had many large customers locked up through its rebate programs and precluded Rebel from displaying its products at Varsity events.[266] Ms. Noseff's statements may be applicable to a particular subset of customers or products, but not to the product market that I have defined.

Prof. Murphy cites to the existence of other apparel providers as evidence that Varsity lacks market power. For example, he claims that "Nfinity has emerged as a strong competitor."[267] To support this claim, Prof. Murphy cites the following testimony from Marlene Cota, former Varsity vice president of corporate alliances and business development, discussing competing apparel providers: "Nfinity definitely in the shoe market, that particular niche segment Nfinity."[268] Ms. Cota was responding to a question asking her to identify Varsity's competitors for supplying apparel to All Star teams. This testimony is notable not for the excerpt above that Prof. Murphy selected, but rather for the testimony he excluded. Specifically, the following exchange is from the question immediately before the excerpt cited by Prof. Murphy: "Q. Okay. Who was Varsity's biggest threat in the All Star apparel market? A. Biggest in terms of size? I mean, there really isn't a closest competitor..."[269] Ms. Cota continued to provide additional

---

[264] Murphy Report, at ¶¶234-235.

[265] 30 July 2021, Declaration of Karen Noseff Aldridge in Support of Rebel Athletic Inc.'s (1) Response to Plaintiffs' Motion to Compel, (2) Motion to Quash Subpoena Duces Tecum, and (3) Response to Plaintiffs' Motion to Transfer, Fusion Elite All Stars, et al. v. Rebel Athletics Inc., No. 3:21-MC-00151-L (United States District Court for the Northern District of Texas Dallas Division).

[266] Prior to being acquired by Varsity, Rebel had a partnership with JAM Brands allowing Rebel to display its products at JAM Brands events, but Varsity terminated this arrangement after acquiring JAM Brands. Netz Opening Report, at 57-58.

[267] Murphy Report, at ¶235.

[268] See, e.g.,

- Murphy Report, at ¶235.

- Deposition of Marline Cota, Volume I, 06 April 2022, at 64:9-11.

[269] Deposition of Marline Cota, Volume I, 06 April 2022, at 63:25-64:5, emphasis added.

Highly Confidential Pursuant to Protective Order

testimony that also directly contradicts Prof. Murphy, including his similar claim that GK Elite is a "strong competitor."[270]

Regarding competitors for supplying apparel to School Cheer teams, Ms. Cota testified,

> "You know, you have brands like Nike and Under Armour that would occasionally come out with product innovations, but nobody can do what Varsity does in terms of customization and personalization. So there is – there wasn't a threat, isn't a threat. There are small companies, GK Elite. The name escapes me now, but it is a smaller midwestern company. But nobody that of the scope of products and services that Varsity offers that really even comes close."[271]

The examples cited by Prof. Murphy do not support his claims, but rather are consistent with the conclusion that Varsity has market power in the Cheer Apparel market.

Prof. Murphy does not contest the direct evidence I presented, including that Varsity was able to maintain supracompetitive prices over time. Specifically, Varsity products are "consistently higher priced than our competitors in all major product categories"; Varsity apparel "underperforms in product delivery and price/value"; and "Varsity is expensive when compared to other vendors. They [Varsity] pretty much have a monopoly over the industry…we have little choice."[272]

## 2.  The Cheer Apparel market is protected by barriers to entry

Prof. Murphy argues that I fail to establish the existence of any significant barriers to entry in the Cheer Apparel market, asserting that Varsity's rebate programs do not constitute barriers to entry because he claims these programs did not foreclose a large enough share of the market.[273] I address this claim in full below in Section VIII.D, where I explain these programs work in conjunction with Varsity's other anticompetitive conduct to foreclose competitors in both the Cheer Competition and Cheer Apparel markets. These programs discourage teams from purchasing non-Varsity apparel, further entrenching Varsity's monopoly. The evidence demonstrates that Varsity focuses its efforts on the largest gyms; to the extent Varsity can lock

---

[270] See, e.g.,

- Murphy Report, at ¶235.

- Ms. Cota mentions multiple apparel providers, including Rebel Athletic, Nfinity, and GK Elite, but testifies that none are threats to Varsity. Deposition of Marline Cota, Volume I, 06 April 2022, at 64-65.

- It is also notable that Ms. Cota identifies Nfinity as a "niche" competitor for shoes only, despite the fact Prof. Murphy cites other testimony in the same footnote indicating they also manufacture apparel and bags.

[271] Deposition of Marline Cota, Volume I, 06 April 2022, at 65:2-65:19, emphasis added.

[272] Netz Opening Report, at 57-58.

[273] Murphy Report, at ¶¶254-255.

Highly Confidential Pursuant to Protective Order

these gyms into rebates programs—some of which require exclusivity with Varsity—competing apparel providers are disadvantaged.[274]

The following deposition excerpt from Jamie Parrish, former Director of Strategy and Special Projects at Varsity All Star, illustrates how Varsity's rebate plans function as barriers to competing suppliers:

> "And I think that's when Nfinity started, you know getting some of that market share. But, you know, if we could go in behind them with our sales rep and push things with the Family Plan and make them deals that they couldn't, you know, refuse, then take – then Nfinity would – you know, they would lose almost every time because we could position other things. We would give them, you know, free registration or we could give them a cut on uniforms or whatever."[275]

The above evidence is consistent with the conclusion that Varsity has market power in the Cheer Apparel market.

### C. Varsity possesses and exercises market power over Cheer Camps

Prof. Murphy claims I fail to show Varsity possesses market power in the Cheer Camps market. To support this argument, he cites the existence of alternative suppliers and the year-to-year fluctuations in attendance at Varsity camps;[276] he also claims there are low barriers to entry.[277] Below I explain why these claims are misguided.

#### 1. Varsity dominates the Cheer Camp market, despite the existence of a competitive fringe

Prof. Murphy's claim regarding the existence of other suppliers of Cheer Camps is brief: he says there are "numerous camp producers" other than Varsity, but then only lists three.[278] As I explained in Section VII.A above, the existence of other Cheer Camp suppliers does not demonstrate that Varsity lacks market power. In my Opening Report, I acknowledged the existence of other suppliers,[279] while also presenting market share figures that demonstrate

---

[274] Varsity documents often identify the largest individual customers, as well as noting that a small share of gyms represent a disproportionate amount of spending. For, example a 2016 Varsity presentation includes a slide listing the largest All Star gym customers, noting that the "Top 5% of Gyms (130): 40% of Total Spend" and the "Top 20% of Gyms (520): 75% of total spend." Seely, Bill, May 2017, Seely President Presentation, Varsity Spirit, VAR00009167 – VAR00009185 at 9185.

[275] See, e.g.,

- Deposition of Jamie Parrish, Volume I, 03 March 2022, at 205:16-206:1.

- Prof. Murphy also cites to testimony from Mr. Parrish regarding competitors in the Cheer Apparel market. Murphy Report, at footnote 432.

[276] Murphy Report, at ¶¶232-233.

[277] Murphy Report, at ¶¶247-248.

[278] Murphy Report, at ¶232.

[279] Netz Opening Report, at 32-33.

Case 2:20-cv-02892-SHL-tmp    Document 389-3    Filed 02/10/23    Page 75 of 131
PageID 10746
Highly Confidential Pursuant to Protective Order

Expert Rebuttal Report of Janet S. Netz, Ph.D.                    70 of 91

Varsity has a dominant share in this market. Specifically, I cited testimony from Varsity employees and Varsity documents; both sources indicate Varsity has a market share of approximately 80-85% throughout the entire Class Period.[280] Although Prof. Murphy also cites additional camps suppliers, he presents no market share figures or any evidence that these firms constrain Varsity's market power in any respect.

Prof. Murphy also argues that the year-to-year fluctuations in attendance by "Scholastic" teams at Varsity camps suggests that customers are switching between Varsity and other suppliers.[281] As I have already explained, Prof. Murphy's definition of "Scholastic" includes many school-affiliated entities that are not Competitive Cheer teams. The appropriate analysis, which Prof. Murphy has not done, would examine the attendance patterns for school-affiliated Competitive Cheer teams that both "participate in competitions" and "participate in camps" according to the definitions on Prof. Murphy's Exhibit 7. As such, the conclusions Prof. Murphy draws from his Exhibit 43 are uninformative to School Cheer teams. Contrary to Prof. Murphy's claims, this evidence does not show that customers are switching between Varsity and other suppliers: there is no information about other suppliers whatsoever and there is no reason to expect, for example, that traditional, sideline cheer teams attend camps every year. Alternatively, these results may simply indicate that about one-third of school teams attend camps every year, while the other two-thirds attend camps every other year, which is consistent with Prof. Murphy's claims that one-third of teams are increasing attendance from the previous year and one-third of teams are decreasing attendance from the previous year.

## 2. The Cheer Camp market is protected by barriers to entry

Prof. Murphy argues that none of the barriers to entry I discussed in my Opening Report are substantial. Specifically, he argues that Varsity's ability to provide bids to national school competitions to "Scholastic" teams at camps does not act as a barrier to entry because 74-79% of schools that send teams to camps do not attend competitions and a new entrant is not precluded from selling to those schools.[282] Similarly, he argues that the Squad Credentialing program that is part of Varsity's camps does not constitute a barrier to entry for the same reason.[283]

As I have already explained, Prof. Murphy's definition of "Scholastic" teams contains traditional, sideline cheer teams and other school-related entities that are not Competitive School Cheer teams. Specifically, only 10,330 of his 16,486 "Scholastic" teams participate in camps and only 3,269 of those "Scholastic" teams participate in competitions.[284] Of the 10,330 teams that participated in camps, 7,061 are not Competitive Cheer teams, but rather traditional sideline teams or some other school-related entity that purchased apparel from Varsity. In other words, those "Scholastic" teams may attend a Varsity camp, but it is some other type of camp, such as

---

[280] Netz Opening Report, at 61.

[281] Murphy Report, at ¶233.

[282] Murphy Report, at ¶247.

[283] Murphy Report, at ¶248.

[284] Murphy Report, at Exhibit 7.

Highly Confidential Pursuant to Protective Order

dance or sideline cheer. The fact that new entrants are not precluded from supplying products to teams attending, for example, dance camps, is irrelevant to this matter. The relevant analysis would examine the share of teams in which we are interested—the 3,269 Competitive Cheer teams that participated in competitions and also attended camps, but Prof. Murphy never examines this group of customers. As a result, any conclusions he draws regarding whether there are or are not significant barriers to entry in the Cheer Camps markets are not appropriate.

Prof. Murphy fails to show that Varsity lacks market power in the Cheer Camps market or that Varsity's market power is not protected by barriers to entry.

## VIII.        Varsity's conduct harmed competition

As explained in my Opening Report and below, the USASF's rules and active coordination with Varsity enabled Varsity to acquire and maintain market power, and to acquire and maintain control of the USASF. Varsity also acted to acquire and maintain market power via its policy of tying Cheer Camps and School Cheer Competitions, its acquisitions of other event producers, and by designing rebate programs for All Star gyms that foreclose competitors.[285]

### A. Varsity's control of and coordination with the USASF harmed competition

As explained in my Opening Report, Varsity's conduct created an ecosystem that enabled it to acquire and maintain market power in the relevant markets.[286] The record evidence shows that Varsity's conduct was part of a deliberate strategy to acquire and maintain market power, and that it was so successful that Varsity sought to replicate the strategy as it expanded internationally:

- "Varsity was instrumental in the creation of the All Star governing body (USASF) which enabled policies beneficial to growth of the overall All Star market and Varsity.

- USASF set the rules of engagement for athletes, coaches, gyms and event producers (including Varsity and non-Varsity parties)."[287]

Varsity understood that control of the USASF enabled it to acquire and maintain its market power: "In the world of sports, he who makes the rules, rules."[288]

Defendants' experts ignore this record evidence.

---

[285] Netz Opening Report, at §V.

[286] Netz Opening Report, at §V.A.

[287] Varsity Brands, 24 October 2017, Q4 Board of Directors Meeting, CB00025330 – CB00025449, at 5396,

[288] Varsity Brands, 24 October 2017, Q4 Board of Directors Meeting, CB00025330 – CB00025449, at 5399.

Highly Confidential Pursuant to Protective Order

## 1. Defendants' experts misconstrue the founding and mission of USASF

I agree with Defendants' experts that sanctioning bodies are not inherently anticompetitive.[289] We also agree that sanctioning bodies, by nature, restrict competition.[290] When an association of member firms restrict competition, there is naturally the potential for anticompetitive behavior.

It's for this reason that, for example, the New York Yankees do not exert unilateral control over Major League Baseball. I am unaware of any sporting association in which the governing body is controlled by a single member.

Competitive Cheer already had an independent sanctioning body, the NACCC, prior to the USASF.[291] Varsity responded to the NACCC by creating the USASF, which in turn acquired and dissolved the NACCC.[292] Prof. Murphy and Mr. Orszag both ignore these facts and instead claim that Varsity created the USASF to fill an unmet need for a governing body.[293] Mr. Orszag only mentions the NACCC in a single footnote, quoting my Opening Report.[294] Prof. Murphy fails to mention the NACCC at all.

## 2. Varsity has controlled USASF since its inception, and its control has only increased

My Opening Report explained how Varsity created the USASF, stacked its decision-making bodies with Varsity employees, and made the USASF and its employees dependent on Varsity. The financial and logistical support Varsity provided created incentives for the USASF to act in ways that benefited Varsity.[295] An extreme example is that USASF employees participated in Varsity stock option plan.[296] This meant that the two most senior USASF employees, both of whom were permanent members of the Board of Directors, had direct financial stakes in providing a competitive advantage for Varsity. Defense experts ignore this fact, asserting that

---

[289] Murphy Report, at ¶¶260-266, and Orszag Report, at ¶25.

[290] Murphy Report, at ¶54, and Orszag Report, at ¶28.

[291] Netz Opening Report, at 18-19.

[292] Netz Opening Report, at 19-20.

[293] Orszag Report, at ¶42.

[294] Orszag Report, at footnote 93.

[295] Netz Opening Report, at 20-21.

[296] See,

- USASF President and Board Member Jim Chadwick remained a Varsity employee by contract during his tenure with USASF and received a "ballpark" $300,000 payment from Varsity's employee stock option plan when Charlesbank purchased an interest in 2014. 15 April 2022, Videotaped Oral 30(b)(6) Deposition of United States All Star Federation, Inc. by Corporate Designee Jim Chadwick, and as 30(b)(1) capacity, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee) (Hereinafter "Deposition of USASF (Jim Chadwick), 15 April 2022"), at 41:1-19 and 274:22-275:3.

- USASF Vice President and Board Member Steve Peterson also received a payment of roughly $250,000 following Charlesbank's purchase. Deposition of USASF (Steve H. Peterson), 09 March 2022, at 282:5-14.

