# Exhibit 3

## FILED UNDER SEAL

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

|  |  |
|---|---|
| **JESSICA JONES et al.** | **Case No. 2:20-cv-02892-SHL-tmp** |
| **v.** | **Hon. Sheryl H. Lipman** |
| **VARSITY BRANDS et al.** |  |

## EXPERT REPORT OF RANDAL HEEB, PHD

### JUNE 20, 2022

## HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER[1]

---

[1] Note: All content herein citing to or relating to the production made by Nfinity Athletic LLC, shall be designated as "Highly Confidential – Attorneys and Expert Eyes Only" pursuant to Order Granting Joint Motion for Entry of Stipulated Protective Order in Fusion Elite All Stars, et al. v. Nfinity Athletic LLC, Case 2:22-cv-02226-SHL-tmp, ECF No. 30, (W.D. Tenn.), filed May 31, 2022 ("Nfinity PO").

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

## Contents

I.    Executive Summary ................................................................................................ 4

    I.A.    Competitive Cheer ......................................................................................... 4

    I.B.    Defendants ..................................................................................................... 4

    I.C.    Alleged anticompetitive conduct ................................................................... 4

    I.D.    Assignment .................................................................................................... 5

    I.E.    Economic approach ........................................................................................ 6

    I.F.    Main conclusions ........................................................................................... 7

II.    Introduction ........................................................................................................... 9

    II.A.    Qualifications ............................................................................................... 9

    II.B.    Brief Case Background ............................................................................... 10

    II.C.    Assignment ................................................................................................. 12

III.    Summary of Opinions ........................................................................................ 13

IV.    The Parties .......................................................................................................... 17

    IV.A.    Plaintiffs .................................................................................................... 17

    IV.B.    Defendants ................................................................................................. 18

      IV.B.1.    Varsity Brands--Defendant ................................................................. 18

      IV.B.2.    U.S. All-Star Federation--Defendant ................................................. 22

      IV.B.3.    Other Defendants ................................................................................ 24

V.    Summary of Allegations and Class Definition .................................................... 25

    V.A.    Summary of Allegations ............................................................................ 25

    V.B.    Class Definition ......................................................................................... 29

VI.    Class Certification .............................................................................................. 29

    VI.A.    Relevant Product and Geographic Markets for Assessing Competitive Harm .......... 32

      VI.A.1.    Cheer Competitions is a Relevant Product Market, with Two Relevant Disciplines – All-Star Cheer and School Cheer ................................................................. 38

      VI.A.2.    Cheer Camps is a Relevant Product Market ....................................... 49

      VI.A.3.    Cheer Apparel is a Relevant Market ................................................... 52

    VI.B.    Varsity has Market Power in Each of the Defined Relevant Product and Geographic Markets ................................................................................................. 58

      VI.B.1.    Defendants Have Market Power in the Cheer Competitions Relevant Markets ... 58

      VI.B.2.    Defendants Have Market Power in the Cheer Camps Relevant Market .............. 63

      VI.B.3.    Defendants Have Market Power in the Cheer Apparel Relevant Market ............. 64

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

VI.C.   Common Evidence of Artificially Inflated Prices Caused by Defendants'
Anticompetitive Conduct ........................................................................... 66

    VI.C.1.   Varsity's Alleged Anticompetitive Scheme to Extract Monopoly Rents from
Purchasers of Cheer Competitions, Apparel, and Camps ..................................... 66

    VI.C.2.   Anticompetitive Effects of Varsity's Acquisition Scheme ................... 86

    VI.C.3.   Varsity's Acquisition of Apparel Competitors Diminished Competition ........... 94

    VI.C.4.   Diminished Cheer Camp Competition ............................................... 95

VI.D.   Common Evidence Can Be Used to Establish Class-wide Impact on Indirect
Purchasers ................................................................................................... 98

    VI.D.1.   Direct Purchasers Overcharge Model Estimates in the Cheer Competitions Market
98

    VI.D.2.   Direct Purchasers Overcharge Model Estimates in the Cheer Apparel Market
(SECTION DESIGNATED HIGHLY CONFIDENTIAL – EXPERT AND ATTORNEYS'
EYES ONLY) ............................................................................................. 108

    VI.D.3.   Direct Purchasers Overcharge Model Estimates in the Cheer Camps Market ... 111

    VI.D.4.   Common Evidence Can Be Used to Establish That a De Minimus Fraction of
Class Members Were Unharmed ........................................................................ 113

VI.E.   Common Evidence Can be Used to Construct a Class-wide Common Damages Model
115

    VI.E.1.   Damages for Indirect Purchasers in the Cheer Competitions Market ................ 115

    VI.E.2.   Damages Model for Indirect Purchasers in the Cheer apparel Market .............. 116

    VI.E.3.   Damages Model for Indirect Purchasers in the Cheer Camps Market ............... 116

Attachment 1:  Curriculum Vitae of Randal Heeb, PhD .......................................... 118

Attachment 2:  Materials Relied On .............................................................. 125

Attachment 3:  Additional Tables ................................................................ 133

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# I.    EXECUTIVE SUMMARY

## I.A. Competitive Cheer

1.    Competitive cheer is a sport in which teams of athletes compete against other teams in performing a two and one-half minute routine set to music that includes stunts, jumps, tumbling, amongst other aerobatics. Teams are typically affiliated with a private gym or with a school.

## I.B. Defendants

2.    Defendant Varsity Brands, LLC, and its subsidiary Defendant companies Varsity Spirit, LLC and Varsity Spirit Fashion & Supplies, LLC, are collectively a portfolio business focusing on all cheerleading-related activities ("Varsity"). Varsity is the self-proclaimed "leading marketer and manufacturer of branded products and services to the spirit industry," including producing and promoting cheer competitions and cheer camps, and selling cheer-related apparel and accessories.

3.    Defendant U.S. All-Star Federation, Inc. ("USASF") is a non-profit corporation founded in 2003. It is the governing body for Competitive Cheer responsible for establishing rules and competition standards.

4.    Defendant Jeff Webb is the founder and Chairman of the board of directors of Varsity Brands, LLC.

5.    Defendant Charlesbank Capital Partners LLC ("Charlesbank") wholly owned Varsity Brands, LLC from 2014 to 2018, and is currently a minority stakeholder in that business.

6.    Defendant Bain Capital Private Equity ("Bain" or "Bain Capital") purchased defendant Varsity Brands, LLC in 2018, and currently has a seat on Varsity's Board of Directors.

## I.C. Alleged anticompetitive conduct

7.    Plaintiffs allege that Varsity and its co-defendants are engaged in a continuing scheme to exclude its rivals in an attempt to acquire, enhance, and maintain its monopoly power in three antitrust markets: cheer competitions, cheer camps, and cheer apparel. Plaintiffs have also alleged that Varsity, in conjunction with the USASF, have substantially foreclosed competition and have abused and continue to abuse their market power to enhance, maintain and extend their monopoly position over cheer competitions, cheer camps, and cheer apparel;

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

and have engaged in unreasonable restraint of trade with the purpose of acquiring, maintaining, and enhancing their market power. These anticompetitive acts are alleged to be a violation of state and federal antitrust laws.

8.  The alleged anticompetitive conduct include all of the following, as well as additional other anticompetitive acts: the anticompetitive acquisition of rival event producers, including engaging in conduct to disadvantage or impair rival event producers; acquiring market power through acquisition, and then closing acquired rival events to reduce competition, and/or raising acquired brand's prices to monopoly levels after competition has been eliminated, and thereby protecting and extending its own monopoly power; the anticompetitive acquisition of rival apparel makers; the foreclosure of necessary marketing channels to rival apparel makers at its own market-dominant events; use and leverage of its monopoly position in cheer events to acquire control and influence at USASF and other organizations, and the use of that control to anticompetitively disadvantage rivals in the allocation of rights to award bids to attend national events, and to create competition rules that favor Varsity and disadvantage rivals; employing a scheme of anticompetitive conditional bundled-loyalty rebate contracts, which when employed by a firm with market power have the effect of foreclosing less powerful rivals or rivals without products in the other bundled markets.

**I.D. Assignment**

9.  I have been asked by the Joseph Saveri Law Firm LLP, counsel for Plaintiffs, to provide economic analysis and associated opinions on the definition and parameters of a class of indirect purchasers seeking injunctive relief and damages from the Defendants resulting from Defendants' anticompetitive monopolistic and restraint of trade conduct. I also have been asked to conduct economic analysis, including analysis of quantitative evidence, as to Defendants' liability with respect to their anticompetitive monopolistic and restraint of trade conduct, and the effects of that conduct. I have been asked to determine if the economic analyses necessary to conduct an antitrust evaluation of the Plaintiffs' allegations can be conducted using common evidence, including whether common evidence shows the class members have sustained antitrust injury as a result of the alleged conduct, and whether an appropriate methodology can be employed using common evidence to determine reasonable damages.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

10.  In performing my analysis, I considered documents, depositions, and other materials produced by Defendants and Plaintiffs in this matter, publicly available information, and relied on my own expertise and knowledge of economics, antitrust, and class action principles.

### I.E. Economic approach

11.  I have undertaken a rigorous economic antitrust examination of the three markets at issue in this case: cheer competitions, cheer camps, and cheer apparel. In doing so, I employed standard economic and antitrust methodologies, including conducting a survey of Varsity's revenues, prices, and sales data, conducting a review of the documentary evidence related to the alleged conduct, applying well-studied economic models of anticompetitive conduct, and conducting statistical analyses including multiple linear regression analysis.

12.  I first examined the three markets to determine the appropriate "relevant product and geographic antitrust market definitions" for each of the alleged markets. I used a standard methodology known as the "hypothetical monopolist test," which is the preferred approach to market definition of the US antitrust authorities.

13.  In employing this test, I applied both economic analytic methods as well as empirical measures that were also used to develop overcharges. This is not unusual in monopolization matters such as this one, because market definition is based on whether a particular market as defined can sustain market power. The overcharge analysis determines whether there was an effect and what was the effect of the exercise of market power. The existence, therefore, of a monopoly overcharge or supracompetitive prices is also part of the proof that the market is properly defined. To test my conclusions on market definition, I also examined empirically the extent of Varsity's market shares, as a proxy for market power, at a far narrower level than any plausible market definition. This served two purposes: first, it shows the geographic extent of Varsity's market power, and informs the geographic scope over which overcharges are best estimated (answer: national average overcharges); and second, it enables me to reach a conclusion on the maximum proportion of the putative class members that conceivably might have been unharmed by the conduct (answer: the share of unharmed class members is de minimis).

14.  I then estimate the degree to which Varsity's cheer competitions were overpriced, compared

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

to a competitive benchmark of prices comprised of the following set of prices: the pre-acquisition prices of competitor events of acquired competitors, where available; the first year post-acquisition prices of events that Varsity acquired, where available (because Varsity tended to avoid disrupting previously established prices in the first year); and the prices of previously acquired events that were eventually discontinued. This latter group was included in the benchmark, because Varsity appears to have often implemented price increases in acquired brands by discontinuing old events and staring new events with much higher prices, rather than simply stepping up prices at old events. I also tested the effect on acquired brand prices post-acquisition independently, to document and study this method of implementing price increases.

15.    To estimate overcharges in apparel, I use a benchmark of Nfinity shoes. Nfinity is the only rival apparel producer for which data was received. Nfinity primarily sells shoes used by athletes in cheer competitions, so that is the only product for which an Apparel benchmark is possible. Economic theory implies that overcharges are likely to be similar across apparel product groups, and that among the six major apparel groups, shoes are likely the best proxy for overcharges for all apparel.

16.    Finally, I estimate an overcharge for camps using economic theoretical analysis showing that overcharges for camps are likely to be higher than overcharges for apparel or competitions, because Varsity has more market power in camps than in those other markets, and because higher prices in the other markets may lead customers to shift to less expensive choices, whereas that is not as easy with respect to camps. Therefore, overcharges in competitions and apparel are used a lower bound on overcharges for camps.

17.    Since all these analyses were done using exclusively common evidence, this demonstrates that common evidence can be used to conduct all antitrust and overcharge related analysis and calculations.

### I.F. Main conclusions

18.    Cheer competitions, cheer camps, and cheer apparel are each relevant antitrust product markets. Within competitions and camps there is a distinction between school and All-Star, but these are substitutes for each other for participants (on a seasonal basis) and, as my analysis shows, are in the same markets together. There is no meaningful distinction between

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

schools and All-Star in apparel, and schools and All-Star are in the same market. See Section VI.A.

19. Cheer competitions have some characteristics of a national geographic market and some of a regional geographic market, but under a hypothetical monopolist test, ultimately, these are regional antitrust markets largely because of potential travel cost considerations. Multiple alternative regional markets would qualify as antitrust markets. I have defined the regions by the five geographic regions which the Defendants appear to have used in the ordinary course of business. See Section VI.A.1.

20. All market definition analyses and calculations are based upon common evidence, and common issues predominate over individual issues. See Section IV.C.

21. Notwithstanding the technical definition of the competitions markets as regional, empirical evidence shows that the conduct, which itself is national in scope, has an anticompetitive impact that is reasonably and reliably estimated by a single national level overcharge. See Section IV.D.

22. Varsity has substantial market power in all three product markets, based on its own assessments of market power and market share, and based on analysis of the price premium it commands over competitive benchmarks for competitions and apparel. See Section VI.B.

23. The competition overcharge based on a competitive benchmark of acquired brands' pre-acquisition price levels is 24%. See Section VI.D.1.

24. The apparel overcharge is calculated using a competitive benchmark of Nfinity brand shoes, compared to Varsity shoes, and applied to all apparel products. The estimated apparel overcharge is 10%. See Section VI.D.2.

25. There are no data available to empirically estimate camp overcharges. However, strong economic theoretical and analytical reasons show that camp overcharges will tend to be higher than overcharges in competitions or apparel. Therefore, camp overcharges are based on those overcharges, which establish a lower bound for camps. The estimated camp overcharge is 24%. See Section VI.D.3.

26. These calculations are all based on common evidence. Common issues predominate over individual issues for each of the three markets. See Section IV.C.

27. In my opinion, the proportion of class members who were unharmed by the conduct is *de minimis*. See Section VI.D.4.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

## II.    INTRODUCTION

### II.A. Qualifications

28.  I am a Senior Managing Director at FTI Consulting Inc., where I lead the Litigation and
Dispute Resolution group. My work as a consulting economist includes, among other things,
serving as an expert witness on antitrust and intellectual property cases; evaluating contracts
and agreements for their competitive implications; and advising clients related to antitrust
and other economic issues in a variety of litigation and non-litigation related circumstances.

29.  I have been retained to testify as an expert economist by both plaintiffs and defendants in
litigation. I have also been retained by both plaintiffs and defendants to lead teams of
economists and consultants to conduct analyses and prepare expert reports in support of other
testifying experts and to assess damages and liability in antitrust, intellectual property, breach
of contract, and other business disputes. I have been accepted as an expert economist, game
theorist, and econometrician and have offered expert opinions and testimony before US state
and federal courts, Canadian courts, arbitration panels, the US Copyright Royalty Board, and
the US Federal Energy Regulatory Commission. I have presented economic antitrust
analyses on behalf of clients to the staffs of the US Federal Trade Commission, the US
Department of Justice, the Competition Bureau of Canada, and the European Commission's
DG Comp, among others. Since 2019, I have been recognized as a leading competition
economist by Global Competition Review in *Who's Who Legal – Competition*.

30.  Over my career I have had several appointments as a university faculty member. In 2011, I
was a Senior Faculty Fellow at the Yale School of Management, where I taught MBA
students in both core and advanced MBA strategy courses. I have taught courses in
economics and business strategy, including courses and topics related to product pricing,
business strategy, negotiation analysis, licensing, and antitrust-related topics, to MBA
students, PhD students, and business executives as an assistant professor at the University of
Chicago's Booth School of Business and the INSEAD Business School in France. I have
also published peer-reviewed scholarly work related to antitrust and other topics.

31.  Previous to my employment as a consulting economist and professor of economics, I was the
President of Policy Planning Associates, a software development firm specializing in the
development of customized econometric and statistical applications for the electricity and

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

natural gas industries.

32. A copy of my curriculum vitae, which lists my previous testimony, is included as Attachment A. FTI Consulting is being compensated for my time in this matter at a rate of $1,200 per hour. Neither my compensation nor FTI Consulting Inc.'s compensation depends upon the outcome of this litigation.

## II.B. Brief Case Background[2]

33. Competitive cheer is a sport in which teams of athletes compete against other teams in performing a two and one-half minute routine that includes stunts, jumps, tumbling, amongst other aerobatics.[3] Teams are typically affiliated with a private gym ("All-Star cheer") or with a school ("school cheer"), and competitions are either for All-Star cheer teams or school cheer teams.[4] Competition events occur during October to May.[5] The number of competing teams typically ranges from as few as 60 for smaller event producers to as many as 1,300 for end-of-year national championship events.[6]

34. Cheer athletes practice for multiple hours a week, all year long, to perfect their performances for multiple competitive events held each year.[7] Teams compete at standard competitions which are held annually and are produced by regionally diverse brands. In addition, there are qualifying events in which teams compete for a bid to a national championship, such as the Summit or the Worlds.[8] Cheer competitions are typically one-day or two-day events hosted on weekends, although national championships such as the Summit or the Worlds typically last three to four days. The Summit is an end-of-year championship held at the Walt Disney World Resort ("Disney") in Orlando, Florida each year in which teams compete throughout

---

[2] I rely on the Expert Report of Dr. Janet Netz, submitted June 20, 2022 in the above-captioned case, for a history of competitive cheer.

[3] Deposition of Brian Elza, November 16, 2021, at 59:17-19. The deposition testimony referred to and/or cited to throughout my report was entered in one or more of the related actions: Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al, No. 2:20-cv-02600-SHL-tmp, Jessica Jones, et al. v. Varsity Brands, LLC, et al., No. 2:20-cv-02892-SHL-tmp (W.D. Tenn.); or American Spirit and Cheer Essentials, Inc. et al. v. Varsity Brands, LLC, et al., 2:20-cv-02782-SHL-TMP (W.D. Tenn.). For purposes of simplicity in this report, hereinafter, I cite to deposition testimony in short format only.

[4] VAR00092896, at -897; CB00485513, at -544, -546. See also FEAS-Ares00075739, at -800 ("two disciplines of cheer and dance, School and All-Star/Club.").

[5] VAR00078751 (Elza Exhibit 15), at -756.

[6] See, e.g., JEFF00262840, at Analysis tab, rows 20-36 (indicating range in 2018 for All-Star events is between 145 and 1,296 teams), and VAR00342165, at Analysis tab, row 13-22 (indicating range in 2018 for school cheer competitions between 58 and 762 teams).

[7] VAR00584154, at -161.

[8] VAR00310631, at -631.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

the year for a bid to compete. The D2 Summit is similar but is exclusively for gyms with 125 athletes or less.

35.    The number of teams that participate in cheer competitions can vary from 50 to 500 teams.[9] Varsity alone puts on over 600 cheer competitions across the country annually.[10] The events attract some 900,000 entrants, including hundreds of teams in the All-Star and school cheer divisions.[11] Since approximately 1995, Varsity has partnered with Disney and currently holds at least six major Varsity events at Disney.[12] More than 73,000 cheer athletes, plus spectators, attend annually. Varsity is Disney's largest customer.[13] Two-day events tend to have more teams than one-day events, which typically have between 50 and 100 teams. The maximum number of cheer athletes that can participate on one cheer team at a competition depends on the division and age group but can be as high as 38 athletes.[14]

36.    To participate in sanctioned cheer events, athletes need to purchase specialized apparel and often attend special cheer camps to learn new skills or routines, or to hone existing skills and routines, to compete successfully against other teams. Competitions, camps, and apparel are recognized business lines within the industry and are the three primary cost items to athletes and their families.[15] Other costs include spectator fees for families/friends attending a cheer event and accommodations/travel expenses to attend non-local competitions.

37.    Various governing organizations regulate and establish rules and policies for competitive

---

[9] VAR00352218-25.

[10] FEAS-Ares00075739, at -805.

[11] VAR00352218-25. I use the term "entrant" to refer to each instance a unique athlete/participant attends an event. For example, the same person (athlete/participant) could attend five events in a particular year. There is a unique athlete/participant, but the number of entrants equals five. Entrants is a better measure of quantity as Varsity generates additional revenue if the same person (athlete/participant) attends more events.

[12] Events held at Disney World in 2013-2020 include: (1) Florida Dance Championship (January), (2) National Dance Team Championships (January/February); (3) International All-Star Championships (March); (4) National High School Cheerleading Championships (January/February); (6) USASF Worlds; and (7) The Summit (May). Varsity held another event, The Triple Crown, at Disney in March 2014. (Based on event data produced by USASF). The current Disney contract with Varsity, which runs from 2022-2037 includes seven events: (1) National College Cheerleading & Dance Team Championships; (2) National Dance Team Championships; (3) National High School Cheerleading Championships; (4) International All-Star Championships; (5) Cheerleading and Dance Worlds; (6) The Summit—All-Star Championships; and (7) D2 Summit—National Small Program Championships. See JEFF00263834. The contract has a 40,000 minimum number of performing participants from 2020-2023 and 85,000 minimum for 2024-2032. Id., at -842-843. Varsity must pay a Shortfall Fee if it does not meet the Adjusted Athlete Participants threshold.

[13] FEAS-Ares00075739, at -805.

[14] VAR00248665, at -666; USASF_00003390, at -393.

[15] VAR00341580, at -580; VAR00008463, at -543-547; VAR00008543 (Webb Exhibit 30), at -543-547; FEAS-Ares00075739, at -803-806.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

cheer. These include U.S. All-Star Federation ("USASF"), which sets the rules and regulations for All-Star gym competitions, including guidelines on the apparel athletes are allowed to wear in competitions; International Cheer Union ("ICU"), which is the global governing body for Cheer and provisional recognition with the International Olympic Committee ("IOC"); American Association of Cheerleading Coaches & Associations ("AACCA"), which oversees coach and athlete safety standards and rules; and USA Cheer, which is the national governing body for the U.S. recognized by ICU.[16]

38. The largest producer of cheer competitions and cheer camps, and largest seller of cheer apparel, is Varsity Brands, LLC. Plaintiffs allege Varsity has substantial market power that it acquired through various means, including systematic acquisitions of key rivals and use of exclusionary conduct. With this market power, Varsity has leveraged its dominant position in cheer to create barriers to foreclose competitors and limit competition. Varsity further maintains control over USASF and other rule-making organizations that oversee cheer in order to maintain and enhance its monopoly power.

39. This anticompetitive conduct has artificially inflated the price of participating in this sport via the costs of cheer competitions, cheer apparel, and cheer camps. As a result, purchasers of these cheer goods and services allegedly have indirectly paid higher prices than would exist in a competitive market and thereby have suffered anticompetitive injury.

### II.C. Assignment

40. I have been asked by the Joseph Saveri Law Firm LLP, on behalf of Plaintiffs Jessica Jones and Christina Lorenzen and others similarly situated, to provide economic analysis and associated opinions on the definition and parameters of a class of indirect purchasers seeking injunctive relief and damages from Varsity Brands, LLC ("Varsity Brands"), Varsity Spirit ("Varsity Spirit"), LLC Varsity Spirit Fashion & Supplies, LLC ("Varsity Spirit Fashion") (together, "Varsity"), USASF, Jeff Webb, Charlesbank Capital Partners, LLC ("Charlesbank"), and Bain Capital Private Equity ("Bain") (collectively, "Defendants"), resulting from Defendants' anticompetitive monopolistic and restraint of trade conduct. I also have been asked to conduct economic analysis, including analysis of quantitative evidence, as to Defendants' liability with respect to their anticompetitive monopolistic and

---

[16] See VAR00309426 (LeTard Exhibit 4), at -491-495.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

restraint of trade conduct, and the effects of that conduct. In performing my analysis, I considered documents, depositions, and other materials produced by Defendants and Plaintiffs in this matter, publicly available information, and relied on my own expertise and knowledge of economics, antitrust, and class action principles. Attachment B to this report contains a list of materials I relied on in performing my analysis and forming my opinions.

## III.    SUMMARY OF OPINIONS

41.    There are three relevant product markets for purposes of analyzing the Plaintiffs' antitrust claims, including the determination of antitrust injury – cheer competitions, cheer camps, and cheer apparel. The first relevant market I examine is cheer competitions.[17] Cheer competitions include participants from two "disciplines," All-Star cheer athletes and school cheer athletes. The activity is essentially the same in both disciplines - the distinction is based only on the sponsor of the teams, schools versus gyms.

42.    Varsity's market power is nearly ubiquitous throughout the United States, and its centrally directed conduct has an anticompetitive impact across the entire country and the class. Thus, the appropriate geographic area over which to analyze the anticompetitive impacts of the alleged conduct is the United States. Indeed, from an economic perspective, proof of the existence and exercise of market power through direct and indirect evidence is sufficient unto itself to prove antitrust injury, class-wide impact, and damages. Market definition is simply a tool to aid in that investigation. As a technical matter, regions larger than a local community and smaller than the entire country are relevant antitrust markets to be considered, since a hypothetical monopolist's ability to raise cheer competition prices within any given proposed geographic market is limited to some extent by participants' willingness to travel to alternative events located outside that market. Hence travel costs and travel times show that the geographic market is technically regional. All alternative definitions may meet the requirements to be an antitrust market. In this circumstance, the choice of precise regional boundaries is not material, because Varsity effectively has market power throughout the United States. For analytic convenience, I have chosen the regional geographic definitions

---

[17] For expositional convenience I will usually shorten this to "cheer competitions" and will sometimes use the phrases "cheer events" or "events" or "competitions" interchangeably with cheer competitions. When doing so, I am still always referring to competitive cheer, and not to sideline cheerleading or non-competitive recreational cheering.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

used by the USASF to perform analysis. This has the added benefit that it corresponds to the Varsity management structure that implemented the anticompetitive conduct.

43.   A hypothetical monopolist over cheer competitions would be able to sustain a "small but significant and non-transitory increase in price" (SSNIP) in each such market.

44.   The relevant geographic and product antitrust markets for cheer competitions can be established by common evidence as I discuss in Section VI.C.

45.   A second relevant antitrust product market is cheer camps. Like the cheer competitions market, the market for cheer camps also contains the same segmentation between school and All-Star disciplines. Camps catering to both disciplines are in the same product market. Travel costs and travel times also play a role in camps. Like cheer events, the relevant geographic market for cheer camps is regional, but antitrust analysis of Varsity's conduct is applied throughout the country. For similar reasons, the same geographic regions apply for camps as for competitions.

46.   A hypothetical monopolist over cheer camps would be able to sustain a "small but significant and non-transitory increase in price" (SSNIP) in each such market.

47.   The relevant geographic and product antitrust markets for cheer camps can be established by common evidence.

48.   A third relevant product market is cheer apparel, which consists of specialized apparel, accessories, and equipment. Apparel is restricted to specialized clothing such as uniforms, warmups, and camp wear. This market also includes specialized accessories such as hair bows and headbands, specialized equipment such as backpacks and shoes, and specialized lettering for uniforms and accessories.

49.   The geographic antitrust market for cheer apparel is national.

50.   A hypothetical monopolist over cheer apparel would be able to sustain a "small but significant and non-transitory increase in price" (SSNIP).

51.   The relevant geographic and product antitrust markets for cheer apparel can be established by common evidence.

52.   The class consists of purchasers of products within the relevant markets from December 10, 2016, to the present. These include indirect purchasers in the United States that paid for (a) registration, entrance or other fees and expenses associated with participation in one or more

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Varsity cheer competitions; (b) Varsity cheer apparel; and (c) Varsity cheer camp fees.[18]

53.    Varsity and Defendants are alleged to have engaged in a course of anticompetitive behavior including, but not limited to anticompetitive bundled loyalty rebates, anticompetitive acquisitions of competitors, conspiracy with USASF to disadvantage Varsity's competitive rivals, and other anticompetitive conduct.

54.    This conduct has resulted an increase in Varsity's market power in all three relevant markets. Whereas Varsity's market power was already, at the beginning of the Class Period (December 10, 2016 to present), uncompetitively high, this conduct also sustained, preserved and extended that monopoly power.

55.    To evaluate and calculate class-wide impact I use multiple linear regression modeling, a standard and well-accepted methodology for economists, statisticians, and other experts to find statistically significant relationships and reach conclusions about overcharges and damages. I have reliably used these techniques repeatedly throughout my professional career. The use of such techniques is standard in the field, including in particular with respect to antitrust economics and antitrust economic analysis.

56.    The antitrust evaluation of the effects of Defendants' alleged anticompetitive conduct can be conducted with common evidence. Using common evidence, I have calculated that the average price level in Varsity's own cheer competitions is approximately 24% higher than a competitive benchmark established by the prices of its rivals, as reflected in the pre-acquisition price levels of competitions of the rival firms it acquired.

57.    After acquisition of rival firms, Varsity continued some events of the acquired rival, discontinued some events, and launched other new events under its rival's brand. On average, from the date of acquisition to the end of the period, Varsity increased the price of its rival's events that it continued to produce by 41%. On average, the new events that were launched under that brand were 45% more expensive than the events that were discontinued.

58.    In aggregate during the Class Period, Varsity maintains a monopoly overcharge of 24% compared to the competitive benchmark.

59.    This estimate of monopoly overcharges in cheer competitions was calculated using common evidence.

---

[18] I have not been asked to determine overcharges related to accommodation expenses or other fees and expenses except those that are included in prices of Varsity cheer competitions, cheer camps, or cheer apparel.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

60. I calculated the average price that Varsity charged for cheer shoes and compared that to the average price charged by its competitive rival, Nfinity. I use this as a benchmark to establish an overcharge estimate that I apply to apparel prices in all product categories. This establishes my estimate of the overcharges in cheer apparel. I estimate Varsity's monopoly price overcharge to be 10% in apparel.

61. This estimate of monopoly overcharges in cheer apparel was calculated using common evidence.

62. There were no data available in discovery on which to empirically estimate a competitive benchmark or overcharge estimate for cheer camps. There is, however, a strong economic theoretical foundation for estimating the relative allocation of the overall monopoly overcharge to cheer camps, relative to the other markets. A monopolist setting profit-maximizing prices over three markets with identical supply and demand conditions would set identical monopoly mark-ups for the products in the three markets. Therefore, such a monopolist is only concerned with finding the profit-maximizing total cost of participation, and a common overcharge rate that achieves it.

63. As explained below, the relevant differences between the markets for cheer camps, apparel, and competitions would tend to cause the monopolist in this matter to adjust away from a common overcharge rate by setting the monopoly overcharge higher in camps than in either apparel or competitions. Therefore, the overcharge estimates for cheer apparel and cheer competitions would serve as a reliable estimate of the minimum expected overcharge percentage in cheer camps. Hence, I estimate the overcharge for cheer camps to be at least 24%.

64. Since the overcharge estimates for cheer competitions and cheer apparel are based on common evidence, the overcharge for cheer camps, which is based in turn on those other estimates, is also estimated based on common evidence.

65. Common issues relevant to this inquiry predominate over individual issues. These measures of the antitrust injury to class members were calculated using common evidence.

66. Varsity engaged in a program, the Family Plan, of using bundled loyalty rebates across all Varsity expenditures that were conditional on both the level of aggregate bundled purchases of all Varsity products, and the number of Varsity Cheer events attended by a gym. This program had the effect of creating anticompetitive incentives that rival firms could not match,

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

as they lacked the entire bundle of competitions, camps, and apparel that Varsity offered.

67. As a result of this anticompetitive rebate program, purchase decisionmakers (gyms) were incentivized to purchase more apparel from Varsity and attend more Varsity events than they otherwise would have in a competitive market. In addition, those rebate payments were paid not to parents and participants, who funded those purchases, but to the gyms. These quantity distortions are not accounted for in the monopoly overcharges, even though they further increase the total amount of monetary harm that the indirect purchasers suffered as a result of the anticompetitive conduct. Thus, the estimated overcharges are conservative lower-bound estimates of the damages suffered by putative class members.[19]

68. I have determined the estimated maximum percentage of class members that could possibly have suffered no antitrust injury and conclude that all or nearly all class members were harmed.

69. All of the analyses and calculations to determine the proportion of unharmed class members was done using common evidence.

70. The only individual evidence necessary to establish a reasonable estimate of the compensatory damages owed to class members is the same type of evidence required in every class action case – namely proof of the actual payments by the individual class member. This can be established by evidence of payments for Varsity cheer competitions, cheer camps, and cheer apparel payments, in the form of receipts. To supplement such documentation from individual class members, additional receipts from gyms and schools may be used to substitute for those class members who have not retained this documentation.

71. My other opinions and their foundations, as well as my elaboration of the opinions expressed above and the foundations of those opinions, are provided throughout this report.

72. I reserve the right to supplement or amend my opinions in response to opinions expressed by Defendants' experts in this matter, or in light of any additional evidence, testimony, discovery or other information that may be provided to me after the date of this report.

73. In addition, I expect that I may be asked to consider and testify about issues that may be raised by Defendants' fact witnesses and other experts at trial or in their reports. It may be necessary for me to supplement my opinions as a result of Court rulings and testimony at

---

[19] The proposed class has not yet been certified. While I refer to the "class" or "class members" herein, for simplicity, it is recognized that the class certification stage has not yet occurred.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

trial. At trial, I may rely on visual aids and demonstrative exhibits that show the bases for my opinions. The visual aids and demonstrative exhibits may include, for example, interrogatory responses, deposition testimony and exhibits, as well as charts, photographs, diagrams, videos and animated or computer-generated visual aids.

## IV.   THE PARTIES

### IV.A.  Plaintiffs[20]

74.   Two named plaintiffs in this matter represent a putative class of similarly situated purchasers of cheer competitions, cheer camps, and cheer apparel. Plaintiff Jessica Jones is the parent of two cheer athletes who were members of All-Star teams.[21]  Plaintiff Christina Lorenzen is the parent of a Cheer athlete who was a member of a school team.[22] The two named plaintiffs (collectively, "Plaintiffs") indirectly paid Varsity for enrollment in cheer competitions and indirectly purchased cheer apparel manufactured and sold by Varsity Brands.[23] These parents also incurred spectator fees, and lodging/travel expenses for non-local competition events.[24]

### IV.B.  Defendants

75.   Defendants in this litigation include: (1) Varsity Brands, LLC; (2) Varsity Spirit, LLC; (3) Varsity Spirit Fashion & Supplies, LLC; (4) U.S. All-Star Federation, Inc.; (5) Jeff Webb; (6) Charlesbank Capital Partners LLC; and (7) Bain Capital Private Equity.[25]

#### IV.B.1.    *Varsity Brands--Defendant*

76.   Varsity Brands, LLC, formerly known as Varsity Brands, Inc., is a Delaware corporation with its principal place of business in Memphis, Tennessee. Varsity Brands is a portfolio

---

[20] A fuller description of the named plaintiffs and their circumstances is provided in the Expert Report of Janet Netz, PhD (hereafter "Netz Expert Report"). I have conducted my own independent survey of the history and market background of the Competitive Cheer industry. My independent research and analysis are consistent with the findings of Dr. Netz, and I adopt her more complete background discussion rather than duplicating many of the same facts here in my report.

[21] Complaint, at ¶ 13.

[22] Complaint, at ¶ 15.

[23] Complaint, at ¶¶ 13-15.

[24] Deposition of Jessica Jones, February 10, 2022, at 143:1-17; Deposition of Christina Lorenzen, January 20, 2022, at 93:6-97:5.

[25] A fuller description of each defendant and their circumstances is provided in the Netz Expert Report. I adopt her more complete background discussion rather than duplicating many of the same facts here in my report.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

business focused on what it terms as "the student experience" which is comprised of BSN Sports ("BSN"), Varsity Spirit, and Herff Jones ("Herff Jones").[26] BSN focuses on team-sports apparel and equipment.[27] Varsity Spirit focuses on all cheerleading-related activities.[28] Herff Jones manufactures and sells milestone products (e.g., class rings, yearbooks, caps and gowns, etc.) for high schools and colleges.[29] The BSN and Herff Jones entities do not sell products and services within the alleged relevant markets.

77.   Jeffrey Webb founded Universal Cheerleaders Association ("UCA") in 1974 and changed its name to Varsity Spirit Corporation when it went public in 1989.[30] In 2001, it changed its name to Varsity Brands Holding Co., Inc. It is the corporate parent company of Varsity Spirit Fashion & Supplies, LLC.[31] Herff Jones began as an independent company founded in 1920.[32] In 2011, Herff Jones merged with Varsity Spirit and in 2013 the company acquired BSN.[33] In 2014, the company rebranded itself under the Varsity Brands name, with Herff Jones, BSN, and Varsity Spirit becoming subsidiaries.[34]

78.   Varsity Spirit produces over 600 cheer competitions in the United States annually in which over 750,000 athletes participate each year.[35] In addition to regional and national tournaments, Varsity Spirit organizes competitions for private gyms (i.e., "All-Star cheer"), schools, and youth & recreation.[36] Varsity Spirit has over 2,500 gyms, over 19,000 middle/high schools, and over 1,000 college programs participating in its competitions.[37]

---

[26] VAR00008463, at -472 ("Three Complementary Divisions Elevating Student Experiences in Sport, Spirit, Achievement"); FEAS-Ares00075739, at -745.

[27] Varsity Brands: BSN Sports Website, accessed on June 6, 2022, available at: https://www.varsitybrands.com/sport

[28] Varsity Brands: Varsity Spirit Website, accessed on June 6, 2022, available at: https://www.varsitybrands.com/spirit

[29] Varsity Brands: Herff Jones Website, accessed on June 6, 2022, available at: https://www.varsitybrands.com/achievement

[30] Lauren Hirsch, "Bain Nears 2.5 Billion Deal for Cheer Uniform Leader Varsity Brands," CNBC.com, June 19, 2018, accessed on Nov. 8, 2021, available at: https://www.cnbc.com/2018/06/19/bain-nears-2-point-5-billion-deal-for-cheer-uniform-leader-varsity-brands.html. See also JEFF00047202, at -212.

[31] VAR00008463, at -471.

[32] Herff Jones Website, accessed on June 6, 2022, available at: https://www.herffjones.com/about/

[33] Michael Sheffield, "Rebranding Spreads Varsity Name Around," Memphis Business Journal, June 3, 2014, accessed on Nov. 8, 2021, available at: https://www.bizjournals.com/memphis/news/2014/06/03/rebranding-spreads-varsity-name-around.html

[34] Ibid.

[35] See VAR00008463, at 540-542. See also Varsity, "Varsity Spirit and Fabletics Team Up to Bring Activewear and Experiential Events to America's Cheer and Dance Community," Oct. 24, 2018, accessed on Nov. 8, 2021, available at: https://www.varsity.com/about/press/varsity-spirit-and-fabletics-team-up-to-bring-activewear-and-experiential-events-to-americas-cheer-and-dance-community/

[36] VAR00424538, at -544-545.

