# Exhibit 5

## FILED UNDER SEAL

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF**

**TENNESSEE WESTERN DIVISION**

| |
|---|
| **Jones, et al. v. Varsity Brands, LLC, et al.** |
| |
| **JURY TRIAL DEMANDED** |
| |

Case 2:20-cv-02892-SHL-tmp

Hon. Sheryl H. Lipman

**EXPERT DAMAGES REPORT OF JEN MAKI, PHD**

**JUNE 20, 2022**

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

TABLE OF CONTENTS

1.  Introduction ............................................................................................................................. 4

    1.1.    Qualifications and Experience ................................................................................. 4

    1.2.    Compensation ........................................................................................................... 4

    1.3.    Assignment ................................................................................................................ 4

    1.4.    Information and Materials Relied Upon ................................................................. 5

2.  Executive Summary ................................................................................................................ 5

3.  Allegations .............................................................................................................................. 7

    3.1.    Plaintiffs .................................................................................................................... 8

        3.1.1.    Jessica Jones ................................................................................................ 8

        3.1.2.    Christina Lorenzen ..................................................................................... 8

    3.2.    Defendants ................................................................................................................ 8

        3.2.1.    Varsity Brands ............................................................................................. 8

        3.2.2.    Varsity Spirit ................................................................................................ 8

        3.2.3.    Varsity Spirit Fashion ................................................................................. 9

        3.2.4.    USASF .......................................................................................................... 9

        3.2.5.    Jeffrey Webb ................................................................................................ 9

        3.2.6.    Charlesbank ............................................................................................... 10

        3.2.7.    Bain ............................................................................................................ 10

4.  Class Definition and Class Period ..................................................................................... 10

5.  Summary of Opinions .......................................................................................................... 11

6.  Background ........................................................................................................................... 12

    6.1.    Industry Background and Varsity's Operations ................................................. 12

        6.1.1.    Competitive Cheer .................................................................................... 12

        6.1.2.    Cheer Competitions .................................................................................. 13

        6.1.3.    Cheer Camps ............................................................................................. 15

        6.1.4.    Cheer Apparel ........................................................................................... 15

        6.1.5.    Bids ............................................................................................................ 16

        6.1.6.    Competitive Cheer Governing Associations .......................................... 16

    6.2.    Varsity ...................................................................................................................... 16

7.  Relevant Markets ................................................................................................................. 20

    7.1.    Cheer Competitions ............................................................................................... 20

    7.2.    Cheer Camps ........................................................................................................... 20

    7.3.    Cheer Apparel ......................................................................................................... 21

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

    7.4.      Varsity's Market Share in the Relevant Markets ..................................................... 21

8.    Defendants' Conduct ................................................................................................ 22

    8.1.      Defendants' Conduct Created Barriers to Entry for Varsity's Rivals in Relevant Markets .... 22

    8.2.      System of Bids for Invitation to National Competitions ........................................... 22

    8.3.      Control of the Governing Structures and Competition Rules to Deny Entry to Potential Competitors .................................................................................................................... 23

    8.4.      Competition in the Camps Market is Foreclosed by Leveraging Dominance in the Competitions Market  24

    8.5.      Counterprogramming Rivals' Competitions ............................................................. 25

    8.6.      Acquisition of Rival Competitors in the Cheer Competitions Market ...................... 26

    8.7.      Varsity's Leverage of Monopoly Power in Related Market Components ................... 28

        8.7.1.    Exclusive Agreements with All-Star Gyms ............................................... 28

        8.7.2.    Stay-to-Play (Accommodations) ................................................................ 31

        8.7.3.    Commuter Packages (Accommodations) ..................................................... 34

        8.7.4.    Spectator Fees ............................................................................................ 35

        8.7.5.    Varsity TV .................................................................................................. 36

9.    Damages Estimation ............................................................................................... 37

    9.1.      Damages Related to Cheer Competition Registration .............................................. 37

    9.2.      Damages Related to Cheer Camp Registration ........................................................ 42

    9.3.      Damages Related to Cheer Apparel (SECTION DESIGNATED HIGHLY CONFIDENTIAL – EXPERT AND ATTORNEYS' EYES ONLY) ................................................................. 43

    9.4.      Interest Applied to Damages .................................................................................... 45

    9.5.      Pass Through Damages to Class Members ................................................................ 45

    9.6.      Conclusions .............................................................................................................. 46

10.      Expert Declaration and Signature ........................................................................... 47

11.      Appendix A - Curriculum Vitae of Jen Maki ......................................................... 48

12.      Appendix B – List of Materials Relied Upon .......................................................... 49

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

# 1. INTRODUCTION

## 1.1. Qualifications and Experience

1.   I am a Managing Director at FTI Consulting, Inc. ("FTI"), and I lead the Commercial Due Diligence offering for the Transactions practice. FTI is an international management and business consulting firm of financial analysts, economists, accountants, valuation specialists and engineers who specialize in providing accounting, financial, economic and project management consulting services to clients and client companies, including providing assistance to counsel and their clients with the resolution of business problems and disputes, many of which involve parties in litigation. My professional responsibilities include the analysis and modeling of factors that drive demand for products and services, assessment of trends within markets, analysis of the competitive landscape, and the identification of factors that drive purchase decisions.

2.   I hold a Ph.D. in economics from North Carolina State University with fields of specialization in health economics and labor economics. While in the doctoral program at North Carolina State University, I taught undergraduate courses in microeconomics. I currently hold a position as an Academic Associate at Arizona State University's College of Health Solutions and teach a masters-level health economics course. I have authored three peer reviewed publications in the past ten years. Those publications are listed in my Curriculum Vitae which is attached hereto as Appendix A.

## 1.2. Compensation

3.   FTI bills for my time at an hourly rate of $945. In addition, other professionals at my firm acting under my direct supervision have assisted me on this matter. FTI will be compensated at the same hourly rate if I am asked to testify in deposition or during trial. Neither FTI's compensation nor my compensation depend on the conclusions reached in this report or the outcome of this case.

## 1.3. Assignment

4.   I have been retained by the Joseph Saveri Law Firm, LLP ("Counsel"), counsel for representative plaintiffs Jessica Jones and Christina Lorenzen ("Plaintiffs") and all those indirect purchasers similarly situated ("The Class" or "Class Members"),[1] to provide consulting, investigative and litigation support services. More specifically, I have been asked to conduct an independent analysis of the alleged anticompetitive conduct by Defendants[2] and to determine the extent (if any) of the

---

[1] For simplicity, I refer to "The Class," but understand that the class has not yet reached the class certification stage and is still putative. The Class is defined, and Plaintiffs' allegations are set forth in full in their Class Action Complaint (ECF No. 1) in *Jessica Jones, et al. v. Varsity Brands, LLC, et al.*, Case No. 2:20-cv-02892-SHL-tmp (W.D. Tenn.) (referred to herein as "Complaint").

[2] See ¶¶ 9-11, infra.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

economic harm (damages) that The Class may have sustained due to such conduct, and the future economic harm (damages).

5.  Certain aspects of my review and analysis are ongoing as discovery in this matter is continuing. As such, the opinions expressed in this report and portion of the information presented in the accompanying exhibits are subject to amendments or additions as a result of additional relevant discovery and/or production prior to or at the time of trial including further findings of facts, additional analyses, reports, or testimony of other witnesses in deposition or at trial. The analysis and methodology used to calculate my opinion of damages was tailored to the data received during discovery. If additional data were to become available, this may have a bearing on the analysis and/or methodology employed herein, and I reserve the right to amend or modify my opinion based upon such information. I understand that the alleged conduct is ongoing and will update the damage calculations presented in this report prior to trial. I will be able to apply the same methodology to calculate future classwide damages using common proof, as a I have for the damage calculation presented in this report.

6.  This report is intended to be used solely in this litigation and should not be relied upon for any other purpose. FTI is not a public accounting firm and did not audit any financial statements or perform any attest procedures during this engagement, nor has FTI provided any legal advice to Counsel or Plaintiffs, including within this report.

### 1.4.    Information and Materials Relied Upon

7.  In preparing this report, I relied upon information from a variety of sources, each of which is of a type reasonably relied on by experts in my field. The list of materials I relied upon is listed in Appendix B or elsewhere in my report. Review and analysis of this information, together with my background, training, education and experience, has formed the basis of my opinions.

## 2.    EXECUTIVE SUMMARY

8.  Competitive Cheer is a sport where teams of cheer athletes compete, performing a 2-and-a-half minute routine with music that includes stunts, jumps, and tumbling. The teams are judged based on level of difficulty and execution.[3] Competitive Cheer has two disciplines: 1) All-Star Cheer (participation on teams sponsored by gyms); and 2) School Cheer (participation in Competitive Cheer

---

[3] https://www.varsity.com/news/what-is-competitive-cheerleading/ (accessed 4/22/2022).

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

on teams sponsored by schools).[4]

9.      The Defendants in this matter are Varsity Brands, LLC ("Varsity Brands"), Varsity Spirit, LLC ("Varsity Spirit"), Varsity Spirit Fashion & Supplies, Inc. ("Varsity Spirit Fashion") (together, "Varsity"), U.S. All Star Federation, Inc. ("USASF"), Jeffrey Webb, Charlesbank Capital Partners, LLC ("Charlesbank") and Bain Capital Private Equity ("Bain"). I will refer to them collectively as "Defendants."

10.     The Defendants conspired to raise, fix and stabilize prices in the Competitive Cheer market by attaining, furthering, and maintaining Varsity's monopoly power in three relevant markets: Competitive Cheer competitions ("Competitions"); Competitive Cheer camps ("Camps"); and Competitive Cheer apparel ("Apparel"). Varsity's monopoly power was attained through acquisition of its rivals in the relevant markets and maintained through exclusionary conduct and its control of the rule-making organizations that govern Competitive Cheer, such as the USASF, to create barriers to foreclose competition.

11.     I have been asked to conduct an independent analysis of Defendants' alleged monopolistic actions and to determine the extent (if any) of the economic damages that The Class may have sustained due to Varsity and Defendants' alleged monopolistic behavior together with the ongoing future economic impact of any such monopolistic behavior.

12.     I reviewed data and information obtained during discovery, including depositions, to gain insight into Defendants' business practices and to identify material relevant to my damages calculation. I limited my damages estimate to only overcharges resulting from Competition registration costs, Camp registration costs, and Apparel. The damages estimate is calculated as the product of the overcharge percentage and the sales revenue related to each of these three relevant markets. In addition, I find that there are many related areas where it is likely that Varsity used its market power to increase prices and extract additional revenue from The Class. Some of these include items like required hotel stays for some Competitions in conjunction with Varsity's Stay-to-Play program. Where possible, I present a quantification of the classwide impact for the benefit of the Court and can do so by using common proof.

13.     Through review of the distribution chain connecting Plaintiffs, indirect purchasers, to Varsity, I find that alleged overcharges were passed through to Plaintiffs and The Class with a pass-on rate of 100%.

---

[4] CB00485513, at 5546.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Varsity uses its market power to obtain supercompetitive prices. As a result, Plaintiffs and The Class suffered damages in excess of $234 million, this estimate is conservative because it does not include other factors such as induced purchases or those elements that could not be quantified or were outside of overcharge related to competition registration, apparel purchases, or camp registration.

**3.    ALLEGATIONS**

14.    Plaintiffs allege that Varsity and the other Defendants engaged in a scheme to exclude rivals and acquire, enhance, and maintain monopoly power in the three relevant markets: Competitions, Camps, and Apparel in violation of state and federal law. Plaintiffs allege that Varsity, in coordination with the other Defendants, used its monopoly power to foreclose potential competitors in the relevant markets, which reduced the number of Varsity alternatives and resulted in fewer options being available to participants in these markets. For purposes of my opinion, I assume these allegations to be true.

15.    In determining the exclusionary scheme which caused the anticompetitive effects in the three relevant markets, I rely on the analysis of those issues conducted by Dr. Janet Netz and presented in her report. Dr. Netz summarizes her conclusions as follows:

- There are relevant antitrust markets for Cheer Competitions, Cheer Apparel, and Cheer Camps.

- Varsity possesses and exercises market power in all three of these relevant markets.

- Varsity has engaged in anticompetitive conduct that has allowed it to acquire and maintain its monopoly power in these markets. The anticompetitive conduct was designed to reinforce market power in each and across the markets.

- Varsity's anticompetitive conduct foreclosed rivals and harmed competition in the form of higher prices, reduced output, reduced choice.[5]

16.    Plaintiffs seek damages and/or injunctive and declaratory relief for the following claims: (1) Violation of Sections 1, 2, and 3 of the Sherman Act, 15 U.S.C. §§ 1—3; (2) Violation of Tennessee antitrust laws, Tenn. Code Ann. §§ 47-25-101, et seq.; (3) Violation of numerous states' antitrust laws; (4) Violation of numerous states' consumer protection laws, including unfair methods of competition and unfair and deceptive acts; and (5) Unjust enrichment under Tennessee Law.[6]

---

[5] Netz Report, at Section VI.
[6] See Complaint, ¶¶ 231-268.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

### 3.1.    Plaintiffs

#### 3.1.1.    Jessica Jones

17.    Plaintiff Jessica Jones is a parent of two Competitive Cheer athletes who were members of All-Star teams. Ms. Jones currently resides in Wichita, Kansas. Ms. Jones indirectly paid Varsity for enrollment and participation in Competitions and indirectly purchased Apparel manufactured and sold by Varsity.[7]

#### 3.1.2.    Christina Lorenzen

18.    Plaintiff Christina Lorenzen is the parent of a Competitive Cheer athlete who was a member of a school team. Ms. Lorenzen resides in Berthoud, Colorado. Ms. Lorenzen indirectly paid Varsity for enrollment in Varsity school Competitions and indirectly purchased Apparel manufactured and sold by Varsity.[8]

### 3.2.    Defendants

#### 3.2.1.    Varsity Brands

19.    Varsity Brands, LLC—formerly known as Varsity Brands, Inc.— is a Delaware corporation with its principal place of business in Memphis, Tennessee focused on elevating "the student experience in Sport, Spirit, and Achievement."[9] It is the corporate parent company of Varsity Spirit and Varsity Spirit Fashion & Supplies.[10] Varsity Brands is a portfolio business comprised of BSN Sports, Varsity Spirit, and Herff Jones.[11] BSN Sports is the largest U.S. distributor of team sports apparel and equipment in the United States.[12] Varsity Spirit focuses on "all things spirit" including competitions, educational camps, cheerleading, dance team and performing arts apparel.[13] Herff Jones manufactures and sells milestone products (e.g., class rings, yearbooks, cap and gowns, etc.) to high schools and colleges.[14]

#### 3.2.2.    Varsity Spirit

20.    Varsity Spirit, formerly known as Varsity Spirit Corporation, is the company through which Varsity

---

[7] Complaint, ¶13.

[8] Complaint, ¶15.

[9] www.varsitybrands.com/about/mission-values (accessed 4/24/2022); Complaint, ¶16.

[10] FEAS-Ares00001098 (corporate structure, as of 12/2/2014, post Charlesbank acquisition); VAR00009646 (corporate structure, circa 7/2018, post Bain acquisition).

[11] www.varsitybrands.com/about (accessed 4/24/2022); BARC_00000008, at 00000018; VAR00008463, at 8471.

[12] www.bsnsports.com/company-info (accessed 6/13/2022).

[13] www.varsity.com/about/ (accessed 6/13/2022).

[14] www.herffjones.com/about/ (accessed 4/23/2022).

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Brands produces educational camps, clinics and competitions for Competitive Cheer and dance teams, as well as markets apparel, including uniforms and accessories to All-Star Cheer and School Cheer teams in the youth, junior high, high school and college markets, impacting more than a million Competitive Cheer athletes each year.[15] The company also produces televised cheerleading and dance team championships, organizes domestic and international travel tours and sponsors special events for school spirit groups.[16] Varsity Spirit is "the global leader in apparel, camps and competitions for cheerleaders, dance teams and bands."[17]

### 3.2.3.    Varsity Spirit Fashion

21.    Varsity Spirit Fashion, founded in 1980, is the company through which Varsity Brands manufactures, distributes, and sells Competitive Cheer Apparel.[18] The company designs and markets sweaters, jumpers, vests, skirts, warm-up suits, t-shirts, shorts, pompons, socks, jackets, pins and gloves and operates worldwide.[19]

22.    Varsity Brands, Varsity Spirit, and Varsity Spirit Fashion collectively represent themselves as one corporate family, rather than separate subsidiaries and parents. Therefore, my report refers to these entities together as Varsity.

