# Exhibit 6

## FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF

TENNESSEE WESTERN DIVISION

| | |
|---|---|
| **Jones, et al. v. Varsity Brands, LLC, et al.** | Case 2:20-cv-02892-SHL-tmp |
| | Hon. Sheryl H. Lipman |
| **JURY TRIAL DEMANDED** | |

EXPERT DAMAGES REBUTTAL REPORT OF JEN MAKI, PHD

DECEMBER 14, 2022

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

TABLE OF CONTENTS

| | |
|---|---|
| 1.   Introduction | 4 |
|     1.1.   Qualifications and Experience | 4 |
|     1.2.   Compensation | 4 |
|     1.3.   Assignment | 4 |
|     1.4.   Information and Materials Relied Upon | 5 |
| 2.   Executive Summary | 6 |
| 3.   Critique of Dr. Kevin Murphy's Opinions and Conclusions | 6 |
|     3.1.   Approach to Calculating Damages | 6 |
|     3.2.   Dr. Murphy Misunderstands the Purchasing Process Related to Competitions, Camps, and Apparel Leading to Erroneous Assumptions Related to the Pass Through Rate | 7 |
|     3.3.   Dr. Murphy Mischaracterizes the Impact and the Economic Incentive of Rebates | 10 |
| 4.   Updated Damage Calculations | 12 |
|     4.1.   Cheer Competition Damages | 12 |
|         4.1.1.   Revised Cheer Competition Revenue | 12 |
|         4.1.2.   Revised Cheer Competition Overcharge Calculation | 12 |
|         4.1.3.   State-Level Damages | 13 |
|     4.2.   Camp Damages | 13 |
|         4.2.1.   Revised Cheer Camp Revenue | 13 |
|         4.2.2.   Revised Cheer Camp Overcharge Calculation | 13 |
|         4.2.3.   State-Level Damages | 14 |
|     4.3.   Apparel Damages | 14 |
|         4.3.1.   Revised Apparel Revenue | 14 |
|         4.3.2.   Revised Apparel Overcharge Calculation | 14 |
|         4.3.3.   State-Level Damages | 15 |
| 5.   Damages Estimation | 15 |
|     5.1.   Interest Applied to Damages | 16 |
| 6.   Conclusions | 18 |
| 7.   Expert Declaration and Signature | 18 |
| 8.   Appendix A – Curriculum Vitae of Jen Maki | 19 |
| 9.   Appendix B – List of Additional Materials Relied Upon | 23 |
| 10.  Appendix C - Summary of Cheer Competition Damages by State | 25 |
| 11.  Appendix D - Summary of Cheer Camp Damages by State | 26 |
| 12.  Appendix E - Summary of Apparel damages by State | 27 |

2

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

**13.**   Appendix F - Cheer Competition Damages by State - Regional Overcharge Percentage .................. 28

**14.**   Appendix G - Cheer Camp Damages by State - Regional Overcharge Percentage ........................... 29

**15.**   Appendix H - Summary of Total Damages for Select States............................................................. 30

**16.**   Appendix I - Total Damages by State - Regional Overcharge Percentages........................................ 31

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

## 1.    INTRODUCTION

### 1.1.    Qualifications and Experience

1.    As discussed in my previous Expert Damages Report, dated June 20, 2022, I am a Managing Director at FTI Consulting, Inc. ("FTI"), and I lead the Commercial Due Diligence offering for the Transactions practice. FTI is an international management and business consulting firm of financial analysts, economists, accountants, valuation specialists and engineers who specialize in providing accounting, financial, economic and project management consulting services to clients and client companies, including providing assistance to counsel and their clients with the resolution of business problems and disputes, many of which involve parties in litigation. My professional responsibilities include the analysis and modeling of factors that drive demand for products and services, assessment of trends within markets, analysis of the competitive landscape, and the identification of factors that drive purchase decisions.

2.    I hold a Ph.D. in economics from North Carolina State University with fields of specialization in health economics and labor economics. While in the doctoral program at North Carolina State University, I taught undergraduate courses in microeconomics. I currently hold a position as an Academic Associate at Arizona State University's College of Health Solutions and teach a masters-level health economics course. I have authored three peer reviewed publications in the past ten years. Those publications are listed in my Curriculum Vitae which is attached hereto as Appendix A.

### 1.2.    Compensation

3.    FTI bills for my time at an hourly rate of $945. In addition, other professionals at my firm acting under my direct supervision have assisted me on this matter. FTI will be compensated at the same hourly rate if I am asked to testify in deposition or during trial. Neither FTI's compensation nor my compensation depend on the conclusions reached in this report or the outcome of this case.

### 1.3.    Assignment

4.    I have been retained by the Joseph Saveri Law Firm, LLP ("Counsel"), counsel for representative plaintiffs Jessica Jones and Christina Lorenzen ("Plaintiffs") and all those indirect purchasers similarly situated ("The Class" or "Class Members"),[1] to provide consulting, investigative and litigation support services. More specifically, I have been asked to conduct an independent analysis

---

[1] For simplicity, I refer to "The Class," but understand that the class has not yet reached the class certification stage and is still putative. The Class is defined, and Plaintiffs' allegations are set forth in full in their Class Action Complaint (ECF No. 1) in *Jessica Jones, et al. v. Varsity Brands, LLC, et al.*, Case No. 2:20-cv-02892-SHL-tmp (W.D. Tenn.) (referred to herein as "Complaint").

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

of the alleged anticompetitive conduct by Defendants[2] and to determine the extent (if any) of the economic harm (damages) that The Class may have sustained due to such conduct, and the future economic harm (damages). I previously submitted an expert report dated June 20, 2022 (the "Maki Report") in connection with this matter, in which I opined:

    a.  Varsity used its market power to charge anti-competitive prices resulting in increased revenue;

    b.  In addition, there are many related areas where it is likely that Varsity used its market power to increase prices and extract additional revenues from The Class; and

    c.  Based on the analysis performed at the time of my report, I estimated classwide damages related to Competition registration, Camp registration and Apparel in excess of $234.5 million.

5.    I have been asked to respond to the Defendants' expert, Dr. Kevin Murphy, in areas relevant to my analysis and findings. While I did not attempt to respond to every opinion offered by Dr. Murphy, the absence of a response should not be construed as implicit agreement with the views and opinions offered. As in the Maki Report, I reserve the right to update my report to the extent any additional information is produced by either party or their experts.

6.    This report is intended to be used solely in this litigation and should not be relied upon for any other purpose. FTI is not a public accounting firm and did not audit any financial statements or perform any attest procedures during this engagement, nor has FTI provided any legal advice to Counsel or Plaintiffs, including within this report.

### 1.4.    Information and Materials Relied Upon

7.    In preparing this report, I rely upon information from a variety of sources, each of which is of a type reasonably relied on by experts in my field. I supplement the List of Materials Relied Upon provided in my previous report with additional information I rely on for this report. The list of additional materials relied upon is provided in Appendix B or elsewhere in my report. Review and analysis of this information, together with my background, training, education and experience, forms the basis of my opinions.

---

[2] See Maki Report ¶¶ 9-11.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

## 2.  EXECUTIVE SUMMARY

8.    In this report, I address the unsubstantiated claims and criticisms made by Dr. Murphy regarding the estimated damages presented in my first report. Dr. Murphy makes several errors in his opinions and conclusions. Dr. Murphy indicates that my application of an overcharge percentage to the relevant revenue data is problematic but applies the same methodology in his approach. It also appears that Dr. Murphy misunderstands the commercial structure that exists in the Cheer market and believes that Gyms are unable or unwilling to pass on the prices (including the anticompetitive overcharge) charged by Varsity when evidence clearly indicates that they do. It is also apparent that Dr. Murphy does not understand the impact of the cash and apparel rebates on the decision-making process of the gym owner and greatly underestimates the economic incentives, and impact on gyms, that results from the Varsity Family Plan and Varsity Networking Agreements. Each of these arguments are further addressed in the sections below.

9.    The methodology I use to calculate damages remains unchanged, however the damages have increased from $234.5 million to $253.4 million to reflect an update in the overcharge percentages calculated by Dr. Heeb.[3]

10.    I was instructed by Counsel to provide a breakdown of the estimated damages by state. These summaries are located in the Appendix sections and also referenced within this report.

*Table 1. Summary of Damages*

| Description | Report Section | Revenue | Damages |
|---|---|---|---|
| Competition Registration | 4.1 | $  470,156,731 | $ 128,729,973 |
| Camps | 4.2 | 238,800,459 | 65,384,104 |
| Apparel (Uniforms, competition gear, practice-wear, camp wear, and other apparel) | 4.3 | 540,353,340 | 59,198,475 |
| **Total** | | **$1,249,310,530** | **$253,312,552** |

## 3.  CRITIQUE OF DR. KEVIN MURPHY'S OPINIONS AND CONCLUSIONS

### 3.1.  Approach to Calculating Damages

11.    I calculate estimated damages by applying the overcharge percentage to the transaction level sales data. Dr. Murphy does not rebut this methodology or put forward an alternate methodology. He merely takes issue with Dr. Heeb's overcharge percentages and whether the damages were passed on

---

[3] In this report, I reduced competition, camp and apparel revenue to better align revenue amounts with the proposed Class Members. While this adjustment reduces overall revenue, applying the updated overcharge percentage resulted in an increase in overall damages.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

to indirect purchasers.

### 3.2. Dr. Murphy Misunderstands the Purchasing Process Related to Competitions, Camps, and Apparel Leading to Erroneous Assumptions Related to the Pass Through Rate

12. Pass through is a term used by economists to indicate the amount of a price increase or overcharge that is passed on to the end customer. In the current context, the pass through rate is a measure of how much of the Varsity overcharge is passed onto parents vs. absorbed by All-Star gyms.

13. The level of complexity related to determining pass through varies by industry and the relevant part of the supply chain being analyzed. If there is a very long supply chain with many steps separating the suppliers from the ultimate purchasers, it can be difficult to observe pass through. For example consider an industry like pharmaceuticals where there is a long and convoluted supply chain. Raw materials are sourced from many suppliers, manufactured by another, and then the final dosage form is sold to a wholesaler/distributor who then contracts with another intermediary (a pharmacy benefit manager) who then sells to a pharmacy. The consumer then faces a price that may be set by the insurer or reduced through the use of a coupon.

14. Cheer, and in particular the very narrow part of the supply chain relevant to this case, is much less complex which makes it easier to evaluate pass through. There is only one intermediary, the direct purchaser, separating Varsity from the indirect purchaser. The indirect purchaser is presented with a set of prices determined by Varsity for competitions, camps, and apparel. These prices are clear and straightforward and can be observed by both the indirect and direct purchaser.

15. These prices are presented to participants at the start of the season and participants are informed that they will face a set of explicit costs in order to participate. For example, parent information clearly indicates that competition attendance is required to participate in Competitive Cheer and All-Star registration packets inform potential participants of this expected cost.[4] Participants agree to pay these costs as a term and condition of participation.

16. Once the purchasing decisions have been made for a specific season, the prices for apparel, competitions, and camps are known and the direct purchaser would be well positioned to communicate these prices to the indirect buyer. This means that at the beginning of a season, the All-Star gym or school would be able to set the prices that parents pay at an amount to cover the direct, third party costs. Based on these dynamics, it is unreasonable to assume that pass through related to

---

[4] REDACTED00000157.pdf; CNY_CHEER 000002.pdf

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Varsity purchases is anything less than 100 percent.

