# Exhibit 7

## FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

**JESSICA JONES** and **CHRISTINA LORENZEN**
on Behalf of Themselves and All Others Similarly
Situated,

*Plaintiffs*,

-*versus*-

**VARSITY BRANDS, LLC; VARSITY SPIRIT,
LLC; VARSITY SPIRIT FASHION &
SUPPLIES, LLC; U.S. ALL STAR
FEDERATION, INC.; JEFF WEBB;
CHARLESBANK CAPITAL PARTNERS LLC;**
and **BAIN CAPITAL PRIVATE EQUITY,**

*Defendants*.

Case No. 2:20-cv-02892

---

**EXPERT REPORT OF JAMES H. ARONOFF**

**HIGHLY CONFIDENTIAL**

**SUBJECT TO PROTECTIVE ORDER**

## <u>TABLE OF CONTENTS</u>

I.      Introduction ................................................................................................................. 1

II.     Executive Summary ..................................................................................................... 2

III.    Scope of Engagement ................................................................................................. 4

IV.     Qualifications and Experience ................................................................................... 4

V.      Compensation ............................................................................................................. 6

VI.     Materials Relied On .................................................................................................... 7

VII.    Background .................................................................................................................. 7

    A.      Competitive Cheer ........................................................................................... 7

        1.      Cheer Competitions ............................................................................. 8

        2.      Cheer Camps ....................................................................................... 9

        3.      Cheer Apparel ................................................................................... 10

    B.      Varsity ............................................................................................................ 11

        1.      Corporate History .............................................................................. 11

        2.      Acquisition History ........................................................................... 13

        3.      Involvement with Competitive Cheer Governing Bodies .................. 19

    C.      Private Equity Firms ...................................................................................... 22

        1.      Charlesbank ....................................................................................... 23

        2.      Bain ................................................................................................... 26

VIII.   Aspects of Varsity's Operational Model .................................................................. 28

    A.      Operation of Cheer Competitions .................................................................. 28

        1.      Bid System ........................................................................................ 28

        2.      Rebate Programs ............................................................................... 30

        3.      Cheer Competition Rules .................................................................. 31

**HIGHLY CONFIDENTIAL**

4. Cheer Competition Scheduling ................................................................ 32

B. Operation of Cheer Camps ................................................................................ 33

C. Operation of Cheer Apparel .............................................................................. 34

IX. Recommended Changes to Varsity's Operational Model ................................................ 35

A. Cheer Competitions ......................................................................................... 35

1. Rebates ............................................................................................... 35

2. Competition Rules .............................................................................. 35

3. Competition Judging .......................................................................... 36

4. Competition Accommodations ........................................................... 36

B. Cheer Camps ................................................................................................... 36

1. Rebates ............................................................................................... 36

2. Bid System ......................................................................................... 37

C. Cheer Apparel ................................................................................................. 37

1. Event Marketing ................................................................................. 37

2. Rebates ............................................................................................... 38

D. Competition Bids ............................................................................................ 38

1. Bid System ......................................................................................... 38

2. Number of Bid Earning Events .......................................................... 39

3. Scheduling of Bid Earning Events ..................................................... 39

4. Bid Earning Cheer Camps .................................................................. 39

E. Governance and Compliance ........................................................................... 40

1. Financial Support ............................................................................... 40

2. Board Composition ............................................................................ 40

3. Transparency ...................................................................................... 41

4. Regulation .......................................................................................... 41

**HIGHLY CONFIDENTIAL**

## I.    INTRODUCTION

1.    I have been retained as an expert witness by the Joseph Saveri Law Firm, Inc. ("JSLF" or "Counsel"), counsel for plaintiffs, Jessica Jones and Christina Lorenzen ("Plaintiffs"), and all others similarly situated (together with Plaintiffs, the "Class"), to provide recommendations for relief with respect to the alleged activity of defendants, including Varsity Brands, LLC ("Varsity Brands"); Varsity Spirit, LLC ("Varsity Spirit"); Varsity Spirit Fashion & Supplies, LLC ("Varsity Spirit Fashion") (collectively, "Varsity"); U.S. All Star Federation, Inc. ("USASF"); Jeff Webb; Charlesbank Capital Partners LLC ("Charlesbank"); and Bain Capital Private Equity ("Bain") (all defendants together, "Defendants") in participating in an alleged exclusionary scheme and conspiring to raise, fix, and stabilize the prices charges associated with competitive cheerleading.[1]

2.    I understand from Counsel that Plaintiffs seek damages and/or injunctive and declaratory relief for the following claims: (1) Violation of Sections 1, 2, and 3 of the Sherman Act, 15 U.S.C. §§ 1—3; (2) Violation of Tennessee antitrust laws, Tenn. Code Ann. §§ 47-25-101, et seq.; (3) Violation of numerous states' antitrust laws; (4) Violation of numerous states' consumer protection laws, including unfair methods of competition and unfair and deceptive acts; and (5) Unjust enrichment under Tennessee Law.[2]

---

[1] *See generally,* Class Action Complaint, *Jessica Jones, et al. v. Varsity Brands, LLC, et al.*, Case No. 2:20-cv-02892-SHL-tmp (W.D. Tenn.), filed Dec. 10, 2020 ("Complaint").

[2] Complaint at ¶¶ 231-268.

## II.    EXECUTIVE SUMMARY

3.    I have been retained as an expert witness by Counsel for Plaintiffs, and all others similarly situated, to provide recommendations for relief with respect to the alleged activity of the Defendants.

4.    I have more than 38 years of experience as a senior executive and board member for regulated companies in highly competitive markets. I am currently a Managing Director at CohnReznick where I advise clients regarding, among other things, internal and external compliance and reporting programs, the creation and revision of policies and procedures, the implementation of best practices, and the development of new products and businesses.

5.    I have been retained to offer recommendations for structural relief with regard to the alleged anti-competitive conduct of the Defendants and the effect of that conduct on the Competitive Cheer market.

6.    Competitive Cheer is a team-based sport where groups of athletes perform routines and compete against each other in formal competitions.  The routines are judged by trained experts on both difficulty and execution, and a winner is determined. This report examines three distinct segments of the Competitive Cheer market: Cheer Competitions, Cheer Camps and Cheer Apparel.

7.    Cheer Competitions are organized events where multiple Competitive Cheer teams compete against one another for the best routine. These competitions are typically held over the course of a weekend but can last longer. Cheer Competitions are judged according to a set of "consistent rules and competition standards" established by the USASF, a governing body of the sport. Varsity controls approximately 80% of the Cheer Competitions market.

8.    Competitive Cheer athletes attend multi-day, overnight Cheer Camps during the summer. These camps are attended by Competitive Cheer athletes regardless of age or level and

2

**HIGHLY CONFIDENTIAL**

are intended for the athletes to practice and learn new skills, develop routines, and purchase apparel and other Competitive Cheer related merchandise. Varsity is the largest operator of Cheer Camps in the world and controls over 80% of the market.

9.      The attire and equipment of Competitive Cheer athletes is highly regulated by the various event organizers and rules committees. Cheer Competitions and Cheer Camps often serve as merchandise showrooms for Cheer Apparel. Varsity controls approximately 80% of the Cheer Apparel market.

10.     This report summarizes the background and history of Varsity with respect to Varsity's growth, ownership structure, and product and services offerings. The numerous acquisitions of competitors and related entities by Varsity are also discussed, as is the special relationship Varsity has had with Competitive Cheer governing bodies over the years.

11.     This report also contains a discussion of private equity firms, in general, and two specific private equity firms, in particular, and the way each of those firms actively contributed to Varsity's growth. Those two firms are Charlesbank, which acquired Varsity in 2014 for approximately $1.5 billion, and Bain, which acquired Varsity in 2018 for approximately $2.5 billion.

12.     The final sections of this report: 1) describe in detail various aspects of Varsity's operational model whereby Varsity allegedly creates barriers to entry, and otherwise uses its superior market share and access to capital, to dampen and eliminate competition in a number of related segments of the Competitive Cheer market, and 2) provide specific, pragmatic recommendations for structural relief to the Competitive Cheer market. Each recommendation is designed to ameliorate specific alleged anti-competitive activities or practices of Varsity described herein. In addition, each of these recommendations, if implemented, should cause little

3

**HIGHLY CONFIDENTIAL**

or no disruption to the day-to-day normal business activities of Varsity or other market participants and, in my experience, represent fairly standard solutions to the allegedly improper practices and activities described herein.

## III.    SCOPE OF ENGAGEMENT

13.    I have been retained by Counsel for the Plaintiffs to offer my professional opinion regarding recommendations for structural relief with regard to the alleged anti-competitive conduct of the Defendants and the effect of that conduct on the Competitive Cheer market.

14.    For the avoidance of doubt, I do not purport to interpret the alleged activity of the Defendants as a legal matter or offer any legal opinion herein. I merely offer my expert opinion as to recommendations for relief, based upon my knowledge, skill, experience, training, and education as such background relates risk management, to corporate governance and operating as a senior executive or director in highly competitive markets.

15.    I reserve the right to amend, supplement and/or revise my analysis, findings, and opinions if new evidence becomes available, if the scope of discovery or the causes of action change in any material way, or in response to any attempt to rebut my opinions and conclusions.

## IV.    QUALIFICATIONS AND EXPERIENCE

16.    I have more than 38 years of professional experience, primarily in the financial services industry.  Throughout my career, I have gained considerable experience and knowledge  in  all aspects of operating businesses as a C-Suite executive in extremely competitive and highly regulated markets.  I have held many positions in the financial services industry, including senior management, strategic planning, product development, due diligence, sales, negotiating transactions, and risk management.

**HIGHLY CONFIDENTIAL**

17.    As particularly relevant to this report, I have held numerous senior positions within highly regulated financial institutions operating in very competitive markets.  For example, I was a Managing Director of Nomura Securities International, Inc. ("Nomura") where I obtained numerous FINRA licenses[3] and was responsible for the profitability and compliance of my group. As an international investment bank and registered broker-dealer, Nomura was required to comply with a plethora of state and federal banking and securities regulations, as well as myriad internal policies and procedures. I also served on the Board of Directors of several Nomura subsidiaries related to the acquisition of residential mortgage loans and the issuance of residential mortgage-backed securities ("RMBS").  Moreover, I was the founder, CEO, and Chairman of a non-bank specialty finance company, FC Capital, which was subject to Federal consumer protection and debt collection regulations, as well as mortgage banking and consumer lending regulations in each of more than 40 states where the company was licensed.

18.    I am currently a Managing Director at CohnReznick LLP (CohnReznick"), based in New York, and work as a consultant advising clients on issues relating to, among other things, regulatory compliance, best practices, restructuring and workouts, dispute resolution, and enterprise risk management.

19.    I received my Juris Doctor from Cornell Law School.  I also hold a Bachelor of Arts from Yale College, where I majored in Economics and Political Science.

20.    Upon graduating from law school, I worked as a securities attorney at Thacher Proffitt and Wood LLP ("Thacher").  Upon leaving Thacher, I spent the next decade or so as a senior executive at investment banking and insurance firms. In 1997, I founded and served as

---

[3] I obtained the Series 7, Series 12, Series 24, and Series 63 FINRA licenses.

**HIGHLY CONFIDENTIAL**

Chairman and CEO of FC Capital, a non-bank specialty loan origination, loan acquisition and servicing company, which was ultimately sold to a publicly traded financial services company.

21.    Since 2000, I have been the Managing Partner of MTGX, LLC, an advisory firm I founded, where I provide advice in the areas of risk assessment and management strategies, best practices and compliance, portfolio valuation, capital raising, restructuring, and workouts. In addition, I have worked for and consulted with numerous clients regarding internal and external compliance and reporting programs, the creation and revision of policies and procedures, the implementation of best practices, and the development of new products and businesses.

22.    Since 2007, have provided expert and consulting witness services for cases in numerous state and federal courts.  I have provided expert reports, rebuttal reports, and deposition testimony in about thirty (30) cases, and in-court testimony in four cases.  A copy of my Curriculum Vitae, which contains a summary of my professional experience and educational background, is attached as Appendix A to this report.  A full list of my expert reports and trial and deposition testimony is attached hereto as Appendix B.

## V.    COMPENSATION

23.    CohnReznick LLP ("CohnReznick") is being compensated for my work on this engagement at an hourly rate of $995.  CohnReznick is also being compensated for the work of other CohnReznick employees, to the extent they assist in this engagement, at rates between $300 and $995.  CohnReznick is also reimbursed for actual, reasonable travel and out-of-pocket expenses.

24.    The payment of such fees and expenses is not contingent upon the opinions I render herein or the outcome of this litigation.  My opinion has not been affected in any way by the compensation that CohnReznick has received or will receive.

**HIGHLY CONFIDENTIAL**

## VI.    MATERIALS RELIED ON

25.    The materials I relied upon in forming my opinions, some of which materials were produced by Counsel to facilitate this report, are cited herein and listed in Appendix C attached hereto.

