# Exhibit 8

## FILED UNDER SEAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| **JESSICA JONES** and **CHRISTINA LORENZEN** on Behalf of Themselves and All Others Similarly Situated, | Case No. 2:20-cv-02892 |
| *Plaintiffs*, | |
| *-versus-* | |
| **VARSITY BRANDS, LLC; VARSITY SPIRIT, LLC; VARSITY SPIRIT FASHION & SUPPLIES, LLC; U.S. ALL STAR FEDERATION, INC.; JEFF WEBB; CHARLESBANK CAPITAL PARTNERS LLC;** and **BAIN CAPITAL PRIVATE EQUITY,** | |
| *Defendants*. | |

**EXPERT REBUTTAL REPORT OF JAMES H. ARONOFF**

**HIGHLY CONFIDENTIAL**

**SUBJECT TO PROTECTIVE ORDER**

## TABLE OF CONTENTS

I.    Introduction ................................................................................................ 1

II.   Executive Summary ..................................................................................... 1

III.  Scope of Engagement ................................................................................ 2

IV.   Murphy Report .......................................................................................... 5

      A.    Cheer Competitions ....................................................................... 5

            1.    Rebates ................................................................................ 5

            2.    Competition Rules & Judging .......................................... 8

            3.    Competition Accommodations ........................................ 10

      B.    Cheer Camps ................................................................................ 11

            1.    Rebates .............................................................................. 11

            2.    Bid System ........................................................................ 12

      C.    Cheer Apparel .............................................................................. 15

            1.    Event Marketing ............................................................... 15

            2.    Rebates .............................................................................. 16

      D.    Competition Bids .......................................................................... 18

      E.    Governance and Compliance ....................................................... 20

V.    Orszag Report .......................................................................................... 23

      A.    Actions of the USASF and Varsity ............................................. 23

            1.    Actions of the USASF ...................................................... 23

            2.    Varsity's Involvement With The USASF .......................... 24

      B.    USASF Governance Structure and Rules .................................... 25

            1.    USASF Governance Structure .......................................... 25

            2.    USASF Rules Regarding World Bid Events .................... 27

**HIGHLY CONFIDENTIAL**

3.      USASF Rules Gave Varsity an Advantage................................................ 28

**HIGHLY CONFIDENTIAL**

## **<u>APPENDICES</u>**

Appendix A……………………………………………...Curriculum Vitae of James H. Aronoff

Appendix B……………………………………………..……………Materials Relied Upon

**HIGHLY CONFIDENTIAL**

## I.    INTRODUCTION

1.      As stated in my Expert Report dated June 20, 2022 (the "Aronoff Report" or "my opening report"), I have been retained as an expert witness by the Joseph Saveri Law Firm, Inc. ("JSLF" or "Counsel"), counsel for plaintiffs, Jessica Jones and Christina Lorenzen ("Plaintiffs"), and all others similarly situated (together with Plaintiffs, the "Class"), to provide recommendations for relief with respect to the alleged activity of defendants, including Varsity Brands, LLC ("Varsity Brands"); Varsity Spirit, LLC ("Varsity Spirit"); Varsity Spirit Fashion & Supplies, LLC ("Varsity Spirit Fashion") (collectively, "Varsity"); U.S. All Star Federation, Inc. ("USASF"); Jeff Webb; Charlesbank Capital Partners LLC ("Charlesbank"); and Bain Capital Private Equity ("Bain") (all defendants together, "Defendants") in participating in an alleged exclusionary scheme and conspiring to raise, fix, and stabilize the prices charges associated with competitive cheerleading.[1]

2.      I understand from Counsel that Plaintiffs seek damages and/or injunctive and declaratory relief for the following claims: (1) Violation of Sections 1, 2, and 3 of the Sherman Act, 15 U.S.C. §§ 1—3; (2) Violation of Tennessee antitrust laws, Tenn. Code Ann. §§ 47-25-101, et seq.; (3) Violation of numerous states' antitrust laws; (4) Violation of numerous states' consumer protection laws, including unfair methods of competition and unfair and deceptive acts; and (5) Unjust enrichment under Tennessee Law.[2]

## II.    EXECUTIVE SUMMARY

3.      In my opinion, the Defendants' Reports are deficient in various respects, the most significant of which are discussed in this Rebuttal Report. Neither the opinions put forth by Dr.

---

[1] *See generally,* Class Action Complaint, *Jessica Jones, et al. v. Varsity Brands, LLC, et al.,* Case No. 2:20-cv-02892-SHL-tmp (W.D. Tenn.), filed Dec. 10, 2020 ("Complaint").

[2] Complaint at ¶¶ 231-268.

Murphy or Mr. Orszag alter any of the conclusions or opinions in my opening report. The absence of a comment or comments in this Rebuttal Report on any aspect of the Defendants' Reports should not be interpreted as agreement with any position taken Messrs. Murphy or Orszag.

4.      The structural relief and remedies I propose would not generally change the rules of the competitions themselves and would leave them intact. This would mean that they are generally neutral with respect to the competitions from the perspective of athletes or gyms. They would thus not diminish or effect conduct which other experts or market participants do not identify as exclusive or anticompetitive. Having years of experience in this area, the recommendations I make are sufficiently specific and practical that they could be readily adopted and therefore be effective and administrable. Once implemented, they would not require extensive outside involvement, other than reporting that the recommendations have been implemented, while Varsity continues to market and sell cheer competitions, camps and apparel.

## III.    SCOPE OF ENGAGEMENT

5.      In this report (the "Rebuttal Report"), I have also been asked to review and respond to certain aspects of the report submitted by Dr. Kevin Murphy, dated September 23, 2022 (the "Murphy Report") and the report of Jonathan M. Orszag dated September 23, 2022 (the "Orszag Report") (the Murphy Report and the Orszag Report, together, the "Defendants' Reports").  I have also been asked to determine whether and to what extent those reports affect the opinions expressed in my opening report or require a response.

6.      As noted in my opening report and herein, I have been retained to provide recommendations for relief with respect to certain alleged anticompetitive activities of the Defendants. I have not been retained to analyze the activity of the Defendants nor have I been asked to provide an opinion whether or not any such activity is anticompetitive.  For purposes of

2

HIGHLY CONFIDENTIAL

this assignment, I have not been engaged as an economic expert, nor to have examined any anticompetitive effects of the alleged activity of the Defendants. For that, I rely upon the Plaintiffs' economic experts, Dr. Janet S. Netz and Dr. Randal Heeb.

7.    Dr. Netz' opinions are set forth in her report, dated June 20, 2022 (the "Netz Report"). Dr. Netz "reviewed the anticompetitive conduct in which Defendants engaged by using economic research/doctrine typically applied to monopolies and antitrust conspiracies."[3] The Netz Report concluded that "Varsity has engaged in anticompetitive conduct that has allowed it to acquire and maintain its monopoly power in [the Cheer Competitions, Cheer Apparel, and Cheer Camps] markets," and that "Varsity's anticompetitive conduct foreclosed rivals and harmed competition in the form of higher prices, reduced output, reduced choice."[4] I rely upon the conclusions set forth in the Netz Report, and, as provided in my opening report, make recommendations for relief with regard to this conduct.

8.    Dr. Heeb's opinions are set forth in his report, dated June 20, 2022 (the "Heeb Report"). As part of his assignment, Dr. Heeb was "asked to determine if the economic analyses necessary to conduct an antitrust evaluation of the Plaintiffs' allegations can be conducted using common evidence, including whether common evidence shows the class members have sustained antitrust injury as a result of the alleged conduct, …"[5] The Heeb Report concludes that "[c]heer competitions, cheer camps, and cheer apparel are each relevant antitrust product markets."[6] Specifically regarding cheer competitions, the Heeb Report further states that "Varsity's market

---

[3] Netz Report at 2.

[4] Netz Report at 115.

[5] Heeb Report at ¶9.

[6] Heeb Report at ¶18.

**HIGHLY CONFIDENTIAL**

power is nearly ubiquitous throughout the United States, and its centrally directed conduct has an anticompetitive impact across the entire country and the class."[7]  I rely upon the conclusions set forth in the Heeb Report, and, as provided in my opening report, make recommendations for relief with regard to this conduct.

9.      My qualifications and experience are set forth in my opening report,[8] and in my curriculum vitae appended hereto.[9]

10.     For the avoidance of doubt, I do not purport to interpret the alleged activity of the Defendants as a legal matter or offer any legal opinion herein. I merely offer my expert opinion as to recommendations with respect to relief for the conduct alleged, based upon my knowledge, skill, experience, training, and education as such background relates risk management, to corporate governance and to serving as a senior executive or director at companies in highly competitive markets.

