# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| JESSICA JONES et al., | |
| Plaintiffs, | **Civ. Action No. 2:20-cv-02892** |
| v. | |
| VARSITY BRANDS, LLC et al., | |
| Defendants. | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' PROFERRED EXPERT JEN MAKI, PHD

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

ARGUMENT ......................................................................................................................3

I.     DR. MAKI'S DAMAGE CALCULATIONS ARE BASED ON AN IMPROPER
METHODOLOGY AND USE INCORRECT INPUTS ......................................................4

     A.     Dr. Maki Relies On Heeb's Fatally Flawed Overcharge Percentages......................5

     B.     Dr. Maki Overstates the Relevant Sales For Numerous Reasons, Which
Inflate Her Damages Calculations ............................................................................6

     C.     Dr. Maki's 100% Pass through Assumption, Which Inflates Her Damages
Calculations, Is Also Plainly Incorrect.....................................................................9

     D.     Dr. Maki Should Not Be Permitted to Inflate Her Damages Figures in Her
Rebuttal Report ........................................................................................................16

II.     DR. MAKI'S "COMMON PROOF" OPINION IS WITHOUT BASIS ..........................17

III.     THE VAST MAJORITY OF DR. MAKI'S REPORTS ARE FACTUAL NARRATIVE
AND SHOULD NOT BE PERMITTED AS EXPERT TESTIMONY ............................18

CONCLUSION..................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. AMTRAK,*
  303 F.3d 256 (2d Cir. 2002) ....................................................................... 3-4

*Ask Chems., LP v. Comput. Packages, Inc.,*
  593 F. App'x 506 (6th Cir. 2014) .................................................................. 20

*Daubert v. Merrell Dow Pharms., Inc.,*
  509 U.S. 579 (1993) ........................................................................................ 3

*Gen. Elec. Co. v. Joiner,*
  522 U.S. 136 (1997) ........................................................................................ 4

*Heller v. Shaw Indus., Inc.,*
  167 F.3d 146 (3d Cir. 1999) ........................................................................... 3

*Illinois Brick v. Illinois,*
  431 U.S. 720 (1977) ................................................................................... 9-10

*In re Class 8 Transmission Indirect Purchaser Antitrust Litig.,*
  679 Fed. App'x 135, 141 (3d Cir. 2017) ................................................ 11, 18

*In re Davol, Inc./C.R. Bard, Inc.. Polypropylene Hernia Mesh Prods. Liab. Litig.,*
  546 F. Supp. 3d 666 (S.D. Ohio 2021) ......................................................... 19

*In re Domestic Drywall Antitrust Litig.,*
  No. 130-MD-2436, 2017 WL 3700999 (E.D. Pa. Aug. 24, 2017) ............ 14-15

*In re Graphics Processing Units Antitrust Litig.,*
  253 F.R.D. 478 (N.D. Cal. 2008) ......................................................... 5, 10, 15, 8

*In re: LIBOR-Based Fin. Instruments Antitrust Litig.,*
  299 F. Supp. 3d 430 (S.D.N.Y. 2018) ........................................................... 18

*In re Lyondell Chem. Co.,*
  558 B.R. 661 (Bankr. S.D.N.Y. 2016) ........................................................... 18

*In re NASDAQ Mkt-Makers Antitrust Litig.,*
  169 F.R.D. 493 (S.D.N.Y. 1996) ..................................................................... 7

*In re Optical Disk Drives Antitrust Litig.*,
 303 F.R.D. 311 (N.D. Cal. 2014) ........................................................................13

*In re Processed Egg Prods. Antitrust Litig.*,
 312 F.R.D. 124 (E.D. Pa. 2015) .............................................................. 11-12, 18

*In re Toilet Seat Antitrust Litig.*,
 1977 WL 1453 (E.D. Mich. Aug. 24, 1977) ...........................................................7

*Kumho Tire Co. v. Carmichael*,
 526 U.S. 137 (1999).................................................................................................3

*Nelson v. Tennessee Gas Pipeline Co.*,
 243 F.3d 244 (6th Cir. 2001)...................................................................................3

*Newell Rubbermaid, Inc. v. Raymond Corp.*,
 676 F.3d 521 (6th Cir. 2012)...................................................................................4

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
 491 F.3d 1342 (Fed. Cir. 2007)............................................................................20

*Reynolds v. Freightliner LLC*,
 Civ. No. 05-70-GFVT, 2006 WL 5249744 (E.D. Ky. June 21, 2006) .............. 19-20

*Rose v. Matrixx Initiatives, Inc.*,
 No. 07-2404-JPM/tmp, 2009 WL 902311 (W.D. Tenn. Mar. 31, 2009) ...................3

*Seiber v. Estate of McRae*,
 No. 1:11-CV-00111-TBR, 2013 WL 5673601 (W.D. Ky. Oct. 17, 2013)................20

*Somers v. Apple, Inc.*,
 258 F.R.D. 354, 361 (N.D. Cal. 2009) ...................................................................10

*Tchatat v. City of New York*,
 315 F.R.D. 441 (S.D.N.Y. 2016) ............................................................................19

*United States v. Rios*,
 830 F.3d 403 (6th Cir. 2016)..................................................................................20

*Yancey v. Carson*,
 Nos. 3:04-CV-556, 3:04-CV-610, 2007 WL 3088232 (E.D. Tenn. Oct. 19, 2007) ................19

**Other Authorities**

Fed. R. Evid. 403 ......................................................................................................19

Fed. R. Evid. 702 .................................................................................................3, 20

Fed. R. Evid. 703 ......................................................................................................18

## INTRODUCTION

Dr. Maki is Plaintiffs' expert on damages, but her damages opinion should be excluded as classic "garbage in/garbage out." Her quantification of damages is based on overcharge percentages supplied by Dr. Heeb multiplied by the amount of Varsity's sales in the alleged market at issue. Because Dr. Heeb's overcharge percentages are improperly derived and do not fit with the basis for a damages calculation in an antitrust action, Dr. Maki's use of them to derive her opinions is necessarily invalid. And, because Dr. Maki uses such incorrect numbers in her calculations, the results of those calculations are not sufficiently sound to present to a jury.

