# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| JESSICA JONES et al., | |
|            Plaintiffs, | **Civ. Action No. 2:20-cv-02892** |
|      v. | |
| VARSITY BRANDS, LLC et al., | |
|            Defendants. | |

## DEFENDANTS' MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ......................................................................................................... 1

BACKGROUND ............................................................................................................ 1

ARGUMENT ................................................................................................................. 4

I.      PLAINTIFFS MAY NOT MAINTAIN A CLASS ACTION UNDER THE TCPA ......... 5

II.     PLAINTIFFS HAVE NOT SATISFIED THE ELEMENTS OF RULE 23(A) ................ 6

        A.      There Are No Truly Common Questions of Law or Fact ...................................... 6

        B.      Plaintiffs' Claims Are Not Typical of All Class Members ................................... 8

        C.      Plaintiffs are Not Adequate Representatives of the Class .................................... 9

        1.      There Are Inherent Conflicts in the Classes, Which Destroy Adequacy ............... 9

        2.      Ms. Lorenzen's Is not An Adequate Class Representative .................................. 11

        3.      Plaintiffs' Counsel Are Not Adequate .................................................................. 12

III.    THE RULE 23(B)(3) PREDOMINANCE REQUIREMENT IS NOT SATISFIED ....... 12

        A.      Plaintiffs Have Not Shown They Can Establish Overcharges to Direct Purchasers
                Via Common Proof .............................................................................................. 16

        B.      Plaintiffs Have Not Shown They Can Establish Passthrough to Indirect Purchasers
                Via Common Proof .............................................................................................. 17

        C.      Plaintiffs Have Not Shown They Can Establish Aggregate Damages to Either of
                Their Damages Classes Via Common Proof ........................................................ 19

        D.      Common Issues Do Not Predominate in the State Law Damages Class Because of
                Variations in State Law ....................................................................................... 22

        E.      Determining Impact and Amount of Class-Wide Damages Would Require
                Hundreds of Thousands of Minitrials .................................................................. 26

IV.     THE "INJUNCTIVE RELIEF CLASS" SHOULD NOT BE CERTIFIED .................... 28

CONCLUSION ............................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Aluminum Warehousing Antitrust Litig.*,
  336 F.R.D. 5 (S.D.N.Y. 2020) ...................................................................... *passim*

*Am. Express Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013)....................................................................................................4

*In re Am. Med. Sys., Inc.*,
  75 F.3d 1069 (6th Cir. 1996) ..................................................................................22

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ....................................................................................................7

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018).....................................................................................13

*Bearden v. Honeywell Int'l*,
  No. 3:09-1035, 2010 WL 3239285 (M.D. Tenn. Aug. 16, 2010).............................5

*Bieneman v. City of Chicago*,
  864 F.2d 463 (7th Cir. 1988) ...................................................................................10

*Blewett v. Abbott Labs.*,
  86 Wash.App. 782 (Wash. Ct. App. 1997) .............................................................23

*In re Brand Name Prescription Drugs Antitrust Litig.*,
  Nos. C 897, MDL 997, 1994 WL 663590 (N.D. Ill. Nov. 18, 1994) ..................9, 15

*In re Capacitors Antitrust Litig. (No. III)*,
  No 17-md-02801-JD, 2020 WL 6462393 (N.D. Cal. Nov. 3, 2020)......................15

*Cascade Health Sols. v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008) ...................................................................................24

*In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*,
  No. 1:14-md-2508, 2015 WL 5166014 (E.D. Tenn. June 24, 2015)......................23

*In re Chocolate Confectionary Antitrust Litig.*,
  749 F. Supp. 2d 224 (M.D. Pa. 2010)......................................................................24

*In re Class 8 Transmission Indirect Purchaser Litig.*,
  679 Fed. App'x 135 (3d Cir. 2017).........................................................................15

*Coleman Motor Co. v. Chrysler Corp.*,
   525 F.2d 1338 (3d Cir. 1975) ..............................................................................17

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) .............................................................................4, 16, 17

*Commonwealth Elec. Inspection Servs., Inc. v. Town of Clarence*,
   6 A.D.3d 1185 (N.Y. App. Div. 2004) ............................................................23, 24

*Davis v. Cintas Corp.*,
   717 F.3d 476 (6th Cir. 2013) ...............................................................................6

*In re Digit. Music Antitrust Litig.*,
   321 F.R.D. 64 (S.D.N.Y. 2017) ..................................................................... *passim*

*Dimidowich v. Bell & Howell*,
   803 F.2d 1473 (9th Cir. 1986), *opinion modified on other grounds on denial of*
   *reh'g*, 810 F.2d 1517 (9th Cir. 1987) ............................................................23, 24

*In re Disposable Contact Lens Antitrust*,
   329 F.R.D. 336 (M.D. Fla. 2018) ...................................................................25, 26

*In re Domestic Drywall Antitrust Litig.*,
   No. 2437, 2017 WL 3700999 (E.D. Pa. Aug. 24, 2017) ................................... *passim*

*Erie R. Co. v. Tompkins*,
   304 U.S. 64 (1938) ...............................................................................................5

*State ex rel. Fitch v. Yazaki N. Am., Inc.*,
   294 So. 3d 1178 (Sup. Ct. of Miss. 2020) ............................................................23

*In re Fla. Cement & Concrete Antitrust Litig.*,
   278 F.R.D. 674 (S.D. Fla. 2012) .........................................................................15

*Fla. Seed Co., Inc. v. Monsanto Co.*,
   105 F.3d 1372 (11th Cir. 1997) .............................................................................8

*In re Flash Memory Antitrust Litig.*,
   No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010.) .................. *passim*

*In re Flonase Antitrust Litig.*,
   284 F.R.D. 207 (E.D. Pa. 2012) ...........................................................................25

*In re Graphics Processing Units Antitrust Litig.*,
   253 F.R.D. 478 (N.D. Cal. 2008) ................................................................... *passim*

*Ham v. Swift Transp. Co., Inc.*,
   No. 2:09-cv-02145, 2011 WL 13350069 (W.D. Tenn. Oct. 12, 2011) .......................5

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3rd Cir. 2008) ...................................................................................13, 15

*Idstrom v. All. Radiology, P.A.*,
   388 P.3d 923 (Kan. Ct. App. 2017) ...........................................................................24

*Kentucky v. Marathon Petroleum Co. LP*,
   464 F.Supp.3d 880 (W.D. Ky. 2020) .........................................................................17

*In re Lithium Ion Batteries Antitrust Litig.*,
   No. 13-MD-2420 YGR, 2017 WL 1391491 (N.D. Cal. 2017) .................................15

*Lozano v. AT & T Wireless Servs., Inc.*,
   504 F.3d 718 (9th Cir. 2007) .....................................................................................28

*Mack v. Bristol-Myers Squibb Co.*,
   673 So.2d 100 (Fla. Dist. Ct. App. 1996) ..................................................................23

*Maldonado v. Ochsner Clinic Found.*,
   493 F.3d 521 (5th Cir. 2007) .....................................................................................29

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
   708 F.2d 1081 (7th Cir. 1983) ...................................................................................17

*In re Methionine Antitrust Litig.*,
   204 F.R.D. 161 (N.D. Cal. 2001) ...............................................................................15

*In re NASDAQ Mkt-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) ...............................................................................21

*In re New Motor Vehicles Canadian. Exp. Antitrust Litig.*,
   522 F.3d 6 (1st Cir. 2008) .....................................................................................14, 15

*In re Nexium Antitrust Litig.*,
   777 F.3d 9 (1st Cir. 2015) ..........................................................................................25

*In re Niaspan Antitrust Litig.*,
   464 F. Supp. 3d 678 (E.D. Pa. 2020) .........................................................................15

*In re Optical Disk Drives Antitrust Litig.*,
   303 F.R.D. 311 (N.D. Cal. 2014).................................................................15, 18, 26

*In re Packaged Ice Antitrust Litig.*,
   322 F.R.D. 276 (E.D. Mich. 2017) ............................................................................25

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   233 F.R.D. 229 (D. Mass. 2006).................................................................................25

*Pilgrim v. Universal Health Card, LLC*,
  660 F.3d 943 (6th Cir. 2011) ...............................................................23

*Polyurethane Foam Antitrust Litig.*,
  No. 1:10 MD 2196, 2015 WL 44459636 (N.D. Ohio July 21, 2015).....................................25

*In re Pre-Filled Propane Tank Antirust Litig.*,
  No. 2567, 2019 WL 4796528 (W.D. Mo. Aug. 21, 2019)......................................24

*In re Pre-filled Propane Tank Antitrust Litig.*,
  No. 14-02567-MD, 2021 WL 5632089 (W.D. Mo. Nov. 9, 2021).........................................15

*In re Processed Egg Prods. Antitrust Litig.*,
  312 F.R.D. 124 (E.D. Pa. 2015)........................................................................... *passim*

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013) ...............................................................13

*In re Relafen Antitrust Litig.*,
  221 F.R.D. 260 (D. Mass. 2004).........................................................................23

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010).........................................................................5

*Sheet Metal Workers Local 441 Health & Welfare Plan v. Glaxosmithkline, PLC*,
  No. 04-5898, 2010 WL 3855552 (E.D. Pa. Sept. 30, 2010) ..............................................14, 15

*Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*,
  543 F.3d 597 (10th Cir. 2008) ...............................................................30

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
  299 F.R.D. 555 (E.D. Tenn. 2014).........................................................................8, 15, 24

*Somers v. Apple, Inc.*,
  258 F.R.D. 354 (N.D. Cal. 2009)......................................................................14, 15, 16, 18

*Southaven Land Co., Inc. v. Malone & Hyde, Inc.*,
  715 F.2d 1079 (6th Cir. 1983) ...............................................................8

*Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*,
  131 F.3d 874 (10th Cir. 1997) ...............................................................26

*Sprague v. Gen. Motors Corp.*,
  133 F.3d 388 (6th Cir. 1998) ...............................................................4

*In re State Farm Fire & Cas. Co.*,
  872 F.3d 567 (8th Cir. 2017) ...............................................................4

*Stout v. J.D. Byrider*,
    228 F.3d 709 (6th Cir. 2000) ...........................................................................4, 9, 11, 12

*MD. ex rel. Stukenberg v. Perry*,
    675 F.3d 832 (5th Cir. 2012) ...........................................................................30

*In re Target Corp. Data Sec. Breach Litig.*,
    66 F. Supp. 3d 1154 (D. Minn. 2014) ...........................................................5

*In re Toilet Seat Antitrust Litig.*,
    No. 75-184, 1977 WL 1453 (E.D. Mich. Aug. 24, 1977) ...........................21

*Vacco v. Microsoft Corp.*,
    260 Conn. 59 (2002) .......................................................................................23

*Valley Drug Co. v. Geneva Pharm., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) .....................................................................10

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...........................................................................6, 7, 30

*Walker v. Sunrise Pontiac-GMC Truck, Inc.*,
    249 S.W.3d 301 (Tenn. 2008) .......................................................................5

*In re Wellbutrin XL Antitrust Litig.*,
    282 F.R.D. 126 (E.D. Pa. 2011) ..................................................................25

*In re Wellbutrin XL Antitrust Litig.*,
    308 F.R.D. 134 (E.D. Pa. 2015) ..................................................................15, 25

**Statutes**

Ark. Code Ann. § 4-75-315 ...................................................................................23

Hawaii Code § 480–13.3(a) ...................................................................................24

Idaho Code § 48-108 .............................................................................................23

Iowa Code § 553.12 ...............................................................................................24

Md. Code Ann., Com. Law § 11-209(b)(ii) ..........................................................23

Miss. Code Ann. § 15-1-49(1) ...............................................................................24

N.D. Cent. Code §§ 51-08.1-08(2) ........................................................................24

Neb Rev. St. 59-821 ...............................................................................................24

Neb. Rev. St. 84-212 ..............................................................................................24

Tenn. Code Ann. § 47-18-109(g) .................................................................................................5

**Other Authorities**

Fed. R. Civ. P. 23 ............................................................................................... *passim*

## INTRODUCTION

Plaintiffs' proposed classes do not satisfy Rule 23.  In stark contrast to typical antitrust cases, where there is one course of conduct affecting the products in one market, here there are numerous alleged facts impacting different markets, different products, different geographic regions, and distinct cheer disciplines—scholastic and All Star.  Indeed, *according to Plaintiffs*, the proposed classes consist of purchasers of products and services in *three* different antitrust product markets and *five* different antitrust geographic markets for a total of *eleven* product/geographic market pairs.  Likewise, members of the proposed classes obtained the various products and services at issue in two distinct and very different ways:  through All Star gyms, which are commercial enterprises providing coaching, practice time, competitions, apparel and other products and services often for one, all-in price; and schools, which often act as purchasing agents for cheerleaders' competitions, apparel, and camps or pay for those products and services out of their own budgets or via fundraising.

Because of this complexity and the sprawling nature of their proposed classes, Plaintiffs cannot meet their burden of showing that impact can be proven by common proof.  Even in far less complicated circumstances, courts have described that burden as "daunting," "a tall task," and "immensely difficult."  Here, the burden is impossible to carry.  For this and the other reasons discussed below, Plaintiffs' motion should be denied.

## BACKGROUND

Plaintiffs, who are purported indirect purchasers of cheerleading-related merchandise and/or services, seek to recover on a class-wide basis for alleged overcharges for competition entry fees, apparel, and cheerleading camps for both All Star and scholastic cheerleading.  (This is in contrast to the related *Fusion Elite* case, where Plaintiffs' claims were limited to All Star cheer competitions.)  Plaintiffs' expert Dr. Heeb identified three separate product markets (cheer

competitions, cheer camps, and cheer apparel) and, as to cheer competitions and cheer camps, five separate geographic markets (Northeast, Midwest, Southeast, Southwest, and West).  In other words, Plaintiffs, through their expert contend that there are eleven product/geographic market pairs (five regional markets for competitions, five regional markets for camps, and one national market for apparel).  At the same time, Plaintiffs assert that All Star and scholastic cheer competitions are in the same product market, which is disputed.

Plaintiffs are two parents of competitive cheerleaders, one (Ms. Jones) whose children purportedly participated in All Star cheer but not school cheer in the Midwest, and the other (Ms. Lorenzen) whose child purportedly participated in school cheer but not All Star cheer in California.  (ECF No. 1 at PageID 6-7.)  None of the children ever attended a Varsity cheer camp.  Plaintiffs therefore participated in only a few of the eleven markets.

All Star and scholastic cheer are fundamentally different.  (Ex. A,[1] Seely Dep. 44:11-45:9; Ex. B, Parrish Dep. 202:5-7; Ex. C, L. Gurske Dep. 318:6-15.)  All Star cheerleaders are members of teams that are affiliated with gyms.  (Ex. D, Newby Dep. 79:11-25.)  Those gyms typically bundle a myriad of products, such as apparel, practice wear, and accessories, with services including coaching, gym time, and competitions in packages with various terms and conditions.  (Ex. E, T. Gurske Dep. 80:12-24; Ex. F, Minzghor Dep. 63:5-68:16.)  Schools sponsor scholastic teams and have their own varied methods of paying for them, including out of their own budget, through fundraising, via booster clubs, and by collecting money from parents to remit to the goods or service provider on their behalf, none of which constitute indirect purchases by a parent or cheerleader.  (Ex. G, Lorenzen Dep. 96:5-98:4.)

Plaintiffs try to blur these distinctions by invoking terms like "Varsity's cheer

---

[1] References to "Ex. __" are to exhibits to the Kaiser Declaration, which is submitted herewith.

ecosystem," but ultimately the actions of which they complain did not affect competition across the eleven product/geographic markets or even all three of the identified product markets. Most of the challenged conduct relates only to All Star competitions. Essentially none of the conduct relates to apparel. For example, Plaintiffs assert that certain Varsity acquisitions were "anticompetitive," but do not assert that they affected the price of apparel or camps. They assert that Varsity's All Star rebate programs and its relationship with USASF were "anticompetitive," but neither had anything to do with scholastic cheer or camps. They claim that Varsity required attendance at its camps to be eligible to attend a few Varsity end-of-season national scholastic championships, but this has no bearing on All Star cheer, Varsity's other scholastic competitions, or, for that matter, camp attendees who did not attend the few scholastic championships at issue. Yet Plaintiffs rely on a "one size fits all" approach to the critical issues in class certification, including the need to establish impact and amount of class-wide damages by common proof.

Notwithstanding all of these differences, Plaintiffs propose three classes, each of which encompass indirect purchasers in all eleven of the product/geographic market pairs without distinction, even between All Star and scholastic: (1) a "Nationwide Damages Class," which would include "[a]ll natural persons and entities in the United States that indirectly paid Varsity or any Varsity subsidiary or affiliate, from December 10, 2016, until the continuing Exclusionary Scheme alleged herein ends … for: (a) registration fees associated with participation in Varsity Cheer Competitions; (b) Varsity Cheer Apparel; or (c) registration fees for attendance at Varsity Cheer Camps" and would seek relief under Tennessee law; (2) a "State Law Damages Class," which is the same but limited to thirty-two states and the District of Columbia, and apparently would seek relief for transactions in the listed jurisdictions under the laws of those jurisdictions; and (3) an "Injunctive Relief Class," which would seek injunctive relief under federal law.

## ARGUMENT

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citations and quotation marks omitted). "No class action may be certified unless the party seeking certification 'affirmatively demonstrate[s] his compliance with Rule 23.'" *In re State Farm Fire & Cas. Co.*, 872 F.3d 567, 572 (8th Cir. 2017) (quoting *Comcast*, 569 U.S. at 33). "Rule [23] imposes stringent requirements for certification that in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). "[A] district court may not certify any class without 'rigorous analysis' of the requirements of Rule 23." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998).

