# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TENNESSEE

|  |  |
|---|---|
| JESSICA JONES et al., <br><br>           Plaintiffs, <br> v. <br><br> VARSITY BRANDS, LLC et al., <br><br>          Defendants. | Civ. Action No. 2:20-cv-02892 |

## DEFENDANTS' MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE JONATHAN M. ORSZAG AND DR. KEVIN MURPHY, IN PART

## TABLE OF CONTENTS

I.   PLAINTIFFS' MOTION TO EXCLUDE MR. ORSZAG IS ENTIRELY WITHOUT
     MERIT. ...........................................................................................................................2

     A.   Mr. Orszag Is A Well-Respected Economist Whose Qualifications Have Been
          Recognized By Numerous Courts. .........................................................................2

     B.   Mr. Orszag's Opinions Are Not Based On His Own *Ipse Dixit*. ...........................4

     C.   Mr. Orszag Considered Evidence That Pre-Dates The Class Period, But In Any
          Event, This Would Not Be Grounds For Exclusion. ..............................................8

     D.   The E-Books Case Is Inapposite And Does Not Provide A Basis To Exclude Mr.
          Orszag's Testimony. .............................................................................................9

II.  PLAINTIFFS' MOTION TO PARTIALLY EXCLUDE PROF. MURPHY IS
     EQUALLY BASELESS. .................................................................................................11

     A.   Prof. Murphy Reliably Calculated Participation To Conclude That There Was A
          "Net Benefit" To Consumers. ...............................................................................11

          1.   Prof. Murphy's event participation analysis ensured relevant, consistent
               comparisons of participation pre- and post-acquisition. ...........................11

          2.   Prof. Murphy's finding of net benefits to consumers is economically
               correct and supported by the record. ........................................................13

     B.   Prof. Murphy Used The Hypothetical Monopolist Test To Properly Analyze
          Geographic Markets For Competitions. ................................................................15

     C.   Prof. Murphy Appropriately Used NFHS Survey Results To Derive An
          Informative Demand Proxy. .................................................................................18

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*,
  917 F.2d 1413 (6th Cir. 1990) ...............................................17

*Babcock Power, Inc. v. Kapsalis*,
  854 F. App'x 1 (6th Cir. 2021)...............................................17

*Bamcor LLC v. Jupiter Aluminum Corp.*,
  767 F. Supp. 2d 959 (N.D. Ind. 2011)....................................10

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ...............................................................15

*Burnett v. Damon Corp.*,
  2013 WL 6230108 (N.D.N.Y. Dec. 2, 2013) .........................12

*Chavez v. Carranza*,
  559 F.3d 486 (6th Cir. 2009) .................................................16

*Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
  95 F.3d 593 (7th Cir. 1996) ...................................................15

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)...............................................................22

*Hammond v. Int'l Harbester Co.*,
  691 F.2d 646 (3d Cir. 1982) ....................................................3

*In re Dealer Management Sys. Antitrust Litig.*,
  581 F. Supp. 3d 1029 (N.D. Ill. 2022)………………………………………6, 7

*In re Electronic Books Antitrust Litigation*,
  2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) .......................12

*In re Processed Egg Prods. Antitrust Litig.*,
  81 F. Supp. 3d 412 (E.D. Pa. 2015) .....................................5, 6

*In re Scrap Metal Antitrust Litig.*,
  527 F.3d 517 (6th Cir. 2008) .................................................22

*In re Southeastern Milk Antitrust Litig.*,
  739 F.3d 262 (6th Cir. 2014) .................................................18

*In re Southeastern Milk Antitrust Litig.*,
   2010 WL 8228885 (E.D. Tenn. Dec. 8, 2010)........................................................12

*In re Urethane Antitrust Litig.*,
   152 F. Supp. 3d 357 (D.N.J. 2016) ........................................................................5

*In re Urethane Antitrust Litig.*,
   2012 WL 6681783 (D. Kan. Dec. 21, 2012) .........................................................11

*Katt v. City of New York*,
   151 F. Supp. 2d 313 (S.D.N.Y. 2001) ..................................................................16

*McLean v. 988011 Ontario, Ltd.*,
   224 F.3d 797 (6th Cir. 2000) ...............................................................................22

*Modern Holdings, LLC v. Corning, Inc.*,
   2022 WL 71074 n.9 (E.D. Ky. Mar. 9, 2022).......................................................12

*Moran v. Ford Motor Co.*,
   476 F.2d 289 (8th Cir. 1973) .................................................................................3

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) .........................................................................................17

*Pearlman v. Cablevision Sys. Corp.*,
   2015 WL 9462104 (E.D.N.Y. Dec. 28, 2015) ........................................................4

*Provost v. Crockett County, Tenn.*,
   2018 WL 11416133 (W.D. Tenn. July 23, 2018) ..................................................11

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
   173 F.3d 995 (6th Cir. 1999) .............................................................................5, 9

*Summit 6, LLC v. Samsung Elecs. Co.*,
   802 F.3d 1283 (Fed. Cir. 2015).............................................................................21

*United States v. L.E. Cooke Co.*,
   991 F.2d 336 (6th Cir.1993) ................................................................................22

*Wilson v. Maricopa Cty.*,
   2007 WL 686726 (D. Ariz. Mar. 2, 2007).......................................................12, 13

*Zuzula v. ABB Power T&D Co., Inc.*,
   267 F. Supp. 2d 703 (E.D. Mich. 2003) .................................................................2

**RULES**

Fed. R. Evid. 703 .......................................................................................................21

iii

**OTHER AUTHORITIES**

Rebecca Boyce, *Cheerleading in the Context of Title IX and Gendering in Sport*, 11 The Sport
Journal, no. 3 (2008) ...........................................................................................................18

Carmen E. Quatman et al., *Sex Differences in "Weightlifting" Injuries Presenting to United
States Emergency Rooms*, 23 Journal Strength & Conditional Res., no. 7 (2009). ..................18

## INTRODUCTION

Defendants' experts, Mr. Orszag and Professor Murphy, are highly trained, well-respected economists with substantial experience and expertise in antitrust economics. Plaintiffs' criticisms of these experts are largely irrelevant, overlook the sound economic analysis and evidentiary support for their opinions, and invite the Court to contravene well-established case law regarding the admissibility of expert opinion testimony. For example, as to Mr. Orszag, Plaintiffs challenge his qualifications, despite the fact that he has an advanced economics degree and many years of real-world economic experience and has been previously qualified as an economics expert in antitrust matters. Plaintiffs also disregard the near entirety of Mr. Orszag's analysis and the basis for that analysis and falsely claim that he opined of his own *ipse dixit* and without considering record evidence prior to the class period. A review of his report and testimony makes clear that this is simply untrue.

