# EXHIBIT 2

**In the Matter Of:**

*Fusion Elite All Stars vs*

*Varsity Brands*

---

*JONATHAN ORSZAG*

*November 15, 2022*

---



Case 2:20-cv-02892-SHL-tmp    Document 423-2    Filed 03/31/23    Page 3 of 226
PageID 14020
Fusion Elite All Stars vs
Varsity Brands
Jonathan Orszag
November 15, 2022

200

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE WESTERN DISTRICT OF TENNESSEE
 3
 4   FUSION ELITE ALL STARS, et al.,   )
                                       )
 5                  Plaintiffs,        )
                                       ) CASE NO.
 6      vs.                            )2:20-cv-02600-SHL-TMP
                                       )
 7   VARSITY BRANDS, L.L.C., et al.,   )      VOLUME 2
                                       )
 8                  Defendants.        )PAGES 200 - 489
                                       )
 9   _____  )
                                       )
10   JONES, et al.,                    )
                                       )
11                  Plaintiffs,        ) CASE NO.
                                       ) 2:20-cv-02892-SHL-TMP
12      vs.                            )
                                       )
13   BAIN CAPITAL PRIVATE EQUITY, et   )
     al.,                              )
14                                     )
                    Defendants.        )
15   _____  )
16
17
18            DEPOSITION OF JONATHAN M. ORSZAG
19               Tuesday, November 15, 2022
20                LOS ANGELES, CALIFORNIA
21
22
23
24
         STENOGRAPHICALLY REPORTED BY:
25       LINDSAY A. STOKER, RPR, CRC
```

201

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF TENNESSEE

3

FUSION ELITE ALL STARS, et al.,   )

4                                  )

              Plaintiffs,          )

5                                  ) CASE NO.

     vs.                           )2:20-cv-02600-SHL-TMP

6                                  )

VARSITY BRANDS, L.L.C., et al.,   )      VOLUME 2

7                                  )

              Defendants.          )PAGES 200 - 489

8                                  )

_____   )

9                                  )

JONES, et al.,                     )

10                                 )

              Plaintiffs,          ) CASE NO.

11                                 ) 2:20-cv-02892-SHL-TMP

     vs.                           )

12                                 )

BAIN CAPITAL PRIVATE EQUITY, et   )

13   al.,                          )

                                   )

14            Defendants.          )

_____   )

15

16

17

18

19     Deposition of Jonathan M. Orszag, taken at the Law

20   Offices of Locke Lord, 300 S. Grand Avenue, Suite 2600,

21   Los Angeles, CA 90071, commencing at 9:14 a.m., on

22   Tuesday, November 16, 2022, before Lindsay Stoker, RPR,

23   CRC, Certified Shorthand Reporter No. 14373 in and for

24   the State of California.

25

320

1    Q.   And did you speak with any of these

2    individuals?

3    A.   Yes, I did.

4    Q.   With Mr. Peterson?

5    A.   That is correct.

6    Q.   Anybody else?

7    A.   No, I did not.  I reviewed deposition

8    testimony of -- of some of these people but not

9    the -- not -- I did not talk to them directly.

10    Q.   Will you flip back a couple pages?  There's

11    a slide entitled "USASF Boards and Committees."

12    Yeah, you've got it in front of you.

13    Did your review any of the rules of any of these

14    committees?

15    A.   I have.  Yes, sir.

16    Q.   And for which ones?

17    A.   Certainly, the sanctioning committee.  I

18    believe I cite to the -- some of those documents.

19    Q.   Right.

20    Did you -- did you review the rules of any of

21    the other committees?

22    A.   I cite to various rules.  I actually have a

23    footnote that describes how they promulgate rules

24    every so often, and I just don't know if those are

25    the rules of the committee.  Like, I -- I didn't

321

1   commit to memory what -- whether they're rules of

2   the committee or rules of the USASF as a whole.

3       But I have reviewed and cite to various

4   documents with regard to the sanctioning committee

5   for sure and possibly with regard to the other ones

6   as well.

7       Q.   Okay.  You can put that aside.

8       A.   Is it a good time for a short break?

9       MR. SAVERI:  Whenever you want.

10      THE WITNESS:  Let's -- let's take a 10-minute

11  break.

12      MR. SAVERI:  Let's go off -- let's go off the

13  record.

14      THE VIDEOGRAPHER:  Going off the record.

15      (Recess.)

16      THE VIDEOGRAPHER:  Going back on the record.

17  The time is 11:58 a.m.

18  BY MR. SAVERI:

19      Q.   Mr. Orszag, in -- in connection with your

20  report, did you review any of the financial

21  materials of USASF?  Financial statements, P&Ls,

22  budget, anything like that?

23      A.   My recollection is some of those documents

24  were attached to or part of various documents that I

25  looked at.

322

1    Q.   Okay.  Do you know where the initial

2   funding for USASF came from?

3    A.   In part, some of it came from Varsity.  And

4   then obviously there were early funders who paid

5   revenue into the organization, and so they would

6   help fund it as well.

7    Q.   Okay.  Do you know how much of the original

8   funding for USASF came directly from Varsity?

9    A.   I don't know how one can reliably do that

10   analysis because there is -- if you are getting

11   revenue from membership, say, at the same time that

12   you may get a -- a loan from a party, in thinking

13   about the first year, they are both relevant for

14   helping the organization to get off the ground.

15    Q.   Okay.  And, as you think about that period

16   where Varsity -- where USASF was getting off the

17   ground, do you recall -- well, let me ask you this:

18    Do you recall, like, in nominal terms, how much

19   the original loan was?

20    A.   I -- I believe in nominal terms the

21   original loan was $1.8 million.

22    Q.   And do you recall, at least as of that

23   time, how much of USASF's annual budget that

24   represents?

25    MS. RICCIO:  Objection.

323

1        THE WITNESS:  Sit -- sitting here today, I do

2   not recall that question -- the -- the total revenue

3   of USASF in, say, 2005.

4   BY MR. SAVERI:

5        Q.    Okay.  And thinking about that time when it

6   was getting off the ground, do you recall how much

7   of USASF's budget came from outside sources?  From

8   membership or -- or other?

9        A.    I'm going to give you the same answer.

10  Sitting here today, I do not recall the -- the

11  financials from 2000 -- 2004 or '5 time frame.

12       MS. RICCIO:  Objection.

13  BY MR. SAVERI:

14       Q.    Do you recall at least that the original

15  funding that Varsity provided was significant and

16  important to the formation and -- and -- and

17  initiation of USASF?

18       MS. RICCIO:  Objection.

19       MR. KAISER:  Objection.

20       THE WITNESS:  I -- I think I use language to

21  that effect that Varsity helped to create this

22  sanctioning organization that benefited the entire

23  industry and other event producers as well.

24  BY MR. SAVERI:

25       Q.    Well, when you say when it "helped," that

324

1   included substantial financial support; correct?

2       A.   Its help came in -- of -- several forms,

3   one of which was financial assistance.

4       Q.   Was there any other organization that

5   provided more funding or financial support to USASF

6   when it got -- when it first got going as far as you

7   know?

8       A.   No.

9       Q.   Are you aware that Varsity provided office

10  space to USASF?

11      A.   Yes.  I write about that in my expert

12  report.

13      Q.   It was in the same building as Varsity?

14      A.   Yes.  But let's be clear, it provided

15  office, and USASF paid for that office space.

16      Q.   Do you -- are you aware that the same

17  lawyers represented both the USASF and Varsity at

18  the beginning?

19      MR. KAISER:  Objection.

20      MS. RICCIO:  Objection.

21      THE WITNESS:  The precise, you know, nature of

22  that is not something that is fresh in my mind,

23  sitting here today.

24  BY MR. SAVERI:

25      Q.   Do you know what Varsity paid back --

325

1    excuse me.  Do you know when USA -- USASF paid back

2    the loan to Varsity?

3         A.   I have not --

4         MR. KAISER:  Objection.

5         THE WITNESS:  -- I have not committed the

6    precise year to memory, but it was at some point

7    after they received the loan.

8    BY MR. SAVERI:

9         Q.   Is it fair to say it was a number of years

10   after USASF was formed?

11        MR. KAISER:  Objection.

12        THE WITNESS:  Sitting here today, anything more

13   than two years, I think, would be counted as the

14   number of years, and so the answer would be yes.

15   BY MR. SAVERI:

16        Q.   Okay.  Are you aware that -- that the USASF

17   paid off the loan and -- and moved out of Varsity's

18   offices in order to address concerns that USASF was

19   part of Varsity?

20        MS. RICCIO:  Objection.

21        MR. KAISER:  Objection.

22        THE WITNESS:  Sitting here today, you would have

23   to point me to that.  I know that they moved out in

24   roughly 2014, '15 kind of time frame.  It may have

25   been '13; it may have been '16.  But I -- the

326

1    precise date is in my report.  I can look it up.

2    BY MR. SAVERI:

3        Q.   Okay.  Are you aware that USASF paid off

4    the loan and moved out of Varsity's office in order

5    to address concerns that -- that USASF was

6    controlled by Varsity?

7        MS. RICCIO:  Objection.

8        MR. KAISER:  Objection.

9        THE WITNESS:  The record will speak for itself

10   on that.  I -- my analysis was regards to the claims

11   put forward by the experts that you have retained in

12   this case and the economic analysis relevant to

13   that.

14   BY MR. SAVERI:

15       Q.   Okay.  In connection with your report, did

16   you -- did you look at or review any of the -- of

17   the criticism that was raised in the cheerleading

18   community regarding the view that USASF was

19   controlled by Varsity?

20       MR. KAISER:  Objection.

21       THE WITNESS:  I'm going to give you the same

22   answer.  I've reviewed various deposition testimony

23   as well as other documents, as well as the reports

24   of the experts that you have retained in this

25   matter.

Case 2:20-cv-02892-SHL-tmp    Document 423-2    Filed 03/31/23    Page 12 of 226
PageID 14029
Fusion Elite All Stars vs                                           Jonathan Orszag
Varsity Brands                                                  November 15, 2022

327

1    And they make -- they make those claims in -- in

2    their expert reports, for example.  So thus I'm

3    aware of them.

4    BY MR. SAVERI:

5        Q.   Could you turn to your report?

6        A.   Yes, sir.

7        Q.   I'm going to ask you some questions about

8    your assignment in the case.  Can you turn to

9    paragraph 11, sir?

10       A.   Yes, sir.

11       Q.   And in -- in paragraph 11, you say, "I have

12   been asked by counsel for USASF to review and

13   assess, from an economic perspective, whether the

14   available evidence is consistent with Plaintiffs'

15   allegations that USASF conspired with Varsity to

16   foreclose competition and raise prices in cheer

17   competitions, apparel, and camps.

18       Specific- -- specifically, I have been asked to

19   offer an independent economic assessment of, one,

20   the opinions and analysis of Dr. Netz's report as

21   they relate to the role of USASF as a sanctioning

22   organization for All Star Cheer and to alleged

23   conspiracy with Varsity; two, additional claims made

24   by Drs. Heeb, Maki, and Mr. Aronoff, related to

25   USASF's role in the alleged conspiracy."

328

1      Was that your assignment?

2      A.   Yes, sir.

3      Q.   Okay.  And, generally, how did you approach

4  that task?

5      A.   I have already answered that question.  I

6  think, based on the previous question that you

7  asked, is I considered the opinions and the evidence

8  that they put forward and I looked at the economic

9  evidence relevant to these questions and -- and

10  whether they were consistent with or not the claims

11  put forward.

12      And I found that the economic evidence is

13  inconsistent with the claims put forward by the

14  experts that you've retained as I've described in

15  this report.

16      Q.   Did you conduct any surveys?

17      A.   No, I did not.

18      Q.   And did you conduct any financial modeling?

19      A.   No, I did not.

20      Q.   And did you conduct any econometric or

21  statistical modeling?

22      A.   No, I did not.

23      Q.   And did you model supply and demand?

24      A.   No, I did not.

25      Q.   Okay.  And did you model pricing or prices?

Case 2:20-cv-02892-SHL-tmp    Document 423-2    Filed 03/31/23    Page 14 of 226
PageID 14031

Fusion Elite All Stars vs
Varsity Brands

Jonathan Orszag
November 15, 2022

329

1      A.   No.  And this is part of my critique -- is

2  that they have not considered -- when it comes to

3  the issues with regard to USASF, a whole host of

4  issues -- and I describe how the experts you've

5  retained have failed to address critical issues as

6  part of their analyses.

7      Q.   Okay.  And just so I'm clear, did you

8  conduct or perform any modeling of pricing or

9  prices?

10     A.   My first word was, no, I have not.

11     Q.   Okay.  Thank you.  And did you conduct any

12  modeling or analysis of market shares?

13     A.    In order to reliably measure market share,

14  I believe one needs to reliably measure or define

15  the relevant market, and I have not conducted a

16  relevant market analysis in this case.

17     Q.   Okay.  And generally the -- the materials

18  that you relied on were documents that were produced

19  in the case by the parties; is that correct?

20     A.   That's one element, yes.

21     Q.   Depositions of witnesses in this case,

22  that's one element?

23     A.   That is correct.

24     Q.   The interviews that you conducted that

25  weren't recorded; correct?

330

1    A.    They were not recorded.  That is correct.

2    Q.    And --

3    (Reporter clarification.)

4    MR. KAISER:  Yes.  Argumentative.

5 BY MR. SAVERI:

6    Q.    And some publicly available materials, I

7 think, that you cite in your Appendix B; correct?

8    A.    Among other information, yes.

9    Q.    Okay.  And -- but you cite no transaction

10 data; correct?

11   A.    That is correct.

12   Q.    Or pricing data; is that correct?

13   A.    That is correct because the plaintiffs'

14 experts that you have retained do not cite that with

15 regard to their claims with regard to the alleged

16 collusion with USASF, and I am responding to their

17 economic analysis or lack thereof.

18   Q.    Is the analysis that you're putting forward

19 qualitative as the -- as an economist uses that

20 term?

21   A.    It is in part qualitative and in part

22 quantitative.

23   Q.    Okay.  Well, let me ask you what are the

24 economic aspects of your analysis?

25   A.    Thy are all described here in terms of

331

1    the -- the fact that, for example, the experts

2    you've retained have failed to consider any

3    procompetitive benefits from the rules that they

4    have examined, number one.

5        And they have failed to examine any effects of

6    the alleged collusion, and they make sweeping

7    speculation about how the rules, for example, are

8    biased in favor of Varsity, and that's allowed

9    Varsity to add events.

10       And what I can show is quantitatively that

11   Varsity has not done that, according to the data,

12   over and above what it acquired as part of its

13   unilateral business interest.

14       Q.   Well, do you think that ordinary people

15   with common sense could review that same evidence

16   that you reviewed and come to their -- those

17   conclusions?

18       MS. RICCIO:  Objection.

19       THE WITNESS:  Your experts did not review the

20   empirical evidence; so I -- I'm confused.  They did

21   not do the most simple look at the data, and what

22   I'm saying is they make these sweep- -- sweeping

23   speculations; and, if they just looked at the actual

24   data in terms of the number of events produced by

25   Varsity and what's happened in terms of the

332

1   sanctioned events over time, that it -- there's not

2   evidence to support their speculative claims.

3       And so they failed to -- my critique is they

4   failed to consider the data that you seem to suggest

5   is so simple, in which completely rebuts and

6   suggests that their speculative qualitative analyses

7   are just wrong and they didn't do that.

8   BY MR. SAVERI:

9       Q.   Well, as an economist, what do -- what do

10  you bring to bear to that analysis?

11      MR. KAISER:  Objection.

12      MS. RICCIO:  Objection.

13      THE WITNESS:  That I conducted -- I -- where

14  they just speculate about what happened or would

15  have happened or did happened, I showed what

16  actually did happen with empirical evidence, and

17  what did happen is not consistent with the claims

18  they put forward and the theories they put forward;

19  so that tells me that their theories are wrong.

20      And it's -- their theory of alleged collusion is

21  inconsistent with the empirical facts.

22  BY MR. SAVERI:

23      Q.   Well, is -- do you agree that ordinary

24  people with common sense could review the same

25  evidence that you reviewed and come to the same

Case 2:20-cv-02892-SHL-tmp   Document 423-2   Filed 03/31/23   Page 18 of 226
PageID 14035
Fusion Elite All Stars vs
Varsity Brands
Jonathan Orszag
November 15, 2022

333

1    conclusion?

2        MS. RICCIO:  Objection.

3        THE WITNESS:  I'm -- I'm sitting here today

4    saying to you that the experts for -- that you've

5    retained did not look at this data and did not

6    consider it and it contradicts their claims where

7    they make broad speculative assertions and I show

8    that those broad speculative assertions are

9    inconsistent with the data that they claim should

10   have -- what should have happened in the data that

11   -- if -- if what they say is correct.

12   BY MR. SAVERI:

13       Q.   What -- what particular part of your

14   training, as an economist, permits you to read that

15   evidence differently than anybody else?

16       MS. RICCIO:  Objection.

17       THE WITNESS:  That you consider the claim that

18   you both have exits and entry, and I -- I don't know

19   how to even answer your question.

20       The -- there's empirical evidence that goes

21   directly to the question, and I'm just focusing on

22   one part of the work.  There's obviously other

23   discussions in here in terms of the economics of

24   free writing, the economics of procompetitive

25   benefits, which are ignored by the experts that you

334

1    retained and going right to one of the points of

2    effects which they ignore.

3        (Reporter clarification.)

4    BY MR. SAVERI:

5        Q.    Are you familiar with the concept called

6    the null hypothesis?

7        A.    Yes.

8        Q.    And what is that?

9        A.    It is that you have a hypothesis that you

10   test whether it is correct or not.

11       Q.    And how do scientists test a null

12   hypothesis?

13       A.    You put forward a hypothesis, say, for

14   example, you say, "If I change X, it will change Y,"

15   and then you test whether that is correct.  And you

16   have a control group, and you either use a

17   before-and-after-type analysis, or you use a control

18   group to test it.

19       Q.    Have you done any sort of that testing in

20   this case?

21       A.    In essence, what we've done is -- what I've

22   done is to look at how -- how the number of events

23   produced by Varsity has changed over time, ignoring

24   controlling for the events that they acquired as

25   part of their unilateral business interests.

335

1    Q.   So could you state for the record, then,

2   what is the null hypothesis, then, that you test?

3    A.   You can test in either direction.  I am

4   testing the question of whether there was a change

5   in the number of events produced by Varsity over and

6   above what they acquired during the class period.

7    And the answer is, no, there was not; and that's

8   then -- that then shows that the analysis conducted

9   by the experts that you retained is wrong with

10   regard to these issues.

11    Q.   Is there any other null hypothesis that you

12   tested?

13    A.   In terms of effects, no.  There's

14   discussions that are ignored by -- in the

15   qualitative discussions put forward by the experts

16   that you retained that I also consider that they

17   failed to consider.

18    Q.   And in that qualitative analysis, you

19   analyzed the discovery record in this case; is that

20   correct?

21    A.   Not necessarily.  Some of it is just based

22   on basic economics.

23    Q.   Okay.

24    A.   And I cite to economics literature or the

25   sports economics literature more specifically in

336

1    some circumstances with regard to those issues.

2        Q.    Okay.  But you also relied extensively on

3    analysis or review of the -- of the -- of the

4    discovery record in this case; correct?

5        A.    I would say that discovery record helps to

6    inform certain questions that I examined.  For

7    example, there are certain claims Ms. -- Dr. Netz

8    puts forward --

9        Q.    Right.

10       A.    -- that are factually incorrect and I show

11   how they are factually incorrect based on the record

12   evidence that she must have failed to examine.

13       Q.    But, you know, is that factual issue --

14   isn't that factual issue a matter for the jury to

15   decide in this case?

16       MS. RICCIO:  Objection.

17       MR. KAISER:  Objection.

18       THE WITNESS:  That's somebody -- that's -- I'm

19   not a lawyer; so I will defer to counsel or to a

20   judge about that question.

21       As an economist, I can analyze whether she read

22   something correctly from an economic perspective,

23   and the answer is she makes certain assertions and

24   claims that are factually incorrect.

25       And so I point those out.  Ultimately, whether

337

1  she is right will be -- somebody else perhaps could

2  assess that.  That's a legal question.  But I can,

3  as an economist, look at the words that she as an

4  economist puts forward and say, "Do I see what she

5  says in the document that she cites?"

6  BY MR. SAVERI:

7      Q.   And -- and your opinion cites the instances

8  where you disagree with Dr. Netz as to the factual

9  conclusions that she draws from those documents --

10     MS. RICCIO:  Objection.

11  BY MR. SAVERI:

12     Q.   -- is that correct?

13     A.   In -- there's -- in certain places.  There

14  are certain places where -- and I -- I make a note

15  of this where I may disagree with her, but I don't

16  raise it because, if not, this could be hundreds of

17  pages.  I try to focus on the bigger topics rather

18  than nitpicking on small issue.

19     Q.   And then is it also fair to say that you

20  reached similar conclusions that Dr. Heeb has

21  misinterpreted some of the documents or records in

22  this case?

23     A.   In certain circumstances, Dr. Heeb and

24  Dr. Netz disagree with each other about

25  interpretations; so I point out sometimes where

338

1    there's a conflict among the experts that you've

2    retained in terms of their own interpretations of

3    the documents that they are each pointing to.

4        Q.   Okay.   I understand -- my question, sir,

5    was whether you in certain situations disagree with

6    the conclusions that Dr. Heeb has -- has reached

7    about -- with respect to some of the facts or

8    discovery records in this case?

9        A.   That's fair that he makes certain factual

10   assertions, and I point out where my reading of it

11   is different than his reading.

12       Q.   Now, as part of your analysis, did you look

13   for examples or instances of conspiracy between

14   Varsity on one hand and USASF on the other?

15       A.   Yes.

16       Q.   And did you find any instances?

17       A.   I found no instances consistent with the

18   claims put forward by either in the complaint or the

19   experts that you have retained.

20       Q.   Did you look for evidence of agreements

21   between Varsity and USASF that favored Varsity over

22   other competitors?

23       A.   I -- I don't know how to think about the

24   question you just asked because a -- the question,

25   from an economic perspective, is did they collude in

Case 2:20-cv-02892-SHL-tmp    Document 423-2    Filed 03/31/23    Page 24 of 226
PageID 14041

Fusion Elite All Stars vs
Varsity Brands

Jonathan Orszag
November 15, 2022

339

1    a way to harm competition or consumers?  I'm not

2    sure that's the economic question to -- to examine.

3        Q.   Okay.  Well, let me -- let me -- let me

4    make sure I ask my question.  Did you look for

5    evidence of agreements between Varsity and USASF

6    that favored Varsity over other competitors?

7        MS. RICCIO:  Objection.

8        THE WITNESS:  I can't.  I don't know how to

9    answer it because it may be that there's a provision

10   that the entire USASF board agreed to, that all

11   members voted for, including independent event

12   producers, that in the end benefited Varsity more

13   than, say, someone else.

14       And so I'm not sure how to answer your question.

15   That's not collusion.  They -- everyone -- USSF --

16   USASF promulgated a rule and ultimately -- I'm --

17   I'm just using as a hypothetical -- Varsity

18   benefited more than others.  And, under the way you

19   framed the question, that would suggest some form of

20   favoritism.

21       But, from an economic analysis, that's not the

22   case because there was a decision that was made that

23   ultimately Varsity may have benefited from and that

24   would not be, quote, "favoritism," in a way that I

25   would think about it.

340

1    BY MR. SAVERI:

2        Q.    Well, if you found examples where there

3    were policies or rules that were adopted or put into

4    place by USASF that Varsity -- that advantaged

5    Varsity over other competitors, would you, as an

6    economist, look or analyze that evidence for the

7    purposes of determining whether there was a

8    conspiracy or collusion?

9        A.    I would dig deeper in that circumstance

10   about why that rule was put into place and the

11   effects of that rule.

12       Q.    Now, with respect to your opinion about

13   whether or not there was a conspiracy between USF --

14   USASF and Varsity, did you understand it was your

15   assignment to include -- your assignment to include

16   the task of finding such evidence and refuting it?

17       MR. KAISER:   Objection.

18       THE WITNESS:   My task was to examine the claims

19   put forward in the complaint as well as put forward

20   by the experts that you retained in this case in

21   assessing whether the claims that they've made were

22   consistent with collusion and inconsistent with

23   independent conduct by USASF.

24   BY MR. SAVERI:

25       Q.    Okay.   Well, did you -- you -- you

Case 2:20-cv-02892-SHL-tmp   Document 423-2   Filed 03/31/23   Page 26 of 226
PageID 14043

Fusion Elite All Stars vs
Varsity Brands

Jonathan Orszag
November 15, 2022

341

1    understand the part of our -- the claim that we make

2    in this case is that there was an illegal agreement

3    between USASF and Varsity; it was illegal under the

4    antitrust laws?

5        A.   I understand that, yes.

6        Q.   And did you view it as part of your task to

7    look for evidence of agreement and -- and refuting

8    it?

9        MS. RICCIO:   Objection.

10       THE WITNESS:   I -- I don't view my task as,

11   quote, "refuting it."  I view my task as looking at

12   the evidence and assessing whether the evidence is

13   consistent with collusion and inconsistent with

14   independent conduct.

15       Whether -- if it -- if it's -- if the evidence

16   showed that it was consistent with collusion and

17   inconsistent with independent conduct, I would state

18   as such.  And if the evidence is inconsistent with

19   collusion and consistent with independent conduct, I

20   will state as such.

21   BY MR. SAVERI:

22       Q.   Did you, in your analysis, find any

23   contractural agreements between Varsity employees

24   and employees of USASF?

25       A.   I'm not a lawyer; so I'm going to defer to

489

1    STATE OF CALIFORNIA      )

2                             )   ss.

3    COUNTY OF ORANGE         )

4

5              I, LINDSAY STOKER, Certified Shorthand

6    Reporter qualified in and for the State of California,

7    do hereby certify:

8              That the foregoing transcript is a true and

9    correct transcription of my original stenographic notes;

10             I further certify that I am neither attorney

11   or counsel for, nor related to or employed by any of the

12   parties to the action in which this proceeding was

13   taken; and, furthermore, that I am not a relative or

14   employee of any attorney or counsel employed by the

15   parties hereto or financially interested in the action.

16             IN WITNESS WHEREOF, I have hereunto set my

17   hand this 16th day of November, 2022.

18

19

                     LINDSAY STOKER

20                   CSR 14373

21

22

23

24

25

# Errata Sheet for Deposition Transcript

**Case:** *Fusion Elite All Stars, et al. v. Varsity Brands, LLC, et al., Action No.: 2:20-cv-2600*

*Jones, et al. v. Bain Capital Private Equity, et al., Action No.: 20-cv-02892*

**Date**: November 15, 2022

**Deponent**: Jonathan M. Orszag (Day 2)

| November 15, 2022 | | | | |
|---|---|---|---|---|
| Page | Line | Now Reads | Should Read | Reason |
| 261 | 3 | in an allergy | in a case on behalf of the Academy of Allergy and Asthma | Clarification |
| 276 | 24 | So I have see | So I have to see | Transcription Error/Clarification |
| 286 | 19 | business | business document | Clarification |
| 324 | 15 | office | offices | Transcription Error/Clarification |
| 333 | 24 | free writing | free riding | Transcription Error |
| 337 | 18 | nitpicking on | nitpicking one | Transcription Error |
| 342 | 2 | agreement," by definition | Agreement," is by definition | Transcription Error/Clarification |
| 351 | 20 | involved | involvement | Transcription Error/Clarification |
| 361 | 16 | experience are | experiences are | Transcription Error/Clarification |
| 371 | 22 | Varsity that | Varsity vote that | Clarification |
| 373 | 21 | depend | depends | Transcription Error/Clarification |
| 391 | 11 | illegible | ineligible | Transcription Error |
| 414 | 24 | 2- to $300,000 | $200,000 to $300,000 | Clarification |
| 424 | 24 | 2- and $300,000 | $200,000 and $300,000 | Clarification |
| 440 | 16 | biassing | biasing | Transcription Error |
| 441 | 9 | Varsity | USASF | Clarification |
| 471 | 9 | Silting | Sitting | Transcription Error |
| 481 | 5 | biassing | biasing | Transcription Error |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 15, 2022.

_____
Jonathan M. Orszag

# EXHIBIT 3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE

JESSICA JONES, et al.,
            Plaintiffs,

v.

VARSITY BRANDS, LLC, et al.,
            Defendants.

Case No. 2:20-cv-02892

**EXPERT REPORT OF JONATHAN M. ORSZAG**

**September 23, 2022**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# CONTENTS

I.  Qualifications ....................................................................................................................... 3

II.  Assignment and Summary of Conclusions ....................................................................... 4

III.  Background on All Star Cheer and USASF ....................................................................... 7

    A.  All Star Cheer ............................................................................................................ 7

    B.  USASF's Role in All Star Cheer ................................................................................ 9

    C.  The Role of Sanctioning Organizations in Promoting Competition ............................ 12

    D.  Worlds ..................................................................................................................... 14

IV.  Plaintiffs' Experts Do Not Provide Economic Support for The Allegation that USASF Was Part of a Conspiracy ....................................................................................................................... 15

    A.  Plaintiffs' Experts Fail to Identify Any Actions Taken by USASF that Created an Anticompetitive Benefit for Varsity During the Alleged Class Period ...................................... 16

    B.  Plaintiffs' Experts Ignore Varsity's Procompetitive Contributions to USASF ............................ 19

    C.  Dr. Netz Provides No Reliable Evidence that USASF Failed to Uphold Its Mission ................... 21

    D.  Plaintiffs' Experts Ignore Data that Contradict Their Conclusions ............................... 22

    E.  Plaintiffs' Experts Provide No Reliable Evidence that the Alleged Conspiracy Impacted School Cheer ....................................................................................................................... 22

V.  Analysis of USASF's Rules and Behavior During the Class Period Demonstrates No Economic Evidence of Anticompetitive Conduct ........................................................................................ 23

    A.  Plaintiffs' Experts Do Not Provide Economic Support for Their Claim that USASF Changed Its Governance Structure to Advantage Varsity ............................................................... 23

    B.  Plaintiffs' Experts Do Not Provide Economic Support for Their Claims that USASF Changed or Selectively Enforced Its Rules Regarding World Bid Events to Favor Varsity ............................ 25

        1.  USASF Did Not Change the Membership of Its Sanctioning Committee to Advantage Varsity During the Class Period ...................................................................................... 26

        2.  Plaintiffs' Experts Do Not Provide Economic Support that USASF Changed or Selectively Enforced Its Worlds Bid Event Approval Rules to Advantage Varsity During the Class Period ....................................................................................................................... 28

        3.  USASF's "125 Team" Threshold for Worlds Bid Events Did Not Materially Advantage Varsity ..................................................................................................................... 30

        4.  Plaintiffs' Experts' Claims that Guideline 3.B Restricts Entry and Competition Is Unfounded ................................................................................................................. 32

        5.  Plaintiffs' Experts' Claims that Varsity Was Able to "Undercut" Events Hosted by Rivals with "Aid" from USASF Do Not Survive Scrutiny ............................................................. 33

1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

C.    Plaintiffs' Experts' Claims that USASF Prohibited Members from Participating in "Rivals'
Events" Are Unfounded and Do Not Support Plaintiffs' Allegations of a Conspiracy ............... 35

D.    Plaintiffs' Experts' Claims that USASF Prohibited Members from Partnering with Rival
Sanctioning Bodies Are Unfounded and Do Not Support Plaintiffs' Allegations of Conspiracy . 38

E.    Plaintiffs' Experts' Claims Regarding USASF's Insurance Requirement Do Not Support Plaintiffs'
Allegations of Conspiracy ....................................................................................................... 40

F.    Plaintiffs' Experts' Claims that Other USASF Competition and Apparel Rules Advantage Varsity
Do Not Support Plaintiffs' Allegations of Conspiracy .................................................................. 41

Appendix A: Curriculum Vitae of Jonathan M. Orszag

Appendix B: Materials Relied Upon

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# I.    Qualifications

1.    My name is Jonathan Orszag.  I am a Senior Managing Director and member of the Executive Committee of Compass Lexecon, LLC, an economic consulting firm.  My services have been retained in the past by a variety of public-sector entities and private-sector firms ranging from small businesses to Fortune 500 companies.  These engagements have involved a wide array of matters, from entertainment and telecommunications issues to matters affecting the sports and retail industries.  I have provided testimony to administrative agencies, the U.S. Congress, U.S. courts, the European Court of First Instance, and other domestic and foreign regulatory bodies on a range of issues, including antitrust (competition) policy, industry structure, and fiscal policy.

2.    Previously, I served as the Assistant to the U.S. Secretary of Commerce and Director of the Office of Policy and Strategic Planning, and as an Economic Policy Advisor on President Clinton's National Economic Council.  For my work at the White House, I was presented the Corporation for Enterprise Development's 1999 leadership award for "forging innovative public policies to expand economic opportunity in America."  I have taught at both the University of Southern California and UCLA; most recently, I served as a Lecturer at UCLA, teaching a class on antitrust and merger analysis.

3.    I received a M.Sc. in economic and social history from Oxford University, which I attended as a Marshall Scholar.  I graduated summa cum laude in economics from Princeton University, where I was elected to Phi Beta Kappa.  I have been named by Who's Who Legal as one of the most highly regarded competition economists in the world.

4.    I have testified or consulted on matters of antitrust and competition policy, liability, and damages in many cases covering a wide range of industries, including—but not limited to—automotive, entertainment, technology, transportation, pharmaceuticals, insurance, pay television, medical devices, and financial services.

5.    I have been active in applying economic analysis to the sports and media sectors for many years.  For example, I have written papers on the economics of college sports and the application of labor market tournament theory to the PGA TOUR.  I have also advised an NBA team on the fair market value of its media rights; advised cable and satellite companies on the fair market value of sports programming; worked on mergers in the sports industry, such as the TaylorMade-Adams merger; advised a players union in its negotiations with a league; testified regarding the impact of various regulations on college sports; and worked on other cases at the intersection of the sports and the media sectors.

6.    My involvement in the sports sector extends beyond my academic and consulting work.  I serve on the Board of Trustees of The First Tee program—the foundation arm of the PGA Tour, which seeks to promote life skills and leadership through golf—and I am on the Board of Governors of the TGR Foundation (formerly the Tiger Woods Foundation).  I am currently a minority investor in a minor league baseball franchise and formerly a minority investor in the Milwaukee Bucks.

7.    My curriculum vitae, including a list of matters in which I have testified, is attached as Appendix A.  The rate charged by Compass Lexecon for my work on this matter is $1,500 per hour.  I have no financial interest in the outcome of this proceeding.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## II.    Assignment and Summary of Conclusions

8.    Plaintiffs in this case allege that Defendants Varsity Brands, LLC ("Varsity Brands"); Varsity Spirit, LLC ("Varsity Spirit"); Varsity Spirit Fashion & Supplies, LLC ("Varsity Spirit Fashion") (collectively with Varsity Brands and Varsity Spirit, "Varsity"); U.S. All Star Federation, Inc. ("USASF"); Jeff Webb; Charlesbank Capital Partners LLC ("Charlesbank"); and Bain Capital Private Equity ("Bain") conspired to raise, fix, and stabilize the prices associated with Competitive Cheer.[1]  In particular, Plaintiffs claim that USASF conspired with Varsity and others to engage in anticompetitive conduct that resulted in Varsity acquiring monopoly power in the markets for cheer competitions, cheer apparel, and cheer camps.[2]

9.    Plaintiffs have retained Drs. Janet Netz, Randal Heeb, Jen Maki, and Mr. James Aronoff as economic experts.  In her report, Dr. Netz claims that Varsity and the USASF acted in concert to harm competition, for example, by engaging in coordinated conduct to promulgate USASF rulings that favored Varsity over its rival cheer competition event producers; to disadvantage and eliminate rival event producers; and to enforce rules selectively against Varsity's rivals.[3] Dr. Netz also offers the opinion that, absent the alleged conspiracy, "USASF would act as an independent sanctioning body in the best interests of the sport as a whole, on behalf of all event producers, apparel providers, camp providers, coaches, and athletes."[4]  In his report, Dr. Heeb claims that Varsity's conspiracy with USASF to disadvantage Varsity's competitive rivals, and other anticompetitive conduct, resulted in an increase in Varsity's market power in cheer competitions, cheer apparel, and cheer camps.[5]  In her report, Dr. Maki claims that Varsity used its market power to charge anti-competitive prices and estimates class-wide damages related to competition registration, apparel, and camp registration.[6] Finally, Mr. Aronoff was asked to offer "recommendations for structural relief with regard to the alleged anti-competitive conduct of the Defendants."[7]

10.   Plaintiffs seek to certify three damages classes of persons who indirectly paid Varsity for "(a) registration, entrance, or other fees and expenses associated with participation in one or more Varsity Cheer Competitions, including registration fees to USASF; (b) Varsity Cheer Apparel; and (c)

---

[1]    *Jessica Jones, Michelle Velotta, and Christina Lorenzen on Behalf of Themselves and All Others Similarly Situated, v. Varsity Brands, LLC; Varsity Spirit, LLC; Varsity Spirit Fashion & Supplies, LLC; U.S. All Star Federation, Inc.; Jeff Webb; Charlesbank Capital Partners LLC; and Bain Capital Private Equity*, Complaint, December 10, 2020 (hereinafter, *Complaint*), ¶ 1.

[2]    *Complaint*, ¶ 117.  I understand that Plaintiffs do not limit harm to All Star Cheer (and focus on both All Star and school cheer).  This report only addresses claims related to USASF, *i.e.*, All Star Cheer.

[3]    Expert Report of Janet S. Netz, Ph.D., June 20, 2022 (hereinafter, *Netz Report*), pp. 4, 69.

[4]    *Netz Report*, p. 5.

[5]    Expert Report of Randal Heeb, Ph.D., June 20, 2022 (hereinafter, *Heeb Report*), ¶¶ 52-54.

[6]    Expert Damages Report of Jen Maki, June 20, 2022 (hereinafter, *Maki Report*), ¶ 29.

[7]    Expert Report of James H. Aronoff, June 20, 2022 (hereinafter, *Aronoff Report*), ¶ 13.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Varsity Cheer Camp Fees."[8] Plaintiffs define the class period for all three proposed classes as December 10, 2016 until "the continuing Exclusionary Scheme alleged" has ended ("class period").[9]

