**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| **JESSICA JONES, et al.,** | Case No. 2:20-cv-02892-SHL-tmp |
| Plaintiffs, | |
| v. | |
| **VARSITY BRANDS, LLC, et al.,** | **JURY DEMAND** |
| Defendants. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JAMES H. ARONOFF

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ...............................................................................................................1

II.     LEGAL STANDARD..........................................................................................................2

III.    SUMMARY OF ARONOFF'S TESTIMONY ....................................................................3

IV.     ARGUMENT .......................................................................................................................5

      A.      Mr. Aronoff is Eminently Qualified to Testify as an Expert ...................................6

      B.      Mr. Aronoff's Structural Relief Recommendations Provide a Framework
           to Assist the Trier of Fact.........................................................................................9

      C.      Mr. Aronoff's Recommendations are Based on Relevant Facts and Data ............12

      D.      Mr. Aronoff's Experience Provides a Reliable Basis for His Expert
           Testimony ...............................................................................................................14

      E.      Mr. Aronoff Appropriately Contextualized Facts to Arrive at His
           Recommendations...................................................................................................17

      F.      Defendants' Arguments Against Implementation of Two of Mr. Aronoff's
           Recommendations are No Basis for Exclusion.......................................................19

V.      CONCLUSION...................................................................................................................20

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JAMES H.
ARONOFF

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171 (6th Cir. 2009)........................................3

*Bledsoe v. FCA US LLC*, 2022 WL 4596156 (E.D. Mich. Sept. 30, 2022)................................2, 3

*Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002)........................................3

*Croom v. Guideone Am. Ins. Co.*, No. 06-CV-1238, 2009 WL 3763066 (W.D. Tenn. Mar. 23, 2009) ........................................................................18

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ............................... *passim*

*David E. Watson, P.C. v. United States*, 668 F.3d 1008 (8th Cir. 2012)........................................12

*Guild v. Gen. Motors Corp.*, 53 F. Supp. 2d 363 (W.D.N.Y. 1999)................................................3

*Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cnty., Tennessee v. Momenta Pharms., Inc.*, 333 F.R.D. 390 (M.D. Tenn. 2019)............................................14, 15

*In re Davol, Inc.*, 546 F. Supp. 3d 666 (S.D. Ohio 2021)........................................13, 17

*In re E. I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.*, 345 F. Supp. 3d 920 (S.D. Ohio 2015)......................................................3, 13, 17, 18

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008)..................................2, 3, 15, 18

*Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 520 F. Supp. 3d 872 (E.D. Mich. 2021) ........................................................................2

*Jahn v. Equine Servs., PSC*, 233 F.3d 382 (6th Cir. 2000)......................................13, 18

*Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802 (3d Cir. 1997)................................................19

*Kush Enterprises, LLC v. Massachusetts Bay Ins. Co.*, No. 3:18-CV-492, 2021 WL 3007263 (E.D. Tenn. July 15, 2021) ..............................................................6, 8

*Lawler v. Hardeman Cnty., Tennessee*, No. 1:19-CV-1174-STA-TMP, 2022 WL 4554430 (W.D. Tenn. Sept. 29, 2022)......................................................15, 16

*Mannino v. Int'l Mfg. Co.*, 650 F.2d 846 (6th Cir. 1981) ..............................................................9

*Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) ......................................11, 19

*McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797 (6th Cir.2000)......................................19

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JAMES H. ARONOFF

*Mod. Holdings, LLC v. Corning, Inc.*, No. 5:13-CV-00405-GFVT, 2022 WL
2910005 (E.D. Ky. July 22, 2022) ............................................................12

*O'Bannon, v. Nat'l Collegiate Athletic Ass'n,* 7 F. Supp. 3d 955 (N.D. Cal. 2014),
*aff'd in part vac'd in part,* 805 F. 3d 1049 (9th Cir. 2015) .............................5, 6, 9

*Rose v. Truck Ctrs., Inc.*, 388 F. App'x 528 (6th Cir. 2010) ...........................6

*Starnes v. Sears Roebuck & Co.*, No. 01-2804 B AN, 2005 WL 3434637 (W.D.
Tenn. Dec. 14, 2005)..................................................................................15

*Tigrett v. Cooper*, No. 10-02724-STA-TMP, 2013 WL 12407199 (W.D. Tenn.
Dec. 23, 2013)............................................................................................12

*Tindall v. H & S Homes, LLC*, No. 5:10-CV-044, 2012 WL 3241885 (M.D. Ga.
Aug. 7, 2012) ...............................................................................................6

*United States v. Jones*, 107 F.3d 1147 (6th Cir. 1997) ...................................15

*United States v. Roberts*, 830 F. Supp. 2d 372 (M.D. Tenn. 2011) .................13

*Zuzula v. ABB Power T & D Co., Inc.*, 267 F. Supp. 2d 703 (E.D. Mich. 2003) ...........6

**Federal Statutes**

15 U.S.C § 1.................................................................................................5, 17

15 U.S.C § 4.....................................................................................................5

15 U.S.C § 16...................................................................................................5

**Rules**

Fed. R. of Evid. 702 ................................................................................. *passim*

Fed. R. of Evid. 703 ...................................................................................12

**Other Authorities**

John E. Lopatka & William Page, *Devising a Microsoft Remedy that Serves
Consumers*, 9 Geo. Mason L. Rev. 961 (2001) .......................................10

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JAMES H.
ARONOFF

Plaintiffs respectfully submit this opposition to Defendants' Motion to Exclude the Testimony of James H. Aronoff, ECF No. 385 ("Motion") and accompanying Memorandum of Law, ECF No. 385-1 ("Memo"). This opposition is supported by the Declaration of Joseph R. Saveri and accompanying exhibits.[1] Plaintiffs request a hearing on this Motion because Plaintiffs believe it would benefit the Court to hear from the parties and perhaps the experts themselves to have the full picture and to understand the finer points of the methodologies employed.

