# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| **JESSICA JONES, et al.,** | Case No. 2:20-cv-02892-SHL-tmp |
| Plaintiffs, | |
| v. | |
| **VARSITY BRANDS, LLC, et al.,** | **JURY DEMAND** |
| Defendants. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JANET S. NETZ, PHD

## <u>TABLE OF CONTENTS</u>

**Page**

I.   INTRODUCTION ............................................................................................................1

II.  LEGAL STANDARD....................................................................................................2

III. ARGUMENT ................................................................................................................4

    A.   Dr. Netz's Product Market Definitions Are Reliable...............................................4

    B.   Dr. Netz Properly Defines Geographic Markets as National..................................12

    C.   Dr. Netz's Opinions Will Be Helpful to the Trier Of Fact ....................................15

IV.  CONCLUSION.............................................................................................................19

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ACT, Inc. v. Worldwide Interactive Network*, No. 3:18-CV-186, 2020 WL
12574235 (E.D. Tenn. Mar. 24, 2020) ............................................................9

*ASK Chemicals, LP v. Computer Packages, Inc.*, 593 Fed. App'x 506 (6th Cir.
2014) .............................................................................................................13

*Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171 (6th Cir. 2009) ........................................3

*Bledsoe v. FCA US LLC*, 2022 WL 4596156 (E.D. Mich. Sept. 30, 2022) ...............................2, 3

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) .....................................4, 8, 12

*Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002) ..................................2, 15

*Counts v. Gen. Motors, LLC*, 606 F.Supp.3d 547 (E.D. Mich. 2022) ............................4

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ............................... *passim*

*Disney Enters., Inc. v. VidAngel Inc.*, 2019 WL 4544428 (C.D. Cal. May 29,
2019) ..............................................................................................................4

*Encana Oil & Gas, Inc. v. Zaremba Family Farms, Inc.*, 2015 WL 12883545
(W.D. Mich. Sept. 18, 2015) .........................................................................12

*Fed. Trade Comm'n v. Advoc. Health Care Network*, 841 F.3d 460 (6th Cir. 2016) ...................12

*GED Integrated Sols., Inc. v. Durotech Int'l, Inc.*, 2009 WL 233872 (N.D. Ohio
Jan. 30, 2009) ..............................................................................................7, 14

*General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795 (8th Cir. 1987) ...........................10

*Guild v. Gen. Motors Corp.*, 53 F.Supp.2d 363 (W.D.N.Y. 1999) ..................................3

*Hyland v. HomeServices of America, Inc.*, 2012 WL 12995647 (W.D. Ken. July.
3, 2012) ......................................................................................................11, 15

*Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) .................................10

*In re Blood Reagents Antitrust Litig.*, 783 F.3d 183 (3d Cir. 2015) ..............................12

*In re E. I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.*, 345 F.Supp.3d 920
(S.D. Ohio 2015) ................................................................................................3

*In re FCA US LLC Monostable Elec. Gearshift Litig.*, 2022 WL 1504810 (E.D.
Mich. May 12, 2022) ........................................................................................18

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430
(S.D.N.Y. 2018) ................................................................................................17

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008) .......................... *passim*

*In re Southeastern Milk Antitrust Litig*, 739 F.3d 262 (6th Cir. 2014) ...................5, 13

*Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 520 F.Supp.3d 872
(E.D. Mich. 2021) ..............................................................................................2

*Jones v. Wiseman*, 2019 WL 12762948 (W.D. Tenn. June 3, 2019) .........................8, 14

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d
908 (6th Cir. 2009) ...........................................................................................10

*Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999) ...............................2, 17, 19

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F.Supp.3d 485 (S.D.N.Y.
2015) ..................................................................................................................4

*ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559 (6th Cir. 2014) ............................10

*Queen City Pizza, Inc. v. Domino's Pizza Inc.,* 124 F.3d 430 (3rd Cir. 1997) ............10

*Quiet-Tech. DC-8, Inc. v. Hurel-Dubois K Ltd.*, 326 F.3d 1333 (11th Cir. 2003) .......16

*State of New York v. Kraft General Foods*, 926 F.Supp. 321 (S.D.N.Y. 1995) ............9

*U.S. v. E. I. Du Pont de Nemours & Co.*, 353 U.S. 586 (1957) ....................................10

*U.S. v. Phillipsburg Nat'l Bank & Trust Co.*, 399 U.S. 350 (1970) ............................10

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ..................................................9

*Universal Surveillance Corp. v. Checkpoint Sys., Inc.*, 2015 WL 6082122 (N.D.
Ohio Sept. 30, 2015) ...................................................................................8, 13, 16

*Yancey v. Carson*, 3:04-CV-556, 2007 WL 3088232 (E.D. Tenn. Oct. 19, 2007) ........14

**Federal Rules**

Fed. R. Evid. 403 ................................................................................................................1

Fed. R. Evid. 702 ......................................................................................................... *passim*

Plaintiffs respectfully submit this opposition to Defendants' Motion to Exclude the

Testimony of Plaintiffs' Proffered Expert Janet S. Netz, Ph.D., ECF No. 382 ("Motion") and

accompanying Memorandum of Law, ECF No. 382-1 ("Memo"). This opposition is supported

by the Declaration of Joseph R. Saveri and accompanying exhibits.[1] Plaintiffs request a hearing

on this Motion because Plaintiffs believe it would benefit the Court to hear from the parties and

perhaps the experts themselves to have the full picture and to understand the finer points of the

methodologies employed.

## I.    INTRODUCTION

Based on reliable methodology and analysis, Dr. Netz first defines the relevant product

and geographic markets, and then, after studying the evidence and competitive effects of

Varsity's market power, she offers opinions on how that conduct had the effect of foreclosing

Varsity's competitors and excluding rivals. Defendants do not dispute Dr. Netz's impeccable

qualifications. Instead, they attack her market definitions and repeatedly mischaracterize her

analysis, testimony, and opinions, trying to diminish their strength. Yet, Dr. Netz reliably defines

the relevant product and geographic markets. And one only needs to look at her report and

rebuttal to understand that her opinions have been formed through diligent analysis, including

consideration of any potential unfavorable evidence. Dr. Netz's opinions will be helpful to the

trier of fact, and all meet the standards of Federal Rules of Evidence 702 ("Rule 702") and 403

("Rule 403") and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Defendants raise

***disputes of fact*** that go the weight of the evidence at trial, not its admissibility. Defendants'

Motion should be denied.

