**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| **JESSICA JONES, et al.,** | Case No. 2:20-cv-02892-SHL-tmp |
| Plaintiffs, | |
| v. | |
| **VARSITY BRANDS, LLC, et al.,** | **JURY DEMAND** |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE
TESTIMONY OF JEN MAKI, PH.D.**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...........................................................................................................1

II.   LEGAL STANDARD ....................................................................................................2

III.  ARGUMENT .................................................................................................................4

    A.    Dr. Maki Employed a Reliable, Generally Accepted Methodology to
        Calculate Damages..........................................................................................4

        1.    Dr. Maki Properly Relied on Dr. Heeb's Economic Analysis ....................4

        2.    Defendants' Five Arguments for Why Dr. Maki's Damages
               Calculations Should Be Reduced Go to the Weight of her
               Testimony, not its Admissibility.................................................................6

        3.    Dr. Maki is Justified in Using a 100% Pass-Through Rate ......................11

        4.    Dr. Maki's Rebuttal Report Simply Updated Her Calculations
               Using New Data; She Did Not Offer New Opinions.................................17

    B.    Dr. Maki Offers No "Common Proof" Opinion .................................................17

    C.    Dr. Maki's Factual Evidence is Reliable Support for her Opinions .....................19

IV.   CONCLUSION ............................................................................................................19

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JEN MAKI,
PH.D.

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ............................................................18

*Asad v. Cont'l Airlines, Inc.*, 314 F. Supp. 2d 726 (N.D. Ohio 2004) ............................................4

*ASC Engineered Sols., LLC v. Island Indus., Inc.*, No. 220CV02284JPMCGC,
   2021 WL 2941989 (W.D. Tenn. July 13, 2021) .......................................................................17

*Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171 (6th Cir. 2009) .....................................................3

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946) ........................................................13

*Bledsoe v. FCA US LLC*, 2022 WL 4596156 (E.D. Mich. Sept. 30, 2022) ................................2, 3

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ..........................................................................13

*Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002) ..........................................3

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ...........................................2, 3, 4, 14

*Guild v. Gen. Motors Corp.*, 53 F. Supp. 2d 363 (W.D.N.Y. 1999) .................................................3

*Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cnty., Tennessee v.
   Momenta Pharms., Inc.*, 333 F.R.D. 390 (M.D. Tenn. 2019) .....................................13, 14, 15

*In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326 (E.D. Mich. 2001) ......................................18

*In re E. I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.*, 345 F. Supp. 3d
   920 (S.D. Ohio 2015) ....................................................................................................................3

*In re Graphics Processing Units Antitrust Litigation*, 253 F.R.D. 478 (N.D. Cal.
   2008) ............................................................................................................................................15

*In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996) ......................19

*In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156 (1st Cir. 2009) ....................19

*In re Polyester Staple Antitrust Litig.*, No. 3:03CV1516, 2007 U.S. Dist. LEXIS
   52525 (W.D.N.C. Jul. 19, 2007) ..................................................................................................19

*In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226 (N.D. Ohio 2014) .................13, 14, 15

*In re Processed Egg Products Antitrust Litigation*, 312 F.R.D. 124 (E.D. Pa.
   2015) ............................................................................................................................................15

Case No. 2:20-cv-02892-SHL-tmp                                   iii

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JEN MAKI,
PH.D.

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008)......................................2, 3, 13, 18

*In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. C07-01819 CW, 2008 U.S. Dist. LEXIS 107523 (N.D. Cal. Sept. 29, 2008)............................................19

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827, 2012 U.S. Dist. LEXIS 94049 (N.D. Cal. Jan. 26, 2012)................................................................................19

*Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 520 F. Supp. 3d 872 (E.D. Mich. 2021) ........................................................................................................................2

*J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981) ...........................................13

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995) ...........................................................3

*McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797 (6th Cir. 2000)..............................................7, 14

*Mod. Holdings, LLC v. Corning, Inc.*, No. 5:13-CV-00405-GFVT, 2022 WL 2910005 (E.D. Ky. July 22, 2022) ..........................................................................................5

*Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253 (D. Mass. 2008) ........................................................................................................................................18

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931)...........................13

*United States v. L.E. Cooke Co.*, 991 F.2d 336 (6th Cir.1993)................................................7, 14

**Rules**

Fed. R. Civ. P. 16 ................................................................................................................................2

Fed. R. Civ. P. 23 ..............................................................................................................................17

Fed. R. Evid. 702 .......................................................................................................................2, 3, 4

Fed. R. Evid. 703 ................................................................................................................................4

**Other Authorities**

Varian, Hal, "What Use is Economic Theory", University of Michigan, 1993 https://deepblue.lib.umich.edu/handle/2027.42/101038. ........................................................15

W. Rubenstein, et al., *Newberg on Class Actions* § 10.7 (2012) ...................................................19

Case No. 2:20-cv-02892-SHL-tmp                    iv

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JEN MAKI, PH.D.

Plaintiffs respectfully submit this opposition to Defendants' Motion to Exclude the Testimony of Plaintiffs' Proferred Expert Jen Maki, Ph.D., ECF No. 391 ("Motion") and accompanying Memorandum of Law, ECF No. 391-1 ("Memo"). This opposition is supported by the Declaration of Joseph R. Saveri and accompanying exhibits.[1] Plaintiffs request a hearing on this Motion because Plaintiffs believe it would benefit the Court to hear from the parties and perhaps the experts themselves to have the full picture and to understand the finer points of the methodologies employed.

