# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| **JESSICA JONES, et al.,** | Case No. 2:20-cv-02892-SHL-tmp |
| Plaintiffs, | |
| v. | |
| **VARSITY BRANDS, LLC, et al.,** | **JURY DEMAND** |
| Defendants. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS'
## MOTION TO EXCLUDE THE TESTIMONY OF RANDAL HEEB, PHD

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   LEGAL STANDARD............................................................................................1

III.  ARGUMENT .........................................................................................................3

    A.    Dr. Heeb Employed Textbook Methodology to Define the Relevant
           Markets .............................................................................................................3

           1.    Dr. Heeb Reliably Defines the Cheer Competitions Market .....................5

           2.    Dr. Heeb Reliably Defines the Cheer Apparel Market............................7

           3.    Dr. Heeb Reliably Defines the Cheer Camps Market...............................9

    B.    Dr. Heeb Uses Reliable Methods to Show the Anticompetitive Effects of
           Varsity's Rebate and Discount Programs ...................................................9

    C.    Dr. Heeb's Overcharge Methodology is Both Reliable and Admissible .............13

           1.    Dr Heeb Connects Defendants' Anticompetitive Conduct to
                 Overcharges ..........................................................................................14

           2.    Cheer Competitions Overcharge is Reliable.............................................15

           3.    Dr. Heeb's Camps Overcharge is Reliable ...............................................20

           4.    Dr. Heeb's Apparel Overcharge is Reliable ............................................22

           5.    Defendants are not Prejudiced by Dr. Heeb's Amended
                 Overcharge Figures................................................................................26

    D.    Dr. Heeb's Common Impact Opinion is Sound and Admissible .........................27

IV.   CONCLUSION.....................................................................................................28

PLAINTIFFS' OPP TO DEFENDANTS' MTN TO EXCLUDE THE TESTIMONY OF RANDAL HEEB, PHD

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*ACT, Inc. v. Worldwide Interactive Network*, No. 3:18-CV-186, 2020 WL
12574235 (E.D. Tenn. Mar. 24, 2020)......................................................................7

*ASC Engineered Sols., LLC v. Island Indus., Inc.*, 2021 WL 2941989 (W.D. Tenn.
July 13, 2021)......................................................................................................15, 28

*Bentley v. Highlands Hosp. Corp.,* 2016 WL 5867496 (E.D. Ky. Oct. 6, 2016).........................28

*Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171 (6th Cir. 2009).......................................2

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946).......................................13

*Bledsoe v. FCA US LLC*, 2022 WL 4596156 (E.D. Mich. Sept. 30, 2022).................................2

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ...........................................3, 5, 9

*Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008)...............................10, 11, 12

*Citizens for a Better Gretna v. City of Gretna, La.*, 636 F. Supp. 1113 (E.D. La.
1986), aff'd, 834 F.2d 496 (5th Cir. 1987) ..............................................................24

*Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264 (6th Cir. 2015)...................................11

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ......................................................14, 15

*Continental Ore Co. v. Union Carbide & Carbon Corp*, 370 U.S. 690 (1962)...........................14

*Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002).......................2, 15, 16, 19

*Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547 (E.D. Mich. 2022) .................................10, 26

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ..............................................*passim*

*Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359 (1927)...............................14

*EEOC v. Tepro, Inc.*, 133 F. Supp. 3d 1034 (E.D. Tenn. 2015)......................................28

*Eleven Line, Inc. v. North Texas State Soccer Ass'n*, 213 F.3d 198 (5th Cir. 2000) ...................16

*General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795 (8th Cir. 1987).........................8

*Guild v. Gen. Motors Corp.*, 53 F. Supp. 2d 363 (W.D.N.Y. 1999)................................2

*Hyland v. HomeServices of America, Inc.*, 2012 WL 12995647 (W.D. Ken. Jul. 3, 2012) ...................................................................................................................5, 16

*Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) ....................................8

*In re E. I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.*, 345 F. Supp. 3d 920 (S.D. Ohio 2015) ..................................................................................................2

*In re Graphics Processing Units Antitrust Litig.*, 235 F.R.D. 478 (N.D. Cal. 2008) ...................27

*In re Polyurethane Foam Antitrust Litig.*, 2014 WL 6461355 (N.D. Ohio Nov. 17, 2014) ..................................................................................................................22, 28

*In re Scrap Metal Antitrust Litig.*, 2006 WL 2850453 (N.D. Ohio Sept. 30, 2006) .....................13

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008).................................................1, 2

*In re Southeastern Milk Antitrust Litig*, 739 F.3d 262 (6th Cir. 2014) ...........................................5

*In re Urethane Antitrust Litig.*, 2012 WL 6681783 (D. Kan. Dec. 21, 2012) ............................5, 6

*In re Zetia (Ezetimibe) Antitrust Litig.*, 2021 WL 6689718 (E.D. Va. Nov. 1, 2021) ..................................................................................................................22

*Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 520 F. Supp. 3d 872 (E.D. Mich. 2021) ..................................................................................................2

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981)....................................22

*Jones v. Varsity Brands*, LLC, No. 220CV02892SHLCGC, 2022 WL 3043895 (W.D. Tenn. Aug. 1, 2022) .............................................................................20

*Kanuszewski v. Shah*, 583 F. Supp. 3d 1018 (E.D. Mich. 2022) ...................................................11

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).............................................................1

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485 (S.D.N.Y. 2015) ..................................................................................................................10

*Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 106 F.3d 1388 (7th Cir. 1997) ..................................................................................................................19

*Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244 (6th Cir. 2001)...........................................12

*Park W. Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314 (S.D.N.Y. 2009) ....................10

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993) ..................................................................................................................16

*ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559 (6th Cir. 2014) ...............................................8

*Rich v. City of Savannah,* 2005 WL 6739798 (W.D. Tenn. Aug. 25, 2005) .................................21

*The Iams Co. v. Nutro Prods., Inc.*, 2004 WL 5496244 (S.D. Ohio June 30, 2004) ...................23

*U.S. v. E. I. Du Pont de Nemours & Co.*, 353 U.S. 586 (1957) .....................................................8

*U.S. v. Phillipsburg Nat'l Bank & Trust Co.*, 399 U.S. 350 (1970) ..............................................8

*Ullman v. Auto-Owners Mut. Ins. Co.*, 2007 WL 1057397 (S.D. Ohio Apr. 5,
2007) ...................................................................................................................................27

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ..................................................................7

*Universal Coin & Bullion, Ltd. v. Fed. Express Corp.*, 2015 WL 12001264 (W.D.
Tenn. June 30, 2015)...........................................................................................................23

*Universal Surveillance Corp. v. Checkpoint Sys., Inc.*, 2015 WL 6082122 (N.D.
Ohio Sept. 30, 2015) ...............................................................................................3, 10, 12

*Watson v. Willow Enterprises, Inc.,* 2017 WL 3434088 (E.D. Mich. Aug. 10,
2017) ...................................................................................................................................27

**Federal Rules**

Fed. R. Civ. P. 26 .........................................................................................................................27

Fed. R. Evid. 702 .................................................................................................................1, 2, 3, 5

Plaintiffs respectfully submit this opposition to Defendants' Motion to Exclude the Testimony of Randal H. Heeb, ECF No. 388 ("Motion") and accompanying Memorandum of Law, ECF No. 388-1 ("Memo"). This opposition is supported by the Declaration of Joseph R. Saveri and accompanying exhibits.[1] Plaintiffs request a hearing on this Motion because Plaintiffs believe it would benefit the Court to hear from the parties and perhaps the experts themselves to have the full picture and to understand the finer points of the methodologies employed.

## I.     INTRODUCTION

Defendants do not challenge Dr. Heeb's impeccable qualifications and experience. Instead, they seek to exclude Dr. Heeb's testimony and opinions as unreliable by misconstruing economic and antitrust principles and arguing hotly disputed factual issues. Dr. Heeb has employed reliable, textbook methodology. Any challenges raised by Defendants are ***disputes of fact*** that go the weight of the evidence at trial, not its admissibility. Defendants' Motion should be denied.

## II.     LEGAL STANDARD

The starting point for evaluating a *Daubert* challenge is Federal Rule of Evidence 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. *Id.* (quoting Fed. R. Evid. 702).

As the Supreme Court cautioned in *Kumho Tire Co., Ltd. v. Carmichael*, however, a Rule 702 inquiry is a "flexible one." 526 U.S. 137, 150 (1999); *see also Scrap Metal*, 527 F.3d at 529

---

[1] Unless otherwise noted, all citations to "Ex. _" refer to the exhibits attached to the Saveri Declaration filed in support of all four oppositions to Defendants' *Daubert* motions.

