# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| **JESSICA JONES, et al.,** | Case No. 2:20-cv-02892-SHL-tmp |
| Plaintiffs, | |
| v. | |
| **VARSITY BRANDS, LLC, et al.,** | **JURY DEMAND** |
| Defendants. | |

# SUPPLEMENTAL DECLARATION OF JOSEPH R. SAVERI IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, Joseph R. Saveri, declare the following under penalty of perjury:

1. I am the Founder and Managing Partner of the Joseph Saveri Law Firm, LLP, counsel for Plaintiffs Jessica Jones and Christina Lorenzen (collectively, "Plaintiffs"), in *Jones v. Bain Capital Private Equity*, case no. 2:20-cv-02892-SHL-tmp. I am a member in good standing of the State Bar of California and have been admitted *pro hac vice* in the United States District Court for the Western District of Tennessee, Western Division. I am over 18 years of age and have personal knowledge of the facts stated in this Declaration. If called as a witness, I could and would testify competently to them.

2. I make this Declaration in further support of Indirect Purchaser Plaintiffs' Motion for Class Certification, ECF No. 387 ("Motion") and Memorandum of Law in support thereof, ECF No. 389 ("Memo"), and in addition to my earlier Declaration and accompanying exhibits in support of Motion, ECF No. 389-1 ("Saveri Decl."). This Declaration is also in support of Plaintiffs' Reply in Support of Indirect Purchaser Plaintiffs' Motion for Class Certification ("Reply"), filed herewith, and in reply to Defendants' opposition, ECF No. 420 ("Opp.").[1]

3. Plaintiffs have described the many common questions of law and fact that exist in this case. *See* Class Action Complaint, ECF No. 1 ("Complaint"), ¶36 (a)-(n).

4. Plaintiffs' experts have carefully analyzed the data and other evidence in this case and have applied reliable methodology to establish causation and impact and to estimate damages using common evidence. Plaintiffs' experts have provided detailed reports and rebuttal reports in response to Defendants' experts Dr. Murphy and Mr. Orszag. *See* Saveri Decl., Exs. 1-8; *see also* ECF Nos. 424, 426, 428, 430 (Plaintiffs' oppositions to Defendants' *Daubert* motions). In providing their rebuttal reports, Plaintiffs' experts considered the opinions, criticisms, and citations provided by Defendants' experts, including consideration of any

---

[1] Please note, to avoid confusion with the exhibits submitted with my previous declaration, the exhibits to my instant supplemental declaration are all referred to herein with the prefix "SSD, Ex. _" and are submitted with this supplemental declaration and filing. Exhibits to my previous declaration are prefaced herein with "Saveri Decl., Ex. _," and are not reattached. Rather, they were included with Plaintiffs' opening Motion and Memo, and are simply referenced herein.

procompetitive or lawful explanations Defendants offer for their conduct, and accounted for them in forming their rebuttal opinions. *See generally* Saveri Decl., Ex. 2 (Netz Rebuttal Report at 5, 75-89); Saveri Decl., Ex. 4 (Heeb Rebuttal Report, ¶¶4, 252-258, 330-339, 383-388, 407, 410-412, 457-460, 489). For example, Dr. Netz considered USASF's rules and policies, board minutes, and correspondence with Varsity to rebut Defendants' positition that "Varsity's control of the rules-making process and the ongoing cooperation of the USASF [with Varsity]" is consistent with procompetitive conduct. Saveri Decl. Ex. 2 (Netz Rebuttal Report at 78-83). Likewise, Dr. Heeb considered evidence such as Varsity's internal communications and events participation data, which Defendants purport to be proof of the procompetitive effect of Varsity's "attack events," to support his conclusion that Varsity's counter-programming strategy "reduce[d] the attendance at the competitor events, sometimes below thresholds that were required for the event to maintain its World Bids Event status, and reduced the revenue and profit for the competitor." Saveri Decl., Ex. 4 (Heeb Rebuttal Report), ¶¶252-258.

