# EXHIBIT 12

# FILED UNDER SEAL



**JamBrands Transaction Summary**

October 9, 2015

**Target Company:**

JamBrands Inc., based in Louisville, KY, provides over 100 high quality cheer and dance competitions annually through seven different event brands. Included in their portfolio of events are 5 "signature" (World Bid) events which have significant competitive advantages in the All Star competition space, as well as 70% interest in a well-positioned end of the season championship, The US Finals. The remaining 30% of The US Finals is owned by a group of 4 event producers, collectively called the NLCC. Additionally, JamBrands host several international events in the UK, Japan, and Canada. With their approximately 50 employees, they focus on high energy, fun, interactive events designed for cheerleaders and dancers of all ability levels. JamBrands has a well-established customer base, predominantly in the Midwest and Northeast, areas where Varsity All Star could benefit from deeper market penetration. Last fiscal year (June '14-May '15), JamBrands Inc. and US Finals generated around $19.3m in revenue and $4.4m in EBITDA. As a result of price increases, improved event planning, and sales efforts, we are forecasting a 15-16 EBITDA of $5.2m. See also Appendix A (Company Overview), Appendix E (Financial Projections), Appendix F (Legal Summary).

**Concept:**

The All Star cheerleading event business is a thriving sector of the spirit industry. It is our belief that the overall market is growing and the businesses in this space are highly profitable with an average EBITDA margin in the high teens. Historically, acquisitions of similar businesses have proven to be valuable and add to a synergistic, critical mass, which has allowed us to exponentially grow EBITDA for the Varsity All Star division. The acquisition of JamBrands, including the 30% NLCC interest in The US Finals, will complement our current portfolio of events and provide both strategic and financial value. In addition to protecting Varsity All Star's current position in the market, tangible synergies and our organic strategies will drive continued growth. See also Appendix B (Transaction Rationale), Appendix C (Integration Approach), and Appendix D (Transaction Terms).

**Status:**

All significant diligence areas have been completed and final terms of the acquisition have been negotiated. Reed Smith is now finalizing the stock purchase agreement for purchase of 100% of the membership units of JamBrands Inc., as well as documentation governing the buy-out of the remaining 30% NLCC interest in The US Finals championship, with a closing target of October 16, 2015.

Confidential

# Appendix A

# Company Overview

- Financial summary (FY: June 2014–May 2015)
    - Revenue:                 $19,302,180
    - EBITDA:                  $4,351,663
    - EBITDA Margin:           23%
- Headquarters location: Louisville, KY
- # of employees: approx. 50
- Focus
    - Target customers / segments:  All Star Gyms/Club Cheerleading

| Type | % of Revenue |
|------|--------------|
| Domestic | 98% |
| International | 2% |

- Products and services

| Type | % of Revenue |
|------|--------------|
| Championships/Events | 92% |
| Apparel/Merchandise | 8% (majority from onsite event sales) |
| Instructional Conferences | Less than 1% |

- Geographic scope

| Region | % of Revenue |
|--------|--------------|
| MidWest | 52% |
| Northeast | 27% |
| Southeast | 14% |
| Southwest | 3% |
| West | 3% |
| International (Canada, UK, Sweden, Japan) | 2% |

- Ownership
    - The Jam Brands, INC.
        - Aaron Flaker – 45%
        - Emmitt Tyler – 45%
        - Dan Kessler – 10%
    - US Finals, LLC
        - The Jam Brands, INC. – 70%
        - NLCC, LLC – 30%
            *the NLCC consists of 4 small competition companies that partner with JamBrands on the US Finals.

- Rationale for sale – It is our belief that the JamBrands ownership group have reached a point in the development of their business where they are content with what they have built, understand that they are not capable of significant growth in the current landscape, and are interested in cashing out.  In addition, they see longevity for their brand and key employees through an acquisition by Varsity, which has displayed a consistent track record of fairly incorporating their acquisitions and is one of the leaders in the industry.

Confidential

CB00382195

- Business Model and Sources of Competitive Advantage

    o Go-to-market model – direct sales with JamCare Reps, advertising in industry periodicals, website, and social selling
    o Product and service position – alternative to Varsity events, mid – low market customers, strong locations and dates
    o Cost position – free admission events, multi-event discounts, JamRewards discount/rebate program (similar to Varsity Family Plan)
    o Sources of competitive advantage
        ▪ Core competencies – marketing/branding, promotions, sales/JamCare Reps, customer services, efficient operations
        ▪ Strategic assets – venue contracts, customer relationships, USASF board seat, US Finals, international operations

- Management
    o Aaron Flaker
        ▪ Owner (45%), current President
        ▪ Contributes to high level decisions, general direction of company
        ▪ Retention: Consulting role for 1-2 years, keep on the team to show solidarity
    o Emmitt Tyler
        ▪ Owner (45%), current Vice President
        ▪ Accounting, HR/Insurance, high level decisions, de facto CFO
        ▪ Retention: 1 year employment contract. Committed for 1-2 years (30 hrs/wk), willing to stay longer if current lifestyle is not disrupted and still enjoying his work
    o Dan Kessler
        ▪ Owner (10%), current General Manager
        ▪ Customer facing operations, brand leader, sales/marketing, event operations
        ▪ Retention:  3 year employment contract
    o Tara Harris
        ▪ VP of Sales
        ▪ Responsible for event sales and manages JamCare Reps (sales team)
        ▪ Retention: Yes, incorporate into sales management team
    o Augustina (Tina) Sexton
        ▪ VP, Support
        ▪ Manages Strategic Director, Scoring Director, Development Director, US Finals Director, and Creative Director
        ▪ Retention:  Yes, continue as a part of JamBrands management team
    o Alisa Blankenship
        ▪ VP of Events Operations
        ▪ Manages event operations: Logistics Managers, Operations Managers, and Registration Managers
        ▪ Retention:  Yes, continue to manage JamBrands event operations

Confidential

# Appendix B

# Transaction Rationale

1. Attractive market
   - The All Star cheerleading event business is growing. The businesses in this space have strong profitably with average EBITDA margins in the high teens. Additional opportunities are beginning to develop internationally.
2. Attractive target
   - JamBrands is a strong competitor.  They also have a strategically important USASF board seat and influence with our core customers.  They are growing internationally and could become disruptive to our international strategy.
3. Sources of value creation / synergy
   - Strategic Value
     - Market share – immediate expansion of market share, most notably in the Midwest and Northeast
     - International – build upon their current international presence and remove disruptive components
     - USASF – secures a unified presence within the USASF
     - US Finals – season-ending event opportunity to develop beyond The Summit (Varsity's premier end of the season championship)
   - Financial Value
     - Consolidation of events – There are around 40 opportunities to eliminate or merge Varsity and JamBrands events.  By strategically restructuring our portfolio of events, we could increase EBITDA by approximately $500K.
     - Spectator admission – The majority of JamBrands events do not charge spectator admission.  Potential revenue with a $10/spectator fee is approximately $500K.
     - Grow "signature", high margin events – e.g. take Indy from 500 teams to 800 teams by removing surrounding events and expand offerings (Summit Bids, Family Plan, etc.)
     - US Finals – grow participation through a comprehensive strategy aligned with The Summit
     - Customer acquisition – expansion of customer base and increase retention
     - Increase operating margin – With the acquisition of our strongest competitor, we should be able to increase operating margins through resources utilization, best practices, and operational synergies. Potential areas of improvement include:
       - Discount/reward programs (Family Plan)  – over $10M combined
       - Selling expenses – reduce travel, conferences, personnel, advertising
       - Production – share resources and reduce spending – approx. 10% of revenue
       - Personnel – consolidation of duplicate roles

Confidential

# Appendix C

## Integration Approach

Short term (first 6 months) we will take a "do no harm" position.  As with previous acquisitions of this nature, our general philosophy is to allow JamBrands to retain its identity and accountability for their performance.  Allow them to operate as is, with the addition of resources and a collaborative management team.

Integration will be gradual throughout the 15-16 season, beginning with accounting and HR, then sales/marketing, and eventually some event operations.  Currently, there are no plans to eliminate their office or significantly adjust their management team.  Integration of our event portfolios will begin in November 2015 in preparation for the 16-17 season.  This will also include a cost beneficial restructuring of our rewards/discount programs (Varsity Family Plan) as well as our sales teams.

Confidential

**Appendix D**

**Transaction Terms**

- Price: $34,900,000
  - JamBrands $32,900,000
  - NLCC 30% interest in US Finals $2,200,000, less $200,000 contributed by JamBrands at close
- NLCC $800,000 cash, and target earn-out of $1,200,000 payable over 5 years
  - Earn-out based on number of teams contributed to US Finals each season
- FY 14-15 EBITDA multiple – 8.0x
- FY 14-15 EBITDA multiple post tax benefit – 6.8x
- 5 year non-compete agreements for selling shareholders
- Employment contracts for key management

Confidential

## Appendix E

## Financial Projections

(JamBrands and 100% of US Finals)

| | For the twelve months ending May 31, | | | | |
|---|---|---|---|---|---|
| | [3] 2013 | [3] 2014 | [3] 2015 | 2016P | 2017P |
| **Revenue**[1] | 19.0 | 20.8 | 19.3 | 19.7 | 20.3 |
| *% Growth* | | 9.5% | -7.2% | 2.1% | 3.0% |
| | | | | | |
| **Gross Profit** | 17.9 | 19.6 | 18.2 | 18.6 | 19.2 |
| *% Margin* | 94.2% | 94.2% | 94.3% | 94.4% | 94.6% |
| *% Growth* | | 9.5% | -7.1% | 2.2% | 3.2% |
| | | | | | |
| **SG&A**[2] | 12.6 | 14.4 | 14.0 | 13.4 | 13.7 |
| *% of Sales* | 66.3% | 69.2% | 72.5% | 68.0% | 67.5% |
| *% Growth* | | 14.3% | -2.8% | -4.3% | 2.2% |
| | | | | | |
| **EBITDA** | 5.3 | 5.2 | 4.4 | 5.2 | 5.5 |
| *% of Sales* | 27.9% | 25.0% | 22.8% | 26.4% | 27.1% |
| *% Growth* | | -1.9% | -15.4% | 18.2% | 5.8% |

[1]Projected revenue includes current year change to more aggressive rewards program. It does not included potential integrations with VBR rewards program (Varsity Family Plan).

[2]SG&A for target includes many competition cost that are reported in COGS for Varsity Brand's Reporting.

[3]Cancelled events for FY 2016 were not removed from acutals. These are events that JAMBrand's have already cancelled for FY 2016 and have been removed from our projections (approx. 16 events).

*2015 decline can be contributed to the following:

- Reduced participation: 5 out of 7 brands had a reduction in teams from the previous year equaling a total drop of 565 teams.
- Poor event planning: JamBrands continued to produce several low – negative profit events. In addition, they did not advantageously organize their brands and event dates in preparation for the 14-15 season.
- Lack of annual price increase: Prices remained flat for the 14-15 season in an attempt to attract more teams.

*2016P rebound is expected due to the following:

- Improved event planning: JamBrands management has cancelled 16 low – negative profit events. In addition, they have focused on better date selection, specifically for their higher profit margin "signature" (World Bid) events. e.g. moved Coastal Battle at the Capital from January to March and GLCC Showdown Grand Nationals from February to March
- Price increase: JamBrands instituted a price increase for the 15-16 season accounting for approximately a 2% increase in registration fee revenue and a 26% increase in admission revenue.
- Reward program changes: The format of the JamRewards program has been simplified and adjusted to be more attractive to customers. This should improve participation; however we are anticipating an increased payout. Net effect should be positive.

Confidential

## Appendix F

## Legal Summary

- Jam Brands, Inc. has just one threatened or potential claim as of June 15, 2015. The insurance company has been notified.
- See attached closing memorandum and draft PA

Confidential

PROJECT BIO

STOCK PURCHASE AGREEMENT

BY AND AMONG

VARSITY SPIRIT, LLC

AARON FLAKER

EMMITT TYLER

AND

DANIEL KESSLER

* * *

CLOSING MEMORANDUM

The proposed transaction involves an acquisition by Varsity Spirit, LLC (the "Buyer") from Aaron Flaker, Emmitt Tyler and Daniel Kessler (collectively, the "Sellers") of: (i) the issued and outstanding shares of stock (the "Shares") in JAM Brands, Inc., a Kentucky corporation (the "Domestic Company"); and (ii) the issued and outstanding equity interests (the "Interests") in JAM Brands Europe Limited, a company organized under the laws of the United Kingdom (the "Foreign Company", and together with the Domestic Company, the "Target Companies").The acquisition of the Domestic Company and the Foreign Company is referred to herein as the ("Transaction"). Capitalized terms used, but otherwise not defined, herein have the respective meanings ascribed to them in the draft Stock Purchase Agreement by and among the Buyer and the Sellers (the "SPA").

This memorandum sets forth certain closing items and similar considerations pertaining to the Transaction. This memorandum is intended to be used for discussion purposes only and does not set forth an exhaustive list of all issues, known or unknown, material or nominal, relating to the Transaction. This memorandum is not intended as legal advice and cannot be relied upon as such.

* * *

**Pre-Closing Items.**[1]

The following are to be completed / satisfied on or prior to the Closing Date:

    1.    US Finals Purchase Agreement. US Finals, LLC is a 70%-owned subsidiary of the Domestic Company. Varsity is not interested in keeping NLCC, LLC (the 30% member of US Finals, LLC) in the venture. In connection with, and immediately prior to (and as a condition

---

[1] Note: For purposes of this memorandum, we assume there will be a simultaneous sign and close.

US_ACTIVE-123667652.6

precedent to) the Closing of, the Transaction, the Domestic Company shall purchase the remaining 30% of US Finals, LLC from NLCC, LLC and will execute and deliver a definitive agreement effecting the same (the "US Finals Purchase Agreement").

    a.   With respect to the US Finals Purchase Agreement:

        i.   The agreement will be between NLCC, LLC and the Domestic Company.

        ii.   The Domestic Company shall agree to a five (5) year earn-out which will depend on the amount of teams that NLCC, LLC contributes annually to the competitions operated by US Finals, LLC after the Transaction.

           1.   Varsity will assume this earn-out obligation after the Transaction in the event the Domestic Company is dissolved after the Closing.

2.    <u>Stock Purchase Agreement</u>.  Varsity shall acquire the Domestic Company and the Foreign Company (the latter is under common control with the Domestic Company, but not a subsidiary thereof).  The Target Companies comprise substantially all of the target business and are integral to the operation thereof going forward.  We propose to enter into one (1) stock purchase agreement to acquire both the Domestic Company and the Foreign Company.

    a.   The SPA will account for the Foreign Company and require Sellers to make specific representations and warranties relating to the Foreign Company.

3.    <u>Escrow Agent / Agreement</u>.  An agreed upon portion of the Purchase Price (12.5%) will be deposited into an escrow account for purposes of satisfying indemnification claims under the SPA.  The Parties need to enter into an escrow agreement with Wilmington Trust Company, the escrow agent, prior to Closing.

4.    <u>Certain Closing Deliverables</u>.  Section 2.04 of the SPA sets forth customary closing deliverables (e.g., copies of organizational documents and good standing certificates, share certificates, evidence of proper authorization, etc.).  Set forth below are the transaction-specific closing deliverables of the Sellers (which are also set forth in Section 2.04 of the SPA)

    a.   *Employment Agreements*.  Each of the Sellers will be continuing as employees of either Varsity, the Domestic Company, or one of their respective affiliates. Execution and delivery of employment agreements, in form and substance reasonably satisfactory to Varsity, will be a condition precedent to, and will be deliverables at the Closing of the Transaction.

    b.   *Building Lease Agreements.*  The two (2) building leases for which the Domestic Company is the lessee shall be amended and restated to provide for a five (5) year term, with the right for Varsity (i.e., the Domestic Company post-close) to terminate the leases after three years by providing one-year's prior written notice. Execution and delivery of appropriate lease agreements will be a condition precedent to, and will be deliverables at the Closing of the Transaction.

- 2 -

Confidential

      i.  Sellers will provide landlord estoppel certificates for each lease agreement and the certificates will also be deliverables at the Closing of the Transaction.

**Other Matters**.

      1.  <u>Tax Matters</u>. In connection with the Transaction, the Domestic Company will make a Section 338(h)(10) election in order to achieve a step-up in tax basis in the business assets of the Domestic Company's subsidiaries. We have been asked whether the Domestic Company will be required to obtain a new employer identification number as a result of the 338(h)(10) election. In accordance with applicable Treasury Regulations, we believe that the Domestic Company may continue to use its existing EIN post-Closing.

**Post-Closing Items**.

      1.  <u>Jam Active</u>. The SPA will provide a covenant whereby Sellers agree to dissolve Jam Active, LLC, by December 31, 2015.

      2.  <u>Jam Air</u>. The SPA will provide a covenant whereby Sellers agree to dissolve JAM AIR, LLC, by December 31, 2015 or to rename the company so that its name no longer contains "JAM".

      3.  <u>Restructuring</u>. Varsity intends to dissolve the Domestic Company post-Closing. The timing of the dissolution will depend upon, among other things: (i) the need to transfer and assign intellectual property currently owned by the Domestic Company to Varsity and (ii) obtaining any and all required consents for the assignment of all commercial agreements to which the Domestic Company may be a party. Below are some other considerations relating to the proposed, post-Closing dissolution of the Domestic Company:

      a.  *Corporate Matters*. In connection with the proposed dissolution of the Domestic Company, any commercial contracts or similar agreements need to be further reviewed to determine whether there are any restrictions on assignment / transfer. We have reviewed commercial agreements only for material issues relating to the proposed Transaction. If Varsity moves forward with the proposed dissolution of the Domestic Company, all commercial agreements to which the Domestic Company is a party should be reviewed in this regard. Reed Smith would be pleased to assist in that effort.

      b.  *Tax Matters*.

      i.  **Basis Step-up**. The proposed acquisition of the Domestic Company involves the Domestic Company making a Section 338(h)(10) election, thereby providing Varsity with a basis step-up in the underlying assets of the target business.

