# EXHIBIT 31

## FILED UNDER SEAL

## SEPARATION AND CONSULTING AGREEMENT

This Separation and Consulting Agreement (this "Agreement") is being entered into this 1st day of December 2020 ("Effective Date"), by and between Jeffrey Webb ("Webb"), on the one hand, and Varsity Spirit LLC ("Varsity Spirit") and Varsity Brands LLC ("VB" and, together with Varsity Spirit, "Varsity"), on the other hand. For purposes of this Agreement, Webb, Varsity Spirit and VB may collectively be referred to as the "Parties" or each individually as a "Party."

WHEREAS, Webb has had a long-standing and successful career with Varsity and has historically been recognized as the Founder of Varsity;

WHEREAS, Webb is currently employed as the Chairman of Varsity Spirit pursuant to that certain Amended Employment Agreement, by and between Webb and Varsity Spirit, dated as of August 1, 2019 ("Employment Agreement"), and capitalized terms used but not otherwise defined in this Agreement shall have the meaning ascribed to such terms in the Employment Agreement; and

WHEREAS, after working with Varsity Spirit for more than forty (40) years, Webb wants to voluntarily leave Varsity Spirit, and the Parties want to end the Employment Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises set forth herein, the Parties agree as follows:

1.    Announcement.    On or about December 10, 2020, the Parties shall publicly announce that Webb is voluntarily leaving Varsity Spirit, effective as of the end of calendar year 2020, in order to focus his time and attention on the International Cheer Union ("ICU"). On or about December 10, 2020, the Parties agree to publish the internal and external announcements attached hereto as Exhibit D.

2.    Separation Date. On December 31, 2020, Webb's employment with Varsity Spirit shall end (the "Separation Date"), and except as expressly provided in this Agreement, the terms of the Employment Agreement shall no longer be in force and effect after the Separation Date, except as otherwise provided in this Agreement. Effective as of the Separation Date, Webb shall be deemed to have resigned from all of his then-current positions at Varsity and its affiliates, and Webb agrees to execute such additional documentation as Varsity may reasonably request and as may be necessary to effectuate the foregoing. Webb's active participation in and coverage under all benefit plans and programs sponsored by or through Varsity and its affiliates shall end on the Separation Date. Webb's separation from Varsity Spirit shall be treated as a voluntary resignation by Webb without Good Reason.

3.    Consulting Arrangement.

(a)    *Consulting Term*.    Beginning January 1, 2021 and continuing until December 31, 2021 (the "Initial Consulting Term"), Webb agrees to provide the Consulting Services (as defined in Section 3(b) below) to Varsity Spirit. The Initial Consulting Term shall terminate on December 31, 2021, unless (i) earlier terminated by either Webb or Varsity Spirit, for any reason or no reason, upon at least thirty (30) days' prior written notice to the other Party, or

1

(ii) the Parties mutually agree in writing to extend the Initial Consulting Term for one (1) additional year or another mutually agreed upon period of time (the Initial Consulting Term, as extended, the "Consulting Term"). During the Consulting Term, (A) Webb shall not be required to maintain an office or work any set number of hours per month at Varsity Sprit or VB, and (B) Webb shall be paid Twenty Thousand Eight Hundred Thirty-Three and 34/100 Dollars ($20,833.34) per month (pro-rated for any partial months of service) by Varsity Spirit (such amount, the "Consulting Fees"). If the Consulting Term is terminated by Varsity Spirit without Cause (other than due to Webb's death or Disability), then provided that Webb continues to comply with terms of this Agreement, including Section 7, Varsity Spirit shall continue paying Webb the Consulting Fees for the remainder of the originally agreed period of the Consulting Term. For the avoidance of doubt, if the Consulting Term is terminated by Varsity Spirit for Cause, or by Webb for any reason or no reason (including by reason of Webb's death or Disability), Webb shall not be entitled to receive any portion of the Consulting Fees for the period of the Consulting Term following the termination date of the Consulting Term.

(b)    *Consulting Services.*  During the Consulting Term, Webb shall provide advisory assistance, including the Litigation Assistance (as defined below), from time to time as reasonably requested by the Chief Legal Officer of VB (the "CLO"), and shall make himself reasonably available to attend Varsity events, including, but not limited to, sales and cheer events, camps, competitions, speeches, sales meetings, rookie talks or events, Disney-related events, parties, official or unofficial dinners and the like (collectively, "Varsity Events"), but only upon formal written invitation of the CLO (collectively, the "Consulting Services"). Varsity acknowledges and agrees that Webb's participation in and involvement at such Varsity Events is intended to be structured in a manner respectful of his role as Founder of Varsity, and if Varsity invites Webb to a Varsity Event, Varsity will instruct its employees in charge of such Varsity Event to act accordingly. Webb agrees not to attend any Varsity Event unless formally invited by the CLO.

(c)    *Consulting Authority.*  During the Consulting Term, Webb shall have no right or authority, and shall not represent that he has any right or authority, to act or speak for or on behalf of, or otherwise represent, Varsity or any of its affiliates in any manner except as specifically requested or instructed by the CLO to do so. In addition, during the Consulting Term, Webb shall not, absent the CLO's written request or instruction, (i) enter into any contract or commitment in the name, or on behalf of, Varsity or any of its affiliates or attempt to bind, assume or create any obligation or responsibility, express or implied, in the name, or on behalf of Varsity or any of its affiliates, in any manner whatsoever, and (ii) officially speak for, or on behalf of, Varsity Spirit or VB.  For the avoidance of doubt, nothing herein is meant to preclude or prevent Webb from speaking on his personal behalf in any manner whatsoever, provided, that, such speech does not violate any of Webb's non-disparagement obligations.

(d)    *Litigation and Government Inquiry Support.*  Webb understands that Varsity is from time to time subject to litigation and/or government inquiries. Webb further understands that he is likely to possess knowledge and/or information bearing on those matters. During the Consulting Term, (i) Webb agrees to reasonably assist Varsity and/or any of its affiliates in responding to such litigation and/or government inquiries in a reasonably prompt manner (the "Litigation Assistance"); and (ii) in addition to the Consulting Fees, Varsity agrees to advance and pay for all of Webb's legal fees and costs that are reasonably and necessarily incurred

2

by Webb as a result of his assistance provided to Varsity in defending Varsity against any such lawsuit, including any such assistance rendered in the form of his participation and/or cooperation in connection with any such suits, subject, in each case, to the applicable attorney's compliance with Varsity's written billing guidelines and procedures, a copy of which is attached as Exhibit A hereto (the "Varsity Billing Guidelines"). For the avoidance of doubt, if called upon to testify in any litigation or government inquiry relating to his work for Varsity, Webb agrees to testify truthfully. The consideration provided in this Agreement is in no way dependent upon the outcome of any litigation or government inquiry or on the content of any testimony Webb may provide in connection with such litigation or government inquiry.

4.    Healthcare Continuation Benefits.    Subject to Webb's timely election of continuation coverage under COBRA, Varsity Spirit shall (a) directly pay the monthly COBRA premiums for Webb's (and his eligible dependents') continued participation in Varsity Spirit's group health plan for up to eighteen (18) months following the Separation Date (the "COBRA Benefits"); and (b) following cessation of the COBRA Benefits and for a period of six (6) months thereafter, pay Webb a monthly cash stipend equal to the monthly COBRA premium amount referred to in clause (a) above to allow him to subsidize the costs associated with obtaining substantially similar group health coverage.

5.    Support Services.    Varsity Spirit agrees to provide Webb the use of Carla McDonald's support and secretarial services through December 31, 2020, at which point Webb shall be permitted to hire (and pay for) Ms. McDonald's future services.    Regardless of whether Webb hires Ms. McDonald, Varsity Spirit's obligation to pay for her services shall cease as of December 31, 2021.

6.    Business Expenses.    During the Consulting Term, Webb will be reimbursed by Varsity Spirit for all ordinary, necessary and reasonable business and travel expenses incurred by him in connection with performing the Consulting Services, upon timely submission by Webb of receipts and other documentation as required by the Code and in conformance with Varsity Spirit's normal procedures; the determination of such reimbursement shall be consistent with Varsity Spirit's business expense reimbursement policies in effect from time to time. Webb shall be entitled to travel via business class air travel for all flights necessarily taken to perform the Consulting Services and shall be reimbursed for such flights in accordance with Varsity Spirit's business expense policies. The Parties agree that any international travel for the ICU shall be paid by the ICU, unless such international travel is specifically taken for Varsity Spirit's international business. For the avoidance of doubt, following the Separation Date, Webb shall not have the right or ability to use Varsity's corporate aircraft.

7.    Ongoing Obligations.    The Parties expressly acknowledge and agree that, notwithstanding Webb's separation from employment with Varsity Spirit and the end of the Employment Agreement, Webb hereby reaffirms his restrictive covenant obligations under the Employment Agreement and that certain Employee Confidentiality, Non-Solicitation, Non-Competition and Invention Assignment Agreement, by and between Webb and Hercules Achievement, Inc., dated as of January 8, 2016 (the "Confidentiality Agreement"), both of which are attached as Exhibit B hereto. Accordingly, the Confidentiality Agreement and certain sections of the Employment Agreement (specifically, 14-Confidentiality; 15-Noncompetition; 16-Nonsolicitation; 17-Mutual Non-Disparagement; 18-Indemnification; 22-Severability; and 23-

3

Survivorship; 25-No Set-Off, Mitigation) shall remain in full force and effect following the Separation Date; provided, that the Date of Termination (or term of similar import with respect to the Confidentiality Agreement) for purposes of determining the post-termination portion of the Noncompete Period (or term of similar import with respect to the Confidentiality Agreement) shall be the last day of the Consulting Term; and provided, further, that Webb's work, involvement and participation in the IOC/ICU shall not be a breach of the Employment Agreement, the Confidentiality Agreement or Section 7 of this Agreement. In addition, the indemnification provisions contained in the Amended and Restated By-Laws of each of Hercules Achievement Holdings, Inc., adopted on December 11, 2014 (the "HAH By-Laws"), and Hercules VB Holdings, Inc., adopted on December 12, 2014 (the "HVBH By-Laws" and, together with the HAH By-Laws, the "Varsity By-Laws"), a copy of each of which is attached as Exhibit C hereto, shall also remain in full force and effect pursuant to their terms.

       8.     Lawsuit. The Parties are currently named defendants in a lawsuit styled *American Spirit and Cheer Essentials, Inc. et al v. Varsity Brands, LLC et al and Jeff Webb*, Cause No. 2:20-cv-02782 (W.D. Tn. 2020) ("Lawsuit"). Pursuant and subject to the terms and conditions of the Varsity By-Laws, Varsity agrees to advance and pay for all reasonable attorneys' fees incurred by Webb in connection with Webb's defense and participation in the Lawsuit, including all such costs and attorneys' fees incurred by Webb for legal services rendered to him by Paul Coggins and the law firm Locke Lord LLP ("LL"). To the extent payable, such costs and fees shall be timely paid by Varsity Spirit to LL within thirty (30) days after receiving a monthly invoice for such legal services, subject to LL's compliance with the Varsity Billing Guidelines.

       9.     No Other Compensation or Benefits. Webb acknowledges that, except (a) as expressly provided in this Agreement or the surviving provisions of the Employment Agreement, (b) as otherwise specifically provided under any employee benefit plan of Varsity in effect on the date hereof or (c) as otherwise required by applicable law, Webb shall not receive any additional compensation, severance or other benefits of any kind following the Separation Date.

      10.    Tax Matters.

          (a)    Varsity makes no representation to Webb concerning the tax consequences of the payments to be made under this Agreement. Webb shall be solely responsible for all federal, state and local income or business taxes, including estimated taxes, self-employment and any other taxes, fees, additions to tax, interest or penalties, that may be assessed, imposed, or incurred as a result of the payment of such payments, or any other amounts paid by Varsity to Webb in connection with this Agreement.

          (b)    The intent of the Parties is that the payments contemplated under this Agreement be either compliant with, or exempt from, Section 409A, and accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith or exempt therefrom. Further, Section 31 of the Employment Agreement is fully incorporated herein by reference.

          (c)    During the Consulting Term, Webb will perform the Consulting Services pursuant to this Agreement as an independent contractor. Nothing in this Agreement shall be construed to constitute or create any association, partnership, joint venture, employee or agency

HIGHLY CONFIDENTIAL                                                        Webb_IPP_00000621

relationship between Webb and Varsity for any purpose. Webb shall furnish all tools and materials necessary to perform the Consulting Services. Webb: (i) acknowledges and agrees that he is obligated to report as income all payments or amounts received by him pursuant to this Agreement; and (ii) acknowledges his obligation to pay all required taxes and obligations pursuant to Section 10(a) above. Varsity shall not be obligated to withhold any portion of any payments or amounts owed to Webb hereunder for payment of any taxes for which Webb is liable. Webb shall not be entitled to, and shall make no claim to, any rights or benefits afforded to employees or any other consultant or representative of Varsity, including, without limitation, disability or unemployment insurance, workers' compensation insurance, pension and retirement benefits, profit-sharing or other rights under any other benefit plan, agreement, arrangement, policy or program applicable to employees of Varsity. Subject to Section 4 above, neither the Varsity nor any of its affiliates shall have responsibility to provide any such benefits to Webb. Webb hereby agrees to make Webb's own arrangements for any of such benefits as Webb may desire and acknowledges and agrees that Webb shall be solely responsible for any and all costs due in connection with any such arrangements.

12.    Arbitration.    Other than in respect of any claim by any Party seeking to enjoin violation of this Agreement by the other, or otherwise seeking equitable relief, any dispute arising out of or related to this Agreement shall be exclusively resolved by arbitration in Memphis, Tennessee in accordance with the Employment Rules of the American Arbitration Association then in effect. The Parties agree that a hearing before an AAA arbitrator shall commence within one hundred twenty (120) days after the arbitrator has been appointed by the AAA. Judgment may be entered on the arbitrator's award in any court having jurisdiction. All costs and expenses of any such arbitration (including all legal fees and expenses incurred by Webb) shall be borne by Varsity Spirit, provided, however, that the legal fees and expenses incurred by Webb shall be borne by Webb and not by Varsity Spirit if such arbitration results in a determination that the position taken by Webb was incorrect.

13.    Confidentiality.    The Parties agree to keep the terms of this Agreement confidential and not to disclose the terms to any third-parties or persons outside Varsity, except as may be necessary to effectuate the express terms and obligations of this Agreement or to the extent expressly permitted or required by applicable law. For the avoidance of doubt, nothing in this Agreement shall prohibit or restrict the Parties or their respective attorneys from: (i) making any disclosure of relevant and necessary information or documents in any action, investigation, or proceeding relating to this Agreement made hereunder, or as required by law or legal process, including with respect to possible violations of law; (ii) participating, cooperating, or testifying in any action, investigation, or proceeding with, or providing information to, any governmental agency or legislative body, any self-regulatory organization, and/or pursuant to the Sarbanes-Oxley Act; or (iii) accepting any U.S. Securities and Exchange Commission awards. In addition, nothing in this Agreement prohibits or restricts the Parties from initiating communications with, or responding to any inquiry from, any regulatory or supervisory authority regarding any good faith concerns about possible violations of law or regulation. Pursuant to 18 U.S.C. § 1833(b), Webb will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret of Varsity or any of its affiliates that (A) is made (x) in confidence to a federal, state, or local government official, either directly or indirectly, or to Webb's attorney and (y) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. If

5

Webb files a lawsuit for retaliation by Varsity or any of its affiliates for reporting a suspected violation of law, Webb may disclose the trade secret to Webb's attorney and use the trade secret information in the court proceeding, if Webb files any document containing the trade secret under seal and does not disclose the trade secret except under court order. Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by such section.

14.    <u>Entire Agreement</u>.  This Agreement, along with those specific sections of the Employment Agreement referred to herein, the Confidentiality Agreement and the Varsity By-Laws, represents and contains the entire understanding and agreement between the Parties and shall supersede all prior undertakings and agreements, whether oral or in writing, previously entered into between the Parties. For the avoidance of doubt, the Parties acknowledge and agree that nothing in this Agreement abrogates Webb's (a) rights arising under the Varsity By-Laws or (b) obligations under the Employment Agreement (as modified herein) and the Confidentiality Agreement. Except as specifically contemplated herein, to the extent there are any inconsistencies or conflicts between the terms of this Agreement and the terms of any other agreement, the terms of this Agreement shall control and govern.

15.    <u>Counterparts & Signatures</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, and together any counterparts shall constitute one and the same instrument. Additionally, the parties to this Agreement agree that electronic reproductions of signatures (*e.g.*, scanned PDF versions of original signatures, facsimile transmissions) shall be treated as original signatures for purposes of execution of this Agreement.

16.    <u>Successors</u>.  This Agreement shall be binding on, and the rights and obligations of the Parties under this Agreement shall inure to the benefit of, the Parties and their respective heirs, administrators, representatives, successors and assigns.

*[signature page follows]*

HIGHLY CONFIDENTIAL                                                                          Webb_IPP_00000623

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date.

**JEFFREY WEBB**

Jeffrey Webb

**VARSITY SPIRIT LLC**

By: Bill Seely

Title: President

-and-

**VARSITY BRANDS LLC**

By: Burton Brillhart

Title: Chief Legal Officer and General Counsel

Signature Page – Separation and Consulting Agreement

**HIGHLY CONFIDENTIAL**

**EXHIBIT A**

**Varsity Billing Guidelines**

See attached.

HIGHLY CONFIDENTIAL



### OUTSIDE COUNSEL ENGAGEMENT GUIDELINES - 2020

I.   INTRODUCTION

   A.   These Outside Counsel Engagement Guidelines ("Guidelines") are intended to communicate the requirements of the Office of the Chief Legal Officer ("OCLO") with respect to outside counsel's handling of legal matters on behalf of Varsity Brands, LLC and its affiliated companies (collectively, "Varsity").

   B.   In order to perform legal services for Varsity, attorneys and law firms (herein "Counsel") representing Varsity are required to comply with these Guidelines, unless otherwise agreed to in writing by an attorney in the OCLO. Varsity will not be responsible for payment for legal services, expenses or costs that are incurred in contravention of these Guidelines.

   C.   To the extent that any of the terms and conditions of these Guidelines conflict with previous billing guidelines, engagement letters or other agreements between you and Varsity, these Guidelines supersede all prior agreements or arrangements, except to the extent set forth in **Schedule 1**.

II.  TEAM CONCEPT

   A.   An attorney in the OCLO will be Counsel's contact with Varsity (the "Supervising Attorney"). You may also have another contact at one or more of Varsity's affiliated companies. You **must** copy the Supervising Attorney on all correspondence that you direct to any other employees of Varsity. If a non-legal professional within Varsity requests legal services, please notify an attorney in the OCLO to ensure that a Supervising Attorney is assigned to the matter.

   B.   We expect and encourage Counsel to communicate frequently with the Supervising Attorney on the matter(s) or case(s) being handled. We expect prompt, timely responses to our inquiries and advance notice of all significant events in a case or matter. Counsel should communicate promptly on any significant developments in the case or matters such as depositions, discovery responses, expert reports, settlement options, dispositive motions, etc. While we rely on our Counsel and their expertise, please note that you are not authorized to make substantive decisions, such as whether to settle a case, or for how much, without the express written authorization of the Supervising Attorney.

   C.   All documents prepared by Counsel for service or filing should be sent to the Supervising Attorney with ample time to allow for meaningful review (e.g., a minimum of one week for major documents and non-urgent matters). Only in exceptional circumstances (for example, an emergency hearing) should the Supervising Attorney be given less than seventy-two (72) hours to review work product.

HIGHLY CONFIDENTIAL

Webb_IPP_00000626

D. Copies of final or as-filed documents must be sent to the Supervising Attorney, as should copies of all substantive file memoranda, with a copy to the Chief Legal Officer. Memoranda should be sent in the form they exist for you and should not be finalized or polished for this purpose. They should be sent as soon as practicable after they are created or filed.

E. Please send any materials (i.e. correspondence, documents to be reviewed, spreadsheets, etc.) electronically via email to the Supervising Attorney using Microsoft programs. Signed documents should be scanned to a PDF file and emailed. Electronically transmitted final documents do not need to be followed by hard copies unless expressly requested by the Supervising Attorney.

## III. LITIGATION CASE PLANS

For litigation matters only, Counsel shall submit to the Supervising Attorney within thirty (30) days of retention for a particular matter, a **legal plan of action** for the litigation matter (the "Case Plan") and a **budget** (the "Case Budget") for that matter. The Case Plan and Case Budget shall be updated promptly as circumstances require.

A. The Case Plan should contain a detailed strategy, which should include an initial analysis of the matter, identification of issues and objectives, development of a strategy, identification of required activities, target dates for completion and the projected cost for each phase, including e-discovery where applicable. The Case Plan may be in letter or outline form.

B. The Case Budget may be incorporated in the Case Plan or may be submitted separately in letter, outline or spreadsheet form. We take Case Plans and Case Budgets seriously and expect Counsel to follow the Case Plan and Case Budget for a given matter unless deviation is discussed with the Supervising Attorney and approved.

## IV. ASSIGNMENT OF A MATTER

A. The level of expertise of the persons from your firm working on an assignment must be appropriate to the complexity of the task. For example:

1. Partners should not bill for tasks that can be more economically performed by associates (or at least should not bill at their partner rates);

2. Research is to be done by associates to the extent necessary; or paralegals, if appropriate;

3. Similarly, associates should not bill for tasks that can be more economically performed by paralegals; and

4. The use of summer associates, interns or law clerks on any matter must be discussed in advance with the Supervising Attorney. We expect the costs associated with the use of such personnel to be strictly scrutinized by the billing partner (i.e., Varsity does not expect to pay for general research or "busy work" performed by summer associates, interns or law clerks). Generally speaking, we view summer associate programs as more of a recruiting tool for your law firm and find that we seldom get much added value from the use of summer associates for anything other than routine research projects.

HIGHLY CONFIDENTIAL

Webb_IPP_00000627

B. We are to be consulted in advance about the lawyers, and the number of lawyers, at your firm who will work on a matter, including both the overall staffing structure and the individuals involved. We generally request continuity in the lawyers who work on our matters (including, but not limited to, drafting and revising motions), both in the course of a single representation and in subsequent representations, so that we may benefit from Counsels' experience in working with us and on our issues. If staffing must be changed in the course of a matter, we do not expect to be charged for bringing a replacement up to speed.

C. "Local" counsel, experts and other consultants may not be retained without our prior approval. We expect local counsel and significant consultants to be governed by these Guidelines and we ask that you provide a copy to local counsel, experts and consultants when they are retained. The terms of any expert or consultant's engagement must be discussed in advance with us.

V. CONFLICTS

A. Varsity has subsidiaries and affiliates that may conduct business under various trade names. It is important that you be sensitive to both direct conflicts of interest posed by your representation of Varsity's subsidiaries or affiliates and other clients, and the more indirect, but nevertheless serious, conflicts that may arise from your firm's advocacy on behalf of other clients of positions conflicting with important Varsity business interests. We expect to be informed of, and consulted with respect to, all potential conflicts promptly, including any positions the firm has taken or is presently taking on issues which to your knowledge may be adverse, harmful or otherwise prejudicial to the interests of Varsity and its subsidiaries or affiliates.

B. You must ensure that you have the necessary information with respect to Varsity and its subsidiaries or affiliates to thoroughly assess these issues. To assist you in your evaluation of this issue, a list of Varsity's affiliated companies and trade names is attached hereto as **Schedule 2**. This list will be updated from time-to-time. Please be mindful that this list is highly confidential and should not be used for any external purposes.

C. Varsity will not pay any bills related to your conflicts of interest searches or investigations to ascertain whether you can enter into a representation relationship with Varsity.

VI. MEDIA RELATIONS

A. Varsity does not authorize Counsel to comment publicly on any aspect of Varsity's legal matters or business. All media inquiries must be discussed with the Supervising Attorney before responding to the media contact in any way. This includes even "no comment" or other non-substantive responses.

B. We are aware that many law firms have engaged in comprehensive marketing of their services. Nonetheless, Varsity does not permit you to advertise or promote the fact of your relationship with Varsity other than listing Varsity as a represented client unless we specifically agree otherwise. Notwithstanding the foregoing, in all cases, we must know in advance the content and context of any such mention of our Company and your representation of Varsity.

3

 Webb_IPP_00000628

VII. FEES AND RATES; EXPENSES

    A.  Fees and Rates

        1.  Please propose fixed fee arrangements to the extent possible, and in particular for project-based matters;
        2.  Hourly rates must be agreed to in advance by the Supervising Attorney prior to undertaking a particular matter;
        3.  Rate increases require the written consent of the OCLO;
        4.  Varsity will not honor unilateral rate increases not approved in advance; and
        5.  Where services are rendered on a basis other than hourly rates, a specific agreement must be made in advance.

    B.  Expenses

        1.  Varsity will only pay the actual incurred costs for expenses (without "premiums" or "markups" and net of any discounts or incentives);
        2.  Any expense of $500 or more must be pre-approved by the Supervising Attorney, except for travel-related expenses, discussed below;
        3.  All invoices for expenses must have supporting documentation available for review upon our request, unless otherwise provided herein; and
        4.  All invoices must contain a detailed itemization by category, cost item, and date (including detail for phone and messenger charges).

VIII.  BILLING PROCEDURES AND REQUIREMENTS

    A.  With limited exceptions, **all** law firms are expected to comply with procedures implemented for submission of Varsity invoices **electronically**.

    B.  Varsity's expectation is that it will pay all invoices that comply with these Guidelines within 60 days of its receipt. Please do not include previous amounts billed as unpaid, delinquent or outstanding on subsequent invoices, unless the 60 days payment date has passed from that particular invoice's date.

    C.  Invoices should be submitted monthly no later than 30 days after services are rendered. Electronic invoices are to be submitted via email as shown below. Please include the Supervising Attorney's name in the email if it is not included on the invoice. **DO NOT MAIL HARD COPIES.**

        BSN Sports        legalinvoices@bsnsports.com
        Varsity Spirit      legalinvoices@varsity.com
        Herff Jones       legalinvoices@herffjones.com
        Varsity Brands    legalinvoices@varsitybrands.com (*enterprise/corporate matters only*)

    D.  Invoices **must** be submitted for the preceding year **no later than February 15** of the subsequent year. Our budgets are set for specific periods (usually from year to year), and invoices on matters may not be carried over from one budget period to another without prior written consent of the OCLO.

4

E.  Unless there are exceptions approved by the OCLO or extenuating circumstances, no timekeeper, experts' or consultants' billings, or expenses, should be presented for payment that are 90 days or older in arrears.

F.  Each firm must provide the name and contact information of their billing administrator responsible for submitting bills either on the invoice or in the invoice transmittal email.

G.  **Each matter or case must be billed on a separate invoice**. Unless approved in advance, matters will not be designated as "general" without identifying a specific case or matter. "Miscellaneous" or "For Services Rendered" are not acceptable matter names. Code names for any new matters necessitating a code name due to sensitivity or confidentiality will be assigned by the OCLO and must be used consistently on invoices.

H.  If separate matters must be opened in support of a central matter (e.g., oppositions in a trademark dispute), a summary must be provided to the Supervising Attorney that shows all time accrued in support of the central matter during the month.

I.  Invoices must include:

    1.  The firm's IRS number, address and phone number;
    2.  The Business Unit name for the matter (Varsity Brands, Varsity Spirit, BSN Sports, Herff Jones); if you are uncertain as to which Business Unit a matter is to be billed to, please consult the Supervising Attorney prior to invoice submission;
    3.  The caption of the case or name of the matter;
    4.  Litigation matters should be the style of the case or a recognizable abbreviation thereof;
    5.  Invoice number;
    6.  Invoice date; and
    7.  Invoice amount.

J.  Each invoice must provide a summary of the charges billed by each individual timekeeper (an invoice format example is attached as Attachment A) and will include:

    1.  Identity of timekeeper;
    2.  Status (e.g., partner, associate, paralegal, etc.);
    3.  Hourly rate;
    4.  Total time billed by each timekeeper included on the invoice;
    5.  Corresponding total dollar amount charged by each timekeeper;
    6.  Discounts, if applicable; and
    7.  A running total of the fees accrued in support of the matter to date (historical accruals).

