## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| JESSICA JONES, ET Al., <br><br> Plaintiffs, <br> v. <br><br> VARSITY BRANDS, LLC, ET AL., <br><br> Defendants. | Case No. 2:20-cv-02892-SHL-cgc |

### JEFF WEBB'S INDIVIDUAL MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Jeff Webb is an innovator who has dedicated his entire professional life to sharing his passion for cheerleading. With Varsity,[1] he not only built a highly successful company, but was also instrumental in building an entire sport. From introducing cheer competitions to guiding cheerleading to its recognition as an Olympic sport, Mr. Webb has always been a positive influence on cheerleading. Plaintiffs demean this dedication and accuse Mr. Webb of restricting competition and restraining growth of the sport he has focused on expanding. Plaintiffs are misguided in their claims. Plaintiffs' antitrust claims against Varsity are meritless, and their attempt to lodge responsibility for their baseless claims with Mr. Webb fall even shorter of any support or substance. Mr. Webb is entitled to summary judgment because the evidence demonstrates that he did not engage in anticompetitive conduct or influence Varsity to do so. Instead, during the four-year period[2] applicable to this case, Mr. Webb has been solely focused on the growth and success of cheerleading.

## SUMMARY OF UNDISPUTED MATERIAL FACTS[3]

While his formal title changed over time, Mr. Webb acted as Varsity's CEO from 1974 until March 2016. (SUF ¶ 165.) In December 2015, the Varsity Brands' Board of Directors decided to replace Mr. Webb as CEO, and the change became effective March 2, 2016. (SUF ¶ 166.) After being replaced as CEO, Mr. Webb became Founder and Chairman of the Board of Varsity Brands,

---

[1] For the purposes of this memorandum, "Varsity" refers to Varsity Brands, LLC, Varsity Spirit, LLC, and Varsity Spirit Fashions & Supplies, LLC.

[2] The statute of limitations for federal antitrust claims is four years. 15 U.S.C. § 15(b). Nearly all of the state statutes identified by Plaintiffs have the same, or even shorter, statutes of limitations. A small number of states have limitations periods of up to six years, but Plaintiffs do not have evidence of any anticompetitive conduct attributable to Mr. Webb during the longer period.

[3] The Statement of Undisputed Material Facts filed in support of Defendants' Joint Motion for Summary Judgment (ECF No. 466) is incorporated by reference and cited herein as "SUF ¶ _."

remaining a member of Varsity Brands' Board of Directors. (SUF ¶ 167.) Mr. Webb was not a member of Varsity's Executive Leadership Team, its Senior Leadership Team, its Corporate Support Group, or its Senior Management Team. (SUF ¶¶ 168 - 170.) After March 2, 2016, Mr. Webb no longer possessed operational authority at Varsity, was not "driving the business," and was not involved in Varsity's day-to-day operations. (SUF ¶¶ 171 - 172.) Instead, Mr. Webb operated as an advisor and provided input to the company, primarily with respect to Varsity's communications efforts. (SUF ¶¶ 171, 173.)

In 2018, funds advised by Defendant Bain acquired a majority interest in Varsity Brands. (SUF ¶ 178.) After that acquisition, Mr. Webb was no longer a member of the Varsity Board. (SUF ¶ 179.) Mr. Webb continued to hold the title of Chairman of Varsity Spirit, acting in an advisory role, without decision-making authority. (SUF ¶¶ 180 – 181.)

Mr. Webb has been the president of the International Cheer Union ("ICU")[4] for approximately a decade. (SUF ¶ 183.) The ICU operates as the international governing body of cheerleading. (SUF ¶ 184.) After Mr. Webb left the role of CEO of Varsity, he remained the president of the ICU, continuing to focus on the growth of cheerleading internationally. (SUF ¶ 185.) In particular, Mr. Webb focused on efforts to persuade the International Olympic Committee ("IOC") to recognize the ICU as cheerleading's international governing body and to recognize cheerleading as a sport, making cheerleading eligible for inclusion in upcoming Olympic Games. (SUF ¶ 183 – 185.)

Effective December 31, 2020, Mr. Webb's employment with Varsity ended. (SUF ¶ 186.) Mr. Webb remains the president of the ICU. (SUF ¶ 187.)

