# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| JESSICA JONES et al., <br><br> Plaintiffs, <br> v. <br><br> VARSITY BRANDS, LLC et al., <br><br> Defendants. | **Civ. Action No. 2:20-cv-02892** |

**U.S. ALL STAR FEDERATION, INC.'S INDIVIDUAL MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

I.    INTRODUCTION ...............................................................................................................1
II.   BACKGROUND .................................................................................................................2
      A.   USASF's Board of Directors and Sanctioning Committee.....................................2
      B.   The Cheerleading Worlds and the Worlds Bid System ..........................................3
      C.   USASF's Uniform Rules .........................................................................................6
III.  LAW AND ARGUMENT ...................................................................................................7
      A.   Plaintiffs' Claims Are Barred By The Applicable Statutes of Limitations. .............7
      B.   Plaintiffs Cannot Establish The Elements Of A Conspiracy to Monopolize Claim
           Against USASF in the Proposed Markets................................................................9
           1.   Plaintiff Cannot Establish The "Overt Act" Element. ...............................10
           2.   Plaintiff Cannot Establish The Essential Element Of Specific Intent........10
           3.   Plaintiffs cannot establish that any USASF's rules or policies caused any
                antitrust injury............................................................................................14
IV.   CONCLUSION..................................................................................................................14

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*AD/SAT v. Associated Press*,
  181 F.3d 216 (2d Cir 1999) ............................................................................................. 13

*Bailey's, Inc. v. Windsor America, Inc.*,
  948 F.2d 1018 (6th Cir. 1991) ......................................................................................... 11

*Barnosky Oils v. Union Oil Co. of California*,
  665 F.2d 74 (6th Cir. 1981) ............................................................................................... 9

*Brookins v. Int'l Motor Contest Ass'n*,
  219 F.3d 849 (8th Cir. 2000) ........................................................................................... 13

*Great Escape, Inc. v. Union City Body Co.*,
  791 F.2d 532 (7th Cir. 1986) ........................................................................................... 11

*Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*,
  602 F.3d 237 (3d Cir. 2010) ............................................................................................ 14

*Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.*,
  510 F.2d 1140 (2d Cir. 1975) .......................................................................................... 11

*In re Travel Agent Comm'n Antitrust Litig.*,
  583 F.3d 896 (6th Cir. 2009) ............................................................................................. 9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ........................................................................................................ 14

*North Am. Soccer League, LLC v. United States*,
  296 F. Supp. 3d 442 (E.D.N.Y. 2017) ............................................................................. 11

*NYNEX Corp. v. Discon, Inc.*,
  525 U.S. 128 (1998) ........................................................................................................ 14

*Oxbow Carbon & Mins., LLC v. Union Pac. R. Co.*,
  926 F. Supp. 2d 36 (D.D.C. 2013) .................................................................................... 9

*Paladin Assocs., Inc. v. Montana Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) .................................................................................... 9, 14

*Peck v. General Motors Corp.*,
  894 F.2d 844 (6th Cir. 1990) ......................................................................................... 8, 9

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
   924 F. Supp. 1474 (N.D. Ohio 1996) ............................................................... 10, 11, 13

*Richter Concrete Corp. v. Hilltop Concrete Corp.*,
   691 F.2d 818 (6th Cir. 1982) ...................................................................... 9, 10, 12, 13

*Times-Picayune Pub. Co. v. United States*,
   345 U.S. 594 (1953) ............................................................................................... 13

*United States v. Yellow Cab Co.*,
   332 U.S. 218 (1947) ................................................................................................. 9

*Williams v. Kleaveland*,
   534 F. Supp. 912 (W.D. Mich. 1981) ...................................................................... 10

*Z Techs. Corp. v. Lubrizol Corp.*,
   753 F.3d 594 (6th Cir. 2014) .................................................................................. 8, 9

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
   401 U.S. 321 (1971) ................................................................................................. 8

**<u>Statutes</u>**

14 M.R.S.A. § 75 ............................................................................................................ 9

A.R.S. § 12-541(5) ......................................................................................................... 9

