**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| **JESSICA JONES, et al.,** | Case No. 2:20-cv-02892-SHL-tmp |
| Plaintiffs, | |
| v. | |
| **VARSITY BRANDS, LLC, et al.** | |
| Defendants. | |
| | **JURY DEMAND** |

## PLAINTIFFS' OPPOSITION TO DEFENDANT U.S. ALL STAR FEDERATION'S MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

FACTS .................................................................................................................................1

ARGUMENT .......................................................................................................................2

I.      Plaintiffs' Claims are Not Barred by Any Limitation Periods ...............................2

        A.      The Evidence Shows USASF's Continuing Violations................................2

        B.      USASF is Jointly and Severally Liable for Acts of its Co-Defendants .................3

        C.      Conspiracy Evidence Must be Viewed as a Whole.....................................4

II.     USASF's Many Overt Acts in Furtherance of the Conspiracy ...............................4

        D.      USASF Conspired with Varsity and Jeff Webb to Set Worlds Bid Rules ...............5

        E.      USASF Conspired with Varsity to Protect Varsity's Events ....................8

        F.      USASF Conspired with Varsity and Webb to Counterprogram Varsity Events
                Against IEP Events ......................................................................................9

        G.      USASF Conspired with Varsity and Webb to Hurt Cheer Apparel Rivals ...........10

        H.      USASF Conspired with Varsity and Webb Block Apparel Rivals from Displaying
                Cheer Apparel at Competitions..................................................................11

        I.      Other USASF Policies Foreclose Varsity Rivals .....................................12

        J.      USASF's Insurance Program Harms Non-Varsity Event Producers.....................13

        K.      USASF's Failure to Act to Protect its Members was Anticompetitive .................13

III.    USASF's Acts Were Overt and Its Intentions Were Clear ...................................14

IV.     Each Defendant in a Conspiracy does not Need to Participate in All Acts........................15

V.      Plaintiffs Are Not Required to Parse Effects by Defendant ................................16

VI.     There Is No Competitive Justification for USASF's Conduct ..........................16

CONCLUSION..................................................................................................................17

**PLAINTIFFS' OPPOSITION TO DEFENDANT U.S. ALL STAR FEDERATION'S MOTION FOR
SUMMARY JUDGMENT**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556 (1982)......................8, 9, 17

*Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623 (9th Cir. 2018).......................15

*Arbitron Co. v. Tropicana Prod. Sales, Inc.*, No. 91 CIV. 3697 (PKL), 1993 WL
   138965 (S.D.N.Y. Apr. 28, 1993)...........................................................................................15

*Black L. Enf't Officers Ass'n v. City of Akron*, 824 F.2d 475 (6th Cir. 1987)................................4

*Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849 (8th Cir. 2000) ...............................7, 8, 9, 17

*Consumer Fin. Prot. Bureau v. Borders & Borders*, *PLC*, 3:13-CV-1047-JGH,
   2015 WL 11675669 (W.D. Ky. Apr. 28, 2015)........................................................................4

*Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002).........................................12

*DXS, Inc. v. Siemens Med. Sys., Inc.,* 100 F.3d 462 (6th Cir. 1996)................................................3

*Esco Corp. v. United States*, 340 F.2d 1000 (9th Cir. 1965) .........................................................14

*In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781 (7th
   Cir.1999) ................................................................................................................................16

*In re Cardizem CD Antitrust Litig.*, 105 F.Supp.2d 618 (E.D. Mich.2000) ..................................16

*In re Glumetza Antitrust Litig.*, No. C 19-05822 WHA, 2021 WL 1817092 (N.D.
   Cal. May 6, 2021) ..................................................................................................................15

*In re Se. Milk Antitrust Litig.,* 739 F.3d 262 (6th Cir.2014) .........................................................16

*In re Se. Milk Antitrust Litig.*, 801 F.Supp.2d 705 (E.D. Tenn. 2011)............................................3

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003)....................................................................4, 15

*Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568 (6th Cir. 1986) ............................................4

*United States v. Brown*, 332 F.3d 363 (6th Cir. 2003)...................................................................4

*United States v. Garvin*, 565 F.2d 519 (8th Cir. 1977)..................................................................4

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940)....................................................3

*United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972).............................................................8

**PLAINTIFFS' OPPOSITION TO DEFENDANT U.S. ALL STAR FEDERATION'S MOTION FOR
SUMMARY JUDGMENT**

**Federal Statutes**

15 U.S.C. § 1 ..........................................................................................................................5

15 U.S.C. § 2 ..........................................................................................................................5

**PLAINTIFFS' OPPOSITION TO DEFENDANT U.S. ALL STAR FEDERATION'S MOTION FOR
SUMMARY JUDGMENT**

## INTRODUCTION

Despite the mountain of evidence that exists against USASF and its Co-Defendants,[1] USASF remarkably claims it was a neutral governing body in the sport of competitive cheer ("Competitive Cheer"). On the one hand, it claims it did not engage in any anticompetitive conduct at all. On the other, it argues that even if it did, it was before the applicable limitation periods began to run and, thus, summary judgment is appropriate. ECF No. 469 at 7-9. Both arguments fail. This Court has already rejected USASF's same limitation period argument at the motion to dismiss stage with respect to its Co-Defendants Charlesbank and Bain. *See* ECF No. 332 at 6-9, finding that Plaintiffs sufficiently alleged continuing violations. *Id.* at 9. This Court has also set forth the types of facts, if proven, that would be sufficient to prove Plaintiffs' claims against USASF. *See* ECF No. 333 at 745. Those exact types of facts are now borne out by the evidence. In sum, there is a genuine issue of material fact for the jury as to USASF's role in the conspiracy, and USASF's Motion for Summary Judgment must be denied.[2]

