# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| **JESSICA JONES** and **CHRISTINA LORENZEN** on Behalf of Themselves and All Others Similarly Situated, | Case No. 2:20-cv-02892-SHL-tmp |
| **Plaintiffs,** | AMENDED COMPLAINT CLASS ACTION |
| v. | **JURY DEMAND** |
| **VARSITY BRANDS, LLC; VARSITY SPIRIT, LLC; VARSITY SPIRIT FASHION & SUPPLIES, LLC; U.S. ALL STAR FEDERATION, INC.; JEFF WEBB; CHARLESBANK CAPITAL PARTNERS LLC; CHARLESBANK EQUITY FUND VII, LIMITED PARTNERSHIP; CHARLESBANK EQUITY FUND VIII, LIMITED PARTNERSHIP; CHARLESBANK EQUITY FUND IX, LIMITED PARTNERSHIP; BAIN CAPITAL PRIVATE EQUITY, LP; BAIN CAPITAL FUND XII, L.P.; BAIN CAPITAL FUND (DE) XII, L.P.; and BAIN CAPITAL FUND (LUX) XII, SCSP,** | |
| **Defendants.** | |

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ...................................................................1

II.     JURISDICTION AND VENUE.............................................................2

III.    PARTIES ................................................................................................3

IV.     AGENTS & CO-CONSPIRATORS ..................................................11

V.      CLASS ALLEGATIONS ....................................................................12

VI.     INTERSTATE TRADE & COMMERCE...........................................16

VII.    FACTUAL ALLEGATIONS...............................................................16

        A.      Background .............................................................................16

                1.      About Competitive Cheer ............................................16

                2.      Cheer Apparel ..............................................................20

                3.      Cheer Camp...................................................................21

                4.      Varsity ..........................................................................22

        B.      Varsity Engaged in a Scheme to Exclude Rivals and Acquire, Enhance,
                and Maintain Monopoly Power in the Relevant Markets. ...................................39

                1.      Elements of Varsity's Exclusionary Scheme.............................40

                2.      Varsity and USASF Created Competition Rules That Deny
                        Potential Competitors a Foothold in the Industry. ..................42

                3.      Varsity Uses Exclusive Agreements with All-Star Gyms and
                        Schools to Foreclose Access to the Relevant Markets...........................45

                4.      Varsity Forecloses Access to the Cheer Apparel Market. ......................48

                5.      Varsity Leverages Its Monopoly Power in the Cheer
                        Competition Market to Foreclose Competition in the Cheer
                        Camp Market.................................................................49

                6.      Varsity Counter-Programmed Rivals' Competitions...............................50

        C.      Varsity's Monopoly Power in the Relevant Markets ...........................................52

                1.      Monopoly Power in the Cheer Competition Market (the
                        Primary Market)...........................................................52

                2.      Monopoly Power in the Cheer Apparel Market (Related
                        Market)..........................................................................56

                3.      Monopoly Power in the Cheer Camp Market (Related Market).............60

VIII.   PLAINTIFFS HAVE BEEN HARMED AND SUFFERED ANTITRUST INJURY AS A DIRECT AND PROXIMATE RESULT OF DEFENDANTS' UNLAWFUL ACTIONS. ...................................................................................................................62

     A.   Varsity Charges Parents Monopoly Rents in Related Markets. ...........................63

     B.   The Exclusionary Scheme Caused Anticompetitive Effects in the Relevant Markets Without Procompetitive Benefits. ..........................................65

IX.   CLAIMS FOR RELIEF ....................................................................66

AMENDED COMPLAINT CLASS ACTION

Plaintiffs Jessica Jones and Christina Lorenzen ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Defendants Varsity Brands, LLC ("Varsity Brands"); Varsity Spirit, LLC ("Varsity Spirit"); Varsity Spirit Fashion & Supplies, LLC ("Varsity Spirit Fashion") (collectively with Varsity Brands and Varsity Spirit, "Varsity" or the "Varsity Defendants"); U.S. All Star Federation, Inc. ("USASF"); Jeff Webb; Charlesbank Capital Partners LLC ("Charlesbank"); Charlesbank Equity Fund VII, Limited Partnership ("Charlesbank Fund VII"); Charlesbank Equity Fund VIII, Limited Partnership ("Charlesbank Fund VIII"); Charlesbank Equity Fund IX, Limited Partnership ("Charlesbank Fund IX") (collectively with Charlesbank Funds VII and VIII, the "Charlesbank Funds") (together with Charlesbank, the "Charlesbank Defendants"); and Bain Capital Private Equity, LP ("Bain" or "Bain Capital"); Bain Capital Fund XII, L.P., Bain Capital Fund (DE) XII, L.P., and Bain Capital Fund (Lux) XII, SCSp (collectively the "Bain Funds" or "Bain Fund XII") (together with Bain, the "Bain Defendants") (together with Varsity, USASF, Jeff Webb and the Charlesbank Defendants, "Defendants") and allege as follows:

## I.   NATURE OF THE ACTION

1.     Acting in concert, Defendants Varsity, USASF, Jeff Webb, Bain, Charlesbank and their co-conspirators conspired to raise, fix and stabilize the prices charged associated with Competitive Cheer. Defendants did so by forming a scheme to create an illegal monopoly and to dominate Competitive Cheer in the United States (the "Scheme," "Exclusionary Scheme," or "Challenged Conduct"). Defendants accomplished this through the acts detailed below. The Scheme continues today. As a result, cheer athletes, together with their parents, friends, and family have been overcharged by Defendants. Defendants have obtained hundreds of millions of dollars in supracompetitive illegal profits.

2.     Competitive Cheer is a sport in which teams of athletes develop routines combining tumbling, stunting, pyramids, and dance. The teams are typically affiliated with a private gym or with a school. Teams compete against one another in Cheer Competitions. Rule-

making organizations such as USASF set the rules and regulations for Cheer Competitions, including rules about the apparel athletes can wear in Cheer Competitions.

3.      Varsity has monopoly power in the market for Cheer Competitions, and it controls the USASF and all other rule-making organizations governing the sport of Competitive Cheer. Varsity acquired its monopoly through a systematic program of acquiring its rivals and using its dominant market position and its control of the rule-making organizations to create barriers to foreclose competition in the Cheer Competition Market.

4.      Varsity also manufactures and sells the apparel, accessories, and equipment athletes are required to use in Cheer Competitions and at practices. Varsity has acquired its largest competitors in the Cheer Apparel Market and leveraged its dominant position in the Cheer Competition Market to acquire, enhance, and maintain monopoly power in the Cheer Apparel Market.

5.      Competitive Cheer is a year-round sport. After a competition season that roughly corresponds with the school year, cheer teams attend camps where they work on their skills and develop their routines. Here again, Varsity has leveraged its power in the Cheer Competition Market to acquire, enhance, and maintain monopoly power in the Cheer Camp Market.

6.      As a direct and proximate result of Varsity's unlawful and anticompetitive Exclusionary Scheme, Plaintiffs and the members of the Classes (defined below) have indirectly paid higher prices for Cheer Competitions, Cheer Apparel, and Cheer Camps, as well as related goods and services, than they would have paid in a competitive marketplace absent the Exclusionary Scheme, and have thereby suffered, and continue to suffer, antitrust injury.

## II.     JURISDICTION AND VENUE

7.      The Court has jurisdiction over Plaintiffs' claim for injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), 1337(a), and 1367.

8.      This Court has personal jurisdiction over Defendants because they purposefully directed their business activities toward this jurisdiction and had substantial contacts with this

jurisdiction, and because Plaintiffs' claims for relief arise from and relate to illegal acts committed by Defendants within this jurisdiction. Plaintiffs paid unlawful overcharges to Varsity and suffered antitrust injury within this jurisdiction.

9.      Venue is appropriate within this District under 28 U.S.C. §1391 because, at all relevant times, Defendants transacted business within this District, and the interstate trade and commerce described hereinafter was and is carried out, in substantial part, in this District.

10.      Defendants engaged in conduct inside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

11.      Defendants' activities were within the flow of, and were intended to and did have a substantial effect on, interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

12.      By reason of the unlawful activities hereinafter alleged, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and the geographically dispersed Class members. Defendants, directly and through their agents, engaged in activities affecting all states, to obtain and maintain monopolistic power in the Relevant Markets and charge supracompetitive prices to Plaintiffs and the Classes for Cheer Competitions, Cheer Apparel and Cheer Camps, unreasonably restrained trade, and adversely affected the above-described markets.

## III.    PARTIES

### A.  Plaintiffs

13.      Plaintiff Jessica Jones is the parent of two Competitive Cheer Athletes who were members of All-Star Gyms. During the Class Period, Ms. Jones indirectly paid Varsity for enrollment in Cheer Competitions and indirectly purchased Cheer Apparel manufactured and sold by Varsity. Ms. Jones paid artificially inflated prices for goods and services purchased indirectly from Varsity in the Relevant Markets, and thus has suffered economic harm and damages as a direct and proximate result of Defendants' unlawful conduct. At all times relevant

to this litigation, Ms. Jones was and is a citizen and resident of the United States, currently residing in Wichita, Kansas.

14.     Plaintiff Christina Lorenzen is the parent of a Competitive Cheer Athlete who was a member of a school team. During the Class Period, Ms. Lorenzen indirectly paid Varsity for enrollment in Varsity School Competitions and indirectly purchased Cheer Apparel manufactured and sold by Varsity. Ms. Lorenzen paid artificially inflated prices for goods and services purchased indirectly from Varsity in the Relevant Markets, and thus has suffered economic harm and damages as a direct and proximate result of Defendants' unlawful conduct. At all times relevant to this litigation, Ms. Lorenzen was and is a citizen and resident of Berthoud, Colorado.

### B.  Varsity Defendants

15.     Defendant Varsity Brands, LLC—formerly known as Varsity Brands, Inc.— is a Delaware corporation with its principal place of business in Memphis, Tennessee. It is the corporate parent company of Defendants Varsity Spirit, LLC and Varsity Spirit Fashion & Supplies, LLC. At all times relevant to this Complaint, either directly or through the affiliates it wholly owns and/or controls, Varsity Brands (a) organized, promoted, produced, and/or managed Cheer Competitions throughout the United States, including in this District; (b) manufactured, distributed, marketed, and/or sold Cheer Apparel that was sold and purchased throughout the United States, including in this District; and (c) organized, operated, and managed Cheer Camps attended by Competitive Cheer Athletes throughout the United States, including in this District.

16.     Defendant Varsity Spirit LLC—formerly known as Varsity Spirit Corporation—is a Tennessee corporation with its principal place of business in Memphis, Tennessee. At all times relevant to this Complaint, either directly or through the affiliates it wholly owns and/or controls (including Universal Cheerleading Association ("UCA") and National Cheerleading Association ("NCA"), among others), Varsity Brands (a) organized, promoted, produced, and/or managed Cheer Competitions throughout the United States, including in this District; (b) manufactured, distributed, marketed, and/or sold Cheer Apparel that was sold and purchased throughout the

United States, including in this District; and (c) organized, operated, and managed Cheer Camps attended by Competitive Cheer Athletes throughout the United States, including in this District.

17.  Defendant Varsity Spirit Fashion & Supplies Inc. ("Varsity Spirit Fashion") is a Minnesota corporation with its principal place of business in Memphis, Tennessee. At all times relevant to this Complaint, either directly or through the affiliates it wholly owns and/or controls, Varsity Brands: (a) organized, promoted, produced, and/or managed Cheer Competitions throughout the United States, including in this District; and (b) manufactured, distributed, marketed, and/or sold Cheer Apparel that was sold and purchased throughout the United States, including in this District.

**C.  Defendant USASF**

18.  Defendant U.S. All Star Federation, Inc. ("USASF") is a Tennessee non-profit corporation with its principal place of business in Memphis, Tennessee. At all times relevant to this Complaint, USASF, either directly and/or through its affiliates, which it wholly owns and/or controls has: (a) promulgated and/or enforced rules governing Cheer Competitions and, more broadly, Competitive Cheer throughout the United States, including in this District; and (b) organized, promoted, produced, and/or managed Cheer Competitions throughout the United States, including in this District and furthered the goals and purposes of the conspiracy and other anticompetitive activity as set forth herein.

**D.  Defendant Jeff Webb**

19.  Defendant Jeff Webb, a resident of Memphis, Tennessee, is the founder and Chairman of the board of directors of Varsity Brands, LLC. He was Varsity's president until 2017. At all times relevant to this complaint, Mr. Webb exercised control over all decisions about: (a) acquisitions of rival cheerleading event producers, apparel manufacturers and cheer camp providers throughout the United States, including this District; (b) pricing and policies for Cheer Competitions, Cheer Apparel, and Cheer Camps throughout the United States, including this District; and (c) investing in and conspiring with Cheer Competition rule-making organizations throughout the United States, including this District. Through these and other acts

Mr. Webb played a key role in the conception and execution of the alleged unlawful conspiracy as set forth herein.

### E. Charlesbank Defendants

20.     Defendant Charlesbank Capital Partners LLC ("Charlesbank") is a Massachusetts limited partnership with its principal place of business in Boston, Massachusetts. Founded in 1998, Charlesbank is a private equity firm with more than $15 billion of cumulative capital raised since its inception. Charlesbank typically acquires ownership interests in companies with enterprise values of $150 million to $3 billion. Companies in which Charlesbank acquires an ownership stake are referred to as "portfolio companies." Far from being a passive capital investor, Charlesbank states that it maintains an "intense and regular involvement" in each portfolio company. Charlesbank's targets include privately held companies seeking to accelerate growth through acquisition, facilitate ownership change, or recapitalize their balance sheets.

21.     From 2014 to 2018, Charlesbank and Charlesbank Funds VII and VIII owned Varsity. To carry out its "intense and regular involvement" in the business affairs of Varsity, and in its direction and furtherance of the anticompetitive Exclusionary Scheme, Charlesbank used and continues to use a complex maze of related Charlesbank entities, including investment funds which operate as limited partnerships. Among other things, Charlesbank used and continues to use this maze to conceal its involvement in and avoid responsibility for the Exclusionary Scheme.

22.     Defendant Charlesbank Equity Fund VII, Limited Partnership ("Charlesbank Fund VII") is a Massachusetts limited partnership with its principal place of business in Boston, Massachusetts.[1] Charlesbank Fund VII has held an ownership interest in Varsity since 2014.

---

[1] Technically, Charlesbank Fund VII is comprised of Defendant Charlesbank Equity Fund VII, Limited Partnership, and three affiliated funds: Charlesbank Equity Coinvestment Fund VII, Limited Partnership; CB Parallel Fund VII, Limited Partnership; and CB Offshore Equity Fund VII, L.P. The same entity, Charlesbank Equity Fund VII GP, Limited Partnership, is either the direct or indirect general partner of Charlesbank Fund VII and each of its affiliates, all of which are advised and controlled by Charlesbank and/or Charlesbank principals and acted as a unit in furtherance of the Exclusionary Scheme.

23.     Defendant Charlesbank Equity Fund VIII, Limited Partnership ("Charlesbank Fund VIII") is a Massachusetts limited partnership with its principal place of business in Boston, Massachusetts.[2] Charlesbank Fund VIII has held an ownership interest in Varsity since 2014.

24.     Defendant Charlesbank Equity Fund IX, Limited Partnership ("Charlesbank Fund IX") is a Massachusetts limited partnership with its principal place of business in Boston, Massachusetts.[3] Charlesbank Fund IX has held an ownership interest in Varsity since 2018.

25.     At all relevant times, Charlesbank controlled the Charlesbank Funds and their affiliates through interlocking directors, officers and principals, including but not limited to

███████████████████████████████████████████████████████████

███████████████████████████████████████[4] Each of these individuals were and/or are actively involved in the management and operations of Varsity.

26.     The Charlesbank Defendants operate as a common enterprise and single economic unit. They use the same office space and principal place of business (i.e., 200 Clarendon Street, 54th Floor, Boston, MA 02116). Mail sent to the any of the Charlesbank Funds is directed to the same address "c/o Charlesbank Capital Partners." Control and management of the Charlesbank

---

[2] Charlesbank Fund VIII is comprised of Defendant Charlesbank Equity Fund VIII, Limited Partnership, and three affiliated funds: Charlesbank Equity Coinvestment Fund VIII, Limited Partnership; CB Offshore Equity Fund VIII, L.P.; and CB Associates Fund VIII, Limited Partnership. Charlesbank is the general partner of CB Associates Fund VIII, Limited Partnership. A single entity, Charlesbank Equity Fund VIII GP, Limited Partnership, is the general partner of Charlesbank Fund VIII and Charlesbank Equity Coinvestment Fund VIII, Limited Partnership. Also, Charlesbank Fund VIII and each of its affiliates are advised and controlled by Charlesbank and/or Charlesbank principals and acted as a unit in furtherance of the Exclusionary Scheme.

