# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| JESSICA JONES and CHRISTINA LORENZEN on Behalf of Themselves and All Others Similarly Situated, </br></br>Plaintiffs, </br></br>v. </br></br>VARSITY BRANDS, LLC, et al., </br></br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) </br></br>No. 2:20-cv-02892-SHL-tmp |

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO EXCLUDE EXPERTS

Before the Court is Plaintiffs Jessica Jones and Christina Lorenzen's (together, "Indirect Purchasers") Motion to Exclude Jonathan M. Orszag and Dr. Kevin Murphy, In Part, filed on February 10, 2023. (ECF No. 384 (sealed).)  Defendants Varsity Brands, LLC; Varsity Spirit, LLC; Varsity Spirit Fashions & Supplies, LLC; U.S. All Star Federation ("USASF"); USA Sport Cheering, d/b/a USA Cheer; Charlesbank Capital Partners, LLC; Bain Capital Private Equity, LP; and Jeff Webb (together, "Defendants") filed a response on March 31, 2023.  (ECF No. 422.)  Indirect Purchasers replied on April 28, 2023.  (ECF No. 441 (sealed).)  For the reasons stated below, Indirect Purchasers' Motion to Exclude Jonathan M. Orszag is **GRANTED**.  Indirect Purchaser's Motion to Exclude Dr. Kevin Murphy is **DENIED** as to his opinions that 1) Varsity's acquisitions were procompetitive; and 2) the geographic market for cheer competition events is local, but the motion to exclude his opinion that event prices increased due to demand is **GRANTED.**

**BACKGROUND**

Varsity[1] is a prominent host of competitive cheerleading competitions and camps.  The Indirect Purchasers are the parents of competitive cheer athletes who were members of either All-Star Gym teams or school cheer teams.  (ECF No. 1 at PageID 6.)  They allege that they paid artificially inflated prices for goods and services, including enrollment in cheer competitions and apparel purchased indirectly from Varsity, and they seek to represent a class of all indirect purchasers of Varsity products and all entrants into Varsity or All-Star Cheer Competitions.  (Id.)

On September 23, 2022, Defendant USASF disclosed an expert report by Jonathan M. Orszag, a Senior Managing Director and Executive Committee member of the economic consulting firm Compass Lexecon, LLC.  (ECF No. 384-4 (sealed) at PageID 9694.)  Orszag's report contains two broad opinions, both of which Indirect Purchasers challenge: 1) Indirect Purchasers' experts do not provide economic support for the allegation that USASF was part of a conspiracy; and 2) analysis of USASF's rules and behavior during the class period demonstrates no economic evidence of anticompetitive conduct.  (Id.)

The same day, Defendants also disclosed an expert report by Dr. Kevin Murphy, the George J. Stigler Distinguished Service Professor of Economics in the Booth School of Business and the Department of Economics at the University of Chicago.  (ECF No. 384-3 (sealed) at PageID 9343.)  Indirect Purchasers challenge three of Dr. Murphy's opinions: 1) Varsity's acquisitions were procompetitive; 2) the geographic market for cheer competition events is local; and 3) prices for events increased because of natural increases in demand, not due to any anticompetitive effect.  (ECF No. 384-1 (sealed) at PageID 9312–13.)

---

[1] The Indirect Purchasers define "Varsity" as the collective term to represent Varsity Brands, LLC; Varsity Spirit, LLC; and Varsity Fashion & Supplies, LLC.  (ECF No. 1 at PageID 4.)

Indirect Purchasers seek to exclude Orszag's testimony in its entirety and Dr. Murphy's testimony in part.[2] (ECF No. 384 (sealed).)

## ANALYSIS

**I.   Legal Standard**

Courts are tasked with a gatekeeping function as to the admissibility of expert testimony. <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 597 (1993).  Federal Rule of Evidence 702 requires that an expert witness be specially qualified before they can give opinion testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Thus, the opinion offered by the expert must satisfy three requirements to be admissible: "First, the witness must be qualified by 'knowledge, skill, experience, training, or education.'  Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'  Third, the testimony must be reliable." <u>In re Scrap Metal Antitrust Litig.</u>, 527 F.3d 517, 528–29 (6th Cir. 2008) (quoting Fed. R. Evid. 702); <u>accord</u> <u>United States v. Rios</u>, 830 F.3d 403, 413 (6th Cir. 2016), <u>reh'g en banc denied</u>.

