## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| JESSICA JONES and CHRISTINA LORENZEN, on Behalf of Themselves and All Others Similarly Situated,<br><br>   Plaintiffs,<br><br>v.<br><br>VARSITY BRANDS, LLC, et al.,<br><br>   Defendants. | ) ) ) ) ) ) ) ) ) | No. 2:20-cv-02892-SHL-tmp |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JANET S. NETZ, PHD

Before the Court is Defendants Varsity Brands, LLC; Varsity Spirit, LLC; Varsity Spirit Fashions & Supplies, LLC; U.S. All Star Federation ("USASF"); USA Sport Cheering, d/b/a USA Cheer; Charlesbank Capital Partners, LLC; Bain Capital Private Equity, LP; and Jeff Webb's (together, "Defendants") Motion to Exclude the Testimony of Janet S. Netz, PhD, filed February 10, 2023.  (ECF No. 382.)  Plaintiffs Jessica Jones and Christina Lorenzen's (together, "Indirect Purchasers") responded on March 31, 2023.  (ECF No. 425.)  Defendants replied on April 28, 2023.  (ECF No. 444.)  For the reasons stated below, the motion is **GRANTED** only as to her opinions regarding Varsity's motives.  The remainder of the motion is **DENIED**.

## BACKGROUND

Varsity[1] is a prominent host of competitive cheerleading competitions and camps.  The Indirect Purchasers are the parents of competitive cheer athletes who were members of either

---

[1] The Indirect Purchasers define "Varsity" as the collective term to represent Varsity Brands, LLC; Varsity Spirit, LLC; and Varsity Fashion & Supplies, LLC.  (ECF No. 1 at PageID 4.)

All-Star Gym teams or School Cheer teams.[2]  (ECF No. 1 at PageID 6.)  They allege that they paid artificially inflated prices for goods and services, including enrollment in cheer competitions and apparel purchased indirectly from Varsity, and they seek to represent a class of all indirect purchasers of Varsity products and all entrants into Varsity or All-Star Cheer Competitions.  (Id.)

On June 20, 2022, Indirect Purchasers disclosed an expert report by Dr. Janet S. Netz, a founder and partner of the economic consulting firm applEcon.  (ECF No. 383-2 (sealed) at PageID 8736.)  Dr. Netz's report contains two broad opinions, both of which Defendants challenge: 1) Varsity has the market power necessary to raise prices; and 2) Varsity's conduct harmed competition.  (Id.)

On December 14, 2022, Indirect Purchasers also disclosed a rebuttal report from Dr. Netz that responded to opinions offered by other experts.  (ECF No. 383-3 (sealed).)  On February 10, 2023, Defendants filed this motion, seeking to exclude Dr. Netz's testimony in its entirety.[3]  (ECF No. 382.)

---

[2] All-Star Cheer teams are affiliated with private gyms and School Cheer teams are affiliated with middle schools, high schools, or colleges.   (ECF No. 1 at PageID 15–16.)

[3] Although both Parties request oral argument on the motion (ECF No. 382 at PageID 8547, ECF No. 425 at PageID 14274), the Court finds oral argument unnecessary as the motion can be resolved on the briefs.

<u>ANALYSIS</u>

Defendants' motion challenges the admissibility of Dr. Netz's opinions, offering two broad arguments: 1) Dr. Netz's market definition analysis failed to consider narrower markets and is therefore unreliable, and 2) the majority of her opinions are factual narrative based on an incomplete review of the evidence.  (<u>See</u> ECF No. 382-1.)

## I.   Legal Standard

Courts are tasked with a gatekeeping function as to the admissibility of expert testimony. <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 597 (1993).   Federal Rule of Evidence 702 requires that an expert witness be specially qualified before they can give opinion testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b)  the testimony is based on sufficient facts or data;
> >
> > (c)  the testimony is the product of reliable principles and methods; and
> >
> > (d)  the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Thus, the opinion offered by the expert must satisfy three requirements to be admissible: "First, the witness must be qualified by 'knowledge, skill, experience, training, or education.'  Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'  Third, the testimony must be reliable." <u>In re Scrap Metal Antitrust Litig.</u>, 527 F.3d 517, 528–29 (6th Cir. 2008) (quoting Fed. R. Evid. 702); <u>accord</u> <u>United States v. Rios</u>, 830 F.3d 403, 413 (6th Cir. 2016), <u>reh'g en banc denied</u>.

Federal district courts have broad discretion to exclude proposed expert testimony.  See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 139 (1997); accord Lovelace v. Pediatric Anesthesiologists, P.A., No. 2:13-cv-02289-SHL-dkv, 2014 WL 8136184, at *1 (W.D. Tenn. Nov. 14, 2014).  Once a litigant challenges the admissibility of proposed expert testimony, the proponent bears the burden of establishing, by a preponderance of the evidence, that it is admissible.  Fed. R. Evid. 702 advisory committee's note to the 2023 amendments (citing Bourjaily v. United States, 483 U.S. 171 (1987)).

