**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| JESSICA JONES and CHRISTINA LORENZEN, on Behalf of Themselves and All Others Similarly Situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | No. 2:20-cv-02892-SHL-tmp |
| VARSITY BRANDS, LLC, et al., | ) ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF RANDAL HEEB, PHD**

Before the Court is Defendants Varsity Brands, LLC; Varsity Spirit, LLC; Varsity Spirit Fashions & Supplies, LLC; U.S. All Star Federation ("USASF"); USA Sport Cheering, d/b/a USA Cheer; Charlesbank Capital Partners, LLC; Bain Capital Private Equity, LP; and Jeff Webb's (together, "Defendants") Motion to Exclude the Testimony of Randal Heeb, PhD, filed February 10, 2023. (ECF No. 388.) Plaintiffs Jessica Jones and Christina Lorenzen (together, "Indirect Purchasers") responded on March 31, 2023. (ECF No. 429.) Defendants replied on April 28, 2023. (ECF No. 448.) For the reasons stated below, the motion is **GRANTED** only as to his opinions regarding Varsity's motives. The remainder of the motion is **DENIED**.

## BACKGROUND

Varsity[1] is a prominent host of competitive cheerleading competitions and camps. The Indirect Purchasers are the parents of competitive cheer athletes who were members of either All

---

[1] The Indirect Purchasers define "Varsity" as the collective term to represent Varsity Brands, LLC; Varsity Spirit, LLC; and Varsity Fashion & Supplies, LLC. (ECF No. 1 at PageID 4.)

Star Gym teams or School Cheer teams.[2]  (ECF No. 1 at PageID 6.)  They allege that they paid artificially inflated prices for goods and services, including enrollment in cheer competitions and apparel purchased indirectly from Varsity, and they seek to represent a class of all indirect purchasers of Varsity products and all entrants into Varsity or All Star Cheer Competitions.  (Id.)

On June 20, 2022, Indirect Purchasers disclosed an expert report by Dr. Randal Heeb, Senior Managing Director at FTI Consulting Inc., where he leads the litigation and dispute resolution groups.  (ECF No. 390-2 (sealed) at PageID 11783.)  On December 14, 2022, Indirect Purchasers also disclosed a rebuttal report from Dr. Heeb that responded to arguments propounded by other experts.  (ECF No. 383-3 (sealed).)  On February 10, 2023, Defendants filed the instant motion, seeking to exclude Dr. Heeb's testimony in its entirety.[3]  (ECF No. 388.)

## LEGAL STANDARD

Courts are tasked with a gatekeeping function as to the admissibility of expert testimony. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993).  Federal Rule of Evidence 702 requires that an expert witness be specially qualified before they can give opinion testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

[2] All Star Cheer teams are affiliated with private gyms, and School Cheer teams are affiliated with middle schools, high schools, or colleges.  (ECF No. 1 at PageID 15–16.)

[3] Although both Parties request oral argument on the motion (ECF No. 388 at PageID 10418, ECF No. 429 at PageID 14376), oral argument is unnecessary as the motion can be resolved on the briefs.

> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Thus, the opinion offered by the expert must satisfy three requirements to be admissible: "First, the witness must be qualified by 'knowledge, skill, experience, training, or education.'  Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'  Third, the testimony must be reliable." In re Scrap Metal Antitrust Litig., 527 F.3d 517, 528–29 (6th Cir. 2008) (quoting Fed. R. Evid. 702); accord United States v. Rios, 830 F.3d 403, 413 (6th Cir. 2016), reh'g en banc denied (Sept. 27, 2016).

Federal district courts have broad discretion to exclude proposed expert testimony.  See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 139 (1997); accord Lovelace v. Pediatric Anesthesiologists, P.A., No. 2:13-cv-02289-SHL-dkv, 2014 WL 8136184, at *1 (W.D. Tenn. Nov. 14, 2014).  Once a litigant challenges the admissibility of proposed expert testimony, the proponent bears the burden of establishing, by a preponderance of the evidence, that it is admissible.  Fed. R. Evid. 702 advisory committee's note to the 2023 amendments (citing Bourjaily v. United States, 483 U.S. 171 (1987)).

## ANALYSIS

Defendants' motion challenges the admissibility of Dr. Heeb's opinions, offering several arguments: 1) Dr. Heeb did not employ his chosen methodology for assessing relevant markets; 2) his analysis of Varsity's rebate programs does not fit the foreclosure test; 3) his "overcharge" analyses are inadmissible; 4) his common impact opinion should be excluded; and 5) many of his opinions are factual narrative that usurp the jury's role as factfinder.  (See ECF No. 388-1.)  As

is explained in more detail below, the motion is **GRANTED** only as to Dr. Heeb's opinions

regarding Varsity's motives.  The remainder of the motion is **DENIED**.

## I.      Relevant Market Definitions

Defendants argue that Dr. Heeb's definition of relevant markets must be excluded

because he misapplies the Hypothetical Monopolist Test ("HMT").  (Id. at PageID 10430.)

Defendants state:

> [The HMT] considers whether a hypothetical monopolist of a certain candidate set
> of products could successfully impose a small but significant non-transitory
> increase in price ("SSNIP") on at least one of the products—typically 5% or 10%—
> without losing so many customers to an alternative product outside of the candidate
> market (which is referred to as "diversion") such that the price increase would be
> unprofitable.  If one conducts the hypothetical monopolist test and finds that such
> diversion occurs, the alternative product should be considered part of the relevant
> market.  The test is repeated until there is a candidate market in which the
> imposition of a SSNIP is profitable.

> [The] [k]ey to correctly applying the hypothetical monopolist test, however, is that
> one must start with the *narrowest* set of products or services and only expand to
> add more products or services to the candidate market if, according to the test, a
> hypothetical monopolist of the products in the candidate market could not
> profitably sustain a price increase.  Failure to start with the narrowest set of products
> introduces the risk that the candidate market is in fact too broad, including products
> that are not actually competitive alternatives, and rendering the resulting market
> definition inaccurate and unreliable.

(Id. at PageID 10429–30) (internal citations omitted).  Defendants argue that Dr. Heeb started

with markets that are too broad, rendering his relevant market opinions incorrect as a matter of

law and economics.  (Id. at PageID 10430.)  They also assert that Dr. Heeb failed to conduct any

diversion analyses on any of the markets he considered.  (Id.)  Defendants challenge his

definition of cheer competition, cheer apparel, and cheer camp markets, each of which is

addressed below.  (Id. at PageID 10430–38.)

4

A.     Cheer Competition Market

In his report, Dr. Heeb states that, "[t]he first relevant market I examine is cheer competitions.  Cheer competitions include participants from two 'disciplines,' All-Star cheer athletes and school cheer athletes."  (ECF No. 390-2 (sealed) at PageID 11787.)  Defendants argue that Dr. Heeb misapplies the HMT because he fails to consider distinctions between All Star and school competitions.  (ECF No. 388-1 at PageID 10430.)  Defendants point out several differences between these types of competitions, including different prices, end-of-season events, and rules.  (Id. at PageID 10431.)  Indirect Purchasers counter, arguing that "[w]hether All Star Cheer and School Cheer are reasonably interchangeable as properly defined under the HMT is an issue for the jury, not a reason to exclude the testimony under Daubert."  (ECF No. 429 at PageID 14381–82.)

