# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| **JESSICA JONES, et al.,** | Case No. 2:20-cv-02892-SHL-tmp |
| Plaintiffs | |
| v. | |
| **VARSITY BRANDS, LLC, et al.,** | **JURY DEMAND** |
| Defendants | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE JONATHAN M. ORSZAG AND DR. KEVIN MURPHY, IN PART

## TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION ................................................................................................... 1

II.  LEGAL STANDARD ........................................................................................... 2

III. ARGUMENT REGARDING MR. ORSZAG ........................................................ 3

   A.   MR. ORSZAG'S OPINIONS ARE ONLY BASED ON HIS *IPSE DIXIT* ................... 3

   B.   MR. ORSZAG'S OPINIONS HAVE BEEN EXCLUDED BEFORE ............................ 6

   C.   MR. ORSZAG IGNORES RECORD EVIDENCE PRIOR TO CLASS PERIOD ........ 8

   D.   MR. ORSZAG IS NOT QUALIFIED TO OPINE ON THE CHEER INDUSTRY ....... 9

IV.  ARGUMENT REGARDING DR. MURPHY .......................................................... 10

   A.   DR. MURPHY'S EXHIBIT 45 AND OPINIONS REGARDING IT ARE BASED ON
UNRELIABLE METHODOLOGY AND SHOULD BE EXCLUDED ................................. 10

     1.   Dr. Murphy fails to consider sufficient facts and data in crafting Exhibit 45. ............... 10

     2.   Dr. Murphy does not analyze or calculate the purported "net benefit." ........................ 11

   B.   DR. MURPHY'S OPINION THAT THE MARKET FOR CHEER EVENTS IS
LOCAL IS IRRELEVANT AND UNRELIABLE AND SHOULD BE EXCLUDED ............ 13

   C.   DR. MURPHY'S RELIANCE ON AN ONLINE "SURVEY" LACKS ANY INDICIA
OF RELIABILITY, AND CANNOT BE TESTED ................................................................. 16

V.   CONCLUSION ...................................................................................................... 20

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE
JONATHAN M. ORSZAG AND DR. KEVIN MURPHY, IN PART

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Brock v. Positive Changes Hypnosis, LLC*, 589 F. Supp. 2d 974 (W.D. Tenn. 2008) ..............................................................................................................10

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ...............................14

*Conwood Co. v. L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002)....................................14

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ................................ *passim*

*Ellipsis, Inc. v. The Color Works, Inc.*, 428 F. Supp. 2d 752 (W.D. Tenn. 2006).......................2, 9

*Elswick v. Nichols*, 144 F. Supp. 2d 758 (E.D. Ky. 2001)................................9

*Fed. Trade Comm'n v. Fleetcor Techs., Inc.*, No. 1:19-CV-5727-AT, 2022 WL 3350066 (N.D. Ga. Aug. 9, 2022)..............................................................20

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ...............................................3

*In re Elec. Books Antitrust Litig, In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008)................................................................................................4

*In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 45 F. Supp. 3d 724 (N.D. Ohio 2014) ......................................................................................13

*Innovation Ventures, L.L.C. v. Custom Nutrition Labs., L.L.C.*, 520 F. Supp. 3d 872 (E.D. Mich. 2021) ......................................................................................3

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908 (6th Cir. 2009)......................................................................................14

*Madej v. Maiden*, 951 F.3d 364 (6th Cir. 2020) ...............................................3

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024 (N.D. Ill. 2003) ........................................................................................................18

*Birge ex rel. Mickens v. Dollar Gen. Corp.*, No. 04-2531 B/P, 2006 WL 5175758 (W.D. Tenn. Sept. 28, 2006)...........................................................................3

*Navarro v. Procter & Gamble Co.*, 501 F. Supp. 3d 482 (S.D. Ohio 2020) ................................13

*Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244 (6th Cir. 2001)...........................13

*Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521 (6th Cir. 2012) ................................13

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE JONATHAN M. ORSZAG AND DR. KEVIN MURPHY, IN PART

*Ortho Pharm. Corp. v. Cosprophar, Inc.*, 828 F. Supp. 1114 (S.D.N.Y. 1993),
aff'd, 32 F.3d 690 (2d Cir. 1994) ............................................................................17

*Sheffield v. Int'l Paper Co.*,  No. 2018-CV-02701-JPM-CGC, 2020 WL 1882906,
(W.D. Tenn. Feb. 26, 2020) .....................................................................................12

*Sports Auth., Inc. v. Abercrombie & Fitch, Inc.*, 965 F. Supp. 925 (E.D. Mich.
1997) ........................................................................................................................18

*Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665 (6th Cir. 2010) .........................................14

*Toth Gray v. LG&M Holdings LLC*, No. CV-18-02543-PHX-SRB, 2020 WL
9074812 (D. Ariz. Sept. 3, 2020) .............................................................................17

*United States v. Lang*, 717 F. App'x 523 (6th Cir. 2017) ............................................12

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) ...................................20

**Federal Rules**

Fed. R. Evid. 602 ...........................................................................................................6

Fed. R. Evid. 702 ................................................................................................ *passim*

Fed. R. Evid. 802 ...........................................................................................................6

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE JONATHAN M.
ORSZAG AND DR. KEVIN MURPHY, IN PART

## I.  INTRODUCTION

Plaintiffs move to exclude USASF's proffered expert witness, Mr. Jonathan M. Orszag, and move to exclude in part, Defendants' proffered expert, Dr. Kevin Murphy, pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

Mr. Orszag has an impressive resume of political appointments, but his credentials for offering economic and antitrust opinions are light at best. He lacks the expected Ph.D. in economics that is typically held by antitrust experts offering economic opinions, which may explain the lack of any econometric analysis in his report. Mr. Orszag was retained by USASF to criticize Plaintiffs' economists, which he does, but without any testable methodology to support his opinions. If not excluded, the Court and jury would be asked to accept his testimony on his "say so" and nothing more. Not surprisingly, Mr. Orszag has been excluded for this exact reason before. Just as in a prior case his opinions were excluded, Mr. Orszag is not entitled to opine based on his *ipse dixit*. Mr. Orszag's report and testimony should be excluded entirely.

