# EXHIBIT 3

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TENNESSEE

JESSICA JONES et al.,

                Plaintiffs,

    v.

VARSITY BRANDS, LLC et al.,

                Defendants.

**Civ. Action No. 2:20-cv-02892**

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE
TESTIMONY OF PLAINTIFFS' PROFFERED EXPERT RANDAL HEEB, PHD**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.    DR. HEEB DID NOT ACTUALLY EMPLOY HIS CHOSEN METHODOLOGY FOR
      ASSESSING RELEVANT MARKETS ......................................................................... 3

      A.    Dr. Heeb's Cheer Competition Market Is Improperly Defined ............................ 4

      B.    Dr. Heeb's Apparel Market Is Improperly Defined ............................................. 6

      C.    Dr. Heeb's Camp Market Is Improperly Defined ................................................. 8

II.   DR. HEEB'S ANALYSIS OF VARSITY'S REBATE PROGRAMS DOES NOT FIT
      THE FORECLOSURE TEST ......................................................................................... 8

III.  DR. HEEB'S "OVERCHARGE" ANALYSES ARE INADMISSIBLE ....................... 12

      A.    Dr. Heeb's Apparel "Overcharge" Analysis Is Makeweight ............................. 14

      B.    Dr. Heeb's Competition "Overcharge" Analysis Does Not Withstand Scrutiny.. 18

      C.    Dr. Heeb's Camp "Overcharge"—Which Is His Competition Overcharge
            Recycled—Is Based on No Analysis At All ...................................................... 22

      D.    Dr. Heeb's Increased Overcharge Figures In His Rebuttal Report Were not
            Timely Disclosed and Should Be Excluded ...................................................... 26

IV.   DR. HEEB'S COMMON IMPACT OPINION SHOULD BE EXCLUDED .................. 27

V.    MANY OF DR. HEEB'S "OPINIONS" ARE SIMPLY FACTUAL NARRATIVE THAT
      IMPROPERLY USURPS THE JURY'S ROLE AS FACTFINDER .............................. 28

CONCLUSION ................................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Apotex, Inc. v. Cephalon, Inc.*,
  321 F.R.D. 220 (E.D. Pa. 2017) ............................................................. 20

*Ask Chems., LP v. Comput. Packages, Inc.*,
  593 F. App'x 510 (6th Cir. 2014) ........................................................... 28

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ............................................................................... 10

*B & H Med., L.L.C. v. ABP Admin., Inc.*,
  526 F.3d 257 (6th Cir. 2008) ................................................................. 10

*Brooke Grp., Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) .......................................................................... 10, 11

*Coleman Motor Co. v. Chrysler Corp.*,
  525 F.2d 1338 (3d Cir. 1975) ................................................................. 13

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
  781 F.3d 264 (6th Cir. 2015) ................................................................... 9

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) ............................................................... 22

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ...................................................................... 2, 22, 27

*In re Davol, Inc./C.R. Bard, Inc. Polypropylene Hernia Mesh Prods. Liab. Litig.*,
  546 F. Supp. 3d 666 (S.D. Ohio 2021) ................................................... 28

*DeMerrell v. City of Cheboygan*,
  206 F. App'x 418 (6th Cir. 2006) ........................................................... 11

*Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*,
  612 F. Supp. 2d 330 (S.D.N.Y. 2009) ...................................................... 7

*Food Lion, LLC v. Dean Foods Co.*,
  312 F.R.D. 472 (E.D. Tenn. Jan. 26, 2016) ............................................ 19

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ................................................................................. 2

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008) ........................................................27

*Green Cnty. Food Mkt., Inc. v. Bottling Grp., LLC*,
371 F.3d 1275 (10th Cir. 2004) ...........................................................7

*Heller v. Shaw Indus., Inc.*,
167 F.3d 146 (3d Cir. 1999) .................................................................2

*Indeck Energy Servs., Inc. v. Consumers Energy Co.*,
250 F.3d 972 (6th Cir. 2000) ..............................................................10

*In re Intel Corp. Microprocessor Antitrust Litig.*,
C.A. No. 05–485–JJF, 2010 WL 8591815 (D. Del. July 28, 2010)........................22

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
588 F.3d 908 (6th Cir. 2009) ...........................................................5, 6

*Kentucky v. Marathon Petroleum Co. LP*,
464 F. Supp. 3d 880 (W.D. Ky. 2020) ...................................................13

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)...........................................................................2

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
299 F. Supp. 3d 430 (S.D.N.Y. 2018).....................................................30

*Louisa Coca-Cola Bottling Co. v. Pepsi-Cola Metro. Bottling Co.*,
94 F. Supp. 2d 804 (E.D. Ky. 1999) .....................................................10

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
708 F.2d 1081 (7th Cir. 1983) ............................................................13

*Mike's Train House, Inc. v. Lionel, L.L.C.*,
472 F.3d 398 (6th Cir. 2006) ..............................................................11

*Nelson v. Tennessee Gas Pipeline Co.*,
243 F.3d 244 (6th Cir. 2001) ...............................................................2

*Newell Rubbermaid, Inc. v. Raymond Corp.*,
676 F.3d 521 (6th Cir. 2012) ......................................................3, 15, 22

*Nilavar v. Mercy Health Sys.-W. Ohio*,
244 F. App'x 690 (6th Cir. 2007) .........................................................10

*Queen City Pizza, Inc. v. Domino's Pizza Inc.*,
124 F.3d (3d Cir. 1997)........................................................................5

*Rose v. Matrixx Initiatives, Inc.*,
   No. 07–2404–JPM/tmp, 2009 WL 902311 (W.D. Tenn. Mar. 31, 2009)................................2

*Rose v. Truck Ctrs., Inc.*,
   388 F.App'x 528 (6th Cir. 2010) ............................................................................21

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*,
   580 U.S. 405 (2017)................................................................................................17

*Stephen Branch v. Temple Univ.*,
   Civil Action No. 20-2323, 2021 WL 2823071 (E.D. Pa. July 7, 2021)...................................11

*Superior Prod. P'ship v. Gordon Auto Body Parts Co.*,
   784 F.3d 311 (6th Cir. 2015) .................................................................................9

*Tamraz v. Lincoln Elec. Co.*,
   620 F.3d 665 (6th Cir. 2010) ...............................................................................26

*Tchatat v. City of New York*,
   315 F.R.D. 441 (S.D.N.Y. 2016) ..........................................................................28

*The Iams Co. v. Nutro Prods., Inc.*,
   No. 3:00-CV-566, 2004 WL 5496244 (S.D. Ohio June 30, 2004)........................................24

*United States v. Chaney*,
   577 F.2d 433 (7th Cir. 1978) ...............................................................................11

*United States v. Rios*,
   830 F.3d 403 (6th Cir. 2016) ...............................................................................28

*Universal Coin & Bullion, Ltd. v. Fed Express Corp.*,
   No. 2:12-cv-2778-SHM-dkv, 2015 WL 12001264 (W.D. Tenn. June 30, 2015).............24, 25

**Other Authorities**

Fed. R. Evid. 702(a)-(d).............................................................................................2

Federal Rule of Evidence 702.................................................................................1, 2, 15

Federal Rules of Evidence Rules 702 and 403 .........................................................2, 30

Rules 703 and 403.....................................................................................................28

## INTRODUCTION

The Court should exclude Dr. Heeb's testimony as inadmissible under Federal Rule of Evidence 702 because his opinions lack factual support, rest on unreliable methodology, and will not aid the jury in understanding the issues in this case. Dr. Heeb relies on unjustified extrapolation and anecdote in lieu of rigorous analysis. His conclusions are inconsistent with the facts of the case and in effect seek to punish Varsity for entirely legal conduct.

## BACKGROUND

Dr. Heeb submitted two expert reports in this matter. He provides various assertions, generally unconnected to any analysis, about the relevant antitrust markets, Varsity's position in the markets, and about certain Varsity conduct. The centerpiece of his presentation is his regression model, which he says compares the pricing of cheerleading events that Varsity acquired from 2012 to 2016 before and after Varsity acquired them. He concludes that Varsity increased pricing on these events (but not on events Varsity already owned) by 24% (later amended in his "rebuttal" report to 27%). He then opines that this price change on acquired events is an "overcharge" for all Varsity events, both those that Varsity acquired and those that it did not, from December 10, 2016 forward. Taking another intellectual leap, he asserts that this very same 24% or 27% overcharge should be applied to camps as well, without having done a whit of analysis relevant to camps, and even though there were no acquisitions in camps and virtually none of the conduct of Varsity or USASF that he labels "anticompetitive" had anything to do with camps. As to apparel, he does no regression at all, but simply compares the average price of Varsity cheerleading shoes to the average price of Nfinity shoes, finds it was 10% (or 11% in his "rebuttal report") higher, and concludes that this price differential represents an "overcharge" for not just shoes, but for all cheerleading apparel. Failing to show overcharges or

1

provide any rigorous analysis of any relevant issue, Dr. Heeb turns to long factual narratives that, if allowed, would improperly usurp the role of the jury.

