# EXHIBIT 8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| JONES, et al. | |
| Plaintiffs, | |
| v. | Case No. 2:20-cv-02892-SHL-tmp |
| VARSITY BRANDS, LLC, et al., | |
| Defendants. | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS'
JOINT MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

I.    CHEER CAMPS ................................................................................................. 1

II.   CHEER APPAREL ............................................................................................. 4

III.  CHEER COMPETITIONS................................................................................. 9

IV.  VARSITY FAMILY PLAN AND NETWORK AGREEMENTS ................................... 15

V.   USASF............................................................................................................ 22

VI.  JEFF WEBB .................................................................................................... 33

VII. BAIN .............................................................................................................. 41

VIII. CHARLESBANK ............................................................................................. 43

IX.  MISCELLANEOUS......................................................................................... 45

**EXHIBITS TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR JOINT MOTION FOR SUMMARY JUDGMENT**

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| A | Jim Chadwick Deposition Excerpts – April 15, 2022 |
| B | USASF_00032456-USASF_00032466 |
| C | USASF_00028673-USASF_00028712 |
| D | USASF_00032454-USASF_00032455 |
| E | VAR00351488-VAR00351491 |
| F | USASF_00032439-USASF_00032441 |
| G | William Hopping Seely IV Deposition Excerpts (Day 1) – April 13, 2022 |
| H | Jeff Webb Deposition Excerpts (Day 1) – May 12, 2022 |
| I | Ali Stangle Deposition Excerpts – March 30, 2022 |
| J | Steve H. Peterson Deposition Excerpts (Day 1) – March 9, 2022 |
| K | Jeffrey Fowlkes Deposition Excerpts – April 5, 2022 |
| L | Declaration of Ali Stangle |
| M | USASF_00030535- USASF_00030538 |
| N | USASF_00056250- USASF_00056254 |
| O | Steve Peterson Deposition Excerpts (Day 2) – April 4, 2022 |
| P | USASF_00081398- USASF_00081402 |
| Q | Janet Netz Deposition Excerpts – January 17, 2023 |
| R | USASF_00027858-USASF_00027861 |
| S | VAR00319008-VAR00319010 |
| T | USASF_00030547- USASF_00030548 |
| U | USASF_00032433- USASF_00032434 |
| V | USASF_00055929- USASF_00055933 |
| W | USASF_00026548- USASF_00026554 |
| X | USASF_00085198- USASF_00085199 |
| Y | VAR00348574-VAR00348616 |
| Z | Backup Materials for the Expert Report of Jonathan M. Orszag |
| AA | USASF_00019474-USASF_00019477 |
| AB | USASF_00019528- USASF_00019531 |

| AC | USASF_00020057- USASF_00020058 |
|---|---|
| AD | USASF_00086125, USASF_00002776, USASF_00002779, USASF_00002782, USASF_00002785 |
| AE | USASF_00012988 |
| AF | VAR00421095-VAR00421097 |
| AG | USASF_00088638-USASF_00088639 |
| AH | USASF_00088659-USASF_00088661 |
| AI | Leslie Wright Deposition Excerpts – February 9, 2022 |
| AJ | USASF_00022109-USASF_00022111 |
| AK | Randall Heeb Deposition Excerpts – January 19, 2023 |
| AL | Amy Clark Deposition Excerpts – March 31, 2022 |
| AM | Karen Wilson Deposition Excerpts – April 14, 2022 |
| AO | USASF_00023946-USASF_00023954 |
| AP | USASF_00051791- USASF_00051796 |
| AQ | USASF_00027831-USASF_00027832 |
| AR | USASF_00090186-USASF_00090188 |
| AS | Declaration of John Newby |
| AT | VAR00160803 |
| AU | VAR00020214 |
| AV | VAR00175267-VAR00175268 |
| AW | VAR00017932-VAR00017942 |
| AX | Plaintiffs' Combined Objections and Responses to Defendants' First Set of Interrogatories, Attach. A |
| AY | Christina Lorenzen Deposition Excerpts – January 20, 2022 |
| AZ | Jessica Jones Deposition Excerpts – February 10, 2022 |
| BA | John Newby Deposition Excerpts (Day 1) – March 23, 2022 |
| BB | VAR00160802 |
| BC | Buffy Duhon Deposition Excerpts – March 25, 2022 |
| BD | Jen Maki Deposition Excerpts – January 23, 2023 |
| BE | Sarah Minzghor Deposition Excerpts – December 17, 2021 |
| BF | Alexa Bray Deposition Excerpts – January 11, 2022 |
| BG | Lauren Gurske Deposition Excerpts – December 7, 2021 |

iv

| BH | John Sadlow Deposition Excerpts – April 7, 2022 |
|----|---|
| BI | Heidi Weber Deposition Excerpts – October 4, 2022 |
| BJ | Jackie Kennedy Deposition Excerpts – March 16, 2023 |
| BK | VAR00009293-VAR00009366 |
| BL | Jim Hill Deposition Excerpts – March 21, 2022 |
| BM | VAR00233675-VAR00233713 |
| BN | VAR00302098-VAR00302100 |
| BO | VAR00147772-VAR00147774 |
| BP | Hal Singer Deposition Excerpts – December 16, 2022 |
| BQ | Brian Elza Deposition Excerpts (Day 1) – November 16, 2021 |
| BR | VAR00009486-VAR00009500 |
| BS | Melanie Berry Deposition Excerpts – March 18, 2022 |
| BT | Rebecca Foster Deposition Excerpts – December 21, 2021 |
| BU | Timothy Gurske Deposition Excerpts – December 9, 2021 |
| BV | USASF_00064795-USASF_00064797 |
| BW | VAR00185006-VAR00185007 |
| BX | VAR00075027-VAR00075028 |
| BY | VAR00439301 |
| BZ | VAR00439295 |
| CA | VAR00439312 |
| CB | FUSIONELI000000424- FUSIONELI000000427 |
| CC | VAR00439297 |
| CD | VAR00439306 |
| CE | VAR00439309 |
| CF | Francis Xavier ("Tres") LeTard Deposition Excerpts – November 22, 2021 |
| CG | VAR00322126 |
| CH | VAR00325318 |
| CI | VAR00233174-VAR00233175 |
| CJ | VAR00074760- VAR00074761 |
| CK | BAIN00067980- BAIN00067998 |
| CL | Ryan Cotton Deposition Excerpts – May 5, 2022 |

| CM | Declaration of Ryan Cotton |
|---|---|
| CN | Andrew Janower Deposition Excerpts – July 6, 2022 |
| CO | Declaration of Andrew Janower |
| CP | Joshua Beer Deposition Excerpts – April 20, 2022 |
| CQ | Neil Kalvelage Deposition Excerpts – May 4, 2022 |
| CR | Declaration of Jeff Webb |
| CS | USASF_00039789 |
| CT | USASF_00107876-USASF_00107879 |
| CU | Andrew Janower Deposition Excerpts – April 22, 2022 |
| CV | CB00314261 |
| CW | CB00114878-CB00114879 |
| CX | CB00373462-CB00373500 |
| CY | Pashupati ("Pash") Nangia Deposition Excerpts – March 10, 2022 |
| CZ | John Newby Deposition Excerpts (Day 2) – March 24, 2022 |
| DA | John Nichols Deposition Excerpts – March 8, 2022 |
| DB | Sheila Noone Deposition Excerpts – April 19, 2022 |
| DC | Thomas O'Rourke Deposition Excerpts – May 4, 2022 |
| DD | BAIN00062831-BAIN00062835 |
| DE | BAIN00013400-BAIN00013401 |
| DF | BAIN00074357-BAIN00074362 |
| DG | William Hopping Seely IV Deposition Excerpts (Day 2) – April 14, 2022 |
| DH | Jeff Webb Deposition Excerpts (Day 2) – May 13, 2022 |

I, Steven J. Kaiser, swear under penalty of perjury that the exhibits submitted herewith are true and correct copies of the indicated documents.

Steven J. Kaiser

Defendants hereby submit this statement of undisputed material facts in support of their Joint Motion for Summary Judgment.

**I.     CHEER CAMPS**

1.      Varsity offers camps to train competitive and sideline scholastic cheerleaders. (Compl. ¶¶ 62-63; ECF No. 382-6 at ¶ 247 (showing that ███ to ███ of Varsity school camp customers did not attend any competitions).)

2.      The types of camps offered by Varsity include clinics, day camps, and multi-day camps.  (ECF No. 388-4 at ¶ 155.)

3.      Among the training and instruction provided at Varsity's multi-day camps is instruction on the "five key roles" of a cheerleader, namely "crowd leader, spirit raiser, ambassador, athlete and entertainer" along with "leadership and safety."  (Ex. AT, VAR00160803.)

4.      Very few All Star teams attend camps, which are geared toward scholastic teams, including those that do not participate in competitions.  (Netz Rep, ECF No. 382-3 at p. 60 ("[N]early all camp participants are school teams that would otherwise have a break in their season during the summer when Cheer Camps are usually held.  All Star gyms do not have a similar break during the summer and, therefore, have less of a need or availability to attend Cheer Camps."); Ex. Q, Netz Dep. 89:12-18; Ex. AK, Heeb Dep. 133:15-21.

5.      There is no rebate under the Varsity Family Plan ("VFP") or a Network Agreement for camp registration fees, and there never has been.  (Ex. AK, Heeb Dep. 244:17-22, 254:8-12, 322:8-12; *see also, e.g.*, Ex. AU, VAR00020214 (VFP); Ex. AV, VAR00175267 at -268 (VFP); Ex. AW, VAR00017932 at -932-942 (Network Agreement)).

6.      Neither Plaintiffs paid for a registration at or even attended a Varsity cheer camp. (Ex. AX, Plaintiffs' Combined Objections and Responses to Defendants' First Set of Interrogatories at Attachment A at 1-6 (demonstrating, through list of purchases made by Plaintiffs, that neither of the remaining Plaintiffs made any camp purchase);  Ex. AY, Lorenzen Dep. at 86:12-19 ("Q: [Y]ou mentioned earlier today, I believe, that your child attended a camp in relation -- in connection with cheerleading; is that correct? A: No."); Ex. AZ, Jones Dep. at 49:4-50: 7.)

7.      There are many different kinds of cheer camps within Plaintiffs' proposed "Cheer Camp Market," including multi-day, single day, in the school's facilities, at the facilities of major universities, high school camps, middle school camps, and so on.  (ECF No. 382-6 at ¶¶ 133-134, 181-184, Exs. 14 and 15.

8.      In order to attend one of Varsity's three national championship events for high school teams, a team must first have 75% of its members complete the Squad Credentialing Program at a multi-day Varsity cheer camp.  (Ex. AT, VAR00160803 at -803 (listing the events to which the Squad Credentialing Program applied prior to 2021 and the program's requirements); Ex. BB, VAR00160802 (Duhon Exhibit 5) at -802.)

9.      Varsity first instituted the Squad Credentialing Program as to the National High School Cheerleading Championship (NHSCC) with UCA in the 2016-2017 season.  (Ex. BB, VAR00160802 (Duhon Exhibit 5) at -802; Ex. BC, Duhon Dep. 48:4-50:17.)

10.     Varsity instituted the Squad Credentialing Program as to the NCA Junior & Senior High School National Championship in the 2017-2018 season.  (*Id*.)

11.     Varsity instituted the Squad Credentialing Program as to USA Spirit Nationals in the 2020-2021 season.  (Ex. BC, Duhon Dep. 102:19-103:4.)

12.    The Squad Credentialing Program is not applicable to cheer teams that do not participate in one of the three specific Varsity competitions.  (Ex. AK, Heeb Dep. 197:3-12; Ex. BB, VAR00160802 (Duhon Exhibit 5) at -802.)

13.    Of the ███ schools that attended a Varsity camp each season from the 2016-2017 season to the 2018-2019 season, less than ███ attended a competition requiring squad credentialing.  (ECF No. 382-6 at ¶ 383, Ex. 55 (establishing that the minimum percentage of schools attending events requiring squad credentialing was between ██████████ from the 2016-2017 season to the 2018-2019 season).)

