# EXHIBIT 9

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**

JONES, et al.

　　　　　Plaintiffs,

　　v.

VARSITY BRANDS, LLC, et al.,

　　　　　Defendants.

Case No. 2:20-cv-02892-SHL-tmp

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

BACKGROUND OF FACTS AND CLAIMS ...................................................................... 3

   Varsity Created and Grew Competitive Cheerleading ...................................................... 3

   Cheer Competitions and Rebates ...................................................................................... 4

   Apparel ............................................................................................................................... 6

   Camps ................................................................................................................................. 7

   Plaintiffs' Proposed Relevant Antitrust Markets ............................................................. 7

   Plaintiffs' "Claims for Relief" ......................................................................................... 8

ARGUMENT ........................................................................................................................ 9

   I.    PLAINTIFFS' ATTACKS ON VARSITY'S SUCCESS IN THE MARKETPLACE DO NOT AMOUNT TO ANTITRUST CLAIMS ................................................................. 11

   II.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CAMP CLAIMS ......................................................................................................... 17

      A.   Plaintiffs Lack Article III Standing in Camps ............................................... 17

      B.   Plaintiffs Also Lack Antitrust Standing in Camps ........................................ 18

      C.   There Is No Evidence of Harm in Camps ..................................................... 20

      D.   There Is Also No Basis to Find Anticompetitive Conduct Related to Camps ............... 23

   III.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' APPAREL CLAIMS ................................................................................................. 25

      A.   Plaintiffs' Cheer Apparel "Market" Is Untenable as a Matter of Law ........................... 25

      B.   There Is No Evidence of Anticompetitive Conduct Relating to Apparel ...................... 30

      C.   There Is No Evidence of Harm in Apparel ................................................... 32

   IV.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' COMPETITIONS CLAIMS ....................................................................................... 34

      A.   Market Definition ......................................................................................... 34

B.  There Was No Anticompetitive Conduct in Cheer Competitions ................................. 38

  1. School ............................................................................................................... 38

  2. All Star .............................................................................................................. 39

    a. VFP and Network Agreements ...................................................................... 39

    b. Acquisitions ................................................................................................... 41

    c. Counterprogramming Rival Events ................................................................ 44

    d. USASF ........................................................................................................... 45

C.  There Is No Admissible Evidence of Harm Relating to Competitions .......................... 46

V.   PLAINTIFFS' CONSPIRACY-BASED CLAIMS SHOULD BE DISMISSED FOR
     ADDITIONAL REASONS .............................................................................................. 47

VI.  PLAINTIFFS' CLAIMS ARE DEFICIENT FOR ADDITIONAL REASONS UNDER
     THE LAWS OF VARIOUS STATES ............................................................................. 47

A.  Tennessee Law Precludes Recovery for Most of Plaintiffs' Claims ............................. 48

  1. Because the TTPA Applies Only to Purchases Made in Tennessee, Defendants

  Are Entitled to Summary Judgment on All Claims Under the TTPA for Purchases Made

  Outside Of Tennessee .......................................................................................... 48

  2. The TTPA Does Not Apply to Services and Therefore Does Not Reach Claims

  Relating to Camps or Competitions ..................................................................... 50

  3. The TCPA Does Not Apply to Claims Sounding in Antitrust ........................... 53

  4. Plaintiffs' Unjust Enrichment Claims Under Tennessee Law Cannot Go Forward

  as a Matter of Law ............................................................................................... 54

B.  Several States Do Not Recognize Claims Based on Unilateral Conduct ...................... 56

C.  Several States Do Not Allow Indirect Purchaser Claims .............................................. 57

D.    There Is No Basis to Assess Damages In States with Statutes of Limitations That Differ from the Four-Year Federal Statute of Limitations ................................................................ 58

E.    Various Procedural Requirements Have Not Been Met ................................................. 59

VII.    Plaintiffs' Claim for "Declaratory Relief" Should Be Dismissed ................................... 59

CONCLUSION.................................................................................................................... 60

## TABLE OF AUTHORITIES

**Cases**

*ADT Sec. Servs., Inc. v. Alarm Co., LLC,*
   No. 05-2779, 2006 WL 8435888 (W.D. Tenn. Nov. 13, 2006).............................................51

*Alpert v. United States,*
   481 F.3d 404 (6th Cir. 2007) ...............................................................................................10

*Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publications,*
   *Inc.,*
   108 F.3d 1147 (9th Cir. 1997) .............................................................................................21

*Amodeo v. ConservCare, LLC,*
   No. W2007-02610-COA-R3-CV, 2009 WL 736656 (Tenn. Ct. App. Mar. 20, 2009) ..........52

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986).......................................................................................................9-10

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*
   459 U.S. 519 (1983)............................................................................................................19

*Atl. Richfield Co. v. USA Petroleum Co.,*
   495 U.S. 328 (1990)............................................................................................................30

*Auto Indus. Supplier v. Ford Motor Co.,*
   435 F. App'x 430 (6th Cir. 2011)........................................................................................22

*B & H Med., L.L.C. v. ABP Admin., Inc.,*
   526 F.3d 257 (6th Cir. 2008)........................................................................................25, 39

*Baird Tree Co. v. City of Oak Ridge,*
   No. E2007-01933-COA-R3-CV, 2008 WL 2510581 (Tenn. Ct. App. June 24, 2008) ..........52

*Bearden v. Ballad Health,*
   967 F.3d 513 (6th Cir. 2020) ..............................................................................................18

*Bennett v. Visa U.S.A. Inc.,*
   198 S.W.3d 747 (Tenn. Ct. App. 2006)........................................................................53, 55

*Best Pallets Inc. v. Brambles Indus., Inc.,*
   No. 08-2012, 2009 WL 10672543 (W.D. Ark. Aug. 17, 2009)...........................................37

*Blewett v. Abbott Lab'ys,*
   938 P. 2d. 842 (Wash. 1997)...............................................................................................57

*Blue Shield of Va. v. McCready,*
   457 U.S. 465 (1982)............................................................................................................19

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
   509 U.S. 209 (1993)............................................................................................................16

*Brookins v. Int'l Motor Contest Ass'n,*
   219 F.3d 849 (8th Cir. 2000) ..............................................................................................24

*Brown Shoe Co. v. U.S.,*
   370 U.S. 294 (1962)............................................................................................................35

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)..................................................................................14

*California v. Infineon Techs. AG*,
    531 F. Supp. 2d 1124 (N.D. Cal. 2007) ...................................................57

*Cascade Health Sols. v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) ....................................................................41

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................................10

*Chase Manhattan Bank, N.A. v. CVE, Inc.*,
    206 F. Supp. 2d 900 (M.D. Tenn. 2002)...................................................54

*Chi. Pro. Sports Ltd. P'ship v. NBA*,
    95 F.3d 593 (7th Cir. 1996) ................................................................ 43-44

*Ciardi v. F. Hoffman-La Roche, Ltd.*,
    762 N.E.2d. 303 (Mass. 2002) ..................................................................57

*Coleman Motor Co. v. Chrysler Corp.*,
    525 F.2d 1338 (3d Cir. 1975)....................................................................15

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
    781 F.3d 264 (6th Cir. 2015) ....................................................................41

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)....................................................................................15

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) .............................................................39, 42

*CSX Transp., Inc. v. Norfolk S. Ry. Co.*,
    No. 2:18cv530, 2023 WL 25344 (E.D. Va. Jan. 3, 2023)........................58

*Cullen v. Nissan N. Am., Inc.*,
    No. 3:09-0180, 2010 WL 11579748 (M.D. Tenn. Mar. 26, 2010) ...........54

*Dimidowich v. Bell & Howell*,
    803 F.2d 1473 (9th Cir. 1986), *opinion modified on denial of reh'g*, 810 F.2d 1517
    (9th Cir. 1987)...........................................................................................56

*DXS Inc. v. Siemens Med. Sys., Inc.*,
    100 F.3d 462 (6th Cir. 1996) ......................................................................9

*Eastman v. Quest Diagnostics Inc.*,
    724 F. App'x 556 (9th Cir. 2018) ..............................................................31

*Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Lowey, LLP*,
    612 F. Supp. 2d 330 (S.D.N.Y. 2009)........................................................27

*Energy Conversion Devices Liquidation Tr. v. Trina Solar Ltd.*,
    833 F.3d 680 (6th Cir. 2016) ....................................................................15

*Expert Masonry, Inc. v. Boone County*,
    440 F. 3d 336 (6th Cir. 2006) .....................................................................9

*Feitelson v. Google Inc.*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) ................................................................................31
*Fla. Seed Co., Inc. v. Monsanto Co.*,
    105 F.3d 1372 (11th Cir. 1997) ..........................................................................................18
*Fraser v. Major League Soccer, L.L.C.*,
    284 F.3d 47 (1st Cir. 2002) .................................................................................................39
*Freeman Indus. v. Eastman Chem. Co.*,
    172 S.W.3d 512 (Tenn. 2005) .......................................................................................51, 55
*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ..............................................................................................14
*FTC v. Staples, Inc.*,
    970 F. Supp. 1066 (D.D.C. 1997) .......................................................................................28
*Glob. Reins. Corp.-U.S. Branch v. Equitas Ltd.*,
    969 N.E.2d 187 (N.Y. 2012) ..............................................................................................56
*Green Cnty. Food Mkt., Inc. v. Bottling Grp., LLC*,
    371 F.3d 1275 (10th Cir. 2004) .............................................................................. 26-27, 29
*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*,
    221 F. Supp. 3d 1033 (N.D. Ind. 2016) ..............................................................................59
*Harvey v. Fearless Farris Wholesale, Inc.*,
    589 F.2d 451 (9th Cir. 1979) ..............................................................................................47
*Heerwagen v. Clear Channel Commc'ns*,
    435 F.3d 219 (2d Cir. 2006) ...............................................................................................36
*Heller v. Shaw Indus., Inc.*,
    167 F.3d 146 (3d Cir. 1999) ...............................................................................................10
*Hyland v. Homeservs. of Am., Inc.*,
    No. 3:05-CV-612-R, 2008 WL 4000546 (W.D. Ky. Aug. 25, 2008) ...................................18
*Idstrom v. All. Radiology, P.A.*,
    388 P.3d 923 (Kan. Ct. App. 2017) (Kansas) .....................................................................58
*In re Aluminum Warehousing Antitrust Litig.*,
    833 F.3d 151 (2d Cir. 2016) ...............................................................................................19
*In re Capacitors Antitrust Litig.*,
    106 F. Supp. 3d 1051 (N.D. Cal. 2015) ..............................................................................49
*In re Effexor Antitrust Litig.*,
    357 F. Supp. 3d 363 (D.N.J. 2018) .....................................................................................59
*In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs.& Antitrust Litig.*,
    336 F. Supp. 3d 1256 (D. Kan. 2018) ............................................................................ 56-57
*In re Flash Memory Antitrust Litig.*,
    643 F.Supp.2d 1133 (N.D.Cal.2009) ..................................................................................59
*In re Flash Memory Antitrust Litig.*,
    No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010) .....................................23

*In re Flonase Antitrust Litig.*,
　　610 F. Supp. 2d 409 (E.D. Pa. 2009) ........................................................54

*In re Graphics Processing Units Antitrust Litig.*,
　　253 F.R.D. 478 (N.D. Cal. 2008) ..............................................................23

*In re Graphics Processing Units Antitrust Litig.*,
　　527 F. Supp. 2d 1011 (N.D. Cal. 2007) ..............................................48, 50

*In re Pre-Filled Propane Tank Antirust Litig.*,
　　No. 14-02567-MD-W-GAF, 2019 WL 4796528 (W.D. Mo. Aug. 21, 2019) ..................42, 58

*In re Relafen Antitrust Litig.*,
　　221 F.R.D. 260 (D. Mass. 2004) ................................................................56

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
　　299 F.R.D. 555 (E.D. Tenn. 2014) .......................................................49, 54

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
　　580 F. Supp. 2d 896 (N.D. Cal. 2008) .......................................................57

*In re TFT–LCD (Flat Panel) Antitrust Litig.*,
　　599 F. Supp. 2d 1179 (N.D.Cal.2009) .......................................................57

*Int'l Logistics Grp. v. Chrysler Corp.*,
　　884 F.2d 904 (6th Cir. 1989) .....................................................................13

*Isaksen v. Vt. Castings, Inc.*,
　　825 F.2d 1158 (7th Cir. 1987) ...................................................................58

*It's My Party, Inc. v. Live Nation, Inc.*,
　　811 F.3d 676 (4th Cir. 2016) ...............................................................14, 36

*Jo Ann Forman, Inc. v. Nat'l Council on Comp. Ins., Inc.*,
　　13 S.W.3d 365 (Tenn. Ct. App. 1999) .......................................................53

*Kaufman v. Time Warner*,
　　836 F.3d 137 (2d Cir. 2016) ......................................................................21

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
　　588 F. 3d 908 (6th Cir. 2009) ............................................................ *passim*

*Kentucky v. Marathon Petroleum Co. LP*,
　　464 F.Supp.3d 880 (W.D. Ky. 2020) ....................................................15, 37

*Laughlin v. Evanston Hospital*,
　　550 N.E.2d 986 (Ill. 1990) ........................................................................56

*Los Angeles v. Lyons*,
　　461 U.S. 95 (1983) ....................................................................................17

*Lujan v. Defs. of Wildlife*,
　　504 U.S. 555 (1992) ............................................................................. 17-18

*Mack v. Bristol-Meyers Squibb Co.*,
　　673 So. 2d 100 (Fla. Dist. Ct. App. 1996) ...............................................57

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
　　475 U.S. 574 (1986) ....................................................................................9

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) .................................................................................48

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
    708 F.2d 1081 (7th Cir. 1983) ...............................................................................15

*Midwest Agency Servs., Inc. v. J.P. Morgan Chase Bank, N.A.*,
    No. 2: 09-165-DCR, 2010 WL 935450 (E.D. Ky. Mar. 11, 2010)........................31

*Midwestern Mach. Co., Inc. v. Nw. Airlines, Inc.*,
    392 F.3d 265 (8th Cir. 2004) .................................................................................42

*Mullaney v. Wilbur*,
    421 U.S. 684 (1975).................................................................................................51

*New York v. Meta Platforms, Inc.*,
    66 F. 4th 288 (D.C. Cir. 2023)...............................................................................16

*Nicolosi Distrib., Inc. v. Finishmaster, Inc.*,
    No. 18-cv-03587-BLF, 2019 WL 1560460 (N.D. Cal. Apr. 10, 2019) ..................31

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007) (en banc) ...........................................................18, 44

*Nilavar v. Mercy Health Sys.-W. Ohio*,
    244 F. App'x 690 (6th Cir. 2007) ..........................................................................14

*Ohio v. Am. Express Co.*,
    138 S.Ct. 2274 (2018).......................................................................................11, 14

*Omega Env't v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ...............................................................................39

*Peck v. Gen. Motors Corp.*,
    894 F.2d 844 (6th Cir. 1990) .............................................................................16, 19

*Pilgrim v. Universal Health Card, LLC*,
    660 F.3d 943 (6th Cir. 2011) .................................................................................48

*Pineda Transp., LLC v. FleetOne Factoring, LLC*,
    No. 3:18-cv-0089, 2018 WL 2137760 (M.D. Tenn. May 9, 2018) ........................60

*Premier Comp Sols. LLC v. UPMC*,
    377 F. Supp. 3d 506 (W.D. Pa. 2019).....................................................................29

*Richter Concrete Corp. v. Hilltop Concrete Corp.*,
    691 F.2d 818 (6th Cir. 1982) .................................................................................11

*Rick-Mik Enters., Inc. v. Equilon Enters., LLC*,
    532 F.3d 963 (9th Cir. 2008) .................................................................................17

*Sherwood v. Microsoft Corp.*,
    No. M2000-01850-COA-R9-CV, 2003 WL 21780975 (Tenn. Ct. App. July 31, 2003).........54

*Southaven Land Co., Inc. v. Malone & Hyde, Inc.*,
    715 F.2d 1079 (6th Cir. 1983) ...............................................................................18

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993).................................................................................................16

