# EXHIBIT 10

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

**JESSICA JONES, et al.,**

               Plaintiffs,

v.

**VARSITY BRANDS, LLC, et al.**

               Defendants.

Case No. 2:20-cv-02892-SHL-tmp

**JURY DEMAND**

---

## STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.    COMPETITIVE CHEER INDUSTRY[1]

1.    Millions of athletes participate in the sport of competitive cheerleading ("Competitive Cheer"), either through private gyms, commonly referred to as All Star gyms ("All Star Cheer") or through schools ("School Cheer"), or both. **Ex. 2** [Netz Rebuttal] at 89 & n. 72; **Ex. 51** at 5544 (2/2018, Bain Presentation).

2.    School Cheer consists of Competitive Cheer teams affiliated with middle schools, high schools, or colleges. **Ex. 1** at 15-16 [Netz Rep.]; **Ex. 52** at 8542 (5/2018, Varsity Presentation).

3.    Regardless of whether an athlete competes on a gym team or a school team, both activities are essentially the same. **Ex. 1** [Netz Rep.] at 5-13; **Ex. 33** [Kennedy Dep.] at 302:12-308:7 ("All Competitive Cheer teams (gyms and schools) compete head-to-head against other teams in events with unique, choreographed, and highly acrobatic routines that last two and a half minutes.").

4.    Competitive Cheer is a competitive sport distinct from sideline cheerleading.[2] **Ex. 1** [Netz Rep.] at 11-12. **Ex. 51** at 5546.

5.    Competitive Cheer athletes and their families pay fees to their gyms and schools to participate in Competitive Cheer. Those gyms and schools then pay Varsity to attend its Cheer Competitions and Cheer Camps, and to purchase Cheer Apparel (collectively, "the relevant

---

[1] For the purposes of this Statement, "Varsity" refers collectively to Varsity Brands, LLC ("Varsity Brands"), Varsity Spirit, LLC ("Varsity Spirit"), and Varsity Spirit Fashions & Supplies, LLC ("Varsity Fashion"). Defendants also include Charlesbank Capital Partners, LLC ("Charlesbank") and Bain Capital Private Equity, LP ("Bain"). On August 23, 2022, Plaintiffs moved to add additional Defendants. *See* ECF No. 344 at 4-5.

[2] Defendants incorrectly use the term "scholastic cheer" instead of Plaintiffs' term School Cheer, which encompasses sideline cheer and other activities that are not the subject of Plaintiffs' claims. This distinction is important because Defendants incorrectly posit and predicate their arguments and facts on "scholastic" cheer, and not School Cheer, as Plaintiffs define it.

markets"), as well as a host of other fees required to participate in the sport, such as for travel, lodging, and to be a spectator at events. **Ex. 1** [Netz Rep.] at 1-2.

6.    Cheer Competitions, Cheer Apparel and Cheer Camps are the three main types of costs incurred by athletes and their families to participate in Competitive Cheer. **Ex. 1** [Netz Rep.] at 13-14; **Ex 3** [Heeb Rep.] at ¶ 36.

7.    The average cost per All Star Cheer season to a team member's family is approximately $4,000 including uniforms, apparel, travel, and camps. However, the total cost to families can exceed $10,000 when including lodging, spectator fees, and other related expenses. **Ex. 1** [Netz Rep.] at 13; **Ex. 53** at 4735 ███████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████ ).

8.    All Star and School Cheer teams participate in Cheer Camps. **Ex. 51** at 5547-48.

9.    The average cost for School Cheer is approximately ██████ per athlete, including uniforms, apparel, competitions, camps, and travel. **Ex. 1** [Netz Rep.] at 13-14; **Ex. 53** at 4739.

10.    Over time, total participation costs have increased for both All Star Cheer and School Cheer athletes due to rising prices of Cheer Competitions, Cheer Camps, and Cheer Apparel. **Ex. 1** [Netz Rep.] at 13-14; **Ex. 3** [Heeb Rep.] at 198, 264-265.

11.    Competitive Cheer is essentially a year-round commitment for teams, athletes, and families. **Ex. 1** [Netz Rep.] at 13, 5-17; **Ex. 54** at 9324.

12.    All Star teams attend an average of seven to nine cheer competitions each season. **Ex. 1** [Netz Rep.] at 16. **Ex. 51** at 5546 ("Top cheer gyms … will compete 7-9 times per year nationally.").

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

13.    School Cheer teams attend an average of six competitions each season. **Ex. 3**
[Heeb Rep.] at ¶ 130.

14.    Competitive Cheer athletes compete during the season with the goal of attending
key end-of-season events. The Cheerleading Worlds ("Worlds"), hosted by the USASF, is the
most prestigious end-of-season event for All Star Cheer teams. **Ex. 1** [Netz Rep.] at 16-17; **Ex. 2**
[Netz Rebuttal] at 89-90 & n. 243 (Worlds bids and Summit bids are coveted events); **Ex. 22**
[Foster Dep.] at 170:23 – 171:5 (Q: Was that considered a significant accomplishment by a team
to go to cheerleading Worlds? A: I would say so, yes.").

15.    Teams qualify for Worlds by performing well at other USASF-sanctioned
competitions, held by one of the 42 event Tier 1 event producers. **Ex. 1** at 16 [Netz Rep.] The 42
Tier 1 event producers also make up the composition of USASF's Sanctioning Committee
("USASF SC"). As of 2015 with Varsity's acquisition of JAM Brands, Varsity owned the
majority of the 42 Tier 1 event producer seats, giving it control of the USASF SC. **Ex. 55** at 0664
(Point 16.f re M&A strategy for All Star events: "Varsity now owns 32 of those Tier 1 companies
███████████"). As of early 2020, Varsity owned 34 of the 42 Tier 1 EPs. **Ex. 56** at
8761.

16.    Varsity owns three end-of-season events, The Summit, The D2 Summit, and the
U.S. Finals, for which teams strive to obtain a bid and attend. **Ex. 1** [Netz Rep.] at 17; **Ex. 55** at
0631, 0664.

17.    Teams strive to attend The Summit, which is held at Disney World in Orlando,
Florida, and Varsity describes it as the "All Star cheerleading grand finale." **Ex. 1** [Netz Rep.] at
17-18; **Ex. 55** at 0631.

18.    Varsity created The Summit to hinder competition. It did so by requiring that All

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Star teams could only earn a bid to The Summit by attending at least one regular season Varsity event. **Ex. 1** [Netz Rep.] at 17-18; **Ex. 57** at 2584 ███████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ ").

19.     Varsity also hosts the U.S. Finals end-of-year championship and assumed ownership of this event through its acquisitions of JAM Brands and EPIC Brands. **Ex. 1** [Netz Rep.] at 16-18, 94-98; **Ex. 58** at 5064, 5076.

20.     The School Cheer season culminates with a national championship event, the U.S. Nationals ("Nationals"), which is owned by Varsity. **Ex. 1** [Netz Rep.] at 16-18 & Exhibit 2 (list of Varsity-owned brands).

21.     Varsity also owns and controls three School Cheer competition brands, Universal Cheerleaders Association ("UCA"), National Cheerleaders Association ("NCA") and United Spirit Association ("USA"), all of which hold year-end championships for high school and college athletes. **Ex. 1** [Netz Rep.] at 15.

22.     Under Varsity's Squad Credentialing Program, to qualify for Nationals, high school cheer teams first must qualify by performing well in a regional event, with only those who attend a Varsity-owned camp being able to qualify for Nationals at such regional events. **Ex. 59** (UCA website: teams that do not attend a Varsity Spirit camp can compete at a local UCA competition "but they will not be eligible to receive a bid to the NHSCC [National High School Cheerleading Championship]."); **Ex. 1** [Netz Rep.] at 25, 61-62 (Varsity's Squad Credentialing Program is one way Varsity tied Cheer Competitions and Cheer Camps market).

23.     Over time, Varsity has obtained control over nearly all of the sanctioning bodies that govern All Star and School Cheer, including the AACCA, ICU, NACCC, USA Cheer, IASF,

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

USASF, and NFHS. **Ex. 1** [Netz Rep.] at 19 & n. 73-74; *id.* at Exhibit 3 (chart of sanctioning

bodies controlled by Varsity); **Ex. 4** [Heeb Rebuttal], at ¶ 376, n. 427; **Ex. 54** at 9353-59; **Ex. 60**

at 7215.

## II.    PLAINTIFFS

24.     Plaintiffs are parents, guardians, and families of athletes who participate in

Competitive Cheer on teams run through All Star gyms, schools, or both. ECF No. 1 (Complaint,

¶¶ 13-15).

25.     Jessica Jones is the parent of two Competitive Cheer athletes who participated in

the sport as members of All Star gym teams. Ms. Jones indirectly paid Varsity for enrollment and

admission to Varsity Cheer Competitions and indirectly purchased Cheer Apparel manufactured

and sold by Varsity. ECF No. 1 (Complaint, ¶13); **Ex. 61** at ¶¶ 5-6.

26.     Christina Lorenzen is the parent of a Competitive Cheer athlete who participated

in the sport on School Cheer teams. Ms. Lorenzen indirectly paid Varsity for registration in

Varsity School Cheer Competitions and for Cheer Apparel. ECF No. 1 (Complaint, ¶ 15). As part

of her participation on her School Cheer team, Ms. Lorenzen's daughter was required to attend a

tumbling clinic each week at a gym, Cheer Central Suns, which she testified was mandatory and

required by the team's coach, and for which she paid to have her daughter attend. **Ex. 35**

[Lorenzen Dep.] at 69:23-69:1.

27.     On February 2, 2023, Plaintiffs filed a motion to add Amy Coulson as a class

representative. ECF No. 394. Ms. Coulson resides in the Memphis, Tennessee metropolitan area,

where Varsity has its headquarters. She has paid Varsity indirectly for her three daughters to

compete in Varsity Cheer Competitions and to attend Varsity Cheer Camps, and has indirectly

purchased Varsity Cheer Apparel, including uniforms, other apparel, and accessories, continually

since 2012. Her daughters have competed on All Star gym teams as well as for their middle

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

school and high school cheerleading teams, and have attended Varsity competitions and camps, and purchased apparel in connection with both teams. ECF No. 394-2, ¶ 7.

28.     Families of cheer athletes struggle to keep up with the rising costs of Competitive Cheer. **Ex. 30** [Jones Dep.] at 34:21-36:6, 36:2-36:6 (some families are so desperate they donate their plasma to fund cheer); **Ex. 63** at 7474 ("Owners feel like they are constantly apologizing for pricing because it is so readily available for parents to see and they deconstruct cost of events and is SO expensive) (emphasis in original).

### III.     DEFENDANTS AND CORPORATE OWNERSHIP STRUCTURE

29.     Varsity was founded by Jeff Webb in 1974 to create a related, but distinct, sport from the traditional sport of sideline cheer, **Ex. 1** [Netz Rep.] at 12-16; **Ex. 64** at 4559; **Ex. 12** [Elza Dep.] at 59:11-22.

30.     In 2014, Charlesbank acquired Varsity Brands for nearly $1.5 billion. **Ex. 1** [Netz Rep.] at 63; **Ex. 65** (Charlesbank, Portfolio/Consumer, Varsity Brands, https://www.charlesbank.com/portfolio/companies/varsity-brands/ (last visited Feb. 9, 2023)).

31.     After Bain purchased Varsity in 2018, Charlesbank still retained a seat on Varsity's Board. **Ex. 28** [Janower Dep.] at 158:01-158:08, 185:11-185:15; **Ex. 29** [Charlesbank 30(b)(6) Dep.] at 185:11-186:7 (Charlesbank has continuously held one seat on Varsity's Board of Directors since the Bain transaction); **Ex. 66** (list of officers and directors of Varsity entities as of 3/2/2018); **Ex. 67** (list of officers and directors of Varsity entities as of 9/22/2016).

32.     In 2018, Charlesbank sold Varsity to Bain for nearly $2.9 billion, securing significant profits from the sale. **Ex. 68** at 1550 (6/23/2018, White (Charlesbank): "As you know, earlier this week we signed a transaction to sell Varsity to Bain Capital for $2.88 billion, a ~3.4x multiple of our original investment."); **Ex. 21** [Bain Dep.] at 16:1-12] (confirming Varsity purchase price of $2.88 billion).

33.    Charlesbank continued to hold a financial stake in Varsity after the company was sold to Bain. **Ex. 1** [Netz Rep.] at 9; **Ex. 68** at 1553 (6/23/2018, White (Charlesbank): "As part of the sale, we along with Partners Group have the right to purchase up to ~25% of the equity in the Bain transaction; … Over the last 6 months we have thoroughly re-underwritten the business and we recommend that Fund IX invest in the Bain transaction.").

