# EXHIBIT 11

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| **JESSICA JONES, et al.,** | Case No. 2:20-cv-02892-SHL-tmp |
| Plaintiffs, | |
| v. | |
| **VARSITY BRANDS, LLC, et al.** | |
| Defendants. | |
| | **JURY DEMAND** |

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

Indirect Purchaser Plaintiffs ("Plaintiffs") respond to Defendants' Statement of
Undisputed Material Facts ("DSOF") as follows. As a preliminary note, regarding cited
documents and testimony, Plaintiffs do not dispute the authenticity and admissibility of the
materials cited by Defendants in their DSOF for purposes of summary judgment only, unless
otherwise noted below. For purposes of summary judgment only, Plaintiffs also do not dispute
that the quotations taken from documents and testimony are accurately reproduced, unless
otherwise noted below. Plaintiffs expressly reserve the right to object, on any appropriate basis,
to the admission of any of the cited materials at trial. Materials, information, and claims "not
disputed for purposes of summary judgment" are undisputed *only* for purposes of summary
judgment. **Appendix A** to this response sets forth evidentiary and/or admissibility objections to
the documents cited by Defendants in their DSOF.

Plaintiffs also object to Defendants' improper use of the term "scholastic cheer," which
they use interchangeably with "sideline cheer" throughout their DSOF. As stated throughout this

litigation, the activity at issue in this action, regardless of whether it is being performed by an All

Star Gym team or a School Cheer team, is Competitive Cheer, i.e., teams performing

choreographed routines, set to music, which incorporates elements of gymnastics, tumbling, and

dance, is performed on spring floors, and is adjudicated by a team of judges. Sideline cheer is a

different activity. *See* Plaintiffs' Statement of Facts (cited hereinafter as "PSOF"). Therefore,

unless otherwise noted, Plaintiffs refer to School Cheer to mean Competitive Cheer as practiced

by teams from middle schools, high schools, colleges, and universities.

For ease of review, Plaintiffs use Defendants' heading as they appear in the DSOF.

However, that does not mean Plaintiffs agree to or adopt the particular language or titles used in

Defendants' headings.

References to previous responses within this document are cited as "Resp., ¶_."

## I.    CHEER CAMPS

1.    Varsity offers camps to train competitive and sideline scholastic cheerleaders.

(Compl. ¶¶62-63; ECF No. 382-6 at ¶247 (showing that ▆ to ▆ of Varsity school camp

customers did not attend any competitions).)

**Response: Disputed in part.**

Undisputed that Varsity[1] offers camps to train Competitive Cheer teams, which are either

All Star Cheer teams in a gym or School Cheer teams at a school. *See* PSOF, ¶¶ 1-3.

Disputed to the extent Varsity improperly lumps Competitive School Cheer with sideline

cheer (and calls the two "scholastic" cheer throughout). Sideline cheer is a distinct category of

cheer not included in Plaintiffs' School Cheer Definition. *See* **Ex. 1** [Netz Rep.] at 11-12; **Ex. 3**

---

[1] For the purposes of this Statement, "Varsity" refers collectively to Varsity Brands, LLC ("Varsity Brands"), Varsity Spirit, LLC ("Varsity Spirit"), and Varsity Spirit Fashions & Supplies, LLC ("Varsity Fashion"). Defendants also include Charlesbank Capital Partners, LLC ("Charlesbank") and Bain Capital Private Equity, LP ("Bain"). On August 23, 2022, Plaintiffs moved to add additional Defendants. *See* ECF No. 344 at 4-5.

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

[Heeb Rep.] at 40. Varsity's own documents concede and acknowledge that the two are materially different and that sideline cheer is not a competitive sport. **Ex. 51** at -5546.[2]

Disputed that "█ to █ of Varsity school camp customers did not attend any competitions." Defendants' percentages are uninformative because Dr. Murphy includes irrelevant groups not at issue in this litigation, like sideline cheer teams and dance camps, in his calculation. **Ex. 1** [Netz Rep.] at 11-13; **Ex. 2** [Netz Rebuttal] at 70-71, 85. The correct analysis is how many School Cheer teams who attend Cheer Camps attend at least one Cheer Competition, which Murphy never examines. *Id.* When using correct data, the percentage of School Cheer camp customers who attend at least one Cheer Competition is 70% for the 2015 to 2016 season and 80% for the 2018-2019 season. *Id.*

2.      The types of camps offered by Varsity include clinics, day camps, and multi-day camps.  (ECF No. 388-4 at ¶155.)

**Response: Undisputed for purposes of summary judgment only.**

3.      Among the training and instruction provided at Varsity's multi-day camps is instruction on the "five key roles" of a cheerleader, namely "crowd leader, spirit raiser, ambassador, athlete and entertainer" along with "leadership and safety."  (Ex. AT, VAR00160803.)

**Response: Disputed in part.**

Undisputed that the document cited lists "crowd leader, spirit raiser, ambassador, athlete and entertainer", "leadership and safety" as part of instruction.

Disputed that any evidence is offered to show that such instruction took place at a Varsity Camp, nor does the document cited state that these are "five key roles." Cheer Camps were a primary means of Defendants' anticompetitive conduct. Defendants used camps to tie athletes to Varsity competitions and lock them into the Varsity ecosystem. *See* **Ex. 20** [Cota Dep.] at

---

[2] Unless otherwise noted, citations to individual exhibits ("Ex."), are citations to the exhibits to the Declaration of Joseph R. Saveri in support of Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, filed herewith

223:11-17; **Ex. 114** at -0727–0729 (discussing implementation of policy to force teams "going to gym camps" to instead go to Varsity camps and grow Varsity's business); **Ex. 54** at –9337

████████████████████); **Ex. 1** [Netz Rep.] at 89–92; **Ex. 2** [Netz Rebuttal] at 84–85.

The evidence also shows Varsity did not care about safety. For example, USASF used to prohibit athletes from wearing jewelry because it was dangerous during stunts. **Ex. 200** (USASF_00009869). However, after Varsity partnered with Swarovski Crystal, USASF removed its longstanding rule against jewelry. *See* **Ex. 11** at 70:22-71:23; Ex. 305.

4.      Very few All Star teams attend camps, which are geared toward scholastic teams, including those that do not participate in competitions.  (Netz Rep, ECF No. 382-3 at p. 60 ("[N]early all camp participants are school teams that would otherwise have a break in their season during the summer when Cheer Camps are usually held.  All Star gyms do not have a similar break during the summer and, therefore, have less of a need or availability to attend Cheer Camps."); Ex. Q, Netz Dep. 89:12-18; Ex. AK, Heeb Dep. 133:15-21.

**Response: Disputed in part.**

Undisputed that fewer All Star Cheer teams attend camps.

Undisputed that some school teams attend camps but competitions.

Disputed that the use of the term "scholastic teams" is misleading and inaccurate. Resp., ¶1.

5.      There is no rebate under the Varsity Family Plan ("VFP") or a Network Agreement for camp registration fees, and there never has been.  (Ex. AK, Heeb Dep. 244:17-22, 254:8-12, 322:8-12; see also, e.g., Ex. AU, VAR00020214 (VFP); Ex. AV, VAR00175267 at –268 (VFP); Ex. AW, VAR00017932 at -932-942 (Network Agreement).

**Response: Undisputed for purposes of summary judgment only.**

6.      Neither Plaintiffs paid for a registration at or even attended a Varsity cheer camp. (Ex. AX, Plaintiffs' Combined Objections and Responses to Defendants' First Set of Interrogatories at Attachment A at 1-6 (demonstrating, through list of purchases made by Plaintiffs, that neither of the remaining Plaintiffs made any camp purchase);  Ex. AY, Lorenzen

Dep. at 86:12-19 ("Q: [Y]ou mentioned earlier today, I believe, that your child attended a camp in relation -- in connection with cheerleading; is that correct? A: No."); Ex. AZ, Jones Dep. at 49:4-50: 7.)

**Response: Disputed.**

Disputed as misleading. Plaintiffs—who are parents of Competitive All Star Cheer athletes—indirectly paid Varsity for Varsity Cheer Competition costs and indirectly purchased Cheer Apparel. **Ex. 61** at ¶¶5-6; **Ex. 62** at, ¶¶5-8. Further, there is a dispute as to whether Plaintiff Lorenzen paid for a camp. Lorenzen was required to—and did—pay the All Star gym Cheer Central Suns for her daughter to attend a weekly tumbling "clinic." **Ex. 35** [Lorenzen Dep.] at 68:23-69:5. Defendants include "clinics" in their definition of "camps" herein. *See* DSOF, ¶2. Plaintiffs also have a pending motion to add a class representative who purchased Cheer Competitions, Cheer Camps, and Cheer Apparel. *See* ECF No. 394-2.

7.    There are many different kinds of cheer camps within Plaintiffs' proposed "Cheer Camp Market," including multi-day, single day, in the school's facilities, at the facilities of major universities, high school camps, middle school camps, and so on.  (ECF No. 382-6 at ¶¶133-134, 181-184, Exs. 14 and 15.)

**Response: Disputed in part.**

Undisputed that camps vary in length or location.

Disputed to the extent Defendants claim Plaintiffs' Cheer Camps market is not properly defined. Plaintiffs properly define both the product market and geographic market for Camps. **Ex. 1** [Netz Rep.**]** at 32-33, 60; **Ex. 3** [Heeb Rep.]  at ¶¶112-117, 145-152; *See also* ECF No. 389; ECF No. 454.

8.    In order to attend one of Varsity's three national championship events for high school teams, a team must first have 75% of its members complete the Squad Credentialing Program at a multi-day Varsity cheer camp.  (Ex. AT, VAR00160803 at -803 (listing the events to which the Squad Credentialing Program applied prior to 2021 and the program's requirements); Ex. BB, VAR00160802 (Duhon Exhibit 5) at -802.)

**Response: Undisputed for purposes of summary judgment only.**

9.    Varsity first instituted the Squad Credentialing Program as to the National High School Cheerleading Championship (NHSCC) with UCA in the 2016-2017 season.  (Ex. BB, VAR00160802 (Duhon Exhibit 5) at -802; Ex. BC, Duhon Dep. 48:4-50:17.)

**Response: Undisputed for purposes of summary judgment only.**

10.    Varsity instituted the Squad Credentialing Program as to the NCA Junior & Senior High School National Championship in the 2017-2018 season.  (Id.)

**Response: Undisputed.**

11.    Varsity instituted the Squad Credentialing Program as to USA Spirit Nationals in the 2020-2021 season.  (Ex. BC, Duhon Dep. 102:19-103:4.)

**Response: Undisputed.**

12.    The Squad Credentialing Program is not applicable to cheer teams that do not participate in one of the three specific Varsity competitions.  (Ex. AK, Heeb Dep. 197:3-12; Ex. BB, VAR00160802 (Duhon Exhibit 5) at -802.)

**Response: Disputed.**

Disputed as to use of the term "applicable." The Squad Credentialing Program locks Competitive Cheer athletes into the Varsity ecosystem by making it mandatory for high school teams to attend a multi-day Varsity Cheer camp in order to compete at a national Varsity competition. It serves to tie the Cheer Competitions and Cheer Camps markets. **Ex. 1** [Netz Rep.] at 25, 89-92. Competitive Cheer athletes compete during the season with the goal of attending key end-of-season events and qualify by performing well at a Tier 1 event then obtaining a bid. PSOF, ¶¶ 14-15. Thus, while a cheer team may attend a Camp—making a Squad Credentialing Program likely "applicable"—it may not receive a bid to compete.

13.    Of the ▮▮▮▮ schools that attended a Varsity camp each season from the 2016-2017 season to the 2018-2019 season, less than 10% attended a competition requiring squad credentialing.  (ECF No. 382-6 at ¶383, Ex. 55 (establishing that the minimum percentage of schools attending events requiring squad credentialing was between ▮▮▮▮▮▮▮▮ from the

2016-2017 season to the 2018-2019 season).)

**Response: Disputed.**

Defendants' percentages are uninformative because Dr. Murphy improperly includes irrelevant teams, like sideline cheer teams and dance groups, in his calculation. **Ex. 1** [Netz Rep.] at 11-13; **Ex. 2** [Netz Rebuttal] at 70-71, 85. The proper metric to evaluate potential foreclosure impact of the tying requirement is the share of Competitive School Cheer teams that attend a Varsity Cheer Camp. When using correct data, the percentage of School Cheer camp customers who attend at least one Cheer Competition is ██ for the 2015 to 2016 season and ██ for the 2018-2019 season. *Id.*

14.    Prior to December 10, 2016, Varsity did not make any acquisition of a cheer camp producer that Plaintiffs assert was anticompetitive.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).[3]

Notwithstanding, disputed. Varsity's acquisitions of numerous cheer camp producers prior to December 10, 2016 were part of its comprehensive anticompetitive strategy. A 2014 Varsity document shows Varsity possessed 80-85% of the Cheer Camps Market, which it maintained and continued to enhance by creating barriers to entry and eliminating competition across all three intertwined relevant markets. **Ex. 87** at -1581; **Ex. 1** [Netz Rep.] at 61-65; **Ex. 2** [Netz Rebuttal] at 69-71.

*See, e.g.,* Varsity's market power in and intertwining of the Relevant Cheer Markets (PSOF, ¶¶60-67, 82-94); how Varsity protects its market power by erecting barriers to entry

---

[3] *See Gunn v. Senior Servs. of N. Kentucky*, 632 F. App'x 839, 847 (6th Cir. 2015) ("'conclusory and unsupported allegations, rooted in speculation,' are insufficient to create a genuine dispute of material fact for trial.") (quoting *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir.2003)); *Collier v. City of Memphis*, No. 19-CV-2476-TMP, 2021 WL 799875, at *1 (W.D. Tenn. Mar. 2, 2021) ("court[s] need not consider any unsupported factual assertions or materials in the record not cited by the parties.") (citing Fed. R. Civ. P. 56(c)(3)).

[particularly by tying Cheer Camps to Cheer Competitions] (*id.* ¶¶71-81); and how Varsity abuses its market power and forecloses its rivals through willful acquisitions (*id.* ¶¶95-106), control of governing bodies (*id.* ¶¶107-108), counterprogramming (*id.* ¶¶109-111), blocking retail and event vendors (*id.* ¶¶112-116), exclusionary contracts with gyms and schools (*id.* ¶¶117-126), "stay-to-play" (*id.* ¶¶127-130), and conspiring with Defendants (*id.*, Section VI). Varsity's anticompetitive conduct, taken as a whole, served to raise prices, reduce output, and reduce consumer choice. **Ex. 1** [Netz Rep.] at 113-115; PSOF, ¶¶ 211-214.

15.    On or after December 10, 2016, Varsity did not make any acquisition of a cheer camp producer that Plaintiffs assert was anticompetitive.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Plaintiffs do assert that Varsity's acquisitions of cheer camp producers after December 2016—e.g., All Things Cheer Skillz Camp in 2017 and Epic Brands in 2018, both of which operated multiple cheer camps throughout the United States—were anticompetitive. By this time, Varsity already had monopoly power, which it maintained and enhanced by creating barriers to entry and eliminating competition across all three intertwined relevant markets. **Ex. 87** at -1581; **Ex. 1** [Netz Rep.] at 61-65; **Ex. 2** [Netz Rebuttal] at 69-71.

*See, e.g.,* Varsity's market power in and intertwining of the Relevant Cheer Markets (PSOF, ¶¶60-67, 82-94); how Varsity protects its market power by erecting barriers to entry [particularly by tying Cheer Camps to Cheer Competitions] (*id.* ¶¶71-81); and how Varsity abuses its market power and forecloses its rivals through willful acquisitions (*id.* ¶¶95-106), control of governing bodies (*id.* ¶¶107-108), counterprogramming (*id.* ¶¶109-111), blocking retail and event vendors (*id.* ¶¶112-116), exclusionary contracts with gyms and schools (*id.* ¶¶117-126), "stay-to-play" (*id.* ¶¶127-130), and conspiring with Defendants (*id.*, Section VI). Varsity's anticompetitive conduct, taken as a whole, served to raise prices, reduce output, and reduce consumer choice. **Ex. 1** [Netz Rep.] at 113-115; PSOF, ¶¶ 211-214.

16.     Prior to December 10, 2016, Varsity did not make any acquisition that enabled Varsity to charge higher prices for cheer camps.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. In 2003, Varsity started its acquisition strategy to dominate the Cheer Competitions market with the acquisition of a major cheer organization, National Spirit Group and the NCA brands. **Ex. 1** [Netz Rep.] at 93. Varsity went on to own and control the other two main organizations that promote Camps and Competitions—the UCA and USA. *Id.* at 15. The NCA, UCA, and USA comprised Varsity's ██████████████████ revenue over the 2004-2013 period. **Ex. 93** at –6010. The NCA brand alone accounts for a significant chunk of Varsity's Camps revenue. See **Ex. 284** at –5631; **Ex. 93** at –6023. Through ownership and control of these three organizations alone, Varsity controlled 80% of the entire Cheer Camp market. *Id.*

With this market share, Varsity was able to exclude Cheer Camps competitors, mainly via its policy of tying Cheer Camps and Cheer Competitions (schools are primary participants in Camps, and because school teams want to compete at the national events, this tying strategy of entry to the NCA with attendance of a Cheer Camp serves to exclude non-Varsity suppliers). **Ex. 1** [Netz Rep.] at 89-92. As result, Varsity had the monopoly power necessary to raise prices (**Ex. 1** [Netz Rep.] at 37-41; PSOF, ¶¶ 62-63, 65) and it did raise prices, as Plaintiffs and putative class members suffered an overcharge of 27.4% on Cheer Camps. PSOF, ¶ 213. Ultimately, taken as a whole, Varsity's acquisitions and foreclosure strategy served to raise prices, reduce output, and reduce consumer choice across all relevant markets. **Ex. 1** [Netz Rep.] at 113-115; PSOF ¶¶ 95-106, 211-214.

17.     On or after December 10, 2016, Varsity did not make any acquisition that enabled Varsity to charge higher prices for cheer camps.

**Response: Disputed.**

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed as misleading. Varsity acquired several competitors that operated camps throughout the United States. In 2017, Varsity acquired All Things Cheer, & Dance (ATC), which operates camps in the western United States and elsewhere. [White Ex. 28, CB00075991] at 5998. In 2018, Varsity acquired Epic Spirit Ventures, which operated camps in the eastern United States. *Id*. at 6004. Varsity maintained its monopoly over the Cheer Camps market throughout the class period through its ownership and control of the NCA, UCA and USA, which accounted for 80% of the Cheer Camps market by Varsity's own analysis. **Ex. 93** at –6023. As result, Varsity had the monopoly power necessary to raise prices (**Ex. 1** [Netz Rep.] at 37-41; PSOF, ¶¶ 62-63, 65), and it did raise prices, as Plaintiffs and putative class members suffered an overcharge of 27.4% on Cheer Camps. PSOF, ¶ 213.

Ultimately, taken as a whole, Varsity's acquisitions and foreclosure strategy served to raise prices, reduce output, and reduce consumer choice across all relevant markets. **Ex. 1** [Netz Rep.] at 113-115; PSOF, ¶¶ 95-106, 211-214.

18.    Varsity did not engage in any anticompetitive conduct with respect to camps that led Plaintiffs to pay higher prices in another market.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Varsity maintained market share and monopoly power in each of the three markets. **Ex. 1** [Netz Rep.] at 55-70; **Ex. 85** at -6985. It leverages power in each to charge supracompetitive prices in another; for example, by leveraging its market power in the Cheer Competitions market to enhance and maintain its market power in the Cheer Camps market. **Ex. 20** [Cota Dep.] at 223:11-17; **Ex. 3** [Heeb Rep.] at ¶118; **Ex. 1** [Netz Rep.] at 89- 92. Varsity identifies the "high barriers to entry" that it erects as the primary reason for its growth,

and specifically the "high barriers to entry resulting from the Company's integrated business model" and "relationships focused on cross-selling activities." **Ex. 64** at -4544-45.

Webb, as Varsity founder and former CEO, conceded in 2018 that Varsity's strategy was to create an ecosystem that could cross-market its segments and foreclose competition. **Ex. 109** at 1 (2018 quote from Webb in *Chief Executive* magazine: "We were really creating an industry as we went along and it became an ecosystem in that we were creating the concept, we were creating the industry, and then we were positioning ourselves to provide all the products and services … utilized [within that industry]. Not only did we have the number one position in [the camps, apparel, and competitions] segments, but then we developed a cross-marketing model where we could promote [the segments within each other] and to be honest with you, it took off.").

The exclusionary scheme and acts of foreclosure allowed Varsity to charge higher prices to gyms and schools in all three markets. PSOF, ¶¶211-214.

19.    Prices for two-day camps increased slightly by 2.0% the first season the Squad Credentialing requirement took effect, increased by only 0.1% the following season, and decreased by 0.6% the season after that. (ECF No. 382-6 at ¶429.)

**Response: Disputed.**

Without conceding the accuracy of the percentages cited, Plaintiffs dispute this assertion as misleading and irrelevant, as Plaintiffs' theory of harm does not predict a significant price response caused by implementation of the Squad Credentialing Requirement but rather that it would have maintained and preserved Varsity's monopoly and existing supracompetitive pricing and served to bolster its tying scheme with the Cheer Competitions Market. **Ex. 4** [Heeb Rebuttal] at ¶¶618, 619.).

20.    Registration fees for Varsity camps were not higher than they would have been in the absence of whatever conduct Plaintiffs in this case assert is anticompetitive.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by

evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Defendants' exclusionary scheme and acts of foreclosure allowed Varsity to charge higher prices to gyms and schools in all three Cheer markets. PSOF, ¶¶ 211-214. Plaintiffs and putative class members suffered an illegal overcharge of 27% on Cheer Camps (as well as an illegal overcharge of 27% on Cheer Competitions and 11% on Cheer Apparel) as a result, in part, of Varsity's acquisition strategy. PSOF, ¶ 213.

21.    Dr. Heeb's camp-related overcharge assertion is identical to his competition-related overcharge assertion.  (ECF No. 388-3 at ¶¶63, 310; ECF No. 388-4 at ¶21.)

**Response: Disputed in part.**

Undisputed that 27.4% is the overcharge figure for both competitions and camps.

Disputed that the overcharges are "identical." Consistent with accepted economic principles, the overcharge of 27.4% for competitions is an empirical estimate of a conservative, lower bound overcharge that Varsity could extract for camps. **Ex. 3** [Heeb Rep.] at ¶¶16, 25, 307, 308; **Ex. 4** [Heeb Rebuttal] at ¶615-617. As Varsity holds a larger share of the Cheer Camps than Cheer Competitions market, and because price elasticity is inversely related to market power, Varsity's overcharge in the Cheer Camps market would minimally be at least as high as the overcharge in the Competitions market. *Id.* Varsity produced data in this matter about pre-acquisition pricing for event producers acquired over the years, which provided a statistically viable benchmark against which Dr. Heeb estimated Varsity's competitions overcharge, but did not produce comparable benchmark data for the Cheer Camps market. *Id.*

22.    In calculating his camp-related overcharge, Dr. Heeb did not use prices charged for cheer camp registrations in his calculations.  (ECF No. 388-3 at ¶¶308-312; ECF No. 388-4 at ¶21.)

**Response: Disputed.**

Disputed to the extent Defendants suggest Heeb employing the methodology of using econometric regression analysis on a benchmark in one market to determine an overcharge in a related market is not sound, particularly where Defendants have not made the latter data

available in discovery. *See* Resp., ¶21.

23.     In calculating his camp-related overcharge, Dr. Heeb only used prices charged for cheer competition registrations.  (ECF No. 388-3 at ¶¶56, 63; ECF No. 388-4 at ¶¶21, 85 (same).)

**Response: Disputed.**

*See* Resp., ¶¶21, 22.

24.     A firm's ability to charge supracompetitive prices is determined by a multitude of product-specific supply and demand factors.  (See Ex. BD, Maki Dep. 70:17-19 ("[I]t's the dynamics that exist within that market that would allow you to assess what that overcharge is or if it is occurring.").)

**Response: Undisputed.**

25.     Dr. Maki did not calculate or analyze passthrough specifically as it relates to schools.  (Ex. BD, Maki Dep. 88:6-16, 88:23-89:2 ("Q: Okay. And did you find anything from any school where the school said we pass through our costs to parents or other members of the [putative] class? A: I do not recall coming across something like that.").)

**Response: Disputed.**

The evidence cited does not support the fact asserted. Defendants rely on a single response in Dr. Maki's testimony—that she did not specifically recall a statement from a school that they affirmatively pass through costs to parents—into the false statement that she did not "calculate or analyze passthrough specifically as it relates to schools." Indeed, Dr. Maki concluded, based on her analysis of documents and testimony in this case, that (1) the pass-through rate to schools was at least 100% and (2) this rate is likely conservative, given evidence of the gyms marking up already inflated costs when they pass them through to the end purchaser and receiving large rebates of monopoly profits. *See* **Ex. 9** at ¶¶3-6; **Ex. 8** [Maki Rebuttal] at ¶¶17–20.

