# EXHIBIT 12

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| **JESSICA JONES, et al.,** | Case No. 2:20-cv-02892-SHL-tmp |
| Plaintiffs, | |
| v. | |
| **VARSITY BRANDS, LLC, et al.** | |
| Defendants. | |
| | **JURY DEMAND** |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS CHARLESBANK PARTNERS, LLC
AND BAIN CAPITAL PRIVATE EQUITY'S MOTION FOR SUMMARY JUDGMENT**

Case No. 2:20-cv-02892-SHL-tmp

**PLAINTIFFS' OPPOSITION TO DEFENDANTS CHARLESBANK PARTNERS, LLC AND BAIN
CAPITAL PRIVATE EQUITY'S MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

FACTS ............................................................................................................................... 2

I.     Charlesbank's Ownership, Control, and Involvement (2014–2018) ................................ 2

II.    Bain's Ownership, Control, and Involvement (2018 to Present) ...................................... 7

ARGUMENT ..................................................................................................................... 11

I.     Legal Standard ...................................................................................................... 11

II.    Charlesbank and Bain Are a Single Enterprise with Varsity ............................................ 11

III.   Charlesbank and Bain Are Active Participants in the Exclusionary Scheme .................. 15

      A.    Charlesbank Actively Participated in the Anticompetitive Scheme ..................... 15

      B.    Bain Actively Participated in the Anticompetitive Scheme .................................. 17

IV.   Charlesbank and Bain Are Vicariously Liable for the Acts of Their Agent, Varsity ......... 18

CONCLUSION .................................................................................................................. 19

Case No. 2:20-cv-02892-SHL-tmp         i

**PLAINTIFFS' OPPOSITION TO DEFENDANTS CHARLESBANK PARTNERS, LLC AND BAIN
CAPITAL PRIVATE EQUITY'S MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*American Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556 (1982) ..............18, 19

*Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623 (9th Cir. 2018)............13, 14, 15

*Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002).......................................17

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984).....................................1, 12, 13, 14

*Esco Corp. v. United States,* 340, F.2d 1000, 1008 (9th Cir. 1965) ................................................15

*Fed. Trade Comm'n v. On Point Glob. LLC*, No. 19-25046-CIV, 2021 WL
    4892228 (S.D. Fla. Sept. 29, 2021) ......................................................................................12

*Freeman v. San Diego Ass'n of Realtors* 322 F.3d 1133 (9th Cir. 2003).....................................13

*In re Outpatient Medical Center Employee Antitrust Litig.,* 630 F. Supp. 3d 968
    (N.D. Ill. 2022)......................................................................................................................15

*In re Packaged Seafood Prod. Antitrust Litig.*, No. 15-MD-2670 DMS (MDD),
    2022 WL 836951 (S.D. Cal. Mar. 21, 2022) .......................................................................13

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221 (10th Cir.
    2017) ......................................................................................................14, 15, 17, 18

*Malin v. JPMorgan*, 860 F. Supp. 2d 574 (E.D. Tenn. 2012) ......................................................19

*Stanley v. FCA U.S, LLC*, 51 F.4th 215 (6th Cir. 2022) ...............................................................13

*United States v. Bestfoods,* 524 U.S. 51 (1998) ...................................................................11, 12

**Statutes**

15 U.S.C. § 1 ...................................................................................................................13, 14, 15

**PLAINTIFFS' OPPOSITION TO DEFENDANTS CHARLESBANK PARTNERS, LLC AND BAIN
CAPITAL PRIVATE EQUITY'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Charlesbank Capital Partners, LLC's ("Charlesbank") and Bain Capital Private Equity's, ("Bain") Individual Motions for Summary Judgment ("Motions") should be denied. A jury will likely find both Charlesbank and Bain jointly liable for the anticompetitive scheme perpetrated by Defendants. Plaintiffs have abundant evidence showing both Charlesbank and Bain's participation in Varsity's exclusionary scheme. As this Court has previously held, this is enough. *See* ECF No. 332 at 9–10 (holding that "*Copperweld* requires viewing [Charlesbank and Bain] as a joint enterprise with Varsity," and that Plaintiffs must provide "evidence that each defendant independently participated in the enterprise's scheme, to justify holding that defendant liable as part of the enterprise.") (citing *Copperweld* and its progeny). There is a dispute over whether Charlesbank and Bain participated in the scheme. Their motion must thus be denied.

Charlesbank and Bain are both firms that bought majority, controlling interest in Varsity and ran Varsity as their subsidiary. As this Court has previously held, under *Copperweld* and its progeny, Charlesbank and Bain can be found liable by a jury if the jury finds that Charlesbank and Bain participated in Defendants' anticompetitive scheme. The evidence easily meets this standard. Thus, Charlesbank and Bain ignore that standard and instead set up a straw man, arguing that the Charlesbank and Bain executives serving on Varsity's Board of Directors must be shown to have acted against the interests of Varsity while promoting the interests of Charlesbank and that Plaintiffs have failed to show as much. *See* ECF No. 473 ("CB Brief") at 4; ECF No. 472 ("Bain Brief") at 4. But this is the wrong standard. Notably, Defendants fail to cite to even a single antitrust case that employs this standard.

Abundant evidence shows that Charlesbank and Bain were active participants in Defendants' anticompetitive scheme: they both had knowledge when they purchased majority interests in Varsity for billions of dollars that Varsity had monopoly power, lacked real competition, enjoyed significant barriers to entry (a competitive "moat"), and that even further monopoly power could be acquired and maintained through continued acquisitions and other anticompetitive conduct. Because Charlesbank and Bain are or were majority owners who

**PLAINTIFFS' OPPOSITION TO DEFENDANT CHARLESBANK PARTNERS, LLC AND BAIN
CAPITAL PRIVATE EQUITY'S MOTION FOR SUMMARY JUDGMENT**

actively controlled their corporate subsidiary, Varsity, and because they actively participated in the scheme, they are considered to be a single enterprise with Varsity for purposes of the antitrust laws, nothing more is required to hold Charlesbank and Bain directly liable for their role in Defendants' anticompetitive scheme. The evidence shows Charlesbank and Bain were both private equity firms eager to supply capital and management expertise to a monopoly so it could continue to consolidate its monopoly power and extract even more ill-gotten monopoly profits.

At a minimum, a genuine issue of material fact exists for the jury to decide over whether Charlesbank and Bain are liable for their participation in the anticompetitive scheme. Their Motions should be denied.

