# EXHIBIT 13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| **JESSICA JONES, et al.,** | Case No. 2:20-cv-02892-SHL-tmp |
| Plaintiffs, | |
| v. | |
| **VARSITY BRANDS, LLC, et al.** | |
| Defendants. | |
| | **JURY DEMAND** |

## PLAINTIFFS' OPPOSITION
## TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND FACTS AND CLAIMS ...........................................................................1

LEGAL STANDARD ..........................................................................................................5

ARGUMENT .......................................................................................................................7

I.     VARSITY'S ANTICOMPETITIVE CONDUCT CREATES A CLASSIC
       DISPUTE OF FACT FOR THE JURY .....................................................................7

II.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT WITH
       RESPECT TO COMPETITIONS. ..........................................................................11

       A.     The Cheer Competitions Market Is a Proper Antitrust Market ...........................11

              i.     Product Market ..........................................................................................11

              ii.    Geographic Market ....................................................................................15

       B.     Anticompetitive Conduct with Respect to Competitions ....................................16

              i.     Exclusionary Rebate Programs and Contracts ...........................................18

              ii.    Acquisitions ..............................................................................................21

                     a.     Varsity's Acquisitions Allowed it to Eliminate Competitors
                            and Build Dominant Market Share ..................................................23

                     b.     Acquisitions of Tier I Event Producers ...........................................25

              iii.   Counterprogramming .................................................................................26

              iv.    The Conspiracy with USASF and Other Organizations ............................29

       C.     There is Evidence of Harm in the Competitions Market .....................................30

III.   DEFENDANTS' ARE NOT ENTITLED TO SUMMARY JUDGMENT WITH
       RESPECT TO CAMPS. ..........................................................................................34

       A.     Plaintiffs Jones and Lorenzen Have Standing with Respect to All Claims
              for Damages and Injunctive Relief ....................................................................34

              i.     Article III Standing ...................................................................................34

              ii.    Antitrust Standing .....................................................................................35

       B.     There is Evidence of Anticompetitive Conduct with respect to Camps .............40

              i.     Varsity's Impact Program ("VIP") ...........................................................41

              ii.    Bids to End of Year Competitions .............................................................41

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

iii.    Varsity's Anticompetitive Tying Scheme ................................................42

C.    There is Evidence of Harm in the Camps Market ....................................43

IV.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT WITH
RESPECT TO APPAREL. ...........................................................................43

A.    The Cheer Apparel Market .....................................................................43

B.    Evidence of Anticompetitive Conduct in the Apparel Market...............46

i.    Rebates ..........................................................................................46

ii.    Conspiracy with USASF ...............................................................47

iii.    Acquisitions ..................................................................................48

C.    There is Evidence of Harm in the Cheer Apparel Market ......................49

V.    PLAINTIFFS' STATE LAW CLAIMS ARE NOT DEFICIENT ....................50

A.    Tennessee Law Permits Recovery on Plaintiffs' Claims........................50

i.    TCPA's Class Action Bar is Procedural ......................................50

ii.    Plaintiffs' Claims for Unjust Enrichment Should Move Forward ............50

B.    Plaintiffs' Claims are Based on a Conspiracy Between USASF and Varsity ........53

C.    Plaintiffs Can Bring Indirect Purchaser Claims in Arkansas, Florida,
Idaho, Massachusetts, and Washington...................................................54

D.    It is Immaterial if States Have Statute of Limitations That Differ from the
Federal Statute of Limitations.................................................................55

E.    Plaintiffs Were Not Required to Meet Preempted Procedural Requirements ........55

VI.    SUMMARY JUDGEMENT IS IMPROPER AS TO PLAINTIFFS' CLAIM FOR
DECLARATORY RELIEF ..........................................................................56

CONCLUSION.........................................................................................................56

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Allen v. Wright*, 468 U.S. 737 (1984) ................................................................34

*Am. Ad Mgmt. Inc. v. Gen. Tel. Co.*, 190 F.3d 1494 (9th Cir. 1999) .....................35, 36

*American Tobacco Co. v. United States*, 328 U.S. 781 (1946) ................................1, 8

*Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413 (6th Cir. 1990) .........1

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585 (1985) ...................21

*Associated Gen. Contractors of Cal., Inc. v. California State Council of
    Carpenters*, 459 U.S. 519 (1983) .............................................................35, 36, 40

*B & H Medical, L.L.C. v. Stephen M. Ryan, P.L.L.C.*, 526 F.3d 257 (6th Cir.
    2008) ...............................................................................................................42

*Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946) ..........................................33

*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) ...................................37

*Bodie-Rickett Assocs. v. Mars, Inc.*, 957 F.2d 287 (6th Cir. 1992) .........................35

*Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849 (8th Cir. 2000) ......................42

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) .........................11, 12, 15, 43

*Burley v. Sumner Cnty. 18th Jud. Dist. Drug Task Force,* No. 3:19-CV-00118,
    2022 WL 18028283 (M.D. Tenn. Dec. 30, 2022) ...........................................6

*Calderone v. United States,* 799 F2d 254 (6th Cir. 1986) ......................................6

*Caribbean Broad Sys. Ltd. v. Cable Wireless PLC*, 148 F.3d 1080 (D.C. Cir.
    1998) ...............................................................................................................7

*Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820 (D.N.J. 2015) ........................32

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................................5

*City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373 (9th Cir.1992) ..................7, 46

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991) .................................6

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

*Comprehensive Sec., Inc. v. Metro. Gov't of Nashville & Davidson Cty., Tennessee*, No. 21-5617, 2022 WL 670135 (6th Cir. Mar. 7, 2022) ......................................11

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962)........................... *passim*

*Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002)............................... *passim*

*Cullen v. Nissan N. Am., Inc.*, 3:09-0180, 2010 WL 11579748 (M.D. Tenn. Mar. 26, 2010) ........................................................................................................................51

*Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097 (N.D. Cal. 2013).....................37, 39

*Dolgencorp, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh Pennsylvania*, No. 3:18-CV-0529, 2018 WL 3753157 (M.D. Tenn. Aug. 8, 2018)............................................56

*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992)....................8, 10, 11

*Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556 (9th Cir. 2018) ..........................................47

*F.T.C. v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ..............................................45

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (1997)..............................................................44, 45, 46

*High Tech Gays v. Def. Indus. Sec. Clearance Off.*, 895 F.2d 563 (9th Cir. 1990).......................6

*Gannon Int'l Ltd. v. Blocker*, 684 F.3d 785 (8th Cir. 2012) .........................................................5

*Hunter v. Caliber Sys., Inc.*, 220 F.3d 702 (6th Cir. 2000).......................................................6, 15

*In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041 (N.D. Ill. Nov. 5) .........................54

*In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224 (D. Conn. 2015) ..........................................55

*In re Auto. Parts Antitrust Litig.*, 12-MD-02311, 2014 WL 2993753 (E.D. Mich. July 3, 2014)....................................................................................................................51

*In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 836 (E.D. Mich. 2014) ....................................54

*In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2013 WL 2456612 (E.D. Mich. June 6, 2013) ....................................................................................................34, 37

*In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 1720468 (N.D. Ill. May 27, 2022) ..................................................................................................................55

*In re Broiler Chicken Antitrust Litig.*, 290 F.Supp.3d 772 (N.D. Ill.2017) ..................................54

*In re Cathode Ray Tube Antitrust Litig*, 738 F. Supp. 2d 1011 (N.D. Cal. 2010) ........................37

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL 1917, 2013 WL 4505701
(N.D. Cal. Aug. 21, 2013) ....................................................................................40

*In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538 (M.D. Pa.
2009) ...................................................................................................................54

*In re Dealer Mgmt. Sys. Antitrust Litig.*, 18 C 864, 2023 WL 4305901 (N.D. Ill.
June 29, 2023) .....................................................................................................56

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d
1072 (N.D. Cal. 2007) .........................................................................................54

*In re Flash Memory Antitrust Litig*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009) ..............37

*In re Flonase Antitrust Litig.*, 692 F.Supp.2d 524 (E.D. Pa. 2010) ...............................51

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160 (D.
Me. 2004) ............................................................................................................54

*In re Propranolol Antitrust Litig.*, 249 F.Supp.3d 712 (S.D.N.Y. 2017) ......................56

*In re Restasis Antitrust Litig.,* 355 F.Supp.3d 145 (E.D.N.Y.2018) .............................55

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1
(E.D.N.Y. 2020) ..................................................................................................32

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008) ..................................32

*In re Se. Milk Antitrust Litig.*, 739 F.3d 262 (6th Cir. 2014) ..........................6, 12, 13, 15

*In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d 705 (E.D. Tenn. 2011) ...................45, 53

*In re Whirlpool Corp. Front–Loading Washer Prods. Liab. Litig.*, 684 F. Supp. 2d
942 (N.D. Ohio 2009) .........................................................................................51

*J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981) ...........................33

*Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 725 (W.D. Tenn. 2022) ..........10, 23, 41

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) .............................................9, 10, 17

*Logan v. Denny's, Inc.,* 259 F.3d 558 (6th Cir. 2001) .....................................................6

*Lujan v. Defs. Of Wildlife*, 504 U.S. 555 (1992) ...........................................................34

*Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405 (6th. Cir. 2008) ..............6

*Masimo Corp. v. Tyco Health Care Group, L.P.*, No. CV 02-4770 MRP, 2006
WL 1236666 (C.D. Cal. Mar. 22, 2006) .............................................................20

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

*Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834 (7th Cir.2011) ....................................52

*Midwest Agency Servs., Inc. v. JP Morgan Chase Bank, N.A.*, No. CIVA2:09-165-DCR, 2010 WL 935450 (E.D. Ky. Mar. 11, 2010)...................................................47

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009)........................................36

*Monsanto Co. v. Trantham*, 156 F. Supp. 2d 855 (W.D. Tenn. 2001) ....................................13, 15

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85 (1984)........................................................................................45

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099 (9th Cir. 2000) ................................6

*Peck v. General Motors Corp.*, 894 F.2d 844 (6th Cir. 1990).......................................35

*Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464 (1962)........................................6, 7

*Radair, LLC v. Alaska Airlines, Inc.*, No. 2:20-cv-02286-MSN-cgc, 2022 WL 193736 (W.D. Tenn. Jan. 20, 2022).............................................................51

*Re/Max Int'l, Inc. v. Realty One, Inc.,* 173 F.3d 995 (6th Cir. 1999)..................................2

*Re/Max International v. Realty One, Inc.*, 900 F. Supp. 132 (N.D. Ohio 1995) .........................35

*Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) ...............................55

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline*, PLC, 737 F. Supp. 2d 380 (E.D. Pa. 2010) ...................................................54

*South- East Coal Co. v. Consol. Coal Co.*, 434 F.2d 767 (6th Cir. 1970)...................................33

*Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917 (6th Cir. 2005)................................ *passim*

*SPX Corp. v. Mastercool, U.S.A., Inc.*, 2011 WL 3610094 (N.D. Ohio Aug. 17, 2011) ......................................................................................47

*Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 US 555 (1931)............................33

*SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275 (8th Cir. 1981)..................................45

*Tolan v. Cotton*, 572 U.S. 650 (2014)..........................................................6

*Troche v. Crabtree,* 814 F.3d 795 (6th Cir. 2016)...............................................6

*United States v. Diebold Inc.*, 369 U.S. 654 (1962)..............................................6

*United States v. Gen. Dynamics Corp.*, 415 U.S. 486 (1974)........................................22

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

*United States v. Phila. Nat. Bank*, 374 U.S. 321 (1963) .................................................45

*United States Futures Exch., LLC v. Bd. of Trade of City of Chicago, Inc.,* 346
    F.Supp.3d 1230 (N.D. Ill.2018) .................................................52

*United States v. Cent. State Bank*, No. 89-1162, 1989 WL 146531 (6th Cir. 1989) ...................45

*United States v. Grinnell Corp.,* 384 U.S. 563 (1966).........................................1, 8, 9

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940)...................................54

*Valley Forge Christian College v. Americans United for Separation of Church
    and State, Inc.*, 454 U.S. 464 (1982)...............................................34

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP,* 540 U.S. 398 (2004).....................48

*Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288 (1st Cir. 2000).......................55

**State Cases**

*Ciardi v. F. Hoffmann–La Roche, Ltd.*, 436 Mass. 53, 762 N.E.2d 303 (2002)...........................54

*Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512 (Tenn. 2005) ........................5, 52

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

This case is about classic monopolists operating in a unique market. Defendants have intentionally and successfully implemented an illegal anticompetitive scheme to acquire and exercise monopoly power over one of America's iconic endeavors: cheerleading. Defendants did so through the Varsity Cheer ecosystem, foreclosing and harming competition in the markets for competitions, camps, and apparel. The record Plaintiffs have developed shows Defendants charged supra-competitive prices in all three markets throughout the Class Period, extracting hundreds of millions of dollars of ill-gotten profits from cheer athletes and their families through the anticompetitive scheme.

For all the below reasons, Defendants' Joint Motion for Summary Judgment must be denied.

## BACKGROUND FACTS AND CLAIMS[1]

Varsity's own internal documentation shows their market share for cheer competitions increased from roughly 42% in 2013 to over 80% in 2018 for All Star competitions that cater to All Star gym teams, while achieving 100% of cheer competitions for school teams throughout the Class Period. Ex. 1 [Netz Rep.] at 52; Ex. 2 [Netz Rebuttal] at ¶ 11. This was the selling point for both Bain and Charlesbank when they each acquired control of Varsity from its founder, Defendant Webb, and infused it with private equity capital. *See e.g.* Ex. 93 at -6023.

This market share alone demonstrates monopoly power. Generally, proof of more than 60% of market share creates presumptive monopoly power. *See United States v. Grinnell Corp.,* 384 U.S. 563, 571 (1966); *American Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946) (over two-thirds of market constitutes a monopoly); *Arthur S. Langenderfer, Inc. v. S.E. Johnson*

---

[1] As cited herein, "PSOF" refers to Plaintiffs' Additional Statement of Facts, filed herewith, and "RDSOF" refers to Plaintiffs' Response to Defendants' Statement of Facts, filed herewith. Unless otherwise noted, all citations to exhibits herein ("Ex. __") are citations to the exhibits attached to the Declaration of Joseph R. Saveri, filed herewith.

*Co.*, 917 F.2d 1413, 1443 (6th Cir. 1990) ("There is substantial merit in a presumption that market shares below 50 or 60 percent do not constitute monopoly power."). The facts adduced on the record further show that by 2018, thanks to its scheme, Varsity controlled 80% of the cheer camps market, 60% of the cheer apparel market targeted at schools and 80% of the cheer apparel market sold to All Star gym teams despite selling apparel widely considered by the public to be higher priced and lower in quality than its competition. Ex. 1 [Netz Rep.] at 57; Ex. 93 at -6023. Varsity's monopoly power is further demonstrated by Varisty's ability to charge supracompetitive prices and increase its market share in all three relevant markets throughout the class period. *See e.g. Re/Max Int'l, Inc. v. Realty One, Inc.,* 173 F.3d 995, 1019 (6th Cir. 1999) (Actual, sustained adverse effects on competition in the relevant market is legally sufficient to support a finding that the challenged restraints were unreasonable, even in the absence of elaborate market analysis). In fact, nowhere do Defendants challenge Plaintiffs' proof that Varsity has monopoly power in all three related relevant markets that comprise the Varsity Cheer ecosystem.

Instead, Varsity has advanced a hodgepodge of arguments in the hopes this Court improperly views each of the relevant markets and each of its anticompetitive tactics in isolation, rather than as part of Varsity's broader, multi-faceted scheme to monopolize the entire Varsity Cheer ecosystem. This is impermissible. As the Supreme Court recognized in *Cont'l Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699 (1962), a court must look to the monopolist's conduct taken as a whole, rather than considering each aspect of their anticompetitive conduct in isolation. The Court stated, "in a case like the one before us [alleging § 1 and § 2 violations], the duty of the jury was to look at the whole picture and not merely at the individual figures in it." *Id*. (citation omitted); *See also Spirit Airlines, Inc. v. Nw. Airlines, Inc*., 431 F.3d 917, 931 (6th Cir. 2005).

The whole picture here shows that Varsity's scheme employed numerous complimentary anticompetitive means to acquire and maintain its monopoly power over the Varsity Cheer ecosystem, the anticompetitive effects of which must be considered in the aggregate. *See Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002). First, like a classic

monopolist, Varsity funded with capital of their investor owners, Charlesbank and Bain, utilized a strategy of anticompetitive acquisitions whose express purpose was to eliminate cheer competition and apparel competitors and to raise prices in violation of the Sherman and Clayton Acts. Second, in lieu of acquiring certain competitors, Varsity demonstrably sought to and was successful in intentionally destroying any competition. It applied and maintained its monopoly power through a number of interconnected exclusionary practices, in combination with its co-conspirators, USASF, Jeff Webb, Charlesbank and Bain.

Varsity conspired with the rule making bodies of competitive cheer, including the USASF, the NFHS and the NCA, among others, to foreclose competition in the cheer apparel, cheer camps and cheer competitions markets. *See, e.g.*, ECF No. 479 [USASF Brief]; RDSOF at ¶¶ 41, 61, 63, 116, 119, 121, 127, 129, 135, 138, 140, 141, 142, 143, 144, 160, 161; PSOF ¶¶ 87-88, 107, 108, 113, 114, 131-147, 150, 157, 158.

