# EXHIBIT 14

### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TENNESSEE

JONES, et al.

              Plaintiffs,

    v.

VARSITY BRANDS, LLC, et al.,

           Defendants.

**Case No. 2:20-cv-02892-SHL-tmp**

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 1

I.    PLAINTIFFS CANNOT CONTRIVE DISPUTES TO AVOID DISMISSAL ............... 1

II.   PLAINTIFFS' CAMP CLAIMS SHOULD BE DISMISSED ...................................... 3

    A.   Plaintiffs Lack Article III Standing in Camps ........................................................ 3

    B.   Plaintiffs Also Lack Antitrust Standing in Camps ................................................. 4

    C.   There Is No Evidence of Anticompetitive Conduct Related to Camps .......................... 6

    D.   There Is No Evidence of Harm in Camps to Anyone ................................................. 8

III.  PLAINTIFFS' APPAREL CLAIMS SHOULD BE DISMISSED ................................. 9

    A.   Cheer Apparel Is Not a Viable "Cluster Market" ................................................... 9

    B.   There Is No Evidence of Anticompetitive Conduct Relating to Apparel .................... 11

    C.   There Is No Evidence of Harm in Apparel .......................................................... 12

IV.   PLAINTIFFS' CHEER COMPETITIONS CLAIMS SHOULD BE DISMISSED ....... 13

    A.   Market Definition ........................................................................................... 13

    B.   There Was No Anticompetitive Conduct in Cheer Competitions ............................. 15

        1.   School ...................................................................................................... 15

        2.   All Star ..................................................................................................... 16

    C.   There Is No Admissible Evidence of Harm Relating to Competitions ........................ 21

V.    PLAINTIFFS' CLAIMS ARE DEFICIENT FOR ADDITIONAL REASONS UNDER
      THE LAWS OF VARIOUS STATES ...................................................................... 21

VI.   The Claim for Declaratory Relief Should Be Dismissed ........................................... 27

CONCLUSION ................................................................................................................. 27

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*4th Leaf, LLC v. City of Grayson*,
    425 F. Supp. 3d 810 (E.D. Ky. 2019)...................................................... 22

*Associated Gen. Contractors of Cal. v. California State Council of Carpenters*,
    459 U.S. 519 (1983)......................................................................4-5

*B & H Med., L.L.C. v. ABP Admin., Inc.*,
    526 F.3d 257 (6th Cir. 2008)............................................................. 7

*Blue Shield of Va. v. McCready*,
    457 U.S. 465 (1982)........................................................................ 5

*Bodie-Rickett and Assocs. v. Mars., Inc.*,
    957 F.2d 287 (6th Cir. 1992)............................................................. 6

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)........................................................................ 2

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)....................................................................... 19

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962)........................................................................ 3

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
    290 F.3d 768 (6th Cir. 2002)........................................................... 19

*Cullen v. Nissan N.A., Inc.*,
    No. 3:09-0180, 2010 WL 11579748 (M.D. Tenn. 2010)................................... 24

*Dang v. San Francisco Forty Niners*,
    964 F. Supp. 2d 1097 (N.D. Cal. 2013)................................................... 5

*Dolgencorp v. Nat'l Union Fire Ins. Co.*,
    No. 3:18-cv-0529, 2018 WL 3753157 (M.D. Tenn. Aug. 18, 2018).................... 27

*Eastman Kodak Co. v. Image Tech. Services*,
    504 U.S. 451 (1992)........................................................................ 3

*Evans v. Walgreen Co.*,
    813 F. Supp. 2d 897 (W.D. Tenn. 2011)............................................... 2, 28

*Horton v. Potter*,
    369 F.3d 906 (6th Cir. 2004) ................................................................................. 2

*In re Auto. Parts Antitrust Litig.*,
    No. 12-md-02311, 2013 WL 2456612 (E.D. Mich. June 6, 2013) ........................ 4

*In re Auto. Parts Antitrust Litig.*,
    29 F. Supp. 3d 982 (E.D. Mich. 2014) ................................................................ 5

*In re Broiler Chicken Antitrust Litig.*,
    No. 16 C 8637, 2022 WL 1720468 (N.D. Ill. May 27, 2022) ........................... 26

*In re Broiler Chicken Antitrust Litig.*,
    No. 16 C 8637, 2023 WL 5227130 (N.D. Ill. Aug. 15, 2023) ........................... 23

*In re Cathode Ray Tube Antitrust Litig.*,
    738 F. Supp. 2d 1011 (N.D. Cal. 2010) .............................................................. 5

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
    44 F.4th 959 (10th Cir. 2022) ............................................................................. 3

*In re Flash Memory Antitrust Litig.*,
    643 F. Supp. 2d 1133 (N.D. Cal. 2009) .............................................................. 5

*In re Google Play Store Antitrust Litigation*,
    No. 20-cv-05761-JD, 2023 WL 5602143 (N.D. Cal. Aug. 28, 2023) .................. 9

*In re Lipitor Antitrust Litig.*,
    336 F. Supp. 3d 395 (D.N.J. 2018) ................................................................... 27

*In re Loestrin 24 FE Antitrust Litig.*,
    410 F. Supp. 3d 352 (D.R.I. 2019) ................................................................... 27

*In re: Qualcomm Antitrust Litig.*,
    No. 17-md-02773-JSC, 2023 WL 6301063 (N.D. Cal. Sept. 26, 2023) ............. 9

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
    No. 1:12-md-2343, 2013 WL 2181185 (E.D. Tenn. May 20, 2013) .................... 3

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
    299 F.R.D. 555 (E.D. Tenn. 2014) .................................................................... 24

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
    588 F. 3d 908 (6th Cir. 2009) ..................................................................... 9, 13

*Mack v. Bristol-Meyers Squibb Co.*,
    673 So. 2d 100 (Fla. Dist. Ct. App. 1996) .......................................................... 25

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
    708 F.2d 1081 (7th Cir. 1983) .......................................................................... 19

*New York v. Deutsche Telekom AG*,
    439 F. Supp. 3d 179 (S.D.N.Y. 2020) ............................................................... 18

*Ortiz v. Sig Sauer, Inc.*,
    No. 19-cv-1025-JL, 2023 WL 1928094 (D.N.H. Feb. 10, 2023) ......................... 24

*Saunders v. Michelin Tire Corp.*,
    942 F 2d 299 (5th Cir. 1991) .............................................................................. 2

*Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ........................................................................................ 27

*Turner v. Nat'l Ass'n of Letter Carriers Branch No. 27*,
    No. 2:20-cv-02025-SHL-atc, 2022 WL 807378 (W.D. Tenn. Feb. 11, 2022) .................... 1-2

*United States v. Google*,
    No. 20-cv-3010 (APM), No. 20-cv-3715 (APM), 2023 WL 4999901 (D.D.C. Aug. 4, 2023) .................................................................................................................. 3

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) .......................................................................................... 6

**Other Authorities**

Ark. Code Ann. § 4-75-301 ..................................................................................... 25

Ark. Code Ann. §§ 4-88-101 .................................................................................... 25

Idaho Antitrust Act .................................................................................................. 25

Kan. Stat. Ann. § 60–512 ........................................................................................ 26

Miss. Code Ann. § 15-1-49(1) ................................................................................. 26

Tenn. Code Ann. § 28-3-105 ................................................................................... 26

## INTRODUCTION

It is simply not illegal to provide benefits to one's better and best customers. This happens all across the economy, from a free cup of coffee on the tenth punch of a loyalty card to buy one get one free offers. It is likewise not illegal to offer other products to a customer buying one product or service in an effort to increase sales and expand the customer relationship. It is not illegal to try to win business away from a competitor, even when the result is that the competitor goes out of business. That is the essence of competition.

Plaintiffs' opposition seeks to stand these common sense principles on their head. Their response suffers from at least three fatal infirmities. First, Plaintiffs have no admissible evidence of harm because their experts' opinions are inadmissible under *Daubert*. Second, Plaintiffs' "evidence" is almost entirely focused on All Star Cheerleading competitions—which, as the Court knows, was the subject of the related (and now resolved) *Fusion Elite* case. The other "evidence" Plaintiffs cite plainly does not create a genuine issue of fact relating to camps, school competitions, or apparel. Third, even Plaintiffs' "evidence" relating to All Star competitions does not provide a triable issue of anticompetitive conduct or effect. Plaintiffs' lack of evidence on essential elements of an antitrust case cannot be made up for by putting a sinister spin on ordinary business conduct. Summary judgment should therefore be granted for Defendants.