Highly Confidential Pursuant to Protective Order

USASF's "outsourcing of services to Varsity" did not create an anticompetitive advantage for Varsity.[297]

In my Opening Report, I also explained how Varsity's acquisitions of rival event producers strengthened its control of the USASF.[298] Varsity's acquisition of companies with voting seats on the USASF Board of Directors and Sanctioning Committee have given it a permanent majority of votes on both. The USASF took no action to prevent a single member firm from attaining control over its key committees, as I discuss in Section VIII.A.3.f). Defendants' experts agree that Varsity has a permanent voting majority and that this is the result of Varsity's acquisition of its competitors.[299]

### 3. Varsity and USASF actively coordinated to benefit Varsity

Prior to the class period, Varsity and the USASF coordinated to enact rules governing All Star Cheer that enabled Varsity's acquisition and maintenance of market power. Substantially all of these rules are still in place today.

Defendants' experts claim that Varsity and the USASF did not actively coordinate their actions to provide Varsity a competitive advantage over its rivals.[300] They ignore record evidence showing that Varsity and the USASF coordinated in the following ways.

#### a) Varsity and USASF actively coordinated to choose which event producers could grant Worlds bids

For example, USASF President Jim Chadwick asked Varsity founder Jeff Webb for permission to add independent event producers to the list of approved Worlds bids granting events. Mr. Chadwick relayed the discussions to Varsity's Co-General Manager and Vice President of Sales Brian Elza and Co-General Manager and Vice President of Operations Tres LeTard to discuss the idea further:

> "I spoke with Mr. Webb yesterday and he is fine with adding 2 or 3 independent event producers to the 42 approved Worlds bid givers. Steve is doing an analysis to see who might qualify. Once that is done, I will set up an [sic] conference call so the four of us talk about next steps."[301]

In other words, Varsity and Jeff Webb determined whether independent event producers could grant Worlds bids. On this occasion, Varsity allowed three independent event producers to grant Worlds bids, but generally it restricted the number of Worlds bid events available to competitors. Absent coordination between Varsity and the USASF, the latter would have independently determined the appropriate number of Worlds bid events and distributed them in a manner that

---

[297] Orszag Report, at ¶43.

[298] Netz Opening Report, at §V.D.

[299] Orszag Report, at ¶¶41, 51, 56, 61, 63-64.

[300] Orszag Report, at ¶36-41, and Murphy Report, at ¶256, 267-276.

[301] Chadwick, Jim, 16 April 2019, Email: Follow Up, USASF_00039789.

Highly Confidential Pursuant to Protective Order

weighed the benefits to the Competitive Cheer community as a whole, consistent with its role as the sanctioning body.

> b) Varsity and USASF actively coordinated to grant Varsity the power to unilaterally take away a Worlds bid event from a rival event producer

Varsity and USASF not only coordinated to determine which events could grant Worlds bids, they also coordinated to give Varsity the power to unilaterally revoke the Worlds bids of any event producer. In 2016, Varsity founder Jeff Webb and USASF Vice President and Board Member Steve Peterson changed the USASF's Worlds Approval Guidelines. The change in policy was implemented without a vote. The new policy read:

> "In an effort to protect the integrity of Worlds, the USASF reserves the right to make changes to Tier 1 approval guidelines, as recommended by the Sanctioning Committee, prior to each year's approval process. Therefore, there is no guarantee that an existing Event Producer or one under new ownership, holding a current season Worlds bid event, will be approved for the following season."[302]

In other words, the USASF Sanctioning Committee, which was controlled by Varsity, could unilaterally change the approval guidelines and deny any producer of a Worlds bid event approval for the following year.

> c) Varsity and USASF actively coordinated to kill at least two proposals in order to protect Varsity's Summit event

The USASF rejected a 2015 proposal by independent event producers to add junior events to Worlds.[303] This proposal was sent by Billy Smith, owner of the IEP Spirit Celebration, on behalf of 36 IEPs and another 15 related companies.[304] Mr. Smith wrote there were many event producers that are "just blocked by the rules of 200 miles and 30 days but want to participate in the process of giving bids to an Elite Championship" and he described the groups' "thought process" as follows: "The USASF is our governing body and should host the ultimate event for all levels like they do Worlds levels 5 & 6. They [the USASF] are not an EP but they are our governing body. We want the event staff to rotate and show more balance."[305] The proposal included the following provisions, among others: each event producer can only award a single bid and the event would be managed by USASF, but staffing of the event would rotate among

---

[302] Webb, Jeff, 31 August 2016, Email: Re: Worlds bids, VAR00110239, at 0239.

[303] Elza, Brian, 07 August 2015, Email: Fwd: All Level Championship Concept, VAR00273953 - VAR00273955.

[304] The proposal was initially discussed with Steve Peterson, USASF Vice President of Events and Corporate Alliances, who advised Mr. Smith to send it to the USASF Sanctioning Committee, which included Brian Elza, former General Manager and Vice President of Sales at Varsity All Star.

[305] Elza, Brian, 07 August 2015, Email: Fwd: All Level Championship Concept, VAR00273953 - VAR00273955, at 3954.

Highly Confidential Pursuant to Protective Order

three groups (independent event producers, JAM Brands, and Varsity).[306] The USASF Sanctioning Committee failed to act on this proposal. Within a few months of this proposal being submitted, Varsity acquired JAM Brands, which gave it a majority share of seats on the USASF Sanctioning Committee.[307]

Two years later, the USASF and Varsity coordinated to kill a similar IEP proposal. This is demonstrated in the following email from Jeff Fowlkes, former Manager at Varsity Spirit, to John Newby, the Executive Vice President of Impact and VIP Branding at Varsity Brands, regarding a proposal to add lower levels to Worlds. Mr. Fowlkes indicates that two USASF employees and board members, Jim Chadwick, President of the USASF, and Steve Peterson, USASF Vice President of Events and Corporate Alliances, have already agreed to derail the plan before it can even be considered because it will negatively impact Varsity's Summit:

> "Today's USASF Board call should be uneventful. The only potential controversial issue is Joelle's[308] proposal to add Jr.s [sic] to Worlds. This is obviously not something we would want for a number of reasons including that it would negatively impact the Summit. Chadwick has agreed to have Peterson jump in after Joelle's presentation and state he will add it to the World Advisory Committee meeting this summer. It will die there without us having to publicly oppose it."[309]

If the independent event producers' proposals had been enacted, the expanded Worlds event would have competed directly with Varsity's Summit event.[310] Varsity coordinated with USASF Board members to kill the proposals, thereby protecting Varsity from additional competition.

### d) USASF's rules protect incumbent event producers, chiefly Varsity

Several USASF rules protect incumbent event producers, especially producers of Worlds bid events. As the dominant event producer and the producer of the vast majority of Worlds bid events, Varsity is by far the biggest beneficiary of these rules.

The USASF places limits on the date and location of Worlds bid events to protect other Worlds bid events. Mr. Orszag argues that because these limitations protect both Varsity and non-Varsity Worlds bid events, they cannot be anticompetitive.[311] The geographic limitations protect

---

[306] Smith, Billy, 25 July 2015, Championship NAB proposal.docx, VAR00273956 - VAR00273958, at 3956 and 3958.

[307] Netz Opening Report, at 96.

[308] This refers to Joelle Antico, the owner of the World Cup All Star gym in New Jersey. Deposition of Varsity (John Newby), 23 March 2022, at 234:8-10.

[309] Newby, John, 01 June 2017, Email: Re: This Morning's USASF Call, VAR00250643, emphasis added.

[310] While the divisions have changed over time, for most of the class period only senior L5-L7 teams were eligible to compete at Worlds and L1-L5 non-Worlds eligible teams were eligible to compete at The Summit.

[311] Orszag Report, at ¶¶75-76.

Highly Confidential Pursuant to Protective Order

incumbent Worlds bid event holders from competition. Varsity benefits from this disproportionately because it owns most Worlds bid events.

Defendants' experts claim these limitations are procompetitive because they prevent multiple events from cannibalizing each other's registrations or oversaturating a given region with events.[312] However, the limitations only apply to Worlds bid events. Crucially, these geographic and date limitations do not apply to Varsity's Summit bid events. This double-standard has enabled Varsity to target other event producers' Worlds bid events by locating its Summit bid events near Worlds bid events.

USASF rules protected incumbent event producers, chiefly Varsity, in other ways. Mr. Orszag argues that I misinterpreted USASF rules in my Opening Report.[313] He is wrong. In my Opening Report, I explained that the USASF forbids its member athletes, judges, gyms, and event producers from attending or hosting events that could undermine Varsity's dominance, including any year-end competitions that purport to be a World championship.[314] I cited a letter from the USASF President Jim Chadwick to members and officials that stated:

> "It is therefore the policy of the USASF/IASF that no athlete, coach, judge, or official is permitted to participate in any way in any event that claims to be a World or International Championship, other than the ICU World Championships for National teams, or the USASF/IASF Worlds for All Star or Club teams. This stipulation applies to any regional international championship affiliated with an organization claiming to operate a World Championship, other than the ICU and USASF/IASF.
>
> Failure to comply with this rule is grounds for disqualifying any athlete, coach, judge, or official from participating in the ICU and USASF/IASF World Championships. Therefore, it is critical that you clearly communicate this stipulation to all your participants, athletes, and coaches in order to insure [sic] compliance and to insure [sic] that their eligibility for Worlds is protected."[315]

My Opening Report also explained that the USASF membership agreement for event producers includes stipulations precluding members from hosting "World" championship event or recruiting teams for such an event hosted by a third party.[316]

---

[312] Orszag Report, at ¶77, and Murphy Report, at ¶273.

[313] The section headings are "Varsity and USASF conspired to prohibit USASF members from participating in rivals' events" and "Varsity and USASF conspired to prohibit members from partnering with rival sanctioning bodies".

[314] Netz Opening Report, at 85.

[315] Chadwick, Jim, U.S. All Star Federation, et al., 18 October 2011, USASF/IASF: Worlds Policy Update, Spirit Post, https://spiritpost.com/2011/10/usasfiasf-worlds-policy-update/, accessed 12 April 2022 (Hereinafter "USASF/IASF: Worlds Policy Update"), emphasis added.

[316] Netz Opening Report, at 86.

Highly Confidential Pursuant to Protective Order

Mr. Orszag claims that I misrepresented the USASF's policy and that "at all times relevant to this case, such a limitation did not apply to member athletes, coaches, or judges." He cited deposition testimony from USASF employee Amy Clark that directly contradicts the letter.[317] He also states that the letter I cited "was never authenticated as actually being written or distributed by Mr. Chadwick and/or Mr. Peterson."[318] In addition to the publicly-available version of the letter cited in my opening report, I have located an additional copy of the letter that was produced by Plaintiff Craig Hallmark.[319]

Regardless of whether the USASF did punish its member athletes, coaches, judges or officials for attending or hosting a non-sanctioned World championship event, the USASF did communicate to its members that it would punish such actions. As I explained in Section VII.A.2, there is also evidence that Varsity threatened judges for judging non-Varsity competitions, which suggests such threats would be taken seriously by industry participants.[320]

Even if the USASF did not in fact punish members for attending or hosting non-USASF sanctioned events, communicating that it would do so would have a chilling effect. Moreover, Mr. Orszag and Prof. Murphy agree that it was the USASF's policy to prevent event producer members from participating in events that were marketed as a "World" championship.[321]

---

[317] Orszag Report, at footnote 161.

[318] Orszag Report, at footnote 160.

[319] U.S. All Star Federation, 18 October 2011, Email: Worlds Policy Update, AMSPIR060900 - AMSPIR060901.

[320] See, e.g.,

- In an internal email, Tres LeTard of Varsity writes, "Jeff [Webb] is hot on taking down Rebel right now and not looking to play nice. I feel like we should rethink letting those Rebel reps Judge for us. I can already hear it…'why…would we give them access to our events!'" Carrier, Justin, 16 September 2016, Email: Re: Rebel, VAR00438032 – VAR00438036, at 8033.

- "A. There are some crossovers, but there are also some – there's also pushback. If you judge outside of Varsity, there's pushback; you get phone calls. Q. Pushbacks and phone calls from whom? us. A. Justin Carrier [Vice President at Varsity Spirit]. Q. Oh, Varsity pushes back? A. Yes. Q. Just to make sure I have this right. Is it your testimony that judges who choose to judge for Varsity as well non-Varsity competitions get pushback from Varsity for judging non-Varsity competitions? A. Yes. Absolutely. My friend – my good friend Frank Middleton and my good friend Amy Tyler were very seasoned judges within the Varsity framework. They went to a lot of competitions. Another friend of mine, Tanya Bowles, was also a very, very seasoned judge with many, many amazing Varsity, you know, events, all – you know, NCA, Battle in the Arena, Battle in the Big Top. I mean, lots of – strike 'Battle in the Arena.' Battle in the Arena is not what I meant to say. I meant to say 'Battle Under the Big Top.' I'm sorry. But then Frank and Amy decided that they wanted to go out and start their own judging company, and there was some severe pushback. And I don't know how that worked out. But I do know that they were called and, you know, reprimanded. And, you know, 'We put you in this business,' and, you know, 'You won't ever judge for us,' and blah, blah, blah. I mean, there were – there was [sic] some definite threats to Frank and Tanya and Amy Tyler." Deposition of Jamie J. Parrish, 03 March 2022, at 110:3-111:11.

[321] Orszag Report, at ¶82, and Murphy Report, at ¶276

Highly Confidential Pursuant to Protective Order

Prof. Murphy argues that this rule was simply intended to prevent "brand confusion".[322] Prof. Murphy does not explain how the USASF threatening punishment for athletes, coaches, judges and officials would prevent brand confusion, nor does he explain why the USASF and Varsity could not avoid brand confusion by enforcing their relevant trademarks.[323]

Based on the clear meaning of the USASF/IASF: Worlds Policy Update letter, the USASF threatened all members with punishment for supporting any event that attempted to compete with the Cheerleading Worlds. The fact that the Cheerleading Worlds was the only event billed as a "world" championship made it desirable to attend. One former USASF board member explained, "The USASF was extremely wise to legislate their way into the exclusive use of 'World Champion' in its title, because that is 99% of the reason teams attends the event. If Worlds had to compete on an even footing with a quality alternative, I don't believe many would show [sic] teams would show up."[324]

Varsity, as the largest producer of Worlds bid events, would necessarily be the main beneficiary of the policy. Any policy that enhanced or protected the value of Worlds would enhance and protect the value of Worlds bid events as well.

Mr. Orszag argues that the USASF's anticompetitive rules were all in place prior to the class period and that Plaintiffs' claim is that USASF should have changed its rules to prevent Varsity's control of the relevant markets.[325] He also argues that Varsity's share of Worlds bid events was due entirely to its acquisitions, which he claims are the result of Varsity's unilateral conduct.[326] While I agree that Varsity's acquisitions allowed it to acquire and maintain market power in the relevant market for All Star Competitions, the USASF played a part in the acquisitions.