[37] See VAR00008463, at 540-542.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Table 1 shows key participation statistics for Varsity All-Star events by season.[38]

*Table 1. Summary of All-Star Events and Gyms*

| Season | Varsity's US All-Star Events | Varsity's US All-Star Gyms |
|--------|------------------------------|----------------------------|
| 2013-2014 | 247 | 2,036 |
| 2014-2015 | 265 | 2,113 |
| 2015-2016 | 269 | 2,120 |
| 2016-2017 | 325 | 2,311 |
| 2017-2018 | 364 | 2,343 |
| 2018-2019 | 444 | 2,427 |
| 2019-2020 | 321 | 2,124 |

Sources: VAR00352218-25.
Notes: Cheer events area defined as events having unique GL codes in a season. Gyms are defined as count of unique customer numbers in a season.

79.  For cheer athletes competing for All-Star gyms that are Varsity customers, athletes' families typically pay fees directly to the gym, which in turn pays Varsity for entry fees to competitions, uniforms, and other related fees.[39] For cheer athletes competing for schools that are Varsity customers, athletes' families pay participation fees to the school, which in turn pays entry fees and/or purchases uniforms and equipment from Varsity.[40] Varsity is also the largest operator of cheer camps, sponsoring more than 5,700 camps annually.[41] Cheer camps are widely attended by athletes in the school segment of cheer.

80.  End-of-season national competition events are an important factor in the sport. Varsity sponsors three end-of-year All-Star events. The Summit, introduced in 2012, and D2 Summit, introduced in 2015, both take place at Disney and teams compete at qualifying Varsity events throughout the season to obtain a bid permitting them to compete in these championships.[42] Approximately 25% of teams receive an invitation.[43] Varsity also owns The U.S. Finals end-of-year championship, which it acquired through two acquisitions—

---

[38] VAR00352218-25. Cheer events are defined as events having unique GL codes in a season. Gyms are defined as count of unique customer numbers in a season.
[39] VAR00009293, at -324; CB00485513, at -546, -548; FEAS-Ares00075739, at -757 ("Insulation from price pressure and competition as purchase decision makers (coaches, etc.) remain distinct from purchasers (athletes, etc.).").
[40] FEAS-Ares00075739, at -759.
[41] VAR00424538, at -544-545; Varsity Camp Brands, accessed Nov. 8, 2021, available at: https://www.varsity.com/school/camps/brands/
[42] VAR00001611, at -612-613.
[43] Id., at -624.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

JamBrands and EPIC.[44] The U.S. Finals championship is an invitation-only event made up of the top 3 finishers from eight select Varsity regional championships across the country.[45] In addition, USASF sponsors the "Worlds" competition each year. While the event is hosted by the USASF, it pays Varsity an annual management fee of $400,000 to produce the Worlds event.[46]

81.  Varsity also owns National Cheerleading Association (NCA) and Universal Cheer Association (UCA) which promote school competitions, cheer camps, and national tournaments and championships. NCA was founded in 1948 and participates with coaches and cheerleaders at summer camps and competitions.[47] UCA was founded in 1974 by Jeff Webb to provide educational training for cheerleaders. Today, UCA is one of the largest cheerleading camp companies and holds regional events across the country and a championship event at Disney annually.[48]

82.  In addition to competitions and cheer camps, Varsity also manufactures, distributes, and sells cheer apparel through its subsidiary Varsity Spirit Fashion & Supplies. Varsity entered the uniform business in 1979. It founded Varsity Spirit Fashion & Supplies in 1989.[49] It offers custom-made uniforms, accessories, lettering, practice wear, shoes, and warm-ups.[50] It maintains a direct sales force of over 435 representatives, largely former cheerleaders with strong relationships with gyms, schools, and parents.[51]

83.  As Varsity itself described, Varsity has created an ecosystem interconnecting its products and services offering. Figure 1 below illustrates this Varsity Spirit ecosystem.[52]

---

[44] Deposition of Brian Elza, November 16, 2021, at 95:1-14.

[45] VAR00078751 (Elza Exhibit 15), at -764. See also Deposition of William Seely, April 13, 2022, at 234:15-25. The U.S. Finals is a regional experience in contrast to The Summit or the Worlds.

[46] Deposition of Jeffrey Fowlkes, April 5, 2022, at 53:22-55:21. USASF pays Varsity to "help manage the event and help with the logistics of the event on-site." Varsity has performed this role since the very beginning of the competition, i.e., 2002 or 2003.

[47] NCA Brand Website, accessed on June 3, 2022, available at: https://www.varsity.com/nca/

[48] UCA Brand Website, accessed on June 3, 2022, available at: https://www.varsity.com/uca/

[49] Lauren Hirsch, "Bain Nears 2.5 Billion Deal for Cheer Uniform Leader Varsity Brands," CNBC.com, June 19, 2018, accessed on Nov. 8, 2021, available at: https://www.cnbc.com/2018/06/19/bain-nears-2-point-5-billion-deal-for-cheer-uniform-leader-varsity-brands.html. See also JEFF00047202, at -212.

[50] JEFF00141901, at -952-953.

[51] VAR00009293, at -310.

[52] VAR00012792, at -792-794.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Figure 1. The Varsity Spirit Ecosystem*



Source: VAR00008463, at -543.

### IV.B.2.    U.S. All-Star Federation--Defendant

84.    USASF is a Tennessee non-profit corporation with its principal place of business in Memphis, Tennessee that was founded in 2003.[53] USASF is the governing body for competitive cheer responsible for establishing rules and competition standards.[54] Though considered a separate entity, Varsity created and funded the USASF.[55] Two of Varsity's

---

[53] USASF Website, accessed on June 3, 2022, available at: https://www.usasf.net/about

[54] Ibid.

[55] Deposition of Brian Elza, November 16, 2021, at 150:19-21. See also VAR00351488, at -489 ("After USASF was formed, Varsity provided an interest free line of credit to the USASF. At its peak, the loan balance was $1.8M. As of December 31, 2012, the balance on the loan was $565K. Varsity has allowed the USASF to have complete flexibility with our repayment schedule. The loan has been completely interest free to the USASF. This has been an incredible benefit to our organization and members, and it would have been impossible for the USASF to survive without it. Varsity has also continued to guarantee a substantial 'rainy day' fund to insure USASF could withstand any type of unforeseen natural or financial disaster such as having to cancel Worlds one year. There has been no 'co-mingling of funds' or any other impropriety. Just as any lending institution would do, Varsity secures the loan by retaining certain rights to the USASF trademark and intellectual property.").

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

employees serve as the president and a top vice president of USASF.[56] Additionally Varsity-owned companies hold a permanent majority of seats on USASF's Board of Directors.[57] From approximately 2004 through 2015, USASF shared office space with Varsity and during that period Varsity processed the paychecks of USASF employees under its own name, for which USASF reimbursed Varsity.[58]

85.    In 2003, a group of cheerleading coaches formed an independent 501(c)(3) organization, called the National All-Star Cheerleading Coaches Congress (NACCC), to establish uniform rules for All-Star Cheer. The organization was open to all event producers, coaches, and gyms. Through the NACCC, the initial set of universal All-Star cheerleading rules was established. In response to the formation of NACCC, Varsity joined with another promoter to create the USASF in 2003. Varsity provided initial capital to USASF in the form of a line of credit (valued at $1.8 million).[59]

86.    According to USASF, the total number of athletes, the total number of sanctioned USASF events, and the total number of event producers are shown in Table 2.[60]

---

[56] Daniel Connolly, "Cheer Empire: A For-profit Company Built Competitive Cheer, Pays People Who Make its Rules," Commercial Appeal, Sep. 18, 2020, accessed on Nov. 8, 2021, available at: https://www.commercialappeal.com/in-depth/news/2020/09/18/cheer-empire-profit-company-created-cheerleading-regulators-pays-salaries/3468551001/

[57] See, e.g., USASF_00032444 (Chadwick Exhibit 2), at -445 showing that Varsity controlled at least 11 of the 17 Board seats following its acquisition of JamBrands in November 2015. See also USASF_00019064 (Peterson Exhibit 24), at -064 in which Steve Peterson reports that Varsity holds 16 of 35 EPs on the critical Sanctioning Committee at that time in 2015. Varsity was seeking to move an event to Philadelphia (over 200 miles from its original location) in which a competing producer had scheduled an event in Wildwood, NJ, which is 82 miles from Philadelphia, on the same weekend. Varsity needed approval from the Sanctioning Committee to make the 200-mile move and would need additional votes to achieve a majority vote to approve the move. See also USASF_00020227 (Peterson Exhibit 25), at -227 in which Steve Peterson reports that Varsity has 21 Tier 1 Cheer Sanctioning Committee votes and there are 15 non-Varsity Tier 1 EPs on Committee as of February 2016. See also Daniel Connolly, "Cheer Empire: A For-profit Company Built Competitive Cheer, Pays People Who Make its Rules," Commercial Appeal, Sep. 18, 2020, accessed on Nov. 8, 2021, available at: https://www.commercialappeal.com/in-depth/news/2020/09/18/cheer-empire-profit-company-created-cheerleading-regulators-pays-salaries/3468551001/

[58] Deposition of Steve Peterson, March 9, 2022, at 274:4-17; 275:5-276:20. See also USASF_00032540, at -541 ("The no-interest start up loan, along with the necessary office support, provided by Varsity was the foundation that allowed the USASF to establish and develop our mission.").

[59] VAR00274967, at -970.

[60] USASF_00000297, at -297.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 2. Summary of Athletes, Events, and Producers*

|  | 2015-2016 | 2016-2017 | 2017-2018 | 2018-2019 |
|---|---|---|---|---|
| **Total athletes** | 158,404 | 148,846 | 149,444 | 151,960 |
| **Sanctioned USASF events** | 809 | 945 | 831 | 745 |
| **Event producers** | 93 | 103 | 100 | 95 |

Sources: USASF_00000297, at -297.

87. USASF operates with three tiers of competition event producers. Tier 1 events, of which there are a maximum of 42 event producers, awards World bids to attendees. These event producers' competitions are protected, because the dates and locations of competitions are regionally determined, and material changes must be approved by USASF's Sanctioning Committee. The voting seats in the Sanctioning Committee are identical to the number of Tier 1 event producers (i.e., 42 total voting seats). Varsity owns 34 of the 42 Tier 1 event producers and therefore 34 of the 42 voting seats in the Sanctioning Committee. Varsity therefore holds the majority of votes on the Sanctioning Committee to approve changes in dates or locations of producers' events.[61] There are currently 54 Tier 2 and Tier 3 event producers.[62] These producers cannot distribute World bids. For a Tier 2 or Tier 3 producer to move up to Tier 1, a current Tier 1 member must be removed, usually via a failure to meet the threshold number of teams attending the producer's bid event.[63]

### IV.B.3.    Other Defendants

88. Jeff Webb, a Defendant, is the founder and Chairman of the board of directors of Varsity Brands. In the late 1960's, Jeff Webb worked at the NCA after completing his cheerleading career at the University of Oklahoma. In 1974, Webb left NCA and formed his own cheerleading business, UCA. UCA focused more on gymnastics-like skills and new tournaments created solely for cheer squads. In 1983, Webb changed the business name from UCA to Varsity Spirit, Inc. In June 1997, Riddell Sports Inc. ("Riddell") acquired Varsity Spirit, Inc., and its subsidiaries for $91 million.[64] Jeff Webb, at that time the President and CEO of Varsity, became Vice Chair of the Board of Directors of Riddell. In 2016, Webb

[61] VAR00310631, at -664.
[62] VAR00078751 (Elza Exhibit 15), at -761.
[63] Ibid.
[64] Reuters, "Riddell in Deal for Maker of Cheerleading Uniforms," New York Times, May 7, 1997, accessed on June 3, 2022, available at: https://www.nytimes.com/1997/05/07/business/riddell-in-deal-for-maker-of-cheerleading-uniforms.html

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

stepped down as CEO of Varsity Brands. He is the founder and current president of the ICU, which is the international governing body of cheerleading. He is credited for pushing for cheerleading's international recognition, including, most recently, adding it as an Olympic sport.[65]

89. Defendant Charlesbank is a Massachusetts Limited Partnership with its principal place of business in Boston, Massachusetts. Charlesbank wholly owned Varsity Brands, LLC from 2014 to 2018.[66] Charlesbank acquired Varsity in 2014 for approximately $1.5 billion.[67] Charlesbank, together with its other investors and owners, obtained financial rewards and benefits of around $1 billion when it sold Varsity to Bain for approximately $2.5 billion in 2018.[68] Charlesbank maintains a seat on Varsity's Board of Directors and still holds a minority stake in the business.[69]

90. Defendant Bain is a Massachusetts Limited Partnership, with its principal place of business in Boston, Massachusetts. Bain acquired defendant Varsity Brands, LLC from Charlesbank and its other owners in 2018.[70] Bain currently has a seat on Varsity's Board of Directors.[71]

# V.    SUMMARY OF ALLEGATIONS AND CLASS DEFINITION

## V.A. Summary of Allegations

91. Plaintiffs allege that Varsity and its Co-Defendants are engaged in a continuing scheme to exclude its rivals in an attempt to acquire, enhance, and maintain its monopoly power in three or more relevant markets—cheer competitions (or events), cheer camps, and cheer apparel in violation of state and federal antitrust laws. Plaintiffs allege that Varsity, along with the

---

[65] USA Cheer, "USA Cheer Welcomes International Olympic Committee's Full Recognition of the International Cheer Union," accessed on June 3, 2022, available at:  https://www.usacheer.org/usa-cheer-welcomes-international-olympic-committees-full-recognition-of-the-international-cheer-union

[66] Charlesbank, "Case Study: Varsity Brands," accessed on June 3, 2022, available at: https://www.charlesbank.com/portfolio/case-studies/varsity-brands/

[67] Lauren Hirsch, "Bain Nears 2.5 Billion Deal for Cheer Uniform Leader Varsity Brands," CNBC.com, June 19, 2018, accessed on Nov. 8, 2021, available at: https://www.cnbc.com/2018/06/19/bain-nears-2-point-5-billion-deal-for-cheer-uniform-leader-varsity-brands.html

[68] Ibid.

[69] Charlesbank, "Case Study: Varsity Brands," accessed on June 3, 2022, available at: https://www.charlesbank.com/portfolio/case-studies/varsity-brands/

[70] Lauren Hirsch, "Bain Nears 2.5 Billion Deal for Cheer Uniform Leader Varsity Brands," CNBC.com, June 19, 2018, accessed on Nov. 8, 2021, available at: https://www.cnbc.com/2018/06/19/bain-nears-2-point-5-billion-deal-for-cheer-uniform-leader-varsity-brands.html

[71] I do not perform any analysis on the role of defendants other than Varsity and the USASF. I understand that Dr. Janet Netz's expert report deals with establishing the liability of other defendants in this matter.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Defendants, have substantially foreclosed competition and have abused and continue to abuse Varsity's market power to maintain and enhance Varsity's market power over cheer competitions, camps, and apparel. In addition, Plaintiffs allege that Defendants have engaged in an unreasonable restraint of trade with the purpose of acquiring, maintaining, and enhancing their market power to the detriment of indirect purchasers who have been subjected to supracompetitive expenditures.[72]

92. Specifically, regarding cheer competitions, Plaintiffs allege that Varsity has acquired monopoly power by acquiring rival event producers, including engaging in conduct to disadvantage or impair its rival event producers. In many cases, this alleged conduct has led to a devaluation of the competitive and financial position of these rivals after which Varsity has stepped in to acquire the producer's operations.[73]

93. At various times since 2011, Varsity has acquired its largest rivals, including: National Spirit Group, which included National Cheerleaders Association ("NCA"), Universal Dance Association ("UDA"), and Cheerleader & Danz Apparel (2004); Spirit Festival (2011); Spirit Holdings, which included CHEERSPORT, CheerLogistics, and Universal Spirit (2012); Cheer Limited (2014); and The JamBrands, which operated one of the highest-profile competition brands not owned by Varsity (2015). Since 2015, Varsity has also acquired Aloha Productions (2016), Spirit Celebrations (2017), Jam Spirit Group (2017), Mardi Gras Nationals (2017), All Things Cheer (2017), and Epic (2018) brand event producers.[74]

94. Plaintiffs further allege that Varsity has acquired monopoly power in the cheer apparel relevant market by acquiring or impairing rival apparel producers.[75] Cheer apparel acquisitions included BSN in 2013 and allgoods LLC in 2015.[76] The BSN acquisition provided Varsity with the largest "K-through Colleges" salesforce in cheer apparel.[77]

95. In addition to its cheer apparel acquisition strategy, Varsity has allegedly engaged in conduct to prohibit rival cheer apparel producers from displaying their merchandise at Varsity cheer competitions. As Varsity produces the largest and most prestigious cheer competitions in the United States, this prohibition allegedly has disadvantaged Varsity's rivals in competing with

---

[72] Complaint, at ¶¶ 231-238.
[73] Complaint, at ¶¶ 87-97.
[74] Complaint, at ¶¶ 87-97.
[75] Complaint, at ¶¶ 98-101.
[76] VAR00008463, at -495. JEFF00035010, at -037.
[77] Ibid.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Varsity in the cheer apparel market.[78]

96.    Plaintiffs also allege that Varsity has enhanced its monopoly power by exercising control over organizations that set the rules for competitive cheer. Foremost among these is the USASF. Varsity provided the initial capital to fund the USASF in 2003.[79]  It owned the USASF trademarks until 2017.[80] The USASF shared offices with Varsity at Varsity's headquarters in Memphis, Tennessee for many years.[81] According to Plaintiffs allegations, the USASF bylaws provide that a permanent majority of USASF's voting board members are allocated to seven cheer competition brands—UCA, CHEERSPORT, NCA, United Spirit Association ("USA"), American Cheerleaders Association, Universal Dance Association, and JAMFest—all of which are now owned by Varsity.[82] Plaintiffs allege that Varsity now controls the majority of seats on the USASF Board of Directors (75%), and the remaining non-Varsity seats are non-voting.[83] Plaintiffs allege that the vast majority of the USASF Board of Directors is now affiliated with Varsity such that Varsity can dictate USASF policy and decisions.[84]

97.    Plaintiffs also allege that Varsity has engaged in exclusionary conduct to exclude and/or competitively disadvantage its rivals to maintain or enhance its monopoly power in the relevant markets. This conduct has taken the form of (1) an alleged scheme to manipulate and control the system of bids for admission to national tournaments as a means to competitively favor Varsity brand cheer events;[85] (2) conspiring with the USASF to create competition rules that deny potential Cheer event competitors a foothold in the industry;[86] (3) use of exclusive agreements, e.g., Varsity Family Plan and Network Agreements, with All-Star gyms and schools to foreclosure or diminish competition with Varsity;[87] (4)

---

[78] Complaint, at ¶¶ 98-101. See also VAR00087216.
[79] VAR00424775, at -776.
[80] See, e.g., VAR00421046; VAR00348766, at -767.
[81] Deposition of Steve Peterson, March 9, 2022, at 274:4-17.
[82] Complaint, at ¶¶ 103-112. See also VAR00339736, at -736.
[83] Complaint, at ¶ 110.
[84] Complaint, at ¶¶ 103-112. Plaintiffs further allege that Varsity has significant influence over other regulatory organizations, such as the National Federation of State High School Associations ("NFHS"), which sets rules for many high school sports, and USA Cheer (aka USA Federation for Sport Cheering), which Varsity established as a 501(c)(3) organization in 2007. Complaint, at ¶¶ 113-114. See also VAR00339736, at -736-737; VAR00129038, at -038.
[85] Complaint, at ¶¶ 121-129.
[86] Complaint, at ¶¶ 130-140.
[87] Complaint, at ¶¶ 141-152.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

leveraged its monopoly power in cheer competitions to foreclose or competitively disadvantage competition in the cheer camp relevant market;[88] and (5) counter-programming rival cheer competitions directly and with the consent of the USASF to foreclose or competitively disadvantage Varsity rivals.[89]

98.    As a result of this anticompetitive conduct, plaintiffs and other class members allege that they have been harmed and have suffered antitrust injury. Plaintiffs and other class members have incurred anticompetitive increases in prices and overall expenditures on products and services within the relevant markets. Moreover, Varsity and its Co-Defendants have conspired to foreclose and competitively disadvantage Varsity's rivals, which has not only increased prices for products and services within the relevant markets, but also likely reduced the quality of products and services (including a potential reduction in safety, a dimension of quality) offered within the relevant markets, further harming Plaintiffs and class members.[90]

99.    Plaintiffs seek damages and/or injunctive and declaratory relief for the following claims: (1) Violation of Sections 1, 2, and 3 of the Sherman Act, 15 U.S.C. §§ 1—3; (2) Violation of Tennessee antitrust laws, Tenn. Code Ann. §§ 47-25-101, *et seq*.; (3) Violation of numerous states' antitrust laws; (4) Violation of numerous states' consumer protection laws, including unfair methods of competition and unfair and deceptive acts; and (5) Unjust enrichment

---

[88] Complaint, at ¶¶ 156-159.

[89] Complaint, at ¶¶ 160-164. See also VAR00233528, at -528-531 (Email from Kevin Brubaker dated October 5, 2016: "we left the Varsity Strategy Meetings in Memphis a couple of weeks ago with the thoughts of attacking our competitors competitions. Specifically, by targeting other companies World Bid events we feel like we can grow Varsity competitions through the country in different territories."); VAR00472431 (Berry Exhibit 18), at -431-434; VAR00190278 (Berry Exhibit 19, Sadlow Exhibit 13), at -278-279 (Email from Brian Elza to Kevin Brubaker, Jim Hill, and Tres LeTard dated Sept. 14, 2017: "Kevin and Jim: Will you make sure we have events on top of these Cheer Derby events. Per Bill Seely. We may already have it covered."; Email from Kevin Brubaker to Brian Elza, Tres LeTard, and Jim Hill dated Sept. 14, 2017: "Below are the Varsity Events that we currently have lined up that are around the same dates and regional locations as the 3 Cheer Derby competitions").

[90] USASF_00009869, at -869 (email from Steve Peterson to Lynn Singer and Jim Chadwick dated February 25, 2020; in response to customers' complaints "about how long it took an ambulance to get to an event to move an injured athlete," Steve Peterson wrote, "It had been discussed years ago. However, the Sanctioning Committee did feel it was too expensive to require ambulances at all events."); Deposition of Jamie Parrish, March 2, 2022, at 70:16-71:23 ("there was a rule that said you could not have jewelry." "the reason there was a rule that you couldn't have jewelry in cheerleading was because jewelry, when the flyers would come down, earrings would get ripped out of ears; sometimes if they had a ring, and they were coming down out of a stunt, they would cut a girl's face. Things happen when you have sharp, metal-pronged objects on a kid's body. But, you know, Varsity had a partnership with Swarovski crystals. And so the USASF Board somehow had a long-standing rule against jewelry, but then all of a sudden it was legal for uniforms to have Swarovski crystals. Now, what does Swarovski crystals mean to Varsity? It means a huge upcharge. It means a uniform that would cost $150, when you cover it in Swarovski crystals, you can now charge $450 for that uniform.").

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

under Tennessee Law.[91]

### V.B. Class Definition

100.  The Nationwide Damages Class alleged in this matter is defined as:

> All natural persons and entities in the United States that indirectly paid Varsity or any Varsity subsidiary or affiliate, from December 10, 2016, and until the continuing Exclusionary Scheme alleged herein ends (the "Class Period") for (a) registration, entrance, or other fees and expenses associated with participation in one or more Varsity Cheer Competitions; (b) Varsity Cheer Apparel; (c) Varsity Cheer Camp Fees; or (d) accommodations at one or more Varsity Cheer competitions.[92]

101.  In addition, Plaintiffs also allege a State Law Damages Class defined as follows:

> All natural persons and entities in the United States that indirectly paid Varsity or any Varsity subsidiary or affiliate, from December 10, 2016, and until the continuing Exclusionary Scheme alleged herein ends (the "Class Period") for (a) registration, entrance, or other fees and expenses associated with participation in one or more Varsity Cheer Competitions; (b) Varsity Cheer Apparel; (c) Varsity Cheer Camp Fees; or (d) accommodations at one or more Varsity Cheer Competitions, in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, the District of Columbia, Florida, Idaho, Illinois, Iowa, Kansas, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, Washington, West Virginia, and Wisconsin.[93]

## VI.    CLASS CERTIFICATION

102.  In examining the appropriateness of the purported class, I reviewed the record evidence to determine those persons who are in the same position as the class representatives, i.e., indirect purchasers of goods and services from Varsity Brands or its subsidiary, Varsity Spirit, that are encompassed within the relevant product markets—cheer competitions, cheer camps, and cheer apparel—and who purchased these goods and services during the alleged class period December 10, 2016, to the present. I conducted the examination considering evidence that is common to the class.

103.  As the class definition includes only those persons who indirectly paid Varsity through

---

[91] Complaint, at ¶¶ 231-268.

[92] Complaint, at ¶ 30. The class definition excludes Defendants, their parent companies, subsidiaries and affiliates, officers, executives, and employees; defendants' attorneys in this case, federal government entities and instrumentalities, states and their subdivisions, and all judges assigned to this case. The Complaint also defines an Injunctive Relief Class, which I examine as similar in scope to the Nationwide Damages Class.

[93] Complaint, at ¶ 31. As above, the class definition excludes Defendants, their parent companies, subsidiaries and affiliates, officers, executives, and employees; defendants' attorneys in this case, federal government entities and instrumentalities, states and their subdivisions, and all judges assigned to this case.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

intermediaries, e.g., gyms or schools, for the products and services encompassed in the relevant product markets, the proposed class is objectively defined and class members can be identified through a reasonable method, such as payment receipts for goods and services in the relevant product markets, within the relevant geographic markets (collectively, within the United States), for each relevant product market, during the period December 10, 2016 to the present. Payment receipts would be available from All-Star gyms, schools, or individual class members.

104. Moreover, as I demonstrate below, the anticompetitive conduct at issue, namely monopolization or attempted monopolization through acquisitions, bundled loyalty programs, and other conduct to disadvantage rivals, is common to the class and resulted in anticompetitive prices above those which would have existed but-for the alleged conduct in each of the affected markets. Consequently, all, or nearly all, of the putative class members suffered antitrust injury since prices were elevated above competitive levels throughout the country in the apparel market and in every region throughout the country in the camp and competitions markets. Using common evidence, I conclude class members were also harmed by Defendants' anticompetitive strategies that induced gyms and schools to attend more events and camps, and to buy more, and more expensive, apparel than their customers, the members of the indirect class, would have purchased. Thus, the antitrust harm to the class members includes not only higher payments caused by artificially elevated prices, but also harm from greater total payments resulting from the anticompetitive inducement to gyms and schools to attend more events and chose more expensive apparel than they would have in a more competitive market unmanipulated by the anticompetitive conduct. Class members participated in events affected by this anticompetitive conduct and thus paid overcharges in the form of supracompetitive prices.

105. I have been asked to address whether common issues predominate over individual issues in this matter, and whether those common issues can be addressed through common evidence. In my opinion, the common issues predominate over any individual issues that may arise. These common issues can be addressed through common evidence necessary to demonstrate that all, or nearly all, indirect purchasers have been injured by defendants' anticompetitive conduct. These common issues include, but are not limited to, the following:

- Determination of the relevant antitrust product markets for analyzing the alleged

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

anticompetitive effects;

- Determination of the relevant geographic markets for analyzing the alleged anticompetitive effects in each antitrust product market;

- The extent to which Varsity had market power in all relevant product and geographic antitrust markets;

- Whether Varsity's alleged conduct resulted in it acquiring, perpetuating, and/or enhancing monopoly power in the relevant markets;

- Whether or not all, or nearly all, of the class members suffered antitrust injury as a result of Varsity's alleged conduct;

- Whether alleged joint actions by Varsity and the USASF assisted Varsity to maintain, perpetuate, and/or enhance its monopoly power;

- Whether the Defendants' allegedly unlawful bundled loyalty programs tended to impair or exclude rivals in the relevant markets and thereby foreclosed significant competition and enhanced the Defendants' market power in those markets;

- Whether the Varsity's strategic acquisition of competitive rivals resulted in an increase in its market power, including conduct pre-acquisition which may have weakened those rivals, and conduct post-acquisition which may have exploited the resulting reduction in competition and inflicted antitrust injury;

- Whether Defendants engaged in alleged unfair methods of competition in violation of state consumer protection laws;

- Whether the above alleged conduct caused antitrust injury to Plaintiffs and class members in the form of higher prices and distorted quantity of purchases that were inflicted on consumers and would not have occurred but for this alleged conduct; and

- Whether appropriate measures of alleged damages can be determined along with declaratory and injunctive relief to resolve these claims.

106. Using evidence common to the class, I demonstrate below that Varsity engaged in anticompetitive conduct with the design and effect of increasing its monopoly profits by acquiring and/or disadvantaging its rivals and by enticing direct purchasers to participate in its bundled loyalty programs to further disadvantage its competitors, diminish competition and reap the monopoly profits from diminished competition. In my examination of the issues listed above, I use both qualitative evidence from the parties' own documents and

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

depositions; quantitative econometric and statistical evidence; and economic analysis and theory sufficient to resolve those questions without recourse to individualized inquiry. This is the type of evidence relied on by economists and in the field of economics. I use the same common evidence and analysis to show that class members, i.e., indirect purchasers, suffered antitrust injury as a result of this anticompetitive conduct. Moreover, this same common evidence can be used to proffer a reasonable estimate of overcharges, from which the damages suffered by this class can be calculated.

### VI.A.  Relevant Product and Geographic Markets for Assessing Competitive Harm

107.  In examining alleged anticompetitive conduct, one must first define the set of goods or services allegedly affected by the conduct. These "relevant antitrust markets" have a product dimension, the set of products that are reasonable substitutes for each other, and a geographic dimension, specifying the area within which those products are substitutes.[94] As the U.S. Supreme Court stated, "[w]ithout a definition of the market there is no way to measure [a party's] ability to lessen or destroy competition."[95] An antitrust market generally is defined in terms of reasonable substitution or interchangeability of one product or service for another. Reasonable interchangeability is defined by "customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service."[96]

108.  An important component of market definition is demand-side substitutability. Economists may assess whether a set of products is reasonably interchangeable through several means depending on the availability of direct and indirect data and information on product substitution. Indirect methods make use of existing historical information on substitution and prices. These methods may include, for example, the use of price correlations, survey

---

[94] Defining a relevant antitrust market is necessary in most monopolization and attempted monopolization claims under state and federal antitrust laws. See ABA Section of Antitrust Law, Market Power Handbook (2005), at p. 53. ("Relevant market definition is in most circumstances a 'necessary predicate' to assessing a firm's market power, and indeed market definition is outcome determinative in many antitrust cases"). Citations omitted.

[95] Antitrust Health Care Handbook, Fourth Edition, ABA Section of Antitrust Law, at p. 27, citing Walker Process Equip. v. Food Mach. And Chem. Co., 382 U.S. 172, 177 (1965); see also Little Rock Cardiology Clinic, P.A. v. Baptist Health, 591 F. 3d 591, 596 (8th Cir. 2009).

[96] U.S. Department of Justice and Federal Trade Commission, "Horizontal Merger Guidelines," Issued: August 19, 2010, at §4. The Supreme Court in the "Brown Shoe" case has held that "the outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Brown Shoe Co. v. United States, 370 U.S. 294 (1962). Although these definitions differ, in principle, the relevant concepts are similar.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

techniques, natural experiments, or shock analyses. The use of such tools depends on the facts and circumstances of particular cases, including the availability of contemporaneous qualitative evidence and data. Direct methods attempt to simulate hypothetical substitution patterns and the degree of substitution among potential market candidate products. These methods may include diversion ratio analyses, critical loss analyses, the hypothetical monopolist ("HMT") test, and the full equilibrium relevant market ("FERM") test.[97] The principles of the HMT have been adopted as the preferred method for direct quantitative analysis of market definition and are specifically endorsed by the 2010 DOJ/FTC Horizontal Merger Guidelines.[98] Implementing the HMT entails examining whether a hypothetical monopolist would be able to profitably impose a "small but significant and non-transitory increase in price" (i.e., a SSNIP test). If sufficiently many buyers would substitute away from the products within the market in response to such a price increase, such that the price increase would be unprofitable, then the candidate market must be expanded until a hypothetical monopolist would profitably benefit from such a pricing strategy.[99]

109. Other evidence that may be relevant to the market definition exercise for economists include contemporaneous documents detailing competition among products, such as win-loss data, strategy and product market positioning documents, marketing materials, and other sales information. These so-called "practical indicia" of the reasonableness of substitution used by economists include: (1) industry or public recognition of separate markets; (2) the products' characteristics and uses; (3) unique production facilities; (4) distinct customers; (5) distinct prices; (6) sensitivity to price changes; and (7) specialized vendors.[100] From the economic

---

[97] See, e.g., Quantitative Techniques for Competition and Antitrust Analysis, Peter Davis and Eliana Garces, Princeton University Press (2010), Chapter 4.

[98] U.S. Department of Justice and Federal Trade Commission, "Horizontal Merger Guidelines," Issued: August 19, 2010, at §4.1.1.

[99] The HMT necessarily examines whether a hypothetical monopolist can profitably sustain a price increase *above the competitive level* without being disciplined by competitors from outside of the candidate market. If the market is already in a state of supra-competitive prices because of existing market power, it may not be profitable to raise prices even higher than the already monopoly price. This observation is known as the *Cellophane* fallacy, from the case in which a monopolist was already pricing at the profit-maximizing monopoly price, and hence could not profitably raise its price any higher. See United States v. E. I. du Pont De Nemours & Co., 351 U.S. 377 (1956) and Quantitative Techniques for Competition and Antitrust Analysis, Peter Davis and Eliana Garces, Princeton University Press, 2010, at pp. 207-210 for its economic relevance in defining antitrust markets. This observation is important in this current case, as Varsity already had substantial monopoly power as of December 10, 2016 (the start of the Class Period).

[100] These practical indicia are often referred to as the "Brown Shoe" factors based on Brown Shoe Co. v. United States, 370 U.S. 294 (1962).

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

perspective, these factors individually are not sufficient to define a separate antitrust market, and even collectively are only relevant insofar as they are evidence of the reasonableness of substitution, which the hallmark principle of market definition.

110.   A product market in an antitrust investigation consists of all goods and services that customers view as close substitutes.[101] This is assessed by analyzing whether the customers' response to an increase in price of one product, by switching to a different product, means that the price increase would not be profitable. These two products may be in the same product market because consumers will substitute to related products based on changes in relative prices. Conversely, if a change in price does not cause customers to switch to different products, then these different products are not part of the product market.[102]

111.   A geographic market in an antitrust investigation is the area where customers would likely buy the goods or services in the product market.[103] Geographic markets, generally can be defined in one of two ways: (1) based on the location of suppliers; and (2) based on the location of customers. As set forth in the Merger Guidelines: "Geographic markets based on the locations of suppliers apply when customers receive goods or services at suppliers' locations."[104]

112.   Defining a relevant market in a dispute under state and federal antitrust laws is a predicate to assessing a firm's market power.[105] In practice, "market definition for competition policy purposes is directly related to the concept of market power."[106] Importantly, as set forth in the 2010 Horizontal Merger Guidelines, "relevant markets need not have precise metes and bounds."[107] Although considered sufficient in some monopolization cases, defining a relevant market may not be necessary where it is possible to prove market power by relying

---

[101] U.S. Federal Trade Commission, "Competition Guidance: Guide to Antitrust Laws: Mergers," accessed on June 3, 2022, available at: https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/mergers/markets

[102] Ibid.

[103] Ibid.

[104] U.S. Department of Justice and Federal Trade Commission, "Horizontal Merger Guidelines," Issued: August 19, 2010, at §4.2.1 ("Competitors in the market are firms with relevant production, sales, or service facilities in that region. Some customers who buy from these firms may be located outside the boundaries of the geographic market…When the geographic market is defined based on supplier locations, sales made by suppliers located in the geographic market are counted, regardless of the location of the customer making the purchase.").

[105] ABA Section of Antitrust Law, Market Power Handbook (2005), p. 53.

[106] Quantitative Techniques for Competition and Antitrust Analysis, Peter Davis and Eliana Garces, Princeton University Press (2010), p. 162.

[107] U.S. Department of Justice and Federal Trade Commission, "Horizontal Merger Guidelines," Issued: August 19, 2010, at §4.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

on evidence of direct harm.[108] Market definition is a useful ***tool*** and as such, there may be multiple plausible relevant markets appropriate for assessing anticompetitive harm. As I show below in applying standard market definition practices, the narrowest plausible relevant geographic market in this matter would be regional in scope. However, my quantitative analyses further show Varsity's market power and alleged anticompetitive conduct are ubiquitous across multiple geographic market definitions, whether defined as local, regional or national. Moreover, I present a statistical analysis showing that the resulting anticompetitive harm, i.e., the estimated overcharge, is present throughout the United States. In my opinion, based on this statistical evidence, and other evidence, it is most reasonable to use a common estimate of overcharges for cheer competitions throughout the country.

113.    The HMT that I use to determine the relevant geographic market involves an assessment of whether "a hypothetical profit-maximizing firm that was the only present or future producer of the relevant product(s) located in the region would impose at least a SSNIP from at least one location, including at least one location of one of the merging firms."[109] Under the Horizontal Merger Guidelines, the relevant geographic market emerges when the price increase would not be defeated by sufficient substitution away from the relevant product or by arbitrage, i.e., customers leaving the region to obtain the relevant product.[110]

114.    As part of the full assessment of competitive effects, economists consider the history of entry as well as "the timeliness, likelihood, and sufficiency of the entry efforts an entrant may employ" to enter the relevant market.[111] Barriers to entry fall into two main types: natural (structural) barriers or artificial (strategic).[112] Natural, or structural, barriers include obstacles due to the nature of the product or service and the characteristics of the relevant market. These obstacles may include economies of scale, network effects, high R&D costs, high set-

---

[108] Carlton, Dennis, U.S. Department of Justice, Economic Analysis Group Discussion Paper, Market Definition: Use and Abuse (2007). See also FTC v. Indiana Federation of Dentists, 476 U.S. 447, 460-61 (1986) (citing 7 P. Areeda, Antitrust Law ¶ 1511, at p. 429 (1986)). See also, e.g., Areeda, Phillip, and Herbert Hovenkamp, Fundamentals of Antitrust Law, supra note 82, ¶ 520 at 136-37; Hovenkamp, Herbert, and Carl Shapiro, Horizontal Mergers, Market Structure, & Burdens of Proof, The Yale Law Journal, 127:7 (2018), 2015-16.