### 3.2.4.    USASF

23.    USASF is a non-profit organization founded by Varsity in 2003 with the goal of ensuring that All-Star is a safe sport "by establishing fair and consistent rules and competitions standards."[20] The USASF sets the rules and regulations for Competitions and Apparel, including guidelines about the apparel athletes can wear at Competitions.[21] The organization also establishes guidelines not directly related to safety rules, but "important to the integrity of the sport."[22]

### 3.2.5.    Jeffrey Webb

24.    Jeffrey Webb is the founder, former CEO and former Chairman of Varsity Spirit. Plaintiffs allege

---

[15] www.varsity.com/about/press/varsity-spirit-inducts-2021-class-into-varsity-legends/ (accessed 5/16/2022); www.bloomberg.com/profile/company/VARS:US (accessed 4/23/2022).

[16] www.bloomberg.com/profile/company/VARS:US (accessed 4/23/2022).

[17] www.varsity.com/about/press/varsity-spirit-signs-lease-with-keel-street-llc-for-hq-move-to-downtown-memphis/ (accessed 4/24/2022).

[18] www.varsity.com/school/spirit-fashion/why-choose-varsity/ (accessed 4/23/2022).

[19] www.bloomberg.com/profile/company/0126199D:US (accessed 4/23/2022).

[20] www.usasf.net/about (accessed 5/22/2022); JEFF00236982, at 6987; VAR00009293, at 9355; VAR00092826, at 92845.

[21] https://usasfmain.s3.amazonaws.com/Rules/USASF_Cheer_Rules_21-22.pdf (accessed 4/22/2022)

[22] www.usasf.net/rules (accessed 6/16/2022)

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Webb, along with his Co-Defendants engaged in a scheme to exclude rivals and acquire, enhance, and maintain Varsity's monopoly power in the relevant markets. He transitioned from CEO to Chairman in June 2018 and stepped down as Chairman in December 2020.[23]

### 3.2.6.    Charlesbank

25.    Charlesbank purchased Varsity in 2014. Charlesbank sold Varsity to Bain in 2018 and made a significant co-investment alongside side Bain.[24] Between 2014-2018, Charlesbank controlled and managed the affairs of Varsity, including but not limited to control of Varsity's Board of Directors, overseeing and supervising Varsity's management and other operations.[25]

### 3.2.7.    Bain

26.    In July 2018, Bain Capital Private Equity ("Bain Capital") purchased the Varsity Brands portfolio in a deal estimated at $2.5 billion from Charlesbank and other shareholders.[26] Once acquired, Plaintiffs allege that Bain controlled and managed the affairs of Varsity, including but not limited to control of Varsity's Board of Directors, overseeing and supervising Varsity's management and other operations.[27]

## 4.    CLASS DEFINITION AND CLASS PERIOD

27.    The Nationwide Damages Class alleged in this litigation is defined as:

> All natural persons and entities in the United States that indirectly paid Varsity or any Varsity subsidiary or affiliate, from December 10, 2016, and until the continuing Exclusionary Scheme alleged herein ends (the "Class Period") for (a) registration, entrance, or other fees and expenses associated with participation in one or more Varsity Cheer Competitions, including registration fees to USASF; (b) Varsity Cheer Apparel; (c) Varsity Cheer Camp Fees; or (d) accommodations at one or more Varsity Cheer Competitions.[28]

28.    Additionally, the Plaintiffs also allege a State Law Damages Class defined as:

---

[23] www.linkedin.com/in/realjeffwebb/ (accessed 4/25/2022); www.investors.com/news/management/leaders-and-success/varsity-brands-jeff-webb-rebranded-cheerleading-with-focus-on-athleticism-entertainment/ (accessed 4/23/2022); www.varsity.com/about/press/varsity-spirit-founder-and-chairman-jeff-webb-transitions-to-focus-on-the-global-development-of-cheer/ (accessed 4/25/2022); Webb_AS_00000443, at 0453; Complaint, ¶¶ 117-120.

[24] www.charlesbank.com/portfolio/companies/varsity-brands/ (accessed 4/23/2022).

[25] Complaint, ¶¶ 21, 119.

[26] www.baincapital.com/news/varsity-brands-leader-elevating-student-experiences-sports-spirit-and-achievement-be-acquired (accessed 4/23/2022) and www.cnbc.com/2018/06/19/bain-nears-2-point-5-billion-deal-for-cheer-uniform-leader-varsity-brands.html (accessed 5/16/2022).

[27] Complaint, ¶¶ 22, 120.

[28] Complaint, ¶ 30. The Class definition excludes Defendants, their parent companies, subsidiaries and affiliates, officers, executives, and employees; Defendants' attorneys in this case, federal government entities and instrumentalities, states and their subdivisions, and all judges assigned to this case. The Complaint also defines an Injunctive Relief Class under federal law.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

All natural persons and entities in the United States that indirectly paid Varsity or any Varsity subsidiary or affiliate, from December 10, 2016, and until the continuing Exclusionary Scheme alleged herein ends (the "Class Period") for (a) registration, entrance, or other fees and expenses associated with participation in one or more Varsity Cheer Competitions, including registration fees to USASF; (b) Varsity Cheer Apparel; (c) Varsity Cheer Camp Fees; or (d) accommodations at one or more Varsity Cheer Competitions, in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, the District of Columbia, Florida, Idaho, Illinois, Iowa, Kansas, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, Washington, West Virginia, and Wisconsin.[29]

**5.    SUMMARY OF OPINIONS**

29.    Based on the analysis performed and presented in this report, and relying on findings presented in the Netz Report and the Expert Report of Randal Heeb, PhD ("Heeb Report"), I find that Varsity used its market power to charge anti-competitive prices resulting in increased revenue. While there are certain data limitations that preclude me from quantifying damages for all relevant components in each market segment, I am able to estimate classwide damages related to Competition registration, Camp registration, and Apparel. I do so based on the evidence that is common to The Class. These damages estimates are summarized in Table 1. In addition, I find that there are many related areas where it is likely that Varsity used its market power to increase prices and extract additional revenue from The Class. A summary of revenue associated with these other items is presented in Table 2. For those segments where I am unable to quantify damages, I present qualitative evidence. As such, damages claimed in this report should be viewed as conservative as they capture only a portion of the actual damages incurred and it would be reasonable in such circumstances to conclude that those actual damages should be significantly higher.

*Table 1. Summary of Damages*

| Description | Report Section | Amount | Estimated Damages |
|---|---|---|---|
| All-Star Competition Registration | 9.1. | $    354,768,246 | $    84,581,410 |
| School Competition Registration | 9.1. | 136,756,418 | 32,604,527 |
| Cheer Camp Registration | 9.2. | 242,343,096 | 57,777,778 |
| Apparel (Uniforms, competition gear, practice-wear, camp wear, and other apparel) | 9.3. | 595,938,970 | 59,539,561 |
| **Total** | | **$    1,329,806,730** | **$    234,503,276** |

---

[29] Complaint, ¶ 32. As above, The Class definition excludes Defendants, their parent companies, subsidiaries and affiliates, officers, executives, and employees; Defendants' attorneys in this case, federal government entities and instrumentalities, states and their subdivisions, and all judges assigned to this case.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 2. Summary of Revenue in Related Market Components*

| Description | Category | Report Section | Amount |
|---|---|---|---|
| All-Star Competition Registration | Competitions | 9.1. | $  354,768,246 |
| School Competition Registration | Competitions | 9.1. | 136,756,418 |
| Hotel Rebates | Competitions | 8.7.2. | 9,678,573 |
| Commuter Packages | Competitions | 8.7.3. | *Unk.* |
| Spectator Fees | Competitions | 8.7.4 | 85,929,241 |
| Varsity TV | Competitions | 8.7.5. | *Unk.* |
| Cheer Camp Registration | Camps | 9.2. | 242,343,096 |
| Uniforms, competition gear, practice-wear, camp wear, and other apparel | Apparel | 9.3. | 595,938,970 |
| Gym Rebates | Apparel | 8.7.1. | 31,124,104 |
| **Total** | | | **$ 1,456,538,647** |

6.    **BACKGROUND**

   6.1.    **Industry Background and Varsity's Operations**

      6.1.1.    **Competitive Cheer**

30.    Competitive Cheer is a sport where cheer athletes are focused on athletic training and performing at competitions.[30] Teams, affiliated through private gyms (All-Star Cheer) or with a school (School Cheer),[31] perform a 2-and-a-half minute routine which includes stunts, jumps, and tumbling, amongst other acrobatics.[32] Governing organizations such as USASF (relating to All-Star Cheer) set the rules and regulations for Competitions and Apparel, including guidelines about the apparel athletes can wear at Competitions.[33] USASF's core principle is ensuring All-Star Cheer is a safe sport "by establishing fair and consistent rules and competitions standards."[34] USASF also establishes guidelines not directly related with safety rules, but "important to the integrity of the sport."[35] Varsity also has influence over the organizations that govern School Cheer, such as the National Federation of State High School Associations, as discussed in the Netz Report.[36]

31.    There are two different Competitive Cheer disciplines:[37] (1) All-Star Cheer, in which teams are based

---

[30] www.varsity.com/news/what-is-competitive-cheerleading/ (accessed 4/22/2022); VAR00424538, at 4559.
[31] FEAS-Ares00075739, at 5800.
[32] Deposition of B. Elza, Nov. 16, 2021, at 59:17-18; www.varsity.com/news/what-is-competitive-cheerleading/ (accessed 4/22/2022).
[33] https://usasfmain.s3.amazonaws.com/Rules/USASF_Cheer_Rules_21-22.pdf   (accessed 4/22/2022).
[34] www.usasf.net/about (accessed 4/22/2022).
[35] www.usasf.net/rules (accessed 4/22/2022).
[36] Netz Report, at Section III.A.2 and III.B.6.
[37] CB00485513, at 5544, 5546.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

out of private gyms;[38] (2) School Cheer, in which teams are subdivided into Middle School, High School and College.[39] A third discipline: Youth & Recreation Cheer, which is organized at a local level by a youth/recreation league is not relevant to this case and it is not included in my damages estimate.[40]

32.    Competitive Cheer is distinct from sideline cheering.[41] In Competitive Cheer, teams often practice year-round and participate in competitions from October through April.[42] The main focus is the routine itself. Sideline cheering, also called "spirit cheer," is to promote school spirit at school sponsored events.[43]

33.    Competitive Cheer is an expensive sport. A single season costs on average $1,600 for School Cheer athletes.[44] For All-Star Cheer athletes, the average single season costs are approximately $4,000,[45] but can reach up to $6,000 -- $10,000.[46]

### 6.1.2.    Cheer Competitions

34.    Cheer Competitions are events where teams perform in front of spectators and judges who score the teams' performance routines. Competitions are hosted by event producers, which include Varsity and non-Varsity producers also known as Independent Event Producers ("IEPs").

35.    Competitive Cheer athletes frequently attend seven or more competitions a year.[47] Cheer Competitions are typically one-day or two-day events hosted on weekends, although national championships such as The Summit or The Cheerleading Worlds ("Worlds") typically last three to four days.[48]

36.    All-Star Cheer teams' competitive season includes several regular season competitions and

---

[38] www.usacheer.org/All-Star (accessed 4/22/2022).

[39] www.usacheer.org/junior-high-cheer (accessed 4/22/2022); www.usacheer.org/high-school-cheer (accessed 4/22/2022); www.usacheer.org/college-cheer (accessed 4/22/2022).

[40] www.usacheer.org/youth-rec-cheer (accessed 4/22/2022).

[41] CB00485513, at 5546.

[42] VAR00424538, at 4559.

[43] https://www.varsity.com/news/what-is-competitive-cheerleading/ (accessed 4/22/2022); VAR00304734, at 4767; Deposition of B. Elza, Nov. 16, 2021, at 59:13-16.

[44] VAR00009293 (Seely Exhibit 17), at 9333.

[45] CB00485513, at 5548.

[46] VAR00420493 (Nangia Exhibit 26), at 0493.

[47] VAR00309426 (LeTard Exhibit 4), at 9460.

[48] FUSIONELI000000164; USASF_00096556; Deposition of D. Albee, Jan. 11, 2022, at 291:25-292:25.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

culminates with end-of-season competitions.[49] The Cheerleading Worlds, hosted by the USASF is an end-of-season event held at Walt Disney World Resort ("Disney") in Orlando, Florida and is open to Senior competitive levels 6 and 7 as well as Open level 5 and 6 teams.[50] The Summit, hosted by Varsity, also at Disney in Orlando includes "Youth, Junior and Senior teams of all levels 1 through non-Worlds level 5, thus providing a Worlds type of experience for teams other than those that are eligible to compete at The Cheerleading Worlds."[51] The D2 Summit, also hosted by Varsity at Disney in Orlando was created for levels 1 through 3 from smaller gyms who qualify as Division II gyms.[52] The U.S. Finals are regional end-of-season events which are less competitive but more affordable because attendance to these competitions is more regionally located.[53]

37.    School Cheer teams' competitive seasons also includes several regular season competitions and culminates with end-of-season competitions. Varsity's hosts end the season championships for School Cheer teams including the College Cheerleading and Dance Team National Championship and the National High School Cheerleading Championship, both held at Disney in Orlando, Florida in January and February, respectively.[54]

38.    Most Competitive Cheer athletes aspire to participate in one the prestigious end-of-season competitions such as The Cheerleading Worlds,[55] The Summit,[56] the National High School Cheerleading Championship ("Nationals"),[57] or the College Cheerleading and Dance Team National Championship.[58] All-Star Cheer coaches strategize their competition schedule around the goal of winning a bid (or invitation) to attend one of these aforementioned events.[59]

39.    Varsity alone hosts over 600 Competitions for All-Star Cheer and School Cheer athletes across the country, annually, which attract over 900,000 athletes and 1.4 million spectators each year, including

---

[49] VAR00310631, at 0631.
[50] www.heartofcheer.com/industry/world-and-summit-bids-explained/ (accessed 4/22/2022).
[51] Ibid.
[52] VAR00304734, at 4755.
[53] VAR00078752, at 8764; Deposition of B. Elza, Nov. 16, 2021, at 95:15-24.
[54] www.varsity.com/uca/school/competitions/college-nationals/ (accessed 6/20/2022); and www.varsity.com/uca/school/competitions/high-school-nationals/ (accessed 6/20/2022).
[55] Deposition of R. Foster, Dec. 21, 2021, at 231:12-15; Deposition of A. Bray, Jan. 11, 2022, at 46:20-24.
[56] Ibid.
[57] VAR00009293 (Seely Exhibit 17), at 9333.
[58] www.varsity.com/uca/school/competitions/college-nationals/ (accessed 6/20/2022).
[59] Deposition of R. Foster, Dec. 21, 2021, at 231:12-15 indicates the competitions on Stars & Stripes Kids Activity Center's Schedule – contained in STARSANDSTRIPES000000025, at 0027 – were chosen because their goal was to "get a bid to either The Summit or Worlds, and these competitions were giving…those bids away."

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

hundreds of teams in the All-Star and School Cheer divisions.[60] Varsity has a long-standing relationship with Disney and ESPN.[61] Since approximately 1994, Varsity has partnered with Disney and holds at least six major Varsity events at Walt Disney World Resort attended by over 73,000 Competitive Cheer athletes.[62]

### 6.1.3.    Cheer Camps

40.    Camps are an integral part of School Cheer. School Cheer athletes participate in multi-day or overnight camps where athletes practice Competitive Cheer skills and develop routines. Cheer Camps are marketed to cheer consumers as training opportunities to improve cheer skills, receive one-on-one attention, create team bonding, learn about cheer safety, etc.[63] Cheer Camps mainly occur during the summer.[64] Cheer athletes pay to participate in Camps.[65]

41.    Varsity uses Camps as a means of marketing their products and services and building brand loyalty.[66] Instructors at Varsity Camps are considered valuable in cross-selling Varsity Spirit products and services.[67] In 2014, Varsity's hosted over 309,000 camp participants.[68] In 2017, Varsity hosted over 20,000 teams at more than 5,600 camps across the United States, tallying over 320,000 participants.[69] In 2018, participation increased to over 335,000 campers.[70] Additionally, Camps provide Competitive Cheer teams with credentialing in leadership and safety, which is required to participate in national competitions.[71]

### 6.1.4.    Cheer Apparel

42.    Cheer Apparel is an important element of Competitive Cheer. Cheerleading uniforms and footwear have transformed over the years and are differentiated by the official colors of the team fostering a

---

[60] FEAS-Ares00075739, at 5805; www.varsity.com/about/press/varsity-spirit-and-fabletics-team-up-to-bring-activewear-and-experiential-events-to-americas-cheer-and-dance-community/ (accessed 6/17/2022).

[61] FEAS-Ares00075739, at 5800.

[62] FEAS-Ares00075739, at 5805; VAR00424538, at 4565.

[63] www.varsity.com/school/camps/ (accessed 4/22/2022); www.varsity.com/nca/school/camps/types/overnight-camp/ (accessed 4/22/2022); VAR00008463 (Webb Exhibit 30), at 8545.