17.    Dr. Murphy states that pass through in an industry "must be analyzed given the facts of that industry at that time."[5] While he goes on to state that analysis involving the elasticity of demand and a firm's cost curve for competitions, camps and apparel is one possible approach, he fails to follow through and perform such analysis. It appears that data that would allow for such analysis is proprietary data and it is not available -- which may explain why Dr. Murphy did not attempt such a calculation. But more importantly, there is no evidence that direct purchasers absorbed the anticompetitive overcharge. In fact, the evidence shows that the full price of apparel, competitions, and camps, including the overcharge, were passed on to parents, athletes, and other payers. I use the facts of the industry to confirm the full pass through rate of the anticompetitive overcharge for competitions, camps and apparel. The key factors I rely upon are as follows:

a.    Assertations of purchasers indicate full pass through: Review of All-Star gym registration forms and assertions by All-Star gym owners via deposition and response to subpoenas indicate that the price passed onto parents is the full cost of the item and may include an additional upcharge. This is the opposite of any form of cost sharing and suggests a pass through rate of 100 percent. ACE Cheer states that "we charge the athlete the registration fee for each event."[6] Gymnastics Sports Center provided actual costs for competitions and the amount charged to parents which showed that parents were charged more than the actual competition costs while apparel was charged at "actual cost."[7] Woodlands Elite's price list indicates that the competition fees are "estimated" at the beginning of the season which suggests that they are based on the actual competitions attended and their respective costs.[8] Liberty Cheer also makes clear that competition fees are estimates stating "we reserve the right to modify dates, times and costs" throughout their Open Call[9] package. They also note that an 'in-house credit' is provided if a competition is cancelled and not replaced with another event rather than issuing a refund.[10] In relation to upcharges, CNY

---

[5] Murphy Report, para 438.

[6] ACE Cheer questionnaire, ACE 000001- ACE 000004 at ACE 000002. (ACE 1-4.pdf).

[7] GYMPROD_GYMNATICES SPORT CENTER_000001.xls. The aggregated fee per athlete for the full set of competitions was compared to the amount paid by parents to determine that actual competition registration prices were less than the amount collected.

[8] GYMPROD_WoodlandsElite000001.

[9] The Open Call package created by Liberty Cheer provides an overview of the cheer program including but is not limited to: tryout schedule, practice schedule, attendance policy, competition schedule, parent communication, team attire, tuition payment and billing policies, choreography and camp requirements. Other gyms refer to this collection of information as Team Placement Packet, All-Star Handbook, Information Packet, and Tryout Packet. (Gyms Data).

[10] STARSANDSTRIPES000000025 at 0027.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Cheer Company indicated that competition fees do not have an upcharge but camps do.[11]

    b. Sustainable business practices and basic microeconomic theory suggest full pass through: Pricing below cost is an unsustainable practice.[12] Many All-Star gyms are small businesses and would have little ability to absorb a portion of all the costs for competitions, camps, or apparel.

    c. Basic commercial practices suggest a minimum of full pass through. When a firm sells a product or service obtained from a third party, it is standard to apply a mark-up.[13] Products sold at retailers are generally not sold at cost but at an amount that covers cost and provides a profit. Selling at cost would be unprofitable for a firm as the profit margin goes to cover costs related to selling that product.

18. Dr. Murphy states that All-Star gyms offering discounts for lump sum, up-front payments is evidence that pass through is less than 100 percent. This conclusion is not supported by the facts of the case. The available evidence indicates that All-Star gyms rarely offer discounts for lump sum payment and, in the rare circumstance that they do, there is no indication that the discounts offset competition registration, apparel, or camp fees.[14] The lump sum discounts are more likely an incentive to collect upfront payment thereby reducing the gym's operating costs (including administrative fees associated with billing and account reconciliation) and allowing gyms more control of their cash flow.

19. In addition, if All-Star gyms were indeed engaging in absorbing or paying the overcharge to any significant degree, they would be motivated to advertise this as a technique to attract more participants and increase market share. Dr. Murphy cites to no such evidence.

20. Dr. Murphy claims there is no reason to believe that rebates would not have been passed through to

---

[11] CNY Cheer Questionnaire. (CNY_CHEER 000001).

[12] "Over the long pull, there is one simple criterion for the survival of a business enterprise: Profits must be nonnegative…failure to satisfy this criterion means ultimately that a firm will disappear from the economic scene" Scherer F. M. 1980. *Industrial Market Structure and Economic Performance*. 2d ed. Chicago: Rand McNally College Pub.

[13] The Harvard Business Review on Pricing states that "Surveys show that for most companies, the dominant factor in pricing is product cost. Determine the cost and apply the desired markup, and that's the price." The Harvard Business Review, 2008 *Harvard business review on pricing*. Harvard Business School Pub.

[14] Of the full set of 29 gym open call/registration packets I reviewed, only two gyms offered a lump sum payment for paying in full. CNY Cheer offered a $150 lump sum discount for paying in full for the 2021-2022 season (CNY_CHEER 000002 at 0008) and an unquantifiable discount for their 2020-2021 season (CNY_CHEER 000064-0076). No lump sum payment discounts were offered for the 2015-2019 seasons (CNY_CHEER 000029-0036, CNY_CHEER 000037-0050, CNY_CHEER 000053-0063, CNY_CHEER 000085-0095, CNY_CHEER 000098-0106). Royal Elite offered a $100 lump sum discount in season 2018-2019 (NP Royalty Elite 000035) but not in subsequent seasons. Moreover, Royal Elite's 2019-2020 season registration packet clearly notes that "there is no sibling discount for the 2019-2020 season on any cheer fees, competition fees, or rec cheer sessions" (NP Royalty Elite 000072).

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

parents.[15] But Dr. Murphy does not adequately support this statement, and in fact, the record evidence supports the contrary. First, I have not seen any record evidence that Varity's rebate program was disclosed to parents. Under the rebate program, there were no restrictions on the use of refunds. All-Star gyms receiving rebates could use the money for any purposes, including for personal reasons like purchasing vacations or cars.[16] Second, there is considerable evidence that Varsity undertook efforts to conceal or obscure the substantial amounts of rebates paid to gyms to prevent parents from learning of the rebates and pressuring All-Star gym owners to pass on the benefit.[17]

### 3.3.    Dr. Murphy Mischaracterizes the Impact and the Economic Incentive of Rebates

21.    Competitive Cheer athletes purchase Apparel, attend Competitions and may participate in Camps, all of which Varsity refers to as the "Varsity Spirit Ecosystem".[18] The Varsity Family Plan ("VFP") and Varsity Network Agreement ("VNA[19]") are loyalty programs acting to lock gyms into this Varsity ecosystem.[20] These agreements provide financial incentives, in the form of rebates based on the amount of cheer spend, to encourage gyms to buy from Varsity, and not others.[21,22]

22.    The rebates are a form of kickbacks from Varsity and are paid directly to All-Star gyms with no requirement or expectation that the monetary benefit will be passed through to parents or athletes (i.e., Class Members).[23] In order to maximize the rebates, Varsity's rebate program is structured to incentivize gyms to attend more Varsity competitions and purchase apparel from Varsity, rather than offerings from Varsity's competitors.[24, 25] There is nothing in Dr. Murphy's analysis that

---

[15] Murphy Report, para 447.

[16] Deposition of J. Parrish, Mar. 17, 2022, at 326:20-328:7; Deposition of J. Webb, May 13, 2022, at 144:11-24.

[17] Deposition of B. Elza, Nov. 16, 2021, at 318:7-319:2.

[18] FEAS-Ares00075739, at 5803.

[19] The VNA represents a more exclusive arrangement between two parties that indicate items must be purchased from only one seller (i.e. Varsity).

[20] As referred to by Varsity.

[21] VAR00106861, at 6865; VAR00020213 (Elza Exhibit 22), at 0214.

[22] Varsity paid out the rebates to the gym-owners at the end of the cheer season when the gym-owners were low on funds. Deposition of J. Parrish, Mar. 3, 2022, at 137:18-138:8.

[23] As noted above, Varsity undertook efforts to avoid disclosing the fact or the amount of rebates to parents. See footnote 17, above.

[24] The owner of Stars & Stripes' gym (Liberty Cheer program) admitted to the influence of the rebate program in how she selected competitions: "yeah, if you went to a certain amounts of Varsity competitions, you could get a certain percentage of a rebate. (…) And however many athletes you had going, you could get a percentage back on" (Deposition of R. Foster, Dec. 21, 2021, at 265:24-266:9).

[25] Varsity's own general manager and VP of Sales, Brian Elza references the influence of the Family Plan, likening it to an additive drug and saying, "No other sport, not even one, has rebate plans like Varsity/All Star cheer…We can keep them coming back for the Family Plan crack." He goes on to reference the gym – Varity relationship as one between a "ho" (the gym) and "pimp" (Varsity) saying "Sooner or later, crack ho's turn on their pimp wanting more crack, better crack, and for less output." VAR00182095 (Elza Exhibit 26), at 2095-2096.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

demonstrates that the rebates were based on or benefited the ultimate purchaser.

23.     Dr. Murphy confuses the issue and does not disprove that the VFP and VNA programs are a mechanism to foreclose competition, but instead seeks to demonstrate that gym owners benefit from the rebate program.[26] This observation supports my conclusion: gym owners receive a benefit that is not shared with athletes or parents. The rebates provide an economic incentive to do business with Varsity, driving sales to Varsity and away from competitors. This foreclosing of the competition reinforces the economic harm to the ultimate purchasers (parents, etc.). Dr. Murphy never addresses or shows how the economic benefits of Varsity's rebate program actually reaches these ultimate purchasers.

24.     Dr. Murphy's characterization that VFP or VNP rebates were not substantial in nature is incorrect.[27] Dr. Murphy details the number of regular-season competitions attended by gyms and participants by season in his Exhibit 4.[28] Using his numbers, up to 45% of the gyms attended five or more events which would make the gym owners eligible for cash and apparel rebates.[29] Again using his numbers, approximately 1.8 million registrants attended 5 or more events, accounting for 91% of the total registrations. The total rebates kicked-back by Varsity during the five seasons totaled $32.2 million or roughly 17% of the competition registration fees paid to Varsity by the gym owners. See Table 2 below.

*Table 2. Varsity Family Plan Rebates by Season and Tier*

| Family Plan Tier Type | 2015-2016 | 2016-2017 | 2017-2018 | 2018-2019 | Total Rebates |
|---|---|---|---|---|---|
| New Network | $    109,326 | $    105,411 | $    85,659 | $    104,245 | $    404,641 |
| Old Network | 2,979,830 | 3,139,986 | 3,602,991 | 3,549,459 | 13,272,265 |
| Premier & Blank | 236,841 | 34,165 | 2,750 | 2,508 | 276,264 |
| Standard VFP | 4,793,533 | 4,405,278 | 4,898,656 | 4,161,236 | 18,258,704 |
| **Total** | **$  8,119,530** | **$  7,684,840** | **$  8,590,056** | **$  7,817,448** | **$  32,211,874** |
| Amount Paid to Varsity | $  43,700,526 | $  45,568,059 | $  50,729,684 | $  51,113,482 | $ 191,111,751 |
| % Rebated | 19% | 17% | 17% | 15% | 17% |

*Source: VAR00352214.*

---

[26] Murphy Report, Exhibit 52.

[27] Murphy Report, para 243.

[28] Murphy Report, Exhibit 4.

[29] Minimum threshold of events needed to qualify for VFP increased from 5 to 6 events in Season 2018-2019 (VAR00079196, at 9196).

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

### 4.    UPDATED DAMAGE CALCULATIONS

#### 4.1.    Cheer Competition Damages

25.    Damages are updated to reflect revisions to the Cheer Competition registration revenue as well as the competition overcharge percentage. These updates result in damages of $128.7 million during the Class Period which is an increase of $11.5 million over the original $117.2 million.[30]

##### 4.1.1.    Revised Cheer Competition Revenue

26.    I reduce the Cheer Competition registration revenue by $21.4 million to exclude competition registration revenue attributable to dance and youth groups. These participants are not proposed Class Members[31] and are therefore removed from my damage calculation.[32]

##### 4.1.2.    Revised Cheer Competition Overcharge Calculation

27.    In my original Cheer Competition damages, I applied the overcharge percentage determined by Dr. Heeb (23.8%[33]) to Varsity's total competition registration revenues (competition fees less discounts) charged to US-based customers for all US-based competitions during the Class Period. In Dr. Heeb's Rebuttal Expert Report dated December 14, 2022 ("Heeb Rebuttal Report"), he details the changes behind his revised overcharge percentage of 27.4%.[34] Accordingly, I update the estimated damages for Cheer Competitions and present them below in Table 3. Total Cheer Competition damages of $128.7 million were incurred during the Class Period.