## VII.    BACKGROUND

### A.    COMPETITIVE CHEER

26.    Competitive cheer is a team-based sport where groups of athletes perform routines and compete against each other in formal competitions ("Competitive Cheer").[4]  These routines are typically two and a half minutes long and contain stunts, jumps, tumbling, and elements of dance.[5]  The routines are judged by trained experts on both difficulty and execution, and a winner is determined.[6]

27.    The two main disciplines of Competitive Cheer are all-star and school cheer ("All-Star Cheer" and "School Cheer", respectively).[7]  All-Star Cheer teams are affiliated with private gyms and exist solely to compete.[8]  School Cheer teams are affiliated with middle schools, high schools, or colleges, and also compete in events where the routine is the main focus.[9]

---

[4] VARSITY, *What is Competitive Cheerleading*, Feb. 20, 2018, https://www.varsity.com/news/what-is-competitive-cheerleading/.

[5] *Ibid.*

[6] *Ibid.*

[7] Varsity Brands Growth Assessment prepared by Bain & Company dated Feb. 2018, CB00485513, at CB00485546; VARSITY, *What is Competitive Cheerleading*, Feb. 20, 2018, https://www.varsity.com/news/what-is-competitive-cheerleading/.

[8] *Ibid.*

[9] *Ibid.*  School Cheer teams can also participate in some form of traditional sideline cheerleading, although sideline cheer is distinct from Competitive Cheer.

7

**HIGHLY CONFIDENTIAL**

28.     Competitive Cheer is a rigorous sport that often requires a year-round commitment from athletes and their families.[10] A typical Competitive Cheer athlete may participate in skill building camps in the summer, pre-competition training in the fall, and multiple competitions in the winter and spring. These activities are expensive, and costs for a single All-Star season can range between $1,000 and $10,000 per athlete.[11]  These costs can exceed $10,000 when including the cost of transportation, lodging, and attendance for the various competitions and camps.[12] Competitive Cheer teams often attend multiple competitions a year, including four to five overnight events.[13]

### 1.     Cheer Competitions

29.     Cheer competitions are organized events where multiple Competitive Cheer teams compete against one another for the best routine ("Cheer Competitions"). These competitions are typically held over the course of a weekend, however certain larger, more popular competitions can last up to four days.  These Cheer Competitions can be local, regional, or national. Cheer Competitions are judged according to a set of "consistent rules and competition standards" established by the USASF.[14]

---

[10] Varsity Spirit Divisional Presentation dated May 2018, VAR00009293 (Seely Exhibit 17), at VAR00009324, VAR00009333.

[11] *Ibid.*, at VAR00009324 ("Represents the range of total annual spend per athlete from basic to elite levels of engagement").

[12] Varsity presentation undated, VAR00584154, at VAR00584161.  ("Costs can exceed $10,000 / season primarily driven by travel.")

[13] *Ibid.*.

[14] *See*  U.S. ALL STAR FEDERATION, About the USASF, accessed May 10, 2022, https://www.usasf.net/about.

**HIGHLY CONFIDENTIAL**

30.     Varsity controls approximately 80% of the Cheer Competitions market.[15]  As of 2017, Varsity produced approximately 600 competitions each year which were attended by approximately 900,000 athletes and over 1.4 million spectators.[16]  Notable Varsity events include NCA All Star Nationals, CHEERSPORT, UCA, US. Finals, and The Summit.[17]  Additionally, Varsity has a long-standing partnership with Disney and holds at least seven major Varsity events at Walt Disney World Resort annually.[18]

### 2.    Cheer Camps

31.     It is typical of Competitive Cheer athletes to attend multi-day and/or, overnight cheer camps during the summer school break ("Cheer Camps"). These camps are attended by Competitive Cheer athletes to practice and learn new skills, develop routines, and purchase apparel and other Competitive Cheer-related merchandise.[19]

32.     Varsity is the largest operator of Cheer Camps in the world and controls over 80% of the market.[20]  As of 2018, Varsity operated more than 5,600 Cheer Camps each summer which were attended by over 320,000 athletes.[21]  Varsity owned Cheer Camps operate under various brand names including: Universal Cheerleaders Association ("UCA"), National Cheerleaders

---

[15] See Deposition of Marlene Cota, Apr. 6, 2022, at 53:9-54:2.  From 2012 to 2018, Varsity's market share increased up to 85% in the competitive cheer market and 80% in the All-Star apparel market.

[16] Management Presentation dated May 2018, VAR00008463 (Webb Exhibit 30), at VAR00008540;  VARSITY, Corporate Partnerships, accessed May 10, 2022, https://www.varsity.com/about/partners/.

[17] Varsity Spirit Divisional Presentation dated May 2018, VAR00009293 (Seely Exhibit 17), at VAR00009324.

[18] Agreement between Disney Destinations, LLC d/b/a Disney Youth Programs and Varsity Spirit LLC, CB00537470.

[19] Varsity Spirit Divisional Presentation dated May 2018, VAR00009323 (Seely Exhibit 17), at VAR00009334.

[20] See, Varsity Information Memorandum dated Jan. 2011, VAR00424538, at VAR00424563

[21] Management Presentation dated May 2018, VAR00008463 (Webb Exhibit 30), at VAR00008545.

**HIGHLY CONFIDENTIAL**

Association ("NCA"), United Spirit Association, The Urban Cheerleading Experience, and V!ROC.[22]

### 3.    Cheer Apparel

33.    The attire and equipment of Competitive Cheer athletes is highly regulated by the various event organizers and rules committees.[23]  For example, soft-soled shoes are required, inseams must meet a certain length, and tops must be secured over at least one shoulder.[24]

34.    Varsity controls approximately 80% of the cheer apparel market.[25]  Varsity attained this market share through a combination of acquisitions and strategies like rebates and exclusivity agreements that make it expensive for gym owners and cheer squads to use alternative suppliers.[26] Varsity offers "Bow-to-Toe" apparel solutions, including everything from custom uniforms to branded footwear.[27]

---

[22] VARSITY, Our Camp Brands, accessed May 10, 2022, https://www.varsity.com/school/camps/brands/.

[23] *See, e.g.,* 2019-2020 USASF Cheer Safety Rules, USASF_00001818 (Stangle Exhibit 13), at USASF_00001832, USASF_00001864; *see generally,* USASF Professional Responsibility Code Version 9.0, Effective for the 2019-2020 membership, June 1, 2019 through May 31, 2019, USASF_00000192 (Wilson Exhibit 21).

[24] See, e.g., USASF_00001818 (Stangle Exhibit 13), at USASF_00001832, USASF_00001864 (2019-2020 USASF Cheer Safety Rules).

[25] See Deposition of Marlene Cota, Apr. 6, 2022, at 53:9-54:2.  From 2012 to 2018, Varsity's market share increased up to 85% in the competitive cheer market and 80% in the All-Star apparel market.

[26] *See* Section IX.

[27] Varsity Spirit Divisional Presentation dated May 2018, VAR00009293 (Seely Exhibit 17), at VAR00009305, VAR00009309, and VAR00009320.

10

**HIGHLY CONFIDENTIAL**

B.    **VARSITY**[28]

1.    **Corporate History**

35.    Varsity was founded in 1974 by Jeff Webb.[29]  Webb, a former collegiate cheerleader, left his position at the National Cheerleaders Association and formed his own cheerleading business, the Universal Cheerleaders Association ("UCA").[30]

36.    In June 1997, Varsity was acquired by Riddell Sports Inc. ("Riddell") for $91 million.[31]  Following the acquisition, Webb acted as President and Chief Operating Officer of Varsity, as well as Vice Chairman of Riddell and a member of the Riddell Board's Executive Committee.[32]  In June 2001, following the divestment of the company's athletic equipment business unit, Riddell was renamed Varsity Brands Inc. and Webb was appointed President and Chief Executive Officer.[33]

37.    Varsity was publicly traded between 2001 and 2003. In 2003, Varsity was purchased by members of senior management and merchant banking firm Leonard Green & Partners in a deal valued at $131 million.[34] Webb remained Chairman and CEO of Varsity following this transaction.

---

[28] "Varsity" as used herein means the legal Varsity entity existing at that time.

[29] UCA, About, accessed May 10, 2022, https://www.varsity.com/uca/about/.

[30] *Ibid.*

[31] Riddell Sports Inc., SEC Form 10-K for the period ended Dec. 31, 1997, at 4; THE NEW YORK TIMES, *Riddell in Deal for Maker of Cheerleading Uniforms*, May 7, 1997, https://www.nytimes.com/1997/05/07/business/riddell-in-deal-for-maker-of-cheerleading-uniforms.html.

[32] Riddell Sports Inc., SEC Form 10-K for the period ended Dec. 31, 1997, at 4.

[33] THE NEW YORK TIMES, *Chief Executive at Riddell Sports Quits*, Jun. 26, 2001, https://www.nytimes.com/2001/06/26/business/chief-executive-at-riddell-sports-quits.html.

[34] Varsity Brands, Inc., SEC Form 10-Q for the period ended Jun. 30, 2003, at 11;  THE NEW YORK TIMES, *Company News; Uniform Maker Agrees to $131 Million Buyout*, Apr. 23, 2003, https://www.nytimes.com/2003/04/23/business/company-news-uniform-maker-agrees-to-131-million-buyout.html.

**HIGHLY CONFIDENTIAL**

38.    In December 2014, Varsity was acquired by an investment group led by Charlesbank Capital Partners ("Charlesbank") for approximately $1.5 billion.[35] Varsity senior management remained in their positions following this transaction and invested in the company alongside Charlesbank.[36]

39.    In March 2016, Jeff Webb stepped down as Varsity CEO, but remained its Chairman.[37]

40.    In 2018, Bain acquired Varsity from Charlesbank for a reported $2.5 billion.[38] At the time of this report, Varsity remains a Bain portfolio company.[39] Jeff Webb stepped down as Chairman of Varsity in December 2020, to "focus [on] growing cheer globally through his role as President of the International Cheer Union."[40]

41.    At the time of this report, Varsity had three primary divisions: BSN Sports (the "sport division"), Varsity Spirit (the "spirit division"), and Herff Jones (the "achievement

---

[35] CHARLESBANK CAPITAL PARTNERS, *Charlesbank Capital Partners Completes Acquisition of Varsity Brands*, Dec. 15, 2014, https://www.charlesbank.com/news/2014/charlesbank-capital-partners-completes-acquisition-varsity-brands/; CHARLESBANK CAPITAL PARTNERS, Portfolio / Consumer – Varsity Brands, accessed May 10, 2022, https://www.charlesbank.com/portfolio/companies/varsity-brands/.

[36] PR NEWSWIRE, *Varsity Brands Enters into Definitive Agreement to be Acquired by Charlesbank Capital Partners*, Nov. 3, 2014, https://www.prnewswire.com/news-releases/varsity-brands-enters-into-definitive-agreement-to-be-acquired-by-charlesbank-capital-partners-281315161.html.

[37] PR NEWSWIRE, *Varsity Brands Announces Appointment of Matthew E. Rubel as CEO*, Mar. 3, 2016, https://www.prnewswire.com/news-releases/varsity-brands-announces-appointment-of-matthew-e-rubel-as-ceo-300230740.html.

[38] BAIN CAPITAL PRIVATE EQUITY, *Varsity Brands, the Leader in Elevating Student Experiences in Sports, Spirit, and Achievement, to be Acquired by Bain Capital Private Equity*, Jun. 19, 2018, https://www.baincapital.com/news/varsity-brands-leader-elevating-student-experiences-sports-spirit-and-achievement-be-acquired; CNBC, *Bain to acquire Varsity Brands, a top maker of cheerleader uniforms and school spirit items, for roughly $2.5 billion*, Jun. 19, 2018, https://www.cnbc.com/2018/06/19/bain-nears-2-point-5-billion-deal-for-cheer-uniform-leader-varsity-brands.html.

[39] BAIN CAPITAL PRIVATE EQUITY, Portfolio – Varsity Brands, accessed May 10, 2022, https://www.baincapitalprivateequity.com/portfolio.

[40] VARSITY, *Varsity Spirit Founder and Chairman Jeff Webb Transitions to Focus on the Global Development of Cheer*, Dec. 9, 2020, https://www.varsity.com/about/press/varsity-spirit-founder-and-chairman-jeff-webb-transitions-to-focus-on-the-global-development-of-cheer/.

12

**HIGHLY CONFIDENTIAL**

division").[41]  Of these brands, Varsity has described BSN Sports as "the recognized leader in team

athletic gear;" Varsity Spirit as "the driving force in spirit;" and Herff Jones as "the most trusted

name in celebrating student milestones."[42]  Figure 1 below depicts the "Varsity Brands" family.

**Figure 1.          Varsity Brands Family[43]**



### 2.    Acquisition History

42.    Varsity has historically made strategic acquisitions within the Competitive Cheer

industry. Since the early 2000s, Varsity has pursued a strategy of acquiring its competitors.[44]

43.    Table 1 below provides a timeline of select Varsity merger and acquisition activity.

This timeline is not exhaustive and does not include all Varsity mergers and acquisitions made

during this period. The events contained in Table 1 are described more fully below.

---

[41] VARSITY, Varsity Brands - Sport, accessed May 10, 2022, https://www.varsitybrands.com/sport; VARSITY, Varsity Brands -  Spirit, accessed May 10, 2022, https://www.varsitybrands.com/spirit; VARSITY, Varsity Brands - Achievement, accessed May 10, 2022, https://www.varsitybrands.com/achievement.