11.     I reserve the right to amend, supplement, and/or revise my analysis, findings, and opinions if new evidence becomes available, if the scope of discovery or the causes of action change in any material way, or in response to any attempt to rebut my opinions and conclusions. I also reserve the right to rebut the opinions expressed by other experts.

---

[7] Heeb Report at ¶42.

[8] Aronoff Report at ¶¶16-22.

[9] My curriculum vitae is attached hereto as Appendix A.  I have not provided any additional reports or testimony since my opening report.  In addition to the materials previously relied on, additional materials upon which I have relied and have cited herein that have not been previously cited in my opening report are listed in Appendix B, also attached hereto.

**HIGHLY CONFIDENTIAL**

## IV.    MURPHY REPORT

12.    Dr. Murphy was asked to provide an economic analysis of the Plaintiff's claims on behalf of the Defendants Varsity, Bain and Charlesbank,.[10]

### A.    CHEER COMPETITIONS

#### 1.    Rebates

13.    As described in my opening report, Varsity offers rebates to All-Star teams that participate in a certain number of Varsity competitions.  This is primarily done through Network Agreements and the Varsity Family Plan.  Network Agreements require participating teams to attend at least five Varsity competitions per season and spend at least $30,000 in registration fees in order to receive rebates.[11] Similarly, the Varsity Family Plan is a separate program that requires participating teams to attend at least six Varsity competitions per season in exchange for a combination of cash rebates and discounts.[12]

14.    Dr. Netz analyzed these programs and concluded in her report, that "[w]hile the rebate programs reduce the net prices direct purchasers pay to Varsity in the short run, they also function as anticompetitive exclusive dealing arrangements harming competition in the long run," and that "Varsity's rebate programs create strong financial incentives for firms to buy exclusively from Varsity…"[13]  My opening report includes recommendations for relief related to Varsity's rebate programs.[14]

---

[10] Murphy Report at ¶8.

[11] *See e.g.,* Network Agreement 2016 Varsity Network Agreement by and between Varsity Spirit and Carolina All Stars dated May 11, 2016, VAR00079804, at VAR00079804.

[12] Email from B. Eliza dated Oct. 25, 2018 attaching Varsity All Star presentation, VAR00097495 (LeTard Exhibit 17), at VAR00097512 – VAR00097513.

[13] Netz Report at 104.

[14] Aronoff Report at ¶96.

**HIGHLY CONFIDENTIAL**

15.     The Murphy Report states that my observation that All-Star teams "typically attend no more than six competitions per season" is "contradicted not only by Plaintiffs' other experts but also by the evidence in this case."[15] Dr. Murphy is incorrect.  The Heeb Report states that "All-Star teams compete in 4.9 events on average across all Varsity customers, with larger teams attending more events in a season."[16]   This is further supported by Dr. Murphy's own report. Exhibit 5 to the Murphy Report shows that, from the 2015-2016 season through the 2018-2019 season, on average, 80% of All Star gyms attend six events or fewer.[17]  Regardless, the number of cheer competitions that All-Star teams attend is not relevant to my recommendations, and my recommendations regarding rebate programs are unchanged.

16.     Dr. Murphy asserts that "Varsity does not have any exclusive agreements with either All Star gyms or with schools as it relates to cheerleading competitions," and that "[Varsity Network Agreements] are only with All Star gyms and exclusivity is limited to apparel."[18]  Once again, Dr. Murphy has missed the point of my recommendations and quarrels about facts which do not undercut my opinion.  As discussed above, teams participating in Network Agreements are required to attend at least five Varsity competitions per season in order to receive rebates.[19] Similarly, teams participating in the Varsity Family Plan are required to attend at least six Varsity competitions per season in exchange for a combination of cash rebates and discounts.[20]  As Dr.

---

[15] Murphy Report at ¶455.

[16] Heeb Report at ¶131.

[17] Murphy Report at Exhibit 5.

[18] Murphy Report at ¶457.

[19] *See e.g.,* Network Agreement 2016 Varsity Network Agreement by and between Varsity Spirit and Carolina All Stars dated May 11, 2016, VAR00079804, at VAR00079804.

[20] Email from B. Eliza dated Oct. 25, 2018 attaching Varsity All Star presentation, VAR00097495 (LeTard Exhibit 17), at VAR00097512 – VAR00097513.

6

**HIGHLY CONFIDENTIAL**

Murphy's own report shows that 80% of All Star gyms attend six events or fewer, both Varsity Network Agreements and the Varsity Family Plan effectively act as exclusivity agreements.[21] These programs require All-Star teams to devote all or the majority of their competition season to Varsity competitions. The Netz Report concluded that "Varsity's rebates function as de facto exclusive dealing arrangements," which she perceived to be anticompetitive.[22] My recommendations that Varsity "offer rebates based on the amount spent on competitions," and eliminate exclusive agreements are intended to mitigate that conduct.[23]

17.    The Murphy Report states that the recommendation contained in my opening report to offer rebates based on the amount spent on competitions, rather than on the number of competitions attended, "could potentially result in some All Star gyms having to spend more on cheer competitions to earn the same rebate they would have under the [Varsity Family Plan]."[24] Dr. Murphy also states that "[Varsity Family Plan] rebates are already equivalent to flat-rate discounts on total registration expenditures."[25] Dr. Murphy is misunderstanding the effect of the conduct that my recommendation is intended to mitigate. The Varsity Family Plan requires participation in at least six Varsity competitions per season.[26] If the majority of All-Star teams attend approximately six competitions each season, then a team is required to dedicate all or a majority of their season to Varsity events. As stated in the Netz Report, this requirement forecloses

---

[21] Murphy Report at Exhibit 5.

[22] Netz Report at 5.

[23] Aronoff Report at ¶96.

[24] Murphy Report at ¶456.

[25] Murphy Report at ¶456.

[26] Email from B. Eliza dated Oct. 25, 2018 attaching Varsity All Star presentation, VAR00097495 (LeTard Exhibit 17), at VAR00097513.

**HIGHLY CONFIDENTIAL**

attendance by All-Star teams at events of other producers, even events that may be less costly.[27]

My recommendation to offer rebates based on the amount spent on competitions, rather than on the number of competitions attended is intended to lessen the anticompetitive impact of the current Varsity rebate system, which is tied to competition attendance. My recommendations would not affect or change the Varsity competitions themselves from the perspective of gyms or athletes. Were my recommendations adopted, they would be neutral with respect to the cheer competitions themselves.

### 2.    Competition Rules & Judging

18.    As noted in my opening report, Varsity, via the USASF, effectively exercises control over both the competition rules and competition judging.  Varsity's entanglement with the USASF is discussed at length in the Netz Report, which, among other things,  states "Varsity and USASF controlled and manipulated the event sanctioning and bid system to disadvantage rivals."[28] Both the Netz Report and the Heeb Report identify specific facts regarding this statement.[29]  My opening report includes recommendations for relief regarding competition rules and judging, including that competition rules should be made available to all event producers, and that judges should be trained independently.[30]  My recommendations would not affect or change the competition rules themselves or the judging criteria or procedures. They would be neutral with respect to them. My recommendations would also not affect or change Varsity competitions themselves from the perspective of gyms or athletes, other than making the rules and judging

---

[27] Netz Report at 113 ("Varsity's rebate programs thus ensure that customers attend few non-Varsity events and are more likely to purchase Cheer Apparel exclusively from Varsity.").

[28] Netz Report at 69.

[29] *See* Netz Report at 65-89 and Heeb Report at ¶202-218.

[30] Aronoff Report at ¶¶98, 100.

**HIGHLY CONFIDENTIAL**

transparent and widely known.  Were my recommendations adopted, they would be neutral with respect to the cheer competitions themselves.

19.    The Murphy Report asserts that in my opening report I do "not identify any competitive issue with Varsity training judges on scoring at its own competitions," and that "Varsity has an interest in ensuring judges at its events are properly trained, as properly trained judges improve the experience of the event to the benefit of participants."[31]  Dr. Murphy further observes that in my opening report I do not "identify any competitive issue with any training process USASF may have for cheer competition judges … or any connection between USASF and Varsity's training for judges."[32]

20.    As noted herein, above, I have not been engaged to identify anticompetitive conduct by Varsity.  In making the recommendations for relief contained in my opening report, I relied on the conclusions contained in the Netz Report and the Heeb Report.  It is typical of other sports similar to Competitive Cheer that competition rules and requirements be made public, and that competition judges are trained independent of event producers.  For example, in competitive figure skating, competition rules and judging standards are made public each year by U.S. Figure Skating, a similar sport governing body to the USASF.[33]  The U.S. Figure Skating bylaws also provide for an "Officials Training Committee," which is "responsible for providing educational programs and training tools to ensure all certified officials are qualified to serve."[34]  Like the USASF, U.S. Figure

---

[31] Murphy Report at ¶459.