In addition, Dr. Maki applied Dr. Heeb's flawed overcharge percentages to Varsity's total sales in the alleged markets to her own incorrect calculation of the relevant volume of Varsity's sales, without, for example, taking out sales to end payers or eliminating sales to end users in states that do not have indirect purchaser laws.

Dr. Maki's damage calculation is untenable for the additional reason that she "determined"—based on no quantitative analysis of any kind—that any "overcharge" paid by a Varsity direct customer in any of the three broad areas of competitions, apparel, or camps, was necessarily 100% passed through to a downstream customer. As counterintuitive as assuming that literally *no* overcharge was *ever* absorbed by a gym or school and as contradicted as her conclusion is by the record and, indeed, by Dr. Maki herself, the inappropriateness of this assumption is illustrated all the more so in that Dr. Maki assumed that 0% of any rebate paid to a direct Varsity customer resulted in *lower* prices to putative class members.

As a result of these fundamental analytical errors, Dr. Maki's damages calculations is wildly inflated. Presenting it to the jury would severely and unfairly prejudice Defendants and would run afoul of Rule 702 and 403 of the Federal Rules of Evidence.

## BACKGROUND

Dr. Maki offers numerous calculations of "damages."  In general, she determined her numbers by multiplying the overcharge percentages that Dr. Heeb divined (both those in his opening report and the different ones in his rebuttal report) by totals for Varsity's sales that Dr. Maki calculated, across three different "markets"—competitions, apparel, and camps.  In her opening report, her damages numbers were all national but, in the case of competitions, were split out among All Star and scholastic competitions and regular-season and end-of-season.  In her rebuttal report, Dr. Maki abandoned splitting out the competitions but instead lumped all competitions into one category.  In her rebuttal report she also put forward numbers on a state-by-state basis for the first time and presented calculations for different regions of the country using "regional overcharge" figures that Dr. Heeb provided.  She also provides numbers using Heeb's "national" overcharge percentages, but these are limited to certain states, which, for the most part, are the states under the laws of which Plaintiffs have asserted claims.

Dr. Maki offers no guidance or opinion on which of these various calculations are the correct ones and repeatedly referred back to Dr. Heeb during her deposition.  Indeed, she generally performed the role of a calculator, rather than an economist.

Other than presenting her myriad "damages" numbers, Dr. Maki presents long factual narratives and tables of information she apparently calculated from data produced in discovery.  This information is not connected to her opinions, and it is unclear why it is provided or even relevant.  She also presents a series of tables showing the effect of adding 10% simple interest per year to her damages calculations.  She does not opine that this would be an appropriate

measure of loss; rather, as with essentially all of her "analysis," she explained at her deposition that she "used the 10 percent as instructed by counsel."  (Ex. A[1], Maki Dep. 85:21-22.)

## ARGUMENT

A party offering expert testimony must "establish its admissibility by a preponderance of proof."  *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).  Rule 702 of the Federal Rules of Evidence allows a "witness who is qualified as an expert by knowledge, skill, experience, training, or education [to] testify in the form of opinion or otherwise" in certain limited circumstances.  First, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  Second, the testimony must be "based on sufficient facts or data."  Fed. R. Evid. 702(b).  Third, the testimony must be "the product of reliable principles and methods."  Fed. R. Evid. 702(c).  Finally, the expert must have "reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702(d).  All four of these requirements must be satisfied.

The Court has a "gatekeeping obligation" to ensure that any expert testimony "is not only relevant, but reliable."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  This obligation "applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*."  *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999).  This requires the court to examine each part of an expert's analysis, because any unreliable step "renders the expert's testimony inadmissible."  *Rose v. Matrixx Initiatives, Inc.*, 2009 WL 902311, at *10 (W.D. Tenn. Mar. 31, 2009) (quoting *Amorgianos v. AMTRAK*, 303 F.3d

---

[1] References herein to "Ex. __" refer to the corresponding Exhibit in the Kaiser Declaration, which is submitted herewith.

256, 267 (2d Cir. 2002); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  "Red flags

that caution against certifying an expert include reliance on anecdotal evidence, improper

extrapolation, failure to consider other possible causes, lack of testing, and subjectivity."  *Newell*

*Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012).  "In addition, if a

purported expert's opinion was prepared solely for litigation, that may also be considered as a

basis for exclusion."  *Id.*  Essentially all of the "red flags" that the Sixth Circuit identified in

*Newell Rubbermaid* are present in Dr. Maki's opinions, as set forth in greater detail below.

## I.      DR. MAKI'S DAMAGE CALCULATIONS ARE BASED ON AN IMPROPER METHODOLOGY AND USE INCORRECT INPUTS

Dr. Maki's self-stated function in this case is "to provide a damages estimate."  (Ex. A,

Maki Dep. 14:16-17.)  The "methodology" that Dr. Maki employed in her opening report was to

multiply the overcharge percentage put forward by Dr. Heeb by a calculation she did of Varsity's

national sales.  (Ex. A, Maki Dep. 129:12-20.)  She then essentially assumed—and certainly did

not quantitative analysis of any kind to verify—that all of the so-called "overcharge" was paid by

the members of the proposed class, which is to say that 100% of Varsity's sales were to buyers

who then resold to members of the proposed class and that these middlemen passed 100% of any

overcharge that they paid onto members of the proposed class.  (Ex. B, Maki Rep. ¶¶ 119-20.)