Plaintiffs seek to certify the "Nationwide Damages Class" and "State Law Damages Class" under Rule 23(b)(3) of the Federal Rules of Civil Procedure and the "Injunctive Relief Class" under Rule 23(b)(2) of the Federal Rules of Civil Procedure. The requirements of Rule 23(a) must be satisfied for each class, as well as the particular requirements of Rules 23(b)(3) for the damages classes and 23(b)(2) for the injunctive relief class. *Stout v. J.D. Byrider*, 228 F.3d 709, 717-18 (6th Cir. 2000). Plaintiffs argue that courts have granted class certification in antitrust cases that they (incorrectly) claim are "similar" to this one and that "it would not be feasible or economical for class members to litigate the same case individually, nor are there other individual lawsuits by class members already begun." (Pls.' Br. at 27.) But, as courts have emphasized, these are not valid reasons to allow claims that do not meet the requirements of Rule 23 to be jammed together in a class action:

> Understandably, the difficulties in certifying a class can be frustrating when it appears so unlikely that individuals will bring their own lawsuits. But Rule 23's requirements seek to ensure that the due process rights of litigants are not lost among the tumult of an unwieldy and disorderly class action. That is, Rule 23 recognizes a risk that rough justice can be injustice, and thereby mandates a

4

> rigorous analysis to prevent subjecting the class and the class's opponent to it. Here, Defendants are facing liability under the laws of 21 states. Plaintiffs are seeking a massive monetary award on behalf of millions of individuals. Rough justice would indeed lead to injustice here, where millions of people and millions of dollars fall within the wide margins of error. The Court must therefore undertake a rigorous analysis to ensure that Rule 23's requirements are met, even in cases involving many small claims.

*In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 171 (E.D. Pa. 2015) (denying class certification). So too here.

Ultimately, Plaintiffs' classes cannot be certified for two fundamental reasons. First, they are too broad, crossing what they say are eleven product/geographic market pairs, and encompassing a myriad of products and services, not to mention the distinct genres of All Star and scholastic cheerleading. Second (and relatedly), Plaintiffs have not shown a viable way to show impact on the disparate members of the classes or class-wide damages by common proof.

## I.   PLAINTIFFS MAY NOT MAINTAIN A CLASS ACTION UNDER THE TCPA

At the threshold, Plaintiffs Nationwide Damages Class and that portion of their State Law Damages Class based on the Tennessee Consumer Protection Act may not be certified because that law specifically excludes a class action remedy. Tenn. Code Ann. § 47-18-109(g) ("No class action lawsuit may be brought to recover damages for an unfair or deceptive act or practice declared to be unlawful by this part."); *see also Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 308-11 (Tenn. 2008) (holding that TCPA provides to individuals only the right to pursue claims on an individual basis). As numerous courts have held, the statute's prohibition on class actions is a substantive limitation and binding in federal court under *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). *See, e.g., In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154, 1165 (D. Minn. 2014); *Ham v. Swift Transp. Co., Inc.*, 2011 WL 13350069, at *2-3 (W.D. Tenn. Oct. 12, 2011); *Bearden v. Honeywell Int'l*, 2010 WL 3239285, at *10 (M.D. Tenn. Aug. 16, 2010). The courts in each of these cases considered whether *Shady Grove Orthopedic*

*Assocs., P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010) permitted federal courts to entertain class actions under the TCPA and held that, because the TCPA specifically precludes class actions as a potential remedy and its class action prohibition is not a separate procedural rule or law, class actions for claims under the TCPA are not permitted in federal court.

## II.   PLAINTIFFS HAVE NOT SATISFIED THE ELEMENTS OF RULE 23(A)

The four requirements of Rule 23(a) are: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  Numerosity under Rule 23(a)(1) is not disputed, but Plaintiffs' proposed classes fail each of the other three requirements.

### A.   There Are No Truly Common Questions of Law or Fact

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injuries."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011) (citations and quotation marks omitted).  "This does not mean merely that they have all suffered a violation of the same provision of law. …  Their claims must depend on a common contention[, which] must be of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of *each one* of the claims in *one* stroke."  *Id.* at 350 (emphasis added); *see also Davis v. Cintas Corp.*, 717 F.3d 476, 487-89 (6th Cir. 2013) (affirming denial of class certification because movant failed to identify any common issues).  "What matters to class certification ... is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."  *Dukes,* 564

U.S. at 350. A movant's failure to identify a single particular fact that is truly *common* to the claims of *all* of the putative class members dooms their motion. *Id.*

Plaintiffs' motion fails on this point because they do not identify any one "issue that is central to the validity of *each* one of the claims in *one* stroke." *Id.* (emphasis added). To the contrary, at a minimum, they claim separate injuries from separate conduct relating to each product market. Their list of "common questions," namely: (1) "the nature and extent of Defendants' anticompetitive scheme"; (2) "the nature and extent of Defendants' exclusionary practices"; (3) "the scheme's duration"; (4) "the participation of each Defendant"; (5) "the anticompetitive effect of such conduct"; (6) "antitrust injury"; and (7) "damages"—is tautological as it *assumes* commonality.

Plaintiffs' identification of common issues that they say predominate (Pls.' Br. at 18-19) likewise does not identify any actual common issues. Plaintiffs point to the Varsity Family Plan and Network Agreements, but those relate only to All Star competition, not scholastic, and have nothing to do with camps. They point to an alleged "conspiracy" with USASF, but USASF also relates solely to All Star cheer, not scholastic or camps. They point to market definition, market power, and "intent to monopolize," but, with eleven different product/geographic market pairs, proof on these issues would inherently not be common to *all* of the classes' claims. They point to alleged "tying" of camps to competitions, but that has nothing to do with apparel or All Star competitions and is, thus, not common to *all* of the putative class members' claims.[2] Plaintiffs' effort to ignore all of this with the talisman of "Varsity ecosystem" fails.

---

[2] Of course, even if there were some common issues, for a class to be certified, common issues must "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). That is a separate and "far more demanding" requirement, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997), which is discussed below in Section III.

### B.     Plaintiffs' Claims Are Not Typical of All Class Members

Typicality is also not met.  Plaintiffs did not participate in most of the eleven different product/geographic markets they assert and, therefore, lack basic standing to assert claims in them.  For example, neither Plaintiff paid "registration fees for attendance at Varsity Cheer camps" in any geographic market, much less in all of them.  Yet, Plaintiffs seek to represent classes of individuals as to such claims, even though they themselves do not have standing.  Plaintiffs also lack standing to assert claims relating to competitions in geographic markets where they did not attend a competition.  *See, e.g.*, *Southaven Land Co., Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1086 (6th Cir. 1983) ("A significant element of the § 4 'standing' inquiry is the nature of the plaintiff's alleged injury either as a 'customer' or 'participant' in the 'relevant market.'"); *Fla. Seed Co., Inc. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997) ("Basically, a plaintiff must show that it is a customer or competitor in the relevant antitrust market.").

Plaintiffs' claims as related to the "Nationwide Damages Class," which they seek to bring under "Tennessee" law, are also not typical.  Plaintiffs made no purchases in Tennessee.  Any such claim must be brought under the laws of the state(s) in which the alleged actionable purchases were made.  Because Plaintiffs seek to bring claims for the Nationwide Damages Class under the laws of Tennessee alone, the Nationwide Damages Class may not be certified. *See In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 588 (E.D. Tenn. 2014) (denying certification of nationwide class based on Tennessee law because "the Court concludes it must apply the law of the state where the injury occurred, not Tennessee's" and "[i]ndirect purchasers, however, only alleged Tennessee state law causes of action for the nationwide

class").[3]

## C.  Plaintiffs are Not Adequate Representatives of the Class

"Under Rule 23(a)(4), a plaintiff seeking to represent the class must demonstrate that he or she will fairly and adequately represent and protect the interests of the class." *Stout*, 228 F.3d at 717.  The Court must "determine whether class counsel are qualified, experienced and generally able to conduct the litigation, and to consider whether the class members have interests that are not antagonistic to one another." *Id.*  There must also be a "representative who will vigorously prosecute the rights of the class." *In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 WL 663590, *4 (N.D. Ill. Nov. 18, 1994).  Adequacy is likewise not met and a class cannot be certified where, as here, the members of the putative class have diverging interests that put them in conflict with one another. *See, e.g., Stout*, 288 F.3d at 717 (affirming denial of class certification because putative class members had interests that were "antagonistic to one another").

### 1.  There Are Inherent Conflicts in the Classes, Which Destroy Adequacy

The proposed classes have several disabling conflicts.  Plaintiffs challenge Varsity's rebate programs, the Varsity Family Plan and Varsity Network Agreements, as anticompetitive. According to Plaintiffs, under Network Agreements, the "largest and most prominent All-Star Gyms" receive "increasing rebate percentages" based on the amount they spend on Varsity events.  (Compl. ¶¶ 143-44.)  The Family Plan also provides rebates for participating gyms that have done a significant amount of business with Varsity in the most recent year.  (*Id.* ¶¶ 147,

---

[3] The Court has already dismissed Plaintiffs' putative claims under Tennessee law relating to cheer camps and cheer competitions (ECF No. 333 at PageID 7239 and claims in effect held that only claims for purchases of apparel in Tennessee can be subject to a claim under Tennessee law (*id.* at PageID 7241 (denying motion to dismiss apparel claims under Tennessee law because "it is plausible that an unnamed Plaintiff in Tennessee indirectly paid overcharges for Varsity Cheer Apparel within Tennessee")).