As to Professor Murphy, Plaintiffs attack Exhibit 45 to his report, but their criticisms are misplaced and do not withstand scrutiny. Contrary to Plaintiffs' assertions, in relation to Exhibit 45, Prof. Murphy correctly designed his analysis to demonstrate the improvements Varsity made to acquired events during the proposed class period. His opinions are substantiated by a robust analysis and the evidence. Further, Prof. Murphy's rebuttal to Plaintiffs' geographic market analysis is, in fact, based on his application of the hypothetical monopolist test ("HMT"). Plaintiffs' misunderstanding of or quibbles with his analysis are not grounds for exclusion. Further, Plaintiffs ignore the wealth of case law endorsing the use of surveys in the very same manner that Prof. Murphy uses the NFHS survey. Plaintiffs also ignore that Prof. Murphy reached consistent conclusions when he conducted alternative versions of his regression models, some without the survey-based demand proxy. In short, Plaintiffs' motion is without basis and is

1

merely a reciprocal litigation tactic to Defendants' well-founded motions to exclude Plaintiffs'
experts.

## I.    PLAINTIFFS' MOTION TO EXCLUDE MR. ORSZAG IS ENTIRELY WITHOUT MERIT.

Plaintiffs' motion to exclude Mr. Orszag is entirely without merit.  Mr. Orszag is a well-
respected economist whose qualifications have been recognized by numerous courts.  Indeed, his
qualifications as an economic expert have never before been challenged.  Far from being based
on his own *ipse dixit*, Mr. Orszag's opinions are derived from a detailed review of the economic
evidence, from both before and during the class period.  He performed a quantitative analysis of
the impact of the challenged conduct on the allocation of Worlds bids, considered the
procompetitive reasons for various rules, and pointed out significant facts and evidence that
Plaintiffs' experts failed to consider.  His opinions are based on widely recognized economic
principles regarding sanctioning organizations and sports leagues.  Plaintiffs' claim that Mr.
Orszag's opinions should be excluded because they were previously excluded in part on one
occasion is unsupported by the case law.  Mr. Orszag's opinions are reliable, properly supported,
and precisely the type of opinions that courts allow from economic experts in antitrust cases.
Plaintiffs' motion should be denied.

### A.  Mr. Orszag Is A Well-Respected Economist Whose Qualifications Have Been Recognized By Numerous Courts.

Plaintiffs' challenge to Mr. Orszag's qualifications merely because he lacks a doctoral
degree reeks of desperation.  *See Zuzula v. ABB Power T&D Co., Inc.*, 267 F. Supp. 2d 703, 713
(E.D. Mich. 2003) (acknowledging that the court's investigation of qualifications "must look to
underlying competence, not labels"); *Hammond v. Int'l Harbester Co.*, 691 F.2d 646, 653 (3d
Cir. 1982) ("[U]nder Rule 702, an individual need possess so special academic credentials to
serve as an expert witness. . . . '[P]ractical experience as well as academic training and

2

credentials may be the basis of qualification (as an expert witness).'") (quoting *Moran v. Ford Motor Co.*, 476 F.2d 289, 291 (8th Cir. 1973)).  Mr. Orszag has an advanced degree in economics, he has worked as an economist for the government and as a consultant for over twenty years, he has numerous accolades, and he has been qualified as an expert by other courts. Mr. Orszag is more than qualified to offer opinions in the fields of applied microeconomics, industrial organization, and antitrust economics, as well as in sports economics specifically.

Indeed, Mr. Orszag's credentials are so robust that his qualification as an economic expert has never been previously challenged.  Mr. Orszag received an A.B. in economics from Princeton University, and subsequently enrolled in a doctorate program at Oxford University. (Ex. 1 (Orszag CV) at 2; Ex. 2 (Orszag Tr., Nov. 15, 2022) at 217:2-18, 228:19-230:14.)  While at Oxford, Mr. Orszag was called to serve as Economic Policy Advisor to the Clinton Administration.  (Ex. 2 at 229:11-230:8.)  As a result, he switched to a shorter Masters track program at Oxford, after which he returned to the U.S. to serve his country and obtain real-world economic experience.  (*Id.*; Ex. 3 (Orszag Report) at ¶ 3.)  He has since served as Assistant to the Secretary of Commerce and Director of the Office of Policy and Strategic Planning at the U.S. Department of Commerce.  (Ex. 3 (Orszag Report) at ¶ 2.)  He is currently a Senior Managing Director at Compass Lexecon, an economic consulting firm.  (Ex. 1 at 1; Ex. 3 at ¶ 1.)  He has testified on numerous occasions before the Federal Communications Commission (FCC), as well as before the Senate Judiciary Committee's Subcommittee on Antitrust, Competition Policy, and Consumer Rights.  (Ex. 1 at 10-12.)  His CV sets forth his numerous presentations, publications, and other accolades in the field of economics.  (*See generally* Ex. 1.)  Among other accolades, he was awarded the "Founders Award" by FTI Consulting, Inc., which is the very same company that employs Plaintiffs' experts Randall Heeb and Jen Maki.  (Ex. 1 at 3.)  Mr. Orszag has

particular experience and expertise in sports economics, including consulting work for the PGA

Tour, an NBA team, a professional players' union, and various sports broadcasting networks.

(Ex. 3 at ¶ 5.)  Further, Mr. Orszag has been qualified as an expert by numerous other courts.