11. I have been asked by counsel for USASF to review and assess, from an economic perspective, whether the available evidence is consistent with Plaintiffs' allegations that USASF conspired with Varsity to foreclose competition and raise prices in cheer competitions, apparel, and camps. Specifically, I have been asked to offer an independent economic assessment of:

(1) The opinions and analyses in Dr. Netz's report as they relate to the role of USASF as a sanctioning organization for All Star Cheer and to the alleged conspiracy with Varsity.

(2) Additional claims made by Drs. Heeb, Maki, and Mr. Aronoff, related to USASF's role in the alleged conspiracy.[10]

I do not attempt to respond in detail to every opinion offered by Drs. Netz, Heeb, Maki, and Mr. Aronoff. The absence of an explicit response in this report to any specific opinion of Plaintiffs' economic experts should not be interpreted as agreement.[11]

12. Based on my analysis of Plaintiffs' experts' reports, the factual discovery record in this case, interviews with current and former USASF employees,[12] and my years of experience in analyzing competition issues in numerous industries, including sports, I have concluded that the economic evidence in this case is not consistent with Plaintiffs' allegations of a conspiracy by which USASF coordinated with Varsity to harm competition. More specifically:

(1) One of USASF's key responsibilities is to establish and enforce rules governing All Star Cheer that apply to all USASF-sanctioned competitions. I find that USASF's rules are broadly consistent with its missions and with the types of rules implemented by other sports leagues and sanctioning organizations.

(a) USASF—like other sanctioning organizations—does not have a singular mission or purpose. Instead, USASF has multiple objectives that it must balance as it develops rules and standards for All Star Cheer.

(b) The structure of USASF's rules also played a critical role in incentivizing participants—including event producers—to join USASF at the time of its inception and to adhere to its rules subsequently.

---

[8]  *Netz Report*, pp. 1-2. *See also Complaint*, ¶¶ 29-31.

[9]  *Complaint*, ¶¶ 29-31; *Netz Report*, p. 2.

[10]  I understand than another expert for the Defendants focuses on the allegations with respect to Varsity.

[11]  I am also submitting a separate expert report in a related case, *Fusion Elite All Stars, et al., v. Varsity Brands, LLC, et al.*, on September 23, 2022, which covers similar topics to this report. I incorporate that report by reference to the extent applicable and reserve the right to rely on any facts and opinions stated in that report as applicable.

[12]  In preparing my opinions, I, and my team at my direction, conducted interviews with Jim Chadwick (former President, USASF) (interview conducted September 20, 2022) and Steve Peterson (Vice President of Events & Corporate Alliances, USASF) (interview conducted September 20, 2022).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

(2) Plaintiffs' experts provide no economic basis to support Plaintiffs' allegation that USASF was part of a conspiracy with Varsity during the alleged class period.

    (a) Plaintiffs' experts fail to describe how USASF conspired with Varsity during the class period.  Despite claiming that USASF conspired with Varsity to implement rules that favored Varsity or to enforce rules selectively against Varsity's rivals, Plaintiffs' experts do not provide details of what Defendants agreed to or how they aimed to implement the alleged conspiracy.

    (b) In particular, Plaintiffs' experts do not identify a single rule enacted, changed, or deviated from by USASF during the class period that materially enhanced Varsity's competitive position above what Varsity obtained by itself.

        (i) In fact, most of the rules that Plaintiffs' experts point to were in effect prior to the alleged class period—many of them in some form since USASF's creation.

    (c) Plaintiffs' experts fail to show that USASF's rules and behavior—at the time they were implemented—were both consistent with conspiratorial conduct and inconsistent with legitimate, procompetitive conduct.

    (d) Plaintiffs' experts' allegations related to Varsity having control of USASF not only fail to demonstrate a conspiracy between USASF and Varsity, but they, in fact, point at actions that are, in principle, *procompetitive*—because Varsity contributed to the development of USASF as a sanctioning organization, which benefited all its members.  Moreover, most of these alleged influences over USASF would have been in place from USASF's inception, and certainly prior to the alleged class period.

    (e) Rather than identifying any material rules USASF implemented or selectively enforced for the benefit of Varsity, Plaintiffs' experts simply speculate that, absent the alleged conduct, USASF would be expected to implement different rules.  The fact that USASF, in hindsight, *could* have implemented different, perhaps better, rules years before the alleged class period does not imply that there was a conspiracy between USASF and Varsity, as Plaintiffs' experts claim.

(3) Plaintiffs' experts discuss certain rules and behavior by USASF which, they claim, are anticompetitive and the result of coordination with Varsity.  However, Plaintiffs' experts' claims are based on an incorrect understanding of the facts of the case and USASF's rules; do not make sense as a matter of economics; and/or ignore relevant procompetitive reasons for the USASF rules and behavior they challenge.

    (a) Moreover, in certain cases, Plaintiffs' experts contradict each other with respect to the competitive or anticompetitive aspects of certain rules.

(4) Plaintiffs' experts also fail to analyze the available data to assess whether the USASF rules they challenge had, in fact, *any effect* in providing Varsity with a competitive advantage.  The available evidence does not support such a conclusion.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

(a) Central to Plaintiffs' experts' theory of harm are speculations that certain USASF rules favored Varsity in the allocation of events that grant bids for participation in USASF's Cheerleading World Championship. However, the available data directly contradict Plaintiffs' experts' speculations, and instead show that, during the class period, there was no material change in Varsity's share of these events beyond what Varsity obtained unilaterally (*i.e.*, through acquisitions of event producers). As such, Plaintiffs' experts' speculations are contradicted by the record evidence.

(b) In fact, Plaintiffs' experts' own empirical analyses are inconsistent with the claim that USASF materially enhanced Varsity's competitive position in the dissemination of bids to the Cheerleading World Championship above what Varsity obtained by itself.

(5) All in all, I have found the conduct by USASF challenged by Plaintiffs' experts to be consistent with legitimate, non-conspiratorial behavior for a sanctioning organization, and I have found nothing in USASF's rules and regulations that provides Varsity with an anticompetitive advantage over what Varsity can or has obtained by itself.

13. The remainder of this report develops the support for these conclusions in more detail. In Section III, I briefly describe All Star Cheer and USASF as its sanctioning organization, as the key backdrop against which Plaintiffs' allegations must be assessed. In Section IV, I show that Plaintiffs' experts' claims of a conspiracy between USASF and Varsity are unsupported by economic evidence. In Section V, I provide a more detailed analysis of each behavior by USASF discussed by Drs. Netz, Heeb, Maki, and Mr. Aronoff in their expert reports and explain why such actions were consistent with rational, independent (*i.e.*, pro-competitive) behavior. A list of the materials I have relied upon in reaching my conclusions is included as Appendix B. I reserve the right in the future to incorporate into my analysis any additional evidence that may emerge.

## III.    Background on All Star Cheer and USASF

14. As background for understanding Plaintiffs' allegations and my opinions, I briefly describe All Star Cheer and the roles of USASF.

### A.    All Star Cheer

15. All Star Cheer is an athletic competition in which teams of athletes perform 2 ½ minute choreographed routines incorporating elements of cheerleading, dance, and stunting.[13] Unlike in traditional sideline cheerleading, where cheerleaders support and generate enthusiasm for other athletic teams, the primary purpose of All Star Cheer is competition. All Star Cheer teams are

---

[13]    USASF, *What is All Star Cheer?*, https://www.usasf.net/cheer.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

typically organized through independent gyms ("All Star Gyms") and are not affiliated with schools or academic institutions.[14, 15]

16. All Star Cheer teams often participate in multiple events during the regular season,[16] which runs from October to April.[17] Teams may be invited to compete in end-of-season events, which take place at the end of or after the regular season, based on their performance at regular-season competitions.[18] There are multiple end-of-season events for All Star Cheer participants in the United States: (i) The Cheerleading World Championship ("Worlds"), which is hosted by USASF and is the premier international championship for elite All Star Cheer teams, held each year at the ESPN Wide World of Sports Complex at Walt Disney World;[19] (ii) The U.S. Finals, which takes place in multiple locations across the country, and is open to several levels of All Star Cheer teams;[20] (iii) The Summit, which takes place at Walt Disney World, and is open to several levels of All Star Cheer teams;[21] (iv) The Pinnacle Cheerleading Championship, which is hosted by JAMZ Cheer & Dance;[22] (v) Surf's Up

---

[14] *Id.*

[15] I understand that Plaintiffs' experts analyze competitive cheer (including All Star and school cheer) as a single market (*see, e.g.*, *Netz Report*, § III.B.2). This report and the analysis herein focus specifically on All Star Cheer, since that is the only discipline relevant to USASF (*see infra*, ¶ 17). Similarly, this report does not address any allegations by Plaintiffs' experts related to cheer camps or pricing in the market for camps, where I understand USASF has no involvement.

[16] *See, e.g.*, Deposition of Jim Chadwick, April 15, 2022 (hereinafter, *Chadwick Dep.*), 342:16-18.

[17] I understand that the end-of-season events, such as Worlds, are typically held in late April or early May, following the end of the regular season. *See, e.g.*, Deposition of Steve Peterson, March 9, 2022 (hereinafter, *Peterson Dep., March 9, 2022*), 34:23-35:1; *Chadwick Dep.*, 71:11-14. *See also,* The Cheerleading Worlds, *Countdown To Worlds And Future Dates*, https://thecheerleadingworlds.net/future-dates/ (showing Worlds scheduled in late April).

[18] *See, e.g.*, *Chadwick Dep.*, 59:2-13, discussing the bid allocation process for The Cheerleading World Championship ("[I]f you're going to have Worlds to be the Super Bowl, then there needed to be a way— an organized way to determine who—should go… So the intent was to have the largest, most prestigious competitions. The winners of those that would beat the most teams would then qualify to go to the World Championship."); *Peterson Dep., March 9, 2022*, 127:5-9 ("Q. What is your understanding of a Summit bid event? A. It's an event qualifier for […] Summit bids that is offered by the company."). I understand that there may be some end-of-season events that are "open," in that they do not require an invitation to participate.

[19] The Cheerleading Worlds, https://thecheerleadingworlds.net/ ("More than 120 USASF/IASF member event producers across the U.S. and in over 40 countries around the world qualify top teams at their premier national championships to compete at Worlds. This international event brings together more than 9000 cheer and 3500 dance athletes to vie for world champion titles in senior and international club divisions and categories.").

[20] Varsity, *The U.S. Finals*, https://www.varsity.com/all-star/competitions/end-of-season-events/us-finals/.

[21] Varsity, *The Summit Championship*, https://www.varsity.com/all-star/competitions/end-of-season-events/the-summit/. In recent years, The Summit has expanded to include teams from outside of the United States.

[22] JAMZ, *The Pinnacle Cheerleading Championship*, https://www.jamz.com/the-pinnacle.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Grand National Championship, which is hosted by Shout! Cheer and Dance;[23] (vi) The One Cheer & Dance Finals, which takes place at multiple locations across the country and is hosted by a collective of event producers;[24] (vii) The Open Championships, which takes place at multiple locations across the country and is hosted by a non-USASF member event producer;[25] and (vii) Allstar World Championship, which takes place in Orlando, Florida, and is also hosted as part of the Open Championships series.[26]  I provide additional detail on the process through which All Star Teams compete at specific sanctioned events ("Worlds Bid Events") to receive invitations ("Worlds Bids") to USASF's Worlds later in this section.

## B.    USASF's Role in All Star Cheer

17.    USASF was formed in the 2003-2004 timeframe,[27] with the goal of "making All Star a safer sport by establishing fair and consistent rules and competition standards."[28]  As the sanctioning organization for All Star Cheer, USASF develops and enforces standardized sets of rules for competition (including rules pertaining to routine length, complexity, and apparel)[29] and judging that apply to all Federation-sanctioned competitions—including Worlds, the foremost All Star event—and determines which competitions meet its sanctioning criteria.[30]  USASF's rules apply specifically to its All Star Cheer members in the U.S.[31]  I understand that the rules governing other cheerleading disciplines are set by their corresponding sanctioning bodies.[32]

18.    USASF—like other sanctioning organizations—does not have a singular mission or purpose.  Instead, USASF has multiple objectives that it must balance as it develops rules and standards for All Star Cheer.  The organization's bylaws identified at least three goals around the time of its inception:[33]

---

[23]    Shout Cheer & Dance, *Surf's Up Grand National Championship*, https://www.shoutcheer.com/2022-23-events/surf's-up-grand-national-championship.

[24]    ONE, *The ONE Cheer & Dance Finals*, http://www.theonefinals.com/.

[25]    The Open Championships, *Championships,* https://openchampionshipseries.com/2023-championships/.

[26]    The Open Championships, *Allstar Worlds Championship*, https://theallstarworldchampionship.com/.

[27]    I understand that USASF was informally established in 2003 but was not formally incorporated until February 2004.  *See*, USASF, *Mission & History,* https://www.usasf.net/about; USASF_00032403-5.

[28]    USASF, *Mission & History,* https://www.usasf.net/about.

[29]    *See, e.g.*, USASF, 2022-2023 USASF Cheer Rules, https://usasfmain.s3.amazonaws.com/Rules/USASF_Cheer_Rules_22-23.pdf.

[30]    USASF, *Boards and Committees*, https://www.usasf.net/boards-committees.

[31]    I understand that USASF also serves as the sanctioning body for All Star Dance competitions in the United States.  For the purposes of this report, I focus only on USASF's role as it pertains to All Star Cheer.

[32]    For example, rules for School Cheer are set by the National Federation of State High School Associations (NFHS).  *See,* NHFS, *Spirit*, https://www.nfhs.org/activities-sports/spirit/.

[33]    USASF_00032456-66 (*Chadwick Dep.*, Exhibit 4), at 56 (*emphasis added*).  Jim Chadwick, former President of USASF, further identified multiple goals for USASF when it was established.  *See Chadwick Dep.*, 34:8-25 ("At the beginning … we were trying to create a uniform set of rules and a way to make sure people were qualified to do what they were doing such as coaching; to try and create standards for competitions; to

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

The purposes and mission of the Corporation are to *establish rules for sanctioning and providing governance* for cheerleading, dance and spirit-related competitions and events; to provide *counseling in the administration* of cheerleading, dance and spirit-related competitions and events; and to *provide educational counseling services* in the fields of cheerleading, dance and spirit-related completions [sic] and events.

19. USASF's updated mission statement likewise lists at least four similar, but slightly different, objectives:[34]

To support and enrich the lives of our All Star athletes and members. We provide *consistent rules*, strive for a *safe environment* for our athletes, drive *competitive excellence*, and *promote a positive image* for the sport.

20. As such, USASF has had various objectives over its history—including some not explicitly stated in its mission—and has to simultaneously balance multiple goals in its role as sanctioning organization.

21. One of USASF's key responsibilities is to establish and enforce rules governing All Star Cheer that apply to all USASF-sanctioned competitions, events, and member gyms. USASF's rules directly contribute to its aforementioned objectives as a sanctioning organization:[35] For example, rules related to athlete apparel and the use of props, as well as rules specifying proficiencies required for level progression, allow USASF to prioritize the safety of athletes in competition. Similarly, rules governing the length of routines and the particular skills that can be performed at each level of competition encourage consistency and fairness in All Star Cheer.[36] These types of rules not only reinforce USASF's mission, but are consistent with the types of rules implemented by other sports sanctioning organizations.[37]

---

[34]     try and create some uniform safety practices for gyms… A way to pull the industry together to support best practices from rules, from safety, from all the difference facets that came into the sport.").

[34]     USASF, *Mission & History*, https://www.usasf.net/about (*emphasis added*).

[35]     USASF, *Rules*, https://www.usasf.net/rules ("USASF rules, divisions and categories create a safe, consistent and fair platform for cheer and dance athletes at All Star events and practices. Safety, followed by skill progression and fair play, is the top priority when setting or adjusting any rule or guideline. The USASF also establishes guidelines for best practices in areas of All Star not directly involved with safety rules, but important to the integrity of the sport.").

[36]     I understand that USASF's rules have remained largely consistent across the class period; however, USASF re-publishes and updates (as needed) its rules each season. *See, e.g.*, USASF_00046687-740 (2015-2017 USASF Cheer Safety Rules); USASF_00051808-63 (2016-2017 USASF Cheer Safety Rules); USASF_00030653-710 (2017-2019 USASF/IASF Cheer Safety Rules); USASF_00042331-89 (2018-2019 USASF Cheer Safety Rules); USASF_00022755-98 (2019-2020 USASF Cheer Rules).

[37]     For example, I understand that the National Basketball Association ("NBA"), the sanctioning organization for men's basketball (professional) in the U.S., determines a 3-point line of 23 feet, 9 inches at the top of the arc (*see*, NBA, *Rulebook*, https://official.nba.com/rule-no-1-court-dimensions-equipment/). But the National Collegiate Athletic Association ("NCAA"), another sanctioning organization for basketball in the U.S. (collegiate), determines a 3-point line of 22 feet, 1 ¾ inches at the top of the arc (*see, e.g.,* NCAA, *Men's basketball 3-point line extended to international distance*, June 5, 2019,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

22. USASF is governed by a Board of Directors comprised of thirteen voting members and five advisory members. The Board includes representation from a variety of stakeholders including USASF staff members, Cheer and Dance member gyms and coaches, and sanctioned event producers.[38] USASF's bylaws reserve two voting Board seats for USASF and an additional seven voting seats for event producers.[39]

23. USASF also operates several boards and committees, each of which is focused on promoting a specific objective, or set of objectives, of the organization.[40] One specific committee at issue in this case, the Sanctioning Committee, is relevant to USASF's work for two main reasons. As described on USASF's website:[41]

> The Sanctioning Committee works to develop and maintain: (1) the standards by which competitions qualify for USASF Sanctioning and the process and guidelines governing compliance, and (2) the approval process and criteria for event producer memberships including eligibility to offer Worlds bids.

24. USASF's Sanctioning Committee is comprised of representatives from each event producer sanctioned to award Worlds Bids (also known as "Tier 1" producers). Each approved event producer holds a single voting seat on the committee, with the ability to designate its representative as it

---

https://www.ncaa.org/news/2019/6/5/men-s-basketball-3-point-line-extended-to-international-distance.aspx). In order to have athletic competitions, there must be agreement among competitors about the rules of the game—*e.g.*, one team cannot play from an 18 foot 3-point line, while the other plays from 21 feet. The role of a sanctioning body is to determine those common and consistent rules for all teams that play athletic competition. This responsibility was recognized by the U.S. Supreme Court. *See, National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma and University of Georgia Athletic Association*, Syllabus, Case No. 83-271 (1984), pp. 7-8 (quoting pp. 101-102) ("What the NCAA and its member institutions market in this case is competition itself—contests between competing institutions. Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed. A myriad of rules affecting such matters as the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or prescribed, all must be agreed upon, and all restrain the manner in which institutions compete… And the integrity of the 'product' cannot be preserved except by mutual agreement; if an institution adopted such restrictions unilaterally, its effectiveness as a competitor on the playing field might soon be destroyed. Thus, the NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable. In performing this role, its actions widen consumer choice—not only the choices available to sports fans but also those available to athletes—and hence can be viewed as procompetitive.").

[38]  USASF, *Boards and Committees*, https://www.usasf.net/boards-committees. *See also*, USASF_00032454-5, at 54: USASF Board Operating Guidelines and approved Bylaw Amendments ("The Board of Directors is made up of representatives from Competition Event Producers, gym owners/coaches, and the USASF. (Approved by the USASF Board of Directors on September 1, 2005)").

[39]  USASF_00032454-5, at 54.

[40]  USASF, *Boards and Committees*, https://www.usasf.net/boards-committees.

[41]  *Id.*

chooses, and Sanctioning Committee votes are decided by majority.[42]  Because USASF rules allowed for no more than 42 Tier 1 event producers for most of the alleged class period, the Sanctioning Committee also had no more than 42 members during that period.[43]

## C.    The Role of Sanctioning Organizations in Promoting Competition[44]

25.    Sports activities (and associated competitions) require a certain degree of coordination among members for the simple reason that more than one team is required to have a competition.  Unlike traditional product markets (*e.g.*, the market for tomatoes), in order to have a competition in sport activities, competitors need to agree to certain rules of the competition.  As such, for the market to function, certain rules, restraints, and regulations are needed.  And although similar rules are not necessary for competition in other markets—and might even be seen as anticompetitive—in sports activities those rules are procompetitive because they are necessary for those who wish to participate in the sport (as athletes, coaches, event organizers, media commenters, advertisers, etc.) to know when, where, and how the competitions will take place, and what is and is not allowed (*i.e.*, what the rules of competition are).

26.    For example, Noll (2003) highlights many coordinated decisions that teams or leagues need to make, such as the format of the competitions; the number and hierarchy of leagues of different quality; the rules for membership; and the governance methods for deciding and enforcing rules and policies, including rules regarding the economic behavior of its members.[45]  Participants typically rely on leagues and sanctioning organizations to create these regulations, which facilitate and enhance competitive interactions and are thus procompetitive.

27.    Sanctioning organizations, like USASF, play a critical role in creating rules and best practices for safety and "competitive excellence,"[46] and in incentivizing participants to adhere to a league's

---

[42]    USASF_00081398-402, at 399 (listing as one of the benefits of Tier 1 membership "[h]ave a seat to participate on the USASF Sanctioning Committee").  *See also*, Deposition of Steve Peterson, April 4, 2022 (hereinafter, *Peterson Dep., April 4, 2022*), 340:15-18, 342:2-22, 343:16-20.

[43]    *See, e.g.*, VAR00319008-10, at 08.  I understand that USASF increased the number of Tier 1 event producers to 46 in 2020 (*Netz Report*, pp. 16-17), after deciding to extend the probationary period for events held in early 2020 that did not re-qualify as Worlds Bid Events based on team attendance. I further understand that for the 2021-2022 season, USASF changed its event producer membership structure to include five tiers, three of which have the ability to award Worlds Bids—each with different membership fees and event attendance criteria.  *See, e.g.*, USASF, *Event Producer Membership Application*, https://usasf.formstack.com/forms/usasf_ep_membership_application_worldsbid_22_23, allowing applicants to select between three "Worlds Bid Membership Level[s]".

[44]    In this section, I use the term "competition" to discuss how teams compete in athletic events, and not to refer to "competition" within a marketplace, as in often analyzed in antitrust economics.

[45]    *See* Noll, Roger G. (2003), "The Organization of Sports Leagues," *Oxford Review of Economic Policy,* 19:4 (hereinafter, *Noll* (2003)), pp. 530-531.

[46]    *See, e.g.*, Weistart, John C. (1977), "Player Discipline in Professional Sports: The Antitrust Issues," *William & Mary Law Review*, 18:4 (hereinafter, *Weistart* (1977), pp. 708-709 ("Sports enterprises would appear to

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

established rules.  Although participants in a league may initially agree on rules to govern competition, individual participants may see benefits from noncompliance and choose not to follow them.  As Mitchell et al. (1999) write:[47]

> Most leagues have bylaws and rule books that run into the hundreds, and sometimes thousands, of pages.  Although representatives of teams voluntarily come together to articulate a mission, write rules, and enforce procedures, members of those organizations regularly violate these rules.  Not unlike nations attempting to prevent an arms race or to protect the global environment, sport teams find themselves torn between their individual short-term interests and their collective long-term interests.  Upholding the league's mission and fulfilling its rules helps maintain the fair competition essential to the sport but increases the risk of losing the game.  Violating league rules might help win today's game or the league championship but undermines the fair competition from which all teams generally benefit [].

28.  This tension between short-term and long-term incentives can cause sports leagues to "unravel."  That is, it is not enough for a sanctioning organization, such as USASF, to simply establish rules that encourage "fair competition," but it also must structure those rules (and any associated enforcement mechanisms) in such a way that participants are sufficiently incentivized to adhere to them:[48]

> Maintaining such competition often requires teams, inter alia, to limit roster-size agree on eligibility requirements, establish rules limiting drug use, and agree on minimum and maximum lengths of schedule.  Yet the need for these rules arises precisely because although each team could often gain a competitive advantage if it could violate these standards without getting caught, an escalating spiral of such violations could lead to the unraveling of the league itself…  Because teams always have the option to leave a league, *league rules and enforcement policies must be*

---

present clear examples of groups which need this authority for self-regulation.  Not only are rules necessary for the successful staging of competition but in addition, the groups have an interest in insuring that their ventures remain free of illegal and fraudulent activities which might undermine fan support.  Moreover, private regulation is necessary because traditional public legal remedies - those secured through the criminal process or through civil actions - are typically inadequate.").

[47]  Mitchell, Ronald, Todd Crosset, and Carol A. Barr (1999), "Encouraging Compliance Without Real Power: Sport Associations Regulating Teams," *Journal of Sport Management*, 13 (hereinafter, *Mitchell et al.* (1999)), p. 217.

[48]  *Mitchell et al.* (1999), pp. 218-219 (*emphasis added*).  *See also id.*, p. 218 ("Although teams nominally delegate enforcement power to the league, teams retain considerable power over the league and its enforcement procedures.  Teams can leave one league or association to join a new one, dismantle and reform leagues, or weaken the power of league offices if they so choose."); and *Noll* (2003), p. 540 ("Typically, the chief executive serves at the pleasure of a majority of the teams, and can be removed without cause if a majority so desire.  As a result, the league chief executive can exercise considerable authority in disciplining the bad behaviour of one owner or player, but is not likely to survive in office if a decision is made that harms most teams.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

> *strong enough to maintain adequate fair play and public trust, without being so restrictive that they cause the teams to rebel and reclaim the powers given to the league.*

29. Indeed, testimony provided in this litigation reflects this tension, and describes it as a key motivation behind USASF's creation.  For example, Jim Chadwick, former president of USASF, explained that prior to USASF's formation, event producers determined and modified their rules in response to requests from gyms, in order to better attract them to competitions.[49]  However, a set of standardized rules of competition was necessary to make All Star "legitimate" and "safe," "as opposed to what everybody called 'the Wild West.'"[50]  Jeffrey Fowlkes, who worked for Cheersport—a founding member of USASF—at the time of USASF's inception, similarly explained that prior to USASF's formation, each event producer set their own rules resulting in a lack of uniformity and safety concerns, and that uniform rules were necessary to "legitim[ize]" All Star.[51]

30. Depending on the sport and the context, sports leagues have addressed these tensions by implementing a variety of types of rules and membership structures.  Similarly, leagues have been organized in dramatically different ways,[52] for example, from those that have expanded over time by adding teams to others that have contracted by expelling their weakest members—even if they have not violated any rules.[53]  Similarly, certain leagues have permanent, fixed membership while others regularly change their membership by replacing the weakest teams with the best teams in lesser leagues.[54]

### D.  Worlds

31. Worlds is the final end-of-season event for elite All Star Cheer teams, and the culminating championship for the All Star Cheer season.  The event was first held by USASF in 2004,[55] and "was

---

[49]  *Chadwick Dep.*, 35:18-36:2 ("Event producers created different rules because a gym owner would say, 'I have these teams, and if you would just adjust the divisions or the skills, then I would have a better chance of winning.  So I'm not going to come to your competition unless you change this or that to favor my teams.'  And so, like, geographically, event producers had felt that they had created a competitive advantage for themselves by their rules.").

[50]  *Chadwick Dep.*, 37:7-9.  *See also, Chadwick Dep.*, 37:18-38:3, describing why uniformity of rules was necessary to make All Star "legitimate"; *Chadwick Dep.,* 36:3-36:9, explaining that the lack of standardized rules led to "expense" and "hardship" for gyms and created "safety concerns" for athletes.

[51]  Deposition of Jeffrey Fowlkes, April 5, 2022 (hereinafter, *Fowlkes Dep.*), 37:19-38:11.  *See also,* Deposition of John Newby, March 23, 2022 (hereinafter, *Newby Dep., March 23, 2022*), 214:1-8, noting that "[i]t was kind of a Wild West" before Worlds was formed "as a rallying point".

[52]  *See, e.g., Noll* (2003), p. 551 ("Perhaps the greatest lesson to be learned from the study of comparative leagues is the amazing variety across sports and countries in how basically the same types of businesses have attempted to solve the same basic puzzles.").

[53]  *Id.*, p. 536.

[54]  *Id.*, p. 531.

[55]  The Cheerleading Worlds, https://thecheerleadingworlds.net/.  *See, also*, *Chadwick Dep.*, 54:4-6.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

designed to be the Super Bowl of cheerleading, a competition among the best of the best[.]"[56]  Since the first championship in 2004, USASF has paid Varsity an annual fee to produce and run Worlds, and to "maintain the…relationship and contract" at Disney, where Varsity hosts other events.[57] USASF determined that Disney was a good venue for Worlds because it is a "great destination," "family-oriented," and "secure."[58]

32.    To attend Worlds, All Star teams must receive an invitation to the championship, also known as a "Worlds Bid."[59]  Teams earn Worlds Bids based on their performance at one of the 42 regular-season competitions sanctioned by USASF to distribute Bids ("Worlds Bid Events").  Each Worlds Bid Event has a set number of Worlds Bids that it can award in a season, some of which cover a portion of the cost of attending Worlds.[60]

33.    USASF does not sponsor or organize any All Star events other than Worlds.  However, as described above, based on established parameters, USASF's Sanctioning Committee determines which events can award Worlds Bids (and how many) and has rules governing when and where those events can be held.  I understand that USASF's interest in Worlds Bid Events is derived from its interest in the success of Worlds, and thus on the collective ability of Worlds Bid Events to appropriately screen and select teams to compete at Worlds.

## IV.    Plaintiffs' Experts Do Not Provide Economic Support for The Allegation that USASF Was Part of a Conspiracy

34.    Plaintiffs' experts provide no economic basis to support Plaintiffs' allegation that USASF was part of a conspiracy with Varsity during the alleged class period.  While they claim that USASF engaged in "coordinated conduct" with Varsity to "favor" Varsity and to selectively enforce its rules against

---

[56]    *Chadwick Dep.*, 285:3-5.  *See also, id.*, 53:23-54:3 ("It's, essentially, the Super Bowl of cheerleading for All Star teams…  I believe it is the most challenging and most prestigious event for All Star teams.").

[57]    VAR00253877-81, at 77.  *See also, e.g., Chadwick Dep.*, 256:15-257:4, explaining the "operations" role that USASF paid Varsity to perform at Worlds.  I understand that Varsity's existing relationship with Disney was instrumental in USASF's ability to host the first Worlds at its venues.  (Interview with Jim Chadwick, September 20, 2022.)

[58]    *Chadwick Dep.*, 232:23-233:5.

[59]    *See, e.g.,* USASF_00048185-221 (2017 Cheerleading Worlds Registration Information), at 189-190; USASF_00050475-98 (2018 Cheerleading Worlds Registration Information), at 80-81; USASF_00051272-95 (2019 Cheerleading Worlds Registration Information), at 77.

[60]    I understand that during the class period, Worlds Bid Events offered two types of Cheer Worlds Bids: (i) Paid Bids, which cover a set dollar amount per athlete and a predetermined number of coaches, to be used toward registration fees and lodging, and (ii) At-Large Bids, which represent an invitation to Worlds, but which do not include any sponsorship.  Prior to the 2016-2017 season, event producers could also award partially paid bids, which covered 50% of the value of paid bids.  *See, e.g., Peterson Dep., March 9, 2022,* 49:6-50:21, 51:19-52:2, and 158:10-12.  *See also, id.*, 55:3-22, explaining how the number of paid and at-large bids awarded by an event producer is determined.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Varsity's rivals,[61]  Plaintiffs' experts fail to describe how USASF conspired with Varsity and do not identify a single rule enacted, changed, or deviated from by USASF during the class period that materially enhanced Varsity's competitive position above what Varsity obtained by itself.  Without providing any support for their claims, Plaintiffs' experts speculate that, absent the alleged conspiratorial conduct, USASF would have implemented different sets of rules to prevent Varsity's dominance.

35.    In the rest of this section, I show that none of Plaintiffs' experts proves liability or causation with respect to USASF—that is, none of Plaintiffs' experts even attempts to show that USASF's rules and behavior are both consistent with conspiratorial conduct and inconsistent with legitimate, non-conspiratorial conduct for a sanctioning organization such as USASF.

## A.    Plaintiffs' Experts Fail to Identify Any Actions Taken by USASF that Created an Anticompetitive Benefit for Varsity During the Alleged Class Period

36.    Plaintiffs' experts present a lengthy discussion of various USASF rules that, they claim, benefitted Varsity.  However, they fail to identify a single USASF rule that was implemented or changed during the class period that created a material, anticompetitive advantage for Varsity beyond what Varsity obtained by itself.  They also fail to identify a single rule that USASF deviated from or failed to enforce during the class period that created a material, anticompetitive advantage for Varsity beyond what Varsity obtained by itself.  Instead, as shown below, most of the rules Plaintiffs' experts point to were in effect prior to the alleged class period—many of them in some form since USASF's creation.[62]  For example:

---

[61]    *See*, *Netz Report*, p. 4 ("Varsity's control of the USASF allows it to promulgate rulings that favor Varsity over its rival Cheer Competition producers.  Varsity and the USASF engaged in coordinated conduct to disadvantage and eliminate rival Cheer Competition producers.  The conduct included providing Varsity with information not provided to rivals, enforcing rules selectively against Varsity's rivals, controlling the date and location of Cheer Competitions awarding 'Worlds' bids, prohibiting USASF members from working with rival sanctioning bodies, and targeting rivals' events by offering a Varsity event in a close vicinity and around the same time to take away customer from competitors"); p. 66 ("Varsity and the governing body for All Star Competitive Cheer, the USASF, conspired to exclude and disadvantage Varsity's rivals").  *See, also*, *Maki Report*, ¶ 10 ("Varsity's monopoly power was attained through acquisition of its rivals in the relevant markets and maintained through exclusionary conduct and its control of the rule-making organizations that govern Competitive Cheer, such as the USASF, to create barriers to foreclose competition."); *Heeb Report*, ¶ 53 ("Varsity and Defendants are alleged to have engaged in a course of anticompetitive behavior including … conspiracy with USASF to disadvantage Varsity's competitive rivals…").

[62]    I also note that, as it relates to USASF, Plaintiffs' experts' analysis primarily focuses on data through 2020 and Plaintiffs' experts provide no reliable analysis of the impact of any changes in USASF rules after 2020.  *See, e.g., Maki Report*, ¶ 66 (discussing Varsity's share of USASF Worlds bids through the 2019-2020 season); *Heeb Report*, ¶ 86 and Table 2 (discussing USASF membership through the 2018-2019 season); ¶¶ 87, 207-216 and Table 14 (discussing the tier system and Sanctioning Committee makeup in place through 2020); *Netz Report*, p. 16 (discussing Sanctioning Committee makeup at the end of 2020).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

(1) Plaintiffs' experts claim that USASF's bylaws allowed Varsity to use acquisitions to acquire the majority of seats on USASF's Board of Directors ("Board")[63] and Sanctioning Committee.[64] However, I understand that the number and type of USASF Board seats were set forth in amendments to USASF's Bylaws adopted in September 2005.[65] Likewise, the composition of the Sanctioning Committee—one seat for each Tier 1 event producer—has been in place since at least 2012.[66]

(2) Plaintiffs' experts take issue with the fact that USASF restricted Tier 1 event producer membership to 42 bid events. Again, this rule has been in place since at least 2012.[67]

(3) Plaintiffs' experts further take issue with the fact that "[p]riority for Tier 1 cheer membership is given to event producers based on their seniority as USASF members," and that protecting event producers with seniority is predicated on the goal of "recogniz[ing] the contribution made by early USASF supporters whose financial support made the Worlds possible initially."[68] These policies are memorialized in USASF's Approval Process & Criteria for Tier 1 and Tier 2 Event Producers and Worlds Bid Eligibility at least as early as 2012.[69]

(4) Plaintiffs' experts claim that the effect of USASF location/date rules that protect Worlds Bid Events is "to restrict new entry and competition among events."[70] These rules (*i.e.*, Guideline 3.B) have been in place since at least 2012.[71]

(5) Plaintiffs' experts claim that Varsity took advantage of the requirement that "event producers must have at least 125 level five teams attend a competition to continue giving out bids in future years."[72] This requirement, however, was adopted and announced by December 2014.[73]

---

[63]  *See, e.g.*, *Heeb Report*, ¶ 96; *Aronoff Report*, ¶ 60.

[64]  *See, e.g.*, *Maki Report*, ¶65; *Netz Report*, § V.D.7.b.

[65]  USASF_00032454-5.

[66]  USASF_00081398-402, at 399 (listing as one of the benefits of Tier 1 membership "[h]ave a seat to participate on the USASF Sanctioning Committee").

[67]  VAR00319008-10, at 08 ("For the 2012-2013 season, the USASF will not sanction more than 42 Cheerleading Worlds qualifying events in the US."). *See also*, n. 43.

[68]  *Heeb Report*, ¶¶ 207-208; *Netz Report*, pp. 17, 71.

[69]  VAR00319008-10, at 08 ("Priority will be given to members based upon their seniority as USASF member event producers."); *Id.,* at 10 ("Another goal is to recognize the contribution made by the early USASF supporters whose financial support made the Worlds possible initially.").

[70]  *Heeb Report*, ¶¶ 205-206; *Netz Report*, p. 71.

[71]  USASF_00090186-8 (discussing the 200-mile rule in effect in 2010).

[72]  *Netz Report*, p. 71; *Heeb Report*, ¶ 214. I understand that USASF's policies include explanation of which All Star teams count towards the 125-team minimum, but that they do not restrict to level 5 teams, as Dr. Netz suggests.

[73]  VAR00348574-5; VAR00348595-600.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

In Section V, I also show that that Plaintiffs' experts' claims do not make economic sense or are not supported by the record evidence.