## I.    INTRODUCTION

Defendants motion to exclude the testimony of James H. Aronoff should be denied. Mr. Aronoff is qualified to offer expert testimony regarding the availability and efficacy of changes to Varsity's conduct which would address and ameliorate the anticompetitive conduct in this case while preserving and promoting the experience of cheer athletes and gyms. Mr. Aronoff is an expert regarding corporate compliance. Based on his long experience in the field, including real world experience in highly regulated industries, Mr. Aronoff has conducted a qualitative analysis of the business practices and conduct at issue in the case. In Mr. Aronoff's opinion, such conduct could be modified and remedied through changes in conduct which would be neutral.

Defendants' challenges under Rule 702 of the Federal Rules of Evidence are misplaced. Mr. Aronoff is well qualified to offer such an opinion. He has conducted a careful analysis based on an extensive review of the discovery record in this case, gathered and reviewed publicly available material and applied his lengthy experience on this topic. The opinion is not speculative but is based qualitatively on relevant facts and data. Based on this analysis on the relevant facts and data, the testimony is reliable opinion of an expert well-qualified to opine on corporate governance and regulation. The testimony will aid the finder of fact, particularly with respect to structural or injunctive relief which Plaintiffs seek in this case. Although Defendants raise disagreements with the expressed recommendations, such disagreement goes to the weight of the testimony, not its admissibility.

---

[1] Unless otherwise noted, all citations to "Ex. _" refer to the exhibits attached to the Saveri Declaration filed in support of all four oppositions to Defendants' *Daubert* motions.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JAMES H. ARONOFF

## II.   LEGAL STANDARD

The starting point for evaluating a *Daubert* challenge is Federal Rule of Evidence 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. *Id.* (quoting Fed. R. Evid. 702).

As the Supreme Court cautioned in *Kumho Tire Co., Ltd. v. Carmichael*, however, a Rule 702 inquiry is a "flexible one." 526 U.S. 137, 150 (1999); *see also Scrap Metal*, 527 F.3d at 529 (the test of reliability is "flexible"); *Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 520 F. Supp. 3d 872, 880 (E.D. Mich. 2021) ("the threshold for indicia of reliability in a *Daubert* motion is a liberal one"). The *Daubert* factors "do not constitute a definitive checklist or test" and "specific factors neither necessarily nor exclusively appl[y] to all experts or in every case." *Bledsoe v. FCA US LLC*, 2022 WL 4596156, at *3 (E.D. Mich. Sept. 30, 2022) (citing *Kumho*, 526 U.S. at 150 and quoting *Daubert*, 509 U.S. at 593); *see also Scrap Metal*, 527 F.3d at 529 ("Indeed, we have recognized that the *Daubert* factors 'are not dispositive in every case' and should be applied only 'where they are reasonable measures of the reliability of expert testimony.'")

"[A] court must be sure not to 'exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.'" *Id.* (citing Advisory Committees note, 2000 amend.). Instead, the requirement that an expert's testimony be reliable means that it must be "supported by appropriate validation – i.e., 'good grounds,' based on what is known.'" *Id.* (quoting *Daubert*, 509 U.S. at 590). "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine

whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529-530 (internal citations omitted); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (district court must determine if proffered expert testimony "rests on a reliable foundation"). "Admissibility under Rule 702 does not require perfect methodology." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 181 (6th Cir. 2009). Attacks regarding the completeness of an expert's methodology go to the weight and not the admissibility of testimony. *Id.* at 182. "Any doubts should be resolved in favor of admissibility." *In re E. I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.*, 345 F. Supp. 3d 920, 925 (S.D. Ohio 2015). For this reason, "rejection of expert testimony is the exception rather than the rule." *Scrap Metal*, 527 F.3d at 530; *Bledsoe*, 2022 WL 4596156, at *4.

When applying Rule 702, the gatekeeper role is not intended to supplant the adversary system or role of the jury. *See Daubert*, 509 U.S. at 596; *see also Guild v. Gen. Motors Corp.*, 53 F. Supp. 2d 363, 369–70 (W.D.N.Y. 1999) ("[T]rial judges acting as gatekeepers under *Daubert* must not assume 'the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul' and thereby usurp the 'ageless role of the jury' in evaluating witness credibility and weight of the evidence.") (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1045 (2d Cir. 1995). Where experts may reasonably differ as to the proper calculation of damages or harm, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. These conventional devices rather than wholesale exclusion are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702. *Id.*

### III.     SUMMARY OF ARONOFF'S TESTIMONY

Based on Mr. Aronoff's extensive real-world experience, Mr. Aronoff identified particular changes in conduct or structural relief with regard to Defendants' anticompetitive conduct. Mr. Aronoff performed a qualitative analysis of the market context in which Varsity operates and the anticompetitive conduct Plaintiffs challenge to determine if there were structural

changes to be adopted to address or ameliorate that conduct. In doing so, Mr. Aronoff extensively analyzed the nature of competitive cheer business practices, including Varsity's marketing materials and other business records. *See* Ex. 7 [Aronoff Rep.] at ¶¶26–34 (discussing competitive and scholastic cheer, cheer competitions, cheer camps and cheer apparel); *Id.* at Appendix C (compiling materials relied on for his analysis). Aronoff also studied the history of Varsity and its strategy of acquisitions, including acquisitions of independent event producers, cheer camp producers and apparel companies. *Id.* at ¶¶35–53. Aronoff studied Varsity's operations. *Id.* at ¶¶91-92. Further, Aronoff examined Varsity's involvement with and control of the competitive cheer governing bodies, including USASF. *Id.* at ¶¶55-61. Aronoff also studied the involvement of private equity firms, particularly Charlesbank and Bain, in the acquisition and management of Varsity. *Id.* at ¶ 65. Aronoff analyzed Varsity's bid system. *Id.* at ¶¶76–80, 111–118. Aronoff investigated Varsity's Family Plan and Network Agreements, by which Varsity provided rebates which excluded rivals and prevented competition. *Id.* at ¶¶ 81–85. Aronoff also studied Varsity's cheer competition rules and cheer competition scheduling. *Id.* at ¶¶86–88.