---

[1] Unless otherwise noted, all citations to "Ex. _" refer to the exhibits attached to the Saveri
Declaration filed in support of all four oppositions to Defendants' *Daubert* motions.

## II.     LEGAL STANDARD

The starting point for evaluating a *Daubert* challenge is Federal Rule of Evidence 702.

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *In re Scrap Metal Antitrust Litig.*,

527 F.3d 517, 528 (6th Cir. 2008). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education may testify thereto in the form of
> an opinion or otherwise, if (1) the testimony is based on sufficient
> facts or data, (2) the testimony is the product of reliable principles
> and methods, and (3) the witness has applied the principles and
> methods reliably to the facts of the case. *Id.* (quoting Fed. R. Evid.
> 702).

As the Supreme Court cautioned in *Kumho Tire Co., Ltd. v. Carmichael*, however, a Rule

702 inquiry is a "flexible one." 526 U.S. 137, 150 (1999); *see also Scrap Metal*, 527 F.3d at 529

(the test of reliability is "flexible"); *Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*,

520 F. Supp. 3d 872, 880 (E.D. Mich. 2021) ("the threshold for indicia of reliability in a *Daubert*

motion is a liberal one"). The *Daubert* factors "do not constitute a definitive checklist or test"

and "specific factors neither necessarily nor exclusively appl[y] to all experts or in every case."

*Bledsoe v. FCA US LLC*, 2022 WL 4596156, at *3 (E.D. Mich. Sept. 30, 2022) (citing *Kumho*,

526 U.S. at 150 and quoting *Daubert*, 509 U.S. at 593); *see also Scrap Metal*, 527 F.3d at 529

("Indeed, we have recognized that the *Daubert* factors 'are not dispositive in every case' and

should be applied only 'where they are reasonable measures of the reliability of expert

testimony.'")

"[A] court must be sure not to 'exclude an expert's testimony on the ground that the court

believes one version of the facts and not the other.'" *Id.* (citing Advisory Committees note, 2000

amend.). Instead, the requirement that an expert's testimony be reliable means that it must be

"supported by appropriate validation – i.e., 'good grounds,' based on what is known.'" *Id.*

(quoting *Daubert*, 509 U.S. at 590). "The task for the district court in deciding whether an

expert's opinion is reliable is not to determine whether it is correct, but rather to determine

whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529-530 (internal citations omitted); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (district court must determine if proffered expert testimony "rests on a reliable foundation"). "Admissibility under Rule 702 does not require perfect methodology." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 181 (6th Cir. 2009). Attacks regarding the completeness of an expert's methodology go to the weight and not the admissibility of testimony. *Id.* at 182. "Any doubts should be resolved in favor of admissibility." *In re E. I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.*, 345 F. Supp. 3d 920, 925 (S.D. Ohio 2015). For this reason, "rejection of expert testimony is the exception rather than the rule." *Scrap Metal*, 527 F.3d at 530; *Bledsoe*, 2022 WL 4596156, at *4.

When applying Rule 702, the gatekeeper role is not intended to supplant the adversary system or role of the jury. *See Daubert*, 509 U.S. at 596; *see also Guild v. Gen. Motors Corp.*, 53 F. Supp. 2d 363, 369–70 (W.D.N.Y. 1999) ("[T]rial judges acting as gatekeepers under *Daubert* must not assume 'the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul' and thereby usurp the 'ageless role of the jury' in evaluating witness credibility and weight of the evidence.") (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1045 (2d Cir. 1995). Where experts may reasonably differ as to the proper calculation of damages or harm, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. These conventional devices rather than wholesale exclusion are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702. *Id.*

## III.    ARGUMENT[2]

### A.    Dr. Netz's Product Market Definitions Are Reliable

Dr. Netz reliably applied the Hypothetical Monopolist Test ("HMT") to define the relevant product and geographic markets in this case. The HMT is a widely accepted method used by economists to define product markets in merger and monopolization cases.[3] Dr. Netz applied the HMT, in each market, consistent with the Department of Justice and Federal Trade Commission's Horizontal Merger Guidelines ("HMGs"). Ex. 3 [Netz Rep.] at 40, 59-61. Dr. Netz first identified the sets of goods alleged to have been affected by Defendants' conduct. *Id.* at 41-44. She then performed an analysis of what products are reasonably interchangeable with one another by looking at demand-side substitutability. *Id.* This is defined by looking at a "customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service." *Id.*; Ex. 9-1 [HMGs] at 8-14. Dr. Netz performed this analysis looking at all relevant facts and variables. Ex. 3 [Netz Rep.] at 39-41. Defendants' arguments reflect a misunderstanding of the HMT and how economists apply the test, and the factors to be considered. *See* Memo at 3-4.

Defendants claim Dr. Netz cannot use qualitative analysis in defining the markets and claim she must use quantitative analysis. *Id.* at 4. Yet, qualitative analysis is standard and reliable on its own to define product markets. *See, e.g., Counts v. Gen. Motors, LLC*, 606 F.Supp.3d 547, 571 (E.D. Mich. 2022) (citing *Park W. Radiology v. CareCore Nat'l LLC*, 675 F.Supp.2d 314, 327 (S.D.N.Y. 2009)) (finding expert opinion based on qualitative evidence, and not empirical

---

[2] Plaintiffs note the impropriety of Defendants' attempt to use their *Daubert* briefing as a sur-rebuttal to argue the facts, and to offer analysis on issues not found in Dr. Netz's expert reports.