## I.      INTRODUCTION

Defendants' *Daubert* challenge to Dr. Jen Maki hinges on its attack on Dr. Heeb's regression analysis. For the reasons explained in response to Defendants' motion to exclude Dr. Heeb's testimony, which wildly misconstrues Dr. Heeb's work, Dr. Heebs' regression analysis is analytically sound. Defendants' only challenge to Dr. Maki's work that does not hinge on its attack on Dr. Heeb involves the parties' differing interpretations of the factual record. There is nothing in Defendants' motion to exclude Dr. Maki that hinges on the reliability or suitability of economic methodologies she applied or her qualifications to apply those methodologies. As Defendants admit, they simply disagree over whether some of the sales should be included in her calculations affecting the amount of damages. But those types of factual issues are classic fact issues for the jury—not the type of issues that invoke this Court's gate-keeping role. Defendants

---

[1] Unless otherwise noted, all citations to "Ex. _" refer to the exhibits attached to the Saveri Declaration filed in support of all four oppositions to Defendants' *Daubert* motions.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JEN MAKI, PH.D.

also missed the Court-ordered deadline, filing their unredacted motion, along with all exhibits in support, a day late. *See* ECF No. 392.[2] Defendants' motion should be denied.

## II.    LEGAL STANDARD

The starting point for evaluating a *Daubert* challenge is Federal Rule of Evidence 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. *Id.* (quoting Fed. R. Evid. 702).

As the Supreme Court cautioned in *Kumho Tire Co., Ltd. v. Carmichael*, however, a Rule 702 inquiry is a "flexible one." 526 U.S. 137, 150 (1999); *see also Scrap Metal*, 527 F.3d at 529 (the test of reliability is "flexible"); *Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 520 F. Supp. 3d 872, 880 (E.D. Mich. 2021) ("the threshold for indicia of reliability in a *Daubert* motion is a liberal one"). The *Daubert* factors "do not constitute a definitive checklist or test" and "specific factors neither necessarily nor exclusively appl[y] to all experts or in every case." *Bledsoe v. FCA US LLC*, 2022 WL 4596156, at *3 (E.D. Mich. Sept. 30, 2022) (citing *Kumho*, 526 U.S. at 150 and quoting *Daubert*, 509 U.S. at 593); *see also Scrap Metal*, 527 F.3d at 529 ("Indeed, we have recognized that the *Daubert* factors 'are not dispositive in every case' and

---

[2] Defendants' filed their motion late and have not sought court approval or permission to do so. *See* ECF No. 392. Absent Court permission, Defendants' February 11, 2023 filing (ECF No. 392) should be stricken, including all of the exhibits in support. The Court should only consider the redacted motion without any exhibits in support (ECF No. 391). When Plaintiffs filed papers late, they immediately sought Court permission for filing after the Court set deadline. ECF No. 99. As the Court is aware, Defendants took the opportunity to chastise Plaintiffs' counsel and accuse them of incompetence. ECF No. 105. Defendants argued that "Rule 16 requires that a scheduling order be followed unless relief is granted upon good cause shown." *Id*. Unlike Plaintiffs, Defendants have made no attempt to seek relief.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JEN MAKI, PH.D.

should be applied only 'where they are reasonable measures of the reliability of expert testimony.")

"[A] court must be sure not to 'exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.'" *Id.* (citing Advisory Committees note, 2000 amend.). Instead, the requirement that an expert's testimony be reliable means that it must be "supported by appropriate validation—i.e., 'good grounds,' based on what is known.'" *Id.* (quoting *Daubert*, 509 U.S. at 590). "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529-530 (internal citations omitted); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (district court must determine if proffered expert testimony "rests on a reliable foundation"). "Admissibility under Rule 702 does not require perfect methodology." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 181 (6th Cir. 2009). Attacks regarding the completeness of an expert's methodology go to the weight and not the admissibility of testimony. *Id.* at 182. "Any doubts should be resolved in favor of admissibility." *In re E. I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.*, 345 F. Supp. 3d 920, 925 (S.D. Ohio 2015). For this reason, "rejection of expert testimony is the exception rather than the rule." *Scrap Metal*, 527 F.3d at 530; *Bledsoe*, 2022 WL 4596156, at *4.

When applying Rule 702, the gatekeeper role is not intended to supplant the adversary system or role of the jury. *See Daubert*, 509 U.S. at 596; *see also Guild v. Gen. Motors Corp.*, 53 F. Supp. 2d 363, 369–70 (W.D.N.Y. 1999) ("[T]rial judges acting as gatekeepers under *Daubert* must not assume 'the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul' and thereby usurp the 'ageless role of the jury' in evaluating witness credibility and weight of the evidence.") (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1045 (2d Cir. 1995). Where experts may reasonably differ as to the proper calculation of damages or harm, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means

of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. These conventional devices rather than wholesale exclusion are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702. *Id.*

### III.   ARGUMENT

### A.   Dr. Maki Employed a Reliable, Generally Accepted Methodology to Calculate Damages

Defendants reflexively invoke Fed. R. Evid. 702 but make no challenge to Dr. Maki's qualifications. Nor could they. Unlike their expert Mr. Orszag, Dr. Maki has a Ph.D. in economics. She has taught undergraduate and graduate-level economics and has been qualified to testify on damages and other economic issues without challenge. Her opinion testimony applies reliable generally accepted methodologies to the evidence and data here to calculate damages. Significantly, Defendants also concede that Dr. Maki—like Dr. Heeb and Dr. Netz—relied on the appropriate dataset as the basis for her analyses and calculations. While Defendants dispute whether some of the individual sales should be included in applying these generally accepted methodologies, Defendants argument over inputs to the calculation is a factual dispute, not a legitimate *Daubert* issue. Lastly, Defendants quibble with Dr. Maki's qualitative analysis. Economists can apply their expertise qualitatively. Dr. Maki uses economic theory to dictate and support her quantitative analysis, and to explain data issues, which is the right way to offer opinions based on qualitative analysis.