(the test of reliability is "flexible"); *Innovation Ventures, LLC v. Custom Nutrition Labs*., *LLC*, 520 F. Supp. 3d 872, 880 (E.D. Mich. 2021) ("the threshold for indicia of reliability in a *Daubert* motion is a liberal one"). The *Daubert* factors "do not constitute a definitive checklist or test" and "specific factors neither necessarily nor exclusively appl[y] to all experts or in every case." *Bledsoe v. FCA US LLC*, 2022 WL 4596156, at *3 (E.D. Mich. Sept. 30, 2022) (citing *Kumho*, 526 U.S. at 150 and quoting *Daubert*, 509 U.S. at 593); *see also Scrap Metal*, 527 F.3d at 529 ("Indeed, we have recognized that the *Daubert* factors 'are not dispositive in every case' and should be applied only 'where they are reasonable measures of the reliability of expert testimony.")

"[A] court must be sure not to 'exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.'" *Id.* (citing Advisory Committees note, 2000 amend.). Instead, the requirement that an expert's testimony be reliable means that it must be "supported by appropriate validation – i.e., 'good grounds,' based on what is known.'" *Id.* (quoting *Daubert*, 509 U.S. at 590). "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529-530 (internal citations omitted); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (district court must determine if proffered expert testimony "rests on a reliable foundation"). "Admissibility under Rule 702 does not require perfect methodology." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 181 (6th Cir. 2009). Attacks regarding the completeness of an expert's methodology go to the weight and not the admissibility of testimony. *Id.* at 182. "Any doubts should be resolved in favor of admissibility." *In re E. I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.*, 345 F. Supp. 3d 920, 925 (S.D. Ohio 2015). For this reason, "rejection of expert testimony is the exception rather than the rule." *Scrap Metal*, 527 F.3d at 530; *Bledsoe*, 2022 WL 4596156, at *4.

When applying Rule 702, the gatekeeper role is not intended to supplant the adversary system or role of the jury. *See Daubert*, 509 U.S. at 596; *see also Guild v. Gen. Motors Corp.*, 53

F. Supp. 2d 363, 369–70 (W.D.N.Y. 1999) ("[T]rial judges acting as gatekeepers under *Daubert* must not assume 'the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul' and thereby usurp the 'ageless role of the jury' in evaluating witness credibility and weight of the evidence.") (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1045 (2d Cir. 1995). Where experts may reasonably differ as to the proper calculation of damages or harm, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. These conventional devices rather than wholesale exclusion are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702. *Id.*

## III.    ARGUMENT[2]

### A.    Dr. Heeb Employed Textbook Methodology to Define the Relevant Markets

Dr. Heeb employed two standard methodologies to define the relevant product markets. First, he used the hypothetical monopolist test ("HMT"), a standard method used by economists to define product markets in merger and monopolization cases.[3] *See, e.g., Universal Surveillance Corp. v. Checkpoint Sys., Inc.*, 2015 WL 6082122 (N.D. Ohio Sept. 30, 2015). Second, Dr. Heeb also examined and applied the factors set forth by the Supreme Court in *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962).

Dr. Heeb applied the HMT consistent with the Department of Justice and Federal Trade Commission's Horizontal Merger Guidelines ("HMGs"), to define the relevant product and geographic markets. Ex. 1 [Heeb Rep.] at ¶¶107 & fns. 96, 100, 109; Ex. 2 [Heeb Reb.] at ¶¶110-28); Ex. 9-1 [HMGs] at §4. Dr. Heeb first identified the sets of goods alleged to have been affected by Defendants' conduct. Ex. 1 [Heeb Rep.] at ¶¶107-108. He then performed an analysis

---

[2] Plaintiffs note the impropriety of Defendants' attempt to use their *Daubert* briefing as a sur-rebuttal to argue the facts, and to offer analysis on issues not found in Plaintiffs' expert reports.

[3] Notably, Defendants' expert, Dr. Murphy, did not perform the HMT for any of the product markets that he or Defendants criticize. *See* Ex. 14 [Murphy Dep.] at 74-76, 249-252.

of what products are "reasonably interchangeable" with one another by looking at demand-side substitutability. *Id.* This is defined by looking at a "customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service." *Id.* (citing HMGs, §4). Dr. Heeb elaborates on his application of the HMT and how he also studied market power as part of his methodology:

> In employing this test, I applied both economic analytic methods as well as empirical measures that were also used to develop overcharges. This is not unusual in monopolization matters such as this one, because market definition is based on whether a particular market as defined can sustain market power. The overcharge analysis determines whether there was an effect and what was the effect of the exercise of market power. The existence, therefore, of a monopoly overcharge or supracompetitive prices is also part of the proof that the market is properly defined. To test my conclusions on market definition, I also examined empirically the extent of Varsity's market shares, as a proxy for market power, at a far narrower level than any plausible market definition. This served two purposes: first, it shows the geographic extent of Varsity's market power, and informs the geographic scope over which overcharges are best estimated (answer: national average overcharges); and second, it enables me to reach a conclusion on the maximum proportion of the putative class members that conceivably might have been unharmed by the conduct (answer: the share of unharmed class members is *de minimis*). Ex. 1 [Heeb Rep.] at ¶13.

Defendants' claim Dr. Heeb did not start with the "narrowest set of products" as described in the HMGs. Memo at 4-5. Yet, the HMGs provide that "[t]he hypothetical monopolist test ensures that markets are not defined too narrowly, but it does not lead to a single relevant market." *See* Ex. 9-1 [HMGs] at 8-10; *see also* Ex. 1 [Heeb Rep.] at ¶112 & fn. 107 (citing ABA Section of Antitrust Law, Market Power Handbook at 53) ("relevant markets need not have precise metes and bounds"). In fact, the HMGs do not contain *any* statement suggesting that the HMT is meant to ensure that markets are not defined too broadly. Instead, the goal of the HMT is to ensure that the market is not too narrowly defined, which prevents an overstatement of anticompetitive impact by overestimating the hypothetical monopolist's market power. Ex. 9-1 [HMGs] at 7-14. That is precisely what Dr. Heeb did in analyzing and forming his opinion.

In addition to the HMT, Dr. Heeb also applied *Brown Shoe*. Ex. 1 [Heeb Rep.] ¶¶107-109 & fn. 96, in which the Supreme Court established factors for the purpose of defining the relevant product markets. Dr. Heeb analyzed these factors and along with the HMT. Ex. 2 [Heeb Reb.] at ¶45. The resolution of the issue of market definition is fact specific under the HMT or when considering the *Brown Shoe* factors. As this Court has already held, market definition is a highly factual question. *See* ECF No. 333 [Order] at 29 ("And defining a product market is highly factual and can require analysis of relevant expert opinion, testimony to understand the dynamics of product market, and documentary evidence"); *see also In re Southeastern Milk Antitrust Litig*, 739 F.3d 262, 282-83 (6th Cir. 2014) (internal citation omitted) ("Multiple courts of appeal have held that market definition is a question of fact ... that [] is better left for a jury to decide.").

### 1.    Dr. Heeb Reliably Defines the Cheer Competitions Market

Dr. Heeb defines the product market for cheer competitions to include both cheer competitions attended by gyms and cheer competitions attended by schools. Ex. 1 [Heeb Rep.] at ¶121. Defendants argue that Dr. Heeb's cheer competition market is "contrary to law." Memo at 4. Yet, Defendants have filed a *Daubert* motion, not a motion for summary judgment. *See Hyland v. HomeServices of America, Inc.*, 2012 WL 12995647, at *4 (W.D. Ken. Jul. 3, 2012) (rejecting defendant's Daubert challenge and noting that they "seem to confuse and conflate the issue of admissibility with the issue of the sufficiency of Plaintiffs' evidence to survive summary judgment"). Defendants also assert that Dr. Heeb should have performed "diversion analyses" instead of, or in addition to, the HMT. Memo at 4. Yet, there is no mandate that Dr. Heeb must use Defendants' preferred method, or multiple methods. *See, e.g., In re Urethane Antitrust Litig.*, 2012 WL 6681783, at *7 (D. Kan. Dec. 21, 2012) ("Arguments about which method is superior for use in this case" go to the weight of [expert's] opinions, not to their admissibility under Rule 702.").