5. Dr. Maki has submitted a Declaration to respond to Defendants' opposition to Plaintiffs' Motion and to support Plaintiffs' Reply, in which she explains her passthrough methodology. *See* Declaration of Dr. Jen Maki ("Maki Decl.") and accompanying exhibits, submitted herewith. Dr. Maki shows that the criticism of her work is misguided, inconsistent with the record in this case, and at odds with basic economic and econometric principles. In her Declaration, Dr. Maki details the support for her conclusion of a 100% passthrough rate, and the calculations and sales that were properly included in her estimations and calculations. *Id.*

6.       The record is replete with documents and testimony from Defendants[2] and others in the industry that demonstrate that Plaintiffs can answer the many common questions that exist here using common proof, common to all class members. For example:

a. Plaintiffs can show with common proof that Defendants formed an exclusionary scheme, and that each defendant had a role in it. *See generally* Saveri Decl., Ex. 1 (Netz Report); Saveri Decl., Ex. 2 (Netz Rebuttal Report); Saveri Decl., Ex 3 (Heeb Report); Saveri Decl., Ex. 4 (Heeb Rebuttal Report).

b. Plaintiffs can show with common proof that the relevant geographic market is nationwide. *See generally* Saveri Decl., Ex. 1 (Netz Report at 3, 43-45, 56, 61); Saveri Decl., Ex. 2 (Netz Rebuttal at 39-40, 55). Defendants' own documents recognize and acknowledge that the markets were national and operated on a national scale. For example:

- A September 2014 due diligence presentation prepared by Jefferies in connection with Charlesbank's acquisition of Varsity, notes that Varsity's "national base of customers" includes "525,000 athletes across 20,000 schools and 2,500 gyms." SSD, **Ex. 1** at -5865. The same document states that Varsity is "[t]he only company with field reps assigned to every customer in every state." *Id.* Varsity's "350 field sales representatives" include "15 All-Star Event Sales Reps," "291 Nationwide Apparel Sales Reps," and "44 State Directors support[ing] the camps." *Id.*

- A May 23, 2018 email with attachments from John Sadlow, Varsity's Vice President of Strategy, characterizes Varsity as a "Nationwide operator of cheer and dance instructional camps." SSD, **Ex. 2** (March 10, 2022, P. Nangia Deposition, Exhibit 1 at 46).

- Jackie Kennedy, Varsity's Vice President of Marketing and Communications, testified that Varsity owned and operated camps for school cheer teams, that are nationwide, all around the United States. SSD, **Ex. 3** at 308:4-308:7.

c. Plaintiffs can show with common proof that Varsity's pricing and policies were set on a national scale. *See generally* Saveri Decl., Ex. 3 (Heeb Report, ¶¶138,

---

[2] "Defendants" in this action are Varsity Brands, LLC, Varsity Spirit, LLC, Varsity Spirit Fashion & Supplies, LLC (together "Varsity"); Jeff Webb; United States All Star Federation ("USASF"); Bain Capital Private Equity, LLC ("Bain"); and, Charlesbank Capital Partners, LLC ("Charlesbank").

144, 275); Saveri Decl., Ex. 4 (Heeb Rebuttal Report, ¶188 & fns. 123, 126). For example:

- A September 2018 Varsity document, prepared ahead of a visit to Memphis from Defendant Bain, demonstrates that, although prices are set and implemented locally, Varsity's pricing strategy is determined, administered, and set at a national level "to ensure consistency across the business." SSD, **Ex. 4** at -1126; *see also id.* at -1123-25.

d. Plaintiffs can show with common proof that Varsity has acquired market power in each of the relevant product markets, and that such market power is nationwide. *See generally* Saveri Decl., Ex. 1 (Netz Report at 3, 41-62); Saveri Decl., Ex. 3 (Heeb Report, ¶¶42, 112); Saveri Decl., Ex. 4 (Heeb Rebuttal Report, ¶¶8, 36, 126). Defendants' own documents show that Varsity's market power was ubiquitous across the United States. For example:

- Former Varsity employee Jaime Parrish testified that "Varsity has control over cheerleading at every level of the U.S. and abroad. There is no resistance." He confirmed that Varsity is "in control over everything that happens in All Star Cheerleading in the country... [and] the entire high school competition space." SSD, **Ex. 5** at 476:9-478:12.