      1.  From a U.S. federal income tax perspective, the dissolution of the Domestic Company should not have an adverse effect on the basis step-up achieved through the above-referenced tax elections,

- 3 -

Confidential

regardless of the taxable year in which such dissolution becomes effective.

c. *Building Leases*. The building leases provide that the tenant shall not assign or sublet the premises without the written consent of the landlord, such consent not to be unreasonably withheld (***other than to the tenant's affiliate companies or subsidiaries***). Post-Closing, it appears that the Domestic Company can transfer the lease to an affiliate or subsidiary without obtaining the landlord's consent.

d. *Intellectual Property Matters*. Much of the intellectual property ("IP") used in connection with and relating to the target business (the "Target IP") is owned by the Domestic Company. Prior to dissolution, the Domestic Company will need to assign all Target IP to an appropriate entity (likely Varsity), and such assignment agreements will be recorded with the USPTO (for patents and trademarks) or the Library of Congress (for copyrights). For international Target IP registrations, to the extent we need to make any assignments, the assignment agreements will need to be recorded with the appropriate entity.

   i. We anticipate using one master IP assignment agreement for the domestic Target IP registrations, which we will begin drafting prior to the Closing of the Transaction. With respect to international Target IP registrations, we are confirming whether any assignments will be required in connection with the proposed dissolution of the Domestic Company.

   ii. The Domestic Company traditionally has *not* utilized license agreements where subsidiaries or affiliate entities use IP owned by the Domestic Company. We would suggest that Varsity use IP license agreements post-Closing, but this should not delay the dissolution process.

- 4 -

US_ACTIVE-123667652.6

CB00382205

*REED SMITH DRAFT – 09/18/2015*

---

STOCK PURCHASE AGREEMENT

BY AND AMONG

[VARSITY SPIRIT, LLC]

AARON FLAKER

EMMITT TYLER

AND

DANIEL KESSLER

Dated as of [●], 2015

---

US_ACTIVE-123064852.14-PTROWE 10/09/2015 4:51 PM

Confidential

CB00382206

## TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ................................................................................................ 1
    Section 1.01   Definitions.................................................................................................. 1
    Section 1.02   Certain Matters of Construction.............................................................. 11
ARTICLE II PURCHASE AND SALE OF INTERESTS; CLOSING.................................. 12
    Section 2.01   Purchase and Sale of Interests................................................................ 12
    Section 2.02   Purchase Price........................................................................................ 12
    Section 2.03   Closing ................................................................................................... 12
    Section 2.04   Closing Deliveries and Payments. .......................................................... 13
    Section 2.05   Purchase Price Adjustment .................................................................... 14
    Section 2.06   Adjustments for Tax Purposes ............................................................... 15
    Section 2.07   Release of Escrow .................................................................................. 15
    Section 2.08   Withholding ............................................................................................ 16
ARTICLE III REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY 16
    Section 3.01   Organization and Good Standing............................................................. 16
    Section 3.02   Power and Authorization ........................................................................ 16
    Section 3.03   No Consents; No Conflicts ..................................................................... 17
    Section 3.04   Capitalization. ........................................................................................ 17
    Section 3.05   No Subsidiaries ...................................................................................... 17
    Section 3.06   Financial Statements and Other Financial Matters. ................................ 17
    Section 3.07   Legal Requirements and Permits. ........................................................... 19
    Section 3.08   Legal Proceedings ................................................................................. 19
    Section 3.09   Tax Matters. ........................................................................................... 20
    Section 3.10   Employee Benefit Plans.......................................................................... 23
    Section 3.11   Employees; Employment Matters. .......................................................... 25
    Section 3.12   Contracts. ............................................................................................... 25
    Section 3.13   Customers and Vendors .......................................................................... 26
    Section 3.14   Real Property. ......................................................................................... 27
    Section 3.15   Personal Property. ................................................................................... 27
    Section 3.16   Sufficiency of Assets ............................................................................. 27
    Section 3.17   Intellectual Property. .............................................................................. 28
    Section 3.18   Insurance. ............................................................................................... 29
    Section 3.19   Absence of Certain Developments........................................................... 30

US_ACTIVE-123084852.14-PTROWE 10/09/2015 4:51 PM

Section 3.20    Related Party Transactions ............................................................................ 30

Section 3.21    Absence of Illegal Payments ......................................................................... 30

Section 3.22    Books and Records ........................................................................................ 30

Section 3.23    Brokers ........................................................................................................... 30

Section 3.24    Disclosure ...................................................................................................... 31

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS ............................ 31

Section 4.01    Power and Authorization .............................................................................. 31

Section 4.02    No Violations .................................................................................................. 31

Section 4.03    Legal Proceedings ......................................................................................... 31

Section 4.04    Ownership of Interests. .................................................................................. 31

Section 4.05    Brokers' Fees ................................................................................................. 32

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER ................................ 32

Section 5.01    Organization and Good Standing .................................................................. 32

Section 5.02    Power and Authorization .............................................................................. 32

Section 5.03    No Violations .................................................................................................. 32

Section 5.04    Legal Proceedings ......................................................................................... 33

Section 5.05    Brokers' Fees ................................................................................................. 33

ARTICLE VI COVENANTS OF THE PARTIES ................................................................... 33

Section 6.01    Further Assurances ........................................................................................ 33

Section 6.02    Confidential Information. .............................................................................. 33

Section 6.03    Public Announcements .................................................................................. 34

Section 6.04    Restrictive Covenants. ................................................................................... 34

ARTICLE VII SURVIVAL AND INDEMNIFICATION ....................................................... 35

Section 7.01    Survival. ......................................................................................................... 35

Section 7.02    Indemnification. ............................................................................................. 36

Section 7.03    Limitations on Indemnification ..................................................................... 36

Section 7.04    Procedures for Indemnification ..................................................................... 37

Section 7.05    Additional Limitations .................................................................................. 41

Section 7.06    Remedies ........................................................................................................ 41

Section 7.07    Exclusive Remedies ...................................................................................... 41

ARTICLE VIII TAX MATTERS .............................................................................................. 41

Section 8.01    [Conduct of Business with Respect to Taxes ................................................ 41

Section 8.02    Cooperation ................................................................................................... 42

Section 8.03    Preparation and Filing of Pre-Closing Period Tax Returns of the Company and
                its Subsidiaries ............................................................................................... 42

Confidential

CB00382208

Section 8.04   Preparation and Filing of Straddle Period Tax Returns of the Company and its
Subsidiaries .................................................................................................... 43

Section 8.05   Transfer Taxes ................................................................................................ 44

Section 8.06   Computation of Liabilities ............................................................................. 44

Section 8.07   Tax Contests ................................................................................................... 44

Section 8.08   Election pursuant to Section 338 of the Code ............................................... 46

Section 8.09   Adjustments to the Purchase Price ................................................................ 47

ARTICLE IX MISCELLANEOUS ........................................................................................ 48

Section 9.01   Entire Agreement ........................................................................................... 48

Section 9.02   Successor and Assigns; Assignment; No Third-Party Beneficiaries ............ 48

Section 9.03   Amendments ................................................................................................... 48

Section 9.04   Notices ............................................................................................................ 48

Section 9.05   Governing Law ............................................................................................... 49

Section 9.06   Severability .................................................................................................... 49

Section 9.07   Transaction Costs and Expenses .................................................................... 50

Section 9.08   Counterparts ................................................................................................... 50

Section 9.09   Jurisdiction; Venue; Service of Process ........................................................ 50

Section 9.10   Specific Performance ..................................................................................... 51

Section 9.11   Waiver of Jury Trial ....................................................................................... 51

Section 9.12   Disclosure Schedules ..................................................................................... 51

Confidential

CB00382209

# STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (as amended, modified or supplemented from time to time, this "Agreement") is made and entered into as of September 30, 2015 by and between Varsity Spirit, LLC, a Tennessee limited liability company ("Buyer"), on the one hand, and Aaron Flaker, Emmitt Tyler and Daniel Kessler, each an individual (individually, a "Seller"; collectively, the "Sellers"), on the other hand. Buyer and Sellers are sometimes referred to herein individually as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, Sellers own all of the issued and outstanding shares of stock (the "Shares") in JAM Brands, Inc., a Kentucky corporation (the "Company");

WHEREAS, Buyer desires to purchase from Sellers, and Sellers desire to sell to Buyer, the Shares pursuant to the terms and conditions set forth herein (the "Transaction");

WHEREAS, in connection with (and contemporaneous with the Closing of) the Transaction, Buyer desires to purchase from Sellers, and Sellers desire to sell, directly or indirectly, to Buyer (the "Related Transactions"), the ownership interests in certain other Affiliate entities of the Company that are set forth on **Schedule A** (collectively, and together with the Company, the "Target Companies").[1]

## AGREEMENT

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01    Definitions. The terms below shall have the following meanings when used in this Agreement:

"Accountants" has the meaning set forth in Section 8.03 of this Agreement.

"Actual Net Cash Amount" has the meaning set forth in Section 2.05B of this Agreement.

"Affiliate" means, with respect to an entity, any other entity controlling, controlled by or under common control with such entity. For purposes of this Agreement, the following entities will not be considered an Affiliate within the meaning of this definition: [(i) All About Kids Childcare and Learning Center, LLC and 360 Dance Inc.] As used in this definition, the term "control", including the correlative terms "controlling", "controlled by" and "under common

---

[1] RS Note: To be discussed in connection with the acquisition of non-U.S. entities under common control with the Company.

US_ACTIVE-123064852.14-PTROWE 10/09/2015 4:51 PM

Confidential
CB00382210

control with", means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, whether through ownership of voting securities, by contract or otherwise.

"Aggregate Purchase Price" means the aggregate purchase price to be paid by Buyer to the Sellers in connection with the Related Transactions.

"Agreement" has the meaning set forth in the introductory paragraph of this Agreement.

"Ancillary Agreements" means the Employment Agreements, the definitive agreements to be executed in connection with the Related Transactions, and [●].

"Business" means the business currently conducted by the Company and previously conducted by the Company over the twelve (12) month period prior to the date hereof.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks in [New York, New York] are authorized or required by law to be closed.

"Buyer" has the meaning set forth in the introductory paragraph of this Agreement.

"Buyer Indemnified Party(ies)" has the meaning set forth in Section 7.02A of this Agreement.

"Claimant" has the meaning set forth in Section 7.04A of this Agreement.

"Closing" has the meaning set forth in Section 2.03 of this Agreement.

"Closing Cash Payment" means an amount equal to $[Purchase Price less Escrow Amount].

"Closing Date" has the meaning set forth in Section 2.03 of this Agreement.

"Closing Statement" has the meaning set forth in Section 2.05B of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the introductory paragraph of this Agreement.

"Company Intellectual Property" means, collectively, the Owned Intellectual Property and the Licensed Intellectual Property.

"Contemplated Transactions" means the transactions contemplated by this Agreement, including (a) the Transaction, (b) the Related Transactions, (c) the execution, delivery and performance of the Ancillary Agreements and (d) the payment of fees and expenses relating to such transactions.

"Contract" means any contract, commitment, lease, license, mortgage, bond, note or other instrument, or other legally binding agreement (whether written or oral and whether express or implied), and all amendments thereof, but excluding any Permits.

- 2 -

CB00382211

"Due Date" means the due date with respect to an applicable Tax Return (taking into account valid extensions).

"Election(s)" has the meaning set forth in Section 8.08A of this Agreement.

"Employee Benefit Plans" has the meaning set forth in Section 3.10A of this Agreement.

"Employment Agreements" means the employment or consulting agreements, as applicable, dated as of the date hereof, by and between the Company and each of Aaron Flaker, Emmitt Tyler and Daniel Kessler.

"Environmental Laws" means all Legal Requirements relating to pollution, protection of the environment (including wildlife, flora and fauna), natural resources, human health, safety or welfare, or exposure to Hazardous Materials, including but not limited to all those Legal Requirements relating to Releases or threatened Releases of Hazardous Materials or otherwise relating to the identification, generation, use, labeling, processing, control, discharge, emission, investigation, removal, remediation, monitoring, handling, transportation, treatment, storage or disposal of any Hazardous Materials or human health, safety or welfare, including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.) the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Safe Drinking Water Act (42 U.S.C. §300f et seq.) the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), and/or any similar state or local Legal Requirements, as each has been or may be amended and the regulations promulgated pursuant thereto.

"Environmental Permits" has the meaning set forth in Section 3.07D of this Agreement.

"Equity Interest" means, with respect to any Person, (a) any capital stock, partnership or membership interest, unit of participation or other similar interest (however designated) in such Person and (b) any option, warrant, purchase right, conversion right, exchange right or other Contract which would entitle any other Person to acquire any such interest in such Person or otherwise entitle any other Person to share in the equity, profits, earnings, losses or gains of such Person (including stock appreciation, phantom stock, profit participation or other similar rights).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, with respect to any entity, trade or business, any other entity, trade or business that is a member of a group described in Sections 414(b), (c), (m) or (o) of the Code or Section 4001(b)(l) of ERISA that includes the first entity, trade or business.

"Escrow Agent" means [●].

"Escrow Agreement" means an escrow agreement by and among Buyer, Sellers and the Escrow Agent with respect to the Escrow Funds.

"Escrow Amount" means an amount equal to 12.5% of the Purchase Price.

- 3 -

Confidential    CB00382212

"Escrow Balance" has the meaning set forth in <u>Section 2.07</u> of this Agreement.

"Escrow Funds" means the amount of funds held by the Escrow Agent pursuant to the Escrow Agreement from time to time.

"Estimated Net Cash Amount" has the meaning set forth in <u>Section 2.05A</u> of this Agreement.

"Estimated Schedule" has the meaning set forth in <u>Section 2.05A</u> of this Agreement.

"Financial Statements" has the meaning set forth in <u>Section 3.06A</u> of this Agreement.

"First Escrow Release Date" has the meaning set forth in <u>Section 2.07</u> of this Agreement.

"GAAP" means generally accepted accounting principles in the United States as in effect from time to time.

"Governmental Entity" means any court, governmental department, commission, council, board, agency, bureau or other instrumentality of the United States of America, any foreign jurisdiction, or any state, provincial, county, municipality or local governmental unit thereof, including any Taxing Authority.

"Hazardous Material" means any substance, material or waste that is regulated, classified or otherwise considered or could be considered under any applicable Legal Requirement as "hazardous", "toxic", "pollutant," "contaminant", "radioactive", or words of similar meaning or effect, including petroleum and its by-products, asbestos, asbestos containing products, polychlorinated biphenyls, radioactive materials, toxic mold and urea formaldehyde insulation.

"Indemnified Party" means, with respect to any Indemnity Claim, each Buyer Indemnified Party or Seller Indemnified Party, as the case may be.

"Indemnifying Party" means, with respect to any Indemnity Claim, the Person or Persons against whom such Indemnity Claim may be or has been asserted.

"Indemnity Claim" means a claim for indemnity under <u>Section 7.02</u> or under the indemnification provisions of the Related Purchase Agreements, as the case may be.

"Independent Accounting Firm" has the meaning set forth in <u>Section 2.05C</u> of this Agreement.

"Intellectual Property" means all domestic and foreign intellectual property rights including all: (a) trademarks and service marks, logos, trade dress, trade names and similar indicators of origin, all applications or registrations pertaining to the foregoing and all goodwill associated therewith; (b) patents, inventions, discoveries, improvements, ideas, know-how, formula methodology, business methods, processes, technology and computer programs, software and databases (including source code, object code, development documentation, programming tools, drawings, user manuals, specifications and data) and all applications or registrations in any jurisdiction pertaining to the foregoing, including all reissues, continuations,

- 4 -

Confidential

CB00382213

divisions, continuations-in-art, renewals or extensions thereof; (c) trade secrets, including confidential and other non-public information, and the right in any jurisdiction to limit the use or disclosure thereof; (d) copyrights in writings, designs, or other works, and registrations or applications pertaining thereto; (e) domain names and registrations or applications for registration; and (f) web pages, social media pages, and social media handles (e.g., hashtags, etc.).

"IRS" means the United States Internal Revenue Service.

"Jam Active" means Jam Active, LLC, a Kentucky limited liability company, which is an Affiliate of the Company.

"Key Employees" means Aaron Flaker, Emmitt Tyler and Daniel Kessler.

["Knowledge" and similar formulations mean that (i) in the case of Sellers, each Seller, or (ii) in the case of the Company, one or more of [●], either (a) has actual knowledge of the fact or other matter at issue or (b) should have had actual knowledge of such fact or other matter assuming the diligent exercise of such individual's duties as a manager, officer or employee of such Person and after reasonable investigation of all employees of such Person reasonably expected to have actual knowledge of such fact or matter.]

"Latest Balance Sheet" has the meaning set forth in Section 3.06A.2 of this Agreement.

"Latest Balance Sheet Date" has the meaning set forth in Section 3.06A.2 of this Agreement.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, hearings, inquiries, investigations or other proceedings (public or private) commenced, brought, conducted or heard before, or otherwise involving, any Governmental Entity or arbitrator.

"Legal Requirement" means all applicable laws, statutes, rules, regulations, codes, ordinances, Permits, bylaws, variances, policies, judgments, injunctions, orders, guidelines, conditions, licenses, common laws or other requirements of a Governmental Entity having jurisdiction over the assets, properties or operations of any Party, including the Foreign Corrupt Practices Act of 1977, as amended, and all rules and regulations promulgated thereunder.

"Liabilities" means any direct or indirect liability, indebtedness, obligation, expense, claim, loss, damage, deficiency, guaranty, or endorsement of any nature, of or by any Person, whether known or unknown, absolute or contingent, secured or unsecured, recourse or non-recourse, filed or unfiled, accrued or unaccrued, due or to become due, or liquidated or unliquidated.

"Licensed Intellectual Property" means all Intellectual Property that any Person other than the Company owns and that the Company is currently permitted to use in the operation of the Business.

"Licensed Software" has the meaning set forth in Section 3.17F of this Agreement.

- 5 -

Confidential
CB00382214

"Lien" means any lien, mortgage, pledge, condemnation award, expropriation award, encumbrance, lease, sublease, preferential purchase right, option, conditional sales contract, security interest or encumbrance of any nature whatsoever.

"Losses" means any and all damages, dues, liabilities, Taxes, obligations, disbursements, deficiencies, diminution in value, claims, demands and suits, penalties or settlements, fines, costs, losses and expenses of any kind or nature, including all interest, penalties, legal, accounting, other professional fees and expenses or other costs and expenses incurred in the investigation, collection, prosecution or defense of any and all Actions that may be imposed on or otherwise incurred or suffered, in each case, whether covered by insurance or a third party or not, whether such matters arise out of contract, tort, violation of law or any other theory and whether such matters are brought or initiated by a Person or a Governmental Entity.

"Material Adverse Effect" means any event, change, fact, condition, circumstance or occurrence that, when considered either individually or in the aggregate together with all other adverse events, changes, facts, conditions, circumstances or occurrences with respect to which such phrase is used in this Agreement, has had or would reasonably be expected to have a material adverse effect on (a) the business, operations, results of operations, properties, assets, prospects or condition (financial or otherwise) of the Company, (b) the reputation of the Company, or (c) the ability of Sellers to satisfy their obligations hereunder.

"Material Contract" has the meaning set forth in Section 3.12A of this Agreement.

"Net Working Capital" means the current assets of the Company less the current liabilities of the Company, calculated in accordance with GAAP.

"Non-Competition Period" has the meaning set forth in Section 6.04A of this Agreement.