Time Entries:

    1.  Time must be recorded with specific detail, sufficient to understand what work was done.
    2.  All time must be billed in tenth-of-an-hour increments unless a pre-approved alternative fee arrangement is applicable.
    3.  Each bill must reflect entry of **single-activity time** records.
    4.  Daily time must be segregated by tasks with the time expended for each task defined clearly (e.g., telephone conference with opposing counsel (.3); prepare motion to dismiss (.7)). Time billed in excess of 8 hours in one day by a single timekeeper requires prior approval by the OCLO. **Blocked billed time is not acceptable and invoices will be returned for further clarification.**

HIGHLY CONFIDENTIAL                                                                            Webb_IPP_00000630

5. Each time record must provide the date of performance and the identity of the timekeeper performing the work.

6. Each time record must provide a detailed description of all work performed. This includes, but is not limited to, the following:

- The specific identity of participant(s) and subject matter(s) involved in intraoffice and third-party communications (e.g., telephone calls, correspondence, meetings, etc.);
- Varsity participants should never be generally referred to as "Client;"
- The purpose of a hearing;
- The identity of each deponent/interviewee when the deposition/interview is attended, prepared for, summarized, etc.;
- The purpose of extensive review of transcripts (deposition, trial, other testimony) or other documents;
- Legal research billings should include a brief description of the issue researched, as well as names or citations of the digests, statutes, annotations, cases, journals, etc. reviewed (e.g., "Perform case analysis under Texas law regarding reasonable geographical scope for employee non-competition agreements");
- The specific non-deposition discovery performed; and
- The identity of materials/documents reviewed or drafted.

7. Generic descriptions such as the following are not acceptable for billing purposes without further detail being provided:

- Attention to matter;
- Attention to file;
- Review case and issues;
- Review correspondence;
- Arrangement;
- Discovery;
- Trial preparation;
- Organize file;
- Meeting;
- Update strategy;
- Motion work;
- Work on project or case;
- Pleadings;
- Work on file;
- Prepare for meeting;
- Work on discovery;
- Receive/review documents;
- Research;
- Analysis; or
- Any other nondescript activity.

K. Invoices

1. Implicit in the submission of a statement for services rendered and out-of-pocket disbursements is the assurance of the Relationship Partner that he or she has reviewed the bill and is satisfied that the services billed are accurate, in compliance with these

6

HIGHLY CONFIDENTIAL

Guidelines, were effective and efficient, and produced appropriate value for the dollars being billed.

2. Varsity will not pay for:

- Preparation of invoices or responses to billing inquiries;
- Audit response letters that are billed in excess of two hours;
- Interest or late fees on invoices;
- Time spent reviewing or analyzing the law firm's conflicts issues, opening or closing the file, or other administrative activities;
- Clerical work;
- Charges directly related to the departure of a lawyer or paralegal (including startup work or higher rates for replacement personnel);
- Electronic research;
- Incoming fax charges;
- Fees related to the preparation and filing of motions for extension of time, unless such motions are necessitated by the actions and/or omissions of Varsity;
- Intra-office communications, such as conferences and telephone calls, unless such conferences and calls are for the purpose of formulating legal strategy and limited to no more than one half-hour conference every month, or are pre-approved by the Supervising Attorney;
- Travel time or expenses for your use of out-of-town lawyers or paralegals for a local matter, even if your principal office is located out of town;
- Case management or litigation software or systems;
- Unauthorized imaging services and costs related to discovery documents;
- Unauthorized creation of illustrative exhibits and other presentation materials;
- Continuing education for any personnel;
- Overhead, including rent, conference rooms, equipment rental, utilities, computer equipment, software, books, electronic research except as provided above, publications, seminars, office supplies, routine postage, refreshments and meals during meetings, local telephone charges, and non-attorney or non-paralegal staff (such as library staff);
- Law office staff overtime charges (unless pre-approved);
- Fees and expenses for secretarial work, word processing, proofreading, overtime, transportation and meals, collating, velo binding, copying, faxing, scheduling, making travel arrangements, charges to open or close a file, organization and managing clerical work;
- Costs and expenses that arise from third parties performing facsimile and copy services;
- Federal Express, UPS, other express mail carriers, and/or courier charges as a result of avoidable delay; and
- Inadequately described or "miscellaneous" expenses.

3. Varsity will not pay for the following without prior approval:

- Time incurred performing legal research in excess of 3 hours or $1,500 per month;
- Digesting or otherwise preparing page and line summaries of depositions or other recorded testimony before trial is imminent;
- Excessive reworking or redrafting of pleadings, correspondence, legal memoranda, or other documents;
- Trial preparation undertaken when trial is not imminent;

HIGHLY CONFIDENTIAL

Webb_IPP_00000632

- More than one attendee or participant at a deposition, trial, mediation, arbitration, hearing, court appearance, meeting with third parties and other similar or related events including conference calls, unless advance approval is given;
- **Duplicated efforts**; or
- Activities that otherwise deviate from the Guidelines and procedures set forth herein.

4. Varsity will pay for:

- Internal photocopying up to 5 cents per page. The per-page photocopying rate, the date the photocopying was performed, and the number of copies made must be noted on the bill before it will be paid;
- Actual long-distance telephone charges (no mark ups will be accepted);
- **Reasonable travel expenses**, including airline transportation not to exceed coach fares will be reimbursed. We will pay mileage at the IRS-approved rate. Travel charges must provide detailed travel and itinerary information. We expect you to use appropriate efforts to obtain available discounts and to pass the benefit of such discounts on to Varsity. We expect you will not bill for unproductive travel time and in no event will work performed during travel time exceed five (5) hours in a single day. *To qualify for payment, expense bills must contain an "expense account" level of detail and must be accompanied by receipts and other expense documentation for all travel and reimbursements*. Pre-approval is required for all anticipated travel expenses of $2,500 or more;
- Experts and investigators' expenses, provided that they have been approved by the Supervising Attorney;
- Necessary messenger delivery and air freight/courier (e.g., Federal Express, Airborne, UPS, etc.) expenses. Overnight/courier services should be used only when there is insufficient time to use standard U.S. mail, electronic mail or facsimile transmission or sensitive documents/flash drives are being submitted to another party. We also encourage you to use second-day delivery where feasible and to send documents electronically, preferably in a PDF format;
- Court filing fees, jury fees and witness fees, if previously approved; and
- Expenses for services provided by contractors or other non-employees of the law firm if pre-approved by the Supervising Attorney.

L. Invoice Disputes

1. Varsity is not responsible for charges that it disputes, and over which Counsel does not express disagreement within 90 days of the disputed invoice. Varsity's expectation is that it will convey its disagreement regarding any invoice within 30 days of receipt thereof either expressly to the law firm's billing administrator and/or Relationship Partner or by not paying the disputed amount(s). In either event, Counsel will have notice of Varsity's dispute with a particular invoice within the 90-day period referenced herein.

IX.  MISCELLANEOUS

A. Ownership of Work Product. Varsity is the owner of the files reflecting work done on its behalf. While a law firm may retain a duplicate set of files materials (at its expense) at the termination of a matter, all original file materials are expected to be forwarded to Varsity as promptly as possible after request for such materials.

8

B. <u>Audits</u>.

1. Varsity reserves the right to examine and audit books, records, other documents, and supporting material for the purpose of evaluating compliance with these Guidelines, the billing requirements set forth herein, and the reasonableness of the firm's charges.
2. The books, records and documents we may examine include without limitation:

   - Original time sheets from attorneys and staff;
   - Explanations of billing methods and practices;
   - Attorney work product and other contents of open and closed files involving the representation of Varsity; and
   - Phone message records, diaries, etc.

3. All requested books and records must he made available to us during business hours for examination, audit, or reproduction.
4. We shall employ, at our discretion, internal auditors or independent outside auditors for purposes of accomplishing audits.
5. On the basis of Varsity's evaluation or audit(s), we may request invoice reductions, reimbursements, and reassignment of firm personnel responsible for assigned cases or new arrangements.
6. Varsity's prior payment of legal bills and expenses on a file does not constitute a waiver of any of its rights to request reimbursement resulting from an evaluation or audit of your firm's work and bills.

C. Varsity reserves the right to modify its Guidelines, procedures, and requirements for Counsel as may become appropriate in the future. We will advise you of any such changes or modifications as they arise.

D. Questions regarding these Guidelines and any notices related thereto should be directed to the Supervising Attorney.

9

## ATTACHMENT A

### Sample Invoice Format

Submit a **separate invoice for each matter** your firm is handling, no later than 30 days after the month services are rendered, to the email addresses shown below, as applicable. Please contact the Supervising Attorney if you have any questions.

| | |
|---|---|
| BSN Sports | legalinvoices@bsnsports.com |
| Varsity Spirit | legalinvoices@varsity.com |
| Herff Jones | legalinvoices@herffjones.com |
| Varsity Brands | legalinvoices@varsitybrands.com (*enterprise/corporate matters only*) |

**NOTE:  DO NOT SEND HARD COPIES**

Date
REMITTANCE

Smith & Jones, LLP
800 Main Street, Suite 250
Anywhere, TX 12345

Telephone:  555-444-3333
Federal Tax ID Number: 75-1234567

Varsity entity:       Varsity Spirit
Matter Name:       *John Doe v. Varsity Spirit*

Invoice No:             20-12345

Invoice Date:          January 1, 2020

Total Fees:              $1,620.00

Total Costs:            $1,000.00

Total Amount Due:  $2,620.00

10

**HIGHLY CONFIDENTIAL**                                                                                      Webb_IPP_00000635

Invoice #              20-12345

Invoice Date:        January 1, 2020

Varsity entity:      Varsity Spirit

Matter/Case/Project Name:    *John Doe v. Varsity Spirit*


Varsity Attorney:  **Tiffany Tsumpis**

For Services Rendered from_____to _____

| Date | Person/Status | Description of Task(s) | Time (Hrs.) |
|------|---------------|------------------------|-------------|
| 12/1 | J. Smith/partner | Attend deposition of plaintiff's expert James Doe | 7.2 |
| 12/15 | M. Doe /paralegal | Draft memorandum in support of motion for summary judgment | 2.0 |
|  | **TOTAL HOURS** |  | 9.2 |

Summary

J. Smith    7.2 hrs. @$200/hr. = $1,440.00

M. Doe     2.0 hrs. @$90/hr. = $    180.00

TOTAL FOR PROFESSIONAL FEES              $1,620.00

Expenses

| | |
|---|---|
| Air fare (round trip) from_____to_____ | $773.50 |
| Court Reporters (3 hours @$25.00 hr.) | 225.00 |
| Copies (30 @ .05 cents) | 1.50 |
| Total for Expenses | $1,000.00 |
| Less Varsity Discount | - _____ |
| Total This Invoice | $2,620.00 |
| Total Fees and Expenses Accrued to Date | _____ |

HIGHLY CONFIDENTIAL                                    Webb_IPP_00000636

# SCHEDULE 1

Exceptions to Item I.C., if any

HIGHLY CONFIDENTIAL                    Webb_IPP_00000637

# SCHEDULE 2

| Entity | Trade Name/Division |
|---|---|
| BSN Sports, LLC | BSN<br>BSN Sports<br>Passon's Sports<br>The Athletic Connection<br>Tomark Sports<br>U.S. Games<br>New England Camp Discounter<br>allgoods llc<br>-Acrux Holdings, LLC<br>-Blue Moose Tees<br>-Fan Cloth Products<br>-Volume Specialties |
| Herff Jones, LLC | Camera Art<br>Camera Art School Photographers<br>Collegiate Cap & Gown<br>Delmar<br>Delmar Printing & Publishing<br>Framing Success<br>Hercules Lone Star Assets, LLC<br>Herff-Jones Education Division<br>Herff Jones Canada, Inc.<br>It's About Time<br>Masters of Design<br>Murphy Cap & Gown Company<br>Murphy Robes<br>NYSTROM<br>Reed Ring |
| Varsity Spirit, LLC | 180 PRO<br>ACDA<br>All Things Cheer (ATC)<br>All Star Challenge<br>All Star Championships<br>Aloha Spirit Championships<br>American Championships<br>American Cheer and Dance Academy<br>American Cheer Power<br>American Cheerleader Magazine<br>American Cheerleader Media, LLC<br>American Cheerleaders Association (ACA)<br>America's Best<br>Athletic Championships<br>Champion Cheer and Dance<br>Champion Spirit Group<br>Cheer Ltd<br>CHEERSPORT<br>Cheerstarz<br>COA CHEER & DANCE |

13

| Entity | Trade Name/Division |
|---|---|
| | Coastal cheer & dance |
| | Dance Fest |
| | Double Down Championship |
| | Encore |
| | EPIC Brands |
| | Feel the Power |
| | GLCC Events |
| | GSSA (Golden State Spirit Association) |
| | IASF |
| | Inside Cheerleading, LLC |
| | Jam Brands Europe Limited |
| | jamfest! |
| | Just Dance! |
| | Live! Cheer & Dance Competitions |
| | Mardi Gras |
| | Mid Atlantic Championships |
| | Nation's Choice |
| | National All Star Cheerleading Championship (NASCC) |
| | National Cheerleaders Association (NCA) |
| | National Dance Alliance (NDA) |
| | National Dance Team Championship (NDTC) |
| | National High School Cheerleading Championship (NHSCC) |
| | One Up Championships |
| | NOW O-ZONE |
| | Ozone, LLC |
| | Pac West |
| | Pacific All Star Championships |
| | Premier Athletics |
| | PURE |
| | Spirit Apparel, LLC |
| | Spirit Celebration |
| | Spirit Cheer |
| | Spirit Festival |
| | Spirit Sports Cheer & Dance |
| | Spirit Xpress Cheerleading |
| | Spirit Unlimited |
| | Stanbury Uniforms, LLC |
| | Team Champion |
| | The Atlantic Championships |
| | The American Championships |
| | The D2 Summit |
| | The Dance Summit |
| | The Groove Experience |
| | The Summit |
| | The U.S. Finals |
| | United Spirit Association (USA) |
| | Universal Cheerleaders Association (UCA) |
| | Universal Dance Association (UDA) |
| | Universal Spirit |
| | Urban Cheer Experience |
| | Varsity |

HIGHLY CONFIDENTIAL    Webb_IPP_00000639

| Entity | Trade Name/Division |
|---|---|
| | Varsity All Star<br>Varsity All Star Fashion<br>Varsity Canada<br>Varsity International, LLC<br>Varsity Intropa Tours<br>Varsity Shop<br>Varsity Spirit Canada, Inc.<br>Varsity Spirit Fashion<br>Varsity Spirit Fashions & Supplies, LLC<br>Varsity University<br>World Spirit Federation (WSF)<br>Xpress Brands<br>Varsity Performing Arts<br>Varsity Athletic Band<br>Varsity Winter Showcase |
| Varsity Brands, LLC | Varsity Brands Europe GmbH<br>Varsity China, LLC<br>Varsity Europe<br>Varsity Europe UK Limited<br>Varsity (Guangzhou) Sports Co., Ltd.<br>Varsity TV Europe<br>V!ROC<br>The European Open<br>German All Level Championship<br>Europe Shop |

15

HIGHLY CONFIDENTIAL

Webb_IPP_00000640

# EXHIBIT B

## Employment Agreement and Confidentiality Agreement

See attached.

HIGHLY CONFIDENTIAL

## AMENDED EMPLOYMENT AGREEMENT

THIS AMENDED EMPLOYMENT AGREEMENT (the "Agreement") is entered into as of August 1, 2019 ("Effective Date"), by and between VARSITY SPIRIT LLC (the "Company") on the one hand and JEFFREY WEBB ("Executive") on the other hand, and replaces Executive's Employment Agreement with HERFF JONES, LLC, dated as of March 2, 2016 (the "Former Agreement"). The Company and Executive may collectively be referred to as the "Parties."

WHEREAS, historically Executive has been recognized as the founder of Varsity Brands and the Company;

WHEREAS, Executive has most recently been employed as Founder and Chairman under the Former Agreement and the Parties desire to terminate and/or replace the Former Agreement with this Agreement commencing on the Effective Date; and

WHEREAS, the Company wishes to employ Executive, and Executive wishes to be employed by the Company, pursuant to the terms of this Agreement.

NOW, THEREFORE, the Parties agree as follows:

1.    Employment.  The Company and Executive hereby terminate the Former Agreement. The Company hereby agrees to continue to employ Executive, and Executive hereby agrees to accept continued employment with the Company, upon the terms and subject to the conditions set forth herein.

2.    Term.  The term of employment under this Agreement shall become effective on the Effective Date and, unless earlier terminated pursuant to Section 10, shall expire on August 1, 2021 (such period, the "Initial Term"). After the Initial Term, this Agreement will continue in effect for an additional period of one (1) year, unless ninety (90) days prior to the end of the Initial Term the Company or Executive has delivered written notice to the other party that the Agreement will not be so extended, in which event the term shall expire at the end of the Initial Term (the Initial Term, together with any extensions thereof, shall be collectively referred to hereunder as the "Term").

3.    Position.  During the Term, Executive shall serve as the Chairman of the Company.

4.    Duties and Reporting Relationship.  During the Term, Executive shall use his skills and render services to the best of his abilities in supervising and conducting the activities set forth on Schedule A. Executive shall report directly to the President of the Company and shall have such customary responsibilities, duties and authority customarily associated with this position in a company the size and nature of the Company, as well as those responsibilities, duties and authority described on the attached "Schedule A." Nothing in this Agreement shall be deemed to prevent Executive from participating in or serving on (i) the governing body of any civic, community, charitable or political organization with which Executive may currently be or hereafter become involved, (ii) the board of directors or governing body of another business entity that is not a competitor of the Company, or (iii) overseeing his personal investments and non-competitive business interests outside the Company; provided, however, that such participation or service may not interfere with Executive performing his duties hereunder.

5.    Place of Performance.  Executive shall perform his duties and conduct his business at the offices of the Company in Memphis, Tennessee, such other locations as Executive may deem appropriate, or where the Company's business may reasonably require his physical presence.  Executive shall

1

HIGHLY CONFIDENTIAL    Webb_IPP_00000642

generally have discretion to determine what travel is reasonably required to carry out his responsibilities and the Company shall not impose travel requirements that exceed (in terms of time commitment) the proportion of Executive's time spent traveling during calendar year 2018.

6.    Base Salary and Bonus.

(a)    Base Salary.  During the Term, Executive's base salary (the "Base Salary") hereunder shall be no less than $375,000 per year, payable in accordance with the Company's normal payroll procedures.

(b)    Annual Bonus Plan.  During the Term, Executive shall be eligible to receive an annual target bonus ("Annual Bonus") equal to one hundred percent (100%) of his Base Salary, earned in accordance with a Board-approved bonus plan.  The Annual Bonus shall be paid on or before March 15th of the year immediately succeeding the calendar year to which the Annual Bonus relates.

7.    Vacation, Holidays and Sick Leave.  During the Term, Executive shall be entitled to four (4) weeks of paid vacation, in addition to paid holidays and sick leave, all in accordance with the Company's standard policies for its senior executive officers.

8.    Business Expenses.  During the Term, Executive will be reimbursed for all ordinary and necessary business expenses incurred by him in connection with his employment upon timely submission by Executive of receipts and other documentation as required by the Internal Revenue Code of 1986, as amended (the "Code") and in conformance with the Company's normal procedures; the determination of such reimbursement shall be consistent with the Company's business expense reimbursement policies in effect as of the date hereof.  Executive shall be entitled to travel for Company business via business class air travel for all flights and shall be reimbursed for such flights in accordance with the Company's business expense policies and in accordance with Section 31(b)(v).

9.    Retirement and Welfare Benefits.  During the Term, Executive shall be eligible to participate in all health benefits, insurance programs, retirement plans and other employee benefit and compensation arrangements (collectively, the "Employee Benefits") available to officers of the Company generally. Executive shall be entitled to receive Employee Benefits no less favorable than those provided to any other senior executive officer of the Company.

10.    Termination of Employment.

(a)    General.  Executive's employment hereunder may be terminated by Executive, on the one hand, or the Company, on the other hand, as applicable, upon the circumstances described in this paragraph 10(a).

(i)    Death.  Executive's employment hereunder shall automatically terminate upon the death of Executive.

(ii)    Disability.  The Company may terminate Executive's employment hereunder due to his Disability (as defined in Section 10(a)(vii)(C)).

(iii)    Termination for Cause.  The Company may terminate Executive's employment hereunder for Cause (as defined in Section 10(a)(vii)(A)).

(iv)    Termination without Cause.  The Company may terminate Executive's employment hereunder without Cause.

Amended Employment Agreement

HIGHLY CONFIDENTIAL                                    Webb_IPP_00000643

      (v)   <u>Termination for Good Reason</u>. Executive may terminate his employment hereunder for Good Reason (as defined in Section 10(a)(vii)(D)) by providing Notice of Termination, as defined below, within sixty (60) days of the date Executive becomes aware of the occurrence of the event constituting the grounds for such Good Reason.

      (vi)   <u>Termination without Good Reason</u>. Executive may voluntarily terminate his employment hereunder without Good Reason, upon sixty (60) days' advance written notice to the Company specifying the date as of which such termination is to become effective.

      (vii)   <u>Certain Definitions</u>. For purposes of this Agreement:

      (A)   "<u>Cause</u>" shall mean (i) gross neglect by Executive of Executive's duties, (ii) conviction of Executive of any felony or crime involving moral turpitude, (iii) gross or intentional misconduct by Executive in connection with the performance of any material portion of Executive's duties, or (iv) breach by Executive of any material portion of this Agreement (including, but not limited to, Sections 14, 15 and 16). The Company shall give Executive fifteen (15) days' prior written notice before any termination of employment for Cause due to any conduct or action described in clauses (i), (iii) or (iv) of the definition of "Cause" with an opportunity to meet with the Board and discuss or cure any such alleged conduct or action.

      (B)   If the Company terminates Executive's employment for Cause and any element of Cause identified by the Company as a basis for such termination hereunder is based upon allegations, either public or private, of any illegal act or omission by Executive, including but not limited to allegations of harassment, misappropriation, or engaging in any conduct that allegedly adversely affects the reputation or standing of the Company, the Company must, within thirty (30) days after the related Termination Date, (i) deposit in escrow with a national bank with an office in Memphis, Tennessee ("<u>Escrow Agent</u>"), an amount equal to the payment Executive would be entitled to receive under Section 11(d)(i) were Executive terminated by the Company without Cause, and (ii) initiate an arbitration proceeding under Section 26. In such proceeding the Parties shall direct the arbitrator to determine whether such allegations of wrongful conduct supporting "Cause" are materially accurate. The Company has the burden of establishing such material accuracy by a preponderance of the evidence. Settlement of allegations of wrongdoing by Executive out of court or to resolve any other proceeding shall not serve as evidence of the material accuracy of such allegations. Company and Executive shall cooperate in the expeditious completion of such arbitration and shall make available to the other party and the arbitrator all relevant evidence (including any evidence made available to such party in any other proceeding or investigation). During the pendency of such arbitration, any other compensation that would otherwise be payable to Executive if his employment were terminated by the Company without Cause under Section 11(d) shall be deposited by the Company with the Escrow Agent. If the arbitrator finds the allegations materially accurate (or finds that Executive defaults in the defense of the arbitration), the Escrow Agent shall release all deposited funds and all interest thereon to the Company. If the arbitrator's determination does not find the allegations materially accurate, the Escrow Agent shall release all of the deposited funds and all interest thereon to Executive (and Executive's employment will be deemed to have been terminated without Cause hereunder).

      (C)   If, as a result of Executive's incapacity due to physical or mental illness, Executive shall be "<u>Disabled</u>" for any six (6) months (whether or not consecutive) during any twelve (12) consecutive month period, Executive's employment hereunder may thereafter be terminated by the Company for "<u>Disability</u>." For purposes of this Agreement, Executive shall be deemed to be "<u>Disabled</u>" if, during the period referred to in the immediately preceding sentence, (i) his condition is such that it would have qualified him for disability benefits under the Company's long-term disability plan, or (ii) he had a physical or mental disability that is expected to result in death or can be expected to

Amended Employment Agreement

- 3 -

last for a continuous period of not less than twelve (12) months which rendered him incapable, after the provision of reasonable accommodations, of performing substantially all of his duties hereunder. In the event of a dispute as to whether Executive is Disabled, the Company may, at its expense, refer him to a licensed practicing physician of the Company's choice, and Executive agrees to submit to such tests and examination as such physician shall deem appropriate.

(D)  "Good Reason" shall mean the occurrence (without Executive's express written consent) of any one of the following acts by the Company unless such act or failure to act is corrected by the Company prior to the Date of Termination specified in the Notice of Termination (which, for the avoidance of doubt, shall be a date not less than thirty (30) days following the date the Notice of Termination is provided): (i) any decrease in Executive's Base Salary, (ii) a material diminution in Executive's title, authority, duties or responsibilities to a level below that of Founder and Chairman ( as described on Schedule A) or as otherwise defined on Schedule A, (iii) a material change in the geographic location (Memphis, Tennessee) at which Executive must perform services under this Agreement, (iv) any other action or inaction that constitutes a material breach by the Company of this Agreement; or (v) a material violation by the Company of the travel limitation provision of Section 5; provided that Executive shall not have Good Reason to resign his employment unless he provides the Company with Notice of Termination within sixty (60) days after the occurrence of the act or failure to act purported to constitute Good Reason. Executive stipulates that none of the following constitutes "Good Reason" under this Agreement or under the Former Agreement: (i) the termination of the Former Agreement; and/or (ii) the replacement of the Former Agreement with this Agreement.

(E)  "Date of Termination" shall mean: (i) if Executive's employment is terminated because of death, the date of Executive's death; (ii) if Executive's employment is terminated for Disability, the date the Notice of Termination is provided; (iii) if Executive's employment is terminated pursuant to Section 10(a)(iii) or 10(a)(iv), the date specified in the Notice of Termination (which may be the date such Notice of Termination is provided); (iv) if Executive's employment is terminated pursuant to Section 10(a)(v), the date specified in the Notice of Termination (which shall not be less than thirty (30) days following the date such Notice of Termination is provided); and (v) if Executive's employment is terminated pursuant to Section 10(a)(vi), the date specified in the Notice of Termination (which shall not be less than sixty (60) days following the date such Notice of Termination is provided); provided in each case that such Date of Termination shall occur on the date of Executive's "separation of service" within the meaning of Treasury Regulation Section 1.409A-1(h).

(b)  Notice of Termination. Any purported termination of Executive's employment by the Company or by Executive (other than a termination pursuant to Section 10(a)(i)) shall be communicated by written Notice of Termination to the other party hereto in accordance with Section 21. "Notice of Termination" shall mean a written notice by one party to the other party hereto, indicating the specific termination provision in this Agreement relied upon and setting forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of Executive's employment under the provision so indicated.

(c)  Outplacement Services. If the Company terminates Executive's employment without Cause or Executive terminates his employment for Good Reason, then Executive shall be entitled to the services of an outplacement firm for a period of six (6) months following such termination, which outplacement firm shall be selected by Executive and the reasonable fees and expenses for which shall be paid by the Company.

11.  Compensation During Disability, or Upon Death or Other Termination.

HIGHLY CONFIDENTIAL                                                        Webb_IPP_00000645

(a)    Disability Period.  During any period that Executive fails to perform his duties hereunder as a result of incapacity due to physical or mental illness, Executive shall receive (i) his Base Salary at the rate then in effect until his employment is terminated pursuant to Section 10(a)(ii); provided that such payments shall be reduced by the sum of the amounts, if any, paid to Executive with respect to such period under disability benefit plans of the Company or under the Social Security disability insurance program, and which amounts were not previously applied to reduce any such payment.

(b)    Termination due to Death or Disability.  Subject to Section 31, if Executive's employment is terminated by his death or Disability, the Company shall pay (i) any amounts due to Executive under Section 6 through the Date of Termination, and (ii) his Base Salary (at the rate in effect as of the date of such termination) that would have become due (and at the times that such amounts would have become due) to Executive under Section 6 had Executive's employment continued until the last day of the Company's fiscal year in which the Date of Termination occurs; provided, that such payments shall be reduced by the sum of the amounts, if any, paid to Executive with respect to such period under death or disability benefit of the Company or under the Social Security disability insurance program, and which amounts were not previously applied to reduce any such payment.

(c)    Termination for Cause or without Good Reason.

(i)    If Executive's employment shall be terminated by the Company for Cause at any time, or by Executive other than for Good Reason more than one (1) year after the Effective Date, the Company shall, until the Date of Termination: (I) pay Executive his Base Salary at the rate in effect as of the time Notice of Termination is provided; and (II) provide benefits as in effect at the time Notice of Termination is provided, and the Company shall have no further obligations to Executive under this Agreement, except as otherwise specifically provided in Section 15 hereof.

(ii)    If Executive's employment is voluntarily terminated by Executive without Good Reason prior to the first anniversary of the Effective Date, subject to Executive's execution and non-revocation of the Release in accordance with Section 31(c), Executive shall be paid: (I) severance in an amount equal to one (1) year of Executive's Base Salary in installments over a period of twelve (12) consecutive months beginning on the first Company payroll date following the date on which the Release first becomes effective and non-revocable (subject to Section 31); and (II) a pro rata portion of his Annual Bonus  (with the amount determined based on actual performance for the entire calendar year in which the Date of Termination occurs and the proration determined based on when the Date of Termination occurs during the calendar year), payable no later than March 15th of the year following the calendar year in which the Date of Termination occurs.