---

[4] The ICU is a non-profit international organization with at least 117 member nations and federations. (SUF ¶¶ 183 – 184.) The ICU is not a defendant in this lawsuit.

# LAW AND ARGUMENT[5]

## I. Plaintiffs' Federal Antitrust Claims Fail.

### A. Plaintiffs Cannot Maintain Any Federal Antitrust Claims Against Mr. Webb, Individually.

For the reasons stated in the Joint Brief, Plaintiffs cannot prevail on their federal antitrust claims against any defendant. However, even if Plaintiffs could prevail against some Defendants, they cannot prevail on their federal antitrust claims against Mr. Webb, individually.

"Individual liability under the antitrust laws can be imposed only where corporate agents are actively and knowingly engaged in a scheme designed to achieve anticompetitive ends." *Brown v. Donco Enters., Inc.*, 783 F.2d 644, 646 (6th Cir. 1986). To meet this standard, "the evidence must show that the defendant exerted influence over corporate decisions to the point that his influence shaped corporate intentions." *In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d 705, 737 (E.D. Tenn. 2011) (interpreting *Brown*). Evidence that a defendant simply participated in an allegedly anticompetitive scheme is insufficient to defeat summary judgment. *Id.* Indeed, even intimate participation and engaging in "acts in furtherance of an anticompetitive scheme" are insufficient to defeat summary judgment. *Id.* Instead, a plaintiff must show that the individual's "actions somehow influenced the corporate decisions that were made." *Id.* If a plaintiff only offers "evidence from which equally balanced inferences of anticompetitive and pro-competitive activity are established," summary judgment for the individual defendant is appropriate. *Id.*

Here, Plaintiffs cannot identify any material evidence supporting a conclusion that Mr. Webb "exerted his influence" over corporate decisions "so as to shape corporate intentions" with

---

[5] The standard of review for summary judgment is stated fully in Defendants' Memorandum of Law in Support of Joint Motion for Summary Judgment (the "Joint Brief"), which is being filed contemporaneously with this Motion.

respect to anticompetitive conduct or to achieve anticompetitive ends. *See Brown*, 783 F.2d at 646.

### 1. *Mr. Webb's role at Varsity during the relevant statutory period requires granting summary judgment.*

The undisputed evidence demonstrates that, after March 2016, Mr. Webb did not have the authority to shape corporate decision-making within Varsity. Mr. Webb did not have "actual operational authority" at Varsity, was not involved in making strategic decisions, and was not involved in Varsity's day-to-day operations. (SUF ¶¶ 171, 176.) Instead, that responsibility fell to two other individuals—John Nichols and later Bill Seely. (SUF ¶ 176.) Neither Mr. Nichols nor Mr. Seely reported to Mr. Webb after March 2016. (SUF ¶ 177.)

After Mr. Webb left his role as CEO, he acted primarily in an advisory capacity. (SUF ¶ 173.) (explaining that in 2017, Mr. Webb "was just an advisor.") Mr. Webb provided overall input, much of which involved corporate communications, and acted as "the face of the company." (SUF ¶¶ 173 - 174.) Mr. Webb also remained available to provide guidance and perspective to the Varsity Spirit team, including advice on strategy, branding, positioning, and culture. (SUF ¶ 175.) His primary focus was on the growth of international cheerleading, the further development of the ICU (of which he remained president) and efforts to gain the IOC's recognition of cheerleading as an Olympic sport. (SUF ¶ 185.)

The leadership structure at Varsity after March 2, 2016, and throughout the applicable statutory period, reflects Mr. Webb's diminished role and authority. During the relevant statutory period for this case, Mr. Webb was not a member of Varsity's Executive Leadership Team. (SUF ¶ 168.) Nor was he a member of Varsity's Senior Leadership Team. (SUF ¶ 169.) Mr. Webb also was not a member of Varsity Brand's Corporate Support Group or Senior Management Team. (SUF ¶ 170.) The undisputed evidence establishes that Mr. Webb did not driving Varsity's business during the relevant period, and was not in any position to do so. (SUF ¶ 172.) Instead, Mr. Webb

4

acted in a support role for other executives at Varsity Spirit and Varsity Brands. (SUF ¶ 172.)