Ark. Code Ann. § 4-88-115 ........................................................................................... 9

MCL 445.991(9) ............................................................................................................ 9

Minn. Stat. Ann. § 541.05, subd. 1(2) ........................................................................... 9

Mo. Rev. Stat. § 516.120(2) .......................................................................................... 9

Or. Rev. Stat. § 646.638(6) ........................................................................................... 9

Wis. Stat. § 425.307(1) .................................................................................................. 9

**<u>Rules</u>**

Fed. R. Civ. P. 56 .......................................................................................................... 8

I.  INTRODUCTION

At the pleading stage, Plaintiffs made a number of bold accusations about USASF's role in the cheerleading industry. Among other things, Plaintiffs alleged that "USASF rules govern virtually every detail of what All-Star Cheer Athletes may wear in a competition" (Compl. ¶ 59); that through Varsity's alleged "influence with the captured USASF" it "cause[d] the judges to advantage Competitive Cheer Teams that wear Varsity Cheer Apparel" (*id.* ¶ 60); that "Varsity and USASF agreed that USASF would provide fully paid trips for certain gyms to attend as a method of securing USASF authority and dominance of the Varsity-promoted events" (*id.* ¶ 123); that "[w]ith respect to World Championships, Varsity and USASF agreed on how participants can gain entry to the tournament to restrict competition and to exclude rivals" (*id.* ¶ 126); and that "the USASF will not permit a Cheer Competition producer to hold a Bid-qualifying Cheer Competition within 500 miles of another Bid-qualifying competition" (*id.* ¶ 136). Through discovery, all of these accusations were shown to be factually false or, at a minimum, severely misleading.

Despite the benefit of voluminous discovery, Plaintiffs lack any competent, admissible evidence that supports their claims against USASF. The crux of Plaintiffs' claims against USASF is that it "acted in concert" and "conspired" with Varsity in the identified markets—(1) cheerleading competitions (both All Star and School cheer), (2) cheerleading apparel, and (3) cheerleading camps[1]—and enabled Varsity to charge supracompetitive prices in those markets, in violation of federal antitrust law and state antitrust and consumer protection laws. Plaintiffs' claims fail because (1) they are barred by the statute of limitations, (2) there is no evidence of any overt anticompetitive act on the part of USASF, (3) there is no evidence that USASF possessed the requisite specific intent, and (4) there is no evidence that any conduct of USASF caused any

---

[1] The issues with these so-called markets are addressed in the joint brief submitted by all Defendants.

1

antitrust injury. Accordingly, no reasonable jury could find that USASF engaged in any conspiracy or concerted action with Varsity, and USASF is entitled to summary judgment as a matter of law.

## II.     BACKGROUND[2]

USASF was officially formed in 2004. (SUF ¶ 115.) The purpose and goals of USASF include the following: to provide rules for All Star cheerleading competitions, to strive for a safe environment for All Star athletes, to drive competitive excellence, and to promote a positive image for the sport. (SUF ¶ 116.) USASF's role as a sanctioning organization is limited to the sport of All Star cheer. (SUF ¶ 157.) Its members include All Star athletes, coaches, gym owners, and event producers. (SUF ¶ 158.) USASF's rules and policies do not apply to School Cheer, nor do they apply to camps. (SUF ¶ 159.) Camps are generally not attended by All Star cheer teams. (SUF ¶ 4.)

### A.    USASF's Board of Directors and Sanctioning Committee

Pursuant to amendments to its bylaws adopted in 2005, USASF's Board is made up of representatives of event producers ("EPs"), gym owners/coaches, and the USASF. (SUF ¶ 117.) The bylaw amendments also dictated that there would be thirteen voting seats total, made up of seven representatives named by seven particular EPs, two representatives named by the Chairman of USASF, and four coaches/gym owners approved by the Board and subject to reelection every two years. (SUF ¶ 118.) In 2006, USASF's Board adopted certain bylaw amendments to protect the voice of non-Varsity members of the organization, including (1) requiring unanimous consent to replace any of the nine permanent USASF Board seats, including those of non-Varsity event producers CheerSport and JAM Brands; and (2) requiring unanimous Board approval for any contracts involving Varsity. (SUF ¶ 119.) USASF's bylaws thereafter remained unchanged