## FACTS[3]

The importance of USASF to Varsity and the success of the overall conspiracy is perhaps best stated in an October 24, 2017, Varsity presentation: "<u>In the world of sports, he who makes the rules, rules.</u>" Ex. 274 at -8996 (emphasis added). USASF has never functioned as a neutral or independent governing body. PSOF, ¶¶39-48.[4] USASF was created by Varsity in 2004 to do its

---

[1] For purposes of this brief, "Varsity" refers to Defendants Varsity Brands, LLC, Varsity Spirit, LLC, and Varsity Spirit Fashion & Supplies, LLC. USASF's other Co-Defendants include Charlesbank Capital Partners, LLC ("Charlesbank") and Bain Capital Private Equity, LP ("Bain").

[2] Due to the complex nature of the case, and the many issues of material fact that are in dispute, Plaintiffs request oral argument on Defendants' Motions for Summary Judgment.

[3] As cited herein, "PSOF" refers to Plaintiffs' Additional Statement of Facts, filed herewith. Unless otherwise noted, all citations to exhibits herein ("Ex. __") are citations to the exhibits attached to the Declaration of Joseph R. Saveri, filed herewith.

[4] "PSOF" refers to Plaintiffs' Additional Statement of Facts, filed herewith. All citations to exhibits herein ("Ex.") are exhibits to the Declaration of Joseph R. Saveri, filed herewith.

**PLAINTIFFS' OPPOSITION TO DEFENDANT U.S. ALL STAR FEDERATION'S MOTION FOR SUMMARY JUDGMENT**

bidding. *Id.*, ¶39. Until recently, USASF was operated by Varsity-paid employees. *Id.*, ¶¶40, 42, 46. For example, Steve Peterson, USASF's Vice President of Events and Corporate Alliances, has worked at USASF since 2004, but was technically a Varsity employee until 2020. *Id.* USASF personnel, as employees of Varsity, received incentives from Varsity, including participation in Varsity's profit-sharing plan. *Id.*, ¶42; *id.*, ¶44 (Varsity owned all of USASF's trademarks until 20170; *id.*, ¶41 (USASF and Varsity shared the same office space); *id.*, ¶43 (Varsity financed and funded USASF with non-traditional loans).

From 2005 until at least March 15, 2023, Varsity controlled the USASF Board, holding no fewer than seven out of its thirteen voting seats. *id.*, ¶46. Nine of those voting seats are permanent, seven are reserved for representatives from proscribed event producers, and two are reserved for USASF representatives. *Id.* Varsity-paid employees have filled the two permanent seats reserved for USASF representatives: Jim Chadwick from 2004 to 2021 and Steve Peterson from 2004 to present. *Id.* In 2005, Varsity also owned five of the seven event producers with permanent seats on the USASF Board. *Id.* By 2015, with its acquisition of Cheer Sport in 2012 and JAM Brands in November 2015, Varsity had gained control of all seven permanent seats reserved for event producers on the USASF Board, paving the way for USASF and Varsity to manipulate rules, set policies, and carry out anticompetitive acts without challenge. *Id.*

Varsity also controls the USASF Sanctioning Committee ("USASF SC"). *Id.* ¶¶47-48. Varsity intentionally sought to acquire rival Tier 1 event producers to gain control of the USASF SC and the Worlds bids process and by November 2015 with the JAM Brands acquisition it owned 32 of the 42 Tier 1 event producers. *Id.*, ¶48.

## ARGUMENT

### I. Plaintiffs' Claims are Not Barred by Any Limitation Periods

#### A. The Evidence Shows USASF's Continuing Violations

As this Court explained in its Orders on motions to dismiss, claims brought under the Sherman Act are subject to a four-year statute of limitations beginning on the date that "the cause

of action accrued." ECF No. 332 at 7 (citing 15 U.S.C. §15b). The Court explained that "[a] cause of action accrues and the limitations period commences each time a defendant commits an act which injures the plaintiff's business." *Id.* (citing *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 848 (6th Cir. 1990), quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)). Parties may allege a "continuing antitrust" violation – that is, when a party's interests "are repeatedly invaded" as Plaintiffs do here. *Id.* (citing *Peck*, 894 F.2d at 849). "[I]n the context of a continuing conspiracy, the statute of limitations runs from the commission of the act that causes the plaintiff's damage." *Id.* (internal citation omitted). "An overt act restarts the period for continuing violations." *Id.* (quoting *Peck*, 894 F.2d at 849).[5]

Here, Plaintiffs allege both conspiracy and monopolization claims. This Court has already found that Plaintiffs sufficiently allege continuing violations, when assessed under either type of claim. *Id.* at 4-5, 9. The evidence explicitly shows that not only did USASF (and its Co-Defendants) engage in overt conspiratorial acts before any applicable limitation period began to run, but USASF has constantly been committing new acts, triggering the re-start of any applicable periods from 2004 to present. *See DXS, Inc. v. Siemens Med. Sys., Inc.,* 100 F.3d 462 (6th Cir. 1996) (each instance of conduct is a new trigger of the limitation period).