[3] Charlesbank Fund IX is comprised of Defendant Charlesbank Equity Fund IX, Limited Partnership and three affiliated funds: CB Offshore Equity Fund IX, Limited Partnership; Charlesbank Executives Fund IX, Limited Partnership; and Charlesbank Associates Fund IX, Limited Partnership. A single entity, Charlesbank Equity Fund IX GP, Limited Partnership, is either the direct or indirect general partner of Charlesbank Fund IX and each of its affiliates, all of which are advised and controlled by Charlesbank and/or Charlesbank principals and acted as a unit in furtherance of the Exclusionary Scheme. .

[4] ████████████████████████████████████████████████████.

Defendants is interlocking and interconnected. For example, Charlesbank is either the general partner or sole member of the general partners of the Charlesbank Funds. As such, Charlesbank is effectively and as a matter of law the general partner of each of the Charlesbank Funds, which are consequently controlled by "managing directors" of Charlesbank.[5] In addition to their active participation in the control mechanisms of the Charlesbank Funds, ████████████████

████████████████████████████████████████████████

████████████████████████████████████

27.     From 2014 to 2018, Charlesbank and Charlesbank Funds VII and VIII conspired with Varsity, USASF and/or Jeff Webb to acquire rival cheerleading event producers, cheer apparel manufacturers, and cheer camp providers throughout the United States, including this District. Acting in concert with one another, and with other members of the Exclusionary Scheme, Charlesbank and Charlesbank Funds VII and VIII committed overt acts in furtherance of the Exclusionary Scheme. Charlesbank and Charlesbank Funds VII and VIII provided funding to enhance, extend, and ensure Varsity Brand's monopoly power and obtained financial rewards from having done so.

28.     Since 2018, after the sale to Bain, the Charlesbank Defendants have maintained an ownership interest in Varsity as its largest minority shareholder, owning approximately 18% of Varsity. Since 2018, Charlesbank Defendants have continued to participate in the Exclusionary Scheme as set forth herein.



[5]

### F.  Bain Defendants

29.    Bain Capital Private Equity, LP ("Bain" or "Bain Capital") is a Massachusetts limited partnership, with its principal place of business in Boston, Massachusetts. Founded in 1984, Bain is a private equity firm with approximately $175 billion in assets under management. Companies in which Bain acquires an ownership stake are referred to as "portfolio companies." Far from being a passive capital investor, Bain pioneered a "consulting-based approach" to private equity investing, partnering closely with management teams of its portfolio companies, including but not limited to active involvement in the day-to-day operations and decision making of its portfolio companies. Collectively, more than 10% of Bain's private equity funds' commitments come from its own professionals, including partners and managing directors, which is far more than industry convention.

30.    The Bain Defendants have owned Varsity since 2018. To carry out its business with respect to Varsity, Bain uses a complex maze of related entities, including investment funds which operate as limited partnerships.

31.    Defendant Bain Capital Fund XII, L.P. is a Cayman Islands limited partnership with its principal place of business in Boston, Massachusetts.

32.    Defendant Bain Capital Fund (DE) XII, L.P. is a Delaware limited partnership with its principal place of business in Boston, Massachusetts.

33.    Defendant Bain Capital Fund (Lux) XII, SCSp is a Luxembourg special limited partnership with its headquarters in Boston, Massachusetts.

34.    Defendants Bain Capital Fund XII, L.P., Bain Capital Fund (DE) XII, L.P., and Bain Capital Fund (Lux) XII, SCSp (collectively the "Bain Funds" or "Bain Fund XII") have held a majority controlling ownership interest in Varsity since 2018.[6] At all relevant times, Bain controlled Bain Fund XII and its affiliates.

---

[6] In addition to the named defendants, Bain Fund XII also includes BCIP Associates V, LP and BCIP Associates V-B, LP. These affiliated funds are Delaware limited partnerships, which, until March 2023, shared headquarters with the Bain Defendants in Boston, Massachusetts.

35.     At all relevant times, Bain controlled the Bain Funds and their affiliates through interlocking directors, officers and principals, including ███████████████████████ ██████████████████████, who at various times simultaneously served as directors and officers of Varsity entities. Each of these individuals were and/or are actively involved in the management and operations of Varsity.

36.     The Bain Defendants operate as a common enterprise and single economic unit. They use the same office space for their headquarters (i.e., 200 Clarendon Street, Boston, MA 02116), and mail sent to Bain Fund XII is directed to the same address "c/o Bain Capital Private Equity, LP." Control and management of the Bain Defendants is interlocking and interconnected. ████████████████████████████████████████████████ ██████████████████████████████████████████████████ █████████████████████████████████████████████████████ ███████████████████████[7] As such, Bain is effectively and as a matter of law the general partner of Bain Fund XII, which is consequently controlled by Bain's principals.[8] In addition to their active participation in Bain Fund XII's control mechanisms, ███████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████

---

[7] In a March 31, 2023, SEC filing, Bain states that Bain Capital Investors, LLC ("BCI") is the "General Partner or serves in a similar capacity for of [sic] each of the General Partners" of Bain's funds. ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ █████████████████████████████████████████████████ █████████████████████████████

[8] ███████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████

37.     The Bain Defendants purchased Varsity in 2018 to obtain the benefits of Varsity's monopoly power in the Cheer Competitions, Cheer Apparel, and Cheer Camps markets throughout the United States, and in this District. The Bain Defendants provided funding to enhance, extend, and protect Varsity Brands' monopoly power and obtained financial rewards and benefits from having done so and continue to do so as forth herein.

## IV.   AGENTS & CO-CONSPIRATORS

38.     The anticompetitive and unlawful acts alleged against Defendants in this Complaint were authorized, ordered, or performed by their officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction or control of Defendants' business or affairs.

39.     The officers, agents, employees, representatives, or shareholders operated under the explicit and apparent authority of their principals. As set forth in detail herein, the agents held themselves out as acting for or on behalf of their respective principals. The agents acted within the scope of their explicit and apparent authority, binding their respective principals.

40.     Each Defendant, and its respective subsidiaries, affiliates and agents operated as a single unified entity.

41.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

42.     Individuals alleged to have engaged in misconduct in violation of the laws listed herein are alleged to have done so on behalf of all members of their corporate family, i.e., Varsity. Individuals within the companies and customers did not know or did not distinguish between the corporate affiliations of different individuals. Varsity Brands, Varsity Spirit, and Varsity Spirit Fashion all affirmatively and collectively represent themselves as one corporate

family, rather than separate subsidiaries and parents. For instance, and without limitation, the Varsity Brands website states "WE ARE…Varsity Spirit."

43.    Various persons, businesses, or fictitious persons not named as Defendants herein participated as co-conspirators in the Exclusionary Scheme alleged herein and may have performed acts and made statements in furtherance thereof. For example, various businesses, through the aid or assistance of Varsity, promoted Varsity-affiliated activities and earned substantial income from such activities, with the knowledge, support and encouragement of Varsity and other co-conspirators. Plaintiffs reserve the right to name some or all of these persons as defendants at a later date.

## V.    CLASS ALLEGATIONS

44.    Plaintiffs bring this action on behalf of themselves, under Federal Rule of Civil Procedure 23(a), (b)(1), and (b)(2), as representatives of a class of indirect purchasers seeking injunctive relief ("Injunctive Relief Class") defined as follows:

> All natural persons and entities in the United States that indirectly paid Varsity or any Varsity subsidiary or affiliate, from December 10, 2016, until the continuing Exclusionary Scheme alleged herein ends (the "Class Period") for: (a) registration, entrance, or other fees and expenses associated with participation in one or more Varsity Cheer Competitions, including registration fees to USASF; (b) Varsity Cheer Apparel; (c) Varsity Cheer Camp Fees; or (d) accommodations at one or more Varsity Cheer Competitions, including registration fees to USASF; (b) Varsity Cheer Apparel; or (c) Varsity Cheer Camp Fees.

45.    Plaintiffs also bring this action under Federal Rules of Civil Procedure 23(a) and (b)(3), as representatives of a nationwide class seeking damages for violations of Tenn. Code Ann. §§ 47-25-101, *et seq*., ("Nationwide Damages Class") defined as follows:

> All natural persons and entities in the United States that indirectly paid Varsity or any Varsity subsidiary or affiliate, from December 10, 2016, until the continuing Exclusionary Scheme alleged herein ends (the "Class Period") for: (a) registration, entrance, or other fees and expenses associated with participation in one or more Varsity Cheer Competitions; (b) Varsity Cheer Apparel; (c) Varsity Cheer

Camp Fees; or (d) accommodations at one or more Varsity Cheer Competitions.

46.     In the alternative, Plaintiffs also bring this action under Federal Rules of Civil Procedure 23(a) and (b)(3), as representatives of a class seeking damages for violations of various state antitrust and consumer protection laws ("State Law Damages Class") defined as follows:

> All natural persons and entities in the United States that indirectly paid Varsity or any Varsity subsidiary or affiliate, from December 10, 2016, until the continuing Exclusionary Scheme alleged herein ends (the "Class Period") for: (a) registration, entrance, or other fees and expenses associated with participation in one or more Varsity Cheer Competitions; (b) Varsity Cheer Apparel; (c) Varsity Cheer Camp Fees; or (d) accommodations at one or more Varsity Cheer Competitions, in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, Washington, West Virginia, and Wisconsin.

47.     Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, officers, executives, and employees; defendants' attorneys in this case, federal government entities and instrumentalities, states or their subdivisions, and all judges and jurors assigned to this case.

48.     The members of the Classes are so numerous and geographically dispersed throughout the United States that joinder of all members is impracticable. Moreover, given the costs of complex antitrust litigation, it would be uneconomical for many plaintiffs to join their individual claims.

49.     Plaintiffs' claims are typical of the members of the Classes. Plaintiffs and all members of the Classes were injured by the same wrongful conduct by Defendants. Defendants' anticompetitive conduct deprived the members of the Classes of the benefits of competition from less expensive competitions, apparel, equipment, camps, insurance and accommodations, causing

them to pay artificially-inflate supracompetitive prices in the Relevant Markets. Although the precise number of such individuals is unknown to Plaintiffs, Plaintiffs believe that the number of Class members is, at minimum, in the thousands, and that the members reside or are located throughout the United States, including in this District.

50.    Plaintiffs will fairly and adequately protect and represent the interests of the Classes. The interests of the Plaintiffs are aligned with, and not antagonistic to, those of the other Class members.

51.    Common questions of law and fact exist as to all members of the Classes. Defendants' anticompetitive Exclusionary Scheme commonly implicated and was generally applicable to all the Class members, thereby making class-wide adjudication and relief appropriate. Such questions of law and fact common to the Class include, but are not limited to:

(a)    whether Defendants engaged in a conspiracy in violation of the antitrust laws;

(b)    whether the markets for Cheer Competitions, Cheer Apparel, and Cheer Camps are appropriate relevant markets for analyzing the claims in this case;

(c)    whether the relevant geographic market is the United States;

(d)    whether Varsity possesses monopoly power in the Relevant Markets;

(e)    whether Varsity willfully acquired, maintained, and/or enhanced monopoly power in the Relevant Markets;

(f)    whether Varsity and USASF conspired to assist Varsity in maintaining and/or enhancing dominance in the Relevant Markets;

(g)    whether Varsity and USASF engaged in overt acts furthering their conspiracy to maintain and enhance Varsity's dominance in the Relevant Markets;

(h)    whether Defendants engaged in unlawful exclusionary conduct to impair the opportunities of actual or potential rivals in the Relevant Markets and thereby foreclosed substantial competition in those markets;

(i)      whether Defendants' Exclusionary Scheme maintained or enhanced Varsity's monopoly power in one or more of the Relevant Markets;

(j)      whether Defendants engaged in unfair methods of competition, and unfair and deceptive acts, in violation of state consumer protection laws;

(k)      whether Defendants' Exclusionary Scheme had anticompetitive effects in one or more of the Relevant Markets;

(l)      whether Defendants' actions alleged herein caused injury to Plaintiffs and the Class members by causing them to pay artificially inflated prices in the Relevant Markets during the Class Period;

(m)      the appropriate measure of damages; and

(n)      the propriety of declaratory and injunctive relief.

52.      Plaintiffs are more than adequate representatives of the Classes, and their chosen class counsel (the undersigned) are more than adequate attorneys. Plaintiffs have the incentive, and are committed to prosecuting this action, for the benefit of the Classes. Plaintiffs have no interests that are antagonistic to those of the Classes. Plaintiffs have retained counsel highly experienced in antitrust and class action litigation.

53.      Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

54.      Plaintiffs know of no difficulty to be encountered in the maintenance of this action that

would preclude its maintenance as a class action.

## VI.   INTERSTATE TRADE & COMMERCE

55.   Defendants' anticompetitive and unlawful conduct as alleged herein has taken place in and affected the continuous flow of interstate trade and commerce in the United States by:

(a)   organizing, promoting, and managing Varsity Cheer Competitions throughout the United States; and

(b)   manufacturing, distributing, marketing, and selling Varsity Cheer Apparel throughout the United States;

(c)   organizing, promoting and managing Varsity Cheer Camps throughout the United States.

56.   The Challenged Conduct alleged herein affected billions of dollars of commerce during the relevant period. During the Class Period, Varsity controlled approximately 80% of the Cheer Competition Market; 80% of the Cheer Apparel Market and 75% of the Cheer Camp Market. Plaintiffs and the proposed Class members collectively paid billions of dollars to Varsity for All-Star Cheer and School Cheer Competitions, USASF registration fees, Cheer Apparel, and Cheer Camps as well for goods and services in related markets like lodging and insurance. Defendants have inflicted antitrust injury by foreclosing competition by actual and potential rivals and artificially inflating prices paid by Plaintiffs and the Class members, all of whom have been engaged in commerce, in the Relevant Markets, within the Class Period.

## VII.   FACTUAL ALLEGATIONS

### A.   Background

#### 1.   About Competitive Cheer

57.   Competitive Cheer is an activity in which teams of athletes perform routines lasting

2 minutes and 30 seconds that incorporate elements of tumbling, stunting, pyramids, and synchronized dance, set to music. In some competitions, the routines also integrate elements of traditional sideline cheerleading, such as fight songs and motivational cheers. Competitive Cheer

is athletically rigorous and technically challenging. It requires a significant amount of strength, flexibility, endurance, effort, coordination, focus, and cooperative teamwork.

58.   Unlike traditional sideline cheer, in which the participants perform on the sidelines in support of another sport, in Competitive Cheer, the athletes performing the routines are themselves the main event. Competitive Cheer frequently requires a year-round commitment from athletes and their families, with training beginning in the Fall, competitions running through the Winter and Spring, and camps in the Summer.

59.   About 4 million athletes participate in Competitive Cheer. It is an expensive sport. A single season costs between $3,000 and $7,000 per team member. These prices can rise to $20,000 per family, including costs for transportation, lodging, and attendance at Cheer Competitions and Cheer Camps. Competitive Cheer Athletes frequently attend six or more competitions a year.

60.   Competitive Cheer Athletes form teams that participate in Cheer Competitions with other teams. Cheer Competitions take the form of organized tournaments or similar events where teams are judged against one another. Cheer Competitions can be local, regional, or national in scope. For example, there are national tournaments in which teams from across the United States participate. These include the Varsity sponsored UCA, NCA and USA Championships. These are conducted under the auspices of the USASF.

61.   Cheer Competitions are typically one-day or two-day events hosted on weekends, although national championships such as The Summit or the Worlds typically last three to four days. Teams often travel great distances, either regionally or nationally, depending on the event. Competitive Cheer Athletes practice for multiple hours a week, all year long, to perfect their performances for about six of these events each year.