---

[2] Although both Parties request oral argument on the motion (ECF No. 385 at PageID 10084; ECF No. 424 at PageID 14248), the Court finds oral argument is unnecessary and that the motion can be resolved on the briefs.

Federal district courts have broad discretion to exclude proposed expert testimony.  See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 139 (1997); accord Lovelace v. Pediatric Anesthesiologists, P.A., No. 2:13-cv-02289-SHL-dkv, 2014 WL 8136184, at *1 (W.D. Tenn. Nov. 14, 2014).  Once a litigant challenges the admissibility of proposed expert testimony, the proponent bears the burden of establishing, by a preponderance of the evidence, that it is admissible.  Fed. R. Evid. 702 advisory committee's note to the 2023 amendments (citing Bourjaily v. United States, 483 U.S. 171 (1987)).

**II.    Orszag Testimony**

Indirect Purchasers' motion challenges the admissibility of Orszag's opinions offering four arguments: 1) Orszag is not qualified to opine on the cheer industry; 2) his opinions are not reliable because they are only based on ipse dixit; 3) his opinions have been excluded in another case; and 4) he ignores record evidence prior to the class period.  (See ECF 384-1 (sealed).)  Although the Court finds that Orszag is qualified, his opinions are not supported by any reliable methodology or connected to his own experience; therefore, his testimony is excluded.  Because the Court finds his testimony to be unreliable, the Court only addresses his qualifications and reliability below.

      A.     Orszag's Qualifications

First, Indirect Purchasers argue that Orszag is not qualified by training or experience to opine on the cheerleading industry.  (Id. at PageID 9320.)  They assert that Orszag has not done any expert work or written scholarly articles related to cheerleading, he does not hold a doctorate in economics, and the majority of his experience is in the political sphere.  (Id. at PageID 9320.)

Defendants counter, arguing that Orszag is a "well-respected economist whose qualifications have been recognized by numerous courts."  (ECF No. 423 (sealed) at PageID 13995.)  They point out that Orszag has an advanced degree in economics, has worked as an

4

economist for the government and as a consultant for more than twenty years, and has been qualified as an expert by other courts. (Id. at PageID 13996.) Additionally, Defendants assert that Orszag has "experience and expertise in sports economics, including consulting work for the PGA Tour, an NBA team, a professional players' union, and various sports broadcasting networks." (Id. at PageID 13997.)

The fact that Orszag does not have any experience specific to the cheer industry does not disqualify him as an expert. (The Court suspects there are very few economists with a cheerleading specialty.) Nor does the fact that Orszag does not possess a doctorate in economics result in automatic exclusion. See Ohio Organizing Collaborative v. Husted, No. 2:15-cv-1802, 2016 WL 8201848 (S.D. Ohio May 24, 2016) ("But education is not alone determinative; a witness may also be qualified as an expert in a particular area by his experience.") Orszag's experience as an economist, particularly in sports, qualifies him to offer opinions on sports economics, including the cheer industry.

B.  Reliability of Orszag's Opinions

Next, Indirect Purchasers contend that Orszag's opinions must be excluded because they are "not based on any established methodology or principles." (ECF No. 384-1 (sealed) at PageID 9315.) Indirect Purchasers point out that Orszag did not "perform any econometric analysis of the available transaction or sales data" or "perform any surveys." (Id.)

In response, Defendants argue that courts often permit economic experts to testify about "whether certain conduct is indicative of collusion." (ECF No. 423 (sealed) at PageID 13997) (citing In re Processed Egg Prods. Antitrust Litig., 81 F. Supp. 3d 412, 424–25 (E.D. Pa. 2015)). Defendants rely on In re Dealer Management Sys. Antitrust Litig., 581 F. Supp. 3d 1029, 1052–53 (N.D. Ill. 2022), in which the court explained that it was appropriate for defendants' expert to "perform[] similar evaluations of the record and offer opinions that the documents do not support

5

a hypothesis of unlawful collusion." (Id. at PageID 13998). The Dealer Management court stated that experts need not "use a formal model quantifying the relative gains from unilateral versus conspiratorial conduct; nor [need] they identify any model that [the expert] could have, but did not, use instead." (Id. at PageID 13998) (quoting In re Dealer Mgmt. Sys. Antitrust Litig., 581 F. Supp. 3d at 1052–53). Like the expert in Dealer Management, Defendants contend that Orszag "considered, from an economic perspective, whether the available evidence is consistent with Plaintiffs' allegations that USASF conspired with Varsity to foreclose competition and raise prices in cheer competitions, apparel, and camps." (ECF No. 423 (sealed) at PageID 13998.) He also examined "the rules and behavior of USASF that Plaintiffs' experts claimed supported the existence of a conspiracy." (Id.)