As explained in more detail below, Dr. Netz's opinions are admissible, except those that relate to Varsity's motives.

## II.    Market Definition

Defendants argue that Dr. Netz's definition of relevant markets must be excluded because she misapplies the Hypothetical Monopolist Test ("HMT") and disregards substantial evidence that undermines her conclusions.  (ECF No. 382-1 at PageID 8556.)  According to Defendants :

> [The HMT] considers whether a hypothetical monopolist of a candidate set of products could impose a small but significant non-transitory increase in price ("SSNIP") —typically 5% or 10%—on at least one of the products without losing so many customers to an alternative product outside of the candidate market such that the price increase would be unprofitable.  If one conducts the hypothetical monopolist test and finds that such diversion occurs, the alternative product must be considered part of the relevant market and the test repeated until there is a candidate market in which the imposition of a SSNIP is profitable.  As Dr. Netz acknowledges, one must start with the narrowest set of products and only expand as needed to satisfy the test.  But, she failed to do this both for her product and geographic markets, rendering the resulting market definition inaccurate, unreliable, and thus inadmissible.

(Id. at PageID 8557) (internal citations omitted).  Defendants challenge Dr. Netz's definition of cheer competitions, cheer apparel, and cheer camp product markets, as well as the relevant geographic market.  Each is addressed below.

4

A.     Cheer Competition Market

In her report, Dr. Netz states, "the narrowest possible product market is for All Star competitions or for School competitions."  (ECF No. 382-2 (sealed) at PageID 8660.) Defendants argue that Dr. Netz misapplies the HMT because she fails to consider distinctions between All Star and school competitions.  (ECF No. 382-1 at PageID 8557.)  Defendants point out several distinctions between these types of competitions, including different prices, equipment, and rules.  (Id. at PageID 8558.)  Indirect Purchasers counter, arguing that "[a]fter careful qualitative analysis, including the testing of other possible candidate products, Dr. Netz defined the cheer competitions market to include both All Star Cheer and what Indirect Purchasers define to be School Cheer,[4] as those products would be subject to the same competitive effects."  (ECF No. 425 at PageID 14279.)

In her report, Dr. Netz explains her definition of the cheer competition market as follows:

> Varsity documents and other evidence indicate that All Star Cheer Competitions and School Cheer Competitions are competitively distinct activities; teams do not participate in the same competitions or events.  In addition, Varsity views these two types of competitions as separate markets in terms of its strategies and pricing decisions.   In addition, the cost to participate in these two activities is distinct.

---

[4] Indirect Purchasers also contend that Defendants' arguments are based on an incorrect definition of School Cheer, explaining:

> Plaintiffs use the term School Cheer to mean the activity which involves school cheer teams competing against other school cheer teams at cheer competitions. Defendants, on the other hand, continue to use the term "Scholastic Cheer," which refers to both School Cheer, as Plaintiffs define it, *and* other categories of cheer, including sideline cheer (a different activity where a school cheer team does not compete with other cheer teams, rather, it is a sport to support other school teams). Therefore, Defendants' arguments are based on categories of cheer that Plaintiffs do not even allege, and which Dr. Netz does not include in her product market definition.

(ECF No. 425 at PageID 14279 n.6) (internal citations omitted).

Annual costs for All Star Cheer are significantly more than the annual costs incurred in School Cheer.

However, while All Star gym owners and School athletic directors decide which competitions a team will attend each year, ultimately their decisions reflect the decisions of the individual athletes. If a putative monopolist that controlled All Star competitions raised price by 5-10% for a year, athletes may choose to leave an All Star team and join a School team. Similarly, if a putative monopolist that controlled all School competitions raised price by 5-10% for a year, athletes may choose to leave a School team and join an All Star team. If there is sufficient substitution from one type of team to the other to make a price increase for one type of competition unprofitable, the candidate relevant antitrust market would be for Cheer competitions, including both All Star and School competitions.

(ECF No. 383-2 (sealed) at PageID 8661.)