Dr. Heeb's analysis included the evaluation of all potential close substitutes—sideline cheer, gymnastics, and competitive dance—finding that they were not interchangeable under an HMT analysis.  (ECF No. 390-2 (sealed) at PageID 11813–14.)  He also explains why he considers the cheer competition market to include both All Star cheer and school cheer:

> Cheer competitions, which includes both All-Star cheer competitions and school cheer competitions, are events in which athletic teams compete at sanctioned events by performing a two and one-half minute routine with music.  Competitors are judged on their performance.  These performances include elements of tumbling, stunting, pyramids, and synchronized dance.  Unlike traditional sideline cheer, competitive cheer athletes perform routines as the main event.  Competitive cheer requires year-round commitment from athletes and families, with training beginning in the fall, competitions running through the winter and spring, and cheer camps in the summer.

(ECF No. 390-2 (sealed) at PageID 11813.)  He concludes that "[a] hypothetical monopolist over cheer competitions would be able to sustain a 'small but significant and non-transitory increase in price' . . . in each such market."  (Id. at PageID 11788.)

5

Although Defendants may disagree with Dr. Heeb's methodology in defining the cheer competition market, they have not demonstrated that it is unreliable.  He has applied a recognized methodology—the HMT test—and determined that the All Star competitions and School competitions are reasonably interchangeable under the SSNIP test.  See Babcock Power, Inc. v. Kapsalis, 854 F. App'x 1, at *8–9 (6th Cir. 2021) (admitting an expert who used "recognized methods" with a "reasonable factual basis").  Defendants' avenue for challenging Dr. Heeb's methodology and its application is cross-examination.  United States v. L.E. Cooke Co., Inc., 991 F.2d 336, 342 (6th Cir. 1993) (citing United States v. 0.161 Acres of Land, 837 F.2d 1036, 1040 (11th Cir. 1988)).  The motion to exclude this opinion is **DENIED**.

B.    Cheer Apparel Market

Dr. Heeb proposes that the Cheer Apparel market includes "uniforms, shoes, lettering, warmups, campwear, and accessories."  (ECF No. 390-2 (sealed) at PageID 11828.)  Defendants argue that this definition "does not meet the basic requirement that the products in a market must be reasonably interchangeable because products as varied as uniforms and shoes do not serve the same function."  (ECF No. 388-1 at PageID 10432.)  In response, Indirect Purchasers argue that "market definitions including differentiated goods and services are widely accepted by both economists and courts."  (ECF No. 429 at PageID 14382) (citing United States v. Grinnell Corp., 384 U.S. 563, 572 (1966) (rejecting argument that burglar alarms and fire alarms were not in the same relevant market because they were too different)).

Dr. Heeb opines, based on sales and marketing practices, that the apparel products purchased by indirect purchasers are sufficiently related, linked, joined or bundled to be considered together.  (ECF No. 390-2 (sealed) at PageID 11828–30.)  As a result, he concludes that "a hypothetical monopolist of cheer apparel would be able to impose a SSNIP without the

6

risk of participants substituting to other non-competition apparel, thereby rending the SSNIP unprofitable." (Id. at PageID 11830.)

A "cluster" of services can be a "distinct line of commerce" and serve as a relevant product market for the purposes of an antitrust claim. ACT, Inc. Worldwide Interactive Network, 3:18-cv-186, 2020 WL 12574235, *3 (E.D. Tenn. Mar. 24, 2020) (citing Grinnell, 384 U.S. at 573). The Sixth Circuit has recognized two theories by which markets for products or services can be "clustered" into a single market. Id. (citing ProMedica Health Sys., Inc. v. Fed. Trade Comm'n, 749 F.3d 559, 565 (6th Cir. 2014)). First, markets can be clustered pursuant to the "administrative-convenience" theory when "there is no need to perform separate antitrust analyses for separate product markets when competitive conditions are similar for each." Id. (citations omitted). Clustering is warranted in such situations because, when competitive conditions are similar across markets, the antitrust analysis should be similar as well. Id.

Second, product markets can be clustered pursuant to the "package-deal" theory. Id. Under that theory, "if most customers would be willing to pay monopoly prices for the convenience of receiving certain products as a package, then the relevant market for those products is the market for the package as a whole." Id. Products within the package need not be substitutes for one another for the product markets to be clustered based on this theory. Id. Because there is legal support for clustering non-substitutable products, Defendants' argument is not a basis to exclude Dr. Heeb's Cheer Apparel market definition. If Defendants wish to challenge Dr. Heeb's methodology and its application, they may do so on cross-examination. L.E. Cooke, 991 F.2d at 342 (citing 0.161 Acres of Land, 837 F.2d at 1040). The motion to exclude this opinion is **DENIED**.

C.      Cheer Camp Market

Defendants also challenge Dr. Heeb's definition of the Cheer Camp market, arguing that

he does not acknowledge that there are different types of camps available, and that these camps

are not substitutable for each other.  (ECF No. 388-1 at PageID 10434.)  Indirect Purchasers

counter, arguing that Dr. Heeb examined the characteristics of different types of camps and

applied the HMT to determine substitutability.  (ECF No. 429 at PageID 14384.)   Additionally,

Indirect Purchasers assert that this is a factual dispute that does not warrant exclusion under Rule

702.  (Id.)

Dr. Heeb describes the Cheer Camp market in his report as follows:

Cheer camps are primarily geared towards school cheer with limited participation
from All-Star cheer.  The purpose of cheer camps is to prepare athletes for game
day, teach skills & techniques, learn material for sideline and crowd-appeal
performance, and teambuilding.  Cheer camps credential and qualify cheer teams
and athletes to attend certain Varsity national championships.

Regardless of the level at which they participate, cheer athletes typically participate
in multi-day overnight "camps" where cheer athletes practice cheer skills, develop
routines and purchase cheer apparel.  Cheer camps, by and large, occur during the
summer when school is not in session.  Cheer athletes pay to participate in camps.

Summer cheer camps are an integral part of cheer and Varsity is one of the largest
operators of cheer camps.  Varsity's cheer camp division is one of its most
profitable.  Varsity offers school, All-Star, and youth and rec camps, in large part
during the summer months, through its affiliates and assumed names[.]

(ECF No. 390-2 (sealed) at PageID 11823–24.)

Although Defendants disagree with Dr. Heeb's methodology in defining the cheer camp

market, they have failed to demonstrate it is unreliable.  He applied a recognized methodology—

the HMT test—and determined that cheer camps are interchangeable under the SSNIP test.  See

Kapsalis, 854 F. App'x 1, at *8–9.  Defendants' challenge to Dr. Heeb's methodology and its

application can be addressed through cross-examination.  L.E. Cooke, 991 F.2d at 342 (citing 0.161 Acres of Land, 837 F.2d at 1040).  The motion to exclude this opinion is **DENIED**.