Plaintiffs also move to exclude certain opinions of Dr. Murphy. While most of Dr. Murphy's proffered opinions can be addressed through cross-examination, there are three that violate the standards of Federal Rule of Evidence 702 ("Rule 702") and should be excluded.

***First***, Plaintiffs seek to exclude Exhibit 45 to Dr. Murphy's Report ("Exhibit 45") and Dr. Murphy's opinions relating to Exhibit 45. In Exhibit 45, Dr. Murphy offers a conclusion that attendance increased at Varsity events post-acquisition by 12%. Dr. Murphy then bootstraps this finding to opine that because Varsity's acquisitions led to greater attendance, Varsity's acquisitions were procompetitive. The problem is that Dr. Murphy created Exhibit 45 without considering sufficient facts or data and then applied incorrect and unreliable methodologies, all leading to an erroneous and unreliable result. Had he applied a reliable methodology, he would have been forced to conclude that total attendance *decreased* by 42%. Because Exhibit 45 is not the product of reliable principles and methods, it does not provide a reliable foundation for his opinion. Exhibit 45 and his opinions based on it should be excluded.

**Second**, Dr. Murphy's opinion that the geographic market for cheer competition events is "local" should be excluded. Unlike Plaintiffs' experts, who used direct evidence and the widely accepted hypothetical monopolist test ("HMT") to define the markets and confirm their results, Dr. Murphy does not define the geographic product markets at all, and, instead, uses an analysis of "consumer travel patterns" and what he calls "catchment areas" to form his opinion. In fact, the term "local" is entirely subjective and Dr. Murphy's "catchment" analysis is an entirely novel and untested method. His opinions based on that methodology are thus irrelevant, unscientific, unreliable, and should be excluded.

**Third**, Dr. Murphy puts forward several regressions that use a "demand variable," to opine that prices for events increased after Varsity acquired them only due to natural increases in demand, and not due to any anticompetitive effect. But his purported "demand variable" is based entirely on an online survey which Dr. Murphy did not conduct. Dr. Murphy does not provide any information as to how the "survey" was conducted nor whether any accepted survey methodology was employed. There is not even a shred of indicia of reliability. It appears that Dr. Murphy's team simply copied the purported survey result numbers from the internet. Nor did Defendants disclose that the purported survey was prepared by a strategic partner of Varsity, with financial incentives to increase participation numbers—the very numbers Dr. Murphy uses to opine that increased participation means no anticompetitive harm. The online survey must be excluded, as well as Dr. Murphy's regressions that rely on it.

## II.  LEGAL STANDARD

Under Fed. R. Evid. 702, "expert testimony may only be admitted into evidence if: (1) the witness qualifies as an expert; (2) the methodology by which the expert reaches his or her conclusions is sufficiently reliable; and (3) the expert's testimony will assist the trier of fact to understand the evidence or determine a fact in issue." *Ellipsis, Inc. v. The Color Works, Inc*., 428 F. Supp. 2d 752, 757 (W.D. Tenn. 2006). Rule 702 imposes "a gatekeeping obligation on the trial court to ensure expert testimony is not only relevant but reliable." *Id.* (citing *Daubert,* 509

U.S. at 597). "This gatekeeping function applies not only to the scientific testimony but also to testimony regarding technical or other specialized knowledge." *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)). For expert opinions to pass through the gate, the Court must conduct a two-step inquiry of the "relevance and reliability" of an expert's opinion. *Id.* The relevance step of the inquiry is designed to ensure that there is a fit between the testimony and the issues to be resolved by the trial, while the reliability step focuses on the methodology and principles that form the basis for the testimony. *Id.* To pass these tests, the proposed expert must (1) offer testimony based on sufficient facts or data; (2) the testimony must be the product of reliable principles and methods; and (3) the testimony must reliably apply the principles and methods to the facts of the case. *Id.* A court must inquire as to whether the methodology underlying the preferred expert testimony is valid and whether the methodology may be properly applied to the facts at issue in the case. *Id.*

### III.   ARGUMENT REGARDING MR. ORSZAG

### A.    MR. ORSZAG'S OPINIONS ARE ONLY BASED ON HIS *IPSE DIXIT*

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Madej v. Maiden*, 951 F.3d 364, 373 (6th Cir. 2020) (citing *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010)) ("[I]pse dixit of the expert' alone is not sufficient to permit the admission of an opinion."); *Birge ex rel. Mickens v. Dollar Gen. Corp.,* No. 04-2531 B/P, 2006 WL 5175758, at *3 (W.D. Tenn. Sept. 28, 2006) ("The trial court's gatekeeping function requires more than simply taking the expert's word for it."). Rather, *Daubert* requires that the expert's testimony "be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Innovation Ventures, L.L.C. v. Custom Nutrition Labs., L.L.C.*, 520 F. Supp. 3d 872, 880 (E.D. Mich. 2021) (citing *Daubert*, 509 U.S. at 590). On a *Daubert* motion, district courts are required to assess whether the expert

testimony "rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-30 (6th Cir. 2008).

Here, Mr. Orszag's opinions are not based on any established methodology or principles. They are based only on his subjective beliefs and speculation. For example, although not an expert on sanctioning organizations, Mr. Orszag opines that the purported procompetitive benefits of USASF's conduct outweigh the anticompetitive effects. He measured neither.[1] He did not perform any econometric analysis of the available transaction or sales data.[2] He did not do any modeling or regression analyses.[3] He did not perform any surveys.[4] In fact, he acknowledges that he did not perform any econometric analysis whatsoever.[5] While Mr. Orszag claims he conducted a quantitative analysis, in part, his so-called quantitative analysis involved simply counting and adding the number of World Bid events produced by Varsity over time and excluding the events Varsity obtained by "unilateral business interest" to find that there was no material change in Varsity's share of World Bid events beyond what Varsity obtained

---

[1] *See* Saveri Decl., Ex. 8 (Orszag Dep. at 237:16-25) (Q: … do you have an opinion in this case whether the data – the quantitative that is available is sufficient or insufficient to conduct a quantitative analysis of any of the economic issues I n this case A: I have no opinion one way or the other about any of the analyses that don't – aren't—relevant to the work I have done here).

[2] *See* Saveri Decl., Ex. 8 (Orszag Dep. at 238:16-21) (Q: Okay. Is—is it fair to say though, sir, that you have not done a quantitative analysis of any of the transaction data, any of the sales data, in this case? A: That is fair description. That is correct.).