In short, at virtually every turn, Dr. Heeb's conclusions are supported by little analysis, and what analysis he did perform is seriously flawed and cannot form the basis of admissible expert opinion testimony under Rules 702 and 403 of the Federal Rules of Evidence.

## ARGUMENT

A party offering expert testimony must "establish its admissibility by a preponderance of proof." *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001). Under Federal Rule of Evidence 702, expert testimony is admissible only if the party offering the expert has proven that: (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the testimony is based on sufficient facts or data;" (3) "the testimony is the product of reliable principles and methods;" and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d).

The Court has a "gatekeeping obligation" to ensure that any expert testimony "is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). This obligation "applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999). This requires courts to examine each part of an expert's analysis, because any unreliable step "renders the expert's testimony inadmissible." *Rose v. Matrixx Initiatives, Inc.*, 2009 WL 902311 at *10 (W.D. Tenn. Mar. 31, 2009) (quoting *Amorgianos v. AMTRAK*, 303 F.3d 256, 267 (2d Cir. 2002)); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "Red flags that caution against certifying an expert include reliance on anecdotal evidence, improper

2

extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012). "In addition, if a purported expert's opinion was prepared solely for litigation, that may also be considered as a basis for exclusion." *Id.*

## I.    DR. HEEB DID NOT ACTUALLY EMPLOY HIS CHOSEN METHODOLOGY FOR ASSESSING RELEVANT MARKETS

Dr. Heeb reported that he relied on the methodology for defining markets contained in the DOJ and FTC's Horizontal Merger Guidelines ("HMGs"[1]), in particular the "hypothetical monopolist test." (Ex. A,[2] Heeb Rep. ¶¶ 108, 110.) This test considers whether a hypothetical monopolist of a certain candidate set of products could successfully impose a small but significant non-transitory increase in price ("SSNIP") on at least one of the products—typically 5% or 10%—without losing so many customers to an alternative product outside of the candidate market (which is referred to as "diversion") such that the price increase would be unprofitable. (Ex. A, Heeb Rep. ¶ 110; HMGs at 9.) If one conducts the hypothetical monopolist test and finds that such diversion occurs, the alternative product should be considered part of the relevant market. (Ex. A, Heeb Rep. ¶ 110.) The test is repeated until there is a candidate market in which the imposition of a SSNIP is profitable. (HMGs at 9.)

Key to correctly applying the hypothetical monopolist test, however, is that one must start with the *narrowest* set of products or services and only expand to add more products or services to the candidate market if, according to the test, a hypothetical monopolist of the

---

[1] The HMGs are not law and do not purport to be. Rather, they "outline the principal analytical techniques, practices, and the enforcement policy of the Department of Justice and the Federal Trade Commission … with respect to mergers and acquisitions involving actual or potential competitors … under the federal antitrust laws." (HMGs at 1.)

[2] References herein to "Ex. __" refer to the corresponding Exhibit in the Kaiser Declaration, which is submitted herewith.

products in the candidate market could not profitably sustain a price increase. Failure to start with the narrowest set of products introduces the risk that the candidate market is in fact too broad, including products that are not actually competitive alternatives, and rendering the resulting market definition inaccurate and unreliable. For example, if one were to start with a candidate market of "cars and orange juice," the fact that someone with a monopoly in cars and a monopoly in orange juice could raise prices of both products without losing profits would not suggest that cars and orange juice are, in fact, in the same relevant antitrust market, which plainly they are not.

This is precisely the error that Dr. Heeb made in assessing relevant markets—he starts with markets that are too broad—which renders his relevant market opinions incorrect as a matter of law and economics. Dr. Heeb also did not conduct any diversion analyses on any of the markets he considered.

### A.    Dr. Heeb's Cheer Competition Market Is Improperly Defined

Rather than properly start with the narrowest possible market as the HMT requires, Dr. Heeb started his relevant market analysis relating to cheer competitions with the combination of scholastic and All Star competitions in the same relevant market. (Ex. A, Heeb Rep. ¶ 41) In other words, Dr. Heeb failed to consider potential narrower markets, such as All Star competitions or scholastic competitions. (Ex. C, Heeb Dep. (Vol. II) 130:13-25.) In doing so, Dr. Heeb misapplied his chosen methodology, rendering his "all" cheer competition market contrary to law and thus unhelpful to a trier of fact. This is not just Defendants' contention or the conclusion of *their* expert—after analyzing the identical facts, *Plaintiffs'* expert in the *Fusion Elite* case concluded that "All Star Events are a distinct product market, and that Gyms and Athletes ... do not view other activities (such as dance or *scholastic cheer*) to be reasonably close substitutes to All Star Events." (Ex. E, Singer Rebuttal Rep. ¶ 35) (emphasis added).

4

This error is fatal to Dr. Heeb's analysis because the hypothetical monopolist test will never reveal if the candidate product market is too *broad* (as the alleged cheer competition market is here); it will only reveal that it is too *narrow*.  (HMGs at 9) ("The hypothetical monopolist test ensures that markets are not defined too narrowly.")  Dr. Heeb's incorrect application of the hypothetical monopolist test, designed to support his desired product market, is invalid and should be excluded.  *See, e.g.*, *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918 (6th Cir. 2009) (excluding an expert witness' "own version" of the SSNIP test "produced solely" for litigation).

Dr. Heeb's conclusion also does not comport with the basic facts of the case.  For products to be in the same relevant market, they must be reasonably interchangeable with one another.  *See, e.g., Queen City Pizza, Inc. v. Domino's Pizza Inc.*, 124 F.3d, 430, 436-37 (3d Cir. 1997); *see also* HMGs at 8-9.  Dr. Heeb does not dispute this.  (Ex. A, Heeb Rep. ¶ 108.)  All Star and scholastic competitions are *not* reasonably interchangeable.  As even Dr. Heeb acknowledged at his deposition, scholastic teams generally attend scholastic competitions, while All Star teams generally attend All Star competitions.  And even when a particular competition has both scholastic and All Star divisions, the teams do not compete against one another.  (Ex. C, Heeb Dep. 118:1-119:6.)  Moreover, All Star and scholastic teams attend different end-of-season events, and different rulemaking bodies sanction All Star and scholastic competitions.  (Ex. C, Heeb Dep. 120:6-9, 120:16-121:22.)  As Dr. Heeb agreed, All Star cheer exhibits higher athletic skill, and scholastic teams attend fewer Varsity competitions than All Star teams.  (Ex. C, Heeb Dep. 123:17-25, 124:2-8.)  A participant deciding what cheerleading competition to attend would not find the two activities reasonably interchangeable.  The prices for All Star competitions are also far higher than for scholastic competitions (Ex. C, Heeb Dep. 122:6-24), which suggests that

All Star teams do not switch to scholastic competitions in the face of higher prices for All Star competitions, undermining Dr. Heeb's conclusion that they are all in the same market. His only answer to these obvious and undisputed distinctions is to say that All Star and scholastic cheer "are effectively the same activity," with "similarities" in the competitions. (Ex. A, Heeb Rep. ¶ 127; Ex. B, Heeb Rebuttal Rep. ¶ 131.) But that is like saying the NFL and youth football are in the same relevant market because it is "all just football."

### B.    Dr. Heeb's Apparel Market Is Improperly Defined

Dr. Heeb's "apparel market" is similarly flawed. Dr. Heeb defines a single product market for *all* "cheer apparel," including "uniforms, shoes, lettering, warmups, campwear, and accessories." (Ex. A, Heeb Rep. ¶ 158.) Dr. Heeb's all in apparel market does not meet the basic requirement that the products in a market must be reasonably interchangeable because products as varied as uniforms and shoes do not serve the same function. (Ex. C, Heeb Dep. ¶ 141:6-9.) In Dr. Heeb's own words: "[o]bviously shoes are not a substitute for uniforms." (Ex. C, Heeb Dep. ¶ 140:20-21.) But, as the Sixth Circuit has held, the "'reasonable interchangeability' standard [is] '[t]he essential test for ascertaining the relevant product market.'" *Kentucky Speedway*, 588 F.3d at 917 (citing *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 500 (6th Cir.1983)).