14.    Prior to December 10, 2016, Varsity did not make any acquisition of a cheer camp producer that Plaintiffs assert was anticompetitive.

15.    On or after December 10, 2016, Varsity did not make any acquisition of a cheer camp producer that Plaintiffs assert was anticompetitive.

16.    Prior to December 10, 2016, Varsity did not make any acquisition that enabled Varsity to charge higher prices for cheer camps.

17.    On or after December 10, 2016, Varsity did not make any acquisition that enabled Varsity to charge higher prices for cheer camps.

18.    Varsity did not engage in any anticompetitive conduct with respect to camps that led Plaintiffs to pay higher prices in another market.

19.    Prices for two-day camps increased slightly by 2.0% the first season the Squad Credentialing requirement took effect, increased by only 0.1% the following season, and decreased by 0.6% the season after that.  (ECF No. 382-6 at ¶ 429.)

20.    Registration fees for Varsity camps were not higher than they would have been in the absence of whatever conduct Plaintiffs in this case assert is anticompetitive.

21.    Dr. Heeb's camp-related overcharge assertion is identical to his competition-related overcharge assertion.  (ECF No. 388-3 at ¶¶ 63, 310; ECF No. 388-4 at ¶ 21.)

22.    In calculating his camp-related overcharge, Dr. Heeb did not use prices charged for cheer camp registrations in his calculations.  (ECF No. 388-3 at ¶¶ 308-312; ECF No. 388-4 at ¶ 21.)

23.    In calculating his camp-related overcharge, Dr. Heeb only used prices charged for cheer competition registrations.  (ECF No. 388-3 at ¶¶ 56, 63; ECF No. 388-4 at ¶¶ 21, 85 (same).)

24.    A firm's ability to charge supracompetitive prices is determined by a multitude of product-specific supply and demand factors.  (*See* Ex. BD, Maki Dep. 70:17-19 (""[I]t's the dynamics that exist within that market that would allow you to assess what that overcharge is or if it is occurring.").)

25.    Dr. Maki did not calculate or analyze passthrough specifically as it relates to schools.  (Ex. BD, Maki Dep. 88:6-16, 88:23-89:2 ("Q: Okay. And did you find anything from any school where the school said we pass through our costs to parents or other members of the [putative] class? A: I do not recall coming across something like that.").)

## II.    CHEER APPAREL

26.    The constituent components of Plaintiffs' "Cheer Apparel Market"–namely cheer uniforms, shoes, accessories (including outerwear, poms, bows, socks, undergear, bags, and game day apparel, warm-ups (which itself includes jackets pants and other apparel)), and camp wear (including t-shirts, tanks, polos, athletic shorts, skirts, skorts, and practice wear) are not functional substitutes for one another, which is to say they cannot be used for the same purposes. (Ex. AK, Heeb Dep. 140:20-21 ("Obviously shoes are not a substitute for uniforms"), 141:6-9 (same); Ex. Q, Netz Dep. 210:11-211:6 ("Q: So is a uniform substitutable for shoes? A: No. Q:

4

Okay. And a warmup isn't substitutable for shoes? A: Correct. Q: And an accessory like a hair

bow isn't substitutable for shoes; right? A: Correct.").)

27.     The constituent components of Plaintiffs' "Cheer Apparel Market" are not

economic substitutes for one another, which is to say that if the price of one product goes up,

customers will not substitute to another product.  (ECF No. 382-6 at ¶ 208.)

28.     Cheerleaders did not necessarily (and often did not) purchase all of the constituent

products in Plaintiffs' "Cheer Apparel Market" from Varsity or from any other single supplier.

(ECF No. 382-6 at ¶ 142, Ex. 19 (demonstrating that Varsity customers bought from different

apparel categories in different proportions); Ex. AZ, Jones Dep. 174:15-176:21 (explaining that

Ms. Jones's daughter used Varsity uniforms, Rebel shoes, and a Rebel makeup palette in 2019);

Ex. BE, Minzghor Dep. 140:12-21 (stating that Fusion Elite gym used Varsity uniforms and

Nfinity shoes, as well as Varsity shoes and Rebel uniforms in the past); Ex. BF, Bray Dep. 40:1-

41:13 (stating that Stars & Stripes All Star cheerleaders used shoes from Nfinity, uniform tops

from Varsity, practice shorts from Nike, and practice tank tops from Custom Ink); Ex. BG, L.

Gurske Dep. 143:4-22 (stating that gym bought uniforms from Varsity but also bought apparel

from other vendors).)

29.     Varsity designed new forms of apparel conducive to the increasing athleticism of

cheerleading.  (Ex. AS, Newby Decl. ¶ 3.)

30.     Among All Star gyms that participated in Varsity competitions during the class

period, ▮ purchased uniforms from Varsity whereas only ▮ purchased shoes.  (ECF No.

382-6 at ¶ 142, Ex. 19.)

31.     According to Plaintiffs, only 30% of Varsity's customers purchase from Varsity

products in each of the categories that Plaintiffs identified in their "Cheer Apparel Market."

(ECF No. 388-3 at ¶ 158, Table 6 (citing a Varsity document stating that "███ of customers purchase products from all six product categories" and calculating that only ███ of Varsity's apparel revenue is from customers who buy from all categories).)

32.    A seller of all products in Plaintiffs' "Cheer Apparel Market" is not able to command higher prices than sellers of individual products in Plaintiffs' "Cheer Apparel Market."

33.    There are numerous other cheer apparel competitors, including Omni, Rebel Athletic, GK Elite, and Nfinity.  (Ex. BH, Sadlow Dep. 40:23-25 ("On the school apparel business, really anyone that sells athletic apparel is a competitor to Varsity Spirit."), 41:5-16 ("There are multiple competitors in the school cheer uniform segment. […] I can't give an exhaustive list, but Omni, GTN, Rebel, GK Elite, Nfinity, Adidas, Under Armour. I'm sure there's a lot others that I can't remember."), 42:10-22 ("Everyone I listed on that other side is also a competitor in All Star, and then they will have other competitors in that business as well.").)

34.    Certain cheer apparel providers do or did provide certain, but not all, products in Plaintiffs' "Cheer Apparel Market."  (*See, e.g.*, ECF No. 388-4 at ¶ 582 ("Nfinity is a cheer apparel company that specializes in shoes."); Ex. BI, Weber Dep. 211:13-18 ("Q: Is that the only vendor that sold merchandise at the All Star World Championship in 2022? A: No. […] Build a Bowtique, like B-O-W.").)

35.    Many major apparel brands, including Adidas, Under Armour, Nike, and Reebok, sell certain products in Plaintiffs' "Cheer Apparel Market" but also sell similar apparel outside of the context of competitive cheer.  (Ex. BH, Sadlow Dep. 40:23-25 ("On the school apparel business, really anyone that sells athletic apparel is a competitor to Varsity Spirit."); 41:5-16 ("There are multiple competitors in the school cheer uniform segment. […] I can't give an exhaustive list, but Omni, GTN, Rebel, GK Elite, Nfinity, Adidas, Under Armour. I'm sure there's

a lot others that I can't remember."), 42:17-22; ("Q: [C]an you think of any additional competitors -- competitors in the All Star apparel business that you didn't list that are related to the school apparel business? A: Yes. Nike, Blue Linen Athletics, Athletica, Reeboks [sic]."), Ex. AK, Heeb Dep. 157:4-13 ("Q: And Adidas and Under Armour are major apparel brands, aren't they? A: They're large general merchandising competitors. Q: And they sell apparel outside of the context of competitive cheer, right? A: Yes."); *id.* at 158:1-9 ("Q: Nike and Reebok, those are major apparel brands, correct? A: Yes.").)

36.     Prior to December 10, 2016, Varsity did not make any acquisition of a cheer apparel supplier that Plaintiffs assert was anticompetitive.

37.     On or after December 10, 2016, Varsity did not make any acquisition of a cheer apparel supplier that Plaintiffs assert was anticompetitive.

38.     Prior to December 10, 2016, Varsity did not make any acquisition that enabled Varsity to charge higher prices for cheer apparel.

39.     On or after December 10, 2016, Varsity did not make any acquisition that enabled Varsity to charge higher prices for cheer apparel.

40.     No Varsity acquisition had any effect on prices for the products in Plaintiffs' "Cheer Apparel Market."

41.     No agreement involving the U.S. All Star Federation ("USASF") had any effect on prices in Plaintiffs' "Cheer Apparel Market."

42.     Cheer apparel is typically sold by sales representatives in one-on-one interactions with customers.  (Ex. BE, Minzghor Dep. Tr. 136:7-16 ("Q: What is the process that Fusion Elite goes through to obtain the uniforms for its cheerleading athletes? How does that process work?

A: Usually contact the company. There's a design process, a prototype process, and then an ordering process. Q: And when you say you contact the company -- A: A sales rep.").)

43.      Varsity and its competitors maintain relationships with gyms and schools to facilitate sales.  (Ex. BJ, Kennedy Dep. 46:17-47:13 ("Q: If Varsity says in promotional materials, Varsity is the respected brand with respect to All Star uniforms, what does that mean? [...] [W]hat is it that renders Varsity respected, in your -- in your view? [...] A: In my view, I would say that it's the relationships between the specialist and the gyms, and the services that they provide."); Ex. BH, Sadlow Dep. 37:10-17, 231:1-232:11.)

44.      There are many channels available to sell cheer apparel, including the Internet. (Ex. AS, Newby Decl. ¶ 4.)

45.      Merchandise sold at cheer competitions are typically souvenirs, not athletic gear for competitions.  (Ex. BK, VAR00009293 at -329; Ex. BL, Hill Dep. 330:5-13; Ex. BG, L. Gurske Dep. 353:17-20.)

46.      Varsity, like its competitors, generally does not allow its apparel competitors to sell apparel at its own competitions.  (Ex. AS, Newby Decl. ¶ 5.)

47.      Competitors of Varsity often sell cheerleading-related items in close proximity to Varsity cheer competitions, such as at pop-up booths immediately outside the venue in which the Varsity cheer competition is being held.  (Ex. BG, Hill Dep. 330:16-331:19.)

48.      Results at Varsity cheer competitions were not affected by the brand of apparel worn.  (*See, e.g.*, Ex. BM, VAR00233675 at -677-712 (demonstrating through detailed collection of materials providing scoring guidance that scores did not depend on which apparel brand cheer participants wore); Ex. BN, VAR00302098 at -098-099 (example scoring sheet showing that

participants were not evaluated based on which apparel brand they wore); Ex. BO,

VAR00147772 at -772-773 (same).

49.    The prices for whatever Varsity "apparel" products that Plaintiffs seek damages in

relation to were not higher than they would have been in the absence of whatever conduct

Plaintiffs assert was anticompetitive.

50.    Dr. Heeb's damages analysis related to apparel was conducted based on prices in

one product: sneakers.  (ECF No. 388-3 at ¶¶ 300, 303; ECF No. 388-4 at ¶ 20.)

51.    Dr. Heeb's damages analysis did not use prices for any other apparel product.

(ECF No. 388-3 at ¶¶ 300, 303; ECF No. 388-4 at ¶ 20.)

## III.    CHEER COMPETITIONS

52.    Prior to December 10, 2016, Varsity did not make any acquisition of a school

cheer event producer (or school cheer event) that Plaintiffs assert was anticompetitive.

53.    On or after December 10, 2016, Varsity did not make any acquisition of a school

cheer event producer or school cheer event.  (ECF No. 388-3 at Table 15 (summarizing

acquisitions of event producers by Varsity, which only included All Star event producers);  Ex.

AK, Heeb Dep. 288:4-10 ("Q. You don't describe any Varsity acquisitions of scholastic event

producers or school cheer event producers in your reports, correct?  A.  That's right.  Q.  And you

acknowledge that no school cheer acquisitions occur during the class period, right?  A.  Not that

I'm aware of, no.").)