*SPX Corp. v. Mastercool, U.S.A., Inc.*,
   No. 3:10 CV 1266, 2011 WL 3610094 (N.D. Ohio Aug. 17, 2011) ......................................31
*Stromberg v. Qualcomm Inc.*,
   14 F. 4th 1059 (9th Cir. 2021) ...............................................................................50, 57
*Superior Prod. P'ship v. Gordon Auto Body Parts*,
   784 F.3d 311 (6th Cir. 2015) .....................................................................................11
*Tampa Electric Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961).................................................................................................39
*Tamraz v. Lincoln Elec. Co.*,
   620 F.3d 665 (6th Cir. 2010) .....................................................................................22
*Tarrant Serv. Agency v. Am. Standard, Inc.*,
   12 F.3d 609 (6th Cir. 1993) .................................................................................. 10-11
*The Iams Co. v. Nutro Prods., Inc.*,
   No. 3:00-CV-566, 2004 WL 5496244 (S.D. Ohio June 30, 2004)........................................21
*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
   875 F.2d 1369 (9th Cir. 1989) ....................................................................................29
*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
   552 F.3d 430 (6th Cir. 2008) .....................................................................................13
*Trails End Campground, LLC v. Brimstone Recreation, LLC*,
   No. E2014-00336-COA-R3-CV, 2015 WL 388313 (Tenn. Ct. App. Jan. 29, 2015) ..............52
*Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*,
   998 F.2d 1073 (1st Cir. 1993) ....................................................................................39
*United States v. Syufy Enters.*,
   903 F.2d 659 (9th Cir. 1990) .....................................................................................42
*Universal Coin & Bullion, Ltd. v. Fed Express Corp.*,
   No. 2:12-cv-2778-SHM-dkv, 2015 WL 12001264 (W.D. Tenn. June 30, 2015)....................21
*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004)...................................................................................... 13-14, 31
*Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*,
   623 F.3d 281 (6th Cir. 2010) .....................................................................................11
*Westman Comm'n Co. v. Hobart Int'l, Inc.*,
   796 F.2d 1216 (10th Cir. 1986) ..................................................................................29
*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
   549 U.S. 312 (2007).................................................................................................15
*Worldwide Basketball & Sport Tours, Inc. v. NCAA*,
   388 F.3d 955 (6th Cir. 2004) .....................................................................................35
*Z Techs. Corp. v. Lubrizol Corp.*,
   753 F.3d 594 (6th Cir. 2014) .....................................................................................42

**Other Authorities**

15 U.S.C. § 1.................................................................................................8, 10, 14
15 U.S.C. § 2......................................................................................................... *passim*

15 U.S.C. § 15 ...................................................................................................................18

28 U.S.C. § 2201 ...............................................................................................................9

Fed. R. Civ. P. 56..............................................................................................................9

Miss. Code Ann. §§ 15–1–49 ..........................................................................................58

Tenn. Code Ann. § 47–25–101 .................................................................................8, 53

Tenn. Code § 28–3–105 ............................................................................................42, 58

Tennessee Consumer Protection Act ........................................................................ 53-54

Tennessee Trade Practices Act ................................................................................ *passim*

## INTRODUCTION[1]

When all is said and done, Plaintiffs, two parents from among the millions whose children have been active in the sport of cheerleading, seek to warp Varsity's tremendous success in creating, growing, and expanding the sport of cheerleading into a sprawling antitrust case. The effort is misguided: far from restricting output of cheerleading, the core concern of antitrust, Varsity and its founder and former CEO Jeff Webb have been the catalyst and accelerant of its exponential growth. Varsity took what was once a sideline activity for girls in support of boys' football and basketball and transformed it into a highly-athletic, highly-competitive, independent sport in its own right, involving millions of athletes from around the world. In no small part through the efforts of Mr. Webb, competitive cheerleading has progressed to being recognized by the International Olympic Committee for possible inclusion in the 2028 Olympic Games.

Throughout its history, Varsity has propelled this growth: it developed competitions in the United States and abroad, including the most popular and exciting championship competitions; it pioneered fashion-forward apparel conducive to the athleticism of the newly-defined activity; and it has organized and supported membership organizations, like the U.S. All Star Federation ("USASF"), that have taken a chaotic and dangerous stunt arms race that scared off athletes and parents and created an organized sport with standardized safety and participation rules that reassured participants and created the environment necessary for growth. It partnered with Disney to create glamorous end-of-season events. It pioneered broadcasting of cheerleading competitions on a fledgling and unproven network, ESPN, at its birth. Perhaps most impactfully,

---

[1] In accordance with the Court's Order of July 11, 2023 (ECF No. 465), this memorandum addresses issues that are common to all Defendants and is joined by all Defendants.

Varsity has imbued its scholastic competitions with the character-building and inspirational ethic that has put millions of kids on the right path for future success.

Against this background, it should not be surprising that the undisputed facts establish that Plaintiffs' nitpicking of commercial arrangements, and proposing competition rules that they prefer in lieu of those selected by market participants, does not make out an antitrust case. Indeed, even with the benefit of extensive discovery, Plaintiffs have brought forth no competent, admissible evidence of harm to themselves or the class they seek to represent. This is crucial because an antitrust claim requires that a plaintiff demonstrate that it suffered actual pecuniary harm *as a result of* anticompetitive conduct in cognizable antitrust markets. At the end of the day, Plaintiffs' case boils down to showing "high market shares" and differences in pricing between Varsity's products or services and those of its competitors'. That is not sufficient to take a case to a jury.

There are numerous grounds for summary judgment, including:

- Plaintiffs allege monopolization of the "Cheer Camp Market." But neither Plaintiff paid for a camp registration. Plaintiffs therefore lack standing to assert any such claims.

- There is no evidence of anticompetitive conduct in Cheer Camps. There is likewise no evidence of anticompetitive overcharges in the alleged "Cheer Camp Market." The only "evidence" Plaintiffs put forward is the inadmissible opinion of Dr. Heeb that the "overcharge" he calculated for *competitions* applies to *camps* as well, even though he concedes that camps and competitions are not in the same relevant antitrust market.

- The facts undermine Plaintiffs' "Cheer Apparel Market." As Plaintiffs have sought to define it, this market consists of hundreds of non-substitutable products, which is contrary to the premise of a relevant antitrust market. There is likewise no evidence that customers buy these various products together, or even from the same vendor.

- Plaintiffs' assertion of harm in the apparel market is based solely on their expert's inadmissible observation that Varsity has charged 10% or 11% more on average than one among many competitors for shoes, a single product among hundreds included in Plaintiffs' "Cheer Apparel Market."

- Plaintiffs' proposed market definition relating to cheer competitions also cannot go forward as a matter of law. It lumps together very different activities—All Star

2

competitions and what Plaintiffs call "school" competitions—into a single product market, even though participants in those two distinct types of competitions are largely different, the rules are different, the objectives are different, judging standards are different, and All Star teams are not permitted to compete against school teams.

- There is likewise no competent, admissible evidence of anticompetitive conduct in Plaintiffs' "Cheer Competitions Market," much less conduct within the relevant statute of limitations periods, or any evidence of harm related to competitions. Plaintiffs' expert's analysis is based on a comparison of Varsity's prices for All Star competitions with the pricing of certain of its competitors, dating back to 2014. There is no evidence connecting those differences in prices with the conduct complained of within that statute of limitations period. Finally, the conduct complained of and the prices asserted only relate to All Star cheer: there is no evidence of any anticompetitive conduct in "school cheer."

In light of these and the many other fatal deficiencies discussed below, Defendants are entitled to judgment as a matter of law dismissing each of Plaintiffs' claims.

## BACKGROUND OF FACTS AND CLAIMS

The following facts are undisputed for purposes of this motion.

**Varsity Created and Grew Competitive Cheerleading**

Since its founding in 1974, Varsity has vastly expanded cheerleading from traditional sideline crowd cheerleading to a competitive undertaking, with distinct variations for school and "club" teams, involving about four million athletes at any one time. (Compl. ¶¶ 44, 70.) Varsity's founder and former chief executive officer, Jeff Webb, brought numerous innovations to cheerleading, including "more focus on gymnastics-like skills and new tournaments created solely for cheer squads." (*Id.* ¶ 79.)

One type of cheerleading is "All Star" cheer, which involves "club" teams that are sponsored by cheer gyms that train teams at multiple levels. (Compl. ¶¶ 49, 51; SUF ¶ 71.) Another type of cheerleading is what Plaintiffs call "school" cheer, which involves teams affiliated with schools, generally high schools or middle schools. (Compl. ¶ 52; SUF ¶ 70.) Both types of teams compete, but the rules for school cheer are different than the rules for All

Star cheer (SUF ¶ 75), and school cheer teams do not compete against All Star cheer teams. (SUF ¶ 66.)

In 2003, Varsity and others in the industry founded USASF.  (Compl. ¶ 104.)  USASF has expanded All Star cheer by "publish[ing] uniform rules and judging standards for Cheer Competitions."  (*Id.* ¶ 106.)  USASF sanctions events that adhere to its rules and requirements. (SUF ¶ 61.)  USASF is not and has never been involved in school cheer or any other form of scholastic cheer.  (SUF ¶ 62.)

**Cheer Competitions and Rebates**

Varsity and many other companies conduct cheer competitions, where teams perform time-limited routines involving gymnastics, stunts, jumps, and dance.  (Compl. ¶ 42, 45.)  At competitions, cheer teams compete in various divisions and judges score the performances on various criteria.  (Compl. ¶ 45.)  When selecting which competitions they will attend during their regular season, cheer teams seek to stay within driving distance (a few hundred miles at most) of their homes.  (SUF ¶ 78.)

As in any sport, the best teams and cheerleaders "desire the challenge and recognition that comes with competing against the best…"  (Compl. ¶ 181.)  To meet this demand, in 2004 Varsity and USASF together created an annual championship event for All Star cheer called "Worlds" (Compl. ¶ 123), which is held at Walt Disney World in Orlando, Florida.  To make this event an opportunity to compete against "elite" teams, USASF has selected a small group of competitions around the country to award bids to this event.  (SUF ¶ 131.)  Some of these qualifying events are conducted by Varsity, and some are conducted by other event producers. (Compl. ¶¶ 123-26.)  The process of choosing which competitions can award bids is subject to rules that have been in place for many years.  (SUF ¶ 132.)  Varsity also produces two other end-of-season, championship-style competitions for All Star cheer teams, called "The Summit" and

"U.S. Finals." (Compl. ¶ 127.) Varsity designates the teams that qualify for participation in The Summit based on how they perform during regular season Varsity competitions. (Compl. ¶ 127.)

Under the Varsity Family Plan (the "VFP") and Varsity Network Agreements, Varsity offers discounts to All Star gyms based on their participation in Varsity events and how much they spend on event registrations. (Compl. ¶¶ 142-44, 146-49.) Under the VFP, a gym that, over the course of the season, attended a certain number of Varsity All Star competitions (currently four, although the minimum number has varied over the years) has been eligible to receive a rebate of a percentage of the amount the gym spent on competition registrations in that just-completed season. (SUF ¶¶ 83, 88.) There is no requirement that a gym or a team compete exclusively in Varsity competitions to participate in the VFP. (SUF ¶ 93, 101.) There is no requirement (nor has there ever been) for a particular *team* within a gym to have participated in a particular number of Varsity competitions for its sponsoring *gym* to qualify for the VFP. (SUF ¶ 89.) For example, if the event requirement were four, a gym could meet that requirement by having four of its *teams* go to four different Varsity competitions, by having one of its *teams* go to four different Varsity competitions (with its other teams going to non-Varsity competitions), or any other combination. (SUF ¶¶ 89, 93, 101.) It is not unusual for gyms not to send all of their teams to the same competitions in a given year. (SUF ¶ 91.) There is also no requirement that a gym participate in the VFP or that a gym commit at the beginning of the season or at any other time to participate in the VFP or to attend any particular number of competitions with its teams. (SUF ¶ 94.) Rather, *after the season is over*, a gym may, if it chooses, request whatever rebate is available to it under the VFP for that completed season. (SUF ¶ 95.) A gym that chooses to claim a rebate in a given year does not commit to attend any competitions in the future. (SUF ¶ 96.) The amount a participant spends on Varsity apparel is not (and has never been) a factor in

5

the amount of rebate received under the VFP.  (SUF ¶ 85.)

Historically, Varsity also has had contracts with a small percentage of its gym customers (between ████ depending on the year) called Network Agreements.  (SUF ¶ 104.) Network Agreements are, in essence, sponsorship arrangements, like those common across sports, whereby, in exchange for Varsity's sponsorship, the gym typically agrees to wear at least certain items of Varsity apparel (like a uniform) exclusively.  (SUF ¶¶ 97, 98.)  Although all are not identical, a gym with a Network Agreement typically would be eligible, as with the VFP, to receive an after-the-season rebate based on its Varsity All Star competition registrations.  (SUF ¶ 86.)  Network Agreements typically do not require exclusive attendance at Varsity competitions. (SUF ¶¶ 101, 102.)

Varsity has also fueled huge growth in school cheer by, among other things, creating the "preeminent School national championships…"  (Compl. ¶ 56.)  Notwithstanding that growth, most school teams confine themselves to traditional sideline cheerleading, and only a small percentage of schools that have cheer teams have attended competitions.  (SUF ¶ 73.)  The VFP and Network Agreements do not apply to school cheer, and Varsity has not had, and does not have, a rebate program for school cheer.  (SUF  ¶¶ 113, 114.)

**Apparel**

Varsity's vision for a new and energetic sport of cheerleading included an exciting and updated look, conducive to the athleticism of the activity.  (SUF ¶ 29.)  In 1980, Varsity launched a line of apparel and equipment for competitive cheerleaders.  (Compl. ¶¶ 4, 60.)  There are numerous other competitors in cheer apparel, including Rebel Athletic, GK Elite, Nfinity, Nike, and Under Armour.  (SUF ¶¶ 33, 35.)  One of those competitors, Rebel Athletic, filed a sworn declaration in this Court to the effect that it believes it accounts for more than 50% of All Star cheer apparel sales in the United States.  (*Rebel* ECF No. 8 at PageID 337.)

6

Cheer apparel is typically sold through sales representatives or online.  (SUF ¶ 42, 44.)
Varsity and its competitors maintain relationships with gyms and schools to facilitate such sales.
(SUF ¶ 43.)  Very little cheer apparel is sold at competitions, where mainly "meet gear"
souvenirs, such as meet-themed t-shirts and sweatshirts, are sold.  (SUF ¶ 45.)  Varsity, like its
competitors, generally does not allow its apparel competitors to sell apparel at its own
competitions.  (SUF ¶ 46.)  Competitors often sell apparel at "pop up" shops immediately outside
the venue.  (SUF ¶ 47.)

**Camps**

Varsity offers camps to train *scholastic* cheerleaders, both competitive and sideline.
(SUF ¶ 1.)  These include clinics, day camps, and multi-day camps.  (SUF ¶ 2.)  Among the
training and instruction provided at Varsity's multi-day camps is instruction on the "five key
roles" of a cheerleader; namely "crowd leader, spirit raiser, ambassador, athlete and entertainer"
along with "safety and leadership."  (SUF ¶ 3.)  First in the 2016-17 season, and subsequently in
its two other end-of-season scholastic championships, Varsity required participant teams to have
at least 75% of the team receive "Squad Credentialing" at one of its camps.  (SUF ¶¶ 8-11.)  Of
Varsity's roughly ▮▮▮▮ camp customers each season between the 2016-2017 season and the
2018-2019 season, less than ▮▮▮ attended competitions that require Squad Credentialing.  (SUF
¶ 13.)

Very few All Star teams attend camps, which are geared to scholastic teams, including
those that do not participate in competitions.  (SUF ¶ 4.)  There is no rebate under the VFP or a
Network Agreement for camp registration fees and there never has been.  (SUF ¶ 5, 85.)

**Plaintiffs' Proposed Relevant Antitrust Markets**

Plaintiffs identify three cheer-related "product markets":  (1) "Cheer Competitions,"
which includes All Star *and* school competitions in a single market; (2) "Cheer Apparel," which

includes in a single market "uniforms, shoes, accessories, warm-ups, and camp wear."

"Accessories" includes a "[w]ide range of outerwear, poms, bows, socks, undergear, bags and

game day apparel."  "Camp wear" includes "[t]-shirts, tanks, polos, athletic shorts, skirts, skorts,

and practice wear"; and "warm-ups" including "jackets, pants and other apparel"); and (3)

"Cheer Camps," which includes multi-day, single day, home camps, school camps, resort camps,

and university camps.  (Compl. ¶¶ 165, 189, 202; ECF No. 382-3 at 28, 29 n.112.)