34.    After the sale to Bain, Charlesbank invested an additional ███████ in Varsity and continued to influence Varsity's business strategy. **Ex. 1** [Netz Rep.] at 9; **Ex. 3** [Heeb Rep.] at ¶ 89; **Ex. 68** at 1550-1554; **Ex. 29** [Charlesbank Dep.] at 167:4-169:24, 185:11-186:7.

### A.    composition of varsity board of directors

35.    Varsity Brands is governed by a Board of Directors ("Varsity Board"). Between December 2014 and July 2018, Charlesbank held a controlling majority on the Varsity Board. **Ex. 69** at 7068 (Charlesbank held ████ seats); **Ex. 10** [Webb Dep.] at 343:3-6 ("Charlesbank . . . were in control of the board").

36.    On March 2, 2016, when Jeff Webb exited his position as CEO of Varsity Brands, he continued to serve on Varsity company boards. **Ex. 21** [Bain Dep.] at 100:20-101:15 (Varsity Board); **Ex. 70** at 1297-98 (Varsity Spirit Board); **Ex. 10** [Webb Dep. 41:1-4]; **Ex. 66** (list of officers and directors of Varsity entities as of 3/2/2018); **Ex. 67** (list of officers and directors of Varsity entities as of 9/22/2016); **Ex. 70** at 1297-98, 1300 [Webb Dep.]; **Ex. 33**.

37.    On or around July 2018, Bain created a "new holding structure on top including a top level partnership where the real substantive board is." **Ex. 71** at 3840.

38.    Bain constructed the current Varsity Board so that Bain is entitled to four of six seats, with the remainder reserved for Varsity's CEO and a Charlesbank representative. **Ex. 1** [Netz Rep.] at 9-11.

### B.    varsity control over usasf and other rulemakers

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

39.    Varsity created USASF in 2004 as a means to control the sport of Competitive Cheer. **Ex. 1** [Netz Rep.] at 19-22 & Exhibit 2; **Ex. 11** [Parrish Dep.] at 32:8-32:33 (USASF was also formed to neutralize the NACCC, a competing group); **Ex. 73** (USASF website); **Ex. 74** at 5399 (In Varsity's own words: "<u>In the world of sports, he who makes the rules, rules.</u>") (emphasis added); **Ex. 75** at 9106 ("USASF was created as a Varsity strategy"); **Ex. 76** at 7772-78 (6/28/2019, IEP Letter to Gym Owners: "One company runs our sport. One company runs our governing body." … Lord Acton of Great Britain said, "Absolute power corrupts absolutely.").

40.    USASF was operated by Varsity-paid employees since its inception until recently. **Ex. 14** [Peterson Dep.] at 275:1-10 (Steve Peterson, USASF President of Events and Corporate Alliances, has worked at the USASF since 2004, but was technically a Varsity employee until 2020); **Ex. 15** [Chadwick Dep.] at 38:17-39:4, 41:1-41:19 (Jim Chadwick, USASF President and Chairman, worked for USASF from 2004 to 2021); **Ex. 204** at 2897 (through 2015, USASF employees were employees of Varsity and were paid by Varsity, which was then reimbursed by USASF).

41.    Until 2015, USASF and Varsity shared the same office space at Varsity's offices. **Ex. 1** [Netz Rep.] at 19-22; **Ex. 77** at 0485.

42.    USASF personnel were employees of Varsity and received incentives from Varsity, including participation in Varsity's profit-sharing plan. **Ex. 1** [Netz Rep.] at 6-7, 21 & n. 7-8, 80, 82; **Ex. 77** at 0485 (six USASF individuals included on Varsity email regarding ESOP distribution); **Ex. 14** [Peterson Dep.] at 274:8-276:24, 281:22-282:14; **Ex. 12** [Elza Dep.] at 152:7-156:3.

43.    Varsity also financed and funded USASF. *See* **Ex. 12** [Elza Dep.] at 150:19-156:3; **Ex. 78** at 2541 ("The [$1.8 million] no-interest start up loan, along with the necessary office

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

support, provided by Varsity was the foundation that allowed the USASF to establish and develop our mission."); **DX Ex. E** at 1489 (Varsity provided rainy day fund to USASF).

44.     Varsity owned the USASF trademarks until 2017. **Ex. 1** [Netz Rep.] at 19-20; **Ex. 79** at 0555; **Ex. 15** [Chadwick Dep.] at 154:4-156:5.

45.     Varsity controls the USASF Board of Directors ("USASF Board"). **Ex. 1** [Netz Rep.] at 21-22; **Ex. 6** [Aronoff Rebuttal] at 80 & n. 86; **Ex. 11** [Parrish Dep.] at 612:13-25 (through USASF, Varsity controls USASF's rule changes and other decisions).

46.     In January 2005, the USASF Board increased its number of voting seats from nine to thirteen. **Ex. _** [Aronoff Rebuttal] at 80 & n. 86; **DX Ex. R** at 1. Since 2005, Varsity has controlled the USASF Board with no fewer than seven out of 13 voting seats. Nine of the voting seats on the USASF Board are permanent: seven are reserved for representatives from proscribed event producers; two are reserved for USASF representatives. **DX Ex. D** at 2454. Varsity-paid employees, Jim Chadwick and Steve Peterson, occupied the permanent seats reserved for USASF representatives on the USASF Board: Jim Chadwick from 2004 to 2021 and Steve Peterson from 2004 to present. **Ex. 15** [Chadwick Dep.] at 38:9-19, 41:1-19]; **Ex. 14** [Peterson Dep.] at 275:1-15, 392:17-21. In 2005, Varsity owned five of the seven event producers with permanent seats on the USASF Board. **DX Ex. D** at 2454. With its acquisition of CheerSport in 2012 and JAM Brands in November 2015, Varsity gained control of all seven permanent seats reserved for event producers. To gain the seats, Varsity simply kept the seats of those event producers it had acquired. **Ex. 24** [Fowlkes Dep.] at 51:19-23 ("Q. When you -- when Cheer Sport was acquired by Varsity in approximately 2012, was there any discussion that you should give up your Board seat on the USASF? A. No, sir."). The strategy of subsuming USASF Board seats was deliberate. **Ex. 80** at 0282 (█████████████████████████████

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

████████████████████████████████████████████

████████████████████████████████████████████

████████ ).

47.    Varsity controls the USASF Sanctioning Committee ("USASF SC"), at least since
it acquired JAM Brands in November 2015, at which time Varsity then owned 32 of the 42 Tier 1
event producer seats on USASF's SC. **Ex. 55** at 0664; **Ex. 56** at 8761; **Ex. 83** at 0227.

48.    Varsity intentionally sought to acquire rival Tier 1 event producers to gain control
of the USASF SC and the Worlds bid system. **Ex. 55** at 0644 ("We look to acquire all the Tier I
event companies . . . that give bids to the cheerleading . . . Worlds. There are only 42 Tier I event
companies. Varsity now owns 36 of those Tier I companies in all of the best markets."); **Ex. 292**
(Tier 1 producers have power to grant Worlds bids).

## IV.    MARKET DEFINTIONS AND MARKET POWER

### A.    the relevant markets are properly defined

49.    Cheer Competitions is a relevant and properly defined product market. **Ex. 1**
[Netz Rep. at 41-45]; **Ex. 3** [Heeb Rep.] at ¶¶ 117-120.

50.    All Star and School Cheer competitions are properly defined in the same relevant
market for Cheer Competitions. **Ex. 4** [Heeb Rebuttal] at ¶¶ 129-140; **Ex. 2** [Netz Rebuttal] at
17-20.

51.    Regular and end-of-season competitions are properly defined in the same relevant
market. **Ex. 2** [Netz Rebuttal] at 20-24; **Ex. 4** [Heeb Rebuttal] at ¶¶ 141-142.

52.    Regular season School Cheer Competitions and Post-season School Cheer
competitions are properly defined in the same relevant market. **Ex.4** [Heeb Rebuttal] at ¶¶ 143-
145.

53.    The relevant geographic market for Cheer Competitions is national. **Ex. 1** [Netz

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Rep.] at 41-45; *see also* **Ex. 12** [Elza Dep.] at 304:23-305:24 ("Q. Some gyms travel across the country from various different … across states to go to events. I mean, Indianapolis and Atlantic City are pretty far apart, correct? [Objection Omitted] A. That's correct. Q. And so if you moved an event from Indianapolis to Atlantic City, you could still attract at least some of the same customers; is that fair? [Objection Omitted] A. Yes. … that's our sales strategy across the board.").

54.    Cheer Camps is a relevant and properly defined product market. **Ex. 1** [Netz Rep.] at 60; **Ex. 3** [Heeb Rep.] at ¶¶ 112-117.

55.    The relevant geographic market for Cheer Camps is national. **Ex. 1** [Netz Rep.] at 60-62; **Ex. 3** [Heeb Rep.] at ¶¶ 145-152.

56.    Cheer Apparel is a relevant and properly defined product market. **Ex. 1** [Netz Rep.] at 55-57; **Ex. 3** [Heeb Rep.] at ¶¶ 112-117; 153-162.

57.    Varsity Cheer Apparel includes five apparel product categories: uniforms, shoes, accessories, warm-ups, and camp wear. **Ex. 84** at 1952.

58.    These five products generally form a kit that all athletes must purchase in order to compete in Cheer Competitions and to participate on All Star and School Cheer teams. **Ex. 54** at 9305, 9309, 9320 ████████████████████).

59.    The relevant geographic market for Cheer Apparel is national. **Ex. 1** [Netz Rep.] at 55-59; **Ex. 3** [Heeb Rep.] at ¶¶ 165-168; **Ex. 4** [Heeb Rebuttal] at ¶ 49.

**B.    varsity possesses market power in each relevant market**

60.    Varsity possesses market power in the Cheer Competitions market. **Ex. 1** [Netz Rep.] at 45-61 (By 2016, Varsity had 75% market share of US Cheer Competitions); **Ex. 3** [Heeb Rep.] at ¶¶ 169-181.

61.    By eliminating nearly all of its major rivals, Varsity's market share in Cheer

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Competitions grew from 42% in 2013 to 80-85% in 2018. **Ex. 1** [Netz Rep.] at 52; **Ex. 20** [Cota

Dep.] at 53:15–21; **Ex. 85** at 6985; **Ex. 86** at 5236.

62.     Varsity possesses market power in the Cheer Camps market. **Ex. 1** [Netz Rep.] at

60-62; **Ex. 3** [Heeb Rep.] at ¶¶ 112-117.

63.     Varsity is the largest operator of Cheer Camps in the United States and controls

over 80% of the market. **Ex. 1** [Netz Rep.] at 33, 61; **Ex. 3** [Heeb Rep.] at ¶¶ 38, 79, 147; **Ex. 52**

at 8545 (As of May 2018, Varsity operated more than 5,600 Cheer Camps each summer, which

were attended by over 320,000 athletes.).

64.     Varsity possesses market power of the Cheer Apparel market. **Ex. 1** [Netz Rep.] at

50-52; **Ex. 3** [Heeb Rep.] at ¶¶ 185-193. Varsity controls approximately 80% of the Cheer

Apparel market. **Ex. 20** [Cota Dep.] at 53:9-54:2 (From 2012 to 2018, Varsity's market share

increased up to 85% in the competitive cheer market and 80% in the All-Star apparel market);

**Ex. 1** [Netz Rep.] at 58 & n. 233; **Ex. 88** at 0397.

65.     Defendants admit Varsity dominated the relevant markets in their own documents.

**Ex. 1** [Netz Rep.] at 51; **Ex. 3** [Heeb Rep.] at ¶¶ 196-200; **Ex. 89** at 5574-75 (8/21/2017,

"Varsity Spirit has managed to become the total market leader in all things cheer." …  "The key

is to maintain market share, avoid being viewed as a monopoly, and respond directly and firmly

to all competitors in the space." … slide titled "THE ELEPHANT IN ROOM" reads: "The

success of UCA, the subsequent acquisitions, and the general practices of Varsity Spirit, have put

the company in a very successful, dominant position."); **Ex. 64** at 4544 ("Varsity is the leading

marketer and manufacturer of branded products and services to the school spirit industry." …

"The Company's dominant market platform allows it to continually expand the sector through

Varsity's leading organizations and brands within the cheerleading industry."); **Ex. 90** at 2211

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

(Varsity has "#1 Market position" in uniforms, camps, and competitions; Varsity has "dominant market position in all segments") (emphasis added); **Ex. 91** at 0158 (11/20/2014, Jefferies presentation for investors in Varsity: "Varsity Spirit … remains the leading player in the market. The business holds a number one position in uniforms, camps, and competitions and its prominent brand name is synonymous with cheerleading. Varsity Spirit's next largest competitor is less than one tenth the size of Varsity Spirit based on revenue.") (emphasis added); **Ex. 92** at 1205 (2018, "In terms of competitions overall, seems like Varsity has monopoly").