## II.     CHEER APPAREL

26.     The constituent components of Plaintiffs' "Cheer Apparel Market"–namely cheer

uniforms, shoes, accessories (including outerwear, poms, bows, socks, undergear, bags, and game day apparel, warm-ups (which itself includes jackets pants and other apparel)), and camp wear (including t-shirts, tanks, polos, athletic shorts, skirts, skorts, and practice wear) are not functional substitutes for one another, which is to say they cannot be used for the same purposes. (Ex. AK, Heeb Dep. 140:20-21 ("Obviously shoes are not a substitute for uniforms"), 141:6-9 (same); Ex. Q, Netz Dep. 210:11-211:6 ("Q: So is a uniform substitutable for shoes? A: No. Q: Okay. And a warmup isn't substitutable for shoes? A: Correct. Q: And an accessory like a hair bow isn't substitutable for shoes; right? A: Correct.").)

**Response: Disputed.**

Defendants quote Dr. Heeb's statement out of context. Dr. Heeb testified that Varsity marketed—and Plaintiffs and the Class purchased—Varsity's apparel products as a bundle:

> Q. Whether a hypothetical monopolist could sustain a price increase on shoes depends on whether apparel items are reasonably interchangeable with shoes, looking at a narrower market of shoes.  Is that correct?
>
> A. No. That's misguided, and that's maybe the point of the bundled market. Obviously shoes are not a substitute for uniforms. But what is important is does the collection of cheer apparel packaged and sold as a bundle, is that disrupted by substitution of one element out of a bundle to others and is that where we get a meaningfully different answer? And the answer to that, I believe, is no, that these products -- and we see it because we see in Varsity's data that the products are by and large sold as a bundle. The overwhelming majority of customers, certainly as a function of revenue, buy the bundle. **Ex. 26** [Heeb Dep.] at 140:14-141:5.

Varsity's website markets its apparel products together. **Ex. 249**. When goods tend to be purchased together, it is generally the combined price of the products together that it is relevant for customers' willingness to substitute away from the seller if the seller's price is too high. **Ex. 2 [Heeb Rep.]** at ¶¶306, 158-162, Table 6; **Ex 1** [Netz Rep.] at 39, 55-57; **Ex. 39** [Netz Dep.] at 53:18-56:23.

27.    The constituent components of Plaintiffs' "Cheer Apparel Market" are not economic substitutes for one another, which is to say that if the price of one product goes up, customers will not substitute to another product.  (ECF No. 382-6 at ¶208.)

**Response: Disputed**.

Disputed on the basis that Defendants mischaracterize Plaintiffs' properly defined product market for Cheer Apparel. See Resp., ¶26.

28.    Cheerleaders did not necessarily (and often did not) purchase all of the constituent products in Plaintiffs' "Cheer Apparel Market" from Varsity or from any other single supplier. (ECF No. 382-6 at ¶142, Ex. 19 (demonstrating that Varsity customers bought from different apparel categories in different proportions); Ex. AZ, Jones Dep. 174:15-176:21 (explaining that Ms. Jones's daughter used Varsity uniforms, Rebel shoes, and a Rebel makeup palette in 2019); Ex. BE, Minzghor Dep. 140:12-21 (stating that Fusion Elite gym used Varsity uniforms and Nfinity shoes, as well as Varsity shoes and Rebel uniforms in the past); Ex. BF, Bray Dep. 40:1-41:13 (stating that Stars & Stripes All Star cheerleaders used shoes from Nfinity, uniform tops from Varsity, practice shorts from Nike, and practice tank tops from Custom Ink); Ex. BG, L. Gurske Dep. 143:4-22 (stating that gym bought uniforms from Varsity but also bought apparel from other vendors).)

**Response: Disputed**.

Disputed to the extent Defendants suggest parents and families of Competitive Cheer athletes do not overwhelmingly purchase different items of Varsity apparel together in a bundle. **Ex. 26** [Heeb Dep.] at 138:9-20, 140:14-141:5; **Ex. 3** [Heeb Rep.] at ¶158-159, Table 6. No competent evidence is cited in support of the assertion that athletes "often did not" purchase all products in the Cheer Apparel Market. Rather, ██ of All Star "Gyms with L5-L7 Teams" purchase some apparel from Varsity and ██ of these same teams purchase uniforms. **Ex. 2** [Netz Rebuttal] at 36. While Varsity faced more competition in the Cheer Apparel market than Camps or Competitions, there was not a sufficient competitive restraint on Varsity's ability to raise prices supracompetitively, which is the relevant inquiry for market power. **Ex. 3** [Heeb Rep.] at Tables 23 and 24, ¶193 ("How do we price relative to competitors? Based on VSF catalog pricing we are consistently higher prices than our competitors in all major product categories.")

Varsity was able to maintain that market power by creating barriers to enter the Cheer Apparel market, with its bundled rebate schemes, various schemes and policies restrict to rival companies from selling merchandise at Varsity events, aggressive enforcement of its trademarks, and acquisitions of rival apparel brands. PSOF, ¶¶113-116; **Ex. 4** [Heeb Rebuttal] at 299, 324-329. Varsity concedes that no other retailer "even comes close" to Varsity in the Cheer Apparel market. **Ex. 20** [Cota Depo] at 64:24-65:19.

29.    Varsity designed new forms of apparel conducive to the increasing athleticism of cheerleading.  (Ex. AS, Newby Decl. ¶3.)

**Response: Disputed.**

Varsity apparel customers complained about its low-quality, poorly fitting, under-performing, yet overly expensive apparel products on numerous occasions. **Ex. 246** at –2183-2184; **Ex. 1** [Netz Rep.] at 57 & n. 228, 60. As there is zero admissible evidence cited in support of this assertion, Defendants fail to present a material fact.

30.    Among All Star gyms that participated in Varsity competitions during the class period, ███ purchased uniforms from Varsity, whereas only ███ purchased shoes.  (ECF No. 382-6 at ¶142, Ex. 19.)

**Response: Disputed.**

The evidence cited is incorrectly quoted. Exhibit 19 shows that between ███ and ███ of All Star teams and over ███ of school teams that attended a Varsity Cheer Competition purchased Varsity uniforms, and between ███ and ███ of All Star teams and ███ of school teams that attended a Varsity Cheer Competition purchased Varsity shoes—*not* ███ and ███

31.    According to Plaintiffs, only 30% of Varsity's customers purchase from Varsity products in each of the categories that Plaintiffs identified in their "Cheer Apparel Market." (ECF No. 388-3 at ¶158, Table 6 (citing a Varsity document stating that ███ of customers purchase products from all six product categories" and calculating that only ███ of Varsity's apparel revenue is from customers who buy from all categories).)

**Response: Disputed.**

Disputed as incomplete to the extent Defendants suggest parents and families of Competitive Cheer athletes do not overwhelmingly purchase different items of Varsity apparel together in a bundle. **Ex. 26** [Heeb Dep.] at 138:9-20, 140:14-141:5; **Ex. 3** [Heeb Rep.] at ¶¶158-159, Table 6; *see also* Resp., ¶¶26, 28.

32.     A seller of all products in Plaintiffs' "Cheer Apparel Market" is not able to command higher prices than sellers of individual products in Plaintiffs' "Cheer Apparel Market."

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. *See* Resp., ¶¶26, 28.

33.     There are numerous other cheer apparel competitors, including Omni, Rebel Athletic, GK Elite, and Nfinity.  (Ex. BH, Sadlow Dep. 40:23-25 ("On the school apparel business, really anyone that sells athletic apparel is a competitor to Varsity Spirit."), 41:5-16 ("There are multiple competitors in the school cheer uniform segment. […] I can't give an exhaustive list, but Omni, GTN, Rebel, GK Elite, Nfinity, Adidas, Under Armour. I'm sure there's a lot others that I can't remember."), 42:10-22 ("Everyone I listed on that other side is also a competitor in All Star, and then they will have other competitors in that business as well.").)

**Response: Disputed in part.**

Undisputed that there are other cheer apparel retailers.

Disputed that the listed companies are viable competitors, given Varsity's market share and efforts to leverage that market power to exclude competitors and create barriers to entry. **Ex. 1** [Netz Rep.] at 56-60; **Ex. 2 [**Netz Rebuttal] at 66-69. **Ex. 2 [Heeb Rep.]**  at ¶187-188. PSOF, ¶¶113-116. S*ee also* **Ex. 250** at –0904.

Varsity concedes this, as Varsity Vice President of Corporate Alliances and Business Development testified that no apparel retailer poses a real threat to Varsity, and that "no one even comes close" to doing what Varsity does. **Ex. 20** [Cota Depo] at 20:3-13, 63:25-64:5, 64:24-

65:19.

34.     Certain cheer apparel providers do or did provide certain, but not all, products in

Plaintiffs' "Cheer Apparel Market." (See, e.g., ECF No. 388-4 at ¶582 ("Nfinity is a cheer

apparel company that specializes in shoes."); Ex. BI, Weber Dep. 211:13-18 ("Q: Is that the only

vendor that sold merchandise at the All Star World Championship in 2022? A: No. […] Build a

Bowtique, like B-O-W.").)

**Response: Disputed in part.**

Undisputed that other apparel retailers sold certain products in Plaintiffs' Cheer Apparel

Market.

Disputed to the extent the evidence cited suggests Varsity does not dominate the Cheer

Apparel Market and does not secure and maintain its dominance by eliminating competition and

creating barriers to entry. **Ex.** 1 [Netz Rep.] at 56-60; **Ex. 2 [**Netz Rebuttal] at 66-69. For

example, Defendants conspired extensively to block Varsity's rivals from partnering with non-

Varsity apparel companies. *See, e.g.,* **Ex. 150** at –5328-5329; **Ex. 27** [Hill Dep.] at 149:14-

151:13; **Ex. 251** at –8717; **Ex. 98** at –4732; PSOF, ¶¶ 113-116.

As another example, Jamie Parrish, Varsity's former Director of Strategy and Special

Projects for Varsity All Star, testified about leveraging Varsity's rebate programs to edge out

apparel rival Nfinity:

> And I think that's when Nfinity started, you know getting some of that market share.
> But, you know, if we could go in behind them with our sales rep and push things
> with the Family Plan and make them deals that they couldn't, you know, refuse,
> then take – then Nfinity would – you know, they would lose almost every time
> because we could position other things. We would give them, you know, free
> registration or we could give them a cut on uniforms or whatever. **Ex. 11** [Parrish
> Dep.] at 205:16-206:1].

35.     Many major apparel brands, including Adidas, Under Armour, Nike, and Reebok,

sell certain products in Plaintiffs' "Cheer Apparel Market" but also sell similar apparel outside of

the context of competitive cheer. (Ex. BH, Sadlow Dep. 40:23-25 ("On the school apparel

Case No. 2:20-cv-02892-SHL-tmp          18

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

business, really anyone that sells athletic apparel is a competitor to Varsity Spirit."); 41:5-16 ("There are multiple competitors in the school cheer uniform segment. […] I can't give an exhaustive list, but Omni, GTN, Rebel, GK Elite, Nfinity, Adidas, Under Armour. I'm sure there's a lot others that I can't remember."), 42:17-22; ("Q: [C]an you think of any additional competitors -- competitors in the All Star apparel business that you didn't list that are related to the school apparel business? A: Yes. Nike, Blue Linen Athletics, Athletica, Reeboks [sic]."), Ex. AK, Heeb Dep. 157:4-13 ("Q: And Adidas and Under Armour are major apparel brands, aren't they? A: They're large general merchandising competitors. Q: And they sell apparel outside of the context of competitive cheer, right? A: Yes."); *id.* at 158:1-9 ("Q: Nike and Reebok, those are major apparel brands, correct? A: Yes.").)

      **Response: Disputed in part.**

      No competent evidence is cited in support of the asserted fact.

      Undisputed that the brands identified sell similar apparel outside the context of competitive cheer.

      Disputed to the extent the evidence cited suggests Varsity does not dominate Cheer Apparel Market and does not secure and maintain its dominance by creating barriers to entry. **Ex. 1** [Netz Rep.] at 56-60; **Ex. 2 [**Netz Rebuttal] at 66-69.

      For example, Defendants conspired to block Varsity's rivals from partnering with non-Varsity apparel companies. *See, e.g.,* **Ex. 150** at –5328-5329; **Ex. 27** [Hill Dep.] at 149:14-151:13; **Ex. 251** at –8717; **Ex. 98** at -4732; PSOF, ¶¶ 113-116.

      36.    Prior to December 10, 2016, Varsity did not make any acquisition of a cheer apparel supplier that Plaintiffs assert was anticompetitive.

      **Response: Disputed.**

      This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

      Notwithstanding, disputed. Notwithstanding, Plaintiffs do assert that Varsity's acquisitions of cheer apparel suppliers both before and after December 10, 2016 were

anticompetitive. PSOF, ¶¶ 95, 96, 99, 102, 103, 106. Plaintiffs and putative class members suffered an illegal overcharge of 11% on Cheer Apparel (as well as an illegal overcharge of 27% on Cheer Competitions and 27% on Cheer Camps) as a result, in part, of Varsity's acquisition strategy. PSOF, ¶ 213. Ultimately, taken as a whole, Varsity's acquisitions and foreclosure strategy served to raise prices, reduce output, and reduce consumer choice across all relevant markets. **Ex. 1** [Netz Rep.] at 113-115; PSOF ¶¶ 95-106, 211-214.

37.    On or after December 10, 2016, Varsity did not make any acquisition of a cheer apparel supplier that Plaintiffs assert was anticompetitive.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. See Resp. ¶ 36.

38.    Prior to December 10, 2016, Varsity did not make any acquisition that enabled Varsity to charge higher prices for cheer apparel.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. As a result of Varsity's anticompetitive conduct both before and after December 10, 2016, as set forth in Section V of the PSOF, Varsity had the market power necessary to raise prices (**Ex. 1** [Netz Rep.] at 37-41; PSOF, ¶¶ 64-65) and did raise prices, as Plaintiffs and putative class members suffered an overcharge of 11% on Cheer Apparel (PSOF, ¶ 213).

39.    On or after December 10, 2016, Varsity did not make any acquisition that enabled Varsity to charge higher prices for cheer apparel.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

Notwithstanding, disputed. See Resp. ¶ 38.

40.  No Varsity acquisition had any effect on prices for the products in Plaintiffs'
"Cheer Apparel Market."

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by
evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, Varsity's acquisitions did affect prices for the products in the Cheer
Apparel Market. Plaintiffs and putative class members suffered an overcharge of 11% on
Cheer Apparel. PSOF, ¶ 213.

41.  No agreement involving the U.S. All Star Federation ("USASF") had any effect on
prices in Plaintiffs' "Cheer Apparel Market."

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by
evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. USASF, Varsity, and Jeff Webb conspired to hurt Varsity's
Cheer Apparel rivals and help Varsity to raise its prices in a variety of ways. *See* PSOF,
¶¶114, 133,138, 139, 140, 141, 142, 150, 151, 209. *See also,* **Ex. 11** at 70:22-71:23 (after
Varsity partnered with Swarovski Crystal for apparel products, USASF changed its
longstanding rule prohibiting athletes from wearing jewelry for safety reasons).

42.  Cheer apparel is typically sold by sales representatives in one-on-one interactions
with customers.  (Ex. BE, Minzghor Dep. Tr. 136:7-16 ("Q: What is the process that Fusion
Elite goes through to obtain the uniforms for its cheerleading athletes? How does that process
work?  A: Usually contact the company. There's a design process, a prototype process, and
then an ordering process. Q: And when you say you contact the company -- A: A sales rep.").)

**Response: Undisputed for purposes of summary judgment only.**

43.  Varsity and its competitors maintain relationships with gyms and schools to
facilitate sales.  (Ex. BJ, Kennedy Dep. 46:17-47:13 ("Q: If Varsity says in promotional

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

materials, Varsity is the respected brand with respect to All Star uniforms, what does that mean?
[...] [W]hat is it that renders Varsity respected, in your -- in your view? [...] A: In my view, I
would say that it's the relationships between the specialist and the gyms, and the services that
they provide."); Ex. BH, Sadlow Dep. 37:10-17, 231:1-232:11.)

> **Response: Disputed in part.**

Because the cited material does not include "competitors," the assertion is not supported
by competent evidence, fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a), and thus
fails to state an undisputed material fact.

Undisputed that Varsity maintains relationships with gyms and schools to facilitate sales
(indeed, Varsity concedes that its "████████████████" with customers "█████████████
████████████ for other brands. **Ex. 98** at -4732.

44.    There are many channels available to sell cheer apparel, including the Internet.
(Ex. AS, Newby Decl. ¶4.)

> **Response: Undisputed for the purposes of summary judgment only.**

45.    Merchandise sold at cheer competitions are typically souvenirs, not athletic gear
for competitions.  (Ex. BK, VAR00009293 at -329; Ex. BL, Hill Dep. 330:5-13; Ex. BG, L.
Gurske Dep. 353:17-20.)

> **Response: Disputed.**

The evidence cited does not support the fact asserted, as the document only states: "At the
largest events Varsity Spirit sells event merchandise via the Varsity Spirit Shop division of
Varsity Spirit." This document does not define event merchandise, does not say that Varsity does
*not* sell athletic gear for competitions at its events, and in no way rules such sales out.

Moreover, disputed. Varsity sells apparel at competitions, and Defendants took
coordinated anticompetitive action to hurt Varsity's Cheer apparel rivals, including by (1)
blocking other retailers from selling at competitions, or near competitions and (2) giving Varsity
access to confidential rule changes and proposed penalties that USASF intended to implement as
rulemaking body over apparel. **Ex. 1** [Netz Rep.] at 59,  n.229; **Ex. 12** at 112:8-14; **Ex. 20** [Cota

Dep.] at 218:18-244; PSOF, ¶¶ 113-116.

46.     Varsity, like its competitors, generally does not allow its apparel competitors to sell apparel at its own competitions.  (Ex. AS, Newby Decl. ¶5.)

**Response: Disputed in part.**

Undisputed that Varsity generally does not allow apparel competitors to sell apparel at its competitions; indeed, Varsity conspired with other Defendants to block Cheer Apparel rivals. *See* PSOF ¶¶ 113-116. Disputed that Varsity's conduct in this manner is "like its competitors" and no competent evidence is cited in support.

47.     Competitors of Varsity often sell cheerleading-related items in close proximity to Varsity cheer competitions, such as at pop-up booths immediately outside the venue in which the Varsity cheer competition is being held.  (Ex. BG, Hill Dep. 330:16-331:19.)

**Response: Disputed.**

This fact is incomplete, inaccurate, and misleading. No competent evidence is cited in support. The testimony cited by Defendants (presumably Exhibit BL, not Exhibit BG) relates to the Worlds competition, which is technically a USASF event, not a Varsity event. The witness cited admits he has no direct personal knowledge of USASF's policies regarding vendors: "I don't recall who – who exactly oversaw the sales of those t-shirts." *See* Defendants' Exhibit BL, Deposition of Jim Hill at 330:10-11. Further, Defendants omit directly contradicting testimony on the preceding page: "I don't recall any type of vendor mall or anything like that at Worlds." **Ex. 27** [Hill Dep.] at 329:5-6.

Disputed to the extent Defendants suggest USASF and Varsity did not coordinate to prevent apparel manufacturers, including GK and Nfinity, from selling products near USASF's Worlds competition. **Ex. 151** at –1243; *see also* **Ex. 14** [Peterson Dep.] at 462:10-463:3. And, as noted in Resp. ¶¶ 34 and 45, Varsity imposed significant barriers to entry on other apparel manufacturers by prohibiting them from selling apparel at Varsity Cheer Competitions.

48.     Results at Varsity cheer competitions were not affected by the brand of apparel worn.  (See, e.g., Ex. BM, VAR00233675 at -677-712 (demonstrating through detailed collection

of materials providing scoring guidance that scores did not depend on which apparel brand cheer participants wore); Ex. BN, VAR00302098 at -098-099 (example scoring sheet showing that participants were not evaluated based on which apparel brand they wore); Ex. BO, VAR00147772 at -772-773 (same).

**Response: Disputed.**

The evidence cited does not support the fact asserted. That the example scoring sheet cited by Varsity does not include Varsity apparel criteria does not preclude the possibility that judges considered or were influenced by whether a team was wearing Varsity Cheer Apparel. At least one parent of a Cheer Athlete testified that "[t]eams that wear the Varsity apparel" "do better" even "if [the] team has several falls and not as clean of a routing as a team with a similarly difficult routine[] that has a clean one . . . ." **Ex. 19** [Cherasaro Dep.] at 58:18-59:7.

49.    The prices for whatever Varsity "apparel" products that Plaintiffs seek damages in relation to were not higher than they would have been in the absence of whatever conduct Plaintiffs assert was anticompetitive.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Plaintiffs and putative class members suffered an overcharge of 11% on Cheer Apparel as a result of the conduct Plaintiff assert was anticompetitive. PSOF, ¶ 213.

50.    Dr. Heeb's damages analysis related to apparel was conducted based on prices in one product: sneakers.  (ECF No. 388-3 at ¶¶300, 303; ECF No. 388-4 at ¶20.)

**Response: Disputed.**

Disputed to the extent Defendants suggest Heeb's damages analysis is incomplete. Dr. Heeb developed a conservative estimate of Varsity's percentage overcharge using an appropriate benchmark, then estimated damages by applying the overcharge percentage to Varsity's apparel pricing data—a common and accepted technique. **Ex. 3** [Heeb Rep.] at ¶¶284-285, 301, 308,

320-323.

51.    Dr. Heeb's damages analysis did not use prices for any other apparel product.

(ECF No. 388-3 at ¶¶300, 303; ECF No. 388-4 at ¶20.)

**Response: Disputed.**

Disputed as inaccurate and misleading. *See* Resp., ¶50.

### III.    CHEER COMPETITIONS

52.    Prior to December 10, 2016, Varsity did not make any acquisition of a school

cheer event producer (or school cheer event) that Plaintiffs assert was anticompetitive.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by

evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Beginning in the mid-2000s, Varsity set out to acquire nearly

all of its competitors in the school competitions market, including the National Cheerleaders

Association and the United Spirit Association, among others. Varsity acquired dominant shares

of the cheer competitions and camps markets in the years before 2016 through these acquisitions.

**Ex. 1** [Netz Rep.] at 15 ("There are at least three organizations that promote School Cheer

Competitions and Camps: NCA, UCA, and the USA. Varsity owns and controls all three."); *id*. at

n.51; **Ex. 3** [Heeb Rebuttal] at ¶195.

Varsity directed other anticompetitive efforts toward the School Cheer market as a part of

its strategy. For example, one of the stated goals of Varsity's IMPACT/VIP Branding Program

was to monopolize the School Cheer market. **Ex. 163** –4354 ("We can do more with VIP brand,

and own the intellectual property of every high school in America."); **Ex. 164** at –3560

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████  (emphasis added.)

Varsity has been successful in its efforts. School Cheer comprised ████ of its revenue in

2016. **Ex. 107** at –4154. And ultimately, taken as a whole, Varsity's acquisitions and foreclosure strategy served to raise prices, reduce output, and reduce consumer choice across all relevant markets. **Ex. 1** [Netz Rep.] at 113-115; PSOF, ¶¶ 95-106, 211-214.

53.    On or after December 10, 2016, Varsity did not make any acquisition of a school cheer event producer or school cheer event. (ECF No. 388-3 at Table 15 (summarizing acquisitions of event producers by Varsity, which only included All Star event producers); Ex. AK, Heeb Dep. 288:4-10 ("Q. You don't describe any Varsity acquisitions of scholastic event producers or school cheer event producers in your reports, correct? A. That's right. Q. And you acknowledge that no school cheer acquisitions occur during the class period, right? A. Not that I'm aware of, no.").)

**Response: Undisputed for purposes of summary judgment only.**

54.    On or after December 10, 2016, Varsity did not make any acquisition of a school cheer event producer (or school cheer event) that Plaintiffs assert was anticompetitive.

**Response: Disputed in part.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Disputed that Varsity's acquisitions before that date did not continue to have an anticompetitive effect following that date. By eliminating major rivals, including its acquisition of EPIC Brands in 2018, Varsity's market share in Cheer Competitions grew from 42% in 2013 to 80-85% in 2018, and Plaintiffs and putative class members suffered an overcharge of 27% on Cheer Competitions as result. *See* PSOF, ¶¶ 95-98, 213; **Ex. 1** [Netz Rep.] at 592-96; **Ex. 20** [Cota Dep.] at 53:15–21; PSOF, ¶ 213. Ultimately, Varsity's acquisitions and foreclosure strategy served to raise prices, reduce output, and reduce consumer choice across all relevant markets. **Ex. 1** [Netz Rep.] at 113-115; PSOF ¶¶ 95-106, 211-214

55.    Prior to December 10, 2016, Varsity did not make any acquisition of a school cheer event producer (or school cheer event) that enabled Varsity to charge higher prices for cheer events.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Varsity both had the market power necessary to raise prices (**Ex. 1** [Netz Rep.] at 37-41; PSOF, ¶¶ 60, 61, 65), and it did raise prices, as Plaintiffs and putative class members suffered an overcharge of 27% on Cheer Competitions. PSOF, ¶ 213.

One means by which Varsity was able to charge higher event prices was through its counterprogramming strategy (*See* PSOF, ¶¶ 109-112), which it would use to consistently acquire event rivals then just cancel the acquired events so as to get ████████████

████████████████████████ resulting in both higher fees and reduced output for customers. **Ex. 127** at –1775; **Ex. 58** at –5065; **Ex. 12** [Elza Dep.] at 284:14-285:13, 230:23-232:1; **Ex. 123** at –1396 **Ex. 125**; **Ex. 1** [Netz Rep.] at 45-47, n. 183, 103-104; **Ex. 2** [Heeb Rep.] at 284-285, Tables 19 and 20.