## FACTS[1]

### I.    Charlesbank's Ownership, Control, and Involvement (2014–2018)

Varsity was started in 1983 by Jeff Webb, who retained a senior leadership position for many decades. By 2013, through numerous mergers and acquisitions and other anticompetitive conduct, Varsity was a dominant supplier of cheerleading competitions, camps, and apparel, with significant market power. Charlesbank purchased Varsity in 2014 for approximately $1.5 billion. *See* Ex. 29 [CB 30(b)(6) Dep.] at 33:13-33:22. Charlesbank was aware of Varsity's previous acquisitions, its monopoly power, and its ability to acquire and maintain further monopoly power through additional acquisitions of its major competitors. *See e.g.*, Ex. 97 at -5882 (September 2014 due diligence presentation cites Varsity's "Multi-Pronged Growth Strategy," including "Tack-On and Transformational Acquisitions" and identifying Varsity Spirit as "the industry consolidator of choice / Primarily focused on the camp and competition markets / [with] Identified roll-up opportunities in adjacent and complementary categories"). Charlesbank acquired Varsity with full knowledge of Varsity's monopoly power. Ex. 284 at -5631.

---

[1] As cited herein, "PSOF" refers to Plaintiffs' Additional Statement of Facts, filed herewith. Unless otherwise noted, all citations to exhibits herein ("Ex. __") are citations to the exhibits attached to the Declaration of Joseph R. Saveri, filed herewith.

Charlesbank became the new majority owner of Varsity after its 2014 acquisition, owning roughly 65% of Varsity. *See, e.g.*, Ex. 29 [CB 30(b)(6) Dep.] at 37:3-10, 224:15-21. ("Charlesbank entities owned 64-point-whatever percent Joe told us earlier of the equity of those companies. So we had a majority stake. So technically, we would have been considered… the control shareholder; 'we,' the Charlesbank entities.").[2] The organizational chart of the post-closing entity structure shows that Charlesbank (along with Partners Group and a management group) owned "Hercules VB Holdings, Inc.," which owned "Varsity Brands Holding Co., Inc.," which owned the Varsity defendants. *See* Ex. 70 at -1300.

As the new majority owner of Varsity, Charlesbank had complete control and authority over Varsity's affairs, something that Charlesbank specifically bargained for. In the Term Sheet agreement between Charlesbank and Partners Group regarding the purchase of Varsity, Charlesbank and Partners Group agreed that the "newly formed" entities that would own Varsity would be "controlled by Charlesbank." *See, e.g.*, Ex. 283 at -6147. The Agreement further provided that the board of directors controlling the Varsity entities would initially be comprised of 7 directors, with 3 being appointed by Charlesbank and 1 being appointed mutually by Charlesbank and Partners Group. *See Id*. at -6148. Thus, Charlesbank in effect controlled four of seven board members. *See* Ex. 29 [CB 30(b)(6) Dep.] at 251:15-251:23. The Agreement further provided Charlesbank the ability change the board (for further control) at any time. It provided that at "Charlesbank's discretion," the board could be expanded to ▮ members, with Charlesbank either adding ▮ directors if Partners Group had less than ▮ ownership, or, if Partners Group had more than ▮ ownership, Charlesbank would add ▮ director and be allowed to swap the

---

[2] In addition, Charlesbank principles, who also served on the Varsity management team, made individual direct co-investments along side Charlesbank. *See* Ex. 31 [Kalvelage Dep.] at 35:22-36:4 ("The management team, including the executives, invested a significant amount of their own capital alongside ▮▮▮▮▮ and other investors into the transaction. So they also owned a piece of the business."); *See* Ex. 32 [Katz Dep.] at 40:15-22 ( ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."). See Ex. 31 [Kalvelage Dep.] at 35:22-36:4; Ex. 47 [White Dep.] at 59:24-60:4 ("I made coinvestments in those funds and own a share of the profits that come from those investments.")

**PLAINTIFFS' OPPOSITION TO DEFENDANTS CHARLESBANK PARTNERS, LLC AND BAIN CAPITAL PRIVATE EQUITY'S MOTION FOR SUMMARY JUDGMENT**

"independent" director for ▮ of its own. *Id*. at 227:24-229:7. Under either scenario, Charlesbank would have ▮ board members. *Id.* The document specified that the Board of Directors (of which Charlesbank had control), was to "oversee, and be primary body for managing the business and affairs of the Purchasers and their subsidiaries." *Id.* at 230:12-16. The "Purchasers" referred to the Hercules holding companies; their subsidiaries include the Varsity defendants. *See id.* at 212:9–213:7.

After acquiring Varsity and taking control, Charlesbank acted quickly to effectuate and accelerate Varsity's monopoly position. Charlesbank worked directly with its new subsidiary, Varsity, to consolidate its market power by acquiring its biggest rivals. *See* Ex. 229 at-5991 (Internal Acquisition Memo that lists eight entities that were acquired from 2015 to 2018 during Charlesbank's control over Varsity, including JAM Brand and Epic; Ex. 28 [Janower Dep.] at 66:12–66:19; Ex. 285 -1040.

Charlesbank was actively involved in selecting the targets and approving the acquisitions. *See, e.g.*, Ex. 286 at -2247 (email showing that Charlesbank independently reviewed the "transaction pipeline" of potential acquisitions for Varsity, including Jam Brands). Indeed, Charlesbank mandated that Varsity seek Charlesbank's independent approval for any acquisition over $2.5 million, and the boards' approval (of which Charlesbank had contractually mandated control) for any acquisition over $5 million. *See* Ex. 213 at -1305. Charlesbank even went so far as to require final sign off on announcing the acquisition of Jam Brands. *See* Ex. 287 at -9470 (email showing Josh Beer of Charlesbank working independently with Goldman Sachs to announce the acquisition of Jam Brands, which "cement[ed] Varsity Spirit's #1 position in cheerleading," and requiring Charlesbank's "final" signoff to act.).