Varsity also utilized its monopoly power to implement various anticompetitive contracts in restraint of trade throughout the Varsity cheer ecosystem that kicked back monopoly profits to schools and gyms while harming the athletes and their families, the Indirect Purchasers, who ultimately paid the inflated payments to Varsity. Varsity utilized three types of anticompetitive contracts with schools and gyms: The Family Plan, the Network Agreements, and the Impact ("VIP") program. *See* RDSOF at ¶¶ 84, 89; PSOF ¶¶ 74, 80, 118–126. These loyalty contracts with gyms and schools all contained multiple anticompetitive aspects, including minimum purchasing thresholds, and anticompetitive rebates to schools and gyms of monopoly profits that were ultimately paid by the Indirect Purchaser cheer families, to keep those schools and gyms locked into the Varsity ecosystem, and exclusivity provisions with penalties for buying outside the Varsity ecosystem of competitions, camps and apparel. *Id.*

As Plaintiffs will demonstrate and their experts will testify to, Varsity acquired and maintained monopoly power with this scheme and was able to and did overcharge in all three relevant markets throughout the Class Period. And there is little doubt these overcharges were passed through at a minimum 100% pass-through rate from gyms and schools to their athletes.

Varsity's own documents show that even before considering further markups by schools and gyms or the massive rebates/kick-backs at work, Indirect Purchasers accounted for at least 90% of all of Varsity's revenue. Ex. 7 [Maki Rep.] at ¶ 81; Ex. 53 at -4773.

Plaintiffs thus bring the following claims: (1) for violation of the Sherman Act Section 1, 15 U.S.C. § 1; (2) for violation of the Sherman Act Section 2, 15 U.S.C. § 2; (3) for violations of numerous state antitrust laws; (4) for violations of numerous state consumer protection laws; (5) for violating the Tennessee Trade Practices Act ("TTPA")[2]; (6) for unjust enrichment under Tennessee law; and (7) for conspiring to violate federal and state antitrust laws. The elements of each of Plaintiffs' claims are provided below.

Plaintiffs seek injunctive relief under the federal antitrust laws and seek damages under state antitrust law. As Defendants themselves now concede, the state antitrust laws are modelled after the federal antitrust statues and many of them include formalization provisions adopting or following federal antitrust standards. *See* Defs' Joint Mot. at 47 ("[I]f Plaintiffs federal antitrust claims fail, so too do their claims under the laws of the . . . states.").[3] Generally, the state laws permit claims for concerted action[4] and for monopolization.[5]

---

[2] The Court recently dismissed on the pleadings Plaintiffs' claim under the Tennessee Trade Practices Act.

[3] Defendants' arguments with respect to specific state laws is addressed below in Section V.

[4] Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1. The elements of a Section 1 violation are (1) the existence of a contract, combination, or conspiracy between or among at least two separate entities; (2) that the contract, combination, or conspiracy unreasonably restrains trade; (3) that the restraint affects interstate or foreign commerce; and (4) that the restraint caused plaintiff to suffer an injury to its business or property. *See* 2 Model Jury Instructions in Civil Antitrust Cases (2016).

[5] Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty." 15 U.S.C. § 2. A claim under Section 2 of the Sherman Act requires proof of two elements: (1) the possession of monopoly power in a relevant market; and (2) the willful acquisition, maintenance, or use of that power by anti-competitive or exclusionary means as opposed to "growth or development resulting from a superior product, business acumen, or historic accident." *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002)

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

**State Consumer Protection Law Claims**. Plaintiffs' complaint also alleges violations of state consumer protection laws which can be predicated on the same underlying conduct that violates the federal antitrust laws.

**Tennessee Unjust Enrichment Claim**. The elements of an unjust enrichment claim under Tennessee law are (1) "[a] benefit conferred upon the defendant by the plaintiff"; (2) "appreciation by the defendant of such benefit"; and (3) "acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (quoting *Paschall's, Inc. v. Dozier*, 219 Tenn. 45 (1966)). "The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust." *Id.* Varsity was unjustly enriched by its illegal and unethical scheme at cost to Plaintiffs.

## LEGAL STANDARD

Summary judgment is only appropriate when there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). Because summary judgment is a drastic device that cuts off a right to a jury, the moving party bears the initial burden of establishing the absence of any triable issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Defendants must support their motion with supporting evidence. *Celotex Corp. v. Catrett,* 477 U.S. 317, 328 (1986) (White, J. concurring) ("It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case."); FRCP 56(c)(1)(B).[6] If the moving party's burden of initial

_____

(quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 595–96 (1985)). "To establish the offense of monopolization a plaintiff must demonstrate that a defendant either unfairly attained or maintained monopoly power[.]" *Id.* "[N]o monopolist monopolizes unconscious of what he is doing." *Id.* (quoting *Aspen Skiing*, 472 U.S. at 602). Thus, "[i]mproper exclusion (exclusion not the result of superior efficiency) is always deliberately intended." *Id.* (quoting *Aspen Skiing*, 472 U.S at 603) (citation omitted).

[6] The opposing party may object that the material cited by the moving party to support a fact cannot be presented in a form that would be admissible in evidence. FRCP 56(c)(2); *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012). Plaintiffs have separately objected to the material relied on by the moving parties. *See* Appendix A to Plaintiffs' RDSOF.

production is not met, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial. *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 725–26 (6th Cir. 2000); *Burley v. Sumner Cnty. 18th Jud. Dist. Drug Task Force,* No. 3:19-CV-00118, 2022 WL 18028283, at *4 (M.D. Tenn. Dec. 30, 2022) (*citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 160 (1970); *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything. *See High Tech Gays v. Def. Indus. Sec. Clearance Off.*, 895 F.2d 563, 574; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 607 (11th Cir. 1991). If the moving party's burden is met, the nonmoving party must then present facts that show a genuine issue appropriate for trial. *U. S. v. Diebold Inc.*, 369 U.S. 654, 655 (1962). In reviewing the evidence presented, the Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.*; *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Logan v. Denny's, Inc.,* 259 F.3d 558, 566 (6th Cir. 2001). All reasonable inferences must be drawn in favor of the non-moving party. *Troche v. Crabtree,* 814 F.3d 795, 798 (6th Cir. 2016). If a nonmoving party fails to properly support an assertion of a material disputed fact, the Court can provide them the opportunity to do so. Fed. R. Civ. P. 56(e).

Judges may not weigh or determine the credibility of the evidence proffered in opposing summary judgment. The judge's function is only to determine whether the opposing party's evidence—accepting it as true and resolving all disputes in its favor—is sufficient to satisfy the relevant standard of proof. *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 411 (6th. Cir. 2008). A factual dispute is genuine if a reasonable factfinder could return a verdict for the nonmoving party. *Id.* Thus, for the moving party to prevail on summary judgment, the Court must find that a reasonable trier of fact could only find for the moving party based on the relevant substantive law. *See Calderone v. United States,* 799 F2d 254, 259 (6th Cir. 1986).

Both the Supreme Court and the 6th Circuit have expressed a clear reluctance to dispose of antitrust litigation by way of summary judgment. *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 473 (1962); *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 270 (6th Cir. 2014). This

reluctance rests on the fact that intent and motive are critical in antitrust claims, that key proof is often only in the hands of alleged conspirators, and that establishing a conspiracy tends to require the factfinder to draw inferences. *Poller*, 368 U.S. at 473. As such, "trial by affidavit is no substitute for trial by jury," where witness credibility, intent, and motive to conspire can more properly be examined. *Id*. "[I]f the opposing party's expert provides a reliable and reasonable opinion with factual support, summary judgment is inappropriate." *Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 931 (6th Cir. 2005).

## ARGUMENT

## I.     Varsity's Anticompetitive Conduct Creates a Classic Dispute of Fact for the Jury

The major premise and indeed the first assertion of Defendants' motion is that all of the conduct Plaintiffs claim—and show—to be anticompetitive and illegal is simply Varsity's business "success." *See* Defs' Joint Mot. at 11–17. This premise is flawed as a matter of law and fact. As a matter of law, the evidence of challenged conduct "must be considered in the context of [Plaintiff's] theory." *Conwood*, 290 F.3d 768, 787 (6th Cir. 2002) (scheme to eliminate competition from snuff manufacturer through elimination of racks and point of sale advertising); *Caribbean Broad. Sys., Ltd. v. Cable Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998) (misrepresentations to advertisers and government in order to protect monopoly); *City of Anaheim v. S. Cal. Edison Co*., 955 F.2d 1373, 1376 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect . . . . We are dealing with what has been called the 'synergistic effect' of the mixture of the elements."). There is substantial evidence that the Defendants agreed with one another and acted together to eliminate competition and raise prices. The evidence shows a multi-year concerted scheme to eliminate and foreclose competition through a number of exclusionary practices. *See, e.g.*, PSOF ¶¶ 95-106 (acquisitions); ¶¶ 117-130 (exclusive dealing and rebate agreements); ¶¶ 39, 76, 107, 108, 131-147, 150-151 (conspiracy with USASF); ¶¶ 84-89, 94 (unlawful tying arrangements); ¶¶ 74, 113-116 (exclusionary conduct); ¶¶ 109-112 (other anticompetitive conduct). As in *Conwood*, the scheme was "directed from the highest levels of a

national monopoly." *See Conwood*, 290 F.3d at 788. With the participation and direction of other Defendants, Charlesbank, Bain, Jeff Webb and USASF, Varsity committed dozens—if not hundreds—of overt acts in furtherance of that scheme across the United States, with the explicit purpose of building a deep moat protecting Varsity from competition, with the purpose and effect of raising prices paid by Plaintiffs.

"Monopoly power consists of 'the power to control prices or exclude competition.'" *Conwood*, 290 F.3d at 782 (quoting *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 574 (6th Cir. 1986); *see United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (monopoly power is "the power to control prices or exclude competition") (quoting *United States v. du Pont & Co.*, 351 U.S. 377, 391 (1956)). Ample evidence supports a finding that Defendants intentionally utilized anticompetitive conduct to acquire and maintain their monopoly power in the three relevant interconnected markets challenged here. That conduct was anticompetitive. Varsity, with its co-conspirators, affiliates and principles erected barriers to entry, restrained trade, foreclosed rivals' ability to compete, and raised prices above competitive levels. Monopoly was the goal. Varsity achieved it to an extraordinary degree, amassing market shares at levels virtually unseen since the 1890s, when the antitrust laws in the United States were instituted.

Defendants do not dispute that Varsity has obtained dominant monopoly power with respect to competitions, camps and apparel. Nor could they. Such high market shares alone are sufficient to survive summary judgment. *See Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 481 (1992) (concluding, without elaboration that evidence that Kodak "control[led] nearly 100% of the parts market and 80 to 95% of the service market, with no readily available substitutes," was sufficient to survive summary judgment). As discussed below, Defendants' market power is easily and convincingly established from Varsity's extraordinary market share. *See Grinnell*, 384 U.S. at 571 ("The existence of such power ordinarily may be inferred from the predominant share of the market."); *See also American Tobacco Co. v. U. S.*, 328 U.S. 781, 797 (1946) (two-thirds of entire domestic market is a monopoly). For example, Varsity rolled up cheer competitions across the United States, acquiring all of its largest rivals.

Varsity's revenue market share of All Star competitions grew from 75% of the All Star cheer competitions market in 2016 to 85% in 2018. *See* Ex. 4 [Heeb Rebuttal] at ¶ 33; PSOF ¶¶ 61. On par with the market shares like those in the monopoly outlawed in *Grinnell*, Varsity had acquired and possessed roughly 88% of All Star cheer competitions, 100% of school cheer competitions, 80% of cheer camps, 80% of cheer apparel targeted at gyms, and 60% of cheer apparel targeted at schools. Ex 2 [Netz Rebuttal] at 60; Ex. 93 at -6023; PSOF ¶¶ 60, 62, 64, 70. Varsity's acquisition strategy, organized and directed by Jeff Webb, Charlesbank and Bain, was central to the scheme. Mergers themselves violate the antitrust law when the effect "may be substantially to lessen competition, or to tend to create a monopoly." *See* 15 U.S.C. § 18. The acquisitions did just that. Ex. 1 [Netz Rep.] at 92–104; Ex. 2 [Netz Rebuttal] at 56–61, 85–89 ; Ex. 3 [Heeb Rep.] at ¶¶ 169–181. Further, Varsity's foreclosure efforts and exclusionary practices had the specific purpose of weakening independent event producers and others to force them out of business and reduce the value of the businesses. PSOF ¶¶ 108-130. Varsity used the lower values to acquire rivals at low prices, furthering the scheme. *See, e.g.*, PSOF at ¶¶ 95-106; Ex. 3 [Heeb Rep.] at ¶¶ 227–266; Ex. 4 [Heeb Rebuttal] at ¶¶ 250–58.

Plaintiffs allege a single anticompetitive scheme and conspiracy that sought to restrain trade, exclude rivals, impose barriers to entry, and monopolize the cheerleading industry, causing harm to competition and damages within the markets for cheer competitions, cheer camps, and cheer apparel. Defendants erroneously seek to "tightly compartmentaliz[e] the various factual components and wip[e] the slate clean after scrutiny of each." *Cont'l Ore Co.*, 370 U.S. at 699 .

Viewing the evidence of the scheme as a whole is particularly important in cases challenging a monopoly. *See Conwood*, 290 F.3d at 782. As the Third Circuit aptly explained in *LePage's Inc. v. 3M*, "[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to *consider their overall combined effect*." 324 F.3d 141, 162 (3d Cir. 2003) (quoting *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992)).

The relevant inquiry is the anticompetitive effect of Defendants' exclusionary practices considered together. As the Supreme Court recognized in *Cont'l Ore Co.*, 370 U.S. at 699, the

courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation. The Court stated, "in a case like the one before us [alleging § 1 and § 2 violations], the duty of the jury was to look at the whole picture and not merely at the individual figures in it." *Id*. (citation omitted).

With respect to monopoly claims, exclusionary practices and conduct foreclosing competition must be analyzed together. As further explained in *LePage's*:

> This court, when considering the anticompetitive effect of a defendant's conduct under the Sherman Act, has looked to the increase in the defendant's market share, the effects of foreclosure on the market, benefits to customers and the defendant, and the extent to which customers felt they were precluded from dealing with other manufacturers.

*LePage's*, 324 F.3d at 162; *see also Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 725, 756-57 (W.D. Tenn. 2022), (same, quoting *Cont'l Ore*, 370 U.S. at 699).

Consideration of such conduct is fact specific and not susceptible to resolution by summary judgment. The Sixth Circuit recognizes, consistent with settled law, that evaluation of such conduct requires "a thorough analysis of each fact situation." *Conwood*, 290 F.3d at 782 (quoting *Byars v. Bluff City News Co*., 609 F.2d 843, 860 (6th Cir 1979); *see Eastman Kodak*, 504 U.S. at 467 ("This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record.'"). At minimum, Defendants' efforts to argue the evidence frame genuine disputes of material fact for the trier of fact.

The evidence shows that the nationwide scheme intended to form a self-described "ecosystem" surrounded by a "moat." Ex. 52 at -8477, -8543. The goal was an entrenched and durable monopoly foreclosing competition in its three main segments, competitions, camps and apparel, each of which was connected to the others by overlapping and reinforcing exclusionary conduct. *See* Ex. 1 [Netz Rep.] at 62-65; Ex. 2 [Netz Rebuttal] at 3. "Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." *Eastman Kodak*, 504 U.S. at 466–67. In the marketplace, Varsity leveraged its monopoly power in competitions by making attendance at Varsity's cheer camps a requirement for

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

attending its competitions—a classic anticompetitive tie-in. *See* Ex. 1 [Netz Rep.] at 89-92; Ex. 2 [Netz Rebuttal] at 69-71. At the mandatory Varsity camps, Varsity competition judges instructed campers on Varsity-specific competition content and techniques and gave bids to Varsity Competitions. *See infra* Section III.2 (explaining how the markets for camps, competitions, and apparel are inextricably intertwined). And Varsity documents show that Varsity marketed its apparel—not others—resulting in purchases of Varsity apparel. *See id*. Thus, Defendants' ecosystem must be evaluated in its entirety when evaluating their anticompetitive conduct.

## II. Defendants Are Not Entitled to Summary Judgment with Respect to Competitions.

### A. The Cheer Competitions Market Is a Proper Antitrust Market

Defendants attack cheer competitions as a relevant antitrust market. Defendants ignore the record evidence, which shows the market for cheer competitions is a relevant antirust market.

### i. Product Market

Defendants attack the cheer competition relevant market based on unsupported factual assertions. Defendants argue that the cheer competitions market definition fails because both school cheer competitions and All Star cheer competitions are included. *See* Defs' Joint Mot. at 34-38.