## ARGUMENT

### I. PLAINTIFFS CANNOT CONTRIVE DISPUTES TO AVOID DISMISSAL

Defendants negated each of Plaintiffs' claims by pointing out the absence of a genuine dispute of material fact on one or more necessary elements of their claims—and in many cases, by providing contrary evidence, too. In response, Plaintiffs have for the most part attempted to contrive a dispute of fact where there is none by mischaracterizing evidence, or by characterizing the undisputed fact as "misleading." Such responses are not disputes at all. *Turner v. Nat'l Ass'n*

*of Letter Carriers Branch No. 27*, 2022 WL 807378, at *2 (W.D. Tenn. Feb. 11, 2022) (deeming facts undisputed where non-movant asserted "tangential information that does not contradict" the movant's facts), *report and recommendation adopted by* 2022 WL 801555 (W.D. Tenn. Mar. 15, 2022); *Evans v. Walgreen Co.*, 813 F. Supp. 2d 897, 931-32 (W.D. Tenn. 2011) (deeming facts admitted where non-movant's "dispute" rested on mischaracterized evidence). The facts stated in Defendants' Statement of Undisputed Facts to which Plaintiffs have responded in this way should all be deemed admitted for purposes of this motion. Some of these contrived "disputes" are addressed where relevant below. Defendants' complete response is contained in Defendants' Reply in Support of their Statement of Undisputed Material Fact, filed concurrently herewith.[1]

Plaintiffs otherwise seek to avoid their lack of evidence by trying to shift the burden to *Defendants* to *negate* facts that Plaintiffs could not establish. They argue that a movant must establish "the absence of any triable issue of material fact." (Pls.' Br. at 5.) In fact, a movant is not required to "negat[e] the opponent's claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party discharges its burden by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (quoting *Celotex*, at 325). The burden is then on the nonmovant to produce evidence of a genuine issue of material fact. *Celotex*, at 324-25.[2]

---

[1] Each citation to Defendants' Statement of Undisputed Facts ("Defs.' SUF") refers to Defendants' statement, Plaintiffs' response, and Defendants' reply, collectively. Likewise, each citation to Plaintiffs' Statement ("Pls.' SUF") refers to the statement and Defendants' response.

[2] *See also Saunders v. Michelin Tire Corp.*, 942 F 2d 299, 301 (5th Cir. 1991) ("The moving party need not produce evidence negating the existence of a material fact, but need only point out the absence of evidence supporting the nonmoving party's case."). Plaintiffs rely on Justice White's *disagreement* with the majority on the movant's burden at summary judgment. (*See* Pls.' Br. at 5 (citing *Celotex*, at 328 (White, concurring in the result).)

Plaintiffs also misrepresent *Eastman Kodak Co. v. Image Technical Services*, 504 U.S. 451, 481 (1992) as holding that "high market shares alone are sufficient to survive summary judgment." (Pls.' Br. at 8.) The Court held no such thing. Rather, it required the plaintiff to demonstrate a genuine issue of material fact on each element of its claims, not just on the market power element. *See Kodak*, at 481-82 (addressing requirement of showing anticompetitive effect). Plaintiffs likewise misconstrue *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) as relieving them of their burden of proving specific anticompetitive conduct having anticompetitive effects in each of the relevant antitrust markets. As numerous courts have recognized, this is not what *Continental Ore* holds. *See, e.g., In re Skelaxin (Metaxalone) Antitrust Litig.*, 2013 WL 2181185 *12 (E.D. Tenn. May 20, 2013) (considering *Cont'l Ore* and finding that "independent theories of liability should be considered separately"); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir. 2022) (When "[r]eal-world monopolists … engage in allegedly exclusionary conduct which does not fit within a single paradigm[,] … the courts disaggregate the exclusionary conduct into its component parts before applying the relevant law."); *United States v. Google*, 2023 WL 4999901, at *12-13 (D.D.C. Aug. 4, 2023) ("[C]ourts must evaluate whether each type of alleged exclusionary practice has the requisite anticompetitive effect.").

## II.     PLAINTIFFS' CAMP CLAIMS SHOULD BE DISMISSED

### A.  Plaintiffs Lack Article III Standing in Camps

The fact that neither of the two Plaintiffs paid to attend (or even attended) a Varsity camp (Defs.' SUF ¶ 6) is not genuinely disputed. Plaintiffs say the fact is "disputed as misleading," but point to no actual dispute. Instead, they assert that: (1) the Court may allow a new plaintiff to join the case and (2) one of the Plaintiffs said she paid to attend *non-Varsity tumbling lessons*. (Defs.' SUF ¶ 6.) Of course, the Court has not allowed the new party to join the case, nor should

it.  (*See* ECF No. 404 at PageID 13536-38).  If it were to, new discovery would be taken and new dispositive motions could be brought.  Likewise, the fact that a Plaintiff may have paid for *non*-Varsity *tumbling lessons* does not create a dispute over payment for a *Varsity camp*.

Plaintiffs suggest that this Court should ignore the law and this Court's prior rulings in the related *American Spirit* case, that a purchaser plaintiff must have actually purchased products in the relevant market to have standing.  They seek to expand the zone of standing so that anyone who purchased any product from Varsity in one alleged relevant market would have standing to assert a claim in another relevant market, but they cite no case that supports this premise.  In the one case they cite, *In re Auto. Parts Antitrust Litig.*, 2013 WL 2456612, at *9 (E.D. Mich. June 6, 2013), the plaintiff was an indirect purchaser of the very product (wire harnesses) that were allegedly price fixed.  Here the undisputed evidence establishes that neither Plaintiff was a direct or indirect purchaser of the product at issue (a Varsity camp).[3]

### B.  Plaintiffs Also Lack Antitrust Standing in Camps

Plaintiffs concede that antitrust standing is more limited than Article III standing.  (Pls.' Br. at 35.)  Thus, if there is no Article III standing, antitrust standing is irrelevant.

Despite this, Plaintiffs argue that, *if* they had Article III standing in camps, they would have antitrust standing under *Associated General Contractors of Cal. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*").  They ignore controlling law that, under *AGC*, a plaintiff must have participated in the relevant market as a customer or competitor to have antitrust standing to bring claims regarding that market.  (Defs.' Br. at 18-19)  Plaintiffs try to invoke a limited exception to that rule by arguing that the alleged *markets* for camps,

---

[3] Plaintiffs try to avoid these basic standing requirements by reference to the class certification process.  Plaintiffs, who say they indirectly purchased Varsity competitions and apparel, certainly do not have claims that are typical of a party who purchased a camp registration.  There plainly is no commonality or typicality with the camp claims.  (ECF No. 420 at PageID 13741-42.)

competitions, and apparel are "inextricably intertwined." (Pls.' Br. at 36-37) That is not the law: Plaintiffs needed to show that *their injury* is "inextricably intertwined" with harm in camps, *i.e.*, that they were used as a "market force" in the other alleged markets to cause harm in camps. (*American Spirit*, ECF No. 194 at PageID 2938.) They offer no evidence of this at all.

Plaintiffs' reliance on *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982), is misplaced. As the Supreme Court made clear in *AGC*, *McCready* does not provide for recovery for losses in a different market than the one in which the plaintiff participated. *AGC*, 459 U.S. at 538. Nor do Plaintiffs address, much less distinguish, the other cases Defendants cited in their opening brief (Defs.' Br. at 18-20), which further confirm this point. Instead of addressing this on-point authority, Plaintiffs cite cases where a downstream indirect purchaser was found to have standing to assert indirect purchaser claims under state law, but there were no such purchases here.[4]

In this case, the five *AGC* factors cannot be satisfied by a consumer that did not purchase products or services in the relevant market. First, there is no "harm," much less a harm causally connected to the "antitrust violation," because Plaintiffs did not pay for a camp. Second, Plaintiffs are neither consumers nor competitors in the alleged relevant market. *Bodie-Rickett and Assocs. v. Mars., Inc.*, 957 F.2d 287, 290-91 (6th Cir. 1992). Third, Plaintiffs experienced no direct injury relating to camps and any alleged injury in other markets is indirect. Fourth, allowing someone who did not even pay for a camp registration to pursue claims based on camp registrations would, at a minimum, create "potential for duplicative recovery." Finally, there are more direct alleged "victims": those who actually paid to attend Varsity camps.

---

[4] *See In re Automotive Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1001-03 (E.D. Mich. 2014); *In re Cathode Ray Tube Antitrust Litig.*, 738 F. Supp. 2d 1011, 1023-24 (N.D. Cal. 2010) *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1140-41 (N.D. Cal. 2009); *see also Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097, 1114 (N.D. Cal. 2013).