Varsity and the USASF created, enforced, and refused to change the rules that facilitated Varsity's acquisition and maintenance of market power. The fact that many of USASF's rules were enacted prior to the class period is irrelevant as a matter of economics. An independent sanctioning body that was not coordinating with Varsity to disadvantage its rivals would have taken actions to ensure the relevant markets remained competitive. Instead, the USASF's inaction was inconsistent with its obligations as a sanctioning body; the only reasonable explanation for its conduct is that it was actively coordinating with Varsity.

> e) Varsity's targeting of other event producers was enabled by USASF

---

[322] Murphy Report, at ¶276.

[323] Varsity owned the trademark for the Cheerleading Worlds. U.S. All Star Federation, 2013, An Open Letter to Our Membership, VAR00351488 - VAR00351491, at 1489.

[324] Singer, Lynn, 03 May 2016, Email: Fwd: Worlds and USASF Concerns, USASF_00011067 - USASF_00011070, at 1067.

[325] Orszag Report, at ¶¶36-37.

[326] Orszag Report, at ¶¶12(a), 51, 56, and 61.

Highly Confidential Pursuant to Protective Order

In my Opening Report, I presented evidence demonstrating that Varsity targeted rivals' events by scheduling a Varsity event in close vicinity to, and around the same time as, its rivals' events.[327] The purpose of this strategy was to take customers away from competitors; Varsity focused its efforts on both established Tier 1 event producers as well as nascent competitors.[328] I explained how these efforts were enabled and encouraged by the USASF. Defendants' experts dismiss the evidence I presented, claiming that that the USASF rules did not favor Varsity,[329] that any information provided to Varsity by the USASF was available to other event producers as well,[330] and that this conduct is consistent with procompetitive conduct.[331]

In my Opening Report, I described that Varsity was able to successfully target competitors' events because of its control of the rules-making process and the ongoing cooperation of the USASF. Specifically, there are USASF rules that determine when and where certain events can take place in relation to existing Worlds bid events, and there are USASF rules setting the minimum number of teams an event must attract in order to retain its Worlds bids.

Regarding the first rule, USASF Guideline 3.b states that existing Worlds bid events will be "protected, within a four-week window on either side of the current bid giving event, for a 200 mile radius" and "protected for a 500 mile radius from other bid giving events on the same weekend."[332] Mr. Orszag argues that this rule does not favor Varsity because it applies to all event producers hosting Worlds bid events. However, as of 2020, Varsity controlled 36 of 46 Worlds bids events and, therefore, Varsity disproportionately benefits from this rule.[333] Varsity obtained this number of Worlds bid events through its anticompetitive conduct.[334]

Mr. Orszag argues that there are legitimate reasons for the USASF to enact and enforce Rule 3.b, including to spread out events over time and throughout the country; as support, he presents examples of other sports leagues having similar rules.[335] I do not dispute those rules exist in other sports leagues nor that they serve legitimate, procompetitive purposes in those instances. However, the analogy is not applicable to the USASF and Varsity because other sports leagues

---

[327] Netz Opening Report, at §V.B.1.

[328] Netz Opening Report, at §§V.B.1.b) - V.B.1.c).

[329] Orszag Report, at ¶79.

[330] Orszag Report, at ¶¶71-72.

[331] Murphy Report, at ¶345, and Orszag Report, at ¶74.

[332] See, e.g.,

- Peterson, Steve, 12 December 2016, Email: IMPORTANT: Tier 1 Event Producer Application Process 2017-2018, USASF_00011692 - USASF_00011743, at 1717.

- Netz Opening Report, at 71.

[333] Netz Opening Report, at 101.

[334] Netz Opening Report, at §§V.B. and V.D.7.b).

[335] Orszag Report, at ¶77.

Highly Confidential Pursuant to Protective Order

do not allow a single event producer to gain control of the majority of events or a majority of board seats.

The USASF rule only applies to Worlds bids events, while other events are provided no protection. This allows Varsity to use its other events, including those that give bids to The Summit, to target any type of event hosted by IEPs, including both Worlds bid events and non-Worlds bid events. In my Opening Report, I provide many examples of: Varsity targeting IEPs in this manner; communications from IEPs to the USASF expressing concern over this conduct; and communications from the USASF continuing to encourage Varsity's conduct despite the concerns of its other member event producers.[336] An email from Brian Elza, Co-General Manager and Vice President of Sales at Varsity, to his colleagues at Varsity summarizes the impact of Varsity's conduct: "Truth be known the Summit has destroyed our competitors and will continue to worsen with the D2 Summit. With our control of the BOD [Board of Directors] of the USASF we are clearly in the drivers [sic] seat."[337]

Varsity is able to use Summit events to target competing events because the USASF has enabled this conduct by repeatedly refusing to create or support any end-of-season events for lower-level teams, including anything that competed with The Summit, as explained in Section VIII.A.3. Absent this favorable conduct from USASF, Varsity would be unable to use The Summit bid events to target its competitors' events.

In my opening report, I explained that the USASF introduced a rule for the 2016/2017 season that mandated event producers must have at least 125 level five teams attend a competition to continue giving out Worlds bids in future years.[338] If the event producer is unable to attract 125 level five teams in one year, it is put on probation; if it is unable to attract 125 level five teams for the following year, it loses the event's Worlds bids, which makes the event far less attractive to participants in the following years.[339] Mr. Orszag claims this rule did not benefit Varsity because only two event producers lost Worlds bid events as a result.[340] Mr. Orszag's claims fails to respond to my entire argument. Varsity initially proposed this 125-team rule, not the USASF,[341] and its intention was clear: "He [Mr. Webb] believes, and I agree (for whatever that's worth), that in some cases the ability to give Worlds Bids is keeping these companies viable and certainly driving up their value if we decide to acquire them."[342]

---

[336] Netz Opening Report, at 73-84.

[337] Elza, Brian, 07 August 2015, Email: Fwd: All Level Championship Concept, VAR00273953 - VAR00273955.

[338] Netz Opening Report, at 71-72.

[339] Netz Opening Report, at 71.

[340] Orszag Report, at ¶73.

[341] Netz Opening Report, at 72-74.

[342] See, e.g.,

- Netz Opening Report, at 72.

- Fowlkes, Jeff, 22 September 2017, Email: Worlds Bids, VAR00244139 - VAR00244140, at 4139.

Highly Confidential Pursuant to Protective Order

Varsity targeted Mardi Gras, an independent event producer, with the intention of obtaining its
Worlds bids.[343] Jim Hill, former National Director of Sales at Varsity All Star, testified that the
Mardi Gras Worlds bid event "was, obviously, an event that we attacked…we put other events
around it for the sole purpose of—of, you know, trying to attack it."[344] Varsity acquired Mardi
Gras after it was placed on probation by the USASF for not meeting the team minimum. Mr. Hill
testified that it was "probably one of our better attacks to shut down a more—I mean, honestly,
had we not acquired them…they would have probably gone out of business, lost their Tier 1
status."[345] After acquiring Mardi Gras, Varsity cancelled the event it used to target the Mardi
Gras event.[346]

Mr. Orszag claims the information provided by the USASF to Varsity regarding which events
and event producers were on probation could not advantage Varsity because that information
was provided to other event producers as well. Mr. Orszag fails to recognize the fact that the
USASF provided this information regularly to Varsity, as well as encouraged Varsity to attack
other event producers knowing that its other rules favored Varsity. For example, the USASF was
aware that competing event producers were disadvantaged by the rules determining who received
Worlds bid events after a producer was put on probation but failed to meet the 125-team
minimum the following year. One of the documents cited by Mr. Orszag as evidence that the
USASF shares which event producers are on probation demonstrates this fact. David Owens, the
Owner and CEO of Rockstar Championships (whom Mr. Orszag erroneously identifies as being
affiliated with Halliburton, a non-existent tier 3 event producer),[347] did send emails inquiring

---

[343] Netz Opening Report, at 77-78.

[344] 21 March 2022, Videotaped Oral Deposition of Jim Hill, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et
al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee)
(Hereinafter "Deposition of Jim Hill, 21 March 2022"), at 158:12-18.

[345] Deposition of Jim Hill, 21 March 2022, at 160:9-17.

[346] See, e.g.,

- The Varsity event was called "The Cajun Jam" and took place in Baton Rouge. U.S. All Star Federation, 18
April 2017, usasf_events_16-17_17-04-18, VAR00360675.

- A December 2017 email from Brian Elza, the former Co-General Manager and Vice President of Sales at
Varsity All Star, to several Varsity colleagues discusses cancelling the Cajun Jam and notes the "Plan
would be to cancel JAM [Cajun Jam] and move all those teams to MARDI GRAS" to which Jim Hill
responded, "…need to cancel the Jam event." Nichols, John, 07 December 2017, Email: Re: MARDI
GRAS, VAR00081396, at 1396.

- A May 2018 email indicates that the JAMfest Cajun JAM last occurred in 2016 and was cancelled for the
2017-18 season. Lomba, Jessica, 23 May 2018, Email: Re: A Listing of Events for the 2018-2019
Regional/Competition Season, VAR00135529 - VAR00135536, at 5529.

[347] The email Mr. Orszag cites is from David Owens, but the signature is for his other job at Halliburton, the
multinational energy corporation. The logo, company address, email address (david.owens4@halliburton.com ), and
job title (Materials Control Specialist) are all clearly affiliated with the Halliburton energy company. It is unclear
why Mr. Orszag claims Halliburton is a "Tier 3 producer"; I have seen no reference to an event producer also named

Highly Confidential Pursuant to Protective Order

about the Tier 1 waiting list and asked which event producers were on probation. During this exchange he realized his company once again did not have a chance of obtaining any Worlds bid events that year. In response, Mr. Owens asked Mr. Peterson, the USASF Vice President of Events and Corporate Alliances, "At what point is the system going to change? Is legal action going to have to be required for us to get to that point? There is a distinct possibility of that happening or a general revolt without change since the USASF is essentially restricting trade by favoring one group of members over others. With that, the vagueness and lack of an actual clear and legitimate path to being on the same playing field as other EP's is unacceptable and deliberate it seems."[348]

Both Prof. Murphy and Mr. Orszag claim that Varsity's targeting conduct discussed above is procompetitive. Prof. Murphy asserts that Varsity's targeting conduct is merely a concerted effort to draw potential customers to its events and represents a "hallmark of healthy competition."[349] For the reasons already stated, Varsity's conduct can be distinguished from healthy competition. Regarding USASFs 125-team minimum rule, Mr. Orszag claims I ignore the "obvious procompetitive benefits of the addition of a probationary year relative to not having such an option for event producers (i.e., relative to the situation in which the event producer loses its bid immediately after the number of teams falls below 125)."[350] To support this claim, Mr. Orszag argues that the probationary period provides the event producer an opportunity to increase participation at its event, but the record evidence shows that Varsity uses this period to ensure the event producer cannot increase participation and does so with the encouragement of the USASF. Consider, for example, the following exchange between Steve Peterson, the USASF Vice President of Events and Corporate Alliances, and Tres LeTard, the former Co-General Manager and Vice President of Operations at Varsity All Star, discussing an IEP on probation: "So far, in 19-20 we have Cheer Tech and ASC on probation. If you guys [Varsity] can put the squeeze on them next season, that would be great."[351] Mr. Orszag's arguments are theoretically correct: the USASF providing event producers an opportunity to increase attendance could be procompetitive; however, USASF identifying event producers on probation and encouraging Varsity to attack them is not.

Varsity's control of the rules-making process and the ongoing cooperation of the USASF enabled Varsity to successfully target competitors' events. These rules favored Varsity over

---

Halliburton. There are, however, many references to David Owens being affiliated with Rockstar Championship. See Orszag Report, at footnote 155, citing Peterson, Steve, 17 October 2017, Email: Re: [EXTERNAL] Re: Tier 1 - Waiting List, USASF_00011972 - USASF_00011975.

[348] Peterson, Steve, 17 October 2017, Email: Re: [EXTERNAL] Re: Tier 1 - Waiting List, USASF_00011972 - USASF_00011975, at 1972.

[349] Murphy Report, at ¶345.

[350] Orszag Report, at ¶74.

[351] LeTard, Tres, 11 March 2019, Email: Re: VOTE NEEDED: 2019-2020 Tier 1 Approval Process, VAR00365110 - VAR00365117.

Highly Confidential Pursuant to Protective Order

other event producers, and the USASF repeatedly failed to act in a manner to protect IEPs against this conduct, often by simply failing to act at all.

> f)   In coordination with Varsity, the USASF failed to make procompetitive rule changes and ensure its independence

In coordination with Varsity, the USASF failed to enact rules—consistent with its mission as a neutral sanctioning body—that would have prevented Varsity from acquiring and maintaining market power in the market for All Star Competitions.

As explained above, the USASF and Varsity declined a proposal by independent event producers to add lower-tiers teams to Worlds to compete with The Summit. The proposal included various means to ensure that no single event producer controlled bids to the event and that the event producers would take turns hosting the event. USASF declined to consider the proposal.[352]

Varsity and the USASF also rejected proposed rules changes that would have reduced Varsity's influence in the sanctioning body. For example, the USASF board refused a request from independent event producers to add permanent board seats for IEP members, as it "didn't feel it was needed."[353]

Varsity and the USASF could have taken any number of actions to ensure the latter's independence but did not do so. For example:

- The USASF did not adopt a rule that would prevent a member with existing permanent board seats from acquiring other permanent board members and their board seats.[354]

- The USASF did not adopt a rule that would prevent a member with Worlds bid events from acquiring other members and their Worlds bid events and representation on the USASF Sanctioning Committee.[355]

- The USASF did not adopt a rule that would have limited each event producer to a single vote on the USASF Sanctioning Committee, regardless of the number of event brands that they owned.[356]

---

[352] Newby, John, 01 June 2017, Email: Re: This Morning's USASF Call, VAR00250643.

[353] See,

- Deposition of USASF (Jim Chadwick), 15 April 2022, at 235:22 – 236:9.

- Smith, Shawn L., 20 May 2013, Letter from Smith to Chadwick concerning April 9, 2013 "Open Letter to Our Membership", VAR00321654.

[354] Deposition of USASF (Jim Chadwick), 15 April 2022, at 125:12 – 126:18.

[355] See,

- Deposition of USASF (Steve H. Peterson), 09 March 2022, at 344:21-345:14,

- Deposition of USASF (Chadwick), 15 April 2022, at 164:3-165:12.

[356] Deposition of USASF (Steve H. Peterson), 09 March 2022, at 345:174-346:6.

Highly Confidential Pursuant to Protective Order

Any of these simple rules—or similar rules—would have limited Varsity's ability to dictate USASF policy.