[109] U.S. Department of Justice and Federal Trade Commission, "Horizontal Merger Guidelines," Issued: August 19, 2010, at §4.2.1.

[110] Ibid.

[111] U.S. Department of Justice and Federal Trade Commission, "Horizontal Merger Guidelines," Issued: August 19, 2010, at §9.

[112] Corporate Finance Institute, "Barriers to Entry," April 29, 2022, accessed on June 3, 2022, available at: https://corporatefinanceinstitute.com/resources/knowledge/economics/barriers-to-entry/

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

up costs, or consolidated ownership of key resources.[113] Artificial, or strategic, barriers include obstacles imposed by existing dominant players or governments to prevent new entrants and competition into the relevant market. These obstacles can be established through predatory pricing or acquisition, limit pricing, advertising, strong brand value, patents and licenses, loyalty schemes, or switching costs.[114]

115. Common issues in defining the relevant market for purposes of accessing antitrust injury predominate over individual issues in this matter. At issue are the markets for cheer competitions, cheer camps, and cheer apparel (each, for both All-Star cheer and school cheer). Cheer competitions and camps are somewhat differentiated in terms of locations and quality of events, but there is a high degree of supply-side substitution (except when foreclosed by anticompetitive conduct) such that producers compete on the basis of quality-adjusted price. Likewise, in the cheer apparel market, differentiation also exists in terms of types of products (uniforms, accessories, shoes, etc.) and differentiation further occurs within those categories in terms of alternative styles. Nonetheless, these differences do not limit or restrict the ability to use common evidence to determine antitrust injury for members of the class. Nor do these differences rise to the level of individual issues predominating over common issues in examining and proving antitrust injury, as I demonstrate below.

116. Moreover, as part of its business, Defendant Varsity sells its portfolio of competitions, camps, and apparel across the United States. The data for competitions, apparel, and camps indicate that there is variation in pricing based on variations in products and services and geographic location but these price variations stem from common pricing strategies set at the corporate (national) level. Changes in competitive conditions affect prices for all these products and services, including all the permutations in styles, quality levels, and geographic locations, in a similar way. As such, all indirect purchasers would benefit from greater price competition in the absence of the Defendants' alleged anticompetitive conduct. Likewise, all indirect purchasers suffered harm due to Defendants' alleged anticompetitive conduct. Hence, based on common proof, common issues in defining the relevant markets at issue predominate over individual issues as I describe below.

117. The relevant product markets are cheer competitions, cheer camps, and cheer apparel. Total

---

[113] Ibid.
[114] Ibid.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

revenue for all of these markets during the Class Period (through end of 2020) is $465 million for the All-Star discipline and $865 million for the school discipline, as shown in Table 3 below. For competitions and camps, the total number of entrants during the Class Period is 2.3 million for the All-Star discipline and 1.4 million for the school discipline, as reported in Table 3. Rebates are earned by All-Star gyms based on payments in in the cheer competitions and cheer apparel markets. The rebates earned total $35 million during the Class Period, as reported in Table 3.

*Table 3. Revenues, Entrants, and Rebates by Market and Customer Type*

| Division Type | Year | Revenues (in millions) | | | | Entrants (in thousands) | | | Rebates (in millions) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Events | Camps | Apparel | Total | Events | Camps | Total | Earned from Event Spend | Earned from Apparel Spend | Total |
| All-Star | 2016 | $47.1 | $1.1 | $26.9 | $75.1 | 451 | 11 | 461 | $7.8 | $1.2 | $9.0 |
| All-Star | 2017 | $90.0 | $1.1 | $27.7 | $118.7 | 556 | 10 | 566 | $9.1 | $1.4 | $10.6 |
| All-Star | 2018 | $101.3 | $1.1 | $29.5 | $131.9 | 613 | 10 | 623 | $8.0 | $1.3 | $9.3 |
| All-Star | 2019 | $111.4 | $1.1 | $31.3 | $143.7 | 675 | 11 | 685 | $8.3 | $1.4 | $9.7 |
| All-Star | 2020 | $48.1 | $0.3 | $17.7 | $66.1 | 375 | 2 | 377 | $4.0 | $0.8 | $4.7 |
| **All-Star** | **Class Period** | **$354.8** | **$3.5** | **$106.7** | **$465.0** | **2,259** | **33** | **2,291** | **$30.1** | **$4.9** | **$35.0** |
| School | 2016 | $29.6 | $67.4 | $120.4 | $217.4 | 85 | 277 | 362 | | | |
| School | 2017 | $30.3 | $71.0 | $125.5 | $226.8 | 91 | 287 | 378 | | | |
| School | 2018 | $32.5 | $74.5 | $132.6 | $239.6 | 99 | 294 | 393 | | | |
| School | 2019 | $38.4 | $78.2 | $140.6 | $257.2 | 109 | 304 | 413 | | | |
| School | 2020 | $35.3 | $14.8 | $89.9 | $140.1 | 73 | 92 | 164 | | | |
| **School** | **Class Period** | **$136.8** | **$238.7** | **$489.2** | **$864.7** | **380** | **980** | **1,359** | | | |

Sources: VAR00352218-25; VAR00010122-27; VAR00352199-202; VAR00462074-79; VAR00604800-805; VAR00352214.
Notes: Class Period includes all event start dates, camp start dates, and apparel ship dates from December 10, 2016, through the present.

118. Across all three relevant product markets, Varsity's contemporaneous business records attest to the "significant barriers to entry" it had cultivated and established as early as 2011 when it was seeking to obtain outside investors through its financial advisors Rothschild Inc. and Jefferies & Company:[115]

> "Through relationships and infrastructure established over a long period of time, there exists a high barrier to entry, characterized by the following:
>
> - *Established network*. Varsity has a unique set of partners and alliances both

---

[115] VAR00424538, at -552.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

domestically and internationally, comprised of long-standing relationships with corporations, colleges, high schools, middle schools and industry governing bodies. In addition, the Company has a unique presence in online and print media, enhancing brand awareness and allowing the Company to reach its core demographic across a variety of channels. Varsity believes it would take a significant investment in time and money for a competitor to achieve similar goodwill among industry participants.

- *Scope of product and services offering*. The Company's comprehensive products and services offering allows it to benefit from cross-selling and cost sharing opportunities. For example, in order to participate in the various special events Varsity offers, such as the nationally-televised Macy's Thanksgiving Day Parade in New York City, a cheerleader must attend and excel at one of the Company's camps. Participants in Varsity's special events often come from a variety of schools, which in turn requires the need for an additional uniform in order to portray a unified appearance. Similarly, the Company holds local cheerleading competitions that progress to various regional levels during the course of the fall, which is the only way for a team to qualify for Varsity championships, which are held at Walt Disney World Resort in Orlando, Florida and nationals televised on ESPN2.

- *Economies of scale*. Varsity employs the largest sales force in the industry, which has relationships with over 40,000 middle schools, high schools, colleges and 2,500 cheerleading gyms in all 50 states. The Company also hosts over 5,700 summer camps and approximately 300 national and regional competitions, with seven nationally-televised championships. As the market leader, Varsity also benefits from volume and critical mass efficiencies, namely spreading of fixed costs, negotiating power with suppliers, and an improved production process."[116]

### VI.A.1.    Cheer Competitions is a Relevant Product Market, with Two Relevant Disciplines – All-Star Cheer and School Cheer

#### VI.A.1.a)   The relevant antitrust product market is no broader than the sport of competitive cheer

119.  Allegations against Varsity and its co-defendants involve three relevant product markets: cheer competitions, cheer apparel, and cheer camps. Varsity's internal business documents define camps, competitions, and apparel as business segments.[117] Within cheer competitions and camps, there are two "disciplines"—All-Star cheer, in which teams fielded by All-Star gyms compete, and school cheer, in which the school-sponsored teams compete.

120.  The All-Star cheer competitions are distinguished from school cheer competitions, although

---

[116] Ibid. See also JEFF00047202, at -207 ("Built dominant brand…high barriers to entry and competitive advantages: industry leadership, deeply entrenched relationships and multi-channel reach").
[117] VAR00341580, at -580; VAR00008463, at -542-547; VAR0008543 (Webb Exhibit 30), at -543-547; FEAS-Ares00075739, at -803.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Varsity and other event producers stage events for both disciplines.[118] USASF rules do not allow USASF All-Star participants to compete in school competitions.[119] Varsity has different targeting and pricing strategies for these two customer groups.[120] I use common evidence to apply the HMT to define each of the relevant product and geographic markets required to assess antitrust injury.

121. Cheer competitions, which includes both All-Star cheer competitions and school cheer competitions, are events in which athletic teams compete at sanctioned events by performing a two and one-half minute routine with music.[121] Competitors are judged on their performance. These performances include elements of tumbling, stunting, pyramids, and synchronized dance.[122] Unlike traditional sideline cheer, competitive cheer athletes perform routines as the main event.[123] Competitive cheer requires year-round commitment from athletes and families, with training beginning in the fall, competitions running through the winter and spring, and cheer camps in the summer. In contrast, sideline cheerleading traditionally supports team sports at schools to engage spectators during a competition.[124] The culmination of an All-Star season is the opportunity to attend end-of-the-season championship events, such as the Summit or the Worlds.[125] Varsity also puts on many late season regional and national championship events.[126]

122. Competitive cheer is distinct from other youth athletic activities like sideline cheer, gymnastics, and competitive dance. Dance and gymnastics follow different rules and regulations compared to competitive cheer.

123. Unlike traditional sideline cheer, competitive cheer athletes perform routines as the main event, competing against other cheer teams.[127] No other sports are involved. Routines are set

---

[118] VAR00352218-25; VAR00462074-79.
[119] VAR00341580, at -580; VAR00008463, at -543-547; VAR0008543 (Webb Exhibit 30), at -543-547; FEAS-Ares00075739, at -803.
[120] VAR00101122, at -125, -126.
[121] Deposition of Brian Elza, November 16, 2021, at 59:17-19.
[122] See Varsity, "What is Competitive Cheerleading," Feb. 20, 2018, accessed on June 3, 2022, available at: https://www.varsity.com/news/what-is-competitive-cheerleading/. Although Competitive Cheer incorporates some elements of choreographic and gymnastic skills, Competitive Cheer is readily distinguished from dance or gymnastic.
[123] CB00485513, at -546.
[124] See, e.g., Deposition of Brian Elza, November 16, 2021, at 59:8-60:2.
[125] VAR00008463, at -555.
[126] VAR00352218-25. See also VAR00009293, at -324 (Figure 3).
[127] CB00485513, at -546.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

to music and must comply with standards set by the USASF and other organizing bodies. Sideline cheering is "traditionally invented for support groups at school to cheer on teams on the sidelines: football, basketball, and volleyball."[128] Members of sideline cheer squads attend one or two competitions a year and primarily focus on performing at other school athletic games in a non-competitive manner. Although there may be athletes who would engage in both sports, or who have switched over from side-line cheer to competitive cheer, or vice versa, I have seen no economic evidence in the record that would suggest a sufficient number of competitive cheer athletes would switch to sideline cheer as a substitute for competitive cheer if a hypothetical monopolist were to impose as significant, non-transitory increase in price on competitive cheer sufficient to discipline the price of competitive cheer. Varsity's own documents and testimony confirm that sideline cheer is a different experience for its athletes than competitive cheer.[129] Competitive cheer and sideline cheerleading are not in the same relevant product market.

124. Similarly, gymnastics would not be considered an appropriate substitute for competitive cheer. While there are some similarities in the techniques and athleticism required in both competitive cheer and gymnastics, gymnastics is more individually focused. Gymnasts perform routines by themselves and receive points for each routine. Individual points are accumulated into a team score. Gymnastics has routines that are performed on multiple domains depending on if the athlete is male or female. Male gymnastics feature the vault, the pommel horse, still rings, parallel bars, the horizontal bar (high bar), and the floor exercise.[130] Female gymnastics feature the vault, uneven bars, balance beam, and the floor exercise.[131] Competitive cheer is usually done on the floor and does not incorporate some of the more complicating tumbling required by gymnasts. These advanced techniques can be considered "illegal" during competitive cheer performances.[132] Additionally, some of the required stunts in competitive cheer involve multiple team members, whereas gymnastics involves individual gymnasts' performances.[133] I have seen no economic evidence in the record

---

[128] Deposition of Brian Elza, November 16, 2021, at 59:13-16.
[129] See fnt 118, 119 and 120.
[130] MasterClass, "What is Artistic Gymnastics?" accessed on June 3, 2022, available at:
https://www.masterclass.com/articles/a-guide-to-competitive-artistic-gymnastics#what-is-artistic-gymnastics
[131] Ibid.
[132] All Gymnasts, "Gymnastics and Cheerleading: What is the Difference?" Aug. 4, 2022, accessed on June 3, 2022, available at: https://allgymnasts.com/gymnastics-cheerleading-difference/
[133] Deposition of Brian Elza, November 16, 2021, at 61:12-15.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

indicating that gymnastics and competitive cheer are economic substitutes. Given the substantial functional differences in the two sports, and the different skills required of athletes that compete in them, I have seen no evidence to indicate that a hypothetical monopolist of competitive cheer would lose sufficient numbers of cheer participants to gymnastics in the event of a small but significant and non-transitory increase in price to render the price increase unprofitable (i.e., a SSNIP test). As evidence of this, Varsity acquired several producers of competitive cheer events between 2015 and 2018. Following these acquisitions, Varsity raised the prices of the acquired events by more than the 5% threshold of the SSNIP test, which was profitable for the company to do without fear of losing customers to gymnastics events (see Table 19 below). Therefore, competitive cheer and gymnastics are not in the same relevant product market.

125. Similarly, competitive dance also is not an economic substitute for competitive cheer. Although Varsity and other event producers offer competitive dance at its events, these competitions are recognized as different experiences for athletes.[134] Nor would competitive cheer athletes consider competitive dance as a substitute for competitive cheer as its fundamental routines do not include many of the difficult gymnastics and tumbling required in competitive cheer, which are defining characteristics of competitive cheer.[135] I have seen no economic evidence in the record to indicate that competitive cheer athletes would find competitive dance an economic substitute. There is no evidence to indicate that a hypothetical monopolist of competitive cheer would lose sufficient numbers of participants to competitive dance in the event of a small but significant and non-transitory increase in price, or vice versa. On the contrary, the evidence shows that even without a complete and total monopoly, Varsity commands a significant price premium over other competitive cheer events, regardless of any additional competition from competitive dance and other non-cheer activities. This is effectively a (non-) hypothetical monopolist test. Hence competitive cheer and dance are not in the same relevant product market.

126. Cheer competitions already have natural barriers to entry. Competitions have high start-up costs, including venue rentals, promotion and marketing expenses, and other fixed costs like

---

[134] Ibid.
[135] Ibid.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

paying employees, travel costs, and other business expenses.[136] To host competitions, producers must also have access to teams and credible judges.[137] The likelihood that producers of these adjacent activities—competitive dance, gymnastics, and side-line cheer— would cross-over and provide a supply response to competitively discipline a hypothetical monopolist from raising prices to extract monopoly rents is not supported by the economic evidence in the record. The evidence shows that Varsity, a non-hypothetical monopolist, was able to maintain a monopoly price premium that was not eroded by entry from existing firms in these adjacent businesses. Moreover, information and data in the record indicate that a hypothetical monopolist of competitive cheer would find it profitable to affect a small but significant and non-transitory price increase (above the competitive level) to gain monopoly rents without fear that a significant number of competitive cheer participants would switch over to gymnastics, side-line cheer or competitive dance. As I discuss later in this Report, Varsity's share of the competitive cheer market strongly indicates that it already has monopoly power which it exerts to extract increasing payments by competitive cheer participants to increase its overall monopoly profits.

### VI.A.1.b)   *Competitive cheer is separated into two disciplines: All-Star cheer and competitive school cheer*

127.  Within competitive cheer, there are two disciplines:[138] (1) All-Star cheer, in which teams are affiliated with private gyms (about 25-30% of competitive cheer teams); and (2) school cheer (about 60-75% of competitive cheer teams), in which teams are affiliated with middle schools, high schools, or colleges.[139] All-Star cheer and school cheer are effectively the same activity, involving judged team performances, typically about 2½ minutes in length set to music, in an event forum where cheer routines are the main attraction.[140] Teams compete against each other and are judged on their routines. The primary distinction is not the activity

---

[136] VAR00117735-40.

[137] VAR00424538, at -552.

[138] VAR00008463, at -542.

[139] In addition to competitive cheer teams (All-Star competitive cheer and school competitive cheer), there are also sideline cheerleading teams for schools, and youth & recreation cheer teams, affiliated with a recreational organization such as the YMCA or with no affiliation at all. These are not at issue in this litigation. Sideline cheerleading teams account for about 30% of all cheerleading teams, and recreational teams account for about 10%. See VAR00304733 (Elza Exhibit 7), at -737.

[140] VAR00009293, at -329 ("Routines are 2:30 mins and teams perform once at our 1-day events and twice at our 2-day events").

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

itself, but the sponsor of the team, either All-Star gyms or schools.

128. Across the overall cheerleading industry, schools account for about 70% of overall spend (including both school competitive cheer and school sideline cheer), while All-Star accounts for the remaining 30% of overall spend.[141] Varsity's revenues mirror these percentages.[142] According to Varsity, in-school participation is growing due to high interest while All-Star is flat due to high costs and increasing levels of athletic difficulty.[143]

129. The All-Star program was originally created as an alternative for athletes not on a school team.[144] About 150,000 athletes participate in All-Star competitive cheer.[145] All-Star gyms typically have multiple teams broken down by ability level and age ranging from very young up to 21 years of age.[146] Level 6 and 7 are the most difficult levels and these athletes compete at Worlds and Summit end-of-season competitions.[147]

130. A single season costs approximately $4,000, on average, per All-Star athlete when including "apparel (incl. uniforms), competition, camp, travel, and gym fees."[148] School cheer costs approximately $1,600, on average, per cheerleader.[149] All-Star cheer athletes frequently attend six or more competitions a year.[150]

131. All-Star athletes regularly travel to events and are not associated with a school, but rather a local All-Star gym.[151] All-Star teams compete in 4.9 events on average across all Varsity customers, with larger teams attending more events in a season.[152]

132. School cheer is the largest segment of overall cheerleading and in recent years has been

---

[141] CB00485513, at -544 ("In-school is ~70% of total industry; participation is up due to high interest from students and a desire for more competition opportunities for school cheerleaders is driving higher spend per athlete. Participation in All Star (~30% of industry) has flattened due to high costs and increasing levels of athletic difficulty; spend per athlete in this segment is ~3x higher than in-school and is rising across categories (apparel/uniforms, camps, and competitions).").

[142] VAR00304733 (Elza Exhibit 7), at -735, -748. See also CB00485513, at -557 ("In-School is ~70% of Varsity Revenue; All Star is ~30%").

[143] CB00485513, at -544, -554, -555.

[144] VAR00009293, at -323.

[145] VAR00078751 (Elza Exhibit 15), at -768.

[146] Deposition of Brian Elza, November 16, 2021, at 60:11-21.

[147] Varsity introduced the D2 Summit, the D2/D3 Summit, and the Quest as national competitions for lower-level teams.

[148] CB00485513, at -547. See also VAR00584154, at -161 ("Costs can exceed $10,000 / season, primarily driven by travel").

[149] Ibid. See also VAR00304733 (Elza Exhibit 7), at -739.

[150] VAR00584154, at -161.

[151] VAR00009293, at -323.

[152] VAR00310631, at -663.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

growing the fastest.[153] Cheer competitions for schools are primarily focused on middle school, high school, and college teams. More schools are offering competitive cheer and participation is increasing for, among other reasons, All-Star participants switching over to the less expensive school cheer.[154]

133. The calendars for school cheer and All-Star cheer are slightly different, providing opportunities for attendance at summer camp for school cheer athletes, and culminating in national year-end championship events, as shown in Figure 2 and Figure 3 below, for school cheer and All-Star cheer, respectively.[155]

---

[153] CB00485513, at -547.
[154] CB00485513, at -555 ("More schools offer cheerleading"); -554 ("All Stars cite cost and time commitment cited [sic] as top reason for quitting. Some All Star cheerleaders are switching to in school.").
[155] VAR00008463, at -544; VAR00009293, at -333, -324.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Figure 2. Varsity Spirit School Customer Journey*



Sources: VAR00009293, at -333.

*Figure 3. Varsity Spirit All-Star Customer Journey*



Sources: VAR00009293, at -324.

134.  With increasing participation in school cheer, more competition events are being added for

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

school teams.[156] School cheer competitions serve as a key source of revenue for Varsity, not only for event revenue but to increase revenue for apparel and camps.[157] Similar to All-Star cheer, the season culminates with a championship at Disney. Varsity promotes or produces over 200 local, regional, state, and national competitions each year for school cheer teams.[158]

135.    A hypothetical monopolist of competitive cheer events would be able to profitably impose a SSNIP above competitive price levels without the risk of losing sufficient participants to make the SSNIP unprofitable. Sideline cheering and participation in recreational cheering are the closest plausible substitutes for competitive cheer, followed by exiting from participation in organized cheering altogether. The rapid growth of competitive cheer over the last three decades indicates its strong popularity and is sufficient to demonstrate that few participants would quit the sport in response to a small price increase over competitive levels. While there is evidence of price-induced switching of participants from All-Star cheer to school cheer in response to the perceived increases in the total cost of participation in All-Star cheer, those relative price levels do not suggest any difference in the treatment of the three relevant product markets.[159]

### VI.A.1.c)   *The appropriate geographic markets for competitive cheer events (both All-Star and school) have both national and regional characteristics*

136.    The market for competitive cheer events (for both disciplines) has some aspects of both a national and regional market. This is irrelevant for evaluating the antitrust impacts of Varsity's conduct. As I demonstrate below, Varsity's market power is nearly ubiquitous throughout the United States, and statistical evidence demonstrates that a common estimate of overcharges can be reasonably applied throughout the entire country. Thus, the appropriate geographic area in which to analyze the anticompetitive impacts of the alleged conduct is the entire country.

137.    A season of competitive cheer begins with local and regional events, at which competitors

---

[156] VAR00462074-79. See also CB00485513, at -555.
[157] VAR00584154, at -154.
[158] VAR00462074-79. See also VAR00009293, at -334.
[159] The lower price point represented by school cheer compared to All-Star cheer does not suggest that they are in different markets. On the contrary, it is precisely the fact that school cheer presents an opportunity to participate in the same activity, though perhaps less intensively, at less than half the annual cost, that makes school cheer a close substitute for All-Star cheer for many participants.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

seek to win "bids" to qualify their teams to compete at national end-of-season events, the Worlds and the Summit. The structure of World bid allocation, which are so important that World bid events command substantial price premiums, is controlled and administrated by Varsity and the USASF at the national level. The school cheer season is similar, with school competitions during the year, followed by regional and national championships and other final events, many of which are Varsity events.[160]

138.   The purpose of evaluating the market definition is to determine the competitive impact of Varsity's alleged anticompetitive conduct. Consistent with Varsity's plans, that conduct is national in scope. Varsity's pricing strategy for competitions is centrally coordinated with a common national pricing policy, involves anticompetitive pricing that is bundled with another national market, apparel, and involves allegations of national level conspiracy to control the sport's governing body.

139.   It is unsurprising that participants in cheer events travel to events and there are costs incurred by participants in doing so. Travel costs and travel time may be significant factors for determining the relevant antitrust market. Varsity acknowledges this by scheduling events throughout the United States. That there is a cost of travel implies that there is a limit to how far teams may travel to avoid a price increase in event entry fees imposed by a monopolist. Cheer teams may routinely travel hundreds of miles to attend a competition. They may travel to various parts of the United States to participate in important events, such as the World or the Summit competitions, but would not routinely do so to attend regular season events.[161] Therefore, events that were further away than this distance would not compete on price with each other, unless there were other events located between them that competed with both and effectively conveyed the competitive effect beyond the travel radius of an individual team.

140.   Thus, as a technical matter, the relevant geographic market for antitrust purposes is smaller than national, and larger than local communities. Hence it is regional. There are multiple alternative definitions of the regions that would all qualify as relevant antitrust markets under a hypothetical monopolist test (HMT), the standard definition of an antitrust market. The regions as defined by the USASF are relevant geographic markets for antitrust analysis of

---

[160] VAR00009293, at -333 (Figure 2).
[161] CB00485513, at -562 ("chance to win bids is a key decision criteria").

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

competitive cheer events.[162] A hypothetical monopolist over any of these regions would be able to sustain a SSNIP in this market. Moreover, the collection of all the regions, i.e., the national market, is also a relevant antitrust market (a hypothetical monopolist over the entire nation could sustain a SSNIP), provided that one also confirms that the market power of the alleged monopolist is in fact present in all of those regions. As I demonstrate below, the monopoly power of Varsity is exhibited in each and all of the proposed regional markets, so the treatment of the antitrust market as effectively national will yield the same antitrust conclusions as separate regional treatment.

141. To corroborate this finding, I compare imputed Varsity market shares at the level of a CSA to its overall market share in the region in which the CSA is located. As shown below in Table 18, Varsity's market shares at the end of the 2017-2018 season (following its acquisition of EPIC) ranged from 73% - 84% across the five regions of the United States (as used by the USASF). For each CSA in the United States, I compute the expected number of total entrants per thousand of population by observing the Varsity's regional market share, Varsity's observed number of participants, and the region's population. From this estimate of the total entrants per thousand of population, and the observed number of Varsity entrants in Varsity events hosted in that CSA, I estimate Varsity's market share in that CSA.[163]

142. In three local areas, I also adjust these estimates to take account of CSAs in which a large number of cheer events occur across the border from a nearby CSA with a large population. These three areas are New York City – Philadelphia, where there are large numbers of events occurring in nearby Atlantic City and Ocean City, the "Texas Triangle" area of Dallas, Houston and San Antonio, and the Little Rock, Arkansas where the cheer events are disproportionately conducted at nearby Hot Spring, Arkansas. I call the CSA, including the three areas with local adjustments, "adjusted-CSAs," or "adj-CSAs."

143. I find that only about 3.0% of the class members were Varsity entrants at events in adj-CSAs with Varsity market shares smaller than 40%. Further details of my analysis are contained in Attachment 3. This demonstrates that even at localities smaller than the smallest reasonable geographic market, Varsity's market shares, as a proxy for Varsity's market power, are high

---

[162] This geographic market boundary has the added advantage that it mirrors the record keeping and organizational structure of the entity whose allegedly anticompetitive conduct is the focus of the analysis.

[163] VAR00352218-25; Wikipedia, "Metropolitan Statistical Area," accessed June 1, 2022, available at: https://en.wikipedia.org/wiki/Metropolitan_statistical_area

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

throughout the entire country. This demonstrates that regardless of the particular geographic market definition that is chosen, the analysis of the effects of Varsity's conduct will likely yield similar conclusions with respect to any reasonable geographic market definition. This analysis of the market shares at the CSA level also has a second important application beyond market definition. This same analysis can be utilized to determine the maximum number of class members that may not have suffered antitrust injury under my theory of harm. This analysis is provided in Section VI.D.

144. As explained below, Varsity's impact on competitive cheer event prices is best estimated as a common overcharge throughout the country. Evaluation of the alleged conduct at the national level is also appropriate because the conduct itself is national in scope, and its anticompetitive bundled conditional rebate program integrates jointly implicates both the national apparel market and the regional competition and camp markets, across the entire collection of regions which the Defendants may have used in organizing their businesses across the United States. Varsity's anticompetitive conduct related to its control of the USASF, the Summit and World bids and bid events, and its conduct related to apparel pricing, are national in scope and implementation. There are no regional or CSA-level differences in how competitions are run or who is eligible to perform at them. Although prices are set locally, Varsity's pricing strategy is determined, administered, and set at a national level and implemented locally.[164] Varsity pays rebates on Varsity purchases across the United States, without regard for locality or region. Varsity's pricing strategy is to strategically move prices upward depending on whether Varsity viewed prices as "value priced" and where price sensitivity would permit an increase.[165] In addition, Varsity's pricing strategy included charging higher fees for prestigious competitions where World bids or Summit bids would be distributed. This strategy was deployed across all areas in which Varsity did business, including in nearly every large CSA throughout the United States.

### VI.A.2.    Cheer Camps is a Relevant Product Market

145. Cheer camps are primarily geared towards school cheer with limited participation from All-Star cheer. The purpose of cheer camps is to prepare athletes for game day, teach skills &

---

[164] VAR00101122, at -126.
[165] VAR00345315, at -360 ("Pricing enablers and outcomes" for "Camps/Competitions: preliminary analysis shows no correlation between event participant growth and price increases").

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

techniques, learn material for sideline and crowd-appeal performance, and teambuilding.[166] Cheer camps credential and qualify cheer teams and athletes to attend certain Varsity national championships.

146. Regardless of the level at which they participate, cheer athletes typically participate in multi-day overnight "camps" where cheer athletes practice cheer skills, develop routines and purchase cheer apparel. Cheer camps, by and large, occur during the summer when school is not in session. Cheer athletes pay to participate in camps.[167]

147. Summer cheer camps are an integral part of cheer and Varsity is one of the largest operators of cheer camps.[168] Varsity's cheer camp division is one of its most profitable.[169] Varsity offers school, All-Star, and youth and rec camps, in large part during the summer months, through its affiliates and assumed names, including: the Universal Cheerleaders Association (UCA), National Cheerleaders Association (NCA), United Spirit Association (USA), United Dance Association (UDA), . . . the American Cheerleaders Association (ACA), ACDA Spirit, . . . National Dance Alliance (NDA), the Urban Cheerleading Experience (UXC), Varsity! Remarkable Original Choreography ("V!ROC") and many more.[170]

148. Cheer camps provide instructional training on dance and cheer for athletes. They are typically held at universities, resorts, hotels, and campgrounds and led by "top instructors with formal, industry leading training."[171]

149. Varsity acquired United Spirit Association (USA) Cheer camps in 1994. USA is the largest summer camp promoter in the Western United States, conducting camps primarily in Arizona, Arkansas, California, Colorado, Hawaii, Idaho, Montana, New Mexico, Nevada, Oregon, Texas, Utah, Washington, and Wyoming. In 1996, Varsity acquired United Special Events, a large California camp promoter. In 2004, Varsity acquired NCA and its portfolio of camps, which are held across the country.

150. Camps are considered "the gateway for events" for Varsity athletes competing at the school level and are used to build brand loyalty.[172] Instructors at camps serve as "advocates who

---

[166] VAR00006767, at -768.
[167] VAR00006786, at -787.
[168] VAR00009293, at -297. Varsity ranks itself #1 in market position for camps market.
[169] VAR00304733 (Elza Exhibit 7), at -743 ("Camp related spend adds up to $600 per year" per cheerleader).
[170] VAR00125907, at -910.
[171] VAR00009293, at -334.
[172] VAR00009293, at -337. See also VAR00424538, at -570.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

cross-sell Varsity Spirit products and services, including new apparel designs and branded shoes."[173] A 2016 PowerPoint on the "Importance of Camp" stated that "90% of camp customers buy apparel. And teams who attend camp spend 3.5 times more!"[174] Camps focus on game day training, safety & skills instruction, choreography, and coaches training.[175]

151.   Schools generate the most revenue for Varsity camps, but All-Star teams also attend Varsity camps, as shown in Table 4 below.

*Table 4. Cheer Camp Revenue, 2015-2019*

| Customer Type | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| **All-Star** | $ 1,192,947 | $ 1,145,253 | $ 1,089,424 | $ 1,051,964 | $ 1,056,129 |
| **School** | $64,586,100 | $67,417,627 | $70,980,771 | $74,512,382 | $78,165,986 |
| **Total** | **$65,779,047** | **$68,562,880** | **$72,070,195** | **$75,564,345** | **$79,222,116** |

Sources: VAR00462074-79.

152.   Like competitions, the cost of participation in camps includes the travel costs associated with travel from the participants' homes to the camp venue, typically a university campus with dormitory and athletic facilities that are otherwise underutilized during summer months. Since these travel costs increase with distance, in certain geographic areas camps can compete for participants with other camps within that area. However, competitors from across the country would not be able to prevent a SSNIP from being implemented by a monopolist in one region, because the increase in travel costs would provide a price wedge to allow the regional monopolist to sustain the SSNIP. Thus, cheer camps, like cheer competitions, can be analyzed as regional markets, since most participants would not attend camps far from their home to avoid a small increase in price. However, from an economist's perspective, the most important fact for antitrust purposes and proving common impact is the evidence showing that Varsity has a dominant market share (a proxy for market power) in all of the regional markets, which allowed it to implement and enforce its anticompetitive scheme and conduct across the United States. Thus, just as with cheer competitions, a hypothetical monopolist over the entire national market for cheer camps would be able to implement and sustain a SSNIP. However, antitrust analysis must also demonstrate that the monopolist has market power through the various regions that comprise such a national

---

[173] VAR00009293, at -334.
[174] VAR00006767, at -770.
[175] VAR00009293, at -334.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

market.

### VI.A.3.    *Cheer Apparel is a Relevant Market*

153.  Cheer apparel is an important requirement of cheer competitions. Participants in cheer events wear uniforms as part of a cheer team. USASF rules govern virtually every detail of what All-Star cheer athletes are permitted to wear in a competition. Soft-soled shoes—which Varsity manufactures and sells—are required.[176] Skirts, briefs, and shorts must meet inseam guidelines.[177] Exposed midriffs are forbidden for certain age groups, and tops must be secured over at least one shoulder.[178] Bows cannot be of "excessive size," jewelry is forbidden, and makeup must be "uniform and appropriate."[179] Varsity entered the Cheer apparel market in 1980. It has steadily increased its presence in the cheer apparel market beginning with its acquisition in 1989 of Varsity Spirit Fashion & Supplies.[180]

154.  Cheerleading apparel is a major component of the Varsity ecosystem. Varsity markets itself as having "unique, highly-customizable products that meet distinct needs of cheerleaders and dancers."[181] Varsity defines cheerleading apparel into six categories: uniforms, shoes, lettering, warmups, camp wear, and accessories.[182] Across each of these categories, Varsity offers a comprehensive variety of apparel offerings, as shown in Table 5.[183]

---

[176] VAR00247460, at -473 ("Soft-soled shoes must be worn while competing.").
[177] VAR00247460, at -498.
[178] Ibid.
[179] VAR00001346, at -399.
[180] VAR00129039.
[181] JEFF00141901, at -945.
[182] JEFF00141901, at -952.
[183] JEFF00141901, at -952.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 5. Cheer Apparel Offerings by Category, with 2017 Revenue*

| Category | Apparel Offerings |
|---|---|
| **Uniforms (32% of apparel sales)** | Shell tops, skirts, pants, and bodyliners available in multiple innovative, proprietary fabrics that can be completely customized and personalized |
| **Shoes (10% of apparel sales)** | Exclusive Varsity branded Cheer and dance shoes, including custom offerings |
| **Lettering (16% of apparel sales)** | |
| **Warmups (10% of apparel sales)** | Jackets, pants, and other apparel that keeps teams warm and looking sharp no matter the weather |
| **Campwear (13% of apparel sales)** | T-shirts, tanks, polos, athletic shorts, skirts, skorts, and practice wear |
| **Accessories (18% of apparel sales)** | Wide range of outerwear, poms, bows, socks, undergear, bags, and game day apparel |

Sources: JEFF00141901, at -952.

155.  The apparel production cycle begins in the fall with pattern design for uniforms. Catalogs are distributed to customers in January. Sales take place throughout the year. Varsity sales force representatives visit high school and college customers in the spring. Uniforms are produced during the spring and summer months, and they are shipped prior to the start of school in the fall. Most of the clothing is made to order, "allowing for wide array of style choices while avoiding inventory exposure."[184] A typical uniform can cost between $250 and $400.[185]

156.  Competitive cheer uniforms are designed specifically to provide comfort and movement to support the athlete during competitions. As such, apparel designed for other sports would not be an appropriate substitute for competitive cheer athletes. Cheer uniforms require a fitted top and bottom to allow for complex tumbling and stunts. For example, jerseys and shorts used for competitive lacrosse or soccer would impede a cheer athlete from performing properly. Similarly, a uniform required for gymnastics would not be appropriate for cheerleading. Due to the nature of cheer stunts, shoes with soles are required to perform. In contrast, gymnasts typically perform barefoot or with gymnastics shoes that allow for great flexibility. Gymnastics also use leotards during their performances and can choose colors and patterns that suit them individually. Cheer uniforms are traditionally chosen to have the same logos, colors, and patterns across the team as performances are done together.

---

[184] VAR00009293, at -307, -308.
[185] VAR00424538, at -561.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Typically, with school cheer, uniforms display school and/or mascot identification.

157.  Clothing is made specifically for the sport of competitive cheer. Cheer apparel includes clothing, shoes, accessories, and equipment, e.g., pompoms. The apparel is "fancier" than sideline cheering in that it typically includes glitter and sparkles. Each team member wears matching sets of apparel. Apparel rules govern what an athlete may wear in USASF sanctioned competitions.[186]

158.  Cheer apparel is broadly defined as clothing used during cheer competitions by cheer athletes. Clothing consists of uniforms, shoes, lettering, warmups, campwear, and accessories. Each cheer athlete wears items from most (or all) of these categories, with highly coordinated designs in common across all the component categories and worn by all members of the team. A Varsity presentation in May 2018 reported that 31% of customers purchase products from all six product categories.[187] The category of uniforms is the primary product category for Varsity's apparel sales as it drives sales in all other product categories. A Varsity presentation in May 2018 reported that 100% of the customers that purchase uniforms also purchase products from other product categories, and the total annual spend for such customers on Varsity apparel was $3,300.[188]

159.  Table 6 below illustrates the significant degree by which Varsity apparel customers purchase products from four, five, or even all six, product categories. For example, as depicted in Table 6 below, customers purchasing from four or more product categories account for more than 87 percent of total Varsity apparel revenue (28.2% + 42.2% + 17.6% = 88.0%). Customers purchasing from five or more product categories account for more than 69 percent of the total Varsity apparel revenue across these categories (28.2% + 42.2% = 70.4%). For uniforms, which account for $277 million in Varsity apparel revenue (45.5% of the total Varsity apparel revenue across these categories), the uniform revenue is allocated as follows: 26.7% from customers purchasing from all six categories, 39.6% from customers purchasing from five of the six categories, 18.7% from customers purchasing from four of the six categories, and the remaining 14.9% from customers purchasing from one, two, or three of the categories.