[64] VAR00424538, at 4596.

[65] Ibid., at 4591.

[66] Ibid., at 4570.

[67] VAR00008463 (Webb Exhibit 30), at 8545.

[68] VAR00106861, at 6862.

[69] VAR00009293 (Seely Exhibit 17), at 9334.

[70] VAR00106861, at 6862.

[71] www.varsity.com/school/camps/; (accessed 4/22/2022); www.varsity.com/nca/school/camps/types/overnight-camp/ (accessed 4/22/2022).

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

sense of pride in representing their team.[72] School Cheer Apparel style is noted to be collegiate and athletic with a strong focus on school brand whereas All-Star Cheer apparel is performance and skills oriented aimed to complement the team's routine.[73] Varsity cheerleading Apparel can be classified in six aggregate categories: uniforms, accessories, lettering, camp wear or practice wear, warm-ups, and shoes.[74] Impact for these categories is capable of being measured using common proof.

### 6.1.5.    Bids

43.    As discussed in the Netz Report, annual end-of-season Competitions such as Worlds, The Summit, D2 Summit, and the National High School Cheerleading Championship, among others, are annual events that require All-Star Cheer and School Cheer teams to earn bids to participate.[75] A bid is an invitation to compete at one of these national events. Teams earn bids by competing at regional competitions. Bids are awarded to the highest-scoring bid-eligible team.

### 6.1.6.    Competitive Cheer Governing Associations

44.    In 2003, Varsity founded USASF to provide fair and consistent rules and competition standards, while providing a safe environment for Cheer athletes.[76] USASF's Board of Directors includes 13 voting members representing event producers, program owners and USASF staff. The Board of Directors also works with a non-voting Advisory Board of Directors which includes event producer, coach, dance, and program owner representation.[77] USASF determines, among other things, the scoring rubric and which competition events can offer bids to Worlds.[78]

### 6.2.    Varsity

45.    Varsity Spirit focuses on "all things spirit" including competitions, educational camps, cheerleading, dance teams, and performing arts apparel.[79] Varsity Spirit dominates the market in Competitions, Camps, and Apparel.[80] In 2014, Charlesbank noted that Varsity Spirit was 10 times larger than its nearest competitor.[81] According to a press release in 2018, Varsity Spirit produces over 600

---

[72] https://beyondthebarreusa.com/blogs/fashion-styling/cheer-on-all-about-cheer-leading-uniforms (accessed 4/24/2022).

[73] VAR00008463 (Webb Exhibit 30), at 8542.

[74] JEFF00141901, at 1952; VAR00009293 (Seely Exhibit 17), at 9312.

[75] Netz Report, at Section III.A.3.

[76] www.usasf.net/about (accessed 5/22/2022).

[77] USASF Annual Report 2021, Page 6, at https://viewer.joomag.com/annual-report-use/0963356001646063348?short&. (accessed 5/22/2022).

[78] Ibid, page 7.

[79] www.varsity.com/about/ (accessed 4/24/2022).

[80] CB00000275, at 0291.

[81] Ibid., at 0277.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Competitions in the United States annually in which over 900,000 athletes participate each year.[82] In addition to regional and national tournaments, Varsity Spirit is also the largest operator of Cheer Camps in the United States and the world.[83] Varsity Spirit organizes competitions for All-Star Cheer, School Cheer, and Youth & Recreation.[84]

46.    Competitive Cheer athletes purchase Apparel, attend Competitions, and may participate in Camps. Varsity refers to this as the "Varsity Spirit Ecosystem" and recognizes these markets as distinct but reinforcing business lines.[85] Spending per Competitive Cheer athlete is significantly higher than for sideline cheerleading.[86]

47.    Varsity's two main customer segments are School Cheer and All-Star Cheer athletes. In 2016, School Cheer contributed nearly 70% to Varsity's revenue while All-Star Cheer contributed about 30%.[87] All-Star Cheer Competition participation remained stable between 2014 - 2017 due to rising costs and time commitment requirements.[88] Conversely, School Cheer grew between 2011 and 2016 at 2.3% compound annual growth rate (CAGR) as more schools offered cheerleading.[89] School Cheer coaches cited the increased competitiveness of the sport as an attractor of school cheerleaders[90] and the increased emphasis on School Cheer Competitions has driven the increase in Cheer Camp fees.[91]

48.    Table 3 shows All-Star athlete participation counts from the 2015-2016 through the 2019-2020 season using Varsity's internal registration data.[92] Acquired brands are the eight event producers which Varsity acquired since 2014.[93] Legacy brands are the remainder of Varsity All-Star competition brands. Participation in legacy brand events declined from 435,822 athletes in the 2015-2016 seasons to 423,888 athletes in the 2018-2019 season. Some of the decline in the 2019-2020 season could be attributed to cancelled events due to the COVID-19 pandemic.

---

[82] www.varsity.com/about/press/varsity-spirit-and-fabletics-team-up-to-bring-activewear-and-experiential-events-to-americas-cheer-and-dance-community/ (accessed 6/17/2022).

[83] VAR00008463, at 8545; www.varsity.com/school/camps/brands/ (accessed 5/22/2022).

[84] www.varsity.com/ (accessed 6/17/2022). As mentioned in paragraph 31 above, the Youth & Recreation discipline is not relevant to this case and not included in my damages estimate.

[85] FEAS-Ares00075739, at 5803; VAR00341580-1582 contains a meeting agenda with separate discussions for camps, competitions, and apparel.

[86] CB00485513, at 5548.

[87] VAR00304734, at 4748.

[88] Ibid., at 4744-4745.

[89] Ibid., 4746.

[90] Ibid.

[91] VAR00304734, at 4743.

[92] Includes regional and national All-Star events. Counts reflect registrations and are not unique athletes.

[93] The acquired brands are Aloha, All Things Cheer, Cheer LTD, , EPIC, JamBrands, Mardi Gras, and Spirit Celebration.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 3. All-Star Athlete Participation, 2015-2020*

| | Varsity All-Star Athlete Counts | | | | |
|---|---|---|---|---|---|
| **Brand** | **2015-2016** | **2016-2017** | **2017-2018** | **2018-2019** | **2019-2020** |
| Legacy | 435,822 | 433,306 | 420,650 | 423,888 | 274,921 |
| Acquired | 9,040 | 108,572 | 182,609 | 249,498 | 172,790 |
| **Total** | **444,862** | **541,878** | **603,259** | **673,386** | **447,711** |

*Source: VAR00010122-27, VAR00352199-202, VAR00352218-25*

49.  Varsity engages with its All-Star customers on a year-round basis. In the early summer months, gym owners host try-outs and assemble their teams for the upcoming competitive season. This is also when Varsity apparel representatives work with the gym owners to design custom uniforms. In the summer, Varsity promotes its Varsity University which offers education and training courses to gym owners and coaches. The All-Star competitive season begins in October where teams typically attend seven to nine competitions per season. Varsity hosts many large marquee regular season events such as the NCA All-Star Nationals, CHEERSPORT, and UCA that are held in February and March.[94] The season culminates in April/May with various end-of-season Varsity events including the U.S. Finals, The Summit, and D2 Summit.[95]

50.  Varsity also engages with its School Cheer customers on a year-round basis. School teams typically consult with the Varsity apparel representative sometime between January and March to determine which Cheer Camp(s) to attend and to select team camp apparel. Athletes are fitted for their uniforms between March and June, and uniforms are typically delivered between May and August.[96] Cheer Camps run from June to August and attract hundreds of thousands of participants.[97] Varsity's School Cheer customers typically attend one to three local, state and regional competitions between September and January.[98] Varsity hosts School Cheer Competitions under the brand names of Universal Cheerleaders Association (UCA), National Cheerleaders Association (NCA) and United Spirit Association (USA).[99] Varsity's hosts end the season championships for School Cheer teams such as the National High School Cheerleading Championship at Disney in Orlando, Florida in February.[100]

---

[94] VAR00009293 (Seely Exhibit 17), at 9324.
[95] Ibid., at 9324.
[96] Ibid., at 9333.
[97] Ibid., at 9333-9334.
[98] Ibid., at 9333.
[99] www.varsity.com/school/competitions/brands/ (accessed 4/22/2022).
[100] VAR00009293 (Seely Exhibit 17), at 9333.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

51.    In All-Star Cheer, an athlete's family typically pay fees to a private gym that in turn pays Varsity for entry fees to competitions, uniforms, and other related fees.[101] For School Cheer, an athlete's family typically pays participation fees to the school which in turn pays Varsity entry fees to Competitions, fees for Apparel, and other related items.[102] School Cheer athletes' fees may be partially subsidized by proceeds of fundraisers (e.g. car washes, cookie sales, etc.).[103]

52.    Varsity holds several Competitions that influence the behavior of Competitive Cheer athletes and reinforce the strength of the Varsity ecosystem. Varsity created The Summit in 2013,[104] a prestigious end-of-season event at Disney in Orlando, Florida for cheerleading levels 1 through 5,[105] with the goal of increasing All-Star competition participation.[106] As noted in Varsity executives' internal communications, Varsity created The Summit "in an effort to create a strong "post season" event…The goal was to create an event that you had to obtain a bid by attending one of our other Varsity All Star events. By doing this it helped drive customers to more of our regular season events and away from our competitors."[107] Further, the perceived value of The Summit protected Varsity from price sensitivity on Competition registration fees at Summit-bid-awarding events.[108] Table 4 shows athlete counts at the Summit and D2 Summit from 2015-2019. Participation has increased over the time period.

*Table 4. Summary of Athletes Attending The Summit and D2 Summit*

| Season | The Summit | | D2 Summit | |
|---|---|---|---|---|
| | Athletes | YoY Increase | Athletes | YoY Increase |
| 2014-15 | *14,497* | | | |
| 2015-16 | *17,088* | 18% | *8,779* | |
| 2016-17 | 18,544 | 9% | 11,451 | 30% |
| 2017-18 | 22,265 | 20% | 14,939 | 30% |
| 2018-19 | 23,375 | 5% | 16,281 | 9% |

*Sources: VAR00080966 (italicized), VAR00352199-2202 (2017-2020)*

53.    Varsity introduced the D2 Summit end-of-season event in 2015[109] for smaller, Division II gyms in

---

[101] VAR00304734, at 4773; Deposition of S. Minzghor, Dec. 17, 2021, at 106:13-20.

[102] VAR00304734, at 4773; Deposition of C. Lorenzen, Jan. 20, 2022, at 111:3-6.

[103] Deposition of C. Lorenzen, Jan. 20, 2022, at 97:2-19.

[104] www.varsity.com/All-Star/competitions/end-of-season-events/the-summit/ (accessed 6/17/2022); VAR00008463, at 8541.

[105] VAR00304734, at 4755.

[106] VAR00009293 (Seely Exhibit 17), at 9330.

[107] VAR00253935, at 3935.

[108] Ibid., at 3936.

[109] www.varsity.com/All-Star/competitions/end-of-season-events/the-d2-summit/  (accessed 6/17/2022).

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

response to customer feedback and demand.[110] Division II teams are defined by USASF as "having 125 or fewer athletes registered in its competitive cheer program."[111]

54.    As discussed in the Netz Report, Varsity is the largest producer of Competitions, Camps, and Apparel and its conduct (along with that of its co-Defendants) created an ecosystem that enabled it to acquire and maintain market power across the Competitions, Camps, and Apparel markets. Varsity's de facto control of the USASF has allowed it to work in coordination with the USASF to advantage Varsity events and/or disadvantage rival event promoters.[112] Varsity has several Cheer Competition brands that include both All-Star and School competitions.[113] Varsity also has several Cheer Camp brands.[114]

### 7.    Relevant Markets

#### 7.1.    Cheer Competitions

55.    Cheer Competitions are described in section 6.1.2 of this report. As discussed in the Netz Report, while there are similar sports to Competitive Cheer such as sideline cheer, gymnastics, and dance, none of those sports are reasonable substitutes to constrain Varsity's Competitions pricing.[115] The relevant geographic market for Competitive Cheer is the United States.[116]

#### 7.2.    Cheer Camps

56.    Cheer Camps are described in section 6.1.3 of this report. As discussed in the Netz Report, there are many sports camps, such as traditional sideline cheer, competitive dance, and gymnastics camps, but none of those camp types are reasonable substitutes to constrain Varsity's Camp pricing.[117] The relevant geographic market for Cheer Camps is the United States.[118]

---

[110] VAR00009293 (Seely Exhibit 17), at 9330.

[111] https://usasfmain.s3.amazonaws.com/Membership/docs/USASF_Program_Definition.pdf (accessed 4/22/2022).

[112] Netz Report, at Section I.D.

[113] These include Universal Cheerleaders Association (UCA), National Cheerleaders Association (NCA), United Spirit Association (USA), The Summit, D2 Summit, The U.S. Finals, American Cheerleaders Association, ACDA Spirit, All Star Challenge, Aloha Spirit Championships, America's Best. All Star Championships, All Things Cheer and Dance, Athletic Championships, American Cheer Power, Champion Cheer & Dance, Champion Spirit Group, Cheer Ltd, Cheersport, COA Cheer & Dance, Coastal Cheer & Dance, Feel the Power, GLCC Events, Golden State Spirit Association, JAMfest Events, Mid Atlantic Championships, Mardi Gras Spirit Events, Nation's Choice, One Up, Pacific All-Star Championships, Pac West, Sea to Sky Cheerleading Championship, Spirit Celebration, Spirit Cheer, Spirit Festival, Spirit Sports, Spirit Unlimited Cheer & Dance, Spirit Xpress Cheerleading, The American Championships, Universal Spirit, and World Spirit Federation  (www.varsity.com/all-star/competitions/brands/ (accessed 4/22/2022) and www.varsity.com/school/competitions/brands/ (accessed 4/22/2022)).

[114] Universal Cheerleaders Association (UCA), National Cheerleaders Association (NCA), United Spirit Association (USA), The Urban Cheerleading Experience (UXC), and V!ROC www.varsity.com/school/camps/brands/ (accessed 5/22/2022).

[115] Netz Report, at Section IV.A.1.

[116] Ibid.

[117] Netz Report, at Section IV.C.1.

[118] Ibid.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

### 7.3.    Cheer Apparel

57.    Cheer Apparel is described in section 6.1.4 of this report. As discussed in the Netz Report, Cheer athletes are generally not able to substitute the custom-designed Cheer Apparel used in Competitive Cheer with apparel designed for other activities in order to constrain Varsity's Apparel pricing.[119] Varsity is an Apparel provider of uniforms, competition gear, practice-wear, camp wear, and other apparel as well as poms, bags, accessories and footwear.[120] The relevant geographic market for Apparel is the United States.[121]

### 7.4.    Varsity's Market Share in the Relevant Markets

58.    Table 5 shows the HHIs for Varsity using estimated 2016 brand revenues.[122] Herfindahl-Hirschman Index (HHI) is a common measure of market concentration and used to determine competitiveness in a market pre- and post-merger. A market with an HHI between 1,500 and 2,500 is generally considered to be moderately concentrated while a HHI of 2,500 or greater is considered highly concentrated. In a highly concentrated market, transactions that increase HHI by 200 points or more likely result in an increase of market power.[123] In the 2015-2016 season, Varsity had an HHI of 5,704, well above the threshold for a highly concentrated market. Subsequent acquisitions in the following years increased Varsity's market concentration further and increased market power.[124]

*Table 5. Varsity Shares and HHI using 2016 Brand Revenues*

| Season | HHI using 2016 Brand Revenues |
|--------|-------------------------------|
| 2015-2016 | 5,705 |
| 2016-2017 | 6,431 |
| 2017-2018 | 7,759 |
| 2018-2019 | 7,759 |

*Source: VAR00101102*

59.    **Error! Reference source not found.** shows Varsity's pre-acquisition share and the incremental share due to Varsity's acquisition of the independent event producer. In the 2015-2016 season, Varsity's

---

[119] Netz Report, at Section III.B.1.

[120] https://shop.varsity.com/pages/competition-gear (accessed 4/22/2022).

[121] Netz Report, at Section IV.B.1.

[122] VAR00101102. Revenue data includes dance revenues. I am unable to disaggregate revenues for dance events.

[123] The United States Department of Justice and the Federal Trade Commission.  Horizontal Merger Guidelines (08/19/2010). https://www.justice.gov/atr/horizontal-merger-guidelines-08192010#5c (accessed 6/13/2022).

[124] Varsity's market power garnered the attention of external third parties including the popular press. Stoller, Matt, Jan. 14, 2020, "This is not a democracy, it's a cheerocracy: the cheerleading monopoly Varsity Brands," mattstoller.substack.com, retrieved 3/16/22, (Parrish Ex. 27) (No Bates).