---

[30] The Complaint in this case defines "Class Period" as beginning on December 10, 2016 and continuing through the present. Varsity has produced transactional data through 2020. My damage calculation methodology can be applied to calculate additional overcharges on production of additional data through present.

[31] For simplicity, I refer to "Class Members," but understand that the class has not yet reached the class certification stage and is still putative. The Class is defined, and Plaintiffs' allegations are set forth in full in their Class Action Complaint (ECF No. 1) in Jessica Jones, et al. v. Varsity Brands, LLC, et al., Case No. 2:20-cv-02892-SHL-tmp (W.D. Tenn.) (referred to herein as "Complaint").

[32] While the registration revenue decreased, the increase in the overcharge percentage lead to a net increase in estimated damages.

[33] Heeb Report dated June 20, 2022, at Section VI.E.1.

[34] Heeb Rebuttal Report dated December 14, 2022, at Section V.D.1.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 3. Cheer Competition Overcharge Damages, Dec 10 2016 - End Dec 2020*

| Year | Revenue | Overcharge | Damages |
|------|---------|------------|---------|
| 2016 | $    4,111,269 | 27.4% | $    1,125,675 |
| 2017 | 116,353,432 | 27.4% | 31,857,832 |
| 2018 | 129,016,078 | 27.4% | 35,324,893 |
| 2019 | 143,711,180 | 27.4% | 39,348,445 |
| 2020 | 76,964,771 | 27.4% | 21,073,128 |
| **Class Period** | **$470,156,731** | | **$128,729,973** |

*Sources: Varsity Competitions Data, World Bids Events Data, Pre-Acquisition Data*

### 4.1.3.    State-Level Damages

28.    I was instructed by Counsel to provide damages by state. Cheer Competition damages by state are presented in Appendix C.

## 4.2.    Camp Damages

29.    Damages are updated to reflect revisions to the Cheer Camp revenues and overcharge percentage. These updates result in damages of $65.4 million which is an increase of $7.6 million over the original $57.8 million.[35]

### 4.2.1.    Revised Cheer Camp Revenue

30.    I reduce the Cheer Camp revenues by $3.5 million to exclude camp registration fee revenue attributable to dance and youth groups. These participants are not proposed Class Members and are therefore removed from my damage calculation.

### 4.2.2.    Revised Cheer Camp Overcharge Calculation

31.    In my original Cheer Camp damages, I applied the overcharge percentage determined by Dr. Heeb (23.8%[36]) to Varsity's total camp revenues charged to US-based customers for all US-based camps during the Class Period. In the Heeb Rebuttal Report, he details the changes behind his revised overcharge percentage of 27.4%.[37] Accordingly, I update the estimated damages for Cheer Camp and present them below in Table 4. Total Cheer Camp damages of $65.4 million were incurred during the Class Period.

---

[35] Varsity has produced transactional data through 2020. My damage calculation methodology can be applied to calculate additional overcharges on production of additional data through present.

[36] Heeb Report, at Section VI.E.3. dated June 20, 2022.

[37] Heeb Rebuttal Report dated December 14, 2022, at Section V.D.2.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 4. Cheer Camp Overcharge Damages, Dec 10 2016 - End Dec 2020*

| Year | Revenue | Overcharge | Damages |
|---|---|---|---|
| 2016 | $       166,644 | 27.4% | $       45,627 |
| 2017 | 71,049,137 | 27.4% | 19,453,414 |
| 2018 | 74,553,964 | 27.4% | 20,413,043 |
| 2019 | 78,174,068 | 27.4% | 21,404,236 |
| 2020 | 14,856,647 | 27.4% | 4,067,783 |
| Class Period | $238,800,459 | | $65,384,104 |

*Sources: Varsity Competitions Data, World Bids Events Data, Pre-Acquisition Data*

### 4.2.3.    State-Level Damages

32.    I was instructed by Counsel to provide damages by state. Cheer Camp damages by state are provided in Appendix D.

## 4.3.    Apparel Damages

33.    Damages are updated to reflect revisions to the Apparel revenues and overcharge percentage. These updates result in damages of $59.2 million which is a decrease of .3 million over the original $59.5 million.[38]

### 4.3.1.    Revised Apparel Revenue

34.    I reduce the Apparel revenues by $55.6 million to account for further refinement of non-US 'bill to' addresses and purchases coded as dance or youth. These participants are not proposed Class Members and are therefore removed from my damage calculation.

### 4.3.2.    Revised Apparel Overcharge Calculation

35.    In my original Apparel damages, I applied the overcharge percentage determined by Dr. Heeb (10%[39]) to Varsity's total apparel revenues charged to US-based customers during the Class Period. In the Heeb Rebuttal Report, he details the changes behind his revised overcharge percentage of 11.0%[40] and I use this value for Varsity's overcharge for all apparel. The estimate of 11% overcharge is conservative considering the results in Table 5 below which show that the overcharge was significantly higher in the preceding year of 2016.

---

[38] Varsity has produced transactional data through 2020. My damage calculation methodology can be applied to calculate additional overcharges on production of additional data through present.

[39] Heeb Report, at Section VI.E.2 dated June 20, 2022.

[40] Heeb Rebuttal Report dated December 14, 2022, at Section V.D.3.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 5. Overview of Apparel Overcharge (TABLE DESIGNATED HIGHLY CONFIDENTIAL –*
*EXPERT AND ATTORNEYS' EYES ONLY)[41]*

| Year | Overcharge |
|------|------------|
| 2016 | 27.1% |
| 2017 | 10.8% |
| 2018 | 12.5% |
| 2019 | 9.6% |

Sources: Varsity Apparel Data; NFINITY000297
(DESIGNATED HIGHLY CONFIDENTIAL –
EXPERT AND ATTORNEYS' EYES ONLY).

36.     Accordingly, I update the estimated damages for Apparel and present them in Table 6. Total Apparel
damages of over $59.2 million were incurred during the Class Period.

*Table 6. Apparel Overcharge Damages, Dec 10 2016 - End Dec 2020*

| Year | Revenue | | Overcharge | Damages | |
|------|---------|-|------------|---------|-|
| 2016 | $ | 927,469 | 11.0% | $ | 101,609 |
| 2017 | | 137,987,643 | 11.0% | | 15,117,253 |
| 2018 | | 145,883,646 | 11.0% | | 15,982,300 |
| 2019 | | 154,590,979 | 11.0% | | 16,936,233 |
| 2020 | | 100,963,602 | 11.0% | | 11,061,080 |
| Class Period | $ | 540,353,340 | | $ | 59,198,475 |

Note: Year 2016 excludes amounts prior to Dec. 10, 2016.
*Sources: Apparel Data, Nfinity Apparel Data*

### 4.3.3.    State-Level Damages

37.     I was instructed by Counsel to provide damages by state. Apparel damages by state are provided in
Appendix E.

### 5.    DAMAGES ESTIMATION

38.     I estimate classwide damages using common proof for each of the relevant markets. Varsity's use of
its market power harms Class Members through various mechanisms and across the markets included
in its ecosystem. In some cases, the harm can be expressly quantified while in others it is only possible
to provide directional or qualitative evidence. Actual damages claimed pertain to only those areas

---

[41] All content citing to or relating to the production made by Nfinity Athletic LLC, shall be designated as "Highly Confidential –
Attorneys and Expert Eyes Only" pursuant to Order Granting Joint Motion for Entry of Stipulated Protective Order in Fusion
Elite All Stars, et al. v. Nfinity Athletic LLC, Case 2:22-cv-02226-SHL-tmp, ECF No. 30, (W.D. Tenn.), filed May 31, 2022
("Nfinity PO").

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

where it was possible to quantify the impact of specific actions. As such, estimated damages presented in this report should be viewed as a lower bound as they are conservative and do not capture other areas where Varsity also leveraged its dominant position in the market for economic enrichment, often without regard to the overall benefit to the sport, the participants, the supporters or other non-Varsity stakeholders.

39.     My damage calculations are based on a nationwide overcharge percentage for competition, camps and apparel. In the event that it is determined that damages must be calculated by region or state, I provide a summary of Cheer Competition damages by region and state in Appendix F and Camp damages by region and state in Appendix G.

### 5.1.    Interest Applied to Damages

40.     Damages presented in this report pertain to overcharges over a historical period. I was instructed by Counsel to calculate the simple interest related to damages presented in this report. In doing so, I use the maximum allowable prejudgment interest rate of 10% per year.[42] I present the calculated damages for each Cheer market and apply the designated interest rate. Simple interest is calculated using the competition start date, camp start date or apparel ship date depending on the respective Cheer market through December 14, 2022. Table 7 below shows the total interest related to estimated damages as presented in this report to be $107.3 million.

---

[42] *See* Tenn. Code Ann. § 47-14-123 ("Prejudgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum[.]"

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*Table 7. Summary of Interest to be Applied to Damages by State*