[42] VARSITY, About Varsity Brands, accessed May 10, 2022, https://www.varsitybrands.com/about.

[43] *Ibid.*

[44] *See,* Varsity Information Memorandum dated Jan. 2011, VAR00424538, at VAR00424565; Varsity Spirit Internal Acquisition Memos for time period 2015-2018, CB00075991 (White Exhibit 28).

**HIGHLY CONFIDENTIAL**

Table 1.                        **Select Varsity Mergers and Acquisitions**

| Date | Event | Category |
|------|-------|----------|
| **2003** | **Varsity Acquired by Leonard Green & Partners[45]** | |
| 2004 | National Spirit Group (National Cheerleaders Association, the Universal Dance Association, and Cheerleader & Danz Apparel)[46] | Competitions, Camps, Apparel |
| Jul. 2005 | Athletic Championships LLC and Premier Athletics LLC[47] | Competitions |
| 2010 | Just Briefs[48] | Apparel |
| Jun. 2011 | Herff Jones[49] | Other |
| Aug. 2011 | Spirit Festival[50] | Competitions |
| Dec. 2012 | Spirit Holdings (CHEERSPORT, CheerLogistics, and Universal Spirit)[51] | Competitions |
| May 2013 | BSN[52] | Apparel |
| Jun. 2014 | Cheer Limited[53] | Competitions |
| **Dec. 2014** | **Varsity acquired by Charlesbank[54]** | |
| Nov. 2015 | The JAM Brands[55] | Competitions |
| Dec. 2015 | Allgoods, LLC[56] | Apparel |
| Dec. 2016 | Aloha Productions[57] | Competitions |
| Feb. 2017 | Spirit Celebration[58] | Competitions |
| Apr. 2017 | All Things Cheer & Dance[59] | Competitions |
| Nov. 2017 | Jam Spirit Group[60] | Competitions |
| Dec. 2017 | Mardi Gras Nationals[61] | Competitions |
| Dec. 2017 | Sea to Sky[62] | Competitions |
| Jan. 2018 | EPIC[63] | Competitions |
| **Jun. 2018** | **Varsity acquired by Bain[64]** | |

### a)    Cheer Competition Acquisitions

44.    In July 2005, Varsity announced the acquisitions of both Athletic Championships

LLC and Premier Athletics LLC.[65]  Unrelated prior to the acquisitions, Athletic Championships

---

[45] THE NEW YORK TIMES, *Company News; Uniform Maker Agrees to $131 Million Buyout*, Apr. 23, 2003, https://www.nytimes.com/2003/04/23/business/company-news-uniform-maker-agrees-to-131-million-buyout.html.

[46] Acquisition Dates, VAR00129039 (Coda Exhibit 7), at VAR00129039.

[47] MEMPHIS BUSINESS JOURNAL, *Varsity Brands acquires Athletic Championships and Premier Athletics*, Jul. 6, 2005, https://www.bizjournals.com/memphis/stories/2005/07/04/daily16.html.

[48] See VAR00275846 (Cota Exhibit 21), at 7 ("Varsity acquired Just Briefs in 2010 and closed it").

[49] PR NEWSWIRE, *Varsity Brands and Herff Jones Merge*, Jun. 15, 2011, https://www.prnewswire.com/news-releases/varsity-brands-and-herff-jones-merge-123921169.html/.

[50] Acquisition Dates, VAR00129039 (Cota Exhibit 7), at VAR00129040.

[51] *Ibid.*

**HIGHLY CONFIDENTIAL**

operated 14 Cheer Competitions in 11 states and Premier Athletics operated a similar number of

cheer and gymnastics training centers in six states.[66]

45.    In 2011, Varsity acquired Spirit Festival, a cheer competition organizer.[67]  Spirit

Festival organized the popular Spirit Fest Cheer & Dance Nationals.[68]

46.    In December 2012, Varsity completed the acquisition of Spirit Holdings.[69]  Spirit

Holdings is the parent company of CHEERSPORT, CheerLogisitics, and Universal Spirit.[70]  At

---

[52] MEMPHIS BUSINESS JOURNAL, *Memphis' Varsity gets another sibling, BSN*, May 16, 2013, https://www.bizjournals.com/memphis/news/2013/05/16/memphis-varsity-gets-another-sibling.html.  The transaction was announced in May 2013 and closed in June 2013.

[53] Acquisition Dates, VAR00129039 (Cota Exhibit 7), at VAR00129041.

[54] CHARLESBANK CAPITAL PARTNERS, *Charlesbank Capital Partners Completes Acquisition of Varsity Brands*, Dec. 15, 2014, https://www.charlesbank.com/news/2014/charlesbank-capital-partners-completes-acquisition-varsity-brands/.

[55] Varsity Spirit Internal Acquisition Memos for the time period 2015-2018, CB00075991(White Exhibit 28).

[56] PR NEWSWIRE, *Varsity Brands Announces Acquisition of allgoods, LLC*, Dec. 23, 2015, https://www.prnewswire.com/news-releases/varsity-brands-announces-acquisition-of-allgoods-llc-300196819.html.

[57] Varsity Spirit Internal Acquisition Memos for the time period 2015-2018, CB00075991(White Exhibit 28).

[58] *Ibid.*

[59] *Ibid.*

[60] *Ibid.*

[61] *Ibid.*

[62] *Ibid.*

[63] *Ibid.*

[64] BAIN CAPITAL PRIVATE EQUITY, *Varsity Brands, the Leader in Elevating Student Experiences in Sports, Spirit, and Achievement, to be Acquired by Bain Capital Private Equity*, Jun. 19, 2018, https://www.baincapital.com/news/varsity-brands-leader-elevating-student-experiences-sports-spirit-and-achievement-be-acquired.

[65] MEMPHIS BUSINESS JOURNAL, *Varsity Brands acquires Athletic Championships and Premier Athletics*, Jul. 6, 2005, https://www.bizjournals.com/memphis/stories/2005/07/04/daily16.html.

[66] *Ibid.*

[67] Acquisition Dates, VAR00129039 (Cota Exhibit 7), at VAR00129040.

[68] SPIRIT POST, *Varsity Acquires Spirit Festival*, Aug. 2011, https://spiritpost.com/2011/08/varsity-acquires-spirit-festival/.

[69] Acquisition Dates, VAR00129039 (Cota Exhibit 7), at VAR00129040.

[70] *Ibid.*

15

**HIGHLY CONFIDENTIAL**

the time of the acquisition, Spirit Holdings entities hosted more than 30 competitions each year.[71] CHEERSPORT's signature event was the "Nationals" competition, which was, at the time, "the single largest cheer and dance competition in the United States, attracting more than 900 cheerleading and dance teams from around the country."[72]

47.    In 2014, Varsity acquired Cheer Limited.[73]  At the time of the acquisition, Cheer Limited produced more than 25 competitions each year, including the Cheer Limited Nationals and the NCHSAA State High School Cheerleading Championship.[74]

48.    In late 2015, Varsity acquired JAM Brands, LLC ("JAM Brands").[75]  At the time, JAM Brands was the second largest event producer behind Varsity, and "ran most of the high-profile competitions that Varsity [did not] own."[76]  JAM Brands owned independent event producers Cheerleaders of America and America's Best.[77]  JAM Brands also produced several popular Cheer Competitions, including The MAJORS, the U.S. Finals, and JAMFest Cheer Super

---

[71] SPIRIT POST, *Spirit Holding and Cheersport Join the Varsity Family of Brands*, Dec. 28, 2012, https://spiritpost.com/2012/12/spirit-holding-and-cheersport-join-the-varsity-family-of-brands/.

[72] *Ibid.*

[73] Acquisition Dates, VAR00129039 (Cota Exhibit 7), at VAR00129041.

[74] VARSITY, *Varsity Spirit and Cheer Ltd Announce Merger*, Jun. 24, 2015, https://files.varsity.com/uploads/editor/files/PDFS/Varsity/Varsity-Spirit-Cheer-LTD-Merger.pdf.

[75] INC. MAGAZINE, *Meet Rebel, the $20 Million Cheerleading Startup Living Up to Its Name*, Mar. 2016, https://www.inc.com/magazine/201603/leigh-buchanan/rebel-athletic-custom-cheerleading-uniforms-startup.html; Varsity Spirit Internal Acquisition Memos for the time period 2015-2018, CB00075991(White Exhibit 28).

[76] INC. MAGAZINE, *Meet Rebel, the $20 Million Cheerleading Startup Living Up to Its Name*, Mar. 2016, https://www.inc.com/magazine/201603/leigh-buchanan/rebel-athletic-custom-cheerleading-uniforms-startup.html.

[77] *See,* VAR00415061 (Sadlow Exhibit 17), at VAR00415064 (11/2/2015 JAMBrands Transaction Summary); EVERIPEDIA, The JAM Brands, https://everipedia.org/The_JAM_Brands.

**HIGHLY CONFIDENTIAL**

Nationals.[78]  Following the acquisition, Varsity controlled "roughly 90 percent of the major events."[79]

49.    Following the major acquisition of JAM Brands, Varsity continued to pursue acquisitions of smaller independent event producers.  In 2016, Varsity acquired Aloha Productions.[80]  In 2017, Varsity acquired Spirit Celebration, All Things Cheer & Dance, Jam Spirit Group, Mardi Gras Nationals, and Sea to Sky.[81]  In 2018, Varsity acquired the EPIC brands.[82]

### b)    Cheer Camp Acquisitions

50.    In early 2004, Varsity acquired National Spirit Group, which included the National Cheerleaders Association ("NCA"), the Universal Dance Association ("UDA"), and Cheerleader & Danz Apparel.[83]  At the time it was acquired, National Spirit Group was Varsity's largest competitor in both the Cheer Apparel and Cheer Camps markets.[84]  NCA was a cheer camp company started in 1948. UDA is a dance company cofounded in 1980 by Jeff Webb.  A Varsity SEC filing from 2003 described  National Spirit Group as "Varsity's only national competitor."[85]

---

[78] *See,* Deposition of Landon Craft, Apr. 8, 2022, at 210:10-213:25.  As part of the JAM Brands acquisition, Varsity acquired a 70% interest in the U.S. Finals.  Varsity acquired the remaining 30% in a subsequent transaction.

[79] INC. MAGAZINE, *Meet Rebel, the $20 Million Cheerleading Startup Living Up to Its Name*, Mar. 2016, https://www.inc.com/magazine/201603/leigh-buchanan/rebel-athletic-custom-cheerleading-uniforms-startup.html.

[80] *See,* Varsity Spirit Internal Acquisition Memos for the time period 2015-2018, CB00075991(White Exhibit 28).

[81] *Ibid.*

[82] *Ibid.*

[83] Acquisition Dates, VAR00129039 (Coda Exhibit 7), at VAR00129039.

[84] Confidential Information Memorandum dated Nov. 20, 2014, JEFF00049649 (Newby Exhibit 10), at JEFF00049693  ("In 2004, Varsity Spirit acquired National Spirit Group, its largest competitor.")

[85] Varsity Brands, Inc., SEC Form 10-Q for the period ending Jun. 30, 2003, at 18.

**HIGHLY CONFIDENTIAL**

The acquisition consolidated "the bulk of the industry's most recognizable entities into the Varsity fold" and increased Varsity's annual revenue by an estimated $244 million in 2004.[86]

### c) Cheer Apparel Acquisitions

51.     In 2010, Varsity acquired Just Briefs, a designer and manufacturer of Cheer Apparel, and  closed the company shortly thereafter.[87]

52.     In May 2013, Herff Jones, which had merged with Varsity two years earlier, announced the acquisition of BSN, a manufacturer and distributor of team sports apparel.[88] The merger was finalized the following month.[89] At the time of the transaction, BSN was one of the largest provider of team uniforms, including those used in Competitive Cheer, in the United States.[90] At the time of this report, BSN operates as a "unique but interrelated business[]" within the "Varsity Brands family."[91]

53.     In December 2015, Varsity announced the acquisition of Allgoods, LLC ("Allgoods"), "one of the largest and fastest growing apparel-oriented fundraising companies in

---

[86] MEMPHIS BUSINESS JOURNAL, *Varsity Brands acquires Athletic Championships and Premier Athletics*, Jul. 6, 2005, https://www.bizjournals.com/memphis/stories/2005/07/04/daily16.html.

[87] *See,* VAR00275846 (Cota Exhibit 21), at 7 (stating that "Varsity acquired Just Briefs in 2010 and closed it").

[88] MEMPHIS BUSINESS JOURNAL, *Memphis' Varsity gets another sibling, BSN*, May 16, 2013, https://www.bizjournals.com/memphis/news/2013/05/16/memphis-varsity-gets-another-sibling.html.

[89] MEMPHIS BUSINESS JOURNAL, *Memphis' Varsity gets another sibling, BSN*, May 16, 2013, https://www.bizjournals.com/memphis/news/2013/05/16/memphis-varsity-gets-another-sibling.html;  SGB MEDIA, *BSN Sports and Herff Jones Finalize Merger*, Jun. 25, 2013, https://sgbonline.com/bsn-sports-and-herff-jones-finalize-merger/.