[32] Murphy Report at ¶459.

[33] *See* U.S. FIGURE SKATING, The 2022-2023 Official U.S. Figure Skating Rulebook (Jul. 2022), available at https://www.usfigureskating.org/about/rules.

[34] U.S. FIGURE SKATING, The 2022-2023 Official U.S. Figure Skating Rulebook (Jul. 2022) at 83, available at https://www.usfigureskating.org/about/rules.

**HIGHLY CONFIDENTIAL**

Skating has copyrighted its rulebook, however, unlike the USASF, U.S. Figure Skating is transparent in that this information is available to the public.

### 3.    Competition Accommodations

21.    As described in my opening report, Varsity imposes a stay-to-play rule at many of its competitions, requiring families to stay only at certain accommodations approved by Varsity. My opening report includes recommendations for relief, including that "Varsity can no longer require families to stay at specific accommodations."[35]  The anticompetitive effect of this policy imposed by Varsity is discussed in the Netz Report.[36]

22.    The Murphy Report asserts, without any analysis or support by Dr. Murphy, that my recommendation "may cause a decreased number of events, locations that are considered less optimal or central from a consumer's perspective, and higher costs to participants."[37]  Dr. Murphy also asserts that the "stay-to-play program ensures sufficient rooms are available for those attending the All Star event at lower rates."[38]  Dr. Murphy appears to have misunderstood the recommendation he has criticized. My recommendation is not that Varsity should no longer reserve room blocks at competition venues. The recommendation contained in my opening report is that Varsity should no longer require cheer athletes and their families to stay at specific hotels in order to participate in any particular competition. Fowlkes, Davis, and Duhon all state in their depositions that it is often a requirement of the venue to have blocks of rooms set aside for the

---

[35] Aronoff Report at ¶102.

[36] Netz Report at 48-50.

[37] Murphy Report at ¶464.

[38] Murphy Report at ¶464.

**HIGHLY CONFIDENTIAL**

competitions.[39]  The issue is not the fact that Varsity sets aside a block of rooms, it is that Varsity requires teams to stay at these hotels when there may be less expensive alternatives available.  If, as Dr. Murphy implies, Varsity is getting the best rates available, then teams can still choose to stay in these hotels, and nothing will change.  Cheer athletes and their families should have the option to stay where they choose, and Varsity's requirement prevents them from doing that.[40]  My recommendations would not affect or change the competitions themselves. They would be neutral with respect to them. My recommendations would also not affect or change Varsity competitions themselves from the perspective of gyms or athletes because lodging for events is logically distinct and separate from the competitions. Were my recommendations adopted, they would be neutral with respect to the cheer competitions themselves

### B.  CHEER CAMPS

#### 1.  Rebates

23.    As noted in my opening report, rebates are available for certain teams to attend certain Varsity run camps.[41]  Dr. Murphy criticizes my report for not completing any analysis on the economic impact of my recommendations to offer rebates based on the amount spent on camps.[42]  In addition, Dr. Murphy states that I have done no analysis on whether "non-Varsity camps provide rebates and, if so, how such rebates impact camp selection."[43]

---

[39] Deposition of J. Fowlkes, Apr. 5, 2022, at 274:13-19;  Deposition of C. Davis, Feb. 24, 2022, at 178:5-11, 179:13-180:17;  Deposition of B. Duhon, Mar. 25, 2022, at 112:11-24.

[40] Dr. Murphy's statements implying that the stay-to-play program is for the benefit of the consumer is diminished by Varsity having a direct economic interest in athletes staying in the Varsity reserved hotel blocks.  Stay-to-play was a revenue source for the company, and Varsity received rebates directly from the hotels where they required families to stay.  Deposition of J. Fowlkes, Apr. 5, 2022, at 274:6-13.

[41] Aronoff Report at ¶89, citing National Cheerleaders Association, Summer Camp 2017 [VAR00074687].

[42] Murphy Report at ¶¶468-469.

[43] Murphy Report at ¶468

**HIGHLY CONFIDENTIAL**

24.     As stated above, I was not engaged to provide an analysis of the anticompetitive effects of Varsity's conduct. The recommendations for relief contained in my opening report are intended to mitigate the impact of specific policies, activities, and behavior determined to be anticompetitive by other experts in this case.  As noted in my opening report and herein, I was asked to rely on those determinations, and as such, I did not conduct independent anticompetitive analysis with respect to the findings of other experts in this case.  Drs. Netz and Heeb both identified anticompetitive conduct as it relates to Varsity's activity in the cheer camp market.[44] My recommendation that Varsity "only offer rebates based on the amount of money spent on camps" is intended to mitigate the effects of that conduct.[45]  My recommendation would not change Varsity's ability to offer rebates, only the way in which rebates are offered so that there are no anticompetitive effects from doing so.

### 2.    Bid System

25.     As I described in my opening report, in order for a high school cheer team to secure a bid to certain prestigious high school national championships, "Varsity requires at least 75% of the members of each team attend Varsity Cheer Camps."[46]  The National Federation of State High School Associations ("NFHS") enforces Varsity's squad credentialing program, which requires high school cheer athletes to attend Varsity overnight Cheer Camps in order to be eligible for

---

[44] See Netz Report at 3 ("In the market for Cheer Camps, Varsity has excluded rivals via its anticompetitive tying policy …") ; *See* Heeb Report at ¶104 ("I conclude class members were also harmed by Defendants' anticompetitive strategies that induced gyms and schools to attend more events and camps …").

[45] Aronoff Report at ¶104.

[46] Aronoff Report at ¶90, citing  VAR00160799 (Duhon Exhibit 5), at VAR00160803 (Q&A: Varsity Spirit/NFHS Squad Credentialing Program, attachment to Feb. 11, 2019 email from B. Duhon to M. Burgess).

**HIGHLY CONFIDENTIAL**

national Cheer Competitions.[47]  This requirement effectively limits opportunity for competing

cheer camps to participate in the high school cheer market.[48]

26.    Dr. Murphy attempts to criticize my recommendation that Varsity "can no longer

require Competitive Cheer team members to attend only Varsity Cheer Camps in order to qualify

for a national championship bid" by stating that this requirement only applies to certain "scholastic

end-of-season competitions – specifically UCA NHSCC, NCA High School Nationals, and USA

Spirit Nationals.  This requirement does not exist for any All Star competition…"[49]  It is unclear

why Dr. Murphy shares this observation.  The documents that I reference in my opening report

clearly indicate that this camp attendance requirement only applies to school cheer, and only

certain end-of-season events.[50]

27.    Dr. Murphy goes on to argue that the reason for this requirement is that "Varsity's

Squad Credentialing Program serves an important purpose in that it teaches attendees safety,

leadership, and the 'five roles of a cheerleader' ('crowd leader,' 'spirit raiser,' 'ambassador,'

'athlete,' and 'entertainer') that underlie the scoring system used at these national events."[51]  Dr.

Murphy appears to have done no analysis and simply disagrees with my recommendation.  He also

states that the credentialing requirement does not apply to any "regular season competitions."[52]

---

[47] Netz Report at 25.

[48] Netz Report at 89-92.

[49] Aronoff Report at ¶106;  Murphy Report at ¶472.

[50] *See* Aronoff Report at ¶90, citing VAR00160799 (Duhon Exhibit 5), at VAR00160803 (Q&A: Varsity Spirit/NFHS Squad Credentialing Program, attachment to Feb. 11, 2019 email from B. Duhon to M. Burgess) and Deposition of B. Duhon, Mar. 25, 2022, at 25:12-25:19 (testifying that the only way for teams to receive a bid to attend the high school nationals is by attending a camp or clinic and receiving an NFHS credential), id., at 25:23-26:1 (testifying that the only way for teams to receive a bid to attend the college nationals is by attending a camp or sending in a video).

[51] Murphy Report at ¶473.

[52] Murphy Report at ¶472.