Dr. Maki's methodology and the resulting calculations are flawed in all respects.  First,

she relies on Dr. Heeb's overcharge percentages, which themselves are incorrect as discussed in

the motion to exclude his testimony, filed concurrently and incorporated by reference here.  (*See*

ECF No. 388-1.)  Second, she applied those overcharge percentages to dollar figures that she

purports to have determined were Varsity's sales but fails to exclude many direct sales to end

users, sales where there was no indirect purchase, and sales in states that do not permit indirect

purchaser actions.  Third, she assumed that any "overcharge" to a Varsity customer was, without

exception, 100% paid by the end purchaser, with no party in the middle absorbing even a portion of it—which makes no sense at all. This 100% pass through conclusion is even more untenable in light of her further conclusion that any rebate that Varsity paid was *never* passed through.

### A.   Dr. Maki Relies On Heeb's Fatally Flawed Overcharge Percentages

Dr. Maki did not calculate the overcharge percentages she used to calculate damages. Instead, she simply used Dr. Heeb's overcharge numbers. (Ex. A, Maki Dep. 34:12-15 ("Q: … The overcharge percentage is something that Dr. Heeb came up with, right? A. That is correct.").) But, as set forth in the *Daubert* motion relating to Dr. Heeb, his calculations are fatally flawed for numerous reasons. To the extent Dr. Heeb's testimony on these overcharges is excluded, Dr. Maki's calculations and testimony based on them must be excluded as well. *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 502 (N.D. Cal. 2008) ("*GPU*") (rejecting damages expert's opinion because it "hinge[d] on the accuracy of [another expert's] conclusions that defendants' actions led to an overcharge on their direct purchases and that that impact can be demonstrated by common proof").)

Among other things, Dr. Heeb's national overcharge percentages should not be used to calculate damages in competitions and camps, which Dr. Heeb says have regional geographic markets. As noted, Dr. Maki presents calculations using Dr. Heeb's regional overcharge numbers, which results in more than ███████ less in damages.[2] In addition, Dr. Heeb's regional overcharge is not statistically significant, and when that region's competition and camp damages are taken out, the total damages amount reduces by another almost ███████.[3]

---

[2] The precise calculation is ███████ in Table 7 of Dr. Heeb's rebuttal report minus ███████ in Appendix I, which equals ███████.

[3] The precise calculation is ███████ (for competitions in the ███ region) plus ███████ (for camps in the ███ region), which equals ███████.

**B.     Dr. Maki Overstates the Relevant Sales For Numerous Reasons, Which Inflate Her Damages Calculations**

Dr. Maki's calculations are also fatally flawed because she overstates the amount of relevant Varsity sales.  In that regard, she assumes that every sale where payment came to Varsity from a gym or a school was accompanied by an "indirect purchase" by one of the putative class members.  But that is simply not the case.  Schools in particular may not charge their cheerleaders *anything* to participate on the cheerleading team or the charge may be a flat activity or similar fee that has no relation to what the school may pay Varsity to provide cheerleading apparel, competitions, and/or camps.  Sometimes gyms would "eat" the costs of a competitions when an athlete did not pay, particularly where the athlete played a critical role on the team.  (Ex. E, Minzghor Dep. 107:8-17, 108:8-109:18.)  Dr. Maki did not consider this possibility, much less account for it in her calculations of relevant Varsity sales.  (*See* Ex. A, Maki Dep. 65:19-66:10.) This is the first of her errors in calculating relevant Varsity sales.

Dr. Maki's second error in calculating relevant sales stems from her failure to account for the fact that, even where a school does not absorb the charge (and any overcharge), other entities, such as booster clubs, may pay.  Or the costs may be covered by fundraising efforts.  (*See, e.g.*, Ex. F, Haygood Dep. 139:1-142:18; Ex. G, Hayes Dep. 131:20-132:4; Ex. H, Lorenzen Dep. 96:8-97:5; Ex. I, Cherasaro Dep. 89:20-91:15.)  Although Dr. Maki understands this happens (*see* Ex. A, Maki Dep. 160:25-162:4), she confirmed at her deposition that she did not exclude these sorts of sales from her calculations.  (*id*. 65:19-66:10, 71:18-72:7, 76:1-10, 76:20-77:2.)

Even in the case where parents or cheerleaders pay the gym or school in the first instance, the payment is often a direct purchase from Varsity and not part of Plaintiffs' case.  For example, when a school or gym pools money from a cheerleading team and then remits that money to Varsity, the team members, not the entity, are the direct purchasers  (*See, e.g.*, Ex. E, Minzghor

Dep. 107:1-11 (describing collecting competition fees from parents for remittance to competition

provider).)[4]  When such an intermediary acts as a mere conduit for the sale, never acquires the

product or service, and takes no risk in the transaction, the payer (here the cheerleader or parent)

is a direct, not indirect, purchaser.  *See, e.g., In re Toilet Seat Antitrust Litig.*, 1977 WL 1453, *2

(E.D. Mich. Aug. 24, 1977) (holding that purchaser that purchased through purchasing agent was

a direct purchaser, not an indirect purchaser); *see also In re NASDAQ Mkt-Makers Antitrust

Litig.*, 169 F.R.D. 493, 506 (S.D.N.Y. 1996) (same as to clients of stockbroker).  Sales in that

situation should not have been included in Dr. Maki's calculation of relevant sales.  Dr. Maki did

nothing to account for this common circumstance, thereby overstating the amount of sales that

resulted in indirect purchases, which in turn increases the amount of Dr. Maki's damages

calculations.  This is her third error in calculating relevant Varsity sales.