185.)  In ███████ geographic markets identified by Plaintiffs, the "regional overcharge"

that Dr. Heeb calculated (ECF No. 388-3 at ¶ 296) was *less than* the maximum rebate under

those plans.  (*See* Ex. H, VAR00020214.)[4]  A gym receiving a rebate of *more than* the alleged

overcharge certainly was not harmed, and a customer of such a gym likewise had no overcharges

"passed through" to it.  "[N]o circuit has approved of class certification where some class

members derive a net economic benefit from the very same conduct alleged to be wrongful by

the named representatives of the class."  *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181,

1190 (11th Cir. 2003) (vacating district court's certification of a class because some members of

the class benefitted from defendants' allegedly anticompetitive conduct); *In re Digit. Music*

*Antitrust Litig.*, 321 F.R.D. 64, 92 (S.D.N.Y. 2017) (denying certification of indirect purchaser

class because "[d]etermining whether any given class member was injured by the alleged

conspiracy or, in fact, benefited from it by paying less for music downloads than he or she

otherwise would have, would require analyzing each purchase made by that class member and

determining the price at which each such track would have been sold in a world absent the

alleged conspiracy"); *see also Bieneman v. City of Chicago*, 864 F.2d 463, 465 (7th Cir. 1988)

(denying class certification because some class members "undoubtedly derive[d] great benefit"

from the challenged conduct); *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 43

(S.D.N.Y. 2020) (discussing adequacy issue where the "conduct the [plaintiffs] allege was illegal

is the *same* conduct that benefitted numerous proposed class members.")

The five regional geographic markets that Plaintiffs posit create additional conflicts in the

class.  Plaintiffs put forward two different "overcharge" percentages, a "national" percentage,

---

[4] In his "rebuttal" report, Dr. Heeb ███████████████████████████████████████
█████████████ the maximum rebate under the Varsity Family Plan *still* exceeded his overcharge
percentage in ███████████.  (*See* ECF No. 388-4 at ¶ 540.)

and five "regional percentages."  (ECF No. 388-3 at ¶¶ 295-96.)  Putative members of the class

who (indirectly) paid for competitions in a region where Plaintiffs' expert showed an

"overcharge" percentage that was lower than the "national overcharge" percentage would want

the *national* overcharge percentage to be pursued.  Conversely, those in regions where the expert

calculated a higher overcharge than the national overcharge would prefer that *regional*

overcharges be advanced, to the detriment of others.  Ms. Lorenzen lives in ▮▮▮▮▮, in the one

region where Plaintiffs' expert could not even find a statistically significant overcharge ▮▮▮

▮▮. Ms. Lorenzen and the putative class members living in that region would certainly want

the higher and allegedly statistically significant national overcharge to be advanced, to the

detriment of and in conflict with putative class members in regions like ▮▮▮▮▮▮▮▮

▮▮▮, where the alleged regional overcharge (per Plaintiffs) exceeded the national

overcharge.  (*See* ECF No. 388-1 at PageID 10445.)

### 2. Ms. Lorenzen's Is not An Adequate Class Representative

Ms. Lorenzen has not demonstrated that she can adequately represent and protect the

interests of the class.  Ten months after filing this lawsuit, and in the midst of discovery, Ms.

Lorenzen ceased communicating with her counsel.  At the time, Plaintiffs' counsel represented to

the Court that "Ms. Lorenzen has ceased communicating with counsel, rendering effective

representation in accordance with the Tennessee Rules of Professional Conduct difficult if not

impossible.  Further, the failure to communicate violates her obligations as set forth in her

agreement with this firm and is *not consistent with the role of a potential class representative* in

federal litigation" (ECF No. 125 at PageID 2341) and "is unable to fulfill her duty to the class to

vigorously prosecute the lawsuit" (ECF No. 125-1 at PageID 2344).  Although she later began

communicating again, such a representative cannot be expected to "adequately represent and

protect the interests of the class."  *Stout*, 228 F.3d at 717.  Another original Plaintiff, Ms. Velotta,

11

likewise ceased to communicate and was dropped from the case on April 6, 2022.

Plaintiffs also have only a passing knowledge of the case.  For example, Ms. Jones could not explain why she made certain allegations in her complaint or why ██████████████ ██████████████████, merely stating ██████████████████ (Ex. I, Jones Dep. 196:17-24, 197:14-15, 244:11-22, 251:23-24.)  Ms. Lorenzen similarly stated that ██████████ ██████████ for answers to basic questions about her claims, ███████████████████ ██████ (Ex. G, Lorenzen Dep. 192:14-195:24.)  Ultimately, there has been no showing that these individuals have any real inclination to prosecute the case, as opposed to being along for the ride with Plaintiffs' counsel.[5]

### 3.    Plaintiffs' Counsel Are Not Adequate

For the reasons stated in Defendants' opposition to the appointment of class counsel, including their continued effort to pursue claims in camps for which neither Plaintiff has standing and their cavalier wasting of resources in pursuing multiple non-meritorious discovery motions, Plaintiffs' counsel do not meet the adequacy requirement.  (*See* ECF No. 398.)

## III.    THE RULE 23(B)(3) PREDOMINANCE REQUIREMENT IS NOT SATISFIED

Plaintiffs' proposed classes under Rule 23(b)(3) (the Nationwide Damages Class and State Law Damages Class) should not be certified for the additional reason that Plaintiffs have failed to show that "questions of law or fact common to class members" "predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3); *see also Stout*, 288 F.3d

---

[5] That this case was apparently prompted by counsel, not Plaintiffs, may explain their displays of unsuitability to serve as class representatives.  Discovery revealed that counsel solicited Ms. Lorenzen's participation through an "ad online that was saying something to the effect of, 'Do you think you spent too much money on cheerleading?  If so, we'd like to hear from you.'"  (Ex. G, Lorenzen Dep. 19:3-6.)  When Ms. Lorenzen clicked on the ad, she was directed to fill out "an online form, and after that [she] was put in touch with [her] attorneys which subsequently joined this lawsuit."  (*Id.* 19:7-10.)  Ms. Jones testified similarly.  (Ex. I, Jones Dep. 27:11-30:8.)

at 717 ("Rule 23(b)[(3)] requires that the court find that common questions of law or fact predominate over individual issues in the case.")

To establish predominance in an antitrust case, the movant must establish "fact of damage" for "every class member through proof common to the class." *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53, 57 (1st Cir. 2018) (holding that if there are class members who "in fact suffered no injury," the "need to identify those individuals will predominate"). Thus, "the task for plaintiffs at class certification is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3rd Cir. 2008). "'Without proof of injury and causation, [antitrust] plaintiffs cannot establish predominance.'" *In re Aluminum*, 336 F.R.D. at 45 (citations omitted) (collecting cases). Plaintiffs must also establish a valid method for determining class-wide damages. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013) ("No damages model, no predominance, no class certification.").

"Where, as here, the plaintiffs are indirect purchasers, there are two-steps to the predominance analysis. First, Plaintiffs must show that direct purchasers paid an artificially inflated price for [the products or services at issue]. And second, Plaintiffs must establish that the direct purchasers, in turn, passed through some or all of the inflated cost to indirect purchasers." *In re Flash Memory Antitrust Litig.*, 2010 WL 2332081, at *7 (N.D. Cal. June 9, 2010.) Thus, "the problem of proof in an indirect purchaser case is intrinsically more complex, because the damage model must account for the actions of innocent intermediaries who allegedly passed on the overcharge." *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 499 (N.D. Cal. 2008) ("GPU"). Courts have described the challenge to a plaintiff to meet this

13

requirement as "daunting," *Somers v. Apple, Inc.*, 258 F.R.D. 354, 361 (N.D. Cal. 2009); a "tall

task," *Egg Prods.*, 312 F.R.D. at 149; and "immensely difficult," *Sheet Metal Workers Local 441

Health & Welfare Plan v. Glaxosmithkline, PLC*, 2010 WL 3855552, at \*21 (E.D. Pa. Sept. 30,

2010).  Courts accordingly have declined to certify indirect purchaser class actions where the

plaintiff, as here, failed to establish "a reliable method for proving common impact on all

purchasers of [the] defendant's products throughout the chain of distribution."  *Apple*, 258 F.R.D.

at 358 (quoting *GPU*, 253 F.R.D. at 507.)

   The inquiry is all the more critical in cases like this one, which is not a simple price-

fixing case.  Rather, Plaintiffs complain about a myriad of Varsity business practices and

acquisitions, which, they contend, had indirect effects on Varsity's pricing in eleven different

relevant markets.  *See, e.g., In re New Motor Vehicles Canadian. Exp. Antitrust Litig.*, 522 F.3d

6, 27 (1st Cir. 2008) (vacating grant of class certification) ("Plaintiffs' theory of impact on

indirect purchasers is both novel and complex.  Injury in price-fixing cases is sometimes not

difficult to establish.  Plaintiffs do not, however, advance such a price-fixing theory.  Rather, the

plaintiffs' theory is that the higher prices are the result of a 'but-for' world.")