*See, e.g.*, *Pearlman v. Cablevision Sys. Corp.*, 2015 WL 9462104, at *9 (E.D.N.Y. Dec. 28,

2015); Ex. 4 - *U.S. v. Aetna, Inc.*, Case No. 1:16-cv-01494-JDB (D.D.C.), ECF No. 299 at 3013

("we will admit Mr. Orszag and receive his testimony in the field or fields of applied

microeconomics, industrial organization, and antitrust economics."); Ex. 5 - *U.S. Department of

Justice v. AB Electrolux*, Case No. 1:15-cv-01039-EGS (D.D.C.), ECF No. 409 at 4309 (same).[1]

There is no basis for Plaintiffs'' claim that Mr. Orszag is not qualified to serve as an expert in

this case.

### B.  Mr. Orszag's Opinions Are Not Based On His Own *Ipse Dixit*.

Courts regularly permit economic experts to offer the type of opinions that Mr. Orszag

offers here.  *See, e.g.*, *In re Urethane Antitrust Litig.*, 152 F. Supp. 3d 357, 361-63 (D.N.J. 2016)

(permitting economic expert to testify about whether evidence was consistent with the existence

of a cartel by analyzing the market composition, economic behavior, and trends in pricing); *In re

Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 424-25 (E.D. Pa. 2015) (noting that

the "widely followed approach allows economic experts to testify about whether certain conduct

is indicative of collusion" and permitting expert opinion considering various industry conditions

and whether the alleged conduct could be explained by rational, self-interested behavior absent

collusion); *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1003, 1010-11 (6th Cir. 1999)

(expert economist expressed opinion that conduct was consistent with alleged antitrust

conspiracy); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 52 (D.D.C.

---

[1] (*See also* Ex. 1 at 12-16 for additional instances of trial testimony where Mr. Orszag was qualified as an expert.)

2017) (to the extent that an expert, "after reviewing the documentary record, opines as to whether defendants' behavior is consistent with collusion, this is permissible expert opinion").

For example, in *In re Dealer Management Sys. Antitrust Litig.*, the court held that testimony "that an alleged arrangement 'furthered [Defendants'] collusive interest, but was inconsistent with Defendants pursuing their independent, unilateral self-interest'" was "'precisely the type of inquiry an economist can be expected to make using his expertise.'" 581 F. Supp. 3d 1029, 1052 (N.D. Ill. 2022) (quoting *Processed Egg. Prods. Antitrust Litig.*, 81 F. Supp. 3d at 424) (emphasis in original). The court explained that it was similarly appropriate for defendants' experts to "perform[] similar evaluations of the record and offer opinions that the documents do not support a hypothesis of unlawful collusion." *Id.* at 1053. The court observed that the parties had not "identif[ied] any case law requiring [the expert] to use a formal model quantifying the relative gains from unilateral versus conspiratorial conduct; nor [did] they identify any model that [the expert] could have, but did not, use instead." *Id.*

Just as in *Dealer Management Systems*, Mr. Orszag considered, from an economic perspective, whether the available evidence is consistent with Plaintiffs' allegations that USASF conspired with Varsity to foreclose competition and raise prices in cheer competitions, apparel, and camps. (Ex. 3 at ¶ 11.) In particular, Mr. Orszag examined the rules and behavior of USASF that Plaintiffs' experts claimed supported the existence of a conspiracy. (Ex. 2 at 320:13-321:6, 330:23-331:13, 340:1-341:20; Ex. 3 at Section IV.) Mr. Orszag then analyzed each rule, and where appropriate, criticized Plaintiffs' experts for failing to show how that rule and behavior materially enhanced Varsity's competitive position above what Varsity obtained itself (i.e., by independently growing its market share), and considered whether such rule might have a legitimate, procompetitive justification. (*See, e.g.*, Ex. 3 at Sections IV and V.)

For example, Plaintiffs' experts take issue with various rules relating to USASF's process for allocating Worlds bids. For these rules, Mr. Orszag analyzed the composition of the Sanctioning Committee at the time such rules were adopted or modifications to the rules were considered. (*See, e.g.*, Ex. 3 at ¶ 36, ¶ 61, n.113, ¶62, ¶ 63, n.116, ¶ 64, n.118, ¶¶ 68-69, ¶ 70, n.128, ¶ 71, n.134, ¶ 76; Ex. 6 (Orszag Backup Material – Varsity Ownership of Tier 1 Events 2011-2012 & 2014-2015); Ex. 7 (Orszag Backup Material – Varsity Ownership Summary 2011-2015.) He determined that, for example, at the time that USASF adopted a 42-event cap on the number of Worlds bid events and certain geographic limitations, less than 50% of the seats on the Sanctioning Committee were held by Varsity-branded event producers. (Ex. 3 at ¶¶ 67-70, n.128, ¶ 76.) He explained why, from an economics perspective, a sports organization like USASF might adopt such rules or engage in such behaviors and why they would be procompetitive and good for the sport. (*See, e.g.*, *id.* at ¶¶ 25-30, 33, 42-45, 58-59, 68, 70, 74, 76-77, 83-86, 89, 92, 99.) In doing so, he considered principles applicable to sports organizations generally, including specific examples that helped inform his opinions, and also considered particular publications in the field of sports economics. (*See id.* at ¶ 21 & n.37 (citing example of NBA and NCAA), ¶¶ 26-28, nn. 45-48, ¶ 30, n.52, ¶ 48, n.96, ¶ 77, nn. 149-150, ¶¶ 84-86, nn.169-174, ¶ 89, n.182-183.)

Similarly, Mr. Orszag considered whether USASF's procedure for allocating Worlds bids resulted in Varsity obtaining more Worlds bids than it would have obtained simply through its independent conduct. For example, in August 2014, USASF's Sanctioning Committee adopted a rule to be implemented in the 2016-2017 season, which required all event producers to have a minimum of 125 All Star cheer teams participating at the same prior year's competition to qualify to award Worlds bids. (Ex. 3 at ¶¶ 71-72.) Mr. Orszag analyzed whether any event

producers lost their Worlds bids as a result of this rule change and determined that, based on the

data, only two event producers lost their Worlds bids between the 2015-2016 and 2019-2020

season after that rule went into effect, one of which was a Varsity-owned event and one of which

was not.  (*Id.* at ¶ 73.)  These two event producers were subsequently replaced by two other

event producers, one of which was a Varsity-owned event and one of which was not.  (*Id.*)  As a

result, Mr. Orszag determined that Varsity did not experience a net gain as a result of this rule

change and as a result, Plaintiffs' experts could not show that this rule materially enhanced

Varsity's competitive position.  (*Id.* at ¶¶ 73-74.)