37.   In effect, Plaintiffs' experts' claims boil down to the assertion that USASF should have changed its rules—as established long before the alleged class period—in order to prevent Varsity's alleged "control" of the relevant markets, and that the only plausible explanation for why it did not do so is the alleged collusion with Varsity.[74]  Plaintiffs' experts do not even attempt to show that the USASF rules they take issue with were both consistent with conspiratorial conduct and inconsistent with legitimate, non-conspiratorial conduct—*at the time they were implemented*.

38.   Despite claiming that USASF conspired with Varsity to "enforce rules selectively against Varsity's rivals,"[75] Plaintiffs' experts provide no clarity on the details of what Defendants agreed to or how they aimed to implement the alleged conspiracy, and do not point to any behavior by USASF that took place during the alleged class period (*e.g.*, new policies, changing rules) that created a material, anticompetitive advantage for Varsity beyond what Varsity obtained by itself.

39.   Rather than identifying any material rules USASF implemented for the benefit of Varsity during the class period (or that it "selectively" enforced against Varsity's rivals), Plaintiffs' experts simply speculate that, absent the alleged conduct, USASF "would be expected to implement different policies."[76]  Of course, the fact that USASF, in hindsight, *could* have implemented different, perhaps better rules (under some undefined criterion) years before the alleged class period does not imply that there was a conspiracy between USASF and Varsity, as Plaintiffs' experts claim.  As such, Plaintiffs' experts fail to demonstrate any conspiracy involving USASF.  Moreover, Plaintiffs' experts do not even attempt to demonstrate empirically that their proposed rules would have been superior if they had been implemented in the past; nor do they demonstrate that the reason USASF did not implement their preferred rules was the conspiracy Plaintiffs allege.

40.   Central to Plaintiffs' experts' arguments is the claim that the alleged conspiracy with USASF enabled or facilitated Varsity's exclusion of its competitors and dominance of "all aspects of Competitive Cheer."[77]  To support such a claim, Plaintiffs' experts need to demonstrate that, through coordinated, anticompetitive actions with USASF, Varsity obtained a presence in the marketplace that it would not have obtained by itself, for example, through its acquisitions and other conduct.  That is, if Varsity's current marketplace position is solely the result of its own actions (regardless of

---

[74]   In some cases, rather than pointing to a particular action or rule implementation by USASF in conspiracy with Varsity during the alleged class period, Plaintiffs' experts' allegations appear to fault USASF for not changing its long-established rules in a way that would have directly discriminated against Varsity.  *See, e.g.*, *Aronoff Report*, ¶¶ 112, 114, 116, 122.  As an economist, I will not opine on whether USASF was legally obligated or even allowed to enforce competition laws.  I note, however, that sports organizations do not typically take the antitrust enforcer's role—that responsibility falls on very capable and well-staffed government agencies, such as the U.S. Department of Justice and the Federal Trade Commission.

[75]   *Netz Report*, p. 4; *Maki Report*, ¶ 71.

[76]   *Netz Report*, p. 113.

[77]   *See, e.g.*, *Netz Report*, p. 4; *Heeb Report*, ¶ 215; *Maki Report*, ¶¶ 61, 65; *Aronoff Report*, ¶ 86.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

whether those actions were procompetitive or anticompetitive), then Plaintiffs' experts cannot claim the alleged conspiracy with USASF had any effect on the marketplace.

41. In fact, Plaintiffs' experts' own empirical analyses are inconsistent with the claim that USASF materially enhanced Varsity's competitive position in the marketplace above what Varsity obtained by itself. For example, Dr. Netz claims that, as a result of its acquisitions, by 2018, Varsity had reached a 75% to 85% revenue "market" share of "All Star Competitions."[78] At the same time, she claims that Varsity eventually controlled 36 out of 46 of Worlds Bid Events (78%) and their associated seats on the USASF Sanctioning Committee.[79] As such, using Dr. Netz's own calculations, she cannot show that Varsity enjoyed, to any material extent, any increased participation in Worlds Bid Events or the USASF Sanctioning Committee beyond what was driven by its acquisitions of event producers. In other words, Plaintiffs' experts do not provide any evidence that USASF's behavior created any increment in Varsity's share of Worlds Bids or seats on the Sanctioning Committee beyond what Varsity obtained by itself through acquisitions and other independent behavior.[80]

## B.    Plaintiffs' Experts Ignore Varsity's Procompetitive Contributions to USASF

42. Plaintiffs' experts claim to describe the various ways in which Varsity "controlled" USASF from its inception. They describe, for example, Varsity's initial funding of USASF; the sharing of office space; USASF's agreement with Varsity for the processing of the payroll for USASF's employees; and USASF's licensing of Varsity's trademarks.[81] Not only do Plaintiffs' experts' fail to demonstrate that these claimed influences imply a conspiracy between USASF and Varsity, but they, in fact, point at actions that are, in principle, *procompetitive*—because Varsity contributed to the development of

---

[78]    *Netz Report*, pp. 52, 99. Dr. Heeb estimates that Varsity had a 76% revenue share at the end of the 2017-2018 season (*Heeb Report*, ¶ 178).

[79]    *Netz Report*, pp. 53, 101. Dr. Heeb claims that "Varsity owns 34 of the 42 Tier 1 event producers and therefore 34 of the 42 voting seats in the Sanctioning Committee." (*Heeb Report*, ¶¶ 87, 210). Under Dr. Heeb's calculation, Varsity's share would be 81%. *See, id.*, Table 13.

[80]    This is also evident in Dr. Heeb's analysis, which concludes that "*[t]hrough acquisitions,*" Varsity's share of paid bids increased to 80% in the 2018-2019 season (*Heeb Report*, ¶ 216 (*emphasis added*)).

[81]    *Netz Report*, § III.B.2, pp. 20-21 ("Varsity provided the USASF with financial assistance, including a $1.8 million interest-free loan and a guaranteed 'rainy day' fund. The USASF stated that Varsity 'secures the loan' by retaining the rights to the USASF trademark and intellectual property. The USASF repaid the loan in 2013. Varsity and the USASF were enmeshed in other ways as well. For example, the USASF offices were located within Varsity's offices, and through 2015, USASF employees were employees of Varsity and were paid by Varsity, which was then reimbursed by USASF."). *See also*, *Aronoff Report*, ¶ 58 ("Varsity has exercised control over the USASF since the organization's inception. The initial funding for the organization as provided by Varsity in the form of a $1.8 million interest free loan. For at least the first 15 years of its existence, USASF offices were located at Varsity's corporate address, a Varsity representative answered the phone for USASF, and USASF employees were paid directly by Varsity. Additionally, Varsity owned USASF's trademarks until 2017."); *Heeb Report*, ¶ 84 ("Though considered a separate entity, Varsity created and funded the USASF… From approximately 2004 through 2015, USASF shared office space with Varsity and during that period Varsity processed the paychecks of USASF employees under its own name, for which USASF reimbursed Varsity.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

USASF as a sanctioning organization, which benefited all members of the organization, including Varsity and other event producers.

43.  There are several problems with Plaintiffs' experts' claims that Varsity "controlled" USASF.  *First*, none of these observations by Plaintiffs' experts imply that Varsity and USASF conspired to the benefit of Varsity or that USASF's actions would have been any different but-for the alleged conspiracy.  *Second*, most of these claimed influences were in place prior to the alleged class period—and some even ended prior to the class period (*e.g.*, Drs. Netz and Heeb acknowledge that USASF moved out of Varsity's offices in 2015).[82]  That is, Plaintiffs' experts provide no evidence of any material change in rules or behavior during the class period to support their conclusion of conspiracy.  *Third,* Plaintiffs' experts provide no analysis that even attempts to show that the outsourcing of services to Varsity somehow created an anticompetitive advantage for Varsity in any relevant market.

44.  As Plaintiffs' experts acknowledge, USASF *repaid* Varsity for payroll expenses.[83]  USASF similarly *paid* Varsity rent for the space it occupied.[84]  Dr. Heeb also acknowledges that USASF has, from its outset, *paid* Varsity an annual management fee to produce Worlds,[85] and to leverage Varsity's relationships at ESPN and Disney to host its championship event.[86]  It is often efficient for a company or any organization of small size, such as USASF at its inception,[87] to outsource certain services (such as payroll, insurance, accounting, promotional events, etc.) rather than providing them in-house.

45.  Indeed, providing or enabling USASF to outsource these services are important *contributions* that Varsity made to USASF.  In fact, I understand that to a large extent it was Varsity's initiative and funding that led to the creation of USASF—and the Worlds.[88]  No other event producer contributed as much to the development of USASF—which in turn benefited the organization; event producers that joined as members or that follow USASF's safety rules and best practices; as well as athletes, gyms, and coaches.  As such, these contributions are procompetitive.  Plaintiffs' experts provide no analysis showing that the outsourcing of services to Varsity somehow created an anticompetitive advantage—and they certainly fail to identify how the renting of office space from Varsity, for example, influenced any USASF rules during the alleged class period.

---

[82]  *See*, *Netz Report*, pp. 20-21; *Heeb Report*, ¶ 84.  As Mr. Aronoff acknowledges, USASF also obtained the rights to its trademarks less than one year into the alleged class period (*Aronoff Report*, ¶ 58, citing USASF_00032524-9 (*Chadwick Dep.*, Exhibit 7) and *Chadwick Dep.*, 154:4-156:5).

[83]  *Netz Report*, p. 21; *Heeb Report*, ¶ 84.

[84]  *Chadwick Dep.*, 257:22-25 ("We were paying Varsity rent for the space we had all along.").

[85]  *Heeb Report*, ¶ 80 and n. 46.

[86]  VAR00253877-81, at 77.  *See also*, *e.g.*, *Chadwick Dep.*, 256:15-257:4, explaining the "operations" role that USASF paid Varsity to perform at Worlds.

[87]  I understand that USASF currently only employs approximately 20 full-time employees.  (Interview with Jim Chadwick, September 20, 2022.)  *See also¸* USASF, *Staff*, https://www.usasf.net/staff.

[88]  *See*, *e.g.*, *Newby Dep., March 23, 2022,* 227:12-15 ("[T]he USASF was a membership organization that – that [Varsity] helped to create and form and invest in, when nobody else was willing to do that."); and *Fowlkes Dep.*, 41:22-42:6.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### C.  Dr. Netz Provides No Reliable Evidence that USASF Failed to Uphold Its Mission

46.  Dr. Netz concludes that "[i]n the but-for world … USASF would act as an independent sanctioning body in the best interests of the sport as a whole[,]"[89] thereby implying that USASF failed to uphold its mission[90] of promoting the "best interests" of All Star Cheer participants.[91]  Dr. Netz also claims that USASF, in coordination with Varsity, engaged in conduct to disadvantage or eliminate Varsity's competitors rather than acting as an independent sanctioning body "in the best interests of the sport as a whole."[92]  Because Dr. Netz does not demonstrate that Varsity's alleged dominance was caused by USASF's actions (as opposed to Varsity's own conduct), Dr. Netz assumes the conclusion that USASF failed to uphold its purported missions.

47.  Moreover, as discussed in Section III.B above, and in Plaintiffs' experts' own reports,[93] USASF had multiple goals and missions.  And such goals and missions may be, at times, in tension with each other.  As such, it is incorrect to characterize USASF as having a single mission, assert that USASF's actions failed to meet that particular mission (without even evaluating whether there are multiple ways to meet objectives), and then conclude that USASF behaved anticompetitively because it failed to meet that particular goal or mission.

48.  For example, Dr. Netz implies that one of USASF's goals is to promote "the best interests of the sport as a whole, on behalf of all event producers, apparel providers, camp providers, coaches, and athletes."[94]  However, in any economic activity, the interests of various participants will collide, such that any sanctioning organization cannot promote the interests of all industry participants at the same time.  Similarly, whereas USASF strives to provide *safety* for All Star athletes, another of its goals is to promote *competitive excellence*.[95]  It is common in sports to find this trade-off between safety and "aggressive play" that consumers of the sport may value.[96]  For example, depending on who one asks, a particular tumbling rule may allow for more daring cheer routines and hence foster competitive excellence, or it may be considered simply unsafe.  Plaintiffs' experts' simplistic arguments ignore that USASF's rules have to balance these conflicting goals.

---

[89]    *Netz Report*, p. 5.

[90]    *See, e.g.*, *Netz Report*, p. 84.

[91]    *See, e.g.*, *Netz Report*, pp. 5, 113.

[92]    *Netz Report*, pp. 4-5.

[93]    *See, e.g.*, *Netz Report*, pp. 19-20 ("The stated objective of the USASF was the same as the NACCC – setting standard rules for All Star Cheerleading."); *Maki Report*, ¶ 23 ("USASF is a non-profit organization founded by Varsity in 2003 with the goal of ensuring that All-Star is a safe sport 'by establishing fair and consistent rules and competition standards'…  The organization also establishes guidelines not directly related to safety rules, but 'important to the integrity of the sport'.").

[94]    *Netz Report*, p. 5.

[95]    USASF, *Mission & History*, https://www.usasf.net/about ("We provide consistent rules, strive for a safe environment for our athletes, drive competitive excellence, and promote a positive image for the sport.").

[96]    *See, e.g.*, Wright, Joshua (2010), "Optimal Sanctions for NFL Hits," *International Center for Law & Economics.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

49.  Finally, even if Dr. Netz were able to show that USASF failed to meet its objectives as a sanctioning organization (which she has not), all that does is to show that USASF did not do a good job as a sanctioning organization.  Or, more precisely, that, with the benefit of hindsight, Dr. Netz would have preferred for USASF to adopt different rules many years before the class period.  What it does not show is that USASF engaged in anticompetitive behavior in coordination with Varsity.

### D.    Plaintiffs' Experts Ignore Data that Contradict Their Conclusions

50.  Central to Plaintiffs' experts' theory of harm are speculations that certain USASF rules and behavior favored Varsity in the allocation of Worlds Bid Events—in particular, through Varsity's presence in USASF's Sanctioning Committee, USASF's requirements for approving Worlds Bid Events, and Varsity's competition with other event producers for hosting Worlds Bid Events.  However, Plaintiffs' experts do not review any data or conduct any empirical analysis to assess whether the USASF's rules they challenge had, in fact, *any effect* on how many Worlds Bid Events Varsity controlled during the alleged class period.

51.  As I discuss in more detail in Section V.B below, the available data on Worlds Bid Events directly contradict Plaintiffs' experts' speculations, and instead show that, during the class period, there was no material change in Varsity's share of Worlds Bid Events beyond what Varsity obtained unilaterally (*i.e.*, through acquisitions of event producers).  As such, Plaintiffs' experts' claims are simply speculative, unscientific, and not supported by the record evidence.

### E.    Plaintiffs' Experts Provide No Reliable Evidence that the Alleged Conspiracy Impacted School Cheer

52.  Although Plaintiffs' experts' theory of conspiracy points to a variety of alleged conduct involving Varsity and USASF (the sanctioning organization for All Star Cheer), Plaintiffs' experts do not limit their allegations of harm from that conduct to All Star Cheer.  Instead, Plaintiffs' experts assert that the alleged conspiracy between USASF and Varsity created anticompetitive effects in markets related to "competitive cheer," which they claim include participants from both All Star gyms *and school teams*.[97]

53.  Plaintiffs' experts fail to explain how USASF rules and policies—such as the composition of USASF's Board of Directors and Sanctioning Committee, or its competition or apparel rules—would have any impact on School Cheer, which consists of separate competitions and is governed by a different sanctioning organization that sets its own rules.[98]  For example, even if Plaintiffs' experts had provided evidence that USASF's apparel rules were anticompetitive—*which they have not*,[99] those rules only apply to All Star Cheer competitions, and as such, without further analysis, Plaintiffs' experts could only infer harm related to All Star.  They cannot simply assume that any

---

[97]    *See, e.g., Netz Report*, p. 3.

[98]    *See* n. 32.

[99]    *See* Section V.F.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

anticompetitive effect of USASF's rules would *also* impact School Cheer—which represents the majority of Plaintiffs' experts' "competitive cheer" description.[100]  In other words, Plaintiffs' experts fail to demonstrate that any impact of the alleged conspiracy would have effects outside of All Star Cheer.  If anything, they provide support for the fact that All Star represents only one segment within the broader discipline of cheerleading.

## V.  Analysis of USASF's Rules and Behavior During the Class Period Demonstrates No Economic Evidence of Anticompetitive Conduct

54.  I now discuss each of Plaintiffs' experts' main claims related to the alleged conspiracy between USASF and Varsity, and explain that the facts and economics of this case show that USASF's behavior was either inconsistent with the alleged conspiracy, consistent with legitimate, pro-competitive behavior, or both.

### A.  Plaintiffs' Experts Do Not Provide Economic Support for Their Claim that USASF Changed Its Governance Structure to Advantage Varsity

55.  Plaintiffs' experts claim that USASF's governance structure and allocation of Board Seats for Event Producers allowed Varsity to "achieve[] implicit control of the Board of Directors of the USASF."[101]  In particular, they claim that, as a result of Varsity's acquisitions, Varsity has owned all of the permanent Board seats for event producers.[102]

56.  Notably, these allegations do not involve actions taken by USASF during the alleged class period.  In fact, USASF's bylaws governing the composition of its Board of Directors have been in place since September 2005—essentially since USASF's inception.[103]  And Plaintiffs' experts do not point to a single piece of evidence suggesting that USASF in any way altered its existing rules, or its enforcement of them, to allow Varsity to gain board seats it would not have otherwise gained through its own behavior (*i.e.*, acquisitions made unilaterally).  Further, nothing about the rules at

---

[100]  *See, e.g., Heeb Report*, ¶ 127, noting that school cheer represents "about 60-75% of competitive cheer teams."

[101]  *Netz Report*, p. 96.

[102]  *Heeb Report*, ¶ 203 ("Varsity either held or acquired all the event producers that have permanent seats on the USASF Board of Directors"); *Aronoff Report*, ¶ 60 ("Varsity effectively controls the USASF Board of Directors.  Currently, the USASF Board has 13 voting seats: The Chairman, one senior staff member, four gym owners, and seven event producers.  The seven event producer Board seats are for each of the event producers that founded the USASF.  All seven event producer Board seats have come to be controlled by Varsity by way of acquisitions").  *See also*, *Netz Report*, pp. 21-22 ("Over time, Varsity acquired all of the competing rival event producers on the USASF Board of Directors, with the last acquisition (JAM Brands) coming in 2015… Currently, six of the thirteen USASF board seats are filled by permanent member brands, all of which are Varsity brands.").

[103]  USASF_00032454-5.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

issue even mention Varsity[104]—nor do Plaintiffs' experts claim that they do.  Thus, Plaintiffs' experts fail to show that USASF's rules favored Varsity or that any other event producer could not have benefited from the rules in the same way.

57. Despite Plaintiffs' experts' failure to describe any role for USASF in Varsity's obtaining Board seats, Mr. Aronoff suggests that, "[t]o provide relief, the USASF or any future governing body, can restructure the Board to better represent non-Varsity market participants and to ensure that no single Competitive Cheer market participant has inappropriate influence or control regarding governance decisions."[105]  However, Mr. Aronoff does not identify how USASF's bylaws should change to "better represent non-Varsity market participants," or whether it is even feasible—or would have been feasible at any point during the alleged class period—for USASF to change its bylaws to do so.  Further, even if it were possible for USASF to have changed its bylaws in the way Mr. Aronoff suggests, one cannot conclude that doing so would necessarily be a good idea without conducting an economic analysis of how the change would affect event producers' incentives and the resulting competitive effects (which Mr. Aronoff does not analyze).

58. Plaintiffs' experts also ignore potential procompetitive reasons for USASF to implement its bylaws in 2005—more than ten years before the alleged conspiracy period.  They fail to analyze, for example, (i) whether those rules—at the time—were necessary to ensure sufficient participation and investment by event producers; and (ii) whether alternative, more restrictive rules would have raised concerns among event producers, coaches, and gyms.  As noted above, sanctioning organizations need to manage the tension between establishing rules that encourage fair competition and structuring those rules in such a way that participants—including Varsity, which led the initial efforts to develop USASF as a sanctioning organization—are sufficiently incentivized to adhere to them.[106]  Considering the need to attract event producers at its inception, I find it reasonable for USASF to have the rules it had.  And because Plaintiffs' experts fail to analyze the procompetitive reasons for these bylaws, they cannot demonstrate that such bylaws are anticompetitive.

59. In fact, several of USASF's bylaws and amendments were adopted in 2005 and 2006 at the behest of other, then non-Varsity, event producers.  For example, Cheersport, a non-Varsity event producer in 2006 which had been allocated a USASF board seat, proposed the bylaw amendment requiring unanimous consent to replace any of the nine permanent USASF Board seats, as a means of protecting Cheersport's voice on the Board.[107]  JAMfest, another non-Varsity event producer at the time, likewise enjoyed similar protection with a permanent seat on the USASF Board "based on similar concerns."[108]  In other words, at the time that USASF's bylaws and amendments were adopted in 2005 and 2006, they were adopted to protect the voice of other event producers on USASF's Board.  Similarly, USASF adopted a tiered membership system for event producers in 2005

---

[104]    *Id.*

[105]    *Aronoff Report*, ¶ 122.

[106]    *See* Section III.C.

[107]    VAR00351488-91, at 89.

[108]    *Id.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"to allow companies to tailor their USASF membership level to both their budgets as well as the value they perceive receiving from the USASF."[109]  The reasoning behind this structure was to "help smaller companies join the USASF, allow larger companies that may not have All Stars as a major part of their competition mix reap more value from their USASF investment, and help companies that want to take full advantage of USASF membership to better differentiate themselves from the balance of USASF members."[110]  In other words, contrary to Plaintiffs' claims, the tiered membership system for event producers was designed to benefit *all* types of event companies that might want to join the USASF.

## B.    Plaintiffs' Experts Do Not Provide Economic Support for Their Claims that USASF Changed or Selectively Enforced Its Rules Regarding World Bid Events to Favor Varsity

60.    Plaintiffs' experts take issue with USASF's rules and policies regarding how and when to sanction Worlds Bid Events.  They present a lengthy discussion that, in sum, concludes that USASF's rules related to sanctioning—in particular, the composition of its Sanctioning Committee, how it evaluated applicants for new Worlds Bid Events, when (and how many) new Worlds Bid Events it sanctioned, and where and when those events could be held—advantage Varsity and "exclude and disadvantage" its rivals.[111]  In this section, I address each of Plaintiffs' experts' allegations related to World Bid Events (and USASF's sanctioning rules) and show that none of Plaintiffs' experts' claims support a conclusion of conspiracy between USASF and Varsity.

61.    Critical to all these claims, however, is that Plaintiffs' experts fail to offer any data analysis supporting their speculations—and their claims are simply contradicted by the record evidence.  The available data on Worlds Bid Events show that there was no material change in Varsity's share of Worlds Bid Events beyond what Varsity obtained unilaterally (*i.e.*, through acquisitions of event producers) between the 2015-2016 and 2019-2020 All Star seasons.[112]  Specifically, the ten incremental Worlds Bid Events that Varsity gained during this period were all obtained when it acquired competing event producers.[113]

62.    Further, only two new Worlds Bid Events were approved between the 2015-2016 and 2019-2020 All Star seasons, after two events—one owned by Varsity and one not owned by Varsity—failed to re-

---

[109]    USASF_00027858-61, at 58.

[110]    *Id*.

[111]    *See, e.g.*, *Netz Report*, § V.B.  *See also*, *Maki Report*, ¶ 65; *Heeb Report*, ¶ 206.

[112]    The period for which data are available.

[113]    *See* my backup materials.  I determined whether particular Worlds Bid Events were owned and operated by Varsity in each season based on USASF_00086125, USASF_00002776, USASF_00002779, USASF_00002782, USASF_00002785, VAR00010122-7, and VAR00462071-2, and supplemented my findings through communications my team had with Varsity counsel.  I find that Varsity owned and operated 23 Worlds Bid Events in the 2015-2016 season and acquired ten additional events between the 2015-2016 and 2019-2020 seasons.  The other nine Worlds Bid Events remained non-Varsity throughout the analysis period.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

qualify as Worlds Bid Events after the 2015-2016 season.[114]  Of the two events that were approved as replacements, one was owned by Varsity and the other remained non-Varsity through the end of the 2019-2020 season.[115]  That is, in net, the number of Worlds Bid Events owned by Varsity remained the same after these changes—contradicting Plaintiffs' claims that USASF's rules or behavior favored Varsity.

### 1.  USASF Did Not Change the Membership of Its Sanctioning Committee to Advantage Varsity During the Class Period

63.  Plaintiffs' experts claim that Varsity obtained "majority control" of USASF's Sanctioning Committee, and was therefore able to "use the Sanctioning Committee to disadvantage its rivals."[116]  As discussed above, each approved Tier 1 event producer holds a single voting seat on the Sanctioning Committee and votes are decided by majority.  Because USASF's rules allowed for no more than 42 Tier 1 event producers during the alleged class period, the Sanctioning Committee also had no more than 42 members during this period.  Varsity obtained its seats on the Sanctioning Committee unilaterally, i.e., by organizing events that qualified as Tier 1 events under USASF rules or through acquisitions of event producers.  Plaintiffs' experts do not even claim to provide evidence that USASF took actions to further Varsity's position in the Sanctioning Committee during this period.

64.  Indeed, the rules for the composition of the Sanctioning Committee—one seat for each Tier 1 event producer, with a maximum of 42 Tier 1 producers—have been in place since at least 2012,[117] a fact that none of Plaintiffs' experts refute.  And, at that time, Varsity did not have a majority of seats—in other words, at the time, the structure adopted by USASF gave non-Varsity event producers the majority of votes on the Sanctioning Committee.[118]  That Varsity obtained additional seats on the Sanctioning Committee by unilaterally acquiring the Tier 1 event producers that held those seats

---

[114]    I understand that Orlando Magic (a Varsity-owned event producer) and AmeriCheer (a non-Varsity event producer) each lost their status as a sanctioned Worlds Bid Event for the 2016-2017 season, after failing to meet USASF's team attendance requirements.  See, e.g., USASF_00019528-31; USASF_00020057-8.

[115]    See my backup materials.

[116]    Netz Report, p. 96 ("The Sanctioning Committee, which is of crucial importance because of its power to allocate Worlds bids and approve the dates and locations of Worlds bid events, is composed of Tier 1 event producers that have Worlds bid events, with representation in proportion to the number of Worlds bid events.  Prior to the JAM Brands acquisition [in 2015], Varsity held 16 of 35 seats on the USASF Sanctioning Committee.  By adding JAM Brands' five seats on the Sanctioning Committee, Varsity gained a majority control that it has maintained until today.  This gave Varsity the ability to use the Sanctioning Committee to disadvantage its rivals.").  See also, Heeb Report, ¶¶ 205-206.

[117]    USASF_00081398-402, at 399 (listing as one of the benefits of Tier 1 membership "[h]ave a seat to participate on the USASF Sanctioning Committee").

[118]    See my backup materials.  Using USASF_00080543 and communications my team had with Varsity, I find that Varsity owned and operated no more than 14 out of 32 Tier 1 events in the 2011-2012 season.  I understand that Varsity similarly held the minority of Sanctioning Committee seats in the 2010-2011 season, when the policy limiting Worlds Bid Events to 42 would likely have been voted on.  I also understand that Guideline 3.B, which existed in the same form from at least 2012-2020, would also have been voted on and approved during a time when Varsity held only a minority of Sanctioning Committee seats.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

(under rules predating the class period) does not support Plaintiffs' allegations of conspiracy between USASF and Varsity.  Plaintiffs' experts are unable to point to any rule that USASF implemented or changed—or any rule that it deviated from or did not enforce—that resulted in Varsity gaining seats on the Sanctioning Committee that it would not have otherwise obtained through its own (unilaterally performed) acquisitions.[119]  Further, nothing about the rules at issue even mention Varsity[120]—nor do Plaintiffs' experts claim that they do.  Thus, Plaintiffs' experts fail to show that USASF's rules favored Varsity or that any other event producer could not have benefited from the rules in the same way.

65.    Nonetheless, Mr. Aronoff suggests that "to provide relief, Varsity cannot have *any involvement* with or control over the bid assigning and bid awarding process" because he argues that Varsity's involvement "is a conflict of interest and puts non-Varsity event producers at a disadvantage."[121]  Mr. Aronoff's recommendation is illogical because the same reasoning can be applied to any event producer: that is, if it is a conflict of interest for Varsity to participate in the Sanctioning Committee, it is conflict of interest for all other event producers.  Mr. Aronoff ignores that there are clear procompetitive reasons for event producers that host Worlds Bid Events to have representation on the committee governing the approval of those events.  Without that representation, these event producers may not have sufficient incentive to invest in hosting World Bid Events.  Further, given their experience hosting Worlds Bid Events, such event producers are well equipped to advise on and propose sanctioning rules.[122]  To be clear, Mr. Aronoff does not go so far as to suggest that there is no role for event producers on the Sanctioning Committee *at all*—he simply calls for the exclusion of one specific event producer: Varsity.  Thus, Mr. Aronoff's claim, that there can be a role for event producers on the Sanctioning Committee, but that Varsity, the largest event producer, should be intentionally barred from participating, is contradictory and illogical, at best.

---

[119]    In fact, Plaintiffs' experts appear to concede that Varsity obtained its Sanctioning Committee seats unilaterally (through its acquisitions).  *See, e.g.*, *Maki Report*, ¶ 65 ("Through its acquisitions, Varsity has gained permanent majority control of the USASF Sanctioning Committee."); *Netz Report*, p. 22 ("When Varsity acquired JAM Brands in late 2015, it gained control of its seats on the Sanctioning Committee, giving it a permanent majority."); *Netz Report*, p. 67 ("[B]y the end of 2015, Varsity controlled a permanent majority of the USASF Sanctioning Committee seats.  This control was achieved in large part through its anticompetitive acquisition strategy…"); *Heeb Report*, ¶¶ 209-210 ("Voting seats in USASF's Sanctioning Committee, which votes on rules for Worlds bids, were determined by the number of Tier 1 event producers. The total number of Tier 1 event producers was 42, so ownership of 22 Tier 1 event producers would provide a company with a majority of the voting seats in the Sanctioning Committee. Varsity owned, following its acquisition of competing event producers, substantially more than 22 Tier 1 event producers.").

[120]    USASF_00081398-402.

[121]    *Aronoff Report*, ¶¶ 111-112 (*emphasis added*).

[122]    Mr. Chadwick provided a similar reasoning for why USASF's Sanctioning Committee is comprised of Worlds Bid Event producers.  In particular, he noted that such event producers are well-suited to propose rules because they are among the most sophisticated and knowledgeable participants in All Star, and have the strongest incentives for Worlds Bid Events to be successful.  (Interview with Jim Chadwick, September 20, 2022.)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

66. Further, as explained above, USASF did nothing to favor Varsity with respect to the composition of its Sanctioning Committee during the alleged class period. All that Plaintiffs' experts claim is that Varsity, as the largest event producer, benefits more from certain preexisting rules. But such an argument could be made of any procompetitive action that benefits event producers—that is, in absolute terms, it would benefit more the larger event producers. It does not imply that the rule provides such firms with an anticompetitive advantage over their competitors, as Plaintiffs' experts incorrectly suggest. Instead, Mr. Aronoff's proposal appears to claim that USASF should implement rules that discriminate *specifically against Varsity*, by eliminating its role on the Sanctioning Committee. Plaintiffs' experts fail to identify what those rules should look like, or whether they would be legal—if feasible at all—or to provide any analysis supporting that the results of such a rule change would be procompetitive. It is not the role of a sanctioning organization to adopt the discriminatory approach Plaintiffs' experts propose.

### 2. Plaintiffs' Experts Do Not Provide Economic Support that USASF Changed or Selectively Enforced Its Worlds Bid Event Approval Rules to Advantage Varsity During the Class Period

67. Plaintiffs' experts also claim that USASF's sanctioning rules governing Worlds Bid Event eligibility and approval "favor" Varsity.[123] In particular, Plaintiffs' experts suggest that USASF's policies of (i) limiting the number of Worlds Bid Events in a season and (ii) prioritizing "event producers based on their seniority as USASF members" when evaluating applications for new Worlds Bid Events provide Varsity with an advantage over competing event producers and aided Varsity in "fully control[ing] Tier 1 cheer competitions."[124]

68. With respect to the maximum of 42 Tier 1 events, Plaintiffs' experts provide no reliable economic support for their claim that such a limit is anticompetitive. In particular, Plaintiffs' experts present no analysis evaluating the competitive aspects of such a rule *vis-à-vis* alternative rules. Sanctioning organizations, or any event organizer for that matter, need to balance two opposing forces when hosting "championship" events: On the one hand, they want to make the event accessible so as to attract participants, but on the other hand, if everybody can access the event, the perceived value of the event (and the trophy) is diminished. As such, organizers have to somehow limit the number of

---

[123]    *Heeb Report*, ¶ 207.

[124]    *Heeb Report*, ¶ 207 ("USASF's rules and procedures in structuring sanctioning events and the awarding of Worlds bids favored Varsity's acquisition strategy as a mechanism to fully control Tier 1 cheer competitions. For example, USASF Tier 1 event producer membership was restricted to 42 bid events… Priority for Tier 1 cheer membership is given to event producers based on their seniority as USASF members"). *See also, Netz Report*, p. 71 ("As explained above, there has been a limited number of bids to The Cheerleading Worlds and these bids were allocated to event producers based on seniority."); *Heeb Report*, ¶ 212 ("Producers seeking to award bids to USASF Worlds events submit applications to the Sanctioning Committee. Applications are prioritized based on membership date. Next, the Sanctioning Committee, where Varsity holds a majority of the voting seats, votes to approve World bids applications. Thus, not only does Varsity, as a senior member, have the advantage to retain its Tier 1 membership as an incumbent event producer, but has a majority of voting seats in the Sanctioning Committee that determines which event producers can offer new Tier 1 events.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

participants.  Documents from USASF provide a similar reasoning for limiting the number of Worlds Bids Events.  For example, the Sanctioning Committee's 2012-2013 approval process rules state that "the goal is to make Worlds qualifying events as accessible as possible for all star programs *without diminishing a qualifying event's prestige by over saturating any given market.*"[125]  Plaintiffs' experts fail to acknowledge that USASF's rules are consistent with procompetitive behavior.  (And, even if in hindsight, Plaintiffs' experts would have preferred that USASF established different rules, the fact that USASF could have adopted different rules in 2012 does not imply the presence of a conspiracy with Varsity.)

69.  Plaintiffs' experts also take issue with the fact that "[p]riority for Tier 1 cheer membership is given to event producers based on their seniority as USASF members."[126]  This allegation, similarly, does not involve actions taken by USASF during the alleged class period.  Indeed, the rules that govern the process of approving Worlds Bid Events have been in place since at least 2012—four years prior to the start of the alleged class period.[127]  Plaintiffs' experts do not even attempt to conduct any analysis to assess whether the challenged rules had any effect on the approval of Worlds Bid Events during the alleged class period.

70.  Moreover, Plaintiffs' experts' hindsight-based claims ignore critical context and potential procompetitive reasons for USASF to implement the rules it did.  They ignore, for example, that at the time USASF implemented the rules at issue, Varsity did not own a majority of Tier 1 event producers,[128] and that USASF's policies provide an objective standard through which to determine which events are approved, in the event that multiple events qualify to fill a single spot.  Plaintiffs' experts also similarly fail to consider, for example, whether those rules were necessary at the time to foster adoption of USASF's policies, incentivize membership, or encourage investment by event producers.  As noted above, sanctioning organizations need to structure rules in such a way that participants are sufficiently incentivized to adhere to them.[129]  It is economically reasonable for a company or organization to incentivize early investment by offering discounts, free items, or future rewards.  Without such analysis, Plaintiffs' experts cannot reliably claim that alternative rules would have been better for competition—let alone assert that USASF's existing rules demonstrate anticompetitive behavior.

---

[125]  VAR00319008-10, at 08 (*emphasis added*).

[126]  *Heeb Report*, ¶¶ 207-208; *Netz Report*, pp. 17, 71.

[127]  A document that outlines the "Sanctioning Committee's Approval Process & Criteria for Tier 1 and Tier 2 Event Producers and & [sic] Worlds Bid Eligibility" for the 2012-2013 season, suggests that "[p]riority will be given to members based upon their seniority as USASF member event producers" (VAR00319008-10, at 08), and that "[a]nother goal is to recognize the contribution made by the early USASF supporters whose financial support made the Worlds possible initially." (*Id.*, at 10).

[128]  Varsity did not obtain the majority of USASF's Sanctioning Committee, through its acquisitions, until 2016. *See e.g.*, *Peterson Dep., March 9, 2022*, 191:20-192:1; *Chadwick Dep.*, 163:6-9.

[129]  *See* Section III.C.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### 3.    USASF's "125 Team" Threshold for Worlds Bid Events Did Not Materially Advantage Varsity

71.    Plaintiffs' experts take particular issue with one of USASF's "new" sanctioning rules, which requires all event producers to "have a minimum of 125 All Star 'cheer' teams participating at the same prior year's competition to qualify" as a Tier 1, beginning in the 2016-2017 All Star season,[130] with a 1-year probationary period for event producers that fail to meet that threshold.[131]  However, as Dr. Netz implicitly acknowledges,[132] the 125-rule requirement was not a new rule introduced for the 2016-2017 season—instead, USASF simply updated its existing rules to remove an exception allowing event producers that joined USASF prior to the 2007-2008 season to continue awarding Worlds Bids with fewer than 125 (but at least 100) teams attending their events.[133]  The updated requirement was adopted and announced by December 2014, prior to the start of the alleged class period.[134]

72.    Plaintiffs' experts claim that USASF, in coordination with Varsity, "established the new 125 team threshold rule and created the probationary period."[135]  They further claim that the 125-team rule "provided the mechanism through which Varsity targeted specific event producers."[136]  Their claims appear to be based on Dr. Netz's speculation that "changes in the rules forced an increased number of independent event producers into a probation period, *most likely* the smaller event producers,"[137] and that "Varsity would *likely* be awarded the forfeited Worlds bids because of its USASF membership seniority."[138]  Similarly, Dr. Heeb speculates that the aim of such a strategy was to cause Varsity's rivals to fail to meet the minimum team threshold, and that the "released World bids would be available to be obtained by a new event producer, which could include Varsity."[139]