Based on this qualitative analysis, Aronoff identified a number of possible or recommended changes to address the anticompetitive conduct challenged by Plaintiffs here. *Id.* at ¶¶ 94–126. These included changes to the system of rebates (¶¶95–96, 103–104), competition rules (¶¶97–98), competition judging (¶¶99–110), competition accommodations (¶¶101–102), and bids. (¶¶111–118). Mr. Aronoff also specifically addressed corporate governance and compliance, including eliminating financial support and control of USASF by Varsity (¶¶ 119–122).

Finally, Mr. Aronoff also described how the appointment of an independent regulator and robust monitoring and reporting program would address the anticompetitive conduct. *Id.* at ¶¶ 125–26. As Aronoff noted, this structural relief would not generally change the rules of the competitions and would generally be neutral with respect to the competitions from the perspective of athletes or gyms. Ex 8 [Aronoff Rebuttal Rep.] ¶ 4. Further, in his rebuttal report, Mr. Aronoff evaluated all the criticisms and observations offered by Defendants' witnesses and

found them insubstantial, incorrect, or unsupported by the record in this case *Id.* at ¶¶12–51. Mr. Aronoff supported his opinion with an extensive review of the discovery record in this case, including Defendants' business record, and numerous documents and other records available from public sources. *See* Ex 7 [Aronoff Rep.] at Appendix C.

The testimony is relevant to issues of liability as well as the injunctive relief Plaintiffs seek here. In addition to their claims for damages, Plaintiffs allege a claim for injunctive relief under Section 16 of the Clayton Act and pray for injunctive relief. *See* 15 U.S.C § 4 ("the several district courts of the United States are invested with jurisdiction to prevent and restrain violations" of § 1 of the Sherman Act); *O'Bannon, v. Nat'l Collegiate Athletic Ass'n,* 7 F. Supp. 3d 955, 1007–08 (N.D. Cal. 2014), *aff'd in part vac'd in part*, 805 F. 3d 1049 (9th Cir. 2015) (discussing the availability of injunctive relief under Section 16 of the Clayton Act). Under the antitrust laws, as well as under principles of equity, the district court has the authority to enjoin violations of the antitrust laws as well as provide injunctive relief under the other laws or statutes which give rise to Plaintiffs' claims. *See O'Bannon*, 7 F. Supp. 3d 955, 1007–08. Among other things, the Court is empowered to enjoin any unreasonable elements of the restraints found in this case. *Id*. Mr. Aronoff's testimony goes directly to addressing the availability and efficacy of injunctive relief, including whether they are reasonable neutral alternatives to the anticompetitive conduct which could be implemented while maintaining the participatory experience of gyms and athletes. In addition, Mr. Aronoff's rebuttal testimony directly addresses criticisms and objections raised by Defendants' experts, Dr. Murphy and Mr. Orszag.

## IV.   ARGUMENT

Mr. Aronoff's testimony is admissible under well-settled standards. First, Mr. Aronoff is a qualified expert based on his specialized knowledge and experience in corporate compliance, corporate governance, and risk management. Mr. Aronoff's specialized knowledge and qualitative analysis will help the fact finder assess the evidence and fact issues in this case. Mr. Aronoff has reliably applied his extensive experience to the facts of the case.

### A.      Mr. Aronoff is Eminently Qualified to Testify as an Expert

Defendants first argue that "Mr. Aronoff is not qualified to serve as an expert." ECF No. 385-1 at 7. But there is no dispute as to whether Mr. Aronoff is qualified. His long curriculum vitae demonstrates his experience and expertise with corporate governance and compliance of large and complex business organizations. "The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Rose v. Truck Ctrs., Inc.*, 388 F. App'x 528, 533 (6th Cir. 2010) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). To determine whether Mr. Aronoff's qualifications meet Rule 702, the Court first must evaluate "the purpose for which the testimony is offered." *Kush Enterprises, LLC v. Massachusetts Bay Ins. Co.*, No. 3:18-CV-492, 2021 WL 3007263, at *4 (E.D. Tenn. July 15, 2021) (quoting *Meemic Ins. Co. v. Hewlett- Packard Co*., 717 F. Supp. 2d 752, 762 (E.D. Mich. 2010). Stated differently, Mr. Aronoff's "qualifications must be relevant to the opinion sought." *See Zuzula v. ABB Power T & D Co., Inc*., 267 F. Supp. 2d 703, 713 (E.D. Mich. 2003).

Here, Mr. Aronoff was retained as an expert to offer testimony, based on the particular facts of this case, about regulatory compliance, corporate governance, and conduct relief. In particular, he is prepared to offer testimony regarding available corporate regulations or structural relief. Such proposals or recommendations would mitigate or ameliorate both the anticompetitive conduct alleged in this Action, and the effects of that conduct, while remaining neutral with respect to other market participants. Ex. 7 [Aronoff Rep.] at ¶¶ 5, 13; Ex. 12 [Aronoff Dep.] at 11:8-15. Courts generally allow expert testimony on matters of corporate governance. *Tindall v. H & S Homes, LLC*, No. 5:10-CV-044, 2012 WL 3241885, at *10 (M.D. Ga. Aug. 7, 2012). Courts also rely on expert testimony in fashioning injunctive relief. *See O'Bannon*, 7 F. Supp. 3d at 1007–08. This is far from the first time Mr. Aronoff has presented expert testimony on these topics. Indeed, Mr. Aronoff has provided such expert testimony through written reports and affidavits in over 30 cases. *See generally,* Ex. 7 [Aronoff Rep.] at Appendix B. His expert testimony has never been excluded—in whole or in part—by any court.