[3] *See* Ex. 9-1 [HMGs] at 7-14. Defendants' expert, Dr. Murphy, did not perform the HMT, although he criticizes Plaintiffs' experts' results. *See* Ex. 14 [Murphy Dep.] at 74-76, 249-252.

analyses or quantitative findings, was reliable and would assist the trier of fact).[4] Dr. Netz explains how she applied the HMT and also applied the *Brown Shoe*[5] "practical indicia," another standard economic method in defining markets in antitrust cases, which specifically requires qualitative analysis:

> It is often difficult to quantitatively implement the hypothetical monopolist test with mathematical precision, because doing so would require detailed data sufficient to estimate buyers' substitution patterns, and such data are often unavailable. However, even when it is not possible to implement the test quantitatively to mathematical certainty, it is a useful conceptual framework for antitrust market definition. Additional types of evidence on market definition can be relevant and informative when assessing the reasonableness of substitutability when defining markets. Specifically, the following "practical indica" are considered by economists: (1) industry or public recognition of separate markets; (2) the products' characteristics and uses; (3) unique production facilities; (4) distinct customers; (5) distinct prices; (6) sensitivity to price changes; and (7) specialized vendors. Ex. 3 [Netz Rep.] at 41 & fns. 165-166.

Defendants next claim that Dr. Netz was mandated by the HMGs to start with the "narrowest set of products." Memo at 2-9. This is incorrect. The HMGs provide that "[t]he hypothetical monopolist test ensures that markets are not defined too narrowly, but it does not lead to a single relevant market." *See* Ex. 9-1 [HMGs] at 8-10. In fact, the HMGs do not contain *any* statement suggesting that the HMT is meant to ensure that markets are not defined too broadly. Instead, the goal of the HMT is to ensure that the market is not too narrowly defined, to prevent an overstatement of anticompetitive impact by overestimating the hypothetical monopolist's market power. *See id.*

---

[4] *See also, e.g., Disney Enters., Inc. v. VidAngel Inc.*, 2019 WL 4544428, at *5 (C.D. Cal. May 29, 2019) ("[T]estimony is not excludable as unreliable or speculative or otherwise simply because it is qualitative instead of quantitative"); *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F.Supp.3d 485, 507 (S.D.N.Y. 2015) ("[T]hat an analysis may be qualitative does not mean that it is unreliable for the purposes of *Daubert*.").

[5] *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

Defendants attack Dr. Netz for how she assessed whether the products in her defined product markets were "reasonably interchangeable." Memo at 5. Yet, Dr. Netz applied her methodology with diligence, observing all relevant data and evidence. *See* Ex. 3 [Netz Rep.] at 38-62 (explaining the standards and how standards were applied to assess substitutability in each relevant market). In sum, Dr. Netz applied reliable methodology to define the relevant product markets. Defendants' arguments only reflect that they disagree with her conclusions. As this Court has already held, market definition is a highly factual question. *See* ECF No. 333 [Order] at 29 ("And defining product market is highly factual and can require analysis of relevant expert opinion, testimony to understand the dynamics of product market, and documentary evidence"); *see also In re Southeastern Milk Antitrust Litig*, 739 F.3d 262, 282-83 (6th Cir. 2014) (citing *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 442 (4th Cir. 2011)) ("Multiple courts of appeal have held that market definition is a question of fact ... that [] is better left for a jury to decide.").

### a.    Product Market for Cheer Competitions is Reliably Defined

Dr. Netz explains in detail how she applied the HMT and considered the qualitative evidence to define the product market for cheer competitions. *See* Ex. 3 [Netz Rep.] at 41-55. After careful qualitative analysis, including the testing of other possible candidate products, Dr. Netz defined the cheer competitions market to include both All Star Cheer and what Plaintiffs define to be School Cheer, as those products would be subject to the same competitive effects.[6] She concludes:

---

[6] Defendants consistently misstate what Plaintiffs define to be included in the term School Cheer. Memo at 4-5. Dr. Netz only includes in her market definition what Plaintiffs term as "School Cheer." *See* Ex. 3 [Netz Rep.] at 41-43. Plaintiffs use the term School Cheer to mean the activity which involves school cheer teams competing against other school cheer teams at cheer competitions. Defendants, on the other hand, continue to use the term "Scholastic Cheer," which refers to both School Cheer, as Plaintiffs define it, *and* other categories of cheer, including sideline cheer (a different activity where a school cheer team does not compete with other cheer teams, rather, it is a sport to support other school teams). Memo at 4. Therefore, Defendants' arguments are based on categories of cheer that Plaintiffs do not even allege, and which Dr. Netz does not include in her product market definition.

> The relevant product market is no wider than Cheer Competitions. Much
> of Varsity's conduct is equally applicable to both All Star Cheer and
> School Cheer, and it has a similar dominant share of both disciplines. Ex.
> 3 [Netz Rep.] at 43.

Defendants claim that, in their view, All Star Cheer competitions and School Cheer competitions should not be included in the same product market. Memo at 3-5. Defendants also quote Dr. Netz out of context to say that she somehow agrees with Defendants' statements that the markets are distinct. Memo at 5. For example, Defendants say Dr. Netz agrees that All Star Cheer and School Cheer are distinct markets. *Id.* It is true that Dr. Netz analyzes and discusses differences between the two, but she ultimately concludes that individual athletes may choose to leave All Star Cheer for School Cheer or vice versa in response to a hypothetical monopolist raising prices by 5-10% for a year, making them reasonably interchangeable under the SSNIP test. Ex. 3 [Netz Rep.] at 42-43.