### 1.   Dr. Maki Properly Relied on Dr. Heeb's Economic Analysis

Defendants seek to exclude Dr. Maki's testimony in part because she relied on "Dr. Heeb's overcharge numbers." ECF No. 391-1 at 5. But Defendants do not cite a single case for the proposition that an expert may not rely on the work done by another expert. *Id.* In fact, the opposite is true: "[A]n expert's testimony may be formulated by the use of the facts, data and conclusions of other experts." *Asad v. Cont'l Airlines, Inc.*, 314 F. Supp. 2d 726, 740 (N.D. Ohio 2004). "While it is true that one expert may not simply 'adopt another expert's opinions wholesale,' . . . it is firmly established under Rule 703 that an expert's testimony may be formed

using the conclusions and opinions of other experts." *Mod. Holdings, LLC v. Corning, Inc.*, No. 5:13-CV-00405-GFVT, 2022 WL 2910005, at *6 (E.D. Ky. July 22, 2022). Defendants do not dispute this.

Defendants merely parrot back from their motion to exclude Dr. Heeb's testimony that Dr. Heeb's overcharge percentages are "fatally flawed." ECF No. 391-1 at 5. But as explained in Plaintiffs' opposition to Defendant's motion to exclude Dr. Heeb's testimony, Dr. Heeb's overcharge analysis is the product of standard methodologies applied rigorously to the record in this case and should not be excluded. *See* Pls' Opp. to Defs' Mot. to Exclude the Testimony of Randall Heeb.

Dr. Maki has maintained repeatedly that her damages calculations rely on Dr. Heeb's overcharge calculations. *See, e.g.*, Ex. 5 [Maki Rep.] at ¶¶ 110, 112-13, 115; Ex. 11 [Maki Dep.] at 34:12–15 ("██████████████████████████████████████████ ██████████████"). She makes no claim to have calculated Varsity's overcharge herself.

Defendants further argue nonsensically that Dr. Maki should not have based her damages calculations "using Dr. Heeb's regional overcharge numbers," because the regional overcharge results in damages that are ████████ *less* in damages." ECF No. 391-1 at 5 (emphasis added). But Defendants mischaracterize Dr. Maki's opinions. Dr. Maki's report relies on the nationwide overcharges calculated by Dr. Heeb to prepare and calculate a damages model for the class. Ex. 5 [Maki Rep.] at ¶¶ 110–111. After Dr. Maki and Dr. Heeb prepared their reports, the Court issued its order on Defendants' Motions to Dismiss. ECF No. 333. Based on that decision and the critique of Dr. Murphy, Dr. Maki fine tuned and updated her damages calculations in her Rebuttal report. Dr. Maki then prepared a state-by-state analysis using the same nationwide overcharge, in case the Court ultimately rules that only Plaintiffs in particular states may collect damages. Ex. 6 [Maki Rebuttal Rep.] at ¶¶ 38, 39, 41 and Table 7 and Appendix C, D, E, H. Further, Dr. Maki also provided a separate calculation based on Dr. Heeb's alternative regional overcharge calculation, solely for the purpose of providing an alternative damages calculation in

the event that the trier of fact believes that the damages must be calculated on a regional, not a national level. *See id.* at ¶ 39 and Appendix F, G.

### 2. Defendants' Five Arguments for Why Dr. Maki's Damages Calculations Should Be Reduced Go to the Weight of her Testimony, not its Admissibility

Defendants make five arguments for why Defendants believe that Dr. Maki's damages calculations should be reduced. ECF No. 391-1 at 6–9. Defendants argue that Dr. Maki's damages calculations should be reduced because (1) in some instances "[s]chools . . . may not charge their cheerleaders" and "sometimes gyms would 'eat' the costs of competitions;" (2) sometimes "booster clubs" or other "fundraising efforts" "may" assist cheerleader families in paying fees; (3) sometimes gyms might "pool" funds from the cheerleader families and remit the payments directly to Varsity (arguing that therefore the direct purchaser is merely a "conduit"); (4) some of the payments included in Dr. Maki's calculations might have been from sideline cheer teams and not competitive cheer teams; and (5) Defendants argue that Plaintiffs cannot recover damages from purchases made in states that have no indirect purchaser repealer statute. *See id*. The first four of Defendants arguments are factual arguments that go to the weight of her testimony, and what the final damages figure should be. The fifth argument misunderstands Plaintiffs' Motion for Class Certification and the law on indirect purchasers.