Defendants next claim that Dr. Heeb's market definition should be excluded because he included All Star Cheer and "Scholastic Cheer" in the same market, whereas their expert, Dr.

Murphy, and the expert in the *Fusion Elite* action, Dr. Singer, both found the two markets to be distinct. Memo at 4. This argument fails. Defendants' term, "Scholastic Cheer," refers to both "school cheer and sideline cheer." *Id.* at 4-6. Plaintiffs here do not bring any claims related to sideline cheer, nor does Dr. Heeb define it as part of his cheer competitions market. Ex. 1 [Heeb Rep.] at ¶121-123. Instead, Dr. Heeb uses the term "School Cheer" specifically to mean only the activity of school cheer teams competing against other school cheer teams at Varsity cheer competitions, i.e., essentially the same activity as All Star Cheer, but excluding sideline cheer. *See* Ex. 2 [Heeb Reb.] at ¶¶129-130 (explaining both activities and why they are essentially the same). Indeed, Varsity itself considers them to be the same activity and in the same market. *See id.* at ¶123 fn. 120, 129.

Defendants then use their flawed terminology to argue that All Star Cheer and "Scholastic Cheer" are not "reasonably interchangeable" because teams that are operated through gyms and teams that are operated through schools do not compete directly against each other at cheer competitions. Memo at 5-6. But the standard of "reasonable interchangeability" under the HMT does not require that teams in the same market compete against each other, rather it focuses on whether products suffer the same competitive effects. Ex. 1 [Heeb Rep.] at ¶110, 113-14. As Dr. Heeb explains after analysis of the evidentiary record, All Star Cheer and School Cheer are essentially the same activity, and both involve teams who pay to participate in Varsity-owned cheer competitions and perform the same 2.5-minute routines. *Id.* at ¶121. As Dr. Heeb found, in many instances, All Star Cheer teams and School Cheer teams attended the same Varsity cheer competitions, at the same venues, and paid the same prices. Ex. 2 [Heeb Reb.] at ¶116 & Table 8. Dr Heeb evaluated all potential close substitutes, and ruled out those such as sideline cheer, gymnastics, and competitive dance, that were not interchangeable under an HMT analysis. Ex. 1 [Heeb Rep.] at ¶¶123-124. Whether All Star Cheer and School Cheer are

reasonably interchangeable as properly defined under the HMT is an issue of fact for the jury, not reason to exclude the testimony under *Daubert*.[4]

### 2. Dr. Heeb Reliably Defines the Cheer Apparel Market

Dr. Heeb defines the market for cheer apparel to include six categories, the same categories that Varsity uses to define cheerleading apparel:  uniforms, shoes, letter, warmups, camp wear, and accessories. *Id.* at ¶154. He analyzes, among other things, the products, the production cycle for the products, the design of the uniforms, the cost of uniforms, clothing that is made specifically for the sport of competitive cheer (and those items that are not), and the extent to which customers can and do purchase products across all six categories. *Id.* at ¶¶153-159 & Table 6. He demonstrates through empirical evidence that 97% of apparel revenue comes from a common set of products purchased by both All Star and School Cheer customers. *Id.* at ¶¶163-168 & Tables 7-9.

Defendants also disagree that cheer apparel can be defined as a single market. Memo at 6-8. Defendants argue that the products defined by Dr. Heeb for cheer apparel are not substitutable for each other. *Id.* As explained, Dr. Heeb reliably defined the market after sufficient testing of substitutability and consideration of the evidence.[5] Dr. Heeb concludes that based on the real-world sales and marketing practices, the apparel products purchased by plaintiffs are sufficiently related, linked, joined or bundled to be considered together. Ex. 1 [Heeb Rep.] at ¶¶158-162. Courts consider the bundles of products to be "cluster markets" that

---

[4] Dr. Heeb considered the question of whether athletes switch between All Star and School Cheer. As his analyses show, Varsity's own registration records and market analysis of its business demonstrate that athletes on All Star teams have switched, and do switch, to School Cheer teams. Ex. 1 [Heeb Rep.] at ¶¶132, 135.

[5] Market definitions including differentiated goods and services are widely accepted by both economists and courts. *See, e.g., United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966) (rejecting argument that burglar alarms and fire alarms were not in the same relevant market because they were too different); *ACT, Inc. v. Worldwide Interactive Network*, No. 3:18-CV-186, 2020 WL 12574235, at *3 (E.D. Tenn. Mar. 24, 2020) (citing *Grinnell*, 384 U.S at 573) ("The Supreme Court has held that a "cluster" of services can be a 'distinct line of commerce' and serve as a relevant product market for the purposes of an antitrust claim.").

consist of products that are not direct substitutes for one another: "if 'most customers would be willing to pay monopoly prices for the convenience' of receiving certain products as a package, then the relevant market for those products is the market for the package as a whole…This is true even though the individual products in the package are not substitutes for each other." *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 567 (6th Cir. 2014). The relevant considerations for a "cluster market" are "whether the different products and services are ordinarily combined" and "that each service or product within a relevant market need not be the exact functional equivalent if it is a distinct line of commerce." *Id.*[6] Here, the products defined by Dr. Heeb can be considered part of a cluster under *ProMedica*.

Dr. Heeb relied on substantial evidence, which he quantified, showing the frequency with which Plaintiffs purchased various apparel products as bundles, and the extent to which consumers purchased products separately or together. *See* Ex. 1 [Heeb Rep.] at ¶¶159-165. Further, Dr. Heeb explains that "Varsity markets itself as having 'unique, highly-customizable products that meet distinct needs of cheerleaders and dancers'" and identifies the "significant degree by which Varsity apparel customers purchase products from four, five, or even all six, product categories" of cheer apparel (as identified by Varsity), including that 87% of Varsity apparel revenue is from customers purchasing in four or more product categories, 69% from customers purchasing in five or more product categories, and 28% from customers purchasing in all six product categories. *Id.* at ¶¶154, 159, Table 6. Further, Dr. Heeb identifies in his rebuttal that "Varsity's apparel customers typically and often bundle cheer apparel across the six cheer apparel categories identified by Varsity" and that "… purchases in one apparel category are linked to purchases in another apparel category. They are part of the overall cheer competition

---

[6] *See also U.S. v. E. I. Du Pont de Nemours & Co.*, 353 U.S. 586, 595 (1957); *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202-07 (9th Cir. 1997); *General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 805-06 (8th Cir. 1987); *U.S. v. Phillipsburg Nat'l Bank & Trust Co.*, 399 U.S. 350, 360 (1970). Dr. Murphy does not disagree. He explained at deposition how cluster markets contain distinct products that are not direct substitutes but are usually complements and usually purchased or used together. *See* Ex 14 (Murphy Dep. at 115:12-23).

apparel spending decision by an All-Star gym or a school." Ex. 2 [Heeb Reb.] at ¶¶215-216. Dr.

Heeb's methodology is reliable. While Defendants argue about the record evidence, this is

grounds for cross-examination, not a basis for exclusion.

### 3. Dr. Heeb Reliably Defines the Cheer Camps Market

Dr. Heeb reliably applied the HMT and *Brown Shoe* to define the cheer camps market as

a single market, taking all relevant factors into account. Ex. 1 [Heeb Rep.] at ¶¶145-152. Dr.

Heeb examined characteristics of different types of camps (e.g., summer camps or overnight

camps). He assessed the extent to which gym and school teams attend camps, the rules for

camps, cheer camp revenue from 2015-2019, the cost for a team to participate in a camp, and the

extent to which teams may choose to travel to a camp, i.e., the substitutability of different types

of camps within a certain distance. He applied the HMT to determine such substitutability.[7] He

also examined market power considerations. *Id.* at ¶¶145-152. Defendants attack Dr. Heeb's

methodology by attempting to provide facts to differentiate camps by type and number of

participants. Memo at 8. Again, this goes to the weight of the evidence and provides a basis for

cross-examination, not for exclusion under 702 or *Daubert*.

### B. Dr. Heeb Uses Reliable Methods to Show the Anticompetitive Effects of Varsity's Rebate and Discount Programs

Dr. Heeb analyzed Varsity's conditional rebate and discount programs and assessed the

ability of the incentives for these programs to foreclose rival event producers and rival apparel

manufacturers in their respective markets. Ex. 1 [Heeb Rep.] at ¶¶219-226. To perform his

analysis, Dr. Heeb analyzed competition registration records, apparel transaction data, and

earned rebate information for the Varsity Family Plan ("VFP") and Varsity Network Agreements

---

[7] Dr. Heeb also conducted a SSNIP test. As the HMG states, in the merger context, the test requires that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products ("hypothetical monopolist") likely would impose at least a small but significant and non-transitory increase in price ("SSNIP") on at least one product in the market, including at least one product sold by one of the merging firms." Ex. 9-1 [HMGs] at §4.1.1 at 9.