- A 2014 Bain presentation claims that "Varsity is the undisputed leader in cheerleading uniforms, competitions, and camps" and includes a chart illustrating that 100% of the U.S. market for School Cheer competitions in 2013 belonged to UCA, NCA, and USA—all Varsity-owned brands. SSD, **Ex. 6** at -5631. A similar chart in a 2018 presentation shows that Varsity maintained its total dominance of the school cheer competitions market. *See* SSD, **Ex. 7** at -6023.

- A March 2018 presentation, which was prepared in connection with Bain's acquisition of Varsity, demonstrates that Varsity's nationwide "[f]ootprint" in the Cheer Camps market is unrivalled. SSD, **Ex. 8** at -9470. The same document notes that "[t]eam credentialing in leadership and safety [through attending a Varsity camp] … is required to participate in [Varsity's] national competitions." *Id.*

e. Plaintiffs can show with common proof that Defendants specifically intended to dominate the relevant markets through an aggressive system of acquisitions. *See* Saveri Decl., Ex. 1 (Netz Report at 67 & n. 266); Saveri Decl., Ex. 2 (Netz Rebuttal Report at 85-89). For example:

- A January 22, 2013, email from , Jeff Webb stated that "acquisitions are better viewed as tactical and used for roll ups … or to **eliminate competitors**." **Ex. 9** (Jeff Webb, January 22, 2013, Email re "Throw it on the wall …. Strategy Session," VAR00351376) (emphasis added).

Four years later, in 2017, Varsity noted that its acquisition strategy to "roll-up the All Star market" had been successful: "Commercial Growth [bullet] Simultaneously, we built national event coverage through aggressive organic growth and acquisitions to roll-up the All Star market and create a sustainable position [bullet] Strategy took millions of investment over 12 years to accomplish, but has eventually become a key driver of revenue and EBITDA growth over the last 5 five years." SSD, **Ex. 10** at -5396.

- A February 2015 Varsity document explains: "We look to acquire all the Tier I event companies (brands such as American Championships, Athletic Championships) that give bids to the cheerleading and dance Worlds. There are only 42 Tier I event companies. Varsity now owns 32 of those Tier I companies in all of the best markets." SSD, **Ex. 11** at -0664.

- An October 2015 document attached to Varsity's acquisition of JAM Brands describes the benefits of acquiring its competitors as providing: 1) immediate expansion of market share, 2) **the ability to eliminate events produced by the acquired firm**, 3) **the ability to increase prices post-acquisition**, and 4) the acquisition of strategically important Tier 1 events that held Worlds bids. SSD, **Ex. 12** at -2197 (emphasis added).

- In December 2016, Varsity acquired Aloha Productions for $3.25 million. Saveri Decl., Ex. 1 (Netz Report at 97). Aloha produced approximately 30 annual events, including three World bid events, across three brands in eleven states. *Id.* Varsity described its motivation for acquiring Aloha as "immediate expansion of market share, notably on the West Coast." SSD, **Ex. 13** at -5061.

- An August 21, 2017, Varsity document describes its strategy as "**Dissolve and Conquer**": "By reducing brands, driving customer traffic to other brands, we increase profitability through lower production costs. Coaches will not go to fewer competitions, and those taking advantage of the Family Plan will not stray away from Varsity…Elimination would be based on profitability and Varsity's need to secure venue date windows." ECF No. 389-10 (Saveri Decl., Ex. 29 (VAR00255570 at 5580)) (emphasis added). This strategy was borne out: After the JAM Brands acquisition, Varsity discontinued multiple JAM Brands events, a strategy that Varsity's General Manager and Vice President of Sales, Brian Elza, testified was common. SSD, **Ex. 14** at 87:7-88:25.