"Objection Notice" has the meaning set forth in Section 2.05C of this Agreement.

"Order" means any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Entity or by any arbitrator.

"Ordinary Course of Business" means, with respect to any Person, actions or inactions that are consistent with the past practices of such Person, taken in the ordinary course of the normal day-to-day operations of such Person.

"Organizational Documents" means, with respect to any Person, the certificate of incorporation, certificate of limited partnership, articles of incorporation or association and by-laws, the limited liability company agreement, or limited partnership agreement or other agreement or agreements that establish the legal personality of such Person, in each case as amended to date.

"Outstanding Debt" means, with respect to the Company, (a) all indebtedness of the Company for borrowed money, (b) all obligations of the Company evidenced by bonds, debentures, notes or similar instruments (including any letter of credit, surety bond, banker's acceptance or similar reimbursement agreement or obligation), (c) all obligations of the

- 6 -

Confidential

Company to pay the deferred purchase price of property or services (excluding trade accounts payable arising in the Ordinary Course of Business of the Company) including earn-outs, (d) all obligations of the Company under leases required to be capitalized in accordance with GAAP, (e) all obligations of the Company under any interest rate, currency, or hedging arrangement, (f) all obligations of the Company under any direct or indirect guaranties in respect of, or obligations (contingent or otherwise) of the Company to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness for borrowed money or obligations of others of the kinds referred to in clauses (a) through (e) above, (g) all obligations of the kinds referred to in clauses (a) through (f) above of other Persons secured by any Lien on any property or asset of the Company, and (h) all obligations of the Company for any accrued interest, if any, and any termination fees, prepayment penalties, "breakage" costs, or similar payments associated with the prepayment of any indebtedness or other obligations of the kinds referred to in clauses (a) through (f) above.  For purposes of clarification, indebtedness and obligations of the Company include those that arise from the Company's assumption of liability, successor liability, by merger or otherwise.

"Owned Intellectual Property" means all Intellectual Property owned by the Company.

"Party(ies)" has the meaning set forth in the introductory paragraph of this Agreement.

"Permits" means all of the permits, licenses, variances, exemptions, orders, franchises, certificates and approvals of all Governmental Entities necessary to conduct the Business in compliance with all Legal Requirements.

"Permitted Liens" means (a) statutory Liens for current Taxes or assessments, or other similar governmental charges, not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP on the Financial Statements, (b) carriers', warehousemen's, mechanics', materialmen's, repairmen's or other similar Liens arising or incurred in the Ordinary Course of Business not yet due and payable or the amount or validity of which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP on the Financial Statements, (c) zoning, entitlement and other land use or environmental regulations by any Governmental Entity that have not been violated and that do not materially impair the Company's ability to operate in the Ordinary Course of Business, and (d) Liens that represent purchase money security interests for personal property purchased in the Ordinary Course of Business.

"Person" means any natural person, corporation, company, partnership (general or limited), limited liability company, trust, joint venture, estate, association, organization, labor union or other entity or Governmental Entity.

"Pre-Closing Period" means any taxable period ending on or before the Closing Date.

"Pre-Closing Period Tax Return" means any Tax Return relating to a Pre-Closing Period.

"Pre-Closing Taxes" means, without duplication, (a) any and all Taxes of or imposed on the Company or any of its Subsidiaries for any and all Pre-Closing Periods (including, without limitation, any and all Taxes resulting from any election under Section 338 of the Code), (b) any

- 7 -

and all Taxes of or imposed on the Company or any of its Subsidiaries for any and all portions of Straddle Periods ending on the Closing Date (determined in accordance with <u>Section 8.06</u> hereof), (c) any and all Taxes of an "affiliated group" (as defined in Section 1504 of the Code) (or affiliated, consolidated, unitary, combined or similar group under applicable state, local or foreign law) of which the Company or any of its Subsidiaries (or any predecessor of any such Person) is or was a member on or prior to the Closing Date, including pursuant to Treasury Regulations Section 1.1502-6 (or any predecessor or successor thereof or any analogous or similar state, local or foreign law), (d) any and all Taxes of or imposed on any of the Sellers, including Taxes of the Sellers imposed on the Buyer or any of its Affiliates, or the Company or any of its Subsidiaries as a result of transferee, successor or similar liability (including bulk transfer or similar laws) or pursuant to any law or otherwise, which Taxes relate to an event or transaction (including transactions contemplated by this Agreement) occurring on or before the Closing Date, (e) any and all Transfer Taxes required to be paid by the Sellers pursuant to <u>Section 8.05</u>, (f) any and all Taxes of or imposed on the Company or any of its Subsidiaries related or attributable to any election under Section 338 of the Code (or similar provisions of state or local law), including any and all Taxes imposed under Section 1374 of the Code (or similar provisions of state or local law) as a result of the Election, and (g) any and all amounts required to be paid by the Company or any of its Subsidiaries pursuant to any Tax Sharing Agreement that the Company or any Subsidiary was a party on the Closing Date. Notwithstanding anything to the contrary set forth herein: (x) in determining U.S. federal and applicable state, local and foreign income Taxes of or imposed on the Company or any of its Subsidiaries pursuant to this definition related or attributable to any entity treated as a partnership for U.S. federal or state, local or foreign income Tax purposes, the taxable income of the Company or such Subsidiary (as the case may be) shall be determined as if the taxable year of the Company or such Subsidiary treated as such a partnership closed on the Closing Date and (y) "Pre-Closing Taxes" means the amount of Taxes which would have been payable or paid without taking into account any carryback of any Tax attribute (including any net operating loss carryback) arising in any Tax period ending after the Closing Date.

"<u>Proprietary Software</u>" means software, databases, applications and programs owned by the Company.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 2.02</u> of this Agreement.

"<u>Real Property Leases</u>" means all leases, subleases, licenses, concessions and other Contracts applicable to the leasehold estates of the Company, and any ancillary documents pertaining thereto, including, for example, amendments, modifications, supplements, exhibits, schedules, addenda and restatements thereto and thereof.

"<u>Registered Intellectual Property</u>" means all Owned Intellectual Property that is subject to active registrations, currently pending applications for registration, or other active filings with or active issuances by any Governmental Entity.

"<u>Related Person</u>" means:

      A.     with respect to a particular individual:

- 8 -

Confidential

      1.      each other member of such individual's Family;

      2.      any Person that is directly or indirectly controlled by such individual or one or more members of such individual's Family; and

      3.      any Person with respect to which such individual or one or more members of such individual's Family serves as a director, officer, partner, executor or trustee (or in a similar capacity).

B.      with respect to a specified Person other than an individual:

      1.      any Person that directly or indirectly controls, is directly or indirectly controlled by, or is directly or indirectly under common control with, such specified Person;

      2.      each Person that serves as a director, officer, partner, executor or trustee of such specified Person (or in a similar capacity); and

      3.      any Person with respect to which such specified Person serves as a general partner or a trustee (or in a similar capacity).

For purposes of this definition, (a) the "Family" of an individual includes (i) the individual, (ii) the individual's spouse, (iii) any other natural person who is related to the individual or the individual's spouse within the second degree and (iv) any other natural person who resides with such individual, and (b) the term "control", including the correlative terms "controlling", "controlled by" and "under common control with", means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, whether through ownership of voting securities, by contract or otherwise.

"Related Purchase Agreements" means the definitive purchase agreements that Buyer and Sellers enter into in connection with the Related Transactions.

"Related Transactions" has the meaning set forth in the recitals.

"Release" means any depositing, spilling, leaking, pumping, pouring, placing, emitting, discarding, abandoning, emptying, discharging, migrating, injecting, escaping, leaching, dumping or disposing into the indoor or outdoor environment.

"Representative" means, with respect to any Person, any director, officer, employee, agent, manager, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

"Schedules" has the meaning set forth in Section 9.12 of this Agreement.

"Second Escrow Release Date" has the meaning set forth in Section 2.07 of this Agreement.

Confidential

CB00382218

"Seller Fundamental Representations" has the meaning set forth in Section 7.01A of this Agreement.

"Seller Indemnified Party" means Sellers, their Representatives, and the successors and assigns of each of the foregoing Persons.

"Sellers" has the meaning set forth in the introductory paragraph of this Agreement.

"Shares" has the meaning set forth in the recitals.

"Straddle Period" means any taxable period beginning on or before and ending after the Closing Date.

"Straddle Period Tax Return" means any Tax Return relating to a Straddle Period.

"Subsidiary" means any Person of which the Company (or other specified Person) shall own directly or indirectly, a nominee arrangement or otherwise at least a majority of the outstanding capital stock (or other shares of beneficial interest) entitled to vote generally or otherwise have the power to elect a majority of the board of directors or similar governing body or the legal power to direct the business or policies of such Person.

"Tangible Personal Property" has the meaning set forth in Section 3.15A of this Agreement.

"Target Companies" has the meaning set forth in the recitals.

"Tax" or "Taxes" means all (a) taxes, charges, withholdings, fees, levies, imposts, duties and governmental fees or other like assessments or charges of any kind whatsoever in the nature of taxes imposed by any United States federal, state, local or foreign or other Taxing Authority (including those related to income, net income, gross income, receipts, capital, windfall profit, severance, property (real and personal), production, sales, goods and services, use, business and occupation, license, excise, registration, franchise, employment, payroll (including social security contributions), deductions at source, withholding, alternative or add-on minimum, intangibles, ad valorem, transfer, gains, stamp, customs, duties, estimated, transaction, title, capital, paid-up capital, profits, premium, value added, recording, inventory and merchandise, business privilege, federal highway use, commercial rent or environmental tax, and any liability under unclaimed property, escheat, or similar laws), (b) interest, penalties, fines, additions to tax or additional amounts imposed by any Taxing Authority in connection with (i) any item described in clause (a) or (ii) the failure to comply with any requirement imposed with respect to any Tax Return, and (c) liability in respect of any items described in clause (a) and/or (b) payable by reason of contract (including any Tax Sharing Agreement), assumption, transferee, successor or similar liability, operation of law (including pursuant to Treasury Regulations Section 1.1502-6 (or any predecessor or successor thereof or any analogous or similar state, local, or foreign law)) or otherwise.

"Tax Allocation Statement" has the meaning set forth in Section 8.08B of this Agreement.

- 10 -

Confidential
CB00382219

"Tax Claim Notice" has the meaning set forth in Section 8.07A of this Agreement.

"Tax Contest" has the meaning set forth in Section 8.07A of this Agreement.

"Tax Return" means any return, declaration, form (including Form TD F90-22.1), report, claim, informational return (including all Forms 1099) or statement required to be filed with any Governmental Entity with respect to Taxes, including any schedule or attachment thereto or amendment thereof.

"Tax Sharing Agreement" means any Tax indemnity agreement, Tax sharing agreement, Tax allocation agreement or similar contract or arrangement, whether written or unwritten (including, without limitation, any such agreement, contract or arrangement included in any purchase or sale agreement, merger agreement, joint venture agreement or other document).

"Taxing Authority" means, with respect to any Tax or Tax Return, the Governmental Entity that imposes such Tax or requires a person to file such Tax Return and the agency (if any) charged with the collection of such Tax or the administration of such Tax Return, in each case, for such Governmental Entity.

"Third Party Claim" has the meaning set forth in Section 7.02A of this Agreement.

"Transaction" has the meaning set forth in the recitals to this Agreement.

"Transfer Taxes" has the meaning set forth in Section 8.05 of this Agreement.

"Treasury Regulations" means the regulations promulgated under the Code, as such Treasury Regulations may be amended from time to time. Any reference herein to a particular provision of the Treasury Regulations means, where appropriate, the corresponding successor provision.

"Unaudited Financial Statements" has the meaning set forth in Section 3.06A.1 of this Agreement.

Section 1.02    Certain Matters of Construction.

A.    The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

B.    Section and subsection headings are not to be considered part of this Agreement, are included solely for convenience, are not intended to be full or accurate descriptions of the content of the Sections or subsections of this Agreement and shall not affect the construction hereof.

C.    Except as otherwise explicitly specified to the contrary herein, (i) the words "hereof," "herein," "hereunder" and words of similar import shall refer to this

Confidential

CB00382220

Agreement as a whole and not to any particular Section or subsection of this Agreement and reference to a particular Section of this Agreement shall include all subsections thereof, (ii) references to a Section, Exhibit, Annex or Schedule mean a Section of, or Exhibit, Annex or Schedule to this Agreement, unless another agreement is specified, (iii) definitions shall be equally applicable to both the singular and plural forms of the terms defined, and references to the masculine, feminine or neuter gender shall include each other gender, (iv) the word "including" means including without limitation, (v) any reference to "$" or "dollars" means United States dollars and (vi) references to a particular statute or regulation include such statute or regulation, all rules and regulations thereunder and any successor statute, rule or regulation, in each case as amended or otherwise modified from time to time.

## ARTICLE II

## PURCHASE AND SALE OF INTERESTS; CLOSING

Section 2.01    Purchase and Sale of Interests. At the Closing, subject to the terms and conditions of this Agreement, and in reliance upon the representations, warranties and covenants set forth herein, the Parties shall consummate the Contemplated Transactions as follows and in the following order:

A.    Buyer and Sellers shall consummate the Transaction; and

B.    Contemporaneous with the consummation of the Transaction, Buyer and Sellers shall consummate the Related Transactions.

Section 2.02    Purchase Price. The aggregate consideration for the purchase and sale of the Interests being acquired by Buyer pursuant to this Agreement shall be equal to the following (the "Purchase Price"), which shall be paid at the Closing in accordance with Section 2.04B below:

A.    the Closing Cash Payment, as adjusted pursuant to Section 2.05A below; *plus*

B.    the Escrow Amount, which shall be paid by wire transfer of immediately available funds to an account designated by the Escrow Agent.

Section 2.03    Closing. The closing (the "Closing") of the Contemplated Transactions shall take place at the offices of Reed Smith LLP, 599 Lexington Avenue, Floor 22, New York, New York 10022 on the date hereof,[2] or at such other place or time, and in such manner (including by email, fax or other electronic means), as the Parties mutually agree.  The date on which the Closing actually occurs is referenced herein as the "Closing Date". The Closing shall be effective for all purposes as of 12:01 a.m. EST on the Closing Date.

---

[2] RS Note: Simultaneous sign and close to be discussed.

- 12 -

Section 2.04    Closing Deliveries and Payments.

A.    <u>Seller Closing Deliveries</u>.  Upon the terms set forth in this Agreement, Buyer's obligations to purchase the Shares and to take the other actions required to be taken by Buyer at the Closing, are subject to Sellers delivering or causing to be delivered to Buyer, at or prior to the Closing, all of the following (any of which may be waived by Buyer, in whole or in part):[3]

1.    a copy of each Related Purchase Agreement, duly executed and delivered in accordance with its terms;

2.    a copy of the [Certificate of Incorporation] of the Company, certified by the Secretary of State for the State of [Kentucky], dated not more than ten (10) days prior to the Closing Date;

3.    a [Certificate of Good Standing for the Company], issued by the Secretary of State for the State of [Kentucky], dated not more than ten (10) days prior to the Closing Date;

4.    with respect to the Shares, the current original certificates duly endorsed or accompanied by a Stock power duly endorsed, in favor of the Buyer or Buyer's designee;

5.    the Employment Agreements, duly executed by all parties, which agreements shall be in form and substance reasonably satisfactory to Buyer;

6.    amendments to the Real Property Leases, in form and substance reasonably satisfactory to the Buyer;

7.    [a copy of the Amended and Restated Limited Liability Operating Agreement for US Finals, LLC, in form and substance reasonably satisfactory to the Buyer];[4]

8.    resignations from each of the individuals listed on <u>Schedule 2.04(a)(v)</u> resigning from any positions held by each such individual on the [Board of Directors] or as an officer of a Target Company;

9.    certified copies of the resolutions duly adopted by the Sellers in their capacity as the sole shareholders of the Company authorizing the execution, delivery and performance of this Agreement, the Ancillary Agreements (as applicable) and the performance of the Contemplated Transactions;

10.    an executed release by each of the Sellers that unconditionally and irrevocably acquits, releases, waives and forever discharges, to the maximum

---

[3] RS Note:  Additional conditions precedent / Closing deliverables may be added, depending on the results of our ongoing due diligence review.
[4] RS Note:  Subject to further discussions with the Sellers and NLCC.

- 13 -

CB00382222

extent provided by Legal Requirements, the Company from any and all actual or potential claims, counterclaims, demands, causes of action, liabilities, contracts, agreements, promises, obligations or defenses of any kind whatsoever, whether known or unknown, which Sellers and their Affiliates have or may have against the Company, based upon, arising out of, or in connection with, or related in any manner whatsoever to events or occurrences taking place prior to and/or at the Closing;

11.    a waiver from NLCC, waiving any and all rights and claims that it may have with respect to the Contemplated Transactions, including a waiver of NLCC's right of first refusal pursuant to Section 6.1.4 of the operating agreement of US Finals, LLC;

12.    a joint waiver from NLCC and US Finals, LLC, waiving the condition of transfer set forth in Section 6.1.1.3 of the operating agreement of US Finals, LLC, with respect to any Transfer (as that term is defined in such operating agreement) by the Company (in its capacity as a member of US Finals, LLC) to Buyer or any of its Affiliates after the Closing, in form and substance satisfactory to Buyer;

13.    the written authorizations, consents and approvals listed on Schedule 2.04(a)(xiii);

14.    all other documents, certificates and instruments reasonably requested by Buyer.

B.    Buyer Closing Deliveries.  Upon the terms and subject to the conditions set forth in this Agreement, Buyer shall deliver or cause to be delivered at the Closing the following to Sellers:

1.    the Purchase Price, to be paid to Sellers in immediately available funds to an account or accounts designated by Sellers; and

2.    all other documents, certificates and instruments reasonably requested by Sellers or the Company.

Section 2.05    Purchase Price Adjustment.

A.    Estimated Purchase Price Adjustment.  Sellers shall deliver to Buyer, no later than two (2) business days prior to the Closing Date, an unaudited schedule (the "Estimated Schedule") listing the net amount of (i) cash estimated to be paid by the Company from [●] until the Closing less (ii) (A) cash estimated to be received by the Company as deposits for future events of the Business, (B) prepayments and prepaid expenses, and (C) customer deposits and similar amounts, each that shall not be retained by the Company after the Closing (sub clause (i) minus sub clause (ii), the "Estimated Net Cash Amount"). The Estimated Schedule shall be prepared in accordance with GAAP applied consistently with the Financial Statements.  If the Estimated Net Cash Amount is positive, Buyer shall add to the Closing Cash Payment an amount equal to

- 14 -

such positive amount. If the Estimated Net Cash Amount is negative, at the Closing, Buyer shall deduct from the Closing Cash Payment an amount equal to such negative amount.