(d)    Termination without Cause or Termination for Good Reason.  Subject to Section 31, if (x) the Company shall terminate Executive's employment without Cause, or (y) Executive shall terminate his employment for Good Reason, then:

(i)    Subject to Executive's execution and non-revocation of a full and unconditional release of any and all claims which Executive may have against the Company and its affiliates in substantially the form attached hereto as Exhibit A (a "Release") in accordance with Section 31(c), the Company shall pay Executive (I) an amount equal to one (1) year of Executive's Base Salary in installments over a period of twelve (12) consecutive months beginning on the first payroll date following the date on which the Release first becomes effective and non-revocable (subject to Section 31) (the "Severance Period"); and (II) a pro rata portion of Executive's Annual Bonus (with the amount determined based on actual performance for the entire calendar year in which the Date of Termination occurs and the proration determined based on when the Date of Termination occurs during the calendar

Amended Employment Agreement

- 5 -

HIGHLY CONFIDENTIAL

year), payable no later than March 15th of the year following the calendar year in which the Date of Termination occurs.

        (ii)      The Company shall, on terms and conditions substantially comparable to those in effect at the time Notice of Termination is provided, (A) unless prohibited under the terms of the applicable Company benefit plan, or unless such coverage would result in penalties under Section 4980D of the Code, continue coverage for Executive and his covered dependents under the Company's life, health, dental and vision plans until the end of the Severance Period; *provided* that in the event that such benefit is determined to constitute a discriminatory benefit under Section 105(h) of the Code or the Patient Protection and Affordable Care Act, in lieu of such benefit, subject to the Executive's copayment of premium amounts at the active employees' rates, the Company shall pay to the Executive a monthly cash payment equal to the portion of the monthly premium for the Executive's participation in the Company's group health plans pursuant to COBRA in the same proportion it pays for active employees of the Company; and (B) allow Executive to retain Executive's cell phone (which costs shall be the responsibility of Executive after the Notice of Termination is provided) and computers, provided Executive provides any computers to the Company prior to the Date of Termination to allow Company confidential information, programs and other property to be removed from such computers. As a condition of eligibility for such payments under clause (A) of this Subsection 11(d)(ii), the Executive shall promptly respond fully to any reasonable inquiries related to COBRA eligibility. If coverage to be provided under clause (A) of this Subsection 11(d)(ii) is otherwise prohibited under the terms of a Company benefit plan, or would result in penalties under Section 4980D of the Code, the Company shall provide Executive substantially similar benefits through the Severance Period. The Severance Period shall end with respect to, and the Company shall have no further obligations under clause (A) of this Subsection 11(d)(ii) to provide, a benefit if Executive becomes eligible for a comparable benefit as the result of Executive's employment with a subsequent employer. Executive shall promptly report to the Company his eligibility for any such comparable benefit. For purposes of clarification, Executive shall be treated as having a COBRA "qualifying event" as of his Date of Termination (rather than as of the expiration of any coverage provided under clause (A) of this Subsection 11(d)(ii)), and any health, dental or vision coverage provided under this Subsection 11(d)(ii) shall reduce the maximum period of coverage to which Executive and his eligible dependents are entitled under COBRA resulting from his termination of employment.

        (e)      <u>Limit on Payments</u>. Notwithstanding any other provision in this Agreement to the contrary:

        (i)      In the event that Executive becomes entitled to any payments or benefits under this Agreement and any portion of those payments or benefits, when added to any other amount theretofore or thereafter payable to Executive as a result of or in connection with the change in control of the Company, whether or not under any other plan, arrangement or agreement with the Company, any person whose actions resulted in the change in control or any person having such a relationship with the Company or such person as to require attribution of stock ownership between the Parties under Section 318(a) of the Code (the "<u>Aggregate Payments</u>") would be subject to the tax (the "<u>Excise Tax</u>") imposed by Section 4999 of the Code, then the payments or benefits under this Agreement shall be reduced (first by reducing the cash payments under this Agreement, then by reducing any fringe or other benefits required to be provided under this Agreement and then by reducing the payments under any other plan, arrangement or agreement) to an amount which is one dollar ($1.00) less than the amount of the Aggregate Payments which could be made to Executive before any portion of the Aggregate Payments was subject to the Excise Tax; provided, however, that, in the event that the Company does not undertake the Shareholder Vote Process (as defined below), the foregoing reduction will be made only if and to the extent that such reduction would result in greater Aggregate Payments retained by the Executive than had such reduction not been made, determined on an after-tax basis (taking into account the Excise Tax, or

HIGHLY CONFIDENTIAL                                 

any applicable federal, state and local income and employment taxes). For purposes of determining whether any of the Aggregate Payments will be subject to the Excise Tax: (A) Any payments or benefits received or to be received by Executive in connection with the termination of Executive's employment (whether pursuant to the terms of this Agreement or any other plan, arrangement or agreement with the Company, any person whose actions result in a change in ownership or control, or any person having such a relationship with the Company or such person as to require attribution of stock ownership between the parties under Section 318(a) of the Code) shall not be treated as subject to the "parachute payments" within the meaning of Section 280G(b)(2) of the Code, unless, in the opinion of tax counsel selected by Executive and reasonably acceptable to the Company, such payments or benefits (in whole or in part) constitute parachute payments, or such excess parachute payments, if any, (in whole or in part) do not represent reasonable compensation for services actually rendered (or the refraining from the performance of services) within the meaning of Section 280G(b)(4) of the Code; (B) the amount of the payments or benefits under this Agreement which shall be treated as subject to the Excise Tax for the purposes of the potential reduction above shall be equal to the lesser of (i) the total amount of the payments under this Agreement or (ii) the amount of excess parachute payments within the meaning of Sections 280G(b)(1) and (4) of the Code (after applying clause (A) above); and (C) the value of any non-cash benefits or any deferred payment or benefit shall be determined by the Company's independent auditors in accordance with the principles of Sections 280G(d)(3) and (4) of the Code. If any portion of the Aggregate Payments would otherwise be subject to the Excise Tax (before giving effect to any reduction in Aggregate Payments contemplated by this Section 11(e), the Company will use its reasonable best efforts to submit to the shareholders of the Company (in a manner which satisfies all applicable requirements of Section 280G(b)(5)(B) of the Code and the Treasury Regulations thereunder, including Q-7 of Section 1.280G-1 of such Treasury Regulations) a vote regarding the approval of the Aggregate Payments by such number of shareholders of the Company as is required by the terms of Section 280G(b)(5)(B) of the Code so as to render the parachute payment provisions of Section 280G of the Code inapplicable to the Aggregate Payments that would be reduced or eliminated by operation of this Section 11(e) if such shareholder approval was not obtained (the "Shareholder Vote Process").

12.    Representations.

(a)    The Company represents and warrants that this Agreement has been authorized by all necessary corporate action and is a valid and binding agreement of the Company enforceable against it in accordance with its terms.

(b)    Executive represents and warrants that he is not a party to any agreement or instrument which would prevent him from entering into or performing his duties in any way under this Agreement.

13.    Successors; Binding Agreement.

(a)    The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets thereof to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

(b)    This Agreement is a personal contract and the rights and interests of Executive hereunder may not be sold, transferred, assigned, pledged, encumbered, or hypothecated by him, except as otherwise expressly permitted by the provisions of this Agreement. This Agreement shall inure to the benefit of and be enforceable by Executive and his personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees. If Executive should die while any amount would still be payable to him hereunder had Executive continued to live, all such amounts shall

Amended Employment Agreement

HIGHLY CONFIDENTIAL    Webb_IPP_00000648

be paid in accordance with the terms of this Agreement to his devisee, legatee or other designee or, if there is no such designee, to his estate.

14.    Confidentiality. Executive covenants and agrees that he will not at any time during and after the end of the Term, directly or indirectly, use (other than for the benefit of the Company or its affiliates), or disclose to any person, firm or corporation, other than authorized officers, directors and employees of the Company or its subsidiaries, Confidential Information (as hereinafter defined) of the Company. As used herein, "Confidential Information" of the Company means any Company proprietary information or trade secrets, including, without limitation, information with respect to the Company's operations, processes, products, inventions, business practices, finances, principals, vendors, suppliers, customers, potential customers, marketing methods, costs, prices, contractual relationships, regulatory status, compensation paid to employees or other terms of employment, which information is not generally known within the industry.

15.    Noncompetition.

(a)    During his employment with the Company, and during the Noncompete Period, Executive shall not, directly or indirectly, compete or enter the employ of, or render any services to, any person, firm or corporation engaged in any business (for profit or not for profit) which competes in the Territory (defined below) in any business conducted or engaged in by the Company within one (1) year preceding the Date of Termination, including: (i) any business which provides products and services to school spirit teams (including, but not limited to, the design, marketing or sales of cheerleader and dance team uniforms and accessories and the design, operation or marketing of cheerleader and dance team camps, clinics, competitions or tours); or (ii) any business which provides class rings, recognition jewelry, yearbooks, caps, gowns and similar regalia, diplomas, announcements and related fine paper products, maps, globes and education curriculum products, including software applications. Executive acknowledges while providing services under the Agreement he will have had substantial operating or supervisory involvement with each of the Company's and its subsidiaries' business lines (collectively, businesses described in the preceding sentence are referred to as the "Supervised Business") in the countries, states or counties in which the Company (or its subsidiaries) is actively engaged or has an interest in a business entity or affiliate which is actively engaged in any Supervised Businesses at the time of Executive's separation from service from the Company (the "Territory"). Executive shall not become interested in any such competing business, directly or indirectly, as an individual, partner, shareholder, director, officer, principal, agent, employee, trustee, consultant, or in any other relationship or capacity. The "Noncompete Period" is the period ending on the date one (1) year after the Date of Termination occurring for any reason and under any circumstances, unless in its discretion the Company gives written notice to Executive following a Date of Termination that the Noncompete Period shall end on an earlier date. Nothing contained in this Section 15 shall be deemed to prohibit Executive from acquiring, solely as an investment, up to five (5) percent of the outstanding shares of capital stock of any public corporation.

(b)    The Noncompete Period shall terminate if the Company fails to pay any material compensation due to Executive under this Agreement (other than a payment that has been deposited with the Escrow Agent in accordance with Section 10(a)(vii)(B)); provided that (i) Executive must provide the Company with written notice of the Company's failure to pay any such material compensation within thirty (30) days after such compensation was payable, and (ii) the Company shall have fifteen (15) days following its receipt of such notice to pay such compensation (and in the event that such compensation is paid during such 15 day period, the Noncompete Period shall remain in full force and effect and shall not terminate pursuant to this sentence). For avoidance of doubt, Executive shall not be entitled to elect to decline or forego noncompete payments in order to be permitted to engage in conduct that would violate his obligations hereunder.

Amended Employment Agreement

- 8 -

16.    Nonsolicitation.

(a)    During Executive's employment with the Company, and during the Noncompete Period, Executive shall not, directly or indirectly, for his benefit or for the benefit of any other person, firm or entity, do any of the following:

(i)    Solicit from any customer doing business with the Company as of the date of Executive's termination, business that is the same or of a similar nature to the business of the Company;

(ii)    Solicit from any known potential customer of the Company an oral bid, offer or proposal by the Company with a view to making such a bid, proposal or offer, within twelve (12) months prior to Executive's termination; and

(iii)    During Executive's employment with the Company, and for three (3) years following Executive's termination of his employment for any reason, Executive shall not, directly or indirectly, for his benefit or for the benefit of any other person, firm or entity, solicit the employment or services of, or hire, to work for any person or entity that is a competitor to the Company any person who upon the termination of Executive's employment, or within twelve (12) months prior thereto, was known to be (A) employed by the Company, or (B) a consultant to the Company with respect to any Supervised Business (other than pursuant to a general public solicitation of employees undertaken on or following the eighteen (18) month anniversary of his termination of employment). For purposes of this Section 16, a "customer" includes not only end purchasers of goods or services but also any person, individual or entity representing a relationship through which the Company effects or promotes sales of goods or services, such as schools, school districts, colleges, universities, fraternities, sororities, booster clubs, cheer, spirit or gymnastics teams, clubs or associations, parent-teacher associations and the like.

17.    Mutual Non-Disparagement. Neither the Company (which shall include its affiliates) nor Executive shall directly or indirectly disparage the other in a manner which results in material harm (economic or otherwise).

18.    Indemnification. The Company shall indemnify Executive from and against any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by, or in the right of, the Company), brought to impose a liability or penalty on Executive in his capacity of director, if applicable, officer, employee or agent of the Company, or of any other corporation or entity which he serves as such at the request of the Company, against judgments, fines, amounts paid in settlement and expenses, including attorneys' fees actually and reasonably incurred as a result of such action, suit or proceeding, or any appeal thereof to the same extent that the Company provides such indemnification to members of the Company's Board and other officers of the Company with respect to occurrences while Executive is or was a member of the applicable Board or an officer of the Company.

19.    Entire Agreement. This Agreement, along with the other agreements and benefit plan documents referred to herein, contains all the understandings between the Parties hereto pertaining to the matters referred to herein and as of the Effective Date shall supersede all undertakings and agreements, whether oral or in writing, previously entered into by Executive and the Company with respect thereto. To the extent there are any inconsistencies or conflicts between the term of this Agreement and the terms

HIGHLY CONFIDENTIAL                                                                                    Webb_IPP_00000650

of any other agreements or benefit plan, the terms of this Agreement shall control and govern; <u>provided that</u> notwithstanding the foregoing, Executive shall remain bound by that certain Employee Confidentiality, Non-Solicitation, Non-Competition and Invention Assignment Agreement, dated January 8, 2016 by and between the Company and Executive (the "<u>Confidentiality Agreement</u>"), and the Confidentiality Agreement shall survive and remain in effect in accordance with the terms therein.

        20.    <u>Amendment or Modification; Waiver.</u>  No provision of this Agreement may be amended or waived unless such amendment or waiver is agreed to in writing, signed by Executive and by a duly authorized officer of the Company. No waiver by any party hereto of any breach by another party hereto of any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of a similar or dissimilar condition or provision at the same time, any prior time or any subsequent time.

        21.    <u>Notices.</u>  Any notice to be given hereunder shall be in writing and shall be deemed given when delivered personally, sent by nationally recognized courier service or registered or certified mail, postage prepaid, return receipt requested, addressed to the party concerned at the address indicated below, or to such other address as such party may subsequently give notice of hereunder in writing:

        To the Company at:

        Varsity Spirit LLC
        6745 Lenox Center Court
        Suite 300
        Memphis, TN 38115
        Attn: Board of Managers

        With a copy to:

        Varsity Brands, LLC
        14460 Varsity Brands Way
        Farmers Branch, TX 75244
        Attn: Chief Legal Officer

        To Executive at the address set forth on the signature page hereto

        with a copy to:

        Keith Clouse
        Clouse Brown PLLC
        1201 Elm Street
        Suite 5250
        Dallas, TX 75270

Any notice delivered personally or by courier under this Section 21 shall be deemed given on the date delivered, any notice sent by nationally recognized courier service shall be deemed given on the second day after being given to the courier service and any notice sent by registered or certified mail, postage prepaid, return receipt requested, shall be deemed given on the fifth day after being given to the U.S. mail.

        22.    <u>Severability.</u>  If any provision of this Agreement (including without limitation Section 14, 15 or 16) or the application of any such provision to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement, or the application of such provision to such person or circumstances other than those to which

Amended Employment Agreement

HIGHLY CONFIDENTIAL

Webb_IPP_00000651

it is so determined to be invalid and unenforceable, shall not be affected thereby, and each provision hereof shall be validated and shall be enforceable to the fullest extent permitted by law. In the event a court or arbitrator determines that any terms, provisions, or covenants in this Agreement are unreasonable or unenforceable for any reason, including without limitation, the time period, geographical area, and scope of activity covered by such term, provision or covenant, a court or arbitrator is authorized to limit the application of any such term, provision or covenant, or modify any such term, provision or covenant and proceed to enforce this Agreement as so limited or modified. It is the intent of the parties that Executive shall be bound and restricted by the restrictions herein contained to the fullest extent permitted by law.

23.    Survivorship. The respective rights and obligations of the parties hereunder shall survive any termination of this Agreement to the extent necessary to the intended preservation of such rights and obligations including, but not limited to, Sections 14, 15 and 16.

24.    Governing Law; Specific Performance, Certain Acknowledgements.

(a)    This Agreement will be governed by and construed in accordance with the laws of the State of Tennessee, without regard to its conflicts of laws principles.

(b)    Executive acknowledges that the services to be rendered by him are of a special and unique character which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a material breach or threatened breach by him of any of the provisions contained in Sections 14, 15 and 16 will cause the Company irreparable injury. Executive therefore agrees that the Company shall be entitled, in addition to any other right or remedy, to a temporary, preliminary and permanent injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or restraining Executive from any such violation or threatened violations.

(c)    Executive further acknowledges and agrees that due to the uniqueness of his services and confidential nature of the information he will possess, the covenants set forth in Sections 14, 15 and 16 are reasonable and necessary for the protection of the business and goodwill of the Company.

25.    No Set-Off; Mitigation. The obligation of the Company to make the payments provided in this Agreement and otherwise to perform its obligations hereunder shall not be affected by any set-off, counterclaim, defense, or other claim, right or action which the Company may have or may allege to have against Executive or others. Executive shall have no duty to mitigate the amount of any payment provided for in Section 11 herein by seeking other employment, nor shall the amount of any payment provided for in this Agreement be reduced by any compensation earned by Executive as the result of employment by another employer after the Date of Termination (except as may otherwise be provided herein).

26.    Arbitration. Other than in respect of any claim by either of the Parties to this Agreement seeking to enjoin violation of this Agreement by the other, or otherwise seeking equitable relief, any dispute arising under or in connection with this Agreement shall be settled exclusively by arbitration in Memphis, Tennessee in accordance with the Employment Rules of the American Arbitration Association then in effect. The Parties agree that a hearing before the arbitrator shall commence within one hundred twenty (120) days after the arbitrator has been appointed. Judgment may be entered on the arbitrator's award in any court having jurisdiction. All costs and expenses of any such arbitration (including all legal fees and expenses incurred by Executive) shall be borne by the Company, provided, however, that the legal fees and expenses incurred by Executive shall be borne by Executive and not by the Company if such arbitration results in a determination (a) in the case of a dispute with respect to termination of

HIGHLY CONFIDENTIAL                                                              Webb_IPP_00000652

Executive's employment by the Company for Cause or upon Disability, that a proper basis for such termination did exist and appropriate procedures were followed by the Company, or (b) in the case of any other dispute, that the position taken by Executive was incorrect.

27.    Legal Fees.  The Company shall pay or reimburse Executive for reasonable and documented fees and expenses incurred by him in connection with the preparation of this Agreement.

28.    Headings; Section Numbers.  All descriptive headings of sections and paragraphs in this Agreement are intended solely for convenience, and no provision of this Agreement is to be construed by reference to the heading of any section or paragraph.  Unless the context clearly indicates otherwise, all Section numbers referenced herein shall refer to Sections of this Agreement.

29.    Withholdings.  All payments to Executive under this Agreement shall be reduced by all applicable withholdings required by federal, state or local law.

30.    Counterparts; Facsimile.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Executed copies of this Agreement sent by facsimile shall have the same effect as originally executed copies of this Agreement.

31.    Section 409A.

(a)    General. The Parties acknowledge and agree that, to the extent applicable, this Agreement shall be interpreted to be exempt from or in compliance with, and, where applicable, the Parties agree to use their best efforts to achieve timely compliance with, Section 409A of the Internal Revenue Code of 1986, as amended, and the Department of Treasury Regulations and other interpretive guidance promulgated thereunder (collectively, "Section 409A"), including without limitation any such regulations or other guidance that may be issued after the Effective Date.  Notwithstanding any provision of this Agreement to the contrary, in the event that the Company determines that any compensation or benefits payable or provided under this Agreement may be subject to Section 409A, the Company may adopt (without any obligation to do so or to indemnify Executive for failure to do so) such limited amendments to this Agreement and appropriate policies and procedures, including amendments and policies with retroactive effect, that the Company reasonably determines are necessary or appropriate to (i) exempt the compensation and benefits payable under this Agreement from Section 409A and/or preserve the intended tax treatment of the compensation and benefits provided with respect to this Agreement or (ii) comply with the requirements of Section 409A; provided that the Company shall not amend the Agreement or this Amendment in a manner which materially and adversely affects the value or amount of the compensation and benefits to which Executive is otherwise entitled hereunder unless such amendment is agreed to in writing by Executive. No provision of this Agreement shall be interpreted or construed to transfer any liability for failure to comply with the requirements of Section 409A from Executive or any other individual to the Company or any of its respective affiliates, employees or agents.

(b)    Separation from Service under 409A. Notwithstanding any provision to the contrary in this Agreement:

(i)    No amount of deferred compensation subject to Section 409A payable under this Agreement upon Executive's termination of employment shall be paid unless the termination of Executive's employment constitutes a "separation from service" within the meaning of Section 1.409A-1(h) of the Department of Treasury Regulations;

Amended Employment Agreement

- 12 -

  (ii)     If Executive is deemed at the time of his separation from service to be a "specified employee" for purposes of Section 409A(a)(2)(B)(i) of the Code, to the extent delayed commencement of any portion of the termination benefits to which Executive is entitled under this Agreement (after taking into account all exclusions applicable to such termination benefits under Section 409A), including, without limitation, any portion of the additional compensation awarded pursuant to Section 11(b), Section 11(c), Section 11(d) or Section 15, is required in order to avoid a prohibited distribution under Section 409A(a)(2)(B)(i) of the Code (any such delayed commencement, a "Payment Delay"), such portion of Executive's termination benefits shall not be provided to Executive prior to the earlier of (A) the expiration of the six-month period measured from the date of Executive's "separation from service" with the Company (as such term is defined in the Department of Treasury Regulations issued under Section 409A of the Code) or (B) the date of Executive's death. Upon the earlier of such dates, all payments deferred pursuant to this Section 30(b)(ii) shall be paid in a lump sum to Executive, and any remaining payments due under the Agreement shall be paid as otherwise provided herein. Any payment subject to the Payment Delay shall be credited with interest for the period during which such payment is delayed pursuant to the Payment Delay at a rate equal to the appropriate short-term applicable federal rate published by the Internal Revenue Service, as compounded semi-annually; and

  (iii)     The determination of whether Executive is a "specified employee" for purposes of Section 409A(a)(2)(B)(i) of the Code as of the time of his separation from service shall be made by the Company in accordance with the terms of Section 409A of the Code and applicable guidance thereunder (including without limitation Section 1.409A-1(i) of the Department of Treasury Regulations and any successor provision thereto); and

  (iv)     For purposes of Section 409A of the Code, Executive's right to receive installment payments pursuant to Section 11(b), Section 11(d) or Section 15 shall be treated as a right to receive a series of separate and distinct payments; and

  (v)     The reimbursement of any expense under Section 8 or Section 11 shall be made no later than December 31 of the year following the year in which the expense was incurred. The amount of expenses reimbursed in one (1) year shall not affect the amount eligible for reimbursement in any subsequent year.

  (c)  Release. Notwithstanding anything to the contrary in this Agreement, to the extent that any payments of "nonqualified deferred compensation" (within the meaning of Section 409A) due under this Agreement as a result of Executive's termination of employment are subject to Executive's execution and delivery of a Release: (i) the Company shall deliver the Release to Executive within ten (10) business days following the Date of Termination; (ii) if Executive fails to execute the Release, or revokes the Release within seven days after signing, in either case on or prior to the Release Expiration Date (as defined below), Executive shall not be entitled to any payments or benefits otherwise conditioned on the Release; and (iii) in any case where the Date of Termination and the Release Expiration Date fall in two (2) separate taxable years, any payments required to be made to Executive that are conditioned on the Release and are treated as nonqualified deferred compensation for purposes of Section 409A shall be made in the later taxable year. For purposes of this Section 31(c), "Release Expiration Date" shall mean the date that is (I) twenty-one (21) days following the date upon which the Company timely delivers the Release to Executive, or, (II) in the event that Executive's termination of employment is "in connection with an exit incentive or other employment termination program" (as such phrase is defined in the Age Discrimination in Employment Act of 1967), the date that is forty-five (45) days following such delivery date, plus in either case ((I) or II)) and as applicable, eight days after Executive signs the Release, to allow for the revocation period required by applicable law. To the extent that any payments of nonqualified deferred compensation (within the meaning of Section 409A) due under this Agreement as a result of Executive's termination of employment are delayed pursuant to this Section 31(c), such amounts shall be

Amended Employment Agreement

- 13 -

 Webb_IPP_00000654

paid or commence to be paid on the first payroll date following the date on which the Release first becomes effective and non-revocable or, in the case of any payments subject to Subsection 31(c)(iii), on the first payroll period to occur in the subsequent taxable year, if later.

(d) <u>Treatment under Section 409A</u>.  Each party acknowledges that he or it has retained his or its own legal, tax or other advisors to evaluate and advise him or it with respect to the aspects of this Agreement and the Former Agreement that may relate to Section 409A and is not relying on the other party for such advice.  The Parties further acknowledge and agree that they expect no payments hereunder are, or will be subject to, interest and additional tax under Section 409A(a)(1)(B) of the Code, and the Company agrees to report any amounts payable hereunder accordingly.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**VARSITY SPIRIT LLC**

By: _____

Its: _____President_____

**EXECUTIVE**

_____
Jeffrey Webb

Residence Address

~~6589 Green Shadows Lane~~ 545 Club Walk
~~Memphis, TN 38119~~ memphis, TN 38111

HIGHLY CONFIDENTIAL                                                                            Webb_IPP_00000655

## **SCHEDULE A**

**Executive Job Duties, Responsibilities and Authority:**

Executive shall maintain the title and authority as Chairman of the Company

Involvement and collaboration with President of the Company on strategy, talent and major initiatives

Direct, participate in and speak at training seminars and Company functions

Consult with President of the Company to evaluate and negotiate major acquisitions

Significant strategic and operational involvement

Continue as President of International Cheer Union – including being the principle liaison with the International Olympic Committee, SportAccord, ARIFS and all International Sports Federations

Head up strategy for lead international development

Speak at major Company meetings on Company direction, culture and major initiatives

Amended Employment Agreement

- 15 -

HIGHLY CONFIDENTIAL

Webb_IPP_00000656

DocuSign Envelope ID: D399F482-DCF2-4177-A66F-CFA935C8E42D

## HERCULES ACHIEVEMENT, INC.

### Employee Confidentiality, Non-Solicitation, Non-Competition and Invention Assignment Agreement

In consideration and as a condition of (a) my employment or continued employment by Hercules Achievement, Inc. (the "Company") and/or any of its affiliates (the Company or any direct or indirect parent or subsidiary entity of the Company, a "Company Entity") (b) my receipt on or about the date hereof of an award under the Hercules Achievement, Inc. Phantom Unit Plan (the "Phantom Plan") and (c) my access to Proprietary Information (defined below), I agree as follows:

**1.    Proprietary Information.**    I agree that all information, whether or not in writing, concerning the Company Entities' business, technology, business relationships or financial affairs that the Company Entities have not released generally within the industry or industries in which they operate (collectively, "Proprietary Information") is and will be the exclusive property of the Company Entities. By way of illustration, Proprietary Information may include information or material which has not been made generally available to the public, such as: (a) *corporate information*, including plans, strategies, methods, policies, resolutions, negotiations or litigation; (b) *marketing information*, including strategies, methods, customer identities or other information about customers, prospect identities or other information about prospects, or market analyses or projections; (c) *financial information*, including cost and performance data, debt arrangements, equity structure, investors and holdings, purchasing and sales data and price lists; and (d) *operational and technological information*, including plans, specifications, manuals, forms, templates, software, designs, methods, procedures, formulas, discoveries, inventions, improvements, concepts and ideas; and (e) *personnel information*, including personnel lists, reporting or organizational structure, resumes, personnel data, compensation structure, performance evaluations and termination arrangements or documents. Proprietary Information also includes information received in confidence by the Company Entities from their respective customers or suppliers or other third parties.

**2.    Recognition of Company's Rights.**    I will not, at any time, without the Company's prior written permission, either during or after my employment, disclose any Proprietary Information to anyone outside of the Company Entities, or use or permit to be used any Proprietary Information for any purpose other than the performance of my duties as an employee of the Company Entity; provided, however, in no case shall I disclose or provide any Proprietary Information in connection with, or as part of, any "expert network" interview with any third party. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure of all Proprietary Information. I will deliver to the Company all copies of Proprietary Information in my possession or control upon the earlier of a request by the Company or termination of my employment.