After July 2018, Mr. Webb was no longer a member of Varsity's Board of Directors, but continued in an advisory capacity as Chairman of Varsity Spirit, a title that was effectively "meaningless." (SUF ¶ 180.) He remained focused on international cheer, continued to attend Varsity camps, and acted in an advisory role to the president of Varsity Spirit. (SUF ¶ 181.) Mr. Webb's role was as "culture keeper and inspiration, not perceived as [an] operator." (SUF ¶ 182.)

Because the undisputed evidence demonstrates that Mr. Webb did not have operational control or decision-making authority after March 2, 2016, Plaintiffs cannot prove that Mr. Webb exerted influence over Varsity's decisions, such that he shaped Varsity's corporate intentions during the statutory period with respect to any aspect of Varsity's business. *See Brown*, 783 F.2d at 646. This is especially so with regard to in the three product markets (competitions, apparel, and camps) in which Plaintiffs claim anticompetitive conduct.

### 2. *Mr. Webb did not influence and shape corporate intentions with respect to conduct Plaintiffs allege was anticompetitive.*

Lacking evidence that Mr. Webb shaped Varsity's corporate intentions overall, Plaintiffs similarly lack evidence that Mr. Webb shaped Varsity's corporate intentions with respect to any of the conduct Plaintiffs contend was anticompetitive. Specifically, Plaintiffs contend that Varsity's acquisitions, rebate programs, scheduling practices, Squad Credentialing program, and relationship with USASF and USASF's criteria for awarding bids to the Cheerleading Worlds were anticompetitive practices. As the Joint Brief makes clear, Plaintiffs are wrong in those contentions. However, even if the Court were to find that such conduct permits antitrust claims against certain Defendants, Plaintiffs cannot maintain antitrust claims against Mr. Webb on such grounds.

#### a. Mr. Webb did not exert influence and shape corporate intentions with respect to acquisitions.

Plaintiffs contend that Varsity's acquisition of companies that produced All Star

5

cheerleading competitions[6] was anticompetitive. Virtually all of the acquisitions referenced in the Complaint are alleged to have occurred outside the applicable statute of limitations. For the few acquisitions Varsity made during the period relevant to this case, there is no evidence that Mr. Webb influenced corporate decisions with respect to any of them.

As detailed above, starting in March 2016, Mr. Webb was no longer Varsity's CEO, and no longer possessed operational authority within the company. *Supra* Part I.A.1. Consistent with his greatly diminished role and authority, Mr. Webb had limited, if any, involvement in acquisitions. (SUF ¶ 188.) After March 2016, Mr. Webb did not make "operational decisions," such as "authorizing any acquisition or declining any acquisition." (SUF ¶ 192.) For instance, Mr. Webb did not identify event producers as potential targets for acquisition. (SUF ¶ 189.) Nor did he negotiate acquisitions. (SUF ¶ 190.) He also did not direct Varsity employees to pursue acquisitions, or decline to pursue acquisitions. (SUF ¶ 191.)

Mr. Webb's lack of involvement in acquisitions is consistent with his role at Varsity after being replaced as CEO. While Mr. Webb was Chairman of the Board from March 2016 until July 2018, his influence in connection with acquisitions was limited to that of a single board member. (SUF ¶ 193.) Only acquisitions where the purchase price exceeded $5 million required board approval. (SUF ¶ 194.) If such an acquisition came before the Board, Mr. Webb possessed only one vote, like any other board member, and he had no veto power. (SUF ¶ 195,) Thus, the board could approve or reject any acquisition with or without Mr. Webb's vote. (SUF ¶¶ 193, 195.) There is no evidence that Mr. Webb used his position on Varsity's Board from March 2016 to July 2018 to influence Varsity's decision-making with respect to acquisitions. Nor is there any evidence

---

[6]Plaintiffs have no evidence of acquisitions of cheer apparel companies or cheer camps during the relevant statutory period, much less that Mr. Webb exerted his influence such as to shape Varsity's intentions with respect to any such acquisitions.