---

[2] The Statement of Undisputed Material Facts is cited herein as "SUF ¶ _."

through 2022. (SUF ¶ 120.) Varsity did not own all of its seven EPs with seats on USASF's Board until it completed its acquisition of JAM Brands in late 2015. (SUF ¶ 121.) Further, Varsity has allocated one of its EP seats to a non-employee coach/gym owner since 2012 and has never had seven Varsity-employed representatives in its seven EP seats at any one time. (*Id.*; *see* SUF ¶ 122.)

In addition to its Board, USASF also acts through its committees. While USASF's committee structure has evolved over time, USASF has had a Sanctioning Committee since 2004. (SUF ¶ 123.) The Sanctioning Committee promulgates: (1) the standards by which competitions qualify for USASF Sanctioning and the process and guidelines governing compliance, and (2) the approval process and criteria for event producer memberships including eligibility to offer athletes bids to compete at Worlds. (SUF ¶ 124.) Throughout its existence, the Sanctioning Committee has been composed of a representative from each EP who is eligible to award fully paid bids to Worlds. (SUF ¶ 125.) Varsity did not hold a majority of seats on USASF's Sanctioning Committee until it completed its acquisition of JAM Brands in late 2015. (SUF ¶ 126.)

Thus, any rule or policy voted on by USASF's Board or Sanctioning Committee prior to late 2015 was either approved or disapproved before Varsity obtained the majority of seats on the Board or Sanctioning Committee, respectively. (SUF ¶ 127; *see also* SUF ¶ 122.) USASF did not participate in any of Varsity's acquisitions. (SUF ¶ 128.) Rather, any acquisitions of EPs that Varsity made were done by Varsity unilaterally. (*Id.*) Nor did USASF alter any of its rules or policies or deviate from them to assist Varsity in undertaking these acquisitions or to provide Varsity some additional advantage unavailable to other members of USASF. (SUF ¶ 129.)

B.      The Cheerleading Worlds and the Worlds Bid System

USASF produces only one All Star cheer competition, The Cheerleading Worlds ("Worlds"). (SUF ¶ 130.) Through its Sanctioning Committee, USASF promulgates criteria for cheer events which can provide athletes with bids to compete at Worlds, which are known as

3

"Worlds Bid Events". (SUF ¶ 131-132.) As part of its process for determining which events qualify as Worlds Bid Events, USASF created a tier system in 2005 "to allow companies to tailor their USASF membership level to both their budgets as well as the value they perceive receiving from the USASF." (SUF ¶ 133.) At the outset of this tier system, EPs who met the criteria for Tier 1 were permitted to offer "fully paid bids" to Worlds, while EPs who met the criteria for Tier 2 were permitted to offer "partially paid bids" to Worlds. (SUF ¶ 134.) As All Star cheerleading grew, so did the number of event producers who qualified to offer Worlds Bid Events. (SUF ¶ 135.)

Plaintiffs' claims against USASF are largely focused on the criteria promulgated by USASF for EPs to host Worlds Bid Events, despite the fact that Worlds Bid Events represent a very small fraction of the hundreds of All Star cheerleading events. (*See, e.g.*, Compl. ¶¶ 126, 136, 160-161, 184; SUF ¶ 144.) However, all of the rules and procedures at issue were adopted well before the proposed class period began in December 2016. Further, there is no evidence that any of these rules or procedures had a detrimental effect on the All Star cheerleading industry or impacted pricing of All Star competitions.