### B.    USASF is Jointly and Severally Liable for Acts of its Co-Defendants

USASF is also liable for any acts of its Co-Defendants under joint and several liability. *See In re Se. Milk Antitrust Litig.*, 801 F.Supp.2d 705, 742 (E.D. Tenn. 2011) (citing *United States v. Murphy,* 937 F.2d 1032, 1041 (6th Cir. 1991)) ("Each conspirator is liable for the overt acts committed by any member of the conspiracy, even if the defendant did not personally commit the acts"); *U.S. v. Socony-Vacuum Oil Co*., 310 U.S. 150, 253–54 (1940) ("For a

---

[5] "In the Sixth Circuit, an overt act is defined as (1) 'a new and independent act that is not merely a reaffirmation of a previous act,' and (2) an act that 'inflict[s] a new and accumulating injury on the plaintiff.'" *Id.* (quoting *Z Techs. Corp.*, 753 F.3d at 600). In the monopolization context, continuing violations are considered where a plaintiff alleges "not only acquisitions, but also various forms of anticompetitive conduct that inflict new and accumulating injuries on them." *Id.* at 8.

**PLAINTIFFS' OPPOSITION TO DEFENDANT U.S. ALL STAR FEDERATION'S MOTION FOR SUMMARY JUDGMENT**

conspiracy is a partnership in crime; and an 'overt act of one partner may be the act of all without any new agreement specifically directed to that act"). USASF puts forth no evidence that it has withdrawn from the conspiracy to relieve it from liability for the actions of Varsity or its Co-Defendants during the statutory periods. *See United States v. Brown*, 332 F.3d 363, 374 (6th Cir. 2003). Here, not only were USASF's conspiratorial acts ongoing, but so too were the acts of its Co-Defendants, and each Defendant is joint and severally liable for all.

### C.      Conspiracy Evidence Must be Viewed as a Whole

Furthermore, while a limitation period may limit the period during which damages are sought, it does not preclude the consideration of evidence by a jury that falls outside of the limitation period. *See. e.g., Black L. Enf't Officers Ass'n v. City of Akron*, 824 F.2d 475, 483 (6th Cir. 1987) "The statute of limitations is a defense ..., not a rule of evidence. Therefore, ... [it] has no bearing on the admissibility of evidence.") (citation omitted); *United States v. Garvin*, 565 F.2d 519, 523 (8th Cir. 1977) (evidence outside the statute of limitations is admissible "to show motive, intent, a continuing scheme, and lack of inadvertent action"). Courts recognize for monopolization claims, in particular, that facts leading up to when monopoly power was acquired or explaining how a defendant acquires its illegal monopoly power become especially important to the conspiracy story, even where such facts pre-date the limitations period. *See Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 574 (6th Cir. 1986). And in conspiracy cases, it is well settled that conspiracy facts should be considered as a whole. *See LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003); *see also See Consumer Fin. Prot. Bureau v. Borders & Borders, PLC,* 3:13-CV-1047-JGH, 2015 WL 11675669, at *3 (W.D. Ky. Apr. 28, 2015) (citing *Hanover Shoe, Inc. v. United Shoe Machine Corp.*, 392 U.S. 481, 502 n.15 (1968)) (when a continuing scheme is alleged "all conduct related to the scheme is actionable so long as any part of such conduct occurred within the statutory period of limitation").

## II.     USASF's Many Overt Acts in Furtherance of the Conspiracy

The evidence that USASF engaged in anticompetitive conduct, constantly, from the time

it was created by Varsity in 2004 to present, is explicit and USASF's intent to commit those acts is plain. This Court has already specified the types of facts that, if shown, would be sufficient to show USASF's participation in the alleged conspiracy:

> Indeed, they point to multiple actions of USASF and Varsity – USASF's insurance requirements, USASF and Varsity's limitations on bid-qualifying events, Varsity's hosting of events to draw other teams away from competitors' events, and the USASF's rule requiring that bid-qualifying events be over 500 miles from each other – that allegedly prevent competition or close the market to newcomers. (ECF No. 1 at PageID 31.)

> Here, the Court agrees with the Indirect Purchasers. Their Complaint alleges coordinated activities between USASF and Varsity that, when taken as true, are plausibly actionable as anticompetitive conduct, including rule-setting for competitions. See ECF No. 333 at 16-17.

While Plaintiffs and the Court have framed the standard to fall under a Section 1 conspiracy rubric, 15 U.S.C. §1, USASF frames its arguments as a Section 2 conspiracy to monopolize claim, 15 U.S.C. §2. ECF No. 469 at 14. In any event, the evidence is explicit and the facts easily meet either standard for summary judgment to be denied.

### D.   USASF Conspired with Varsity and Jeff Webb to Set Worlds Bid Rules

USASF conspired with Varsity and Webb to set rules on Worlds bids. *See* PSOF, ¶¶108, 132-135. In the 2016/2017 season, USASF introduced a rule that mandated event producers must have at least 125 level-five teams attend a competition to continue giving out Worlds bids in future years. PSOF, ¶134; If an event producer is unable to attract 125 level-five teams in one year, it is put on probation; if it is unable to attract 125 level-five teams for the following year, it loses the event's Worlds bids, which makes the event far less attractive to participants in the following years (and drives participants away from those events to events that can grant Worlds bids, i.e., to Varsity owned events). *Id.* As Jeff Fowlkes (Varsity) explained in September 2017:

> He [Mr. Webb] believes, and I agree (for whatever that's worth), that in some cases the ability to give Worlds Bids is keeping these companies viable and certainly driving up their value if we decide to acquire them. Ex. 132 at 4139.

USASF acted to put event producers on probation to exclude them from being able to offer World bids through at least February 2020. PSOF, ¶134. A September 22, 2017 Varsity email

explains the intention of the rule:

> As you both know, Jeff W. [Webb] wants the USASF Worlds Bid process changed to <u>prevent small competitors from being allowed to offer World Bids.</u> Ex. 132 at -4139 (emphasis added).