62.   The number of teams that participate in Cheer Competitions can vary from 50 to 500 teams. Varsity alone puts on over 600 Cheer Competitions across the country annually. The events attract some 900,000 participants, including hundreds of teams in the All-Star and School Cheer divisions. Since approximately 1995, Varsity has partnered with Disney and holds at least

seven major Varsity events at Walt Disney World Resort attended by nearly 200,000 Competitive Cheer Athletes and spectators annually. Two-day events tend to have more teams than one-day events, which typically have between 50 and 100 teams. The maximum number of Competitive Cheer Athletes that can participate on one Competitive Cheer Team at a competition depends on the division and age group but can be as high as 38 people.

63.    There are three different Competitive Cheer divisions: (1) All-Star Cheer, in which teams are affiliated with private gyms; (2) School Cheer, in which teams are affiliated with middle schools, high schools, or colleges; and (3) Youth & Recreation Cheer, in which teams are affiliated with a recreational organization such as the YMCA, or have no affiliation at all.[9]

a.    **All-Star Cheer**

64.    In the All-Star Cheer division, athletes join teams that are usually affiliated with a private gym. In All-Star Cheer, athletes' families typically pay monthly or annual fees to the gym, which in turn pays Varsity for entry fees to competitions, uniforms, and other related fees. Varsity controls 90% of the All-Star Cheer Competition Market.

65.    All-Star Cheer Competitions are events at which All-Star Cheer Teams perform time-limited routines composed of tumbling, stunting, pyramids, and synchronized dance, set to music. Tumbling involves gymnastic skills like cartwheels and back handsprings. Stunting refers to a group of two or more individuals that elevate another cheerleader in the air. Pyramids are a form of interconnected stunting that involve a large group. Dance is a portion of a routine that consists of choreographed high-energy dance moves. The routines are performed and scored against other All-Star Cheer Teams at various local, regional, national, and worldwide competitions. All-Star Cheer Competitions involve All-Star Cheer Teams with participants from a wide variety of age groups, from preschool through college.

66.    All-Star Cheer Competitions do not involve sideline cheerleading. They are not sponsored by, or associated with, particular schools, intercollegiate athletics (like the National

---

[9] Varsity controls only 10% of the Youth and Recreation Cheer market. Thus, Plaintiffs are not including the Youth and Recreation Cheer market in this class action.

Collegiate Athletic Association), athletic conferences or similar organizations associated with college sports or amateur athletics. All-Star Cheer Competitions, instead, are organized by All-Star Gyms, which are central to the business. Participants typically compete in divisions defined by the USASF. Participants pay to compete, including fees for events, USASF registration fees, music licensing and insurance. Participants pay substantial sums to Varsity for associated goods and services, as set forth herein.

### b.    School Cheer

67.    In Varsity's School Cheer division, athletes join a team affiliated with middle school, high school, or college. Athletes' families pay participation fees to the school, which in turn pays entry fees and purchases uniforms and equipment from Varsity, among other charges. Varsity controls 70% of the School Cheer Competition Market.

68.    According to parents' associations, School Cheer is "a discipline of cheer that involves athletes in a School setting who cheer in support of other sports, most often football and basketball." According to USA Cheer, the national governing body for competitive cheerleading, school teams perform 2 minute and 30 seconds routines composed of tumbling, stunting, pyramids, and synchronized dance, in addition to elements of traditional sideline cheer such as band chants, fight songs, and motivational cheers. School teams can also compete in sideline Cheer Competitions, where they are judged on their ability to present cheers related to fictitious game situations and on the clarity and energy of their routines.

69.    National Cheerleading Association and Universal Cheer Association, both owned by Varsity, promote School Competitions, Cheer Camps, and national tournaments and championships. Most college teams now attend either NCA or UCA Championships. UCA and NCA also hold the largest middle and high school Nationals in the country.

70.    The costs for School Cheer are also high. Participants—in fact their parents, families and others—must pay for cheer apparel, practice clothes, camps, competitions, which together frequently exceeds several thousands of dollars per year, not including costs for

transportation to and lodging at competitions, which parents also have to pay for separately. Varsity earns substantial income and supracompetitive profits as an intended and foreseeable result.

71.     Varsity exercises near complete control over the organizations that regulate the School Cheer Competition Market. Varsity founded USA Cheer and acquired control of AACCA and has been deeply involved with NFHS, the governing bodies for School Cheer. Varsity owns and controls the preeminent School national championships in NCA and UCA. Varsity founder Jeff Webb, when interviewed, has said that "the idea there was . . . for us to take achievement and spirit and sport, come together and become an extracurricular partner to the schools so that we not only sell products, we use the entrée with the cheerleading and graduation to go in and rebrand the school, help them redefine their mission, to modernize so that more kids are involved."

72.     Many students participate in both All-Star and School Cheer. They participate in School Cheer from August to November. They then participate in All-Star Cheer from November until May after The Summit, Worlds, and UCA and NCA School and All-Star Championships. Some students participate in both School and All-Star Cheer simultaneously.

73.     In 2017, Varsity created the Impact Program to sell rebranding in uniforms and cheer and dance to Junior Highs, High Schools, and Colleges, as well as VIP branding to sell additional products to schools. Under the Impact Program, Varsity supplies schools with signage and other branding merchandise, in exchange for an agreement by the school to attend Varsity Cheer Competitions and purchase Varsity Cheer Apparel.

### 2.    Cheer Apparel

74.     Cheer Apparel is an important requirement of Cheer Competitions. USASF rules govern virtually every detail of what All-Star Cheer Athletes may wear in a competition. Soft-soled shoes—which Varsity manufactures and sells—are required. Skirts, briefs, and shorts must meet inseam guidelines. Exposed midriffs are forbidden for certain age groups, and tops must be

secured over at least one shoulder. Bows cannot be of "excessive size," jewelry is forbidden, and makeup must be "uniform and appropriate."

75.     Varsity-promoted events operate as a showroom and sales platform for Cheer Apparel. Varsity entered the Cheer Apparel Market in 1980. Since then, Varsity has, through its Scheme, gained an 80% share of the Cheer Apparel Market, beginning with its acquisition in 1989 of Varsity Spirit Fashions and Supplies. As part of the Scheme, Varsity has used its monopoly power in the Cheer Competition Market to: (a) cause All-Star Cheer Gyms to enter into exclusive dealing agreements and rebate programs— including Varsity's Family Plan and Network Agreements—which make buying from non-Varsity Cheer Apparel competitors prohibitively expensive; (b) cause School Cheer programs to enter into exclusive agreements with Varsity through its Impact and VIP Branding programs; (c) exclude Cheer Apparel competitors from the merchandise showrooms at their Cheer Competitions; (d) acquire (and often dissolve) Cheer Apparel competitors; and (e) through its influence with the captured USASF, cause the judges to advantage Competitive Cheer Teams that wear Varsity Cheer Apparel.

76.     As one recent article states, "Thanks to an aggressive campaign of acquisitions, rebate plans that make it expensive for gym owners to switch suppliers, and other strategies, Varsity Spirit, the corporation's cheer division, commands north of 80 percent of the uniform market, as estimated by competitors. The company also wields outsize influence in virtually every aspect of the industry, including the camps and—most important—the competitions, which also serve as merchandise showrooms for apparel vendors."

### 3.     Cheer Camp

77.     Regardless of the level at which they participate, Cheer Athletes participate in multi-day overnight "camps" where Cheer Athletes practice Competitive Cheer skills, develop routines and purchase Cheer Apparel ("Cheer Camps"). Cheer Camps, by and large, occur during the Summer. Cheer Athletes pay to participate in Cheer Camp.

78.     Summer Cheer Camps are an integral part of All-Star and School Cheer and Varsity is the dominant player in the market. Varsity's Cheer Camp division is one of its most profitable. Varsity-promoted Cheer Camps operate as a showroom and sales platform for Cheer Apparel and other income streams of the anticompetitive Scheme.

79.     Through its Scheme, Varsity has acquired and maintained control over 75% of the Cheer Camp Market. Varsity is the largest Cheer Camp operator in the world. About 330,000 team athletes attend 4,000 Varsity Cheer Camps each summer. Varsity Brands offers Cheer Camps for all age groups but most prominently for high school and college age athletes.

80.     Varsity offers School, All-Star, and Youth and Rec Cheer Camps, in large part during the Summer months, through its affiliates and assumed names, including: UCA, NCA, United Spirit Association, Cheerleading Techniques Camps, American Cheerleaders Association, Spirit Xpress Cheerleading, American Cheer Power, V!ROC, and Spirit Cheer.

81.     Varsity controls the premier Cheer Camps in the country. When Jeff Webb left NCA and started UCA, Cheer Camps were a large part of its portfolio. Varsity then set about acquiring or driving out its largest competitors, eventually acquiring monopoly power in the Cheer Camp Market.

82.     Varsity acquired United Spirit Association (USA) Cheer Camps in 1994. USA is the largest Summer Cheer Camp promoter in the Western United States, conducting camps primarily in Arizona, Arkansas, California, Colorado, Hawaii, Idaho, Montana, New Mexico, Nevada, Oregon, Texas, Utah, Washington, and Wyoming.

83.     In 1996, Varsity acquired United Special Events, a large California camp promoter.

84.     In 2004, Varsity acquired NCA and its portfolio of camps, which are held across the country.

### 4.     Varsity

85.     Defendant Varsity was founded by Jeffrey Webb in 1974.

86.     Today, Varsity produces over 600 Cheer Competitions in the United States annually in which approximately 900,000 athletes participate each year. Varsity produces the largest and most prestigious tournaments, including several national tournaments that attract more than 20,000 athletes at a time. Varsity is also the largest producer of Cheer Camps in the United States.

87.     Varsity controls 90% of the All-Star Cheer Competition Market and 70% of the School Cheer Competition Market. Varsity is a monopolist that has possessed and continues to possess monopoly power.

88.     Varsity manufactures and sells clothing, shoes, accessories like bows, and equipment (such as backpacks, pom poms, and megaphones) specifically intended for Cheer Athletes to wear and use at practice and in competitions ("Cheer Apparel"). Varsity acquired its monopoly power in the Cheer Apparel and Cheer Competition Markets by acquiring other Cheer Apparel manufacturers, by leveraging its monopoly power and by creating incentives—in the form of rebates for All-Star Gyms and free branding merchandise for schools—to sign exclusive contracts with Varsity. Under these contracts, All-Star Gyms and schools agree to purchase Varsity Cheer Apparel exclusively. Additionally, Varsity has created artificial barriers to entry in the form of competition rules that favor Varsity Cheer Apparel. Varsity Founder Jeff Webb has admitted that competition judges have awarded more points to teams that used Varsity equipment as props. Varsity holds an 80% market share in the Cheer Apparel Market.

89.     Varsity organizes and operates Cheer Camps, which are a requirement to enter most if not all competitions. Approximately 330,000 Cheer Athletes attend Varsity Cheer Camps every year. Varsity is a dominant producer of Cheer Camps. Varsity controls 75% of the Cheer Camp Market.

90.     For Competitive Cheer Athletes and their parents, All-Star Gyms and schools act as gateways to the sport of Competitive Cheer. Parents pay fees and other costs to the All-Star Gyms or schools with which their children's teams are affiliated, and the All-Star Gyms or schools use those fees to set up the teams, select the competitions they will compete in, register

and pay entrance fees for the competitions, purchase uniforms and equipment for the athletes, and frequently select the camps the athletes will attend, among other things. Thus, the parents' fees to the All-Star Gyms and schools indirectly pay for Varsity's artificially inflated prices for general competition fees, USASF registration fees, apparel, camps, lodging and insurance. Varsity earns substantial income and supracompetitive profits as an intended and foreseeable result.

91.     For Varsity and its co-conspirators, on the other hand, All-Star Gyms and schools are the conduits that Varsity uses to gain access to the parents of Competitive Cheer Athletes and to funnel them into the Varsity monopoly. The goal is to obtain the hard-earned money the parents devote to their children's activities and to obtain it at supracompetitive prices. By establishing exclusive relationships with All-Star Gyms and schools, Varsity and its co-conspirators obtain exclusive access to the parents that provide the funding for the income produced in the Relevant Markets.

### a.     A Brief History of Varsity

92.     In 1948, Lawrence Herkimer, a former cheerleader at Southern Methodist University, founded a cheerleading business that he named the National Cheerleaders Association ("NCA"). Herkimer was instrumental in modern day cheer, Herkimer patented pom-poms and created the "Herkie Jump." Under Herkimer, the NCA ran cheer camps and sold sweaters and skirts. At the time, there were no Cheer Competitions, nor did Competitive Cheer exist.

93.     In the late 1960's Jeff Webb, Varsity's founder and former CEO, went to work at the NCA after completing his cheerleading career at the University of Oklahoma. Webb quickly rose the ranks. His view of cheerleading's future differed from Herkimer's. Herkimer explained to Sports Illustrated in 1991 that "[o]ur people are teachers, not showoffs," but Webb "hired hot dogs."

94.     In 1974, Webb left the NCA and took some of Herkimer's top employees with him to form his own cheerleading business, the Universal Cheerleaders Association ("UCA"), which was similar to the NCA but with Webb's own added twists: more focus on gymnastics-like skills and new tournaments created solely for cheer squads.

95.     In 1983, Webb changed the business's name from Universal Cheerleaders Association to Varsity Spirit, Inc. Varsity owns and operates UCA, which continues to be one of Varsity Brands' subsidiaries to this day.

96.     In June 1997, Riddell acquired Varsity Spirit, Inc. and its subsidiaries for $91 million. Jeff Webb, at that time the President and CEO of Varsity, became Vice Chair of the Board of Directors.

97.     Varsity was a publicly traded company between 2001 and 2003.

98.     In 2003, Leonard Green and Partners took Varsity private in a deal valued at $131 million, and changed the name to Varsity Brands, Inc.

99.     In December 2014, Charlesbank and Charlesbank Funds VII and VIII acquired Varsity, including Varsity Brands, Inc. and Varsity Spirit, Inc. for approximately $1.5 billion ("Charlesbank Acquisition" or "2014 Acquisition"). ████████████████████ ███████████████████████████████████ ████████████████

100.     Prior to the 2014 Acquisition, ██████████████████████ ███████████████████████████████ ██████████████████████████ ███████████████████████████████ ███████████████████████████████ ████████████████████████████████ ████████████████████████████████ ██████████████████████████ ████████████████████████████████



101.    To fund the 2014 Acquisition,

██████████████████████████████████████████████████████

████████████████████████

102.   ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████[11]

103.   Between December 2014 and July 2018, Charlesbank and Charlesbank Funds VII and VIII participated in the Exclusionary Scheme. ████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

104.   In or around May 2015, Charlesbank and Charlesbank Funds VII and VIII ████████████████████████████████████████

105.   In or around November 2015, ████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

_____

[10] ███████████████████████████████████████████████████████
█████████████████████

[11] *See, e.g., supra* ¶ 25, n. 4; ¶ 26, n. 5.



Confidential                                                    CB00041045

106.    In or around November 2016, ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████

107.    In or around January 2018, ████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████

108.    In July 2018, Varsity was acquired by the Bain Defendants for approximately $2.9 billion ("Bain Acquisition" or "2018 Acquisition"). ████████████████████████████

████████████████████████████████████████████████████

109.    Prior to the 2018 Acquisition, ████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████



110.    To fund the 2018 Acquisition, ████████████████████████

111.    ████████████████████████████████████████████

AMENDED COMPLAINT CLASS ACTION

██████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

112.   ███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

113.   Since 2018, Bain Defendants have participated in the Exclusionary Scheme and have conducted numerous overt acts in furtherance thereof. █████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████

114.   Since 2018, Charlesbank Defendants have continued to participate in the Exclusionary Scheme and have conducted numerous overt acts in furtherance thereof.

█████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████

115.   In or around June 2020, █████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

---

[13] ████████████████████████████████████████████████████
████████████████

[14] *See generally infra* § VII.B.3.



116.     Subsequent to joining the Exclusionary Scheme, none of the Bain Defendants or Charlesbank Defendants have withdrawn from the Exclusionary Scheme. In fact, their conduct has continued to this day.

117.     In 2018, Varsity agreed with ESPN Wide World of Sports at Walt Disney World Resort to create a venue specially designed for cheerleading and dance competitions. The 8,000 seat, 286,000-square-foot Competitive Cheer complex opened in January 2018, hosting the UCA and UDA College Cheerleading and Dance Team National Championship on January 12-14, 2018. Referring to the new Competitive Cheer facility, Jeff Webb said, "Varsity Spirit invented the modern-day cheerleading and dance competition and we are proud to be the force behind this project, which represents our commitment to providing the very best and safest environment in the world for our athletes and coaches."