Four factors must be considered when analyzing the reliability of the reasoning or methodology underlying expert testimony: 1) whether a method has been tested, 2) whether it has been peer reviewed, 3) whether it has a high rate of error, and 4) whether it is generally accepted within the relevant community. Daubert, 509 U.S. at 592–94. However, experience-based testimony can also satisfy Daubert's reliability requirements. Little Hocking Water Ass'n, Inc. E.I. du Pont de Nemours and Co., 90 F. Supp. 3d 746, 754 (S.D. Ohio 2015) (citing United States v. Poulsen, 543 F.Supp.2d 809, 811–12 (S.D. Ohio 2008); First Tenn. Bank Nat'l Ass'n v. Barreto, 268 F.3d 319, 335 (6th Cir. 2001)). If an expert is relying on their "practical experiences," their report must include "how and why the expert reached a particular result, not merely the expert's conclusory opinions." Williams v. Syphan, No. 22-3222, 2023 WL 1305084, at *3 (6th Cir. Jan. 31, 2023) (quoting Barreto, 268 F.3d at 335; Thacker v. Ethicon, Inc., 47 F.4th 451, 459 (6th Cir. 2022)).

Orszag's report purports "to review and assess, from an economic perspective, whether the available evidence is consistent with Plaintiffs' allegations that USASF conspired with

6

Varsity to foreclose competition and raise prices in cheer competitions, apparel, and camps." (ECF No. 384-4 (sealed) at PageID 9696.) His report responds to the opinions in Plaintiffs' experts' reports, specifically Dr. Janet S. Netz's report regarding USASF's role as a sanctioning organization for All Star Cheer and its alleged conspiracy with Varsity, as well as Dr. Randall Heeb, Dr. Jen Maki, and James H. Aronoff's claims regarding USASF's role in the alleged conspiracy. (Id.)

Both Drs. Netz and Heeb ran multi-variate regression analyses to support their conclusions. (See ECF Nos. 383 (sealed), 390 (sealed)). As a result, these opinions can be tested and numerically challenged. However, in challenging these expert opinions, Orszag does not apply any economic modeling, regression, statistical, or econometric analysis of his own. (ECF No. 384-10 (sealed) at PageID 9825.) He simply asserts that "the economic evidence in this case is not consistent with Plaintiffs' allegations of a conspiracy by which USASF coordinated with Varsity to harm competition." (ECF No. 384-4 (sealed) at PageID 9696.)

Unlike in Dealer Management, there are models and methodologies that Orszag could have used. (ECF No. 423 (sealed) at PageID 13998.) Instead, Orszag explains that his opinions are based on his "analysis of Plaintiffs' experts' reports, the factual discovery record in this case, interviews with current and former USASF employees, and [his] years of experience in analyzing competition issues in numerous industries, including sports." (Id.) Because Orszag appears to be relying primarily on his experience, rather than any methodology, he must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Adams v. City of Clarksville, No. 3:09-CV-220, 2010 WL 11693099, at *4 (M.D. Tenn. Feb. 25, 2010) (citing Thomas v. City of Chattanooga, No. 1:02-CV-228, 2003 WL 23471547, at *13 (E.D. Tenn. Dec. 4, 2003)). He offers none of these.

Orszag does not connect the dots between his opinions and his prior experience; he simply offers his opinions without any rationale to support his conclusions. Because Orszag's opinions are insufficiently supported by any reliable methodology or connected to his own experience, the Court finds his testimony is inadmissible.[3] Id. The Motion to Exclude Orszag's testimony is **GRANTED**.

## II.     Dr. Murphy's Testimony

Indirect Purchasers also seek to exclude three of Dr. Murphy's opinions: 1) Varsity's acquisitions were procompetitive; 2) the geographic market for cheer competition events is local; and 3) prices for events increased because of natural increases in demand, and not due to any anticompetitive effect. (ECF No. 384-1 (sealed) at PageID 9312–13.) After examining each opinion below, the Motion to Exclude Dr. Murphy's opinions regarding procompetitive acquisitions and geographic markets is **DENIED** and the Motion to Exclude his opinion on event price increases is **GRANTED**.