There are four factors to consider when analyzing the reliability of the reasoning or methodology underlying expert testimony: 1) whether a method has been tested, 2) whether it has been peer reviewed, 3) whether it has a high rate of error, and 4) whether it is generally accepted within the relevant community. Daubert, 509 U.S. at 592–94. Although Defendants may disagree with Dr. Netz's methodology in defining the cheer competition market, they have not demonstrated that it is unreliable. She has applied a recognized methodology—the HMT test—and determined that the All Star competitions and School competitions are reasonably interchangeable under the SSNIP test. See Babcock Power, Inc. v. Kapsalis, 854 F. App'x 1, at *8–9 (6th Cir. 2021) (admitting an expert who used "recognized methods" with a "reasonable factual basis"). Defendants' avenue for challenging Dr. Netz's methodology and its application is cross-examination. United States v. L.E. Cooke Co., Inc., 991 F.2d 336, 342 (6th Cir. 1993) (citing United States v. 0.161 Acres of Land, 837 F.2d 1036, 1040 (11th Cir. 1988)). The motion to exclude this opinion is **DENIED**.

B.      Cheer Apparel Market

In her report, Dr. Netz proposes that the Cheer Apparel market includes "uniforms, shoes, accessories, warm-ups, and camp wear." (ECF No. 383-2 (sealed) at PageID 8674.) She asserts that "[t]he same types of apparel are purchased by both All Star teams and School teams[.]" (Id.) Defendants argue that this definition "defies law, economics, and the record" because: "(1) it includes products that are not reasonably interchangeable with each other both across and within product categories; (2) it artificially excludes identical products not specifically marketed for cheer[] and . . . results from an unreliable application of the hypothetical monopolist test." (ECF No. 382-1 at PageID 8560.)

First, Defendants argue that the product market is overinclusive because it includes products that are not interchangeable, like hair bows and shoes. (Id. at PageID 8561.) In response, Indirect Purchasers argue that "market definitions with differentiated goods are widely accepted by both economists and courts." (ECF No. 425 at PageID 14282) (citing United States v. Grinnell Corp., 384 U.S. 563, 572 (1966) (rejecting argument that burglar alarms and fire alarms were not in the same relevant market because they were too different)).

A "cluster" of services can be a "distinct line of commerce" and serve as a relevant product market for the purposes of an antitrust claim. ACT, Inc. Worldwide Interactive Network, 3:18-cv-186, 2020 WL 12574235, *3 (E.D. Tenn. Mar. 24, 2020) (citing Grinnell, 384 U.S. at 573). The Sixth Circuit has recognized two theories by which markets for products or services can be "clustered" into a single market. Id. (citing ProMedica Health Sys., Inc. v. Fed. Trade Comm'n, 749 F.3d 559, 565 (6th Cir. 2014)). First, markets can be clustered pursuant to the "administrative-convenience" theory when "there is no need to perform separate antitrust analyses for separate product markets when competitive conditions are similar for each." Id.

(citations omitted).  Clustering is warranted in such situations because, when competitive conditions are similar across markets, the antitrust analysis should be similar as well.  Id.

Second, product markets can be clustered pursuant to the "package-deal" theory.  Id. Under that theory, "if most customers would be willing to pay monopoly prices for the convenience of receiving certain products as a package, then the relevant market for those products is the market for the package as a whole."  Id.  Products within the package need not be substitutes for one another for the product markets to be clustered based on this theory.  Id. Because there is legal support for clustering non-substitutable products, Defendants' argument is not a basis to exclude Dr. Netz's Cheer Apparel market definition.

Next, Defendants argue that Dr. Netz's Cheer Apparel market is underinclusive because it creates "an artificial distinction between apparel used by competitive cheer teams and the same apparel when used for other athletic activities."  (ECF No. 382-1 at PageID 8562.)  They also assert that she "relies on only three Varsity documents," ignores the narrowest possible market, and uses Indirect Purchasers' complaint as a starting point.  (Id.)

Indirect Purchasers respond, arguing that Dr. Netz explains how the application of the HMT does not support including companies that make athletic gear that is not specific to competitive cheer.  (ECF No. 425 at PageID 14283.)  They also state that Dr. Netz "cites to well over 50 documents in the cheer apparel and related sections, as well as public news articles, witness testimony and USASF's rules and guidelines on apparel."  (Id. at PageID 14282.) Further, they argue that Dr. Netz "faithfully and reliably applied standard economic tests, evaluating all factors (even those that may be unfavorable) and formed her opinions therefrom." (Id. at PageID 14284.)