       D.      Diversion Analysis

In passing, Defendants argue that Dr. Heeb's market definitions should be excluded because he failed to conduct any diversion analyses.  (ECF No. 388-1 at PageID 10430.) However, there is no mandate that an expert use Defendants' preferred method, or multiple methods.  See, e.g., In re Urethane Antitrust Litig., 2012 WL 6681783, at *7 (D. Kan. Dec. 21, 2012) ("Arguments about which method is superior for use in this case" go to the weight of expert's opinions, not to their admissibility under Rule 702.).  As stated above, in reaching his market definitions, Dr. Heeb used a recognized methodology, the HMT, to reach his opinions. Defendants' argument that he should have used a different or additional method does not impact the reliability of Dr. Heeb's opinions.  Id.  Defendants can challenge Dr. Heeb's methodology and its application on cross-examination.  L.E. Cooke, 991 F.2d at 342 (citing 0.161 Acres of Land, 837 F.2d at 1040).  The motion to exclude these opinions on this basis is **DENIED**.

**II.**    **Rebate Programs**

Next, Defendants challenge Dr. Heeb's opinion that the Varsity Family Plan ("VFP") and Varsity Network Agreements ("VNA") diminished competition and foreclosed rivals.  (ECF No. 388-1 at PageID 10434.)  Defendants assert that these programs are actually procompetitive and that Dr. Heeb failed to perform the required economic analysis required to show that these programs are anticompetitive.  (Id.)  In addition, Defendants assert that Dr. Heeb's analysis is based on critical misunderstandings of the VFP and VNA.  (Id. at PageID 10437.)

According to Defendants, Dr. Heeb's analysis of Varsity's rebate programs must be excluded because he does not apply the "discount attribution test."  (Id. at PageID 10435.)

Defendants assert that this test "requires a plaintiff alleging that such a discount or rebate program is anticompetitive to prove, among other things, that when the full discount is allocated to the competitive product(s), 'the resulting price of the competitive product or products is below the defendant's incremental cost to produce them.'"  (Id. at PageID 10435) (citing Collins Inkjet Corp. v. Eastman Kodak Co., 781 F.3d 264, 273 (6th Cir. 2015)).  Because Dr. Heeb has not demonstrated below-cost pricing, Defendants contend that his opinion must be excluded as a matter of law.  (Id.)

Defendants rely on Collins Inkjet to support their position.  In that case, the Sixth Circuit adopted the "discount attribution" standard when determining whether a bundled discount is an unlawful "attempt to monopolize" under § 2 of the Sherman Act.  781 F.3d at 273.  The court defined the standard as follows:

> [T]he full amount of the discounts given by the defendant on the bundle are allocated to the competitive product or products. If the resulting price of the competitive product or products is below the defendant's incremental cost to produce them, the trier of fact may find that the bundled discount is exclusionary for the purpose of § 2. This standard makes the defendant's bundled discounts legal unless the discounts have the potential to exclude a *hypothetical* equally efficient producer of the competitive product.

Id. (citing Cascade Health Solutions v. PeaceHealth, 515 F.3d 883, 906 (9th Cir.2008)).  However, in Collins Inkjet, the court noted that the discount attribution test applied where the only tying mechanism is differential pricing.  Id.  ("When differential pricing is the only means of coercion, results other than what a competitive, unbundled market would achieve are possible only if the discount attribution standard is met and the defendant is in effect selling the tied good below cost.")

Here, Dr. Heeb relies on additional means of coercion besides differential pricing, including the bundling of those programs across the apparel and competition markets and the requirement to attend a minimum number of Varsity events:

> Discounting is usually procompetitive because it reduces the price to consumers. However, when a monopolist conditions the availability or amount of its discount on reaching large purchase quantity thresholds, as Varsity does by requiring that its customers attend a minimum number of Varsity events, this discounting scheme becomes highly coercive and exclusionary. This anticompetitive effect is amplified when the monopolist conditions the amount of the rebates on purchases in multiple product categories, as Varsity does by giving its rebates on the total amount of purchases across Varsity apparel, camps, and events. The resulting rebate scheme has a strong propensity to foreclose rival's ability to compete against the monopolist. The rebates are awarded for (or discounts applied to) incremental sales, but the amount of the rebate or discount depends upon total expenditures. This has a "high-powered" effect of lowering the effective incremental price a lot without necessarily lowering the overall price by nearly as much, if at all. In addition, the monopolist's undiscounted price is likely to be much higher than it would normally be without the anticompetitive rebate scheme. In addition, this program has the effect of making the rival competitors make large incremental price concessions to compete, which tends to weaken those rivals that are smaller than the monopolist.

(ECF No. 390-2 (sealed) at PageID 11852.) Because Dr. Heeb cites to other means of coercion besides differential pricing, his failure to demonstrate below cost pricing does not warrant exclusion.

Next, Defendants challenge the facts Dr. Heeb relies on regarding the VFP and VNA. (ECF No. 388-1 at PageID 10437.) "Where an expert's testimony amounts to 'mere guess or speculation,' the court should exclude [the] testimony, but where the opinion has a reasonable factual basis, it should not be excluded. Rather, it is up to opposing counsel to inquire into the expert's factual basis." L.E. Cooke, 991 F.2d at 342 (quoting 0.161 Acres of Land, 837 F.2d at 1040). Although Defendants may disagree with the data used, Dr. Heeb's opinion is not based on "mere guess and speculation," but rather substantial citations to the record. See (ECF No. 390-2 (sealed) at PageID 11849–53); L.E. Cooke, 991 F.2d at 342. Because there is a reasonable

11

factual basis for his opinion, it is not excludable under Rule 702.  Disputes about the data and Dr.

Heeb's resultant findings may be addressed on cross-examination.  The motion to exclude Dr.

Heeb's opinions regarding Varsity's rebate programs is **DENIED**.

## III.   Overcharge Analysis

Next, Defendants argue that Dr. Heeb's overcharge analysis for all three product markets

is inadmissible because he did not connect the overcharge to anticompetitive conduct.  (ECF No.

388-1 at PageID 10439.)  Further, they assert that even if he had, the opinion would still be

inadmissible because his calculations are flawed.  Finally, they assert that the increased

overcharge figures in his rebuttal report were not timely disclosed and should be excluded.  (Id.

at PageID 10452–53.)  Each argument is addressed below.

### A.   Connection to Anticompetitive Conduct

Defendants first assert Dr. Heeb's overcharge opinion must be excluded because he did

not sufficiently connect his estimated overcharges to actionable illegal conduct.  (Id. at PageID

10440.)  Indirect Purchasers counter, arguing that Dr. Heeb "properly applied economic

principles to identify anticompetitive conduct and connected it with Varsity's overcharges in the

markets."  (ECF No. 429 at PageID 14390.)

Defendants rely on Comcast Corp. v. Behrend, 569 U.S. 27 (2013), for the proposition

that damages must reflect only the losses directly attributable to unlawful competition.  (ECF No.