[3] *See* Saveri Decl., Ex. 8 (Orszag Dep. at 265:10-17) (Q: Okay. And did you do any modeling? A: I did not do modeling because I'm responding to the lack of modeling by the experts that you have retained in this matter, and my work in this case is responsive to their work. Q: Okay. And so you didn't do any regression, correct? A: That is correct.).

[4] *See* Saveri Decl., Ex. 8 (Orszag Dep. at 328:16-17) (Q: Did you conduct any survey? A: No, I did not.).

[5] *See* Saveri Decl., Ex. 8 (Orszag Dep. at 265:18-22) (Q: And so, you didn't do any statistical or econometric work; is that correct? A: Whatever – the quantitative analyses that I conducted are presented in the report. I did not do any econometric analysis in this report).

unilaterally.[6] Mr. Orszag never explains how or why this matters, or how it is tied to the subject of proper expert testimony. Mr. Orszag employed no scientific tools to study relationships between observed facts or market conditions to confirm cause and effect. Such unsupported opinions are properly excluded as *ipse dixit*.

In addition, Mr. Orszag's observations ignore the record evidence. Mr. Orszag makes conclusory statements such as "no other event producer contributed as much to the development of USASF— which in turn benefitted the organization; event producers that joined as members or that follow safety rules and best practices; as well as athletes, gyms, and coaches" and finds that these contributions were procompetitive. *See* Saveri Decl., Ex. 2 (Orszag Rep., ¶45). Yet, in making this statement, he offers no evidence of how gyms, athletes, and coaches benefitted. *Id.* He simply asserts that sanctioning organizations in sports are intrinsically procompetitive. *Id.*, ¶¶25–26. Mr. Orszag's opinion contains other sweeping generalizations without support. For example, he states that sanctioning organizations, in general, encourage competition by establishing regulations and enhancing competitive interactions, but offers no concrete facts or data to support this proposition. *Id.*, ¶26. He points to the so-called "tension" between long-term incentives provided by safety rules and the benefits participants might realize in the short term from not adhering to rules. *Id.*, ¶28. He states that USASF was founded to address this tension and make All Star cheerleading "legitimate" and "safe." *Id.*, ¶29. Yet, he fails to provide any evidence showing greater safety resulted. These are simply characterizations of the evidence and argument under the guise of expert testimony. Such testimony will confuse the jury and invite

---

[6] *See* Saveri Decl., Ex. 8 (Orszag Dep. at 335:1-10) (Q: So could state for the record, then, what is the null hypothesis, then, that you test? A: You can test in either direction. I am testing the question of whether there was a change in the number of events produced by Varsity over and above what they produced during the class period. And the answer is, no, there was not; and that then—that then shows that the analysis conducted by the experts that you retained is wrong with regard to those issues); *Id.* at 482:24-483:4 (Q: Okay. And I just want to make sure I'm clear as can be that the empirical evidence you just talked about is—are the—are the studies of what? A: The studies of who owns the World Bid events that are—is described in my report).

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE JONATHAN M.
ORSZAG AND DR. KEVIN MURPHY, IN PART

speculation. It is inadmissible hearsay, offered by a witness without expert or personal

knowledge. *See* Federal Rules of Evidence 602, 802.

## B.    MR. ORSZAG'S OPINIONS HAVE BEEN EXCLUDED BEFORE

In *In re Elec. Books Antitrust Litig* ("*E-books*"), Mr. Orszag offered similar opinions to

those offered here. 2014 WL 1282298, at *13 (S.D.N.Y. Mar. 28, 2014). They were excluded. *Id.*

In *E-books*, the court excluded Mr. Orszag's opinions that: (1) but for the conspiracy, Amazon

would have lowered e-reader prices less than it did; (2) the price-fixing conspiracy increased the

availability of self-published and free e-books; and (3) some e-books purchased through the

iBook store and Barnes & Noble's Nook Book Store would not have been purchased in a but-for

world. *Id.* at *14. The *E-books* court found that Mr. Orszag's opinions failed the gatekeeping

requirements of relevance and reliability because they were "divorced from the transaction at

issue" and "unmoored from the record facts and not supported by any rigorous analysis." *Id.* at

*15. None of his opinions in *E-books* reflected "considered and developed economic analysis

that would be of assistance to a jury in either understanding a weakness in the [Plaintiffs'

expert's] calculation of damages or in using an alternative calculation." *Id.*

The court found Mr. Orszag's first opinion rested on "layers of assumptions, many of

which [were] untethered to the real world or at odds with the facts." *Id.* at *16. It reasoned that

"the sheer length of Orszag's chain of shaky inferences, without any modeling or analysis,

invite[d] the jury to speculate about any potential impact on a damages calculation." *Id.* Instead

of examining the market and performing a study, as an economist would, Mr. Orszag engaged in

"back of the napkin-calculation" by taking a remark from an Amazon executive about its goals

and extrapolating back to find that every penny in 2010 from the sales of Amazon's e-reader

were attributable to the rise in e-book prices and was not attributable to competition in the e-

reader market or anything else. *Id.* at *16-17. The court found there were "scientific tools to

study relationships between phenomena, or markets and to confirm causality," but that "Orszag

has employed none here." *Id.* His first opinion was barred by Federal Rules of Evidence 702 and

403 due to lack of intellectual rigor, flawed assumptions, and invitation to engage in guesswork. *Id.* at \*18.

The court found Mr. Orszag's second opinion divorced from the record and scientific method for two reasons. *Id.* First, Mr. Orszag did not provide any theoretical basis, either legal or economic, for including an offset in damages for the sale of self-published or free books. *Id.* Second, he "d[id] not even purport to reliably calculate the supposed benefits to consumers from the self-publishing or free eBook phenomena." *Id.* at \*19. He created no model based on economic theory and had done no rigorous study. *Id.* Instead, he selected arbitrary figures for illustrative purposes. *Id.* Such guesswork did not meet *Daubert* standards for the admission of expert testimony. *Id.*

In his third opinion in *E-books*, Mr. Orszag offered testimony that 15% of iBookstore sales would not have occurred in the but-for world and that damages were overestimated by $2 - $6 million. *Id.* He also assumed that the Nook Book Store would not have been profitable in the but-for world and would have been shuttered shortly after launch, completely ignoring that the Nook Book Store still existed nearly two years after the end of the collusive agreements. *Id.* The court found that this was simply a guess. Mr. Orszag's guesses fell "far short of professional standards and would not assist the trier of fact." *Id.* at \*20.