Rather than undertake an appropriate analysis of interchangeability, Dr. Heeb avers that customers "often" buy more than one class of apparel items from Varsity (Ex. B, Heeb Rebuttal Rep. ¶ 215) (for example, uniforms and lettering on the uniforms), and, based on that, analogizes the disparate apparel items to the various components of a car, like a steering wheel and a brake pedal. (Ex. C, Heeb Dep. 141:10-18.) Of course, the fact that customers buy two products does not put them in the same relevant antitrust market: the fact that a customer buys orange juice and

a car does not mean they are in the same market.  The only "evidence" Dr. Heeb brings forward

on this point is not evidence of actual bundled purchases, but rather data that at most suggests

that over time Varsity's customers not infrequently (but by no means always) buy multiple

cheerleading apparel products from it.  But, as the record also shows, customers often purchase

apparel from multiple sources.  For example, Sarah Minzghor of Fusion Elite, a cheerleading

gym, testified that cheerleaders in her gym use Varsity uniforms and Nfinity shoes.  (Ex. F,

Minzghor Dep. 140:12-20.)  Others testified to similar sourcing from different vendors.  (*See,

e.g.*, Ex. G, L. Gurske Dep. 143:4-22 (stating that gym bought uniforms from Varsity but also

bought apparel from other vendors); Ex. H, Bray Dep. 40:1-41:11 (stating that gym required

athletes to purchase shoes from Nfinity, uniform tops from Varsity, practice shorts from Nike,

and practice tank tops from Custom Ink).  Even Dr. Heeb's analysis showed that the large

majority—at least 68%—of Varsity apparel customers bought uniforms but not accessories from

Varsity.  (Ex. C, Heeb Dep. 147:15-16.)  Clearly, buying cheerleading apparel is nothing like

buying a car.

In any event, Dr. Heeb's analysis does not speak to the limited circumstances where a

group of complementary products can as a matter of law be in the same antitrust market.  *See,

e.g.*, *Green Cnty. Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1284 (10th Cir. 2004)

("[T]he cluster approach is only appropriate where the product package is significantly different

from, and appeals to buyers on a different basis from, the individual products considered

separately.") (internal quotation marks omitted); *Emigra Grp., LLC v. Fragomen, Del Rey,

Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 354 (S.D.N.Y. 2009) ("If, however, buyers could

and would respond to a price increase by a full line seller by shifting all or part of their business

to partial line or single product sellers, … then a cluster market would not be appropriate.")

Again, having failed to perform a rigorous economic analysis to make the showing required by these cases, Dr. Heeb's opinion should be excluded.

### C.    Dr. Heeb's Camp Market Is Improperly Defined

Dr. Heeb's analysis of the relevant market related to cheer camps suffers from the same maladies.  As with cheer competitions, in concluding that all cheer camps are in the same relevant market (Ex. A, Heeb Rep. ¶ 18), he failed to consider potentially narrower markets.  In doing so, he ignores the significant differentiation among cheer camps, which range from home camps with an average of █ participants to resort camps with over █ participants.  (Ex. D, Murphy Rep. at Ex. 14, 15.)  Dr. Heeb asserted in his rebuttal report that he "considered the differences in camps" but only presents figures on the number of registrations at different types of camps.  (Ex. B, Heeb Rebuttal Rep. ¶ 154-155).  He never even attempts to conduct an analysis of narrower markets with respect to camps or otherwise perform a proper evaluation under the HMT or any other test.

## II.    DR. HEEB'S ANALYSIS OF VARSITY'S REBATE PROGRAMS DOES NOT FIT THE FORECLOSURE TEST

Discounts and rebate programs provide benefits to customers in the form of lower prices.  As such, they are not in general anticompetitive and, indeed, generally are the result of competition as firms seek to attract customers by offering benefits to large and/or repeat customers.  Airline frequent flyer programs are a common example.  Dr. Heeb does not dispute this.  (Ex. C, Heeb Dep. 235:21-237:1.)  Nor does Dr. Heeb perform the requisite economic analysis required to show that this particular program is anticompetitive.

Nevertheless, Dr. Heeb opines that the Varsity Family Plan ("VFP") and Varsity Network Agreements ("VNAs") are anticompetitive.  He does so without engaging in a rigorous economic analysis of any kind, much less the kind that the Sixth Circuit has specified.  Indeed, Dr. Heeb

concedes that a critical element of such an analysis—below cost pricing—is not present. Allowing Dr. Heeb to label these plans as anticompetitive when he does not apply the appropriate legal and economic standard would confuse the jury, would not help the jury determine any facts in issue, and would be prejudicial to Defendants. *See Superior Prod. P'ship v. Gordon Auto Body Parts Co.*, 784 F.3d 311, 324-25 (6th Cir. 2015) (excluding expert opinion on alleged predation because expert could not demonstrate below-cost pricing).

Dr. Heeb's issue with the VFP and VNAs is that they award greater benefits to gym customers that spend more on Varsity competitions or that attend more Varsity competitions. But the law requires that a party seeking to establish that a rebate or discount based on the purchase of multiple products apply the "discount attribution test."  This test requires a plaintiff alleging that such a discount or rebate program is anticompetitive to prove, among other things, that when the full discount is allocated to the competitive product(s), "the resulting price of the competitive product or products is below the defendant's incremental cost to produce them." *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 273 (6th Cir. 2015) (quoting *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 906 (9th Cir. 2008)).

Dr. Heeb did no analysis to demonstrate that this legally-mandated test is satisfied and, indeed, he did no quantitative analysis of any kind to support his assertions that the VFP and VNAs are "anticompetitive."  In fact, he conceded that the requirements for the discount attribution test are not met in this case, admitting at his deposition that, even "[w]ith the VFP rebates deducted, Varsity's prices are not 'below cost.'"  (Ex. B, Heeb Rebuttal Rep. ¶ 475.) This admission dooms his opinion on foreclosure under applicable law.  Ultimately, Dr. Heeb's attack on the VFP and VNAs is that Varsity's above-cost pricing is too low, but, as the Supreme Court has held on numerous occasions, pricing above cost is *not* exclusionary and is *not* illegal

under the antitrust laws.  *See, e.g.*, *Brooke Grp., Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993); *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990) ("Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition.")  To bring this into the zone where a bundled rebate program can potentially be attacked as anticompetitive, the discount attribution analysis required by the Sixth Circuit must be undertaken and its requirement met.  Dr. Heeb simply and admittedly has not done that.

Because Dr. Heeb's opinions do not apply any scientific economic methodology, let alone the one mandated by the Sixth Circuit, they should not be presented to the jury, which would only cause confusion and not help the jury determine any relevant fact in issue.[3]

Dr. Heeb was also misinformed and confused as to many of the factual parameters of the VFP.  An expert offering an opinion should not and cannot "lack[] a rudimentary understanding"

---

[3] Dr. Heeb does not contend that the VFPs or VNAs are anticompetitive exclusive dealing arrangements, and for good reason.  The VFP cannot be such as a matter of law because it covers just one year, and contracts of one year are subject to recurring competition at the time of potential renewal.  *See, e.g.*, *Louisa Coca-Cola Bottling Co. v. Pepsi-Cola Metro. Bottling Co.*, 94 F. Supp. 2d 804, 816 (E.D. Ky. 1999) (dismissing claims based on non-exclusive one-year contracts because "short duration and easy terminability substantially negate their potential for foreclosing competition"); *see also Nilavar v. Mercy Health Sys.-W. Ohio*, 244 F. App'x 690, 701 (6th Cir. 2007) (dismissing restraint of trade claim where contract at issue was "nominally effective for only two years"); *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 977-78 (6th Cir. 2000) (affirming summary judgement against antitrust claim where defendant's exclusive contracts were alleged to have foreclosed 87% of the market because plaintiff failed to show how the contracts' discounts, limited duration, and freedom to seek other alternative suppliers at their conclusion injured competition).  Moreover, the VFP is not an agreement at all; a gym makes no commitment to attend events up front, it is merely rewarded for attending events after the year is *over*.  As for VNAs, they only apply to a small percentage of Varsity's customers and revenue.  The VNAs are therefore not actionable exclusive dealing because they do not foreclose a significant percentage of the market from other potential suppliers, which typically has been defined as at least 30%.  *See B & H Med., L.L.C. v. ABP Admin., Inc*., 526 F.3d 257, 266 (6th Cir. 2008) ("[F]oreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent.") (quoting *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004)).

of the facts relating to that opinion. *See, e.g., Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 408 (6th Cir. 2006) (excluding expert testimony on whether Korean model-train designs were copied because expert "lacked a rudimentary understanding of the Korean model-train design industry"). Expert testimony based in facts that contradict the record, like Dr. Heeb's here, should be excluded. *See, e.g., Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."); *United States v. Chaney*, 577 F.2d 433, 435 (7th Cir. 1978); *DeMerrell v. City of Cheboygan*, 206 F. App'x 418, 427 (6th Cir. 2006) (rejecting expert report because it "contradict[ed] the uncontroverted facts"); *Stephen Branch v. Temple Univ.*, 2021 WL 2823071, at *4 (E.D. Pa. July 7, 2021) ("Although the Third Circuit does not require 'mathematical exactness,' Staller's calculation is blatantly contradicted by the plain language of SJU's policy in such a way that renders Staller's opinion unreasonable.")