54.    On or after December 10, 2016, Varsity did not make any acquisition of a school

cheer event producer (or school cheer event) that Plaintiffs assert was anticompetitive.

55.    Prior to December 10, 2016, Varsity did not make any acquisition of a school

cheer event producer (or school cheer event) that enabled Varsity to charge higher prices for

cheer events.

56.    On or after December 10, 2016, Varsity did not make any acquisitions of a school cheer event producer (or school cheer event) that enabled Varsity to charge higher prices for cheer events.

57.    Prior to December 10, 2016, Varsity did not make any acquisition of a school cheer event producer (or school cheer event) that was anticompetitive.

58.    On or after December 10, 2016, Varsity did not make any acquisitions of a school cheer event producer (or school cheer event) that was anticompetitive.

59.    Varsity did not "counterprogram" (as Plaintiffs' use that term) school events.

60.    When Varsity "counterprogrammed" (as Plaintiffs' use that term) an event, output of opportunities to participate in an All Star cheer competition increased.  (Ex. AK, Heeb Dep. 303:15 ("Customers might benefit from that short-run competition."); Ex. BC, Duhon Dep. 38:13-24 (explaining that Varsity added new events "[t]o give other options to customers in that area"); Ex. BQ, Elza Dep. 185:20-24 ("It was part of our strategy to look across the board and see where successful events were.  If there was an opportunity to put another event in a similar market in the same week, then we did do that.").)

61.    The USASF sanctions events that adhere to its rules and requirements.  (Ex. BK, VAR00009293 at -355, -357 (showing that USASF's "primary focus" is to standardize rules across events and that USASF "credentials coaches, certifies safety judges, sanctions events and maintains safety guidelines…"); Ex. K, Fowlkes Dep. 38:21-40:25.)

62.    USASF had no involvement in school competitions at all.  (Ex. CZ, Newby Dep. 632:5-9 ("Q. And does the USASF have anything to do with those events, either in terms of owning the event or promoting it? A. Nothing at all to do with any school events.");  Ex. BJ, Kennedy Dep. 209:1-9; Ex. AY, Lorenzen Dep. 191:22-202:19.)

63.     There was no agreement between Varsity (or any other Defendant) and USASF that had any anticompetitive effect on school competitions.

64.     The cheer competitions known as "Worlds," "The Summit," and "U.S. Finals " are for All Star teams only.  (Ex. Q, Netz Dep. 62:25-63:21 .)

65.     Scholastic cheer teams may not enter the cheer competitions known as "Worlds," "The Summit," and "U.S. Finals."  (*Id*.)

66.     All Star teams and scholastic teams are not permitted to compete against each other.  (Ex. Q, Netz Dep. 62:7-15 ("Q: [Y]ou agree that All Star and School Cheer teams often attend different competitions; right?  A. I agree.  And at their competitions they compete in different divisions such that All Star Cheer teams and School Cheer teams don't compete against each other; right?  A.  Correct."); Ex. CZ, Newby Dep. 625:12-626:8 ("Q: Well, when -- the competition at NCA event is between school competition teams, correct? A: The NCA High School Championship would only have school teams. [...] Q: So, for example, gym-sponsored teams don't participate in NCAA [sic]? A: To the best of my knowledge, they -- [there] would not have been divisions where they -- they could compete. [...] Q: Okay. And is there -- is there any point in the kind of Varsity world where the NCA school teams compete in competitive cheer with gym-sponsored teams? A: Not to my knowledge.").)

67.     Because All Star teams are not permitted to compete in a scholastic competition, an All Star gym could not substitute a scholastic competition for an All Star competition.  Ex. BG, L. Gurske Dep. 317:22-318:1 ("Q. Okay. Could -- could your All Star cheer team attend sideline cheer competitions if -- A: No. Q: -- they wanted to? A. No."); Ex. Q, Netz Dep. 64:5-7 ("Q: Only School Cheer teams may attend school end-of-season events; right?  A.  Yes."); Ex. BE, Minzghor Dep. 223:11-23 ("Q: So could Fusion's All Star cheer athletes perform their

routines at sideline cheer competitions? A: No."); Ex. BG, L. Gurske Dep. 318:6-15 ("All Star

athletes are not sideline cheerleaders. Q: So because you're not associated with a sports team,

you cannot enter [...] sideline cheer? A. Correct. And our routines are completely different.").)

68.    Because scholastic cheer teams are not permitted to compete in an All Star

competition, a scholastic cheer team could not substitute an All Star competition for a scholastic

competition.  (Ex. CZ, Newby Dep. 625:2-8 ("Q: Okay. And is there -- is there any point in the

kind of Varsity world where the NCA school teams compete in competitive cheer with gym-

sponsored teams? A: Not to my knowledge"); Ex. BG, L. Gurske Dep. 318:6-15 ("All Star

athletes are not sideline cheerleaders. [...] And our routines are completely different."); Ex. BE,

Minzghor Dep. 223:2-23.)

69.    A cheer team literally cannot substitute a scholastic competition for an All Star

competition, or vice versa.  (Ex. BG, L. Gurske Dep. 317:22-318:1 ("Q. Okay. Could -- could

your All Star cheer team attend sideline cheer competitions if -- A: No. Q: -- they wanted to? A.

No."); Ex. Q, Netz Dep. 64:5-7 ("Q: Only School Cheer teams may attend school end-of-season

events; right?  A.  Yes."); Ex. CZ, Newby Dep. 625:2-8 ("Q: Okay. And is there -- is there any

point in the kind of Varsity world where the NCA school teams compete in competitive cheer

with gym-sponsored teams? A: Not to my knowledge"); Ex. BG, L. Gurske Dep. Tr. 318:6-15

("Q: So because you're not associated with a sports team, you cannot enter [...] sideline cheer?

A. Correct."); Ex. BE, Minzghor Dep. 223:2-23.)

70.    School cheer teams are affiliated with a school.  (ECF No. 1 at ¶¶ 48, 52; Ex. Q,

Netz Dep. 60:20-61:2; Ex. BQ, Elza Dep. 59:24-60:2; Ex. BH, Sadlow Dep. 38:5-11, 39:2-10.)

71.     All Star cheer teams are affiliated with a gym.  (ECF No. 1 at ¶¶ 48-49, 51; Ex. Q,
Netz Dep. 60:11-15; Ex. BH, Sadlow Dep. 38:5-11; Ex. BA, Newby Dep. 79:2-25; Kennedy
Dep. 205:10-15.)

72.     All Star cheer teams are not affiliated with schools.  (Ex. BJ, Kennedy Dep.
205:10-15; Ex. BA, Newby Dep. 79:2-25.)

73.     Most school teams confine themselves to traditional sideline cheerleading, and as
such only a small percentage of schools that have cheer teams have attended competitions.  (ECF
No. 382-6 at ¶ 247 (showing that ███████ of schools that attend Varsity camps do not enter any
competitions).)

74.     The goals of scholastic cheerleading are very different from those of All Star
cheerleading.  (Ex. BE, Minzghor Dep. 223:11-23 ("A. The primary -- the primary purpose of the
sideline cheer is to support the -- the athletic team. So a lot of the cheers and stuff that they do on
the sidelines are not what -- what All Stars do."); Ex. BH, Sadlow Dep. 39:2-10 ("School cheer,
because it's associated with school, has other responsibilities or has multiple – multiple activities
that they will provide to the school.").)

75.     All Star competition and scholastic competitions are judged by different
standards.  (Ex. BG, L. Gurske Dep. 318:3-319:4; Ex. BE, Minzghor Dep. 223:2-23.)

76.     All Star competitions and scholastic competitions lead to separate and distinctive
championships.  (Ex. Q, Netz Dep. 62:16-19 ("Q.  And All Star Cheer teams and School Cheer
teams also attend different end-of-season events; right?  A.  Typically, yes."), 62:25-63:21; Ex.
CZ, Newby Dep. 625:12-15; *see also* Ex. BR, VAR00009486 at 88-90 (depicting different
directors for Varsity's School Competitions and All Star competitions); Ex. BS, Berry Dep. 20:7-
13 (listing school national championships).)

13

77.    All Star athletes are trained to a higher level of athleticism that would be dangerous for scholastic cheerleaders to emulate given their lack of training and practice.  (Ex. BG, L. Gurske Dep. 319:16-320:7.)

78.    The vast majority of cheer competition participants attend competitions that are within a few hundred miles of their homes.  (ECF No. 382-6 at ¶¶ 185-98 ("Varsity regular-season competitions typically draw participants from limited geographic regions"), Exs. 32-40 (analyzing Varsity attendance data and demonstrating few teams travel more than a few hundred miles to attend competitions); *see also* ECF No. 388-3 at ¶ 139 ("Travel costs and travel time may be significant factors for determining the relevant antitrust market. […] [Cheer teams] may travel to various parts of the United States to participate in important events, such as the World or the Summit competitions, but would not routinely do so to attend regular season events.").)

79.    An in-season cheer competition that is more than a few hundred miles from cheer teams' members' homes is not a reasonable substitute for one that is within that range. Customers would not travel several hundred miles to avoid a 10% price increase in registration fees (which on average would amount to $5 to $10) in sufficient numbers to discipline such a price increase by a firm closer to the customers.  (ECF No. 382-6 at Exs. 23, 27 (showing that a 10% price increase in Varsity competition registration fees would on average amount to $5 to $10); Ex. BF, Bray Dep. 60:9-24 (stating that Stars & Stripes "tried to compete locally whenever possible" due to travel costs); Ex. BT, Foster Dep. 291:17-292:1 (same); Ex. BU, T. Gurske Dep. 211:12-14 ("Q: But you never traveled across the country as a gym, right? A: Correct."); Ex. BE, Minzghor Dep. 80:6-17 ("Q: Why do you think a parent would want to drive to a competition as opposed to flying? […] Because of the cost of air travel? A: Yes.").)

14

80.     An increase in price of All Star competitions would not lead All Star cheer teams to switch to participating in school competitions.

81.     An increase in price of school competitions would not lead school cheer teams to switch to participating in All Star competitions.

82.     Registration fees for Varsity cheer competitions were not higher than they would have been in the absence of whatever conduct Plaintiffs in this case assert is anticompetitive.

## IV.    VARSITY FAMILY PLAN AND NETWORK AGREEMENTS

83.     Under the VFP, gyms could earn and receive rebates for certain All Star competition registration fees from the just-completed season.  (Ex. AS, Newby Decl. ¶ 9; *see also* Ex. Q, Netz Dep. 266:10-14 ("Q.  And you agree that Varsity's Family Plan provided All Star customers with discounts based on the number of events they attended and the amount they spent on Varsity events; right?  A.  Correct."); Ex. AU, VAR00020214 (2016-2017 flyer); Ex. BW, VAR00185006 (2017-2018 flyer); Ex. BX, VAR00075027 (2018-2019 flyer); Ex. AV, VAR00175267 (2019-2020 flyer).)

84.     The VFP did not provide rebates for purchases of anything other than certain All Star competition registration fees.  (Ex. AS, Newby Decl. ¶ 8; *see also* Ex. Q, Netz Dep. 271:18-273:4 ("Q.  [S]o spending on All Star events is all that counts towards the spending thresholds on this chart; right?  A.  …[Y]es…. Q.  [Y]our statement that apparel purchases count towards the main Varsity Family Plan rebate, meaning the cash rebate, is not right; right?  A.  For the 2016-2017 season."); Ex. CZ, Newby Dep. 632:23-633:3 ("Q.  Are the schools eligible to participate in the Varsity family pan – plan…?  A.  No.  There is no Family Plan for schools"), 633:19-22 ("Q.  So put another way, the Varsity Family Plan rebate are only available to gyms that participate in All Star events; is that fair?  A.  That is fair."); Ex. AK, Heeb Dep. 244:9-22 ("Q.  [S]chools do not participate in the VFP, do they?  A.  That's right.").)