The Complaint alleges national geographic markets for cheer competitions, cheer apparel,

and cheer camps.  (Compl. ¶¶ 173, 191, 205.)  One of Plaintiffs' economists agrees that the

relevant geographic markets were all national.  (ECF No. 382-3 at 43-4, 56, 61.)  Another asserts

that there are five "regional" geographic markets for cheer competitions and cheer camps and

one nationwide geographic market for cheer apparel.  (ECF No. 388-3 ¶¶ 140, 152, 168.)

**Plaintiffs' "Claims for Relief"**

Plaintiffs assert (*see* Compl. ¶¶ 231-68) that "Varsity, acting in concert with USASF" has

obtained, enhanced, and maintained monopoly power" in the identified markets in violation of

15 U.S.C. § 1.  They further assert that "Varsity engaged in a continuing Exclusionary [sic]

scheme with respect to" those markets "in an unreasonable restraint of trade and commerce, with

the purpose and effect of acquiring, enhancing, and maintaining monopoly power" in those

markets in violation of 15 U.S.C. § 2.  Under their "First Claim for Relief" they seek "injunctive

relief" for these alleged violations of the federal antitrust laws.  Based on the identical conduct,

they further assert claims on behalf of all *indirect* purchases of competitions, apparel, and camps

*in the entire United States* under the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-

101 to -112 (the "TTPA") ("Second Claim for Relief") and, apparently in the alternative, under

the laws of more than thirty states and the District of Columbia for purchases made in those

jurisdictions, including under the antitrust laws of most (but not all) of those jurisdictions ("Third

Claim for Relief") and the consumer protection laws of most (but not all) of those jurisdictions

("Fourth Claim for Relief").[2]  They also assert a nationwide claim under Tennessee law for

"unjust enrichment," apparently only against Varsity ("Fifth Claim for Relief").  Finally, they

assert a claim for "declaratory relief" under 28 U.S.C. § 2201 related to the same conduct ("Sixth

Claim for Relief").

## ARGUMENT

Summary judgment should be granted "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  "A factual dispute is 'material' if, under the governing law,

its resolution might affect the action's outcome.  A factual dispute is 'genuine' if a reasonable

factfinder could return a verdict for the nonmoving party."  *DXS Inc. v. Siemens Med. Sys., Inc.*,

100 F.3d 462, 467 (6th Cir. 1996).

As the Sixth Circuit held in *Expert Masonry, Inc. v. Boone County*, 440 F. 3d 336, 341

(6th Cir. 2006): "The nonmoving party must do more than simply show that there is some

metaphysical doubt as to the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986), it must present significant probative evidence in support of its

complaint to defeat the motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 249-50 (1986)."  "The mere existence of a scintilla of evidence in support of the

---

[2] The Court has already dismissed certain claims from the Complaint.  (*See* ECF No. 333 at
PageID 7201.)  In particular, the Court dismissed Plaintiffs' Second Claim for Relief under the
TTPA as to the Cheer Camps and Cheer Competitions markets, and dismissed entirely claims
"asserted under the state antitrust and consumer protection laws of Alaska, Colorado, Illinois,
and Alabama as well as the consumer protection laws of Tennessee."  (*Id.*)

plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252.

A movant is not required to "negat[e] the opponent's claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has "point[ed] out" "the absence of a genuine issue of material fact [on] an issue on which the nonmoving party bears the burden of proof," the burden is on the nonmovant—here Plaintiffs—to demonstrate there is a genuine issue of material fact "by her own affidavits, or by the depositions, answers to interrogatories and admissions on file." *Id.* at 324-25 (internal quotation marks omitted). The nonmovant may not rely on inadmissible materials to defeat summary judgment, including expert opinions that are not admissible under *Daubert*. *See, e.g., Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F. 3d 908, 921 (6th Cir. 2009) (affirming summary judgment because only "evidence" of market definition was excluded testimony of expert economists); *Alpert v. United States*, 481 F.3d 404 (6th Cir. 2007) (holding that inadmissible "evidence" may not be used to defeat summary judgment); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146 (3d Cir. 1999) (affirming award of summary judgment resulting from exclusion of expert opinions that were only evidence of particular elements of the plaintiff's claims).

The elements of a claim for monopolization under Section 2 of the Sherman Act are "(1) possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident." *Tarrant Serv. Agency v. Am. Standard, Inc.*, 12 F.3d 609, 613 (6th Cir. 1993). The elements of a claim under Section 1 of the Sherman Act are: "(1) that the antitrust defendant contracted, combined, or conspired; (2) that the combination or conspiracy produced adverse anticompetitive effects; (3) within relevant product

and geographical markets; (4) that the objects of and conduct pursuant to that contract or conspiracy were illegal; and (5) that the plaintiff was injured as a proximate result of that conspiracy." *Id.* at 617. "[A] plaintiff must allege, *inter alia*, that the purportedly unlawful contract, combination, or conspiracy 'produced adverse, anticompetitive effects within relevant product and geographic markets.'" *Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, 623 F.3d 281, 286 (6th Cir. 2010) (quoting *Crane & Shovel Sales Corp., v. Bucyrys-Erie Co.*, 845 F.2d 802, 805 (6th Cir. 1988)). "Conspiracy to monopolize entails 'proof of concerted activity,' but [also] requires an initial identification of the relevant markets." *Superior Prod. P'ship v. Gordon Auto Body Parts*, 784 F.3d 311, 318 (6th Cir. 2015). The inquiry must "distinguis[h] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Ohio v. Am. Express Co.*, 138 S.Ct. 2274, 2284 (2018) (citation omitted). Proof of "specific intent to monopolize" is also required. *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 827 (6th Cir. 1982).

Each of Plaintiffs' claims accordingly requires proof of harm to Plaintiffs resulting from the anticompetitive effects, in one or more properly defined relevant product and geographic markets, of conduct of Defendant that was actionable and illegal. As set forth below, such proof is lacking here as to each claim in each market. For that and other reasons discussed below, Defendants are entitled to judgment as a matter of law.

## I.    PLAINTIFFS' ATTACKS ON VARSITY'S SUCCESS IN THE MARKETPLACE DO NOT AMOUNT TO ANTITRUST CLAIMS

It is undisputed that Varsity has played the leading role in the growth of All Star and school cheerleading for decades. Varsity created an All Star infrastructure in which, through the USASF sanctioning process, participants can be assured that events—even those not run by Varsity—will meet appropriate standards; there are events for the best teams to satisfy the

cheerleaders' "desire … [to] "compet[e] against the best in the sport" (Compl. ¶ 181); and cheer attire is available that goes beyond the staid tradition of sideline cheering and makes a contemporary fashion statement attractive to competitors and conducive to the athleticism introduced into the sport.  Separately from All Star, Varsity has created school competitions, including the leading end-of-season events.  For the select few teams that qualify for scholastic end-of-season championship competitions, Varsity developed a training program to educate athletes on the standards by which they would be judged, to ensure that the gymnastic and stunt elements are within safety standards and to inculcate the leadership ethic appropriate to their roles as school cheerleaders.  It is undisputed that the sport has grown tremendously during this period—with participation and output increasing many times over.

At their core, Plaintiffs various claims all attack Varsity's success by labeling Varsity a "monopoly."  But in the leading modern case relating to monopolization, the Supreme Court cautioned courts to be wary of antitrust claims in cases like this, where the claim is grounded in criticism of a defendant's success, even where that defendant has achieved so-called "monopoly power":

> It is settled law that this offense requires, in addition to the possession of monopoly power in the relevant market, the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.  The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices—at least for a short period—is what attracts "business acumen" in the first place; it induces risk taking that produces innovation and economic growth.  To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct.
>
> Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers.  Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive

12

> for the monopolist, the rival, or both to invest in those economically
> beneficial facilities.  Enforced sharing also requires antitrust courts to act
> as central planners, identifying the proper price, quantity, and other terms
> of dealing—a role for which they are ill-suited.

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (2004)

(internal quotation marks and citation omitted).

To prevent mistaken applications of the antitrust laws that would stifle competition, the

Supreme Court and the Sixth Circuit have identified several critical elements that must be

established for an antitrust claim to go forward.  Among other things, a claimant must present

admissible evidence of a relevant market or markets (product and geographic) in which a court

or jury can assess the presence or absence of *competitive effects* of whatever the plaintiff asserts

was anticompetitive conduct.  *See, e.g., Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross &

Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) ("The Supreme Court requires plaintiffs to

identify the relevant product and geographic markets so the district court can assess what the

area of competition is, and whether the alleged unlawful acts have anticompetitive effects in that

market.") (internal quotation marks and citation omitted).  Without a well-defined relevant

market or markets, claims under the antitrust laws may not go forward as a matter of law.  *See,

e.g., Kentucky Speedway*, 588 F.3d at 921 (affirming summary judgment dismissing antitrust

claim because of lack of admissible relevant market evidence); *Int'l Logistics Grp. v. Chrysler

Corp.*, 884 F.2d 904, 907 (6th Cir. 1989) (affirming summary judgment dismissing antitrust

claims where Plaintiffs "failed to sustain their burden of defining and proving the relevant

product market").

"The essential test for ascertaining the relevant product market" is the "reasonable

interchangeability standard." *Kentucky Speedway,* 588 F.3d at 917 (6th Cir. 2009) (quotation

marks omitted).  "Reasonable interchangeability is assessed by considering (1) product uses

(whether substitute products can perform the same function) and/or (2) consumer response (also known as 'cross-elasticity'), defined as consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service." *Id.* "The relevant geographic market in antitrust cases is defined by the area within which the defendant's customers … can practicably turn to alternative supplies if the defendant were to raise its prices." *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 682 (4th Cir. 2016) (internal quotation marks omitted).

Second, an antitrust plaintiff must demonstrate that the defendant had monopoly power (or market power in the case of claims under Section 1 of the Sherman Act). Simply pointing to the "possession of monopoly power" does not suffice, "unless it is accompanied by an element of anticompetitive *conduct*." *Trinko*, 540 U.S. at 407. This is an all-critical requirement "[t]o safeguard the incentive to innovate." *Id.* Because the antitrust laws protect competition, not competitors, it is also not enough to simply point to actions that may have disadvantaged competitors, which ultimately is all that Plaintiffs do here. *See, e.g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). Indeed, "it is the nature of competition that at some point there are winners and losers, and the losers are excluded." *Nilavar v. Mercy Health Sys.-W. Ohio*, 244 F. App'x 690, 699 (6th Cir. 2007) (citation omitted). Rather, an antitrust plaintiff must establish that the conduct had "substantial anticompetitive effect[s]." *Ohio v. Am. Express Co.*, 138 S. Ct. at 2284 (2018); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) (holding this framework is "essentially the same" for evaluating Section 1 and Section 2 claims). To avoid "false positives"—condemning strong or even severe competition as opposed to anticompetitive conduct—courts have created specific tests to assess this question. For example, because low prices are inherently beneficial to consumers, antitrust claims based on prices being reduced "too much" to the detriment of competitors' ability to compete are inherently suspect.

14

They are cognizable, if at all, when the plaintiff can demonstrate the prices were below the

seller's costs and threatened to drive competitors out of business, allowing the seller to recoup

the initial losses and make up for the lost time value of money through later price increases. *See*

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 318-320 (2007)

(holding that predatory pricing claims require a showing of below-cost pricing and a "dangerous

probability of recoupment of losses" by "driv[ing] competitors out of business"); *Energy*

*Conversion Devices Liquidation Tr. v. Trina Solar Ltd.*, 833 F.3d 680, 685 (6th Cir. 2016)

(holding that below-cost pricing and recoupment are requirements for predatory pricing claims

under both Section 1 and Section 2). Otherwise, the lower prices benefitted customers, which is

the purpose of the antitrust laws in the first place.

Third, an antitrust plaintiff must also have Article III and antitrust standing; that is, the

plaintiff must have suffered pecuniary harm as a result of the allegedly anticompetitive conduct.

A claimant accordingly must identify the pecuniary harm that it suffered and *connect that harm*

to the anticompetitive aspects of whatever actionable conduct is at issue. *Comcast Corp. v.*

*Behrend*, 569 U.S. 27, 38 (2013); *see also MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d

1081, 1161 (7th Cir. 1983) ("It is essential, however, that damages reflect only the losses directly

attributable to *unlawful* competition."); *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338,

1353 (3d Cir. 1975) ("The damage figures advanced by plaintiff's experts may be substantially

attributable to lawful competition. In the absence of any guidance in the record, we cannot

permit a jury to speculate concerning the amount of losses resulting from unlawful, as opposed to

lawful, competition."); *Kentucky v. Marathon Petroleum Co. LP*, 464 F.Supp.3d 880, 895 (W.D.

Ky. 2020) ("Sattinger's report fails because he did not specify what portion of the calculated

damages figure stems from Defendants' legal conduct and what portion, if any, is caused by any of their allegedly illegal forms of conduct.").

Fourth, antitrust claims are limited to those that accrued during the relevant statute of limitations period. *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 848 (6th Cir. 1990) (citing *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971)). The federal statute of limitations—which sets a guideline for the laches period as well (*see, e.g., New York v. Meta Platforms, Inc.*, 66 F. 4th 288, 300 (D.C. Cir. 2023))—is four years, while the various state laws at issue in this case generally have the same or shorter periods. *Peck*, 894 F.2d at 849. A party may not wait until after the statute-of-limitations period expires as to the alleged anticompetitive actions in question to pursue a claim. *Id.* Only acts occurring within the statutory period may be challenged. *Id.* (rejecting effort to avoid statute of limitations because the plaintiffs had "no serious contention that the overt acts causing their injuries occurred" within the limitations period).

Finally, an antitrust plaintiff may not simply point to actions that they say Varsity took that helped it secure business and label them "anticompetitive"; such a standard would condemn anything and everything as anticompetitive, including offering new and better products, reducing prices, and otherwise responding to consumer demand. *See, e.g., Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("[T]his Court and other courts have been careful to avoid constructions of § 2 which might chill competition, rather than foster it.") Moreover, the antitrust laws are not a catch-all for complaints about a business' actions in the marketplace. *See, e.g., Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair

16

competition or purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.") (internal quotation marks omitted). Without evidence that these alleged actions actually had actual anticompetitive effects—that hurt consumers, not just competitors—in a properly defined market, they cannot support an antitrust claim in that market.

Plaintiffs assert claims for injunctive and declaratory relief under federal law and for monetary damages under the laws of more than thirty states and the District of Columbia. While problems with their claims under particular state laws abound, if there is no baseline claim under federal law, there is also no claim under any of these state laws, either. *See, e.g., Rick-Mik Enters., Inc. v. Equilon Enters., LLC,* 532 F.3d 963, 976 n.5 (9th Cir. 2008) ("[S]tate law antitrust claims are derivative of the federal law claims. Because the federal claims fail, the state law claims fail."). Accordingly, the next four sections discuss the fatal deficiencies in Plaintiffs' federal antitrust claims, with the following section discussing additional and separate disabling infirmities under certain of the various state laws under which Plaintiffs seek to bring their claims for damages.

## II. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CAMP CLAIMS

### A. Plaintiffs Lack Article III Standing in Camps

It is undisputed that neither Plaintiff paid for a camp registration. (SUF ¶ 6.) They therefore did not suffer harm relating to camps and therefore lack standing under Article III of the U.S. Constitution to assert any camp-related claims. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992) ("[T]he 'injury-in-fact test … requires that the party seeking review be himself among the injured."); *Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) ("The plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct …."). "Injury in fact is a constitutional requirement

17

[and] there's no Clayton Antitrust Act exception to this rule." *Bearden v. Ballad Health*, 967
F.3d 513, 518 (6th Cir. 2020).

Because it is undisputed that Plaintiffs suffered no camp-related harm (having not paid
for attendance at any camp), Defendants are entitled to summary judgment on all of Plaintiffs'
camp-related claims. *See, e.g., Lujan*, 504 U.S. at 578 (reversing denial of summary judgment
because the plaintiff lacked standing); *see also Hyland v. Homeservices of Am., Inc.*, 2008 WL
4000546, at *2 (W.D. Ky. Aug. 25, 2008) ("If a plaintiff does not have Article III standing, he
cannot later create subject matter jurisdiction by adding a plaintiff who has Article III
standing.").

### B.  Plaintiffs Also Lack Antitrust Standing in Camps

To pursue a claim under the antitrust laws, a plaintiff must *also* establish *antitrust
standing* under Section 4 of the Clayton Act, 15 U.S.C. § 15.  *See, e.g.*, *NicSand, Inc. v. 3M Co.*,
507 F.3d 442, 449-59 (6th Cir. 2007) (en banc) (affirming dismissal of antitrust claims on
standing grounds because, although the plaintiff satisfied Article III standing requirements, it did
not have antitrust standing).