66.    Varsity's dominance and market power is a well-known fact in the industry, as is the harm that it causes. **Ex. 76** at 7774-78 (6/28/2019, letter from IEPs sent to gym owners: "As we have seen the power in our sport go to one company, the changes we have seen have not all been for the betterment of the sport but for the betterment of the company's bottom line. The governing body is controlled by them. We are dealing with a MI-fledged MONOPOLY and FEAR is their weapon of choice. Many of us … have been too afraid to voice our concerns for fear of retribution against our gyms and teams. Think about that. WE FEAR A COMPANY THAT WE PAY because of what they may do to our businesses." … "How do you believe this entity may have harmed competition?") (emphasis in original).

67.    In 2021, Jeff Webb published a book in which he essentially admits that he ran a monopoly at Varsity. **Ex. 94** ("I ran an exceptionally large company occupying a prominent space in my industry."). An email from his editor noted: "Jeff, I lead with you admitting you ran a near monopoly." **Ex. 95**.

**C.    varsity's market power is ubiquitous throughout the u.s.**

68.    Varsity's market power is ubiquitous throughout the United States. **Ex. 1** [Netz Rep.] at 3, 41-62; **Ex. 4** [Heeb Rebuttal] ¶¶ 8, 36, 126; **Ex. 11** [Parrish Dep.] at 476:9-478:12 ("Varsity has control over cheerleading at every level of the U.S. and abroad. There is no

resistance." … Varsity is "in control over everything that happens in All Star Cheerleading in the country... [and] the entire high school competition space.") **Ex. 284** at 5634 ("Varsity is the undisputed leader in cheerleading uniforms, competitions, and camps," and includes a chart illustrating that 100% of the U.S. market for School Cheer competitions in 2013 belonged to UCA, NCA, and USA – all Varsity owned brands); **Ex. 10** [Webb Dep.] at 95:13-16 ("Q. Varsity puts on some events that attract teams from all over the country, correct? A. Yes."); **Ex. 14** [Peterson Dep.] at 33:18-34:2 ("Q. And to your knowledge, are the All Star gyms located around the country? A. Yes, sir. Q. And I just want to make sure I understand this. So All Star teams compete against other All Star teams at All Star competitions around the country, correct? [Objection Omitted] A. Yeah.").

69.    Varsity's pricing policies emanated from its headquarters in Memphis, Tennessee and were set on a national scale. **Ex. 4** [Heeb Rebuttal] ¶¶ 138, 144, 275; **Ex. 96** at 1126 (9/2018, document prepared in advance of Bain visit to Memphis shows that although prices are set and implemented locally, Varsity's pricing strategy is determined, administered, and set at a national level "to ensure consistency across the business.") (emphasis added).

70.    Defendants' own documents acknowledge that each of the three relevant markets were national and operated on a national scale. **Ex. 97** at 5865 (9/2014, due diligence presentation prepared by Jefferies in connection with Charlesbank's acquisition of Varsity: Varsity's "national base of customers" includes "███ athletes across ███ schools and ███ gyms."); *id.* (Varsity is "[t]he only company with field reps assigned to every customer in every state."); *id.* (Varsity's "██ field sales representatives" include ██ All-Star Event Sales Reps," "██ Nationwide Apparel Sales Reps," and "██ State Directors support[ing] the camps."); **Ex. 33** [Kennedy Dep.] at 308:4-308:7 (Varsity owned and operated camps for school teams that

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

are nationwide).

### D. Varsity's market power is protected by barriers to entry

71. Each of the three relevant markets is protected by significant barriers to entry, making it difficult for non-Varsity competitors to enter into and to participate in those markets. **Ex. 1** [Netz Rep.] at 4; **Ex. 3** [Heeb Rep.] at ¶¶ 169-184.

72. The Cheer Competitions market is protected by significant barriers to entry. **Ex. 1** [Netz Rep.] at 4, 52; **Ex. 98** at 4732; **Ex. 99** at 9684 (11/20/2014, Jefferies presentation: describes these barriers to entry for potential investors: "███████████████████

████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

███████████████████████████████████████).

73. The Cheer Apparel market is also protected by barriers to entry. **Ex. 1** [Netz Rep.] at 4, 57-59 & n. 207; **Ex. 3** [Heeb Rep.] at ¶¶ 185-193.

74. Varsity's rebate plans, such as the Varsity Family Plan ("VFP"), function as barriers to entry for competing apparel manufacturers and suppliers. **Ex. 2** [Netz Rebuttal] at 68-69, 91-92; **Ex. 11** [Parrish Dep.] at 205:16-206:1 (explaining how Varsity could foreclose Nfinity because of its rebate programs).

75. Varsity holds over 200 design copyrights for Cheer Apparel, creating an additional barrier to entry for any who might try to produce their own Cheer Apparel. **Ex. 1** [Netz Rep.] at 63; **Ex. 101**.

76. Another barrier to entry in the Cheer Apparel market is USASF's rules specifying which apparel can be worn by All Star athletes. **Ex. 1** [Netz Rep.] at 59 & n. 114. These rules are

established by the USASF, but Varsity personnel have input into proposed rules changes and are also given early access to any changes in the rules that are established compared to other non-Varsity cheer apparel. *Id.*

77.     Collectively, the barriers to entry in the Cheer Apparel market are so significant that "some small competitors just throw up their hands" and exit the Cheer Apparel market altogether. **Ex. 102**.

78.     The Cheer Camps Market is also protected by barriers to entry. **Ex. 1** [Netz Rep.] at 61-62; **Ex. 3** [Heeb Rep.] at ¶¶ 182-185.

79.     One main barrier is Varsity's policy of tying Cheer Camps and Cheer Competitions. **Ex. 1** [Netz Rep.] at 54-55, 57-60, 61-63; **Ex. 11** [Parrish Dep.] at 435:23- 437:3.

80.     The barriers to entry in the Competitive Cheer industry foreclose competition. **Ex.1** [Netz Rep] at 4, 52; **Ex. 64** at 4552 (Varsity PPT for investors describes "significant barriers to entry" and "the company's comprehensive products and services offering allows it to benefit from cross-selling."); **Ex. 105** at 9926 ███████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████ .

81.     Varsity has built what it calls a "competitive moat" to create barriers for its rivals and to lock consumers into its ecosystem. **Ex. 2** [Netz Rebuttal] at 61-66; **Ex. 52** at 8477; **Ex. 106** at 6217 ("How can we create a sustainable business (deep moat)?").

**E.     THE VARSITY ECOSYSTEM AND INTERTWINING OF RELEVANT MARKETS**

82.     Varsity's conduct created an ecosystem that enabled it to acquire and maintain

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

market power across all three relevant markets, and to lock purchasers into that ecosystem. **Ex. 1**
[Netz Rep.] at 4-5, 31, 36-37, 62-65; **Ex. 52** at 9431 (2018, Varsity described itself as having
created a "[f]ully-integrated ecosystem with apparel, camps and competitions.").

83.    The Varsity ecosystem is protected by cheer governing bodies, safety
organizations, and strategic partners. **Ex. 1** [Netz Rep.] at 62-65; **Ex. 52** at 8543; **Ex. 107** at
4154; **Ex. 86** at 5224; **Ex. 108** at 7635, 7638; **Ex. 107** at 4147; **Ex. 109** (2018 quote from Webb
in *Chief Executive* magazine: "We were really creating an industry as we went along and it
became an ecosystem in that we were creating the concept, we were creating the industry, and
then we were positioning ourselves to provide all the products and services … utilized [within
that industry]. Not only did we have the number one position in [the camps, apparel, and
competitions] segments, but then we developed a cross-marketing model where we could
promote [the segments within each other] and to be honest with you, it took off.").

84.    The Cheer Competitions and Cheer Camps markets were deeply intertwined. **Ex.
1** [Netz Rep.] at 62; **Ex. 3** [Heeb Rep.] at ¶¶ 182-184; **Ex. 88** at 0366 ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮); **Ex. 89** at 5579 (On or about 2020, Varsity
PPT, "Our school reps need to ENSURE the success of the All Star reps because All Star Cheer
will drive the fashion trends for high school. It's all connected.") (emphasis in original).

85.    Under Varsity's Squad Credentialing Program, to attend Nationals, teams are
required to attend a Varsity camp. **Ex. 110** at 4442 (4/2016, Bain document: "For UCA nationals,
you have to attend a camp (beginning of season) and then have to get a bid from a regional
competition. … In college, just need to attend a camp at the beginning of the season."); **Ex. 20**
[Cota Dep.] at 223:11-17 (testifying that Varsity leverages its market power in the Cheer
Competitions market to enhance and maintain its market power in the Cheer Camps market); **Ex.**

**59** (teams that do not attend a Varsity camp can compete at local UCA competitions "but they will not be eligible to receive a bid to the NHSCC [Nationals]"); **Ex. 111** at 0803 (for a high school cheer team to qualify for Varsity's high school national championships, at least 75% of its members must have attended one of Varsity's cheer camps in the preceding 12 months).

86.    The Squad Credentialing Program is implemented at the majority of Varsity's camps. **Ex. 206**.

87.    In 2015, Varsity negotiated a deal with NFHS whereby ██████████████ ████████████████████████████████████████████████ ████████████████████ **Ex. 113** at 9874.

88.    The Squad Credentialing Program forecloses Varsity's Cheer Camp competitors and leaves teams with few options other than Varsity camps. **Ex. 1** [Netz Rep. at 92]; **Ex. 114** at 0729 (discussing implementation of policy to force teams "going to gym camps" to instead go to Varsity camps and grow Varsity's camp business); **Ex. 51** at 5565 ("Teams must attend a Game Day Camps in order to compete in Game Day Regionals"); **Ex. 115** at 8240 (blog complaint from anonymous: "it seemed that HS teams had to attend a Varsity camp or use [VROC!] as their choreographer in order to 'get certified' to attend Nationals. If that's not a monopolistic behavior ….").

89.    Varsity intentionally tried to lock School Cheer teams into the Varsity ecosystem through Cheer Camps. **Ex. 114** at 0727 (9/2019, Buffy Duhon (Varsity): "My guess is that we won't get a lot of push this fall because it's not required for 2020, but it will grow summer camp business and fall 2020 since it will be required."); **Ex. 23** [Duhon Dep.] at 110:3-25 (Duhon explaining her email described in Ex. 114: "That teams that had wanted to come to nationals that may not have attended camps in the past, would learn about the programs because we would be

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

reaching out to them to let them know about the credentialing program, that they would then sign up for camp, for the camp experience and the ability to come to nationals."); **Ex. 54**

███████████████████████████████████████████████████████

████████

90.     Because Varsity is the dominant producer of School Cheer competitions, virtually all competitive School Cheer teams participate in Varsity's School Cheer Competitions. *See* **Ex. 1** [Netz Rep.] 92-104; **Ex. 2** [Netz Rebuttal] at 84-85 & Exhibit 20 (Chart re Varsity Cheer Camp attendance).

91.     Cheer Camps and Cheer Competitions are also intertwined at the college level. **Ex. 1** [Netz Rep.] at 89–92; **Ex. 2** [Netz Rebuttal] at 84–85; **Ex. 20** [Cota Dep.] at 223:11-17; **Ex. 111** at 0803; **Ex. 114** at 0728; **Ex. 116** at 1; **Ex. 117** at 1.

92.     In any given year, virtually all competitive School Cheer teams attend an event at which they can qualify to attend a Varsity end-of-season event. **Ex. 2** [Netz Rebuttal] at 85 (80% of School Cheer teams that attended a Varsity competition also attended one or more of Varsity's cheer camps during the 2018/19 season, up from 70% in the 2015/16 season).

93.     The Cheer Apparel and Cheer Competitions markets are also intertwined through Varsity's exclusionary contracts with All Star gyms, such as the VFP and Varsity Network Agreements. **DX Ex. AW** (collection of exclusionary Network Agreements over time).

94.     Varsity, Bain, and Charlesbank stress the value of cross-selling between the markets as a way to increase revenue. **Ex. 105** at 9926 ████████████████████████████

████████████████████████████); **Ex. 64** at 4544 ("All of the Company's marketing activities are designed to reinforce one another …"); **Ex. 88** at 0495; **Ex. 54** at 9334.

## V.      ABUSE OF MARKET POWER AND ANTICOMPETITIVE CONDUCT

### A.      willful acquisitions – "dissolve and conquer"

95.    Varsity, supported by its Co-Defendants, sought to acquire and consolidate power
in the relevant markets through an aggressive strategy of mergers and acquisitions. **Ex. 1** [Netz
Rep.] at 92-104; **Ex. 3** [Heeb Rep.] at ¶¶ 93-94, 174-177; **Ex. 5** [Aronoff Rep.] at ¶¶ 43-54 &
Table 1 (Select Varsity Mergers and Acquisitions); **Ex. 89** at 5580; **Ex. 87** at 1580.