56.    On or after December 10, 2016, Varsity did not make any acquisitions of a school cheer event producer (or school cheer event) that enabled Varsity to charge higher prices for cheer events.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Varsity both had the market power necessary to raise prices (**Ex. 1** [Netz Rep.] at 37-41; PSOF, ¶¶ 60, 61, 65) and it did raise prices, as Plaintiffs and putative class members suffered an overcharge of 27% on Cheer Competitions. PSOF, ¶¶ 213.

57.    Prior to December 10, 2016, Varsity did not make any acquisition of a school cheer event producer (or school cheer event) that was anticompetitive.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a). It also attempts to

pass a legal judgment as a statement of fact. Such arguments are inappropriate in a statement of material facts. *See, e.g.*, *Sutton v. CHSPSC, LLC*, No. 116CV01318STAEGB, 2018 WL 3318961, at *2 (W.D. Tenn. July 5, 2018).

Notwithstanding, disputed. Plaintiffs do assert that Varsity made anticompetitive acquisitions of cheer event producers before 2016 that resulted in Plaintiffs and putative class members suffering an overcharge of 27% on Cheer Competitions. **Ex. 1** [Netz Rep.] at 92-96; PSOF, ¶¶ 213. Ultimately, Varsity's acquisitions strategy both before and after December 10, 2016 served to raise prices, reduce output, and reduce consumer choice across all relevant markets. **Ex. 1** [Netz Rep.] at 113-115; PSOF ¶¶ 95-106, 211-214.

One means by which Varsity was able to charge higher event prices was through ██████████████████████████████████████████████████████ ████████████████████████████████████████ resulting in both higher fees and reduced output. **Ex. 127** at –1775; **Ex. 58** at –5065; **Ex. 12** [Elza Dep.] at 284:14-285:13, 230:23-232:1; **Ex. 123** at –1396 **Ex. 125**; **Ex. 1** [Netz Rep.] at 45-47, n. 183, 103-104; **Ex. 2** [Heeb Rep.] at 284-285, Tables 19 and 20.

58.      On or after December 10, 2016, Varsity did not make any acquisitions of a school cheer event producer (or school cheer event) that was anticompetitive.

**Response: Disputed in part.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a). It also attempts to pass a legal judgment as a statement of fact. Such arguments are inappropriate in a statement of material facts. *See, e.g.*, *Sutton v. CHSPSC, LLC*, No. 116CV01318STAEGB, 2018 WL 3318961, at *2 (W.D. Tenn. July 5, 2018).

Undisputed that Varsity did not acquire an event producer after December 10, 2016.

Disputed that Varsity's acquisitions before that date did not continue to have an anticompetitive effect following that date. By eliminating major rivals, Varsity's market share in cheer competitions grew from 42% in 2013 to 80-85% in 2018, and Plaintiffs and putative class

members suffered an overcharge of 27% on Cheer Competitions as a result. *See* PSOF, ¶¶ 99-101; **Ex. 1** [Netz Rep.] at 92-96; **Ex. 20** [Cota Dep.] at 53:15–21; PSOF, ¶¶ 95-98.

59.    Varsity did not "counterprogram" (as Plaintiffs' use that term) school events.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. That Varsity did not have to counterprogram competitors' events on the same scale that it did in the All Star market merely serves to confirm that Varsity already controlled the vast majority of the School Competitions Market. See Resp., ¶52.

60.    When Varsity "counterprogrammed" (as Plaintiffs' use that term) an event, output of opportunities to participate in an All Star cheer competition increased.  (Ex. AK, Heeb Dep. 303:15 ("Customers might benefit from that short-run competition."); Ex. BC, Duhon Dep. 38:13-24 (explaining that Varsity added new events "[t]o give other options to customers in that area"); Ex. BQ, Elza Dep. 185:20-24 ("It was part of our strategy to look across the board and see where successful events were.  If there was an opportunity to put another event in a similar market in the same week, then we did do that.").)

**Response: Disputed.**

Counterprogramming resulted in *decreased*, not increased, opportunity to participate in competitions. Counterprogramming was a concerted policy that Varsity employed with the explicit goal of hurting rival event producers. **Ex. 125** (Varsity: "<u>As you know we often put events on other events to hurt our competitors.</u>") (emphasis added); **Ex. 143** at –8899 (Varsity: "So far this season there are 3 non Varsity events that are in danger...due to low attendance...None of this would be possible without a team effort and targeted approach on where to put the Varsity All Star Events.")

After edging competitors' events out, Varsity would often acquire them, only to then cancel the acquired, ███████████████████████████████████

███████████████    **Ex. 127** at –1775. The record is rife with examples of this internal strategy:

**Ex. 12** [Elza Dep.] at 284:9- 285:13: Varsity "had too many events" after acquiring JAM Brands and decided to cancel certain Varsity or JAM Brand events; this strategy ultimately resulted in fewer choices for gyms and teams: Q. So the JAM Brands acquisition was the acquisition of its – of Varsity's largest competitor at the time in the All Star market; is that right? A. Yes. Q. And then there's a dash after this bullet point that says 'in line with the broader strategy to,' and it lists some items. The first is 'consolidate event footprint around most profitable events.' What does that mean? A. We had too many events at the time, and we were looking to eliminate a number of those events to drop participation in certain events. Q. And when you say you 'had too many events,' that's because of the acquisition of the JAM Brands; so you had too many – Varsity was now running too many events in the same regions at the same time; is that right? A. That's correct. Q. And so as a result of the JAM Brand acquisition, you at Varsity decided to cancel certain Varsity events or JAM Brand events; is that right? A. Yes, that is correct. Q. And so as a result of the acquisition of JAM, at least in certain regions, there were fewer events for gyms and participants to attend; is that right? A. Yes, that would be correct.";

**Ex. 12** [Elza Dep.] at 230:23-231:1: Q. And you're saying that after the JAM Brands acquisition, Varsity would likely cancel certain events; is that right? A. Yes. We did that often.";

**Ex. 123** at –1396: 12/7/2017, Email from J. Nichols (Varsity): In xxxx, Varsity acquired Mardi Gras, and then proceeded to cancel its major event, the JAMFest Cajun Jam. "Plan would be to cancel JAM [Cajun Jam] and move all those teams to MARDI GRAS" to which John Nichols responded, "…need to cancel the Jam event.");

**Ex. 124** at –5529 (5/23/2018, Email from J. Lomba (reflecting cancellation of JAMfest);

**Ex. 125** ("As you know we often put event on other events to hurt our competitors." … "Strategy worked, and now Mardi Gras is sitting around 60 ish teams and JAM at 70." … "If Mardi Gras doesn't hit 125 teams they lose their Tier 1 Status." … "Plan would be to cancel JAM and move all of those teams to MARDI GRAS.")

*See also,* **Ex. 1** [Netz Rep.] at 45-47, n. 183, 73-81, 103-104; **Ex. 3** [Heeb Rep.] at 284-285, Tables 19 and 20; PSOF, ¶¶ 109-112.

Disputed that Dr. Heeb is quoted out of context. The full statement reads: "Taken in isolation and without thinking about what would happen afterwards if the other event is harmed or the other event is acquired and simply looking at the very short-run effect, then the answer is yes. Customers might benefit from that short-run competition."

61.    The USASF sanctions events that adhere to its rules and requirements. (Ex. BK,

VAR00009293 at -355, -357 (showing that USASF's "primary focus" is to standardize rules across events and that USASF "credentials coaches, certifies safety judges, sanctions events and maintains safety guidelines…"); Ex. K, Fowlkes Dep. 38:21-40:25.)

**Response: Disputed in part.**

Undisputed that USASF sanctions events that adhere to its rules.

Disputed that the evidence cited states that the above was USASF's "primary focus." The evidence instead shows that Varsity created USASF as a means of controlling the sport, maintaining market dominance, and driving profits for the Defendants. *See* PSOF, ¶¶131-147, 157, 158, 163, 196, 208, 209.

62.    USASF had no involvement in school competitions at all.  (Ex. CZ, Newby Dep. 632:5-9 ("Q. And does the USASF have anything to do with those events, either in terms of owning the event or promoting it? A. Nothing at all to do with any school events.");  Ex. BJ, Kennedy Dep. 209:1-9; Ex. AY, Lorenzen Dep. 191:22-202:19.)

**Response: Undisputed for purposes of summary judgment only.**

63.    There was no agreement between Varsity (or any other Defendant) and USASF that had any anticompetitive effect on school competitions.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a). It also attempts to pass a legal judgment as a statement of fact. Such arguments are inappropriate in a statement of material facts. *See, e.g.*, *Sutton v. CHSPSC, LLC*, No. 116CV01318STAEGB, 2018 WL 3318961, at *2 (W.D. Tenn. July 5, 2018).

Notwithstanding, disputed. While USASF is the governing body for All Star Cheer, the evidence shows that the entire Varsity ecosystem, including school competitions, was influenced by Defendants' coordinated exclusionary conduct in All Star Competitions and in Cheer Apparel. *See* PSOF, Section VI [Concerted Conduct]; **Ex. 1** [Netz Rep.] at 62-65; **Ex. 2** [Netz Rebuttal] at 61-66; **Ex. 60** at -7207; **Ex. 64** at 4544.

64.    The cheer competitions known as "Worlds," "The Summit," and "U.S. Finals" are for All Star teams only.  (Ex. Q, Netz Dep. 62:25-63:21.)

**Response: Undisputed for purposes of summary judgment only.**

65.    Scholastic cheer teams may not enter the cheer competitions known as "Worlds," "The Summit," and "U.S. Finals."  (Id.)

**Response: Undisputed for purposes of summary judgment only.**

66.    All Star teams and scholastic teams are not permitted to compete against each other.  (Ex. Q, Netz Dep. 62:7-15 ("Q: [Y]ou agree that All Star and School Cheer teams often attend different competitions; right?  A. I agree.  And at their competitions, they compete in different divisions such that All Star Cheer teams and School Cheer teams don't compete against each other; right?  A.  Correct."); Ex. CZ, Newby Dep. 625:12-626:8 ("Q: Well, when -- the competition at NCA event is between school competition teams, correct? A: The NCA High School Championship would only have school teams. [...] Q: So, for example, gym-sponsored teams don't participate in NCAA [sic]? A: To the best of my knowledge, they -- [there] would not have been divisions where they -- they could compete. [...] Q: Okay. And is there -- is there any point in the kind of Varsity world where the NCA school teams compete in competitive cheer with gym-sponsored teams? A: Not to my knowledge.").)

**Response: Undisputed for purposes of summary judgment only.**

67.    Because All Star teams are not permitted to compete in a scholastic competition, an All Star gym could not substitute a scholastic competition for an All Star competition.  Ex. BG, L. Gurske Dep. 317:22-318:1 ("Q. Okay. Could -- could your All Star cheer team attend sideline cheer competitions if -- A: No. Q: -- they wanted to? A. No."); Ex. Q, Netz Dep. 64:5-7 ("Q: Only School Cheer teams may attend school end-of-season events; right?  A.  Yes."); Ex. BE, Minzghor Dep. 223:11-23 ("Q: So could Fusion's All Star cheer athletes perform their routines at sideline cheer competitions? A: No."); Ex. BG, L. Gurske Dep. 318:6-15 ("All Star athletes are not sideline cheerleaders. Q: So because you're not associated with a sports team, you cannot enter [...] sideline cheer? A. Correct. And our routines are completely different.").)

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

**Response: Disputed.**

Disputed as to use of "scholastic competition," as Defendants attempt to muddy Plaintiffs' Definition of Competitive Cheer by including irrelevant groups (*see* Resp., ¶1). Moreover, many athletes participate in both All Star cheer and school cheer. *See* **Ex. 27** [Hill Dep.] at 223:21-22; **Ex 30** Jones at 224:9-15. Regardless of whether an athlete competes on an All Star Cheer or School Cheer team, both activities are essentially the same. **Ex. 1** [Netz Rep.] at 3 ("Competitive Cheer is a distinct sport for teams associated with gyms and schools. Unlike traditional sideline cheerleading, Competitive Cheer teams compete head-to-head against each other in events with unique, choreographed, and highly acrobatic routines that last two and a half minutes. The season culminates in national championship events which teams endeavor to attend."); *id*. at 42 ("If a putative monopolist that controlled all All Star competitions raised price by 5-10% for a year, athletes may choose to leave an All Star team and join a School team. Similarly, if a putative monopolist that controlled all School competitions raised price by 5-10% for a year, athletes may choose to leave a School team and join an All Star team."). **Ex. 33** [Kennedy Dep.] at 302:12-308:7.

68.    Because scholastic cheer teams are not permitted to compete in an All Star competition, a scholastic cheer team could not substitute an All Star competition for a scholastic competition. (Ex. CZ, Newby Dep. 625:2-8 ("Q: Okay. And is there -- is there any point in the kind of Varsity world where the NCA school teams compete in competitive cheer with gym-sponsored teams? A: Not to my knowledge"); Ex. BG, L. Gurske Dep. 318:6-15 ("All Star athletes are not sideline cheerleaders. [...] And our routines are completely different."); Ex. BE, Minzghor Dep. 223:2-23.)

**Response: Disputed.**

See Resp., ¶67.

69.    A cheer team literally cannot substitute a scholastic competition for an All Star competition, or vice versa. (Ex. BG, L. Gurske Dep. 317:22-318:1 ("Q. Okay. Could -- could your All Star cheer team attend sideline cheer competitions if -- A: No. Q: -- they wanted to? A.

No."); Ex. Q, Netz Dep. 64:5-7 ("Q: Only School Cheer teams may attend school end-of-season events; right?  A.  Yes."); Ex. CZ, Newby Dep. 625:2-8 ("Q: Okay. And is there -- is there any point in the kind of Varsity world where the NCA school teams compete in competitive cheer with gym-sponsored teams? A: Not to my knowledge"); Ex. BG, L. Gurske Dep. Tr. 318:6-15 ("Q: So because you're not associated with a sports team, you cannot enter [...] sideline cheer? A. Correct."); Ex. BE, Minzghor Dep. 223:2-23.)

**Response: Disputed.**

See Resp., ¶67.

70.    School cheer teams are affiliated with a school.  (ECF No. 1 at ¶¶48, 52; Ex. Q, Netz Dep. 60:20-61:2; Ex. BQ, Elza Dep. 59:24-60:2; Ex. BH, Sadlow Dep. 38:5-11, 39:2-10.)

**Response: Undisputed for purposes of summary judgment only.**

71.    All Star cheer teams are affiliated with a gym.  (ECF No. 1 at ¶¶48-49, 51; Ex. Q, Netz Dep. 60:11-15; Ex. BH, Sadlow Dep. 38:5-11; Ex. BA, Newby Dep. 79:2-25; Kennedy Dep. 205:10-15.)

**Response: Undisputed for purposes of summary judgment only.**

72.    All Star cheer teams are not affiliated with schools.  (Ex. BJ, Kennedy Dep. 205:10-15; Ex. BA, Newby Dep. 79:2-25.)

**Response: Undisputed for purposes of summary judgment only.**

73.    Most school teams confine themselves to traditional sideline cheerleading, and as such, only a small percentage of schools that have cheer teams have attended competitions.  (ECF No. 382-6 at ¶247 (showing that ██████ of schools that attend Varsity camps do not enter any competitions).)

**Response: Disputed in part.**

Undisputed that school teams include traditional sideline cheer.

Disputed that ██████ of Varsity Camp customers did not attend competitions. Defendants' percentages are incorrect because they improperly include sideline cheer data in their calculations. **Ex. 1** [Netz Rep] at 11-13; **Ex. 2** [Netz Rebuttal] at 70-71. The correct analysis

is how many School Cheer teams who attend Cheer Camps attend at least one Cheer Competition, which is a group of customers that Murphy never examines. *Id.*

74.     The goals of scholastic cheerleading are very different from those of All Star cheerleading.  (Ex. BE, Minzghor Dep. 223:11-23 ("A. The primary -- the primary purpose of the sideline cheer is to support the -- the athletic team. So a lot of the cheers and stuff that they do on the sidelines are not what -- what All Stars do."); Ex. BH, Sadlow Dep. 39:2-10 ("School cheer, because it's associated with school, has other responsibilities or has multiple – multiple activities that they will provide to the school.").)

**Response: Disputed.**

*See* PSOF, ¶ 4; Resp., ¶¶ 1, 67.

75.     All Star competitions and scholastic competitions are judged by different standards.  (Ex. BG, L. Gurske Dep. 318:3-319:4; Ex. BE, Minzghor Dep. 223:2-23.)

**Response: Disputed.**

See Resp., ¶67. Both All Star and School Competitive Cheer teams engage in routines lasting 2 minutes 30 seconds that are set to music and incorporate elements of tumbling, stunts, and gymnastics. Compare Ex. 253 *UCA All Star Rules & Regulations*, available for download at https://www.varsity.com/uca/wp-content/uploads/2022/11/22-23-UCA-All-Star-Rules.pdf, with Ex. 254 *NCA School Competition Rules*, available for download at https://tinyurl.com/NCARuleBook; *See* Defendants Exs. BG at 319:3-9, BE at 223:8-19.

76.     All Star competitions and scholastic competitions lead to separate and distinctive championships.  (Ex. Q, Netz Dep. 62:16-19 ("Q.  And All Star Cheer teams and School Cheer teams also attend different end-of-season events; right?  A.  Typically, yes."), 62:25-63:21; Ex. CZ, Newby Dep. 625:12-15; see also Ex. BR, VAR00009486 at 88-90 (depicting different directors for Varsity's School Competitions and All Star competitions); Ex. BS, Berry Dep. 20:7-13 (listing school national championships).)

**Response: Disputed in part.**

Undisputed that School Cheer and All Star Cheer attend different competitive championships.

Disputed as to use of term "scholastic competitions." See Resp., ¶1.

77.    All Star athletes are trained to a higher level of athleticism that would be dangerous for scholastic cheerleaders to emulate given their lack of training and practice.  (Ex. BG, L. Gurske Dep. 319:16-320:7.)

**Response: Disputed.**

Disputed.  School Cheer athletes perform the timed routines set to music that combine elements of gymnastics, tumbling, and dance, performed on a spring floor, just as All Star athletes do. The level of athleticism does not differ appreciably from that of All Star routines. Indeed, many cheer athletes compete for school teams and All Star teams. *See* PSOF, ¶¶1-4; *see also* **Ex. 1** [Netz Rep.] at 5-13, 15-16.

78.    The vast majority of cheer competition participants attend competitions that are within a few hundred miles of their homes.  (ECF No. 382-6 at ¶¶185-98 ("Varsity regular-season competitions typically draw participants from limited geographic regions"), Exs. 32-40 (analyzing Varsity attendance data and demonstrating few teams travel more than a few hundred miles to attend competitions); see also ECF No. 388-3 at ¶139 ("Travel costs and travel time may be significant factors for determining the relevant antitrust market. […] [Cheer teams] may travel to various parts of the United States to participate in important events, such as the World or the Summit competitions, but would not routinely do so to attend regular season events.").)

**Response: Disputed.**

Disputed as misleading and immaterial. The relevant geographic market for Cheer Competitions is national. *See* **Ex. 1** [Netz Rep.] at 41-50; **Ex. 3** [Heeb Rep.] at ¶¶136-144; **Ex. 4** **[**Heeb Rebuttal] at ¶¶645-649; *see also* **Ex. 12** [Elza Dep.] at 304:23-305:24:

> (Q. Some gyms travel across the country from various different -- across states to go to events. I mean, Indianapolis and Atlantic City are pretty far apart, correct?

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

[Objection Omitted.] A. That's correct. Q. And so if you moved an event from Indianapolis to Atlantic City, you could still attract at least some of the same customers; is that fair? [Objection Omitted] A. Yes. That -- that's our sales strategy across the board.").

"Q. And after the acquisition of JAM, Varsity didn't need those events anymore; is that right? A. We would -- some of those events, we just moved to different weekends. We had an Atlantic City event that was always on MLK weekend. While that seems a long distance from Indianapolis, it was still competing for the same customer base. So we moved that event to a couple weekends earlier. Q. So it's fair to say that some gyms might decide to go to Indianapolis or Atlantic City on a – on any given weekend; is that fair? [Objection Omitted] A. That would be fair. Oh -- Q. Some gyms travel across the country from various different -- across states to go to events. I mean, Indianapolis and Atlantic City are pretty far apart, correct? [Objection Omitted] A. That's correct. Q. And so if you moved an event from Indianapolis to Atlantic City, you could still attract at least some of the same customers; is that fair? [Objection Omitted] A. Yes. That -- that's our sales strategy across the board."

79.    An in-season cheer competition that is more than a few hundred miles from cheer teams' members' homes is not a reasonable substitute for one that is within that range. Customers would not travel several hundred miles to avoid a 10% price increase in registration fees (which on average would amount to $5 to $10) in sufficient numbers to discipline such a price increase by a firm closer to the customers.  (ECF No. 382-6 at Exs. 23, 27 (showing that a 10% price increase in Varsity competition registration fees would on average amount to $5 to $10); Ex. BF, Bray Dep. 60:9-24 (stating that Stars & Stripes "tried to compete locally whenever possible" due to travel costs); Ex. BT, Foster Dep. 291:17-292:1 (same); Ex. BU, T. Gurske Dep. 211:12-14 ("Q: But you never traveled across the country as a gym, right? A: Correct."); Ex. BE, Minzghor Dep. 80:6-17 ("Q: Why do you think a parent would want to drive to a competition as opposed to flying? […] Because of the cost of air travel? A: Yes.").)

**Response: Disputed.**

Disputed. Teams can—and do—reasonably substitute between two different geographics, particularly given Varsity's nationwide market power. **Ex. 1** [Netz Rep.] at 43-47, 52-53, n.179 (re: Varsity's ██████████████████████████████████████████████████████████ ██); **Ex. 2** [Netz Rebuttal] at 39-45 & n.165; **Ex. 12** [Elza Dep.] at 304:23-305:24.

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

80.    An increase in price of All Star competitions would not lead All Star cheer teams to switch to participating in school competitions.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Competitive Cheer athletes, whether they compete for an All Star team or a School Cheer team, do not consider sideline cheer to be an alternative to competitive cheer. But they would be likely to switch from school to All Star or vice versa in response to a significant increase in price. **Ex. 1** [Netz Rep.] at 42-43; **Ex. 2** [Netz Rebuttal] at 50-55.

81.    An increase in price of school competitions would not lead school cheer teams to switch to participating in All Star competitions.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. *See* Resp., ¶80.

82.    Registration fees for Varsity cheer competitions were not higher than they would have been in the absence of whatever conduct Plaintiffs in this case assert is anticompetitive.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Competition fees were higher than they would have been absent Defendants' anticompetitive conduct, including but not limited to Varsity's counterprogramming strategy, which raised both (1) registration prices for athletes and (2) spectator admission fees. *See* Resp., ¶60; **Ex. 1** [Netz Rep.] at 45-47 & n. 184; **Ex. 122** at – 2197]; **Ex. 7** [Maki Rep.] at ¶¶98-101 (explaining how acquisition of JAM Brands and the ability to raise spectator fees would lead to ████ in additional revenue); PSOF, ¶¶ 204-206, 213.

## IV.       VARSITY FAMILY PLAN AND NETWORK AGREEMENTS

83.    Under the VFP, gyms could earn and receive rebates for certain All Star competition registration fees from the just-completed season.  (Ex. AS, Newby Decl. ¶9; see also Ex. Q, Netz Dep. 266:10-14 ("Q.  And you agree that Varsity's Family Plan provided All Star customers with discounts based on the number of events they attended and the amount they spent on Varsity events; right?  A.  Correct."); Ex. AU, VAR00020214 (2016-2017 flyer); Ex. BW, VAR00185006 (2017-2018 flyer); Ex. BX, VAR00075027 (2018-2019 flyer); Ex. AV, VAR00175267 (2019-2020 flyer).)

**Response: Undisputed.**

84.    The VFP did not provide rebates for purchases of anything other than certain All Star competition registration fees.  (Ex. AS, Newby Decl. ¶8; see also Ex. Q, Netz Dep. 271:18-273:4 ("Q.  [S]o spending on All Star events is all that counts towards the spending thresholds on this chart; right?  A.  …[Y]es…. Q.  [Y]our statement that apparel purchases count towards the main Varsity Family Plan rebate, meaning the cash rebate, is not right; right?  A.  For the 2016-2017 season."); Ex. CZ, Newby Dep. 632:23-633:3 ("Q.  Are the schools eligible to participate in the Varsity family pan – plan…?  A.  No.  There is no Family Plan for schools"), 633:19-22 ("Q.  So put another way, the Varsity Family Plan rebate are only available to gyms that participate in All Star events; is that fair?  A.  That is fair."); Ex. AK, Heeb Dep. 244:9-22 ("Q.  [S]chools do not participate in the VFP, do they?  A.  That's right.").)