Of critical importance to effectuating the anticompetitive scheme, Charlesbank was instrumental in securing hundreds of millions of dollars in further financing for the express purpose of funding Varsity acquisitions. *See* Ex. 29 [CB 30(b)(6) Dep.] at 137:25–138:03 ("the ▮ . . . went to the balance sheet of Varsity Brands, the intent of which was to help fund acquisitions."). In 2015, for example, Charlesbank secured ▮ to fund Varsity's

**PLAINTIFFS' OPPOSITION TO DEFENDANTS CHARLESBANK PARTNERS, LLC AND BAIN
CAPITAL PRIVATE EQUITY'S MOTION FOR SUMMARY JUDGMENT**

acquisition of Project Cloth, and ███████ to replenish the cash used to acquire Jam Brands.
*See* Ex. 29 [CB 30(b)(6) Dep.] at 150:9–151:19, 153:24-154:10; *see also* Ex. 288 at -3480
("Company will retain firepower to complete acquisitions - Varsity Brands will retain ample
acquisition capacity, with the ability to acquire over ███ in EBITDA - Simultaneously plan to
upsize maximum ABL capacity to ██████"). After Charlesbank secured the financing for
Varsity's acquisitions, Charlesbank directed Varsity to use the money on acquisitions. *See* Ex.
223 at -1045 (email from Charlesbank's Josh Beer to Varsity's new CEO, "Well, we've got the
dough for our acquisitions now…let's make it sweat!").

Within just over three years, Varsity, with Charlesbank's funding and direction, had
acquired its largest remaining competitors in the Cheer Competition Market, including Jam
Brands, Aloha Productions, Spirit Celebration, All Things Cheer, Mardi Gras Nationals, Jam
Spirit Group, Sea to Sky, and Epic. Ex. 289 at -9041-9042; Ex. 229 at -5991]; Ex. 47 [White
Dep.] at 276:25–277:16. Indeed, Charlesbank reported to its investors, taking credit for
accomplishing the acquisitions. Ex. 282 at -7575 (Summary of Charlesbank's accomplishments
while owners of Varsity includes: "Completed three highly strategic and accretive acquisitions in
Q4 2015 and Ql 2016 including apparel oriented fundraising business allgoods, cheerleading
competition operator JAM Brands and Lids Team Sports, BS's next largest competitor."). By the
time this spree was finished, Varsity controlled approximately 85% of the Cheer Competitions
Market. PSOF, ¶ 78, Ex. 1 [Netz Rep.] at 52; Ex. 85 at -6985; Ex. 20 [Cota Dep.] at 53:15–21;
Ex. 86 at -5236.

Charlesbank was also actively involved in Varsity's day-to-day operations. Indeed,
Charlesbank Operating Partner Neil Kalvelage served as Interim CEO of Varsity Brands in 2016
and 2017. Ex. 31 [Kalvelage Dep.] at 83:15-18. While serving in that role, Mr. Kalvelage was
actively engaged in Varsity's exclusionary conduct aimed at rivals. Ex. 290, at -1179 (Kalvelage
writes, with reference to a licensing agreement between GK and Under Armour, "taking a license
away from a competitor is something we have to look at seriously and evaluate."). Charlesbank
Managing Director Josh Beer was also actively engaged in the granular operation of Varsity's

**PLAINTIFFS' OPPOSITION TO DEFENDANTS CHARLESBANK PARTNERS, LLC AND BAIN
CAPITAL PRIVATE EQUITY'S MOTION FOR SUMMARY JUDGMENT**

business, for example, approving and even editing a press release about a Varsity Brands acquisition. Ex. 291; Ex. 16 [Beer Dep.] at 89:8-19 (admitting that he remembered reviewing and approving a Varsity acquisition)]. Indeed, Varsity CEO Jeff Webb bristled at the level of control Charlesbank was exercising over Varsity. *See* Ex. 29 [Charlesbank 30(b)(6) Dep] at 278:04-278:07] ("Q. Did Jeff Webb express to Charlesbank an unhappiness or uncomfortableness with the level of engagement that Charlesbank wanted in the business? A. Absolutely."); Ex. 21 (talking points for Charlesbank meeting with Jeff Webb states, "You are uncomfortable and unhappy with the level of engagement we want in the business."). And Charlesbank was intimately involved in the decision to fire and replace Varsity founder Jeff Webb. *Id.* at 265:14-266:04 (quoting from an email to Jeff Webb, "[o]ur hope is that the new CEO will be hired with your input but we are fully prepared to act unilaterally"); *id*. at 258:20-258:25 ("Q. Did Charlesbank decide to fire Jeff Webb as CEO and replace him? […] A. In consultation with our other nonmanagement Board members…yes.").

Charlesbank was intimately aware of the anticompetitive nature of Defendants' activities. Charlesbank was aware, for example, that Varsity exploited its relationships with gym owners, coaches, and athletic directors to maintain supracompetitive prices for the indirect purchasers:

> "[W]e should make the point somewhere that **we are insulated from competition and price pressure because those making the buy decision aren't the ones writing the check.** Something like . . . 'Those making the purchase decision (coaches, cheer advisors, YB advisors, administrators, etc) and those paying the money (athletes/students) are distinct. Purchase decision makers care most about service and relationship, insulating Varsity from price pressure and competition.' This is a unique attribute of our business I think we need to highlight more throughout the CIM.") (Emphasis added).

Ex. 293 at -4857. Charlesbank was aware that the anticompetitive scheme enabled Defendants to raise prices above competitive levels regardless of demand. *See, e.g*., Ex. 68 at -1628 ("Scheduled Disney cost increases in 2020 will meaningfully increase cost per participant above projected "normal" rate of ~6%; Spirit plans to significantly increase prices to consumers to more than offset rising costs"); *id*. at -1617 ("PARTICIPATION IS FLAT FOR ALL STAR;

**PLAINTIFFS' OPPOSITION TO DEFENDANTS CHARLESBANK PARTNERS, LLC AND BAIN
CAPITAL PRIVATE EQUITY'S MOTION FOR SUMMARY JUDGMENT**

SPEND IS UP FOR BOTH SEGMENTS"); *id.* at -1629 ("All product lines show high-single-digit YOY revenue growth and low single-digit unit growth, with uniform volume flat since 2014"). Charlesbank was also aware of the impact of its acquisitions on Varsity's market share. *See id.* at -1612 ("Team has completed 8 deals since acquisition by Charlesbank that collectively added ▮▮▮ of EBITDA • **Successfully consolidated All-Star competition market • Remaining whitespace for M&A is primarily in apparel**") (emphasis added), *id.* at -1622 ("Successfully closed nine deals since 2014 focused on All-Star event provider market as part of broader strategy to grow market share, leverage synergies across events and grow year-end Varsity Spirit events • Strategic rationale for acquisitions: . . . [includes] Acquiring strategic events (i.e., World Bid events)").