Defining a relevant market for antitrust analysis is a "highly factual" inquiry and can "require[] analysis of relevant expert opinion, testimony to understand the dynamics of the product market, and documentary evidence*." Comprehensive Sec., Inc. v. Metro. Gov't of Nashville & Davidson Cty., Tennessee*, No. 21-5617, 2022 WL 670135, at \*4 (6th Cir. Mar. 7, 2022). As the Supreme Court stated in *Brown Shoe*, determining a relevant market for antitrust analysis is highly fact-based and depends on industry recognition and practical realities:

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. *United States v. E. I. du Pont de Nemours & Co*., 353 U.S. 586, 593-595. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production

facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

*Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (internal citations omitted); *In re Se Milk Antitrust Litig.*, 739 F.3d 262, 277, 282-83 (6th Cir. 2014); *see also* Jones, 618 F. Supp. 3d at 750 ("If a hypothetical monopolist could increase the price of its product by a small but significant amount, usually around 5 percent, and realize a profit from the increase, the test suggests the product market is properly defined.") (quoting *Encana Oil & Gas, Inc. v. Zaremba Fam. Farms, Inc.*, No. 1:12-CV-369, 2015 WL 12883545, at *4 (W.D. Mich. Sept. 18, 2015)); *See* Ex. 3 [Heeb Rep.] at ¶¶ 107-110 (discussing hypothetical monopolist test (HMT) and *Brown Shoe* factors).[7] *See* Ex. 1 [Netz Rep.] at 37-41.

 Dr. Heeb examined each of the three markets. Ex. 3 [Heeb Rep.] at ¶¶ 107-118. Dr. Heeb applied the HMT, determining whether a hypothetical monopolist would be able to profitably impose a small but significant and non-transitory increase in price. Ex. 3 [Heeb Rep.] at ¶ 108. Dr. Heeb also applied the *Brown Shoe* factors to the evidence in this case, as well as those found in the Merger Guidelines. *See* Ex. 3 [Heeb Rep.] at ¶¶ 107-118.[8]

With respect to competitions, Heeb and Netz both confirmed that the relevant market is cheer competitions, including All Star Cheer and competitive school cheer. Ex. 3 [Heeb Rep.] at

---

[7] The HMT has been adopted by the United States Department of Justice and the Federal Trade Commission. U.S. Department of Justice and Federal Trade Commission, Horizontal Merger Guidelines, (Aug. 19, 2010) ("Merger Guidelines") (available at https://www.ftc.gov/system/files/documents/public_statements/804291/100819hmg). The Guidelines provide a framework for analysis of mergers and other issues under the antitrust law, reflecting the views of the Department of Justice and the Federal Trade Commission. They do not have the force of law. With respect to market definition, *Brown Shoe* remains the controlling precedent. Dr. Heeb applied both.

[8] Dr. Heeb analyzed the business records and other data and concluded that these markets, as Varsity confirmed in due diligence materials prepared by Rothschild and Jefferies and disseminated to outside investors were characterized by "significant barriers to entry." *See* Ex. 3 [Heeb Rep.] ¶ at 118. They concluded that the barriers to entry were a result of Varsity's unique sales and marketing network, the scope of product and service offerings, and economies of scale. *See id.*; Ex. 60. To reproduce these advantages would take "significant time and money for a competitor to achieve. . . ." *Id.*

¶¶ 119-144; Ex. 1 [Netz Rep.] at 41-44. Both Heeb and Netz performed the HMT test. *See* Ex. 3 [Heeb Rep.] at ¶ 120. Heeb and Netz also analyzed the practical indicia, including barriers to entry, costs and other market dynamics. Ex. 3 [Heeb Rep.] at ¶¶ 126-135; Ex. 1 [Netz Rep.] at 41-55. It does not include other activities, like sideline cheer, gymnastics or competitive dance. Ex. 3 [Heeb Rep.] at ¶¶ 122-126; Ex. 1 [Netz Rep.] at 42-43. While the analysis was different, they reached the same conclusion.

Defendants' argument with respect to competitions is untenable. First, Defendants make the incorrect assertion that "it is undisputed that All Star gyms . . . would not consider a school competition to be a substitute for an All Star competition because All Star teams are not permitted to compete with school teams." *Id.* at 35. Far from it. There is substantial record evidence that competitive cheer is separated into two disciplines: All Star cheer and competitive school cheer. The nature of the events is virtually identical. *See* Ex. 3 [Heeb Rep.] at ¶¶ 121-123; Ex. 4 [Heeb Rebuttal] at ¶¶ 129-140. Thus, the fact that a school team cannot enter an All Star competition and vice versa says nothing about the elasticity of demand between these two competition regimes.[9] *See Monsanto Co. v. Trantham*, 156 F. Supp. 2d 855, 862 (W.D. Tenn. 2001) (quoting *White & White, Inc. v. Am. Hosp. Supply Corp.,* 723 F.2d 495, 501 (6th Cir. 1983)) (market defined by where consumers could turn for alternatives if a defendant raised its prices); *See also*, *In re Se. Milk Antitrust Litig*., 739 F.3d 262, 277 (6th Cir. 2014). Indeed, substitution between the two is used by Varsity in setting prices *See* Ex. 3 [Heeb Rep.] at ¶ 135; Ex. 4 [Heeb Rebuttal] at ¶¶ 129-134.

Cheer families may choose between competing on a school team and competing on an All Star gym team or compete in both. *See* Ex. 1 [Netz Rep.] at 42; Ex. 2 [Netz Rebuttal] at 16. Indeed, the evidence shows that many athletes competed for both school and gym teams

---

[9] Varsity's strained argument is akin to arguing that consumers who enter a Chic-Fil-A shop cannot purchase a Five Guys chicken sandwich (and vice versa), and therefore, on that basis alone, Chic-Fil-A and Five Guys are not in the same market. The logic is flawed because of course, consumers can choose which shop to enter to begin with.

simultaneously. *See* Ex. 51 at -5544 (stating that "individual cheerleaders compete in one or both segments" of "in-school and All Star."); Ex. 51 at -5546 (stating that there are students who "[w]ill compete at some local competitions with [their] school team during the winter season" and also "practic[e] and compet[e] with [their] All Star team."). From the perspective of an economist, this shows that the products are substitutable, and the demand is elastic and price sensitive. Ex. 4 [Heeb Rebuttal] at ¶ 132 and Ex. 2 [Netz Rebuttal] at 17-20. As Plaintiffs' economists show, the economic consequence is that both should be included in the same market. If Varsity had raised the prices of UCA, NCA, and USA school cheer competitions, a portion of cheer athletes would switch from competing for their school to competing for a gym team. *See* Ex. 3 [Heeb Rep.] at ¶¶ 42–46; Ex. 2 [Netz Rebuttal] at 20. Beyond demand elasticities, the evidence shows the same Varsity marketing department marketed to both school and All Star teams. Ex. 1 [Netz Rep.] at 33 n.133.

Defendants attempt to separate the two markets claiming that "the goals of scholastic cheerleading are very different from those of All Star cheerleading," and that "All Star athletes are trained to a higher level of athleticism that would be dangerous for scholastic cheerleaders to emulate given their lack of training and practice." *Id.* at 35. But Defendants mislead the Court by supporting this dubious factual assertion with citations to *sideline* cheer. But in so doing, Defendants ignore the fact that Plaintiffs experts each independently tested whether competitive cheer could be substituted for sideline cheer. *See* Ex. 3 [Heeb Rep.] at ¶¶ 121, 123, 126; Ex. 4 [Heeb Rebuttal] at ¶¶ 130-133; Ex 1 [Netz Rep.] at 41-43; Ex. 2 [Netz Rebuttal] at 11-13, 17-20; *See also* RDSOF at ¶¶ 74-77, 80-81.

Defendants also argue that vaguely defined "youth" cheer and "recreational" cheer should be included in the relevant market because they are "much closer" substitutes for All Star than school cheer. Defs' Joint Mot. at 36. Defendants support this claim with no reliable evidence whatsoever. Defendants never explain what either "youth" or "recreational" cheer are. They also

fail to show—or test—their substitutability for All Star cheer.[10] By failing to put forward any evidence sufficient to carry their burden, there is no response required to defeat the motion. *See Hunter v. Caliber Sys., Inc*., 220 F.3d at 725–26. Nonetheless there is substantial record evidence at odds with Defendants' assertions.

### ii.    Geographic Market

Defendants also challenge Plaintiffs' definition of the geographic market and thus argue that summary judgment must be awarded. Defs' Joint Mot. at 36-38. Not so. Like the product market, the Sixth Circuit has held that geographic market definition is a fact-intensive inquiry requiring that "[t]he area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Monsanto Co. v. Trantham*, 156 F. Supp. 2d 855, 862 (W.D. Tenn. 2001)*; In re Se. Milk Antitrust Litig*., 739 F.3d 262, 277 (6th Cir. 2014).

As explained by Dr. Heeb, although the competitions market has both regional and national aspects to it, using a national geographic market for antitrust analysis is proper and appropriate here. *See* Ex. 3 [Heeb Rep.] at ¶¶ 107-118, 136-144; Ex. 4 [Heeb Rebuttal] at ¶¶ 109-128. As Dr. Heeb will testify, he utilized both the *Brown Shoe* and the Hypothetical Monopolist Test to adduce evidence of customer substitution patterns; specifically that customers almost always travel outside their home region for events, which is the essential factor for market definitions under both the HMT and the *Brown Shoe* indicia. Dr. Heeb will testify that Varsity's market power is nearly ubiquitous throughout smaller geographic areas and its market share is so large as to indicate a presumption of market power ("highly concentrated markets") in almost all regions.*See* Ex. 3 [Heeb Rebuttal] at Table 6 and Table 7. Dr. Heeb also will testify that price impacts of Varsity's conduct are similar in each of the regional markets, such that a common

---

[10] Defendants offered the testimony of Dr. Kevin Murphy. Dr. Murphy offers a host of *ipse dixit* assertions, devoid of quantitative or qualitative analysis. Dr. Heeb and Dr. Netz responded to each, demonstrating the criticisms were off base and without foundation in the records. See Ex. 4 [Heeb Rebuttal] at ¶¶ 129-58, Ex. 2 [Netz Rebuttal] at 16-35.

national level overcharge is appropriate, and that these estimates can be reliably obtained for the

Class from common evidence. *See* Ex. 4 [Heeb Rebuttal] at ¶¶ 528-557, Table 26. This evidence

presents genuine issues of material fact and Defendants' argument must be rejected. *Spirit*

*Airlines*, 431 F.3d at 931 ("if the opposing party's expert provides a reliable and reasonable

opinion with factual support, summary judgment is inappropriate").

### B. Anticompetitive Conduct with Respect to Competitions

Defendants claim that Plaintiffs have adduced no evidence of anticompetitive conduct

related to competitions. This is not well-taken. *See* Defs' Joint Mot. at 38–45. There is ample

evidence showing that Defendants engaged in anticompetitive conduct that harmed competition

and caused damages in the cheer competitions market. This evidence includes extensive

documentary evidence, deposition testimony, basic economics and the testimony of multiple

qualified experts.

Repeating their erroneous market definition claims, Defendants first argue that all of the

evidence of anticompetitive conduct relates to All Star cheer competitions, and thus Plaintiffs fail

with respect to school cheer competitions included in the market. First, this is at odds with the

market definition evidence cited above. Second it is at odds with substantial evidence of

anticompetitive conduct aimed at cheer competitions for both All Star gyms and for schools.

To begin with, Varsity owned 100% of school cheer competitions. *See, e.g.*, Ex. 93 at

-6023. This is because Varsity owns all the school cheer rule-making bodies that produce these

school cheer competitions, the UCA, NCA and the USA. *See id.*; Ex. 284 at 5631; Ex. 2 [Netz

Rebuttal] at 60 & n.229.

Further, Defendants employed the Varsity IMPACT program, or "VIP" program, an

exclusivity agreement with schools, requiring schools to purchase $50,000 of exclusive

purchasing of Varsity's cheer competitions, camps and apparel, in exchange for the school

receiving $30,000 or more of Varsity's products and services in the form of "free" benefits that

Varsity threatens to invoice schools for after the fact, should they stray from their exclusivity

commitments. RDSOF at ¶ 114. Under that program, school participants received free goods,

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

branding services and other monopoly kickbacks that the athletes and their families ultimately paid for.

Varsity also explicitly tied school competitions to school camps through its "Squad Credentialing Program." *See* PSOF at 22, 85-88. Varsity, in coordination and through corruption of the high school cheer rule-making body, the NFHS, required school cheer teams to attend Varsity cheer camp as a condition to compete at any of the school-cheer championship competitions, which as indicated above, were owned 100% by Varsity. Varsity influenced and controlled the NFHS, the high school rule-making body. Mr. Seely, President of Varsity, explained in a 2015 email that ███████████████████████████████████████ ███████████████████████████████████████████████████████████. Ex. 113 at -9874.

Defendants next challenge the evidence of exclusionary conduct with respect to cheer competitions generally. *See* Defs' Joint Mot at 39–46. In particular, Defendants dispute the following: (1) Defendants' exclusionary contracts, including rebate programs; (2) Defendants' acquisitions of rival competition producers; (3) Defendants' "counterprogramming" events pursued through its conspiracy with USASF; and (4) Defendants' conspiracy with USASF and capture of other cheer governing bodies. Significantly, this conduct is not limited to competitions. Each aspect applies to competitions, camps and apparel. Indeed, the fact that they do provides the mechanism for the anticompetitive scheme. Together they constitute the foundation for the Varsity ecosystem. The adoption of these practices by a national monopoly with dominant market shares is at the heart of Plaintiffs' claims. *See e.g. Conwood,* 290 F.3d at 787-88; *LePage's*, 324 F.3d at 162.

Moreover, Defendants wholly fail to address additional anticompetitive conduct that harmed competition in the Competitions market. For example, Defendants do not address the anticompetitive nature of the World Bid system and how they acquired almost all World Bids. *See* PSOF ¶¶ 48, 103; RDSOF at ¶¶ 127, 129, 133, 135, 136, 138, 140, 141, 142, 143, 144. Nor do they address Defendants' anticompetitive tying of camps to competitions. The general

categories of anticompetitive conduct are discussed below.

### i.    Exclusionary Rebate Programs and Contracts

Varsity utilized "loyalty," "rebate," and/or "discount" programs with schools and All Star gyms to create insurmountable barriers to entry into the relevant markets, foreclose competition, and successfully maintain its monopoly power. *See* Ex. 1 [Netz Rep.] at 5, 104–113; Ex. 2 [Netz Rebuttal] at 2–3, 89; Ex. 3 [Heeb Rep.] ¶¶ 219–226; Ex. 4 [Heeb Rebuttal] at ¶¶ 259–70, 470–81;Ex. 8 [Maki Rebuttal] at ¶¶ 21–24. Varsity implemented two rebate programs for gyms, the "Varsity Family Plan" ("VFP") and the "Varsity Network Agreement" ("VNA") to foreclose competition. Ex. 1 [Netz Rep.] at 104–113. As to school cheer teams, Varsity used its "Varsity Impact Program" ("VIP") contracts. *See* Ex. 162 at -5023.

First as to schools, Varsity's VIP program targeted schools with competitive school cheer teams to enter exclusionary contracts that gave financial incentives for exclusively purchasing Varsity competitions, camps, and apparel. *See* Ex. 162 at -5027 (5-year exclusivity agreement to purchase Varsity apparel, camps, and competitions); *see also* RDSOF at ¶¶ 52, 114; PSOF at ¶¶ 124-126. Indeed, the exclusionary VIP program specifically required that a school purchase only Varsity camps' apparel and competitions as a part of the school's commitment to spend $50,000 exclusively with Varsity or face a penalty of being invoiced for up to $48,500 worth of "free" Cheer "benefits" paid directly to the school. For example, in its contract with , Varsity ⬛⬛⬛ in exchange for ⬛⬛⬛ *Id.* at -5027.

Varsity's loyalty and rebate programs with gyms**,** the Varsity Family Plan and Varsity Network Agreements are fully described in Plaintiff's Additional Statement of Facts ("PSOF"), and in Plaintiffs' expert reports. *See, e.g.*, PSOF at ¶¶ 74, 80, 118–26; Ex. 1 [Netz Rep.] at 104–113; Ex. 7 [Maki Rep.] at ¶¶ 81-88; Ex. 3 [Heeb Rep.] at *e.g.*, ¶¶ 66–67. These programs were designed to create barriers to entry by locking gyms into the Varsity ecosystem. These

agreements provide financial incentives, in the form of rebates based on the amount of cheer spend at Varsity, to encourage gyms to buy from Varsity, and not others. Ex. 8 [Maki Rebuttal] at ¶ 21. Varsity pays increasing rebates based on the number of Varsity events a gym attends and the total amount of money the gym spends on Varsity competitions and apparel. Ex. 1 [Netz Rep.] at 104–05. They further involved cross marketing of competitions and apparel for gym teams. Ex. 105 at -9926; Ex. 1 [Netz Rep.] at 59.

Any All Star gym can participate in the VFP as long as it attends the minimum number of Varsity events in a given season. For the 2016/2017 season, Varsity increased the minimum number of events to qualify from four to five, leaving little room to attend non-Varsity events. Ex. 1 [Netz Rep.] at 105–06. The VFP evolved over the Class Period and these changes made it harder to earn the same cash reward year after year. Prior to the Class Period, gym owners received a 100% cash rebate. For the 2016-2017 season, Varsity changed the all-cash rebate to a 75% cash and 25% apparel credit called "Fashion Dollars" which could only be spent on Varsity apparel the following year. Gym owners were only given a few months to use these Fashion Dollars. Ex. 7 [Maki Report] at ¶ 84.