Plaintiffs try to obscure the standing issue by arguing that Varsity' Squad Credentialing program "bolster[ed] and enhance[e]d apparel sales," because camp attendees would purchase "camp wear." (Pls.' Br. at 38-39.) But, again, since Plaintiffs did not attend a Varsity camp, there is no connection between this allegation and any harm or impact on either Plaintiff. Nor do Plaintiffs assert, much less point to any evidence, that increasing apparel sales to camp goers had any effect on the price of apparel to non-camp goers like Plaintiffs.

### C. There Is No Evidence of Anticompetitive Conduct Related to Camps

Plaintiffs identify a hodgepodge of alleged anticompetitive conduct relating to scholastic cheer, focusing on camps, but none of these claims are supported.

*Awarding Bids.* First, Plaintiffs are wrong that Varsity's granting of bids to its own competitions at its own camps is somehow anticompetitive. Plaintiffs apparently contend that Varsity is required to share the benefits of its popular competitions with rival camp providers or not make its camps more attractive by offering such bids. (Pls.' Br. at 42-43.) But that is exactly what the Supreme Court cautioned against in *Trinko*. (*See* Defs.' Br. at 12-13).

*Squad Credentialing.* Second, Plaintiffs do not seriously dispute Varsity's right to set the rules of eligibility for its own competitions, including through the Squad Credentialing requirement. Plaintiffs call this "tying" even though they have disclaimed seeking to assert a tying claim. (ECF No. 433 at PageID 16646 n.8 ("Plaintiffs are not pursuing Section 1 tying claims.")) In any event, Plaintiffs do not properly dispute that the credentialing requirement only applies to a very small number of end-of-season scholastic competitions or that less than ██ of teams that chose to attend a Varsity camp later went to one of those competitions. (Defs' SUF ¶¶ 8-13.)[5] Thus, any antitrust challenge to the requirement would fail for lack of substantial

---

[5] Plaintiffs assert that ██ is not the correct foreclosure amount (Pls.' Br. at 42 n.29), but the alternative they propose—which includes nearly all teams that attended any competition, on the

foreclosure.  *See B & H Med., L.L.C. v. ABP Admin., Inc.*, 526 F.3d 257, 266 (6th Cir. 2008)

("[F]oreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent.").

***IMPACT Program.***  Third, as to "rebates" and "exclusive dealing," Plaintiffs concede

that the Varsity Family Plan and Varsity Network Agreements do not apply to camps.  (Pls.' Br. at

41.)  Plaintiffs assert that Varsity used a different program, called IMPACT, to provide "rewards

and other financial incentives for exclusively purchasing … camps."  (*Id.*)  This is not what the

record says.  Rather, under the IMPACT Program, Varsity provides branding and related services

at no cost to a small percentage of schools in the United States and those schools commit to give

Varsity the opportunity to bid for their business in various things that are mainly sold by BSN

and Herff Jones, Varsity Spirit's sister companies.  (*See, e.g.*, Pls.' Ex. 40 at 638:1-4 ███████

████████████████████████████████████████████████████████████████████

██████████████████████████████████))  Most IMPACT Program

agreements do not even cover cheerleading at all.  (*Id.* at 567:8-16 (former Executive Vice

President of Impact testified that ██████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████); *see also* Pls.' Ex. 162, at -5019 (█████████████████████████

██████████████████████████))

Moreover, as the evidence demonstrates, IMPACT Program agreements are not exclusive

dealing arrangements, much less anticompetitive exclusive dealing.  Plaintiffs cite an agreement

under which ██████████████████████████████████████████████████████

███████████████.  (*See* Defs.' SUF ¶ 114)  The document itself says Varsity only had a

---

unsupported theory that all school teams "could" attend one of the three Varsity events at issue—
is not supported by any evidence.  (Defs.' SUF ¶ 13.)

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████. (Pls.' Ex. 162, at -5027.) Further,

Plaintiffs point to no evidence that Varsity has IMPACT Program agreements with a significant

portion of schools, or that even among the schools that have an Impact Program agreement with

Varsity, the agreement covers cheerleading at all. (*Cf.* Pls.' Ex. 238, at -9267, -9372 (identifying

███ school partnerships out of more than 130,000 schools and colleges.)) Plaintiffs likewise

provide no evidence that IMPACT Program agreements had any effect on the pricing of camps

(or apparel or school competitions), which is necessary for there to be an antitrust issue.

### D.  There Is No Evidence of Harm in Camps to Anyone

As to hypothetical harm that actual camp customers may have suffered, Plaintiffs rely

entirely on their experts. That reliance is particularly misplaced, because their expert Dr. Heeb

did not even consider pricing in *camps* in undertaking his assessment, but rather simply copied

the "overcharge" percentage he put forward for *competitions*. (Defs.' SUF ¶¶ 22-23.) Plaintiffs

further do not deny that Dr. Heeb's "overcharge" percentage is completely inconsistent with the

real-world data that shows flat camp prices when the Squad Credentialing Program was put into

place. (Defs.' Br. at 20-22.) Instead, Plaintiffs assert that they need not show that their alleged

(but unproven) higher prices for camps resulted from anticompetitive conduct (Defs.' SUF ¶ 19),

but that is not the law. (*See* Defs.' Br. at 15-16.)

Plaintiffs do not seriously dispute that Dr. Maki did not look at anything relating to

school practices, including even whether and to what extent any school passed on the cost of a

camp to parents, in reaching her speculative "opinion" of 100% passthrough. In other words, in

addition to the fact that Dr. Maki's passthrough opinion is itself based on the review of just a few

8

All Star gyms' practices, she did not even look at school information.[6]  Because camps are for

school teams, not All Star teams, Dr. Maki's 100% passthrough speculation is particularly inapt

to camps.  Plaintiffs otherwise point to a document that says nothing about passthrough.  (Defs.'

SUF ¶ 25; Pls.' Ex. 9 at ¶¶ 3-6.)

## III.    PLAINTIFFS' APPAREL CLAIMS SHOULD BE DISMISSED

### A.  Cheer Apparel Is Not a Viable "Cluster Market"

Plaintiffs do not dispute that, unless they can establish with proper evidence the relevant

antitrust markets, their claims cannot go forward as a matter of law.  (*See* Defs.' Br. at 13, 25.)

They also do not meaningfully dispute that their "Cheer Apparel" market consists of dozens or

hundreds of non-interchangeable products.  (Defs.' SUF ¶¶ 26-27)  They ignore the Sixth

Circuit's holding that "[t]he essential test for ascertaining the relevant product market" is the

"reasonable interchangeability standard."  *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car

Auto Racing, Inc.*, 588 F. 3d 908, 917 (6th Cir. 2009) (quotation marks omitted).

Plaintiffs assert that because *sometimes* cheerleaders buy several cheer-related apparel

items (and non-apparel items, like backpacks) from Varsity, every cheer-related product that

Varsity sells is in the same relevant antitrust market.  They ignore the many cases that have

rejected defining markets this way.  (*See* Defs.' Br. at 29.)  In the face of this authority, Plaintiffs

are reduced to making manifestly incorrect factual statements, for example, that "[c]heer apparel

---

[6] Plaintiffs ignore *In re Google Play Store Antitrust Litigation*, 2023 WL 5602143 (N.D. Cal.
Aug. 28, 2023), which Defendants filed as supplemental authority.  In that case, Judge Donato
held that an expert's passthrough opinions—which, unlike here, were actually based on
mathematical modeling—were inadmissible.  In doing so, Judge Donato confirmed once again
that *ipse dixit* declarations by experts is not sufficient.  *See also In re: Qualcomm Antitrust Litig.*,
2023 WL 6301063 at *7-8 (N.D. Cal. Sept. 26, 2023) (granting summary judgment because
Plaintiffs' passthrough expert failed to conduct pass-through analysis and instead relied on
speculation).  Plaintiffs' supplemental authority does not help them.  For example, in one case,
the expert conducted a regression analysis and analyzed profit margins of the distributors—but it
is undisputed that Dr. Maki did *neither* here.  (*See* ECF No. 486-3 at PageID 31510.)

is custom made" (Pls.' Br. at 43), for which they cite no evidence and is simply false for many of

the products in Plaintiffs' "Cheer Apparel Market," such as shoes and pom poms. Plaintiffs cite

nothing but their expert's improper efforts to provide factual testimony for this sweeping, and

incorrect, statement. In any event, Dr. Heeb's report does not even say this.