### B. Varsity ties Cheer Camps and School Cheer Competitions, leveraging market power in competitions to the camp market

I explained in my Opening Report that Varsity ties Cheer Camps and School Cheer Competitions in a way that leverages Varsity's market power over School Cheer Competitions into the market for Cheer Camps.[357] Prof. Murphy disagrees with my findings in two dimensions: that Cheer Camps and School Cheer Competitions are a single product, and that a tie cannot be, and is not, effective.[358]

Prof. Murphy claims that "Squad Credentialing [which occurs at Varsity Cheer Camps] is in reality part of Varsity's provision of a single product (the relevant high school nationals competition)." [359] This interpretation does not fit the facts. Cheer Camps and Cheer Competitions are separate products. Prof. Murphy agrees that most School Competition events[360]—the USA Junior National championship, college-level nationals, and Varsity's regional competitions—do not have a camp requirement.[361] Because the two products are typically provided separately, Cheer Camps and Cheer Competitions cannot be a single product for the purpose of tying analysis.

Prof. Murphy claims that the tying requirement could not, and did not, cause teams to attend Varsity's camps. He presents analyses purporting to show that few high school cheer teams attended Varsity's School Cheer Camps and even fewer attended its season-ending School Cheer Competitions.[362] Prof. Murphy's analysis uses the wrong data to answer the wrong question.

Prof. Murphy includes all "Scholastic teams" in his analyses. As I explained in Section IV above, his definition includes mostly sideline cheer teams that are outside the scope of the Complaint and the relevant market. He calculates that 3% of "Scholastic" Cheer teams attended Nationals and says this means a desire to attend Nationals cannot be a driver of camp attendance.[363] This is nonsensical—it is akin to saying Harvard is not a desirable school because only 1,200 freshman enroll each year, or that high school and college athletes are not motivated by the chance to make

---

[357] Netz Opening Report, at §V.C.

[358] Murphy Report, at ¶381.

[359] Murphy Report, at ¶381.

[360] I use Prof. Murphy's terminology for "Scholastic" Competitions: "nationals" refers to end-of-season events and "regional" are equivalent to his regular season All Star Competitions.

[361] Murphy Report, at ¶380.

[362] Murphy Report, Exhibits 16 and 55.

[363] Murphy Report, at ¶383.

Highly Confidential Pursuant to Protective Order

it as a professional athlete. Prof. Murphy also claims that only 56% of "Scholastic" cheer teams attended camps.[364]

I present the camp attendance figures for School Cheer teams that attended at least one competition for each season in the data provided by Varsity in Exhibits 18 and 19. These calculations show that Prof. Murphy's "Scholastic" teams are composed almost entirely of sideline cheer teams. For example, in the 2018/19 season, 2,388 School Cheer teams that attended a competition also attended a Varsity camp. This compares to Prof. Murphy's calculation that over 14,872 schools attended a camp between 2015/16 and 2018/19.[365] The vast majority of the "Scholastic" teams in Prof. Murphy's analysis did not attend competitions and are irrelevant to the present case.

The proper metric to evaluate the potential foreclosure impact of the tying requirement is the share of Competitive School Cheer teams that attend a Varsity Cheer Camp. In Exhibit 20, I show that 80% of School Cheer teams that registered for a Varsity competition[366] also attended one or more of Varsity's camps during the 2018/19 season, up from 70% in the 2015/16 season.[367]

In any given year, virtually all competitive school teams attended an event at which they could qualify to attend a Varsity end-of-season event. Because of Varsity's tying policy, these teams must attend a Varsity School Cheer Camp to be eligible for a national championship. As a result, over 80% of teams that attended a competition also attended a Varsity School Cheer Camp. Rival Cheer Camp providers are effectively foreclosed from providing Camps to over 80% of the Competitive School Cheer teams.

### C.  Varsity's acquisition strategy harmed competition for Cheer Competitions

As I explained in my Opening Report, Varsity's acquisitions dramatically increased concentration in the relevant markets for Cheer Competitions, gave Varsity control over most Worlds bid events, and gave Varsity complete control over the USASF Board and Sanctioning Committee.[368] Exhibit RR-7 catalogues 27 acquisitions between 1996-2018, 9 of which were between 2015-2018. The record evidence demonstrates that Varsity developed the acquisition strategy with the goal of monopolizing the All Star market and that it was successful in doing so.[369] In 2013, Jeff Webb said that "acquisitions are better viewed as tactical and used for roll

---

[364] Murphy Report, at ¶383.

[365] Prof. Murphy does not report figures by season. Murphy Exhibit 16.

[366] Because Varsity is the dominant producer of School Cheer Competitions, virtually all competitive school teams participate in Varsity's School Cheer Competitions.

[367] Varsity's policy tying camp attendance to national championship eligibility does not apply to college teams. Accordingly, I exclude college teams from my analysis.

[368] Netz Opening Report, at 92-104.

[369] Varsity has long been the dominant provider of School Cheer Competition. See, e.g.,

Highly Confidential Pursuant to Protective Order

ups…or to eliminate competitors."[370] Four years later, Varsity explained that its acquisition strategy to "roll-up the All Star market" had been successful.[371]

Defendants' experts do not dispute that the U.S. Cheer Competition industry is highly concentrated, nor that this is the result of Varsity's acquisition strategy. Defendants' experts agree that as of 2020, Varsity owned 36 of 46 of Worlds bid events and a permanent voting majority on the USASF Board and Sanctioning Committee, all of which are the direct result of its acquisition strategy.[372] As explained in my Opening Report, Worlds bid events are critically important for event producers because customers' demand for Worlds bids is high, and the number of bids is capped, which allows event producers to charge higher registration fees for such events.[373]

Prof. Murphy claims Worlds bid events are not critical inputs, but again he ignores the overwhelming record evidence that Worlds bid events are, in fact, critical inputs.[374] He ignores direct testimony concerning the competitive importance of Worlds bid events.[375] He also ignores Varsity's contemporaneous business documents explaining the strategic importance of Worlds bid events as one of the primary motivations for Varsity's acquisitions.[376]

---

- A 2014 Bain presentation claims that "Varsity is the undisputed leader in cheerleading uniforms, competitions, and camps" and includes a chart illustrating that 100% of the U.S. market for School Cheer Competitions belonged to UCA, NCA, and USA—all Varsity-owned brands—in 2013. Bain Capital, 17 October 2014, Project Hercules Interim IC, BAIN00055587 - BAIN00055646, at 5631.

- A 2018 Bain presentation includes a similar chart illustrating that 100% of the U.S. market for School Cheer Competitions still belonged to UCA, NCA, and USA in 2017. Bain Capital, July 2018, Project Impact Diligence Summary, FEAS-Ares00075986 - FEAS-Ares00076033, at 6023.

[370] Webb, Jeff, 22 January 2013, Email: Throw it on the wall .... Strategy session, VAR00351376.

[371] "Commercial Growth [bullet] Simultaneously, we built national event coverage through aggressive organic growth and acquisitions to roll-up the All Star market and create a sustainable position [bullet] Strategy took millions of investment over 12 years to accomplish, but has eventually become a key driver of revenue and EBITDA growth over the last 5 five years." Varsity Brands, 24 October 2017, Q4 Board of Directors Meeting, CB00025330 - CB00025449, at 5396.

[372] Orszag Report, at ¶¶51, 56, 61, 63-64.

[373] Netz Opening Report, at 93-94.

[374] Murphy Report, at ¶¶351-353.

[375] "Q. So the ability to offer a bid for an All Star event producer and an All Star event is important to allow them to compete in the All Star event production marketplace; is that fair? [Objection Omitted.] A. Yes." Deposition of Brian Elza, 16 November 2021, at 97:3-8

[376] See, e.g.,

- Varsity Brands, 09 October 2015, JamBrands Transaction Summary, CB00382194 - CB00382262, at 2197.

- Sadlow, John, 20 April 2018, Email: FW: Data room document feedback, VAR00415061 - VAR00415076, at 5061, 5065, 5068, and 5072 - 5074.

Ignoring all of the record evidence to the contrary, Prof. Murphy points to a single table that purports to show that most Competitive Cheer gyms do not attend many of Varsity's Worlds bid events.[377] However, his analysis is flawed for two reasons. First, even if his calculations were correct (they are not), his own calculations show that 80% of registrations at Varsity events are from teams that attend at least one Worlds bid event.[378] Second, Prof. Murphy's calculations are flawed. In creating his Exhibit 48, Prof. Murphy includes dance teams and youth groups (neither of which are at issue in this case) and excludes all packaged events (i.e., Worlds bid events at which Varsity bundled registrations with accommodations, park passes, and other ancillary products). In other exhibits, Prof. Murphy does the opposite.[379] I correct these errors in Exhibit 21, which shows that 87% of registrations at Varsity events are from teams that attend at least one Worlds bid event;[380] the median registrant belongs to a gym that attends two or three Varsity Worlds bid events and seven or eight Varsity events in total.[381]

Prof. Murphy agrees that the competitive impact of acquisitions should be evaluated via changes in output and prices.[382] His own analysis shows that Varsity increased prices and restricted output of the events that it acquired, indicating that its acquisition strategy harmed competition. Prof. Murphy calculates that Varsity shut down one third of acquired events.[383] While Varsity introduced a handful of new events under the acquired brands,[384] the net effect was a 22% reduction in the number of events.[385] This figure likely understates the reduction in output

---

- "We look to acquire all the Tier I event companies (brands such as American Championships, Athletic Championships) that give bids to the cheerleading and dance Worlds. There are only 42 Tier I event companies. Varsity now owns 32 of those Tier I companies in all of the best markets." Varsity Spirit, Undated, All Star Overview, VAR00310631 - VAR00310666, at 0664.

[377] Murphy Report, at ¶352 and Exhibit 48.

[378] Prof. Murphy reports in his Exhibit 48 that 20.4% of All Star athletes do not attend any Varsity Worlds bid events. That implies 79.6% attend at least one Varsity Worlds bid event.

[379] For example, Prof. Murphy's Exhibit 49 excludes dance teams and youth groups, while including packaged events.

[380] Correcting Prof. Murphy's calculations, I find that 13.3% of All Star athletes do not attend any Varsity Worlds bid events. This implies that 86.7% attend at least one Varsity Worlds bid event.

[381] Gyms that attend three or more Varsity Worlds bid events account for 325,272 registrations and gyms that attend two or more Worlds bid events account for 280,751. The median athlete registration thus belongs to a gym that attends two or three Worlds bid events. Such gyms also attend another 4.6 to 4.7 Varsity non-Worlds bid events on average.

[382] Murphy Report, at ¶292.

[383] Out of 153 acquired events acquired by Varsity, Prof. Murphy identifies 51 that were discontinued post-acquisition. Murphy Report, at Exhibit 45.

[384] Prof. Murphy identifies seventeen events that were introduced post-acquisition.

[385] According to Prof. Murphy's analysis, Varsity reduced the number of events at the acquired brands from 153 to 119. Murphy Report, at Exhibit 45.

Highly Confidential Pursuant to Protective Order

because it does not include the existing Varsity events that it shut down after acquiring a rival event.

Prof. Murphy's analysis also shows that Varsity increased the registration prices of events it acquired and continued to operate by 8% on average and up to 23% in some cases.[386]

A decline in the events available to athletes and an increase in the prices is evidence that the acquisitions were anticompetitive. Prof. Murphy purports to show that registrations increased at these events and claims this is evidence the reduced number of events and price increases resulting from the acquisitions were not anticompetitive. His analysis is misleading for two reasons.

First, it ignores the events that Varsity closed. After accounting for the net 22% net reduction in events, total registrations at the brands acquired by Varsity only increased by 1.5%.[387]

Second, Prof. Murphy's analysis of output and pricing at continuing events is flawed because it fails to account for the fact that participation in Competitive Cheer was generally increasing during the time. To account for this growth in participation generally, I calculate the change in prices and registrations for events Varsity already owned; I report the results in Exhibit 22. Comparing Prof. Murphy's Exhibit 45 to Exhibit 22, I find that prices increased faster and output more slowly at acquired events than at Varsity's other events during the same time period. Varsity increased real prices at acquired events by 8% compared to 1% at non-acquired events during the same time period. Registrations increased by 1.5% at acquired brands, less than the 14% increase at Varsity's other events. This is consistent with the qualitative record evidence that Varsity's strategy and intent for its acquisitions was to acquire and exercise market power by reducing output and increasing price.

The empirical evidence showing that Varsity reduced output and raised prices at acquired events relative to its other events is consistent with the qualitative record evidence. Varsity is able to increase price and drive customers to its higher margin events, including specifically by cancelling events post acquisition.[388] Testimony from Mr. Elza, the former Co-General Manager and Vice President of Sales at Varsity All Star, is similar, indicating that Varsity "had too many events" after acquiring JAM Brands and decided to cancel certain Varsity or JAM Brand events;

---

[386] Murphy Report, at Exhibit 45.

[387] According to Prof. Murphy's calculations, prior to the acquisition, the acquired brands had 153 events, with an average of 1,002 participants per event, or roughly 153,306 total registrations. Two years post-acquisition, there were 119 events, with an average of 1,308 participants per event, or roughly 155,652 total registrations. This represents a 1.5% increase in total registrations.

[388] "Participation per team and teams per event has trended downward over the past few years. Most of our acquisitions had a market that was comprised of smaller gyms and in smaller markets that hosted typically smaller events. As we acquired those companies the averages have dropped. Revenue and EBITDA per participant in that same time frame has increased as we have driven folks to our larger, higher margin events and had steady increase in our pricing strategy." Elza, Brian, 30 May 2018, Email: Re: Answers, VAR00182584 - VAR00182588, at 2584.

Highly Confidential Pursuant to Protective Order

this strategy ultimately resulted in fewer choices for gyms and teams.[389] Mr. Elza testified that Varsity would cancel whichever event—either the existing Varsity event or one of the acquired events—was the least profitable.[390] Mr. Elza testified that shutting down events after an acquisition was commonplace, often including shutting down multiple events.[391]

### D. Varsity's rebate programs foreclose competitors

As I explained in my Opening Report, Varsity's rebate programs foreclosed a substantial portion of the market for All Star Cheer Competitions.[392] While Prof. Murphy estimates that Varsity's rebate programs foreclosed roughly 10% of the market,[393] he concludes that this level of foreclosure is insufficient to trigger antitrust liability.[394] While I am not qualified to offer a legal opinion regarding the proper foreclosure threshold, it is clear as a matter of economics that Varsity's rebate programs did harm competition.

Moreover, Varity's rebate programs were only one aspect of its "ecosystem" that enabled it to acquire and maintain market power. Varsity's rebate programs by themselves may have "only" foreclosed 10% of the market for All Star Competitions, but its acquisitions and conspiracy with the USASF also harmed competition, and Varsity's anticompetitive strategies reinforced each other. For example, a rival event producer that is foreclosed from 10% of the market is less likely to meet the participation threshold to stage a Worlds bid event, and with the resulting reduced revenues, is an easier acquisition target for Varsity.