---

[186] Deposition of Brian Elza, November 16, 2021, at 110:25-112:11.
[187] VAR00009293, at -312.
[188] Ibid.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 6. Percentage of Purchases in each Apparel Category by Number of Categories-purchased*

| Apparel Category | Customers purchasing in all 6 categories | Customers purchasing in 5 categories | Customers purchasing in 4 categories | Customers purchasing in 3 categories | Customers purchasing in 2 categories | Customers purchasing in only 1 category | Total across all bundle sizes |
|---|---|---|---|---|---|---|---|
| Total revenue for bundle size | $171,451,731 | $256,412,708 | $106,932,399 | $50,776,640 | $18,354,222 | $3,234,786 | $607,162,486 |
| Bundle share of overall revenue | 28.2% | 42.2% | 17.6% | 8.4% | 3.0% | 0.5% | 100.0% |
| Uniforms | 26.7% | 39.7% | 18.7% | 9.9% | 4.4% | 0.6% | $276,543,043 |
| Lettering | 28.8% | 40.0% | 18.1% | 9.1% | 3.8% | 0.2% | $105,206,458 |
| Shoes | 24.6% | 41.5% | 20.2% | 11.0% | 1.6% | 1.1% | $93,292,358 |
| Warmups | 29.5% | 50.6% | 14.6% | 4.0% | 1.0% | 0.3% | $53,190,668 |
| Campwear | 39.5% | 44.4% | 13.9% | 1.7% | 0.2% | 0.2% | $50,510,840 |
| Accessories | 30.3% | 58.3% | 9.3% | 1.8% | 0.2% | 0.0% | $28,419,120 |

Sources: VAR00604800-805.

160.  Table 7 below further demonstrates the degree of cross-category purchases by Varsity apparel customers. Uniforms are purchased by 91% of Varsity customers that purchase from one of the six product categories. Shoes are purchased by 93% of Varsity customers that purchase from at least four product categories. Lettering is purchased by 96% of Varsity customers that purchase from at least 2 product categories.

*Table 7. Percentage of Varsity Customers Purchasing each Category by Categories-purchased*

| Apparel Category | Customers purchasing in all 6 categories | Customers purchasing in at least 5 categories | Customers purchasing in at least 4 categories | Customers purchasing in at least 3 categories | Customers purchasing in at least 2 categories | Customers purchasing in at least 1 category | Total revenue |
|---|---|---|---|---|---|---|---|
| Uniforms | 100.0% | 99.9% | 99.4% | 98.0% | 95.6% | 91.1% | $276,543,043 |
| Lettering | 100.0% | 100.0% | 99.9% | 99.2% | 96.4% | 89.0% | $105,206,458 |
| Shoes | 100.0% | 98.1% | 92.5% | 85.8% | 73.0% | 68.0% | $93,292,358 |
| Warmups | 100.0% | 92.7% | 77.6% | 62.0% | 51.5% | 46.8% | $53,190,668 |
| Campwear | 100.0% | 86.5% | 70.3% | 53.4% | 43.7% | 39.6% | $50,510,840 |
| Accessories | 100.0% | 53.1% | 39.1% | 30.7% | 25.1% | 22.7% | $28,419,120 |

Sources: VAR00604800-805.

161.  As a practical matter, it would be costly and difficult to coordinate purchases of general market apparel to assemble the necessary components of the entire kit for all team members from multiple vendors and sources, even if such products were suitable for competitive cheer, which most are not. This added cost provides a price wedge that allows a hypothetical monopolist over specialized, coordinated cheer apparel to profitably increase the price of cheer apparel, compared to a benchmark established by competitive general clothing market

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

products.[189]

162. Because of this, a hypothetical monopolist of cheer apparel would be able to impose a SSNIP without the risk of participants substituting to other non-competition apparel, thereby rendering the SSNIP unprofitable. Therefore, cheer apparel is a proper antitrust product market.

163. There is a single antitrust product market for cheer apparel in which apparel for both All-Star competitive cheer athletes and school competitive cheer athletes purchase apparel for competitions and training. At the most granular level of product information available in the Varsity apparel data, I identify products that are purchased by both All-Star athletes and school athletes, products only purchased by All-Star athletes, and products only purchased by school athletes. Table 8 below summarizes the distribution of apparel revenue across these three categories. As reported in Table 8, approximately 97% of all apparel revenue is from the sales of products purchased by both All-Star athletes and school athletes. This demonstrates a substantial degree of overlap between products purchased by All-Star customers and products purchased by school customers.

*Table 8. Revenue on Apparel Products Purchased by Both All-Star and School Compared to Revenue on Apparel Products Purchased by Only All-Star or Only School*

| | Revenue | | | | |
|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** |
| **AS and School** | $ 153,318,547 | $ 160,395,052 | $ 165,641,514 | $ 174,887,177 | $ 185,811,743 |
| | 97.7% | 97.2% | 97.0% | 96.5% | 96.5% |
| **AS Only** | $ 1,372,127 | $ 2,166,872 | $ 2,225,354 | $ 2,924,523 | $ 2,973,160 |
| | 0.9% | 1.3% | 1.3% | 1.6% | 1.5% |
| **School Only** | $ 2,239,486 | $ 2,422,513 | $ 2,935,265 | $ 3,494,259 | $ 3,692,406 |
| | 1.4% | 1.5% | 1.7% | 1.9% | 1.9% |
| **Total Revenue** | $ 156,930,160 | $ 164,984,437 | $ 170,802,134 | $ 181,305,960 | $ 192,477,308 |
| | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Sources: VAR00604800-805.

164. The above table demonstrated that 97% of revenues come from a common set of products purchased by both All-Star and school customers. The following table calculates the fraction

---

[189] Given the very high propensity of purchasers to purchase from most of the available product categories, it is most reasonable to consider the entire package of required and optional apparel used by competitive cheer athletes as a single antitrust market. A hypothetical monopolist could sustain a SSNIP over the entire bundle equivalent to the convenience value of coordinating the purchases of the entire bundle for the entire team and ensuring the entire team has properly coordinated equipment.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

of customers with certain splits between the common set of products and discipline-specific products (i.e., products purchased by only All-Star customers or products purchased by only school customers).

165. Table 9 below reports the percentages of total apparel purchases on products purchased by both All-Star and school customers. The analysis is at the individual customer level. For a given customer, if all purchases in a year are in the common set of products, then the percentage equals 100%; while if all purchases are on products specific to the discipline (either All-Star or school), then the percentage equals 0%. If five Varsity customers have percentages equal to 0%, 25%, 50%, 75%, and 100%, then the median of these five Varsity customers spends 50% of its purchases on the common set of products. By analyzing at the level of the customer, I evaluate if the purchasing behavior is common across all customers (regardless of purchase amount).

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

166. As shown in Table 9 below, most Varsity customers purchase products that are purchased by both All-Star and School athletes. For example, 99% of All-Star customers have more than half of their Varsity apparel purchases on the common set of products (1st percentile row for All-Star in Table 9); 95% of All-Star customers have at least 80% of their purchases on the common set of products (5th percentile for All-Star in Table 9), and 75% of All-Star customers have 100% of their purchases on the common set of products (25th percentile for All-Star in Table 9). The proportions are similar for school customers: 99% of school customers have more than 70% of their Varsity apparel purchases on the common set of products (1st percentile for school in Table 9); 95% of school customers have at least 90% of their purchases on the common set of products (5th percentile for school in Table 9), and 75% of school customers have 99% of their purchases on the common set of products (25th percentile for school in Table 9).

*Table 9. Percentages of Total Apparel Purchases on Products Purchased by Both All-Star and School, Distribution Across the Population of All-Star and School Customers*

|  |  | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| **All-Star** | **1st Percentile** | 68.3% | 56.3% | 48.3% | 59.3% | 54.3% |
|  | **5th Percentile** | 89.6% | 82.1% | 77.7% | 80.1% | 80.6% |
|  | **10th Percentile** | 96.4% | 92.1% | 89.0% | 89.3% | 88.7% |
|  | **25th Percentile** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
|  | **Median** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| **School** | **1st Percentile** | 77.6% | 74.6% | 75.2% | 71.2% | 74.0% |
|  | **5th Percentile** | 91.7% | 91.6% | 90.6% | 89.8% | 89.7% |
|  | **10th Percentile** | 95.9% | 95.3% | 94.9% | 94.6% | 94.6% |
|  | **25th Percentile** | 100.0% | 99.7% | 99.6% | 99.4% | 99.4% |
|  | **Median** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Sources: VAR00604800-805.

167. In addition, USASF regulates the apparel guidelines for competitive cheer to perform at sanctioned events. It would generally be cost prohibitive to purchase two sets of uniforms. Athletes cannot switch to unsanctioned cheer apparel because they would not be able to compete in USASF sanctioned cheer events.[190]

168. The relevant geographic market for determining antitrust injury is the United States. Firms offering cheer apparel can and do offer their products throughout the country via a variety of

---

[190] VAR00270286, at -287 (email from Jim Chadwick (USASF) to Jeff Webb (Varsity) dated May 7, 2019: "Uniform Look – 2019-20 voluntary, 2020-21 – warning then penalty – purchase cycle considered.").

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

channels, including internet, catalogs, and sales representative contacts. Gyms and athletes across the country all have access to the same apparel catalogs and online product offerings and can be targeted by national sales representatives. Cheer apparel is also promoted at competitions. This latter channel is particularly notable and important, first because such marketing is directly targeted at the key audience in a concentrated and low-cost manner, at a moment of high salience; and second, because Varsity is alleged to have restricted access to this marketing channel to reduce competition for its cheer apparel products.

### VI.B. Varsity has Market Power in Each of the Defined Relevant Product and Geographic Markets

#### VI.B.1. Defendants Have Market Power in the Cheer Competitions Relevant Markets

169. Varsity admits – and indeed promotes – that it has the top market position in all three relevant markets.[191] In addition, Varsity Spirit has generated "significant barriers to entry given [its] longstanding leadership in the industry and unique product offering."[192]

170. As early as 2011, Varsity and its financial consultants Rothschild and Jefferies, estimated that Varsity had the #1 market position in "Cheerleading Uniforms, Cheerleading Team Educational Camps, and Cheerleading and Dance Team Competitions" with an estimated market share in the United States of 75% in the "Cheerleading Uniforms" segment, 80% in the "Cheerleading Team Educational Camps" segment, and 40% in the "Cheerleading and Dance Team Competitions" segment.[193] Varsity further identifies "high barriers to entry" as the primary reason for future growth opportunities, specifically the "high barriers to entry resulting from the Company's integrated business model and strong relationships focused on cross-selling activities."[194] Such statement were repeated in subsequent efforts to sell Varsity to outside investors, Charlesbank and Bain.

171. Varsity's market power in competitions, which in turn drives to a large degree its market power in the other two markets, is common across all the regions of the United States.

172. In Table 18, I analyze Varsity's market share by region based on the share of bids to World events and the share of World bid events. The anticompetitive conduct, including "price

---

[191] See, e.g., VAR00009293, at -297.
[192] JEFF00025079, at -093.
[193] VAR00424538, at -544.
[194] Id., at -545.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

optimization" and the bundled, quantity-forcing rebates schemes was centrally planned and implemented by Varsity, and was national in scope. Other important elements of that anticompetitive strategy were fundamentally national in character, including the capture and manipulation of the USASF, including its allocation of world bids, and the anticompetitive acquisition of an overwhelming majority of the bid events for the Worlds national tournament.

173. The resulting price elevation occurred throughout the country and is reasonably estimated to be the same in all regions.[195] As a result, the price impact on the class of Varsity's anticompetitive conduct is effectively national.

174. Varsity acknowledged its market dominance: "Varsity Spirit has managed to become the total market leader in all things cheer. But with that market share comes a responsibility to manage the position as a global leader in our space. The key is to maintain market share, avoid being viewed as a monopoly, and respond directly and firmly to all competitors in the space. It is imperative that Varsity recognize that just being the market leader is not enough. To maintain a position of dominance we must develop a graceful appearance, and humanize our brand."[196] In fact, Varsity referred to its "very successful, dominant position" as "the elephant in the room."[197]

175.  Table 10 below is a reproduction of a table from a Varsity presentation delivered in the 2013-2014 season that breaks down the All-Star competitions at that time.[198]

---

[195] The general level of event prices for both Varsity and its former competitors varies somewhat by region, but the price premium that Varsity maintains, and the price elevation that it imposes when it acquires or replaces rival events, are similar across the country, after controlling for the characteristics of the event, such as date, and whether it is a Tier 1 event.

[196] VAR00094550, at -550. See also VAR00177654 (Elza Exhibit 6), at -659.

[197] VAR00177654 (Elza Exhibit 6), at -659.

[198] VAR00323451, at -456. The presentation was titled "VAS Sales Meeting Presentation 2014.pptx" and sent as an email attachment from Tres LeTard to Brian Elza and Lauryn Turner on February 3, 2014. See VAR00323450, at -450 (Elza Exhibit 4).

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 10. Market Overview, 2013-2014 Season*

| All Star Company | Est. $ Revenues | % Market Share |
|---|---|---|
| Varsity Brands | $ 35,000,000 | 50.0% |
| Jam Brands | $ 21,000,000 | 30.0% |
| Spirit Brands | $ 1,900,000 | 2.8% |
| Americheer | $ 1,600,000 | 2.3% |
| WSA | $ 1,500,000 | 2.1% |
| Jamz | $ 1,300,000 | 1.9% |
| Epic Brands | $ 1,300,000 | 1.9% |
| Champion Spirit Group | $ 1,000,000 | 1.4% |
| Mardi Gras Spirit | $ 800,000 | [left blank by Varsity] |
| Spirit Celebration | $ 700,000 | 1.0% |
| Cheer America | $ 700,000 | 1.0% |
| Cheer Ltd. | $ 500,000 | [left blank by Varsity] |
| Others: | $ 1,700,000 | 4.3% |
| **Total:** | **$ 69,000,000** | **100.0%** |

Sources: VAR00323451, at -456.

176. Table 11 below is a reproduction of a Varsity document before the start of the 2016-2017
season that describes the market share breakdown at that time.[199]

*Table 11. All-Star Competition Market Share, Start of 2016-2017 Season*

| All Star Event Companies | Revenues | % of Market |
|---|---|---|
| Varsity All Star Events | $ 103,420,000 | 75.0% |
| EPIC | $ 8,000,000 | 6.0% |
| GSSA/Aloha | $ 3,200,000 | 2.0% |
| Spirit Celebration | $ 2,200,000 | 2.0% |
| Champion Spirit Group | $ 2,500,000 | 2.0% |
| WSA | $ 1,500,000 | 1.0% |
| JAMZ | $ 1,750,000 | 1.0% |
| All Others | $ 15,000,000 | 11.0% |
| **Total** | **$ 137,570,000** | **100.0%** |

Sources: VAR00101102.

177. Varsity acquired eight cheer competition event producers between 2014 and 2018: Cheer
Ltd. in June 2014, JamBrands in November 2015, Aloha Productions in December 2016,

---

[199] VAR00101102. The Excel workbook was titled "Varsity All Star Market Shares est. – 2016.xlsx" and sent as an
email attachment from Tres LeTard to John Sadlow and Brian Elza on September 16, 2016. See VAR00101100
(Elza Exhibit 5).

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Spirit Celebration in February 2017, All Things Cheer in April 2017, Jam Spirit Group in November 2017, Mardi Gras Spirit in December 2017, and Epic Brand in January 2018.[200] Based on the DOJ/FTC Merger Guidelines, there is a presumption of anticompetitive harm from the three acquisitions in the 2017-2018 season (Jam Spirit Group, Mardi Gras Spirit, and EPIC Brand) and the potential for anticompetitive harm in both the 2015-2016 season (JamBrands) and the 2016-2017 season (Aloha, Spirit Celebration, All Things Cheer).

178. Table 12 below summarizes the market share evidence according to the thresholds in the DOJ/FTC Merger Guidelines. For this analysis, I use Varsity's share of All-Star competitions as an extremely conservative estimate of its market share. I use this measure as I have the most reliable data on the total number of All-Star competitions in the United States. This data is reported by the USASF as the total number of USASF sanctioned events. Varsity's market share of 56.2% at the end of the 2017-2018 season (following its acquisition of EPIC) is a conservative estimate of its revenue market share. First, Varsity's All-Star competitions are more expensive than other competitors in the market. Second, Varsity's events may have more entrants than other competitors in the market. As an example, if Varsity's competition prices are 25% higher than competitors' prices and its events have twice as many entrants, then Varsity's event market share of 56.2% corresponds to a revenue market share of 76.2%.[201]

179. Further, for the analysis in Table 12 below, I only have access to event market share information for Varsity and companies that it acquired. Thus, I am unable to calculate the HHI for the entire market, but only the minimum HHI corresponding to Varsity and the companies that it acquires. For example, if Varsity has 50% event market share and its acquisition has 10% event market share, then the HHI is at least 2,600 as the inclusion of other competitors in the market with nontrivial market share will only increase this value.[202]

---

[200] VAR00009293, at -361; VAR00415063; VAR00083645; VAR00017827; VAR00128725; VAR00081770; VAR00017807; VAR00076749. See.

[201] Varsity's revenue market share in this example = (56.2% * 1.25 * 2) / (56.2% * 1.25 * 2 + 43.8%), under the assumption that Varsity's prices are 25% larger and the number of entrants is twice as large.

[202] Minimum HHI for the example in which Varsity has 50% market share and its acquisition has 10% market share equals $(50)^2 + (10)^2 = 2,600$.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 12. Varsity's Acquisitions are Presumed to Raise Competitive Concerns under DOJ/FTC Guidelines*

| | | Varsity Share | Minimum HHI / Change in HHI | DOJ/FTC Merger Guidelines |
|---|---|---|---|---|
| **2015-2016** | | | | |
| | Beginning of Season | 34.1% | 1,233 | |
| | JF (Nov. 2015) | 8.3% | | |
| | End of Season | 42.4% | 1,798 | Moderately Concentrated Market |
| | Change in HHI | | 565 | Potentially raises significant competitive concerns |
| **2016-2017** | | | | |
| | Beginning of Season | 36.4% | 1,329 | |
| | ALO (Dec. 2016) | 1.7% | | |
| | SCB (Feb. 2017) | 1.1% | | |
| | ATC (Apr. 2017) | 0.5% | | |
| | End of Season | 39.7% | 1,575 | Moderately Concentrated Market |
| | Change in HHI | | 245 | Potentially raises significant competitive concerns |
| **2017-2018** | | | | |
| | Beginning of Season | 46.0% | 2,186 | |
| | CSG (Nov. 2017) | 1.1% | | |
| | MGS (Dec. 2017) | 0.7% | | |
| | EPIC (Jan. 2018) | 8.4% | | |
| | End of Season | 56.2% | 3,158 | Highly Concentrated Market |
| | Change in HHI | | 972 | Presumed to be likely to enhance market power |

Sources: VAR00352218-25; VAR00010122-27; VAR00352199-202; and U.S. Department of Justice and Federal Trade Commission, "Horizontal Merger Guidelines," Issued: August 19, 2010, at §5.3.
Notes: Varsity market share based on count of All-Star events. The end-of-season HHI measure is the minimum HHI defined as Varsity's end-of-season market share (as a percent) squared.

180. Yet, even for the event market share that significantly understates Varsity's market share and for a minimum HHI that significantly understates the HHI in the market, Table 12 above demonstrates a presumption of anticompetitive harm from Varsity's acquisitions in the 2017-2018 season and potentially also in the 2015-2016 and the 2016-2017 seasons. In the 2017-2018 season, the post-acquisition HHI was *at least* 3,131, which exceeds the DOJ/FTC threshold for a "Highly Concentrated Market," and the change in HHI (Delta HHI) equaled 967, which exceeded, by a factor of four, the threshold of 200 points beyond which the "increase in the HHI of more than 200 points will be presumed to be likely to enhance market

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

power."[203] In both the 2015-2016 and 2016-2017 seasons, the post-acquisition HHI was *at least* 1,777 and 1,558, respectively, which exceeds the DOJ/FTC threshold for a "Moderately Concentrated Market," and the change in HHI equaled 561 and 244, respectively, which exceeded the threshold of 100 points beyond which the "increase in the HHI of more than 100 points potentially raise significant competitive concerns and often warrant scrutiny."[204] "The higher the post-merger HHI and the increase in the HHI, the greater are the Agencies' potential competitive concerns."[205]

181.   Further, in Table 18, I analyze Varsity's market share by region based on the share of bids to World events and the share of World bid events.

### VI.B.2.    *Defendants Have Market Power in the Cheer Camps Relevant Market*

182.   Cheerleading camps have significant start-up costs. To be successful, camp organizers need to procure facilities to host camps which include lodging and dining for overnight camps. Additionally, they need experienced instructors, support staff, medical staff, equipment, insurance, etc.

183.   Varsity creates artificial barriers to entry in the cheer camp market across the United States through several schemes. Varsity provides bids to some of its national competitions through its cheer camps.[206] Since the national competitions are highly regarded events at the end of the year, new entrants have limited leverage of hosting successful camps.

184.   Further, pursuant to the anticompetitive scheme, Varsity requires that its school teams seeking to attend certain marquee national competitions must complete a credentialing program that is only offered at Varsity camps. The Squad Credentialing Program occurs at Varsity camps "that are at least two days long," and the Program is a requirement (75% of team members must have completed the Program) for teams to compete at "NCA Junior & Senior High School Nationals Championship" and "National High School Cheerleading

---

[203] U.S. Department of Justice and Federal Trade Commission, "Horizontal Merger Guidelines," Issued: August 19, 2010, at §5.3.
[204] Ibid.
[205] Ibid.
[206] VAR00355287, worksheet "Cheer," row 8 ("All Paid Bids to Nationals distributed at college summer camps ONLY").

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Championship (NHSCC) with UCA."[207]

### VI.B.3.    *Defendants Have Market Power in the Cheer Apparel Relevant Market*

185.  In 2020, Varsity identified its main rivals in the cheer apparel market as Rebel ("a very real competitor"), Nfinity ("the leader in the shoe space"), and GK.[208]

186.  Cheerleading apparel manufacturing has significant start-up costs related to finding production facilities, warehouses, inventory management, and distribution channels to serve customers. Additionally, natural barriers such as specialty designs and copyrighted or patented designs exist making it difficult for new apparel entrants compete with Varsity apparel.[209]

187.  Varsity imposes barriers in the apparel market through other means as well. Varsity restricts rival companies from selling merchandise at Varsity events.[210] At the largest events, Varsity Spirit sells merchandise via the Varsity Spirit Shop division of Varsity Spirit, similar to a merchandise booth or store at a concert or sporting event. At smaller events, Varsity uses external vendors and receives a percentage of sales. Varsity's primary external vendor is All-Star Outfitters and Varsity receives 37.5% of sales.[211]

188.  Varsity's various schemes and policies actively restrict rival companies from selling merchandise at Varsity events. For example, a 2017 joint agreement between NCA & NDA and a high school to host a championship event had a stipulation in the contract granting NCA & NDA "the exclusive right to sell merchandise...at the Event through its Store."[212]

---

[207] VAR00160802 (Duhon Exhibit 5), at -802 ("The Varsity Spirit/NFHS Squad Credentialing program will be implemented at all camp types for UCA, NCA, USA, V!ROC and Premier camps this summer that are at least two days long. We feel very strongly that this program is one more way we can ensure that cheerleaders understand their role, are knowledgeable about cheerleading safety and achieve success on and off the sidelines. Because this is important to us, the Squad Credentialing program will be a requirement for participation in the following competitions: NCA Junior & Senior High School Nationals Championship in January 2018 and National High School Cheerleading Championship (NHSCC) with UCA – requirement began in 2017"); VAR00160803, at -803 ("Q: How many squad members need to attend camp? A: We require that 75% of the members competing must have completed Squad Credentialing.").

[208] VAR00255570 (Parrish Exhibit 9), at -596 (email from Jamie Parrish to John Newby sent on August 21, 2017, containing slides for a presentation title "2020: Varsity Spirit Project").

[209] VAR00274992.

[210] VAR00067447, at -448; VAR00370795, at -796; VAR00421817, at -818.

[211] VAR00009293, at -329.

[212] VAR00067447, at -448. ("Allow NCA & NDA the exclusive right to sell merchandise (i.e., clothing and athletic wear, novelty and souvenir items, and other Event specific merchandise) at the Event through its Store. Under no circumstances can any other items be sold (including 'shoutouts') and no other outside vendor may be present at the competition, without the written permission of the NCA & NDA. Vendors that sell clothing, bows, pins (or other items typically sold at the Varsity Shop) likely will not be approved.").

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Similarly, USASF restricts apparel vendors or event producers from exhibiting merchandise at the USASF national meetings.[213] Internal documents from Varsity suggest that Varsity also weighs in on USASF's decisions to receive sponsorships. Varsity expressed displeasure at USASF's sponsorship deal during 2019 since the exposure sponsors received is "disproportionate to what they paid in relation to what [Varsity has] spent to essentially fund Worlds".[214]

189. A Supreme Court decision from 2016, shared by Varsity's Chief Legal Officer Burton D. Brillhart with Jeff Webb in November 2016, was rendered in favor of Varsity after it had sued a rival apparel manufacturer (Star Athletica) for infringing a copyright that Varsity had obtained on "its distinctive designs with stripes, zigzags and color patterns" on cheerleader uniforms.[215] Varsity's rival claimed that Varsity's copyrights were "seeking a century-long monopoly on cheerleader-uniform designs" as the "designs served core functional purposes" (for example, "the lines and zigzags serve to make cheerleaders appear taller and slimmer").[216]

190. A 2016 document describing Varsity's 2017 strategic initiatives, describes its long-term objectives for its apparel business to "acquire competitors with strategic products that compliment Varsity portfolio (premium product shoes, makeup) …Candidates include GK Elite, Nfinity, Fancy Face."[217]

191. In addition to acquiring rival apparel brands, Varsity's strategy, as quoted in internal documents, included using its market power to eliminate its strongest apparel competitors.[218]

192. As an example of the policies that Varsity institutes to competitively disadvantages its rivals in the apparel market, a Varsity policy in effect since at least 2016 does not permit judges at

---

[213] VAR00370795, at -796.
[214] VAR00421817, at -818. Email string re: "USASF Sponsorships" with Fowlkes, Nichols, Newby, and Elza (1/4/2017 11:19 am), Fowlkes: "My bigger concern is the regional meeting which we allow competitors to exhibit. This gives our small competitors access to customers in a very cost effective way. I am checking to see where USASF is in that process to determine if we can change things this year. As we have discussed previously, I think we can get the regional meetings eliminated without a 'fight' if we give them one more year."
[215] VAR00272717, at -718.
[216] VAR00272717, at -718, -719.
[217] VAR00272785, at -787.
[218] See, e.g., VAR00448716, at -717 (email from Tres LeTard to Justin Carrier and Brian Elza dated September 14, 2016: "Jeff is hot on taking down Rebel right now and not looking to play nice.").

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

its events "who work for uniform competitors."[219]

193. Based on Varsity's information provided to Bain during Bain's 2018 acquisition of Varsity Brands, Varsity acknowledged that its apparel prices are higher than its competitors in all major categories.[220] When describing the recent wins made by Varsity's apparel rival Rebel, Varsity acknowledges that "the #1 reason gyms go with [Rebel] is price and free uniforms."[221]

### VI.C.  Common Evidence of Artificially Inflated Prices Caused by Defendants' Anticompetitive Conduct

194. I have been asked by Counsel for the indirect purchaser plaintiffs to determine whether economic evidence and analyses, common to the proposed class as a whole, demonstrate that (1) prices for cheer competitions, cheer apparel, and cheer camps were artificially inflated due to the alleged conduct by Defendants during the proposed Class Period; and (2) these higher prices were paid by all, or nearly all, members of the proposed class.

### VI.C.1.    Varsity's Alleged Anticompetitive Scheme to Extract Monopoly Rents from Purchasers of Cheer Competitions, Apparel, and Camps

195. Varsity's alleged scheme to disadvantage rivals and diminish competition to achieve supracompetitive profits resulted in indirect purchasers paying higher prices and an overconsumption of products and services. Varsity's acquisitions, pricing and rebate programs perpetuated and increased Varsity's monopoly power and exploited that monopoly power to increase Varsity's profits. The resulting higher prices paid by gyms and schools were passed through to participants and their families. In addition, the bundled first-dollar rebate scheme incentivized decisionmakers (gyms and schools) to purchase more, and more expensive, events and products than participants would have preferred without the scheme. These rebates amounted to kickbacks to those decisionmakers, the direct purchasers, who generally did not share those payments the participates.

196. As I discuss herein, Varsity's market share of All-Star competition events, in-school events,

---

[219] VAR00448716, at -716 (email from Justin Carrier to Tres LeTard and Brian Elza dated September 15, 2016: "We can definitely continue moving forward with our new policy of zero tolerance for bringing on new judges who work for uniform competitors.").

[220] VAR00310631, at -663 ("How do we price relative to competitors? Based on VSF catalog pricing we are consistently higher priced than our competitors in all major product categories.").

[221] VAR00448716, at -720.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

camps, and apparel, exceeded thresholds commonly viewed as sufficient to create "significant competitive concerns."[222] Varsity's dominant share in such a highly concentrated market creates the presumption that acquisitions of the size that were repeatedly undertaken by Varsity would be likely to result in enhanced market power.[223] Similar concern is warranted regarding other actions that Varsity has allegedly engaged in to increase and exercise its market power, such as its conditional rebate programs and its "price optimization strategy."

197. Varsity's monopoly position was recognized not only by the cheer community but also by Varsity itself. Varsity refers to itself as having "built dominant brand and unique business model" and is the "leading marketer and manufacturer of branded products and services to the spirit industry." It also refers to "high barriers to entry and competitive advantages: industry leadership, deeply entrenched relationships and multi-channel reach." Varsity views itself as the "creator and innovator of modern cheerleading."[224]

198. Varsity wielded and advanced its monopoly power through its alleged anticompetitive conduct. But for this conduct, indirect purchasers would have paid lower prices and paid less money overall to participate in Varsity Competitive Cheer "ecosystem." As described by Varsity, this ecosystem, "[t]hrough the integration of uniforms and accessories, camps, and competitions, Varsity Spirit is cheerleading." Varsity also references the "[s]ignificant barriers to entry given Varsity Spirit's longstanding industry leadership, unique product offering and national sales organization."[225]

199. Varsity's pricing strategy inherently incorporates the recognition that many Varsity events were already at monopoly prices (that is, price levels at which Varsity's ability to raise price is constrained not by the threat of competition, but from the concern that customers will simply not purchase at such high prices). In response, Varsity focused on increasing prices where it could, rationalizing its event offerings to reduce intra-firm competition created by acquisitions, and incentivizing and enabling gyms to send teams to more events than the participants and parents would themselves prefer to purchase, thereby increasing its

---

[222] See U.S. Department of Justice and Federal Trade Commission, "Horizontal Merger Guidelines," Issued: August 19, 201, §5.3.
[223] See Table 17.
[224] JEFF00035010, at -065.
[225] JEFF00034795, at -849.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

supracompetitive profits.[226]

200. These strategic price changes reflect Varsity's recognition that cheer, particularly All-Star cheer, may be a price sensitive activity for some participants.[227] As a monopolist, Varsity's pricing strategy was consistent with monopoly pricing, including price discrimination across events aimed at different market segments. At the same time, it executed purchase incentive programs with direct purchasers, i.e., gyms and schools, that benefitted these purchasers but at the expense of indirect purchasers who – while not receiving the rebate payments – found themselves compelled to spend more for Varsity events, apparel, and camps than they otherwise would have but for this anticompetitive scheme. This overall strategy further reinforced Varsity's already extensive market power by disadvantaging its rivals and diminishing competition. Varsity recognized that one-day events were lower priced and lower margin compared with multi-day events. Yet, Varsity further recognized that exiting from one-day competitions "would be counter to our strategy, allowing our competitors to enter the space."[228] Varsity's ability to price discriminate in this fashion is further evidence of its monopoly power.

201. Other Defendants participated in this scheme. Both Charlesbank and Bain advanced and facilitated an acquisition scheme to acquire Varsity's key competitors to reduce competition and expand its offering of local and regional events (including obtaining even greater monopoly power over coveted World bids events), increase prices where feasible, and incentivize gyms to attend more events and purchase more Varsity branded apparel and camps.

202. As I describe below, the USASF also participated in advancing Varsity's anticompetitive scheme. Far from being an independent governing body, its organizational ties to Varsity were extensive. It was aware of independent event producers' concerns that Varsity

---

[226] See, e.g., VAR00101122, at -126 ("All-Star market was created for competition so customers are typically less price sensitive than school competitors. Pricing for All-Star events attempts to maximize profitability without sacrificing participation at events due to cost." "price increases are considered for both participant registration and spectator admission…average annual price increase vary by event but are typically in the ~1.5% to 25% range.").

[227] VAR00253876 (Newby Exhibit 20), at -877. (For gyms, "the primary drive[r] of event selection and schedule… is location, date, and bid offering…price being a distant 4th in that process."). See also VAR00254066 (Davis Exhibit 8), at -071 ("In general, customers are sensitive to prices, however, we have been successful in implementing price increases at Disney events and in our State and Local competition.").

[228] VAR00418061 (Nangia Exhibit 9), at -062.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

controlled the USASF and exercised market power within cheer.[229] Nonetheless, its rules made it exceedingly difficult for any rival of Varsity's to discipline or challenge Varsity's anticompetitive scheme.

### VI.C.1.a)   Conspiracy of Varsity and USASF to Exclude/Disadvantage Rivals

203.  USASF is the governing body for cheer that establishes rules, regulations and policies governing such items as cheer participants competition apparel, location, and dates of cheer events for Tier 1 and 2 competitions, allocation of World paid bids, among other items.[230] Though portrayed as an independent entity, the USASF was created and funded by Varsity.[231] This is consistent with Varsity's claim that it [Varsity] "developed industry regulatory bodies, rules, regulations and safety guidelines."[232] Two of Varsity's employees served as the president and a top vice president of USASF.[233] Additionally, Varsity either held or acquired all the event producers that have permanent seats on the USASF Board of Directors.[234]

204.  On numerous occasions, Varsity exercised its control to place its own events in direct competition with a rival's event in order to disadvantage the rival's ability to meet the threshold requirements to remain a distributor of World bids, or to competitively de-value a rival producer such that it would become a less expensive acquisition target for Varsity.[235] For example, Varsity's Jeff Fowlkes wanted the USASF to prevent small competitors from offering World bids because it enabled these competitors to remain viable and drove up their

---

[229] See, e.g., USASF_00070540 (Singer Exhibit 8). VAR00321653 (Chadwick Exhibit 20), at -654; USASF_00005125 (Chadwick Exhibit 37), at -126; and VAR00431092 (Webb Exhibit 27) ("with our control of the BOD of USASF we are clearly in the driver's seat. We should probably discuss our strategy soon."); and USASF_00055921, at 924.

[230] USASF Website, accessed on June 3, 2022, available at: https://www.usasf.net/about

[231] Deposition of Brian Elza, November 16, 2021, at 150:19-21. See also VAR00351487 (Chadwick Exhibit 59, Peterson Exhibit 65), at -189 ("After USASF was formed, Varsity provided an interest free line of credit to the USASF. At its peak, the loan balance was $1.8M.").

[232] JEFF00035010, at -065.

[233] Daniel Connolly, "Cheer Empire: A For-profit Company Built Competitive Cheer, Pays People Who Make its Rules," Commercial Appeal, Sep. 18, 2020, accessed on Nov. 8, 2021, available at: https://www.commercialappeal.com/in-depth/news/2020/09/18/cheer-empire-profit-company-created-cheerleading-regulators-pays-salaries/3468551001/ ("Varsity employees also serve as the president and a top vice president of the Memphis-based U.S. All Star Federation...").

[234] VAR00339736. USASF_00032444 (Chadwick Exhibit 2), at -444-446 showing USASF Board members by date of appointment. See also Deposition of Jim Chadwick, April 15, 2022, at 129:2-8.

[235] See, e.g., VAR00233528; VAR00472431 (Berry Exhibit 18); VAR00190278 (Berry Exhibit 19, Sadlow Exhibit 13).

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

potential acquisition value.[236]

205. Moreover, Varsity's acquisitions of USASF competing independent event producers since 2014 provided Varsity with majority control of USASF's Sanctioning Committee, which determined World bids events and the location and date of USASF sanctioned bid events.[237] For example, the Sanctioning Committee protects Sanctioned Championships occurring within a four-week window on either side of a requested date and prevents event producers from moving sanctioned events more than 500-miles from its original location without the expressed permission of the Sanctioning Committee.[238]

206. The effect of these location/date rules is to restrict new entry and competition among events. Moreover, Varsity effectively has used its market power within the Sanctioning Committee to disadvantage its rivals and to reduce or diminish competition. Varsity also appears to have engaged in long term strategy planning with USASF to maximize its own benefits.[239]

207. USASF's rules and procedures in structuring sanctioned events and the awarding of Worlds bids favored Varsity's acquisition strategy as a mechanism to fully control Tier 1 cheer competitions. For example, USASF Tier 1 event producer membership was restricted to 42 bid events (see Table 13 below). Priority for Tier 1 cheer membership is given to event producers based on their seniority as USASF members. New Tier 1 event producers could only be added if an existing Tier 1 member fails to meet the threshold requirement of 125 teams participating at that year's event. Tier 1 event producers also are protected in offering events in terms of location and date of the event based on seniority.[240]

---

[236] See, e.g., VAR00244139 (Elza Exhibit 16), at -139 ("Jeff W. wants the USASF Worlds Bid process changed to prevent small competitors from being allowed to offer World Bids. [...] He believes, and I agree (for whatever that's worth), that in some cases the ability to give Worlds Bids is keeping these companies viable and certainly driving up their value if we decide to acquire them.").

[237] See, e.g., USASF_00030535 (Seely Exhibit 14), at -536-537; Deposition of Jim Chadwick, April 15, 2022, at 63:15-64:8.

[238] USASF_00001966, at -968 ("Tier 1 Championships will be protected, within a four week window on either side of the current bid giving event, for a 200 mile radius. In addition, Tier 1 events will be protected for a 500 mile radius from other bid giving events on the same weekend."). See also USASF, "Sanctioning Committee's Approval Process & Criteria For Tier 1 Event Producers and & Worlds Bid Eligibility," accessed June 3, 2022, available at: https://usasfmain.s3.amazonaws.com/EventProducer/docs/19-20/USASF_Event-Producer_Tier-1_Approval_Guidelines_19-20.pdf

[239] See, e.g., VAR00250013, at -022. ("Determine long-term strategy with USASF and assess needs/benefit/role of USASF that benefits Varsity, including funding World bids and cost savings for Varsity…Varsity Spirt Camps—education and Training (Seely and team. Explore more aggressive pricing strategy).").