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

pre-acquisition share was 75.2%. In the 2016-2017 seasons, Varsity acquired Aloha, All Things Cheer, and Spirit Celebration. This led to an incremental share increase of 4.8% (delta HHI 726) to a total market share of 79.9%. During the 2017-2018 season, Varsity acquired am Spirit Group (DBA Team Champion), Mardi Gras, and EPIC, which led to an incremental share increase of 8.1% (delta HHI 1,328) to a total market share of 88.0%.

*Table 6. HHI after Acquisitions using 2016 Brand Revenues*

| Season | Beginning of Season | | Brands Acquired | | | | | | End of Season | | |
| | Varsity Share | HHI | Aloha | Spirit Celebration | All Things Cheer | Champion Spirit Group | Mardi Gras | EPIC | Varsity Share | HHI | Delta HHI |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Acquisition Date: | Dec. 2016 | Feb 2017 | Apr 2017 | Nov 2017 | Dec 2017 | Jan 2018 | | | |
| 2015-2016 | 75.2% | 5,705 | 2.6% | 1.6% | 0.6% | | | | 79.9% | 6,431 | 726 |
| 2016-2017 | 79.9% | 6,431 | | | | 1.8% | 0.5% | 5.8% | 88.0% | 7,759 | 1,328 |
| 2017-2018 | 88.0% | 7,759 | | | | | | | 88.0% | 7,759 | - |

Note: Share percentages may not sum due to rounding.
*Source: VAR00101102*

## 8.    DEFENDANTS' CONDUCT

### 8.1.    Defendants' Conduct Created Barriers to Entry for Varsity's Rivals in Relevant Markets

60.    As stated in the Netz Report, Defendants engaged in an exclusionary scheme and used their market power to create barriers to entry.[125]

### 8.2.    System of Bids for Invitation to National Competitions

61.    As discussed in the Netz Report, Varsity and USASF created and manipulated the bid system to disadvantage rivals.[126]

62.    As described in section 6.1.2, Competitive Cheer teams compete in various events throughout the competition season. The season culminates in various Cheer championships, depending on the level and type of team. The largest and most prestigious of these Competitions are Worlds, The Summit, UCA National High School Cheerleading Championship, and U.S. Finals.[127] In order to compete in these events, Competitive Cheer teams must receive a bid to the event. Ms. Alexa Bray, former instructor at Stars & Stripes, conveys the sentiment of The Summit competition noting, "It's a pretty prestigious event. It was always our goal for the end of the season."[128] Gym owner, Sarah Minzghor

---

[125] Netz Report, at Section IV.A.2.
[126] Ibid., at Section V.B.1.
[127] Ibid., at Section III.A.3.
[128] Deposition of A. Bray, Jan. 11, 2022, at 46:22-24.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

lost athletes when she removed the opportunity for her teams to go to The Summit as a result of discontinuing attendance to Varsity events.[129]

63.    Event producers benefit from being able to offer bids to these Cheer Championships. Varsity and USASF control the number of event producers that can award bids at their Cheer Competitions. Varsity controls at least 34 of the 42 Cheer Competitions, or roughly 80% of the Bids to Worlds (USASF's championship) and controls all of the Cheer Competitions that can award Bids to The Summit (Varsity's championship) and U.S. Finals (Varsity's regional, more affordable championship).[130]

64.    All-Star gyms created policies in response to bid allocations. For example, when asked why Stars & Stripes' Full-Year Team Competition Schedule (Liberty Cheer program) in their Open Call packet for the 2015-2016 season[131] did not include any non-Varsity events, gym owner Rebecca Foster indicated that "the majority of [competitions] at that point [were] owned by Varsity"… "and their goal was to try to get a bid to either The Summit or Worlds, and [the competitions on the schedule] were giving those bids away."[132]

### 8.3.    Control of the Governing Structures and Competition Rules to Deny Entry to Potential Competitors

65.    As discussed in the Netz Report, Varsity and USASF conspired to prohibit members from partnering with rival event promoters.[133] USASF's rules and procedures in sanctioning events and awarding bids to the World's championship event has greatly favored Varsity.[134] Varsity has used its acquisition strategy as a mechanism to fully control Tier 1 Competitive Cheer competitions.[135] Each of the brands Varsity chose to acquire allowed it to gain additional bid-qualifying World event(s).[136] Priority to receive Tier 1 status is based on the event producer's seniority as USASF members.[137] New Tier 1 members can only be added if an existing Tier 1 member fails to meet the threshold requirement of 125 team participants two years in a row (after the first year, the Event Producer is put on

---

[129] Deposition of S. Minzghor, Dec. 17, 2021, at 192:15-20.
[130] VAR00078752, at 8761, 8763-8764.
[131] STARSANDSTRIPES000000025, at 0027.
[132] Deposition of R. Foster, Dec. 21, 2021, at 231:6-15.
[133] Netz Report, at Section V.B.2.
[134] Ibid.
[135] VAR00183218 (Nangia Exhibit 14), at 3219.
[136] VAR00415061 (Nangia Exhibit 4), at 5061-5076.
[137] USASF_00001955, at 1955-1957.

23

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

probation).[138] Date and location of a member's event are protected based on seniority. To move a USASF sanctioned event more than 200 miles or change the date, members need approval from USASF's Sanctioning Committee.[139] Through its acquisitions, Varsity has gained permanent majority control of the USASF Sanctioning Committee.[140] USASF personnel were employees of Varsity and participated in Varsity's stock option plan.[141]

66.      Events with bids offer a powerful incentive for Varisty competition attendance. As Varsity's share of bids grows, so does its ability to attract athletes. Table 7 presents Varsity's share of total bids, paid bids, and bid-awarding events across USASF nationally from the 2016-2017 to the 2019-2020 season. At the start of the alleged Class Period (December 10, 2016 to present, as discussed in paragraphs 27 and 28 above),[142] Varsity was already producing a large share of the bid-awarding events (61.9%) and granting a majority of the paid bids (70.7%) to attend Worlds events. Varsity's acquisition strategy focused on event producers with World Bids, and by doing so, increased its share of Paid Bids from 70.7% in the 2016-2017 season to 84.3% in the 2019-2020 season.

*Table 7. Varsity's Share in USASF Bids and Events*

| | All Bids* | | | Paid Bids | | | Events | | |
|---|---|---|---|---|---|---|---|---|---|
| Season | Total | Varsity | Varsity Share | Total | Varsity | Varsity Share | Total | Varsity | Varsity Share |
| 2016-2017 | 369 | 261 | 70.7% | 123 | 87 | 70.7% | 42 | 26 | 61.9% |
| 2017-2018 | 378 | 315 | 83.3% | 126 | 105 | 83.3% | 42 | 33 | 78.6% |
| 2018-2019 | 378 | 318 | 84.1% | 126 | 106 | 84.1% | 42 | 33 | 78.6% |
| 2019-2020 | 381 | 321 | 84.3% | 127 | 107 | 84.3% | 42 | 33 | 78.6% |

\* Includes Paid bids and At-Large bids.
*Sources: USASF_00002776, USASF_00002779, USASF_00002782, USASF_00002785, USASF_00052537, USASF_00084806*

### 8.4.    Competition in the Camps Market is Foreclosed by Leveraging Dominance in the Competitions Market

67.      As stated in the Netz Report, Varsity leveraged its power in the Cheer Competitions market to foreclose competition in the Cheer Camp market.[143]

68.      Varsity is the leading provider in overnight, day, home, resort, youth and college cheerleading

---

[138] Ibid; VAR00078752, at 8761.
[139] USASF_00001966, at 1968.
[140] Deposition of J. Chadwick, Apr. 15, 2022, at 91:14-98:18.
[141] Deposition of S. Peterson, Mar. 9, 2022, at 275, 281-282.
[142] Complaint, ¶¶ 29-30.
[143] Netz Report, at Section V.C.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

camps.[144] Varsity hosts several cheer camps including day camps and overnight camps, as well as other types of camps focusing on specific choreography and skills.[145]

69.     By early 2011, Varsity controlled an estimated 80% of the Cheer Camps market.[146] As Cheer Camps are the gateway to competition events,[147] strong market presence here reinforces market power in the Cheer Competitions market. In addition, 90% of camp customers buy apparel, and camp-attending teams buy 3.5 times more.[148]

70.     School Cheer athletes are required to attend Varsity Camps in order to participate in National competitions.[149] For example, The NCA Junior & Senior High School National Championship requires attendance to the Squad Credentialing program as a requirement for participation.[150] Furthermore, NCA High School National Championship and UCA National High School Cheerleading Championships require 75% of a team's athletes to attend Varsity Cheer Camp as a prerequisite to the team registering for the event.[151] By tying Cheer Competition entry to Cheer Camps, Varsity was able to compel attendance to Camps, increase Competitive Cheer participant spend, and increase Varsity revenue.

### 8.5.    Counterprogramming Rivals' Competitions

71.     As discussed in the Netz Report, Varsity engaged in counterprogramming and conspired with the USASF to selectively enforce USASF rules. Counterprogramming of events occurred when Varsity would adjust the event schedule so that a Varsity event would occur on or near the date of a competitor's event. By doing so, Varsity sought to redirect participants away from a competitor's events and toward Varsity's own events and thereby utilized its dominant position to reduce overall competition.[152]

72.     According to various documents and email exchanges between Varsity executives, Varsity

---

[144] VAR00424538, at 4550; www.varsity.com/school/camps/brands/ (accessed 5/22/2022).

[145] www.varsity.com/nca/school/camps/types/ (accessed 6/17/2022); www.varsity.com/uca/school/camps/types/; www.varsity.com/usa/school/camps/types/ (accessed 6/17/2022);  UCE - 2022 UCE Camp Brochure.pdf at view.publitas.com/uce/2022-uce-camp-brochure/page/6-7 (accessed 6/17/2022); and www.varsity.com/vroc/pricing/ (accessed 6/17/2022).

[146] VAR00424538, at 4544.

[147] VAR00009293 (Seely Exhibit 17), at 9337.

[148] VAR00006767, at 6770-6771.

[149] Deposition of J. Quintero, Mar. 29, 2022, at 185:8-12.

[150] VAR00160801, at 0801.

[151] Deposition of J. Quintero, Mar. 29, 2022, at 185:18-186:4; VAR00160803, at 0803.

[152] Netz Report, at Section V.B.1.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

aggressively pursued this strategic approach to eliminate competitors. For example:

73.     A 2015 Varsity Strategic Priorities Update document plainly states that one strategic initiative was to "identify and target attack events to gain market share from key competitors."[153] In an email exchange in October 2016 between Varsity executives with respect to an event in the Pacific Northwest region, Matthew Goto, Varsity's Director of Sales for The United Spirit Association and Director of Choreography, V!ROC All-Star, indicates "our goal was to add an event in the Pacific Northwest to hurt ATC [All Things Cheer]…"[154] Varsity's National Sales Director of New Business Development, Kevin Brubaker indicated the event was expected to be a success, and the "best part is that is [sic] will hopefully take away team's [sic] from ATC."[155,156]

74.     In an email exchange in 2018 from Damianne Albee, Varsity's current Vice President of International Operations[157] to several Varsity Knoxville employees regarding a potential Varsity event in Las Vegas coinciding with a Jamz event also in Las Vegas, Ms. Albee indicates "Ok good – we need to do whatever it takes for it to be planted somewhere to compete against Jamz. We are trying to box that event in with as many events as we can on the same weekend."[158] With respect to this location, an additional email from Brian Elza, Varsity's General Manager, Vice President of Sales, in 2020 indicates "If you recall a few years ago we set out to "put a hurting" on the JAMZ Worlds Bid event which had been growing at an unprecedented amount year after year. In order to achieve this, we added a new two-day event in the Las Vegas market under the Encore brand. Last year the events were one week apart – this season we actually went head to head on the same weekend as their event. Over the course of those two years we have stripped away nearly 100 of their teams while growing a strong brand in the Vegas market…"[159]

### 8.6.    Acquisition of Rival Competitors in the Cheer Competitions Market

75.     As stated in the Netz Report, "Varsity's acquisition strategy has eliminated its strongest competitors, resulted in a highly concentrated market, gave it control over cheer sanctioning bodies and allowed it to reduce output and increase prices."[160]

---

[153] VAR00107430, at 7430.

[154] VAR00326030 (Albee Exhibit 19), at 6035.

[155] Ibid., at 6034.

[156] All Things Cheer, also known as ATC was acquired by Varsity in 2017 (see VAR00117966 (Albee Exhibit 1)).

[157] Deposition of D. Albee, Jan. 11, 2022, at 22:14-17.

[158] VAR00119257 (Albee Exhibit 37), at 9257.

[159] VAR00118899 (Albee Exhibit 38), at 8899.

[160] Netz Report, at Section V.D.7.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

76.     Varsity has acquired most of the brand event producers who (i) enjoy recognition in the marketplace, (ii) are qualified to award Worlds Bids, and (iii) are geographically- and date-protected by USASF rules.[161] According to various documents and email exchanges, Varsity's strategy to eliminate competitors included the acquisition of its competitors and imposing non-compete agreements as a term in the transaction. For example, the acquisition terms of All Things Cheer included a 3-year employment contract to the former owners with an 18-month non-compete agreement upon the termination of the contract as well as an additional 3-year non-competition period beginning on the closing date.[162]

77.     As noted in internal Varsity communication in 2017, Joshua Johnson, Varsity National Account Manager, indicates "looking at the new acquisition of Spirit Celebration dates next season, our coverage can't get any better in North Texas… These additional events are going to cover up the hoes in our VAS schedule as well as keep our competitors from growing on select weekends."[163]

78.     With respect to gyms' Cheer Competition choices, Rebecca Foster, owner of the gym Stars & Stripes, noted that at the onset of her cheer program there was an opportunity to register for different competitions but "over time, it became more and more centralized around Varsity or the competitions we went to, those vendors were purchased by Varsity. And Varsity became the – the place you needed to go… For example, if you wanted your rewards, you had to do so many competitions." Ms. Foster added, "in order to be able to go to the big one, such as a Worlds or The Summit, you had to get a bid to go there; in order to get a bid, you had to be at the Varsity competitions. So as a – as a gym and -- you had no other options other than to do that. And there weren't any other options available that could work out that were non-Varsity events that we could – that we could do. Without having the opportunity to, we just wouldn't be successful. And when they're following the big-name gyms that are going to all the Varsity competitions, that's what your smaller gym has to do to – to try to stay afloat."[164]

79.     Acquisition of rival events had a negative impact on participants in terms of both price and quality of event. After the acquisition of GSSA/Aloha and JAM Brands, the competitions fees for cheer athletes

---

[161] VAR00009293 (Seely Exhibit 17), at 9325.

[162] VAR00010365, at 0365.

[163] VAR00248481, at 8481.

[164] Deposition of R. Foster, Dec. 21, 2021, at 183:13-184:10.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

noticeably increased[165] while production quality decreased, and choices were eliminated.[166]

### 8.7.    Varsity's Leverage of Monopoly Power in Related Market Components

80.    Varsity has abused its monopoly power in the three Competitive Cheer markets to force parents and families of Competitive Cheer athletes to pay inflated prices for related charges including lodging during competitions (accommodations), spectator fees, and Varsity TV.

#### 8.7.1.    Exclusive Agreements with All-Star Gyms

81.    Varsity developed exclusive arrangements with All-Star gyms in an apparent effort to lock in gyms to the Varsity ecosystem and increase Varsity's share of cheer spend.[167] These agreements provide financial incentives to gyms in the form of rebates based on the amount of money spent on Varsity Cheer Competitions and Apparel.[168,169] Varsity understands that gym owners and cheer coaches are the decision makers on which competitions and camps will be attended as well as the apparel that will be used for competition, warm-up and practice.[170] Parents and cheer athletes provide the funding for about 90% of cheer-related spend.[171]

82.    Varsity incentivized gym owners to attend Varsity competitions and to purchase Varsity apparel via two reward programs: Network Agreement and Varsity Family Plan ("VFP"). The Network Agreements were invite-only and reserved for the "heavy spenders with Varsity."[172] Network Agreements ensured that large gyms were exclusive to Varsity during the typical 3-year agreement term and offered a 30% flat rebate on all Varsity spending (excluding travel and spectator fees)[173]. Throughout the Class Period, Varsity had Network Agreements with approximately 100 gym owners. Varsity did not publicly promote this program 'to avoid parents from inquiring about it.'[174] Varsity does not put limitations on the use rebate recipients may make of rebates. It appears that seldom, if ever, did the gym owners pass along the rebates to their customers, the members of The Class.

---

[165] Deposition of S. Minzghor, Dec. 17, 2021, at 235:1-2.

[166] Ibid., Dec. 17, 2021, at 238:4-240:7.

[167] Netz Report, at Section IV.A.2.b.

[168] VAR00106861, at 6865; VAR00020213 (Elza Exhibit 22), at 0214.