| State | Competition Damages | Interest | Camp Damages | Interest | Apparel Damages | Interest | Total Damages | Interest | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Alabama | $ 2,689,292 | $ 1,128,832 | $ 2,939,106 | $ 1,233,498 | $ 3,632,549 | $ 1,462,686 | $ 9,260,947 | $ 3,825,015 | $ 13,085,962 |
| Alaska | 84,950 | 40,287 | 39,246 | 16,082 | 15,551 | 6,424 | 139,746 | 62,793 | 202,540 |
| Arizona | 2,717,464 | 1,181,848 | 896,955 | 376,941 | 536,546 | 209,578 | 4,150,965 | 1,768,367 | 5,919,332 |
| Arkansas | 1,661,624 | 726,363 | 1,667,284 | 687,327 | 1,427,562 | 569,063 | 4,756,469 | 1,982,754 | 6,739,223 |
| California | 10,603,800 | 4,699,724 | 6,937,709 | 3,013,771 | 5,488,955 | 2,217,957 | 23,030,464 | 9,931,453 | 32,961,916 |
| Colorado | 2,826,842 | 1,225,748 | 1,351,623 | 584,325 | 713,760 | 296,028 | 4,892,224 | 2,106,100 | 6,998,325 |
| Connecticut | 1,098,835 | 488,548 | 227,033 | 96,608 | 180,711 | 72,870 | 1,506,580 | 658,026 | 2,164,606 |
| Delaware | 453,167 | 197,145 | 66,124 | 27,411 | 77,114 | 30,114 | 596,405 | 254,671 | 851,076 |
| Florida | 7,324,017 | 3,172,339 | 3,632,072 | 1,527,517 | 3,069,519 | 1,223,614 | 14,025,608 | 5,923,470 | 19,949,078 |
| Georgia | 4,640,394 | 2,005,589 | 1,559,275 | 678,980 | 2,434,188 | 969,555 | 8,633,857 | 3,654,124 | 12,287,981 |
| Hawaii | 238,283 | 109,402 | 30,430 | 13,617 | 20,667 | 9,056 | 289,379 | 132,075 | 421,454 |
| Idaho | 515,045 | 231,660 | 345,774 | 147,513 | 212,987 | 84,010 | 1,073,806 | 463,183 | 1,536,989 |
| Illinois | 3,244,611 | 1,418,411 | 2,800,507 | 1,226,266 | 1,416,393 | 583,757 | 7,461,510 | 3,228,435 | 10,689,945 |
| Indiana | 3,132,373 | 1,349,006 | 1,555,930 | 673,525 | 1,113,328 | 442,928 | 5,801,631 | 2,465,459 | 8,267,091 |
| Iowa | 879,471 | 380,161 | 645,070 | 277,214 | 431,928 | 171,486 | 1,956,469 | 828,861 | 2,785,330 |
| Kansas | 1,854,155 | 809,011 | 892,044 | 372,467 | 683,307 | 275,659 | 3,429,507 | 1,457,137 | 4,886,643 |
| Kentucky | 5,076,681 | 2,181,768 | 1,347,874 | 563,280 | 897,826 | 356,117 | 7,322,381 | 3,101,165 | 10,423,546 |
| Louisiana | 4,113,899 | 1,758,480 | 3,204,955 | 1,371,210 | 3,299,379 | 1,335,840 | 10,618,232 | 4,465,530 | 15,083,763 |
| Maine | 414,301 | 179,906 | 72,113 | 31,325 | 35,134 | 13,763 | 521,547 | 224,996 | 746,544 |
| Maryland | 1,391,083 | 595,532 | 320,418 | 141,098 | 344,630 | 138,362 | 2,056,132 | 874,992 | 2,931,123 |
| Massachusetts | 2,468,301 | 1,092,190 | 293,507 | 127,898 | 251,894 | 101,507 | 3,013,703 | 1,321,594 | 4,335,297 |
| Michigan | 1,771,053 | 788,981 | 567,583 | 243,120 | 287,714 | 117,162 | 2,626,351 | 1,149,263 | 3,775,614 |
| Minnesota | 1,017,268 | 433,146 | 393,564 | 163,187 | 240,495 | 97,791 | 1,651,327 | 694,124 | 2,345,451 |
| Mississippi | 1,985,291 | 832,016 | 2,476,881 | 1,061,743 | 2,332,728 | 949,782 | 6,794,900 | 2,843,541 | 9,638,442 |
| Missouri | 3,224,129 | 1,398,577 | 2,285,938 | 974,597 | 1,165,948 | 465,449 | 6,676,014 | 2,838,623 | 9,514,636 |
| Montana | 58,358 | 24,605 | 74,080 | 32,762 | 25,176 | 10,155 | 157,614 | 67,521 | 225,135 |
| Nebraska | 857,824 | 365,830 | 918,434 | 389,012 | 879,113 | 357,315 | 2,655,371 | 1,112,156 | 3,767,527 |
| Nevada | 1,036,259 | 445,204 | 331,747 | 144,662 | 432,809 | 182,065 | 1,800,815 | 771,931 | 2,572,746 |
| New Hampshire | 843,627 | 375,780 | 57,540 | 26,370 | 190,096 | 71,467 | 1,091,263 | 473,617 | 1,564,880 |
| New Jersey | 4,879,813 | 2,118,005 | 879,320 | 369,879 | 828,832 | 328,257 | 6,587,965 | 2,816,141 | 9,404,106 |
| New Mexico | 307,024 | 134,354 | 414,056 | 181,782 | 284,068 | 118,464 | 1,005,148 | 434,599 | 1,439,747 |
| New York | 5,269,406 | 2,267,111 | 1,049,601 | 440,839 | 748,994 | 300,673 | 7,068,001 | 3,008,623 | 10,076,624 |
| North Carolina | 4,457,495 | 1,939,014 | 1,315,586 | 555,921 | 1,124,429 | 454,193 | 6,897,510 | 2,949,128 | 9,846,639 |
| North Dakota | 286,817 | 124,458 | 157,968 | 65,223 | 61,190 | 24,878 | 505,975 | 214,558 | 720,533 |
| Ohio | 4,623,223 | 2,014,675 | 1,845,531 | 786,792 | 1,385,044 | 554,763 | 7,853,798 | 3,356,231 | 11,210,029 |
| Oklahoma | 1,900,994 | 832,214 | 1,096,353 | 466,669 | 1,397,068 | 526,194 | 4,394,416 | 1,825,078 | 6,219,493 |
| Oregon | 645,013 | 276,938 | 420,585 | 182,191 | 221,044 | 94,319 | 1,286,641 | 553,449 | 1,840,090 |
| Pennsylvania | 7,400,572 | 3,151,198 | 1,661,245 | 690,241 | 1,398,276 | 562,568 | 10,460,094 | 4,404,007 | 14,864,101 |
| Rhode Island | 436,954 | 187,607 | 66,274 | 27,395 | 49,978 | 19,414 | 553,206 | 234,417 | 787,623 |
| South Carolina | 1,773,945 | 777,628 | 1,119,315 | 489,885 | 958,548 | 387,744 | 3,851,807 | 1,655,257 | 5,507,064 |
| South Dakota | 409,174 | 175,342 | 97,820 | 40,942 | 74,599 | 30,083 | 581,594 | 246,368 | 827,961 |
| Tennessee | 5,570,519 | 2,337,086 | 2,057,557 | 875,203 | 2,582,211 | 1,029,981 | 10,210,287 | 4,242,270 | 14,452,557 |
| Texas | 14,201,621 | 6,114,856 | 11,654,237 | 4,951,282 | 13,435,185 | 5,369,885 | 39,291,043 | 16,436,024 | 55,727,067 |
| Utah | 2,213,330 | 955,408 | 800,321 | 330,716 | 798,368 | 306,192 | 3,812,019 | 1,592,316 | 5,404,335 |
| Vermont | 19,365 | 7,819 | 22,578 | 10,028 | 3,924 | 1,605 | 45,867 | 19,452 | 65,319 |
| Virginia | 2,109,223 | 888,702 | 786,668 | 339,013 | 568,706 | 232,714 | 3,464,596 | 1,460,429 | 4,925,025 |
| Washington | 1,546,293 | 654,232 | 1,388,109 | 602,016 | 1,051,400 | 435,973 | 3,985,802 | 1,692,220 | 5,678,022 |
| Washington, D.C. | 40,935 | 17,849 | 12,100 | 5,092 | 8,487 | 3,387 | 61,522 | 26,328 | 87,849 |
| West Virginia | 988,229 | 428,657 | 62,682 | 26,724 | 163,059 | 66,457 | 1,213,970 | 521,839 | 1,735,810 |
| Wisconsin | 1,412,595 | 582,165 | 471,525 | 201,342 | 178,011 | 71,252 | 2,062,131 | 854,759 | 2,916,890 |
| Wyoming | 15,036 | 6,937 | 73,857 | 31,087 | 39,050 | 15,513 | 127,943 | 53,538 | 181,481 |
| **Total** | **$128,729,973** | **$ 55,628,345** | **$65,384,104** | **$27,893,591** | **$59,198,475** | **$23,756,071** | **$253,312,552** | **$107,278,007** | **$360,590,558** |

*Sources: Varsity Competitions Data, World Bids Events Data, Pre-Acquisition Data, Apparel Data, Nfinity Apparel Data*

41.     I was instructed by Counsel to summarize the damages for the thirty-three (33) states for which Plaintiffs have pending state law claims. Total damages for these select states are provided in Appendix H.

42.     As discussed in paragraph 39, my damage calculations are based on a nationwide overcharge

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

percentage for Cheer Competitions, Camps, and Apparel. In the event that it is determined that damages must be calculated by region or state, I provide in Appendix I the total damages by state using regional overcharge percentages for Cheer Competitions and Camps and nationwide overcharge percentage for Apparel along with prejudgment interest of 10%.

### 6.    CONCLUSIONS

43.    As indicated in my first report, Varsity has significant market power in the Competitive Cheer market. While Dr. Murphy attempts to present an alternative view, the facts of the case and evidence are in stark contrast and do not support his findings. He fails to understand the dynamics of the market and, accordingly, is unable to appropriately quantify the damages that stem from Varsity's use of their market power and the supracompetitive pricing that result.

44.    My damages estimate in this report is adjusted to reflect the updated overcharge percentages presented in the Heeb Rebuttal Report. I find that relative to the but-for world, Class Members suffered damages in excess of $253.3 million. As noted in my original report, this represents a lower boundary because it only captures the anticompetitive behavior that could be reliably quantified. My damages calculations, which establish damages for indirect purchasers (Class Members) are established using common evidence.

### 7.    EXPERT DECLARATION AND SIGNATURE

45.    My opinions are based upon my analysis of the information available to date. I may review and consider additional information that may be produced by the parties to this dispute. I reserve the right to revise the opinions, assumptions and calculations set forth herein as my investigation and analysis is ongoing. I also reserve the right to revise the opinions, assumptions and calculations set forth herein upon consideration of the report of any other testifying expert, the testimony of, or new documents produced by, any witness, any information or documents that any testifying expert produces or upon which he or she relies, and other material that may be presented to me prior to or at trial that I may properly consider under the governing rules or guidelines set by the court. This report is highly confidential and is only to be used for its stated purpose.

_Jen Maki_

_____

Jen Maki, PhD

December 14, 2022

8.   APPENDIX A – CURRICULUM VITAE OF JEN MAKI



# Jen Maki, Ph.D.

Managing Director

4835 East Cactus Road, Suite 230 - Scottsdale, AZ 85254
+1 602 744 7157
jen.maki@fticonsulting.com

**Education**

BS, Economics, 2000
Arizona State University
MS, Accountancy, 2001
University of Notre Dame
MS, Economics, 2011
North Carolina State University
PhD, Economics, 2013
North Caroline State University

**Associations**

Antitrust and Healthcare
Sections, American Bar
Association (ABA)
American Health Law
Association (AHLA)

**Expertise**

Due Diligence
Disputes
Econometrics & Statistical
Analysis
Expert Testimony

Jen Maki has 22 years of experience providing financial and economic consulting, damages quantification, valuation and expert witness services to clients including legal counsel, service providers, product manufacturers and private equity funds. Dr. Maki concentrates her work on the analysis and modeling of factors that drive demand for products and services, market assessments and commercial due diligence. She has testified in matters filed in federal court as well as in international arbitration.

Dr. Maki frequently works with various data including client, third party, and publicly available data to assess demand for products, price and price variation, and to evaluate usage patterns. Her dual background in economics and accounting enables her to apply both economic theory and financial analysis to isolate and quantify the impact from events. She served as a testifying expert providing information on the healthcare landscape, factors influencing demand for pharmaceutical products and insurance plan coverage decisions. Dr. Maki's work often includes assessing and forecasting disease prevalence, the impact of treatment and/or interventions, and the related effect on utilization and cost. She provides context and clarity to complex situations by refining data and analysis from disparate sources to provide clear and compelling narratives.

Dr. Maki is an active researcher and has written on topics including digital health and issues related to cost-effectiveness, utilization, and equity; the effects of informational interventions on individual decision-making; and on tobacco policies and their effect on smoking cessation. Her research articles have been published in peer reviewed journals, including the Southern Economic Journal and the International Journal of Drug Policy. She also holds a position as an Academic Associate at Arizona State University's College of Health Solutions and teaches a graduate-level health economics course.

Prior to joining FTI Consulting, Dr. Maki was a research assistant at North Carolina State University (2009-2012), a certified appraiser and owner at Desert Hills Appraisal (2005-2008), a certified appraiser and manager at Oakley Appraisal Service (2003-2005), and a senior assurance and advisory business services with Ernst & Young, LLP (2000-2003).

**EXPERTS WITH IMPACT™**



JEN MAKI, PhD

**Representative Experience**

— Engaged as a testifying expert in arbitration proceedings between an international pharmaceutical manufacturer and a pharmaceutical distributor. Provided information related to market dynamics, pricing, and projected sales volume through the term of the disputed contract while accounting for market shocks and the impact of Covid-19.

— Retained as a testifying expert to provide information relating to demand for care, provision of care and how it evolved over time, and supply constraints that impact availability of desired treatments. This information was used to support an employer sponsored health insurance plan embroiled in litigation related to coverage decisions.

— Engaged as a testifying expert in opioid related litigation; Provided information about the healthcare landscape including material regarding geographic variation in utilization and information relating to changes in treatment patterns of care for pain.