[90] SGB MEDIA, BSN Sports and Herff Jones Finalize Merger, Jun. 25, 2013, https://sgbonline.com/bsn-sports-and-herff-jones-finalize-merger/.

[91] BSN SPORTS, Our Brand Family, accessed May 10, 2022, https://www.bsnsports.com/our-brand-family.

**HIGHLY CONFIDENTIAL**

the US."[92]  Allgoods generates revenue and acts as a fundraising source for schools and programs through the sale of custom apparel.[93]

### d)    Other Mergers and Acquisitions

54.    In June 2011, Varsity announced its merger with Herff Jones, "a leading manufacturer and publisher of educational products, recognition awards and graduation-related items."[94]  At the time, Jeff Webb remarked that the merger "positions Varsity to serve all segments of the cheer community -- college, high school and all-star -- and continue to provide the excellent service and products that these groups have come to expect."[95]  Today, Herff Jones is the "achievement division" of Varsity.

### 3.    Involvement with Competitive Cheer Governing Bodies

55.    Varsity has a long history of direct involvement with the organizations that set the guidelines and standards for Cheer Competitions.[96]  These organizations administer and govern all aspects of Competitive Cheer, including competition rules and uniform requirements.

56.    In 2003, a group of cheerleading coaches established an organization to create standardized uniform rules for All-Star Cheer.[97]  This organization, called the National All-Star

---

[92] PR NEWSWIRE, *Varsity Brands Announces Acquisition of allgoods, LLC*, Dec. 23, 2015, https://www.prnewswire.com/news-releases/varsity-brands-announces-acquisition-of-allgoods-llc-300196819.html.

[93] *Ibid.*

[94] PR NEWSWIRE, *Varsity Brands and Herff Jones Merge*, Jun. 15, 2011, https://www.prnewswire.com/news-releases/varsity-brands-and-herff-jones-merge-123921169.html/.

[95] *Ibid.*

[96] Email from B. Seeley dated Oct. 19, 2018 and accompanying documents, VAR00371189, at VAR00371265.

[97] Deposition of J. Parrish, Mar. 3, 2022, at 36:23 – 37:5.

**HIGHLY CONFIDENTIAL**

Cheerleading Coaches Congress ("NACCC"), was the first of its type and established the initial set of universal competitive cheer rules.[98]

57.     Shortly after the formation of the NACCC, Varsity joined with other event promoters to create the USASF.[99]  The USASF had the same purpose as the NACCC, and was intended to be a governing body for All-Star Cheer.[100]

58.     Varsity has exercised control over the USASF since the organization's inception. The initial funding for the organization was provided by Varsity in the form of a $1.8 million interest free loan.[101]  For at least the first 15 years of its existence, USASF offices were located at Varsity's corporate address, a Varsity representative answered the phone for the USASF, and USASF employees were paid directly by Varsity.[102] Additionally, Varsity owned USASF's trademarks until 2017.[103]

59.     The USASF acquired the NACCC in 2005.[104]  However, the NACCC was dissolved within a few years.[105]

---

[98] *Ibid.*, at 37:22 – 38:03.

[99] Email from B. Seeley Oct. 19, 2018 and accompanying documents, VAR00371189 (Berry Exhibit 24), at VAR00371265, VAR00371267.

[100] *Ibid.*

[101] *See,* VAR00351487 (Chadwick Exhibit 19), at VAR00351489 ("After USASF was formed, Varsity provided an interest free line of credit to the USASF. At its peak, the loan balance was $1.8 million."); VAR00351289, at VAR00351290 (USASF list of questions (undated)).

[102] Deposition of S. Peterson Mar. 9, 2022, at 274:8-274:17;  VAR00351289, at VAR00351290 (USASF list of questions (undated)).

[103] Trademark License Agreement, September 2008, USASF_00032524 (Chadwick Exhibit 7); Deposition of J. Chadwick April 15, 2022, at 154:4-156:5 ("By agreement dated August 1, 2017, Varsity assigned to USASF all of its rights, titles, and interest in the trademarks").

[104] Deposition of J. Parrish Mar. 3, 2022, at 43:19-43:21.

[105] *Ibid.*, at 42:18-42:19.

**HIGHLY CONFIDENTIAL**

60.    Varsity effectively controls the USASF Board of Directors. Currently, the USASF Board has 13 voting seats: The Chairman, one senior staff member, four gym owners, and seven event producers.[106] The seven event producer seats are for each of the event producers that founded the USASF.[107] All seven event producer Board seats have come to be controlled by Varsity by way of acquisitions.

61.    In 2007, Varsity established the USA Federation for Sport Cheering ("USA Cheer") "to serve as the National Governing Body for Sport Cheering in the United States."[108] The mission of USA Cheer is to "serve the cheer community, including club cheering (all-star), youth recreational cheer, traditional school-based cheer programs, and the growing sport of STUNT."[109]

---

[106] Deposition of S. Peterson Mar. 9, 2022, at 31:10-31:14;  U.S. ALL STAR FEDERATION, Board Members, accessed May 10, 2022, https://www.usasf.net/committee-board.

[107] Deposition of J. Chadwick, Apr. 15, 2022, at 129:2-129.

[108] USA CHEER, About USA Cheer, accessed May 10, 2022, https://www.usacheer.org/about; VAR00371189 (Berry Exhibit 24), at VAR00371265 (Email from B. Seeley dated Oct. 19, 2018 and accompanying documents).

[109] USA CHEER, About USA Cheer, accessed May 10, 2022, https://www.usacheer.org/about.

**HIGHLY CONFIDENTIAL**

### C.  **PRIVATE EQUITY FIRMS**

62.     A private equity firm is an investment management company that provides financial backing and generally makes investments in privately held, startup, or operating companies through a variety of investment strategies including leveraged buyout, venture capital, and growth capital. Often described as a financial sponsor, each private equity firm will raise funds that will be invested in accordance with one or more specific investment strategies. Unlike an individual investor that purchases shares in a mutual fund or even a publicly traded stock where that investor is a passive investor, a private equity firm will generally invest in a company with the intent to take an active role in the strategic management of the target company.

63.     Typically, a private equity firm will raise funds that provide the equity contributions for these transactions. These funds are generally structured as a partnership with the private equity firm acting as the general partner. The general partner of the fund is responsible for the operation of the fund with a fiduciary duty to act in the best interest of the investors of the fund.[110] The general partner, or an affiliate thereof, will, generally, also act as the fund's investment manager and carry out the day-to-day activities of the fund.[111]

64.     Institutional investors, such as pension and endowment funds, retirement funds, and insurance companies, typically are the limited partners and are passive investors in the fund, with little or no ability to make investment decisions of the fund.  Private equity firms receive a periodic management fee as well as a share in the profits earned (carried interest) from each managed fund.

65.     The typical structure of a private equity fund is depicted below in Figure 2.

---

[110] Powers, Hugh, "Private Equity" March 2021 ("Powers"), at 7.

[111] *Ibid.*, at 8.

**HIGHLY CONFIDENTIAL**

**Figure 2.**                    **Private Equity Structure[112]**



66.    The goal of a private equity firm is to extract value in their target companies that the market has yet to identify, and to possibly improve processes and or productivity that will result in an increase in value of the target company. The typical holding period of an investment of this type is from three to seven years.[113]

67.    The ultimate goal of a private equity firm at the end of the holding period is to sell or "spin-off" each portfolio company at or above a targeted return by means of either a private sale or selling stock in the company in a public offering.

1.    **CHARLESBANK**

68.    Charlesbank is a private equity firm focused on management-led buyouts and

---

[112] Diagram of Private Equity Fund Structure, https://www.writework.com/uploads/12/123617/english-diagram-private-equity-fund-structure-private-equity.png.

[113] Powers, at 10.

**HIGHLY CONFIDENTIAL**

growth capital financing of middle-market companies.[114]  The company initially operated as the captive private equity investment arm of the Harvard University endowment until 1998, when Charlesbank was launched as an independent, employee-owned firm.[115] Charlesbank invests across a broad range of industries and transaction types and strives to exploit inefficiencies and discover hidden values within its investments.[116]

69.    In November of 2014, Charlesbank announced that it acquired Varsity for an estimated $1.5 billion.[117] Charlesbank's investment in Varsity was based on Varsity's position as a market leader in each of the business segments in which Varsity operated: BSN Sports, Herff Jones and Varsity Spirit.[118] With regard to Varsity Spirit, Charlesbank was specifically attracted to its understanding that Varsity Spirit was "10x size of nearest completitor [sic]" and "Varsity Spirit created the modern cheerleading industry and has the ability to drive continued growth through new products and new events."[119]

70.    In less than a three-year period after Charlesbank's purchase of Varsity, Varsity made the following acquisitions:

---

[114] *See,* CHARLESBANK, About, https://www.charlesbank.com/about/.

[115] *See,* CB00000386, at CB00000406.

[116] *See,* CHARLESBANK, Our Approach, https://www.charlesbank.com/approach/.

[117] *See,* CHARLESBANK, Portfolio / Consumer – Varsity Brands, https://www.charlesbank.com/portfolio/companies/varsity-brands/.

[118] *See,* CB00330039 (White Exhibit 17), at CB00330057 ("Investment Scorecard […] Relative Market Share […] Market leadership across all divisions. #1 in cheer; #1 in sports; #1 or 2 across all achievement segments")

[119] *See,* CB00000275, at CB00000277.

**HIGHLY CONFIDENTIAL**

**Table 2.**                         **Acquisitions During Charlesbank Ownership**

| Date | Acquisition Company | Market Sector | Market Description |
|---|---|---|---|
| November 2015 | JamBrands | Event Producer | Over 100 competitions and 5 World Bid events . Also has a 70% interest in an end of season championship, The US Finals.[120] |
| December 2016 | Aloha Productions | Event Producer | Approximately 30 Cheer Competitions across 11 states and 3 World Bid Events[121] |
| February 2017 | Spirit Celebrations | Event Producer | Thirteen competitions, primarily in Texas, with 1 World Bid Event in Dallas.[122] |
| April 2017 | All Things Cheer and Dance | Event Producer Choreography Camps | Four US competitions (including 1 World Bid event), 3 in Canada (including a Canadian World Bid event} and 2 in Western Australia. In addition, they offer skill development camps and routine choreography services to All-Star gyms in the US and Canada.[123] |
| November 2017 | Jam Spirit Group (DBA – Team Champion) | Event Producer | Thirty cheer and dance competitions, 2 cheer Worlds Bid events, and 2 dance Worlds Bid events.[124] |
| December 2017 | Mardi Gras Nationals, Inc. | Event Producer | Twelve cheer and dance competitions. 1 cheer Worlds Bid event.[125] |
| December 2017 | Sea to Sky | Event Producer | The largest All Star Cheerleading competition in Western Canada and offers 1 World Bid event.[126] |
| January 2018 | Epic Spirit Ventures<br><br>EPIC Gear | Event Producer & Camps<br><br>Apparel | Offers a scaled-down, more affordable event experience than Varsity currently offers.[127] |

---

[120] See Varsity Spirit Internal Acquisition Memos for time period 2015-2018, CB00075991 (Katz Exhibit 21), at CB00075993

[121] *Ibid.*, at CB00075995.

[122] *Ibid.*, at CB00075997.

[123] *Ibid.*, at CB00075998.

[124] *Ibid.*, at CB00076000.

[125] *Ibid.*, at CB00076001.

[126] *Ibid.*, at CB00076002.

[127] *Ibid.*, at CB00076004.

HIGHLY CONFIDENTIAL

71.     As the owner of Varsity during these acquisitions, Charlesbank was aware of and facilitated these transactions. According to a February 2017 Varsity presentation, "Growth Through Acquisition," acquisitions between $2.5 million and $5 million required Charlesbank's approval and any acquisitions over $5 million required approval of the entire Board of Directors of Varsity.[128] Even for smaller acquisitions, Charlesbank maintained an "intense and regular involvement in each portfolio company."[129] Further, based on information contained in the record of this matter, in December of 2015, Charlesbank was instrumental in assisting Varsity to secure an additional $125 million loan facility to fund future acquisitions.[130]

### 2.    BAIN

72.     Bain purchased Varsity in 2018 for an estimated $2.5 billion.[131] Bain is a private investment firm that specializes in private equity, venture capital, credit, public equity, impact investing, life sciences, and real estate.[132] They invest across a range of industry sectors and geographic regions. As of June, 2022, Bain had approximately $160 billion in assets under management. The firm was founded in 1984 by partners of Bain & Company, a consulting firm.[133]

73.     According to Bain's website, it takes a "consulting-based approach to private equity investing, partnering closely with management teams to offer the insights that challenge

---

[128] *See,* Presentation, "Varsity Brands Growth Through Acquisition," dated Feb. 16, 2017, CB00000188 (Kalvelage Exhibit 18), at CB00000196.

[129] *See,* Email from K. Ahearn to J. Beer, dated May 17, 2017, CB00044502 (Kalvelage Exhibit 2), at CB00044517.

[130] *See,* CB00041045 (Beer Exhibit 11).