13

**HIGHLY CONFIDENTIAL**

However, simply because Varsity does not enforce this policy consistently across its events, but only enforces the credentialing requirement for the end-of-season events, does not mean that it is not appropriate to mitigate the effect of this policy, which has been demonstrated as anticompetitive by other experts in this case. The fact that Varsity does this some of the time, but not all of the time, does not provide an explanation for the occasions when Varsity does enforce it. Dr. Murphy fails to acknowledge that Varsity is not the only organization that can serve the "important purpose" of teaching safety, leadership, and other cheer skills.[53] Accordingly, Dr. Murphy's objections to my recommendation that Varsity "can no longer require Competitive Cheer team members to attend only Varsity Cheer Camps in order to qualify for a national championship bid" does nothing to undercut my recommendation, and in fact provides further support for my recommendation.[54]

28.    Dr. Murphy argues that "Varsity has an interest in ensuring that proper safety and other skills are taught to attendees of its end-of-season competitions…"[55] I find this claim by Dr. Murphy to be disingenuous and it misses the point, particularly when the effect of this requirement is to limit the eligibility of cheer athletes to attend national competitions to only those athletes that attend Varsity cheer camps.[56] In addition to the fact that non-Varsity camps can also provide training for "proper safety and other skills," it is also unclear why, if the true aim of the requirement was to ensure proper safety training, that only teams attending end-of-season events would be required to be adequately trained on safety. If it is truly unsafe for teams to compete in end-of-season competitions without adequate training, then it would also be unsafe for them to compete

---

[53] Murphy Report at ¶473.

[54] Aronoff Report at ¶106.

[55] Murphy Report at ¶474.

[56] Netz Report at 89-92.

14

**HIGHLY CONFIDENTIAL**

in regular season competition without adequate safety training. In any event, my recommendation was merely that if Varsity requires camp attendance as a prerequisite to competitions, that Varsity not make the requirement exclusive to Varsity camps, regardless of what competitions they are required for.  Dr. Murphy fails to provide any logical objection to this recommendation.  Also, my recommendation with respect to the requirement of camp attendance would not change the rules of the competitions themselves and would therefore be neutral for gyms and athletes with respect to the competitions themselves.

### C.  <u>CHEER APPAREL</u>

#### 1.  Event Marketing

29.    As noted in my opening report, Varsity does not allow other vendors to market and sell their products at Varsity competitions and events.[57]  This policy effectively impedes important sales and marketing opportunities by non-Varsity apparel vendors.[58]  Another recommendation in my opening report is that Varsity should allow non-Varsity vendors to market and sell their products at Varsity competitions and end-of-season events.[59]  At a minimum, where Varsity

---

[57] See, e.g., Deposition of J. Parrish, Mar. 3, 2022, at 121:23-122:24 (re forcing out apparel vendors Rebel and Nfinity from Worlds); id., at 88:8-10 ("…Tate Chalk at Nfinity has been asked to leave competitions because he's the shoe competitor."); id., at 88:11-25 (testifying that Varsity's marketing team will make the decision whether a vendor will be asked to leave and then would ask the security officer to ask such vendors to leave); Deposition of J. Hill, Mar. 21, 2022, at 330:16-331:24 (testifying that Varsity set up its own vendors at its competitions, but not non-Varsity vendors and that at big events competitors would set up pop up spaces nearby, but were not allowed inside the event).

[58] Netz Report at 59-60 ("The Varsity policy of precluding rival Cheer Apparel providers from displaying products at Varsity Cheer Competitions is another barrier to entry" and "Collectively, the barriers to entry in the Cheer Apparel market are so significant that 'some small competitors just throw up their hands' and exit the Cheer Apparel market."); id., at 104 ("In 2016, Varsity instituted a 'zero tolerance' policy in which employees of rival apparel makers would not be allowed any access to Varsity events, even to attend as an event judge.  This policy not only prevented rival Cheer Apparel makers from directly marketing to potential customers at Varsity events, it also prevented them from attending for networking or research purposes.").

[59] Aronoff Report at ¶108.

15

**HIGHLY CONFIDENTIAL**

chooses to dedicate space to displaying and selling cheer apparel at competitions, Varsity should allocate a certain number of booths or amount of vendor space to non-Varsity vendors.[60]

30.    The Murphy Report states that I "provide[] no analysis supporting [my] conclusion," and that "other event producers are free to prevent Varsity from offering its merchandise for sale at their events or direct to consumers."[61]  Dr. Murphy is, in effect, not denying, and therefore conceding, that Varsity does not allow other vendors to sell apparel and merchandise at Varsity events.  He does, however, appear blind to the negative impact and potential harm this requirement may have with respect to non-Varsity vendors.  According to Dr. Netz, Competitive Cheer events are also important product showcases, and since Varsity controls the majority of these events, by not allowing other vendors to sell products, Varsity is restricting the ability of competitors to sell their products to participants in the cheer market.[62]

### 2.    Rebates

31.    As noted in my opening report, Varsity offers All-Star gyms rebates for purchasing Varsity apparel through exclusive purchasing agreements. [63]  Similar to rebates offered for

---

[60] Aronoff Report at ¶108.

[61] Murphy Report at ¶476.

[62] Netz Report at 104 ("In 2016, Varsity instituted a 'zero tolerance' policy in which employees of rival apparel makers would not be allowed any access to Varsity events, even to attend as an event judge.  This policy not only prevented rival Cheer Apparel makers from directly marketing to potential customers at Varsity events, it also prevented them from attending for networking or research purposes.")  *See also* Inc. Magazine article cited in both my opening report and in the Murphy Report,  "[Varsity] also wields outsize influence in virtually every aspect of the industry, including the camps and--most important--the competitions, which also serve as merchandise showrooms for apparel vendors."  INC. MAGAZINE, Meet Rebel, the $20 Million Cheerleading Startup Living Up to Its Name, Mar. 2016, https://www.inc.com/magazine/201603/leigh-buchanan/rebel-athletic-customcheerleading-uniforms-startup.html.

[63] Varsity Network Agreements and the Varsity Family Plan both offer rebates in exchange for purchasing Varsity apparel.  *See* 2016 Varsity Network Agreement [VAR00079804]:  "Member will exclusively purchase and wear Varsity uniforms, warm-ups, practice wear, and shoes," and "VSF/VASF will offer apparel and accessories to Member at fifteen (15%) discount from catalogue prices."  *See also* Email from B. Eliza dated Oct. 25, 2018 attaching Varsity All Star presentation, VAR00097495 (LeTard Exhibit 17), at VAR00097512:  "Additional 10% Varsity Fashion Dollars rewards will be earned on all uniform and accessory purchases."

16

**HIGHLY CONFIDENTIAL**

competition spending, this is primarily done through Network Agreements and the Varsity Family Plan. My opening report includes recommendations for relief with regard to this practice.[64]

32.    The Murphy Report states that I offer "no support" for the statement that Varsity offers rebates to gyms that only purchase Varsity apparel.[65] This is incorrect. As stated in my opening report and herein, Varsity does this through Network Agreements and the Varsity Family Plan.[66] In my opening report, I cite a Network Agreement from May 2016 between Varsity Spirit and Carolina All Stars.[67] That agreement includes terms such as "[Carolina All Stars] will exclusively purchase and wear Varsity uniforms, warm-ups, practice wear, and shoes," and "[Varsity] will offer apparel and accessories to [Carolina All Stars] at fifteen (15%) discount from catalogue prices."[68] Dr. Netz stated that these agreements "function as de facto exclusive dealing arrangements," and concluded that they are anticompetitive.[69] My recommendations that Varsity eliminate these types of agreements will mitigate the negative effects of Varsity's current conduct as it relates to apparel.[70] My recommendations would not affect or change the Varsity competitions themselves from the perspective of gyms or athletes. Were my recommendations adopted, they would be neutral with respect to the cheer competitions themselves.

---

[64] Aronoff Report at ¶110.

[65] Murphy Report at ¶478.

[66] *See* Aronoff Report at ¶¶81-85, discussing Network Agreements and the Varsity Family Plan.

[67] *See* Aronoff Report at ¶¶82-83, citing Network Agreement 2016 Varsity Network Agreement by and between Varsity Spirit and Carolina All Stars dated May 11, 2016, VAR00079804.

[68] Network Agreement 2016 Varsity Network Agreement by and between Varsity Spirit and Carolina All Stars dated May 11, 2016, VAR00079804.

[69] Netz Report at 5 ("Varsity designed rebate programs with the intent and effect of foreclosing Cheer Competition and Cheer Apparel rivals. Varsity's rebates differ from standard discount programs in several ways. Varsity's rebates function as de facto exclusive dealing arrangements …").

[70] Aronoff Report at ¶110.