Dr. Maki also employed an invalid methodology for excluding sales relating to sideline

school cheerleading.  In particular, she included all sales to a school if the school attended a

single competition *or camp* during the putative class period.  At a minimum, including schools

that did not attend a single competition on the basis that they attended a camp is invalid and

overstates sales to schools that participate in *competitive* cheerleading, which in turn overstates

damages.  There is no dispute that many sideline cheer teams—*i.e.*, those that do not compete—

attend cheerleading camps.[5]  Indeed, Dr. Netz, another Plaintiffs' expert, expressly *excluded* sales

to schools that did not attend competitions from her analysis.[6]  At her deposition, Dr. Maki

---

[4] Ms Minzghor testified that, when the cheerleader did not pay, "[e]ither they wouldn't go or the
gym would have to eat it" and that both scenarios happened "[e]very year."  (Ex. E, Minzghor
Dep. 107:10-11, 107:23.)

[5] Dr. Murphy found that 74 to 79% of school camp customers in a given year did not attend any
competitions.  (Ex. D, Murphy Rep. ¶ 247.)

[6] *See, e.g.*, ECF 382-4 at 17-20.

conceded that any revenue from such schools was "inappropriately included" in her calculations. (Ex. A, Maki Dep. 84:7-8.)  This is her fourth error in calculating Varsity sales.

Importantly, each of these errors compounds the other.  Even if each error only affected, for example, 20% of all sales, combined they would suggest that Dr. Maki's overcharges, on a national basis, were almost 60% overstated.[7]

Finally, in her initial report, Dr. Maki included sales in the many states that do not allow or recognize a cause of action for indirect purchasers.  (*See also* Ex. A, Maki Dep. 66:11-67:8.)  Including sales in these states had the effect of vastly overstating the amount of sales, which in turn lead Dr. Maki to have a proportionally overstated amount of damages.  In her rebuttal report, Dr. Maki did provide breakouts by states and a table showing those states under the laws of which Plaintiffs seek to bring claims (for the most part).  These figures show 52% less damages than the nationwide calculation she presents in the same report.[8]  In other words, when the necessary reduction for states that do not provide indirect purchaser causes of action are considered, the damages calculation reduces by at least another nearly 52% using the calculations that Dr. Maki presented in her rebuttal report.

Combining this 52% reduction with the four errors described above suggests that Dr. Maki's sales volumes are inflated by 80% or more, with a corresponding overstatement of damages.  This overstatement of damages is *independent* of the errors discussed in Section I.A

---

[7] This figure is based on four errors that independently affect 20% of sales.  The specific calculation is $(1 - 0.2)^4$ equals 0.4096.  Similar results (albeit suggestive of an even greater error on Dr. Maki's part) obtain if the various elements are weighted at 20%, 5%, 40%, and 20%, which yields 0.3648 (0.8 x 0.95 x 0.6 x 0.8).

[8] In her rebuttal report, Dr. Maki provides a summation of damages "for select states," which are generally the states under the laws of which Plaintiffs bring this case.  Her total for those states is ████████, versus her "national" total presented in her rebuttal report of ████████.  ████████ divided by ████████ is 0.4832.  Thus, using Dr. Maki's own calculations, using just the states at issue yields an almost 52% reduction in her damages calculation alone.

(relying on Heeb's incorrect overcharge percentages) and I.C (applying a 100% pass through). Such patently unreliable analysis should not be presented to a jury.

### C.   Dr. Maki's 100% Pass through Assumption, Which Inflates Her Damages Calculations, Is Also Plainly Incorrect

Another fatal error in Dr. Maki's analysis is her assumption that, in those instances where there was a sale and resale, 100% of any overcharge was always "passed on" to a putative class member. (Ex. B, Maki Rep. ¶ 120; Ex. A, Maki Dep. 86:4-10.) This conclusion was not based on any economic principle or study. As Professor Murphy notes, "the pass-through rate that arises in an industry at a given time is a function of supply and demand conditions and must be analyzed given the facts of the industry at that time. The elasticity of demand, shape of the demand curve, and shape of firms' cost curves all generally affect the degree to which pass through occurs. An empirical analysis is required to assess the degree of pass-through in a particular setting." (Ex. D, Murphy Rep. ¶ 438.) Dr. Maki even conceded that pricing "can be based on a variety of factors. Sometimes it's based on cost. Other times, it's based on demand, and the influence of each of these factors can vary depending on the specifics of the particular market and the dynamics associated with that event." (Ex. A, Maki Dep. 37:14-18.[9])

These are the very issues that prompted the Supreme Court in *Illinois Brick v. Illinois*, 431 U.S. 720 (1977) to bar indirect purchaser suits under federal antitrust law. As the Supreme Court observed, even under "an array of simplifying assumptions" regarding elasticities of demand at the downstream (here gym or school) level "it is unrealistic to think that elasticity studies introduced by expert witnesses will resolve the pass-on issue." *Id.*at 741-42; *see also id.*

---

[9] In this part of her testimony, Dr. Maki was attempting to dispute that the registration fee for events that awarded bids to end-of-season events were higher because of the costs of those bids, but the testimony illustrates the basic point that there is no real dispute that the pass through of costs—which Dr. Maki asserts is 100%—cannot just be assumed.

at 731-32 (discussing the "uncertainties and difficulties in analyzing price and output decisions in the real economic world rather than an economist's hypothetical model" (internal quotations marks omitted).  As one court observed, in light of these economic realities, showing pass through is a "daunting task."  *Somers v. Apple, Inc.*, 258 F.R.D. 354, 361 (N.D. Cal. 2009).