   How or if a particular act of Defendants, alone or in combination with other acts, affected

the prices in the eleven separate product/geographic market pairs that Plaintiffs posit is a much

more complicated set of questions than are typically presented in antitrust cases.  *See, e.g., In re

Aluminum*, 336 F.R.D. at \*45-46 (concluding that because "this case is decidedly idiosyncratic

[with the] allegations … far afield from the paradigm in which competitors gather and secretly

set a price … to sustain a certified class, [the plaintiffs] must show by competent proof each step

in the causal chain leading from conspiratorial agreement to price impact on direct purchasers").

Where, as here, "[p]laintiffs' theory of impact on indirect purchasers is both novel and complex,"

"a more searching inquiry is into whether plaintiffs will be able to prove the pivotal elements of their theory at trial" is "necessitate[d]." *New Motor Vehicles*, 522 F.3d at 26-27 (vacating grant of motion to certify indirect purchaser class).

Plaintiffs' assertion that "Courts routinely certify antitrust cases like this one" (Pls.' Br. at 12), is wrong.[6]  In reality, courts have sparingly granted motions to certify classes of indirect purchasers and, if anything, routinely *deny* such motions.[7]  And when they have granted class certification, it has been based on proof far more extensive than the *ipse dixit* of experts that Plaintiffs provide here.  In that regard, Plaintiffs' effort to prove common impact and class-wide

---

[6] Indeed, in one of the cases that Plaintiffs cite in support of their claim that classes in cases "like this one" are "routinely certified," the court later *decertified* the indirect purchaser class.  *See In re Wellbutrin XL Antitrust Litig.*, 308 F.R.D. 134, 147-51 (E.D. Pa. 2015).

[7] *See, e.g.*, *In re Pre-filled Propane Tank Antitrust Litig.*, No. 14-02567-MD, 2021 WL 5632089, *4-*13 (W.D. Mo. Nov. 9, 2021); *In re Capacitors Antitrust Litig. (No. III)*, No 17-md-02801-JD, 2020 WL 6462393, *2-8 (N.D. Cal. Nov. 3, 2020); *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 35-66 (S.D.N.Y. 2020); *In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 697-725 (E.D. Pa. 2020); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2017 WL 1391491, *6-19 (N.D. Cal. 2017); *In re Digit. Music Antitrust Litig.*, 321 F.R.D. 64, 85-99 (S.D.N.Y. 2017); *In re Domestic Drywall Antitrust Litig.*, No. 2437, 2017 WL 3700999, *3-16 (E.D. Pa. Aug. 24, 2017), *In re Processed Egg Products Antitrust Litig.*, 312 F.R.D. 124, 131-63 (E.D. Pa. 2015); *In re Wellbutrin XL Antitrust Litig.*, 308 F.R.D. 134, 147-51 (E.D. Pa. 2015); *In re Optical Disk Drives Antitrust Litig.*, 303 F.R.D. 311, 323-25 (N.D. Cal. 2014); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 589-90 (E.D. Tenn. 2014); *In re Fla. Cement & Concrete Antitrust Litig.*, 278 F.R.D. 674, 678-87 (S.D. Fla. 2012); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline*, PLC, No. 04-5898, 2010 WL 3855552, *4-31 (E.D. Pa. Sept. 30, 2010); *In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081, *7-15 (N.D. Cal. June 9, 2010); *Somers v. Apple, Inc.*, 258 F.R.D. 354, 359-61 (N.D. Cal. 2009); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 501-07 (N.D. Cal. 2008); *In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 163-67 (N.D. Cal. 2001); *In re Brand Name Prescription Drugs Antitrust Litig.*, Nos. 94 C 897, MDL 997, 1994 WL 663590, *6-7 (N.D. Ill. Nov. 18, 1994).   There are also numerous instances of Courts of Appeals either affirming such denials or vacating orders granting certification of indirect purchaser classes in antitrust cases.  *See, e.g.*, *In re Class 8 Transmission Indirect Purchaser Litig.*, 679 Fed. App'x 135 (3d Cir. 2017) (affirming denial of motion to certify indirect purchaser class); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6 (1st Cir. 2008) (vacating grant of motion to certify indirect purchaser class); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3rd Cir. 2009) (same).

damages rests entirely on the manifestly flawed opinions of two of their experts, Dr. Heeb and Dr. Maki. Following the Supreme Court's decision in *Comcast*, "circuit courts in antitrust cases have consistently, and correctly, read that decision to require that district courts carefully examine, at the class certification stages, the soundness of an expert's model relied upon to establish classwide impact." *In re Aluminum*, 336 F.R.D. at *47. Defendants have moved to exclude the testimony of Dr. Heeb and Dr. Maki on these points. (*See* ECF Nos. 388 (Heeb), 391 (Maki).) If *either* of those motions are granted, Plaintiffs' motion for class certification must be denied because there will be no evidence on the critical issues of common proof of harm and amount of class-wide damages. But even if both motions were to be denied, Plaintiffs would *still* have failed to carry their burden in light of the counter-evidence brought forward by Defendants. *See, e.g.*, *Egg Prods.*, 312 F.R.D. at 151 ("Dr. Stiegert's expert testimony, even if admissible under *Daubert*, would not mean Plaintiffs satisfied Rule 23."); *Apple,* 258 F.R.D. at 361 (weighing expert and other evidence in denying certification of indirect purchaser class).

### A. Plaintiffs Have Not Shown They Can Establish Overcharges to Direct Purchasers Via Common Proof

As set forth in Defendants' *Daubert* motion relating to Dr. Heeb (ECF No. 388), Dr. Heeb simply divines a "competitive price" (which in reality is just an assessment of Varsity's prices before 2014 relative to other event producers' prices), compares Varsity's price to that "competitive price," and assigns 100% of the difference to "overcharges."

This analysis provides no basis to show harm by common proof because it fails to take into account what the actual prices would have been in the absence of any complained of conduct that *actually violated the antitrust laws*, the all-critical question. "Prices whose level [are] above what an expert deems competitive has been caused by factors unrelated to an accepted theory of antitrust harm are not anticompetitive in any sense relevant here. The first required step is to

16

translate the *legal theory of the harmful event* into an analysis of the economic impact *of that event*." *Comcast*, 569 U.S. at 38 (internal quotations omitted); *see also MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) ("It is essential, however, that damages reflect only the losses directly attributable to *unlawful* competition."); *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1353 (3d Cir. 1975) ("The damage figures advanced by plaintiff's experts may be substantially attributable to lawful competition.  In the absence of any guidance in the record, we cannot permit a jury to speculate concerning the amount of losses resulting from unlawful, as opposed to lawful, competition."); *Kentucky v. Marathon Petroleum Co. LP*, 464 F.Supp.3d 880, 895 (W.D. Ky. 2020) ("Sattinger's report fails because he did not specify what portion of the calculated damages figure stems from Defendants' legal conduct and what portion, if any, is caused by any of their allegedly illegal forms of conduct.").

This failure is compounded by Plaintiffs' attack on Varsity's rebate programs relating to All Star cheer.  According to Plaintiffs, in the "but-for" world, those programs would not have existed.  This means that in the "but-for" world, different All Star gyms would have paid *more* for competitions and apparel than they actually did, which under Plaintiffs' theory means that putative class members would have paid *more* as well and, therefore, been *worse* off.  As discussed above, a class cannot include members who were better off in the real world than in the but-for world.  Here in at least several regions the Varsity Family Plan offered rebates in excess of the overcharge percentage that Dr. Heeb calculated.  Gyms receiving such rebates, and customers of those gyms, were not harmed even under *Plaintiffs'* calculations.

### B.   Plaintiffs Have Not Shown They Can Establish Passthrough to Indirect Purchasers Via Common Proof

Plaintiffs have likewise not established they can show passthrough to downstream purchasers (*i.e.*, putative class members) through common proof.  Dr. Maki's conclusion that

100% of any overcharge was always "passed on" to putative class members (ECF No. 391-4 at ¶ 120; Ex. J, Maki Dep. 86:4-10), even though putative class members bought a variety of different products in a variety of different geographies through a variety of different intermediaries facing different competitive conditions, is not based on any economic principle or study and, thus, is essentially *per se* invalid.  *See, e.g., Apple*, 258 F.R.D. at 361 ("Dr. French has proffered no specific economic model and has examined no set of data, and has never accomplished what he purports to accomplish in an indirect purchaser antitrust class action.") Rather, in the two paragraphs Dr. Maki devotes to the issue of passthrough in her report, she merely asserts that the supply chain is "simple" and that gyms and schools perform the role of a middleman.  In fact, as discussed in the motion to exclude Dr. Maki's testimony (ECF No. 391-1, at PageID 12800-02), the supply chain—with two distinct channels (schools and gyms), multiple purchasing models, three different product markets, and eleven total product/geographic markets—is anything but "simple."  Although practices vary, gyms often bundle gym time, training, apparel, choreography, and competitions, with competitions being a relatively small portion of the total.  Schools may pay for their cheerleading teams through their own budgets, through fundraising, or through booster clubs.  There is no "one size fits all"; far from it.