Indeed, Mr. Orszag went beyond the experts in *Dealer Management Systems* and

performed a quantitative analysis to identify the relative gains from unilateral versus

conspiratorial conduct.  While Plaintiffs attempt to belittle Mr. Orszag's quantitative analysis,

their experts offer no such model and they fail to identify any model that Mr. Orszag could have

used instead.  Rather, Mr. Orszag's opinions are well supported by the data and are directly

relevant to (1) the composition of the Sanctioning Committee when each rule was considered or

adopted (i.e., whether it was actually endorsed by non-Varsity event producers comprising a

majority of the committee); and (2) whether the allocation of Worlds bids was impacted by the

rule.  This empirical analysis buttresses his criticisms of Plaintiffs' experts, who merely assumed

without analysis that the challenged USASF's rules and behaviors impacted pricing in the

alleged product markets.[2]  (*See* Ex. 2 at 332:13-21 ("where [plaintiffs' experts] just speculate

---

[2] Even though Plaintiffs bear the burden to prove a conspiracy to monopolize, Plaintiffs' experts
performed no such analysis.  *See generally Re/Max Int'l*, 173 F.3d at 1007-1021 (discussing
plaintiffs' burden).  Plaintiffs' experts simply identified rules and claimed that they resulted in
anticompetitive effects, without evaluating the possible procompetitive justifications for the rules
or whether they impacted prices to consumers.  Plaintiffs' experts gave no consideration as to
whether the alleged price effects were the result of any USASF rule or behavior or simply the
result of Varsity's unilateral conduct (for example, Varsity's increased market share, which

about what happened or would have happened or did happened [*sic*], I showed what actually did happen with empirical evidence, and what did happen is not consistent with the claims they put forward and the theories they put forward; so that tells me that their theories are wrong. And it's -- their theory of alleged collusion is inconsistent with the empirical facts.").)  It is well established that an expert may criticize the analysis and conclusions offered by the opposing side's expert. *See Bamcor LLC v. Jupiter Aluminum Corp.*, 767 F. Supp. 2d 959, 976 (N.D. Ind. 2011) ("An expert may criticize the methods, calculations, and conclusions offered by the opposing side's expert. Such criticisms aid the trier of fact in determining how much weight to assign the expert's opinion in deliberation.") (internal citations omitted).

### C.  Mr. Orszag Considered Evidence That Pre-Dates The Class Period, But In Any Event, This Would Not Be Grounds For Exclusion.

Plaintiffs also wrongly claim that Mr. Orszag "specifically limits his analysis to events which occurred during the class period." (Pls.' Br. at 8.)  This is incorrect. In any event, Plaintiffs fail to cite *a single* case that would justify exclusion on this basis.

Mr. Orszag considered substantial record evidence from before and during the class period—indeed, everything considered by Plaintiffs' experts—in forming his opinions. (Ex. 12 (Orszag Report Appendix B) at 1 (listing "EXPERT REPORTS (Including materials referenced within)").)  Notably, he specifically addressed the challenged USASF bylaws regarding the composition of its Board of Directors, which have been in place since September 2005. (Ex. 3 at ¶¶ 56, 58-59.)  He also addressed the challenged process for awarding Worlds bids, the 42-event

---

could have increased regardless of any USASF rule). They certainly did not perform any econometric or regression analysis—or any quantitative analysis at all—as to the impact of the challenged USASF's rules and behaviors. (*See* Ex. 8 - Heeb Tr. 302:6-9 ("Q. Did you attempt to isolate what price effects you found resulted from the alleged conspiracy with USASF as opposed to the other challenged conduct?  A. No."); *see also* Ex. 9 - Netz Tr. 13:25-14:3; Ex. 10 - Maki Tr. 239:20-24; Ex. 11 - Aronoff Tr. 173:16-21, 176:22-177:3.)

cap, and Guideline 3.B, all of which had been in place since at least 2012.  (*Id.* at ¶¶ 64, n.118, 68-70, n.127, 76-77.)  In addition, Mr. Orszag addressed the "125 Team" threshold and probationary period challenged by Plaintiffs and their experts, which were adopted in 2014 or earlier.  (*Id.* at ¶¶ 71, n.134, 73-74.)   He specifically considered the composition of the Sanctioning Committee at the time that various rules or actions were considered in 2012 and 2014, prior to the class period.  (*Id.* at ¶ 64, n.118, ¶ 68, n.128, ¶ 74, n.134, ¶ 76.)  Even a cursory review of Mr. Orszag's report reveals numerous documents pre-dating that class period that Mr. Orszag considered and analyzed in reaching his opinions.

In any event, to the extent that Plaintiffs take issue with Mr. Orszag's review of the record, this is a matter of cross-examination and not a basis to exclude Mr. Orszag's testimony entirely.  *See, e.g.*, *In re Urethane Antitrust Litig.*, 2012 WL 6681783, at *2 (D. Kan. Dec. 21, 2012) (expert's decision not to include additional year after the conspiracy period alleged by plaintiff "is solely a matter for cross-examination and does not affect . . . admissibility"); *Provost v. Crockett County, Tenn.*, 2018 WL 11416133, at *2 (W.D. Tenn. July 23, 2018) ("Generally, the factual basis of an expert opinion goes to the credibility of the testimony and not to its admissibility."); *In re Southeastern Milk Antitrust Litig.*, 2010 WL 8228885, at *1-3 (E.D. Tenn. Dec. 8, 2010) (denying motion to exclude because a disagreement regarding the expert's conclusions derived from the underlying facts "is not a basis to challenge whether he should be permitted to testify" and instead "goes to the weight to be accorded his testimony").