---

[130]    *See, e.g.,* USASF_00019474-7, at 74, describing the rule.

[131]    *See, e.g., Netz Report,* p. 71.

[132]    *Netz Report*, p. 72 ("Prior to this rule being established, a Tier 1 event producer with a USASF membership date *during or before the 2007-08 season* only had to meet a 100-team minimum to continue offering Worlds bids.") (*emphasis added*).

[133]    *See, e.g.,* USASF_00030547-8, at 47 (August 2008 Board of Directors minutes approving the exception: "Tier 1 requirements for current Tier 1 members (those approved in 2007-08 or earlier) are reduced from 125 to 100 all star cheer teams.  All new Tier 1 applicants must meet the 125 all star team standard.").

[134]    VAR00348574-5; VAR00348595-600.  I understand that, at the time that this rule was announced (and presumably voted on), Varsity did not hold the majority of votes on the Sanctioning Committee.  *See* my backup materials.  Specifically, based on USASF_00085173 and communications between my team and Varsity counsel, I find that Varsity owned 16 out of 35 Tier 1 producers during the 2014-2015 season.

[135]    *Netz Report*, pp. 72-73.

[136]    *Netz Report*, p. 72.  *See also Heeb Report*, ¶ 214 ("Taking advantage of this rule and its market power, Varsity has engaged in an anticompetitive strategy of locating its own events near a rival's bid event in an effort to attract teams to participate in the Varsity bid event and discourage teams from participating in the rival's bid competition.").

[137]    *Netz Report*, p. 73 (*emphasis added*).

[138]    *Netz Report*, p. 74 (*emphasis added*).

[139]    *Heeb Report*, ¶ 214.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

However, Plaintiffs' experts provide no factual analysis supporting their speculation that the rule benefited Varsity at the expense of its rivals.

73. In fact, the available data contradict Plaintiffs' experts' speculations. The data on Worlds Bid Events show that the implementation of the 125-team threshold did not cause any material change in event producers' participation that favored Varsity. Only two event producers lost their Worlds Bids between the 2015-2016 and 2019-2020 All Star seasons after the rule went into effect.[140] I understand that both of these events—Varsity-owned Orlando Magic's "Showdown in O'town" and AmeriCheer's "Buckeye Open National Championships"—were Tier 2 producers during the 2015-2016 season,[141] at which time USASF eliminated the Tier 2 category.[142] Since both events had fewer than 125 teams compete in both the 2014-2015 and 2015-2016 seasons, they failed to qualify as Tier 1 event producers for the 2016-2017 season and lost their ability to award Worlds Bids.[143] In the place of Orlando Magic and AmeriCheer, two new event producers qualified as Tier 1 for the 2016-2017 season: Varsity-owned Encore Championships, and non-Varsity Greater Midwest Cheer Expo. In other words, when the 125-team threshold went into effect, Varsity lost one Worlds Bid Event and gained one Worlds Bid Event, and a non-Varsity event producer lost one Worlds Bid Event and a different non-Varsity event producer gained one Worlds Bid event. As such, Plaintiffs' experts provide just speculation—the evidence shows no material impact from the rule change.

74. Dr. Netz also claims that the probationary period "allows Varsity to both identify possible acquisition targets and/or sabotage those events that were struggling to meet the minimums."[144] Dr. Netz ignores the obvious procompetitive benefits of the addition of a probationary year relative to not having such an option for event producers (*i.e.*, relative to the situation in which the event producer loses its bid immediately after the number of teams falls below 125). The probationary period gives event producers a chance to maintain their bids by attracting 125 teams or more in the following year. As such, the event producer does not risk its investment on the off chance of having a single bad year. Because Dr. Netz does not specify any counterfactual rule, she provides no reliable analysis showing that the probationary period harmed competition—let alone showing that USASF engaged in anticompetitive behavior in coordination with Varsity.

---

[140] *See* my backup materials. The data available to me cover the 2015-2016 through 2019-2020 All Star seasons.

[141] *See, e.g.*, USASF_00019474-7, at 74 (noting that Orlando Magic had been a Tier 2 producer); USASF_00086125 (showing that Orlando Magic and AmeriCheer both could only award Partial Paid Bids to Worlds for the 2015-2016 season).

[142] *Peterson Dep.*, *March 9, 2022*, 158:7-9.

[143] *See, e.g.*, USASF_00019474-7, at 74 (noting that Orlando Magic's event was attended by 122 teams in the 2014-2015 season and 95 teams in the 2015-2016 season); USASF_00019528-31, at 28; USASF_00020057-8, at 57 ("Americheer is not eligible to award 2017 **Cheer** [sic] Worlds bids since Americheer was on probation during the 15-16 season and not making the 125 team minimum requirement for the 16-17 season.").

[144] *Netz Report*, pp. 72-73. *See also id.* ("This information allows Varsity to selectively target the event promoters and events that are most likely to result in Varsity obtaining additional Worlds bids.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

4.   **Plaintiffs' Experts' Claims that Guideline 3.B Restricts Entry and Competition Is Unfounded**

75.   USASF's Sanctioning Committee Guideline 3.B provides that "Tier 1 and Tier 2 events will be protected, within a four week window, either side of the current bid giving event for a 200 mile radius" and "protected for a 500 mile radius from other bid giving events on the same weekend."[145] Dr. Heeb claims that the effect of such rules is to "restrict new entry and competition among events," presumably to the benefit of Varsity.[146]

76.   Guideline 3.B has been in place since at least the 2012-2013 season.[147]  Plaintiffs' experts do not provide evidence that, during the alleged class period, USASF implemented or enforced Guideline 3.B in a way that favored Varsity.  In addition, Guideline 3.B sets forth location and date requirements for all Worlds Bid Events, not only Varsity's.  As such, to the extent that it protects Varsity's events from competition, it provides a similar protection to Varsity's competitors.  Because Plaintiffs' experts do not even claim to provide any reliable analysis showing that Guideline 3.B was implemented for the benefit of Varsity, their arguments do not support any anticompetitive conduct by USASF.

77.   Critically, it is easy to see that there are legitimate, procompetitive reasons for USASF to spread out Worlds Bid Events over time and throughout the country.  As in any sport, the collective efforts of many event producers contribute to enhance the popularity of the sport by appropriately selecting times and locations that would be attractive to both participants and spectators.  This objective inherently involves a significant degree of cooperation among the sanctioning organization and the event producers.  In fact, spreading out events is standard for major leagues in the United States, which typically have rules that protect teams from local competition[148] in a "home territory," such as a metropolitan area.[149]  As such, teams cannot have matches—or even broadcast games—within another team's home area without first obtaining permission.[150]  Moreover, to have a real "World" championship event, it makes economic sense for USASF to avoid concentrating bid-awarding

---

[145]   VAR00319008-10, at 09.

[146]   *Heeb Report*, ¶¶ 205-206.  *See also*, *Netz Report*, p. 71 ("Event producer members of the USASF need permission from the USASF Sanctioning Committee to either move an event more than 200 miles or change the date if it is located too close to an existing member's bid event that had seniority. In other words, event promoters with earlier USASF membership dates are afforded protections for their events from possible new events being hosted in a similar area or date range.").

[147]   VAR00319008-10.  Other documents indicate that Guideline 3.B was actually in place, in some form, even earlier, at least as early as 2010 (s*ee, e.g.*, USASF_00090186-8, at 86 (discussing the 200-mile rule in effect in 2010).

[148]   I use the term "competition" here to discuss how teams compete, and not as "competition" within a marketplace, as in antitrust economics.

[149]   *Noll* (2003), p. 538.

[150]   Noll (2003) notes that when approval was given, it required substantial compensation: "For example, the New York Mets baseball team paid the New York Yankees $10,000,000 for the right to share New York City.  Similar deals were arranged to enable the California Angels to play in Los Angeles and the Oakland Athletics (A's) to play in the San Francisco–Oakland metropolitan area."  *Id.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

events in a few areas and "oversaturating" those regions while leaving large areas of the country unrepresented.[151]  Guideline 3.B is consistent with USASF's mission to spread All Star Cheer through the country, fostering access to All Star Cheer events in less densely populated areas rather than having event producers focus their efforts in the most profitable metropolitan areas.

78.   Shockingly, another of Plaintiffs' experts, Mr. Aronoff, proposes very similar rules to Guideline 3.B in his recommendations for relief ("Varsity cannot schedule a bid earning event in the same location or at the same time as any previously scheduled event")—but his proposed rules are targeted specifically at Varsity.  In other words, taken in sum, Plaintiffs' experts consider rules that limit event producers from hosting Worlds Bid Events in close geographic or temporal proximity to other Worlds Bid Events anticompetitive, unless they specifically target Varsity.  It is not the role of a sanctioning organization to adopt the discriminatory approach Plaintiffs' experts propose.  And, most importantly, it defies economic logic that the absence of such a discriminatory approach demonstrates a conspiracy between USASF and Varsity.

### 5.    Plaintiffs' Experts' Claims that Varsity Was Able to "Undercut" Events Hosted by Rivals with "Aid" from USASF Do Not Survive Scrutiny

79.   Dr. Netz also speculates that Varsity, with "the aid of information provided by the USASF," "undercut events hosted by rival event producers."[152]  Specifically, Dr. Netz claims that Varsity obtained from USASF information on which event producers were in "probation" (as a result of not meeting the 125-team minimum) and information on the World bids allocated to rival event producers.[153] However, I understand, and record evidence supports, that this type of information

---

[151]   *See, e.g., Peterson Dep., March 9,* 2022, 131:16-132:2, discussing Guideline 3.B ("Q. What is the purpose of this guideline?  A. It's in place to protect a specific region of the country that may be oversaturated with Worlds bid-qualifying events—and targeting—Yeah.  So that they're not, you know, targeting the same customers.  And, once again, it's to protect the number of bids being awarded versus the number of teams that are out there to receive those bids.")  *See also, Chadwick Dep.*, 59:20-60:3 ("So the intent was to try and spread out so you wouldn't have all the – all the events only being from Atlanta, which would disadvantage teams from Wyoming or wherever, because it would be more expensive for them to compete than it was elsewhere.  So there was an attempt to try and create a – a level playing field based on geography and on the number of teams that were there, and that the USASF rules would be followed.  And I think that was the basis for the bid allocation system.").

[152]   *Netz Report*, p. 73.  *See also, id.*, p. 4.

[153]   *Netz Report*, p. 73.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

was shared with Tier 1 event producers at least annually,[154] and was available to all USASF event producer members upon request.[155]

80. Once one considers that the information Dr. Netz refers to was largely available to all event producers, Dr. Netz's lengthy discussion simply boils down to the manner in which Varsity—*by itself*—competed with its rivals.[156]  It does not support any reliable claim of conspiracy with USASF. And, again, the empirical evidence shows that USASF, on balance, did not have any incremental effect on Varsity's control of Worlds Bid events.[157]

---

[154]    *See, Peterson Dep., Mach 9, 2022,* 83:10-13 ("I do send this list to event producers and also our working staff and those registration specialists that manage the registrations for Worlds so everybody is aware.")  *See also, e.g.,* USASF_00082519 (March 2013 email from Mr. Peterson to "Tier 1 & 2 Applicants," attaching the list of approved Worlds Bid Events and identifying event producers on probation (USASF_00082520)); USASF_00084032-5 (February 2014 email from Mr. Peterson to Sanctioning Committee, soliciting votes for Tier 1 and 2 approvals and attaching spreadsheet identifying event producers on probation (USASF_00084036)); USASF_00020212-3 (Forwarded February 2016 email from Mr. Peterson to Sanctioning Committee members, attaching a spreadsheet identifying event producers on probation (USASF_00020214)); USASF_00013105-6 (February 2017 email from Mr. Peterson to Sanctioning Committee, attaching the list of approved Worlds Bid Events and identifying event producers on probation (USASF_00013107)); USASF_00013111 (February 2018 email from Mr. Peterson to Cheer Sanctioning Committee members, attaching a list of applicants for Tier 1 spots (USASF_00013112) and noting that "all 42 2017-2018 Tier 1 members will be returning" if Aloha Productions "meet[s] the minimum number of teams at their upcoming event").

[155]    *See, e.g.,* USASF_00011972-5 (email in which Mr. Peterson provided Halliburton (Tier 3 producer) with the "Tier 1 waiting list" ahead of Halliburton and the names of event producers on probation); USASF_00087504 (email to Team Champion, attaching a spreadsheet summarizing Worlds Bid Events and probation status (USASF_00087505)); USASF_00085645-6 (email from Steve Peterson to an event producer, re-attaching a list of Worlds Bid Events indicating which producers are on probation (USASF_00085646)).  Mr. Peterson confirmed that he provided event producers with details regarding which Tier 1 event producers were on probation when asked.  (Interview with Steve Peterson, September 20, 2022.)

[156]    *See Netz Report,* § V.B.1.b.

[157]    *See* my backup materials.  In particular, Dr. Netz claims that Varsity acquired two Worlds Bid Events after event producers went on probation in early 2020 (*Netz Report*, p. 84).  USASF ultimately extended the probationary period for those two events (American Spirit Championships and CheerTech), in light of the effect the COVID-19 pandemic may have had on competition attendance.  *See,* USASF_00012988; The Cheerleading Worlds, *2022-2023 Bid Events Schedule,* https://thecheerleadingworlds.net/bid-events-schedule/, showing that both American Spirit Championships and Cheer Tech are still hosting Worlds Bid Events in the 2022-2023 season.  I understand that USASF subsequently approved two new non-Varsity Worlds Bid Events in addition to the two approved Varsity events (bringing the total number of Worlds Bid Events to 46).  Thus, after accounting for the full circumstances, this example does not support claims that USASF incrementally advantaged Varsity.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### C. Plaintiffs' Experts' Claims that USASF Prohibited Members from Participating in "Rivals' Events" Are Unfounded and Do Not Support Plaintiffs' Allegations of a Conspiracy

81. Dr. Netz incorrectly claims that "Varsity and the USASF forbid its member athletes, judges, gyms, and event producers from attending and hosting events that could undermine Varsity's dominance."[158]  More specifically, she claims that "USASF policy precludes any USASF member athletes, coaches, or judges from attending any year-end competitions that purport to either be 'World/International' or 'Worlds' competitions unless they are run by either Varsity or ICU."[159]

82. Critically, Dr. Netz misrepresents USASF's policies.  Dr. Netz incorrectly claims that USASF policy precludes member "*athletes, coaches, or judges*" from attending Worlds/International competitions unless they are run "by either *Varsity* or ICU."[160]  *First*, based on testimony from USASF, I understand that at all times relevant to this case, such a limitation did not apply to member athletes, coaches, or judges.[161, 162]  During this period, USASF has only had a limitation for *event producers* that prohibits them from affiliating with another event with "World" or "Worlds" in the name other than the USASF or ICU Worlds.[163]  As discussed below, such a rule makes economic sense.  *Second*, there is no

---

[158]    *Netz Report*, p. 85.

[159]    *Netz Report*, p. 85.

[160]    *Netz Report*, p. 85 (*emphasis added*).  I understand that the letter cited by Dr. Netz, from October 2011, was never authenticated as actually being written or distributed by Mr. Chadwick and/or Mr. Peterson and, as shown in deposition testimony and USASF's Company Member Agreement (referenced above), it does not accurately reflect USASF's policy.  *See Netz Report*, n. 337 (referencing USASF/IASF: Worlds Policy Update, Spirit Post, https://spiritpost.com/2011/10/usasfiasf-worlds-policy-update/).

[161]    *See* Deposition of Amy Clark March 31, 2022 (hereinafter, *Clark Dep.*), 45:25-46:2 ("The USASF doesn't take any disciplinary action against anybody that attends a non-sanctioned event."); 255:16-19 ("You can go to an unsanctioned event -- if you are a gym, you can go to one of those events.  We don't stop you from going to those events."); and 258:11-17 ("So, again, we did not police our members, as you say, saying that they could only attend sanctioned events.  That's -- that's not -- so -- so our members, our gym owners, who owned programs or clubs and their coaches could take their teams and athletes to any event they wanted, whether it was sanctioned or unsanctioned.").

[162]    Dr. Netz also claims, incorrectly, that there is evidence that the policy she describes was enforced (against a gym/team).  (*Netz Report*, p. 86, n. 341).  However, Dr. Netz appears to misrepresent the evidence.  Based on an email chain, she discusses "repercussions for a team that attended a 2017 event in Japan which *violated the USASF policy regarding 'world' events*."  (*Netz Report*, n. 341 (*emphasis added*)).  In the document cited, however, USA Cheer (not USASF) requested that USASF disqualify two owners of a gym from attending USASF events as coaches *as a result of a different violation*.  I understand that USA Cheer is the National Governing Body appointed by the U.S. Olympic Committee.  Under the Amateur Sports Act, USA Cheer is the exclusive body who can send teams to compete internationally on behalf of the USA.  As discussed in the email chain, the team that attended the 2017 event in Japan held itself as representing the USA without authorization from USA Cheer (the email chain says nothing about "world" events).  In addition, USA Cheer did not request that the athletes in the team to be impacted and the document does not indicate how USASF responded to USA Cheer's request.  *See* USASF_00039898-901.

[163]    I understand that each year, event producers (including Varsity) voluntarily enter into one-year membership agreements with USASF.  During the term of their membership, they agree (i) not to

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

mention of Varsity in any of the documents referenced by Dr. Netz. And Dr. Netz's report provides no support for her claim that such rules were the result of a conspiracy between USASF and Varsity.[164]

83.    Dr. Netz vaguely claims that that USASF rules prevent members from participating in "rivals' events" that could "undermine Varsity's dominance."[165] But the rules she purports to reference *do not* prevent members (such as athletes and gyms) from attending Varsity's rival events or otherwise discriminate against Varsity's rival event producers offering USASF-sanctioned events, which is one of Plaintiffs' experts' main arguments in this case. At most, the purported rules equally prevent *both* Varsity and its rival event producers from associating themselves with non-sanctioned "Worlds" competitions. As such, the referenced rules do not support a claim that USASF discriminates against rival event producers in favor of Varsity's events, as Dr. Netz suggests.

84.    Unlike Dr. Netz, Dr. Heeb seems to acknowledge that USASF rules only apply to event producers.[166] But like Dr. Netz, Dr. Heeb claims that such rules are the result of a conspiracy between Varsity and USASF to prohibit "gyms from competing in rivals' events" and concludes that the rules are "anticompetitive."[167] Plaintiffs' experts' reports provide no support for their claim that Varsity and USASF conspired to create such rules. In addition, they ignore basic economics when they assume without any reliable analysis that a *vertical restraint,* such as the questioned USASF's rules, must be

---

associate with another "World" event or characterize teams as "world champion" based on the results of any other event; and (ii) with respect to Levels 5 and 6 (later Levels 6 and 7), not to have a multi-brand event (*i.e.*, an event hosted by three or more USASF member event producers) on the same weekend as Worlds. I understand that these agreements do not prevent event producers from having single-brand events on Worlds' weekends; from having events that are "championships" but do not use the word "World(s);" or from having lower-level multi-brand events on Worlds' weekends. *See, e.g.*, 2017-2018 USASF Company Member Agreement, USASF_00011695-711, at 696-8 (§§ 7, 19.a, and 19.c). *See also*, USASF_00011692-3.

[164]    *See Netz Report*, p. 85 ("Varsity and USASF conspired to prohibit USASF members from participating in rivals' events."). I also note that Dr. Netz's referenced letter on page 85 appears to be from October 2011, many years before the alleged class period. Although such a letter does not reflect USASF policy, as discussed below, the referenced rules were indeed in place before the alleged class period. *See, e.g.*, , USASF_00019495-527 (2015-2016 USASF Company Member Agreement), at 516-20 (§ 7); USASF_00081167-83 (2012-2013 USAF Company Member Agreement), § 6.

[165]    *Netz Report*, p. 85. Dr. Netz's incorrect statements are also echoed by Dr. Maki. *See Maki Report*, ¶ 65 ("As discussed in the *Netz Report*, Varsity and USASF conspired to prohibit members from partnering with rival event promoters.").

[166]    *Heeb Report*, ¶ 215 ("The USASF Company Member Agreement, which applies to the Tier 3 and 4 members, states that the event producer (the "Company") will not 'produce, or recruit teams for a cheerleading or dance 'World' championship event, or participate in, or sponsor a cheerleading or dance 'World' championship event conducted by a third party'.").

[167]    *Heeb Report*, ¶ 215. *See also*, *Netz Report*, p. 53 ("Varsity, in coordination with the USASF, also restricts competing event producers' access to All Star gyms in several ways, including prohibiting gyms and school teams from competing in rivals' events (discussed further in Section V.B.2) and from partnering with competing event producers (discussed further in Section V.B.3)."); and pp. 86-87 ("There are no counterbalancing procompetitive benefits to these policies.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"anticompetitive" (and to the benefit of Varsity).[168]  Depending on the type of restraint and the marketplace environment, vertical restraints can be procompetitive, anticompetitive, or they can have ambiguous effects.[169]  As noted above, the referenced USASF rules do not prevent gyms from competing at Varsity's rival events, but rather prohibit both Varsity and competing event producers from associating themselves with non-sanctioned events that claim to be "World" championships.

85.  Moreover, based on an incorrect understanding of USASF's rules, and without any reliable analysis, Dr. Netz claims that "[t]here are no counterbalancing procompetitive benefits to these policies."[170]  Dr. Netz ignores economic literature that shows that, although certain leagues allow for multiple memberships, "[l]eagues normally require exclusive membership."[171]  The main reason is that membership to multiple championships can reduce the value of each championship.[172]

86.  In the case of USASF's policy, the obvious procompetitive rationale is to protect the investment in Worlds, and associated trademark, and to avoid confusion among USASF members as to whether another event with "Worlds" in the name is actually the USASF's Worlds championship.  Consistent with many sports, a sanctioning organization that offers a world championship does not want its members to call some other tournament the world championship.  That would allow other organizers to *free ride* on the investments and reputation of the sanctioning organization,[173]  which, in turn, would reduce the incentive for the organization to invest in such an event—if it makes the investment at all.  As such, it makes economic sense—and leads to procompetitive economic efficiencies—for the organization to make the investment but at the same time agree with participating members that those members would not associate themselves with a different event that uses the same name.  As noted by Professor Noll:[174]

> The strongest governing bodies are those that control valuable events, such as the Olympics and the World Cup, and they are likely to be very protective of these events because their ability to carry on their broader missions depends on

---

[168]    In economics, contractual restrictions on nonprice terms are called vertical restraints.  Vertical restrains are commonly used by companies to solve problems in distribution, in particular, free riding problems.  For example, "manufacturers commonly restrict their distributors by limiting their sales territories, setting inventory requirements, and, where legal, setting the minimum retail price they charge."  *See* Carlton, Dennis W., and Jeffrey M. Perloff, *Modern Industrial Organization*, 4th Ed., Pearson (2005) (hereinafter, *Carlton and Perloff* (2005)), pp. 395, 415.

[169]    *See Carlton and Perloff* (2005), pp. 425-431.

[170]    *Netz Report*, pp. 86-87.

[171]    *Noll* (2003), p. 536.

[172]    Professor Noll also mentions the possibility of teams reducing the quality of play in one championship to focus their energies on another championship in which they expect better chances, or the potential for creating large gaps in quality and competitiveness (and revenues) between teams that participate in multiple leagues and those who can only participate in one league.  *See* Noll (2003), p. 536.

[173]    In economics, free riding refers to an agent or firm that benefits from the actions of another without paying for it, which can lead to perverse (inefficient) incentives and ultimately harm consumers.  *See, e.g.,*  *Carlton and Perloff* (2005), pp. 414, 418-424, 602-603.

[174]    *Noll* (2003), p. 543.

maximizing income from them.  It is not realistic to expect that these bodies will take any action that undermines the value of these important sources of income. An example is the attack of the International Olympic Committee on other organizations that use the word 'Olympics'.

### D.    Plaintiffs' Experts' Claims that USASF Prohibited Members from Partnering with Rival Sanctioning Bodies Are Unfounded and Do Not Support Plaintiffs' Allegations of Conspiracy

87.   Dr. Netz makes similarly inaccurate and nonsensical claims with respect to USASF members' ability to join rival sanctioning bodies.  She claims that USASF "conspired" with Varsity to "forbid its members from partnering with rival sanctioning bodies or hosting events that could undermine Varsity's dominance."[175]  (She provides no supporting evidence for her statement.)  She also claims that "[t]hese policies are designed to foreclose rival event producers and All Star gyms from hosting events."[176]

88.   *First*, Dr. Netz's claim is factually incorrect.  As discussed above, USASF does not prevent gyms, athletes, and coaches from joining non-sanctioned events or rival sanctioning organizations.[177] *Second*, Dr. Netz provides no support for her claim that any of the rules she discusses are the result of a conspiracy between USASF and Varsity.[178]  *Third*, Dr. Netz's economic logic appears to be backwards:  In principle, restricting entry by gyms and their athletes (*i.e.*, Varsity's customers) to All Star events, by not allowing them to join rival sanctioning bodies, affects both Varsity and its rival event producers alike.  Dr. Netz provides no reliable analysis that even attempts to show that restricting entry by gyms and their athletes, or restricting the ability of *all* event producers from hosting non-sanctioned events, ultimately benefits Varsity at the expense of rival event producers. To make such a claim, the liability expert would have to provide empirical support, of which Dr. Netz provides none.

89.   USASF rules do place certain restrictions on *event producers* to host non-sanctioned *All Star* cheer or dance events.[179]  Dr. Netz simply claims that "there are no counterbalancing procompetitive benefits

---

[175]   *Netz Report*, p. 87.

[176]   *Netz Report*, p. 88.

[177]   *See* ¶ 83.  Dr. Netz makes the unsupported claim that "Athletes and gyms that attend any single USASF competition must be members of the USASF; as such, they are bound by the USASF membership agreement that precludes them from hosting any non-USASF events." (*Netz Report*, p. 88).  The document cited by Dr. Netz only states that "Athletes participating at USASF sanctioned events must be registered members of the USASF for the current season."  (*Id.*, n. 347).  As such, it does not show that gyms and athletes cannot join or host non-USASF events.

[178]   Dr. Netz only claims to provide evidence that Varsity considered the potential for entry by rival event producers and All Star gyms hosting events as threats.  (*Netz Report*, p. 88).  But she provides no evidence showing that Varsity and USASF coordinated to prevent those threats to Varsity.

[179]   *See, e.g.*, Deposition of Ali Stangle, March 30, 2022 (hereinafter *Stangle Dep.*), 75:24-76:1 ("Q. And if the event producer comes on as a USASF member, can they still have [recreational] competitions?  A. Yes.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

to these policies."[180]  However, she conducts no reliable analysis of the potential procompetitive reasons for USASF to limit event producers from hosting non-sanctioned events.  These include, for example, the potential for *free riding* on USASF's investments and reputation.  Over the years, USASF has done abundant work to develop detailed safety rules and other requirements for sanctioned events.[181]  Because athletes and their parents may not readily ascertain whether an event is sanctioned by USASF or not, an event producer that hosts sanctioned and non-sanctioned events (over which USASF has no control) could free ride on USASF's reputation of ensuring safe and consistent events for its members without providing the same conditions when hosting non-sanctioned events.  It has long been understood that sanctioning organizations need to protect themselves from such a behavior,[182] and the economics literature shows that such a behavior could be detrimental to all USASF members, including event producers, gyms, coaches, and athletes.[183]  As

---

[180]   *Netz Report*, p. 89.

[181]   For example, the USASF's Cheer Event Sanctioning Standards provide for the minimum standards that apply to all event producers to be USASF-sanctioned.  These standards include many rules, such as the need to have EMT or athletic trainer present, a documented emergency plan, background checks for employees, liability insurance, and safety judges.  They also include rules with respect to the warm-up and event area conditions, including size, carpet/foams, ceiling clearance, and cleaning methods.  *See, e.g.*, USASF_00002943-4 (USASF Cheer Event Sanctioning Standards 2020-2021).  In addition, the USASF's Cheer Rules contain lengthy safety rules related to tumbling, stunts, pyramids, dismounts, and tosses—for seven different levels of competition.  They also contain Athletic Performance Standards, which include uniform rules meant to avoid, for example, "risqué, sexually provocative or lingerie looking inspired uniform."  *See, e.g.*, USASF_00022755-98 (2019-2020 USASF Cheer Rules).  *See also*, Deposition of Lynn Singer, March 2, 2022 (hereinafter, *Singer Dep.*) 141:24-142:7 ("The sanctioned competitions or sanctioning a competition is really all about safety.  So it's the type of floors that are used, the ceiling height of the performance floors, the type of mats that are used in warm-up room that they have, that the teams have sufficient time to warm up for events.  So there's a -- there's a list of items that sanctioned competitions agree to follow, and it's all pointed mostly at athlete safety."); 169:16-22 ("I think part of it is consistency so that as gyms and studios go to competitions across the country, that they can expect a similar -- the -- the flooring and the length of the competition day, and the -- who's allowed in the warm-up rooms, and things like that.  It's consistency across the board."); and 170:3-10 ("For a specific example, the sanctioning guidelines specify the hours of the day that you can hold a competition.  So it can't start earlier than 7:00 in the morning and can't go later than 10:00 or 11:00, whatever time it is, at night.  So that previously there were events that would run on and on till -- teams would still be competing at 1:00 or 2:00 in the morning.").

[182]   *See Weistart* (1977), p. 707, (referring to the need to suspend players for certain infractions): ("It would be a rather startling notion if the antitrust laws meant that a business operation such as a league could not protect itself against actions of participants which might seriously injure, if not destroy, the enterprise.").

[183]   The economics literature provides abundant examples of such free riding in the context of manufacturing companies and their distributors or retailers.  *See, e.g., Carlton and Perloff* (2005), pp. 418-424, for many situations in which free riding occurs.  For example, "free riding occurs when the *reputation of the product*, which the dealer can affect, influences the overall demand for the product.  For example, imagine a chain of independently owned food shops all selling under the same brand name (say, McDonald's, Burger King, or Wendy's).  The brand name carries a certain reputation that attracts buyers.  If one shop decides to chisel on quality and to produce a lower quality than the other shops, the brand's reputation declines and all distributors suffer."  *Id.*, p. 421.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

such, it makes economic sense that USASF would have such rules—which, by protecting and incentivizing USASF investments in the Worlds championship, are procompetitive.

### E.    Plaintiffs' Experts' Claims Regarding USASF's Insurance Requirement Do Not Support Plaintiffs' Allegations of Conspiracy

90.    Dr. Netz claims that USASF's policy of requiring its members to carry insurance, and the insurance company's (K&K) practice of charging higher premiums for teams that attend non-sanctioned events, create an "effective barrier for potential new entrants."[184]

91.    Notably, Plaintiffs' experts do not claim that USASF's insurance requirements are the result of coordinated behavior between USASF and Varsity.[185]  Nor do they claim that USASF anticompetitively erects barriers to entry through the insurance requirements—Dr. Netz simply claims that insurance costs, *which are present in virtually every industry*, create barriers to entry.[186]

92.    To the extent that Dr. Netz claims that USASF's practice of requiring insurance is anticompetitive (and/or conspiratorial), she does not provide any reliable economic analysis to support her claim. For example, Dr. Netz provides no evidence of anticompetitive agreements between the insurer, USASF, and/or Varsity.  She does not even claim that the referenced insurer does not act in an independent, profit-maximizing manner.  Nor does Dr. Netz analyze whether the insurer expects costs from claims to be higher when athletes attend non-sanctioned events—which do not follow the USASF extensive safety rules discussed above.  Of course, it is procompetitive for USASF to ensure All Star events are safer, which would be reflected in lower insurance rates and would benefit Varsity, non-Varsity event producers, gyms, and *athletes*.

93.    Finally, Dr. Netz concedes that "USASF does not mandate that its members obtain insurance from K&K."[187]  Deposition testimony from Sarah Minzghor, a direct class representative, shows that (i) she

---

[184]    *Netz Report*, p. 53.  Dr. Netz incorrectly cites to USASF's company member agreements for the proposition that USASF requires its members to maintain comprehensive general liability and automotive insurance. Id., n. 208.  Such requirements are for event producers.  For gyms/programs, the requirements are described in, *e.g.*, USASF_00042049-52, at 49 ("A program must provide proof of (and maintain) current commercial general liability insurance that includes, at a minimum, participant legal liability and participant excess accident medical insurance.").

[185]    I also note that insurance requirements for gym owners have been included in USASF's rules since at least 2013-2014.  (*See, e.g.*, USASF Professional Responsibility Code V4.0, 2013-2014 (USASF_00027885-91)).

[186]    Dr. Netz's only discussion related to USASF's insurance rules appears to take documents out of context. Dr. Netz refers to a statement from Mr. Chadwick, which she interprets to mean that the USASF insurance requirement for members was used as a "stick" to combat non-sanctioned events.  (*Netz Report*, p. 54, n. 214).  The cited document refers to "athlete insurance" (USASF_00028264-71, at 65 and 69), which I understand to be one of the benefits that USASF provides to its athlete members, that is, $50,000 in excess accident medical insurance and $2 million in catastrophic accident insurance.  Of course, this coverage provided by USASF only applies to USASF-sanctioned competitions. *See, e.g.*, USASF_00028041-2, at 41; *Chadwick Dep.*, 345:17-20 ("...I think our goal was trying to get every All Star program to register athletes and let them become members and get the advantage of the insurance and everything else.").

[187]    *Netz Report*, p. 53.

40

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

understands that it is important for gyms to have insurance; (ii) she had no problems switching between K&K and other insurers; and (iii) she did not perceive that USASF's insurance requirements were based on any favoritism towards Varsity.[188]  As such, the evidence does not support Dr. Netz's claim that USASF's insurance requirements raise anticompetitive barriers to entry for Varsity's rival event producers.

### F.    Plaintiffs' Experts' Claims that Other USASF Competition and Apparel Rules Advantage Varsity Do Not Support Plaintiffs' Allegations of Conspiracy

94.    Dr. Netz claims that USASF establishes apparel rules with "Varsity personnel input" and provides Varsity "early access to any changes in the rules" relative to other apparel suppliers.[189]  Dr. Netz further claims that such a behavior "advantages Varsity and presents a barrier to entry for rival apparel manufacturers.[190]

95.    Dr. Netz provides no reliable support for her conclusory statements.  In her report, she only cites to communications between USASF and Varsity regarding apparel rules.[191]  I understand that apparel rule changes are done with the involvement of various committees, which include apparel manufacturers (other than Varsity) as well as other interested parties (*e.g.*, choreographers, people producing makeup, bows).[192]  As such, Dr. Netz provides no evidence that USASF creates any material advantage for Varsity in those communications.

96.    My review of the evidence also shows that USASF's apparel rules have been in effect for a long time (well before the alleged class period) and had few changes over the years (typically announced well ahead of their implementation).[193]  In particular, I did not find any major changes in USASF's Image

---

[188]    Deposition of Sarah Minzghor, December 17, 2021, 151:2-152:8; 179:18-180:9; 180:24-181:4.  *See also*, Deposition of Rebecca Foster, December 21, 2021, 179:7-180:5.

[189]    *Netz Report*, p. 59.

[190]    *Netz Report*, p. 60.  Dr. Heeb also claims that "USASF restricts apparel vendors or event producers from exhibiting merchandise at the USASF national meetings."  (*Heeb Report*, ¶ 188, and n. 213).  *See also*, *Aronoff Report*, ¶ 107 ("Varsity bans non-Varsity vendors from marketing their products … at USASF end-of-season events.").  Dr. Heeb's claim is based on a June 2020 document reflecting a new USASF policy by which it would not allow "apparel [vendors] or event producers" to exhibit at the National Meeting because "[t]hose two groups typically require an enormous amount of space."  (VAR00370795-96, at 96).  I understand that the National Meeting in 2020 did not happen because of the Covid-19 pandemic.  Importantly, the new rule applies to all apparel vendors and event producers, including Varsity.  As such, it does not support a claim of USASF conspiring to favor Varsity over its rival apparel vendors or event producers.

[191]    *Netz Report*, n. 239.

[192]    *Chadwick Dep.*, 449:13-451:18 (explaining that Rebel, for example, was involved "from the very beginning" in the image policy).

[193]    I understand that the USASF Image Policy was passed in March 2012, as a result of input gathered during the Summer Regional Meetings and a survey conducted during January and February.  *See* USASF_00088638-9, at 39; USASF_00088659-61.  The language of the Image Policy was further refined in

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Policy (which includes uniform, cover-up, makeup, and choreography guidelines) during the alleged class period.[194]

97.  Dr. Netz provides no analysis showing any material rule changes that were adopted to advantage Varsity (and disadvantage rival apparel vendors).  Dr. Netz also fails to provide in her report any reliable analysis showing that Varsity received material information from USASF—not available to rival apparel vendors—in advance of rules changes which gave Varsity such a head start that it could impose a non-transitory price increase on apparel or otherwise affect the competitive process by substantially disadvantaging Varsity's rivals.  Without any such analysis, Dr. Netz cannot provide support for her claim that USASF's apparel rules create barriers to entry for Varsity's rivals—nor can she provide any support for Plaintiffs' conspiracy allegations.

98.  Mr. Aronoff also claims that USASF has enacted competition rules that "exclude or limit non-Varsity entities."[195]  As support, he refers to USASF not making competition rules available to non-USASF members and the fact that USASF copyrighted its competition rules.[196]  Mr. Aronoff claims, without

---