Mr. Aronoff reviewed in detail the record of Varsity's business practices in this case and applied his decades of knowledge, skill, practical experience, training, and education as it relates to risk management and corporate governance in competitive, regulated markets. *Id.* ¶¶ 14, 16. As of the time of his report, Mr. Aronoff possessed more than 38 years of experience as a senior executive and board member for regulated companies in highly competitive markets. Ex. 7 [Aronoff Rep.] at ¶ 4. Among his experiences and his duties, Mr. Aronoff advises regarding internal and external compliance and reporting programs, the creation and revision of policies and procedures, the implementation of best practices, and the development of new products and businesses. *Id*. In particular, Mr. Aronoff has personal experience creating and administering corporate compliance and governance procedure. *Id*. ¶ 4. These included companies that were highly regulated under federal or state law. *Id*. ¶ 17. Further, Mr. Aronoff has extensive practical real-world experience in implementing and reformulating policies and procedures for companies facing potential risk or exposure, including in particular antitrust compliance. *Id*. ¶¶ 4, 16–17; Ex. 12 [Aronoff Dep.] at 33:20–25. Thus, Mr. Aronoff's vast real-world experience in those areas and in crafting policies and procedures to assist companies in ensuring their conduct falls within the bounds of their ethical and legal obligations, *id.* at 128:15-23, directly relates to the recommendations provided in his Report. Aronoff's curriculum vitae suggests that his long career in the field of corporate governance and compliance relate to the efficacy of conduct relief.

Defendants do not—and cannot—dispute Mr. Aronoff's compliance and regulatory experience. Remarkably, Defendants point to this experience and instead argue that this shows Mr. Aronoff is not qualified in this case. Defendants fail to explain why this is so. Defendants do not explain—or show—anything so special or unique about Varsity's business that would make broad and deep expertise in corporate governance and compliance in other industries irrelevant or not applicable to Varsity. Indeed, applying this logic would lead to the conclusion that only Varsity or Varsity's executives are qualified to understand or comment on proposed changes and injunctive relief which could be adopted to address the conduct challenged here.

That is incorrect. Indeed, Varsity offers the expert testimony of individuals with no prior experience in cheer, camps, apparel or at Varsity.

In fact, Mr. Aronoff's broad experience makes him well qualified. Indeed, as Mr. Aronoff testified, in many of his roles, he was charged "almost exclusively [with] setting up the policies and procedures" to ensure corporate regulatory compliance, *id*. at 19:21–20:17; 22:3–6, and that while his clients were primarily in the structured finance industry, his engagements related to restructuring in order to help rehabilitate previously bad actors and/or assist companies in setting up programs to minimize liability and remain within the bounds of compliance. *Id.* at 21:16–25. That is precisely the subject matter of Mr. Aronoff's opinion testimony: the nature and efficacy of structural relief designed to mitigate the effects of Defendants' anticompetitive conduct, and which serve as guideposts for the implementation of more specific policies and procedures. *Id.* at 92:3–8; 110:24–111:7; 159:16–22.

Defendants complain that Mr. Aronoff has had no professional experience relating to sports or sports management. Defendants do not explain how this experience is required, or relevant at all. Varsity is not a professional competitive sport. Varsity is a business that puts on competitions and camps and sells apparel. Indeed, Varsity is the dominant firm, exercising ownership and control of key elements of the cheer business, including its control of USASF, whose executives Varsity has employed and compensated.

Defendants also point out that Mr. Aronoff is not an economist. This is of no moment. Mr. Aronoff is not offering an opinion on the subject of economics or purporting to offer any economic analysis. Mr. Aronoff's testimony is based on his uncontested expertise in corporate governance and compliance. He need not be an economist, nor expert in any sports-related or sports managements field in forming his corporate governance opinions. And even if his experience in the field were found to be limited, this would not be a basis to conclude he is not qualified to render an expert opinion. *See Kush Enterprises, LLC v. Massachusetts Bay Ins. Co.*, No. 3:18-CV-492, 2021 WL 3007263, at *5 (E.D. Tenn. July 15, 2021) (denying defendants' motion to exclude expert testimony and finding proffered expert need not be an expert in

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JAMES H. ARONOFF

disciplines that may inform his opinion); *See also Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 850 (6th Cir. 1981)) (confirming "the expert need not have complete knowledge about the field in question"). Indeed, for the purpose of providing testimony on appropriate and achievable injunctive relief in the form of corporate governance controls, the finder of fact is entitled to give testimony from a witness with Mr. Aronoff's experience more weight than that of an economist, who possesses no particular expertise in the corporate governance or regulatory fields.

> **B.      Mr. Aronoff's Structural Relief Recommendations Provide a Framework to Assist the Trier of Fact**

Once it finds the basis of the testimony to be reliable pursuant to Rule 702, the district court must determine the expert testimony's relevance—i.e., whether it will "assist the trier of fact." Defendants grossly mischaracterize the purpose and nature of Mr. Aronoff's recommendations as requiring "that the Court order whatever practice [ ] the other [Plaintiffs'] experts identified be terminated by injunction." ECF No. 385-1 at 8. Not so. The Court is empowered to order injunctive relief based on the findings of the trier of fact and the reasonable exercise of its equitable powers with respect to injunctive relief. *See O'Bannon*, 7 F. Supp. 3d 955, 1007–08 (ordering injunctive relief based on the trial record). Of course, in reaching such a determination, it will be useful to consider the particular business conduct resulting in Plaintiffs' injuries and how they can be remedied through modifications of Varsity's business practices. It is also important that such remedies are reasonable, enforceable and durable. It is also important that such remedies can be adopted in a way that is neutral, can be adopted in lieu of the current business practices, and does not negatively impact the experience of plaintiffs or other market participants. Mr. Aronoff's testimony will assist in that regard.