Defendants argue that Dr. Netz did not properly analyze "substitutability," of potential candidate products, and that her product market definition for cheer competitions must involve quantitative analysis. Memo at 7-9. Again, Dr. Netz thoroughly analyzed the market using qualitative evidence, including specific analysis of the markets that were included and those that were ruled out. *See* Ex. 3 [Netz Rep.] at 41-42; Ex. 9-1 [HMGs] at 10-12, and this is sufficient. *See, supra*, page 14 & fn. 12. She examined the characteristics of both All Star Cheer and School Cheer and accounted for any distinctions. *See* Ex. 3 [Netz Rep.] at 41-55; Ex. 9-1 [HMGs] at 8 ("The Agencies implement these principles of market definition flexibly when evaluating possible candidate markets."). In other words, Dr. Netz did exactly what market definition requires (and what Defendants claim she did not): she considered all the qualitative evidence, considered substitutability, and came to the conclusion by determining both what would be the narrowest and the widest definitions. Ex. 3 [Netz Rep.] at 42-43.

Defendants are also wrong to claim that Dr. Netz did not consider "narrower" options. Memo at 3. Dr. Netz analyzed the data and concluded that there could not be narrower markets. Ex. 3 [Netz Rep.] at 41-45. Defendants also claim that Dr. Netz's methodology conflicts with its

own expert, Dr. Murphy's methodology in defining the market. Memo at 4. Yet, Dr. Murphy did
not even apply the HMT. *See* Ex. 14 [Murphy Dep.] at 74-76, 249-252. And Dr. Murphy does
not explicitly define any of the relevant narrower markets he claims to exist, rather, he just
suggests the markets could be narrower. Ex. 13 [Murphy Rep.] at 42 (noting that there may be
narrower markets due to general differences, but not defining any narrower markets); Ex. 4 [Netz
Reb.] at 382-4 at 15 ("Although Prof. Murphy does not explicitly define any relevant product
markets, he suggests that product markets may be narrower based on differentiation of
product."). A conflict in how the parties' experts might apply methodology or define markets
differently goes to the weight of the evidence, not its admissibility. *See, e.g., GED Integrated
Sols., Inc. v. Durotech Int'l, Inc.*, 2009 WL 233872, at *5 (N.D. Ohio Jan. 30, 2009) ("However,
the simple fact that one expert disagrees with another is insufficient basis for this Court to
exclude evidence."); *Jones v. Wiseman*, 2019 WL 12762948, at *9 (W.D. Tenn. June 3, 2019)
("…this difference of opinion does not mean that her critique of his Expert Report is unreliable
under Rule 702. Here, again … challenge goes to the weight of the testimony and the credibility
of the witness, not to reliability.").

Dr. Netz also provided considerable direct evidence of Varsity's ubiquitous market power
across the United States, another accepted methodology in defining markets. *See* Ex. 3 [Netz
Rep.] at 45-55). *See Universal Surveillance Corp. v. Checkpoint Sys., Inc.*, 2015 WL 6082122, at
*15 (N.D. Ohio Sept. 30, 2015). In sum, Dr. Netz reliably applied the HMT, the *Brown Shoe*
indicia, and assessed Varsity's market power. She considered all relevant factors and possible
substitutes to define the cheer competitions market. Any disputes are factual and go to the weight
of the evidence, not its admissibility.

### b.  Product Market for Cheer Apparel is Reliably Defined

Dr. Netz explains in detail how she applied both the HMT and considered the qualitative
evidence to define the product market for cheer apparel. *See* Ex. 3 [Netz Rep.] at 55-60. Dr. Netz
applied the HMT and analyzed reasonable interchangeability of apparel to define the cheer

apparel market to include "uniforms, shoes, accessories, warm-ups, and camp wear." *See* Ex 3 (Netz Report at 55). Defendants raise a number of arguments, none of them persuasive.

As with cheer competitions, Defendants argue that Dr. Netz should have used quantitative data to perform her analysis and claim what she reviewed only three Varsity documents. Memo at 8. Yet, in her reports Dr. Netz cites to well over 50 documents in the cheer apparel and related sections, as well as public news articles, witness testimony, and USASF's rules and guidelines on apparel. Ex. 3 [Netz Rep., Ex. C]; Ex 4 [Netz Reb., Ex. C]. Plaintiffs could find no case that requires a minimum number of documents be reviewed in order for market definitions to be reliable.

Defendants claim that Dr. Netz's single product market for cheer apparel includes products that are not "reasonably interchangeable" and that she, therefore, did not reliably apply the HMT. Memo at 7. Defendants recycle their argument regarding the product market for cheer competitions to claim that Dr. Netz ignored the "narrowest possible" market definition. *Id.* This argument fails for the same reasons it fails as to cheer competitions. *See* Ex. 3 [Netz Rep.] at 39, 42-44.

Defendants criticize Dr. Netz's cheer apparel definition as overinclusive, and at the same time, fault her for excluding products from the definition that are not "specifically marketed for cheer," claiming that her apparel market is "underinclusive" and claim this is because she did not correctly apply the HMT. Memo at 10. Again, this argument shows a lack of understanding as to how the HMT is applied and how economists define relevant markets that may consist of different goods and services. *See* Ex. 3 [Netz Rep.] at 55-56.

Defendants argue that the products defined by Dr. Netz for cheer apparel are not substitutable for each other. Memo at 11. Yet, market definitions with differentiated goods are widely accepted by both economists and courts. *See, e.g., United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966) (rejecting argument that burglar alarms and fire alarms were not in the same relevant market because they were too different); *ACT, Inc. v. Worldwide Interactive Network*, No. 3:18-CV-186, 2020 WL 12574235, at *3 (E.D. Tenn. Mar. 24, 2020) (citing

*Grinnell*, 384 U.S at 573) ("The Supreme Court has held that a "cluster" of services can be a
'distinct line of commerce' and serve as a relevant product market for the purposes of an antitrust
claim."); *see also State of New York v. Kraft General Foods*, 926 F.Supp. 321, 333 (S.D.N.Y.
1995) (holding that the market for "ready to eat" cereals is so differentiated that determining
what are and are not substitutes is difficult, therefore the relevant market is all "ready-to-eat"
cereals despite differences).