First, Defendants argue that Dr. Maki included some Varsity sales that "may" have been a direct purchase by a school or individual without any associated indirect purchase. *Id.* at 6.[3] But this is simply a factual disagreement over whether certain school or individual purchases were not passed on to the indirect purchaser class. There is nothing problematic with Dr. Maki's methodology. In fact, Defendants agree with Dr. Maki's methodology, because Defendants assert—consistent with Dr. Maki—that direct sales made to Varsity should be excluded from damages. And Dr. Maki did in fact do so, excluding any transactions that indicted it was a direct

---

[3] Defendants offer no alternative calculation of damages of their own or make any effort to quantify the effect of any such hypothetical transactions. Had they done so, Plaintiffs would have evaluated such evidence and incorporated in their analysis.

sale. *See* Ex. 11 [Maki Dep.] at 65:16–17 ("

"); *id.* at 71:15–17 ("

"); *id.* at 76:23–24 ("

"). In total, she reduced Varsity's sales revenue (which was an input into her

damages calculation) by ███████, which she determined represented revenue related to direct

sales without and indirect purchase.[4]

Aside from the particular adjustments made, Defendants' argument here is merely that

it's possible that some individual transactions by schools or individuals were not passed on to

cheer families. ECF No. 391-1 at 6. However, as explained in more detail in Section A.3 below,

there is ample evidence for Dr. Maki to conclude that the competition, camps, and apparel sales

to gyms and schools were overwhelmingly passed on to the individual cheer families. *See* Ex. 6

[Maki Rebuttal Rep.] at ¶¶ 12–20 (citing numerous factual materials specific to this case as well

as economic theory). "An expert's opinion, where based on assumed facts, must find some

support for those assumptions in the record. . . . However, mere 'weaknesses in the factual basis

of an expert witness' opinion . . . bear on the weight of the evidence rather than on its

admissibility." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (quoting

*United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir.1993)).

Second, Defendants argue that some sales transactions included in Dr. Maki's

calculations may have correctly been indirectly purchased by class members, but that in some

instances the cheer families may have been financially supported by "booster clubs," or "may

[have been] covered by fundraising efforts." ECF No. 391-1 at 6. This argument makes little

sense. For starters, whether an indirect purchaser engaged in fundraising from third-party sources

is irrelevant. The same is true for indirect purchasers that raised the money through fundraising

---

[4] The Varsity apparel revenue data contained a type code which was used to identify the purchaser. Only purchases for All Star (AS) and school related codes (including but not limited to High School (HS) and Junior High (JR) were included in the revenue amounts. Data associated with 13 other codes totaling ███ were excluded. (*e.g.*, Individual (IN) and Business (BS)).

labor, like washing cars, mowing lawns, or selling cookies. Fundraising for cheer families for the purpose of those cheer families making an indirect purchase to Varsity does not absolve Varsity from anticompetitive overcharges or remove the overcharge from class damages. For the same reason, Defendants have not cited a single case for the idea that making purchases from money earned or obtained from other sources renders the payment of an overcharge non compensable.

Moreover, even if it did, whether a given transaction should be excluded from class damages is another contested factual contention. For example, how many transactions were paid for by a cheer family through "cookie sales" and "car washes" is a factual dispute. That such a dispute exists is no basis to exclude Dr. Maki's testimony. *See* Ex. 5 [Maki Rep.] at ¶ 51 (citing deposition testimony and acknowledging that some cheer families raised proceeds through car washes and cookie sales).

Third, Defendants argue that even where cheer families paid the gym or school, and the gym or school paid Varsity (i.e., and indirect purchase), some transactions may still be "not part of Plaintiffs' case," because the gym or school may have merely been acting as a "conduit for the sale." ECF No. 391-1 at 6–7. Defendants do not explain what this means. This too is a disputed factual issue.[5]

Fourth, Defendants argue that with respect to apparel Dr. Maki employed an "invalid methodology for excluding sales relating to sideline school cheerleading." ECF No. 391-1 at 7. Defendants argue that Dr. Maki's methodology is over-inclusive, and that certain sales should be

---

[5] Here, Defendants rely on a single answer to a poorly phrased question during the deposition of Ms. Minzghor. *See* ECF No. 391-1 at 6–7 (citing Minzghor Deposition). In fact, Defendants fail to mention other parts of the testimony provide support for Dr. Maki's calculations, and further supports her position that the pass-through rate was 100%. Ms. Minzghor testified that with respect to "Add-on Events," the gym would pay Varsity directly and the families would pay the gyms or schools "dollar-for-dollar" 100% of the cost. *See* Ex. 16 [Minzghor Dep.] at 105:22–107:7. That Defendants contend this means the gyms were merely a "conduit" is not supported by the record or by the very deposition testimony Defendants cite. Moreover, it is a factual issue that Defendants are free to argue at trial but cannot be the basis for excluding Dr. Maki's testimony.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JEN MAKI, PH.D.

excluded from her calculation. *Id.* But Dr. Maki specifically excluded all apparel sales made by gyms or schools that did not attend a competition or camp in order to eliminate apparel purchases not tied to competitive cheer teams. In doing so, Dr. Maki conservatively reduced the commerce subject to the damage calculation. Although Defendants argue that some schools that attended camps but did not attend a Varsity competition may have been sideline school cheerleading, Defendants fail to consider that (1) due to Defendants anticompetitive tying conduct requiring competitors to attend Varsity camps, camp attendance is correlated with competitive cheer; and (2) competitive cheer teams attending Varsity camps likely have competed at non-Varsity competitions. Thus, Defendants' arguments that certain apparel purchases may have been made by sideline cheer teams, does not undercut Dr. Maki's method. Indeed, Defendants overstate Dr. Maki's supposed admission that revenue from schools was "inappropriately included" in her calculations. *See* ECF No. 391-1 at 8. In fact, she testified that it was *possible* that some recreational cheerleaders attending camps and purchasing apparel may have been included. Again, Defendants are apparently aware that there is no data supporting this hypothesis—they have produced none—and defendants have not attempted in any way to quantify the hypothetical. Regardless, this is an argument going to the weight of the ultimate damages calculation, not her methodology.