("VNAs"). *Id.* Dr. Heeb concluded that Varsity's bundled loyalty programs diminished competition and foreclosed rivals, making it hard for them to compete against Varsity. *Id.*

Defendants argue that Varsity's rebates and discounts are procompetitive. Memo at 8. As Dr. Heeb acknowledges, this can be true in the but-for world, untainted by anticompetitive conduct, but that is not the case here. Ex. 1 [Heeb Rep.] at ¶¶66, 224. Dr. Heeb looked at the specific competitive effects of Varsity's rebate and discount programs, including the features of the programs and the bundling requirements of those programs across the competitions and apparel markets. He also considered the effects of how attending additional Varsity events would increase the rebates earned on all other Varsity events. *Id.* at ¶¶117, 222. He found such programs are anticompetitive and had the effect of foreclosing competition. *Id.* As Sixth Circuit and other courts recognize whether conduct is procompetitive or anticompetitive is a question to be weighed by the jury, not one of admissibility. *See, e.g., Universal Surveillance Corp.*, 2015 WL 6561241, at *13 ("Based on the existing record, the magnitude of [Defendant's' bundle discount is an issue for a jury to resolve."); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 906 (9th Cir. 2008) ("The question of 'where antitrust law draws the line' between procompetitive and anticompetitive bundled discounts is likely to be given a more finely-tuned answer by allowing both experts to explain their competing analyses and the facts that support them" to a jury.).

Defendants also claim that Dr. Heeb's methodology is not reliable where the available data did not permit a quantitative analysis. Memo at 9. As explained, Dr. Heeb analyzed Varsity's data and other data on numerous levels to form his opinions. Ex 1 [Heeb Rep.] at ¶¶11-17. However, there is no mandate that experts must only use quantitative analysis. *Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547, 571 (E.D. Mich. 2022) ("Testimony is not excludable as unreliable or speculative or otherwise simply because it is qualitative instead of quantitative"); *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 507 (S.D.N.Y. 2015) ("[T]hat an analysis may be qualitative does not mean that it is unreliable for the purposes of Daubert."). Qualitative evidence is a widely accepted methodology on its own. *See Park W.*

*Radiology v. CareCore Nat'l LLC,* 675 F. Supp. 2d 314, 327 (S.D.N.Y. 2009) (finding that an expert opinion based on qualitative evidence and not empirical analyses, or quantitative findings was reliable and would assist the trier of fact); *Kanuszewski v. Shah*, 583 F. Supp. 3d 1018, 1023 (E.D. Mich. 2022) (although qualitative, medical professor's study was reliable methodology and her opinions based on that study were admissible).

Defendants claim that Dr. Heeb did not do a "rigorous analysis" of Varsity's rebate and discount programs under the VFP and VNA because the "discount attribution test" (what they rename the "foreclosure test") requires that prices of bundled discounts must be below cost in order to be anticompetitive. Memo at 8-12. Defendants claim that because Dr. Heeb did not find the VFP and VNA bundled discounts amounted to below cost pricing, his methodology fails. *Id.* at 10. This argument misses the mark.

First, there is no requirement that experts perform such a test to determine whether a rebate or discount program is anticompetitive in this case. *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 273 (6th Cir. 2015), which adopts the "discount attribution standard" set forth in *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008) is a case that involves predatory pricing claims, not monopolization claims, as here. *Id. Collins* discusses the "discount attribution test" (which is sometimes referred to as the "*PeaceHealth*" test) and addresses it in both the context of rebates on a single product and as to bundled rebates. *Id.* With respect to bundled discounts, the *Collins* court found that, in a predatory pricing case, a bundled discount can be anticompetitive if it amounts to pricing at a lower cost. *Id. Collins* also notes that the attribution standard applies "[w]hen differential pricing is the only means of coercion" that encourages a buyer to purchase a bundle of products. *Id. Collins* is not even applicable here where Plaintiffs allege monopolization claims and allege anticompetitive conduct in many forms beyond just Defendants' exclusionary contracts and how such contracts foreclosed rivals. Therefore, it is stretch to find that the *PeaceHealth* test would even be properly applied here.

More importantly, even under the *PeaceHealth* test, the fact that Dr. Heeb concludes that bundled discounts amount to a certain price discount (whether below or above cost) and

Defendants dispute it as not high enough to impose liability, is not an issue for *Daubert* scrutiny, it is a dispute of fact.[8] In *Universal Surveillance*, plaintiff's expert opined that defendant engaged in anticompetitive conduct in the relevant markets through the use of bundled discounts and exclusive contracts. 2015 WL 6082122, at*10. Defendant in that case also raised a *Daubert* challenge under *PeaceHealth*, claiming that there must be below cost pricing to foreclose rivals (as it would be hard for them to compete to offer the same bundles). *Id.* As the court in *Universal Surveillance* explained, however, the strength of an expert's conclusion regarding whether other competitors could offer the same bundles is a jury question. *Id.* at *11.

Defendants further dispute the facts regarding the VFP and the VNAs, claiming that Dr. Heeb does not contend that the VFP and VNA agreements were anticompetitive exclusive dealing arrangements. Memo at 9-10. Yet, at Dr. Heeb's deposition, he testified as to the contracts themselves being exclusive dealing contracts after Varsity's own counsel introduced them at deposition.[9] Defendants further debate the facts claiming that the VNAs are not "actionable exclusive dealing arrangements" because they do not foreclose enough of the market from other suppliers, which they claim must be at least 30%. Memo at 10, fn.3. They argue that Varsity's VFP contracts cannot be anticompetitive when they last only one year in duration. *Id.* They claim that the VFP is not an "agreement" at all and that a gym makes no commitment to attend events upfront, it is merely rewarded for the events it attends over the course of the year. *Id.* Plaintiffs' experts' reports and rebuttals speak to why Defendants' facts are incorrect, and the record evidence is replete with content to say otherwise. However, these arguments only dispute Dr. Heeb's conclusions, not his methodology. *See, e.g., Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 254, 2001 WL 227426 (6th Cir. 2001) ("As the Court in *Daubert* stated, the inquiry must be "solely on principles and methodology, not on the conclusions that they generate.").

---

[8] See Ex. 9 [Heeb Dep.] at 238:7-239:6; 240:20-240:23; 240:25-241:12.

[9] *See* Ex. 9 [Heeb Dep.] at 239:21–241:1; 256:11–259:16); Ex 9-2 [Heeb Dep., Exhibit 11].

Defendants' contention that Dr. Heeb does not have an understanding of the VFP and VNAs and the markets they impact (Memo at 9-10) is directly contradicted by his reports. *See, e.g.,* Ex 1 [Heeb Rep.] at ¶¶219-226. As explained above, Dr. Heeb uses reliable methodology to analyze Varsity's rebate and discount programs and to conclude they are anticompetitive. Defendants' arguments only serve to illustrate the many factual disputes that exist, not any flaws in the methods employed or analyses performed by Dr. Heeb.

## C.    Dr. Heeb's Overcharge Methodology is Both Reliable and Admissible

Defendants first mount a general attack on all of Dr. Heeb's estimated overcharge opinions, claiming they are unreliable because they are "monolithic," and present an average overcharge for each product market. Dr. Heeb conducted a standard antitrust overcharge analysis, comparing the prices that Varsity charged with the lower prices that Varsity charged but for the anticompetitive conduct. This overcharge calculation is routine in antitrust case and has been used in hundreds if not thousands of antitrust cases. Further, there is no rule requiring mathematical precision in calculating antitrust damages. The Supreme Court has long held that there is no requirement of such precision. Reasonable estimates of damages suffice.[10] Consequently, presenting overcharges as averages in antitrust cases is the norm. *See, e.g., In re Scrap Metal Antitrust Litig.*, 2006 WL 2850453, at *16 (N.D. Ohio Sept. 30, 2006) (recognizing that "antitrust cases present damages questions that are not amenable to concrete mathematical calculations, court[s] have regularly recognized averaging of overcharges as a valid method for determining a uniform undercharge (or overcharge, as the case may be) in well-functioning markets").