- As Brian Elza testified: "Q. "… So let me ask you this: In 2016, Varsity had 75 percent of the All Star event market, and then Varsity, over the course of 2016 to 2018, acquired Epic, GSSA, Aloha, Spirit Celebration,

      and Champion Spirit Group [Jam Spirit Group (DBA Team Champion)]; is that right? A. Yes. Q. So between 2016 and 2018, Varsity purchased its second, third, fourth, and fifth largest competitors in the All Star event market, right? A. Based on this chart, the answer is yes. Q. And it went from – based on this chart, it went from 75 percent of the All Star event market to 86 percent of the All Star event market; is that right? A. Yes. Q. So Varsity bought its way to dominance, correct? A. Some people would say that. Q. Would you say that? A. I don't really know the answer. Repeat that. Would I say what now? **Q. That Varsity bought its way to dominance in the All Star event market. A. Yes."** SSD, **Ex. 14** at 80:18-82:3 (objections omitted) (emphasis added).

  f. Plaintiffs can show with common proof that Varsity's product markets were intertwined, and that Defendants considered the product markets to be within the same ecosystem. Memo at 7. Plaintiffs can also show with common proof that Defendants sought to lock indirect purchasers into the Varsity ecosystem. *See* Memo at 7-8; Saveri Decl., Ex. 1 (Netz Report at 61-65, 89). For example:

- A 2018 article in *Chief Executive* magazine quotes Jeff Webb: "We were really creating an industry as we went along and it became an ecosystem in that we were creating the concept, we were creating the industry, and then we were positioning ourselves to provide all the products and services … utilized [within that industry]. Not only did we have the number one position in [the camps, apparel, and competitions] segments, but then we developed a cross-marketing model where we could promote [the segments within each other] and to be honest with you, it took off." SSD, **Ex. 15** at 1.

- Marlene Cota, former Vice President of Corporate Alliances and Business Development at Varsity, testified that Varsity leverages its market power in the Cheer Competition market to enhance and maintain its market power in the Cheer Camp market. SSD, **Ex. 16** at 223:11-17.

- An April 2016 Bain document describes how schools can qualify for Varsity competitions: "For UCA nationals, you have to attend a camp (beginning of season) and then have to get a bid from a regional competition. … In college, just need to attend a camp at the beginning of the season." SSD, **Ex. 17** at -4442. The same document also explains that "UCA & NCA camps are both run by the people who run the tournament." *Id.* at 9457. Further, School Cheer athletes fund themselves to go to nationals: "Girls have to pay for Tumbling every week; ii. Camp

   in the beginning; iii. Clothing for the camp; iv. Shoes; and v. Nationals is entirely funded by the team." *Id.* at -9443-9444.[3]

- The UCA website explains that teams that do not attend a Varsity camp can compete at a local UCA competition "but they will not be eligible to receive a bid to the NHSCC [National High School Cheerleading Championship]." SSD, **Ex. 18**.

- College teams that attend Varsity camps can receive bids to the NCA College National Championship competitions. College teams that placed highly in the 2022 UCA College National Championship competition are awarded paid bids to the 2023 UCA College National Championship, provided they attend a Varsity camp with at least 18 participants. *See, e.g.,* SSD, **Ex. 19**; SSD, **Ex. 20**.

- A September 2019 email from Buffy Duhon, a senior executive with Varsity, states: "My guess is that we won't get a lot of push this fall because it's not required for 2020, but it will grow summer camp business and fall 2020 since it will be required." ECF No. 389-10 (Saveri Decl., Ex. 27 (VAR00160726 at 0727)). Ms. Duhon later explained the meaning of her email: "That teams that had wanted to come to nationals that may not have attended camps in the past, would learn about the programs because we would be reaching out to them to let them know about the credentialing program, that they would then sign up for camp, for the camp experience and the ability to come to nationals." SSD, **Ex. 21** at 110:3-25.