B.     <u>Preparation and Delivery of Closing Statement</u>. Buyer shall prepare and deliver to Sellers, no later than five (5) business days after the Closing, an unaudited schedule (the "<u>Closing Statement</u>") listing the net amount of (i) cash actually paid by the Company from [●] until the Closing less (ii) cash actually received by the Company as deposits for future events of the Business that was not retained by the Company after the Closing (the "<u>Actual Net Cash Amount</u>"). The Closing Statement shall be prepared in accordance with GAAP applied consistently with the Financial Statements. If the Actual Net Cash Amount exceeds the Estimated Net Cash Amount, Buyer shall, within five (5) business days, pay to Sellers an amount equal to such excess after the Actual Net Cash Amount is determined to be final and binding in accordance with clause (c) below. If the Estimated Net Cash Amount exceeds the Actual Net Cash Amount, Sellers shall promptly pay to Buyer an amount equal to such excess after the Actual Net Cash Amount is determined to be final and binding in accordance with clause (c) below.

C.     <u>Review of Closing Statement</u>. Buyer will cooperate with Sellers to ensure that Sellers will be able to review the Closing Statement as soon as practicable after it is delivered to Sellers and, in connection therewith, have full access to the books and records of Buyer. Within ten (10) business days following Sellers' receipt of the Closing Statement, Sellers shall notify Buyer in writing of any objections that he may have to the Closing Statement, stating in reasonable detail the basis for any such objection (an "<u>Objection Notice</u>"). If Sellers fail to deliver an Objection Notice to Buyer within such ten (10) day period, Sellers will be deemed to have concurred with the Closing Statement and it shall be deemed to be final and binding on the Parties. If Sellers dispute any of the items on the Closing Statement, the Parties shall negotiate in good faith for thirty (30) days to resolve any such disputes, and any such resolution shall be deemed to be final and binding on the Parties. If the Parties are unable to resolve any such disputes, they shall refer such disputes to a firm of independent certified public accountants mutually acceptable to Buyer and Sellers (the "<u>Independent Accounting Firm</u>") for determination, whose determination shall be final and binding on the Parties. The fees and disbursements of the Independent Accounting Firm acting under this section shall be borne equally by Buyer and Sellers.

Section 2.06     Adjustments for Tax Purposes. Any payments made pursuant to <u>Section 2.05</u> shall be treated as an adjustment to the Purchase Price by the Parties for Tax purposes, unless otherwise required by Legal Requirements.

Section 2.07     Release of Escrow. In accordance with the terms of the Escrow Agreement, to the extent that no unresolved claim for indemnification pursuant to the indemnification provisions of the Related Purchase Agreements is outstanding on the date, the Escrow Funds shall be released to the Sellers as follows: (i) [●%] of the Escrow Amount shall be released [fifteen (15) months] after the Closing (the "<u>First Escrow Release Date</u>"), and (ii) the balance of the Escrow Funds shall be released [two (2) months] after the First Escrow Release Date (the "<u>Second Escrow Release Date</u>"). In the event that any claim for indemnification has been asserted, but has not been fully and finally on either the First Escrow Release Date or the

- 15 -

Second Escrow Release Date, the Escrow Agent will release and pay to Sellers the amount of the Escrow Funds due on such date less an amount equal to the aggregate amount of all such unresolved claims (such amount, the "Escrow Balance"), and thereafter, any portion of the Escrow Balance not required to pay such claims as soon as practicable following the full and final resolution of such claims.

Section 2.08    Withholding. Notwithstanding anything in this Agreement to the contrary, each of the Buyer and the Company is entitled to deduct and withhold (or cause to be deducted and withheld) from any amounts payable pursuant to this Agreement, such amounts as the Buyer determines it (or the Company) is required to deduct and withhold with respect to the making of any such payment under the Code or any applicable provision of state, local or foreign law. To the extent that amounts are so deducted and withheld, such deducted and withheld amounts are to be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

ARTICLE III

REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY

Each Seller represents and warrants to Buyer, jointly and severally, that the statements contained in this ARTICLE III are true and correct as of the date hereof, except as set forth in the Schedules numbered to correspond to the Section of this ARTICLE III to which such exception relates:

Section 3.01    Organization and Good Standing.

A.    The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of [Kentucky]. The Company has all requisite corporate power and authority to own, lease and operate the properties and assets it currently owns, leases and operates and to carry on the Business as currently conducted.

B.    The Company is qualified to do business or licensed to do business and is in good standing in each jurisdiction in which its ownership of property or the conduct of the Business as now conducted requires such qualification or license, except to the extent such failure to qualify would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The jurisdictions in which the Company is qualified to do business as a foreign entity are listed on Schedule 3.01(b).

Section 3.02    Power and Authorization. The Company has the requisite power and authority to execute the Ancillary Agreements to which it is a party, and to perform its obligations thereunder. The execution, delivery and performance of the Ancillary Agreements to which the Company is a party have been duly and validly authorized by all required action on behalf of the Company. The Ancillary Agreements to which the Company is a party constitute the valid and binding obligation of the Company enforceable against the Company in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other Legal Requirements relating to or affecting creditors' rights generally or by equitable principles (regardless of whether enforcement is sought at law or in

- 16 -

    CB00382225

equity).  The Company has, in accordance with its Organizational Documents, obtained all approvals necessary for the authorization, execution, delivery and performance of the Ancillary Agreements to which it is a party.

Section 3.03    No Consents; No Conflicts.  Except for any notices, filings, consents or approvals set forth on Schedule 3.03, the execution and delivery of the Ancillary Agreements to which the Company is a party do not and will not, and the performance and compliance with the terms and conditions thereof by the Company and the consummation of the Contemplated Transactions will not (with or without notice or passage of time, or both):

A.      violate, conflict with, result in a breach of or constitute a default under any provisions of the Organizational Documents of the Company or any resolution adopted by [the Board of Managers or] the member of the Company;

B.      (i) violate or conflict with any provision of, (ii) cause a default under, (iii) give rise to, or result in, a right of termination, cancellation or acceleration of any obligation under, (iv) result in the loss by the Company of any material benefits under, (v) result in the creation of any Lien on any of the properties or assets of the Company under, or (vi) require any filing, consent, authorization or approval under, any Legal Requirement, Permit or Contract; or

C.      trigger the termination or material modification or any increased payment under any Contract or Permit.

Section 3.04    Capitalization.

A.      The Shares consist solely of shares of stock, of which as of the date hereof, [●] are issued and outstanding and are owned of record collectively by Sellers in the number set forth on Schedule 3.04.

B.      The Shares are duly authorized and validly issued and fully paid and non-assessable and were issued in conformity with all applicable Legal Requirements, free of restrictions on transfer other than restrictions on transfer under the Organizational Documents of the Company and under applicable Legal Requirements.

C.      Except as set forth in the Organizational Documents of the Company, there are no Contracts (including options, warrants, calls and preemptive rights) obligating the Company (i) to issue, sell, pledge, dispose of or encumber the Shares or any other Equity Interests of the Company, (ii) to redeem, purchase or acquire in any manner any of the Shares or any other Equity Interests of the Company, or (iii) to make any distribution of any kind with respect to the Shares or any other Equity Interests of the Company.

Section 3.05    No Subsidiaries.  Except as set forth on Schedule 3.05, the Company does not own any Equity Interests in any other Person.

Section 3.06    Financial Statements and Other Financial Matters.

- 17 -

Confidential                                                                    CB00382226

A.    The Company has delivered to Buyer true and complete copies of the following financial statements (collectively, the "Financial Statements"), copies of which are attached hereto as Schedule 3.06(a):

    1.    the unaudited balance sheet of the Company as of December 31, 2012, December 31, 2013, December 31, 2014, and July 31, 2015, and the unaudited statements of income, shareholders' equity and cash flows of the Company for the fiscal years then ended and for the partial fiscal year of 2015, from January 1, 2015 through July 31, 2015 (the "Unaudited Financial Statements"); and

    2.    the unaudited balance sheet of the Company as of [●] (the "Latest Balance Sheet" and the date of the Latest Balance Sheet, the "Latest Balance Sheet Date"), and the related unaudited statement of income and cash flows of the Company for the [one]-month period then ended.

B.    The Financial Statements have been prepared (i) in accordance with GAAP applied on a consistent basis throughout the periods covered thereby, subject, in the case of the Unaudited Financial Statements and the Latest Balance Sheet, to the absence of explanatory footnote disclosures and normal non-material year-end adjustments, and fairly present in all material respects the financial condition and results of operations of the Company at the respective dates and for the respective periods described above and (ii) from, and are consistent with, the books and records of the Company unless otherwise required by GAAP as so applied.

C.    All Outstanding Debt of the Company is described on Schedule 3.06(c). The Company is not party to or bound by any letter of credit, surety bond, banker's acceptance or similar reimbursement agreement or Contract except as described on Schedule 3.06(c). The Company is not a party to any off-balance sheet joint venture, off-balance sheet partnership or any similar off-balance sheet agreement where the result, purpose or effect of such agreement is to avoid disclosure of any material transaction involving, or material liabilities of, the Company.

D.    Except as disclosed on Schedule 3.06(d), the Company has no Liabilities of the type required to be reflected on a balance sheet of the Company, prepared in accordance with GAAP except (i) as reflected on the face of the Latest Balance Sheet, (ii) in connection with the Contemplated Transactions, or (iii) in the Ordinary Course of Business since the Latest Balance Sheet Date (none of which results from, arises out of, or relates to any breach or violation of, or default under, a Contract or Legal Requirement or is material).

E.    All accounts receivable reflected on the Latest Balance Sheet and all accounts and notes receivable arising subsequent to the Latest Balance Sheet Date and prior to the Closing Date have arisen in the Ordinary Course of Business, represent legal, valid, binding and enforceable obligations owed to the Company and, subject only to consistently recorded reserves for bad debts set forth on the Latest Balance Sheet, have been, or will be, collected or are, or will be, collectible in the aggregate recorded amounts

- 18 -

Confidential

thereof in accordance with their terms and, to the Company's Knowledge, will not be subject to any contests, claims, counterclaims or setoffs.

Section 3.07    Legal Requirements and Permits.

A.    The Company is, and since January 1, 2012, the Company has been, in compliance in all material respects with all applicable Legal Requirements. The Company has not received notice of any material violation of any Legal Requirement, and the Company is not in default with respect to any Order or award of any court or other Governmental Entity, in each case, applicable to any of its assets, properties or operations or the Contemplated Transactions.

B.    The Company validly holds all Permits necessary for the operation of the Business as currently conducted. The Permits held by the Company are valid and in full force and effect, and the Company is not in default under, and, to the Company's Knowledge, no condition exists that with notice or passage of time or both would constitute a default under any Permit held by the Company.

C.    To the Company's Knowledge, (i) there are no conditions or circumstances relating to any real property currently or formerly owned or leased by the Company for which the Company is reasonably likely to be liable for any material damages, fees or expenses under any Environmental Laws and (ii) no Person has been exposed to any Hazardous Materials in connection with the current or former assets or operations of the Company that is reasonably likely to give rise to material liability under Environmental Laws.

D.    The Company possesses and is in compliance with all Permits required to comply in all material respects with applicable Environmental Laws (the "Environmental Permits"). All such Environmental Permits are in the name of the Company and are in full force and effect, and, to the Company's Knowledge, there are no facts or circumstances, including upon consummation of the transactions contemplated hereby, which will result in the revocation or termination of any Environmental Permit.

E.    The Company has delivered to Buyer true and correct copies of all written third-party environmental assessments, investigations, audit reports, notices and studies relating to the Company or its assets or any real property previously owned, operated or used by the Company or its predecessors that are in the possession or control of the Company.

Section 3.08    Legal Proceedings. There are no Legal Proceedings pending or, to the Knowledge of the Company, threatened against the Company, or, to the Knowledge of the Company, any of its officers, managers, members or employees (in each case, in their capacity as such) or any of the assets of the Company. The Company is not subject to any judgment, Order, arbitration award, temporary or permanent injunction or similar decree of any Governmental Entity. Except as set forth on Schedule 3.08, the Company is not engaged in any Legal Proceedings to recover damages sustained by it. There are no Legal Proceedings pending against the Company, or any of its Affiliates or, to the Knowledge of the Company, threatened against

- 19 -

the Company or any of its Affiliates, in each case, relating to or affecting the Contemplated Transactions or the validity or enforceability of this Agreement or any of the Ancillary Agreements.  The Company has not been held to be a successor to any other entity.

Section 3.09    Tax Matters.

A.    Each of the Company and its Subsidiaries have: (i) except as set forth on Schedule 3.09(a), timely filed all Tax Returns required to be filed by it,  and all such Tax Returns have been properly completed in compliance with all applicable laws, and are true, correct and complete; and (ii) timely paid all Taxes shown to be due on any such Tax Return, and all other Taxes due and payable, except for Taxes being contested in good faith and for which adequate reserves have been established and maintained in accordance with GAAP and reflected on the Financial Statements.

B.    The Company and its Subsidiaries have timely withheld and paid over to the appropriate Taxing Authority all Taxes which it is required to withhold from amounts paid or owing to any employee, shareholders, creditor, holder of securities or other third party, and the Company and its Subsidiaries have complied with all information reporting (including Internal Revenue Service Form 1099) and backup withholding requirements, including maintenance of required records with respect thereto.

C.    The Company and its Subsidiaries have established reserves in accordance with GAAP that are adequate for the payments of all Taxes not yet due and payable or that are being contested in good faith.  Since the date of the Latest Balance Sheet, none of the Company or any of its Subsidiaries has incurred any liability for Taxes other than in the Ordinary Course of Business.

D.    None of the Company or its Subsidiaries has any liability for the Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee, successor or as a result of similar liability, operation of Law, by contract (including any Tax Sharing Agreement) or otherwise. None of the Company or its Subsidiaries has been included in any "consolidated", "unitary", "combined" or similar Tax Return provided for under the United States or any non-U.S. jurisdiction or any state.

E.    None of the Company or its Subsidiaries (i) is a party to, is bound by, or has any obligation under, any Tax Sharing Agreement, or (ii) has any potential liability or obligation (for Taxes or otherwise) to any Person as a result of, or pursuant to, any such Tax Sharing Agreement.

F.    There are no: (i) pending or threatened claims by any Governmental Entity with respect to Taxes relating or attributable to any of the Company or its Subsidiaries; or (ii) deficiencies for any Tax, claim for additional Taxes, or other dispute or claim relating or attributable to any Tax liability of any of the Company or its Subsidiaries claimed, issued or raised by any Taxing Authority that has not been properly reflected in the Financial Statements.

- 20 -

Confidential

G.    There are no Liens relating or attributable to Taxes encumbering (and no Taxing Authority has threatened to encumber) the assets of any of the Company or its Subsidiaries, except for statutory Liens for current Taxes not yet due and payable, or Liens for Taxes being contested in good faith in appropriate proceedings and for which adequate reserves have been established in accordance with GAAP on the Financial Statements.  There are no Liens relating or attributable to Taxes encumbering (and no Taxing Authority has threatened to encumber) the Shares (or other equity interests) in any of the Company or its Subsidiaries

H.    None of the Company or any of its Subsidiaries has waived any statute of limitations for the period of assessment or collection of Taxes, or agreed to or requested any extension of time for the period with respect to a Tax assessment or deficiency, which period (after giving effect to such extension or waiver) has not yet expired.

I.    None of the Company or any of its Subsidiaries will be required to include any item of income in, or exclude any item of deduction from, taxable income for any period ending after the Closing Date as a result of any: (i) change in method of accounting for any period beginning on or prior to the Closing Date pursuant to Section 481 of the Code (or any similar provision of state, local or foreign law); (ii) "closing agreement" as described in Section 7121 of the Code (or any similar provision of state, local or foreign law) executed on or prior to the Closing Date; (iii) installment sale or open transaction disposition made on or prior to the Closing Date; (iv) prepaid income received or accrued on or prior to the Closing Date; or (vi) method of accounting that defers the recognition of income to any period ending after the Closing Date.

J.    None of the Company or any of its Subsidiaries (i) is a party to, is bound by, or has any obligation under, any closing or similar agreement, Tax abatement or similar agreement or any other agreements with any Taxing Authority with respect to any period for which the statute of limitations has not expired and (ii) has any potential liability or obligation (for Taxes or otherwise) to any Person as a result of, or pursuant to, any such agreement.

K.    None of the Company or any of its Subsidiaries has (i) taken a reporting position on a Tax Return that, if not sustained, could be reasonably likely to give rise to a penalty for substantial understatement of federal income Tax under Section 6662 of the Code (or any similar provision of state, local or foreign law), (ii) entered into any transaction identified as a (x) "listed transaction," within the meaning of Treasury Regulations Sections 1.6011-4(b)(2), (y) a "transaction of interest," within the meaning of Treasury Regulations Section 1.6011-4(b)(6), or (z) any transaction that is "substantially similar" (within the meaning of Treasury Regulations Section 1.6011-4(c)(4)) to a "listed transaction" or "transaction of interest," or (iii) entered into any other transaction that required or will require the filing of an IRS Form 8886.

L.    No power of attorney related or attributable to Taxes that currently is in effect has been granted by any of the Company or its Subsidiaries.

- 21 -

CB00382230

M.     The Company has delivered or made available to the Buyer: (i) correct and complete copies of all Tax Returns required to be filed by each of the Company and its Subsidiaries for which the statute of limitations has not expired; (ii) all Tax abatement or similar agreements (or any other agreements) with any Taxing Authority to which the Company or any of its Subsidiaries is a party (and for which any of the Company or its Subsidiaries could have any Tax or other liability thereunder); and (iii) all revenue agent's reports, notices or proposed notices of deficiency or assessment, audit reports, information document requests, material correspondence and other similar documentation relating to Taxes or Tax Returns of each of the Company and its Subsidiaries relating to any period for which the statute of limitations has not expired.

N.     None of the Company or its Subsidiaries has distributed stock of another Person, or had its stock distributed by another Person in a transaction intended or purported to be governed, in whole or in part, by Section 355 of the Code or Section 361 of the Code.

O.     None of the Company or any of its Subsidiaries has made or rescinded any Tax election, changed any annual accounting period, adopted or changed any method of accounting or reversed any accruals (except as required by a change in law or GAAP), filed any amended Tax Returns, signed or entered into any closing agreement or settlement, settled or compromised any claim or assessment of Tax liability, surrendered any right to claim a refund, offset or other reduction in liability, consented to any extension or waiver of the limitations period applicable to any claim or assessment, in each case with respect to Taxes, or acted or omitted to act where such action or omission to act could reasonably be expected to have the effect of increasing any present or future Tax liability or decreasing any present or future Tax benefit for the Company or any of its Subsidiaries.