**3.    Rights of Others.**    I understand that the Company Entities are now and may hereafter be subject to non-disclosure or confidentiality agreements with third persons which require the Company Entities to protect or refrain from use of such third persons' proprietary information. I agree to be bound by the terms of such agreements in the event I have

access to such proprietary information and know or would reasonably be expected to know of such agreements.

**4.    Commitment to Company; Avoidance of Conflict of Interest.**    While an employee of the Company Entity, I will devote my full-time efforts to the business of the Company Entities and I will not engage in any other business activity that reasonably conflicts with my duties to the Company Entities. I will advise the Board of Directors of the Company at such time as any activity of either the Company Entities or another business presents me with a conflict of interest or the appearance of a conflict of interest as an employee of the Company Entity. Upon reasonable notice and an opportunity to cure, I will take whatever action is reasonably requested of me by the Company to resolve any conflict or appearance of conflict which it finds to exist.

**5.    Developments.**    I will make full and prompt disclosure to the Company of all inventions, discoveries, designs, developments, methods, modifications, improvements, processes, algorithms, databases, computer programs, formulae, techniques, trade secrets, mask works, graphics or images, and audio or visual works and other works of authorship (collectively "Developments"), whether or not patentable or copyrightable, that are created, made, conceived or reduced to practice by me (alone or jointly with others) or under my direction during the period of my employment. I acknowledge that all work performed by me is on a "work for hire" basis, and I hereby do assign and transfer and, to the extent any such assignment cannot be made at present, will assign and transfer, to the Company and its successors and assigns all my right, title and interest in all Developments that (a) relate to the business of any Company Entity or any customer of or supplier to any Company Entity or any of the products or services being researched, developed, manufactured or sold by any Company Entity or which may be used with such products or services; or (b) result from tasks assigned to me by a Company Entity; or (c) result from the use of premises or personal property (whether tangible or intangible) owned, leased or contracted for by the Company Entity ("Company-Related Developments"), and all related patents, patent applications, trademarks and trademark applications, copyrights and copyright applications, and other intellectual property rights in all countries and territories worldwide and under any international conventions ("Intellectual Property Rights").

To preclude any possible uncertainty, I have set forth on Exhibit A attached hereto a complete list of Developments that I have, alone or jointly with others, conceived, developed or reduced to practice prior to the commencement of my employment with a Company Entity that I consider to be my

1

DocuSign Envelope ID: D399F482-DCF2-4177-A66F-CFA935C8E42D

property or the property of third parties and that I wish to have excluded from the scope of this Agreement ("Prior Inventions"). If disclosure of any such Prior Invention would cause me to violate any prior confidentiality agreement, I understand that I am not to list such Prior Inventions in Exhibit A but am only to disclose a cursory name for each such invention, a listing of the party(ies) to whom it belongs and the fact that full disclosure as to such inventions has not been made for that reason. I have also listed on Exhibit A all patents and patent applications in which I am named as an inventor, other than those which have been assigned to the Company ("Other Patent Rights"). If no such disclosure is attached, I represent that there are no Prior Inventions or Other Patent Rights. If, in the course of my employment with the Company, I incorporate a Prior Invention into a Company product, process or machine or other work done for the Company, I hereby grant to the Company a nonexclusive, royalty-free, paid-up, irrevocable, worldwide license (with the full right to sublicense) to make, have made, modify, use, sell, offer for sale and import such Prior Invention. Notwithstanding the foregoing, I will not incorporate, or permit to be incorporated, Prior Inventions in any Company-Related Development without the Company's prior written consent.

This Agreement does not obligate me to assign to the Company any Development which, in the sole judgment of the Company, reasonably exercised, is developed entirely on my own time and does not relate to the business efforts or research and development efforts in which, during the period of my employment, the Company actually is engaged or reasonably would be engaged, and does not result from the use of premises or equipment owned or leased by the Company. However, I will also promptly disclose to the Company any such Developments for the purpose of determining whether they qualify for such exclusion. I understand that to the extent this Agreement is required to be construed in accordance with the laws of any state which precludes a requirement in an employee agreement to assign certain classes of inventions made by an employee, this paragraph 5 will be interpreted not to apply to any invention which a court rules and/or the Company agrees falls within such classes. I also hereby waive all claims to any moral rights or other special rights which I may have or accrue in any Company-Related Developments.

**6.    Documents and Other Materials.** I will keep and maintain adequate and current records of all Proprietary Information and Company-Related Developments developed by me during my employment, which records will be available to and remain the sole property of the Company at all times.

All files, letters, notes, memoranda, reports, records, data, sketches, drawings, notebooks, layouts, charts, quotations and proposals, specification sheets, program listings, blueprints, models, prototypes, or other written, photographic or other tangible material containing Proprietary Information, whether created by me or others, which come into my custody or possession, are the exclusive property of the Company to be used by me only in the performance of my duties for the Company. Any property situated on a Company Entity's premises and owned by any Company Entity, including without limitation computers, disks and other storage media,

filing cabinets or other work areas, is subject to inspection by the Company at any time with or without notice. In the event of the termination of my employment for any reason, I will deliver to the Company all files, letters, notes, memoranda, reports, records, data, sketches, drawings, notebooks, layouts, charts, quotations and proposals, specification sheets, program listings, blueprints, models, prototypes, or other written, photographic or other tangible material containing Proprietary Information, and other materials of any nature pertaining to the Company or any Company Entity or to my work, and will not take or keep in my possession any of the foregoing or any copies.

**7.    Enforcement of Intellectual Property Rights.** I will cooperate fully with the Company, both during and after my employment with a Company Entity, with respect to the procurement, maintenance and enforcement of Intellectual Property Rights in Company-Related Developments. I will sign, both during and after the term of this Agreement, all papers, including without limitation copyright applications, patent applications, declarations, oaths, assignments of priority rights, and powers of attorney, which the Company may deem necessary or desirable in order to protect its rights and interests in any Company-Related Development. If the Company is unable, after reasonable effort, to secure my signature on any such papers, I hereby irrevocably designate and appoint each officer of the Company as my agent and attorney-in-fact to execute any such papers on my behalf, and to take any and all actions as the Company may deem necessary or desirable in order to protect its rights and interests in any Company-Related Development.

**8.    Non-Competition and Non-Solicitation.**

In order to protect the Company's and the Company Entities' Proprietary Information and good will, during my employment and for a period of twenty-four (24) months following the termination of my employment for any reason, I will not directly or indirectly, whether as owner, partner, shareholder, director, manager, consultant, agent, employee, co-venturer or otherwise, engage, participate or invest in any business activity, anywhere in any Territory (as defined below), that competes with any business (for profit or not-for-profit) conducted or engaged in by any Company Entity or with any business that any Company Entity is considering conducting or engaging in, including, without limitation, (i) the design, marketing or sales of cheerleader and dance team uniforms and accessories and the design, operation or marketing or sales of cheerleader and dance team camps, clinics, competitions or tours, (ii) the manufacture, marketing or sales of class rings, recognition jewelry, yearbooks, caps, gowns and similar regalia, diplomas, announcements and related fine paper products, digital printing and social media content related to any of the foregoing, including software applications or (iii) the manufacture, sourcing, merchandising, designing, marketing, licensing, distributing, selling or installing durable or non-durable products related to sports, physical activity or leisure activity, including, without limitation, equipment, apparel, games, toys, uniforms, soft goods, hard goods, physical education products and/or supplies; provided that this shall not prohibit any possible investment in publicly traded stock of a company representing less than one percent of the

2

stock of such company. In addition, during my employment and for a period of twenty-four (24) months following the termination of my employment for any reason, I will not, directly or indirectly, or by action in concert with others (a) hire, solicit, entice or attempt to persuade any other employee or consultant of the Company Entities to leave the Company Entities for any reason or otherwise participate in or facilitate the hire, directly or through another entity, of any person who is employed or engaged by any Company Entity or who was employed or engaged by any Company Entity within one (1) year of any attempt to hire such person, and/or (b) call upon, solicit, divert, take away, accept or conduct any business from or with any of the individual and/or institutional customers or prospective customers of the Company or any of its suppliers. I acknowledge and agree that if I violate any of the provisions of this paragraph 8, the running of the applicable period will be extended by the time during which I engage in such violation(s). "Territory" means any country, state, county, city or other territory or jurisdiction in which any Company Entity is actively engaged in, or conducting, business or has an interest in a business entity which is actively engaged in, or conducting, business; provided, however, that I understand that in connection with the termination of my employment, Territory shall only include such countries, states, counties, cities or other territories or jurisdictions in which any Company Entity is actively engaged in, or conducting, business or has an interest in a business entity which is actively engaged in, or conducting, business as of the date of the termination of my employment.

**9.      Government Contracts.**    I acknowledge that the Company may have from time to time agreements with other persons or with the United States Government or its agencies which impose obligations or restrictions on the Company regarding inventions made during the course of work under such agreements or regarding the confidential nature of such work. I agree to comply with any such obligations or restrictions upon the direction of the Company. In addition to the rights assigned under paragraph 5, I also assign to the Company (or any of its nominees) all rights which I have or acquired in any Developments, full title to which is required to be in the United States under any contract between the Company and the United States or any of its agencies.

**10.      Prior Agreements.**    I hereby represent that, except as I have fully disclosed previously in writing to the Company, I am not bound by the terms of any agreement with any previous employer or other party to refrain from using or disclosing any trade secret or confidential or proprietary information in the course of my employment with the Company or to refrain from competing, directly or indirectly, with the business of such previous employer or any other party, or to refrain from soliciting any previous employer's or other party's employees or customers. I further represent that my performance of all the terms of this Agreement as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me in confidence or in trust prior to my employment with the Company. I will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employer or others.

**11.      Remedies Upon Breach.**    I understand that the restrictions contained in this Agreement are necessary for the protection of the business and goodwill of the Company and I consider them to be reasonable for such purpose. Any breach of this Agreement is likely to cause the Company substantial and irrevocable damage and therefore, in the event of such breach, the Company, in addition to such other remedies which may be available, will be entitled to specific performance and other injunctive relief, without the posting of a bond. If I violate this Agreement, in addition to all other remedies available to the Company at law, in equity, and under contract, I agree that I am obligated to pay all the Company's attorneys' fees and expenses in connection with any enforcement action by the Company against me in which the Company is the prevailing party and the Company shall pay all of my attorney's fees and expenses in connection with any enforcement action by me against the Company in which I am the prevailing party.

**12.      Publications and Public Statements.**    I will obtain the Company's written approval before publishing or submitting for publication any material that relates to my work at the Company and/or incorporates any Proprietary Information.    To ensure that the Company delivers a consistent message about its products, services and operations to the public, and further in recognition that even positive statements may have a detrimental effect on the Company in certain securities transactions and other contexts, any statement about the Company which I create, publish or post during my period of employment and for six (6) months thereafter, on any media accessible by the public, including but not limited to social media and networking services and sites, electronic bulletin boards and Internet-based chat rooms, must first be reviewed and approved by an officer of the Company before it is released in the public domain.

**13.      No Employment Obligation.**    I understand that this Agreement does not create an obligation on the Company or any other person to continue my employment. I acknowledge that, unless otherwise agreed in a formal written employment agreement signed on behalf of the Company by an authorized officer, my employment with the Company is at will and therefore may be terminated by the Company or me at any time and for any reason, with or without cause.

**14.      Survival and Assignment by the Company.**    I understand that my obligations under this Agreement will continue in accordance with its express terms regardless of any changes in my title, position, duties, salary, compensation or benefits or other terms and conditions of employment. I further understand that my obligations under this Agreement will continue following the termination of my employment regardless of the manner of such termination and will be binding upon my heirs, executors and administrators. The Company will have the right to assign this Agreement to its affiliates, successors and assigns. I expressly consent to be bound by the provisions of this Agreement for the benefit of the Company or any Company Entity or any of their respective parents, subsidiaries or affiliates to whose employ I may be transferred without the necessity that this Agreement be resigned at the time of such transfer.

3

15.    **Exit Interview.**  If and when I depart from the Company, I may be required to attend an exit interview and sign an "Employee Exit Acknowledgement" to reaffirm my acceptance and acknowledgement of the obligations set forth in this Agreement.   For twelve (12) months following termination of my employment, I will notify the Company of any change in my address and of each subsequent employment or business activity, including the name and address of my employer or other post-Company employment plans and the nature of my activities.

16.    **Severability.**  In case any provisions (or portions thereof) contained in this Agreement shall, for any reason, be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.  If, moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

17.    **Interpretation.**  This Agreement will be deemed to be made and entered into in Tennessee, and will in all respects be interpreted, enforced and governed under the laws of the Tennessee.  I hereby agree to consent to personal jurisdiction of the state and federal courts situated within Tennessee for purposes of enforcing this Agreement, and waive any objection that I might have to personal jurisdiction or venue in those courts.

18.    **Integration.**  I hereby acknowledge and agree that my obligations under this Agreement are in addition and supplementary to any prior understandings and agreements between me and any Company Entity relating to the subject matter hereof, including without limitation any other prior understandings and agreements with any Company Entity relating to confidentiality and restrictive covenant obligations.  This Agreement and any other confidentiality and restrictive covenant obligations I have to any Company Entity shall be interpreted and enforced together so that the maximum restriction applies.

**HIGHLY CONFIDENTIAL**                                              **Webb_IPP_00000660**

DocuSign Envelope ID: D399F482-DCF2-4177-A66F-CFA935C8E42D

**I UNDERSTAND THAT THIS AGREEMENT AFFECTS IMPORTANT RIGHTS.  BY SIGNING BELOW, I CERTIFY THAT I HAVE READ IT CAREFULLY AND AM SATISFIED THAT I UNDERSTAND IT COMPLETELY.**

IN WITNESS WHEREOF, the undersigned has executed this agreement as a sealed instrument as of the date set forth below.

Signed: _Jeff Webb_
81E03A8E08F346A

Type or print name: Jeff Webb

Date: 1/8/2016

State of Residence: Tennessee

1

DocuSign Envelope ID: D399F482-DCF2-4177-A66F-CFA935C8E42D

**EXHIBIT A**

To:     Hercules Achievement, Inc.

From:  Jeff Webb

Date:  1/8/2016

SUBJECT:    **Prior Inventions**

       The following is a complete list of all inventions or improvements relevant to the subject matter of my employment by the Company that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my engagement by the Company:

    X        No inventions or improvements

    ☐       See below:

    ☐       Additional sheets attached

The following is a list of all patents and patent applications in which I have been named as an inventor:

    X        None

    ☐       See below:

2

**HIGHLY CONFIDENTIAL**                    **Webb_IPP_00000662**

# EXHIBIT C

## **Varsity By-Laws**

See attached.

HIGHLY CONFIDENTIAL

# AMENDED AND RESTATED BY-LAWS

of

## HERCULES ACHIEVEMENT HOLDINGS, INC.
### (the "Corporation")

### Article I - Stockholders

1.    <u>Annual Meeting</u>.  The annual meeting of stockholders shall be held for the election of directors each year at such place, date and time as shall be designated by the Board of Directors of the Corporation (the "Board of Directors").  Any other proper business may be transacted at the annual meeting.  If no date for the annual meeting is established or said meeting is not held on the date established as provided above, a special meeting in lieu thereof may be held or there may be action by written consent of the stockholders on matters to be voted on at the annual meeting, and such special meeting or written consent shall have for the purposes of these By-laws or otherwise all the force and effect of an annual meeting.

2.    <u>Special Meetings</u>.  Special meetings of stockholders may be called by the Chief Executive Officer, if one is elected, or, if there is no Chief Executive Officer, a President, or by the Board of Directors, but such special meetings may not be called by any other person or persons.  The call for the meeting shall state the place, date, hour and purposes of the meeting.  Only the purposes specified in the notice of special meeting shall be considered or dealt with at such special meeting.

3.    <u>Notice of Meetings</u>.  Whenever stockholders are required or permitted to take any action at a meeting, a notice stating the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present and vote at such meeting, and, in the case of a special meeting, the purpose or purposes of the meeting, shall be given by the Secretary (or other person authorized by these By-laws or by law) not less than ten (10) nor more than sixty (60) days before the meeting to each stockholder entitled to vote thereat and to each stockholder who, under the Certificate of Incorporation or under these By-laws is entitled to such notice.  If mailed, notice is given when deposited in the mail, postage prepaid, directed to such stockholder at such stockholder's address as it appears in the records of the Corporation.  Without limiting the manner by which notice otherwise may be effectively given to stockholders, any notice to stockholders may be given by electronic transmission in the manner provided in Section 232 of the Delaware General Corporation Law (the "DGCL").

If a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place, if any, and the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken, except that if the adjournment is for more than thirty (30) days, or if after the adjournment a

HIGHLY CONFIDENTIAL

new record date is fixed for the adjourned meeting, notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

4.    Quorum.  The holders of a majority in interest of all stock issued, outstanding and entitled to vote at a meeting, present in person or represented by proxy, shall constitute a quorum.  Any meeting may be adjourned from time to time by a majority of the votes properly cast upon the question, whether or not a quorum is present.  The stockholders present at a duly constituted meeting may continue to transact business until adjournment notwithstanding the withdrawal of enough stockholders to reduce the voting shares below a quorum.

5.    Voting and Proxies.  Except as otherwise provided by the Certificate of Incorporation or by law, each stockholder entitled to vote at any meeting of stockholders shall be entitled to one vote for each share of stock held by such stockholder which has voting power upon the matter in question.  Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by either written proxy or by a transmission permitted by Section 212(c) of the DGCL, but no proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period or is irrevocable and coupled with an interest.  Proxies shall be filed with the Secretary of the meeting, or of any adjournment thereof.  Except as otherwise limited therein, proxies shall entitle the persons authorized thereby to vote at any adjournment of such meeting.

6.    Action at Meeting.  When a quorum is present, any matter before the meeting shall be decided by vote of the holders of a majority of the shares of stock voting on such matter except where a larger vote is required by law, by the Certificate of Incorporation or by these By-laws.  Any election of directors by stockholders shall be determined by a plurality of the votes cast, except where a larger vote is required by law, by the Certificate of Incorporation or by these By-laws.  The Corporation shall not directly or indirectly vote any share of its own stock; provided, however, that the Corporation may vote shares which it holds in a fiduciary capacity to the extent permitted by law.

7.    Presiding Officer.  Meetings of stockholders shall be presided over by the Chairman of the Board, if one is elected, or in his or her absence, the Vice Chairman of the Board, if one is elected, or if neither is elected or in their absence, a President.  The Board of Directors shall have the authority to appoint a temporary presiding officer to serve at any meeting of the stockholders if the Chairman of the Board, the Vice Chairman of the Board or a President is unable to do so for any reason.

8.    Conduct of Meetings.  The Board of Directors may adopt by resolution such rules and regulations for the conduct of the meeting of stockholders as it shall deem appropriate.  Except to the extent inconsistent with such rules and regulations as adopted by the Board of Directors, the presiding officer of any meeting of stockholders shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting.  Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the presiding officer of the meeting, may include, without limitation, the following: (i) the

2

establishment of an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the safety of those present; (iii) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chairman of the meeting shall determine; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (v) limitations on the time allotted to questions or comments by participants. Unless and to the extent determined by the Board of Directors or the presiding officer of the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure.

9.    Action without a Meeting.  Unless otherwise provided in the Certificate of Incorporation, any action required or permitted by law to be taken at any annual or special meeting of stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office, by hand or by certified mail, return receipt requested, or to the Corporation's principal place of business or to the officer of the Corporation having custody of the minute book.  Every written consent shall bear the date of signature and no written consent shall be effective unless, within sixty (60) days of the earliest dated consent delivered pursuant to these By-laws, written consents signed by a sufficient number of stockholders entitled to take action are delivered to the Corporation in the manner set forth in these By-laws.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

10.    Stockholder Lists.  The officer who has charge of the stock ledger of the Corporation shall prepare and make, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder.  Nothing contained in this Section 10 shall require the Corporation to include electronic mail addresses or other electronic contact information on such list.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, for a period of at least ten (10) days prior to the meeting in the manner provided by law.  The list shall also be open to the examination of any stockholder during the whole time of the meeting as provided by law.

## Article II - Directors

1.    Powers.  The business of the Corporation shall be managed by or under the direction of a Board of Directors who may exercise all the powers of the Corporation except as otherwise provided by law, by the Certificate of Incorporation or by these By-laws.  In the event of a vacancy in the Board of Directors, the remaining directors, except as otherwise provided by law, may exercise the powers of the full Board of Directors until the vacancy is filled.

3

2.    Number and Qualification.  Unless otherwise provided in the Certificate of
Incorporation or in these By-laws, the number of directors which shall constitute the whole
board shall be determined from time to time by resolution of the Board of Directors.  Directors
need not be stockholders.

3.    Vacancies; Reduction of Board.  A majority of the directors then in office,
although less than a quorum, or a sole remaining Director, may fill vacancies in the Board of
Directors occurring for any reason and newly created directorships resulting from any increase
in the authorized number of directors.  In lieu of filling any vacancy, the Board of Directors
may reduce the number of directors.

4.    Tenure.  Except as otherwise provided by law, by the Certificate of
Incorporation or by these By-laws, directors shall hold office until their successors are elected
and qualified or until their earlier resignation or removal.  Any director may resign at any time
upon notice given in writing or by electronic transmission to the Corporation.  Such
resignation shall be effective upon receipt unless it is specified to be effective at some other
time or upon the happening of some other event.

5.    Removal.  To the extent permitted by law, a director may be removed from
office with or without cause by vote of the holders of a majority of the shares of stock entitled
to vote in the election of directors.

6.    Meetings.  Regular meetings of the Board of Directors may be held without
notice at such time, date and place as the Board of Directors may from time to time determine.
Special meetings of the Board of Directors may be called, orally or in writing, by the Chief
Executive Officer, if one is elected, or, if there is no Chief Executive Officer, the President, or
by two or more Directors, designating the time, date and place thereof.  Directors may
participate in meetings of the Board of Directors by means of conference telephone or other
communications equipment by means of which all directors participating in the meeting can
hear each other, and participation in a meeting in accordance herewith shall constitute presence
in person at such meeting.

7.    Notice of Meetings.  Notice of the time, date and place of all special meetings
of the Board of Directors shall be given to each director by the Secretary, or Assistant
Secretary, or in case of the death, absence, incapacity or refusal of such persons, by the officer
or one of the directors calling the meeting.  Notice shall be given to each director in person, by
telephone, or by facsimile, electronic mail or other form of electronic communications, sent to
such director's business or home address at least twenty-four (24) hours in advance of the
meeting, or by written notice mailed to such director's business or home address at least
forty-eight (48) hours in advance of the meeting.

8.    Quorum.  At any meeting of the Board of Directors, a majority of the total
number of directors shall constitute a quorum for the transaction of business.  Less than a
quorum may adjourn any meeting from time to time and the meeting may be held as adjourned
without further notice.

4

HIGHLY CONFIDENTIAL

9.    Action at Meeting.  At any meeting of the Board of Directors at which a quorum is present, unless otherwise provided in the following sentence, a majority of the directors present may take any action on behalf of the Board of Directors, unless a larger number is required by law, by the Certificate of Incorporation or by these By-laws.  So long as there are two (2) or fewer Directors, any action to be taken by the Board of Directors shall require the approval of all Directors.

10.    Action by Consent.  Any action required or permitted to be taken at any meeting of the Board of Directors may be taken without a meeting if all members of the Board of Directors consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the records of the meetings of the Board of Directors.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

11.    Committees.  The Board of Directors may, by resolution passed by a majority of the whole Board of Directors, establish one or more committees, each committee to consist of one or more directors.  The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.

Any such committee, to the extent permitted by law and to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to the following: (i) approving or adopting, or recommending to the stockholders, any action or matter expressly required by the DGCL to be submitted to stockholders for approval or (ii) adopting, amending or repealing any provision of these By-laws.

Except as the Board of Directors may otherwise determine, any such committee may make rules for the conduct of its business, but in the absence of such rules its business shall be conducted so far as possible in the same manner as is provided in these By-laws for the Board of Directors.  All members of such committees shall hold their committee offices at the pleasure of the Board of Directors, and the Board of Directors may abolish any committee at any time.

## Article III - Officers

1.    Enumeration.  The officers of the Corporation shall consist of one or more Presidents (who, if there is more than one, shall be referred to as Co-Presidents), a Treasurer, a Secretary, and such other officers, including, without limitation, a Chief Executive Officer

HIGHLY CONFIDENTIAL                                                  Webb_IPP_00000668

and one or more Vice Presidents (including Executive Vice Presidents or Senior Vice Presidents), Assistant Vice Presidents, Assistant Treasurers and Assistant Secretaries, as the Board of Directors may determine. The Board of Directors may elect from among its members a Chairman of the Board and a Vice Chairman of the Board.

2.    Election. The Presidents, Treasurer and Secretary shall be elected annually by the Board of Directors at their first meeting following the annual meeting of stockholders. Other officers may be chosen by the Board of Directors at such meeting or at any other meeting.

3.    Qualification. No officer need be a stockholder or Director. Any two or more offices may be held by the same person. Any officer may be required by the Board of Directors to give bond for the faithful performance of such officer's duties in such amount and with such sureties as the Board of Directors may determine.

4.    Tenure. Except as otherwise provided by the Certificate of Incorporation or by these By-laws, each of the officers of the Corporation shall hold office until the first meeting of the Board of Directors following the next annual meeting of stockholders and until such officer's successor is elected and qualified or until such officer's earlier resignation or removal. Any officer may resign by delivering his or her written resignation to the Corporation, and such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event.

5.    Removal. The Board of Directors may remove any officer with or without cause by a vote of a majority of the directors then in office.

6.    Vacancies. Any vacancy in any office may be filled for the unexpired portion of the term by the Board of Directors.

7.    Chairman of the Board and Vice Chairman. Unless otherwise provided by the Board of Directors, the Chairman of the Board of Directors, if one is elected, shall preside, when present, at all meetings of the stockholders and the Board of Directors. The Chairman of the Board shall have such other powers and shall perform such duties as the Board of Directors may from time to time designate.

Unless otherwise provided by the Board of Directors, in the absence of the Chairman of the Board, the Vice Chairman of the Board, if one is elected, shall preside, when present, at all meetings of the stockholders and the Board of Directors. The Vice Chairman of the Board shall have such other powers and shall perform such duties as the Board of Directors may from time to time designate.

8.    Chief Executive Officer. The Chief Executive Officer, if one is elected, shall have such powers and shall perform such duties as the Board of Directors may from time to time designate.

9.    Presidents. The Presidents shall, subject to the direction of the Board of Directors, each have general supervision and control of the Corporation's business and any

6

HIGHLY CONFIDENTIAL

action that would typically be taken by a President may be taken by any Co-President. If there is no Chairman of the Board or Vice Chairman of the Board, a President shall preside, when present, at all meetings of stockholders and the Board of Directors. The Presidents shall have such other powers and shall perform such duties as the Board of Directors may from time to time designate.

10.    Vice Presidents and Assistant Vice Presidents. Any Vice President (including any Executive Vice President or Senior Vice President) and any Assistant Vice President shall have such powers and shall perform such duties as the Board of Directors may from time to time designate.

11.    Treasurer and Assistant Treasurers. The Treasurer shall, subject to the direction of the Board of Directors, have general charge of the financial affairs of the Corporation and shall cause to be kept accurate books of account. The Treasurer shall have custody of all funds, securities, and valuable documents of the Corporation, except as the Board of Directors may otherwise provide. The Treasurer shall have such other powers and shall perform such duties as the Board of Directors may from time to time designate.

Any Assistant Treasurer shall have such powers and perform such duties as the Board of Directors may from time to time designate.

12.    Secretary and Assistant Secretaries. The Secretary shall record the proceedings of all meetings of the stockholders and the Board of Directors (including committees of the Board of Directors) in books kept for that purpose. In the absence of the Secretary from any such meeting an Assistant Secretary, or if such person is absent, a temporary secretary chosen at the meeting, shall record the proceedings thereof. The Secretary shall have charge of the stock ledger (which may, however, be kept by any transfer or other agent of the Corporation) and shall have such other duties and powers as may be designated from time to time by the Board of Directors.

Any Assistant Secretary shall have such powers and perform such duties as the Board of Directors may from time to time designate.

13.    Other Powers and Duties. Subject to these By-laws, each officer of the Corporation shall have in addition to the duties and powers specifically set forth in these By-laws, such duties and powers as are customarily incident to such officer's office, and such duties and powers as may be designated from time to time by the Board of Directors.