6

that Mr. Webb otherwise exerted his influence on Varsity's decision-making and strategy with respect to acquisitions after March 2016.[7] Consequently, Plaintiffs cannot rely on Varsity's acquisitions as a basis for their claims against Mr. Webb, individually. *See In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d at 737 (noting "evidence must show that an individual's participation was active and knowing" and "mere participation" is insufficient).

      b. <u>Mr. Webb did not exert influence and shape corporate intentions with respect to the family plan or network agreements.</u>

As explained in the Joint Brief, Varsity's rebate programs are not anticompetitive and cannot serve as a basis for Plaintiffs' claims against any Defendant, including Mr. Webb. Even if the Court found these rebate programs to be anticompetitive, Plaintiffs cannot identify any material evidence to support a claim that Mr. Webb exerted his influence to shape corporate intentions with respect to the Family Plan or Network Agreements.

Mr. Webb did not participate in the creation of Varsity's rebate programs, and his familiarity with the programs is limited. (SUF ¶¶ 197, 199.) (stating that Mr. Webb is "very vaguely" familiar with network agreements.) For instance, Mr. Webb did not make any decisions regarding the number of events that a gym must attend to participate in the Family Plan. (SUF ¶ 200.) Nor was Mr. Webb involved in determining the benefits received by gyms under the Family Plan. (SUF ¶ 201.) The undisputed evidence shows that Mr. Webb was not involved with the Family Plan after he was no longer CEO. (SUF ¶ 202.) Moreover, even when he was CEO, Mr. Webb was not regularly consulted regarding Varsity's rebate programs. (SUF ¶ 198.)

---

[7] It is especially implausible to conclude that Mr. Webb exerted his influence over acquisitions at a time when Mr. Webb rarely interacted with Varsity Spirit's CFO. Pash Nangia, Varsity Spirit's CFO from November 2017 to January 2021, testified that he rarely met with Mr. Webb because there was no need for him to do so. (SUF ¶ 196.). (explaining "[i]t was extremely rare" for Mr. Nangia to meet with Mr. Webb because "[t]here was no need for [Mr. Nangia] as the CFO of Varsity Spirit to meet with Mr. [Webb] at a professional level.")

Because the undisputed facts demonstrate that Mr. Webb was not involved with Varsity's Family Plan or Network Agreements, Plaintiffs cannot prove that Mr. Webb shaped Varsity's intentions with respect to either program.

     c. <u>Mr. Webb did not exert influence and shape corporate intentions with respect to Varsity's event scheduling.</u>

Plaintiffs argue that Varsity engaged in anticompetitive conduct by "counter program[ing]" cheer competitions produced by other event producers. (Compl. ¶ 162.) Even in the unlikely event that such conduct—scheduling Varsity's events to compete with events hosted by other event producers—was deemed anticompetitive, there is no basis for Mr. Webb to be held personally liable. Plaintiffs cannot identify any evidence demonstrating that Mr. Webb was involved in any decisions with respect to the alleged "counter programming."

Instead, the evidence demonstrates that Mr. Webb was not involved in Varsity's event scheduling. Mr. Webb testified that he had never heard of any purported counter programming practice or strategy to target other event producers by scheduling a Varsity competition at or near the dates and locations of another event producer's competition. (SUF ¶ 204.) Nor did anyone ever seek Mr. Webb's recommendation with respect to such a practice. (SUF ¶ 205.) Indeed, Mr. Webb did not know if Varsity even maintained a list of competitors' events. (SUF ¶ 203.) During the statutory period, Mr. Webb was not involved in, and did not have any control over or decision-making authority with respect to, selecting locations or dates for Varsity's cheer competitions. (SUF ¶ 206.) Nor did he have any control or decision-making authority with respect to whether certain Varsity-produced cheer competitions awarded bids for the Summit, or any other Varsity cheer competition, end-of-season or otherwise. (*Id.*)

Mr. Webb did not exert his influence such that he shaped corporate intentions with respect to where and when Varsity's competitions took place, or the characteristics of such competitions.