By no later than 2012, USASF had adopted a rule limiting the number of Worlds Bid Events to 42, in an effort to ensure that there was an appropriate number of Worlds bids in relation to Worlds bid-eligible teams. (SUF ¶ 135.) In connection with this limitation, USASF outlined in its "Approval Process & Criteria for Tier 1 and Tier 2 Event Producers and Worlds Bid Eligibility" ("Worlds Bid Criteria") that, where there were more than 42 events that satisfied the other criteria to offer Worlds Bids, "[p]riority" would be given "to event producers based on their seniority as USASF members," in an effort to "recognize the contribution made by early USASF supporters whose financial support made the Worlds possible initially." (*Id.*) USASF sought to incentivize EPs to maintain their membership with USASF by prioritizing the EPs who had financially

4

supported USASF by awarding paid bids to Worlds (of up to $25,000 per bid) for a longer duration. (*Id.*) This priority approach is consistent with USASF's early policies of USASF to incentivize EP membership and support for the organization. (SUF ¶ 136.)

In addition, by no later than 2012, USASF's Worlds Bid Criteria specified in "Guideline 3.B" that "Tier 1 and Tier 2 events will be protected, within a four week window, either side of the current bid giving event for a 200 mile radius" and "protected for a 500 mile radius from other bid giving events on the same weekend." (SUF ¶ 137.) Date and proximity limitations exist in other sports, and can serve legitimate, pro-competitive purposes such as spreading out events over time and geography and maximizing participation and audience to the benefit of a sport. (SUF ¶ 138.) Even Plaintiffs' own expert conceded that Guideline 3.B could be pro-competitive. (*Id.*)

Prior to 2008, in order to qualify as Tier 1, an EP needed to have 125 cheer teams at its previous year's Worlds Bid Event, and in order to qualify as Tier 2, an EP needed to have 100 cheer teams at its previous year's event. (SUF ¶ 139.) In 2008, USASF adopted a change to this requirement, which reduced the minimum team requirements for Tier 1 and Tier 2 EPs who were approved in the 2007-2008 season or earlier. (*Id.*) In 2014, the Sanctioning Committee revisited this exception and voted to require *all* EPs who sought Tier 1 status to have 125 cheer teams at the previous year's event, to be put into effect during the 2016-2017 season. (SUF ¶ 140.) It also eliminated Tier 2 for its cheer EPs beginning with the 2016-2017 season. (*Id.*)

Despite these changes announced in 2014, very few USASF EPs were affected. (SUF ¶ 141.) Only two event producers (one Varsity and one non-Varsity) lost their Worlds Bid Events between the 2015-2016 and 2019-2020 All Star seasons, and they were replaced by the next-qualifying events, one of which was owned by a Varsity brand EP and one of which was not. (*Id.*) In other words, there was no net change to the number of Varsity-owned Worlds Bid Events. (*Id.*)

5

Plaintiffs alleged that Varsity would engage in "counter-programming" and hold "non-Worlds qualifying events in the same geographic area at the same time as an established Tier 1 independent Bid qualifying event," which would "draw teams away from the IEP event, causing them to fail to attract the requisite 125 teams. . . . and eventually lose the privilege of hosting such events." (Compl. ¶ 162.) Setting aside that this "counter-programming" *enhanced* competition in particular markets, there is no evidence that any EP lost their Worlds Bid Events as a result of this conduct. (SUF ¶ 142.) There is also no evidence that USASF ever deviated from its Worlds Bid Criteria to benefit Varsity or that USASF ever participated in any conversations with Varsity regarding setting prices for registration or spectator fees for Varsity's cheerleading competitions. (SUF ¶ 143, 145.)

**C.     USASF's Uniform Rules**

In the apparel space, Plaintiffs' claims are even more unhinged. USASF is not a manufacturer, distributor, or retailer of cheerleading apparel. (SUF ¶ 146.) The only "apparel"-related policy that USASF has is its Image Policy (now known as the Athletic Performance Standards), which was first adopted in 2012. (SUF ¶ 147.) This policy was developed through a collaborative process involving other cheerleading apparel companies. (SUF ¶ 148.) The USASF Image Policy does not require athletes to wear apparel manufactured or sold by any particular company. (SUF ¶ 149.) The impetus for the Image Policy was to help legitimize the sport and reduce the risk of athlete exploitation. (SUF ¶ 150.)