A February 24, 2020 email confirms that Steve Peterson (USASF) continued to put new event producers on probation to intentionally help Varsity kill them off:

> Tres [LeTard of Varsity] and I [Brian Elza of Varsity] also met with Steve Peterson [USASF] on Thursday to discuss a few of the 'on Probation' Worlds bids events. So far this season there are 3 non Varsity events that are in danger of losing their Worlds Bids due to low attendance. One of which already happened—with 98 teams. The two happen[ed] over the next few weeks. Our increased focus on dates and locations from a strategic point of view is continuing to pay off. None of this would be possible without a team effort and targeted approach on when and where to put the Varsity All Star events."  Ex. 143.

Jamie Parrish (Varsity) testified about the how manipulating the Worlds bid system hurt other event producers:

> A. … <u>At all costs get rid of IEPs</u> [Independent Event Producers]. Make it so teams can't go---make it physically, just absolutely, if you can't get a World Bid, and you can't get a Summit bid, and you—and it's going to cost you…. <u>It just makes it too hard for a competitor to offer a competitive, … good or service …Q. you say 'get rid of them,' did you mean put them out of business? A. Yes.</u> Ex. 11 [Parrish Dep.] at 177:11-178:6 (emphasis added).

On, March 11, 2019, an email string between Tre LeTard (Varsity) and Steve Peterson (USASF) shows USASF advocating that Varsity should hurt is competitors:

> The only [EP] on probation this season was Spirit Unlimited and they blew it out this year. So far, in 19-20 we have Cheer Tech and ASC on probation. <u>If you guys [Varsity] can put the squeeze on them next season, that would be great.</u> Ex. 134 at 5110 (emphasis added)

In March 2019, Steve Peterson (USASF) emailed Tres LeTard (Varsity) informing him that WSA, an independent event producer, would be on probation the following season, and cheered Varsity's accomplishment in getting rid of competitors: <u>"WSA did not make 125. That is 3! [thumbs up emoji]." Mr. LeTard replied that it is "[g]etting hard out there" and Mr. Peterson completed the exchange with: "You guys are knocking them off! [smiley emoticon]." Ex. 135.</u> (emphasis added).

USASF's conspiratorial acts regarding the Worlds bid rules did, in fact, foreclose competition. *See* PSOF, ¶¶133-136. For example, Heather Petz, an independent event producer ("IEP") reported that Varsity's conduct was making it difficult for her to offer Worlds bids:

> My numbers are down this year for our upcoming bid event due to mergers, small gyms going out of business, a lot of bids in Kentucky and Varsity putting a Summit Bid qualifier in the same building two weeks prior to my event. Ex. 136 at 4260.

In February 2018, another IEP explained how USASF's sanctioning and bid system caused harm:

> How will we ever be considered for WORLDS bids when current Tier 1 producers are syphoning off our customers with the bids they are already privileged to have? Man[y] of the Tier 3 producers are saying they are closing after this year. We are not the only company in jeopardy of closing our doors. There appears to be no way we will ever achieve Tier 1 status. Ex. 137.

As of February 2018, Varsity controlled 33 of the 42 total Tier 1 events approved to offer Worlds bids. Ex. 14 [Peterson Dep.] at 242:21-24. In August 2017, an IEP explained the harm:

> Currently Tier 3 members rarely, if ever, are able to move up to Tier 1 status. As Varsity Brands continue to grow and acquire other companies, non UCA EP's [sic] continue to lose business. How can we ever hope to reach Worlds requirements when we are consistently losing business to the Varsity machine? Ex. 131 at -6147.

The following year, that same IEP's event dropped from 88 to only 30 teams:

> Our company is dealing with another EP in our area that is a Tier 1 [Varsity]. They [Varsity] moved their National event to last weekend to directly compete with us. A large majority of our customers also compete with them. With their change in date, bids to Cheer and Dance WORLDS plus numerous bids to another end of year event, our registrations went from 88 teams last year to 30 this year! Ex. 137 at -4153.

In December 2018, notes from a West Coast regional meeting of coaches and independent gym owners explain how Varsity's Summit was destroying the industry:

> 'lack of non-Varsity events in our area—big monopoly (JAMZ is the only event and its [sic] only a one day). Lack of competition is hindering the market and allowing rising prices'… 'Summit is destroying our industry' and 'USASF is run by Varsity so its [sic] totally biased.' Ex. 63 at 7474-76.

USASF's overt acts in helping Varsity to set Worlds bid rules to foreclose non-Varsity IEPs is anticompetitive. *See, e.g., Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 853-54 (8th Cir. 2000) (holding that decisions of a rule-making organization are anticompetitive if they

**PLAINTIFFS' OPPOSITION TO DEFENDANT U.S. ALL STAR FEDERATION'S MOTION FOR SUMMARY JUDGMENT**

are "corrupted") (citation omitted); *Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 572 (1982) ("[A] standard-setting organization … can be rife with opportunities for anticompetitive activity.")