**b.      Varsity Has Acquired Monopoly Power in the Cheer Competition Market by Acquiring or Impairing Rival Promoters.**

118.     Varsity did not obtain its market dominance through skill, innovation, or good fortune. For more than fifteen years, and at all times relevant to this litigation, Varsity has pursued an aggressive strategy of acquiring its competitors, with a near-obsessive focus on consolidating market power and acquiring or impairing any potential rivals, resulting in a dominant market share in the Cheer Competition Market. Several times during Varsity's history, it has purchased its largest rivals in the Cheer Competition Market. As one former competitor whose apparel business was acquired by Varsity in 2010—only to be subsequently shut down—put it, "I just think Jeff [Webb] is very driven . . . . There is enough out there for all of us [i.e., Varsity's competitors]. Why make it so difficult? It's like he has to have 100 percent. He can't be happy with just 95 percent."

119.     In 2004, Varsity acquired National Spirit Group, its largest rival at the time. Through the transaction, Varsity acquired Herkimer's National Cheerleaders Association

("NCA"), the Universal Dance Association ("UDA"), and Cheerleader & Danz Apparel. After the merger, Varsity's revenue grew to $244 million that year.

120.    In 2011, Varsity acquired Spirit Festival, another rival that organized the very popular Spirit Fest and Cheer.

121.    In 2012, Varsity acquired Spirit Holdings, which owned CHEERSPORT, CheerLogistics, and Universal Spirit (collectively "Spirit"). At the time. Spirit was one of Varsity's largest competitors—promoting over 30 competitions a year—and CHEERSPORT held a National event in Atlanta that attracted over 900 cheerleading and dance teams from around the United States.

122.    In 2014, Varsity acquired Cheer Limited, one of Varsity's largest rivals. At the time, Cheer Limited produced more than 25 competitions each year, including the Cheer Ltd. Nationals at CANAM and the NCHSAA State High School Cheerleading Championship.

123.    In November 2015, Varsity acquired its largest remaining competitor, The JAM Brands. As one article described it, Varsity's acquisition of The Jam Brands, then "the second-largest event producer[,]" was "one of Varsity's most audacious moves . . . . JAM Brands ran most of the high-profile competitions that Varsity doesn't own. Together, they control roughly 90 percent of the major events, say competitors."

124.    Prior to the acquisition, The JAM Brands was an Independent Event Producer ("IEP") and Varsity's chief competitor. The JAM Brands produced Cheer Competitions that included divisions for high school, college, and All-Star Cheer Teams, as well as recreational divisions. The JAM Brands owned Cheerleaders of America ("COA"), a major IEP in Ohio, and America's Best, an IEP in Texas.

125.    The JAM Brands produced many of the largest and most popular Cheer Competitions in the United States, including The MAJORS, the very popular U.S. Finals, and the JAMFest Cheer Super Nationals, at which over 550 Competitive Cheer Teams competed. Prior to its acquisition, The JAM Brands was a disruptive, aggressive and innovative competitor, introducing new event concepts that competed directly with Varsity's Cheer Competitions and

had the potential of challenging Varsity's dominance. Prior to its acquisition by Varsity, The JAM Brands generally offered free admission to event spectators, many of whom are the parents and other family members of the event participants.

126. In addition, with the acquisition of The JAM Brands, Varsity also gained control over The JAM Brands' board seats on the USASF and the International All Star Federation ("IASF"), solidifying Varsity's control over one of the major sanctioning bodies with respect to Competitive Cheer. As noted below, Varsity used its control over regulating bodies to erect barriers to entry and to foreclose competition in the Relevant Markets.

127. Soon after acquiring The Jam Brands, Varsity sent a letter to All-Star Gym owners, assuring them, "For you as a customer, nothing will change." Yet Varsity increased its registration fees for Cheer Competitions within a year.

128. In 2016-2017, following its acquisition of The JAM brands, Varsity continued to acquire actual or potential competitors in the Cheer Competition Market, including Aloha Productions, Spirit Celebrations, Mardi Gras Spirit, and Team Epic Brands.

### c.      Varsity Has Acquired Monopoly Power in the Cheer Apparel Market by Acquiring or Impairing Rival Promoters.

129. In 2010, Varsity acquired Just Briefs, a cheerleading apparel company and hired its CEO, Tish Reynolds. Soon thereafter, Varsity closed the company. Reynolds admitted that, "[b]asically he [i.e. Jeff Webb] wanted me out the market."

130. In 2012, Varsity acquired BSN for $460 million. At the time, BSN was the largest provider of team uniforms, including those used by participants in Competitive Cheer in the United States. At the time, BSN had a sales staff of over 800 employees. After the transaction, BSN became a wholly owned subsidiary of Varsity. Through this acquisition Varsity became the largest "K-through-Colleges" sales force of Cheer Apparel in the United States.

131. In late 2015, Varsity extended its reach in the Cheer Apparel Market with its purchase of Allgoods, LLC, an apparel company based in Texas that has generated more than $38 million selling custom clothing for thousands of schools and other programs.

132.    Varsity prohibits other Cheer Apparel manufacturers from displaying their merchandise at Varsity Cheer Competitions. As alleged herein, Varsity operates the largest and most prestigious Cheer Competitions in the United States. These events function as market-dominant trade shows, providing a crucial marketing platform for manufacturers of Cheer Apparel with the goal of reaching Cheer Athletes, their target audience. By foreclosing rivals' access to these competitions, Varsity impedes would-be rivals' ability to compete in the Cheer Apparel Market.

   **d.    Varsity Enhances Its Market Dominance by Exercising Near-Complete Control over the Organizations That Set the Rules.**

133.    Varsity pursued a deliberate strategy of controlling the Competitive Cheer industry through its control of organizations that administer and govern Competitive Cheer. Varsity provides those organizations with funding, staffing, and office space. When independent organizations have sprung up, Varsity has acted quickly to bring them under its control either by acquiring them outright or by putting its own executives into positions of power within the organizations.

   **i.    USASF**

134.    In 2003, a group of cheerleading coaches formed an independent 501(c)(3) organization, called the National All-Star Cheerleading Coaches Congress (NACCC), to establish uniform rules for All-Star Cheer. The organization was open to all event producers, coaches and gyms. Through the NACCC, the initial set of universal All-Star cheerleading rules was established.

135.    Sensing a threat to its business and monopoly power, Varsity joined with other promoters to create the USASF in 2003. Varsity provided initial capital to USASF in the form of a $1.8 million interest free loan.

136.    Varsity controlled USASF from its inception. Varsity submitted the original trademark application for the marks "U.S. All Star Federation" and "USASF," listing itself as owner. For at least the first 15 years of its existence, the USASF's offices were located at

Varsity's corporate address, a Varsity representative answered the phone for the USASF, USASF employees were paid directly by Varsity, and Varsity cashed checks issued to the USASF. For the USASF events held at Walt Disney World, all event costs would be billed to Varsity.

137.    Varsity owned the USASF trademarks until 2017. USASF published uniform rules and judging standards for Cheer Competitions. Varsity used the USASF as a means to neutralize the NACCC and extend its control over the Competitive Cheer industry.

138.    In 2005, USASF acquired the NACCC. Under the agreement, NACCC was to become the "rules committee" of USASF in perpetuity. The meeting was run by Jeff Webb in his boardroom in Memphis with no other USASF board members present. Within a few years, Varsity dissolved NACCC. After the demise of NACCC, Varsity, through the USASF controlled rules changes and other decisions.

139.    While USASF was a separate legal entity, USASF was the cat's paw of Varsity: the USASF employees shared offices with Varsity at Varsity's headquarters in Tennessee for many years during the relevant period. Also, during the relevant period, Varsity paid USASF employees.

140.    USASF's bylaws provided, among other things, that a permanent majority of USASF's voting board members are allocated to seven Cheer Competition brands (UCA, CheerSport, NCA, USA, American Cheerleaders Association, Universal Dance Association, and JAMFest). Varsity currently owns all of these brands.

141.    Varsity controls the USASF Board of Directors. The USASF board is empowered to set policy for the USASF. The Board is composed of 13 voting members, one seat each for the seven Cheer Competition producers that started the USASF, the USASF Chairman, a senior USASF staff member, and four program owner members, including the Chairman of the National All Stars Connection. Two USASF board seats are permanent and are held by representatives named by the Chairman of the USASF. As Varsity has acquired more and more of the USASF's founding event producers, it has continued to expand its control of the USASF Board. Since the

AMENDED COMPLAINT CLASS ACTION

acquisition of The JAM Brands and Epic Brands, Varsity has control of 75% of the seats on the Board of Directors. The seats that Varsity does not control do not have voting rights.

142.     In addition, as Varsity has acquired additional Independent Event Producers ("IEPs"), it has gained control of additional seats on the USASF board. By the time it completed its acquisition of Epic Brands in January 2018, the vast majority of the USASF Board of Directors was affiliated with Varsity, more than enough for Varsity to dictate USASF policy.

143.     The USASF's website is located at www.usasf.net, a URL owned by Varsity. Varsity now seeks to conceal its ownership and control of the URL behind the registration of "PERFECT PRIVACY, LLC."

### ii.     Other Regulatory Organizations

144.     In 2003, Varsity entered into an arrangement with the National Federation of State High School Associations ("NFHS"), which sets the rules for many high school sports throughout the United States. Varsity paid approximately $3 million dollars for seven years until 2010 in exchange for the endorsement by NFHS of Varsity's cheerleading and dance championships. Varsity pays NFHS contingent fees based on American Association of Cheerleading Coaches and Administrators ("AACCA") membership and participant increases over an established base level.

145.     In 2007, Varsity established USA Cheer (USA Federation for Sport Cheering) as a nonprofit 501(c)(3) organization. USA Cheer serves All-Star and School Cheer programs. Its objectives are to, "help grow and develop interest and participation in cheer throughout the United States; promote safety and safety education for cheer in the United States; and represent the United States of America in international Cheer Competitions." In 2018, Varsity transferred trademark rights to AACCA and brought it under USA Cheer's umbrella.

146.     By installing itself in the leadership of these and other rule-making organizations, Varsity has been able to exercise control over the Competitive Cheer industry and enhance and maintain its monopoly power in the Relevant Markets.

147.     For example, in 2011, USASF issued a letter to all its 1,200 members informing them that they are not to attend any non-Varsity competition that purports to be a "World/International" or "Worlds" competition except those that are run by ICU or sponsored by Varsity. ICU then issued letters to all of their 101-member federation banning them from entering International Federation of Cheer ("IFC") competitions.

### B. Varsity Engaged in a Scheme to Exclude Rivals and Acquire, Enhance, and Maintain Monopoly Power in the Relevant Markets.

148.     Over the past 15 years, Varsity, under the leadership of Jeff Webb, Charlesbank, Bain Capital, in combination with USASF and other rule-making organizations it controls, has acquired, enhanced, and maintained monopoly power in the Competitive Cheer Market (the "primary market") and the Cheer Apparel Market and Cheer Camp Market (the "related markets"), (collectively with the primary market, the "Relevant Markets") in the United States through an unlawful scheme (the "Scheme," the "Exclusionary Scheme," or the "Challenged Conduct") set forth below.

149.     Jeff Webb is the founder of Varsity and has been actively involved in decisions to acquire rival event producers, apparel manufacturers, and camp providers. Webb was an early investor in cheer governing bodies and played an integral role in setting the policies for cheerleading. Webb has always presented himself as the face of Varsity Brands.

150.     Charlesbank and Charlesbank Funds VII and VIII acquired Varsity in 2014 for approximately $1.5 billion, and with that acquisition and funding, Charlesbank and Charlesbank Funds VII and VIII entrenched and acquired Varsity's monopoly power. After the acquisition, Charlesbank and Charlesbank Funds VII and VIII conspired with Varsity and Webb to consolidate Varsity's market power by acquiring its biggest rivals, acting in furtherance of the Exclusionary Scheme. Charlesbank and the Charlesbank Funds controlled Varsity through their control of its board of directors. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████     As a consequence, Charlesbank and Charlesbank Funds VII and

VIII obtained financial rewards and benefits ████████████████████, when they sold

Varsity to the Bain Defendants for $2.9 billion in 2018. ████████████████████████

████████████████████████████████████████████

████████████████████████████

151.    Bain and the Bain Funds acquired Varsity in 2018. Bain and the Bain Funds were

and are actively involved in the alleged anticompetitive scheme. Bain and the Bain Funds

controlled Varsity through control of its board of directors. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████     In conspiring with Varsity and Jeff Webb, Bain and

the Bain Funds have helped Varsity maintain and enhance its monopoly and ensured that it

continues. Bain has obtained financial rewards and benefits from its involvement in the

exclusionary scheme.

     **1.**    **Elements of Varsity's Exclusionary Scheme**

         **a.**    **Varsity and USASF Created a System of Bids for Admission to National Tournaments as a Means to Funnel Athletes to Its Local and Regional Tournaments.**

152.    To compete in one of Varsity's major Cheer Competitions, teams must receive a

Bid, the vast majority of which can only be awarded by a competition that is owned or controlled

by Varsity. The end-of-season competitions are not just the pinnacle of Competitive Cheer: they

are also huge cheer festivals typically held at attractive locations such as Walt Disney World.

Competitive Cheer Teams aspire to attend one of Varsity's most popular competitions and, as

part of the Scheme, are encouraged to choose Varsity Competitions over those of Varsity's rivals

to improve their chance of getting a Bid. This creates a significant barrier to entry for rival

promoters or new promoters trying to enter the industry.

153.    The monopoly that Varsity has obtained in competitions, provides the company the power and leverage to ensure that new and returning families are paying supracompetitive prices to Varsity in other related markets as well, thus damaging the indirect purchaser class.

154.    In 2004, Varsity introduced the Bid system, through Varsity-controlled USASF. In 2004, USASF hosted the "Worlds" for the first time. At the time, Varsity and USASF agreed that USASF would provide fully paid trips for certain gyms to attend as a method of securing USASF authority and dominance of the Varsity-promoted events.

155.    Under the rules agreed to by Varsity and USASF, Cheer teams must receive a Varsity Bid in order to attend most of Varsity or USASF's Championship competitions. Thus, securing Bids to one of these Varsity-promoted championships and a chance to vie for a "National" title is a primary goal of Competitive Cheer Teams. Teams earn these Bids by attending and succeeding at Varsity owned and operated competitions.

156.    Bids can be fully paid which, as the name implies, means the Competition producer pays the Team's entry fees and all travel and hotel costs. Bids can also be partially paid, which means the Cheer Competition producer pays only a partial amount—typically covering entry fees but not travel or hotel costs. Bids can also be "at-large," which means the team can compete but must pay its own way. Varsity provides local event producers and promoters with the rights to determine how those Bids are awarded. Typically, fully paid are awarded to first place winners of major USASF-sanctioned Cheer Competitions, and partially paid and at-large Bids are awarded to other prominent teams, even if they did not "win" local or regional tournaments.

157.    With respect to World Championships, Varsity and USASF agreed on how participants can gain entry to the tournament to restrict competition and to exclude rivals. Varsity and USASF severely restrict competition in the Cheer Competition Market by limiting the number of Cheer Competitions entitled to provide Bids to Worlds. Of the 42 events providing Bids to the World Championships, Varsity owns 33. USASF also allocates the number of Bids

that each of those 42 Cheer Competitions may award. Through its control of USASF, Varsity event participants receive the vast majority. Varsity controls 80% of Worlds' Bids.

158.    Similarly, Varsity decides which Cheer Competitions may award Bids to The Summit and the U.S. Finals, other important tournaments. Varsity uses its market dominance to restrict competition and to exclude rivals by allocating 100% of The Summit and U.S. Finals Bids to the Cheer Competitions it owns and operates. Varsity holds The Summit a week after The Worlds at Walt Disney World Florida in order to give them the prestige of The Worlds. The Summit is a vehicle to entice parents and gyms to attend Varsity Cheer Competitions in order to have an end of the year championship.

159.    USA Cheer and NFHS govern High School cheer and USA Cheer and the AACCA govern College cheer. Each are controlled by Varsity. Varsity's UCA and NCA hold high school and college championships. Varsity decides which high school and college competitions award Bids to the NCA and UCA National Championships. Where Bids are not a requirement, attendance at Varsity Cheer Camps is. Varsity leverages its market dominance in the School Cheer Competition Market to enhance and maintain its market power in the Cheer Camp Market.