### A.     Varsity's Acquisitions Were Procompetitive

Exhibit 45 to Dr. Murphy's report is a chart titled: "Summary of Participation & Price Changes for Acquired Competitions Pre- and Post-Acquisition." (ECF No. 384-3 (sealed) at PageID 9614.) Exhibit 45 shows, post-acquisition, that there was a twelve percent increase in attendance at competitions acquired by Varsity. (ECF No. 384-1 (sealed) at PageID 9321.) Dr. Murphy relies on this data to support his opinion that Varsity's acquisitions of cheer competition events, despite the resulting price increases, had a procompetitive effect. (ECF No. 384-3 (sealed) at PageID 9481–82.) Indirect Purchasers seek the exclusion of Exhibit 45, along with

---

[3] Because the Court finds Orszag's opinions are unreliable, it is not necessary to address Indirect Purchasers' remaining arguments.

the opinions that rely on it, for two reasons, arguing that Dr. Murphy: 1) failed to consider sufficient facts and data in crafting the exhibit, and 2) did not analyze or calculate the purported "net benefit." (ECF No. 384-1 (sealed) at PageID 9321–22.)

> 1. *Sufficient Facts and Data*

In challenging the reliability of Dr. Murphy's opinions, Indirect Purchasers quote Dr. Heeb's rebuttal report:

> First, Dr. Murphy reports only "Average Athlete Participation" per event and not "Total Athlete Participation." The relevant measure for consumer welfare is "Total Athlete Participation." Second, Dr. Murphy only reports the percentage changes in "Average Athlete Participation" and "Real Average Price per Athlete" for the "Continued" events, but not for the "Unmatched" events (or the "All Events" total at the bottom of his Exhibit 45). Third, Dr. Murphy does not report the percentage change in the number of events. This is important since Varsity cancelled a significant number of acquired brand events. Fourth, and finally, Dr. Murphy does not include the 2015 acquisition of JAM Brands in his analysis. These are flaws with the design and reporting of his Exhibit 45.
>
> In addition to the design flaws, Dr. Murphy uses incorrect data inputs in constructing his Exhibit 45. Without explanation in his report, Dr. Murphy's backup materials indicate that he created his own data inputs for the athlete participation counts. In creating his athlete participation counts, Dr. Murphy undercounts participation in the pre-acquisition data (based on raw data inputs from the registration records of rival event producers) and exaggerates participation in the post-acquisition data (based on raw data inputs from Varsity's registration records). Dr. Murphy's data inputs are incorrect and unreliable.

(ECF No. 390-3 (sealed) at PageID 12047.)

In response, Defendants argue: 1) Dr. Murphy correctly examined average participation "because increased average participation . . . suggests higher event quality"; 2) Exhibit 45 includes average participation at unmatched events pre- and post-acquisition; 3) the change in the number of events is irrelevant because Dr. Murphy's focus was on the improvements Varsity made to acquired events; and 4) Dr. Murphy analyzed the JAM Brands acquisition and explained that its inclusion does not significantly change his results because average participation at JAM Brands events increased 1%. (ECF No. 423 (sealed) at PageID 14004–05.) They also argue that

9

Dr. Murphy's use of data is correct because excluding Dance Studio and Youth Group teams from post-acquisition figures "leads to systematic undercounting of post-acquisition participation relative to pre-acquisition participation." (Id. at PageID 14005–06.)

Indirect Purchasers' arguments to exclude Exhibit 45 and the opinions that rely on it concern the credibility of Dr. Murphy's testimony, not its admissibility. In re Scrap Metal Antitrust Litig., 527 F.3d at 530 ("we will generally permit testimony based on allegedly erroneous facts when there is some support for those facts in the record"). "Where an expert's testimony amounts to 'mere guess or speculation,' the court should exclude his testimony, but where the opinion has a reasonable factual basis, it should not be excluded. Rather, it is up to opposing counsel to inquire into the expert's factual basis." United States v. L.E. Cooke Co., Inc., 991 F.2d 336, 342 (6th Cir. 1993) (quoting United States v. 0.161 Acres of Land, 837 F.2d 1036, 1040 (11th Cir. 1988)).

Although Plaintiffs and their experts may disagree with the data used, it is not based on "mere guess and speculation." L.E. Cooke, 991 F.2d at 342. Here, as Defendants explain, the data used by Dr. Murphy has a reasonable factual basis in the record and is thus admissible under Rule 702(b). Disputes about the data used and Murphy's resultant findings may be addressed on cross-examination.