In her report, Dr. Netz explains her definition of the cheer apparel market as follows:

> There are distinct characteristics of Cheer Apparel such that apparel designed for other activities are not reasonable substitutes to constrain Cheer Apparel pricing in the manner explained above. For example, gymnasts wear similarly tight-fitting clothing which is designed to be flexible while participants perform acrobatic maneuvers, but gymnastics uniforms are otherwise not good substitutes because they typically are not customized in the same elaborate manner as Competitive Cheer uniforms nor are they a similar format . . . . The rules of Competitive Cheer dictate what apparel can and cannot be worn, which precludes, for example, skirts that are designed for other activities but do not comply with the Competitive Cheer rules.
>
> Cheer apparel is custom designed to reflect the personality and tastes of individual gyms; even shoes are custom designed to include logos. As such, off-the-rack athletic gear or uniforms will not substitute for Cheer Apparel. Cheer Apparel includes at least, shoes, accessories, warm ups, and camp wear. Teams prefer that each of these components match and complement the other components of the uniform. As such, there is an advantage for supplier of Cheer Apparel that provide as many—or all—of these categories, particularly if the supplier can customize all of these components.
>
> . . .
>
> Applying the hypothetical monopolist test qualitatively indicates that a hypothetical monopolist in the Cheer Apparel market would be able to increase price (or reduced output, quality, or innovation) by a small but significant, not transitory amount, without losing significant number of athletes to make the price increase unprofitable.

(ECF No. 383-2 (sealed) at PageID 8675.)

As to Defendants' challenge to the facts underlying Dr. Netz's opinion, "[w]here an expert's testimony amounts to 'mere guess or speculation,' the court should exclude [the] testimony, but where the opinion has a reasonable factual basis, it should not be excluded. Rather, it is up to opposing counsel to inquire into the expert's factual basis." L.E. Cooke, 991 F.2d at 342 (quoting 0.161 Acres of Land, 837 F.2d at 1040). Although Defendants may disagree with the data used, Dr. Netz's opinion is not based on "mere guess and speculation," but

rather substantial citation to the record.  See L.E. Cooke, 991 F.2d at 342.  Because there is a reasonable factual basis for her opinion, it is not excludable under Rule 702.  Disputes about the data and Dr. Netz's resultant findings may be addressed on cross-examination.

Turning to Defendants' challenge to her methodology, as with the Cheer Competition market, Defendants have not demonstrated that Dr. Netz's methodology is unreliable.  See Daubert, 509 U.S. at 592–94.  She has applied a recognized methodology—the HMT and SNNIP tests—and determined that off-the-rack athletic gear cannot serve as a substitute for cheer apparel.  See Kapsalis, 854 F. App'x at *8–9.  This recognized methodology is supported by a reasonable factual basis, resulting in a reliable opinion.  As stated above, if Defendants wish to challenge Dr. Netz's methodology and its application, they may do so on cross-examination. L.E. Cooke, 991 F.2d at 342 (citing 0.161 Acres of Land, 837 F.2d at 1040).  The motion to exclude this opinion is **DENIED**.

C.     Cheer Camp Market

Defendants also challenge Dr. Netz's definition of the Cheer Camp market, arguing that she does not acknowledge that there are different types of camps available, and that these camps are not substitutable for each other.  (ECF No. 382-1 at PageID 8562–63.)  They also contend that Dr. Netz's market definition section is not supported by any citations.  (Id. at PageID 8562.)

Plaintiffs counter, pointing out that Dr. Netz's discussion of market power and cheer camps generally is supported by extensive citations.  (ECF No. 426 (sealed) at PageID 14310.) They also argue that Varsity's own documents indicate that they did not view cheer camps as distinct types.  (Id. at PageID 14311) (citing ECF No. 383-2 (sealed) at PageID 8652 n. 129) (quoting a Varsity management presentation: "Varsity Spirit is the largest camp operator in the world, and our camps are run by the leaders and experts in the industry.").  Finally, Indirect

10

Purchasers assert this is a factual dispute that does not warrant exclusion under Rule 702.  ()<u>Id.</u> at

PageID 14311.)

> Dr. Netz describes the Cheer Camp market in her report as follows:
>
> [N]early all [cheer] camp participants are school teams that would otherwise have a break in their season during the summer when Cheer Camps are usually held.  All Star gyms do not have a similar break during the summer and, therefore, have less of a need or availability to attend Cheer Camps.  Cheer Camps provide a unique opportunity to receive specialized coaching from skilled instructors with extensive Competitive Cheer experience.  There are no functional substitutes for Cheer Camps, which provide teams with dedicated cheer skills training for athletes and coaches, as well as team bonding.  A school team seeking a similar experience has no other options.
>
> There are many other sports camps, including competitive dance and gymnastic camps, but none of those types of camps are reasonable substitutes to constrain Varsity's Cheer Camp pricing.  This is true for the same reasons that those sports are not reasonable substitutes . . . . If those sports are not reasonable substitutes, camps specializing in coaching those same sports cannot be substitutes either. Cheer Camps are also unique in that many offer feedback on teams' routines from experienced judges; other types of camps cannot offer this feedback.
>
> Because of these differences, Competitive Cheer athletes do not consider other types of camps to be substitutes for Cheer Camps.  Applying the hypothetical monopolist test qualitatively indicates that a hypothetical monopolist in the Cheer Camp market would be able to increase price by a small but significant, non-transitory amount, without losing a significant number of athletes to make the price increase unprofitable.