388-1 at PageID 10439.)  In Comcast, the expert's overcharge model calculated a "but for"

overcharge figure by assuming a market that was based on four market distortions; however,

only one of those distortions had been accepted for class treatment. Comcast, 569 U.S. at 35.

The expert thus admitted that the model calculated damages resulting from "alleged

anticompetitive conduct as whole, and did not attribute damages to any one particular theory of

12

antitrust impact." Id.  Although the Supreme Court reasoned that this methodology failed to measure damages from the antitrust injury on which petitioners' liability was premised, the Court also acknowledged that the "methodology may have been sound, and might have produced a commonality of damages, if all four of those distortions remained in the case."  Id.

Here, Dr. Heeb analyzes and connects a long list of Defendants' alleged anticompetitive conduct to estimate overcharges.  For example, Dr. Heeb analyzes the evidence to find that Varsity's rebate programs and discounts had the effect of foreclosing rivals (ECF No. 390 (sealed) at PageID 11851–53); Varsity held events near and/or at the same time as rival events (id. at PageID 11864–66); Varsity's relationship with and control over USASF and other regulatory bodies allowed it to exclude and diminish competitors in the market (id. at PageID 11846–48); Varsity's Squad Credential Program required attendance at Varsity camps by school cheer teams in order to attend school cheer competitions, foreclosing competitions by rival camp competitors (id. at PageID 11853); Varsity implemented a policy that excluded rival apparel companies from selling apparel at Varsity events (id. at PageID 11839–40); and Varsity used its relationships with venue operators to exclude rival event producers from hosting events for "60 days before or 90 days after" a Varsity event (ECF No. 390-3 (sealed) at PageID 12016).  Unlike in Comcast, all of this alleged conduct remains part of the case and is properly factored into Dr. Heeb's overcharge estimates.  Additionally, Dr. Heeb's models specifically exclude data that could be attributed to procompetitive explanations.  (See, e.g., ECF No. 390-2 (sealed) at PageID 11874) (dropping the 2019–2021 seasons where decreased attendance could be attributed to COVID-19).

Because Dr. Heeb sufficiently connects his overcharge opinion with alleged anticompetitive conduct, the motion to exclude his overcharge opinions on this basis is

**DENIED**.  In addition to the general arguments about Dr. Heeb's failure to connect anticompetitive activity to his overcharge analysis, Defendants also specifically challenge the overcharge analysis as to each product market.  These markets are considered below.

> B.    Apparel Overcharge

In his opening report, Dr. Heeb estimates the overcharges in cheer apparel to be 10%. (ECF No. 390-2 (sealed) at PageID 11790.)  In his rebuttal report, Dr. Heeb updates his estimate to 11%, however he notes that "[t]here were no methodological changes."  (ECF No. 390-3 (sealed) at PageID 11929.)  Defendants argue that Dr. Heeb's analysis of the overcharge in the apparel market is "makeweight" for several reasons.  (ECF No. 388-1 at PageID 10440–44.)

First, Defendants argue Dr. Heeb's opinion must be excluded because it analyzes the pricing of just one item of apparel: Varsity's cheerleading shoes.  (ECF No. 390 (sealed) at PageID 11752.)  In addition, they contend that the fact that Varsity's shoes are more expensive than Nfinity's does not constitute a legally relevant "overcharge."

Dr. Heeb explains why he chose shoes as a benchmark:

> To estimate overcharges in apparel, I use a benchmark of Nfinity shoes.  Nfinity is the only rival apparel producer for which data was received.  Nfinity primarily sells shoes used by athletes in cheer competitions, so that is the only product for which an Apparel benchmark is possible.  Economic theory implies that overcharges are likely to be similar across apparel product groups, and that among the six major apparel groups, shoes are likely the best proxy for overcharges for all apparel.
>
> . . .
>
> The overcharge for competitive cheer shoes is a reasonable proxy for the entire apparel market.  Shoes are one of the three categories of apparel that are must-have for on-the-floor participation by cheer teams.  The other two categories are uniforms and lettering.  These components are necessary for every team member, and they are most often purchased together.

(ECF No. 390-2 (sealed) at PageID 11781, 11885.)  Dr. Heeb compared the price difference between Nfinity and Varsity cheer shoes and concluded that the 10% overcharge (and later 11%)

14

is a reasonable benchmark for the overcharge that Varsity applies through the cheer apparel market.  (Id. at PageID 11883; ECF No. 390-3 (sealed) at PageID 11929.)

Although Defendants may disagree with Dr. Heeb's means of calculating the overcharge in the apparel market, they have failed to demonstrate that the methodology unreliable.  See Kapsalis, 854 F. App'x 1, at *8–9.  Dr. Heeb identified a comparable set of products for which he had both Varsity and competitor data—cheer shoes—and then performed a direct comparison of the prices of those shoes.  Defendants' challenge to Dr. Heeb's methodology and its application can be addressed during cross-examination.  L.E. Cooke, 991 F.2d at 342 (citing 0.161 Acres of Land, 837 F.2d at 1040).

Further, Defendants' argument that this price difference does not constitute a legally relevant overcharge is a challenge to Dr. Heeb's conclusions, rather than his methodology, and is thus not properly raised in a Daubert motion.  See, e.g., Nelson v. Tennessee Gas Pipeline Co., 243 F.3d 244, 254, 2001 WL 227426 (6th Cir. 2001) ("As the Court in Daubert stated, the inquiry must be 'solely on principles and methodology, not on the conclusions that they generate.'").

Next, Defendants attack the alleged anticompetitive conduct that Dr. Heeb connects to the apparel market.  They assert that the acquisitions of other apparel producers occurred outside the statute of limitations period, thus any opinion regarding out-of-period acquisitions cannot be the basis for damages and is thus irrelevant.  (ECF No. 388-1 at PageID 10442.)  Indirect Purchasers do not seek to recover damages for purchases before the class period. And as the Court previously ruled, parties may allege a "continuing antitrust" violation under the Sherman Act when a party's interests "are repeatedly invaded."  (ECF No. 333 at PageID 7235) (citing Peck v. Gen. Motors Corp., 894 F.2d 844, 849 (6th Cir. 1990)).  As a result, Indirect Purchasers

15

can rely on pre-class period conduct to establish market power and other elements of their claim. (Id.)

Defendants also argue that Dr. Heeb failed to show that Varsity's rebate programs, acquisitions, and their banning competitors from selling apparel at their events are anticompetitive conduct. (ECF No. 388-1 at PageID 10441–43.) However, whether conduct is procompetitive or anticompetitive is a question for the jury, not one of admissibility. See, e.g., Universal Surveillance Corp. v. Checkpoint Sys., Inc., No. 5:11-CV-1755, 2015 WL 6561241, at *13 (N.D. Ohio, Oct. 19, 2015) ("Based on the existing record, the magnitude of [Defendant's bundle discount is an issue for a jury to resolve."); Cascade Health Sols. v. PeaceHealth, 515 F.3d 883, 906 (9th Cir. 2008) ("The question of 'where antitrust law draws the line' between procompetitive and anticompetitive bundled discounts is likely to be given a more finely-tuned answer by allowing both experts to explain their competing analyses and the facts that support them" to a jury.). As a result, the motion to exclude Dr. Heeb's opinion on overcharges in the apparel market is **DENIED**.