Mr. Orszag's opinions in this case suffer from the same fundamental flaws as found in *E-books*. Mr. Orszag did not engage in "rigorous analysis or conduct any studies." He conducted at most one "quantitative" analysis, if counting and adding World Bid events qualifies as quantitative analysis. He does not explain why this count is relevant to any economic analysis. There is no explanation on how this would help the jury, instead of lay testimony on the subject. Here he did not even perform the "back of the napkin" calculation he undertook in *E-books.* He simply reviewed the number of World Bid events belonging to Varsity and opined that they were based on Varsity's unilateral acquisitions rather than any collusion or favorable rulemaking on the part of USASF. *See* Saveri Decl., Ex. 2 (Orszag Rep., ¶ 60-62). He does not even attempt to

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE JONATHAN M.
ORSZAG AND DR. KEVIN MURPHY, IN PART

reliably calculate the benefits to consumers from USASF's rules, repeatedly admitting that he did not do any modeling based on economic theory. *See id.*, Ex. 8 (Orszag Dep. at 238:2-21, 265:10-17, 330:23-331:13, 335:1-10, 482:24-483:4).

Just as in *E-books*, Mr. Orszag's opinions rest on layers of assumptions, many of which are untethered to the real world. For example, he assumes, without support, that limitations on the date and location of World Bid events cannot be anticompetitive because they allegedly apply to both Varsity and non-Varsity events equally. Saveri Decl., Ex. 2 (Orszag Rep., ¶¶75-76). Again, this opinion lacks any analysis, economic or otherwise. Nor does Mr. Orszag even address the fact that this limitation did not apply to Varsity's Summit Bid events, allowing Varsity to target other producers by locating Summit Bid events near World Bid events. *Id.*, Ex. 4 (Netz Reb., VIII.A.3.e). As another example, he asserts that USASF's rule providing for a one-year probationary period for events to attain the requisite 125 participating teams before they lost Tier 1 status was not anticompetitive. *Id.*, Ex. 2 (Orszag Rep., ¶74). In support, he points to two event producers that lost their World Bids between 2015-2016. *Id.*, ¶73. But he completely ignores the record evidence demonstrating that Varsity used this probationary period to target event producers in direct collusion with USASF. For example, he ignores an email written by Steve Peterson, USASF Vice President to Tres LeTard of Varsity, discussing non-Varsity event producers on probation. Mr. Peterson writes: "So far, in 19-20 we have Cheer Tech and ASC on probation. If you guys [Varsity] can put the squeeze on them next season, that would be great." *See id.*, Ex. 10 (VAR00365110). Mr. Orszag's opinions are based on guesswork and are at odds with the facts. They fall short of professional standards and will not assist the trier of fact.

## C. MR. ORSZAG IGNORES RECORD EVIDENCE PRIOR TO CLASS PERIOD

Mr. Orszag specifically limits his analysis to events which occurred during the class period. This blindered approach is artificial and appears designed to ignore substantial and highly probative evidence in the case. Plaintiffs allege Defendants' anticompetitive conduct began before the class period and continued through the class period. This includes the significant

accretion of monopoly power and elimination of competitors which pre-dated the class period, such as the Jam Brands acquisition. *Id.*, Ex. 3 (Netz Rep. at 94–96). It also excludes facts regarding the formation, financial support, and control over USASF, which Varsity leveraged to disadvantage competitors. In so doing, Mr. Orszag ignores overwhelming evidence which contradicts his opinions. This Court has already indicated that this approach is incorrect, addressing the time period of pertinent facts at the motion to dismiss stage. ECF No. 333 at 6-9. Ignoring events that occurred outside of the class period conveniently allows Mr. Orszag to skew his entire analysis and ignores large swaths of material record evidence.

**D.     MR. ORSZAG IS NOT QUALIFIED TO OPINE ON THE CHEER INDUSTRY**

A witness may only offer opinion testimony if he is qualified to do so by knowledge, skill, experience, training, or education. *Ellipsis, Inc. v. The Color Works, Inc.*, 428 F.Supp.2d at 758. "To qualify as an expert, the witness' knowledge, skill, experience, training or education must be closely related to the subject matter of his testimony." *Id.* "The qualification, however, must match up with the subject matter about which the expert is to testify." *Elswick v. Nichols*, 144 F. Supp. 2d 758, 766 (E.D. Ky. 2001). Here, Mr. Orszag is not qualified by training or experience to opine on the cheerleading industry. He has never done any expert work in the cheerleading industry, nor has he written any scholarly articles related to cheerleading. Saveri Decl., Ex. 8 (Orszag Dep. at 270). He does not hold a doctorate in economics. He received the equivalent of a master's degree from Oxford University when he left the Marshall Scholars Program early to return to the United States to pursue a political career. *Id.* at 228:19–230:14. Subsequently, his experience is overwhelmingly in the political sphere. *See id.*, Ex. 2 (Orszag Rep. Appendix A). He does not seem to have any experience related to competitive sports outside of vague mention in his report that he has worked in matters "affecting the sport industry." *Id.*, ¶4. Mr. Orszag is not qualified under Rule 702 to provide expert opinion here.