Dr. Heeb lacks a rudimentary understanding of the critical facts about the VFP and VNAs. For example, Dr. Heeb was simply wrong that rebates are conditioned on spending across apparel, camps, and events. Only spending on competitions is "counted" toward a gym's VFP rebate. (*See, e.g.*, Ex. I, VAR00020214; Ex. J, VAR00175267.) The VFP provides a separate, *flat* rebate on apparel spend that is not tied to the amount of that spend. (Ex. I, VAR00020214; Ex. J, VAR00175267.)[4] Nor does camp spending count toward VFP or VNA thresholds. (Ex. I, VAR00020214; Ex. J, VAR00175267; Ex. K, VAR00017932.)[5] Dr. Heeb

---

[4] Dr. Heeb does not assert that flat rebates are anticompetitive and indeed acknowledged at his deposition that flat rebates are *pro*competitive because they are discounts that benefit customers. (Ex. C, Heeb Dep. 243:4-10.)

[5] Contrary to his reports, Dr. Heeb admitted at his deposition that camp spending did not count towards the VFP and VNA rebates and even admitted that it would be *illogical* for camp

was also wrong in his understanding that there were contracts between Varsity and customer gyms that specified the terms of the VFP, including what purchases counted toward VFP spending thresholds. (Ex. C, Heeb Dep. 255:5-8.) As discussed above, the VFP is a non-contractual loyalty program, much like an airline frequent flyer program, the terms of which apply equally to all participants. (Ex. L, Elza Dep. (Vol. I) 202:20-203:2.)

These misunderstandings go to the core of Dr. Heeb's analysis. For example, Dr. Heeb asserted that the VFP and VNA were anticompetitive because they "condition[] ... rebates on the number of Varsity events and the total dollar spend on all Varsity products." (Ex. A, Heeb Rep. ¶ 219.) Dr. Heeb further stated that the programs were "designed to encourage cross-selling" (Ex. A, Heeb Rep. ¶ 220) because they provided "rebates on the total amount of purchases across Varsity apparel, camps, and events," and that the alleged "anticompetitive effect is amplified" because Varsity supposedly "conditions the amount of the rebates on purchases in multiple product categories" (Ex. A, Heeb Rep. ¶ 224; Ex. B, Heeb Rebuttal Rep. ¶ 261; Ex. C, Heeb Dep. 322:13-19.) But, as discussed above, none of these factual premises is true. Dr. Heeb claims the VFP and VNAs were anticompetitive but—compounding his lack of analysis demonstrating anticompetitive effect—cannot even say in which of his "markets" the supposed effects of those programs were felt.

## III.    DR. HEEB'S "OVERCHARGE" ANALYSES ARE INADMISSIBLE

Dr. Heeb presents percentage "overcharge" figures for the three "markets" that he purports to define. He asserts that these "overcharge" figures represent the amount that Varsity "overcharged" its direct customers during the period December 10, 2016 to the present. Each of these analyses yields a monolithic overcharge percentage, which is to say they do not vary at all

---

spending to count toward spending thresholds because the VFP and VNAs are only available to All Star gyms, which rarely participate in camps. (Ex. C, Heeb Dep. 247:25-248:8, 322:16-19.)

during the period.  Dr. Heeb put forward what he termed "national" overcharge numbers, which

he increased in his "rebuttal" report.  He also put forward "regional" overcharge numbers,

stressing that the "markets" for competitions and camps are, in his view, regional.

Dr. Heeb fails to effectively connect any of his overcharge analysis to *any* conduct.  He

alludes to a hodgepodge of alleged conduct, such as Varsity's rebate programs, so-called

acquisitions in apparel, and a camp credentialing requirement, without analysis showing this

conduct was anticompetitive.  He points to alleged conduct in All Star competitions to support

overcharges in completely unrelated areas, such as camps.  Dr. Heeb simply divines a

"competitive price," compares Varsity's price to that "competitive price" and assigns 100% of

the difference to "overcharges."  This is a fatal error.  As the Supreme Court held in *Comcast

Corp. v. Behrend*, "[p]rices whose level [are] above what an expert deems competitive has been

caused by factors unrelated to an accepted theory of antitrust harm are not anticompetitive in any

sense relevant here.  The first step in a damages study is the translation of the legal theory of the

harmful event into an analysis of the economic impact of that event."  569 U.S. 27, 38 (2013)

(internal quotations omitted); *see also MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d

1081, 1161 (7th Cir. 1983) ("It is essential, however, that damages reflect only the losses directly

attributable to *unlawful* competition."); *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338,

1353 (3d Cir. 1975) ("The damage figures advanced by plaintiff's experts may be substantially

attributable to lawful competition.  In the absence of any guidance in the record, we cannot

permit a jury to speculate concerning the amount of losses resulting from unlawful, as opposed to

lawful, competition."); *Kentucky v. Marathon Petroleum Co. LP*, 464 F. Supp. 3d 880, 895

(W.D. Ky. 2020) ("Sattinger's report fails because he did not specify what portion of the

calculated damages figure stems from Defendants' legal conduct and what portion, if any, is

caused by any of their allegedly illegal forms of conduct.")  Because the "overcharges" that Dr.

Heeb calculates are not connected to actionable illegal conduct and do not exclude conduct that

is not illegal, they are by their nature irrelevant, inherently inflated, and would be unfairly

prejudicial to Defendants if presented to the jury.

Dr. Heeb's calculations themselves are flawed for numerous reasons.  Thus, even had Dr.

Heeb connected the "overcharges" to actionable anticompetitive conduct, which he did not, his

calculation of those "overcharges" would still be inadmissible.

### A.  Dr. Heeb's Apparel "Overcharge" Analysis Is Makeweight

Dr. Heeb opines that Varsity "overcharged" apparel customers by 10%, which he

increased to 11% in his rebuttal report.  (Ex. A, Heeb Rep. ¶ 60; Ex. B, Heeb Rebuttal Rep. ¶

20.)  Dr. Heeb's opinion is that Varsity overcharged by 10% (or 11%) *all* of the apparel that he

has lumped into his sprawling market for apparel, including uniforms, warm-up outfits, team

jerseys, practice gear, hair bows, headbands, backpacks and shoes.  (ECF No. 1 at PageID 43.)

The basis for his conclusion as to the "overcharge" for *all* apparel, however, is a simplistic and

flawed look at the pricing of just one item of apparel, Varsity's cheerleading shoes.

Dr. Heeb's shoes analysis is based on nothing more than a comparison of the average

prices of Varsity shoes to those of a single competitor, Nfinity.  The fact that Varsity's shoes

command a higher price in the marketplace than Nfinity's says nothing about there being a

legally relevant "overcharge," any more than the fact that a polo shirt with an alligator

commands a higher price than one with a penguin.  Customers prefer some brands over others; a

premium on brand value is not anticompetitive.  Dr. Heeb tries to avoid this obvious flaw in his

approach by opining that Varsity's shoes are of "lower quality" than Nfinity's (Ex. A, Heeb Rep.

¶ 306-07; Ex. B, Heeb Rebuttal Rep. ¶ 589.), but that is piling illogic on illogic.  Dr. Heeb is

obviously not qualified to opine on shoe quality and has in fact admitted as much.[6]  His lay

opinion that any price premium paid to Varsity is not attributable to customer preference for

Varsity brand items is therefore  inadmissible.