15

85.    The Varsity Family Plan did not provide rebates for apparel purchases or camp registration fees.  (Ex. AS, Newby Decl. ¶ 8; *see also* Ex. Q, Netz Dep. Tr. 271:18-273:4  ("Q. [S]o spending on All Star events is all that counts towards the spending thresholds on this chart; right?  A.  …[Y]es…. Q.  [Y]our statement that apparel purchases count towards the main Varsity Family Plan rebate, meaning the cash rebate, is not right; right?  A.  For the 2016-2017 season.").)

86.    Gyms that were parties to Varsity Network Agreements could earn and receive rebates for certain All Star competition registration fees.  (Ex. AS, Newby Decl. ¶ 16; *see also* Ex. BY, VAR00439301 ██████████████████████████ ██████████████████████████████ ██████████████████████████████ ██████████████████████ Ex. BZ, VAR00439295 (same); Ex. CA, VAR00439312 (same).)

87.    Varsity Network Agreements did not provide rebates for purchases of anything other than certain All Star competition registration fees, including, for example, rebates for apparel purchases or camp registration fees.  (Ex. AK, Heeb Dep. 259:13-16 ("Q.  So at least with respect to the network agreement loyalty program, you recognize that it is only exclusively relating to event fees, correct?  A.  Yes, that's right.").)

88.    To the extent competition attendance was related to the amount of any rebate under the Varsity Family Plan, it was based solely on attendance by a gym at certain Varsity competitions during the immediately concluded season only.  (Ex. AS, Newby Decl. ¶ 9; *see also* Ex. AV, VAR00175267 (instructing that rebates can be claimed "[a]fter your last Varsity Family Plan event for the 2019-2020 competition season.").)

89.     To satisfy the threshold for receiving a particular rebate under the Varsity Family
Plan, a gym was not required to send all of its teams to a particular Varsity competition but
instead could send a single team.  (Ex. AS, Newby Decl. ¶ 10; *see also* Ex. BA, Newby Dep.
252:17-20 ("[G]yms qualify for the Family Plan. Number of event -- of events could have taken,
you know, one team to that, one event to qualify.").)

90.     Gyms typically have multiple All Star cheerleading teams, including as many as
ten or more.  (Ex. AS, Newby Decl. ¶ 7; *see also* Ex. BQ, Elza Dep. 60:11-13 ("Q.  And All Star
gyms have within them different All Star teams; is that right?  A.  That's correct."); ECF No.
382-6 at Ex. 6 (showing that hundreds of gyms field teams at multiple levels).)

91.     It is not unusual for gyms not to send all of their teams to the same competitions
in a given year.  (ECF No. 386-2 at ¶ 93, Ex. 6 ("Most Varsity gym customers who have both L1-
L4 and L5-L7 teams do not send both of those team types to all or most of the Varsity cheer
competitions they attend."); Ex. CB, FUSIONELI000000424 at -424 (explaining that Fusion
Elite gym offers three cheer programs which attend different types and numbers of cheer
competitions).)

92.     To satisfy the threshold for receiving a particular rebate under the Varsity Family
Plan, a gym could send different teams to each competition, thereby having Varsity competitions
constitute just one competition on that particular team's schedule.  (Ex. AS, Newby Decl. ¶ 11;
*see also* Ex. BA, Newby Dep. 252:17-20 ("[G]yms qualify for the Family Plan. Number of event
-- of events could have taken, you know, one team to that, one event to qualify."); Ex. AK, Heeb
Dep. 239:23-240:1 ("Q.  The Varsity Family Plan did not require that customers attend only
Varsity competitions to qualify for rebates, correct?  A.  That's right.").)

93.     A gym with more teams than the threshold for receiving a particular rebate under the Varsity Family Plan could satisfy that threshold without sending certain members of its teams to any Varsity competitions at all.  (Ex. AS, Newby Decl. ¶ 12; *see also* Ex. BA, Newby Dep. 252:17-20 ("[G]yms qualify for the Family Plan. Number of event -- of events could have taken, you know, one team to that, one event to qualify."); Ex. AK, Heeb Dep. 239:23-240:1 ("Q.  The Varsity Family Plan did not require that customers attend only Varsity competitions to qualify for rebates, correct?  A.  That's right.").)

94.     No gym was ever required to commit to participate in the Varsity Family Plan at any time.  (Ex. BQ, Elza Dep. 202:16-203:2 ("Q.  And it's fair to say that gyms did not need to sign a contract with Varsity in order to be a part of the Varsity Family Plan; is that right?  A.  That is correct."), 221:9-15 ("[N]o one was forced to join the Family Plan or the Network.").)

95.     After a given season is over, a gym may, if it chooses, request whatever rebate is available to it under the VFP for that completed season.  (*See e.g.*, Ex. AV, VAR00175267 ("After your last Varsity Family Plan event for the 2019-2020 competition season, fax or email your completed W9 to your Varsity All Star Advisor for processing before the reward request deadline . . .").)

96.     No gym was ever required to attend or pay a registration fee for any future competitions of Varsity or anyone else as a condition of receiving a rebate under the Varsity Family Plan.  (Ex. AS, Newby Decl. ¶ 13; *see also* Ex. AV, VAR00175267 ("After your last Varsity Family Plan event for the 2019-2020 competition season, fax or email your completed W9 to your Varsity All Star Advisor for processing before the reward request deadline . . ."); Ex. BQ, Elza Dep. 202:16-203:2 ("Q.  And it's fair to say that gyms did not need to sign a contract with Varsity in order to be a part of the Varsity Family Plan; is that right?  A.  That is correct.").)

18

97.     Varsity's Network Agreements are endorsement deals that are commonplace in sports.  (Ex. BA, Newby Dep. 287:2-8, 289:2-14 ("…it is kind of like an endorsement deal, you know, Lebron wearing Nike, for example.").)

98.     Although in some cases Varsity's Network Agreements have required exclusivity as to certain Varsity apparel (often uniforms or shoes), they have never required a gym to exclusively use all of the Varsity products that Plaintiffs have included in their "Cheer Apparel" market.  (Ex. AS, Newby Decl. ¶ 14; *see also* Ex. BA, Newby Dep. at 287:9-13 ("For a while, I think, again, it was a handful of customers that were a part of the Network Agreement that included the rebate, but it also included some element of wearing our uniforms and/or shoes.").)

99.     To the extent competition attendance was related to the amount of any rebate under a Varsity Network Agreement, it was attendance by one or more of a gym's teams at certain Varsity competitions during the immediately concluded season only.  (Ex. AS, Newby Decl. ¶ 16; *see also* Ex. BY, VAR00439301 ("Unless otherwise mutually agreed to by the parties by June 1 of each year of this agreement, the event registration fees paid by Member to Varsity for the aforementioned competitions during that year shall be totaled, and Varsity shall issue a rebate to Member in accordance with the following scale . . ."); Ex. BZ, VAR00439295 (same); Ex. CA, VAR00439312 (same).)

100.    To satisfy the threshold for receiving a particular rebate under a Varsity Network Agreement, a gym was not required to send all of its teams to a particular Varsity competition but instead could send a single team.  (Ex. AS, Newby Decl. ¶ 17; *see also, e.g.*, Ex. BY, VAR00439301 ("Member will support Varsity by ensuring that ████████ will attend at least ████ competitions during each competitive season conducted by Varsity All Star brands."); Ex. BZ, VAR00439295 (same for ████████████).)

19

101.    To satisfy the threshold for receiving a particular rebate under a Varsity Network Agreement, a gym could send different teams to each competition, thereby having Varsity competitions constitute just one competition on each particular team's schedule.  (Ex. AS, Newby Decl. ¶ 18; *see also* Ex. CF, LeTard Dep. 211:7 ("[The Varsity Network Agreement] was not exclusive for events.").)

102.    A gym with more teams than the threshold for receiving a particular rebate under a Varsity Network Agreement could satisfy that threshold without sending some of its teams to any Varsity competitions at all.  (*Id*.)

103.    No gym was ever required to commit to participate in a Varsity Network Agreement at any time.  (Ex. BQ, Elza Dep. 221:9-15 ("[N]o one was forced to join the Family Plan or the Network."); Ex. BA, Newby Dep. 251:10-11 ("The Network Agreements were few and far between.").)

104.    Varsity also historically has had Network Agreements with between ▮ and ▮ of its gym customers each season.  (ECF No. 382-6, Ex. 51.)

105.    No gym was ever required to attend or pay a registration fee for any future competitions of Varsity or anyone else as a condition of receiving a rebate under a Varsity Network Agreement.  (Ex. AS, Newby Decl. ¶ 20; *see also, e.g.,* Ex. BY, VAR00439301 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮); Ex. BZ, VAR00439295 (same); Ex. CA, VAR00439312 (same); Ex. CC, VAR00439297 (same); Ex. CD, VAR00439306 (same); Ex. CE, VAR00439309 (same).)

106.    At least certain gyms that chose to avail themselves of the Varsity Family Plan or a Varsity Network Agreements have also attended non-Varsity events during the same season. (*See, e.g.*, Ex. BG, L. Gurske Dep. 73:13-25.)

107.    For the 2013-2014, 2014-2015, and 2015-2016 competition seasons, the minimum number of (certain) Varsity events to which a gym was required to have sent a team in order to receive a rebate under the Varsity Family Plan was four.  (Ex. CG, VAR00322126 (2013-2014); Ex. CH,VAR00325318 (2014-2015); Ex. CI, VAR00233174 at -175 (2015-2016).)

108.    For the 2013-2014, 2014-2015, and 2015-2016 competition seasons, a gym that had sent one or more of its teams to six or more of (certain) Varsity events did not receive any additional rebate as a result of attending additional competitions.  (*Id*.)

109.    For the 2016-2017 and 2017-2018 competition seasons, the minimum number of (certain) Varsity events to which a gym was required to have sent a team in order to receive a rebate under the Varsity Family Plan was five.  (Ex. CJ, VAR00074760 at -761 (2016-2017); Ex. BW, VAR00185006, at -007 (2017-2018).)

110.    For the 2016-2017 and 2017-2018 competition seasons, a gym that had sent one or more of its teams to eight or more of (certain) Varsity events did not receive any additional rebate as a result of attending additional competitions.  (*Id*.)

111.    For the 2018-2019 and 2019-2020 competition seasons, the minimum number of (certain) Varsity events to which a gym was required to have sent a team in order to receive a rebate under the Varsity Family Plan was six.  (Ex. BX, VAR00075027 at -028 (2018-2019); Ex. AV, VAR00175267 at -268 (2019-2020).)

112.    For the 2018-2019 and 2019-2020 competition seasons, a gym that had sent one or more of its teams to nine or more of (certain) Varsity events did not receive any additional rebate as a result of attending additional competitions.  (*Id*.)

113.    The Varsity Family Plan and Network Agreements do not apply to scholastic or school cheer.  (Ex. AS, Newby Decl. ¶ 21; *see also* Ex. Q, Netz Dep. 269:9-17 ("Q.  And schools

21

don't participate in the Varsity Family Plan; right?  A.  Correct.  Q.  And schools don't enter into

Varsity network agreements; right?  A.  Correct.  Q.  Only All Star gyms participate in those two

programs; right?  A.  Correct."); Ex. AK, Heeb Dep. 244:9-19 ("Q.  [S]chools do not participate

in the VFP, do they?  A.  That's right.").)

114.    Varsity has not and does not have a rebate program for scholastic or school cheer.

(Ex. AS, Newby Decl. ¶ 21.)

V.    **USASF**

115.    USASF" was established as a sanctioning organization for All Star cheer in or

around 2004.  (Ex. A, Chadwick Dep. 38:12-14.)

116.    The purpose and goals of USASF include the following: to provide rules for All

Star cheerleading competitions, to strive for a safe environment for All Star athletes, to drive

competitive excellence, and to promote a positive image for the sport of All Star cheer.  (Ex. B,

USASF_00032456 at -456 (Chadwick Dep., Exhibit 4); Ex. C, USASF_00028673 at -679; Ex.