As this Court held in dismissing the claims of parties who had not participated in the
alleged relevant markets on standing grounds in the related *American Spirit* case, to have
antitrust standing to bring antitrust claims in a particular market, a plaintiff must have
*participated* in that market as a customer or competitor.  (*American Spirit*, ECF No. 194 at
PageID 2938.)  This is settled, black-letter law.  *See, e.g.*, *Southaven Land Co., Inc. v. Malone &
Hyde, Inc.*, 715 F.2d 1079, 1086 (6th Cir. 1983) ("A significant element of the § 4 'standing'
inquiry is the nature of the plaintiff's alleged injury either as a 'customer' or 'participant' in the
'relevant market.'"); *Fla. Seed Co., Inc. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997)
("Basically, a plaintiff must show that it is a customer or competitor in the relevant antitrust

market.").  Because it is undisputed that neither Plaintiff purchased a registration for a Varsity camp (or even attended a Varsity camp) (SUF ¶ 6), Plaintiffs lack *antitrust* standing in addition to lacking Article III standing.

In prior briefing in this case, Plaintiffs argued that the "inextricably intertwined" phrase that the Supreme Court used in *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982), can be the basis for standing to assert claims for camp-related claims, which is to say standing for Plaintiffs to bring claims related to *purchases they did not make*.  *McCready* stands for no such principle. *McCready* speaks to when a party *harmed in a market* can bring an antitrust claim in *that* market, which is to say the type of pecuniary loss for which compensation under the antitrust laws is potentially available.  Thus, for the "inextricably intertwined" concept to be even *potentially* relevant, Plaintiffs would have had to have been harmed in the alleged *camp market*, and it is undisputed that they were not.  Nor do Plaintiffs assert that anticompetitive conduct in the camp market led them to pay higher prices in some other market in which they actually participated. (SUF ¶ 18.)

The Supreme Court made the scope of *McCready* clear the year after it was decided in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*. There the Court rejected standing and specifically noted that "McCready alleged that she was a *consumer of psychotherapeutic services* and that she had been injured by the defendants' conspiracy to restrain competition *in the market for such services*."  459 U.S. 519, 538 (1983) (emphasis added); *see also Peck*, 894 F.2d at 847 (rejecting standing for antitrust plaintiffs who were "neither consumers nor competitors in the [relevant] market" and concluding that "in *McCready*, the plaintiff was actively manipulated by conspirators … in her selection of psychotherapy services," the market allegedly restrained); *In re Aluminum Warehousing Antitrust*

19

*Litig.*, 833 F.3d 151, 161 (2d Cir. 2016) (rejecting "inextricably intertwined" argument where the plaintiff had not purchased a product in the relevant market, on the basis that "to suffer antitrust injury, the putative plaintiff *must be a participant in the very market that is directly restrained*") (emphasis added). Plaintiffs therefore also lack antitrust standing, in addition to lacking Article III standing, for the camp-related claims.

### C.  There Is No Evidence of Harm in Camps

There is also no admissible evidence of harm relating to any putative class members' (or anyone else's) camp registration purchases. (SUF ¶ 20.) Dr. Heeb purports to provide an overcharge opinion, but, as discussed in Defendants' *Daubert* motion, he performed no analysis of overcharges relating to camps at all. Instead, he simply borrowed his overcharge percentages from *competitions* and put the identical percentages forward as overcharge percentages for *camps*. (SUF ¶¶ 21-23.) Simply copying a percentage from one market to another is not based on facts, data, or analysis. It is therefore not evidence of anything and cannot be used to satisfy the required element of harm necessary to avoid summary judgment in camps.

To state the obvious, a firm's ability to charge supracompetitive prices is determined by a multitude of product-specific supply and demand factors. (SUF ¶ 24 *citing* Maki Dep. 70:17-19 ("it's the dynamics that exist within that market that would allow you to assess what that overcharge is or if it is occurring.") Dr. Heeb did not consider these factors for camps.

Dr. Heeb's sole rationalization for assuming the same overcharge for competitions and camps is an internal Varsity document from 2011 listing alleged market share figures of 80% in camps, 75% in apparel, and 40% in competitions. From this one old document, Dr. Heeb concluded that Varsity had greater market power in camps than in competitions from December 10, 2016 onward, and, as a result, any camp overcharge must be at least as high as any competition overcharge. (ECF No. 388-3 at ¶ 310.) In other words, contrary to economic

teaching, legal authority, and basic logic, Dr. Heeb concluded that the overcharge percentage can be determined based on market share alone.  (ECF No. 388-3 at ¶ 310.)  Dr. Heeb points to no basis in economics for this "methodology," nor is there any basis.[3]  *See Kaufman v. Time Warner*, 836 F.3d 137, 143 (2d Cir. 2016) ("A high market share alone, however, is insufficient to infer a seller's market power"); *Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publications, Inc.*, 108 F.3d 1147, 1154 (9th Cir. 1997) ("Even if Harcourt has a high market share, neither monopoly power nor a dangerous probability of achieving monopoly power can exist absent evidence of barriers to new entry or expansion").

Dr. Heeb speculates that the elasticity of demand is lower for camps than for competitions, which, he asserts, justifies an assumption that the overcharge would have been at least as high as his alleged competition overcharge.  He neither provides quantitative analysis nor cites any sources supporting his speculation.  (ECF No. 388-3 at ¶ 311.)  Without any grounding in scientific methodology, this assumption is unreliable and an opinion based on it is inadmissible.  *See, e.g., Universal Coin & Bullion, Ltd. v. Fed Express Corp.,* 2015 WL 12001264, at *8 (W.D. Tenn. June 30, 2015) (excluding expert opinion assuming that demand for gold and demand for rare coins were similar where expert did not cite "proof of cross price elasticity between gold and coins" or analyze whether coin seller's "revenues tracked … gold demand"); *The Iams Co. v. Nutro Prods., Inc.*, 2004 WL 5496244 at *3 (S.D. Ohio June 30,

---

[3] In addition to not being grounded in economics, logic, or common sense, Dr. Heeb's approach is not consistent with his conclusion that the apparel "overcharge" was 10% or 11%.  Following the methodology he applied for camps, the apparel overcharge should be at least as high as the 24% or 27% competition overcharge because, according to the document Dr. Heeb relies on, Varsity's market share in apparel was higher than its market share in competitions.  Similarly, if the document had listed a slightly lower share for camps, the camp overcharge would be less than the apparel overcharge, which is to say less than 11%.  That his study—flawed as it was— did not show such an overcharge demonstrates the fallacy of the approach and the baselessness of his conclusions.

2004) ("Such cross-elasticity is also a measurable quantity ... but [it] has [not] been measured in this case.")

To be sure, none of the conduct that Dr. Heeb says was anticompetitive in respect of competitions had any connection to camps. As discussed below, all had to do with All Star, and camps are virtually entirely confined to school-based cheerleading teams. Using an "overcharge" calculation derived from All Star competitions is therefore particularly inappropriate for camps.

Furthermore, Dr. Heeb's 24% or 27% overcharge figures (and his regional overcharge figures) are completely inconsistent with actual prices observed in the marketplace, *which Dr. Heeb did not even consider*. In fact, there was no price increase remotely resembling 24% or 27% (or his regional overcharge percentages) after the Squad Credentialing Program was put into place.[4] A paid expert's conclusion that so obviously does not fit with the real-world data cannot be the basis for expert testimony and cannot be a means to defeat summary judgment. Rather, "any proper methodology would include intellectual analysis and independent review and verification of the underlying data." *Auto Indus. Supplier v. Ford Motor Co.*, 435 F. App'x 430, 457 (6th Cir. 2011). "At some point, the train becomes too long to pull and the couplings too weak to hold the cars together." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 672 (6th Cir. 2010).

Further, Plaintiffs are indirect purchasers. Even if one were to accept Dr. Heeb's overcharge percentage, Plaintiffs must still establish that any actionable "overcharge" was

---

[4] In fact, prices for two-day camps increased slightly by 2.0% the first season the Squad Credentialing requirement took effect but increased by only 0.1% the following season and *decreased* by 0.6% the season after that, even as the credentialing requirement extended to the two other end-of-season events. (SUF ¶ 19.) These modest changes, not even keeping up with inflation, are utterly inconsistent with Dr. Heeb's assertion of a 24% or 27% overcharge (or his similar regional overcharges).

"passed on" by the intermediaries between Varsity and Plaintiffs.  *See, e.g., In re Flash Memory Antitrust Litig.*, 2010 WL 2332081, at *7 (N.D. Cal. June 9, 2010) ("Plaintiffs must establish that the direct purchasers, in turn, *passed through* some or all of the inflated cost to *indirect purchasers*."); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 499 (N.D. Cal. 2008) ("the problem of proof in an indirect purchaser case is intrinsically more complex, because the damage model must account for the actions of innocent intermediaries who allegedly passed on the overcharge").  Plaintiffs' only "evidence" of passthrough is Dr. Maki's inadmissible opinion that 100% of all charges from Varsity were always passed through, whether via the gym intermediary or school intermediary.  For the reasons discussed in Defendants' *Daubert* briefing—primarily that Dr. Maki's 100% figure is not supported by any quantitative analysis or even an attempt to review the practices of the thousands of gyms and schools that are Varsity's direct customers (*see* ECF No. 391-1 at PageIDs 12800-02; ECF No. 446 at PageIDs 16790-91)—Dr. Maki's overcharge opinion is inadmissible and therefore cannot be used to avoid summary judgment.  Plaintiffs' failure of proof of passthrough is particularly acute as to camps, where the intermediary is a school (not an All Star gym), and Dr. Maki did not calculate or analyze passthrough specifically as it relates to schools.  (SUF ¶ 25.)

### D.  There Is Also No Basis to Find Anticompetitive Conduct Related to Camps

There is also no evidence of anticompetitive conduct in camps.  Dr. Heeb initially asserted that three elements of Varsity's alleged conduct are relevant to camps, but none withstand scrutiny: (1) Varsity's rebate programs (ECF No. 388-3 at ¶ 269), (2) the availability of bids to certain national scholastic competitions at camps, and (3) the Squad Credentialing Program (ECF No. 388-3 at ¶¶  271-272).[5]  But the rebate programs do not even apply to

---

[5] Plaintiffs also have at times pointed to out-of-period acquisitions of camp production companies, but, even putting aside that, as a matter of law an out-of-period acquisition cannot

scholastic purchases in general or to camps in particular.  (SUF ¶ 5.)  Likewise, there is no basis

to conclude that the possibility of winning a bid to a *Varsity* competition at a *Varsity* camp is

anticompetitive.  Ultimately, Varsity is allowed to decide what teams can compete at its own

competitions.

This leaves the Squad Credentialing Program—Varsity's requirement that a school that

attends one of three of Varsity's high school national championships be credentialed through a

Varsity camp.  The Squad Credentialing Program is not anticompetitive as a matter of law.  First,

a party like Varsity offering an athletic competition generally has every right to set the rules for

the competition, including the requirements for eligibility.  *See, e.g.*, *Brookins v. Int'l Motor

Contest Ass'n*, 219 F.3d 849, 854 (8th Cir. 2000) ("So long as IMCA made game-defining rules

decisions based upon its purposes as a sports organization, an antitrust court need not be

concerned with the rationality or fairness of those decisions.").  In that regard, Varsity has

determined that the teams that it showcases at the three competitions in question be trained in the

"five key roles" of a cheerleader; namely "crowd leader, spirit raiser, ambassador, athlete and

entertainer" along with "safety and leadership."  (SUF ¶ 3, 8, 12.)  Educating the athletes as to

these standards by which they will be judged so that they can excel at school and at the

competitions is not an antitrust violation.  Second, the Squad Credentialing Program (and, for

that matter, the alleged offering of bids) only affects school teams that are interested in attending

the three national championship competitions at issue in the first place.  (SUF ¶ 12.) Only a small

portion of Varsity's camp customers—let alone all camp customers—fall into that category.  (For

the 2016-2017 to 2018-2019 seasons, it was less than ███ )  (SUF ¶ 13.)  Given that so small a

---

provide a basis to recover damages (*see infra* Section IV. B. 2.), there is nothing in the record to
substantiate any claim that any acquisition led to higher prices for Cheer Camps or were
otherwise anticompetitive.  (SUF ¶¶ 14-17.)

portion of the alleged camp market is even potentially affected, there is no reason to conclude

there was any anticompetitive effect. Such a *de minimis* share of the market is not "substantial"

foreclosure. *See B & H Med., L.L.C. v. ABP Admin., Inc.*, 526 F.3d 257, 266 (6th Cir. 2008)

("[F]oreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent.")

(quoting *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st

Cir. 2004)). Third, as discussed in the previous section, there is no competent evidence of

"overcharges" in the alleged Cheer Camp market, confirming the lack of anticompetitive effect.

## III. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' APPAREL CLAIMS

There is likewise no basis to allow Plaintiffs' apparel-related claims to go forward. The

discovery record and relevant law fatally undermines Plaintiffs' sprawling "all apparel" market.

Beyond that, although Plaintiffs have put forward largely unsubstantiated assertions regarding

Varsity's practices in relation to apparel, there is nothing in the record to support that any of these

actually had any anticompetitive effect or harmed Plaintiffs.

### A. Plaintiffs' Cheer Apparel "Market" Is Untenable as a Matter of Law

The failure to properly define the relevant product and geographic market is fatal to

claims under the antitrust laws. *See, e.g.*, *Kentucky Speedway*, 588 F. 3d at 921 (upholding grant

of summary judgment because the plaintiff had failed to "define[] the relevant markets"). As

noted, "[t]he essential test for ascertaining the relevant product market" is the "reasonable

interchangeability standard." *Kentucky Speedway*, 588 F. 3d at 917 (quotation marks omitted).

"Reasonable interchangeability is assessed by considering (1) product uses (whether substitute

products can perform the same function) and/or (2) consumer response (also known as 'cross-

elasticity'), defined as consumer sensitivity to price levels at which they elect substitutes for the

defendant's product or service." *Id.* (quotation marks omitted).

Plaintiffs' alleged "Cheer Apparel" market fails the test of reasonable interchangeability. It includes uniforms, shoes, accessories (including outerwear, pompoms, bows, socks, undergear, bags and game day apparel, warm-ups (which itself includes jackets pants and other apparel)), and camp wear (including t-shirts, tanks, polos, athletic shorts, skirts, skorts, and practice wear). (ECF No. 382-3 at 28, n.112; Compl. ¶ 189.)  It is undisputed that these distinct products are not functional substitutes for one another; for example, a pompom is not a substitute for a pair of shoes; and a backpack is not a substitute for a uniform.  (SUF ¶ 26.)  The products also are not economic substitutes for one another, which is to say that if the price of one product goes up, customers will not substitute to another product.  (SUF ¶ 27.)  At the same time, Plaintiffs' proposed market excludes obviously substitutable apparel, such as warm-up gear used for other athletic endeavors, which are closer substitutes for the warm-up gear used in cheer than are, for example, hair bows.  (SUF ¶ 35.)  The proposed "all cheer apparel" product market therefore fails to exclude non-substitutes for each individual product and includes all substitutes for each individual product, rendering it deficient as a matter of law.  Plaintiffs' antitrust claims relating to that market should be dismissed on summary judgment.  *See, e.g.*, *Kentucky Speedway,* 588 F. 3d at 921.

Plaintiffs have sought to excuse the undisputed lack of substitutability among the many products in their apparel "market," by reference to so-called "cluster markets."  After discovery, it is plain that the factual predicates for a cluster market are *not* present here.  Cluster markets are a narrow exception to the requirement of reasonable substitutability among the products in a relevant market, applicable only where the "cluster" is a market unto itself that is separate and apart from the individual products encompassed by the cluster.  "A cluster market exists only when the 'cluster' is *itself* an object of consumer demand."  *Green Cnty. Food Mkt., Inc. v.*

26

*Bottling Grp., LLC*, 371 F.3d 1275, 1284 (10th Cir. 2004) (internal citations omitted). "[T]he cluster approach is only appropriate where the product package is significantly different from, and appeals to buyers on a different basis from, the individual products considered separately." *Id.* (internal quotation marks omitted). A seller of the products within the cluster must be able to command higher prices than sellers of the individual products in the cluster sold separately. *See, e.g.*, *Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Lowey, LLP*, 612 F. Supp. 2d 330, 354 (S.D.N.Y. 2009) ("If, however, buyers could and would respond to a price increase by a full line seller by shifting all or part of their business to partial line or single product sellers, … then a cluster market would not be appropriate.").