96.    Varsity completed 27 acquisitions between 1996 and 2018, nine of which were
between 2015 and 2018. **Ex. 2** [Netz Rebuttal] at 85 & Exhibit RR-7 (chart of Varsity
acquisitions over time).

97.    On at least three occasions, Varsity acquired its largest Cheer Competition
competitor at the time: National Spirit Group in 2004, JAM Brands in 2015, and EPIC Brands in
2018. **Ex. 1** [Netz Rep.] at 99.

98.    Varsity acquired numerous Cheer Camp competitors between 2015 and 2018. **Ex.
118** at 9041 (JAM Brands (11/2/2015); Aloha Spirit Productions (12/15/2016); Spirit Celebration
(2/28/2017); All Things Cheer (4/23/2017); JAM Spirit Group (11/15/2017); Mardi Gras
Nationals (12/1/2017); International Cheer Alliance (12/20/2017); and EPIC Brands (1/19/2018);
**Ex. 1** [Netz Rep.] at Exhibit 2 (list of Varsity-owned brands); **Ex. 3** [Heeb Rep.] at ¶¶ 231-250;
**Ex. 7** [Maki Rep.] at ¶ 107.

99.    Varsity has acquired many of its Cheer Apparel competitors. **Ex. 1** [Netz Rep.] at
Exhibit 2 (list of Varsity-owned brands); **Ex. 2** [Netz Rebuttal] at Ex. RR-7.

100.    Varsity's market share in the market for Cheer Competitions increased
significantly, as a result of its acquisition strategy. After acquiring JAM Brands in November
2015, Varsity's market share increased from 40-50% to 70-80%. **Ex. 1** [Netz Rep.] at 99 & n.
404. Subsequent acquisitions of firms with individual market shares of 2-10% have maintained
Varsity's market share in the 75-85% range. *Id.;* **Ex. 12** [Elza Dep.] at 80:18-82 (Varsity bought

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

its way to dominance in the All Star event market).

101.    Between 2012 and 2018, Varsity's market share in the All Star Cheer

Competitions market rose to 80-85%. **Ex. 20** [Cota Dep.] at 51:3-53:21.

102.    Jeff Webb intended to dominate the cheer industry. **Ex. 102** at 7 (2/24/2016

Inc./Slate article: "Jeff [Webb] is very driven . . . There is enough out there for all of us [i.e.,

Varsity competitors]. Why make it so difficult? It's like he has to have 100 percent. He can't be

happy with just 95 percent.").

103.    Varsity's acquisition strategy was to "Dissolve and Conquer" and was for the

specific purpose of closing out and eliminating competition. **Ex. 89** at 5581 ("Dissolve and

Conquer" … ███████████████████████████████████████████

████████████████████████████████████████████

███████ ); **Ex. 11** [Parrish Dep.] at 178:4-6: ("Q. <u>And when you say "get rid of them," did you

mean put them out of business? A. "Yes."</u>) (emphasis added); **Ex. 102** at 7 (2/24/2016, Inc./Slate

article: "Varsity acquired Just Briefs in 2010 and closed it"). **Ex. 189** (1/22/2013, Webb:

"acquisitions are better viewed as tactical and used for roll ups … or to eliminate competitors.");

**Ex. 122** at 2197 (Varsity described the benefits its 2015 acquisition of JAM Brands as providing:

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████ (emphasis added); **Ex. 121** at 5396

(2017, Varsity noted its acquisition strategy to "roll up the All Star market" had been

successful").

104.    Varsity consistently acquired its Cheer Competition rivals and then cancelled their

acquired competition events, thereby reducing output and raising registration prices. **Ex. 12** [Elza

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Dep.] at 230:23-231:1 ("Q. And you're saying that after the JAM Brands acquisition, Varsity

would likely cancel certain events; is that right? A. Yes. We did that often."); **Ex. 58** at 5065; **Ex.**

**123** at 1396; **Ex. 124** at 5529 (5/23/2018, Email from J. Lomba (reflecting cancellation of

JAMfest); **Ex. 125** at 1435 (12/7/2017, Elza: "As you know we often put event on other events to

hurt our competitors." … "Strategy worked, and now Mardi Gras is sitting around 60 ish teams

and JAM at 70." … "If Mardi Gras doesn't hit 125 teams they lose their Tier 1 Status." … "Plan

would be to cancel JAM and move all of those teams to MARDI GRAS.").

105.    Through acquisitions, Varsity was also able to raise spectator admission fees to its

events. **Ex. 1** [Netz Rep.] at 46 & n. 184; **Ex. 122** at 2197; **Ex. 7** [Maki Rep.] at ¶¶ 98-101

(explaining how acquisition of JAM Brands and the ability to raise spectator fees would lead to

█████ in additional revenue). Varsity requires families that wish to see their athletes perform

to pay as much as $40 per day to gain admission to Varsity events. **Ex. 1** [Netz Rep.] at 45-47.

106.    Varsity's acquisition strategy hurt its rivals in the relevant markets. **Ex. 1** [Netz

Rep.] at 99-104; **Ex. 3** [Heeb Rep.] at ¶¶ 251-266.

### B.    foreclosure of rivals through control of rulemakers

107.    Varsity's control of the governing bodies for Competitive Cheer foreclosed its

rivals in the relevant markets. **Ex. 1** [Netz Rep.] at 65-89 & Exhibit 3.

108.    Varsity controlled the USASF Board and USASF SC. **Ex. 1** [Netz Rep.] at 64-65,

100-101; **Ex. 3** [Heeb Rep.] at ¶¶ 84-87, 202-209. As of February 2018, Varsity controlled 33 of

the 42 total Tier 1 events approved to offer Worlds bids. **Ex. 14** [Peterson Dep.] at 242:21-24;

**Ex. 131** at 6147 (date, IEP: "Currently Tier 3 members rarely, if ever, are able to move up to Tier

1 status. As Varsity Brands continue to grow and acquire other companies, non UCA EP's [sic]

continue to lose business. How can we ever hope to reach Worlds requirements when we are

consistently losing business to the Varsity machine?"); **Ex. 63** at 7474 (12/2018, notes from

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

meeting of coaches and gym owners: there was a <u>"lack of non-Varsity events in our area—big</u>
<u>monopoly (JAMZ is the only event and its [sic] only a one day). Lack of competition is</u>
<u>hindering the market and allowing rising prices"; "Summit is destroying our industry"; and</u>
<u>"USASF is run by Varsity so its [sic] totally biased.")</u> (emphasis added).

### C.    counterprogramming

109.    Varsity intentionally attempted to kill or diminish events hosted by rival event
producers by counterprogramming its own "attack" events nearby. **Ex. 1** [Netz Rep.] at 73-81;
**Ex. 143** at 8899 (2/24/2020, Varsity Email: "If you recall, a few years ago we set out to <u>'put a</u>
<u>hurting'</u> on the JAMZ Worlds Bid event which had been growing at an unprecedented amount
year after year. In order to achieve this, we added a new two-day event in Las Vegas market
under the Encore brand." … "Over the course of those two years we have stripped away nearly
100 of their teams …") (emphasis added); **Ex. 11** [Parrish Dep.] at 125:18-22 ("strategy would
be to put a Family Plan event on either side of them on the weekend before and the weekend
after, and then we would call our sales team and say, 'Hey, try to poach teams off of that – that
event.'"); **Ex. 144** at 4423 (2/24/2017, Tres LeTard (Varsity): "I had an interesting conversation
with Jeff Webb on the way down to Orlando. We were discussing competitors … I mentioned
EPIC and he asked what we could do to apply pressure to them. I said we have Summit Bids and
some events near them on similar weekends but could do more at ASC – Baltimore if needed
(and explained the new bid strategy). He strongly recommended that we do all we can.").

110.    Varsity also targeted nascent competitors, attempting to kill them off before they
could even get started. **Ex. 1** [Netz Rep.] at 78-84; **Ex. 145** at 8910, 8913 (12/19/2019, re rival
event producer, Varsity says "crush her" before "she really gets wings and creates more issues for
our other territories."); **Ex. 146** at 7691 (re Spirit Championships, Varsity says: <u>"The goal for us</u>

is simple…We need to stop this train before it starts."); **Ex. 147** at 8030 (re counterprogramming against Nfinity by putting Summit bid events near to Nfinity event and doing "[w]hatever we need to do to make sure they are not successful.").

111.    Varsity scheduled "attack" events explicitly for the purpose of hurting competitors. **Ex. 1** [Netz Rep.] at 73-78; **Ex. 125** (Varsity: "As you know we often put events on other events to hurt our competitors.") (emphasis added); **Ex. 148** at 3800 (9/27/2016, internal Varsity email: "I am WAY ahead of you. I have downloaded ALL of our competitors['] World Bid events to see where they are in relation to our closest 2-Day Summit Bid Event. I want to see what dates we need to change to hurt our competition."); **Ex. 149** at 2462 (12/2017, internal Varsity "competitor tracking" document: "[Varsity Spirit] has an incredible hold on the major markets of Texas and continues to apply pressure" on IEPs and non-sanctioned members, including strategically scheduling events and allocating Summit bids to "push[] out all IEP presence" in any given location. … Varsity adds: "We have officially pushed all competitors out of this market on this weekend" and "VAS [Varsity] owns this market on this weekend and continues to push out IEPs."); **Ex. 27** [Hill Dep.] at 158:12-158:18 (Mardi Gras Worlds bid event "was, obviously, an event that we attacked … we put other events around it for the sole purpose of—of, you know, trying to attack it."); **Ex. 143** at 8899.

112.    Varsity's counterprogramming efforts not only foreclosed competition in the Cheer Competitions market, but also in the Cheer Apparel market. **Ex. 1** [Netz Report] at 58-59

### D.    blocking rival apparel vendors from displaying at events

113.    Varsity, USASF, and Jeff Webb coordinated to block Varsity's rivals from partnering with non-Varsity apparel companies. **Ex. 150** at 5328-29 (when Varsity learned that Cheer Derby, an independent event producer ("IEP"), was partnering with the apparel company GK Elite, Varsity targeted multiple Cheer Derby events: "Will you make sure we have events on

top of these Cheer Derby events."); **Ex. 27** [Hill Dep.] at 149:14-151:13 ("You got Rebel,

Nfinity, GK. And they would—they would partner with non-Varsity events to gain access to

customers to try to expand their—their brand, the uniform, so to speak…obviously, we couldn't

prevent them from partnering with Cheer Derby. But, you know, if customers aren't going to

their [Cheer Derby's] event; you know, it kind of limit[s] their access…this has as much to do

with maintaining fashion business or affecting a fashion company competitor's business as much

as it did event business.").

114.    Varsity and USASF also took actions to block Cheer Apparel competitors from

showing their wares at competitions, blocking them from event venues as well as at the hotels

where teams stayed. **Ex. 1** [Netz Rep.] at 57 & n. 229; **Ex. 151** at 1243 (2/1/2012, Peterson

(USASF) to Chadwick (USASF) and Newby (Varsity) re blocking GK Elite and Nfinity from

Disney cheer merchandising expo: "I will contact her and try to discourage her from having this

Mall event or best case have her discontinue the use of 'Worlds.' I will also follow up with GK

and Nfinity to let them know that they may not participate and sell products at this Mall event

because it is on Disney property."); **Ex. 102** at 6-7 (2/22/2016, Slate article re Rebel: "Varsity's

hardball tactics are structured to keep … rivals off the playing field." … "rival apparel makers

can't show their wares at [Varsity competitions], which are important showrooms for cheer

merchandise." … Karen Noseff Aldridge, founder of Rebel Athletics: "Not partnering with an

event company is one thing[.] But being locked out of partnering with an event company—

knowing that a competitor is now going to be in your booth space showing its product— it's a

double whammy."); **Ex. 153** at 2613 (2/25/2019, Carrier (Varsity) to Waymire (Connections

Housing, company who booked Stay-to-Play hotels) asking her to block Tate Chalk (Nfinity)

from soliciting apparel sales in Omni Hotel Bar during event); **Ex. 154** at 7155-56 (USASF

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

communication with Varsity "GTM is on the list and they are apparel. Correct? We will also have to let some of these bow companies and other suppliers [know] the[y] can not [sic] promote campwear.").