**Response: Disputed**.

The VFP did provide rebates for other Varsity products. It evolved to include some combination of cash, credit for Varsity Fashion apparel, and other benefits. **Ex. 1** [Netz Rep.] at 105 & n. 429. Thus, not only did the VFP provide rebates for apparel (*See* **Ex. 255** at –2441(VFP 2015-2016 flyer stating, "Earn a 10% rebate on Varsity All Star Fashion Purchases"; **Ex. 256** at –8724), but it provided comprehensive rebates across its products, and was designed to leverage market power from one market to another. The program creates large incentives for customers to

buy all of Varsity's products exclusively from Varsity, including with "first dollar discounts," which condition large rebates on marginal purchasing decisions [i.e., once the customer reaches the spending threshold for the discount, the rebate applies to all of a customer's spending retroactively]. **Ex. 1** [Netz Rep.] at 105-106 & n. 434, 107-108; **Ex. 2** [Netz Rebuttal] at 3; **Ex. 3** [Heeb Rep.] at ¶97.

Varsity itself describes the VFP as a loyalty program that encourages coordinated cross-selling of fashion:



**Ex. 105** at –9926.

Varsity's efforts to lock parents and gyms into the Varsity apparel, camp, and competition ecosystem using the VFP are well documented in the record, e.g., in internal emails likening the VFP to "crack" and the gym customers to "crack ho's" (**Ex. 257** at –2095-2096); internal emails strategizing making "casual threats" to end the VFP as a way to convince gym owners to stop complaining about the program in statements online (*id.*); and a Varsity representative admitting that the program was "designed" not "ethical[ly]" so as to make it hard for the gyms "to say no to the money" (**Ex. 11** [Parrish Dep.] at 175:2 – 176:20).

85.    The Varsity Family Plan did not provide rebates for apparel purchases or camp registration fees. (Ex. AS, Newby Decl. ¶8; *see also* Ex. Q, Netz Dep. Tr. 271:18-273:4 ("Q. [S]o spending on All Star events is all that counts towards the spending thresholds on this chart; right? A. …[Y]es…. Q. [Y]our statement that apparel purchases count towards the main Varsity Family Plan rebate, meaning the cash rebate, is not right; right? A. For the 2016-2017 season.").)

**Response: Disputed.**

See Resp., ¶84; *see also*, **Ex. 1** [Netz Rep.] 108-110 & n. 440.

86.     Gyms that were parties to Varsity Network Agreements could earn and receive
rebates for certain All Star competition registration fees.  (Ex. AS, Newby Decl. ¶16; see also Ex.
BY, VAR00439301 ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████     Ex. BZ, VAR00439295 (same); Ex. CA,
VAR00439312 (same).)

**Response: Undisputed for purposes of summary judgment only.**

87.     Varsity Network Agreements did not provide rebates for purchases of anything
other than certain All Star competition registration fees, including, for example, rebates for
apparel purchases or camp registration fees.  (Ex. AK, Heeb Dep. 259:13-16 ("Q.  So at least
with respect to the network agreement loyalty program, you recognize that it is only exclusively
relating to event fees, correct?  A.  Yes, that's right.").)

**Response: Disputed.**

Varsity Network Agreements explicitly require that members exclusively purchase
Varsity Cheer Apparel to receive a rebate. Paragraph 6 of Varsity's Network Agreements sets
forth (1) ██████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
████████████████████████     **Ex. 256** at –8724.  ████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████     *Id.*

As members only earn a rebate for complying with those terms, the agreement clearly
predicates a rebate on Varsity Cheer Apparel purchases. PSOF, ¶¶ 93-94.

88.     To the extent competition attendance was related to the amount of any rebate
under the Varsity Family Plan, it was based solely on attendance by a gym at certain Varsity

competitions during the immediately concluded season only.  (Ex. AS, Newby Decl. ¶9; see also Ex. AV, VAR00175267 (instructing that rebates can be claimed "[a]fter your last Varsity Family Plan event for the 2019-2020 competition season.").)

**Response: Disputed.**

Disputed as misleading. The VFP was designed to lock gyms into the Varsity ecosystem from one season to the next. The Family Plan is a forward-looking program that incentivizes gyms to schedule as many Varsity events in a coming season as possible and provides future discounts on apparel that must be used for the following season. *See*, Defendants Ex. AU (Varsity Family Plan brochure for 2019/2020); **Ex. 1** [Netz Rep.] at 105-106, n. 429, 108-110.

89.    To satisfy the threshold for receiving a particular rebate under the Varsity Family Plan, a gym was not required to send all of its teams to a particular Varsity competition but instead could send a single team.  (Ex. AS, Newby Decl. ¶10; see also Ex. BA, Newby Dep. 252:17-20 ("[G]yms qualify for the Family Plan. Number of event -- of events could have taken, you know, one team to that, one event to qualify.").)

**Response: Disputed.**

Disputed as misleading. In order to qualify for the VFP, All Star gyms are required to attend a minimum number of Varsity cheer competitions in a given season. **Ex. 119** at -0213; **Ex. 161** [cc Ex. 50 (VAR00097496 at –7512-7513)] This structuring highly incentivizes a gym to send more than one team and leaves little room for All Star gyms to attend non-Varsity events as teams, on average, attend seven to nine events a year. **Ex. 1** [Netz Rep.] at 105-106. The goal of the VFP was clearly to foreclose competition and lock in customers. **Ex. 225** at –9570 (Varsity agenda items include: "For every IEP they support, drop a % point" and "[o]nly allow programs to achieve the top level of VFP [Varsity Family Plan] if they are exclusive to Varsity.")

90.    Gyms typically have multiple All Star cheerleading teams, including as many as ten or more.  (Ex. AS, Newby Decl. ¶7; see also Ex. BQ, Elza Dep. 60:11-13 ("Q.  And All Star gyms have within them different All Star teams; is that right?  A.  That's correct."); ECF No. 382-6 at Ex. 6 (showing that hundreds of gyms field teams at multiple levels).)

**Response: Undisputed for purposes of summary judgment only.**

91.    It is not unusual for gyms not to send all of their teams to the same competitions in a given year.  (ECF No. 386-2 at ¶93, Ex. 6 ("Most Varsity gym customers who have both L1-L4 and L5-L7 teams do not send both of those team types to all or most of the Varsity cheer competitions they attend."); Ex. CB, FUSIONELI000000424 at -424 (explaining that Fusion Elite gym offers three cheer programs which attend different types and numbers of cheer competitions).)

**Response: Disputed.**

Testimony from Varsity directly contradicts this asserted fact. *See* **Ex. 24** [Fowlkes Dep.] at 39:18-40:1 ("[P]rograms generally take their entire program to an event…there are some exceptions, but in the vast majority of cases, the gyms, the programs take their entire Levels 1 through whatever they have, 1 through 6, or 1 through 7, to the same event.") Fowlkes manages Cheersport (since 2000) and Universal Spirit for Varsity, both of which run multiple cheer events, from local events to national championships. *Id*. at 23:6-9; 32:24-33:7.

Further, the explicit goal of the VFP was to eliminate Varsity's competition. A summary of the "Varsity Family Plan 2.0" explains that the goal of the program was to: "Get rid of any competitors, make it so that teams couldn't go to IEP." **Ex. 298** at -9570.

92.    To satisfy the threshold for receiving a particular rebate under the Varsity Family Plan, a gym could send different teams to each competition, thereby having Varsity competitions constitute just one competition on that particular team's schedule.  (Ex. AS, Newby Decl. ¶11; see also Ex. BA, Newby Dep. 252:17-20 ("[G]yms qualify for the Family Plan. Number of event -- of events could have taken, you know, one team to that, one event to qualify."); Ex. AK, Heeb Dep. 239:23-240:1 ("Q.  The Varsity Family Plan did not require that customers attend only Varsity competitions to qualify for rebates, correct?  A.  That's right.").)

**Response: Disputed.**

Undisputed that gyms could send different teams to different competitions.

Disputed because it was Varsity's explicit goal to achieve the opposite. A summary of the

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

"Varsity Family Plan 2.0" explains that the goal of the program was to: "Get rid of any competitors, make it so that teams couldn't go to IEP." **Ex. 298** at -9569; PSOF, ¶¶ 118-119; **Ex. 1** [Netz Rep.] at 111.

93.     A gym with more teams than the threshold for receiving a particular rebate under the Varsity Family Plan could satisfy that threshold without sending certain members of its teams to any Varsity competitions at all.  (Ex. AS, Newby Decl. ¶12; see also Ex. BA, Newby Dep. 252:17-20 ("[G]yms qualify for the Family Plan. Number of event -- of events could have taken, you know, one team to that, one event to qualify."); Ex. AK, Heeb Dep. 239:23-240:1 ("Q. The Varsity Family Plan did not require that customers attend only Varsity competitions to qualify for rebates, correct?  A.  That's right.").)

**Response: Disputed.**

Disputed as misleading in that it ignores the significant incentives for gyms to send their teams to as many Varsity events and camps and purchase as much Varsity apparel as possible. *See* Resp., ¶¶84, 89; PSOF, ¶¶ 120-123.

94.     No gym was ever required to commit to participate in the Varsity Family Plan at any time.  (Ex. BQ, Elza Dep. 202:16-203:2 ("Q.  And it's fair to say that gyms did not need to sign a contract with Varsity in order to be a part of the Varsity Family Plan; is that right?  A. That is correct."), 221:9-15 ("[N]o one was forced to join the Family Plan or the Network.").)

**Response: Disputed.**

Disputed as misleading in that it ignores the significant incentives for gyms to send their teams to as many Varsity events and camps and purchase as much Varsity apparel as possible. *See* Resp., ¶¶84, 89.

95.     After a given season is over, a gym may, if it chooses, request whatever rebate is available to it under the VFP for that completed season.  (See, e.g., Ex. AV, VAR00175267 ("After your last Varsity Family Plan event for the 2019-2020 competition season, fax or email your completed W9 to your Varsity All Star Advisor for processing before the reward request deadline . . .").)

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

**Response: Undisputed.**

96.     No gym was ever required to attend or pay a registration fee for any future competitions of Varsity or anyone else as a condition of receiving a rebate under the Varsity Family Plan.  (Ex. AS, Newby Decl. ¶13; see also Ex. AV, VAR00175267 ("After your last Varsity Family Plan event for the 2019-2020 competition season, fax or email your completed W9 to your Varsity All Star Advisor for processing before the reward request deadline . . ."); Ex. BQ, Elza Dep. 202:16-203:2 ("Q.  And it's fair to say that gyms did not need to sign a contract with Varsity in order to be a part of the Varsity Family Plan; is that right?  A.  That is correct.").)

**Response: Disputed.**

Disputed that payment of a registration fee was not a condition of receiving a rebate. Gyms that wish to participate in the Varsity Family Plan must pay $250,000 in registration fees to attend a specified number of Varsity events (typically six or more) <u>before</u> they can receive a Family Plan rebate. **Ex. 1** [Netz Rep.] at 105-106; **Ex. 256** at –8723-8724.

97.     Varsity's Network Agreements are endorsement deals that are commonplace in sports.  (Ex. BA, Newby Dep. 287:2-8, 289:2-14 ("…it is kind of like an endorsement deal, you know, Lebron wearing Nike, for example.").)

**Response: Disputed.**

Defendants fail to provide admissible evidence in support of the faulty claim that Varsity's Network Agreement is like a Nike endorsement contract for a famous athlete, and thus fail to state a material fact. Unlike an endorsement, under which a celebrity is paid by a manufacturer to endorse the manufacturer's product, the Network Agreement is an exclusively dealings contract, under which customers are forced to purchase their requirements for the sport from a company that has monopolized all relevant markets, in exchange for rebates that only serve to keep them locked in the ecosystem. Varsity's goal with the Network Agreements is to preclude customers from purchasing competitors' products. *See* **Ex. 1** [Netz Rep.] at 106-107, 104-113; **Ex. 2** [Netz Rebuttal] at 3; **Ex. 3** [Heeb Rep.] at ¶¶219-225; **Ex. 26** [Heeb Dep.] at 316:2-316:7.

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

98.     Although in some cases Varsity's Network Agreements have required exclusivity as to certain Varsity apparel (often uniforms or shoes), they have never required a gym to exclusively use all of the Varsity products that Plaintiffs have included in their "Cheer Apparel" market.  (Ex. AS, Newby Decl. ¶14; see also Ex. BA, Newby Dep. at 287:9-13 ("For a while, I think, again, it was a handful of customers that were a part of the Network Agreement that included the rebate, but it also included some element of wearing our uniforms and/or shoes.").)

**Response: Disputed.**

The Network Agreements expressly mandate that Members purchase all Cheer Apparel for the entire season from only Varsity in order to receive the rebate of ▮▮ of total All Star registration fees, effectively requiring gyms to exclusively use Varsity apparel. **Ex. 256** at –8723-8724.

99.     To the extent competition attendance was related to the amount of any rebate under a Varsity Network Agreement, it was attendance by one or more of a gym's teams at certain Varsity competitions during the immediately concluded season only.  (Ex. AS, Newby Decl. ¶16; see also Ex. BY, VAR00439301 ("Unless otherwise mutually agreed to by the parties by June 1 of each year of this agreement, the event registration fees paid by Member to Varsity for the aforementioned competitions during that year shall be totaled, and Varsity shall issue a rebate to Member in accordance with the following scale . . ."); Ex. BZ, VAR00439295 (same); Ex. CA, VAR00439312 (same).)

**Response: Disputed.**

Under Varsity's Network Agreements, gyms sign up in advance for a specified term (typically ▮▮▮ years or more) and commit to spend a threshold amount (typically ▮▮▮▮▮ or more) on competition registration fees and purchase only Varsity apparel in each year of the contract, in exchange for a rebate for each year that the gym satisfies the terms.  These are forward-looking commitments: a prior season's attendance does not count toward each new season's minimum payment threshold. **Ex. 1** [Netz Rep.] at 105-106; **Ex. 256** at –8723-8724 (a Network agreement executed in 2019 that bound the parties for the ▮▮▮▮▮▮▮▮▮

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

 All Star seasons, states: "Member will support Varsity by spending at least ████
████████████████████████████████████████████) during each competitive season in registration
fees")

100.    To satisfy the threshold for receiving a particular rebate under a Varsity Network
Agreement, a gym was not required to send all of its teams to a particular Varsity competition but
instead could send a single team.  (Ex. AS, Newby Decl. ¶17; see also, e.g., Ex. BY,
VAR00439301 ("Member will support Varsity by ensuring that ████████ will attend at least
████ competitions during each competitive season conducted by Varsity All Star brands."); Ex.
BZ, VAR00439295 (same for ████████████).)

**Response: Disputed.**

Disputed as misleading in that it ignores the significant incentives for gyms to send their
teams to as many Varsity events and camps and purchase as much Varsity apparel as possible.
*See* Resp., ¶¶84, 89.

101.    To satisfy the threshold for receiving a particular rebate under a Varsity Network
Agreement, a gym could send different teams to each competition, thereby having Varsity
competitions constitute just one competition on each particular team's schedule.  (Ex. AS, Newby
Decl. ¶18; see also Ex. CF, LeTard Dep. 211:7 ("[The Varsity Network Agreement] was not
exclusive for events.").)

**Response: Disputed.**

Disputed as misleading in that it ignores the significant incentives for gyms to send their
teams to as many Varsity events and camps and purchase as much Varsity apparel as possible.
*See* Resp., ¶¶84, 89.

102.    A gym with more teams than the threshold for receiving a particular rebate under a
Varsity Network Agreement could satisfy that threshold without sending some of its teams to any
Varsity competitions at all.  (Id.)

**Response: Disputed.**

Disputed as misleading in that it ignores the significant incentives for gyms to send their

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

teams to as many Varsity events and camps and purchase as much Varsity apparel as possible.
*See* Resp., ¶¶84, 89.

103.    No gym was ever required to commit to participate in a Varsity Network
Agreement at any time.  (Ex. BQ, Elza Dep. 221:9-15 ("[N]o one was forced to join the Family
Plan or the Network."); Ex. BA, Newby Dep. 251:10-11 ("The Network Agreements were few
and far between.").)

**Response: Disputed.**

Disputed as misleading in that it ignores the significant incentives for gyms to send their
teams to as many Varsity events and camps and purchase as much Varsity apparel as possible.
*See* Resp., ¶84, 89.

104.    Varsity also historically has had Network Agreements with between ██ and ██
of its gym customers each season.  (ECF No. 382-6, Ex. 51.)

**Response: Disputed.**

Plaintiffs dispute this fact as misleading because the same Exhibit also shows that fees
paid by the gyms in the Network Agreement program represented between ████ and ████
of total fees received by Varsity during the same years.

105.    No gym was ever required to attend or pay a registration fee for any future
competitions of Varsity or anyone else as a condition of receiving a rebate under a Varsity
Network Agreement.  (Ex. AS, Newby Decl. ¶20; see also, e.g., Ex. BY, VAR00439301 ████
████████████████████████████████████████████████████
██████); Ex. BZ, VAR00439295 (same); Ex. CA, VAR00439312 (same); Ex. CC,
VAR00439297 (same); Ex. CD, VAR00439306 (same); Ex. CE, VAR00439309 (same).)

**Response: Disputed.**

Disputed that payment of a registration fee was not a condition of receiving a rebate.
Gyms that wish to participate in the Varsity Family Plan must pay $250,000 in registration fees
to attend a specified number of Varsity events (typically six or more) <u>before</u> they can receive a
Family Plan rebate. **Ex. 1** [Netz Rep.] at 105-106; **Ex. 256** Newby Ex. 30, VAR00018721 at 723-

724.

106.    At least certain gyms that chose to avail themselves of the Varsity Family Plan or a Varsity Network Agreements have also attended non-Varsity events during the same season. (See, e.g., Ex. BG, L. Gurske Dep. 73:13-25.)

**Response: Undisputed for purposes of summary judgment only.**

107.    For the 2013-2014, 2014-2015, and 2015-2016 competition seasons, the minimum number of (certain) Varsity events to which a gym was required to have sent a team in order to receive a rebate under the Varsity Family Plan was four.  (Ex. CG, VAR00322126 (2013-2014); Ex. CH,VAR00325318 (2014-2015); Ex. CI, VAR00233174 at -175 (2015-2016).)

**Response: Undisputed for purposes of summary judgment only.**

108.    For the 2013-2014, 2014-2015, and 2015-2016 competition seasons, a gym that had sent one or more of its teams to six or more of (certain) Varsity events did not receive any additional rebate as a result of attending additional competitions.  (Id.)

**Response: Disputed.**

Defendants' Exhibits CG, CH, and CI all show that a gym's percentage rebate could increase in two ways: by meeting thresholds for the number of events attended and by meeting thresholds for the amount of money spent on registration fees. The rebate is applied to every dollar spent on registration fees, so each additional dollar spent led to an additional rebate, even if the additional spend did not move the gym into a higher rebate percentage category. Moreover, if a gym attended more than six competitions—and by doing so moved into a higher rebate percentage category based on total spend—then would receive a higher *percentage* rebate than if it had only attended six competitions. Thus, even after a gym had attended six events, each additional event attended would lead to an additional rebate for the gym owner.

109.    For the 2016-2017 and 2017-2018 competition seasons, the minimum number of (certain) Varsity events to which a gym was required to have sent a team in order to receive a rebate under the Varsity Family Plan was five.  (Ex. CJ, VAR00074760 at -761 (2016-2017); Ex. BW, VAR00185006, at -007 (2017-2018).)

**Response: Undisputed for purposes of summary judgment only.**

110.    For the 2016-2017 and 2017-2018 competition seasons, a gym that had sent one or more of its teams to eight or more of (certain) Varsity events did not receive any additional rebate as a result of attending additional competitions.  (Id.)

**Response: Disputed.**

*See* Resp., ¶108.

111.    For the 2018-2019 and 2019-2020 competition seasons, the minimum number of (certain) Varsity events to which a gym was required to have sent a team in order to receive a rebate under the Varsity Family Plan was six.  (Ex. BX, VAR00075027 at -028 (2018-2019); Ex. AV, VAR00175267 at -268 (2019-2020).)

**Response: Undisputed for purposes of summary judgment only.**

112.    For the 2018-2019 and 2019-2020 competition seasons, a gym that had sent one or more of its teams to nine or more of (certain) Varsity events did not receive any additional rebate as a result of attending additional competitions.  (Id.)

**Response: Disputed.**

*See* Resp.¶108.

113.    The Varsity Family Plan and Network Agreements do not apply to scholastic or school cheer.  (Ex. AS, Newby Decl. ¶21; see also Ex. Q, Netz Dep. 269:9-17 ("Q.  And schools don't participate in the Varsity Family Plan; right?  A.  Correct.  Q.  And schools don't enter into Varsity network agreements; right?  A.  Correct.  Q.  Only All Star gyms participate in those two programs; right?  A.  Correct."); Ex. AK, Heeb Dep. 244:9-19 ("Q.  [S]chools do not participate in the VFP, do they?  A.  That's right.").)

**Response: Undisputed for purposes of summary judgment only.**

114.    Varsity has not and does not have a rebate program for scholastic or school cheer. (Ex. AS, Newby Decl. ¶21.)

**Response: Disputed.**

Disputed to the extent Defendants imply Varsity does not financially incentivize school

cheer programs to use Varsity cheer apparel, camps, and competitions. Under Varsity's IMPACT Program, through which it has contracted with ███ of schools, Varsity provides schools with as much as ███ worth of merchandise and educational resources in exchange for the school's agreement to spend a minimum of ███ each year for ██ years on Varsity products—the functional equivalent of a rebate. *See* **Ex. 162** at –5026-5028; **Ex. 258** at –9367 (as of 2017 Varsity had signed IMPACT contracts with ██ schools).

V.    USASF

115.    USASF" was established as a sanctioning organization for All Star cheer in or around 2004.  (Ex. A, Chadwick Dep. 38:12-14.)

**Response: Undisputed.**

116.    The purpose and goals of USASF include the following: to provide rules for All Star cheerleading competitions, to strive for a safe environment for All Star athletes, to drive competitive excellence, and to promote a positive image for the sport of All Star cheer.  (Ex. B, USASF_00032456 at -456 (Chadwick Dep., Exhibit 4); Ex. C, USASF_00028673 at -679; Ex. A, Chadwick Dep. 34:8-25 ("At the beginning . . . we were trying to create a uniform set of rules and a way to make sure people were qualified to do what they were doing such as coaching; to try and create standards for competitions; to try and create some uniform safety practices for gyms.  A way to pull the industry together to support best practices from rules, from safety, from all the difference facets that came into the sport.").)

**Response: Disputed in part.**

Undisputed that USASF provided rules for All Star competitions.

Disputed that its "purpose and goals" were to strive for a safe environment, drive competitive excellence, or promote a positive image.

Varsity created the USASF in direct response to the creation of the National All-Star Cheerleading Coaches Congress (NACCC) because it feared losing control of competitive cheer to the NACCC. *See* **Ex. 11** [Parrish Dep.] at 31:22-33:3.

After its creation, USASF acted in concert with Varsity to disadvantage Varsity's rivals and thereby maintain and enhance Varsity's dominant position in the market, including by manipulating bid and sanction rules to benefit Varsity (PSOF, ¶¶133, 134, 141); actively encouraging Varsity acquisitions (PSOF, ¶135); blocking other apparel and event producers from competing with Varsity at competitions (PSOF, ¶¶135, 139, 142); facilitating Varsity's counterprogramming strategy and foreclose competition from IEPs (PSOF, ¶136, 143); divulging strategic information to Varsity only (PSOF, ¶140); coordinating to kill proposals from IEPs (PSOF, ¶¶137, 145);  rejecting IEP's requests to lessen Varsity's influence (PSOF, ¶146); and more (PSOF, ¶147). For purposes of favoring Varsity's bottom line, USASF even disregarded athlete safety standards. *See,* ¶Resp., 41.

117.    Pursuant to amendments to its bylaws adopted in 2005, USASF's Board of Directors is made up of representatives of competition event producers ("Eps"), gym owners/coaches, and the USASF.  (Ex. D, USASF_00032454 at -454, ¶1.)

**Response: Undisputed for purposes of summary judgment only.**

118.    The bylaw amendments adopted in 2005 also dictated that there would be thirteen voting seats total, made up of seven EP seats filled with representatives named by seven particular Eps, two representatives named by the Chairman of USASF, and four coaches/gym owners approved by the Board and subject to reelection every two years. (Id., ¶¶4, 5, 7, 9.)

**Response: Undisputed for purposes of summary judgment only.**

119.    In 2006, USASF's Board adopted certain bylaw amendments to protect the voice of non-Varsity members of the organization, including (1) requiring unanimous consent to replace any of the nine permanent USASF Board seats, which included non-Varsity event producers CheerSport and JAM Brands; and (2) requiring unanimous Board approval for any contracts involving Varsity.  (Ex. E, VAR00351488 at -489; Ex. F, USASF_00032439 at -439; Ex. D, USASF_00032454 at -454-455, ¶¶13, 14, 16-18; Ex. A, Chadwick Dep. 121:21-122:11.)

**Response: Disputed**.

Disputed that the adopted amendments were "to protect the voice of non-Varsity

members of the organization" (nor is that statement supported by cited evidence, in violation of
Fed. R. Civ. P. 56(c)(1) and LR 56.1(a)). Disputed as misleading that CheerSport and JAM
Brands are "non-Varsity event producers" as Varsity has owned both for years (Cheersport since
2012 and Jam Brands since 2015). **Ex. 118**.