Following Charlesbank's sale to Bain, Charlesbank and it partners reinvested over ▮▮▮ in Varsity, maintaining a seat on the Varsity Board. *See* Ex. 29 [Charlesbank 30(b)(6) Dep.] at 166:8-11 (Charlesbank and its partners acquired equity valued at ▮▮▮▮▮). Four years after purchasing Varsity, and subsequently directing the acquisition of nearly all its competitors, Charlesbank sold Varsity for $2.9 billion, nearly doubling the purchase price in four short years. Even then, Charlesbank still retained a Board seat, sensing there were still opportunities to exploit Varsity's dominant market position for ill-gotten gain. *See* Ex. 29 Charlesbank 30(b)(6) Dep. (Janower) 158:01-158:08, 185:11-185:15. In this way, Charlesbank continued to be actively involved in Defendants' anticompetitive activities.

## II.    Bain's Ownership, Control, and Involvement (2018 to Present)

Bain purchased Varsity from Charlesbank for roughly $2.9 billion in 2018. *See* Ex. 21 [Bain 30(b)(6) Dep.] ("Cotton Dep.") at 16:7–16:22. Bain was well aware of Varsity's monopoly power when it acquired Varsity. Ex. 93 at -6023. Bain itself contributed approximately $607 million in cash. Bain became the controlling shareholder, acquiring an approximate 67.5% ownership interest in Varsity, *id.* at 85:10–85:12, and four of seven of the seats on Varsity's Board of Directors, *id.* at 90:25–91:01). To its investors, and the outside world, Bain held itself out as active managers of the companies it acquired. *See* Ex. 231.

**PLAINTIFFS' OPPOSITION TO DEFENDANTS CHARLESBANK PARTNERS, LLC AND BAIN
CAPITAL PRIVATE EQUITY'S MOTION FOR SUMMARY JUDGMENT**

[https://www.baincapital.com/about-us] ("[W]e pioneered a consulting-based approach to private equity investing, partnering closely with management teams to offer the insights that challenge conventional thinking, build great businesses and improve operations."). Bain specifically continued Charlesbank's previous agenda of aggressively pursuing acquisitions of Varsity's major rivals. *See, e.g.,* Ex. 21 [Bain 30(b)(6) Dep.] ("Cotton Dep.") at 109:01–109:3 ("[M]embers of the Bain team provided advice and counsel to the management team of Varsity Brands on their M&A strategy."). After the acquisition, Bain reconstituted the board of directors, removing Jeff Webb and others. *Id.* at 99:17–99:22 (regarding firing of Webb, "[o]f course, Bain intends to honor your current contractual commitments, but they also plan to run the company slightly differently with a very small board of their NewCo"). Bain is the majority, controlling owner of Varsity.

Bain was well aware of Varsity's dominant position, exclusionary conduct and anticompetitive scheme prior to its acquisition, and was sold on it. *See, e.g.*, Ex. 294 at -497) (2018 Jefferies due diligence material confirming "Insulation from price pressure and competition as purchase decision makers (coaches, etc.) remain distinct from purchasers (athletes, etc.)"). Indeed, Bain paid over $607 million in cash to acquire Varsity's monopoly with respect to competitions, camps and apparel. *See, e.g.*, Ex. 295 at -2953 (Bain's internal due diligence material referred to Varsity as "Great Business, Competitive Moat"). Ryan Cotton, principally responsible for Bain's decision to purchase Varsity, stated that Varsity's "competitive moat" was strong and durable, characterizing it as "difficult to. . . erode." *See* Ex. 232 [Cotton Dep.] at 44:24–46:3.

Bain documents show that Bain executives controlled and directed Varsity, taking an active role in maintaining and extending Varsity's monopoly through, among other things, acquisitions and exclusionary practices. [Bain 30(b)(6) Dep.] at 108:18–110:2 ("There is also a regular dialogue about potential targets that [Varsity] management may want to think about acquiring."); *id.* at 109:17-109:21; Ex. 269 at -1028 (Bain email discussing thorough review of Varsity acquisitions and putting in place "more routine review of M&A pipeline"); Ex. 270 at -

8196–97(internal Bain email discusses ways to "provide more structure and framing for Adam around M&A to help sort through and prioritize different opportunities"). In fact, Bain made sure that it had control over decisions with respect to significant acquisitions. *See, e.g.*, Ex. 21 [Bain 30(b)(6) Dep] at 109:17-109:21 ("The management team is free to make acquisitions beneath certain thresholds without consulting the board. Above that threshold, they're required to obtain the approval of the board of directors."); Ex. 12 [Elza Dep. 51:13-52:12] ("During acquisitions, our strategy was we put together on paper what we wanted to go – companies we looking at, work with folks to get – prepare that, and that got presented to Bain and they ultimately approved those transactions. . . . They were – they were ultimately presented to Bain for final buy-off, yes.").

The record provides extensive documentation of Bain's involvement and direction of Varsity Brands' acquisitions. Saron Tesfalul, a Bain principal, led Varsity's merger efforts. *See* Ex. 234 (Bain Managing Director Ryan Cotton writes, "Please meet Saron Tesfalul, one of our star Principals who is leading the M&A efforts of Varsity Brands."). Indeed, Tesfalul did so without the participation of Varsity management. *See* Ex. 235 (Tesfalul providing communication with investment banker arranging acquisition by Varsity's Herff Jones business segment to several other Bain executives, but no Varsity executives).

During Bain's ownership of Varsity, although most of Varsity's competitors had already been acquired and Varsity enjoyed substantial monopoly power by 2018, Bain continued to execute acquisitions to eliminate nascent competitors to maintain Varsity's monopoly power. *See, e.g.*, Ex. 236 at -6944, 6960-61 (executed asset purchase agreement for Varsity's acquisition of B2 Cheer and Dance, Inc., dated January 9, 2019); Ex. 237 (confirming that Varsity viewed the acquisition of B2 Cheer and Dance, a competitor in the Cheer Camps Market, as an opportunity to foreclose a key competitor in the Cheer Apparel Market and increase participation at 'Varsity's national competitions in the School Cheer Market); Ex. 238 (confirming that Varsity attempted to increase its share in the Cheer Camps Market by acquiring Champion Cheerleading Co. and

**PLAINTIFFS' OPPOSITION TO DEFENDANTS CHARLESBANK PARTNERS, LLC AND BAIN CAPITAL PRIVATE EQUITY'S MOTION FOR SUMMARY JUDGMENT**

"[i]mmediately becom[ing] the dominant camp operator in Michigan strengthen our current ecosystem in the region.").