The Varsity Network Agreements were explicitly exclusionary and offered a range of additional benefits for the most important "mega gyms," which signed exclusive three-year agreements with Varsity that effectively precluded them from attending any non-Varsity events and explicitly forbid them from purchasing any non-Varsity apparel. Ex. 1 [Netz Rep.] at 109–110. These agreements targeted the largest gyms and their coaches and owners giving competition discounts as high as 32%, apparel discounts as high as 52%, and a range of additional benefits for gyms. All Star gyms receiving rebates could use the money for any purpose, including for personal reasons like purchasing vacations or cars. Ex. 11 [Parish Dep.] at 326:20–328:7; Ex. 10 [Webb Dep.] at 144:11–24.

The anticompetitive "first dollar" rebates of the VFP and VNA were significant and amounted to kick-backs of Varsity's ill-gotten monopoly profits directly to gyms to foreclose competition and create insurmountable artificial barriers to entry in the relevant markets. Ex. 1

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

[Netz Rep.] at 104–114; Ex. 4 [Heeb Rebuttal] at ¶¶ 259–270.[11]  Such rebates can act as a penalty because possible loss of discounts on all purchases functioned as a penalty, forcing gyms to deal exclusively with Varsity. *See Masimo Corp. v. Tyco Health Care Group, L.P.*, No. CV 02-4770 MRP, 2006 WL 1236666 (C.D. Cal. Mar. 22, 2006). In *Masimo*, the court held that the jury reasonably could have concluded that the market-share discounts "were designed to and did maintain monopoly power" in violation of Section 2 and constituted illegal exclusive dealing in violation of Section 1 and Section 3 of the Clayton Act. *Id* at *11. In fact, as Plaintiffs' experts show, the volume of commerce affected by the VFP plan is high. Rebate payments alone from the 2011-2012 to 2020-2021 seasons amounted to over $61 million. Of this amount, over $31 million was rebated during the class period. Ex. 7 [Maki Rep.] at ¶ 88.

Varsity's documents show that the goal of the "Varsity Family Plan 2.0" program was to "**Get rid of any competitors**, make it so that teams couldn't go to IEP." Ex. 298 at -9570 (emphasis added). The evidence shows Varsity and Bain were acutely aware of and sensitive to the magnitude of these rebates being provided throughout the Varsity ecosystem and took steps to affirmatively conceal those rebates from the athletes and their parents. Ex. 1 [Netz Rep.] at 110; Ex. 12 [Elza Dep.] at 318:7–319:2. Varsity did not publicly promote the VNA program "to avoid parents from inquiring about it." *See, e.g.*, Ex. 7 [Maki Rep.] at ¶ 82. Varsity was aware of the magnitude of these discounts and as of 2019 made efforts to conceal the total value of the rebates paid through its loyalty programs for fear that other industry participants would realize how large Varsity had become.  Ex. 1 [Netz Rep.] at 109-110; Ex. 301 at -7295. There is

---

[11] The applicability of the discount to all units distinguishes the situation from various pricing schedules that consumers frequently face. For example, a record club might offer "buy two albums at full price and get all additional albums at 50% off. " In that situation, the discounts do not go back to the first units. There is considerable academic literature showing the anticompetitive effects of such rebates. *See* Willard K. Tom et al., *Anticompetitive Aspects of Market-Share Discounts and Other Incentives to Exclusive Dealing*, 67 Antitrust L.J. 615, 627 (2000) (discounts can be used to achieve total or partial exclusivity where a "dominant firm is so well established among ultimate consumers that its customers . . . have a base, inelastic demand for the firm's products").

considerable additional evidence that Varsity undertook efforts to conceal these kickbacks from parents and athletes. Ex. 12 [Elza Dep. Nov. 16, 2021] at 318:7–319:2.

Varsity executive Jamie Parrish admitted: "No other sport, not even one, has rebate plans like Varsity/All Star cheer. . . We can keep them [gyms] coming back for the Family Plan crack." Parrish implied that gyms who participate in the Varsity Family Plan are "crack ho's" (sic) and Varsity is a "pimp." Ex. 257 at -2095–96; *See also* Ex. 11 [Parrish Dep.] at 177:4–178:6 ("when you're that big, you can price things so strategically that if teams – I mean, if you're going to pay me $500 to go to a Varsity competition or pay me nothing to go to an IEP, I'm going to go to the Varsity competition. That's how to get rid of IEPS.").

Further, the amount of the discounts available because they applied to all products was far in excess of marginal cost of producing apparel. *See* Ex. 1 [Netz Rep.] at 11–12 ("Absent Varsity's Network Agreement, the [apparel] competitor's proposal clearly offered superior value to the gym owner. However, purchasing practice wear from the competitor would break the Network Agreement, costing the gym $136,078.45. Even if the rival apparel vendor gave the practice wear to the gym for free, it still couldn't compete with the exclusivity provision of the Network Agreement. That is, the opportunity cost of forgoing the rebate of $136,078 was higher than the value of the free apparel, $70,200."). Such conduct by a monopolist, especially one possessing such high market shares, has the likely effect of foreclosing rivals and eliminating competition. *See Aspen*, 472 U.S. at 605; *Conwood*, 290 F. 3d. at 783. The fact that rebates were in excess of costs indicates the rebates were akin to predatory below cost pricing and therefore anticompetitive. There is no question that a genuine dispute of fact exists regarding the anticompetitive nature and effects of Varsity's exclusionary rebate programs.

### ii.      Acquisitions

Funded by large sums of capital from Charlesbank, Bain and other outside investors, Varsity was acquisitive and avaricious. First under the leadership of Jeff Webb, and later under the ownership of Charlesbank and Bain, Defendants pursued a series of acquisitions which

allowed them to eliminate rivals and foreclose competition. *See* Ex. 1 [Netz Rep.] at 92-104.[12]

Rather than compete on the merits, by offering better products or lower prices, Varsity preferred

to merge and acquire to increase market share and eliminate competition, even with existing

monopoly power. Such conduct by a monopolist inherently lessens competition. *U. S. v. Gen.*

*Dynamics Corp*., 415 U.S. 486, 497 (1974) ("we think that a merger which produces a firm

controlling an undue percentage share of the relevant market, and results in a significant increase

in the concentration of firms in that market, is so inherently likely to lessen competition

substantially that it must be enjoined in the absence of evidence clearly showing that the merger

is not likely to have such anticompetitive effect").

Varsity chose its acquisition targets not for purposes of efficiency nor to reduce costs but

instead the reverse. Varsity acquired to eliminate competition and enhance its monopoly. This is

antithetical to antitrust laws. As Jeff Webb stated, Varsity's acquisitions are "tactical and used for

roll ups . . . to eliminate competitors." Ex. 189. Those acquisitions, beginning as early as 2003,

continued for decades. *See* Ex. 1 [Netz Rep.] at 92-99. Those acquisitions permitted Varsity, and

Charlesbank and Bain, to acquire a monopoly in competitions, camps and apparel. The market

shares achieved are extraordinarily high, by any measure, which Defendants do not dispute.

These acquisitions allowed Varsity to raise prices and foreclose competition. *See* Ex. 1 [Netz

Rep.] at 99-104; Ex. 3 [Heeb Rep.] at ¶¶ 278–299; Ex. 7 [Maki Rep.] at ¶¶ 106-113; Ex. 2 [Netz

Rebuttal] at 85-89.

Defendants seek to avoid this evidence. First, they argue that any acquisitions that took

place prior to the statute of limitations must be wholly ignored by the Court (and the Jury). *See*

Defs' Joint Mot. at 41-42.[13] Defendants have already raised and lost this argument. *See* ECF No.

---

[12] Section 7 of the Clayton Act proscribes any merger or acquisition where "the effect of such
acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15
U.S.C. § 18.

[13] As the court has found, this conduct constitutes overt acts, committed in furtherance of the
scheme. The jury is entitled to receive this evidence as part of the proof of liability. *See* ECF No.
333 [Order denying MTD] at 36-37 ("For both the conspiracy and monopolization claims, the
Indirect Purchasers sufficiently allege anticompetitive conduct that involves – but is not solely

333 [Order denying MTD] at 36-37; *Jones,* 618 F. Supp. 3d at 757. The Court found that conduct

outside the damages period is relevant and admissible to prove the conduct and violations. This

is hornbook law. At this juncture, the argument is frivolous.

Next, Defendants attempt to repeat and rehash the same arguments they made in support

of their Daubert motion against Dr. Heeb. *See* Defs' Joint Mot. at 43. They say that Dr. Heeb's

economics testimony should be excluded under Rule 702. For the reasons shown in the parties'

briefing on Defendants' motion, Defendant's Daubert motion must be denied. *See* ECF Nos. 388,

440 and 448. Dr. Heeb applied well established economic techniques and analysis to Varsity's

conduct and concluded they were in fact anticompetitive. Indeed, Defendants' expert, Dr.

Murphy applied many of the same techniques and methodologies and reached a different

conclusion.

Substantial evidence shows that Defendants' acquisition strategy was wholly part of their

anticompetitive scheme to roll up the markets for cheer competitions, camps, and apparel,

eliminate and foreclose competition, restrain trade, raise barriers to entry, and charge monopoly

prices. Plaintiffs' claim is that Defendants engaged and conspired in an anticompetitive scheme

to restrain trade and monopolize the competitive cheer industry. Acquisitions must be viewed in

context with the other anticipative conduct. *Jones,* 618 F. Supp. at 757 ("viewing all alleged

anticompetitive conduct in the aggregate, without 'tightly compartmentalizing the various factual

components and wiping the slate clean after scrutiny of each,'"); *see also Cont'l Ore Co. v.*

*Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

a.    **Varsity's Acquisitions Allowed it to Eliminate Competitors and Build Dominant Market Share**

With respect to cheer competitions, Varsity engaged in a long-term strategy to acquire

---

reliant on – acquisitions, and therefore constitute continuing violations."). As the Court
acknowledged at that time, Plaintiffs link these acquisitions to increased market power and
higher prices. *Id.* Through discovery, Plaintiffs have adduced substantial evidence in support.
The limitations period only circumscribes the period of time for which plaintiffs may recover
damages. *Jones v. Varsity Brands*, LLC, 618 F. Supp. 3d 725, 757 (W.D. Tenn. 2022).

competitors. Ex. 1 [Netz Rep.] at 92-99; Ex. 85 at -6986. In 2003, Varsity acquired the National

Spirit Group and the NCA brand. *Id*. Ex. 60 at -7212. By 2009, Varsity had acquired seven of the

largest and best All Star cheerleading competitions. *Id*. By 2012, Varsity estimated its share of

the All Star competition market to be 42%, with competitor JAM Brands at 30.4% and a number

of smaller rivals accounting for 1-10% each. Ex. 1 [Netz Rep.] at 93, Exhibit 6.

In 2014, Varsity identified the following independent event producers as its main

competitors in the Cheer Competition market: JAM Brands, EPIC Brands, Aloha, Spirit

Celebration, Jam Spirit Group (DBA Team Champion), Cheer America, Spirit Unlimited, JAMZ,

and WSA. Ex. 1 [Netz Rep.] at 93; Ex. 87 at -1581. That same year, Charlesbank purchased

Varsity, taking control over the company and directing its management and operations. Ex. 1

[Netz Rep.] at 94. Funded by Charlesbank capital, Varsity would soon acquire all of their

significant IEP competitors. *See* RDSOF ¶ 239. Varsity acquired its largest competitor, JAM

Brands, in 2015. The following year, Varsity estimated that it had a 75% share of the All Star

Cheer Competition market, leaving only EPIC Brands (6%), Aloha (2%), Spirit Celebration

(2%), and Jam Spirit Group (DBA Team Champion) (2%) as competitors. *Id.* Over the next three

years Varsity would acquire each of these as well as a handful of smaller event producers. *See*

Ex. 1 [Netz Rep.] at 96-99 & Exhibit 7 (list of Varsity acquisitions from 2015 to the present); Ex.

122 at -2197; Ex. 58 at 5061, 5065, 5068, 5072–5074. By 2018, its market share for All Star

competitions was 80%. Ex. 1 [Netz Rep.] at 52; Ex. 4 [Heeb Rebuttal] at ¶ 33 (88% market share

by revenue).

Varsity's intent to merge to acquire and maintain a dominant monopoly position was

explicit. As Varsity admitted "[w]e look to acquire all the Tier I event companies (brands such as

American Championships, Athletic Championships) that give bids to the cheerleading and dance

Worlds. There are only 42 Tier I event companies. Varsity now owns 32 of those Tier I

companies in all of the best markets." Ex. 55 at -0664. Through these acquisitions, Varsity sought

to expand its market share, to eliminate rival independent event producers, to increase prices and

also to acquire strategically important Tier I events that held Worlds bids. Ex. 1 [Netz Rep.] at

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

94; Ex. 122 at -2191; Ex. 58 at -5061, 5065, 5068, 5072–74.

### b.    Acquisitions of Tier I Event Producers

The acquisition of Tier I IEPs was key to Varsity's acquisition strategy. The strategy was sophisticated, involving the cooperation and coordination with USASF as well as the investors who provided the capital required for the acquisitions.

Controlling bids to end of year national or world championships was another key to Varsity's anticompetitive conduct. *See* Ex. 1 [Netz Rep.] at 16-18. One of the chief goals of cheer competitors was to qualify for the Cheerleading Worlds, the end of year competition that took place at Disneyworld.[14] World bids were high visibility and high prestige events and constitute critical inputs. *See* Ex. 1 [Netz Rep.] at 69-73. As Varsity recognized, "these events are historically our largest and most established and ▮▮▮▮▮▮ events." Ex. 54[15]; Ex. 3 [Heeb Repl.] at ¶ 257. The ability to award bids constituted a significant barrier to entry. Ex. 2 [Netz Rebuttal] at 62-63.

The standards for recognition as a Tier I event producer were set by the USASF. Further, under USASF rules, bids to Worlds were only available at Tier I events. There were only 42 Tier I event producers eligible to put on competitions accredited to provide world bids. Only Tier I event producers were permitted to vote on the USASF Sanctioning Committee which oversees USASF membership and the allocation of bids to the season-ending Worlds competition. The Sanctioning Committee determines which event producers

---

[14] The Worlds were owned by USASF. Varsity and USASF worked together to control and manipulate rules associated with qualification for it. *See* ECF No. 479 [USASF Brief].

[15] In similar fashion, Varsity developed its own end of year competition called the Summit. Like the Worlds, bids to the Summit were highly desired by teams and attracted teams looking to qualify. *See* Ex. 3 [Heeb Rep.] at ¶ 263. Varsity owned 100% of the events that offered bids to the Summit. Ex. 1 [Netz Rep.] at 17. Following the success of the Summit, Varsity developed two other end of season events: the D2 Summit (also held at Disneyworld) and the U.S. Finals. *Id*. With respect to school cheer, Varsity owned three school competitions brands, UCA, NCA and USA, all of which held year-end championships for high school and college athletes. ▮▮▮▮ school athletes attended the national championships at Disneyworld. *Id*.

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

are able to award Worlds bids as well as the date and location of Worlds bid events. The ability to award Worlds bids is valuable because customer demand for Worlds bids is high and the number of Tier 1 events is capped by the Sanctioning Committee. Each Tier 1 event producer is given a vote on the Sanctioning Committee. When a Tier 1 event producer is acquired by another, the Worlds bid event and Sanctioning Committee vote are transferred to the new owner.[16] Ex. 1 [Netz Rep.] at 22; *see also* PSOF at ¶¶ 15, 48.

By producing Tier I events, IEPs competed head to head with Varsity, in particular with respect to competitions offering Worlds bids. Tier I events attracted more competition participants and charged them higher fees to participate. Established IEPs put on Tier I events annually, developing a customer base and achieving financial stability which in turn was reflected in better quality events. Much of Varsity's anticompetitive energy was devoted to devising schemes to hamstring and hobble IEPs to the point their businesses were wrecked. Counterprogramming and other steps were undertaken to attack such IEPs. Because such efforts were successful, many if not all of them were forced ultimately to sell their businesses to Varsity at reduced acquisition prices, and thus further enhancing and increasing Varsity dominance. Ex. 1 [Netz Rep.] at 69-72; *see also* PSOF at ¶¶ 109-112.

Varsity further consolidated its control of the USASF with acquisitions of other Tier 1 event producers including Aloha (three Worlds bid events), Spirit Celebration (one Worlds bid events), All Things Cheer (one Worlds bid events), Jam Spirit Group (DBA Team Champion) (two Worlds bid events), Mardis Gras (one Worlds bid events) and EPIC Brands (two Worlds bid events). By 2020, Varsity had acquired 36 of 46 Worlds bid events. Because each Worlds bid comes with a seat on the USASF sanctioning body, by 2020 Varsity had 32 of 42 seats on the Sanctioning Committee as well. Ex. 1 [Netz Rep.] at 101; *see also* PSOF at ¶15.