Plaintiffs do not address the evidence from gyms and multiple parents of cheerleaders

that cheerleading teams often did not use apparel from just one vendor. (*See* Defs.' Br. at 27-30.)

Plaintiffs say they dispute Defendants' SUF ¶ 28, but they rely on nothing more than their

expert's assertion that cheerleaders "overwhelmingly purchase different items of Varsity apparel

together in a bundle." Nor do Plaintiffs dispute the chart (Defs.' Br. at 28) that shows the wide

dispersion of apparel products that Varsity's customers purchased. If gyms and schools did in

fact routinely purchase all their needed apparel from a single vendor as a bundle, one would

expect to see a similar distribution of purchasers versus non-purchasers across each of the

apparel categories (*e.g.*, the percentage of gyms that purchase uniforms from Varsity would be

close to the percentage of gyms that buy shoes from Varsity). This is clearly not the case.[7]

Without evidence, Plaintiffs assert that offering all the products in Plaintiffs' "Cheer

Apparel Market" enables Varsity to charge more for these products. (Pls.' Br. at 46.) The basis

for Plaintiffs' assertion that Varsity can charge "more" for the cheer apparel "bundle" is Dr.

Heeb's analysis of prices not of the bundle, but of a single product within the bundle: *shoes*. (*Id.*

at 49) Thus, while acknowledging that to sustain a "bundle" product market they must show that

a seller of the bundle can command higher prices for the bundle than for the same products

---

[7] The fact that customers purchase different items in the alleged "bundle" in different proportions
shows that competitors can compete with Varsity for individual product sales. For example, a
shoe seller can compete for shoe sales without selling other products in the "bundle." For each
product, Varsity competes with the sellers of that individual product—not just sellers of the
"bundle." This dynamic further confirms that there is not a "bundle" product market.

outside the bundle, they do not even try to make this showing.

### B. There Is No Evidence of Anticompetitive Conduct Relating to Apparel

*Rebates.*  Plaintiffs try to raise disputes regarding anticompetitive conduct relating to apparel, but those efforts fail.  First, Plaintiffs say that Varsity had rebate programs relating to apparel, but they failed to produce any evidence that there were rebates offered on apparel spending under the VFP or Varsity Network agreements.  (Defs.' SUF ¶¶ 84, 85, 87.)  Plaintiffs raise the Varsity IMPACT program, but, as discussed above, the IMPACT program did not involve rebates or exclusivity and, indeed, had little to do with cheerleading at all or affected the price of cheer apparel.  (*See supra* at 7)

*Competitors Selling at Varsity Competitions.*  Plaintiffs next claim that Varsity does not let apparel competitors sell at Varsity competitions.  (Pls.' Br. at 47.)  As noted in Defendants' opening brief, this Court has already recognized that not letting competitors sell their product in one's own space is not anticompetitive.  (Defs.' Br. at 31.)  Even were this to be a viable theory of anticompetitive conduct, Plaintiffs provide no basis—other than more speculation from their experts—that these practices had any effect on competitors, much less competition.  Plaintiffs were unable to obtain evidence from a single apparel seller to substantiate this speculation.  Plaintiffs make similar assertions about Varsity "pushing" its products at its camps and other events (Pls.' Br. at 48), but that is common-place cross-selling and is not anticompetitive.  Again, Plaintiffs' burden is not met by conclusory assertions and expert *ipse dixit*.

Plaintiffs do not dispute that cheer apparel is typically sold by sales representatives in one-on-one interactions with customers (Defs.' SUF ¶ 42), and there are many available sales channels, including the Internet.  (*Id.* ¶ 44.)  These concessions alone destroy Plaintiffs' efforts to assert that the complained-of practices foreclose competition.  Plaintiffs offer no evidence that

11

any actual cheer apparel producer was blocked from any customer in any meaningful way or that anyone paid higher prices as a result of these normal commercial practices.

*USASF.*  Next, in an effort to somehow bring USASF into a "conspiracy" related to apparel, Plaintiffs claim, citing only their experts' improper factual assertions, that USASF gave "early access" to Varsity "regarding apparel rule changes" and "conspired with Varsity to impose penalties on noncompliance." (Pls.' Br. at 48.)  Plaintiffs do not take issue with the penalty itself, which an organization like USASF is entitled to establish.  And Plaintiffs' so-called evidence of this "early access conspiracy" is an email from USASF to Varsity explaining what the penalties would be.  (*See* Pls.' SUF ¶ 140; Pls.' Ex. 178 at -0287.)  It would make no sense for USASF to keep penalties a secret from parties that have to impose them, *i.e.*, event producers like Varsity.

*Acquisition.*  Grasping at the thinnest of straws, Plaintiffs assert that there were "acquisitions" in the apparel space that were anticompetitive.  But the only acquisition they actually identify is of a small Arkansas company (████) that Plaintiffs concede was a "cheer camp" producer, not an apparel provider, which Varsity acquired for approximately ████.  (Pls.' Br. at 48; Pls.' Ex. 237 at -8670.)  Plaintiffs go on to assert that a reason for the transaction was to "gain exclusive access to ████ customers (currently under contract with ████)."  But the "access" that Plaintiffs speak of is access to customers at ████'s camps.  Plaintiffs provide no support for the proposition that this acquisition of a camp producer had any anticompetitive effect on apparel at all.  Indeed, Plaintiffs do not assert that the transaction was anticompetitive in the so-called "camp market," presumably because they know it was so small as to be entirely inconsequential even in that "market," much less in the much larger cheer apparel "market."

### C.  There Is No Evidence of Harm in Apparel

As with camps, Plaintiffs concede that their only "evidence" of harm in apparel are the opinions of Dr. Heeb (on "overcharges") and Dr. Maki (on passthrough).  If the Court excludes

those opinions, as it should, Plaintiffs will have no evidence of harm, requiring dismissal.[8]

## IV.  PLAINTIFFS' CHEER COMPETITIONS CLAIMS SHOULD BE DISMISSED

### A.  Market Definition

Plaintiffs do not dispute that their market definitions as related to competitions (both product and geographic) are entirely dependent on their expert testimony, which is the subject of *Daubert* challenge.  (ECF No. 388-1 at PageID 1430-32; ECF No. 382-1 at PageIDs 8557-60)  Nor do Plaintiffs dispute that if those challenges are successful, they will have no evidence of market definition and their claims will have to be dismissed.  *See, e.g., Kentucky Speedway*, 588 F.3d at 921 (upholding summary judgment because expert market definition testimony was inadmissible under *Daubert*).

Plaintiffs also concede that cheer competitions "fall into two disciplines: All Star cheer and competitive school cheer."  (Pls.' Br. at 13.)  They further concede that a "school cheer team cannot enter an All Star competition and vice versa."  (*Id.*)  Citing only their own experts' factual assertions and in the face of all actual evidence, they argue that a cheerleader might switch between the two "disciplines" in the face of a small change in price.  (Pls.' Br. at 14.)  But the customers for All Star competitions are gyms and the customers for school competitions are schools, not cheerleaders, and Plaintiffs concede that they cannot switch across the disciplines.  (Defs.' SUF ¶¶ 64-72)  In any event, there is no evidence—zero—of cheerleaders switching between the two disciplines in response to changes in relative prices, and Plaintiffs provide no

---

[8] Plaintiffs curiously assert, without evidence, that Varsity's cheer apparel was "broadly considered lower in quality."  (Pls.' Br. at 50.)  Plaintiffs cite their own experts, but their experts have no first-hand knowledge of "cheer apparel quality," nor do they purport to be experts on that subject.  Plaintiffs otherwise cite a single customer service email, where the customer complained of a poor experience but also recounted that there were competitive options in cheer apparel available to it at a lower price.  (Pls.' Ex. 246, at -2184.)  This is not evidence that Varsity apparel was "broadly considered" to be lower in quality and further undermines Plaintiffs' overall assertion that there are no viable cheer apparel alternatives.

support for the premise. (Plaintiffs' purported expert opinions on this point do not show this at all.) Instead, Plaintiffs speak about cheerleaders who compete *both* for their school and for an All Star club, which is entirely different than switching from one to the other. (Pls.' Br. at 13-14.) Plaintiffs have provided no evidence that a school cheerleader is any less likely to switch to the school's gymnastics, tumbling, or dance teams rather than abandoning a school sponsored activity like scholastic cheer for a club sport like All Star.[9]

As to geographic markets, Plaintiffs do not address the law at all. They try to create a disputed fact by having their experts contradict each other by claiming inconsistently both regional and National markets. The undisputed and overwhelming evidence from numerous witnesses attests that the impracticalities and expense of travel cause the vast majority of cheer competition participants to attend competitions that are within a few hundred miles of their homes. (*See* Defs.' Br. at 37 (discussing witness testimony to which Plaintiffs do not respond.)) The uncontradicted evidence is further that these costs make it impractical to travel further afield in the face of small but significant price increases of events closer by. (*See* Defs.' Br. at 36-38.) This means that competitions outside those geographic confines are not sufficiently substitutable to require inclusion in the geographic market. Plaintiffs do not truly dispute these facts. (*See* Defs.' SUF ¶¶ 78-79.)