---

[389] "Q. So the JAM Brands acquisition was the acquisition of its – of Varsity's largest competitor at the time in the All Star market; is that right? A. Yes. Q. And then there's a dash after this bullet point that says 'in line with the broader strategy to,' and it lists some items. The first is 'consolidate event footprint around most profitable events.' What does that mean? A. We had too many events at the time, and we were looking to eliminate a number of those events to drop participation in certain events. Q. And when you say you 'had too many events,' that's because of the acquisition of the JAM Brands; so you had too many – Varsity was now running too many events in the same regions at the same time; is that right? A. That's correct. Q. And so as a result of the JAM Brand acquisition, you at Varsity decided to cancel certain Varsity events or JAM Brand events; is that right? A. Yes, that is correct. Q. And so as a result of the acquisition of JAM, at least in certain regions, there were fewer events for gyms and participants to attend; is that right? A. Yes, that would be correct." Deposition of Brian Elza, 16 November 2021, at 284:9-285:13.

[390] "Q. And you're saying that after the JAM Brands acquisition, Varsity would likely cancel certain events; is that right? A. Yes. We did that often." Deposition of Brian Elza, 16 November 2021, at 230:23-232:1.

[391] "Q. Under 'Event Consolidation,' it says: 'Post acquisition – too many events. Cannibalization.' What does that mean? A. Oftentimes when we would buy a particular company, you would look across the landscape and say, Hey, do we really need two events in Columbus, Ohio in the month of November? Would it not make more sense to eliminate one of those events to drop participation at one versus two. Q. So often when Varsity bought a rival event producer in the All Star space, there would now be too many, from Varsity's perspective, events in a particular region; is that fair? [Objection omitted] A. That is – Q. Go ahead. A. That is – that is fair. Q. And so what Varsity often would do, after it purchased event producers, was shut down one or more events in order to consolidate the number of events in a particular region; is that fair?" Deposition of Brian Elza, 16 November 2021, at 179:10-180:8.

[392] Netz Opening Report, at §V.E.

[393] Murphy Report, at Exhibit 53.

[394] Murphy Report, at ¶370.

Highly Confidential Pursuant to Protective Order

### E. Structural reforms can be procompetitive

Prof. Murphy argues that the structural reforms recommended by Mr. Aronoff[395] are largely based on faulty factual assumptions and devoid of any analysis of the competitive effects of such reforms. I do not take a position on each of Mr. Aronoff's individual suggested reforms, but as a general matter, structural reforms such as altering the structure of the USASF Board to be more representative of all industry participants rather than being dominated by a single entity, Varsity, would be a procompetitive structural reform. Currently, Varsity has a permanent voting majority of seats on the USASF Board of Directors and, since 2015, has controlled a permanent majority of the USASF Sanctioning Committee seats.[396] As of 2020, Varsity controlled 36 of the 46 events that are permitted by the USASF to grant bids to The Worlds.[397] As a result, the interests of all industry participants, including other event producers, gyms, coaches, and athletes, are not represented. A more representative USASF board is consistent with Defendants' experts' arguments that sanctioning bodies for sports and sports competitions are both necessary and procompetitive. Specifically, Mr. Orszag writes:

> "As such, for the market to function, certain rules, restraints, and regulations are needed. And although similar rules are not necessary for competition in other markets—and might even be seen as anticompetitive—in sports activities those rules are procompetitive because they are necessary for those who wish to participate in the sport (as athletes, coaches, event organizers, media commenters, advertisers, etc.) to know when, where, and how the competitions will take place, and what is and is not allowed (i.e., what the rules of competition are)."[398]

Mr. Orszag recognizes that certain sports competitions require coordination among various types of stakeholders. This is a stark contrast to the USASF board, which is not just controlled by a single type of entity (i.e., event producer), but is also, in fact, controlled by a single firm, Varsity.

### IX. Summary

After reviewing the critiques from Defendants' experts, my conclusions are unchanged. Based on the analyses and evidence described both above and in my Opening Report, I come to the following conclusions to the issues I was asked to consider by Plaintiffs' counsel:

- There are relevant antitrust markets for Cheer Competitions, Cheer Apparel, and Cheer Camps.

- Varsity possesses and exercises market power in all three of these relevant markets.

---

[395] Aronoff, James H., 20 June 2022, Expert Report of James H. Aronoff, Jessica Jones, et al., v. Varsity Brands, LLC, et al., No. 2:20-cv-02892-SHL-tmp (In the United States District Court for the Western District of Tennessee Western Division).

[396] Netz Opening Report, at 67.

[397] Netz Opening Report, at 53.

[398] Orszag Report, at ¶25.

Highly Confidential Pursuant to Protective Order

- Varsity and the USASF have acted jointly to provide Varsity a competitive advantage over its rivals.

- Varsity has engaged in anticompetitive conduct that has allowed it to acquire, enhance, and maintain its market power in these markets. The anticompetitive conduct is the result of a deliberate strategy and was designed to reinforce market power in each market and across all the markets.

- Varsity's anticompetitive conduct has harmed competition by eliminating competitors, foreclosing competitors, reducing output, reducing choices for athletes, and increasing overall participation costs.

Dated: December 14, 2022

By:

JANET S. NETZ



# Dr. Janet S. Netz

**Contact Information**

applEcon LLC                    Office:   (734) 214-2213 (direct)
617 E. Huron Street             Fax:      (734) 213-1935
Ann Arbor, MI 48104             E-mail:  netz@applEcon.com
                                Web:      www.applEcon.com

**Education**

Ph.D. Economics, University of Michigan, 1992
M.A. Economics, University of Michigan, 1990
B.A. Economics, University of California at Berkeley, 1986, *cum laude*

**Employment**

Founder and Partner, applEcon, May 2001 to present
Visiting Associate Professor, University of Michigan, Fall 2001, Fall 2002, Fall 2003
Associate Professor, Purdue University, Fall 2001 to January 2003
Visiting Assistant Professor, University of Michigan, Winter 2001
Assistant Professor, Purdue University, Fall 1994 to Spring 2001
Assistant Professor, University of Delaware, Fall 1992 to Summer 1994

**Courses Taught**

Industrial Organization (undergraduate and doctoral)
Antitrust and Regulation (undergraduate)
Intermediate Microeconomics (undergraduate and master's)
Microeconomic Principles (undergraduate)
International Economics (undergraduate and master's)

**Honors and Awards**

Outstanding Antitrust Litigation Achievement in Economics, awarded by the American Antitrust
Institute, for work In re TFT-LCD Antitrust Litigation, 2013.

Outstanding Economics Professor of the Year, Economics Club, Purdue University, 1999.

**Publications**

"Are All Men's College Basketball Players Exploited?", with Erin Lane and Juan Nagel, *Journal of Sports Economics*, 15(3), June 2014, 237-262.

"Price Regulation: Theory and Performance", in *Regulation and Economics*, Roger J. Van den Bergh and Alessio M. Pacces, eds., Edward Elgar Publishing, 2011.

"Sports Trivia: A Review of The Economics of Intercollegiate Sports by Randy R. Grant, John Leadley, and Zenon Zygmont", *Journal of Economic Literature*, 47(2), June 2009, 485-489.

"One-Way Standards as an Anti-Competitive Strategy", with Jeffrey K. MacKie-Mason, in *Standards and Public Policy*, Shane Greenstein and Victor Stango, eds., Cambridge Press, 2007.

"International Integration and Growth:  A Further Investigation on Developing Countries", with Claire Economidou and Vivian Lei, *International Advances in Economic Research*, 12(4), November 2006, 435-448.

"Maximum or Minimum Differentiation?  An Empirical Investigation into the Location of Firms", with Beck A. Taylor, *Review of Economics and Statistics*, 84(1), February 2002, 162-175.

"International Integration and Growth: A Survey and Empirical Investigation", with Vivian Lei and Jon D. Haveman, *Review of Development Economics*, 5(2), June 2001, 289-311.

"Price Regulation: A (Non-Technical) Overview", in *Encyclopedia of Law and Economics*, Boudewijn Bouckaert and Gerrit De Geest, eds, Edward Elgar and University of Ghent, 2000.

"Exercising Market Power in Proprietary Aftermarkets," with Severin Borenstein and Jeffrey K. MacKie-Mason, *Journal of Economic and Management Strategy*, 9(2), Summer 2000, 157-188.

"All in the Family:  Family, Income, and Labor Force Attachment", with Jon D. Haveman, *Feminist Economics*, 5(3), November 1999, 85-106.

"Why Do All Flights Leave at 8am?:  Competition and Departure-Time Differentiation in Airline Markets", with Severin Borenstein, *International Journal of Industrial Organization*, 17(5), July 1999, 611-640.

"An Empirical Test of the Effect of Basis Risk on Cash Market Positions", *Journal of Futures Markets*, 16(3), May 1996, 289-312.

"The Effect of Futures Markets and Corners on Storage and Spot Price Variability", *American Journal of Agricultural Economics*, 77(1), February 1995, 182-193.

"Antitrust Policy in Aftermarkets", with Severin Borenstein and Jeffrey K. MacKie-Mason, *Antitrust Law Journal*, 63(2), Winter 1995, 455-482.

"The Economics of Customer Lock-In and Market Power in Services", with Severin Borenstein and Jeffrey K. MacKie-Mason, in *The Service Productivity and Quality Challenge*, Patrick T. Harker, ed., Kluwer Academic, 1994.

**Working Papers and Work in Progress**

"LCDs and Antitrust: Does Crime Pay?", with Nick Navitski and Josh Palmer

"Fantasy Football Points as a Measure of Performance", with Erin Lane and Juan Nagel

"Non-Profits and Price-Fixing: The Case of the Ivy League"

"The End of Collusion? Competition after Justice and the Ivy League and MIT Settle"

"Basis and Exchange Rate Risks and their Impact on Storage and Exports"

**Research Grants**

"Product Customization and Product-Space Positioning", Dauch Center for the Management of Manufacturing Enterprises, Summer 2000.

"Trade Barriers, Trade Blocs, Growth, and Convergence", Purdue Research Foundation, 1998-1999.
"Effects of Informational Asymmetry on Competition in the Residential Long Distance Calling Market", Purdue Research Foundation, 1997-1998.

"Basis and Exchange Rate Risks and their Impact on Storage and Exports", Center for International Business and Economic Research, Summer 1997.

Global Initiative Faculty Grant (Course Development), "Industrial Organization in an International Marketplace", Purdue University, Summer 1997.

"Trade, Not Aid", Purdue Research Foundation, Summer 1996.

"Trade, Not Aid", Center for International Business and Economic Research, Summer 1996.

"The Effect of Price-Fixing by Institutions of Higher Education", Purdue Research Foundation, Summer 1995.

"Applied Microeconomics/International Workshop", Purdue University, Spring 1995.

"The Market Structure of Higher Education", University of Delaware, Summer 1993.

Research Associate, Center for the Study of Futures Markets, Columbia University, 1991.

Rackham Merit Fellowship, University of Michigan, 1987-1989.

Chancellor's Scholar, University of California at Berkeley, 1983-1986.

**Referee**

American Economic Review
Contemporary Economic Policy
Economics Bulletin
Feminist Economics
International Journal of the Economics of Business
International Journal of Industrial Organization
Journal of Economic Education
Journal of Economic and Management Strategy
Journal of Family and Economic Issues
Journal of Futures Markets
Journal of Industrial Economics
Journal of Law and Economics
Journal of Law, Economics, and Organization
Management Science
Review of Economics and Statistics
Scandinavian Journal of Economics

Telecommunications Systems

**Conference and Workshop Presentations**

Panel participant, "*Apple v. Pepper*: SCOTUS Clarifies Application of *Illinois Brick*", ABA Section of Antitrust Law, May 2019.

Panel participant, "Is 'Direct' Really Correct? Bricks, Tix, Kicks, and Apps after Apple v. Pepper", ABA Section of Antitrust Law, Pricing Conduct and Civil Practice and Procedure Committees Program, October 2018.

Panel participant, "Will Apple's App Store Lead to the end of Illinois Brick", CLA Antitrust, UCL & Privacy Law Section and ABA Antitrust Section's Global Private Litigation Committee program, San Francisco, CA, July 2018.

Guest lecturer, Antitrust Law, University of San Francisco Law School, April 2017 and 2018.

Panel participant, "The Challenge of Circumstantial Proof of Cartel Behavior and of Presenting Economic Issues and Concepts to Judges and Juries", American Antitrust Institute, 10th Annual Private Enforcement Conference, Washington, DC, November 2016.

Panel participant, "Winning or Losing: Class Certification Post-Comcast", American Bar Association, 62nd Antitrust Law Spring Meeting, Washington, DC, March 2014.

Panel participant, "Preparing Early and Often", State-of-the-Art Strategies for Managing Class Action Experts, American Bar Association, 16th Annual National Institute on Class Actions, Chicago, IL, October 2012.

Panel participant, "Hot Topics Involving Experts in Antitrust Litigation", New York State Bar Association, Antitrust Law Section, Annual Meeting, New York, NY, January 2011.

Guest lecturer, Alternative Dispute Resolution Practicum, University of Michigan Law School, April 2008.

"The Economics of Indirect Purchaser Cases", State Bar of Arizona Annual Conference, Phoenix, AZ, June 2004.

"Manipulating Interface Standards as an Anti-Competitive Strategy", Standards and Public Policy Conference, Federal Reserve Bank of Chicago, Chicago, Il, May 2004.

"One-Way Standards as an Anti-Competitive Strategy", Telecommunications Policy Research Conference, Alexandria, VA, September 2002.

"Product Proliferation and Product Space Location", Econometric Society Meetings, New Orleans, January 2001.

"The End of Collusion? Competition after Justice and the Ivy League and MIT Settle", American Economics Association Meetings, New Orleans, January 2001.

"The End of Collusion? Competition after Justice and the Ivy League and MIT Settle", Indiana University-Purdue University Indianapolis, November 2000.

"Maximum or Minimum Differentiation? An Empirical Investigation into the Location of Firms", University of British Columbia, March 2000.

"Non-Profits and Price-Fixing: The Case of the Ivy League", University of Illinois, October 1999.

"The End of Collusion? Competition after Justice and the Ivy League and MIT Settle", Baylor University, September 1999.

"The End of Collusion? Competition after Justice and the Ivy League and MIT Settle", Western Economic Association Meetings, San Diego, July 1999.

"Non-Profits and Price-Fixing: The Case of the Ivy League", University of Chicago, April 1999.

"Non-Profits and Price-Fixing: The Case of the Ivy League", Indiana University, December 1998.

"International Integration and Growth: A Survey and Empirical Investigation", Dynamics, Economic Growth, and International Trade, III, Taiwan, August 1998.

Discussant ("Fiscal Policy and International Demand Spillovers"), Dynamics, Economic Growth, and International Trade, III, An International Conference, Taiwan, August 1998.