[240] See, e.g., USASF_00001966, at -967 ("If a Tier 1 Event Producer with a later membership date desires to move their bid weekend/city for any reason and the move encroaches (to infringe/invade) upon an existing Tier 1

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

208. In addition, more senior events are given priority in considering other new sanctioned events in terms of approving the location, date, and the number and type of bids given by other event producers. Moreover, an event producer needs permission of the Sanctioning Committee to move an event more than 200 miles or change the date if it were located close to another member's bid event.[241] Protecting event producers with seniority is predicated on the goal of "recogniz[ing] the contribution made by early USASF supporters whose financial support made the Worlds possible initially."[242]

209. Voting seats in USASF's Sanctioning Committee, which votes on rules for World bids, were determined by the number of Tier 1 event producers. The total number of Tier 1 event producers was 42, so ownership of 22 Tier 1 event producers would provide a company with a majority of the voting seats in the Sanctioning Committee.

210. Varsity owned, following its acquisition of competing event producers, substantially more than 22 Tier 1 event producers. For example, in February 2017, following its acquisition of Spirit Celebration, Varsity owned 27 of the 42 total Tier 1 event producers.[243] Further, in February 2018, a due diligence analysis by Charlesbank reported that Varsity owned 32 of the 42 total Tier 1 event producers.[244] Finally, in February 2020, in an internal Varsity presentation, Varsity reported that it owned 34 of the 42 total Tier 1 event producers.[245]

211. Using these three data points, Table 13 shows Varsity's share of the USASF Tier 1 event producers, and consequently, Varsity's share of the voting seats on the USASF Sanctioning Committee.

---

Event Producer's event who has an earlier membership date, the "later membership date" Tier 1 Event Producer's request will be denied unless the Tier 1 Event Producer with the earlier membership date agrees to allow the move.") (emphasis in original).

[241] See, e.g., USASF_00001966, at -967 ("A Tier 1 Event Producer requesting to "move" its bid event date over 200 miles, must appeal to the USASF Sanctioning Committee for an approval. […] A Tier 1 Event Producer requesting to "move" its bid event date and or location after the "Approval Process" is completed, and encroaches upon another member's date and or location, must appeal to the USASF Sanctioning Committee for an approval.").

[242] USASF_00084334 (Stangle Exhibit 20), at -349.

[243] USASF_00015124 (Peterson Exhibit 33), at -124 (Email from Steve Peterson to Brian Elza and Tres LeTard, February 28, 2017: "Now 27 Varsity Brands of the 42 Tier 1's. Any chance you will have all 42 one day?  :)").

[244] VAR00310631, at -664 ("There are only 42 Tier 1 event companies. Varsity now owns 32 of those Tier 1 companies in all of the best markets."). The due diligence report follows an M&A pipeline summary announcing completed deals through February 8, 2018 and targeted deals for February 2018 – May 2018, citing February 2018 board materials. See VAR00310631, at -642.

[245] VAR00078751 (Elza Exhibit 15), at -761 "Varsity owns 34 of the 42 Tier 1 Event companies." The presentation was titled "What is Varsity All Star_Feb 20.pptx" and attached to an email from Brian Elza to Tres LeTard on February 17, 2020.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 13. Sanctioning Committee Voting Seats and Tier 1 Event Shares*

| | February 2017 | February 2018 | February 2020 |
|---|---|---|---|
| **Varsity Tier 1 Event Producers** | 27 | 32 | 34 |
| **Total Tier 1 Event Producers** | 42 | 42 | 42 |
| **Varsity Share** | 64.0% | 76.0% | 81.0% |
| **Varsity Share of Voting Seats on Sanctioning Committee** | 64.0% | 76.0% | 81.0% |

Sources: USASF_00015124 (Peterson Exhibit 33); VAR00310631, at -664; VAR00078751 (Elza Exhibit 15), at -761.

212. Producers seeking to award bids to USASF Worlds events submit applications to the Sanctioning Committee. Applications are prioritized based on membership date.[246] Next, the Sanctioning Committee, where Varsity holds a majority of the voting seats, votes to approve World bids applications.[247] Thus, not only does Varsity, as a senior member, have the advantage to retain its Tier 1 membership as an incumbent event producer, but has a majority of voting seats in the Sanctioning Committee that determines which event producers can offer new Tier 1 events.

213. As recognized by Varsity, the ability to host and distribute a World bid event enables Varsity to charge more for these events, offer more of these events, attract more participants, and effectively obtain greater revenues from participation fees, spectator fees, and associated apparel and other sources of revenue.[248] The USASF rules for prioritizing bid applications, developed in concert with Varsity, works to enhance Varsity's market power in cheer events.

214. For example, one of those rules stipulate that event producers may become disqualified from offering paid World bids if the bid events sponsored do not meet the minimum teams attendance threshold, which was originally set at 100, but has since been increased to 125 teams.[249] Taking advantage of this rule and its market power, Varsity has engaged in an anticompetitive strategy of locating its own events near a rival's bid event in an effort to

---

[246] See USASF_00001955, at -955 ("In addition the Sanctioning Committee will consider the other following criteria. […] The date the event producer became a member of the USASF").

[247] See USASF_00001955, at -955 ("USASF Tier 1 membership will be approved by the Sanctioning Committee with the final consent of the USASF Board of Directors."); Deposition of Jeffrey Fowlkes, April 5, 2022, at 59:12 - 62:22; Deposition of Brian Elza, November 17, 2021, at 77:24 – 78:15.

[248] See VAR00472431 (Berry Exhibit 18). See also VAR00103719 (LeTard Exhibit 18); JEFF00262824.

[249] USASF_00001955, at -956 ("Have had a minimum of 125 All Star "cheer" teams participating at the same prior year's competition to qualify for this tier.") (emphasis in original). See also USASF_00001219, at -219 ("NEW…all event producers applying to award 2017 Cheerleading Worlds Bids will only be approved as a Tier 1 who must have a minimum of 125 All Star "cheer" teams participating at the same prior year's competition to qualify for this tier.").

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

attract teams to participate in the Varsity bid event and discourage teams from participating in the rival's bid competition.[250] The aim of this strategy is to cause these rivals to fail to meet the minimum team threshold and consequently relegate these rival event producers to a probationary status. The released World bids would be available to be obtained by a new event producer, which could include Varsity or at the very least an event producer approved by Varsity through its voting power in the Sanctioning Committee.

215. Effectively, Varsity and USASF conspired to prohibit All-Star gyms from competing in rivals' events. The USASF Company Member Agreement, which applies to the Tier 3 and 4 members, states that the event producer (the "Company") will not "produce, or recruit teams for a cheerleading or dance 'World' championship event, or participate in, or sponsor a cheerleading or dance 'World' championship event conducted by a third party."[251] In addition, the anticompetitive agreement requires event producers to follow all Level 5 and 6 guidelines including restricting teams that compete at the Worlds from competing at any "year-end and multi-brand events." [252]

216. My analysis of the World bids data shows that the redistribution of USASF World paid bids based on these highly biased rules set up by Varsity has resulted in Varsity capturing a large portion of these bids to the disadvantage of rival event producers. Table 14 below shows that Varsity's share of events increases from 50% in the 2014-2015 season to 76% in the 2017-2018 season. Through acquisitions, Varsity's share of paid bids increased from 57% in the 2014-2015 season to 80% in the 2018-2019 season.

---

[250] See, e.g., USASF_00014260 (Peterson Exhibit 32).
[251] USASF_00012460 (Peterson Exhibit 22), at -464 (Number 7).
[252] See USASF_00019495 (Peterson Exhibit 17), at -517.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 14. World Bids Events Shares*

| Season | Varsity Bids | Total Bids | Varsity Bid Share | Varsity Events | Total Events | Varsity Event Share |
|--------|--------------|------------|-------------------|----------------|--------------|---------------------|
| **2014-2015** | 60 | 105 | 57.1% | 21 | 42 | 50.0% |
| **2015-2016** | 71 | 109 | 65.1% | 24 | 42 | 57.1% |
| **2016-2017** | 82 | 123 | 66.7% | 25 | 42 | 59.5% |
| **2017-2018** | 100 | 126 | 79.4% | 32 | 42 | 76.2% |
| **2018-2019** | 101 | 126 | 80.2% | 32 | 42 | 76.2% |
| **2019-2020** | 102 | 127 | 80.3% | 32 | 42 | 76.2% |

Sources: USASF_00002776; USASF_00002779; USASF_00002782; USASF_00002785; USASF_00052537; USASF_00084806.
Notes: The bids reported in the table are the number of paid bids. The number of at-large bids equals, by rule, two times the number of paid bids. A Tier 1 event is the same as a World bids event, namely an event in which bids to USASF Worlds championships are awarded. There was a total of 42 Tier 1 events.

217. According to the USASF, only 15-20 percent of Level 6 and 7 teams do not receive a bid for the end-of-year World cheer championships.[253] As Varsity has the vast majority of USASF bid events, this suggests that a large portion of all participants are increasingly dependent on Varsity events to receive bids to the World championship.

218. Varsity used and continues to use these membership "guidelines" to re-position its competitions to disadvantage its rivals and foreclose competition.[254]

### VI.C.1.b)   *Varsity's Use of Bundled Loyalty Programs to Diminish Competition and Foreclosure Rivals*

219. In addition, Varsity uses bundled loyalty programs to incentivize gyms to attend Varsity events rather than competitors' events, and to attend a greater absolute number of Varsity events, through its use of the Varsity Family Plan and Varsity Network programs. The more events a gym attended, combined with the more dollars the gym spent on Varsity-related products—competition, apparel, camps—the more of a rebate the gym would receive.[255] By conditioning these rebates on the number of Varsity events and the total dollar spend on all

---

[253] Deposition of Steve Peterson, March 9, 2022, at 57:19-24.

[254] USASF_00084334 (Stangle Exhibit 20), at -336. See also USASF_00020227 (Peterson Exhibit 25); USASF_00020257 (Peterson Exhibit 26); USASF_00020387 (Peterson Exhibit 27); USASF_00020397 (Peterson Exhibit 28); USASF_00002366 (Peterson Exhibit 29), USASF_00021714 (Peterson Exhibit 31), USASF_00001296 (Peterson Exhibit 39); USASF_00017975 (Peterson Exhibit 40); VAR00239326 (Elza Exhibit 10); VAR00095101, at -101.

[255] VAR00324110, at -110 (email from Tres LeTard to John Newby dated April 23, 2014, on the Family Plan: "over the past two seasons, we've adjusted the reward scale to encourage customers to attend additional events within the season. Now teams must attend 6+ events to earn what they used to be able to with only 4 events.").

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Varsity products, Varsity created very large incremental incentives for gyms to switch from a non-Varsity event to a Varsity event, and to choose a Varsity event over a rival's event for its incremental event choices.[256] This excluded rivals and foreclosed competition.

220. Moreover, these programs were designed to encourage cross-selling of fashion and events and increase overall spending on Varsity product.[257] Effectively this was accomplished by implementing a rebate program with which smaller rivals without monopoly power in multiple product markets could not compete. The Varsity Network agreement, the more aggressive version of the Varsity Family Plan, required the member (All-Star gym) to exclusively purchase and ensure that the member's All-Star team customers would exclusively wear uniforms and shoes should by Varsity Spirit Fashions ("VSF") and/or Varsity All-Star Fashion ("VASF").[258] In addition, VSF would have the first right of refusal on manufactured/custom practice wear (excluding t-shirts) and warmup orders. The Network agreement also required members to attend a certain number of events and buy a certain amount of Varsity apparel.[259] These rebates provided funds to a gym, particularly in the off-season, and acted to lock in gyms to prefer or attend only Varsity events. Gyms became more reliant on rebates over time.[260] Varsity set the minimum number of Varsity events to receive

---

[256] Ho, Katherine, Justin Ho, and Julie Holland Mortimer. "The use of full-line forcing contracts in the video rental industry." American Economic Review 102:2, 686-719 (2012); Bernheim, B. Douglas, and Randal Heeb, "A framework for the economic analysis of exclusionary conduct," The Oxford Handbook of International Antitrust Economics, Vol. 2 (2014): 3-39; O'Brien, Daniel P., and Greg Shaffer. "Vertical control with bilateral contracts." The RAND Journal of Economics 23:3, 299-308 (1992); Schwartz, Marius, and Daniel R. Vincent. "The no surcharge rule and card user rebates: Vertical control by a payment network." Review of Network Economics 5:1, 72-102 (2006); Greenlee, Patrick, David Reitman, and David S. Sibley. "An antitrust analysis of bundled loyalty discounts." International Journal of Industrial Organization 26:5, 1132-1152 (2008). In the economics literature, these potentially anticompetitive contracts are known under a variety of names, including "quantity-forcing contracts," "first-dollar discounts," "all-units discounts," and more generally "loyalty discounts." Such contracts are particularly likely to be anticompetitive when, as in this case, the amount of the discount or rebate depends upon the amount spent on a bundle of products, including some that competitive rivals may not offer.

[257] VAR00310631, at -664. See also VAR00241726 (Email from Scott Foster to Brian Elza on February 5, 2018: "My Allstar numbers in Greenville have been shrinking. I can't agree to a $250,000 spending amount. I have no idea how big my program will be in the next year or 3 years from now. I don't want to agree to shoes, uniforms and all of this and get no rebate if my gym is too small to support that. I would be ok with $200,000 or higher. Obviously I'm going to force as much spending possible to get the rebate. No problem").

[258] Deposition of Brian Elza, November 16, 2021, at 206:10-22. See also VAR00081049, at -049 ("VSF/VASF Dealing").

[259] Ibid.

[260] VAR00182095 (Parrish Exhibit 8), at -095-096 (email from Jamie Parrish to Brian Elza, Tina Sexton, Jeff Fowlkes, and Tres LeTard dated August 14, 2019: "We will never have the image and support on social media we want, until we turn our customers into brand ambassadors. What We Know. No other sport, not even one,

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

a rebate at five and increased it to six in the 2016-2017 season.[261] This effectively locked gyms into attending few if any non-Varsity events for risk of losing access to this rebate money.

221. Unlike more conventional loyalty plans, these rebates have a particularly pernicious anticompetitive effect with respect to the expenditures of participants and their parents. The gyms make the decisions about which events (and how many events) to attend, and which uniforms teams will wear, but the participants typically pay for the entry fees and uniform costs. The season is over and after those expenditures have been made by the participants, the gyms receive large rebates if they chose Varsity events, apparel, and camps. It does not appear that gyms refund the money that is rebated to them by Varsity back to participants.[262]

222. Loyalty programs that are structured as conditional rebates have anticompetitive consequences. These contracts typically set a discount conditional on meeting some pre-established threshold, e.g., share of buyer's requirements, revenue levels, or quantity levels to qualify for the discount. In this matter, Varsity introduced the Varsity Family Plan in 2007. Rebates were conditioned on a gym meeting prescribed Varsity dollar purchases targets and attending a threshold number of competitions. The rebates originally were in the form of cash. In the 2018-2019 season, Varsity changed the rebate program to raise the both the dollar purchases and number of attended events thresholds.[263]  In addition, the program has been modified to provide 65% of the rebate in the form of cash and the remaining 35% in the form of an apparel credit or "Varsity Fashion Dollars."[264] An additional 10% Varsity Fashion Dollars rewards could be earned on all uniform and accessory purchases.[265] Only actual All-Star registration fees are credited along with apparel and camps. Hotels, transportation,

---

has rebate plans like Varsity/All Star cheer. Pros: We can keep them coming back for the Family Plan crack. Cons: Sooner or later, crack ho's turn on their pimp wanting more crack, better crack, and for less output. How we fix this? Blame it on Posh, or fake a survey, let me explain – Option One – Casually Threaten Via Verbal Campaign. My suggestion is that we develop talking points that basically threaten the cheer community without threatening them. Talking points for our brand managers, and Memphis staff: 'Man, the higher ups keep seeing all this negativity on social about Varsity and they don't see the benefit of the Family Plan anymore. They think that is must somehow [sic] be having the 'reverse' effect than they intended it to have. It really sucks, because if the gym owners don't stop blaming Varsity for everything, they (the higher up's) think that we are damned if we do, and damned if we don't. And if that is the case, they say why even both with a Family Plan, because they are still gonna' blame 'The Monopoly' for everything bad anyway.").

[261] VAR00101110 (LeTard Exhibit 8), at -119.
[262] See the discussion at ¶222.
[263] VAR00097495 (LeTard Exhibit 17), at -515.
[264] VAR00078751 (Elza Exhibit 15), at -758.
[265] Ibid.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

theme park/sporting event tickets, etc., are not included towards revenue/spend thresholds. Payment of a significant portion of the rebate as a credit toward future purchases also serves to lock in Varsity customers and foreclose rivals, since if the gym switches to a rival apparel source, it loses those unspent credits.

223. Another loyalty plan, Varsity Network, is a contractual agreement with event and fashion requirements. This program is offered only to the largest gyms. To receive a rebate, the gym must attend at least a minimum number of Varsity events and spend a minimum of dollar amount with Varsity. In 2016-17, the minimum number of Varsity events was eight and customers were required to purchase from at least three Varsity Cheer apparel product categories: uniforms, shoes, and a third product category of the member's choice (warmups, camp wear, lettering, or accessories).[266]

224. Discounting is usually procompetitive because it reduces the price to consumers. However, when a monopolist conditions the availability or amount of its discount on reaching large purchase quantity thresholds, as Varsity does by requiring that its customers attend a minimum number of Varsity events, this discounting scheme becomes highly coercive and exclusionary. This anticompetitive effect is amplified when the monopolist conditions the amount of the rebates on purchases in multiple product categories, as Varsity does by giving its rebates on the total amount of purchases across Varsity apparel, camps, and events. The resulting rebate scheme has a strong propensity to foreclose rival's ability to compete against the monopolist. The rebates are awarded for (or discounts applied to) incremental sales, but the amount of the rebate or discount depends upon total expenditures. This has a "high-powered" effect of lowering the effective incremental price a lot without necessarily lowering the overall price by nearly as much, if at all. In addition, the monopolist's undiscounted price is likely to be much higher than it would normally be without the anticompetitive rebate scheme. In addition, this program has the effect of making the rival competitors make large incremental price concessions to compete, which tends to weaken those rivals that are smaller than the monopolist. [267]

---

[266] VAR00097495 (LeTard Exhibit 17), at -515.
[267] VAR00079196 (Jim Hill Exhibit 16); See also Deposition of Jim Hill, March 21, 2022, at 84:18 – 86:5, 179:5 – 180:21, 183:24- 184:17 ("The intent was to kind of create more customer loyalty from the Family Plan without as much of a financial commitment from Varsity.") See also Deposition of Brian Elza, November 16, 2021, at 56:9 - 57:18.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

225. Finally, this arrangement may also lead to an overconsumption of a Varsity's products, relative to the volumes that parents and participants would have chosen based on average prices. This has the effect of extracting consumer surplus from the participants' families, and diverting to the monopolist, relative to what would have resulted from more conventional discounts such as a simple percentage discount on each purchase. I have seen no evidence that any portion of the rebate was reimbursed to, or shared with, the indirect purchasers, i.e., participants or their family. On the contrary, Varsity's own testimony and documents suggest that the rebates were not shared.[268]

226. Varsity also linked its participation in its events with participation in its summer camps. The Varsity Spirit/NFHS ("National Federation of High School") credentialing program, which was created in collaboration with the National Federation, required teams participating at NCA and UCA's school National Championships to attend any two-day or longer Varsity camps in the summer. Teams could attend local NCA or UCA competitions without attending the Varsity camps but would not be eligible to receive a bid to nationals.[269] At least 75% of members competing must have completed Squad Credentialing.[270]

### VI.C.1.c)   *Varsity's Acquisition of Rivals to Eliminate or Diminish Competition*

227. In furtherance of Defendants' scheme to enhance Varsity's market power to raise prices, and hence, total expenditures from indirect purchasers of competitive cheer events, apparel, and camps, Varsity engaged in a long-term strategy to acquire its closest rivals and other nascent competitors to diminish competition in the relevant markets. The overall rationale for this acquisition strategy was to grow Varsity's market share and leverage synergies as all of these rivals were in the same market of Varsity All-Star event providers. These transactions were "primarily driven by entering into a new geographic area and/or acquiring strategic

---

[268] VAR00177295 (Elza Exhibit 25), at -295-296; Deposition of Brian Elza, November 16, 2021, at 216:8-14; 259:10-23 (re press release announcing rebates to gym owners and coaches not shared with parents); 318:7-15 (decision not to widely advertise rebate program so that parents would be wondering where their share of rebates were); 349:9-13 (rebates could be over $200,000 but not shared with parents); Deposition of John Newby, March 23, 2022, 363:7-363:23 ("Q: And was it true that Varsity decided not to disclose that because they didn't want the parents, or the customers of the gyms, to know how much the gyms had received in the form of a rebate? A: I think the reason was we were providing this rebate back to the gyms, you know, per their agreement with us, and they're a private entity; and if they wanted to disclose that, they could, but I don't think it would be our place to disclose that."); 365:5-15 ("Our customers are parents, athletes, gym owners, coaches that attend our events" "To my knowledge, we weren't providing rebates to parents.").

[269] VAR00160802 (Duhon Exhibit 5), at -802.

[270] VAR00160803, at -803.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

events."[271]

228. Varsity's primary strategy of growth has been through acquisitions.[272] In the early 2000s, Varsity started an acquisition strategy to gain market power in the All-Star market by acquiring the National Spirit Group and the NCA brand.[273] Varsity identifies new cheer event producer acquisitions for incremental growth opportunities.[274] Since 2012, Varsity's primary ongoing market development strategy has been to "attack" product categories within segments to "take away market share and revenues from them".[275]

229. A 2014 Varsity meeting agenda identified its competitors in the cheer events. These included (1) JamBrands, (2) EPIC, (3) Aloha, (4) Spirit Celebration, (5) Champion (aka Jam Spirit Group), (6) Cheer America, (7) Spirit Unlimited, (8) JAMZ, (9) WSA, and (10) about 90 other event producers running multiple competitions.[276]

230. The brands that Varsity has targeted are historically their "largest, most established and highest profit events."[277] By 2019, Varsity had acquired seven of the largest All-Star cheer competition companies (JamBrands, EPIC, Aloha, Spirit Celebrations, Champion, Mardi Gras Spirit, and All Things Cheer) and had consolidated these brands into a business unit called Varsity All-Star, which now holds the largest share in the All-Star market.[278] Through these strategic acquisitions, Varsity's market share in the All-Star market has grown from 42% to over 70%.[279] Varsity's strategy after acquisition has been to maintain the brand's existing name, rather than converting to a "Varsity" brand. Varsity targets key regional competitors that have brand recognition in the marketplace and brand loyalty from customers.[280]

231. Table 15 below summarizes Varsity's acquisitions of competing event producers since 2014.

---

[271] VAR00415063, at -064.
[272] See, e.g., VAR00129038 and VAR00129039.
[273] VAR00073336, at -337.
[274] VAR00009293, at -301.
[275] VAR00346980, at -986; VAR00102784, at -784.
[276] VAR00341580, at -581.
[277] VAR00009293, at -325.
[278] VAR00346980, at -986.
[279] VAR00101102, FEAS-ARES00066909. See also Table 11 and Table 14.
[280] VAR00009323 (Seely Exhibit 17), at -325.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 15. Varsity Acquisitions Summary*

| Acquisition | Brands | Acquisition Date | US Events | World Bid Events | Yearly Revenue | Cash Purchase Price |
|---|---|---|---|---|---|---|
| Cheer Ltd.[1] | CL | June 20, 2014 | 25+ | 1 | $ 1,000,000 | $ - |
| JamBrands[2] | JAMfest, COA, America's Best, Coastal, GLCC, Live!, U.S. Finals | November 02, 2015 | 100+ | 5 | $ 19,300,000 | $ 34,900,000 |
| Aloha[3] | Aloha Spirit, GSSA, MAC | December 15, 2016 | 30 | 3 | $ 2,440,000 | $ 3,250,000 |
| Spirit Celebration[4] | SCB | February 28, 2017 | 13 | 1 | $ 2,200,000 | $ 2,100,000 |
| All Things Cheer[5] | ATC | April 21, 2017 | 4 | 1 | $ 1,200,000 | $ 160,000 |
| Jam Spirit Group[6] | CSG, Team Champion | November 15, 2017 | 30 | 2 | $ 1,900,000 | $ 1,400,000 |
| Mardi Gras Spirit[7] | MGS | December 01, 2017 | 12 | 1 | $ 899,000 | $ 750,000 |
| Epic Brand[8] | EPIC, Spirit Unlimited, American Cheer, Champion Cheer | January 19, 2018 | 70+ | 2 | $ 7,900,000 | $ 12,900,000 |

Sources: 1 - VAR00009293, at -361; 2 - VAR00415063, VAR00009293, at -361; 3 - VAR00083645, VAR00009293, at -361; 4 - VAR00017827, VAR00009293, at -361; 5 - VAR00128725, VAR00009293, at -361; 6 - VAR00081770, VAR00009293, at -361; 7 - VAR00017807, VAR00009293, at -361; and 8 - VAR00076749, VAR00009293, at -361.

232.  Varsity's acquisitions of competing event producers included the acquisition of "signature" (World bids) events. Table 16 below lists the World bids events acquired by Varsity since 2014.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 16. World Bid Events Acquired by Varsity*

| Acquired Event Producer | Number of World Bids Events | World Bid Events | | | | |
|---|---|---|---|---|---|---|
| **Cheer Ltd. (CL)** | 1 | Cheer Ltd Nationals at CANAM (Myrtle Beach, SC) | | | | |
| **JamBrands (JF)** | 5 | JAMfest - Cheer Super Nationals (Indianapolis, IN) | COA - Midwest National Championship (Columbus, OH) | Coastal - Battle at the Capitol (National Harbour, MD) | America's Best - National Championship (Kansas City, MO) | GLCC - The Showdown Grand Nationals (Schaumburg, IL) |
| **Aloha Productions (ALO)** | 3 | Mid Atlantic Championships (Richmond, NJ) | GSSA Championships (Bankersfield, CA) | Aloha Spirit Championships (Phoenix, AZ) | | |
| **Spirit Celebration Brands (SCB)** | 1 | Spirit Celebration Christmas Classic (Dallas, TX) | | | | |
| **All Things Cheer (ATC)** | 1 | ATC International Championship DI & DII (Bellevue, WA) | | | | |
| **Champion Spirit Group (CSG)** | 1 | CSG Super Nationals (Schaumburg, IL) | | | | |
| **Mardi Gras Spirit (MGS)** | 1 | MG Extravaganza National (New Orleans, LA) | | | | |
| **The Epic Brands (EPIC)** | 2 | Battle at the Boardwalk Nationals (Atlantic City, NJ) | Reach the Beach All Star Nationals (Ocean City, MD) | | | |

Sources: VAR00352218-25; USASF_00002776; USASF_00002779; USASF_00002782; USASF_00002785; USASF_00052537; USASF_00084806.

233.  I provide a brief description of each of these key acquisitions below, including Varsity's

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

stated strategic rationale for the transaction. The date of the acquisition of each brand is given in parentheses beside the brand name.

### JamBrands (2015)

234. JamBrands Inc. was based in Louisville, KY. It offered over 100 high quality cheer and dance competitions annually via seven different event brands. It was a key competitor of Varsity in that it offered five "signature" (World bids) events which, according to Varsity, had "significant competitive advantages in the All-Star competition space."[281] JamBrands also held a 70% interest in The US Finals, a popular end-of-season championship.[282] Varsity described its strategic value as an immediate expansion of its market share, particularly in the Midwest and Northeast, and as securing a unified presence within the USASF. Other sources of strategic value identified were (1) building on JamBrands current international presence and developing US Finals beyond The Summit's season-ending event opportunity.

235. Varsity also identified financial value creation from the JamBrands acquisition. Varsity indicated it would eliminate or merge 40 Varsity and JamBrands events to increase its EBITDA. It noted that the majority of JamBrands events did not charge spectator admissions. Moreover, it would be able to grow "signature" high margin events by removing surrounding events and expand offerings, e.g., Summit Bids and Varsity Family Plan. Varsity further stated that "with the acquisition of a strong competitor, we should be able to increase operating margins through resources utilization, best practices, and operational synergies", such as its Varsity Family Plan, reducing selling expense, shared production resources and personnel consolidation. In addition, the terms of the transaction included a five-year non-compete agreement for shareholders and employment contracts for key management. Many of these synergies can be termed pro-competitive while others are a means of furthering Varsity's market power and exclusionary scheme to diminish competition or foreclose its closest rivals.[283]

### Aloha Productions (2016)

236. Aloha Productions was based in Philomath, OR. It offered three different event brands and

---

[281] The five "signature" bid-qualifying event producers that are under the JamBrands group are: JAMfest, COA, America's Best, Coastal Corporation, and GLCC. See Wikipedia, "The JAM Brands," accessed June 3, 2022, available at: https://yamm.finance/wiki/The_JAM_Brands.html

[282] VAR00415063, at -064.

[283] VAR00415063, at -065.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

around 30 annual high-quality cheer and dance competitions throughout 11 states. Aloha's portfolio included three "signature" or World bid events which, as described by Varsity, "have significant competitive advantages in the All-Star competition space."[284] In addition, Aloha Productions had recently acquired Mid-Atlantic Cheer Company, which Varsity saw as a "tremendous" opportunity to increase Varsity's presence in the Mid-Atlantic area where Varsity had relatively more competitors.[285]

237. Varsity described Aloha as a leader in competitive cheer, particularly on the West Coast, and that "the majority of customers on the West Coast split their spending between Varsity and Aloha."[286] The acquisition would increase Varsity's event presence on the West Coast from 40 to 62 events. Varsity described the strategic value of acquiring Aloha Productions as (1) an immediate increase in market share, particularly on the West Coast, (2) newly acquired World bid events, and (3) the opportunity to consolidate Aloha's competing Cali Finale with Varsity's U.S. Finals and The Summit to increase overall profitability.[287] In addition, Varsity described Aloha's price point as significantly lower than Varsity's events in the same market, which presented an opportunity for Varsity to execute "responsible" price increases.[288]

238. Similar to the JamBrands acquisition, Varsity found significant potential to increase its margins by acquiring Aloha Productions. Varsity described Aloha's current price point as "value" pricing with opportunity for price optimization. A further potential existed with the three World bid events to double them in size over two years via Summit Bids and the Varsity Family Plan. In addition, given its overlap geographically with Aloha events, Varsity foresaw opportunities to reduce selling expenses, production costs, and logistics.[289]

239. Also similar to JamBrands, the transaction terms included a three-year non-compete for shareholders and am 18-month non-compete for key management who were offered three-year employment agreements with Varsity.[290]

---

[284] VAR00415063, at -066. See also VAR00128718. The three "signature" bid-qualifying event producers that are under Aloha Productions are: Mid-Atlantic Cheer, GSSA, and Aloha. See Everything Cheer Magazine, "Aloha Productions Merges with Varsity Spirit," accessed on June 3, 2022, available at: http://everythingcheermagazine.com/article/aloha-productions-merges-with-varsity-spirit/
[285] VAR00415063, at -066.
[286] Ibid.
[287] Ibid.
[288] VAR00128718, at -720.
[289] VAR00415063, at -066.
[290] VAR00128718, at -722.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

240. Varsity projected a 10% organic growth from ticket prices, registration price, data adjustments, and increased attendance in the first year following the acquisition and an increase in EBITDA in the second year from increased pricing, sales efforts, and improved event planning.[291]

241. As described above, Varsity and Aloha were each other's closest competitors with participants splitting their activities between the two event producers.

**Mardi Gras Nationals, Inc. (2017)**

242. Mardi Gras Nationals, Inc., based in New Orleans, offered 12 cheer and dance competitions throughout the Eastern United States. Its portfolio of events includes one World bid event in New Orleans. At the time of the acquisition, Varsity did not have a World bid event in the Mid-South geographic area, nor did it have many events in the area.[292]

243. As with other acquisitions, the Mardi Gras provided Varsity with the opportunity to "price optimize" certain of Mardi Gras' "value" priced events and to grow "signature" high margin events and margins using such mechanisms as Summit Bids and Varsity Family Plan. Varsity financial projections included increasing prices with the 2018-2019 season and driving event growth via Summit and The U.S. Finals bids and Varsity Family Plan.[293] Mardi Gras' owner was offered a one-year contract with a three-year non-compete as part of the transaction's terms.[294]

**Spirit Celebration (2017)**

244. Spirit Celebration, headquartered in Dallas, TX, offered 13 high quality cheer and dance competitions annually primarily in Texas. Its portfolio includes one World bid event in Dallas as well as a "signature" event at AT&T stadium and a yearend event called The Title in Dallas.[295] Spirit Celebration's owner was a Board member and key spokesperson for the Independent Event Producers ("IEP").[296]

245. Varsity viewed Texas and the Southwest as an attractive market. Similar to Aloha on the West Coast, Varsity saw customers splitting their spending between Varsity and Spirit Celebration. Varsity also saw the owner as a leader of Independent Event Producers who had

---

[291] Ibid.
[292] VAR00415063, at -073.
[293] VAR00017807, at -807, -809.
[294] VAR00415063, at -073.
[295] Id., at -068.
[296] Ibid.

85

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

helped build competitor's business.[297] Also similar to Aloha, Varsity perceived Spirit Celebration events as "value" pricing with an upside revenue opportunity for "price optimization", i.e., price increases at specific events. It also saw opportunity to grow "signature" high margin events, e.g., World bid events, and double the margin via mechanisms such as Summit bids and Varsity Family Plan. Additional margin enhancing benefits included opportunities to reduce selling expenses, production costs, and logistics. Financials projections assumed increasing prices in 2018.[298] As with Aloha, Varsity offered key management employment contracts with three-year non-competes.[299]

### Jam Spirit Group (2017)

246.  Jam Spirit Group, Inc., (dba Team Champion) was based in Chicago, IL and offered 30 cheer and dance competitions in the Midwest. Its portfolio included two Worlds bid events. Varsity indicated in its rationale for the transaction that it had struggled to gain traction in the greater Chicago area, and it had no World bid events in that area. In addition, Varsity noted that Jam Spirit was first-in-line for the next World bid event if an existing event producer failed to meet the minimum event requirements and acquiring Jam Spirit would potentially enable Varsity to offer another World bid event at no additional cost in the future.[300]

247.  Varsity also saw opportunities with the Jam Spirit acquisition to immediately increase market share in a geographic area where it had struggled and to prevent other event producers from expanding into the World bid market.[301] Opportunities also existed to increase prices at Jam Spirit's lower-priced events, to grow "signature" high-margin events, and to double margins through Summit bids and Varsity Family Plans.[302] Similar to other acquisitions, Varsity offered one-year employment contracts for key management which included three-year non-competes.[303]

### All Things Cheer & Dance (2017)

248.  All Things Cheer & Dance ("ATC"), based in Phoenix, AZ, encompassed All-Star cheer competitions, choreography, and All-Star skill camps. It also offered choreography and skill camps to other All-Star gyms. ATC's operations were focused on the West Coast with

---

[297] VAR00017827, at -829.
[298] Ibid.
[299] VAR00415063, at -069.
[300] VAR00415063, at -072.
[301] VAR00081770, at -772.
[302] VAR00081661, at -614, -616.
[303] VAR00415063, at -072.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

international operations in Canada and Australia. The acquisition of ATC provided Varsity with two additional World bid events in the Pacific Northwest and Canada, which would advance Varsity's Canadian expansion and increase Varsity's presence in the Pacific Northwest, which Varsity viewed as underserved. Like its other acquisitions, Varsity viewed the ATC acquisition as providing an immediate increase in market share in the Pacific Northwest and an opportunity to increase pricing via "price optimization" at specific events where Varsity viewed as "value" pricing. It also saw opportunities to grow "signature" high margin events by leveraging Varsity brand and Summit bids. Additional cost synergies were recognized. Like other acquisitions, key management personnel were offered employment contracts with three-year non-competes.[304]

**EPIC (2018)**

249. EPIC, based near Baltimore, MD, included not only events and camps (EPIC Spirit Ventures) but also apparel (EPIC Gear). In addition, EPIC had two existing World bids. EPIC was viewed by Varsity as a more scaled-down, affordable event offering, and this price point would provide Varsity access to the value customer segment and opportunity to grow the business.[305]

250. EPIC held a majority of the non-Varsity-owned stake in The U.S. Finals (Varsity acquired JamBrands' 70% ownership stake in 2015). EPIC had 75% of the remaining interest (22.5% of the total share), so the acquisition would give Varsity a controlling 92.5% overall ownership share of The U.S. Finals. Americacheer held the remaining 7.5% share of The U.S. Finals. Varsity indicated that its goal was to acquire the entire ownership of The U.S. Finals, because having full ownership would enable Varsity to offer two distinct year-end event options for different customer segments.[306]

### VI.C.2.    *Anticompetitive Effects of Varsity's Acquisition Scheme*

251. Varsity's strategic rationale for these acquisitions is consistent across transactions. The rationale was: (1) immediate expansion of market share, (2) price optimization, (3) acquire World bids, (4) grow financial value through acquiring high margin events via the use of Summit bids and the Varsity Family Plan, and (5) expand customer base and increase

---

[304] VAR00415063, at -070-071. See also VAR00369554 and VAR00128725.
[305] VAR00415063, at -076.
[306] Ibid.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

retention of non-Varsity customers.

252. As described earlier (see Table 14), Varsity's acquisition of key competitors has significantly increased its market share of cheer events from 50% prior to the 2015-2016 season to 76% at the end of the 2017-2018 season. Although antitrust economists as well as courts disagree as to a critical market share whereby a firm becomes sufficiently dominate to exercise unilateral market power, most agree that markets with leading firm market shares below 30-40% are considered "unconcentrated" and unlikely to generate concerns about unilateral market power.[307]

253. Data produced by Varsity and the USASF during discovery show that Varsity increased its market share of USASF cheer competition events from 55% in the 2011-2012 season to 76% in the 2018-2019 season. Its share of brands increased from 25% in the 2011-2012 season to 50% in the 2018-2019 season.[308] These shares are sufficient to show a presumption of concern about market power.

254. Table 17 below shows the incremental increase in Varsity's market share with acquisitions in the 2015-2016 season through the 2017-2018 season. The analysis is based on a count of the Varsity-owned cheer events calculated from Varsity's registrations data relative to the total number of USASF sanctioned events. Since there is no available data on competitor event counts and competitor market shares, I compute the minimum value for the HHI concentration index based only on Varsity's shares. For example, if Varsity's market share equals 40%, then the minimum HHI is 1,600 (Varsity's market share squared).