[169] Varsity paid out the rebates to the gym-owners at the end of the cheer season when the gym-owners were low on funds. Deposition of J. Parrish, Mar. 3, 2022, at 137:18-138:8.

[170] VAR00106861, at 6865; VAR00304734, at 4775.

[171] VAR00304734, at 4773.

[172] Deposition of F. LeTard, Nov. 22, 2021, at 142:13-22.

[173] Varsity categorized the various rebate plans as "Old Network, New Network, Standard VFP, and Premier." Some of the gyms receiving rebates were not assigned a particular group [VAR00117693, at 7693]. At least a few of the gyms entered into "Platinum Network Agreements" that were tracked internally as "Old Network." See, e.g., VAR00017932; VAR00079604.

[174] VAR00101110 (LeTard Ex 8), at 1110.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

83.    Varsity introduced VFP in 2007.[175] The VFP was designed to encourage gym owners to attend Varsity events as opposed to non-Varsity by providing cash rebates to gym owners which were issued at the end of the season.[176] By paying at the end of the season, gym owners were able to receive income during the off-season summer months, when they would ordinarily receive little or no income from athletes or athlete families or other members of The Class.[177] This program was open to all All-Star gyms.[178] Participation in the program was contingent on the gym owner attending a minimum number of Varsity events.[179] The rebate percentage earned was tiered based on the number of Varsity Competitions attended and overall spending.[180] The more a gym owner spent on Varsity events and Varsity apparel, the higher the rebate percentage and therefore cash back to the gym owner.

84.    The VFP evolved over the Class Period and these changes made it harder to earn the same cash reward year after year. Prior to the Class Period, gym owners received a 100% cash back rebate.[181] For the 2016-2017 season, Varsity changed the all-cash rebate to a 75% cash and 25% apparel credit called "Fashion Dollars" which could only be spent on Varsity apparel.[182] For the 2018-2019 season, Varsity changed the rebate to a 65% cash and 35% apparel credit in "Fashion Dollars" further encouraging greater sales of Apparel and reducing Varsity's cash outlay.[183] Gym owners were only given a few months to use these Fashion Dollars.[184]

85.    As Varsity acquired more brands, the VFP event minimum threshold increased, the spending tier amounts were adjusted upwards, and the rebate percentages decreased. For example, for the 2015-2016 season, a gym owner who participated in six events and spent $100,000 qualified for a 25% all cash rebate, or $25,000. By the 2018-2019 season, keeping all else equal, that same gym owner would receive a total rebate of only $8,000, to be paid out with a 65%/35% split of cash to Fashion Dollars. The relevant spend thresholds and rebate percentages are presented in **Error! Reference source not found.** below.

---

[175] Deposition of F. LeTard, Nov. 22, 2021, at 34:21-36:6.

[176] Deposition of F. LeTard, Nov. 22, 2021, at 42:1-10; STARSANDSTRIPES000002440, at 2441; VAR00020213 (Elza Exhibit 22), at 0214.

[177] Deposition of B. Elza, Nov. 16, 2021, at 88:3-22; VAR00106861, at 6865.

[178] STARSANDSTRIPES000002440, at 2440; VAR00020213 (Elza Exhibit 22), at 0214.

[179] STARSANDSTRIPES000002440, at 2441; VAR00020213, (Elza Exhibit 22), at 0214; and VAR00079196, at 9196.

[180] Ibid.

[181] VAR00183218 (Elza Exhibit 8), at 3219.

[182] VAR00183218 (Elza Exhibit 8), at 3219; VAR00079196 (Elza Exhibit 23), at 9196.

[183] VAR00079196 (Elza Exhibit 23), at 9196.

[184] VAR00020213 (Elza Exhibit 22), at 0214.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 8. Overview of Varsity Family Plan Changes, 2015-2016 v 2018-2019*

| Season | $ Spent | | Rebate % by Number of Events Attended | | | | | |
|---|---|---|---|---|---|---|---|---|
| | From | To | 4 | 5 | 6 | 7 | 8 | 9+ |
| 2015-2016 | $0 | $29,999 | 6% | 8% | 10% | | | |
| 2015-2016 | $30,000 | $49,999 | 8% | 10% | 12% | | | |
| 2015-2016 | $50,000 | $74,999 | 10% | 12% | 15% | | | |
| 2015-2016 | $75,000 | $99,999 | 12% | 15% | 20% | | | |
| 2015-2016 | $100,000 | Above | 15% | 20% | 25% | | | |
| 2018-2019 | $0 | $49,999 | | | 4% | 5% | 7% | 8% |
| 2018-2019 | $50,000 | $79,999 | | | 5% | 7% | 8% | 10% |
| 2018-2019 | $80,000 | $114,999 | | | 8% | 10% | 12% | 14% |
| 2018-2019 | $115,000 | $149,999 | | | 10% | 12% | 14% | 17% |
| 2018-2019 | $150,000 | Above | | | 12% | 14% | 17% | 20% |

*Sources: STARSANDSTRIPES000002441, VAR00079196*

86.    As with the Network Agreement, there is no evidence to suggest that cash rewards and Fashion Dollar savings were passed on to their customers. According to testimony of Ms. Bray, when asked if any rebates were refunded to the parents, she replied "It was not refunded to the parents. I don't know specifically, you know, what exactly it was spent on. No."[185]

87.    While the term rebate may sound innocuous, they are in fact kickbacks from Varsity to gyms and are funded at the expense of parents and athletes without ever being passed on to those parents or athletes (i.e., Class Members). In addition to the kickback, it is likely that the rebate program and structure acts to induce higher overall levels of spend on Varsity offerings. If gyms seek to maximize the benefit they receive through Varsity's rebate program, they will, at the margin, be more willing to attend Varsity competitions and purchase Varsity apparel rather than attending events hosted by IEPs or purchase apparel from Varsity's competitors.[186, 187] To the extent that Varsity Competitions and Apparel are priced higher than those other competitors, Class Members suffer harm related to increased spend and inflated price levels.

---

[185] Deposition of A. Bray, Jan. 11, 2022, at 64:25-65:6.

[186] The owner of Stars & Stripes' gym (Liberty Cheer program) admitted to the influence of the rebate program in how she selected competitions: "yeah, if you went to a certain amounts of Varsity competitions, you could get a certain percentage of a rebate. (…) And however many athletes you had going, you could get a percentage back on" (Deposition of R. Foster, Dec. 21, 2021, at 265:24-266:9).

[187] Varsity's own general manager and VP of Sales, Brian Elza references the influence of the Family Plan, likening it to an additive drug and saying "No other sport, not even one, has rebate plans like Varsity/All Star cheer…We can keep them coming back for the Family Plan crack." He goes on to reference the gym – Varity relationship as one between a "ho" (the gym) and "pimp" (Varsity) saying "Sooner or later, crack ho's turn on their pimp wanting more crack, better crack, and for less output." VAR00182095 (Elza Exhibit 26), at 2095-2096.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

88.    Analysis of data provided during discovery demonstrates that total rebates during the 2011-2012 to 2020-2021 seasons amount to over $61 million. Of this amount, over $31 million relates to the damages period under review as presented in Table 9 below. This $31 million relates to kickbacks for competition registration and apparel purchases originating from a discrete set of All-Star gyms.

*Table 9. Summary of VFP Rebates by Season*

| Season | Total Rebates Issued | Cash Rebates | Cash Relative to Total | Apparel Credits | "Fashion Dollars" |
|---|---|---|---|---|---|
| 2012-2013 | $  5,611,215 | *Unk.* | 100.0% | *Unk.* | #N/A |
| 2013-2014 | 6,663,679 | *Unk.* | 100.0% | $  307,760 | #N/A |
| 2014-2015 | 9,149,895 | *Unk.* | 100.0% | 505,491 | #N/A |
| 2015-2016 | 8,629,356 | *Unk.* | 100.0% | 488,887 | #N/A |
| 2016-2017 | 8,184,671 | *Unk.* | 100.0% | 532,709 | #N/A |
| 2017-2018 | 8,846,318 | $  6,650,477 | 75.2% | 516,471 | $ 1,679,370 |
| 2018-2019 | 8,211,910 | 6,343,694 | 77.2% | 413,851 | 1,454,366 |
| 2019-2020 | 5,689,230 | 4,405,263 | 77.4% | 410,924 | 873,044 |
| 2020-2021 | 191,975 | 191,975 | 100.0% | *Unk.* | *Unk.* |
| **Class Period** | **$ 31,124,104** | **$ 23,690,371** | **76.12%** | **$1,873,955** | **$5,559,781** |

Notes:

1 - #N/A indicates a value is not applicable for this field.

2 - Damages period is defined as any rebate transaction on or after December 10, 2016.

3 - Total Rebate Issued is the amount of the rebate that participating gyms received from meeting certain thresholds on competition and apparel spend. The two types of rebates are Cash Rebates

4 - Cash and "Fashion Dollar" rebates are awarded at the end of the season after gyms submit proper documentation to Varsity.

5 - In the 2016-2017 season, "Fashion Dollars" were introduced [VAR00020214]. This split Apparel Rebates into two types: Apparel Credits (used anytime) and "Fashion Dollars." "Fashion Dollars" must be used by August 1 [VAR00020214].

6 - The split between Cash Rebates and Apparel Rebates changed from 75/25 to 65/35 in the 2018-2019 season [VAR00079196 (Elza Ex. 23) at 9196].

*Source: VAR00352214*

### 8.7.2.    Stay-to-Play (Accommodations)

89.    Stay-to-Play, now rebranded to Stay Smart,[188] is a program put in place by Varsity that required Competitive Cheer athletes attending non-Disney Varsity competitions to book from a block of rooms at selected hotels from whom Varsity receives rebates or kickbacks.[189] This program effectively tied accommodations to competitions. Cheer athletes traveling to most multi-day competitions are required to book their housing accommodations at official hotels approved by Varsity through third

---

[188] Deposition of J. Parrish, Mar. 3, 2022, at 368:19-369:18; VAR00420493 (Nangia Exhibit 26), at 0493.

[189] Deposition of B. Elza, Nov. 16, 2021, at 343:2-17; Deposition of J. Parrish, Mar. 3, 2022, at 369:7-18.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

party housing vendors.[190],[191] This policy is strictly enforced and participants unable to prove that they stayed at the preferred hotel may be disqualified from the competition.[192],[193]

90.    While this program is purportedly intended to assure room availability for competition participants,[194] it served as a revenue-generating vehicle for Varsity.[195] Hotel rates charged to participants were inflated above actual cost either through elevated rates or by failing to pass on discounts achieved on bookings, to participants. Historically, the Stay-to-Pay price was "equal to or higher than the published rate at most hotels" in order to apparently secure a rebate that could be passed onto Varsity.[196],[197] Varsity's third-party contract with Team Travel Source ("TTS") included terms to contractually obligated TTS to pay Varsity a guaranteed $20 rebate per room night actualized.[198]

91.    Gym owners communicated to Varsity concerns related to this program.[199] Despite the customers' outcry, the program was expanded and more events were added the Stay-to-Play requirement.[200] After the acquisition of GSSA/Aloha, Varsity immediately implemented the Stay-to-Play policy on two-day events.[201] Varsity had a captive audience and did not allow participants to make their own hotel arrangements, forcing parents to pay for hotel stays when possibly cheaper, more convenient alternatives were available.

---

[190] VAR00231910-11; Deposition of B. Elza, Nov. 16, 2021, at 344:7-22.

[191] While the policy was broadly applied to participants, exceptions were granted on occasion. See Deposition of K. Radek, Mar. 29, 2022, at 155:1-156:6.

[192] Deposition of B. Elza, Nov. 16, 2021, at 344:1-22.

[193] Cheer athletes who live near the competition event are not required to participate in Stay-to-Play, however, Varsity tightened that exemption allowance from a 90-mile radius to 70-mile radius in recent years forcing more parents and families into the Stay-to-Play program. (Deposition of S. Minzghor, Dec. 17, 2021, at 243:22-244:6).

[194] Deposition of F. LeTard, Nov. 22, 21, at 395:6-9.

[195] Deposition of J. Parrish, Mar. 3, 2022, at 368:2-17.

[196] Deposition of J. Parrish, Mar. 3, 2022, at 370:3-6 and 638:2-639:7.

[197] After the Stay Smart program was initiated, if coaches could find a less expensive published rate, they could bring that and try to get a better price. (Deposition of J. Parrish, Mar. 3, 2022, at 638:2-10)

[198] VAR00124047, at 4047.

[199] As early as 2013, Varsity was fully aware of the pushback gym owners were receiving from the cheer parents as evidenced by numerous complaints posted to the ASGA Facebook group for All-Star cheer and compiled by Varsity employee Brian Elza in his email to Tres LeTard. (VAR00322387) For example, one exasperated gym owner wrote this about the Stay to Play policy, "This is becoming a huge problem and I'm tired of hearing that this is helping our customers, because it is not. Not when you can go to Hotwire and get the same hotel almost $50 cheaper per night. Our sport is already too expensive and making money off of every room…it's too much. Give the parents the option to stay where they want…and get rid of Stay to Play. Find another source of revenue…" (VAR00322387, at 2388) More recently, a gym owner noted "the parents were upset about stay-to-play because they were not able to book where they wanted or use -- like, if they had Marriott rewards, they weren't able to use those. And they felt that Liberty Cheer was trying to force them to stay somewhere that they didn't necessarily want to stay" (Deposition of R. Foster, Dec. 21, 2021, at 68:9-15) "So we received a bit of flack on that end and trying to explain to them that that had nothing to do with – with us personally. I had no personal gain for staying at a particular hotel." (Deposition of R. Foster, Dec. 21, 2021, at 272:24-273:3)

[200] VAR00229759 (Parrish Exhibit 20), at 9760; Deposition of J. Quintero, Mar. 29, 2022, at 44:2-17.

[201] Deposition of S. Minzghor, Dec. 17, 2021, at 238:11-239:1.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

92.    In late 2016, internal communications show Varsity was contemplating changes to its Stay-to-Play program to generate more revenue. Per Varsity's analysis, housing rebates revenue per room ranged from $9.23 to $37.41 in 2016.[202] By making all of its multi-day Worlds bid events Stay-to-Play, bringing the program 'in-house' thereby eliminating third party housing groups, and increasing the average rebate revenue per room per night, Varsity estimated it could generate an additional $1.7 million.[203] This estimate illustrates Varsity's leverage of its monopoly power to extract more revenue from its athletes without regard to their best interest, and indeed, those of the sport while acknowledging "it would not be good for our customers to know how much revenue we are generating in hotel rebates."[204] As a result, Varsity has seen its annual kickbacks increase from $2.8 million in 2016 to approximately $4 million in 2019.[205] And while the program was repackaged in 2019 as Stay Smart to remove the monopolistic connotation, Varsity's own documents indicate this rebranding was like "put[ting] lipstick on a pig."[206]

93.    The Stay-to-Play requirement enacted by Varsity generated rebates or kickbacks to Varsity whereby the parents/participants paid the quoted rate for a room and this inflated rate covered both the amount charged for the hotel reservation as well as a premium that Varsity received. While deposition testimony and documents received during discovery indicate that these kickbacks amount to an excess of $4 million annually, I conservatively use the values that Varsity records in their All-Star general ledger detail to quantify the amount. As presented in Table 10 below, All-Star hotel rebates amount to over $9.6 million dollars between December 2016 and 2020.

*Table 10. Summary of Varsity's All-Star Hotel Rebates by Year*

| All-Star Hotel Rebates | |
|---|---|
| **Year** | **Amount** |
| 2016 [1] | $          173,175 |
| 2017 | 1,945,052 |
| 2018 | 2,539,680 |
| 2019 | 2,925,126 |
| 2020 | 2,095,539 |
| **Total  $** | **9,678,573** |

[1] Excludes amounts prior to Dec. 10, 2016.
*Source: VAR00117736 - VAR00117740*

---

[202] VAR00083611 (Sadlow Exhibit 4), at 3612.

[203] Ibid.

[204] VAR00196544, at 6545.

[205] VAR00083611 (Sadlow Exhibit 4), at 3612; VAR00420493 (Nangia Exhibit 26), at 0493.

[206] VAR00176405 (Parrish Exhibit 10), at 6415.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

### 8.7.3. Commuter Packages (Accommodations)

94. Varsity events held at Disney are subject to a different set of lodging requirements. While athletes are not subject to the Stay-to-Play requirement at Varsity competitions held at Disney, athletes competing at The Summit and D2 Summit must choose one of the Disney Hotel Packages or must purchase a Commuter Package.[207] Each Commuter Package includes a multi-day Disney Park Hopper pass which includes admission to the venue when not competing and registration fees.[208]

95. While admission to the venue is required for both participants and spectators, Varsity undertook actions to enrich itself at the expense of those required to purchase the passes. Park Hopper passes are acquired from Disney at a substantial discount and then sold to participants and their family at an inflated rate. The Key Terms of the Varsity-Disney contract indicate that from 2015-2019 Varsity purchased Park Hopper passes at 65% off the Disney Gate price, and starting in 2020, Varsity purchases these passes at 50% discount.[209] Varsity then sold these passes for substantial profit, as indicated below in Table 11.