— Supported damages expert in a litigation matter relating to alleged anti-competitive behavior in the automotive industry. Created forecasts and evaluated actions by both parties to quantify damages.

— Engaged by a telecom company serving healthcare providers and organizations to assess marketplace stability and identify opportunities, by market segment, for expansion; conducted an assessment of specific health technology offerings in the electronic health records and telemedicine space for potential strategic partnerships.

— Evaluated the relationship between initial treatment intensity and future healthcare cost as well as utilization for individuals diagnosed with autism. The findings were used to show that intensive early treatment can reduce long-term healthcare costs.

— Created detailed demand models using advanced simulation techniques to analyze current and future levels of care and utilization under a status quo as compared to a new respiratory care delivery process. Developed disease forecasts, future patient volume, and resource utilization analysis to support new treatment regimens.

— Supported expert on economic analysis in a litigation matter on the relationship between hospital prices and patient acuity, estimation of hospital prices under alternative in-network and out-of-network payer status.

— Supported expert on predictive modeling in a litigation matter to forecast disease incidence and the corresponding demand for treatment over a 20-year time period as well as the effect of supply limitations on patient care modality choice.

— Created the framework and conducted the analysis to assess market attractiveness and identify which countries the firm should grow, optimize, or harvest and exit for a private equity firm purchasing a major medical product manufacturer; Conducted a profitability study to assess true product-level profitability, identify avoidable costs, and quantify return on investment.

— Led comprehensive assessment of population-level health, cost, quality, and access in the Nashville Region for the Nashville Area Chamber of Commerce using empirical techniques and estimation, and extensive commercial claims data and large public datasets on health and healthcare.

— Utilized predictive modeling to project population demographic characteristics, disease prevalence, and the use of a new treatment technology over a ten-year time period to support an academic medical center during their internal evaluation regarding the potential acquisition of new technology.

**Testifying Experience**

— *Hutchison Whampoa Sinopharm Pharmaceuticals (Shanghai) Company Limited v. Luye Pharma Hong Kong Limited*, Arbitration No. HKIAC/A19169, (Hong Kong International Arbitration Centre). Expert report, October 15, 2020; Second expert report, November 10, 2020; Third expert report, February 1, 2021; arbitration testimony, June 16, 2021.

— *D.T. v. NECA/IBEW Family Med. Care Plan*, Case No. 2:17-cv-00004-RAJ, (Western District of Washington). Expert report, June 28, 2019; deposition, September 10, 2019.



JEN MAKI, PhD

— *State of West Virginia ex rel. Darrell V McGraw, Jr., Attorney General v. AmerisourceBergen Drug Corporation, et al.*, Civil Action No. 12-C-141 (Circuit Court, Boone County, West Virginia). Expert report, October 28, 2016; deposition, November 15, 2016.

## Teaching Experience

— 2017 to Present, Faculty Associate: Graduate Health Economics, Arizona State University

— 2012, Instructor: Intermediate Microeconomics, North Carolina State University

— 2011, Instructor: Principles of Economics, North Carolina State University

## Research, Publications and Presentations

— "Issues in Equity, Cost-Effectiveness and Utilization Relating to Digital Health" with Susan Manning and John Maruyama.  ICLG – Digital Health Laws and Regulations. March 2020

— "Golden Years or Financial Fears? How Plans Change After Retirement Seminars" with Steven Allen, Robert Clark, and Melinda Morrill. Journal of Retirement, 3, no. 3 (2016): 96

— "Assessment of Nashville Region Health, Cost, Access, and Quality: Results of a Pilot Study," (with Meg Guerin-Calvert, Center for Healthcare Economics and Policy, FTI Consulting, Inc. and The Research Center, Nashville Area Chamber of Commerce), June 2015.

— "The Incentives Created by a Harm Reduction Approach to Smoking Cessation: Snus and Smoking in Sweden and Finland." *International Journal of Drug Policy,* June 2015, 26(2015):569-574

— "Re-Aligning Prospective Hospital Merger Guidance: Moving Beyond Concentration to More Meaningful Approaches" (with Meg Guerin-Calvert and Bruce C. Vladeck), Working Paper, http://dx.doi.org/10.2139/ssrn.2593165, April 2015.

— "Sex, Drugs, and Cancer: The Association between Oral Tobacco Use, Risky Sexual Behavior, and Head and Neck Cancer."  Working Paper.  October 2015.

— "Can Simple Informational Nudges Increase Employee Participation in 401(k) Plans?" with Robert Clark and Melinda Morrill, *Southern Economic Journal*, January 2014, 80(3):677-701.

— "Hospital Realignment: Mergers Offer Significant Patient and Community Benefits," (with Meg Guerin-Calvert), Center for Healthcare Economics and Policy, January 2014.

— "Encouraging New Hire to Save for Retirement" with Robert Clark and Melinda Morrill. 2011 RAND Working Paper WR-892-SSA. 2012

— "Sex, Drugs, and Cancer: The Association between Oral Tobacco Use, Risky Sexual Behavior, and Head and Neck Cancer"

> *Southern Economic Association*, New Orleans, LA, November 2012
> *Invited Seminar*, Eastern Carolina University, Greenville, NC, November 2012
> *Invited Seminar*, Elon University, Elon, NC, November 2012.
> *Invited Seminar*, University of Louisville, Louisville, KY, October 2012.
> *Invited Seminar*, University of North Carolina at Greensboro, Greensboro, NC, October 2012.

— "The Swedish Experience and the Incentives Created by Harm Reduction"

> *Southern Economic Association*, New Orleans, LA, November 2012

— "Can Simple Informational Nudges Increase Employee Participation in 401(k) Plans?" with Robert Clark and Melinda Morrill

> Association for Public Policy Analysis and Management, Baltimore, MD, November 2012



JEN MAKI, PhD

*Society of Labor Economist* (Poster), Chicago, IL, May 2012

— "A Misguided Tobacco Policy? Public Policy and Consumption Substitutability between Cigarettes and an Important Smokeless Tobacco Alternative"

Agricultural and Applied Economics Association (Poster), Pittsburgh, PA, July 2011

**Other Professional Activities**

— Referee, Nicotine and Tobacco Research

— Referee, Contemporary Economic Policy



**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

9.    APPENDIX B – LIST OF ADDITIONAL MATERIALS RELIED UPON

*Jones, et al. v. Varsity Brands, LLC, et al.*

<u>Additional Depositions</u>

1.    Clark, Amy deposition dated March 31, 2022

2.    Duhon, Buffy deposition dated March 25, 2022

3.    Hallmark, Daryl deposition dated May 12, 2022

4.    Owens, David deposition dated May 17, 2022

5.    Kennedy, deposition Jackie dated March 16, 2022

6.    Hill, Jim deposition dated March 21, 2022

7.    Berry, Melanie deposition dated March 18, 2022

8.    Elza, Brian Deposition and Exhibits dated November 16 and November 17, 2021

9.    Parrish, Jamie Deposition and Exhibits dated March 3 and 17 ,2022

10.   Webb, Jeff Deposition and Exhibits dated May 12 and 13, 2022

11.   Foster, Rebecca Deposition and Exhibits dated December 21, 2021

<u>Additional Bates Numbered Documents</u>

12.   Varsity Competitions Data: VAR00010122; VAR00010123; VAR00010124; VAR00010125;
      VAR00010126; VAR00010127; VAR00352199; VAR00352200; VAR00352201;
      VAR00352202; VAR00352218; VAR00352219; VAR00352220; VAR00352221;
      VAR00352222; VAR00352223; VAR00352224; VAR00352225; VAR00439290;
      VAR00439291, VAR00462074; VAR00462075; VAR00462076; VAR00462077;
      VAR00462078; VAR00462079

13.   Apparel Data: VAR00604800; VAR00604801; VAR00604802; VAR00604803;
      VAR00604804; VAR00604805

14.   World Bids Events Data: USASF_00002779; USASF_00002782; USASF_00002785;
      USASF_00052537; USASF_00066898; USASF_00068486; USASF_00084806;
      USASF_00002776

15.   Pre-Acquisition Data: VAR00127208; VAR00234212; VAR00513660; VAR00017306;
      VAR00018967; CB00063214; VAR00582534; VAR00445395; VAR00123779;
      VAR00123780; VAR00195096; VAR00195098

16.   Nfinity Apparel Data: NFINITY000297

17.   Gyms Data: GYMPROD_ArizonaElite000001-0004; CNY_CHEER 000001; CNY_CHEER
      000002-0012; CNY_CHEER 000029-0036; CNY_CHEER 000037-0050; CNY_CHEER
      000053-0063; CNY_CHEER 000064-0076; CNY_CHEER 000085-0095; CNY_CHEER

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

000098-0107; STARSANDSTRIPES000000025-0039; STARSANDSTRIPES000000257-0269; STARSANDSTRIPES000000998-0112; CAP 0002-0038; REDACTED00001055; SPIRITFAC000001383-1392; FUSIONELI000000236-0247; GYMPROD_Mustang_000001-0030; NP Royalty Elite 000012-0157; GYMPROD_WoodlandsElite000001; ACE Cheer questionnaire, ACE 000001- ACE 000004 at ACE 000002. (ACE 1-4.pdf); GYMPROD_GYMNATICES SPORT CENTER_000001.xls

18. FEAS-Ares00075739

19. VAR00106861

20. USASF_00000297

21. REDACTED00000157

*Additional Court Documents*

22. Declaration of Karen Noseff Aldridge

*Additional References*

23. Scherer F. M. 1980. *Industrial Market Structure and Economic Performance*. 2d ed. Chicago: Rand McNally College Pub.

24. The Harvard Business Review, 2008 *Harvard business review on pricing*. Harvard Business School Pub.

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

10.    APPENDIX C - SUMMARY OF CHEER COMPETITION DAMAGES BY STATE

| | | Competitions | |
| --- | --- | --- | --- |
| | Revenue | Overcharge Percentage | Damages |
| Alabama | $      9,822,023 | 27.4% | $     2,689,292 |
| Alaska | 310,259 | 27.4% | 84,950 |
| Arizona | 9,924,916 | 27.4% | 2,717,464 |
| Arkansas | 6,068,702 | 27.4% | 1,661,624 |
| California | 38,727,948 | 27.4% | 10,603,800 |
| Colorado | 10,324,391 | 27.4% | 2,826,842 |
| Connecticut | 4,013,245 | 27.4% | 1,098,835 |
| Delaware | 1,655,087 | 27.4% | 453,167 |
| Florida | 26,749,295 | 27.4% | 7,324,017 |
| Georgia | 16,947,978 | 27.4% | 4,640,394 |
| Hawaii | 870,274 | 27.4% | 238,283 |
| Idaho | 1,881,084 | 27.4% | 515,045 |
| Illinois | 11,850,196 | 27.4% | 3,244,611 |
| Indiana | 11,440,276 | 27.4% | 3,132,373 |
| Iowa | 3,212,065 | 27.4% | 879,471 |
| Kansas | 6,771,877 | 27.4% | 1,854,155 |
| Kentucky | 18,541,413 | 27.4% | 5,076,681 |
| Lousiana | 15,025,074 | 27.4% | 4,113,899 |
| Maine | 1,513,138 | 27.4% | 414,301 |
| Maryland | 5,080,613 | 27.4% | 1,391,083 |
| Massachusetts | 9,014,905 | 27.4% | 2,468,301 |
| Michigan | 6,468,366 | 27.4% | 1,771,053 |
| Minnesota | 3,715,338 | 27.4% | 1,017,268 |
| Mississippi | 7,250,819 | 27.4% | 1,985,291 |
| Missouri | 11,775,391 | 27.4% | 3,224,129 |
| Montana | 213,139 | 27.4% | 58,358 |
| Nebraska | 3,133,006 | 27.4% | 857,824 |
| Nevada | 3,784,698 | 27.4% | 1,036,259 |
| New Hampshire | 3,081,153 | 27.4% | 843,627 |
| New Jersey | 17,822,400 | 27.4% | 4,879,813 |
| New Mexico | 1,121,334 | 27.4% | 307,024 |
| New York | 19,245,296 | 27.4% | 5,269,406 |
| North Carolina | 16,279,979 | 27.4% | 4,457,495 |
| North Dakota | 1,047,534 | 27.4% | 286,817 |
| Ohio | 16,885,262 | 27.4% | 4,623,223 |
| Oklahoma | 6,942,946 | 27.4% | 1,900,994 |
| Oregon | 2,355,761 | 27.4% | 645,013 |
| Pennsylvania | 27,028,895 | 27.4% | 7,400,572 |
| Rhode Island | 1,595,876 | 27.4% | 436,954 |
| South Carolina | 6,478,926 | 27.4% | 1,773,945 |
| South Dakota | 1,494,415 | 27.4% | 409,174 |
| Tennessee | 20,345,045 | 27.4% | 5,570,519 |
| Texas | 51,868,168 | 27.4% | 14,201,621 |
| Utah | 8,083,680 | 27.4% | 2,213,330 |
| Vermont | 70,728 | 27.4% | 19,365 |
| Virginia | 7,703,453 | 27.4% | 2,109,223 |
| Washington | 5,647,482 | 27.4% | 1,546,293 |
| Washington, D.C. | 149,505 | 27.4% | 40,935 |
| West Virginia | 3,609,280 | 27.4% | 988,229 |
| Wisconsin | 5,159,180 | 27.4% | 1,412,595 |
| Wyoming | 54,917 | 27.4% | 15,036 |
| **Total** | $   470,156,731 | | $   128,729,973 |