[131] CNBC, *Bain to acquire Varsity Brands, a top maker of cheerleader uniforms and school spirit items, for roughly $2.5 billion,* Jun. 19, 2018, https://www.cnbc.com/2018/06/19/bain-nears-2-point-5-billion-deal-for-cheer-uniform-leader-varsity-brands.html.

[132] *See,* BAIN, About Us, https://www.baincapital.com/about-us.

[133] *Ibid.*

**HIGHLY CONFIDENTIAL**

conventional thinking, build great businesses and improve operations."[134]

74.    At the time of its acquisition of Varsity, Bain stated "We are excited to partner with the company's experienced, committed management team to amplify the company's ecommerce operations and digital expansion, while accelerating its growth through complementary acquisitions and organic initiatives to become the go-to source for every school's sport, spirit and achievement needs."[135] Bain was further motivated to "build the digital side of the business, creating a heftier platform to buy team merchandise online, similar to professional merchandise online retailer Fanatics."[136] According to Bain's internal investment memo, Bain saw growth in both the BSN equipment line as well as Varsity Spirit due to an increase in participation rates among athletes as well as an increase in total spending per athlete.[137]

75.    Bain further stated when acquiring Varsity, "we approach investing as strategists with an "operator's mindset," and we believe this differentiated approach has been a key driver of our strong investment track record. Our investment philosophy has always been centered on backing industry leaders with differential competitive advantages seeking to drive growth in complex, dynamic environments."[138]

---

[134] *Ibid.*

[135] *See,* Bain, *Varsity Brands, the Leader in Elevating Student Experiences in Sports, Spirit, and Achievement, to be Acquired by Bain Capital Private Equity*, Jun. 19, 2018, https://www.baincapital.com/news/varsity-brands-leader-elevating-student-experiences-sports-spirit-and-achievement-be-acquired.

[136] *See,* CNBC, *Bain to acquire Varsity Brands, a top maker of cheerleader uniforms and school spirit items, for roughly $2.5 billion*, Jun. 19, 2018, https://www.cnbc.com/2018/06/19/bain-nears-2-point-5-billion-deal-for-cheer-uniform-leader-varsity-brands.html.

[137] *See,* Description of All-Star and Competitive Cheer, undated, CB00485513, at CB00485518, CB00485544.

[138] *See,* Presentation "Project IMPACT Refresh Proposals," dated June 2018, JEFF00225986, at JEFF00225993.

**HIGHLY CONFIDENTIAL**

# VIII.  ASPECTS OF VARSITY'S OPERATIONAL MODEL

## A.    OPERATION OF CHEER COMPETITIONS

### 1.    Bid System

76.    To participate in Varsity's most prestigious Cheer Competitions, including premier competitions like Worlds and Summit, teams must receive an invitation to compete called a "bid."[139]  In many cases, bids are essentially scholarships for competition participants, as they can be fully paid, partially paid, or at-large.  Fully paid bids cover all competition expenses, including travel and lodging.[140]  Partial bids typically include only the entry fee.[141]  At-large bids are invitations to compete at a prestigious event, but do not cover any of the competition expenses.[142]

77.    Varsity, as an entity, and through its control of the USASF board, controls the system through which competitions are assigned bids.[143]  Varsity, through the USASF, dictates the number of bids that can be awarded, the events at which they can be awarded, and the distribution of available bids among those events.  Substantially all of the bids are assigned to Varsity owned or controlled competitions, and, as a result, only these competitions have the ability

---

[139] WORLDWIDE SPIRIT ASSOCIATION, Understanding Worlds and Summit Bids, accessed May 10, 2022, https://www.wsacheer.com/national-cheerleading-competition/understanding-worlds-summit-bids/.

[140] *Ibid.*

[141] *Ibid.*

[142] *Ibid.*

[143] Currently, the USASF Board is made up of 13 voting seats: the Chairman, one senior staff member, four gym owners, and seven event producers.  All seven event producer Board seats are controlled by Varsity.  ; *See,* Deposition of J. Chadwick, Apr. 15, 2022, at 120:10-120:17 ("The USASF Board is limited to 13 seats.  This can only be increased or decreased by unanimous consent of the Board."); *see also,* Deposition of J. Parrish, Mar. 2, 2022, at 61:18-62:3 (re composition of the USASF Board: "Re composition of USASF BOD:  "[H]istorically, you will find the the  USASF Board has always been made up of at least seven ... current Varsity employees at the time the Board was in existence for that year.  So if you ... look from 2003 all the way to now, you will find that on the Board sit seven Varsity employees, always and forever. ... I don't know exactly how many Network Agreement gym owners sit on the Board, but I can promise you that ratio would be extremely high.").

**HIGHLY CONFIDENTIAL**

to provide athletes with bids to the most prestigious events.  For example, Varsity controls approximately 80% of Worlds bids and 100% of  Summit and U.S. Finals bids.[144]

78.    Historically, a significant part of Varsity's acquisition strategy has been to acquire independent event producers that host bid events.  A September 2016 email discussing the potential acquisitions of Aloha Productions, Spirit Celebration, and All Thing Cheer & Dance states that "if [Varsity] were to acquire Aloha, SC, and ATC [Varsity] would acquire 5 new Worlds bid events for a very reasonable price, and then change the dynamics of how the USASF permits Worlds Bid distribution."[145]  By the end of April 2017, Varsity had acquired each of these companies.[146] Internal acquisition memos for each transaction note bid events as part of the transaction rationale.[147]

79.    Varsity's control over the bid system is evident in an internal January 2019 email chain discussing potentially transitioning from a bid system to a points system.[148]  Over the course of multiple emails, various Varsity employees discuss the logistics of a points system and evaluate the pros and cons to Varsity.[149]  There are no USASF employees included on these emails.  One email summarizes the issue as "basically taking something finite (the amount of bids) and transferring it over to something that **we can grow and shrink as much as we want** (points)."[150]

---

[144] Deposition of Steven H. Peterson, at 263: 12-263;23.

[145] Email from J. Webb dated Sep. 8, 2016, VAR00272846 (Nichols Exhibit 14), at VAR00272847.

[146] Varsity Spirit Internal Acquisition Memos for the time period 2015-2018, CB00075991 (White Exhibit 28), at CB00075991.

[147] *Ibid.*, at CB00075995, CB00075997- CB00075998.

[148] Email from K. Harrison dated Jan. 23, 2019, VAR00095101, at VAR00095101- VAR00095107.

[149] *Ibid.*

[150] Ibid., at VAR00095101, at VAR00095101 (Emphasis added).

**HIGHLY CONFIDENTIAL**

80.     Varsity's relationship with the USASF, and the means by which Varsity administers the assignment and awarding of bids creates a conflict of interest, and puts non-Varsity event producers at a disadvantage.  Varsity's control of nearly all of the Cheer Competitions at which bids can be earned makes it extremely difficult for non-Varsity event producers to attract participants to their events.

## 2.    Rebate Programs

81.     Varsity offers financial incentive in the form of rebates to teams that meet certain thresholds of participation at Varsity competitions, attending Varsity camps, and purchasing Varsity apparel.  Under these programs, All-Star gyms sign agreements wherein such gyms agree to attend Varsity competitions and purchase Varsity apparel in exchange for rebates.

82.     Varsity targets certain, more significant All-Star gyms to sign "Network Agreements."  These gyms receive rebates in exchange for agreeing almost exclusively to attend Varsity competitions and camps, as well as purchase Varsity apparel. The more events attended, and the more apparel purchased, the larger the rebate to that gym.

83.     Network Agreements require the gyms to have their teams attend at least five Varsity competitions per season and spend at least $30,000 in registration fees for Varsity events.[151]  As All-Star teams typically attend no more than six competitions per season, the requirements of the Network Agreements make it difficult for such teams to attend non-Varsity competitions.

---

[151] *See e.g.,* Network Agreement 2016 Varsity Network Agreement by and between Varsity Spirit and Carolina All Stars dated May 11, 2016, VAR00079804, at VAR00079804.

**HIGHLY CONFIDENTIAL**

84.     In addition, certain All-Star gyms that have not entered into Network Agreements are invited to participate in another Varsity rebate program called the "Family Plan." The Family Plan is available to every gym in the country. The Family Plan requires that participants attend at least six Varsity events per year in exchange for a combination of cash rebates and discounts on competitions and apparel.[152] As a result, participants in the Family Plan must devote nearly all of their competition dates in a season to Varsity events in order to satisfy the Family Plan requirements to receive rebates and discounted pricing.

85.     Like the Network Agreements, the effect of the Family Plan is not only to reward loyal customers, but also to prevent teams from attending non-Varsity events or purchasing non-Varsity apparel. Notes from a 2020 "Varsity Family Plan 2.0" strategy meeting include: "Get rid of any competitors, make it so that teams couldn't go to IEP."[153]

### 3.    Cheer Competition Rules

86.     Varsity, both independently and via the USASF, has enacted competition rules that exclude or limit non-Varsity entities. For example, the USASF does not make competition rules available to non-USASF member event producers, thus making it virtually impossible for these independent event producers to introduce and establish alternative cheer competitions.[154] To further protect themselves, the USASF copyrighted its competition rules.[155] As a result, non-

---

[152] Email from B. Eliza dated Oct. 25, 2018 attaching Varsity All Star presentation, VAR00097495 (LeTard Exhibit 17), at VAR00097512 – VAR00097513.

[153] An "IEP" is an Independent Event Producer; Email from B. Eliza dated Apr. 21, 2020 attaching document titled "Varsity Family Plan 2.0," VAR00199570 (Elza Exhibit 28), at VAR00199570.

[154] *See,* Email from Jim Chadwick re "Non Sanctioned Events, dated Sept. 4, 2018, VAR00082292 (Chadwick Exhibit 43), at VAR00082292 ("We attempt to deny non sanctioned event producers and non member programs access to [USASF] programs and resources, including member communications, meetings, rules, and judges.")

[155] Deposition of K Wilson dated April 14, 2022, at 97:7 – 97:8.

**HIGHLY CONFIDENTIAL**

USASF member event producers are not allowed access to these rules and cannot use these rules at their events under the guise of trademark and copyright protections. To participate in a competition held by a non-USASF, non-Varsity, event producer, cheer athletes would be required to comply with a new and different set of rules, further disincentivizing teams from participating at these events. Additionally, there is no transparency regarding how the rules are determined. Varsity, via the USASF, also controls the training process for cheer competition judges.[156]

### 4.    Cheer Competition Scheduling

87.    The USASF does not allow event producers to host a bid qualifying cheer competition within 500 miles of another bid qualifying cheer competition held on the same weekend.[157] This limitation, combined with Varsity's large portfolio of event producers and broad geographic reach makes it nearly impossible for non-Varsity event producers to conduct alternative events. In order to gain additional bids, an independent event producer would need to acquire other non-Varsity event producers that also host bid qualifying events.[158] However, due to Varsity's substantial acquisition activity, there are relatively few remaining non-Varsity event producers that host bid qualifying cheer competitions.

---

[156] Deposition of J. Parrish dated Mar. 3, 2022, at 108:16 – 109:1.

[157] USASF Sanctioning Committee's Approval Process & Criteria for Tier 1 Event Producers and & [*sic*] Worlds Bid Eligibility for the 2020-2021 season, USASF_00003075, at USASF_00003077. ("Tier 1 Championships will be protected, within a four week window on either side of the current bid giving event, for a 200 mile radius. In addition, Tier 1 events will be protected for a 500 mile radius from other bid giving events on the same weekend.").

[158] Email from B. Elza dated Feb. 2, 2015, VAR00439212, at VAR00439212. ("The only opportunity to add a Worlds bid is to acquire one.").

**HIGHLY CONFIDENTIAL**

88.    In addition to geographic limitations, Varsity, in the past, has strategically scheduled its bid earning events to conflict with events of non-Varsity event producers.[159]  A 2019 email describes Varsity leveraging the finite number of bids to "sabotage other events"[160]:

> During the early stages of Summit and before the Jam acquisition, Varsity strategically dropped Summit event less than 10 miles away from Jam's Battle at the Capital.[161]

These scheduling practices by Varsity make non-Varsity events less attractive to participating teams and create barriers to entry.

### B.    OPERATION OF CHEER CAMPS

89.    Which Cheer Camps each athlete attends are typically determined by their gym or school.  Currently, Varsity offers additional rebates to teams that participate in Varsity camps.[162]  The more teams and the more athletes that a gym or other team sponsor sends to a Varsity camp, the greater the rebate.

90.    In order for a team to secure a bid to certain of the more prestigious competitions, including national championships, Varsity requires at least 75% of the members of each team attend Varsity Cheer Camps.[163]  The skills learned or perfected at these camps are an important

---

[159] *See e.g.,*  Email from B. Elza dated Feb. 2, 2015, VAR00439212, at VAR00429212.  ("We have placed a competing event in Toms River, NJ the same weekend each year…");  Email from K. Brubaker dated Sep. 14, 2017, VAR00375328 (Seely Exhibit 48), at VAR00375328 - VAR00375329  (B. Elza asks, "Will you make sure we have events on top of these Cheer Derby events."  K. Brubaker replies, "… the highlighted Varsity events are currently on the same weekend and going head-to-head with Cheer Derby.").

[160] Email from K. Harrison dated Jan. 23, 2019, VAR00095101, at VAR00095101.