17

**HIGHLY CONFIDENTIAL**

### D. <u>COMPETITION BIDS</u>

33.    As noted in my opening report, Varsity manages the process of awarding bids to the end-of-season cheer competitions, including Worlds.[71]  Varsity, via control of the USASF board, controls the system through which competitions are assigned bids and teams are awarded bids.[72]  Varsity's entanglement with the USASF and influence over the bid system, and the evidence showing this, are discussed at length in the Netz Report.[73]  Dr. Netz concluded that "Varsity and USASF controlled and manipulated the event sanctioning and bid system to disadvantage rivals."[74]  My opening report contains specific recommendations for structural relief, including: Varsity cannot have any involvement with or control over the bid assigning and bid awarding process; Varsity can only host a portion of bid earning competitions; Varsity can determine its event schedule without reference to the schedules of other event producers; and Varsity can no longer exclusively offer bids to certain school cheer end-of-season events to only teams that participate in Varsity Cheer Camps.[75] Here too, my recommendations would not affect or change the Varsity competitions themselves from the perspective of gyms or athletes. Were my recommendations adopted, they would be neutral with respect to the cheer competitions themselves.

34.    Dr. Murphy asserts that "the USASF board does not determine how bids are awarded," and that "bids are awarded to qualifying event producers based on seniority."[76]  Dr.

---

[71] Aronoff Report at ¶¶76-80.

[72] Currently, the USASF Board is made up of 13 voting seats: the Chairman, one senior staff member, four gym owners, and seven event producers. All seven event producer Board seats are controlled by Varsity.  Deposition of J. Chadwick, Apr. 15, 2022, at 120:10-120:17 ("The USASF Board is limited to 13 seats. This can only be increased or decreased by unanimous consent of the Board…"). *See also* USASF_0003245 (Chadwick Exhibit 5) (USASF Board Operating Guidelines and Approved Bylaw Amendments).

[73] Netz Report at 69-84.

**HIGHLY CONFIDENTIAL**

Murphy attempts to use this reasoning to suggest that Varsity does not exercise control over the bid system.[77]  Dr. Murphy's opinion is not supported by the evidence in this case.  For example, Jim Chadwick, the former President of the USASF, stated in his deposition testimony that the "Sanctioning Committee" determines the criteria for Worlds bids.[78]  Mr. Chadwick stated that "Worlds bids were allocated based on meeting specific criteria, not based on who the individual was that owned the company."[79]  It was also Mr. Chadwick's understanding that, since at least 2016, Varsity had the majority of the voting seats on the Sanctioning Committee.[80]  The Netz Report discusses at length how "Varsity and the USASF controlled and manipulated the event sanctioning rules."[81]  Dr. Murphy inexplicably ignores this and other evidence on this point.  My recommendation that "Varsity cannot have any involvement with or control over the bid assigning and bid awarding process," and that any governing body assigning and/or awarding bids "can operate independently from Varsity" is intended to mitigate the effect of this conduct.[82]  Dr. Murphy does not claim or show that an entity which Varsity controls through ownership or board participation or otherwise through less formal means, like personal relationships, is required to administer a bid system. [83]

---

[74] Netz Report at 69.

[75] Aronoff Report at ¶¶112, 114, 116, 118.

[76] Murphy Report at ¶479.

[77] Murphy Report at ¶479.

[78] Deposition of J. Chadwick, Apr. 15, 2022, at 161:3-10.

[79] Deposition of J. Chadwick, Apr. 15, 2022, at 165:5-7.

[80] Deposition of J. Chadwick, Apr. 15, 2022, at 163:6-9.

[81] Netz Report at 69-73.

[82] Aronoff Report at ¶112.

[83] I also note that executives of USASF during the period were direct employees of Varsity and received incentive based compensation through participation in Varsity stock option plans. For example, Steve Peterson, the USASF

**HIGHLY CONFIDENTIAL**

35.     The Murphy Report further states that "there are numerous USASF event producers who successfully offer All Star events without Worlds bids."[84]  Dr. Murphy apparently has misunderstood the intent of my recommendations.  There are, of course, other, non-Varsity competitions that both provide and do not provide Worlds bids.  However, because Varsity controls the bulk of the Worlds bid events (either directly through acquisition or indirectly by undermining competitor events) and also has enacted competition participation requirements for Network Agreement and Varsity Family Plan participants, Varsity has made it almost impossible for non-Varsity event producers to attract participants.[85]  My recommendations are intended to mitigate the impact of this existing practice by suggesting that there should be a limit on the number of bids that a single producer can control.

### E.    GOVERNANCE AND COMPLIANCE

36.     As noted in both my opening report and herein, Varsity is intertwined with the USASF.[86]  This relationship is also discussed at length in the Netz Report, which concludes,

---

Vice President of Events and Corporate Alliances, has worked at the USASF since 2004, but was legally a Varsity employee until February 2020. Logically, this would provide a personal incentive for USASF executives and staff to promote the financial interests of Varsity because it would be in their personal financial interest to do so. Deposition of S. Peterson, Mar. 9, 2022, at 275:1-10, 280:18-282:4.  *See also* USASF_00011614, an email from C. Aldridge, Varsity Spirit Human Resources Manager, to various recipients, including "Karen Wilson USASF," "Lynn Singer USASF," "mduckworth@usasf.net," and "Matt McDonough USASF" regarding Varsity employee stock ownership plan.

[84] Murphy Report at ¶480.

[85] *See* Netz Report at 73-74 (describing this strategy and quoting the deposition testimony of Jamie Parrish, "He testified that Varsity monitored other event producers' registration numbers and when they approached the 125-team threshold, the Varsity 'strategy would be to put a Family Plan event on either side of them on the weekend before and the weekend after, and then we would call our sales team and say, 'Hey, try to poach teams off of that – that event.'").

[86] Varsity effectively controls the USASF Board of Directors. Currently, the USASF Board has 13 voting seats: The Chairman, one senior staff member, four gym owners, and seven event producers.  The seven event producer seats are for each of the event producers that founded the USASF.  All seven event producer Board seats have come to be controlled by Varsity by way of acquisitions.  Deposition of S. Peterson, Mar. 9, 2022, at 31:10-14; U.S. ALL STAR FEDERATION, Board Members, accessed May 10, 2022, https://www.usasf.net/committee-board; Deposition of J. Chadwick, Apr. 15, 2022, at 129:2-8.

20

**HIGHLY CONFIDENTIAL**

"Varsity and the USASF have been intertwined since the inception of the USASF and Varsity uses its control over the USASF to disadvantage its rivals."[87]  In my opening report, I make recommendations for changes to Varsity's relationship with USASF, as it relates to governance and compliance.[88]  I have seen no evidence or assertions that it is essential for Varsity to control USASF in order to market and sell competitions, camps or apparel.

37.    My proposals would eliminate or limit control by Varsity over the rulemaking organization which controls Worlds bids and sets other standards and policies. I understand that Varsity is the largest cheer organization in the United States. I also understand that Drs. Netz and Heeb conclude that Varsity is a dominant firm from the perspective of an economist. My recommendations would eliminate or limit control over USASF by Varsity. They would not limit Varsity's marketing or sale of competitions, camps or apparel.

38.    The Murphy Report takes issue with my recommendations for increased transparency and monitoring.[89]  Regarding my recommendation that Varsity disclose corporate affiliations, decision-making processes and governance structure, Dr. Murphy infers that I am "advocating for the disclosure of competitively sensitive information, which would have anticompetitive effects."[90]  Not only is Dr. Murphy's inference incorrect, it is also misguided.  First, I never made such a statement.  Second, Dr. Murphy does not cite any relevant studies or analysis performed to support this statement.  Third, it is not uncommon for sport governing bodies to

---

[87] Netz Report at 89.

[88] Aronoff Report at ¶¶120, 122, 124, 126.

[89] Murphy Report at ¶¶486-489.

[90] Murphy Report at ¶487.