Dr. Maki was not equal to that task.  She did not provide any empirical analysis of anything, much less a proper one.  Rather, she did exactly what an expert must *not* do, particularly on an issue where the party professing the expert has the burden of proof, which is to assume the answer that is favorable to their sponsor.  In other words, contrary to law, which requires a plaintiff to *prove* pass through to establish harm and damages, Dr. Maki simply says that, because she was unable to locate anything contrary to her 100% pass through conclusion, her job was done.  Dr. Maki does not contest the general principles that Professor Murphy (and relevant caselaw) identified.  Rather, she cites lack of data and criticizes Professor Murphy for not doing his *own* analysis.  (Ex. C, Maki Rebuttal Rep. ¶ 17 ("It appears that data that would allow for such analysis is proprietary data and is not available …."); *id.* ("[T]here is no evidence that direct purchasers absorbed the anticompetitive overcharge."); Ex. A, Maki Dep. 86:25-87:10 (excusing lack of looking at particular transactions because of lack of data).)  But lack of data is no excuse; as the court in *GPU* concluded in rejecting a pass through analysis that was far *more* rigorous than what Dr. Maki offers, "[i]f plaintiffs were having difficulty obtaining data from defendants or third parties or sorting through that data, they should have timely raised that issue."  *GPU*, 253 F.R.D. at 506.  Indeed, "lack of data" means that Dr. Maki is unable to reach a conclusion, and her opinion should be disregarded.

Ultimately, Dr. Maki's only actual evidence—confined to All Star cheerleading gyms—is anecdotal deposition testimony and is not based on any statistical analysis or technique.  But

even accepting her read on those snippets, the fact that snippets of empirical evidence suggests
that in *some* instances an "overcharge" may have been passed on is not evidence that in *all*
instances *all* overcharges were passed on 100%.  Indeed, this is precisely the sort of speculation
that cannot ground proper expert testimony on pass through.  *See, e.g.*, *In re Processed Egg
Prods. Antitrust Litig.*, 312 F.R.D. 124, 162 (E.D. Pa. 2015) ("Plaintiffs would have needed to
demonstrate that this single pass-through rate is not simply speculating that the variation among
stores, retailers, and geographic areas is accounted for in that single pass-through rate.  This
variation in the pass-through rates shows that it is not reasonable to assume that one retailer's
pass-through rate will estimate all the others' pass-through rates.")) 

     In the fairly rare instances where a plaintiff has been able to show pass through in an
indirect purchaser antitrust case such as this one, it has been via a well-conceived and executed
regression, based on specific transaction data across the entire market.  Indeed, proper statistical
models that were confined to a few middlemen—which is far *more* than what Dr. Maki offers
here—have been judged to be insufficient.  *See, e.g.*, *Egg Prods.*, 312 F.R.D. at 159 (rejecting
pass through analysis because, despite being based on statistic modeling using regressions,
expert failed to "explore[], at the transaction level, the extent to which the overcharge was passed
through in each of the Class Jurisdictions and at more than of the retailers"); *see also In re Class
8 Transmission Indirect Purchaser Antitrust Litig.*, 679 Fed. App'x 135, 141 (3d Cir. 2017)
(rejecting certification of indirect purchaser class because, even though expert performed
regression, he analyzed "less than one percent of total truck sales from the putative indirect
purchase class—and based on data from [only] two dealers in California.").  Reliance on a few
anecdotes with no empirical analysis—as Dr. Maki did here—is even worse because by necessity
it improperly generalizes from a tiny portion of the market.  *See Egg Prods.*, 312 F.R.D. at 160

(rejecting pass through model because "[t]he pass-through model improperly assumes, without adequate support, that because one retailer passed through the overcharge at a certain rate averaged across its stores, all retailers *nationwide* shared that overcharge rate or, at least, passed along some positive overcharge.")[10]

To be sure, although Dr. Maki cherry picks testimony that she says support her view of pass through, there is ample evidence pointing in the other direction—in other words, showing that charge (and overcharges) were not passed through to customers. For example, one cheerleading parent testified that when the gym changed its competition schedule, "they don't charge us more." (Ex. I, Cherasaro Dep. 79:5-7.) She also noted that they "also don't get a refund if it's less." (*Id.* 79:7-8.) In other words, there is no pass through. Rebecca Foster of All Star gym Stars and Stripes testified that, ██████████████████████████ ████████████████████████████, which again shows there is no pass through. (Ex. J, Foster Dep. 85:12-86:10.) Likewise, several gym owners testified that they used no formula in setting their prices, which also undermines the premise of 100% pass through. For example, Tim Gurske of Fuel Athletics, an All Star gym, testified that "there isn't …a formula that we put all the variable into and get an exact result. We take a best guess. And things do change, and we have ways to adjust what our costs are to account for pluses or minuses in our expenses." (Ex. K, T. Gurske Dep. 95:14-19.) Similarly, Sarah Minzghor of Fusion Elite, an All Star Gym, testified that Fusion Elite set its prices based on the prior year and that there

---

[10] As noted, in the cases cited, the expert did undertake a regression analysis, which Dr. Maki did not do. Tellingly, one of Plaintiffs' other experts, Dr. Netz, has puts herself forward as an expert in the area of pass through in other matters and has had put forward pass through opinions in the past. (Janet S. Netz, PhD, applEcon, https://applecon.com/team/janet-s-netz-phd/ ("She has extensive experience in calculating pass-through rates in order to calculate damages on behalf of indirect purchasers.").) Despite that "extensive experience," she did not put forth a pass through opinion in this case.

was no "formula" to set All Star team prices.  (Ex. E, Minzghor Dep. 52:19-53:3.)

Assuming 100% pass through, as Dr. Maki does, is all the more untenable because the cost to be a member of an All Star team is typically many times whatever registration fees the gym may incur to enter that team in a competition.  This complicating factor tends to undermine any claim of a uniform, 100% pass through.  *See, e.g.*, *In re Optical Disk Drives Antitrust Litig.*, 303 F.R.D. 311, 324-25 (N.D. Cal. 2014) ("Among other things, the IPPs have not presented a persuasive explanation as to why it would be reasonable to assume a uniform pass through rate given that [optical disks] typically make up a relatively small portion of the cost of the products into which they are incorporated and given the existence of price points.")