Nakedly asserting 100% passthrough—without any reasoned support—does not suffice to sustain a motion for class certification.  *See, e.g.*, *In re Optical Disk Drives Antitrust Litig.*, 303 F.R.D. 311, 323-24 (N.D. Cal. 2014) ("[S]howing the existence of industry characteristics that are conducive to classwide impact may fulfill a requisite first step, but it does not establish such impact.").  "The tracing process requires more than the one-size-fits-all theoretical construct proposed by [Plaintiffs' expert]."  *Flash Memory*, 2010 WL 2332081, at *11.  This is especially true where, as here, there are multiple products and geographic markets; within the product

markets, there are numerous "differentiated products with diverse price points that have been purchased by putative class members over the course of the last decade"; and "[s]uch products are sold to class members by hundreds of different retailer suppliers." *Id.* As the record here shows, "different retailers [i.e., gyms] respond to cost changes in different ways, with some choosing not to pass-through cost changes in the form of higher prices for the end-user." *Id.* "The 'economic theory' cited by [the expert] accounts for none of these anomalies." *Id.; see also GPU*, 253 F.R.D. at 496 (("Dr. Teece may not meet his burden [of showing common impact] by simply stating that 'economic theory' dictates that prices for retail and wholesale purchases generally go up together.") (internal quotations omitted).[8]

### C.   Plaintiffs Have Not Shown They Can Establish Aggregate Damages to Either of Their Damages Classes Via Common Proof

"Plaintiffs must also demonstrate that common issues predominate as to the element of 'measurable damages.'" *In re Domestic Drywall Antitrust Litig.*, 2017 WL 3700999, at *14 (E.D. Pa. Aug. 24, 2017) (citation omitted). Plaintiffs fail to provide a method to show the amount of damages to either of their damages classes via common proof. Plaintiffs rely entirely on Dr. Maki's calculations, in which she multiplied the overcharge percentages that Dr. Heeb calculated by her calculation of the amount of Varsity's sales in each of the three product "markets" that Dr. Heeb identified.

As an initial matter, because Dr. Heeb's overcharge percentages are, as discussed above, fatally flawed, Dr. Maki's use of them renders her damages model useless. *See, e.g.*, *GPU*, 253 F.R.D. at 502 (rejecting damages expert's opinion because it "hinge[d] on the accuracy of [another expert's] conclusions that defendants' actions led to an overcharge on their direct

---

[8] The court in *Flash Memory* also rejected the expert's regression models that "she claims bolster her prediction of a 100% pass-through rate." 2010 WL 2332081, at *11-13. Dr. Maki did not even provide any regressions in this case to substantiate her claim of 100% pass through.

purchases and that that impact can be demonstrated by common proof"). Likewise, Dr. Maki's baseless 100% passthrough assumption independently wrecks her class-wide damages calculation. *See also Egg Prods.*, 312 F.R.D. at 162 (rejecting plaintiffs' effort to show aggregate damages using common proof because, among other things, "[p]laintiffs did not demonstrate to the Court that their single pass-through rate adequately accounts for the variation in pricing and would result in a reasonably accurate measure of damages on a classwide basis"); *Drywall*, 2017 WL 3700999, at *14 (rejecting damages model because it "assumes a 100% pass-through rate, which is something that [the plaintiffs] must prove").

Those issues aside, Dr. Maki's calculations are also fatally flawed because, as set forth in Defendants' *Daubert* motion regarding Dr. Maki (ECF No. 391), Dr. Maki wildly overstates the amount of relevant Varsity sales. *See also Drywall*, 2017 WL 3700999, at *14 (concluding that use of inapplicable sales figures doomed damage calculation). First, Dr. Maki assumed, incorrectly and without factual support, that every sale where payment came to Varsity from a gym or a school was accompanied by an "indirect purchase" by one of the putative class members. In fact, gyms and schools do not necessarily always charge cheerleaders for competitions, camps, or apparel. (*See* ECF No. 391-1 at PageID 12793.)

Second, Dr. Maki failed to account for the fact that, even where a school does not absorb the charge (and any overcharge), other entities, such as booster clubs, may pay or the costs may be covered by fundraising efforts. (*Id.*) Both Ms. Lorenzen and Ms. Jones explained that certain purchases were financed, at least in part, through other entities or fundraising. (*See infra* Section E.) Varsity's sales that were paid for this way should not have been included in Dr. Maki's calculation of relevant sales, but they were. (*See* ECF No. 391-1 at PageID 12793.)

Third, even where parents or cheerleaders paid the gym or school in the first instance, the

gym or school often acted as a collector of funds to pay Varsity and did not itself make the purchase.  When such an intermediary acts as a mere conduit for the sale, never acquires the product or service, and takes no risk in the transaction, the payer (here the cheerleader or parent, *i.e.*, the putative class member) is a direct, not indirect, purchaser.  *See, e.g., In re Toilet Seat Antitrust Litig.*, 1977 WL 1453, *2 (E.D. Mich. Aug. 24, 1977) (holding that purchaser that purchased through purchasing agent was a direct purchaser, not an indirect purchaser); *see also In re NASDAQ Mkt-Makers Antitrust Litig.*, 169 F.R.D. 493, 506 (S.D.N.Y. 1996) (same as to clients of stockbroker).  Sales in that situation should not have been included in Dr. Maki's calculation of relevant sales, but they were.  (ECF No. 391-1 at PageID 12793.)

Fourth, Dr. Maki improperly included all sales to a school if the school attended a single competition *or camp* during the putative class period.  (*Id.* at PageID 12794.)  At a minimum, including schools that did not attend a single competition on the basis that they attended a camp is invalid and overstates sales to schools that participate in *competitive* cheer, which in turn overstates damages.  There is no dispute that many sideline cheer teams—*i.e.*, those that do not compete—attend cheer camps.  Indeed, Dr. Netz, also Plaintiffs' expert, expressly *excluded* sales to schools that did not attend competitions from her analysis.  (*See, e.g.*, ECF No. 382-4 at 17- 20.)  At her deposition, Dr. Maki conceded that any revenue from such schools was "inappropriately included" in her calculations.  (Ex. J, Maki Dep. 84:7-8; *see also* ECF No. 391- 1 at PageID 12795.)  Nor should camp registrations where the cheerleader did not also attend a competition requiring credentialing have been included because, as discussed above, there is no tying claim without the purchase of the alleged tied and tying product or service.

Each of these errors compounds the others.  Even if each error only affected, for example, 20% of all sales, combined they would suggest that Dr. Maki's overcharges, on a national basis,

were overstated by approximately 60%.  (*See id.*)  For these reasons Dr. Maki's damage

calculation is so deeply flawed, Plaintiffs have failed to show that the aggregate amount of

damages can be shown by common proof for either of their damages classes.

> **D.    Common Issues Do Not Predominate in the State Law Damages Class Because of Variations in State Law**

Plaintiffs seek to bring claims under the laws of 32 different states and the District of

Columbia.  "Where proposed classes would implicate the laws of multiple states, *the party*

*seeking class certification* must creditably demonstrate, through an *extensive analysis* of state

law variances, that class certification does not present insuperable obstacles."  *Digit. Music*, 321

F.R.D. at *99-100 (internal quotation marks omitted and emphasis added).  In its order on

Defendants' motion to dismiss, the Court noted that the issue would be addressed "at the class

certification stage."  (ECF No. 333 at PageID 7244.)

Now at that stage, Plaintiffs fail to address this issue at all, much less present an

"extensive analysis" or explain how a Memphis jury could possibly assess the vast trove of facts

that Plaintiffs apparently intend to present in a proposed multi-week trial and apply those facts to

these different laws, which is their burden.  This is fatal to certification because "[i]f more than a

few of the laws of the [relevant] states differ, the district judge would face an impossible task of

instructing a jury on the relevant law."  *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir.

1996) (issuing writ of mandamus to district court to reverse its certification of class).

There are significant variations in the laws of the 33 jurisdictions under which Plaintiffs

seek to bring their antitrust and other claims.[9]  For example, although virtually all of the

complained of conduct is unilateral conduct by Varsity, the laws of New York, California,

---

[9] *See also* Appendix A, where these variations are set out in chart form.

Tennessee and Kansas do not provide a cause of action for unilateral conduct.[10]  To find a violation of those states' laws, a factfinder would need to parse the alleged conduct between unilateral and non-unilateral, which would be a practical impossibility for a jury, particularly where, as here, the only non-unilateral conduct asserted is between Varsity and USASF, which has nothing to do with apparel, camps, or scholastic cheerleading.  To state a claim under Mississippi antitrust law, Plaintiffs must allege that the monopoly was "accomplished in part at least by transactions lying wholly within the state." *State ex rel. Fitch v. Yazaki N. Am., Inc.*, 294 So. 3d 1178, 1188 (Sup. Ct. of Miss. 2020) (internal quotations and citation omitted).  The factfinder would, thus, have to consider whether this provision was satisfied for claims under Mississippi law.  Arkansas, Connecticut, Florida, Idaho, Maryland, and Washington do not provide a private antitrust cause of action for indirect purchasers at all,[11] and any claims under their laws would need to be decided under the separate (and varying) standards of those states' consumer protection laws.  *See, e.g., Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946 (6th Cir. 2011) (striking class allegations where the court would need to apply the consumer protection laws of many states).