### D.  The E-Books Case Is Inapposite And Does Not Provide A Basis To Exclude Mr. Orszag's Testimony.

Plaintiffs also spend several pages arguing that Mr. Orszag's opinions should be excluded because his opinions were excluded in part on one prior occasion, in *In re Electronic Books Antitrust Litigation*, 2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) (the "E-Books case").

9

Tellingly, Plaintiffs cite no case law in support of this argument, and Defendants are not aware of any which support Plaintiffs' position. To the contrary, it is well established that "exclusion of an expert's opinion in one case does not mean that the same expert's opinion must be excluded in another case, particularly in cases in district courts in other circuits." *Modern Holdings, LLC v. Corning, Inc.*, 2022 WL 71074, at *12 n.9 (E.D. Ky. Mar. 9, 2022); *see also Burnett v. Damon Corp.*, 2013 WL 6230108, at *6 n.7 (N.D.N.Y. Dec. 2, 2013) (holding that expert's prior disqualification had "no bearing on the admissibility and reliability of his opinion and testimony in this case"); *Wilson v. Maricopa Cty.*, 2007 WL 686726, at *11 (D. Ariz. Mar. 2, 2007) (expert's prior disqualification was "of dubious relevance" because a "host of [] factors might well have influenced the trial judge's decision"). As explained above, Mr. Orszag has been qualified as an expert on numerous other occasions, including since the decision in the E-Books case.

Further, Plaintiffs misstate the court's holding in the E-Books case and the similarities to this case. In the E-Books case, Mr. Orszag offered four opinions, three of which were characterized as "offset opinions" and one of which was a critique of the opposing expert's damages model. *Id.* at *14. There was no argument that Mr. Orszag was not qualified as an economist, as Plaintiffs argue here. Further, in the E-Books case, Mr. Orszag's opinions were only excluded *in part*. Of note, the court permitted Mr. Orszag's opinion regarding his criticisms of the opposing expert's damages model. *Id.* at *20. Moreover, the "offset opinions" excluded in the E-Books case are nothing like the opinions Mr. Orszag is offering here. In the E-Books case, Mr. Orszag attempted to calculate a procompetitive benefit to "offset" the alleged overcharge calculated by the opposing side's expert. Here, he does not offer such opinions. Rather, Mr. Orszag critiqued Plaintiffs' experts for failing to perform any analysis of the effects

of the alleged conspiracy between USASF and Varsity, considered whether any of the challenged conduct involving USASF might have procompetitive reasons or effects that Plaintiffs' experts failed to consider, and analyzed from an economic perspective whether the challenged conduct was consistent or inconsistent with the alleged collusion. As explained above, this is permissible economic expert testimony and there is no basis to exclude Mr. Orszag's opinions.

## II.    PLAINTIFFS' MOTION TO PARTIALLY EXCLUDE PROF. MURPHY IS EQUALLY BASELESS.

### A.    Prof. Murphy Reliably Calculated Participation To Conclude That There Was A "Net Benefit" To Consumers.

#### 1.    Prof. Murphy's event participation analysis ensured relevant, consistent comparisons of participation pre- and post-acquisition.

Plaintiffs' criticisms of Prof. Murphy's participation calculations do not withstand scrutiny. They are based on three observations about his analyses: He 1) reported average, not total, participation; 2) reported percentage changes in participation at continued but not unmatched events; and 3) did not state the change in the number of events. (Pls.' Br. at 10.) These points are irrelevant and do not show Prof. Murphy's Exhibit 45 to be unreliable. To start, Prof. Murphy correctly examined average participation because increased average participation—which he demonstrated—suggests higher event quality. (ECF No. 382-6 at ¶ 344.) Next, Exhibit 45 clearly includes average participation at unmatched events pre- and post-acquisition. (*See id.* at Ex. 45.) In any case, Prof. Murphy correctly highlighted percentage changes in participation at continued events because his focus was on the improvements Varsity made to acquired events, thus only continued events are relevant. (*See id.* at ¶ 293.) For the same reason, the change in the number of events is irrelevant.

Plaintiffs also fail to offer any explanation as to why Prof. Murphy's exclusion of the 2015 JAM Brands acquisition from Exhibit 45, but not from his report, renders his opinions

11

unreliable.  (*See* Pls.' Br. at 10) (quoting ECF No. 388-4 at ¶ 350.)  It does not.  Prof. Murphy

analyzed the JAM Brands acquisition and explained that JAM Brands' inclusion does not

significantly change his results because average participation at continued JAM Brands events

increased 1%.  (ECF No. 382-6 at ¶ 294, n.507, ¶ 318, n.524.)  Moreover, the JAM Brands

acquisition took place more than a year prior to the beginning of the statute of limitations

period—December 2016.  Plaintiffs can only claim damages for acquisitions that took place

during the period, thus Prof. Murphy correctly excluded out-of-period conduct from Exhibit 45.

Finally, Plaintiffs argue that Prof. Murphy used incorrect data inputs to calculate

participation changes.  (*See* Pls.' Br. at 10-11).  Not only is Prof. Murphy's use of data reliable, it

is *necessary and correct*.  For example, Dr. Heeb—whose critiques Plaintiffs adopt wholesale—

claims Prof. Murphy erred by including "Dance Studio" and "Youth" teams in his post-

acquisition participation figures.  (ECF No. 388-4 at ¶ 359.)  However, those teams *must* be

counted toward post-acquisition participation to avoid an "apples to oranges" comparison, as

they are inextricable from pre-acquisition figures.  As Prof. Murphy noted, "Dance Studio" and

"Youth Group" are designations used by Varsity.  (ECF No. 382-6 at ¶ 88).  As Dr. Heeb

implicitly acknowledged, there is no basis to assume other event producers employ these same

labels.[3]  And the pre-acquisition diligence materials do not have sufficient detail to

systematically exclude Dance Studio and Youth Group teams from pre-acquisition figures.

Thus, excluding Dance Studio and Youth Group teams from post-acquisition figures, as Dr.

---

[3] Dr. Heeb notes that pre-acquisition data lacks distinctions for what Varsity considers "Dance Studio" or "Youth" teams.  (ECF No. 388-4 at ¶ 359, n.409.)  He claimed his "intention" was to exclude those teams when counting pre-acquisition participation but could not confirm he did so. (Ex. 8 at 266:24-267:4).  Examination of the programs in his backup materials shows that he did not filter out Dance Studio or Youth Group teams from *pre*-acquisition participation but only from *post*-acquisition participation. *See* Murphy Decl., ¶ 2.