May 2012 and July 2012 after feedback from the USASF membership.  *See*, USASF_00088657-8; USASF_00088659-61; USASF_00088662-4.  The main guideline impacting apparel set to go into effect for the 2012-2013 season was the "Cover Up Guidelines," which simply stated that "Athletes with non-full top uniforms must wear a t-shirt or other suitable cover up over their uniforms unless they are in the warm-up area, traveling as a group directly to or from the warm up area, or on the performance stage." (USASF_00088660-1, at 60).  There was also bow guideline announced at that time set to go into effect the 2013-2014 season.  (*Id.*)  And, in the same document, a more significant uniform policy was not scheduled to go into effect until the 2015-2016 season (roughly 3.5 years after it was adopted), which, for example, restricted "risqué, sexually provocative or lingerie looking or inspired uniform or garments" and required skirts to "fully cover the hips."  (*Id.*, at 61).  *See also*, 2015-2017 USASF Cheer Safety Rules (USASF_00046687-740, at 737-738).

[194]  *See, e.g.*, 2015-2017 USASF Cheer Safety Rules (USASF_00046687-740), at 737-738 (USASF Image Policy); 2018-2019 USASF Cheer Safety Rules (USASF_00042331-89), at 81 (USASF Image Policy); 2017-2019 USASF/ISASF Cheer Safety Rules (USASF Image Policy) (USASF_00030653-710, at 708-709); 2018-2019 USASF Cheer Rules, at 39 (USASF Image Policy renamed as USASF Athletic Performance Standards) (USASF_00042331-89, at 81).

[195]  *Aronoff Report*, ¶ 86.

[196]  *Aronoff Report*, ¶ 86.  In addition, Mr. Aronoff claims that "Varsity, via the USASF, also controls the training process for cheer competition judges" and argues that, as relief, an independent entity should train judges.  (*Aronoff Report*, ¶¶ 86, 100).  Mr. Aronoff does not claim to provide any evidence of a conspiracy between USASF and Varsity regarding judges.  In addition, the reference provided by Mr. Aronoff (*id.*, n. 156) specifies that Varsity trains judges "on the Varsity scoring system."  *See* Deposition of Jamie Parrish, March 3, 2022, 108:16-109:1.  I am not aware of any requirement from USASF that event producers need to use Varsity's judges or Varsity's scoring system.  I understand that event producers are free to train their own judges.  However, because many event producers use Varsity's scoring system, some non-Varsity event producers may rely on judges trained under Varsity's program.  *See, e.g.*, VAR00167235-87, at 37 (noting that Varsity's scoring system had been "adopted by more than 65 EPs so far"); *Stangle Dep.*, 167:7-11 ("Q. You said that USASF does not dictate scoring, am I – am I correct?  Did I state that correct? […] A.  Yes.  Except for the World Championship."); *Clark Dep.*, 279:11-25; 280:2-8; 282:4-9.  In addition, I understand that USASF trains officials and judges only for Worlds.  *See, e.g.*, USASF_00032565-665 (USASF-branded training deck for judges at Worlds).

any supporting analysis, that such rules make it "virtually impossible" for competing event producers to introduce and establish alternative cheer competitions.

99.   Mr. Aronoff's claims do not make economic sense.  *First*, the referenced rules, at most, disadvantage potential non-USASF event producers.  They do not favor Varsity relative to other USASF-sanctioned event producers.  As discussed above, just because USASF promulgates rules to the benefit of its members and event producers, and Varsity is the largest event producer, it does not follow that such rules are the result of a conspiracy to favor Varsity relative to its rivals.  *Second*, Mr. Aronoff does not even attempt to analyze the procompetitive reasons for USASF not to freely share its rules with non-USASF members and potential USASF rivals.  For example, there could be a risk that non-members take USASF's rules, modify them (potentially making them less safe), and use them without clarifying that they are not USASF rules.  Or rules from USASF could be used with the USASF logo or otherwise suggesting that a non-sanctioned event is affiliated with USASF, thereby free riding on USASF's investments and reputation.  *Third*, Mr. Aronoff provides no evidence to support his claim that lack of access to USASF is what made it "virtually impossible" for any potential event producer to introduce an event or a competition.  I understand that at different times during the alleged class period USASF rules were publicly available on its website.[197]  Moreover, even if access to the rules were limited, Plaintiffs' experts provide no evidence that USASF restricted non-members from using them if they obtained a copy.[198]  Nor could USASF prevent non-members from developing their own set of rules based on similar concepts.[199]  In fact, I understand that Open Championship Series, a non-USASF entity,[200] closely incorporated elements of USASF's apparel (and general competition) rules into the rules they established for its competitions.[201]  If USASF's apparel rules favored Varsity, as Plaintiffs' experts claim, they would not have been adopted nearly in full by

---

[197]   *See, e.g.,* USASF, *2016-2017 Safety Rules & Glossary*, https://web.archive.org/web/20161106132927/http://usasf.net/safety/cheer/rules/16-17/ (accessed via the Wayback Machine); USASF, *Cheer Rules,* https://web.archive.org/web/20170806210422/http://usasfrules.com:80/  (accessed via the Wayback Machine), linking the 2017-2019 rules; USASF, *Rules Access*, https://web.archive.org/web/20180922121830/http://www.usasf.net/safety/cheer/rulesmembers (accessed via the Wayback Machine), stating that USASF removed its rules from its public websites because unauthorized use was "put[ting] athletes at risk", and explaining how the rules could be accessed; USASF, *Rules*, https://www.usasf.net/rules and https://web.archive.org/web/20200806102642/https://www.usasf.net/rules (accessed via the Wayback Machine), showing that USASF's current rule page has been live since at least August 6, 2020.

[198]   Deposition testimony is consistent with the fact that non-members used USASF rules.  *See* Deposition of Brian Elza, November 16, 2021, 309:5-11.

[199]   I also understand that whatever copyright protection USASF has in its rules, it does not prevent others from composing their own set of rules incorporating similar concepts.

[200]   I understand that Open Championship Series is involved in a separate lawsuit involving USASF.

[201]   *See, e.g.,* The Open Championships, The Open Championship Series Cheerleading Rules & Guidelines 2022-2023, (apparel rules at p. 6), available at: https://openchampionshipseries.com/wp-content/uploads/2022/07/OCS-RuleBook.pdf.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

a non-USASF group (and one actively marketing an alternative to Worlds,[202] such as the Open Championship Series).

_____
Jonathan M. Orszag

September 23, 2022

---

[202]    *See, e.g.,* The Open Championships, *Allstar World Championship,*
https://theallstarworldchampionship.com/; The Open Championships, *About Us,*
https://openchampionshipseries.com/about-us/ ("In 2019, a group of event producers joined together to
create the Open Championship Series after realizing the cheerleading industry needed solutions to ever-
growing prices, lack of choices, and limited championship options"); The Open Championships, *Allstar
World Championship Frequently Asked Questions*, https://theallstarworldchampionship.com/faqs/ ("The
same group that brought you The Open Championship Series and changed the way we compete now
offers an exciting, and very exclusive opportunity for the World's top teams!  This is a bid only event for
the world's best teams in the Mini, Youth, Junior and Senior divisions.  Teams will have the ability to
qualify at hundreds of events offering At-Large Bids and Full Paid Bids.").

# EXHIBIT 4

Case 2:20-cv-12892-SHL-tmp   Document 488-2  Filed 01/31/23  Page 76 of 226
Case 1:16-cv-01494-JDB   Document 209-2  Filed 01/11/17  Page 1 of 154
PageID 14093

2997

1            UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3

4    UNITED STATES OF AMERICA,          :
     et al.,                            :
5                                       :
                    Plaintiffs,         CA No. 16-1494 (JDB)
6                                       :
        v.                              :
7                                       :  DAY 11
     AETNA, INC., et al.,               :  P.M. SESSION
8                                       :

9              Defendants.      :

10             TRANSCRIPT OF BENCH TRIAL
          BEFORE THE HONORABLE JOHN D. BATES
11            UNITED STATES DISTRICT JUDGE

12            Monday, December 19, 2016

13   APPEARANCES:

14     For Plaintiffs:        CRAIG W. CONRATH, ESQ.
                              RYAN M. KANTOR, ESQ.
15                            ERIC J. MAHR, ESQ.
               JUSTIN HEIPP, ESQ.
16                            PETER MUCCHETTI, ESQ.
                              ERIC D. WELSH, ESQ.
17             U.S. Department of
                              Justice
18                            Antitrust Division
                              450 Fifth Street, NW
19                            Washington, D.C. 20530

20

21   State of Iowa:          LAYNE M. LINDEBAK, ESQ.

22

23   State of Pennsylvania:   JAMES A. DONAHUE, III, ESQ.

24

25

              BARBARA DeVICO, FCR, CRR, RMR
                 (202)354-3118      Room 6509

Case 2:20-cv-02892-SHL Document 488-2 Filed 03/31/23 Page 77 of 226
Case 1:16-cv-01494-UDB Document 299-2 Filed 01/11/17 Page 2 of 154
PageID 14094

2998

1      For Defendants:

2      AETNA, INC,:      JOHN M. MAJORAS, ESQ.
                         GEOFFREY S. IRWIN, ESQ.
3           PAULA RENDER, ESQ.
                         CHRISTOPHER N. THATCH, ESQ.
4                        Jones Day
                         51 Louisiana Ave., NW
5                        Washington, D.C.  20001

6       HUMANA, INC.,:   KENT A. GARDINER, ESQ.
                         SHARI ROSS LAHLOU, ESQ..
7          DAVID M. SCHNORRENBERG, ESQ.
                         CROWELL & MORING, LLP
8                        1001 Pennsylvania Avenue, NW
                         Washington, D.C. 2000

9

10      Proceedings reported by machine shorthand, transcript

11      produced by computer-aided transcription.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:20-cv-12892-SHL-tmp   Document 439-2   Filed 01/31/23   Page 78 of 226
Case 1:16-cv-01494-UDB   Document 239-2   Filed 01/11/17   Page 3 of 154
PageID 14095

2999

<u>P R O C E E D I N G S</u>

1

2

3          THE COURT:  All right.  Good afternoon.

4          MR. MAJORAS:  Good afternoon, Your Honor.

5          THE COURT:  Mr. Majoras.

6          MR. MAJORAS:  **The defendants call Mr. Jonathan**

7    **Orszag.**

8                ************************

9              J O N A T H A N   O R S Z A G,

10   Having been called as a witness on behalf of the Defense

11   and having been first duly sworn by the Deputy Clerk,

12   was examined and testified as follows:

13          THE COURT:  Good afternoon, Mr. Orszag.

14          THE WITNESS:  Good afternoon, Your Honor.

15          THE COURT:  Mr. Majoras?

16          MR. MAJORAS:  Thank you, Your Honor.

17                 DIRECT EXAMINATION

18   BY MR. MAJORAS:

19          Q.    Mr. Orszag, would you please introduce

20   yourself to the Court.

21          A.    My name is Jonathan Orszag.  I'm a senior

22   managing director at Compass Lexecon, an economic

23   consulting firm.  I also was a founder of the firm, and

24   on the firm's executive committee.

25          Q.    Would you describe your educational

Case 2:20-cv-12892-SHL-tmp   Document 489-2   Filed 01/11/27   Page 4 of 154
Case 1:16-cv-01494-UDB   Document 489-2   Filed 01/31/23   Page 79 of 226
PageID 14096

3000

1    background.

2           A.    Sure.  I received my undergraduate degree

3    in economics from Princeton University, and then I

4    received a Marshall Scholarship to attend Oxford

5    University where I received a master's of science.

6           Q.    What is a Marshall Scholarship?

7           A.    After the World War II, as a thank you to

8    the American people, the British government said they'd

9    fund I believe it's 32 Americans to travel to England to

10   get their graduate education.

11          Q.    What was your degree from Princeton

12   focused on?

13          A.    Economics.

14          Q.    And how about your master's from Oxford?

15          A.    It was economics and history.

16          Q.    Could you share with us some of the

17   educational highlights, particularly of earning your

18   master's degree from Oxford relating to economics.

19          A.    Part of my studies -- I'd sort of take

20   the whole period because, when I was an undergraduate, I

21   took many graduate classes.  I actually served as a

22   teaching assistant for one of the leading

23   econometricians at Princeton as an undergraduate, which

24   is usually reserved for graduate students.

25          So I was a research assistant for Alan Krueger,

Case 2:20-cv-02892-SHL-tmp   Document 488-2  Filed 01/13/23  Page 80 of 226
Case 1:16-cv-01494-JDB   Document 299-2  Filed 01/11/17  Page 3 of 154
PageID 14097

3001

1    who is a leading labor economist, and I worked for him

2    for many years.  And so all of that was part of my

3    educational experience, both undergraduate and then in

4    graduate school.

5         Q.     And in terms of your economics work at

6    Oxford, did you have a focus?

7         A.     I studied a variety of things involving

8    labor economics.  Applied microeconomics was my focus.

9         Q.     What is applied microeconomics?

10        A.     It's the study of the firm.  Study of

11   industries is the area that I focused in on even more.

12   And so I take a pretty broad interest in economics.

13        When I went to Oxford, I was very focused on

14   policy issues in particular.  I had spent time in the

15   federal government prior to that, and I knew I was going

16   back to work in the federal government.  And so I like

17   the application of economics to real-world situations.

18   And so that was a focus of my research and my work when

19   I was in school.

20        Q.     Once you completed your work toward your

21   master's degree, did you then study for a Ph.D.?

22        A.     No, I did not.

23        Q.     What did you do instead?

24        A.     Well, I had previously been asked to come

25   back to serve at the White House on the president's

Case 2:20-cv-12892-SIU4-ttmb    Document 400-2    Filed 01/11/17    Page 81 of 226
Case 1:16-cv-01494-UDB    Document 289-2    Filed 03/31/23    Page 8 of 154
PageID 14098

3002

1    National Economic Council.

2            Q.      What time was that?  What year?

3            A.      This was in 1996.

4            Q.      I'm sorry to interrupt.  Please go ahead.

5            A.      So I had this opportunity and, as a young

6    person, it was a very difficult choice for me.  I had

7    come from a family of academics.  My father was a

8    professor of mathematics.  So I grew up with a PDP-11 in

9    my basement, which is a big computer.  And my oldest

10   brother was an academic.

11           So my father was pushing me very much to stay in

12   academics, but my heart and my passion was policy.  And

13   so I really wanted to go back to Washington.  And I had

14   this terrific opportunity to return to the National

15   Economic Council and work with some absolutely brilliant

16   economists.

17           So had previously, when I was in government,

18   worked with Alan Krueger, who had brought me to the

19   government; Joe Stiglitz, who won the Nobel Prize in

20   economics, and Joe and I have written a number of papers

21   together; Larry Summers, who is absolutely brilliant,

22   has a very big brain; Janet Yellen, who's currently the

23   chair of the Federal Reserve.

24           They were all economists in the administration

25   at that time.  And as a young staff person, I could work

Case 2:20-cv-12892-SJM-tom   Document 488-2   Filed 01/11/17   Page 7 of 154
Case 1:16-cv-01494-DB   Document 239-2   Filed 01/11/17   Page 82 of 226
PageID 14099

3003

1    directly with them and learn from them.  So it was an

2    amazing educational experience.

3         Q.    Could you give us just a bit of a

4    background.

5         What is the National Economic Council?

6         A.    Sure.  It was created in 1993 by

7    President Clinton to coordinate economic policy

8    throughout the government.  And so it sits on top of all

9    of the economic agencies.  So the Department of

10   Treasury, the Counsel of Economic Advisers, the

11   Department of Commerce, the Office of Management and

12   Budget.  And it was responsible for coordinating policy

13   and providing the president unbiased guidance about what

14   was the best course of action.

15        Q.    So once you joined the National Economic

16   Council, how long were you engaged with that?

17        A.    So I started at the National Economic

18   Council at the end of 1995.  I was there through 1996.

19   I then left.  I then came back in 1997, and I was in

20   government through 2000.

21        My last job in government was -- I was asked to

22   run the policy department at the Department of Commerce.

23   And so that was the last job I had in government was the

24   director of the Office of Strategic Planning, which is

25   the secretary's seniormost policy position.

Case 2:20-cv-02892-SHL-tmp  Document 409-2  Filed 01/31/23  Page 83 of 226
Case 1:16-cv-01494-DDB  Document 209-2 Filed 01/11/17 Page 8 of 154  PageID 14100

3004

1          Q.      And how does that relate to your economic

2     studies and work?

3          A.      When you're in charge of the policy

4     unit -- the Commerce Department has all of the economic

5     statistics agencies except for the Bureau of Labor

6     Statistics.  So it's responsible for the decennial

7     census, for example, economic growth statistics,

8     et cetera.  I spent a lot of time involved in

9     telecommunications issues, innovation issues, et cetera.

10         Q.      What was the total amount of time you

11    spent with the government?

12         A.      Almost six years.

13         Q.      While you were with the government in

14    that six years of service, did you have any involvement

15    with Medicare issues?

16         A.      Yes, I did.

17         Q.      Could you tell us about that?

18         A.      When I started in government, when Alan

19    Krueger brought me to government, I was actually right

20    next door at the Department of Labor.  And the Secretary

21    of Labor -- I was in the Office of the Chief Economist

22    there.

23         The Secretary of Labor is a trustee of Medicare.

24    And unbeknownst to me, when I was a young staff person,

25    no one at the Department of Labor really had that much

Case 2:20-cv-02892-SHL-tmp   Document 433-2   Filed 01/31/23   Page 84 of 226
Case 1:16-cv-01494-UDB   Document 289-2   Filed 01/11/17   Page 9 of 154
PageID 14101

3005

1    experience with Medicare.  And so it had been tasked to

2    me to prepare the secretary's testimony for Congress in

3    June of 1995.

4          So I spent a couple months learning everything I

5    could about Medicare, and it was a different program

6    somewhat back then.  And there were funding issues.  And

7    so I spent my time learning as much as I could, and I

8    was the principal author of the secretary's testimony.

9          Q.    The testimony related to Medicare?

10         A.    Related to Medicare before Congress.

11         Q.    So once you ended your government

12   service, have you remained involved in policy issues?

13         A.    Yes, I have.

14         Q.    In what way?

15         A.    In several ways.  I'd probably focus on

16   three.  First, I've been a fellow at -- or senior fellow

17   at a think tank here in Washington, D.C., at various

18   times over the last 15 years.

19         Second, Candidate Obama, then candidate Obama,

20   in 2008, asked me to serve on a very small, I think it

21   was, eight or nine people pretransition economic team

22   responsible for preparing the transition team, if he

23   were to win, on economic issues.  So I served in that

24   role.

25         I was actually responsible for auto-related

Case 2:20-cv-02892-SHL-tmp   Document 433-2   Filed 03/31/23   Page 95 of 226
Case 1:16-cv-01494-JDB   Document 299-3   Filed 03/13/17   Page 1006 of 1540
PageID 14102

3006

1    issues.  So I handed off my work to that team that

2    worked on the auto bailout issues when they assumed

3    office.

4            The third way is I've continued to advise

5    President Clinton on development issues in particular in

6    Africa.  And I've traveled with him to Africa, to East

7    Africa, South Africa on those development-related

8    issues.

9            Q.    So backing up a bit to about 2000, is

10   that when you left your government service?

11           A.    That is correct, sir.

12           Q.    By that, I mean your government

13   employment.

14           A.    That is correct.

15           Q.    What did you do after that?

16           A.    I started the predecessor firm to Compass

17   Lexecon.

18           Q.    And that is -- currently, you're the

19   senior managing director of Compass Lexecon?

20           A.    That is correct.

21           Q.    Talk to us about your experience both

22   with the predecessor company and currently at Compass

23   Lexecon.

24           A.    I folded the -- the original firm my

25   brother and I started, I folded it into Compass Lexecon.

3007

1    So it's one and the same.  We have focused on what I'd

2    call interesting economic issues, applied

3    microeconomics.  And I've had a speciality in mergers

4    over that time period.

5         Q.    Give us a sense of how large Compass

6    Lexecon is today.

7         A.    We have about 420 employees.

8         Q.    And I'd like to focus just on your

9    consulting work now since you've been at Compass

10   Lexecon.

11        Could you please describe the types of matters

12   that you have found yourself involved in.

13        A.    As I said, I find myself involved in many

14   different economic issues.  My main focus has been

15   mergers.

16        So since I started this, I've probably have

17   worked on well more than 100 mergers.  I stopped

18   counting actually at 100.  We're probably at about 150

19   or more at this point.

20        Q.    Is that always in a litigation context?

21        A.    It's very rarely in the litigation

22   context.  It's mostly in -- an advisory role is --

23   probably takes the vast majority of those situations.

24        Q.    How would you describe the fields of work

25   that your consulting work has focused on?

3008

1        A.      Applied microeconomics, industrial

2   organization.  And I would say antitrust economics is a

3   simpler way of saying industrial organization.  That's

4   the industrial organization's more technical term, I'd

5   say.

6        Q.      You described for us earlier a bit about

7   applied microeconomics.

8        What's your description of the latter two, the

9   industrial organization and antitrust economics?

10       A.      It's a subset of applied microeconomics.

11  It's the theory of the firm, the study of industries.

12  And so it's, in essence, what we're here to study today,

13  conduct of firms as they merge, conducts of firms as

14  they enter into contracts, et cetera.

15       Q.      Now, have you authored any publications

16  on these topics?

17       A.      Yes, I have.

18       Q.      I know they're in the exhibit -- I'm

19  sorry -- Appendix B to your report.  I was wrong.

20  Appendix A to your report.

21       But could you just describe generally the types

22  of publications you've authored.

23       A.      Given the variety of interest that I take

24  in economics, the publications I've had are various as

25  well.  I've done everything from the economics of

Case 2:20-cv-02892-SHL-tmp    Document 433-2    Filed 03/31/23    Page 98 of 226
PageID 14105
Case 1:16-cv-01494-JDB    Document 299-3    Filed 03/13/17    Page 130 of 154

3009

1    college sports to the consumer benefits of broadband to

2    issues related to patent settlements.

3            Q.      Are you involved in any professional

4    economic societies?

5            A.      Yes, I am.

6            Q.      Which ones?

7            A.      I'm a member of the American Economic

8    Association, the American Finance Association, and the

9    Econometric Society.

10           Q.      Have you received any rewards related to

11   your work?

12               THE COURT:   I'm assuming he's gotten some

13   rewards.

14               THE WITNESS:   Those are mouths that you have

15   to feed.

16   BY MR. MAJORAS:

17           Q.      Let me make sure we're clear.

18           Have you received any awards for your work,

19   sir?

20           A.      Yes, I have.

21           Q.      Please tell us about those.

22           A.      Can I have my mom testify?

23           So when I was in government, I received an award

24   for expanding economic opportunity in America for

25   efforts, for a bill that I helped design and then get

3010

1    passed helping to increase savings.  And it was a

2    specific policy related to savings.  So I won that

3    award.

4           In the late 1990s when I was younger than I am

5    today, I won various awards for being a top young

6    competition economist.  And the most -- this year, I was

7    named as one of the top ten most highly regarded

8    competition economists in a survey of lawyers and

9    economists.

10          Q.    Let's turn now to the work that you've

11   done on disputes and in litigation.

12          How many matters have you worked on that were

13   either in litigation or anticipated litigation?

14          A.    With the caveat that I'm not sure how I

15   answer anticipated litigation because, as an economist,

16   I don't necessarily have full insight, what I'd say is,

17   if you include testifying, I would say it's probably a

18   dozen to a dozen and a half matters that I've testified

19   in court.

20          Q.    And let's back up a little bit from

21   testifying.

22          Have you also been involved in matters where

23   you submitted expert reports but never ended up

24   testifying?

25          A.    For sure, because many cases end up

Case 2:20-cv-02892-SHL-tmp   Document 433-2   Filed 03/31/23   Page 90 of 226
Case 1:16-cv-01494-JDB   Document 299-3   Filed 03/13/17   Page 1506 of 1854
PageID 14107

3011

1   settling.  So I'd probably double that number, but I've

2   never counted it that way.

3           Q.      And how many times have you been accepted

4   by a court or tribunal as an expert in economics.

5           A.      I've never been rejected as an expert in

6   economics or econometrics on that metric.

7           Q.      So that would take us back to the dozen

8   or so that ended up in litigation?

9           A.      That is correct.

10          Q.      Of those, when you have testified, how

11  often has the subject of your testimony related to

12  merger work and the types of issues you've addressed

13  here?

14          A.      If I take a broad view of antitrust

15  economics or applied microeconomics, basically every

16  single time.

17          Q.      Have you ever testified before Congress

18  or other governmental bodies?

19          A.      Yes, sir.

20          Q.      Which ones?

21          A.      In front of Congress, in front of the

22  Federal Communications Commission, in front of the

23  European Court of First Instance, which is always a very

24  interesting experience because there are 13 judges and

25  no real cross-examination except from the judges.  I've

Case 2:20-cv-02892-SHL-tmp   Document 433-2   Filed 03/31/23   Page 91 of 154
Case 1:16-cv-01494-JDB   Document 299-3   Filed 03/17/17   Page 1806 of 226
PageID 14108

3012

1    been in front of foreign tribunals and other regulatory

2    authorities.

3            Q.      Have you ever been barred in whole from

4    testifying before a court?

5            A.      Not in whole.

6            Q.      How about in part?

7            A.      One time.

8            Q.      Please describe that.

9            A.      Judge Cote, in the Apple matter, accepted

10   all of my econometric analyses, and then there were

11   analyses in another relevant market that she rejected,

12   as I understand it -- I'm not a lawyer -- as a matter of

13   law.  And then she criticized those analyses as well.

14           Q.      But you were accepted at least for what

15   part?

16           A.      For all my econometric work.

17           Q.      And even after that case, you have since

18   been accepted again as a qualified expert in economics?

19           A.      In this courthouse, yes, sir.

20           Q.      Please describe that for us.

21           A.      I testified last year in the

22   GE-Electrolux merger matter where the government had

23   sought to block that merger.  And I was the economic

24   expert for the merging parties.

25               MR. MAJORAS:  Your Honor, at this time, the

Case 2:20-cv-02892-SHL-tmp   Document 433-2   Filed 03/31/23   Page 92 of 226
Case 1:16-cv-01494-JDB   Document 299-3   Filed 01/13/17   Page 176 of 154
PageID 14109

3013

1    defendants move that Mr. Orszag be qualified as an

2    expert in the field of an applied microeconomics,

3    industrial organization, and antitrust economics.

4            MR. CONRATH:  No objection.

5            THE COURT:  Without objection, we will admit

6    Mr. Orszag and receive his testimony in the field or

7    fields of applied microeconomics, industrial

8    organization, and antitrust economics.  I assume there's

9    some overlap, as he's described it, between those.  But

10   we welcome him and will receive the testimony.

11           MR. MAJORAS:  Thank you, Your Honor.

12   BY MR. MAJORAS:

13       Q.    And, Mr. Orszag, if there are particular

14   aspects about your opinions that one of those fields is

15   more relevant than another's, please explain that to us.

16           How did you first get involved in looking at

17   the Aetna-Humana merger?

18       A.    I received a phone call from counsel for

19   Aetna right around the time that the merger was either

20   signed or within a week or two either direction.

21       Q.    And let's draw a line between the period

22   you just described and when litigation was filed.

23           Would you briefly describe the work that you

24   did as a consultant.

25       A.    Well, the first thing, I do what I always

# EXHIBIT 5

Case 2:20-cv-02892-SHL-tmp   Document 423-2  Filed 08/36/23   Page 94 of 226
Case 1:15-cv-01039-EGS   Document 409-2  Filed 06/29/16   Page 105 of 193
PageID 14111

4193

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )  Civil Action
                               )  No. 15-1039
     v.                        )
                               )  December 3, 2015
AB ELECTROLUX, et al.,         )  11:08 a.m.
                               )
          Defendants.          )  Washington, D.C.
                               )
                               )

VOLUME 15 - MORNING and PARTIAL AFTERNOON SESSION
*TRANSCRIPT OF BENCH TRIAL PROCEEDINGS*
*(Excluding Closed/Sealed Portions)*
*BEFORE THE HONORABLE EMMET G. SULLIVAN,*
*UNITED STATES DISTRICT COURT JUDGE*

APPEARANCES:

   For the Plaintiff:          **Ethan Glass, Trial Attorney**
                               U.S. DEPARTMENT OF JUSTICE
                               450 Fifth Street, NW
                               Room 4000
                               Washington, DC 20001
                               (202) 305-1489
                               Email: Ethan.glass@usdoj.gov

                               **William Henderson Jones, II, Trial
                               Attorney**
                               U.S. DEPARTMENT OF JUSTICE
                               Antitrust Division
                               450 Fifth Street, NW, Room 4000
                               Washington, DC 20001
                               (202) 514-0230
                               Fax: (202) 514-7308
                               Email: Bill.jones2@usdoj.gov

                               **Bryson L. Bachman, Trial Attorney**
                               U.S. DEPARTMENT OF JUSTICE
                               Antitrust Division
                               450 Fifth Street, NW, Suite 7026
                               Washington, DC 20530
                               (202) 514-5621
                               Email: Bryson.bachman@usdoj.gov



 8                      *   *   *   *   *

 9           (Thereupon, the previously closed proceedings concluded

10      and the following further proceedings were held in open Court:)

11                      *   *   *   *   *

12           MR. DEMITRACK:  Good afternoon, Your Honor.

13           THE COURT:  Good afternoon, Counsel.

14           MR. DEMITRACK:  Tom Demitrack for the Electrolux

15      defendants.  The defendants call Mr. Jonathan Orszag.

16           THE COURT:  All right.

17           MR. DEMITRACK:  Your Honor, while the witness is

18      approaching, you should have two binders:  One, a small binder

19      with a series of slides that we'll be using, called Volume 1.

20           THE COURT:  Let's see.  I'm sure I do.

21           (Discussion had off the record.)

22           THE COURT:  All right.  Good afternoon, sir.

23           THE WITNESS:  Good afternoon to you.

24           (JONATHAN ORSZAG, DEFENDANTS' WITNESS, SWORN)

25

Case 2:20-cv-02892-SHL-tmp   Document 463-2   Filed 02/21/23   Page 96 of 226
Case 1:15-cv-01039-ECB   Document 493   Filed 06/29/16   Page 110 of 193
PageID 14113
4302

1            DIRECT EXAMINATION OF JONATHAN ORSZAG

2    BY MR. DEMITRACK:

3    Q.  Good afternoon.  Can you please state your name so we have

4    it for the record?

5    A.  Jonathan Orszag.

6    Q.  Mr. Orszag, where are you currently employed?

7    A.  I'm a senior managing director at Compass Lexecon, an

8    economic consulting firm.

9    Q.  And what is Compass?

10   A.  It's an economic consulting firm.  We do a wide variety of

11   work on economic matters.  A big portion of our work involves

12   antitrust matters.

13   Q.  You're married, I assume?

14   A.  Yes, I am.

15   Q.  You're wearing a ring.  Kids?

16   A.  11-month-old daughter who has given me many illnesses, so

17   thus I'm nursing a sore throat again.

18   Q.  If you put the mic up close, that will assist, sir.

19   A.  Thank you.

20   Q.  Could you tell the Court a little bit about your educational

21   background?

22   A.  Sure.  I studied first at Princeton.  I studied economics.

23   And given that it's relevant for this case, I had three mentors

24   or advisors while I was there.  One is -- not as relevant for

25   this case -- Alan Krueger, who's gained some notoriety recently

1    because he was mentioned in one of the presidential debates.

2           Another was Orley Ashenfelter, A-S-H-E-N-F-E-L-T-E-R,

3    and Professor Ashenfelter did one of the merger retrospectives

4    on the Maytag/Whirlpool deal which I'll be talking about today.

5           And my final mentor advisor was Robert Willig, who's an

6    antitrust economist and scholar and was mentioned earlier in

7    this case as someone who's laid the foundations for some of the

8    analyses that we will do here.

9    **Q.**   Okay.  And do you have any degrees after Princeton?

10    **A.**   Yes.  I received a scholarship to attend Oxford University,

11    and I received a Master's of Science there at Oxford.

12    **Q.**   No Ph.D.?

13    **A.**   No.  When I was at Oxford I had -- I was given the

14    opportunity to return to Washington and serve for President

15    Clinton on his National Economic Council, and I had to make a

16    tradeoff:  To stay in school and finish my Ph.D., or to try to

17    apply economics in real-world situations.  And I came from an

18    academic family.  My oldest brother was an academic.  My father

19    was one at MIT, Princeton and Yale throughout his career.  And I

20    made the decision at that time that serving in government was

21    what was best for me, and it would allow me to learn from some

22    of the best economists that there were in the world.  At the

23    time Janet Yellen, who's now the chairwoman of the Federal

24    Reserve, was the chair of the Council of Economic Advisors,

25    people like Lori Polsen, Gene Sperling and many others,

1    including Larry Summers, who were there, were people who helped

2    inform how to apply economics to real-world situations for me.

3    **Q.**  And how long did you stay in that position, sir?

4    **A.**  I stayed in there a total of six years working in the

5    Clinton administration.  I started actually in the building

6    right next door here at the Department of Labor, and then --

7    this was before I went to graduate school.  And then I worked at

8    the White House.  And I finished my government career as the

9    director of the Office of Policy and Strategic Planning at the

10   U.S. Department of Commerce.

11   **Q.**  And what did you do in that position, Mr. Orszag?

12   **A.**  I did what I had done at the White House, which was apply

13   economics to real-world policy situations.  It was also right

14   around 1999, 2000, so I was deeply involved in the biggest

15   survey that the government does every year, the decennial

16   census.  And as some people in the room may know, the Department

17   of Commerce also oversees a number of economic statistics

18   agencies, so I was deeply involved in those issues as well.

19   **Q.**  And you said you spent about six years with the Clinton

20   White House.

21        Did you have any subsequent government service?

22   **A.**  No, I left -- when I left the administration, I started in

23   the private sector.  I've continued to keep my hand in the

24   policy world.  I'm a senior fellow at the Center for American

25   Progress here in Washington, D.C., and I've been asked by then

1    candidate Obama to serve on a very small pre-transition economic

2    team to help advise on what to do when -- if he were elected in

3    November of 2008 and how he should get running right away.  And

4    so it was a team that included the current Secretary of the

5    Treasury, Jack Lew; the former ambassador to the OACD; the

6    former White House chief of staff; somebody who runs a think

7    tank here in Washington, D.C.  Let's see, it was also the former

8    director of the Congressional Budget Office.  So it was a very

9    small team.  There were nine of us, and we started meeting in

10   the summer of 2008, and we met up until the election day when we

11   then worked with the transition team.  And I was responsible for

12   overseeing issues with the auto industry.  So how could the

13   president, once he took office, help get the auto industry back

14   up on its feet.

15   **Q.**   In the late summer early fall 2008 was a significant time in

16   this country's history, correct?

17   **A.**   Yes.

18   **Q.**   Economically?

19   **A.**   Economically, yes.  In September of '08 the country went

20   through a very significant market panic, I think, is fair to

21   describe it as, and liquidity crisis.  And we saw companies that

22   we never thought could go under go bankrupt.  And so that period

23   from September to November was particularly an important time

24   for the economy.

25   **Q.**   Let's turn to your work at -- your professional work at

1  Compass Lexecon.  What type of matters do you work on at

2  Compass?

3  **A.**  I like to say I work on anything with interesting economic

4  issues.

5  **Q.**  Have you analyzed mergers?

6  **A.**  That's some of the most interesting work I think that the

7  firm has, and so I'm very involved in the analysis of mergers.

8  It's what I primarily do.

9  **Q.**  Okay.  Approximately how many mergers have you analyzed from

10  a competitive standpoint during your period of time at Compass

11  Lexecon?

12  **A.**  It's too many to count at this point.  I stopped counting

13  when I did about 100, and I believe it's now something on the

14  order or magnitude of 125 to 150 where I've either provided

15  counseling prior to a merger -- so that may be a merger that

16  never got announced -- to working on consummated mergers.

17  **Q.**  And in the course of your work on merger analysis, have you

18  also addressed the issue of efficiencies insofar as they relate

19  to mergers?

20  **A.**  Yes.  Efficiencies are a central part of the analysis of

21  mergers, and so in many, not all cases, I've been involved in

22  the efficiencies analysis.

23  **Q.**  And you've conducted efficiencies in the course of that

24  work?

25  **A.**  Yes, I have.

1    **Q.**  Have you received any professional honors for your work in

2    the field of economics?

3    **A.**  Yes, I have.  When I was in government, I received an award

4    from a nonprofit here in Washington, D.C. for my work for

5    expanding economic opportunity in America.  This was about

6    increasing savings rates among lower income individuals and

7    families.  It was a policy idea that I had worked on for a

8    number of years and then helped get implemented, passed by

9    Congress and then funded.  And so I received an award during

10    that time.

11         In the private sector I've received awards for being

12    40 -- under 40 in the industry magazines, in terms of best

13    competition economists and then one of the best young

14    competition economists, and acknowledged in various other

15    magazines about being at the top of the competition space, I'd

16    say.

17    **Q.**  Have you published any papers in the field of economics?

18    **A.**  Yes, I have.

19    **Q.**  And have you published any papers in the field of economics

20    in a peer-reviewed journal?

21    **A.**  Yes, I have.

22    **Q.**  Okay.  What's a peer-reviewed journal?

23    **A.**  It's when you submit a paper and other economists review it,

24    provide comments and either it's accepted outright, it's

25    accepted with revisions or it's rejected.  And so in the cases

Case 2:20-cv-02892-SHL-tmp   Document 423-2   Filed 09/01/23   Page 102 of 226
Case 1:19-cv-01019-ECS   Document 409-2   Filed 06/29/16   Page 115 of 193
PageID 14119

4308

1    where it was either accepted or accepted with revisions, it

2    ended up in the journal.

3    **Q.**  Are you a member of any professional economic associations?

4    **A.**  Yes, I am.  I'm a member of the American Economic

5    Associations, the American Finance Association, and the

6    Econometric Society.

7    **Q.**  Thank you.  Have you testified in or before courts or other

8    judicial bodies or administrative bodies?

9    **A.**  Yes, I have.

10   **Q.**  A number of times?

11   **A.**  I haven't counted.  If I include testifying to Congress, I'd

12   probably say 15 to 20, but I don't have a precise number in my

13   head.

14   **Q.**  All right.  Thank you.

15           And in your testimony in courts or other judicial

16   bodies, have you addressed issues of economics?

17   **A.**  Every single time I would say that they were about economics

18   because that's what I do.

19   **Q.**  Okay.  And is there a particular area of economics that you

20   specialize in?

21   **A.**  I like to call it applied microeconomics.  It's -- because

22   my specialty is in applying economics to real-world situations,

23   so that's why I like using the term "applied microeconomics."

24   And that would cover a subpart of microeconomics, which would be

25   industrial organization, which can also be known as antitrust