Defendants wrongly suggest that Mr. Aronoff "did not seriously dispute this at his deposition." ECF 385-1 at 8. To the contrary, Mr. Aronoff made it abundantly clear throughout his deposition that "none of these recommendations were intended to provide specific rules that may be embodied in an agreement or an order . . . there would have to be more specific rules and regulations that are workable that incorporate the spirit of the recommendations that are made in

this report." Ex. 12 [Aronoff Dep.] at 110:24–111:7. Instead, Mr. Aronoff's recommendations were provided as guideposts for the trier of fact to evaluate when analyzing the competitive effects of Defendants' business practices over the years, including the availability of mitigating practices grounded in corporate governance that would restore and maintain competition in the relevant market—practices that have always been, and which remain available for Defendants to employ.

Consistent with this, Mr. Aronoff provides reasonable recommendations designed to ameliorate anticompetitive effects of conduct alleged in this Action, without going above, or beyond what is necessary. For example, with respect to the anticompetitive conduct surrounding the marketing of cheer apparel at Varsity-sponsored or controlled competitions and USASF end-of-season events, Mr. Aronoff recommends that Varsity allow non-Varsity vendors to market and sell their products at these events, or alternatively, open a certain percentage of booths to non-Varsity vendors of Cheer Apparel. Ex. 7 [Aronoff Rep.] at ¶ 108. Defendants attack Mr. Aronoff's recommendation simply because he did not identify a specific percentage in his alternative recommendation. Ex. 12 [Aronoff Dep.] at 91:25–92:20; ECF 385-1 at 18. Defendants complain that some of Mr. Aronoff's recommendations lacked sufficient specificity. But that criticism—even if valid—clearly goes to the weight. Analogous to Section 2 remedies in government cases, Mr. Aronoff's recommendations here are intended to restore competitive conditions that would have existed but-for the anticompetitive conduct—not "to reshape the market to approximate a competitive ideal." *See* John E. Lopatka & William Page, *Devising a Microsoft Remedy that Serves Consumers*, 9 Geo. Mason L. Rev. 961, 700 (2001). Similarly, Defendants questioned Mr. Aronoff's failure to specify what "portion of bid earning competitions" Varsity should host according to his recommendation designed to mitigate the anticompetitive conduct and effects of Varsity's control of nearly all competitions where a bid to Worlds can be earned. Ex. 7 [Aronoff Rep.] at ¶¶ 113–14. Such specificity is not required. Mr. Aronoff emphasized that "for good reason" he was not tasked with drafting the policies and procedures Varsity should implement, rather, "to provide starting point for practical,

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JAMES H. ARONOFF

manageable, and successful policies and procedures [to be] written." Ex. 12 [Aronoff Dep.] at 105:17–106:1.

In crafting structural relief recommendations, a lack of adaptability may compromise efficacy and therefore, successful policies must balance sufficient specificity against the adaptability necessary to address future developments without impacting other market participants or distorting markets. *See Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1232– 33 (D.C. Cir. 2004) (affirming district court's adoption of a remedy that denies Microsoft the ability to take the same or similar actions to limit competition in the future, thus denying the monopolist the "fruits" of its anticompetitive conduct.). The court held that the district court "reasonably identified opening the channels of distribution for rival middleware as an appropriate goal for its remedy," because it "denies Microsoft the ability to take the same or similar actions . . . in the future." *Id.*

Consistent with this, Mr. Aronoff explained that "the design of the recommendations for relief were tied to specific identified anticompetitive activity of the defendants. And as such, [the Recommendations], if implemented, were created with a mind towards their effect being neutral to other market participants who were not engaged in similar activity and "tailored as finely" as possible to address the anticompetitive conduct while remaining "neutral or benign with respect to other market participants." Ex. 12 [Aronoff Dep.] at 10:25–11:15. Indeed, throughout his deposition Mr. Aronoff emphasized that the conduct changes he identified were designed only to mitigate the alleged anticompetitive activity and not to create specific rules detailing what Defendants should or should not do on a granular level. *See e.g.* Ex. 12 [Aronoff Dep.] at 169:18–23; 109:5–110:3 (describing "intent [behind Recommendation at ¶116] wasn't to craft the specifics of the recommendation but try and prevent the description of what I viewed as predatory scheduling []." Rather, his overriding suggestion in his initial Report, rests on basic good governance and transparency policies intended to mitigate or alleviate the existing problems identified by Plaintiffs' other experts, and is grounded in his years of experience in corporate governance and regulatory compliance. *See* Ex. 7 [Aronoff Rep.]. While Defendants

characterize Mr. Aronoff's grounded recommendations as "anodynes," in fact these recommendations will assist the trier of fact and the court in understanding the availability and viability of simple structural shifts designed to address the anticompetitive conduct challenged here. Mr. Aronoff stresses that structural shifts are best when implemented by all Parties and by no means are his Recommendations intended to usurp the role of the parties, the jury, or Court in crafting such remedies, but rather to assist in appreciating the attainability of such measures and provide a starting point from which more robust policies can be implemented. Mr. Aronoff's Report is particularly useful here owing to Varsity's many acquisitions and its controlling seats on the boards of what a layperson might otherwise consider independent bodies, including rule making authorities.

Finally, the Court's consideration of these specifics in crafting injunctive relief carries little risk of the concern espoused in *Daubert* that the factfinder will be misled. Where, the expert testimony at issue will be considered by a judge as opposed to a jury, concerns about shielding the jury from unreliable expert testimony obviously do not arise. *Tigrett v. Cooper*, No. 10-02724-STA-TMP, 2013 WL 12407199, at *5 (W.D. Tenn. Dec. 23, 2013); *See also David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012) ("When the district court sits as the finder of fact, [t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself."). Thus, courts relax *Daubert's* application in this context. *Tigrett*, 2013 WL 12407199, at *5.