Courts have also defined "cluster markets" that consist of non-substituting products: "if
'most customers would be willing to pay monopoly prices for the convenience' of receiving
certain products as a package, then the relevant market for those products is the market for the
package as a whole…This is true even though the individual products in the package are not
substitutes for each other." *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 567 (6th Cir.
2014). The relevant considerations for a "cluster market" are "whether the different products and
services are ordinarily combined" and "that each service or product within a relevant market
need not be the exact functional equivalent if it is a distinct line of commerce." *Id.*[7] Here, the
cheer apparel products would qualify as a cluster market under *ProMedica*.

Defendants also claim Dr. Netz's definition is underinclusive where it does not include
apparel for other athletic activities that may be worn during training. Memo at 13. Dr. Netz fully
explains how application of the HMT does not support including firms that make athletic gear
that is not specific to competitive cheer. See Ex. 3 [Netz Rep.] at 55-56 (explaining the
differences between what is included in the apparel definition and why "off-the-rack" athletic

---

[7] *See also U.S. v. E. I. Du Pont de Nemours & Co.*, 353 U.S. 586, 595 (1957); *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202-07 (9th Cir. 1997); *General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 805-06 (8th Cir. 1987); *U.S. v. Phillipsburg Nat'l Bank & Trust Co.*, 399 U.S. 350, 360 (1970). Dr. Murphy does not disagree. He explained at deposition how cluster markets contain diverse sets of products that are not substitutes but are usually complements and usually used together. Each product must not be a one-for-one functional substitute for the other. *See* Ex 14 (Murphy Dep. at 115:12-23).

gear is not substitutable). Dr. Netz applies the HMT and SNNIP test to find that there is not

substitution amongst the two.[8] *Id.*

Defendants stretch further to claim that Dr. Netz's methodology was "made for

litigation" and that she used "plaintiffs' litigation goals to direct her research." Memo at 11-12.

As explained, Dr. Netz faithfully and reliably applied standard economic tests, evaluating all

factors (even those that may be unfavorable) and formed her opinions therefrom.[9] Ex. 3 [Netz

Rep.] at 43-44. In any event, an expert should not be excluded where they do not rule out the

possibility of procompetitive factors. *See, e.g., Hyland v. HomeServices of America, Inc.*, 2012

WL 12995647, at *9 (W.D. Ken. July. 3, 2012).

### c.    Product Market for Cheer Camps is Reliably Defined

Dr. Netz explains in detail how she applied both the HMT and considered the qualitative

evidence to define the product market for cheer camps. *Id.* at 60-62. As with the other two

markets, Dr. Netz assesses substitutability and uses quantitative analysis to determine which

products are reasonably interchangeable to be defined in the product market for cheer camps. *Id.*

Defendants claim Dr. Netz's section on camps is too short and does not have enough

cites. Memo at 12. As with the other markets, the question is whether (in assessing the relevant

evidence) the products included are substitutable. *See* Ex. 3 [Netz Rep.] at 61-62. Dr. Netz's

reports contain extensive discussion of Varsity's market power in the camps market with detailed

facts and citations. *Id.* at 32-33, 61-62. In any event, counting paragraphs and documents is not

the proper parameter for assessing reliability.

---

[8] Defendants' citation to *Queen City Pizza, Inc. v. Domino's Pizza Inc.*, does not advance their argument. Memo at 11. *Queen City* is a motion to dismiss opinion, not a *Daubert* opinion. 124 F.3d 430 (3rd Cir. 1997). Therefore, *Queen City* is inapposite.

[9] Defendants' case, *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918 (6th Cir. 2009), does not apply. Memo at 12. The expert in *Kentucky Speedway* did not perform the HMT correctly, rather the expert used a new version of the test that the expert described as not tested, peer reviewed, and not generally accepted by the scientific community. *Id.* at 918. Here, Dr. Netz applied the test in standard form and did not stray from the HMT to create her own test. *See* Ex. 3 [Netz Rep.] at 4, 43-45, 47.

Defendants claim that Dr. Netz does not sufficiently acknowledge that there are different types of camps available, and that different types of camps, in their view, are not substitutable for each other. Memo at 9. Dr. Netz's reports show otherwise. *See, e.g.,* Ex. 3 [Netz Rep.] at 60 (comparing, testing, and describing the various types that she defines as part of the market as well as those that she tested, e.g., other sports camps, gymnastics camps, and found not to be substitutable). Notably, Varsity's own documents indicate that Varsity did not view cheer camps as distinct types. For example, a Varsity management presentation claims that Varsity is the largest cheer camp operator in the world, with 80% market share and described how many camps were hosted in the U.S. including number of teams and athletes in attendance, without differentiating between home camps and hotel camps. *See* Ex 3 [Netz Rep.] at 33, fn. 129.[10] Defendants claim that Dr. Netz's camp analysis is incomplete because it does not find test all camps as distinct products. Memo at 9. Again, Dr. Netz performed the standard tests and employees sufficient comparators to define the cheer camps market. Defendants' arguments are factual disputes.

**B.    Dr. Netz Properly Defines Geographic Markets as National**

Dr. Netz finds that all three relevant markets are national. *See* Ex. 3 [Netz Rep.] at 44-45, 61. To determine the relevant geographic markets, Dr. Netz performed the HMT, determining that different regions are substitutable for one another in the event of a price increase, therefore indicating the relevant geographic market is larger than regional. *Id.* at 44. Dr. Netz then bolstered this conclusion by using Defendants' documents and testimony, which show the markets to be national. *Id.* at 44-45, 61. Notably, there is not one specific test for measuring the relevant geographic market. *See Brown Shoe*, 370 U.S. at 336 (the "process [of identifying a geographic market] is 'fact-intensive and focused on the commercial realities of the industry.'")

---

[10] Defendants further misconstrue Dr. Netz's testimony, claiming that Dr. Netz testified to not having done any analysis to understand substitutability between one-day and two-day camps. *See* Memo at 13 & fn. 9. In this portion of Dr. Netz's deposition, Dr. Netz is responding to a specific hypothetical and continues to explain that she would need more information to do such an analysis. *See* Ex. 10 [Netz Dep.] 179:3-180:18.