Then, Defendants nonsensically argue that "*if*" each of the four supposed errors (they are not errors as described above) affected as much as "20% of all sales," then Dr. Maki's damages calculation would be "almost 60% overstated." ECF No. 391-1 at 8. Defendants' argument is mistaken for multiple reasons. For starters, Defendants pull the 20% figure out of thin air, without any justification for it at all. Dr. Murphy sets forth no alternative damage model and does not provide any opinion or analysis arguing that Dr. Maki's damages calculation was overstated by 20%, or, for that matter, by any amount in particular. Defendants could have just as nonsensically asserted that "*if*" Dr. Maki's calculations were 100% overstated, then there would be no damages in this case at all. Second, Defendants' unsubstantiated mathematical calculations in n.7 are entirely inapplicable here, because (1) they make up hypothetical numbers without any

support; (2) this is not part of any damage or other expert report; and (3) they fail to account for any overlap in the supposed errors.[6]

Fifth, Defendants argue that Dr. Maki calculated damages for states where no indirect purchaser claims are permitted. This is also not true. The issue of whether a nationwide damages class is permissible in this case is currently unresolved. Dr. Maki's Rebuttal Report provides damages calculations for the states in which Plaintiffs have brought state antitrust claims, as well calculations for all 50 states, in case the Court orders that only Plaintiffs from certain states may collect damages. Thus, Dr. Maki's damages calculations are helpful and relevant however the Court ultimately rules on this issue. There is thus no "52%" overstatement of damages in Dr. Maki's report. She merely presents the same data in multiple forms, so that however the Court rules on these issues, her damages model and calculations are still applicable and relevant.

Then, Defendants compound their own previous error, by asserting that if one takes Defendants' previously made-up 60% figure, and combines that with their baseless 52% figure, that this "suggests" that Dr. Maki's sales volumes "are inflated by 80% or more." ECF No. 391-1 at 8. This argument is nonsensical for the same reasons. Defendants' 60% figure is conjured out of thin air with no support in the record or from their experts. Further, if the Court rules that a nationwide damages class is permissible here, there would be no "52%" overstatement. Conversely, if a nationwide damages class is not permissible, there would still be no 52% overstatement. There would simply be the damages in each of the applicable states, as calculated by Dr. Maki at Appendix C, D, E of her Rebuttal Report. *See* Ex. 6 [Maki Rebuttal Rep.]. There is nothing that support Defendants baseless "suggestion" that Dr. Maki's calculations may be 80% inflated.

---

[6] For example, if each of 5 errors affected 10 transactions, and all 5 errors were present in all 10 transactions, there would be only 10 total transactions affected, not 50. In other words, there is no basis to argue that each of Defendants alleged over-inclusions "compound." They only add up in the manner in which Defendants calculate if there is precisely zero overlap of over-inclusions—a highly unlikely situation here. Defendants' expert never made this claim.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JEN MAKI, PH.D.

### 3.    Dr. Maki is Justified in Using a 100% Pass-Through Rate

Defendants argue that Dr. Maki made a "fatal error" by "assuming" a 100% pass-through rate. ECF No. 391-1 at 9. Defendants argue that Dr. Maki employed no "economic principle or study." *Id.* But Defendants completely ignore the work Dr. Maki performed to reach her conclusion and mischaracterize numerous depositions in an attempt to dispute the factual record.

Because there was no available data for quantitative analysis of the elasticity of demand,[7] Dr. Maki engaged in a rigorous qualitative analysis applying economic theory to the evidence in this case. In her rebuttal report, Dr. Maki explained in detail, with numerous citations to the record and to economic theory, how she reached her conclusion, based on generalized evidence, of a 100% pass-through rate. *See* Ex. 6 [Maki Rebuttal Rep.] at ¶¶ 12–20. For example, Dr. Maki based her opinion on numerous factual records supporting a 100% pass-through rate. *See, e.g.*, Ex. 6 [Maki Rebuttal Rep.] at ¶ 17(a) & n.6 (



); *id* at n.7 (

); *id.* at n.8–9 (

); *id.* at n.11

(

). And she supported her conclusion with economic theory too. *See id.* at ¶ 17(b)–(c).

Defendants turn a blind eye to this analysis, instead merely asserting that there is some evidence supporting Defendants' theory that some direct purchasers simply "ate" or "absorbed" registration fees or apparel purchases. But Defendants' arguments mischaracterize the evidence. For example, Defendants cite to the deposition of T. Gurske. *See* ECF No. 391-1 at 12. But that

---

[7] Plaintiffs sought pricing or other data in discovery for the purposes of making such a calculation. Defendant represented that they had produced all the relevant pricing data to Plaintiffs.

testimony actually supports the 100% pass-through rate explained by Dr. Maki. As stated in the testimony cited by Defendants, Mr. Gurske testified that although he does not have an "excel sheet" to determine the gym's exact costs, the gym will "take a best guess" at what the gyms costs are initially and will "adjust" prices according to "expenses." *See* ECF No. 391-11 [Ex. K to Defs' Motion]. In other words, without an excel sheet accounting precisely for all cost fluctuations in real time, he does his best to pass on 100% of costs to his cheer families at the beginning of the season and then adjusts pricing to ensure his expenses (*i.e.* Varsity purchases) are entirely passed on. *Id.*