---

[10] As the Supreme Court noted In *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946):

> The evidence here was ample to support a just and reasonable inference that petitioners were damaged by respondents' action, whose unlawfulness the jury has found. . . . The comparison of petitioners' receipts before and after respondents' unlawful action impinged on petitioners' business afforded a sufficient basis for the jury's computation of the damage, where the respondents' wrongful action had prevented petitioners from making any more precise proof of the amount of the damage. *Id.* at 266.

1.    **Dr Heeb Connects Defendants' Anticompetitive Conduct to Overcharges**

Defendants wrongly argue that Dr. Heeb does not sufficiently connect his estimated overcharges to Varsity's anticompetitive conduct.[11] Again, this misstates the standard and is at odds with settled Supreme Court authority on point. *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 379 (1927) ("Damages are not rendered uncertain because they cannot be calculated with absolute exactness."); *Continental Ore Co. v. Union Carbide & Carbon Corp*, 370 U.S. 690, 700 (1962) (plaintiff must be allowed to have his case reach the jury if he has presented "sufficient evidence for a jury to infer the necessary causal connection between respondents' antitrust violations and petitioners' injury").

As Dr. Heeb describes in his report and rebuttal, Varsity's supra-competitive prices resulted from the illegal maintenance and exploitation of its monopoly power. *See* Ex. 1 [Heeb Rep.] at ¶¶54, 108 n.99; Ex. 2 [Heeb Reb.] at ¶¶195-97, 344, 374. Dr. Heeb analyzed in detail how Varsity engaged in anticompetitive conduct that foreclosed competition and, thus, allowed it to charge supra-competitive prices in the markets for cheer competitions, cheer camps, and cheer apparel camps. *See* Ex. 1 [Heeb Rep.] at ¶194. Defendants cite *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) to argue that Dr. Heeb's overcharge estimates must fail because they include

---

[11] For example, Dr Heeb analyzes the evidence to show: Varsity's rebate programs and discounts had the effect of foreclosing rivals (Ex. 1, Heeb Report at ¶¶ 222-25); Varsity held "attack events" whereby Varsity hosted competitions near and/or at the same time as rival events with the specific intention of harming attendance at those other events (*Id.* at ¶¶258-260); Varsity's relationship with and control over USASF and other regulatory bodies, allowed Varsity to exclude and diminish competitors in the market (*Id.* at ¶¶ 210-216); Varsity's Squad Credential Program, requires attendance at Varsity camps by school cheer teams in order to attend school cheer competitions, which forecloses competitions by rival camp competitors who cannot pave the way to the sought after national school competitions (*Id.* at ¶226); Varsity implemented a policy that did not permit rival apparel companies to sell apparel at Varsity events (*Id.* at ¶¶187-88); Varsity leveraged its relationships with venue operators to "exclude rival event producers from hosting events for '60 days before or 90 days after' a Varsity event" (Ex. 2, Heeb Reb. at ¶271); Varsity intended to drive other event producers out of business so that it could acquire them, and then cancel such acquired events (*Id.* at ¶¶ 252-58); and Varsity's "Stay-to-Play" restrictions provided Varsity another means to extract monopolist rents from customers, and these restrictions were applied to events that Varsity acquired that did not previously have such restrictions (*Id.* at ¶¶272-74).

conduct that was not unlawful. Memo at 13. In *Comcast* the expert's overcharge model calculated a "but for" overcharges figure by assuming a market that was based on the *four* market distortions, but where only one of those was accepted for class treatment. *Id.* at 35. The expert thus admitted that the model calculated damages resulting from "alleged anticompetitive conduct as whole, and did not attribute damages to any one particular theory of antitrust impact." *Id.* at 36. The Court acknowledged that "methodology may have been sound, and might have produced a commonality of damages, if all four of those distortions remained in the case." *Id.* at 37. Here, Dr. Heeb analyzes and connects a long list of Defendants' alleged anticompetitive conduct to estimate overcharges. All of this conduct remains part of the case and is properly factored into Dr. Heeb's overcharge estimates here. *See Conwood*, 290 F.3d at 792 (rejecting defendant's argument that plaintiff did not relate specific "bad acts" to defendant and failed to account for other factors that could have had a negative effect on defendant's sales).

Here, Dr. Heeb properly applied economic principles to identify anticompetitive conduct and connected it with Varsity's overcharges in the markets. Ex. 1 [Heeb Rep.] at ¶¶54, 108 n.99, 194; Ex. 2 [Heeb Reb.] at ¶¶195-97, 252-70, 344, 366, 374. In fact, Dr. Heeb's models specifically exclude data that could be attributed to procompetitive explanations, such as where he relies on Varsity's registration records for its regional and national events for 2013-2014 season through 2018-2019 and drops the 2019-2021 seasons where decreased attendance could be attributed to COVID-19. *See* Ex. 1 [Heeb Rep.] at ¶280.

### 2.     Cheer Competitions Overcharge is Reliable

Dr. Heeb uses standard and reliable methods for calculating antitrust overcharges in the cheer competitions market (finding an estimated overcharge of 27%).[12] Dr. Heeb applies

---

[12] Dr. Heeb determines an overcharge of 24% in his opening report (Ex. 1, Heeb Report, ¶312), and then adjusted that percentage using additional data, to 27% in his rebuttal report. Ex. 2 [Heeb Reb.] at ¶496). This is not improper, rather, it is expected. *See ASC Engineered Sols., LLC v. Island Indus., Inc.*, 2021 WL 2941989, at *2 (W.D. Tenn. July 13, 2021) (amended or supplemental expert reports are also permitted to correct a calculation or to account for additional information not available when expert prepared initial report, as long as expert does not rely on an entirely new legal theory in correcting his supplementation.").

regression analysis (dummy variable approach), yardstick methodology (aka benchmark method), and a before-and-after analysis, all of which are standard methodology for estimating overcharges in antitrust cases. *Id.* at ¶¶278-299. *See, e.g., Conwood Co.*, 290 F.3d at 793 (regression analyses, yardstick test, and before-and-after method are all "generally accepted methods for proving antitrust damages"); *Hyland v. HomeServices of America, Inc.*, 2012 WL 12995647, at *12 (benchmark/yardstick method widely accepted by courts to measure damages); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1238 (3d Cir. 1993) (regression analysis is a reliable means by which economists may prove antitrust damages); *Eleven Line, Inc. v. North Texas State Soccer Ass'n*, 213 F.3d 198, 207 (5th Cir. 2000) (noting that the two most common methods of quantifying antitrust damages are the "before and after" and "yardstick" measures of lost profits). Dr. Heeb also performs an alternative regression to control for cost effects and to assess robustness of his primary regression. Ex. 1 [Heeb Rep.] at ¶283 & Attachment 3, Table 26 (Regression Output for Alternative Regression (Sensitivity Check) with Cost as Explanatory Variable). In addition, Dr. Heeb accounted for any variables, and ruled out the possibilities that the overcharges could have been caused by factors other than Defendants' conduct. *Id.* at ¶290. Defendants' specific arguments further attacking Dr. Heeb's methodology are all without merit:

> a.    **Dr. Heeb Properly Estimated Overcharges at National Level**

Defendants claim that Dr. Heeb cannot calculate overcharges on both the national level and regional level for cheer competitions, and that the national level overcharges should be excluded. Memo at 19-20. Unlike Defendants' experts, who do not estimate or offer any alternative methodology or calculation of their own, Dr. Heeb was thorough in exploring alternative hypotheses and models. Dr. Heeb explains why, after applying reliable methods to calculate *both* regional and national level overcharges, the national overcharge figure is correct:

> To determine if it is more appropriate to use regional or national
> level overcharge estimates, I estimate overcharges both ways, and
> then do a statistical test to compare the alternative approaches. Ex.
> 1 [Heeb Rep.] at ¶295.

Allowing for separate regional level overcharges, shown as
Regression 1 in Table 22, Varsity's price is elevated in all five
regions, compared to the benchmark. Individual estimates of
regional overcharges range from 15.4% in the West to 32.0% in
the Northeast, with intermediate values 17.5% in the Midwest,
25.9% in the Southeast, and 17.5% in the Southwest. The
coefficients upon which these are based are statistically significant
at the 99.0% confidence level for Northeast, Midwest, and
Southeast, statistically significant at the 90.0% confidence level for
the Southwest, and not statistically significant at conventional
confidence levels for the West. This means that the estimate for the
West region is imprecisely estimated, and the true value may be
higher or lower than this estimate. *Id.* at ¶296.