g. Plaintiffs can show with common proof that Defendants engaged in a host of anticompetitive conduct that was intended to foreclose competition in the relevant markets. For example, Plaintiffs can show with common proof that Varsity's rebate and discount programs were exclusionary. *See* Saveri Decl., Ex. 1 (Netz Report at 5, 104-113); Saveri Decl., Ex. 2 (Netz Rebuttal Report at 2-3, 89); Saveri Decl., Ex. 3 (Heeb Report, ¶¶219-226); Saveri Decl., Ex. 4 (Heeb Rebuttal, ¶¶259-270, 470-481). The evidence confirms how Varsity used rebate and discount programs to exclude rivals in the markets. For example:

- A summary of the "Varsity Family Plan 2.0" notes that the goal of the program was to **"Get rid of any competitors, make it so that teams couldn't go to IEP."** SSD, **Ex. 22** at -9570 (emphasis added). The same document illustrates the exclusionary nature of the Varsity Family Plan. For example, agenda items include: "For every IEP [Independent Event Producer] they support, drop a % point" and "[o]nly allow programs to

---

[3] Plaintiff Christina Lorenzen testified that her daughter was required to attend one such tumbling clinic each week, and that she paid for the clinic. *See* SSD, **Ex. 39** at 68:23-69:5.

       achieve the top level of VFP [Varsity Family Plan] if they are exclusive to Varsity." *Id.* at -9569.

- Another Varsity document likens the Varsity Family Plan to "crack cocaine" and suggests ways to addict participants to the plan and Varsity. SSD, **Ex. 23** at -2095-96. The same document makes other suggestions to keep parents locked into the Varsity ecosystem, including **"OPTION ONE – CASUALLY THREATEN VIA VERBAL CAMPAIGN."** *Id.* at 182096 (emphasis added). The document proposes a verbal campaign "That hits every corner of America in 24 hours." *Id.*

h. Plaintiffs can show with common proof that Defendants sought to foreclose rivals in the relevant markets. For example:

- An internal January 6, 2015, email to Jeff Webb suggests that Varsity negotiate a deal with NFHS [National Federation of High Schools], whereby "[i]n order to qualify at any of [Varsity's] National Championships, athletes and coaches would have to receive … [a safety] credential at camp." SSD, **Ex. 24** at -9874. The "Varsity Spirit/NFHS Squad Credentialing Program" was launched later that year "at all camp types … that are at least two days long." SSD, **Ex. 25**. Similarly, School Cheer participants were required to attend a Game Day camp [a school incentive program run by Varsity] in order to compete in Game Day regionals. SSD, **Ex. 26** at -4595.

- Varsity witnesses made clear of Varsity's intentions to foreclose rivals. As Jamie Parrish testified about Exhibit 6 : "At all costs get rid of IEP's [Independent Event Producers]. Make it so teams can't go---make it physically, just absolutely, if you can't get a World Bid, and you can't get a Summit bid, and you—and it's going to cost you…. It just makes it too hard for a competitor to offer a competitive, a competitive good or service." . . . **"Q. And when you say "get rid of them," did you mean put them out of business? A. "Yes."** SSD, **Ex. 5** a 177:4-178:6 (emphasis added).

- A February 22, 2016, magazine article reports how "Varsity's hardball tactics are structured to keep … rivals off the playing field." SSD, **Ex. 16**, 218:18-22, Exhibit 21 at page 4. The article notes that "rival apparel makers can't show their wares at [Varsity competitions], which are important showrooms for cheer merchandise." *Id.* at 6-7.

- In the same article, Karen Noseff Aldridge, founder of Rebel, a major rival of Varsity in the Cheer Apparel market, describes the effect of Varsity's acquisition of JAM Brands, whose competitions had been Rebel's most effective platform for marketing to elite cheer teams: "Not partnering with an event company is one thing[.] But being locked out of

partnering with an event company—knowing that a competitor is now going to be in your booth space showing its product— it's a double whammy." *Id.* at 8.

i. Plaintiffs can show with common proof how Defendants sought to "counter-program" Varsity events to foreclose rivals in the cheer competitions market. For example:

- Jim Hill, former National Director of Sales at Varsity All Star, testified that a Mardi Gras Worlds bid event **"was, obviously, an event that we attacked … we put other events around it for the sole purpose of … trying to attack it.**" SSD, **Ex. 27**, 158:12-18 (emphasis added).