P.     Except as set forth on Schedule 3.09(p), none of the Company or its Subsidiaries have or have had taxable presence in any jurisdiction other than jurisdictions for which Tax Returns have been duly filed and Taxes have been duly and timely paid, and no claim has been made by a Taxing Authority in a jurisdiction where any of the Company or its Subsidiaries does not file Tax Returns and pay Taxes that any such Company or Subsidiary is or may be subject to any Tax Return filing requirements or taxation by that jurisdiction.

Q.     The Company has had in effect at all times since its formation a valid election under Section 1362(a) of the Code (and applicable provisions of state and local law) to be treated as an S corporation within the meaning of Section 1361 of the Code (and applicable provisions of state and local law), and each such election under Section 1362(a) of the Code (and applicable provisions of state and local law) will be in effect on the Closing Date (and the Company is, and will be through and including the Closing Date, an S corporation within the meaning of Section 1361 of the Code (and applicable provisions of state and local law)). Up to and including the Closing Date, neither the Sellers nor the Company will take (or fail to take) or allow to be taken any action that would result in the termination of the Company's election under Section 1362(a) (and applicable provisions of state and local law) to be treated as an S Corporation within the

- 22 -

Confidential                                                                      CB00382231

meaning of Section 1361 of the Code (and applicable provisions of state and local law). None of the Company or any of its Subsidiaries have, in the past ten (10) years, (i) acquired assets from another corporation in a transaction in which the transferee's tax basis for the acquired assets was determined in whole or in part by reference to the tax basis of the acquired assets (or any other property) in the hands of the transferor or (ii) acquired the stock of any corporation which is a qualified subchapter S subsidiary (within the meaning of Code Section 1361(b)(3)(B)).

R.      The Company does not have any liability under Section 1375 of the Code (or corresponding provisions of state or local law).

S.      US Finals, LLC has made a valid and effective election under Section 754 of the Code (and applicable provision of state and local law).

T.      For U.S. federal income tax purposes, the Company (i) has treated US Finals, LLC and US Finals, LLC is properly treated, as a partnership (and not as a corporation or an entity that is disregarded from its owner) and (ii) each of the Subsidiaries (other than US Finals, LLC), and each such Subsidiary is properly treated as an entity that is disregarded from its owner (and not as a corporation or partnership).

Section 3.10    Employee Benefit Plans.

A.      Schedule 3.10(a) contains a correct and complete list of each "employee benefit plan" within the meaning of Section 3(3) of ERISA and all other employee compensation and benefits plans, policies, programs, arrangements or payroll practices, including multiemployer plans within the meaning of Section 3(37) of ERISA, and each other stock purchase, stock option, restricted stock, severance, retention, employment, consulting, change-of-control, collective bargaining, bonus, incentive, deferred compensation, employee loan, fringe benefit and other benefit plan, agreement, program, policy, commitment or other arrangement, whether subject to ERISA (including any related funding mechanism now in effect or required in the future) or not, whether formal or informal, oral or written, in each case sponsored, maintained, contributed or required to be contributed to by the Company or under which the Company has any current or potential liability. All such plans, agreements, programs, policies, commitments and arrangements are collectively referred to as the "Employee Benefit Plans".

B.      The Company has delivered to Buyer, with respect to each and every Employee Benefit Plan, a true and complete copy of all plan documents, if any, including related trust agreements, funding arrangements, and insurance Contracts and all amendments thereto; and, to the extent applicable, (i) the most recent determination letter, if any, received by the Company from the IRS regarding the tax-qualified status of such Employee Benefit Plan; (ii) the current summary plan description and any summaries of material modifications; and (iii) Form 5500 Annual Returns/Reports.

C.      No Employee Benefit Plan is subject to Title IV or Section 302 of ERISA or Sections 412 or 4971 of the Code. To the Company's Knowledge, no event has occurred and no condition exists that would subject the Company by reason of its

- 23 -

                                                                      CB00382232

affiliation with any current or former member of its ERISA Affiliates to any (i) Tax, penalty, fine, (ii) Lien (other than a Permitted Lien) or (iii) other material liability imposed by ERISA, the Code or other applicable Legal Requirements.  No Employee Benefit Plan is a "multiemployer plan" as defined in Section 3(37) of ERISA, and none of the Company or any ERISA Affiliate has withdrawn at any time within the preceding six (6) years from any multiemployer plan, or incurred any withdrawal liability which remains unsatisfied, and no events have occurred and no circumstances exist that could reasonably be expected to result in any such liability to the Company or any ERISA Affiliate.

D.      With respect to each Employee Benefit Plan that is intended to qualify under Section 401(a) of the Code, such plan, and its related trust, has received, has an application pending or remains within the remedial amendment period for obtaining, a determination letter (or opinion letters in the case of any prototype plans) from the IRS that it is so qualified and that its trust is exempt from Tax under Section 501(a) of the Code, and, to the Company's Knowledge, nothing has occurred with respect to the operation of any such plan which could cause the loss of such qualification or exemption or the imposition of any material liability, penalty or Tax under ERISA or the Code.

E.      Each Employee Benefit Plan has been established and administered in accordance with its terms and in compliance in all material respects with the applicable provisions of ERISA, the Code and other applicable Legal Requirements.  There are no pending or, to the Knowledge of the Company, threatened actions, claims or lawsuits against or relating to the Employee Benefit Plans, the assets of any of the trusts under such plans or the plan sponsor or the plan administrator, or against any fiduciary of the Employee Benefit Plans with respect to the operation of such plans (other than routine benefits claims).

F.      None of the Employee Benefit Plans provide retiree health or life insurance benefits except as may be required by Section 4980B of the Code and Section 601 of ERISA, any other applicable Legal Requirement or at the expense of the participant or the participant's beneficiary.  There has been no violation of the "continuation coverage requirement" of "group health plans" as set forth in Section 4980B of the Code and Part 6 of Subtitle B of Title I of ERISA with respect to any Employee Benefit Plan to which such continuation coverage requirements apply.

G.      None of the transactions contemplated by this Agreement (alone or in conjunction with any other event, including any termination of employment on or following the Closing) will (i) entitle any current or former employee of the Company to any compensation or benefit, (ii) accelerate the time of payment or vesting, or trigger any payment or funding, of any compensation or benefit, or (iii) result in any breach or violation of, or default under, or limit the Company's right to amend, modify or terminate, any Employee Benefit Plan.

H.      Each Employee Benefit Plan that is a "non-qualified deferred compensation plan" (as such term is defined in Section 409A(d)(1) of the Code) is in a written form that materially complies with, and has been administered in material

- 24 -

compliance with, the requirements of Section 409A of the Code, the final regulations promulgated and in effect thereunder, and applicable guidance issued thereunder. No current or former employee or director the Company is entitled to receive any gross-up or additional payment by reason of the Tax required by Section 409A of the Code being imposed on such Person.

Section 3.11    Employees; Employment Matters.

A.    The Company has provided Buyer with a true and complete list of the names, positions and current annual salary or hourly rate, and applicable commission rates, of all officers and employees of the Company.  All employees of the Company can be terminated "at will" without penalty or notice from the Company subject to (i) Legal Requirements and (ii) the employment contracts listed on Schedule 3.11(a).

B.    The Company is not a party to any collective bargaining agreement or other labor union contract applicable to employees of the Company and, to the Knowledge of the Company, there are no activities or proceedings of any labor union to organize any such employees.  There is no (i) unfair labor practice charge or complaint pending before any applicable Governmental Entity relating to the Company or any employee thereof or (ii) labor strike, material slowdown or material work stoppage or lockout pending or, to the Knowledge of the Company, threatened against or affecting the Company.

C.    Since January 1, 2012, there has been no "mass layoff" or "plant closing" as defined by the Worker Adjustment and Retraining Notification Act or any similar state or local "plant closing" Legal Requirement with respect to the current or former employees of the Company.

Section 3.12    Contracts.

A.    Schedule 3.12(a) sets forth a correct and complete list of the following Contracts (including any amendments, supplements or modifications thereto) (each a "Material Contract") to which the Company is a party or bound or which is binding on any of its material assets, other than those that have terminated in accordance with their terms or that have no continuing rights or obligations thereunder:

1.    each master service agreement or similar customer Contract between the Company and the customers identified on Schedule 3.13, and each project of the Company estimated, as of the date hereof, to generate future gross revenue to the Company in excess of $[50,000] per annum;

2.    each Real Property Lease;

3.    each Contract (or group of related Contracts with respect to a single transaction or series of related transactions) pursuant to which the Company currently leases personal property (including rolling stock) to or from any Person providing for lease payments or other payments in excess of $[50,000] per annum;

- 25 -

CB00382234

4.      each Contract or group of related Contracts with respect to a single transaction or series of related transactions (other than a customer Contract, a Real Property Lease or a personal property lease) that cannot be terminated without penalty and involves future payments, performance of services or delivery of goods or materials to or by the Company of any amount or value reasonably expected to exceed $[50,000] in any future twelve (12)-month period;

5.      each joint venture, partnership, limited liability company or other agreement involving a sharing of profits, losses, costs or liabilities by the Company with any other Person, including employees;

6.      each Contract that limits the freedom of the Company to compete in any line of business, to compete within any geographic area or restricts the Company's ability to solicit or hire any person as an employee or to solicit business from any Person;

7.      each Contract of the Company relating to Outstanding Debt or the imposition of any Lien (other than Permitted Liens) on any of the Company's assets;

8.      each license under which the Company has received a license to any third party Intellectual Property rights that are embedded in the services of the Company and material to the functionality or present use of such services, excluding all off-the-shelf software; and

9.      each other Contract that is material to the Business not otherwise disclosed above.

B.      True and complete copies of each Material Contract (including all amendments and modifications) have been delivered to Buyer.  With respect to each Material Contract, (i) such Material Contract is the legal and valid obligation of the Company and, to the Knowledge of the Company, of each other party thereto, enforceable against the Company and, to the Knowledge of Company, each other party thereto, in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other Legal Requirements relating to or affecting creditors' rights generally or by equitable principles (regardless of whether enforcement is sought at law or in equity) and (ii) such Material Contract is in full force and effect.  None of the Company, or, to the Knowledge of the Company, any other Person is in material breach or default under any Material Contract and, to the Knowledge of the Company, no event has occurred (including any event with notice or passage of time, or both) that is reasonably likely to give rise to a material breach or default, or permit termination or material modification or acceleration under any such Material Contract.

Section 3.13    Customers and Vendors.  Schedule 3.13 sets forth a true and complete list of (a) the twenty (25) largest customers of the Company (based on revenue received by the Company in 2015 to date) and (b) the twenty (20) largest vendors of the

- 26 -

Company on a consolidated basis (based on dollar volume of purchases from such vendors in 2015 to date). None of the customers or vendors listed on Schedule 3.13 has expressed its intention to discontinue or materially and adversely alter its relationship with the Company (including its willingness to do business with the Company). No customer or supplier of the Company has notified the Company that it is unable to or will not comply with or satisfy its obligations to the Company.

Section 3.14    Real Property.

A.    The Company does not own any real property.

B.    Schedule 3.14(b) sets forth a true and complete list of all Real Property Leases to which the Company is a party or is bound. The leasehold estates covered by the Real Property Leases constitute the only real property that is currently used by the Company. True, correct and complete copies of all Real Property Leases have been delivered to Buyer. All such Real Property Leases are in full force and effect, are valid and effective in accordance with their respective terms, and there is not, under any of such leases, any existing default or event of default (or event which, with notice or lapse of time, or both, would constitute a default) by the Company or, to the Knowledge of the Company, by the other party to such Real Property Lease. To the Knowledge of the Company, each parcel of real property leased by the Company pursuant to the Real Property Leases is neither subject to any decree or order of a Governmental Entity to be sold nor is being condemned, expropriated or otherwise taken by any public authority, nor, to the Knowledge of the Company, has any such condemnation, expropriation or taking been proposed. The Real Property Leases grant to the Company the right to use and occupy the premises demised thereunder, and the Company has not entered into any lease or sublease granting any third party the right to occupy or use (or the option to exercise the right to occupy or use) all or any portion of such premises.

Section 3.15    Personal Property.

A.    The Company is vested with good title in and to, or valid right to use, each item of equipment, power supplies, power generators, security systems, HVAC systems, machinery, supply, furniture, computer hardware, raw material, inventory, motor vehicle, car, truck, tractor, trailer and other rolling stock and each other item of tangible personal property reflected on the Latest Balance Sheet (other than items sold or otherwise disposed of in the Ordinary Course of Business since the Latest Balance Sheet Date) (the "Tangible Personal Property"), and the Company's title thereto is free and clear of all Liens other than Permitted Liens.

B.    All Tangible Personal Property having a value individually exceeding $25,000 or involving payments for the right to use exceeding $1,000 per month is in good working order and repair, ordinary wear and tear excepted.

Section 3.16    Sufficiency of Assets. The assets listed on the Latest Balance Sheet (other than items sold or otherwise disposed of in the Ordinary Course of Business since the Latest Balance Sheet Date) comprise all of the assets, properties and rights of every type and

- 27 -

Confidential

description, whether real or personal, tangible or intangible, that are used or necessary to the conduct of the Business and are adequate to conduct the Business as currently conducted.

Section 3.17    Intellectual Property.

A.    Schedule 3.17(a) sets forth a true and complete list of all Registered Intellectual Property. All such Registered Intellectual Property is valid, subsisting and enforceable.

B.    The Company owns all right, title and interest in and to, or has the valid right to use, all Company Intellectual Property. The Company Intellectual Property constitutes all of the Intellectual Property rights necessary for the operation of the Business in the manner in which it has been operated prior to the Closing. Neither the Owned Intellectual Property nor the operation of the Business infringes, misappropriates or otherwise violates the Intellectual Property rights of any other Person, and to the Company's Knowledge, no Person is infringing, misappropriating or otherwise violating the Company Intellectual Property. There are no pending or, to the Company's Knowledge, threatened claims by any Person against the Company alleging that the use of any Intellectual Property by the Company infringes, misappropriates or interferes with the Intellectual Property rights of such Person, and, to the Company's Knowledge, there is no basis for any of the foregoing to occur. The Company is in material compliance with all hosting, internet access and other agreements pertaining to Company Intellectual Property.[5]

C.    Schedule 3.17(c) sets forth a correct and complete list of all Proprietary Software. Except as set forth on Schedule 3.17(c), no third party has been granted any right to use any Proprietary Software except pursuant to the Company's standard commercial agreements entered into in the Ordinary Course of Business. The Company owns all right, title and interest in and to all Proprietary Software. All Proprietary Software was developed by employees, contractors or consultants of the Company who have executed enforceable, written agreements assigning all right, title and interest in and to all such Proprietary Software to the Company.

D.    Schedule 3.17(d) identifies all Open Source Software that is used by the Company. Except as set forth on Schedule 3.17(d), the Company's use of any Open Source Software has not created any obligations for the Company with respect to any Proprietary Software of the Company or has granted to any third party, any rights or immunities under any Company Intellectual Property (including, but not limited to, by using any Open Source Software that require, as a condition of use, modification and/or distribution of such Open Source Software that other software incorporated into, derived from or distributed with such Open Source Software be (i) disclosed or distributed in source code form; (ii) be licensed for the purpose of making derivative works; or (iii) be redistributable at no charge).

---

[5] RS Note: Pending Supplemental Request response on outstanding IP questions.

Confidential                                                                                                CB00382237

E.    The Company uses commercially available antivirus software with the intention of protecting the Proprietary Software from becoming infected by viruses and other harmful code. To the Company's Knowledge, the Proprietary Software does not contain any computer code that is designed and has the ability to disrupt, disable, harm, distort or otherwise impede the legitimate operations of such software products by or for the Company or its authorized users.

F.    Schedule 3.17(f) sets forth a correct and complete list of all software, databases, applications and programs licensed to the Company by third parties (the "Licensed Software"), other than off-the-shelf shrink-wrap software that is licensed in executable or object code form pursuant to a nonexclusive software license. The Company's use of the Licensed Software is in material compliance with all applicable license agreements.

G.    The Company has taken commercially reasonable steps to maintain the confidentiality of its material trade secrets. None of the Company's material trade secrets have been disclosed to any third party, except pursuant to written confidentiality obligations.

H.    The Company has materially complied with all applicable Legal Requirements, as well as its own rules, policies and procedures, relating to privacy, data protection, and the collection, use, storage and disposal of personal information collected, used, or held for use by the Company in the conduct of the Business.

Section 3.18    Insurance.

A.    Schedule 3.18(a) sets forth a complete list of the policies of insurance and self-insurance arrangements currently maintained by the Company, as well as the insurance companies, policy numbers, aggregate coverage amount and type, and deductibles of all material policies of title, liability, fire, casualty, business interruption, workers' compensation and other forms of insurance insuring the Company and its employees, assets and equity interests as of the date hereof. The Company has delivered to Buyer true and correct copies of all such insurance policies and self-insurance arrangements.

B.    All policies listed on Schedule 3.18(a) are in full force and effect. All premiums due with respect to all periods to and including the date hereof have either been paid or adequate provision for the payment by the Company thereof has been made. The Company is not in default under any provisions of any such policy of insurance. The Company has not canceled, received notice of any material increase of the premiums with respect to, cancelation of, non-renewal or, to the Knowledge of the Company, threatened cancelation or non-renewal of any such policy such insurance without replacement thereof.

C.    Schedule 3.18(c) sets forth a list of all material claims (other than health insurance claims) made since January 1, 2010 by the Company under any insurance policy maintained by the Company. There are no claims (other than health insurance

- 29 -

claims) by the Company under any of such policies relating to the Business, assets or properties of the Company as to which any insurance company is denying (or has denied) liability or defending, questioning or disputing under a reservation of rights or similar clause and all such claims have been satisfied or are pending with an insurance carrier.

Section 3.19   Absence of Certain Developments. Since December 31, 2014, (a) no event, change, fact, condition or circumstance has occurred or arisen that has had, or would reasonably be expected to have, a Material Adverse Effect, and (b) except as disclosed on Schedule 3.19, the Business has been conducted solely in the Ordinary Course of Business and the Company has not suffered any loss, damage, or destruction, whether covered by insurance or not, with respect to any of its material assets or the Business.

Section 3.20   Related Party Transactions. Except for the matters disclosed on Schedule 3.20, no member of the Company or Affiliate of any member of the Company and no officer or manager of the Company (or, to the Company's Knowledge, any Related Person of any such Person who is an individual or any entity in which any such Person or any such Related Person thereof owns a material interest): (a) has any interest in any asset owned or leased by the Company or used in connection with the Business, or (b) has engaged in any transaction, arrangement or understanding with the Company (other than payments made to, and other compensation provided to, officers and managers of the Company in the Ordinary Course of Business).