## Article IV - Capital Stock

1.    Certificates of Stock. Each stockholder shall be entitled to a certificate of the capital stock of the Corporation in such form as may from time to time be prescribed by the Board of Directors. Such certificate shall be signed by a President or a Vice President, and by the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary. Such signatures may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed on such certificate shall have ceased to be such

7

officer, transfer agent or registrar before such certificate is issued, it may be issued by the
Corporation with the same effect as if such person were such officer, transfer agent or registrar
at the time of its issue. Every certificate for shares of stock which are subject to any
restriction on transfer and every certificate issued when the Corporation is authorized to issue
more than one class or series of stock shall contain such legend with respect thereto as is
required by law. The Corporation shall be permitted to issue fractional shares.

2.    Transfers. Subject to any restrictions on transfer, shares of stock may be
transferred on the books of the Corporation by the surrender to the Corporation or its transfer
agent of the certificate therefor properly endorsed or accompanied by a written assignment or
power of attorney properly executed, with transfer stamps (if necessary) affixed, and with such
proof of the authenticity of signature as the Corporation or its transfer agent may reasonably
require.

3.    Record Holders. Except as may otherwise be required by law, by the
Certificate of Incorporation or by these By-laws, the Corporation shall be entitled to treat the
record holder of stock as shown on its books as the owner of such stock for all purposes,
including the payment of dividends and the right to vote with respect thereto, regardless of any
transfer, pledge or other disposition of such stock, until the shares have been transferred on the
books of the Corporation in accordance with the requirements of these By-laws.

It shall be the duty of each stockholder to notify the Corporation of such stockholder's
post office address.

4.    Record Date. In order that the Corporation may determine the stockholders
entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or to
consent to corporate action in writing without a meeting, or entitled to receive payment of any
dividend or other distribution or allotment of any rights, or entitled to exercise any rights in
respect of any change, conversion or exchange of stock or for the purpose of any other lawful
action, the Board of Directors may fix, in advance, a record date, which shall not precede the
date on which it is established, and which shall not be more than sixty (60) nor less than ten
(10) days before the date of such meeting, more than ten (10) days after the date on which the
record date for stockholder consent without a meeting is established, nor more than sixty (60)
days prior to any other action. In such case only stockholders of record on such record date
shall be so entitled notwithstanding any transfer of stock on the books of the Corporation after
the record date.

If no record date is fixed, (a) the record date for determining stockholders entitled to
notice of or to vote at a meeting of stockholders shall be at the close of business on the day
next preceding the day on which notice is given, or, if notice is waived, at the close of business
on the day next preceding the day on which the meeting is held, (b) the record date for
determining stockholders entitled to consent to corporate action in writing without a meeting,
when no prior action by the Board of Directors is necessary, shall be the first date on which a
signed written consent setting forth the action taken or proposed to be taken is delivered to the
Corporation by delivery to its registered office in this state, to its principal place of business,
or to an officer or agent of the Corporation having custody of the book in which proceedings of

8

Webb_IPP_00000671

meetings of stockholders are recorded, and (c) the record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

        5.    <u>Lost Certificates</u>.  The Corporation may issue a new certificate of stock in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate, or his legal representative, to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate.

**Article V - Indemnification**

        1.    <u>Definitions</u>.  For purposes of this Article V:

            (a)    "Corporate Status" describes the status of a person who is serving or has served (i) as a Director of the Corporation, (ii) as an Officer of the Corporation, (iii) as a Non-Officer Employee of the Corporation, or (iv) as a director, partner, trustee, officer, employee or agent of any other corporation, partnership, limited liability company, joint venture, trust, employee benefit plan, foundation, association, organization or other legal entity which such person is or was serving at the request of the Corporation.  For purposes of this Section 1(a), a Director, Officer or Non-Officer Employee of the Corporation who is serving or has served as a director, partner, trustee, officer, employee or agent of a Subsidiary shall be deemed to be serving at the request of the Corporation.  Notwithstanding the foregoing, "Corporate Status" shall not include the status of a person who is serving or has served as a director, officer, employee or agent of a constituent corporation absorbed in a merger or consolidation transaction with the Corporation with respect to such person's activities prior to said transaction, unless specifically authorized by the Board of Directors or the stockholders of the Corporation;

            (b)    "Director" means any person who serves or has served the Corporation as a director on the Board of Directors of the Corporation;

            (c)    "Disinterested Director" means, with respect to each Proceeding in respect of which indemnification is sought hereunder, a Director of the Corporation who is not and was not a party to such Proceeding;

            (d)    "Expenses" means all reasonable attorneys fees, retainers, court costs, transcript costs, fees of expert witnesses, private investigators and professional advisors (including, without limitation, accountants and investment bankers), travel expenses, duplicating costs, printing and binding costs, costs of preparation of demonstrative evidence and other courtroom presentation aids and devices, costs incurred in connection with document review, organization, imaging and computerization, telephone charges, postage, delivery service fees, and all other

9

disbursements, costs or expenses of the type customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in, settling or otherwise participating in, a Proceeding;

(e) "Liabilities" means judgments, damages, liabilities, losses, penalties, excise taxes, fines and amounts paid in settlement;

(f) "Non-Officer Employee" means any person who serves or has served as an employee or agent of the Corporation, but who is not or was not a Director or Officer;

(g) "Officer" means any person who serves or has served the Corporation as an officer of the Corporation appointed by the Board of Directors of the Corporation;

(h) "Proceeding" means any threatened, pending or completed action, suit, arbitration, alternate dispute resolution mechanism, inquiry, investigation, administrative hearing or other proceeding, whether civil, criminal, administrative, arbitrative or investigative; and

(i) "Subsidiary" shall mean any corporation, partnership, limited liability company, joint venture, trust or other entity of which the Corporation owns (either directly or through or together with another Subsidiary of the Corporation) either (i) a general partner, managing member or other similar interest or (ii) (A) 50% or more of the voting power of the voting capital equity interests of such corporation, partnership, limited liability company, joint venture or other entity, or (B) 50% or more of the outstanding voting capital stock or other voting equity interests of such corporation, partnership, limited liability company, joint venture or other entity.

2.    <u>Indemnification of Directors and Officers</u>.  Subject to the operation of Section 4 of this Article V of these By-laws, each Director and Officer shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the DGCL, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), and to the extent authorized in this Section 2.

(a)    <u>Actions, Suits and Proceedings Other than By or In the Right of the Corporation</u>.  Each Director and Officer shall be indemnified and held harmless by the Corporation against any and all Expenses and Liabilities that are incurred or paid by such Director or Officer or on such Director's or Officer's behalf in connection with any Proceeding or any claim, issue or matter therein (other than an action by or in the right of the Corporation), which such Director or Officer is, or is threatened to be made, a party to or participant in by reason of such Director's or Officer's Corporate Status, if such Director or Officer acted in good faith and in a manner such Director or Officer reasonably believed to be in or not opposed to the best interests of the

10

Webb_IPP_00000673

Corporation and, with respect to any criminal proceeding, had no reasonable cause to believe his or her conduct was unlawful.

(b)    Actions, Suits and Proceedings By or In the Right of the Corporation. Each Director and Officer shall be indemnified and held harmless by the Corporation against any and all Expenses that are incurred by such Director or Officer or on such Director's or Officer's behalf in connection with any Proceeding or any claim, issue or matter therein by or in the right of the Corporation, which such Director or Officer is, or is threatened to be made, a party to or participant in by reason of such Director's or Officer's Corporate Status, if such Director or Officer acted in good faith and in a manner such Director or Officer reasonably believed to be in or not opposed to the best interests of the Corporation; provided, however, that no indemnification shall be made under this Section 2(b) in respect of any claim, issue or matter as to which such Director or Officer shall have been finally adjudged by a court of competent jurisdiction to be liable to the Corporation, unless, and only to the extent that, the Court of Chancery or another court in which such Proceeding was brought shall determine upon application that, despite adjudication of liability, but in view of all the circumstances of the case, such Director or Officer is fairly and reasonably entitled to indemnification for such Expenses that such court deems proper.

(c)    Survival of Rights. The rights of indemnification provided by this Section 2 shall continue as to a Director or Officer after he or she has ceased to be a Director or Officer and shall inure to the benefit of his or her heirs, executors, administrators and personal representatives.

(d)    Actions by Directors or Officers. Notwithstanding the foregoing, the Corporation shall indemnify any Director or Officer seeking indemnification in connection with a Proceeding initiated by such Director or Officer only if such Proceeding (including any parts of such Proceeding not initiated by such Director or Officer) was authorized in advance by the Board of Directors of the Corporation, unless such Proceeding was brought to enforce such Officer's or Director's rights to indemnification or, in the case of Directors, advancement of Expenses under these By-laws in accordance with the provisions set forth herein.

3.    Indemnification of Non-Officer Employees. Subject to the operation of Section 4 of this Article V of these By-laws, each Non-Officer Employee may, in the discretion of the Board of Directors of the Corporation, be indemnified by the Corporation to the fullest extent authorized by the DGCL, as the same exists or may hereafter be amended, against any or all Expenses and Liabilities that are incurred by such Non-Officer Employee or on such Non-Officer Employee's behalf in connection with any threatened, pending or completed Proceeding, or any claim, issue or matter therein, which such Non-Officer Employee is, or is threatened to be made, a party to or participant in by reason of such Non-Officer Employee's Corporate Status, if such Non-Officer Employee acted in good faith and in a manner such Non-Officer Employee reasonably believed to be in or not opposed to the best interests of the Corporation and, with respect to any criminal proceeding, had no reasonable cause to believe his or her conduct was unlawful. The rights of indemnification provided by this Section 3 shall

11

exist as to a Non-Officer Employee after he or she has ceased to be a Non-Officer Employee and shall inure to the benefit of his or her heirs, personal representatives, executors and administrators. Notwithstanding the foregoing, the Corporation may indemnify any Non-Officer Employee seeking indemnification in connection with a Proceeding initiated by such Non-Officer Employee only if such Proceeding was authorized in advance by the Board of Directors of the Corporation.

4.    <u>Determination</u>. Unless ordered by a court, no indemnification shall be provided pursuant to this Article V to a Director, to an Officer or to a Non-Officer Employee unless a determination shall have been made that such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation and, with respect to any criminal Proceeding, such person had no reasonable cause to believe his or her conduct was unlawful. Such determination shall be made by (a) a majority vote of the Disinterested Directors, even though less than a quorum of the Board of Directors, (b) a committee comprised of Disinterested Directors, such committee having been designated by a majority vote of the Disinterested Directors (even though less than a quorum), (c) if there are no such Disinterested Directors, or if a majority of Disinterested Directors so directs, by independent legal counsel in a written opinion, or (d) by the stockholders of the Corporation.

5.    <u>Advancement of Expenses to Directors Prior to Final Disposition</u>.

(a)    The Corporation shall advance all Expenses incurred by or on behalf of any Director in connection with any Proceeding in which such Director is involved by reason of such Director's Corporate Status within thirty (30) days after the receipt by the Corporation of a written statement from such Director requesting such advance or advances from time to time, whether prior to or after final disposition of such Proceeding. Such statement or statements shall reasonably evidence the Expenses incurred by such Director and shall be preceded or accompanied by an undertaking by or on behalf of such Director to repay any Expenses so advanced if it shall ultimately be determined that such Director is not entitled to be indemnified against such Expenses. Notwithstanding the foregoing, the Corporation shall advance all Expenses incurred by or on behalf of any Director seeking advancement of expenses hereunder in connection with a Proceeding initiated by such Director only if such Proceeding (including any parts of such Proceeding not initiated by such Director) was (i) authorized by the Board of Directors of the Corporation, or (ii) brought to enforce such Director's rights to indemnification or advancement of Expenses under these By-laws.

(b)    If a claim for advancement of Expenses hereunder by a Director is not paid in full by the Corporation within thirty (30) days after receipt by the Corporation of documentation of Expenses and the required undertaking, such Director may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and if successful in whole or in part, such Director shall also be entitled to be paid the expenses of prosecuting such claim. The failure of the Corporation (including its Board of Directors or any committee thereof, independent legal counsel, or stockholders) to make a determination concerning the permissibility of such advancement of Expenses under this Article V shall not be a defense to an action

12

brought by a Director for recovery of the unpaid amount of an advancement claim and shall not create a presumption that such advancement is not permissible. The burden of proving that a Director is not entitled to an advancement of expenses shall be on the Corporation.

(c)     In any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that the Director has not met any applicable standard for indemnification set forth in the DGCL.

6.     Advancement of Expenses to Officers and Non-Officer Employees Prior to Final Disposition.

(a)     The Corporation may, at the discretion of the Board of Directors of the Corporation, advance any or all Expenses incurred by or on behalf of any Officer or any Non-Officer Employee in connection with any Proceeding in which such person is involved by reason of his or her Corporate Status as an Officer or Non-Officer Employee upon the receipt by the Corporation of a statement or statements from such Officer or Non-Officer Employee requesting such advance or advances from time to time, whether prior to or after final disposition of such Proceeding. Such statement or statements shall reasonably evidence the Expenses incurred by such Officer or Non-Officer Employee and shall be preceded or accompanied by an undertaking by or on behalf of such person to repay any Expenses so advanced if it shall ultimately be determined that such Officer or Non-Officer Employee is not entitled to be indemnified against such Expenses.

(b)     In any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that the Officer or Non-Officer Employee has not met any applicable standard for indemnification set forth in the DGCL.

7.     Contractual Nature of Rights.

(a)     The provisions of this Article V shall be deemed to be a contract between the Corporation and each Director and Officer entitled to the benefits hereof at any time while this Article V is in effect, in consideration of such person's past or current and any future performance of services for the Corporation. Neither amendment, repeal or modification of any provision of this Article V nor the adoption of any provision of the Certificate of Incorporation inconsistent with this Article V shall eliminate or reduce any right conferred by this Article V in respect of any act or omission occurring, or any cause of action or claim that accrues or arises or any state of facts existing, at the time of or before such amendment, repeal, modification or adoption of an inconsistent provision (even in the case of a proceeding based on such a state of facts that is commenced after such time), and all rights to indemnification and advancement of Expenses granted herein or arising out of any act or omission shall vest

13

at the time of the act or omission in question, regardless of when or if any proceeding with respect to such act or omission is commenced. The rights to indemnification and to advancement of expenses provided by, or granted pursuant to, this Article V shall continue notwithstanding that the person has ceased to be a director or officer of the Corporation and shall inure to the benefit of the estate, heirs, executors, administrators, legatees and distributes of such person.

(b)    If a claim for indemnification hereunder by a Director or Officer is not paid in full by the Corporation within sixty (60) days after receipt by the Corporation of a written claim for indemnification, such Director or Officer may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim, and if successful in whole or in part, such Director or Officer shall also be entitled to be paid the expenses of prosecuting such claim. The failure of the Corporation (including its Board of Directors or any committee thereof, independent legal counsel, or stockholders) to make a determination concerning the permissibility of such indemnification under this Article V shall not be a defense to an action brought by a Director or Officer for recovery of the unpaid amount of an indemnification claim and shall not create a presumption that such indemnification is not permissible. The burden of proving that a Director or Officer is not entitled to indemnification shall be on the Corporation.

(c)    In any suit brought by a Director or Officer to enforce a right to indemnification hereunder, it shall be a defense that such Director or Officer has not met any applicable standard for indemnification set forth in the DGCL.

8.    <u>Non-Exclusivity of Rights</u>.  The rights to indemnification and advancement of Expenses set forth in this Article V shall not be exclusive of any other right which any Director, Officer, or Non-Officer Employee may have or hereafter acquire under any statute, provision of the Certificate or these By-laws, agreement, vote of stockholders or Disinterested Directors or otherwise.

9.    <u>Insurance</u>.  The Corporation may maintain insurance, at its expense, to protect itself and any Director, Officer or Non-Officer Employee against any liability of any character asserted against or incurred by the Corporation or any such Director, Officer or Non-Officer Employee, or arising out of any such person's Corporate Status, whether or not the Corporation would have the power to indemnify such person against such liability under the DGCL or the provisions of this Article V.

10.    <u>Other Indemnification</u>.  The Corporation's obligation, if any, to indemnify or provide advancement of Expenses to any person under this Article V as a result of such person serving, at the request of the Corporation, as a director, partner, trustee, officer, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise shall be reduced by any amount such person may collect as indemnification or advancement of Expenses from such other corporation, partnership, joint venture, trust, employee benefit plan or enterprise (the "Primary Indemnitor"). Any indemnification or advancement of Expenses under this Article V owed by the Corporation as a result of a person

14

serving, at the request of the Corporation, as a director, partner, trustee, officer, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise shall only be in excess of, and shall be secondary to, the indemnification or advancement of Expenses available from the applicable Primary Indemnitor(s) and any applicable insurance policies.

## Article VI - Miscellaneous Provisions

1.    Fiscal Year.  Except as otherwise determined by the Board of Directors, the fiscal year of the Corporation shall end on December 31 of each year.

2.    Seal.  The Board of Directors shall have power to adopt and alter the seal of the Corporation.

3.    Execution of Instruments.  Subject to any limitations which may be set forth in a resolution of the Board of Directors, all deeds, leases, transfers, contracts, bonds, notes and other obligations to be entered into by the Corporation in the ordinary course of its business without director action may be executed on behalf of the Corporation by, a President, or by any other officer, employee or agent of the Corporation as the Board of Directors may authorize.

4.    Voting of Securities.  Unless the Board of Directors otherwise provides, a President, any Vice President or the Treasurer may waive notice of and act on behalf of this Corporation, or appoint another person or persons to act as proxy or attorney in fact for this Corporation with or without discretionary power and/or power of substitution, at any meeting of stockholders or shareholders of any other corporation or organization, any of whose securities are held by this Corporation.

5.    Resident Agent.  The Board of Directors may appoint a resident agent upon whom legal process may be served in any action or proceeding against the Corporation.

6.    Corporate Records.  The original or attested copies of the Certificate of Incorporation, By-laws and records of all meetings of the incorporators, stockholders and the Board of Directors and the stock and transfer records, which shall contain the names of all stockholders, their record addresses and the amount of stock held by each, shall be kept at the principal office of the Corporation, at the office of its counsel, or at an office of its transfer agent.

7.    Certificate of Incorporation.  All references in these By-laws to the Certificate of Incorporation shall be deemed to refer to the Certificate of Incorporation of the Corporation, as amended and in effect from time to time.

8.    Amendments.  These By-laws may be altered, amended or repealed, and new By-laws may be adopted, by the stockholders or by the Board of Directors; provided, that (a) the Board of Directors may not alter, amend or repeal any provision of these By-laws which by law, by the Certificate of Incorporation or by these By-laws requires action by the

15

stockholders and (b) any alteration, amendment or repeal of these By-laws by the Board of Directors and any new By-law adopted by the Board of Directors may be altered, amended or repealed by the stockholders.

9.    Waiver of Notice.  Whenever notice is required to be given under any provision of these By-laws, a written waiver, signed by the person entitled to notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time of the event for which notice is to be given, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any meeting needs to be specified in any written waiver or any waiver by electronic transmission.

10.    Conflicts.  In the event of any conflict between the terms and provisions contained in these By-laws and the Stockholders Agreement of the Corporation, dated as of the date hereof, as amended from time to time and in effect (the "Stockholders Agreement"), the Stockholders Agreement shall control.

ADOPTED DECEMBER 11, 2014

HIGHLY CONFIDENTIAL                                    Webb_IPP_00000679

# AMENDED AND RESTATED BY-LAWS

of

## HERCULES VB HOLDINGS, INC.
### (the "Corporation")

### Article I - Stockholders

1.    <u>Annual Meeting</u>.  The annual meeting of stockholders shall be held for the election of directors each year at such place, date and time as shall be designated by the Board of Directors of the Corporation (the "Board of Directors").  Any other proper business may be transacted at the annual meeting.  If no date for the annual meeting is established or said meeting is not held on the date established as provided above, a special meeting in lieu thereof may be held or there may be action by written consent of the stockholders on matters to be voted on at the annual meeting, and such special meeting or written consent shall have for the purposes of these By-laws or otherwise all the force and effect of an annual meeting.

2.    <u>Special Meetings</u>.  Special meetings of stockholders may be called by the Chief Executive Officer, if one is elected, or, if there is no Chief Executive Officer, a President, or by the Board of Directors, but such special meetings may not be called by any other person or persons.  The call for the meeting shall state the place, date, hour and purposes of the meeting.  Only the purposes specified in the notice of special meeting shall be considered or dealt with at such special meeting.

3.    <u>Notice of Meetings</u>.  Whenever stockholders are required or permitted to take any action at a meeting, a notice stating the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present and vote at such meeting, and, in the case of a special meeting, the purpose or purposes of the meeting, shall be given by the Secretary (or other person authorized by these By-laws or by law) not less than ten (10) nor more than sixty (60) days before the meeting to each stockholder entitled to vote thereat and to each stockholder who, under the Certificate of Incorporation or under these By-laws is entitled to such notice.  If mailed, notice is given when deposited in the mail, postage prepaid, directed to such stockholder at such stockholder's address as it appears in the records of the Corporation.  Without limiting the manner by which notice otherwise may be effectively given to stockholders, any notice to stockholders may be given by electronic transmission in the manner provided in Section 232 of the Delaware General Corporation Law (the "DGCL").

If a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place, if any, and the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken, except that if the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, notice of the adjourned meeting shall be given to each

HIGHLY CONFIDENTIAL

stockholder of record entitled to vote at the meeting.

4.    Quorum.  The holders of a majority in interest of all stock issued, outstanding and entitled to vote at a meeting, present in person or represented by proxy, shall constitute a quorum.  Any meeting may be adjourned from time to time by a majority of the votes properly cast upon the question, whether or not a quorum is present.  The stockholders present at a duly constituted meeting may continue to transact business until adjournment notwithstanding the withdrawal of enough stockholders to reduce the voting shares below a quorum.

5.    Voting and Proxies.  Except as otherwise provided by the Certificate of Incorporation or by law, each stockholder entitled to vote at any meeting of stockholders shall be entitled to one vote for each share of stock held by such stockholder which has voting power upon the matter in question.  Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by either written proxy or by a transmission permitted by Section 212(c) of the DGCL, but no proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period or is irrevocable and coupled with an interest.  Proxies shall be filed with the Secretary of the meeting, or of any adjournment thereof.  Except as otherwise limited therein, proxies shall entitle the persons authorized thereby to vote at any adjournment of such meeting.

6.    Action at Meeting.  When a quorum is present, any matter before the meeting shall be decided by vote of the holders of a majority of the shares of stock voting on such matter except where a larger vote is required by law, by the Certificate of Incorporation or by these By-laws.  Any election of directors by stockholders shall be determined by a plurality of the votes cast, except where a larger vote is required by law, by the Certificate of Incorporation or by these By-laws.  The Corporation shall not directly or indirectly vote any share of its own stock; provided, however, that the Corporation may vote shares which it holds in a fiduciary capacity to the extent permitted by law.

7.    Presiding Officer.  Meetings of stockholders shall be presided over by the Chairman of the Board, if one is elected, or in his or her absence, the Vice Chairman of the Board, if one is elected, or if neither is elected or in their absence, a President.  The Board of Directors shall have the authority to appoint a temporary presiding officer to serve at any meeting of the stockholders if the Chairman of the Board, the Vice Chairman of the Board or a President is unable to do so for any reason.

8.    Conduct of Meetings.  The Board of Directors may adopt by resolution such rules and regulations for the conduct of the meeting of stockholders as it shall deem appropriate.  Except to the extent inconsistent with such rules and regulations as adopted by the Board of Directors, the presiding officer of any meeting of stockholders shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting.  Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the presiding officer of the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the safety of those present; (iii) limitations on attendance at or participation in the meeting to

2

stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chairman of the meeting shall determine; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (v) limitations on the time allotted to questions or comments by participants. Unless and to the extent determined by the Board of Directors or the presiding officer of the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure.

9.     Action without a Meeting. Unless otherwise provided in the Certificate of Incorporation, any action required or permitted by law to be taken at any annual or special meeting of stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office, by hand or by certified mail, return receipt requested, or to the Corporation's principal place of business or to the officer of the Corporation having custody of the minute book. Every written consent shall bear the date of signature and no written consent shall be effective unless, within sixty (60) days of the earliest dated consent delivered pursuant to these By-laws, written consents signed by a sufficient number of stockholders entitled to take action are delivered to the Corporation in the manner set forth in these By-laws. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

10.     Stockholder Lists. The officer who has charge of the stock ledger of the Corporation shall prepare and make, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Nothing contained in this Section 10 shall require the Corporation to include electronic mail addresses or other electronic contact information on such list. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, for a period of at least ten (10) days prior to the meeting in the manner provided by law. The list shall also be open to the examination of any stockholder during the whole time of the meeting as provided by law.

### Article II - Directors

1.     Powers. The business of the Corporation shall be managed by or under the direction of a Board of Directors who may exercise all the powers of the Corporation except as otherwise provided by law, by the Certificate of Incorporation or by these By-laws. In the event of a vacancy in the Board of Directors, the remaining directors, except as otherwise provided by law, may exercise the powers of the full Board of Directors until the vacancy is filled.

2.     Number and Qualification. Unless otherwise provided in the Certificate of Incorporation or in these By-laws, the number of directors which shall constitute the whole board shall be determined from time to time by resolution of the Board of Directors. Directors need not be stockholders.

3

    Webb_IPP_00000682

3.     <u>Vacancies; Reduction of Board</u>.  A majority of the directors then in office, although less than a quorum, or a sole remaining Director, may fill vacancies in the Board of Directors occurring for any reason and newly created directorships resulting from any increase in the authorized number of directors.  In lieu of filling any vacancy, the Board of Directors may reduce the number of directors.

4.     <u>Tenure</u>.  Except as otherwise provided by law, by the Certificate of Incorporation or by these By-laws, directors shall hold office until their successors are elected and qualified or until their earlier resignation or removal.  Any director may resign at any time upon notice given in writing or by electronic transmission to the Corporation.  Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event.

5.     <u>Removal</u>.  To the extent permitted by law, a director may be removed from office with or without cause by vote of the holders of a majority of the shares of stock entitled to vote in the election of directors.

6.     <u>Meetings</u>.  Regular meetings of the Board of Directors may be held without notice at such time, date and place as the Board of Directors may from time to time determine.  Special meetings of the Board of Directors may be called, orally or in writing, by the Chief Executive Officer, if one is elected, or, if there is no Chief Executive Officer, the President, or by two or more Directors, designating the time, date and place thereof.  Directors may participate in meetings of the Board of Directors by means of conference telephone or other communications equipment by means of which all directors participating in the meeting can hear each other, and participation in a meeting in accordance herewith shall constitute presence in person at such meeting.

7.     <u>Notice of Meetings</u>.  Notice of the time, date and place of all special meetings of the Board of Directors shall be given to each director by the Secretary, or Assistant Secretary, or in case of the death, absence, incapacity or refusal of such persons, by the officer or one of the directors calling the meeting.  Notice shall be given to each director in person, by telephone, or by facsimile, electronic mail or other form of electronic communications, sent to such director's business or home address at least twenty-four (24) hours in advance of the meeting, or by written notice mailed to such director's business or home address at least forty-eight (48) hours in advance of the meeting.

8.     <u>Quorum</u>.  At any meeting of the Board of Directors, a majority of the total number of directors shall constitute a quorum for the transaction of business.  Less than a quorum may adjourn any meeting from time to time and the meeting may be held as adjourned without further notice.

9.     <u>Action at Meeting</u>.  At any meeting of the Board of Directors at which a quorum is present, unless otherwise provided in the following sentence, a majority of the directors present may take any action on behalf of the Board of Directors, unless a larger number is required by law, by the Certificate of Incorporation or by these By-laws.  So long as there are two (2) or fewer Directors, any action to be taken by the Board of Directors shall require the approval of all Directors.

4

HIGHLY CONFIDENTIAL

10.    Action by Consent.  Any action required or permitted to be taken at any meeting of the Board of Directors may be taken without a meeting if all members of the Board of Directors consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the records of the meetings of the Board of Directors.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

11.    Committees.  The Board of Directors may, by resolution passed by a majority of the whole Board of Directors, establish one or more committees, each committee to consist of one or more directors.  The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.

Any such committee, to the extent permitted by law and to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to the following: (i) approving or adopting, or recommending to the stockholders, any action or matter expressly required by the DGCL to be submitted to stockholders for approval or (ii) adopting, amending or repealing any provision of these By-laws.

Except as the Board of Directors may otherwise determine, any such committee may make rules for the conduct of its business, but in the absence of such rules its business shall be conducted so far as possible in the same manner as is provided in these By-laws for the Board of Directors.  All members of such committees shall hold their committee offices at the pleasure of the Board of Directors, and the Board of Directors may abolish any committee at any time.

## Article III - Officers

1.    Enumeration.  The officers of the Corporation shall consist of one or more Presidents (who, if there is more than one, shall be referred to as Co-Presidents), a Treasurer, a Secretary, and such other officers, including, without limitation, a Chief Executive Officer and one or more Vice Presidents (including Executive Vice Presidents or Senior Vice Presidents), Assistant Vice Presidents, Assistant Treasurers and Assistant Secretaries, as the Board of Directors may determine.  The Board of Directors may elect from among its members a Chairman of the Board and a Vice Chairman of the Board.