8

    d. <u>Mr. Webb did not exert influence and shape corporate intentions with respect to Varsity's Squad Credentialing program.</u>

Varsity requires that, as a condition to qualify for Varsity's UCA National High School Cheerleading Championship, NCA High School Nationals, or USA Spirit Nationals, 75% of the athletes of the school's team must attend a Varsity cheer camp with a Squad Credentialing program. (SUF ¶¶ 8 – 11.) For each competition, this requirement was instituted for the 2016/2017 (UCA), 2017/2018 (NCA) and 2020/2021 (USA) seasons. (*Id.*) As explained in the Joint Brief, the Squad Credentialing program is not anticompetitive and cannot support Plaintiffs' antitrust claims.

 Moreover, there is no basis for any fact finder to hold Mr. Webb liable for any conduct relating to the Squad Credentialing program. There is no evidence that Mr. Webb participated in the creation of the program, directed anyone to do so, or otherwise exerted his influence over the Squad Credentialing program. Plaintiffs cannot produce such evidence because Mr. Webb was not involved in the creation of the Squad Credentialing program. Mr. Webb's lack of involvement makes sense because Varsity instituted the squad credentialing program for each competition *after* Mr. Webb was no longer CEO. (SUF ¶¶ 8 – 11.)

    e. <u>Mr. Webb did not exert influence and shape corporate intentions with respect to USASF's process of awarding bids.</u>

Plaintiffs argue that the USASF's qualification system for its annual year-end championship, The Cheerleading Worlds ("Worlds"), is anticompetitive. Under that system, the USASF identifies cheerleading competitions that are eligible to award "bids" to teams to compete at Worlds. (SUF ¶ 131.) USASF identifies those competitions through application of objective criteria, developed and maintained by the USASF's Sanctioning Committee. (SUF ¶¶ 124, 131.) Because Mr. Webb has never been a member of the USASF Sanctioning Committee or the USASF's Board of Directors, he never had authority over USASF's criteria for choosing

9

competitions that can award bids to Worlds.[8]  (SUF ¶¶ 208 - 209.)

Nor is there evidence that Mr. Webb conspired with the USASF with respect to the criteria for allocation of Worlds bids.  In particular, there is no evidence that he conspired with USASF to change the Worlds bid criteria, or circumvent USASF's formal process for allocating Worlds bids,[9] much less that he did so to benefit Varsity.  Conversely, the evidence shows that, on the rare occasion when the USASF president sought Mr. Webb's opinion about allocating additional bids for Worlds, Mr. Webb did not oppose the allocation of additional Worlds bids to non-Varsity event producers.  (SUF ¶ 212.) (explaining that Mr. Webb expressed that he was "fine with adding 2 or 3 [non-Varsity] event producers to the 42 approved Worlds bid givers.")

> f.　**Mr. Webb did not exert influence and shape corporate intentions with respect to any other anticompetitive conduct in purported product markets for competitions, camps, and apparel.**

To the extent Plaintiffs rely upon any other conduct as purportedly anticompetitive in the purported product markets for competitions, camps, and apparel, they lack any evidence that Mr. Webb exerted his influence and shaped corporate intentions with respect to such conduct.  Because Plaintiffs cannot meet their burden of proving that Mr. Webb exerted his influence and shaped Varsity's intentions, all of their claims against Mr. Webb fail.

> 3.　***Plaintiffs cannot rely on conduct that occurred before the applicable statute of limitations started to run.***

Plaintiffs' federal antitrust claims are subject to a four-year statute of limitations.  15 U.S.C. § 15b.  Plaintiffs filed this lawsuit on December 10, 2020.  (ECF No. 1.)  As such, the

---

[8] While certain Varsity employees and managers emailed Mr. Webb with proposals regarding potential changes to USASF's allocation of Worlds bids, there is no evidence that those proposals were implemented or that Mr. Webb had any influence on their implementation.  *See, e.g.*, (SUF ¶ 210.)  (Mr. Letard proposed a change to Mr. Webb, but it "never went to execution . . . it was just a brainstorm concept, idea.")

[9] There is no evidence that USASF failed to follow its own criteria for allocating bids to Worlds.