When the Image Policy was adopted, the only apparel-related guideline to go into effect in the following 2012-2013 cheerleading season was the "Cover Up Guidelines," which only impacted athletes with "non-full top uniforms" and could be easily satisfied by wearing "a t-shirt or other suitable cover up" (of any brand) when outside the performance area or warm-up areas. (SUF ¶ 151.) The Image Policy also included a bow guideline to go into effect in the 2013-2014 season, which merely limited the size of bows permitted to be worn during competitions. (SUF ¶

6

152.) This guideline could be satisfied by wearing a bow of a smaller size, from any apparel manufacturer or bow company, or by wearing no bow at all. (*Id.*) Lastly, the Image Policy included an "Appropriate Uniform" section, which was to go into effect in the 2015-2016 season, well over three years after it was announced. (SUF ¶ 153.) This delay reflected consideration of the purchase cycle for uniforms. (SUF ¶ 154.) Even when it did go into effect, the "Appropriate Uniform" policy could be satisfied by any brand of uniform, so long as the uniforms were not "sexually provocative" and provided age-appropriate coverage. (SUF ¶ 153.) Plaintiffs' expert Dr. Netz agreed that the USASF Image Policy does not present a barrier to entry for apparel manufacturers. (SUF ¶ 155.) It also only applies to apparel worn at USASF-sanctioned competitions and has no applicability to School Cheer events, camps, or practices. (SUF ¶ 156, 159.)

Plaintiffs assert that USASF's actions as a sanctioning organization were a part of some scheme to monopolize the cheer competition, apparel, and camp markets. However, outside of speculations and accusations, Plaintiffs have not pointed to or established any anticompetitive conduct on the part of USASF. Nor have Plaintiffs pointed to any conduct by USASF within the proposed class period. Further, Plaintiffs have no evidence that the alleged conduct by USASF caused any impact on pricing in any proposed market. (SUF ¶ 160.) Indeed, the record evidence establishes only the legitimate business aims and the pro-competitive benefits of USASF's actions.

### III.   LAW AND ARGUMENT[3]

**A.   Plaintiffs' Claims Are Barred By The Applicable Statutes of Limitations.**

Summary judgment is appropriate because Plaintiffs cannot identify any anticompetitive act by USASF during the applicable limitations period. Each rule or policy that Plaintiffs take

---

[3] The standard for summary judgment is addressed in Defendants' joint brief.

7

issue with was established *before* the class period began in December 2016 and many have been in effect since USASF's inception. (*See* SUF ¶¶ 117-119, 132-135, 137, 139-140, 147-153, 244.) For example, (1) the bylaws at issue were adopted in 2005; (2) the procedure for allocating Sanctioning Committee seats has been the same since before 2012; (3) the criteria for Worlds Bid Events were all adopted by no later than August 2014; and (4) the Image Policy was adopted in 2012. (*Id.*). As a result, Plaintiffs' claims are time-barred under every statute alleged.

The statute of limitations for federal antitrust violations is four years. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971). Nearly all of the state statutes identified by Plaintiffs have the same or shorter[4] statutes of limitation. A small handful have no more than six-year limitations periods,[5] but even those statutes would not reach conduct predating December 2014, which entails all of the alleged conduct by USASF. Only acts occurring within the statutory period may be challenged. *See Peck v. General Motors Corp.*, 894 F.2d 844, 848 (6th Cir. 1990). Plaintiffs have not identified any allegedly anticompetitive conduct by USASF since December 10, 2016 (or even December 10, 2014). Plaintiffs' claims against USASF are accordingly barred by the statutes of limitation, and USASF is entitled to summary judgment as a matter of law.

The lack of any recent overt act by USASF also precludes application of the continuing antitrust violation doctrine. "[W]hen a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act." *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 598 (6th Cir. 2014) (quoting *Peck*, 894 F.2d at 849). Critically, "'a newly accruing claim for damages must be based on some injurious act

---

[4] Several states have statutes of limitation as short as one year, which presents an even narrower window. *See, e.g.*, A.R.S. § 12-541(5); Or. Rev. Stat. § 646.638(6); Wis. Stat. § 425.307(1).
[5] *See* 14 M.R.S.A. § 75; Ark. Code Ann. § 4-88-115; MCL 445.991(9); Minn. Stat. Ann. § 541.05, subd. 1(2); Mo. Rev. Stat. § 516.120(2).