E.     **USASF Conspired with Varsity to Protect Varsity's Events**

In 2012, USASF enacted a rule which mandated that there must be a four-week blackout on either side of a Tier 1 event, during which another Tier 1 event may not take place within 200 miles. PSOF, ¶¶135-136. The same rule expands the protective radius to 500 miles for Tier 1 events taking place on the same date. *Id.* An event producer wishing to obtain an exception to these rules must seek permission from the protected event producer and, if denied, may lodge an appeal with the USASF SC. *Id.* The effect of the 200- and 500- mile rules is to restrict new entry and competition from IEPs. *Id.* As Steve Peterson (USASF) testified:

> Q. And so, basically, for a two month window, out of a season that begins in October and ends sometime in – in April or May, there is not a Tier 1 . . . event allowed within a 200-mile radius of another Tier 1 . . . event; is that correct? . . . A. Correct. Q. And the reason . . . is to protect event member producers, correct? . . . A. Protect their bid-qualifying event. . . . Q. And what's the purpose of [the 500-mile] guideline? A. To have a World bid-qualifying event on the same date, the event producers [on the USASF Sanctioning Committee] felt as if that -- they should be protected by 500 miles; that … is generally the distance, inside that distance, teams travel. Q. But it's protected -- you're protecting one event producer from another event producer through this guideline, correct? . . . A. Correct. (objections omitted). Ex. 14 [Peterson Dep.] at 129:14-130:20.

Conspiring to restrict where other events can locate, or when events can be held, is anticompetitive. *See Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 853 (8th Cir. 2000) (exclusion is not an "incidental and inevitable byproduct of defining the game" where there is "demonstrated significant market foreclosure") (citation omitted). Here, Plaintiffs submit evidence to show that USASF's 200- and 500-mile rules enabled Varsity to obtain and maintain market power, exclude competitors, and disadvantage its rivals without any counterbalancing benefits. *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) ("This Court has reiterated time and time again that '(h)orizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition.'") (citations omitted).

USASF also aided Varsity to kill at least three proposals from event producers in order to protect Varsity's Summit event. PSOF, ¶__. As Brian Elza (Varsity) explained to Jeff Webb and others at Varsity in August 2015:

> The firestorm is coming. Obviously this is an effort to combat the Summit, and if I were in their shoes I would be trying to do something similar. <u>Truth be known the Summit has destroyed our competitors and will continue to worsen with the D2 Summit. With our control of the BOD [Board of Directors] of the USASF we are clearly in the drivers [sic] seat.</u> Ex. 139 (emphasis added).

In June 2017, Jeff Fowlkes (Varsity) wrote in advance of a USASF Board meeting how USASF had agreed to let a proposal die:

> Today's USASF Board call should be uneventful. The only potential issue is Joelle's proposal to add Jr.s [sic] to Worlds. This is obviously not something we would want for a number of reasons including that it would negatively impact the Summit. <u>Chadwick has agreed to have Peterson jump in after Joelle's presentation and state that he will add it to the World Advisory Committee meeting this summer. It will die there without us having to publicly oppose it.</u> Ex. 140 (emphasis added).

Similarly, in April 2018, Jim Chadwick (USASF) agreed, at Varsity's request, to table a proposal which would have had a negative impact on participation levels at Varsity's D2 Summit. PSOF, ¶137; Ex. 141. USASF and Varsity's conspiratorial acts to kill Varsity's Summit event are anticompetitive. *See, e.g., Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 853-55 (8th Cir. 2000); *Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 572 (1982); *see also* Ex. 1 [Netz Rep.] at 89.

### F.   USASF Conspired with Varsity and Webb to Counterprogram Varsity Events Against IEP Events

USASF helped Varsity in its attempt to intentionally kill or diminish events hosted by rival event producers by helping Varsity in its effort to locate its own events nearby. PSOF, ¶¶109, 100, 143,159. For example, on February 24, 2020, Brian Elza (Varsity) wrote to Varsity colleagues and Varsity owned-event producers:

> If you recall, a few years ago we set out to 'put a hurting' on the JAMZ Worlds Bid event which had been growing at an unprecedented amount year after year. In order to achieve this, we added a new two-day event in the Las Vegas market under the

**PLAINTIFFS' OPPOSITION TO DEFENDANT U.S. ALL STAR FEDERATION'S MOTION FOR SUMMARY JUDGMENT**

Encore brand. Last year the events were one week apart - this season we actually went head to head on the same weekend as their event. <u>Over the course of those two years we have stripped away nearly 100 of their teams while growing a strong brand in the Vegas market with ENCORE and 217 teams this past weekend.</u> Ex. 143 at -8899 (emphases added).

In another example, Varsity targeted Mardi Gras, an independent event producer which it later acquired, with the intention of obtaining its Worlds bids. PSOF, ¶104; Ex. 1 [Netz Rep.] at 77-78. Jim Hill, former National Director of Sales at Varsity All Star, testified that <u>the Mardi Gras Worlds bid event "was, obviously, an event that we attacked…we put other events around it for the sole purpose of—of, you know, trying to attack it."</u> Ex. 21 [Hill Dep.] 158:12-158:18 (emphasis added). Varsity acquired Mardi Gras in 2017 after it was placed on probation by the USASF for not meeting the team minimum. Ex. 118. USASF's role in helping Varsity to counterprogram its events to exclude rivals is anticompetitive.

### G.    USASF Conspired with Varsity and Webb to Hurt Cheer Apparel Rivals

USASF sets the rules regarding the apparel that must be worn by All Star athletes. PSOF, ¶139. While the rules do not mandate that athletes must wear Varsity apparel, the rules are designed to exclude other apparel makers. For example, USASF allows Varsity personnel to have input into proposed rule changes, and also gives Varsity early access to any changes in the rules before non-Varsity apparel companies. PSOF, ¶140; Ex. 1 [Netz Rep.] at 59-60 & n. 114. Such early access allows Varsity to have an advantage over apparel competitors who would not have time to adapt their apparel to fit USASF's rules in time to make sales for competition season.