160.    Varsity uses its dominance of the Cheer Competition Market, its control of USASF, and its control of Bids to national championships and other tournaments, combined with the other conduct that is part of the Scheme, to ensure that Competitive Cheer teams will attend Varsity's entry-level Cheer Competitions rather than those owned and produced by Varsity's competitors.

### 2.    Varsity and USASF Created Competition Rules That Deny Potential Competitors a Foothold in the Industry.

161.    As set forth above, for more than fifteen years, Varsity has pursued acquisition of its actual or would-be competitors and created or gained control of the rule-making organizations. *See* §§ VII.B.2 & 4, *supra*. Varsity has exploited and continues to exploit its control of the Cheer Competition Market to exclude competitors from the market.

162.    For example, in 2008, Varsity adopted rules that prohibited participants in its events from participating in events promoted by other rival promoters. Varsity prohibited Cheer teams that competed in Varsity's NDA/NCA College Championships from participating in any other event promoted as a cheer or dance "national championship." This ban had the purpose and effect of impairing rival promoters' ability to compete with Varsity.

163.    In 2010, Varsity Brands prohibited college-level participants from entering into events following the format of the National Collegiate Acrobatic & Tumbling Association (NCATA). Varsity forbade such participants from attending and competing at Varsity-owned or Varsity-sponsored events, like national tournaments, thereby thwarting any potential competitive threat from NCATA.

164.    In 2013, Varsity created The Summit to provide a national championship for lower level teams. Only teams that compete at Varsity Cheer Competitions can qualify for The Summit championships, creating another barrier to entry for other promoters whose competitions cannot qualify a team for The Summit.

165.    Varsity requires All-Star Gyms to be members of the USASF in order to compete in USASF-sponsored Cheer Competitions. This accreditation carries with it a requirement that the All-Star Gyms report all events they attend to USASF. Varsity and USASF representatives then pressure the All-Star Gyms to go only to USASF-sanctioned events, 42% of which are produced by Varsity.

166.    The access of any IEP to All-Star Gyms is further restricted by the USASF-preferred insurer, K&K, which charges All-Star Gyms thousands of dollars in insurance premiums if All-Star Gyms attend non-USASF events. In addition, K&K requires covered All-Star Gyms to be USASF members. The rates for USASF member All-Star Gyms are between $19 and $24.55 per Cheer Athlete, but they increase to $34 per Cheer Athlete if the All-Star Gym enters its Competitive Cheer Team in even a single competition that is not sanctioned by USASF.

167.    Further, the USASF will not permit a Cheer Competition producer to hold a Bid-qualifying Cheer Competition within 500 miles of another Bid-qualifying competition. This

makes it difficult—if not impossible—for an IEP to expand and compete further with Varsity. The ultimate result is that the only way for a Cheer Competition producer to gain additional Bids to Worlds would be to acquire an existing Cheer Competition producer that controls such Bids. Since Varsity's acquisition of Epic Brands in January 2018, there are few producers left outside of Varsity's ownership or control.

168.    All Varsity-sponsored events are USASF-sanctioned. To enter Competitive Cheer Teams in USASF-sanctioned events, All-Star Gyms, All-Star Cheer Athletes, and Competitive Cheer Team coaches must become USASF members and pay annual membership dues to USASF. These membership dues are USASF's primary outside revenue source. For example, USASF collected over $5 million in membership dues in 2017.

169.    USASF also copyrighted its Cheer Competition rules in 2016, which forbids Cheer Competition producers that have not paid USASF membership dues from using those rules at their events. Since Varsity's dominance in the Cheer Competition Market ensures that all or almost all Competitive Cheer Teams fill the majority of their schedules with USASF-sanctioned events, USASF's refusal to allow non-USASF IEPs to use the same rules provides a strong disincentive for Competitive Cheer Teams to include such IEPs in their schedules. Doing so would require Competitive Cheer Teams to learn and compete by a different set of rules for a small share of their yearly competitions. USASF aggressively enforces these limitations through the threat of intellectual property litigation.

170.    Varsity also takes steps to prevent rival sanctioning organizations from creating non-Varsity-controlled Competitive Cheer Championships that could undermine Varsity's dominance. For example, in October 2011, the USASF and IASF wrote a joint letter to member All-Star Gyms, Cheer Competitions, and Competitive Cheer Team coaches stating that it is "the policy of the USASF/IASF that no athlete, coach, judge, or official is permitted to participate in any way in any event that claims to be a World or International Championship, other than the ICU [International Cheer Union] World Championships for National teams, or the USASF/IASF Worlds for Competitive Cheer Teams. This stipulation applies to any regional international

championship affiliated with an organization claiming to operate a World Championship, other than the ICU and USASF/IASF. Failure to comply with this rule is grounds for disqualifying any athlete, coach, judge, or official from participating in the ICU and USASF/IASF World Championships."

171.   USASF membership rules specify that members are not permitted to affiliate, partner with, or own non-USASF-sanctioned IEPs, and that every All-Star Gym that wishes to attend USASF events must become a USASF member. Thus, all All-Star Gyms that attend at least one USASF event per year agree to these exclusionary terms.

### 3.   Varsity Uses Exclusive Agreements with All-Star Gyms and Schools to Foreclose Access to the Relevant Markets.

172.   Varsity also provides financial incentives designed to further enhance and secure its monopoly power and to exclude potential competitors and rivals. These take the form of rebates or free services to All-Star Gyms and cash-strapped schools to encourage their participation. In exchange for these inducements, All-Star Gyms and schools sign exclusionary agreements under which they agree to attend Varsity competitions and purchase Varsity Cheer Apparel. Though the cost of the rebates and services is low from Varsity's perspective, they have an asymmetric effect on the budgets of gyms and schools, providing a crucial influx of cash that gyms rely on to survive slow periods, or valuable improvements for cash-strapped schools, creating a strong inducement to steer their business—and parents' money—to Varsity. Thus, Varsity and its co-conspirators reap hundreds of millions of dollars each year from the parents and others bearing the economic cost of participation by Competitive Cheer Athletes.

173.   Varsity offers rebates to All-Star Gyms that sign agreements under which the All-Star Gyms agree to attend a certain number of Varsity Cheer Competitions and purchase Varsity Cheer Apparel. Varsity induces larger and more prestigious All-Star Gyms, whose attendance is critical to putting on successful All-Star Events and who provide a key distribution channel for Cheer Apparel, to sign Network Agreements, under which All-Star Gyms are required to commit to essentially exclusive attendance at Cheer Competitions and purchase of Cheer Apparel, and

attendance at Cheer Camps. In return for this commitment, the All-Star Gyms receive rebates from Varsity. Varsity encourages All-Star Gyms to participate in Varsity produced events through its rebate program. The more Varsity Competitions an All-Star Gym attends, and the more Varsity Cheer Apparel an All-Star Gym purchases, the larger the rebate to that All-Star Gym.

174. Network Agreements require All-Star Gyms to have their Competitive Cheer Teams attend at least five Varsity-produced Cheer Competitions per season and spend at least $30,000 on registration fees for Varsity events. Moreover, Varsity's Network Agreements provide increasing rebate percentages for All-Star Gyms that spend above $30,000 per year on Varsity registration fees. Given that All-Star Gyms often attend only six Cheer Competitions per season, Varsity's contractual requirements make it extremely difficult, if not impossible, for these All-Star Gyms to attend IEPs' All-Star events, and thus effectively require exclusive dealing.

175. The Network Agreement also provides additional relief from the non-Network penalty registration fees it charges for every dollar an All-Star Gym spends on Varsity Cheer Competition registration fees over and above the required $30,000 minimum. Thus, once an All-Star Gym has spent the required threshold amount, it becomes economically and practically infeasible for such All-Star Gyms to attend non-Varsity events. Further, the Network Agreements explicitly require the largest and most prominent All-Star Gyms to purchase and use Varsity Cheer Apparel exclusively, foreclosing a key distribution channel and critical group of customers from being accessed by Cheer Apparel rivals.

176. Because the Network Agreement is offered to the largest and most successful All-Star Gyms, the All-Star Gyms with the most talented All-Star Cheer Athletes are guaranteed to attend Varsity Cheer Competitions and wear Varsity Cheer Apparel. This, in turn, draws the smaller All-Star Gyms into attending Varsity Cheer Competitions and wearing Varsity Cheer Apparel.

177. For All-Star Gyms that are not induced to execute Network Agreements, Varsity offers terms under its "Family Plan." The Family Plan is offered to every All-Star Gym in the

country, meaning that Varsity has the potential to engage 100% of the All-Star Gyms in the Market in its exclusionary programs.

178.    The Family Plan requires that an All-Star Gym attend a certain number of Varsity Cheer Competitions in one year in order to obtain a small amount of relief from Varsity's penalty pricing on Cheer Apparel and Cheer Competitions. Under the Family Plan, All-Star Gyms must go to at least six Varsity events per year. Because Competitive Cheer Teams often attend only six Cheer Competitions in a season (excluding The Summit and U.S. Finals), All-Star Gyms must devote all or the vast majority of their Cheer Competition season on Varsity events to obtain relief from Varsity's penalty pricing. The amounts All-Star Gyms must spend to obtain a particular percentage of monetary relief from Varsity's penalty pricing has increased over the years.

179.    The Family Plan rebates typically involve providing rebates referred to as "Varsity Fashion Dollars." These Varsity Fashion Dollars may only be used on future purchases from Varsity. As a result, the All-Star Gyms are trapped in an endless cycle with Varsity, as foregoing these future rebates and doing business with Varsity's competitors becomes prohibitively expensive the more they patronize Varsity events and purchase Varsity Cheer Apparel.

180.    Varsity's rebates to All-Star Gyms provide substantial financial incentives to the All-Star Gyms to steer their teams to attend Varsity Cheer Competitions and purchase Varsity Cheer Apparel. The amount of rebates derives from how many Varsity Cheer Competitions the All-Star Gyms enter, how many Varsity Cheer Camps they attend, and how much Varsity Cheer Apparel they purchase; Varsity will pay the All-Star Gyms cash rebates, which start in the thousands and can go into the hundreds of thousands of dollars a year for large All-Star Gyms. The All-Star Gyms rely on the rebate money to hold them over during slow periods, providing a strong incentive to the All-Star Gyms to participate in as many Varsity events as possible for their teams.

181.    The parents whose fees indirectly pay Varsity's competition registration fees and purchase Varsity Cheer Apparel do not receive the benefit of rebate payments Varsity provides to the All-Star Gyms.

182.    Varsity also offers inducements to schools to sign exclusive agreements with Varsity. Through its Impact and VIP Branding programs, Varsity offers schools branding opportunities under which Varsity helps the schools develops a sports identity by "bring[ing] professional design and products to school campuses," creating a sports identity and logo for the schools and supplying wall murals, window branding, mascot costumes, banners, flags, and signs displaying the school's identity and logo. In exchange for these payments, schools sign VIP Agreements under which the schools agree to purchase their uniforms, apparel, and equipment from Varsity and to compete in Varsity Cheer Competitions. Parents who pay for their children to compete on Competitive School Cheer teams end up paying Varsity's supracompetitive monopoly prices.

183.    Through these inducements, Varsity imposes exclusive dealing arrangements on both the primary Cheer Competition Market and the related Cheer Apparel Market, foreclosing competition from other competition producers and apparel manufacturers.

### 4.    Varsity Forecloses Access to the Cheer Apparel Market.

184.    Varsity prohibits other Cheer Apparel manufacturers from displaying their products at Varsity's events, denying would-be rivals a major marketing opportunity with their target customers. All-Star Cheer Competitions are, in part, market-dominant trade shows, and Varsity forbids or severely restricts its Cheer Apparel rivals from displaying wares in those events' "showrooms." By denying rivals access to its market-dominant competitions, Varsity is leveraging its monopoly power in the Cheer Competition Market to vertically foreclose rivals in the Cheer Apparel Market. For example, rival Cheer Apparel manufacturer Rebel had previously displayed and sold Cheer Apparel at JAM Brands' events. Its contract with The JAM Brands was terminated when Varsity acquired

The JAM Brands, and Varsity excluded Rebel from all subsequent JAM Brands events. As one article observed, quoting Rebel's founder:

> The JAM Brands competitions had been Rebel's most effective platform for marketing to elite cheer teams. 'Not partnering with an event company is one thing,' says Noseff Aldridge [founder of Rebel Athletic]. 'But being locked out of partnering with an event company—knowing that a competitor is now going to be in your booth space showing its product—it's a double whammy.'

185.    Further, as mentioned above, certain Varsity contracts and terms with All-Star Gyms combine rebates for attending Varsity Cheer Competitions with agreements requiring All-Star Gyms to purchase their Cheer Apparel exclusively from Varsity. Thus, All-Star Gyms bound by the Network Agreement cannot access non-penalty prices for Cheer Competitions unless they also agree to exclusively buy their Cheer Apparel from Varsity.

186.    Judges at Varsity Cheer Competitions have been known to award more points to Competitive Cheer Teams wearing Varsity Cheer Apparel, and the rules governing USASF and Varsity Cheer Competitions regarding Cheer Apparel are frequently written to favor Varsity's latest Cheer Apparel designs. These practices make the wearing of Varsity Cheer Apparel an important element for success at Cheer Competitions, further impairing the ability of rival Cheer Apparel manufacturers from gaining significant sales.

### 5.    Varsity Leverages Its Monopoly Power in the Cheer Competition Market to Foreclose Competition in the Cheer Camp Market.

187.    Varsity has leveraged and continues to leverage its monopoly power in the market for Cheer Competitions to acquire, enhance, and maintain monopoly power in the market for Cheer Camps. All-Star Gyms and schools decide which camps the teams are going to attend. Varsity offers these programs rebates if they choose Varsity V!ROC choreography camps. The more teams and athletes that an All-Star Gym sends to Varsity V!ROC camps, the larger the rebate. V!ROC offers choreography training for both All-Star and Gameday (which incorporates elements of traditional sideline cheer).

188.     Attending V!ROC camps gives teams an edge over other teams because the V!ROC choreographers are knowledgeable about Varsity's competitions and rules and can and do train teams to gear their routines to score points with Varsity Cheer Competition judges. Non-Varsity camps cannot offer the same advantages, so they cannot compete with Varsity's camps. By exercising this competitive advantage, Varsity creates a barrier to entry for rival cheer camp producers.

189.     Another way Varsity leverages its monopoly power in the Cheer Competition Market is to require Competitive Cheer Athletes to attend Varsity Cheer Camps as a mandatory prerequisite to competing in some Varsity Cheer Competitions. Indeed, many Varsity Cheer Competitions—including the NCA High School National Championship and the UCA National High School Cheerleading Championship, in which a combined total of 45,000 athletes participate, as well as the USA Championships—require 75% of a team's athletes to attend a Varsity Cheer Camp during the preceding summer or fall as a mandatory prerequisite to the team registering for the event. UCA and NCA Cheer Camps are designed for skilled cheerleading squads that operate at a competitive level. Students can attend either day or overnight Cheer Camps that run up to four days, with skill training lasting from morning to night.

190.     Varsity also provides Bids to some of its national competitions at its Cheer Camps, creating another strong incentive for teams to attend Varsity Cheer Camps, and a barrier to entry for other cheer camp producers, who cannot offer Bids to Varsity's premier events.

### 6.     Varsity Counter-Programmed Rivals' Competitions.

191.     In order to compete at the "Worlds," a team must compete at a qualifying event. The USASF set the number of event producers that can hold Worlds qualifying events at 42. For an event producer, the ability to hold a Worlds qualifying event is very prestigious and profitable. A Worlds event producer can bring in over $300,000 in registration fees, spectator admission fees, and merchandise sold at the event.

192.    According to USASF bylaws, a qualifying event must have 125 teams competing. If an event does not attract 125 teams, it is put on probation. If it fails to reach 125 teams a second time, that event will no longer be a Worlds Bid qualifying event.

193.    Plaintiffs are informed and believe that, to impair its potential rivals, Varsity would hold non-Worlds qualifying events in the same geographic area at the same time as an established Tier 1 independent Bid qualifying event, in contravention of USASF rules. Varsity's event would draw teams away from the IEP event, causing them to fail to attract the requisite 125 teams. This would cause the IEP to take in less money from the event, and eventually lose the privilege of hosting such events. An IEP thus deprived of revenue streams would be less likely to threaten Varsity's market position, and would likely become an acquisition target for Varsity.