2.   *Failure to Calculate Net Benefit*

Dr. Murphy found that an attendance increase resulting from Varsity's acquisitions led to an overall "net benefit" in the quality of the events offered, which justifies any increase in price. (ECF No. 384-3 (sealed) at PageID 9482.) Indirect Purchasers seek to exclude this finding, arguing that Murphy failed to analyze or calculate this "net benefit." Indirect Purchasers contend that Dr. Murphy identifies no evidence of Varsity investments that improved the quality of its events, "cherry picks" only certain portions of the available data by omitting events that Varsity

10

already owned and events that Varsity acquired but then closed, and does not connect the increase in event participation and his opinion that Varsity's acquisitions were procompetitive. (ECF No. 384-1 (sealed) at PageID 9322–23.)

Defendants respond by arguing that Dr. Murphy's conclusion that Varsity's acquisitions were procompetitive is based on "a heightened standard of professionalism, and . . . the inclusion of acquired events in the Varsity Family Plan and the addition of Summit bids to many events." (ECF No. 423 (sealed) at PageID 14007.) Defendants assert that Dr. Murphy does not need to calculate the net benefit to consumers because Indirect Purchasers bear the burden of proof in alleging that Varsity's acquisitions were anticompetitive. (Id.)

Dr. Murphy opines that "an increase in participation is consistent with Varsity improving quality and providing additional consumer benefits at acquired events." (ECF No. 384-3 (sealed) at PageID 9482.) He details these benefits in his opinion with citations to the record. (Id. at PageID 9480.) These benefits include enabling the acquired events to "award bids to the Summit and D2 Summit end of season events" and "expanding opportunities for gyms participating in these events to benefit from the [Varsity Family Plan]." (Id.)

Because Dr. Murphy's opinion has a reasonable factual basis in the record, it is not inadmissible under Rule 702. Indirect Purchasers can present their own expert testimony regarding net benefit and can address Dr. Murphy's lack of calculation of "net benefit" on cross-examination. Therefore, Plaintiff's Motion to Exclude Exhibit 45 and the opinions that rely on it is **DENIED**.

B.     Geographic Market

Next, Indirect Purchasers argue that Dr. Murphy's opinion that the market for cheer events is local should be excluded because it is irrelevant and unreliable. (ECF No. 384-1 (sealed) at PageID 9324.) Indirect Purchasers assert that:

> The standard and widely accepted economic methodology used to define a relevant product or geographic market is to look at direct evidence of a company's market power, e.g., such as in a company's own business documents stating its market share, as well as indirect evidence in the form of the hypothetical monopolist test ("HMT") and looking at the practical indicia factors under Brown Shoe Co. v. United States, 370 U.S. 294 (1962).

(Id.) (citing Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc., 588 F.3d 908 (6th Cir. 2009)).

Indirect Purchasers highlight several issues with Dr. Murphy's opinion. First, they argue that Dr. Murphy "does not define any relevant geographic markets in his report and does not apply the HMT." (Id. at PageID 9325.) They assert that his analysis of consumer travel patterns, "specifically his measure of average distance travelled by teams attending competitions, does not address the relevant question regarding how far a team might travel to attend an event if a price were to increase." (Id.) As for this argument, Defendants respond by asserting that Dr. Murphy does apply the HMT, explaining "the HMT defines geographic markets based on reasonable consumer substitution in response to modest price increases, i.e. how far teams 'routinely travel[.]'" (ECF No. 423 (sealed) at PageID 14008.) Defendants explain that "[t]he fact that one team could or might travel 800 miles—more than a 13-hour drive—to attend an event does not mean enough teams would expend the same time, effort, and expense such that a hypothetical monopolist would not be able to raise prices, or that even this one team would be willing to travel that distance multiple times in a season." (Id.) (internal citations omitted).