(ECF No. 383-2 (sealed) at PageID 8679.)

Although Defendants are correct that this particular section of her report is not supported

by citations, the portions of her report on cheer camps as a product, as well as the section on

Varsity's market power over cheer camps, contain extensive citations that provide a factual basis

for Dr. Netz's market definition.  <u>See</u> (<u>id.</u> at PageID 8651–52, 8680–81); (<u>id.</u> at PageID 8651 n.

125) ("A May 2018 Varsity presentation indicates that 8,048 high schools attended Varsity

Cheer Camps."); (<u>id.</u> at PageID 8680) ("Q. And what about the camp market, do you know what

Varsity's market share would have been in the market cheer camps in or around 2012? A. 85 percent.")

Because Dr. Netz's opinion has a reasonable factual basis, it is not excludable under Rule 702. L.E. Cooke, 991 F.2d at 342 (quoting 0.161 Acres of Land, 837 F.2d at 1040). Defendants' disputes may be addressed on cross-examination. Id. The motion to exclude this opinion is **DENIED**.

> D.     Relevant Geographic Market

Dr. Netz opines that the relevant geographic market for all three product markets is national. (ECF No. 383-2 (sealed) at PageID 8663–64.) Defendants contend that her geographic market analysis is unreliable because it is exclusively based on qualitative analysis and contradictory testimony. (ECF No. 382-1 at PageID 8564.) In response, Indirect Purchasers argue that Dr. Netz properly applied the HMT and bolstered her conclusions by using Defendants' documents and testimony. (ECF No. 425 at PageID 14285.)

Defendants first contend that Dr. Netz's methodology is unreliable because she failed to do any quantitative analysis. (ECF No. 382-1 at PageID 8564.) Indirect Purchasers counter, arguing that there is not a specific test for measuring the relevant geographic market. (ECF No. 425 at PageID 14285) (citing Brown Shoe Co. v. United States, 370 U.S. 294 (1962)).

The party alleging an antitrust claim bears the burden of defining the relevant market within which the alleged effects of the anti-competitive conduct occurred. Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc., 588 F.3d 908, 916 (6th Cir. 2009) (quoting Worldwide Basketball & Sport Tours v. Nat'l Collegiate Athletic Ass'n, 388 F.3d 955, 962 (6th Cir. 2004)). "A relevant market consists of both a geographic component and a product component." Id. at 916–17. A geographic market is defined as that "area in which the seller

operates, and to which the purchaser can practically turn for supply." White and White, Inc. v. American Hosp. Supply Co., 723 F.2d 495, 503 (6th Cir. 1983) (quoting Tampa Elect. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961)). "The purpose of defining a geographic market is to reveal whether, or to what extent, market power exists." In re Southeastern Milk Litig., 739 F.3d 262, 277 (6th Cir. 2014) (citing Thompson-Metro. Multi-List, Inc., 934 F.2d 1566, 1573 (11th Cir. 1991)). The process of identifying the geographic market is "fact intensive and focused on the 'commercial realities of the industry.'" Id. (quoting Brown Shoe, 370 U.S. at 336.)

In her report, Dr. Netz explains that she applies the HMT test in defining the relevant geographic markets:

> As explained above, antitrust markets are defined in terms of reasonably substitutable or interchangeable products; the focus is primarily on demand substitution, and the goal is to [] identify the set of products and locations between which buyers can reasonably substitute. The relevant geographic market is defined by the geographic area in which a hypothetical monopolist could profitably raise price by 5-10% without customers buying from suppliers outside that area.

(See 383-2 (sealed) at PageID 8662–63.) The HMT test is recognized and accepted by experts in the field and is thus a reliable methodology. Daubert, 509 U.S. at 592–94.

Defendants next argue that Dr. Netz's definition of the relevant geographic market is not based on sufficient facts because she cherry picks data to supports her own conclusions. (ECF No. 382-1 at PageID 8464.) However, "[w]hen the selection of certain data in an expert's analysis is challenged, but the expert provides a rationale supported by the record, the issue of whether the expert's conclusions are accurate or defensible goes to the weight of the evidence, not its admissibility." Universal Surveillance Corp. v. Checkpoint Sys., Inc., No. 5:11-CV-1755, 2015 WL 6082122, at *6 (N.D. Ohio Sept. 30, 2015). Dr. Netz supports her definition of the relevant geographic market with citations to several Varsity documents, thus providing a

13

reasonable factual basis for her opinion.  Defendants' challenge to the data Dr. Netz relied on can be addressed on cross examination.  Id.  The motion to exclude this opinion is **DENIED**.