  C. Competition Overcharge

In his opening report, Dr. Heeb estimates the overcharges in cheer competitions to be 24%. (ECF No. 390-2 (sealed) at PageID 11789.) After incorporating comments, critiques and suggestions by defense expert Dr. Kevin Murphy, Dr. Heeb updated that estimate to 27.4%. in his rebuttal report. (ECF No. 390-3 (sealed) at PageID 11928.) Defendants raise several challenges to the competition overcharge opinion, arguing that Dr. Heeb: 1) cannot calculate overcharges on the national and regional level; 2) used a flawed methodology; 3) improperly considered acquisitions that occurred before the beginning of the class period; and 4) wrongly

applies his overcharge calculation for All Star competitions to scholastic competitions.  (ECF No. 388-1 at PageID 10444.)  Each argument is discussed below.

       *1.    Relevant Geographic Market*

First, Defendants assert that Dr. Heeb cannot calculate overcharges on both the national and regional level for cheer competitions and that both his national level overcharges and regional overcharges should be excluded.  (Id. at PageID 10445.)

In his opening report, Dr. Heeb opined that the relevant geographic markets are regional.  (ECF No. 390-2 (sealed) at PageID 11821.)  However, he also explains that "the impact of Varsity's conduct is common across the geographic markets and that a national overcharge can be applied for purposes of calculating antitrust injury for Class Members."  (ECF No. 390-3 (sealed) at PageID 11999.)  In determining which market was most appropriate, he calculated both regional and national level overcharges:

> To determine if it is more appropriate to use regional or national level overcharge estimates, I estimate overcharges both ways, and then do a statistical test to compare the alternative approaches.  The uniform national level overcharge is estimated to be 23.8%, and the coefficient upon which this is based is statistically significant at the 99.0% confidence level.
>
> . . .
>
> Allowing for separate regional level overcharges . . . Varsity's price is elevated in all five regions, compared to the benchmark.  Individual estimates of regional overcharges range from 15.4% in the West to 32.0% in the Northeast, with intermediate values 17.5% in the Midwest, 25.9% in the Southeast, and 17.5% in the Southwest.  The coefficients upon which these are based are statistically significant at the 99.0% confidence level for Northeast, Midwest, and Southeast, statistically significant at the 90.0% confidence level for the Southwest, and not statistically significant at conventional confidence levels for the West.  This means that the estimate for the West region is imprecisely estimated, and the true value may be higher or lower than this estimate.
>
> I implement a standard statistical test, called an "F-test" to assess whether the five different regional overcharges are statistically different from each other.  This test does not reject the null hypothesis that the coefficient values are equal (with a p-

17

value of 11.3%), implying that the statistical evidence does not support using separate regional overcharges instead of the national estimate. Instead, this indicates that the common national level estimate of overcharges is more precisely estimated, reliable and appropriate, especially in light of the evidence of national level conduct. As mentioned above, the statistical significance level of the coefficient for the national overcharge coefficient is 99.0%.

(ECF No. 390-2 (sealed) at PageID 11882–83.)

Defendants argue that Dr. Heeb's national overcharge numbers must be excluded because he opines that the relevant geographic market for competitions is regional, rendering the calculations irrelevant. However, as Dr. Heeb explained in his rebuttal report, although he defines the relevant geographic market as regional markets, a national overcharge can be applied for purposes of calculating antitrust injury because the conduct is common across regional markets. (ECF No. 390-3 (sealed) at PageID 11999.) This opinion is therefore relevant and not excludable.

Next, they argue that Dr. Heeb's regional calculation for the West must be excluded because Dr. Heeb found no statistically significant overcharge in the "West" region. (ECF No. 390 (sealed) at PageID 11757.) They claim that "[i]n neither his initial report nor his 'primary' regression in his rebuttal report can Dr. Heeb show that price effects in the 'West' region are not zero." (Id.) As a result, Defendants argue that Dr. Heeb should not present his West regional overcharge calculation and that it should not be used to calculate damages. (Id.) (citing Food Lion, LLC v. Dean Foods Co., 312 F.R.D. 472, 488–89 (E.D. Tenn. Jan. 26, 2016) (excluding expert opinion as unreliable for establishing common impact of alleged overcharges where model could not find statistically significant, positive overcharges on nearly half of purchasers' zip codes)).

Defendants misstate Dr. Heeb's findings as to the West region. Dr. Heeb performed three regressions pertaining to that region. In his first, he estimated the overcharge in the West

18

was 15.4%, however he acknowledged that the estimate for that region was "imprecisely estimated, and the true value may be higher or lower than this estimate." (ECF No. 390-2 (sealed) at PageID 11882.)  In his rebuttal report, which responded to criticism from Dr. Murphy and incorporated newly available data, Dr. Heeb ran the same methodology and found the overcharge in the western region to be "indistinguishable from the national and other regional estimates" at 22.9%. (ECF No. 390-3 (sealed) at PageID 11929.)  Finally, he ran a third regression that controlled for costs and found the overcharge for the region to be 45.3%. (Id. at PageID 12117.)

Defendants have not demonstrated that Dr. Heeb's methodology is unreliable.  He has performed multiple regression analyses and explained the difference between the three.  See Kapsalis, 854 F. App'x 1, at *8–9.  Defendants' challenge to Dr. Heeb's geographic market for overcharges can be addressed on cross-examination.  L.E. Cooke, 991 F.2d at 342 (citing 0.161 Acres of Land, 837 F.2d at 1040).

### 2. Methodology

Defendants also raise several other challenges to Dr. Heeb's methodology in calculating the overcharge in the competition market:

> First, assuming that the acquired events' prices were a competitive "benchmark," that does not mean that Varsity's prices would have been at that level.  Even in competitive markets, different sellers often sell their differentiated products at different prices.  Dr. Heeb assumes that Varsity's events are equivalent to competitor's events, which is an unsupported equivalency.  Even had Varsity raised the prices of acquired events to match its own, this would not indicate deviating from "competitive pricing": Dr. Heeb does not take into account the possibility that Varsity brought up the quality of acquired events, changed some one-day events to multi-day events that commanded higher prices, moved them to better venues, or otherwise improved the events.  In analyzing prices, Dr. Heeb did not account for Varsity's rebate programs in determining post-acquisition prices even as he accounted for discounts offered by pre-acquisition brands.

(ECF No. 390 (sealed) at PageID 11757–58) (internal citations omitted).  However, none of these challenges address the reliability of Dr. Heeb's methodology.  Disputes about the data used and Dr. Heeb's resultant findings may be addressed on cross-examination.  L.E. Cooke, 991 F.2d at 342 (citing 0.161 Acres of Land, 837 F.2d at 1040).