## IV.   ARGUMENT REGARDING DR. MURPHY

### A.   DR. MURPHY'S EXHIBIT 45 AND OPINIONS REGARDING IT ARE BASED ON UNRELIABLE METHODOLOGY AND SHOULD BE EXCLUDED

#### 1.   Dr. Murphy fails to consider sufficient facts and data in crafting Exhibit 45.

Expert testimony must be based on sufficient facts or data to pass the reliability prong of Fed. R. Evid. 702(b). *Brock v. Positive Changes Hypnosis*, *LLC*, 589 F. Supp. 2d 974, 980 (W.D. Tenn. 2008). Here, Dr. Murphy omits and ignores substantial and significant facts and data to present his summarized findings in Exhibit 45. He then concludes there was a total increase in attendance post-acquisition of 12% at competitions acquired by Varsity. *See* Saveri Decl., Ex. 1 (Murphy Rep., ¶¶317–18 & Ex. 45). Dr. Murphy then opines that this increased attendance shows that Varsity's acquisitions of cheer competition events, despite resulting price increases, had a procompetitive effect. *Id.*, ¶¶292, 295. The problem is that Dr. Murphy makes significant errors in his calculations of the total participation changes. In fact, total participation did not increase, as Dr. Murphy alleges, but *decreased* by 42%. *Id.*, Ex. 6 (Heeb Reb., ¶¶347–48 & Tables 14 and 15). This error alone suffices to undercut Dr. Murphy's opinions. As Dr. Heeb explains:

> First, Dr. Murphy reports only "Average Athlete Participation" per event and not "Total Athlete Participation." The relevant measure for consumer welfare is "Total Athlete Participation." Second, Dr. Murphy only reports the percentage changes in "Average Athlete Participation" and "Real Average Price per Athlete" for the "Continued" events, but not for the "Unmatched" events (or the "All Events" total at the bottom of his Exhibit 45). Third, Dr. Murphy does not report the percentage change in the number of events. This is important since Varsity cancelled a significant number of acquired brand events. Fourth, and finally, Dr. Murphy does not include the 2015 acquisition of JAM Brands in his analysis. These are flaws with the design and reporting of his Exhibit 45. *Id.*, ¶350.

> In addition to the design flaws, Dr. Murphy uses incorrect data inputs in constructing his Exhibit 45. Without explanation in his report, Dr.

Murphy's backup materials indicate that he created his own data inputs
for the athlete participation counts. In creating his athlete participation
counts, Dr. Murphy undercounts participation in the pre-acquisition data
(based on raw data inputs from the registration records of rival event
producers) and exaggerates participation in the post-acquisition data
(based on raw data inputs from Varsity's registration records). Dr.
Murphy's data inputs are incorrect and unreliable. *Id.*, ¶351.[7]

These deficiencies are not simply disputes between experts that can be addressed on cross-examination. They are mistakes that render Dr. Murphy's methodology unreliable.

### 2. Dr. Murphy does not analyze or calculate the purported "net benefit."

Dr. Murphy uses his mistaken finding of an attendance increase to assert that the greater attendance that resulted from Varsity's acquisitions led to an overall "net benefit" in the quality of the events offered, which he says justified any increases in price. Murphy Rep., ¶¶294–96. Yet, Dr. Murphy does not analyze or calculate this overall "net benefit." Instead, he simply assumes that his incorrect calculations of increased participation must mean that the real price increases implemented by Varsity can be justified as the economic outcome of more desirable and higher quality events. *Id.*, ¶294. Further, Dr. Murphy does not quantify the size of the real price increases for the acquired brand events that Varsity continued to operate. *See* Ex. 6 (Heeb Reb., ¶368).[8] In fact, Varsity increased prices of acquired brand events by 18.7%. Dr. Murphy identifies no evidence of Varsity investments to improve the quality of its events. To the contrary, evidence on the record shows that Varsity took concerted steps to reduce its

---

[7] In his rebuttal report, Dr. Heeb updates Dr. Murphy's Exhibit 45 with the correct inputs and shows specifically how Murphy's calculations are incorrect. Saveri Decl., Ex. 6 (Heeb Reb., ¶356 & Table 16).

[8] To test, Dr. Heeb used real prices and, using the correct analysis, found that Varsity increased real prices of acquired brand events by 18.7%. *See* Saveri Decl., Ex. 6 (Heeb Reb. ¶¶396-97 & Table 22). To summarize the available evidence of the effects of Varsity's acquisitions of rival event producers: real prices increased; quantity (i.e., total participation) decreased. *See generally id.*, ¶368.

investments and to reduce the quality of its events after acquiring its largest rivals. *See, e.g.,id.*
Ex. 9 (Elza Dep. at 285:14–287:10).

Dr. Murphy's "net benefit" analysis is further flawed. It cherry picks only certain
portions of the available data, omitting and ignoring key facts regarding events that Varsity
already owned and events that Varsity acquired but then closed. This cherry-picking by Dr.
Murphy of only certain data is just as bad as omitting it or making it up altogether. *United States
v. Lang*, 717 F. App'x 523, 535-36 (6th Cir. 2017); *see also Sheffield v. Int'l Paper Co.*, No.
2018-CV-02701-JPM-CGC, 2020 WL 1882906, at *2 (W.D. Tenn. Feb. 26, 2020) ("[t]he Court
is not required to accept an economist's projections where they demonstrate cherry-picking an
isolated and self-serving data point rather than responding to the reality of the case.").

Dr. Murphy makes a further giant, unsubstantiated leap when he opines that because
event participation increased—which is incorrect as explained above—there was, by definition, a
procompetitive effect in that consumers were being offered improved or higher quality events or
a better cheer experience. Saveri Decl., Ex. 1 (Murphy Rep., ¶¶294, 315, 317). But this assumes
the answer Dr. Murphy desires to reach. Dr. Murphy provides no basis for this *ipse dixit*
conclusion. In fact, there is record evidence to the contrary that Dr. Murphy ignores, showing
that quality did not improve as a result of Varsity's acquisitions. *See, e.g.*, Saveri Decl., Ex. 9
(Elza Dep. at 285:14–287:10). Dr. Murphy relies on a single comment from a Varsity employee,
in a prearranged "interview."[9] *See id.*, Ex. 1 (Murphy Rep., ¶323 & n.525) (Interview with Craig
Davis, Aug. 19, 2022). This is hardly a consideration of the record evidence sufficient to opine.
*See, e.g., Navarro v. Procter & Gamble Co.*, 501 F. Supp. 3d 482, 495 (S.D. Ohio 2020); *Nelson
v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 254 (6th Cir. 2001) (quoting *Gen. Elec. Co. v.*

---

[9] Dr. Murphy testified that when he needed information, he would ask Varsity or Varsity's
counsel who he should talk to, and they would arrange for an interview in which no one took any
notes. *See* Saveri Decl., Ex. 7 (Murphy Dep. at 92:6–15, 94:6–95:8).

*Joiner*, 522 U.S. at 146) (excluding testimony because there was "simply too great an analytical gap between the data and the opinion.").