     Nor does Dr. Heeb establish a nexus between prices charged and illegal conduct.  The

Supreme Court's warning in *Comcast* is particularly applicable here.  Without a connection

between actionable illegal conduct and the alleged "overcharge," there is no way to determine

whether the higher average prices for Varsity's shoes that Dr. Heeb posits reflect anything other

than consumer preference.

     None of the alleged "anticompetitive" conduct that Dr. Heeb says pertain to apparel make

such a connection.  First, he points to Varsity's rebate programs.  (Ex. A, Heeb Rep. ¶ 219.)  But,

as discussed above, Dr. Heeb provides no basis to conclude that those rebate programs were

illegal, which means that any effect they had cannot be the basis for actionable "overcharges."

And, as to apparel in particular, the rebate programs are flat percentage rebates on purchases,

---

[6] Dr. Heeb acknowledged at his deposition that he was "not an expert on shoe quality" and lacks "experience assessing the quality of shoes for cheer competitions."  (Ex. C, Heeb Dep. 191:21-192:1.).  He reports looking on online posting called "TheCheerBuzz," a YouTube video, and Amazon reviews of Nfinity shoes.  (Ex. A, Heeb Rep. ¶ 370, Heeb Rebuttal Rep. ¶ 585 n.613).  Dr. Heeb testified that he took the "TheCheerBuzz" article "at face value" and had "not done any investigation" into whether the authors of the article employed reliable methodology in comparing shoe quality.  (Ex. C, Heeb Dep. 189:11-21.)  He also acknowledged that the YouTube video and Amazon reviews do not offer a comprehensive comparison of Nfinity and Varsity shoes but only "two point-wise comparisons."  (*Id*. at 187:18-188:15.)  He confirmed that the YouTube video only compared one model of Nfinity shoe with one model of Varsity shoe and did not even "speak to shoe models after 2012."  (*Id.* at 190:9-24.)  He also agreed that the Amazon reviews of Nfinity shoes generally did not even mention Varsity shoes.  (*Id.* at 188:24-189:1.)  Three sources of questionable reliability and relevance do not constitute "sufficient facts or data" to render Dr. Heeb's assumption about shoe quality admissible under Federal Rule of Evidence 702.  *See also Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) ("Red flags that caution against certifying an expert include *reliance on anecdotal evidence, improper extrapolation*, failure to consider other possible causes, lack of testing, and subjectivity.") (emphasis added).

which Dr. Heeb himself conceded are *procompetitive*.  (Ex. C, Heeb Dep. 243:4-10.)

Next, Dr. Heeb identified Varsity's so-called acquisitions of other apparel producers. (Ex. A, Heeb Rep. ¶ 267-68.)  He points to no such acquisitions in the statute of limitations period; rather he points to Varsity's 2013 acquisition of BSN and its 2015 acquisition of allgoods LLC.  The Court has already held that out-of-period acquisitions cannot be the basis for damages.  (*Fusion Elite* ECF No. 141 at PageID 2269-70.)  This means any opinion from Dr. Heeb that out-of-period acquisitions led to higher apparel prices would be legally irrelevant and therefore unhelpful and confusing to the jury as well as unfairly prejudicial to Defendants.

Putting that dispositive legal point aside, Dr. Heeb provides no analysis to suggest that these acquisitions led to higher cheerleading apparel prices.  Indeed, allgoods *did not even sell* cheer apparel—it provided customizable fan apparel, predominantly for use in fundraising.[7] Moreover, Dr. Heeb had no data on these acquisitions (Ex. B, Heeb Rebuttal Rep. ¶ 345) and performed no economic analysis of the effect of these acquisitions on the alleged apparel market (Ex. C, Heeb Dep. 166:5-167:23).  Therefore, by his own admission, Dr. Heeb did not connect either acquisition to an increase in Varsity's supposed market power in cheerleading apparel or pricing.

Finally, Dr. Heeb pointed to Varsity's policy of not allowing its competitors to sell apparel at Varsity events.  (Ex. A, Heeb Rep. ¶ 187-88.)  But, again, Dr. Heeb performed no analysis of whether Varsity's policy had any effect on prices.  Nor did he address the obvious fact that competitors can and do sell their products through their own distribution channels and directly to customers, such as online.  There is no evidence that anyone ever purchased a uniform

---

[7] *See Varsity Brands Announces Acquisition of allgoods, LLC*, PR Newswire, Dec. 23, 2015, https://www.prnewswire.com/news-releases/varsity-brands-announces-acquisition-of-allgoods-llc-300196819.html.

as a result of its being sold or exhibited at a cheer competition:  Obtaining uniforms is a lengthy process involving design, prototyping, and then ordering the uniforms (Ex. F, Minzghor Dep. 136:7-12) that by necessity occurs *before* the start of each season, as shown by the cheer season calendars he cites in his report (Ex. A, Heeb Rep. ¶ 133).  Dr. Heeb also fails to explain why Varsity's policy is anticompetitive given that businesses commonly restrict other firms from selling products at their own stores or venues to avoid free-riding on their investments.  Antitrust does not require Nike to allow Reebok to sell its products at Nike stores.  Indeed, as this Court observed, "prevailing antitrust law ... generally does not require firms to share their advantage or resources with others."  (*Fusion Elite* ECF No. 141 at PageID 2257, n.2.)  Nor does Dr. Heeb account for the fact that Rebel, despite not being able to market at Varsity events, has achieved what it believes is the most sales in the cheerleading apparel space, surpassing Varsity, the supposedly entrenched monopolist.  (*See Rebel* ECF No. 8 at PageID 337.)

Dr. Heeb makes passing references to other miscellaneous conduct, such as Varsity's prevailing at the Supreme Court on a copyright case relating to uniform designs.[8]  (Ex. A, Heeb Rep. ¶ 189.)  But, as to these references, Dr. Heeb once again fails to 1) show that they are anticompetitive and 2) show any connection to "anticompetitive overcharges."  If anything, the fact that Varsity had apparel copyrights that were upheld by the Supreme Court provides an alternative explanation for why Varsity is able to command higher prices in the marketplace, if in fact it is able to do so.

Of course, given Dr. Heeb's analysis cannot be used in regard to shoes, it certainly has no applicability to the many other products in the "all apparel market" that Dr. Heeb seeks to define.

---

[8] The case that Dr. Heeb referred to was *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405 (2017), in which the Court upheld Varsity's copyrights in its innovative apparel designs.

As to those products, Dr. Heeb has done no analysis at all.  Instead, he relies on his assertion that customers "bundle" their apparel purchases (Ex. A, Heeb Rep. ¶ 306), which is unsupported by any quantitative analysis, and, in fact, is demonstrably incorrect when the data is examined.  (Ex. D, Murphy Rep. ¶ 141-142.)  Even if it were otherwise, Dr. Heeb provides no reason why purchasing the products together would result in "overcharges" rather than discounts, let alone consistent overcharges across all products.[9]

### B.    Dr. Heeb's Competition "Overcharge" Analysis Does Not Withstand Scrutiny

Dr. Heeb claims Varsity "overcharged" its customers for competition entry fees, assessing those overcharges at 24% in his original report and, for the first time in his rebuttal report, at 27%.  (Ex. A, Heeb Rep. ¶ 56; Ex. B, Heeb Rebuttal Rep. ¶ 14.)  He also presented "regional" overcharges ranging from 15.4% to 32.0% in his opening report and 9.9% to 34.3% in his rebuttal report.  (Ex. A, Heeb Rep. ¶ 296; Ex. B, Heeb Rebuttal Rep. ¶ 540.)  To arrive at these "overcharges," Dr. Heeb purports to examine the prices of competitions produced by event producers acquired by Varsity—dating back to acquisitions since 2014, outside the statute of limitations period—before and after acquisition.  He assumes that the pre-acquisition prices provide a "competitive benchmark."  He conducts a regression analysis that, he says, shows an increase in prices for these acquired events.  He then extrapolates this figure to all Varsity events from December 2016 forward.  (Ex. A, Heeb Rep. ¶¶ 287-91, 295-98.)  In other words, even if Varsity did not increase the price of a single competition at any point, Dr. Heeb would still say there was a 24% (or 27%) overcharge.

---

[9] Dr. Heeb also speculates that consumers are more sensitive to shoe prices, but his only basis for that is the observation that Varsity customers purchase uniforms and lettering from Varsity more frequently than they purchase shoes.  (Ex. A, Heeb Rep. ¶ 306.)  He does not calculate demand elasticity for shoes and other types of apparel, nor does he perform any other economic or quantitative analysis to show customers are more price sensitive with respect to shoes.