A, Chadwick Dep. 34:8-25 ("At the beginning . . . we were trying to create a uniform set of rules

and a way to make sure people were qualified to do what they were doing such as coaching; to

try and create standards for competitions; to try and create some uniform safety practices for

gyms. . . . A way to pull the industry together to support best practices from rules, from safety,

from all the difference facets that came into the sport.").)

117.    Pursuant to amendments to its bylaws adopted in 2005, USASF's Board of

Directors is made up of representatives of competition event producers ("EPs"), gym

owners/coaches, and the USASF.  (Ex. D, USASF_00032454 at -454, ¶ 1.)

118.    The bylaw amendments adopted in 2005 also dictated that there would be thirteen

voting seats total, made up of seven EP seats filled with representatives named by seven

particular EPs, two representatives named by the Chairman of USASF, and four coaches/gym owners approved by the Board and subject to reelection every two years. (*Id.*, ¶¶ 4, 5, 7, 9.)

119.    In 2006, USASF's Board adopted certain bylaw amendments to protect the voice of non-Varsity members of the organization, including (1) requiring unanimous consent to replace any of the nine permanent USASF Board seats, which included non-Varsity event producers CheerSport and JAM Brands; and (2) requiring unanimous Board approval for any contracts involving Varsity.  (Ex. E, VAR00351488 at -489; Ex. F, USASF_00032439 at -439; Ex. D, USASF_00032454 at -454-455, ¶¶ 13, 14, 16-18; Ex. A, Chadwick Dep. 121:21-122:11.)

120.    USASF's bylaws thereafter remained unchanged through 2022.  (Ex. L, Stangle Decl ¶ 2.)

121.    In or around November 2012, Varsity nominated a non-employee coach to one of its EP seats on USASF's Board.  (Ex. I, Stangle Dep. 86:7-20; Ex. J, Peterson Dep. (Day 1) . 31:18-32:2; Ex. K, Fowlkes Dep. 264:20-265:5; Ex. AQ, USASF_00027831.)  In or around November 2015, Varsity acquired JAM Brands which afforded it the ability to nominate another representative to USASF's Board.  (Ex. G, Seely Dep. (Day 1) . 231:17-19; Ex. H, Webb Dep. (Day 1) 208:5-7.)  However, because Varsity had already allocated one of its EP seats to a coach/gym owner, Varsity has never had seven Varsity-employed representatives in its seven EP seats at any one time.   (*See* Ex. I, Stangle Dep. 86:7-20; Ex. J, Peterson Dep. (Day 1) 31:18-32:2; Ex. K, Fowlkes Dep. 264:20-265:5; Ex. AQ, USASF_00027831.)

122.    In addition, there was never a case where the Varsity representatives voted one way and the rest of the Board voted another.  (Ex. G, Seely Dep. (Day 1)  358:7-359:2.)

123.    USASF has several committees, including a Sanctioning Committee, a Rules Committee, an Athletic Performance Committee, and more.  The Sanctioning Committee has

existed since 2004 and under its current charter since 2013. (Ex. M, USASF_00030535 at -535 (reflecting Board approval of committee charters); Ex. N, USASF_00056250 at -253.)

124.    The Sanctioning Committee develops and maintains: (1) the standards by which competitions qualify for USASF Sanctioning and the process and guidelines governing compliance, and (2) the approval process and criteria for event producer memberships including eligibility to offer bids to compete at Worlds. (Ex. N, USASF_00056250 at -253.)

125.    Throughout its existence, the Sanctioning Committee has been composed of a representative from each EP who is eligible to award fully paid bids to Worlds. (Ex. O, Peterson Dep. (Day 2) 339:22-341:21 (agreeing that "at any point in time only Tier 1 event producers had a voting seat on the sanctioning committee"); Ex. P, USASF_00081398 at -399 (listing as one of the benefits of Tier 1 membership "[h]ave a seat to participate on the USASF Sanctioning Committee").)

126.    Varsity did not own a majority of the EPs with seats on USASF's Sanctioning Committee until it completed its acquisition of JAM Brands in late 2015. (ECF No. 382-3 at p. 96 ("Prior to the JAM Brands acquisition [in 2015], Varsity held 16 of 35 seats on the USASF Sanctioning Committee."); Ex. Q, Netz Dep. 293:5-8.)

127.    Any rule or policy voted on by USASF's Board or Sanctioning Committee prior to late 2015 was approved or disapproved *before* Varsity obtained the majority of seats on the Board or Sanctioning Committee, respectively. (*See* SUF ¶¶ 121, 126; Ex. Q, Netz Dep. 293:9-23, 296:3-25.)

128.    USASF did not participate in any of Varsity's acquisitions. Rather, any acquisitions of EPs that Varsity made were done by Varsity unilaterally. (Ex. L, Stangle Decl. ¶ 3; Ex. Q, Netz. Dep. 315:20-23.)

129.    USASF did not alter any of its rules or policies to assist Varsity in undertaking these acquisitions or to provide Varsity some additional advantage unavailable to other members of USASF.  (Ex. L, Stangle Decl. ¶ 4; Ex. Q, Netz Dep. 310:2-5.)

130.    USASF also hosts an end-of-season cheer competition for the top All Star cheerleading teams called "The Cheerleading Worlds" ("Worlds").  (Ex. A, Chadwick Dep. 53:20-54:6.)

131.    Through its Sanctioning Committee, USASF promulgates criteria for cheer events which can provide athletes with bids to compete at Worlds, which are known as "Worlds Bid Events".  As part of its process for determining which events qualify as Worlds Bid Events, USASF created a tier-system.  (Ex. R, USASF_00027858 at -858; Ex. A, Chadwick Dep. 58:20-60:5, 140:19-141:22; Ex. J, Peterson Dep. (Day 1) 49:6-20.)

132.    USASF's rules regarding how which events that can award bids to Worlds are selected have been in place for many years.  (Ex. A, Chadwick Dep. 58:1-9 ("At some point in time, USF -- USASF introduced a Worlds bid system, correct? A. Yes. Q. Do you recall when that was? A. That was -- the development began at the very first Worlds [...]"); Ex. BQ, Elza Dep. 118:20-119:1 ("Q. And [Worlds bid-giving events are] protected by the USASF rules; is that right? A. They're protected by the bylaws the USASF adopted 20 years or so ago.").)

133.    USASF adopted a tiered membership system for EPs in 2005 "to allow companies to tailor their USASF membership level to both their budgets as well as the value they perceive receiving from the USASF." (Ex. R, USASF_00027858 at -858.)

134.    At the inception of the tiered membership system, EPs who met the criteria for Tier 1 were permitted to offer "fully paid bids" to Worlds, while EPs who met the criteria for Tier 2 were permitted to offer "partially paid bids" to Worlds.  (Ex. R, USASF_00027858 at -859.)

135.    As the sport of All Star cheerleading grew, the number of event producers who qualified to offer Worlds Bid Events increased.  (Ex. A, Chadwick Dep. 60:6-22.)  By no later than 2012, USASF had adopted a rule limiting the number of Worlds Bid Events to 42, in an effort to ensure that there was an appropriate number of Worlds bids in relation to Worlds bid-eligible teams.  (Ex. J, Peterson Dep. (Day 1) 55:10-56:1 ("We keep a control on the number of bids that are eligible to be awarded versus the number of Level 6 and 7 teams in the country."), 56:12-57:1 ("if there were more bids [than eligible teams", you know, it just -- it loses its credibility"), 57:7-24, 65:20-66:4 ("At some point, the Sanctioning Committee felt as if 42 would be the . . . maximum number of events . . . based of the number of bids being awarded and the number of teams eligible to be awarded bids."); Ex. S, VAR00319008 at -008 ("For the 2012-2023 season, the USASF will not sanction more than 42 Cheerleading Worlds qualifying events in the US."), -010 ("The goal for Worlds bids is to be sufficiently flexible to ensure participation by as many event producers as possible while still protecting the value of Worlds bids by not giving so many that they lose meaning.").  In connection with this limitation, USASF outlined in its "Approval Process & Criteria for Tier 1 and Tier 2 Event Producers and Worlds Bid Eligibility" ("Worlds Bid Criteria") that, where there were more than 42 events that satisfied the other criteria to offer Worlds Bids, "[p]riority" would be given "to event producers based on their seniority as USASF members," in an effort to "recognize the contribution made by early USASF supporters whose financial support made the Worlds possible initially." (Ex. S, VAR00319008 at -008, -010).  USASF sought to incentivize EPs to maintain their membership with USASF by prioritizing the EPs who had financially supported USASF by awarding paid bids to Worlds (of up to $25,000 per bid) for a longer duration.  (Ex. J, Peterson Dep. (Day 1) 135:4-136:9; Ex. T, USASF_00030547 at -547; Ex. A, Chadwick Dep. 175:1-15.)

136.    This priority approach is consistent with the early policies of USASF to incentivize EP membership and support for the organization.  (Ex. U,  USASF_00032433 at -433 ("Unanimous vote in favor of policy that if a member company leaves the USASF, then this company is precluded from re-applying for membership of one year from the time they leave the federation.  This will help to reduce the 'yo-yo' effect of applying for membership when most advantageous for a company.").)

137.    In addition, by no later than 2012, USASF's Worlds Bid Criteria specified in "Guideline 3.B" that "Tier 1 and Tier 2 events will be protected, within a four week window, either side of the current bid giving event for a 200 mile radius" and "protected for a 500 mile radius from other bid giving events on the same weekend."  (Ex. S, VAR00319008 at -009; *see also* Ex. AR, USASF_00090186 at -186 (discussing date/mileage limitation in 2010).)

138.    Date and proximity limitations exist in other sports, and can serve legitimate, pro-competitive purposes such as spreading out events over time and throughout the country and maximizing participation and audience to the benefit of a sport as a whole.  (ECF No. 382-3 at p. 79; Ex. Q, Netz Dep. 328:3-329:9.)  Plaintiffs' expert, Janet Netz, conceded that Guideline 3.B can have pro-competitive effects.  (Ex. Q, Netz Dep. 329:4-9.)

139.    In 2008, USASF adopted, *inter alia*, the following change to the Tier 1 and 2 requirements:

> Tier 1 requirements for current Tier 1 members (those approved in 2007-08 or earlier) are reduced from 125 to 100 all star cheer teams.  All new Tier 1 applicants must meet the 125 all star team standard.  Tier 2 requirements for current Tier 2 members (those approved in 2007-08 or earlier) are reduced from 100 to 75 all star cheer teams.  All new Tier 2 applicants must meet the 100 all star team standard.

(Ex. T, USASF_00030547 at -547.)

27

140.    In August 2014, USASF's Sanctioning Committee approved the proposal that "Beginning with the 2016-17 approval process, all members applying for Tier 1 status must have 125 cheer teams at the previous year's event." (Ex. V, USASF_00055929 at -930.)  This effectively eliminated the exception for Tier 1 members approved in 2007-08 or earlier.  (*Id.*) USASF did, however, relax this standard slightly by allowing "prep" teams to count toward the 125-team minimum.  (Ex. W, USASF_00026548 at -548.)  Also in 2014, USASF eliminated Tier 2 for cheerleading EPs.  (Ex. X, USASF_00085198, at -198.)  This decision was not fully supported by Varsity.  (*Id.*)  As USASF explained in its "General Membership Guidelines": "HEADS UP: New…in the 2016 – 2017, all event producers applying to award 2017 Cheerleading Worlds Bids will only be approved as a Tier 1 who must have a minimum of 125 All Star 'cheer' teams participating at the same prior year's competition to qualify for this tier. Tier 2 will no longer be a USASF Membership Tier Level starting in 2016 – 2017 and Partial Paid Bids will no longer be awarded."  (Ex. Y, VAR00348574 at -595.)