The undisputed evidence shows that customers can and do buy the individual products in the alleged market separately and often from different vendors, many of which do not offer the entire alleged cluster (SUF ¶ 34). Indeed, *Plaintiffs' own expert* found that only one-third of Varsity's customers purchase products in each of the categories that Plaintiffs lumped together into their Cheer Apparel Market. (SUF ¶ 31.) If the cluster market contention had any potential validity as a matter of law, that number would be at or near 100%, reflecting the required consumer demand for the cluster as opposed to the individual components. But, as the following chart shows, this is not the case. (ECF No. 382-6, Ex. 19.)

27

**Exhibit 19**

**Share of Gyms and Schools that Purchased from Varsity Apparel Categories**

by Customer Characteristics and Apparel Category, 2015/2016 to 2018/2019

| | Any | Uniforms | Shoes | Outerwear | Campwear | Accessories | Lettering |
|---|---|---|---|---|---|---|---|
| Gyms | 53.7% | 40.3% | 24.5% | 24.2% | 9.7% | 40.0% | 43.1% |
| Gyms with L5-L7 Teams | 80.0% | 60.6% | 43.5% | 46.7% | 18.6% | 71.1% | 65.9% |
| Gyms with only L1-L4 Teams | 47.1% | 35.2% | 19.7% | 18.5% | 7.4% | 32.2% | 37.4% |
| Schools | 93.7% | 84.6% | 57.7% | 58.4% | 50.3% | 77.8% | 88.0% |
| Attending Varsity Competition. | 77.5% | 70.9% | 51.3% | 55.3% | 53.1% | 69.1% | 74.1% |
| Not Attending Varsity Competition | 100.0% | 89.9% | 60.2% | 59.5% | 42.2% | 81.3% | 93.5% |
| Overall | 88.7% | 79.1% | 53.6% | 54.1% | 45.3% | 73.2% | 82.5% |

Notes:

[1] Gyms includes only customers with type "AS," "YG," or "DS" that registered an L1 to L7 cheer team at a Varsity competition during the period.  Excludes gyms that registered only dance or unrated teams.

[2] Schools include all schools that purchased apparel from Varsity during the period.

[3] Percentages are expenditures of customers with the given characteristics that purchased positive amounts of products in the given apparel category.

Sources: Varsity Apparel Data; Varsity All Star Registration Data; Varsity Scholastic Registration Data.

For example, among All Star gyms that participated in Varsity competitions during the class period, 28% purchased uniforms from Varsity whereas only 16% purchased shoes.  (SUF ¶ 30.)  If gyms and schools did in fact purchase all their needed apparel from a single vendor as a bundle, one would expect to see a similar distribution of purchasers versus non-purchasers across each of the apparel categories.

There likewise is no basis in the record to conclude that a seller can command higher prices as a result of offering all of the products in the cluster.  (SUF ¶ 32.)  Cases like *FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997), are accordingly not on point.  There, the court concluded that the "the unique combination of size, selection, depth and breadth of inventory offered by the superstores distinguishes them from other retailers" in a way that would allow office superstores that did not face competition from other office superstores to charge more, regardless of whether there were other stores selling the individual products at issue.  *Id.* at 1079. This was based on actual pricing evidence—wholly absent here—of higher prices for products at *office superstores* in cities where there were no other *office superstores* selling the entire cluster, but were other sources of office supplies.  *Id.* at 1080-82 ("The evidence of the defendants' own

28

current pricing practices, for example, shows that an office superstore chain facing no competition from other superstores has the ability to profitably raise prices for consumable office supplies above competitive levels." "The pricing evidence indicates a low cross-elasticity of demand between consumable office products sold by Staples or Office Depot and those same products sold by other sellers of office supplies."). By contrast, particularly without pricing evidence, the convenience of a one-stop shop, which is at most what Varsity allegedly provides, is not a basis for a cluster market definition. "[T]he fact that 'one-stop distribution' is an effective or even superior way to compete does not mean that the relevant market is limited to those who use that method of competition." *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1220-21 (10th Cir. 1986) (holding that the contrary district court holding was "clearly erroneous"). For example, home center stores have been found *not* to constitute a cluster market, even though they are specialty retailers and offer "one-stop" shopping. *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1376-77 (9th Cir. 1989).

The so-called Cheer Apparel Market is the type of market that courts have repeatedly rejected as a legally viable "cluster" market. For example, there are no facts in the record suggesting that a consumer of the various products in the "Cheer Apparel Market" would not deal with a single or partial line dealer of those products. *See, e.g., Green Cnty. Food Mkt.*, 371 F.3d at 1284 (rejecting cluster market of various beverage products because there was no basis to conclude that "the absence of one of [the products in the cluster] would cause the customer to go to another store to purchase both"); *see also Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506, 528 (W.D. Pa. 2019) ("Cluster markets are used as a matter of analytical convenience when all or most relevant market participants sell all or most all of the relevant products, and have similar shares in each of the segments."). To the contrary, there are numerous examples in the

record of buyers (including the named Plaintiff in this case) using multiple vendors and of vendors not supplying the myriad of products that Plaintiffs have lumped into the so-called Cheer Apparel Market. (SUF ¶ 28 *citing* Jones Dep. Tr. 174:15-176:21 (daughter used Varsity uniforms, Rebel shoes, and Rebel makeup palette in 2019; Bray Dep. Tr. 40:1-41:11 (Stars & Stripes All Star cheerleaders used shoes from Nfinity, uniform tops from Varsity, practice shorts from Nike, and practice tank tops from Custom Ink.); Minzghor Dep. Tr. 140:7-16 (Fusion Elite All Star cheerleaders used Varsity uniforms and Nfinity shoes).)

### B. There Is No Evidence of Anticompetitive Conduct Relating to Apparel

There is also no evidence of anticompetitive conduct relating to cheer apparel. The gravamen of Plaintiffs' complaint—Varsity's rebate programs, Varsity's acquisitions, Varsity's scheduling practices, and Varsity's interactions with USASF—have no connection to apparel at all. (SUF ¶¶ 36-41, 84, 86, 87.) The VFP has only provided a flat percentage rebate for apparel purchases, which is nothing more than offering a lower net price.[6] (SUF ¶ 85.) The antitrust laws encourage lower prices, they are not a tool to attack them. *See, e.g.*, *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990) ("Low prices benefit consumers regardless of how prices are set, and so long as they are above predatory levels, they do not threaten competition."). Moreover, to the extent a gym or school paid a lower price, this could only benefit Plaintiffs.

Some of Varsity's Network Agreements required a gym to



. (SUF ¶ 98.) Network Agreements did not, however, cover a substantial portion of any alleged relevant market. (SUF ¶

---

[6] The VFP has never required exclusivity in apparel or anything else to obtain rebates, has never had a term longer than one year, nor has it led to below-cost pricing by Varsity. (SUF ¶¶ 84, 85, 94, 96.) It thus cannot have been anticompetitive as a matter of law. (*See infra*, at 39-41.)

104.)  Rather, Varsity had Network Agreements with fewer than ████ of its nearly ████ gym customers, and these gym customers constituted only a portion of all purchasers in Plaintiffs' Cheer Apparel market (for example, they do not include schools, none of which had Network Agreements, and they do not include the many gyms that did not purchase apparel from Varsity). (SUF ¶ 104.)  As such, the Network Agreements could not be illegal as a matter of law.  *See, e.g.*, *SPX Corp. v. Mastercool, U.S.A., Inc.*, 2011 WL 3610094, at *2 (N.D. Ohio Aug. 17, 2011) (on motion for reconsideration, affirming dismissal because, like here, "[plaintiff] does not allege [defendant] has exclusivity arrangements with all its distributors, or even a majority of them"); *Midwest Agency Servs., Inc. v. J.P. Morgan Chase Bank, N.A.*, 2010 WL 935450, at *6 (E.D. Ky. Mar. 11, 2010) (dismissing complaint where plaintiff alleged only that a substantial amount of commerce was foreclosed and failed to provide "percentages or other evidence supporting this statement"); *see also Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556, 559 (9th Cir. 2018) (affirming dismissal of Section 2 claim based on exclusive dealing because plaintiffs failed to allege the "particular portion of the [relevant] market [that] was foreclosed as a result of exclusive dealing"); *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1031-32 (N.D. Cal. 2015) (dismissing exclusive dealing claim for this reason); *Nicolosi Distrib., Inc. v. Finishmaster, Inc.*, 2019 WL 1560460, at *6 (same).

That leaves Plaintiffs' allegation that Varsity's control over the sale of apparel products at its competitions as somehow "anticompetitive."  But, as this Court noted previously, "prevailing antitrust law … generally does not require firms to share their advantage or resources with others."  (*Fusion Elite* ECF No. 141, at PageID 2257 n.2.)  As the Supreme Court held in *Trinko*, "refusal to share" cannot ground an antitrust claim where there was no termination of a prior voluntary course of dealing which is not the case here.  *See* 540 U.S. at 409-10.  Plaintiffs'

complaint is misguided in its own right. Cheer competitions are not the channel through which cheer apparel is generally sold: cheer apparel is typically sold by sales representatives in one-on-one interactions with customers (SUF ¶ 42) and there are many channels available to sell apparel, including the Internet (SUF ¶ 44). Items sold at competitions are typically souvenirs of the competition like t-shirts with the competition logo, not athletic gear for competitions. (SUF ¶ 45.) Finally, competitors set up pop-up booths immediately outside the venue to display and sell their own wares. (SUF ¶ 47.) Thus, there is no evidentiary basis to conclude that Varsity's practice has had a significant effect on competition.

Plaintiffs have hinted at other alleged acts of Varsity relating to skewing its All Star competitions to favor teams that use Varsity apparel and not hiring representatives of competing apparel manufacturers to judge at its All Star competitions, but there is no evidence to substantiate that results at Varsity cheer competitions were affected by the brand of apparel worn or to suggest that, whether alone or in combination with their other allegations, such actions could have had any effect on competition in apparel, much less a substantial anticompetitive effect.[7] (SUF ¶ 48.)

### C.  There Is No Evidence of Harm in Apparel

There is no admissible evidence of harm relating to cheer apparel. Plaintiffs rely entirely on Dr. Heeb for this element but, as detailed in Defendants' *Daubert* motion (ECF No. 388-1 at PageIDs 10440-44), Dr. Heeb's "analysis" is inadmissible. Dr. Heeb merely compared the price

---

[7] As with camps, Plaintiffs again improperly point to out-of-period acquisitions of apparel companies (*see infra* Section IV. B. 2.), and there is again nothing in the record to substantiate any claim that any acquisition led to higher prices for Cheer Apparel or were otherwise anticompetitive. (SUF ¶¶ 36-40.) For example, Plaintiffs have hinted that the acquisition of AllGoods, a t-shirt manufacturer, is at issue but have never even attempted to explain how an acquisition of a t-shirt manufacturer could have lead to higher prices for backpacks, shows, hair bows, or cheerleading uniforms. The same is true of Plaintiffs' one allegation of an out-of-period camp acquisition in 2004.

of one Varsity apparel product—shoes—with the price of a single other supplier, found Varsity's prices to be higher than that competitor's by 10% (later "updated" to 11%) and then attributed that difference to an "overcharge" across every product in the alleged Cheer Apparel market, which he speculates was caused by some unspecified anticompetitive conduct. (SUF ¶¶ 50, 51; ECF No. 388-1 at PageID 10440; ECF No. 388-3 at ¶¶ 300-11; ECF No. 388-4 at ¶¶ 578-80.) This is fatally flawed—the mere fact that Varsity's products command a slight premium over the products of a single competitor that Plaintiffs' expert chose to look at means nothing; otherwise, BMW would be subject to a jury trial on antitrust claims simply because its cars are more expensive than Toyota's. Furthermore, without actual evidence causally connecting the higher price to particular actionable anticompetitive conduct, price differences mean nothing. Here, there is no evidence that the alleged 10% (or 11%) price difference between Varsity shoes and those of a competitor is the result of anticompetitive conduct, such as, for example, the competitive seller's inability to sell at Varsity competitions. In addition to not providing any basis for any overcharge in apparel, Plaintiffs provide no basis to connect any supposed overcharge to any conduct relating to apparel. (SUF ¶ 49.)

Moreover, as discussed above (*supra* at 23), even assuming an actionable "overcharge" to direct customers, there is no admissible evidence that the direct purchasers passed through all or some of the differential to their customers, and therefore no admissible evidence of harm to indirect purchasers like Plaintiffs. Dr. Maki's assertion of 100% passthrough makes particularly little sense as it relates to the myriad different products in Plaintiffs' "Cheer Apparel Market," which are sold through multiple different distribution channels (including mass retailers like Amazon) and face vastly different competitive conditions at each stage of the distribution chain. (SUF ¶¶ 44.)

## IV.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' COMPETITIONS CLAIMS

Plaintiffs' claims relating to competitions are also untenable as a matter of law.  First, Plaintiffs based their claims on an "all-cheer" market.  But there is no *genuine* dispute that All Star and school competitions are very different activities.  They therefore belong in distinct relevant product markets.  Second, the challenged conduct, all of which applies only to All Star competitions, was not anticompetitive.  Third, because Dr. Heeb's overcharge analysis, based solely on prices in All Star, is inadmissible, there is no evidence of actual harm to Plaintiffs or the members of the class they seek to represent.

### A.  Market Definition

Unlike the plaintiffs in the related *Fusion Elite* case, Plaintiffs here include "School Cheer" competitions along with All Star competitions in their "Competitive Cheer" market. (Compare ECF No. 388-7 at ¶ 35 ("All Star events are a distinct product market").)  Try as Plaintiffs might, however, there is no *genuine* dispute as to the facts that require a finding that School Cheer competitions are not in the same relevant market as All Star Cheer competitions. In short, All Star Gyms are not permitted to compete in scholastic cheer competitions, and schools are not permitted to participate in All Star competitions: the two are therefore not reasonably substitutable for each other.  (SUF ¶ 69.)  This is important because almost 30% of Plaintiffs' competition-related damages claim is for school competitions.  Meanwhile, all of Plaintiffs' allegations of anticompetitive conduct—Varsity's acquisitions, Varsity's rebate programs, and Varsity's relationship with USASF—relate *solely* to All Star.  (SUF ¶ 52-54, 113-114, 159.)

Plaintiffs rely entirely on the opinion testimony of Dr. Heeb and Dr. Netz for their assertion of a nationwide, all-cheer competition market.  For the reasons stated in Defendants'

*Daubert* motions, those opinions are inadmissible (ECF No. 388-1 at PageID 1430-32; ECF No. 382-1 at PageIDs 8557-60), leaving no competent evidence of such a market.  *See, e.g., Kentucky Speedway*, 588 F.3d at 921 (upholding summary judgment because expert market definition testimony was inadmissible under *Daubert*).

In any event, it is undisputed that All Star gyms that are the customers of All Star events would not consider a school competition to be a substitute for an All Star competition because All Star teams are not permitted to compete with school teams.  (SUF ¶ 67.)  The opposite is also true: school teams do not compete against All Star teams.  (SUF ¶ 68.)  The reasons are straightforward: the goals of scholastic cheerleading are very different from those of All Star cheerleading; the competitions are judged by different standards; the events lead to separate and distinctive championships that emphasize different skills; All Star athletes are trained to a higher level of athleticism that would be dangerous for scholastic cheerleaders to emulate given their lack of training and practice.  (SUF ¶¶ 74-77.)  In short, these are very different activities and not in the same relevant antitrust market.  *See, e.g., Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."); *Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 961 (6th Cir. 2004) (same).  For all these reasons, All Star teams *are not permitted* to compete in school competitions.  (SUF ¶ 66.)  It is therefore not surprising that there is no evidence that an increase in price of All Star competitions would lead All Star cheer teams to switch to participating in school competitions (or vice versa).  (SUF ¶¶ 80-81.)