115.    Varsity used its control over Varsity TV and other industry media to foreclose apparel vendors. Families that want to watch their children participate without physically attending events must pay $30 per month or $219 per year to watch the events on Varsity TV. **Ex. 7** [Maki Rep.] at ¶¶ 102-103. Athletes and their families were not allowed to record or stream Varsity events, even for private usage. This ban left family members no choice but to pay Varsity's inflated prices to see their athletes compete. Varsity actively enforces this ban on private recording or streaming, leaving family members no choice but to pay Varsity's inflated prices. **Ex. 155** at 3825 ("any program that isn't 100% in VASF uniforms, wouldn't get that icon" on JoinAllStar.com); **Ex. 156** at 1196; **Ex. 157** at 3300.

### E.    foreclosing competition by denying access to venues

116.    Varsity also signed exclusive and non-compete agreements with various venues in an effort to block competing event producers from hosting events. **Ex. 159** at 1443-1445 ("[h]e [the owner of Xtreme Spirit] is a competitor and somewhat of a jerk. We may be interested in running an event there. I have copied Kevin Brubaker as he can look into the venue to see what we could do to block him out."); **Ex. 11** [Parrish Dep.] at 124:5-124:12 (Varsity using venue specifications to block competitors and booking up venues so competitors had no options to host events); **Ex. 160** at 0891(12/10/2012, Varsity Email: ███████████████████ ████████████████████████████████████

### F.    rebate and discount programs were exclusionary contracts that foreclosed competition

117.    Varsity's rebate and other loyalty and discount programs were anticompetitive.

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

They foreclosed competition and disadvantaged Varsity's rivals. **Ex. 1** [Netz Rep.] at 5, 104-113; **Ex. 2** [Netz Rebuttal] at 89; **Ex. 3** [Heeb Rep.] at ¶¶ 219-225]; **Ex. 4** [Heeb Rebuttal] at ¶¶ 470-481].

118.    The Varsity Family Plan ("VFP") was anticompetitive and foreclosed competition. The VFP foreclosed competitors by offering cash and credit for additional purchases of Varsity cheer apparel, and other benefits. **Ex. 1** [Netz Rep.] at 105.

119.    In order to qualify for the VFP, All Star gyms are required to attend a minimum number of Varsity's cheer competitions in a given season. **Ex. 119; Ex. 161** at 7512-13; **Ex. 12** [Elza Dep.] at 56:2-57:12. For example, in the 2018/2019 season the VFP required that teams attend at least six events per year to qualify, which left very little room for non-Varsity events since teams attend, on average, seven to nine events per year. **Ex. 2** [Netz Rebuttal] at 30.

120.    The goal of the VFP was to eliminate competition. A summary of the "Varsity Family Plan 2.0" explains that the goal of the program was to: <u>"Get rid of any competitors, make it so that teams couldn't go to IEP."</u> **Ex. 298** at 9570 (emphasis added); *id* at 9569 ("For every IEP they support, drop a % point" and <u>"[o]nly allow programs to achieve the top level of VFP if they are exclusive to Varsity."</u>) (emphasis added). Another purpose of the VFP was to addict athletes and their families to the VFP and Varsity ecosystem, like "crack cocaine." **Ex. 257** at 2095-96 (Varsity suggest threatening parents to keep them locked into the ecosystem: **"OPTION ONE – CASUALLY THREATEN VIA VERBAL CAMPAIGN"** ... "[t]hat hits every corner of America in 24 hours.") (emphasis added).

121.    The Varsity Network Agreements were exclusive dealing contracts. **Ex. 1** [Netz Rep.] at 104-113; **Ex. 3** [Heeb Rep.] at ¶¶ 219-225. As Plaintiffs' expert Dr. Heeb testified, Varsity Network Agreements (agreements made between Varsity and high value All Star gyms),

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

have a clause "that appears to be an exclusive purchasing requirement that the customer will exclusively purchase and wear Varsity uniforms and Varsity shoes, and it provides an additional discount related to apparel and accessories in exchange for this exclusive dealing arrangement." **Ex. 26** [Heeb Dep.] at 316:2-316:7. **DX Ex. AW** (collection of Network Agreements).

122.    Varsity's rebate plans leverage market power from one market to another through "first dollar discounts," which condition large rebates on marginal purchasing decisions—i.e., once the customer reaches the spending threshold for the discount, the rebate applies to all of the customer's spending retroactively.  **Ex. 2** [Netz Rebuttal] at 3; **Ex. 3** [Heeb Rep.] at ¶ 97.

123.    Varsity's rebate programs create large incentives for customers to buy exclusively from Varsity. **Ex. 2** [Netz Rebuttal] at 3; **Ex. 3** [Heeb Rep.] at ¶ 97.

124.    Varsity's IMPACT Program required schools to enter into exclusionary contracts that gave financial incentives for exclusively purchasing Varsity Competitions, Camps, and Apparel. **Ex. 162** at 5027 (IMPACT program specifically mandated that a school purchase only Varsity camps as a part of its commitment to spend $50,000 exclusively with Varsity or face invoices for up to $48,500 worth of otherwise "free" cheer resources paid directly the school). The contracts also contained penalty provisions, whereby Varsity reserved " the right to invoice for all or a portion of realized products and services provided . . . . ]." *Id*.  The effect on schools was pronounced, given that Varsity had acquired 100% of the School Cheer competitions that lead to Nationals. *See* **Ex. 1** [Netz Rep.] at 11, 17.

125.    One of the stated goals of Varsity's IMPACT/VIP Branding Program was to monopolize the relevant markets. **Ex. 163** at 4354 ("We can do more with VIP brand, and own the intellectual property of every high school in America."); **Ex. 1640** at 3560 ███████████

████████████████████████████████████████████████████████

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

███████████████████████████████████████████████████

██████████

126.     Varsity offers inducements to schools to sign exclusive agreements with Varsity through its Game Day program. In exchange for these inducements, schools sign VIP Agreements under which they agree to purchase their uniforms, apparel, and equipment from Varsity and to compete in Varsity Cheer Competitions. **Ex. 1** [Netz Rep.] at 104-105; **Ex. 3** [Heeb Rep.] at ¶¶ 220-226.

### G.    Varsity's stay to play policy

127.     Varsity further abused its power by implementing a "Stay to Play" policy that requires teams participating in Varsity cheer competitions to stay at hotels pre-selected by Varsity and more expensive than where they might otherwise choose to stay. **Ex. 1** [Netz Rep.] at 48-50; **Ex. 165** at 5259; **Ex. 166** at 7600. If teams do not stay at the designated hotel, they risk disqualification from the competition. **Ex. 167** at 0241.

128.     Varsity receives undisclosed kickbacks from the hotels for rooms booked through the Stay to Play program. **Ex. 168** at 9756; **Ex. 169** at 3932; **Ex. 170** at 8063.

129.     In 2018, Varsity rebranded the Stay to Play program as "Stay Smart," purportedly to alleviate customer complaints. In its own words, however, the new name simply "put lipstick on a pig." **Ex. 171** at 6415 (emphasis added); **Ex. 18** [Bray Dep.] at 99:20 - 100:16 ("Q. What is 'stay-to-play'? A. Stay-to-play was – in order to compete at a certain event, we were forced to use a hotel, … of Varsity's choosing. Q. And how did that affect your travel? A. Prices rose significantly."); **Ex. 166** at 7600 (2/2019, gym owner writes to Varsity President Seely re complaints of roughly 100 parents from meeting of Parent Advisory Board about Stay to Play, quality and safety at events). **Ex. 172** at 0794 ("I don't mind saying that this was my favorite

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

competition, until this year. I've never had a wors[e] experience at a competition in my entire life, all because of the Stay to Play policy.").

130.    Varsity also punished or threatened judges for judging non-Varsity competitions, and manipulating the judging system to favor Varsity. **Ex. 1** [Netz Rep.] at 57-58; **Ex. 19** [Cherasaro Dep.] at 58:5-60:17 (judges and score sheet at competitions favored teams that wore Varsity apparel); **Ex. 173** at 8033 (9/16/2016, suggestion to block Rebel apparel company from being allowed to Judge at Varsity competitions and stating that "Jeff [Webb] is hot on taking down Rebel right now"); **Ex. 11** [Parrish Dep.] at 110:3-111:11 ("A. … If you judge outside of Varsity, there's pushback; you get phone calls. Q. Pushbacks and phone calls from whom? A. Justin Carrier [Vice President at Varsity Spirit]. Q. Oh, Varsity pushes back? A. Yes." … "A. … And, you know, 'We put you in this business,' and, you know, 'You won't ever judge for us,' and blah, blah, blah. I mean, there were – there was [sic] some definite threats to Frank and Tanya and Amy Tyler.").

## VI.    CONCERTED CONDUCT AND EXCLUSIONARY SCHEME

### A.    USASF's role and acts in furtherance of conspiracy

131.    USASF forbids its member athletes, judges, gyms, and event producers from participating in or hosting events that could undermine Varsity's dominance, including any year-end competitions that purport to be a World championship. **Ex. 1** [Netz Rep.] at 85-86 & n. 337, 338, 342; **Ex. 2** [Netz Rebuttal] at 76 & n. 315-316; **Ex. 133** (October 18, 2011, open letter from USASF to "USASF Members and Officials" stating that "no athlete, coach, judge, or official is permitted to participate in any way in any event that claims to be a World or International Championship, other than the ICU or World Championships for National teams, or the USASF/IASF Worlds for All Star or Club teams"); **Ex. 142** at 2043-44 (USASF company membership agreement).

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

132.    USASF cedes to Varsity operational control over Worlds, the largest and most prestigious year-end event in the cheerleading industry. **Ex. 198** (2/21/2020); **Ex. 201** at 1298 (2/10/2020); **Ex. 203** (2/16/2017).

133.    USASF conspired with Varsity and Webb to set Worlds Bid rules that favored Varsity and foreclosed Varsity's rivals. **Ex. 1** [Netz Rep.] at 69-85; **Ex. 2** [Netz Rebuttal] at 79 & n. 332; **Ex. 3** [Heeb Rep.] at ¶¶ 203-218; **Ex. 11** [Parrish Dep.] at 177:4-178:6 ("A. … at all costs, get rid of IEP's (sic). ... Make it so teams can't go---make it physically, just absolutely, if you can't get a World Bid, and you can't get a Summit bid, and you—and it's going to cost you . . . It just makes it too hard for a competitor to offer a competitive … good or service. Q. And when you say "get rid of them," did you mean put them out of business? A. Yes.) (emphasis added); **Ex. 132** at 4139 (9/22/2017); **Ex. 63** at 7475 (12/10/2018); **Ex. 129** at 1339 (5/16/2016); **Ex. 131** at 6147 (8/4/2017); **Ex. 132** at 4139 (9/22/2017, Varsity Email: "As you both know, Jeff W. [Webb] wants the USASF Worlds Bid process changed to prevent small competitors from being allowed to offer World Bids.") (emphasis added). **Ex. 134** at 5110, 5114 (3/11/2019); **Ex. 136** at 4260 (12/21/2018); **Ex. 137**; **Ex. 143** at 8899 (2/24/2020); **Ex. 174** at 1219; **Ex. 176** at (4/28/2020); **Ex. 177** at 4960 (12/9/2015).

134.    USASF, Varsity, and Webb conspired to set a "125 level-five team" rule to foreclose Varsity's rivals. For the 2016/2017 season, USASF introduced a rule that mandated event producers must have at least 125 level-five teams attend a competition to continue giving out Worlds bids in future years. **Ex. 1** [Netz Rep.] at 72-73, 83-84; **Ex. 131** at 6147 (8/4/2017, IEP letter to Peterson (USASF): "As Varsity Brands continue to grow and acquire other companies, non UCA EP's [sic] continue to lose business. How can we ever hope to reach Worlds requirements when we are consistently losing business to the Varsity machine?")

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

(emphasis added); **Ex. 132** at 4139 (9/22/2017, "He [Mr. Webb] believes, and I agree (for whatever that's worth), that in some cases the ability to give Worlds Bids is keeping these companies viable and certainly driving up their value if we decide to acquire them."). If the event producer is unable to attract 125 level-five teams in one year, it is put on probation; if it is unable to attract 125 level five teams for the next year, it loses its Worlds bids for that event, making it far less attractive to participants. Varsity initially proposed this 125-team rule, not the USASF. **Ex. 1** [Netz Rep] at 71-72 & n. 338; **Ex. 134** at 5110 (3/11/2019, Peterson (USASF) to LeTard (Varsity): "The only [IEP] on probation this season was Spirit Unlimited and they blew it out this year. So far, in 19-20 we have Cheer Tech and ASC on probation. <u>If you guys [Varsity] can put the squeeze on them next season, that would be great.</u>") (emphasis added); **Ex. 135** (3/22/2019, Peterson (USASF) to LeTard (Varsity) re putting IEP WSA probation: "<u>WSA did not make 125. That is 3! [thumbs up emoji]</u>." LeTard responded that it is "[g]etting hard out there" and Peterson replied: "<u>You guys are knocking them off! [smiley emoticon].</u>") (emphasis added); **Ex. 136** at 4260 (12/21/2016, Heather Petz, owner of IEP to Peterson (USASF) that 125 level-five team minimum was making it hard for her to have an event that would be able to give Worlds bids: "My numbers are down this year for our upcoming bid event due to mergers, small gyms going out of business, … Varsity putting a Summit Bid qualifier in the same building two weeks prior to my event."); **Ex. 137** at 4153 (2/2018, "IEP explained how USASF's sanctioning and bid system makes it nearly impossible for non-Varsity event producers to obtain Worlds bids and that the result is that it puts them in jeopardy of having to close their doors).