120.    USASF's bylaws thereafter remained unchanged through 2022.  (Ex. L, Stangle
Decl ¶2.)

**Response: Undisputed for purposes of summary judgment only.**

121.    In or around November 2012, Varsity nominated a non-employee coach to one of
its EP seats on USASF's Board.  (Ex. I, Stangle Dep. 86:7-20; Ex. J, Peterson Dep. (Day 1).
31:18-32:2; Ex. K, Fowlkes Dep. 264:20-265:5; Ex. AQ, USASF_00027831.)  In or around
November 2015, Varsity acquired JAM Brands, which afforded it the ability to nominate another
representative to USASF's Board.  (Ex. G, Seely Dep. (Day 1). 231:17-19; Ex. H, Webb Dep.
(Day 1) 208:5-7.)  However, because Varsity had already allocated one of its EP seats to a
coach/gym owner, Varsity has never had seven Varsity-employed representatives in its seven EP
seats at any one time.   (See Ex. I, Stangle Dep. 86:7-20; Ex. J, Peterson Dep. (Day 1) 31:18-
32:2; Ex. K, Fowlkes Dep. 264:20-265:5; Ex. AQ, USASF_00027831.)

**Response: Disputed.**

Disputed as misleading. Since 2005, Varsity has controlled the USASF Board of
Directors with no fewer than seven of 13 voting seats. **Defs' Ex. D** [Chadwick Ex. 5] at 2454.
This was true in 2012, when Varsity employed USASF Board members Jim Chadwick (**Ex. 15**
[Chadwick Dep.], at 41:14-19), Mike Burgess (*id*. at 81:20-21), Lance Wagers (*id*. at 81:11-
82:22); Karen Halterman (*id*. at 85:18-20), Catherine Morris (*id*. at 86:13-19), Jeff Fowlkes (**Ex.
24 [**Fowlkes Dep.] at 51:19-23), and Steve Peterson (**Ex. 14** [Peterson Dep.] at 275:13-15).
Varsity controls the USASF Board to this day. **Ex. 139**. With its acquisitions of CheerSport in
2012 and JAM Brands in November 2015, Varsity gained control of all seven permanent seats
reserved for event producers.

122.    In addition, there was never a case where the Varsity representatives voted one

way and the rest of the Board voted another.  (Ex. G, Seely Dep. (Day 1)  358:7-359:2.)

**Response: Undisputed.**

123.    USASF has several committees, including a Sanctioning Committee, a Rules

Committee, an Athletic Performance Committee, and more.  The Sanctioning Committee has

existed since 2004 and under its current charter since 2013.  (Ex. M, USASF_00030535 at -535

(reflecting Board approval of committee charters); Ex. N, USASF_00056250 at -253.)

**Response: Undisputed for purposes of summary judgment only.**

124.    The Sanctioning Committee develops and maintains: (1) the standards by which

competitions qualify for USASF Sanctioning and the process and guidelines governing

compliance, and (2) the approval process and criteria for event producer memberships, including

eligibility to offer bids to compete at Worlds.  (Ex. N, USASF_00056250 at -253.)

**Response: Undisputed for purposes of summary judgment only.**

125.    Throughout its existence, the Sanctioning Committee has been composed of a

representative from each EP who is eligible to award fully paid bids to Worlds.  (Ex. O, Peterson

Dep. (Day 2) 339:22-341:21 (agreeing that "at any point in time only Tier 1 event producers had

a voting seat on the sanctioning committee"); Ex. P, USASF_00081398 at -399 (listing as one of

the benefits of Tier 1 membership "[h]ave a seat to participate on the USASF Sanctioning

Committee").)

**Response: Undisputed for purposes of summary judgment only.**

126.    Varsity did not own a majority of the EPs with seats on USASF's Sanctioning

Committee until it completed its acquisition of JAM Brands in late 2015.  (ECF No. 382-3 at p.

96 ("Prior to the JAM Brands acquisition [in 2015], Varsity held 16 of 35 seats on the USASF

Sanctioning Committee."); Ex. Q, Netz Dep. 293:5-8.)

**Response: Undisputed.**

127.    Any rule or policy voted on by USASF's Board or Sanctioning Committee prior

to late 2015 was approved or disapproved before Varsity obtained the majority of seats on the

Board or Sanctioning Committee, respectively.  (See SUF ¶¶121, 126; Ex. Q, Netz Dep. 293:9-

23, 296:3-25.)

**Response: Disputed.**

As noted in Resp., ¶121, because both Jim Chadwick and Steve Peterson were Varsity employees before they joined USASF and remained so until at least 2020, Varsity held a majority of the votes on the USASF Board from its inception through 2015 and beyond.

128.    USASF did not participate in any of Varsity's acquisitions.  Rather, any acquisitions of EPs that Varsity made were done by Varsity unilaterally.  (Ex. L, Stangle Decl. ¶3; Ex. Q, Netz Dep. 315:20-23.)

**Response:    Undisputed.**

129.    USASF did not alter any of its rules or policies to assist Varsity in undertaking these acquisitions or to provide Varsity some additional advantage unavailable to other members of USASF.  (Ex. L, Stangle Decl. ¶4; Ex. Q, Netz Dep. 310:2-5.)

**Response: Disputed.**

There are abundant examples in the record of USASF encouraging Varsity's acquisitions and altering its policies to provide Varsity an advantage unavailable to other members of USASF. *See* Resp., ¶116.

130.    USASF also hosts an end-of-season cheer competition for the top All Star cheerleading teams called "The Cheerleading Worlds" ("Worlds").  (Ex. A, Chadwick Dep. 53:20-54:6.)

**Response: Disputed.**

The evidence shows that, while USASF is the host of the Worlds on paper, the frustration in the All Star cheerleading community that USASF cedes control and management of the Worlds to Varsity is no secret. **Ex. 198** at –5997); **Ex. 201** at –1294); **Ex. 202** at –9853); **Ex. 203** at –0810).

131.    Through its Sanctioning Committee, USASF promulgates criteria for cheer events which can provide athletes with bids to compete at Worlds, which are known as "Worlds Bid Events".  As part of its process for determining which events qualify as Worlds Bid Events,

USASF created a tier-system. (Ex. R, USASF_00027858 at -858; Ex. A, Chadwick Dep. 58:20-60:5, 140:19-141:22; Ex. J, Peterson Dep. (Day 1) 49:6-20.)

**Response:    Undisputed for purposes of summary judgment only.**

132.    USASF's rules regarding how which events that can award bids to Worlds are selected have been in place for many years. (Ex. A, Chadwick Dep. 58:1-9 ("At some point in time, USF – USASF introduced a Worlds bid system, correct? A. Yes. Q. Do you recall when that was? A. That was – the development began at the very first Worlds […]"); Ex. BQ, Elza Dep. 118:20-119:1 ("Q. And [Worlds bid-giving events are] protected by the USASF rules; is that right? A. They're protected by the bylaws the USASF adopted 20 years or so ago.").)

**Response:    Undisputed for purposes of summary judgment only.**

133.    USASF adopted a tiered membership system for Eps in 2005 "to allow companies to tailor their USASF membership level to both their budgets as well as the value they perceive receiving from the USASF." (Ex. R, USASF_00027858 at -858.)

**Response:    Disputed in part.**

Undisputed that USASF adopted a tiered membership.

Disputed that the purpose was to allow companies to tailor their memberships. The evidence shows the system was employed to favor Varsity competitions at the expense of the smaller IEPs, and that Varsity intentionally sought to acquire rival Tier 1 event producers to gain control of the USASF Sanctions Committees and World bids system. *See, e.g.*, **Ex. 56** at -8761; **Ex. 55** at –0644 ("We look to acquire all the Tier I event companies . . . that give bids to the cheerleading . . . Worlds. There are only 42 Tier I event companies. Varsity now owns 36 of those Tier I companies ███████████████."); **Ex. 292** [Peterson Ex. 17 at –9499] (Tier 1 producers have power to grant bids).

134.    At the inception of the tiered membership system, EPs who met the criteria for Tier 1 were permitted to offer "fully paid bids" to Worlds, while EPs who met the criteria for Tier 2 were permitted to offer "partially paid bids" to Worlds. (Ex. R, USASF_00027858 at -859.)

**Response: Undisputed for purposes of summary judgment only.**

135.     As the sport of All Star cheerleading grew, the number of event producers who qualified to offer Worlds Bid Events increased.  (Ex. A, Chadwick Dep. 60:6-22.)  By no later than 2012, USASF had adopted a rule limiting the number of Worlds Bid Events to 42, in an effort to ensure that there was an appropriate number of Worlds ids in relation to Worlds bid-eligible teams.  (Ex. J, Peterson Dep. (Day 1) 55:10-56:1 ("We keep a control on the number of bids that are eligible to be awarded versus the number of Level 6 and 7 teams in the country."), 56:12-57:1 ("if there were more bids [than eligible teams", you know, it ju– -- it loses its credibility"), 57:7-24, 65:20-66:4 ("At some point, the Sanctioning Committee felt as if 42 would be the . . . maximum number of events . . . based of the number of bids being awarded and the number of teams eligible to be awarded bids."); Ex. S, VAR00319008 at -008 ("For the 2012-2023 season, the USASF will not sanction more than 42 Cheerleading Worlds qualifying events in the US."), -010 ("The goal for Worlds bids is to be sufficiently flexible to ensure participation by as many event producers as possible while still protecting the value of Worlds bids by not giving so many that they lose meaning.").  In connection with this limitation, USASF outlined in its "Approval Process & Criteria for Tier 1 and Tier 2 Event Producers and Worlds Bid Eligibility" ("Worlds Bid Criteria") that, where there were more than 42 events that satisfied the other criteria to offer Worlds Bids, "[p]riority" would be given "to event producers based on their seniority as USASF members," in an effort to "recognize the contribution made by early USASF supporters whose financial support made the Worlds possible initially." (Ex. S, VAR00319008 at -008, -010).  USASF sought to incentivize EPs to maintain their membership with USASF by prioritizing the EPs who had financially supported USASF by awarding paid bids to Worlds (of up to $25,000 per bid) for a longer duration.  (Ex. J, Peterson Dep. (Day 1) 135:4-136:9; Ex. T, USASF_00030547 at -547; Ex. A, Chadwick Dep. 175:1-15.)

**Response:**          **Disputed in part.**

Undisputed as to all statements except that a limit was placed on number of bids.

Plaintiffs dispute this fact as containing statements not supported by the evidence, including that there was "an effort to ensure that there was an appropriate number of Worlds bids

in relation to Worlds bid-eligible teams."

Abundant evidence shows that the true purpose of limiting the number of bids was to provide a financial advantage to Varsity and foreclose competitors from the market. *See, e.g.*, **Ex. 140 at** –0643 (proposal to expand Worlds to include Juniors was opposed by Varsity because it would "negatively impact the Summit", a Varsity event; USASF agreed to bury it in a committee where "[i]t will die there without us having to publicly oppose it"); **Ex. 259** at –8974 ("Jeff W. wants the USASF Worlds Bid process changed to prevent small competitors from being allowed to offer Worlds Bids. He believes, and I agree (for whatever that's worth), that in some cases the ability to give Worlds Bids is keeping these companies viable and certainly driving up their value if we decide to acquire them"); **Ex. 260** at –1946] (Varsity proposal to add second bid for 200-team 2-day events and rejecting lower threshold "because others could get closer to reaching that number and effect our existing WB events").

136.    This priority approach is consistent with the early policies of USASF to incentivize EP membership and support for the organization. (Ex. U, USASF_00032433 at -433 ("Unanimous vote in favor of policy that if a member company leaves the USASF, then this company is precluded from re-applying for membership of one year from the time they leave the federation. This will help to reduce the 'yo-yo' effect of applying for membership when most advantageous for a company.").)

**Response:        Disputed.**

Plaintiffs dispute this fact as misleading to the extent it fails to acknowledge the competitive advantage the 42-event limitation provides to Varsity. *See* Resp., ¶135.

137.    In addition, by no later than 2012, USASF's Worlds Bid Criteria specified in "Guideline 3.B" that "Tier 1 and Tier 2 events will be protected, within a four week window, either side of the current bid giving event for a 200 mile radius" and "protected for a 500 mile radius from other bid giving events on the same weekend." (Ex. S, VAR00319008 at -009; see also Ex. AR, USASF_00090186 at -186 (discussing date/mileage limitation in 2010).)

**Response:        Undisputed for purposes of summary judgment only.**

138.    Date and proximity limitations exist in other sports, and can serve legitimate, pro-competitive purposes such as spreading out events over time and throughout the country and maximizing participation and audience to the benefit of a sport as a whole. (ECF No. 382-3 at p. 79; Ex. Q, Netz Dep. 328:3-329:9.) Plaintiffs' expert, Janet Netz, conceded that Guideline 3.B can have pro-competitive effects. (Ex. Q, Netz Dep. 329:4-9.)

**Response:    Disputed in part.**

Undisputed that date and proximity locations exist in other sports with pro-competitive purposes.

Disputed that Dr. Netz "conceded that Guideline 3.B can have pro-competitive effects." In her rebuttal report, Dr. Netz clarified: "I do not dispute those rules exist in other sports leagues nor that they serve legitimate, procompetitive purposes in those instances. However, the analogy is not applicable to the USASF and Varsity because other sports leagues do not allow a single event producer to gain control of the majority of events or a majority of board seats." **Ex. 2** [Netz Rebuttal] at 79-80.

139.    In 2008, USASF adopted, inter alia, the following change to the Tier 1 and 2 requirements:

> Tier 1 requirements for current Tier 1 members (those approved in 2007-08 or earlier) are reduced from 125 to 100 all star cheer teams. All new Tier 1 applicants must meet the 125 all star team standard. Tier 2 requirements for current Tier 2 members (those approved in 2007-08 or earlier) are reduced from 100 to 75 all star cheer teams. All new Tier 2 applicants must meet the 100 all star team standard.

(Ex. T, USASF_00030547 at -547.)

**Response: Undisputed.**

140.    In August 2014, USASF's Sanctioning Committee approved the proposal that "Beginning with the 2016-17 approval process, all members applying for Tier 1 status must have 125 cheer teams at the previous year's event." (Ex. V, USASF_00055929 at -930.) This effectively eliminated the exception for Tier 1 members approved in 2007-08 or earlier. (Id.) USASF did, however, relax this standard slightly by allowing "prep" teams to count toward the 125-team minimum. (Ex. W, USASF_00026548 at -548.) Also, in 2014, USASF eliminated Tier

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

2 for cheerleading EPs.  (Ex. X, USASF_00085198, at -198.)  This decision was not fully

supported by Varsity.  (Id.)  As USASF explained in its "General Membership Guidelines":

"HEADS UP: New…in the 2016 – 2017, all event producers applying to award 2017

Cheerleading Worlds Bids will only be approved as a Tier 1 who must have a minimum of 125

All Star 'cheer' teams participating at the same prior year's competition to qualify for this tier.

Tier 2 will no longer be a USASF Membership Tier Level starting in 2016 – 2017 and Partial

Paid Bids will no longer be awarded."  (Ex. Y, VAR00348574 at -595.)

> **Response: Disputed in part.**

Undisputed that USASF approved the proposal in August 2014.

Disputed to the extent Defendants suggest Varsity did not spearhead altering USASF

rules to eliminate the practice of prioritizing membership seniority. **Ex. 1** [Netz Rep.] at 72-84;

*see also*, **Ex. 259** ("Jeff W. wants the USASF Worlds Bid process changed to prevent small

competitors from being allowed to offer Worlds Bids. He believes, and I agree (for whatever

that's worth), that in some cases the ability to give Worlds Bids is keeping these companies

viable and certainly driving up their value if we decide to acquire them").

Disputed that increasing the number of teams needed for Tier 1 status did not serve to

help Varsity foreclose competition, which USASF encouraged and acknowledged:

> **Ex. 135**: In March 2019, Steve Peterson (USASF) emailed Tres LeTard (Varsity)
> informing him that WSA, an independent event producer, would be on probation
> the following season, and cheering Varsity's accomplishment in getting rid of
> competitors: "WSA did not make 125. That is 3! [thumbs up emoji]." Mr. LeTard
> replied that it is "[g]etting hard out there" and Mr. Peterson completed the
> exchange with: "**You guys are knocking them off!** [smiley emoticon]."(emphasis
> added).
>
> **Ex. 136**: Heather Petz, owner of independent event producer ("IEP") Champion
> Cheer Central, reported that Varsity's conduct was making it difficult for her to
> reach the 125-team minimum to give Worlds bids: My numbers are down this
> year for our upcoming bid event due to mergers, small gyms going out of
> business, a lot of bids in Kentucky and Varsity putting a Summit Bid qualifier in
> the same building two weeks prior to my event.
>
> **Ex. 137**: In February 2018, another IEP explained how USASF's sanctioning and

bid system makes it nearly impossible for non-Varsity event producers to obtain Worlds bids: "How will we ever be considered for WORLDS bids when current Tier 1 producers are syphoning off our customers with the bids they are already privileged to have? Man[y] of the Tier 3 producers are saying they are closing after this year. We are not the only company in jeopardy of closing our doors. There appears to be no way we will ever achieve Tier 1 status." Steve Peterson (USASF) forwarded this email to Varsity employees with: "**FYI...It's working** [smiley emoticon]."(emphasis added).

141.    Despite these changes announced in 2014 and 2015 regarding Tier 2 and the 125-team minimum, very few USASF EPs were affected.  (Ex. J, Peterson Dep. (Day 1) 52:14-53:12.)  Only two event producers lost their Worlds Bid Events between the 2015-2016 and 2019-2020 All Star seasons: one of which was owned by a Varsity brand EP and one of which was not.  (ECF No. 384, Orszag Report ¶73 & nn.140-143; Ex. Z, Orszag Backup Materials; Ex. AA, USASF_00019474 at -474; Ex. AB, USASF_00019528 at -528; Ex. AC, USASF_00020057 at -057).  These two event producers were replaced by the next-qualifying events, one of which was owned by a Varsity brand EP and one of which was not.  (ECF No. 384, Orszag Report ¶73 & nn.140-143; Ex. Z, Orszag Backup Materials.)  In other words, when these rule changes went into effect, Varsity lost one Worlds Bid Event and gained one Worlds Bid Event, and a non-Varsity EP lost one Worlds Bid Event and a different non-Varsity event producer gained one Worlds Bid Event.  (Id.).

**Response: Disputed.**

Disputed that "very few USASF EPs were affected" and no competent evidence is cited in support.  Non-Varsity event producers were negatively impacted by the rule changes. *See* Resp., ¶140.

142.    None of the events identified by Plaintiffs' experts that were allegedly victimized by "attack events" lost their ability to award Worlds Bids.  (ECF No. 384, Orszag Report, ¶73-74, 80 ("[T]he empirical evidence shows that USASF, on balance, did not have any incremental effect on Varsity's control of Worlds Bid events."); Ex. Z, Orszag Backup Materials; Collective Ex. AD, USASF_00086125, USASF_00002776, USASF_00002779, USASF_00002782, USASF_00002785; ECF 382-3 at pp. 73-78 (summarizing Plaintiffs' evidence of alleged

"counterprogramming".)

  **Response: Disputed.**

  *See* **Ex. 2** [Netz Rebuttal] at 80-81 & n. 343-346, for just one example—IEP Mardi Gras

was put on probation after not meeting the team minimum, lost its Tier 1 status, and was

acquired by Varsity. Varsity subsequently canceled the event it used to target Mardi Gras.

  143. There is no evidence that USASF ever deviated from its Worlds Bid Criteria to

benefit Varsity. In fact, the only instance where USASF deviated from its Worlds Bid Criteria

was in 2020 and was to the detriment of Varsity. In that instance, two non-Varsity EPs who had

been on probation failed to satisfy the 125-team minimum and should have lost their Worlds Bid

Events for the following season. Instead, USASF granted an exception and permitted them to

maintain their Worlds Bid Events. In addition, instead of merely approving the two Varsity-

owned events that had next-priority to replace these two non-Varsity events, USASF made

another exception to its Worlds Bid Event process to permit two more non-Varsity EPs to hold

Worlds Bid Events, bringing the number of Worlds Bid Events to 46 for the 2020-2021 season.

(ECF No. 384, Orszag Report ¶80 n.157; Ex. AE, USASF_00012988; Ex. J, Peterson Dep. (Day

1) 261:9-262:24.)

  **Response: Disputed.**

  Disputed. USASF documents show that the only reason USASF and Varsity acquiesced

to allowing the two IEPs to remain as Tier 1 (though on probation) was because of unrest among

the other IEPs. As USASF's Steve Peterson put it, "In light of everything that has taken place

over the past 4-5 months and the frustrations I have heard from many of our EP members, I

would like to make a recommendation that we take a few steps back and allow the two Tier 1

EPs (ASC and Cheer Tech) another year as Tier 1 EPs and remain on probation." See **Defs' Ex.**

**AE**, USASF_00012988 (italics added). One expression of that frustration came in the form of a

public letter in or around October of the previous year from a group called Allstar United, calling

for meetings of IEPs to organize a separate All Star organization that specifically excluded

Varsity. **Ex. 261** at –6688. The letter made Varsity nervous:



*Id.* at –6690. Nonetheless, Varsity's proposed responses included:

*See also* Resp., ¶¶129, 135, 140, 141.

144.    The Worlds Bid Guidelines set forth the criteria for roughly 42-46 Worlds Bid

Events, which represents a small fraction of the "hundreds" of All Star cheerleading events.  (Ex.

A, Chadwick Dep. 286:6-7; Ex. AF, VAR00421095 at -095 (reflecting there were 668 USASF-

sanctioned events in the 2015-2016 season).)  They had nothing to do with any other cheerleading

event.  (Ex. O, Peterson Dep. (Day 2) 539:2-25.)

**Response: Disputed.**

Disputed as misleading to the extent that it creates the impression that the other event

producers were not negatively affected by Varsity's control of the USASF. *See* Resp., ¶¶129, 135,

140, 141.

145.    There is no evidence that USASF participated in any conversations with Varsity

regarding setting prices for registration or spectator fees for Varsity's cheerleading competitions.

(Ex. Q, Netz Dep. 315:24-316:5; Ex. L, Stangle Decl. ¶5.)

**Response: Undisputed for purposes of summary judgment only.**

146.    USASF is not a cheer apparel manufacturer, distributor, or retailer.  (Ex. L, Stangle

Decl. ¶6.)

**Response: Undisputed for purposes of summary judgment only.**

147.    In 2012, USASF first adopted its "Image Policy" (now known as the Athletic

Performance Standards) to set out general rules and guidelines regarding athlete appearance at

USASF-sanctioned competitions.  (See Ex. AG, USASF_00088638 at -639; Ex. AH,

USASF_00088659.)

>    **Response: Undisputed for purposes of summary judgment only.**

148.    This policy was developed through a collaborative process involving USASF's

members, including cheerleading uniform companies other than Varsity. (Ex. V,

USASF_00055929 at -930 ("[T]here was a meeting of affiliate member uniform companies in

March [2014] to review the policy."); Ex. A, Chadwick Dep. 450:18-451:18 ("The major players,

in my mind, from the uniform was Rebel Athletic, and they were involved from the very

beginning."); Ex. AI, Wright Dep. 32:6-17 (recalling that Motionwear, Rebel Athletic, GK Elite,

and Glitter Stars were involved in discussions).)

>    **Response:        Undisputed for purposes of summary judgment only**

149.    USASF's Image Policy does not require athletes to wear apparel manufactured or

sold by any particular company.  (Ex. AH, USASF_00088659.)

>    **Response:        Undisputed for purposes of summary judgment only.**

150.    The purpose behind the coverage guidelines was to help legitimatize the sport and

protect against athlete exploitation. (Ex. AJ, USASF_00022109; Ex. AI, Wright Dep. 32:25-

33:25)

>    **Response:  Undisputed for purposes of summary judgment only.**

151.    The main guideline impacting apparel set to go into effect for the 2012-2013

season was the "Cover Up Guidelines," which stated that "Athletes with non-full top uniforms

must wear a t-shirt or other suitable cover up over their uniforms unless they are in the warm-up

area, traveling as a group directly to or from the warm up area, or on the performance stage."

(Ex. AH, USASF_00088659 at -660-661.)  This guideline only impacted athletes with "non-full

top uniforms" and could be satisfied by wearing "a t-shirt or other suitable cover up" (of any

brand) when outside the performance area or warm-up areas.  (Id.; see also Ex. A, Chadwick

Dep. 448:16-19 ("You know, changing the appearance could be as easy as the athlete putting on a

T-shirt or something like that.  It didn't necessarily require an entire new uniform.").)

>    **Response: Undisputed for purposes of summary judgment only.**

152.    The Image Policy announced in 2012 also included a bow guideline set to go into effect the 2013-2014 season, which limited the size of bows cheerleaders could wear while performing.  (Ex. AH, USASF_00088659 at -660-661.)  This guideline could be satisfied by wearing a bow of a smaller size, from any apparel manufacturer or bow company, or by wearing no bow at all.  (Id.)

**Response: Undisputed for purposes of summary judgment only.**

153.    The Image Policy announced in 2012 also included an "Appropriate Uniform" section, which was not scheduled to go into effect until the 2015-2016 season, well over three years after it was announced.  (Ex. AH, USASF_00088659 at -660-661.)  This section provided as follows:

> UNIFORM TOP GUIDELINES
> Uniform tops may not include an exposed midriff (crop top) except when worn by athletes competing in Senior divisions.  Uniform tops must be secured by straps or material over at least one shoulder or around the neck (tube tops are not allowed).