Like Charlesbank before it, Bain was instrumental in securing financing to fund further acquisitions. For example, in 2020, Bain Capital secured roughly $180 million in financing from debt and the sale of a leaseback. *See* Ex. 281 [Bain 30(b)(6) exhibit 7]. Bain's Ryan Cotton disclosed that the money could be used for additional acquisitions, stating: "Ready to go on a buying spree!" *Id.*

Bain exercised control over Varsity through control of its Board of Directors. Indeed, such control was a prerequisite for Bain's acquisition. Bain did so over the objections of Jeff Webb. *See* Ex. 296 at -809 (describing Webb's efforts to add non-Bain executives to the Board of Directors). Bain rejected this. *See id.* ("I told him I understand and appreciate what he is saying, but it just isn't the way Bain operates.").

Bain was not only in control of acquisitions and the Varsity Board, Bain was actively involved in day-to-day operations of Varsity. *See* Ex. 21 [Bain 30(b)(6) Dep.] at 69:23–70:1 ("[T]here were ongoing board-level discussions and day-to-day managerial discussions with [Varsity] about what situation are we in"). For example, Bain created a strategic plan for Varsity, which included modifications to a number of aspects of Varsity sales and marketing, including the exclusionary Varsity Family Plan. *See* Ex. 12 [Elza Dep.] at 56:2–57:17 (Bain developed a strategic plan for Varsity and advised amending the Varsity Family Plan in specific ways to "keep the dollars flowing into Varsity."). Bain even got involved when journalists began reporting on Varsity's monopoly, working with Varsity on a draft response to combat the allegations. *See* Ex. 297 (email from Bill Seely to Adam Blumenfeld and David Spiller, asking for signoff to send content related to antitrust accusations and receiving comments from Bain's David Spiller.)

Bain employees were actively involved in efforts to maintain and protect Varsity's monopoly by increasing attendance and pricing at Varsity competitions and camps and in sales of Varsity apparel. *See, e.g.*, Ex. 268. For example, Varsity SVP for Strategy & School Sales, John Sadlow, wrote to Bain employees Ryan Hansen, Perry Gragg, and Kelsey Lemmons (as well as

**PLAINTIFFS' OPPOSITION TO DEFENDANTS CHARLESBANK PARTNERS, LLC AND BAIN CAPITAL PRIVATE EQUITY'S MOTION FOR SUMMARY JUDGMENT**

Varsity employees Wayne Vacek and Melanie Berry), attaching a draft Varsity presentation about "Initiative Charters." *Id.* Mr. Vacek replied, "Perry, Ryan, and I met today," an apparent reference to Bain employees Ryan Hansen and Perry Gragg, "and here are our comments/questions[:] 1) Should we add something on Sales Rep incentives to drive Camps and Competitions? 2) Is there an opportunity to go after event and camp gear? Not sure on the size of the opportunity, but could be an opportunity to grow Apparel." *Id.* at 780. The presentation contains a Game Day slide that says, "Initiative Overview: Game Day / Objective[:] Increase the number of schools participating in camps and competitions across cheer and dance through Game Day camp curriculum and Game Day competition format[;] Will require renewed focus and training for sales teams on converting customers to camps and competitions." *Id.* at 782.

## ARGUMENT

### I. Legal Standard

Plaintiffs refer the Court to their Opposition to Defendants' Joint Motion for Summary Judgment for the legal standard for summary judgment.

### II. Charlesbank and Bain Are a Single Enterprise with Varsity

Charlesbank and Bain argue that they are separate corporate entities that cannot be held liable for the actions of Varsity under *United States v. Bestfoods. See* CB Brief at 4; Bain Brief at 4. But that is the wrong standard.[3] In the antitrust context, as the Court has held, "a parent

---

[3] Even if the Court credits Charlesbank's *Bestfoods* argument, Charlesbank still loses. In *United States v. Bestfoods*, 524 U.S. 51 (1998), the Court rejected the notion that a parent-subsidiary relationship, without more, is sufficient to establish liability for the parent based on the actions of the subsidiary. *Id.* at 68. The Court reiterated the established principle that a business is responsible for the wrongs committed by its agents in the course of its business. *Id* at 63-65. Direct liability may be imposed on a parent corporation when that company directs, or conducts operations related to the illegal activity. *Id.* at 66. Here, ample evidence establishes Charlesbank's direct participation in the anticompetitive scheme, easily satisfying the standard in *Bestfoods.*

Charlesbank relies on dicta in a *Bestfoods* footnote to argue that Plaintiffs must show that Charlesbank executives were acting contrary to the interests of Varsity and in the interest of Charlesbank while on Varsity's Board or acting in executive roles for Varsity. But *Bestfoods* creates no such rule: "We do not attempt to recite the *ways* in which the Government could show

corporation and its wholly owned subsidiary are treated as a single unit for purposes of antitrust liability." Order Denying Defendants Bain Capital Private Equity, LP and Charlesbank Capital Partners, LLC's Motion to Dismiss ("MTD Order"), ECF No. 332 at 9 (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) ("*Copperweld*")).

Defendants support their position with a sworn declaration from both Charlesbank and Bain representatives, stating that Defendants "have never owned directly or indirectly the Varsity defendants." *See* Defs' Ex. CM [Cotton Decl.] at ¶ 5; Defs' Ex. CO [Janower Decl.] at ¶ 5. But in their Motions to dismiss, Charlesbank and Bain asserted to this Court that "as a matter of law, an entity such as Charlesbank or Bain is legally incapable of 'conspiring' with an entity ***that it owns***." ECF No. 60-1 (emphasis added). They further stated: "[n]or is it possible as a matter of law for an entity to "conspire" with an officer or employee ***of a subsidiary entity***." *Id.* (emphasis added). Charlesbank and Bain are not being candid with the Court. Indeed, Charlesbank and Bain's declaration that they never owned, directly or indirectly, the Varsity Defendants is refuted by their sworn deposition testimony. *See* RDSOF at ¶ 227 and ¶ 238[4] Charlesbank and Bain

---

the dual officers or directors were in fact acting on behalf of the parent." *Id.* at 70, n. 13 (emphasis added). As the Court has noted, the relevant standard is supplied by *Copperweld*. *See* ECF No. 332 (MTD Order) at 9–16. The only case that Charlesbank and Bain cite to in support of their "rule" is not an antitrust case, but rather a CERCLA case from the Third Circuit in which the plaintiffs sued over pollution from a paint factory but failed to produce any evidence that the parent played any role in operating the factory, and sought to hold them liable as a matter of law. *See* CB MSJ at 4; Bain MSJ at 4 (citing *Trinity Indus., Inc. v. Greenlease Holding Co.*, No. CIV.A. 08-1498, 2014 WL 1766083, at *10-11 (W.D. Pa. May 2, 2014)).