### iii.     Counterprogramming

---

[16] For instance Varsity acquired JAM Brands not just for the "immediate expansion of market share" but also because of its "strategically important USASF Board seat" which allowed Varsity to "secure [] a unified presence within the USASF." Ex. 1 [Netz Rep.] at 95; Ex. 122 at -2197.

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

Defendants took conscious steps to schedule Varsity events in the same place and at the same time as those scheduled by competing IEPs. Defendants admit they did so, but say they are entitled to summary judgment because these efforts were merely "choosing to compete." Defs' Joint Mot. at 44. Defendants' argument is erroneous because its conduct must be viewed in context with Defendants' other anticompetitive conduct, including its monopoly market share, its exclusionary contracts and rebates, and its conspiracy with USASF. *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *Conwood,* 290 F.3d at 787.

The record shows that counterprogramming was a conscious effort to frustrate independent event producers from putting on competing events. Ex. 1 [Netz Rep.] at 71-74. Not unlike the efforts to destroy rivals snuff racks in markets in *Conwood*, Varsity's conduct was far from competition on the merits. Critically, Varsity attacked IEPs with the aid of USASF – the governing body that was supposed to protect competition. USASF required that it receive notification from each IEP of the schedule for the coming year. Unbeknownst to IEPs, this information was provided to Varsity which maintained a list of competitor events, including the date and location for each. Ex. 1 [Netz Rep.] at 73; Ex. 175. Varsity used this information to compile lists, identifying specific events and independent event producers they would attempt to "attack." Ex. 1 [Netz Rep.] at 76.[17] The evidence shows that Varsity would schedule competing

---

[17] Mr. Parrish, the former Director of Strategy and Special Projects at Varsity All Star, provided detailed testimony on the subject. Parish testified that when IEPs approached the 125-team threshold set by USASF, Defendants' "strategy would be to put a Family Plan event on either side of them on the weekend before and the weekend after, and then we would call our sales team and say, 'Hey, try to poach teams off of that that event.'" Ex. 11 [Parrish Dep.] at 119:12-21. As part of this strategy, the Varsity sales team then offered incentives for those teams: "if you come over to this [Varsity] competition we'll give you [free registration for] three or four athletes, or we'll give you some Varsity credits, or we'll give you some uniform credits if you will come over here. And the goal being to pull teams from our competitors in an effort to get their number of participation [sic] underneath that requirement set by the USASF to give a Worlds bids." In such event, as Parish testified, "Varsity could then make an appeal to the USASF Board that that particular company had lost its USASF Worlds bid requirement by not having 'X' amount of teams, and then . . .the Worlds bid gets taken, and then puff, there goes that competition." *Id*. As Parish further testified, Varsity used this scheme to acquire IEPS or simply drive them out of business. When asked whether this actually happened, Parrish admitted "[i]t

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

events, some time on the same date and time at facilities within a few miles of the events put on by the independent event producers, aided with rivals' confidential information from its coconspirator, USASF. [18]

USASF provided further assistance to this effort, passing rules that forced independent event producers out of business. USASF passed rules setting minimum participation requirements for IEPS to host Worlds bid events. By counterprogramming, Varsity, aided by USASF, was able to deny IEPs the right to host such events even if they had done so in the past. The combination of these two efforts—counterprogramming and minimum participation requirements—delivered the coup de grace to IEPs, many of whom ultimately sold out to Varsity at reduced prices. *See* Ex. 135 at -6431 (2019 email from Steve Peterson, USASF Vice President, to Varsity general manager: "You guys are knocking them off! [laughter emoji] . . . WSA did not make 125. . . That is 3! [thumbs up emoji]"); Ex. 137 at -4153 (2018 email from non-Varsity event producer to Steve Peterson: "Our company is dealing with another EP in our area that is Tier 1 . . . Our registrations went from 88 teams last year to 30 this year!").[19] The record is

---

[18] Defendants also targeted counterprogramming efforts to "crush" nascent competitors entering the market. For example, when Tammy Van Vleet, an independent event producer, announced she was launching the Spirit Championships for the 2019-2020 season, Varsity immediately began creating a plan to counterprogram against those events, even though none were scheduled head-to-head with Varsity. Ex. 145 at -8910-8912. The Spirit Championships, focused on the West Coast, promised several competitive advantages over Varsity events, including: not charging coaches fees, not charging cross over fees (fees charged for athletes that participate in more than one event at a competition), and a rebate program for coaches. Varsity intended to "crush her" before she "really gets wings and creates more issues for our other territories." Ex. 1 [Netz Rep.] at 79; Ex. 145 at -8910-8912. Another Varsity email regarding the announcement of the Spirit Championships states "The goal for us is simple…We need to stop this train before it starts." Ex. 1 [Netz Rep.] at 79.

[19] Steve Peterson, a Varsity employee who served as a USASF executive in charge of Worlds bids took considerable glee and satisfaction in his efforts with Varsity to run IEPs out of business. After receiving news that these efforts had driven down non-Varsity registrations, Peterson sent this confidential information to Varsity, and wrote: "FYI...Its working. 😊"). Ex. 137.

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

replete with such examples of Varsity purposefully targeting competition and creating insurmountable barriers to entry, and being successful in eliminating competitors. *See* Ex. 1 [Netz Rep.] at 73–89.

Defendants' explanation that they were merely "choosing to compete" is wholly off base. *See* Defs' Joint Mot. at 44. In *Conwood*, the Defendant USTC claimed that its actions "amounted to no more than competition." 290 F.3d at 787. Here too, Varsity's efforts were not competitive conduct spurred by efficiency. Rather than compete on the merits, Varsity colluded with USASF to harm rival independent producers, setting the stage to drive them out of business or force a cheap sale. Taken in the context of Defendants' scheme and dominant market power, this conduct was exclusionary and not justified. *See Conwood*, 290 F.3d at 787-88.

### iv.    The Conspiracy with USASF and Other Organizations

First, Defendants argue that there is no evidence of a conspiracy between USASF and Defendants. Defs' Joint Mot. at 45. Not so. There is ample evidence for a jury to conclude that there was an illicit agreement between USASF and Defendants, particularly given that at summary judgment, all inferences must be resolved in Plaintiffs' favor, because the jury may well do so at trial. *See generally* ECF No. 479 [USASF Brief].

Second, Defendants argue that there is no evidence that USASF' conduct was anticompetitive. Defs' Joint Mot. at 45. But as discussed in Plaintiffs' separate opposition to USASF's separate motion for Summary Judgment, there is ample evidence to conclude that USASF, in conspiracy with Defendants, engaged in anticompetitive conduct that caused harm to the class. The intent was clear in a Varsity email: "As you know, Jeff W. [Webb] wants the USASF Worlds Bids process changed to prevent small competitors from being allowed to offer Worlds Bids." Ex. 132 at -4139.

USASF Tier 1 member event producers are those that can give out bids to the USASF's premier year-end national championship event, The Cheerleading Worlds. Ex. 1 [Netz Rep.] at 69-73. Historically, there were 42 Tier 1 bid events, but that was increased to 46 in November

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

2020; seniority is given to members based on how long they have been a member of the USASF and provides preference for event locations and dates. Varsity's event promoters with earlier USASF membership dates are afforded protections for their events from possible new events being hosted in a similar area or date range. Worlds bids were allocated to event producers based on this seniority. Despite the seniority preference the USASF introduced a new rule for the 2016-2017 season that mandated event producers have at least 125 level five teams attend a competition to continue giving out bids in future years. If the event producer is unable to attract 125 teams in one year they are put on probation; if they are unable to attract 125 teams for the following year, they lose Worlds bids, which makes the event far less attractive to participants in the following years. By putting teams on probation—and sharing that information with Varsity—it allows Varsity to both identify possible acquisition targets and/or sabotage those events that were struggling to meet the minimums. When Varsity acquires any of these event producers, Varsity is allowed to use the acquired event producer's existing membership date for purposes of seniority, including bid approvals, waiting lists, and event move requests. This information allows Varsity to selectively target the event promoters and events that are most likely to result in Varsity obtaining additional Worlds bids. *Id*.

### C.    There is Evidence of Harm in the Competitions Market

Defendants ask the Court to grant summary judgment on the grounds that none of this anticompetitive conduct with respect to competitions caused harm to Plaintiffs. Defs' Joint Mot. at 46. This is incorrect. Dr. Heeb examined the anticompetitive conduct—in particular the rebate programs and acquisitions of competitors—and concluded the diminished competition in the market. There is substantial evidence that through the anticompetitive conduct, Defendants excluded competition. *See* Ex. 3 [Heeb Rep.] at ¶¶ 219-250. The acquisitions also had anticompetitive effects. Ex. 3 [Heeb Rep.] at ¶¶ 251-266. Consistent with basic competition economics, Varsity was able to raise prices and did so. Ex. 3 [Heeb Rep.] at ¶ 256. A chief component of this was the acquisition of competitors that had Worlds bids, Ex. 3 [Heeb Rep.] at ¶¶ 257-58, and eliminating events after acquiring a competitor in order to raise prices. Ex. 3

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

[Heeb Rep.] at ¶¶ 259; *see* Ex. 89 at -5577 (outsider positioning statements include "if you pose a threat to Varsity, you will be acquired, and if have a success in the market, Varsity will […] squish you like a bug."). Based on this evidence, Dr. Heeb performed an analysis to determine antitrust and calculate the impact on Plaintiffs. Ex. 3 [Heeb Rep.] at ¶¶ 278-299. He did so using prices charged by rival IEPs, specifically those that produced rival events prior to acquisition by Varsity. Ex. 3 [Heeb Rep.] at ¶ 278.

Dr. Heeb calculated overcharges nationally and checked his calculation using regional data and information. He examined regional information. Based on that analysis he calculated a national overcharge. Ex. 3 [Heeb Rep.] at ¶ 295.[20] Heeb found that Varsity's cheer competitions were overpriced as compared to the competitive benchmark. He tested his analysis by looking at the prices charged by companies after Defendants acquired them. As he found, Varsity raised prices after acquiring IEPs, causing harm to Plaintiffs. Ex. 4 [Heeb Rebuttal] at ¶¶ 383–406. In sum, Dr. Heeb's analysis demonstrates and confirms harm to competition. *See* Ex. 3 [Heeb Rep.] at ¶¶ 496–577.

Dr. Heeb and Dr. Maki apply standard economic methodologies and analyses with respect to the issues of impact and damages. In so doing, they apply well-established economic principles and basic laws of supply and demand to the record in this case. *Id.* Indeed, they cite dozens of Defendants' business records and substantial deposition testimony in support. In fact, Defendants' experts offer little by way of reliable testimony to controvert these conclusions. These differences frame a straightforward dispute of the experts which the jury must decide.

Plaintiffs' expert's calculation of damages relies on methodology commonly used in indirect purchaser actions like this. First the size of the relevant market and the overcharge rate due to the anticompetitive conduct in that market are determined with econometric analysis, to

---

[20] Dr. Heeb's analysis indicates that the coefficient on which this is based is statistically significant at the 99.0% confidence level. Ex. 3 [Heeb Rep.] at ¶ 295. Dr. Heeb also examined confidence levels of regional level overcharges and performed a standard "F-test" which confirmed that the national overcharge was more precisely estimated, reliable, and appropriate. Ex. 3 [Heeb Rep.] at ¶ 297; Ex. 4 [Heeb Rebuttal] at ¶¶ 547-557, 574.

calculate the total amount of overcharge damages to that relevant market. Defendants' expert economist offered a series of criticisms and proposed corrections to Dr. Heeb's model. Dr. Heeb took these into account, and made modifications as needed. *See* Ex. 4 [Heeb Rebuttal] at ¶¶ 496–577. After modification, Dr. Heeb provided final overcharge calculations. *Id.* Dr. Heeb's econometric analysis concluded that there was a 27.4% overcharge in the cheer competitions market (Ex. 4 [Heeb Rebuttal] at Section V.D.1), a 27.4% overcharge in the cheer camps market (Ex. 4 [Heeb Rebuttal] at Section V.D.2), and a 11% overcharge in the cheer apparel market (Ex. 4 [Heeb Rebuttal] at Section V.D.3).

Second, a "pass-through" rate is determined, (*i.e.*, how much of the damage is passed through to indirect purchasers and other end payors). Contrary to Varsity's assertions, pass-through rates are often *greater* than 100% when intermediaries, like the gyms here, mark up their already inflated costs when they pass them through to the end purchaser or when they receive large rebates of monopoly profits. Ex. 8 [Maki Rebuttal] at ¶¶ 17–20. Using common proof and analysis of the relatively simple markets here, Dr. Maki finds a pass-through rate of 100% is conservative for the class. *See id.*; *see also* ECF No. 428 [Pls' Opp. to Defs' Mot. to Exclude Maki]; Ex. 9 [Maki Decl.]. Defendants do not offer an alternative calculation and indeed fail to perform any quantitative damages analysis of their own. Courts consistently affirm the method used by Dr. Maki as a reliable method for showing pass-through. *See, e.g., In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 15 (E.D.N.Y. 2020) (affirming reliability of same two-step method used by Dr. Maki to prove class-wide injury in fact); *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 847–48 (D.N.J. 2015) (same). Using this widely accepted methodology, Dr. Maki in her Rebuttal report, Ex. 8, calculated damages of ███████████ in the cheer competitions market (¶ 25), ███████████ in the cheer apparel market (¶ 33), and ███████████ in the cheer camp market (¶ 29).

Defendants' attacks on Plaintiffs' damage calculations are inconsistent with settled law regarding calculations of damages in antitrust cases. As the Sixth Circuit has stated "[t]he antitrust cases are legion which reiterate the proposition that, if the fact of damages is proven, the

actual computation of damages may suffer from minor imperfections." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 533 (6th Cir. 2008); *Conwood* 290 F.3d 768, 795 (6th Cir. 2002*); South- East Coal Co. v. Consol. Coal Co.*, 434 F.2d 767, 794 (6th Cir. 1970).[21] Dr. Maki calculated the damages in each of the relevant markets reliably, based on substantial factual analysis and economic expertise, which is certainly enough to create a genuine issue of material fact with regard to damages. *Spirit Airlines,* 431 F.3d at 931.

Dr. Heeb and Dr. Maki apply standard economic methodologies and analyses with respect to the issues of impact and damages. *See* ECF Nos. 428 and 430 [Pls' Opps. to Defs. Mtns. to Exclude Heeb and Maki]. In so doing, they apply well-established economic principles and basic laws of supply and demand to the record in this case. *Id*. Indeed, they cite dozens of Defendants' business records and substantial deposition testimony in support.

Varsity further claims that "Plaintiffs' only 'evidence' of pass-through is Dr. Maki's inadmissible opinion." Defs' Joint Mot. at 23. Not so. Varsity's own documents clearly establish that camp registration fees were passed on to the indirect purchaser class.[22] *See* Ex. 93 at -6022

---

[21] Once liability is established, therefore, a plaintiffs proof of damages is evaluated under a more lenient standard. *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 567 (1981). As the Supreme Court has stated in explaining its "traditional rule excusing antitrust plaintiffs from an unduly rigorous standard of proving antitrust injury . . . [I]t does not 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." *Id.* at 565-67 (quoting *Hetzel v. Baltimore Ohio R.R.*, 169 U.S. 26, 39 (1898)). Where a wrongdoer has by its own action prevented the precise computation of damages, . . . the wrongdoer must bear the risk of the uncertainty and that damages can be shown by just and reasonable estimates based on relevant data. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264-65 (1946); *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 US 555, 563 (1931).

[22] Indeed, Varsity, Bain and Charlesbank touted this indirect purchaser model as insulating Varsity from "price pressure and competition," because it meant that the purchasing decision maker (the school, gym or coach), was not the ultimate purchaser. *See*, *e.g.*, Ex. 307 at -4448 ("Insulation from price pressure and competition as purchase decision makers (coaches, etc.) remain distinct from purchasers (athletes, etc.); *see also* Ex. 306 at -5360 ("Camps/Competitions: preliminary analysis shows no correlation between event participant growth and prince increases."); *See also* Ex. 1 [Netz Rep.] at 46 (discussing how Varsity recognizes that the separation of the purchasing decision maker (schools and gyms) and the purchaser (athletes and families) means that customers do not respond to price increases.).

(showing that parents pay the gyms and schools; the gyms and schools pay Varsity for competitions, camps, and apparel).

## III.    Defendants Are Not Entitled to Summary Judgment with Respect to Camps.

### A.    Plaintiffs Jones and Lorenzen Have Standing with Respect to All Claims for Damages and Injunctive Relief

Defendants argue that the two current class representatives, Jones and Lorenzen, lack standing to seek damages from camp purchases because neither purchased Varsity camps. For several reasons, Varsity's argument fails.