Plaintiffs have offered nothing to counter the common sense conclusion that cheer teams would not generally travel long distances in the face of a hypothetical price increase. Nor do Plaintiffs explain why Dr. Heeb based his overcharge "analysis" on a nationwide market when he says he found different "effects" in different "regions" of the country, including no effects in one

---

[9] Plaintiffs' effort to analogize cheer competitions to Chick-fil-A and Five Guys (Pls.' Br. at 13 n.9) makes no sense. Just like an All Star competition does not allow school teams to enter and vice versa, Five Guys does not sell chicken sandwiches. *See* https://www.fiveguys.com/menu.

region. (ECF No. 388-3 at ¶ 296.) Nor do they explain how he could posit a nationwide market for all cheer competitions without even analyzing school competitions. (*See* Defs.' Br. at 38.)

### B. There Was No Anticompetitive Conduct in Cheer Competitions

#### 1. School

Virtually everything Plaintiffs say was "anticompetitive as to competitions" (the VFP and Network Agreements, acquisitions, counter-scheduling, the so-called "conspiracy" with USASF) relate to All Star competitions, not school competitions. The school specific things that Plaintiffs point to were plainly not anticompetitive.

***IMPACT Program.*** Plaintiffs make the same assertions related to the IMPACT Program as they do as to camps and apparel. As discussed above (*supra* § II.C), under the IMPACT Program, Varsity Brands provides branding services to schools and those schools agree to give Varsity Brands (mostly BSN and Herff Jones) the opportunity to bid on the school's business on a non-exclusive basis, always in accordance with applicable bidding rules. IMPACT Program agreements are non-exclusive, generally do not even cover cheerleading at all (including competitions), and are with only a small percentage of schools. Plaintiffs provide no basis to conclude the IMPACT Agreements had any effect on pricing of school competitions.

***Squad Credentialing Program.*** Plaintiffs make convoluted assertions about the Squad Credentialing Program, which, as discussed above (*supra* § II.C), is a requirement for school teams that attend one of three Varsity end-of-season school competitions to be credentialed at a Varsity camp. Plaintiffs do not articulate how "imposing" a credentialing requirement could have any anticompetitive effects on school competitions. To the contrary: if the credentialing requirement were an anticompetitive imposition on customers, making it a prerequisite for attendance at a Varsity school competition would create competitive opportunities for others to offer competing school competitions without such a requirement.

Because there is no conduct that is even arguably anticompetitive in school cheer competitions, Plaintiffs try to bootstrap conduct in All Star to expand the size of the affected market and therefore their alleged damages. This effort should be rejected, and summary judgement as to school cheer granted.

### 2. All Star

*VFP and Network Agreements.* Plaintiffs do not even attempt to meet the legal standard applicable to the Varsity Family Plans or Network Agreements by showing below-cost pricing or meeting the factual predicates of an exclusive dealing claim. (*See* Defs.' Br. at 39-41.) Nor do Plaintiffs actually dispute Defendants SUF ¶¶ 88-90, 92-96, or 107-112. Plaintiffs either admit the statements, "dispute as misleading," which is in effect an admission, or, in the case of SUF ¶¶ 96, 108, 110 and 112, they purport to dispute statements by misconstruing them. (*See* Defs.' SUF ¶¶ 88-90, 92-96, 107-112.)[10]

As such, there is no genuine dispute that there are no exclusive deals that foreclose a substantial portion of any relevant market for more than one year, as required for a claim of exclusive dealing. The VFP has never required a commitment to do anything. (Defs.' SUF ¶¶ 94-96.) Any rebate under the VFP has been paid after the season is over based on whatever the particular gym chose to do during the *preceding* year. (Defs.' SUF ¶ 88.) Moreover, a gym has been able to meet any event attendance threshold by sending different teams to different

---

[10] SUF ¶ 96 states that "No gym was ever required to attend or pay a registration fee for any future competitions of Varsity or anyone else as a condition of receiving a rebate under the Varsity Family Plan." Plaintiffs say they dispute the fact but their logic is that the rebate was based on past attendance at Varsity events, not future attendance. (*See* Defs.' SUF ¶ 96.) Similarly, Plaintiffs say they dispute that if a gym sent a certain number of teams to Varsity competitions, it would receive no greater rebate for having sent more teams to more competitions. (*see* Defs.' SUF ¶¶ 108, 110, 112.) But that misses the point of those SUFs as stated—which is that there would be no additional rebate solely by virtue of sending teams to more Varsity competitions.

Varsity competitions, while continuing to attend competitors' events, negating the premise that the VFP makes it untenable for gyms to send teams to non-Varsity competitions. (Defs.' SUF ¶¶ 89-90, 92, 107-112.) Plaintiffs likewise do not dispute that gyms that chose to avail themselves of the VFP or have Varsity Network Agreements do not in fact attend only Varsity events. (*See* Defs.' SUF ¶ 106.) Nor do Plaintiffs properly dispute that Network Agreements are not exclusive as to competitions. (*See* Defs.' SUF ¶¶ 86-87, 99-103, 105.)

Because the rebate is based on just the prior year, with no commitment required as to the future, the VFP is not long enough to be "exclusive" in any sense that matters for the antitrust laws. (Defs.' SUF ¶¶ 94-96.); *see also* Defs.' Br. at 39 (discussing caselaw that agreements for one year or less are not considered exclusive for antitrust purposes), to which Plaintiffs do not respond.) Instead of addressing the necessary legal elements for an antitrust claim, Plaintiffs put forward in colorful language various snippets of "evidence" all to the effect that the Varsity Family Plan makes Varsity's products lower cost and therefore more attractive to customers, which is, of course, the very goal of competition and the antitrust laws in the first place.

***Acquisitions.*** Plaintiffs say that Varsity's acquisitions of All Star event producers "allowed it to eliminate competitors and build dominant market share." (Pls.' Br. at 23.) Of course, any acquisition "eliminates" a competitor, but that does not mean that they eliminate *competition* under the antitrust laws. Even acquisitions that are accretive to so-called "high" market shares are not necessarily illegal if competition remains. A merger that creates a firm with greater ability and incentive to offer customers a better product at better prices is procompetitive regardless of its impact on concentration. *See, e.g., New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 248 (S.D.N.Y. 2020). Only those mergers that lead to anticompetitive effects—that is, a reduction in output resulting in higher prices—are potentially

17

illegal. For consummated transactions particularly, that requires at a minimum a showing of higher prices that resulted from the challenged acquisitions.

Plaintiffs have no admissible evidence of such an effect. As discussed above, they have failed to provide competent evidence of market definition. As to market share, they use figures pertaining only to All Star competitions, not the all competition market that they say is the relevant antitrust market. And, in any event, the question of whether an acquisition might have been anticompetitive leads back to the Plaintiffs' burden of showing harm. The only "harm" that Plaintiffs seek to show is the "overcharge" analysis of Dr. Heeb that is subject to the pending *Daubert* challenges. Without that "evidence," Plaintiffs have not shown harm and without a showing of harm, they have not shown anticompetitive effect.

Plaintiffs' failure is even more profound than that. Plaintiffs do not dispute that they have not shown harm specifically from acquisitions as opposed to the other things they assert were anticompetitive. Instead, Dr. Heeb purports to calculate an omnibus overcharge pertaining to all of the conduct Plaintiffs complain of, with no connection between that overcharge and any particular conduct. For example, Plaintiffs here do not present an overcharge model that considered the effects of the acquisitions separately from the effects of the VFP. Because the VFP is not anticompetitive, Plaintiffs have the burden of putting forth such evidence, and their undisputed failure to do so dooms their claim that the acquisitions themselves were anticompetitive. *Comcast Corp. v. Behrend*, 569 U.S. 27, 36-38 (2013); *see also MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) ("It is essential, however, that damages reflect only the losses directly attributable to unlawful competition.").