"International Integration and Growth", Workshop on Empirical Research in International Trade and Investment, Copenhagen, June 1998.

Discussant ("Factor Endowments and the Pattern of Affiliate Production by Multinational Enterprises," by Karolina Ekholm), Workshop on Empirical Research in International Trade and Investment, Copenhagen, June 1998.

"Non-Profits and Price-Fixing: The Case of the Ivy League", Department of Justice Antitrust Division, April 1998.

"Non-Profits and Price-Fixing: The Case of the Ivy League", American Economics Association Meetings, Chicago, January 1998.

Discussant ("Equilibrium under Satisficing," by Ralph W. Pfouts), International Atlantic Economics Society, ASSA Meetings, Chicago, January 1998.

Discussant ("Overseas Investments and Firm Exports," by Keith Head and John Ries), Fourth Annual Empirical Investigations in International Trade conference, Purdue University, November 1997.

"Maximum or Minimum Differentiation? An Empirical Investigation into the Location of Firms", International Atlantic Economic Association Conference, Philadelphia, October 1997.

Discussant ("Antidumping Enforcement in a Reciprocal Model of Dumping: Theory and Evidence," Taiji Furusawa and Thomas J. Prusa) and session chair, Third Annual Empirical Investigations in International Trade conference, Purdue University, November 1996.

"The Effect of Price-Fixing by Institutions of Higher Education", Indiana University-Purdue University Indianapolis, April 1996.

"Exercising Market Power in Proprietary Aftermarkets", with Severin Borenstein and Jeffrey K. MacKie-Mason, Indiana University - Purdue University - IUPUI First Tri-School Conference, March 1996.

"All in the Family: Family, Income, and Labor Force Attachment", with Jon D. Haveman, American Economic Association Meetings, San Francisco, January 1996.

"Family Matters: Unemployment, Wage Changes, and Mobility", with Jon D. Haveman, Southern Economics Association Meetings, New Orleans, November 1995.

Discussant and session chair, Second Annual Empirical Investigations in International Trade conference, Purdue University, November 1995.

"Competition and Anti-Competitive Behavior", ICLE (The State Bar of Michigan) Conference on Antitrust and Intellectual Property, July 1995.

"Price-Fixing, Tuition, and Financial Aid", Midwest Economics Association Meetings, Cincinnati, April 1995.

"Family Matters: Unemployment, Wage Changes, and Mobility," Midwest Economics Association Meetings, Cincinnati, April 1995.

Discussant and session chair, "Customer Discrimination, Entrepreneurial Decisions, and Investment", Midwest Economics Association Meetings, April 1995.

"An Empirical Test of the Effect of Basis Risk on Cash Market Positions", University of Illinois, Urbana-Champaign, February 1995.

Discussant and session chair, First Annual Empirical Investigations in International Trade conference, Purdue University, November 1994.

"Antitrust Policy in Aftermarkets", with Severin Borenstein and Jeffrey K. MacKie-Mason, FTC/DOJ/ABA Conference on Post-Chicago Economics, Washington, D.C., May 1994.

"The Effect of Price-Fixing by Institutions of Higher Education, University of Delaware, May 1994.

"The Effect of Futures Markets and Corners on Storage and Spot Price Variability", Purdue University, February 1994.

"An Empirical Test of the Effect of Basis Risk on Cash Market Positions", University of California at Davis, February 1993.

Discussant, Econometrics Association, Anaheim, 1992 Annual Meetings.

"Testing the Principle of Minimum Differentiation: Airline Departure-Time Crowding", Econometrics Association, Washington, D.C., 1990 Annual Meetings.

**Consulting and Testifying**

In re Hard Disk Drive Suspension Assemblies Antitrust Litigation, 2022-
*United States District Court Northern District of California*, No. 19-md-02918-MMC
Testifying expert for plaintiffs
Deposed December 2022

Jessica Jones, et al. v. Varsity Brands, LLC, et al., 2022-
*United States District Court Western District of Tennessee*, No. 2:20-cv-02892-SHL-tmp
Testifying expert for plaintiffs

Vanzant, et al. v. Hill's Pet Nutrition, Inc., and PetSmart, Inc., 2022-
*United States District Court Northern District of Illinois Eastern Division*, No. 1:17-cv-2535
Testifying expert for plaintiffs
Deposed June 2022, November 2022

Automobile Antitrust Cases I and II, 2021-
*Superior Court of California County of San Francisco Unlimited Jurisdiction*, No. CJC-03-004298 and CJC-03-004303
Testifying expert for plaintiffs
Deposed September 2021

Contant v. Bank of America, 2019-
*United States District Court, Southern District of New York*, No. 17-cv-3139-LGS
Testifying expert for plaintiffs

Barroqueiro, et al. v. Qualcomm Incorporated, et al., 2019-
*Supreme Court of British Columbia*, VLC-S-S1410987
Testifying expert for plaintiffs

Confidential client, 2018-
Antitrust analysis regarding pharmaceutical products

In re Malden Transportation, Inc. et al., v. Uber Technologies, Inc., 2018-2019
*United States District Court, District of Massachusetts*, No. 1:16-cv-12538-NGM
Testifying expert for plaintiffs
Deposed January 2019

Confidential client, 2017-2018
Antitrust analysis regarding various cellular phone components

In re Automotive Parts Antitrust Litigation
*United States District Court, Eastern District of Michigan Southern Division*, No. 2:12-cv-02311
Testifying expert for plaintiffs
- In re Occupant Safety Systems, No. 2:12-cv-00603, 2018-
- In re Heater Control Panels, No. 2:12-cv-00403, 2018-
- In re Anti-Vibrational Rubber Parts, No. 2:13-cv-00803-MOB-MKM, 2016-
- In re Bearings, No. 2:12-cv-00500, 2016-
- In re Automotive Wire Harness Systems Antitrust Litigation, No.12-md-00101, 2012-
- In re Shock Absorbers Cases, No. 2:16-cv-0332, 2015-

Alarm Detection Systems, Inc. v. Orland Fire Protection District, et al., 2016-2019
*United States District Court, Northern District of Illinois*, No. 14-cv-00876
Testifying expert for plaintiff
Deposed May 2017
Testified at trial May 2017

In re LIBOR-Based Financial Instruments Antitrust Litigation, 2016-
*United States District Court, Southern District of New York*, No. 1:11-md-02262-NRB
Testifying expert for plaintiffs
Deposed March 2017, June 2017

Stacey Pierce-Nunes, on behalf of herself and all others similarly situated, v. Toshiba American Information Systems, 2015-2016
*United States District Court, Central District of California,* No. 3:14-CV-00796 JST
Testifying expert for plaintiffs
Deposed April 2016

John Moseley v. Toshiba America Information Systems, Inc., 2015-2016
Judicial Arbitration and Mediation Services No. 1200049482
Testifying expert for claimant
Deposed July 2015

In re Cathode Ray Tube (CRT) Antitrust Litigation, 2008-
*United States District Court, Northern District of California, San Francisco Division,* No. CV-07-5944
Testifying expert for plaintiffs
Deposed November 2012, March 2013, June 2014, September 2014, October 2014, June 2022

In re Photochromic Lens Antitrust Litigation, 2010-2012
*United States District Court Middle District of Florida, Tampa Division*, No. 8:10-md-02173-JDW-EAJ
Testifying expert for plaintiffs
Deposed August 2012

Datel Holdings and Datel Design and Development v. Microsoft, 2010-2011
*United States District Court, Northern District of California, San Francisco Division,* No. 09-cv-05535
Testifying expert for plaintiffs
Deposed October 2011

In re Prefilled Propane Tank Marketing and Sales Practices Litigation, 2010-2011
*United States District Court, Western District of Missouri, Western Division*, No. 4:09-cv-00465
Testifying expert for plaintiffs

In re Florida Cement and Concrete Antitrust Litigation, 2010
*United States District Court, Southern District of Florida, Miami Division*, No. 1:09-cv-23493-CMA
Consulting expert for plaintiffs

Altair Engineering v. MSC Software, 2009-2010
*United States District Court, Eastern District of Michigan, Southern Division,* No. 2:07-cv-12807
Testifying expert for plaintiff
Deposed May 2010

In re Optical Disk Drive products Antitrust Litigation, 2009-2010
*United States District Court, Northern District of California, San Francisco Division,* No. M:2010-cv-02143
Consulting expert for plaintiffs

In re Flash Memory Antitrust Litigation, 2008-2011
*United States District Court, Northern District of California, Oakland Division,* No. C-07-0086-SBA
Testifying expert for plaintiffs
Deposed August 2009

Valassis Communications, Inc. v. News America, Inc., 2008-2009
*United States District Court, Eastern District of Michigan, Southern Division*, No. 2:06-cv-10240
*Circuit Court of the State of Michigan, County of Wayne*, No. 07-0706645-CZ
Consulting expert for plaintiff

In re TFT-LCD (Flat Panel) Antitrust Litigation, 2008-2012
*United States District Court, Northern District of California, San Francisco Division,* No. M:07-cv-01827
Testifying expert for plaintiffs
Deposed July 2009, June 2011, August 2011

Houston Baptist University v. NCAA, 2008-2009
*United States District Court in and for the Southern District of Texas, Houston Division*
Testifying expert for plaintiff

Seoul Semiconductor Co. v. Nichia Corp., 2008
*United States District Court, Northern District of California,* No. 3:08-cv-04932-PJH
Testifying expert for plaintiffs

Albert Andy Cohn v. Office Depot, 2008
*Superior Court of the State of California, County of Los Angeles, Central District, No. BC 372449*
Testifying expert for defendant

In re Graphics Processing Units Antitrust Litigation, 2007-2008
*United States District Court Northern District of California,* No. M:07-CV-01826-WHA
Testifying expert for plaintiffs
Deposed June 2008

Pro-Sys Consultants Ltd. and Neil Godfrey v. Microsoft, 2007-2018
*Supreme Court of British Columbia, No. L043175, Vancouver Registry*
Testifying expert for plaintiffs
Deposed December 2008

In re Dynamic Random Access Memory (DRAM) Antitrust Litigation, 2007
*United States District Court, Northern District of California,* No. 02-cv-01486
Consulting expert for plaintiffs

Jason White et al. v. NCAA, 2006-2008
*United States District Court Central District of California, No. CV 06-0999 RGK (MANx)*
Testifying expert for plaintiffs
Deposed October 2007

In re Reformulated Gasoline (RFG) Antitrust and Patent Litigation, 2004-2008
*United States District Court Central District of California, No. 05-1671 CAS*
Testifying expert for plaintiffs
Deposed December 2006

Carlisle, settlement negotiations with Crompton, EPDM price-fixing cartel, 2005-2007
Consulting expert

Caterpillar and Carlisle, settlement negotiations with DuPont-Dow Elastomers, PCP (or CR) and
EPDM price-fixing cartels, 2004-2005
Consulting expert

City and County of San Francisco et al. v. Microsoft, 2004-2007
*United States District Court for the District of Maryland,* No. 1332
Testifying expert for plaintiffs

The Service Source v. Office Depot, 2004-2005
*United States District Court Eastern District of Michigan Southern Division,* No. 02-73361
Project director

Joe Comes et al. v. Microsoft, 2002-2008
*Iowa District Court for Polk County,* No. CL82311
Testifying expert for plaintiffs
Deposed July 2006, November 2006

Charles Cox et al. v. Microsoft, 2002-2006
*Supreme Court of the State of New York County of New York,* No. 105193/00
Testifying expert for plaintiffs

Daniel Gordon et al. v. Microsoft, 2002-2004
*State of Minnesota District Court County of Hennepin Fourth Judicial District,* No. 00-5994
Testifying expert for plaintiffs
Deposed September 2003

Morelock Enterprises, Inc. v. Weyerhaeuser Co., 2004-2008
*United States District Court District of Oregon,* No. 3:04-cv-00583-PA
Testifying expert for plaintiffs
Deposed October 2004, April 2005, October 2007
Testified in trial April 2008

Compuware v. IBM, 2002-2005
*United States District Court for the Eastern District of Michigan, No. 02-70906*
Project director

In re New Mexico Indirect Purchaser Microsoft Corp. Antitrust Litigation, 2002-2004
*State of New Mexico First Judicial District,* No. D-0101-CV-2000-1697
Testifying expert for plaintiffs

Charles Friedman et al. v. Microsoft, 2002-2004
*Superior Court of the State of Arizona in and for the County of Maricopa,* No. CV2000-000722 /
CV2000-005872
Testifying expert for plaintiffs
Deposed September 2003

In re Massachusetts Consumer Protection Litigation, 2003-2004
*Commonwealth of Massachusetts, Superior Court Department of the Trial Court Middlesex Division,*
No. 00-2456
Consulting expert

Olson v. Microsoft, 2002
*Montana First Judicial District Court Lewis & Clark County, No. CDV-2000-219*
Consulting expert

Covad v. Bell Atlantic (Verizon), 2001-2004
*United District Court for the District of Columbia, No. 99-1046*
Project director

AMD, 2000-2004
Project director

Leckrone, et al. v. Premark International, Inc., et al., 2001
Testifying expert for plaintiffs

Ren, et al. v. EMI Music Distribution, Inc., 2001
*State of Michigan in the Circuit Court of the County of Macomb,* No. 00-2383-CZ
Testifying expert for plaintiffs

SBC, 2000
Staff economist

Lingo et al. v. Microsoft, 1999-2004
*Superior Court of the State of California City and County of San Francisco,* J.C.C.P. No. 4106
Project director

Gravity et al. v. Microsoft, 1999-2003
*United States District Court for the District of Columbia,* No. 1:99CV00363
Staff economist

City and County of San Francisco, 1999
Staff economist

Intergraph v. Intel, 1998-2001
*United States District Court Appeals for the Federal District,* No. 98-1308
Staff economist

Comm-Tract v. Northern Telecom, 1991-1997
*United States District Court District of Massachusetts,* No. 90-13088-WF
Project director

Systemcare, Inc. v. Wang Computer, 1991-1993
*United States District Court for the District of Colorado,* No. 89-B-1778
Staff economist

International Travel Arrangers v. Northwest Airlines, 1988-1989
Staff economist

**Exhibit B: Documents Relied Upon in the Expert Rebuttal Report of Janet S. Netz, Ph.D.**
**Part 1: Bates Numbered Documents**

| | | |
|---|---|---|
| AMSPIR060900 | VAR00101100 | VAR00351488 |
| BAIN00055587 | VAR00101102 | VAR00360675 |
| BAIN00147958 | VAR00104422 | VAR00362133 |
| BAIN00147996 | VAR00106134 | VAR00365110 |
| BAIN00148097 | VAR00110239 | VAR00366698 |
| CB00025330 | VAR00129039 | VAR00371189 |
| CB00382194 | VAR00135529 | VAR00415061 |
| CB00485513 | VAR00158255 | VAR00424537 |
| FEAS-Ares00075986 | VAR00160801 | VAR00424538 |
| FUSIONELI000000236 | VAR00160802 | VAR00438032 |
| JEFF00047202 | VAR00170654 | VAR00453158 |
| JEFF00049646 | VAR00182584 | VAR00499445 |
| USASF_00008564 | VAR00244139 | VAR00579319 |
| USASF_00011692 | VAR00250643 | |
| USASF_00011067 | VAR00253877 | |
| USASF_00011972 | VAR00273953 | |
| USASF_00039789 | VAR00273956 | |
| VAR00005294 | VAR00275774 | |
| VAR00008463 | VAR00304497 | |
| VAR00009167 | VAR00304733 | |
| VAR00009293 | VAR00310631 | |
| VAR00072545 | VAR00320890 | |
| VAR00072652 | VAR00321654 | |
| VAR00073393 | VAR00330170 | |
| VAR00074687 | VAR00332326 | |
| VAR00081396 | VAR00335462 | |
| VAR00094550 | VAR00335468 | |
| VAR00095347 | VAR00345222 | |
| VAR00100694 | VAR00350748 | |
| VAR00100717 | VAR00351376 | |

**Exhibit B: Documents Relied Upon in the Expert Rebuttal Report of Janet S. Netz, Ph.D.**
**Part 2: Confidential Documents without Bates Numbers**

03 June 2022, Declaration of Tamra Van Vleet, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee).

03 March 2022, Videotaped Oral Deposition of Jamie J. Parrish, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-cgc (In the United States District Court for the Western District of Tennessee).