---

[307] ABA Section of Antitrust Law, Market Power Handbook (2005), Chapter V.B.
[308] USASF_00002776; USASF_00002779; USASF_00002782; USASF_00002785; USASF_00052537; USASF_00084806.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 17. Event Market Share, HHI, and Change in HHI by Season and Acquisition*

|  |  | Varsity Share | Minimum HHI / Change in HHI | DOJ/FTC Merger Guidelines |
|---|---|---|---|---|
| 2015-2016 |  |  |  |  |
|  | Beginning of Season | 34.1% | 1,233 |  |
|  | JF | 8.3% |  |  |
|  | End of Season | 42.4% | 1,798 | Moderately Concentrated Market |
|  | Change in HHI |  | 565 | Potentially raises significant competitive concerns |
| 2016-2017 |  |  |  |  |
|  | Beginning of Season | 36.4% | 1,329 |  |
|  | ALO | 1.7% |  |  |
|  | SCB | 1.1% |  |  |
|  | ATC | 0.5% |  |  |
|  | End of Season | 39.7% | 1,575 | Moderately Concentrated Market |
|  | Change in HHI |  | 245 | Potentially raises significant competitive concerns |
| 2017-2018 |  |  |  |  |
|  | Beginning of Season | 46.0% | 2,186 |  |
|  | CSG | 1.1% |  |  |
|  | MGS | 0.7% |  |  |
|  | EPIC | 8.4% |  |  |
|  | End of Season | 56.2% | 3,158 | Highly Concentrated Market |
|  | Change in HHI |  | 972 | Presumed to be likely to enhance market power |
| 2018-2019 |  |  |  |  |
|  | Beginning/End of Season | 63.6% | 4,048 |  |

Sources: VAR00352218-25; VAR00010122-27; VAR00352199-202; U.S. Department of Justice and Federal Trade Commission, "Horizontal Merger Guidelines," Issued: August 19, 2010, at §5.3.

255. Table 17 above demonstrates a presumption of anticompetitive harm from Varsity's acquisitions in the 2017-2018 season and potentially also in the 2015-2016 and the 2016-2017 seasons. In the 2017-2018 season, the post-acquisition HHI was *at least* 3,131, which exceeds the DOJ/FTC threshold for a "Highly Concentrated Market," and the change in HHI equaled 967, which exceeded by a factor of four the threshold of 200 points beyond which the "increase in the HHI of more than 200 points will be presumed to be likely to enhance market power."[309] In both the 2015-2016 and 2016-2017 seasons, the post-acquisition HHI was *at least* 1,777 and 1,558, respectively, which exceeds the DOJ/FTC threshold for a "Moderately Concentrated Market," and the change in HHI equaled 561 and 244, respectively, which exceeded by a factor of five and two, respectively, the threshold of 100

---

[309] U.S. Department of Justice and Federal Trade Commission, "Horizontal Merger Guidelines," Issued: August 19, 2010, at §5.3.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

points beyond which the "increase in the HHI of more than 100 points potentially raise significant competitive concerns and often warrant scrutiny."[310]

256. From a perspective of competition economics, higher market shares typically provide firms with the ability to increase profits above competitive levels by strategically raising prices. Firms with larger market shares can obtain the benefits of an anticompetitive price increase on a larger fraction of their sales.[311] This does not suggest that firms with market power will increase prices across all sales, but a larger market share provides the firm the ability to strategically price discriminate in raising prices to capture greater overall profits without fear that a response from competitors will dissipate these profit gains. Varsity's stated strategic objective was to optimize prices post-acquisition by raising prices at specific events, such as those that Varsity considered to be currently "value-priced" below optimal levels and events that offered World bids that were more valuable to participants. Implicit in Varsity's strategy is the realization that participants already view competitive cheer as expensive. Varsity's acquisition of its closest rivals permitted Varsity to increase prices more easily without the fear of losing customers to its rivals (whose number is now diminished).

257. A critical factor in advancing Varsity's anticompetitive scheme to extract supracompetitive profits from indirect purchasers was to acquire competitors that had World bids. Not all cheer events are created equal. Events in which teams competed for World bids were more prestigious and more valuable to participants.[312] One of Varsity's 2017 core business strategy initiatives was to "[a]cquire regional competition competitors with strategic assets (World's Bids, geographic strength)" and identified candidates meeting that objective, including EPIC, Spirit Celebration, and ATC.[313]

258. A key part of Varsity's M&A strategy for All-Star events was to acquire Tier 1 event competitors.[314] The USASF set a maximum number of 42 Worlds bid qualifying events in

---

[310] U.S. Department of Justice and Federal Trade Commission, "Horizontal Merger Guidelines," Issued: August 19, 2010, at §5.3.

[311] ABA Section of Antitrust Law, Market Power Handbook (2005), Chapter V.B.

[312] VAR00009293, at -325 ("the world bids are attached to brand names and those are protected geographically and by date ranges; these events are historically our largest, most established and highest profit events").

[313] VAR00272785, at -787.

[314] VAR00310631, at -664. (M&A strategy for All-Star events was to acquire Tier 1 event companies. "Typical players are mostly regional event companies who have deep ties into their specific markets. We look to acquire all the Tier 1 event companies (brands such as American Championships, Athletic Championships) that give bids to the cheerleading and dance Worlds").

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

the United States. That maximum has remained the same at least since 2015.[315] Events that offered World bids were important in that Varsity could charge more for these events that were considered more prestigious and desirable, and therefore, had an incentive to acquire these event producers, and hence, the producer's bid event.[316] As discussed above, the strategic rationale for each of the transactions included recognition that the event producer had a certain number of World bids.[317]

259. The strategy also included eliminating events after acquiring a competitor in order to raise prices.[318]

260. There are a maximum of 42 World bid events, and the particular event at which bids are offered can change each year with the approval of the Sanctioning Committee, whose voting seats correspond to the 42 event producers currently hosting World bid events.[319] The criteria for the bid event was based on (1) the date the event producer became a member of the USASF, (2) the location of the competition at which the member desires to give bids, (3) the number of bids being given by other companies in that market, and (4) the date of the bid qualifying event.[320] By controlling a majority of World bid events, Varsity could effectively control decisions affecting its competitors, such as the location and timing of competitors' bid events. Varsity used its power over these date and location decisions to competitively disadvantage its rivals to make it more difficult for a competitor to meet the minimum number of All-Star teams threshold (increased from 100 to 125 in the 2016-2017) to remain

---

[315] See USASF_00084334 (Stangle Exhibit 20), at -335.

[316] VAR00084758, at -758 (email from Rhett Lewis to Tres LeTard dated February 21, 2019: "On the pricing side, if we add bids to an event, it makes it easier to raise the price. If we drop bids, it will be hard to increase price.").

[317] VAR00415063, at -064 ("Included in their portfolio of events are 5 'signature' (World Bid) events which have significant competitive advantages in the All Star competition space"), -066, -068, -070, -072-074; VAR00083645, at -645; VAR00017827, at -827; VAR00128725, at -725; VAR00081770, at -770; VAR00017807, at -807; VAR00076749, at -752 ("2 existing World Bids should have ability to see rapid growth starting in 2019 season.").

[318] VAR00314914, at -914 ("Strategic Initiatives" for "Varsity All Star" include "identify and target attack events to gain market share from key competitors."); VAR00255570 (Parrish Exhibit 9), at -576, -577 ("Outsider positioning statements include: if you pose a threat to Varsity, you will be acquired, and, if you have a success in the market, Varsity will, well, squish you like a bug. Industry competitors took their case to the consumer, and have been using this strategy against us over the last three years. This DOES NOT apply to Impact opportunities where we must convey "We Are Cheerleading" to corporate partners. But to coaches, kids, and parents – we must become a bit more humanized.").

[319] VAR00310631, at -664.

[320] See USASF_00084334 (Stangle Exhibit 20), at -335.

91

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

as a World bid event producer.[321] Table 14 above showed the number of World bid events that Varsity owned over time as a result of its acquisition scheme. These data indicate that by 2016, Varsity held a majority of the 42 World bid events, giving it control over the USASF Sanctioning Committee.

261. The number of bids that an event producer can award at its World bid event is based on the number of teams that the event producer had at its previous year's event.[322] Figure 4 below identifies the states that comprise each of the five USASF regions (replace with map).[323]

*Figure 4. USASF Regions in the United States*



Source: USASF_00000297, at -298 (corrected to locate OK in SW and WY in W; see
 https://www.usasf.net/regional-directors).

---

[321] USASF_00084334 (Stangle Exhibit 20), at -336. See also USASF_00020227 (Peterson Exhibit 25); USASF_00020257 (Peterson Exhibit 26); USASF_00020387 (Peterson Exhibit 27); USASF_00020397 (Peterson Exhibit 28); USASF_00002366 (Peterson Exhibit 29), USASF_00021714 (Peterson Exhibit 31), USASF_00001296 (Peterson Exhibit 39); USASF_00017975 (Peterson Exhibit 40); VAR00239326 (Elza Exhibit 10), at -326-329; VAR00095101, at -101; VAR00239326, at -326-329.

[322] Deposition of Steve Peterson, March 9, 2022, at 54:15-55:9. For every hundred teams that an event producer has at the previous-year event, it can award one paid bid, rounded up, that is 120 All-Star cheer teams results in two paid bids the next year.

[323] Regions are defined using USASF designations. USASF_00000297, at -298 (corrected to locate OK in SW and WY in W; see https://www.usasf.net/regional-directors).

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

262. Table 18 shows the total number of World bids offered by USASF and Varsity's at the regional level. The world bids event data indicate that Varsity has a significant share of bids and World bid events in each region and in total, shares sufficient to indicate a presumptive likelihood of monopoly power.

*Table 18. World Bid Event Shares by Region and Season*

Midwest Region

| Region | Season | Varsity Bids | Total Bids | Varsity Bid Share | Varsity Events | Total Events | Varsity Event Share |
|--------|--------|--------------|------------|-------------------|----------------|--------------|---------------------|
| MW | 2014-2015 | 10 | 20 | 50.0% | 4 | 9 | 44.4% |
| MW | 2015-2016 | 16 | 20 | 80.0% | 7 | 9 | 77.8% |
| MW | 2016-2017 | 19 | 24 | 79.2% | 6 | 8 | 75.0% |
| MW | 2017-2018 | 21 | 25 | 84.0% | 7 | 9 | 77.8% |
| MW | 2018-2019 | 22 | 26 | 84.6% | 7 | 9 | 77.8% |
| MW | 2019-2020 | 22 | 26 | 84.6% | 7 | 9 | 77.8% |

Northeast Region

| Region | Season | Varsity Bids | Total Bids | Varsity Bid Share | Varsity Events | Total Events | Varsity Event Share |
|--------|--------|--------------|------------|-------------------|----------------|--------------|---------------------|
| NE | 2014-2015 | 11 | 22 | 50.0% | 4 | 9 | 44.4% |
| NE | 2015-2016 | 13 | 24 | 54.2% | 4 | 9 | 44.4% |
| NE | 2016-2017 | 14 | 23 | 60.9% | 5 | 9 | 55.6% |
| NE | 2017-2018 | 20 | 24 | 83.3% | 7 | 9 | 77.8% |
| NE | 2018-2019 | 18 | 22 | 81.8% | 7 | 9 | 77.8% |
| NE | 2019-2020 | 19 | 23 | 82.6% | 7 | 9 | 77.8% |

Southeast Region

| Region | Season | Varsity Bids | Total Bids | Varsity Bid Share | Varsity Events | Total Events | Varsity Event Share |
|--------|--------|--------------|------------|-------------------|----------------|--------------|---------------------|
| SE | 2014-2015 | 19 | 24 | 79.2% | 7 | 9 | 77.8% |
| SE | 2015-2016 | 20 | 26 | 76.9% | 7 | 9 | 77.8% |
| SE | 2016-2017 | 27 | 36 | 75.0% | 7 | 10 | 70.0% |
| SE | 2017-2018 | 25 | 32 | 78.1% | 6 | 8 | 75.0% |
| SE | 2018-2019 | 26 | 33 | 78.8% | 6 | 8 | 75.0% |
| SE | 2019-2020 | 25 | 32 | 78.1% | 6 | 8 | 75.0% |

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Southwest Region

| Region | Season | Varsity Bids | Total Bids | Varsity Bid Share | Varsity Events | Total Events | Varsity Event Share |
|--------|--------|--------------|-----------|-------------------|----------------|--------------|---------------------|
| SW | 2014-2015 | 11 | 23 | 47.8% | 2 | 7 | 28.6% |
| SW | 2015-2016 | 11 | 23 | 47.8% | 2 | 7 | 28.6% |
| SW | 2016-2017 | 11 | 23 | 47.8% | 2 | 7 | 28.6% |
| SW | 2017-2018 | 19 | 26 | 73.1% | 5 | 8 | 62.5% |
| SW | 2018-2019 | 20 | 26 | 76.9% | 5 | 8 | 62.5% |
| SW | 2019-2020 | 20 | 26 | 76.9% | 5 | 8 | 62.5% |

West Region

| Region | Season | Varsity Bids | Total Bids | Varsity Bid Share | Varsity Events | Total Events | Varsity Event Share |
|--------|--------|--------------|-----------|-------------------|----------------|--------------|---------------------|
| W | 2014-2015 | 9 | 16 | 56.3% | 4 | 8 | 50.0% |
| W | 2015-2016 | 11 | 16 | 68.8% | 4 | 8 | 50.0% |
| W | 2016-2017 | 11 | 17 | 64.7% | 5 | 8 | 62.5% |
| W | 2017-2018 | 15 | 19 | 78.9% | 7 | 8 | 87.5% |
| W | 2018-2019 | 15 | 19 | 78.9% | 7 | 8 | 87.5% |
| W | 2019-2020 | 16 | 20 | 80.0% | 7 | 8 | 87.5% |

Sources: USASF_00002776; USASF_00002779; USASF_00002782; USASF_00002785; USASF_00052537; USASF_00084806; USASF_00000297, at -298.
Notes: The bids reported in the table are the number of paid bids. The number of at-large bids equals, by rule, two times the number of paid bids. A Worlds bids event is the same as a Tier 1 event. There were 42 Tier 1 events nationally.

263. Another key strategic element in Varsity's acquisition scheme was to grow financial value through acquiring high margin events via the use of Summit bids and the Varsity Family Plan. Similar to offering World bids, Varsity could also offer bids to its own Varsity end-of-year championship competition called the Summit. Again, paid bids to the Summit were highly desired by teams and therefore, attracted more teams to events that would lead to a potential Summit bid.

264. National championships are the key driver of revenue and EBITDA for Varsity each year.[324] Historically, Varsity increases participation and revenue by introducing new competition events and formats.[325] Varsity discussed its success with the coordinated strategy of manipulating post-season Summit bids and driving price increases, "in general, customers are sensitive to prices, however, we have been successful in implementing price increases at

---

[324] BAIN00000352 (Newby Exhibit 12), at -403; FEAS-Ares00075739, at -805.
[325] VAR00009293, at -334.

94

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Disney events and in our State and Local competitions…Since the introduction of the Summit, customer spend has shifted towards our more expensive events. This was strategically driven through the design of our Summit bid allocation at regular season events. We feel the market position and perceived value of the Summit will continue to protect our events from price sensitivity and allow for responsible price increases in the future."[326]

265. In addition, Varsity also incentivized gyms to attend more events through its use of the Varsity Family Plan and Varsity Network programs. As I discussed above, these rebates effectively locked gyms into attending few if any non-Varsity events for risk of losing access to this rebate money. These programs furthered Varsity's intent to expand its customer base not only in events by incentivizing All-Star gyms to attend Varsity events and purchase Varsity apparel and camps, but also incentivized gyms to remain with Varsity events over time in order to receive the rebates. Varsity Network is a similar loyalty plan is offered only to the largest gyms. As part of the Varsity Network, the gym must attend at least eight All-Star events, spend a minimum of $150,000 with Varsity, and must also purchase Varsity All-Star fashion apparel.[327]

266. These programs furthered Varsity's strategy to expand its customer base by disadvantaging Varsity rivals in competing for gyms to make non-Varsity events one of their limited number of events.

### VI.C.3.    *Varsity's Acquisition of Apparel Competitors Diminished Competition*

267. Varsity refers to itself as having the number one market position in uniforms.[328] According to Varsity, it has "[s]ignificantly larger scale than next closest competitor."[329] Varsity described its competitors as consisting of smaller regional players serving the uniform and accessories market in niche geographic areas."[330] In 2014, Varsity listed its top competitors in Cheer apparel. These included: (1) GTM, (2) GK Elite, (3) Online options, (4) Team Cheer, (5) Omni, (6) Soffe, (7) Motionwear, (8) TeamLeader, (9) Nfinity, and (10) Mee Sports. It reported that Varsity had about 60% share of uniforms and about 20% of other

---

[326] VAR00182584, at -586-587.
[327] VAR00097495 (LeTard Exhibit 17), at -515.
[328] JEFF00035010, at -076.
[329] Ibid.
[330] Ibid.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

apparel. It also identified GTM, Nfinity and Motionwear as acquisition targets.[331]

268. A 2017 Varsity All-Star core business initiative for cheer apparel included "acquire competitors with strategic products that compliment Varsity portfolio (premium product, shoes, makeup); candidates include GK Elite, Nfinity, Fancy Fact" Refers to "Halo Effect" from Varsity brand. [332]

### VI.C.4.    Diminished Cheer Camp Competition

269. Plaintiffs allege that Varsity has leveraged and continues to leverage its monopoly power in competitive cheer to enhance or maintain its monopoly power in the market for cheer camps.[333] All-Star gyms decide which camps its teams will attend. Using Varsity's Network and Varsity Family Plan programs, Varsity is able to incentivize gyms and schools to choose Varsity-sponsored camps in an effort to disadvantage Varsity's cheer camp rivals. Gyms payments for camps adds to the total payment targets that gyms need to meet in order to receive increasing rebate dollars. The more teams and athletes the gym sends to a Varsity camp, the closer the gym will be to obtaining a higher rebate, which gyms keep for themselves rather than sharing with indirect purchasers, i.e., participants or their families.[334]

270. In addition, Varsity has its own choreographers, called V!ROC, that train at its camps. These choreographers are knowledgeable about Varsity's competitions, rules, and judging procedures which may provide participants a competitive advantage in choreographing their routines to impress judges at Varsity competitions.[335]

271. Furthermore, Varsity requires school competitive cheer athletes to attend Varsity cheer camps as a mandatory prerequisite to competing in some Varsity cheer competitions. The

---

[331] VAR00341580, at -581, -582, -583. A Varsity document listed its top apparel competitors as (1) GTM, (2) GK Elite, (Team Cheer and (4) Team Leader. See JEFF00035010, at -076.

[332] VAR00272785, at -787.

[333] Complaint, at ¶¶ 156-159.

[334] VAR00177295 (Elza Exhibit 25), at -295-296; Deposition of Brian Elza, November 16, 2021, at 216:8-14; 259:10-23 (re press release announcing rebates to gym owners and coaches not shared with parents); 318:7-15 (decision not to widely advertise rebate program so that parents would be wondering where their share of rebates were); 349:9-13 (rebates could be over $200,000 but not shared with parents); Deposition of John Newby, March 23, 2022, 363:7-23 ("Q: And was it true that Varsity decided not to disclose that because they didn't want the parents, or the customers of the gyms, to know how much the gyms had received in the form of a rebate? A: I think the reason was we were providing this rebate back to the gyms, you know, per their agreement with us, and they're a private entity; and if they wanted to disclose that, they could, but I don't think it would be our place to disclose that."); 365:5-15 ("Our customers are parents, athletes, gym owners, coaches that attend our events" "To my knowledge, we weren't providing rebates to parents.").

[335] VAR00270286, at -287 (changing USASF rules to fit choreography fees).

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Squad Credentialing Program occurs at Varsity camps "that are at least two days long," and the Program is a requirement (75% of team members must have completed the Program) for teams to compete at "NCA Junior & Senior High School Nationals Championship" and "National High School Cheerleading Championship (NHSCC) with UCA."[336]

272. Varsity also provides bids to some of its national competitions at its cheer camps. According to NCA's cheer bid distribution document, camps also can distribute paid bids (gold paid bid, silver paid bid, or bronze paid bid) and at-large bids depending on the enrollment count of athletes at camps and type of camp hosted.[337] Bids are only offered at Overnight, Day, and Elite Home camps at which 8 or more participating members of a team must attend to be considered for a bid.[338] In 2016, NCA was given 10 silver and bronze bids to the D2 Summit to award at its camps.[339]

273. The anticompetitive conduct described above lends itself to common evidence of common impact. Varsity's alleged scheme to disadvantage rivals and diminish competition to achieve supracompetitive profits was not differentiated in its impact of indirect purchasers who faced higher prices and overconsumption of products and services via Varsity's acquisitions and rebate programs that benefitted Varsity and its direct purchasers. The impact of these alleged anticompetitive schemes would have common impact on parents and participants who expended money on cheer competition events, apparel, and camps regardless of location or degree of individualized purchases. But for Varsity's alleged anticompetitive conduct advanced by Varsity's monopoly power, indirect purchasers would have paid less money to participate in Varsity competitive cheer "ecosystem." As I describe below, I estimate revenues per participant at a regional level in a but-for world absent Varsity's anticompetitive conduct. These revenue estimates then can be used by Plaintiffs' damages expert to construct

---

[336] VAR00160802 (Duhon Exhibit 5),, at -802 ("The Varsity Spirit/NFHS Squad Credentialing program will be implemented at all camp types for UCA, NCA, USA, V!ROC and Premier camps this summer that are at least two days long. We feel very strongly that this program is one more way we can ensure that cheerleaders understand their role, are knowledgeable about cheerleading safety and achieve success on and off the sidelines. Because this is important to us, the Squad Credentialing program will be a requirement for participation in the following competitions: NCA Junior & Senior High School Nationals Championship in January 2018 and National High School Cheerleading Championship (NHSCC) with UCA – requirement began in 2017"); VAR00160803, at -803 ("Q: How many squad members need to attend camp? A: We require that 75% of the members competing must have completed Squad Credentialing.").

[337] VAR00160803, at -803. See also VAR00503298, at -303, -304.

[338] VAR00504983, at -5001.

[339] VAR00170292, at -294.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

and estimate damages on a class-wide basis.

274. Varsity's documents report that the high growth in revenue per participant is driven by prices increases.[340] Varsity's Summit competition prices reflected an increase in price from Disney which was passed through to participants.

275. Although Varsity price changes were implemented at a local level, the pricing strategy itself was national in practice in terms of rationale and commonality of impact. Variations in price or price changes are not individualized but can be determine using common evidence. A Varsity document illustrates the overall pricing strategy that it employed in adjusting prices for event competitions.[341] The Varsity document shows proposed registration fees, crossover prices, and admission or spectator fees and the change from the previous year for each event for the 2016-2017 season.[342] Registration fee changes range from a $1 decrease to $10 increase.[343] Proposed 2016-2017 registration prices range from $38 to $159.[344] Registration pricing notes indicate only a few reasons for price changes. These include (1) bringing prices in line with like event tiers in the area, (2) market baring incremental increase, no change/already in line with tier and are, (4) adding admissions/moving registration fee below $90s, and (5) under- priced event.[345]

276. These price changes reflect Varsity's recognition that competitive cheer, particularly All-Star cheer is a price sensitive activity for some participants, not gyms making the decision to attend events.[346] Participants were spending more than $4,000 on average per year to compete. As a monopolist, the profit-maximizing strategy for Varsity would be to exploit price points that are less sensitive to price changes on the margin, and this targeted pricing scheme was how Varsity described its pricing strategy. Varsity typically implemented a 2% compounded average growth rate over the Class Period.[347] As described, Varsity's targeted

---

[340] VAR00033456, at -464.
[341] VAR00249288 (Davis Exhibit 7), at -288.
[342] Ibid.
[343] Ibid.
[344] Ibid.
[345] Ibid.
[346] VAR00253876 (Newby Exhibit 20), at -877. (For gyms, "the primary drive[r] of event selection and schedule… is location, date, and bid offering…price being a distant 4th in that process."). See also VAR00254066 (Davis Exhibit 8), at -071 ("In general, customers are sensitive to prices, however, we have been successful in implementing price increases at Disney events and in our State and Local competition.").
[347] VAR00253876 (Newby Exhibit 20), at -877. See also Deposition of Craig Davis, February 23, 2022, at 161:8-11; VAR00101741 (Davis Exhibit 12).

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

pricing scheme was to:

> "[s]trategically price event by event and we select events that have higher demand in order to raise those prices the most. Going forward, we plan to continue to price event by event and we have modeled a 1-2% price increase overall. On elasticity and influence, we have been able to drive demand to our events with our bid distribution model to Worlds and the Summit events. The more bids we give any particular event the higher the price we can command."[348]

277. As part of an overall strategy to incentivize gyms to attend more events and camps and buy more apparel to maximize rebate rewards for direct purchasers, Varsity uses its monopoly power to increase overall revenues per participant without the risk of losing enough participants to make the operation unprofitable. A key factor in this strategy was to acquire more events to reduce travel cost for participants so that "customers can save on travel while continuing to pay for [V]arsity competitions."[349] The trend in Varsity's revenues per participant is indicative of the overall antitrust injury commonly suffered by indirect purchasers caused by Varsity's exercise and abuse of monopoly power.

### VI.D. Common Evidence Can Be Used to Establish Class-wide Impact on Indirect Purchasers

#### VI.D.1.    Direct Purchasers Overcharge Model Estimates in the Cheer Competitions Market

278. The competitive benchmarks are prices charged by rival event producers, specifically companies that produced rival events prior to being acquired by Varsity. In the but-for scenario absent the alleged conduct, Varsity's prices for All-Star and school cheer competitions would have been consistent with the competitive benchmark. The difference between the actual prices charged (prices in the actual scenario) and the prices that would have been charged for such events in the but-for scenario, as a percentage of the actual prices charged, is the overcharge percentage. The benchmark also includes acquired events in the first year after the acquisition, since Varsity maintained a "do no harm" policy of not raising those prices immediately, as prices are typically published well in advance of the events.[350]

---

[348] VAR00253876 (Newby Exhibit 20), at -877.
[349] VAR00254066 (Davis Exhibit 8), at -071.
[350] During the acquisition season, registration was already open for events and Varsity adopted a "do no harm" approach in which they maintained the competitor registration websites, procedures, and prices. See, e.g.,

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Finally, it also includes events that Varsity acquired but eventually discontinued. This latter group was included in the benchmark, because Varsity appears to have often implemented price increases in acquired brands by discontinuing old events and staring new events with much higher prices, rather than simply stepping up prices at old events. (As described below, I also analyzed the effect on acquired brand prices post-acquisition independently, to document and study this ingenious method of implementing price increases.)

279. The competitive benchmarks includes both regional and national All-Star competitions. National All-Star competitions include The U.S. Finals, owned by JamBrands prior to Varsity's acquisition of JamBrands. I use multiple linear regression methodology to identify and statistically measure the price overcharge on Varsity's event registration fees (i.e., price) relative to the set of competitive benchmarks. The multiple linear regression methodology identifies the factors that are statistically and economically important for predicting registration fees, including the time of year, location, whether the event is a regional or a national event, whether the event is a school or All-Star event, and whether (if regional) the event offers bids to the Worlds event. Multiple linear regression methodology is a standard and well-accepted methodology for economists and experts to find statistically significant relationships and reach conclusions about overcharge and damages.

280. I rely on Varsity's registration records for its regional and national events in the United States from the 2013-2014 season through the 2018-2019 season (6 seasons of complete data total).[351] I drop the 2019-2020 and 2020-2021 seasons due to decreased attendance caused by the COVID-19 pandemic. The registration records include the total fees charged to each registered team, the total discounts that a team receives, and the total athletes that a team registers.

281. Additionally, for five of the recent acquisitions made by Varsity, I have data on the registration fees charged by a competitor (hereinafter Competitor Pricing Data). The data includes registration fees, discounts, and total athletes for the following competitors (data prior to acquisition by Varsity): data for the 2013-2014 and 2014-2015 seasons for

---

VAR00083645, at -648 ("Short term (first 6 months) we will take a general 'do no harm' position.");
VAR00017827, at -830 ("Short term (first 3 months) we will take a general 'do no harm' position.");
VAR00081770, at -773 ("Short term (first 3 months) we will take a general 'do no harm' position.");
VAR00017807, at -810 ("Short term (first 6 months) we will take a general 'do no harm' position."); and
VAR00076749, at -758 ("Short term (first 6 months) we will take a general 'do no harm' position.").
[351] VAR00352218-25; VAR00010122-27; VAR00352199-202 (hereinafter Varsity Registration Data).

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

JamBrands, Inc. (JF), acquired by Varsity in November 2015;[352] data for the 2016-2017 season for Aloha Productions, acquired by Varsity in December 2016;[353] data for the 2016-2017 season for CSG, acquired by Varsity in November 2017;[354] data for the 2016-2017 season for MGS, acquired by Varsity in December 2017;[355] and data for the 2016-2017 season for Epic, acquired by Varsity in January 2018.[356] I note that in all instances, except one, the available data covers seasons prior to Varsity's acquisition. For the case of Aloha, the available data is Aloha's posted prices for the 2016-2017 season, as set by Aloha prior to its acquisition in December 2017.

282. These five acquisitions account for five of the eight acquisitions made by Varsity of competition brands in the United States since 2014. These five acquisitions represent 13 of the 16 "signature" (World bid) events acquired by Varsity since 2014. Further, these five acquisitions represent upwards of 88% of the total yearly revenue for all eight competitors at the time of their acquisition.[357]

283. Additionally, as an alternative regression specification to assess the robustness of my primary regression specification (see Attachment 3), I incorporate the following data when available: event-level general ledger cost information for Varsity events;[358] and event-level indicators for which regionals events offer bids to world events (as determined by the national organization USASF).[359] The available pre-acquisition data for the competitors CSG and MGS includes cost information at the event level, as well.[360]

284. Using widely accepted benchmarks, I compare the prices charged by Varsity competitors (the companies that would later be acquired by Varsity) and the prices charged by Varsity after acquisition. This price comparison is implemented for the exact same event, meaning that the only difference between the two events in the comparison is the passage of time

---

[352] VAR00445395.
[353] VAR00127208; VAR00234212.
[354] VAR00017306; VAR00018967.
[355] VAR00123779; VAR00123780.
[356] CB00063214; VAR00582534.
[357] See Table 15. Revenue and purchase price information is not available for CL. The two largest acquisitions during this time were JF and EPIC, both of which are included in the set of five acquisitions for which pre-acquisition data is available.
[358] VAR00117735-40 (hereinafter Event Cost Data).
[359] USASF_00002776; USASF_00002779; USASF_00002782; USASF_00002785; USASF_00052537; USASF_00084806 (hereinafter World Bids Events Data).
[360] VAR00123779; VAR00123780; CB00063214; VAR00582534.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

(price inflation) and the fact that Varsity sets prices after the acquisition and the competitor set prices before the acquisition.

285. Table 19 below summarizes the before and after price comparison analysis. The analysis compares the change in prices for the same event from one season to the next (events for some acquired brands did not have any data during the season of acquisition). The analysis is limited to only those events that took place prior to acquisition by Varsity. Shaded in blue are the seasons in which Varsity first has pricing control (one season after the acquisition). The seasons prior to Varsity pricing control are seasons in which prices were set by the competitor.[361] As indicated in Table 19 below, prices jump in the seasons in which Varsity first has pricing control and follow long-run inflation trends in other years. This evidence is consistent with a gap between the prices charged by competitors (pre-acquisition) and the prices charged by Varsity. Further, upon closing the acquisitions during the acquisition season and obtaining pricing control for the following season, Varsity immediately closes the pricing gap by elevating the prices of acquired events. As calculated from Table 19 below, the average of the price increase in the first year that Varsity has pricing control (for the five acquired event brands Aloha, CSG, EPIC, JamBrands, and Mardi Gras Spirit) equals 41.0%.[362]

---

[361] During the acquisition season, registration was already open for events and Varsity adopted a "do no harm" approach in which they maintained the competitor registration websites, procedures, and prices. See, e.g., VAR00083645, at -648 ("Short term (first 6 months) we will take a general 'do no harm' position."); VAR00017827, at -830 ("Short term (first 3 months) we will take a general 'do no harm' position."); VAR00081770, at -773 ("Short term (first 3 months) we will take a general 'do no harm' position."); VAR00017807, at -810 ("Short term (first 6 months) we will take a general 'do no harm' position."); and VAR00076749, at -758 ("Short term (first 6 months) we will take a general 'do no harm' position.").

[362] The average of a 74.5% price change for Aloha, a 58.2% price change for CSG, a 11.2% price change for EPIC, a 28.5% price change for JamBrands, and a 32.6% price change for Mardi Gras Spirit equals 41.0%.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 19. Price Changes Season-to-Season Holding Fixed the Event*

| Event Brand | Acquisition Date | From | To | Number of Events | Price Change |
|---|---|---|---|---|---|
| ALO | 12/15/2016 | 2016-2017 | 2017-2018 | 16 | 74.5% |
| ALO | 12/15/2016 | 2017-2018 | 2018-2019 | 12 | 1.3% |
| ALO | 12/15/2016 | 2018-2019 | 2019-2020 | 8 | 5.5% |
| CSG | 11/15/2017 | 2016-2017 | 2018-2019 | 7 | 58.2% |
| CSG | 11/15/2017 | 2018-2019 | 2019-2020 | 5 | 1.9% |
| EPIC | 1/19/2018 | 2016-2017 | 2018-2019 | 51 | 11.2% |
| EPIC | 1/19/2018 | 2018-2019 | 2019-2020 | 24 | 6.5% |
| JF | 11/2/2015 | 2013-2014 | 2014-2015 | 88 | -1.1% |
| JF | 11/2/2015 | 2014-2015 | 2016-2017 | 41 | 28.5% |
| JF | 11/2/2015 | 2016-2017 | 2017-2018 | 41 | 0.9% |
| JF | 11/2/2015 | 2017-2018 | 2018-2019 | 40 | 1.6% |
| JF | 11/2/2015 | 2018-2019 | 2019-2020 | 32 | 3.5% |
| MGS | 12/1/2017 | 2016-2017 | 2017-2018 | 6 | -0.3% |
| MGS | 12/1/2017 | 2017-2018 | 2018-2019 | 6 | 32.6% |
| MGS | 12/1/2017 | 2018-2019 | 2019-2020 | 6 | 7.5% |

Sources: Varsity Registrations Data; Competitor Pricing Data.

286. Further, Varsity not only increased the prices of the acquired brand events, but further, and in support of the price elevation, Varsity eliminated a large fraction of those acquired brand events. Table 20 below tracks the events that existed before the acquisition and the events that remained in the first years of Varsity's ownership. The column "Events Before" in Table 20 reports events that were discontinued by Varsity and the column "Events After" indicates new events that Varsity established with that acquired brand. The difference between the two is the "Net Events Loss," which is positive for all acquired brands, and particularly large for the two biggest acquisitions: EPIC and JamBrands. In Table 20 below, I further compare the average price of events that were discontinued to the average price of new events (weighted by the number of entrants, and without controlling for event characteristics). As calculated from Table 20 below, I find that the new events created by Varsity were significantly more expensive, with an average price increase of 45.4%.[363]

---

[363] The average of the two seasons of post-acquisition pricing data for new CSG events, the two seasons of post-acquisition pricing data for new EPIC events, the four seasons of post-acquisition pricing data for new JamBrands events, and the two seasons of post-acquisition pricing data for new Mardi Gras Spirit events equals 45.4%. Varsity did not create any new Aloha-branded events, only eliminated existing Aloha events.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 20. Number of Events Before and After Acquisitions*

| Event Brand | Acquisition Date | From | To | Events in Common | Events Before | Events After | Net Events Loss | Price Before | Price After | Price Increase |
|---|---|---|---|---|---|---|---|---|---|---|
| ALO | 12/15/2016 | 2016-2017 | 2017-2018 | 16 | 9 | 0 | 9 | $49.83 | - | - |
| ALO | 12/15/2016 | 2016-2017 | 2018-2019 | 13 | 12 | 0 | 12 | $57.43 | - | - |
| ALO | 12/15/2016 | 2016-2017 | 2019-2020 | 8 | 17 | 0 | 17 | $60.70 | - | - |
| CSG | 11/15/2017 | 2016-2017 | 2018-2019 | 7 | 18 | 2 | 16 | $49.75 | $119.11 | 139% |
| CSG | 11/15/2017 | 2016-2017 | 2019-2020 | 5 | 20 | 1 | 19 | $49.70 | $66.87 | 35% |
| EPIC | 1/19/2018 | 2016-2017 | 2018-2019 | 51 | 22 | 16 | 6 | $55.66 | $93.85 | 69% |
| EPIC | 1/19/2018 | 2016-2017 | 2019-2020 | 25 | 48 | 9 | 39 | $67.89 | $70.68 | 4% |
| JF | 11/2/2015 | 2014-2015 | 2016-2017 | 41 | 68 | 26 | 42 | $58.71 | $85.51 | 46% |
| JF | 11/2/2015 | 2014-2015 | 2017-2018 | 47 | 62 | 29 | 33 | $60.62 | $87.26 | 44% |
| JF | 11/2/2015 | 2014-2015 | 2018-2019 | 45 | 64 | 31 | 33 | $60.17 | $88.98 | 48% |
| JF | 11/2/2015 | 2014-2015 | 2019-2020 | 31 | 78 | 20 | 58 | $60.95 | $96.13 | 58% |
| MGS | 12/1/2017 | 2016-2017 | 2017-2018 | 6 | 5 | 0 | 5 | $70.74 | - | - |
| MGS | 12/1/2017 | 2016-2017 | 2018-2019 | 7 | 4 | 1 | 3 | $70.46 | $75.96 | 8% |
| MGS | 12/1/2017 | 2016-2017 | 2019-2020 | 6 | 5 | 1 | 4 | $70.58 | $73.38 | 4% |

Sources: Varsity Registrations Data; Competitor Pricing Data.

287. The competitive benchmark is the set of prices for the following events:

- Events produced by rival event producers — rival event producers pricing *before* they were acquired by Varsity;

- Events produced in the first season of Varsity ownership after its acquisition of the companies — under its "do no harm" strategy, Varsity chose not to change the event pricing, date, or location of the acquired events in the first season;[364] and

- Events produced under Varsity ownership that were acquired by Varsity from acquisitions of rival event producers since 2014 and later discontinued by Varsity.