*Table 11. Overview of Varsity's Profit from Sale of Individual Disney Park Hopper Passes at The Summit*

| Season | Description | [A] Disney Park Hopper | [B] In Advance with Varsity | [C] Contracted Discount | [D]=[A]*[C] Price Varsity Pays Disney | [E] Service Charge | [B]-[D]-[E] Varsity Profit |
|---|---|---|---|---|---|---|---|
| 2018-2019 | 4-Day Park Hopper | $ 494.97 | $ 380.00 | 65% | $ 173.24 | $16.00 | $ 190.76 |
| 2019-2020 | 3-Day Park Hopper | $ 444.00 | $ 356.00 | 50% | $ 222.00 | $16.00 | $ 118.00 |

Sources: VAR00494705 at 4707, VAR00012435 at 2436, VAR00106901 at 6903, JEFF00263834 at 3841.

96. Varsity also charges spectator fees for those seeking access to the performance venue. These fees are in excess of those required by Disney. From 2015-2019 Varsity set admissions prices at its discretion and paid Disney $13 per ticket. As of 2020, Varsity continues to set the price of admission at its discretion but pays Disney $15.50 per ticket.[210] In addition to park admission and spectator fees, Varsity also derives revenue from room rates as they pass the full cost onto attendees but pay 5% below rack rate.[211,212]

---

[207] VAR00002010, at 2016.

[208] Ibid.

[209] VAR00106901, at 6903.

[210] Ibid.

[211] Ibid.

[212] Varsity also appears to have entered into an agreement which reduce production costs for Disney events. Contractual documents indicate that from 2015-2019, Disney shared equally the cost of venue equipment, but starting in 2020, Disney will cover 100% of the venue equipment costs.(VAR00106901, at 6903.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

97.    Review of historical pricing indicates that pricing for Commuter Packages has increased 44% from the 2015-2016 season to the 2021-2022 season. While prices have risen, the Commuter Package provides less as the number of days included in the pass has declined, as indicated in Table 12 below:

*Table 12. Overview of Varsity's Commuter Package Prices*

| Event | Season | Event Dates | Commuter Package Price | Includes | Spectator Fee per Day |
|---|---|---|---|---|---|
| 2016 Summit | 2015-2016 | Apr 29 - May 1 | $285.00 | 3 Day Hopper Pass | $30.00 |
| 2017 Summit | 2016-2017 | May 5 - May 7 | $295.00 | 3 Day Hopper Pass | $30.00 |
| 2018 Summit | 2017-2018 | May 3 - May 6 | $299.00 | 3 Day Hopper Pass | $35.00 |
| 2019 Summit | 2018-2019 | May 4 - May 5 | $340.00 | 3 Day Hopper Pass | $35.00 |
| 2020 Summit | 2019-2020 | May 1 - May 4 | $380.00 | 3 Day Hopper Pass | $40.00 |
| 2021 Summit | 2020-2021 | Apr 30 - May 2 | $390.00 | 2-Day Hopper Pass | *Unk.* |
| 2022 Summit | 2021-2022 | Apr 28 - May 1 | $410.00 | 2-Day Hopper Pass | *Unk.* |

*Sources: VAR00002010 at 2016, 2012, VAR00468329 at 8333, 8346, VAR00487964 at 7968, 7981, VAR00494705 at 4707,4709, VAR00012435 at 2438,*
*https://www.varsity.com/wp-content/uploads/2021/01/VAS_Summit_Pricing_21.pdf,*
*https://www.varsity.com/wp-content/uploads/2021/12/VAS_Summit_Pricing_21.22.pdf*

### 8.7.4.    Spectator Fees

98.    Spectator fees relate to fees charged to individuals that attend Cheer Competitions. As noted in documentation obtained during discovery, "the majority of spectators are family members of the participants."[213] These fees reflect an important revenue stream for Varsity.[214,215] They also represent another avenue through which Varsity was able to exert their market power to increase prices and increase the financial burden on Class Members.

99.    Cheerleading is a time intensive activity and requires a substantial financial investment. Events provide the family of the participant with the opportunity to witness the results of this investment and see their child perform, providing a strong natural incentive to attend these events. However, parents and families of athletes are faced with additional fees once they arrive at the venue for the performance. These fees are in excess of what is considered typical by reference to other similar events. For example, prior to acquisition by Varsity, JAM Brands did not charge a spectator fee.[216]

---

[213] VAR00009293 (Seely Exhibit 17), at 9329.

[214] Deposition of B. Elza, Nov. 17, 2021, at 22:5-9.

[215] Deposition of B. Elza, Nov. 16, 2021, at 300:22-25; VAR00075724 (Albee Exhibit 16), at 5726.

[216] VAR00240079 (LeTard Exhibit 15), at 0080, notes that "the majority of JamBrands events do not charge spectator admission. Potential revenue with a $10/spectator fee is around $500,000." Mr. LeTard noted this amount would be annual. See also Deposition of F. LeTard, Nov. 22, 21, at 286:18-23.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

100.    As illustrated in Table 13 below, the number of Varsity All-Star events with a spectator fee increased between 2016 and 2019. By 2019, 91% of the All-Star events required spectator fees.[217]

*Table 13. Percentage of Varsity All-Star Events with Spectator Fees*

|  | Varsity All-Star Events | | | | | |
|---|---|---|---|---|---|---|
|  | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
| Number of Events | 185 | 253 | 285 | 382 | 367 | 225 |
| Events with Spectator Fees | 145 | 156 | 249 | 342 | 333 | 170 |
| % of All-Star Events with Spectator Fees | 78% | 62% | 87% | 90% | 91% | 76% |

Note: Virtual competitions have been excluded from the Event and Spectator counts.
*Source: VAR00117735-40*

101.    Charging for attendance is simply another way to extract additional revenue from these families that are already deeply invested in the participant and the sport. These fees represent a substantial revenue stream to Varsity's All-Star events as indicated in Table 14 below.

*Table 14. Summary of Spectator Fees at All-Star Events by Year*

| All-Star Spectator Fees | |
|---|---|
| **Year** | **Amount** |
| 2016 | $    1,499,314 |
| 2017 | 21,586,262 |
| 2018 | 25,463,858 |
| 2019 | 26,187,771 |
| 2020 | 11,192,036 |
| **Total   $** | **85,929,241** |

Note: Year 2016 excludes amounts prior to
Dec. 10, 2016.
*Source: VAR00117735-40*

### 8.7.5.    Varsity TV

102.    Varsity TV is a live streaming service where Cheer athletes' friends and family can watch exclusive live coverage of Varsity Competitions such as The Summit.[218] Varsity TV is only accessible via a monthly or annual subscription.[219] Recording is strictly prohibited during Cheer Competitions.[220] Varsity TV was expanded in 2016 through partnership with a sports media company, FloSports, to

---

[217] The dip in 2016 results from Varsity purchasing many IEPS mid-season and did not implement spectator fees until the next full season when Varsity was able to set the prices. VAR00329532 (Albee Exhibit 22), at 9536; see also Deposition of F. LeTard, Nov. 22, 21, 286:5-287:11. While there was also a decline in 2020, it was likely attributable to Covid.
[218] VAR00003766 (Davis Exhibit 26), at 3770.
[219] Ibid.
[220] Deposition of B. Elza, November 16, 2021, 351:19-352:18.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

live stream more events at a lower cost, create more content and engage subscribers on a weekly basis.[221] As of May 2018, monthly and annual subscription were $29.99 and $149.99, respectively.[222] In early 2019, Varsity TV had 20,000 subscribers, livestreamed 40 events, and created 40 million social media impressions through this platform.[223] It appears that Varsity is continuing to push to expand subscription volumes. As noted in internal Varsity documents with 2020 sales goals, certain gyms earn money for new Varsity TV subscribers through a referral link.[224] While subscription-based services to view sporting events are not unusual, it is unusual to own the vertical platform, as Varsity does.

103.    While I was unable to quantify total revenue related to Varsity TV, I note that a conservative back of the envelope calculation assuming only one month of subscription for a customer base of 20,000 would indicate $600,000 of revenue associated with this product. While subscribers likely attribute some value to this service, it can be viewed as an additional expenditure as some competitions were previously broadcast via cable TV without requiring an additional subscription.[225],[226]

## 9.    DAMAGES ESTIMATION

104.    I have estimated classwide damages using common proof for each of the relevant markets. Varsity's use of its market power harms Class Members through various mechanisms and across the markets included in its ecosystem. In some cases, the harm can be expressly quantified while in others it is only possible to provide directional or qualitative evidence. Actual damages claimed pertain to only those areas where it was possible to quantify the impact of specific actions. As such, estimated damages presented in this report should be viewed as a lower bound as they are conservative and do not capture other areas where Varsity also leveraged its dominant position in the market for economic enrichment, often without regard to the overall benefit to the sport, the participants, the supporters or other non-Varsity stakeholder.

### 9.1.    Damages Related to Cheer Competition Registration

105.    I establish classwide damages using common proof. As noted in Varsity's internal communication,

---

[221] VAR00009293 (Seely Exhibit 17), at 9346.

[222] Ibid.

[223] VAR00109311, at 9328.

[224] These gyms are rewarded $5 per subscription for the first new 100 subscribers and $10 per subscription for any additional subscribers over the first 100. VAR00008022, at 8034-8035.

[225] Deposition of J. Parrish, Mar. 3, 2022, 460:7-461:16.

[226] A very limited number of championships are streamed via Varsity's partnership with ESPN (www.varsity.com/espn-air-dates-2022/).

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Varsity drives pricing based on demand and it drives demand using bids.[227] Further internal communication indicates Varsity finds it easier to raise Competition prices when they add bids to an event.[228] Additionally, Varsity is insulated from external price pressure and competition as the purchase decision makers (e.g. coaches, etc.) are distinct and separate from the actual purchasers (e.g. athletes, and their families).[229]

106.    While it is likely that Varsity routinely prices competition events above that of similar IEP events, an express comparison of prices for Varsity vs. other events was not possible.[230] However, viewing the price increases in acquired events is an indicator of an overcharge.[231] For example, internal communications in January 2017 among Varsity executives regarding the Aloha budget following the Aloha Productions and Golden State Spirit Association's (GSSA) acquisition in December 2016 states, "due to the timing of this acquisition, we could not adjust pricing – in year two we can adjust."[232] The same email thread also notes, "The gravy comes when an event is large and and [sic] at a high price point--this event will move to the number one weekends for Varsity (MLK) so it will grow a lot and we have bumped up the price significantly--this GSSA event should do really well."[233]

107.    Another Varsity document titled "Potential Acquisition of Aloha Productions" notes that the Aloha events were much cheaper than Varsity's prices and, if Varsity adjusted registration prices to fall in line with Varsity's prices, Varsity "would see an immediate increase from $1.5M to $1.9M in year one."[234] The propensity for Varsity to increase fees is noted by Varsity's former executives.  For example, Varsity's former Director of Strategy's testimony regarding the Aloha acquisition indicates that "I know when we acquired the California company from Tammy, Tammy Van Vleet, I know we went up on her registration -- parent entry fee."[235, 236] Table 15 below contains all of the brands

---

[227] VAR00182438 (Nangia Exhibit 2), at 2441.

[228] VAR00084758, at 4758.

[229] FEAS-Ares00075739, at 5757.

[230] An express comparison was not possible because I lacked historical pricing information and other relevant data related to competitions quality, etc. for IEPs.

[231] I reference the Heeb Report for the quantitative analysis comparing price changes for acquired events.

[232] VAR00329532 (Albee Exhibit 22), at 9536; https://web.archive.org/web/20161222085858/http://www.cheerdaily.com/aloha-productions-merges-varsity-spirit/ (accessed 4/22/2022).

[233] VAR00329532 (Albee Exhibit 22), at 9535.

[234] While it is unclear whether the $1.5M to $1.9M range indicates an incremental increase of $400k or a net increase in total revenue of nearly $2 million, review of the 2018 admission and competition revenue general ledger data in VAR00117738 for the Aloha, GSSA and Mid Atlantic events indicates the events totaled approximately $3 million and admission fees alone were $400k; therefore, it appears the referenced amount referred to a net increase in total event revenue.

[235] Deposition of J. Parrish, Mar. 3, 2022, 240:22-24.

[236] Tammy Van Vleet was the owner of Aloha Productions prior to its acquisition on December 15, 2016.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Varsity acquired in the U.S. market from 2015 to 2019 which formed the basis of my analysis.

*Table 15. Summary of Brands Acquired by Varsity, 2013-2019*

| Acquired Brand | Season Acquired | | | | | |
|---|---|---|---|---|---|---|
| | 2013-14 | 2014-15 | 2015-16 | 2016-17 | 2017-18 | 2018-19 |
| Aloha | | | | ✓ | | |
| All Things Cheer | | | | ✓ | | |
| Cheer LTD | ✓ | | | | | |
| Jam Spirit Group (DBA Team Champion) | | | | | ✓ | |
| EPIC | | | | | ✓ | |
| JamBrands | | | ✓ | | | |
| Mardi Gras | | | | | ✓ | |
| Spirit Celebration | | | | ✓ | | |

*Source: VAR00415061-5076 (Nangia Exhibit 4)*

108.    Varsity increasing the price of an event once it is acquired, while often decreasing quality, indicates that participants now pay more for substantially less.[237, 238]  The stated justification for the increase is to bring pricing in-line with that of other Varsity events.[239]  By that logic, legacy Varsity events were already overpriced by virtue of Varsity's market power being used to achieve supracompetitive pricing. In 2016, Varsity estimated that it had 75 percent of the All-Star events market.[240] Varsity continued to increase its share with the acquisitions of Epic, GSSA/Aloha, Spirit Celebration, and am Spirit Group (DBA Team Champion) as seen in Table 16 below.[241,242]

---

[237] Deposition of B. Elza, Nov. 17, 2021, at 66:24-67:9 ("So the pressure to drive EBITDA and to drive earnings, like I told you before, the $160,000 mark, we saw a point where the growth in All-Star cheerleading just stalled, and we were trying to reignite the growth that wasn't happening. So the only way to grow was to increase prices and drive earnings by decreasing production and decreasing the amount of dollars we paid out for the family plan…").

[238] Deposition of S. Minzghor, Dec. 17, 2021, 239:18-240:1 (noted with respect to the GSSA and Aloha events post acquisition, "if anything, they went downhill… we used to get, as awards for Aloha competitions, we used to get little surfboards and boogie boards with…the teams names on them; and after Varsity acquired them, they gave you little cardboard cutouts for trophies").

[239] Deposition of B. Elza, Nov. 16, 2021, 301:1-22 (noted that it was a general practice to increase registration fees after acquisitions. Mr. Elza notes that after the JAM acquisition, Varsity rolled out a series of price increases, "it was not right away, but eventually, we looked across the board and identified what certain events should be charging and kind of rolling it out across the platform… And we really tried to streamline that across the whole platform.").

[240] Deposition of B. Elza, Nov. 16, 2021, 78:5-9.

[241] VAR00101100 (Elza Exhibit 5), at 1102.

[242] Deposition of B. Elza, Nov. 16, 2021, 76:11-77:25 (Varsity periodically estimated market share of competitors. Mr. Elza's expressed confidence in his estimates in Elza Exhibit 5 (VAR00101100-1102) because they "had the financial documents on most of those companies, because this is right before we purchased the next four.").

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 16. Varsity's All-Star 2016 Estimated Market Share Post-Acquisition*

| All-Star Event Companies | Estimated Revenue (2016) | % of Market |
|---|---|---|
| Varsity All-Star Events | $    103,420,000 | 75% |
| Epic | 8,000,000 | 6% |
| GSSA/Aloha | 3,200,000 | 2% |
| Spirit Celebration | 2,200,000 | 2% |
| Champion Spirit Group | 2,500,000 | 2% |
| **Varsity Share (post-acquisition)** | **$    119,320,000** | **87%** |

*Source: VAR00101102*

109.    According to economic theory, once monopoly pricing is achieved, significant price increases are not possible without reducing quantity and consequently, reducing total revenue.[243] Pricing at or near this level may have acted as a guard against further increasing prices of legacy events.

110.    I establish classwide damages using common proof. As indicated in the Heeb Report, the overcharge percentage is calculated by comparing Varsity event prices to the competitive benchmark.[244] Using regression analysis, the Heeb Report estimates an overcharge percentage for Varsity's competitions (both All-Star and School).[245] I apply this overcharge percentage (23.8%[246]) to Varsity's total registration revenues (registration fees less discounts) charged to US-based customers for all US-based competitions beginning on or after December 10, 2016 (the commencement of the Damages Period). The most recent available registration data is for events in December 2020, so the competitions registration fee overcharge damages that I calculate accrue from December 10, 2016 – December 2020. Gyms and schools that register for Varsity events are defined as US-based gyms/schools if their customer address includes one of the 50 states or the District of Columbia. Varsity events are defined as US-based if they are hosted at venues within one of the 50 states or the District of Columbia.