*Sources: Varsity Competitions Data, World Bids Events Data, Pre-Acquisition Data*

25

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

11.    APPENDIX D - SUMMARY OF CHEER CAMP DAMAGES BY STATE

|  | Camps | | |
|---|---|---|---|
|  | Revenue | Overcharge Percentage | Damages |
| Alabama | $ 10,734,412 | 27.4% | $ 2,939,106 |
| Alaska | 143,337 | 27.4% | 39,246 |
| Arizona | 3,275,923 | 27.4% | 896,955 |
| Arkansas | 6,089,371 | 27.4% | 1,667,284 |
| California | 25,338,393 | 27.4% | 6,937,709 |
| Colorado | 4,936,494 | 27.4% | 1,351,623 |
| Connecticut | 829,186 | 27.4% | 227,033 |
| Delaware | 241,504 | 27.4% | 66,124 |
| Florida | 13,265,312 | 27.4% | 3,632,072 |
| Georgia | 5,694,894 | 27.4% | 1,559,275 |
| Hawaii | 111,137 | 27.4% | 30,430 |
| Idaho | 1,262,859 | 27.4% | 345,774 |
| Illinois | 10,228,208 | 27.4% | 2,800,507 |
| Indiana | 5,682,679 | 27.4% | 1,555,930 |
| Iowa | 2,355,971 | 27.4% | 645,070 |
| Kansas | 3,257,987 | 27.4% | 892,044 |
| Kentucky | 4,922,802 | 27.4% | 1,347,874 |
| Louisiana | 11,705,362 | 27.4% | 3,204,955 |
| Maine | 263,376 | 27.4% | 72,113 |
| Maryland | 1,170,254 | 27.4% | 320,418 |
| Massachusetts | 1,071,969 | 27.4% | 293,507 |
| Michigan | 2,072,969 | 27.4% | 567,583 |
| Minnesota | 1,437,401 | 27.4% | 393,564 |
| Mississippi | 9,046,242 | 27.4% | 2,476,881 |
| Missouri | 8,348,863 | 27.4% | 2,285,938 |
| Montana | 270,562 | 27.4% | 74,080 |
| Nebraska | 3,354,370 | 27.4% | 918,434 |
| Nevada | 1,211,630 | 27.4% | 331,747 |
| New Hampshire | 210,153 | 27.4% | 57,540 |
| New Jersey | 3,211,514 | 27.4% | 879,320 |
| New Mexico | 1,512,245 | 27.4% | 414,056 |
| New York | 3,833,426 | 27.4% | 1,049,601 |
| North Carolina | 4,804,876 | 27.4% | 1,315,586 |
| North Dakota | 576,942 | 27.4% | 157,968 |
| Ohio | 6,740,379 | 27.4% | 1,845,531 |
| Oklahoma | 4,004,179 | 27.4% | 1,096,353 |
| Oregon | 1,536,089 | 27.4% | 420,585 |
| Pennsylvania | 6,067,318 | 27.4% | 1,661,245 |
| Rhode Island | 242,050 | 27.4% | 66,274 |
| South Carolina | 4,088,041 | 27.4% | 1,119,315 |
| South Dakota | 357,267 | 27.4% | 97,820 |
| Tennessee | 7,514,755 | 27.4% | 2,057,557 |
| Texas | 42,564,430 | 27.4% | 11,654,237 |
| Utah | 2,922,989 | 27.4% | 800,321 |
| Vermont | 82,460 | 27.4% | 22,578 |
| Virginia | 2,873,123 | 27.4% | 786,668 |
| Washington | 5,069,749 | 27.4% | 1,388,109 |
| Washington, D.C. | 44,192 | 27.4% | 12,100 |
| West Virginia | 228,933 | 27.4% | 62,682 |
| Wisconsin | 1,722,137 | 27.4% | 471,525 |
| Wyoming | 269,747 | 27.4% | 73,857 |
| **Total** | **$ 238,800,459** | | **$ 65,384,104** |

*Sources: Varsity Competitions Data, World Bids Events Data, Pre-Acquisition Data*

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

12.    APPENDIX E - SUMMARY OF APPAREL DAMAGES BY STATE

| | Apparel | | |
| --- | --- | --- | --- |
| | Revenue | Overcharge Percentage [1] | Damages |
| Alabama | $ 33,157,272 | 11.0% | $ 3,632,549 |
| Alaska | 141,945 | 11.0% | 15,551 |
| Arizona | 4,897,495 | 11.0% | 536,546 |
| Arkansas | 13,030,533 | 11.0% | 1,427,562 |
| California | 50,102,223 | 11.0% | 5,488,955 |
| Colorado | 6,515,073 | 11.0% | 713,760 |
| Connecticut | 1,649,500 | 11.0% | 180,711 |
| Delaware | 703,882 | 11.0% | 77,114 |
| Florida | 28,018,029 | 11.0% | 3,069,519 |
| Georgia | 22,218,842 | 11.0% | 2,434,188 |
| Hawaii | 188,645 | 11.0% | 20,667 |
| Idaho | 1,944,106 | 11.0% | 212,987 |
| Illinois | 12,928,591 | 11.0% | 1,416,393 |
| Indiana | 10,162,260 | 11.0% | 1,113,328 |
| Iowa | 3,942,565 | 11.0% | 431,928 |
| Kansas | 6,237,110 | 11.0% | 683,307 |
| Kentucky | 8,195,200 | 11.0% | 897,826 |
| Louisiana | 30,116,152 | 11.0% | 3,299,379 |
| Maine | 320,696 | 11.0% | 35,134 |
| Maryland | 3,145,723 | 11.0% | 344,630 |
| Massachusetts | 2,299,244 | 11.0% | 251,894 |
| Michigan | 2,626,202 | 11.0% | 287,714 |
| Minnesota | 2,195,197 | 11.0% | 240,495 |
| Mississippi | 21,292,738 | 11.0% | 2,332,728 |
| Missouri | 10,642,567 | 11.0% | 1,165,948 |
| Montana | 229,800 | 11.0% | 25,176 |
| Nebraska | 8,024,386 | 11.0% | 879,113 |
| Nevada | 3,950,605 | 11.0% | 432,809 |
| New Hampshire | 1,735,162 | 11.0% | 190,096 |
| New Jersey | 7,565,431 | 11.0% | 828,832 |
| New Mexico | 2,592,921 | 11.0% | 284,068 |
| New York | 6,836,689 | 11.0% | 748,994 |
| North Carolina | 10,263,594 | 11.0% | 1,124,429 |
| North Dakota | 558,532 | 11.0% | 61,190 |
| Ohio | 12,642,444 | 11.0% | 1,385,044 |
| Oklahoma | 12,752,195 | 11.0% | 1,397,068 |
| Oregon | 2,017,649 | 11.0% | 221,044 |
| Pennsylvania | 12,763,218 | 11.0% | 1,398,276 |
| Rhode Island | 456,190 | 11.0% | 49,978 |
| South Carolina | 8,749,455 | 11.0% | 958,548 |
| South Dakota | 680,927 | 11.0% | 74,599 |
| Tennessee | 23,569,972 | 11.0% | 2,582,211 |
| Texas | 122,634,022 | 11.0% | 13,435,185 |
| Utah | 7,287,361 | 11.0% | 798,368 |
| Vermont | 35,819 | 11.0% | 3,924 |
| Virginia | 5,191,045 | 11.0% | 568,706 |
| Washington | 9,596,998 | 11.0% | 1,051,400 |
| Washington, D.C. | 77,469 | 11.0% | 8,487 |
| West Virginia | 1,488,375 | 11.0% | 163,059 |
| Wisconsin | 1,624,851 | 11.0% | 178,011 |
| Wyoming | 356,437 | 11.0% | 39,050 |
| **Total** | **$ 540,353,340** | | **$ 59,198,475** |

*Sources: Apparel Data, Nfinity Apparel Data*

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

13.    APPENDIX F - CHEER COMPETITION DAMAGES BY STATE - REGIONAL OVERCHARGE
PERCENTAGE

| Region/State | Revenue | Overcharge Percentage | Damages |
|---|---|---|---|
| **Midwest (MW)** | | | |
| Illinois | $11,850,196 | 23.4% | $2,774,365 |
| Indiana | 11,440,276 | 23.4% | 2,678,394 |
| Iowa | 3,212,065 | 23.4% | 752,008 |
| Kansas | 6,771,877 | 23.4% | 1,585,430 |
| Michigan | 6,468,366 | 23.4% | 1,514,372 |
| Minnesota | 3,715,338 | 23.4% | 869,834 |
| Missouri | 11,775,391 | 23.4% | 2,756,851 |
| Nebraska | 3,133,006 | 23.4% | 733,498 |
| North Dakota | 1,047,534 | 23.4% | 245,248 |
| Ohio | 16,885,262 | 23.4% | 3,953,173 |
| South Dakota | 1,494,415 | 23.4% | 349,872 |
| Wisconsin | 5,159,180 | 23.4% | 1,207,866 |
| **MW Sub-total** | **82,952,907** | | **19,420,913** |
| **Northeast (NE)** | | | |
| Connecticut | 4,013,245 | 34.3% | 1,375,813 |
| Delaware | 1,655,087 | 34.3% | 567,394 |
| Maine | 1,513,138 | 34.3% | 518,731 |
| Maryland | 5,080,613 | 34.3% | 1,741,726 |
| Massachusetts | 9,014,905 | 34.3% | 3,090,472 |
| New Hampshire | 3,081,153 | 34.3% | 1,056,275 |
| New Jersey | 17,822,400 | 34.3% | 6,109,840 |
| New York | 19,245,296 | 34.3% | 6,597,634 |
| Pennsylvania | 27,028,895 | 34.3% | 9,265,992 |
| Rhode Island | 1,595,876 | 34.3% | 547,095 |
| Vermont | 70,728 | 34.3% | 24,247 |
| Virginia | 7,703,453 | 34.3% | 2,640,883 |
| Washington, D.C. | 149,505 | 34.3% | 51,253 |
| West Virginia | 3,609,280 | 34.3% | 1,237,326 |
| **NE Sub-total** | **101,583,574** | | **34,824,680** |