[161] *Ibid*.

[162] *See,* VAR00074687.

[163] VAR00160799 (Duhon Exhibit 5), at VAR00160803 (Q&A: Varsity Spirit/NFHS Squad Credentialing Program, attachment to Feb. 11, 2019 email from B. Duhon to M. Burgess).

**HIGHLY CONFIDENTIAL**

prerequisite for securing a bid.[164]  Varsity has also incentivized teams to attend its camps by awarding national championship bids to camp attendees.[165]  Both the 75% attendance requirement and the potential to secure bids to prestigious events at  Varsity cheer camps makes attending non-Varsity camps less attractive to cheer athletes and their teams.

### C.    OPERATION OF CHEER APPAREL

91.    Cheer Competitions represent important marketing and sales opportunities for cheer apparel vendors.  At many competitions, there are showrooms and booths where cheer apparel and other related merchandise is sold. Currently, Varsity bans non-Varsity vendors from selling, displaying, or otherwise marketing their products at Varsity sponsored or controlled competitions, including the USASF end-of-season events.[166]  This creates an artificial barrier to entry for non-Varsity entities in the cheer apparel market.

92.    Additionally, as described above, Varsity agrees to pay gyms and schools rebates for purchasing only Varsity apparel.  These agreements make it cost prohibitive, and, in certain instances, contractually impossible, for gyms and schools to purchase cheer apparel from non-Varsity vendors.

---

[164] *See, e.g.,* Deposition of B. Duhon, Mar. 25, 2022, at 25:12-25:19 (testifying that the only way for teams to receive a bid to attend the high school nationals is by attending a camp or clinic and receiving an NFHS credential)id., at 25:23-26:1 (testifying that the only way for teams to receive a bid to attend the college nationals is by attending a camp or sending in a video).

[165] *Ibid.*; *see also, e.g.,* VAR00073032, at VAR00073032 (Nationals Bid Format checklist for Varsity camps).

[166] *See, e.g.,* Deposition of J. Parrish, Mar. 2, 2022, at 121:23-122:24 (re forcing out apparel vendors Rebel and Nfinity from Worlds); ibid., at 88:8-88:10 ("Tate Chalk at Nfinity has been asked to leave competitions because he's the shoe competitor."); ibid., at 88:11-88:25 (Varsity's marketing team  will make the decision whether a vendor will be asked to leave and then would ask the security officer to ask such vendors to leave); Deposition of J. Hill, Mar. 21, 2022, at 330:16-331:24 (testifying that Varsity set up its own vendors at its competitions, but not non-Varsity vendors and that at big events competitors would set up pop up spaces nearby, but were not allowed inside the event).

**HIGHLY CONFIDENTIAL**

93.     Varsity uses these methods to limit the access that non-Varsity vendors have to the cheer apparel market.  By leveraging their control over, and influence with respect to, Competitive Cheer and Cheer Competitions, Varsity is able to similarly control and dictate critical aspects of the cheer apparel market.

## IX.    RECOMMENDED CHANGES TO VARSITY'S OPERATIONAL MODEL

94.     I have been asked to develop recommendations for structural relief as part of my assessment of the Competitive Cheer industry and Varsity's alleged anti-competitive conduct. These recommendations follow in the sections below.

### A.    <u>CHEER COMPETITIONS</u>

#### 1.    Rebates

95.     Currently, Varsity offers additional rebates to teams that participate in a certain number of Varsity competitions.

96.     To provide relief, Varsity can offer rebates based on the amount spent on competitions.  In addition, Varsity cannot offer or require exclusive agreements of the type described above with gyms or schools.  Alternatively, rebates can be abolished altogether. However, the elimination of rebates may ultimately be detrimental to athletes and families that presently are eligible to receive rebates.

#### 2.    Competition Rules

97.     Currently, the USASF does not make competition rules available to non-member independent event producers, thus substantially restraining the ability of independent event producers to hold Cheer Competitions. Additionally, there is no transparency in how the rules.

98.     To provide relief, the USASF, or any future governing body, can make competition rules available to all event producers, whether or not they are USASF members, at the beginning

35

**HIGHLY CONFIDENTIAL**

of each competition season, and can be transparent about the rule changes and the reasons for any such changes.

### 3.    Competition Judging

99.    Currently, Varsity controls the training process for competition judges.

100.    To provide relief, Varsity can no longer control the training of Cheer Competition judges.  Judges can be trained by an entity independent from Varsity. In the short term, an independent monitor can oversee the training process and ensure fair training practices.

### 4.    Competition Accommodations

101.    Currently, Varsity imposes a stay-to-play rule at many of its competitions, requiring families to stay at only those accommodations approved by Varsity.  This often results in families paying more for such accommodations than they would otherwise have to pay.

102.    To provide relief, Varsity can no longer require families to stay at specific accommodations, designated by Varsity, to participate in Varsity sponsored or controlled Cheer Competitions.

### B.    <u>CHEER CAMPS</u>

### 1.    Rebates

103.    Currently, Varsity offers additional rebates to teams that participate in Varsity Cheer Camps.  The availability of these rebates increases the difficulty for competing camps to attract cheer athletes.

104.    To provide relief, Varsity can only offer rebates based on the amount of money spent on camps.  In addition, Varsity cannot offer or require agreements of the type described above with gyms or schools.  Alternatively, rebates can be abolished altogether.  However, the

**HIGHLY CONFIDENTIAL**

elimination of rebates may ultimately be detrimental to athletes and families that presently are eligible to receive rebates.

### 2. Bid System

105.    Currently, Varsity requires that at least 75% of the members of a team attend its Cheer Camps in order for that team to qualify for a bid to national competition.  This requirement makes non-Varsity camps less attractive to member of Competitive Cheer teams.

106.    To provide relief, Varsity can no longer require Competitive Cheer team members to attend only Varsity Cheer Camps in order to qualify for a national championship bid.  Rather, the members of any team meeting the applicable bid requirements (See IX. d., below) can qualify for a bid to the national championships regardless of whether or not such camp is owned or controlled by Varsity, or what percentage of team members attend such camp.

### C.    <u>CHEER APPAREL</u>

### 1.    Event Marketing

107.    Currently, Varsity bans non-Varsity vendors from marketing their products at Varsity sponsored or controlled competitions and at USASF end-of-season events.  This creates a barrier to entry non-Varsity vendors of apparel.  Showrooms at competitions and end-of-season events potentially provide important marketing and sales opportunities for such non-Varsity vendors.

108.    To provide relief, Varsity sponsored or controlled competitions can allow non-Varsity vendors to market and sell their products at Varsity sponsored or controlled competitions and end-of-season events.  Alternatively, a certain percentage of booths or showrooms at Varsity sponsored or controlled competitions and end-of-season events can be reserved for, and made to, non-Varsity vendors of Cheer Apparel.

37

**HIGHLY CONFIDENTIAL**

### 2. Rebates

109. Currently, Varsity offers gyms and schools rebates for purchasing only Varsity apparel through exclusive purchasing agreements.

110. To provide relief, Varsity can only offer rebates based on the total dollar amount purchased. In addition, Varsity cannot offer or require agreements of the type described above with gyms or schools. Alternatively, rebates can be abolished altogether. However, the elimination of rebates may ultimately be detrimental to athletes and families that presently are eligible to receive rebates.

### D. <u>COMPETITION BIDS</u>

### 1. Bid System

111. Currently, Varsity, itself, and through its control of the USASF board, controls the system through which competitions are assigned bids and teams are awarded bids.[167] Varsity's control of the bid assigning and bid awarding process is a conflict of interest and puts non-Varsity event producers at a disadvantage.

112. To provide relief, Varsity cannot have any involvement with or control over the bid assigning and bid awarding process. Any current or subsequent governing body of Competitive Cheer can operate independently from Varsity.

---

[167] Currently, the USASF Board is made up of 13 voting seats: the Chairman, one senior staff member, four gym owners, and seven event producers. All seven event producer Board seats are controlled by Varsity. Deposition of J. Chadwick, Apr. 15, 2022, at 120:10-120:17 ("The USASF Board is limited to 13 seats. This can only increased or decreased by unanimous consent of the Board."). *See also,* USASF_0003245 (Chadwick Exhibit 5) (USASF Board Operating Guidelines and Approved Bylaw Amendments).

**HIGHLY CONFIDENTIAL**

### 2. Number of Bid Earning Events

113.    Currently, Varsity's control of nearly all competitions at which bids can be earned makes it almost impossible for non-Varsity event producers to attract participants.

114.    To provide relief, Varsity can only host a portion of bid earning competitions.  The remaining competitions where bids are awarded can be hosted by non-Varsity event producers. This requirement can be monitored by the USASF, if it is independent of Varsity, or by another independent rule-making body.

### 3. Scheduling of Bid Earning Events

115.    Currently, Varsity purposefully schedules its bid earning events to conflict with events of non-Varsity event producers.  This conduct by Varsity makes scheduling and producing successful Cheer Competition events more difficult for non-Varsity event producers then would otherwise be the case.

116.    To provide relief, Varsity can determine its event schedule without reference to the schedules of other event producers.  If the event schedules of non-Varsity event producers are released prior to Varsity's event schedule, Varsity cannot schedule a bid earning event in the same location or at the same time as any previously scheduled event.

### 4. Bid Earning Cheer Camps

117.    Currently, teams can earn bids to certain Varsity national competitions by attending Varsity camps.  This makes non-Varsity camps less attractive to cheer teams.

118.    To provide relief, Varsity can no longer exclusively offer bids to teams that participate in Varsity Cheer Camps.  Non-Varsity camps can be permitted to offer such bids as well.

**HIGHLY CONFIDENTIAL**

E.    **GOVERNANCE AND COMPLIANCE**

1.    **Financial Support**

119.    Currently, Varsity effectively controls the Board of Directors of the USASF, the current governing body of Competitive Cheer.[168]  The USASF was initially funded by Varsity. Many of USASF's financial processes are intertwined with Varsity's processes and operations, and many former Varsity employees are employed at the USASF.

120.    To provide relief, Varsity cannot provide any financial support of the USASF, or any successor governing body.  If the USASF continues as a governing body of Competitive Cheer, Varsity can detach financially from the USASF.  Additionally, the USASF can restructure the Board of Directors to better represent the interests of non-Varsity event producers, athletes, coaches, gyms, schools, and families.

2.    **Board Composition**

121.    Currently, the USASF Board consists of 13 voting seats: The Chairman, one senior staff member, four gym owners, and seven event producers.  All seven event producer Board seats are presently controlled by Varsity.  Two of the Board seats are permanent and are appointed by the Chairman of the Board.[169]

122.    To provide relief, the USASF, or any future governing body, can restructure the Board to better represent non-Varsity market participants and to ensure that no single Competitive Cheer market participant has inappropriate influence or control regarding governance decisions. This objective can also be achieved by appointing an industry governance monitor to the Board.

---

[168] Deposition of B. Elza dated Nov. 16, 2021, at 157:3 – 157:15, 171:8 – 171:12.

[169] Deposition of J. Chadwick dated April 15, 2022, at 119:2 – 119:14.

**HIGHLY CONFIDENTIAL**

### 3.    Transparency

123.    Currently, Varsity offers little or no transparency regarding the specific Competitive Cheer entities where they have relationships and/or control, including USA Cheer.

124.    To provide relief, Varsity can regularly disclose information to Competitive Cheer industry participants regarding Varsity's affiliations, decision-making processes and governance structure.

### 4.    Regulation

125.    Currently, there is no independent regulator to monitor Varsity's actions and its dominant role in the Competitive Cheer industry.  Additionally, there is presently no independent regulator which monitors the Competitive Cheer industry.

126.    To provide relief, Varsity can develop and implement a robust monitoring and reporting program with regard to Varsity's role in the Competitive Cheer market, and those entities affiliated with Varsity and/or with whom Varsity has a controlling interest.  Additionally, Varsity's activity can be overseen by an independent monitor to assure Varsity's compliance with any agreed upon limitations or other remedial action.

41

**HIGHLY CONFIDENTIAL**

Dated:  June 20, 2022

James H. Aronoff

**HIGHLY CONFIDENTIAL**

**APPENDIX A**

# James H. Aronoff

### E-mail: jim.aronoff@cohnreznick.com
### (917) 287-3431

## *Professional Highlights*

Senior, deal-tested, capital markets professional with more than 35 years of experience in all aspects of asset origination, servicing and finance markets, including senior management, capital raising, strategic planning, product development, trading, structuring, valuation, due diligence, sales, and negotiating transactions.

Diverse skills gained through experience as Chairman and CEO of a finance company, senior investment banker, consultant, trader, attorney, and managing director of a major bond insurer.

Possess superior credit analysis, structuring, valuation, and negotiation skills in connection with structured finance transactions, and the origination, acquisition, management, and disposition of performing, sub performing, and distressed consumer, residential, and commercial assets, including subprime loans.

Significant success in identifying market opportunities, designing start-ups, and building, evaluating, and improving profitable asset origination, acquisition, finance, and servicing operations. Effectively implemented new technologies and personnel "team building" approaches to create successful working environments.