**HIGHLY CONFIDENTIAL**

publicly disclose this type of information.[91]  This would increase the opportunities for non-USASF

event producers and create more options for gyms and teams to compete.  The Murphy Report also

states that my recommendation to implement a monitoring and reporting program would "hamper

[Varsity's] ability to innovate to the detriment of consumers," and "shift resources that Varsity

could devote to enhancing the consumer experience…"[92]  Again, Dr. Murphy does not appear to

have cited any relevant studies or completed any analyses to support this assertion.  Regardless,

the intent of my recommendations is to mitigate the impact of Varsity's anticompetitive activity,

as determined by Drs. Netz and Heeb.  Implementing my recommendations would have no impact

on  Varsity's  ability  to  innovate,  nor  would  they  negate  the  benefits  of  Varsity's  non-

anticompetitive conduct.[93]

39.    Finally, it is unclear why Dr. Murphy felt inclined to comment at all regarding the

structural remedies for relief offered in my opening report.  In his deposition, Dr. Murphy conceded

that corporate governance was "not [his] area of expertise."[94]  Later in his deposition, Dr. Murphy

was asked if he was a compliance expert, to which he responded, "No. That would not be my area

---

[91] *See* U.S. FIGURE SKATING, The 2022-2023 Official U.S. Figure Skating Rulebook (Jul. 2022), available at
https://www.usfigureskating.org/about/rules; USA SWIMMING, Corporate Bylaws of USA Swimming (updated Nov.
20, 2022), available at https://www.usaswimming.org/docs/default-source/governance/governance-lsc-
website/bylaws/2022-corporate-bylaws.pdf;  USA GYMNASTICS, INC., Amended and Restated Bylaws of USA
Gymnastics, Inc. (updated Jun. 17, 2022), available at
https://usagym.org/PDFs/About%20USA%20Gymnastics/Governance/usag-bylaws.pdf.

[92] Murphy Report at ¶489.

[93] My recommendations for increased transparency and monitoring are intended to lessen the anticompetitive effect
of Varsity's control over the USASF, which, according to Dr. Netz, is being used to disadvantage rivals.  There was
never any intent that these recommendations could not be implemented and then later adjusted, or even phased out,
once the stated purpose has been achieved.  It is reasonable to assume that my recommendations can be limited in
scope or duration as seen fit by the court.  Netz Report at 89 ("Varsity and the USASF have been intertwined since
the inception of the USASF and Varsity uses its control over the USASF to disadvantage its rivals.").

[94] Deposition of K. Murphy, Nov. 4, 2022, at 260:11.

22

**HIGHLY CONFIDENTIAL**

of expertise."[95]  Given these concessions by Dr. Murphy, it is clear Dr. Murphy does not possess the requisite knowledge and experience to offer meaningful opinions regarding the recommendations provided in my opening report.

## V.    ORSZAG REPORT

40.    Mr. Orszag has provided a report on behalf of the USASF.[96]  Mr. Orszag's report provides an assessment of the Netz Report, the Heeb Report, the report of Dr. Jen Maki, and my opening report.[97]

### A.  ACTIONS OF  THE USASF AND VARSITY

#### 1.    ACTIONS OF THE USASF

41.    Mr. Orszag contends that, because the Plaintiffs' experts did not identify any USASF rules that were implemented or changed "during the class period," then the "Plaintiffs' experts' claims boil down to the assertion that USASF should have changed its rules … in order to prevent Varsity's alleged 'control' of the relevant markets, and that the only plausible explanation for why it did not do so is the alleged collusion with Varsity."[98]  As stated above, I have not been retained as an economic expert, and, as such, I was not tasked with analyzing whether the activity of either the Defendants or the USASF was anticompetitive.  I relied upon the conclusions stated in the Netz Report and the Heeb Report, and made recommendations for relief with regard to conduct that Drs. Netz and Heeb determined was anticompetitive.  The Netz Report found that "Varsity and the USASF have been intertwined since the inception of the USASF and

---

[95] Deposition of K. Murphy, Nov. 4, 2022, at 260:14-15.

[96] Orszag Report at ¶11.

[97] Orszag Report at ¶11.

[98] Orszag Report at ¶37.  I understand "the class period" to mean December 10, 2016 through present.  Orszag Report at ¶10.

**HIGHLY CONFIDENTIAL**

Varsity uses its control over the USASF to disadvantage its rivals."[99]  My recommendations related to the USASF are intended to eliminate the anticompetitive conduct Dr. Netz describes, by promoting transparency and eliminating conflicts of interest, in line with corporate governance best practices in other markets.[100]

42.    What Mr. Orszag fails to acknowledge is that Varsity has taken advantage of the existing USASF rules, and the USASF has failed to implement any changes that would limit the implied or actual influence of Varsity over the sport.  Governing bodies for sports should not be used as a tool to enhance the market position of one of its members over other market competitors.[101]  My recommendations that Varsity no longer provide financial support to the USASF and that the USASF restructure the board to ensure that no single market participant has inappropriate influence or control regarding governance decisions are intended to mitigate the influence of Varsity and restore independence to the USASF, and are consistent  with corporate governance best practices.[102]

## 2.    VARSITY'S INVOLVEMENT WITH THE USASF

43.    The Orszag Report states that the Plaintiffs' experts, including myself, "ignore[d] Varsity's procompetitive contributions to [the] USASF."[103]  Mr. Orszag points to "Varsity's initial funding of USASF; the sharing of office space; USASF's agreement with Varsity for the processing of the payroll for USASF's employees; and USASF's licensing of Varsity's

---

[99] Netz Report at 89.

[100] Aronoff Report at ¶¶120, 122, 124.

[101] The Netz Report states that "Varsity and the USASF conspired to exclude and disadvantage rivals," and "Varsity and the USASF acted in concert to harm competition."  Netz Report at 65 and 69.

[102] Aronoff Report at ¶¶120, 122.

[103] Orszag Report at page 19.

**HIGHLY CONFIDENTIAL**

trademarks," and states that these facts "fail to demonstrate that these claimed influences imply a conspiracy between USASF and Varsity…"[104]   I am not offering an opinion on whether a conspiracy existed.   Again, I have not analyzed any Varsity contributions to the USASF, particularly through the lens of being anticompetitive or procompetitive, and I have not alleged any such conspiracy between the two organizations.   I do note that USASF was formed in 2003, and that any debts owed to Varsity were repaid some time ago.[105]   Even if they did provide a justification, they do not do so any longer.

### B.    USASF GOVERNANCE STRUCTURE AND RULES

#### 1.    USASF GOVERNANCE STRUCTURE

44.    As noted in my opening report, the USASF Board of Directors has thirteen voting members: a Chairman, a senior staff member, four gym owners, and seven event producers.[106] When the USASF was established, the event producer seats were each held by one of seven event producers that founded the USASF.[107]   Over the years, Varsity has come to control all seven of these seats by way of acquisitions.[108]

45.    Mr. Orszag criticizes my recommendations that the USASF restructure the Board so that non-Varsity market participants are better represented and no single market participant has

---

[104] Orszag Report at ¶42.

[105] USASF 2013 Annual Report, USASF_00032535 at USASF_00032536 ("Perhaps the most significant news for the organization in 2013 was the repayment to Varsity Spirit Corporation of the startup loan that funded the USASF launch in 2003.").

[106]  Deposition of S. Peterson, Mar. 9, 2022, at 31:10-14; U.S. ALL STAR FEDERATION, Board Members, accessed May 10, 2022, https://www.usasf.net/committee-board.

[107] Deposition of J. Chadwick, Apr. 15, 2022, at 129:2-8;  USASF_0003245 (Chadwick Exhibit 5) (USASF Board Operating Guidelines and Approved Bylaw Amendments).  *See also* CHEER BIZ NEWS, Then and Now, The Evolving USASF (Aug. - Sep. 2013), USASF_00055669 ("When the USASF was established, the Board of Directors was formed from its founding event producer members.").

[108] Deposition of J. Chadwick, Apr. 15, 2022, at 129:2-8.

HIGHLY CONFIDENTIAL

inappropriate influence or control, and states that I do "not identify how USASF's bylaws should change to 'better represent non-Varsity market participants,' or whether it is even feasible—or would have been feasible at any point during the alleged class period—for USASF to change its bylaws to do so. Further, even if it were possible for USASF to have changed its bylaws in the way Mr. Aronoff suggests, one cannot conclude that doing so would necessarily be a good idea without conducting an economic analysis of how the change would affect event producers' incentives and the resulting competitive effects (which Mr. Aronoff does not analyze)."[109] It does not appear that Mr. Orszag has done any such analysis, certainly not as an economist. The Netz Report states that by completing the JAM Brands acquisition, "Varsity achieved implicit control of the Board of Directors of the USASF," which Varsity used to "disadvantage rivals" and harm its competition.[110] No economic analysis is needed to show that the anticompetitive effects of Varsity's current conduct and control of the USASF Board would be mitigated by implementing my recommendation to restructure the USASF Board so that no single market participant has inappropriate influence.[111]

46.     Mr. Orszag further comments that my suggested relief that Varsity cannot have any involvement in the assignment of the bid awarding process is "illogical because the same reasoning can be applied to any event producer: that is, if it is a conflict of interest for Varsity to participate

---

[109] Orszag Report at ¶57.