Dr. Maki's speculation of 100% pass through is particularly inappropriate given the "packaged" nature of cheerleader's purchases from gyms.  Although the offerings of different gyms vary considerably, often gyms charge an "all-in" price for participation on an All Star cheerleading team, which includes such things as apparel, coaching, practices, insurance, competitions, and other products and services.  Tracing through the cost of aspect of the package that a gym may choose to acquire from Varsity is not a simple matter or susceptible to industry-wide generalization.  As several gym owners testified, there were many different costs that gyms considered in setting prices.  For example, Lauren Gurske of Fuel Athletics, in discussing ████████ ███████████████████████████████████████████████████████████████ and that, in the instance in question, ██████████████████████████████ ████████████████████  (Ex. L, L. Gurske Dep. 53:2-3.)  She added that "[t]here's lots of things we make money on.  And competition registrations is one piece of a puzzle …."  (*Id.* 52:4-6; *see also* Ex. J, Foster Dep. 82:13-86:10 (testifying about many different costs that gyms fact that may affect their pricing); Ex. E, Minzghor Dep. 50:14-53:12 (same)).)

13

A gym is in a similar position to a building contractor in *In re Domestic Drywall Antitrust Litig.*, 2017 WL 3700999 (E.D. Pa. Aug. 24, 2017), where the Court denied the indirect purchaser plaintiffs' motion for class certification.  Like a gym, a building contractor assembles a variety of materials and services and sells them as a package.  It faces its own competitive dynamic and "may not pass on an increase in the cost of raw materials, such as drywall, if the contractor knows that she can make a profit on labor or the profit margin she gets from using subcontractors and paying them a lesser amount than the consumer is being charged for that subcontracting work."  *Id.* at *14.  So, too, with gyms and the items (for example, competitions and apparel) that they purchase from Varsity, and a gym's labor, facility, and other costs, which have nothing to do with Varsity.  As in *Drywall*, "[t]hese varying scenarios show the difficulty in not only parsing out how much was actually paid for drywall in [this] scenario, but how much of any alleged overcharge would have been passed on to the 'end user.'"  *Id.*

Dr. Maki also conceded at her deposition that a profitable enterprise like a gym does not necessarily need to pass on all cost increases to remain profitable and that "whether or not … a firm would respond to [such a price increase] would also be influenced by their competitors." (Ex. A, Maki Dep. 99:22-25.)  Several gyms in fact testified that they profited off of the things they sold.  (Ex. M, Bray Dep. 35:23-24 ("Really, anything that the gym touched was marked up."; *id.* 76:10-77:21 (discussing plan to markup up apparel by 67.5%).  As Dr. Maki conceded, gyms are in competition with one another and there was significant evidence in the record of cheerleaders switching from one gym to another.  (Ex. A, Maki Dep. 96:12-18.)  Because gyms made profits and faced competition, it is not economically sound to assume that 100% of any charge or overcharge was "passed through."  Some (if not most or all) "overcharges" would be expected to be absorbed by the gym.  Yet Dr. Maki studied none of this in reaching her

conclusion that 100% of every gym's payments to Varsity were invariably passed through.

As insufficient as her analysis is as relates to gyms, Dr. Maki provides literally nothing *at all* related to schools.  (*See* Ex. A, Maki Dep. 88:10-13 ("Information on schools was very thin. So I relied on, well, I reviewed the information available to me.  There was not a ton of information that provided a deep level of insight."))  Instead of doing her own analysis, she once again simply said that Dr. Murphy did not disprove her 100% pass through assumption.  Dr. Maki could not identify—nor did she identify in her reports—anything at all related to schools. (*See* Ex. A, Maki Dep. 88:23-89:2 ("Q:  Okay. And did you find anything from any school where the school said we pass through our costs to parents or other members of the putative class?  A. I do not recall coming across something like that."))

This is yet another fatal flaw in her analysis.  Where there are multiple chains of distribution—here one through competitive private-sector enterprises such as gyms and the other through public-sector entities like schools—courts have been particularly skeptical of simplistic speculation about pass through, which is all that Dr. Maki offers.  *See, e.g.*, *Drywall*, at *12 (rejecting pass through opinion and noting that "Defendants point out that there are a lot of different supply chains in the Drywall industry, so being able to assess pass through for all IPPs is difficult, and the IPPs have not presented a method that can do this"); *GPU*, 253 F.R.D. at 499 (discussing difficulty of addressing pass through where graphics processing unit was sometimes "sold to some indirect purchasers on a standalone basis but to others bundled in a computer.") And, even more so than in *Drywall* and *GPU*, here there are multiple products and services— competitions, camps, and apparel—that are distributed in different ways.

Finally, in addition to concluding that 100% of any charge (including any overcharge) was "passed through," Dr. Maki remarkably concluded, again based on no analysis of any kind,

that 0% of any rebate that Varsity paid to gyms was passed back.  (Ex. A, Maki Dep. 106:6-12 ("Q. … Your opinion is that the gyms pass through all the charges they pay to Varsity, but they do not pass through any money they get back from Varsity, in terms of rebates. That's your testimony, right?  A. That is correct.").)  In other words, counter to all economic theory, she assumed that supply and demand conditions were such that pass through only worked in *one* direction.  This convenient and unsupportable assumption allowed her to ignore the more than ▮▮▮▮▮ in rebates that she calculated Varsity paid to gyms in the putative class period in assessing her "overcharges."  (*See* Ex. B, Maki Rep. ¶ 88.)  Dr. Maki conceded at her deposition that it at least "[s]eems possible" that gyms—in advance of setting their prices for a particular season—know the amount of rebate they would receive.  (Ex. A, Maki Dep. 242:16-243:4.) This, of course, means that gyms can factor in their rebate into their cost structure in determining what prices to charge for participation on their All Star teams.  Dr. Maki also agreed that the "fashion dollars" component of rebates "off set the costs for apparel" (Ex. A, Maki Dep. 244:24-245:4) and possibly were used to buy apparel for their athletes (*id*. 245:5-11.)  Yet she stands by her opinion that 0% of rebates benefitted cheerleaders.