There are other complicating differences, such as state-specific standards for damages,

---

[10] *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1478 (9th Cir. 1986) (California), *opinion modified on other grounds on denial of reh'g*, 810 F.2d 1517 (9th Cir. 1987); *Commonwealth Elec. Inspection Servs., Inc. v. Town of Clarence*, 6 A.D.3d 1185, 1186 (N.Y. App. Div. 2004) (New York); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 284 (D. Mass. 2004) (Tennessee); *id.* at 283 (Kansas).

[11] *See* Ark. Code Ann. § 4-75-315; *In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, No. 1:14-md-2508, 2015 WL 5166014, at *22 (E.D. Tenn. June 24, 2015) (dismissing indirect purchaser claims under the Arkansas antitrust statute because it "does not provide for a private individual to bring an action and only permits actions by the Attorney General"); *Vacco v. Microsoft Corp.*, 260 Conn. 59, 87 (2002) (Connecticut); *Mack v. Bristol-Myers Squibb Co.*, 673 So.2d 100, 108 (Fla. Dist. Ct. App. 1996) (Florida); Idaho Code § 48-108 (Idaho); Md. Code Ann., Com. Law § 11-209(b)(ii) (Maryland); *Blewett v. Abbott Labs.*, 86 Wash.App. 782, 783-84 (Wash. Ct. App. 1997) (Washington).

which the fact finder would need to assess on a state-by-state basis.  Arizona, Iowa, Michigan, and North Dakota require a heightened finding of culpability for plaintiffs to recover exemplary or treble damages.[12]  (Nebraska does not allow private treble damages actions at all.[13])  Several states, including California, New York, and Oregon, do not necessarily follow federal antitrust precedent.[14]  Other states, like Kansas, Mississippi, and Tennessee have only a three-year statute of limitations.[15]  Moreover, to evade the statute of limitations in general, Plaintiffs rely heavily on the so-called "continuing violations" doctrine, but that doctrine is not recognized in Florida or the District of Columbia, and its availability under Tennessee law is at best unsettled.[16]  Some states, such as Hawaii, impose procedural requirements that must be observed on pain of dismissal, which would require the jury to determine if those procedures were followed and, if not, to exclude any claims under those states' laws.[17]

Courts have repeatedly concluded that classes seeking to bring claims under a mishmash of different state statutes governing antitrust, consumer protection, unjust enrichment, and other such laws are unmanageable and should not be certified.  *See, e.g., Skelaxin*, 299 F.R.D. at 588

---

[12] *See In re Digit. Music Antitrust Litig.*, 321 F.R.D. 64, 99 (S.D.N.Y. 2017) (Arizona and Michigan); Iowa Code § 553.12 (Iowa); N.D. Cent. Code §§ 51-08.1-08(2) (North Dakota).

[13] *Compare* Neb Rev. St. 59-821 ("any person . . . shall recover actual damages") *to* Neb. Rev. St. 84-212 (The Attorney General . . . may recover treble damages.").

[14] *See, e.g.*, *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 911 (9th Cir. 2008) (Oregon); *Commonwealth Elec. Inspection Servs.*, 6 A.D.3d at 1186 (New York); *Dimidowich v. Bell & Howell*, 803 F.2d at 1478 (California).

[15] *See Idstrom v. All. Radiology, P.A.*, 388 P.3d 923 (Kan. Ct. App. 2017) (Kansas); Miss. Code Ann. § 15-1-49(1) (Mississippi); *In re Pre-Filled Propane Tank Antitrust Litig.*, 2019 WL 4796528, at *15 (W.D. Mo. Aug. 21, 2019) (Tennessee).

[16] *In re Pre-Filled Propane Tank Antitrust Litig.*, 2019 WL 4796528, at *12 (W.D. Mo. Aug. 21, 2019) (holding that the continuing violations doctrine does not apply under the laws of Florida or the District of Columbia).

[17] *See, e.g., In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 232 (M.D. Pa. 2010) (holding that failure to comply with attorney general notification provisions of § 480–13.3(a) of the Hawaii Code required dismissal of claims under that statute).

("Applying the law of forty-nine states likely renders this class simply unmanageable.").  At a

very minimum, Plaintiffs must demonstrate manageability of the claims under different state

laws through extensive analysis, and their failure to do so dooms their motion.  *See, e.g. Drywall*,

2017 WL 3700999, at *15 (rejecting certification of class bringing "claims under the laws of 11

different states, comprising three different claim types (state antitrust, consumer protection, and

unjust enrichment), for a total of 22 state law claims" because "IPPs do not engage with any

potential differences in state law as to [the] elements [of those claims]"); *Egg Prods.*, 312 F.R.D.

at 163-65 (rejecting assertion that classes bringing claims under the laws of 21 states could be

efficiently managed); *Digit. Music*, 321 F.R.D. at *99-100 (rejecting the plaintiffs' argument that

"the variations in state law are only minor").[18]

---

[18] Plaintiffs devote one line and a footnote in their brief to this issue.  (*See* Pls.' Br. at 29 & n.61.)
The cases Plaintiffs cite in their footnote are inapposite.  *In re Wellbutrin XL Antitrust Litig.*, 282
F.R.D. 126, 137 (E.D. Pa. 2011), was, as noted above, later decertified.  *See In re Wellbutrin XL
Antitrust Litig.*, 308 F.R.D. 134 (E.D. Pa. 2015).  The issue of variation of state laws was not
even considered in the original *Wellbutrin* decision.  Nor was it considered in *In re Nexium
Antitrust Litigation*, 777 F.3d 9 (1st Cir. 2015), which involved the issue of unharmed
individuals being included in the class.  In *In re Pharmaceutical Industry Average Wholesale
Price Litigation*, the court *declined* to certify class under consumer protection laws of multiple
states and did not discuss the manageability issues with other classes.  233 F.R.D. 229, 231-32
(D. Mass. 2006).  In *In re Packaged Ice Antitrust Litigation*, the question before the court was
the certification of a settlement class, and the court noted that it was "mindful … that concerns
regarding variation in state law largely dissipate when a court is considering certification of a
settlement class." 322 F.R.D. 276, 286 (E.D. Mich. 2017) (internal quotations omitted).  Other
cases involved price fixing or manipulating the FDA approval process for a particular drug, not
the sort of multi-faceted, years long alleged practices of Defendants at issue here.  *See, e.g.,
Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2015 WL 44459636 (N.D. Ohio July 21,
2015); *In re Flonase Antitrust Litig.*, 284 F.R.D. 207 (E.D. Pa. 2012).  It is one thing to say that
all antitrust regimes condemn price fixing or improper behavior in the drug approval process, but
quite another to carry the burden of showing that every state's laws of unfair competition,
consumer protection, unjust enrichment, and antitrust treat the same all aspects of the conduct
alleged in *this case*.  Moreover, unlike here, in *Polyurethane Foam*, the plaintiffs had "shown the
essential elements of their claims are susceptible of proof on a class-wide basis, and have
presented analysis of the relevant state laws suggesting any differences that might exist among
the various state statutes are minimal and can be addressed with special verdict forms." 2015
WL 4459636, at *2.  Finally, in *In re Disposable Contact Lens Antitrust*, only the laws of

### E.   Determining Impact and Amount of Class-Wide Damages Would Require Hundreds of Thousands of Minitrials

Ultimately, the only proper way to determine whether a particular "indirect purchaser" of cheer competitions, camps, or apparel suffered damages from illegal anticompetitive conduct "would be to conduct a [gym-by-gym] and [school-by-school] investigation, which would essentially result in thousands of mini-trials, rendering this case unmanageable and unsuitable for class action treatment." *GPU*, 253 F.R.D. at 505 (internal quotation marks omitted) (denying class certification for this reason); *see also Optical Disk*, 303 F.R.D. at 324 (same).

Here, these minitrials would entail determining, for each particular purchase by each putative class member, (1) the gym(s) or school(s) at issue, (2) whether the gym(s) or school(s) was overcharged, (3) what rebate, if any, was received, (4) the particular pricing practices of the relevant gym(s) and/or school(s) (to determine if there was passthrough), (5) the applicable state law, and (6) whether and to what extent recovery under that state's law was available. Likewise, each direct sale would need to be examined to determine whether it actually led to an indirect purchase as opposed to, for example, the school or gym absorbing the cost entirely, or the school or gym simply acting as a purchasing agent for the putative (but not really) "indirect" purchaser. Claims based on the purchase of a camp registration would require assessing whether the Varsity camp in question even offered the credentialing requirement that Plaintiffs claim Varsity "tied," and whether the putative class member *also* purchased registrations in one of the few end-of-season scholastic championships to which the requirement even applied. Both would be required to have a potential claim. *See, e.g., Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 887 (10th Cir. 1997) ("[T]wo types of parties may have standing to challenge

---

Maryland and California were implicated, not the laws of 33 separate jurisdictions as here. 329 F.R.D. 336, 350-51 (M.D. Fla. 2018). The court approved the creation of two subclasses "to address variations in state law." *Id.* at 426.

illegal tying arrangements—the purchasers who are forced to buy the tied product to obtain the tying product (the prototypical tying plaintiff), and the competitor who is restrained from entering the market for the tied product.")