Heeb did, leads to systematic undercounting of post-acquisition participation relative to pre-acquisition participation. This biases Dr. Heeb's participation changes downward. Plaintiffs seek to exclude Prof. Murphy's testimony for taking the steps necessary to make valid and consistent comparisons across time, which Dr. Heeb erroneously failed to do.

### 2. Prof. Murphy's finding of net benefits to consumers is economically correct and supported by the record.

Prof. Murphy provided ample support for his conclusion that there was a net benefit to consumers in the form of quality improvements to acquired events. Rather than provide an "*ipse dixit* conclusion" that quality increased, (Pls.' Br. at 12), Prof. Murphy relied on sound economic analysis and record evidence. First, it is well established that where an acquisition expands output, it is procompetitive. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993) ("Where … output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand."); *Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996) ("The core question in antitrust is output. [Without a] reduc[tion in] output in some market, to the detriment of consumers, there is no antitrust problem."). An acquisition can only be anticompetitive if the acquiring firm reduces output to engineer an anticompetitive price increase of the acquired product. If instead the acquiring firm increases output, the acquisition is procompetitive. (ECF No. 382-6 at ¶¶ 315-316.) Absent reductions in output, a price increase does not mean the acquisition is anticompetitive. (*Id.* at ¶ 316.) Prices change for many reasons. The fact that consumers buy more of a product despite higher prices suggests the product is delivering more value to the consumer, such as a higher level of quality. An acquisition that benefits consumers through higher quality products and increased output is not anticompetitive. (*Id.* at ¶ 315.) Prof. Murphy reviewed the data and found that, while some prices of acquired events increased, output also

13

increased, suggesting that consumers valued the higher quality of Varsity events more than they valued the lower-priced pre-acquisition events.   (*Id.* at ¶ 313.)

Prof. Murphy substantiated his conclusion with far more than "a single comment from a Varsity employee."  (Pls.' Br. at 12.)  Prof. Murphy's conclusion is based on a robust record of the high quality of Varsity events, including a heightened standard of professionalism,[4] and, critically, the inclusion of acquired events in the Varsity Family Plan and the addition of Summit bids to many events, which Plaintiffs ignore.  (ECF No. 382-6 at ¶¶ 290-291, 323; *see, e.g.*, Ex. 13 - BAIN00065145 at -65180 ("Varsity Spirit outperforms key competitors on … competition quality").)

Finally, that Prof. Murphy did not "calculat[e]" the net benefit to consumers (Pls.' Br. at 11) does not render his analysis unreliable.[5]  Plaintiffs bear the burden of proof in alleging that Varsity's acquisitions were anticompetitive.  Prof. Murphy demonstrated that the acquisitions brought procompetitive benefits to consumers.  It is thus *Plaintiffs'* burden to show that the alleged harms brought on by the acquisitions outweighed these benefits and to quantify the alleged net detriment to consumers.  *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1422 (6th Cir. 1990) ("[T]he plaintiff faces a stiff burden in any section 2 litigation.") (citations omitted).

---

[4] The fact that Prof. Murphy relies in part on information received in witness interviews to form his opinions, a standard investigative technique, does not disqualify his testimony.  *Chavez v. Carranza*, 559 F.3d 486, 497 (6th Cir. 2009) (admitting expert testimony that relied in part on interviews); *Katt v. City of New York*, 151 F. Supp. 2d 313, 357 (S.D.N.Y. 2001) (noting that interviews are "reasonably relied upon by experts in various disciplines of social science").

[5] Plaintiffs instead offer Dr. Heeb's figure for the alleged price increase at acquired events (Pls.' Br. at 11), but Dr. Heeb's analysis suffers from numerous errors (*see* ECF No. 382-6 at ¶ 328-332).  Dr. Heeb also made no attempt to offset the purported "harm" he asserts with any of the clear benefits from added Summit bids and VFP qualification.  (*Id.* at ¶ 338.)

**B.  Prof. Murphy Used The Hypothetical Monopolist Test To Properly Analyze
Geographic Markets For Competitions.**

Plaintiffs' misunderstanding of Prof. Murphy's report or quibble with his HMT analysis
is no reason to exclude his testimony.  *See Babcock Power, Inc. v. Kapsalis*, 854 F. App'x 1, 9
(6th Cir. 2021) (admitting expert testimony that employed recognized methodology and had a
reasonable factual basis).[6]

First, Plaintiffs incorrectly assert that Prof. Murphy's use of average travel distances to
define the relevant geographic markets means he did not apply the HMT.  (Pls.' Br. at 14-15.)
The HMT defines geographic markets based on reasonable consumer substitution in response to
modest price increases, i.e. how far teams "routinely travel," as Plaintiffs and Dr. Heeb admit.
(ECF No. 388-3 at ¶ 139); *see In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 277 (6th Cir. 2014)
(concluding that a geographic market "entails mapping an area within which the defendant's
customers who are affected by the challenged practice can practicably turn to alternative
suppliers") (citations omitted).  Using the maximum distance a team has ever travelled, as
Plaintiffs suggest Prof. Murphy should have done (Pls.' Br. at 14-15), flies in the face of the
HMT.  The fact that one team *could or might* travel 800 miles—more than a 13-hour drive—to
attend an event (*id.* at 14-15) does not mean enough teams would expend the same time, effort,
and expense such that a hypothetical monopolist would not be able to raise prices, or that even
this one team would be willing to travel that distance multiple times in a season.  And, it

---

[6] Plaintiffs take Prof. Murphy's deposition testimony out of context to claim he did not apply the
HMT.  (*See* Pls.' Br. at 14, n.11.)  Prof. Murphy was explaining that there is insufficient data to
conduct quantitative analysis showing that All Star and scholastic cheer competitions are
separate product markets.  (Ex. 14 - Murphy Tr. (Vol. II) 104:20-105:24.)  Prof. Murphy was
neither opining on geographic markets nor eschewing the HMT framework.  Indeed, he clearly
explained in his report that cheer participants would be unlikely to substitute from All Star to
scholastic cheer.  (ECF No. 382-6 at ¶ 148.)

certainly does not mean that team would be willing to travel that distance to avoid a 5-10% price increase, which would likely amount to only a few dollars.  (*See* ECF No. 382-6 at Ex. 23, 27.)