```
 1    economics.

 2    Q.   Industrial organization is the study of the firm?

 3    A.   Yes.

 4    Q.   Okay.  And just so we're clear, what do you mean by the firm

 5    in that answer?

 6    A.   I think it's fair to just -- I like to broaden it and use a

 7    term that economists often like to use, "industrial

 8    organization."  I think it's just better to use "antitrust

 9    economics" or "competition economics" because that -- while it

10    may sound nice for economists to use terms like "industrial

11    organization," they don't have much meaning outside of the field

12    of economics, and so using "antitrust economics" or "competition

13    economics" seems to me to be more understandable for people

14    outside of the economists' space.

15              MR. DEMITRACK:  Your Honor, at this time the defendants

16    move to quality Mr. Orszag as an expert in the field of applied

17    microeconomics, industrial organization and antitrust economics.

18              THE COURT:  All right.  Any voir dire, Counsel?

19              MR. SHUMAKER:  No, Your Honor, no objection.

20              THE COURT:  All right.  Then the Court will allow the

21    witness to testify as an expert in those proffered areas.

22              All right, Counsel.

23              MR. DEMITRACK:  Thank you.

24    BY MR. DEMITRACK:

25    Q.   When you are retained to evaluate a merger, is there an
```

# EXHIBIT 6

Ex. 6 - Varsity Ownership of Tier 1 Events 2011-2012 & 2014-2015.xlsx

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**TIER 1 EVENT PRODUCERS 2014-2015 SEASON**

| Company Name | Varsity-Owned? |
|---|---|
| All Star Challenge | Yes |
| American Cheer Power | Yes |
| American Cheerleaders Association | Yes |
| Athletic Championships | Yes |
| Cheer LTD. | Yes |
| Cheersport | Yes |
| National Cheerleaders Association | Yes |
| One Up Championships | Yes |
| Pac West Spirit Group | Yes |
| Spirit Cheer | Yes |
| Spirit Festival | Yes |
| Spirit Sports | Yes |
| The American Championships | Yes |
| United Spirit Association | Yes |
| Universal Cheerleaders Association | Yes |
| World Spirit Federation | Yes |
| All Things Cheer | No |
| American Cheer and Dance Academy | No |
| American Spirit Championships | No |
| America's Best Championships | No |
| Champion Spirit  Group | No |
| Cheer America Championships | No |
| Cheer and Dance Extreme | No |
| Cheer Tech | No |
| COA Cheer & Dance | No |
| Coastal Corporation | No |
| Golden State Spirit Association | No |
| Great Lakes Cheer | No |
| JAMfest | No |
| JAMZ | No |
| Mardi Gras Spirit Events | No |
| Mid-Atlantic Cheer | No |
| Spirit Celebration | No |
| Spirit Unlimited | No |
| Worldwide Spirit Assoc. | No |

*Source* : USASF_00085173

*Notes:*
[1] I determined which Worlds Bid Events were owned by Varsity in the 2014-2015 season by supplementing my findings related to Varsity ownership during the
alleged class period with communications my team had with Varsity counsel related to the timing of Varsity acquisitions.

Ex. 6 - Varsity Ownership of Tier 1 Events, 2011-2012 & 2014-2015.xlsx

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**TIER 1 EVENT PRODUCERS 2011-2012 SEASON**

| Company Name | Varsity-Owned? |
|---|---|
| All Star Challenge | Yes |
| American Championships | Yes |
| American Cheer Power | Yes |
| American Cheerleaders Association | Yes |
| Athletic Championships | Yes |
| National Cheerleaders Association & NDA | Yes |
| One Up Championships | Yes |
| Pac West Spirit Group | Yes |
| Spirit Cheer | Yes |
| Spirit Festival | Yes |
| Spirit Sports | Yes |
| United Spirit Association | Yes |
| Universal Cheerleaders Association & UDA | Yes |
| World Spirit Federation | Yes |
| American Cheer and Dance Academy | No |
| AmeriCheer & AmeriDance | No |
| Champion Spirit  Group | No |
| Cheer America Championships | No |
| Cheer LTD. | No |
| Cheer Tech | No |
| Cheersport | No |
| COA Cheer & Dance | No |
| Coastal Corporation | No |
| Elite Cheer Companies | No |
| Golden State Spirit Association | No |
| Great Lakes Cheer | No |
| JAMfest | No |
| Jamz | No |
| Mid-Atlantic Cheer | No |
| Spirit Celebration / Cheer Gyms Association | No |
| Worldwide Spirit Assoc. | No |
| Xtreme Spirit | No |

*Source* : USASF_00080543

*Notes:*
[1] I determined which Worlds Bid Events were owned by Varsity in the 2011-2012 season by supplementing my findings related to Varsity ownership during the alleged class period with communications my team had with Varsity counsel related to the timing of Varsity acquisitions.

# EXHIBIT 7

Ex. 7 - Varsity Ownership Summary_2011-2015.xlsx

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| Season | Number of Varsity-Owned Tier 1 Events | Number of Total Tier 1 Events |
|---|---|---|
| 2014-2015 | 16 | 35 |
| 2011-2012 | 14 | 32 |

**TIER 1 EVENT PRODUCERS 2014-2015 SEASON**

| Company Name | Varsity-Owned? |
| --- | --- |
| All Star Challenge | Yes |
| American Cheer Power | Yes |
| American Cheerleaders Association | Yes |
| Athletic Championships | Yes |
| Cheer LTD. | Yes |
| Cheersport | Yes |
| National Cheerleaders Association | Yes |
| One Up Championships | Yes |
| Pac West Spirit Group | Yes |
| Spirit Cheer | Yes |
| Spirit Festival | Yes |
| Spirit Sports | Yes |
| The American Championships | Yes |
| United Spirit Association | Yes |
| Universal Cheerleaders Association | Yes |
| World Spirit Federation | Yes |
| All Things Cheer | No |
| American Cheer and Dance Academy | No |
| American Spirit Championships | No |
| America's Best Championships | No |
| Champion Spirit  Group | No |
| Cheer America Championships | No |
| Cheer and Dance Extreme | No |
| Cheer Tech | No |
| COA Cheer & Dance | No |
| Coastal Corporation | No |
| Golden State Spirit Association | No |
| Great Lakes Cheer | No |
| JAMfest | No |
| JAMZ | No |
| Mardi Gras Spirit Events | No |
| Mid-Atlantic Cheer | No |
| Spirit Celebration | No |
| Spirit Unlimited | No |
| Worldwide Spirit Assoc. | No |

*Source* : USASF_00085173

*Notes:*
[1] I determined which Worlds Bid Events were owned by Varsity in the 2014-2015 season by supplementing my findings related to Varsity ownership during the alleged class period with communications my team had with Varsity counsel related to the timing of Varsity acquisitions.

**TIER 1 EVENT PRODUCERS 2011-2012 SEASON**

| Company Name | Varsity-Owned? |
| --- | --- |
| All Star Challenge | Yes |
| American Championships | Yes |
| American Cheer Power | Yes |
| American Cheerleaders Association | Yes |
| Athletic Championships | Yes |
| National Cheerleaders Association & NDA | Yes |
| One Up Championships | Yes |
| Pac West Spirit Group | Yes |
| Spirit Cheer | Yes |
| Spirit Festival | Yes |
| Spirit Sports | Yes |
| United Spirit Association | Yes |
| Universal Cheerleaders Association & UDA | Yes |
| World Spirit Federation | Yes |
| American Cheer and Dance Academy | No |
| AmeriCheer & AmeriDance | No |
| Champion Spirit  Group | No |
| Cheer America Championships | No |
| Cheer LTD. | No |
| Cheer Tech | No |
| Cheersport | No |
| COA Cheer & Dance | No |
| Coastal Corporation | No |
| Elite Cheer Companies | No |
| Golden State Spirit Association | No |
| Great Lakes Cheer | No |
| JAMfest | No |
| Jamz | No |
| Mid-Atlantic Cheer | No |
| Spirit Celebration / Cheer Gyms Association | No |
| Worldwide Spirit Assoc. | No |
| Xtreme Spirit | No |

*Source* : USASF_00080543

*Notes:*
[1] I determined which Worlds Bid Events were owned by Varsity in the 2011-2012 season by supplementing my findings related to Varsity ownership during the
alleged class period with communications my team had with Varsity counsel related to the timing of Varsity acquisitions.

# EXHIBIT 8

**In the Matter Of:**

*JESSICA JONES vs*

*VARSITY BRANDS*

---

*RANDALL HEEB*

*January 19, 2023*

---



106

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TENNESSEE
 2                      WESTERN DIVISION

 3  JESSICA JONES and          )
    CHRISTINA LORENZEN on       )
 4  Behalf of Themselves and    )
    All Others Similarly        )
 5  Situated,                   )
          Plaintiffs,           )
 6                              )
    vs.                         ) CASE NO. 2:20-cv-02892-SHL-tmp
 7                              )
    VARSITY BRANDS, LLC;        )
 8  VARSITY SPIRIT, LLC;        )
    VARSITY SPIRIT FASHION &    )
 9  SUPPLIES, LLC; U.S. ALL     )
    STAR FEDERATION, INC.;      )
10  JEFF WEBB; CHARLESBANK      )
    CAPITAL PARTNERS LLC; and   )
11  BAIN CAPITAL PRIVATE        )
    EQUITY,                     )
12      Defendants.             )

13

14              ORAL VIDEOTAPED DEPOSITION

15                     RANDALL HEEB

16                    JANUARY 19, 2023

17                       VOLUME 2

18

19

20

21

22

23

24

25
```

107

1      ORAL VIDEOTAPED DEPOSITION OF RANDALL HEEB, via Zoom

2  and in person, produced as a witness at the instance of

3  the Defendant Varsity Brands, LLC and duly sworn, was

4  taken in the above-styled and numbered cause on the 19th

5  day of January, 2023, from 12:44 p.m. to 7:50 p.m. PST,

6  before Melinda Barre, Certified Shorthand Reporter in

7  and for the State of Texas, reported by computerized

8  stenotype machine, all parties appearing remotely via

9  web videoconference, pursuant to the rules of procedure

10 and the provisions stated on the record or attached

11 hereto.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

266

1 athletes, right?

2     A.   Well, in general they should not include those

3 athletes before or after.

4     Q.   But if they did, if the count did include those

5 athletes, you'd want to make sure they were counted in

6 the post-acquisition, correct?

7     A.   Well, I may have not pointed out that

8 particular error in Dr. Murphy's analysis; but it also

9 would be a concern.

10     Q.   Well, you claim in your report that

11 pre-acquisition data did not include the dance studio or

12 youth teams, right?

13     A.   My pre-acquisition data does not.  That was my

14 intention.

15     Q.   But you didn't provide a source for that in

16 your report?

17     A.   A source for the ...

18     Q.   Omission of those teams from your data.

19          MS. SPIEGEL:  Objection to form.

20     A.   I believe I counted the pre- and

21 post-competitive cheer, not the dance or jazz or the

22 other events.

23 BY MS. NYONG'O:

24     Q.   The acquired events, they included dance and

25 youth teams before pre-acquisition, right?

267

1    A.   I'd have to go back and look.

2    Q.   You have no reason to believe these teams

3 weren't included in pre-acquisition data, do you?

4    A.   Once again, I'd have to go back and look.

5    Q.   So if it was included in the pre-acquisition

6 data and you chose not to include it in the

7 post-acquisition data, that would not be consistent,

8 would it?

9    A.   To the extent that the -- that the counts -- to

10 look at the effect both on continued events and also on

11 discontinued events, you'd like to look at only the

12 cheer, competitive cheer events, and not the other

13 events.

14   Q.   If Varsity acquired an event and continued it,

15 then participation following the acquisition should be

16 considered in your analysis, right?

17           MS. SPIEGEL:  Objection to form.

18   A.   It depends on what you're doing.  But what

19 Dr. Murphy is doing is counting the same events, to the

20 extent that those were continued -- and I have issues

21 with Dr. Murphy's count of those.  But even if I accept

22 Dr. Murphy's counts, Dr. Murphy has excluded an entire

23 class of competitive cheer participants from his

24 analysis of the pre- versus the post-acquisition.

25           In particular, he has ignored the

302

1  able to earn a Worlds bid, right?

2      A.   Yeah.   They have to have -- they have to be

3  awarded a World bid when a World bid is available, and

4  that involves an exercise that includes the success of

5  the event prior to that.

6      Q.   Did you attempt to isolate what price effects

7  you found resulted from the alleged conspiracy with

8  USASF as opposed to the other challenged conduct?

9      A.   No.

10     Q.   In your report you criticize USASF rules that

11 purportedly restrict new entry and competition among

12 events, right?

13     A.   Can you point me to the specific paragraph that

14 you're discussing.

15     Q.   Sure.   So in your opening report in

16 paragraph 205 you talk about the proximity limitations

17 for World bid events, for example.

18     A.   Yes.

19     Q.   Okay.   And you opine that Varsity engaged in

20 counter-programming and placed its own events near other

21 event producers' World bid events, right?

22     A.   So Varsity referred internally to these as

23 attack events and the attack events -- I don't know that

24 they were just limited to World bid events, but they're

25 certainly discussed in the context of World bid events.

328

1                  UNITED STATES DISTRICT COURT
                      DISTRICT OF MINNESOTA
2

3
  Court File No. 0:18-cv-01776-JRT-HB
4

5 IN RE:

6 PORK ANTITRUST LITIGATION

7 _____/

8

9                    REPORTER'S CERTIFICATE

10              ORAL DEPOSITION OF RANDALL HEEB

11                    January 19, 2023

12

13     I, Melinda Barre, Certified Shorthand Reporter in

14 and for the State of Texas, hereby certify to the

15 following:

16     That the witness, RANDALL HEEB, was duly sworn by

17 the officer and that the transcript of the oral

18 deposition is a true record of the testimony given by

19 the witness;

20     That the original deposition was delivered to

21 Heather Nyong'o.

22     That a copy of this certificate was served on all

23 parties and/or the witness shown herein

24 on _____.

25     I further certify that pursuant to FRCP Rule

329

```
1   30(f)(1), that the signature of the deponent:

2        _____ was requested by the deponent or a party before

3   the completion of the deposition and that the signature is

4   to be before any notary public and returned within 30 days

5   from date of receipt of the transcript.  If returned,

6   the attached Changes and Signature Page contains any

7   changes and the reasons therefor:

8        _____was not requested by the deponent or a

9   party before the completion of the deposition.

10       I further certify that I am neither counsel for,

11  related to, nor employed by any of the parties or

12  attorneys in the action in which this proceeding was

13  taken, and further that I am not financially or

14  otherwise interested in the outcome of the action.

15       Certified to by me on this, the _____ day

16  of _____, 2023.

17

18

19

20       _____

21       Melinda Barre
         Texas CSR 2192
22       Expiration:  12/31/23

23

24

25
```

JESSICA JONES vs
VARSITY BRANDS

Randall Heeb
January 19, 2023

330

```
 1  COUNTY OF HARRIS      )

 2  STATE OF TEXAS        )

 3       I hereby certify that the witness was notified on

 4  _____ that the witness has 30 days or (_____

 5  days per agreement of counsel) after being notified by

 6  the officer that the transcript is available for review

 7  by the witness and if there are changes in the form or

 8  substance to be made, then the witness shall sign a

 9  statement reciting such changes and the reasons given by

10  the witness for making them;

11       That the witness' signature was/was not returned as

12  of _____.

13       Subscribed and sworn to on this, the _____ day of

14  _____, 2023.

15

16

17

18

19       _____

20       Melinda Barre
         Texas CSR 2192
21       Expiration:  12/31/23

22

23

24

25
```

**ERRATA SHEET FOR DEPOSITION TRANSCRIPT**

Case:        *Jessica Jones, et. al. v. Varsity Brands, LLC, et. al.*; Case No. 2:20-cv-02892

Dep. Date:   January 19, 2023

Deponent:    Randal Heeb, Ph.D.

**Global Change:**

1.  Change spelling of expert's name from "Randall Heeb" to "Randal Heeb." The instances that
    I have found of the misspelling are on the title pages of the deposition transcripts; in the
    headers of the deposition transcripts; in the description on p. 107; and in the notarized
    declaration on p. 327. The first name is spelled correctly in other instances.

| Page | Line(s) | Now Reads | Should Read | Reason |
|------|---------|-----------|-------------|--------|
| 13 | 5 | "liable" | "libel" | Transcription error |
| 17 | 12 | "Eaton Maritor" | "Eaton v. ZF Meritor" | Transcription error |
| 21 | 12 | "James Arenoff" | "James Aronoff" | Name misspelled |
| 25 | 21 | "Arenoff" | "Aronoff" | Name misspelled |
| 26 | 10 | "Matthew Holle" | "Matthew Hoelle" | Name misspelled |
| 26 | 13 | "Dr. Holle" | "Dr. Hoelle." | Name misspelled |
| 26 | 24 | "Matthew Holle" | "Matthew Hoelle" | Name misspelled |
| 30 | 10 | "Yes" | "No" | Correction |
| 40 | 13 | "briefcase background" | "brief case background" | Transcription error |
| 53 | 11 | "pair of" | "paragraph" | Transcription error |
| 67 | 22 | "miss-answered" | "misanswered." | Transcription error |
| 102 | 12 | "not constant" | "non consistent" | Transcription error |
| 103 | 18 | "distance events" | "distant events" | Transcription error |
| 120 | 2 | "High School 8" | "High School Finals" | Correction |
| 122 | 21 | "and less average" | "and less expensive" | Correction |
| 152 | 20 | "divided by 21.1" | "divided by 91.1" | Correction |
| 155 | 13 | "second" | "secondary" | Transcription Error |
| 203 | 20 | "electively" | "effectively" | Transcription Error |

| Page | Line(s) | Now Reads | Should Read | Reason |
|------|---------|-----------|-------------|--------|
| 216 | 2 | "probably isn't" | "probably is" | Correction |
| 246 | 19 | "That's correct" | "My previous answer is correct. My estimate of overcharges reflects the payment by both schools and gyms" | Clarification |
| 328 | n/a | Court Reporter's Certification is for the wrong case. | n/a | n/a |

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 3, 2023 in Donnelly, ID.

Randal Heeb, Ph.D.

Errata Sheet – Randal Heeb, Ph.D.

# EXHIBIT 9

**In the Matter Of:**

*JESSICA JONES vs*

*VARSITY BRANDS*

---

*JANET NETZ*

*January 17, 2023*

---



1

1           IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF TENNESSEE

3                    WESTERN DIVISION
   _____
4  JESSICA JONES, et al.,        )
                                 )
5  Plaintiffs,                   )
                                 )
6  v.                            )  Case No.
                                 )  2:20-cv-02892-SHL-tmp
7  VARSITY ZBRANDS, LLC, et      )
   al.,                          )
8                                )
                                 )
9  Defendants.                   )
   _____   )

10

11      Videotaped Deposition of JANET S. NETZ, PHD

12              San Francisco, California

13              Tuesday, January 17, 2023

14

15

16

17

18

19

20          Reported Stenographically by

21     Michael P. Hensley, RDR - CA CSR No. 14114

22

23

24

25

2

```
 1        IN THE UNITED STATES DISTRICT COURT

 2       FOR THE WESTERN DISTRICT OF TENNESSEE

 3                 WESTERN DIVISION
    _____
 4  JESSICA JONES, et al.,     )
                               )
 5  Plaintiffs,                )
                               )
 6  v.                         )  Case No.
                               )  2:20-cv-02892-SHL-tmp
 7  VARSITY ZBRANDS, LLC, et   )
    al.,                       )
 8                             )
                               )
 9  Defendants.                )
    _____)

10

11       Videotaped Deposition of JANET S. NETZ, PHD,

12  commencing at the hour of 9:40 A.M. and concluding

13  at the hour of 7:10 P.M. on Tuesday, January 17,

14  2023, at the location of Cleary Gottlieb Steen &

15  Hamilton LLP, 6250 California Street, Suite 2000,

16  San Francisco, California 94108, before

17  Michael P. Hensley, Registered Diplomate Reporter,

18  Certified Shorthand Reporter No. 14114, in and for

19  the State of California.

20

21

22

23

24

25
```

13

```
 1        A.    I'd guess about 12 to -- 12.

 2        Q.    Okay.  And how many of those approximately

 3   23 cases that were antitrust cases in which you've

 4   served as an expert witness were merger cases or

 5   involved mergers?

 6        A.    None.

 7        Q.    So this is the first time you've been

 8   involved in an antitrust case that involves mergers?

 9        A.    No.  I wouldn't say that, but they weren't

10   merger cases.  It's not brought under Clayton

11   Section 7.  Not to say mergers haven't been

12   involved, but it was not a merger case.

13        Q.    What's your field of expertise?

14        A.    Industrial organization.

15        Q.    And can you briefly tell us what

16   "industrial organization" means.

17        A.    Industrial organization is the field of

18   economics that studies how firms are organized and

19   how they interact with each other as well as how

20   they interact with consumers and suppliers.

21        Q.    Is that what your PhD is in?

22        A.    It's in economics.

23        Q.    Are you an econometrician?

24        A.    I'm an applied econometrician.

25        Q.    Did you do any economic -- econometric
```

JESSICA JONES vs                                                          Janet Netz
VARSITY BRANDS                                                     January 17, 2023

14

1  analysis in support of your opening report in this

2  case?

3      A.   No, I did not.

4           ATTORNEY KENNEDY PARK:  Can I have

5  Exhibit 1, please.

6           (Exhibit 1 was marked for identification.)

7           ATTORNEY KENNEDY PARK:  I'm handing to the

8  court reporter what's been marked as Exhibit 1.

9           ATTORNEY SPIEGEL:  Excuse me, Jenn.  Do

10  you have copies?

11           ATTORNEY KENNEDY PARK:  Yeah, we do.

12  Yeah, just give us a second.

13           THE COURT REPORTER:  For the future, feel

14  free to pass that directly to the witness.

15           ATTORNEY KENNEDY PARK:  Great.  Thank you.

16           And thank you to the court reporter for

17  having labels preprepared.

18           ATTORNEY SPIEGEL:  Thank you.

19           ATTORNEY KENNEDY PARK:  For folks on Zoom,

20  we will drop the exhibit into the chat if you will

21  give us a moment or two.

22           Counsel, you have a copy?

23           ATTORNEY SPIEGEL:  Yes, thank you.

24  BY ATTORNEY KENNEDY PARK:

25      Q.   I've put before you what I've labeled as

Case 2:20-cv-02892-SHL-tmp    Document 423-2    Filed 03/31/23    Page 129 of 226
PageID 14146
JESSICA JONES vs
VARSITY BRANDS
Janet Netz
January 17, 2023

348

1                    CERTIFICATE OF SHORTHAND REPORTER

2

3        I, Michael P. Hensley, Registered Diplomate

4    Reporter for the State of California, CSR No. 14114,

5    the officer before whom the foregoing deposition was

6    taken, do hereby certify that the foregoing

7    transcript is a true and correct record of the

8    testimony given; that said testimony was taken by me

9    stenographically and thereafter reduced to

10   typewriting under my direction; that reading and

11   signing was not requested; and that I am neither

12   counsel for, related to, nor employed by any of the

13   parties to this case and have no interest, financial

14   or otherwise, in its outcome.

15

16

17

18

19                        Michael P. Hensley, CSR, RDR

20

21

22

23

24

25

### ERRATA SHEET FOR DEPOSITION TRANSCRIPT

Case:       *Jessica Jones, et. al. v. Varsity Brands, LLC, et. al.*; Case No. 2:20-cv-02892

Dep. Date:    January 17, 2023

Deponent:    Janet S. Netz, Ph.D.

| Page | Line(s) | Now Reads | Should Read | Reason |
|------|---------|-----------|-------------|--------|
| 18 | 24-25 | I did not reply on any communications with Dr. Heeb. | I did not *rely* on any communications with Dr. Heeb. | Transcription |
| 22 | 13-14 | Have you've seen a final copy of either of Dr. Singer or Szymanski's reports? | Have *you* seen a final copy of either of Dr. Singer or Szymanski's reports? | Transcription |
| 33 | 2 | Jeff Web | Jeff *Webb* | Transcription |
| 179 | 5 | From $33 to $33 | "$30 to $33" or "$33 [sic] to $33 | Clarification |

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 24, 2023 in _____Oakland_____, ___CA___.

Janet S. Netz, Ph.D.

# EXHIBIT 10

# In the Matter Of:

*Jones v*

*Varsity*

---

*JEN MAKI*

*January 23, 2023*

---



1

HIGHLY CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY
1              UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF TENNESSEE

3

4   JESSICA JONES, et al.,        )
                                  )
5              Plaintiffs,        )
                                  )
6       VS.                       )    NO. 2:20-cv-02892-SHL-tmp
                                  )
7   VARSITY BRANDS, LLC, et al., )
                                  )
8              Defendants.        )
    _____)
9

10

11

12

13

14          -- H I G H L Y   C O N F I D E N T I A L --

15              FOR ATTORNEYS' EYES ONLY
        VIDEOTAPED VIDEO CONFERENCE DEPOSITION OF
16                JEN MAKI, PH.D.
              MONDAY, JANUARY 23, 2023

17

18

19

20

21

22

23

24

     STENOGRAPHIC REPORTER:  CHRISTA YAN, CSR NO. 14316
25

1    Varsity TV.  And I just want to confirm that that

2    calculation is based on 20,000 subscribers, multiplied by

3    $30 a month in subscription fees?

4        A    This is a very loose example and not something

5    that I think we could place a whole lot of confidence in.

6    As I note, it's just a back-of-the-envelope calculation.

7        MR. KAISER:  I have no further questions.  Thank you.

8        THE WITNESS:  Thank you.

9        MR. KAISER:  Some of the other lawyers may have

10   questions.

11                        EXAMINATION

12   BY MS. RICCIO:

13       Q    Hi, Dr. Maki.  My name's Nicole Riccio.  I'm the

14   attorney for U.S. All Star Federation.  And I just have a

15   few more questions.

16            I believe you said earlier, that a lot of the

17   background information you included was really just for

18   context for your damages opinion; is that right?

19       A    That's correct.

20       Q    Okay.  And so just to be clear, you're not

21   offering an independent opinion regarding whether the

22   rules, decisions, or policies of USASF that are at issue

23   were anticompetitive?

24       A    That is correct.

25       Q    Okay.  In paragraph 29 of your opening report,

Jones v                                                                    Jen Maki
Varsity                    Highly Confidential - Attorneys' Eyes Only    January 23, 2023

256

1                          REPORTER'S CERTIFICATE

2        I, Christa Yan, CSR No. 14316, do hereby declare:
         That, prior to being examined, the witness named in
3    the foregoing deposition was by me duly sworn remotely
     pursuant to Section 30(f)(1) of the Federal Rules of Civil
4    Procedure, and the deposition is a true record of the
     testimony given by the witness as accurately as possible.
5    That said deposition was taken down by me in shorthand at
     the time therein named and thereafter reduced to text
6    under my direction.
         That said witness was requested to review the
7    transcript and make any changes to the transcript as a
     result of that review pursuant to Section 30(e) of the
8    Federal Rules of Civil Procedure.
     _____No changes have been provided by the witness during
9    the period allowed.
     _____The changes made by the witness are appended to the
10   transcript.
     _____No request was made that the transcript be reviewed
11   pursuant to Section 30(e) of the Federal Rules of Civil
     Procedure.
12       I further declare that I have no interest in the event
     of the action.  I declare under penalty of perjury under
13   the laws of the United States of America that the
     foregoing is true and correct.
14       WITNESS my hand this 2nd day of February 2023.

15

16   _____
     Christa Yan, CSR NO. 14316
17

18

19

20

21

22

23

24

25

**ERRATA SHEET FOR DEPOSITION TRANSCRIPT**

Case:    *Jessica Jones, et. al. v. Varsity Brands, LLC, et. al.*; Case No. 2:20-cv-02892

Dep. Date:    January 23, 2023

Deponent:    Jen Maki, Ph.D.

| Page | Line(s) | Now Reads | Should Read | Reason |
|------|---------|-----------|-------------|--------|
| 9 | 12 | "January 28, 2022" | "June 20, 2022" | Transcription error |
| 13 | 16 | "Hall" | "Hoelle" – **global correction** | Misspelling of name |
| 16 | 5 | "direct" | "director" | Transcription error |
| 28 | 21 | "till" | "still" | Transcription error |
| 35 | 5 | "as" | "then" | Transcription error |
| 40 | 24 | "same" | "seen" | Transcription error |
| 45 | 22 | "required" | "acquired" | Transcription error |
| 49 | 20 | "It was Dan Rubinfeld." | It was Dan Rubinfeld, he was the testifying expert for EVR (electronic vehicle registration), part of the DMS case.  Reason: Providing clarification/additional detail | Providing clarification/additional detail |
| 57 | 17 | "relating" | "referring" | Transcription error |
| 60 | 21 | "I think it was monetary" | "I think it was not monetary" | Transcription error |
| 67 | 16 | "Correct." | "Correct, it is based on the Customer location." | Misstatement |
| 123 | 2 | "That"s correct. It"s ship to or bill to." | "Correct, it is based on bill to or Customer location." | Misstatement |
| 123 | 13 | "That"s correct." | "The splits are based on bill to or Customer location." | Misstatement |
| 123 | 17 | "Correct." | "No, apparel is based on the bill to address." | Misstatement |
| 146 | 14 | "may" | "say" | Transcription error |

| Page | Line(s) | Now Reads | Should Read | Reason |
|------|---------|-----------|-------------|--------|
| 148 | 14 | "a gym may send to send its All Star teams" | "a gym may send its All Star teams" | Transcription error |
| 157 | 18 | "2028" | "2018" | Transcription error |
| 222 | 5 | "roommates" | "room rates" | Transcription error |
| 249 | 24 | "shipped" | "billed" | Transcription error |

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 24, 2023 in Scottsdale, Arizona.

<u>See attached.</u>
Jen Maki, Ph.D.

1    READ/SIGN DEPOSITION OF: Jen Maki
     DATE OF DEPOSITION:    January 23, 2023
2    IN THE MATTER OF:    Jones v Varsity

3         DO NOT WRITE ON THE DEPOSITION ITSELF

4    Page Line  Changes or corrections and reason

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____
     I have inspected and read my deposition and
22   have listed all changes and corrections above,
     along with my reason therefor.
23

24   DATE: 02/24/2023  SIGNATURE: _____

# EXHIBIT 11

**In the Matter Of:**

*Jones vs*

*Varsity Brands*

---

# *JAMES ARONOFF*

# *January 13, 2023*

---



1

```
 1                                      VOLUME 1
                                        PAGES:  1-179
 2                                      EXHIBITS:  See Index

 3
                    UNITED STATES DISTRICT COURT
 4                  WESTERN DISTRICT OF TENNESSEE

 5
        _____
 6                                    )
        JESSICA JONES, et al.,        )
 7                                    )
                Plaintiffs,           )
 8                                    ) Civ. Action No.
            v.                        ) 2:20-cv-02892
 9                                    )
        VARSITY BRANDS, LLC; et al.,)
10                                    )
                Defendants.           )
11                                    )
        _____)
12

13

14

15      VIDEOTAPED DEPOSITION of JAMES H. ARONOFF

16           - CONDUCTED BY VIDEOCONFERENCE -

17             Friday, January 13, 2023

18          9:58 a.m. Eastern Standard Time

19

20

21

22          Michelle Keegan, RMR, CRR

23                   Lexitas

24      508-478-9795 ~ 508-478.0595 (Fax)

25              www.LexitasLegal.com
```

173

1        So if you understand that and I'm taking

2    as a given that Varsity's current control and

3    conduct of the USASF board is anticompetitive,

4    it's an assumption, my predicate, then how could a

5    recommendation to say "don't do that any more,

6    change the board" need an economic study to -- I

7    mean, yeah, okay, you don't want to create a

8    similar situation.