### C.   Mr. Aronoff's Recommendations are Based on Relevant Facts and Data

Defendants argue that Mr. Aronoff's testimony should be excluded because Mr. Aronoff "simply takes the various things that Plaintiffs' other proffered experts say was or is anticompetitive," and recommends that Defendants "not to do these things in the future." Defendants' attack is misguided.

First, Mr. Aronoff may rely on the conclusions of other experts. "[I]t is firmly established under Rule 703 that an expert's testimony may be formed using the conclusions and opinions of other experts." *Mod. Holdings, LLC v. Corning, Inc.*, No. 5:13-CV-00405-GFVT, 2022 WL

2910005, at *6 (E.D. Ky. July 22, 2022); See, also *In re Davol, Inc.*, 546 F. Supp. 3d 666, 676 (S.D. Ohio 2021) ("An expert is able to base an opinion on another expert witness for a point of expert knowledge not personally possessed."); *United States v. Roberts*, 830 F. Supp. 2d 372, 383 (M.D. Tenn. 2011) (finding "experts may rely on data from others, at least to the extent that the data is of the type reasonably relied on by other experts in the field").

Second, Defendants neglect the qualitative analysis conducted by Mr. Aronoff. Mr. Aronoff identified the relevant aspects of Varsity's business and specified the business practices and strategies relevant to his analysis. *See* Ex. 7 [Aronoff Rep.] at ¶¶ 26–92. He explained their key relevant characteristics. *Id.* Certainly, experts can, and often should, rely on record facts to support their opinions. *See Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000) (permitting veterinarian to testify to cause of race-horse's death because his opinion had a factual basis in the record). Having identified those practices, he identified ways in which they could be addressed by changes in conduct, doing so in a way which would be neutral to athletes and gyms.

"Expert testimony that relies on expert knowledge and experience to contextualize, analyze, and interpret historical facts is admissible." *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab. Litig.*, 546 F. Supp. 3d 666, 678 (S.D. Ohio 2021). For example, *In re E.I. Du Pont de Nemours & Co.*, the court concluded that it was appropriate for a proffered corporate-conduct expert opining on the applicable standard of care, to "utilize[ ] his expertise and training in analytical chemistry, and his knowledge of how the state of the art methods developed over time, to contextualize the case specific facts against general developments in analytical methods." 345 F. Supp. 3d 920, 927 (S.D. Ohio 2015) (permitting expert to discuss the factual record and history to help the jury assess fifty years of corporate conduct in regulatory, scientific, and technical fields). This is exactly what Mr. Aronoff's report provides in paragraphs 26 through 93: an accounting of years of corporate conduct and the anticompetitive effects described in the reports of Drs. Netz and Heeb, along with Mr. Aronoff's decades of knowledge and experience in compliance and corporate governance to contextualize,

analyze, and ultimately recommend the remedial measures provided in his Report.

Third, Defendants misapprehend the limited purpose of this aspect of Mr. Aronoff's testimony. Defendants can be expected to offer evidence that the business practices Varsity implemented or enforced were required or essential or that there were no less competitive alternatives and that any structural relief would be impossible or counterproductive. Aronoff's testimony on this issue will thus not only be relevant to Plaintiffs' case for injunctive relief but may also be relevant to rebut Defendants' defenses.

Mr. Aronoff accepted that the conduct at issue was as described in the reports of Drs. Netz and Heeb, but he did not do so blindly or without reservation. Mr. Aronoff reviewed those opinions to determine if he found them reasonable. Ex. 12 [Aronoff Dep.] at 47:23–48:2; 62:11–14; 74:23–75:2; 99:13–19. That is, for each opinion relied on, Mr. Aronoff looked at the bases of each and made an independent determination as to the reasonableness of each opinion relied on given the facts offered. *Id.* at 152:5–20. Having reviewed and identified the conduct the expert economists identified as anticompetitive, Mr. Aronoff also reviewed a substantial number of documents and conducted his own independent research, relying on documents produced by Defendants in this litigation, deposition transcripts, as well as publicly available sources. Ex. 12 [Aronoff Dep.] at 45:5–20; 48:24–49:10. Thus, Mr. Aronoff's expert testimony and Report are reliable because they are based on sufficient facts and data. *See Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cnty., Tennessee v. Momenta Pharms., Inc.*, 333 F.R.D. 390, 402 (M.D. Tenn. 2019) (finding expert's reliance on defendants' internal documents and the case record sufficient to satisfy this element).

### D.   Mr. Aronoff's Experience Provides a Reliable Basis for His Expert Testimony

To assist trial courts in their gatekeeping role, the Supreme Court in *Daubert* provided a non-exhaustive list of factors that may be considered when evaluating the reliability of an expert opinion, including "testing, peer review, error rates, and 'acceptability' in the relevant scientific community, some or all which might prove helpful in determining the reliability of a particular

scientific 'theory or technique.'" *Kumho Tire Co*., 526 U.S. at 137. However, "some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise." *Starnes v. Sears Roebuck & Co*., No. 01-2804 B AN, 2005 WL 3434637, at *2 (W.D. Tenn. Dec. 14, 2005) (citing Fed. R. Evid. 702, advisory committee's note, 2000 amendment). Indeed, the Supreme Court explained that "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.*, 526 U.S. at 141–42.

When, as here, a court is called upon to evaluate the reliability of non-scientific expert testimony, the district court may focus on the reliability of the expert's personal knowledge or experience. *Hosp. Auth. of Metro. Gov't of Nashville and Davidson Cnty, Tennessee*, 333 F.R.D. 390, 401 (M. D. Tenn. 2019) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 431– 32 (6th Cir. 2005)). As the Advisory Committee observed, "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."[2] *See United States v. Jones*, 107 F.3d 1147, 1155 (6th Cir. 1997) (reasoning that "a non-scientific expert's experience and training bear a strong correlation to the reliability of the expert's testimony"). "When nonscientific expert testimony is involved, the Court's analysis may focus upon the expert's personal knowledge or experience, because 'the factors enumerated in *Daubert* cannot readily be applied to measure the reliability of such testimony.'" *Lawler v. Hardeman Cnty., Tennessee*, No. 1:19-CV-1174-STA-TMP, 2022 WL 4554030, at *5 (W.D. Tenn. Sept. 29, 2022) (quoting *Surles ex rel. Johnson v. Greyhound Lines, Inc*., 474 F.3d 288, 295 (6th Cir. 2007)). The Sixth Circuit has explained that the *Daubert* factors "are not dispositive in every case and should be applied only where they are reasonable measures of the reliability of expert testimony." *In re Scrap Metal Antitrust Litig*., 527 F.3d 517, 529 (6th Cir. 2008) (internal quotations omitted)).