However, the HMT is an accepted method. *See Fed. Trade Comm'n v. Advoc. Health Care Network*, 841 F.3d 460, 468 (6th Cir. 2016); *see also Encana Oil & Gas, Inc. v. Zaremba Family Farms, Inc.*, 2015 WL 12883545, at *5 (W.D. Mich. Sept. 18, 2015) (noting that the SSNIP is "one way" to measure interchangeability and holding that just because expert did not employ one reliable method "does not establish that the method he did use was unreliable").

Defendants wrongly claim, again, that Dr. Netz cannot rely on qualitative evidence for her analysis. Memo at 10. Quantitative analysis is not required. In *In re Blood Reagents Antitrust Litigation,* Defendants criticized Plaintiffs' expert for not applying a regression analysis to calculate damages. 783 F.3d 183 (3d Cir. 2015). The court found that "Daubert does not mandate the use of such econometric tools." Dr. Netz did a proper qualitative analysis based on the evidence that exists.[11] Defendants also take issue with which documents and events Dr. Netz used to conduct her analysis of market power and disagree with the sample she chose for determining the geographic markets. Memo at 15-16. This selection of data issue goes to the weight of the testimony, not the admissibility. *Universal Surveillance*, 2015 WL 6082122, at *6 ("When the selection of certain data in an experts analysis is challenged, but the expert provides a rationale supported by the record, the issue of whether the expert's conclusions are accurate or defensible goes to the weight of the evidence, not its admissibility.") (citing *In re Scrap Metal*, 527 F.3d at 530-431). "Including some facts while omitting others goes to the 'accuracy of the conclusions, not to the reliability of the testimony.'" *In re Southeastern Milk Antitrust Litig.*, 739 F.3d at 281.

Defendants wrongly claim that Dr. Netz did not review unfavorable evidence. Memo at 10. Defendants' argument, however, only shows a disagreement with what documents and

---

[11] Defendants cite to *ASK Chemicals, LP v. Computer Packages, Inc.*, 593 Fed. App'x 506, 510 (6th Cir. 2014) to claim Dr. Netz's opinion is unreliable without quantitative analysis. Memo at 14. Yet, *ASK* involved an expert doing a quantitative to calculate lost profits not a geographic market definition where qualitative analysis is appropriate. Further the expert in *ASK* was excluded where he did a quantitative analysis without the necessary data to do so properly. *Id.* Here, Dr. Netz uses a largely qualitative method. Ex. 3 [Netz Rep. at 41. Unlike the profit calculation analysis in *ASK*, there is no set universe of data that was required for Dr. Netz here.

evidence Defendants believe Dr. Netz should have used, not that what she did use was insufficient. Defendants claim that Dr. Netz only used maximum distances traveled by certain gyms and schools to conduct her analyses. Memo at 15. This is inaccurate. Exhibits 8 and 11 in Dr. Netz's Rebuttal Report show she used all registrations for a particular event and Exhibits 9 and 10 display all registrations for the chosen entities. Ex. 4 [Netz Reb.] at 87 & Exs. 8-11. These maps show all distances, not just the maximum distances. *Id.* Defendants also challenge Dr. Netz's analyses of end-of-season events, suggesting that she did not properly compare this data to Dr. Murphy's data on regular-season events. Memo at 15. Again, this is incorrect. As stated in their titles, Exhibits 9 and 10 use data from regular season events. *See* Ex. 4 [Netz Reb.] at Exs. 9-10. Finally, the maps Dr. Netz chose were illustrative of her analyses. *Id.* at 47.

Defendants challenge Dr. Netz's geographic market definitions by comparing them to Dr. Heeb (and vice versa). This does not make Dr. Netz's definition any less reliable. As Dr. Heeb explains, there is not a material difference. Ex. 1 [Heeb Rep.] at ¶111-114. The ultimate goal in defining a geographic market is to define a market that will allow for proper evaluation of competitive effects, i.e., to allow the fact finder to determine whether Varsity has sufficient market power to set supra-competitive prices for the at-issue products, to reduce output, to reduce innovation, or to otherwise harm consumers. *Id.* Dr. Netz provides a detailed analysis of Varsity's market power and finds its market power to be ubiquitous across the United States. Ex. 3 [Netz Rep.] at 37-40. Thus, the markets are properly defined as national.

Defendants also attack Dr. Netz for not aligning her geographic definitions with those of their expert, Dr. Murphy. Memo at 14-16. Yet, Dr. Murphy did not even apply the HMT. Ex. 14 [Murphy Dep.] at 74-76, 249-252. Rather, he employed an unknown methodology (a "travel distance methodology" and "catchment area" analysis) that sought to fracture the market and split the markets into thousands of single events and areas, without considering or testing a national market as an alternative. Ex. 14 [Murphy Dep.] at 73-74. Then, based on his novel methodology, concluded the markets are not national. Ex. 14 [Murphy Dep.] at 75-76. In any event, the fact that experts find different results is not a valid basis for exclusion. *See GED*

*Integrated Solutions, Inc.*, 2009 WL 233872, at *5; *Jones*, 2019 WL 12762948, at *9. Dr. Netz used reliable methodology to define the relevant geographic markets.[12] She found them to be national. Any disagreement is a question of fact, not admissibility. *See, supra*, at 6.

## C.    Dr. Netz's Opinions Will Be Helpful to the Trier Of Fact

Defendants attempt to exclude Dr. Netz by painting her report and opinions as narrative that will not be helpful to the trier of fact. Memo at 12. Defendants grossly mischaracterize her testimony and cast off her opinions as conjecture or mere speculation. *Id.* at 15. One only needs to look at the depth in Dr. Netz's reports, analyses and opinions to know this not to be true. Dr. Netz offers opinions based upon economic literature, her own expertise, and Defendants' documents, testimony, and data. Nothing more is required for her testimony to be admissible. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529-30 ("[t]he task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation"); *see also Conwood*, 290 F.3d at 790-92 (refusing to exclude plaintiff's expert's opinion that exclusion of rivals was caused by defendants' anticompetitive conduct and rejecting notion that it was solely constructed for the case).