Similarly, Defendants egregiously mischaracterize the testimony of Janine Cherasaro. *See* ECF No. 391-1 at 12. Defendants claim that because Ms. Cherasaro testified that when a gym changed its competition schedule, it did not necessarily charge the parents more, that proves "there is no pass through." *Id.* In fact, her testimony unequivocally states that the gyms not only passed on all the costs, they also marked up the competition fees to ensure 100% pass-through in the event that some changes were made. *See* Saveri Decl. Ex. 17 [Dep. of J. Cherasaro] at 76:6–91:23. Thus Dr, Maki's opinion on pass-through is entirely consistent with the record.[8] Despite

---

[8] In her testimony, Ms. Cherasaro explained in great detail how she was required to pay all competition fees separately, which included a markup from the gym, as well as apparel fees, which were 100% of the costs. *See id.* at 78:1–18 ("And the travel fees vary from year to year. This year was ▊▊▊. . . . The travel fees, obviously, are the competition fees."); *id.* at 78:5–8 ("And then we have to buy a uniform. Our uniform through Varsity was ▊▊▊. Practice wear was ▊▊▊. Also through Varsity. And sneakers, ▊▊▊, also through Varsity."); *id.* at 78:21-24 ("I know what the gym is charged for the competitions, because you can actually look up the fees for each competition. You know, what it costs your child to participate."); *id.* at 79:1–8 ("So that ▊▊▊ is pretty much directly competition fees. There might be a small [mark-up] in there. Because they average out. You know, like they may change a competition mid-season and they don't charge us more. But we also don't get a refund if it's less."); *id.* at 80:2–5 ("The travel fees change every year. Depending on which competitions we're going to attend. And the uniform fees change depending on the price of the uniform."); *id.* at 80:13–15 ("[A]s far as I know, the gym does not charge on top of the uniform cost. Some gyms do."); *id.* at 84:12–13 ("That's the competition fees. We pay those separately from our tuition."); *id.* at 91:21–23 ("And I would still have to pay [competition fees] separately. Cash or check, for that."). Ms. Cherasaro further testified that the gym never passed on any Varsity rebates to the cheerleading families. *See id.* at 83:4:13 ("So, when you say there was a uniform cost – World Cup, ▊▊▊ – and you said you understood that that's what World Cup paid . . . [does that take] into account any rebate they may have gotten? . . . [It] [d]oes not.").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JEN MAKI, PH.D.

Defendants best attempts to mislead on this point, Ms. Cherasaro's testimony clearly supports Dr. Maki's use of a 100% pass-through rate. And the record is replete with other similar corroborative evidence entirely consistent with the economic theory Dr. Maki relies on. *See* Ex. 6. [Maki Rebuttal Rep.] at ¶ 17(b)–(c).

Under settled law, plaintiffs are entitled to present reasonable estimates and receive the benefit of reasonable inferences with respect to class-wide damages calculations. *See In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 267 (N.D. Ohio 2014). "[I]t will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Id.* (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) (cited with approval in *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013))). The Supreme Court has held that antitrust plaintiffs are not held to "an unduly rigorous standard of proving antitrust injury," because "it does not 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 533 (6th Cir. 2008) ("*Scrap Metal*") (quoting *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566–67 (1981)). "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim." *Id.* (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946)).

Courts likewise do not require any heightened burden with respect to pass-through rates. *See Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cnty., Tennessee v. Momenta Pharms., Inc.*, 333 F.R.D. 390, 412 (M.D. Tenn. 2019) (holding that expert testimony on pass-through simply based on economic theory that "pharmacies would pass through higher costs of generic enoxaparin to their customers, including uninsured patients" was sufficient); *id.* at 413 ("As with all other issues in this case, the parties disagree as to the quantum of damages [including the pass-through rate]. However, at this point, the Court need not provide any definitive answer to this issue."). Courts hold that disagreements over individual pass-through rates go to the weight of the evidence, not admissibility. *See In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 286 (N.D. Ohio 2014). Importantly, Defendants' ability to raise factual questions over whether a

particular gym or school passed on all of the overcharges "cannot defeat an otherwise proper offer of generalized evidence of overcharge passthrough." *Id.* The court in *Polyurethane Foam* stated: "This Court does not doubt that an alleged colluder could find an instance in which, in the short-term, a direct purchaser failed to pass on the amount of an antitrust overcharge. That fact alone cannot defeat an otherwise proper offer of generalized evidence of overcharge passthrough; it instead goes to the weight of evidence offered to prove if passthrough in fact occurred, and the amount of that passthrough." *Id.*

Indeed, the Sixth Circuit is clear that so long as an expert's opinion or assumption "has a reasonable factual basis, it should not be excluded." *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993). "Rather, it is up to opposing counsel to inquire into the expert's factual basis." *Id.* Thus, "an expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. . . . However, mere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.'" *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (quoting *L.E. Cooke Co.*, 991 F.2d at 342).

Further, Defendants argue that because there is not sufficient data to perform a regression analysis related to pass-through, the claim must fail. That is not the law. *See Hosp. Auth. of Metro.*, 333 F.R.D. at 412–413. Use of qualitative analysis in determining pass-through is an accepted methodology, particularly where the data is insufficient. For example, in *In re Blood Reagents Antitrust Litigation,* an expert was challenged for "failing to apply regression analysis to calculate damages." 2015 WL 6123211, at *11 (E.D. Pa. Oct. 19, 2015). But the court held that "*Daubert* does not mandate the use of such econometric tools," in part because a "reliable regression depends on 'data with a reasonable degree of integrity,'" which was unavailable. *Id.*

The use of alternative methodologies to calculate damages, including consideration of pass-through, other than by regression analysis is thus proper. *Id.*.[9]