I implement a standard statistical test, called an "F-test" to assess
whether the five different regional overcharges are statistically
different from each other. This test does not reject the null
hypothesis that the coefficient values are equal (with a p-value of
11.3%), implying that the statistical evidence does not support
using separate regional overcharges instead of the national
estimate. Instead, this indicates that the common national level
estimate of overcharges is more precisely estimated, reliable and
appropriate, especially in light of the evidence of national level
conduct. As mentioned above, the statistical significance level of
the coefficient for the national overcharge coefficient is 99.0%. *Id.*
at ¶297.

*See also* Ex. 2 [Heeb Reb.] at ¶¶538-557. Defendants also misstate Dr. Heeb's findings as to the

"Western Region," where they claim Dr. Heeb found no statistically significant overcharge in

that region, and that Dr. Heeb cannot say overcharges for that region are not 0%. Memo at 19.

Dr. Heeb found an overcharge in the West to be much higher than the national average. *See* Ex. 2

[Heeb Reb.] at ¶¶548-549 & Table 26 (finding a 45.3% overcharge in the Western Region).[13]

---

[13] Dr. Heeb performed three regressions pertaining to the Western region. The first (detailed in
his opening report), did not have sufficient data to estimate a figure for the West. Ex. 1 [Heeb
Rep. at ¶294 & Table 22. In his rebuttal, in response to criticism from Dr. Murphy and as a result
of more data becoming available, Dr. Heeb ran his same methodology and found the overcharge
in the Western region to be 22.9%. Dr. Heeb also ran the regression a third time and added in a
cost variable, which when applied, raised it higher and to be even more precise. When he
controlled for costs and with all additional available data, he found an overcharge for the
Western region of 45.3%. *See* Ex 2 [Heeb Reb.] at ¶¶10-17, 76; ¶¶548-549 & Table 26
(explaining the three regressions and methodology). Even if, however, overcharges in the
Western region were 0%, Dr. Heeb's methodology would still be reliable.

b.      **Dr. Heeb Properly Examined Varsity's Pre-Class Period Acquisitions and Pre-Period Pricing of Cheer Competition Events**

Oddly, Defendants attack Dr. Heeb for analyzing acquisitions that occurred before the beginning of the class period. Dr. Heeb looked at Varsity's acquisitions over time, including back to acquisitions in 2014. Ex 1 [Heeb Rep.] at ¶¶227-266). This is a normal and necessary step in overcharge analysis in monopolization cases. It is also standard practice to use pre-acquisition prices as a competitive benchmark. Rather, in monopoly cases it is especially important to look at how a Defendant acquired its market power, and the effect of that market power on competition, and that would necessarily include looking at the prices of competition events before and after Varsity acquired them. *Conwood*, 290 F.3d at 782 (6th Cir. 2002) ("Monopoly power consists of 'the power to control prices or exclude competition.'"). As the Court has ruled, Plaintiffs can rely on pre-class period conduct to establish market power and other elements of their claims. *See* ECF No. 333 [Order] at 36-37. Logically, monopoly power acquired before the class period remained afterwards. Defendants are free to show—which they cannot—that it dissipated over time. The class period is only relevant to the four year period allowable for the recovery of damages. Plaintiffs are not seeking to recover damages for purchases prior to the class period, as Defendants wrongly assert. Memo at 18.

c.      **Dr. Heeb Properly Analyzes Pre-Existing Conditions**

Here, Dr. Heeb employs a standard benchmark method to examine prices of competitions before and after Varsity's acquisitions. Dr. Heeb shows in his regression analysis that prices increased for these acquired events during the class period (as compared to before). Ex. 2 [Heeb Reb.] at ¶¶62, 74-79. If Defendants dispute the market share percentages and whether prices increased at Varsity's acquired events and to what extent, that is a question of fact, not of admissibility. *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 106 F.3d 1388, 1398 (7th Cir. 1997) ("questions raised concerning damages are essentially questions of fact").

Defendants argue that Dr. Heeb used prices based on pre-existing conditions rather than "in-period conduct," to estimate his overcharges and, therefore, his overcharge percentage cannot

be correct. Memo at 20. Defendants have already lost this argument at the motion to dismiss stage, when this Court concluded that Plaintiffs had sufficiently alleged a continuing antitrust violation such that pre-period conduct is properly considered. *Jones v. Varsity Brands*, LLC, No. 220CV02892SHLCGC, 2022 WL 3043895, at *17 (W.D. Tenn. Aug. 1, 2022). Likewise, Defendants' argument that Dr. Heeb is asserting overcharges based on pricing that reflects preexisting market conditions (Memo at 20), is also incorrect.

Defendants also incorrectly argue that there can be no damages unless Plaintiffs show Varsity increased the price of competitions. Memo at 8. Yet, Plaintiffs are entitled to the difference in the supra-competitive prices charged but for the conduct. This would be so, if Defendants raised their prices, or charged higher prices above the lower prices which would have prevailed, but for the anticompetitive conduct. Defendants then claim that there were higher prices, but they were the result of increased quality of events. Memo at 19-20. Again, the evidence does not support this assertion. Dr. Heeb looked extensively at the available evidence regarding quality, and found that higher prices are not attributable to better quality. Ex. 2 [Heeb Reb.] at ¶288 ("I did not find any evidence to support Dr. Murphy's theory that Varsity had higher quality events than events operated by rival event producers."). In fact, a Varsity executive testified that Varsity's acquisitions permitted the company to take steps to reduce the quality of its events, both its legacy events and its acquired brand events." *See id.* at ¶288 n.318, (citing Elza Dep. at 285:14-287:10).

### d.    Dr. Heeb Properly Estimates Overcharges for School Cheer Events

Defendants also challenge Dr. Heeb's methodology as to school cheer competitions. Memo at 20-21. First, contrary to Defendants' assertions, Dr. Heeb also performs a reliable market definition with respect to All Star Cheer and School Cheer, finding they are reasonably interchangeable and in the same product market. Ex. 1 [Heeb Rep.] at ¶¶163-164 & Table 8. It is grossly unfair and incorrect for Defendants to claim Dr. Heeb is "extrapolating from one market to the next" in his estimation of overcharges for the competitions market. Memo at 22. Dr. Heeb

analyzes the data, applies economic theory and concludes they are in the same product market, are affected by the same anticompetitive conduct, and paid the same average overcharge. For example, Dr. Heeb's analysis shows that more than 50% of Varsity school competition entrants participate in competitions with both All Star and school teams. Ex. 2 [Heeb Reb.] at ¶116, Table 8. Thus, the foreclosure of any competitors from the relevant market would foreclose events for both All Star and School Cheer teams, ultimately leading to price overcharge for both All Star and School Cheer teams. Dr. Heeb's methods are reliable, and Defendants are simply quibbling with the facts. *Rich v. City of Savannah,* 2005 WL 6739798, at *3 (W.D. Tenn. Aug. 25, 2005) ("When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.").

### 3.    Dr. Heeb's Camps Overcharge is Reliable

Likewise, Plaintiffs' experts show how the conduct effected both the markets of competitions and camps. Ex. 1 [Heeb Rep.] at ¶¶ 308-312. The record evidence shows that markets were linked and joined through common coordinated marketing and anticompetitive conduct, including the rebate programs. This evidence provides a reliable foundation for Dr. Heeb's economic model to estimate camp overcharges. Moreover, Dr. Heeb explains the economics underlying these bundling techniques, including data on customer attendance at camps and events, plus Varsity's market share in each market. Dr. Heeb applied a theoretical economic model of how firms maximize profit and set prices when customers bundle products. *Id.* at ¶¶219-222, 226, 248, 249, 265, 269-277, 324-326).[14] However, Varsity's prices for its own camps were subject to its demonstrated market power during the entire period for which data was available. *Id.* at ¶¶324-326. Given the absence of a competitive benchmark for camps, Dr. Heeb applied the conceptual model of firm optimization to support his opinion that a rational firm

---

[14] Defendants did not produce any data on the prices of competitors' camps. *Id.* (¶62).

would apply a higher overcharge on camps (the less price sensitive service) than competitions. *Id.* at ¶¶324-326. When applied, this well-established model of consumer choice and firm profit maximization (a reliable model to predict firm behavior), the overcharge in the camps market would be at least as large as the overcharge in the competition market. *Id.* at ¶¶324-326. This technique, based on sound economic principles, and the record in this case, is more than sufficient to satisfy the requirements of a reasonable estimate of overcharge damages. *See In re Polyurethane Foam Antitrust Litig.*, 2014 WL 6461355, at *44 (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)) ("it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate"); *id.* (quoting *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946)) ("The 'approximate' damages formulation embodies the principle that a too-demanding damages figure would act as an 'inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain.'"); *see also J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981).