- A December 7, 2017 email from Brian Elza also describes how Varsity targeted Mardi Gras (which at the time was an independent event producer): "**As you know we often put events on other events to hurt our competitors**. This past season we decided to put a JAM event in Baton Rouge to go head to head with MARDI GRAS world bid Event in New Orleans on Jan 14 weekend. Strategy worked and now Mardi Gras is sitting around 60ish teams and JAM at 70. If MARDI GRAS doesn't hit 125 teams they lose their Tier 1 Status." SSD, **Ex. 28** (emphasis added).

- A December 2017 internal "competitor tracking" document describes Varsity's strategy regarding its Cheer Competitions rivals: "VAS [Varsity] has an incredible hold on the major markets of Texas and continues to apply pressure to the IEPs [independent event producers that are USASF members] and Non-Sanctioned EPs [event producers that are not USASF members]." SSD, **Ex. 29** at -2462. Such "pressure" included strategically scheduling events and allocating Summit bids to "push[] out all IEP presence" in any given location. *Id.* at -2464. Varsity's strategy was successful. For example, regarding the North Texas area, Varsity states: "We have officially pushed all competitors out of this market on this weekend" and "VAS [Varsity] owns this market on this weekend and continues to push out IEPs." *Id.* at -2462, 2463.

- Varsity's former Creative Director for Corporate Marketing & Communications testified that the Varsity's "sales teams' job" was "to pull teams away from [Varsity's] competitors in an effort to get their number of participation [sic] underneath that requirement set by the USASF Board to give … Worlds bids." SSD, **Ex. 5** at 125:23-127:3.

j. Plaintiffs can show with common proof how the rule-making bodies for competitive cheer were used to further Varsity's monopolies and to exclude

competition. *See generally* Saveri Decl., Ex. 2 (Netz Rebuttal at 73-84). For example:

- A September 22, 2017, Varsity email states: "[A]s you both know, Jeff W. [Webb] wants the USASF Worlds Bid process changed to prevent small competitors from being allowed to offer World Bids." ECF No. 389-11 (Saveri Decl., Ex. 39 (VAR00244139)).

- Communications between Tres Letard (General Manager, Varsity All Star) and Steve Peterson (Vice President, USASF) demonstrate how Varsity and USASF conspired to exploit USASF's "minimum number of teams requirement" to "put the squeeze" on Varsity's competitors in the Cheer Competitions market. ECF No. 389-11 (Saveri Decl, Ex. 47 (VAR00365110 at -5110, 5115-5117)).

- Varsity similarly influenced and controlled the NFHS, the high school rule-making body. Billy Seely, President of Varsity, explained in a 2015 email that the arrangement with NFHS was "geared towards driving summer camp enrollment" and, in exchange, Varsity agreed to pay NFHS $345,000 per year. SSD, **Ex. 24**. The NFHS enforces Varsity's Squad Credentialing Program, which requires high school cheer athletes to attend Varsity overnight camps in order to be eligible for national cheer competitions. *Id.*

k. Plaintiffs can show with common proof that Defendants' conduct caused them injury. (Heeb Report, ¶¶32; 69-72; 93-108; 231-232). *See generally*, Ex. 3 (Heeb Report, ¶¶278-312); Ex. 4 (Heeb Rebuttal Report, ¶¶496-625); *see also* Maki Decl., ¶¶3-5.

l. Plaintiffs can show with common proof that the number of uninjured class members is *de minimis*. *See, e.g.*, Saveri Decl., Ex 3 (Heeb Report, ¶¶13, 313-316); Saveri Decl., Ex. 4 (Heeb Rebuttal Report, ¶¶99-102).