Section 3.21   Absence of Illegal Payments.  Neither the Company nor any of its Affiliates or Representatives on behalf of the Company has (a) directly or indirectly, given, or agreed to give, any illegal gift, contribution, payment or similar benefit to any supplier, customer, governmental official or employee or other Person who was, is or may be in a position to help or hinder the Company (or assist in connection with any actual or proposed transaction) or made, or agreed to make, any illegal contribution, or reimbursed any illegal political gift or contribution made by any other Person, to any candidate for federal, state, local or foreign public office or (b) established or maintained any unrecorded fund or asset or made any false entries on any books or records for any purpose.

Section 3.22   Books and Records. The books of account, minute books, records of equity, and other business records of the Company, all of which have been provided to Buyer, are complete and accurate and have been maintained in accordance with sound business practices and applicable Legal Requirements.  The minute books of the Company contain accurate and complete records of all meetings held, and action taken by, the members or other holders of Equity Interests of the Company, [the Board of Directors and committees of the Board of Directors of the Company], and no meeting of any such members or other holders of Equity Interests of the Company, [Board of Directors or committee has been held for which minutes have not been prepared and are not contained in such minute books.  At the Closing, all of such books and records will be in the possession of the Company.

Section 3.23   Brokers. Except as set forth on Schedule 3.23, the Company is not liable for any investment banking fee, finder's fee, brokerage payment or other like payment in connection with the origination, negotiation or consummation of the Contemplated Transactions.

- 30 -

Confidential

Section 3.24   Disclosure. No representation, warranty or statement contained in this Agreement or any document, agreement or certificate furnished by the Company pursuant to this Agreement contains any untrue statement of material fact or omits to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller represents and warrants to Buyer, jointly and severally, that the statements contained in this ARTICLE IV are true and correct as of the date hereof, except as set forth in the Schedules numbered to correspond to the Section of this ARTICLE IV to which such exception relates:

Section 4.01   Power and Authorization. Each Seller has the requisite power and authority to execute this Agreement and the Ancillary Agreements to which he is a party, and to perform his obligations hereunder and thereunder. The execution, delivery and performance of this Agreement and the Ancillary Agreements to which each Seller is a party have been duly and validly authorized by all required action on behalf of each Seller. This Agreement and each of the Ancillary Agreements to which each Seller is a party constitute the valid and binding obligation of each Seller enforceable against each Seller in accordance with their terms, except as enforceability may be limited by bankruptcy or other Legal Requirements relating to or affecting creditors' rights generally or by equitable principles (regardless of whether enforcement is sought at law or in equity).

Section 4.02   No Violations.  The execution and delivery of this Agreement by each Seller and the Ancillary Agreements to which each such Seller is a party does not and will not, and the performance and compliance with the terms and conditions hereof and thereof by each such Seller and the consummation of the Contemplated Transactions by each such Seller will not (with or without notice or passage of time, or both) violate, conflict with, result in a breach or constitute a default under any provision of, or require any notice, filing, consent, authorization or approval under, any Legal Requirement binding upon each such Seller, any Permit or any Contract to which each Seller is a party or which each such Seller or its assets are otherwise bound or subject.

Section 4.03   Legal Proceedings.  There are no Legal Proceedings pending or, to the Knowledge of each Seller, threatened, nor is any Seller subject to any judgment, Order, arbitration award, temporary or permanent injunction or similar decree of any Governmental Entity, in all such cases, that (a) challenge the validity or enforceability of any Seller's obligations under this Agreement or the Ancillary Agreements to which each Seller is a party or (b) seek to prevent, delay or otherwise would reasonably be expected to adversely affect the consummation by each Seller of the Contemplated Transactions.

Section 4.04   Ownership of Shares.

- 31 -

CB00382240

A.    Sellers collectively own all of the Shares and are selling and delivering such Shares to Buyer free and clear of all Liens other than Permitted Liens. Upon consummation of the Contemplated Transactions, Buyer shall own all of the outstanding Equity Interests in the Company, free and clear of all Liens (other than Permitted Liens and Liens created by Buyer).

B.    Except for this Agreement, (i) the Shares are not subject to any preemptive rights, rights of first refusal, rights of rescission, or similar rights and (ii) there are no outstanding equity awards, options, warrants, calls, rights, exchangeable or convertible securities, commitments or agreements of any character, written or oral, relating to such Interests.

Section 4.05    Brokers' Fees.  No Seller is liable for any investment banking fee, finder's fee, brokerage payment or other like payment in connection with the origination, negotiation or consummation of the Contemplated Transactions.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers that the statements contained in this ARTICLE V are true and correct as of the date hereof, except as set forth in the Schedules numbered to correspond to the Section of this ARTICLE V to which such exception relates:

Section 5.01    Organization and Good Standing.  Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Tennessee.

Section 5.02    Power and Authorization.  Buyer has the requisite power and authority to execute this Agreement and the Ancillary Agreements to which it is a party, and to perform its obligations hereunder and thereunder.  The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Buyer is a party have been duly and validly authorized by all required action on behalf of Buyer.  This Agreement and each of the Ancillary Agreements to which Buyer is a party constitute the valid and binding obligation of Buyer enforceable against Buyer in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other Legal Requirements relating to or affecting creditors' rights generally or by equitable principles (regardless of whether enforcement is sought at law or in equity).  Buyer has, in accordance with its Organizational Documents, obtained all approvals necessary for the authorization, execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is a party.

Section 5.03    No Violations.  The execution and delivery of this Agreement by Buyer and the Ancillary Agreements to which Buyer is a party does not and will not, and the performance and compliance with the terms and conditions hereof and thereof by Buyer and the consummation of the Contemplated Transactions by Buyer will not (with or without notice or passage of time, or both):

- 32 -

CB00382241

      A.     violate or conflict with any of the provisions of any of Buyer's Organizational Documents; or

      B.     violate, conflict with, result in a breach or constitute a default under any provision of, or require any notice, filing, consent, authorization or approval under any Legal Requirement binding upon Buyer, Permit or any Contract to which Buyer is a party or which it or its assets are otherwise bound or subject.

      **Section 5.04    Legal Proceedings.**  There are no Legal Proceedings pending or, to the Knowledge of Buyer, threatened, nor is Buyer subject to any judgment, Order, arbitration award, temporary or permanent injunction or similar decree of any Governmental Entity, in all such cases, that (a) challenge the validity or enforceability of Buyer's obligations under this Agreement or the Ancillary Agreements to which Buyer is a party or (b) seek to prevent, delay or otherwise would reasonably be expected to adversely affect the consummation by Buyer of the Contemplated Transactions.

      **Section 5.05    Brokers' Fees.**  Buyer is not liable for any investment banking fee, finder's fee, brokerage payment or other like payment in connection with the origination, negotiation or consummation of the Contemplated Transactions.

ARTICLE VI

COVENANTS OF THE PARTIES

      **Section 6.01    Further Assurances.**  From and after the Closing Date, upon the request of any Party hereto, each other Party shall do, execute, acknowledge and deliver all such further acts, assurances, deeds, assignments, transfers, conveyances and other instruments and papers as may be reasonably required or appropriate to carry out the Contemplated Transactions.

      **Section 6.02    Confidential Information.**

      A.     The Parties agree that any confidentiality obligations set forth in that certain [Term Sheet] dated [●] shall immediately terminate as of the Closing.

      B.     Each Seller agrees (i) to refrain from, either alone or in conjunction with any other Person, or directly or indirectly, through its Affiliates, disclosing to any Person or using for any purpose, any confidential, proprietary or secret information relating to Buyer and (ii) to refrain from, either alone or in conjunction with any other Person, or directly or indirectly, through its Affiliates, disclosing to any Person or using for any purpose, any confidential, proprietary or secret information relating to the Company or the Business, provided, that the foregoing shall not apply to disclosure required by applicable Legal Requirements.  For purposes of this Section 6.02, "confidential, proprietary or secret information" means any information relating to Buyer or the Company, as applicable, including all client data, financial data, marketing information, Tax Returns, Intellectual Property, business policies, procedures, techniques, business plans and related documents, customer or client lists, Contracts, projections, pricing information, any data on or relating to past, present and prospective customers or clients,

- 33 -

CB00382242

and any and all other materials and information relating to or dealing with business operations or activities, but in any event does not include any information (x) that is or becomes generally available to the public or the industry in which Buyer or the Company, as applicable, competes (other than as a result of a breach of this <u>Section 6.02</u>) or (y) becomes available to any Seller or its Affiliates from a third party after the Closing not bound by a confidentiality agreement or any legal, fiduciary or other obligation restricting the disclosure of such information.

Section 6.03    Public Announcements. No Party shall, nor shall any of their respective Affiliates, without the approval of the other Parties hereto, issue any press releases or otherwise make any public statements with respect to the Contemplated Transactions, except as may be required by applicable Legal Requirements or applicable stock exchange requirements; <u>provided</u> that each of the Parties and their respective Affiliates may (i) make internal announcements to their respective employees regarding the Contemplated Transactions and (ii) provide general information about the subject matter of this Agreement (including the Purchase Price, other financial terms and indemnification provisions) and the Ancillary Agreements to their respective investors and in connection with their or their Affiliates' fund raising activities.

Section 6.04    Restrictive Covenants.

A.    During the period beginning on the Closing Date and ending on the fifth anniversary thereof (the "<u>Non-Competition Period</u>"), Sellers shall not, in the United States, Canada, Mexico, Chile, Japan, Sweden, or the United Kingdom[6], directly or indirectly, in any capacity, render services, engage or have a financial interest in, any business that is competitive with the Business. <u>Schedule 6.04(a)</u> sets forth a list of current entities that are not considered competitive with the Business for purposes of this Section 6.04.

B.    During the Non-Competition Period, Sellers shall not directly or indirectly, (i) induce or seek to induce any customer, supplier or other third party having business dealings with the Company as of the Closing, to cease to do business with the Company or otherwise vary the terms of its relationship with the Company or (ii) solicit or offer to employ or contract with any Person who was an employee or independent contractor of the Company as of the Closing or during the twelve (12) month period prior to the Closing Date; <u>provided</u>, <u>however</u>, that clause (ii) of this <u>Section 6.04B</u> shall not prohibit a general solicitation to the public through general advertising or similar methods of solicitation not specifically directed at employees of the Company but shall prohibit the hiring of any such employees.

C.    The Parties recognize that the Legal Requirements and public policies of the various states of the United States and other jurisdictions may differ as to the validity and enforceability of covenants similar to those set forth in this <u>Section 6.04</u>. It is the intention of the Parties hereto that the provisions of this <u>Section 6.04</u> be enforced to the fullest extent permissible under the Legal Requirements and policies of each jurisdiction in which enforcement may be sought, and that the unenforceability (or the modification

---

[6] RS Note: May have to expand the restrictive covenant.

Confidential

CB00382243

to conform to such Legal Requirements or policies) of any provisions of this Section 6.04 shall not render unenforceable, or impair, the remainder of the provisions of this Section 6.04. Accordingly, if any provision of this Section 6.04 shall be determined to be invalid or unenforceable, such invalidity or unenforceability shall be deemed to apply only with respect to the operation of such provision in the particular jurisdiction in which such determination is made and not with respect to any other provision or jurisdiction. The Parties hereto (i) have carefully read and understand all of the provisions of this Agreement and have had the opportunity for this Agreement to be reviewed by counsel and (ii) acknowledge that the duration, geographical scope and subject matter of this Section 6.04 are reasonable and necessary to protect the goodwill, customer relationships, legitimate business interests, trade secrets and confidential information of the Company.

D.    The Parties to this Agreement acknowledge and agree that any remedy at Law for any breach of the provisions of this Section 6.04 will be inadequate, and Sellers hereby agree that Buyer shall have the right to seek equitable relief, including the issuance of a temporary or permanent injunction by a court of competent jurisdiction, without a requirement for a posting of bond.

Section 6.05    Dissolution of Jam Active.  Prior to December 31, 2015, the Sellers shall cause Jam Active to be dissolved with the Secretary of State of the Commonwealth of Kentucky, as well as to take all necessary actions to formally withdraw from any jurisdiction in which Jam Active is qualified to do business.  Within thirty (30) days of the final dissolution of Jam Active, the Sellers shall provide the Buyer with evidence (reasonably satisfactory to the Buyer) of such dissolution, including but not limited to certificates of dissolution, termination certificates, tax clearance notifications and other similar notices.

## ARTICLE VII

## SURVIVAL AND INDEMNIFICATION

Section 7.01    Survival.

A.    All representations and warranties made by the Parties in this Agreement shall expire on the date which is the [seventeen (17) month] anniversary of the Closing Date, other than (i) the representations and warranties set forth in (A) Section 3.01 (Organization and Good Standing), Section 3.02 (Power and Authorization), Section 3.03 (No Consents; No Conflicts), Section 3.04 (Capitalization) and Section 3.05 (No Subsidiaries), Section 4.01 (Power and Authorization), Section 4.02 (No Violations) and Section 4.04 (Ownership of Shares) (collectively, the "Seller Fundamental Representations"), and (B) Section 5.01 (Organization and Good Standing), Section 5.02 (Power and Authorization) and Section 5.03 (No Violations), all of which shall survive indefinitely, and (ii) Section 3.07C through (e), inclusive (Legal Requirements and Permits), Section 3.09 (Tax Matters), and Section 3.10 (Employee Benefit Plans), all of which shall survive until the date that is sixty (60) days after the applicable expiration of the applicable statute of limitations (taking into account all extensions thereof).

- 35 -

CB00382244

B.    All covenants and agreements contained in this Agreement, any Ancillary Agreement, or any certificate, document or instrument delivered in connection herewith, shall survive the Closing in accordance with its terms, or if no term is specified, for a period of five (5) years.

Section 7.02    Indemnification.

A.    Indemnification by Sellers.  Subject to the limitations set forth in this ARTICLE VII, Sellers shall jointly and severally indemnify and hold harmless Buyer and each of its Affiliates, and the Representatives, successors and assigns of each of the forgoing Persons (each a "Buyer Indemnified Party" and collectively, the "Buyer Indemnified Parties"), from and against any and all Losses and any and all Legal Proceedings (including costs of investigation, defense and enforcement of this Agreement), whether involving a claim by a third party (a "Third Party Claim") or not, incurred or suffered by any Buyer Indemnified Party as a result of, arising out of or relating to, directly or indirectly, (i) any breach of, or inaccuracy in, any representation or warranty set forth in ARTICLE III  and ARTICLE IV of this Agreement (in each case, assuming that all qualifications as to materiality, including each qualifying reference to the defined term "Material Adverse Effect", the phrase "substantial compliance", the words "material" and "materially" and all similar phrases and words were deleted therefrom), (ii) any fraud or intentional misrepresentation by any Seller, (iii) any breach of any covenant or agreement of any Seller made pursuant to this Agreement or the Ancillary Agreements, or (iv) all Pre-Closing Taxes.

B.    Indemnification by Buyer.  Subject to the limitations set forth in this ARTICLE VII, Buyer shall indemnify and hold harmless each of the Seller Indemnified Parties from and against any and all Losses and any and all Legal Proceedings (including costs of investigation, defense and enforcement of this Agreement), whether involving a Third Party Claim or not, incurred or suffered by any Seller Indemnified Party, as applicable, as a result of, arising out of or relating to, directly or indirectly, (i) any breach of, or inaccuracy in, any representation or warranty set forth in ARTICLE V of this Agreement (in each case, assuming that all qualifications as to materiality, including each qualifying reference to the defined term "Material Adverse Effect", the phrase "substantial compliance", the words "material" and "materially" and all similar phrases and words were deleted therefrom), (ii) any fraud or intentional misrepresentation by Buyer, or (iii) any breach of any covenant or agreement of Buyer made pursuant to this Agreement or the Ancillary Agreements.

Section 7.03    Limitations on Indemnification.  Notwithstanding anything to the contrary herein, the rights to indemnification pursuant to the provisions of this ARTICLE VII are subject to the following limitations, as applicable:

A.    the Buyer Indemnified Parties shall not be entitled to recover Losses with respect to a claim under Section 7.02A unless the aggregate amount of Losses suffered by the Buyer Indemnified Parties with respect to claims under Section 7.02A exceeds one hundred thousand dollars ($100,000), in which case the Buyer Indemnified Parties would recover all of such Losses; provided, however, that this Section 7.03A shall not apply to

- 36 -

Confidential                                                                                    CB00382245

any claim for indemnification pursuant to Section 7.02A to the extent such claim is based upon a breach of or inaccuracy in any of the representations or warranties contained in Section 3.09 or Section 3.10, or based on, or arising out of, fraud or intentional misrepresentation; and

B.    (i) the aggregate liability of Sellers pursuant to the indemnification provisions of the Related Purchase Agreements (including this Agreement) shall not exceed an amount equal to three million five hundred thousand dollars ($3,500,000), except in the case of fraud or intentional misrepresentation and/or a breach of or inaccuracy in any of the representations or warranties contained in Section 3.09 or Section 3.10 and (ii) in no event shall the aggregate liability of Sellers to indemnify Buyer for Losses pursuant to the indemnification provisions of the Related Purchase Agreements (including this Agreement) exceed the Aggregate Purchase Price.

Section 7.04    Procedures for Indemnification. The procedure for indemnification shall be as follows:

A.    Procedures for Claims under any Provision of Section 7.02.

1.    If a claim for indemnification is brought pursuant to any provision of Section 7.02 of this Agreement, the Indemnified Party claiming indemnification (the "Claimant") shall give written notice to the Indemnifying Party of any claim, whether between the Parties or involving a Third Party Claim, promptly after receiving notice or becoming aware thereof, and such notice shall specify in reasonable detail (x) the factual basis for such claim and (y) the amount of the claim; provided, however, that any delay or failure by the Claimant in giving such notice shall not relieve the Indemnifying Party of its obligations under this Agreement except and only to the extent that the Indemnifying Party is actually and materially damaged by such delay. Notwithstanding the foregoing, if any Party receives notice or becomes aware of any claim for which an Indemnified Party could reasonably be expected to be entitled to indemnification pursuant to the terms hereof, such Party shall give written notice to the Indemnified Party promptly after receiving notice or becoming aware of such claim, and such notice shall specify in reasonable detail (x) the factual basis for such claim and (y) the amount of the claim.

2.    If the notice from the Claimant delivered pursuant to Section 7.04A.1 above pertains solely to a breach of representation, warranty, covenant or agreement contained in this Agreement or other similar demand for direct indemnification pursuant to this Agreement, then the Indemnifying Party shall have ten (10) calendar days following receipt of the Claimant's notice to make such investigation of the claim as the Indemnifying Party deems necessary or desirable. If the Claimant and the Indemnifying Party agree at or prior to the expiration of said ten (10) day period (or any mutually agreed upon extension thereof) on the validity and amount of such claim (or such other amount agreed to by the applicable Parties), the Indemnifying Party shall promptly thereafter pay to the Claimant the full amount of the claim. Otherwise, the applicable Parties shall

- 37 -

    CB00382246

have such rights as may be available to them under this Agreement and applicable Legal Requirements.