2.    Election.  The Presidents, Treasurer and Secretary shall be elected annually by the Board of Directors at their first meeting following the annual meeting of stockholders.  Other officers may be chosen by the Board of Directors at such meeting or at any other meeting.

3.    Qualification.  No officer need be a stockholder or Director.  Any two or more offices may be held by the same person.  Any officer may be required by the Board of Directors

5

to give bond for the faithful performance of such officer's duties in such amount and with such sureties as the Board of Directors may determine.

4.    Tenure.  Except as otherwise provided by the Certificate of Incorporation or by these By-laws, each of the officers of the Corporation shall hold office until the first meeting of the Board of Directors following the next annual meeting of stockholders and until such officer's successor is elected and qualified or until such officer's earlier resignation or removal.  Any officer may resign by delivering his or her written resignation to the Corporation, and such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event.

5.    Removal.  The Board of Directors may remove any officer with or without cause by a vote of a majority of the directors then in office.

6.    Vacancies.  Any vacancy in any office may be filled for the unexpired portion of the term by the Board of Directors.

7.    Chairman of the Board and Vice Chairman.  Unless otherwise provided by the Board of Directors, the Chairman of the Board of Directors, if one is elected, shall preside, when present, at all meetings of the stockholders and the Board of Directors.  The Chairman of the Board shall have such other powers and shall perform such duties as the Board of Directors may from time to time designate.

Unless otherwise provided by the Board of Directors, in the absence of the Chairman of the Board, the Vice Chairman of the Board, if one is elected, shall preside, when present, at all meetings of the stockholders and the Board of Directors.  The Vice Chairman of the Board shall have such other powers and shall perform such duties as the Board of Directors may from time to time designate.

8.    Chief Executive Officer.  The Chief Executive Officer, if one is elected, shall have such powers and shall perform such duties as the Board of Directors may from time to time designate.

9.    Presidents.  The Presidents shall, subject to the direction of the Board of Directors, each have general supervision and control of the Corporation's business and any action that would typically be taken by a President may be taken by any Co-President.  If there is no Chairman of the Board or Vice Chairman of the Board, a President shall preside, when present, at all meetings of stockholders and the Board of Directors.  The Presidents shall have such other powers and shall perform such duties as the Board of Directors may from time to time designate.

10.    Vice Presidents and Assistant Vice Presidents.  Any Vice President (including any Executive Vice President or Senior Vice President) and any Assistant Vice President shall have such powers and shall perform such duties as the Board of Directors may from time to time designate.

11.    Treasurer and Assistant Treasurers.  The Treasurer shall, subject to the direction of the Board of Directors, have general charge of the financial affairs of the Corporation and

6

                                    Webb_IPP_00000685

shall cause to be kept accurate books of account. The Treasurer shall have custody of all funds, securities, and valuable documents of the Corporation, except as the Board of Directors may otherwise provide. The Treasurer shall have such other powers and shall perform such duties as the Board of Directors may from time to time designate.

Any Assistant Treasurer shall have such powers and perform such duties as the Board of Directors may from time to time designate.

12.    <u>Secretary and Assistant Secretaries</u>. The Secretary shall record the proceedings of all meetings of the stockholders and the Board of Directors (including committees of the Board of Directors) in books kept for that purpose. In the absence of the Secretary from any such meeting an Assistant Secretary, or if such person is absent, a temporary secretary chosen at the meeting, shall record the proceedings thereof. The Secretary shall have charge of the stock ledger (which may, however, be kept by any transfer or other agent of the Corporation) and shall have such other duties and powers as may be designated from time to time by the Board of Directors.

Any Assistant Secretary shall have such powers and perform such duties as the Board of Directors may from time to time designate.

13.    <u>Other Powers and Duties</u>. Subject to these By-laws, each officer of the Corporation shall have in addition to the duties and powers specifically set forth in these By-laws, such duties and powers as are customarily incident to such officer's office, and such duties and powers as may be designated from time to time by the Board of Directors.

## Article IV - Capital Stock

1.    <u>Certificates of Stock</u>. Each stockholder shall be entitled to a certificate of the capital stock of the Corporation in such form as may from time to time be prescribed by the Board of Directors. Such certificate shall be signed by a President or a Vice President, and by the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary. Such signatures may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed on such certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the time of its issue. Every certificate for shares of stock which are subject to any restriction on transfer and every certificate issued when the Corporation is authorized to issue more than one class or series of stock shall contain such legend with respect thereto as is required by law. The Corporation shall be permitted to issue fractional shares.

2.    <u>Transfers</u>. Subject to any restrictions on transfer, shares of stock may be transferred on the books of the Corporation by the surrender to the Corporation or its transfer agent of the certificate therefor properly endorsed or accompanied by a written assignment or power of attorney properly executed, with transfer stamps (if necessary) affixed, and with such proof of the authenticity of signature as the Corporation or its transfer agent may reasonably require.

7

HIGHLY CONFIDENTIAL                                                                      Webb_IPP_00000686

3.    Record Holders.  Except as may otherwise be required by law, by the Certificate of Incorporation or by these By-laws, the Corporation shall be entitled to treat the record holder of stock as shown on its books as the owner of such stock for all purposes, including the payment of dividends and the right to vote with respect thereto, regardless of any transfer, pledge or other disposition of such stock, until the shares have been transferred on the books of the Corporation in accordance with the requirements of these By-laws.

It shall be the duty of each stockholder to notify the Corporation of such stockholder's post office address.

4.    Record Date.  In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or to consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix, in advance, a record date, which shall not precede the date on which it is established, and which shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting, more than ten (10) days after the date on which the record date for stockholder consent without a meeting is established, nor more than sixty (60) days prior to any other action.  In such case only stockholders of record on such record date shall be so entitled notwithstanding any transfer of stock on the books of the Corporation after the record date.

If no record date is fixed, (a) the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held, (b) the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is necessary, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in this state, to its principal place of business, or to an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded, and (c) the record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

5.    Lost Certificates.  The Corporation may issue a new certificate of stock in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate, or his legal representative, to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate.

8

## Article V - Indemnification

1.    Definitions.  For purposes of this Article V:

(a)    "Corporate Status" describes the status of a person who is serving or has served (i) as a Director of the Corporation, (ii) as an Officer of the Corporation, (iii) as a Non-Officer Employee of the Corporation, or (iv) as a director, partner, trustee, officer, employee or agent of any other corporation, partnership, limited liability company, joint venture, trust, employee benefit plan, foundation, association, organization or other legal entity which such person is or was serving at the request of the Corporation.  For purposes of this Section 1(a), a Director, Officer or Non-Officer Employee of the Corporation who is serving or has served as a director, partner, trustee, officer, employee or agent of a Subsidiary shall be deemed to be serving at the request of the Corporation.  Notwithstanding the foregoing, "Corporate Status" shall not include the status of a person who is serving or has served as a director, officer, employee or agent of a constituent corporation absorbed in a merger or consolidation transaction with the Corporation with respect to such person's activities prior to said transaction, unless specifically authorized by the Board of Directors or the stockholders of the Corporation;

(b)    "Director" means any person who serves or has served the Corporation as a director on the Board of Directors of the Corporation;

(c)    "Disinterested Director" means, with respect to each Proceeding in respect of which indemnification is sought hereunder, a Director of the Corporation who is not and was not a party to such Proceeding;

(d)    "Expenses" means all reasonable attorneys fees, retainers, court costs, transcript costs, fees of expert witnesses, private investigators and professional advisors (including, without limitation, accountants and investment bankers), travel expenses, duplicating costs, printing and binding costs, costs of preparation of demonstrative evidence and other courtroom presentation aids and devices, costs incurred in connection with document review, organization, imaging and computerization, telephone charges, postage, delivery service fees, and all other disbursements, costs or expenses of the type customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in, settling or otherwise participating in, a Proceeding;

(e)    "Liabilities" means judgments, damages, liabilities, losses, penalties, excise taxes, fines and amounts paid in settlement;

(f)    "Non-Officer Employee" means any person who serves or has served as an employee or agent of the Corporation, but who is not or was not a Director or Officer;

(g)    "Officer" means any person who serves or has served the Corporation as an officer of the Corporation appointed by the Board of Directors of the Corporation;

9

(h)    "Proceeding" means any threatened, pending or completed action, suit, arbitration, alternate dispute resolution mechanism, inquiry, investigation, administrative hearing or other proceeding, whether civil, criminal, administrative, arbitrative or investigative; and

(i)    "Subsidiary" shall mean any corporation, partnership, limited liability company, joint venture, trust or other entity of which the Corporation owns (either directly or through or together with another Subsidiary of the Corporation) either (i) a general partner, managing member or other similar interest or (ii) (A) 50% or more of the voting power of the voting capital equity interests of such corporation, partnership, limited liability company, joint venture or other entity, or (B) 50% or more of the outstanding voting capital stock or other voting equity interests of such corporation, partnership, limited liability company, joint venture or other entity.

2.    Indemnification of Directors and Officers.  Subject to the operation of Section 4 of this Article V of these By-laws, each Director and Officer shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the DGCL, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), and to the extent authorized in this Section 2.

(a)    Actions, Suits and Proceedings Other than By or In the Right of the Corporation.  Each Director and Officer shall be indemnified and held harmless by the Corporation against any and all Expenses and Liabilities that are incurred or paid by such Director or Officer or on such Director's or Officer's behalf in connection with any Proceeding or any claim, issue or matter therein (other than an action by or in the right of the Corporation), which such Director or Officer is, or is threatened to be made, a party to or participant in by reason of such Director's or Officer's Corporate Status, if such Director or Officer acted in good faith and in a manner such Director or Officer reasonably believed to be in or not opposed to the best interests of the Corporation and, with respect to any criminal proceeding, had no reasonable cause to believe his or her conduct was unlawful.

(b)    Actions, Suits and Proceedings By or In the Right of the Corporation.  Each Director and Officer shall be indemnified and held harmless by the Corporation against any and all Expenses that are incurred by such Director or Officer or on such Director's or Officer's behalf in connection with any Proceeding or any claim, issue or matter therein by or in the right of the Corporation, which such Director or Officer is, or is threatened to be made, a party to or participant in by reason of such Director's or Officer's Corporate Status, if such Director or Officer acted in good faith and in a manner such Director or Officer reasonably believed to be in or not opposed to the best interests of the Corporation; provided, however, that no indemnification shall be made under this Section 2(b) in respect of any claim, issue or matter as to which such Director or Officer shall have been finally adjudged by a court of competent jurisdiction to be liable to the Corporation, unless, and only to the extent that, the Court of Chancery or another court in which such Proceeding was brought shall determine upon application

10

    Webb_IPP_00000689

that, despite adjudication of liability, but in view of all the circumstances of the case, such Director or Officer is fairly and reasonably entitled to indemnification for such Expenses that such court deems proper.

        (c)    <u>Survival of Rights</u>. The rights of indemnification provided by this Section 2 shall continue as to a Director or Officer after he or she has ceased to be a Director or Officer and shall inure to the benefit of his or her heirs, executors, administrators and personal representatives.

        (d)    <u>Actions by Directors or Officers</u>. Notwithstanding the foregoing, the Corporation shall indemnify any Director or Officer seeking indemnification in connection with a Proceeding initiated by such Director or Officer only if such Proceeding (including any parts of such Proceeding not initiated by such Director or Officer) was authorized in advance by the Board of Directors of the Corporation, unless such Proceeding was brought to enforce such Officer's or Director's rights to indemnification or, in the case of Directors, advancement of Expenses under these By-laws in accordance with the provisions set forth herein.

        3.    <u>Indemnification of Non-Officer Employees</u>. Subject to the operation of Section 4 of this Article V of these By-laws, each Non-Officer Employee may, in the discretion of the Board of Directors of the Corporation, be indemnified by the Corporation to the fullest extent authorized by the DGCL, as the same exists or may hereafter be amended, against any or all Expenses and Liabilities that are incurred by such Non-Officer Employee or on such Non-Officer Employee's behalf in connection with any threatened, pending or completed Proceeding, or any claim, issue or matter therein, which such Non-Officer Employee is, or is threatened to be made, a party to or participant in by reason of such Non-Officer Employee's Corporate Status, if such Non-Officer Employee acted in good faith and in a manner such Non-Officer Employee reasonably believed to be in or not opposed to the best interests of the Corporation and, with respect to any criminal proceeding, had no reasonable cause to believe his or her conduct was unlawful. The rights of indemnification provided by this Section 3 shall exist as to a Non-Officer Employee after he or she has ceased to be a Non-Officer Employee and shall inure to the benefit of his or her heirs, personal representatives, executors and administrators. Notwithstanding the foregoing, the Corporation may indemnify any Non-Officer Employee seeking indemnification in connection with a Proceeding initiated by such Non-Officer Employee only if such Proceeding was authorized in advance by the Board of Directors of the Corporation.

        4.    <u>Determination</u>. Unless ordered by a court, no indemnification shall be provided pursuant to this Article V to a Director, to an Officer or to a Non-Officer Employee unless a determination shall have been made that such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation and, with respect to any criminal Proceeding, such person had no reasonable cause to believe his or her conduct was unlawful. Such determination shall be made by (a) a majority vote of the Disinterested Directors, even though less than a quorum of the Board of Directors, (b) a committee comprised of Disinterested Directors, such committee having been designated by a majority vote of the Disinterested Directors (even though less than a quorum), (c) if there are no

11

such Disinterested Directors, or if a majority of Disinterested Directors so directs, by independent legal counsel in a written opinion, or (d) by the stockholders of the Corporation.

    5.    <u>Advancement of Expenses to Directors Prior to Final Disposition</u>.

    (a)    The Corporation shall advance all Expenses incurred by or on behalf of any Director in connection with any Proceeding in which such Director is involved by reason of such Director's Corporate Status within thirty (30) days after the receipt by the Corporation of a written statement from such Director requesting such advance or advances from time to time, whether prior to or after final disposition of such Proceeding. Such statement or statements shall reasonably evidence the Expenses incurred by such Director and shall be preceded or accompanied by an undertaking by or on behalf of such Director to repay any Expenses so advanced if it shall ultimately be determined that such Director is not entitled to be indemnified against such Expenses. Notwithstanding the foregoing, the Corporation shall advance all Expenses incurred by or on behalf of any Director seeking advancement of expenses hereunder in connection with a Proceeding initiated by such Director only if such Proceeding (including any parts of such Proceeding not initiated by such Director) was (i) authorized by the Board of Directors of the Corporation, or (ii) brought to enforce such Director's rights to indemnification or advancement of Expenses under these By-laws.

    (b)    If a claim for advancement of Expenses hereunder by a Director is not paid in full by the Corporation within thirty (30) days after receipt by the Corporation of documentation of Expenses and the required undertaking, such Director may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and if successful in whole or in part, such Director shall also be entitled to be paid the expenses of prosecuting such claim. The failure of the Corporation (including its Board of Directors or any committee thereof, independent legal counsel, or stockholders) to make a determination concerning the permissibility of such advancement of Expenses under this Article V shall not be a defense to an action brought by a Director for recovery of the unpaid amount of an advancement claim and shall not create a presumption that such advancement is not permissible. The burden of proving that a Director is not entitled to an advancement of expenses shall be on the Corporation.

    (c)    In any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that the Director has not met any applicable standard for indemnification set forth in the DGCL.

    6.    <u>Advancement of Expenses to Officers and Non-Officer Employees Prior to Final Disposition</u>.

    (a)    The Corporation may, at the discretion of the Board of Directors of the Corporation, advance any or all Expenses incurred by or on behalf of any Officer or any Non-Officer Employee in connection with any Proceeding in which such person is involved by reason of his or her Corporate Status as an Officer or Non-Officer Employee upon the receipt by the Corporation of a statement or statements from such Officer or

HIGHLY CONFIDENTIAL    Webb_IPP_00000691

Non-Officer Employee requesting such advance or advances from time to time, whether prior to or after final disposition of such Proceeding. Such statement or statements shall reasonably evidence the Expenses incurred by such Officer or Non-Officer Employee and shall be preceded or accompanied by an undertaking by or on behalf of such person to repay any Expenses so advanced if it shall ultimately be determined that such Officer or Non-Officer Employee is not entitled to be indemnified against such Expenses.

(b)    In any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that the Officer or Non-Officer Employee has not met any applicable standard for indemnification set forth in the DGCL.

7.    <u>Contractual Nature of Rights</u>.

(a)    The provisions of this Article V shall be deemed to be a contract between the Corporation and each Director and Officer entitled to the benefits hereof at any time while this Article V is in effect, in consideration of such person's past or current and any future performance of services for the Corporation. Neither amendment, repeal or modification of any provision of this Article V nor the adoption of any provision of the Certificate of Incorporation inconsistent with this Article V shall eliminate or reduce any right conferred by this Article V in respect of any act or omission occurring, or any cause of action or claim that accrues or arises or any state of facts existing, at the time of or before such amendment, repeal, modification or adoption of an inconsistent provision (even in the case of a proceeding based on such a state of facts that is commenced after such time), and all rights to indemnification and advancement of Expenses granted herein or arising out of any act or omission shall vest at the time of the act or omission in question, regardless of when or if any proceeding with respect to such act or omission is commenced. The rights to indemnification and to advancement of expenses provided by, or granted pursuant to, this Article V shall continue notwithstanding that the person has ceased to be a director or officer of the Corporation and shall inure to the benefit of the estate, heirs, executors, administrators, legatees and distributes of such person.

(b)    If a claim for indemnification hereunder by a Director or Officer is not paid in full by the Corporation within sixty (60) days after receipt by the Corporation of a written claim for indemnification, such Director or Officer may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim, and if successful in whole or in part, such Director or Officer shall also be entitled to be paid the expenses of prosecuting such claim. The failure of the Corporation (including its Board of Directors or any committee thereof, independent legal counsel, or stockholders) to make a determination concerning the permissibility of such indemnification under this Article V shall not be a defense to an action brought by a Director or Officer for recovery of the unpaid amount of an indemnification claim and shall not create a presumption that such indemnification is not permissible. The burden of proving that a Director or Officer is not entitled to indemnification shall be on the Corporation.

13

Webb_IPP_00000692

(c)    In any suit brought by a Director or Officer to enforce a right to indemnification hereunder, it shall be a defense that such Director or Officer has not met any applicable standard for indemnification set forth in the DGCL.

8.    Non-Exclusivity of Rights.  The rights to indemnification and advancement of Expenses set forth in this Article V shall not be exclusive of any other right which any Director, Officer, or Non-Officer Employee may have or hereafter acquire under any statute, provision of the Certificate or these By-laws, agreement, vote of stockholders or Disinterested Directors or otherwise.

9.    Insurance.  The Corporation may maintain insurance, at its expense, to protect itself and any Director, Officer or Non-Officer Employee against any liability of any character asserted against or incurred by the Corporation or any such Director, Officer or Non-Officer Employee, or arising out of any such person's Corporate Status, whether or not the Corporation would have the power to indemnify such person against such liability under the DGCL or the provisions of this Article V.

10.    Other Indemnification.  The Corporation's obligation, if any, to indemnify or provide advancement of Expenses to any person under this Article V as a result of such person serving, at the request of the Corporation, as a director, partner, trustee, officer, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise shall be reduced by any amount such person may collect as indemnification or advancement of Expenses from such other corporation, partnership, joint venture, trust, employee benefit plan or enterprise (the "Primary Indemnitor").  Any indemnification or advancement of Expenses under this Article V owed by the Corporation as a result of a person serving, at the request of the Corporation, as a director, partner, trustee, officer, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise shall only be in excess of, and shall be secondary to, the indemnification or advancement of Expenses available from the applicable Primary Indemnitor(s) and any applicable insurance policies.

## Article VI – Miscellaneous Provisions

1.    Fiscal Year.  Except as otherwise determined by the Board of Directors, the fiscal year of the Corporation shall end on December 31 of each year.

2.    Seal.  The Board of Directors shall have power to adopt and alter the seal of the Corporation.

3.    Execution of Instruments.  Subject to any limitations which may be set forth in a resolution of the Board of Directors, all deeds, leases, transfers, contracts, bonds, notes and other obligations to be entered into by the Corporation in the ordinary course of its business without director action may be executed on behalf of the Corporation by, a President, or by any other officer, employee or agent of the Corporation as the Board of Directors may authorize.

4.    Voting of Securities.  Unless the Board of Directors otherwise provides, a President, any Vice President or the Treasurer may waive notice of and act on behalf of this

14

Corporation, or appoint another person or persons to act as proxy or attorney in fact for this Corporation with or without discretionary power and/or power of substitution, at any meeting of stockholders or shareholders of any other corporation or organization, any of whose securities are held by this Corporation.

5.    Resident Agent.  The Board of Directors may appoint a resident agent upon whom legal process may be served in any action or proceeding against the Corporation.

6.    Corporate Records.  The original or attested copies of the Certificate of Incorporation, By-laws and records of all meetings of the incorporators, stockholders and the Board of Directors and the stock and transfer records, which shall contain the names of all stockholders, their record addresses and the amount of stock held by each, shall be kept at the principal office of the Corporation, at the office of its counsel, or at an office of its transfer agent.

7.    Certificate of Incorporation.  All references in these By-laws to the Certificate of Incorporation shall be deemed to refer to the Certificate of Incorporation of the Corporation, as amended and in effect from time to time.

8.    Amendments.  These By-laws may be altered, amended or repealed, and new By-laws may be adopted, by the stockholders or by the Board of Directors; provided, that (a) the Board of Directors may not alter, amend or repeal any provision of these By-laws which by law, by the Certificate of Incorporation or by these By-laws requires action by the stockholders and (b) any alteration, amendment or repeal of these By-laws by the Board of Directors and any new By-law adopted by the Board of Directors may be altered, amended or repealed by the stockholders.

9.    Waiver of Notice.  Whenever notice is required to be given under any provision of these By-laws, a written waiver, signed by the person entitled to notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time of the event for which notice is to be given, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any meeting needs to be specified in any written waiver or any waiver by electronic transmission.

10.    Conflicts.  In the event of any conflict between the terms and provisions contained in these By-laws and the Stockholders Agreement of the Corporation, dated as of the date hereof, as amended from time to time and in effect (the "Stockholders Agreement"), the Stockholders Agreement shall control.

ADOPTED DECEMBER 12, 2014

HIGHLY CONFIDENTIAL                                                        Webb_IPP_00000694

**EXHIBIT D**

**Internal & External Announcements**

See attached.

2

**HIGHLY CONFIDENTIAL**

**Webb_IPP_00000695**

**JW Comms Plan**

12.8.20

**Overview/Key Messages**

- Jeff is moving on from his duties as Chairman of Varsity Spirit, effective 12/31
- He will be turning his focus full-time to his role as President of the ICU and the ICU's quest to have cheer accepted into the Olympic Games
- As well as focusing on a number of public policy initiatives he has launched in the political space in recent months
- He will also provide consultative services to Varsity Spirit
- Full confidence in Bill and the Varsity Spirit Leadership Team to take the company into the future

**Stakeholders**

- Varsity Brands team members
- Varsity Spirit employees
- Varsity Spirit staff & camp admin
- UCA Staff & Alumni
- VS Coaches – School & All Star
- Key Partners
  - NFHS, Disney, ESPN, Jerry Preschutti, Peter Lasser, FloSports, etc.
  - USASF, USA Cheer, ICU
- Media
  - MBJ, Daily Memphian
  - Inside Cheerleading
- ICU Governing Council, National Federations, IOC, etc (to be addressed by ICU)

**Materials**

| Document | Assigned to draft | Status |
|---|---|---|
| Bill email to VS employees | Nicole/Bill | Final below |
| Bill email to VS instructors | Nicole/Bill | Final below |
| Jeff email to VS employees | Jeff | Final below |
| Jeff email to VS staff | Jeff | Same as above |
| Jeff email to UCA staff & Alumni | Jeff | Same as above |
| Adam email to VB team members | Jon/Nicole | Final below |
| Email to VS Customers | TBD | TBD |
| FAQ for leadership | Jon | In progress |
| Talking points for leadership | Jon | In progress |
| Email forward copy for key partners | Ashlee | Final below |
| Press release | Jon | Final below |
| VS Town Hall script | Nicole/Jackie | Rough outline below |
| Video | Nicole | Final below |

Strictly Privileged and Confidential

Webb_IPP_00000696

**Timeline**

| Date | Audience | Description | Responsibility | Status |
|------|----------|-------------|----------------|--------|
| **Tues, 12.1** | VB ELT | Announce to team, send FAQ and talking points | AB | Done |
| **Wed, 12.9 – 11am** | VS ELT | Announce to team, send FAQ and talking points | BS, JW | |
| 2:30 | VB ELT & VS ELT<br><br>VS Members of the VBLC | Send all emails as a heads up<br><br>1. Bill email to VS employees<br>2. Bill email to VS instructors<br>3. Jeff email to VS employees<br>4. Jeff email to VS staff<br>5. Jeff email to UCA staff & Alumni<br>6. Adam email to VB team members | NL | |
| 3pm | ICU Governing Council | Heads up of the press release -- call | ICU | |
| | Strategic Industry Partners (ICU, USA Cheer, USASF) | Heads up of the press release | ICU<br><br>JW – Chadwick, Looie | |
| 3:30 | VS Employees | Email from Bill | Kim | |
| | VS Instructors & Camp Managers | Email from Bill posted in band groups | Liza | |
| 3:40 | VS Employees | Email from Jeff | Kim | |
| | VS Instructors & Camp Managers | Email from Jeff posted in band groups | Liza | |
| | UCA Staff & Alumni | Email from Jeff/Post in UCA/UDA Alumni Group on Facebook | Liza | |
| 3:50 | VB Team Members | Email from Adam | Ashlee | |

Strictly Privileged and Confidential

**HIGHLY CONFIDENTIAL**

| Same time as Adam | ICU National Federations | Email from Jeff with press release | ICU | |
|---|---|---|---|---|
| | Key Partners | Assign key employees to call/forward | NFHS – BS<br>Disney – MB<br>ESPN – NL<br>Jerry Preschutti – JW<br>Peter Lasser – JW<br>Amy Bender -- JW<br>FloSports – BS<br>St. Jude – NL<br>Generation Spirit -- JK | |
| 4pm | General Public | Press release posted on the wire | JM | |
| | VS Customers | Email to Customers/Post on Social Media | | |
| | Local/Industry Media | Send press release to media contacts, industry contacts and influencers (@CheerUpdates) | KC, JK, TS (DJ) | |
| | Cheer Social Media | Monitoring via Meltwaterr; pro-active memories campaign to flood social with positive stories | AR/JK | |
| | Varsity Legends | Email with all materials | EZ | |
| Thurs, 12.10 | VS Employees, Instructors, Camp Admin | Town Hall --<br>    Adam open<br>    Bill talk about Jeff<br>    Play video<br>    Jeff talks about the future of the company | NL/JK | |

**Potential FAQ**

- Why is he leaving?
- Is he leaving because the company has been badly impacted by COVID?
- Is he leaving because of all the lawsuits?
- Will he be involved going forward?
- What will he be focused on now?
- How can we reach out to him?

**Internal talking points**

- To ensure that cheer has its best opportunity to be accepted into the Olympics, the ICU requires full-time attention to be self-sustaining and continue in this pursuit.

Strictly Privileged and Confidential

<u>**JW Letter from Bill**</u>
**To: VS employees**

Team,

As we make our final preparations for the 2021 Varsity Spirit Rally, I wanted to share some news about our founder and the reason many of us are part of the Varsity Spirit family today.

When I became President of Varsity Spirit just over three years ago, I knew this day would come one day, but it doesn't make it any easier. Effective December 31st, Jeff will be turning his focus full-time to his role as President of the ICU and moving on from his duties as Chairman of Varsity Spirit. This will give him the opportunity to continue the ICU's quest for cheer to be accepted into the Olympic games, as well as focus on a number of public policy initiatives he has launched in the political space in recent months.

To be honest, when I sat down to write you this note about Jeff, I didn't know where to start. We all know what Jeff has done to transform cheerleading, building a business from the kitchen table of his two bedroom apartment and inspiring millions of young people through experiences that touched their lives forever. He's why I'm here, and I know there are many of you that feel the same way. And while it's clear the impact Jeff has had on the industry as a whole, it's impossible to put into words what he has meant to all of us, and to me personally.

Over the years, Jeff has always thanked us for "hooking our stars" to this organization, and we've probably not had as many opportunities to thank him for the impact that he's had in our lives. Jeff Webb is undeniably a force of nature – one who drew us in and ignited a fire in us to be extraordinary. Jeff brought us together to build a culture that drove over 45 years of growth at Varsity Spirit. It is undoubtably what has helped us navigate these incredibly difficult times.