10

applicable limitations period for this case began on December 10, 2016. Plaintiffs cannot rely upon Mr. Webb's prior role as CEO or any conduct occurring before December 10, 2016. As of the start of the limitations period, Mr. Webb was no longer CEO and had not been CEO for nearly ten months. As explained above, Mr. Webb's role at Varsity changed significantly in March 2016, after which he did not possess the authority or control over Varsity decisions such that a reasonable fact finder could conclude that he exerted influence over Varsity's corporate decisions.

To the extent Plaintiffs rely on an alleged continuing antitrust violation, there is no evidence to support such a claim against Mr. Webb. "'In the context of a continuing conspiracy, the statute of limitations runs from the commission of the act that causes the plaintiff's damage.'" *Chiropractic Co-op. Ass'n of Mich. v. Amer. Med. Ass'n*, 867 F.2d 270, 275 (6th Cir. 1989) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971)). "Thus, 'even when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act.'" *Peck v. General Motors Corp.*, 894 F.2d 844, 849 (6th Cir. 1990) (quoting *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987)). As detailed above, there is no evidence that Mr. Webb committed any overt act at all, much less one within the limitations period that would extend the statute of limitations against him.[10]

Mr. Webb's continued employment with Varsity through the limitations period does not rescue Plaintiffs' claims against him because "there is no material or substantial evidence that he has been instrumental in any way" in Varsity's alleged anticompetitive conduct. *See Chiropractic*

---

[10] Plaintiffs' inability to identify any overt act by Mr. Webb is fatal to their conspiracy claim, regardless of limitations. *See infra* Part I.B; *see also Howard Hess Dental Labs, Inc. v. Dentsply Intern., Inc.*, 602 F.3d 237, 253 (3d Cir. 2010) (identifying "an overt act in furtherance of the conspiracy" as a necessary element).

11

*Co-op. Ass'n of Mich.*, 867 F.2d at 277 (affirming summary judgment for individual who "continue[d] to be associated with AMA as an executive vice president, [but] there [wa]s not material or substantial evidence that he ha[d] been instrumental in any way [within the limitations period] in AMA's policy towards chiropractic.") Similar to *Chiropractic*, Mr. Webb's "actions are not demonstrated to have been the basis of the antitrust conspiracy alleged nor a proximate cause of any demonstrated injury within the four years of the filing of this suit." *See id.*

> **B.     Plaintiffs Cannot Claim that Mr. Webb Participated in Any Antitrust Conspiracy.**

Plaintiffs allege an antitrust conspiracy involving all Defendants—Varsity, Charlesbank, Bain, USASF, and Mr. Webb. However, Plaintiffs cannot produce evidence that Mr. Webb joined a conspiracy with any of the Defendants, much less with all of them. To prevail on their antitrust conspiracy claim against Mr. Webb, Plaintiffs must "prove both an existence of a conspiracy and specific intent to monopolize." *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 827 (6th Cir. 1982).

For Plaintiffs to prevail against Mr. Webb under a theory that he engaged in an antitrust conspiracy, they must prove that he conspired with USASF.[11] There is no evidence that Mr. Webb conspired with USASF to engage in anticompetitive conduct. Rather, all of the communications between Mr. Webb and USASF were consistent with Mr. Webb's role as a pioneer in the sport of cheerleading and the resident of the ICU. Because Mr. Webb is an expert and leader in competitive cheerleading, USASF's president, Jim Chadwick, occasionally sought advice from Mr. Webb. (SUF ¶ 213.) Mr. Chadwick was free to accept Mr. Webb's advice or to disregard it. (SUF ¶ 214.)

---

[11] The Court has already held that Mr. Webb is incapable of conspiring with Varsity (ECF 333 at PageID 7217), and that Varsity, Bain, and Charlesbank are to be treated as one for purposes of the conspiracy claim. (ECF 332 at PageID 7192.) Regardless, Plaintiffs have failed to produce any evidence that Mr. Webb conspired with *any* Defendant.

12

There is no evidence that Mr. Webb directed Mr. Chadwick or USASF to take any action to benefit Varsity or further any anticompetitive scheme.