8

actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action.'" *Z Techs.*, 753 F.3d at 600 (quoting *Barnosky Oils v. Union Oil Co. of Cal.*, 665 F.2d 74, 81 (6th Cir. 1981)). "[T]he focus is on the timing of the causes of injury, i.e., the defendant's overt acts, as opposed to the effects of the overt acts." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir. 2009) (quoting *Peck*, 894 F.2d at 849).

The record is devoid of any evidence of overt actions by USASF that supposedly created an anticompetitive benefit to Varsity which would "restart" the statute of limitations. There is no evidence in the record illustrating a rule enacted, changed, or deviated from by USASF during the class period that materially enhanced Varsity's competitive position. Rather, the undisputed record reflects that the rules and policies at issue remained materially consistent over the class period. (SUF ¶¶ 117-120, 127, 129, 132-135, 137, 139-140, 147-153, 244.) Plaintiffs' experts' allegations appear to fault USASF for not changing its long-established rules, but this is not adequate to restart the limitations periods, as a matter of law.

**B.     Plaintiffs Cannot Establish The Elements Of A Conspiracy to Monopolize Claim Against USASF in the Proposed Markets.**

To prove that USASF engaged in a conspiracy to monopolize, Plaintiffs must show: "(1) the existence of a combination or conspiracy to monopolize; (2) **an overt act** in furtherance of the conspiracy; (3) the **specific intent** to monopolize; and (4) **causal** antitrust injury." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) (citing *United States v. Yellow Cab Co.*, 332 U.S. 218, 224–225 (1947)); *see also Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 827 (6th Cir. 1982); *Oxbow Carbon & Mins., LLC v. Union Pac. R. Co.*, 926 F. Supp. 2d 36, 44 (D.D.C. 2013).

9

The undisputed material facts illustrate that (1) there is no evidence of an "overt act" by USASF; (2) there is no evidence that USASF possessed the requisite specific intent; and (3) there is no evidence that USASF's policies and rules *caused* any antitrust injury. Thus, no reasonable jury could find the existence of a conspiracy to monopolize on this record, and USASF is entitled to summary judgment as a matter of law.

### 1.   Plaintiff Cannot Establish The "Overt Act" Element.

Just as Plaintiffs cannot establish the existence of an "overt act" to restart the applicable statutes of limitations, Plaintiffs cannot establish the existence of an "overt act" by USASF, as is necessary to establish its participation in an alleged conspiracy to monopolize. *See, e.g.*, *Williams v. Kleaveland*, 534 F. Supp. 912, 922 (W.D. Mich. 1981) (finding "[a]t the bare minimum, the premise for a conspiracy to monopolize claim must include, [*inter alia*], overt acts done in furtherance of the conspiracy") (citation omitted).

### 2.   Plaintiff Cannot Establish The Essential Element Of Specific Intent.

Plaintiffs also lack evidence that USASF possessed the requisite specific intent to monopolize in any of the proposed markets. Specific intent to monopolize is an essential element of a conspiracy to monopolize claim. *See Richter Concrete Corp.*, 691 F.2d at 827. As this Court has held, specific intent may be established by either direct or indirect proof. (ECF No. 333 at 38-39.) "When a defendant's alleged actions 'are ambiguous and could be motivated by factors other than an attempt to monopolize, the likelihood of success is a factor in determining whether the defendants had the requisite specific intent to monopolize.'" *Id.* at 39 (quoting *Re/Max Int'l, Inc. v. Realty One, Inc.*, 924 F. Supp. 1474, 1490 (N.D. Ohio 1996), *aff'd in part, rev'd in part*, 173 F.3d 995 (6th Cir. 1999)). Specific intent may be inferred from predatory conduct, which is defined as "conduct that is in itself an independent violation of the antitrust laws or that has no legitimate business justification other than to destroy or damage competition." *Re/Max*, 924 F.