USASF also conspired with Varsity and Webb to impose penalties on teams who did not meet its apparel guidelines. PSOF, ¶141. For example, a March 3, 2020 email from Jim Chadwick (USASF) to Jeff Webb (Varsity) explains the penalties for the 2019-2020 season:

Jeff, [w]hen we spoke I was focused on the process and probably unclear about the overall structure. The plan would be as follows: a. Hair, make up, bows – 2019-20 warning then penalty USASF b. Choreography and music – 2019-20 warning then penalty – EPs c. Uniform look – 2019-2020 voluntary, 2020-21 – warning then penalty – purchase cycle considered. … Full tops could be included in the overall look timing or phased in. Ex. 178 at -0286-87.

---

USASF also crafted new rules to impose penalties on teams who did not meet its apparel guidelines as late as the 2019-2020 season. *Id.*

### H. USASF Conspired with Varsity and Webb Block Apparel Rivals from Displaying Cheer Apparel at Competitions

USASF and Varsity conspired on which Cheer Apparel vendors could display their apparel at USASF and Varsity Cheer Competitions. PSOF, ¶142. For example, on October 29, 2019, Steve Peterson (USASF) wrote to USASF's Director of Corporate Alliances and Scholarship Programs, asking her for a list of "ALL exhibitors you are going to solicit for booth space at our National Meeting." Peterson writes:

> I told Brian [Elza of Varsity] and Tres [LeTard of Varsity] we would send them the list for their approval." Later in the email string, Peterson explains: "GTM is on the list and they are apparel. Correct? We will also have to let some of these bow companies and other suppliers [know] the[y] can not (sic) promote campwear. Ex. 154 at -7155-56.6

USASF also conspired with Varsity to block non-Varsity apparel manufacturers from competition event venues, and even from the hotels where teams stayed as part of Varsity's Stay-to-Play program. PSOF, ¶114, 127-129; Ex. 1 [Netz Rep.] 57 & n. 229.

A February 22, 2016 article reports how "Varsity's hardball tactics are structured to keep … rivals off the playing field." Ex. 102 at p. 4. The article notes that "rival apparel makers can't show their wares at [Varsity competitions], which are important showrooms for cheer merchandise." *Id.* at pp. 6-7. In the same article, Karen Noseff Aldridge, founder of Rebel Athletics, a major rival of Varsity in the Cheer Apparel market, describes the effect of Varsity's acquisition of JAM Brands, whose competitions had been Rebel's most effective platform for marketing to elite cheer teams:

> Not partnering with an event company is one thing[.] But being locked out of partnering with an event company—knowing that a competitor is now going to be in your booth space showing its product— it's a double whammy. Id. at p. 8.

---

[6] Note that USASF maintains that it has no connection to camps and is only focused on All Star Cheer. Yet, in this instance it is helping Varsity to exclude apparel rivals who sell campwear.

**PLAINTIFFS' OPPOSITION TO DEFENDANT U.S. ALL STAR FEDERATION'S MOTION FOR SUMMARY JUDGMENT**

On or around June 9, 2020, USASF indefinitely prohibited rival Cheer Apparel and Cheer Competition companies from exhibiting at USASF's National Meeting. Ex. 180 at –0796 ("Moving forward into next season we will not be allowing apparel or Event Producers to exhibit at the National Meeting."). On that same date, Jim Lundberg, likely a Cheer Apparel competitor, wrote to Gena Evans (Varsity) about the prohibition of apparel vendors:

> Ok, [I] think this is really a bad decision. USASF and [V]arsity are being sued for class action lawsuit. The suit specifically cites USASF as a co-conspirator which operates as a captive of [V]arsity in order to monopolize the apparel and events side of cheerleading. [N]ot allowing the apparel or event producers an opportunity to exhibit at the national meetings clearly supports the claim that [V]arsity is calling the shots there at USASF at the detriment of the other suppliers. Ex. 152 at –4656 (emphasis added).

Sixth Circuit case law holds that blocking competitors from showing their products is anticompetitive. *See Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002). In Conwood, the plaintiff presented evidence that the defendant had abused its dominant market position by engaging in a scheme to exclude the plaintiff from displaying its products in stores. *See id.* at 777-80. The court determined that the defendant's strategy foreclosed the plaintiff's ability to utilize point-of-sale advertising and, thus, was anticompetitive. *See id.* at 781-82 (finding that the evidence showed an orchestrated campaign to eliminate rival distribution and promotion with no competitive justification). Here, USASF's efforts to exclude Varsity's Cheer Apparel rivals' merchandise and point-of-sale advertising from important retail locations was anticompetitive. USASF has offered no explanation or evidence to show otherwise.

## I.      Other USASF Policies Foreclose Varsity Rivals

USASF also set policies to prohibit USASF members from participating in Varsity rivals' events. PSOF, ¶131. For example, the 2018-2019 USASF Event Producer Agreement required that USASF event producer members provides: "Company agrees that all competitions sponsored or conducted by Company or its Affiliates that include 'All Star' cheer … shall be

**PLAINTIFFS' OPPOSITION TO DEFENDANT U.S. ALL STAR FEDERATION'S MOTION FOR SUMMARY JUDGMENT**

sanctioned by USASF and meet USASF Sanctioning Standards" and "Company agrees that it shall not produce, or recruit teams for a cheerleading or dance 'World' championship event, or participate in, or sponsor a cheerleading or dance 'World' championship event conducted by a third party." Ex. 142 at 2043-44; *see also* Ex. 133 (open letter from USASF to "USASF Members and Officials" stating that "no athlete, coach, judge, or official is permitted to participate in any way in any event that claims to be a World or International Championship, other than the ICU or World Championships for National teams, or the USASF/IASF Worlds for All Star or Club teams").