194.    Plaintiffs contend that Varsity's actions violated, and continue to violate, federal and state antitrust laws and state consumer protection laws, including Sections 1 and 2 of the Sherman Act, and Tenn. Code Ann. §§ 47-25-101, *et seq*., and that they and the members of the proposed Classes were injured and continue to be injured by paying artificially inflated prices indirectly to Varsity for Varsity Cheer Competitions, Varsity Cheer Apparel, Varsity Cheer Camps, and other charges. Plaintiffs seek equitable relief to stop Defendants' continuing anticompetitive conduct and to recover money damages for injuries in the form of artificially inflated prices Plaintiffs indirectly paid to Varsity, incurred as a result of Defendants' anticompetitive conduct alleged herein.

195.    Varsity can charge artificially inflated prices for all of these products and services because it has unlawfully acquired monopolies in the markets for Cheer Competitions, Cheer Apparel, and Cheer Camps. Taken together, these inflated prices add up to millions of dollars in unlawful overcharges indirectly paid to Varsity by the families of athletes that participate in Competitive Cheer.

### C.     Varsity's Monopoly Power in the Relevant Markets

#### 1.     Monopoly Power in the Cheer Competition Market (the Primary Market)

##### a.     The Relevant Cheer Competition Market

196.    The Cheer Competition Market is a single, nation-wide market. Varsity competitions host All-Star and School Cheer Teams, frequently in the same competitions. At all times relevant to this litigation, Varsity has held monopoly power in the Cheer Competition Market. Varsity is the primary supplier in the All-Star Cheer Competition Market.

197.    All-Star Gyms and schools serve as the gateways through which athletes and their families gain access to the sport of Competitive Cheer, and Varsity gains access to the athletes and their families. Families pay fees to the gyms and schools which are used to indirectly pay registration fees for USASF and for Varsity Cheer Competitions, as well as Varsity Cheer Apparel and Varsity Cheer Camps.

198.    Thus, parents indirectly pay the costs of registration in Varsity's All-Star Cheer Competitions.

##### i.     There Are No Substitutes for Competitive Cheer.

199.    Varsity Cheer Competitions lack close economic substitutes that could constrain their pricing, for, e.g., entry fees and other associated costs, USASF registration, to competitive levels.

200.    Competitive Cheer Athletes train vigorously for Cheer Competitions that showcase their unique combination of talents, which draw from cheerleading, dance, and gymnastic routines. Competitive Cheer Athletes would not redeploy their talents to competitive gymnastics, dance, or any other sport or pastime, in response to a small but significant non-transitory increase in the price of attending Cheer Competitions. Thus, a hypothetical monopoly seller or producer of Cheer Competitions would not need to control gymnastics, dance events, or other pastimes, to raise the registration fees and other associated costs for attending Cheer Competitions profitably above competitive levels.

201.    Traditional sideline cheerleading is not a functional or economic substitute for Cheer Competitions. Sideline cheerleaders play a secondary role, supporting a local school's sports team and keeping the crowd excited. In contrast, Cheer Competitions are contests between Cheer Teams: Cheer Teams themselves are the athletes, and their routines are the main event. Traditional sideline cheer typically does not involve the stunts, pyramids, and gymnastics Competitive Cheer incorporates.

202.    Gymnastic competitions are not functional or economic substitutes for Cheer Competitions, which involve multiple athletes performing synchronized movements in a confined area that limits the types of movements that can be performed by participants, requiring an emphasis on different skills than gymnastics. In addition, Competitive Cheer Teams consist of various body types and have different positions that require different skill sets, such as the base, the flyer, the spotter, and the tumbler. Most athletes will be taller than the average gymnast— providing opportunities to compete for individuals who do not possess classic gymnast bodies.

203.    College-level competitive dance and acrobatic events, such as Varsity-backed STUNT and NCATA-backed Acrobatics & Tumbling, are not functional or economic substitutes for Cheer Competitions. By seeking to create NCAA-sanctioned sports, Varsity and the National Collegiate Acrobatics and Tumbling Association ("NCATA") have identified such college-level competitive dance and acrobatic events as complements to Cheer Competitions rather than substitutes. As one USA Cheer publication explained, "STUNT should grow the total number of young people participating in all forms of Cheer…once STUNT is fully adopted as an NCAA sport, the number of collegiate scholarships available to Cheer athletes should increase more than tenfold. This will potentially create huge interest in skill development and competitive experience, and All-Star Gyms have a tremendous opportunity to provide these services." In addition, unlike Competitive Cheer, STUNT and Acrobatics & Tumbling only involve female athletes as they are both "Emerging Sports" seeking full protection under Title IX.

### b.    The Relevant Geographic Market

204.    The relevant geographic market is the United States. Competitive Cheer Teams compete nationwide to receive Bids to attend Competitive Cheer Championships. Of course, there is a regional aspect to competitions: teams emphasize attendance to competitions that maximize their chances of winning Bids to the end-of-season events. From Varsity's perspective, however, these events are administered at a national level, the governing bodies are the same across the country, events are subject to the same set of rules and the allocation of bids responds to a centralized system. It is Varsity's monopoly power that has allowed it to "nationalize" what otherwise may have been more regional competitions or qualifying events.

205.    International Cheer Competitions are not functional or economic substitutes for U.S. Cheer Competitions. Although there is an international division in USASF that can produce Bids to Worlds, U.S. All-Star Gyms and schools do not regularly send teams to Cheer Competitions abroad, in part due to the expense of international travel. International Cheer Competitions are also subject to different rules than U.S. competitions, making United States Competitive Cheer Athletes far less likely to attend them.

206.    A small but significant and non-transitory increase in the price of participating in U.S. Cheer Competitions would not cause participants to seek out international competitions.

### c.    Varsity Has Monopoly Power as a Dominant Supplier in the Cheer Competition Market.

207.    Varsity has, at all relevant times, possessed monopoly power in the market for the production of Cheer Competitions. Varsity owns, produces, and promotes the vast majority of Cheer Competitions in the United States.

208.    Varsity has maintained and enhanced its monopoly power in the market for the production of Cheer Competitions through the anticompetitive conduct alleged herein. Varsity possesses the ability to control, maintain, and increase prices associated with the production of Cheer Competitions above competitive levels and the ability to impair and exclude competitors from producing Cheer Competitions. Varsity has elevated prices charged for registering for and

attending Varsity Cheer Competitions substantially above competitive levels, and restricted output in the Cheer Competition Market, during the Class Period. Varsity has the ability to foreclose, and has in fact foreclosed, actual and would-be rivals from competing in the market for producing Cheer Competitions.

209.    Varsity's monopoly in Cheer Competitions has allowed it to impose exclusionary contracts and vertically foreclose competition in other related, but separate markets. Varsity knows that schools and All-Star Gyms are a crucial funnel through which they can access new and returning athletes to force families into all of their profit-making streams.

### d.    Barriers to Entry

210.    The Cheer Competition Market has high barriers to entry that were reinforced and bolstered by the Exclusionary Scheme as alleged herein.

### i.    Natural Barriers to Entry

211.    A Cheer Competition event producer must have access to capital in order to rent venues, perform adequate marketing, and pay employees, travel costs, and the variety of other expenses associated with the Cheer Competition business.

212.    A Cheer Competition producer must also have access to a critical mass of Competitive Cheer teams, as Competitive Cheer Athletes desire the challenge and recognition that comes with competing against the best in the sport.

213.    Cheer Competition producers must also have access to credible judges, in order to hold their competitions, advertising, and in order to carry out all of its other functions.

### ii.    Barriers Created by the Exclusionary Scheme

214.    As alleged herein, Varsity has used the Exclusionary Scheme to erect insurmountable barriers to entry which, together with the natural barriers, insulate Varsity from competition. To enter the Cheer Competition Market, event producers must have access to the uniform set of rules used by other competitions in the league, as no Competitive Cheer Team wants to learn a new set of rules to compete in just one competition. However, USASF refuses

non-member Independent Event Producers ("IEPs"), Varsity's competitors, from having access to its rules, claiming as a pretext that the rules are subject to trademark and copyright protections.

215.    To be viable in the Cheer Competition Market, event producers must also be able to offer Bids to the Cheer Championships. However, USASF and Varsity have conspired to limit the number of Cheer Competitions that can award these Bids. Varsity owns and controls 33 of the 42 Cheer Competitions that can award Bids to Worlds and all of the Cheer Competitions that can award Bids to The Summit and U.S. Finals. And it offers Bids to its national School Competitions at its Cheer Camps. As a result, a new competitor in the Cheer Competition Market is unlikely to be able to offer Bids and will immediately be rendered competitively irrelevant.

216.    IEP access to All-Star Gyms is further limited by Varsity's Network Agreements and Family Plan Agreements. Varsity uses rebates to induce All-Star Gyms to sign exclusive Network or Family Plan agreements that commit the All-Star Gyms teams to attending a minimum number of Varsity Cheer Competitions and to purchasing their Cheer Apparel from Varsity. All-Star Gyms that fail to register for the minimum number of Varsity Cheer Competitions pay penalty prices on Varsity Cheer Competitions and Cheer Apparel.

217.    Similarly, IEP access to schools is limited by Varsity's Impact and VIP Branding programs, which provide free murals and signage to schools in exchange for an agreement to attend a minimum number of Varsity Cheer Competitions and purchase Varsity Cheer Apparel. Varsity's New School Construction program goes even further, providing professional design guidance to schools to design school facilities from the ground up, and providing equipment including bleachers, weight equipment, and scoreboards, in exchange for the schools' commitment to Varsity Cheer Competitions and Varsity Cheer Apparel.

### 2.    Monopoly Power in the Cheer Apparel Market (Related Market)

### a.    The Relevant Cheer Apparel Market

218.    Competitive Cheer Athletes are required to wear specialized apparel and use specialized equipment in order to compete in Cheer Competitions. USASF rules govern every

detail of this apparel, including minutia, such as what direction hair bows must face and how large those bows can be.

219.    Competitive Cheer Athletes also require specialized apparel and equipment for practice, and All-Star Gyms require specialized apparel and equipment for membership on their Competitive Cheer Teams.

220.    There is a relevant Cheer Apparel Market that is restricted to specialized clothing such as uniforms, warm-up outfits, team jerseys and practice gear; and specialized accessories such as hair bows and headbands; and specialized equipment such as backpacks and shoes. Because Varsity Cheer Competitions require that participants dress and accessorize in accordance with USASF rules, Competitive Cheer Athletes could not shift to more generic athletic apparel in response to a small but significant and non-transitory increase in the price of Cheer Apparel. Thus, a hypothetical monopoly supplier of Cheer Apparel would not need to control any suppliers of non-Cheer Apparel in order to increase the price of Cheer Apparel substantially above competitive levels profitably.

221.    Moreover, All-Star Gyms and schools serve as the gateway to Competitive Cheer for athletes and their families. Because Varsity induces All-Star Gyms and schools to sign exclusive agreements with Varsity through the use of back-end rebates and free improvements to school facilities, the payments that families of Competitive Cheer Athletes make to the All-Star Gyms and schools to purchase Cheer Apparel are steered to Varsity. IEPs cannot break through this artificial barrier to entry.

### b.    The Relevant Geographic Market

222.    The relevant geographic market is the United States. All performances in the primary market occur within the United States and are regulated by standards set in the United States by regulatory organizations that are controlled by Varsity, including the USASF, USA CHEER, the American Association of Cheerleading Coaches and Administrators, and the National Federation of State High School Associations. As such, nearly all of the targeted

customers for Cheer Apparel reside in the United States. Apparel is also sold online, thus emphasizing this market as a nation-wide one, since no location depends exclusively on having a brick and mortar store to purchase apparel.

### c. Varsity Has Monopoly Power with Respect to Sales of Cheer Apparel.

223.    Varsity has, at all relevant times, possessed monopoly power in the market for Cheer Apparel. Varsity has maintained and enhanced, and continues to maintain and enhance, its monopoly power in this market through the Challenged Conduct (as alleged herein). Varsity possesses the ability to control, maintain, and increase prices in the Cheer Apparel Market above competitive levels profitably, and the ability to impair and exclude competitors from this Relevant Market. Varsity has, in fact, inflated prices of its Cheer Apparel above competitive levels during the Class Period. Varsity has the ability to foreclose, and has in fact foreclosed, would-be rivals from the Cheer Apparel Market.

224.    Varsity has assembled at least 200 copyrights on uniform design, which create a barrier to entry by subjecting potential entrants in the Cheer Apparel Market to the threat of copyright lawsuits. Varsity aggressively enforces its copyrights against actual and potential rivals through trademark litigation.

225.    Varsity has gained and maintained at least an 80% share of the Cheer Apparel Market through acquisitions, exclusive dealing arrangements, and other anticompetitive and exclusionary conduct that is part of the Exclusionary Scheme alleged herein.

### d. Barriers to Entry

226.    There are a number of barriers to entry into the Cheer Apparel Market, including many barriers imposed and reinforced as part of the Exclusionary Scheme.

### i. Natural Barriers to Entry

227.    Apparel-manufacturing and marketing facilities require significant investments of capital to design and manufacture shoes, clothing, and accessories. Additionally, retail companies

need significant investments in warehouses, inventory management and distribution chains to serve demand.

228.   Designs for the Cheer Apparel are specific to that market and require specially-trained designers to create and specialty equipment to manufacture.

229.   Intellectual property provides another barrier. Any designer of Cheer Apparel must take care not to infringe the designs of any competitors who hold copyrights or trademarks, or else risk litigation. Varsity has assembled almost 200 copyrights protecting its designs and aggressively enforces those rights against actual and potential rivals.

ii.   **Barriers to Entry Imposed Through the Exclusionary Scheme**

230.   Cheer Apparel manufacturers must have a venue to showcase and sell their apparel. In the Cheer Apparel Market, the main and critical venue is Cheer Competitions. However, Varsity denies its actual and potential competitors access to the showrooms at its market-dominant Cheer Competitions, depriving them of this necessary distribution venue.

231.   Cheer Apparel manufacturers must also have the ability to sell apparel that complies with Cheer Competition rules (the primary venue for such apparel). However, the USASF tailors its rules to allow the type of apparel Varsity manufactures and sells, to the exclusion of competitors' apparel. Further, USASF judges have awarded extra points to Competitive Cheer Teams wearing Varsity Cheer Apparel, thus discouraging them from wearing the apparel of Varsity's competitors.

232.   Varsity's Exclusionary Scheme includes restrictive contracts with All-Star Gyms and schools that require such gyms and schools to exclusively purchase Cheer Apparel from Varsity, foreclosing access by apparel rivals to these important customers and their Competitive Cheer Team members—who comprise a significant share of market sales. Varsity also provides terms for all other All-Star Gyms that make it economically unfeasible for most of them to purchase Cheer Apparel from potential rivals (for instance, Rebel).

### 3.    Monopoly Power in the Cheer Camp Market (Related Market)

#### a.    The Relevant Cheer Camp Market

233.    The Cheer Camp Market includes All-Star and School Cheer Camps. Through acquisitions and design Varsity controls the Cheer Camp Market. Cheer Camp is instrumental for teams if it they want to compete at the championship level. At Cheer Camps, they learn new techniques, skills, and routines.

234.    Varsity produces and promotes camps both for School Cheer and All-Star Cheer Teams. At the High School and College level, Varsity controls the market with USA, NCA, and UCA Cheer Camps.

235.    Varsity controls the largest cheerleading championships in the country for the School Cheer Competition Market under the UCA and the NCA. Teams cannot compete at the UCA or the NCA unless they attend UCA and NCA Cheer Camps.

#### b.    The Relevant Geographic Market

236.    The relevant geographic market is the United States. All performances in the primary market occur within the United States and are regulated by USASF standards set in the United States. As such, nearly all the targeted customers for Cheer Camp reside in the United States. Even though, for teams, there may be a regional sense of camps they would realistically attend, similarly to competitions, Varsity's monopoly has allowed it to govern, manage, produce and design camps at a national level.

#### c.    Varsity Has Monopoly Power in the Production, Ownership and Sales of Cheer Camps.

237.    Varsity has maintained and enhanced its monopoly power in the market for Cheer Camps through the anticompetitive conduct alleged herein. Varsity possesses the ability to control, maintain, and increase prices associated in the Cheer Camp Market above competitive levels and the ability to impair and exclude competitors from producing Cheer Camps. Varsity has elevated prices charged for attending Cheer Camps substantially above competitive levels, and restricted output in the All-Star Cheer Camp Market, during the Class Period. Varsity has the

ability to foreclose, and has in fact foreclosed, actual and would-be rivals from competing in the market for Cheer Camps.