12

Second, Indirect Purchasers fault Dr. Murphy for only examining Varsity All Star events in the analysis he used to build his catchment areas.[4] (ECF No. 384-1 (sealed) at PageID 9326.) They also assert that his analysis is flawed because he does not analyze competitors' events. (Id.) In response, Defendants state that "customer switching and catchment areas for scholastic events are not relevant to his analysis because there were no acquisitions of scholastic events in the relevant period, and Indirect Purchasers' experts did not analyze any such acquisitions." (ECF No. 423 (sealed) at PageID 14009.) Further, they contend that the analysis of competitor's data, "if it could be obtained, would produce even smaller geographic markets

---

[4] Dr. Murphy explains how he derives "catchment areas" in his report:

> To understand the relevance of these catchment areas for geographic market definition, it is useful to consider how the hypothetical monopolist test would apply to a candidate geographic market in cheer competitions. As I discussed above, the profitability of a price increase for a hypothetical monopolist depends on the reactions of consumers, which in turn depend on the alternatives available to them. In response to a price increase at a particular event, some consumers may switch away from that event and to different events. In considering whether to switch and to what event to switch to, one factor that a consumer will weigh is travel cost. Because travel is costly to consumers, if they switch from the reference event at all, they will likely switch to another event in the same proximity. The hypothetical monopolist is assumed to own all events in a particular candidate market. If, because of travel costs, few consumers are willing to travel far enough to leave the area, then a modest price increase on an event within the area will most likely be profitable for the monopolist because even when consumers switch away from the reference event to other events in that same area, the monopolist earns profits from their purchase. In this situation, we would conclude that the relevant geographic market is no larger than the candidate area. If, however, many consumers are willing to travel beyond the candidate area to farther away events (that the hypothetical monopolist does not own), the monopolist loses their sales and therefore the price increase would not be profitable. In this situation, we would conclude that the relevant geographic market is broader than the candidate area. I use the logic of the hypothetical monopolist test and the consumer travel patterns presented above to derive geographic markets ("catchment areas") for each cheer competition considered in my analysis.

(ECF No. 384-3 (sealed) at PageID 9430–31.)

because competing event producers have a stronger incentive than Varsity to place events close to an existing Varsity event, so that customers would likely travel shorter distances when switching between Varsity and non-Varsity events." (Id.)

Finally, Indirect Purchasers challenge Dr. Murphy's regression analysis based on a catchment area of sixty percent, arguing that it is not supported by explanation or citation to academic literature. (ECF No. 384-1 (sealed) at PageID 9325.) Defendants explain that:

> Prof. Murphy used catchment areas to understand how far customers tend to travel when substituting away from a small but significant and non-transitory increase in price ("SSNIP"). He arrived at a 60% catchment area as the maximum geographic market by calculating that a hypothetical monopolist could impose a SSNIP in that area. The HMGs suggest analyzing a 10% price increase to understand consumer responses. Prof. Murphy did just that. Based on observed participation changes following price increases at events, he concluded that at most 24% of event attendees would substitute away from an event in response to a 10% price increase. Then, from data on event producer profitability, he found that a 10% price increase would be profitable as long as an event producer could reduce that 24% attrition rate to 9.6% by recapturing 60% of substituting customers by owning the events they substitute to.

(ECF No. 423 (sealed) at PageID 14009) (internal citations and footnote omitted).

Although Indirect Purchasers may disagree with Dr. Murphy's methodology in defining a geographic market, they have not demonstrated that his methodology is unreliable. He has applied a recognized methodology—the logic of the hypothetical monopolist test—and as explained by Defendants, the data he relied on—consumer travel patterns—has a reasonable factual basis in the record. See Babcock Power, Inc. v. Kapsalis, 854 F. App'x 1, at *8–9 (6th Cir. 2021) (admitting an expert who used "recognized methods" with a "reasonable factual basis"). Indirect Purchasers' avenue for challenging Dr. Murphy's methodology and its application, is cross-examination. L.E. Cooke, 991 F.2d at 342 (citing 0.161 Acres of Land, 837 F.2d at 1040). The Motion to Exclude this opinion is **DENIED**.

### C. Prices for Events Increased Due to Increase in Demand

Finally, Indirect Purchasers challenge Dr. Murphy's opinion that "there were no general adverse effects on the pricing of Varsity's non-acquired competitions as a result of the acquisitions." (ECF No. 384-3 (sealed) at PageID 9490.) To reach this opinion, Dr. Murphy performed regression analyses that relied on a "demand variable." (ECF No. 384-1 (sealed) at PageID 9327.) He derived that variable from the National Federation of State High School Associations High School Participation Survey ("NFHS Survey"). (ECF No. 384-3 (sealed) at PageID 9688.)