## III.    Use of Factual Narrative

Next, Defendants assert that the vast majority of Dr. Netz's reports are factual narratives that do not aid the trier of fact.  (ECF No. 382-1 at PageID 8566.)  Defendants challenge five of Dr. Netz's opinions as impermissible factual narratives: 1) Varsity possesses market power in each relevant product market; 2) Varsity Conspired with USASF; 3) Varsity's Squad Credentialing Program amounts to an anticompetitive tie; 4) Varsity's acquisitions were intended to foreclose rivals in the relevant markets; and 5) Varsity's rebate and discount programs had the anticompetitive effect of foreclosing Varsity's rivals.  (Id. at PageID 8566–74.)  Each argument is analyzed below.

### A.    Market Power

As discussed above, Dr. Netz concludes that Varsity possesses market power in each relevant product market.  (ECF No. 383-2 (sealed) at PageID 8660, 8663–64, 8674, 8679.)  Defendants challenge all three market power opinions, arguing that they are not supported by sufficient facts and that Dr. Netz impermissibly opines as to Varsity's motives.

In challenging Dr. Netz's market power opinions, Defendants argue that they are based on a single deposition by a former Varsity employee and "anecdotal documents and emails."  (ECF No. 382-1 at PageID 8567.)  Further, Defendants contend that "Netz did not examine the assumptions or data sources underlying the documents, nor did she review the deposition testimony of those who prepared them."  (Id.)

Indirect Purchasers respond that Dr. Netz performs a thorough analysis of Varsity's business records, as well as due diligence materials used to assess Varsity for potential buyers.

14

(ECF No. 425 at PageID 14289 (citing ECF No. 382-1 (sealed) 8660–81).)  Additionally, they

contend that Defendants' attempt to cast doubt on the accuracy of their own business documents

does not impact the reliability of Dr. Netz's opinion.  (Id. at PageID 14289) (citing Scrap Metal,

527 F.3d at 529 (finding expert testimony admissible where it relied on inaccurate price index);

Universal Surveillance, 2015 WL 6082122, at *8 (admitting expert opinion because the accuracy

of data underlying a reliable methodology goes to the weight of the opinion, not its

admissibility)).

     As discussed above, opinions that have a reasonable factual basis should not be excluded.

L.E. Cooke, 991 F.2d at 342 (quoting 0.161 Acres of Land, 837 F.2d at 1040).  Based on the

review of the record, it is more likely than not that Dr. Netz's opinion is based on sufficient facts

and data.  Defendants' challenges to the underlying data can be addressed on cross-examination.

Id.

     Defendants also argue that Dr. Netz impermissibly opines on Varsity's motives.

Specifically, Defendants challenge the following opinion in her report:

> Collectively, there are significant barriers to entry, most of which are artificial
> barriers created by Varsity.  Varsity acknowledges many of these same barriers in
> its documents stating its "unique capabilities create a strong sustainable moat."
> Varsity's description of the "Competitive Moat" lists many of the same barriers
> discussed above, *suggesting that Varsity recognizes these barriers as a means to
> thwart competition*.

(ECF No. 383-2 (sealed) at PageID 8673) (emphasis added).  They also challenge Dr. Netz's

opinion that "Rebel has still struggled to take market share away from Varsity due to the barriers

erected by Varsity, as discussed above, including its rebate programs."  (Id. at PageID 8676.)

     Expert testimony on the intent of a party is "not properly the subject of 'scientific,

technical, or other specialized knowledge.'"  Lucio v. Levy Env't Servs. Co., 173 F. Supp. 3d

558, 565 (N.D. Ohio 2016) (citing CMI–Trading v. Quantum Air, 98 F.3d 887, 890 (6th

Cir.1996); <u>MAR Oil Co. v. Korpan</u>, 973 F.Supp.2d 775, 781 (N.D. Ohio 2013) ("No expert, however, knows a party's state of mind.")).  "The jury is sufficiently capable of drawing its own inferences regarding intent, motive, or state of mind from the evidence, and permitting expert testimony on this subject would be merely substituting the expert's judgment for the jury's and would not be helpful[.]"  (<u>Id.</u>) (citing <u>Waite, Schneider, Bayless & Chesley Co., L.P.A. v. Davis</u>, 253 F. Supp. 3d 997, 1013 (S.D. Ohio 2015)).

Varsity's intent is not within the purview of expert opinion testimony.  Thus, Dr. Netz's opinion that "Varsity recognizes these barriers as a means to thwart competition" is **EXCLUDED**.  (ECF No. 383-2 (sealed) at PageID 8673).  However, her opinion that "Rebel has still struggled to take market share away from Varsity due to the barriers erected by Varsity," does not appear to be testimony regarding intent or state of mind and is therefore admissible. (<u>Id.</u> at PageID 8676.)