### 3. Pre-Class Period Acquisitions

Next, Defendants challenge Dr. Heeb's analysis of acquisitions that occurred before the beginning of the class period.  (ECF No. 390 (sealed) at PageID 11758.)  They assert that Indirect Purchasers cannot collect damages based on a preexisting market condition, and that any actionable overcharge must be based on in-period conduct.  (Id.)  As stated above, Indirect Purchasers do not seek to recover damages for purchases prior to the class period.  And as this Court previously ruled, parties may allege a "continuing antitrust" violation under the Sherman Act when a party's interests "are repeatedly invaded."  (ECF No. 333 at PageID 7235) (citing Peck, 894 F.2d at 849).  As a result, Indirect Purchasers can rely on pre-class period conduct to establish market power and other elements of their claim.  (Id.)

### 4. School Cheer Events

Finally, Defendants argue that because Dr. Heeb's calculations of overcharges were limited to All Star competitions, he cannot apply those overcharges to scholastic competitions. (ECF No. 390 (sealed) at PageID 11759.)  However, as stated above, Dr. Heeb applied a recognized methodology to determine that All Star competitions and school competitions are the same product market.  See supra section I.A.  Therefore, Dr. Heeb does not "extrapolate from one market to the next" but simply estimates overcharges for one product market.  If Defendants would like to challenge Dr. Heeb's exclusive reliance on All Star data, they can raise that issue

on cross-examination.  L.E. Cooke, 991 F.2d at 342 (citing 0.161 Acres of Land, 837 F.2d at 1040).

Defendants have failed to demonstrate that Dr. Heeb's competition overcharge opinion is inadmissible.  As a result, the motion to exclude that opinion is **DENIED**.

D.    Camp Overcharge

In his report, Dr. Heeb estimates the overcharge for cheer camps to be at least 24%. (ECF No. 390-2 (sealed) at PageID 11888.)  Defendants challenge the methodology used, and argue that the anticompetitive conduct connected to camps does not withstand scrutiny.

1.    *Methodology*

First, Defendants assert that Dr. Heeb's camp overcharge analysis must be excluded because he simply "recycled his overcharge percentages from competitions and put that forward for camps as well."  (ECF No. 390 (sealed) at PageID 11760.)  Indirect Purchasers counter, asserting that "Dr. Heeb applied the conceptual model of firm optimization to support his opinion that a rational firm would apply a higher overcharge on camps (the less price sensitive service) than competitions."  (ECF No. 430 (sealed) at PageID 14429–30.)

Defendants argue that Dr. Heeb has not shown any basis for assuming the same overcharge for competitions and camps except an internal Varsity document from 2011 that lists the alleged market share figures for camps, apparel, and competitions.  (ECF No. 388-1 at PageID 10449.)  However, Defendants' argument fails to consider the economic theory underlying his opinion.  Dr. Heeb details his overcharge model for the cheer camp market in his report:

> There are no data available in discovery adequate to empirically estimate a competitive benchmark or overcharge estimate for cheer camps.  There is, however, a strong economic theoretical foundation for estimating the relative allocation of the overall monopoly overcharge to cheer camps, relative to the other markets.  A

21

perfect monopolist setting profit maximizing prices over three products with identical supply and demand conditions, all of which are purchased by its customers, would set identical monopoly mark-ups over variable costs for the different products. Therefore, such a monopolist is only concerned with finding the profit-maximizing total cost of participation, and a common mark-up rate that achieves it. Of course, the supply and demand conditions of cheer camps, apparel and competitions are not identical. The relevant differences between the markets for cheer camps, apparel, and competitions would tend to cause the monopolist in this matter to adjust away from a common monopoly mark-up rate by setting the monopoly overcharge higher in camps than in either apparel or competitions.

. . .

To calculate class-wide damages, one would apply the estimated overcharge percentage for competitions across all regions [23.8%] to Varsity's total registration revenues from all cheer camps in the Class Period. To calculate the overcharge paid by indirect purchasers for all Varsity cheer camps during the Class Period, one would apply the (nominal) pass through rate to the overcharge paid by direct purchasers for all Varsity cheer camps during the class period.

(ECF No. 390-2 (sealed) at PageID 11886–87, 11892–93.)

Defendants also assert that Dr. Heeb relies on speculation that the elasticity of demand is lower for camps and competitions. (ECF No. 388-1 at PageID 10450.) However, that determination is well-supported in his report:

When considering the implications that the markets are not commodity markets, the implication is also that overcharges in camps are likely as high or higher than overcharges in competitions and apparel. For competitions and apparel, gyms and schools can adjust their purchases in response to an increase in price by the monopolist without exiting the market. Purchasers can choose a less expensive uniform design or forego non-essential components of the apparel offering, for example. In competitions, the decisionmaker can select less expensive events and can chose to attend more or fewer events to adjust the season-long cost of participation. Camps, in contrast, are either attended or not, and the optimal camp to attend is likely dictated by other characteristics of the camp, including location and other quality related features. Camps are much more of a discrete purchase, and therefore it is more difficult to make small incremental adjustments in overall expenditure to reduce price. This effectively lowers the elasticity of demand for camps, relative to demand for apparel and competitions, and increases the portion of the overcharges that the monopolist will place on camps.

22

(ECF No. 390-2 (sealed) at PageID 11888.)  As Dr. Heeb acknowledges, there is no data on the record that can be used to empirically calculate camp overcharges.  (Id. (sealed) at PageID 11886–87.)  Instead, he applies a model of consumer choice and firm profit maximization to determine that the overcharge in the camps market would be at least as large as the overcharge in the competition market.  Although these calculations are not exact, that is not a reason to exclude them.  See In re Polyurethane Foam Antitrust Litig., No. 1:10 MD 2196, 2014 WL 6461355, at *44 (N.D. Ohio Nov. 17, 2014) (citing Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931) ("it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate")).

Although Defendants may disagree with Dr. Heeb's methodology in calculating overcharges in the camp market, they have failed to demonstrate that his method is unreliable. He has applied a recognized model—firm profit maximization—and determined that the overcharge in the camps market would be at least as large as the overcharge in the competition market.  See Kapsalis, 854 F. App'x 1, at *8–9.  Defendants' challenge to Dr. Heeb's methodology and its application can be addressed through cross-examination.  L.E. Cooke, 991 F.2d at 342 (citing 0.161 Acres of Land, 837 F.2d at 1040).

2.   Anticompetitive Conduct

Next, Defendants attack the alleged anticompetitive conduct that Dr. Heeb connects to the camp market: 1) Varsity's rebate programs; 2) the availability of bids to certain national scholastic competitions at camps; and 3) the requirement that teams complete the Squad Credentialing Program in order to attend the NCA Junior & Senior High School Nationals Championship or the UCA National High School Cheerleading Championship.  (ECF No. 388-1

23

at PageID 10450.)  Defendants argue that this conduct is not sufficiently tied to the camp market. (Id.)