In sum, Dr. Murphy's finding of a 12% increase in attendance at cheer competition events post-Varsity acquisition is fundamentally flawed.[10] Dr. Murphy's opinions based on Exhibit 45 cannot be addressed through cross examination and must be excluded under *Daubert*. *See In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig*., 45 F. Supp. 3d 724, 742, 754 (N.D. Ohio 2014) (methodology underlying expert's study was "fundamentally flawed" and thus, inadmissible); *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citing *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)) ("[r]ed flags that caution against certifying an expert report include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity.").

## B.   DR. MURPHY'S OPINION THAT THE MARKET FOR CHEER EVENTS IS LOCAL IS IRRELEVANT AND UNRELIABLE AND SHOULD BE EXCLUDED

The standard and widely accepted economic methodology used to define a relevant product or geographic market is to look at direct evidence of a company's market power, *e.g.,* such as in a company's own business documents stating its market share, as well as indirect evidence in the form of the hypothetical monopolist test ("HMT") and looking at the practical indicia factors under *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962). *See, e.g., Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, (6th Cir. 2009) (describing Sixth Circuit standards for defining markets). Defining a geographic market focuses on demand substitution, with the goal of identifying the products and locations between which buyers can reasonably substitute when faced with a price increase. *See, e.g., id.* at 916-17. Plaintiffs' experts employ these methods and find Varsity's market power is ubiquitous and

---

[10] By contrast, Dr. Heeb's determination that Varsity's acquisitions resulted in a 42% decrease in event attendance post-acquisition, causing a real price increase in the price of cheer competitions by 20%, on average, is supported by a full record of facts and data and includes analysis of all key inputs. *See* Saveri Decl., Ex. 6 (Heeb Reb., ¶366 & Table 18).

dominant throughout the United States. *See* Saveri Decl, Ex. 5 (Heeb Rep., ¶¶42, 112, 136); *id.*,
Ex. 3 (Netz Rep. at 43-45). Dr. Netz also shows that teams substitute between events throughout
the country. *Id.* at 45.

By contrast, Dr. Murphy does not define any relevant geographic markets in his report
and does not apply the HMT.[11] Without any definition, he claims that the relevant geographic
markets are "typically local or regional." *Id.*, Ex. 1 (Murphy Rep., ¶186). Dr. Murphy bases his
opinion on his own novel analysis of "consumer travel patterns" and a unique analysis of what he
terms "catchment areas." *Id.*, ¶192.[12] *See, e.g., Tamraz v. Lincoln Elec. Co.*, 620 F.3d at 670
("[T]he important thing is not that experts reach the right conclusion, but that they reach it via a
sound methodology." (citing *Daubert*, 509 U.S. at 595)); *Conwood Co. v. L.P. v. U.S. Tobacco
Co.*, 290 F.3d 768, 781 (6th Cir. 2002) (stating that the district court must determine whether
proffered expert testimony "rests on a reliable foundation"). Dr. Murphy's analysis is flawed for
a number of reasons.

*First*, Dr. Murphy's analysis of consumer travel patterns, specifically his measure of
average distance travelled by teams attending competitions, does not address the relevant
question regarding how far a team might travel to attend an event if a price were to increase.
Saveri Decl., Ex. 4 (Netz Reb. at 45). For example, while the average distance travelled for
events in the United States may be 500 miles, that measure says nothing about the alternative
events available to a team that travelled, say, 800 miles to attend that competition, which is borne
out by the record evidence. *Id.* Presumably, if a hypothetical monopolist raised prices, the
example team could at least substitute to all other events within the 800 miles it travelled to

---

[11] Saveri Decl., Ex. 7 (Murphy Dep. at 105:18-24) ("I did not do the [HMT].").

[12] Dr. Murphy provides no support in the academic literature or caselaw for his methodology.
*See Kentucky Speedway,* 588 F.3d at 918 (affirming district court's exclusion of expert testimony
based on the expert's "own version" of the SSNIP test, because it "has not been tested; has not
been subject to peer review and publication; there are no standards controlling it; and there is no
showing that it enjoys general acceptance within the scientific community").

attend the given event. *Id.* Dr. Murphy's average distance analysis says nothing about this demand substitution. *Id.* In addition, Dr. Murphy's average distances calculations do not account for the fact that where a team might decide to travel 1000 miles in one direction, there is no basis to conclude it would not travel in another direction. So, where Dr. Murphy calculates a distance only one way, the distance across which a team might travel is twice that. *Id.* at 47–48.

**Second**, Dr. Murphy presents an analysis of customer switching among regular season Varsity All Star competitions of different types (1-day, 2-day competitions other than Worlds bid competitions, and 2-day Worlds bid competitions in different locations). *Id.,* Ex. 1 (Murphy Rep., Exs. 33-38). This analysis is flawed in that it fails to consider facts and data and key inputs. For example, Dr. Murphy does not present a similar switching analysis for school cheer competitions,[13] which are included in Plaintiffs' allegations and which Plaintiffs' experts define as part of the same relevant product market. *Id.,* Ex. 4 (Netz Reb. at 51). Dr. Murphy's analysis is further flawed because he only includes Varsity events in his analysis, despite his claim that other producers host at least 350 competing events. *Id.;* Ex. 1 (Murphy Rep., Ex. 10). Customers that he characterizes as opt-outs may be switching between Varsity and non-Varsity events, yet, Dr. Murphy includes no data and fails to consider the distance between these two events, which the customers apparently consider to be substitutes. *See* Ex. 4 (Netz Reb. at 51).

**Third**, Dr. Murphy performs a regression based on his "catchment areas." *Id.*, Ex. 1 (Murphy Rep. ¶¶192-94 & Exs. 36–38). He arbitrarily picks a catchment area of 60% with no further explanation or citation to academic literature. *Id.*; *see also id.*, Ex. 6 (Heeb Reb., ¶160).

---

[13] Dr. Murphy's calculations and opinions are further skewed throughout his report where he uses the term "Scholastic Cheer," which improperly lumps in traditional sideline cheer with what Plaintiffs define as school cheer that is the focus of Plaintiffs' Complaint. *See, e.g.,* Saveri Decl., Ex. 1 (Murphy Rep., Section IV.D. and IV.E) ("The Characteristics of All Star and Scholastic Cheer Customers" and "The Characteristics of All Star and Scholastic Cheer Competitions, Cheer Camps and Cheer Apparel," respectively.). This fundamental mischaracterization by Dr. Murphy, throughout his report and exhibits, likely skews all of Dr. Murphy's results where he quantitatively or qualitatively analyzes facts and data based on a wider definition than what Plaintiffs allege.