Dr. Heeb's analysis is invalid for numerous reasons. As an initial matter, Dr. Heeb's "national" numbers for competitions and camps should be excluded. Dr. Heeb argues that the relevant geographic market for competitions and camps is regional. (Ex. B, Heeb Rebuttal Rep. ¶ 120.) At a minimum, this means that national numbers are irrelevant and would not assist the trier of fact in determining any relevant matter. They therefore should not be presented to the jury.

In addition, Dr. Heeb's "regional" calculations reveal that his methodology discerned no statistically significant overcharge in the "West" region. In neither his initial report nor his "primary" regression in his rebuttal report can Dr. Heeb show that price effects in the "West" region are not zero. (Ex. A, Heeb Rep. ¶ 296; Ex. B, Heeb Rebuttal Rep. ¶ 540.). As such, Dr. Heeb should not present his West regional overcharge calculation and it should not be used to calculate damages. *Food Lion, LLC v. Dean Foods Co.*, 312 F.R.D. 472, 488-89 (E.D. Tenn. Jan. 26, 2016) (excluding expert opinion as unreliable for establishing common impact of alleged overcharges where model could not find statistically significant, positive overcharges on nearly half of purchasers' zip codes).

In any event, Dr Heeb's methodology is flawed at its core and does not fit the legal question of whether actionable, illegal conduct of Defendants caused higher prices. First, assuming that the acquired events' prices were a competitive "benchmark," that does not mean that Varsity's prices would have been at that level. Even in competitive markets, different sellers often sell their differentiated products at different prices. Dr. Heeb assumes that Varsity's events are equivalent to competitor's events, which is an unsupported equivalency. Even had Varsity raised the prices of acquired events to match its own, this would not indicate deviating from "competitive pricing": Dr. Heeb does not take into account the possibility that Varsity brought

19

up the quality of acquired events, changed some one-day events to multi-day events that commanded higher prices, moved them to better venues, or otherwise improved the events.  In analyzing prices, Dr. Heeb did not account for Varsity's rebate programs in determining post-acquisition prices even as he accounted for discounts offered by pre-acquisition brands.  (Ex. C, Heeb Dep. 273:1-6, 282:5-17.)

Dr. Heeb argues that in-period activities "maintained" Varsity's (apparently pre-existing) "market power" (Ex. B, Heeb Rebuttal Rep. ¶ 502), but that is at best just speculation; he provides no basis for such a conclusion or analysis of anything to support it.  Dr. Heeb's opinion in that regard is based on the premise that, as of the commencement of the statute of limitations on December 10, 2016, Varsity's market position in cheer competitions, such as it was, allowed it to command a price premium in the marketplace.  By Dr. Heeb's own admission, his competition overcharge figure does not reflect price increases corresponding to the alleged conduct but rather is based solely on prices Varsity already charged at the start of the proposed class period that have since remained the same.  (Ex. B, Heeb Rebuttal Rep. ¶¶ 374, 502-03.) Even assuming that is correct, Plaintiffs may not collect damages based on a preexisting market condition, as this Court has already held.  Instead, any actionable overcharge must be based on in-period conduct.  Dr. Heeb did not analyze such conduct.  His overcharge conclusions therefore have no legal relevance and should be excluded.  *See, e.g.*, *Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220, 236 (E.D. Pa. 2017) ("When recreating a but-for world to establish antitrust damages, a plaintiff must create a world 'characterized by the absence of the … challenged practices.'") (citing *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 165 (C.D. Cal. 2007)).

The calculations that Dr. Heeb used to derive his overcharge figures were limited to *All*

20

*Star* competitions (Ex. C, Heeb Dep. 288:4-17; Ex. B, Heeb Rebuttal Rep. ¶ 518) and therefore provide no legitimate basis to use his overcharge figures in assessing overcharges relating to *scholastic* competitions.  In other words, Dr. Heeb assumed that the alleged overcharge on all scholastic events produced by Varsity was the same as his purported overcharge on a selection of acquired All Star events, despite the fact that the conduct complained of, including acquisitions and rebate programs, apply only to All Star.  An assumption is not sound scientific methodology. *See Rose v. Truck Ctrs., Inc.*, 388 F.App'x 528, 535 (6th Cir. 2010) ("Expert testimony may not be based on mere speculation and assumptions must be supported by evidence in the record.") (citations omitted).

Dr. Heeb attempts to justify this leap by the assertion that athletes at All Star and school events "engag[e] in nearly identical activities, [are] judged by the same criteria, [and] compet[e] at events produced by the same producers, within the same geographies."  (Ex. B, Heeb Rebuttal Rep. ¶ 517.)  That is, he simply recites the sparse qualitative observations underlying his unreliable assumption that All Star and school events are in the same market, with no explanation as to why that would lead to identical overcharges, notwithstanding no conduct related to scholastic cheer events.  Including both All Star and school events in one, overly broad market does not show that conduct related to only All Star would affect scholastic identically.  In an overly broad market, "the relative competitive significance of more distant substitutes is apt to be overstated …"  (HMGs at 10.)[10]  Expert testimony that fails to "incorporate all [relevant]

---

[10] Dr. Heeb included school event data in his regression model, but the inclusion of this data does not constitute scientific evidence that his competition overcharge can be applied to scholastic events.  (Ex. B, Heeb Rebuttal Rep. ¶ 518.)  In his regression model, Dr. Heeb extracts his overcharge solely from alleged price changes on the acquired *All Star* events.  (Ex. A, Heeb Rep. ¶ 290.)  The inclusion of school events played little to no role in the outcome of the model, as Dr. Heeb acknowledged at his deposition.  (Ex. C, Heeb Dep. 288:18-21.)

aspects of the economic reality" is speculative and should be excluded. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000).

To be sure, Dr. Heeb did not tie any supposedly anticompetitive conduct of Defendants to an overcharge for scholastic competitions. None of the items he identifies as relating to overcharges on competitions—the alleged conspiracy with USASF, Varsity's alleged exercise of power over Worlds Bid events, Varsity's rebate programs, and Varsity's acquisition of other event producers (Ex. A, Heeb Rep. ¶ 53, 207)—have anything to do with scholastic competitions. Rather, as Dr. Heeb acknowledged at his deposition, USASF regulates *only* All Star competitions, *only* All Star teams are eligible for Worlds bids, Varsity's rebate programs *only* relate to All Star customers, and Dr. Heeb *only* considered Varsity's acquisition of All Star event producers in his analysis. (Ex. C, Heeb Dep. 290:8-24, 291:17-292:5.)

Dr. Heeb's overcharge analysis related to scholastic cheerleading events is therefore untenable for these additional reasons. As discussed above, an expert cannot claim damages without articulating how those damages follow from the alleged conduct. Extrapolating from one product to another is not proper. *See Newell Rubbermaid*, 676 F.3d at 528 (listing "improper extrapolation" as a "red flag" for *Daubert* purposes and excluding conclusions about one brand of forklift drawn from data on other forklift brands); *see also In re Intel Corp. Microprocessor Antitrust Litig.*, 2010 WL 8591815, at *24-25 (D. Del. July 28, 2010) (rejecting as unreliable an expert opinion that simply applied overcharge analysis of desktop chips to mobile chips.)

C.    **Dr. Heeb's Camp "Overcharge"—Which Is His Competition Overcharge Recycled—Is Based on No Analysis At All**

Dr. Heeb performed no analysis of overcharges relating to camps. Instead, he simply recycled his overcharge percentages from competitions and put that forward for camps as well. (Ex. A, Heeb Rep. ¶ 63; Ex. B, Heeb Rebuttal Rep. ¶ 21.) In addition to having all of the same

methodological failures as with competitions, Dr. Heeb's decision to copy his alleged

competition overcharge over to camps, which even Dr. Heeb concedes are not in the same

market, is not based on facts, data, or analysis.  It should not be presented to the jury.

To state the obvious, a firm's ability to charge supracompetitive prices is determined by a

multitude of product-specific supply and demand factors.  As one of Plaintiffs' other economists

put it, "it's the dynamics that exist within that market that would allow you to assess what that

overcharge is or if it is occurring."  (Ex. M, Maki Dep. 70:17-19; *see also* Ex. D, Murphy Rep. ¶

410.)  Rather than consider these factors, Dr. Heeb blindly ported his competition overcharge

percentages to camps.