141.    Despite these changes announced in 2014 and 2015 regarding Tier 2 and the 125-team minimum, very few USASF EPs were affected.  (Ex. J, Peterson Dep. (Day 1) 52:14-53:12.)  Only two event producers lost their Worlds Bid Events between the 2015-2016 and 2019-2020 All Star seasons: one of which was owned by a Varsity brand EP and one of which was not.  (ECF No. 384, Orszag Report ¶ 73 & nn.140-143; Ex. Z, Orszag Backup Materials; Ex. AA, USASF_00019474 at -474; Ex. AB, USASF_00019528 at -528; Ex. AC, USASF_00020057 at -057).  These two event producers were replaced by the next-qualifying events, one of which was owned by a Varsity brand EP and one of which was not.  (ECF No. 384, Orszag Report ¶ 73 & nn.140-143; Ex. Z, Orszag Backup Materials.)  In other words, when these rule changes went into effect, Varsity lost one Worlds Bid Event and gained one Worlds Bid Event, and a non-

28

Varsity EP lost one Worlds Bid Event and a different non-Varsity event producer gained one

Worlds Bid Event.  (*Id.*).

142.    None of the events identified by Plaintiffs' experts that were allegedly victimized

by "attack events" lost their ability to award Worlds Bids.  (ECF No. 384, Orszag Report, ¶ 73-

74, 80 ("[T]he empirical evidence shows that USASF, on balance, did not have any incremental

effect on Varsity's control of Worlds Bid events."); Ex. Z, Orszag Backup Materials; Collective

Ex. AD, USASF_00086125, USASF_00002776, USASF_00002779, USASF_00002782,

USASF_00002785; ECF 382-3 at pp. 73-78 (summarizing Plaintiffs' evidence of alleged

"counterprogramming".)

143.    There is no evidence that USASF ever deviated from its Worlds Bid Criteria to

benefit Varsity.  In fact, the only instance where USASF deviated from its Worlds Bid Criteria

was in 2020 and was to the detriment of Varsity.  In that instance, two non-Varsity EPs who had

been on probation failed to satisfy the 125-team minimum and should have lost their Worlds Bid

Events for the following season.  Instead, USASF granted an exception and permitted them to

maintain their Worlds Bid Events.  In addition, instead of merely approving the two Varsity-

owned events that had next-priority to replace these two non-Varsity events, USASF made

*another* exception to its Worlds Bid Event process to permit two *more* non-Varsity EPs to hold

Worlds Bid Events, bringing the number of Worlds Bid Events to 46 for the 2020-2021 season.

(ECF No. 384, Orszag Report ¶ 80 n.157; Ex. AE, USASF_00012988; Ex. J, Peterson Dep. (Day

1) 261:9-262:24.)

144.    The Worlds Bid Guidelines set forth the criteria for roughly 42-46 Worlds Bid

Events, which represents a small fraction of the "hundreds" of All Star cheerleading events.  (Ex.

A, Chadwick Dep. 286:6-7; Ex. AF, VAR00421095 at -095 (reflecting there were 668 USASF-

sanctioned events in the 2015-2016 season).)  They had nothing to do with any other cheerleading event.  (Ex. O, Peterson Dep. (Day 2) 539:2-25.)

145.    There is no evidence that USASF participated in any conversations with Varsity regarding setting prices for registration or spectator fees for Varsity's cheerleading competitions. (Ex. Q, Netz Dep. 315:24-316:5; Ex. L, Stangle Decl. ¶ 5.)

146.    USASF is not a cheer apparel manufacturer, distributor, or retailer.  (Ex. L, Stangle Decl. ¶ 6.)

147.    In 2012, USASF first adopted its "Image Policy" (now known as the Athletic Performance Standards) to set out general rules and guidelines regarding athlete appearance at USASF-sanctioned competitions.  (*See* Ex. AG, USASF_00088638 at -639; Ex. AH, USASF_00088659.)

148.    This policy was developed through a collaborative process involving USASF's members, including cheerleading uniform companies other than Varsity. (Ex. V, USASF_00055929 at -930 ("[T]here was a meeting of affiliate member uniform companies in March [2014] to review the policy."); Ex. A, Chadwick Dep. 450:18-451:18 ("The major players, in my mind, from the uniform was Rebel Athletic, and they were involved from the very beginning."); Ex. AI, Wright Dep. 32:6-17 (recalling that Motionwear, Rebel Athletic, GK Elite, and Glitter Stars were involved in discussions).)

149.    USASF's Image Policy does not require athletes to wear apparel manufactured or sold by any particular company.  (Ex. AH, USASF_00088659.)

150.    The purpose behind the coverage guidelines was to help legitimatize the sport and protect against athlete exploitation. (Ex. AJ, USASF_00022109; Ex. AI, Wright Dep. 32:25-33:25)

151.    The main guideline impacting apparel set to go into effect for the 2012-2013
season was the "Cover Up Guidelines," which stated that "Athletes with non-full top uniforms
must wear a t-shirt or other suitable cover up over their uniforms unless they are in the warm-up
area, traveling as a group directly to or from the warm up area, or on the performance stage."
(Ex. AH, USASF_00088659 at -660-661.)  This guideline only impacted athletes with "non-full
top uniforms" and could be satisfied by wearing "a t-shirt or other suitable cover up" (of any
brand) when outside the performance area or warm-up areas.  (*Id.*; *see also* Ex. A, Chadwick
Dep. 448:16-19 ("You know, changing the appearance could be as easy as the athlete putting on a
T-shirt or something like that.  It didn't necessarily require an entire new uniform.").)

152.    The Image Policy announced in 2012 also included a bow guideline set to go into
effect the 2013-2014 season, which limited the size of bows cheerleaders could wear while
performing.  (Ex. AH, USASF_00088659 at -660-661.)  This guideline could be satisfied by
wearing a bow of a smaller size, from any apparel manufacturer or bow company, or by wearing
no bow at all.  (*Id.*)

153.    The Image Policy announced in 2012 also included an "Appropriate Uniform"
section, which was not scheduled to go into effect until the 2015-2016 season, well over three
years after it was announced.  (Ex. AH, USASF_00088659 at -660-661.)  This section provided
as follows:

GENERAL UNIFORM GUIDELINES
No risqué, sexually provocative or lingerie looking or inspired uniform or garments allowed. All uniform pieces
should adequately cover an athlete and must be secured to eliminate any possible wardrobe malfunction.
Appropriate undergarments must be worn.

In addition to the below specific guidelines, athletes must also consider that a combination of uniform pieces may
also deem a uniform appropriate or inappropriate. ALL garments must properly cover the athlete and the athlete's
undergarments during the routine.

UNIFORM SKIRT/SHORTS GUIDELINES
When a skirt is worn as part of the uniform, briefs under the skirt are required. The skirt must fully cover the hips.
The skirt must completely cover the briefs and must fall at least 1 inch below briefs (regular and boy cut briefs).
When shorts are worn as part of the uniform, there must be a minimum of a 2" inseam.

UNIFORM TOP GUIDELINES
Uniform tops may not include an exposed midriff (crop top) except when worn by athletes competing in Senior
divisions.  Uniform tops must be secured by straps or material over at least one shoulder or around the neck (tube
tops are not allowed).

31

(*Id.*)  This policy could be satisfied by any brand of uniform, so long as it was not "sexually provocative" and provided age-appropriate coverage.  (*Id.*; *see also* Ex. Q, Netz Dep. 329:25-330:18 (agreeing that USASF's Image Policy could be satisfied by manufacturers other than Varsity).)

154.    In announcing the "Appropriate Uniform" policy several years before it was to go into effect, USASF considered the purchase cycle for uniforms and recognized that teams buy uniforms for use over multiple years.  (Ex. A, Chadwick Dep. 447:14-448:1.)

155.    USASF's Image Policy does not present a barrier to entry for apparel manufacturers.  (Ex. Q, Netz Dep. 330:22-25.)

156.    USASF's Image Policy only applies to USASF-sanctioned events.  It has no application to school cheer events, non-USASF All Star Cheer events, camps, or practices.  (Ex. L, Stangle Decl. ¶ 7; *see also* SUF ¶ 41.)

157.    USASF's role as a sanctioning organization is limited to the sport of All Star cheer.  (Ex. AK, Heeb Dep. 290:8-11.)

158.    USASF's members include All Star cheer athletes, coaches, gym owners, and event producers.  (Ex. AL, Clark Dep. 27:1-28:16; Ex. AM, Wilson Dep. 44:2-11.)

159.    USASF's rules and policies do not apply to School Cheer, nor do they apply to camps.  (Ex. A, Chadwick Dep. 40:1-4; Ex. L, Stangle Decl. ¶ 8; Ex. CZ, Newby Dep. 632:5-9 (Q. And does the USASF have anything to do with those events, either in terms of owning the event or promoting it? A. Nothing at all to do with any school events.");  Ex. BJ, Kennedy Dep. 209:1-9 ("Q. Do school cheerleaders' uniforms have to comply with USASF's rules? A. Not with the USASF. Q. Do school cheerleaders routines have to comply with USASF's rules? A. Not with the USASF. Q. So school cheer and All Star cheer are not the same thing. Right? A. In my

opinion, no."); Ex. AY, Lorenzen Dep. 191:22-202:19 (explaining that Plaintiff Lorenzen's

daughter was not a USASF member, and Ms. Lornzen has not paid money to USASF).)

160.    Plaintiffs have no evidence that the alleged conduct by USASF caused any impact

on pricing in any of the proposed markets.  (Ex. AK, Heeb Dep. 302:6-9 (acknowledging that he

did not attempt to isolate what "price effects" he found "resulted from the alleged conspiracy

with USASF as opposed to the other challenged conduct."); *see also* SUF ¶ 63.)

161.    Plaintiffs have no evidence that USASF had the specific intent that Varsity

monopolize the proposed markets.  For example, USASF was financially independent from

Varsity during this time period.  (Ex. AO, USASF_00023946 at -948 ("USASF has repaid the

full balance of the start up loan to Varsity . . . and has enough working capital to remain

financially independent moving forward."); Ex. AP, USASF_00051791 at -793 ("[T]he

organization was able to make significant strides toward funding [an operating] reserve in 2014,

with goal of fully funding the reserve in 2015."), -794 (USASF's "move [to new office space]

was complete in February, 2015").)  There is no evidence that USASF, as an organization, had

anything to gain as a result of the alleged monopolization and supracompetitive pricing.

## VI.    JEFF WEBB

162.    Jeff Webb founded Varsity in 1974. (Compl. ¶ 70; Ex. CR, Webb Decl. ¶ 3.)

163.    Through Varsity, Jeff Webb introduced innovations to cheerleading, including a

focus on athleticism and dedicated cheer competitions.  (Compl. ¶ 79.)

164.    Millions of athletes participate in cheerleading.  (Compl. ¶ 44.)

165.    With some variations of his specific title, Jeff Webb was Varsity's CEO from 1974

until March 2016.  (Ex. CR, Webb Decl. ¶ 3.)

166.    In December 2015, the Varsity Brands, LLC Board of Directors decided to replace Jeff Webb as CEO of Varsity Brands.  (Ex. CP, Beer Dep. 98:17-101:4.; Ex. CU, Janower Dep. 38:20-39:16.)

167.    Effective March 2, 2016, Jeff Webb was replaced as CEO, and was subsequently given the title of Founder and Chairman of the Board of Varsity Brands.  (Ex. CR, Webb Decl. ¶ 4.)

168.    After March 2, 2016, Jeff Webb was not a member of Varsity's Executive Leadership Team.  (Ex. CU, Janower Dep. 118:15-119:20; Ex. CV, CB00314261 (Janower Ex. 16).)

169.    After March 2, 2016, Jeff Webb was not a member of Varsity's Senior Leadership Team.  (Ex. CU, Janower Dep. 118:15-119:20; Ex. CV, CB00314261 (Janower. Ex. 16).)