Plaintiffs' exclusion of a third category of cheer competitions, youth and recreational cheer, from an alleged market that includes both All Star and school cheer highlights that the

latter two disciplines are not in the same market.  The only thing that All Star and school cheer have in common—that they both involve cheerleading—is also true for youth and recreational cheer.  In fact, the Complaint demonstrates that "youth and recreational cheer" is a much *closer* substitute for All Star than is school cheer.  As set forth in the Complaint, in contrast to school cheer, both All Star and "youth and recreational" cheer are after-school, competitive cheerleading activities where teams are "affiliated with" non-school organizations like "private gyms" and other "recreational organization[s] such as the YMCA."  (Compl. ¶ 48; SUF ¶ 72.)  Teams in school cheer, by contrast, "are affiliated with middle schools, high schools, or colleges."  (*Id.*)  Plaintiffs exclude youth cheer from their alleged relevant market because, they say, that "Varsity controls only 10% of" those competitions.  (Compl. ¶ 48 n.1.)  In other words, Plaintiffs have gerrymandered the market, including a category (schools) that is more dissimilar from All Star than another category that is excluded (youth and recreational) solely because doing so makes Varsity appear to have a stronger position.  This gerrymandering further illustrates that Plaintiffs market definition for competitions cannot be sustained as a matter of law.

Plaintiffs' geographic market definitions, whether for school cheer or for All Star, also fail.  "The relevant geographic market in antitrust cases is defined by the area within which the defendant's customers can practicably turn to alternative supplies if the defendant were to raise its prices."  *It's My Party, Inc.*, 811 F.3d at 682 (4th Cir. 2016).  "In certain service industries, the geographic market may be confined by the fact that it can be impractical for consumers to travel great distances to procure particular services."  *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 228 (2d Cir. 2006).  Under the so-called "hypothetical monopolist test," it is Plaintiffs' burden to show that a small but not insignificant—often considered to be 5%—increase in the price of the service in a particular area would induce switching to a provider in another area in

such numbers that the price increase would not be profitable. *Kentucky v. Marathon Petroleum Co. LP*, 464 F.Supp.3d at 890; *accord Best Pallets Inc. v. Brambles Indus., Inc*., 2009 WL 10672543, at *10-12 (W.D. Ark. Aug. 17, 2009) (discussing SSNIP Test and concluding that transportation costs negated possibility of national market).

The Complaint alleges national markets both for All Star and for School Cheer. The undisputed facts, however, are that, because of the cost and burden of travel, cheer teams would not switch to out of area events in the face of such a price increase, particularly as to the "regular" season competitions, which constitute the vast majority of Plaintiffs' "Cheer Competition" market. Numerous witnesses testified that impracticalities and expense of travel cause the vast majority of cheer competition participants to attend competitions that are within a few hundred miles of their homes, which means that competitions outside those geographic confines are not substitutes. (SUF ¶ 78-79 *citing* Bray Dep. 60:9-24 ("Q. […] Why was location important? A. We just tried to keep costs down for our families. So we tried to compete locally whenever possible just so there wouldn't be flights or hotels or, you know, those additional expenses that would add up. Q. Okay. And just looking at the competition schedule, it seems that for the most – for the most part, were these competitions that the participants could drive to? A. Yes."); Foster Dep. 291:17-292:1 ("Q. […] 'Most competitions will be within driving distance.' What was the significance of being within driving distance? […] A. That most competitions being within driving distance, being that they didn't have to necessarily buy, like, an airplane ticket to – to go there. We tried to be as local as we could.".)

Plaintiffs have offered nothing to counter the common sense conclusion that cheer teams would not generally travel long distances in the face of a hypothetical price increase. The geographic market for cheer competitions therefore is not the entire United States. This is fatal

to Plaintiffs' competition claim because Dr. Heeb's overcharge "analysis" was based on a

nationwide market. At the same time, confirming that the market for competitions is not

national, Dr. Heeb says that he found different "effects" in different "regions" of the country.

(ECF No. 388-3 at ¶ 296.) And Dr. Heeb did not even consider school competitions in his

analysis at all. (ECF No. 388-4 at ¶ 173) ("I further analyze travel patterns by quantifying how

many All-Star gyms travel to competitions in the same CSA.").)

### B. There Was No Anticompetitive Conduct in Cheer Competitions

#### 1. School

The so-called anticompetitive conduct that Plaintiffs identify related to competitions—

Varsity's rebate programs, Varsity's acquisitions, so-called "counterprogramming" of competitor

events, and Varsity's relationship with USASF—all have to do with All Star cheer, not school

cheer. For example, Plaintiffs focus much of their attention on the need for bids to three

particular Varsity-run All Star cheer competitions—"Worlds," "The Summit," and "U.S.

Finals"—as a "barrier[] to entry." (Compl. ¶¶ 183-84.) Those competitions, however, are

strictly for *All Star* teams, not school teams. (SUF ¶¶ 64-65.) Similarly, Plaintiffs allege that

Varsity's Network Agreements and Family Plans limit event producers' "access to All-Star

Gyms" (Compl. ¶ 185), *not* access to school teams. There is nothing that relates to school cheer

as Plaintiffs have defined the term. Thus, because, as established in the previous section, school

competitions are, as a matter of law, not in the same relevant antitrust market as All Star

competitions, there is no allegations, much less evidence, of anticompetitive conduct relating to

in the relevant market that includes school competitions. Defendants are therefore entitled to

summary judgment as to all claims relating to school competitions.

### 2. All Star

#### a. VFP and Network Agreements

Plaintiffs seek to challenge the VFP and Varsity's Network Agreements as illegal exclusive dealing. Although the VFP (and the vast majority if not all Network Agreements) do not require exclusive event attendance, Plaintiffs' apparently assert that they can nevertheless be challenged as such because the rebates that can be earned traditionally have increased as more competitions are attended.

As an initial matter, even a monopolist may have exclusive contracts with customers or suppliers. *See, e.g.*, *Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 68 (1st Cir. 2002). Only in the limited circumstances where a significant portion of the market is bound in exclusive deals for a significant period of time are such contracts even *potentially* suspect from an antitrust perspective. *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (holding that exclusive dealing contract is only actionable under Section 2 if it is probable that "the contract will foreclose competition in a substantial share" of the relevant market). "[F]oreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent." *B & H Med.*, 526 F.3d at 266. And, where the contractual time period of the so-called "exclusive" arrangement is one year or less, the arrangement is not considered exclusive in the first instance because the business represented by the agreement is available for competition each year. *See, e.g.*, *Omega Env't v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997) ("[T]he short duration and easy terminability of these agreements negate substantially their potential to foreclose competition."); *Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 998 F.2d 1073, 1080 (1st Cir. 1993) ("That some of the contracts are three years, the only specific in the complaint, might invite curiosity, but it does not even begin to establish illegality."); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1059 (8th Cir. 2000) (rejecting exclusive dealing claim).

There is no genuine dispute that there are no exclusive deals that foreclose such a portion of any relevant market for more than one year, as required for a claim of exclusive dealing.  The VFP has never required a commitment to do anything.  (SUF ¶¶ 94-96.)  Any rebate under the VFP has been paid after the season is over based on whatever the particular gym chose to do during the preceding year.  (SUF ¶ 88.)  Moreover, a gym has been able to meet any event attendance threshold by sending different teams to different Varsity competitions, negating the premise that the VFP makes it untenable for gyms to send teams to non-Varsity competitions. (SUF ¶¶ 89-93, 107-112.)  Because the rebate is based on just the prior year, with no commitment required as to the future, the VFP is not long enough to be "exclusive" in any sense that matters for the antitrust laws.  (SUF ¶¶ 94-96.)  Network Agreements are no different in terms of the provisions relating to competitions.  (SUF ¶¶ 86-87, 99-103, 105.)

Plaintiffs have likewise presented no evidence to the effect that gyms that chose to avail themselves of the VFP or have Varsity Network Agreements attend only Varsity events.  In fact, the limited evidence there is in the record is from Plaintiffs in this and the Related Cases, and it is to the contrary.  (SUF ¶ 106.)

At any rate, even if a gym or group of gyms found the VFP or Network Agreements sufficiently economically compelling to decide to attend only Varsity competitions, courts including the Sixth Circuit have carefully delineated the circumstances in which such rebating or discounting (referred to as "bundled discounts") can violate the antitrust laws.  These circumstances are *not* present here.  In particular, bundled discount do not constitute actionable foreclosure as a matter of law except possibly in the very narrow circumstances where there was below-cost pricing that was sufficiently predatory to drive competitors out of business, thus allowing the discounter to recoup the losses borne by its below-cost pricing via later

supracompetitive pricing. *Collins Inkjet Corp. v. Eastman Kodak Co.,* 781 F.3d 264, 272-74 (6th Cir. 2015); *accord Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 903 (9th Cir. 2008) ("[T]he exclusionary conduct element of a claim arising under § 2 of the Sherman Act cannot be satisfied by reference to bundled discounts unless the discounts result in prices that are below an appropriate measure of the defendant's costs."). Any other rule "would chill the very conduct the antitrust laws are designed to protect." *Cascade*, 515 F.3d at 903 (quoting *Weyerhaeuser Co.*, 549 U.S. at 319).

Otherwise, discounts and rebates—even bundled discounts and rebates—do *not* violate the antitrust laws as a matter of law; far from it: "[b]undled discounts are pervasive, and examples abound. … Bundled discounts generally benefit buyers because the discounts allow the buyer to get more for less." *Cascade*, 515 F.3d at 894-95. "[P]rice cutting is a practice the antitrust laws aim to promote." *Id*. at 896.

Plaintiffs themselves maintain that Varsity "has raised prices associated with Cheer Competitions and for Cheer Apparel and Cheer Camps above competitive levels" (Compl. ¶ 227), not below Varsity's costs. Indeed, this is the entire basis for their (albeit fatally unsupported) damages model. Plaintiffs in effect want Varsity to charge more, the opposite of the purpose of the antitrust laws. Plaintiffs cannot have it both ways, with their theory of harm undermining their theory of anticompetitive conduct as a matter of law.

### b. Acquisitions

Plaintiffs recount that Varsity made certain acquisitions of All Star event producers, but those acquisitions provide no basis for an antitrust claim. First, as this Court held in the *Fusion Elite* case (*Fusion Elite* ECF No. 141, at PageID 2269-70), because virtually all of the acquisitions mentioned in the Complaint are alleged to have occurred outside the applicable statute of limitations, they cannot be the basis for a claim of damages based on higher prices,

which is precisely what Plaintiffs seek to pursue.[8]  *See Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 599 (6th Cir. 2014) (affirming dismissal on statute of limitation grounds of antitrust claims under Section 2 of the Sherman Act and Section 7 of the Clayton Act as to two acquisitions consummated more than four years prior to the commencement).  Second, there are no facts in the record about the few acquisitions within the limitations period from which it could plausibly be concluded that any were anticompetitive.

The so-called "continuing violations" doctrine does not help Plaintiffs resurrect claims based on out-of-period acquisitions.  As the Sixth Circuit has held, "the continuing violations doctrine does not apply" to claims that a merger or series of mergers was anticompetitive.  *See, e.g., Z Techs. Corp.*, at 599; *see also Midwestern Mach. Co., Inc. v. Nw. Airlines, Inc.*, 392 F.3d 265, 2271 (8th Cir. 2004) ("Applying th[e] rationale [of continuing violation] to mergers makes no sense. . . . Otherwise, every business decision could qualify as a continuing violation to restart the statute of limitations as long as the firm continued to desire to be merged.  Once the merger is completed, the plan to merge is completed, and no overt acts can be undertaken to further that plan."); *Concord Boat*, 207 F.3d at 1052 (reversing jury verdict reliant on continuing violation doctrine).

Statute of limitations issues aside, acquisitions, even of competitors, are not *per se* illegal.  *See, e.g., United States v. Syufy Enters.*, 903 F.2d 659, 673 (9th Cir. 1990) (holding that, "in a competitive market, buying out competitors is not merely permissible, it contributes to market

---

[8] In *Fusion Elite*, the plaintiffs' claims for damages were subject to a four-year statute of limitations under federal law.  Here, by contrast, Plaintiffs' claims on behalf of the putative Nationwide Damages Class—brought pursuant to the Tennessee Trade Practices Act and Tennessee's common law of unjust enrichment—are subject to a shorter *three-year* statute of limitations.  *See* Tenn. Code § 28-3-105; *In re Pre-Filled Propane Tank Antirust Litig.*, 2019 WL 4796528, at *15 (W.D. Mo. Aug. 21, 2019) (dismissing untimely indirect purchaser claims under the TTPA based on the three-year statute of limitations).

stability and promotes the efficient allocation of resources").  To demonstrate illegality, Plaintiffs would have to show, at a minimum, that the acquisition led to a reduction in output that itself led to higher prices in a relevant market.  There is no such evidence of that here.  *See, e.g.*, *Chi. Pro. Sports Ltd. P'ship v. NBA*, 95 F.3d 593, 597 (7th Cir. 1996) ("The core question in antitrust is output.  [Without a] reduc[tion in] output in some market, to the detriment of consumers, there is no antitrust problem.  A high price is not itself a violation of the Sherman Act.").

Plaintiffs rely on Dr. Heeb's analysis of prices dating back to 2014 (ECF No. 388-3, at ¶¶ 287-91, 295-98), which is to say two years before the statute of limitations began to run.  This analysis is not probative of the effect of any acquisition that took place *after* 2014, much less the in-period (*i.e.*, post-2016) acquisitions.  Such a study is not capable of assessing the impact on prices of acquisitions that took place *after December 10, 2016* (the start of the limitations period), which is the only relevant question.  (*See Fusion Elite* ECF No. 141, at PageID 2270 (allowing claims relating to in-period acquisitions to go forward on basis of *allegations* of raising prices after those *in-period* acquisitions).  Moreover, Dr. Heeb's analysis did not entail considering each individual acquisition's effect on price (if any) or even the effect of in-period acquisitions as a group.  That is fatal because, as the Seventh Circuit held in *Chicago Partnership*, even "[a] high price is not itself a violation."  95 F.3d at 597.  In fact, even accepting Dr. Heeb's 2014 analysis for the sake of argument, the only conclusion that can be drawn is that acquisitions subsequent to his 2014 analysis *had no effect* on prices whatsoever: Dr. Heeb opined that the "overcharge" did not change when acquisitions were made after 2014.  Thus, even accepting all of Dr. Heeb's (dubious) calculations, there is no admissible evidence that Varsity's acquisitions in the statute of limitation period had any effect on prices.

It is worth reiterating that Plaintiffs did not identify any allegedly anticompetitive

acquisitions of school cheer competition providers.  (SUF ¶¶ 52-58.)  The 2014 analysis was limited to looking at All Star prices.  There was no analysis of school prices in 2014 or since. There is therefore no basis to conclude that Varsity's acquisitions had any effect on pricing of school competitions.

### c.  Counterprogramming Rival Events

There is no basis in law or fact for Plaintiffs' apparent attempt to deem illegal Varsity's "hold[ing] non-Worlds qualifying events in the same geographic area at the same time as an established Tier 1 independent Bid qualifying event."  (Compl. ¶ 162.)  The suggestion that choosing to compete is anticompetitive is unsupported and illogical.  (SUF ¶ 60.)  Expanding output by offering more opportunities to compete does not violate the antitrust laws, to the contrary.  *See, e.g.*, *Chi. Pro. Sports*, 95 F.3d at 597 ("The core question in antitrust is output. [Without a] reduc[tion in] output in some market, to the detriment of consumers, there is no antitrust problem.").  The antitrust laws encourage increased competition not, as Plaintiffs would have it, forbid it to protect particular competitors.  *See, e.g.*, *NicSand*, 507 F.3d at 460-61 ("[T]he antitrust laws … were enacted for the protection of *competition*, not *competitors*.") (internal quotation marks omitted) (citing *Bowl-O-Mat, Inc.*, 429 U.S. at 480 (1977)).  Condemning Varsity's effort to compete would be anticompetitive in its own right because doing so would reduce output and consumer choice.  Defendants have found no case coming close to supporting such a proposition.

As with all of Plaintiffs' allegations relating to competitions, Plaintiffs' counterprogramming allegations relate only to All Star competitions.  (SUF ¶¶ 59.)  There is no basis to conclude that such counterprogramming could have, much less did have, any effect on school competitions.

### d. USASF

There is also nothing in the record to suggest that Varsity's relationship with USASF led to anticompetitive harm. While Plaintiffs may criticize Varsity and USASF for how they conducted themselves, they have no antitrust claim unless they can establish that there was an agreement between Varsity and USASF that caused anticompetitive harm in a way that is actionable under the antitrust laws. After extensive discovery, Plaintiffs cannot sustain this burden.