135.    USASF conspired with Varsity to protect Varsity's events and to restrict non-Varsity events by setting rules about the timing and location of events that favored Varsity and excluded its rivals. **Ex. 1** [Netz Rep.] at 71 & n. 278; **Ex. 3** [Heeb Rep.] at ¶ 205 & n. 238; **Ex.**

14 [Peterson Dep.] at 129:2-131:8; **Ex. 140** at 0643 (6/1/2017); **Ex. 141** at 3550 (4/4/2018).

**136.**    USASF coordinated with Varsity to set a rule which mandated that there must be a

four-week black out period on either side of a Tier 1 event during which another Tier 1 event

may not take place within 200 miles. **Ex. 14** [Peterson Dep.] at 129:2-131:8. The same rule

expands the protective radius to 500 miles for Tier 1 events taking place on the same date. *Id.* An

event producer wishing to obtain an exception to these rules must seek permission from the

protected event producer and, if denied, may lodge an appeal with the USASF SC. *Id.* at 133:11-

134:2. The effect of these rules is to restrict new market entrants and foreclose competition from

IEPs. **Ex. 3** [Heeb Rep.] at ¶ 205 & n. 238; **Ex. 14** [Peterson Dep.] at 129:14-130:24.

**137.**    Varsity and USASF actively coordinated to kill at least three proposals to protect

Varsity's Summit event. **Ex. 1** [Netz Rep. at 81 & n. 319; **Ex. 139** at 3953 (8/2015, Varsity: "The

firestorm is coming. … <u>Truth be known the Summit has destroyed our competitors and will

continue to worsen with the D2 Summit. With our control of the BOD [Board of Directors] of the

USASF we are clearly in the drivers [sic] seat.</u>") (emphasis added); **Ex. 140** [<u>Chadwick Ex. 62]

at 0643 (June 2018, Varsity: "Today's USASF Board call should be uneventful. The only

potential issue is Joelle's proposal to add Jr.s (sic) to</u> Worlds. <u>This is obviously not something we

would want for a number of reasons including that it would negatively impact the Summit.

Chadwick has agreed to have Peterson jump in after Joelle's presentation and state that he will

add it to the World Advisory Committee meeting this summer. It will die there without us having

to publicly oppose it.</u>") (emphasis added); **Ex. 141** at 3550 (4/2018).

**138.**    USASF, Varsity, and Jeff Webb conspired to hurt Varsity's Cheer Apparel rivals.

**Ex. 178** at 0286-87 (3/3/2020).

**139.**    USASF set the rules regarding the cheer apparel that could be worn at All Star

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

competitions to harm other apparel makers. **Ex. 12** [Elza Dep.] at 112:8-14 ("Q: Is it fair to say that USASF rules govern what All Star cheerleaders may wear in USASF-sanctioned All Star competition? A: Yes, that's correct. Q: Varsity sells All Star apparel; is that right? A: Yes, that's correct.").

140.    USASF allows Varsity personnel to have input into proposed apparel rule changes before non-Varsity apparel makers, giving Varsity a competitive advantage to make the required apparel in time for the new season's orders, while others did would not have time to get their compliant products to market in time for the event season. **Ex. 1** [Netz Rep.] at 59 & n. 114. **Ex. 175** at 7144 (11/27/2017); **Ex. 190** at 9250 (2/24/2016); **Ex. 191** at 6624-25 (6/22/2016); **DX Ex. CS** at 9789 (4/16/2019); **Ex. 27** [Hill Dep.] at 177:2-177:21; **Ex. 178** (3/3/2020); **Ex. 200** at 9869 (02/25/2020).

141.    Varsity, Jeff Webb and USASF conspired to impose penalties on teams who did not adhere to its apparel guidelines. **Ex. 1** [Netz Rep.] at 60-61; **Ex. 178** at 0286-87.

142.    USASF conspired with Varsity and Webb to block Varsity's Cheer Apparel rivals from displaying their apparel at competitions. **Ex. 1** [Netz Rep.] at 57 & n. 229; **Ex. 20 [**Cota Dep.] at 218:18-22; **Ex. 151** at 1243 (2/1/2012); **Ex. 152** at 4657-4658 (6/9/2020); **Ex. 153** at 2613 (10/3/2018); **Ex. 154** at 7155-56 (11/4/2019); **Ex. 179** at 1873 (4/9/2013); **Ex. 180** at 0795 (6/24/2020); **Ex. 181** at 1817-1818 (1/10/2017); **Ex. 182** at 8422 (8/2/2017).

143.    USASF conspired with Varsity to counterprogram Varsity events against non-Varsity events. *See supra* at ¶¶ 134-136; *see also* **Ex. 1** [Netz Rep.] at 73-81; **Ex. 27** [Hill Dep.] at 158:12-158:18; **Ex. 143** at 8899 (2/24/2020).

144.    USASF's insurance program harms non-Varsity event producers. **Ex. 1** [Netz Rep.] at 53-54; **Ex. 183**; **Ex. 184** at 8265; **Ex. 185** at 0968.

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

145. USASF and Varsity coordinated to kill proposals from IEPs that would have leveled the playing field for event producers to compete in the Cheer Competitions market. **Ex. 1** [Netz Rep.] at 96; **Ex. 2** [Netz Rebuttal] at 75; **Ex. 139** at 3954 (8/7/2015); **Ex. 187** at 3956-58 (7/25/2015); **Ex. 188** at 0643 (6/1/2017).

146. USASF rejected proposed rule changes that would have reduced Varsity's influence in the sanctioning body, failing to protect its members. **Ex. 1** [Netz Rep.] at 96; **Ex. 2** [Netz Rebuttal] at 75, 82-83; **Ex. 14** [Peterson Dep.] at 345:174-346:6; **Ex. 15** [Chadwick Dep.] at 125:12-126:18, 164:3-165:12, 235:22-236:9; **Ex. 139** at 3954 (8/7/2015); **Ex. 152** at 4656-60 (6/9/2020); **Ex. 176** (4/28/2020); **Ex. 186** (5/20/2013); **Ex. 187** at 3956-58 (7/25/2015).

147. USASF's participation in the conspiracy and anticompetitive acts in furtherance were overt and intentional. **Ex 1** [Netz Rep.] at 65-89; **Ex. 2** [Netz Rebuttal] at 73-85; **Ex. 27** [Hill Dep.] at 177:2-177:21; **Ex. 63** at 7472-76 (12/10/2018); **Ex. 81** at 6147-48 (4/17/2014); **Ex. 105** at 9924-25 (4/2018); **Ex. 131** at 6147-48 (8/4/2017); **Ex. 132** at 4139 (9/22/2017); **Ex. 133**; **Ex. 134** at 5110 (3/11/2019); **Ex. 135** at 6431 (3/22/2019); **Ex. 137** at 4153 (2/13/2018); **Ex. 142** (12/11/2017); **Ex. 143** at 8899 (2/24/2020); **Ex. 152** at 4656-58 (6/9/2020); **Ex. 176** at 9027-29 (4/28/2020); **Ex. 193** at 0022; **Ex. 194** at 5124; **Ex. 195** at 7455 (4/19/2017). **Ex. 196** at 2969 (5/15/2020); **Ex. 197** at 2846-47 (9/8/2016); **Ex. 198** (2/21/2020); **Ex. 199** at 9034-35 (5/2/2020); **DX Ex. CS** (4/16/2019).

**B.   jeff webb's ROLE AND ACTS IN FURTHERANCE OF CONSPIRACY**

148. As CEO, Webb drove nearly all of Varsity's acquisitions, and its strategy to aggressively acquire rivals. *See supra* § V.A.*; see also* **Ex. 94**; **Ex. 95**; **Ex. 121** at 5396; **Ex. 212** (9/9/2017, Webb stating that he would tell Chadwick (USASF): "some things are going to have to be different in that we are tired of making our competitors successful and then having to overpay for them.").

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

149.    While CEO, Webb had operational authority over every aspect of Varsity, including its exclusionary contracts and rebate programs, such as the Varsity Family Plan and Varsity Network Agreements, and Varsity's other loyalty programs. **Ex. 1** [Netz Rep.] at 7 & n. 188, n. 234. Webb had a hand in directing the number of events a gym should be required to attend to receive a rebate under the Family Plan. **Ex. 10** at 153:22-154:7.

150.    Webb conspired with USASF to set USASF's rules to favor Varsity, and to counterprogram events specifically to hurt Varsity's competitors. *See supra* at ¶¶ 133-134, 138, 141-142, 147.

151.    Webb actively participated in and directed USASF's efforts to exclude non-Varsity Cheer Apparel vendors from USASF and Varsity-sanctioned events. *See supra* at ¶¶ 141-142.

152.    Webb was the architect of Varsity's Squad Credentialing Program. **Ex. 113** at 9874 (1/6/2015); **Ex. 111** at (2/11/2019); **Ex. 206** (11/13/2019).

153.    After Webb left his CEO position at Varsity on or about March 2, 2016, Webb continued at Varsity with various titles, including as a consultant, Board Member, Founder and Chairman of Varsity Spirit. **Ex. 207** at 0922 (3/2/2016); **Ex. 208** at 0618-19 (12/1/2020). **Ex. 67** at 4379-42 (9/22/2016); **Ex. 66** at 5074-78 (3/2/2018).

154.    After March 2, 2016, Webb continued to be deeply involved in the day-to-day operations of Varsity. **Ex. 15** [Chadwick Dep.] at 386:12-25 (Webb was someone Chadwick called on for advice about how to run USASF's affairs, as often as weekly); **Ex. 20** [Cota Dep.] at 310:24-311:7 (testified Webb was involved with Varsity affairs after 2016); **Ex. 34** [Lauchaire Dep.] at 189:9-16 (testified Webb was part of the leadership team as of October 2017); **Ex. 211** at 5527 (1/26/2017, Charlesbank Email: "we can certainly underscore for Jeff that this does not

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

change his role one iota").

155.    After March 2, 2016, Webb actively participated in decision-making at Varsity through his seat and role as Chairman of the Varsity Board, and as a member of the Varsity Spirit Board. For example, as part of the Varsity Board, Webb had responsibility to approve or disprove all acquisitions over $5 million, and his further influence over the board's votes as Chairman of that Board further demonstrates his continued involvement and influence over Varsity's acquisitions. *See supra* at ¶ 153; *see also* **Ex. 213** (approval matrix).

156.    Webb's overt acts in furtherance of the conspiracy were constantly occurring between before and after March 2, 2016. *See supra* at ¶¶ 133-134, 138, 141-142, 147, 150-151, 154; *see also* **Ex. 1** [Netz Rep.] at 60, 71-72 & n. 240; **Ex. 121** at 5396 (2017); **Ex. 102** at 7 (2/24/2016); **Ex. 139** at 3953 (8/7/2015).

157.    After March 2, 2016, Webb continued to conspire with USASF to foreclose Varsity's Cheer Competition rivals. **Ex. 1** [Netz Rep.] at 71-72; **Ex. 132** at 4139; **Ex. 178** at 0286-87.

158.    After March 2, 2016, Webb continued to conspire with USASF regarding setting Worlds bid rules and other USASF rules to favor Varsity and to foreclose or disadvantage Varsity's competitors. *See supra* at ¶¶ 133-134, 138, 141-142, 147, 150-151, 154.

159.    After March 2, 2016, Webb continued to be involved in counterprogramming of events with the specific intent to hurt Varsity's competitors' events. *See supra* at ¶¶ 109-113, 134; *see also* **Ex. 144** at 4423 (4/24/2017).

160.    Webb continues to participate in anticompetitive acts to foreclose Varsity's Cheer Apparel rivals. *See supra* at ¶¶ 113-114, 130, 141-142; *see also* **Ex. 214** at 2438.

161.    Webb personally profited from Varsity's willful acquisition and abuse of

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

monopoly power and continues to profit to this day. For example, when Charlesbank was sold to

Bain, a list of Common Stock Value shows that Jeff Webb had a Common Stock total of

███████. **Ex. 215** (Varsity Cap Table Summary); **Ex. 216** (re Phantom Unit Plan plan).