(Id.)  This policy could be satisfied by any brand of uniform, so long as it was not "sexually provocative" and provided age-appropriate coverage.  (Id.; see also Ex. Q, Netz Dep. 329:25-330:18 (agreeing that USASF's Image Policy could be satisfied by manufacturers other than Varsity).)

**Response: Undisputed for purposes of summary judgment only.**

154.    In announcing the "Appropriate Uniform" policy several years before it was to go into effect, USASF considered the purchase cycle for uniforms and recognized that teams buy uniforms for use over multiple years.  (Ex. A, Chadwick Dep. 447:14-448:1.)

**Response: Undisputed for purposes of summary judgment only.**

155.    USASF's Image Policy does not present a barrier to entry for apparel manufacturers.  (Ex. Q, Netz Dep. 330:22-25.)

**Response: Disputed as legal argument.**

This purported fact attempts to pass a legal judgment as a statement of fact.  Such arguments are inappropriate in a statement of material facts.  *See, e.g.*, *Sutton v. CHSPSC, LLC*,

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

No. 116CV01318STAEGB, 2018 WL 3318961, at *2 (W.D. Tenn. July 5, 2018) (a concise

statement of facts is "not the place" for legal argument; legal opinion or argument in the concise

statement of facts is not helpful to the court).

156.    USASF's Image Policy only applies to USASF-sanctioned events.  It has no

application to school cheer events, non-USASF All Star Cheer events, camps, or practices.  (Ex.

L, Stangle Decl. ¶7; see also SUF ¶41.)

**Response: Undisputed for purposes of summary judgment only.**

157.    USASF's role as a sanctioning organization is limited to the sport of All Star cheer.

(Ex. AK, Heeb Dep. 290:8-11.)

**Response: Undisputed for purposes of summary judgment only.**

158.    USASF's members include All Star cheer athletes, coaches, gym owners, and

event producers.  (Ex. AL, Clark Dep. 27:1-28:16; Ex. AM, Wilson Dep. 44:2-11.)

**Response: Undisputed for purposes of summary judgment only.**

159.    USASF's rules and policies do not apply to School Cheer, nor do they apply to

camps.  (Ex. A, Chadwick Dep. 40:1-4; Ex. L, Stangle Decl. ¶8; Ex. CZ, Newby Dep. 632:5-9

(Q. And does the USASF have anything to do with those events, either in terms of owning the

event or promoting it? A. Nothing at all to do with any school events.");  Ex. BJ, Kennedy Dep.

209:1-9 ("Q. Do school cheerleaders' uniforms have to comply with USASF's rules? A. Not with

the USASF. Q. Do school cheerleaders routines have to comply with USASF's rules? A. Not

with the USASF. Q. So school cheer and All Star cheer are not the same thing. Right? A. In my

opinion, no."); Ex. AY, Lorenzen Dep. 191:22-202:19 (explaining that Plaintiff Lorenzen's

daughter was not a USASF member, and Ms. Lorenzen [*sic*] has not paid money to USASF).)

**Response: Undisputed for purposes of summary judgment only.**

160.    Plaintiffs have no evidence that the alleged conduct by USASF caused any impact

on pricing in any of the proposed markets.  (Ex. AK, Heeb Dep. 302:6-9 (acknowledging that he

did not attempt to isolate what "price effects" he found "resulted from the alleged conspiracy

with USASF as opposed to the other challenged conduct."); see also SUF ¶63.)

**Response: Disputed.**

USASF's concerted conduct bolstered Varsity's dominant position in the Cheer Competitions Market, which Varsity exploited to charge supracompetitive prices in all three relevant product markets. PSOF, ¶¶45, 131-147; *see also* Resp., ¶¶129, 135, 140, 141.

161.    Plaintiffs have no evidence that USASF had the specific intent that Varsity monopolize the proposed markets.  For example, USASF was financially independent from Varsity during this time period.  (Ex. AO, USASF_00023946 at -948 ("USASF has repaid the full balance of the start up loan to Varsity . . . and has enough working capital to remain financially independent moving forward."); Ex. AP, USASF_00051791 at -793 ("[T]he organization was able to make significant strides toward funding [an operating] reserve in 2014, with goal of fully funding the reserve in 2015."), -794 (USASF's "move [to new office space] was complete in February, 2015").)  There is no evidence that USASF, as an organization, had anything to gain as a result of the alleged monopolization and supracompetitive pricing.

**Response: Disputed.**

Disputed as immaterial; specific intent is not a requisite element for any of Plaintiffs' claims. Plaintiffs have not asserted a claim for attempted monopolization or conspiracy to monopolize under Section 2 of the Sherman Act, or under any analogous state law.

Plaintiffs further dispute that the USASF has nothing to gain from Varsity monopolization and supracompetitive pricing, or that there is no evidence of such. USASF could not have survived without Varsity's financial backing for much of its existence. *See, e.g.,* PSOF, ¶¶43, 196.

**VI.    JEFF WEBB**

162.    Jeff Webb founded Varsity in 1974. (Compl. ¶70; Ex. CR, Webb Decl. ¶3.)

**Response: Undisputed for purposes of summary judgment only.**

163.    Through Varsity, Jeff Webb introduced innovations to cheerleading, including a focus on athleticism and dedicated cheer competitions.  (Compl. ¶79.)

**Response: Undisputed for purposes of summary judgment only.**

164.    Millions of athletes participate in cheerleading.  (Compl. ¶44.)

**Response: Undisputed for purposes of summary judgment only.**

165.    With some variations of his specific title, Jeff Webb was Varsity's CEO from 1974 until March 2016.  (Ex. CR, Webb Decl. ¶3.)

**Response: Undisputed for purposes of summary judgment only.**

166.    In December 2015, the Varsity Brands, LLC Board of Directors decided to replace Jeff Webb as CEO of Varsity Brands.  (Ex. CP, Beer Dep. 98:17-101:4.; Ex. CU, Janower Dep. 38:20-39:16.)

**Response: Undisputed for purposes of summary judgment only.**

167.    Effective March 2, 2016, Jeff Webb was replaced as CEO, and was subsequently given the title of Founder and Chairman of the Board of Varsity Brands.  (Ex. CR, Webb Decl. ¶4.)

**Response: Undisputed for purposes of summary judgment only.**

168.    After March 2, 2016, Jeff Webb was not a member of Varsity's Executive Leadership Team.  (Ex. CU, Janower Dep. 118:15-119:20; Ex. CV, CB00314261 (Janower Ex. 16).)

**Response: Undisputed for purposes of summary judgment only.**

169.    After March 2, 2016, Jeff Webb was not a member of Varsity's Senior Leadership Team.  (Ex. CU, Janower Dep. 118:15-119:20; Ex. CV, CB00314261 (Janower. Ex. 16).)

**Response: Undisputed for purposes of summary judgment only.**

170.    After March 2, 2016, Jeff Webb was not a member of Varsity's Corporate Support Group.  (Ex. CX, CB00373462 (Kalvelage Ex. 5 at -498); Ex. CQ, Kalvelage Dep. 104:1-13.)

**Response: Undisputed for purposes of summary judgment only.**

171.    After March 2, 2016, Jeff Webb did not possess operational authority at Varsity and he was not involved in Varsity's day-to-day business.  (Ex. DH, Webb Dep. (Day 2) 260:15–261:22 (stating he "did not have actual operational authority but, you know, overall input, mostly

communications . . ."), 271:21-273:11 ("once I moved from chairman and CEO to just chairman

during early 2016, again, I didn't have, like, this operational authority, and I wasn't involved in,

you know, making all these personnel decisions and all the strategic decisions . . ."); Ex. CZ,

Newby Dep. 652:14-653:1 (Q: "From your vantage point, how did you view Mr. Webb's role

while he was chairman of the Board?  A:  "I would say more like an advisor . . ." Q: "Was

[Webb] involved in day-to-day operation decisions, as far as you could tell?" A: "As far as I

could tell, no.").)

    **Response: Disputed.**

    Jeff Webb still possessed operational authority at Varsity after March 2, 2016, because he

continued to be involved in the day-to-day business affairs and strategy after that date. See PSOF,

¶¶ 153, 154, 155, 156, 157, 158, 159; *see also*, **Ex. 129**; **Ex. 173** at –8032-34; **Ex. 20** [Cota Dep.]

at 78:13-21, 310:24-311:7; **Ex. 132** at –4139; **Ex. 262** at –3719; **Ex. 13** [LeTard Dep.] at 354:5-

12; **Ex. 212** at –2020; **Ex. 263** at –0326 (in a May 8, 2018 Webb email to USASF President Jim

Chadwick, Webb asks for a meeting to "review financial stuff for the coming year based on

conversations you, John and I have been having" and suggests inviting two other USASF

executives for a second meeting "on the major issues facing All Star and Cheer in general"); **Ex.

264** at –9969.

    172.    After March 2, 2016, Jeff Webb was not "still driving the business" for Varsity,

but was in a support role for other executives.  (Ex. CU, Janower Dep. 121:11-123:3; Ex. CW,

CB00114878 (Janower Dep. Ex. 18) at -878 (reflecting Jeff Webb's roles projected to be

continued support to Mr. Seely, supporting Project Impact, and providing advice "as requested by

Seely and Nichols.")).)

    **Response: Disputed.**

    Disputed. *See* Resp., ¶171.

    173.    After March 2, 2016, Jeff Webb operated as an advisor for Varsity and provided

input to the company, primarily with respect to Varsity's communications efforts.  (Ex. DH, Webb

Dep. (Day 2) 260:15-261:22, 271:21-273:11; Ex. CZ, Newby Dep. 652:14-23; Ex. DG,

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

Seely Dep. 572:12-13, 573:12-22) (explaining that Jeff Webb "was just an advisor" in 2017).)

**Response: Disputed.**

Undisputed that Webb was an advisor.

Disputed that his advisory role primarily concerned communication efforts. *See* Resp., ¶171.

174.    After Jeff Webb was no longer CEO of Varsity he acted as "the face of the company," conducting "a lot of the media interviews." (Ex. DH, Webb Dep. (Day 2) 190:16-191:5, 271:24-273:11.)

**Response: Undisputed.**

175.    After March 2, 2016, Jeff Webb remained available to provide "guidance" and "perspective" to the Varsity Spirit team, including advice on strategy, branding, positioning, and culture. (Ex. DH, Webb Dep. (Day 2) 271:21-273:11.)

**Response: Undisputed.**

176.    After Jeff Webb was no longer CEO, responsibility for day-to-day operations of Varsity Spirit fell to two other individuals—John Nichols and, later, Bill Seely. (Ex. DA, Nichols Dep. 25:19-26:5 (serving as executive vice president July 2013 – October 2017, with responsibility for "overall operations and results of Varsity Spirit"); Ex. G, Seely Dep. 42:17-43:1 (serving as president of Varsity Spirit from September 2017 with responsibility to "overs[ee] Varsity's day-to-day business").)

**Response: Disputed.**

Webb was involved in day-to-day operations. See Resp., ¶171.

177.    After March 2, 2016, neither John Nichols nor Bill Seely reported to Jeff Webb. (Ex. DA, Nichols Dep. 27:2–28:8; Ex. G, Seely Dep. 43:2–7.)

**Response: Disputed.**

After March 2, 2016, both John Nichols and Bill Seely communicated frequently with Jeff Webb, reporting new developments and seeking his guidance. *See* Resp., ¶171.

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

178.    In July 2018, funds advised by Bain Capital acquired a majority interest in Varsity Brands. (Ex. DC, O'Rourke Dep. 17:1-23; Ex. CM, Cotton Dep. 55:22-56:4.)

**Response: Disputed as incomplete and misleading.**

The cited testimony states that "Funds *managed* and advised by Bain Capital were the acquiring entities of Varsity Brands." Defendants Ex. CM, Cotton Deposition, 56:2-4 (emphasis added).

179.    After the Bain transaction in 2018, Jeff Webb was no longer a member of Varsity's Board of Directors.  (Ex. DC, O'Rourke Dep. 64:10-13; Ex. CR, Webb Decl. at ¶10.)

**Response: Undisputed for purposes of summary judgment only.**

180.    After July 2018, Jeff Webb held the title of Chairman of Varsity Spirit, a title that was effectively "meaningless."  (Ex. CR, Webb Decl. at ¶10; Ex. DC, O'Rourke Dep. 68:4-70:8; Ex. DD, BAIN00062831 (O'Rourke Ex. 9 at -834.).

**Response: Disputed.**

Disputed that Webb's title was "meaningless" (as Defendants' own proffered evidence also disputes. *See* Defendants' Ex. DC, Deposition of Tom O'Rourke, May 4, 2022, at 70:9-14-.). No competent evidence is cited in support of this assertion and Defendants thus fail to assert a material fact.

181.    After July 2018, Jeff Webb remained focused on international cheer, worked at camps, and acted in an advisory role to the president of Varsity Spirit.  (Ex. DE, BAIN00013400 (O'Rourke Ex. 8 at -400.)

**Response: Disputed.**

After July 2018, Jeff Webb continued to set strategy and business decisions for Varsity's day-to-day operations. *See* Resp., ¶171.

182.    After July 2018, Jeff Webb was viewed as Varsity's "culture keeper and inspiration, not perceived as [an] operator" at Varsity.  (Ex. DF, BAIN00074357 (O'Rourke Ex. 22) at -357; Ex. DC, O'Rourke Dep. at 122:12-124:10, 125:8-24.)

**Response: Disputed as misleading.**

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

The cited quote is taken out of context. The full quote, from an email from then-newly installed CEO of Varsity Brands Adam Blumenfeld to the new owners at Bain, states, "As it relates to varsity spirit, *it's important his role is as* culture keeper and inspiration, not perceived as operator." Defs' Ex. DF, BAIN00074357 at 357 (italics added). The full quote shows that Blumenfeld said it was important to new owners that Webb not be perceived as running Varsity. As Webb told Brandon White (Managing Director, Charlesbank), his role was much more active: "I'm the face of the industry and the company and I think I can add a lot of value in international, camps, mentoring Bill,[4] helping with strategy, etc. Bill and I compliment [*sic*] one another very well. Our offices are next to one another. We talk everyday. He's my protege and he's doing a great job." *Id.* at 358.

183.    Jeff Webb is the president of the International Cheer Union ("ICU"), a non-profit organization, and has held the position for approximately one decade.  (Ex. CR, Webb Decl. ¶11; Ex. DH, Webb Dep. (Day 2) 13:8-25.)

**Response: Disputed in part as incomplete and misleading.**

Undisputed that Webb is currently serving as President of the International Cheer Union ("ICU") and has held the position for the last ten years.

Disputed insofar as the assertion implies Webb has held the position for only one decade. Webb has held the position since the ICU's inception in 2007. *See* PSOF, ¶ 162.

184.    The ICU cheerleading's international governing body, and is recognized as such by the International Olympic Committee ("IOC").  (Ex. CR, Webb Decl. ¶11.)

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

185.    After Jeff Webb left his role as Varsity's CEO, he remained the president of the ICU, and continued to focus on the growth of cheerleading internationally, and gaining

---

[4] presumably, Varsity Spirit President Bill Seely.

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

recognition by the IOC.  (Ex. CR, Webb Decl. ¶5; Ex. DH, Webb Dep. (Day 2) 260:15-264:10;

Ex. DB, Noone Dep. (Day 2) 330:13-24.)

> **Response: Undisputed for purposes of summary judgment only.**

186.    Effective, December 31, 2020, Jeff Webb's employment with Varsity ended.  (Ex.

CR, Webb Decl. ¶10.)

> **Response: Undisputed for purposes of summary judgment only.**

187.    Jeff Webb remains the president of the ICU.  (Ex. CR, Webb Decl. ¶11.)

> **Response: Undisputed for purposes of summary judgment only.**

188.    After March 2016, Jeff Webb had limited involvement with Varsity's acquisitions.

(Ex. CR, Webb Decl. ¶6.)

> **Response: Disputed.**

See PSOF ¶¶ 94-100, 103, 148, 154-155.

189.    After March 2, 2016, Jeff Webb did not identify event producers as potential

targets for acquisitions.  (Ex. CR, Webb Decl. ¶6.)

> **Response: Disputed.**

See PSOF, ¶¶ 153-155; see also Ex. 109 at –4423.

190.    After March 2, 2016, Jeff Webb did not negotiate acquisitions.  (Ex. CR, Webb

Decl. ¶6.)

> **Response: Undisputed for purposes of summary judgment only.**

191.    After March 2, 2016, Jeff Webb did not direct Varsity employees to pursue

acquisitions or decline to pursue acquisitions.  (Ex. CR, Webb Decl. ¶6.)

> **Response: Undisputed for purposes of summary judgment only.**

192.    After March 2, 2016, Jeff Webb was "not in . . . a position of authority to approve

anything or . . . to make any operational decisions at all" and he would not "be authorizing any

acquisition or declining any acquisition."  (Ex. DH, Webb Dep. (Day 2) 217:14-218:18.)

> **Response: Disputed.**

After March 2, 2016, Mr. Webb remained Chairman of the Varsity Board of Directors

until July 2018. As a member of the Board of Directors it was Mr. Webb's responsibility to vote

to approve or disapprove all acquisitions over ███████. PSOF, ¶¶155.

193.    After March 2, 2016, while Jeff Webb was Chairman of the Board for Varsity

Brands, his authority over acquisitions was limited to that of a single board member.  (Ex. CQ,

Kalvelage Dep 207:24-209:7, 210:2-5.)

**Response: Undisputed for purposes of summary judgment only.**

194.    The only acquisitions that required board approval were those with a purchase

price above ███████.  (Ex. CQ, Kalvelage Dep. 209:19-210:1.)

**Response: Undisputed for purposes of summary judgment only.**

195.    After he was no longer CEO, but while Jeff Webb was Chairman of the Board for

Varsity Brands, he possessed just one vote, like any other board member and had no veto power.

(Ex. CQ, Kalvelage Dep. 209:4-12.)

**Response: Undisputed.**

196.    From November 2017 until Jeff Webb's employment at Varsity ended, it was

extremely rare for Jeff Webb to meet with Varsity Spirit's Chief Financial Officer, Pash Nangia.

(Ex. CY, Nangia Dep. 18:1-7, 21:7-17)  ("There was no need for me as the CFO of Varsity Spirit

to meet with Mr. [Webb] at a professional level.")  Any direct communications with Jeff Webb

were "absolutely casual" such as exchanging morning greetings.  (Id. at 21:14-17.)

**Response: Undisputed.**

197.    Jeff Webb did not participate in the creation of Varsity's rebate programs—the

Varsity Family Plan or the Network Agreements.  (Ex. DH, Webb Dep. (Day 2) 134:15-24.).

**Response: Disputed.**

*See* PSOF, ¶ 149.

198.    When Jeff Webb was Varsity's CEO, he was not regularly consulted regarding

Varsity's rebate programs.  (Ex. CZ, Newby Dep 389:1-13.) ("I don't recall speaking to Mr.

Webb about proposed changes to the Family [P]lan . . . I wouldn't say 'regularly consulted.'")

**Response: Disputed as incomplete and misleading.**

Disputed; the evidence cited contradicts the fact stated. *See* Defendants' Ex. CZ at 389:10-13: "I reported to Jeff at the time, so I would have run business decisions by him to get his feedback or thoughts." *See* Defendants' Exhibits CG, CH, CI, CJ, BW, BX, AV; *see also* Defendants' Statement of Undisputed Material Facts, ¶¶107, 108, 109; *see also* PSOF, ¶ 149.

199.    Jeff Webb is "very vaguely" familiar with Varsity's network agreements. (Ex. DH, Webb Dep. (Day 2) 135:2-12.)

**Response: Disputed.**

Mr. Webb advised Mr. Newby as to how many events a gym should be required to attend to receive a rebate under the Family Plan. *See* Resp.¶198.

200.    Jeff Webb was not involved in decisions regarding the number of events that a particular All Star gym must attend to participate in the Varsity Family Plan. (Ex. DH, Webb Dep. (Day 2) 160:21-161:7; Ex. CR, Webb Decl. at ¶7.)

**Response: Disputed.**

Mr. Webb advised Mr. Newby as to how many events a gym should be required to attend to receive a rebate under the Family Plan. *See* Resp., ¶198.

201.    Jeff Webb was not involved in determining the benefits received by the gyms under the Varsity Family Plan. (Ex. CR, Webb Decl. at ¶7; Ex. DH, Webb Dep. (Day 2) 161:8-162:20.)

**Response: Disputed.**

Mr. Webb advised Mr. Newby as to the size of the rebate gyms should be entitled to under the Family Plan. *See* Resp., ¶198.

202.    After he was no longer Varsity's CEO, Jeff Webb was not involved in the Varsity Family Plan or Network Agreements. (Ex. CR, Webb Decl. ¶7; Ex. DH, Webb Dep. (Day 2) 166:15-167:25 ("I wasn't in a position of authority at this point.").)

**Response: Disputed.**

Mr. Webb advised Mr. Newby as to how many events a gym should be required to attend to receive a rebate under the Family Plan. *See* Resp., ¶198.

203.    Jeff Webb has no knowledge of whether Varsity maintained a list of competitors' events.  (Ex. DH, Webb Dep. (Day 2) 239:11-13.)

**Response: Disputed.**

Webb received at least one email that listed a competitor's events and showed Varsity's "attack events" scheduled to be close in time and location to those of a competitor. **Ex. 150** at – 5328; PSOF ¶186.

204.    Jeff Webb is not aware of any strategy by Varsity to target competitors' events by placing Varsity events near the dates and locations of competitors' events.  Specifically, Jeff Webb is not aware of any policy or practice by Varsity of attacking competitors' events, or any practice referred to as "attack events."  (Ex. DH, Webb Dep. (Day 2) 236:20-237:14, 243:7-24.)

**Response: Disputed.**

*See* Resp., ¶203.

205.    Nobody ever sought Jeff Webb's recommendation about a practice of attempting to attract customers away from competitors' events to Varsity events by scheduling Varsity events close to those of Varsity's competitors.  (Ex. DH, Webb Dep. (Day 2) 238:2-238:22.)

**Response: Disputed.**

*See* Resp., ¶203.

206.    After Jeff Webb was no longer CEO, he was not involved in, and did not have any control or decisions-making authority with respect to, selecting locations or dates for Varsity's cheer competitions.  (Ex. CR, Webb Decl. ¶8.)

**Response: Undisputed for purposes of summary judgment only.**

207.    After Jeff Webb was no longer CEO, he did not have any control or decision-making authority with respect to whether any Varsity-produced cheer competitions awarded bids for the Summit, or any other Varsity cheer competition, end-of-season or otherwise.  (Ex. CR, Webb Decl. ¶8.)

**Response: Disputed.**

*See* Resp., ¶ 141, 171, 209; *see also* PSOF, ¶¶ 157, 158.

208.    Jeff Webb has never been a member of USASF's Board of Directors or USASF's Sanctioning Committee.  (Ex. CR, Webb Decl. ¶9; Chadwick Dep. 385:16-386:11.)

**Response: Undisputed for purposes of summary judgment only.**

209.    Jeff Webb has never had authority over USASF's selection of events that can award bids to USASF's The Cheerleading Worlds ("Worlds").  (Ex. CR, Webb Decl. ¶9.)

**Response: Disputed.**

Disputed that Webb's unfounded statement refutes the evidence that he corresponded with USASF officials on a regular basis, either directly or indirectly through other Varsity executives concerning competition guidelines, policies and procedures, and general business strategy. **Ex. 265** at –3436]; **Ex 15** [Chadwick Dep.] at 392:4-18 (Webb was someone for USASF to call on for advice on running USASF affairs), 386:12-25 ("Q. How frequently did you talk to Mr. Webb after the formal formation of USASF? A. On an as-needed basis, maybe sometimes weekly, maybe sometimes once a month or every six months. Q. Why would you need to talk to him on an as-needed basis? A. Very knowledgeable, a great advisor, seemed to be able to provide me insights that I was not able to -- to reach on my own. Q. Did you talk to him about USASF policies and procedures? A. When I needed his advice, yes.")

210.    Certain Varsity employees emailed Jeff Webb with proposals to change USASF's allocation of Worlds' bids, but those proposals were not implemented.  (Ex. CF, LeTard Dep. 350:6-352:20.) (explaining that Mr. LeTard proposed a change to Jeff Webb, but it "never went to execution . . . it was just a brainstorm concept, idea.")

**Response: Disputed.**

Disputed as misleading, inaccurate, and unsupported by evidence. Defendants refer to employees (plural) that made proposals (plural) that were not implemented, but the cite to only one incident.

211.    Jeff Webb never directed any Varsity employee or USASF employee or director to effectuate a change in USASF's criteria for selecting events that can award bids to Worlds.  (Ex. CR, Webb Decl. ¶9.)

**Response: Disputed.**

Webb provided USASF CEO Jim Chadwick and Varsity manager Tres LeTard with input on how World's bids should be awarded. **Ex. 15 [**Chadwick Dep.] at 386:12-25, *See* **Ex. 266** at – 0541]; **Ex. 262** at –3719]; **Ex. 13 [**LeTard Dep.] at 354:5-12.

212.    Jeff Webb did not express opposition to non-Varsity event producers having the ability to award bids to Worlds.  (Ex. CS, USASF_00039789 (Chadwick Ex. 56 -789); Ex. A, Chadwick Dep. 485:22-486:14 (explaining that Jeff Webb expressed that he was "fine with adding 2 or 3 [non-Varsity] event producers to the 42 approved Worlds bid givers.").)