Charlesbank and Bain's other cases do not even refer to the purported "rule" that Defendants advance. For example, *F.T.C. v. On Point Global LLC* was an action enforcing the FTC Act, which sets its own statutory standard, applicable only in cases enforcing the FTC Act, for when a parent company can be held liable for acts of a related company. *Fed. Trade Comm'n v. On Point Glob. LLC*, No. 19-25046-CIV, 2021 WL 4892228 at *11 (S.D. Fla. Sept. 29, 2021). Defendants' other cases are even further afield, highlighting the threadbare nature of their argument, which steadfastly avoids referring to the applicable *Copperweld* standard.

[4].Moreover, Defendants' well-documented failures to properly comply with discovery has become relevant yet again. Charlesbank and Bain base their motion for summary judgment in part on their declarations regarding the corporate makeup of the various boards of directors. *See* Defs' Ex. CM [Cotton Decl.] at ¶¶ 3, 6, 7; Defs' Ex. CO [Janower Decl.] at ¶¶ 3, 6. Yet Plaintiffs

argued in their motion to dismiss that they were not distinct from Varsity and received the benefit

of the *Copperweld* rule, when the Court held, pursuant to Charlesbank and Bain's Motion to

Dismiss, that "the Holding Company Defendants and Varsity are not separate actors capable of

unlawfully coming to an agreement under § 1 of the Sherman Act," and therefore could not be

held liable for conspiring with Varsity under § 1. MTD Order at 9–11. Defendants have now

asserted a completely contradictory position. Charlesbank, Bain and Varsity should be estopped

from taking such contrary position.[5] "Defendants cannot have the *Copperweld* doctrine both

ways." *Arandell Corp. v. Centerpoint Energy Servs., Inc*., 900 F.3d 623, 631–32 (9th Cir. 2018)

("*Arandell*").

That related or affiliated companies are a single entity can be inferred merely from the

parent's knowledge of the subsidiary's anticompetitive activities prior to its acquisition of the

entity. *See In re Packaged Seafood Prod. Antitrust Litig*., No. 15-MD-2670 DMS (MDD), 2022

WL 836951, at *10 (S.D. Cal. Mar. 21, 2022) ("*Packaged Seafood*") (parent was liable where it

could "reasonably be inferred from the allegations that [the parent] knew that [the subsidiary's]

profits were untenable in a competitive market and were in fact the product of collusive price

agreements . . . , [yet] proceeded to acquire [the subsidiary] with this knowledge"). Proof of a

unified economic purpose can also establish the existence of a single economic enterprise. *See*

*Freeman v. San Diego Ass'n of Realtors* 322 F.3d 1133, 1147-148 (9th Cir. 2003):

> The single-entity rule is relevant in a variety of contexts. It applies to a company
> and its officers, employees and wholly owned subsidiaries . . . , subsidiaries
> controlled by a common parent . . . , firms owned by the same person, . . . a firm

specifically asked for this information in an interrogatory. *See* Ex. 309 [Varsity discovery
response] at Rog 18. Varsity refused to provide this information on the grounds that it seeks
"irrelevant information." Defendants should be estopped from introducing such evidence to
support their defenses.

[5] "Judicial estoppel is a discretionary equitable doctrine . . . [that] 'generally prevents a party
from prevailing in one phase of a case on an argument and then relying on a contradictory
argument to prevail in another phase.'" *Stanley v. FCA U.S, LLC*, 51 F.4th 215, 218 (6th Cir.
2022) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). In doing so, the doctrine
"preserves the integrity of the courts by preventing a party from abusing the judicial process
through cynical gamesmanship." *Id*. (quoting *White v. Wyndham Vacation Ownership, Inc.*, 617
F.3d 472, 476 (6th Cir. 2010).

**PLAINTIFFS' OPPOSITION TO DEFENDANTS CHARLESBANK PARTNERS, LLC AND BAIN
CAPITAL PRIVATE EQUITY'S MOTION FOR SUMMARY JUDGMENT**

> owned by a subset of the owners of another, . . . principal-agent relationships, . . . and to partnerships or other joint arrangements in which persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit. *The theme in these cases is economic unity*. Where there is substantial common ownership, a fiduciary obligation to act for another entity's economic benefit or an agreement to divide profits and losses, individual firms function as an economic unit and are generally treated as a single entity.

(cleaned up, italics added). *See also, Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1234–235 (10th Cir. 2017) ("*Lenox*") (holding that where the parent "played a 'role' in the overall anticompetitive scheme perpetrated by the enterprise as a whole," (*id.* at 1230), the parent and subsidiary comprise a single economic unit for the purposes of both Section 1 and Section 2 of the Sherman Act).

Here, ample evidence shows that both Charlesbank and Bain had a unity of economic purpose as the owner of Varsity, and therefore must be considered as a single economic enterprise. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984); *Arandell Corp. v. Centerpoint Energy Servs.*, Inc., 900 F.3d 623 (9th Cir. 2018); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221 (10th Cir. 2017).  Between 2014 and its sale of Varsity in 2018, Charlesbank owned a majority, controlling interest in Varsity, operating as its controlling shareholder and Board presence. *See supra,* Factual Summary. Likewise, Bain, after it had purchased a majority interest in Varsity from Charlesbank, also fully controlled Varsity and its Board of Directors. *Id*. Further, when Charlesbank acquired Varsity, Charlesbank was aware of Varsity's anticompetitive acquisition strategy, its market power, its exclusionary contracts, its ability to eliminate and foreclose competition, and the market's significant barriers to entry. *See* Ex. 97 at 5805–06, 5810, 5855–5876, 5882 (September 2014 management presentation reviewed by Charlesbank which describes Varsity as the "consolidator of choice" and provides information with respect to Varsity's leading market share in each of the Relevant Markets, its relationship with regulatory bodies for Competitive Cheer, its primary competitors—including JAM Brands, Epic Brands, and Aloha—and acquisition opportunities). Bain was equally knowledgeable at the time it acquired Varsity in 2018 and intended to further entrench and accelerate Varsity's monopoly and competitive restraints. *See supra,* Factual Summary.