#### i.    Article III Standing

Jones and Lorenzen have standing under Article III. Article III "requires that the party seeking review be [herself] among the injured." *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 563 (1992); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 473 (1982) *Allen v. Wright*, 468 U.S. 737, 751–52 (1984). (Article III requires proof of injury which is not "abstract," "conjectural," or "hypothetical," but rather, "distinct and palpable."). There is no dispute that Plaintiffs have suffered injury from the anticompetitive scheme. Plaintiffs have alleged, and they have evinced evidence, that they purchased products which are the subject of the anticompetitive scheme and they have suffered injury in the form of reduced competition and increased prices. Ex. 62 at ¶¶ 5–8, Ex. 61 at ¶¶ 5–6. As a consumer of the products and services effected by the conduct, they have been directly injured and therefore have the requisite standing under Article III to pursue relief. "[A] buyer who is induced to pay an unlawfully inflated price for goods or services obviously suffers an actual injury, that is, an injury-in-fact." *In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2013 WL 2456612, at *9 (E.D. Mich. June 6, 2013), *(citing Chattanooga Foundry and Pipe Works v. City of Atlanta,* 203 U.S. 390, 396 (1906). The injury flowed directly from that which made the conduct unlawful under the antitrust laws. And there is no dispute that Ms. Jones and Ms. Lorenzen were injured by the anticompetitive scheme.[23]

---

[23] *See* Exs. 61-62, Declarations of Jones ¶¶5-6, and Lorenzen ¶¶5-8 stating they paid for

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

ii.        **Antitrust Standing**

In addition, Defendants also assert that Jones and Lorenzen do not have antitrust standing

to pursue damage claims with respect to camps. The Supreme Court has interpreted the Clayton

Act to limit statutory antitrust standing to parties fewer than would be allowed by the full extent

of Article III. *Associated Gen. Contractors of Cal., Inc. v. California State Council of*

*Carpenters*, 459 U.S. 519, 534–46, 535 n. 31 (1983) ("*AGC*"); *see Re/Max International v.*

*Realty One, Inc*., 900 F. Supp. 132, 147 (N.D. Ohio 1995). To determine antitrust standing,

following *AGC*, courts in the Sixth Circuit consider:

> (1) the causal connection between the antitrust violation and harm to the plaintiff
> and whether that harm was intended to be caused; (2) the nature of the plaintiff's
> alleged injury including the status of the plaintiff as consumer or competitor in the
> relevant market; (3) the directness or indirectness of the injury, and the related
> inquiry of whether the damages are speculative; (4) the potential for duplicative
> recovery or complex apportionment of damages; and (5) the existence of more
> direct victims of the alleged antitrust violation."

*Bodie-Rickett Assocs. v. Mars, Inc*., 957 F.2d 287 (6th Cir. 1992) (quoting *Southaven Land Co. v.*

*Malone Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983)). The factors are to be balanced, with no

single factor being conclusive. *Peck v. General Motors Corp*., 894 F.2d 844, 846 (6th Cir. 1990)

(citing *Province v. Cleveland Publishing Co*., 787 F.2d 1047, 1051 (6th Cir. 1986)); *see Am. Ad*

*Mgmt. Inc. v. Gen. Tel. Co.*, 190 F.3d 1494, 1507 (9th Cir. 1999) ("to conclude there is antitrust

standing, a court need not find in favor of the plaintiff on each factor.").

---

competitions and apparel. Defendants do not challenge Article III standing of Jones and
Lorenzen with respect to purchasers of competitions and apparel. With respect to camp
purchasers, the question of whether Jones and Lorenzen may serve as adequate representatives is
an issue properly considered under the class action typicality or adequacy requirements set forth
in Rule 23(a). These issues are the subject of briefing in connection with those motions. See ECF
Nos. 389 and 454. In addition, Plaintiffs have sought leave to add an additional plaintiff, Amy
Coulson, as a new class representative *See* ECF No. 394. Adding a new class representative is
permissible and appropriate. *Id*. It is particularly appropriate here because one of the former class
representatives who purchased Varsity camps, Michelle Velotta, was no longer able to serve as a
class representative. *See id*. As numerous courts have found, replacing class representatives is
proper and appropriate to ensure that the claims of the class (here, thousands of families who
purchased Varsity camps) are not defeated when another adequate class representative is present.

Defendants neglect all the *AGC* factors, save the second. *See* Defs' Joint Mot. at 18. And with respect to that, Defendants claim only that, as class representatives for a class of consumers of competitions, camps, and apparel —Jones and Lorenzen are precluded from recovering camp damages because they did not purchase camps. *Id*. Defendants motion fails under *AGC*. First, as the moving party, it was Varsity's burden to negate each of these factors and it has failed to do so. "At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009). Varsity simply has not done that here and having failed do so, on this basis alone, the antitrust standing motion should be denied.

Even if the Court were to conclude that Defendants have met their initial burden on antitrust standing under the *AGC* five factor test by contesting one, Defendants' motion still fails. The first and most important factor is the connection of the conduct to plaintiff's injury. *See Am Ad. Mgmt.*, 190 F.3d at 1055 (the court should "give great weight to the nature of the plaintiffs' injury"). Here, there is a direct, foreseeable, and intended causal connection between the antitrust violation and harm to plaintiffs, including class representatives Jones and Lorenzen. The anticompetitive conduct—all part of an anticompetitive scheme to exclude competition and foreclose rivals with respect to cheer competitions, camps, and apparel—excluded rivals, foreclosed competition, and raised prices above competitive levels. *See, e.g.*, Ex. 3 [Heeb Rep.] ¶¶278-312; Ex. 4 [Heeb Rebuttal] at ¶¶ 609-625; *See, e.g.*, Ex. 298 at -9570 (summarizing that the goal of the Varsity Family Plan was to: "Get rid of any competitors, make it so that teams couldn't go to IEP"); *id.* at -9569-9570 ("For every IEP they support, drop a % point" and "[o]nly allow programs to achieve the top level of VFP [Varsity Family Plan] if they are exclusive to Varsity."). The conduct was intentional. Importantly, "no monopolist monopolizes unconscious of what he is doing." *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985)). Thus, "[i]mproper exclusion (exclusion not the result of superior efficiency) is always deliberately intended." *Id*.

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

Turning to the factor which Defendants address, Defendants come up short. The Supreme Court long ago recognized that the antitrust standing rules are not to be read so inflexibly to foreclose claims by purchasers in related antitrust markets. *See Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) (holding antitrust standing existed because although the plaintiff "was not a competitor of the conspirators, the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict."). "This exception applies when the claimant can be considered the 'direct victim' of a conspiracy." *Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097, 1111–13 (N.D. Cal. 2013) (markets are sufficiently "inextricably intertwined" for standing purposes where "anticompetitive conduct in [one] market would necessarily have an effect on the [other] market. . . . "). The same is true where demand in one relevant market creates demand in another, making the markets inextricably intertwined. *See In re Automotive Parts Antitrust Litigation*, No. 12-MD-02311, 2013 WL 2456612, *15 (E.D. Mich., 2013). Courts have found far more disconnected markets nonetheless to satisfy *McCready*. *See, e.g.*, *Dang*, 964 F. Supp. 2d 1097 (licensing market for trademark, logos, and other emblems sufficiently connected to retail market for apparel); *In re Cathode Ray Tube Antitrust Litig*, 738 F. Supp. 2d 1011, 1023-24 (N.D. Cal. 2010) (market for cathode ray tubes and televisions sufficiently connected); *In re Flash Memory Antitrust Litig*, 643 F. Supp. 2d at 1194 (markets for flash memory and telephones sufficiently connected).

Here, there is substantial evidence that the markets for competitions, camps, and apparel are inextricably intertwined. Plaintiffs were consumers and suffered injury in the form of paying supracompetitive prices for Defendants' cheer competitions and apparel, which were intertwined with Defendants' camps. *See* Ex. 3 [Heeb Rep.] at ¶¶ 116 (common pricing strategies across all lines of business), ¶118 (barriers to entry across all lines of business). Varsity's internal records show that Varity developed, sold, and marketed competitions, camps, and apparel together along with other products and services. The interconnection of the ecosystem was admitted by Jeff Webb who stated that Varsity was "creating an industry as we went along and it became an ecosystem in that we were creating the concept, we were creating the industry, and then we were

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

positioning ourselves to provide **all the products and services** . . . utilized [within that industry]. Not only did we have the number one position in [the camps, apparel, and competitions] segments, but then we developed a **cross-marketing model** where we could promote [the segments within each other] and to be honest with you, it took off."[24]

Through the Squad Credentialing Program, Varsity conspired with the National Federation of State High School Associations ("NFHS") to promulgate a rule that **required teams** competing in the UCA and NCA cheerleading championships **to attend a Varsity camp**. *See, e.g.*, Ex. 59. In so doing, Varsity explicitly acknowledged the connection of demand for competitions and for camps. Ex. 23 [Buffy Duhon Dep.] at 110:3–25 (testifying that the requirement to attend a Varsity camp in order to compete at nationals would increase demand for Varsity camps);[25] Ex. 20 [Cota Dep.] at 223:11–17 ("[Q.] Would you agree that . . . Varsity leverages its market power in the cheer competition market to enhance and maintain its market power in the camp market? . . . A. Yes."). Defendants' exclusive dealing agreements, including its Family Plan, Network Agreement, and IMPACT program locked cheer families into the Varsity ecosystem for all three relevant markets. *See* Ex. 1 [Netz Rep.] at 104–113; Ex. 3 [Heeb Rep.] at ¶¶ 219-226; Ex. 4 [Heeb Rebuttal] at ¶¶ 259–270.

The connection is also demonstrated through evidence showing that Varsity recognized that forcing cheer families to enroll in Varsity camps would not only provide significant profits in camp registrations (due solely to its monopoly power in competitions) but would also bolster and enhance apparel sales. *See, e.g.*, Ex. 247 at -6770. Cheer teams often purchased "camp wear" or training apparel to attend camps. *See, e.g.*, Ex. 35 [Lorenzen Dep.] at 122:2-12 (testifying that

---

[24] Ex. 109 at 1 [Gabriel Perna, "Varsity Brands Founder On The Big Business of Cheerleading, Chief Executive Oct. 29, 2018)," last accessed May 24, 2023, available at https://chiefexecutive.net/varsity-brands-big-businesscheerleading/]

[25] Varsity's internal recognition of the economic effects of the connection is at odds with its pretextual explanation that this requirement was for safety and other supposed legitimate purposes. If the requirement were truly about safety, there is no reason why the requirement would require athletes to attend only Varsity camps, to the exclusion of other camps organized by competitors.

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

she was required to purchase apparel for her daughter even though her daughter was traveling and therefore unable to attend the camp); Ex. 84 at -1952. (Varsity documents show "camp wear" as one of six apparel categories amounting to 13% of all Varsity apparel sales); Ex. 3 [Heeb Rep.] at ¶¶ 154, 223. Varsity recognized that forcing kids into Varsity camps would mean significant increases in Varsity apparel sales. *See* Ex. 247 at -6770 ("90% of camp customers buy apparel. And teams who attend camp spend 3.5 times more! That is huge. When we lose teams at camp, they become high risk customers for apparel. 50% of non-returning camp customers don't buy apparel the following year."). In addition, Varsity tied competitions and camps by offering bids to Varsity competitions at Varsity camps, excluding the possibility of earning a bid to a non-Varsity competition. *See* Ex. 1 [Netz Rep.] at 89-92. In addition, Varsity camps were staffed by Varsity judges and other Varsity personnel, instructing cheer athletes with routines and techniques specifically designed for Varsity competitions and USASF rules. *See* Ex. Ex. 110 at -9442 (explaining that "UCA & NCA camps are both run by the people who run the tournament."); Ex. 93 at -6023.

Varsity has offered little if any reliable evidence to the contrary. In fact, the evidence shows that "anticompetitive conduct in [the Competitions] market would necessarily have an effect on the [Camps] market" and vice versa. *See Dang*, 964 F. Supp. 2d at 1111–13. At a minimum, there is a dispute of material fact with respect to this factor.[26]

The third factor, directness, clearly supports antitrust standing. Plaintiffs do not purchase camps, or for that matter, competitions and apparel, through a complicated chain of distribution. Ex. 8 [Maki Rebuttal] ¶¶ 13–14. Other than the gyms and schools, there are no intermediaries. And moreover, the products purchased are exactly those sold by Varsity. This is not a case where indirect purchasers suing a price fixing manufacturer did not purchase the product, the price of which was raised by the defendants' anticompetitive conduct. For example, the plaintiffs here did

---

[26] If the Court were not to decide as a matter of law that Plaintiffs have antitrust injury, this is an issue to be presented to the jury.

not purchase a finished product which contains the price fixed product. They purchased the product intact without alteration by an intermediary.

The fourth and fifth factors "can be condensed and considered alongside each other." *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL 1917, 2013 WL 4505701, at *11 (N.D. Cal. Aug. 21, 2013) (citing *AGC*, 459 U.S. at 544). The concern here is that a defendant may be subject to windfall damages by permitting both direct and indirect purchasers to recover damages based on a single overcharge. Thus, *AGC* "stresse[s] the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." *See* 459 U.S. at 543-44 (emphasis supplied). *AGC* suggests that, if duplicate recovery were to occur, damages should be apportioned such that recovery by both direct and indirect purchasers would not yield duplicative recovery, subject to the normal degree of estimation inherent in but-for damages calculations. Here, there is no concern. As Dr. Heeb has shown, all but a *de minimis* number of class members have suffered injury and at least 100% of the overcharges were passed on to cheer families by gyms and schools for all but *a de minimis* number of plaintiffs. Ex. 4 [Heeb Rebuttal] at ¶¶ 97–101. Indeed, as Dr. Maki also shows, 100% is a conservative estimate, since it is likely that Plaintiffs paid more than 100% of the overcharge when gyms marked up the prices the gyms paid directly to Varsity. *See* Ex. 9 [Maki Decl.] at ¶¶ 12–14. Since there is no risk of complex apportionment and no potential for duplicative recovery or complex apportionment of damages, these factors also support standing.

### B. There is Evidence of Anticompetitive Conduct with respect to Camps.

Defendants challenge Plaintiffs' evidence of anticompetitive conduct with respect to the market for cheer camps. *See* Defs' Joint Mot. at 23–25. Varsity focuses on three aspects of the scheme: rebates, bids, and the requirement to attend a Varsity camp to attend an end-of-season competitions.

Once again, Varsity ignores that the scheme Plaintiffs allege is far broader, including a series of related exclusionary practices. Varsity ignores exclusionary practices aimed directly at

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

camps and exclusionary practices affecting camps, along with competitions or apparel, or both. Varsity leverages its monopoly power in cheer competitions to enhance its monopoly power with respect to cheer camps. *See* Ex. 3 [Heeb Rep.] at ¶ 269. Varsity choreographers provided training at camps including knowledge regarding Varsity competitions, rules, and judging procedures in order to ensure choreography impressed the judges at Varsity competitions. Ex. 3 [Heeb Rep.] ¶ 270. Also, as noted above, Varsity required school cheer athletes to attend Varsity cheer camps and provided bids to national competitions at cheer camps. Ex. 3 [Heeb Rep.] at ¶¶ 270, 271; *see supra* Section III.B.ii–iii.[27] *See Conwood*, 290 F.3d at 787-88 & n.4 (noting that *Conwood's* claim was far broader than certain exclusive practices directed by a national monopoly to foreclose competition).

### i.       Varsity's Impact Program ("VIP")

Varsity first focuses on the rebate programs. Varsity states that "the rebate programs do not even apply to scholastic purchases in general or to camps in particular." Defs' Joint Mot. at 23–24 (citing SUF ¶ 5). This is misleading and false. While it may be true that the Family Plan and Network plans did not provide compensation or other benefits for camp purchases, Varsity ran another program, called the IMPACT Program. Under the IMPACT Program, Varsity entered into exclusionary contracts with schools providing rewards and other financial incentives for exclusively purchasing in all three relevant markets, including camps.[28] *See* RDSOF at ¶ 114.

### ii.      Bids to End of Year Competitions

Next, Varsity contends, without citation or explanation that "there is no basis to conclude

---

[27] In order for a cheer team to qualify for varsity's high school national championship. At least 75% of team members must attend one of Varsity's cheer camps in the proceeding 12 months. See Ex. 1 [Netz Rep.] at ¶ 90. Dr. Netz concludes that there was no legitimate justification for tying attendance at cheer camps to eligibility for school cheer competitions. Ex. 1 [Netz Rep.] at 89-90.

[28] Varsity instituted three distinct sets of exclusionary contracts, Varsity offered its Network Agreement to the largest and most important All Star gyms. Varsity offered the Varsity Family Plan to all All Star gyms. Varsity offered the Varsity Impact Program, targeted at school cheer teams. Ex. 1 [Netz Rep.] at 104–113. Ex. 258 at -9367.

that the possibility of winning a bid to a *Varsity* competition at a *Varsity* camp is

anticompetitive," because "Varsity is allowed to decide what teams can compete at its own

competitions." Defs' Joint Mot. at 24. But when viewed in conjunction with Varsity's 100%

control over school cheer competitions and its IMPACT program and other exclusive dealings,

there is without question a reasonable dispute for the jury. As Dr. Heeb's Rebuttal Report

describes, the use of camp bids to its national competitions is another manifestation of leveraging

its dominant market position in competitions. In so doing, Varsity created artificial demand for

its camps (not based on quality or efficiency) and created artificial barriers to entry for possible

new camp entrants. *See* Ex. 4 [Heeb Rebuttal] at ¶¶ 316–322. This artificial demand is not based

on higher quality or reduced costs of the camps, but simply a reflection of Varsity's dominant

control over competitions and camps. *Id*.