In addition, Plaintiffs ignore the fact that their "harm analysis" uses acquisitions from outside the statute of limitations. As this Court has already held, claims based on higher prices

18

resulting from acquisitions must be brought within four years of the acquisition. (*See* Defs.' Br. at 41-42.) But Plaintiffs have not so limited their claims—to the contrary, their harm calculation starts in 2014, long outside the limitations period.

***Counterprogramming Rival Events.*** Plaintiffs do not seriously dispute that Varsity's so-called counterprogramming of rival events is procompetitive. They analogize it to destroying a competitors store setup as in *Conwood*. (Pls.' Br. at 27.) That analogy is inapt. Varsity did not go to the rival events and disrupt or destroy them as the defendants did in *Conwood*. *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 778, 783 (6th Cir. 2002). Instead, it offered alternatives that a customer could choose to attend or not. It seems Plaintiffs are advocating for less options and less competition, which is not what the antitrust laws are about, and deprives their own putative class members of choice and value.

There is likewise no basis to conclude that obtaining the right to offer more bids to USASF's Worlds is a bad thing. As Plaintiffs themselves assert, the ability to give bids to USASF's Worlds attracted teams to competitions. (Pls.' Br. at 25-26.) It is therefore neither surprising nor troublesome that Varsity or any event producer would seek to secure more such rights. Under the rules of the USASF, which applied to Varsity's competitions as well as to anyone else's competitions, competitions that were not popular enough with consumers to maintain a minimum level of attendance were subject to relinquishing their rights to give bids to USASF Worlds. (Defs.' SUF ¶ 140.) Plaintiffs do not apparently challenge this rule as such, but say that offering alternative competitions cognizant that it might cause a competition to fall below this line was anticompetitive. In other words, Plaintiffs condemn better events succeeding under the USASF's rules. The solution is for those events to improve or to offer lower prices. It is not to bring an antitrust suit to penalize success and deprive consumers of their preferred

choice. And, in any event, Plaintiffs do not point to a single instance where Varsity received any additional USASF Worlds' bid rights as a result of "targeting."

**USASF.** Plaintiffs do not dispute that the so-called "conspiracy" with USASF essentially consisted of participating in the rule-setting process that USASF put into place regarding how the right to give out Worlds Bids would be distributed. (Pls.' Br. at 29-30.) Plaintiffs do not dispute that those rules were unanimously adopted by the USASF board comprised of several other event producers along with Varsity, and that the rules were followed by Varsity. For that matter, they do not quarrel with the rules themselves. Instead, Plaintiffs assert that USASF told the Varsity members of the USASF sanctioning committee what events did not meet the requirements to continue to give USASF World Bids. They fail to provide evidence that the same information was not available to all other members of the USASF sanctioning committee. Nor do they dispute the need for the very body charged with deciding which events would have the right to give bids to USASF Worlds to have this information. While they criticize Varsity for what it did with this information, that has nothing to do with USASF. They thus show no "conscious commitment to a common plan" to wipe out Varsity's competitors, as Plaintiffs would have it. Otherwise, Plaintiffs point to a single email about preferences that Jeff Webb is said to have expressed. (Pls.' Br. at 29.) But, again, Plaintiffs do not contend, much less present any evidence to support, that these preferences were ever pursued or enacted by USASF.[11]

---

[11] Plaintiffs do not dispute that the conspiracy they seek to assert was between Varsity/Charlesbank/Bain/Webb, on the one hand, and USASF on the other hand. Nor do they argue that "conspiracy" claims against the other Defendants can go forward if USASF is dismissed. For the additional reasons stated in USASF's opening and reply briefs (ECF No. 469 at 9-14, ECF No. 504), those claims should be dismissed, which will necessitate the dismissal of the conspiracy claims against the other Defendants.

### C. There Is No Admissible Evidence of Harm Relating to Competitions

As with camps and apparel, Plaintiffs do not dispute that they rely entirely on Dr. Heeb's "overcharge analysis" and Dr. Maki's "passthrough analysis," which are the subject of *Daubert* challenges. As such, if the Court rules that those opinions are inadmissible, Plaintiffs' competition claims must be dismissed. Plaintiffs likewise do not respond to Defendants' arguments regarding the fatal infirmities with these analyses. Rather, they assert, without support, that their experts have connected the conduct they complain of to the supposed overcharges that Dr. Heeb calculated. But this is not true at all—Dr. Heeb merely observed price differences and did nothing to assess whether those price difference were actually the result of anticompetitive conduct. Numerous courts have held this is not a sufficient showing in an antitrust case. (*See* Defs.' Br. at 15-16, 46; ECF No. 488 at PageID 16809-10.)

Plaintiffs raise the irrelevant point that a damages computation need not be "perfect" to be admissible. (*See* Pls.' Br. at 32-33.) But here the point is that Plaintiffs have provided no admissible basis to find harm at all. Plaintiffs have also included in their alleged overcharges direct sales that it is undisputed did not lead to indirect purchases at all. And, as to those direct sales that did lead to indirect purchases, Plaintiffs have provided no admissible basis to find that any overcharges were passed through to indirect purchasers rather than absorbed by the direct purchaser. This is not an issue of perfection in calculation of the amount of damages, but rather a failure to show harm to these Plaintiffs, and to indirect purchasers in general.

## V.  PLAINTIFFS' CLAIMS ARE DEFICIENT FOR ADDITIONAL REASONS UNDER THE LAWS OF VARIOUS STATES

Plaintiffs do not dispute that, if their federal antitrust claims fail, their state law claims do as well. In addition, the Court has already limited Plaintiffs' state law claims in several ways. These include holding that only claims relating to purchases in a particular state may be brought

21

under that state's laws (ECF No. 475 at PageID 19523); dismissing "Plaintiffs' claims under the

antitrust laws of Alaska, Colorado, Illinois, and Alabama, as well as the Tennessee claims related

to the Cheer Camp and Cheer Competition markets" (ECF 333 at PageID 7251); holding that

"State consumer protection law claims fail when the antitrust claims based upon the same

underlying conduct also fail"; and dismissing such state consumer protection claims under the

laws of Alaska, Colorado, Illinois, and Alabama on that basis (ECF No. 333 at PageID 7252).

(*See also* App'x A (summarizing current status).)  Certain other state law claims should likewise

be dismissed.  (*See also* App'x B (summarizing these issues by state).)

**Tennessee TTPA, TCPA, and Unjust Enrichment.**  Plaintiffs seek to bring claims under

the TTPA, the TCPA, and Tennessee's law of unjust enrichment.  Although the Court reversed its

dismissal of Plaintiffs' TCPA claims, those claims nevertheless should be dismissed because the

TCPA does not apply to claims based on alleged anticompetitive conduct, including those at

issue in this case.  (Defs.' Br. at 54.)  Plaintiffs ignore this point, and their TCPA claims should

be dismissed.  *4th Leaf, LLC v. City of Grayson*, 425 F. Supp. 3d 810, 823 (E.D. Ky. 2019) ("[A]

plaintiff generally concedes a defense when they fail to respond to the defendant's argument.")

As discussed below (*see infra* at 24-26), the remaining claims under the TCPA should

also be dismissed because they are based on unilateral conduct, and because Plaintiffs have

presented no damages model to address the applicable three-year statute of limitations.

As to Tennessee unjust enrichment law, the fact that the TTPA and TCPA cannot be used

to make a claim in this case means there has been no "unjust" enrichment, and Plaintiffs' unjust

enrichment claims should be dismissed as a matter of law.  As a case that *Plaintiffs* put forward

as "supplemental authority" (ECF No. 486-2 at PageID 31490) concluded, "liability on

[plaintiffs'] unjust enrichment claims rises and falls with liability on their statutory claims." *In re Broiler Chicken Antitrust Litig.*, 2023 WL 5227130 at *3 (N.D. Ill. Aug. 15, 2023).

Plaintiffs' response also fails to establish exhaustion of remedies, which is required to assert a claim under Tennessee unjust enrichment law. Plaintiffs have not made any effort to recover from the schools and gyms that they claim were overcharged in the first instance, even in light of the $43.5 million settlement that Varsity has agreed to pay gyms. Nor do they provide any evidence that such an effort would be futile. Rather, they speculate that a gym, having received payment in settlement, would not refund their customers (either as a matter of course or through a legal proceeding). Speculation does not meet Plaintiffs' burden. The fact that producing such proof would be onerous demonstrates why claims such as this have no place in a proceeding, much less a class action proceeding. Allowing them to be included would deprive Defendants of their Due Process right to defend by sweeping hundreds of thousands of claimants into one class and shifting the burden to Defendants to disprove futility. At a minimum, any claim based on unjust enrichment is overstated to the extent of the recovery in the *Fusion Elite* case, since that portion of any "enrichment" has been disgorged.