03 November 2022, Videotaped Deposition of Kevin Murphy, Ph.D., Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee).

04 November 2022, Videotaped Deposition of Kevin Murphy, Ph.D., Jessica Jones, et al., v. Varsity Brands, LLC, et al., No. 2:20-cv-02892-SHL-tmp (In the United States District Court for the Western District of Tennessee Western Division).

06 April 2022, Remote Videotaped Deposition of Marlene Cota, Volume I, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee).

09 December 2021, Videotaped Deposition of Nicole Lauchaire, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee).

09 March 2022, Videotaped Oral 30(b)(6) Deposition of U.S. All Star Federation (Steve H. Peterson), Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee).

12 May 2022, Hybrid Videotaped Deposition of Jeff Webb, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee).

13 April 2022, Hybrid Videotaped Deposition of Cole Stott, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee).

13 April 2022, Videotaped Videoconference 30(b)(6) Deposition of Defendants Varsity Brands, LLC, Varsity Spirit, LLC, and Varsity Spirit Fashion & Supplies, LLC, By: William Hopping Seely IV and 30(b)(1) Deposition of William Hopping Seely IV, Volume I, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee).

15 April 2022, Videotaped Oral 30(b)(6) Deposition of United States All Star Federation, Inc. by Corporate Designee Jim Chadwick, and as 30(b)(1) capacity, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee).

# Exhibit B: Documents Relied Upon in the Expert Rebuttal Report of Janet S. Netz, Ph.D.
# Part 2: Confidential Documents without Bates Numbers

15 November 2022, Deposition of Jonathan M. Orszag, Jessica Jones, et al., v. Varsity Brands, LLC, et al., No. 2:20-cv-02892-SHL-tmp (In the United States District Court for the Western District of Tennessee Western Division).

16 November 2021, Videotaped Oral Deposition of Brian Todd Elza, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee).

17 November 2021, Remote Videotaped Deposition of Brian Elza, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee).

21 March 2022, Videotaped Oral Deposition of Jim Hill, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee).

22 November 2021, Videotaped Oral Deposition of Francis Xavier LeTard, III, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee).

23 March 2022, Videotaped Oral 30(b)(6) Deposition of Varsity Brands LLC and Varsity Spirit and Individual (John Newby), Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee).

25 March 2022, Videotaped Oral Deposition of Buffy Duhon, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-TMP (In the United States District Court for the Western District of Tennessee).

29 March 2022, Videotaped Oral Deposition of Joshua O. Quintero, Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp (In the United States District Court for the Western District of Tennessee).

Aronoff, James H., 20 June 2022, Expert Report of James H. Aronoff, Jessica Jones, et al., v. Varsity Brands, LLC, et al., No. 2:20-cv-02892-SHL-tmp (In the United States District Court for the Western District of Tennessee Western Division).

Murphy, Kevin, 23 September 2022, Expert Report of Kevin Murphy, Jessica Jones, et al., v. Varsity Brands, LLC, et al., No. 2:20-cv-02892-SHL-tmp (In the United States District Court for the Western District of Tennessee Western Division).

Netz, Janet, Undated, Expert Report of Janet S. Netz, Ph.D., Jessica Jones, et al., v. Varsity Brands, LLC, et al., No. 2:20-cv-02892-SHL-tmp (In the United States District Court for the Western District of Tennessee Western Division).

Orszag, Jonathan, 23 September 2022, Expert Report of Jonathan M. Orszag, Jessica Jones, et al., v. Varsity Brands, LLC, et al., No. 2:20-cv-02892-SHL-cgc (In the United States District Court for the Western District of Tennessee Western Division).

**Exhibit B: Documents Relied Upon in the Expert Rebuttal Report of Janet S. Netz, Ph.D.**
**Part 2: Confidential Documents without Bates Numbers**

Webb, Jeff, 07 May 2010, Report of Jeff Webb, Biediger et al. v. Quinnipiac University, Case No. 3:09-CV-6211(SRU) (U.S. District Court, District of Connecticut), Webb Dep Exhibit 2.

# Exhibit C: Documents Relied Upon in the Expert Rebuttal Report of Janet S. Netz, Ph.D.

30 July 2021, Declaration of Karen Noseff Aldridge in Support of Rebel Athletic Inc.'s (1) Response to Plaintiffs' Motion to Compel, (2) Motion to Quash Subpoena Duces Tecum, and (3) Response to Plaintiffs' Motion to Transfer, Fusion Elite All Stars, et al. v. Rebel Athletics Inc., No. 3:21-MC-00151-L (United States District Court for the Northern District of Texas Dallas Division).

American Bar Association, 2005, Market Power Handbook: Competition Law and Economic Foundations, Second Edition, ABA Book Publishing, Chicago, IL.

Areeda, Phillip E., Hovenkamp, Herbert, and John L. Solow, 1995, Antitrust Law: An Analysis of Antitrust Principles and Their Application, Volume IIA, Little, Brown & Company: Boston, MA.

Carlton, Dennis W., and Jeffrey M. Perloff, 2005, Modern Industrial Organization, Fourth Edition, Addison Wesley.

Carlucci, Domenico, De Gennaro, Bernado, and Roselli, Luigi, 2016, Competitive Strategies of Italian Bottle Water Industry: Evidence from a Hedonic Analysis, Rivista di Economia Agraria, Anno LXXI, No. 1 (Supplemento).

Chadwick, Jim, U.S. All Star Federation, et al., 18 October 2011, USASF/IASF: Worlds Policy Update, Spirit Post, https://spiritpost.com/2011/10/usasfiasf-worlds-policy-update/, accessed 12 April 2022.

Dance Team Union, Undated, About Dance Team Union, https://www.danceteamunion.com, accessed 02 December 2022.

Dance Team Union, Undated, Baton Rouge Regional, https://www.danceteamunion.com/_files/ugd/8d9ab7_8b76d2e40d7e4aac83e500ff2a5faa17.pdf, accessed 02 December 2022.

Eaton, Curtis B. and Richard G. Lipsey, 11 September 1989, Chapter 12: Product differentiation, in Handbook of Industrial Organization, Volume 1, First Edition, Richard Schmalensee and Robert Willig (Eds.), North-Holland.

Edlin, Aaron S. and Rubinfeld, Daniel L., 2004, Exclusion or Efficient Pricing: The "Big Deal" Bundling of Academic Journals, Antitrust LJ, Vol. 72, No.1, 128-159.

FCA Cheerleading, Undated, 2022 FCA Cheer All American Event, https://www.fcacheer.org/, accessed 02 December 2022.

Gandhi, Amit and Aviv Nevo, 06 December 2021, Chapter 2: Empirical models of demand and supply in differentiated products industries, in Handbook of Industrial Organization, Volume 4, First Edition, Kate Ho, Ali Hortacsu and Alessandro Lizzeri (Eds.), North-Holland.

JAMZ, Undated, 2022-23 JAMZ Cheer & Dance, https://www.jamz.com/rules-and-scoring, accessed 02 December 2022.

Landes, Williams M. and Posner, Richard A., March 1981, Market Power in Antitrust Cases, Harvard Law Review, Vol. 94, No. 5, 937-996.

LiveAbout, 21 July 2018, How to Read the NHL Standings, https://www.liveabout.com/nhl-standings-explained-2778913, accessed 05 December 2022.

Parent Action Committee, Undated, Cheer Parents 101: Everything you wanted to know as a Parent of an All Star Cheerleader, U.S. All Star Federation, https://www.yumpu.com/en/document/read/27245738/usasf-cheer-parents-101, accessed 29 November 2022.

Pop Warner Little Scholars, Undated, Cheer & Dance Review, https://www.popwarner.com/CheerDance, accessed 02 December 2022.

Exhibit C
Page 1 of 2

# Exhibit C: Documents Relied Upon in the Expert Rebuttal Report of Janet S. Netz, Ph.D.

PR Newswire, 23 December 2015, Varsity Brands Announces Acquisition Of Allgoods, LLC, https://www.prnewswire.com/news-releases/varsity-brands-announces-acquisition-of-allgoods-llc-300196819.html, accessed 09 May 2022.

Riddell Sports, Inc., 1997, 1997 Form 10-K, https://www.sec.gov/Archives/edgar/data/874786/0000950172-98-000302.txt, accessed 13 December 2022.

Rubinfeld, Daniel L., 2000, Market Definition with Differentiated Products: The Post/Nabisco Cereal Merger, Antitrust Law Journal, Vol. 68(1), 163-185.

Spirit Post: Spirit Post, November 2008, Varsity Acquisitions: A Recap, https://spiritpost.com/2008/11/varsity-acquisitions-a-recap/, accessed 14 December 2022.

The Open Championships, Undated, Scoring and Rules, https://openchampionshipseries.com/scoring-and-rules/, accessed 02 December 2022.

U.S. All Star Federation, 2022, About the USASF, https://www.USASF.net/about, accessed 05 May 2022.

U.S. Department of Justice and the Federal Trade Commission, 19 August 2010, Horizontal Merger Guidelines.

U.S. Department of Justice, 18 March 2022, Competition and Monopoly: Single-Firm Conduct Under Section 2 of The Sherman Act: Chapter 2, https://www.justice.gov/archives/atr/competition-and-monopoly-single-firm-conduct-under-section-2-sherman-act-chapter-2, accessed 14 June 2022.

United Spirit Association, 13 November 2019, Q&A: Varsity Spirit/NFHS Squad Credentialing Program, https://www.varsity.com/usa/wp-content/uploads/2020/07/NFHS.USA_.FAQ_.2021.02.pdf, accessed 06 December 2022.

Exhibit C
Page 2 of 2

Highly Confidential Pursuant to Protective Order

## Glossary of Acronyms and Commonly Used Terms

| Acronym / Term | Definition |
|---|---|
| AACCA* | American Association of Cheerleading Coaches and Administrators. AACCA governed College Cheer until it merged with USA Cheer in 2018. |
| COA* | Cheerleaders of America. COA was an IEP in Ohio owned by JAM Brands; Varsity acquired JAM Brands in 2015. |
| IASF* | International All Star Federation. International sanctioning body for All Star Cheer, spun off from USASF in 2016. |
| ICU* | International Cheer Union. International governing body of all cheerleading disciplines. Established by Varsity. |
| IEP | Independent Event Producer. |
| IFC | International Federation of Cheerleading. The IFC sponsors a variety of international cheerleading competitions. |
| IOC | International Olympic Committee. The authority responsible for organizing the Olympic Games. |
| NACCC* | National All Star Cheerleading Coaches' Congress. An independent organization created by cheerleading coaches in 2003 to establish uniform rules for All Star Cheer. NACCC established the initial set of universal All Star Cheer rules. In 2005, USASF acquired NACCC. Within a few years, Varsity dissolved NACCC. After the demise of NACCC, Varsity (through the USASF) controlled rules changes and other decisions. |
| NCA* | National Cheerleaders Association. Founded by Lawrence Herkimer in 1948. Now owned by Varsity (promotes School Competitions, Cheer Camps, and national tournaments and championships). Most college teams now attend either NCA or UCA Championships. |
| NDA* | National Dance Alliance. |
| NCATA | National Collegiate Acrobatics and Tumbling Association. |
| NFHS | National Federation of State High School Associations, a governing body for School Cheer. |
| UCA* | Universal Cheerleaders Association. Founded by Jeff Webb (Varsity's founder and former CEO) in 1974 after he left the NCA. In 1983, Webb changed the business's name from Universal Cheerleaders Association to Varsity Spirit, Inc. Varsity owns and operates UCA as one of Varsity Brands' subsidiaries. UCA promotes Cheer Competitions, Cheer Camps, and national tournaments and championships. Most college teams now attend either NCA or UCA Championships. |
| UDA* | Universal Dance Association. |
| USA* | United Spirit Association, large summer Cheer Camp promoter acquired by Varsity in 1994. |
| USASF* | U.S. All Star Federation. Varsity created the USASF with other cheer producers in 2003 in response to the creation of the NACCC. Eventually acquired NACCC. |
| USA Cheer* | USA Federation for Sport Cheering. A non-profit organization established by Varsity in 2007. USA Cheer serves All Star and School Cheer programs. Its objectives are to "help grow and develop interest and participation in cheer throughout the United States; promote safety and safety education for cheer in the United States; and represent the United States of America in international Cheer Competitions". USA Cheer governs high school and college cheer. |
| V!ROC* | Varsity's choreography camps. Varsity offers program rebates if All Star gyms and schools choose Varsity V!ROC choreography camps. |

Note(s):    All of the above are cited/explained in the body of the report. Entities currently owned or controlled by Varsity are followed by an asterisk.

Exhibit 1

Highly Confidential Pursuant to Protective Order

## Varsity's Acquisitions 1996 - Present



Note(s):          Blue boxes represent entities in the Cheer Competitions market.  Red boxes represent entities in the Cheer Apparel market.

Data Source(s):  PR Newswire, 23 December 2015, Varsity Brands Announces Acquisition Of Allgoods, LLC, https://www.prnewswire.com/news-releases/varsity-brands-announces-acquisition-of-allgoods-llc-
300196819.html, accessed 09 May 2022; Riddell Sports, Inc., 1997, 1997 Form 10-K, https://www.sec.gov/Archives/edgar/data/874786/0000950172-98-000302.txt, accessed 13 December
2022; Spirit Post: Spirit Post, November 2008, Varsity Acquisitions: A Recap, https://spiritpost.com/2008/11/varsity-acquisitions-a-recap/, accessed 14 December 2022; VAR00129039, at 9041
9042; VAR00371189, at 1271; VAR00332326.