288. I obtain the competitive benchmark prices from the registration and pricing data for Varsity and the rival event producers (pre-acquisition). In all instances, the events in the competitive benchmark are events that were either currently owned by a rival event producer (Cheer Ltd., JamBrands, Aloha, Spirit Celebration, All Things Cheer, CSG, MGS, and Epic) or were previously owned by a rival event producer. For events in the competitive benchmark owned at the time by Varsity (first season of acquisition or discontinued events), price points for such events were established by the rival event producer before acquisition. Each of these

---

[364] During the acquisition season, registration was already open for events and Varsity adopted a "do no harm" approach in which they maintained the competitor registration websites, procedures, and prices. See, e.g., VAR00083645, at -648 ("Short term (first 6 months) we will take a general 'do no harm' position."); VAR00017827, at -830 ("Short term (first 3 months) we will take a general 'do no harm' position."); VAR00081770, at -773 ("Short term (first 3 months) we will take a general 'do no harm' position."); VAR00017807, at -810 ("Short term (first 6 months) we will take a general 'do no harm' position."); and VAR00076749, at -758 ("Short term (first 6 months) we will take a general 'do no harm' position.").

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

companies had a vastly smaller market share than Varsity and each is assumed to be pricing subject to the incentives and pressures of market competition. As such, this set of competitive benchmark prices is the basis for my estimate of Varsity prices in the but-for scenario.

289. The registration data reports total registration fees per team per event, total discount per team per event, and total athletes for each team that are registered for each event. Event revenues are defined as registration fees less discounts. Event price is defined as total revenue per event (i.e., summed over all participating teams) divided by the total number of athletes registered for that event (i.e., summed over all participating teams). The dependent variable is transformed to the natural log of price. The natural log specification is common in multiple linear regression methodology, and particularly for damage modeling.

290. The explanatory variables for this first model include: a dummy variable (1 if True, 0 if False) to indicate the season for the event; a dummy variable to indicate the calendar month for the start of the event (events primarily occur between October and May; events in June were relabeled as May events and events in either August or September were relabeled as October events for the purposes of classification for the regression); a dummy variable to indicate the event brand, where all Varsity event brands owned prior to 2014 are labeled "Legacy" brands; a dummy variable to indicate the region of the event (the USASF regions are Midwest, Northeast, Southeast, Southwest, and West); a dummy variable to indicate if it is a regional or a national competition, which is subsequently interacted with the region dummy variables to generate region-specific "national event" dummy variables; a dummy variable to indicate whether it is an All-Star or school competition, which is subsequently interacted with the region dummy variables to generate region-specific school dummy variables; a dummy variable to indicate whether the event offered bids to a world event, which is subsequently interacted with the region dummy variables to generate region-specific World bid event dummy variables; and a dummy variable to indicate if the event is a "conduct" event (outside the competitive benchmark) or a competitive benchmark event. This latter dummy variable equaled 1 if the event was outside the competitive benchmark (i.e., an event whose conduct we are assessing) and equaled 0 if it was a competitive benchmark event. This "overcharge" dummy variable was subsequently interacted with the region dummy variables to generate region-specific "overcharge" dummy variables.

291. My primary specification implemented a multiple linear regression, where each observation

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

was weighted by the number of athletes at that event (to proxy for event size). I also implemented an unweighted regression and found that the regression predictions are largely consistent (see Table 25 in Attachment 3).

292. In the regression, the flag for "Legacy" brands, the flag for the 2013-2014 season (the first season in the data set), the flag for October (the first competition month of the season), and the flag for the Midwest region were dropped due to collinearity. Table 21 below reports the regression output. Regression 1 reports the regression coefficients for the model with region-specific overcharges and Regression 2 reports the regression coefficients for the model with a single national overcharge. Standard errors are reported in parentheses below the coefficient values. Asterisk next to the coefficient values indicate statistical significance at the 1% (***), 5% (**), and 10% (*) levels.[365]

293. For all coefficients, the signs estimated from the regression match the economics of cheer competitions. First, national events are more expensive than regional events (the coefficient on the dummy variable for national events is positive and statistically significant in each of the regions). Second, World bid events are more expensive than events without World bids at stake (the coefficient on the dummy variable for World bid events is positive and statistically significant in each of the regions). Third, school events are less expensive than All-Star events (the coefficient on the dummy variable for school competitions is negative and statistically significant in each of the regions). And fourth, as I discuss further below, Varsity's events identified as arising from the anticompetitive conduct at issue are more expensive than the competitive benchmark (the coefficient on the dummy variable for Varsity's overcharge events is positive and statistically significant in most regions).

*Table 21. Regression Output for Overcharge Model*

| Dependent Variable: Log Price | | |
|---|---|---|
| VARIABLES | (1) Regression 1 | (2) Regression 2 |
| | | |
| Nationals Flag in MW | 0.956*** | 1.038*** |
| | (0.235) | (0.227) |
| World Bid Event Flag in MW | 0.228** | 0.189** |
| | (0.089) | (0.087) |
| School Flag in MW | -0.987*** | -1.000*** |

---

[365] A coefficient value with statistical significance at the 1% level means that there is a 1% probability (or less) that the data was generated by a model in which the coefficient value equals 0. At such a significance level, there is strong support (greater than 99% confidence) that the coefficient value is ***different*** from 0.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| | (0.087) | (0.087) |
| Nationals Flag in NE | 0.203 | 0.105 |
| | (0.142) | (0.136) |
| World Bid Event Flag in NE | 0.420*** | 0.429*** |
| | (0.074) | (0.074) |
| School Flag in NE | -1.087*** | -1.071*** |
| | (0.092) | (0.092) |
| Nationals Flag in SE | 2.141*** | 2.142*** |
| | (0.047) | (0.047) |
| World Bid Event Flag in SE | 0.505*** | 0.506*** |
| | (0.047) | (0.047) |
| School Flag in SE | -0.848*** | -0.846*** |
| | (0.070) | (0.069) |
| Nationals Flag in SW | 1.285*** | 1.285*** |
| | (0.158) | (0.158) |
| World Bid Event Flag in SW | 0.602*** | 0.600*** |
| | (0.056) | (0.056) |
| School Flag in SW | -0.907*** | -0.909*** |
| | (0.070) | (0.070) |
| Nationals Flag in W | 0.475** | 0.487** |
| | (0.206) | (0.206) |
| World Bid Event Flag in W | 0.624*** | 0.623*** |
| | (0.077) | (0.077) |
| School Flag in W | -1.322*** | -1.326*** |
| | (0.046) | (0.046) |
| Overcharge Flag in MW | 0.192*** | |
| | (0.059) | |
| Overcharge Flag in NE | 0.386*** | |
| | (0.062) | |
| Overcharge Flag in SE | 0.300*** | |
| | (0.082) | |
| Overcharge Flag in SW | 0.192 | |
| | (0.136) | |
| Overcharge Flag in W | 0.167 | |
| | (0.114) | |
| Varsity Competition Overcharge | | 0.272*** |
| | | (0.041) |
| Constant | 4.235*** | 4.168*** |
| | (0.060) | (0.048) |
| | | |
| Observations | 2,763 | 2,763 |
| R-squared | 0.688 | 0.687 |
| Weighted by Athlete Count | Yes | Yes |
| Season Dummies | Yes | Yes |
| Month of Year Dummies | Yes | Yes |
| Region Dummies | Yes | Yes |
| Brand Dummies | Yes | Yes |
| Event Dummies | Yes | Yes |
| Controls for Cost | No | No |

Standard errors in parentheses
*** p<0.01, ** p<0.05, * p<0.1

Sources: Varsity Registrations Data; Competitor Pricing Data; World Bids Events Data.

294.  The coefficients on the regional overcharge dummy variables in Table 21 (Regression 1) are

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

the estimates of Varsity's event price overcharge in this overcharge model (sometimes called a dummy variable model). These results are further summarized in Table 22 below.

*Table 22. Price Overcharge for Varsity's Events*

| Region | Overcharge | Standard Error | Z-score | P-value |
|--------|------------|----------------|---------|---------|
| MW | 17.5% | 0.059 | 3.236 | 0.1% |
| NE | 32.0% | 0.062 | 6.254 | 0.0% |
| SE | 25.9% | 0.082 | 3.672 | 0.0% |
| SW | 17.5% | 0.136 | 1.411 | 15.8% |
| W | 15.4% | 0.114 | 1.461 | 14.4% |
| F-Test | H0: Overcharge_MW = Overcharge_NE = Overcharge_SE = Overcharge_SW = Overcharge_W | | | |
| | F(4, 2600) = 1.87 | | | |
| | Prob > F = 0.1130 | | | |
| ALL REGIONS | 23.8% | 0.041 | 6.607 | 0.0% |

Sources: Varsity Registrations Data; Competitor Pricing Data; World Bids Events Data.

295. To determine if it is more appropriate to use regional or national level overcharge estimates, I estimate overcharges both ways, and then do a statistical test to compare the alternative approaches. The uniform national level overcharge is estimated to be 23.8%, and the coefficient upon which this is based is statistically significant at the 99.0% confidence level. The output from this regression is Regression 2 in Table 21 above.

296. Allowing for separate regional level overcharges, shown as Regression 1 in Table 22, Varsity's price is elevated in all five regions, compared to the benchmark. Individual estimates of regional overcharges range from 15.4% in the West to 32.0% in the Northeast, with intermediate values 17.5% in the Midwest, 25.9% in the Southeast, and 17.5% in the Southwest. The coefficients upon which these are based are statistically significant at the 99.0% confidence level for Northeast, Midwest, and Southeast, statistically significant at the 90.0% confidence level for the Southwest, and not statistically significant at conventional confidence levels for the West. This means that the estimate for the West region is imprecisely estimated, and the true value may be higher or lower than this estimate.

297. I implement a standard statistical test, called an "F-test" to assess whether the five different regional overcharges are statistically different from each other. This test does not reject the null hypothesis that the coefficient values are equal (with a p-value of 11.3%), implying that the statistical evidence does not support using separate regional overcharges instead of the national estimate. Instead, this indicates that the common national level estimate of overcharges is more precisely estimated, reliable and appropriate, especially in light of the

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

evidence of national level conduct. As mentioned above, the statistical significance level of the coefficient for the national overcharge coefficient is 99.0%.

298. The value of the overcharge can be derived from the estimated coefficient for the regional indicator variable by applying the formula overcharge percentage = (exp(coefficient) – 1) / exp(coefficient).[366]

299. For the overcharge model, I consider one robustness check. I include log cost per athlete as an additional explanatory variable in my regression. Data on cost per event is available for only a small fraction of Varsity events and is also available for the rival event producers CSG and EPIC. With limited cost data, the regression only serves as a robustness check, because it lacks the statistical power of my primary regression (as reported in Table 21 above). The regression output for the supplemental regression with log cost per athlete as an additional explanatory variable is reported in Table 26 in Attachment 3. The national and regional overcharge coefficient values in the regression with cost information have similar values as the coefficients for my primary regression (as reported in Table 21 above). This provides confidence that my primary regression provides a reliable estimate of Varsity's event overcharge. I reserve the right to update my opinions further if Varsity makes available a more complete record of its event-level cost data, which I understand was requested by Counsel in this litigation and which Varsity failed to provide to a sufficient degree.

### VI.D.2.    Direct Purchasers Overcharge Model Estimates in the Cheer Apparel Market (SECTION DESIGNATED HIGHLY CONFIDENTIAL – EXPERT AND ATTORNEYS' EYES ONLY)

300. To identify the overcharge applied by Varsity to its apparel sales to direct purchasers in the cheer apparel market, I identify an appropriate competitive benchmark. Based on available data, I identify Nfinity cheer shoes as the appropriate competitive benchmark for Varsity-brand cheer shoes sold by Varsity. I compare this price difference between Nfinity and Varsity brand cheer shoes and conclude that this overcharge is a reasonable benchmark for the overcharge that Varsity applies throughout the cheer apparel market.

301. Nfinity is an apparel company that sells cheerleading shoes and apparel in direct

---

[366] The percentage change in price relative to the competitive benchmark (but-for prices) equals exp(coefficient) – 1. The percentage change in price relative to the actual (elevated) prices equals (exp(coefficient) – 1) / exp(coefficient).

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

competitions with Varsity in the cheer apparel market.[367] Nfinity sells seven brands of cheer competition shoes, meeting the cheer athlete's needs for an all-white shoe.[368] Varsity also sells cheer competition shoes under its own Varsity brand.[369] Based on consumer reports and a video posted by a consumer, the Nfinity appears to be a higher-quality and lower-weight shoe than the Varsity brand shoes.[370] Thousands of consumer reviews on Amazon, the leading reseller of Nfinity Cheer shoes, confirm that the Nfinity competition shoe is a high-quality and highly valued shoe by cheer athletes.[371]

302. Using available Nfinity sales data for its Nfinity brand shoes and Varsity sales data for its Varsity brand shoes,[372] I calculate the average net price for every model of Nfinity brand shoe and every model of Varsity brand shoe sold each year from 2016-2019 (the non-COVID years of the Class Period).[373] For each year, I sort the average net shoes prices from lowest to highest and then I extract the following percentiles from the distribution weighted by the number of shoes sold: 5th percentile, 15th percentile, 25th percentile, 35th percentile, 45th percentile, 55th percentile, 65th percentile, 75th percentile, 85th percentile, and 95th percentile. I then compare the price of the Varsity brand shoe at the 5th percentile in 2015 to the Nfinity brand shoe at the 5th percentile in 2015, and similarly for all other percentiles and all other years (2016-2019). I find the geometric mean of the relative price for each year and use that relative price for each year to calculate the Varsity markup and overcharge on its Varsity brand shoes, relative to the competitive benchmark of the Nfinity brand shoes.

303. The results of my analysis are reported in Table 23 below. The average overcharge

---

[367] Nfinity's Cheerleading Product Collection, accessed June 9, 2022, available at: https://www.nfinity.com/collections/cheerleading

[368] Nfinity's Cheerleading Shoe Collection, accessed June 7, 2022, available at: https://www.nfinity.com/collections/shoes

[369] Varsity's Competition Shoes, accessed June 7, 2022, available at: https://www.varsity.com/shoes-competition-2022/

[370] TheCheerBuzz, "Guide: The Top 7 Best Cheerleading Shoes (Ranked by Actual Athletes)," June 8, 2021, accessed June 7, 2022, available at: https://www.thecheerbuzz.com/guide-the-top-7-best-cheerleading-shoes-ranked-by-actual-athletes/; YouTube, "Nfinity Vengeance VS Varsity Last Pass," accessed June 9, 2022, available at: https://www.youtube.com/watch?v=L6cLgSJDR6A

[371] Amazon, "Nfinity Vengeance Cheer Shoe – Women & Youth Competition Cheerleading Gear," accessed June 9, 2022, available at: https://www.amazon.com/Nfinity-Vengeance-Cheer-Shoe-White/dp/B006WAEW2Y/

[372] VAR00604800-805; NFINITY000297 (DESIGNATED HIGHLY CONFIDENTIAL – EXPERT AND ATTORNEYS' EYES ONLY).

[373] Nfinity branded shoes include the following models: Evolution, Phoenix, Game Day, Vengeance, Defiance, Titan, Rival, Flyte, and Beast Mid Top. Varsity branded shoes include over 30 models, including: Aeros, Ascend, Glitterazzi, V4X, Last Pass, V4S, Apex, and Dbl Edge. See VAR00604800-805; NFINITY000297 (DESIGNATED HIGHLY CONFIDENTIAL – EXPERT AND ATTORNEYS' EYES ONLY).

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

percentage for 2017-2019 equals 10.0% and I take this value as my best estimate of Varsity's overcharge not just in cheer competition shoes, but more broadly for all Varsity cheer apparel in the cheer apparel market. My estimate of 10.0% overcharge is conservative considering the results in Table 23 below showing that the overcharge was significantly higher in 2016.

*Table 23. Varsity Overcharge on Cheer apparel (TABLE DESIGNATED HIGHLY CONFIDENTIAL – EXPERT AND ATTORNEYS' EYES ONLY)*

| Year | Nfinity Weighted Distribution (5th, 15th, …, 95th Percentiles) | Varsity Weighted Distribution (5th, 15th, …, 95th Percentiles) | Overcharge |
|---|---|---|---|
| 2016 | ($34.73, $39.07, $46.75, $46.75, $46.75, $51.85, $51.85, $51.85, $51.85, $71.43) | ($44.14, $52.31, $52.31, $52.31, $69.29, $74.07, $80.70, $80.70, $81.75, $88.21) | 26.3% |
| 2017 | ($42.37, $42.37, $53.76, $53.76, $53.76, $61.26, $61.26, $61.26, $71.92, $82.76) | ($40.49, $45.66, $50.53, $50.53, $64.75, $74.30, $79.35, $79.35, $82.20, $85.79) | 9.3% |
| 2018 | ($41.70, $41.70, $54.79, $54.79, $59.39, $59.39, $59.39, $59.39, $79.22, $81.68) | ($38.58, $49.10, $49.10, $61.84, $67.41, $67.41, $79.26, $86.20, $87.70, $96.14) | 12.0% |
| 2019 | ($44.59, $56.73, $56.73, $56.73, $66.22, $66.22, $66.22, $66.22, $78.65, $78.65) | ($40.88, $49.86, $49.86, $59.87, $69.76, $78.00, $90.36, $90.36, $90.36, $98.97) | 8.7% |

Sources: VAR00604800-805; NFINITY000297 (DESIGNATED HIGHLY CONFIDENTIAL – EXPERT AND ATTORNEYS' EYES ONLY).

304. The discovery in this investigation only provided apparel data from one rival apparel company, Nfinity. I reserve the right to update my opinions if further information and data becomes available through the course of discovery for other rival apparel companies.

305. The overcharge for competitive cheer shoes is a reasonable proxy for the entire apparel market. Shoes are one of the three categories of apparel that are must-have for on-the-floor participation by cheer teams. The other two categories are uniforms and lettering. These components are necessary for every team member, and they are most often purchased together. Table 24 below is a reproduction of Table 7 from above.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 24. Percentage of Varsity Customers Purchasing each Category by Categories-purchased*

| Apparel Category | Customers purchasing in all 6 categories | Customers purchasing in at least 5 categories | Customers purchasing in at least 4 categories | Customers purchasing in at least 3 categories | Customers purchasing in at least 2 categories | Customers purchasing in at least 1 category | Total revenue |
|---|---|---|---|---|---|---|---|
| Uniforms | 100.0% | 99.9% | 99.4% | 98.0% | 95.6% | 91.1% | $276,543,043 |
| Lettering | 100.0% | 100.0% | 99.9% | 99.2% | 96.4% | 89.0% | $105,206,458 |
| Shoes | 100.0% | 98.1% | 92.5% | 85.8% | 73.0% | 68.0% | $93,292,358 |
| Warmups | 100.0% | 92.7% | 77.6% | 62.0% | 51.5% | 46.8% | $53,190,668 |
| Campwear | 100.0% | 86.5% | 70.3% | 53.4% | 43.7% | 39.6% | $50,510,840 |
| Accessories | 100.0% | 53.1% | 39.1% | 30.7% | 25.1% | 22.7% | $28,419,120 |

Sources: VAR00604800-805.

306. As shown in Table 24 above, the three categories of shoes, uniforms, and lettering account for about 78% of total apparel revenues across the six categories. About 86% of customers that purchase from three or more categories of apparel will purchase shoes, and 98% and 99% of customers purchasing from three or more categories will purchase uniforms and lettering, respectively. When goods tend to be purchased together, as these are, it is typically the total price of the products together that is relevant for customers' willingness to substitute away from the seller if the seller's price is too high. Therefore, a monopolist of such products has an incentive to set its monopoly overcharge percentage to be about the same on all of those products, to discourage customers from substituting away from the entire bundle based on the prices charged for one high-priced category.

307. Of the three categories of uniforms, lettering, and shoes, shoes is the category for which there is the most competition, as indicated by the fact that of the three, this is the category for which more teams do not purchase from Varsity (14% of customers with three or more categories, compared to less than 2% for uniforms and lettering). This fact implies that Varsity's customers are likely more price sensitive regarding shoes. The monopolist has an incentive to put a smaller fraction of the total overcharge onto the most price sensitive product, so the estimate of the overcharge for shoes is likely a good estimate of a lower bound for the overcharges on the other two most purchased product categories (uniforms and lettering), and therefore also for the apparel market as a whole.

### VI.D.3.    Direct Purchasers Overcharge Model Estimates in the Cheer Camps Market

308. There are no data available in discovery adequate to empirically estimate a competitive

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

benchmark or overcharge estimate for cheer camps. There is, however, a strong economic theoretical foundation for estimating the relative allocation of the overall monopoly overcharge to cheer camps, relative to the other markets. A perfect monopolist setting profit maximizing prices over three products with identical supply and demand conditions, all of which are purchased by its customers, would set identical monopoly mark-ups over variable costs for the different products.[374] Therefore, such a monopolist is only concerned with finding the profit-maximizing total cost of participation, and a common mark-up rate that achieves it. Of course, the supply and demand conditions of cheer camps, apparel and competitions are not identical. The relevant differences between the markets for cheer camps, apparel, and competitions would tend to cause the monopolist in this matter to adjust away from a common monopoly mark-up rate by setting the monopoly overcharge higher in camps than in either apparel or competitions.

309. The most relevant differences in supply and demand conditions among the three product markets for this purpose are various demand elasticities facing the monopolist setting its prices, and the relative price mark-up over variable costs in each market.[375] First consider the perfect monopolist optimizing over three simple products. Regarding the demand elasticities, we know that the three products all have relatively inelastic own-price elasticities, meaning that there are few good substitutes outside of the product market. If a participant is priced out of this market by the total cost of participation, they would typically exit from all three markets simultaneously.[376] This implies that at prevailing prices, the demand elasticities of the three products are equal, which in turn implies that the monopolist's prices are a common percentage mark-up over marginal costs. The competitive price is determined by price equal to marginal cost, so the monopoly overcharge percentage is the same for all three markets.

310. Now consider the actual situation in competitive cheer, which differs somewhat from a perfect monopolist and three commodity markets. These differences are that Varsity is not a

---

[374] I will follow the antitrust economics convention of referring to a firm with sufficient market power to extract an anticompetitive monopoly rent as a "monopolist" and will use the term "perfect monopolist" to name a firm that is literally the only producer of the good(s) in question.

[375] The price mark-up over cost depends in turn on the underlying supply and demand elasticities and on the level of marginal costs, typically proxied by average variable costs, so the exogenous components are elasticities and marginal costs.

[376] If this were not true, the monopolist would adjust the relative prices until it was true, as part of its profit maximization.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

perfect monopolist in any of the three markets, and the markets are not commodity markets. Varsity has a different share of each of these markets, and hence presumptively a different degrees of market power. The more market power Varsity has within a market, the higher will be its overcharge. Varsity claimed (in 2011) to have markets share of 80% in cheer camps, 75% in cheer apparel, and 40% in cheer competitions.[377] The more market power the monopolist has in each market, the lower is the elasticity of demand faced by the monopolist, and the higher is the monopolist's overcharge. Based on this, I would expect the camp overcharge to be about the same as the competition overcharge, and higher than the apparel overcharge.

311. When considering the implications that the markets are not commodity markets, the implication is also that overcharges in camps are likely as high or higher than overcharges in competitions and apparel. For competitions and apparel, gyms and schools can adjust their purchases in response to an increase in price by the monopolist without exiting the market. Purchasers can choose a less expensive uniform design or forego non-essential components of the apparel offering, for example. In competitions, the decisionmaker can select less expensive events and can chose to attend more or fewer events to adjust the season-long cost of participation. Camps, in contrast, are either attended or not, and the optimal camp to attend is likely dictated by other characteristics of the camp, including location and other quality related features. Camps are much more of a discrete purchase, and therefore it is more difficult to make small incremental adjustments in overall expenditure to reduce price. This effectively lowers the elasticity of demand for camps, relative to demand for apparel and competitions, and increases the portion of the overcharges that the monopolist will place on camps.

312. For all these reasons, the overcharge estimates for cheer apparel and cheer competitions serve as a reliable estimate of the minimum expected overcharge percentage in cheer camps. Hence, I estimate the overcharge for cheer camps to be at least 24%.

### VI.D.4.    *Common Evidence Can Be Used to Establish That a De Minimus Fraction of Class Members Were Unharmed*

313. Using common evidence, I determine that nearly all members of the class suffered antitrust

---

[377] VAR00424538, at -544.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

injury and were materially harmed in the cheer competition market from Varsity's maintenance and exploitation of its market power. Accordingly, the fraction of potentially unharmed class members is *de minimis*.

314.  To calculate the maximum proportion of class members that may have been unharmed, I proceed in several steps. First, I estimate the fraction of class members that suffered harm through purchase of Varsity apparel. The fraction of Varsity customers (gyms and schools) that purchased apparel is about 77.2% on a customer basis, and 90.7% on a revenue basis. To account for the fact that gyms and schools vary significantly in the number of cheer participants, and hence indirect-purchaser class members, I use the 90.7% revenue share as the estimate of class members that indirectly purchased Varsity apparel. I assume that all indirect purchasers of Varsity apparel suffered antitrust harm, effectively assuming that all Varsity apparel is subject to an overcharge and that the price elevation is uniform across the United States.

315.  For the remaining estimated 9.3% of class members that did not suffer antitrust injury due to apparel purchases, I calculate the fraction of those class members whose gyms or schools attended competitions in adjusted-CSA based local areas where Varsity's market share is less than 40%.[378] This number is 4.0%, based on the share of Varsity's gyms and schools customers attending such events, or 3.0% based on the Varsity's event revenue share of those events, which were located in local areas where Varsity's market share is less than 40%. The methodology of this calculation is described below and further in Attachment 3. Once again, the revenue share calculation is the better estimate of the number of class members that participated in Varsity events in local areas in which Varsity has significant market power. Assuming that Varsity events are elevated in price relative to competitive levels in all local areas where Varsity's market share is above 40%, that events in localities with lower market share than 40% are not elevated (likely a highly conservative assumption), and that teams do not travel outside their local areas to attend events (also a highly conservative assumption), then the remaining fraction of unharmed class members is about 0.3%, or about 3 unharmed class members out of each 1000 class members. (This is calculated as the 3.0% of class

---

[378] Forty percent was used as a basis for comparison because that is approximately the share at which Varsity's market share by itself, independent of the relative concentration of other event producers, would generate HHI levels high enough potentially to warrant additional antitrust concern and scrutiny.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

members unharmed by competition overcharges times 9.3% of class members with competition payments that did not make any payments to Varsity in the cheer apparel market equals 0.3% unharmed by either of the two sources of antitrust harm.)

316. This already very small fraction is likely still a substantial overestimate of unharmed class members, because: (1) Varsity is likely to have implemented event overcharges above competitive levels even in the limited areas where its market share is relatively lower, especially as the pricing strategy was a national level strategy; (2) many or most class members likely travel to events outside their local areas, and are likely to suffer antitrust injury at those other events; and (3) many or most school cheer participants, and some All-Star participants, also suffer antitrust injury from overcharges at Varsity camps, which are not included in this estimate.

### VI.E.  Common Evidence Can be Used to Construct a Class-wide Common Damages Model

#### VI.E.1.    Damages for Indirect Purchasers in the Cheer Competitions Market

317. Damages by indirect purchasers equal the amount overpaid by the direct purchasers multiplied by the (nominal) pass through rate that the direct purchasers charge to the indirect purchasers. In the cheer competitions market, the amount overpaid by the direct purchasers equals the total amount paid in registration fees multiplied by the overcharge percentage identified from the empirical analysis. The (nominal) pass through rate is the number of dollars that the price paid by indirect purchasers increases for a one dollar increase in the price paid by direct purchasers.

318. The econometric model identifies a common national overcharge equal to 23.8% (recall Table 22 above). One would apply this overcharge percentage to Varsity's total registration revenues from regional and national competitions, defined as registration fees less discounts, charged to all US-based customers for US-based Varsity events during the Class Period. The Class Period begins on December 10, 2016, and continues through the present. The most recent available registration data is for events in December 2020, so the price overcharge damages that I calculate in the cheer competitions market accrue from December 10, 2016 – December 2020. Customers (gyms and schools) that register for Varsity events are defined as US-based customers if their customer address is US-based. Varsity events are defined as US-based if they are hosted at venues inside the United States (50 states plus the District of

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Columbia).

319. To calculate class-wide damages, one would apply the estimated overcharge percentage for all regions (equals 23.8%, recall Table 22 above) to Varsity's total registration revenues from all cheer competitions in the Class Period. To calculate the overcharge paid by indirect purchasers for all Varsity cheer competitions during the Class Period, one would apply the (nominal) pass through rate to the overcharge paid by direct purchasers for all Varsity cheer competitions during the Class Period.

### VI.E.2.    Damages Model for Indirect Purchasers in the Cheer apparel Market

320. Damages by indirect purchasers equal the amount overpaid by the direct purchasers multiplied by the (nominal) pass through rate that the direct purchasers charge to the indirect purchasers. In the cheer apparel market, the amount overpaid by the direct purchasers equals the revenue Varsity collects for apparel sales to All-Star and school cheer customers multiplied by the overcharge percentage identified from my empirical analysis.

321. The comparison of price for Varsity brand cheer competition shoes to Nfinity brand cheer competition shoes estimated a Varsity overcharge of 10.0% (recall Table 23, for the years 2017-2019). The Nfinity shoes prices are used as the competitive benchmark for this direct comparison of Varsity apparel prices to the competitive benchmark. Given the substantial degree of overlap across the six Varsity apparel categories by the same Varsity apparel customer (recall Table 6 and Table 7), and the volume of shoes sold by Varsity as a share of its overall apparel revenue, I determine that the overcharge of 10.0% on shoes is representative of the overcharge that Varsity applies more broadly to all of its apparel in the cheer apparel market.

322. To calculate class-wide damages, one would apply the estimated overcharge percentage of 10.0% to Varsity's revenues from All-Star and school cheer customers during the Class Period. The Class Period begins on December 10, 2016, and continues through the present. The most recent available apparel data is for products with a ship date no later than December 31, 2020, so the Class Period apparel sales occur between December 10, 2016, and December 31, 2020. One would limit the All-Star and school cheer customers to customers with a billing address and a shipping address located in the United States (in the 50 states or the District of Columbia). The product of the overcharge percentages and the apparel revenue

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

determines the overcharge paid by direct purchasers for all Varsity cheer apparel during the Class Period.

323. To calculate the overcharge paid by indirect purchasers for all Varsity cheer apparel during the Class Period, one would apply the (nominal) pass through rate to the overcharge paid by direct purchasers for all Varsity cheer apparel during the Class Period.

### VI.E.3. Damages Model for Indirect Purchasers in the Cheer Camps Market

324. Damages by indirect purchasers equal the amount overpaid by the direct purchasers multiplied by the (nominal) pass through rate that the direct purchasers charge to the indirect purchasers. In the cheer camps market, the amount overpaid by the direct purchasers equals the total amount paid in camp registration fees multiplied by the overcharge percentage identified from the empirical analysis. The (nominal) pass through rate is the number of dollars that the price paid by indirect purchasers increases for a one dollar increase in the price paid by direct purchasers.

325. The conceptual model of monopolist pricing establishes that the overcharge in the cheer camps market is no smaller than the overcharge in the cheer competitions market. The econometric model identifies a common overcharge equal to 23.8% (recall Table 22 above). I apply this overcharge percentage to Varsity's total registration revenues from camps, as charged to all US-based customers for US-based Varsity camps during the Class Period. The Class Period begins on December 10, 2016, and continues through the present. The most recent available registration data is for camps through the end of 2020, so the price overcharge damages that I calculate in the cheer camps market accrue from December 10, 2016 – December 2020. Customers (gyms and schools) that register for Varsity camps are defined as US-based customers if their customer address is US-based. Varsity camps are defined as US-based if they are hosted at venues inside the United States (50 states plus the District of Columbia).

326. To calculate class-wide damages, one would apply the estimated overcharge percentage for competitions across all regions (equals 23.8%, recall Table 22 above) to Varsity's total registration revenues from all cheer camps in the Class Period. To calculate the overcharge paid by indirect purchasers for all Varsity cheer camps during the Class Period, one would apply the (nominal) pass through rate to the overcharge paid by direct purchasers for all

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Varsity cheer camps during the Class Period.

Randal Heeb, PhD
June 20, 2022

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

**ATTACHMENT 1:**
**CURRICULUM VITAE OF RANDAL HEEB, PHD**

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

# Randal Heeb, Ph.D.

## Senior Managing Director

———

555 12th Street NW, Suite 700 - Washington, DC 20004
+1 703 785 9012
randal.heeb@fticonsulting.com

**Education**

BA, Economics,
University of Washington
MPA,
Harvard Kennedy School
PhD, Economics,
University of Chicago

**Expertise**

Antitrust & Competition
Economics

Intellectual Property

Litigation Support &
Consulting Services

International Arbitration

Commercial Damages
Analysis

**Industries**

Diversified Industrials

Healthcare & Life Sciences

Telecom, Media &
Technology (TMT)

Energy & Utilities

Hospitality, Gaming &
Leisure

Randal Heeb has 35 years of experience providing economic analysis in both the private and public sectors. His expertise includes analysis of liability, damages, and other remedies in antitrust and intellectual property disputes. Dr. Heeb has written, consulted, and testified on a range of issues related to the application of economic and econometric analyses in a variety of industries, including software, computer hardware, telecommunications, commodities and financial markets, biopharmaceuticals, electricity, natural gas, and gaming.

Since 2019, Dr. Heeb has been recognized as a leading competition economist by Global Competition Review in Who's Who Legal - Competition. He has previously held various academic posts in the United States and Europe and was most recently a Senior Faculty Fellow at the Yale School of Management. He has served private sector clients and public authorities operating in both regulated and unregulated markets, and he has taught antitrust compliance to executives in North America, Europe, and Asia.

Prior to joining FTI Consulting, Dr. Heeb was an Equity Partner at Bates White Economic Consulting, where he was the leader of the Intellectual Property Practice and co-leader of the Antitrust and Competition Practice. He has testified extensively in matters before US state and federal courts, Canadian courts, arbitration panels, the US Copyright Royalty Board and the US Federal Energy Regulatory Commission. He has presented economic analyses on behalf of clients to the staffs of the US Federal Trade Commission, the US Department of Justice, the Competition Bureau of Canada, the European Commission's DG Comp, the Korean Fair Trade Commission, and the Japanese Fair Trade Commission.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

**Relevant Experience**

— Testified before the Tax Court of Canada in several cases on the measure of skill versus chance in online and tournament poker.

— Testified before the Federal Court of Canada on reasonable royalties in *Seedlings v Pfizer Canada*.

— Testified before a jury in the US District Court of Delaware on reasonable royalty damages on behalf of Amgen in a biopharmaceutical patent dispute.

— Submitted an expert report on patent damages related to gene therapy technology in REGENXBIO v. Aldevron.

— Submitted expert reports in *Reorganized FLI, Inc. v. The Williams Companies, Inc. and Dynegy Marketing & Trade* related to allegations of price manipulation in natural gas markets.

— Submitted an expert report on damages and testified before an arbitrator in *In re Packaged Seafood Products Antitrust Litigation* related to allegations of price fixing in the market for canned tuna.

— Testified for NOVA Chemical Company before the Federal Court of Canada on reasonable royalties and patent damages issues in *Dow v. NOVA*.

— Submitted an expert report on monopolization and patent misuse issues in *ChromaDex v. Elysium Health*.

— In *In re Western States Wholesale Natural Gas Antitrust Litigation*, submitted multiple expert reports and declarations on behalf of energy trading companies alleged to have violated Section I of the Sherman Act, on issues related to class certification, liability, and damages.

— In *In re Natural Gas Commodity Litigation*, submitted expert testimony on behalf of Coral Energy Resources, an energy trading company, related to allegations of collusion and price manipulation in the NYMEX commodity futures market.

— Testified to an arbitration panel on behalf of Activist in *Activist v. Phoenix*, a trade secrets dispute in the residential mortgage-backed securities industry.

— Served as lead economics consulting expert on behalf of AMD in the landmark microprocessor antitrust case AMD v. Intel. Led the consulting teams supporting three testifying experts and supervised all economics-related contributions. Advised on overall case strategy and performed economic analysis to assess liability and damages resulting from alleged illegal conduct in the United States, Japan, Korea, and Europe.

— Submitted written direct testimony before the Copyright Royalty Board in *In re Distribution of Satellite Royalty Funds*.

— Submitted an expert report on damages in *MCQ v. Idaho Pizza Company*, a dispute involving intellectual property licensing in the franchise restaurant business.

— Provided expert testimony on behalf of Tata Consultancy Services Limited on damages issues in a contract dispute over the implementation of an SAP Enterprise Resource Planning system for a global law firm.

— Served as lead economics consulting expert on behalf of several plaintiff companies in the Butadiene Rubber (BR)/Emulsion Styrene Butadiene Rubber (ESBR) case, which was argued before the English High Court.

— Provided economic expert services to the complainants in a steel industry trade dispute before the US International Trade Commission.

— Testified to an arbitration panel in an intellectual property and trade secrets dispute on behalf of Scentsy, Inc.

— Submitted an expert report on behalf of Central Valle Hermoso, S.A. de C.V. in an international arbitration under the rules of the ICC, in a dispute involving a natural gas supply agreement.

— In Certain Electronic Devices, Including Wireless Communication Devices, Tablet Computers, Media Players and Televisions, and Components Thereof and Certain Wireless Devices with 3G and/or 4G Capabilities and

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Components Thereof, two related ITC investigations involving standard-essential patents (SEPs), served as lead consulting economist.

— Testified before Judge Glazer at the Federal Energy Regulatory Commission on behalf of Shell Energy North America on issues related to allegations of natural gas price misreporting.

— Submitted expert reports and testified before the court in *United States v. Dicristina* regarding econometric and game theoretical evidence on the question of whether poker is a game predominated by skill or chance. Judge Weinstein cited the testimony extensively in his decision.

— Submitted an affidavit in *Cohen v. Minister of Citizenship and Immigration* regarding econometric and game theoretical evidence on the question of whether poker is predominately a game of skill or chance. Judge Harrington cited the affidavit favorably in his decision.

— Submitted expert testimony on damages on behalf of the defendant in a dispute over alleged natural gas and financial derivatives price manipulation in *E. & J. Gallo Winery v. EnCana Corporation*.

— Testimony in a bench trial on the question of whether poker is a game of skill or chance in *Minnesota v. Jerde*, No. 60-CR-12-1715, was cited favorably by Judge Remick in his decision.

— Retained to testify before an arbitration panel on damages for an international seed company, the plaintiff in a patent dispute over licensing of genetic traits for herbicide tolerance. The matter settled prior to testimony.

— Developed damages estimates for mediation in an antitrust and intellectual property dispute in the heavy equipment industry involving issues of bundled pricing and exclusive dealing.

— Lead consulting expert to an international seed company advising on damages and settlement strategy in a defense matter involving licensing of genetic traits for herbicide tolerance before a US District Court.

— Served as lead consulting expert for SAP, defending a patent infringement suit in *Sky Technologies LLC v. SAP AG*.