111.    Price overcharge damages by year for competition registration are presented below. Table 17 reports the price overcharge damages by year and the total over the damages period for All-Star Cheer. Table 18 contains the same information for School Cheer. I calculate the damages from registration fee overcharge at Varsity's regional competitions and national competitions during the damages period equaled over $117 million ($84.6 million related to All-Star competitions plus $32.6 million related

---

[243] Pindyck, Robert S., and Daniel L. Rubinfeld. *Microeconomics*. Pearson Education, 2013.
[244] Heeb Report, at Section VI.D.1.ha
[245] Ibid.
[246] Ibid.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

to School competitions).

*Table 17. All-Star Cheer Competition Overcharge Damages, December 10, 2016 - December 2020*

| Season | Regional / National | Total Varsity Revenue from All-Star Competitions | Overcharge Percentage | Damages |
|---|---|---|---|---|
| 2016-2017 | Regional Competition | $ 47,549,729 | 23.8% | $ 11,336,480 |
| 2016-2017 | National Competition | 34,857,467 | 23.8% | 8,310,478 |
| 2016-2017 | Total | $ 82,407,197 | 23.8% | $ 19,646,958 |
| 2017-2018 | Regional Competition | 59,664,276 | 23.8% | 14,224,747 |
| 2017-2018 | National Competition | 40,483,666 | 23.8% | 9,651,838 |
| 2017-2018 | Total | $ 100,147,942 | 23.8% | $ 23,876,585 |
| 2018-2019 | Regional Competition | 66,885,262 | 23.8% | 15,946,325 |
| 2018-2019 | National Competition | 44,318,797 | 23.8% | 10,566,183 |
| 2018-2019 | Total | $ 111,204,059 | 23.8% | $ 26,512,509 |
| 2019-2020 | Regional Competition | 49,551,004 | 23.8% | 11,813,610 |
| 2019-2020 | National Competition | 7,386,330 | 23.8% | 1,760,998 |
| 2019-2020 | Total | $ 56,937,334 | 23.8% | $ 13,574,608 |
| 2020-2021 | Regional Competition | 4,071,714 | 23.8% | 970,750 |
| 2020-2021 | National Competition | *Unk.* | *Unk.* | *Unk.* |
| 2020-2021 | Total | $ 4,071,714 | 23.8% | $ 970,750 |
| **Class Period** | **Regional Competition** | **$ 227,721,985** | **23.8%** | **$ 54,291,913** |
| **Class Period** | **National Competition** | **$ 127,046,260** | **23.8%** | **$ 30,289,497** |
| **Class Period** | **Total** | **$ 354,768,246** | **23.8%** | **$ 84,581,410** |

Notes:

Damages period includes all events with a competition start date on or after December 10, 2016.

Registration data includes all events with a competition start date through December 2020.

*Sources: VAR00352218-25; VAR00010122-27; VAR00352199-202; VAR00127208, VAR00234212;
VAR00017306; VAR00018967; CB00063214; VAR00582534; VAR00445395; VAR00123779;
VAR00123780; USASF_00002776; USASF_00002779; USASF_00002782; USASF_00002785;
USASF_00052537; USASF_00084806; VAR00117735-40*

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 18. School Cheer Competition Overcharge Damages, December 10, 2016 - December 2020*

| Season | Regional / National | Total Varsity Revenue from School Competitions | Overcharge Percentage | Damages |
|---|---|---|---|---|
| 2016-2017 | Regional Competition | $ 1,249,491 | 23.8% | $ 297,895 |
| 2016-2017 | National Competition | 27,734,423 | 23.8% | 6,612,251 |
| 2016-2017 | Total | $ 28,983,913 | 23.8% | $ 6,910,146 |
| 2017-2018 | Regional Competition | 2,554,549 | 23.8% | 609,038 |
| 2017-2018 | National Competition | 29,680,495 | 23.8% | 7,076,220 |
| 2017-2018 | Total | $ 32,235,044 | 23.8% | $ 7,685,258 |
| 2018-2019 | Regional Competition | 2,828,160 | 23.8% | 674,271 |
| 2018-2019 | National Competition | 35,303,570 | 23.8% | 8,416,835 |
| 2018-2019 | Total | $ 38,131,731 | 23.8% | $ 9,091,106 |
| 2019-2020 | Regional Competition | 3,184,865 | 23.8% | 759,314 |
| 2019-2020 | National Competition | 33,438,424 | 23.8% | 7,972,160 |
| 2019-2020 | Total | $ 36,623,289 | 23.8% | $ 8,731,473 |
| 2020-2021 | Regional Competition | 782,441 | 23.8% | 186,544 |
| 2020-2021 | National Competition | *Unk.* | *Unk.* | *Unk.* |
| 2020-2021 | Total | $ 782,441 | 23.8% | $ 186,544 |
| **Class Period** | **Regional Competition** | **$ 10,599,506** | **23.8%** | **$ 2,527,061** |
| **Class Period** | **National Competition** | **$ 126,156,912** | **23.8%** | **$30,077,465** |
| **Class Period** | **Total** | **$ 136,756,418** | **23.8%** | **$32,604,527** |

Notes:
The damages period include all events with a competition start date on or after December 10, 2016.
Registration data includes all events with a competition start date through December 2020.
*Sources: VAR00352218-25; VAR00010122-27; VAR00352199-202; VAR00127208; VAR00234212;*
*VAR00017306; VAR00018967; CB00063214; VAR00582534; VAR00445395; VAR00123779;*
*VAR00123780; USASF_00002776; USASF_00002779; USASF_00002782; USASF_00002785;*
*USASF_00052537; USASF_00084806; VAR00117735-40*

### 9.2. Damages Related to Cheer Camp Registration

112. I establish classwide damages using common proof. Cheer Camps represent a significant revenue stream for Varsity, especially those that pertain to School Cheer. Revenue figures reflect both an overcharge (as determined in the Heeb Report[247]) and excess spend. Cheer Camps are tied to the end-of-season championship competitions in that camp participation is a requirement for competition participation (see paragraph 70). Accordingly, in a but-for world, it is reasonable to assume that Cheer Camp attendance would be lower than what is observed in the data. However, as I am unable to quantify the revenue related to induced participation (related to the tying behavior), I am unable to

---

[247] Heeb Report, at Section VI.D.3.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

quantify damages related to that behavior and focus instead on quantifying the impact of the overcharge. Consequently, damages estimated in this report undercompensate for the harm caused by the anticompetitive conduct and are conservative as they represent only those items that can be expressly quantified.

113.    The overcharge percentage as calculated in the Heeb Report is 24%.[248]  Applying this to $242.3 million results in estimated damages of $57.8 million as indicated in Table 19 below.

*Table 19. Cheer Camp Registration Overcharge Damages, December 10, 2016 - December 2020*

| Year | Total Varsity Revenue from Camps | Overcharge Percentage | Damages |
|------|------------------------:|:---:|------------------:|
| 2016 | $            171,909 | 24% | $            40,985 |
| 2017 | 72,075,370 | 24% | 17,183,715 |
| 2018 | 75,668,796 | 24% | 18,040,435 |
| 2019 | 79,324,066 | 24% | 18,911,899 |
| 2020 | 15,102,955 | 24% | 3,600,743 |
| **Class Period** | **$      242,343,096** | **24%** | **$      57,777,778** |

*Sources: VAR00462074-79, VAR00352218-25; VAR00010122-27; VAR00352199-202;*
*VAR00127208; VAR00234212; VAR00017306; VAR00018967; CB00063214;*
*VAR00582534; VAR00445395; VAR00123779; VAR00123780; USASF_00002776;*
*USASF_00002779; USASF_00002782; USASF_00002785; USASF_00052537;*
*USASF_00084806; VAR00117735-40*

### 9.3.    Damages Related to Cheer Apparel (SECTION DESIGNATED HIGHLY CONFIDENTIAL – EXPERT AND ATTORNEYS' EYES ONLY)

114.    Varsity states that its pricing is higher than that of competitors for all major product categories of apparel.[249] For example, a Varsity uniform skirt in 2018 cost $79.95 while Omni Cheer[250] offered a similar looking skirt for $17.95. The difference in price for uniform tops was equally stark: $108.95 from Varsity vs. $23.95 from Omni. Varsity also sold one of the higher priced cheer shoes for $99.00 while a comparable Nike product was $85.00.[251]

115.    I establish classwide damages using common proof. As indicated in the Heeb Report, the average overcharge percentage for 2017-2019 equals 10.0%,[252] and I take this value as my best estimate of

---

[248] Ibid.

[249] VAR00259314, at 9316.

[250] Omni Cheer sells a wide selection of cheer apparel and cheer accessories offering "Premium Quality. Spirited Styles and Low Prices." Omni Cheer "maintains one of the largest selections of in-stock, affordable cheerleading uniforms and cheer apparel in the industry including Chasse and GK Cheer." www.omnicheer.com/About-Us (accessed 6/17/2022).

[251] VAR00304734, at 4774.

[252] Heeb Report, at Section VI.D.2.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Varsity's overcharge not just in cheer competition shoes, but more broadly for all Varsity cheer apparel in the cheer apparel market.[253] The estimate of 10.0% overcharge is conservative considering the results in Table 20 below show that the overcharge was significantly higher in the preceding year of 2016.

*Table 20. Overview of Apparel Overcharge (TABLE DESIGNATED HIGHLY CONFIDENTIAL – EXPERT AND ATTORNEYS' EYES ONLY)*

| Year | Overcharge |
|------|------------|
| 2016 | 26.3% |
| 2017 | 9.3% |
| 2018 | 12.0% |
| 2019 | 8.7% |

*Sources: VAR00604800-805; NFINITY000297
(HIGHLY CONFIDENTIAL – ATTORNEY AND
EXPERT EYES ONLY)*

116.    Damages equals the product of the total apparel spend by All-Star and School Cheer customers during the Class Period multiplied by the overcharge percentage of 10.0%.[254] The Class Period begins on December 10, 2016 and continues through the present. The most recent available apparel data is for products with a ship date no later than December 31, 2020, so the Class Period apparel sales occur between December 10, 2016, and December 31, 2020. I limit the All-Star and School Cheer customers to customers with a billing address and a shipping address located in the United States (in the 50 states or the District of Columbia). As indicated in the Table 21 below, apparel overcharges estimated using the approach indicated here amount to over $59.5 million during the relevant time period.

---

[253] I focus on only one category of apparel as additional requested data from Rebel, which would allow for a more extensive analysis, has not yet been supplied. If this data were to become available, I reserve the right to update and extend my analysis.

[254] I identify School Competitive Cheer customers separately from school sideline cheer customers. Specifically, a Varsity school customer that purchases apparel is a School Competitive Cheer customer if that customer also made payments for a Varsity Competition or a Varsity Camp during the Class Period. The total apparel spend by School Cheer customers only includes the School Competitive Cheer customers. In contract, all All-Star Cheer customers are included in The Class and the total Apparel spend by All-Star Cheer customers includes the spend for all All-Star customers.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 21. Apparel Overcharge Damages, December 10, 2016 – December 31, 2020 (Class Period)*

| Year | Revenue | Overcharge | Damages |
|------|---------|-----------|---------|
| 2016 | $      1,055,189 | 10.0% | $        105,423 |
| 2017 | 153,186,290 | 10.0% | 15,304,662 |
| 2018 | 162,132,775 | 10.0% | 16,198,495 |
| 2019 | 171,884,563 | 10.0% | 17,172,784 |
| 2020 | 107,680,153 | 10.0% | 10,758,197 |
| **Class Period** | **$ 595,938,970** | **10.0%** | **$   59,539,561** |

Note: Year 2016 excludes amounts prior to Dec. 10, 2016.
*Sources: VAR00604800-805*

### 9.4.    Interest Applied to Damages

117.    Damages presented in this report pertain to overcharges over a historical period. I was instructed by counsel to calculate interest related to damages presented in this report. In doing so, I use the maximum allowable prejudgment interest rate, 10% per year.[255]

118.    In Table 22, I present the calculated damages for each Cheer market by year and apply the designated interest rate.  I find the total interest related to estimated damages as presented in this report to be $84.9 million.

*Table 22. Summary of Interest to be Applied to Damages*

| Year | Season | Competition Registration | Camps | Apparel | Total Damages | Annual Interest | # of Years | Total Interest | Total |
|------|--------|-------------------------|-------|---------|--------------|-----------------|-----------|----------------|-------|
| 2016 | 2015-2016 | $            - | $      40,985 | $    105,423 | $    146,408 | $    14,641 | 6 | $    87,845 | $    234,253 |
| 2017 | 2016-2017 | 26,557,104 | 17,183,715 | 15,304,662 | 59,045,481 | 5,904,548 | 5 | 29,522,740 | 88,568,221 |
| 2018 | 2017-2018 | 31,561,843 | 18,040,435 | 16,198,495 | 65,800,773 | 6,580,077 | 4 | 26,320,309 | 92,121,082 |
| 2019 | 2018-2019 | 35,603,614 | 18,911,899 | 17,172,784 | 71,688,298 | 7,168,830 | 3 | 21,506,489 | 93,194,787 |
| 2020 | 2019-2020 | 22,306,082 | 3,600,743 | 10,758,197 | 36,665,022 | 3,666,502 | 2 | 7,333,004 | 43,998,026 |
| 2021 | 2020-2021 | 1,157,294 | TBD | TBD | 1,157,294 | 115,729 | 1 | 115,729 | 1,273,024 |
| 2022 | 2021-2022 | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| **Total** | | **$117,185,937** | **$57,777,778** | **$59,539,561** | **$234,503,276** | | | **$84,886,118** | **$319,389,394** |

*Note: Damages calculated based on season are reflected in end of season year totals which is a conservative approach to take for calculating interest.*

### 9.5.    Pass Through Damages to Class Members

119.    The distribution chain connecting the indirect purchasers (Class Members) to Varsity is simple. Cheer athletes participate in teams organized by gyms or schools.[256] Gyms or schools generally decide

---

[255] *See* Tenn. Code Ann. § 47-14-123 ("Prejudgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum[.]"
[256] FEAS-Ares00075739, at 5800.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

which Competitions their athletes attend and which uniforms their athletes wear.[257] Gyms and schools register for events and place orders for Apparel.[258] The gyms and schools are then expensed by and remit payment to Varsity.[259] The athlete's family is charged for the associated expense (including the overcharge) related to Competition registration, Camp registration, and Apparel.[260] Furthermore, according to deposition testimony of Varsity All Star's Executive Vice President and General Manager, John Newby,  Varsity's "customers are parents, athletes, gym owners, coaches that attend our events."[261] Consistent with standard practice and ABA guidelines, pass through can be established by demonstrating that "the economic characteristics of the distribution chain support the pass through of increases in the price paid by the direct purchasers to the indirect purchasers."[262]

120.    Based on review of qualitative data, the overcharge pass-on rate is 100 percent. For example, in deposition testimony from Fuel Athletics, an All-Star gym owner, Timothy Gurske, notes sometimes parents pay Varsity directly for the uniform and in other years, the gym pays Varsity directly while charging parents. When the gym pays Varsity for the uniform purchases, they at times add an additional markup.[263] Sarah Minzghor, a current All-Star gym owner, also states in deposition testimony that even if prices charged by Varsity are less than the amount assessed to parents, no refunds are distributed to parents.[264] Janine Cherasaro, a former All-Star Cheer parent, indicates in deposition testimony that she pays the gym directly for the uniform and the gym then pays Varsity.[265]

### 9.6.    Conclusions

121.    Varsity has significant market power in the Competitive Cheer market. Analysis of information and data suggests that Varsity uses its market power to obtain supracompetitive pricing. I find that relative to the but-for world, Class Members suffered damages in excess of $234 million. This represents a lower boundary as the behavior (and harm) from some anticompetitive behavior could not be quantified and that a court may view there to be a punitive, deterrent or other basis to increase damages on account of the types of behaviors exhibited by Varsity. My damages calculations, which establish damages for indirect purchasers (Class Members) are established using common evidence.

---

[257] VAR00304734, at 4775.

[258] VAR00010712, at 0716; VAR00009293 (Seely Exhibit 17), at 9324, 9333.

[259] Deposition of T. Gurske, Dec. 9, 2021, 99:15-23; Deposition of J. Cherasaro, Feb. 2, 2022, at 78:11-79:25.

[260] VAR00304734, at 4773; Deposition of J. Cherasaro, Feb. 2, 2022, at 78:3-79:25.