| Region/State | Revenue | Overcharge Percentage | Damages |
|---|---|---|---|
| **Southeast (SE)** | | | |
| Alabama | $ 9,822,023 | 30.2% | $ 2,961,983 |
| Florida | 26,749,295 | 30.2% | 8,066,665 |
| Georgia | 16,947,978 | 30.2% | 5,110,925 |
| Kentucky | 18,541,413 | 30.2% | 5,591,451 |
| Mississippi | 7,250,819 | 30.2% | 2,186,597 |
| North Carolina | 16,279,979 | 30.2% | 4,909,480 |
| South Carolina | 6,478,926 | 30.2% | 1,953,821 |
| Tennessee | 20,345,045 | 30.2% | 6,135,364 |
| **SE Sub-total** | **122,415,478** | | **36,916,286** |
| **Southwest (SW)** | | | |
| Arkansas | 6,068,702 | 28.7% | 1,739,091 |
| Louisiana | 15,025,074 | 28.7% | 4,305,693 |
| New Mexico | 1,121,334 | 28.7% | 321,337 |
| Oklahoma | 6,942,946 | 28.7% | 1,989,620 |
| Texas | 51,868,168 | 28.7% | 14,863,714 |
| **SW Sub-total** | **81,026,224** | | **23,219,455** |
| **West (W)** | | | |
| Alaska | 310,259 | 9.9% | 30,869 |
| Arizona | 9,924,916 | 9.9% | 987,486 |
| California | 38,727,948 | 9.9% | 3,853,261 |
| Colorado | 10,324,391 | 9.9% | 1,027,232 |
| Hawaii | 870,274 | 9.9% | 86,588 |
| Idaho | 1,881,084 | 9.9% | 187,160 |
| Montana | 213,139 | 9.9% | 21,206 |
| Nevada | 3,784,698 | 9.9% | 376,561 |
| Oregon | 2,355,761 | 9.9% | 234,388 |
| Utah | 8,083,680 | 9.9% | 804,291 |
| Washington | 5,647,482 | 9.9% | 561,900 |
| Wyoming | 54,917 | 9.9% | 5,464 |
| **W Sub-total** | **82,178,549** | | **8,176,406** |
| **Total** | **$470,156,731** | | **$122,557,740** |

*Sources: Varsity Competitions Data, World Bids Events Data, Pre-Acquisition Data, USASF 00000297 at 0098*

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

14.   APPENDIX G - CHEER CAMP DAMAGES BY STATE - REGIONAL OVERCHARGE PERCENTAGE

| Region/State | Revenue | Camps Overcharge Percentage | Damages | Region/State | Revenue | Camps Overcharge Percentage | Damages |
|---|---|---|---|---|---|---|---|
| **Midwest (MW)** | | | | **Southeast (SE)** | | | |
| Illinois | $10,228,208 | 23.4% | $2,394,625 | Alabama | $ 10,734,412 | 30.2% | $ 3,237,129 |
| Indiana | 5,682,679 | 23.4% | 1,330,427 | Florida | 13,265,312 | 30.2% | 4,000,361 |
| Iowa | 2,355,971 | 23.4% | 551,579 | Georgia | 5,694,894 | 30.2% | 1,717,384 |
| Kansas | 3,257,987 | 23.4% | 762,759 | Kentucky | 4,922,802 | 30.2% | 1,484,547 |
| Michigan | 2,072,969 | 23.4% | 485,323 | Mississippi | 9,046,242 | 30.2% | 2,728,034 |
| Minnesota | 1,437,401 | 23.4% | 336,524 | North Carolina | 4,804,876 | 30.2% | 1,448,985 |
| Missouri | 8,348,863 | 23.4% | 1,954,634 | South Carolina | 4,088,041 | 30.2% | 1,232,812 |
| Nebraska | 3,354,370 | 23.4% | 785,324 | Tennessee | 7,514,755 | 30.2% | 2,266,191 |
| North Dakota | 576,942 | 23.4% | 135,073 | **SE Sub-total** | **60,071,334** | | **18,115,442** |
| Ohio | 6,740,379 | 23.4% | 1,578,056 | **Southwest (SW)** | | | |
| South Dakota | 357,267 | 23.4% | 83,643 | Arkansas | 6,089,371 | 28.7% | 1,745,014 |
| Wisconsin | 1,722,137 | 23.4% | 403,186 | Louisiana | 11,705,362 | 28.7% | 3,354,372 |
| **MW Sub-total** | **46,135,173** | | **10,801,155** | New Mexico | 1,512,245 | 28.7% | 433,360 |
| **Northeast (NE)** | | | | Oklahoma | 4,004,179 | 28.7% | 1,147,466 |
| Connecticut | 829,186 | 34.3% | 284,260 | Texas | 42,564,430 | 28.7% | 12,197,568 |
| Delaware | 241,504 | 34.3% | 82,792 | **SW Sub-total** | **65,875,588** | | **18,877,780** |
| Maine | 263,376 | 34.3% | 90,290 | **West (W)** | | | |
| Maryland | 1,170,254 | 34.3% | 401,184 | Alaska | 143,337 | 9.9% | 14,261 |
| Massachusetts | 1,071,969 | 34.3% | 367,490 | Arizona | 3,275,923 | 9.9% | 325,940 |
| New Hampshire | 210,153 | 34.3% | 72,044 | California | 25,338,393 | 9.9% | 2,521,059 |
| New Jersey | 3,211,514 | 34.3% | 1,100,965 | Colorado | 4,936,494 | 9.9% | 491,160 |
| New York | 3,833,426 | 34.3% | 1,314,168 | Hawaii | 111,137 | 9.9% | 11,058 |
| Pennsylvania | 6,067,318 | 34.3% | 2,079,986 | Idaho | 1,262,859 | 9.9% | 125,649 |
| Rhode Island | 242,050 | 34.3% | 82,979 | Montana | 270,562 | 9.9% | 26,920 |
| Vermont | 82,460 | 34.3% | 28,269 | Nevada | 1,211,630 | 9.9% | 120,552 |
| Virginia | 2,873,123 | 34.3% | 984,959 | Oregon | 1,536,089 | 9.9% | 152,834 |
| Washington, D.C. | 44,192 | 34.3% | 15,150 | Utah | 2,922,989 | 9.9% | 290,825 |
| West Virginia | 228,933 | 34.3% | 78,482 | Washington | 5,069,749 | 9.9% | 504,418 |
| **NE Sub-total** | **20,369,457** | | **6,983,017** | Wyoming | 269,747 | 9.9% | 26,839 |
| | | | | **W Sub-total** | **46,348,907** | | **4,611,513** |
| | | | | **Total** | **$238,800,459** | | **$59,388,908** |

*Sources: Varsity Competitions Data, World Bids Events Data, Pre-Acquisition Data, USASF_00000297 at 0098*

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

**15.    APPENDIX H - SUMMARY OF TOTAL DAMAGES FOR SELECT STATES**

| State | Competition Damages | Competition Interest | Camp Damages | Camp Interest | Apparel Damages | Apparel Interest | Total Damages | Total Interest | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Arizona | $ 2,717,464 | $ 1,181,848 | $ 896,955 | $ 376,941 | $ 536,546 | $ 209,578 | $ 4,150,965 | $ 1,768,367 | $ 5,919,332 |
| Arkansas | 1,661,624 | 726,363 | 1,667,284 | 687,327 | 1,427,562 | 569,063 | 4,756,469 | 1,982,754 | 6,739,223 |
| California | 10,603,800 | 4,699,724 | 6,937,709 | 3,013,771 | 5,488,955 | 2,217,957 | 23,030,464 | 9,931,453 | 32,961,916 |
| Connecticut | 1,098,835 | 488,548 | 227,033 | 96,608 | 180,711 | 72,870 | 1,506,580 | 658,026 | 2,164,606 |
| Florida | 7,324,017 | 3,172,339 | 3,632,072 | 1,527,517 | 3,069,519 | 1,223,614 | 14,025,608 | 5,923,470 | 19,949,078 |
| Hawaii | 238,283 | 109,402 | 30,430 | 13,617 | 20,667 | 9,056 | 289,379 | 132,075 | 421,454 |
| Idaho | 515,045 | 231,660 | 345,774 | 147,513 | 212,987 | 84,010 | 1,073,806 | 463,183 | 1,536,989 |
| Iowa | 879,471 | 380,161 | 645,070 | 277,214 | 431,928 | 171,486 | 1,956,469 | 828,861 | 2,785,330 |
| Kansas | 1,854,155 | 809,011 | 892,044 | 372,467 | 683,307 | 275,659 | 3,429,507 | 1,457,137 | 4,886,643 |
| Maine | 414,301 | 179,906 | 72,113 | 31,325 | 35,134 | 13,765 | 521,547 | 224,996 | 746,544 |
| Maryland | 1,391,083 | 595,532 | 320,418 | 141,098 | 344,630 | 138,362 | 2,056,132 | 874,992 | 2,931,123 |
| Massachusetts | 2,468,301 | 1,092,190 | 293,507 | 127,898 | 251,894 | 101,507 | 3,013,703 | 1,321,594 | 4,335,297 |
| Michigan | 1,771,053 | 788,981 | 567,583 | 243,120 | 287,714 | 117,162 | 2,626,351 | 1,149,263 | 3,775,614 |
| Minnesota | 1,017,268 | 433,146 | 393,564 | 163,187 | 240,495 | 97,791 | 1,651,327 | 694,124 | 2,345,451 |
| Mississippi | 1,985,291 | 832,016 | 2,476,881 | 1,061,743 | 2,332,728 | 949,782 | 6,794,900 | 2,843,541 | 9,638,442 |
| Missouri | 3,224,129 | 1,398,577 | 2,285,938 | 974,597 | 1,165,948 | 465,449 | 6,676,014 | 2,838,623 | 9,514,636 |
| Nebraska | 857,824 | 365,830 | 918,434 | 389,012 | 879,113 | 357,315 | 2,655,371 | 1,112,156 | 3,767,527 |
| Nevada | 1,036,259 | 445,204 | 331,747 | 144,662 | 432,809 | 182,065 | 1,800,815 | 771,931 | 2,572,746 |
| New Hampshire | 843,627 | 375,780 | 57,540 | 26,370 | 190,096 | 71,467 | 1,091,263 | 473,617 | 1,564,880 |
| New Mexico | 307,024 | 134,354 | 414,056 | 181,782 | 284,068 | 118,464 | 1,005,148 | 434,599 | 1,439,747 |
| New York | 5,269,406 | 2,267,111 | 1,049,601 | 440,839 | 748,994 | 300,673 | 7,068,001 | 3,008,623 | 10,076,624 |
| North Carolina | 4,457,495 | 1,939,014 | 1,315,586 | 555,921 | 1,124,429 | 454,193 | 6,897,510 | 2,949,128 | 9,846,639 |
| North Dakota | 286,817 | 124,458 | 157,968 | 65,223 | 61,190 | 24,878 | 505,975 | 214,558 | 720,533 |
| Oregon | 645,013 | 276,938 | 420,585 | 182,191 | 221,044 | 94,319 | 1,286,641 | 553,449 | 1,840,090 |
| Rhode Island | 436,954 | 187,607 | 66,274 | 27,395 | 49,978 | 19,414 | 553,206 | 234,417 | 787,623 |
| South Dakota | 409,174 | 175,342 | 97,820 | 40,942 | 74,599 | 30,083 | 581,594 | 246,368 | 827,961 |
| Tennessee | 5,570,519 | 2,337,086 | 2,057,557 | 875,203 | 2,582,211 | 1,029,981 | 10,210,287 | 4,242,270 | 14,452,557 |
| Utah | 2,213,330 | 955,408 | 800,321 | 330,716 | 798,368 | 306,192 | 3,812,019 | 1,592,316 | 5,404,335 |
| Vermont | 19,365 | 7,819 | 22,578 | 10,028 | 3,924 | 1,605 | 45,867 | 19,452 | 65,319 |
| Washington | 1,546,293 | 654,232 | 1,388,109 | 602,016 | 1,051,400 | 435,973 | 3,985,802 | 1,692,220 | 5,678,022 |
| Washington, D.C. | 40,935 | 17,849 | 12,100 | 5,092 | 8,487 | 3,387 | 61,522 | 26,328 | 87,849 |
| West Virginia | 988,229 | 428,657 | 62,682 | 26,724 | 163,059 | 66,457 | 1,213,970 | 521,839 | 1,735,810 |
| Wisconsin | 1,412,595 | 582,165 | 471,525 | 201,342 | 178,011 | 71,252 | 2,062,131 | 854,759 | 2,916,890 |
| **Total** | **$ 65,504,979** | **$ 28,394,259** | **$31,328,858** | **$13,361,402** | **$25,562,504** | **$10,284,828** | **$122,396,341** | **$ 52,040,489** | **$174,436,830** |