## *Professional Experience*

**CohnReznick LLP,** New York, New York                                      2021 to Present
**Managing Director**

Managing Director in CohnReznick's Restructuring and Dispute Resolution practice. Provide attorneys and other clients with technical and industry expertise to understand and evaluate relevant issues related to complex litigation matters, with a focus on capital markets, secured lending, financial institutions, structured finance, and securitizations, including RMBS, CMBS, CLOs, CDOs, and other ABS. Assist clients by addressing business, due diligence, audit, and valuation issues within a potential dispute, and providing expert witness testimony. Supervise risk management, portfolio valuation, regulatory compliance, and transaction oversight services within the firm's financial services advisory practice. Provide rigorous analyses based upon significant capital markets and financial services industry knowledge and business acumen derived from decades of hands-on experience. Provide comprehensive support throughout all stages of an engagement, from assessment of facts, through determination of strategic options and implementation.

**Friedman LLP,** New York, New York                                      2020 to 2021
**Managing Principal**

Managing Principal of the Financial Institutions Consulting practice. Provide attorneys and other clients with expert witness testimony and comprehensive support throughout all stages of an engagement, from assessment of facts, through determination of strategic options and implementation.

**Forensic Risk Alliance,** New York, New York                                      2019 to 2020
**Partner**

Provide attorneys and other clients with technical and industry expertise to understand and evaluate relevant issues related to complex litigation matters. Assist clients by addressing business, due diligence, audit and valuation issues within a potential dispute, and providing expert testimony. Supervise risk management, portfolio valuation, regulatory compliance and transaction oversight services within FRA's financial services advisory practice.

*Professional Experience (cont'd.)*

**Baker Tilly Virchow Krause, LLP,** New York, New York                    2016 to 2019
**Principal and Practice Leader**

Principal and Practice Leader of the Financial Institutions Consulting practice. Provide attorneys and other clients with expert witness testimony and comprehensive support throughout all stages of an engagement, from assessment of facts, through determination of strategic options and implementation.

**Duff & Phelps,** New York, New York                    2012 to 2015
**Managing Director**

Senior member of Financial Services Industry Dispute and Litigation group.

**MTGX, LLC**, Katonah, New York                    2000 to Present
**Managing Partner**

Founded and manage advisory firm providing capital markets solutions to small and medium sized specialty finance companies. In addition, the firm provides sophisticated and technical expertise to larger financial institutions on an out-source basis. Services offered by MTGX include: risk assessment and management strategies; asset and portfolio valuation; analysis and evaluation of servicing and collection arrangements; expert witness testimony; asset sale advisory services; new product development; operational due diligence; capital raising (equity or debt); and distressed portfolio resolution, remediation and disposition strategies.

**FCS Advisors, Inc.,** New York, New York                    2009 to 2012
**Managing Director**

Provided senior leadership and strategic oversight to the advisory services and consulting business. Sourced and executed fee-based transactions. Services offered included a variety of strategic development, asset management and administrative services on behalf of clients who were typically stakeholders in portfolios of whole loans, securities (including CMBS and RMBS), or other structured products (particularly in the context of workouts). Engagements included: litigation support and dispute resolution, the creation and execution of remediation/liquidation strategies, management of wind-downs/liquidations, asset sales, data management, portfolio surveillance and oversight, re-packaging and/or "de-packaging" assets, independent valuations, and due diligence and operational reviews of asset managers, counterparties, and vendors.

**Garnet Capital Advisors**, New York, New York                    2005 to 2006
**Managing Director, Structured Finance**

Directed and managed Garnet's Structured Finance Group, which provides valuation, liquidation, and advisory services to stakeholders in structured transactions. The Group's primary focus is on distressed securities where the assets or transaction parties are underperforming.

**Portfolio Reconnaissance Services, Inc.**, Shelton, Connecticut                    2003 to 2004
**Founder and Principal**

Conceived, built, and capitalized a start-up to provide investors and portfolio managers with the critical insight required for continuous improvement in asset performance. The services provided by Portfolio Reconnaissance Services, or Recon, include transaction oversight and management, monitoring, consulting and analytics, expertise in evaluating and servicing loan portfolios, advanced risk mitigation techniques, and value-driven, actionable intelligence. Recon's services support institutional investors with respect to whole loan portfolios, fixed income instruments, and structured securities, including Asset Backed Securities (ABS), Residential Mortgage Backed Securities (RMBS) and Commercial Mortgage Backed Securities (CMBS). In 2004, Recon was sold to a private equity firm.

*Professional Experience (cont'd.)*

**FC Capital Corp.**, Valhalla, New York                                          1997 to 2000
**Chairman of the Board and Chief Executive Officer**

Raised $20 million in equity capital and co-founded a residential mortgage loan origination, acquisition, and servicing company. Established multiple credit facilities to finance inventory of loans and securities. Sold and securitized over $500 million of subprime residential loans. Acquired Home First National, a retail loan originator. Articulated and implemented a strong credit and risk management culture. Introduced new technological approaches to building and supporting marketing, underwriting, investing, and servicing capabilities. Sold to a large, public financial services company in 2000.

**Nomura Securities International, Inc.**, New York, New York               1993 to 1997
**Managing Director, Fixed Income Structured Finance**

Built a business of financing, trading and underwriting non-traditional consumer and commercial assets. Senior manager responsible for all aspects of this multi-billion-dollar operation, including daily P/L and balance sheet management, creation and implementation of annual business plans and operating budgets, long-term strategic planning, and all personnel matters, including hiring, evaluation, and compensation issues. Business units included: subprime residential mortgage conduit; ABS/MBS trading desk; whole loan trading; asset-backed finance and warehouse group; and merchant banking operation. Successfully liquidated a $1 billion portfolio of distressed consumer, residential and commercial assets comfortably within projected timelines and proceeds estimates. Obtained Series 7, 12, 24 and 63 NASD (now, FINRA) licenses.

**Financial Security Assurance, Inc.**, New York, New York                  1989 to 1993
**Managing Director and Senior Business Development Officer**

Developed market strategies, business plans and budgets for Residential Mortgage Group. Responsibilities included: credit analysis, risk evaluation, tracking competition, analyzing relevant markets, and identifying profitable opportunities and niches. Devised new products and unique applications of existing products. Marketed, structured, underwrote, negotiated, and closed numerous unusual and complex transactions, including many unique, innovative, and "first time" transactions for FSA. Personally responsible for transactions representing over $3 billion aggregate par insured, which generated present value premiums of more than $50 million.

**Kidder Peabody & Co.**, New York, New York                               1987 to 1989
**Vice President, Kidder Peabody Mortgage Capital Corp.**

Drafted and negotiated transaction documents relating to numerous structures, including servicing released and servicing retained whole loan purchases and sales, and rated and unrated pass-through securities and CMOs, both with and without credit enhancement. Coordinated parties to transactions, including issuers, trading desk, sales force, rating agencies, insurers, lawyers, accountants and investors. Signatory authority with respect to all contracts, payments, borrowings and credit arrangements, including repurchase and reverse repurchase obligations, of Kidder Peabody Mortgage Capital Corp.

**Thacher Proffitt & Wood**, New York, New York                           1983 to 1987
**Associate Attorney, Mortgage Finance Department**

Structured real estate finance and secondary mortgage market transactions. Drafted and negotiated commitment letters, form documents, purchase, participation and servicing agreements and other related documents for private purchases and sales in whole loan, participation or pass-through formats for a broad range of assets, including residential, commercial and multifamily loans. Participated in the preparation of the registration package and prospectus for numerous public transactions, including pass-through certificates, CMOs and REMICs.

*Educational Experience (cont'd.)*

### *Education*

**Cornell Law School**, Ithaca, New York
*Juris Doctor*, Specialization in International Law

**Yale College**, New Haven, Connecticut
*Bachelor of Arts*, Dual Major in Economics and Political Science

**APPENDIX B**

# *James H. Aronoff*

## <u>Publications</u>

I have not authored, co-authored, edited or otherwise written any publications, articles, books, papers and/or presentations in the past ten years.

## <u>Prior Testimony and Expert Reports</u>

1. *MBIA Insurance Corp. v. Countrywide Home Loans*,
   No. 08/602825 (N.Y. Sup. Ct.)
   a. I submitted a written report and a written rebuttal report.
   b. I provided deposition testimony on two separate occasions.

2. *MBIA Insurance Corp. v. Residential Funding Co., LLC*,
   No. 08/603352 (N.Y. Sup. Ct.)
   a. I submitted two written reports.

3. *MBIA Insurance Corp. v. J.P. Morgan Securities LLC (f/k/a as Bear, Stearns & Co. Inc.)*, No. 12/64676
   (N.Y. Sup. Ct.)
   a. I submitted a written report.
   b. I provided deposition testimony.

4. *Massachusetts Mutual Life Insurance Co. v. Countrywide Financial Corp.*, Case No. 11-
   ML-2265-MRP (MANx) (C.D. Cal.).
   a. I submitted a written report.
   b. I provided deposition testimony.

5. *Massachusetts Mutual Life Insurance Co. v. DB Structured Products, Inc., et al.*, Civil Action
   No. 3:11-cv-30039-PBS (D. Mass.)
   a. I submitted a written report and an amended written report.
   b. I also provided a written declaration.
   c. I provided deposition testimony on two separate occasions.

6. *Massachusetts Mutual Life Insurance Co. v. Countrywide Financial Corp., et al.*, Civil Action
   No. 3:11-cv-30215-PBS (D. Mass.)
   a. I submitted a written report.
   b. I provided deposition testimony.

7. *In re Lehman Brothers Holdings Inc., et al.*,
   Case No. 1:08-bk-13555 (SCC) (S.D.N.Y.)
   a. I submitted three written declarations.
   b. I submitted a written report, a written rebuttal report and a written reply report.
   c. I provided deposition testimony on multiple occasions.
   d. I provided testimony in court on multiple occasions.

8. *Ambac Assurance Corporation v. Countrywide Home Loans, Inc. et al*,
   No. 10/651612 (N.Y. Sup. Ct.)
   a. I submitted a written report and a written rebuttal report.
   b. I provided deposition testimony.

9. *Ambac Assurance Corporation v. EMC Mortgage, LLC (formerly known as EMC Mortgage Corporation), et al.,* No. 650421/2011 (N.Y. Sup. Ct.)
   a. I submitted a written report, two written rebuttal reports and a written affidavit.
   b. I provided deposition testimony.

10. *Deutsche Bank National Trust Company, as Trustee for Morgan Stanley ABS Capital I Inc. Trust 2007-HE6 v. Decision One Mortgage Company, LLC*
    Civil Action No. 2013 L 005823 (Cir. Ct. Cook Cty., Ill.)
    a. I submitted a written report and a written rebuttal report.
    b. I provided deposition testimony.

11. *MBIA Insurance Corporation v. Credit Suisse Securities (USA) LLC, et al.,* No. 603751/09 (N.Y. Sup. Ct.)
    a. I submitted a written report and a written rebuttal report.
    b. I provided deposition testimony.
    c. I submitted a written direct testimony affidavit and a written rebuttal affidavit.
    d. I provided testimony in court.

12. *SDG Corporation v. Erato Corp., and Laurus Capital Management, LLC,* Civil Action No. 1:15-cv-06513-PAE (S.D.N.Y.)
    a. I submitted a written report.
    b. I provided deposition testimony.
    c. I provided testimony in court.

13. *In re The Bank of New York Mellon, in its capacity as Trustee or Indenture Trustee of 530 Countrywide Residential Mortgage-Backed Securitization Trusts, for Judicial Instructions under CPLR Article 77 on the Distribution of a Settlement Payment,* No. 150973/2016 (N.Y. Sup. Ct.)
    a. I submitted a written affidavit.

14. *Deutsche Bank National Trust Company, solely in its capacity as Trustee for Morgan Stanley Structured Trust I 2007-1 v. Morgan Stanley Mortgage Capital Holdings LLC, as Successor-by-Merger to Morgan Stanley Mortgage Capital Inc.,* Case No.: 14-CV-3020(LTS)(AJP) (S.D.N.Y.)
    a. I submitted a written report.
    b. I provided deposition testimony.

15. *U.S. Bank National Association, solely in its capacity as Trustee of the Home Equity Asset Trust 2007-1 (HEAT 2007-1) v. DLJ Mortgage Capital, Inc.,* No. 650369/2013 (N.Y. Sup. Ct.)
    a. I submitted a written report.
    b. I provided deposition testimony.

16. *Deutsche Bank National Trust Company, solely in its capacity as Trustee of Equifirst Loan Securitization Trust 2007-1 v. Equifirst Corporation, Equifirst Mortgage Corporation of Minnesota and Barclays Bank PLC,* No. 651957/2013 (N.Y. Sup. Ct.)
    a. I submitted a written report.

17. *Financial Guaranty Insurance Company v. Morgan Stanley ABS Capital I Inc., Morgan Stanley Mortgage Capital Holdings LLC, Morgan Stanley Co., Inc., Morgan Stanley, and Saxon Mortgage Services Inc.,* No. 652914/2014 (N.Y. Sup. Ct.)
    a. I submitted a written report.
    b. I submitted a written reply report.
    c. I provided deposition testimony
    d. I submitted a written rebuttal report

18. *Ambac Assurance Corporation and The Segregated Account of Ambac Assurance Corporation v. Countrywide Home Loans, Inc., Countrywide Securities Corp., Countrywide Financial Corp., and Bank of America Corp.,* No. 653979/2014 (N.Y. Sup. Ct.)
    a. I submitted a written report.
    b. I submitted a written reply report.
    c. I provided deposition testimony.