[110] Netz Report at 95-96, 89.

[111] In his deposition, Mr. Orszag appeared to indicate that it would be acceptable if a sanctioning or rule making body include representatives of the entities subject to such sanctioning or rule making. It would be impractical and unfair for an entity which is the subject of the rules to make and administer the rules, particularly as they apply to them or their competitors. It would be as if the NCAA included schools which are accused of NCAA violations to participate in the investigation of such claims. If the University of Alabama football program is accused of recruiting violations, it would be inappropriate for Nick Saban to participate in the investigation of such claims. *See* Deposition of J. Orszag, Nov. 15, 2022, at 391:20-394:1.

**HIGHLY CONFIDENTIAL**

in the Sanctioning Committee, it is a conflict of interest for all other event producers."[112]  Mr. Orszag is understating Varsity's involvement in the bid awarding process.  As previously discussed, Varsity is not simply "participating in the Sanctioning Committee."  Since at least 2016, Varsity has held the majority of seats on the Sanctioning Committee.[113]  The Netz Report describes Varsity conspiring with the USASF, specifically through Varsity's control over the Sanctioning Committee, "to exclude and disadvantage rivals."[114]  My recommendation is intended to mitigate the effect of this behavior, which Dr. Netz has shown to be anticompetitive.

47.    The need for an independent and transparent governing body is universal across all sports, including Competitive Cheer.  Sports such as gymnastics, swimming and figure skating each have a governing body where the Boards of Directors are elected for a period of time, and include both athlete representatives (former competitors of the sport) and a number of independent or unaffiliated directors.[115]  In contrast, the USASF has a static Board of Directors without any independent members or non-USASF employees.

## 2.    USASF RULES REGARDING WORLD BID EVENTS

48.    As observed in my opening report, Varsity has a history of strategically scheduling events to conflict with the events of non-Varsity event producers in order to draw participants and teams away from the non-Varsity events.[116]  The Netz Report concluded that Varsity's attempts to

---

[112] Orszag Report at ¶65.

[113] Deposition of J. Chadwick, Apr. 15, 2022, at 163:6-9.

[114] Netz Report at 65-84.

[115] *See* U.S. FIGURE SKATING, The 2022-2023 Official U.S. Figure Skating Rulebook (Jul. 2022) at 19, available at https://www.usfigureskating.org/about/rules; USA SWIMMING, Corporate Bylaws of USA Swimming (updated Nov. 20, 2022) at 5-7, available at https://www.usaswimming.org/docs/default-source/governance/governance-lsc-website/bylaws/2022-corporate-bylaws.pdf;  USA GYMNASTICS, INC., Amended and Restated Bylaws of USA Gymnastics, Inc. (updated Jun. 17, 2022) at 12, available at https://usagym.org/PDFs/About%20USA%20Gymnastics/Governance/usag-bylaws.pdf.

[116] *See* Email from K. Harrison dated Jan. 23, 2019, VAR00095101, at VAR00095101.

**HIGHLY CONFIDENTIAL**

"undercut events hosted by rival event producers" via scheduling manipulation was anticompetitive conduct, and that "Varsity was able to successfully implement the anticompetitive conduct … because of its control of the rules-making process and the ongoing cooperation of the USASF."[117]  My recommendation that Varsity can determine its event schedule without reference to the schedules of other event producers, or avoid scheduling events in the competing location or at the same time as previously scheduled events, is intended to mitigate the effects of this activity.[118]

### 3.    USASF RULES GAVE VARSITY AN ADVANTAGE

49.    In my opening report, I noted that "Varsity, both independently and via the USASF, has enacted competition rules that exclude or limit non-Varsity entities" by denying access to the rules imposed by USASF in the sport of Competitive Cheer.[119]  I understand that the failure to provide access to rules that are intended to govern the sport can be seen as anticompetitive, and can be viewed as one of the many ways that "Varsity and the USASF conspired to exclude and disadvantage rivals."[120]  My opening report includes the recommendation that "the USASF, or any future governing body, can make competition rules available to all event producers," which the USASF does not currently make available.[121]  This recommendation is intended to support

---

[117] Netz Report at 73-78.

[118] While Mr. Orszag correctly points out that the USASF has a rule that limits the placement of other "Worlds bid events" in competition with another Worlds bid event (Guideline 3.B), it does not prohibit an event producer from placing a competing event that awards bids to other prestigious end-of-season events.  Orszag Report at ¶78.

[119] Aronoff Report at ¶86.  *See* Varsity Brands Q4 Board of Directors Meeting dated Oct. 24, 2017, CB00025330 at CB00025399.  Varsity Board materials discuss the potential implementation of a governing body for international cheer – that Varsity would not control – as harmful to Varsity's domestic and international business.  The Board materials state, "in the world of sports, he who makes the rules, rules."

[120] Netz Report at 65-89, discussing the conduct of Varsity and the USASF.

[121] Aronoff Report at ¶98.

**HIGHLY CONFIDENTIAL**

transparency, which will lead to fewer conflicts of interest and prevent any "backroom" deals, or the appearance of any such conflicts or deals.[122]

50.    Mr. Orszag takes exception to this suggested relief and claims (i) that Varsity does not directly benefit from keeping the rules away out of the public domain, (ii) that I failed to analyze "the procompetitive reasons for USASF not to freely share its rules with non-USASF members," and (iii) that I show no evidence to support that the lack of access to the rules has made it virtually impossible for non-USASF members to introduce a competition.[123] Mr. Orszag does not appear to have performed any analysis, particularly as economist, to support his claims.  It is not a valid explanation to suggest that rules are appropriate because they do not directly benefit Varsity.

51.    Again, Mr. Orszag's arguments are irrelevant to my opening report and do not pertain to the opinions I was asked to provide.  I was not engaged to conduct the economic analysis that Mr. Orszag criticizes me for failing to undertake.  See Section IV.E. above for discussion regarding my recommendations for enhanced governance and compliance.

---

[122] Publicizing competition rules is common practice among sports with similar governance structures as Competitive Cheer.  *See* U.S. FIGURE SKATING, The 2022-2023 Official U.S. Figure Skating Rulebook (Jul. 2022), available at https://www.usfigureskating.org/about/rules.

[123] Orszag at ¶99.

**HIGHLY CONFIDENTIAL**

Dated:  December 14, 2022

James H. Aronoff

30

**HIGHLY CONFIDENTIAL**

# APPENDIX A

# James H. Aronoff

### E-mail: jim.aronoff@cohnreznick.com
### (917) 287-3431

## *Professional Highlights*

Senior, deal-tested, capital markets professional with more than 35 years of experience in all aspects of asset origination, servicing and finance markets, including senior management, capital raising, strategic planning, product development, trading, structuring, valuation, due diligence, sales, and negotiating transactions.

Diverse skills gained through experience as Chairman and CEO of a finance company, senior investment banker, consultant, trader, attorney, and managing director of a major bond insurer.

Possess superior credit analysis, structuring, valuation, and negotiation skills in connection with structured finance transactions, and the origination, acquisition, management, and disposition of performing, sub performing, and distressed consumer, residential, and commercial assets, including subprime loans.

Significant success in identifying market opportunities, designing start-ups, and building, evaluating, and improving profitable asset origination, acquisition, finance, and servicing operations. Effectively implemented new technologies and personnel "team building" approaches to create successful working environments.

## *Professional Experience*

**CohnReznick LLP,** New York, New York                                    2021 to Present
**Managing Director**

Managing Director in CohnReznick's Restructuring and Dispute Resolution practice. Provide attorneys and other clients with technical and industry expertise to understand and evaluate relevant issues related to complex arbitration, mediation, and litigation matters, with a focus on capital markets, secured lending, financial institutions, structured finance, and securitizations, including RMBS, CMBS, CLOs, CDOs, and other ABS. Assist clients by addressing business, due diligence, audit, and valuation issues within a potential dispute, and providing expert witness testimony. Supervise risk management, portfolio valuation, regulatory compliance, and transaction oversight services within the firm's financial services advisory practice. Provide rigorous analyses based upon significant capital markets and financial services industry knowledge and business acumen derived from decades of hands-on experience. Provide comprehensive support throughout all stages of an engagement, from assessment of facts, through determination of strategic options and implementation.

**Friedman LLP,** New York, New York                                    2020 to 2021
**Managing Principal**

Managing Principal of the Financial Institutions Consulting practice. Provide attorneys and other clients with expert witness testimony and comprehensive support throughout all stages of an engagement, from assessment of facts, through determination of strategic options and implementation.