Without a basis for assessing pass through, her damages calculations fall apart entirely.

### D.     Dr. Maki Should Not Be Permitted to Inflate Her Damages Figures in Her Rebuttal Report

Dr. Maki's so-called "rebuttal" report was not confined to rebuttal.  Instead, she offered *new* damage calculations based on *new* overcharge amounts that Dr. Heeb put forward for the first time in his rebuttal report and applied them to *new* sales figures that Dr. Maki calculated. The late adjustments increased Dr. Maki's damages opinion by approximately ▮▮▮▮▮.  Dr. Maki should not be permitted to offer new opinions six months after the deadline for opinion disclosure.  Rebuttal reports are not an opportunity to augment opinions to the detriment of the

other side in the litigation.  Accordingly, Dr. Maki should not be permitted to present her damage

calculations based on higher overcharge percentages.  Rather, she should, at a minimum,

recalculate her damage figures using her new, lower sales figures but using Heeb's original,

timely-disclosed overcharge percentages.  (Of course, even as recalculated, they will still suffer

from all of the fatal defects discussed above.)

## II.    DR. MAKI'S "COMMON PROOF" OPINION IS WITHOUT BASIS

Dr. Maki's conclusion that damages can be calculated by "common proof" should be

rejected for much the same reasons.  Indeed, her "opinion" is merely the anodyne and circular

observation that a method that multiplies a purported overcharge amount that applies to all

purchases by the total of those purchases is "common."  Dr. Maki has done no work to verify this

claim, for example by testing that Dr. Heeb's calculation of overcharges is correct, checking in

any empirical way that her 100% pass through of overcharges (and 0% pass through of rebates)

is correct, or checking to see if the exclusion of irrelevant sales would affect either Dr. Heeb's

calculation or her pass through assumption.  If Dr. Heeb's opinions are rejected, so, too, must Dr.

Maki's.  *See, e.g., GPU*, 253 F.R.D. at 502 (holding that, because damages expert's "proposed

methodologies … hing[ed] on the accuracy of [another expert's] conclusions that defendants'

actions led to an overcharge on their direct purchasers and that that impact can be demonstrated

by common proof" and the court found the other expert's analysis to be "inadequate," the court

"necessarily [found the pass through expert's] dependent analysis unsuccessful as well").

Fixing the four errors identified above with Dr. Maki's calculation of relevant Varsity

sales can also not be done on a classwide basis.  Instead, each transaction would have to be

analyzed individually to determine what the ultimate source of the payment was.  For example, if

the claim is based on a Varsity sale to a school, did the school charge the athlete at all?  Or did it

absorb the cost in its budget?  Was there a fundraiser?  Did the booster club pay?  Was it a direct

purchase by the athlete with the school acting as a buying agent?  If through a gym, did the gym

use a Varsity rebate to cover the transaction (leading to the gym providing the item to the

cheerleader for free)?  Indeed, even with gyms, there were instances of free items.  For example,

Ms. Minzghor testified that Fusion Elite charged cheerleaders separately for certain end-of-

season competitions.  When the cheerleader did not pay, "[e]ither they wouldn't go or the gym

would have to eat it."  (Ex. E, Minzghor Dep. 107:10-11.)  In the latter scenario, there was no

indirect purchase at all.  There is no way to distinguish these scenarios by "common proof."

And, even if there was a payment from a class member associated with the product or service,

whether there was a passed-through overcharge would also need to be considered on a

transaction-by-transaction basis.  *See, e.g.*, *Egg Prods.*, 312 F.R.D. at 159 (rejecting pass through

analysis because, despite being based on statistic modeling using regressions, expert failed to

"explore[], at the transaction level, the extent to which the overcharge was passed through in

each of the Class Jurisdictions and at more than of the retailers"); *Class 8*, 679 Fed. App'x at 141

(rejecting pass through analysis based on examination of 2% of all transactions).  *See, e.g.*, *In re*

*Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 501 (N.D. Cal. 2008) (striking as

untimely regressions presented for first time in rebuttal report).

## III.   THE VAST MAJORITY OF DR. MAKI'S REPORTS ARE FACTUAL NARRATIVE AND SHOULD NOT BE PERMITTED AS EXPERT TESTIMONY

A "factual narrative that does not draw technical or scientific conclusions" is inadmissible

under Rule 703, as it offers "no more than what counsel for the [plaintiff] will do in argument."

*In re Lyondell Chem. Co.*, 558 B.R. 661, 667-68 (Bankr. S.D.N.Y. 2016) (citation omitted); *In re:*

*LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 584 (S.D.N.Y. 2018)

(excluding testimony of this type from Nobel Prize-winning economist).  "A history without any

expert analysis or other application of the expert's expertise is simply a factual narrative that

should be presented to the jury directly." *In re Davol, Inc./C.R. Bard, Inc.. Polypropylene Hernia Mesh Prods. Liab. Litig.*, 546 F. Supp. 3d 666, 677 (S.D. Ohio 2021).  It also violates Rule 403, as any value it might have would be "far outweighed by the danger that the jury would accord too much weight to such opinions because they come from the mouth of a [] professional." *Tchatat v. City of New York*, 315 F.R.D. 441, 447 (S.D.N.Y. 2016); *see also Yancey v. Carson*, 2007 WL 3088232, at *4 (E.D. Tenn. Oct. 19, 2007) (excluding testimony where the expert "essentially marshaled the facts in the record which support the plaintiff's position").