Plaintiffs' deposition testimony illustrates the plethora of individualized issues.  Ms. Lorenzen testified that ███████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████. (Ex. G, Lorenzen Dep. 129:17-130:5.) ████████████████████████ ██████████████████. (*Id.* 74:2-15.) ██████████████████████ ██████████████████████████████████. (*Id.* 129:17-130:5.) ██████ ███████████████████████████████████████████████████████████ ████████████████████████████████. (*Id.* 183:22-184:8.)  Where donors, fundraising, or the school paid for apparel, camps, or competitions, Ms. Lorenzen was not an indirect purchaser at all.  And there is no indication that the school purchased anything for resale.  Even as to products or services that in some sense Ms. Lorenzen "paid for," the school merely acted as her payment agent.  Yet, even though none of these purchases should be included in an indirect purchaser damages model, Plaintiffs' model includes all of them.

Similarly, Ms. Jones testified that ██████████████████████████ ███████████████████████████████████████████████████████████ ████████████████. (Ex. I, Jones Dep. 43:22-24, 65:13-15.) ████████████ ███████████████████████████████████████████. (*Id.* 65:16-68:8.)  One of the gyms gave a discount to Ms. Jones because she had multiple children in the program.  (*Id.* 67:22-23.)  The pricing at one of the gyms "changed every month." (*Id.* 113:17-18.)  Ms. Jones

also testified that all of the gyms did fundraising to take "money off of tuition." (*Id.* 198:14-15.)

As this sampling of testimony of just two putative class members illustrates, ferreting out which sales of Varsity should be included in the damage model and which should not would require a transaction-by-transaction, class member-by-class member inquiry. Conducting that inquiry for hundreds of thousands of class members and transactions would overwhelm any conceivable common issues.

## IV.   THE "INJUNCTIVE RELIEF CLASS" SHOULD NOT BE CERTIFIED

Plaintiffs devote only one paragraph of their brief to their proposed "Injunctive Relief Class." (*See* Pls.' Br. at 30.) They provide no basis for certifying such a class, other than the bare and unsupported statement that "Defendants' conduct is ongoing." They do not specify what "conduct" is ongoing, what conduct would be enjoined, or how any such conduct would be likely to harm any members of the putative Injunctive Relief Class, much less most or all of them. *See also Egg Products*, 312 F.R.D. at 165 (rejecting certification of injunctive class because Plaintiffs failed to provide "critical, detailed analysis" regarding the "serious issues" that "confront[ed] the proposed injunctive class"). This is fatal: "before the Court can determine whether an injunction could be based on grounds that have general application to the class, it must know what policies of Defendants are ongoing and threaten future injury, and how any injunction could provide relief." *Id.* at 169.

The Injunctive Relief Class should not be certified for multiple additional reasons. First, certification of a class under Rule 23(b)(2) is not appropriate where, as here, the "primary intent [of the] litigation is to recover damages for past purchases." *Flash Memory*, 2010 WL 2332081, at *7 (denying class certification of proposed class under Rule 23(b)(2) on that basis); *GPU*, 253 F.R.D. at 507-08 (same); *see also Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 729 (9th Cir. 2007) (affirming denial of certification on that basis); Fed. R. Civ. P. 23(b)(2), Advisory

28

Committee's Notes to 1966 amend. (subdivision (b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages").

Monetary damages is plainly the "primary intent" here, as evidenced by Plaintiffs' terse treatment of the proposed Injunctive Relief Class in their motion papers. *See, e.g.*, *Egg Prods.*, 312 F.R.D. at 165 (rejecting injunctive class because "the volume of paper and amount of discovery dedicated to the monetary damages classes as opposed to the injunctive class belie any argument that injunctive relief is the primary relief sought in this litigation."); *GPU*, 253 F.R.D. at 507 ("From the onset of litigation, it has been crystal clear that both groups of plaintiffs have primarily sought monetary damages. Several antitrust decisions have denied certifying under Rule 23(b)(2) where the primary relief sought was money.") (collecting cases).

Second, Plaintiffs fail to demonstrate any threat of continuing or future injury to any members of the putative class, much less a majority of the putative class. *See Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 525 (5th Cir. 2007) ("Rule 23(b)(2) certification is ... inappropriate when the majority of the class does not face future harm."). To the contrary, since the case was filed, numerous new competitors have emerged, some of which have banded together under the rubric of the Open Championship Series and the World All Star Federation. (*See* Ex. K, Hanbery Dep. 25:4-26:16, 104:6-18, 191:7-195:23; Ex. L, Weber Dep. 190:16-195:22, 200:12-201:18.) From its launch in 2019, the Open Championship Series reportedly now offers more than 300 regular season events per year from over 50 event producers and end-of-season championship events, including what it calls a "world" championship in Orlando, Florida that in 2022 attracted more than 1,100 teams. (Ex. L, Weber Dep. 18:21-20:24, 22:2-4, 24:1-25, 25:14-25, 36:7-38:17; Ex. M, Owens Dep. 36:7-38:17, 50:7-52:2; Ex. K, Hanbery Dep. 210:4-19, 287:2-23.) Meanwhile, the World All Star Federation has put itself forward as an

alternative to the USASF.  (Ex. L, Weber Dep. 190:16-195:22, 200:12-201:18.)  The entry of new competitors—which Plaintiffs do not address at all—belies any assertion of continuing or future injury to putative class members as a group.

Third, Plaintiffs have "failed to specifically articulate the injunctive relief they seek." *Egg Prods.*, 312 F.R.D. at 170.  "At the class certification stage, the injunctive relief sought must be described in reasonably particular detail such that the court can at least conceive of an injunction that would satisfy Rule 65(d)'s requirements, as well as the requirements of Rule 23(b)(2)."  *Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597, 605 (10th Cir. 2008) (internal quotations and citation omitted); *see also MD. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 845 (5th Cir. 2012) ("[T]he injunctive relief sought must be specific").[19]

Finally, the same issues discussed above relating to "common issues" precludes certifying Plaintiffs' "injunctive relief" class under Rule 23(b)(2).  *See, e.g.*, *Drywall*, 2017 WL 3700999, at *16.  Given the multiple product and geographic markets, Defendants have not "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as whole," as required for certification under Rule 23(b)(2).  *See, e.g., Dukes*, 564 U.S. at 360 ("Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.").

## CONCLUSION

For the reasons discussed above, the Court should deny Plaintiffs' motion in its entirety.

---

[19] Plaintiffs point to the recommendations of Mr. Aronoff, but Mr. Aronoff's recommendations are non-specific.  They also do not take into account the current market conditions (Mr. Aronoff conceded he had not even heard of Open Cheer (*see* Ex. N, Aronoff Dep. 103:25-104:1)) or Defendants' current business practices.  (*See* ECF No. 385-1, at PageID 10102, 10108.)

Dated: March 31, 2023

Respectfully submitted,

/s Matthew S. Mulqueen

George S. Cary*
Steven J. Kaiser*
Linden Bernhardt*
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Phone: (202) 974-1500
Fax: (202) 974-1999
gcary@cgsh.com
skaiser@cgsh.com
lbernhardt@cgsh.com

Jennifer Kennedy Park*
Heather Nyong'o*
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
1841 Page Mill Road, Suite 250
Palo Alto, CA 94304
Phone: (650) 815-4100
Fax: (202) 974-1999
jkpark@cgsh.com
hnyongo@cgsh.com

* Admitted *pro hac vice*

Matthew S. Mulqueen (TN #28418)
Adam S. Baldridge (TN #23488)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ
165 Madison Avenue, Suite 2000
Memphis, TN 38103
Phone: (901) 526-2000
Fax: (901) 577-0866
mmulqueen@bakerdonelson.com
abaldridge@bakerdonelson.com

*Attorneys for Defendants Varsity Brands,
LLC, Varsity Spirit, LLC; Varsity Spirit
Fashions & Supplies, LLC; Charlesbank
Capital Partners, LLC; Bain Capital Private
Equity LP*

31

s/ Nicole Berkowitz Riccio
Grady Garrison (TN #008097)
Nicole Berkowitz Riccio (TN #35046)
James Andrew Roach (TN #37934)
Karen Lott Glover (TN #38714)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ
165 Madison Avenue, Suite 2000
Memphis, TN 38103
Phone: (901) 526-2000
Fax: (901) 577-0866
ggarrison@bakerdonelson.com
nriccio@bakerdonelson.com
aroach@bakerdonelson.com
kglover@bakerdonelson.com

*Attorneys for U.S. All Star Federation, Inc.
and USA Sport Cheering, d/b/a USA Cheer*

s/ Brendan P. Gaffney
Paul E. Coggins*
Brendan P. Gaffney*
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Phone: (214) 740-8000
Fax: (214) 740-8800
pcoggins@lockelord.com
bgaffney@lockelord.com

* Admitted *pro hac vice*

Edward L. Stanton III (TN #018904)
S. Keenan Carter (TN #023386)
BUTLER SNOW LLP
6075 Poplar Avenue, Suite 500
Memphis, Tennessee 38119
Phone: (901) 680-7336
Fax: (901) 680-7201
Edward.Stanton@butlersnow.com
Keenan.Carter@butlersnow.com

*Attorneys for Jeff Webb*