Second, Plaintiffs fault Prof. Murphy for only examining Varsity All Star events in the switching analysis he used to build his catchment areas.  (Pls.' Br. at 15.)  But customer switching and catchment areas for scholastic events are not relevant to his analysis because there were no acquisitions of scholastic events in the relevant period, and Plaintiffs' experts did not analyze any such acquisitions.  In evaluating a merger, the HMT requires that the products of the acquired and acquiring firms be the first candidate market analyzed.  (*See* HMGs at 9.)  In any event, to rebut Dr. Heeb, Prof. Murphy presented data on travel distances to scholastic competitions showing that geographic markets for these competitions are also smaller than Plaintiffs allege.  (ECF No. 382-6 at ¶ 197, Ex. 40.)  This analysis is reliable, and Plaintiffs do not and could not suggest otherwise given that Dr. Heeb's travel analysis did not consider scholastic competitions at all.  (ECF No. 388-4 at ¶ 173) ("I further analyze travel patterns by quantifying how many All-Star gyms travel to competitions in the same CSA.").  Further, Plaintiffs improperly criticize Prof. Murphy for only using Varsity data and not competitor data.  (Pls.' Br. at 13-14.)  Using competitor data, if it could be obtained, would produce even *smaller* geographic markets because competing event producers have a stronger incentive than Varsity to place events close to an existing Varsity event, so that customers would likely travel shorter distances when switching between Varsity and non-Varsity events.  (ECF No. 382-6 at ¶ 189, n.314.)

In addition, Prof. Murphy's use of a 60% catchment area is not "arbitrary" or "assumed." (*See* Pls.' Br. at 15.)  Prof. Murphy used catchment areas to understand how far customers tend to travel when substituting away from a small but significant and non-transitory increase in price

("SSNIP"). (ECF No. 382-6 at ¶ 192.) He arrived at a 60% catchment area as the maximum

geographic market[7] by calculating that a hypothetical monopolist could impose a SSNIP in that

area. The HMGs suggest analyzing a 10% price increase to understand consumer responses.

(*See* HMGs at 9.) Prof. Murphy did just that. (ECF No. 382-6 at ¶ 193) ("[S]uppose that a firm

is considering raising its price by 10%"). Based on observed participation changes following

price increases at events, he concluded that at most 24% of event attendees would substitute

away from an event in response to a 10% price increase. (*Id.* ¶¶ 193, 193 n.316.) Then, from

data on event producer profitability, he found that a 10% price increase would be profitable as

long as an event producer could reduce that 24% attrition rate to 9.6% by recapturing 60% of

substituting customers by owning the events they substitute to. (*Id.* ¶¶ 193-194, 194 n.319.)

Plaintiffs' criticism of Prof. Murphy's regression showing that the price of an event tends

to move with the prices of other events in the same catchment area (Pls.' Br. at 16) also does not

withstand scrutiny. Plaintiffs' assertion that Prof. Murphy's regression "in no way accounts for

the date of events" (*id.*) is simply incorrect; Prof. Murphy used a control variable for the calendar

month in which an event takes place. (*See* ECF No. 382-6 at ¶ 195, Ex. 39.) Moreover,

criticizing Prof. Murphy for how he accounted for the date of a competition rings particularly

hollow because, in the same breath that Plaintiffs assert that all All Star and all scholastic

competitions, regardless of when or where they are held and regardless of whether they are in-

season or championship events, are in the same relevant market, they assert that "[a]n event held

---

[7] Prof. Murphy's catchment areas, if anything, may overestimate the size of geographic markets, as the relevant geographic markets could be *smaller* than the 60% catchment areas Prof. Murphy analyzes. (*See* ECF No. 382-6 at ¶ 196.) If the hypothetical monopolist can sustain a SSNIP in a 60% catchment area, the catchment area is by definition at least as large as the narrowest geographic area in which it can sustain a SSNIP, which in turn is the proper geographic market. *See* HMGs at 10 ("[W]hen the Agencies rely on market shares and concentration, they usually do so in the smallest relevant market satisfying the hypothetical monopolist test.")

in October is unlikely to be a reasonable substitute for an event in February." (Pls.' Br. at 16.) Plaintiffs also assert that the average price of events in a catchment area is not an "important determinant" of a specific event's price (*id.*), but Prof. Murphy never claimed they were. He showed that event prices in a catchment area tend to move together, indicating his catchment areas are proper geographic markets. (ECF No. 382-6 at ¶ 195.) If anything, if prices of other nearby events are not important determinants of an event's price, it is unclear how Plaintiffs can claim that Varsity's acquisitions caused event prices to increase across the board.

### C. Prof. Murphy Appropriately Used NFHS Survey Results To Derive An Informative Demand Proxy.

Relying on inapplicable law relating to the admissibility of surveys (Pls.' Br. at 17), Plaintiffs miss entirely that Prof. Murphy "need not be a survey expert to testify about the information compiled by third-party surveys, so long as the information is of a type reasonably relied upon by experts in the field to form opinions upon the subject."[8] *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1298 (Fed. Cir. 2015). Plaintiffs are likewise incorrect that Prof. Murphy has no knowledge of the methodology behind the National Federation of State High School Associations ("NFHS") survey. (Pls.' Br. at 18.) Appendix D of his report explains that the NFHS survey is compiled using simple participant counts collected from constituent state-level organizations. (ECF No. 382-6 at Appx. D ¶ 1.) The NFHS survey is routinely relied on by experts, including having been cited in academic articles relating to sporting activities.[9]

---

[8] In general, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703.

[9] *See, e.g.*, Rebecca Boyce, *Cheerleading in the Context of Title IX and Gendering in Sport*, 11 The Sport Journal, no. 3 (2008); Carmen E. Quatman et al., *Sex Differences in "Weightlifting" Injuries Presenting to United States Emergency Rooms*, 23 Journal Strength & Conditional Res., no. 7 (2009).