9        But I think my recommendation says the

10    board should be restructured in such a way and as

11    you can demonstrate the decision-making is fair,

12    is transparent, and that no any one constituent

13    has actual or perceived control of this body.  And

14    that's what that sentence says.

15        I mean, it's really a truism on its face.

16    Q.  Okay.  Just to make sure I understand,

17    though, you don't attempt to quantify the extent

18    to which restructuring USASF's board would have an

19    impact on prices for cheerleading competitions.

20    Right?

21    A.  No.  And that may or may not be important

22    when determining, you know, how and in what way

23    should these recommendations be actually

24    implemented or put into policies and procedures.

25        So no.  In this report, in these reports,

Case 2:20-cv-02892-SHL-tmp   Document 423-2   Filed 03/31/23   Page 143 of 226
Jones vs                          PageID 14160                    James Aronoff
Varsity Brands                                                    January 13, 2023

174

1    I was focused on providing a recommendation for

2    structural relief to the problem presented, the

3    activity or the effect presented, while at the

4    same time and without doing an independent study

5    making sure that the recommendation for structural

6    relief didn't negatively impact other market

7    participants, that the day-to-day activities of

8    most of the market participants wouldn't be

9    affected.

10        Q. Is it your opinion that restructuring

11   USASF's board would result in lower prices for

12   both all-star and school cheer competitions?

13        A. I don't have an opinion.  I hadn't looked

14   at that.  I mean, I haven't been asked to examine

15   that.  I don't have an opinion on that.

16        Q. Okay.  Is it -- do you have an opinion on

17   whether restructuring USASF's board would result

18   in increased output in all-star and school

19   competitions?

20        A. No, I don't have an opinion on that.

21        Q. Okay.  Do you have an opinion -- with

22   respect to any of the recommendations in your

23   report, do you have an opinion as to whether

24   implementing those recommendations would have --

25   would result in lower prices in any of the

175

1    all-star or school cheer competition, apparel,

2    camp spaces?

3       A. No.  My perspective -- my perspective is

4    related to my core expertise, which is how do

5    institutions make rules to conduct their business

6    in a way that mitigates the likelihood that they

7    will act in an unethical or illegal fashion and

8    create liability that could otherwise be avoided.

9         So in this context, the specific policies

10   that would say how can we mitigate conduct that

11   may be perceived as anticompetitive, were

12   violative of state laws regarding the competition

13   and federal laws regarding competition, it may be

14   appropriate as you're developing the contours of

15   that particular part of the regulations to do a

16   study.

17        Because what you're talking about is

18   comparative.  Right?  It's looking at the current

19   state and it's looking at -- of affairs and it's

20   looking at allegedly the increased cost to

21   indirect purchasers created by all these

22   anticompetitive activities and comparing it to a

23   market where with some of these recommendations

24   implemented and the nonanticompetitive activity,

25   net is that better for, I guess, consumers in your

Jones vs
Varsity Brands

James Aronoff
January 13, 2023

176

1   example.

2        What I'm saying is that was not something

3   I was asked . . .

4        MS. RICCIO:  You may have frozen.  I don't

5   know about anyone else.

6        MR. SEIDEL:  Frozen for me.

7        THE REPORTER:  Same here.

8        THE VIDEOGRAPHER:  The time is 3:44 p.m.,

9   and we're going off the record.

10       (Off the record 3:44 p.m. to 3:45 p.m.)

11       THE VIDEOGRAPHER:  The time is 3:45 p.m.,

12   and we're back on the record.

13       (Record read)

14       THE WITNESS:  To do.

15   BY MS. RICCIO:

16   Q.  Okay.  Was that the complete answer?

17   A.  Yeah.  To engage in that analysis.

18   Q.  Okay.  And so you didn't analyze whether

19   it would be -- whether there would be cheaper

20   prices for consumers in the but-for -- strike

21   that.

22       You didn't conduct an analysis of what

23   prices would be for consumers in the world where

24   your recommendations were implemented.  Is that

25   fair?

177

1         A.  I didn't conduct any studies around the

2    cost of implementing my recommendations to anyone,

3    including consumers.

4            MS. RICCIO:  Okay.  I have no further

5    questions.  I don't know if anyone else does.

6            Thank you, Mr. Aronoff.

7            MR. GAFFNEY:  No questions from me on

8    behalf of Mr. Webb.

9            MR. KAISER:  No questions from me.

10           MR. SEIDEL:  We're done.

11           THE VIDEOGRAPHER:  This concludes the

12   deposition of Mr. James Aronoff.  The time is

13   3:47 p.m.  Thank you very much.

14           (Off the record at 3:47 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Case 2:20-cv-02892-SHL-tmp   Document 423-2   Filed 03/31/23   Page 147 of 226
PageID 14164

Jones vs
Varsity Brands

James Aronoff
January 13, 2023

178

1   COMMONWEALTH OF MASSACHUSETTS

2   SUFFOLK, SS.

3

4       I, Michelle Keegan, Registered Merit Reporter

5   and Notary Public in and for the Commonwealth of

6   Massachusetts, do hereby certify that JAMES H.

7   ARONOFF, the witness whose deposition is

8   hereinbefore set forth, was duly sworn by me and

9   that such deposition is a true record, to the best

10  of my ability, of the testimony given by the

11  witness.

12      I further certify that I am neither related to

13  or employed by any of the parties in or counsel to

14  this action, nor am I financially interested in

15  the outcome of this action.

16      In witness whereof, I have hereunto set my hand

17  and seal this 19th day of January, 2023.

18

19

20

21

22

23                  Notary Public

24                  My commission expires:

25                  May 15, 2026

**ERRATA SHEET FOR DEPOSITION TRANSCRIPT**

Case:          *Jessica Jones, et. al. v. Varsity Brands, LLC, et. al.*; Case No. 2:20-cv-02892

Dep. Date:    January 23, 2023

Deponent:    James H. Aronoff

| Page | Line | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 19 | 10 | C-suite | C-suite executive | Transcription |
| 43 | 6 | C-suite | C-suite executive | Transcription |
| 51 | 22 | Nondirectly | None directly | Transcription |
| 69 | 19 | Whereas as | Whereas | Transcription |
| 74 | 1 | State of play | stay to play | Transcription |
| 74 | 17 | State of play | stay to play | Transcription |
| 75 | 3 | State of play | stay to play | Transcription |
| 75 | 8 | State of play | stay to play | Transcription |
| 75 | 9 | State of play | stay to play | Transcription |
| 173 | 12 | and that no any one constituent | and that not any one constituent | Transcription |

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 24, 2023 in San Francisco, California.

*/s/ James Aronoff*
James H. Aronoff

# EXHIBIT 12

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Appendix B:**

**Materials Relied Upon**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**LEGAL FILINGS**

*Jessica Jones, Michelle Velotta, and Christina Lorenzen on Behalf of Themselves and All Others Similarly Situated, v. Varsity Brands, LLC; Varsity Spirit, LLC; Varsity Spirit Fashion & Supplies, LLC; U.S. All Star Federation, Inc.; Jeff Webb; Charlesbank Capital Partners LLC; and Bain Capital Private Equity*, Complaint, December 10, 2020

*National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma and University of Georgia Athletic Association*, Syllabus, Case No. 83-271 (1984)

**EXPERT REPORTS (Including materials referenced within)**

Expert Report of Jonathan M. Orszag, *Fusion Elite All Stars, et al., v. Varsity Brands, LLC, et al.*, September 23, 2022

Expert Damages Report of Jen Maki, June 20, 2022

Expert Report of James H. Aronoff, June 20, 2022

Expert Report of Janet S. Netz, Ph.D., June 20, 2022

Expert Report of Randal Heeb, Ph.D., June 20, 2022

**DEPOSITIONS (Including exhibits referenced within)**

Deposition of Ali Stangle, March 30, 2022

Deposition of Amy Clark, March 31, 2022

Deposition of Brian Elza, November 16, 2021

Deposition of Jamie Parrish, March 3, 2022

Deposition of Jeffrey Fowlkes, April 5, 2022

Deposition of Jim Chadwick, April 15, 2022

Deposition of John Newby, March 23, 2022

Deposition of Lynn Singer, March 2, 2022

Deposition of Rebecca Foster, December 21, 2021

Deposition of Sarah Minzghor, December 17, 2021

Deposition of Steve Peterson, April 4, 2022

Deposition of Steve Peterson, March 9, 2022

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**INTERVIEWS**

Interview with Jim Chadwick, September 20, 2022

Interview with Steve Peterson, September 20, 2022

**ACADEMIC LITERATURE**

Carlton, Dennis W., and Jeffrey M. Perloff, *Modern Industrial Organization*, 4th Ed., Pearson (2005)

Mitchell, Ronald, Todd Crosset, and Carol A. Barr (1999), "Encouraging Compliance Without Real Power: Sport Associations Regulating Teams," *Journal of Sport Management*, 13

Noll, Roger G. (2003), "The Organization of Sports Leagues," *Oxford Review of Economic Policy*, 19:4

Weistart, John C. (1977), "Player Discipline in Professional Sports: The Antitrust Issues," *William & Mary Law Review*, 18:4

Wright, Joshua (2010), "Optimal Sanctions for NFL Hits," *International Center for Law & Economics*

**PUBLICLY AVAILABLE MATERIALS**

JAMZ, *The Pinnacle Cheerleading Championship*, https://www.jamz.com/the-pinnacle

NBA, *Rulebook*, https://official.nba.com/rule-no-1-court-dimensions-equipment/

NCAA, *Men's basketball 3-point line extended to international distance*, June 5, 2019, https://www.ncaa.org/news/2019/6/5/men-s-basketball-3-point-line-extended-to-international-distance.aspx

NHFS, *Spirit*, https://www.nfhs.org/activities-sports/spirit/

ONE, *The ONE Cheer & Dance Finals*, http://www.theonefinals.com/

Shout Cheer & Dance, *Surf's Up Grand National Championship*, https://www.shoutcheer.com/2022-23-events/surf's-up-grand-national-championship

The Cheerleading Worlds, *2022-2023 Bid Events Schedule*, https://thecheerleadingworlds.net/bid-events-schedule/

The Cheerleading Worlds, *Countdown To Worlds And Future Dates*, https://thecheerleadingworlds.net/future-dates/

The Cheerleading Worlds, https://thecheerleadingworlds.net/

The Open Championships, *About Us*, https://openchampionshipseries.com/about-us/

The Open Championships, *Allstar World Championship Frequently Asked Questions*, https://theallstarworldchampionship.com/faqs/

The Open Championships, *Allstar World Championship*, https://theallstarworldchampionship.com/

The Open Championships, *Championships*, https://openchampionshipseries.com/2023-championships/

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

The Open Championships, *The Open Championship Series Cheerleading Rules & Guidelines 2022-2023*, https://openchampionshipseries.com/wp-content/uploads/2022/07/OCS-RuleBook.pdf

USASF, *2016-2017 Safety Rules & Glossary*, https://web.archive.org/web/20161106132927/http://usasf.net/safety/cheer/rules/16-17

USASF, *2022-2023 USASF Cheer Rules*, https://usasfmain.s3.amazonaws.com/Rules/USASF_Cheer_Rules_22-23.pdf

USASF, *Boards and Committees*, https://www.usasf.net/boards-committees

USASF, *Cheer Rules*, https://web.archive.org/web/20170806210422/http://usasfrules.com:80/

USASF, *Event Producer Membership Application*, https://usasf.formstack.com/forms/usasf_ep_membership_application_worldsbid_22_23

USASF, *Mission & History*, https://www.usasf.net/about

USASF, *Rules Access*, https://web.archive.org/web/20180922121830/http://www.usasf.net/safety/cheer/rulesmembers

USASF, *Rules*, https://web.archive.org/web/20200806102642/https://www.usasf.net/rules

USASF, *Rules*, https://www.usasf.net/rules

USASF, *Staff*, https://www.usasf.net/staff

USASF, *What is All Star Cheer?*, https://www.usasf.net/cheer

Varsity, *The Summit Championship*, https://www.varsity.com/all-star/competitions/end-of-season-events/the-summit/

Varsity, *The U.S. Finals*, https://www.varsity.com/all-star/competitions/end-of-season-events/us-finals/

**BATES-STAMPED DOCUMENTS (Listing beginning Bates only)**

USASF_00002776

USASF_00002779

USASF_00002782

USASF_00002785

USASF_00002943

USASF_00011692

USASF_00011695

USASF_00011972

USASF_00012988

3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

USASF_00013105

USASF_00013107

USASF_00013111

USASF_00013112

USASF_00019474

USASF_00019495

USASF_00019528

USASF_00020057

USASF_00020212

USASF_00020214

USASF_00022755

USASF_00027858

USASF_00027885

USASF_00028041

USASF_00028264

USASF_00030547

USASF_00030653

USASF_00032403

USASF_00032454

USASF_00032456

USASF_00032565

USASF_00039898

USASF_00042049

USASF_00042331

USASF_00046687

USASF_00048185

USASF_00050475

USASF_00051272

USASF_00051808

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

USASF_00080543

USASF_00081167

USASF_00081398

USASF_00082519

USASF_00082520

USASF_00084032

USASF_00084036

USASF_00085173

USASF_00085645

USASF_00085646

USASF_00086125

USASF_00087504

USASF_00087505

USASF_00088638

USASF_00088657

USASF_00088659

USASF_00088660

USASF_00088662

USASF_00090186

VAR00010122

VAR00010123

VAR00010124

VAR00010125

VAR00010126

VAR00010127

VAR00167235

VAR00253877

VAR00319008

VAR00348574

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

VAR00348595

VAR00351488

VAR00370795

VAR00462071

VAR00462072

# EXHIBIT 13

# Operation Catapult:
## *Bain Capital update*

Monday, November 19th, 2018





**DRAFT**



All logos, trademarks and brand names used belong to their respective owners
This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

## Project objectives

- Develop an **integrated 3–5 year corporate strategy** that:
  - **Prioritizes growth opportunities** across both current and potential new businesses
  - Defines the company's **overall portfolio strategy**, including role of the center, where/how to invest for growth, and cross-business growth opportunities and enablers
  - Determines both attractive **organic new business opportunities and potential M&A moves**
  - Describes the company's **path to equity value creation**—primary levers and highest ROI actions

- Develop a clear **digital strategy,** leveraging technology to provide the right end-to-end experience for customers and create sustained advantages against both current and future competitors

- Jump start efforts to drive near-term profitable growth through increased **salesforce effectiveness** and **optimized pricing**; define and deploy best practices across the portfolio

- Develop an integrated, focused, and pragmatic Varsity-wide value creation plan that management can align around, and mobilize the entire organization against, to **deliver results**

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

Confidential

# Project approach



This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

BAIN & COMPANY   3

Confidential

BAIN00065147

# Meeting roadmap – next week we will discuss Strategic Choices with the Varsity LT

**1a. Digital workshop**

Fri, Oct 5th

*Align on our 'digital departure' and discuss potential priorities towards our 'digital destination'*

**1b. Commercial Excellence**

Mon, Oct 22nd

*Identify the most important SFE and pricing opportunities for immediate action*

**2. Strategic Foundation**

Tues., Nov 6th

*Align on the facts across all of Varsity's businesses and discuss the most promising opportunities for growth and value creation*

**3. Strategic Choices**

Tues., Nov 27th

*Prioritize the opportunities that we will go after as a company (i.e. start, stop, and accelerate)*

**4. Strategy review/ initiative planning**

Wed, Dec 12th (Orlando)

*Set our strategy and understand implications for our organization*

**5. Mobilization**

Tues., Jan 15th

*Agree on the 'how' and mobilize our business*

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

Confidential

# Our analytic path towards strategic choices…

Covered with Varsity on Nov 6



Business definition → Market attractiveness and structure → Competitive positioning and business performance → "Path to Victory" (strategic choices)

Focus of 11/27 Strategic Choices meeting

| How many businesses are we in? What are their boundaries? | How attractive is each market (size, growth, profits)? What is "basis of competition" (what drives leadership)? | How are we positioned with customers? Against competitors? How are we doing and why? | How should we grow? |

This information is confidential and was prepared by Bain & Company solely for the use of our client  it is not to be relied on by any 3rd party without Bains prior written consent

**BAIN & COMPANY** ⊙     5

BAIN00065149

# High level messages from the corporate strategy work

**Varsity Brands is operating in 5+ businesses…**

- Based on "discoverable" business boundaries, we believe Varsity Brands operates in 5+ businesses: Sports apparel & equipment (BSN), Cheer apparel/camps/competitions (Spirit), Yearbooks, Scholastic (e.g. cap & gown, jewelry), and B2C (may be more than 1 business)

**…in which there is an incredible amount of opportunity (differentially within BSN)…**

- BSN, Spirit, and Yearbook generate significant RONA (~700%, ~300%, and ~100%, respectively)

- BSN has significant upside – specifically in SFE/Pricing, going deeper into current accounts (more sports, women's, etc.), and capturing geographic whitespace and greenfield accounts through rep hiring

- Spirit is reaching a ceiling in current business; upside by expanding the addressable market (local competitions, fundraising, reducing travel expenses) and "recreating the magic" in near-in adjacencies such as Dance and Band

- Yearbook is at risk due to technology issues, but plans are in place to preserve profit in this slowly declining market

- Scholastic has challenging market environments and would likely require significant investments in technology and new product development to truly inflect the trajectory (with minimal upside, particularly relative to BSN and Spirit)

- All BUs are dabbling in B2C today; a clear question as to whether Varsity should be in B2C (and if so, what would it take, likely requiring buying assets and capabilities)

**…and a few things we "must get right" to win**

- Across the board, our customers tell us that reliability and on-time delivery is the #1 key purchase criteria and Varsity is underperforming (industry-wide issue, but Varsity gets lower marks)

- Some functions may be raised to the center to drive discipline and support growth – Sales Ops, Digital, and Cost/Procurement are in consideration (among others) – though recognize these are separate businesses

This information is confidential and was prepared by Bain & Company solely for the use of our client  it is not to be relied on by any 3rd party without Bain's prior written consent

**BAIN & COMPANY** ◉    6

Confidential

BAIN00065150

**A G E N D A**

**Business definition**

BSN overview

Varsity Spirit overview

Yearbook overview

Scholastic / College overview

Direct to consumer

Discussion: Initial prioritization and key strategic choices

Confidential

BAIN00065151

# Key principles of business definition

**Boundaries depend on degree of cost sharing, coordination benefits and customer sharing**



**Litmus test:** validate vs. **how industry peers are structured**

**Learnings over time on business definition**

- Boundaries exist because of distinct customer needs and/or **compelling business economics** within the boundary

- Market **boundaries are discovered not decided**

- Boundaries are **not fixed, but continuously evolving**

- It is hard to do strategy if you don't know what they are!

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

Confidential

## **Customer sharing:** Within the major 3 divisions, there is typically a high amount of customer sharing; though Yearbooks and Scholastic/College show differences

### BSN: Apparel and Hard goods have high overlap



### Spirit: Apparel, Competitions, and Camps all have high overlap



### Herff Jones: Yearbook have LOW overlap with rest of achievement



Source: Company internal data

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

BAIN & COMPANY ◷    9

BAIN00065153

# Cost sharing: BSN goes to market with 1 sales force (mix of inside and outside), VS collaborates across product lines and HJ has 3 separate sales forces

## BSN Sports

**APPAREL & EQUIPMENT**

- Sales Pros assigned to schools to sell all products and all product categories; supported by inside sales
  - Outbound telesales
  - Inbound call center
  - Web/digital
  - Bid

## Varsity Spirit

**APPAREL**

- Network of RSMs/reps cover schools

- Separate RSM and 39 reps cover All Star

**CAMPS**

- State Directors cover all camps

**COMPETITIONS**

- All Star Event Advisors

## Herff Jones

**YEARBOOK**

- Reps work primarily with Yearbook Advisers in schools

**SCHOLASTIC (K-12)**

- Independent sales representatives for K-12 customers

**SCHOLASTIC (College)**

- Independent sales representatives for College customers

## Direct-to-consumer

**Sideline Store**

- Digital only channel for Sideline Store – does not have reps

**Fan Cloth**

- Inside reps to sell coaches on running a campaign; limited selling or influencing of ultimate student/parent purchasing



**Outside and inside sales costs are shared across apparel and equipment**

**Separate sales forces that collaborate across product lines**



**No sharing of costs between Yearbook, Scholastic (K-12) and Scholastic (College) sales forces today**

**Digital only costs – limited FTE costs**

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent
Confidential

# My Team Shop and Sideline Store have key differences across products, customers, and business models that lead to different business definitions





| | **My Team Shop** | **Sideline Store / Fan Cloth** |
|---|---|---|
| **Key products** | • In-game (and practice) sports apparel<br>  – Performance oriented<br>  – Often customized | • School / sport appreciation gear<br>  – Designed to show support – not to be game / practice worn |
| **Key customers (buyers of products)** | • Coaches are the designers and approvers of gear | • Parents / students / fan of the team (school) can buy (and sometimes design) gear |
| **Business model** | • Marketed as an extension of the BSN Sales Pro (can be used without the Sales Pro) | • Sideline store does not need to be affiliated with a Sales Pro<br>• Fan Cloth sells through a fundraising platform |

**Likely a "Channel" for BSN**

**Separate businesses…
TBD on if within Varsity Brands or within the BUs**

This information is confidential and was prepared by Bain & Company solely for the use of our client  it is not to be relied on by any 3rd party without Bains prior written consent
Confidential

BAIN00065155

# Our business definition would assert that Varsity Brands operates in 5 distinct businesses



**① BSN SPORTS** THE HEART OF THE GAME

YOUR NAME

Apparel (includes footwear)    Hard goods

MY TEAM SHOP



**② VARSITY**

EAGLES

The SUMMIT

Competitions

Apparel

Camps



**③ HERFF JONES.**    2019

*Yearbook*



**④ HERFF JONES.**

*Scholastic/College*    Jewelry

Cap & Gown    Fine Paper

**⑤ DTC**     Vshop     SIDELINE STORE     Tanccloth    BSNsports.com

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent
Confidential

**A G E N D A**

Business definition

**BSN overview**

Varsity Spirit overview

Yearbook overview

Scholastic / College overview

Direct to consumer

Discussion: Initial prioritization and key strategic choices

BAIN00065157

# BSN serves the ~$5B team sports apparel and equipment segment within US sporting goods that is growing 2-3% per year

**MARKET ATTRACTIVENESS**                                                                                      / PRELIMINARY



**BSN's market is ~$5B…**

Estimated industry size (2017)

**…and is growing at 2-3% per year**

Team sports uniforms and equipment growth

*Note: $5B includes sports apparel and equipment purchased in the "team environment"—funded via school budget, booster donations/fundraising, pay-to-play fees, or online team shops; $13B includes spend for team apparel/equipment not purchased through the team environment and team spend at large colleges; $69B includes all non-team related sports apparel and equipment spend

Source: SFIA Manufacturing Manufacturers' Sales by Category Report (2017); NFHS Sports Participation Survey 2006-2017; NSGA Historical Participation 2017; NSGA Historical Sporting Goods Report (2017); industry participant interviews

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

BAIN & COMPANY ⊙    14

# BSN has ~19% share of the overall market with a differential focus on apparel and High Schools

**COMPETITIVE POSITION**    /PRELIMINARY



**BSN is one of few competitors with scale in the highly fragmented team sports market**

Note: "Out-of-school other" includes Church, Government, and Camp; "School other" includes District; segment size excludes corporate and consumer direct
Source: Industry participant interviews; BSN 2017 internal data

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

Confidential

BAIN & COMPANY    15

BAIN00065159

# BSN doubled its market share from 2014 to 2017, mostly through adding reps…

**COMPETITIVE POSITION**

/ PRELIMINARY

### BSN has taken significant share in the past few years

### Share gains are primarily driven by acquisitions and hiring of new Field Sales Pros





Note: Vets defined as employees hired before 2009 (i.e. 5+ years of experience by 2013); transaction data does not include freight collected; analysis includes all FSPs tied to transaction data.
Source: Field Sales Employee Table; BSN transaction data; BSN company data

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

BAIN & COMPANY ⊙    16

Confidential

BAIN00065160

# …and has captured an out-sized portion of the industry profit pool

**COMPETITIVE POSITION**    **/ PRELIMINARY**



Average gross margin (%)

Total = ~$1.4B

**Note:**
Bar width = Revenue
Bar height = Gross margin %
Bar area = Gross profit $

| | | |
|---|---|---|
| **Apparel** | **Footwear** | **Equipment** |

BSN 39% — $185M
Rest of market 31% — ~$550M
BSN 39% — 7
Rest of market 33% — ~$80M
BSN 44% — $136M
Rest of market 23% — ~$470M

Source: 2017 BSN transaction data; industry participant interviews

This information is confidential and was prepared by Bain & Company solely for the use of our client  it is not to be relied on by any 3rd party without Bain's prior written consent

Confidential

**BAIN & COMPANY** ⏱    17

BAIN00065161

# BSN's margins are higher than industry averages, suggesting it's realizing benefits of scale (e.g. purchasing)



Gross margin %

**Apparel**
- BSN (Proprietary)
- BSN (Non-Proprietary)
- 28-33% Industry average

**Footwear**
- BSN (Non-Proprietary)
- 30-35% Industry average

**Equipment**
- BSN (Proprietary)
- BSN (Non-Proprietary)
- 20-25% Industry average

Source: Industry participant interviews, BSN 2017 internal data

This information is confidential and was prepared by Bain & Company solely for the use of our client  it is not to be relied on by any 3rd party without Bain s prior written consent

**BAIN & COMPANY**    18

Confidential                                                                                           BAIN00065162

# BSN's market share varies significantly by metropolitan area (MSA); lower penetration in the North East and West regions

/ **P R E L I M I N A R Y**

C O M P E T I T I V E   P O S I T I O N

## BSN has high share in the South/Midwest, and low share in the Northeast/West



### Regional market share (HS only)



Note: Only includes high schools, excludes some schools for which CBSA was not available
Source: BSN internal data; Bain 2016 opportunity estimation

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

**BAIN & COMPANY** 19

# Significant white space still exists in current accounts

**COMPETITIVE POSITION**

**/ PRELIMINARY**

**BSN has made progress going deeper into accounts over the past 3 years (HS example)…**

**…And still has significant white space opportunities within current accounts**



# of BSN High School accounts by estimated penetration



BSN Penetration (FY17) All High Schools

Note: Opportunity size based on regression model and expert interviews; *only includes BSN customers with greater than $1K in annual sales; accounts are grouped for visibility
Source: Company data; MDR Database

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

Confidential

**BAIN & COMPANY**    20

# BSN is under-penetrated in hard goods versus the overall market

**COMPETITIVE POSITION**                                        / PRELIMINARY



2017 Market Size

**48%** Hardgoods represents 48% of the overall market…

**37%** …but only 37% of BSN's sales

Note: *Assumes ranged ratio of addressable as overall segment, based on $18B team spend and $88B total sports industry v. $5B addressable and $18B team spend; assumes share of 15% based on share of addressable segments today
Source: NSGA Historical Sporting Goods Report (2017); NFHS Sports Participation Survey 2006-2017; NSGA Historical Participation 2017; SFIA Manufacturers' Sales by Category Report (2017); industry participant interviews

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

**BAIN & COMPANY** ◉    21

BAIN00065165

# BSN is under-penetrated in women's sports versus the market

**COMPETITIVE POSITION**

/ PRELIMINARY

## Women's teams are currently underserved

"Yeah they really just flock to the men's teams. I mean, **for the past 5 years our girls have been ordering men's shoes."**

Women's Basketball Coach, High School

"Girls and young women are one of [the sporting good industry's] **fastest growing-markets, and one of its most-ignored."**

Washington Post, 2014

"I've noticed them **approaching [the girls' teams] differently**. Our uniforms are often ordered as men's sizes, and **then the girls just have to fold them**. They're not built to fit them the right way, and we aren't being offered that… I haven't had a chance to really look at others, but **that would be a huge benefit. I mean, does someone like BSN do this?**"

Girls Athletic Coordinator, High School

"One of the things that the team industry is just **not doing a good job of is really attacking women's sports**."

EVP, Provider

## BSN under-indexes on serving women's sports today



Sales by gender (2017)

Source: NSGA Historical Sporting Goods Report (2017); NFHS Sports Participation Survey 2006-2017; NSGA Historical Participation 2017; SFIA Manufacturers' Sales by Category Report (2017); industry participant interviews; company websites

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

# BSN lags local team dealers on consistently delivering product fast and on time (most important KPC); it excels in breath of product and digital offerings

**COMPETITIVE POSITION**                                                          /PRELIMINARY



Source: BSN Customer Survey Data 2018, N = 810

This information is confidential and was prepared by Bain & Company solely for the use of our client  it is not to be relied on by any 3rd party without Bain's prior written consent

Confidential

BAIN & COMPANY        23

BAIN00065167

# Customer advocacy is high for BSN, including over regional distributors

**COMPETITIVE POSITION**  / P R E L I M I N A R Y

## Customer NPS

% of responses   ☐ Promoters   ☐ Neutral   ■ Detractors



Note: Only includes customers that use vendor as primary vendor for sports equipment/apparel
Source: BSN Customer Survey Data 2018, N = 810

## The "why"

- *"The **variety** in equipment and apparel is excellent. **Prices** are cheaper than most others and the **sales rep and service** are excellent."*

- *"My **sales rep** has been phenomenal. I would not be doing half of what I am doing without [sales rep name] as our sales rep."*

- *"I have had great experiences the last few years working with **multiple BSN salesmen**."*

- *"Awesome **customer service**! They make sure artwork is always correct, and my salesperson will talk even on weekends."*

- *"Overall I'm extremely happy, the only negative (and why a 9, not 10) is that **products are sometimes out of stock or are on back order**, especially Nike products."*

- *"I believe I have the **best and most honest Salesman you can find**...available 24/7."*

- *"Billing system is flawed. Get billed for things I do not receive! **Continually do not get the product that I order (Nike)**, and we are a Nike school!"*

- *"Too many **invoices**. Items not being **shipped** all at once. Items **not in stock**. Items **taking too long to be received** after primary promise date."*

- ***"Products take far to long to arrive** to our College. **Freight on items tends to be expensive** as well as the printing costs on all of our apparel. Have not seen what we were sold on when we switched to BSN over a year ago."*

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

**BAIN & COMPANY** ◷   24

BAIN00065168

# Recent rookie hires (2013-2016 cohorts) has been similarly successfully as "buying reps"; poaching veterans shows highest lifetime profitability for BSN

**B U S I N E S S   P E R F O R M A N C E**

/ P R E L I M I N A R Y



EBITDA NPV of new reps (15 years, $K)

| Acq Costs | $3K | $8K | $234K |
|---|---|---|---|
| 2013 (N) | 19 | 35 | 9 |
| 2014 (N) | 28 | 30 | 20 |
| 2015 (N) | 29 | 44 | 10 |
| 2016 (N) | 53 | 39 | 119 |

- **Veterans:** (i.e. bounties) have been the most attractive talent opportunity with generally low costs of acquisition (~$8K) and below average churn rates (~28% in first five years)

- **Acquisitions:** require higher premiums today (~$200K goodwill per rep on average plus ~$34K signing bonuses), particularly given Trivest pressure, suggesting even more reliance on Red Rover/ Project Boeing type initiatives

- **Rookies**: Improved training and L&D programming likely to improve Rookie ramp and attrition rates, making these reps more attractive

Note: Ramp analysis performed on cohort of FSPs who were employed for the entirety of start date through 2017; Average churn rates based on reps part of cohorts through 2010-2016; Revenue excludes freight collected; Costs include acquisition (i.e. goodwill and signing bonuses), ~11% commission on revenue, annual training and development costs, and ~10% 'Other' G&A costs; Costs exclude 1x1 coaching from RSMs and Annual Sales Conference costs; Internal rate of return of ~11%
Source: 2017 BSN transaction data, BSN company data

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

**BAIN & COMPANY** ◷     25

# New reps to BSN typically see growth in their first few years by growing sales within their existing sports and cross selling hard goods

**BUSINESS PERFORMANCE**

/ P R E L I M I N A R Y

**New reps in 2013 became significantly more productive during their first few years with BSN**

2013 New Field Sales Pro Cohort: Average revenue per FSP ($K)



Most reps come in with a $500-600k book; major bump in first 12-18 months

| | 2014 (Year 1) | 2015 (Year 2) | 2016 (Year 3) | 2017 (Year 4) |
|---|---|---|---|---|
| | 723 | 885 | 1,046 | 1,044 |
| Avg. gross margin | 35.8% | 36.7% | 36.8% | 37.2% |

Note: N=63; only includes new 2013 reps who sold more than $1K per year from 2014-2017
Source: 2017 BSN transaction data, BSN company data

**Growth is driven by deeper account penetration – hard goods and more sports per account**

| | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| Avg. sales per account ($K) | $13.9 | $16.2 | $18.4 | $19.9 |
| Avg. # of accounts | 44 | 46 | 43 | 40 |
| Avg. # of sports per account | 5.8 | 6.0 | 6.0 | 6.2 |
| Avg. sales per sport per account | $2.4 | $2.7 | $3.1 | $3.2 |
| Hardgoods % of sales | 31% | 31% | 29% | 28% |
| Proprietary brand % of sales | 9% | 9% | 8% | 8% |
| Gender (% girls) | 20% | 21% | 22% | 23% |
| High School % of sales | 73% | 73% | 72% | 70% |

Team dealers sell on average 5-10% hard goods...First year bump primarily from ability to sell Hard Goods for the first time

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

# There is opportunity to enhance coverage by dividing the salesforce into distinct roles to target specific segments of the market

**PATH TO VICTORY**

**/ FOR DISCUSSION**

## Clearly defined roles and handoffs

### Potential initiatives



**Field Sales**

**Inside Sales**

Hunt greenfield accounts in 'core'

*Generates leads for Hunter*

Lead Gen Rep

Generate appts. w/ 'core' greenfield opportunities

*Hands off account to Farmer after Year 1*

Penetrate 'core' whitespace and service customers

Support Rep

*Highly cooperative relationship*

Supports FSP to penetrate 'core' whitespace

Penetrate and service 'non-core' accounts

Dedicated Inside Rep



New Field Hunters & Lead Gen Reps

2017 Revenue (in $B)

Total = 5.0

1.6    0.9    0.1    2.4

Greenfield (5K accounts)

More TM focus on selling

BSN

HS/K-12 (200+)    College    HS/K-12 (<200)    Other

Clarify support rep roles for greater utilization

Note: BSN market model measures sports apparel and equipment bought in the "team environment". Split of big (200+) and small (<200) high school segments based on proportional spend and estimated opportunity based on BSN opportunity sizing. Other includes middle school, elementary, district, youth, etc. Whitespace calculated based on share of wallet determined by BSN opportunity sizing and BSN transaction data July 2018 TTM. Assumed average HS SOW for college and other segments.
Source: Impact MP May 2017. BSN opportunity sizing. BSN transaction data.