---

[2] *See* Fed. R. Evid. 702 Advisory Committee's note to the 2000 amendments.

Here, Mr. Aronoff does not offer scientific expert testimony. His specialized knowledge is in corporate governance, compliance, and risk management. He has applied that expertise to the record in this case. Moreover, Mr. Aronoff is not simply asking the Court to take his word for it. Mr. Aronoff explains his qualifications and describes his conclusions. He also identifies the materials he relied on for his opinion.[3]

Mr. Aronoff has extensive experience and personal knowledge in the areas of corporate compliance, corporate governance, and risk management. As discussed *supra*, during his deposition Mr. Aronoff explained in detail how his experience and knowledge were not only relevant to, but guided the opinions set forth in his Report. Ex. 12 [Aronoff Dep.] at 19:6–16; 19:21–20:17; 21:16-25; 22:3–6; 33:20-25; 40:20–41:12. For example, in connection with this opinion regarding remedies for the lack of transparency relating to USASF's competition rules, Mr. Aronoff explained that his Recommendation was derived by "utilizing [his] skill and experience as a compliance manager or good governance expert and creating another way for USASF to provide rules." *Id*. at 63:4–64:16. Similarly, with respect to his opinion concerning rebates relating to cheer competitions, Mr. Aronoff explained "[a]nd in my experience, rebating systems that are not tied to utilizing other products are more common and defensible and less likely to create ethical or legal problems than programs that are based on some volume or expenditures by a good customer." *See id.* at 61:18–23 (discussing his Ex. 7 [Aronoff Rep.] at ¶ 96). And in another example, discussing his recommendation concerning the implementation of a "robust monitoring program with regard to Varsity's role in the Competitive Cheer market," Ex. 7 [Aronoff Rep.] at ¶ 126, Mr. Aronoff described how his experience led him to recommend that Varsity consider implementing "internal policies, procedures, monitoring, and reporting scheme, that provides the market with information about how they do business, why they do

---

[3] Note that in response to Mr. Aronoff, Defendants offered the opinion of Dr. Murphy. While Dr. Murphy is an economist, he is not an expert on corporate governance or regulatory compliance. Dr. Murphy's opinions in response amount to a disagreement with Mr. Aronoff without any experience in corporate governance or regulatory issues. He simply asserts, without explanation or justification, that such structural relief would be impractical or impossible.

things the way they do them, to insulate themselves from liability." Ex. 12 [Aronoff Dep.] at 124:14–126:19 (discussing his Report [Ex. 7] at ¶ 126).

Specifically, Mr. Aronoff explained that his opinion is based on his experience with fundamental principles of corporate governance—that is companies regularly engage in corporate governance, compliance, and risk management exercises "not only to operate properly as a company but to be able to point to the investment in those processes and procedures and training if and when there are allegations that they've acted improperly." *Id.* at 126:21–127:2. For any avoidance of doubt, Mr. Aronoff thoroughly explained that in drafting his recommendations, his focus was on his "core expertise, which is how do institutions make rules to conduct their business in a way that mitigates the likelihood that they will act in an unethical or illegal fashion and create liability that could overwise be avoided," with proper implementation of policies and procedures to address these issues. *Id.* at 175:3–8. Mr. Aronoff described that he arrived at his recommendations utilizing his experience and knowledge in "good governance and basic information sharing and transparency policies that could be implemented to alleviate, to some extent, the existing problem and demonstrate that these parties are interested in being good actors going forward." *Id.* at 170:24–171:6. That is the very same work Mr. Aronoff has engaged in throughout his career in rehabilitating previously bad actors and/or assisting companies in setting up programs to minimize liability and remain within the bounds of compliance. *Id.* at 21:16–25; *see supra,* § I, at p. 4. Thus, the record clearly indicates that Mr. Aronoff adequately explained why his experience is an adequate basis for his recommendations, and how his experience informed the recommendations provided in his report.

### E.    Mr. Aronoff Appropriately Contextualized Facts to Arrive at His Recommendations

"Expert testimony that relies on expert knowledge and experience to contextualize, analyze, and interpret historical facts is admissible." *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab. Litig.*, 546 F. Supp. 3d 666, 678 (S.D. Ohio 2021). In *In re E.I. Du Pont de Nemours & Co.*, the court concluded that it was appropriate for a proffered

corporate-conduct expert opining on the applicable standard of care, to "utilize[ ] his expertise and training in analytical chemistry, and his knowledge of how the state of the art methods developed over time, to contextualize the case specific facts against general developments in analytical methods." 345 F. Supp. 3d 920, 927 (S.D. Ohio 2015). The *Du Pont* court noted that the expert could discuss the factual record or history to help the jury assess fifty years of corporate conduct in regulatory, scientific, and technical fields. *In re E.I. Du Pont*, 345 F. Supp. at 927–30. This is exactly what Mr. Aronoff's report provides in paragraphs 26 through 93—an accounting of years of corporate conduct which is also described in the reports of Drs. Netz and Heeb, along with Mr. Aronoff's decades of knowledge and experience in compliance and corporate governance to contextualize, analyze, and ultimately recommend the remedial measures provided in his Report. "[I]n order to put the recommendations into context I was asked to describe the conduct that the recommendation refers to" and "the recommendation for structural relief, [is] tied specifically to that conduct." Ex. 12 [Aronoff Dep.] at 95:13–96:1. This is perfectly acceptable and common in reports providing structural relief and corporate governance recommendations. Additionally, experts can, and often should, rely on record facts to support their opinions. *See Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000) (permitting veterinarian to testify to cause of race-horse's death because his opinion had a factual basis in the record).