Defendants claim that Dr. Netz did not use all available documents. Memo at 17-18. Yet, disagreement over the selection of certain data or documents, including the exclusion of some data or documents, is not reason to exclude an expert's report. *See In re Scrap Metal*, 527 F.3d at 530-431). Dr. Netz was also under no obligation to use Defendants' chosen documents or data sets. *See, e.g., id.* at 529-30 (rejecting challenges to plaintiff data set choices). Defendants also seem to claim that Dr. Netz cannot rely on documents that contain hearsay (Memo at 18), but

---

[12] Defendants cite *Yancey v. Carson*, 3:04-CV-556, 2007 WL 3088232 at *4 (E.D. Tenn. Oct. 19, 2007). While the court did note that the expert "marshaled the facts in the record which support the plaintiff's position," in that case, it was because the expert's opinions "greatly exceed the scope of [his] expertise." In other words, *Yancey* involved an expert without the necessary qualifications to be helpful to the jury, not a potentially unreliable method as Defendants suggest. Dr. Netz's qualifications are not in dispute in the instant case. *See* Ex. 3 [Netz Rep.] at 142.

even if that were true, it would not render her opinions inadmissible. *See, e.g., Conwood*, 290 F.3d at 768, 786 n.3 ("[Defendant] complains that [Plaintiff] was allowed to rely on numerous hearsay documents . . . . However, experts are entitled to rely on documents, even hearsay documents that are otherwise inadmissible.").

Defendants' attacks on Dr. Netz's specific opinions are also baseless and seem to confuse and conflate the issue of admissibility with the sufficiency of Plaintiffs' evidence to survive summary judgment. *See, e.g., Hyland*, 2012 WL 12995647, at *9 (rejecting defendants challenges to plaintiff's expert conclusions re the existence of collusive activity and finding that expert "need not show a successful conspiracy to be admitted under Rule 702").

***Opinion on Market Power***: After extensive and diligent analysis, Dr. Netz concludes that Varsity has market power in each of the three relevant markets. *See* Ex. 3 [Netz Rep.] at 45. Defendants claim Dr. Netz determined market power in all three markets through deposition testimony of a single ex-Varsity employee. Memo at 13. They fail to mention that Dr. Netz did a thorough analysis of Varsity's own business records as well as due diligence materials that assessed Varsity for potential buyers. *See* Ex. 3 [Netz Rep.] at 41-55 (detailed discussion of evidence and opinions regarding Varsity market power in cheer competitions market); *id.* at 55-60 (same for cheer apparel market); *id.* at 60-62 (same for cheer camps market).

In fact, Dr. Netz used Varsity's contemporaneous business documents, testimony of current and former Varsity employees, Varsity's stated policies, and Varsity's understanding of its own policies and market share percentages to analyze Varsity's market power, as well as reviewing Varsity's many acquisitions. Varsity's former Vice President of Sales, Brian Elza, even testified to the reliability of Varsity's own market figures that Dr. Netz used in her report. *See* Ex 15 [Elza Dep.] at 76:16-77:18. Defendants seemingly suggest that their own business documents are unreliable. Memo at 18. For example, Defendants argue that a Varsity presentation discussing a "barrier to entry" should not be taken to actually be about a "barrier to entry." *Id.* In any event where Varsity disputes the reliability of its own data, that is a question for the jury. *See Scrap Metal*, 527 F.3d at 529 (expert testimony admissible where it relied on

inaccurate price index, an errors were a dispute of fact; "credibility and accuracy" of expert

opinion should not be confused with "reliability"); *Universal Surveillance*, 2015 WL 6082122, at

*8 (expert opinion admissible because in light of Sixth Circuit's instruction that accuracy of data

underlying a reliable methodology goes to weight of the opinion, not to its admissibility); *see*

*also Quiet-Tech. DC-8, Inc. v. Hurel-Dubois K Ltd*., 326 F.3d 1333, 1343-44 (11th Cir. 2003)

(finding expert opinion based on incorrect or missing data which was used to run the wrong

equations admissible because flaws went to accuracy of results not validity of expert's methods).

Therefore, even if Defendants' documents are not accurate, this goes to weight not admissibility.

  *Opinion on USASF and Varsity's Collusion:* After extensive and diligent analysis, Dr.

Netz concludes that Varsity has market power in each of the three relevant markets. *See* Ex. 3

[Netz Rep.] at 45-48, 55-57, 60-61. Dr. Netz's opinion rests on a detailed review of the multitude

of evidence that now exists showing how Varsity and USASF colluded to rig the rules to favor

Varsity, and to further Varsity's illegal monopolies in the three markets, and to exclude rival

event producers. *Id.* at 53. It does not reflect conjecture or Plaintiffs' "spin" on the facts (Memo

at 15), it is based on what is now apparent from the record. For example, Varsity and USASF

restricted competing event producers' access to All Star gyms by prohibiting gyms and school

teams from competing at or partnering with rival event producers. Ex. 3 [Netz Rep.] at 53.

Defendants' challenges as to what Dr. Netz reviewed are only challenges of fact.[13]

---

[13] Defendants cite to *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F.Supp.3d 430, 490 (S.D.N.Y. 2018), the one case in all of her many years of experience as an economist in which Dr. Netz was excluded. Memo at 15. Yet, Dr. Netz's exclusion in *LIBOR* is distinct, as it involves a challenge that is not even presented here. In *LIBOR*, Dr. Netz was excluded for interpreting documents and providing an opinion on intent (state of mind). 299 F.Supp.3d at 490. Defendants attempt to stretch the *LIBOR* ruling to Dr. Netz's analysis here by claiming that Dr. Netz's statements about Varsity's self-described "competitive moat" show that she is commenting on Varsity's actual motives or state of mind. Memo at 14. As stated by Dr. Netz:

> Despite providing higher quality products at lower prices than Varsity, Rebel has still struggled to take market share away from Varsity due to barriers erected by Varsity, as discussed above, including its rebate program … and Varsity's restrictions against displaying products inside Varsity event venues. Ex. 3 [Netz Rep.] at 57.