Further, Defendants' reliance on *In re Graphics Processing Units Antitrust Litigation,* 253 F.R.D. 478, 501 (N.D. Cal. 2008) ("*GPU*") is misplaced. There, the proposed class was flawed in a manner that affected the expert's pass-through analysis by the expert. First, GPU was a price fixing cartel case involving many different manufacturers and types of GPUs. There was a complex chain of distribution, including sales by manufacturers not alleged to be part of the cartel. Purchasers varied greatly in size and end uses of the product, and the products themselves were highly heterogeneous. *GPU* involved indirect purchaser plaintiffs who purchased graphic cards of unknown provenance from potentially thousands of different retailers, who themselves purchases from different manufacturers, some of whom negotiated special prices for the graphic products. *See GPU*, 253 F.R.D. at 504. The inability to identify particular GPU sold by which manufacturers made the court in *GPU* particularly skeptical of the expert's pass-through analysis and the expert's failure to account for different variables. *Id.* Here, the marketplace is for more simple. The potentially thousands of direct purchasers along with numerous manufacturers that the court in *GPU* was concerned about are absent. Instead, this case involves a pass-through from a singular seller (Varsity) to gyms and schools that then pass on the costs of those sellers to the cheer families who ultimately pay.[10] Lastly, the *GPU* court chastised the plaintiffs for the

---

[9] The use of qualitative analysis to augment or supplement quantitative analysis is well established in the field of economics. Varian, Hal, "What Use is Economic Theory", University of Michigan, 1993 (p.3) https://deepblue.lib.umich.edu/handle/2027.42/101038. Indeed, quantitative economic evidence is not viewed as superior or more explanatory than qualitative evidence.

[10] Defendants' reliance on *In re Processed Egg Products Antitrust Litigation*, 312 F.R.D. 124, 130 (E.D. Pa. 2015) ("*Eggs*"), is also misplaced. Like the *GPU* case, *Eggs* involved a highly varied market with numerous producers, wholesalers, and distributors. *Id.* at 158. Defendants in that case performed economic quantitative analysis showing that overcharges in certain sections of the market were not passed-through for specific market and contractual reasons. *Id.* But here, Defendants simply argue over what the deposition testimony in this case supports. ECF No. 391-1 at 9–15. Further, to the extent *Eggs* or *GPU* suggests that a class must prove a uniform pass-through rate for each plaintiff, that is contradicted by other courts. *See Hosp. Auth. of Metro.*, 333 F.R.D. at 412; *Polyurethane Foam,* 314 F.R.D. at 286.

"lack of data"—as Defendants' selectively quote—because the plaintiffs there failed to timely raise the issue and had not filed any motions to compel on that issue. Here, the gaps in the data result wholly from the unavailability of the data from a single source, the Defendant Varsity.

Moreover, in the instant case, the prices of competitions, camps and apparel are not negotiated but set by Varsity. Likewise, the terms of Varsity's agreements, Network Agreements and Family Plans are not the subject of individualized negotiations. Instead, they have detailed terms outlined by Varsity on how to qualify for them, and how to receive rebates. The terms do not vary by direct-purchaser gym. Thus, without any other compelling support from the case law for their argument to exclude Dr. Maki's testimony, Defendants refer to *Illinois Brick* and essentially argue that this market is "too complicated" for antitrust analysis. Defendants' argument is groundless.

Lastly, contrary to Defendant's assertion, Dr. Maki considered whether Varsity's rebate payments to gyms under the Family Plan or Network Agreements were passed on to parents. After a systematic review of the record, Dr. Maki found no evidence that rebate payment received by gyms were passed on. In fact, Varsity's rebate program was not disclosed to parents. *See* Ex. 6 [Maki Reb. Rep.] at ¶20. ████████████████████ ████████████████████████████████████████████████ ████████████████████████ *See id.* at ¶ 20 n.16. On the other hand, she found considerable evidence that Varsity sought to conceal or obscure the substantial amounts of rebates paid to gyms to prevent parents from learning of the rebates, specifically to avoid possible pressure from families to pass on the rebates. Ex. 6 [Maki Reb. Rep.] at ¶20. For example, Dr. Maki relied on Brian Elza's testimony that around 2012, ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████ *See* Ex. 15 [Elza Dep. Nov. 16, 2021] at 318:7–319:4.

4.      **Dr. Maki's Rebuttal Report Simply Updated Her Calculations Using New Data; She Did Not Offer New Opinions**

Dr. Maki reserved the right in her expert report that "[i]f additional data were to become available; this may have a bearing on the analysis and/or methodology employed herein, and I reserve the right to amend or modify my opinion based upon such information." Ex. 5 [Maki Rep.] at ¶5. Thereafter, Dr. Murphy provided previously undisclosed additional data that Dr. Heeb incorporated into his overcharge calculation. And Dr. Maki reduced her sales figures. Dr. Maki's rebuttal report simply updated her damage calculations based on the adjusted numbers. There were no methodological changes and no new opinions—just updated numbers. It is appropriate for an expert to update calculations when new information becomes available. *ASC Engineered Sols., LLC v. Island Indus., Inc*., No. 220CV02284JPMCGC, 2021 WL 2941989, at *2 (W.D. Tenn. July 13, 2021) ("Amended or supplemental expert reports are also permitted where the expert is correcting a damages calculation based on information that was not available when the expert prepared the initial report, as long as the expert does not rely on an entirely new legal theory in correcting his supplementation.") Of course, Defendants seek the benefit of Dr. Maki's reduced sales numbers but not the "detriment" of Dr. Heeb's adjusted overcharge calculation.