Defendants incorrectly state that Dr. Heeb based his overcharge for camps on one document from 2011, and that his opinion is based only on market share. Memo at 23. This is not so. Dr. Heeb provides a detailed explanation for his overcharge calculation Ex. 1 [Heeb Rep.] at ¶¶324-326. Defendants further claim that Dr. Heeb relies on speculation that the elasticity of demand is lower for camps than for competitions. Memo at 24. Not so. Dr. Heeb assesses cross-elasticity of demand and measures it in his report. Ex. 1 [Heeb Rep.] at ¶311. As is common in cases of this type, Defendants do not possess such data. Indeed, Defendants did not perform such an analysis of their own. While economists would love to acquire such data, none existed here, and the absence of such an analysis is not required. *See In re Zetia (Ezetimibe) Antitrust Litig.*, 2021 WL 6689718, at *9 (E.D. Va. Nov. 1, 2021) (finding expert opinion admissible despite not directly analyzing cross-elasticity of demand and that "caselaw does not require that 'an expert offering an opinion on market definition must undertake a certain type of cross-elasticity study").

Unlike here, where Dr. Heeb did a detailed analysis to consider elasticity of demand, the cases cited by Defendants are cases where no proof of cross-elasticity was provided at all.[15]

Defendants also miss the mark where they raise another fact dispute regarding Dr. Heeb's analysis of end of season events and bids. Memo at 25. The evidence shows that bids to end-of-season events are linked to attendance at Varsity camps. Ex. 1 [Heeb Rep.] at ¶183-184 & fn.207. Varsity's Squad Credentialing Program is also linked to camps in that school teams must complete the program in order to attend the NCA Junior & Senior Nationals Championship or the UCA National High School Cheerleading Championship. *Id.* Dr. Heeb concluded that these programs were anticompetitive. *Id.* After analyzing this evidence, Dr. Heeb properly concludes that a significant portion of camp customers were captive to the Varsity ecosystem. *Id.*; Ex. 2 [Heeb Reb.] at ¶495. Dr Heeb's opinion is not speculative (Memo at 26), it is directly grounded in the facts, and factual disputes are for the jury.

### 4.     Dr. Heeb's Apparel Overcharge is Reliable

Dr. Heeb estimates an apparel overcharge of 10% calculated on a national basis. Ex. 1 [Heeb Rep.] at ¶60. To arrive at his figure of 10% he first identified a comparable set of products for which he had both Varsity data and competitor data, i.e., Varsity shoe data and Nfinity shoe data. *Id*. at ¶¶15-16, 66,320-323. Dr. Heeb determined shoes to be the most reliable product to analyze given the available dataset and the interchangeability between the two companies' shoes, which would allow for a direct comparison of the prices across the entire distribution of shoe quality. *Id.* In his assessment, a direct comparison of the shoe prices was a reliable basis for assessing whether, and the degree to which, Varsity's cheer competition shoes had a higher price relative to Nfinity's cheer competition shoes. *Id*. at ¶66. He found that, averaged across deciles of the shoe price distribution, Varsity cheer competition shoes are 10-11% more expensive than Nfinity cheer competition shoes. *Id*. at ¶66.

---

[15] *See Universal Coin & Bullion, Ltd. v. Fed. Express Corp.*, 2015 WL 12001264, at *8 (W.D. Tenn. June 30, 2015); *The Iams Co. v. Nutro Prods., Inc.*, 2004 WL 5496244, at *3 (S.D. Ohio June 30, 2004).

Defendants fault Dr. Heeb for not performing a regression analysis on apparel and suggest he did no analysis. But the point of regression analysis in this situation is to identify the factors that affect price to find a good comparison or basis for estimation.[16] Indeed, a regression, by its very nature, is simply a statistical summary of the relationship between each of the matched pair of points across the distribution of two variables. *Citizens for a Better Gretna v. City of Gretna, La*., 636 F. Supp. 1113, 1126 (E.D. La. 1986), aff'd, 834 F.2d 496 (5th Cir. 1987) ("Correlation and regression analysis provides statistical coefficients that summarize the consistency and strength of the relationship between the two variables" ). This statistical summary of the comparison of matched pairs of points of two variables is exactly the analysis that Dr. Heeb applied to estimate the apparel market overcharge. Ex. 1 [Heeb Rep.] at ¶¶60, 153-168, 300.

Defendants claim that Dr. Heeb cannot use shoes to estimate overcharges for other apparel. In fact, for the reasons stated above, this is reliable estimate based on reasonable assumptions and inferences. *Id.* Defendants also claim that Dr. Heeb cannot assert that prices are higher for shoes where he cannot prove that the price increases were due to better quality Varsity shoes (than Nfinity). Memo at 14-15.[17] While there is evidence that Nfinity shoes are better quality, Dr. Heeb conservatively treated them as being of equal quality to Varsity shoes. Ex. 1 [Heeb Rep.] at ¶302. Defendants assert that there is "a premium on brand value" and that such a premium explains the price difference between Varsity and Nfinity shoes, but they provide no data to support this fact dispute. Memo at 14. Dr. Heeb's analysis shows that Varsity's shoes at the lower-price end of the distribution are less expensive than comparable Nfinity shoes. At the

---

[16] Here, the shoes that Dr. Heeb compared (Varsity shoes and Nfinity shoes), are substantially similar in quality and functionality and, therefore, there are no exogenous factors that need to be accounted for when comparing prices. Ex. 1 [Heeb Rep.] at ¶321.

[17] The evidence includes an online consumer guide, the fact that Nfinity shoes weigh 4.8 ounces and Varsity shoes weigh 6.5 ounces (with lighter shoes providing higher performance for cheer athletes), and customer reviews on Amazon Ex. 1 [Heeb Rep. at ¶¶302 fns. 370-371.

higher-price end of the distribution, on the other hand, Varsity's shoes are significantly more expensive than comparable Nfinity shoes.[18]

Dr. Heeb considers the evidence regarding Varsity's rebate and discount programs in his apparel overcharge estimate. For example, he considered the language of the VFP and VNAs and how it confirms that such contracts are exclusive dealing contracts. Ex. 9 [Heeb Dep.] at 314:16-321:21, 315:23-316:7; Ex. 2 [Heeb Reb.] at ¶262. He considers evidence that shows how Varsity's conditional rebate programs were intended to lock purchasers into the Varsity ecosystem and to harm competitors' chances to compete in the market. Ex. 1 [Heeb Rep.] at ¶¶ 222-25, 471. He considers that Varsity's rebate and discount program "conditions the amount of the rebates on purchases in multiple product categories," specifically events and apparel. *Id*. at ¶224. He considers that Varsity's rebate customers are required to purchase Varsity apparel to collect the full value of the rebates earned from attending events. *Id.* Varsity's "[p]ayment of a significant portion of the rebate as a credit toward future purchases also serves to lock in Varsity customers and foreclose rivals, since if the gym switches to a rival apparel source, it loses those unspent credits." *Id.* at ¶222.

Dr. Heeb also considers the evidence that shows how Varsity and Defendants used a variety of methods to refuse to allow competitors to sell cheer apparel at cheer competitions. *Id*. at ¶95. Defendants dispute the facts claiming that cheer athletes primarily seek to make apparel purchases at cheer competition events. Memo at 17. While this is not a dispute under *Daubert*, there is a clear record of evidence showing how Varsity intended to and did exclude rivals from showing their apparel at Varsity events. Ex. 1 [Heeb Rep.] at ¶95. Dr. Heeb considered Varsity's exclusion of other rival apparel companies in estimating his apparel overcharges. *Id.*

Defendants attack Dr. Heeb's opinion finding that customers bundle apparel purchases as not supported by any quantitative analysis. Memo at 6-7, 17-18. Yet, there is no mandate that an

---

[18] Dr. Heeb compares the price difference at ten comparable points of the two price distributions and determines, on average, that Varsity shoes are 10-11% higher priced than Nfinity shoes. Ex. 1 [Heeb Rep.] at ¶303, Table 23; Ex. 2 [Heeb Reb.] at ¶580, Table 31.

expert cannot use qualitative analysis. *See, e.g., Counts,* 606 F. Supp. 3d at 571 ("Testimony is not excludable as unreliable or speculative or otherwise simply because it is qualitative instead of quantitative"). Here, Dr. Heeb does perform quantitative analysis. Specifically, he quantifies the "significant degree by which Varsity apparel customers purchase products from four, five, or even all six, product categories" of cheer apparel (as identified by Varsity), including 87 percent of Varsity apparel revenue is from customers purchasing in four or more product categories, 69 percent from customers purchasing in five or more product categories, and 28 percent from customers purchasing in all six product categories. Ex. 1 [Heeb Rep.] at ¶¶154, 159, Table 6. On the other hand, Defendants' lone support for their claim that customers do not bundle are two paragraphs from Dr. Murphy's report claiming that "consumers typically purchase their needed cheer apparel from multiple vendors." Memo at 18 (citing Murphy Rep. at ¶¶141-42). Yet, Defendants cite no evidence to support their claim.