m. Plaintiffs can show with common proof that gyms and schools passed on illegal overcharges to cheer athletes and their families at a rate of 100% or greater. *See* Maki Decl., ¶¶6-13.

n. Plaintiffs can also show with common proof that harm to all class members is ongoing. Plaintiffs sufficiently allege ongoing harm in their Complaint. *See* ECF No. 1 (Complaint, ¶¶6, 22, 163, 231-38, 240, 247). There is no indication that Defendants have changed any of the anticompetitive practices and policies that Plaintiffs allege, or that their exclusionary scheme or conduct has ceased. For example, the anticompetitive practices that Plaintiffs allege are evidently still in place:

- Defendant Jeff Webb continues to participate in the conduct alleged. Mr. Webb earns approximately $250,000 per year as a consultant to Varsity. SSD, **Ex. 30**, 399:13-400:11. According to the terms of his consulting agreement, in addition to providing "Litigation and Government Inquiry Support," Webb "shall provide advisory assistance … and shall make himself reasonably available to attend Varsity events, including but not limited to, sales and cheer events, camps, competitions, speeches, sales meetings, rookie talks or events, Disney-related events, parties, official or unofficial dinners and the like." SSD, **Ex. 31** at -0619. Varsity is paying for Mr. Webb's attorneys in this lawsuit. *Id.* at -0621; SSD, **Ex. 30** at 14:11-13.

- The Settlement Agreement in the *Fusion Action* demonstrates USASF's continuing subordination to and financial reliance on Varsity. (*Fusion Action*, ECF 329-2). For example, Varsity effectively indemnifies USASF from liability in the *Fusion Action*. *Id.*, ¶27) ("In light of the monetary settlement with Varsity, Plaintiffs will not look to USASF for any compensation of any kind."). In addition, the agreed prospective remedies are predominantly aimed at mitigating Varsity's undue influence over USASF, including through the unique financial benefits extended to USASF by Varsity and Varsity's current majorities on USASF's Board of Directors and Sanctioning Committee. *Id.* at ¶¶29, 30(b)-(f).

- The *Fusion Action* Settlement Agreement also confirms that Varsity continues to pursue *de facto* exclusive dealing arrangements through its rebate and discount programs. *Id.* at ¶¶29, 30(a).

- Varsity's Squad Credentialing Program continues to require athletes to attend "two days or longer Varsity Spirit camps" to be eligible "for participation at USA Spirit Nationals, NCA Junior & Senior High School National Championships and the National High School Cheerleading Championship (UCA)." *See* SSD, **Ex. 32**.

- The Stay Smart program (formerly known as "Stay to Play") remains in effect, requiring teams stay at hotels preselected by Varsity for "World's Bid giving" and other events. *See* SSD, **Ex. 33**.

- Varsity's Game Day Program remains in place. *See* SSD, **Ex. 34**.

- Through their seats on Varsity's Board of Directors, Bain and Charlesbank continue to be involved in the day-to-day operational management of the company. SSD, **Ex. 35** at 94:1-16.

o. Plaintiffs can show with common proof the aggregate damages to the class with respect to competitions, camps and apparel.

7. Plaintiffs have sufficiently alleged that Varsity and USASF are headquartered in Tennessee and that Varsity's anticompetitive conduct emanated from Tennessee. ECF No. 1 (Complaint, ¶241).

8. Both named plaintiffs are sufficiently knowledgeable and committed to serving the proposed classes. *See* ECF Nos. 389-15, 389-16 (Declaration of C. Lorenzen, ¶¶5-8, 11; Declaration of J. Jones, ¶¶5-9). Defendants' personal attacks on Plaintiffs are unwarranted. Defendants cannot point to any responsibility in which Plaintiffs have not performed their duties as class representatives. To the contrary, Plaintiffs have testified that they have fulfilled all of their responsibilities, that they understand their responsibilities, and that they are dedicated to continuing to fulfill their duties. SSD, **Ex. 36** at 218:10 - 220:24; SSD, **Ex. 37** at 263:14 - 265:2. In fact, Plaintiffs have specifically testified that they sought counsel to right the wrongs caused by Defendants and to seek redress for themselves and all who stand in their same shoes. *See* SSD, **Ex. 36** at 218:10 - 220:8; SSD, **Ex. 37** at 232:8-14.