3.    If the notice from the Claimant delivered pursuant to Section 7.04A.1 above pertains to a Third Party Claim, then the Indemnifying Party shall have twenty (20) calendar days following receipt of the Claimant's notice to (x) make such investigation of the claim or demand as the Indemnifying Party deems reasonably necessary or desirable and (y) notify the Claimant in writing of whether the Indemnifying Party desires to defend the Claimant against such claim or demand or not. During such twenty (20) day period, or until such earlier time as the Claimant receives notice that the Indemnifying Party desires to defend such claim, the Claimant shall make such filings, including motions for continuance (and answers if a motion for continuance has not been granted), as may be necessary to preserve the Parties' positions and rights with respect to such claim or demand; provided, however, that any delay or failure by the Claimant to do so shall not relieve the Indemnifying Party of its obligations under this Agreement except and only to the extent that the Indemnifying Party is actually and materially damaged by such delay or failure.

4.    If the Indemnifying Party acknowledges its obligation to provide indemnification hereunder if such Third Party Claim is ultimately successful, the Indemnifying Party may elect to defend the Claimant against such Third Party Claim, and then the Indemnifying Party shall have the sole power to direct and control such defense so long as the Indemnifying Party agrees that it will be responsible for the full payment of such claim or demand. Upon confirmation by the Indemnifying Party of its obligation to provide indemnification if such Third Party Claim is ultimately successful and of its desire to assume the defense to such claim or demand on the terms set forth above, the Indemnifying Party shall not be liable to the Claimant for any legal fees and expenses subsequently incurred by the Claimant, subject to reimbursement for reasonable actual out-of-pocket expenses incurred by the Claimant as the result of a request for cooperation or assistance by the Indemnifying Party; provided, however, that if, in the reasonable opinion of counsel to the Claimant, there exists a conflict of interest between the Indemnifying Party and the Claimant, the Claimant shall be entitled to engage its own counsel at the Indemnifying Party's sole cost and expense. If the Claimant desires to participate in, but not control, any such defense, it may do so at its sole cost and expense. The Indemnifying Party shall notify the Claimant promptly following any determination by the Indemnifying Party that the tendered claim or demand is not subject to indemnification pursuant to ARTICLE VII; provided, however, that Indemnifying Party agrees that up through the time of any such notification, it shall use its good faith and reasonable efforts to protect and preserve any rights of the Claimant with respect to such claim or demand.

5.    If the Indemnifying Party does not acknowledge its obligation to provide indemnification hereunder or elects not to defend the Claimant against such Third Party Claim, the Claimant shall have the right to defend the claim or

- 38 -

                                                                    CB00382247

demand through appropriate proceedings and shall have the sole power to direct and control such defense. Such defense shall be at the Claimant's sole cost and expense; provided, however, that the Indemnifying Party shall reimburse the Claimant for all reasonable costs and expenses incurred by the Claimant (including attorneys' fees) in connection with such defense if it is ultimately determined that the Claimant is entitled to indemnification from the Indemnifying Party for such Third Party Claim pursuant to the terms hereof.

6.      In connection with any Third Party Claim subject to the procedures set forth in this Section 7.04A, (A) the Claimant shall not settle, compromise, discharge or otherwise admit to any liability for any claim or demand for which the Indemnifying Party has acknowledged its obligation to provide indemnification hereunder without the prior written consent of the Indemnifying Party for any claim or demand if pursuant to the terms thereof (x) injunctive or other equitable relief would be imposed on the Indemnifying Party or (y) the Indemnifying Party is not expressly and unconditionally released of any and all liabilities and obligations associated with such Third Party Claim and (B) the Indemnifying Party shall not settle, compromise, discharge or otherwise admit to any liability for any claim or demand without the prior written consent of the Claimant if pursuant to the terms thereof (x) injunctive or other equitable relief would be imposed on the Claimant or (y) the Claimant is not expressly and unconditionally released of any and all liabilities and obligations associated with such Third Party Claim.

B.      Procedures for Claims under Section 7.02(a).

1.      If a claim for indemnification is brought pursuant to Section 7.02A of this Agreement, Buyer shall give written notice to Sellers of such claim promptly after receiving notice or becoming aware thereof, and such notice shall specify in reasonable detail (x) the factual basis for such claim and (y) the amount of the claim; provided, however, that any delay or failure by Buyer in giving such notice shall not relieve Sellers of their obligations under this Agreement except and only to the extent that Sellers are actually and materially damaged by such delay. Notwithstanding the foregoing, if Sellers receive notice or becomes aware of any claim for which Buyer could reasonably be expected to be entitled to indemnification pursuant to Section 7.02A, Sellers shall give written notice to Buyer promptly after receiving notice or becoming aware of such claim, and such notice shall specify in reasonable detail (x) the factual basis for such claim and (y) the amount of the claim.

2.      If the notice from Buyer delivered pursuant to Section 7.04B.1 above pertains solely to a breach of representation, warranty, covenant or agreement contained in this Agreement or other similar demand for direct indemnification pursuant to this Agreement, then Sellers shall have ten (10) calendar days following receipt of Buyer's notice to make such investigation of the claim as Sellers deem necessary or desirable. If Buyer and Sellers agree at or prior to the expiration of said ten (10) day period (or any mutually agreed upon

- 39 -

extension thereof) on the validity and amount of such claim (or such other amount agreed to by Buyer and Sellers), Sellers shall promptly thereafter pay to Buyer the full amount of the claim. Otherwise, the Parties shall have such rights as may be available to them under this Agreement and applicable Legal Requirements.

3.      If the notice from Buyer delivered pursuant to <u>Section 7.04B.1</u> above pertains to a Third Party Claim, then Sellers shall have twenty (20) calendar days following receipt of Buyer's notice to (x) make such investigation of the claim or demand as Sellers deem reasonably necessary or desirable and (y) notify Buyer in writing of whether Sellers desire to defend Buyer against such claim or demand or not. During such twenty (20) day period, or until such earlier time as Buyer receives notice that Sellers desire to defend such claim, Buyer shall make such filings, including motions for continuance (and answers if a motion for continuance has not been granted), as may be necessary to preserve the Parties' positions and rights with respect to such claim or demand; <u>provided</u>, <u>however</u>, that any delay or failure by Buyer to do so shall not relieve Sellers of their obligations under this Agreement except and only to the extent that Sellers are actually and materially damaged by such delay or failure.

4.      If Sellers acknowledge their obligations to provide indemnification hereunder if such Third Party Claim is ultimately successful, Sellers may elect to defend Buyer against such Third Party Claim, and then Sellers shall have the sole power to direct and control such defense so long as Sellers agree that they will be responsible for the full payment of such claim or demand. Upon confirmation by Sellers of their obligations to provide indemnification if such Third Party Claim is ultimately successful and of their desire to assume the defense to such claim or demand on the terms set forth above, Sellers shall not be liable to Buyer for any legal fees and expenses subsequently incurred by Buyer, subject to reimbursement for reasonable actual out-of-pocket expenses incurred by Buyer as the result of a request for cooperation or assistance by Sellers; <u>provided</u>, <u>however</u>, that if, in the reasonable opinion of counsel to Buyer, there exists a conflict of interest between Sellers and Buyer, Buyer shall be entitled to engage its own counsel at Sellers' cost and expense. If Buyer desires to participate in, but not control, any such defense, it may do so at its sole cost and expense. Sellers shall notify Buyer promptly following any determination by Sellers that the tendered claim or demand is not subject to indemnification pursuant to ARTICLE VII; <u>provided</u>, <u>however</u>, that Sellers agree that up through the time of any such notification, they shall use their good faith and reasonable efforts to protect and preserve any rights of Buyer with respect to such claim or demand.

5.      If Sellers do not acknowledge their obligations to provide indemnification hereunder or elects not to defend Buyer against such Third Party Claim, Buyer shall have the right to defend the claim or demand through appropriate proceedings and shall have the sole power to direct and control such defense. Such defense shall be at Buyer's sole cost and expense; <u>provided</u>, <u>however</u>, that Sellers shall reimburse Buyer for all reasonable costs and expenses incurred by Buyer (including attorneys' fees) in connection with such defense if it

- 40 -

                                                                 CB00382249

is ultimately determined that Buyer is entitled to indemnification from Sellers for such Third Party Claim pursuant to the terms hereof.

6.      In connection with any Third Party Claim subject to the procedures set forth in this <u>Section 7.04B</u>, Sellers shall not settle, compromise, discharge or otherwise admit to any liability for any claim or demand without the prior written consent of Buyer if pursuant to the terms thereof (x) injunctive or other equitable relief would be imposed on Buyer or (y) Buyer is not expressly and unconditionally released of any and all liabilities and obligations associated with such Third Party Claim.

C.      Notwithstanding anything to the contrary contained in this Agreement, the procedures for all Tax Contests shall be governed exclusively by <u>Section 8.07</u> and not this <u>Section 7.04</u>.

Section 7.05    Additional Limitations. The Parties acknowledge and agree that Losses exclude (a) speculative Losses (including lost profits on a future sale of the Company or the Business), and (b) punitive damages, in each case other than with respect to any such Losses that result from fraud or intentional misconduct or any such Loss arising from a Third Party Claim. For the avoidance of doubt, Losses shall include any diminution in value of the Company, its assets, the Shares or other Equity Interests of the Company and shall include consequential damages not excluded in the preceding sentence.

Section 7.06    Remedies. The rights of each Indemnified Party under this <u>ARTICLE VII</u> are cumulative, and each Indemnified Party will have the right in any particular circumstance, in its sole discretion, to enforce any provision of this <u>ARTICLE VII</u> without regard to the availability of a remedy under any other provision of this <u>ARTICLE VII</u>.

Section 7.07    Exclusive Remedies. Except for any equitable relief to which any Party hereto may be entitled from and after the Closing, any claims arising out of fraud or intentional misconduct or the indemnification provisions of this <u>ARTICLE VII</u> shall be the sole and exclusive remedy with respect to any and all claims relating to the subject matter of this Agreement and no Party shall pursue or seek to pursue any other remedy.

## ARTICLE VIII

## TAX MATTERS

Section 8.01    [Conduct of Business with Respect to Taxes. During the period from the date hereof to the Closing Date, without the consent of the Buyer:

A.      none of the Company or any of its Subsidiaries shall make, revoke or amend any Tax election; change any annual accounting period; adopt or change any method of accounting or reverse of any accruals (except as required by a change in law or GAAP); file any amended Tax Returns; sign or enter into any closing agreement or settlement agreement with respect to any, or compromise any, claim or assessment of Tax liability; surrender any right to claim a refund, offset or other reduction in liability;

- 41 -

consent to any extension or waiver of the limitations period applicable to any claim or assessment, in each case, with respect to Taxes; or act or omit to act where such action or omission to act could reasonably be expected to have the effect of increasing any present or future Tax liability or decreasing any present or future Tax benefit for the Company, any of its Subsidiaries, the Buyer or its Affiliates;

B.    none of the Company or its Subsidiaries has taken (or failed to take) or allowed to be taken any action that could result in the failure of the Company to qualify as an S corporation pursuant to Section 1361 of the Code (or applicable provisions of state or local law); and

C.    each of the Company and its Subsidiaries shall: (i) timely file all Tax Returns required to be filed by it and all such Tax Returns shall be prepared in a manner consistent with past practice, (ii) timely pay all Taxes due and payable; and (iii) promptly notify the Buyer of any income, franchise or similar (or other material) Tax claim, investigation or audit pending against or with respect to each of the Company or its Subsidiaries in respect of any Tax matters (or any significant developments with respect to ongoing Tax matters), including material Tax liabilities and material Tax refund claims.][7]

Section 8.02    Cooperation. The Sellers and the Buyer shall reasonably cooperate, and shall cause their respective Affiliates, officers, employees, agents, auditors and representatives reasonably to cooperate, in preparing and filing all Tax Returns of the Company and its Subsidiaries relating to any Pre-Closing Period or Straddle Period, including maintaining and making available to each other all records necessary in connection with Taxes of the Company or its Subsidiaries relating to any Pre-Closing Period or Straddle Period, and in resolving all disputes and audits with respect to all such Pre-Closing Periods and Straddle Periods.

Section 8.03    Preparation and Filing of Pre-Closing Period Tax Returns of the Company and its Subsidiaries. The Sellers shall, at the Sellers' cost and expense, prepare, or cause to be prepared, all Pre-Closing Period Tax Returns required to be filed by or on behalf of each of the Company and its Subsidiaries. All such Pre-Closing Period Tax Returns shall be prepared and filed in a manner that is consistent with the prior practice of the Company or the applicable Subsidiary (as the case may be), except as required by applicable law. The Sellers shall deliver or cause to be delivered drafts of all such Pre-Closing Period Tax Returns to the Buyer for its review at least thirty (30) days prior to the Due Date of any such Pre-Closing Period Tax Return; provided, however, that such drafts of any such Pre-Closing Period Tax Return shall be subject to the Buyer's review and approval. If the Buyer disputes any item on such Pre-Closing Period Tax Return, it shall notify the Sellers (by written notice within fifteen (15) days of receipt of such draft of such Pre-Closing Period Tax Return) of such disputed item (or items) and the basis for its objection. If the Buyer does not object by written notice within such period, the amount of Taxes shown to be due and payable on such Pre-Closing Period Tax Return shall be deemed to be accepted and agreed upon, and final and conclusive, for purposes of this Section 8.03. The Buyer and the Sellers shall act in good faith to resolve any dispute prior to the Due

---

[7] Section 8.01 to be deleted if there is a simultaneous sign and close.

- 42 -

Confidential    CB00382251

Date of any such Pre-Closing Period Tax Return. If the Buyer and the Sellers cannot resolve any disputed item, the item in question shall be resolved by a nationally recognized independent accounting firm mutually agreed to by the Buyer and the Sellers (the "Accountants") (in accordance with the provisions of this Section 8.03), whose determination shall be final and conclusive for purposes of this Section 8.03. The fees and expenses of the Accountants shall be paid fifty percent (50%) by the Buyer and fifty percent (50%) by the Sellers. The Sellers shall timely file all such Pre-Closing Period Tax Returns; provided, however, if any such Pre-Closing Period Tax Return is filed after the Closing Date and the Sellers are not authorized to execute and file such Pre-Closing Period Tax Return by applicable law, the Buyer shall execute and file (or cause to be filed) such Pre-Closing Period Tax Return (as finally determined pursuant to this Section 8.03) with the appropriate Taxing Authority. The Sellers shall pay all Pre-Closing Taxes due and payable in respect of all Pre-Closing Period Tax Returns of each of the Company and its Subsidiaries; provided, however, that if (i) any Pre-Closing Period Tax Return is due after the Closing Date and is to be filed (or caused to be filed) by the Buyer, the Sellers shall pay (in immediately available funds) to the Buyer the amount of all Pre-Closing Taxes due and payable with respect of such Pre-Closing Period Tax Return (determined pursuant to this Section 8.03) no later than three (3) Business Days prior to the earlier of the date such Pre-Closing Period Tax Return is filed or the Due Date of such Pre-Closing Period Tax Return.

Section 8.04    Preparation and Filing of Straddle Period Tax Returns of the Company and its Subsidiaries. The Buyer shall, at its expense, prepare and timely file, or cause to be prepared and timely filed, all Straddle Period Tax Returns required to be filed by each of the Company and its Subsidiaries. All Straddle Period Tax Returns shall be prepared and filed in a manner that is consistent with the prior practice of the Company or the applicable Subsidiary (as the case may be), except as required by applicable law. The Buyer shall deliver or cause to be delivered drafts of all Straddle Period Tax Returns to the Sellers for their review at least thirty (30) days prior to the Due Date of any such Straddle Period Tax Return and shall notify the Sellers of the Buyer's calculation of the Sellers' share of the Taxes of the Company or such Subsidiary (as the case may be) for such Straddle Period (determined in accordance with Section 8.06); provided, however, that such drafts of any such Straddle Period Tax Returns and such calculations of the Sellers' share of the Tax liability for such Straddle Period (determined in accordance with Section 8.06) shall be subject to the Sellers' review and approval, which approval shall not be unreasonably withheld, conditioned or delayed. If the Sellers dispute any item on such Straddle Period Tax Return, they shall notify the Buyer (by written notice within fifteen (15) days of receipt of such Straddle Period Tax Return) of such disputed item (or items) and the basis for their objection. If the Sellers do not object by written notice within such period, the amount of Taxes shown to be due and payable on such Straddle Period Tax Return and calculation of the Sellers' share of the Taxes for such Straddle Period shall be deemed to be accepted and agreed upon, and final and conclusive, for purposes of this Section 8.04. The Buyer and the Sellers shall act in good faith to resolve any dispute prior to the Due Date of any such Straddle Period Tax Return. If the Buyer and the Sellers cannot resolve any disputed item, the item in question shall be resolved by the Accountants (in accordance with the provisions of this Section 8.04), whose determination shall be final and conclusive for purposes of this Section 8.04. The fees and expenses of the Accountants shall be paid fifty percent (50%) by the Buyer and fifty percent (50%) by the Sellers. No later than three (3) Business Days prior to the earlier of the date of the Straddle Period Tax Return of the Company is filed or the Due Date of such Straddle Period Tax Return, the Sellers shall pay (in immediately available funds) to the Buyer

- 43 -

CB00382252

the amount of all Pre-Closing Taxes required to be paid with respect to such Straddle Period Tax Return (determined pursuant to this <u>Section 8.04</u>).

        Section 8.05    Transfer Taxes.  The Sellers shall pay all transfer, real property transfer, documentary, sales, use, stamp, duty, recording and similar Taxes (including any penalties, interest and additions to Tax) incurred in connection with this Agreement and the transactions contemplated hereby (together, "<u>Transfer Taxes</u>").  The Party that has the primary obligation to do so under applicable law shall timely file any Tax Return or other document with respect to such Transfer Taxes, provided, however, that the other Parties shall cooperate with the filing Party in the preparation and filing of all Tax Returns or other applicable documents for or with respect to Transfer Taxes, including timely signing and delivering such Tax Returns, documents, and certificates as may be necessary or appropriate to file such Tax Returns or establish an exemption from (or otherwise reduce) Transfer Taxes.