While I know he's not retiring from the work still yet to be done in cheer, the responsibility is now on our shoulders to keep the fire going, to continue to stoke the flames of our culture. To continue to strive to add real authentic value to the lives of the students we serve. To tirelessly innovate. To continuously improve. To compete – and succeed. And most importantly – like the small group of friends that started this company over 45 years ago and became family, to be there for each other. To have each other's backs. These aspects of our culture are now part of our DNA that Jeff infused in all of us.

From work weeks to new rep training, Jeff taught us that every person in our organization is important, every role critical to the success of the company. He taught us that it takes more than one person to make it happen – it takes all of us, together as one, constantly pursuing excellence, to truly make a difference. A pursuit that is now more important than ever.

You'll be hearing directly from Jeff in a few minutes, and tomorrow we'll have a special Town Hall as a tribute to the original Varsity Legend. We'll be sharing some stories and memories of Jeff, and you may even get an exclusive performance from the Thunderbolts. I encourage you to share your favorite photos and memories of Jeff on social media this week. We may never be able to truly thank Jeff for

Strictly Privileged and Confidential

what he's given us – but it will be a start.  For many of us, he created the foundation for our life's work helping young people reach their full potential and the passion we feel for our careers.  Once we are able to get together again, we'll plan to celebrate him in person.

On behalf of both me and Jeff, I want to thank you for your tireless work during what is no doubt the most challenging season in the history of our company.  You are what makes this company special and who we'll need to bring us back to the top.  I know that together, we will rise.

**JW Letter to Employees, Instructors & Alumni**

My Dear Friends:

Since my decision to found UCA in the mid 1970s, the journey in building our company has been an amazing one. What started as a small band of brothers and sisters intent on creating a new athletic concept grew into a unique world class organization that has benefited millions of young people. Perhaps even more importantly, out of that humble beginning came the underpinning of a unique and powerful culture that has built and sustained one of America's great companies, Varsity Spirit.

Now, as I turn my attention to bringing this same level of passion and positivity to the global stage in my renewed leadership role at ICU, I want to take a look back and offer my heartfelt thanks and appreciation to all of you.

Many of you know the highlights of our story and how we have developed since first setting up "world headquarters" in my Memphis apartment 45 years ago.  We created the training techniques for our new acrobatic approach to cheerleading.  We designed a revolutionary athletic look in uniforms with the introduction of Varsity Spirit Fashion.  We launched a new sports activity through our vision that became the modern day cheer competition (actually based on UCA's original college demos).  We forged a relationship with ESPN when the network was in its infancy.  We took the company public on NASDAQ. We partnered with Disney. We successfully merged UCA and NCA.  We built out the All-Star space to complement our heritage in school cheerleading.  Finally, we helped ensure the global development of our sport with the International Cheer Union. There are more highlights, to be sure, but that list of accomplishments is one on which I can look back with a combined sense of both great pride and great humility.  I worked hard, but I did none of it alone.

While I could fill pages and pages with all that we have accomplished over the years, that's not what is most important.  What is most important is what we have built together… what it has done for the young people who have participated… and hopefully what it has done for you, the employees who have given so much to ensure that our culture and what we stand for have endured.

When I think back to the early days, I can visualize our original staff of 24 people. Individuals like Greg Webb, Robert Tisdale, Kline Boyd, Randy Harris, Kris Shepherd, and Tony Jaeger.  They all had that unique combination of determination, competitiveness, toughness, humor, empathy and kindness.  We were just a bunch of kids, and it was us against the world.  We had each other's backs. And we loved it. As Varsity Spirit developed over time, people who shared these characteristics were drawn to be part of this culture and to make their own mark on its advancement.  I have spoken about this combination of competitive and compassionate traits and I am proud to say that it defines our people still today.

Strictly Privileged and Confidential

**HIGHLY CONFIDENTIAL**                                                      Webb_IPP_00000700

As a leader I have tried to provide a vision for not only our company but cheerleading in general. I have tried to articulate our true mission and how to get there, and I've implored everyone - including myself - to walk the talk. I have also sought to attract the very best people to be part of our organization, to provide you the tools and support to be successful, and then empower you to perform at your highest level.

It is important that we understand and celebrate with pride and confidence the many great accomplishments of our company and the overwhelmingly meaningful experiences we have provided young people over all these years. Our success has been rooted in our commitment to quality, fairness, the safety of our participants, high integrity, continuous improvement, and support for each other.

Looking ahead, I won't be leaving cheerleading - and I won't be leaving you. For now, my main professional focus will be on two things. The first is to continue to build cheerleading on a global scale through my role as President of the International Cheer Union.

I believe that what we do for young people is so important, that I want to make sure millions of others will have the opportunity to experience what young Americans have over the years. At our ICU World Championships, I have seen the excited looks in the eyes of kids from other countries who have longed to be part of what we built here and who have come to America for the first time to participate in the experience about which they've dreamed.   I want to make sure that millions more around the world get a chance to gain the confidence and self esteem that comes from being involved in cheerleading.

Secondly, as many of you know, over the past couple of years I have been gradually working my way into the realm of political ideas and public policy. As I leave Varsity Spirit, after having had the chance to make a difference in the lives of so many people over so many years, I now look forward to making a difference for all Americans, especially the middle class, by using my results-oriented business background to bring efficiency and effectiveness to the functions of government. I may or may not run for office, but through my ongoing effort in this arena, I intend to protect and expand the American spirit that makes companies like Varsity Spirit possible, so that other teams like ours can take on the world too.

As I reflect fondly on my journey, I am humbled by the fact that so many outstanding people have chosen to embrace our dream and make it part of their own. For many of us, our time together, whether at camp, a competition, a sales meeting, a catalog shoot, or just having fun together, has shaped our lives. We have laughed and cried together, we have celebrated and grieved together, and we have supported each other in good times and trying times. This is a reflection of who we are and of those special ties that have always connected the people of Varsity Spirit.

As you go forward, know that I have every confidence in Bill Seely and the team he has assembled to lead Varsity Spirit. They have done amazing work over the last 3+ years, and this year in particular we have experienced some of the most challenging times in our history. I am thankful to Bill, and all of you, for your dedication and your perseverance.

As I look back on what we have built together, I am both proud and humbled. I want to thank each and every one of you for what you have done for our company, for the kids we serve, and frankly for me personally. Thank you, from the bottom of my heart, for your loyalty and your dedication over the years. Your love and your spirit will be with me forever, and please know that it goes both ways.


Strictly Privileged and Confidential

HIGHLY CONFIDENTIAL

Webb_IPP_00000701

I hope to see each of you again sometime soon. Who knows, you might even be able to catch a Thunderbolts concert down the road!

I really wish I could speak with each of you face to face so you could see and feel the emotion and sincerity in my words, and I look forward to talking to you on the Town Hall tomorrow so I can more personally communicate my feelings and appreciation.

May God bless you always,

Jeff

PS. And finally, I cannot sign off without a heartfelt thanks to my longtime Executive Assistant, Carla McDonald. Her tireless efforts over the past 35 years have allowed me to focus on the things most important to me. I am indeed grateful.

### JW Letter from Adam
**To all VB Team Members**

Dear Colleagues:

I don't need to tell you the obvious: 2020 has been a year of unprecedented change. You have responded with determination, grit and an unyielding commitment to "be great" despite it all. I'm proud to work alongside all of you.

Today, I am reaching out to share another change – one that is bittersweet for us all. Specifically, Jeff Webb will be moving on from Varsity Spirit effective December 31. Jeff's legacy at Varsity Spirit and to the broader landscape of cheer is beyond question – he is widely known as the founder of modern cheerleading.

Starting in 1974, Jeff revolutionized cheer, introducing athleticism and entertainment to the traditional style of cheerleading. He created an apparel line to keep pace with this new style, which ultimately became the iconic lifestyle brand for cheerleaders. And he created the concept of competitions for cheerleaders – to recognize and celebrate these new athletes. These competitions were televised around the world and over the last 46 years, cheerleading has seen an explosion of popularity. He *willed* the cheer industry to what we all know it to be today through an unrelenting work ethic and unparalleled vision.

And, just as importantly, Jeff expected excellence – both of himself and of his team. He dreamt big but executed even bigger. From partnerships with Disney to ESPN to Varsity TV and beyond, Jeff created an international phenomenon, inspired participants and intelligently built a thriving spirit community. He has been a passionate and committed leader. He has always cared deeply about Varsity Spirit and, more recently, the entire Varsity Brands family. It was Jeff's vision to bring Varsity Spirit, BSN SPORTS and Herff Jones together to serve as the entire school's extra-curricular partner and he was an integral part of crafting our mission of elevating student experiences.

Bill Seely's tremendous leadership at Varsity Spirit over the past several years has enabled Jeff to venture into new areas including working on public policy initiatives. Now Jeff will be able to exclusively

Strictly Privileged and Confidential

**HIGHLY CONFIDENTIAL**

focus on his work building the cheer community globally as the President of the ICU. And, as Varsity Spirit addresses the ongoing impact of COVID-19, Jeff will remain willing and able to lend his expertise to Bill and his leadership team. We are grateful for his continuing contributions in this respect.

For those of you at Varsity Spirit, I know Jeff has been an important part of your life and inspired your work in so many respects. I don't want there to be any doubt about the commitment Bill and I share to ensure Jeff's spirit remains at the center of Varsity Spirit: relentless passion, hard work, innovation, a strong sense of purpose and a connected culture.

More broadly for Varsity Brands, we all own the responsibility of crystallizing the true essence of "elevating student experiences" and shaping it into an enduring reality. Our Varsity Brands team is well positioned to address and emerge from this pandemic as industry leaders and an inspiration to our customers.

Thank you for your time today -- and please join me in expressing heartfelt appreciation to Jeff.

AB

## PRESS RELEASE

VARSITY SPIRIT FOUNDER AND CHAIRMAN JEFF WEBB
TRANSITIONS TO FOCUS ON THE GLOBAL DEVELOPMENT OF CHEER

-- Acclaimed Entrepreneur Behind Modern Day Cheerleading Transformed the Activity; Drove Its
Immense and Enduring Popularity --

Memphis, Tenn., [December 8, 2020] – Varsity Spirit and its Founder and Chairman, Jeff Webb, today announced that he will be shifting his primary focus to growing cheer globally through his role as President of the International Cheer Union. The ICU represents federations in 116 countries and is recognized by the International Olympic Committee as the sport's governing body. Through this move, Mr. Webb will forgo his full-time responsibilities as chairman of Varsity Spirit but will provide consultative services in addition to his work with the ICU. He will also focus on the recent launch of his political and public policy initiatives.

Mr. Webb transformed cheerleading and created a significant global enterprise that has positively impacted millions of young athletes every year. His leadership at Varsity Spirit created a dynamic company culture with an outstanding track record. In addition to his far-reaching impact in cheer, he brought Varsity Spirit, BSN SPORTS and Herff Jones together to form the Varsity Brands platform. Today, Varsity Brands serves as the extra-curricular "partner of choice" for thousands of schools across the country.

Mr. Webb stated, "What started out of my apartment in 1974 has grown beyond my wildest aspirations and I am proud of what has been accomplished by the entire Varsity Spirit team over all these years. We built a great company, and we have had an incredibly positive impact on so many young people in this country. I am grateful for the opportunity to have led the Varsity Spirit organization over the last 45 years."

Varsity Brands' CEO, Adam Blumenfeld, added, "Jeff Webb's contributions to cheerleading are remarkable. He created an international phenomenon that inspired participants worldwide and created a unique and enduring business. For all that have worked with him, he has been a passionate

Strictly Privileged and Confidential

and committed leader and we are thankful for his vision, energy, and leadership, as are the countless young people that have been positively impacted by his life and career. I wish Jeff well in this next chapter as he champions cheer's global reach and attributes.

Mr. Blumenfeld concluded, "Jeff's legacy at Varsity Spirit will continue with Bill Seely, our President, and his incredibly capable leadership team. It's a perfect hand-off."

"Jeff Webb is undeniably a force of nature – one who drew us in and ignited a fire in us to be extraordinary," added Varsity Spirit President, Bill Seely. "He brought us together to build a culture that drove over 45 years of growth and, while it's clear the impact Jeff has had on the industry as a whole, it's impossible to put into words what he has meant to all of us. He instilled the valuable lesson that every person in our organization is important, every role critical to our customers' success, and that it takes more than one person to make it happen – it takes all of us constantly pursuing excellence to truly make a difference. In short, for Varsity Spirit team members, he created the foundation for our life's work helping young people reach their full potential. As the President of Varsity Spirit, I am committed to building on the foundation that Jeff has created -- a passionate, committed culture, tireless innovation and continuous improvement with the aim to compete – and succeed."

ABOUT VARSITY SPIRIT

Memphis-based Varsity Spirit, the driving force behind cheerleading's dynamic transformation into the high-energy, athletic activity it is today, is the leading global source for all things spirit, including cheerleading, dance team and performing arts. A division of Varsity Brands, Varsity Spirit is a leader in uniform innovation, as well as educational camps, clinics and competitions, impacting more than a million athletes each year. Focused on safety, entertainment and traditional school leadership, Varsity Spirit's 5,000+ employees have been dedicated to celebrating school spirit through its brands since 1974. For more information about Varsity Spirit or Varsity Brands, please visit varsity.com or varsitybrands.com.

ABOUT VARSITY BRANDS

With a mission to inspire achievement and create memorable experiences for young people, Varsity Brands elevates the student experience, promotes participation and celebrates achievement through three unique but interrelated businesses: BSN SPORTS, a Varsity Sport Brand; Varsity Spirit; and Herff Jones, A Varsity Achievement Brand. Together, these assets promote personal, school and community pride through their customizable products and programs to elementary and middle schools, high schools, colleges and universities, as well as church organizations, professional and collegiate sports teams and corporations. Through its 8,600 dedicated employees and independent representatives, Varsity Brands reaches its individual and institutional customers each year via catalog, telesales, e-commerce sites and direct sales channels.

**Forward Email Message**

Hello,

It is a bittersweet day at Varsity Spirit as we announce that our founder, Jeff Webb, will be moving on from his duties as Chairman of Varsity Spirit effective December 31st. Jeff will be turning his focus full-time to his role as President of the International Cheer Union.

Strictly Privileged and Confidential

Bill Seely's leadership at Varsity Spirit over the past several years has enabled Jeff to venture into new areas, including working on public policy initiatives and building the cheer community globally.  Bill will continue to lead Varsity Spirit as President and we look forward to the future under his leadership.

Please read the full press release below, and I'm here if you have any questions.

**VIDEO for Town Hall**

https://gregleslie.digitalpigeon.com/msg/JPsSkDjMEeuSiwbIWq2rQQ/YLqJGHcrqzbsY3ef2dAkug

**Social Media Post**

- **FB/IG**: Thank you, Jeff Webb. Since you established our first world headquarters out of your Memphis apartment 47 years ago, you have transformed the world of cheer and dance. As you shift your focus to growing cheer globally, as President of the ICU, it is our honor and privilege to carry on the legacy you built. From all of us at Varsity Spirit, thank you for your fearless leadership, your unrelenting work ethic and your unparalleled vision. [LINK TO PRESS RELEASE]
- **Twitter**: From all of us at Varsity Spirit, thank you, Jeff Webb, for your fearless leadership and your unparalleled vision. We wish you the best as you shift your focus to growing cheer globally, as President of the ICU. [LINK TO PRESS RELEASE]
- **Photo options**: https://varsityspirit.sharepoint.com/:f:/g/marketing/EtI01izLcsNItdar40LaTtsB0bmkE_h3uJAFRiZ AQx4qJg?e=WsDQ1Q

Strictly Privileged and Confidential

**HIGHLY CONFIDENTIAL**                                                                                      Webb_IPP_00000705

# EXHIBIT 35

# FILED UNDER SEAL
# (Excerpt)

1

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TENNESSEE
 2                      WESTERN DIVISION

 3  JESSICA JONES and          )
    CHRISTINA LORENZEN on       )
 4  Behalf of Themselves and    )
    All Others Similarly        )
 5  Situated,                   )
          Plaintiffs,           )
 6                              )
    vs.                         )  CASE NO. 2:20-cv-02892-SHL-tmp
 7                              )
    VARSITY BRANDS, LLC;        )
 8  VARSITY SPIRIT, LLC;        )
    VARSITY SPIRIT FASHION &     )
 9  SUPPLIES, LLC; U.S. ALL      )
    STAR FEDERATION, INC.;      )
10  JEFF WEBB; CHARLESBANK      )
    CAPITAL PARTNERS LLC; and   )
11  BAIN CAPITAL PRIVATE        )
    EQUITY,                     )
12        Defendants.           )

13

14

15

16

17

18

19

20

21

22

23

24

25
```

94

1    Q.   Okay.  Does Bain still have four out of seven

2   seats on that board of directors?

3    A.   Bain is entitled to four out of seven seats,

4   though only three are currently occupied.

5    Q.   And who occupies those three seats?

6    A.   Myself, Kimberly McCaslin and Joshua

7   Bekenstein.

8    Q.   Okay.  How many board seats total does that

9   board have currently?

10   A.   There are eight authorized and seven occupied

11  seats on that board currently.

12   Q.   Who are the other members of the board

13  currently?

14   A.   Adam Blumenfeld, the CEO of Varsity Brands;

15  Joshua Beer, a representative of Charlesbank; Danita

16  Ostling, an independent; and Jené Elzie, an independent.

17   Q.   Okay.  When did it change from Bain having four

18  representatives on the board of directors to three

19  representatives?

20   A.   2020.

21   Q.   Was that the only time that the composition of

22  the board changed, or were there other changes?

23   A.   There were other changes.

24   Q.   Was 2020 the first time that Bain no longer had

25  four representatives on the board of directors?

145

 1  COUNTY OF HARRIS      )

 2  STATE OF TEXAS        )

 3      I hereby certify that the witness was notified on

 4  _____ that the witness has 30 days or (____

 5  days per agreement of counsel) after being notified by

 6  the officer that the transcript is available for review

 7  by the witness and if there are changes in the form or

 8  substance to be made, then the witness shall sign a

 9  statement reciting such changes and the reasons given by

10  the witness for making them;

11      That the witness' signature was/was not returned as

12  of _____.

13      Subscribed and sworn to on this, the _____ day of

14  _____, 2022.

15

16

17

18

19  _____

20          Melinda Barre
            Texas CSR 2192
21          Expiration:  12/31/23

22

23

24

25

# **EXHIBIT 36**

# **FILED UNDER SEAL (Excerpt)**

1

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE WESTERN DISTRICT OF TENNESSEE

3

4   ----------------------------X
    JONES, et al.,                   )
5                                    )   Case No.
              Plaintiffs,   )   2:20-cv-02892-SHL-cgc
6        vs.                         )
                                     )
7   VARSITY BRANDS, LLC, et al.,  )
                                     )
8              Defendants.    )
                                     )
9   ----------------------------X

10

11          VIDEOTAPED ORAL DEPOSITION OF

12               CHRISTINA LORENZEN

13

14               Held Remotely

15        Thursday, January 20, 2022

16            9:36 a.m. (MST)

17

18

19

20

21

22

23   Stenographically remotely reported by:

24   Mayleen Ahmed, RMR, CRR, CRC, CCR/CSR

25   Job No.: 825462

Case 2:20-cv-02892-SHL-tmp    Document 454-17    Filed 05/25/23    Page 96 of 133
PageID 18137

JONES vs
VARSITY BRANDS, LLC

Christina Lorenzen
January 20, 2022

27

```
 1    BY MR. KAISER:

 2         Q.    Ms. Lorenzen, could you take a look at

 3    what we've marked as Exhibit 1, which is...

 4              I believe it's on the screen.

 5              MR. KAISER:  If not, if you can put it

 6    on the screen.

 7         A.    I only see myself at the moment; so...

 8         Q.    Hold on a sec.

 9         A.    Okay.  I see something else now.

10         Q.    Okay.  So this is a two-page document

11    that was filed in the docket of this case by the

12    Joseph Saveri Law Firm.  As you can see, it purports

13    to be a declaration of Steven Williams.

14              Do you know who Steven Williams is?

15         A.    Yes.

16         Q.    Who is Steven Williams?

17         A.    He's an attorney at the Joseph Saveri

18    Law Firm.

19         Q.    And is he one of your lawyers in this

20    case?

21         A.    I have not been working with him

22    directly.

23         Q.    Okay.  Well, do you see down on item 2

24    of the -- of his declaration, he says that he

25    represents -- it says "Christina Lorenzen," and
```

28

1      that's you, right?

2          A.    Yes.

3          Q.    And notes it is a written contract for

4      the terms of the agreement between Ms. Lorenzen and

5      the Joseph Saveri Law Firm.

6                Do you see that?

7          A.    It's so small.

8                MS. SPIEGEL:  Can you make it a bit

9      bigger?  I can't see it either.  It's very small.

10               This is Ronnie.

11               And also, I'll object.  This is

12     Mr. Williams' declaration, so this would be

13     testimony from Mr. Williams.

14               MR. KAISER:  Okay.  There is absolutely

15     no appropriateness to speaking objections.  There is

16     no valid objection.  I can show her whatever I want.

17     And if you continue to do this, we're going to have

18     a problem, Ronnie.  So please stop.

19     BY MR. KAISER:

20         Q.    Now, my question to you is:  Is it --

21     are you -- so does this not refresh your

22     recollection that on item 3 there, that Mr. Williams

23     sent you an email on September 29, 2021 to attempt

24     to set up a phone conversation "about her case,"

25     meaning this case?

Case 2:20-cv-02892-SHL-tmp    Document 454-17    Filed 05/25/23    Page 98 of 133
PageID 18139
JONES vs
VARSITY BRANDS, LLC
Christina Lorenzen
January 20, 2022

29

```
 1          A.    I get a lot of emails, so it is
 2   impossible for me to remember on that specific day
 3   what emails I might have received, who they would
 4   have been from.
 5          Q.    Okay.
 6          A.    So that's -- that's his statement.  I
 7   can't specifically say on that date what I did or
 8   did not receive.  I just don't recall that far back.
 9          Q.    So you're not disputing that he sent you
10   an email; you just don't remember receiving it?
11                MS. SPIEGEL:  Objection.  Asked and
12   answered.
13          A.    Those are his --
14          Q.    Please answer the question.
15          A.    Those are his words.  And if he says it,
16   then he said it about his actions.  But I --
17          Q.    Are you --
18          A.    But I --
19          Q.    Are you disputing --
20          A.    I --
21          Q.    Are you disputing he sent you an email?
22                This will go a lot quicker if you
23   actually try to answer the questions that are asked.
24                Are you --
25          A.    Sorry.  I --
```

Case 2:20-cv-02892-SHL-tmp   Document 454-17   Filed 05/25/23   Page 99 of 133
PageID 18140
JONES vs
VARSITY BRANDS, LLC

Christina Lorenzen
January 20, 2022

30

1        Q.     -- disputing he sent you an email?

2        A.     I don't know what he did or did not do.

3   Those were his actions.  I can only say that

4   September 29, 2021 was several months ago, and I get

5   probably 50 emails a day.  So I don't know what I

6   may or may not have received on that day.

7        Q.     Okay.  So I gather you're just not going

8   to answer the question about whether you dispute

9   whether he sent you this?

10            MS. SPIEGEL:  Objection.  Asked and

11   answered.  She did --

12            MR. KAISER:  Okay.  We'll take that

13   answer, then, to be that she does not dispute it.

14            Let's move on to the next page.

15            MS. SPIEGEL:  Objection.  That --

16            MR. KAISER:  Okay.

17            MS. SPIEGEL:  -- mischaracterizes her

18   testimony.  She said --

19            MR. KAISER:  What is her testimony,

20   Ronnie?  Does she dispute it or does she not?  It's

21   a simple question.

22            MS. SPIEGEL:  She answered the question.

23   And my objection --

24            MR. KAISER:  And I said, okay, we'll

25   take that to mean --

41

```
 1          A.    I believe so, yes.

 2          Q.    So back on page 1, where all these --

 3    all your counsel say in the middle of the

 4    page there, five lines up, six lines up from the

 5    bottom:

 6                "The failure to communicate violates

 7          her obligations as set forth in her agreement

 8          with this firm and is not consistent with the

 9          role of a potential class representative in

10          federal litigation."

11                Are you saying your counsel were saying

12    something incorrect to the court when they said

13    that?

14                MS. SPIEGEL:  Objection, argumentative.

15    Objection, compound.  Objection, asked and answered.

16                You can go ahead and answer that,

17    Ms. Lorenzen, if you know.  And I caution you not to

18    reveal any privileged communications.

19                And also, Counsel --

20                MR. KAISER:  I object --

21                MS. SPIEGEL:  -- I would note --

22                MR. KAISER:  -- to the continuing

23    speaking objections, but I would like an answer to

24    the question.

25                MS. SPIEGEL:  Okay.  I'm allowed to put
```

42

```
 1   my objections on the record.  Also --
 2            MR. KAISER:  You may say, "Object to
 3   form"; that is all that is permitted.
 4            This is completely improper.  Please
 5   stop.
 6   BY MR. KAISER:
 7       Q.   Now, please answer the question,
 8   Ms. Lorenzen.
 9       A.   Can you please repeat the question?
10       Q.   Okay, sure.
11            So when your counsel represented to the
12   court that your failure to communicate violated your
13   obligations as set forth in your agreement with the
14   Joseph Saveri Law Firm, and was not consistent with
15   the role of a potential class representative in
16   federal litigation, are you sitting here today
17   disputing that and saying that that statement to the
18   court was incorrect?
19            MS. SPIEGEL:  Objection.  You're asking
20   her to testify about her counsel's papers --
21            MR. KAISER:  I'm asking if she --
22            MS. SPIEGEL:  -- not about her own
23   personal --
24            MR. KAISER:  -- agrees with the
25   statement.
```

Case 2:20-cv-02892-SHL-tmp   Document 454-17   Filed 05/25/23   Page 102 of 133
PageID 18143

JONES vs
VARSITY BRANDS, LLC

Christina Lorenzen
January 20, 2022

43

1            MS. SPIEGEL:  -- knowledge.

2            MR. KAISER:  Okay.  Look, I think we're

3    going to have to suspend this deposition because

4    you're not -- Ms. Spiegel, you're being completely

5    disruptive.

6            It's a simple question.  Does she

7    dispute what you and your colleagues at the Joseph

8    Saveri Law Firm said to the court or does she agree

9    with it?  Simple question.

10   BY MR. KAISER:

11       Q.    Please answer the question,

12   Ms. Lorenzen.  Do you agree with that statement or

13   do you dispute it?

14            MS. SPIEGEL:  Objection, calls for a

15   legal conclusion.

16       A.    Those are -- those are Steve's words.  I

17   previously said my words I would use to describe

18   this situation is a "misunderstanding."

19       Q.    Okay.  And that's the

20   misunderstanding --

21       A.    People --

22       Q.    That --

23       A.    People are allowed to have different

24   opinions.  Steve called it a "failure."  I would

25   call it a "misunderstanding."  Now that it's all

Case 2:20-cv-02892-SHL-tmp   Document 454-17   Filed 05/25/23   Page 103 of 133
PageID 18144
JONES vs
VARSITY BRANDS, LLC
Christina Lorenzen
January 20, 2022

44

 1   been resolved, you know, what lawyers do, that's why

 2   they go to law school.  I'm not the lawyer here.

 3          My personal word choice would be

 4   "misunderstanding."  Just the fact that Steve chose

 5   different words, I don't know if you could say

 6   that's like a dispute.  That's just a difference in

 7   opinion.

 8          MS. SPIEGEL:  And I'll caution you here,

 9   again, Ms. Lorenzen, to not reveal anything that

10   might be privileged about what you discussed with

11   your counsel.

12          And, Steve, she's answered the question.

13          MR. KAISER:  Okay.  Ronnie --

14          MS. SPIEGEL:  So --

15          MR. KAISER:  Ronnie, we're going to be

16   here till ten o'clock at night if you keep wasting

17   time with these speaking objections, which is also

18   improper.

19   BY MR. KAISER:

20      Q.    It's very simple.  These questions are

21   not complicated.  But I understand this is the

22   misunderstanding that you're not willing to tell me

23   what it was about, and I think we will move on at

24   this point.  Okay.

25          Do you under- -- do you understand that

68

```
 1        A.    Yes.

 2        Q.    It says "37.57.00."

 3              Is that -- is that supposed to be 37.00

 4   or 57.00 or --

 5        A.    That's supposed to be $37.57.

 6        Q.    Okay.  So the extra ".00" we should just

 7   disregard?

 8        A.    Yes.  That's a typo.

 9        Q.    Okay.  That's fine.

10              And this choreographer, who is the

11   choreographer?