Mr. Webb's communications with officers and directors of USASF is also consistent with his role as the president of the ICU. The ICU hosts its own World Championship at Disney World, typically on back-to-back weekends with USASF's Worlds. For this reason USASF would communicate with Mr. Webb regarding issues relating to Worlds. (SUF ¶ 217.) Similarly, because the ICU is spearheading the movement to gain recognition of cheerleading as an Olympic sport, USASF sought Mr. Webb's input, as ICU president, regarding "USASF efforts to grow the sport and to coordinate with Olympic direction." (SUF ¶ 218.) Plaintiffs cannot identify any anticompetitive conduct with respect to Mr. Webb's dealings with USASF. "'[M]ere contacts and communications, or the mere opportunity to conspire, among antitrust defendants is insufficient evidence [of] an anticompetitive conspiracy.'" *K&S Assocs., Inc. v. Amer. Ass'n of Physicists in Medicine*, 2013 WL 2177938, at *16 (M.D. Tenn. May 20, 2013) (quoting *Amer. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 227 (4th Cir. 2004)).

## II. Plaintiffs' State Antitrust and Consumer Protection Act Claims Fail.

Plaintiffs assert claims under the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, which is subject to a three-year statute of limitations, Tenn. Code Ann. § 28–3–105, as well as under the antitrust laws of more than thirty states and the District of Columbia. (Compl. at Second Claim for Relief and Third Claim for Relief.). Because Plaintiffs' federal antitrust claims against Mr. Webb fail for the reasons stated above, so too do Plaintiffs' claims under state antitrust laws. *See, e.g.*, *Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 976 n.5 (9th Cir. 2008) ("[S]tate law antitrust claims are derivative of the federal law claims. Because the federal claims fail, the state law claims fail.").

13

Similarly, Plaintiffs assert claims under the consumer protection laws of more than thirty states and the District of Columbia. (Compl. at Fourth Claim for Relief.) Where, as here, "consumer protection statute claims are premised wholly on the same underlying alleged anticompetitive behavior and antitrust injury" that forms the basis of antitrust claims, those consumer protection claims should suffer the same fate. *In re Plavix Indirect Purchaser Antitrust Litig.*, No. 1:06-cv-226, 2011 WL 335034, at *5 (S.D. Ohio Jan. 31, 2011). Because Mr. Webb is entitled to summary judgment on Plaintiffs' antitrust claims, he is also entitled to summary judgment on Plaintiffs' state consumer protection claims. *See id.*

### III. Plaintiffs' Unjust Enrichment Claim Fails.

For the reasons stated in the Joint Brief, Plaintiffs cannot maintain their unjust enrichment claim against Mr. Webb. Plaintiffs' unjust enrichment claim also fails because Plaintiffs cannot prove the following elements to support that claim against Mr. Webb. *See Freeman Indus., LLC v. Eastman Chemical Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) ("1) a benefit conferred upon the defendant by the plaintiff; 2) appreciation by the defendant of such benefit; and 3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.").

Plaintiffs have no evidence of a direct benefit conferred by them upon Mr. Webb, nor of his appreciation or acceptance of such benefit. Additionally, because Mr. Webb is not liable for any anticompetitive conduct, there are no circumstances making it inequitable for Mr. Webb to retain any benefit. Consequently, Plaintiffs' unjust enrichment claim fails.

## CONCLUSION

For the foregoing reasons, Mr. Webb respectfully requests that the Court grant his Motion for Summary Judgment (ECF No. 466).

Dated: July 28, 2023

By: /s/ *Brendan P. Gaffney*

Paul E. Coggins*
Brendan P. Gaffney*
Kiprian E. Mendrygal*
Jennifer McCoy*
Katherine Wright*
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Phone: (214) 740-8000
Fax: (214) 740-8800
pcoggins@lockelord.com
bgaffney@lockelord.com
kmendrygal@lockelord.com
jennifer.mccoy@lockeord.com
katie.wright@lockelord.com

* Admitted pro hac vice

Edward L. Stanton III (TN #018904)
S. Keenan Carter (TN # 023386)
BUTLER SNOW LLP
6075 Poplar Avenue, Suite 500
Memphis, Tennessee 38119
Telephone: (901) 680-7336
Fax: (901) 680-7201
Edward.Stanton@butlersnow.com
Keenan.carter@butlersnow.com

**ATTORNEYS FOR JEFF WEBB**