10

Supp. at 153–54. A showing of a conflict of interest is not sufficient; rather, there must be "sufficient evidence of undue influence in the actual standard-setting process" to infer intent to conspire. *N. Am. Soccer League, LLC v. United States*, 296 F. Supp. 3d 442, 463 (E.D.N.Y. 2017).

There is no direct evidence that USASF possessed the requisite specific intent that Varsity monopolized the proposed markets. (SUF ¶ 161.) Further, there is no indirect evidence that USASF possessed the requisite specific intent either before or during the proposed class period. The record is clear that USASF was financially independent from Varsity during this time period. (*Id.*) There is no evidence that USASF, as an organization, stood to benefit from Varsity's alleged monopolization of the proposed markets. There is also no evidence that USASF engaged in any conduct without any legitimate business justification. As such, Plaintiffs' claim of conspiracy to monopolize should be dismissed as a matter of law. *See Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir. 1986) (dismissing conspiracy to monopolize claim on summary judgment due to lack of evidence of specific intent).

      **i.**      **There is no evidence of USASF's specific intent in the proposed cheer camp market.**

In particular, Plaintiffs do not identify any action taken by USASF which would evidence a conspiracy or an effort to benefit Varsity in the **camp** market. The record demonstrates that USASF is not involved with the camp market and its rules do not apply to camps. (SUF ¶¶ 156, 159.) Its role is limited to All Star cheer, and All Star teams rarely attend camps. (SUF ¶¶ 4, 157.)

Numerous cases have held that specific intent cannot be found on the part of the alleged monopolizer where it has negligible market share and no power to control the market. *See Bailey's, Inc. v. Windsor America, Inc.*, 948 F.2d 1018 (6th Cir. 1991) (finding it "wildly improbable" that there was intent to monopolize when defendant held less than 10% of the relevant market share); *see also Re/Max Int'l,* 924 F. Supp. at 132; *Hudson Valley Asbestos Corp. v. Tougher Heating &*

11

*Plumbing Co.*, 510 F.2d 1140, 1144 (2d Cir. 1975) ("[I]t is patently obvious that the defendants had no power to control either market. Although specific intent to monopolize, and not monopoly power, is the essential element when a conspiracy to monopolize is involved, the absence of any likelihood of success is certainly some evidence on the question of whether such specific intent existed."). It is illogical to infer that USASF—a Tennessee nonprofit corporation—would have any economic incentive to help Varsity monopolize a market in which USASF has no involvement.

### ii. There is no evidence of USASF's specific intent in the proposed cheer apparel market.

Plaintiffs similarly lack evidence of USASF's specific intent in the proposed cheer **apparel** market. No reasonable jury could find that USASF's Image Policy—announced in 2012—gives rise to an inference of a specific intent with respect to the proposed cheer apparel industry. *See Richter Concrete Corp.*, 691 F.2d at 827. On its face, the Image Policy is brand-agnostic and contains very general uniform requirements. (SUF ¶¶ 147, 149, 151-153.) The undisputed record evidence establishes that this policy was adopted to protect minor athletes from exploitation and after feedback from a variety of apparel manufacturers and USASF members. (SUF ¶¶ 148, 150). Further, USASF's Image Policy only applies to USASF-sanctioned events, and has no application to School Cheer, which is included in Plaintiffs' proposed cheer apparel market. (SUF ¶ 156.)

Beyond the Image Policy, Plaintiffs point to no evidence that USASF had *any* involvement in the cheer apparel industry, let alone had the requisite specific intent to support a conspiracy claim. Plaintiffs' pleading-stage theory that USASF established cheer uniform rules which would solely benefit Varsity in the apparel market was ultimately unsubstantiated.

### iii. There is no evidence of USASF's specific intent in the proposed competition market.

There is also no evidence that USASF possessed the requisite specific intent in the proposed **cheer competition** market. USASF and its rules have no role in School Cheer

12

competitions. (SUF ¶¶ 157, 159). Plaintiffs have pointed to nothing that would allow a jury to infer that USASF had any specific intent as it relates to School Cheer competitions.