### J.      USASF's Insurance Program Harms Non-Varsity Event Producers

USASF also uses its insurance program to harm Varsity's rival event producers. *See* PSOF, ¶144. For example, on August 8, 2016, the USASF's Cheer National Advisory Board met to discuss, among other topics, how to "limit the success of" or "combat" non-sanctioned events. When a member of the board suggested using a "carrot or stick" approach, Mr. Chadwick stated that "there's already a stick" because "the athlete insurance is only good at sanctioned events." Ex. 184 at –8265. USASF's insurance requirement was the subject of member complaints. *See, e.g.,* Ex. 185 at -0968 ("AAU has better and cheaper insurance for athletes and gyms. They [USASF] don't want you to know this. They [USASF] profit off your customers by keeping you in the VARSITY ecosystem.").

### K.      USASF's Failure to Act to Protect its Members was Anticompetitive

USASF also repeatedly failed to act in a manner to protect its members, often by simply failing to act at all. PSOF, ¶145-146. For example, as early as 2013, IEPs were calling for changes to the USASF rules that would reduce Varsity's influence at USASF. *Id.* In April 2013, the USASF Board refused a request from IEPs to add permanent board seats for IEP members. USASF rejected this proposal because it "didn't feel it was needed." Ex. 15 [Chadwick Dep. at 235:22 – 236:9]; Ex. 186 at -1654.

In August 2015, Billy Smith, owner of IEP Spirit Celebration, made a proposal to USASF

**PLAINTIFFS' OPPOSITION TO DEFENDANT U.S. ALL STAR FEDERATION'S MOTION FOR SUMMARY JUDGMENT**

on behalf of 36 IEPs and another 15 related companies. Ex. 139 at –3954-3955. Mr. Smith

indicated he initially discussed the proposal with Jim Chadwick (USASF) who advised Mr.

Smith to send it to the USASF SC, which included Brian Elza (Varsity). *Id*. Mr. Smith explained

that there were many event producers that are "just blocked by the rules of 200 miles and 30 days

but want to participate in the process of giving bids to an Elite Championship." *Id*. Mr. Smith

explained the proposal as follows:

> The USASF is our governing body and should host the ultimate event for all levels
> like they do Worlds levels 5 & 6. They [the USASF] are not an EP but they are our
> governing body. We want the event staff to rotate and show more balance. Ex. 139
> at –3954.

The proposal included, among other things, that each event producer would only be

allowed to award a single Worlds bid. While the event would be managed by USASF, staffing of

the event would rotate among three groups (IEPs, JAM Brands, and Varsity). Ex. 187 at -3956-

58. The USASF SC failed to act on this proposal. Within a few months of this proposal being

submitted, Varsity acquired JAM Brands, which gave it a majority share of seats on the USASF

Sanctioning Committee. Ex. 1 [Netz Rep.] at 96.

USASF's failure to act to protect its members is anti-competitive in itself. *See, e.g.*, *Esco*

*Corp. v. United States*, 340 F.2d 1000, 1008 (9th Cir. 1965) ("Thus not only action, but even a

lack of action, may be enough from which to infer a combination or conspiracy.").

## III.  USASF's Acts Were Overt and Its Intentions Were Clear

USASF claims that Plaintiffs must show that USASF had the "specific intent" to

conspire. ECF No. 469 at 10-13. While Plaintiffs disagree that this is correct, analyzed under a

"conspiracy to monopolize" standard, overt acts, specific intent, and injury are shown. USASF's

overt acts of conspiracy with Varsity and Jeff Webb are explicit. *See* PSOF, ¶¶ 131-147. As

described herein, there is ample evidence to show that USASF specifically intended to help

Varsity willfully acquire, maintain, and abuse its market power to foreclose competition so that

all Defendants could profit. The evidence shows they did profit from the injury that was caused.

*See* PSOF, ¶ 42, 196.

**PLAINTIFFS' OPPOSITION TO DEFENDANT U.S. ALL STAR FEDERATION'S MOTION FOR**
**SUMMARY JUDGMENT**

## IV.   Each Defendant in a Conspiracy does not Need to Participate in All Acts

USASF claims that Plaintiffs cannot show overt acts by USASF that relate to Cheer Camps (or the specific intent to harm Varsity's Cheer Camp rivals) because USASF was the governing body for All Star Cheer and not School Cheer. ECF No. 469 at 10-14. There are several reasons why this argument fails and has no bearing on summary judgment.