238.   Through Varsity's exclusionary scheme with All-Star Gyms, owners choose Varsity Cheer Camps and choreographers because they get further rebates and an inside track to what Varsity Cheer Competition judges are looking for.

239.   In addition to control over USASF, Varsity has control over the governing bodies for High Schools and Colleges through USA Cheer, AACCA, and NFHS.

240.   High School and College cheer coaches choose which Cheer Camps the school is going to attend. Varsity spends a lot of money on donating equipment and rebranding services for schools which in exchange purchase Varsity Cheer Apparel and attend Varsity Cheer Competitions and Varsity Cheer Camps.

241.   Varsity's control of the regulatory bodies and the national championships has foreclosed on rival camp providers from either entering or maintaining a position in the market.

242.   Varsity has over 4,000 Cheer Camps throughout the United States with over 330,000 participants attending their camps.

### d.   Barriers to Entry

243.   There are a number of barriers to entry into the Cheer Camp Market, including many barriers imposed and reinforced as part of the Exclusionary Scheme.

### i.   Natural Barriers to Entry

244.   Cheer Camps require a significant up-front investment. To put on a successful camp, producers need to procure facilities to host the camps, including lodging and dining facilities for overnight camps; experienced instructors, including coaches, assistants, and choreographers; support staff; medical staff; equipment for stunts; liability insurance; and marketing and access networks to recruit campers.

> ii.    **Barriers to Entry Imposed Through the Exclusionary Scheme**

245.    Varsity provides bids to some of its national competitions through its Cheer Camps. Thus, teams hoping to attend these national championships must attend Varsity Cheer Camps in order to vie for a Bid. This puts other producers of Cheer Camps, who cannot offer such Bids, at a competitive disadvantage.

246.    Varsity also requires 75% of the members of any team hoping to compete in UCA, NCA, or USA national competitions to attend UCA/NCA/USA Cheer Camps. Like the bids Varsity offers for some of its national competitions through its Cheer Camps, the 75% requirement creates a barrier to entry for other prospective Cheer Camp producers.

247.    Athletes also choose NDA, UCA, and USA Cheer Camps also because they know that the Cheer Camp coaches and judges will also be at the NCA, UCA, and USA state and national championships. The Cheer Camps offer teams an opportunity to showcase new routines and receive feedback from judges. Rival providers cannot offer an equivalent advantage to Cheer Camp attendees.

## VIII.    PLAINTIFFS HAVE BEEN HARMED AND SUFFERED ANTITRUST INJURY AS A DIRECT AND PROXIMATE RESULT OF DEFENDANTS' UNLAWFUL ACTIONS.

248.    As a direct and proximate result of Varsity's Exclusionary Scheme, as alleged herein, Plaintiffs and the members of the Classes have suffered antitrust injury in that they indirectly paid artificially inflated prices for goods and services that they purchased indirectly from Varsity, through All-Star Gyms and schools, in the Relevant Markets during the Class Period. The full amount of such damages Plaintiffs and the Classes suffered will be calculated after discovery and upon proof at trial.

249.    The conduct comprising Varsity's Exclusionary Scheme is continuing, as are the injuries and damages suffered by the members of the Classes as a direct and foreseeable result.

A.      **Varsity Charges Parents Monopoly Rents in Related Markets.**

250.    In addition to charging artificially high supracompetitive prices for Varsity's competitions, apparel, and camps, as alleged above, Varsity leverages its monopoly in the primary Cheer Competition Market to force parents to pay inflated prices for other related charges.

251.    For example, athletes and their families attending Varsity Cheer Competitions are required to stay at Varsity-approved "Housing Partner" hotels. This is frequently referred to as "Stay-to-Play." "Stay-to-Play" hotels generally charge substantially more than the competitive rate charged to other guests. For example, under Varsity's NCA "Team Placement Program, "[a]ll performers, coaches and spectators attending NCA All-Star Nationals are required to stay through our housing programs." If a Competitive Cheer Athlete were to stay at a hotel outside the "Stay-to-Play" consortium, that athlete's All-Star Cheer Team is barred from participating in the Competition. If Varsity learns of a rule violation after an All-Star Cheer Competition, it fines the All-Star Gym that fielded that participant's All-Star Cheer Team for the violation. Even athletes and families that choose not to stay in one of Varsity's pre-approved hotels must pay a "Commuter Participant Fee" that can run as high as $365 for some Varsity Cheer Competitions. Although Varsity refers to this fee as a "participant registration fee," this fee is separate from the competition registration fee paid for by the team. Additionally, the policy makes it difficult for families hoping not to pay the inflated prices by staying with relatives. Plaintiffs are informed and believe that Varsity and/or its affiliates or partners receive a certain percentage of the inflated prices. Through this practice, Varsity effectively restricts competition that would exist between hotel and motels during an event, that would provide parents with lower prices and better deals.

252.    Admission to Varsity Cheer Competitions is expensive. In contrast to other promoters that do not charge admission to tournaments or other events, Varsity requires families that wish to see their athletes perform to pay as much as $40 per day to gain admission to Varsity events.

253.     Families that want to watch their children participate without physically attending events must pay $30 per month or $219 per year to watch the events on Varsity TV. Recording or streaming Varsity events, even for private usage, is strictly forbidden. Varsity actively enforces this ban on private recording or streaming, leaving family members no choice but to pay Varsity's inflated prices.

254.     Thus, Varsity exploits its market power in the primary Cheer Competition Market to overcharge the families of participants in competitive cheer in multiple ways. Parents indirectly pay unlawfully inflated prices to Varsity for: (a) registration and entry fees for tournaments in which the All-Star Gyms enroll; (b) registration fees for USASF; (c) uniforms and equipment the All-Star Gyms purchase for use in practices and competitions; (d) All-Star Gyms' Cheer Camps; (e) hotels Varsity requires the athletes and their families to patronize during Varsity Cheer Competitions; (f) admission fees at Varsity Cheer Competitions; and (g) fees for Varsity TV.

255.     Plaintiffs and the member of the Classes are further harmed because Varsity's unlawful scheme has thwarted innovation, particularly with regard to safety issues. Competitive Cheer is a notoriously dangerous sport. One recent study recently found that Competitive Cheer was the 16th most dangerous sport in the United States, while another found that, "cheerleading is the most dangerous sport for females because of the high risk for concussions and "catastrophic" injuries, which are classified as injuries that result in long-term medical conditions, permanent disabilities or a shorter lifespan." More than 30,000 cheerleaders go to the hospital each year for cheer-related injuries, including concussions. Sources state that "Some schools have actually seen more concussions on the cheerleading squads than football or soccer teams."

256.     In a competitive market, parents and athletes could reasonably expect that producers would vie for their business by innovating to make the sport safer. But because Varsity has such a stranglehold on the industry, and in particular on the rule-making organizations, Competitive Cheer remains among the most dangerous sports in the country.

B.    **The Exclusionary Scheme Caused Anticompetitive Effects in the Relevant Markets Without Procompetitive Benefits.**

257.    Defendants' Exclusionary Scheme has substantially foreclosed competition in the Relevant Markets and allowed Varsity to obtain, maintain, and/or enhance monopoly power in the Relevant Markets. As a result of the Exclusionary Scheme, prices in the Relevant Markets have been artificially inflated above competitive levels, output in each of the Relevant Markets has fallen below competitive levels, and the athletes and their parents have less choice in all of the Relevant Markets.

258.    Due to the Exclusionary Scheme, Varsity has raised prices associated with Cheer Competitions and for Cheer Apparel and Cheer Camps above competitive levels. For instance, participation fees for Varsity Cheer Competitions have increased substantially over the Class Period. Varsity also began charging spectator admission fees to legacy-JAM Brands events in 2016. Varsity has steadily increased those admission fees during the Class Period. In events such as JAMFest Bam JAM, admission fees for adults have doubled between late 2016 and 2019, and each parent now pays a $20 spectator fee to watch his or her child perform a two- or three-minute routine. Charlesbank, Charlesbank Funds, Bain, and Bain Funds, respectively, have been actively involved in adopting and setting Varsity's strategy of maintaining and increasing prices for Cheer Competitions, Cheeer Apparel, and Cheer Camps. This conduct directly and foreseeably caused injury to Plaintiffs and members of the Class.

259.    The Exclusionary Scheme has eliminated and impaired rivals in the Relevant Markets and blocked the entry and growth of others potential rivals. As a result, the number, size, and significance of Cheer Apparel manufacturers and Cheer Competition producers have been reduced, and fewer people participate as All-Star Cheer Athletes. At least 35 All-Star Gyms closed in 2019 as compared to a normal rate of 5 to 10 such closings in previous years.

260.    During the Class Period, Varsity shut down many of its own Cheer Competitions in addition to eliminating rival IEPs and these rivals' events.

261.    There are no legitimate procompetitive justifications or efficiencies for the conduct alleged as part of the Exclusionary Scheme. Any arguable procompetitive justifications or efficiencies are far outweighed by the anticompetitive effects of the Scheme.

## IX.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**For Injunctive Relief Under Section 16 of the Clayton Act for
Violations of Sections 1, 2 and 3 of the Sherman Act, 15 U.S.C. §§ 1-3
(On Behalf of Plaintiffs and the Injunctive Relief Class)**

262.    Plaintiffs incorporate the above paragraphs by reference.

263.    The Relevant Markets are the markets for Cheer Competitions, Cheer Apparel, and Cheer Camps in the United States.

264.    Varsity controls approximately 80% of the Cheer Competition Market, 80% of the Cheer Apparel Market, and 75% of the Cheer Camp Market.

265.    Varsity, acting in concert with USASF, Charlesbank, Charlesbank Funds, Bain and Bain Funds have obtained, enhanced, and maintained monopoly power in the Relevant Markets through the Exclusionary Scheme alleged herein, which conduct is continuing. Varsity, USASF, Charlesbank, Charlesbank Funds, Bain, and Bain Funds have substantially foreclosed competition and have abused and continue to abuse their power to maintain and enhance its market dominance in the Relevant Markets through its Exclusionary Scheme, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

266.    During the Class period Varsity Charlesbank, Charlesbank Funds, Bain, and Bain Funds engaged in a continuing Exclusionary scheme with respect to the Relevant Markets in an unreasonable restraint of trade and commerce, with the purpose and effect of acquiring, enhancing, and maintaining monopoly power in the Relevant Markets, in violation of the Sherman Act, 15 U.S.C. §2.

267.    As a direct and proximate result of this continuing violation of Sections 1 and 2 of the Sherman Act, Plaintiffs and the members of the Injunctive Relief Class have suffered and

continue to suffer injury and damages in that they have paid and continue to pay artificially inflated prices indirectly to Varsity for Cheer Competitions, Cheer Apparel, Cheer Camps, and other ancillary charges including stay-to-play accommodation charges at Varsity Cheer Competitions and insurance.

268.    Plaintiffs and members of the Injunctive Relief Class will continue to suffer injury, in the form of paying artificially inflated prices indirectly to Varsity for Cheer Competitions, Cheer Apparel, Cheer Camps, and accommodations at Varsity Cheer Competitions, if Varsity's unlawful conduct is not enjoined.

269.    Plaintiffs and the members of the Injunctive Relief Class therefore seek equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws, to correct for the anticompetitive market effects caused by Varsity's unlawful conduct, and to assure that similar anticompetitive conduct and effects do not continue or reoccur in the future.

**SECOND CLAIM FOR RELIEF**
**Violation of Tennessee Antitrust Law**
**(On Behalf of Plaintiffs and the Nationwide Damages Class)**

270.    Plaintiffs incorporate the above paragraphs by reference.

271.    In addition to violating Sections 1 and 2 of the Sherman Act and Section 16 of the Clayton Act, Varsity, together with Charlesbank, Charlesbank Funds, Bain, and Bain Funds, violated Tennessee Code Ann. §§ 47-25-101, *et seq*. when it intentionally and wrongfully acquired, enhanced, and maintained monopoly power in the relevant markets through its ongoing exclusionary scheme.

272.    Defendants' illegal scheme and conspiracy was conceived and implemented in Tennessee. The core Defendants—including Mr. Webb, Varsity Brands, Varsity Spirit, Varsity Spirit Fashion, and USASF—are residents of Tennessee and have committed overt acts in Tennessee, including directing the Scheme. Varsity Brands and Varsity Spirit are Tennessee corporations and USASF is a Tennessee non-profit corporation. All, along with Varsity Spirit Fashion, have their principal place of business in Memphis, Tennessee. Accordingly, the State of

Tennessee has a recognized and compelling interest in the enforcement of its antitrust, consumer protection and common law with respect to the violations of law alleged in this Complaint.

273.    By engaging the conduct alleged herein, Defendants intentionally and wrongfully engaged in conduct, a combination, or conspiracy in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq*.

274.    As a direct and proximate result of Defendants unlawful scheme, Plaintiffs have been harmed in that they paid artificially inflated prices for Varsity's Cheer Competitions, Cheer Apparel, Cheer Camps, accommodations at Varsity Cheer Competitions, and other related fees and charges. Because Plaintiffs and the members of the Nationwide Damages Class were harmed by Defendants' unlawful actions, which were conceived and executed within Tennessee's borders by persons and corporations that are residents of Tennessee, the state has a significant aggregation of contacts to the claims asserted by each member of the plaintiff class.

275.    The injuries suffered by Plaintiffs and the members of the Nationwide Damages Class are of the type that Tenn. Code Ann. §§ 47-25-101, *et seq*. are intended to prevent, and flow from that which makes Defendant's conduct unlawful.

276.    Plaintiffs and the members of the Nationwide Damages Class therefore seek money damages under Tenn. Code Ann. §§ 47-25-101, *et seq*., to correct for the anticompetitive market effects caused by Varsity's unlawful conduct, and compensate the Plaintiffs and the members of the Nationwide Damages Class for the harm they have suffered as a result of defendants' unlawful scheme.

### THIRD CLAIM FOR RELIEF
### Violation of State Antitrust Law
### (On Behalf of Plaintiffs and the State Law Damages Class)

277.    Plaintiffs incorporate the above paragraphs by reference.

278.    In addition to violating Sections 1 and 2 of the Sherman Act and Section 16 of the Clayton Act, Varsity intentionally and wrongfully maintained monopoly power in the Relevant Markets through its ongoing exclusionary scheme.

279.    By engaging the foregoing conduct, Varsity, together with Charlesbank, Charlesbank Funds, Bain, and Bain Funds, intentionally and wrongfully engaged in conduct, a combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

A.    Ala. Code §§ 8-10-1, *et seq*., and Ala. Code § 6-5-60(a) with respect to purchases of Defendants' products and services in Alabama by Class members and/or by Alabama residents.

B.    Alaska Stat. §§ 45.50.562, *et seq*., with respect to purchases of Defendants' products and services in Alaska by Class Members and/or by Alaska residents.

C.    Ariz. Rev. Stat. §§ 44-1402, *et seq*., with respect to purchases of Defendants' products and services in Arizona by Class members and/or by Arizona residents.

D.    Ark. Code Ann. §§ 4-75-309, *et seq*., with respect to purchases of Defendants' products and services in Arkansas by Class members and/or by Arkansas residents.

E.    Cal. Bus. and Prof. Code §§ 16720, *et seq*., with respect to purchases of Defendants' products and services in California by Class members and/or by California residents.

F.    Colo. Rev. Stat. §§ 6-4-104, *et seq*., with respect to purchases of Defendants' products and services in Colorado by Class members and/or by Colorado residents.

G.    D.C. Code §§ 28-4502, *et seq*., with respect to purchases of Defendants' products and services in the District of Columbia by Class members and/or by District of Columbia residents.

H.    Haw. Rev. Stat §§ 480-1, *et seq*., with respect to purchases of Defendants' products and services in Hawaii by Class members and/or by Hawaii residents.

I.    Idaho Code §§ 48-104, *et seq*., with respect to purchases of Defendants' products and services in Idaho by Class members and/or Idaho residents.

J.    740 Ill. Comp. Stat. 10/3, *et seq*., with respect to purchases of Defendants' products and services in Illinois by Class members and/or by Illinois residents

K.    Iowa Code §§ 553.4, *et seq*., with respect to purchases of Defendants' products and services in Iowa by Class members and/or by Iowa residents.