Indirect Purchasers challenge Dr. Murphy's use of the survey because he had no role in the survey's construction, and offered no testimony as to whether it was performed under any proper or reliable survey methodology. (ECF No. 384-1 (sealed) at PageID 9328.) Indirect Purchasers assert that "because the survey has no indicia of reliability, and because Plaintiffs cannot cross examine the unknown individuals who conducted the alleged survey, Dr. Murphy's regressions that use the survey as inputs are not admissible." (Id.) Defendants respond, arguing that Dr. Murphy "need not be a survey expert to testify about the information compiled by third-party surveys, so long as the information is of a type reasonably relied upon by experts in the field to form opinions upon the subject." (ECF No. 423 (sealed) at PageID 14011.)

Indirect Purchasers also assert that the survey is unreliable because NFHS is a "strategic partner" of Varsity and that "[t]here are significant incentives for Varsity and NFHS[] to manipulate or forge the data or to control the methodology of the survey to ensure that it shows significant increased demand for the sport[.]" (ECF No. 384-1 (sealed) at PageID 9329.) Defendants respond by pointing out that "the survey was created prior to Varsity's creation, that it covers many youth sports other than scholastic cheerleading, and that NFHS receives fees from dozens of participating entities." (ECF No. 423 (sealed) at PageID 14012.)

In Appendix D of Dr. Murphy's report, he provides background on the NFHS survey and his use of it:

> The National Federation of State High School Associations ("NFHS") is an association created to advocate for the participation of youth in high school athletics, fine arts, and performing arts. The NFHS is made up of 51 member associations representing the 50 U.S. states and Washington, D.C, and represents 19,500 high schools. In addition to providing guidance on rules and regulations for high school sports, the NFHS has tracked the participation of youth in various sports in each academic calendar year [through] its High School Participation Surveys. These surveys collect information from each of the 51 member associations and are available from the 1969-1970 academic year to the 2018-2019 academic year. The survey provides information on the number of participants of various high school athletics by activity and gender.

(ECF No. 384-3 (sealed) at PageID 9688.) Dr. Murphy also explains that there are limitations to the data in the survey,

> because the survey is conducted by the member states, response rates and the activities covered by the survey may vary. In some years, the survey provides no information on the number of participants in competitive spirit squads for some of the states. When this happens, comparing the aggregate number of participants from year to year may result in misleading changes in the participant counts.

(Id.) To account for this, Dr. Murphy uses a process called "chaining," which he describes in Appendix D:

> I begin by calculating the year-over-year change in female participation in competitive spirit squads within each state, beginning with the 2010-2011 to 2011-2012 survey years. If a state did not report its participation values in the NFHS survey for either 2010-2011 or 2011-2012, it is not included in this year-over-year change calculation. This process is referred to as chaining.

(Id. at PageID 9688–89.)

"Courts have generally found consumer survey evidence admissible under Daubert if a qualified expert testifies that the survey was conducted according to generally-accepted principles of survey research." Menasha Corp. v. News Am. Mktg. In-Store, Inc., 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003). The "proponent of a [] survey has the burden of establishing that

16

it was conducted in accordance with accepted principles of survey research." Sports Auth., Inc. v. Abercrombie & Fitch, Inc., 965 F. Supp. 925, 933 (E.D. Mich. 1997).

Although Dr. Murphy explained his own process when using the data from the survey, he has not established the reliability of the survey itself. Indeed, in his deposition, Dr. Murphy acknowledged that "I do not know the details of the survey design." (ECF No. 384-9 (sealed) at PageID 9814.) Because Dr. Murphy has not met his burden of establishing that the survey was conducted in accordance with accepted principles of survey research, the Motion to Exclude the survey and Dr. Murphy's opinions that rely on it is **GRANTED**. See Abercrombie & Fitch, 965 F. Supp. at 933.

## CONCLUSION

For the reasons stated above, Indirect Purchasers' Motion to Exclude Jonathan M. Orszag is **GRANTED**. Indirect Purchaser's Motion to Exclude Dr. Kevin Murphy is **DENIED** as to his opinions that 1) Varsity's acquisitions were procompetitive; and 2) the geographic market for cheer competition events is local, but the Motion to Exclude his opinion that event prices increased due to demand is **GRANTED.**

**IT IS SO ORDERED,** this 6th day of February, 2024.

                                                                s/ Sheryl H. Lipman  
                                                                SHERYL H. LIPMAN  
                                                                CHIEF UNITED STATES DISTRICT JUDGE