In summary, Defendants' motion to exclude Dr. Netz's opinions on market power for their alleged reliance on unreliable data is **DENIED**.  However, the motion to exclude her opinions regarding Varsity's intent is **GRANTED**.

B.    <u>Conspiracy with USASF</u>

In her report, Dr. Netz concludes that Varsity controlled USASF and that the two organizations "acted in concert to harm competition."  (ECF No. 383-2 (sealed) at PageID 8688.) Defendants argue that this opinion should be excluded because it is based exclusively on her review of emails.  (ECF No. 382-1 at PageID 8569.)  Indirect Purchasers assert that Defendants' challenge to the documents relied on by Dr. Netz are questions of fact rather than a challenge to Dr. Netz's reliability.  (ECF No. 426 (sealed) at PageID 14316.)

Once again, opinions that have a reasonable factual basis should not be excluded.  L.E. Cooke, 991 F.2d at 342 (quoting 0.161 Acres of Land, 837 F.2d at 1040).  Dr. Netz cites to several emails, presentations, depositions, and business documents to support her conclusion. (ECF No. 383-2 (sealed) at PageID 8686–88.)  Based on a review of the record, it is more likely than not that Dr. Netz's opinion is based on sufficient facts and data.  Defendants' challenges to the documents relied on can be addressed on cross-examination.  L.E. Cooke, 991 F.2d at 342. The motion to exclude this opinion is **DENIED**.

       C.      Varsity's Squad Credentialing Program

In her report, Dr. Netz concludes that:

> Varsity and its co-conspirators required School Cheer teams to participate in Varsity-brand Cheer Camp in order to participate in certain Cheer Competitions. This is an example of an economic tie, when a seller requires the buyer to purchase a good or service (the tied good) in order to purchase [a] second good or service (the tying good).

(ECF No. 383-2 (sealed) at PageID 8708.)  Defendants seek to exclude this opinion because Dr. Netz does not acknowledge that the credentialing program is designed to promote safe practices and develop leadership skills.  (ECF No. 382-1 at PageID 8570.)  They also argue that Dr. Netz failed to quantitatively analyze the impact of the Credentialing Program.  (Id.)  Indirect Purchasers counter, asserting that Dr. Netz provided a detailed factual basis to support her opinion.  (ECF No. 425 at PageID 14291.)

In her report, Dr. Netz acknowledges that the Universal Cheerleaders Association website states that the credentialing program's goal is to promote safety and build leadership skills. (ECF No. 383-2 (sealed) at PageID 8710.)  However, she additionally cites to Varsity business documents and the testimony of current and former employees to support her conclusion that the credentialing program amounts to a competitive tie.

Further, the fact that Dr. Netz's evaluation of record evidence is qualitative rather than quantitative does not warrant its exclusion.  See Counts v. General Motors, LLC, 606 F. Supp. 3d 547, 570 (E.D. Mich. 2022).  Indeed, Rule 702 "does not limit the subject matter of expert testimony to scientific or technical evidence," and "the district court is not bound by any explicit test when determining reliability."  United States v. LaVictor, 848 F.3d 428, 443 (6th Cir. 2017). "[T]estimony is not excludable as unreliable or speculative or otherwise simply because it is qualitative instead of quantitative."  Disney Enters. v. VidAngel Inc., No. CV1604109ABPLAX, 2019 WL 4544428, at *5 (C.D. Cal. May 29, 2019).  Because there is a reliable factual basis for Dr. Netz's opinions, the motion to exclude this opinion is **DENIED**.  L.E. Cooke, 991 F.2d at 342.

D.      Acquisitions

In her report, Dr. Netz concludes that "Varsity's acquisition strategy substantially increased its share of the Cheer Competition market, and prevented any single competitor from achieving similar scale to Varsity."  (ECF No. 383-2 (sealed) at PageID 8712.)  Defendants argue that this opinion is simply a timeline of acquisitions disguised as an expert opinion.  (ECF No. 382-1 at PageID 8571.)  Indirect Purchasers counter that "[i]t is hard to understand what Defendants' proposed method of analyzing Varsity's acquisition would be if not to review them chronologically and to study the increased market share acquired with each."  (ECF No. 425 at PageID 14291–92.)

"'[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence.'"  Shall v. Suzuki Motor of America, Inc., No. 4:14-CV-00074-JHM, 2020 WL 1162193, at *5 (W.D. Ky. Mar. 10, 2020) (citing In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009); Highland Capital Mgmt., LP v.

Schneider, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005)).  To the extent such evidence is

admissible, it is "properly presented through percipient witnesses and documentary evidence."

Id.  (citing Tillman v. C.R. Bard, Inc., 96 F. Supp. 3d 1307, 1330 (M.D. Fla. 2015)).  "However,

as opposed to providing a mere factual narrative, [an] expert is allowed to articulate the 'factual

underpinning' upon which [he or she] bases [his or her] opinion."  Id.  (quoting Pledger v.