Dr. Heeb relies on record evidence to show that the three product markets were linked and joined through common coordinated marketing, which includes the rebate programs.  (ECF No. 390-2 (sealed) at PageID 11790.)  He also cites to evidence that shows that bids to end-of-season events are linked to attendance at Varsity camps.  (Id. at PageID 11838.)  Finally, he connects the Squad Credentialing Program to camps by noting that this program is only offered at Varsity camps.  (Id.)  Dr. Heeb has sufficiently connected alleged anticompetitive conduct to the camp market.

Because Defendants have failed to demonstrate that Dr. Heeb's camp overcharge opinion is inadmissible, the motion to exclude that opinion is **DENIED**.

E.    Increased Overcharge Figures

In his rebuttal report, Dr. Heeb offers higher overcharge numbers than in his opening report.  Defendants argue that these new figures must be excluded because they are untimely. (ECF No. 388-1 at PageID 10453.)

However, Dr. Heeb explains in his rebuttal report that the change in the numbers is based on additional data and corrections from Dr. Murphy's report.  (ECF No. 390-3 (sealed) at PageID 11928.)  Dr. Heeb used the same methodology with the new and corrected data to arrive at the updated figures.  (Id.)

Federal Rule of Civil Procedure 26(e)(2) provides that "the party's duty to supplement [an expert report] extends both to information included in the report and to information given during the expert's deposition.  Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures [ ] are due."  Fed. R. Civ. P. 26(e)(2); see also Fed. R.

Civ. P. 26(a)(2)(B) & (a)(3)(B).  Parties must supplement or correct disclosures "in a timely

manner if the party learns that in some material respect the disclosure or response is incomplete

or incorrect[.]"  Fed. R. Civ. P. 26(e)(1)(A).

"Amended or supplemental expert reports are . . . permitted where the expert is correcting

a damages calculation based on information that was not available when the expert prepared the

initial report, as long as the expert does not rely on an entirely new legal theory in correcting his

supplementation." ASC Engineered Sols., LLC v. Island Indus., Inc., No. 2:20-cv-02284-JPM-

cgc, 2021 WL 2941989, at *2 (W.D. Tenn. July 13, 2021) (citing See Antioch Co. Litig. Tr. v.

McDermott Will & Emery, LLP, Case No. 3:09-cv-218, 2016 WL 8257680, at *2 (S.D. Ohio

July 15, 2016)).  That is the case here.  After incorporating the new data and corrections from Dr.

Murphy's report, Dr. Heeb repeated the same multiple regression analyses to arrive at these

numbers.  This supplementation is proper under Rule 26(e)(1)(A).  Id.

For the reasons stated above, Defendants' motion to exclude Dr. Heeb's overcharge

opinion is **DENIED**.

## IV.    Common Impact Opinion

Defendants also challenge Dr. Heeb's opinion that "nearly all members of the class

suffered antitrust injury and were materially harmed."  (ECF No. 388-1 at PageID 10453)

(quoting ECF No. 390-2 (sealed) at PageID 11888–89.)  Defendants argue that this opinion is

based on the unsupported assumption that everyone was overcharged.  (Id.)

Dr. Heeb explains his common impact analysis in his report:

> Using common evidence, I determine that nearly all members of the class suffered
> antitrust injury and were materially harmed in the cheer competition market from
> Varsity's maintenance and exploitation of its market power.  Accordingly, the
> fraction of potentially unharmed class members is de minimis.

25

For the remaining estimated 9.3% of class members that did not suffer antitrust injury due to apparel purchases, I calculate the fraction of those class members whose gyms or schools attended competitions in adjusted-CSA based local areas where Varsity's market share is less than 40%. This number is 4.0%, based on the share of Varsity's gyms and schools customers attending such events, or 3.0% based on the Varsity's event revenue share of those events, which were located in local areas where Varsity's market share is less than 40%. . . Once again, the revenue share calculation is the better estimate of the number of class members that participated in Varsity events in local areas in which Varsity has significant market power. Assuming that Varsity events are elevated in price relative to competitive levels in all local areas where Varsity's market share is above 40%, that events in localities with lower market share than 40% are not elevated (likely a highly conservative assumption), and that teams do not travel outside their local areas to attend events (also a highly conservative assumption), then the remaining fraction of unharmed class members is about 0.3%, or about 3 unharmed class members out of each 1000 class members. (This is calculated as the 3.0% of class members unharmed by competition overcharges times 9.3% of class members with competition payments that did not make any payments to Varsity in the cheer apparel market equals 0.3% unharmed by either of the two sources of antitrust harm.)

This already very small fraction is likely still a substantial overestimate of unharmed class members, because: (1) Varsity is likely to have implemented event overcharges above competitive levels even in the limited areas where its market share is relatively lower, especially as the pricing strategy was a national level strategy; (2) many or most class members likely travel to events outside their local areas, and are likely to suffer antitrust injury at those other events; and (3) many or most school cheer participants, and some All-Star participants, also suffer antitrust injury from overcharges at Varsity camps, which are not included in this estimate.

As stated above, Dr. Heeb used reliable methods to define the relevant product markets and to determine his overcharge estimates in each of those markets. See supra Sections I, III. Thus, Dr. Heeb's use of this data in forming his common impact opinion is also reliable.

Defendants also argue that Dr. Heeb's overcharges cannot be used to calculate damages because those calculations are inadmissible. (ECF No. 388-1 at PageID 10454.) But, as stated above, the Court finds Dr. Heeb's overcharge analysis to be admissible. See supra Section III. Therefore, the common impact opinion is not excludable on that basis either.

Because Defendants have not shown that Dr. Heeb's common impact opinion is inadmissible, the motion to exclude that opinion is **DENIED**.

**V.     Use of Factual Narrative**

Finally, Defendants assert that many of Dr. Heeb's opinions are factual narratives that do not aid the trier of fact.  (ECF No. 388-1 at PageID 10454.)  Defendants challenge four opinions on this basis: 1) Varsity Conspired with USASF to harm competition; 2) the history of Varsity's acquisitions; 3) Varsity's Squad Credentialing Program is an artificial barrier, 4) Varsity exploited its alleged market power to charge customers "inflated housing prices."  (Id. at PageID 10455–56.)  Each argument is analyzed below.

A.     Conspiracy with USASF

Dr. Heeb concludes that Varsity and USASF conspired to harm competition.  (ECF No. 390-2 (sealed) at PageID 11848.)  Defendants argue that this opinion should be excluded because it is exclusively based on tallying up Varsity Worlds bid events and seats on the USASF Sanctioning Committee.  (ECF No. 388-1 at PageID 10455.)

"Where an expert's testimony amounts to 'mere guess or speculation,' the court should exclude [the] testimony, but where the opinion has a reasonable factual basis, it should not be excluded.  Rather, it is up to opposing counsel to inquire into the expert's factual basis." L.E. Cooke, 991 F.2d at 342 (quoting 0.161 Acres of Land, 837 F.2d at 1040).  Although Defendants may disagree with the data used and conclusions reached, Dr. Heeb's opinion is not based on "mere guess and speculation," but rather substantial citations to the record.  Id.  Because there is a reasonable factual basis for his opinion, it is not excludable under Rule 702.  Disputes about the data and Dr. Heeb's resultant findings may be addressed on cross-examination.  The motion to exclude this opinion is **DENIED**.