Dr. Murphy then regresses the price of an event on the average price of all events within his "catchment area" during the entire season and claims that a positive and statistically significant estimated coefficient on the price variable is consistent with his definition of the geographic market. *Id.*, Ex. 1 (Murphy Rep. ¶195 & Ex. 39). Dr. Netz explains the flaws in her rebuttal:

> Prof. Murphy claims that his regression tests "whether an event's price tends to change contemporaneously with the prices of other events in the same geographic area." However, he regresses price for a given event held at a given point in time on the average price for all events in the entire season that are in the "catchment area." Thus, his regression in no way accounts for the date of events, a factor which Prof. Murphy claims "cannot be ignored." An event held in October is unlikely to be a reasonable substitute for an event in February. … In addition, Prof. Murphy's regression demonstrates that the average price of events within his "catchment areas" explains virtually none of the variation in event prices. Dropping the "catchment area" price from the regression leaves the explanatory power of the regression unchanged. This can be seen in Exhibit 15; when the regression includes the "catchment area" price, it explains 97–98% of the variation in prices, when the "catchment area" price is excluded, the regression explains 97%. That is, the average price of other events in the catchment area are not an important determinant of prices after controlling for event fixed effects. Saveri Decl., Ex. 4 (Netz Reb. at 53).

In sum, Dr. Murphy's analysis of travel distances and his idiosyncratic catchment areas is not a reliable methodology to determine the geographic market definition for cheer and, therefore, his opinion that the cheer competition events market is local should be excluded.

## C.    DR. MURPHY'S RELIANCE ON AN ONLINE "SURVEY" LACKS ANY INDICIA OF RELIABILITY AND CANNOT BE TESTED

Certain of Dr. Murphy's regressions use a variable that Dr. Murphy alleges represents "demand for cheer competitions." *Id.*, Ex. 1 (Murphy Rep., ¶308). Dr. Murphy uses the results of that regression to conclude that "there were no general adverse effects on the pricing of Varsity's non-acquired competitions as a result of the acquisitions." *Id.*, ¶309. But Murphy's "demand variable" derives entirely from a survey he found online without any analysis or knowledge as to its reliability, or even what methodology (if any) was used. *Id.*, ¶308 & n.520. Dr. Murphy

simply copied the survey results as the data to generate his demand variable.[14] Dr. Murphy and his team had no role in the survey's construction. He has no basis to conclude the survey was performed under any proper or reliable survey methodology, or even whether it is a true survey at all. Thus, because the survey has no indicia of reliability, and because Plaintiffs cannot cross examine the unknown individuals who conducted the alleged survey, Dr. Murphy's regressions that use the survey as inputs are not admissible.

Surveys are only admissible when they are performed using a reliable methodology. *See, e.g.*, *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 828 F. Supp. 1114, 1122 (S.D.N.Y. 1993), *aff'd*, 32 F.3d 690 (2d Cir. 1994) ("This court cannot conclude that the surveys were "properly conducted" from the foundation laid by Mr. Altomari, and therefore concludes, again, that the surveys are inadmissible hearsay."); *Toth Gray v. LG&M Holdings LLC*, No. CV-18-02543-PHX-SRB, 2020 WL 9074812, at *4 (D. Ariz. Sept. 3, 2020) (to be admissible surveys must be "conducted according to accepted principles"); *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003) ("Courts have generally found consumer survey evidence admissible under *Daubert* if a qualified expert testifies that the survey was conducted according to generally-accepted principles of survey research."). The "proponent of a [] survey has the burden of establishing that it was conducted in accordance with accepted principles of survey research." *Sports Auth., Inc. v. Abercrombie & Fitch, Inc.*, 965 F. Supp. 925, 933 (E.D. Mich. 1997).

Here, Dr. Murphy has lifted a purported survey he found online and used the numbers presented in the "Competitive Spirit" category as the sole basis for his demand variable, without any basis to conclude that the survey was conducted using a proper scientific methodology. There is thus no foundation to conclude that the survey was done in accordance with any

---

[14] Neither Dr. Murphy nor Varsity disclosed the alleged survey during the discovery period. As further explained below, there is evidence to suggest that Varsity paid for the survey itself, a fact which it apparently did not disclose to Dr. Murphy, or Plaintiffs. *See* Saveri Decl., ¶2.

scientific methodology at all, or whether it is even the results of a real survey. Nor can plaintiffs test the reliability of the survey numbers because Dr. Murphy did not conduct the survey, and there is no record of how it was conducted. Saveri Decl., Ex. 7 (Murphy Dep. at 221:16–224:10). When questioned, Dr. Murphy had no idea how the survey was conducted, who conducted the survey, what questions were asked, or even what sports were included in the "Competitive Spirit" category, the category on which Dr. Murphy relies. *See id.*

While many courts have noted that purported flaws in a survey methodology generally go to the weight and not the admissibility, they do so on the grounds that the methodology and conclusions can be explored by cross examination. Here, Dr. Murphy and the Plaintiffs have no idea whether any proper survey methodology was used, or even what sports were included in the "Competitive Spirit" category on which Dr. Murphy relies. It is not Dr. Murphy's survey. The methodology employed by the survey is entirely unknown. Plaintiffs cannot ask questions of those who conducted the survey and determine its reliability (if any) nor even understand what the data represents. That alone is sufficient to exclude Dr. Murphy's reliance on the survey.

Further, Plaintiffs have learned that the National Federation of State High School Associations ("NFHS"), the organization allegedly responsible for conducting the survey, is a strategic partner of Varsity. *See* Saveri Decl., Ex. 13 (Varsity Brands 10-K Annual Report for FY ended 12/31/2002, at page F-16); *id.*, Ex. 6 (Heeb Reb., ¶376 & n.428). In fact, Varsity has paid the NFHS roughly $▮ million, including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮"—the very information the purported "survey" is intended to measure, and on which Dr. Murphy bases his "demand variable." *See id*. There are significant incentives for Varsity and NFHS, to manipulate or forge the data or to control the methodology of the survey to ensure that it shows significant increased demand for the sport (the definition of which we do not even know), particularly when Varsity was being offered for sale to Charlesbank and then Bain. *See id.*, ¶¶376-77. And in this case, allegedly higher participation purports to support Dr. Murphy's conclusion that high demand levels are causing increased prices, not anticompetitive conduct.