Ultimately, Dr. Heeb's sole basis for assuming the same overcharge for competitions and

camps is an internal Varsity document from 2011 listing alleged market share figures of 80

percent in camps, 75 percent in apparel, and 40 percent in competitions.  From this one 2011

document alone, Dr. Heeb concluded that Varsity had greater market power in camps than in

competitions from December 10, 2016 onward, and, as a result, any camp overcharge must be at

least as high as any competition overcharge.  (Ex. A, Heeb Rep. ¶ 310.)  In other words, contrary

to economic teaching and basic logic, Dr. Heeb in effect concludes that overcharge percentage

can be determined based on market share alone and, even worse here, can be based on a

document from years before the relevant time period.  Dr. Heeb points to no basis for this

methodology, such as it is.[11]

---

[11] In addition to not being grounded in economics, logic, or common sense, Dr. Heeb's approach
is not consistent with his conclusion that the apparel "overcharge" was 10% or 11%.  Following
the methodology he applied for camps, the apparel overcharge should be at least as high as the
24% or 27% competition overcharge.  Similarly, if the document had listed slightly less for
camps, the camp overcharge would be less than the apparel overcharge, which is to say less than
11%.  That his study—flawed as it was—did not show such an overcharge demonstrates the
fallacy of the approach and the baselessness of his conclusions.

Dr. Heeb also attempts to justify his extrapolation by speculating that the elasticity of demand is lower for camps than for competitions, but he neither provides quantitative analysis nor cites any sources supporting this claim. (Ex. A, Heeb Rep. ¶ 311.) Without any grounding in scientific methodology, this assumption is unreliable and an opinion based on it cannot be admitted. *See, e.g., Universal Coin & Bullion, Ltd. v. Fed Express Corp.,* 2015 WL 12001264, at *8 (W.D. Tenn. June 30, 2015) (excluding expert opinion assuming that demand for gold and demand for rare coins were similar where expert did not cite "proof of cross price elasticity between gold and coins" or analyze whether coin seller's "revenues tracked … gold demand"); *The Iams Co. v. Nutro Prods., Inc.*, 2004 WL 5496244 at *3 (S.D. Ohio June 30, 2004) ("Such cross-elasticity is also a measurable quantity ... but [it] has [not] been measured in this case.")

To be sure, none of the conduct that Dr. Heeb says was anticompetitive in respect of competitions—the "market" in which he derived his camp overcharges in the first place—had any connection to camps. As discussed above, all had to do with All Star, and camps are virtually entirely confined to school-based cheerleading teams. Using an "overcharge" calculation derived from All Star competitions would be particularly inappropriate given that fact.

Otherwise, Dr. Heeb claims three elements of Varsity's alleged conduct are relevant to camps, but none withstand scrutiny: (1) Varsity's rebate programs (Ex. A, Heeb Rep. ¶ 269), (2) the availability of bids to certain national scholastic competitions at camps, and (3) the requirement that teams complete the Squad Credentialing Program in order to attend the NCA Junior & Senior High School Nationals Championship or the UCA National High School Cheerleading Championship (Ex. A, Heeb Rep. ¶¶ 271-272).

Putting aside the fact that Dr. Heeb did not perform an appropriate assessment of

24

Varsity's rebate programs (*see supra* Section II), those programs do not even apply to scholastic purchases in general or to camps in particular, as Dr. Heeb conceded at his deposition. (Ex. C, Heeb Dep. 244:17-22, 254:8-12, 322:8-12.)

Dr. Heeb also failed to connect the offering of end-of-season competition bids at camps or the Squad Credentialing Program to any supposed overcharge. By his own admission, he did not quantify the number of customers or the potential revenue affected by the Credentialing Program. (Ex. B, Heeb Rebuttal Rep. ¶ 495.) And, as Dr. Heeb conceded at his deposition, the offer of bids and the Squad Credentialing Program only affect school teams that are interested in the first place in attending the related national competitions. (Ex. C, Heeb Dep. 197:3-12.) This is important, because ▮▮▮ to ▮▮▮ of school camp customers do not enter *any* competitions, let alone those national competitions. (Ex. A, Murphy Rep. ¶ 247.) That is, ▮▮▮▮▮▮▮ or more of school customers *could not have been affected* by the offer of bids or the Squad Credentialing Program.

It is therefore beyond implausible that any significant proportion of camp customers were or are "captive" to Varsity, as Dr. Heeb baselessly claims. (Ex. B, Heeb Rebuttal Rep. ¶ 495.) Indeed, the extent of Dr. Heeb's "analysis" is to present two emails from school coaches expressing frustration with the Squad Credentialing Program and his own observation, without any explanation of its context, that Varsity's camp revenue happened to increase the year the credentialing requirement took effect. (Ex. B, Heeb Rebuttal Rep. ¶¶ 317-19.) Yet again, Dr. Heeb uses anecdotes as a crutch where his analysis lacks basis in scientific methodology. Opinions based on such limited anecdotal evidence without any analysis are not admissible. *See, e.g., Universal Coin & Bullion,* 2015 WL 12001264, at *11 (excluding expert testimony for failing to consider alternative explanations for Plaintiff's reduced revenues, even though such

25

analysis "could have easily been accomplished and would be highly relevant to the issue at hand.")

Furthermore, Dr. Heeb's 24% or 27% overcharge figures (and his regional overcharge figures) do not comport with actual prices observed in the marketplace, which Dr. Heeb did not even bother to consider. Indeed, illustrating the drone-like approach Dr. Heeb used, he opined in his rebuttal report that the camp overcharge figure should be increased to 27%, which is to say be in lockstep with the competition overcharge. (Ex. B, Heeb Rebuttal Rep. ¶ 21.) He provided no explanation as to what changed in his analysis of alleged camp-relevant conduct would support such an increase, which simply highlights how baseless his camp "overcharge" is. In fact, there was no price increase of anything remotely resembling 24% or 27% (or his regional overcharge percentages) after the Squad Credentialing Program was put into place.[12] A conclusion that so obviously does not fit with the real-world data cannot be the basis for expert testimony. Rather, "it would seem that any proper methodology would include intellectual analysis and independent review and verification of the underlying data." *Auto Indus. Supplier*, 435 F.App'x at 457.

Dr. Heeb's alleged *competition* overcharge is already speculative. Dr. Heeb's *camp* overcharge adds speculation on speculation and should be excluded: "At some point, the train becomes too long to pull and the couplings too weak to hold the cars together." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 672 (6th Cir. 2010).

### D.   Dr. Heeb's Increased Overcharge Figures In His Rebuttal Report Were not Timely Disclosed and Should Be Excluded

As noted, Dr. Heeb offered higher "overcharge" numbers in his rebuttal report than in his

---

[12] Prices for two-day camps increased by 2.0% the first season the Squad Credentialing requirement took effect, but increased by only 0.1% the following season and *decreased* by 0.6% the season after that. (Ex. A, Murphy Rep. ¶ 429.) These modest changes, not even keeping up with inflation, are utterly inconsistent with Dr. Heeb's assertion of a 24% or 27% overcharge (or his regional overcharges).

opening report.  Dr. Heeb should not be permitted to offer new opinions six months after the

deadline for opinion disclosure.  Rebuttal reports are not an opportunity to augment an expert's

opinions to the detriment of the other side in the litigation.  Accordingly, the higher overcharge

figures in Dr. Heeb's rebuttal report should not be admitted or used as a basis for Dr. Maki's

damage calculations, as should all other opinions that Dr. Heeb offers for the first time in his

rebuttal report.  *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 501

(N.D. Cal. 2008) (striking as untimely calculations presented for first time in rebuttal report).

## IV.    DR. HEEB'S COMMON IMPACT OPINION SHOULD BE EXCLUDED

Dr. Heeb's opinion that "nearly all members of the class suffered antitrust injury and

were materially harmed in the cheer competition market" (Ex. A, Heeb Rep. ¶ 313) should also

be excluded.  Indeed, in his own words, in reaching this conclusion, Dr. Heeb "assume[d] that all

indirect purchasers of Varsity apparel suffered antitrust harm" and then he "effectively

asssum[ed] that all Varsity apparel is subject to an overcharge and that the price elevation is

uniform across the United States."  (Ex. A, Heeb Rep. ¶ 314.)  Based on these assumptions, he

concluded that he need perform no further analysis on the "77.2%" of "Varsity customers (gyms

and schools)" that "purchased apparel."  (*Id.*)  As to the rest of Varsity's gym and school

customers, Dr. Heeb assumed that any Varsity customer that attended a competition in an

"adjusted CSA region" where Varsity's "market" share exceeded 40% paid an "overcharge."