170.    After March 2, 2016, Jeff Webb was not a member of Varsity's Corporate Support Group.  (Ex. CX, CB00373462 (Kalvelage Ex. 5 at -498); Ex. CQ, Kalvelage Dep. 104:1-13.)

171.    After March 2, 2016, Jeff Webb did not possess operational authority at Varsity and he was not involved in Varsity's day-to-day business.  (Ex. DH, Webb Dep. (Day 2) 260:15–261:22 (stating he "did not have actual operational authority but, you know, overall input, mostly communications . . ."), 271:21-273:11 ("once I moved from chairman and CEO to just chairman during early 2016, again, I didn't have, like, this operational authority, and I wasn't involved in, you know, making all these personnel decisions and all the strategic decisions . . ."); Ex. CZ, Newby Dep. 652:14-653:1 (Q: "From your vantage point, how did you view Mr. Webb's role while he was chairman of the Board?  A:  "I would say more like an advisor . . ." Q: "Was [Webb] involved in day-to-day operation decisions, as far as you could tell?" A: "As far as I could tell, no.").)

34

172.    After March 2, 2016, Jeff Webb was not "still driving the business" for Varsity, but was in a support role for other executives.  (Ex. CU, Janower Dep. 121:11-123:3; Ex. CW, CB00114878 (Janower Dep. Ex. 18) at -878 (reflecting Jeff Webb's roles projected to be continued support to Mr. Seely, supporting Project Impact, and providing advice "as requested by Seely and Nichols.")).)

173.    After March 2, 2016, Jeff Webb operated as an advisor for Varsity and provided input to the company, primarily with respect to Varsity's communications efforts.  (Ex. DH, Webb Dep. (Day 2) 260:15-261:22, 271:21-273:11; Ex. CZ, Newby Dep. 652:14-23; Ex. DG, Seely Dep. 572:12-13, 573:12-22) (explaining that Jeff Webb "was just an advisor" in 2017).)

174.    After Jeff Webb was no longer CEO of Varsity he acted as "the face of the company," conducting "a lot of the media interviews."  (Ex. DH, Webb Dep. (Day 2) 190:16-191:5,  271:24-273:11.)

175.    After March 2, 2016, Jeff Webb remained available to provide "guidance" and "perspective" to the Varsity Spirit team, including advice on strategy, branding, positioning, and culture.  (Ex. DH, Webb Dep. (Day 2) 271:21-273:11.)

176.    After Jeff Webb was no longer CEO, responsibility for day-to-day operations of Varsity Spirit fell to two other individuals—John Nichols and, later, Bill Seely.  (Ex. DA, Nichols Dep. 25:19-26:5 (serving as executive vice president July 2013 – October 2017, with responsibility for "overall operations and results of Varsity Spirit"); Ex. G, Seely Dep. 42:17-43:1 (serving as president of Varsity Spirit from September 2017 with responsibility to "overs[ee] Varsity's day-to-day business").)

177.    After March 2, 2016, neither John Nichols nor Bill Seely reported to Jeff Webb. (Ex. DA, Nichols Dep. 27:2–28:8; Ex. G, Seely Dep. 43:2–7.)

178.    In July 2018, funds advised by Bain Capital acquired a majority interest in Varsity Brands. (Ex. DC, O'Rourke Dep. 17:1-23; Ex. CM, Cotton Dep. 55:22-56:4.)

179.    After the Bain transaction in 2018, Jeff Webb was no longer a member of Varsity's Board of Directors.  (Ex. DC, O'Rourke Dep. 64:10-13; Ex. CR, Webb Decl. at ¶ 10.)

180.    After July 2018, Jeff Webb held the title of Chairman of Varsity Spirit, a title that was effectively "meaningless."  (Ex. CR, Webb Decl. at ¶ 10; Ex. DC, O'Rourke Dep. 68:4-70:8; Ex. DD, BAIN00062831 (O'Rourke Ex. 9 at -834.).

181.    After July 2018, Jeff Webb remained focused on international cheer, worked at camps, and acted in an advisory role to the president of Varsity Spirit.  (Ex. DE, BAIN00013400 (O'Rourke Ex. 8 at -400.)

182.    After July 2018, Jeff Webb was viewed as Varsity's "culture keeper and inspiration, not perceived as [an] operator" at Varsity.  (Ex. DF, BAIN00074357 (O'Rourke Ex. 22) at -357; Ex. DC, O'Rourke Dep. at 122:12-124:10, 125:8-24.)

183.    Jeff Webb is the president of the International Cheer Union ("ICU"), a non-profit organization, and has held the position for approximately one decade.  (Ex. CR, Webb Decl. ¶ 11; Ex. DH, Webb Dep. (Day 2) 13:8-25.)

184.    The ICU cheerleading's international governing body, and is recognized as such by the International Olympic Committee ("IOC").  (Ex. CR, Webb Decl. ¶ 11.)

185.    After Jeff Webb left his role as Varsity's CEO, he remained the president of the ICU, and continued to focus on the growth of cheerleading internationally, and gaining recognition by the IOC.  (Ex. CR, Webb Decl. ¶ 5; Ex. DH, Webb Dep. (Day 2) 260:15-264:10; Ex. DB, Noone Dep. (Day 2) 330:13-24.)

186.    Effective December 31, 2020, Jeff Webb's employment with Varsity ended.  (Ex. CR, Webb Decl. ¶ 10.)

187.    Jeff Webb remains the president of the ICU.  (Ex. CR, Webb Decl. ¶ 11.)

188.    After March 2016, Jeff Webb had limited involvement with Varsity's acquisitions. (Ex. CR, Webb Decl. ¶ 6.)

189.    After March 2, 2016, Jeff Webb did not identify event producers as potential targets for acquisitions.  (Ex. CR, Webb Decl. ¶ 6.)

190.    After March 2, 2016, Jeff Webb did not negotiate acquisitions.  (Ex. CR, Webb Decl. ¶ 6.)

191.    After March 2, 2016, Jeff Webb did not direct Varsity employees to pursue acquisitions or decline to pursue acquisitions.  (Ex. CR, Webb Decl. ¶ 6.)

192.    After March 2, 2016, Jeff Webb was "not in . . . a position of authority to approve anything or . . . to make any operational decisions at all" and he would not "be authorizing any acquisition or declining any acquisition."  (Ex. DH, Webb Dep. (Day 2) 217:14-218:18.)

193.    After March 2, 2016, while Jeff Webb was Chairman of the Board for Varsity Brands, his authority over acquisitions was limited to that of a single board member.  (Ex. CQ, Kalvelage Dep 207:24-209:7, 210:2-5.)

194.    The only acquisitions that required board approval were those with a purchase price above ███████ .  (Ex. CQ, Kalvelage Dep. 209:19-210:1.)

195.    After he was no longer CEO, but while Jeff Webb was Chairman of the Board for Varsity Brands, he possessed just one vote, like any other board member and had no veto power. (Ex. CQ, Kalvelage Dep. 209:4-12.)

196.     From November 2017 until Jeff Webb's employment at Varsity ended, it was extremely rare for Jeff Webb to meet with Varsity Spirit's Chief Financial Officer, Pash Nangia. (Ex. CY, Nangia Dep. 18:1-7, 21:7-17)  ("There was no need for me as the CFO of Varsity Spirit to meet with Mr. [Webb] at a professional level.")  Any direct communications with Jeff Webb were "absolutely casual" such as exchanging morning greetings.  (*Id*. at 21:14-17.)

197.     Jeff Webb did not participate in the creation of Varsity's rebate programs—the Varsity Family Plan or the Network Agreements.  (Ex. DH, Webb Dep. (Day 2) 134:15-24.).

198.     When Jeff Webb was Varsity's CEO, he was not regularly consulted regarding Varsity's rebate programs.  (Ex. CZ, Newby Dep 389:1-13.) ("I don't recall speaking to Mr. Webb about proposed changes to the Family [P]lan . . . I wouldn't say 'regularly consulted.'")

199.     Jeff Webb is "very vaguely" familiar with Varsity's network agreements.  (Ex. DH, Webb Dep. (Day 2) 135:2-12.)

200.     Jeff Webb was not involved in decisions regarding the number of events that a particular All Star gym must attend to participate in the Varsity Family Plan.  (Ex. DH, Webb Dep. (Day 2) 160:21-161:7; Ex. CR, Webb Decl. at ¶ 7.)

201.     Jeff Webb was not involved in determining the benefits received by the gyms under the Varsity Family Plan.  (Ex. CR, Webb Decl. at ¶ 7; Ex. DH, Webb Dep. (Day 2) 161:8-162:20.)

202.     After he was no longer Varsity's CEO, Jeff Webb was not involved in the Varsity Family Plan or Network Agreements.  (Ex. CR, Webb Decl. ¶ 7; Ex. DH, Webb Dep. (Day 2) 166:15-167:25 ("I wasn't in a position of authority at this point.").)

203.     Jeff Webb has no knowledge of whether Varsity maintained a list of competitors' events.  (Ex. DH, Webb Dep. (Day 2) 239:11-13.)

204.    Jeff Webb is not aware of any strategy by Varsity to target competitors' events by placing Varsity events near the dates and locations of competitors' events.  Specifically, Jeff Webb is not aware of any policy or practice by Varsity of attacking competitors' events, or any practice referred to as "attack events."  (Ex. DH, Webb Dep. (Day 2) 236:20-237:14, 243:7-24.)

205.    Nobody ever sought Jeff Webb's recommendation about a practice of attempting to attract customers away from competitors' events to Varsity events by scheduling Varsity events close to those of Varsity's competitors.  (Ex. DH, Webb Dep. (Day 2) 238:2-238:22.)

206.    After Jeff Webb was no longer CEO, he was not involved in, and did not have any control or decisions-making authority with respect to, selecting locations or dates for Varsity's cheer competitions.  (Ex. CR, Webb Decl. ¶ 8.)

207.    After Jeff Webb was no longer CEO, he did not have any control or decision-making authority with respect to whether any Varsity-produced cheer competitions awarded bids for the Summit, or any other Varsity cheer competition, end-of-season or otherwise.  (Ex. CR, Webb Decl. ¶ 8.)

208.    Jeff Webb has never been a member of USASF's Board of Directors or USASF's Sanctioning Committee.  (Ex. CR, Webb Decl. ¶ 9; Chadwick Dep. 385:16-386:11.)

209.    Jeff Webb has never had authority over USASF's selection of events that can award bids to USASF's The Cheerleading Worlds ("Worlds").  (Ex. CR, Webb Decl. ¶ 9.)

210.    Certain Varsity employees emailed Jeff Webb with proposals to change USASF's allocation of Worlds' bids, but those proposals were not implemented.  (Ex. CF, LeTard Dep. 350:6-352:20.) (explaining that Mr. LeTard proposed a change to Jeff Webb, but it "never went to execution . . . it was just a brainstorm concept, idea.")

211.    Jeff Webb never directed any Varsity employee or USASF employee or director to effectuate a change in USASF's criteria for selecting events that can award bids to Worlds.  (Ex. CR, Webb Decl. ¶ 9.)

212.    Jeff Webb did not express opposition to non-Varsity event producers having the ability to award bids to Worlds.  (Ex. CS, USASF_00039789 (Chadwick Ex. 56 -789); Ex. A, Chadwick Dep. 485:22-486:14 (explaining that Jeff Webb expressed that he was "fine with adding 2 or 3 [non-Varsity] event producers to the 42 approved Worlds bid givers.").)

213.    USASF President Jim Chadwick occasionally sought advice from Jeff Webb because he viewed Jeff Webb as an expert and leader in competitive cheerleading.  (Ex. A, Chadwick Dep. 386:12-25 (describing Jeff Webb as "very knowledgeable, a great advisor, seemed to be able to provide me insights that I was not able to – reach on my own."), 390:2-16 (seeking advice because "Jeff Webb is an expert at creating cheerleading competitions.").)