Plaintiffs' main focus seems to be on the process for awarding "bid-giving" rights to USASF's end-of-season "Worlds" championship event for top-level teams. Of course, to hold a "Worlds" championship, some process must be in place to select teams. From the inception of Worlds, USASF has assigned "bid-giving" rights to a limited number of competitions and adopted rules to ensure that those competitions are dispersed in time and geography. (SUF ¶¶ 131-132.) As discussed in greater detail in USASF's individual brief (ECF No. 469 at p. 14), which is incorporated by reference by all Defendants, there is no evidence that USASF ever deviated from those rules in favor of Varsity. (SUF ¶ 143.) Nor is there any evidence that USASF's rules had anticompetitive effects. In similar circumstances, the Sixth Circuit in *Kentucky Speedway* upheld summary judgment and "question[ed]" whether claims flowing from the refusal of NASCAR to grant a "Sprint Cup" race to a particular event producer could give rise to antitrust injury "because there are many considerations relevant to the quintessential business judgment of whether expanding the Sprint Cup to northern Kentucky makes economic sense in developing the NASCAR brand on a national basis." 588 F. 3d at 908, 920. (Ultimately the Court upheld summary judgment because the plaintiffs had, as here, failed to come forward with admissible expert testimony or other competent evidence of market definition. *Id.* at 921.) Plaintiffs cannot show otherwise here.

45

### C. There Is No Admissible Evidence of Harm Relating to Competitions

As with camps and apparel, Plaintiffs rely entirely on the opinions of Dr. Heeb and Dr. Maki as the basis for showing that Plaintiffs have been harmed by the alleged conduct. As discussed above, Dr. Heeb compared the prices that Varsity charged for competitions with what some of Varsity's All Star competition competitors charged in 2014, found a difference, assumed the difference was due to Varsity having "monopoly power" in 2014, assumed that that 2014 "monopoly power" had been illegally obtained, and assigned the difference in price between Varsity and its competitor (what he calls an "overcharge") as damages to all purchases made going forward for all All Star and school competitions through to the present. (ECF No. 388-3, at ¶¶ 287-91, 295-98.) He did no quantitative analysis of any conduct, whether inside or outside the statue-of-limitations period to assess what effect that conduct had on his so-called overcharge. On the contrary, his opinion establishes that the conduct challenged has had no measurable effect on prices since 2014, almost 10 years ago, and two years before the statute of limitations began to run. (SUF ¶ 82.)

For the reasons discussed in Defendants' briefing in support of their motion to exclude Dr. Heeb's testimony on this subject (ECF No. 388-1 at Page IDs 10438-53; ECF No. 488 at PageIDs 16809-11), Dr. Heeb's overcharge opinion is inadmissible. It therefore cannot be used to avoid summary judgment.

There is also no admissible evidence of harm to indirect purchasers due to the lack of admissible evidence that any overcharge was passed through from direct to indirect purchasers. (*See supra*, at 23.) As discussed above, to show such an overcharge, Plaintiffs would have to establish that the intermediaries between Varsity and Plaintiffs "passed on" any overcharges to them.

As discussed above, Plaintiffs rely on the wholly implausible *ipse dixit* of Dr. Maki, who

opined that the passthrough is always 100% for all purchases of all products in all markets.  As

set forth in Defendants' *Daubert* motion relating to Dr. Maki (ECF No. 391-1 at PageIDs 12796-

803), her 100% passthrough opinion is inadmissible.  Among other things, she reached her

"conclusion" without any systematic analysis of any data and, indeed, provided far less basis

than experts whose passthrough opinion has been excluded.  She conceded she did not look at

any school-related information at all.  Nor did she differentiate among the supply and demand

conditions for different products, services, distribution channels (gyms versus schools), or areas

of the country.

## V.    PLAINTIFFS' CONSPIRACY-BASED CLAIMS SHOULD BE DISMISSED FOR ADDITIONAL REASONS

The Court has already dismissed Plaintiffs' conspiracy-based claims to the extent they are

based on a conspiracy between or among Bain, Charlesbank, Varsity, and Webb.  (ECF No. 332

at PageID 7187; ECF No. 333 at PageID 7217.)  This leaves USASF as the alleged co-

conspirator, but, as set forth in USASF's memorandum in support of summary judgment (ECF

No. 469 at pp. 9-14), those claims are untenable as a matter of law and should be dismissed.

Because USASF is the only potential conspirator with the other Defendants, any conspiracy-

related claims should likewise be dismissed against all Defendants.  *See Harvey v. Fearless*

*Farris Wholesale, Inc.*, 589 F.2d 451, 455 (9th Cir. 1979) ("It is fundamental that a single person

or economic entity cannot combine or conspire in isolation").

## VI.    PLAINTIFFS' CLAIMS ARE DEFICIENT FOR ADDITIONAL REASONS UNDER THE LAWS OF VARIOUS STATES

As discussed above, if Plaintiffs federal antitrust claims fail, so too do their claims under

the laws of the more than thirty states that Plaintiffs have brought into issue in their Second

through Fifth "Claims for Relief."  The laws of certain of the states, however, are different from

47

the federal antitrust laws in ways that entitle Defendants to judgment as a matter of law,

regardless of how the Court rules in respect of Plaintiffs' claims under federal law.

### A.  Tennessee Law Precludes Recovery for Most of Plaintiffs' Claims

#### 1.  Because the TTPA Applies Only to Purchases Made in Tennessee, Defendants Are Entitled to Summary Judgment on All Claims Under the TTPA for Purchases Made Outside Of Tennessee

Through their "Second Claim For Relief," Plaintiffs seek to bring claims under the TTPA

on behalf of what they term a "Nationwide Damages Class," which is to say a class of

individuals the vast majority of whom do not reside in Tennessee and made no purchases in

Tennessee.  In their "Third Claim for Relief," Plaintiffs seek to bring overlapping claims for the

same purchases under the laws of more than 30 states and jurisdictions, including Tennessee, but

those claims are limited to putative members of the "State Law Damages Class," which includes

individuals who purchased the products and services at issue in each of those jurisdictions.

As numerous courts have held, where a party seeks to assert antitrust claims under a

particular state's law for purchases made outside of the state, the choice-of-law principles of the

forum state determine which state's law applies to the claims based on such out-of-state

purchases.  *See, e.g., Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946 (6th Cir. 2011)

(concluding that forum state's "choice-of-law rules determine which consumer-protection laws

cover these claims" and affirming district court's striking of class claims based on differing state

consumer protection laws); *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012).

Where one state's law conflicts with another's, the court determines which state's law to apply.

Here there are multiple conflicts in the antitrust and consumer protection laws of the fifty

states and the District of Columbia, most prominently in that the laws of many states do not

permit indirect purchaser actions like the ones at bar.  Courts have recognized this to be a

significant conflict mandating a choice-of-law analysis.  *See, e.g., In re Graphics Processing*

48

*Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1028 (N.D. Cal. 2007) (dismissing plaintiffs' *Illinois Brick*–circumventing California–law claims and noting that "[i]t is hard to see why the laws of other states should be tossed overboard and their residents remitted to California law for transactions that, for individual consumers, are local in nature"). In the face of such conflicts, "Tennessee [law] traditionally looks to the law of the state where the injury occurred." *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 586 (E.D. Tenn. 2014) (citing *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992).) In antitrust cases, this is "where the plaintiffs were overcharged," which is to say where the individual putative class member "purchased the [item] from [the intermediary]." *Id.* at 589. Although other factors—for example the place where the conduct causing the injury occurred; the domicile, residence, nationality, place of incorporation and place of business of the parties; and the place where the relationship, if any, between the parties is centered—may be relevant in other circumstances, these have given way to the conclusion that the state in which the offending sale to the putative class member was made is the overriding factor in the choice-of-law analysis. *See, e.g., id.*, at 588 ("[T]he Court concludes that it must apply the law of the state where the injury occurred, not Tennessee's.").

Thus, if the law of the state in which the particular indirect purchase was made does not permit indirect purchaser actions under its antitrust laws—as many do not—an indirect purchaser plaintiff may not pursue such an indirect purchaser claim under Tennessee law. *See, e.g., Skelaxin*, 299 F.R.D. at 589 (concluding that, because "many of the states involved here do not allow indirect purchasers to sue … the court would have to amend the definition to omit those states"). As a result, "nationwide classes" under the laws of a particular individual state, such as what Plaintiffs' propose here, are untenable as a matter of law. *Skelaxin*, 299 F.R.D. at 581-90 (declining to certify such a class under Tennessee law); *In re Capacitors Antitrust Litig.*, 106 F.

49

Supp. 3d 1051, 1073-74 (N.D. Cal. 2015) (same as to California law); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007) (same); *see also Stromberg v. Qualcomm Inc.*, 14 F. 4th 1059, 1069-76 (9th Cir. 2021) (vacating order certifying nationwide class of indirect purchasers under California law).

Accordingly, Defendants are entitled to summary judgment dismissing all claims under Tennessee law for purchases made *outside* of Tennessee, including the claims of the named Plaintiffs, neither of whom made any purchases in Tennessee. (SUF ¶ 245.) Any claims related to such purchases must be made under the laws of the state in which the particular purchase was made. As a practical matter, this means that Plaintiffs' "Second Claim for Relief" should be dismissed entirely because any "in-state" purchases in Tennessee are covered by Plaintiffs' "Third Claim for Relief" and "Fourth Claim for Relief."[9]

### 2. The TTPA Does Not Apply to Services and Therefore Does Not Reach Claims Relating to Camps or Competitions

In its decision on Defendants' motion to dismiss, the Court dismissed Plaintiffs' purported claims under the TTPA as related to camps and competitions. (ECF No. 333 at PageID 7239.) The Court held that Plaintiffs had not responded to Defendants' argument on this point and as such conceded it. Plaintiffs filed for reconsideration on the basis that the argument had not been sufficiently pursued in Defendants' briefing. In fact, it had been addressed.[10]

---

[9] Other than as noted below, in their "Third Claim for Relief" Plaintiffs do not appear to seek to assert claims under the laws of states that do not permit indirect purchaser claims.

[10] (*See* ECF No. 57-1 at PageID 279 ("This statute, however applies only to tangible goods, not intangible services… as a threshold matter, this claim cannot apply to the alleged Cheer Competitions and Cheer Camps markets"); ECF No. 74 at PageID 581 ("Critically, Plaintiffs do not respond to USASF's arguments that the [TTPA] cannot support a claim for the alleged Cheer Competitions and Cheer Camps markets, which involve intangible services and appear to concede that they cannot state a TTPA claim for these markets.")) Ultimately, even Plaintiffs ultimately were forced to concede that the argument was in fact raised in the initial briefing. (ECF No. 335-1 at PageIDs 7288-89.)

There is no reason to revisit the Court's prior ruling on this point. The TTPA does not apply to services like cheer camps and competitions:

> *The TTPA, by its terms, applies only to articles or products and not to services.* Tennessee courts have held that "intangible contract right[s] or service[s]" are not within the scope of the TTPA. *See McAdoo Contractors, Inc. v. Harris*, 439 S.W.2d 594, 597 (Tenn. 1969) (holding that Tennessee anti-trust provisions do not apply to agreements controlling awards of building construction contracts because such contracts are not articles); *Beaudreau v. Larry Hill Pontiac*, 160 S.W.3d 874, 882 (Tenn. Ct. App. 2004) (holding that the TTPA does not apply to agreements about the arranging of auto financing because auto financing is a service); *Jo Ann Forman, Inc. v. Nat'l Council on Comp. Ins., Inc.*, 13 S.W.3d 365, 370 (Tenn. Ct. App. 1999) (holding that the TTPA does not apply to agreements about insurance premiums because insurance premiums are not articles within the TTPA).

*ADT Sec. Servs., Inc. v. Alarm Co., LLC*, 2006 WL 8435888, *2 (W.D. Tenn. Nov. 13, 2006) (emphasis added). In *Freeman Industries, LLC v. Eastman Chemical Co.*, the Tennessee Supreme Court emphasized that the TTPA pertains to tangible goods, not services or other intangibles, holding that the two purposes of the act were (1) "to preserve full and free competition in the sale of *merchandise* that had become a part of the *mass of property* in the state" and (2) "to preserve full and free competition in the manufacture and sale of *articles* of domestic growth and domestic *raw material.*" 172 S.W.3d 512, 517 (Tenn. 2005).[11]

Cheer competitions and cheer camps are not bundled goods and services in any sense that matters. When a team attends a cheer competition, it pays (or its team members pay) a registration fee so that to the team can compete, be judged, and receive scores. All of these things are *services.* Likewise, when a cheerleader attends a cheer camp, they pay a registration fee for the instruction that will be provided, which is a *service.*

---

[11] The Tennessee Supreme Court's construction of Tennessee state law is, of course, binding on this Court. *See, e.g., Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) (holding that "[t]his Court … repeatedly has held that state courts are the ultimate expositors of state law" and "accept[ing] as binding the Maine Supreme Judicial Court's construction of [Maine state] law").

Grasping at straws, Plaintiffs have argued that cheer camps and competitions are "goods" because, incidental to the provisioning of the services, a cheer camp or competition participant is given incidental access to a facility, such as a performance hall or practice space.  (ECF No. 451 at PageIDs 16872-73.)  That argument would swallow the distinction between goods and services that Tennessee courts have articulated because *any* service provided on the premises of the service provider (or space leased by the service provider) would likewise be considered a good, which would make no sense at all. Tennessee courts have recognized as much.  *See, e.g., Trails End Campground, LLC v. Brimstone Recreation, LLC*, 2015 WL 388313, at *11 (Tenn. Ct. App. Jan. 29, 2015) (holding that TTPA did not apply to an agreement to lease property to an outdoor recreation company).  Tennessee appellate courts have also rejected the argument that *actual* goods (not ephemeral access to performance or practice space) that are provided incidentally with a service can bring a claim under the purview of the TTPA.  *See, e.g.*, *id.* (holding the TTPA was inapplicable even though the competing companies provided "various outdoor recreation-related 'sundries'" in the course of their "service-oriented businesses"); *Amodeo v. ConservCare, LLC*, 2009 WL 736656, at *2 (Tenn. Ct. App. Mar. 20, 2009) (affirming dismissal of antitrust claims relating to chiropractic services even though chiropractors provided various products, such as ankle supports and cervical collars, and holding that "[t]o allow such a claim would expand the TTPA beyond the scope intended by the General Assembly and allow claims under the TTPA whenever a primarily service industry provides a product ancillary to such a service"); *Baird Tree Co. v. City of Oak Ridge*, 2008 WL 2510581, at *7 (Tenn. Ct. App. June 24, 2008) (rejecting argument that anticompetitive conduct in the awarding of a contract to provide tree trimming and removal was actionable under the TTPA because the contract would require the bidder to provide herbicides and, referring to *McAdoo*, concluding that "[i]f a

contractor having to purchase building materials to complete construction of a warehouse does not involve tangible goods, we fail to see how the service contract at issue would involve tangible goods simply because herbicide would have to be purchased in order to complete some of the requirements of the service contract.")

Plaintiffs also have argued that "bids" to other competitions that are sometimes awarded or the tickets to Disney World that are sold with registrations for competitions at the Walt Disney World complex constitute "goods." (ECF No. 335-1 at PageIDs 7289-90; ECF No. 451 at PageID 16870.) This makes no sense, either. In both cases, all that is provided is access to *more services*, either another competition in the case of a bid, or the rides, shows, and other services provided at Walt Disney World. *See also Bennett v. Visa U.S.A. Inc.*, 198 S.W.3d 747, 753 n.3 (Tenn. Ct. App. 2006) (holding that an ATM card is not a "product" for purposes of the TTPA because "[t]hese cards serve no function other than to identify their holders as individuals entitled to use the Defendants' [payment card processing] services").

In short, Tennessee courts have declined to "'expansively constru[e] what is a "product" or an 'article' within the meaning of Tennessee Code Annotated section 47–25–101." *Jo Ann Forman, Inc. v. Nat'l Council on Comp. Ins., Inc.*, 13 S.W.3d 365, 372 (Tenn. Ct. App. 1999). Registration fees for competitions or camps accordingly are not articles or products under the TTPA, and claims related to them accordingly are not cognizable under the TTPA.

### 3. The TCPA Does Not Apply to Claims Sounding in Antitrust

The Court has already dismissed Plaintiffs' claim under the Tennessee Consumer Protection Act (the "TCPA") because the TCPA forbids the amalgamation of claims under the TCPA in a class action. (ECF No. 333, at PageIDs 7253-54.) Plaintiffs have moved for reconsideration of the Court's decision. (ECF No. 335-1.) The Court should deny that motion. (*See* ECF No. 420 at PageIDs 13739-40.)