162.    Jeff Webb is currently serving as President of the International Cheer Union

("ICU"), a title he has held since it was founded in 2007. **Ex. 1** [Netz Report] at 23 & n. 89, 36.

163.    Webb leveraged his role as President of ICU to establish Competitive Cheer as an

Olympic sport to further his own, Varsity's and USASF's profits. Ex. 163 at 4354 ("Jeff was over

in Switzerland and he was more hopeful that the IOC might recognize cheerleading. If that

happens, then the countries will fund it. Money will flow to the sport and it could grow the

business internationally."); Ex. 209 at 1327; Ex. 210 at 1172; Ex. 208 at 0656. Most of the ICU's

annual revenue has come from hosting Worlds in conjunction with USASF, from which Webb

profited. **Ex. 1** [Netz Report] at 85-87 & n.143.

### C.    Charlesbank's role and acts in furtherance of conspiracy

164.    In December 2014, Charlesbank purchased Varsity for $1.5 billion, including both

Varsity Brands, Inc. and Varsity Spirit, Inc., which Charlesbank subsequently converted to LLCs,

owned and controlled by Charlesbank. **Ex. 218.**

165.    After entering into a definitive purchase agreement with Varsity in November

2014, Charlesbank stated that the transaction represented the "culmination of a deliberate and

comprehensive process overseen by the Board of Directors to help ensure that Varsity Brands has

the capital structure, resources, and financial flexibility to build on its presence in these markets."

**Ex. 219** at 1.

**166.**    Charlesbank purchased Varsity only after extensive due diligence into every

aspect of its operations, including its divisions, its sales, its market shares, its structure, and its

policies and programs. **Ex. 1** [Netz Rep.] at 9 & n. 22; **Ex. 97** at 5805-06, 5810, 5855-76, 5882;

**Ex. 29** [Charlesbank 30(b)(6) Dep.] at 20:10-23:24 (Charlesbank was "involved in the prior sale

processes for Varsity in both 2002 and 2011" and had made an offer to purchase Varsity in 2011).

167.    While owner of Varsity, Charlesbank maintained an "intense and regular

involvement" in Varsity's day-to-day operations. **Ex. 1** [Netz Rep.] at 9-10 & n. 16, 24-25; **Ex. 5**

[Aronoff Rep.] at ¶¶ 38-43; **Ex. 224** at 4517 (Charlesbank maintained "intense and regular

involvement in each portfolio company."); **Ex. 225** at 1541 (Charlesbank believed that Webb was

"uncomfortable and unhappy with the level of engagement [it] want[ed] in the business.").

Charlesbank set board agendas, shaped strategy, interviewed key new hires, and interacted with

operating executives on specific projects. **Ex. 226** at 4258-59; **Ex. 227**.

168.    Charlesbank used its operational control to fire Webb as CEO and negotiate with

him on his new position and title. **Ex. 225** at 1541 (January 2016, Charlesbank personnel

discussed meeting Mr. Webb in New York to terminate his position as CEO: "He [Mr. Webb] is

going to be very on edge that we have summoned him to New York alone to fire him."); **Ex. 10**

[Webb Dep.] at 186:17-187:6.

169.    While at the helm of Varsity, Charlesbank controlled the Varsity Board. It held

████████ seats on Varsity's Board and had "significant influence" over a ████

"independent" seat. **Ex. 28** [Janower Dep.] at 251:15-251:23. **Ex. 69** at 7068; **Ex. 10** [Webb

Dep.] at 343:3-6 ("Charlesbank ... were in control of the board").

170.    Charlesbank has been involved in the exclusionary scheme since 2014 when it

acquired Varsity and provided the necessary funding for Varsity "to enhance, extend, and ensure

[its] monopoly power" as Varsity "acquired [its] biggest rivals. **Ex. 1** [Netz Rep.] at 3; **Ex. 29**

[Charlesbank Dep.] at 54:20-55:3 (Charlesbank "owned the controlling interest in [Varsity]

between 2014 and the Bain Capital transaction").

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

171.    While owner of Varsity, Charlesbank approved and facilitated Varsity's acquisitions of nearly all of its largest rivals. **Ex. 1** [Netz Rep.] at 10 & n. 24; **Ex. 2** [Netz Rebuttal at RR-7 (chart of acquisitions over time); **Ex. 222** at 0196; **Ex. 223** at 1047.

172.    Charlesbank requested information from Varsity specifically on the acquisitions Varsity was contemplating, and that Charlesbank ultimately approved.  **Ex. 230** at 0255; **Ex. 12** [Elza Dep.] at 322:5-13. A Varsity presentation indicates that Charlesbank must approve any acquisition over ▇▇▇ million. **Ex. 222** at 0169 (2/162017, Presentation, "Growth Through Acquisition").

173.    Charlesbank's acquisition of Varsity provided funding that allowed Varsity to acquire and maintain its market power, among other things. **Ex. 28** [Janower Dep.] at 137:25-138:03 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ **Ex. 223** at 1047 (date, Beer (Charlesbank): "Well, we've got the dough for our acquisitions now…let's make it sweat!").

174.    While at the helm of Varsity, Charlesbank conspired with Varsity and Jeff Webb to consolidate Varsity's market power by acquiring its biggest rivals, including ▇▇▇▇▇▇ to fund the acquisition of Project Cloth. **Ex. 28** [Janower Dep.] at 154:8-154:10.

175.    Between 2014 and 2018, the period when Charlesbank owned Varsity, Varsity's market power grew considerably through its many acquisitions. *See supra* ¶¶ 60-61, 64, 100, 101; *see also* **Ex. 229** (Memo lists eight entities that were acquired from 2015 to 2018, including JAM Brand and Epic); **Ex. 92** at 2 (5/2018, Charlesbank document stating that "[i]n terms of competitions overall, seems like Varsity has monopoly").

176.    Varsity's acquisition of its most significant competitors occurred only with Charlesbank's approval. **Ex. 222** at 0196 (showing that Charlesbank's approval was required for

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

acquisitions with purchase prices of ▮▮▮ million or greater); **Ex. 12** [Elza Dep.] at 328:14-22

("Q: And for acquisitions, mergers under Charlesbank, did you understand that they still had to

ultimately approve those transactions. . . . A: That's – that's always been my understanding. . . .

But, yes, there was presentations involved prior to any acquisitions that had to go all the way to

the – to the ownership group.").

177.    Charlesbank continued to provide funding and to invest in Varsity even after

Charlesbank was sold to Bain in 2018. **Ex. 220**; **Ex. 29** [Charlesbank 30(b)(6) Dep.] at 167:4-

169:25, 185:11-186:7 (confirming the identities of the Charlesbank entities that acquired an ▮▮▮

ownership interest in Varsity in the Bain transaction and that Charlesbank has maintained one

seat on Varsity's Board of Directors since then).

178.    Charlesbank participated in anticompetitive acts in furtherance of the conspiracy

from the time it acquired Varsity in 2014 to present. See, e.g., Ex. 21; Ex. 68 at 1612, 1622,

1628-29; Ex. 70 at 1300; Ex. 85 at 6985; Ex. 86 at 5236; Ex. 97 at 5805–06, 5810, 5855–76,

5882; Ex. 213 at 1305; Ex. 223 at 1045-47; Ex. 229 at 5991-93; Ex. 283 at 6147; Ex. 284 at

5631; Ex. 285 at 1040; Ex. 286 at 2247; Ex. 287 at 9470; Ex. 288 at 3480; Ex. 289 at 9041-42;

Ex. 290 at 1179; Ex. 291; Ex. 293 at 4857; Ex. 297; Ex. 308 at 2926, 2929, 2931.

### D.    bain's role and acts in furtherance of conspiracy

179.    On June 19, 2018, a definitive agreement was reached for Bain to purchase

Varsity from Charlesbank for approximately $2.9 billion. **Ex. 68** at 1550 (June 23, 2018, email

from Brandon White stating that "earlier this week we signed a transaction to sell Varsity to Bain

Capital for $2.88 billion, a ~3.4x multiple of our original investment"); **Ex. 21** [Bain 30(b0(6)

Dep.] at 16:1-12 (confirming Varsity purchase price of $2.88 billion). Bain gained an

approximate 67.5% ownership interest in Varsity and four of seven of the seats on Varsity's

Board of Directors. *Id.* at 85:8-12, 90:22-91:01.

180.    Bain actively participated in the anticompetitive scheme after it acquired Varsity in 2018 by making decisions on the Varsity Board of Directors. **Ex. 12** [Elza Dep.] at 38:11-17, 43:14-44:19 (Bain participated in Varsity Board of Directors' meetings and provided strategic advice to Varsity including, for example, how to restructure its customer rebate programs). **Ex. 239** at 7945.

181.    Bain takes a "consulting-based approach to private equity investing, partnering closely with management teams to offer the insights that challenge conventional thinking, build great businesses and improve operations." **Ex. 231**.

182.    Prior to acquiring Varsity, Bain conducted a substantial amount of due diligence including extensive presentations where Varsity employees provided information and answered Bain's questions. For example, Mr. Elza testified that Bain "did a lot of due diligence prior to acquiring our company, and they hired companies to dig in and try to figure out all they could… they worked with the directors of strategy to try to come up with these numbers." **Ex. 12** [Elza Dep.] at 104:6-10. Bain's due diligence confirmed that it understood Varsity's strategy to maintain and increase its market power through anticompetitive acquisitions and the maintenance of Varsity's exclusionary practices, including control of end-of-season competitions, exclusionary rebate programs, and other anticompetitive practices. **Ex. 1** [Netz Rep.] at 10-11 & n. 30-31, 33; **Ex. 12** [Elza Dep.] at 102:19-104:10.

183.    Prior to the Bain acquisition, Varsity created a presentation titled "Varsity Brands, Elevating Student Experience, Varsity Spirit Divisional Presentation, May 2018" which provided a detailed overview of the company and was to be presented to high-level executives at Bain. **Ex. 12** [Elza Dep.] at 281:23-282:10; **Ex. 54**. Bain was informed about the history of Varsity, including specifically its mergers and acquisitions strategy prior to purchasing the company. *Id.*

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

184.    When Bain acquired Varsity, it acquired the right to control and manage its affairs and operations. **Ex. 10** [Webb Dep.] 342:23-344:5 (testifying that Bain owns the "controlling interest" in Varsity); **Ex. 21** [Bain Dep.] at 28:16-29:7 (confirming that Bain acquired an ████ ownership interest in Varsity); **Ex. 71** at 3840 (stating Bain's intention to create a "top-level partnership where the real substantive board is" in contrast to the "lower boards" of Hercules VB Holdings, Inc. and Hercules Achievement Holdings, Inc.).

185.    Bain was actively involved in Varsity's day-to-day operations, including changing Varsity's leadership. For example, Varsity replaced many Varsity employees who were former cheerleaders with Bain personnel. **Ex. 12** [Elza Dep.] at 272: 3-12, 264:20-265:5. Bain would provide advice and input into hiring and firing at Varsity. **Ex. 232** [Bain 30(b)(6) Dep.] at 138:10-138:11; **Ex. 21** [Bain Dep.] at 91:7-23; **Ex. 232** [Cotton Dep.] at 69:23-25 (regarding the COVID-19 pandemic, "[t]here were ongoing board-level discussions and day-to-day managerial discussions with [Varsity] about what situation are we in").

186.    Bain personnel are woven into Varsity's administration on every level. **Ex. 12** [Elza Dep.] at 272:3-12 (testifying that Bain was "active" in the hiring and firing of key Varsity's employees, for example by replacing "[a]ll the cheerleaders" with "bigwigs from Bain").

187.    Bain acted cooperatively with its Co-Defendants to acquire, enhance, and maintain Varsity's market power. **Ex. 1** [Netz Rep.] at 3.

188.    Bain oversaw Varsity's monopolization of the relevant markets, and supported and furthered the abuse of that market power. Ex. [Elza Dep.] 57:2-17, 51:13-52:12, 272:3-12. Bain admits that "[b]y heritage, we approach investing as strategists with an 'operator's mindset.'" **Ex. 233** at 5993.

189.    Bain provided strategic advice regarding Varsity's Family Plan. **Ex. 12** [Elza

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Dep.] at 57:2-17 (testifying that Bain provided strategic advice involved in key elements of the exclusionary scheme, including "changing, amending, or adapting the Varsity Family Plan . . . to eventually try to eliminate at least the cash portion of the Varsity Family Plan . . . to keep the dollars flowing to Varsity").

190.    Bain was informed of any potential acquisitions of competing event producers by Varsity before the acquisition, and Bain had to approve these transactions. **Ex. 12** [Elza Dep.] at 39:17-40:12 **(**Mr. Elza testified that presentations regarding each acquisition were shown to Bain for final approval.); **Ex. 21** [Bain 30(b)(6) Dep.] at 109:17-109:21 ("The management team is free to make acquisitions beneath certain thresholds without consulting the board. Above that threshold, they're required to obtain the approval of the board of directors.").