**Response: Disputed.**

Disputed that Webb did not express opposition.  **Ex. 132** at – 4139]; **Ex. 24** [Fowlkes Dep.] at 215:23-25.

213.    USASF President Jim Chadwick occasionally sought advice from Jeff Webb because he viewed Jeff Webb as an expert and leader in competitive cheerleading.  (Ex. A, Chadwick Dep. 386:12-25 (describing Jeff Webb as "very knowledgeable, a great advisor, seemed to be able to provide me insights that I was not able to – reach on my own."), 390:2-16 (seeking advice because "Jeff Webb is an expert at creating cheerleading competitions.").)

**Response: Undisputed.**

214.    USASF President Jim Chadwick was free to accept or disregard Jeff Webb's advice.  (Ex. A, Chadwick Dep. 492:15-493:12 (Q: "So as USASF president, you felt free to reject the requests from Jeff Webb?" A: "Yes.").)

**Response: Disputed as misleading.**

Jim Chadwick was a Varsity employee throughout his entire tenure at USASF. *See* **Ex. 15 [**Chadwick Dep.] at 41:14-19). Mr. Chadwick received a payment of approximately ▮▮▮▮▮ from the Varsity Spirit Employee Stock Ownership Plan ("ESOP") when Charlesbank purchased Varsity in 2014. **Ex. 267** at –5726; *see also* **Ex. 15** [Chadwick Dep.] at 274:22-275).

215.    Jeff Webb never told USASF President Jim Chadwick that the USASF needed to take action for Varsity's financial benefit.  (Ex. A, Chadwick Dep. 493:3-7.)

**Response: Disputed**.

Disputed that Webb did not request Chadwick act on behalf of USASF for Varsity's financial benefit. **Ex. 212** at –2020] (September 5, 2017 email from Webb that he will let Chadwick "know that some things are going to have to be different in that we are tired of making our competitors successful and then having to overpay for them,"); **Ex. 263** at –0326. See also, Resp., ¶211.

216.   The ICU hosts its own World Championship at Disney World, typically on back-to-back weekends with USASF's Worlds.  (Ex. A, Chadwick Dep. 484:12-23.)

**Response: Undisputed.**

217.   USASF's Worlds' inclusion of international teams, and the fact that the ICU hosts a World Championship at the same location and back-to-back with USASF's Worlds were both reasons that USASF would communicate with Jeff Webb regarding issues relating to Worlds. (Ex. A, Chadwick Dep. 481:20-482:15, 483:14-485:10.)

**Response: Disputed.**

218.   USASF sought Jeff Webb's input, as ICU president, regarding "USASF efforts to grow the sport and to coordinate with Olympic direction."  (Ex. CT, USASF_00107876 (Chadwick Ex. 68 -878); Ex. A, Chadwick Dep. 490:9-492:10.)

**Response: Undisputed.**

VII.   **BAIN**

219.   No Bain-affiliated individual was on the board of managers of BCPE Hercules GP, LLC until July 30, 2018.  No Bain-affiliated individual has ever served on the boards of the Varsity Defendants.  No Bain-affiliated individual has ever served as an officer of the Varsity Defendants.  (Ex. CM, Cotton Decl. ¶6-8; see also Ex. CK, BAIN00067980, -983 (providing that Josh Bekenstein, Ryan Cotton, Kim McCaslin, and Tom O'Rourke would become members of the BCPE Hercules GP, LLC Board of Managers on July 30, 2018); Ex. CL, Cotton Dep. 15:5-6.)

**Response: Disputed as incomplete and misleading.**

In Bain's 30(b)(6) deposition, Bain stated that the board of the holding company, BCPE Hercules Holdings was the only board that governed the Varsity defendants. *See, e.g.*, **Ex. 21** [Bain 30(b)(6) Dep.] at 90:22-93:14. The structure was established such that the only governing board for the Varsity defendants was at the holding company level. *See id.* at 91:12-13 ("The [Varsity Brands] board of directors is generally considered to be the board of the BCPE Hercules Holdings, LP."). Thus, when asked if Bain held four seats on the "Varsity board of directors," Bain answered "yes." *Id.* at 90:22-91:1. *See also* **Ex. 299**.

220.    Bain has never conducted a cheer competition or a cheer camp or sold cheer apparel.  (Ex. CM, Cotton Decl. ¶9.)

**Response: Undisputed for purposes of summary judgment only.**

221.    No Bain officer or Bain-affiliated individual, including the Bain officers who served on the board of the Holding Company, had any direct involvement in any of the conduct that Plaintiffs label anticompetitive.

**Response: Disputed.**

Like Charlesbank before it, Bain was instrumental in securing financing to fund further acquisitions. For example, in 2020, Bain's "capital markets team" secured roughly $180 million in financing. *See* **Ex. 281** (David Spiller of Bain emails 10 Bain individuals, thanking "the capital markets team for getting us to a great result here." Bain's Ryan Cotton disclosed that the money could be used for additional acquisitions, stating: "Ready to go on a buying spree!" *Id.*

Bain was also intimately involved in acquisition strategy. *See, e.g.,* **Ex. 21** [Bain 30(b)(6) Dep.] at 108:18–110:2 ("There is also a regular dialogue about potential targets that [Varsity] management may want to think about acquiring."); *id.* at 109:17-109:21; **Ex. 269** at –1028 (Bain email discussing thorough review of Varsity acquisitions and putting in place "more routine review of M&A pipeline"); **Ex. 269** at –8196–97(internal Bain email discusses ways to "provide more structure and framing for Adam around M&A to help sort through and prioritize different opportunities"). Bain had control over decisions with respect to significant acquisitions. *See, e.g.*, **Ex. 21** [Bain 30(b)(6) Dep.] at 109:17-109:21 ("The management team is free to make

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

acquisitions beneath certain thresholds without consulting the board. Above that threshold, they're required to obtain the approval of the board of directors."); **Ex. 12** [Elza Dep.] at 51:13-52:12 ("During acquisitions, our strategy was we put together on paper what we wanted to go – companies we looking at, work with folks to get – prepare that, and that got presented to Bain and they ultimately approved those transactions. . . . They were – they were ultimately presented to Bain for final buy-off, yes.").

Bain was involved with and directed Varsity Brands' acquisitions. Saron Tesfalul, a Bain principal, was the "leader" of Varsity's merger efforts. *See* **Ex. 234** at –8442 (Bain Managing Director Ryan Cotton writes, "Please meet Saron Tesfalul, one of our star Principals who is leading the M&A efforts of Varsity Brands."). Indeed, Tesfalul did so without the participation of Varsity management. *See* **Ex. 235** at –1344] (Tesfalul providing communication with investment banker arranging acquisition by Varsity's Herff Jones business segment to several other Bain executives, but no Varsity executives).

During Bain's ownership of Varsity, although most of Varsity's competitors had already been acquired and Varsity enjoyed substantial monopoly power by 2018, Bain continued to execute acquisitions to eliminate nascent competitors and maintain Varsity's monopoly power. *See, e.g.*, **Ex. 236** at –6944, –6960-61 (executed asset purchase agreement for Varsity's acquisition of B2 Cheer and Dance, dated January 9, 2019); **Ex. 237** at –8668] (confirming that Varsity viewed the acquisition of B2 Cheer and Dance, a competitor in the Cheer Camps Market,



**Ex. 238** at –1156]

222.     Bain had no involvement with USASF. (Ex. CL, Cotton Dep. 123:24-124:9 ("Q. And have you had any involvement in decisions related to the USASF? A. I have not. Q. And do you know if anyone else at Bain Capital has had involvement in decisions related to the USASF?

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

A. I don't believe that we have.").)

**Response: Undisputed for purposes of summary judgment only.**

223.   Bain and its individual affiliates were not involved in setting the terms of the

Varsity Family Plan or negotiating Varsity Network Agreements.  (Ex. CM, Cotton Decl. ¶10; see

also Ex. CL, Cotton Dep. 123:12-23 ("Q. Are you familiar with rebate or discount programs

offered by Varsity Spirit to All Star Cheer or school cheer teams? A. I think some version of that

as been mentioned conceptually once or twice, but I'm very far from the details. Q. Do you know

if anyone else at Bain Capital may have had more involvement in those discount programs? A. I

would imagine not. We tend not to involve ourselves in line pricing decisions.").)

**Response: Disputed.**

Bain was actively involved in setting the terms of the Varsity Family Plan, including the

changes that were instituted in 2018. *See, e.g.*, **Ex. 12** [Elza Dep.] at 56:2-57:17.

224.   Bain and its individual affiliates had no involvement with Varsity's Squad

Credentialing Program.  (Ex. CM, Cotton Decl. ¶11).

**Response: Undisputed for purposes of summary judgment only.**

225.   Bain and its individual affiliates had no involvement with the scheduling of

Varsity's cheer competitions.  (Ex. CM, Cotton Decl. ¶12).

**Response: Undisputed for purposes of summary judgment only.**

226.   Bain did not provide funding for any acquisition by Varsity relating to

cheerleading.  (Ex. CM, Cotton Decl. ¶13; see also Ex. CL, Cotton Dep. 30:15-31:3 ("Q. Would

Bain Capital also provide capital for acquisitions, if necessary? A. We surely provide advice on

the best way to obtain that capital. It is not always the case that our own money is the most

efficient means of financing things like that. And so I think part of the strategic value we add is

access to deep and wide capital markets that allow us to steer the company to the best possible,

lowest cost capital solution, whatever that may be at the moment."); id. at 122:17-123:7.)

**Response: Disputed as incomplete and misleading.**

The cited testimony does not support the asserted fact. Asked directly if Bain would

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

provide capital for Varsity acquisitions, Mr. Cotton responded only that "We surely provide advice on the best way to obtain that capital," leaving the question unanswered. Moreover, the evidence show that Bain executives played an active role in determining what acquisitions Varsity would make, securing funding for those acquisitions, and acquiring companies relating to cheerleading in order to protect and maintain Varsity's monopoly. *See supra*, Plaintiffs' response to Bain's SUF #221.

227.    Bain has never owned, directly or indirectly, the Varsity Defendants. (Ex. CM, Cotton Decl. ¶5.)

**Response: Disputed.**

Ryan Cotton's declaration that Bain has never owned, directly or indirectly, the Varsity Defendants is directly contradicted by Bain's own filings in this case. *See, e.g.*, ECF No. 60-1 at 3 ("[A]s a matter of law, an entity such as Charlesbank or Bain is legally incapable of "conspiring" with an entity that it owns. . . . Nor is it possible as a matter of law for an entity to "conspire" with an officer or employee of a subsidiary entity.").

Numerous sworn deposition testimony further confirm that Bain purchased Varsity, including the Varsity Defendants, in 2018: *See, e.g.*, **Ex. 43** [O'Rourke Dep.] at 17:15-18:4 ("Q. Sure. Well, let's start with the July 2018 time period. Is that when -- is that when Bain Capital acquired the Varsity Brands conglomerate? A. Around that time frame. I don't recall the specifics of when the transaction closed, but that seems about right. Q. Okay. And Bain acquired its majority stake from Charlesbank. Is that consistent with your recollection? A. Yes.");

228.    In connection with his or her involvement with Varsity, no employee of Bain did anything that was plainly contrary to the interests of Varsity yet nonetheless advantageous to Bain.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

229.    On July 30, 2018, BCPE Hercules Holdings, LP (the "Holding Company"), an

entity owned by certain Bain-advised funds, indirectly acquired the Varsity entities that are Defendants in this litigation.  The entities between the Holding Company and the highest-level Varsity Defendant are called BCPE Hercules VB Topco, Inc.; BCPE Hercules VB Intermediate Holdings, Inc.; BCPE Hercules VB Holdings, Inc.; Hercules VB Holdings, Inc.; and Varsity Brands Holding Co., Inc.  (Ex. CM, Cotton Decl. ¶¶3, 4.)

**Response: Disputed.**

Defendants' implied and embedded assertion that "Bain-advised funds" were the only legal owners of BCPE Hercules Holdings, LP is vague and unclear, as Bain has declared in filings and in numerous deposition testimony that it was Bain that acquired and owned Varsity. *See supra*, Pls' Response to Defs' SUF # 227.

230.    No acquisition Plaintiffs label anticompetitive occurred on or after July 30, 2018.

**Response: Disputed**

After July 30, 2018, during Bain's ownership of Varsity, Bain continued to execute acquisitions to eliminate nascent competitors, foreclose rivals, and maintain Varsity's monopoly power. *See, e.g.*, **Ex. 236** at –6944, –6960-61 (executed asset purchased agreement for Varsity's acquisition of B2 Cheer and Dance, dated January 9, 2019); **Ex. 237** at –8668] at –8669 (Dec. 2018) (confirming that Varsity viewed the acquisition of B2 Cheer and Dance, a competitor in the Cheer Camps Market, as an opportunity to ███████████████████████████ ███████████ and increase participation at Varsity's national competitions in the School Cheer Market); *id.* ██████████████████████████████████ ███████████████████████████████ ███████); **Ex. 238** at –1156 (Feb. 2019) (confirming that Varsity attempted to increase its share in the Cheer Camps Market by acquiring ████████████████. and ██████████ ████████████████████████████████████████ ██████); *id.* (noting that the acquisition would provide █████████████████████ █████████████████████████████ and would ██████████████ ██████████

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

VII.        CHARLESBANK

231.    Charlesbank-affiliated individuals served on the board of managers of the Varsity
Defendants' parent company beginning in 2014.  Only one Charlesbank-affiliated individual has
been on the board of managers of the Varsity Defendants' parent company since July 30, 2018.
(Ex. CO, Janower Decl. ¶¶3, 6; see also Ex. CK, BAIN00067980, -983 (providing that Andrew
Janower was the only "Charlesbank Manager" on the BCPE Hercules GP, LLC Board of
Managers installed on July 30, 2018); Ex. CN, Janower Dep. 185:11-15.)

**Response: Undisputed for purposes of summary judgment only.**

232.    Charlesbank and its individual affiliates did not interact with USASF.  (Ex. CO,
Janower Decl. ¶8; see also Ex. CN, Janower Dep. 81:6-82:2 ("Q. Are you familiar with an entity
that goes by the initials USASF?  A. Vaguely, yes. Q. Were personnel who worked at USASF
employees of Varsity Brands . . . or related companies?  A. It's not – not something I would have
been familiar with in my capacity as a director of the parent company.").)

**Response: Disputed.**

The cited evidence fails to provide support for the asserted fact.

233.    Charlesbank and its individual affiliates were not involved in setting the terms of
the Varsity Family Plan or negotiating Varsity Network Agreements.  (Ex. CO, Janower Decl. ¶9;
see also Ex. CP, Beer Dep. 144:24-145:1 ("I know [the Varsity Family Plan is] like a frequent
flyer-type loyalty program, but I don't know how it works.").)

**Response: Undisputed for purposes of summary judgment only.**

234.    Charlesbank and its individual affiliates had no involvement with Varsity's Squad
Credentialing Program.  (Ex. CO, Janower Decl. ¶10.)

**Response: Undisputed for purposes of summary judgment only.**

235.    Charlesbank and its individual affiliates had no involvement with the scheduling of
Varsity's cheer competitions.  (Ex. CO, Janower Decl. ¶11.)

**Response: Undisputed for purposes of summary judgment only.**

236.    Charlesbank did not provide funding for any acquisition by Varsity relating to cheerleading. (Ex. CO, Janower Decl. ¶12; see also Ex. CN, Janower Dep. 141:9-20 ("Q. Mr. Janower, was Charlesbank involved with any of these acquisitions? A. Not -- I mean, above and beyond our capacity as directors of the corporation, not to my recollection. Q. Did Charlesbank arrange any of the financing associated with these acquisitions? A. Uh-hmm. Well, in the ordinary course of business, Charlesbank, as a private equity investor and in our capacity as Board members, we do help our companies raise capital to do things like acquisitions. ").

**Response: Disputed.**

The cited testimony directly contradicts the fact stated. Further, Charlesbank raised funding for Varsity's use, "the intent of which was to help fund acquisitions" and which resulted in considerable growth of Varsity's market share. *See* PSOF ¶¶199-201.

Charlesbank was instrumental in securing over $100 million in financing for the express purpose of funding Varsity acquisitions. *See* **Ex. 29** [Charlesbank 30(b)(6) Dep.] at 137:25–138:03 ██████████████████████████████████████████████

██████████████████████████ In 2015, for example, Charlesbank secured ████████ to fund Varsity's acquisition of Project Cloth, and ██████████ to replenish the cash used to acquire Jam Brands. *See* **Ex. 29** [Charlesbank 30(b)(6) Dep.] at 150:9–151:19; *see also* **Ex. 288** at –3480 ("Company will retain firepower to complete acquisitions - Varsity Brands will retain ample acquisition capacity, with the ability to acquire over ██████ in EBITDA - Simultaneously plan to upsize maximum ABL capacity to ████████"). After Charlesbank secured the financing for Varsity's acquisitions, Charlesbank directed Varsity to use the money on acquisitions. *See* **Ex. 223** at –1047 (email from Charlesbank's Josh Beer to Varsity's new CEO, "Well, we've got the dough for our acquisitions now…let's make it sweat!").

237.    Charlesbank has never conducted a cheer competition or a cheer camp or sold cheer apparel. (Ex. CO, Janower Decl. ¶7.)

**Response: Undisputed for purposes of summary judgment only.**

238.    Charlesbank has never owned, directly or indirectly, the Varsity Defendants. (Ex.

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

CO, Janower Decl. ¶5.)

**Response: Disputed.**

Andrew Janower's declaration that Charlesbank has never owned, directly or indirectly, the Varsity Defendants is directly contradicted by Charlesbank's own filings in this case. *See, e.g.*, Memorandum of Law in Support of Motion to Dismiss of Defendants Charlesbank Capital Partners, LLC, and Bain Capital Private Equity, LLC, ECF No. 60-1 at 3 ("[A]s a matter of law, an entity such as Charlesbank or Bain is legally incapable of "conspiring" with an entity that it owns. . . . Nor is it possible as a matter of law for an entity to "conspire" with an officer or employee of a subsidiary entity.").

Deposition testimony further confirms that Charlesbank acquired Varsity, including the Varsity Defendants, in 2014: *See, e.g.*, **Ex. 29** [Charlesbank 30(b)(6) Dep.] at 25:1-4 ("[I]s it fair to say that ·the first time that Charlesbank acquired an ownership interest in Varsity was in 2014? A. Correct.").

239.     No Charlesbank officer or affiliate, including the Charlesbank officers who served on the board of the Holding Company, had any direct involvement in any of the conduct that Plaintiffs label anticompetitive.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. There is substantial evidence showing that Charlesbank had substantial involvement in Varsity's anticompetitive scheme, including, among other things, by providing critical funding for Varsity to pursue its anticompetitive acquisition strategy. *See* **Ex. 229** (Internal Acquisition Memo that lists eight entities that were acquired from 2015 to 2018 during Charlesbank's control over Varsity, including JAM Brand and Epic); **Ex. 28** [Janower (Individual) Dep.] at 66:12–66:19 (referring to **Ex. 285** at –1040) ("Q. And what's the second bullet point there? A. "Added capabilities and consolidated key markets through acquisition." Q.

And why -- do you agree that that was part of the platform development at that time? A. Well, we did -- we did make several acquisitions while we owned the company in this period."); **Ex. 286** (email showing that Charlesbank independently reviewed the "transaction pipeline" of potential acquisitions for Varsity, including Jam Brands); **Ex. 213** at –1305 (Showing that Varsity was required to seek Charlesbank's independent approval for any acquisition over ███████, and the boards' approval (of which Charlesbank had contractually mandated control) for any acquisition over ███████.); *See* **Ex. 287** (email showing Josh Beer of Charlesbank working independently with Goldman Sachs to announce the acquisition of Jam Brands, which "cement[ed] Varsity Spirit's #1 position in cheerleading," and requiring Charlesbank's "final" signoff to act.); *See* **Ex. 29** [Charlesbank 30(b)(6) Dep.] at 137:25–138:03 ███████████████ ████████████████████████████████████████████████████

**Ex. 29** [Charlesbank 30(b)(6) Dep.] at 150:9–151:19 (explaining that Charlesbank secured ███ to fund Varsity's acquisition of Project Cloth, and ███████ to replenish the cash used to acquire Jam Brands0; **Ex. 288** at –3480 ("Company will retain firepower to complete acquisitions - Varsity Brands will retain ample acquisition capacity, with the ability to acquire over ███████ in EBITDA - Simultaneously plan to upsize maximum ABL capacity to ███████"); **Ex. 223** at –1047 (email from Charlesbank's Josh Beer to Varsity's new CEO, "Well, we've got the dough for our acquisitions now…let's make it sweat!"); **Ex. 271** at –9166] (Kalvelage is asked to review and approve the acquisition of Spirit Celebration, including an in-depth explanation of how the acquisition will affect the Family Plan); **Ex. 272** at –4818 (Kalvelage approves of the acquisition of Cheer Celebration); **Ex. 273** at –7930] (December 20, 2017 Varsity email to Charlesbank's Andrew Janower, Brandon White, and Kim Davis seeking approval for the acquisition of Epic, a producer of Cheer Competitions and manufacturer of Cheer Apparel, which Varsity did acquire in 2018").

Within just over three years, Varsity, with Charlesbank's funding and direction, had acquired its largest competitors in the Cheer Competition Market, including Jam Brands, Aloha Productions, Spirit Celebration, All Things Cheer, Mardi Gras Nationals, Jam Spirit Group, Sea

to Sky, and Epic. *See* **Ex. 289** at –9041-9042; **Ex. 229** at –5991]; **Ex. 47** [White Dep.] at 276:25-277:16; **Ex. 282** at –7575. (Summary of Charlesbank's accomplishments while owners of Varsity include, ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████ By the time this spree was finished, Varsity controlled approximately 85% of the Cheer Competitions Market. **Ex. 1** [Netz Rep. at 52]; **Ex. 85** at -6985; **Ex. 20** [Cota Dep.] at 53:15–21]; **Ex. 86** at -5236.

240.    In connection with his or her involvement with Varsity, no employee of Charlesbank did anything that was plainly contrary to the interests of Varsity yet nonetheless advantageous to Charlesbank.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

241.    In December 2014, certain Charlesbank-advised funds acquired a majority of the equity in an entity called Hercules VB Holdings, Inc. (the "Holding Company"). The Holding Company, through an intermediate downstream entity called Varsity Brands Holdings Co., Inc., indirectly acquired the Varsity entities that are Defendants in this litigation. (Ex. CO, Janower Decl. ¶¶3-4.)

**Response: Disputed.**

Defendants' implied assertion that "Charlesbank-advised funds" were the only legal owners of Hercules VB Holdings, Inc. is vague and unclear, as Charlesbank has declared in filings and in numerous deposition testimony that it was Charlesbank that acquired and owned Varsity. *See* Resp ¶238.

242.    For a brief period of time in 2017, a Charlesbank officer served as CEO of Varsity Brands. (Ex. CQ, Kalvelage Dep. 83:12-18; 163:12-16-166:19.)

**Response: Undisputed.**

243.    Charlesbank did not negotiate, direct, or fund any of the acquisitions plaintiffs

label anticompetitive.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. *See* Resp ¶239.

## IX.    MISCELLANEOUS

244.    The proposed class period begins December 10, 2016. (Compl. ¶29; ECF No. 387, Pls.' Motion for Class Certification, p. 1-2.)

**Response: Undisputed.**

245.    Neither Plaintiff paid Varsity for anything in the state of Tennessee.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Plaintiffs and the class made many purchases indirectly through Varsity's website, which were processed in Tennessee. **Ex. 19**, (Cherasaro Depo.) at 78:19-79:25.

246.    Plaintiffs have not notified the attorneys general of Arizona, Connecticut, Hawaii, Minnesota, Nevada and Utah.

**Response: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Under *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, federal procedural rules apply. 559 U.S. 393, 399–400, (2010)  ("And like the rest of the Federal Rules of Civil Procedure, Rule 23 *automatically* applies in all civil actions and proceedings in the United States district courts."). Accordingly, Plaintiffs are not required to follow the procedural notification rules of the aforementioned states.

Dated: September 15, 2023

Respectfully submitted,

By:_____/s/ Joseph R. Saveri_____
        Joseph R. Saveri

Joseph R. Saveri*
Steven N. Williams*
Ronnie Seidel Spiegel*+
Kevin E. Rayhill*
Elissa A. Buchanan*
David Seidel*
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
rspiegel@saverilawfirm.com
krayhill@saverilawfirm.com
eabuchanan@saverilawfirm.com
dseidel@saverilawfirm.com

Van Turner Jr. (TN Bar No. 22603)
**TURNER FEILD, PLLC**
2650 Thousand Oaks Blvd., Suite 2325
Memphis, Tennessee 38118
Telephone: (901) 290-6610
Facsimile: (901) 290-6611
VTurner@TurnerFeildLaw.com

Richard M. Paul III*
Sean R. Cooper*
Ashlea Schwarz*
**PAUL LLP**
601 Walnut, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
rick@paulllp.com
sean@paulllp.com
ashlea@paulllp.com

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

Jason S. Hartley*
Fatima Brizuela*
**HARTLEY LLP**
101 West Broadway, Suite 820
San Diego, CA 92101
Telephone: (619) 400-5822
hartley@hartleyllp.com
brizuela@hartleyllp.com

Daniel E. Gustafson*
Daniel C. Hedlund*
Daniel J. Nordin*
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com

* Admitted pro hac vice

+Located in Washington State

*Attorneys for Individual and
Representative Plaintiffs*

# Appendix A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

**JESSICA JONES. et al.,**

        Plaintiffs,

v.