As a single enterprise, once participation in the anticompetitive scheme is shown, the entities are liable as a single enterprise. *See Arandell*, 900 F.3d at 631. The same is true for Section 2 of the Sherman Act. *Lenox*, 847 F.3d at 1233-34 ("*Copperweld's* reasoning with respect to § 1 applies equally to § 2").

### III.    Charlesbank and Bain Are Active Participants in the Exclusionary Scheme

As the Court has held, Charlesbank and Bain may be held liable if the jury finds that "each defendant independently participated in the enterprise's scheme." ECF No. 332 [MTD Order] at 12 (quoting *Arandell*, 900 F.3d at 631). "A parent's direct involvement in its subsidiary's antitrust conspiracy can be shown where the parent directed, controlled, or encouraged its subsidiary's participation in the scheme." *In re Outpatient Medical Center Employee Antitrust Litig.,* 630 F. Supp. 3d 968, 991 (N.D. Ill. 2022). Acquisitions may constitute anticompetitive conduct if they "lead to a monopoly," or "exclude competition," or where they further an anticompetitive scheme. ECF No. 332 [MTD Order] at 15 (citing *United States v. Grinnell Corp.,* 384 U.S. 563 (1966). Potentially anticompetitive conduct must be viewed in the aggregate. *Id.* (citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690 (1962)).

It is not necessary to show that each defendant participated in every overt act or indeed independently satisfies each element of the claim. *See Esco Corp. v. United States,* 340, F.2d 1000, 1008 (9th Cir. 1965); *Lenox*, 847 F.3d at 1236. *Lenox* is on point. In *Lenox*, the Court rejected the defendants' theory that the plaintiff had to show that both parent and subsidiary "independently satisfied each necessary element of the claims." 847 F.3d at 1236:

> Rather, in a single-enterprise situation, it is the **affiliated corporations' collective conduct**—i.e., the conduct of the enterprise they jointly compose—that matters; it is **the enterprise** which must be shown **to satisfy the elements** of a monopolization or attempted monopolization claim. . . . Stated another way, the related entities' coordinated conduct must be treated as the unitary conduct of the single enterprise which together they form, and it is that aggregated conduct which must be scrutinized.

*Id.* (emphasis added).

### A.  Charlesbank Actively Participated in the Anticompetitive Scheme

**PLAINTIFFS' OPPOSITION TO DEFENDANTS CHARLESBANK PARTNERS, LLC AND BAIN CAPITAL PRIVATE EQUITY'S MOTION FOR SUMMARY JUDGMENT**

Charlesbank is liable for its direct role in the exclusionary scheme. In the aggregate, Plaintiffs' showing of Charlesbank's ownership of Varsity, control of Varsity's Board, active management and direction of Varsity operations, and providing the dry powder for financing and targeting anticompetitive acquisitions creates—at minimum—a genuine issue of material fact.

Charlesbank asserts that there is no evidence of its direct participation in the scheme. Motion at 5. This is wrong. *See supra,* Factual Summary. Most critically, Charlesbank secured substantial financing for the anticompetitive acquisitions. *See, e.g.*, Ex. 223 (email from Charlesbank's Josh Beer to Varsity's new CEO, "Well, we've got the dough for our acquisitions now…let's make it sweat!"). In fact, Varsity's anticompetitive scheme to monopolize the markets for Cheer Competitions, Camps, and Apparel, likely would not have succeeded *but for* Charlesbank's direction and financing for acquisitions.

Abundant evidence shows that Charlesbank was a knowing and active participant in Defendants' unlawful scheme. As the Statement of Facts shows, Charlesbank:

•    actively assessed, approved, and provided financing for Varsity's anticompetitive acquisitions, effectuating the acquisition of at least 8 of Varsity's largest competitors and providing well over ███████ to finance the acquisitions;

•    was actively involved in removing founder Jeff Webb from his position as CEO of Varsity Brands, hand-picked his successor, then installed one of its own executives as CEO when the hand-picked successor did not work out;

•    installed a permanent majority on the Board of Directors of the Varsity holding company by requiring 3 of the 7 seats to belong to Charlesbank and a fourth to be selected by Charlesbank and in which it installed an individual over whom it exercised "significant influence";

•    drafted communications and other documents on Varsity's behalf;

•    communicated to potential investors in a debt offering the nature of Varsity's anticompetitive scheme and the implicit promise of supracompetitive profits to continue by stating, "we are insulated from competition and price pressure because those making the buy

decision aren't the ones writing the check. Something like . . . 'Those making the purchase decision (coaches, cheer advisors, YB advisors, administrators, etc) and those paying the money (athletes/students) are distinct."

Any of these factors alone is sufficient for the jury to find active participation. *See Lenox*, 847 F.3d at 1236. But when viewed in the aggregate, as they must be, these facts clearly demonstrate that Charlesbank was an active and direct participant in Defendants' anticompetitive scheme. At minimum, this creates a clear dispute of fact. Moreover, the idea that Charlesbank and Bain were unaware of the purpose and effect of this conduct is not credible. *See Conwood Co., L.P. v. U.S. Tobacco Co*., 290 F.3d 768, 782 (6th Cir. 2002) ("no monopolist monopolizes unconscious of what he is doing.") (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp*., 472 U.S. 585, 602 (1985)). Indeed, in Charlesbank's acquisition memo, summarizing the many acquisitions that Charlesbank directed and secured financing for, Charlesbank notes that "All deals were in the same market of All Star event providers as part of strategy to grow market share and leverage synergies." *See* Ex. 229 at -5993.

## B.  Bain Actively Participated in the Anticompetitive Scheme

Bain is likewise liable for its direct role in the exclusionary scheme. As with Charlesbank, Plaintiffs' showing of Bain's ownership and control of Varsity, control of Varsity's Board, active management and direction of Varsity operations, and providing the dry powder for anticompetitive acquisitions creates—at minimum—a genuine issue of material fact. Just as with Charlesbank, Bain secured significant financing to fund Varsity's acquisitions and protect its monopoly, *See, e.g.*, Ex. 281 (Bain's Ryan Cotton stating with respect to significant new funding: "Ready to go on a buying spree!").