### iii.      Varsity's Anticompetitive Tying Scheme

Varsity also instituted the Squad Credentialing Program, requiring that teams seeking to

qualify for a school end-of-season competition must have enrolled in a Varsity camp. Defendants

rely on *Brookins,* for the proposition that "Varsity has every right to set the rules for the

competition, including the requirements for eligibility." Defs' Joint Mot. at 24 (citing *Brookins v.

Int'l Motor Contest Ass'n*, 219 F.3d 849, 854 (8th Cir. 2000)). But Defendants' general and

unfounded assertion is misplaced.[29] Moreover, the effect the program had on Varsity's rival camp

---

[29] Varsity's reliance on *Brookins* is misplaced. In *Brookins*, the Eighth Circuit affirmed dismissal
of an antitrust claim against an auto-racing sanctioning body. *Brookins*, 219 F.3d at 852. The
complaint alleged that the rules on eligible transmission types in a certain class of auto-racing
precluded the use of the plaintiff's transmission. *Id*. Significantly, plaintiffs in that case failed to
plead facts showing the defendants possessed market power. *Id*. at 854-55. Varsity omits this key
fact.

Varsity also relies on *B & H Medical, L.L.C. v. Stephen M. Ryan, P.L.L.C.*,  526 F.3d 257 266
(6th Cir. 2008) for the proposition that the Squad Credentialing cannot be anticompetitive
because it foreclosed a small share of the market. *See* Defs' Joint Mot. at 25. This assertion is at
odds with the record. The record shows that these arrangements effected a substantial amount of
commerce on their own. *See* RDSOF at ¶¶ 12, 13. Defendants attempt to minimize the
significance on the grounds that only 10% of school cheer teams make it to the end-of-season
competitions that mandate Varsity camp attendance. Defs' Joint Mot. at 25. The logic is flawed.
The requirement did not just affect the teams that qualified. It affected all of the teams that

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

producers—by creating further barriers to entry and limiting rival camp producers' ability to gain a foothold in Varsity's dominant monopoly position—maintained and entrenched Varsity's monopoly power, and therefore limited cheer athletes' camp options, even for those few teams that were not interested in attending end-of-season competitions and who may not have considered themselves actually *required* to attend a Varsity camp.

### C.    There is Evidence of Harm in the Camps Market

Reprising their argument with respect to competitions, Defs' Joint Mot. at 20-23, this argument fares no better here. Relying on Varsity's high market shares and market power, together with proof of barriers to entry and the Squad Credentialing Program, Dr. Heeb showed that Varsity's conduct foreclosed competition with respect to camps. Ex. 3 [Heeb Rep.] at ¶¶ 182–184, 269–277. Dr. Heeb applied the same methodology with respect to competitions and camps. His analysis, modified and corrected following the suggestions of Dr. Murphy, shows damages and calculates a positive overcharge. Ex. 4 [Heeb Rebuttal] at ¶¶ 5–32, 615–622.

## IV.    Defendants are not Entitled to Summary Judgment with Respect to Apparel.

### A.    The Cheer Apparel Market

Defendants also dispute the apparel market. Defs' Joint Mot. at 25–30. Defendants base this claim on the assertion that each piece of apparel is different. Shirts are different than skirts, which are different than pants, which are different than shoes, the argument goes. *Id.* Defendants also indicate that all sorts of non-cheer apparel should be included. The argument is sophism, at odds with economic analysis, applicable case law, and the facts here.

As described above, Dr. Heeb applied well-established methodologies to market definition. *See Brown Shoe*, 370 U.S. at 325; *see supra* Section II.A.i. Heeb analyzed the nature of cheer apparel, and recognized as Varsity does, that cheer apparel has special physical

---

wished to qualify. *See* Ex. 1 [Netz Rep.] at 91; Ex. 2 [Netz Rebuttal] at 38. *B & H Medical* is also distinguishable because the plaintiff in B&H did not allege a coordinated anticompetitive scheme, or show market power. The *B&H* plaintiff did not assert—or show—the connection of the decision to reject the plaintiff from the network connected to any other conduct.

characteristics and rules. Ex. 3 [Heeb Rep.] ¶¶ 153-58. Cheer apparel is custom made and Plaintiffs purchase products from six categories. Ex. 3 [Heeb Rep.] ¶ 158-60. Because athletes participate as teams, they wear the same uniform. Indeed, given the team nature of the sport, apparel in the form of uniforms must be coordinated in style and color, often customized specifically for the school or gym. It would be impractical to mix and match apparel purchases from numerous vendors. Ex. 3 [Heeb Rep.] at ¶ 161. Heeb confirms that cheer apparel is the relevant product market and the geographic market is the United States. Ex. 3 [Heeb Rep.] ¶¶ 163–68. These selling practices are encouraged by the fact that USASF and Varsity set standards and rules for apparel worn by cheer teams at competitions. *See, e.g.*, Ex. 1 [Netz Rep.] at n.114; Ex. 302; Ex. Ex 303.[30]

These qualitative reasons for considering apparel a single market is confirmed by expert quantitative analysis. Dr. Heeb analyzed the sales data and found that cheer teams overwhelmingly tend to purchase apparel products as a bundle from the same supplier. *See* Ex. 3 [Heeb Rep.] at ¶¶ 159-167; Ex. 4 [Heeb Rebuttal] at ¶¶ 215-228. As Dr. Heeb concluded, "more than 70% of Varsity revenue is from customers who purchase from at least five of the six cheer apparel categories, and more than 96% of revenue is from customers who purchase at least three categories of apparel." Ex. 4 [Heeb Rebuttal] at ¶ 215.[31] The qualitative and quantitative analysis confirm the conclusion that cheer teams overwhelmingly purchase their cheer apparel as a bundle from the same supplier.[32]

_____

[30] For example, USASF required that any skirt must "completely cover the briefs and must fall at least 1 inch below briefs (regular and boy cut briefs). When shorts are worn as part of the uniform, there must be a minimum of a 2" inseam." Ex. 305; *see also* Ex. 12 [Elza Dep.] at 110:25-112:11.

[31] Defendants conceded this point, offering no testimony disputing the data or the data analysis.

[32] Similar analysis has been applied with respect to other markets reaching similar conclusions. For example. *See FTC v. Staples, Inc*., 970 F. Supp. 1066, 1074 (D.D.C. 1997) (concluding that while office products like legal pads and compact discs are not substitutes for one another, they can be considered together as part of a relevant market for "consumable office supplies"). Indeed, cheer teams are far more incentivized to purchase all of their cheer apparel (or most of it) from the same supplier—who can design sell all of the pieces of apparel to fit and match together

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

Defendants concede, as they must, that many cases have found relevant markets consisting of a "cluster" or "bundle" of products to be sufficient for purposes of antitrust market definition. Defs' Joint Mot. at 26–27. Defendants also do not dispute Plaintiffs' experts analysis confirming that the apparel market involves cluster or bundled products. Defendants instead claim that a "cluster" market is a "narrow exception" to markets defined purely by consideration of demand substitutability. *Id.* at 26. Not so. As explained by the Supreme Court, a market of such groups or clusters of products is by no means rare or unusual. For example, in *U. S. v. Phila. Nat. Bank*, 374 U.S. 321, 356 (1963), the Court considered the impact of a merger on the markets for "commercial banking services" which included such diverse products as checking account services and personal loans. *Id.*; *see also United States v. Cent. State Bank*, No. 89-1162, 1989 WL 146531, at *1 (6th Cir. Dec. 5, 1989) (citing *Phila. Nat. Bank*, 374 U.S. at 321 and analyzing effect on market for the cluster of products making up "Commercial Banking Services"). Other cases are in accord. *See, e.g.*, *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1074 (D.D.C. 1997) ("consumable office supplies" included products ranging from legal pads to CDs); *F.T.C. v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1039 (D.C. Cir. 2008) (analyzing effect of merger on cluster of grocery store products); *see also SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1278 (8th Cir. 1981); *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 112 (1984). Far from forbidden as a matter of law, the sufficiency of a market definition including a number of items is a question of fact. *See In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d 705, 723 (E.D. Tenn. 2011); *See also Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 945 (6th Cir. 2005) ("'intellectual disagreement' among the parties' experts creates material factual disputes on the relevant market").[33]

---

into the same design theme—than is a consumer looking to purchase office supplies.

[33] Defendants' last stand is the claim that, unless "100%" of all cheer apparel purchases include the same bundle, plaintiffs' apparel market definition fails as a matter of law. *See* Defs' Joint Mot. at 27 ("If the cluster market contention had any potential validity as a matter of law, that number would be at or near 100%, reflecting the required consumer demand for the cluster as opposed to the individual components.") But Defendants provide no citation for this bald assertion, and it should be rejected on that basis alone. Moreover, the contention is at odds with

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

Dr. Heeb's analysis demonstrates that even though 100% of all purchasers do not purchase all cheer apparel as a bundle, the amount of purchasers who do choose to do so, is substantial, allowing Varsity to raise prices in cheer apparel profitably, and thus demonstrating that cheer apparel is a meaningful relevant market for antitrust analysis. *See* Ex. 3 [Heeb Rep.] at ¶¶ 153-168, Ex. 4 [Heeb Rebuttal] at ¶¶ 214-228; Ex. 1 [Netz Rep.] at 27-32, 55-56]; Ex. 2 [Netz Rebuttal] at 35–37.

### B. Evidence of Anticompetitive Conduct in the Apparel Market

Defendants repackage their arguments over anticompetitive conduct with respect to apparel. Defs' Joint Mot. at 30-32. Defendants take on the evidence to argue that Defendants' rebate programs, its scheduling practices, and its Conspiracy with USASF have no connection to apparel at all. Defs' Joint Mot. at 30. As explained above, the conduct cannot not be compartmentalized and should be considered in the context of Plaintiffs allegations as a whole. *Cont'l Ore Co*., 370 U.S. at 699; *Conwood*, 290 F.3d 768; *City of Anaheim*. 955 F.2d at 1376. Plaintiffs have direct evidence of intentional foreclosure in the cheer apparel market.

### i. Rebates

For the same reasons as described above with respect to Competitions and Camps, Varsity's Family Plan, Network Agreement, and IMPACT Program were all anticompetitive and part of the anticompetitive monopolization scheme. *See supra* Section II.B.i; RDSOF at ¶¶ 52, 114; PSOF ¶¶ 74, 80, 118–126. And they all applied to the apparel market too. *See supra* Section II.B.i; PSOF ¶¶ 74, 93. Plaintiffs' experts demonstrate that the exclusionary rebate and exclusive dealing programs affected the entire ecosystem, including the apparel market. *See* Ex. 1 [Netz Rep.] at 62–65; Ex. 2 [Netz Rebuttal] at 66–69; Ex. 3 [Heeb Rep.] at ¶¶ 219-226.

Defendants argument that the rebate and exclusive contracts could not be anticompetitive

---

the case law. *See Phila. Nat. Bank*, 374 U.S. at 356, (with respect to Commercial Banking Products, some people still purchased some products piecemeal, like personal loans through 'small loan companies"). *FTC v. Staples* (no requirement that 100% of all consumers purchased both legal pads and compact discs).

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

as a matter of law with respect to apparel is groundless. First, they argue that no school had a "Network Agreement," entirely ignoring the Impact ("VIP") program, which specifically required schools to purchase Varsity camps, competition, and apparel. *See* PSOF at ¶¶ 124–126; RDSOF at ¶¶ 52, 114.[34]

### ii.    Conspiracy with USASF

Defendants are also wrong about Varsity's conspiracy with USASF having nothing to do with apparel. Direct evidence of intentional, conspiratorial foreclosure of apparel competition exists here. *See* ECF No. 479 [USASF Brief] at Section II.G–H. For instance, Plaintiffs will present evidence of Jim Webb directing John Newby, a Varsity executive, to "please mention to Chadwick [USASF President] that since Tate [Founder of Nfinity, a major cheer apparel competitor] is an event producer now he will not be able to have Infinity [sic] sponsor World's / USASF anymore." Ex. 179 at -1873. Further emails show USASF conspiring with Varsity to seek approval from Varsity about which cheer apparel brands were permitted to have booths to sell apparel at USASF national competitions, implementing Varsity's ban on apparel competitors. Ex. 154 at -7155-56; Ex. 180 at -0796.

Other evidence shows Varsity's various schemes and policies actively restrict rival companies from selling merchandise at Varsity events. For example, a 2017 joint agreement between NCA & NDA and a high school to host a championship event had a stipulation in the

---

[34] Defendants' reliance on *SPX Corp. v. Mastercool, U.S.A., Inc.*, 2011 WL 3610094 at *2 (N.D. Ohio Aug. 17, 2011) makes little sense. *See* Defs' Joint Mot. at 31. The antitrust counterclaims there were part of a patent suit and based on single termination clause in a contract where the contracts did not have "the practical effect of substantially limiting competition or foreclosing entry into the [relevant market]." *Id.* at *2. Here we have direct evidence of intentional, successful foreclosure of competition to all three markets that make up the ecosystem, including the cheer apparel market, as well as erecting barriers to entry. Defendants' citation to *Midwest Agency Servs., Inc. v. JP Morgan Chase Bank, N.A.*, No. CIVA2:09-165-DCR, 2010 WL 935450, at *6 (E.D. Ky. Mar. 11, 2010) is flawed for essentially the same reasons, as it involved a single contract provision and the primary holding on a motion to dismiss was based on the lack of adequately pled antitrust injury, including failure to adequately allege the elements of a tying arrangement. *Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556, 559 (9th Cir. 2018) is also inapposite.

contract granting NCA & NDA "the exclusive right to sell merchandise…at the Event through its Store." Ex. 304 at 2 (item 16). These barriers to entry are significant, are achieved by leveraging Varsity's monopoly over cheer competitions, and exist across the market for cheer apparel. Ex. 3 [Heeb Rep.] at ¶188. Ex. 304 at -7448. USASF also provided early access to Varsity regarding apparel rule changes, giving Varsity an advantage over other apparel rivals who might not be able to make changes to apparel in time to meet the rule changes. *See* ECF No. 479 [USASF Brief] at Section II.G. USASF and Varsity also conspired to impose penalties on noncompliance. *Id.* Plaintiffs' evidence of anticompetitive conduct here is not merely based on Varsity's refusal of sharing of resource with others, as Defendants claim. Defs' Joint Mot. at 31–32. Defendants' reliance on *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP,* is inapposite because there the services allegedly withheld were not otherwise marketed or available to the public and were not discrete markets in and of themselves. 540 U.S. 398, 410 (2004). Varsity's tactics, including pushing apparel at its camps which it ties to its competitions, and conspiring with USASF to preclude apparel competition at its cheer competitions, involves three discrete but related markets, in two of which they enjoy undisputed monopoly power. There are clear material issues of fact regarding Varsity's anticompetitive conduct here in the cheer apparel market and Defendants' argument otherwise must be rejected.

### iii.    Acquisitions

Varsity's acquisition of independent producers, discussed at length *supra* Section II.B.ii, also had important anticompetitive impact on the apparel market. For starters, Defendants' anticompetitive acquisitions targeted apparel manufacturers to roll-up the cheer apparel market too. *See* Ex. 3 [Heeb Rep.] at ¶¶ 267-268. Indeed, as recently as 2019, under Bain's direction, Defendants were still acquiring its rivals, including for the stated purpose of foreclosing apparel rivals. *See* Ex. 236 at -6944, 6960-61 (executed asset purchase agreement for Varsity's acquisition of B2 Cheer and Dance, dated January 9, 2019); Ex. 237 (confirming that Varsity viewed the acquisition of B2 Cheer and Dance, a competitor in the cheer camps market, as an opportunity to foreclose a key competitor in the cheer apparel market and increase participation

at Varsity's national competitions in the school cheer market). In the B2 Cheer transaction

summary, Defendants stated the strategic rationale for the acquisition as an "[o]pportunity for

Varsity Apparel reps to gain exclusive access to B2 customers (currently under contract with

Rebel)". Rebel's exclusivity to B2 customers will be terminated upon deal closing.").

Moreover, acquisitions and anticompetitive conduct in the competitions market to

increase and maintain Defendants' monopoly, had a clear effect on the apparel market because

Defendants used exclusive dealing and rebate programs with gyms related to both competitions

and apparel markets. *See generally* Ex. 1 [Netz Rep.] at 56–60 (apparel); 62–65 (ecosystem).