Plaintiffs likewise fail to meaningfully address that Tennessee unjust enrichment law would not apply to purchases made outside of Tennessee. They say that there are no meaningful differences among the unjust enrichment laws of various states, but that is contrary to settled law, which holds that any claim for unjust enrichment must be brought under the law of the state in which the transaction at issue occurred, because the "unjust" aspect of unjust enrichment is derivative of the particular state's law at issue. *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 586 & n.15 (E.D. Tenn. 2014); *Cullen v. Nissan N.A., Inc.*, 2010 WL 11579748, at *5 (M.D. Tenn. 2010). They do not dispute that, as in *Cullen*, for example, there are different

23

statutes of limitations. (Pls.' Br. at 51.)  Plaintiffs' effort to brush those and other distinctions

aside simply does not withstand scrutiny.  "[S]everal courts have surveyed the unjust enrichment

laws of the 50 states and found that they 'var[y] significantly from state to state.'"  *Ortiz v. Sig*

*Sauer, Inc.*, 2023 WL 1928094, at *10 (D.N.H. Feb. 10, 2023) (citation omitted).  These

differences include "the disparity in proof required to prove an enrichment was 'unjust or

wrongful[,]' ... [ ] the requirement by some states that there be no adequate remedy at law[,]" the

"direct and indirect benefit elements of unjust enrichment," and the availability and treatment of

equitable defenses like unclean hands.  *Id.* (citation omitted).

  ***No Unilateral Conduct States.***  Plaintiffs do not dispute that several of the state statutes

at issue—namely California, New York, Tennessee, and Kansas—do not apply to unilateral

conduct.  Rather, they argue that their claims are based on allegations of conspiracy with USASF,

not unilateral conduct.  But there is no evidence of an agreement among Defendants regarding

camps, apparel, or non-All Star competitions, much less a conspiracy.  (ECF No. 469 at 9-14;

ECF No. 504; *supra* at 20.)  Without any actual agreement, there cannot be a conspiracy as to

those products and services.  Claims relating to camps and apparel are therefore based entirely on

unilateral conduct of Varsity and cannot go forward under the laws of California, New York,

Tennessee, and Kansas.

  ***No Indirect Purchaser Claim States.***  Plaintiffs curiously argue that they can bring

indirect purchaser claims in "Arkansas, Florida, Idaho, Massachusetts, and Washington."  (*See*

Pls.' Br. at 54.)  In their complaint, however, they do not seek to bring any claims under the laws

of Washington.  (Compl. ¶¶ 246-256.)  As to Arkansas, the Court in its Motion to Dismiss

decision concluded that Plaintiffs sought to plead their case under Arkansas law "under the

ADTPA"— the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-101—not the

Arkansas antitrust statute, Ark. Code Ann. § 4-75-301.  The claims under the Arkansas *antitrust* statute accordingly were in effect dismissed.  Plaintiffs apparently do not dispute this, citing cases involving the ADTPA, not about the Arkansas antitrust statute and they fail to otherwise show that claims could be brought under the Arkansas antitrust statute.  (*See* Pls.' Br. at 54.)

As to the other states (Florida, Idaho, and Massachusetts), as in Arkansas, Plaintiffs contend that they can bring claims as indirect purchasers under statutes *other than* the antitrust laws of those states (Pls.' Br. at 54), effectively conceding they cannot bring indirect purchaser claims under the *antitrust* laws of those states.  Nonetheless, they purport to pursue a claim under the Idaho Antitrust Act (*see* Compl. ¶ 248.I), but that law does not permit indirect purchaser actions.  *See, e.g., Mack v. Bristol-Meyers Squibb Co.*, 673 So. 2d 100, 102-03 (Fla. Dist. Ct. App. 1996).  Plaintiffs do not argue otherwise.  In addition (and as to Florida and Massachusetts), this Court has already held that "State consumer protection law claims fail when the antitrust claims based upon the same underlying conduct also fail."  (ECF No. 333 at PageID 7252).  Plaintiffs say there is contrary authority as to Florida and Massachusetts (not Idaho), but they have not requested (or met the high bar for) reconsideration of the Court's ruling.

In sum, Plaintiffs' Complaint purports to assert claims under the antitrust laws of Arkansas and Idaho, but neither state allows indirect purchaser claims under its antitrust laws.  The claims under the antitrust laws of those states should be dismissed.  Plaintiffs do not assert that the antitrust laws of Florida, Idaho, or Massachusetts allow antitrust indirect purchaser claims either, and Plaintiffs' claims under the consumer protection laws of those states should also be dismissed based on the Court's prior ruling.

***Three-Year Statute of Limitations States.***  Plaintiffs do not dispute that several states have statutes of limitations that are shorter than the four-year statute of limitations that pertains

to claims under the federal antitrust laws and that defines their damages period.  (*See* Pls.' Br. at 55.)  At a minimum, claims based on purchases in states with statute of limitations of less than four years must accordingly be dismissed, in particular, claims based on purchases in Kansas, Mississippi, and Tennessee made before December 10, 2017.  *See* Kan. Stat. Ann. § 60–512; Miss. Code Ann. § 15-1-49(1); Tenn. Code Ann. § 28-3-105.  One of the cases Plaintiffs cite confirms such sales must be "excluded."  *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *20 (N.D. Ill. May 2, 2022).

"Excluding" such sales requires Plaintiffs to present a damage model that does not "include" these sales.  Plaintiffs do not dispute that they have not done so.  (*See* Defs.' Br at 58-59.)  Plaintiffs' only answer is that this issue "only relates to the extent of damages" and that their "experts have broken out damages by year within the class period."  (Pls.' Br. at 55.)  They refer to Dr. Maki's Expert Report at pp. 41 and 45, but those pages do not provide state-by-state figures.  To the extent Plaintiffs meant to refer to Table 7 of the Rebuttal Report (ECF No. 391-5 at ¶ 40), that too does not provide a breakout by year or product and would not assist in excluding out of period sales (*i.e.*, those from December 2016 to December 2017).

***Antecedent Procedural Requirement States.***  Plaintiffs do not dispute that they failed to follow the requirements to assert claims in Arkansas, Connecticut, Hawaii, Minnesota, and Nevada.  Instead, they argue that those requirements do not apply, because they have brought the case in federal court, relying on *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393 (2010).  Although Plaintiffs cite some cases where courts have allowed claims in Arizona, Hawaii, and Utah to go forward, "the majority of the district courts that have been presented with the same issue… have concluded that state statutory notice provisions control in federal court." *In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395, 416 (D.N.J. 2018) (dismissing Arizona,

26

Hawaii, Nevada, and Utah state antitrust claims for failure to comply with notice provisions.)
"These notice provisions create a prerequisite for filing an antitrust lawsuit under the states'
laws; they do not create requirements for maintaining a class action." *In re Loestrin 24 FE
Antitrust Litig.*, 410 F. Supp. 3d 352, 375 (D.R.I. 2019) (dismissing antitrust claims under the
laws of Arizona, Hawaii, and Nevada for this reason). In other words, the requirements are
precursors to having a claim under the state law at issue, not a procedural limitation on court
proceedings as was the issue in *Shady Grove*. *See id.* Plaintiffs likewise point to no cases
addressing the laws of Connecticut, Minnesota, or Nevada, which have similar provisions.

## VI.    THE CLAIM FOR DECLARATORY RELIEF SHOULD BE DISMISSED

There is no difference between Plaintiffs' claim for declaratory judgment and their other
claims, so the claims fail together. Plaintiffs argue that a declaratory judgment would "clarify the
proper standard for Varsity and USASF's *future* business dealings" (Pls.' Br. at 56), but they
never explain how. By contrast, the cases that allow such relief involved active contracts, which
are not at issue here. *See, e.g.*, *Dolgencorp v. Nat'l Union Fire Ins. Co.*, 2018 WL 3753157, *2
(M.D. Tenn. Aug. 18, 2018). The Court allowed Plaintiffs' claim to proceed at the motion-to-
dismiss stage (*see* Pls.' Br. at 56), but at summary judgment, Plaintiffs need to produce evidence
to support their entitlement to declaratory relief. *Evans*, 813 F. Supp. 2d at 930 ("A plaintiff is
not entitled to declaratory relief in the absence of a viable claim."). They failed to do so.