Source File(s):   Varsity's Acquisitions.xlsx; Varsity's Acquisitions.tmv; Varsity's Acquistions_rebuttal Update.tmv

Exhibit RR-7

Highly Confidential Pursuant to Protective Order

# 2018 NCA All Star National Championship – Dallas, Texas
All Star Travel Map



Notes: All blue dots represent unique gyms (customer numbers) while the red dot is the event. The red circle is 500 miles in radius and corresponds to the 89th percentile for travel distance for Worlds bid events (see Prof. Murphy Exhibit 32). The green travel lines were drawn using the geosphere package in R. The travel line off the West Coast is for Hawaii and the line going into Canada is for Alaska. Only All Star registrations are included.

Data Sources: db_regs.rds, db_events.rds, Customer_and_Venue_Unique_ZIPs_to_Coordinates.xlsx from Prof. Murphy's data build

Source File: Travel Map Exhibits Output.R

Exhibit 8

Highly Confidential Pursuant to Protective Order

# Travel Map of 200 All Star Gyms That Competed in 6–9 Regular Season Events
## 2017/2018 Season



Notes: All events took place in the 2017/2018 season as defined as July 1, 2017 – June 30, 2018 by Prof. Murphy. All blue dots represent unique gyms (customer numbers) while the red dots represent events. The green travel lines were drawn using the geosphere package in R. There are 230 unique events represented in this map.

Data Sources: db_regs.rds, db_events.rds, Customer_and_Venue_Unique_ZIPs_to_Coordinates.xlsx from Prof. Murphy's data build

Source File: Travel Map Exhibits Output.R

Exhibit 9

Highly Confidential Pursuant to Protective Order

# Travel Map of 500 Scholastic Programs That Competed in 1 Regular Season Event
## 2017/2018 Season



Notes: All events took place in the 2017/2018 season as defined as July 1, 2017 – June 30, 2018 by Prof. Murphy. All blue dots represent unique scholastic programs (customer numbers) while the red dots represent event locations. These events exclude the 7 end–of–season events mentioned in Prof. Murphy Exhibit 21 and only include events with 1 or 2 day duration. The green travel lines were drawn using the geosphere package in R. The travel line off the West Coast is for Hawaii.

Data Sources: db_regs.rds, db_events.rds, Customer_and_Venue_Unique_ZIPs_to_Coordinates.xlsx from Prof. Murphy's data build

Source File: Travel Map Exhibits Output.R

Exhibit 10

Highly Confidential Pursuant to Protective Order

# 2018 National High School Cheerleading Championship
Scholastic Travel Map



Notes: All blue dots represent unique scholastic programs (customer numbers) while the red dot is the event. The red circle is 871 miles in radius and is the average travel distance at this event according to Prof. Murphy Exhibit 21. The green travel lines were drawn using the geosphere package in R. The travel line off the West Coast is for Hawaii.

Data Sources: db_regs.rds, db_events.rds, Customer_and_Venue_Unique_ZIPs_to_Coordinates.xlsx from Prof. Murphy's data build

Source File: Travel Map Exhibits Output.R

Exhibit 11

Highly Confidential Pursuant to Protective Order

# Hypothetical Event Location Map



Notes: The red dots represent hypothetical event locations. Each blue circle is 500 miles in radius and represents the 89th percentile for travel distance to Worlds bid competitions (Prof. Murphy Exhibit 32). Any overlap between the circles represents regions where events compete to draw competitors. The circles are shaded semi–transparently such that a darker shade of blue represents more layers of overlap.

Data Sources: db_regs.rds, db_events.rds, Customer_and_Venue_Unique_ZIPs_to_Coordinates.xlsx from Prof. Murphy's data build

Source File: Travel Map Exhibits Output.R

Exhibit 12

Highly Confidential Pursuant to Protective Order

# Location and Travel Radius – Worlds Bid Events
## 2017/2018 Season



Notes:  All events took place in the 2017/2018 season as defined as July 1, 2017 – June 30, 2018 by Prof. Murphy. The red dots represent 28 Worlds bid events. Each blue circle is 500 miles in radius and represents the 89th percentile for travel distance to Worlds bid events (Prof. Murphy Exhibit 32). The circles are shaded semi–transparently such that a darker shade of blue represents more layers of overlap.

Data Sources: db_regs.rds, db_events.rds, Customer_and_Venue_Unique_ZIPs_to_Coordinates.xlsx from Prof. Murphy's data build

Source File: Travel Map Exhibits Output.R

Exhibit 13

Highly Confidential Pursuant to Protective Order

# Location and Travel Radius – 2 Day Events
March 2018



Notes: The red dots represent 27 2–day events. Each blue circle is 300 miles in radius and represents the 88.4th percentile for travel distance to 2–day competitions (Prof. Murphy Exhibit 32).
The circles are shaded semi–transparently such that a darker shade of blue represents more layers of overlap.

Data Sources: db_regs.rds, db_events.rds, Customer_and_Venue_Unique_ZIPs_to_Coordinates.xlsx from Prof. Murphy's data build

Source File: Travel Map Exhibits Output.R

Exhibit 14

Highly Confidential Pursuant to Protective Order

## Price Effects from Changes in Local Market Conditions
Fall 2013/2014 to Spring 2018/2019

| Dependent Variable: Real Net Revenue Post Rebate per Athlete (Price) | (1) | | (2) | |
|---|---|---|---|---|
| | Levels | Logs | Levels | Logs |
| Average Real Price of Nearby Events | 0.0184 | 0.0520 | | |
| | (0.0193) | (0.0371) | | |
| Observations | 1151 | 1151 | 1616 | 1616 |
| R-squared | 0.983 | 0.978 | 0.972 | 0.965 |
| Weights | Athletes | Athletes | Athletes | Athletes |
| Season Fixed Effects | Yes | Yes | | |
| Month-of-Year Fixed Effects | Yes | Yes | | |
| Event Fixed Effects | Yes | Yes | Yes | Yes |
| Matched by Season and Month | Yes | Yes | | |

Note(s):    * - p < 0.1; ** - p < 0.05; *** - p < 0.01.

Includes only registrations of type All Star, excludes end-of-season events.

Standard errors clustered by event year and month in parentheses.

For regression 1, nearby events are defined as taking place in the same month and season and occuring within the distance radius used in Prof. Murphy's Exhibit 39. Regression 2 uses event fixed effects only (by regressing on competition ID).

Data Sources:    regdata.rds from Prof. Murphy's data build

Source Files:    Ex39 Regression output.R, Ex39regressiondata.xlsx

Exhibit 15

Highly Confidential Pursuant to Protective Order

# Location of Cheer Camps
## 2017/2018 Season



Notes: All camps took place in the 2017/2018 season as defined as May 01, 2017, through April 30, 2018, since scholastic programs begin registering for camps in May for the following school year. The red dots each represent one of 5396 cheer camps; all camp types are included.

Data Sources: db_regs.rds, db_events.rds, Customer_and_Venue_Unique_ZIPs_to_Coordinates.xlsx from Prof. Murphy's data build

Source File: Cheer Camp Maps.R

Exhibit 16

Highly Confidential Pursuant to Protective Order

# Travel Map of the 10 Largest Hotel/Resort Camps
2017/2018 Season



Notes: All camps took place in the 2017/2018 season as defined as May 01, 2017, through April 30, 2018, since scholastic programs begin registering for camps in May for the following school year.
The red dots represent camp locations. They were chosen as the ten largest camps by total participants in unique cities that were of the type "resort camp" or "hotel camp". The blue dots represent customer locations. The green travel lines were drawn using the geosphere package in R.

Data Sources: db_regs.rds, db_events.rds, Customer_and_Venue_Unique_ZIPs_to_Coordinates.xlsx from Prof. Murphy's data build

Source File: Cheer Camp Maps.R

Exhibit 17

Highly Confidential Pursuant to Protective Order

## Cheer Camp Attendance by Number of Camps
Measured in Teams per Season

| Number of Camps | Season | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2015/2016 | | 2016/2017 | | 2017/2018 | | 2018/2019 | |
| | Teams | Percentage | Teams | Percentage | Teams | Percentage | Teams | Percentage |
| 1 | 1,216 | 69.4% | 1,248 | 65.4% | 1,404 | 64.2% | 1,523 | 63.8% |
| 2 | 341 | 19.5% | 424 | 22.2% | 503 | 23.0% | 523 | 21.9% |
| 3 | 134 | 7.7% | 159 | 8.3% | 196 | 9.0% | 233 | 9.8% |
| 4 | 46 | 2.6% | 58 | 3.0% | 63 | 2.9% | 73 | 3.1% |
| 5+ | 14 | 0.8% | 20 | 1.0% | 21 | 1.0% | 36 | 1.5% |
| Total | 1,751 | 100.0% | 1,909 | 100.0% | 2,187 | 100.0% | 2,388 | 100.0% |

Note(s):    Number of Camps is calculated per team (defined as a unique team level and customer number). A team is only included in a given season if they competed in a Varsity scholastic competition (excluding scholastic end-of-season events listed in Prof. Murphy's Exhibit 13) and attended at least one camp in the season. Collegiate teams are excluded. The season for camp data is defined as beginning on May 01 and completing the following April 30.

Data Sources:    db_regs.rds and db_events.rds from Prof. Murphy's data build

Source Files:    Camp Attendance Team Level.R, Camp Attendance Team Level.xlsx

Exhibit 18

Highly Confidential Pursuant to Protective Order

# Cheer Camp Attendance by Number of Camps
Measured in Registrations per Season

| Number of Camps | Season | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2015/2016 | | 2016/2017 | | 2017/2018 | | 2018/2019 | |
| | Registrations | Percent | Registrations | Percent | Registrations | Percent | Registrations | Percent |
| 1 | 23,522 | 48.0% | 24,181 | 43.4% | 27,104 | 42.0% | 29,499 | 40.3% |
| 2 | 12,725 | 26.0% | 16,128 | 29.0% | 18,916 | 29.3% | 20,597 | 28.2% |
| 3 | 7,899 | 16.1% | 9,072 | 16.3% | 11,697 | 18.1% | 13,858 | 19.0% |
| 4 | 3,387 | 6.9% | 4,237 | 7.6% | 4,570 | 7.1% | 5,642 | 7.7% |
| 5+ | 1,427 | 2.9% | 2,074 | 3.7% | 2,206 | 3.4% | 3,530 | 4.8% |
| **Total** | **48,960** | **100%** | **55,692** | **100.0%** | **64,493** | **100.0%** | **73,126** | **100.0%** |

Note(s):       Number of Camps is calculated per team (defined as a unique team level and customer number). A team is only included in a given season if they competed in a Varsity scholastic competition (excluding scholastic end-of-season events listed in Prof. Murphy's Exhibit 13) and attended at least one camp in the season. Collegiate teams are excluded. The season for camp data is defined as beginning on May 01 and completing the following April 30.

Data Sources:    db_regs.rds and db_events.rds from Prof. Murphy's data build

Source Files:    Camp Attendance Team Level.R and Camp Attendance Team Level.xlsx

Exhibit 19

Highly Confidential Pursuant to Protective Order

# Varsity Camp Attendance by Competing Scholastic Teams
by Season

|  | Season | | | |
|---|---|---|---|---|
|  | **2015/2016** | **2016/2017** | **2017/2018** | **2018/2019** |
| **Camps** | 1,751 | 1,909 | 2,187 | 2,388 |
| **Competitions** | 2,505 | 2,492 | 2,735 | 2,973 |
| **Camp Percentage** | 69.9% | 76.6% | 80.0% | 80.3% |

Note(s):    Teams are defined by a unique team level and customer number. A team is only included in a given season if they competed in a Varsity scholastic competition (excluding scholastic end-of-season events listed in Prof. Murphy's Exhibit 13) and attended at least one camp in the season. Collegiate teams are excluded. The season for camp data is defined as beginning on May 01 and completing the following April 30.

Data Source(s):    db_regs.rds and db_events.rds from Prof. Murphy's data build

Source File(s):    Camp registrations competing output AE.R, Camp_regs_competing_outputAE.xlsx

Exhibit 20

Highly Confidential Pursuant to Protective Order

## Varsity All Star Customers

by Number of Varsity Worlds Bid Events Attended, 2018/2019

| Number of Varsity Worlds Bid Events Attended | Number of Gyms | Number of Registrations | Average Varsity Non-World Bids Competitions |
|:---:|:---:|:---:|:---:|
| 0 | 750 | 80,311 | 3.1 |
| 1 | 432 | 97,657 | 3.9 |
| 2 | 263 | 102,783 | 4.7 |
| 3 | 197 | 115,712 | 4.6 |
| 4 | 143 | 105,064 | 4.5 |
| 5 | 61 | 61,575 | 4.8 |
| 6 | 22 | 28,381 | 5.2 |
| 7 | 4 | 7,565 | 6.5 |
| 8 | 2 | 3,421 | 9.0 |
| 9 | 1 | 3,554 | 8.0 |
| Overall | 1,875 | 606,023 | 3.9 |
| Share Attending Zero Worlds Bid Events | 40.0% | 13.3% | |
| Share Attending 4 or Fewer Worlds Bid Events | 95.2% | 82.8% | |

Note(s):        Based on All-Star Registrations for the 2018/2019 seasons
Data Sources:   regt.rds, regn.rds, and events.rds from Prof. Murphy's data build
Source Files:   Exhibit 48 corrected AE output.R, Ex48outputAE.xlsx

Exhibit 21

Highly Confidential Pursuant to Protective Order

## Summary of Participation and Price Changes for Non-Acquired
2015/2016 to 2018/2019

| | Percentage Change | |
|---|---|---|
| **Period Studied** | Athlete Participation | Real Average Price per Athlete |
| 2015/2016 to 2017/2018 | 19.0% | 2.2% |
| 2016/2017 to 2018/2019 | 9.4% | 0.2% |
| **Total** | 13.8% | 1.1% |

Note(s):    All events belonging to the acquired brands ALO, ATC, CSG, EPIC, MGS, and SCB (per Prof. Murphy's Exhibit 45), as well as all end-of-season All Star events (per Prof. Murphy's Exhibit 12) were excluded from these calculations. All packaged events were excluded from the price calculations. Real prices were calculated using the CPI index. Average prices are weighted by participants. "Total" refers to a comparison of the 2017/2018 and 2018/2019 seasons to the 2015/2016 and 2016/2017 seasons.

Data Sources:    db_regs.rds, db_events.rds, and cpi.rds from Prof. Murphy's data build

Source Files:    Price and Attendance Changes.R, Price and Attendance Changes.xlsx

Exhibit 22