— Served as lead consulting economist in a matter alleging trade secret misappropriation and antitrust counterclaims of tying, exclusive dealing, and attempted monopolization in the property management software market.

— Led the external economic team supporting the Competition Bureau of Canada's evaluation of the merger of Maple Acquisition Group and the parent company of the Toronto Stock Exchange.

— Retained to submit an expert report on damages for a defendant computer manufacturer in an intellectual property dispute involving component patents. The matter settled prior to testimony.

— Served as lead consulting expert for Amgen, Inc., on issues related to a request for permanent injunction in the patent infringement suit Teva v. Amgen.

— Provided economic analysis to the Competition Bureau of Canada in its evaluation of the acquisition of Maple Leaf Sports Entertainment by Bell Canada Enterprises Inc. and Rogers Communications, Inc.

— Led the economics team providing advice to the Competition Bureau of Canada in its evaluation of the acquisition of Potash Corporation by BHP Billiton.

— Provided economic analysis on behalf of tire manufacturers in the UK proceedings regarding private damages claims related to the EU synthetic rubber cartel case. Supported testifying expert and worked with attorneys on both sides of the Atlantic to quantify potential damages.

— Led a joint US–European consulting team providing support to a leading firm in the freight forwarding industry to address inquiries from antitrust authorities in a number of jurisdictions throughout the world, including the European Commission and the US Department of Justice, related to allegations of price-fixing and other anticompetitive conduct.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

— Led the economics team supporting an expert testifying on behalf of Music Choice before the Copyright Royalty Board of the US Library of Congress.

— Estimated damages related to allegations of natural gas price manipulation, and provided advice as a consulting expert.

— Served as Scientist-in-Charge (principal investigator) of a European Union–funded research study of the economics of network industries.

— Provided economic analysis to New England Power Service Company supporting both the planning and the divestiture of the Seabrook nuclear power station.

— Developed electric utility resource planning and asset valuation methodology and software that was implemented in six states and used by federal government researchers.

— Developed a simulation model to calibrate electricity forecasting and planning methodologies to variations in weather.

— Provided advice to multiple defendants as a consulting expert in support of successful settlement negotiations in a number of state indirect purchaser cases in matters involving allegations of physical natural gas price manipulation.

— Retained as an expert by an energy trading company in a case involving allegations of securities market manipulation in the propane industry.

— Designed and implemented short-term econometric forecasting methodology that is widely used to support trading in deregulated electricity markets.


**Testifying Experience**

— *REGENXBIO Inc., and The Trustees of the University of Pennsylvania v. Aldevron LLC*, Case No. 3:20-CV-00171-PDW-ARS, (D. North Dakota Eastern Division). Expert report, February 15, 2022; erratum expert report, February 28, 2022; deposition, April 19, 2022.

— *Reorganized FLI, Inc. v. The Williams Companies, Inc. and Dynegy Marketing & Trade*, Case No. 2:05-cv-02389-JAR-GEB, (D. Kansas). Expert report, October 15, 2021. Supplemental expert report, December 17, 2021.

— *Bérubé v. Her Majesty the Queen*, Files: 2014-461(IT)G 2014-123(IT)G, (Tax Court of Canada). Expert report, August 21, 2020; Second expert report, September 11, 2020; Rebuttal report, November 25, 2020; Surrebuttal report, July 14, 2021; Trial testimony, September 22, 2021.

— *D'Auteuil v. Her Majesty the Queen*, 2014-1171(IT)G 2014-90(IT)G, (Tax Court of Canada). Expert report, August 21, 2020; Second expert report, September 11, 2020; Rebuttal report, November 25, 2020; Surrebuttal report, July 14, 2021; Trial testimony, September 22, 2021.

— *Giguère v. Her Majesty the Queen*, 2014-1787(IT)G 2014-1786(IT)G, (Tax Court of Canada). Expert report, August 21, 2020; Second expert report, September 8, 2020; Rebuttal report, November 25, 2020; Surrebuttal report, July 14, 2021; Trial testimony, September 22, 2021.

— *Duhamel v. Her Majesty the Queen*, Files: 2018-1782 (IT)G, (Tax Court of Canada). Expert report, December 16, 2020; Rebuttal report, January 19, 2021; Surrebuttal report, February 18, 2021. Trial testimony, November 22-23, 2021.

— *In re Packaged Seafood Products Antitrust Litigation*, Case No. 15-MD-2670-JLS-MDD (S.D. California). Expert report, May 10, 2019; deposition, June 7, 2019; arbitration testimony, January 22, 2020.

— *ChromaDex, Inc., v. Elysium Health, Inc.*, Case No. SACV 16-02277-CJC (DFMx), (C.D. California). Expert report July 26, 2019, deposition August 14, 2019.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

— *Seedlings Life Science Ventures LLC v. Pfizer Canada Inc.*, No. T-608-17 (Canada Federal Court). Expert report, May 29, 2019, trial testimony October 24-25, 2019.

— *In re Distribution of Satellite Royalty Funds*, No. 14-CRB-0011-SD (2010-13). Written direct testimony, Mar. 22, 2019; corrected written direct testimony, June 6, 2019; rebuttal testimony, August 26, 2019, corrected rebuttal testimony October 14, 2019.

— *Central Valle de Hermoso, S.A. de C.V. v BNP Paribas*, International arbitration under rules of the ICC. Expert report, February 8, 2018.

— *Amgen Inc. v. Hospira Inc.*, Case No. 15-cv-839-RGA (D. Delaware). Expert report, February 3, 2017; reply report, April 13, 2017; deposition, April 28, 2017; jury testimony, September 19, 2017.

— *Los Angeles Turf Club, et al. v. Horse Racing Labs, LLC, et al.*, Case No. 2:15-cv-9332 (C.D. Cal). Expert report, March 8, 2017, corrected expert report, March 15, 2017; declaration April 20, 2017; deposition May 10, 2017.

— *The Dow Chemical Company v. NOVA Chemicals Corporation*, No. T-2051-10 (Canada Federal Court, 2011). Expert report, September 26, 2016; reply report, November 30, 2016; testimony, December 15–16, 2016, January 11, 2017.

— *In re Western States Wholesale Natural Gas Antitrust Litigation*, MDL-1566, Base Case No. CV-S-2:03-1431-RCJ-PAL, Case Nos. CV-S-03-1431-RCJ-PAL, CV-S-06-233-RCJ-PAL, CV-S-07-987-RCJ-PAL, CV-S-07-1019-RCJ-PAL, CV-S-09-00915-RCJ-PAL (D. Nevada). Declaration, June 23, 2016; deposition, August 1, 2016; expert report, September 12, 2016; rebuttal declaration, November 3, 2016; deposition, March 21, 2017.

— *Sinclair Oil Corporation v. ONEOK Energy Services Company, L.P.*, MDL-1566, Base Case No. CV-S-2:03-1431-RCJ-PAL. Case No. 2:06-CV-0282-RCJ-PAL. (D. Nevada). Expert report, September 12, 2016.

— *Baker and McKenzie Global Services LLC v. Tata America International Corp.* (AAA Case No. 01-14-0000-0618). Expert report, January 15, 2016; deposition, February 19, 2016; testimony, April 27, 2016.

— Public Utils. Comm'n of the State of Cal. v. Sellers of Long-Term Contracts to the Cal. Dep't of Water Res. and California Elec. Oversight Board v. Sellers of Energy & Capacity Under Long-Term Contracts with the Cal. Dep't of Water Res., Nos. EL02-60-007 and EL02-62-006 (FERC). Answering testimony, July 21, 2015; deposition, September 22, 2015; cross-examination testimony, November 24, 2015.

— *Activist Special Advisory Services LLC v. Phoenix Real Estate Solutions Ltd*. (AAA Case No. 011400002627). Expert report, February 19, 2015; testimony before arbitration panel, February 25, 2015.

— *Marosvari v. Scentsy, Inc.*, No. CV OC 1210673 (Arbitration ordered by Idaho Dist. Ct., Ada Cnty). Expert report, November 17, 2014; deposition, December 5, 2014; testimony before arbitration panel, December 17, 2014.

— *Minnesota v. Jerde*, No. 60-CR-12-1715 (Minn. Dist. Ct., Polk Cnty. filed 2012). Declaration, October 17, 2014; oral testimony in bench trial, November 6, 2014.

— *Minnesota v. Johnson*, No. 60-CR-12-1713 (Minn. Dist. Ct., Polk Cnty. filed 2012). Declaration, October 17, 2014.

— *Cohen v. Minister of Citizenship and Immigration*, No. IMM-7846-14 (Can. Fed. Ct.). Affidavit, December 11, 2013.

— *Kentucky v. Pocket Kings*, No. 10-CI-0505 (Ky. Cir. Ct., Franklin Cnty. Mar. 25, 2010). Affidavit, September 24, 2012.

— *United States v. Dicristina*, No. 11-CR-414 (E.D.N.Y. June 1, 2011). Expert report, July 5, 2012; oral testimony in bench trial, July 9, 2012, August 10, 2012; supplemental expert report, August 13, 2012; declaration, August 20, 2012.

— *MCQ v. Idaho Pizza Co., Inc.*, No. CV OC 1025077 (D. Idaho, Dec. 22, 2010). Expert report, July 11, 2011.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

— *E. & J. Gallo Winery v. EnCana Corp.*, No. CV F 03-5412 (E.D. Cal. Sept. 30, 2005). Expert report, April 1, 2009; deposition, April 2009.

— *In re Natural Gas Commodity Litig.*, No. 03 CV 6186 (S.D.N.Y. Oct. 14, 2004). Expert report, December 5, 2006.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

**ATTACHMENT 2:**
**MATERIALS RELIED ON**

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

## Attachment 2

I incorporate by reference any citation that appears in footnotes in this report including the tables and references therein. I have access to all documents produced and depositions taken in this litigation.

## Legal Filings

- Brown Shoe Co. v. United States, 370 U.S. 294 (1962)
- Comcast Corp. v. Behrend, 569 U.S., 1428, 1433 (2013)
- Complaint
- FTC v. Indiana Federation of Dentists, 476 U.S. 447, 460-61 (1986)
- Little Rock Cardiology Clinic, P.A. v. Baptist Health, 591 F. 3d 591, 596 (8th Cir. 2009)
- United States v. E. I. du Pont De Nemours & Co., 351 U.S. 377 (1956)
- Walker Process Equip. v. Food Mach. And Chem. Co., 382 U.S. 172, 177 (1965)

## Depositions

- Deposition and Exhibits of Brian Elza, November 16, 2021 and November 17, 2021
- Deposition and Exhibits of Tres LeTard, November 22, 2021
- Deposition and Exhibits of Lauren Gurske, December 7, 2021
- Deposition and Exhibits of Tim Gurske, December 9, 2021
- Deposition and Exhibits of Nicole Lauchaire, December 09, 2021
- Deposition and Exhibits of Sarah Minzghor, December 17, 2021
- Deposition and Exhibits of Rebecca Foster, December 21, 2021
- Deposition and Exhibits of Damianne Albee, January 11, 2022
- Deposition and Exhibits of Alexa Bray, January 11, 2022
- Deposition and Exhibits of Christina Lorenzen, January 20, 2022.
- Deposition and Exhibits of Janine Cherasaro, February 2, 2022
- Deposition and Exhibits of Leslie Wright, February 9, 2022
- Deposition and Exhibits of Jessica Jones, February 10, 2022.
- Deposition and Exhibits of Lauren Hayes, February 18, 2022
- Deposition and Exhibits of Craig Davis, February 23, 2022
- Deposition and Exhibits of Lynn Singer, March 2, 2022
- Deposition and Exhibits of Jamie Parrish, March 3, 2022 and March 17, 2022
- Deposition and Exhibits of Steve Peterson, March 9, 2022
- Deposition and Exhibits of Pashupati Nangia, March 10, 2022
- Deposition and Exhibits of Melanie Berry, March 18, 2022
- Deposition and Exhibits of Jim Hill, March 21, 2022
- Deposition and Exhibits of John Newby, March 23, 2022 and March 24, 2022
- Deposition and Exhibits of Josh Quintero, March 29, 2022
- Deposition and Exhibits of Kathryn Radek, March 29, 2022 and March 30, 2022
- Deposition and Exhibits of Ali Stangle, March 30, 2022
- Deposition and Exhibits of Amy Clark, March 31, 2022
- Deposition and Exhibits of Jeffrey Fowlkes, April 5, 2022

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

- Deposition and Exhibits of Marlene Cota, April 07, 2022
- Deposition and Exhibits of John Sadlow, April 7, 2022
- Deposition and Exhibits of Landon Craft, April 8, 2022
- Deposition and Exhibits of William Seely, April 13, 2022 and April 14, 2022
- Deposition and Exhibits of Cole Stott, April 13, 2022
- Deposition and Exhibits of Sheila Noone, April 14, 2022
- Deposition and Exhibits of Karen Wilson, April 14, 2022
- Deposition and Exhibits of Jim Chadwick, April 15, 2022
- Deposition and Exhibits of David Hanberry, April 18, 2022
- Deposition and Exhibits of Josh Beer, April 20, 2022
- Deposition and Exhibits of Andrew Janower, April 22, 2022
- Deposition and Exhibits of Saron Tesfalul, April 27, 2022
- Deposition and Exhibits of David Katz, April 29, 2022
- Deposition and Exhibits of Brandon White, April 29, 2022
- Deposition and Exhibits of Ethan Portnoy, May 2, 2022
- Deposition and Exhibits of Neil Kalvelage, May 4, 2022
- Deposition and Exhibits of Thomas O'Rourke, May 4, 2022
- Deposition and Exhibits of Ryan Cotton, May 5, 2022
- Deposition and Exhibits of Jeff Webb, May 12, 2022 and May 13, 2022

## Academic

- ABA Section of Antitrust Law, Market Power Handbook (2005).
- Antitrust Health Care Handbook, Fourth Edition, ABA Section of Antitrust Law (2010).
- Areeda, Phillip E. & Herbert Hovenkamp, 2020 Supp. to Antitrust Law – An Analysis of Antitrust Principles and Their Application (2020).
- Bernheim, B. Douglas, and Randal Heeb. "A framework for the economic analysis of exclusionary conduct." The Oxford Handbook of International Antitrust Economics: Vol. II (2014): 3-39.
- Carlton, Dennis, U.S. Department of Justice, Economic Analysis Group Discussion Paper, Market Definition: Use and Abuse (2007).
- Davis, Peter, and Eliana Garces. Quantitative Techniques for Competition and Antitrust Analysis, Princeton University Press (2010).
- Greenlee, Patrick, David Reitman, and David S. Sibley. "An antitrust analysis of bundled loyalty discounts," International Journal of Industrial Organization 26:5, 1132-1152 (2008).
- Ho, Katherine, Justin Ho, and Julie Holland Mortimer. "The use of full-line forcing contracts in the video rental industry," American Economic Review 102:2, 686-719 (2012).
- Hovenkamp, Herbert, and Carl Shapiro, Horizontal Mergers, Market Structure, & Burdens of Proof, The Yale Law Journal, 127:7, 1996-2025 (2018).
- O'Brien, Daniel P., and Greg Shaffer. "Vertical control with bilateral contracts," The RAND Journal of Economics 23:3, 299-308 (1992).
- Schwartz, Marius, and Daniel R. Vincent. "The no surcharge rule and card user rebates: Vertical control by a payment network," Review of Network Economics 5:1, 72-102 (2006).

## Expert Report

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

- Expert Report of Dr. Janet S. Netz (June 20, 2022)

**Bates-Stamped Documents**
- BAIN00000352 (Newby Exhibit 12)
- CB00485513
- FEAS-ARES00066909
- FEAS-ARES00075739
- JEFF00025079
- JEFF00034795
- JEFF00035010
- JEFF00047202
- JEFF00141901
- JEFF00262824
- JEFF00262840
- JEFF00263834
- USASF_00000297
- USASF_00001296 (Peterson Exhibit 39)
- USASF_00001955
- USASF_00001966
- USASF_00002243
- USASF_00002366 (Peterson Exhibit 29)
- USASF_00003390
- USASF_00005125 (Chadwick Exhibit 37)
- USASF_00009869
- USASF_00012460 (Peterson Exhibit 22)
- USASF_00014260 (Peterson Exhibit 32)
- USASF_00015124 (Peterson Exhibit 33)
- USASF_00017975 (Peterson Exhibit 40)
- USASF_00019064 (Peterson Exhibit 24)
- USASF_00019495 (Peterson Exhibit 17)
- USASF_00020227 (Peterson Exhibit 25)
- USASF_00020257 (Peterson Exhibit 26)
- USASF_00020387 (Peterson Exhibit 27)
- USASF_00020397 (Peterson Exhibit 28)
- USASF_00021435 (Peterson Exhibit 30)
- USASF_00021714 (Peterson Exhibit 31)
- USASF_00030535 (Seely Exhibit 14)
- USASF_00032444 (Chadwick Exhibit 2)
- USASF_00032540
- USASF_00055921
- USASF_00070540 (Singer Exhibit 8)
- USASF_00084334 (Stangle Exhibit 20)

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

- VAR00001346
- VAR00001611
- VAR00006767
- VAR00006786
- VAR00008463
- VAR00008543 (Webb Exhibit 30)
- VAR00009293
- VAR00009323 (Seely Exhibit 17)
- VAR00012792
- VAR00017807
- VAR00017827
- VAR00033456
- VAR00067447
- VAR00073336
- VAR00076749
- VAR00078751 (Elza Exhibit 15)
- VAR00079196 (Hill Exhibit 16)
- VAR00081049
- VAR00081661
- VAR00081770
- VAR00082437
- VAR00083645
- VAR00084758
- VAR00087216
- VAR00092896
- VAR00094549
- VAR00094550
- VAR00095101
- VAR00097495 (LeTard Exhibit 17)
- VAR00101100 (Elza Exhibit 5)
- VAR00101102
- VAR00101110 (LeTard Exhibit 8)
- VAR00101122
- VAR00101741 (Davis Exhibit 12)
- VAR00102784
- VAR00103719 (LeTard Exhibit 18)
- VAR00106514
- VAR00125907
- VAR00128718
- VAR00128725
- VAR00129038
- VAR00129039

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

- VAR00160802 (Duhon Exhibit 5)
- VAR00160803
- VAR00170292
- VAR00177295 (Elza Exhibit 25)
- VAR00177654 (Elza Exhibit 6)
- VAR00182095 (Parrish Exhibit 8)
- VAR00182584
- VAR00190278 (Berry Exhibit 19, Sadlow Exhibit 13)
- VAR00217710
- VAR00233528
- VAR00239326 (Elza Exhibit 10)
- VAR00241726
- VAR00244139 (Elza Exhibit 16)
- VAR00247460
- VAR00248665
- VAR00249288 (Davis Exhibit 7)
- VAR00250013
- VAR00253876 (Newby Exhibit 20)
- VAR00254066 (Davis Exhibit 8)
- VAR00255570 (Parrish Exhibit 9)
- VAR00270286
- VAR00272717
- VAR00272785
- VAR00274967
- VAR00274992
- VAR00304733 (Elza Exhibit 7)
- VAR00309426 (LeTard Exhibit 4)
- VAR00310631
- VAR00314914
- VAR00321653 (Chadwick Exhibit 20)
- VAR00323450 (Elza Exhibit 4)
- VAR00323451
- VAR00324110
- VAR00339736
- VAR00341580
- VAR00342165
- VAR00345315
- VAR00346980
- VAR00348766
- VAR00351487 (Chadwick Exhibit 59, Peterson Exhibit 65)
- VAR00351488
- VAR00355287

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

- VAR00369554
- VAR00370795
- VAR00415063
- VAR00418061 (Nangia Exhibit 9)
- VAR00421046
- VAR00421817
- VAR00424538
- VAR00424775
- VAR00431092 (Webb Exhibit 27)
- VAR00448716
- VAR00472431 (Berry Exhibit 18)
- VAR00503298
- VAR00504983
- VAR00584154

## Public Documents

- "About Varsity Brands," https://www.varsitybrands.com/about
- Amazon.com, "Nfinity Vengeance Cheer Shoe - Women & Youth Competition Cheerleading Gear," https://www.amazon.com/Nfinity-Vengeance-Cheer-Shoe-White/dp/B006WAEW2Y/
- Charlesbank, "Case Study: Varsity Brands," https://www.charlesbank.com/portfolio/case-studies/varsity-brands/
- Connolly, Daniel, "Cheer Empire: A For-profit Company Built Competitive Cheer, Pays People Who Make its Rules," USA Today and The Memphis Commercial Appeal, Sept. 18, 2020, Updated Feb. 8, 2021, https://www.commercialappeal.com/in-depth/news/2020/09/18/cheer-empire-profit-company-created-cheerleading-regulators-pays-salaries/3468551001/
- Corporate Finance Institute, "Barriers to Entry," April 29, 2022, https://corporatefinanceinstitute.com/resources/knowledge/economics/barriers-to-entry/
- Devenney, Cara, "Gymnastics and Cheerleading: What is the Difference?", All Gymnasts, August 4, 2020, https://allgymnasts.com/gymnastics-cheerleading-difference/
- Herff Jones, "About," https://www.herffjones.com/about/
- Hirsch, Lauren, "Bain to Acquire Varsity Brands, a Top Maker of Cheerleading Uniforms and School Spirit Items, For Roughly $2.5 Billion," CNBC, June 19, 2018, https://www.cnbc.com/2018/06/19/bain-nears-2-point-5-billion-deal-for-cheer-uniform-leader-varsity-brands.html
- Everything Cheer Magazine, "Aloha Productions Merges with Varsity Spirit," http://everythingcheermagazine.com/article/aloha-productions-merges-with-varsity-spirit/
- MasterClass, "A Guide to Competitive Artistics Gymnastics," September 13, 2021, https://www.masterclass.com/articles/a-guide-to-competitive-artistic-gymnastics#what-is-artistic-gymnastics
- Nfinity, "Cheerleading," https://www.nfinity.com/collections/cheerleading
- Nfinity, "Shoes," https://www.nfinity.com/collections/shoes

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

- Reuters, "Riddell in Deal for Maker of Cheerleading Uniforms," The New York Times, May 7, 1997, https://www.nytimes.com/1997/05/07/business/riddell-in-deal-for-maker-of-cheerleading-uniforms.html
- Sheffield, Michael, "Rebranding Spreads Varsity Name Around," Memphis Business Journal, June 3, 2014, https://www.bizjournals.com/memphis/news/2014/06/03/rebranding-spreads-varsity-name-around.html
- TheCheerBuzz, "Guide: The Top 7 Best Cheerleading Shoes (Ranked by Actual Athletes)," June 8, 2021, https://www.thecheerbuzz.com/guide-the-top-7-best-cheerleading-shoes-ranked-by-actual-athletes/
- U.S. Department of Justice and Federal Trade Commission, "Horizontal Merger Guidelines," Issued: August 19, 2010
- US Federal Trade Commission, "Competition Guidance: Guide to Antitrust Laws: Mergers," https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/mergers/markets
- USA Cheer, "USA Cheer Welcomes International Olympic Committee's Full Recognition of the International Cheer Union," July 20, 2021, https://www.usacheer.org/usa-cheer-welcomes-international-olympic-committees-full-recognition-of-the-international-cheer-union
- USASF, "About the USASF," https://www.usasf.net/about
- USASF, "Sanctioning Committee's Approval Process & Criteria For Tier 1 Event Producers & World Bid Eligibility," https://usasfmain.s3.amazonaws.com/EventProducer/docs/19-20/USASF_Event-Producer_Tier-1_Approval_Guidelines_19-20.pdf
- USASF, "USASF Regional Directors," https://www.usasf.net/regional-directors
- Varsity Brands, "Achievement," https://www.varsitybrands.com/achievement
- Varsity Brands, "Spirit," https://www.varsitybrands.com/spirit
- Varsity Brands, "Sport," https://www.varsitybrands.com/sport
- Varsity Press Release, "Varsity Spirit and Fabletics Team Up to Bring Activewear and Experiential Events to America's Cheer and Dance Community," https://www.varsity.com/about/press/varsity-spirit-and-fabletics-team-up-to-bring-activewear-and-experiential-events-to-americas-cheer-and-dance-community/
- Varsity, "NCA," https://www.varsity.com/nca/
- Varsity, "Our Camp Brands," https://www.varsity.com/school/camps/brands/
- Varsity, "UCA," https://www.varsity.com/uca/
- Varsity, "Varsity Competition Shoes," https://www.varsity.com/shoes-competition-2022/
- Varsity, "What is Competitive Cheerleading," February 20, 2018, https://www.varsity.com/news/what-is-competitive-cheerleading/
- Wikipedia, "Metropolitan Statistical Area," https://en.wikipedia.org/wiki/Metropolitan_statistical_area
- Wikipedia, "The JAM Brands," https://yamm.finance/wiki/The_JAM_Brands.html
- YouTube, "Nfinity Vengeance VS Varsity Lass Pass," https://www.youtube.com/watch?v=L6cLgSJDR6A

## Data Sources

- CB00063214

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

- NFINITY000297 (DESIGNATED HIGHLY CONFIDENTIAL – EXPERT AND ATTORNEYS' EYES ONLY)[379]
- USASF_00002776
- USASF_00002779
- USASF_00002782
- USASF_00002785
- USASF_00052537
- USASF_00084806
- VAR00010122
- VAR00010123
- VAR00010124
- VAR00010125
- VAR00010126
- VAR00010127
- VAR00017306
- VAR00018967
- VAR00117735
- VAR00117737
- VAR00117738
- VAR00117739
- VAR00117740
- VAR00123779
- VAR00123780
- VAR00127208
- VAR00234212
- VAR00352199
- VAR00352200
- VAR00352201
- VAR00352202
- VAR00352214
- VAR00352218
- VAR00352219
- VAR00352220
- VAR00352221
- VAR00352222
- VAR00352223
- VAR00352224
- VAR00352225

---

[379] "Highly Confidential – Attorneys and Expert Eyes Only" pursuant to Order Granting Joint Motion for Entry of Stipulated Protective Order in Fusion Elite All Stars, et al. v. Nfinity Athletic LLC, Case 2:22-cv-02226-SHL-tmp, ECF No. 30, (W.D. Tenn.), filed May 31, 2022 ("Nfinity PO")

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

- VAR00445395
- VAR00462074
- VAR00462075
- VAR00462076
- VAR00462077
- VAR00462078
- VAR00462079
- VAR00582534
- VAR00604800
- VAR00604801
- VAR00604802
- VAR00604803
- VAR00604804
- VAR00604805

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

**ATTACHMENT 3:**
**ADDITIONAL TABLES**

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

**Attachment 3**

*Table 25. Regression Output for Unweighted and Weighted Regression Models*

| | Dependent Variable: Log Price | |
|---|---|---|
| | (1) | (2) |
| VARIABLES | Regression 1 | Regression 2 |
| | | |
| Nationals Flag in MW | 0.784** | 0.956*** |
| | (0.382) | (0.235) |
| World Bid Event Flag in MW | 0.285 | 0.228** |
| | (0.195) | (0.089) |
| School Flag in MW | -0.559*** | -0.987*** |
| | (0.061) | (0.087) |
| Nationals Flag in NE | 0.191 | 0.203 |
| | (0.255) | (0.142) |
| World Bid Event Flag in NE | 0.602*** | 0.420*** |
| | (0.141) | (0.074) |
| School Flag in NE | -0.772*** | -1.087*** |
| | (0.079) | (0.092) |
| Nationals Flag in SE | 2.317*** | 2.141*** |
| | (0.112) | (0.047) |
| World Bid Event Flag in SE | 0.839*** | 0.505*** |
| | (0.104) | (0.047) |
| School Flag in SE | -0.416*** | -0.848*** |
| | (0.053) | (0.070) |
| Nationals Flag in SW | 0.983*** | 1.285*** |
| | (0.225) | (0.158) |
| World Bid Event Flag in SW | 0.739*** | 0.602*** |
| | (0.146) | (0.056) |
| School Flag in SW | -0.469*** | -0.907*** |
| | (0.071) | (0.070) |
| Nationals Flag in W | 0.855*** | 0.475** |
| | (0.204) | (0.206) |
| World Bid Event Flag in W | 0.952*** | 0.624*** |
| | (0.147) | (0.077) |
| School Flag in W | -0.768*** | -1.322*** |
| | (0.042) | (0.046) |
| Overcharge Flag in MW | 0.246*** | 0.192*** |
| | (0.069) | (0.059) |
| Overcharge Flag in NE | 0.392*** | 0.386*** |
| | (0.068) | (0.062) |
| Overcharge Flag in SE | 0.239*** | 0.300*** |
| | (0.081) | (0.082) |
| Overcharge Flag in SW | 0.192 | 0.192 |
| | (0.137) | (0.136) |
| Overcharge Flag in W | 0.101 | 0.167 |
| | (0.120) | (0.114) |
| Constant | 3.908*** | 4.235*** |
| | (0.069) | (0.060) |
| | | |
| Observations | 2,763 | 2,763 |
| R-squared | 0.470 | 0.688 |
| Weighted by Athlete Count | No | Yes |

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| Season Dummies | Yes | Yes |
| Month of Year Dummies | Yes | Yes |
| Region Dummies | Yes | Yes |
| Brand Dummies | Yes | Yes |
| Event Dummies | Yes | Yes |
| Controls for Cost | No | No |

Standard errors in parentheses
*** $p<0.01$, ** $p<0.05$, * $p<0.1$

Sources: Varsity Registrations Data; Competitor Pricing Data; World Bids Events Data.

*Table 26. Regression Output for Alternative Regression (Sensitivity Check) with Cost as Explanatory Variable*

| | Dependent Variable: Log Price | |
|---|---|---|
| | (1) | (2) |
| VARIABLES | Regression 1 | Regression 2 |
| | | |
| Log Cost per Athlete | 0.026*** | 0.026*** |
| | (0.006) | (0.006) |
| Nationals Flag in MW | 1.997*** | 1.753*** |
| | (0.467) | (0.357) |
| World Bid Event Flag in MW | 0.411*** | 0.411*** |
| | (0.127) | (0.127) |
| Nationals Flag in NE | 0.263 | 0.316* |
| | (0.183) | (0.175) |
| World Bid Event Flag in NE | 0.366*** | 0.366*** |
| | (0.083) | (0.083) |
| Nationals Flag in SE | 1.843*** | 1.842*** |
| | (0.054) | (0.054) |
| World Bid Event Flag in SE | 0.341*** | 0.341*** |
| | (0.049) | (0.049) |
| Nationals Flag in SW | -0.064 | -0.064 |
| | (0.275) | (0.275) |
| World Bid Event Flag in SW | 0.419*** | 0.419*** |
| | (0.057) | (0.056) |
| Nationals Flag in W | -0.007 | -0.007 |
| | (0.260) | (0.260) |
| World Bid Event Flag in W | 0.232*** | 0.232*** |
| | (0.081) | (0.081) |
| Overcharge Flag in MW | 0.546*** | |
| | (0.200) | |
| Overcharge Flag in NE | 0.282*** | |
| | (0.109) | |
| Overcharge Flag in SE | 0.301 | |
| | (0.250) | |
| Overcharge Flag in SW | -0.006 | |
| | (0.665) | |
| Overcharge Flag in W | 0.028 | |
| | (0.831) | |
| Varsity Competition Overcharge | | 0.336*** |
| | | (0.093) |
| Constant | 3.948*** | 4.157*** |

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

|  | (0.203) | (0.102) |
|---|---|---|
| Observations | 987 | 987 |
| R-squared | 0.740 | 0.740 |
| Weighted by Athlete Count | Yes | Yes |
| Season Dummies | Yes | Yes |
| Month of Year Dummies | Yes | Yes |
| Region Dummies | Yes | Yes |
| Brand Dummies | Yes | Yes |
| Event Dummies | Yes | Yes |
| Controls for Cost | No | No |

Standard errors in parentheses
*** $p<0.01$, ** $p<0.05$, * $p<0.1$

Sources: Varsity Registrations Data; Event Cost Data; Competitor Pricing Data; World Bids Events Data.

327. Table 27 below demonstrates the results of my CSA analysis. When analyzing CSAs, I make three changes. First, I combine the CSA of Hot Springs, Arkansas with the CSA of Little Rock, Arkansas. The centers of these two CSAs are located 56 miles apart. Second, I combine the CSA of New York City, New York and the CSA of Philadelphia, Pennsylvania. These two cities in the Northeast region are less than 100 miles apart, and numerous Varsity events were hosted in Atlantic City, New Jersey and Ocean City, New Jersey, which are both MSAs in the Philadelphia CSA. These New Jersey event locations are locations that many New York City-based teams frequently traveled to for competitions. Third, in Texas, the cities of Houston and Austin host a disproportionately small number of Varsity events, while the nearby cities of San Antonio and Dallas host a disproportionately large number of Varsity events. I combine all CSAs in the "Texas Triangle," including the cities of Houston, Austin, San Antonio, and Dallas, to evaluate the imputed market share at the subregional level.

328. Table 27 below reports the share of Varsity entrants participating in Varsity events in CSAs with market shares below 40% by season (for all seasons during the Class Period, excluding the COVID season of 2020-2021) and all regions. As demonstrated by the CSA analysis and reported in Table 27 below, across all seasons and regions, the fraction of Varsity entrants participating in Varsity events in "share < 40%" CSAs (defined as having market share less than 40%) is 4.0%, and the fraction of total competition revenue that Varsity collects from such entrants is 3.0%.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 27. Varsity Competition Entrants in CSAs with Market Shares Below 40% Represent a De Minimus Share of the Class Members*

| Region | Season | Entrants in "Share < 40%" CSAs | Total Number of Entrants | Fraction of Entrants in "Share < 40%" CSAs | Entrant Revenue in "Share < 40%" CSAs | Total Revenue | Fraction of Entrant Revenue in "Share < 40%" CSAs |
|---|---|---|---|---|---|---|---|
| MW | 2016-2017 | 8,730 | 100,743 | 8.7% | $645,586 | $11,113,258 | 5.8% |
| MW | 2017-2018 | 7,843 | 99,487 | 7.9% | $565,459 | $10,723,050 | 5.3% |
| MW | 2018-2019 | 6,603 | 106,726 | 6.2% | $515,296 | $11,833,008 | 4.4% |
| MW | 2019-2020 | 4,134 | 80,572 | 5.1% | $367,228 | $9,533,781 | 3.9% |
| NE | 2016-2017 | 0 | 81,968 | 0.0% | $0 | $8,823,743 | 0.0% |
| NE | 2017-2018 | 0 | 96,949 | 0.0% | $0 | $10,280,815 | 0.0% |
| NE | 2018-2019 | 1,869 | 141,444 | 1.3% | $124,325 | $14,063,337 | 0.9% |
| NE | 2019-2020 | 0 | 88,642 | 0.0% | $0 | $9,288,966 | 0.0% |
| SE | 2016-2017 | 13,417 | 151,694 | 8.8% | $1,155,095 | $16,428,603 | 7.0% |
| SE | 2017-2018 | 10,542 | 158,570 | 6.6% | $943,426 | $17,558,903 | 5.4% |
| SE | 2018-2019 | 11,398 | 176,629 | 6.5% | $1,037,330 | $19,426,234 | 5.3% |
| SE | 2019-2020 | 6,824 | 124,906 | 5.5% | $628,861 | $13,793,335 | 4.6% |
| SW | 2016-2017 | 4,744 | 87,019 | 5.5% | $289,681 | $9,298,354 | 3.1% |
| SW | 2017-2018 | 1,795 | 106,040 | 1.7% | $116,445 | $11,434,393 | 1.0% |
| SW | 2018-2019 | 3,051 | 106,041 | 2.9% | $222,815 | $11,978,080 | 1.9% |
| SW | 2019-2020 | 1,394 | 83,675 | 1.7% | $128,301 | $10,136,031 | 1.3% |
| W | 2016-2017 | 653 | 77,608 | 0.8% | $58,390 | $7,779,305 | 0.8% |
| W | 2017-2018 | 717 | 91,831 | 0.8% | $103,855 | $9,667,690 | 1.1% |
| W | 2018-2019 | 689 | 92,386 | 0.7% | $86,000 | $9,770,889 | 0.9% |
| W | 2019-2020 | 0 | 65,093 | 0.0% | $0 | $6,801,506 | 0.0% |
| **All Regions** | **Class Period** | **84,403** | **2,118,023** | **4.0%** | **$6,988,093** | **$229,733,280** | **3.0%** |

Sources: VAR00352218-25; Wikipedia, "Metropolitan Statistical Area," accessed June 1, 2022, available at: https://en.wikipedia.org/wiki/Metropolitan_statistical_area

329. Further, these 4.0% of entrants at Varsity competitions and 3.0% of total Varsity competition revenue from entrants participating in Varsity events in "share < 40%" CSAs would only be uninjured members of the class if they did not make any payments to Varsity in the cheer apparel market or the cheer camps market. I find that the fraction of Varsity competition customers who additionally made payments to Varsity in the cheer apparel market during the Class Period is 77.2%. As a fraction of Varsity's total competition revenue, the customers making payments in the cheer apparel market represented 90.7% of total revenue. This means that only 9.3% (at most) of Varsity's competition customers are customers in just that one market and do not make payments to Varsity in the cheer apparel or the cheer camps markets.

330. As described previously (recall Table 27 above), at most 3.0% (in terms of revenue) of Varsity's customers could have been uninjured in the cheer competition market (based on my analysis at the CSA level). Of that 3.0% of potentially uninjured class members from the

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

cheer competition market, an estimated 90.7% of them (in terms of revenue) would have made a purchase in the cheer apparel market. Every customer that made purchases from Varsity in the cheer apparel market during the Class Period was injured, since the overcharge was common across products in the market and applied uniformly across the United States. Thus, 90.7% of the 3.0% of potentially uninjured class members from the cheer competition market were likely injured based upon their payments to Varsity in the cheer apparel market. The remaining 9.3% of the 3.0% of potentially uninjured class members from the cheer competition market were, possibly, uninjured after taking account of apparel and competitions. This amounts to 0.3% of the total class members (by revenue). This 0.3% fraction of the class members that were uninjured is the maximum number of class members that were uninjured. The actual fraction is likely lower, and it could be the case that every class member was injured, when accounting for customer payments to Varsity in the cheer camps market and the possibility that customers attended a Varsity event in a "share < 40%" CSA despite having also attended an event in a "share > 40%" CSA. Other sources of potential antitrust injury not accounted for here (and not included in damages calculated for these Plaintiffs) include higher prices paid to entities other than Varsity because the "monopoly umbrella" effect that Varsity's monopoly prices may have allowed other companies to also raise prices above the competitive level, and the various other unquantified sources of injury from Varsity's conduct, such as inappropriate influence at the USASF.

331. Thus, at most a *de minimus* share (0.3%) of the class was uninjured.