[261] Deposition of J. Newby, Mar. 23, 2022, 365:5-10.

[262] ABA Section of Antitrust Law, Indirect Purchaser Litigation Handbook, Second Edition (2016) Chapter VII.B.3.b.2.

[263] Deposition of T. Gurske, Dec. 9, 2021, 99:4-100:21.

[264] Deposition of S. Minzghor, Dec. 17, 2021, 69:8-15.

[265] Deposition of J. Cherasaro, Feb. 2, 2022, 79:10-25.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

**10.    EXPERT DECLARATION AND SIGNATURE**

122.    My opinions are based upon my analysis of the information available to date. I may review and consider additional information that may be produced by the parties to this dispute. I reserve the right to revise the opinions, assumptions and calculations set forth herein as my investigation and analysis is ongoing. I also reserve the right to revise the opinions, assumptions and calculations set forth herein upon consideration of the report of any other testifying expert, the testimony of, or new documents produced by, any witness, any information or documents that any testifying expert produces or upon which he or she relies, and other material that may be presented to me prior to or at trial that I may properly consider under the governing rules or guidelines set by the court. This report is highly confidential and is only to be used for its stated purpose.


_____

Jen Maki, PhD

June 20, 2022

**10. APPENDIX A – CURRICULUM VITAE OF JEN MAKI**



4835 East Cactus Road, Suite 230
Scottsdale, AZ 85254
602.744.7157 (p)

**www.fticonsulting.com**

## JEN MAKI

Email: jen.maki@fticonsulting.com

## EDUCATION

| | |
|---|---|
| 2013 | Ph.D., Economics, North Carolina State University |
| 2011 | M.S., Economics, North Carolina State University |
| 2001 | M.S., Accountancy, University of Notre Dame |
| 2000 | B.S., Economics, Arizona State University |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2018-Present | Managing Director, FTI Consulting, Inc. |
| 2015-2018 | Senior Director, FTI Consulting, Inc. |
| 2013-2015 | Director, FTI Consulting, Inc. |
| 2009-2012 | Research Assistant, North Carolina State University |
| 2005-2008 | Certified Appraiser/Owner, Desert Hills Appraisal |
| 2003-2005 | Certified Appraiser/Manager, Oakley Appraisal Service |
| 2000-2003 | Senior I – Assurance and Advisory Business Services, Ernst & Young, LLP |

## TEACHING EXPERIENCE

| | |
|---|---|
| 2017 -Present | Faculty Associate: Graduate Health Economics, Arizona State University |
| 2012 | Instructor: Intermediate Microeconomics, North Carolina State University |
| 2011 | Instructor: Principles of Economics, North Carolina State University |

## TESTIMONIES

Engaged as a testifying expert in arbitration proceedings between an international pharmaceutical manufacturer and a pharmaceutical distributor. Provided information related to market dynamics, pricing, and projected sales volume through the term of the disputed contract while accounting for market shocks and the impact of Covid-19. Arbitration under the Hong Kong International Arbitration Center. (2021)

Retained as a testifying expert to provide information relating to demand for care, provision of care and how it evolved over time, and supply constraints that impact availability of desired treatments. This information was used to support an employer sponsored health insurance plan embroiled in litigation related to coverage decisions. Case No. 2:17-cv-00004-RAJ. (2020)

Engaged as a testifying expert in opioid-related litigation; Provided information about the healthcare landscape including material regarding geographic variation in utilization and information relating to changes in treatment patterns of care for pain. Case No. 12-c-141. (2016)

## REPRESENTATIVE PROJECTS

Supported damages expert in a litigation matter relating to alleged anti-competitive behavior in the automotive industry. Created forecasts and evaluated actions by both parties to quantify damages. Case No. 18-cv-00864.

Evaluated the relationship between initial treatment intensity and future healthcare cost as well as utilization for individuals diagnosed with autism. The findings were used to show that intensive early treatment can reduce long-term healthcare costs.

Created detailed demand models using advanced simulation techniques to analyze current and future levels of care and utilization under a status quo as compared to a new respiratory care delivery process; Developed disease forecasts, future patient volume, and resource utilization analysis to support new treatment regimens.

Supported expert on economic analysis in a litigation matter on the relationship between hospital prices and patient acuity; estimation of hospital prices under alternative in-network and out-of-network payer status.

Supported expert on predictive modeling in a litigation matter to forecast disease incidence and the corresponding demand for treatment over a 20-year time period as well as the effect of supply limitations on patient care modality choice.

Created the framework and conducted the analysis to assess market attractiveness and identify which countries the firm should grow, optimize, or harvest and exit for a private equity firm purchasing a major medical product manufacturer; Conducted a profitability study to assess true product-level profitability, identify avoidable costs, and quantify return on investment.

Led comprehensive assessment of population-level health, cost, quality, and access in the Nashville Region for the Nashville Area Chamber of Commerce using empirical techniques and estimation, and extensive commercial claims data and large public datasets on health and healthcare.

Utilized predictive modeling to project population demographic characteristics, disease prevalence, and the use of a new treatment technology over a ten-year time period to support an academic medical center during their internal evaluation regarding the potential acquisition of new technology.

## RESEARCH, PUBLICATIONS AND PRESENTATIONS

*"Issues in Equity, Cost-Effectiveness and Utilization Relating to Digital Health"* with Susan Manning and John Maruyama. *ICLG – Digital Health Laws and Regulations.* March 2020

*"Golden Years or Financial Fears? How Plans Change After Retirement Seminars"* with Steven Allen, Robert Clark, and Melinda Morrill. *Journal of Retirement,* 3, no. 3 (2016): 96

"Assessment of Nashville Region Health, Cost, Access, and Quality: Results of a Pilot Study," (with Meg Guerin-Calvert, Center for Healthcare Economics and Policy, FTI Consulting, Inc. and The Research Center, Nashville Area Chamber of Commerce), June 2015.

"The Incentives Created by a Harm Reduction Approach to Smoking Cessation: Snus and Smoking in Sweden and Finland." *International Journal of Drug Policy,* June 2015, 26(2015):569-574

"Re-Aligning Prospective Hospital Merger Guidance: Moving Beyond Concentration to More Meaningful Approaches" (with Meg Guerin-Calvert and Bruce C. Vladeck), Working Paper, http://dx.doi.org/10.2139/ssrn.2593165, April 2015.

*"Sex, Drugs, and Cancer: The Association between Oral Tobacco Use, Risky Sexual Behavior, and Head and Neck Cancer.*" Working Paper. October 2015.

*"*Can Simple Informational Nudges Increase Employee Participation in 401(k) Plans?" with Robert Clark and Melinda Morrill, *Southern Economic Journal*, January 2014, 80(3):677-701.

"Hospital Realignment: Mergers Offer Significant Patient and Community Benefits," (with Meg Guerin-Calvert), Center for Healthcare Economics and Policy, January 2014.

*"Encouraging New Hire to Save for Retirement"* with Robert Clark and Melinda Morrill. 2011 *RAND Working Paper* WR-892-SSA. 2012

"Sex, Drugs, and Cancer: The Association between Oral Tobacco Use, Risky Sexual Behavior, and Head and Neck Cancer"
>        *Southern Economic Association*, New Orleans, LA, November 2012
>        *Invited Seminar*, Eastern Carolina University, Greenville, NC, November 2012
>        *Invited Seminar*, Elon University, Elon, NC, November 2012.
>        *Invited Seminar*, University of Louisville, Louisville, KY, October 2012.
>        *Invited Seminar*, University of North Carolina at Greensboro, Greensboro, NC, October 2012.

"The Swedish Experience and the Incentives Created by Harm Reduction"
>        *Southern Economic Association*, New Orleans, LA, November 2012

"Can Simple Informational Nudges Increase Employee Participation in 401(k) Plans?" with Robert Clark and Melinda Morrill
>        *Association for Public Policy Analysis and Management*, Baltimore, MD, November 2012
>        *Society of Labor Economist* (Poster), Chicago, IL, May 2012

"A Misguided Tobacco Policy? Public Policy and Consumption Substitutability between Cigarettes and an Important Smokeless Tobacco Alternative"
   *Agricultural and Applied Economics Association* (Poster), Pittsburgh, PA, July 2011

## OTHER PROFESSIONAL ACTIVITIES

Referee, Nicotine and Tobacco Research

Referee, Contemporary Economic Policy

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

**11. APPENDIX B – LIST OF MATERIALS RELIED UPON**

***Jones, et al. v. Varsity Brands, LLC, et al.***

*All Depositions*

1. Albee, Damianne Deposition and Exhibits dated Jan 11, 2022

2. Bray, Alexa Deposition and Exhibits dated Jan 11, 2022

3. Chadwick, Jim Deposition and Exhibits dated Apr 15, 2022

4. Cherasaro, Janine Deposition and Exhibits dated Feb 2, 2022

5. Davis, Craig Deposition and Exhibits dated Feb 23, 2022

6. Elza, Brian Deposition and Exhibits dated Nov 16 and 17, 2021

7. Foster, Rebecca Deposition and Exhibits dated Dec 21, 2021

8. Gurske, Lauren Deposition and Exhibits dated Dec 7, 2021

9. Gurske, Tim Deposition and Exhibits dated Dec 9, 2021

10. Lauchaire, Nicole Deposition and Exhibits dated Dec 9, 2021

11. LeTard, Tres Deposition and Exhibits dated Nov 22, 2021

12. Lorenzen, Christina Deposition and Exhibits dated Jan 20, 2022

13. Minzghor, Sarah Deposition and Exhibits dated Dec 17, 2021

14. Nangia, Pashupati Deposition and Exhibits dated Mar 10, 2022

15. Newby, John Deposition and Exhibits dated Mar 23 and 24, 2022

16. Parrish, Jamie Deposition and Exhibits dated Mar 3 and 17 ,2022

17. Quintero, Josh Deposition and Exhibits dated Mar 29, 2022

18. Radek, Kathryn Deposition and Exhibits dated Mar 29, 2022

19. Seely, William Deposition and Exhibits dated Apr 13 and 14, 2022

20. Webb, Jeff Deposition and Exhibits dated May 12 and 13, 2022

*Bates Numbered Documents*

21. BARC_00000008

22. CB00000275

23. CB00063214

24. CB00485513

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

25. FEAS-Ares00001098

26. FEAS-Ares00075739

27. FUSIONELI000000164

28. JEFF00141901

29. JEFF00236982

30. JEFF00263834

31. NFINITY000297 (Highly Confidential - Attorney and Expert Eyes Only)

32. STARSANDSTRIPES000000025

33. STARSANDSTRIPES000002441

34. USASF_00000756

35. USASF_00001955

36. USASF_00001966

37. USASF_00002776

38. USASF_00002779

39. USASF_00002782

40. USASF_00002785

41. USASF_00032444

42. USASF_00052537

43. USASF_00084806

44. USASF_00096556

45. VAR00002010

46. VAR00003766

47. VAR00006767

48. VAR00008022

49. VAR00008463

50. VAR00009293

51. VAR00009646

52. VAR00010122

53. VAR00010365

54. VAR00010712

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

55. VAR00012435

56. VAR00017306

57. VAR00017932

58. VAR00018967

59. VAR00020213

60. VAR00020214

61. VAR00078752

62. VAR00079196

63. VAR00079604

64. VAR00080966

65. VAR00083612

66. VAR00084758

67. VAR00092896

68. VAR00101102

69. VAR00101110

70. VAR00106861

71. VAR00106901

72. VAR00107430

73. VAR00109311

74. VAR00117693

75. VAR00117735

76. VAR00117736

77. VAR00117738

78. VAR00117740

79. VAR00118899

80. VAR00119257

81. VAR00123779

82. VAR00123780

83. VAR00124047

84. VAR00127208

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

85. VAR00160801

86. VAR00160803

87. VAR00176405

88. VAR00182438

89. VAR00183218

90. VAR00183219

91. VAR00196544

92. VAR00220904

93. VAR00225510

94. VAR00225512

95. VAR00229759

96. VAR00231910-11

97. VAR00234212

98. VAR00240078

99. VAR00240079

100. VAR00248481

101. VAR00253935

102. VAR00259314

103. VAR00270038

104. VAR00272785

105. VAR00304734

106. VAR00304743

107. VAR00309426

108. VAR00309460

109. VAR00310631

110. VAR00322387

111. VAR00326030

112. VAR00329532

113. VAR00341580

114. VAR00352199

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

115. VAR00352214

116. VAR00352218

117. VAR00415061-76

118. VAR00420493

119. VAR00424538

120. VAR00445395

121. VAR00462007

122. VAR00462031

123. VAR00462055

124. VAR00462067

125. VAR00462074

126. VAR00468329

127. VAR00487964

128. VAR00494705

129. VAR00582534

130. VAR00604800

131. Webb_AS_00000443

*Court Document*

132. Complaint Class Action, Filed 12/10/2020

*References*

133. ABA Section of Antitrust Law, Indirect Purchaser Litigation Handbook, Second Edition 2016 Chapter VII.B.3.b.2.

134. Pindyck, Robert S., and Daniel L. Rubinfeld. Microeconomics. Pearson Education, 2013

*Publicly Available Citations*

135. www.varsity.com/school/competitions/brands/

136. https://beyondthebarreusa.com/blogs/fashion-styling/cheer-on-all-about-cheer-leading-uniforms

137. https://shop.varsity.com/pages/competition-gear

138. https://usasfmain.s3.amazonaws.com/Rules/USASF_Cheer_Rules_21-22.pdf

139. https://viewer.joomag.com/annual-report-use/0963356001646063348?short&.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

140. https://web.archive.org/web/20161222085858/http://www.cheerdaily.com/aloha-productions-merges-varsity-spirit/

141. https://www.justice.gov/atr/horizontal-merger-guidelines-08192010#5c (accessed 6/13/2022)

142. https://www.omnicheer.com/About-Us , 6/10/2022

143. https://www.varsity.com/uce/

144. www.baincapital.com/news/varsity-brands-leader-elevating-student-experiences-sports-spirit-and-achievement-be-acquired

145. www.bloomberg.com/profile/company/0126199D:US

146. www.bloomberg.com/profile/company/VARS:US

147. www.bsnsports.com/company-info

148. www.charlesbank.com/portfolio/companies/varsity-brands/

149. www.cnbc.com/2018/06/19/bain-nears-2-point-5-billion-deal-for-cheer-uniform-leader-varsity-brands.html

150. www.heartofcheer.com/industry/world-and-summit-bids-explained/

151. www.herffjones.com/about/

152. www.investors.com/news/management/leaders-and-success/varsity-brands-jeff-webb-rebranded-cheerleading-with-focus-on-athleticism-entertainment/

153. www.linkedin.com/in/realjeffwebb/

154. www.usacheer.org/All-Star

155. www.usacheer.org/college-cheer

156. www.usacheer.org/high-school-cheer

157. www.usacheer.org/junior-high-cheer

158. www.usacheer.org/youth-rec-cheer

159. www.usasf.net/about

160. www.usasf.net/rules

161. www.varsity.com/about/

162. www.varsity.com/about/press/

163. www.varsity.com/about/press/varsity-spirit-and-fabletics-team-up-to-bring-activewear-and-experiential-events-to-americas-cheer-and-dance-community/

164. www.varsity.com/about/press/varsity-spirit-founder-and-chairman-jeff-webb-transitions-to-focus-on-the-global-development-of-cheer/

165. www.varsity.com/about/press/varsity-spirit-inducts-2021-class-into-varsity-legends/

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

166. www.varsity.com/about/press/varsity-spirit-signs-lease-with-keel-street-llc-for-hq-move-to-downtown-memphis/

167. www.varsity.com/all-star/competitions/brands/

168. www.varsity.com/All-Star/competitions/end-of-season-events/the-d2-summit/

169. www.varsity.com/All-Star/competitions/end-of-season-events/the-summit/

170. www.varsity.com/nca/school/camps/types/

171. www.varsity.com/nca/school/camps/types/overnight-camp/

172. www.varsity.com/news/what-is-competitive-cheerleading/

173. www.varsity.com/school/camps/

174. www.varsity.com/school/camps/brands/

175. www.varsity.com/school/competitions/brands/

176. www.varsity.com/school/spirit-fashion/why-choose-varsity/

177. www.varsitybrands.com/about

178. www.varsitybrands.com/about/mission-values

179. www.varsity.com/uca/school/competitions/college-nationals/

180. www.varsity.com/uca/school/competitions/high-school-nationals/

181. www.varsity.com/espn-air-dates-2022

182. http://www.varsity.com/wp-content/uploads/2021/01/VAS_Summit_Pricing_21.pdf

183. http://www.varsity.com/wp-content/uploads/2021/12/VAS_Summit_Pricing_21.22.pdf

*Expert Reports*

184. Expert Report of Janet S. Netz, Ph.D.

185. Expert Report of Randal Heeb, Ph.D.