*Sources: Varsity Competitions Data, World Bids Events Data, Pre-Acquisition Data, Apparel Data, Nfinity Apparel Data*

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

## 16.    APPENDIX I - TOTAL DAMAGES BY STATE - REGIONAL OVERCHARGE PERCENTAGES

| Region/State | Competition | | Camp | | Apparel | | Total | | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| | Damages | Interest | Damages | Interest | Damages | Interest | Damages | Interest | |
| **Midwest (MW)** | | | | | | | | | |
| Illinois | $  2,774,365 | 1,212,839 | $ 2,394,625 | 1,048,542 | 1,416,393 | 583,757 | 6,585,384 | 2,845,138 | 9,430,522 |
| Indiana | 2,678,394 | 1,153,493 | 1,330,427 | 575,910 | 1,113,328 | 442,928 | 5,122,149 | 2,172,331 | 7,294,481 |
| Iowa | 752,008 | 325,063 | 551,579 | 237,037 | 431,928 | 171,486 | 1,735,515 | 733,587 | 2,469,102 |
| Kansas | 1,585,430 | 691,760 | 762,759 | 318,485 | 683,307 | 275,659 | 3,031,497 | 1,285,904 | 4,317,400 |
| Michigan | 1,514,372 | 674,633 | 485,323 | 207,884 | 287,714 | 117,162 | 2,287,409 | 999,680 | 3,287,089 |
| Minnesota | 869,834 | 370,370 | 336,524 | 139,536 | 240,495 | 97,791 | 1,446,853 | 607,697 | 2,054,550 |
| Missouri | 2,756,851 | 1,195,879 | 1,954,634 | 833,348 | 1,165,948 | 465,449 | 5,877,433 | 2,494,675 | 8,372,108 |
| Nebraska | 733,498 | 312,810 | 785,324 | 332,632 | 879,113 | 357,315 | 2,397,935 | 1,002,756 | 3,400,691 |
| North Dakota | 245,248 | 106,420 | 135,073 | 55,770 | 61,190 | 24,878 | 441,512 | 187,067 | 628,579 |
| Ohio | 3,953,173 | 1,722,686 | 1,578,056 | 672,762 | 1,385,044 | 554,763 | 6,916,273 | 2,950,210 | 9,866,484 |
| South Dakota | 349,872 | 149,930 | 83,643 | 35,008 | 74,599 | 30,083 | 508,114 | 215,021 | 723,135 |
| Wisconsin | 1,207,866 | 497,791 | 403,386 | 172,161 | 178,011 | 71,252 | 1,789,063 | 741,204 | 2,530,267 |
| **MW Subtotal** | **19,420,913** | **8,413,673** | **10,801,155** | **4,629,074** | **7,917,070** | **3,192,523** | **38,139,138** | **16,235,270** | **54,374,408** |
| **Northeast (NE)** | | | | | | | | | |
| Connecticut | 1,375,813 | 611,694 | 284,260 | 120,959 | 180,711 | 72,870 | 1,840,784 | 805,523 | 2,646,307 |
| Delaware | 567,394 | 246,839 | 82,792 | 34,320 | 77,114 | 30,114 | 727,299 | 311,273 | 1,038,573 |
| Maine | 518,731 | 225,254 | 90,290 | 39,213 | 35,134 | 13,765 | 644,155 | 278,240 | 922,395 |
| Maryland | 1,741,726 | 745,644 | 401,184 | 176,664 | 344,630 | 138,362 | 2,487,540 | 1,060,670 | 3,548,210 |
| Massachusetts | 3,090,472 | 1,367,492 | 367,490 | 160,136 | 251,894 | 101,507 | 3,709,856 | 1,629,135 | 5,338,991 |
| New Hampshire | 1,056,275 | 470,501 | 72,044 | 33,017 | 190,096 | 71,467 | 1,318,415 | 574,985 | 1,893,400 |
| New Jersey | 6,109,840 | 2,651,879 | 1,100,965 | 463,113 | 828,832 | 328,257 | 8,039,636 | 3,443,248 | 11,482,884 |
| New York | 6,597,634 | 2,838,569 | 1,314,168 | 551,959 | 748,994 | 300,673 | 8,660,796 | 3,691,201 | 12,351,997 |
| Pennsylvania | 9,265,992 | 3,945,502 | 2,079,986 | 864,226 | 1,398,276 | 562,568 | 12,744,254 | 5,372,297 | 18,116,551 |
| Rhode Island | 547,095 | 234,897 | 82,979 | 34,301 | 49,978 | 19,414 | 680,052 | 288,611 | 968,663 |
| Vermont | 24,247 | 9,790 | 28,269 | 12,556 | 3,924 | 1,605 | 56,440 | 23,951 | 80,390 |
| Virginia | 2,640,883 | 1,112,712 | 984,959 | 424,466 | 568,706 | 232,714 | 4,194,547 | 1,769,892 | 5,964,439 |
| Washington, D.C. | 51,253 | 22,348 | 15,150 | 6,376 | 8,487 | 3,387 | 74,890 | 32,110 | 107,000 |
| West Virginia | 1,237,326 | 536,707 | 78,482 | 33,461 | 163,059 | 66,457 | 1,478,868 | 636,625 | 2,115,492 |
| **NE Subtotal** | **34,824,680** | **15,019,827** | **6,983,017** | **2,954,775** | **4,849,835** | **1,943,160** | **46,657,532** | **19,917,761** | **66,575,293** |
| **Southeast (SE)** | | | | | | | | | |
| Alabama | 2,961,983 | 1,243,294 | 3,237,129 | 1,358,573 | 3,632,549 | 1,462,686 | 9,831,661 | 4,064,553 | 13,896,214 |
| Florida | 8,066,665 | 3,494,011 | 4,000,361 | 1,682,405 | 3,069,519 | 1,223,614 | 15,136,544 | 6,400,030 | 21,536,574 |
| Georgia | 5,110,925 | 2,208,954 | 1,717,384 | 747,828 | 2,434,188 | 969,555 | 9,262,497 | 3,926,337 | 13,188,833 |
| Kentucky | 5,591,451 | 2,402,997 | 1,484,547 | 620,396 | 897,826 | 356,117 | 7,973,824 | 3,379,510 | 11,353,333 |
| Mississippi | 2,186,597 | 916,382 | 2,728,034 | 1,169,402 | 2,332,728 | 949,782 | 7,247,360 | 3,035,566 | 10,282,926 |
| North Carolina | 4,909,480 | 2,135,628 | 1,448,985 | 612,291 | 1,124,429 | 454,193 | 7,482,895 | 3,202,112 | 10,685,007 |
| South Carolina | 1,953,821 | 856,478 | 1,232,812 | 539,559 | 958,548 | 387,744 | 4,145,180 | 1,783,781 | 5,928,962 |
| Tennessee | 6,135,364 | 2,574,063 | 2,266,191 | 963,948 | 2,582,211 | 1,029,981 | 10,983,766 | 4,567,992 | 15,551,758 |
| **SE Subtotal** | **36,916,286** | **15,831,808** | **18,115,442** | **7,694,402** | **17,031,998** | **6,833,671** | **72,063,726** | **30,359,881** | **102,423,607** |
| **Southwest (SW)** | | | | | | | | | |
| Arkansas | 1,739,091 | 760,227 | 1,745,014 | 719,371 | 1,427,562 | 569,063 | 4,911,666 | 2,048,661 | 6,960,327 |
| Louisiana | 4,305,693 | 1,840,462 | 3,354,372 | 1,435,137 | 3,299,379 | 1,335,840 | 10,959,444 | 4,611,439 | 15,570,883 |
| New Mexico | 321,337 | 140,617 | 433,360 | 190,257 | 284,068 | 118,464 | 1,038,765 | 449,338 | 1,488,103 |
| Oklahoma | 1,989,620 | 871,013 | 1,147,466 | 488,426 | 1,397,068 | 526,194 | 4,534,155 | 1,885,633 | 6,419,788 |
| Texas | 14,863,714 | 6,399,936 | 12,197,568 | 5,182,115 | 13,435,185 | 5,369,885 | 40,496,467 | 16,951,937 | 57,448,404 |
| **SW Subtotal** | **23,219,455** | **10,012,255** | **18,877,780** | **8,015,307** | **19,843,261** | **7,919,447** | **61,940,497** | **25,947,009** | **87,887,505** |
| **West (W)** | | | | | | | | | |
| Alaska | 30,869 | 14,640 | 14,261 | 5,844 | 15,551 | 6,424 | 60,682 | 26,908 | 87,590 |
| Arizona | 987,486 | 429,466 | 325,940 | 136,975 | 536,546 | 209,578 | 1,849,971 | 776,018 | 2,625,990 |
| California | 3,853,261 | 1,707,809 | 2,521,059 | 1,095,159 | 5,488,955 | 2,217,957 | 11,863,276 | 5,020,925 | 16,884,201 |
| Colorado | 1,027,232 | 445,418 | 491,160 | 212,335 | 713,760 | 296,028 | 2,232,151 | 953,781 | 3,185,932 |
| Hawaii | 86,588 | 39,755 | 11,058 | 4,948 | 20,667 | 9,056 | 118,313 | 53,759 | 172,072 |
| Idaho | 187,160 | 84,182 | 125,649 | 53,604 | 212,987 | 84,010 | 525,795 | 221,796 | 747,591 |
| Montana | 21,206 | 8,941 | 26,920 | 11,905 | 25,176 | 10,155 | 73,302 | 31,001 | 104,303 |
| Nevada | 376,561 | 161,781 | 120,552 | 52,568 | 432,809 | 182,065 | 929,922 | 396,414 | 1,326,335 |
| Oregon | 234,388 | 100,635 | 152,834 | 66,206 | 221,044 | 94,319 | 608,266 | 261,160 | 869,426 |
| Utah | 804,291 | 347,181 | 290,825 | 120,177 | 798,368 | 306,192 | 1,893,483 | 773,550 | 2,667,033 |
| Washington | 561,900 | 237,738 | 504,418 | 218,763 | 1,051,400 | 435,973 | 2,117,718 | 892,474 | 3,010,192 |
| Wyoming | 5,464 | 2,521 | 26,839 | 11,297 | 39,005 | 15,513 | 71,352 | 29,331 | 100,683 |
| **W Subtotal** | **8,176,406** | **3,580,066** | **4,611,513** | **1,989,781** | **9,556,311** | **3,867,270** | **22,344,230** | **9,437,117** | **31,781,347** |
| **Total** | **$ 122,557,740** | **$ 52,857,629** | **$ 59,388,908** | **$ 25,283,339** | **$ 59,198,475** | **$ 23,756,071** | **$ 241,145,123** | **$ 101,897,038** | **$ 343,042,161** |

*Sources: Varsity Competitions Data, World Bids Events Data, Pre-Acquisition Data, Apparel Data, Nfinity Apparel Data, USASF_00000297 at 0098*