19. *Ambac Assurance Corporation and The Segregated Account of Ambac Assurance Corporation v. Nomura Credit & Capital, Inc. and Nomura Holding America, Inc.,* No. 651359/2013 (N.Y. Sup. Ct.)
    a. I submitted a written report.
    b. I submitted an expert rebuttal report.
    c. I provided deposition testimony.

20. *U.S. Bank National Association, solely in its capacity as Trustee of the Home Equity Asset Trust 2006-8 (HEAT 2006-8) v. DLJ Mortgage Capital, Inc.,* No. 654157/2012 (N.Y. Sup. Ct.)
    a. I submitted a written report.
    b. I provided deposition testimony.

21. *U.S. Bank National Association, solely in its capacity as Trustee of the Home Equity Asset Trust 2007-2 (HEAT 2007-2) v. DLJ Mortgage Capital, Inc.,* No. 651174/2013 (N.Y. Sup. Ct.)
    a. I submitted a written report.
    b. I provided deposition testimony.

22. *U.S. Bank National Association, solely in its capacity as Trustee of the CSMC Asset-Backed Trust 2007-NC1 (CSMC 2007-NC1) v. DLJ Mortgage Capital, Inc.,* No. 777000/2015 (N.Y. Sup. Ct.)
    a. I submitted a written report.
    b. I provided deposition testimony.

23. *Ambac Assurance Corporation and The Segregated Account of Ambac Assurance Corporation v. First Franklin Corporation, Bank of America, N.A., Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch Mortgage Lending, Inc., and Merrill Lynch Mortgage Investors, Inc.,* No. 651217/2012 (N.Y. Sup. Ct.)
    a. I submitted a written expert report.
    b. I submitted a written expert rebuttal report.
    c. I provided deposition testimony.

24. *U.S. Bank National Association, solely in its capacity as Trustee of the Morgan Stanley Mortgage Loan Trust 2007-2AX (MSM 2007-2AX) v. Morgan Stanley Mortgage Capital Holdings LLC, as Successor-by-Merger to Morgan Stanley Mortgage Capital Inc. and Greenpoint Mortgage Funding, Inc.* No. 650339/2013 (N.Y. Sup. Ct.)
    a. I submitted a written report.
    b. I provided deposition testimony.

25. *U.S. Bank National Association, solely in its capacity as Trustee of the Home Equity Asset Loan Trust 2007-3 (HEAT 2007-3) v. DLJ Mortgage Capital Inc.* No. 651563/2013 (N.Y. Sup. Ct.)
    a. I submitted a written report.
    b. I submitted a two written expert rebuttal reports.
    c. I provided deposition testimony on multiple occasions.

26. *BWCI PENSION TRUSTEES LIMITED in their capacity as Trustees of the Deferred Retirement Annuity Trust Scheme v. PROVIDENCE CAPITAL HOLDINGS, LLC, CAMBRIDGE CAPITAL GROUP, LLC, CAMBRIDGE CAPITAL GROUP ADVISORS, LLC, A&T DEVELOPMENT, LLC, HOWARD & ASSOCIATES ATTORNEYS AT LAW, P.A., and TIMOTHY HOWARD,* No. 502018CA004464XXXXMB*

(FL. 15th Circuit Ct)
    a.  I submitted a written affidavit.

27. *In the Matter of the Trust Established under the Pooling and Servicing Agreement relating to the Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2007-C30* Case No. 19-cv-1387 (D. Minn.)
    a.  I submitted a written report.
    b.  I submitted a written expert rebuttal report.
    c.  I provided deposition testimony.

28. *Deutsche Bank National Trust Company, solely in its capacity as Trustee for the Morgan Stanley ABS Capital I Inc. Trust, Series 2007-NCI v. Morgan Stanley ABS Capital I Inc.*, Index No. 650291/2013 (Sup. Ct. N.Y. Cnty.)
    a.  I submitted a written report.
    b.  I submitted two written expert rebuttal report.
    c.  I provided deposition testimony.

29. *Deutsche Bank National Trust Company, solely in its capacity as Trustee for the Morgan Stanley ABS Capital I Inc. Trust, Series 2007-NC3 v. Morgan Stanley ABS Capital I Inc.*, Index No. 651959/2013 (Sup. Ct. N.Y. Cnty.)
    a.  I submitted a written report.
    b.  I submitted two written expert rebuttal report.
    c.  I provided deposition testimony.

30. *RMBS Recovery Holdings I, LLC et al., v. HSBC Bank USA, National Association,* Case No. 2017-7583 (Circuit Ct. VA, Fairfax Cnty.)
    a.  I submitted a written report.

# APPENDIX C

# APPENDIX C

## <u>Materials Relied Upon</u>

**Previously Produced Documents**
- CB00000188
- CB00000275
- CB00000386
- CB00041045
- CB00044502
- CB00075991
- CB00330039
- CB00485513
- CB00537470
- JEFF00049649
- JEFF00225986
- USASF_00000192
- USASF_00001818
- USASF_00003075
- USASF_00032524
- VAR00008463
- VAR00009293
- VAR00009323
- VAR00073032
- VAR00074687
- VAR00079804
- VAR00082292
- VAR00095101
- VAR00097495
- VAR00129039
- VAR00160799
- VAR00199570
- VAR00272846
- VAR00275846
- VAR00351289
- VAR00351487
- VAR00371189
- VAR00375328
- VAR00415061
- VAR00424538
- VAR00439212
- VAR00584154

**Docket Entries in this Case**

- Class Action Complaint, *Jessica Jones, et al. v. Varsity Brands, LLC, et al.*, Case No. 2:20-cv-02892-SHL-tmp (W.D. Tenn.), filed Dec. 10, 2020

**Deposition Transcripts**

- Deposition of J. Chadwick, Apr. 15, 2022 (and associated exhibits)
- Deposition of M. Cota, Apr. 6, 2022 (and associated exhibits)
- Deposition of L. Craft, Apr. 8, 2022 (and associated exhibits)
- Deposition of B. Duhon, Mar. 25, 2022 (and associated exhibits)
- Deposition of B. Elza, Nov. 16, 2021 (and associated exhibits)
- Deposition of J. Hill, Mar. 21, 2022 (and associated exhibits)
- Deposition of J. Parrish, Mar. 2, 2022 and Mar. 3, 2022 (and associated exhibits)
- Deposition of S. Peterson, Mar. 9, 2022 (and associated exhibits)
- Deposition of K. Wilson, April 14, 2022 (and associated exhibits)

**SEC Filings**

- Riddell Sports Inc., SEC Form 10-K for the period ended Dec. 31, 1997
- Varsity Brands, Inc., SEC Form 10-Q for the period ended Jun. 30, 2003

**Websites**

- Bain, About Us, https://www.baincapital.com/about-us
- Bain, Portfolio – Varsity Brands, https://www.baincapitalprivateequity.com/portfolio
- BSN Sports, Our Brand Family, https://www.bsnsports.com/our-brand-family
- Charlesbank, About, See https://www.charlesbank.com/about/
- Charlesbank, Our Approach, https://www.charlesbank.com/approach/
- Charlesbank, Portfolio / Consumer – Varsity Brands, https://www.charlesbank.com/portfolio/companies/varsity-brands/
- Everipedia, The JAM Brands, https://everipedia.org/The_JAM_Brands
- UCA, About, https://www.varsity.com/uca/about/
- U.S. All Star Federation, About, https://www.usasf.net/about
- U.S. All Star Federation, Board Members, https://www.usasf.net/committee-board
- USA Cheer, About USA Cheer, https://www.usacheer.org/about
- Varsity, About Varsity Brands, https://www.varsitybrands.com/about
- Varsity, Corporate Partnerships, https://www.varsity.com/about/partners/
- Varsity, Our Camp Brands, https://www.varsity.com/school/camps/brands/
- Varsity, Varsity Brands - Achievement, https://www.varsitybrands.com/achievement.
- Varsity, Varsity Brands - Spirit, https://www.varsitybrands.com/spirit
- Varsity, Varsity Brands - Sport, https://www.varsitybrands.com/sport

**Other Secondary Sources**

- Bain, *Varsity Brands, the Leader in Elevating Student Experiences in Sports, Spirit, and Achievement, to be Acquired by Bain Capital Private Equity*, Jun. 19, 2018, https://www.baincapital.com/news/varsity-brands-leader-elevating-student-experiences-sports-spirit-and-achievement-be-acquired

- Charlesbank, *Charlesbank Capital Partners Completes Acquisition of Varsity Brands*, Dec. 15, 2014, https://www.charlesbank.com/news/2014/charlesbank-capital-partners-completes-acquisition-varsity-brands/
- CNBC, *Bain to acquire Varsity Brands, a top maker of cheerleader uniforms and school spirit items, for roughly $2.5 billion*, Jun. 19, 2018, https://www.cnbc.com/2018/06/19/bain-nears-2-point-5-billion-deal-for-cheer-uniform-leader-varsity-brands.html
- Diagram of Private Equity Fund Structure, https://www.writework.com/uploads/12/123617/english-diagram-private-equity-fund-structure-private-equity.png
- Inc. Magazine, *Meet Rebel, the $20 Million Cheerleading Startup Living Up to Its Name*, Mar. 2016, https://www.inc.com/magazine/201603/leigh-buchanan/rebel-athletic-custom-cheerleading-uniforms-startup.html
- Memphis Business Journal, *Varsity Brands acquires Athletic Championships and Premier Athletics*, Jul. 6, 2005, https://www.bizjournals.com/memphis/stories/2005/07/04/daily16.html
- Memphis Business Journal, *Memphis' Varsity gets another sibling, BSN*, May 16, 2013, https://www.bizjournals.com/memphis/news/2013/05/16/memphis-varsity-gets-another-sibling.html
- Powers, Hugh, "Private Equity," Mar. 2021
- PR Newswire, *Varsity Brands and Herff Jones Merge*, Jun. 15, 2011, https://www.prnewswire.com/news-releases/varsity-brands-and-herff-jones-merge-123921169.html/
- PR Newswire, *Varsity Brands Enters into Definitive Agreement to be Acquired by Charlesbank Capital Partners*, Nov. 3, 2014, https://www.prnewswire.com/news-releases/varsity-brands-enters-into-definitive-agreement-to-be-acquired-by-charlesbank-capital-partners-281315161.html
- PR Newswire, *Varsity Brands Announces Acquisition of allgoods, LLC*, Dec. 23, 2015, https://www.prnewswire.com/news-releases/varsity-brands-announces-acquisition-of-allgoods-llc-300196819.html
- PR Newswire, *Varsity Brands Announces Appointment of Matthew E. Rubel as CEO*, Mar. 3, 2016, https://www.prnewswire.com/news-releases/varsity-brands-announces-appointment-of-matthew-e-rubel-as-ceo-300230740.html
- SGB Media, *BSN Sports and Herff Jones Finalize Merger*, Jun. 25, 2013, https://sgbonline.com/bsn-sports-and-herff-jones-finalize-merger/
- Spirit Post, *Varsity Acquires Spirit Festival*, Aug. 2011, https://spiritpost.com/2011/08/varsity-acquires-spirit-festival/
- Spirit Post, *Spirit Holding and Cheersport Join the Varsity Family of Brands*, Dec. 28, 2012, https://spiritpost.com/2012/12/spirit-holding-and-cheersport-join-the-varsity-family-of-brands/
- The New York Times, *Riddell in Deal for Maker of Cheerleading Uniforms*, May 7, 1997, https://www.nytimes.com/1997/05/07/business/riddell-in-deal-for-maker-of-cheerleading-uniforms.html
- The New York Times, *Chief Executive at Riddell Sports Quits*, Jun. 26, 2001, https://www.nytimes.com/2001/06/26/business/chief-executive-at-riddell-sports-quits.html

- The New York Times, *Company News; Uniform Maker Agrees to $131 Million Buyout*, Apr. 23, 2003, https://www.nytimes.com/2003/04/23/business/company-news-uniform-maker-agrees-to-131-million-buyout.html
- Varsity, *Varsity Spirit and Cheer Ltd Announce Merger*, Jun. 24, 2015, https://files.varsity.com/uploads/editor/files/PDFS/Varsity/Varsity-Spirit-Cheer-LTD-Merger.pdf
- Varsity, *What is Competitive Cheerleading*, Feb. 20, 2018, https://www.varsity.com/news/what-is-competitive-cheerleading/
- Varsity, *Varsity Spirit Founder and Chairman Jeff Webb Transitions to Focus on the Global Development of Cheer*, Dec. 9, 2020, https://www.varsity.com/about/press/varsity-spirit-founder-and-chairman-jeff-webb-transitions-to-focus-on-the-global-development-of-cheer/
- Worldwide Spirit Association, *Understanding Worlds and Summit Bids*, https://www.wsacheer.com/national-cheerleading-competition/understanding-worlds-summit-bids