**Forensic Risk Alliance,** New York, New York                                    2019 to 2020
**Partner**

Provide attorneys and other clients with technical and industry expertise to understand and evaluate relevant issues related to complex litigation matters. Assist clients by addressing business, due diligence, audit and valuation issues within a potential dispute, and providing expert testimony. Supervise risk management, portfolio valuation, regulatory compliance and transaction oversight services within FRA's financial services advisory practice.

*Professional Experience (cont'd.)*

**Baker Tilly Virchow Krause, LLP,** New York, New York                2016 to 2019
**Principal and Practice Leader**

Principal and Practice Leader of the Financial Institutions Consulting practice.

**Duff & Phelps,** New York, New York                2012 to 2015
**Managing Director**

Senior member of Financial Services Industry Dispute and Litigation group.

**MTGX, LLC**, Katonah, New York                2000 to Present
**Managing Partner**

Founded and manage advisory firm providing capital markets solutions to small and medium sized specialty finance companies. In addition, the firm provides sophisticated and technical expertise to larger financial institutions on an out-source basis. Services offered by MTGX include: risk assessment and management strategies; asset and portfolio valuation; analysis and evaluation of servicing and collection arrangements; mediation and arbitration services; expert witness testimony; asset sale advisory services; new product development; operational due diligence; capital raising (equity or debt); and distressed portfolio resolution, remediation and disposition strategies.

**FCS Advisors, Inc.,** New York, New York                2009 to 2012
**Managing Director**

Provided senior leadership and strategic oversight to the advisory services and consulting business. Sourced and executed fee-based transactions. Services offered included a variety of strategic development, asset management and administrative services on behalf of clients who were typically stakeholders in portfolios of whole loans, securities (including CMBS and RMBS), or other structured products (particularly in the context of workouts). Engagements included: litigation support and dispute resolution, the creation and execution of remediation/liquidation strategies, management of wind-downs/liquidations, asset sales, data management, portfolio surveillance and oversight, re-packaging and/or "de-packaging" assets, independent valuations, and due diligence and operational reviews of asset managers, counterparties, and vendors.

**Garnet Capital Advisors**, New York, New York                2005 to 2006
**Managing Director, Structured Finance**

Directed and managed Garnet's Structured Finance Group, which provides valuation, liquidation, and advisory services to stakeholders in structured transactions. The Group's primary focus is on distressed securities where the assets or transaction parties are underperforming.

**Portfolio Reconnaissance Services, Inc.**, Shelton, Connecticut                2003 to 2004
**Founder and Principal**

Conceived, built, and capitalized a start-up to provide investors and portfolio managers with the critical insight required for continuous improvement in asset performance. The services provided by Portfolio Reconnaissance Services, or Recon, include transaction oversight and management, monitoring, consulting and analytics, expertise in evaluating and servicing loan portfolios, advanced risk mitigation techniques, and value-driven, actionable intelligence. Recon's services support institutional investors with respect to whole loan portfolios, fixed income instruments, and structured securities, including Asset Backed Securities (ABS), Residential Mortgage-Backed Securities (RMBS) and Commercial Mortgage-Backed Securities (CMBS). In 2004, Recon was sold to a private equity firm.

*Professional Experience (cont'd.)*

**FC Capital Corp**., Valhalla, New York                                                    1997 to 2000
**Chairman of the Board and Chief Executive Officer**

Raised $20 million in equity capital and co-founded a residential mortgage loan origination, acquisition, and servicing company. Established multiple credit facilities to finance inventory of loans and securities. Sold and securitized over $500 million of subprime residential loans. Acquired Home First National, a retail loan originator. Articulated and implemented a strong credit and risk management culture. Introduced new technological approaches to building and supporting marketing, underwriting, investing, and servicing capabilities. Sold to a large, public financial services company in 2000.

**Nomura Securities International, Inc**., New York, New York                        1993 to 1997
**Managing Director, Fixed Income Structured Finance**

Built a business of financing, trading and underwriting non-traditional consumer and commercial assets. Senior manager responsible for all aspects of this multi-billion-dollar operation, including daily P/L and balance sheet management, creation and implementation of annual business plans and operating budgets, long-term strategic planning, and all personnel matters, including hiring, evaluation, and compensation issues. Business units included: subprime residential mortgage conduit; ABS/MBS trading desk; whole loan trading; asset-backed finance and warehouse group; and merchant banking operation. Successfully liquidated a $1 billion portfolio of distressed consumer, residential and commercial assets comfortably within projected timelines and proceeds estimates. Obtained Series 7, 12, 24 and 63 NASD (now, FINRA) licenses.

**Financial Security Assurance, Inc**., New York, New York                          1989 to 1993
**Managing Director and Senior Business Development Officer**

Developed market strategies, business plans and budgets for Residential Mortgage Group. Responsibilities included: credit analysis, risk evaluation, tracking competition, analyzing relevant markets, and identifying profitable opportunities and niches. Devised new products and unique applications of existing products. Marketed, structured, underwrote, negotiated, and closed numerous unusual and complex transactions, including many unique, innovative, and "first time" transactions for FSA. Personally responsible for transactions representing over $3 billion aggregate par insured, which generated present value premiums of more than $50 million.

**Kidder Peabody & Co**., New York, New York                                        1987 to 1989
**Vice President, Kidder Peabody Mortgage Capital Corp.**

Drafted and negotiated transaction documents relating to numerous structures, including servicing released and servicing retained whole loan purchases and sales, and rated and unrated pass-through securities and CMOs, both with and without credit enhancement. Coordinated parties to transactions, including issuers, trading desk, sales force, rating agencies, insurers, lawyers, accountants and investors. Signatory authority with respect to all contracts, payments, borrowings and credit arrangements, including repurchase and reverse repurchase obligations, of Kidder Peabody Mortgage Capital Corp.

**Thacher Proffitt & Wood**, New York, New York                                    1983 to 1987
**Associate Attorney, Mortgage Finance Department**

Structured real estate finance and secondary mortgage market transactions. Drafted and negotiated commitment letters, form documents, purchase, participation and servicing agreements and other related documents for private purchases and sales in whole loan, participation or pass-through formats for a broad range of assets, including residential, commercial and multifamily loans. Participated in the preparation of the registration package and prospectus for numerous public transactions, including pass-through certificates, CMOs and REMICs.

*Educational Experience (cont'd.)*

### *Education*

**Cornell Law School**, Ithaca, New York
*Juris Doctor*, Specialization in International Law

**Yale College**, New Haven, Connecticut
*Bachelor of Arts*, Dual Major in Economics and Political Science

# APPENDIX B

# APPENDIX B

# Materials Relied Upon[1]

**Expert Reports**
- Expert Report of James H. Aronoff and materials relied upon, Jun. 20, 2022 (and attachments thereto)
- Expert Report of Randal Heeb, PhD and materials relied upon, Jun. 20, 2022 (and attachments thereto)
- Expert Report of Janet S. Netz, Ph.D. and materials relied upon, Jun. 20, 2022 (and attachments thereto)
- Expert Report of Kevin Murphy and materials relied upon, Sep. 23, 2022 (and attachments thereto)
- Expert Report of Jonathan M. Orszag and materials relied upon, Sep. 23, 2022 (and attachments thereto)

**Previously Produced Documents**
- CB00025330
- USASF_00011614
- USASF_00032535
- USASF_00055669

**Deposition Transcripts**
- Deposition of C. Davis, Feb. 24, 2022 (and associated exhibits)
- Deposition of J. Fowlkes, Apr. 5, 2022 (and associated exhibits)
- Deposition of K. Murphy, Nov. 4, 2022 (and associated exhibits)
- Deposition of J. Orszag, Nov. 15, 2022 (and associated exhibits)

**Other Secondary Sources**
- U.S. FIGURE SKATING, The 2022-2023 Official U.S. Figure Skating Rulebook (Jul. 2022), available at https://www.usfigureskating.org/about/rules
- USA GYMNASTICS, INC., Amended and Restated Bylaws of USA Gymnastics, Inc. (updated Jun. 17, 2022), available at https://usagym.org/PDFs/About%20USA%20Gymnastics/Governance/usag-bylaws.pdf
- USA SWIMMING, Corporate Bylaws of USA Swimming ( updated Nov. 20, 2022), available at https://www.usaswimming.org/docs/default-source/governance/governance-lsc-website/bylaws/2022-corporate-bylaws.pdf

---

[1] I have not repeated here materials previously listed in my opening report. *See* Aronoff Report at Appendix C.