The vast majority of Dr. Maki's reports are just this type of inadmissible factual narrative. This includes the "Background" section in her opening report but also includes most of the rest of her reports, where she simply makes factual assertions with footnotes to various deposition testimony or documents, some of which were produced in this case and others she found on the Internet.  In some instances, she simply cites the Plaintiffs' Complaint or says she is relying on and essentially repeating what Dr. Heeb or Dr. Netz said.  At her deposition, Dr. Maki confirmed that she "[t]ook the information that they present in their findings, and [believes] that they are true or at least have been instructed to assume that they are true."  (Ex. A, Maki Dep. 28:3-6.) Dr. Maki did nothing to verify the veracity of this material; she merely accepted it at face value.

It is not clear whether Plaintiffs expect to have Dr. Maki testify on the alleged facts she sets forth in these sections, but such testimony should not be permitted.  Plaintiffs should not be allowed to use Dr. Maki to summarize their version of the facts, which is to say, provide a closing argument or summation.  There is no expert analysis or application of expert expertise; factual assertions and legal arguments should not be laundered through the guise of a so-called expert's testimony.  *See, e.g.*, *Reynolds v. Freightliner LLC*, 2006 WL 5249744, at *6 (E.D. Ky.

June 21, 2006) (excluding expert witness testimony on the basis that it "[s]imply regurgitate[ed],

in a conclusory, 'expert' manner," information from the factual record); *PharmaStem*

*Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1354-55 (Fed. Cir. 2007) (excluding as

unhelpful the proffered expert's practice of quoting from the opposing party's materials and then

drawing inferences from those materials).

  Because such a biased factual summary is simply putting Dr. Maki's "expert" imprimatur

on disputed factual evidence, rather than providing the results of an expert-based analysis that is

helpful to the trier of fact, it cannot be admitted into evidence under Rule 702 and should not be

considered as part of the class certification record.  Instead, such evidence can and should be

weighed impartially by the trier of fact.  *See, e.g.*, *United States v. Rios*, 830 F.3d 403, 413 (6th Cir.

2016) (relevance of expert testimony depends on "whether the untrained layman would be

qualified to determine intelligently and to the best possible degree the particular issue without

enlightenment from those having a specialized understanding of the subject involved in the

dispute.") (quoting Fed. R. Evid. 702, Adv. Comm. Notes (internal quotation omitted)); *Ask*

*Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 510 (6th Cir. 2014) ("Where an expert

merely offers his client's opinion as his own, that opinion may be excluded."); *see also Seiber v.*

*Estate of McRae*,  2013 WL 5673601, at *6-7 (W.D. Ky. Oct. 17, 2013) (striking an expert opinion

in which the proposed analysis did "not speak to matters outside the purview of laypersons").

## CONCLUSION

  Dr. Maki employs an unsound methodology to calculate damages, which, if allowed to be

heard by the jury, would unfairly prejudice Defendants.  She otherwise reports on "facts" that she

gleaned from the Complaint, documents in the case, or the conclusions of other experts, and

testimony from Dr. Maki on these "facts" is not permitted under the Federal Rules.  Her

testimony should be excluded in its entirety.

Dated: February 10, 2023

Respectfully submitted,

/s Matthew S. Mulqueen

George S. Cary*
Steven J. Kaiser*
Linden Bernhardt*
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Phone: (202) 974-1500
Fax: (202) 974-1999
gcary@cgsh.com
skaiser@cgsh.com
lbernhardt@cgsh.com

Jennifer Kennedy Park*
Heather Nyong'o*
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
1841 Page Mill Road, Suite 250
Palo Alto, CA 94304
Phone: (650) 815-4100
Fax: (202) 974-1999
jkpark@cgsh.com
hnyongo@cgsh.com

* Admitted *pro hac vice*

Matthew S. Mulqueen (TN #28418)
Adam S. Baldridge (TN #23488)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ
165 Madison Avenue, Suite 2000
Memphis, TN 38103
Phone: (901) 526-2000
Fax: (901) 577-0866
mmulqueen@bakerdonelson.com
abaldridge@bakerdonelson.com

*Attorneys for Defendants Varsity Brands,
LLC; Varsity Spirit, LLC; Varsity Spirit
Fashions & Supplies, LLC; Charlesbank
Capital Partners, LLC; and Bain Capital
Private Equity LP*

21

s/ Nicole Berkowitz Riccio
Grady Garrison (TN #008097)
Nicole Berkowitz Riccio (TN #35046)
James Andrew Roach (TN #37934)
Karen Lott Glover (TN #38714)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ
165 Madison Avenue, Suite 2000
Memphis, TN 38103
Phone: (901) 526-2000
Fax: (901) 577-0866
ggarrison@bakerdonelson.com
nriccio@bakerdonelson.com
aroach@bakerdonelson.com
kglover@bakerdonelson.com

*Attorneys for U.S. All Star Federation, Inc. and USA Sport Cheering, d/b/a USA Cheer*

s/ Brendan P. Gaffney
Paul E. Coggins*
Brendan P. Gaffney*
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Phone: (214) 740-8000
Fax: (214) 740-8800
pcoggins@lockelord.com
bgaffney@lockelord.com

* Admitted *pro hac vice*

Edward L. Stanton III (TN #018904)
S. Keenan Carter (TN #023386)
BUTLER SNOW LLP
6075 Poplar Avenue, Suite 500
Memphis, Tennessee 38119
Phone: (901) 680-7336
Fax: (901) 680-7201
Edward.Stanton@butlersnow.com
Keenan.Carter@butlersnow.com

*Attorneys for Jeff Webb*

22