Moreover, the survey is cited because it is produced by a reputable organization that has been surveying participation in a variety of youth sports for more than 50 years and in competitive cheer for almost 30 years.[10]  Despite all of this, Plaintiffs assert without any evidence that NFHS has "significant incentives" to "manipulate or forge" the survey data to Varsity's benefit and point to round numbers as their proof.  (Pls.' Br. at 18-19.)  They tellingly fail to note that the survey was created prior to Varsity's creation, that it covers many youth sports other than scholastic cheerleading, and that NFHS receives fees from dozens of participating entities.[11]

Next, Plaintiffs seek to exclude Prof. Murphy's regression analyses that employ the demand proxy he constructed using the NFHS survey.  (Pls.' Br. at 16-17.)  Prof. Murphy used the demand proxy as a control variable in some versions of his regression models showing that, controlling for demand, Varsity's acquisitions did not increase fees at other events and Dr. Heeb's purported overcharge regression analysis produces no overcharges, except in one USASF region.[12]  (*See* ECF No. 382-6 at ¶¶ 302, 308-309, 409, Ex. 52, 58.)  Instead of meeting their burden of proof by rebutting Prof. Murphy's finding that overall demand, rather than the alleged conduct, accounted for any price increases, Plaintiffs attack one of many control variables used in these regressions.  (*See id.* ¶¶ 304, 308, 407-409.)  And, Plaintiffs omit that Prof. Murphy accounted for any potential limitations of the NFHS survey data when constructing his demand proxy.  (*See id.* at Appx. D ¶¶ 1-2.)  His use of the survey to show that demand, rather than the alleged conduct, caused any price increases was thus entirely proper.  *See In re Scrap Metal*

---

[10] *See* ECF No. 382-6 at Appx. D ¶ 1; "High School Athletics Participation History (1969-2008)," National Federation of State High School Associations, available at https://www.nfhs.org/media/1020206/hs_participation_survey_history_1969-2009.pdf, at 1, 235.

[11] *See* "Our Partners," National Federation of State High School Associations, available at https://www.nfhs.org/home-page-content/our-partners/.

[12] Plaintiffs also claim that Prof. Murphy relies on the survey at Exhibit 54 of his report, but Exhibit 54 does not employ the survey data.  The citation to the survey at Exhibit 54 is in error.

*Antitrust Litig.*, 527 F.3d 517, 531 (6th Cir. 2008) (admitting expert testimony despite use of disputed price index where inaccuracies in index were "irrelevant so long as the index moved up and down over time parallel to actual market prices"); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("[M]ere 'weaknesses in the factual basis of an expert witness' opinion ... bear on the weight of the evidence rather than on its admissibility.'") (citing *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir.1993)).

Finally, Prof. Murphy's opinion is sufficiently "supported by appropriate validation—i.e., 'good grounds,' based on what is known." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993)). Prof. Murphy's conclusions are not reliant on the survey or its results. He confirmed his conclusions are robust by reaching them multiple ways. As shown in Exhibits 52, 56 and 58 of his report, Prof. Murphy conducted alternative versions of his regression models, some without the survey-based demand proxy, and reaches consistent conclusions. (*See also* ECF No. 382-6 at ¶¶ 308, 409.) Were Prof. Murphy's use of his demand proxy fatally flawed, it's unlikely he would have reached such consistent results. Thus, even were the Court to accept Plaintiffs' criticisms of the NFHS survey itself, Plaintiffs fail to demonstrate that Prof. Murphy's regression analyses are unreliable.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion to exclude Mr. Orszag and to partially exclude Professor Murphy.

Dated: March 31, 2023

Respectfully submitted,

/s Matthew S. Mulqueen

George S. Cary*
Steven J. Kaiser*
Linden Bernhardt*
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Phone: (202) 974-1500
Fax: (202) 974-1999
gcary@cgsh.com
skaiser@cgsh.com
lbernhardt@cgsh.com

Jennifer Kennedy Park*
Heather Nyong'o*
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
1841 Page Mill Road, Suite 250
Palo Alto, CA 94304
Phone: (650) 815-4100
Fax: (202) 974-1999
jkpark@cgsh.com
hnyongo@cgsh.com

* Admitted *pro hac vice*

Matthew S. Mulqueen (TN #28418)
Adam S. Baldridge (TN #23488)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ
165 Madison Avenue, Suite 2000
Memphis, TN 38103
Phone: (901) 526-2000
Fax: (901) 577-0866
mmulqueen@bakerdonelson.com
abaldridge@bakerdonelson.com

*Attorneys for Defendants Varsity Brands,
LLC, Varsity Spirit, LLC; Varsity Spirit
Fashions & Supplies, LLC; Charlesbank
Capital Partners, LLC; Bain Capital Private
Equity LP*

21

s/ Nicole Berkowitz Riccio
Grady Garrison (TN #008097)
Nicole Berkowitz Riccio (TN #35046)
James Andrew Roach (TN #37934)
Karen Lott Glover (TN #38714)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ
165 Madison Avenue, Suite 2000
Memphis, TN 38103
Phone: (901) 526-2000
Fax: (901) 577-0866
ggarrison@bakerdonelson.com
nriccio@bakerdonelson.com
aroach@bakerdonelson.com
kglover@bakerdonelson.com

*Attorneys for U.S. All Star Federation, Inc.
and USA Sport Cheering, d/b/a USA Cheer*

s/ Brendan P. Gaffney
Paul E. Coggins*
Brendan P. Gaffney*
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Phone: (214) 740-8000
Fax: (214) 740-8800
pcoggins@lockelord.com
bgaffney@lockelord.com

* Admitted *pro hac vice*

Edward L. Stanton III (TN #018904)
S. Keenan Carter (TN #023386)
BUTLER SNOW LLP
6075 Poplar Avenue, Suite 500
Memphis, Tennessee 38119
Phone: (901) 680-7336
Fax: (901) 680-7201
Edward.Stanton@butlersnow.com
Keenan.Carter@butlersnow.com

*Attorneys for Jeff Webb*