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

**BAIN & COMPANY**    27

# Under the current coverage model, FSPs currently serve all types of accounts

**PATH TO VICTORY**

👤 Field Rep     👤 Inside Rep

| | | High School | Middle School / Elementary | College | Parks & Rec / YMCA / Other | Select / Club Leagues |
|---|---|---|---|---|---|---|
| **Market Landscape** | Market Oppt. | $1,500M | $700M | $750M | $650M | $750M |
| | Total Accts | 20K | 77K | 6K | TBD | TBD |
| | Rev / Acct | **$75K** | **$9K** | **$125K** | TBD | TBD |
| | BSN Rev (Share) | $400M (~25%) | $40M (~5%) | $130M (~15%) | $55M (~10%) | $65M (~10%) |
| | BSN Accts | 13K | 5K | 3K | 13K | 11K |
| | BSN Rev / Acct | **$28K** | **$7K** | **$50K** | **$4K** | **$6K** |
| | % FSP Rev | 98% | 75% | 98% | 50% | 90% |
| | GP% | 37% | 43% | 35% | 44% | 36% |

**Rep Coverage**

👤 FSP

| **Field Sales Pro (918)** |
| *~40 accounts per rep, ~15 high school/college accounts drive ~80% of revenues* |

**OVERLAP OF ACCOUNT MANAGEMENT**

👤 TM

| **'In School' (65)** | **'CCC' (10)** | **'Out of School' (24)** | **'Youth' (27)** |
| *Each TM plays a mix of inside archetype roles: prospectors, E2E account owner, field support* | | | |

**Category Managers (10)**
*Sport-specific Specialists*

👤 CSR

| **CSRs (360)** |
| *Support* |

Note: Analysis excludes "Other School" (e.g., district deals); All school account analysis is for accounts with >$1K in spend; All non-school account analysis is for accounts with >$0 spend
Source: BSN transaction data

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

BAIN & COMPANY     28

# Under the potential future state, FSPs should drive much deeper penetration within High School/College, stripping away smaller accounts for Inside Reps



| PATH TO VICTORY | | High School / College | Middle School / Elem / Low value HS | Parks & Rec / YMCA / Other | Select / Club Leagues |
|---|---|---|---|---|---|
| **Market Landscape** | Market Oppt. | $2,250M | $700M | $650M | $750M |
| | *Greenfield* | *$1,125M* | *$655M* | | |
| | *Current accts* | *$1,125M* | *$45M* | | |
| | Total Accts | 26K | 77K | TBD | TBD |
| | BSN Rev (Share) | $530M (~25%) | $40M (~5%) | $55M (~10%) | $65M (~10%) |
| | BSN Accts | 16K | 5K | 13K | 11K |

Field Rep · Inside Rep

**Rep Coverage**

*Demand Gen* — **Digital Demand Gen**

*Account Acq* — Prospector + Hunter | Prospector + Associate | Prospector + Specialist

*Full Potential Growth* — FSP + Inside Support | Associate *(same as above)* | Specialist *(same as above)*

**Customer Service**

Note: Analysis excludes "Other School" (e.g., district deals); All school account analysis is for accounts with >$1K in spend; All non-school account analysis is for accounts with >$0 spend
Source: BSN transaction data

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

**BAIN & COMPANY** · 29

# Reducing the wide customer-level margin variability in the Sales Pro channel can generate an EBITDA opportunity of $7-9M

**PATH TO VICTORY**

**Variability in margins across customers purchasing products from active field reps present significant opportunity for margin improvement**

**Methodology**



Gross Margin % (Active Sales Pros)

Each dot represents a customer

Top quartile

3rd quartile

Middle 50% of customers

2nd quartile

Bottom quartile

Customer Revenue ($, Orders booked in 2017) (Field, Active reps)

| # of Customers | 17K | 10K | 8K | 5K | 2.7K | 801 | 70 |
| % of Revenue | 2% | 5% | 13% | 24% | 29% | 21% | 5% |

**Increase margin by adjusting pricing policies**
- Increase margins for customers in the bottom 3 quartiles to the nearest upper quartile
- Limit price increase to 10% for bottom 2 quartiles and to 5% for 3rd quartile

Note: Includes orders booked in 2017; sales doc type "TA" and "ZMTO"; orders through active sales pros only; excludes MTS orders; excludes B1 orders and intercompany transactions; excludes resellers, and customers with negative/100% margins; opportunity net of ~32% commission pay out (including additional pay out on base revenue)
Source: Company Data

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

**BAIN & COMPANY** 30

BAIN00065174

# **Commercial excellence**: Diagnostic identified a number of opportunities for BSN

| **PATH TO VICTORY** | **Diagnostic findings** |
|---|---|



**Coverage model aligned to market opportunities**

- **Many accounts are not adequately covered:** FSPs have ~40 active accounts, but are only spending meaningful time with ~10 of them, and not hunting
- **There is significant room to reduce FSP non-selling time:** ~35% of FSP's time spent on order support (unchanged since 2015)



**Digital marketing intelligence and lead generation**

- **No targets** for marketing lead generation and ROI, though advances made towards 1:1 marketing



**Account planning, pipeline management, and target setting**

- **Majority of growth from acquisitions and new reps**, while veteran rep organic growth has only contributed ~1% CAGR since 2013
- **Only ~50% of FSPs achieve sales targets**, which are 1) not based on rigorous opportunity quantification, and 2) potentially unrealistic given FSP capacity
- **RSMs are not equipped** to drive a strong sales cadence:
  - **Spread thin:** 16 FSPs each, vs. 10-12 benchmark
  - ~50% spend >10% time **selling to own customers**



**Pricing enablers and outcomes**

- **Significant margin variability** at the customer level for Sales Pro and MTS sales, however lower variability across Pros



**Compensation that incentivizes sales performance**

- **Veteran reps are not driving sales growth** above market growth rate (~3%), with no incentives to sell above current commission levels

This information is confidential and was prepared by Bain & Company solely for the use of our client. It is not to be relied on by any 3rd party without Bain's prior written consent

**BAIN & COMPANY** ⏻    31

BAIN00065175

**A G E N D A**

Business definition

BSN overview

**Varsity Spirit overview**

Yearbook overview

Scholastic / College overview

Direct to consumer

Discussion: Initial prioritization and key strategic choices

BAIN00065176

# Cheerleading TAM is ~$725M across Apparel, Camps and Competitions; including gym fees raises TAM to ~$900M; Market is growing 3-5% p.a.

**MARKET ATTRACTIVENESS**                                      / PRELIMINARY



Source: Bain Cheer Consumer Survey (N=989); industry participant interviews; NSGA Historical Sports Participation

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

# Varsity Spirit's margins are higher than industry averages, suggesting it's realizing benefits of scale

**MARKET ATTRACTIVENESS**

/ PRELIMINARY



Gross margin %

| | Apparel | Camps | Competitions |
|---|---|---|---|
| Est. VS gross profit share (% of industry GP) | 64% | 86% | -* |
| Est. VS market share (% of sales) | 51% | 80% | 74% |

:Note: *Due to high market share and fragmented market, industry average gross margin was not estimated
Source: Industry participant interviews; VS 2017 internal data

This information is confidential and was prepared by Bain & Company solely for the use of our client  it is not to be relied on by any 3rd party without Bain's prior written consent

# Varsity Spirit has been gaining market share

**COMPETITIVE POSITION**

PRELIMINARY

Share of Market (%)



## Factors in share shifts

- Omni and GK have lost market share due to poor sales performance in apparel

- Rebel is gaining share through gym partnerships backing All-Star gym businesses

- GTM experienced significant operational issues in 2014/2015 due to poor SAP implementation

- Nike and Under Armour are growing school-wide deal penetration
  - Not notable in market share today, but is a factor in future share

Source: Bain 2014 Cheerleading Decision Maker Survey, N=95; industry participant interviews; VS 2017 internal data

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

**BAIN & COMPANY**  35

# Varsity Spirit outperforms key competitors on camp and competition quality, but underperforms in product delivery and price/value

**COMPETITIVE POSITION**

P R E L I M I N A R Y



Source: Big S Customer Survey Data 2018, N=695

On a scale of 1-5, how well does each of the following statements describe [vendor]?

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

BAIN & COMPANY    36

Confidential

BAIN00065180

# Overall, Varsity Spirit has a NPS of 60% overall, which consistently beats the majority of other vendors, though opportunity still exists

**COMPETITIVE POSITION**

/ PRELIMINARY

## Customer NPS



% of responses

□ Promoters  □ Neutral  ■ Detractors

NPS score:
- GTM Sportswear: 62%
- Rebel: 64%
- Other: 33%
- Varsity Spirit: 60%

Source: Big S Customer Survey Data 2018, N=695

## The "why"

- *"The leading provider for all things SPIRIT! **Anything else is 2nd best!**"*

- *"Always keeping up with **current trends**. Reliable, first-class camps and competitions. **Great support** staff!"*

- *"Varsity has always provided **high quality products** and **impeccable service**! I could never imagine ordering uniforms from another provider."*

- *"Friendly, efficient, punctual and professional! **Customer service is amazing!**"*

- *"I am very pleased with the quality of gear we order as well as the **option to customize** specific pieces of our uniforms."*

- *"Our Varsity rep is so **accommodating and helpful**, plus Varsity has the best products for our needs."*

- *"Primarily **cost**. Varsity is expensive when compared to other vendors. They pretty much have a monopoly over the industry…we have little choice."*

- *"My primary reason is because of the **cost to value ratio**. The clothes are very expensive and the quality is just OK."*

- *"The **price raises** yearly when the quality of the products does not. I often feel as though Varsity charges a lot for products because they know they are the most popular vendor"*

- *"There is **always a glitch in the process somewhere** - incorrect monogramming, bows detaching from ponytail holders, small backpacks, incorrect sizers and even a completely different font on a fill-in uniform"*

This information is confidential and was prepared by Bain & Company solely for the use of our client  it is not to be relied on by any 3rd party without Bain's prior written consent

Confidential

BAIN & COMPANY    37

# Spirit growth has been growing at ~8% p.a. since 2014, driven primarily Summit (a new series of All Star competitions)

**B U S I N E S S　P E R F O R M A N C E**　　　　　　　　　　　　　　　　　／ P R E L I M I N A R Y

## Varsity Spirit has outgrown the overall cheerleading market, led by All-Star events



Varsity revenue growth by product type ($M)

CAGR ('14-'17)

- $354M — 4.4%
- $382M
- $420M
- $450M — 8.3%

All-Star growth driven by creation of The Summit in 2013 (grown to $80M) — 23.4%

Apparel — 5.3%

Source: Varsity Spirit P&Ls; Varsity Spirit internal data

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

Confidential

**BAIN & COMPANY**　38

# Majority of profitability is driven by school in both apparel and camps

BUSINESS PERFORMANCE

**PRELIMINARY**



Notes:
Contribution Margin is will not reflect EBITDA margin from P&L statements due to allocation methodology, which is based on activity drivers
Other for Apparel includes Elite Brands GMBH, Ozone, and Spirit Apparel; Other for All Star includes Charlotte Ops, Cheer Ltd, Dickinson Ops, Mardi Gras, Spirit Celebration, Team Champion, and VBI Champion
Source: Varsity Spirit P&Ls; Varsity Spirit internal data

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

BAIN & COMPANY   39

BAIN00065183

# Cross-selling opportunities between sales teams remain a path for increased whitespace growth

**PATH TO VICTORY**

**~40% of apparel-buying squads are not currently attending Varsity camps, which could be enabled through better collaboration between the sales teams**

**What we heard**



No. of squads attending camp

Total = 17,687



Apparel Rep perception of collaboration

*"The way I think about it is 'Let's help each other!' I try to leverage my Apparel Rep to help my re-sign my loyal squads so I can focus on growing the business. They get the campwear from the business."*

State Director

*"The collaboration with Apparel reps could be better given the selling seasons are about the same."*

All Star Advisor

*"The incentive is not there for me to spend my time on camps/competitions. Even if I bring in a ton of business, I am not going to see a meaningful bonus from it. **Why waste my time?"***

Apparel Rep

Note: Squads included in opportunity sizing spent at least $2.5K on Varsity apparel products
Source: 2018 Territory Opportunity Analysis; Bain Varsity Spirit Sales Surveys: Apparel Reps (n=307)

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

Confidential

**BAIN & COMPANY**    40

BAIN00065184

# **Competitions:** Travel costs are high for both school and All Star cheerleaders, driving demand for local events

**PATH TO VICTORY**

### Travel costs are high for both school and All Star

Travel % of event costs



### Some are spending more every year on competition travel

Number of cheerleaders



### Local competitions reduce travel costs

*"We travel all over the southeast to attend competitions. The team is spending 15-20 nights each season in a hotel room. **We try to keep the schedule as local as possible,** and it's always within driving range, but the travel costs definitely add up."*

All Star Cheer Coach

*"We are a small gym from a rural area. Our parents can't afford to spend a fortune on cheerleading. **We really try to stay local, but most of our competitions are at least 2-3 hours away."***

All Star Cheer Coach

*"Fees are going up; a weekend at Disney is easily $3000. **There are times when it feels like they're going to start pricing out some of the All Star athletes."***

Sales Rep, Cheer Brand

Note: Changes in travel costs shown only for those cheerleaders who went to the same number of camps / competitions as the previous year
Source: Bain Cheer Consumer Survey (N=989)

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

# Near-in adjacencies: Marching band apparel TAM is estimated at $175-230M



**P A T H   T O   V I C T O R Y**                                                    / P R E L I M I N A R Y



Participants (M)

College 2.3

High school band

Middle school band

Participants

Avg. uniform cost
# $400-500
/ every 7 years

$$ \boxed{\textbf{\$60-70}} + \boxed{\textbf{\$20-30}} $$
Uniform cost/year         Other apparel

X

Band participants
# 2.3M
=
# $175-230M
Addressable apparel market

## Key insights

- Uniform design starts up to 18 months before uniforms are expected to be purchased

- Design is the most important component for band directors
  - Process is time consuming
  - Significant coordination required during the design process

- Key players in the market:
  - Fred J. Miller, Inc. (FJM)
  - Stanbury Uniforms
  - Digital Performance Gear
  - DeMoulin Brother's & Company
  - Dance Sophisticates
  - AWCT Performance Wear

- Band camps/competitions represent add'l opportunity (has not been sized)

**Critical question: can Varsity do for Band what it did for Cheer (grow the market by owning and redefining the sport)**

Source: National Association for Music Education (MENC); College Band Directors National Association

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

**BAIN & COMPANY** ⦿    42

Confidential

BAIN00065186

# **Near-in adjacencies:** Team dance apparel market is $100-300M

**PATH TO VICTORY**

/ **HIGHLY PRELIMINARY**

High school dance team participants

# **200-400K**

X

Uniform costs per year

# **$200-400**

+

Other apparel + Accessories

# **$300-400**

=

# **$100-300M**

Addressable dance apparel market

**Early thoughts on how to win in dance apparel**

- Similar to cheer, accurate sizing, fit, and quality are essential to success as a dance apparel vendor

- Coaches highly value tailored service from reps during the design and fitting process (similar to cheer)

- Customization of dance uniforms is essential
  - Standing out at competitions is a high priority for coaches
  - Offering a variety of styles, colors, and customization is crucial for vendors



**Critical question: can Varsity achieve the scale in the Dance industry?**

Note: Target market is high school team dance participants; Dance team is defined as having >10 participants
Source: Industry participant interviews

This information is confidential and was prepared by Bain & Company solely for the use of our client. It is not to be relied on by any 3rd party without Bain's prior written consent

**BAIN & COMPANY** ⊘    43

BAIN00065187

# Commercial Excellence: Diagnostic identified a number of strengths and opportunities across the Varsity Spirit commercial team

| P A T H   T O   V I C T O R Y | Diagnostic findings |
| --- | --- |



**Coverage model aligned to market opportunities**

- On average, Varsity Spirit reps are assigned large number of accounts (~90 per Apparel Rep), but **do not have the capacity to properly service them all**
- There is **room to reduce non-selling time**, particularly for Apparel Reps: ~60% of time is spent on non-selling activities



**Digital marketing intelligence and lead generation**

- Recent investments in digital marketing data engine, but **no target-setting process** and **limited tracking of digital marketing KPIs**



**Account planning, pipeline management, and target setting**

- **Goal-setting is not based on market opportunity**: flat 6% growth over prior year's sales
- **Variation across sales team and regions in terms of sales goal attainment**: ~45% of reps reached goal in 2017
- RSMs are noted as critically important to success of sales reps, but **only spend ~50% of their times supporting reps** (13% of which is spent training)



**Pricing enablers and outcomes**

- Camps/Competitions: limited correlation between event participant growth and price increases implying **list price opportunity**



**Compensation that incentivizes growth & 'value based' margin realization**

- **No quota requirements** or minimum margins
- Reps are **not incentivized to cross-sell**: ~$40% of Apparel-buying squads are not going to camp

This information is confidential and was prepared by Bain & Company solely for the use of our client  it is not to be relied on by any 3rd party without Bain s prior written consent

**A G E N D A**

Business definition

BSN overview

Varsity Spirit overview

**Yearbook overview**

Scholastic / College overview

Direct to consumer

Discussion: Initial prioritization and key strategic choices

BAIN00065189

# Yearbook market is ~$910M with majority of sales in the high school segment

**MARKET ATTRACTIVENESS**

/ P R E L I M I N A R Y

**~75% of the yearbook market is focused on high school**

2017 Revenue (in $M)



~$910M

- Other (MS, elem, college)
- High school

Market (2017)

**Yearbook market penetration estimated ~80-90%;
elementary/middle school estimated ~60-70%**

Estimated penetration (% of total schools in US)

/ D I R E C T I O N A L



~80-90

~60-70

High school     Elementary (including middle school)

Source: Industry participant interviews; HJ internal data

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

Confidential

**BAIN & COMPANY**     46

BAIN00065190

# Overall market contraction has slowed to (~1%) per year; contraction driven by decreased buy rates in high school segment and marginally offset by elementary

**MARKET ATTRACTIVENESS**                                                    /PRELIMINARY

## Core Yearbook buy rates have been declining but flattening in recent years

Three-year rolling average buy rate for
Core Yearbook (# purchased / HS
student)



*Core (HS) yearbook only*

'08 - '12 CAGR: (~4.7%)      '12 - '17 CAGR: (1%)

Buy rates

## Declining industry sales based largely on falling buy rates, offset partially by price and elementary sales

- Contracting market is driven largely by **decreased buy rates for high school yearbooks**, owing to:
  - Increased use of social media
  - Increased price-sensitivity (dovetailing with industry-wide price increases)

- Falling unit sales have been **partially offset by price increases and add-ons** (e.g., custom covers); however as price continues to rise, **unit sales continue to fall**

- **Slight growth in elementary/middle school segment** as penetration ticks up slightly

*"You can't deny that the **market is shrinking**. Everyone is feeling it, but **high school yearbook is hit the hardest**. Even with price increases and the elementary segment growing slightly, most schools are largely penetrated, so the **unit attrition is hard to recover**."*

Corporate VP of E-Business & Business Development, Yearbook Co.

Source: Industry participant interviews; yearbook and class jewelry consumer survey (N=1,500)

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent
Confidential

BAIN & COMPANY    47

BAIN00065191

# Competition in the yearbook market is driven by differentiation – in service, product quality, sales reps, value, and delivery

**MARKET ATTRACTIVENESS**                                          / PRELIMINARY

## Differentiation drives market share

| | What good looks like | Customer quotes |
|---|---|---|
| **Easy to work with** | • Responsive reps<br>• Simple, digital ordering/ payment systems | *"I heavily rely on my vendor's expertise and need them to respond quickly to my questions"* |
| **Highest quality products** | Overall high quality experience from curriculum, software, service/support and book quality | *"Actual books aren't that different, but the experience a vendor offers me and my students makes all the difference"* |
| **Best sales representatives** | • Trusted consultant for Yearbook Advisers and their students; sought after for guidance/curriculum | *"Besides typical customer service, I need my sales rep to be my mentor and help teach my students"* |
| **Best value** | • Superior service with competitive pricing | *"As a principal, I have to make sure that the product is competitively prices for the students/parents"* |
| **Delivers fast and on time** | • 100% on time delivery | *"You only get one shot with a yearbook—you can't miss on delivery"* |

*Most important* ↑

*Less important* ↓

## …And scale drives leadership economics

**Operational leverage**

• Relative market share correlates w/ Return on Sales (EBITDA %)

• Jostens (#1 player) estimated EBITDA margin is ~5-10% higher than HJ, likely driven by:
  – Leveraging selling and administrative costs
  – Higher manufacturing utilization

**Sales productivity**

• Recent HJ analysis suggests that penetration drives sales productivity as territories with higher market share have higher sales per rep
  – ~$600K avg sales per rep in "low share" territories
  – ~$900K avg sales per rep in "high share" territories

Source: HJ Company Data, Industry participant interviews

This information is confidential and was prepared by Bain & Company solely for the use of our client  it is not to be relied on by any 3rd party without Bains prior written consent

# Herff's largest competitor is Jostens who differentiates in both go-to-market and service capabilities

**COMPETITIVE POSITION**

**PRELIMINARY**

| | Position | Share Δ | Commentary |
|---|---|---|---|
| *Jostens* | #1 in Core HS<br>#2 in E/MS | | • Known for focusing on **high-end customers**<br>• Strengths in **e-Commerce** capabilities and **user interface**<br>• ~ **60% of sales online** with one portal to buy Yearbooks as well as other Scholastic products |
| HERFF JONES | #2 in Core HS<br>*(Same as Balfour)*<br>#3 in E/MS | ↘ | • **Most award-winning** yearbook company (50-60 Crown or Pacemaker award finalists annually)<br>• Perceived as offering **highest quality service** |
| balfour | #2 in Core HS<br>#3 in E/MS | | • Solid sales rep relationships in schools with **brand recognition in the Southwest and South**<br>• **Technology is lagging**, but working to improve digital capabilities with a new HTML offering<br>• Reputation has taken a hit for **production quality issues** |
| *Walsworth* yearbooks | #3 in Core HS | | • Perceived as middle-of-the-road technology offering but **lacking customer service and support**<br>• Small-scale, family-owned player with **limited growth initiative** |
| Shutterfly Lifetouch | #1 in E/MS | | • Lifetouch (acquired by Shutterfly) is aggressively hiring sales executives in major metropolitan areas<br>• Primarily plays in the **budget low end** of the core market and often **tries to bundles yearbook with portrait** services |
| TreeRing picaboo YEARBOOKS | Small | ↗ | • Small digital players attempting to innovate and create option for **one-off yearbook orders and permanent databases**<br>• Some market themselves as being no cost to schools; sells directly to parents |

Source: Industry participant interviews

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

BAIN & COMPANY    49

Confidential

BAIN00065193

# Herff Jones Yearbook revenue is ~$122M, with $48M in overall EBITDA, seeing declines that are roughly in-line with the industry

**BUSINESS PERFORMANCE**                                    / PRELIMINARY

### Herff Jones Yearbook revenue declining annually, Y Yearbook sales increasing (but off a small base)



Historical Net Sales by Product

|  | CAGR ('14-'16) | CAGR ('14-'18E) |
|---|---|---|
| | **-3%** | **-2%** |
| | -11% | -12% |
| | 5% | 7% |
| | -3% | -3% |
| | -3% | 0% |

Core Yearbook ■ Y
■ Other (covers)   EBITDA

Source: HJ internal data; Sales Partner interviews; customer interviews

### Description

- Core yearbook sales have declined roughly at the market rate over the last few years

  – Reps and customers tell us that High Schools are more sophisticated about managing inventory and they are seeing slight declines in popularity

- Herff has seen growth in Y books (elementary and middle schools) due to focusing on capturing schools who do not currently have yearbooks

- Herff's moving with the market is likely attributable to the overall sticky product/relationship

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

**A G E N D A**

Business definition

BSN overview

Varsity Spirit overview

Yearbook overview

**Scholastic / College overview**

Direct to consumer

Discussion: Initial prioritization and key strategic choices

BAIN00065195

# Vendors are differentiated (and thus chosen) by offering value, ease of working, and fast and reliable product delivery

**OVERALL**

/ P R E L I M I N A R Y

| | What customers tell us drives their buying decision | Customer quotes |
|---|---|---|
| **Offers the best value** | • Offers substantial options and customizations with superior cost position to local jewelers / competitors | • *"We need someone who is easy to work with and affordable"*<br><br>• *"I want good products with fair pricing for our families"* |
| **Easy to work with** | • Significant involvement with school staff/students showcasing product design/options<br><br>• Seamless order updates and other touch-points | • *"Great customer service and efficient process is very important to us"*<br><br>• *"This year the rep is better than years past, much more responsive and easier to work with"* |
| **Fast and reliable** | • Zero defect orders<br><br>• On-time delivery of customized goods, as promised | • *"If they are going to serve us, they need to get it done on time"*<br><br>• *"Good customer service is so important; if something needs to be corrected, they need to be able to resolve the issue"* |

*Most important* ↑

*Less important* ↓

Source: Big S Customer Survey Data 2018; N=109; Industry participant interviews

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

**BAIN & COMPANY** (copyright)    52

BAIN00065196

# Revenues lower year-over-year since 2014; modest growth anticipated in 2018 due to strong Cap & Gown performance

**O V E R A L L**

/ P R E L I M I N A R Y



Herff Jones Scholastic / College net revenues ($M)

| | 2014 | 2015 | 2016 | 2017 | 2018E | CAGR ('14-'18E) |
|---|---|---|---|---|---|---|
| Total | 249 | 244 | 237 | 232 | 234 | -1.5% |
| Fine Paper | 63 | 61 | 57 | 55 | 52 | -4.7% |
| | | | | | | -3.5% |
| Cap & Gown | 87 | 91 | 92 | 92 | 96 | 2.5% |
| EBITDA ($M) | 52 | 50 | 34 | 45 | 50 | -1.0% |
| EBITDA Margin | 21% | 20% | 14% | 19% | 21% | |

## Commentary

**Fine Paper - $52M Rev / $4M EBITDA**

– Steep declines from 2016/2017 operational issues

**Jewelry - $86M Rev / $16M EBITDA**

– Market is shifting towards non-ring products, which Herff does not offer

– College and Champ rings (~20% of business) are growing at 4%-5% p.a.

**Cap & Gown - $96M Rev / $30M EBITDA**

– Growth entirely due to introduction of new custom C&G; remaining 80% of business is declining 2-3% p.a.

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

# Herff Jones' Scholastic / College division is well-rated by customers across the most important criteria: value, ease of doing business, and quick/timely delivery of product

**OVERALL**

**/ P R E L I M I N A R Y**



Source: Big S Customer Survey Data 2018; N=109; Yearbook and Scholastic Survey Data 2018, N = 65

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

**BAIN & COMPANY** ⊙    54

BAIN00065198

# Commercial Excellence X-Ray suggests that Herff Jones has some larger issues in addition to sales force effectiveness and pricing

## HJ Commercial Excellence X-Ray results



Note: Industry: Consumer Products; Commercial Model: Direct, Simple    ■ Average    ■ Top 10 important best practice

## Themes

- Herff Jones needs a **foundational rethinking of its value proposition to customers**, and what products and services it should offer to create value for the customer

- With a clear value proposition, Herff Jones can then **design a commercial model optimized around its value proposition**

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

BAIN & COMPANY ◐    55

BAIN00065199

# Commercial Excellence: Diagnostic identified a number opportunities at Herff Jones

| Major themes | Diagnostic findings |
|---|---|
| **Value proposition**<br>*(Additional theme not observed across other BUs)* | • Management has low confidence in **current value proposition to customer and sales partners** (identified via CE X-Ray) |
|  **Coverage model aligned to market opportunities** | • **Number of sales partners are declining** across Yearbook (-8%) and Scholastic (-6%)<br>• Significant room to **reduce partner non-selling time**, especially among Scholastic and College reps (~40% of time on admin and order support) |
|  **Digital marketing intelligence and lead generation** | • **No targets** for marketing lead generation and ROI |
|  **Account planning, pipeline management, and target setting** | • Same partner sales are **flat or declining**<br>   – Yearbook and College: ~2% growth<br>   – Scholastic: ~2% decline<br>• There is very **little cross-selling** between Scholastic and Yearbook (17/83) |
|  **Pricing enablers and outcomes** | • Multiple pricing opportunities exist; **most critical initiatives appear to be in-flight** with newly hired HJ pricing team |
|  **Compensation that incentivizes growth & 'value based' margin realization** | • **Limited visibility** into partner compensation relative to gross profit contributed |

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

**A G E N D A**

Business definition

BSN overview

Varsity Spirit overview

Yearbook overview

Scholastic / College overview

**Direct to consumer**

Discussion: Initial prioritization and key strategic choices

BAIN00065201

# Varsity Brands currently leverages numerous channels / platforms to sell DTC

**D T C**

## Direct to consumer revenue

B2C Revenue 2016-2017 (in $M)



YoY

39% (Sideline)

26% (Fan Cloth)

Source: Internal data

## Platform offerings

| Platform | Description |
|---|---|
| **Fan Cloth** | • **Fundraising platform** with dedicated online website and physical catalogs open to for a **set period of time** to raise money for various athletic teams |
| **Sideline** | • Dedicated **24/7 online fanwear store** set up by the school through sales reps with a focus on promoting school spirit for students, families, and general fans |
| **Other BSN and Varsity Brands platforms** | • Website where consumers can purchase goods |

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

**BAIN & COMPANY**  58

BAIN00065202

# ~20-30% of high schools have a **school-wide spirit merchandise ecommerce program**; market size at this current penetration is ~$500-525M today

**D T C**

### The online DTC market is ~20-30% penetrated into high schools today

Current high school e-commerce DTC penetration



Excludes intercity, rural, and high schools without dedicated DTC apparel sales.

30

High estimation

Total highschools

### "average" schools capture between $50-100/student p.a....

**10.5K "penetrated" schools with online spirit store**

**500-1,000 students per school**

**$50-100 per student (including parents and relatives)**

**~$50,000 per high school**

### … which suggests a market size of 525M today with room to grow

DTC online market size ($M)



*"The **nightmare scenario** is holding excess physical inventory, the move to online will be **as fast as ecommerce developed in the 90s**"*
High School Athletic Director

Note: Includes fundraising revenue
Source: Market participant interviews, National Federation of State High School Associations Participation Data, National Center for Education Statistics

This information is confidential and was prepared by Bain & Company solely for the use of our client it is not to be relied on by any 3rd party without Bains prior written consent

Confidential

**BAIN & COMPANY** ⏱ 59

BAIN00065203

# Additionally, **merchandise fundraising** is a ~$300M portion of a fragmented ~$1.5B-$2B fundraising market that primarily channel through coaches/organizations

**DTC**

/ **PRELIMINARY**

## Athletic and Extracurricular Fundraising Market



Fundraising market (in $M)

## Key trends

- "In recent years, federal funding continued to decline for K-12 education, leaving private funding to fill in the gap"

- There are many types of fundraising completed for athletics and extracurricular actives

- Fanwear is a key fundraising mechanism used by ~50% of schools

- Online giving for K-12 rose ~8% from 2016-2017

Note: Certain company financial data is not available; assume 50% of Order My Gear includes fundraising; Market Size of $1.5-2B: 35K assumes schools at $40-60K per school raised ($43K in Survey); segments based on survey responses of each category as % of total funds raised
Source: 2017 High School Leader Survey, N =100; company information from discussions and website reviews; Blackbaud 2017 annual giving report

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

**BAIN & COMPANY** ◉    60

**A G E N D A**

Business definition

BSN overview

Varsity Spirit overview

Yearbook overview

Scholastic / College overview

Direct to consumer

**Discussion: Initial prioritization and key strategic choices**

BAIN00065205

# Strategy: We have identified potential growth initiatives ("path to victory") based on the 'size of the prize' and time to value

**/ FOR DISCUSSION**



**High**

- DTC (disintermediating the coach)
- School "golden record" to understand complete opportunity
- YB: Protect current share through flash conversion
- Band / Dance    Accelerate B2B2C with eye towards DTC

- Deliver reliably to customer through ops/inventory
- Attack geographic greenfield through rep hire/acquire

**Size of the prize**

*(EBITDA contribution, 3-5 year run rate)*

- Upgrade sales coverage model
- Develop digital/DIY ordering capabilities
- Scholastic: Regain fine paper share
- Scholastic: Develop e-commerce capability
- YB: Develop new GTM model (value prop, SFE/coverage)
- YB: Increase buy rates via marketing to students/parents
- YB: Increase penetration in elementary/middle schools
- YB: Fill off-cycle printing capacity and increase utilization

- Invest in sales force enablement for deeper penetration
- Scholastic: Expand into non-ring graduation jewelry
- Scholastic: Grow customized cap and gown business
- Make competitions more accessible (local/lower cost) to increase number of participants
- Expand new digital 1-to-1 marketing capabilities
- Increase cross-selling across apparel and camps/competition
- Monetize social influencers to sell direct to cheerleaders

**Low**

**Harder**                 **Ability to capture**                 **Easier**

*(Change management required, risk of business disruption, frontline behavior change required, etc.)*

**Business Unit**

● BSN    Spirit    Herff

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent

**BAIN & COMPANY** ◉    62

BAIN00065206

## Commercial Excellence: Nine high priority initiatives to pursue across the organization to drive towards full potential



**1** Drive FSP productivity, enabled by:

– Realign account coverage based on market opportunities

– Institute robust account planning, pipeline management, and target setting process to deploy capacity to full potential

– Increase FSP capacity and redeployment by reducing admin/order burden through automation, support staff, and comp. model

**2** Adjust rep coverage model to accelerate greenfield opportunity capture

**A** Create field "hunter" reps , supported by lead gen reps, to drive core greenfield

**B** Add TMs as dedicated inside sales reps to target non-core opportunities

**3** 'Start immediately' pricing opportunities

– FSP price getting, MTS list price setting and central control, "round up" pricing, and freight as profit center



Implement pricing opportunities and build in attainment of target price into compensation plan

– All-Star: Test increasing mix of rewards dollars towards apparel

– Camps/Competitions: List price optimization

– Apparel: Limit discretionary discounting

Realign Apparel rep coverage and support to improve goal attainment

– Improve territory management supported by frontline management training

– Provide more capacity to sell through automation and support services

– Institute more robust account planning and goal-setting processes

Test dedicated Inside Sales team to capture smaller, greenfield opportunities



*Key management initiatives:*

Execute key sales force transformation initiatives *(in flight)*:

– Automated administrative and ordering processes and platforms

– Data visibility

– Sales team reorganization and training

– 17/83 cross-selling initiative

Create a formalized account planning and pipeline management process through Sales Ops *(in flight)*

– Enabled by a strong, sales manager-driven sales cadence and supported by manager capability-building

– Successfully execute 'Status' program

Capture pricing opportunities *(in flight)*

This information is confidential and was prepared by Bain & Company solely for the use of our client  it is not to be relied on by any 3rd party without Bain's prior written consent

# Varsity Brands Choices discussion

**P R E L I M I N A R Y**

## Strategic Choices

- **BSN**: Where and <u>how</u> should BSN continue to attack greenfield and whitespace?

- **BSN:** What are the best supply chain levers to pull to improve our on-time-delivery?

- **BSN:** How should we approach the private label business?

- **Varsity Spirit:** What is the best way to expand the market?

- **Varsity Spirit:** Should VS expand into adjacent markets (and which ones)?

- **HJ Yearbook:** What is the best way to preserve profit and pursue the most attractive growth options?

- **HJ Scholastic**: Which levers and opportunities can create the most value?

- **DTC**: Does VB need to play in the DTC market and what is the best entry strategy?

## Implications and enablers of choices

- **Corporate Center**: What corporate functions should sit at the center?

- **Golden Record**: Should a Golden Record be created at the center?

- **Digital:** Which digital initiatives should be prioritized?

- **IMPACT:** [TBD] Where do most of the cross-sell benefits occur?

- Others for discussion

This information is confidential and was prepared by Bain & Company solely for the use of our client; it is not to be relied on by any 3rd party without Bain's prior written consent
Confidential



Confidential

BAIN00065209

# EXHIBIT 14

### In the Matter Of:

*Jones vs*

*Varsity Brands*

---

## KEVIN MURPHY

## *November 04, 2022*

---



104

1  people would look at market definition.

2        Q.  Did you use some version of the

3  hypothetical monopolist test in determining what you

4  believe are the relevant market in this case?

5        A.  Yeah.  What I looked at is evidence of

6  where would people switch to, which can be thought of as

7  diversion or recapture rates, which is kind of a way

8  that people now approach the hypothetical monopolist

9  test.  They sort of ask if you were to raise price and

10  you controlled all the outlets, say, if you're doing

11  geographic market definition within a given distance,

12  would you recapture enough of the lost business to make

13  the price increase profitable.

14            So I think the hypothetical monopolist test

15  is the basis for that kind of recapture-type analysis.

16  And that's one of the things I do in my report.

17        Q.  Now, it's -- let me ask you some questions

18  about the product markets in this case.

19        A.  Okay.

20        Q.  Is it your opinion that All Star

21  competitions are in a distinct market from the

22  Scholastic Cheer competitions?

23        A.  Yes, it is.

24        Q.  And what is that based on?

25        A.  I would say it's based on an analysis of

105

1  the products, the consumers, the consumption patterns of

2  those consumers.  So it's -- it's based largely on those

3  pieces of the evidence.

4          Q.   Anything else?

5          A.   I would say those are the main ones.

6  That's what comes to my mind as I sit here today.

7          Q.   So would you agree that the hypothetical

8  monopolist test is a proper test, then, for determining

9  whether All Star competitions are in the same or

10 separate markets from Scholastic competitions?

11         A.   I'm not sure exactly how one would apply

12 the hypothetical monopolist test in that context.  I'm

13 not sure you have the kind of quantitative data you

14 would need to do that vis-a-vis the hypothetical

15 monopolist test methodology.  If you had such data and

16 had a methodology for doing it, that would be a proper

17 test.

18         Q.   Did you conduct that test in this case with

19 respect to those markets?

20         A.   With respect to the fact that those are in

21 separate markets, I did not do the hypothetical

22 monopolist test, because the data we have in this case,

23 and that comparison doesn't lend itself to the

24 hypothetical monopolist test methodology.

25         Q.   Is it -- isn't it -- isn't it true that All