To the extent that Defendants' Motion is based on objections to the factual foundation of Mr. Aronoff's opinion, including his reliance on the findings of Plaintiffs' experts, Dr. Netz and Dr. Heebs, nothing in *Daubert* or its progeny changed the fundamental rule that the factual basis of an expert opinion goes to the credibility of the testimony, not its admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530–31(explaining that where the expert opinion has a reasonable factual basis, it should not be excluded, "[r]ather it is up to opposing counsel to inquire into the expert's factual basis."); *Croom v. Guideone Am. Ins. Co.*, No. 06-CV-1238, 2009 WL 3763066, at *1 (W.D. Tenn. Mar. 23, 2009) ("Generally the factual basis of an expert

opinion goes to the credibility of the testimony and not to its admissibility."); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir.2000) ("Mere weaknesses in the factual basis of an expert witness's opinion . . . bear on the weight of the evidence rather than on its admissibility."); *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 807, 809 (3d Cir. 1997) (quotation marks omitted) (reversing exclusion of expert based on "insufficient factual foundation" and cautioning that the "trial judge must be careful not to mistake credibility questions for admissibility questions"). Thus, Defendants' challenges to Mr. Aronoff's testimony based on his factual foundations are grounds for cross-examination, not admissibility. Moreover, concerns about admissibility can be properly addressed through jury instructions or limiting instructions. Defendants' Motion to exclude Mr. Aronoff should be denied.

### F.   Defendants' Arguments Against Implementation of Two of Mr. Aronoff's Recommendations are No Basis for Exclusion

Defendants argue that Mr. Aronoff should be excluded from testifying because Defendants believe that two of the types of structural relief he identifies would go too far. *See* ECF No. 385-1 at 17–18. First, Defendants argue that "prohibiting discounts" would end up raising Varsity's prices, and thus would be bad for consumers. *Id.* at 17. Second, Defendants argue that prohibiting Varsity from specifically targeting other events by scheduling bid-earning events at the same date and time would be anticompetitive itself. *Id.* at 18. But this is no basis to exclude Mr. Aronoff's testimony, and in fact shows precisely why Mr. Aronoff's testimony is needed. Defendants argue that certain injunctive remedies would go too far and therefore should not be adopted. Plaintiffs believe that the relief—as properly articulated and subject to proof at trial—is warranted. The Court will need to decide whether any injunctive relief is appropriate, and if so, the nature and scope of that relief. *See, e.g.*, *Microsoft Corp.*, 373 F.3d at 1232–33. That the parties disagree over the proper injunctive relief is no reason to exclude an immensely qualified expert from testifying on the issue. Defendants' arguments here go directly to the merits. Indeed, Defendants would be free to argue this point and offer admissible percipient witness or expert evidence. Significantly, Defendants have not produced any in discovery.

Further, Defendants once again mischaracterize Mr. Aronoff's recommendations. For example, Mr. Aronoff does not suggest "prohibiting discounts." Mr. Aronoff explains that Varsity could stop its anticompetitive rebate program, which is exclusionary and forecloses rivals and competition. Mr. Aronoff specifically supports rebates that do not suffer from such problems, specifically rebates "tied to the amount spent," that would not have an exclusive dealing component. *See* Ex. 7 [Aronoff Rep.] ¶¶ 95–96. And, given that the rebates were provided to gyms in cash, and were intentionally kept secret from the cheerleader families who ultimately foot the bill, these "rebates" are more accurately described as "kick-backs." *See, e.g.*, Ex. 6 [Maki Reb. Rep.] at ¶20; Ex. 15 [Elza Dep. Nov. 16, 2021] at 318:7–319:4.

## V.      CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Exclude the expert testimony of James H. Aronoff.


Dated: March 31, 2023                          Respectfully submitted,

                                               By:_____*/s/ Joseph R. Saveri*_____
                                                     Joseph R. Saveri

                                               Joseph R. Saveri*
                                               Steven N. Williams*
                                               Ronnie Seidel Spiegel*+
                                               Kevin E. Rayhill*
                                               Elissa A. Buchanan*
                                               David Seidel*
                                               JOSEPH SAVERI LAW FIRM, LLP
                                               601 California Street, Suite 1000
                                               San Francisco, California 94108
                                               Telephone: (415) 500-6800
                                               Facsimile: (415) 395-9940
                                               jsaveri@saverilawfirm.com
                                               swilliams@saverilawfirm.com
                                               rspiegel@saverilawfirm.com
                                               krayhill@saverilawfirm.com
                                               eabuchanan@saverilawfirm.com
                                               dseidel@saverilawfirm.com

Van Turner Jr. (TN Bar No. 22603)
TURNER FEILD, PLLC
2650 Thousand Oaks Blvd., Suite 2325
Memphis, Tennessee 38118
Telephone: (901) 290-6610
Facsimile: (901) 290-6611
vturner@turnerfeildlaw.com

Richard M. Paul III*
Ashlea Schwarz*
PAUL LLP
601 Walnut, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
rick@paulllp.com
ashlea@paulllp.com

Jason S. Hartley*
Fatima Brizuela*
HARTLEY LLP
101 West Broadway, Suite 820
San Diego, CA 92101
Telephone: (619) 400-5822
hartley@hartleyllp.com
brizuela@hartleyllp.com

Daniel E. Gustafson*
Daniel C. Hedlund*
Daniel J. Nordin*
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com

* Admitted *pro hac vice*

+Located in Washington State

*Attorneys for Individual and
Representative Plaintiffs*