*Opinion on Tying of Camps and Competitions (Not Based on Safety):* After extensive and diligent analysis, Dr. Netz concludes that Varsity's conduct in tying competitions and camps was anticompetitive and Varsity's Squad Credentialling Program amounts to a competitive tie, not based on safety concerns. *See* Ex. 3 [Netz Rep.] at 53-55, 61-62, 90-91. The documents speak plainly about Varsity's tying of camps and competitions. *Id.* The documents also speak plainly to contradict Defendants' assertion that the program was in the interests of safety. *Id.* Dr. Netz did a thorough review of the record in forming her opinions, including reviewing evidence across the board, not simply what might be favorable to Plaintiffs. As the Sixth Circuit has explained, "Rule 702 does not require an expert to consider *all* the facts and data available," although "it does require the factual basis of [the] opinion to be sufficient." *See In re FCA US LLC Monostable Elec. Gearshift Litig.*, 2022 WL 1504810, at *4 (E.D. Mich. May 12, 2022) (quoting *EEOC v. Kaplan Higher Educ. Corp.*, 748 F.3f 749 (6th Cir. 2014)) (emphasis in original). Here, Dr. Netz provides a detailed factual basis to support her opinions.

*Opinion on Acquisitions:* After extensive and diligent analysis, Dr. Netz concludes that Varsity's acquisitions were intended to foreclose rivals in the relevant markets. *See* Ex. 3 [Netz Rep. at 93] ("acquisitions are better viewed as tactical and used for roll ups… or to eliminate competitors."). It is hard to understand what Defendants' proposed method of analyzing Varsity's acquisition would be if not to review them chronologically and to study the increased

---

This quote does not assign intention to Varsity as Defendants argue. Memo at 14-15. Here, Dr. Netz explains how certain barriers erected by Varsity have harmed competitors. Dr. Netz further avoided commenting on intent by allowing these documents speak for themselves. Ex. 3 [Netz Rep.] at 57. The documents are quoted in full without paraphrasing to ensure that they are not misunderstood. *Id.* Ultimately, Dr. Netz is providing context to documents and actions that a layperson may not understand. It may not be clear on its face what effects a rebate program, for instance, has on competition. Dr. Netz is not simply narrating facts by conveying opinions on documents based on her expertise, she is making terms and fact understandable for the jury. Translating "esoteric" terms, is a permissible function of expert testimony. *See LIBOR*, 299 F.Supp. at 490 (citing *U.S. v. Mejia*, 545 F.3d 179, 190 (2d Cir. 2008)). And, deriving conclusions from observations and specialized expertise is exactly the role of an expert. *See Kumho*, 526 U.S. at 148 ("Experts of all kinds tie observation to conclusions through the use of what Judge Learned Hand called 'general truths derived from...specialized experience.'").

market share acquired with each. Dr. Netz does this study over time, as well as accounts for other relevant factors that may have shed light on Varsity's acquisitions. *Id.* at 93-99. Dr. Netz shows how Varsity increased its control through its acquisitions, and documents also leave no doubt, making Defendants' intentions explicit for an expert to draw a conclusion. Varsity purchased all of its strongest competitors resulting in control of the cheer competition market. *Id.* at 94-95. For example, in 2015 Varsity owned 40-50% of the competitive cheer market while Jam Brands owned a 30% share. The Jam Brands acquisition resulted in Varsity having a dominant share of the cheer competitions market. *Id.* at 95, 99-101.

**Opinion on Rebate Foreclosure:** After extensive and diligent analysis, Dr. Netz concludes that Varsity's rebate and discount programs had the anticompetitive effect of foreclosing Varsity's rivals. *Id*. at 104-105. The evidence shows that the Varsity Family Plan and Varsity Network Agreements are exclusive dealing agreements. *Id.* at 109-110. They tie the product markets for cheer competitions and apparel. *Id.* at 104-113; *see also* Ex. 9 [Heeb Dep. Ex. 11] (sample agreements).

In sum, there is no danger that Dr. Netz's opinions will not "usurp the role of the factfinder." Memo at 12. To the contrary, Dr. Netz explains the complicated economic implications of the challenged conduct based on the facts of the industry and what she observed. Her opinions will transmit such economically complicated information to assist the jury. *See Kumho*, 526 U.S. at 149 ("And whether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest upon an experience confessedly foreign in kind to the jury's own.") (internal citation omitted).

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.

Dated: March 31, 2023

Respectfully submitted,

By: _____/s/ Joseph R. Saveri_____
Joseph R. Saveri

Joseph R. Saveri*
Steven N. Williams*
Ronnie Seidel Spiegel*+
Kevin E. Rayhill*
Elissa A. Buchanan*
David Seidel*
JOSEPH SAVERI LAW FIRM, LLP
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
rspiegel@saverilawfirm.com
krayhill@saverilawfirm.com
eabuchanan@saverilawfirm.com
dseidel@saverilawfirm.com

Van Turner Jr. (TN Bar No. 22603)
TURNER FEILD, PLLC
2650 Thousand Oaks Blvd., Suite 2325
Memphis, Tennessee 38118
Telephone: (901) 290-6610
Facsimile: (901) 290-6611
vturner@turnerfeildlaw.com

Richard M. Paul III*
Ashlea Schwarz*
PAUL LLP
601 Walnut, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
rick@paulllp.com
ashlea@paulllp.com

Jason S. Hartley*
Fatima Brizuela*
HARTLEY LLP
101 West Broadway, Suite 820
San Diego, CA 92101
Telephone: (619) 400-5822

hartley@hartleyllp.com
brizuela@hartleyllp.com

Daniel E. Gustafson*
Daniel C. Hedlund*
Daniel J. Nordin*
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com

* Admitted *pro hac vice*

+Located in Washington State

*Attorneys for Individual and
Representative Plaintiffs*