B.      **Dr. Maki Offers No "Common Proof" Opinion**

Defendants argue that Dr. Maki's so-called "common proof" opinion is without basis. Defendants appear to be claiming that Dr. Maki is offering an opinion about the standards applicable under Rule 23. That is a stretch. Instead, Dr. Maki reported on the evidence that she relied on and the manner in which she relied on it applying standard reliable economic methodology. It is a simple fact that this evidence is generalized and does not differ from class member to class member. Dr. Maki provides an opinion showing there is a classwide measure of damages and demonstrates that measure, calculating damages for the class. █████████ ████████████████████████████████████████████████████

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JEN MAKI, PH.D.

██████████████████████████████ *Id.* at ¶122; Ex. 6 [Maki Reb. Rep.] at ¶44.

Defendants, however, offer no alternative damages model and make no effort to calculate pass-through. Dr. Maki conservatively calculated damages that "represent[] a lower boundary because it only captures the anticompetitive behavior that could be reliably quantified." Ex. 6 [Maki Reb. Rep.] at ¶44. In doing so, she reported that she was able to run her calculations using "common evidence," which "is of a type reasonably relied on by experts in [her] field." Ex. 5 [Maki Rep.] at ¶7; Ex. 6 [Maki Rebuttal Rep.] at ¶44. This is not at all surprising, as the Supreme Court has noted that "predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). In other words in antitrust cases, "common liability issues such as conspiracy or monopolization have, almost invariably, been held to predominate over individual issues." *Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253, 269 (D. Mass. 2008).

Indeed, Dr, Maki employs a measure of aggregate damages of the type widely used and approved in antitrust class actions. As explained in the leading class action treatise: "It has been settled that classwide proof of the measure of damages suffered by class members generally is proper, especially in price-fixing cases, followed by a Phase II stage of litigation to determine amounts of damages for each, which becomes little more than an application of the damages formula found by the jury or court in Phase I." W. Rubenstein, et al., *Newberg on Class Actions* § 10.7 (2012). Courts in this Circuit are in accord. *See Scrap Metal*, 527 F.3d at 534; *In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 326, 350 (E.D. Mich. 2001) ("[D]espite Defendants' claims to the contrary, the use of an aggregate approach to measure class-wide damage is appropriate. As observed by a leading commentator on class actions: 'aggregate computation of class monetary relief is lawful and proper. Challenges that such aggregate proof affects substantive law and otherwise violates the defendant's due process or jury trial rights to contest

each member's claim individually, will not withstand analysis.'") (quoting 2 *Newberg on Class Actions*, Chapter 10, § 10.05 (3d ed. 1992)).[11]

### C.   Dr. Maki's Factual Evidence is Reliable Support for her Opinions

Plaintiffs wholly agree that no expert witness in this case should be permitted to take the stand and regurgitate either side's factual narrative for the sake of regurgitation. While this appears to be the focus of the reports of Defendants' experts, Plaintiffs have no intention of using Dr. Maki to testify in that manner. Each of Dr. Maki's factual recitations were included to provide adequate disclosure of the facts on which she relied to form her opinions.

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to exclude the testimony of Dr. Maki.

Dated: March 31, 2023                              Respectfully submitted,

                                                  By:      */s/ Joseph R. Saveri*
                                                           Joseph R. Saveri

                                                  Joseph R. Saveri*
                                                  Steven N. Williams*
                                                  Ronnie Seidel Spiegel*+
                                                  Kevin E. Rayhill*
                                                  Elissa A. Buchanan*
                                                  David Seidel*
                                                  JOSEPH SAVERI LAW FIRM, LLP

---

[11] *See also In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. C07-01819 CW, 2008 U.S. Dist. LEXIS 107523, at **47-48 (N.D. Cal. Sept. 29, 2008); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 525 (S.D.N.Y. 1996) ("aggregate judgments have been widely used in antitrust, securities and other class actions."); *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197 (1st Cir. 2009) ("[t]he use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself."); *In re Polyester Staple Antitrust Litig.,* No. 3:03CV1516, 2007 U.S. Dist. LEXIS 52525, at **106-13 (W.D.N.C. Jul. 19, 2007) (crediting aggregate damages calculation substantially similar to Dr. Maki's); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827, 2012 U.S. Dist. LEXIS 94049, at *48 (N.D. Cal. Jan. 26, 2012) ("[T]he use of aggregate damages in antitrust cases has been approved numerous times.").

601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
rspiegel@saverilawfirm.com
krayhill@saverilawfirm.com
eabuchanan@saverilawfirm.com
dseidel@saverilawfirm.com

Van Turner Jr. (TN Bar No. 22603)
TURNER FEILD, PLLC
2650 Thousand Oaks Blvd., Suite 2325
Memphis, Tennessee 38118
Telephone: (901) 290-6610
Facsimile: (901) 290-6611
vturner@turnerfeildlaw.com

Richard M. Paul III*
Ashlea Schwarz*
PAUL LLP
601 Walnut, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
rick@paulllp.com
ashlea@paulllp.com

Jason S. Hartley*
Fatima Brizuela*
HARTLEY LLP
101 West Broadway, Suite 820
San Diego, CA 92101
Telephone: (619) 400-5822
hartley@hartleyllp.com
brizuela@hartleyllp.com

Daniel E. Gustafson*
Daniel C. Hedlund*
Daniel J. Nordin*
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622

dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com

* Admitted *pro hac vice*

+Located in Washington State

*Attorneys for Individual and
Representative Plaintiffs*