Dr. Heeb determined that shoes were an appropriate benchmark for all apparel items because shoes are the most price sensitive of the three apparel categories that make up "78% of total apparel revenues across six categories" of apparel identified in his product market definition. Ex. 1 [Heeb Rep.] at ¶¶306-307. Dr. Heeb concludes that Varsity's price overcharge for shoes will be lower than its price overcharge for uniforms or lettering. *Id.* at ¶¶66-68. Thus, the overcharge for shoes will be lower than its overcharge for uniforms or lettering. *Id.* Thus, the overall apparel overcharge (with the most conservative estimate) is not lower than the 10-11% that Dr. Heeb calculated for shoes. *Id.* at ¶303. This conclusion holds regardless of the underlying "demand elasticity for shoes," which Defendants cite as an attack on Dr. Heeb. As Dr. Heeb explains in his report, demand elasticity is an equilibrium outcome based on the degree of competition for products, a well-established property of neoclassical economic theory. *Id.* at ¶309.

> **5.      Defendants are not Prejudiced by Dr. Heeb's Amended Overcharge Figures**

Defendants claim Dr. Heeb's amended overcharge percentage for cheer competitions –
provided in his rebuttal report (adjusting the estimated overcharge from 24% to 27%) should be
excluded as untimely. Memo at 26-27. This argument is not persuasive. Dr. Heeb's adjusted
figures take into account the rebuttal of Defendants' expert Dr. Murphy (and small errors pointed
out by Dr. Murphy). Ex. 2 [Heeb Reb.] at ¶¶ 11-14, 496-498, 523-576. Dr. Heeb then corrected
for those errors in his rebuttal, ran his same methodology with those corrected numbers and then
adjusted the figure as a result. *Id*.  Rule 26 allows changes to an expert report to include
information "thereafter acquired" or to be a genuine attempt to remedy previously "incomplete
or incorrect" information. *Ullman v. Auto-Owners Mut. Ins. Co.*, 2007 WL 1057397, at *4 (S.D.
Ohio Apr. 5, 2007). Dr. Heeb's rebuttal report was served on Defendants on December 14, 2022,
nearly two months before Dr. Heeb's deposition in February 2023. At deposition, Defendants
had the opportunity to cross-examine Dr. Heeb on both his opening and rebuttal reports, and on
the adjusted figures (and his methodology in estimating his overcharge percentages). Therefore,
it is hard to understand how this adjustment prejudiced Defendants in any way. *Watson v. Willow
Enterprises, Inc.,* 2017 WL 3434088, at *2 (E.D. Mich. Aug. 10, 2017) (finding a party's
untimely expert disclosure harmless when the other party had an opportunity to cross-examine
proffered expert on expected rebuttal opinion during his deposition)[19]

The calculations themselves, namely the algebraic equations and the methodology, were
identical in Dr. Heeb's opening report and his rebuttal report. Ex. 2 [Heeb Reb.] at ¶¶11-13. The
only thing that changed were a few numbers that went into those calculations. *Id.* Dr. Murphy
identified minor discrepancies in Dr. Heeb's opening report and identified additional datasets
containing competitor prices. *Id.* at ¶11. With this new information, and the criticisms and
critiques of Dr. Murphy, Dr. Heeb applied the same analytical methodology in his rebuttal report

---

[19] Dr. Heeb is not raising new opinions for the first time in his rebuttal as Defendants wrongly
suggest. *In re Graphics Processing Units Antitrust Litig.*, 235 F.R.D. 478, 501 (N.D. Cal. 2008)
is not persuasive.

to calculate updated overcharge figures. *Id.* at ¶¶496-536. It is proper for an expert witness to update opinions when new information becomes available. *ASC Engineered Sols., LLC v. Island Indus., Inc.*, 2021 WL 2941989, at *2 (W.D. Tenn. July 13, 2021) ("Amended or supplemental expert reports are also permitted where the expert is correcting a [] calculation based on information that was not available when the expert prepared the initial report, as long as the expert does not rely on an entirely new legal theory in correcting his supplementation"). This process of evaluating the economic merit of an opposing expert's economic analysis and updating one's own opinions as errors are identified or new information becomes available, is proper expert witness rebuttal. *Bentley v. Highlands Hosp. Corp.,* 2016 WL 5867496, at *4 (E.D. Ky. Oct. 6, 2016) ("Courts have [] permitted parties to fill gaps in initial reports when they later learn of the missing information."); *EEOC v. Tepro, Inc*., 133 F. Supp. 3d 1034, 1047 (E.D. Tenn. 2015) ("Rebuttal experts can properly "respond[ ] to the content of [the original] expert witness' report and opinions.").

D.      **Dr. Heeb's Common Impact Opinion is Sound and Admissible**

        Defendants provide no basis to exclude Defendants' common impact opinion. As explained, Dr. Heeb uses reliable methods to determine his overcharge estimates in each of the relevant product markets. Dr. Heeb finds Varsity's market power to be ubiquitous across the United States (whether calculated on a regional basis or a national basis). Ex. 1 [Heeb Rep.] at ¶¶42, 112, 136; Ex. 2 [Heeb Reb.] at ¶¶8, 36, 126, 144, 178-194. Where Varsity's market power is ubiquitous across all customers and markets, and where the evidence shows that Varsity' abused its market power in those markets to foreclose competition and charge supra-competitive prices, the same common proof exists to estimate overcharges for the relevant product markets, as all class members who purchased products in those markets would have suffered the same harms. *See, e.g., Polyurethane Foam*, 2014 WL 6461355, at *15. Dr. Heeb's methodology is reliable in defining the markets and estimating overcharges, which sufficiently support his finding that common proof can be used to demonstrate common impact.

## IV.     CONCLUSION

Defendants' Motion should be denied.


Dated: March 31, 2023                          Respectfully submitted,

                                               By: _____*/s/ Joseph R. Saveri*_____
                                                          Joseph R. Saveri

                                               Joseph R. Saveri*
                                               Steven N. Williams*
                                               Ronnie Seidel Spiegel*+
                                               Kevin E. Rayhill*
                                               Elissa A. Buchanan*
                                               David Seidel*
                                               JOSEPH SAVERI LAW FIRM, LLP
                                               601 California Street, Suite 1000
                                               San Francisco, California 94108
                                               Telephone: (415) 500-6800
                                               Facsimile: (415) 395-9940
                                               jsaveri@saverilawfirm.com
                                               swilliams@saverilawfirm.com
                                               rspiegel@saverilawfirm.com
                                               krayhill@saverilawfirm.com
                                               eabuchanan@saverilawfirm.com
                                               dseidel@saverilawfirm.com

                                               Van Turner Jr. (TN Bar No. 22603)
                                               TURNER FEILD, PLLC
                                               2650 Thousand Oaks Blvd., Suite 2325
                                               Memphis, Tennessee 38118
                                               Telephone: (901) 290-6610
                                               Facsimile: (901) 290-6611
                                               vturner@turnerfeildlaw.com

                                               Richard M. Paul III*
                                               Ashlea Schwarz*
                                               PAUL LLP
                                               601 Walnut, Suite 300
                                               Kansas City, Missouri 64106
                                               Telephone: (816) 984-8100
                                               rick@paulllp.com
                                               ashlea@paulllp.com

Jason S. Hartley*
Fatima Brizuela*
HARTLEY LLP
101 West Broadway, Suite 820
San Diego, CA 92101
Telephone: (619) 400-5822
hartley@hartleyllp.com
brizuela@hartleyllp.com

Daniel E. Gustafson*
Daniel C. Hedlund*
Daniel J. Nordin*
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com

* Admitted *pro hac vice*

+Located in Washington State

*Attorneys for Individual and
Representative Plaintiffs*