9. While Defendants had a full day to question Ms. Lorenzen during her deposition about her qualifications to serve as class representative, they instead focused much of their questioning on wholly inappropriate topics with the intent to tarnish Ms. Lorenzen and her motives for participating in the lawsuit. For example, they asked about her personal medical history. *See* SSD, **Ex. 36** at 27:2 - 30:25, 41:11- 44:18. They asked about her mental health. *Id.* at 202:10 - 207:18. They asked about her personal finances, divorce agreement, and child custody arrangements, despite massive objections as to the inappropriateness of such questioning. *Id.* at 207:2 - 213:25. They asked about her conversations with her minor daughter—about how her daughter felt about the lawsuit. *Id.* at 214:3 - 216:17. These topics were all objectionable and did not at all focus on the fact that Ms. Lorenzen is knowledgeable, committed, honest, and trustworthy. She has stated her reasons for wanting to be involved with the lawsuit—all of which center on serving the proposed classes. *Id.* at 218:10–220:8. She made this clear at the end of her deposition in response to questioning from Plaintiffs' attorneys and in her Declaration submitted along with Plaintiffs' Motion. *Id.* at 250:22 – 251:4; Lorenzen Decl., ¶10.

10. Dr. Maki has provided methodology that will allow for calculation of aggregate damages for the class. Saveri Decl., Ex. 6 (Maki Report, ¶¶104-120); Saveri Decl., Ex. 7 (Maki Rebuttal Report, ¶¶39-42); Maki Decl., ¶¶1-4. This remains true even if any categories of sales are ultimately excluded after summary judgment or trial. This also remains true to the extent the sales for any particular state may ever be excluded from any of the classes. *Id.* Overcharge rates can ultimately be applied to each verified claim, yielding each class member's recovery. *See* Appendix D (Sample Notice Plan).

11. On the other hand, there is no evidence that Defendants' experts analyzed pass through evidence at all. *See* Maki Decl., ¶6.

12. Plaintiffs demonstrate how they can address any differences in damage calculations. For example, Plaintiffs have provided a well-designed proposed trial plan and sample notice plan that will each class member receives damage payments only as appropriate. *See* Reply, Appendix C (Sample Trial Plan) and Appendix D (Sample Notice Plan).

13. Plaintiffs also provide a template for how any state law differences can be addressed. Plaintiffs provide a detailed chart analyzing the similarities and variances in state laws. *See* Reply, Appendix A. Plaintiffs also intend to use pattern jury instructions for common questions as well as special verdict forms to accommodate for any state law variances. *See* Reply, Appendices B (Sample Special Verdict Forms).

14. Plaintiffs' expert, James Aronoff, provided reports to explain Defendants' behaviors that are anticompetitive, and suggests remedies. *See* Saveri Decl. Ex. 7 (Aronoff Report, ¶¶94-126); Saveri Decl., Ex. 8 (Aronoff Rebuttal Report, ¶¶ 36-51). There is no indication that any such proposed solutions have been implemented by Defendants, to date.

15. Plaintiffs have filed a motion to substitute Amy Coulson as a named Plaintiff to replace former Plaintiff Ms. Velotta. Ms. Coulson purchased numerous cheer camps as well as cheer competitions during the alleged class period. ECF Nos. 344, 355.

16. Plaintiffs are willing and able to participate in an evidentiary hearing should the Court wish to have further explanation or a further showing of the evidence, or to hear from Plaintiffs' experts, or Plaintiffs themselves.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 25, 2023 in San Francisco, California.

                                                                */s/ Joseph R. Saveri*
                                                                  Joseph R. Saveri