        Section 8.06    Computation of Liabilities.  To the extent permitted or required, the taxable year of each of the Company and its Subsidiaries that includes the Closing Date shall close as of the end of the Closing Date.  Whenever it is necessary to determine the liability for Taxes for a Straddle Period relating to:

        A.    Taxes of the Company or any of its Subsidiaries imposed on a periodic basis (such as such as real property Taxes or other ad valorem Taxes), the determination of the Taxes of the Company and its Subsidiaries for the portion of the Straddle Period ending on and including, and the portion of the Straddle Period beginning and ending after, the Closing Date shall be calculated by allocating to the periods before and after the Closing Date pro rata, based on the number of days of the Straddle Period in the period before and ending on the Closing Date, on the one hand, and the number of days in the Straddle Period in the period after the Closing Date, on the other hand; and

        B.    Taxes of the Company or any of its Subsidiaries not described in <u>Section 8.06A</u> (such as (i) Taxes based on the income or receipts of the Company or any of its Subsidiaries  for a Straddle Period, (ii) Taxes imposed in connection with any sale or other transfer or assignment of property (including all sales and use Taxes) for a Straddle Period, other than Transfer Taxes described in <u>Section 8.05</u>), and (iii) withholding and employment Taxes relating to a Straddle Period), the determination of the Taxes of the Company and its Subsidiaries for the portion of the Straddle Period ending on and including, and the portion of the Straddle Period beginning and ending after, the Closing Date shall be calculated by assuming that the Straddle Period consisted of two taxable periods, one which ended at the close of the Closing Date and the other which began at the beginning of the day following the Closing Date and items of income, gain, deduction, loss or credit of the Company and its Subsidiaries for the Straddle Period shall be allocated between such two taxable years or periods on a "closing of the books basis" by assuming that the books of the Company and its Subsidiaries were closed at the close of the Closing Date.

        Section 8.07    Tax Contests.

Confidential

CB00382253

A.    The Buyer shall deliver a written notice to the Sellers in writing promptly following any demand, claim, or notice of commencement of a claim, proposed adjustment, assessment, audit, examination or other administrative or court Proceeding with respect to Taxes of any of the Company or its Subsidiaries for which the Sellers may be liable ("Tax Contest") and shall describe in reasonable detail (to the extent known by the Buyer) the facts constituting the basis for such Tax Contest, the nature of the relief sought, and the amount of the claimed Losses (including Taxes), if any (the "Tax Claim Notice"), provided, however, that the failure or delay to so notify the Sellers shall not relieve the Sellers of any obligation or liability that the Sellers may have to the Buyer, except to the extent that the Sellers demonstrate that the Sellers are materially and adversely prejudiced thereby.

B.    With respect to Tax Contests for Taxes of each of the Company and its Subsidiaries for a Pre-Closing Period, the Sellers may elect to assume and control the defense of such Tax Contest by written notice to the Buyer within thirty (30) days after delivery by the Buyer to the Sellers of the Tax Claim Notice.  If the Sellers elect to assume and control the defense of such Tax Contest, the Sellers (i) shall bear their own costs and expenses, (ii) shall be entitled to engage its own counsel and (iii) may (A) pursue or forego any and all administrative appeals, proceedings, hearings and conferences with any Taxing Authority, (B) either pay the Tax claimed or sue for refund where applicable law permits such refund suit or (C) contest, settle or compromise the Tax Contest in any permissible manner, provided, however, that the Sellers shall not settle or compromise (or take other actions described herein with respect to) any Tax Contest without the prior written consent of the Buyer (such consent not to be unreasonably withheld, delayed or conditioned), provided, further, that the Sellers shall not settle or compromise (or take other actions described herein with respect to) any Tax Contest without the prior written consent of the Buyer (which consent may be withheld in the sole discretion of the Buyer) if such settlement or compromise would reasonably be expected to adversely affect the Tax liability of the Buyer or any of its Affiliates (including any of the Company or any of its Subsidiaries) for any Tax period ending after the Closing Date.  If the Sellers elect to assume the defense of any Tax Contest, the Sellers shall (x) keep the Buyer reasonably informed of all material developments and events relating to such Tax Contest (including promptly forwarding copies to the Buyer of any related correspondence, and shall provide the Buyer with an opportunity to review and comment on any material correspondence before the Sellers send such correspondence to any Taxing Authority), (y) consult with the Buyer in connection with the defense or prosecution of any such Tax Contest and (z) provide such cooperation and information as the Buyer shall reasonably request, and the Buyer shall have the right to participate in (but not control) the defense of such Tax Contest (including participating in any discussions with the applicable Tax Authorities regarding such Tax Contests).

C.    In connection with any Tax Contest that relates to Taxes of the Company or any of its Subsidiaries for a Pre-Closing Period that (i) the Sellers do not timely elect to control pursuant to Section 8.07B or (ii) the Sellers fail to diligently defend, such Tax Contest shall be controlled by the Buyer (and the Sellers shall reimburse the Buyer for all reasonable costs and expenses incurred by the Buyer relating to a Tax Contest described

- 45 -

  CB00382254

in this Section 8.07C) and the Sellers agree to cooperate with the Buyer in pursuing such Tax Contest.

D.     In connection with any Tax Contest for Taxes of each of the Company or any of its Subsidiaries for any Straddle Period, such Tax Contest shall be controlled by the Buyer; provided, however, that (i) the Buyer shall not settle or compromise any such Tax Contest without the prior written consent of the Sellers, such consent not to be unreasonable withheld, conditioned or delayed and (ii) the Sellers shall have the right to participate in (but not control) the defense of such Tax Contest (including participating in any discussions with the applicable Tax Authorities regarding such Tax Contests).

E.     Notwithstanding anything to the contrary contained in this Agreement, the procedures for all Tax Contests shall be governed exclusively by this Section 8.07 (and not Section 7.04).

Section 8.08    Election pursuant to Section 338 of the Code.

A.     The Buyer and the Sellers shall jointly make a timely and effective election provided for by Section 338(h)(10) of the Code and Section 1.338(h)(10)-1 of the Treasury Regulations and any comparable election under state and local law with respect to the purchase of all of the [Shares] (each, an "Election" and collectively, the "Elections"). The Buyer and the Sellers shall cooperate with each other to take all actions necessary and appropriate, including filing such additional forms, returns, elections, schedules and other documents as may be required to effect and preserve timely Elections in accordance with the provisions of Section 338(h)(10) of the Code and Section 1.338(h)(10)-1 of the Treasury Regulations (and any comparable provisions of state, local law) or any successor provisions. If changes are required in any of these forms as a result of information which is first available after the date on which any such form is completed and executed, the parties will act in good faith to agree on such changes. Unless otherwise required by a final determination (within the meaning of Section 1313(a) of the Code), the Buyer and the Sellers shall report the purchase by the Buyer of all of the [Shares] consistent with the Elections and shall take no position inconsistent therewith in any Tax Return, in any proceeding before any Taxing Authority or otherwise.

B.     Within thirty (30) Business Days after the Closing the Buyer shall provide to the Sellers a schedule which will provide for the allocation of the aggregate deemed "sale price" (as defined in Treasury Regulations Section 1.338-4) among the assets of the Company, which allocation schedule shall be in accordance with Section 338 of the Code and applicable Treasury Regulations thereunder or comparable provisions of state or local law (such schedule, the "Tax Allocation Statement"), which is intended to be consistent with the allocations set forth on Schedule 8.08(b). The Tax Allocation Statement shall be subject to the review and consent of the Sellers, which consent shall not be unreasonably withheld, delayed or conditioned. The Sellers shall have the right to withhold their consent (in accordance with the standards set forth in this B) to any portion of the Tax Allocation Statement (by written notice to the Buyer) if and to the extent the Tax Allocation Statement is not consistent with the allocations set forth on Schedule

- 46 -

Confidential

8.08(b).  If the Sellers do not object to the Tax Allocation Statement by written notice to the Buyer within thirty (30) days after receipt by the Sellers of the Tax Allocation Statement, then the Tax Allocation Statement shall be deemed to have been accepted and agreed upon, and final and conclusive, for all purposes of this Agreement; provided, however, that such Tax Allocation Statement shall be subject to adjustment upon and as a result of any adjustment to the amounts used to determine the allocations used to prepare the Tax Allocation Statement under this Agreement.  If the Sellers object to the Tax Allocation Statement (or any portion thereof), they shall notify the Buyer in writing of its objection to the Tax Allocation Statement within thirty (30) days after receipt by the Sellers of the Tax Allocation Statement and shall set forth in such written notice the disputed item or items and the basis for its objection, and the Sellers and the Buyer shall act in good faith to resolve any such dispute for a period of thirty (30) days thereafter.  If, within thirty (30) days of the Sellers' delivery of a valid written notice of objection to the Tax Allocation Statement, the Buyer and the Sellers have not reached an agreement regarding the disputed item or items specified in such written notice, the dispute shall be presented to Accountants, whose determination shall be binding upon the Parties.  The fees and expenses of the Accountants in connection with the resolution of any dispute under this B shall be paid 50% by the Sellers and 50% by the Buyer.  [In the event that any adjustment to the Purchase Price is paid between the parties pursuant to the terms of this Agreement, the Buyer shall provide the Sellers revised Tax Allocation Statements and the principles of this B shall apply to each of the revised Tax Allocation Statements.][8]

C.     Each of the Parties and their respective Affiliates shall, unless otherwise required by a final "determination" (within the meaning of Section 1313(a) of the Code), (i) prepare and file all Tax Returns, including all IRS Forms 8023 and 8883, in a manner consistent with the Elections and the Tax Allocation Statement, in each case, as finally determined pursuant to this Section 8.08 (subject to adjustment in accordance with this Section 8.08 in the event of any adjustment to the Purchase Price) and (ii) take no position in any Tax Return, Tax Contest or otherwise that is inconsistent with the Elections or the Tax Allocation Statement, in each case, as finally determined pursuant to this Section 8.08 (subject to adjustment in accordance with this Section 8.08 in the event of any adjustment to the Purchase Price).  In the event that any of the allocations set forth in the Tax Allocation Statement are disputed by any Taxing Authority, the Party receiving notice of such dispute shall promptly notify and consult with the other Parties concerning the resolution of such dispute, and use reasonable best efforts to contest such dispute in a manner consistent with the Tax Allocation Statement.

Section 8.09    Adjustments to the Purchase Price.  The Buyer and the Sellers agree to treat any amounts payable after the Closing by the Sellers to Buyer (or by Buyer to the Sellers) pursuant to this Agreement as an adjustment to the Purchase Price, unless a final determination by the appropriate Taxing Authority or court causes any such payment not to be treated as an adjustment to the Purchase Price for Tax purposes.

---

[8] INTERNAL NOTE:  Only include if there is to be a working capital adjustment or similar post-Closing payment.

Confidential                                                                                    CB00382256

## ARTICLE IX

## MISCELLANEOUS

Section 9.01    Entire Agreement.  This Agreement, together with the Schedules and the Ancillary Agreements, contains the sole and entire agreements among the Parties with respect to the subject matter hereof and thereof and supersede all prior and contemporaneous discussions, understandings, negotiations and agreements (whether written or oral) among the Parties or between any of them with respect to the subject matter of this Agreement and the Ancillary Agreements.

Section 9.02    Successor and Assigns; Assignment; No Third-Party Beneficiaries. This Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Parties.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assignable by (a) Sellers without the prior written consent of Buyer, or (b) Buyer without the prior written consent of Sellers; provided, however, that Buyer may assign its rights under this Agreement (x) to any Affiliate of Buyer or to any future purchaser of Buyer or its assets and/or (y) as collateral security to any lender or lenders (including any agent for any such lender or lenders) or to any assignee or assignees of such lender, lenders or agent; provided that any such assignment by Buyer shall not relieve Buyer of its obligations hereunder. Nothing in this Agreement shall confer upon any Person not a party to this Agreement any rights or remedies of any nature or kind whatsoever under or by reason of this Agreement, except the Indemnified Parties shall be the third-party beneficiaries of the indemnification rights in ARTICLE VII hereof.

Section 9.03    Amendments.  This Agreement may be amended, modified or superseded, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by all Parties or, in the case of a waiver, by or on behalf of the Party waiving compliance.  The failure of any Party at any time or times to require performance of any provisions hereof will in no manner affect the right at a later time to enforce the same.  No waiver by any Party of any condition, or of any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, will be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or warranty.

Section 9.04    Notices.  Unless otherwise provided herein, all notices, requests, consents, approvals, demands and other communications to be given hereunder will be in writing and will be deemed given upon (a) confirmation of receipt of a facsimile transmission, (b) confirmed delivery by a reputable overnight carrier or when delivered by hand, (c) actual receipt or (d) the expiration of three (3) Business Days after the day when mailed by registered or certified mail (postage prepaid, return receipt requested), addressed to the respective Parties listed below at the following addresses (or such other address for a Party hereto as will be specified by like notice):

If to Buyer, to:

- 48 -

Confidential

Varsity Spirit, LLC
6745 Lenox Center Court, Suite 300
Memphis, TN 38115
Attention: John M. Nichols, EVP and General Manager
[Facsimile : [●]]

and

Varsity Spirit, LLC
6745 Lenox Center Court, Suite 300
Memphis, TN 38115
Attention: Burton D. Brillhart, Esq. Chief Legal Officer
[Facsimile : [●]]


with a copy (which shall not constitute notice) to:

Reed Smith LLP
599 Lexington Avenue, Floor 22
New York, New York 10022
Attention: David M. Grimes, Esq.
Facsimile: (212) 549-0240

If to Sellers, to:

[●]
[Address Information]

with a copy (which shall not constitute notice) to:

[●]
[●]
[●]

Section 9.05    Governing Law.  This Agreement will be governed by, and construed in accordance with, the internal laws of the [State of Tennessee/Commonwealth of Kentucky] regardless of the laws that might otherwise govern under applicable principles of conflict of laws.

Section 9.06    Severability.  In the event any of the provisions hereof are held to be invalid or unenforceable under applicable Legal Requirements, the remaining provisions hereof will not be affected thereby.  In such event, the Parties hereto agree and consent that such provisions and this Agreement will be modified and reformed so as to effect the original intent of the Parties as closely as possible with respect to those provisions which were held to be invalid or unenforceable.

- 49 -

Section 9.07    Transaction Costs and Expenses.  The Sellers shall bear and pay (a) all reasonable fees, costs and expenses (including legal fees and accounting fees) that have been incurred or that are incurred by Sellers in connection with the Contemplated Transactions and (b) all investment banking fees that have been incurred or that are incurred by any of the Parties in connection with the Contemplated Transactions.  Buyer shall equally share and pay all other fees, costs and expenses (including legal fees and accounting fees) incurred by Buyer in connection with the Contemplated Transactions, including all fees associated with technology consultants, professional background checks and other out of pocket expenses incurred by Buyer during the due diligence process.

Section 9.08    Counterparts.  This Agreement may be executed simultaneously in two or more counterparts, each of which will be deemed an original, but all of which will constitute one agreement.  Execution and delivery of this Agreement by exchange of facsimile or other electronically transmitted counterparts bearing the signature of a Party shall be equally as effective as delivery of a manually executed counterpart of such Party.

Section 9.09    Jurisdiction; Venue; Service of Process

A.    Each of the Parties, by its execution hereof, (i) hereby agrees that all Actions arising out of or relating to this Agreement exclusively be heard and determined in any state or federal court (and any applicable appellate court) located in [●] and the Parties hereby irrevocably submit to the exclusive jurisdiction of such courts in any such Action and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action, (ii) hereby waives to the extent not prohibited by applicable Legal Requirements, and agrees not to assert, by way of motion, as a defense or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that any such Action brought in one of the above-named courts should be dismissed on grounds of *forum non conveniens*, should be transferred or removed to any court other than one of the above-named courts, or should be stayed by reason of the pendency of some other Action in any other court other than one of the above-named courts or that this Agreement, any Ancillary Agreement or the subject matter hereof or thereof may not be enforced in or by such court and (iii) hereby agrees not to commence any such Action other than before one of the above-named courts.  Notwithstanding the previous sentence a Party may commence any Action in a court other than the above-named courts solely for the purpose of enforcing an Order issued by one of the above-named courts.

B.    Each of the Parties hereby (i) consents to service of process in any Action among any of the Parties relating to or arising in whole or in part under or in connection with this Agreement, any Ancillary Agreement or the Contemplated Transactions in any manner permitted by New York law, (ii) agrees that service of process made in accordance with clause (i) or made by registered or certified mail, return receipt requested, at its address specified pursuant to Section 9.04, will constitute good and valid service of process in any such Action and (iii) waives and agrees not to assert (by way of motion, as a defense, or otherwise) in any such Action any claim that service of process made in accordance with clause (i) or (ii) does not constitute good and valid service of process.

- 50 -

                                                                           CB00382259

Section 9.10    Specific Performance. Each of the Parties acknowledges and agrees that the other Parties would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached or violated.  Accordingly, each of the Parties agrees that, without posting a bond or other undertaking, the other Parties will be entitled to an injunction or injunctions to prevent breaches or violations of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any Action instituted in any court of the United States or any state thereof having jurisdiction over the Parties and the matter in addition to any other remedy to which it may be entitled, at law or in equity.  Each Party further agrees that, in the event of any action for specific performance in respect of such breach or violation, it will not assert that the defense that a remedy at law would be adequate.

Section 9.11    Waiver of Jury Trial.  TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, THE PARTIES HEREBY WAIVE, AND COVENANT THAT THEY WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING IN WHOLE OR IN PART UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION WHATSOEVER BETWEEN OR AMONG THEM RELATING TO THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS AND THAT SUCH ACTIONS WILL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

Section 9.12    Disclosure Schedules.  Information set forth in the schedules to this Agreement (the "Schedules") shall modify, supplement, qualify or limit the representations made in ARTICLE III, ARTICLE IV and ARTICLE V, respectively.  The disclosure of any information shall not be deemed to constitute an acknowledgment that such information is required to be disclosed in connection with the representations and warranties made by Sellers or Buyer, as applicable, in this Agreement or that such information is material, nor shall such information be deemed to establish a standard of materiality, nor shall it be deemed an admission of any liability of, or concession as to any defense available to, any Party.  The Section number headings in the Schedules correspond to the Section numbers in this Agreement; provided that any information disclosed in any Section of the Schedules shall be deemed to be disclosed and incorporated into any other Section of the Schedules to the extent the information is disclosed with such reasonable specificity that its applicability to such other Section of the Schedules is reasonably apparent on the face of the disclosure without investigation or reference to underlying documentation.

[Signature Pages Follow]

- 51 -

                                                                                       CB00382260

IN WITNESS WHEREOF, each of the undersigned has executed this Membership Interest Purchase Agreement as of the date first above written.

[VARSITY SPIRIT, LLC]

By: [●]

By:_____
Name:
Title:


AARON FLAKER


_____


EMMITT TYLER


_____


DANIEL KESSLER


_____


Signature Page to Membership Interest Purchase Agreement

CB00382261

**Schedule A**

JAM Brands Europe Limited

[others to be confirmed]

Confidential

CB00382262