12        A.    I don't know the person's name.

13        Q.    Do you know if the choreographer had any

14   affiliation at all with Varsity?

15        A.    I don't know.

16        Q.    Was this money paid to the school?  Did

17   you pay this money to the school, the 37.57?

18   $37.57?

19        A.    Yes.

20        Q.    And as far as you know, the school paid

21   for the choreographer?

22        A.    That is my understanding.

23        Q.    Okay.  And then Cheer Central Suns cheer

24   lessons, what was that?

25        A.    My daughter was required to attend
```

69

```
 1    weekly tumbling lessons at Cheer Central Suns.
 2         Q.   And as far as you know, Cheer Central
 3    Suns is not in any way affiliated with Varsity,
 4    right?
 5         A.   I do not know.
```

```
 6         Q.   All right.  Well, let's turn back to
 7    page 1, which is the items that you listed Varsity
 8    as the -- as the provider.
 9              And I just want to be clear that I
10    understand what's going on here.
11              So 6 -- the three that are listed in
12    6/5/2009 [sic], that's June 5, 2019?  Excuse me.
13    Right?
14         A.   Yes.
15         Q.   All right.  Okay.  So there are three
16    items:  One says $83, one says $88, and one says
17    23.85, right, as far as price?
18         A.   Yes.
19         Q.   And I'm going to say that that totals
20    $194.84 when you add it up.  You can get a
21    calculator if you want to verify my arithmetic,
22    but -- I should say and 85 cents.
23              Why don't -- why don't you -- what I'd
24    like you to do right how is take that tab 2, and you
25    can just take it right out of the -- out of the
```

202

```
 1              MS. SPIEGEL:  Well, it has been
 2   answered.  You just didn't care for the answer.
 3              But, Ms. Lorenzen, if you know, if you
 4   would like to answer the question, please do.  You
 5   know, it has, in my opinion, already been asked and
 6   answered several times.  But if you know, you can go
 7   ahead and answer the question.
 8        A.   My daughter did not participate in
 9   All Star cheer, so I don't have any more to say
10   about this specific line of questioning.
11        Q.   Okay.  You don't have anything to say
12   about USASF; is that fair?
13              MS. SPIEGEL:  Objection.  Argumentative,
14   and asked and answered.
15        A.   Yeah, that's not exactly what I said.  I
16   said I don't have anything more to say.
17        Q.   Okay.  So you have nothing more to say
18   about USASF beyond what you've already said?
19        A.   Yes.
20        Q.   Okay.  Switching gears a bit, I want to
21   circle back to some of the questions, a subject
22   Mr. Kaiser asked about in the time period of
23   September and October 2021.
24              Were you experiencing any medical issues
25   at that time?
```

203

1          MS. SPIEGEL:  Objection.  This is sort

2    of a personal nature.

3          Is this related to the claims in the

4    litigation?  You're asking about her personal

5    medical history?

6          MS. BERKOWITZ:  Yes.  This is relevant,

7    and I don't think I need to explain, but it is

8    relevant.

9          MS. SPIEGEL:  Is there a document that

10   you are going to show for this?

11         MS. BERKOWITZ:  No.  I was not planning

12   to show a document.  I'm just asking if she had any

13   medical issues in September-October 2021.

14         THE WITNESS:  You're talking about three

15   to four months ago?

16         MS. BERKOWITZ:  Yes.

17         THE WITNESS:  So this -- how much of

18   this falls under HIPAA?

19         MS. SPIEGEL:  Objection.  I think this

20   is an improper question about her -- her personal

21   medical history that you're asking.

22         MS. BERKOWITZ:  No.  I don't believe it

23   is.  You're welcome to designate this portion of the

24   transcript as confidential.

25         MS. SPIEGEL:  Okay.  Well, maybe we'll

204

```
 1    do that.

 2              But you can go ahead and answer the

 3    question if you'd like to.

 4              THE WITNESS:  I have had lingering

 5    health issues that come and go since my initial

 6    short-term disability that initially caused the

 7    financial hardship that I believe I mentioned

 8    earlier.

 9    BY MS. BERKOWITZ:

10         Q.    Okay.  And were those health issues

11    present in September or October 2021?

12         A.    They're always present since that

13    injury.

14         Q.    Okay.  What was the injury that caused

15    you to go on short-term disability?

16              MS. SPIEGEL:  Sorry.  I'm going to

17    object to this, and potentially instruct her not

18    to -- I really think this is an inappropriate line

19    of questioning about her personal health and

20    personal medical conditions.

21              I'm not sure where you're going with

22    this, but I would ask that you, you know, find a way

23    to ask what you're asking about without delving into

24    her personal medical history.  I don't believe

25    that's appropriate.
```

205

1              MS. BERKOWITZ:  Sure.

2    BY MS. BERKOWITZ:

3         Q.    Do you experience any memory issues?

4         A.    No.

5         Q.    Okay.  Do you take any medications that

6    impact your memory?

7         A.    No.

8         Q.    Okay.  Do you take any medications that

9    might impact your ability to testify truthfully?

10        A.    No.

11        Q.    Okay.  Were you experiencing any, I

12   guess, nonhealth-related personal issues in

13   September or October 2021?

14             MS. SPIEGEL:  Again, this is something

15   that's really like borderline inappropriate here,

16   asking about her very personal life.  So can you

17   maybe explain how you're going to tie this to the

18   case?

19             I'm not sure why this should be part of

20   deposition testimony, or that she should have to

21   reveal it to a group of people here.  It's personal

22   information.

23             MS. BERKOWITZ:  I think this relates to

24   her ability to serve as class representative, and I

25   think I'm entitled to ask these questions.  And

Case 2:20-cv-02892-SHL-tmp   Document 454-17   Filed 05/25/23   Page 110 of 133
PageID 18151

JONES vs
VARSITY BRANDS, LLC

Christina Lorenzen
January 20, 2022

206

1    she -- you know, she brought this lawsuit; she's

2    serving as a plaintiff.  And when you do that, you

3    subject yourself to a deposition that might have

4    some intrusive questions.

5            And I'm not trying to be rude, but I do

6    need to ask these questions in order to properly

7    defend my client.

8            MS. SPIEGEL:  And I would ask that you

9    confine it to her duties or responsibilities as a

10   class representative, not about her personal life

11   and her personal medical history.  I don't -- I

12   don't see that has any connection to her ability to

13   serve as a class representative.

14           So I'll put my objection on the record.

15   Ms. Lorenzen, you can answer if you like.  But I

16   would like my objection noted, and it's improper.

17   BY MS. BERKOWITZ:

18       Q.    Okay.  I'll ask my question again.

19           Were you experiencing any --

20   experiencing any personal issues in September or

21   October 2021?

22       A.    Not that I recall.

23       Q.    What were the specific dates that you

24   were on short-term disability?

25       A.    That was approximately February of 2019

207

1    through June of 2019.

2        Q.    Okay.  And then after June of 2019, did

3    you go on long-term disability?

4        A.    No.  I returned to work.

5              MS. SPIEGEL:  Objection.  I'd like to

6    put in an objection.

7              THE WITNESS:  Sorry.

8              MS. SPIEGEL:  That's okay.

9              Objection.  Objection to form.

10             You know, I think Ms. Lorenzen can

11   answer questions about the litigation or her duties

12   or her responsibility, but to ask a bunch of

13   questions about her personal life, I think, is

14   really threading on an area that's not acceptable.

15             So I'll ask again that I'd focus the

16   questions on her as a class representative or

17   something that has to do with this lawsuit and not

18   her personal life.

19             MS. BERKOWITZ:  Okay.

20             THE WITNESS:  Can you repeat the

21   question, please?  Or did I answer it?

22             MS. BERKOWITZ:  I think you answered it.

23             THE WITNESS:  Okay.

24   BY MS. BERKOWITZ:

25       Q.    I think you said you returned to work

208

```
 1    after June 2019?

 2         A.    I did.

 3         Q.    I know you said there were 14 -- was

 4    there 14 athletes on your daughter's team her

 5    sophomore year?

 6         A.    At the beginning of the year.  By the

 7    time they went to nationals, one girl had dropped

 8    out, and it was 13.

 9         Q.    Okay.  Do you know how many athletes

10    were on her team her junior year?

11         A.    That was the year of COVID, and there

12    were eight.

13         Q.    And what about her senior year?

14         A.    This year they started with 15, and

15    three have dropped out, and they're currently at 12.

16         Q.    You testified earlier about a $700

17    payment that you made to the school in connection

18    with your daughter's -- your daughter competing at

19    nationals.  Do you remember that?

20         A.    Yes.

21         Q.    All right.  Did your ex-husband provide

22    any portion of those funds?

23         A.    No.  My ex-husband only provides child

24    support.

25         Q.    Okay.  How much does he pay in child
```

Case 2:20-cv-02892-SHL-tmp   Document 454-17   Filed 05/25/23   Page 113 of 133
PageID 18154
JONES vs
VARSITY BRANDS, LLC
Christina Lorenzen
January 20, 2022

209

1   support?

2          MS. SPIEGEL:  I'm sorry.  Again, this is

3   a question that is about her personal situation and

4   child and child support and divorce, and I don't

5   really think this has anything to do with this

6   litigation.

7          So I think these questions are really

8   improper about what her -- and it's probably the

9   subject of a private legal agreement that's conf- --

10  privileged and confidential.

11          So I would not ask for these details,

12  and I don't -- I don't think the witness should be

13  forced to answer these questions.

14          MS. BERKOWITZ:  Well, I'm trying --

15          MS. SPIEGEL:  Child support is not at

16  issue in this litigation at all, and I don't see any

17  connection or how a judge would see any connection

18  to that.  That's really off limits.

19          MS. BERKOWITZ:  Well, I think, you know,

20  you have two people who pay money for a child, and

21  their welfare and well-being and activities and all

22  that, and it goes into a pool, and she's taking here

23  about payments that she made.  That's the whole

24  point of this lawsuit.

25          So I think I'm entitled to find out

210

1    where that money came from and whether it was her

2    money that was used for this, or child support

3    money, or a pool that we can't identify.

4              MS. SPIEGEL:  Well, if you want to

5    confine the questions to who paid the cheerleading

6    costs, that he's a different situation; who might

7    have paid for the costs that are at issue here.

8              But to just ask about her child support

9    payment and what she gets in child support, you

10   know, that's not at issue and shouldn't be; so...

11             MS. BERKOWITZ:  Let me ask in a

12   different way.

13   BY MS. BERKOWITZ:

14        Q.    Do you put the money you receive in

15   child support in a separate account from your other

16   funds?

17        A.    No.

18        Q.    Okay.  So when you write a check out of

19   your account, it is a combination of your income and

20   the money that has been received from child support;

21   is that fair?

22             MS. SPIEGEL:  Objection to form.

23             And, again, this is about her personal

24   finances, and I'm not seeing how this connects to

25   what she paid for cheerleading.  People's sources of

211

```
 1   income is not at issue here.

 2              If you want to focus it on the

 3   cheerleading costs and who paid those costs,

 4   that's -- that would be in the realm.  But I don't

 5   see how her personal child support income or how she

 6   keeps that money in her bank account is relevant

 7   here.

 8              If you want to go ahead and answer the

 9   question, you can answer the question, but I'm

10   noting my objection for the record.

11        A.   I also pay my mortgage out of that same

12   bank account.  Does that mean he has part ownership

13   in my house?  No.  You know.  Or, you know, my car

14   payments.  No, he doesn't partially own that.

15              I pay those bills.  My daughter and I

16   decided she would sign up for cheerleading.  I have

17   sole custody.  We made that decision knowing that I

18   would take on that additional financial burden.

19   It's not like my child support went up because we

20   signed up for cheerleading.

21        Q.   Right.  But the child support is for the

22   benefit of your daughter, though, right, not for

23   you?

24        A.   Right.  But I need to provide my

25   daughter a place to live.
```

212

1        Q.    And it is --

2              MS. SPIEGEL:  I'm going -- I'm going to

3   object to the whole line of questioning.  This isn't

4   a debate about her child support or what she does

5   with it.

6              If you want to connect it the

7   cheerleading or the cheerleading costs, then ask

8   those questions.  But I don't think just because

9   she's a class representative, you're entitled to

10  every detail of her divorce, and her personal life,

11  and her personal history, and how she gets her child

12  support payments.

13             If you want to focus in on the part

14  that's about cheerleading and cheerleading costs,

15  then why don't you do that instead of probing into

16  these very personal issues.

17             MS. BERKOWITZ:  I don't think I'm asking

18  for every detail.  I think I'm asking for the

19  details that specifically relate to this case.

20             Do you --

21             MS. SPIEGEL:  Can you rephrase the

22  question so it focuses on this case instead of just

23  her personal life and her personal child support

24  that should not be at issue here?

25             MS. BERKOWITZ:  Sure.

                                                                        213

 1    BY MS. BERKOWITZ:

 2        Q.    Do you agree that the child support that

 3    you receive for the benefit of your daughter

 4    contributes to payments that you have made on her

 5    behalf for cheerleading?

 6              MS. SPIEGEL:  Same objections.

 7              You can go ahead and answer if you are

 8    able.

 9        A.    You know, I don't know how to really

10    identify what dollar goes where.  All of my income,

11    which comes from a couple of different sources, goes

12    into one bucket, and from there it goes out.

13              We talked about this thing with the same

14    kind of thing with her cheer account.  It's the same

15    idea.

16              What's her portion of my living

17    expenses?  You know, have I already spent my child

18    support by the time I pay for that?  You know, how

19    do -- how do you break all that up once it's my

20    income?

21              My ex-husband has no decision authority

22    over my child.  My daughter and I made the decision

23    for her to go out for cheerleading, and I -- and we

24    did that knowing that I would ultimately be

25    responsible for all of the cheerleading expenses.

214

```
 1            I don't -- I can't be any more specific
 2    than that about every specific dollar.
 3            Q.    I appreciate it.  Thank you.
 4            I understand your daughter is a senior.
 5    Does she turn 18 this year?
 6            A.    Her birthdate is later this year, and
 7    she will turn 18.
 8            Q.    Okay.  In 2022, I guess?
 9            A.    Correct.
10            Q.    Have you had any discussions with your
11    daughter about this lawsuit?
12            A.    Yes.
13            Q.    What was her reaction when you told her
14    about this lawsuit?
15            MS. SPIEGEL:  And just to caution again
16    that you're asking about a minor and delving into
17    potentially, like, privileged territory here; so...
18            MS. BERKOWITZ:  I'm not asking about
19    questions [sic] that she's had with counsel.  I'm
20    specifically -- or discussions she had with counsel.
21    I'm specifically asking about discussions she had
22    with her daughter.
23            MS. SPIEGEL:  Okay.  Over my objection.
24    Go ahead.  Objection to form.  Objection, you know,
25    borderline inappropriate question here.
```

215

```
 1              But go ahead.  If you know the answer,
 2   go ahead.
 3              THE WITNESS:  My daughter's only
 4   involvement was initially, upfront, you know, I told
 5   her that I inquired.  And I have -- she is aware of
 6   the fact that I am a part of it; she is aware that I
 7   have a deposition today.  But as far as, you know,
 8   details of it, her only involvement has been to help
 9   me track down and identify the specific expenses.
10   BY MS. BERKOWITZ:
11       Q.    Okay.  So has your daughter been
12   supportive of this lawsuit?
13              MS. SPIEGEL:  Objection.  Relevance.
14              Again, like I'm not sure why this is
15   relevant to the litigation.  And you're delving into
16   personal issues about Ms. Lorenzen and her daughter.
17   These are personal issues, and about her personal
18   issues --
19              MS. BERKOWITZ:  I asked if she's been
20   supportive about the lawsuit.
21              MS. SPIEGEL:  You can go ahead and
22   answer the question if you want.  But, you know,
23   please note my objections on the record.
24              THE WITNESS:  I think, in general, my
25   daughter is supportive of me simply because I'm her
```

Case 2:20-cv-02892-SHL-tmp   Document 454-17   Filed 05/25/23   Page 120 of 133
PageID 18161
JONES vs
VARSITY BRANDS, LLC
Christina Lorenzen
January 20, 2022

216

1    mother.  So I would say she supports me in this

2    because simply for the fact that I'm her mother.

3    BY MS. BERKOWITZ:

4        Q.   Okay.  Has your daughter mentioned any

5    comments from anyone else on her cheerleading team

6    about this lawsuit?

7            MS. SPIEGEL:  Objection.  Calls for

8    hearsay.  Objection, relevance.  This is -- if you

9    want to pose questions for the witness about her own

10   personal knowledge, then please do so.  But you're

11   asking about what her -- what someone else thought.

12       Q.   You can answer.

13       A.   Only my daughter is aware of this, and

14   I've asked her not to tell, not to discuss it.

15           So assuming she followed my wishes, then

16   there wouldn't even be those comments to talk about

17   because no one would even know.

18       Q.   Okay.  And so does that mean that --

19   have you had any discussions with any other parents

20   of cheerleaders on the team or the coach or the

21   assistant principal about this lawsuit?

22       A.   No.

23       Q.   Okay.  Have you spoken with the Federal

24   Trade Commission about this lawsuit?

25       A.   No.

218

1    of the attorneys that represents you and Jones

2    plaintiffs in this matter.  I have a few follow-up

3    questions for you.

4              MS. SPIEGEL:  And I'd just like to put

5    on the record that I don't have the hard copy

6    documents.  I will -- I took notes on the exhibits

7    and the Bates numbers and, hopefully, I will get

8    those correct.

9    BY MS. SPIEGEL:

10             Q.    Okay.  Why did you want to be part of

11   this lawsuit?

12             A.    Well, ultimately --

13             MR. KAISER:  Objection.  Calls for --

14   calls for privileged and confidential materials.

15             These are the exact questions you

16   wouldn't let her answer, note for the record.

17             Q.    You can go ahead and answer the

18   question.

19             A.    Ultimately, I just felt like I had paid

20   way too much for cheerleading.

21             Q.    Do you have any financial motives for

22   representing the class in this lawsuit other than

23   just doing what's best for the class?

24             A.    No.

25             Q.    And is there anything preventing you

219

1    from being a good class representative?

2              MR. KAISER:   Objection.

3        Q.    You can answer.

4        A.    No.

5        Q.    Are you seeking any special treatment in

6    serving as a class representative?

7        A.    No.   I expect to be treated just like

8    all the other class members.

9        Q.    And do you plan to uphold all of your

10   duties as a class representative?

11       A.    Yes.

12       Q.    And what are those duties?

13       A.    My duties as a class representative are

14   to obtain counsel to participate in the litigation

15   so, so I've signed documents that required my

16   signature; I participated in producing all my

17   documents to my attorneys.

18              I'm here today participating in the

19   discovery phase.   I will testify, if that was

20   required, if it makes it to trial.

21              And then there's the class

22   notifications.   So if the class is certified, I work

23   with my attorneys to make sure that's handled

24   properly.   And then, if there's any sort of a

25   settlement notification, again, I'd rely on the

220

```
 1   assistance of my attorneys to accomplish that duty.
 2        Q.   And do you understand that, if
 3   necessary, you might need to testify at trial?
 4        A.   Yes.
 5        Q.   And are you willing to testify at trial
 6   if asked?
 7        A.   Yes.
 8        Q.   Thank you.
 9             And did you see a copy of the complaint
10   before it was filed?
11        A.   Yes.
12        Q.   And did you review your discovery
13   responses before they were sent out to -- sorry.
14   Strike that.
15             Did you receive a copy of your discovery
16   responses before they were served on defense
17   counsel?
18        A.   Yes.
19        Q.   And did you sign a verification to
20   attest to their accuracy?
21        A.   Yes.
22        Q.   Okay.  And you gave all the facts you
23   could as you knew them at the time; is that correct?
24        A.   Yes.
25        Q.   All right.  If you can refer to what's
```

250

1        A.    The nationals held in Orlando, Florida,

2    that they did attend, and -- yeah.  So then

3    nationals state -- or high school cheerleading.  I'm

4    not sure what the exact title of it is, but the one

5    they attended in Orlando, Florida.

6        Q.    Okay.  Understood.  Okay.

7              Do you know who the anonymous donor was

8    that gave the $10,000?

9        A.    I do not.

10             MR. KAISER:  Okay.

11             We have no further questions.  Thank

12   you.

13             THE VIDEOGRAPHER:  Any follow-ups?

14             MS. BERKOWITZ:  I do have just one

15   additional question.

16             I don't know, Brendan, if you have

17   anything first?

18             MR. GAFFNEY:  No, I don't.

19             MS. BERKOWITZ:  Okay.

20                    FURTHER EXAMINATION

21   BY MS. BERKOWITZ:

22       Q.    Ms. Lorenzen, your counsel asked you

23   earlier about serving as a class representative.

24             Has there been any time since you filed

25   this complaint at the end of, I guess, 2020, until

251

1    today, where you did not want to be part of this

2    case?

3            A.    No.  I have always wanted to participate

4    and see this through.

5            Q.    Okay.

6                  MS. BERKOWITZ:  No further questions

7    from me.

8                  MS. SPIEGEL:  Brendan, did you have

9    questions?  I have one, maybe one short follow-up

10   question when defendants are done.

11                 MR. GAFFNEY:  No questions.

12                      FURTHER EXAMINATION

13   BY MS. SPIEGEL:

14           Q.    Okay.  So Ms. Lorenzen, Mr. Kaiser just

15   directed you back to an exhibit, and it was Bates

16   page -751, about the hotels and about the commuter

17   option.  I'm sorry that I don't have the documents,

18   so I don't have it in front of me with the exact

19   exhibit number.

20                 But do you have that page in front of

21   you?

22           A.    I do.  Yes.

23           Q.    Okay.  And the nationals competition

24   took place in Orlando, Florida, correct?

25           A.    Yes.

JONES vs
VARSITY BRANDS, LLC

Christina Lorenzen
January 20, 2022

256

```
 1              REPORTER'S CERTIFICATE

 2          I, MAYLEEN AHMED, the undersigned, do

 3   hereby certify:

 4          That the witness, CHRISTINA LORENZEN,

 5   before examination was remotely duly sworn; that the

 6   foregoing deposition was taken remotely

 7   stenographically by me on January 20, 2022, and

 8   thereafter was transcribed by me; that the

 9   deposition is a full, true, and complete transcript

10   of the testimony; and that, in accordance with

11   FRCP 30(e)(1), before completion of the proceedings,

12   review of the transcript was not requested and

13   signature was not reserved by the witness.  I

14   further certify that I am not a relative or employee

15   of any attorney or counsel or any party to this

16   action, and that I am not financially interested in

17   said action or the outcome thereof.

18          In WITNESS WHEREOF, I have hereunto set
     my hand this 25th day of January 2022.
19

20

21   _____
     /s/  MAYLEEN AHMED, RMR, CRR, CRC
22   Washington CCR No. 3402 - Exp 12/29/22
     Oregon CSR No: 17-0447 - Exp 12/31/23
23   Texas CSR No:  9428 - Exp 7/31/23
     California CSR No: 14380 - Exp 12/31/22
24   New York Notary Public

25
```

# EXHIBIT 37

## FILED UNDER SEAL
## (Excerpt)

1

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE WESTERN DISTRICT OF TENNESSEE

3

FUSION ELITE ALL STARS,        )
4  et al.,                         )  Case No.
                                   )  2:20-cv-02600-SHL-cgc
5              Plaintiffs,         )
        vs.                        )
6                                  )
VARSITY BRANDS, LLC, et al., )
7                                  )
             Defendants.     )
8  ----------------------------X

9

10

11          VIDEOTAPED ORAL DEPOSITION OF

12                 JESSICA JONES

13

14

15               Held Remotely

16          Thursday, February 10, 2022

17              9:32 a.m. (CST)

18

19

20

21

22

23  Stenographically remotely reported by:

24  Mayleen Ahmed, RMR, CRR, CRC, CCR/CSR

25  Job No.: 821679

232

1              "I won't make any money, maybe $50, but

2         at least if we win the costs will come down

3         and that will save more than $50!"

4              Is that right?

5         A.    Yes.

6         Q.    What did you mean by "won't make any

7    money"?

8         A.    Well, I don't know what I meant because

9    I don't remember any of this.  But what I can

10   assume, because it's what I think currently, is that

11   my intentions for being a named plaintiff are that

12   the prices are not fair and it's incredibly

13   expensive, and it would be fair if the prices were

14   more affordable.

15        Q.    Which prices?

16        A.    Cheer prices.

17        Q.    Prices for what, though?

18        A.    For competitions and uniforms and camps.

19        Q.    What about the cost of your gym?

20        A.    The gym costs aren't very expensive.

21        Q.    They're not very expensive?

22        A.    Not just for coaches and gym.  I don't

23   believe so.  Total cost, it's expensive.

24        Q.    Of the monthly fee that you pay your

25   gyms, how much of that were for coaching costs?

263

```
 1   a count of how much time is left?

 2              THE VIDEOGRAPHER:  Okay.  So we are

 3   going off the video record.  The time is 4:38.

 4              (Recess taken.)

 5              THE VIDEOGRAPHER:  We are back on the

 6   record.  The time is 4:50.

 7                      EXAMINATION

 8   BY MS. SPIEGEL:

 9       Q.    Good afternoon, Ms. Jones.  As you know,

10   I'm one of the attorneys representing you and the

11   other plaintiffs in this lawsuit.

12              Thank you very much for your testimony

13   and giving your time today.

14              Why did you want to be a part of this

15   lawsuit?

16       A.    I feel like it's my civil duty.  I feel

17   like it's a valid case.  I feel like the prices to

18   be in this world are too high.  When I say "this

19   world," I'm referring to the cheer world.  And a

20   class suit is more effective than an individual

21   suit.

22       Q.    Do you have any financial motives for

23   wanting to participate in this lawsuit?

24       A.    No.

25       Q.    Is there anything preventing you from
```

264

1    being a good class representative in this lawsuit if

2    the class suit is certified?

3           A.    Not that I'm aware of.

4           Q.    Do you plan to uphold all of your duties

5    as a class representative?

6           A.    Yes.

7           Q.    And what are those duties?

8           A.    Hire experienced attorneys, which I feel

9    like I have done; be generally familiar with the

10   case; do what is in the best interest of the class;

11   all of the paperwork that I have been involved in.

12          Q.    Did you see the Complaint before it was

13   filed?

14          A.    Yes.

15          Q.    And did you see the Complaint after it

16   was filed?

17          A.    Yes.

18          Q.    Did you see your discovery responses

19   before they were served?

20          A.    Yes.

21          Q.    And did you verify that those responses

22   were accurate before they were --

23          A.    Yes.

24          Q.    -- served?

25                Are you aware that part of your duties

265

1   might require you to testify at trial?

2        A.   Yes.

3             MS. BERNHARDT:  Object to form.

4        Q.   Are you aware that part of your duties

5   may be to assist with notice to the class regarding

6   class certification and/or settlement?

7        A.   Yes.

8             MS. BERNHARDT:  Object to form.

9        Q.   Are you aware that you will need to

10  consult with counsel if a settlement is proposed and

11  before it is accepted?

12       A.   Yes.

13       Q.   Do you know what the class period is in

14  this case?

15       A.   Yes.  It is from December of 2016 to

16  present day.

17       Q.   And did you cooperate fully with

18  providing your documents to counsel?

19       A.   Yes.

20            MS. BERNHARDT:  Object to form.

21            MS. SPIEGEL:  No further questions.

22            MS. BERNHARDT:  All right.  Why don't we

23  take five minutes, and we'll see if we have any

24  further questions.

25            THE VIDEOGRAPHER:  Okay.  We are going

269

```
1                   REPORTER'S CERTIFICATE

2           I, MAYLEEN AHMED, the undersigned, do

3    hereby certify:

4           That the witness, JESSICA JONES, before

5    examination was remotely duly sworn; that the

6    foregoing deposition was taken remotely

7    stenographically by me on February 10, 2022, and

8    thereafter was transcribed by me; that the

9    deposition is a full, true, and complete transcript

10   of the testimony; and that, in accordance with

11   FRCP 30(e)(1), before completion of the proceedings,

12   review of the transcript was not requested and

13   signature was not reserved by the witness.  I

14   further certify that I am not a relative or employee

15   of any attorney or counsel or any party to this

16   action, and that I am not financially interested in

17   said action or the outcome thereof.

18           In WITNESS WHEREOF, I have hereunto set

19   my hand this 17th day of February 2022.

20

21           _____

22           /s/   MAYLEEN AHMED, RMR, CRR, CRC
             Washington CCR No. 3402 - Exp 12/29/22
23           Oregon CSR No: 17-0447 - Exp 12/31/23
             Texas CSR No:  9428 - Exp 7/31/23
24           California CSR No: 14380 - Exp 12/31/22
             New York Notary Public
25
```