Further, there is neither direct evidence nor evidence of predatory conduct which could show specific intent on the part of USASF as to All Star competitions. As explained above, the rules with which Plaintiffs take issue were established prior to the proposed class period. (SUF ¶¶ 117-119, 132-135, 137, 139-140, 147-153, 244.) And the record is clear that USASF had legitimate, pro-competitive reasons for adopting the rules at issue. *See Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 627 (1953) (holding actions supporting legitimate business aims cannot bear out the requisite specific intent); *AD/SAT v. Assoc. Press*, 181 F.3d 216, 233 (2d Cir 1999) ("[I]f the defendants have 'no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy[.]"); *Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 853 (8th Cir. 2000) (observing that the "rule-makers" of sports activities are generally given "considerable discretion to achieve their sporting objectives"). The record lacks evidence which would show that USASF's rules reflect (1) an independent antitrust violation or (2) conduct which has no legitimate business justification other than to destroy or damage competition. *See Re/Max Int'l*, 924 F. Supp. at 153–54. To the extent that many years after their adoption, Varsity engaged in unilateral conduct within the confines of USASF's rules to acquire other EPs and gain more Worlds Bid events, such unilateral conduct *by Varsity* is not sufficient to establish specific intent *on the part of USASF*. *See Richter Concrete Corp.*, 691 F.2d at 827 ("It is not reasonable to assume that [Defendants] conspired in 1964 to drive [Plaintiff] out of business in 1972."). No reasonable jury could find that USASF's rules evidence the requisite specific intent.

13

### 3.  Plaintiffs cannot establish that any USASF's rules or policies caused any antitrust injury.

Plaintiffs have offered no evidence linking the alleged rules and policies of USASF to the alleged harm—supracompetitive pricing. (*See* Compl. ¶ 12.) Causation is a necessary element in a conspiracy to monopolize claim. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986) ("First, respondents must show more than a conspiracy in violation of the antitrust laws; they must show an injury to them resulting from the illegal conduct."); *Paladin*, 328 F.3d at 1148 (causal antitrust injury is element of Section 2 claim for conspiracy to monopolize); *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010) (same); *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 139 (1998) (unless a defendants' actions "harmed the competitive process, they did not amount to a conspiracy to monopolize").

Plaintiffs fail to present proof linking any alleged conduct of USASF to the alleged harm. Specifically, Plaintiffs' put forth no evidence showing what alleged harm was caused by the various USASF policies and procedures versus what alleged harm was caused by other factors, such as Varsity unilaterally increasing its market share. (SUF ¶ 160.) Indeed, Plaintiffs' expert Dr. Heeb concedes this. (*Id.*) Rather, the record illustrates the existence of legitimate, procompetitive business goals behind each challenged USASF policy. (*See, e.g.*, SUF ¶¶ 116, 119, 133, 135-136, 138, 150.) Thus, Plaintiffs' claims against USASF fail as a matter of law. *See Paladin*, 328 F.3d at 1148 (granting summary judgment for defendants where "[t]he procompetitive benefits of [defendants] five-year transportation assignments outweighed any anticompetitive harm they might have caused").

### IV.  CONCLUSION

For the foregoing reasons, USASF respectfully requests that this Court grant summary judgment in favor of USASF on all claims.

|  |  |
|---|---|
| Dated: July 28, 2023 | Respectfully submitted,<br><br>*s/ Nicole Riccio*<br>Grady Garrison (TN #008097)<br>Nicole Berkowitz Riccio (TN #35046)<br>James Andrew Roach (TN #37934)<br>BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ<br>165 Madison Avenue, Suite 2000<br>Memphis, TN 38103<br>Phone: (901) 526-2000<br>Fax: (901) 577-0866<br>ggarrison@bakerdonelson.com<br>nriccio@bakerdonelson.com<br>aroach@bakerdonelson.com<br><br>*Attorneys for U.S. All Star Federation, Inc.* |