First, it is well-settled that a defendant need not participate in every aspect of a conspiracy – one act in furtherance is enough. *See Arbitron Co. v. Tropicana Prod. Sales, Inc.*, No. 91 CIV. 3697 (PKL), 1993 WL 138965, at *9 (S.D.N.Y. Apr. 28, 1993) ("To state a claim for conspiracy to monopolize, a claimant must allege . . . the commission of at least one act in furtherance of the conspiracy.") (citations omitted); *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 634 (9th Cir. 2018) ("Nor must the government show that each defendant or all defendants must have participated in each act or transaction.") (citation and internal quotation marks omitted). Second, under joint and several liability, USASF is equally liable for the acts of its co-conspirators, making any one Defendant's anticompetitive conduct as to Cheer Camps attributable to USASF as if it had committed the act itself. *In re Glumetza Antitrust Litig.*, No. C 19-05822 WHA, 2021 WL 1817092, at *17 (N.D. Cal. May 6, 2021) ("[A]ctions in furtherance of a conspiracy are imputed to all involved until its purpose has been achieved or abandoned.") (internal citations omitted); *see also Arandell Corp.* 900 F.3d at 634 ("Involvement in but two of ten allegedly conspirational [sic] situations does not absolve [a defendant] from participation in the entire conspiracy if its involvement in the two was unlawful and knowingly and purposely performed.") (internal citations omitted). Third, in conspiracy cases, evidence is considered as a whole. *See Le Page's, Inc. v. 3M,* 324 F.3d 141, 162 (3d Cir. 2003) ("The relevant inquiry is the anticompetitive effect of [the defendant's] exclusionary practices considered together."). Finally, as Plaintiffs have explained, the cheer markets were intertwined, and Varsity dominated the entire ecosystem. PSOF, ¶¶81-94. USASF's conspiratorial acts helped Varsity willfully acquire and abuse its market power across the entire Varsity ecosystem, and USASF and its executives

profited from such abuse across the three relevant markets. *Id.*, ¶¶42, 194-201.

## V.   Plaintiffs Are Not Required to Parse Effects by Defendant

Plaintiffs are not required, as USASF argues (ECF No. 469 at 10-14), to isolate the price effects that resulted from the conspiracy with USASF from other anticompetitive conduct by Varsity. *See In re Se. Milk Antitrust Litig.,* 739 F.3d 262, 286 (6th Cir.2014); *see also In re Cardizem CD Antitrust Litig.*, 105 F.Supp.2d 618, 649 (E.D. Mich.2000) ("If there is sufficient evidence in the record to support an inference of causation between the antitrust violation and the injury suffered, the ultimate conclusion as to what that evidence proves is for the jury*")*; *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 787 (7th Cir.1999) ("[Plaintiffs] did not…as the defendant manufacturers rather absurdly argue, have to exclude all possibility that the manufacturers' price discrimination was unilateral rather than collusive. That would imply that the plaintiff in an antitrust case must prove a violation of the antitrust laws not by a preponderance of the evidence, not even by proof beyond a reasonable doubt. . . but to a 100 percent certainty, since any lesser degree of certitude would leave a possibility that the defendant was innocent.").

## VI.   There Is No Competitive Justification for USASF's Conduct

USASF's conspiratorial acts and participation in the exclusionary scheme were overt and intentional. PSOF, ¶¶114, 131-147. However, should the Court apply the rule of reason standard, the evidence of anticompetitive conduct clearly outweighs any procompetitive justifications USASF  attempts to put forth. USASF claims it made its rules and acted in the name of budgets, safety, and looking out for the best interests of its members. ECF No. 469 at 10-14. Yet, USASF has presented nothing to support its excuse other than boilerplate language and its own public relations statements about its overall mission. On the other hand, Plaintiffs present a mountain of evidence that <u>explicitly</u> shows that the anticompetitive nature and intent of USASF's conduct was to further Varsity's market power and to foreclose its rivals. *See* PSOF, ¶¶114, 131-147. Where a governing body or standard setting organization is corrupted, as USASF is here, such

**PLAINTIFFS' OPPOSITION TO DEFENDANT U.S. ALL STAR FEDERATION'S MOTION FOR
SUMMARY JUDGMENT**

behavior is anticompetitive and cannot be shown to be for any independent purpose. *See e.g., Brookins*, 219 F.3d at 854 (if decisions of rule-making body are corrupted by coercion by competitors of the disadvantaged supplier, its decisions are anticompetitive); *Hydrolevel*, 456 U.S. at 1939-1945 (Defendant's standard-setting organization violated antitrust laws where it was influenced by Defendant). Here, USASF's acts in furtherance of the conspiracy cannot be justified on any procompetitive grounds. *See* PSOF, ¶¶114, 131-147, 204-210. To the extent there is any doubt, there are genuine issues of material fact that should go to a jury.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny USASF's request for summary judgment.

**PLAINTIFFS' OPPOSITION TO DEFENDANT U.S. ALL STAR FEDERATION'S MOTION FOR
SUMMARY JUDGMENT**

Dated: September 15, 2023

Respectfully submitted,

By:_____/s/ Joseph R. Saveri_____
              Joseph R. Saveri

Joseph R. Saveri*
Steven N. Williams*
Ronnie Seidel Spiegel*+
Kevin E. Rayhill*
Elissa A. Buchanan*
David Seidel*
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
rspiegel@saverilawfirm.com
krayhill@saverilawfirm.com
eabuchanan@saverilawfirm.com
dseidel@saverilawfirm.com

Van Turner Jr. (TN Bar No. 22603)
**TURNER FEILD, PLLC**
2650 Thousand Oaks Blvd., Suite 2325
Memphis, Tennessee 38118
Telephone: (901) 290-6610
Facsimile: (901) 290-6611
VTurner@TurnerFeildLaw.com

Richard M. Paul III*
Ashlea Schwarz*
**PAUL LLP**
601 Walnut, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
rick@paulllp.com
ashlea@paulllp.com

Jason S. Hartley*
**HARTLEY LLP**
101 West Broadway, Suite 820
San Diego, CA 92101
Telephone: (619) 400-5822
hartley@hartleyllp.com

Daniel E. Gustafson*
Daniel C. Hedlund*
Daniel J. Nordin*
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com

* Admitted *pro hac vice*

+Located in Washington State

*Attorneys for Individual and
Representative Plaintiffs*