L.      Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of Defendants'
products and services in Kansas by Class members and/or by Kansas residents.

M.      Me. Stat. tit. 10 §§ 1101, *et seq.*, with respect to purchases of Defendants'
products and services in Maine by Class members and/or by Maine residents.

N.      Md. Code, Com Law, Section 11-204, *et seq.*, with respect to purchases of
Defendants' products and services in Maryland by Class members and/or by Maryland residents.

O.      Mich. Comp. Laws §§ 445.772, *et seq.*, with respect to purchases of Defendants'
products and services in Michigan by Class members and/or by Michigan residents.

P.      Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases of Defendants' products
and services in Minnesota by Class members and/or by Minnesota residents.

Q.      Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of Defendants'
products and services in Mississippi by Class members and/or by Mississippi residents.

R.      Neb. Rev. Stat. §§ 59-801, *et seq.*, with respect to purchases of Defendants'
products and services in Nebraska by Class members and/or by Nebraska residents.

S.      Nev. Rev. Stat. §§ 598A.060, *et seq.*, with respect to purchases of Defendants'
products and services in Nevada by Class members and/or by Nevada residents.

T.      N.H. Rev. Stat. Ann. §§ 356:2, *et seq.*, with respect to purchases of Defendants'
products and services in New Hampshire by Class members and/or by New Hampshire residents.

U.      N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of Defendants'
products and services in New Mexico by Class members and/or by New Mexico residents.

V.      N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of Defendants'
products and services in New York by Class members and/or by New York residents.

W.      N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of Defendants' products
and services in North Carolina by Class members and/or by North Carolina residents.

X.      N.D. Cent. Code §§ 51-08.1-02, *et seq.*, with respect to purchases of Defendants'
products and services in North Dakota by Class members and/or by North Dakota residents.

Y.      Or. Rev. Stat. §§ 646.725, *et seq*., with respect to purchases of Defendants' products and services in Oregon by Class members and/or by Oregon residents.

Z.      R.I. Gen. Laws §§ 6-36-4, *et seq*., with respect to purchases of Defendants' products and services in Rhode Island by Class members and/or by Rhode Island residents.

AA.     S.D. Codified Laws §§ 37-1-3.1, *et seq*., with respect to purchases of Defendants' products and services in South Dakota by Class members and/or by South Dakota residents.

BB.     Tenn. Code Ann. §§ 47-25-101, *et seq*., with respect to purchases of Defendants' products and services in Tennessee by Class members and/or by Tennessee residents.

CC.     Utah Code Ann. §§ 76-10-3104, *et seq*., with respect to purchases of Defendants' products and services in Utah by Class members and/or by Utah residents.

DD.     W. Va. Code §§ 47-18-1, *et seq*., with respect to purchases of Defendants' products and services in West Virginia by Class members and/or by West Virginia residents.

EE.     Wis. Stat. §§ 133.03, *et seq*., with respect to purchases of Defendants' products and services in Wisconsin by Class members and/or by Wisconsin residents.

280.    Plaintiffs and members of the State Law Damages Class have been injured by reason of Defendants' antitrust violations alleged in this Claim. Their injuries consist of paying higher prices for Cheer Competitions, Cheer Apparel, Cheer Camps, accommodations at Varsity Cheer Competitions, and other related fees and charges, than they would have paid in the absence of Defendants' conduct. These injuries are of the type that the foregoing laws are intended to prevent, and flow from that which makes Defendant's conduct unlawful.

281.    Plaintiffs and the State Law Damages Class seek damages and multiple damages as permitted by law for their injuries by Defendants' violations of the aforementioned statutes.

**FOURTH CLAIM FOR RELIEF**
**Unfair Methods of Competition, and Unfair and Deceptive Acts, in Violation of State Consumer Protection Law**
**(On Behalf of Plaintiffs and the State Law Damages Class)**

282.    Plaintiffs incorporate the above paragraphs by reference.

283.    Varsity, together with Charlesbank, Charlesbank Funds, Bain, and Bain Funds, engaged in unlawful and unfair acts and practices to willfully and wrongfully obtain, enhance, and maintain its monopoly in the markets for Cheer Competitions, Cheer Apparel, and Cheer Camps. These unlawful and unfair acts included: (a) offering rebates to gyms and schools that entice the gyms and schools to favor Varsity's Cheer Competition and Cheer Apparel over those of other promoters, at the expense of Plaintiffs and members of the State Law Damages Class; (b) concealing the existence of its exclusionary agreements with All-Star Gyms and schools from Plaintiffs and the members of the class, thereby fraudulently concealing the extent of its exclusionary scheme and the effect of that scheme on Plaintiffs and the members of the State Law Damages Class; (c) exploiting its control over USASF and other rule-making organizations to create rules that unfairly favored Varsity by assigning the power to offer bids to the three recognized championship competitions for Competitive Cheer almost exclusively to Varsity owned or controlled Cheer Competitions; (d) counterprogramming would-be rivals Cheer Competitions, thus impairing their ability to compete, and depriving Plaintiffs and the State Law Damages Class of the ability to seek the best value in a competitive market. These unlawful actions had the purpose and effect of channeling Competitive Cheer Athletes and teams to Varsity's Cheer Competitions, Cheer Apparel, and Cheer Camps, all of which put other promoters of Cheer Competitions and manufacturers of Cheer Apparel at a competitive disadvantage by effectively locking them out of the Relevant Markets.

284.    As a direct and proximate result of Varsity's unlawful and unfair business practices, Plaintiffs and members of the State Law Damages Class were denied the opportunity to shop for competitively priced Cheer competitions, Cheer Apparel, and Cheer Camps that they would have had access to in a properly functioning competitive market. Plaintiffs and members of the State Law Damages Class were forced to pay artificially inflated prices for Varsity's products, and lost money or property as a result.

285.    The gravity of harm from Defendants' wrongful conduct significantly outweighs any conceivable utility from that conduct. Plaintiffs and class members could not reasonably have avoided injury from Defendants' wrongful conduct.

286.    By engaging in such conduct, Defendants violated the following state consumer protection laws:

A.    Ariz. Rev. Stat. Ann. §§ 44-1521, *et seq.*, with respect to purchases of Defendants' products and services in Arizona by Class members and/or by Arizona residents.

B.    Ark. Code §§ 4-88-101, *et seq.*, with respect to purchases of Defendants' products and services in Arkansas by Class members and/or by Arkansas residents.

C.    Cal. Bus. & Prof Code §§ 17200, *et seq.*, with respect to purchases of Defendants' products and services in California by Class members and/or by California residents.

D.    Colo. Rev. Stat. §§ 6-1-101, *et seq.*, with respect to purchases of Defendants' products and services in Colorado by Class members and/or by Colorado residents.

E.    Conn. Gen. Stat. §§ 42-110b, *et seq.*, with respect to purchases of Defendants' products and services in Connecticut by Class members and/or by Connecticut residents.

F.    D.C. Code §§ 28-3901, *et seq.*, with respect to purchases of Defendants' products and services in the District of Columbia by Class members and/or by District of Columbia residents.

G.    Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases of Defendants' products and services in Florida by Class members and/or by Florida residents.

H.    Haw. Rev. Stat. §§ 481-1, et seq., with respect to purchases of Defendants' products and services in Hawaii by Class members and/or by Hawaii residents.

I.    Idaho Code Ann. §§ 48-601, *et seq.*, with respect to purchases of Defendants' products and services in Idaho by Class members and/or by Idaho residents.

J.    815 Ill. Comp. Stat. 505/1, *et seq.*, with respect to purchases of Defendants' products and services in Illinois by Class members and/or by Illinois residents.

K.  Kan. Stat. Ann. §§ 50-623, *et seq*., with respect to purchases of Defendants' products and services in Kansas by Class members and/or by Kansas residents.

L.  Me. Stat. tit. 5, §§ 207, *et seq*., with respect to purchases of Defendants' products and services in Maine by Class members and/or by Maine residents.

M.  Mass. Gen. Laws ch. 93A, §§ 1, *et seq*., with respect to purchases of Defendants' products and services in Massachusetts by Class members and/or by Massachusetts residents.

N.  Mich. Comp. Laws §§ 445.901, *et seq*., with respect to purchases of Defendants' products and services in Michigan by Class members and/or by Michigan residents.

O.  Minn. Stat. §§ 325F.68, *et seq*., and Minn. Stat. § 8.31, *et seq*., with respect to purchases of Defendants' products and services in Minnesota by Class members and/or by Minnesota residents.

P.  Mo. Rev. Stat. §§ 407.010, *et seq*., with respect to purchases of Defendants' products and services in Missouri by Class members and/or by Missouri residents.

Q.  Mont. Code Ann. §§ 30-14-103, *et seq*., with respect to purchases of Defendants' products and services in Montana by Class members and/or by Montana residents.

R.  Neb. Rev. Stat. §§ 59-1601, *et seq*., with respect to purchases of Defendants' products and services in Nebraska by Class members and/or by Nebraska residents.

S.  Nev. Rev. Stat. Ann. §§ 598.0903, *et seq*., with respect to purchases of Defendants' products and services in Nevada by Class members and/or by Nevada residents.

T.  N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq*., with respect to purchases of Defendants' products and services in New Hampshire by Class members and/or by New Hampshire residents.

U.  N.M. Stat. Ann. §§ 57-12-1, *et seq*., with respect to purchases of Defendants' products and services in New Mexico by Class members and/or by New Mexico residents.

V.  N.Y. Gen. Bus. Law §§ 349, *et seq*., with respect to purchases of Defendants' products and services in New York by Class members and/or by New York residents.

W.  N.C. Gen. Stat. §§ 75-1.1, *et seq*., with respect to purchases of Defendants' products and services in North Carolina by Class members and/or by North Carolina residents.

X.      Or. Rev. Stat. §§ 646.605, *et seq.*, with respect to purchases of Defendants' products and services in Oregon by Class members and/or by Oregon residents.

Y.      R.I. Gen. Laws §§ 6-13.1-1, *et seq.*, with respect to purchases of Defendants' products and services in Rhode Island by Class members and/or by Rhode Island residents.

Z.      S.D. Codified Laws §§ 37-24-6, *et seq.*, with respect to purchases of Defendants' products and services in South Dakota by Class members and/or by South Dakota residents.

AA.     Tenn. Code Ann. §§ 47-18-101, *et seq.*, with respect to purchases of Defendants' products and services in Tennessee by Class members and/or by Tennessee residents.

BB.     Utah Code Ann. §§ 13-11-1, *et seq.*, with respect to purchases of Defendants' products and services in Utah by Class members and/or by Utah residents.

CC.     Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*, with respect to purchases of Defendants' products and services in Vermont by Class members and/or by Vermont residents.

DD.     W. Va. Code §§ 46A-6-101, *et seq.*, with respect to purchases of Defendants' products and services in West Virginia by Class members and/or by West Virginia residents.

EE.     Wis. Stat. § 100.20, *et seq.*, with respect to purchases of Defendants' products and services in Wisconsin by Class members and/or by Wisconsin residents.

287.    On behalf of themselves and the State Law Damages Class, Plaintiffs seek all appropriate relief provided for under the foregoing statutes.

### FIFTH CLAIM FOR RELIEF
### Unjust Enrichment Under Tennessee Law
### (On Behalf of Plaintiffs and the Nationwide Damages Class)

288.    Plaintiffs incorporate the above paragraphs by reference.

289.    This claim is pleaded in the alternative to the other claims in this Complaint.

290.    Defendants have reaped and retained substantial benefits in the form of higher profits due to their unjust scheme to monopolize the markets for Cheer Competitions and for Cheer Apparel.

291.    The financial benefits to Defendants from their wrongful conduct are traceable to overpayments for Cheer Competition registration fees, Cheer Apparel, Cheer Camps, and other ancillary charges including stay-to-play charges for accommodations at Varsity Cheer Competitions by Plaintiffs and members of the Nationwide Damages Class.

292.    Plaintiffs and members of the Nationwide Damages Class have conferred upon Defendants an economic benefit—its profits stemming from anticompetitive overcharges. Plaintiffs and members of the Nationwide Damages Classpaid those monopoly overcharges to their substantial economic detriment.

293.    It would be futile for Plaintiffs and members of the Nationwide Damages Class to seek relief against any party with whom they have privity of contract, including the gyms and schools to which they indirectly paid Varsity's artificially inflated prices, because the gyms and schools did not retain the full benefit of Varsity's unlawfully inflated prices.

294.    The financial benefits that Varsity, Charlesbank, Charlesbank Funds, Bain and Bain Funds derived by charging supracompetitive prices for its Cheer Competition registration fees, Cheer Apparel, Cheer Camps, and other ancillary charges including stay-to-play charges for accommodations at Varsity Cheer Competitions directly and proximately resulted from Varsity's unjust practices described herein. Those benefits rightfully belong to Plaintiffs and the members of the Nationwide Damages Class.

295.    It would be wrong and inequitable for Varsity to be permitted to retain any of the ill-gotten gains from its wrongful monopolization scheme.

296.    The benefits conferred upon Varsity, Charlesbank, Charlesbank Funds, Bain, and Bain Funds are measurable, in that the revenue they  have  earned due to its unlawful overcharges for Cheer Competition registration fees, Cheer Apparel, Cheer Camps, and other ancillary charges including stay-to-play charges for accommodations at Varsity Cheer Competitions is ascertainable by review of sales records.

297.    Varsity, Charlesbank, Charlesbank Funds, Bain, and Bain Funds should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the class all proceeds

that it inequitably derived from its scheme, and a constructive trust should be imposed upon such sums.

## SIXTH CLAIM FOR RELIEF
### For Declaratory Relief Under 28 U.S.C. § 2201 for Violations of Sections 1, 2, and 3 of the Sherman Act, 15 U.S.C. §§ 1–3 (On Behalf of Plaintiffs and the Injunctive Relief Class)

298.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

299.   Plaintiffs and the members of the Injunctive Relief Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201, hereby seek a declaratory judgment that Defendant's conduct in seeking to prevent competition as described herein violates Section 2 of the Sherman Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes, pray for judgment against Varsity as follows:

A.   Determining that this action may be maintained as a class action pursuant to Rules 23(a), 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the members of the Classes, and appoint the Plaintiffs as the named representatives of the Classes;

B.   Awarding Plaintiffs and the Class treble damages in an amount to be determined in trial, plus interest in accordance with law;

C.   Entering joint several judgments against Varsity, Charlesbank, Charlesbank Funds, Bain, and Bain Funds in favor of Plaintiffs and the Classes;

D.   Granting Plaintiffs and the Classes equitable relief in the form of disgorgement or restitution, and creation of a constructive trust to remedy the unjust enrichment of Varsity, Charlesbank, Charlesbank Funds, Bain, and Bain Funds;

E.   Awards Plaintiffs and the Classes their costs of suit, including reasonable attorneys' fees as provided by law; and

F.      Awarding such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(c), Plaintiffs demand a trial by jury on all issues so triable.

Dated: September 27, 2023

Respectfully submitted,

By:      /s/ Joseph R. Saveri
        Joseph R. Saveri

Joseph R. Saveri*
Steven N. Williams*
Ronnie Seidel Spiegel*+
Kevin E. Rayhill*
Elissa A. Buchanan*
David Seidel*
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
rspiegel@saverilawfirm.com
krayhill@saverilawfirm.com
eabuchanan@saverilawfirm.com
dseidel@saverilawfirm.com

Van Turner Jr. (TN Bar No. 22603)
**TURNER FEILD, PLLC**
2650 Thousand Oaks Blvd., Suite 2325
Memphis, Tennessee 38118
Telephone: (901) 290-6610
Facsimile: (901) 290-6611
VTurner@TurnerFeildLaw.com

Richard M. Paul III*
Ashlea Schwarz*
**PAUL LLP**

601 Walnut, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
rick@paulllp.com
ashlea@paulllp.com

Jason S. Hartley*
**HARTLEY LLP**
101 West Broadway, Suite 820
San Diego, CA 92101
Telephone: (619) 400-5822
hartley@hartleyllp.com
brizuela@hartleyllp.com

Daniel E. Gustafson*
Daniel C. Hedlund*
Daniel J. Nordin*
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com

* Admitted *pro hac vice*

+Located in Washington State

*Attorneys for Individual and
Representative Plaintiffs*