Reliance Trust Co., No. 1:15-CV-4444-MHC, 2019 WL 4439606, at *12 (N.D. Ga. Feb. 25,

2019)).  That is the case here.  Dr. Netz relies on record evidence to draw the conclusion that

Varsity increased its control of the market through its acquisitions.  (ECF No. 425 at PageID

14292.)

     The remainder of Defendants' challenges amount to disputes regarding the documents

that Dr. Netz used to reach her conclusions.  Based on the review of the record, it is more likely

than not that Dr. Netz's opinion is based on sufficient facts and data.  See Fed. R. Evid. 702.

Defendants' challenges to the documents underlying Dr. Netz's opinions can be addressed on

cross-examination.  See L.E. Cooke, 991 F.2d at 342.  The Motion to exclude this opinion is

**DENIED**.

     E.    Rebate Foreclosures

     In her report, Dr. Netz concludes:

> Varsity offers rebate programs to owners of All Star Gyms.  While the rebate
> programs reduce the net prices direct purchasers pay to Varsity in the short run,
> they also function as anticompetitive exclusive dealing arrangements harming
> competition in the long run.  Varsity's rebate programs create strong financial
> incentives for firms to buy exclusively from Varsity and leverage Varsity's market
> power from one relevant market to another, foreclosing Varsity's rivals in the
> relevant markets for Cheer Competitions and Cheer Apparel.

(ECF No. 383-2 (sealed) at PageID 8723.)  Defendants seek to exclude this opinion because she

provides a history of changes to the programs over time while ascribing to Varsity an intent to

develop and use these programs to "exclude competitors" and "foreclose" the market.  (ECF No. 382-1 at PageID 8573.)

As stated above, "[an] expert is allowed to articulate the 'factual underpinning' upon which [he or she] bases [his or her] opinion."  Shall, 2020 WL 1162193, at *5 (quoting Pledger, 2019 WL 4439606, at *12).  That is what Dr. Netz does in her report.  She explains the economic implications of the challenged conduct with citations to record evidence.  (ECF No. 383-2 (sealed) at PageID 8723–32.)  The history of changes to the program are relevant to her finding.

However, Dr. Netz again provides impermissible opinions on Varsity's intent.  (Id. at PageID 8730) ("These rebate programs were intended to exclude competitors.")  As stated above, experts cannot testify to the intent of a party.  See Lucio, 173 F. Supp. 3d at 565 (citing CMI–Trading, 98 F.3d at 890; MAR Oil, 973 F. Supp. 2d at 781).  As a result, Dr. Netz's opinions regarding Varsity's intent are **EXCLUDED**.

Next, Defendants argue that "Dr. Netz challenges conduct that the antitrust laws are designed to *encourage*—lowering prices [to] benefit consumers."  (ECF No. 382-1 at PageID 8573).  However, this argument does not go to Dr. Netz's reliability as an expert and is thus not relevant to this motion.

Finally, Defendants challenge Dr. Netz's assessment of the rebates received by Louisiana Spirit Gym, arguing that she does not explain how she picked this particular gym and that she incorrectly included apparel spending as a contributor to the rebate thresholds.  (Id. at PageID 8574 (citing ECF No. 383-2 (sealed) at PageID 8732).)   Dr. Netz's reliance on a specific gym as an example does not render her opinion unreliable because that opinion is still based on sufficient facts and data.  See Fed. R. Evid. 702.  Additionally, Dr. Netz's purported error in calculating the rebate goes to the credibility of her testimony rather than its admissibility.  See

Smith v. Pfizer Inc., 714 F. Supp. 2d 845, 851 (M.D. Tenn. 2010) (citing Baldwin v. Bader, 539 F. Supp. 2d 443, 446 (D. Me. 2008)).  Defendants' challenges to Dr. Netz's gym choice and her calculation of the rebate can be addressed on cross-examination.  See L.E. Cooke, 991 F.2d at 342.

In sum, Defendants' motion to exclude Dr. Netz's rebate foreclosure testimony because it is based on factual narrative, challenges conduct encouraged by antitrust laws, cherry-picks data, and includes calculation errors is **DENIED**.  However, their motion to exclude opinions regarding Varsity's intent is **GRANTED**.

## CONCLUSION

For the reasons stated above, Defendants' Motion to Exclude the Testimony of Janet S. Netz, PhD is **GRANTED** only as to her opinions regarding Varsity's motives.  The remainder of the motion is **DENIED**.

 **IT IS SO ORDERED,** this 28th day of February, 2024.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
CHIEF UNITED STATES DISTRICT JUDGE

21