B.    History of Varsity's Acquisitions

Defendants next challenge Dr. Heeb's timeline of Varsity acquisitions, calling it "an uncritical adoption of corporate market share estimates in the guise of an expert opinion on anticompetitive intent."  (ECF No. 388-1 at PageID 10455.)  "'[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence.'"  Shall v. Suzuki Motor of America, Inc., No. 4:14-CV-00074-JHM, 2020 WL 1162193, at *5 (W.D. Ky. Mar. 10, 2020) (citing In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009); Highland Capital Mgmt., LP v. Schneider, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005)).  To the extent such evidence is admissible, it is "properly presented through percipient witnesses and documentary evidence."  Id.  (citing Tillman v. C.R. Bard, Inc., 96 F. Supp. 3d 1307, 1330 (M.D. Fla. 2015)).  "However, as opposed to providing a mere factual narrative, [an] expert is allowed to articulate the 'factual underpinning' upon which [he or she] bases [his or her] opinion."  Id.  (quoting Pledger v. Reliance Trust Co., No. 1:15-CV-4444-MHC, 2019 WL 4439606, at *12 (N.D. Ga. Feb. 25, 2019)).

Additionally, expert testimony on the intent of a party is "not properly the subject of 'scientific, technical, or other specialized knowledge.'" Lucio v. Levy Env't Servs. Co., 173 F. Supp. 3d 558, 565 (N.D. Ohio 2016) (citing CMI–Trading v. Quantum Air, 98 F.3d 887, 890 (6th Case 2:20-cv-02892-SHL-tmp Document 577 Filed 02/28/24 Page 15 of 21 PageID 33859 16 Cir.1996); MAR Oil Co. v. Korpan, 973 F.Supp.2d 775, 781 (N.D. Ohio 2013) ("No expert, however, knows a party's state of mind.")). "The jury is sufficiently capable of drawing its own inferences regarding intent, motive, or state of mind from the evidence, and permitting expert testimony on this subject would be merely substituting the expert's judgment for the jury's and

would not be helpful[.]" (Id.) (citing Waite, Schneider, Bayless & Chesley Co., L.P.A. v. Davis, 253 F. Supp. 3d 997, 1013 (S.D. Ohio 2015)).

Although Heeb can rely on the history of these acquisitions to support his opinion that the acquisitions eliminated or diminished competition, he cannot opine that it was Varsity's intention to do so. See Lucio, 173 F. Supp. 3d at 565 (citing CMI–Trading, 98 F.3d at 890; MAR Oil, 973 F. Supp. 2d at 781). Therefore, all opinions regarding Varsity's intent are **EXCLUDED**. However, the motion to exclude the history of the acquisitions is **DENIED**.

C.      Varsity Squad Credentialing Program

Dr. Heeb also concludes that Varsity's Squad Credentialing Program is an artificial barrier to entry as part of an "alleged scheme to disadvantage rivals and diminish competition to achieve supracompetitive profits." (ECF No. 390-2 (sealed) at PageID 11838, 11871.) Defendants seek to exclude this opinion because it is "based on nothing more than a cursory explanation of the Program's requirements and a small handful of internal documents." (ECF No. 388-1 at PageID 10455.)

Defendants' challenges amount to disputes regarding the documents that Dr. Heeb used to reach his conclusions. As discussed above, opinions that have a reasonable factual basis should not be excluded. L.E. Cooke, 991 F.2d at 342 (quoting 0.161 Acres of Land, 837 F.2d at 1040). Based on the review of the record, it is more likely than not that Dr. Heeb's opinion is based on sufficient facts and data. Defendants' challenges to the documents that Dr. Heeb relied on can be addressed on cross-examination. Id. The motion to exclude this opinion is **DENIED**.

D.      Housing Prices

Finally, Defendants challenge Dr. Heeb's assessment that Varsity exploited its alleged market power to charge customers inflated housing prices for two reasons: 1) the opinion was

29

not timely disclosed; and 2) it is based on only a cursory review of the factual record.  (ECF No. 388-1 at PageID 10455–56.)

Rule 26 requires expert disclosures "at the times and in the sequence that the court orders."  Fed. R. Civ. P. 26(a)(2)(D).  Under Rule 16, district courts have broad discretion to exclude untimely disclosed expert-witness testimony.  Boone v. Stieve, 642 F. Supp. 597, 602 (E.D. Mich. 2022) (citing Pride v. BIC Corp., 218 F.3d 566, 578–79 (6th Cir. 2000); Moore, Owen, Thomas & Co. v. Coffey, 992 F.2d 1439, 1446 (6th Cir. 1993)).  Here, Dr. Heeb complied with the Court's Scheduling Order in submitting his initial and rebuttal reports.

Rule 26(a)(2)(D)(ii) states that rebuttal evidence is "intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)[.]"  Fed. R. Civ. P. 26(a)(2)(D)(ii).  A "rebuttal expert may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert."  Bentley v. Highlands Hosp. Corp., No. CV 15-97-ART-EBA, 2016 WL 5867496, at *5 (E.D. Ky. Oct. 6, 2016) (quoting Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Trust v. State St. Bank & Trust Co., 290 F.R.D. 11, 16 (D. Mass. 2013)).  "But they may not 'advance new arguments or new evidence' outside the scope of the opposing expert's testimony."  Id. (quoting Blake v. Securitas Sec. Servs., Inc., 292 F.R.D. 15, 17 (D.D.C. 2013)).

It is true that Dr. Heeb discusses housing prices for Varsity competitions for the first time in his rebuttal report.  (ECF No. 390-3 (sealed) at PageID 12016.)  However, this opinion is in direct response to Dr. Murphy's opinion that "Varsity's stay-to-play program reduces housing costs at a number of Varsity competitions."  (ECF No. 384-3 (sealed) at PageID 9559.)  For that reason, Dr. Heeb's opinion on housing is proper rebuttal testimony, and therefore is timely.

Defendants' additional challenge amounts to a dispute about the documents that Dr. Heeb used to reach his conclusions.  As discussed above, opinions that have a reasonable factual basis should not be excluded.  <u>L.E. Cooke</u>, 991 F.2d at 342 (quoting <u>0.161 Acres of Land</u>, 837 F.2d at 1040).  Based on the review of the record, it is more likely than not that Dr. Heeb's opinion is based on sufficient facts and data.  Defendants' challenges to the documents that Dr. Heeb relied on can be addressed on cross-examination.  <u>Id.</u>  The motion to exclude this opinion is **DENIED**.

## <u>CONCLUSION</u>

For the reasons stated above, Defendants' Motion to Exclude the Testimony of Randal Heeb, PhD is **GRANTED** only as to his opinions regarding Varsity's intent.  The remainder of the motion is **DENIED.**

  **IT IS SO ORDERED,** this 6th day of March, 2024.

s/ Sheryl H. Lipman                
SHERYL H. LIPMAN
CHIEF UNITED STATES DISTRICT JUDGE