Dr. Murphy has no way of ensuring the data was not simply made up, especially where Plaintiffs have uncovered other documents showing that Varsity employees discussed "faking surveys" to promote Varsity's interests.[15] The fact that Varsity's own "strategic" partner, the NFHS, conducted the survey under Varsity's funding is yet further grounds to exclude Dr. Murphy's reliance on it—particularly when Defendants never disclosed it.

Even a cursory review of the purported survey shows it could not have been carried out using any form of scientific methodology. For example, Colorado has identical Boys and Girls "Competitive Spirit" Participation in both 2018-19 and 2017-18. West Virginia has identical Girls Participation in 2017-18, 2016-17, and 2015-16. Texas has exactly 25,000 Girls Participants in 2016-17. *See, e.g.*, *id.*, Ex. 14 (https://www.nfhs.org/media/1020204/2016-17_hs_participation_survey.pdf). No properly run survey adhering to any form of survey methodology could possibly generate these and many other anomalies. Dr. Heeb shows through statistical analysis that "the observed frequencies are not randomly distributed, as is expected from a reliable and unbiased population count survey." *Id.*, Ex. 6 (Heeb Reb., ¶378–381).

During his deposition, Dr. Murphy could not answer a single question about the survey's scientific methodology. *See id.*, Ex. 7 (Murphy Dep. at 221:16–224:10). Instead of admitting that he did not conduct the survey and therefore had no information as to how the survey results were generated, Dr. Murphy insisted repeatedly that the methodological information was in his "backup" material, and that he simply could not remember. Dr. Murphy even went as far as to

---

[15] *See* Saveri Decl., Ex. 11 (VAR00228394, at 394-395) (8/14/2019 Email from J. Parrish to B. Elza, et al.: "No other sport, not even one, has rebate plans like Varsity/All Star cheer. Pros: We can keep them coming back for the Family Plan crack. Cons: Sooner or later, crack ho's turn on their pimp wanting more crack, better crack, and for less output. How we fix this? Blame it on Posh, or fake a survey, let me explain- … OR OPTION TWO We send out a customer survey: We develop a 'survey' for the gym owners to take online. It would go something like this. … A survey of this type … would just use the power of suggestion to have them 'worry' that Varsity is indeed thinking of going public with the family plan to gain positive press."); *Id.*, Ex. 12 (VAR00182095 (Elza Dep. Ex. 26) at -095) (8/14/2019 Email from B. Elza responding to the prior email, "Good thoughts.").

assert definitively that the "questions that were asked" were in his work papers. *See id.*, Ex. 7 (Murphy Dep. at 222:13–24). But all of that is demonstrably false. And it hindered Plaintiffs ability to depose Dr. Murphy on the data he relied on. Dr. Murphy's backup materials do not contain any information about the survey's methodology, who conducted it, what questions were asked, or even what sports are included in the "Competitive Spirit" category. *See* Saveri Decl., ¶2. The "survey" cannot be shown to be anything more than self-supporting numbers published online by a Varsity-affiliated entity.

Even if Varsity's failure to disclose the provenance of the survey are ignored, Dr. Murphy's reliance on the online survey is entirely unreliable, and entirely untestable. Nor is the methodology subject to cross examination. Thus, Dr. Murphy's opinions which rely on the survey cannot be admitted. *See Fed. Trade Comm'n v. Fleetcor Techs., Inc.*, No. 1:19-CV-5727-AT, 2022 WL 3350066, at *8 (N.D. Ga. Aug. 9, 2022) ("[I]t is well-settled that *Daubert* requires that an expert "testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis," meaning that "any step that renders the analysis unreliable under the [*Daubert*] factors renders the expert's testimony inadmissible."). "An expert's 'lack of familiarity with the methods and the reasons underlying [someone else's] projections virtually preclude[s] any assessment of the validity of the projections through cross-examination.'" *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 293 (3d Cir. 2012). Because Dr. Murphy cannot meet his burden that the survey was conducted using any proper scientific methodology at all, and because Plaintiffs have no ability to cross-examine on this issue, the Court should exclude Dr. Murphy's regressions with a demand variable based entirely on the Varsity-NFHS survey. Dr. Murphy also relies on the purported survey in Exhibits 52, 54, and 58 of his report, and his analysis at ¶409 and note 636 of his report, which should also be excluded on the same grounds.

## V.  CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion to exclude Mr. Jonathan M. Orszag and exclude in part Dr. Kevin Murphy.

Dated: February 10, 2023

Respectfully submitted,

By:_____/s/ Joseph R. Saveri_____
         Joseph R. Saveri

Joseph R. Saveri*
Steven N. Williams*
Ronnie Seidel Spiegel*+
Kevin E. Rayhill*
Elissa A. Buchanan*
David Seidel*
JOSEPH SAVERI LAW FIRM, LLP
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
rspiegel@saverilawfirm.com
krayhill@saverilawfirm.com
eabuchanan@saverilawfirm.com
dseidel@saverilawfirm.com

Van Turner Jr. (TN Bar No. 22603)
TURNER FEILD, PLLC
2650 Thousand Oaks Blvd., Suite 2325
Memphis, Tennessee 38118
Telephone: (901) 290-6610
Facsimile: (901) 290-6611
vturner@turnerfeildlaw.com

Richard M. Paul III*
Ashlea Schwarz*
PAUL LLP
601 Walnut, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
rick@paulllp.com
ashlea@paulllp.com

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE JONATHAN M.
ORSZAG AND DR. KEVIN MURPHY, IN PART

Jason S. Hartley*
Fatima Brizuela*
HARTLEY LLP
101 West Broadway, Suite 820
San Diego, CA 92101
Telephone: (619) 400-5822
hartley@hartleyllp.com
brizuela@hartleyllp.com

Daniel E. Gustafson*
Daniel C. Hedlund*
Daniel J. Nordin*
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com

* Admitted *pro hac vice*

+Located in Washington State

*Attorneys for Individual and
Representative Plaintiffs*