(*Id.* ¶ 315.)  Not surprisingly, the results of Dr. Heeb's "everyone was overcharged" assumptions

was the conclusion that "everyone was overcharged," which he says is "common proof."[13]

Dr. Heeb's assertion that his overcharge percentages can be used to calculate damages

---

[13] Dr. Heeb offers no opinion on whether downstream purchasers—*i.e.*, members of the proposed class—were overcharged, but curiously left that to Dr. Maki.  As discussed in the *Daubert* motion related to Dr. Maki, Dr. Maki failed utterly to show such pass through.

(Ex. A, Heeb Rep. ¶ 317-26) is likewise unsupported.  Rather, it reduces to the anodyne

observation that *if* his overcharge percentages are correct as to all purchases throughout the class

period and *if* an appropriate methodology of determining which direct purchases led to indirect

purchases by members of the putative class were employed and *if* the "pass through rate" could

properly be assessed, a total damage number for the class could be constructed by multiplying

the three together.  The problem is that Dr. Heeb's overcharge figures are not correct and Dr.

Maki failed to provide the other pieces.

## V.    MANY OF DR. HEEB'S "OPINIONS" ARE SIMPLY FACTUAL NARRATIVE THAT IMPROPERLY USURPS THE JURY'S ROLE AS FACTFINDER

Dr. Heeb claims that Varsity engaged in a variety of conduct in an effort to enhance its

market power, but he obscures his lack of methodology in reaching those conclusions with

simple interpretations of curated portions of the record.  This is improper expert testimony.  At

best, it will not aid the jury, but rather would confuse it.  *See In re Davol, Inc./C.R. Bard, Inc.*

*Polypropylene Hernia Mesh Prods. Liab. Litig.*, 546 F. Supp. 3d 666, 677 (S.D. Ohio 2021)

(citation omitted) ("A history without any expert analysis or other application of the expert's

expertise is simply a factual narrative that should be presented to the jury directly."); *Tchatat v.*

*City of New York*, 315 F.R.D. 441, 447 (S.D.N.Y. 2016) (noting that any value factual narrative

might have would be "far outweighed by the danger that the jury would accord too much weight

to such opinions because they come from the mouth of a [] professional.").  Such opinions are

excluded under Rules 703 and 403.  *See, e.g.*, *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F.

App'x 510, 510 (6th Cir. 2014) ("Where an expert merely offers his client's opinion as his own,

that opinion may be excluded."); *see also United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016)

(relevance of expert testimony depends on "whether the untrained layman would be qualified to

determine intelligently and to the best possible degree the particular issue without enlightenment

from those having a specialized understanding of the subject involved in the dispute.") (quoting Fed. R. Evid. 702, Adv. Comm. Notes).

Dr. Heeb's "opinions" are for the most part just this type of inadmissible factual narrative.  For instance, Dr. Heeb recites documents and deposition testimony to conclude that Varsity and USASF conspired to harm competition.  (Ex. A, Heeb Rep. ¶¶ 203-18.)  Although Dr. Heeb opines that "it is not possible to separate USASF from any of Varsity's anticompetitive conduct" due to their close relationship, (Ex. B, Heeb Rebuttal Rep. ¶ 456), his only "analysis" of that relationship amounts to tallying up Varsity's Worlds bid events and seats on the USASF Sanctioning Committee.  (Ex. A, Heeb Rep. ¶¶ 210-11, 216.)  He performs no analysis to show the effect of USASF's rules and analyzes no voting records to understand Varsity's role in making them.  He similarly relies solely on a biased review of select record evidence to conclude that so-called "attack events" are part of a "concerted plan to achieve and maintain monopoly prices."  (Ex. B, Heeb Rebuttal Rep. ¶ 460.)  Indeed, Dr. Heeb counterintuitively concludes, in his "economic opinion," that Varsity's practice of offering more events for consumers to choose from is not "remotely procompetitive" without performing a single economic analysis.  (*Id.*)

Dr. Heeb makes this error elsewhere, too.  He cloaks a timeline of Varsity's acquisitions and an uncritical adoption of corporate market share estimates in the guise of an expert opinion on anticompetitive intent.  (Ex. A, Heeb Rep. ¶¶ 233-66.)  He also asserts that Varsity's Squad Credentialing Program is an artificial barrier to entry part of an "alleged scheme to disadvantage rivals and diminish competition to achieve supracompetitive profits," (Heeb Rep. ¶ 273), based on nothing more than a cursory explanation of the Program's requirements and a small handful of internal documents (*see, e.g.*, *id.* at ¶ 184; Ex. B, Heeb Rebuttal Rep. ¶¶ 316-22.)  And Dr. Heeb's assessment (improperly put forward for the first time in his rebuttal report) that Varsity

exploited its alleged market power to charge customers "inflated housing prices" is based on nothing more than a cursory review of the factual record. (Ex. B, Heeb Rebuttal Rep. ¶¶ 272-74.) He conducts no analysis of whether housing prices were higher, which would seem unlikely given that Varsity secures blocks of rooms at the best available rates to avoid hotel price gouging when Varsity's events brings thousands of cheerleaders and their families to a particular area.

Plaintiffs should not be allowed to use Dr. Heeb to summarize their version of the facts. The interpretation of documents and deposition testimony is a role properly reserved for the jury, and a jury will not be aided by Dr. Heeb's qualitative interpretations of cherry-picked evidence. *See, e.g.*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 584 (S.D.N.Y. 2018) (excluding testimony where economic expert "purport[ed] to interpret documents" because such "opinions are not the product of [his] expertise, as the documents he purports to interpret are equally understandable by the trier of fact at this stage").

Although it is not possible in the space available to catalog each and every instance where Dr. Heeb resorts to this approach in his 468 pages of reports, it should not be permitted in any instance.

**CONCLUSION**

For the reasons discussed above, Dr. Heeb's testimony should be excluded under Rules 702 and 403 of the Federal Rules of Evidence.

Dated: February 10, 2023

Respectfully submitted,

/s Matthew S. Mulqueen

George S. Cary*
Steven J. Kaiser*
Linden Bernhardt*
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Phone: (202) 974-1500
Fax: (202) 974-1999
gcary@cgsh.com
skaiser@cgsh.com
lbernhardt@cgsh.com

Jennifer Kennedy Park*
Heather Nyong'o*
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
1841 Page Mill Road, Suite 250
Palo Alto, CA 94304
Phone: (650) 815-4100
Fax: (202) 974-1999
jkpark@cgsh.com
hnyongo@cgsh.com

* Admitted *pro hac vice*

Matthew S. Mulqueen (TN #28418)
Adam S. Baldridge (TN #23488)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ
165 Madison Avenue, Suite 2000
Memphis, TN 38103
Phone: (901) 526-2000
Fax: (901) 577-0866
mmulqueen@bakerdonelson.com
abaldridge@bakerdonelson.com

*Attorneys for Defendants Varsity Brands,
LLC, Varsity Spirit, LLC; Varsity Spirit
Fashions & Supplies, LLC; Charlesbank
Capital Partners, LLC; Bain Capital Private
Equity LP*

31

s/ Nicole Berkowitz Riccio
Grady Garrison (TN #008097)
Nicole Berkowitz Riccio (TN #35046)
James Andrew Roach (TN #37934)
Karen Lott Glover (TN #38714)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ
165 Madison Avenue, Suite 2000
Memphis, TN 38103
Phone: (901) 526-2000
Fax: (901) 577-0866
ggarrison@bakerdonelson.com
nriccio@bakerdonelson.com
aroach@bakerdonelson.com
kglover@bakerdonelson.com

*Attorneys for U.S. All Star Federation, Inc.
and USA Sport Cheering, d/b/a USA Cheer*

s/ Brendan P. Gaffney
Paul E. Coggins*
Brendan P. Gaffney*
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Phone: (214) 740-8000
Fax: (214) 740-8800
pcoggins@lockelord.com
bgaffney@lockelord.com

* Admitted *pro hac vice*

Edward L. Stanton III (TN #018904)
S. Keenan Carter (TN #023386)
BUTLER SNOW LLP
6075 Poplar Avenue, Suite 500
Memphis, Tennessee 38119
Phone: (901) 680-7336
Fax: (901) 680-7201
Edward.Stanton@butlersnow.com
Keenan.Carter@butlersnow.com

*Attorneys for Jeff Webb*

32