214.    USASF President Jim Chadwick was free to accept or disregard Jeff Webb's advice.  (Ex. A, Chadwick Dep. 492:15-493:12 (Q: "So as USASF president, you felt free to reject the requests from Jeff Webb?" A: "Yes.").)

215.    Jeff Webb never told USASF President Jim Chadwick that the USASF needed to take action for Varsity's financial benefit.  (Ex. A, Chadwick Dep. 493:3-7.)

216.    The ICU hosts its own World Championship at Disney World, typically on back-to-back weekends with USASF's Worlds.  (Ex. A, Chadwick Dep. 484:12-23.)

217.    USASF's Worlds' inclusion of international teams, and the fact that the ICU hosts a World Championship at the same location and back-to-back with USASF's Worlds were both reasons that USASF would communicate with Jeff Webb regarding issues relating to Worlds.  (Ex. A, Chadwick Dep. 481:20-482:15, 483:14-485:10.)

218.    USASF sought Jeff Webb's input, as ICU president, regarding "USASF efforts to grow the sport and to coordinate with Olympic direction."  (Ex. CT, USASF_00107876 (Chadwick Ex. 68 -878); Ex. A, Chadwick Dep. 490:9-492:10.)

## VII.    BAIN

219.    No Bain-affiliated individual was on the board of managers of BCPE Hercules GP, LLC until July 30, 2018.  No Bain-affiliated individual has ever served on the boards of the Varsity Defendants.  No Bain-affiliated individual has ever served as an officer of the Varsity Defendants.  (Ex. CM, Cotton Decl. ¶ 6-8; *see also* Ex. CK, BAIN00067980, -983 (providing that Josh Bekenstein, Ryan Cotton, Kim McCaslin, and Tom O'Rourke would become members of the BCPE Hercules GP, LLC Board of Managers on July 30, 2018); Ex. CL, Cotton Dep. 15:5-6.)

220.    Bain has never conducted a cheer competition or a cheer camp or sold cheer apparel.  (Ex. CM, Cotton Decl. ¶ 9.)

221.    No Bain officer or Bain-affiliated individual, including the Bain officers who served on the board of the Holding Company, had any direct involvement in any of the conduct that Plaintiffs label anticompetitive.

222.    Bain had no involvement with USASF.  (Ex. CL, Cotton Dep. 123:24-124:9 ("Q. And have you had any involvement in decisions related to the USASF? A. I have not. Q. And do you know if anyone else at Bain Capital has had involvement in decisions related to the USASF? A. I don't believe that we have.").)

223.    Bain and its individual affiliates were not involved in setting the terms of the Varsity Family Plan or negotiating Varsity Network Agreements.  (Ex. CM, Cotton Decl. ¶ 10; *see also* Ex. CL, Cotton Dep. 123:12-23 ("Q. Are you familiar with rebate or discount programs offered by Varsity Spirit to All Star Cheer or school cheer teams? A. I think some version of that

41

has been mentioned conceptually once or twice, but I'm very far from the details. Q. Do you

know if anyone else at Bain Capital may have had more involvement in those discount

programs? A. I would imagine not. We tend not to involve ourselves in line pricing decisions.").)

224.    Bain and its individual affiliates had no involvement with Varsity's Squad

Credentialing Program.  (Ex. CM, Cotton Decl. ¶ 11.)

225.    Bain and its individual affiliates had no involvement with the scheduling of

Varsity's cheer competitions.  (Ex. CM, Cotton Decl. ¶ 12.)

226.    Bain did not provide funding for any acquisition by Varsity relating to

cheerleading.  (Ex. CM, Cotton Decl. ¶ 13; *see also* Ex. CL, Cotton Dep. 30:15-31:3  ("Q. Would

Bain Capital also provide capital for acquisitions, if necessary? A. We surely provide advice on

the best way to obtain that capital. It is not always the case that our own money is the most

efficient means of financing things like that. And so I think part of the strategic value we add is

access to deep and wide capital markets that allow us to steer the company to the best possible,

lowest cost capital solution, whatever that may be at the moment."); *id.* at 122:17-123:7.)

227.    Bain has never owned, directly or indirectly, the Varsity Defendants. (Ex. CM,

Cotton Decl. ¶ 5.)

228.    In connection with his or her involvement with Varsity, no employee of Bain did

anything that was plainly contrary to the interests of Varsity yet nonetheless advantageous to

Bain.

229.    On July 30, 2018, BCPE Hercules Holdings, LP (the "Holding Company"), an

entity owned by certain Bain-advised funds, indirectly acquired the Varsity entities that are

Defendants in this litigation.  The entities between the Holding Company and the highest-level

Varsity Defendant are called BCPE Hercules VB Topco, Inc.; BCPE Hercules VB Intermediate

Holdings, Inc.; BCPE Hercules VB Holdings, Inc.; Hercules VB Holdings, Inc.; and Varsity

Brands Holding Co., Inc.  (Ex. CM, Cotton Decl. ¶¶ 3, 4.)

      230.    No acquisition Plaintiffs label anticompetitive occurred on or after July 30, 2018.

## VIII.    CHARLESBANK

      231.    Charlesbank-affiliated individuals served on the board of managers of the Varsity

Defendants' parent company beginning in 2014.  Only one Charlesbank-affiliated individual has

been on the board of managers of the Varsity Defendants' parent company since July 30, 2018.

(Ex. CO, Janower Decl. ¶¶ 3, 6; *see also* Ex. CK, BAIN00067980, -983 (providing that Andrew

Janower was the only "Charlesbank Manager" on the BCPE Hercules GP, LLC Board of

Managers installed on July 30, 2018); Ex. CN, Janower Dep. 185:11-15.)

      232.    Charlesbank and its individual affiliates did not interact with USASF.  (Ex. CO,

Janower Decl. ¶ 8; *see also* Ex. CN, Janower Dep. 81:6-82:2 ("Q. Are you familiar with an entity

that goes by the initials USASF?  A. Vaguely, yes. . . . Q. Were personnel who worked at USASF

employees of Varsity Brands . . . or related companies? . . . A. It's not – not something I would

have been familiar with in my capacity as a director of the parent company.").)

      233.    Charlesbank and its individual affiliates were not involved in setting the terms of

the Varsity Family Plan or negotiating Varsity Network Agreements.  (Ex. CO, Janower Decl. ¶

9; *see also* Ex. CP, Beer Dep. 144:24-145:1 ("I know [the Varsity Family Plan is] like a frequent

flyer-type loyalty program, but I don't know how it works.").)

      234.    Charlesbank and its individual affiliates had no involvement with Varsity's Squad

Credentialing Program.  (Ex. CO, Janower Decl. ¶ 10.)

      235.    Charlesbank and its individual affiliates had no involvement with the scheduling

of Varsity's cheer competitions.  (Ex. CO, Janower Decl. ¶ 11.)

236.    Charlesbank did not provide funding for any acquisition by Varsity relating to cheerleading.  (Ex. CO, Janower Decl. ¶ 12; *see also* Ex. CN, Janower Dep. 141:9-20 ("Q. Mr. Janower, was Charlesbank involved with any of these acquisitions?  A. Not -- I mean, above and beyond our capacity as directors of the corporation, not to my recollection.  Q. Did Charlesbank arrange any of the financing associated with these acquisitions?  A. Uh-hmm. Well, in the ordinary course of business, Charlesbank, as a private equity investor and in our capacity as Board members, we do help our companies raise capital to do things like acquisitions. ").

237.    Charlesbank has never conducted a cheer competition or a cheer camp or sold cheer apparel.  (Ex. CO, Janower Decl. ¶ 7.)

238.    Charlesbank has never owned, directly or indirectly, the Varsity Defendants.  (Ex. CO, Janower Decl. ¶ 5.)

239.    No Charlesbank officer or affiliate, including the Charlesbank officers who served on the board of the Holding Company, had any direct involvement in any of the conduct that Plaintiffs label anticompetitive.

240.    In connection with his or her involvement with Varsity, no employee of Charlesbank did anything that was plainly contrary to the interests of Varsity yet nonetheless advantageous to Charlesbank.

241.    In December 2014, certain Charlesbank-advised funds acquired a majority of the equity in an entity called Hercules VB Holdings, Inc. (the "Holding Company").  The Holding Company, through an intermediate downstream entity called Varsity Brands Holdings Co., Inc., indirectly acquired the Varsity entities that are Defendants in this litigation.  (Ex. CO, Janower Decl. ¶¶ 3-4.)

242.     For a brief period of time in 2017, a Charlesbank officer served as CEO of Varsity Brands.  (Ex. CQ, Kalvelage Dep.  83:12-18; 163:12-16-166:19.)

243.     Charlesbank did not negotiate, direct, or fund any of the acquisitions plaintiffs label anticompetitive.

## IX.    MISCELLANEOUS

244.     The proposed class period begins December 10, 2016. (Compl. ¶ 29; ECF No. 387, Pls.' Motion for Class Certification, p. 1-2.)

245.     Neither Plaintiff paid Varsity for anything in the state of Tennessee.

246.     Plaintiffs have not notified the attorneys general of Arizona, Connecticut, Hawaii, Minnesota, Nevada and Utah.

Dated: July 28, 2023                    Respectfully submitted,

                                        s/ Matthew S. Mulqueen

                                        George S. Cary*
                                        Steven J. Kaiser*
                                        CLEARY GOTTLIEB STEEN & HAMILTON LLP
                                        2112 Pennsylvania Avenue, NW
                                        Washington, DC 20037
                                        Phone: (202) 974-1500
                                        Fax: (202) 974-1999
                                        gcary@cgsh.com
                                        skaiser@cgsh.com

                                        Jennifer Kennedy Park*
                                        Heather Nyong'o*
                                        CLEARY GOTTLIEB STEEN & HAMILTON LLP
                                        1841 Page Mill Road, Suite 250
                                        Palo Alto, CA 94304
                                        Phone: (650) 815-4100
                                        Fax: (202) 974-1999

jkpark@cgsh.com
hnyongo@cgsh.com

* Admitted *pro hac vice*

Matthew S. Mulqueen (TN #28418)
Adam S. Baldridge (TN #23488)
BAKER, DONELSON, BEARMAN, CALDWELL &
BERKOWITZ
165 Madison Avenue, Suite 2000
Memphis, TN 38103
Phone: (901) 526-2000
Fax: (901) 577-0866
mmulqueen@bakerdonelson.com
abaldridge@bakerdonelson.com

*Attorneys for Varsity Brands, LLC; Varsity Spirit, LLC; Varsity Spirit Fashions & Supplies, LLC; Charlesbank Capital Partners, LLC; Bain Capital Private Equity LP*


s/ Nicole Berkowitz Riccio

Grady Garrison (TN #008097)
Nicole Berkowitz Riccio (TN #35046)
James Andrew Roach (TN #37934)
BAKER, DONELSON, BEARMAN, CALDWELL
& BERKOWITZ
165 Madison Avenue, Suite 2000
Memphis, TN 38103
Phone: (901) 526-2000
Fax: (901) 577-0866
ggarrison@bakerdonelson.com
nriccio@bakerdonelson.com
aroach@bakerdonelson.com

*Attorneys for U.S. All Star Federation, Inc.*


s/ Brendan P. Gaffney

Paul E. Coggins*
Brendan P. Gaffney*
Kiprian E. Mendrygal*
Jennifer McCoy*

46

Katherine Wright
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Phone: (214) 740-8000
Fax: (214) 740-8800
pcoggins@lockelord.com
bgaffney@lockelord.com
kmendrygal@lockelord.com
jennifer.mccoy@lockeord.com
katie.wright@lockelord.com

* Admitted pro hac vice

Edward L. Stanton III (TN #018904)
S. Keenan Carter (TN # 023386)
BUTLER SNOW LLP
6075 Poplar Avenue, Suite 500
Memphis, Tennessee 38119
Telephone: (901) 680-7336
Fax: (901) 680-7201
Edward.Stanton@butlersnow.com
Keenan.carter@butlersnow.com

*Attorneys for Jeff Webb*