53

Regardless of the resolution of the motion for reconsideration, any claims under the

TCPA may not go forward as a matter of law for the independent reason that the TCPA does not

apply to claims based on anticompetitive conduct, including those at issue in this case.  *See, e.g.,*

*Sherwood v. Microsoft Corp.*, 2003 WL 21780975, at *33 (Tenn. Ct. App. July 31, 2003) ("[W]e

conclude that claims based upon anticompetitive conduct are not cognizable under the TCPA.

Plaintiffs' TCPA claims based on allegations of anticompetitive conduct must be dismissed."); *In

re Flonase Antitrust Litig.*, 610 F. Supp. 2d 409, 417 (E.D. Pa. 2009) ("[P]laintiffs cannot bring

claims based on anticompetitive conduct under the Tennessee Consumer Protection Act.").

### 4.  Plaintiffs' Unjust Enrichment Claims Under Tennessee Law Cannot Go Forward as a Matter of Law

Plaintiffs' fifth claim for relief seeks to apply unjust enrichment under Tennessee law to

Plaintiffs' entire Nationwide Damages Class.  (Compl. ¶¶ 257-66.)  The "law of unjust

enrichment varies from state to state in material respects," requiring a choice of law analysis.

*Cullen v. Nissan N. Am., Inc.*, 2010 WL 11579748, at *4 (M.D. Tenn. Mar. 26, 2010).  As with

Plaintiff's TTPA claim, "the local law of the state which 'has the most significant relationship to

the occurrence and the parties' should be applied."  *Chase Manhattan Bank, N.A. v. CVE, Inc.*,

206 F. Supp. 2d 900, 906 (M.D. Tenn. 2002).  Because antitrust claims of customers, and indirect

purchasers in particular, "focus on the place the injury occurred," the states with the most

significant relationships are those in which the members of the putative class made their

purchases.  *Skelaxin*, 299 F.R.D. at 586 & n.15 ( "interests of the states discussed herein would

mirror those in consideration of [plaintiffs' TTPA] claims" and holding that Tennessee unjust

enrichment law could not apply to out-of-state indirect purchasers); *Cullen*, 2010 WL 11579748,

at *5 (concluding, in a putative class action, that "any alleged unjust enrichment occurred at the

time and place of purchase, [] not necessarily in Tennessee," and that the laws of the states of

purchase should apply instead of Tennessee).  Without a valid basis to apply Tennessee unjust enrichment law nationwide, Plaintiffs' fifth claim for relief should be dismissed.

Moreover, even if Tennessee law did apply, that law would require Plaintiffs to prove that they "exhaust[ed] all remedies against the party with whom the plaintiff is in privity" unless the "pursuit of [such] remedies would be futile."  *Freeman Indus. v. Eastman Chem. Co.*, 172 S.W.3d 512, 526 (Tenn. 2005) (reversing trial court's denial of summary judgment of unjust enrichment claims of indirect purchases).  Plaintiffs are in privity with their gyms and schools, and there is no evidence that they have pursued remedies against either.  Whether the hundreds of thousands of members of Plaintiffs' putative "Nationwide Damages Class" have is, of course, unknowable without inquiry as to each.  There is nothing in the record to suggest that the pursuit of such remedies would be futile.

Plaintiffs also must show that Varsity "retained any unjust enrichment or money had and received."  *Bennett*, 198 S.W.3d at 756.  This is not the case here because, as the Court is aware, Varsity has agreed to pay $43.5 million to a nationwide class of gyms, from which the gyms' claims against Varsity will be satisfied.  (*See Fusion Elite* ECF No. 329.)  Thus, as in *Bennett*, at least as to purchases that Plaintiffs made from gyms, Varsity has not been "unjustly enriched … because [it has] paid consideration to the merchants for any benefits received indirectly from the plaintiffs."  *Id.* (reversing failure to dismiss unjust enrichment claims because the defendants had paid money to the intermediaries in settlement of the intermediary's claims).  Plaintiffs have the remedy of seeking recovery from the gyms, which means they have not exhausted their remedies against the gyms.  Any claim for unjust enrichment as to such purchases cannot go forward as a matter of law.

**B.  Several States Do Not Recognize Claims Based on Unilateral Conduct**

For the most part, Plaintiffs' claims are based on unilateral conduct by Varsity, which is

not actionable under these states' laws.  The lone exception is Plaintiffs' claim of a conspiracy

involving Varsity and USASF.  (Compl. ¶ 234.)

Several of the state statutes at issue—namely California, New York, Tennessee, and

Kansas—do not apply to unilateral conduct.  *See Dimidowich v. Bell & Howell*, 803 F.2d 1473,

1478 (9th Cir. 1986), *opinion modified on denial of reh'g*, 810 F.2d 1517 (9th Cir. 1987) ("No

California statute deals expressly with monopolization or attempted monopolization."); *Glob.*

*Reins. Corp.-U.S. Branch v. Equitas Ltd.*, 969 N.E.2d 187, 192 (N.Y. 2012) (holding that in New

York "[a]n antitrust claim under the Donnelly Act . . . must allege both concerted action by two

or more entities and a consequent restraint of trade within an identified relevant product

market"); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 284 (D. Mass. 2004) (reviewing

Tennessee's antitrust statute and holding that "[n]one of these terms appears to include unilateral

conduct."); *In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs.& Antitrust Litig.*,

336 F. Supp. 3d 1256, 1314 (D. Kan. 2018) (dismissing "the class plaintiffs' Kansas antitrust law

claims based on unilateral conduct" because "the Kansas Restraint of Trade Act does not permit

unilateral conduct").  Insofar as USASF has nothing to do with cheer camps, school cheer, or

apparel (SUF ¶ 41, 62-63, 159), Plaintiffs' purported claims under the antitrust laws of those

states' laws related to those items cannot go forward as a matter of law.  Nor can Plaintiffs'

consumer protection claims under those states' laws go forward.  As the Court has already held,

"[s]tate consumer protection law claims fail when the antitrust claims based upon the same

underlying conduct also fail."  (ECF No. 333 at PageID 7252.)  In so holding, the Court quoted

the on-point holding of the Illinois Supreme Court in *Laughlin v. Evanston Hospital*, 550 N.E.2d

986, 993 (Ill. 1990), that "[i]t would be inconsistent to provide that the very conduct which is not

sufficient to state a cause of action under the Antitrust Act is sufficient to state a cause of action under the Consumer Fraud Act."

### C.  Several States Do Not Allow Indirect Purchaser Claims

Indirect purchaser claims are not allowed under the antitrust laws of Arkansas, Florida, Idaho, Massachusetts, and Washington.  *See Stromberg*, 14 F.4th at 1069 n.3 (holding that Arkansas antitrust law limits indirect purchaser claims to those brought by the state attorney general); *Mack v. Bristol-Meyers Squibb Co.*, 673 So. 2d 100, 102-03 (Fla. Dist. Ct. App. 1996) (holding that Florida antitrust law bars indirect purchaser claims); *Stromberg*, 14 F.4th at 1069 n.3 (holding that Idaho antitrust law limits indirect purchaser claims to those brought by the state attorney general); *Ciardi v. F. Hoffman-La Roche, Ltd.*, 762 N.E.2d 303, 307-08 (Mass. 2002) (holding that Massachusetts antitrust law bars indirect purchaser claims); *Blewett v. Abbott Lab'ys*, 938 P. 2d. 842, 846 (Wash. 1997) (holding that Washington antitrust law bars indirect purchaser claims).  Defendants are entitled to summary judgment on Plaintiffs' purported claims under the antitrust laws of those states.  *See, e.g., In re TFT–LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1191 (N.D.Cal.2009) (dismissing indirect claims under Arkansas law); *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124, 1145 (N.D. Cal. 2007) (dismissing indirect purchaser claims under Florida antitrust act); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 907 (N.D. Cal. 2008) (dismissing indirect purchaser claims under Idaho antitrust act); *In re: EpiPen Mktg.*, 336 F. Supp. 3d at 1312-13 (dismissing indirect purchaser claims under Massachusetts antitrust act); *Blewett*, 938 P. 2d. at 847 (dismissing indirect purchaser claims under Washington antitrust act).  And, as noted in the previous section, the Court has already held that claims that cannot be brought under a state's antitrust statute cannot be brought under a state's consumer protection statute (ECF No. 333 at

PageID 7252), which means that claims under those states' consumer protection statutes included in Plaintiffs' Fourth Claim for Relief) may not go forward, either.

### D. There Is No Basis to Assess Damages In States with Statutes of Limitations That Differ from the Four-Year Federal Statute of Limitations

Several states have statutes of limitations that are different (and generally shorter) than the four-year statute of limitations that pertains to claims under the federal antitrust laws.[12] At a minimum, this means that the claims under these statutes must be limited to the relevant period before the complaint was filed. There is no basis in the record for the trier-of-fact to do this, however. The "damage" numbers that Plaintiffs have put forward, even to the extent broken out by state, do not reflect the pertinent statute of limitations period for these states. This is even more remarkable given that Plaintiffs' second cause of action under the TTPA and fifth cause of action for unjust enrichment—the basis for Plaintiffs' putative nationwide damages class—are each subject to a three-year statute of limitations. *See* Tenn. Code § 28–3–105.

Because Plaintiffs have provided no sound basis for the trier-of-fact to calculate damages as to claims under Tennessee's or these other states laws, those claims must be dismissed. *See Isaksen v. Vt. Castings, Inc.*, 825 F.2d 1158, 1165 (7th Cir. 1987) ("We do not allow antitrust plaintiffs or any other plaintiffs to obtain damage awards without proving what compensable damages were actually suffered as a result of the defendant's unlawful conduct."); *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 2023 WL 25344, at *18 (E.D. Va. Jan. 3, 2023) (record supported entry of summary judgement on damages because plaintiffs' "damages model is fundamentally flawed in that it does not even attempt to separate harm stemming from the limited conduct within the

---

[12] In particular, Kansas, Mississippi and Tennessee have a three-year statute of limitations for claims brought under state law. *See Idstrom v. All. Radiology, P.A.*, 388 P.3d 923 (Kan. Ct. App. 2017) (Kansas); Miss. Code Ann. §§ 15-1-49(1) (Mississippi); *In re Pre-Filled Propane Tank Antitrust Litig.*, 2019 WL 4796528, at *15 (W.D. Mo. Aug. 21, 2019) (Tennessee).

limitations period… This is not a case where the plaintiff has admissible evidence supporting its damages claim separate and apart from its damages expert."); *Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, 221 F. Supp. 3d 1033, 1044–45 (N.D. Ind. 2016) ("[Plaintiffs' expert] gives the jury no basis on which to evaluate the effect of the statute of limitations on his damages opinion… he did not tie his damages opinion to any particular injury… the jury would be left entirely to speculation to determine whether any snowball effect was triggered by acts that accrued before or after the limitations period began, or to assess what portion of the snowball was attributable to acts that caused harm within the limitations period. No award of damages based on that sort of speculation could be sustained.")

### E.  Various Procedural Requirements Have Not Been Met

Several states' antitrust laws have procedural requirements that Plaintiffs have not satisfied.  Arizona, Connecticut, Hawaii, Minnesota, Nevada, and Utah require plaintiffs to notify the attorney general about the filing of any class action involving antitrust violations under their laws.  Failure to comply with these notice provisions results in dismissal.[13]  Plaintiffs have not complied with the notice requirements in each of these states (SUF ¶ 246), and their claims under Arizona, Connecticut, Hawaii, Minnesota, Nevada, and Utah laws should be dismissed.

## VII.   PLAINTIFFS' CLAIM FOR "DECLARATORY RELIEF" SHOULD BE DISMISSED

In their "Sixth Claim for Relief," Plaintiffs "incorporate by reference each proceeding and succeeding paragraph [of their Complaint]" and "seek a declaratory judgment that Defendant's conduct seeking to prevent competition as described herein violates Section 2 of the

---

[13] *See In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 385, 389 (D.N.J. 2018) (dismissing class claims under Arizona's Uniform Antitrust Act for failure to comply with Arizona's notice provisions); *In re Flash Memory Antitrust Litig.*, 643 F.Supp.2d 1133, 1158 (N.D.Cal.2009) (same under Hawaii antitrust act); *In re Effexor*, 357 F. Supp. 3d at 389 (same under Nevada Unfair Trade Practices Act and Utah Antitrust Act).

Sherman Act." (Compl. ¶¶ 267-68.) In other words, in addition to seeking to bring a claim under Section 2 in their so-called "First Claim for Relief," Plaintiffs ask this Court to declare that some or all of Defendants' conduct "violates Section 2 of the Sherman Act." Of course, if summary judgment regarding Plaintiffs' Section 2 claims is granted, summary judgment dismissing Plaintiffs' "Sixth Claim for Relief" should be as well. Further, because whether there was a violation of Section 2—the (one) thing Plaintiffs say they seek a "declaration" of—will necessarily be decided in the disposition of Plaintiffs' Section 2 claim, the claim for declaratory relief adds nothing and should be dismissed as superfluous. *See, e.g.*, *Pineda Transp., LLC v. FleetOne Factoring, LLC*, 2018 WL 2137760, at *7 (M.D. Tenn. May 9, 2018) (dismissing a claim for declaratory relief because "[a] declaration of rights as requested could clarify the rights and relations of the parties, but so could a ruling on Plaintiffs' other claims").

## CONCLUSION

For the reasons discussed above, Defendants respectfully request that the Court grant Defendants' motion for summary judgment and dismiss Plaintiffs' case in its entirety. To the extent the Court concludes that the entire case is not subject to dismissal, Defendants respectfully request partial summary judgment as to those claims and issues as to which the Court determines there is no genuine issue of material fact.

Dated: July 28, 2023                     Respectfully submitted,

                                         s/ Matthew S. Mulqueen
                                         _____

                                         George S. Cary*
                                         Steven J. Kaiser*
                                         CLEARY GOTTLIEB STEEN & HAMILTON LLP
                                         2112 Pennsylvania Avenue, NW
                                         Washington, DC 20037
                                         Phone: (202) 974-1500
                                         Fax: (202) 974-1999
                                         gcary@cgsh.com

skaiser@cgsh.com

Jennifer Kennedy Park*
Heather Nyong'o*
CLEARY GOTTLIEB STEEN & HAMILTON LLP
1841 Page Mill Road, Suite 250
Palo Alto, CA 94304
Phone: (650) 815-4100
Fax: (202) 974-1999
jkpark@cgsh.com
hnyongo@cgsh.com

* Admitted *pro hac vice*

Matthew S. Mulqueen (TN #28418)
Adam S. Baldridge (TN #23488)
BAKER, DONELSON, BEARMAN, CALDWELL &
BERKOWITZ
165 Madison Avenue, Suite 2000
Memphis, TN 38103
Phone: (901) 526-2000
Fax: (901) 577-0866
mmulqueen@bakerdonelson.com
abaldridge@bakerdonelson.com

*Attorneys for Varsity Brands, LLC*; *Varsity Spirit,
LLC*; *Varsity Spirit Fashions & Supplies, LLC;
Charlesbank Capital Partners, LLC; Bain Capital
Private Equity LP*

s/ Nicole Berkowitz Riccio

Grady Garrison (TN #008097)
Nicole Berkowitz Riccio (TN #35046)
James Andrew Roach (TN #37934)
BAKER, DONELSON, BEARMAN, CALDWELL
& BERKOWITZ
165 Madison Avenue, Suite 2000
Memphis, TN 38103
Phone: (901) 526-2000
Fax: (901) 577-0866
ggarrison@bakerdonelson.com
nriccio@bakerdonelson.com
aroach@bakerdonelson.com

*Attorneys for U.S. All Star Federation, Inc.*

s/ Brendan P. Gaffney

Paul E. Coggins*
Brendan P. Gaffney*
Kiprian E. Mendrygal*
Jennifer McCoy*
Katherine Wright
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Phone: (214) 740-8000
Fax: (214) 740-8800
pcoggins@lockelord.com
bgaffney@lockelord.com
kmendrygal@lockelord.com
jennifer.mccoy@lockeord.com
katie.wright@lockelord.com

* Admitted pro hac vice

Edward L. Stanton III (TN #018904)
S. Keenan Carter (TN # 023386)
BUTLER SNOW LLP
6075 Poplar Avenue, Suite 500
Memphis, Tennessee 38119
Telephone: (901) 680-7336
Fax: (901) 680-7201
Edward.Stanton@butlersnow.com
Keenan.carter@butlersnow.com

*Attorneys for Jeff Webb*