191.    Bain provided funding for Varsity to acquire rivals. **Ex. 12** [Elza Dep.] at 51:13-52:12 ("During acquisitions, our strategy was we put together on paper what we wanted to go – companies we looking at, work with folks to get – prepare that, and that got presented to Bain and they ultimately approved those transactions. . . . They were – they were ultimately presented to Bain for final buy-off, yes."); **Ex. 236** at 6944, 6960-61 (executed asset purchase agreement for Varsity's acquisition of B2 Cheer and Dance, dated January 9, 2019); **Ex. 237** (confirming that Varsity viewed the acquisition of B2 Cheer and Dance, a competitor in the Cheer Camps Market, as an opportunity to foreclose a key competitor in the Cheer Apparel Market and increase participation at Varsity's national competitions in the School Cheer Market); **Ex. 238** at 1156 ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

192.    Bain advised Varsity on which companies it should acquire. **Ex. 21** [Bain 30(b)(6)

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Dep.] at 111:09-111:14 ("[T]he bulk of the advice was provided around adjacent space M&A,

what were adjacent markets such as band or dance that we could think about acquiring through

our shared platform, as well as occasionally advice on specific targets that the management team

had identified or was considering."); *id.* at 109:25 -110:2 ("There is also a regular dialogue about

potential targets that [Varsity] management may want to think about acquiring.").

193.    Bain traveled to Memphis, Tennessee, on at least one occasion, for a meeting

regarding setting prices for competitions, camps, and apparel. **Ex. 240** at 1120 (9/4/2018) ("Bain

will be live in Memphis on 10/1," and attaches Varsity Spirit Price Setting Overview).

## VII.    DEFENDANTS WERE UNJUSTLY ENRICHED

194.    Plaintiffs have paid illegal overcharges in the three relevant markets, and ancillary

charges such as those incurred by Plaintiffs for Stay-to-Play and higher spectator fees. **Ex. 1**

[Netz Rep.] at 45-47 & n. 184; **Ex. 122** at 2197; **Ex. 7** [Maki Rep.] at ¶¶ 98-101; **Ex. 3** [Heeb

Rep.] at ¶¶ 198-199 & n. 226.

195.    Defendants have reaped and retained substantial benefits in the form of higher

profits due to their unjust exclusionary scheme. **Ex. 215** ( █████████████████████████

█████████████████████████ ); **Ex. 216** (Phantom Unit Plan).

196.    USASF staff participated in Varsity's employee stock option plan. **Ex. 14**

[Peterson Dep.] at 278-306 (Peterson was legally a Varsity employee for part of the period

between 2004-2020 and received large payments each time Varsity was acquired: from the

Charlesbank acquisition, he received between $250,000-$276,000 for his "phantom shares" in

Varsity; from the Bain acquisition, he received $200,000 from an employee stock option plan)

**Ex. 14** [USASF  30(b)(6) Dep.] at 281:22-282:4; **Ex. 205**; **Ex. 14** [Peterson Dep.] at 281:22-

282:14, 286:22-288:8 (USASF Vice President of Events and Corporate Alliances that he received

$250,000-$276,000 for his "phantom shares" in Varsity from the Charlesbank acquisition and

Case No. 2:20-cv-02892-SHL-tmp                45

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

$200,000 from a similar plan when Bain purchased Varsity); **Ex. 205** (2015 email to "eligible ESOP participants," including six USASF individuals, who had become "100% vested" since "the transaction with Charlesbank is now complete).

197.    On or around December 12, 2014, Varsity employees received approximately $79.5 million in LTIP payouts and change-of-control bonuses in connection with the Charlesbank acquisition. **Ex. 29** [Charlesbank 30(b)(6) Dep.] at 66:6-13. Webb received approximately $34.8 million. **Ex. 29** [Charlesbank 30(b)(6) Dep.] at 67:4-7.

198.    In or around November 2016, Varsity distributed a shareholder dividend of ███ ███ **Ex. 29** [Charlesbank Dep.] at 84:21-25, 91:24-92:7. Charlesbank received approximately ███████. **Ex. 29** [Charlesbank Dep.] at 92:8-93:23. Varsity employees received approximately ████████. **Ex. 248** ("Investor Summary" at Rows 24-117, Column M). Jeff Webb received approximately ████████. **Ex. 29** [Charlesbank Dep.] at 95:23-96:5.

199.    In January 2018, Varsity distributed a shareholder dividend of approximately ███████ **Ex. 29** [Charlesbank Dep.] at 114:18-20, 116:5-10, 120:10-19. Charlesbank received approximately ████████. **Ex. 29** [Charlesbank Dep.] at 121:2-9. Varsity employees received approximately ███████ in dividend payments and phantom distributions. **Ex. 29** [Charlesbank Dep.] at 121:10-122:4; **Ex. 228** ("Investor Summary" at Rows 26-240). Jeff Webb received approximately ████████. **Ex. 29** [Charlesbank Dep.] at 123:6-10.

200.    On or around July 30, 2018, Charlesbank received ████████ as part of Bain's acquisition of Varsity. **Ex. 29** [Charlesbank 30(b)(6) Dep.] at 191:8-192:15. Varsity employees received approximately $78 million. **Ex. 21** [Bain 30(b)(6) Dep.] at 37:22-41:11.

201.    Webb received ████████ as part of Bain's acquisition of Varsity from Charlesbank. **Ex. 10** [Webb Dep.] at 397:18-398:6.

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## VIII.   ANTICOMPETITIVE CONDUCT IS ONGOING

202.    Harm to all putative class members is ongoing. Plaintiffs sufficiently allege

ongoing harm in their Complaint. ECF No. 1, Complaint, ¶¶ 6, 22, 163, 231-38, 240, 247.

203.    There is no indication that Defendants have changed any of the anticompetitive

practices and policies that Plaintiffs allege, or that their exclusionary scheme or conduct has

ceased. For example, the anticompetitive practices that Plaintiffs allege are evidently still in

place. **Ex. 2** [Netz Rebuttal] at 79, 82, 90; Ex. 3 [Heeb Rep.] at ¶¶ 7, 91, 218, 269; **Ex. 5**

[Aronoff Rep.] at 35-41.

## IX.   DEFENDANTS' CONDUCT WAS NOT PROCOMPETITIVE

204.    Varsity's acquisitions did not lead to better event offerings, there were fewer

events to choose from and higher prices to pay. **Ex. 1** [Netz Rep.] at 102-104; **Ex. 2** [Netz

Rebuttal] at 92.

205.    Varsity's acquisitions of competitors and higher prices did not translate to better

quality of events. Rather, quality decreased. **Ex. 1** [Netz Rep.] at 47 & n. 185, 102-103; **Ex. 2**

[Netz Rebuttal] at 87-89; **Ex. 12** [Elza Dep.] at 203:23-231:9, 285:14–287:10; **Ex. 13** [LeTard

Dep.] at 263:1-264:7; **Ex. 245** at 0926 (3/3/2015, complaint from All Star owner to USASF

reporting that move from JAM Brands to Varsity event led to worse experience); **Ex. 63** at 7474

(complaints from 23 gyms owners re lower quality of Varsity events).

206.    Varsity's higher apparel prices did not translate into better quality products. **Ex. 1**

[Netz Rep.] at 57 & n. 228, 113-115 (noting numerous instances of Varsity apparel customers

complaining about poor quality products and customer service); **Ex. 2** [Netz Rebuttal] at 87-89

**Ex. 246** at 2183-84.

207.    Varsity's targeting of other non-Varsity events does not have a procompetitive

justification. It is not a practice of healthy competition. **Ex. 1** [Netz Rep.] at 98-101; **Ex. 2** [Netz

Rebuttal] at 79-83; **Ex. 63** at 7475; **Ex. 137** (2/13/2018, discussing impact of Varsity targeting

events: "with their change in date, bids to Cheer and Dance WORLDS plus numerous bids to

another end of year event, our registrations went from 88 teams last year to 30 this year!").

208.    USASF rules and policies cannot be justified as in the name of "safety." Varsity's

Squad Credentialing Program was not to protect athlete safety; it was to grow Varsity's Cheer

Camps and Cheer Competitions market power. **Ex. 1** [Netz Rep.] at 89-92; **Ex. 113; Ex. 114** at

0729 (discussing implementation of policy to force teams "going to gym camps" to instead go to

Varsity camps and grow Varsity's camp business); **Ex. 112**; **Ex. 247**; **Ex. 178; Ex. 200; Ex. 198**;

**Ex. 63** at 7472; **Ex. 199**; **Ex. 131** at 6147.

209.    USASF has extensive policies precluding event producers from competing with

USASF. Yet, when Varsity told USAF it planned to allow levels 6 and 7 at Summit in 2020, in

direct competition with Worlds, USASF did not express any concerns and instead expressed

willingness to help. **Ex. 176.**

210.    Varsity designed rebate programs with the intent and effect of foreclosing Cheer

Competition and Cheer Apparel rivals, not to benefit gyms and schools. **Ex. 1** [Netz Rep.] at 104-

108; **Ex. 2** [Netz Rebuttal] at 2-3.

## X.    INJURY

211.    Varsity's anticompetitive strategy to foreclose competitors was effective. **Ex. 1**

[Netz Rep.] at 81-84; **Ex. 63** at 7475; **Ex. 131** at 6147; **Ex. 137** at 4153; **Ex. 139.**

212.    As a result of Defendants' exclusionary scheme, Varsity was able to charge supra-

competitive prices in the three relevant markets, which Plaintiffs were forced to pay. **Ex. 1** [Netz

Rep.] at 38-39, 56-61; **Ex. 3** [Heeb Rep.] at ¶¶ 293; **Ex. 4** [Heeb Rebuttal] at ¶¶ 75-84, 649 &

Tables 2, 24.

213.    Defendants' exclusionary scheme and acts of foreclosure allowed Varsity to

Case No. 2:20-cv-02892-SHL-tmp                48

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

charge higher prices to gyms and schools in the three relevant markets. As a result, Plaintiffs and

putative class members suffered illegal overcharges of 27% on Cheer Competitions, 27% on

Cheer Camps, and 11% on Cheer Apparel. **Ex. 4** [Heeb Rebuttal] at ¶¶ 75-84, 649 & Tables 2,

24.



; **Ex. 19** [Cherasaro Dep.] at 78:19 – 79:25 (the cheer families paid directly to the

gyms, and the gyms paid directly to Varsity and gyms sell the uniforms at cost).

## XI.    MISCELLANEOUS FACTS

215.    Bain, USASF, and Varsity have been the focus of a number of news articles and

media segments, as well as complaints from IEPs, gyms, and other industry participants, which

have focused on Varsity's monopoly and abuse of its market power. For example, on August 24,

2021, HBO's Real Sports with Bryant Gumbel aired a program about allegations All Star Cheer

participants regarding sexual abuse they were subjected to while competing with Varsity-

affiliated gyms. Ex. 20 [Cota Dep.] 257:9-260:24; Ex. 4 [Heeb Reb.] at ¶¶ 330-339 & n. 392

(citing Daniel Libit, "Varsity Cheerleading Faces Sex Abuse Claims Amid Antitrust Litigation,"

Sportico, Sep. 7, 2022); Ex. 76 at 7771-78 (6/28/2019).

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Dated: September 15, 2023

Respectfully submitted,

By:_____/s/ Joseph R. Saveri_____
          Joseph R. Saveri

Joseph R. Saveri*
Steven N. Williams*
Ronnie Seidel Spiegel*+
Kevin E. Rayhill*
Elissa A. Buchanan*
David Seidel*
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
rspiegel@saverilawfirm.com
krayhill@saverilawfirm.com
eabuchanan@saverilawfirm.com
dseidel@saverilawfirm.com

Van Turner Jr. (TN Bar No. 22603)
**TURNER FEILD, PLLC**
2650 Thousand Oaks Blvd., Suite 2325
Memphis, Tennessee 38118
Telephone: (901) 290-6610
Facsimile: (901) 290-6611
VTurner@TurnerFeildLaw.com

Richard M. Paul III*
Ashlea Schwarz*
**PAUL LLP**
601 Walnut, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
rick@paulllp.com
ashlea@paulllp.com

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Jason S. Hartley*
**HARTLEY LLP**
101 West Broadway, Suite 820
San Diego, CA 92101
Telephone: (619) 400-5822
hartley@hartleyllp.com

Daniel E. Gustafson*
Daniel C. Hedlund*
Daniel J. Nordin*
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com

* Admitted *pro hac vice*

+Located in Washington State

*Attorneys for Individual and
Representative Plaintiffs*

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**