**VARSITY BRANDS. LLC. et al.**

        Defendants.

Case No. 2:20-cv-02892-SHL-tmp

**JURY DEMAND**

---

## PLAINTIFFS' OBJECTIONS TO EVIDENCE

**PLAINTIFFS' OBJECTIONS TO EVIDENCE**

Plaintiffs Jessica Jones and Christina Lorenzen ("Plaintiffs") hereby submit the following

objections to evidence submitted by Defendants Varsity Brands, LLC ("Varsity Brands"); Varsity

Spirit, LLC ("Varsity Spirit"); Varsity Spirit Fashion & Supplies, LLC ("Varsity Spirit Fashion")

(collectively with Varsity Brands and Varsity Spirit, "Varsity"); U.S. All Star Federation, Inc.

("USASF"); Jeff Webb; Charlesbank Capital Partners LLC ("Charlesbank"); and Bain Capital

Private Equity ("Bain") (together with Varsity, USASF, Jeff Webb, and Charlesbank,

"Defendants") in support of Defendants' Joint Motion for Summary Judgement (ECF No. 471)

and individual motions for summary judgment from Bain (ECF No. 472), Charlesbank (ECF No.

473), USASF (ECF No. 469), and Jeff Webb (ECF No. 467). Plaintiffs reserve all rights to object

to evidence introduced at trial.

| No. | Defendants Evidence | Objections |
|---|---|---|
| 1 | Ex. A - Chadwick Dep. 34:8-25. | Hearsay. to the extent the witness attempts to report or describe the intent of the USASF Board of Directors or of Varsity. Fed. R. Evid. 802. Lack of personal knowledge. Fed. R. Evid. 602. Speculative. *See Simmerman v. Ace Bayou Corp..* No. 5:14-382-DCR. 2016 WL 109944. at *3 (E.D. Ky. Jan. 8. 2016) ("Speculative testimony is inadmissible for lay and expert witnesses alike."). |
| 2 | Ex. A - Chadwick Dep. 58:1-9 | Hearsay. to the extent the witness attempts to speak for "Steve." Fed. R. Evid. 802. Lack of personal knowledge. Fed. R. Evid. 602. Speculative. *See Simmerman v. Ace Bayou Corp..* No. 5:14-382-DCR. 2016 WL 109944. at *3 (E.D. Ky. Jan. 8. 2016) ("Speculative testimony is inadmissible for lay and expert witnesses alike."). |
| 3 | Ex. A - Chadwick Dep. Tr. 58:20- 60:5. | Hearsay. to the extent the witness attempts to report or describe the intent of the USASF Board of Directors or of Varsity. Fed. R. Evid. 802. Lack of personal knowledge. Fed. R. Evid. 602. Improper expert testimony from lay witness re comparisons to professional sports. Fed. R. Evid. 701. Speculative. *See Simmerman v. Ace Bayou Corp..* No. 5:14-382-DCR. 2016 WL 109944. at *3 (E.D. Ky. Jan. 8. 2016) ("Speculative testimony is inadmissible for lay and expert witnesses alike."). |

| No. | Defendants Evidence | Objections |
|---|---|---|
| 4 | Ex. A - Chadwick Dep. 60:6-22. | Hearsay. to the extent the witness attempts to report or describe the intent of the USASF Board of Directors or of Varsity. Fed. R. Evid. 802. Lack of personal knowledge. Fed. R. Evid. 602. Speculative. *See Simmerman v. Ace Bayou Corp..* No. 5:14-382-DCR. 2016 WL 109944. at *3 (E.D. Ky. Jan. 8. 2016) ("Speculative testimony is inadmissible for lay and expert witnesses alike."). |
| 5 | Ex. A - Chadwick Dep. 121:21-122:11. | Hearsay. Fed. R. Evid. 802. Lack of personal knowledge. Fed. R. Evid. 602. Speculative. *See Simmerman v. Ace Bayou Corp..* No. 5:14-382-DCR. 2016 WL 109944. at *3 (E.D. Ky. Jan. 8. 2016) ("Speculative testimony is inadmissible for lay and expert witnesses alike."). |
| 6 | Ex. A - Chadwick Dep. 175:1-15. | Hearsay. Fed. R. Evid. 802. Lack of personal knowledge. Fed. R. Evid. 602. Speculative. *See Simmerman v. Ace Bayou Corp..* No. 5:14-382-DCR. 2016 WL 109944. at *3 (E.D. Ky. Jan. 8. 2016) ("Speculative testimony is inadmissible for lay and expert witnesses alike."). |
| 7 | Ex. A - Chadwick Dep. 447:14-448:1. | Hearsay. Fed. R. Evid. 802. Lack of personal knowledge. Fed. R. Evid. 602. Speculative. *See Simmerman v. Ace Bayou Corp..* No. 5:14-382-DCR. 2016 WL 109944. at *3 (E.D. Ky. Jan. 8. 2016) ("Speculative testimony is inadmissible for lay and expert witnesses alike."). |
| 8 | Ex. A - Chadwick Dep. Tr. 482:10–15. | No foundation has been laid for this testimony; lack of personal knowledge. Fed. R. Evid. 602. Speculative. *See Simmerman v. Ace Bayou Corp..* No. 5:14-382-DCR. 2016 WL 109944. at *3 (E.D. Ky. Jan. 8. 2016) ("Speculative testimony is inadmissible for lay and expert witnesses alike."). |
| 9 | Ex. A - Chadwick Dep. Tr. 482:25–483:3. | Hearsay. Fed. R. Evid. 802. Lack of personal knowledge. Fed. R. Evid. 602. Speculative. *See Simmerman v. Ace Bayou Corp..* No. 5:14-382-DCR. 2016 WL 109944. at *3 (E.D. Ky. Jan. 8. 2016) ("Speculative testimony is inadmissible for lay and expert witnesses alike."). |
| 10 | Ex. A - Chadwick Dep. 485:22-486:14 | Hearsay. Fed. R. Evid. 802. to the extent the witness attempts to report or describe Mr. Webb's statements or thoughts; lack of personal knowledge. Fed. R. Evid. 602. Speculative. *See Simmerman v. Ace Bayou Corp..* No. 5:14-382-DCR. 2016 WL 109944. at *3 (E.D. Ky. Jan. 8. 2016) ("Speculative testimony is inadmissible for lay and expert witnesses alike."). |

| No. | Defendants Evidence | Objections |
|---|---|---|
| 11 | Ex. A - Chadwick Dep. 493:3-7 | Hearsay. to the extent the witness attempts to report or describe what Mr. Webb did or did not say. Fed. R. Evid. 802. |
| 12 | Ex. B - USASF_0003246 | Exhibit is unsigned. No foundation. |
| 13 | Ex. C - USASF_00028673 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. |
| 14 | Ex. F - USASF_00032439 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. |
| 15 | Ex. G - Seely Dep. Tr. Excerpts 43:2–7. | Lacks relevance with regard to the purported statement of fact "After March 2. 2016. neither John Nichols nor Bill Seely reported to Jeff Webb" because the cited testimony does not say that Mr. Seely stopped reporting to Mr. Webb. only that he reported to Adam Blumenfeld once Mr. Blumenfeld took over as CEO. Fed. R. Evid. 401, 402. |
| 16 | Ex. I - Stangle Dep. 86:7-20. | Lacks personal knowledge. Fed. R. Evid. 602. |
| 17 | Ex. J - Peterson Vol. 1 Dep. Tr. 31:18-32:2. | Lacks personal knowledge. Fed. R. Evid. 602. |
| 18 | Ex. J - Peterson Vol. 1 Dep. Tr. 52:14-53:12. | Contains inadmissible hearsay. Fed. R. Evid. 802. |
| 19 | Ex. N - USASF_00056250 | Contains inadmissible hearsay. Fed. R. Evid. 802. |
| 20 | Ex. P - USASF_00081398 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. |
| 21 | Ex. R - USASF_00027858 | Contains inadmissible hearsay. Fed. R. Evid. 802. |
| 22 | Ex. S - VAR00319008 | Contains inadmissible hearsay. Fed. R. Evid. 802. |
| 23 | Ex. T - USASF_00030547 | Contains inadmissible hearsay. Fed. R. Evid. 802. |
| 24 | Ex. U - USASF_00032433 | Contains inadmissible hearsay. Fed. R. Evid. 802. |
| 25 | Ex. V - USASF_00055929 | Contains inadmissible hearsay. Fed. R. Evid. 802. |
| 26 | Ex. W - USASF_00026548 | Contains inadmissible hearsay. Fed. R. Evid. 802. |
| 27 | Ex. X - USASF_00085198 | Contains inadmissible hearsay. Fed. R. Evid. 802. |
| 28 | Ex. AA - USASF_00019474 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. |
| 29 | Ex. AB - USASF_00019528 | Exhibit supported only by counsel's affidavit. not otherwise authenticated. Fed. R. Evid. 901. |

| No. | Defendants Evidence | Objections |
|---|---|---|
| 30 | Ex. AC - USASF_00020057 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. |
| 31 | Ex. AD - Collective Discovery Docs | Exhibit supported only by counsel's affidavit. not otherwise authenticated. Fed. R. Evid. 901. |
| 32 | Ex. AE - USASF_00012988 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. Inadmissible character evidence by using an instance of conduct to say that USASF would never deviate from its World Bid Criteria to benefit Varsity. Fed. R. Evid. 404(a)(1). Voting to keep ASC and Cheer Tech as Tier 1 EP Members not probative or material. Fed. R. Evid. 401, 402. |
| 33 | Ex. AF - VAR00421095 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. |
| 34 | Ex. AG - USASF_00088638 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. |
| 35 | Ex. AH - USASF_00088659 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. |
| 36 | Ex. AI - Wright Dep. Excerpts | Contains inadmissible hearsay to the extent the witness purports to speak for the USASF Image Committee. Fed. R. Evid. 802 |
| 37 | Ex. AJ - USASF_00022109 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. |
| 38 | Ex. AO - USASF_00023946 | Insufficient foundation in Nichols depo (Ex. 23). FRE 901. Inadmissible hearsay. Fed. R. Evid. 802. |
| 39 | Ex. AP - USASF_00051791 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. |
| 40 | Ex. AQ - USASF_00027831 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. |
| 41 | Ex. AR - USASF_00090186 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. |
| 42 | Ex. AY - Lorenzen Dep. Tr. Excerpts | Calls for legal conclusion and encroaches on privileged information. Fed. R. Evid. 501, 701. |

| No. | Defendants Evidence | Objections |
|-----|---------------------|------------|
| 43 | Ex. BA - Newby Dep. Tr. Day 1 287:2-8 | Witness lacks requisite personal knowledge re sports endorsements. Fed. R. Evid. 602. Witness is lay witness lacking requisite specialized knowledge to opine re sports endorsement contracts. Fed. R. Evid. 701. |
| 44 | Ex. BA - Newby Dep. Tr. Day 1 287:9-13 | Witness lacks requisite personal knowledge re sports endorsements. Fed. R. Evid. 602. |
| 45 | Ex. BA - Newby Dep. Tr. Day 1 251:10-11 | Witness lacks requisite personal knowledge re number of network agreements. Fed. R. Evid. 602. |
| 46 | Ex. BC - Duhon Dep. Tr. 38:13-24 | As the witness admits at 38:19. she lacks personal knowledge. Fed. R. Evid. 602. |
| 47 | Ex. BE - Minzghor Dep. Tr. 136:7-16; 140:12-21. 223:2-23 | Lacks relevance. Fed. R. Evid. 401, 402. |
| 48 | Ex. BF - Bray Dep. Tr. 40:1-41:13; 60:9-24 | Lacks relevance. Fed. R. Evid. 401, 402. |
| 49 | Ex. BG - L. Gurske Dep. Tr. 353:17-21. | Defendants' asserted fact ("Merchandise sold at cheer competitions are typically souvenirs. not athletic gear for competitions.") is directly contradicted by the cited testimony ("At bigger-scale events. like UCA. for example. they would actually have Varsity Shop set up **where you could buy your event shirts and all of your event apparel. and they would sell Varsity shoes** and they would sell other things."). Lacks relevance. Fed R. Evid. 401, 402. |
| 50 | Ex. BG - L. Gurske Dep. Tr. 317:22-318:1; 318:3-319:4; 319:16-320:7. | Lacks relevance (sideline cheer is not relevant to Plaintiffs' claims. which relate exclusively to competitive cheer). Fed. R. Evid. 401, 402. |
| 51 | Ex. BH - Sadlow Dep. Tr. 40:23-25 | Witness lacks specialized knowledge to offer expert testimony. Fed. R. Evid. 701. |
| 52 | Ex. BH - Sadlow Dep. 37:10-17. 231:1-232:11. | Defendants' asserted fact ("Varsity and its competitors maintain relationships with gyms and schools to facilitate sales.") is not supported by this testimony. Lacks relevance. Fed. R. Evid. 401, 402. Witness lacks personal knowledge regarding Varsity's competitors sales practices. Fed. R. Evid. 602. |
| 53 | Ex. BH - Sadlow Dep. 39:2-10. | Lacks relevance (sideline cheer is not relevant to Plaintiffs' claims. which relate exclusively to competitive cheer). Fed. R. Evid. 401, 402. |
| 54 | Ex. BI - Weber Dep. Tr. Excerpts | Lacks foundation. Lacks relevance. Fed. R. Evid. 401, 402. Lacks personal knowledge. Fed. R. Evid. 602. |

PLAINTIFFS' OBJECTIONS TO EVIDENCE

| No. | Defendants Evidence | Objections |
|---|---|---|
| 55 | Ex. BJ - Kennedy Dep. Tr. 205:10-15; 209:1-9 | Lacks relevance (sideline cheer is not relevant to Plaintiffs' claims. which relate exclusively to competitive cheer). Fed. R. Evid. 401, 402. |
| 56 | Ex. BJ - Kennedy Dep. Tr. 46:17-47:13. | Witness lacks personal knowledge. as she states in the cited testimony ("·Q.· ·Okay.· Does Varsity describe itself as a respected brand with respect to All Star uniforms? ·A.··I would think that we have said that. ·Q.·Okay.· And what does Varsity mean when it says that? A. **Well. I can't be quite sure what is meant in a specific context. if you're referring to that.** Q. If Varsity says in promotional materials. Varsity is the respected brand with respect to All Star uniforms. what does that mean? A.·**I could tell you what I think.**"). Fed. R. Evid. 602. Testimony is speculative. Lacks relevance. Fed. R. Evid. 401, 402. |
| 57 | Ex. BK - VAR00009293 at 329. 355. 357. | Hearsay. Fed. R. Evid. 802. |
| 58 | Ex. BL - Hill Dep. Tr. 330:5-13 | The cited testimony shows the witness lacks personal knowledge (" But it's not -- it's -- it's like -- I'm not -- I mean. I guess. I don't recall who -- who  exactly oversaw the sales of those t-shirts. I mean. yes. there's "Worlds," like commemorative t-shirts at the event. but I don't -- I mean. I don't know who's selling it.  I mean. I presume it's the USASF."). Fed. R. Evid. 602. Lacks relevance. Fed. R. Evid. 401, 402. |
| 59 | Ex. BM - VAR00233675 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. |
| 60 | Ex. BN - VAR00302098 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. |
| 61 | Ex. BO - VAR00147772 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. |
| 62 | Ex. BQ - Elza Vol 1. Dep. Tr. 59:24-60:2 | Lacks relevance (sideline cheer is not relevant to Plaintiffs' claims. which relate exclusively to competitive cheer). Fed. R. Evid. 401, 402. |
| 63 | Ex. BQ - Elza Vol 1. Dep . Tr. 60:11-13. | Lacks foundation. witness lacks personal knowledge. questions and answer are vague (does not specify which gyms). Fed. R. Evid. 602. Lacks relevance. Fed. R. Evid. 401, 402. |

| No. | Defendants Evidence | Objections |
|---|---|---|
| 64 | Ex. BQ - Elza Vol 1. Dep. Tr. 202:16-203:2. | Appears to lack personal knowledge of Varsity Family Plan requirements because gyms must pay in advance in order to attend a competition. so *every* competition a gym attends that qualifies for a Family Plan rebate is a payment for a future competition. Fed. R. Evid. 602. |
| 65 | Ex. BR - VAR00009486 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. |
| 66 | Ex. BU - T. Gurske Dep. Tr. Excerpts | Lacks relevance. Fed. R. Evid. 401, 402. |
| 67 | Ex. CB - FUSIONELI000000424 | Lacks relevance. Fed. R. Evid. 401, 402. Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. |
| 68 | Ex. CF - Le Tard Dep. Tr. 211:7 | Selective citation is incomplete and misleading: full statement reads "It was not exclusive for events. It was exclusive for uniforms." |
| 69 | Ex. CF - Le Tard Dep. Tr. 350:6-352:20. | Contains inadmissible hearsay. Fed. R. Evid. 802. |
| 70 | Ex. CL - Cotton Dep. Tr. 123:12-23; 123:24-124:9; | Lacks personal knowledge. Fed. R. Evid. 602. Contains inadmissible hearsay to the extent that the witness purports to speak for others at Bain. Fed. R. Evid. 802. |
| 71 | Ex. CL - Cotton Dep. Tr. 30:15-31:3. | Lacks relevance. Fed. R. Evid. 401, 402. |
| 72 | Ex. CN - Janower 30b6 Dep. Tr. 141:9-20 | Lacks relevance - the testimony does not have a tendency to make a fact more or less probable than it would be without the evidence because it is internally inconsistent. stating first that that Charlesbank was not involved in Varsity acquisitions "beyond our capacity as directors of the corporation," then stating **"as a private equity investor . . . we do help our companies raise capital to do things like acquisitions."** Fed. R. Evid. 401, 402. |
| 73 | Ex. CP - Beer Dep . Tr. 98:17-101:4; 144:24-145:1. | Lacks personal knowledge. Fed. R. Evid. 602. Contains inadmissible hearsay to the extent that the witness purports to speak for others at Charlesbank. Fed. R. Evid. 802. |
| 74 | Ex. CS - USASF_00039789 | Contains inadmissible hearsay to the extent it purports to report or describe statement by Mr. Webb. Fed. R. Evid. 802. |

| No. | Defendants Evidence | Objections |
|---|---|---|
| 75 | Ex. CU - Janower Dep. Tr. 121:11-123:3 | The testimony does not have a tendency to make a fact more or less probable than it would be without the evidence with regard to the purported statement of fact "Jeff Webb was not 'still driving the business' for Varsity." That question was put to Mr. Janower directly and his response evaded the question: "Q.· ·Okay.· And that would have been correct so that after he was no longer CEO. it would have been inaccurate for Jeff to describe himself as effectively driving the business; right? ·A.·**Well. that was the goal we were trying to achieve**." The testimony has a tendency to show that Charlesbank was actively involved in Varsity's internal management personnel decisions. but it does not show that Mr. Webb "was not 'still driving the business' for Varsity." Lacks relevance. Fed. R. Evid. 401, 402. |
| 76 | Ex. CV - CB00314261 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. |
| 77 | Ex. CW - C800114878 | The document does not have a tendency to make a fact more or less probable than it would be without the evidence with regard to the purported statement of fact "Jeff Webb was not 'still driving the business' for Varsity." The document has a tendency to show that Charlesbank was actively involved in Varsity's internal management personnel decisions. but it does not show that Mr. Webb "was not 'still driving the business' for Varsity." Lacks relevance. Fed R. Evid. 401, 402. |
| 78 | Ex. CX - CB00373462 | The Hercules VB Holdings. Inc.. Board Minutes and Hercules Achievement Holdings. Inc. Board Minutes are unsigned and therefore lack proper indicia of authenticity. Fed. R. Evid. 901. 902. |
| 79 | Ex. CZ - Newby Dep. Tr. Day 2 652:14-653:1 | Lacks personal knowledge. Fed. R. Evid. 602. |

**PLAINTIFFS' OBJECTIONS TO EVIDENCE**

| No. | Defendants Evidence | Objections |
|-----|---------------------|------------|
| 80 | Ex. CZ - Newby Dep. Tr. Day 2 389:1-13. | Lacks personal knowledge to the extent that the witness did not "recall speaking to Mr. Webb about proposed changes to the Family [P]lan." Also lacks personal knowledge as to whether other Varsity personnel consulted with Mr. Webb. 389:3-4. Fed. R. Evid. 602. Lacks relevance - the testimony does not have a tendency to make a fact more or less probable than it would be without the evidence with regard to the purported statement of fact "When Jeff Webb was Varsity's CEO. he was not regularly consulted regarding Varsity's rebate programs" because the testimony is internally inconsistent. When asked "was Mr. Webb regularly·consulted on -- on changes to the Family Plan?". Mr. Newby first responded "I wouldn't say 'regularly consulted,'" then stated "I reported to Jeff at the time. so I would have run business decisions by him to get his feedback or·thoughts." Fed. R. Evid. 401, Fed. R. Evid. 602. |
| 81 | Ex. DA - Nichols Dep. Tr. 7:2–28:8 | Lacks relevance with regard to the purported statement of fact "After March 2. 2016. neither John Nichols nor Bill Seely reported to Jeff Webb" because the cited testimony does not say that Mr. Nichols stopped reporting to Mr. Webb. only that he was "also reporting" the Matt Rubel once Mr. Rubel took over as president. 27:15. Fed. R. Evid. 401, 402. |
| 82 | Ex. DC - O'Rourke Dep. Tr. 68:4-70:8 | Lacks relevance with regard to the purported statement of fact "After July 2018. Jeff Webb held the title of Chairman of Varsity Spirit. a title that was effectively 'meaningless'" because while the cited testimony does show that Bain actively participated in internal Varsity management personnel decisions. it does not say anything about what Mr. Webb's new job responsibilities were or how Mr. Webb actually performed in the position. Fed. R. Evid. 401, 402. |
| 83 | Ex. DD - BAIN00062831 | Lacks relevance with regard to the purported statement of fact "After July 2018. Jeff Webb held the title of Chairman of Varsity Spirit. a title that was effectively 'meaningless'" because while the document does show that Bain actively participated in internal Varsity management personnel decisions. it does not say anything about what Mr. Webb's new job responsibilities were or how Mr. Webb actually performed in the position. Fed. R. Evid. 401, 402. |

| No. | Defendants Evidence | Objections |
|-----|---------------------|------------|
| 84 | Ex. DE - BAIN00013400 | Lacks relevance because the document refers only to a discussion about a planned conversation with Mr. Webb. Does not show what his actual responsibilities or actions were or even whether he accepted the position. Fed. R. Evid. 401, 402. Contains inadmissible hearsay. Fed. R. Evid. 802. |
| 85 | Ex. DF - BAIN00074357 | Inadmissible hearsay. Fed. R. Evid. 802. |
| 86 | Ex. DG - Seely Dep. Tr. 572:12-13. 573:12-22 | Lacks personal knowledge - the witness states "I think he was just an advisor," but Mr. Webb was the Chairman of the Board at that time. Fed. R. Evid. 602. |
| 87 | Ex. DH - Webb Dep. Tr. Vol 2 272:12-273:11 | Testimony lacks relevance because Mr. Webb prefaces his testimony by saying "So a staged answer here," indicating that the testimony was rehearsed and therefore unreliable. Fed. R. Evid. 401, 402. |

Dated: September 15. 2023

Respectfully submitted,

By:_____/s/ Joseph R. Saveri_____
           Joseph R. Saveri

Joseph R. Saveri*
Steven N. Williams*
Ronnie Seidel Spiegel*+
Kevin E. Rayhill*
Elissa A. Buchanan*
David Seidel*
**JOSEPH SAVERI LAW FIRM. LLP**
601 California Street. Suite 1000
San Francisco. California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
rspiegel@saverilawfirm.com
krayhill@saverilawfirm.com
eabuchanan@saverilawfirm.com
dseidel@saverilawfirm.com

Van Turner Jr. (TN Bar No. 22603)
**TURNER FEILD. PLLC**
2650 Thousand Oaks Blvd.. Suite 2325
Memphis. Tennessee 38118
Telephone: (901) 290-6610
Facsimile: (901) 290-6611
VTurner@TurnerFeildLaw.com

Richard M. Paul III*
Ashlea Schwarz*
**PAUL LLP**
601 Walnut. Suite 300
Kansas City. Missouri 64106
Telephone: (816) 984-8100
rick@paulllp.com
ashlea@paulllp.com

**PLAINTIFFS' OBJECTIONS TO EVIDENCE**

Jason S. Hartley*
**HARTLEY LLP**
101 West Broadway. Suite 820
San Diego. CA 92101
Telephone: (619) 400-5822
hartley@hartleyllp.com

Daniel E. Gustafson*
Daniel C. Hedlund*
Daniel J. Nordin*
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street. Suite 2600
Minneapolis. MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com

* Admitted *pro hac vice*

+Located in Washington State

*Attorneys for Individual and
Representative Plaintiffs*

**PLAINTIFFS' OBJECTIONS TO EVIDENCE**