Bain asserts that there is no evidence of its direct participation in the scheme. Motion at 5. This is wrong. *See supra* Factual Summary. Abundant evidence shows that Bain was a knowing and active participant in Defendants' unlawful scheme. Among other things, Bain:

- was aware of Varsity's anticompetitive scheme prior to purchasing Varsity, and recognized the ability to further entrench Varsity's monopoly;

**PLAINTIFFS' OPPOSITION TO DEFENDANTS CHARLESBANK PARTNERS, LLC AND BAIN CAPITAL PRIVATE EQUITY'S MOTION FOR SUMMARY JUDGMENT**

- played an active role in assessing and selecting Varsity's acquisition targets;

- secured financing to further fund anticompetitive acquisitions that maintained and protected Varsity's monopoly;

- exercised control over Varsity's Board of Directors; and

- was active in Varsity's day-to-day operations, including:

  o   Amending the terms for Varsity's Family Plan;

  o   Pursuing efforts to increase attendance at Varsity camps and competitions; and,

  o   Arranging the sale and leaseback of Varsity's headquarters.

Any of these factors, viewed on its own, would be sufficient to prove Bain's active participation in the scheme, because it is not necessary to show that Bain participated in every aspect of the scheme. *See Lenox*, 847 F.3d at 1236. But when viewed in the aggregate, as they must be, these facts clearly demonstrate that Bain was an active and direct participant in Defendants' anticompetitive scheme. At minimum, this creates a clear dispute of fact.

## IV.    Charlesbank and Bain Are Vicariously Liable for the Acts of Their Agent, Varsity.

Charlesbank and Bain can also be held liable under basic agency law regardless of their direct participation. *See American Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556 (1982). Defendants' Motions do not seek summary judgment on this basic theory of liability and fail to meet their burden on summary judgment. Charlesbank and Bain moved for summary judgment solely on two narrow—and off base—grounds.

Charlesbank and Bain's motion did not, however, address other grounds for liability, including vicarious liability under basic agency principles. It is black letter law that a principal is vicariously liable for the conduct of its agents, carried out with apparent or actual authority. Such principles apply to antitrust violations. *Hydrolevel*, 456 U.S. at 570. Charlesbank and Bain are liable under the antitrust laws for the misdeeds of their corporate agents acting with apparent or actual authority. *Id.* Here, there is probative evidence that Varsity was an agent of Charlesbank and Bain during the respective ownership period of each. For example, in 2016, when Varsity

raised capital to fund a dividend distribution and "retain firepower to complete acquisitions," the syndicator and lenders were aware that Varsity was authorized by Charlesbank. Ex. 288 at -3480; *see also id.* ("Charlesbank and Goldman will coordinate with lenders and the ratings agencies"). Similarly, in 2020, Varsity acted with Bain's authority to raise over $180 million and "leverage its balance sheet" to "build on recent momentum and accelerate growth." Ex. 308 at -2926, -2929, -2931 (confirming Jefferies was aware that Bain was managing and directing Varsity in the deal); *see also* Ex. 281 at -7151-53.

Defendants never moved for summary judgment under agency law.[6] Plaintiffs thus have no duty or burden to identify facts from which a jury could find Defendants liable on an agency basis. There are, however, abundant facts from which a jury could do so, and the agency principles expressed in *Hydrolevl* are particularly apt here.[7]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask the Court to deny Charlesbank and Bain's Motion for Summary Judgment.

---

[6] To the extent Charlesbank and Bain attempt to raise a new argument and basis for summary judgment on agency liability in their Reply briefing, the Court should not consider it. *See Malin v. JPMorgan*, 860 F. Supp. 2d 574, 577 (E.D. Tenn. 2012) ("[A] movant cannot raise new issues for the first time in a reply brief because consideration of such issues deprives the non-moving party of its opportunity to address the new arguments.").

[7] The Supreme Court's rational is particularly apt given the Defendants' arguments here. As the Supreme Court said:

> The wisdom of the apparent authority rule becomes evident when it is compared to the alternative approaches advanced by the District Court's instructions to the jury, see supra, at 1941, and advocated by ASME.12 First, ASME insists that it should not be held liable unless it ratified the actions of its agents. But a ratification rule would have anticompetitive effects, directly contrary to the purposes of the antitrust laws. ASME could avoid liability by ensuring that it remained ignorant of its agents' conduct, and the antitrust laws would therefore encourage ASME to do as little as possible to oversee its agents.

*Hydrolevel* at 573.

**PLAINTIFFS' OPPOSITION TO DEFENDANTS CHARLESBANK PARTNERS, LLC AND BAIN
CAPITAL PRIVATE EQUITY'S MOTION FOR SUMMARY JUDGMENT**

Dated: September 15, 2023

Respectfully submitted,

By: _____ */s/ Joseph R. Saveri* _____
         Joseph R. Saveri

Joseph R. Saveri*
Steven N. Williams*
Ronnie Seidel Spiegel*+
Kevin E. Rayhill*
Elissa A. Buchanan*
David Seidel*
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
rspiegel@saverilawfirm.com
krayhill@saverilawfirm.com
eabuchanan@saverilawfirm.com
dseidel@saverilawfirm.com

Van Turner Jr. (TN Bar No. 22603)
**TURNER FEILD, PLLC**
2650 Thousand Oaks Blvd., Suite 2325
Memphis, Tennessee 38118
Telephone: (901) 290-6610
Facsimile: (901) 290-6611
VTurner@TurnerFeildLaw.com

Richard M. Paul III*
Ashlea Schwarz*
**PAUL LLP**
601 Walnut, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
rick@paulllp.com
ashlea@paulllp.com

**PLAINTIFFS' OPPOSITION TO DEFENDANTS CHARLESBANK PARTNERS, LLC AND BAIN
CAPITAL PRIVATE EQUITY'S MOTION FOR SUMMARY JUDGMENT**

Jason S. Hartley*
**HARTLEY LLP**
101 West Broadway, Suite 820
San Diego, CA 92101
Telephone: (619) 400-5822
hartley@hartleyllp.com

Daniel E. Gustafson*
Daniel C. Hedlund*
Daniel J. Nordin*
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com

* Admitted *pro hac vice*

+Located in Washington State

*Attorneys for Individual and
Representative Plaintiffs*

**PLAINTIFFS' OPPOSITION TO DEFENDANTS CHARLESBANK PARTNERS, LLC AND BAIN
CAPITAL PRIVATE EQUITY'S MOTION FOR SUMMARY JUDGMENT**