### C. There is Evidence of Harm in the Cheer Apparel Market

Defendants raise similar challenges to Plaintiffs' proof of impact and damages with

respect to the cheer apparel market. Defs' Joint Mot. at 31-32. Here again, Defendants repeat

their *Daubert* arguments. Dr. Heeb and Dr. Maki apply standard economic methodologies and

analyses with respect to the issues of impact and damages. *See* Ex. 3 [Heeb Rep.] at ¶¶ 300-307;

Ex. 7 [Maki Rep.] at ¶¶ 114-120; *see also* ECF Nos. 428 and 430 [Daubert Oppositions]. In so

doing, they apply well-established economic principles and basic laws of supply and demand to

the record in this case. Indeed, they cite dozens of defendants' business records and substantial

deposition testimony, independently admissible to defeat Defendants' assertions. As in their

*Daubert* motions, Defendants' challenge Dr. Heeb's methodology of and analysis of the Varsity

Cheer shoe market as a benchmark for overcharges. *See* Ex. 3 [Heeb Rep.] at ¶¶ 300-307; Ex. 7

[Maki Rep.] at 114-120. Such a dispute proves there are issues of fact for the jury to consider

here. Dr. Heeb, through econometric analysis of all the different types of Varsity Cheer shoes

over a four-year period determined conservatively that there was a 10% overcharge during that

time period. *See* Ex. 3 [Heeb Rep.] Table 23, ¶303. Dr. Heeb also presents evidence that the

submarket for cheer shoes is the most price sensitive in cheer apparel and thus is a reasonable

proxy for the larger cheer apparel market to gauge overcharge. Ex. 3 [Heeb Rep.] ¶¶ 305–307.

Defendants admit they charged higher prices for apparel. *See* Defs' Joint Mot. at 32. But Defendants state that "without actual evidence causally connecting the higher price to particular actionable anticompetitive conduct, price difference means nothing."

To the contrary, the record is replete with evidence, connected to the anticompetitive scheme, of anticompetitive conduct with respect to apparel. The direct and foreseeable effect of that conduct was an increase in apparel prices accompanied by a decline in apparel quantity. *See, e.g.*, Ex. 4 [Heeb Rebuttal] at ¶¶ 578–601.

Despite the higher price of Varsity's cheer apparel, it was broadly considered lower in quality. The Cheer community found Varsity's products to be of lesser quality despite that overcharge. *See* Ex. 1 [Netz Rep.] at 57; Ex. 3 [Heeb Rep.] at ¶301, Ex. 7 [Maki Rep.] at ¶108; *see also* Ex. 246 at -2183-2184.

Finally, as with the other markets, Defendants make a passing argument that there is no evidence of pass-through. As explained above, Defendants' argument is merely another bite at the apple of the fully briefed *Daubert* motion on pass-through. For the reasons discussed in Plaintiffs prior briefing, Defendants' motion to exclude Dr. Maki's testimony should be denied. *See* ECF No. 428 [Pls' Opp. to Defs' Mot. to Exclude Maki]; Ex. 9. Moreover, the issue is a question of fact, and Defendants' own documents establish pass-through. *See* Ex. 93 at -6022 (showing that "cheerleaders and parents" pay "high schools" and "All Star gyms," who in turn pay Defendants in all three markets).

## V.    Plaintiffs' State Law Claims Are Not Deficient

### A.    Tennessee Law Permits Recovery on Plaintiffs' Claims

#### i.    TCPA's Class Action Bar is Procedural

As this Court recently concluded, the TCPA's class action bar is procedural and does not bar claims in federal court. *See* ECF No. 475 at Page ID 19513. Defendants' motion for summary judgment on this issue has therefore already been decided.

#### ii.    Plaintiffs' Claims for Unjust Enrichment Should Move Forward

Defendants seek dismissal of Plaintiffs' claim for unjust enrichment under Tennessee law arguing that unjust enrichment laws vary from state to state in material respects and require a choice-of-law analysis. But Defendants must first show an actual conflict of laws, and then must conduct a meaningful choice-of-law analysis. *See Radair, LLC v. Alaska Airlines, Inc.*, No. 2:20-cv-02286-MSN-cgc,, 2022 WL 193736, at *4 (W.D. Tenn. Jan. 20, 2022) (an actual conflict between states law is a "prerequisite to a choice of law analysis"). Defendants fail on both.

An actual conflict exists when "two or more states have a legitimate interest in a particular set of facts in the litigation and the laws of those states differ or would produce different results." *Id.* There is no actual conflict here because "although the particular elements of unjust enrichment vary from jurisdiction to jurisdiction, when stripped to its essence, a claim of unjust enrichment requires [a plaintiff] to show that Defendants received a benefit and under the circumstances of the case, retention of the benefit would be unjust." *In re Auto. Parts Antitrust Litig.*, 12-MD-02311, 2014 WL 2993753, at *25 (E.D. Mich. July 3, 2014); *In re Whirlpool Corp. Front–Loading Washer Prods. Liab. Litig.*, 684 F. Supp. 2d 942, 959 (N.D. Ohio 2009), as amended (Nov. 4, 2009) ("Rather than describing the specific conduct of the defendant, the 'unjust, inequitable, or wrongful' element of an unjust enrichment claim speaks to the general circumstances of the parties"); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 541 (E.D. Pa. 2010).

Rather than establish an actual conflict of laws, Defendants simply cite *Cullen v. Nissan N. Am., Inc.*, 3:09-0180, 2010 WL 11579748, at *4 (M.D. Tenn. Mar. 26, 2010) for the proposition that state unjust enrichment laws have "material differences." Defendants fail to point to any of the differences referenced in *Cullen* as outcome determinative in this case. They are not. First, *Cullen* referenced differing limitations periods (*see id.* at *5), but, as explained below, that simply limits the damages period—it does not bar Plaintiffs' claim under any state's law. Second, *Cullen* references the fact that some states require a heightened level of misconduct such as dishonesty or fraud. *Id.* Here, Plaintiffs' claim is based on a scheme by a monopolist and its co-conspirators to monopolize cheer-related markets, to foreclose competition, restrain trade,

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

and raise prices for consumers. This satisfies any heightened misconduct requirement. *See Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir.2011) ("Federal antitrust laws are implicated only when that conduct is predatory or unjustifiable"); *see also U.S. Futures Exch., LLC v. Bd. of Trade of City of Chicago, Inc.,* 346 F.Supp.3d 1230, 1250 (N.D. Ill.2018) (finding that despite conduct being dishonest or distasteful it did not rise to the level of an antitrust violation). Because applying the unjust enrichment laws of other states is not outcome determinative, Defendants choice-of-law argument fails.

Defendants next assert that even if Tennessee unjust enrichment law applies it requires Plaintiffs to exhaust all remedies against gym owners. That is not the law. Where, as here, an intervening party has not retained the benefit of the unjust act, claims against the intervening party are deemed futile and thus plaintiffs need not exhaust remedies against such parties. *Freeman Indus., LLC v. Eastman Chem. Co*., 172 S.W.3d 512, 526 (Tenn.2005) ("[T]o maintain an action for unjust enrichment, a plaintiff is not required to exhaust all remedies against the party with whom the plaintiff is in privity if the pursuit of the remedies would be futile"). Here, the evidence shows that gyms and schools passed the full measure of the supra-competitive prices on to Plaintiffs and did not retain a benefit from Varsity's unlawfully inflated prices. Indeed, the evidence shows that the financial benefits to Defendants are traceable to overpayments for cheer competition registration fees, spectator fees, cheer apparel, cheer camps, and other ancillary charges including stay-to-play charges.

Last, Defendants contend that Varsity did not retain any unjust enrichment because it agreed to pay $43.5 million to a nationwide class of gyms. First, the settlement in *Fusion* is a negotiated compromise, a middle ground between the parties. It does not represent—nor even purport to reflect—the whole of profits that Defendants unjustly received due to its anticompetitive conduct towards gym owners. Further, the settlement does not account for the overcharges that were passed on to Plaintiffs who provide funding for all or virtually all of cheer-

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

related spend.[35] Additionally, the settlement does not reflect the unlawful benefits that Varsity retained from schools, competitions, and camps. Nor does it account for non-monetary benefits conferred on Defendants in the cheerleading market such as the capital to drive their anticompetitive scheme and acquire a monopoly in the cheerleading market. Thus, summary judgment is improper as to Plaintiffs' unlawful enrichment claims.

### B.    Plaintiffs' Claims are Based on a Conspiracy Between USASF and Varsity

Defendants repackage the same argument that Plaintiffs' claims are based on unilateral conduct by Varsity, and thus claims in states that do not recognize unilateral conduct should fail. This is incorrect for a couple of reasons. First and foremost, Plaintiffs state law claims are premised on concerted action between Varsity and its co-conspirators. *See* Compl. ¶ 247-248. There is substantial and largely uncontroverted evidence of the purpose, intent and scope of the scheme. The record demonstrates numerous overt acts in furtherance of that scheme. As further detailed in Plaintiff's Opposition to USASF's Motion for Summary Judgment, the evidence demonstrates that from the inception of USASF, Defendants endeavored to create an anticompetitive scheme to dominate the cheerleading ecosystem as a whole. In the apparel market, USASF colluded with Varsity to stop rival apparel companies from exhibiting products at USASF meetings which were once viewed as low cost way for competitors to reach customers. (Ex. 152, Ex. 181). Additionally, Defendants leveraged the unlawful benefits they retained in the cheer competitions and apparel markets into camps and schools through bundling.

Second, Defendants are engaged in an unlawful conspiracy to monopolize the cheerleading market and are thus responsible for the actions of other co-conspirator even if they were not personally involved in those actions. *See In re Se. Milk Antitrust Litig.*, 801 F.Supp.2d 705, 742 (E.D. Tenn. 2011) (citing *United States v. Murphy*, 937 F.2d 1032, 1041 (6th Cir. 1991)) ("Each conspirator is liable for the overt acts committed by any member of the conspiracy, even

---

[35] Plaintiffs' expert calculated the overcharge pass-on as at least 100% in all markets. *See* Ex. 7 [Maki Rep.] at ¶120; *see also* Ex. 53 at -4773. As noted above, this likely understates Varsity's ill-gotten gains.

if the defendant did not personally commit the acts"); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 253–54 (1940) ("For a conspiracy is a partnership in crime; and an 'overt act of one partner may be the act of all without any new agreement specifically directed to that act"). Actions undertaken by one Defendant are properly imputed on other Defendants as part of the conspiracy.

Third, Plaintiff's claims that are not based on concerted action can be dealt with in a jury instruction or on the special verdict form. If the jury finds Varsity liable but not one of the other Defendants in a state that does not allow unilateral conduct, the verdict form will allow the jury to find for Varsity in that state. Thus, summary judgement should be denied on this basis.

### C.    Plaintiffs Can Bring Indirect Purchaser Claims in Arkansas, Florida, Idaho, Massachusetts, and Washington

Courts including this Court have found that indirect purchaser can bring claims in Massachusetts, Florida, and Arkansas. *See* ECF 333 at Page ID7247 ("The Indirect Purchasers correctly asserts their ability to bring antitrust claims under the ADPTA); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline*, PLC, 737 F. Supp. 2d 380, 405 (E.D. Pa. 2010) (Indirect purchasers may plead antitrust claims under the Arkansas Deceptive Trade Practices Act, this includes antitrust harm)[36]; *Ciardi v. F. Hoffmann–La Roche, Ltd.*, 762 N.E.2d 303, 309 (Mass. 2002) (holding that individuals that were indirect purchaser were not barred from bringing claims under the Massachusetts consumer protection act); *In re Broiler Chicken Antitrust Litig.*, 290 F.Supp.3d 772, 819 (N.D. Ill.2017) ("[i]ndirect purchasers of a monopolist's or price fixer's products, such as Plaintiffs here, may bring suit under the Florida DTPA"). Thus, summary judgment is not proper on this ground and should be denied.

---

[36] The following cases also upheld ADTPA indirect purchaser and/or indirect antitrust claims: *In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 836, 859 (E.D. Mich. 2014); *In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, at *9 (N.D. Ill. Nov. 5); *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 583 (M.D. Pa. 2009) (accord); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1109 (N.D. Cal. 2007); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 178 (D. Me. 2004).

### D.  It is Immaterial if States Have Statute of Limitations That Differ from the Federal Statute of Limitations

Defendants point out that several states have statute of limitations that are different than the four-year statute of limitations. This is wholly irrelevant. *See In re Broiler Chicken Antitrust Litig.,* No. 16 C 8637, 2022 WL 1720468 at *20 (N.D. Ill. May 27, 2022) (holding that "this is only relevant to the extent of damages and can be easily addressed by excluding sales outside the relevant periods"); *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) (acknowledging limitations differences but finding them "to be inconsequential"). Plaintiff's experts have broken out damages by year within the class period making it easy for the jury to exclude sales outside of the relevant statutory period. *See e.g.* Ex. 7 [Maki Rep.] at 41, 45. Therefore, summary judgment should be denied on this ground.

### E.  Plaintiffs Were Not Required to Meet Preempted Procedural Requirements

Defendants concede that the state law notice requirements are procedural but puzzlingly assert that Plaintiffs are nevertheless required to adhere to them in federal court. *See* ECF 471 at 59. These notice requirements are preempted under *Shady Grove* because they are procedural and conflict with Federal Rule of Civil Procedure 23. The requirement to give notice is a condition precedent for class treatment, which is the exact kind of conflict the Supreme Court addressed in *Shady Grove*. *See In re Restasis Antitrust Litig.,* 355 F.Supp.3d 145, 156 (E.D.N.Y.2018) (citing *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 419 (2010) (Stevens, J., concurring) ("[A] state law that restricts the types of claims eligible for class treatment beyond the limits established beyond Rule 23 conflicts with the federal rule"). Moreover, numerous courts considering this same issue have found these notice requirements inapplicable in federal court because they conflict with Rule 23. *In re Restasis*, 355 F.Supp.3d at 156 (concluding that Hawaii's law does not alter the substantive elements of the plaintiff's claim, and is "surely no more substantive than the statute at issue in *Shady Grove*, which barred class action suits for an entire category of claims"); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 254 (D. Conn. 2015) (reasoning that Hawaii's notice requirements are not "sufficiently a 'part of a State's

framework of substantive rights or remedies' to be controlling in federal court even under the Stevens concurrence"); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 18 C 864, 2023 WL 4305901, at *50 (N.D. Ill. June 29, 2023) (finding that Arizona, Hawaii, and Utah's notice requirements are preempted by Rule 23); *In re Propranolol Antitrust Litig.*, 249 F.Supp.3d 712, 728 (S.D.N.Y. 2017). Thus, Arizona, Connecticut, Hawaii, Minnesota, Nevada, and Utah's notice requirements are preempted by Rule 23 and summary judgment should be denied on this ground.

## VI.   Summary Judgement is Improper as to Plaintiffs' Claim for Declaratory Relief

Defendants assert that Plaintiffs' claim for declaratory relief is superfluous and should be dismissed. But this Court has already found at the motion to dismiss stage that the declaratory judgment claim is not superfluous of Plaintiffs' claim under Section 2 and Defendants have argued nothing new. *See* ECF No. 333 at PageID 7260. A decree from the Court that Defendants' conduct violates Section 2 of the Sherman Act would control and clarify the proper standard for Varsity and USASF's *future* business dealings and not merely resolve Plaintiffs' past claims. *Dolgencorp, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh Pennsylvania*, No. 3:18-CV-0529, 2018 WL 3753157, at *2 (M.D. Tenn. Aug. 8, 2018) (although the claim for declaratory relief overlaps with Plaintiff's breach of contract and bad faith claims, clarification of whether Plaintiff fulfilled its responsibilities under the insurance contracts, in light of the normal course of dealing between the parties, will affect future relations and actions by the parties). Therefore, summary judgment should be denied on this basis.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be denied. Pursuant to Local Rule 7.2(d), Plaintiffs respectfully request a hearing to address any questions the Court may have.

Dated: September 15, 2023                    Respectfully submitted,

                                            By:_____ */s/ Joseph R. Saveri*_____
                                                    Joseph R. Saveri

                                            Joseph R. Saveri*
                                            Steven N. Williams*
                                            Ronnie Seidel Spiegel*+
                                            Kevin E. Rayhill*
                                            Elissa A. Buchanan*
                                            David Seidel*
                                            **JOSEPH SAVERI LAW FIRM, LLP**
                                            601 California Street, Suite 1000
                                            San Francisco, California 94108
                                            Telephone: (415) 500-6800
                                            Facsimile: (415) 395-9940
                                            jsaveri@saverilawfirm.com
                                            swilliams@saverilawfirm.com
                                            rspiegel@saverilawfirm.com
                                            krayhill@saverilawfirm.com
                                            eabuchanan@saverilawfirm.com
                                            dseidel@saverilawfirm.com

                                            Van Turner Jr. (TN Bar No. 22603)
                                            **TURNER FEILD, PLLC**
                                            2650 Thousand Oaks Blvd., Suite 2325
                                            Memphis, Tennessee 38118
                                            Telephone: (901) 290-6610
                                            Facsimile: (901) 290-6611
                                            VTurner@TurnerFeildLaw.com

                                            Richard M. Paul III*
                                            Ashlea Schwarz*
                                            **PAUL LLP**
                                            601 Walnut, Suite 300
                                            Kansas City, Missouri 64106
                                            Telephone: (816) 984-8100
                                            rick@paulllp.com
                                            ashlea@paulllp.com

                                            Jason S. Hartley*
                                            **HARTLEY LLP**
                                            101 West Broadway, Suite 820
                                            San Diego, CA 92101
                                            Telephone: (619) 400-5822

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY
JUDGMENT**

hartley@hartleyllp.com
brizuela@hartleyllp.com

Daniel E. Gustafson*
Daniel C. Hedlund*
Daniel J. Nordin*
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com

* Admitted *pro hac vice*

+Located in Washington State

*Attorneys for Individual and
Representative Plaintiffs*