## CONCLUSION

For the reasons discussed above and in Defendants' opening brief, Defendants
respectfully request that the Court grant Defendants' Motion for Summary Judgment and dismiss
Plaintiffs' case in its entirety. To the extent the Court concludes that the entire case is not subject
to dismissal, Defendants respectfully request partial summary judgment as to those claims and
issues as to which the Court determines there is no genuine issue of material fact.

Dated: October 13, 2023

Respectfully submitted,

s/ Matthew S. Mulqueen

George S. Cary*
Steven J. Kaiser*
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Phone: (202) 974-1500
Fax: (202) 974-1999
gcary@cgsh.com
skaiser@cgsh.com

Jennifer Kennedy Park*
Heather Nyong'o*
CLEARY GOTTLIEB STEEN & HAMILTON LLP
1841 Page Mill Road, Suite 250
Palo Alto, CA 94304
Phone: (650) 815-4100
Fax: (202) 974-1999
jkpark@cgsh.com
hnyongo@cgsh.com

* Admitted *pro hac vice*

Matthew S. Mulqueen (TN #28418)
Adam S. Baldridge (TN #23488)
BAKER, DONELSON, BEARMAN, CALDWELL &
BERKOWITZ
165 Madison Avenue, Suite 2000
Memphis, TN 38103
Phone: (901) 526-2000
Fax: (901) 577-0866
mmulqueen@bakerdonelson.com
abaldridge@bakerdonelson.com

*Attorneys for Varsity Brands, LLC*; *Varsity Spirit, LLC*; *Varsity Spirit Fashions & Supplies, LLC; Charlesbank Capital Partners, LLC; Bain Capital Private Equity LP*

s/ Nicole Berkowitz Riccio

Grady Garrison (TN #008097)

28

Nicole Berkowitz Riccio (TN #35046)
James Andrew Roach (TN #37934)
BAKER, DONELSON, BEARMAN, CALDWELL
& BERKOWITZ
165 Madison Avenue, Suite 2000
Memphis, TN 38103
Phone: (901) 526-2000
Fax: (901) 577-0866
ggarrison@bakerdonelson.com
nriccio@bakerdonelson.com
aroach@bakerdonelson.com

*Attorneys for U.S. All Star Federation, Inc.*


s/ Brendan P. Gaffney

Paul E. Coggins*
Brendan P. Gaffney*
Kiprian E. Mendrygal*
Jennifer McCoy*
Katherine Wright
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Phone: (214) 740-8000
Fax: (214) 740-8800
pcoggins@lockelord.com
bgaffney@lockelord.com
kmendrygal@lockelord.com
jennifer.mccoy@lockeord.com
katie.wright@lockelord.com

* Admitted pro hac vice

Edward L. Stanton III (TN #018904)
S. Keenan Carter (TN # 023386)
BUTLER SNOW LLP
6075 Poplar Avenue, Suite 500
Memphis, Tennessee 38119
Telephone: (901) 680-7336
Fax: (901) 680-7201
Edward.Stanton@butlersnow.com
Keenan.carter@butlersnow.com

*Attorneys for Jeff Webb*

29

Appendix A

Prior Rulings and Summary Judgment Issues with Claims Under Various State Laws

| State | Post-MTD Status of Claim Under State Antitrust Law (Am. Compl. ¶ 279) | Post-MTD Status of Claim Under Consumer Protection Law (Am. Compl. ¶ 282) | Issue at Summary Judgment |
|---|---|---|---|
| Alabama | Dismissed (ECF No. 333 at PageID 7251) | Dismissed (ECF No. 333 at PageID 7252) | |
| Alaska | Dismissed (ECF No. 333 at PageID 7251) | Dismissed (ECF No. 333 at PageID 7252) | |
| Arizona | Not dismissed | Not dismissed | • Plaintiffs failed to provide required notice to have claim under state consumer protection law. |
| Arkansas | Dismissed (ECF No. 333 at PageID 7251) (Court construed claims under Arkansas law to be brought under the ADTPA) | Not dismissed | • Indirect purchaser claims not recognized.<br>• Because no claim under state antitrust law, there is no claim under state consumer protection law. |
| California | Not dismissed | Not dismissed | • Claims based on unilateral conduct should be dismissed. |
| Colorado | Dismissed (ECF No. 333 at PageID 7251) | Dismissed (ECF No. 333 at PageID 7252) | |
| Connecticut | Not asserted | Not dismissed | |
| District of Columbia | Not dismissed | Not dismissed | |

| State | Post-MTD Status of Claim Under State Antitrust Law (Am. Compl. ¶ 279) | Post-MTD Status of Claim Under Consumer Protection Law (Am. Compl. ¶ 282) | Issue at Summary Judgment |
|---|---|---|---|
| Florida | Not asserted | Not dismissed | • Indirect purchaser claims not recognized.<br>• Because no claim under state antitrust law, there is no claim under state consumer protection law. |
| Hawaii | Not dismissed | Not dismissed | • Plaintiffs failed to provide required notice to have claim under state consumer protection law. |
| Idaho | Not dismissed | Not dismissed | • Indirect purchaser claims not recognized.<br>• Because no claim under state antitrust law, there is no claim under state consumer protection law. |
| Illinois | Dismissed (ECF No. 333 at PageID 7251) | Dismissed (ECF No. 333 at PageID 7252) | |
| Iowa | Not dismissed | Not asserted | |
| Kansas | Not dismissed | Not dismissed | • Claims based on unilateral conduct should be dismissed.<br>• All claims subject to three year statute of limitations. |
| Maine | Not dismissed | Not dismissed | |
| Massachusetts | Not asserted | Not dismissed | • Indirect purchaser claims not recognized.<br>• Because there is no claim under state antitrust law, there is no claim under state consumer protection law. |
| Maryland | Not dismissed | Not asserted | |
| Michigan | Not dismissed | Not dismissed | |
| Minnesota | Not dismissed | Not dismissed | • Plaintiffs failed to provide required notice to have claim under state consumer protection law. |
| Mississippi | Not dismissed | Not asserted | • All claims are subject to three year statute of limitations. |
| Missouri | Not asserted | Not dismissed | |
| Montana | Not asserted | Not dismissed | |

| State | Post-MTD Status of Claim Under State Antitrust Law (Am. Compl. ¶ 279) | Post-MTD Status of Claim Under Consumer Protection Law (Am. Compl. ¶ 282) | Issue at Summary Judgment |
|---|---|---|---|
| Nebraska | Not dismissed | Not dismissed | |
| Nevada | Not dismissed | Not dismissed | • Plaintiffs failed to provide required notice to have claim under state consumer protection law. |
| New Hampshire | Not dismissed | Not dismissed | |
| New Mexico | Not dismissed | Not dismissed | |
| New York | Not dismissed | Not dismissed | |
| North Carolina | Not dismissed | Not dismissed | |
| North Dakota | Not dismissed | Not asserted | |
| Oregon | Not dismissed | Not dismissed | |
| Rhode Island | Not dismissed | Not dismissed | |
| South Dakota | Not dismissed | Not dismissed | |
| Tennessee | Dismissal as to cheer camps and cheer competitions (ECF No. 333 at PageID 7251, ECF No. 475 at PageID 19506) | Not dismissed | • Claims based on unilateral conduct should be dismissed.<br>• All claims are subject to three year statute of limitations.<br>• Claims under TCPA are invalid because relate to competition. |
| Utah | Not dismissed | Not dismissed | • Plaintiffs failed to provide required notice to have claim under state consumer protection law. |
| Vermont | Not asserted | Not dismissed | |
| West Virginia | Not dismissed | Not dismissed | |
| Wisconsin | Not dismissed | Not dismissed | |

Appendix B

Current Summary Judgment Issues With State Laws

| State | Three Year Limitations Period | No Claims Based on Unilateral Conduct | No Indirect Purchaser Claims | Notice Not Provided | TCPA Bar on Claims Relating to Competition |
|---|---|---|---|---|---|
| Arizona | | | | ✓ | |
| Arkansas | | | ✓ | | |
| California | | ✓ | | | |
| Florida | | | ✓ | | |
| Hawaii | | | | ✓ | |
| Idaho | | | ✓ | | |
| Kansas | ✓ | ✓ | | | |
| Massachusetts | | | ✓ | | |
| Minnesota | | | | ✓ | |
| Mississippi | ✓ | | | | |
| Nevada | | | | ✓ | |
| Tennessee | ✓ | ✓ | | | ✓ |
| Utah | | | | ✓ | |