# EXHIBIT 16

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE

JESSICA JONES et al.,

               Plaintiffs,

    v.

VARSITY BRANDS, LLC et al.,

               Defendants.

**Civ. Action No. 2:20-cv-02892**

## DEFENDANTS' REPLY IN SUPPORT OF STATEMENT OF UNDISPUTED MATERIAL FACT

## PRELIMINARY STATEMENT

Defendants respectfully submit this reply in support of their Statement of Undisputed Material Facts.[1]

Plaintiffs' responses frequently advance irrelevant narratives and objections without engaging with the undisputed evidence supporting Defendants' Motions, and without clearly stating which part of each statement is undisputed. This is not permitted under the local rules. *See* W.D. Tenn. L.R. 56.1(b). Even still, it is clear that many of Defendants' statements are not actually disputed, and the reply notes that. Defendants provide a more detailed response where it may be helpful to assess Plaintiffs' lengthy narratives and purported new facts that are not responsive to Defendants' original statement. In particular, many of Plaintiffs' responses are defective for one or more of the following reasons, as described in greater detail below:

*First*, Plaintiffs argue that some statements are improper because they are "not supported by evidence." *See* SUF ¶¶ 14-18, 20, 32, 36-41, 43, 49, 52, 54-59, 63, 80-82, 184, 228, 239, 240, 243, 245, 246. This is incorrect. Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Lansky v. Protection One Alarm Monitoring, Inc.*, No. 17-2883, 2019 WL 575390, at *2, *5 (W.D. Tenn. Feb. 12, 2019).

*Second*, in many cases, Plaintiffs purport to dispute statements as "misleading" or "incomplete," or by citing to mischaracterized evidence that does not controvert the evidence cited in Defendants' statement. This does not create a genuine dispute of material fact. *Turner*

---

[1] Appendix A to this reply sets forth evidentiary and admissibility objections to the materials cited by Plaintiffs in their responses to Defendants' Statement. Appendix B sets forth responses to Plaintiffs' evidentiary and admissibility objections to materials cited by Defendants in support of Defendants' Statement.

*v. National Association of Letter Carriers Branch No. 27*, No. 2:20-cv-2025-SHL-atc, 2022 WL
807378, at *2 (W.D. Tenn. Feb. 11, 2022) (deeming facts undisputed where non-movant asserted
"tangential information that does not contradict" the movant's facts, report and recommendation
adopted by 2022 WL 801555 (W.D. Tenn. Mar. 15, 2022); *Evans v. Walgreen Co.*, 813 F. Supp.
2d 897, 931-32 (W.D. Tenn. 2011) (deeming facts admitted where non-movant's "dispute"
rested on mischaracterized evidence); *see also Baity v. Kralik*, 51 F.Supp.3d 414, 418 (S.D.N.Y.
2014) (disregarding "purported 'denials' . . . that do not actually deny or refute the specific facts
asserted by Defendants, are not supported by citations to admissible evidence in the record, are
contradicted by other admissible evidence in the record, or that are improper legal arguments").

*Third*, Plaintiffs purport to dispute statements primarily or exclusively based on
testimony from their proposed experts.  In many cases, Plaintiffs cite to their experts'
interpretation or recitation of documents and testimony, which is inadmissible.  *Ask Chems., LP
v. Comput. Packages, Inc.*, 593 F. App'x 510, 510 (6th Cir. 2014) ("Where an expert merely
offers his client's opinion as his own, that opinion may be excluded."); *In re LIBOR-Based Fin.
Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 584 (S.D.N.Y. 2018) (excluding testimony
where economic expert "purport[ed] to interpret documents" because such "opinions are not the
product of [his] expertise").  This, too, does not create a genuine dispute of material fact.

*        *        *

1.      Varsity offers camps to train competitive and sideline scholastic cheerleaders. (Compl. ¶¶62-63; ECF No. 382-6 at ¶247 (showing that ███ to ███ of Varsity school camp customers did not attend any competitions).)

**Plaintiffs' Response to SUF No. 1: Disputed in part.**

Undisputed that Varsity offers camps to train Competitive Cheer teams, which are either All Star Cheer teams in a gym or School Cheer teams at a school. *See* PSOF, ¶¶ 1-3. Disputed to the extent Varsity improperly lumps Competitive School Cheer with sideline cheer (and calls the two "scholastic" cheer throughout). Sideline cheer is a distinct category of cheer not included in Plaintiffs' School Cheer Definition. *See* **Ex. 1** [Netz Rep.] at 11-12; **Ex. 3** [Heeb Rep.] at 40. Varsity's own documents concede and acknowledge that the two are materially different and that sideline cheer is not a competitive sport. **Ex. 51** at -5546. Disputed that "███ to ███ of Varsity school camp customers did not attend any competitions." Defendants' percentages are uninformative because Dr. Murphy includes irrelevant groups not at issue in this litigation, like sideline cheer teams and dance camps, in his calculation. **Ex. 1** [Netz Rep.] at 11-13; **Ex. 2** [Netz Rebuttal] at 70-71, 85. The correct analysis is how many School Cheer teams who attend Cheer Camps attend at least one Cheer Competition, which Murphy never examines. *Id.* When using correct data, the percentage of School Cheer camp customers who attend at least one Cheer Competition is 70% for the 2015 to 2016 season and 80% for the 2018-2019 season. *Id.*

**Defendants' Reply:**  Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted.  Plaintiffs do not engage with Defendants' statement; instead, they assert an incoherent and irrelevant narrative that does not address the fact at issue.  For example, Plaintiffs dispute the percentage of Varsity's camps customers that do not attend competitions on the basis that it includes Varsity's camps customers that do not attend competitions.  Plaintiffs also cite Exhibit 51 in support of their argument that Varsity "concedes" sideline and school cheer are two "materially different" activities, but Exhibit 51 only makes a distinction between "in-school cheer" and "out-of-school" cheer (i.e., All Star).  *See* Pls.' Ex. 51 at CB00485545.  Indeed, although Plaintiffs claim that sideline cheer is not at issue in this litigation, Plaintiffs continue to seek damages for sideline cheer.  *See* Maki Daubert Mot. ECF No. 391-1 at PageID 12794.

Otherwise, Plaintiffs fail to support their irrelevant narrative with admissible evidence: they cite only their expert's recitation and interpretation of documents, which is inadmissible.

4

Fed. R. Evid. 702, 403; *see also Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 510, 510 (6th Cir. 2014).

2.      The types of camps offered by Varsity include clinics, day camps, and multi-day camps. (ECF No. 388-4 at ¶155.)

      **Plaintiffs' Response to SUF No. 2: Undisputed for purposes of summary judgment only.**

      **Defendants' Reply:**  No response required.

3.      Among the training and instruction provided at Varsity's multi-day camps is instruction on the "five key roles" of a cheerleader, namely "crowd leader, spirit raiser, ambassador, athlete and entertainer" along with "leadership and safety." (Ex. AT, VAR00160803.)

      **Plaintiffs' Response to SUF No. 3: Disputed in part.**

      Undisputed that the document cited lists "crowd leader, spirit raiser, ambassador, athlete and entertainer", "leadership and safety" as part of instruction. Disputed that any evidence is offered to show that such instruction took place at a Varsity Camp, nor does the document cited state that these are "five key roles." Cheer Camps were a primary means of Defendants' anticompetitive conduct. Defendants used camps to tie athletes to Varsity competitions and lock them into the Varsity ecosystem. *See* **Ex. 20** [Cota Dep.] at 223:11-17; **Ex. 114** at -0727–0729 (discussing implementation of policy to force teams "going to gym camps" to instead go to Varsity camps and grow Varsity's business); **Ex. 54** at –9337 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮; **Ex. 1** [Netz Rep.] at 89–92; **Ex. 2** [Netz Rebuttal] at 84–85. The evidence also shows Varsity did not care about safety. For example, USASF used to prohibit athletes from wearing jewelry because it was dangerous during stunts. **Ex. 200** (USASF_00009869). However, after Varsity partnered with Swarovski Crystal, USASF removed its longstanding rule against jewelry. *See* **Ex. 11** at 70:22-71:23; Ex. 305.

      **Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted.  Plaintiffs do not engage with Defendants' statement; instead, they assert an irrelevant narrative that does not address the fact at issue.

      In addition, Plaintiffs' irrelevant narrative is unsupported.  Plaintiffs cite Ms. Cota's testimony, but Ms. Cota is not offered as an expert witness, and her testimony is a plainly inadmissible legal conclusion.  *See* Pls.' Ex. 20, Cota Dep. at 223:11-17 ("[Q.] Would you agree that … Varsity leverages its market power in the cheer competition market to enhance and maintain its market power in the camp market? [Objection] A. Yes."); *see also* Fed. R. Evid.

702.  None of Plaintiffs' cited materials dispute Defendants' statement regarding the content of

the training and instruction that was provided at Varsity's camps.

Plaintiffs cite their experts' recitation and interpretation of documents, which is

inadmissible. Fed. R. Evid. 702, 403.

4.       Very few All Star teams attend camps, which are geared toward scholastic teams,
         including those that do not participate in competitions. (Netz Rep, ECF No. 382-3 at p.
         60 ("[N]early all camp participants are school teams that would otherwise have a break in
         their season during the summer when Cheer Camps are usually held. All Star gyms do
         not have a similar break during the summer and, therefore, have less of a need or
         availability to attend Cheer Camps."); Ex. Q, Netz Dep. 89:12-18; Ex. AK, Heeb Dep.
         133:15-21.

         **Plaintiffs' Response to SUF No. 4: Disputed in part.**

         Undisputed that fewer All Star Cheer teams attend camps. Undisputed that some school
teams attend camps but competitions. Disputed that the use of the term "scholastic teams" is
misleading and inaccurate. Resp., ¶1.

         **Defendants' Reply:**  Plaintiffs admit this fact in relevant part, and this fact should be

deemed admitted.  Plaintiffs' additional narrative is irrelevant.  Plaintiffs try to downplay this

fact by stating that "fewer" All Star teams attend camps, but they do not dispute what their own

expert has admitted: "nearly all camp participants are school teams."  Pls.' Ex. 1, Netz Rep. at p.

60.

5.       There is no rebate under the Varsity Family Plan ("VFP") or a Network Agreement for
         camp registration fees, and there never has been. (Ex. AK, Heeb Dep. 244:17-22, 254:8-
         12, 322:8-12; see also, e.g., Ex. AU, VAR00020214 (VFP); Ex. AV, VAR00175267 at –
         268 (VFP); Ex. AW, VAR00017932 at -932-942 (Network Agreement).

         **Plaintiffs' Response to SUF No. 5: Undisputed for purposes of summary judgment
         only.**

         **Defendants' Reply:**  No response required.

6.       Neither Plaintiffs paid for a registration at or even attended a Varsity cheer camp. (Ex.
         AX, Plaintiffs' Combined Objections and Responses to Defendants' First Set of
         Interrogatories at Attachment A at 1-6 (demonstrating, through list of purchases made by
         Plaintiffs, that neither of the remaining Plaintiffs made any camp purchase); Ex. AY,
         Lorenzen Dep. At 86:12-19 ("Q: [Y]ou mentioned earlier today, I believe, that your child

attended a camp in relation – in connection with cheerleading; is that correct? A: No.");
Ex. AZ, Jones Dep. At 49:4-50: 7.)

**Plaintiffs' Response to SUF No. 6: Disputed.**

Disputed as misleading. Plaintiffs—who are parents of Competitive All Star Cheer
athletes—indirectly paid Varsity for Varsity Cheer Competition costs and indirectly purchased
Cheer Apparel. **Ex. 61** at ¶¶5-6; **Ex. 62** at, ¶¶5-8. Further, there is a dispute as to whether
Plaintiff Lorenzen paid for a camp. Lorenzen was required to—and did—pay the All Star gym
Cheer Central Suns for her daughter to attend a weekly tumbling "clinic." **Ex. 35** [Lorenzen
Dep.] at 68:23-69:5. Defendants include "clinics" in their definition of "camps" herein. *See*
DSOF, ¶2. Plaintiffs also have a pending motion to add a class representative who purchased
Cheer Competitions, Cheer Camps, and Cheer Apparel. *See* ECF No. 394-2.

**Defendants' Reply:**  Plaintiffs admit this fact in relevant part, and this fact should be

deemed admitted.  Plaintiffs' additional narrative is irrelevant.

Plaintiffs ignore the undisputed evidence cited in Defendants' statement, and their

additional evidence only confirms this fact.  *See* Pls.' Ex. 62 at ¶ 7 (Ms. Lorenzen admitting:

"my daughter's team did go to a summer camp, but . . . she was unable to attend.  I did not pay

for that particular camp.").  Plaintiffs claim this statement is misleading because Ms. Lorenzen

paid for a *non-Varsity* "weekly tumbling 'clinic'", but that is irrelevant to the undisputed fact that

neither Plaintiff paid for or even attended a *Varsity cheer camp*.  Plaintiffs argue that "clinics"

are included in the definition of "camps," but this too is irrelevant because Ms. Lorenzen did not

pay for a "clinic."  Ms. Lorenzen testified that she paid for her daughter to attend "weekly

tumbling lessons."  See Pls.' Ex. 35 at 68:23-69:5; Pls.' Ex. 62 at ¶ 7 (same).  Ms. Lorenzen has

never claimed to have paid for a clinic, nor does the word "clinic" appear anywhere in Ms.

Lorenzen's deposition transcript, interrogatory responses, or declaration.  *See* Pls.' Ex. 35; Defs.'

Ex. AX; Pls.' Ex. 62.

7.    There are many different kinds of cheer camps within Plaintiffs' proposed "Cheer Camp
      Market," including multi-day, single day, in the school's facilities, at the facilities of
      major universities, high school camps, middle school camps, and so on. (ECF No. 382-6
      at ¶¶133-134, 181-184, Exs. 14 and 15.)

**Plaintiffs' Response to SUF No. 7: Disputed in part.**

Undisputed that camps vary in length or location. Disputed to the extent Defendants claim Plaintiffs' Cheer Camps market is not properly defined. Plaintiffs properly define both the product market and geographic market for Camps. **Ex. 1** [Netz Rep.] at 32-33, 60; **Ex. 3** [Heeb Rep.] at ¶¶112-117, 145-152; *See also* ECF No. 389; ECF No. 454.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be

deemed admitted. Plaintiffs' additional narrative is irrelevant. Plaintiffs cite their expert's

recitation and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

8.    In order to attend one of Varsity's three national championship events for high school teams, a team must first have 75% of its members complete the Squad Credentialing Program at a multi day Varsity cheer camp. (Ex. AT, VAR00160803 at -803 (listing the events to which the Squad Credentialing Program applied prior to 2021 and the program's requirements); Ex. BB, VAR00160802 (Duhon Exhibit 5) at -802.)

**Plaintiffs' Response to SUF No. 8: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

9.    Varsity first instituted the Squad Credentialing Program as to the National High School Cheerleading Championship (NHSCC) with UCA in the 2016-2017 season. (Ex. BB, VAR00160802 (Duhon Exhibit 5) at -802; Ex. BC, Duhon Dep. 48:4-50:17.)

**Plaintiffs' Response to SUF No. 9: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

10.    Varsity instituted the Squad Credentialing Program as to the NCA Junior & Senior High School National Championship in the 2017-2018 season. (Id.)

**Plaintiffs' Response to SUF No. 10: Undisputed.**

**Defendants' Reply:** No response required.

11.    Varsity instituted the Squad Credentialing Program as to USA Spirit Nationals in the 2020-2021 season. (Ex. BC, Duhon Dep. 102:19-103:4.)

**Plaintiffs' Response to SUF No. 11: Undisputed.**

**Defendants' Reply:** No response required.

8

12.    The Squad Credentialing Program is not applicable to cheer teams that do not participate in one of the three specific Varsity competitions. (Ex. AK, Heeb Dep. 197:3-12; Ex. BB, VAR00160802 (Duhon Exhibit 5) at -802.)

**Plaintiffs' Response to SUF No. 12: Disputed.**

Disputed as to use of the term "applicable." The Squad Credentialing Program locks Competitive Cheer athletes into the Varsity ecosystem by making it mandatory for high school teams to attend a multi-day Varsity Cheer camp in order to compete at a national Varsity competition. It serves to tie the Cheer Competitions and Cheer Camps markets. **Ex. 1** [Netz Rep.] at 25, 89-92. Competitive Cheer athletes compete during the season with the goal of attending key end-of-season events and qualify by performing well at a Tier 1 event then obtaining a bid. PSOF, ¶¶ 14-15. Thus, while a cheer team may attend a Camp—making a Squad Credentialing Program likely "applicable"—it may not receive a bid to compete.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs' additional narrative is irrelevant.

Plaintiffs ignore the undisputed evidence cited in Defendants' statement, which supports that the Squad Credentialing Program was only a requirement for cheer teams to participate in one of three specific Varsity competitions. In addition, Plaintiffs fail to support their response with admissible evidence; instead, they cite only their expert's recitation and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

13.    Of the ▮▮▮ schools that attended a Varsity camp each season from the 2016- 2017 season to the 2018-2019 season, less than ▮▮ attended a competition requiring squad credentialing. (ECF No. 382-6 at ¶383, Ex. 55 (establishing that the minimum percentage of schools attending events requiring squad credentialing was between ▮▮▮ and ▮▮▮ from the 2016-2017 season to the 2018-2019 season).)

**Plaintiffs' Response to SUF No. 13: Disputed.**

Defendants' percentages are uninformative because Dr. Murphy improperly includes irrelevant teams, like sideline cheer teams and dance groups, in his calculation. **Ex. 1** [Netz Rep.] at 11-13; **Ex. 2** [Netz Rebuttal] at 70-71, 85. The proper metric to evaluate potential foreclosure impact of the tying requirement is the share of Competitive School Cheer teams that attend a Varsity Cheer Camp. When using correct data, the percentage of School Cheer camp customers who attend at least one Cheer Competition is ▮▮▮ for the 2015 to 2016 season and ▮▮▮ for the 2018-2019 season. *Id.*

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted.  Plaintiffs provide no support for disputing the percentage of allegedly "tied" camps customers that purchased the allegedly "tying" competition registration as "uninformative."  Tying is judged on its effects on competition for the tied product.  *See* Defs.' Reply Br. at 6.  Plaintiffs ultimately bear the burden of proof on this issue. Further, merely stating that a fact is "uninformative" is not a dispute of its veracity.  Plaintiffs ignore the undisputed evidence cited in Defendants' statement, which supports that less than 10% of schools attending Varsity camps attended a competition requiring squad credentialing. Plaintiffs argue this metric is not "proper" because some school cheer teams attend Varsity's camps with the goal of attending one of the three relevant competitions, but they fail to obtain a bid to do so.  *See* Pls.' Resp. to Defs.' SUF ¶ 12.  But Plaintiffs provide no evidence as to how many schools fall into this category.  Instead, Plaintiffs offer what they say is the percentage of "School Cheer" camps customers who attend at least one cheer competition.  To the extent Plaintiffs imply that *every* Varsity camp customer who attends *any* Varsity cheer competition necessarily aims to also attend one of the three relevant competitions that requires squad credentialing, Plaintiffs fail to support this argument with admissible evidence.  Plaintiffs cite only their expert's *ipse dixit* assertion, which is inadmissible.  Fed. R. Evid. 702, 403.

Moreover, Plaintiffs misconstrue their own expert's percentages.  Dr. Netz did not conclude that the percentage of "School Cheer" *camps* customers who attend at least one cheer *competition* is ▮▮▮ or ▮▮▮, as Plaintiffs claim.  Rather, Dr. Netz concluded that the percentage of "School Cheer" *competition* customers who attend at least one cheer *camp* is ▮▮▮ or ▮▮▮. *See* Pls.' Ex. 2 at 85.  Dr. Netz's analysis is irrelevant, as it says nothing about the percentage of

camps customers who do or do not seek to attend any competition, let alone the three relevant

ones.

14.    Prior to December 10, 2016, Varsity did not make any acquisition of a cheer camp
producer that Plaintiffs assert was anticompetitive.

**Plaintiffs' Response to SUF No. 14: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by
evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Varsity's acquisitions of numerous cheer camp producers
prior to December 10, 2016 were part of its comprehensive anticompetitive strategy. A 2014
Varsity document shows Varsity possessed 80-85% of the Cheer Camps Market, which it
maintained and continued to enhance by creating barriers to entry and eliminating competition
across all three intertwined relevant markets. **Ex. 87** at -1581; **Ex. 1** [Netz Rep.] at 61-65; **Ex. 2**
[Netz Rebuttal] at 69-71. *See, e.g.,* Varsity's market power in and intertwining of the Relevant
Cheer Markets (PSOF, ¶¶60-67, 82-94); how Varsity protects its market power by erecting
barriers to entry [particularly by tying Cheer Camps to Cheer Competitions] (*id.* ¶¶71-81); and
how Varsity abuses its market power and forecloses its rivals through willful acquisitions (*id.*
¶¶95-106), control of governing bodies (*id.* ¶¶107-108), counterprogramming (*id.* ¶¶109-111),
blocking retail and event vendors (*id.* ¶¶112-116), exclusionary contracts with gyms and schools
(*id.* ¶¶117-126), "stay-to-play" (*id.* ¶¶127-130), and conspiring with Defendants (*id.*, Section VI).
Varsity's anticompetitive conduct, taken as a whole, served to raise prices, reduce output, and
reduce consumer choice. **Ex. 1** [Netz Rep.] at 113-115; PSOF, ¶¶ 211-214.

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.  Plaintiffs respond that the statement is "not

supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue.

Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have

failed to produce admissible evidence to establish a genuine issue.  Plaintiffs' additional

narrative is irrelevant.  Plaintiffs argue that the alleged conduct was anticompetitive "as a

whole," but their response fails to identify a single acquisition that was anticompetitive, *i.e.*, that

resulted in higher prices by reducing output.  Plaintiffs cite their expert's recitation and

interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

15.    On or after December 10, 2016, Varsity did not make any acquisition of a cheer camp
producer that Plaintiffs assert was anticompetitive.

**Plaintiffs' Response to SUF No. 15: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Plaintiffs do assert that Varsity's acquisitions of cheer camp producers after December 2016—e.g., All Things Cheer Skillz Camp in 2017 and Epic Brands in 2018, both of which operated multiple cheer camps throughout the United States—were anticompetitive. By this time, Varsity already had monopoly power, which it maintained and enhanced by creating barriers to entry and eliminating competition across all three intertwined relevant markets. **Ex. 87** at -1581; **Ex. 1** [Netz Rep.] at 61-65; **Ex. 2** [Netz Rebuttal] at 69-71. *See, e.g.,* Varsity's market power in and intertwining of the Relevant Cheer Markets (PSOF, ¶¶60-67, 82-94); how Varsity protects its market power by erecting barriers to entry [particularly by tying Cheer Camps to Cheer Competitions] (*id.* ¶¶71-81); and how Varsity abuses its market power and forecloses its rivals through willful acquisitions (*id.* ¶¶95-106), control of governing bodies (*id.* ¶¶107-108), counterprogramming (*id.* ¶¶109-111), blocking retail and event vendors (*id.* ¶¶112-116), exclusionary contracts with gyms and schools (*id.* ¶¶117-126), "stay-to-play" (*id.* ¶¶127-130), and conspiring with Defendants (*id.*, Section VI). Varsity's anticompetitive conduct, taken as a whole, served to raise prices, reduce output, and reduce consumer choice. **Ex. 1** [Netz Rep.] at 113-115; PSOF, ¶¶ 211-214.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs respond that the statement is "not supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue. Plaintiffs' additional narrative is irrelevant.

Plaintiffs raise "All Things Cheer Skillz Camp" and "Epic Brands" as anticompetitive cheer camp acquisitions, but none of their cited materials supports (or even claims) that either acquisition resulted in higher prices by reducing output. Plaintiffs' cited materials do not even mention "All Things Cheer Skillz Camp." Plaintiffs' Exhibit 81 discusses "Epic Brands" in terms of cheer competitions, not camps. Otherwise, Plaintiffs rely on their expert's recitation and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403. In any event,

12

the cited expert materials do not claim that "All Things Cheer Skillz Camp" or "Epic Brands" were anticompetitive cheer camp acquisitions. *See* Pls.' Ex. 1 at 61-65; Pls.' Ex. 2 at 69-71.

16.     Prior to December 10, 2016, Varsity did not make any acquisition that enabled Varsity to charge higher prices for cheer camps.

**Plaintiffs' Response to SUF No. 16: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. In 2003, Varsity started its acquisition strategy to dominate the Cheer Competitions market with the acquisition of a major cheer organization, National Spirit Group and the NCA brands. **Ex. 1** [Netz Rep.] at 93. Varsity went on to own and control the other two main organizations that promote Camps and Competitions—the UCA and USA. *Id.* at 15. The NCA, UCA, and USA comprised Varsity's "███████████████████" revenue over the 2004-2013 period. **Ex. 93** at –6010. The NCA brand alone accounts for a significant chunk of Varsity's Camps revenue. See **Ex. 284** at –5631; **Ex. 93** at –6023. Through ownership and control of these three organizations alone, Varsity controlled 80% of the entire Cheer Camp market. *Id.*

With this market share, Varsity was able to exclude Cheer Camps competitors, mainly via its policy of tying Cheer Camps and Cheer Competitions (schools are primary participants in Camps, and because school teams want to compete at the national events, this tying strategy of entry to the NCA with attendance of a Cheer Camp serves to exclude non-Varsity suppliers). **Ex. 1** [Netz Rep.] at 89-92. As result, Varsity had the monopoly power necessary to raise prices (**Ex. 1** [Netz Rep.] at 37-41; PSOF, ¶¶ 62-63, 65) and it did raise prices, as Plaintiffs and putative class members suffered an overcharge of 27.4% on Cheer Camps. PSOF, ¶ 213. Ultimately, taken as a whole, Varsity's acquisitions and foreclosure strategy served to raise prices, reduce output, and reduce consumer choice across all relevant markets. **Ex. 1** [Netz Rep.] at 113-115; PSOF ¶¶ 95-106, 211-214.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs respond that the statement is "not supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue. Plaintiffs' additional narrative is irrelevant. Plaintiffs argue that "acquisitions and foreclosure strategy served to raise prices," but their response fails to identify a single acquisition that enabled Varsity to charge

13

higher prices for cheer camps.  Plaintiffs' assertion that they suffered overcharges is not

supported by admissible evidence.  *See* Maki Daubert Mot. ECF No. 391-1 at PageID 12791-

12792.

17.    On or after December 10, 2016, Varsity did not make any acquisition that enabled Varsity
       to charge higher prices for cheer camps.

**Plaintiffs' Response to SUF No. 17: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by
evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed as misleading. Varsity acquired several competitors that
operated camps throughout the United States. In 2017, Varsity acquired All Things Cheer, &
Dance (ATC), which operates camps in the western United States and elsewhere. [White Ex. 28,
CB00075991] at 5998. In 2018, Varsity acquired Epic Spirit Ventures, which operated camps in
the eastern United States. *Id*. at 6004. Varsity maintained its monopoly over the Cheer Camps
market throughout the class period through its ownership and control of the NCA, UCA and
USA, which accounted for 80% of the Cheer Camps market by Varsity's own analysis. **Ex. 93** at
–6023. As result, Varsity had the monopoly power necessary to raise prices (**Ex. 1** [Netz Rep.] at
37-41; PSOF, ¶¶ 62-63, 65), and it did raise prices, as Plaintiffs and putative class members
suffered an overcharge of 27.4% on Cheer Camps. PSOF, ¶ 213.

Ultimately, taken as a whole, Varsity's acquisitions and foreclosure strategy served to
raise prices, reduce output, and reduce consumer choice across all relevant markets. **Ex. 1** [Netz
Rep.] at 113-115; PSOF, ¶¶ 95-106, 211-214.

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.  Plaintiffs respond that the statement is "not

supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue.

Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have

failed to produce admissible evidence to establish a genuine issue.  Plaintiffs' additional

narrative is irrelevant.  Plaintiffs argue that the alleged conduct was anticompetitive "as a

whole," but their response fails to identify a single acquisition that enabled Varsity to charge

higher prices for cheer camps.  *See also* Defs.' SUF ¶ 16 reply.  Plaintiffs cite their expert's

recitation and interpretation of documents**,** which is inadmissible. Fed. R. Evid. 702, 403.

18.    Varsity did not engage in any anticompetitive conduct with respect to camps that led Plaintiffs to pay higher prices in another market.

**Plaintiffs' Response to SUF No. 18: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Varsity maintained market share and monopoly power in each of the three markets. **Ex. 1** [Netz Rep.] at 55-70; **Ex. 85** at -6985. It leverages power in each to charge supracompetitive prices in another; for example, by leveraging its market power in the Cheer Competitions market to enhance and maintain its market power in the Cheer Camps market. **Ex. 20** [Cota Dep.] at 223:11-17; **Ex. 3** [Heeb Rep.] at ¶118; **Ex. 1** [Netz Rep.] at 89- 92. Varsity identifies the "high barriers to entry" that it erects as the primary reason for its growth, and specifically the "high barriers to entry resulting from the Company's integrated business model" and "relationships focused on cross-selling activities." **Ex. 64** at -4544-45.

Webb, as Varsity founder and former CEO, conceded in 2018 that Varsity's strategy was to create an ecosystem that could cross-market its segments and foreclose competition. **Ex. 109** at 1 (2018 quote from Webb in *Chief Executive* magazine: "We were really creating an industry as we went along and it became an ecosystem in that we were creating the concept, we were creating the industry, and then we were positioning ourselves to provide all the products and services … utilized [within that industry]. Not only did we have the number one position in [the camps, apparel, and competitions] segments, but then we developed a cross-marketing model where we could promote [the segments within each other] and to be honest with you, it took off."). The exclusionary scheme and acts of foreclosure allowed Varsity to charge higher prices to gyms and schools in all three markets. PSOF, ¶¶211-214.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs respond that the statement is "not supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue. Plaintiffs' additional narrative is irrelevant. Plaintiffs simply do not identify any conduct related to *camps* that led Plaintiffs to pay higher prices in another market.

In addition, Plaintiffs' irrelevant narrative is unsupported. Plaintiffs cite Ms. Cota's testimony, but Ms. Cota is not offered as an expert witness, and her testimony is a plainly inadmissible legal conclusion. *See* Pls.' Ex. 20, Cota Dep. at 223:11-17 ("[Q.] Would you agree

15

that … Varsity leverages its market power in the cheer competition market to enhance and maintain its market power in the camp market? [Objection] A. Yes."); *see also* Fed. R. Evid. 702.  Further, Plaintiffs' proposed expert testimony is inadmissible.  *See* Netz Daubert Mot. ECF No. 382-1; Heeb Daubert Mot. ECF No. 388-1.  Finally, in addition to being irrelevant, Plaintiffs' Exhibit 109 plainly does not support that Varsity had a strategy to foreclose competition or that Mr. Webb "conceded" as much.

19.     Prices for two-day camps increased slightly by 2.0% the first season the Squad Credentialing requirement took effect, increased by only 0.1% the following season, and decreased by 0.6% the season after that.  (ECF No. 382-6 at ¶429.)

**Plaintiffs' Response to SUF No. 19: Disputed.**

Without conceding the accuracy of the percentages cited, Plaintiffs dispute this assertion as misleading and irrelevant, as Plaintiffs' theory of harm does not predict a significant price response caused by implementation of the Squad Credentialing Requirement but rather that it would have maintained and preserved Varsity's monopoly and existing supracompetitive pricing and served to bolster its tying scheme with the Cheer Competitions Market. Ex. 4 [Heeb Rebuttal] at ¶¶618, 619.).

**Defendants' Reply:**  Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted.  Plaintiffs fail to offer any evidence, admissible or otherwise, to dispute the cited percentages.  Plaintiffs' additional narrative is irrelevant.  Plaintiffs cite their expert's recitation and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

20.     Registration fees for Varsity camps were not higher than they would have been in the absence of whatever conduct Plaintiffs in this case assert is anticompetitive.

**Plaintiffs' Response to SUF No. 20: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Defendants' exclusionary scheme and acts of foreclosure allowed Varsity to charge higher prices to gyms and schools in all three Cheer markets. PSOF, ¶¶ 211-214. Plaintiffs and putative class members suffered an illegal overcharge of 27% on Cheer Camps (as well as an illegal overcharge of 27% on Cheer Competitions and 11% on Cheer Apparel) as a result, in part, of Varsity's acquisition strategy. PSOF, ¶ 213.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue. Plaintiffs' proposed expert testimony is inadmissible. *See* Maki Daubert Mot., ECF No. 391-1; Heeb Daubert Mot., ECF No. 388-1.

21.    Dr. Heeb's camp-related overcharge assertion is identical to his competition- related overcharge assertion. (ECF No. 388-3 at ¶¶63, 310; ECF No. 388-4 at ¶21.)

**Plaintiffs' Response to SUF No. 21: Disputed in part.**

Undisputed that 27.4% is the overcharge figure for both competitions and camps.

Disputed that the overcharges are "identical." Consistent with accepted economic principles, the overcharge of 27.4% for competitions is an empirical estimate of a conservative, lower bound overcharge that Varsity could extract for camps. **Ex. 3** [Heeb Rep.] at ¶¶16, 25, 307, 308; **Ex. 4** [Heeb Rebuttal] at ¶615-617. As Varsity holds a larger share of the Cheer Camps than Cheer Competitions market, and because price elasticity is inversely related to market power, Varsity's overcharge in the Cheer Camps market would minimally be at least as high as the overcharge in the Competitions market. *Id.* Varsity produced data in this matter about pre-acquisition pricing for event producers acquired over the years, which provided a statistically viable benchmark against which Dr. Heeb estimated Varsity's competitions overcharge, but did not produce comparable benchmark data for the Cheer Camps market. *Id.*

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs admit that Dr. Heeb simply copied his 27.4% overcharge for competitions and applied it to camps. Plaintiffs' additional narrative about Varsity's purported market power is irrelevant.

Further, Varsity produced voluminous pricing data for all of its cheer camps from 2014 to 2020. Plaintiffs have not disputed this data as inaccurate. *See, e.g.*, ECF No. 382-6 at Appendix B (listing Varsity camp and scholastic material relied on: VAR00462073, VAR00462074, VAR00462075, VAR00462076, VAR00462077, VAR00462078, VAR00462079). Dr. Heeb chose not to use such pricing data, which shows no material price increases. *See* Defs.' SUF

¶ 19.  Plaintiffs complain that Varsity did not produce "comparable benchmark data" for Plaintiffs to compare Varsity's camps pricing data to, but it is not Varsity's burden to produce pricing data Varsity does not have related to cheer camp competitors Varsity does not own.  If Plaintiffs required such competitor benchmark data to conduct their analysis, Plaintiffs should have sought third-party discovery but they chose not to.  In any event, Plaintiffs' complaint does not change the fact that Dr. Heeb simply calculated an "overcharge" for competitions which he then transposed to camps to create his camp-related overcharge.  *See* Pls.' Ex. 3 at ¶ 310 ("I would expect the camp overcharge to be about the same as the competition overcharge").

22.    In calculating his camp-related overcharge, Dr. Heeb did not use prices charged for cheer camp registrations in his calculations.  (ECF No. 388-3 at ¶¶308-312; ECF No. 388-4 at ¶21.)

**Plaintiffs' Response to SUF No. 22: Disputed.**

Disputed to the extent Defendants suggest Heeb employing the methodology of using econometric regression analysis on a benchmark in one market to determine an overcharge in a related market is not sound, particularly where Defendants have not made the latter data available in discovery. *See* Resp., ¶21.

**Defendants' Reply:**  Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Indeed, Plaintiffs do not attempt to dispute that Dr. Heeb failed to use any prices charged for cheer camp registrations in his overcharge calculations for the cheer camps market.  Instead, Plaintiffs merely dispute the suggestion that Dr. Heeb's application of an All Star competitions overcharge to an entirely different market—cheer camps—is erroneous.  Dr. Heeb performed no analysis whatsoever with regards to camps overcharges.  *See* Heeb Daubert Mot. ECF No. 388-1 at PageID 10448-10452.

23.    In calculating his camp-related overcharge, Dr. Heeb only used prices charged for cheer competition registrations.  (ECF No. 388-3 at ¶¶56, 63; ECF No. 388-4 at ¶¶21, 85 (same).)

**Plaintiffs' Response to SUF No. 23: Disputed.**

*See* Resp., ¶¶21, 22.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be

deemed admitted. Plaintiffs admit that Dr. Heeb's overcharge simply copied his 27.4%

overcharge for competitions and applied it to camps. Plaintiffs merely dispute whether doing so

was proper. It was not. *See* Heeb Daubert Mot. ECF No. 388-1 at PageID 10448-10452.

24.    A firm's ability to charge supracompetitive prices is determined by a multitude of product-
       specific supply and demand factors. (See Ex. BD, Maki Dep. 70:17-19 ("[I]t's the
       dynamics that exist within that market that would allow you to assess what that
       overcharge is or if it is occurring.").)

       **Plaintiffs' Response to SUF No. 24: Undisputed.**

       **Defendants' Reply:** No response required.

25.    Dr. Maki did not calculate or analyze passthrough specifically as it relates to schools.
       (Ex. BD, Maki Dep. 88:6-16, 88:23-89:2 ("Q: Okay. And did you find anything from any
       school where the school said we pass through our costs to parents or other members of the
       [putative] class? A: I do not recall coming across something like that.").)

       **Plaintiffs' Response to SUF No. 25: Disputed.**

       The evidence cited does not support the fact asserted. Defendants rely on a single
response in Dr. Maki's testimony—that she did not specifically recall a statement from a school
that they affirmatively pass through costs to parents—into the false statement that she did not
"calculate or analyze passthrough specifically as it relates to schools." Indeed, Dr. Maki
concluded, based on her analysis of documents and testimony in this case, that (1) the pass-
through rate to schools was at least 100% and (2) this rate is likely conservative, given evidence
of the gyms marking up already inflated costs when they pass them through to the end purchaser
and receiving large rebates of monopoly profits. *See* **Ex. 9** at ¶¶3-6; **Ex. 8** [Maki Rebuttal] at
¶¶17–20.

       **Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.

       Plaintiffs concede that Dr. Maki could not recall finding *anything* from a school passing

through its costs to parents or other putative class members. Plaintiffs argue that Dr. Maki did

calculate a "pass-through rate to schools," but their cited materials confirm that Dr. Maki looked

at gyms (*i.e.*, All Star cheer), and thus she did not calculate or analyze passthrough *specifically*

*as it relates to schools.  See* Pls.' Ex. 9 at ¶ 3 ("In my analysis of passthrough...I also analyzed

data showing prices indirect purchasers (cheer families) where *charged by gyms* for competition,

camps, and apparel." (emphasis added)); Pls.' Ex. 8 at ¶17 ("The key factors I rely upon...

[*r*]*eview of All-Star gym registration forms and assertions by All-Star gym owners* via deposition

and response to subpoenas...." (emphasis added)).

26.    The constituent components of Plaintiffs' "Cheer Apparel Market"–namely cheer
uniforms, shoes, accessories (including outerwear, poms, bows, socks, undergear, bags,
and game day apparel, warm-ups (which itself includes jackets pants and other apparel)),
and camp wear (including t-shirts, tanks, polos, athletic shorts, skirts, skorts, and practice
wear) are not functional substitutes for one another, which is to say they cannot be used
for the same purposes. (Ex. AK, Heeb Dep. 140:20-21 ("Obviously shoes are not a
substitute for uniforms"), 141:6-9 (same); Ex. Q, Netz Dep. 210:11-211:6 ("Q: So is a
uniform substitutable for shoes? A: No. Q: Okay. And a warmup isn't substitutable for
shoes? A: Correct. Q: And an accessory like a hair bow isn't substitutable for shoes;
right? A: Correct.").)

**Plaintiffs' Response to SUF No. 26: Disputed.**

Defendants quote Dr. Heeb's statement out of context. Dr. Heeb testified that Varsity
marketed—and Plaintiffs and the Class purchased—Varsity's apparel products as a bundle:

> Q. Whether a hypothetical monopolist could sustain a price increase on
> shoes depends on whether apparel items are reasonably interchangeable
> with shoes, looking at a narrower market of shoes.  Is that correct?
>
> A. No. That's misguided, and that's maybe the point of the bundled market.
> Obviously shoes are not a substitute for uniforms. But what is important is
> does the collection of cheer apparel packaged and sold as a bundle, is that
> disrupted by substitution of one element out of a bundle to others and is that
> where we get a meaningfully different answer? And the answer to that, I
> believe, is no, that these products -- and we see it because we see in Varsity's
> data that the products are by and large sold as a bundle. The overwhelming
> majority of customers, certainly as a function of revenue, buy the bundle. **Ex.
> 26** [Heeb Dep.] at 140:14-141:5.

Varsity's website markets its apparel products together. **Ex. 249**. When goods tend to be
purchased together, it is generally the combined price of the products together that it is relevant
for customers' willingness to substitute away from the seller if the seller's price is too high. **Ex. 2**
[Heeb Rep.] at ¶¶306, 158-162, Table 6; **Ex 1** [Netz Rep.] at 39, 55-57; **Ex. 39** [Netz Dep.] at
53:18-56:23.

**Defendants' Reply:**  Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted.  Plaintiffs do not dispute that the constituent components of their proposed "Cheer Apparel Market" are not functional substitutes for each other.  Pls.' Ex. 26, Heeb Dep. at 140:14-141:5 ("Obviously shoes are not a substitute for uniforms.").  Plaintiffs' additional narrative is irrelevant.

Plaintiffs contend that "Varsity's website markets its apparel products together."  That is immaterial to whether the constituent products of Plaintiffs' "Cheer Apparel" are functional substitutes for one another, and to whether the products "tend to be purchased together." Plaintiffs fail to support their asserted fact with admissible evidence; instead, they cite only their expert's recitation and interpretation of documents, which is inadmissible.  Fed. R. Evid. 702, 403.  Plaintiffs' cited deposition and expert testimony is also irrelevant.  Plaintiffs suggest that the relevant analysis in a bundled market is whether the seller can command a higher combined price for the products.  But Plaintiffs do not present any evidence that Varsity's apparel prices are higher when purchased together so as to support a bundled market.  Indeed, Plaintiffs' experts do not even purport to analyze the price of an apparel bundle in their calculation of damages.  Plaintiffs' expert only analyzed the prices of Varsity's shoes.  *See* Heeb Daubert Mot. ECF No. 388-1 at PageID 10440-10444.  Plaintiffs ultimately bear the burden of proof on this issue.

27.   The constituent components of Plaintiffs' "Cheer Apparel Market" are not economic substitutes for one another, which is to say that if the price of one product goes up, customers will not substitute to another product.  (ECF No. 382-6 at ¶208.)

**Plaintiffs' Response to SUF No. 27: Disputed.**

Disputed on the basis that Defendants mischaracterize Plaintiffs' properly defined product market for Cheer Apparel. *See* Resp., ¶26.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs do not address the evidence cited in Defendants' statement, and they do not cite any evidence to the contrary.

28. Cheerleaders did not necessarily (and often did not) purchase all of the constituent products in Plaintiffs' "Cheer Apparel Market" from Varsity or from any other single supplier. (ECF No. 382-6 at ¶142, Ex. 19 (demonstrating that Varsity customers bought from different apparel categories in different proportions); Ex. AZ, Jones Dep. 174:15-176:21 (explaining that Ms. Jones's daughter used Varsity uniforms, Rebel shoes, and a Rebel makeup palette in 2019); Ex. BE, Minzghor Dep. 140:12-21 (stating that Fusion Elite gym used Varsity uniforms and Nfinity shoes, as well as Varsity shoes and Rebel uniforms in the past); Ex. BF, Bray Dep. 40:1- 41:13 (stating that Stars & Stripes All Star cheerleaders used shoes from Nfinity, uniform tops from Varsity, practice shorts from Nike, and practice tank tops from Custom Ink); Ex. BG, L. Gurske Dep. 143:4-22 (stating that gym bought uniforms from Varsity but also bought apparel from other vendors).)

**Plaintiffs' Response to SUF No. 28: Disputed.**

Disputed to the extent Defendants suggest parents and families of Competitive Cheer athletes do not overwhelmingly purchase different items of Varsity apparel together in a bundle. **Ex. 26** [Heeb Dep.] at 138:9-20, 140:14-141:5; **Ex. 3** [Heeb Rep.] at ¶158-159, Table 6. No competent evidence is cited in support of the assertion that athletes "often did not" purchase all products in the Cheer Apparel Market. Rather, ▮▮▮ of All Star "Gyms with L5-L7 Teams" purchase some apparel from Varsity and ▮▮▮ of these same teams purchase uniforms. **Ex. 2** [Netz Rebuttal] at 36. While Varsity faced more competition in the Cheer Apparel market than Camps or Competitions, there was not a sufficient competitive restraint on Varsity's ability to raise prices supracompetitively, which is the relevant inquiry for market power. **Ex. 3** [Heeb Rep.] at Tables 23 and 24, ¶193 ("How do we price relative to competitors? Based on VSF catalog pricing we are consistently higher prices than our competitors in all major product categories.")

Varsity was able to maintain that market power by creating barriers to enter the Cheer Apparel market, with its bundled rebate schemes, various schemes and policies restrict to rival companies from selling merchandise at Varsity events, aggressive enforcement of its trademarks, and acquisitions of rival apparel brands. PSOF, ¶¶113-116; **Ex. 4** [Heeb Rebuttal] at 299, 324-329. Varsity concedes that no other retailer "even comes close" to Varsity in the Cheer Apparel market. **Ex. 20** [Cota Depo] at 64:24-65:19.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs respond that the statement is "not supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have

failed to produce admissible evidence to establish a genuine issue.  Plaintiffs' additional

narrative is irrelevant.

Plaintiffs' response that parents purchase "different items" of apparel together, and that

some All Star teams purchase "some apparel" from Varsity, does not controvert the fact that

cheerleaders did not purchase *all* of the products in Plaintiffs' cheer apparel market from Varsity

or from any other single supplier.  In addition, Plaintiffs fail to support their response with

admissible evidence.  Plaintiffs rely almost exclusively on inadmissible expert testimony.  *See*

Heeb Daubert Mot. ECF No. 388-1; Netz Daubert Mot. ECF No. 382-1.  Otherwise, Plaintiffs

say "Varsity concedes" that no retailer comes close to Varsity in apparel, but their source is not

"Varsity," it is Ms. Cota: a former employee who admitted she has no knowledge of the volume

of Varsity's apparel sales, or the volume of apparel sales for Varsity's competitors, for any

relevant period of time.  Pls.' Ex. 20 at 327:11-331:23.  Her testimony is thus inadmissible for

lack of personal knowledge and foundation.  Fed. R. Evid. 602.

29. Varsity designed new forms of apparel conducive to the increasing athleticism of
    cheerleading.  (Ex. AS, Newby Decl. ¶3.)

**Plaintiffs' Response to SUF No. 29: Disputed.**

Varsity apparel customers complained about its low-quality, poorly fitting, under-
performing, yet overly expensive apparel products on numerous occasions. **Ex. 246** at –2183-
2184; **Ex. 1** [Netz Rep.] at 57 & n. 228, 60. As there is zero admissible evidence cited in support
of this assertion, Defendants fail to present a material fact.

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.  Plaintiffs' additional narrative is irrelevant.

Plaintiffs assert that "there is zero admissible evidence" to support this fact, but they

ignore the undisputed evidence in Defendants' statement.  Plaintiffs claim that "apparel

customers complained," but they cite to a single complaint from just one customer, which does

23

not controvert this fact. *See* Pls.' Ex. 246. Plaintiffs also cite their expert's recitation and

interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

30.    Among All Star gyms that participated in Varsity competitions during the class period, ▮ purchased uniforms from Varsity, whereas only ▮ purchased shoes. (ECF No. 382-6 at ¶142, Ex. 19.)

**Plaintiffs' Response to SUF No. 30: Disputed.**

The evidence cited is incorrectly quoted. Exhibit 19 shows that between ▮ and ▮ of All Star teams and over ▮ of school teams that attended a Varsity Cheer Competition purchased Varsity uniforms, and between ▮ and ▮ of All Star teams and ▮ of school teams that attended a Varsity Cheer Competition purchased Varsity shoes—*not* ▮ and ▮.

**Defendants' Reply:**  Plaintiffs concede that even the corrected percentages they cite in

Exhibit 19 show that cheer teams largely do not purchase shoes and uniforms together.

Plaintiffs' response does not create a genuine dispute of material fact as to whether customers

largely purchase the constituent components of the "Cheer Apparel" market in combination with

each other.  Indeed, Exhibit 19 demonstrates that an even larger percentage of Varsity's

customers purchased Varsity's uniforms but necessarily did not purchase Varsity's shoes than

Defendants previously stated.  The undisputed fact that not all purchasers of Varsity uniforms

also purchase Varsity shoes and vice-versa should be deemed admitted.

31.    According to Plaintiffs, only 30% of Varsity's customers purchase from Varsity products in each of the categories that Plaintiffs identified in their "Cheer Apparel Market." (ECF No. 388-3 at ¶158, Table 6 (citing a Varsity document stating that "▮ of customers purchase products from all six product categories" and calculating that only ▮ of Varsity's apparel revenue is from customers who buy from all categories).)

**Plaintiffs' Response to SUF No. 31: Disputed.**

Disputed as incomplete to the extent Defendants suggest parents and families of Competitive Cheer athletes do not overwhelmingly purchase different items of Varsity apparel together in a bundle. **Ex. 26** [Heeb Dep.] at 138:9-20, 140:14-141:5; **Ex. 3** [Heeb Rep.] at ¶¶158-159, Table 6; *see also* Resp., ¶¶26, 28.

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.  Plaintiffs ignore the undisputed evidence cited in

Defendants' statement, including Plaintiffs' own expert report. Plaintiffs claim that the

statement is "incomplete," but they do not controvert the fact that only ▆ of Varsity's

customers purchase products from all six product categories in the alleged "bundle" from

Varsity.

32.    A seller of all products in Plaintiffs' "Cheer Apparel Market" is not able to command
       higher prices than sellers of individual products in Plaintiffs' "Cheer Apparel Market."

**Plaintiffs' Response to SUF No. 32: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by
evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a). Notwithstanding,
disputed. *See* Resp., ¶¶26, 28.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted. Plaintiffs respond that the statement is "not

supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue.

Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have

failed to produce admissible evidence to establish a genuine issue. Plaintiffs cross-reference

their responses to other statements, but those responses do not address this fact.

33.    There are numerous other cheer apparel competitors, including Omni, Rebel Athletic, GK
       Elite, and Nfinity. (Ex. BH, Sadlow Dep. 40:23-25 ("On the school apparel business,
       really anyone that sells athletic apparel is a competitor to Varsity Spirit."), 41:5-16
       ("There are multiple competitors in the school cheer uniform segment. […] I can't give
       an exhaustive list, but Omni, GTN, Rebel, GK Elite, Nfinity, Adidas, Under Armour. I'm
       sure there's a lot others that I can't remember."), 42:10-22 ("Everyone I listed on that
       other side is also a competitor in All Star, and then they will have other competitors in
       that business as well.").)

**Plaintiffs' Response to SUF No. 33: Disputed in part.**

Undisputed that there are other cheer apparel retailers.

Disputed that the listed companies are viable competitors, given Varsity's market share
and efforts to leverage that market power to exclude competitors and create barriers to entry. **Ex.
1** [Netz Rep.] at 56-60; **Ex. 2** [Netz Rebuttal] at 66-69. **Ex. 2** [Heeb Rep.] at ¶187-188. PSOF,
¶¶113-116. *See also* **Ex. 250** at –0904. Varsity concedes this, as Varsity Vice President of
Corporate Alliances and Business Development testified that no apparel retailer poses a real

threat to Varsity, and that "no one even comes close" to doing what Varsity does. **Ex. 20** [Cota Depo] at 20:3-13, 63:25-64:5, 64:24-65:19.

      **Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be

deemed admitted. Plaintiffs' additional narrative is irrelevant.

      In addition to being irrelevant, Plaintiffs' narrative about the "viability" of other

competitors is not supported with admissible evidence.  Plaintiffs ignore undisputed evidence

from one of those competitors, Rebel Athletic, whose Chief Executive Officer filed a sworn

declaration in this Court that it believes it accounts for more than 50% of All Star cheer apparel

in the United States.  (*Rebel* ECF No. 8 at PageID 337.)  Further, Plaintiffs' proposed expert

testimony is inadmissible.  *See* Netz Daubert Mot. ECF No. 382-1 at PageID 8566-8569.

Plaintiffs say "Varsity concedes" that no retailer comes close to Varsity in apparel, but their

source is not "Varsity," it is Ms. Cota: a former employee who admitted she has no knowledge of

the volume of Varsity's apparel sales, or the volume of apparel sales for Varsity's competitors,

for any relevant period of time.  Pls.' Ex. 20 at 327:11-331:23.  Her testimony is thus

inadmissible for lack of personal knowledge and foundation.  Fed. R. Evid. 602.  Plaintiffs cite to

Exhibit 250 without explanation, and they omit the related testimony of Ms. Lauchaire on this

document.  Ms. Lauchaire explained that Varsity did not want SnapChat to allow *Varsity's*

*competitors*, including Nike and Under Armour, to run advertisements over Varsity's content on

SnapChat.  Pls.' Ex. 34, Lauchaire Dep. at 298:12-304:2.  This did not "exclude competitors,"

who could create their own content, or run advertisements with other brands.  This document and

testimony also further support that Varsity saw major apparel brands like Nike and Under

Armour as competitors in apparel.

34.    Certain cheer apparel providers do or did provide certain, but not all, products in
        Plaintiffs' "Cheer Apparel Market."  (See, e.g., ECF No. 388-4 at ¶582 ("Nfinity is a
        cheer apparel company that specializes in shoes."); Ex. BI, Weber Dep. 211:13-18 ("Q: Is

26

that the only vendor that sold merchandise at the All Star World Championship in 2022?
A: No. […] Build a Bowtique, like B-O-W.").)

**Plaintiffs' Response to SUF No. 34: Disputed in part.**

Undisputed that other apparel retailers sold certain products in Plaintiffs' Cheer Apparel Market.

Disputed to the extent the evidence cited suggests Varsity does not dominate the Cheer Apparel Market and does not secure and maintain its dominance by eliminating competition and creating barriers to entry. **Ex. 1** [Netz Rep.] at 56-60; **Ex. 2** [Netz Rebuttal] at 66-69. For example, Defendants conspired extensively to block Varsity's rivals from partnering with non-Varsity apparel companies. *See, e.g.,* **Ex. 150** at –5328-5329; **Ex. 27** [Hill Dep.] at 149:14-151:13; **Ex. 251** at –8717; **Ex. 98** at –4732; PSOF, ¶¶ 113-116.

As another example, Jamie Parrish, Varsity's former Director of Strategy and Special Projects for Varsity All Star, testified about leveraging Varsity's rebate programs to edge out apparel rival Nfinity:

> And I think that's when Nfinity started, you know getting some of that market share. But, you know, if we could go in behind them with our sales rep and push things with the Family Plan and make them deals that they couldn't, you know, refuse, then take – then Nfinity would – you know, they would lose almost every time because we could position other things. We would give them, you know, free registration or we could give them a cut on uniforms or whatever. **Ex. 11** [Parrish Dep.] at 205:16-206:1].

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs' additional narrative is irrelevant.

Plaintiffs' Exhibit 98 has nothing to do with Varsity's competitors' partnering with apparel companies. Plaintiffs cite Exhibit 251 without explanation, and it does not support their assertion. *See* Pls.' Ex. 251 at -8720 (noting that Varsity had "lost 30 accounts to Rebel" and Varsity's "strategy is to be competitive in the market"); *see also Rebel* ECF No. 8 at PageID 337 ("upon information and belief—Rebel has maintained a greater share of that [All Star apparel] market than Varsity since at least 2019."). Plaintiffs' citation to Exhibit 11 does not support their assertion that Varsity "eliminated" competition from Nfinity. Plaintiffs ignore undisputed evidence from Varsity Spirit's former Chief Financial Officer that, at least during his tenure from

2018 to 2021, Nfinity was the market leader in cheer shoes. *See* Pls.' Ex. 38 at 24:10-17.

Otherwise, Plaintiffs cite inadmissible expert opinions. *See* Netz Daubert Mot. ECF No. 382-1.

35. Many major apparel brands, including Adidas, Under Armour, Nike, and Reebok, sell certain products in Plaintiffs' "Cheer Apparel Market" but also sell similar apparel outside of the context of competitive cheer. (Ex. BH, Sadlow Dep. 40:23-25 ("On the school apparel business, really anyone that sells athletic apparel is a competitor to Varsity Spirit."); 41:5-16 ("There are multiple competitors in the school cheer uniform segment. […] I can't give an exhaustive list, but Omni, GTN, Rebel, GK Elite, Nfinity, Adidas, Under Armour. I'm sure there's a lot others that I can't remember."), 42:17-22; ("Q: [C]an you think of any additional competitors -- competitors in the All Star apparel business that you didn't list that are related to the school apparel business? A: Yes. Nike, Blue Linen Athletics, Athletica, Reeboks [sic]."), Ex. AK, Heeb Dep. 157:4-13 ("Q: And Adidas and Under Armour are major apparel brands, aren't they? A: They're large general merchandising competitors. Q: And they sell apparel outside of the context of competitive cheer, right? A: Yes."); *id.* at 158:1-9 ("Q: Nike and Reebok, those are major apparel brands, correct? A: Yes.").)

**Plaintiffs' Response to SUF No. 35: Disputed in part.**

No competent evidence is cited in support of the asserted fact.

Undisputed that the brands identified sell similar apparel outside the context of competitive cheer.

Disputed to the extent the evidence cited suggests Varsity does not dominate Cheer Apparel Market and does not secure and maintain its dominance by creating barriers to entry. **Ex. 1** [Netz Rep.] at 56-60; **Ex. 2** [Netz Rebuttal] at 66-69.

For example, Defendants conspired to block Varsity's rivals from partnering with non-Varsity apparel companies. *See, e.g.,* **Ex. 150** at –5328-5329; **Ex. 27** [Hill Dep.] at 149:14-151:13; **Ex. 251** at –8717; **Ex. 98** at -4732; PSOF, ¶¶ 113-116.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs assert that the statement is not supported by competent evidence, but they ignore the cited evidence, including testimony from Plaintiffs' own proposed expert witness. Plaintiffs' additional narrative is irrelevant. *See also* Defs.' SUF No. 24.

36. Prior to December 10, 2016, Varsity did not make any acquisition of a cheer apparel supplier that Plaintiffs assert was anticompetitive.

**Plaintiffs' Response to SUF No. 36: Disputed.**

28

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Notwithstanding, Plaintiffs do assert that Varsity's acquisitions of cheer apparel suppliers both before and after December 10, 2016 were anticompetitive. PSOF, ¶¶ 95, 96, 99, 102, 103, 106. Plaintiffs and putative class members suffered an illegal overcharge of 11% on Cheer Apparel (as well as an illegal overcharge of 27% on Cheer Competitions and 27% on Cheer Camps) as a result, in part, of Varsity's acquisition strategy. PSOF, ¶ 213. Ultimately, taken as a whole, Varsity's acquisitions and foreclosure strategy served to raise prices, reduce output, and reduce consumer choice across all relevant markets. **Ex. 1** [Netz Rep.] at 113-115; PSOF ¶¶ 95-106, 211-214.

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted.  Plaintiffs respond that the statement is "not supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue.  Plaintiffs' additional narrative and legal conclusions are irrelevant.

Plaintiffs cite their expert's recitation and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.  The only Varsity apparel acquisition mentioned in Plaintiffs' laundry list of cross-references is a t-shirt fundraising company called "Allgoods, LLC" from December 2015.  *See* Pls.' SUF ¶ 96 (citing Pls. Ex. 2 at 85 & Exhibit RR-7.) Plaintiffs offer no evidence that this acquisition was anticompetitive, *i.e.*, that it resulted in higher prices due to reduced output.  Plaintiffs' expert simply lists this acquisition in a timeline of acquisitions, without analysis.  *See* Pls.' Ex. 2 at 85 & Exhibit RR-7 (chart of Varsity acquisitions over time).  Plaintiffs even ignore their own experts, who concede that Allgoods LLC does not produce cheer apparel.  *See* Pls.' Ex. 26 at 164:14-22 ("A. That's not contrary to my understanding.  I don't know that I had that detailed of an understanding.  Q. So you know that they [Allgoods] did not do cheer apparel?  A.  Presumably Varsity saw synergy with the products that it sells.").

37.    On or after December 10, 2016, Varsity did not make any acquisition of a cheer apparel
supplier that Plaintiffs assert was anticompetitive.

**Plaintiffs' Response to SUF No. 37: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by
evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. See Resp. ¶ 36.

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.  Plaintiffs respond that the statement is "not

supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue.

Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have

failed to produce admissible evidence to establish a genuine issue.  Plaintiffs refer to their

response to ¶ 36, which indirectly references only the acquisition of Allgoods LLC in *2015*.  *See*

Defs.' SUF No. 36.  Thus, Plaintiffs have failed to identify any anticompetitive acquisition of a

cheer apparel supplier on or *after* December 10, 2016.

38.    Prior to December 10, 2016, Varsity did not make any acquisition that enabled Varsity to
charge higher prices for cheer apparel.

**Plaintiffs' Response to SUF No. 38: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by
evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. As a result of Varsity's anticompetitive conduct both before
and after December 10, 2016, as set forth in Section V of the PSOF, Varsity had the market
power necessary to raise prices (**Ex. 1** [Netz Rep.] at 37-41; PSOF, ¶¶ 64-65) and did raise
prices, as Plaintiffs and putative class members suffered an overcharge of 11% on Cheer Apparel
(PSOF, ¶ 213).

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.  Plaintiffs respond that the statement is "not

supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue.

Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have

30

failed to produce admissible evidence to establish a genuine issue. Plaintiffs' additional narrative is irrelevant and fails to identify a single acquisition that enabled Varsity to charge higher prices for cheer apparel. Plaintiffs fail to support their asserted fact with admissible evidence; instead, they cite only their expert's recitation and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

39.     On or after December 10, 2016, Varsity did not make any acquisition that enabled Varsity to charge higher prices for cheer apparel.

**Plaintiffs' Response to SUF No. 39: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. See Resp. ¶ 38.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs respond that the statement is "not supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue. Plaintiffs' additional narrative is irrelevant and fails to identify a single acquisition that enabled Varsity to charge higher prices for cheer apparel.

40.     No Varsity acquisition had any effect on prices for the products in Plaintiffs' "Cheer Apparel Market."

**Plaintiffs' Response to SUF No. 40: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, Varsity's acquisitions did affect prices for the products in the Cheer Apparel Market. Plaintiffs and putative class members suffered an overcharge of 11% on Cheer Apparel. PSOF, ¶ 213.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs respond that the statement is "not supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue. Plaintiffs' cite their expert's "overcharge" analysis, but their expert simply compared the prices of two shoes, deemed that price difference an overcharge, and then applied it to the entirety of Plaintiffs' alleged "Cheer Apparel" market. Asserting that the prices of two products are priced differently does not as a matter of logic or economics mean that one of their prices is an "overcharge" for the other. This testimony is inadmissible and non-responsive. *See* Heeb Daubert Mot., ECF No. 388-1 at PageID 10440-10444.

41. No agreement involving the U.S. All Star Federation ("USASF") had any effect on prices in Plaintiffs' "Cheer Apparel Market."

**Plaintiffs' Response to SUF No. 41: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. USASF, Varsity, and Jeff Webb conspired to hurt Varsity's Cheer Apparel rivals and help Varsity to raise its prices in a variety of ways. *See* PSOF, ¶¶114, 133,138, 139, 140, 141, 142, 150, 151, 209. *See also,* **Ex. 11** at 70:22-71:23 (after Varsity partnered with Swarovski Crystal for apparel products, USASF changed its longstanding rule prohibiting athletes from wearing jewelry for safety reasons).

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs respond that the statement is "not supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue. Plaintiffs' cited materials do

32

not support Plaintiffs' suggestion that USASF and Varsity conspired to "help Varsity raise its prices in a variety of ways."

Plaintiffs' additional narrative about Varsity's alleged partnership with Swarovski and USASF's supposed rule changes are irrelevant to whether Varsity had an agreement with USASF and whether such an agreement had any effect on cheer apparel. It is also unsupported. Plaintiffs suggest that Varsity "partnered" with Swarovski and then caused USASF to change a "longstanding rule" prohibiting athletes from wearing jewelry. Plaintiffs fail to support this allegation with admissible evidence. Further, Plaintiffs' citation to Exhibit 11 is inadmissible because the witness lacked personal knowledge and testified without foundation. Fed. R. Evid. 602. Mr. Parrish testified based on speculation, not personal knowledge, as to whether, how, or why USASF changed its rules, or whether Varsity even had a partnership with Swarovski. Pls.' Ex. 11 at 71:20-22 ("I *believe in my heart of hearts* that that is because Varsity had a multimillion dollars contract with Swarovski....") (emphasis added). Plaintiffs also ignore undisputed evidence from the former Varsity employee that was actually in charge of Varsity's apparel business and testified that there was no such partnership with Swarovski outside of a typical manufacturer/supplier relationship, and that Varsity's competitors, like GK Elite, also used Swarovski crystals as rhinestones in their uniforms. *See* Pls.' Ex. 49 at 82:23-83:17. Plaintiffs likewise point to no rule that USASF has ever had, let alone changed, related to the use of rhinestones embedded in uniforms.

42.     Cheer apparel is typically sold by sales representatives in one-on-one interactions with customers. (Ex. BE, Minzghor Dep. Tr. 136:7-16 ("Q: What is the process that Fusion Elite goes through to obtain the uniforms for its cheerleading athletes? How does that process work? A: Usually contact the company. There's a design process, a prototype process, and then an ordering process. Q: And when you say you contact the company -- A: A sales rep.").)

**Plaintiffs' Response to SUF No. 42: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

43.  Varsity and its competitors maintain relationships with gyms and schools to facilitate sales. (Ex. BJ, Kennedy Dep. 46:17-47:13 ("Q: If Varsity says in promotional materials, Varsity is the respected brand with respect to All Star uniforms, what does that mean? [...] [W]hat is it that renders Varsity respected, in your -- in your view? [...] A: In my view, I would say that it's the relationships between the specialist and the gyms, and the services that they provide."); Ex. BH, Sadlow Dep. 37:10-17, 231:1-232:11.)

**Plaintiffs' Response to SUF No. 43: Disputed in part.**

Because the cited material does not include "competitors," the assertion is not supported by competent evidence, fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a), and thus fails to state an undisputed material fact.

Undisputed that Varsity maintains relationships with gyms and schools to facilitate sales (indeed, Varsity concedes that its "███████████████" with customers "████████████
████████████" for other brands. **Ex. 98** at -4732.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be

deemed admitted. Plaintiffs' additional narrative is irrelevant.

44.  There are many channels available to sell cheer apparel, including the Internet. (Ex. AS, Newby Decl. ¶4.)

**Plaintiffs' Response to SUF No. 44: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

45.  Merchandise sold at cheer competitions are typically souvenirs, not athletic gear for competitions. (Ex. BK, VAR00009293 at -329; Ex. BL, Hill Dep. 330:5-13; Ex. BG, L. Gurske Dep. 353:17-20.)

**Plaintiffs' Response to SUF No. 45: Disputed.**

The evidence cited does not support the fact asserted, as the document only states: "At the largest events Varsity Spirit sells event merchandise via the Varsity Spirit Shop division of Varsity Spirit." This document does not define event merchandise, does not say that Varsity does *not* sell athletic gear for competitions at its events, and in no way rules such sales out.

Moreover, disputed. Varsity sells apparel at competitions, and Defendants took coordinated anticompetitive action to hurt Varsity's Cheer apparel rivals, including by (1) blocking other retailers from selling at competitions, or near competitions and (2) giving Varsity access to confidential rule changes and proposed penalties that USASF intended to implement as

rulemaking body over apparel. **Ex. 1** [Netz Rep.] at 59, n.229; **Ex. 12** at 112:8-14; **Ex. 20** [Cota Dep.] at 218:18-244; PSOF, ¶¶ 113-116.

 **Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted.  Plaintiffs respond that the statement is "not supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue.  Plaintiffs' additional narrative and legal conclusions about "coordinated anticompetitive action" are irrelevant and does not create a genuine dispute of material fact.

 Plaintiffs' response disputing that merchandise sold at competitions primarily consists of souvenirs is not supported by their cited material.  Plaintiffs' citation to Exhibit 12 merely states that Varsity sells All Star apparel with no reference to the particular channels through which such All Star apparel is sold.  See Pls.' Ex. 11 at 112:8-14 ("Q. Varsity sells All Star apparel; is that right? A. Yes, that's correct.").  Plaintiffs' citation to Exhibit 20 consists entirely of Plaintiffs' counsel reading out loud the contents of an internet article about "Varsity's hardball tactics" to Ms. Cota, followed by Ms. Cota's acknowledgement that she can see the document presented to her.  See Pls.' Ex. 20 at 218:18-24 ("Q.  And if you turn to page 4 of 7, last paragraph there, the article reads... ...Do you see that?  A.  I do.").  Plaintiffs also cite their expert's recitation and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

46. Varsity, like its competitors, generally does not allow its apparel competitors to sell apparel at its own competitions.  (Ex. AS, Newby Decl. ¶5.)

 **Plaintiffs' Response to SUF No. 46: Disputed in part.**

 Undisputed that Varsity generally does not allow apparel competitors to sell apparel at its competitions; indeed, Varsity conspired with other Defendants to block Cheer Apparel rivals.

*See* PSOF ¶¶ 113-116. Disputed that Varsity's conduct in this manner is "like its competitors" and no competent evidence is cited in support.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs respond that the statement is "not supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue. Plaintiffs' additional narrative is irrelevant.

47.    Competitors of Varsity often sell cheerleading-related items in close proximity to Varsity cheer competitions, such as at pop-up booths immediately outside the venue in which the Varsity cheer competition is being held. (Ex. BG, Hill Dep. 330:16-331:19.)

**Plaintiffs' Response to SUF No. 47: Disputed in part.**

This fact is incomplete, inaccurate, and misleading. No competent evidence is cited in support. The testimony cited by Defendants (presumably Exhibit BL, not Exhibit BG) relates to the Worlds competition, which is technically a USASF event, not a Varsity event. The witness cited admits he has no direct personal knowledge of USASF's policies regarding vendors: "I don't recall who – who exactly oversaw the sales of those t-shirts." *See* Defendants' Exhibit BL, Deposition of Jim Hill at 330:10-11. Further, Defendants omit directly contradicting testimony on the preceding page: "I don't recall any type of vendor mall or anything like that at Worlds." **Ex. 27** [Hill Dep.] at 329:5-6.

Disputed to the extent Defendants suggest USASF and Varsity did not coordinate to prevent apparel manufacturers, including GK and Nfinity, from selling products near USASF's Worlds competition. **Ex. 151** at –1243; *see also* **Ex. 14** [Peterson Dep.] at 462:10-463:3. And, as noted in Resp. ¶¶ 34 and 45, Varsity imposed significant barriers to entry on other apparel manufacturers by prohibiting them from selling apparel at Varsity Cheer Competitions.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact as to whether competitors of Varsity often sell cheerleading-related items in close proximity to Varsity cheer competitions, and this fact should be deemed admitted. Plaintiffs additionally assert that Varsity's refusal to share space with other apparel producers at Varsity's own competitions is a "barrier to entry." Plaintiffs do not support their suggestion that such refusals could have had any possible effect on competition with any evidence.

36

48.    Results at Varsity cheer competitions were not affected by the brand of apparel worn. (See, e.g., Ex. BM, VAR00233675 at -677-712 (demonstrating through detailed collection of materials providing scoring guidance that scores did not depend on which apparel brand cheer participants wore); Ex. BN, VAR00302098 at -098-099 (example scoring sheet showing that participants were not evaluated based on which apparel brand they wore); Ex. BO, VAR00147772 at -772-773 (same).

**Plaintiffs' Response to SUF No. 48: Disputed.**

The evidence cited does not support the fact asserted. That the example scoring sheet cited by Varsity does not include Varsity apparel criteria does not preclude the possibility that judges considered or were influenced by whether a team was wearing Varsity Cheer Apparel. At least one parent of a Cheer Athlete testified that "[t]eams that wear the Varsity apparel" "do better" even "if [the] team has several falls and not as clean of a routing as a team with a similarly difficult routine[] that has a clean one…….." **Ex. 19** [Cherasaro Dep.] at 58:18-59:7.

**Defendants' Reply:**  As demonstrated by Plaintiffs' own language that Defendants' support "does not preclude the possibility," Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted.  Plaintiffs respond that the statement is "not supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue.  Plaintiffs do not controvert this fact with admissible evidence.  Plaintiffs' citation to Exhibit 19 is both inadmissible hearsay and inadmissible because the witness lacked personal knowledge and testified without foundation.  Fed. R. Evid. 602; Fed. R. Evid. 802.  *See* Pls.' Ex. 19 at 56:10-15 ("Q. Are you aware of any USASF rule that favored Varsity apparel?  A.  I've heard of it before.  But do I know it for a fact? No.").  Ms. Cherasaro's testimony on this issue was based on only her personal *opinion*—rather than fact from personal knowledge—that her own daughter did not deserve to win a bid to a Varsity competition and was only awarded it because her daughter's team wore Varsity apparel. Pls.' Ex. 19 at 56:10-57:6 ("Q. So you're saying your daughter's team didn't deserve a Summit bid?  A.  Absolutely.").

37

49.    The prices for whatever Varsity "apparel" products that Plaintiffs seek damages in relation to were not higher than they would have been in the absence of whatever conduct Plaintiffs assert was anticompetitive.

**Plaintiffs' Response to SUF No. 49: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Plaintiffs and putative class members suffered an overcharge of 11% on Cheer Apparel as a result of the conduct Plaintiff assert was anticompetitive. PSOF, ¶ 213.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs respond that the statement is "not supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue. Plaintiffs' additional narrative is irrelevant. Plaintiffs cite their expert's "overcharge" analysis, but Dr. Heeb simply compared the prices of two shoes, deemed that price difference an overcharge, and then applied it to the entirety of Plaintiffs' alleged "Cheer Apparel" market. Asserting that the prices of two products are priced differently does not as a matter of logic or economics mean that one price is an "overcharge" for the other. *See* Heeb Daubert Mot., ECF No. 388-1 at PageID 10440-10444.

50.    Dr. Heeb's damages analysis related to apparel was conducted based on prices in one product: sneakers. (ECF No. 388-3 at ¶¶300, 303; ECF No. 388-4 at ¶20.)

**Plaintiffs' Response to SUF No. 50: Disputed.**

Disputed to the extent Defendants suggest Heeb's damages analysis is incomplete. Dr. Heeb developed a conservative estimate of Varsity's percentage overcharge using an appropriate benchmark, then estimated damages by applying the overcharge percentage to Varsity's apparel pricing data—a common and accepted technique. **Ex. 3** [Heeb Rep.] at ¶¶284-285, 301, 308, 320-323.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs' additional narrative is irrelevant.

51.    Dr. Heeb's damages analysis did not use prices for any other apparel product. (ECF No. 388-3 at ¶¶300, 303; ECF No. 388-4 at ¶20.)

**Plaintiffs' Response to SUF No. 51: Disputed.**

Disputed as inaccurate and misleading. See Resp., ¶50.

**Defendants' Reply:**  Plaintiffs admit this fact in relevant part, and this fact should be

deemed admitted.  Plaintiffs' additional narrative is irrelevant.

52.    Prior to December 10, 2016, Varsity did not make any acquisition of a school cheer event producer (or school cheer event) that Plaintiffs assert was anticompetitive.

**Plaintiffs' Response to SUF No. 52: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Beginning in the mid-2000s, Varsity set out to acquire nearly all of its competitors in the school competitions market, including the National Cheerleaders Association and the United Spirit Association, among others. Varsity acquired dominant shares of the cheer competitions and camps markets in the years before 2016 through these acquisitions. **Ex. 1** [Netz Rep.] at 15 ("There are at least three organizations that promote School Cheer Competitions and Camps: NCA, UCA, and the USA. Varsity owns and controls all three."); *id*. at n.51; **Ex. 3** [Heeb Rebuttal] at ¶195.

Varsity directed other anticompetitive efforts toward the School Cheer market as a part of its strategy. For example, one of the stated goals of Varsity's IMPACT/VIP Branding Program was to monopolize the School Cheer market. **Ex. 163** –4354 ("We can do more with VIP brand, and own the intellectual property of every high school in America."); **Ex. 164** at –3560 (" ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████ ") (emphasis added.)

Varsity has been successful in its efforts. School Cheer comprised 68% of its revenue in 2016. **Ex. 107** at –4154. And ultimately, taken as a whole, Varsity's acquisitions and foreclosure strategy served to raise prices, reduce output, and reduce consumer choice across all relevant markets. **Ex. 1** [Netz Rep.] at 113-115; PSOF, ¶¶ 95-106, 211-214.

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.  Plaintiffs respond that the statement is "not

supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue.

Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have

failed to produce admissible evidence to establish a genuine issue. Plaintiffs' identification of three acquisitions from 2004 is supported only by their expert's recitation and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

Plaintiffs' additional narrative about branding programs and Varsity's purported market power are irrelevant and do not create a genuine dispute of material fact. Regardless, neither Plaintiffs' Exhibit 163 nor Exhibit 164 contain any statements stating or even suggesting that a "stated goal of Varsity's IMPACT/VIP Branding Program was to monopolize the School Cheer market." Plaintiffs' cited material does not even mention school competitions. The quoted language from Exhibit 163 is among a list of thoughts related to sporting goods sold by BSN, a separate company owned by Varsity Brands that is not involved in cheerleading and not subject to this litigation. Pls.' Ex. 163. Plaintiffs' Exhibit 164 references IMPACT/VIP Branding in the context of unspecified cross-selling efforts, sales of mascots to schools, and facility branding.

53.    On or after December 10, 2016, Varsity did not make any acquisition of a school cheer event producer or school cheer event. (ECF No. 388-3 at Table 15 (summarizing acquisitions of event producers by Varsity, which only included All Star event producers); Ex. AK, Heeb Dep. 288:4-10 ("Q. You don't describe any Varsity acquisitions of scholastic event producers or school cheer event producers in your reports, correct? A. That's right. Q. And you acknowledge that no school cheer acquisitions occur during the class period, right? A. Not that I'm aware of, no.").)

   **Plaintiffs' Response to SUF No. 53: Undisputed for purposes of summary judgment only.**

   **Defendants' Reply:** No response required.

54.    On or after December 10, 2016, Varsity did not make any acquisition of a school cheer event producer (or school cheer event) that Plaintiffs assert was anticompetitive.

   **Plaintiffs' Response to SUF No. 54: Disputed in part.**

   This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

   Disputed that Varsity's acquisitions before that date did not continue to have an anticompetitive effect following that date. By eliminating major rivals, including its acquisition

of EPIC Brands in 2018, Varsity's market share in Cheer Competitions grew from 42% in 2013 to 80-85% in 2018, and Plaintiffs and putative class members suffered an overcharge of 27% on Cheer Competitions as result. *See* PSOF, ¶¶ 95-98, 213; **Ex. 1** [Netz Rep.] at 592-96; **Ex. 20** [Cota Dep.] at 53:15–21; PSOF, ¶ 213. Ultimately, Varsity's acquisitions and foreclosure strategy served to raise prices, reduce output, and reduce consumer choice across all relevant markets. **Ex. 1** [Netz Rep.] at 113-115; PSOF ¶¶ 95-106, 211-214

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs do not dispute that Varsity did not make any acquisition of a school cheer event producer after December 10, 2016. *See* Pls.' Resp. to Defs.' SUF No. 53. Obviously, if there were no such acquisitions after December 10, 2016, none could have been anticompetitive.

Plaintiffs additional narrative is irrelevant. Plaintiffs also cite their expert's recitation and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

55.    Prior to December 10, 2016, Varsity did not make any acquisition of a school cheer event producer (or school cheer event) that enabled Varsity to charge higher prices for cheer events.

**Plaintiffs' Response to SUF No. 55: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Varsity both had the market power necessary to raise prices (**Ex. 1** [Netz Rep.] at 37-41; PSOF, ¶¶ 60, 61, 65), and it did raise prices, as Plaintiffs and putative class members suffered an overcharge of 27% on Cheer Competitions. PSOF, ¶ 213.

One means by which Varsity was able to charge higher event prices was through its counterprogramming strategy (*See* PSOF, ¶¶ 109-112), which it would use to consistently acquire event rivals then just cancel the acquired events so as to get ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," resulting in both higher fees and reduced output for customers. **Ex. 127** at –1775; **Ex. 58** at –5065; **Ex. 12** [Elza Dep.] at 284:14-285:13, 230:23-232:1; **Ex. 123** at –1396 **Ex. 125**; **Ex. 1** [Netz Rep.] at 45-47, n. 183, 103-104; **Ex. 2** [Heeb Rep.] at 284-285, Tables 19 and 20.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs respond that the statement is "not supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue.

41

Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue. Plaintiffs' additional narrative about All Star competitions is irrelevant as to school competitions.

Plaintiffs' proposed expert testimony relating to so-called "counterprogramming" and purported overcharges in *All Star* competitions is irrelevant as to school competitions and otherwise inadmissible. *See* Netz Daubert Mot., ECF No. 382-1; Heeb Daubert Mot., ECF No. 388-1 at PageID 10444-10448.

56.    On or after December 10, 2016, Varsity did not make any acquisitions of a school cheer event producer (or school cheer event) that enabled Varsity to charge higher prices for cheer events.

   **Plaintiffs' Response to SUF No. 56: Disputed.**

   This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

   Notwithstanding, disputed. Varsity both had the market power necessary to raise prices (**Ex. 1** [Netz Rep.] at 37-41; PSOF, ¶¶ 60, 61, 65) and it did raise prices, as Plaintiffs and putative class members suffered an overcharge of 27% on Cheer Competitions. PSOF, ¶¶ 213.

   **Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs respond that the statement is "not supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue. Plaintiffs' additional narrative about All Star competitions is irrelevant as to school competitions. Plaintiffs' proposed expert testimony relating to purported overcharges in All Star competitions is irrelevant as to school competitions and otherwise inadmissible. *See* Netz Daubert Mot., ECF No. 382-1; Heeb Daubert Mot., ECF No. 388-1 at PageID 10444-10448.

57.    Prior to December 10, 2016, Varsity did not make any acquisition of a school cheer event producer (or school cheer event) that was anticompetitive.

**Plaintiffs' Response to SUF No. 57: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a). It also attempts to pass a legal judgment as a statement of fact. Such arguments are inappropriate in a statement of material facts. *See, e.g.*, *Sutton v. CHSPSC, LLC*, No. 116CV01318STAEGB, 2018 WL 3318961, at *2 (W.D. Tenn. July 5, 2018).

Notwithstanding, disputed. Plaintiffs do assert that Varsity made anticompetitive acquisitions of cheer event producers before 2016 that resulted in Plaintiffs and putative class members suffering an overcharge of 27% on Cheer Competitions. **Ex. 1** [Netz Rep.] at 92-96; PSOF, ¶¶ 213. Ultimately, Varsity's acquisitions strategy both before and after December 10, 2016 served to raise prices, reduce output, and reduce consumer choice across all relevant markets. **Ex. 1** [Netz Rep.] at 113-115; PSOF ¶¶ 95-106, 211-214.

One means by which Varsity was able to charge higher event prices was through ███████████████████████████████████████████████████ resulting in both higher fees and reduced output. **Ex. 127** at –1775; **Ex. 58** at –5065; **Ex. 12** [Elza Dep.] at 284:14-285:13, 230:23-232:1; **Ex. 123** at –1396 **Ex. 125**; **Ex. 1** [Netz Rep.] at 45-47, n. 183, 103-104; **Ex. 2** [Heeb Rep.] at 284-285, Tables 19 and 20.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs respond that the statement is "not supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue. Plaintiffs' additional narrative about All Star competitions is irrelevant as to school competitions. Plaintiffs' proposed expert testimony relating to acquisitions of All Star competitions and purported overcharges in All Star competitions is irrelevant as to school competitions and otherwise inadmissible. *See* Netz Daubert Mot., ECF No. 382-1; Heeb Daubert Mot., ECF No. 388-1 at PageID 10444-10448.

58.     On or after December 10, 2016, Varsity did not make any acquisitions of a school cheer event producer (or school cheer event) that was anticompetitive.

**Plaintiffs' Response to SUF No. 58: Disputed in part.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a). It also attempts to pass a legal judgment as a statement of fact. Such arguments are inappropriate in a statement of material facts. *See, e.g.*, *Sutton v. CHSPSC, LLC*, No. 116CV01318STAEGB, 2018 WL 3318961, at *2 (W.D. Tenn. July 5, 2018).

Undisputed that Varsity did not acquire an event producer after December 10, 2016.

Disputed that Varsity's acquisitions before that date did not continue to have an anticompetitive effect following that date. By eliminating major rivals, Varsity's market share in cheer competitions grew from 42% in 2013 to 80-85% in 2018, and Plaintiffs and putative class members suffered an overcharge of 27% on Cheer Competitions as a result. *See* PSOF, ¶¶ 99-101;**Ex. 1** [Netz Rep.] at 92-96; **Ex. 20** [Cota Dep.] at 53:15–21; PSOF, ¶¶ 95-98.

**Defendants' Reply:**  Plaintiffs admit the fact in relevant part, and this fact should be deemed admitted.  Indeed, Plaintiffs specifically admit that it is "undisputed that Varsity did not acquire an event producer after December 10, 2016."  As this is the only fact asserted in Defendants' statement No. 58, Plaintiffs' additional narrative is irrelevant.  Plaintiffs cite their expert's recitation and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

59.    Varsity did not "counterprogram" (as Plaintiffs' use that term) school events.

**Plaintiffs' Response to SUF No. 59: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. That Varsity did not have to counterprogram competitors' events on the same scale that it did in the All Star market merely serves to confirm that Varsity already controlled the vast majority of the School Competitions Market. See Resp., ¶52.

**Defendants' Reply:**  Plaintiffs admit the fact in relevant part, and this fact should be deemed admitted.  Plaintiffs' additional narrative is irrelevant.  To the extent Plaintiffs imply that Varsity counterprogrammed school events at all on any "scale," Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue.

60.     When Varsity "counterprogrammed" (as Plaintiffs' use that term) an event, output of
        opportunities to participate in an All Star cheer competition increased.  (Ex. AK, Heeb
        Dep. 303:15 ("Customers might benefit from that short-run competition."); Ex. BC,
        Duhon Dep. 38:13-24 (explaining that Varsity added new events "[t]o give other options
        to customers in that area"); Ex. BQ, Elza Dep. 185:20-24 ("It was part of our strategy to
        look across the board and see where successful events were.  If there was an opportunity
        to put another event in a similar market in the same week, then we did do that.").)

**Plaintiffs' Response to SUF No. 60: Disputed.**

        Counterprogramming resulted in *decreased*, not increased, opportunity to participate in
competitions. Counterprogramming was a concerted policy that Varsity employed with the
explicit goal of hurting rival event producers. **Ex. 125** (Varsity: "As you know we often put
events on other events to hurt our competitors.") (emphasis added); **Ex. 143** at –8899 (Varsity:
"So far this season there are 3 non Varsity events that are in danger...due to low
attendance...None of this would be possible without a team effort and targeted approach on
where to put the Varsity All Star Events.")

        After edging competitors' events out, Varsity would often acquire them, only to then
cancel the acquired, "████████████████████████████████████████
████████████████     **Ex. 127** at –1775. The record is rife with examples of this internal strategy:

        **Ex. 12** [Elza Dep.] at 284:9- 285:13: Varsity "had too many events" after
        acquiring JAM Brands and decided to cancel certain Varsity or JAM Brand
        events; this strategy ultimately resulted in fewer choices for gyms and teams: Q.
        So the JAM Brands acquisition was the acquisition of its – of Varsity's largest
        competitor at the time in the All Star market; is that right? A. Yes. Q. And then
        there's a dash after this bullet point that says 'in line with the broader strategy
        to,' and it lists some items. The first is 'consolidate event footprint around most
        profitable events.' What does that mean? A. We had too many events at the time,
        and we were looking to eliminate a number of those events to drop participation
        in certain events. Q. And when you say you 'had too many events,' that's
        because of the acquisition of the JAM Brands; so you had too many – Varsity
        was now running too many events in the same regions at the same time; is that
        right? A. That's correct. Q. And so as a result of the JAM Brand acquisition, you
        at Varsity decided to cancel certain Varsity events or JAM Brand events; is that
        right? A. Yes, that is correct. Q. And so as a result of the acquisition of JAM, at
        least in certain regions, there were fewer events for gyms and participants to
        attend; is that right? A. Yes, that would be correct.";

        **Ex. 12** [Elza Dep.] at 230:23-231:1: Q. And you're saying that after the JAM
        Brands acquisition, Varsity would likely cancel certain events; is that right? A.
        Yes. We did that often.";

        **Ex. 123** at –1396: 12/7/2017, Email from J. Nichols (Varsity): In xxxx, Varsity
        acquired Mardi Gras, and then proceeded to cancel its major event, the JAMFest
        Cajun Jam. "Plan would be to cancel JAM [Cajun Jam] and move all those teams

to MARDI GRAS" to which John Nichols responded, "…need to cancel the Jam event.");

**Ex. 124** at –5529 (5/23/2018, Email from J. Lomba (reflecting cancellation of JAMfest);

**Ex. 125** ("As you know we often put event on other events to hurt our competitors."… "Strategy worked, and now Mardi Gras is sitting around 60 ish teams and JAM at 70." … "If Mardi Gras doesn't hit 125 teams they lose their Tier 1 Status." … "Plan would be to cancel JAM and move all of those teams to MARDI GRAS.")

*See also,* **Ex. 1** [Netz Rep.] at 45-47, n. 183, 73-81, 103-104; **Ex. 3** [Heeb Rep.] at 284-285, Tables 19 and 20; PSOF, ¶¶ 109-112.

Disputed that Dr. Heeb is quoted out of context. The full statement reads: "Taken in isolation and without thinking about what would happen afterwards if the other event is harmed or the other event is acquired and simply looking at the very short-run effect, then the answer is yes. Customers might benefit from that short-run competition."

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs do not support their assertion that overall opportunities to attend All Star events decreased. Plaintiffs cite evidence that is irrelevant or which simply reflects greater competition as a result of what Plaintiffs call "counterprogramming." If a rival event lost customers because they preferred to attend a Varsity event instead, even if the rival event lost a World bid as a result, that is not a material decrease in output that is relevant for purposes of antitrust law. It cannot be anticompetitive for consumers to simply prefer one seller over another, even if that results in a loss of business for one seller. Plaintiffs also cite their expert's recitation and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

61.   The USASF sanctions events that adhere to its rules and requirements. (Ex. BK, VAR00009293 at -355, -357 (showing that USASF's "primary focus" is to standardize rules across events and that USASF "credentials coaches, certifies safety judges, sanctions events and maintains safety guidelines…"); Ex. K, Fowlkes Dep. 38:21-40:25.)

**Plaintiffs' Response to SUF No. 61: Disputed in part.**

Undisputed that USASF sanctions events that adhere to its rules.

Disputed that the evidence cited states that the above was USASF's "primary focus." The evidence instead shows that Varsity created USASF as a means of controlling the sport, maintaining market dominance, and driving profits for the Defendants. *See* PSOF, ¶¶131-147, 157, 158, 163, 196, 208, 209.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs' additional narrative is irrelevant.

As to Plaintiffs' response disputing whether the evidence cited in fact states that "standardized rules, divisions and athlete safety" are USASF's "primary focus," Defendants respectfully direct Plaintiffs to Defendants' Exhibit BK. *See* Ex. BK at -355 (for USASF, under column labeled "Primary Focus": "Standardized rules, divisions and athlete safety"); *see also id*. at -357 ("[t]he organization credentials coaches, certifies safety judges, sanctions events and maintains and adjusts safety guidelines..."). Additionally, Plaintiffs cite their expert's recitation and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

62.    USASF had no involvement in school competitions at all. (Ex. CZ, Newby Dep. 632:5-9 ("Q. And does the USASF have anything to do with those events, either in terms of owning the event or promoting it? A. Nothing at all to do with any school events."); Ex. BJ, Kennedy Dep. 209:1-9; Ex. AY, Lorenzen Dep. 191:22-202:19.)

**Plaintiffs' Response to SUF No. 62: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

63.    There was no agreement between Varsity (or any other Defendant) and USASF that had any anticompetitive effect on school competitions.

**Plaintiffs' Response to SUF No. 63: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a). It also attempts to pass a legal judgment as a statement of fact. Such arguments are inappropriate in a statement of material facts. *See, e.g.*, *Sutton v. CHSPSC, LLC*, No. 116CV01318STAEGB, 2018 WL 3318961, at *2 (W.D. Tenn. July 5, 2018).

Notwithstanding, disputed. While USASF is the governing body for All Star Cheer, the evidence shows that the entire Varsity ecosystem, including school competitions, was influenced by Defendants' coordinated exclusionary conduct in All Star Competitions and in Cheer Apparel.

*See* PSOF, Section VI [Concerted Conduct]; **Ex. 1** [Netz Rep.] at 62-65; **Ex. 2** [Netz Rebuttal] at 61-66; **Ex. 60** at -7207; **Ex. 64** at 4544.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs respond that the statement is "not supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue. Plaintiffs' additional conjecture about Varsity's "ecosystem" is irrelevant as to whether any purported agreement between Varsity and USASF had any effect on school competitions. Plaintiffs cite their expert's recitation and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

64. The cheer competitions known as "Worlds," "The Summit," and "U.S. Finals" are for All Star teams only. (Ex. Q, Netz Dep. 62:25-63:21.)

    **Plaintiffs' Response to SUF No. 64: Undisputed for purposes of summary judgment only.**

    **Defendants' Reply:** No response required.

65. Scholastic cheer teams may not enter the cheer competitions known as "Worlds," "The Summit," and "U.S. Finals." (Id.)

    **Plaintiffs' Response to SUF No. 65: Undisputed for purposes of summary judgment only.**

    **Defendants' Reply:** No response required.

66. All Star teams and scholastic teams are not permitted to compete against each other. (Ex. Q, Netz Dep. 62:7-15 ("Q: [Y]ou agree that All Star and School Cheer teams often attend different competitions; right? A. I agree. And at their competitions, they compete in different divisions such that All Star Cheer teams and School Cheer teams don't compete against each other; right? A. Correct."); Ex. CZ, Newby Dep. 625:12-626:8 ("Q: Well, when -- the competition at NCA event is between school competition teams, correct? A: The NCA High School Championship would only have school teams. [...] Q: So, for example, gym-sponsored teams don't participate in NCAA [sic]? A: To the best of my knowledge, they -- [there] would not have been divisions where they -- they could compete. [...] Q: Okay. And is there -- is there any point in the kind of Varsity world where the NCA school teams compete in competitive cheer with gym-sponsored teams? A: Not to my knowledge.").)

**Plaintiffs' Response to SUF No. 66: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

67. Because All Star teams are not permitted to compete in a scholastic competition, an All Star gym could not substitute a scholastic competition for an All Star competition. Ex. BG, L. Gurske Dep. 317:22-318:1 ("Q. Okay. Could -- could your All Star cheer team attend sideline cheer competitions if -- A: No. Q: -- they wanted to? A. No."); Ex. Q, Netz Dep. 64:5-7 ("Q: Only School Cheer teams may attend school end-of-season events; right? A. Yes."); Ex. BE, Minzghor Dep. 223:11-23 ("Q: So could Fusion's All Star cheer athletes perform their routines at sideline cheer competitions? A: No."); Ex. BG, L. Gurske Dep. 318:6-15 ("All Star athletes are not sideline cheerleaders. Q: So because you're not associated with a sports team, you cannot enter [...] sideline cheer? A. Correct. And our routines are completely different.").)

**Plaintiffs' Response to SUF No. 67: Disputed.**

Disputed as to use of "scholastic competition," as Defendants attempt to muddy Plaintiffs' Definition of Competitive Cheer by including irrelevant groups (*see* Resp., ¶1). Moreover, many athletes participate in both All Star cheer and school cheer. *See* **Ex. 27** [Hill Dep.] at 223:21-22; **Ex 30** Jones at 224:9-15. Regardless of whether an athlete competes on an All Star Cheer or School Cheer team, both activities are essentially the same. **Ex. 1** [Netz Rep.] at 3 ("Competitive Cheer is a distinct sport for teams associated with gyms and schools. Unlike traditional sideline cheerleading, Competitive Cheer teams compete head-to-head against each other in events with unique, choreographed, and highly acrobatic routines that last two and a half minutes. The season culminates in national championship events which teams endeavor to attend."); *id*. at 42 ("If a putative monopolist that controlled all All Star competitions raised price by 5-10% for a year, athletes may choose to leave an All Star team and join a School team.

Similarly, if a putative monopolist that controlled all School competitions raised price by 5-10% for a year, athletes may choose to leave a School team and join an All Star team."). **Ex. 33** [Kennedy Dep.] at 302:12-308:7.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs suggest that "many athletes participate in both All Star cheer and school cheer." They ignore the undisputed evidence that regardless of whether some athletes may participate in both forms of cheer, an All Star team could not enter a scholastic cheer competition.

Plaintiffs do not support their assertion that All Star cheer and school cheer activities "are essentially the same" with admissible evidence. Plaintiffs' sole support for this assertion is an

49

uncited Executive Summary of their expert's report.  *See* Pls.' Ex. 1 at 3.  Plaintiffs' expert's

summary of her recitation and interpretation of documents is inadmissible. Fed. R. Evid. 702,

403.  Further, Plaintiffs' citation to Exhibit 33 directly contradicts Plaintiffs' assertion that "both

activities are essentially the same."  *See* Pls.' Ex. 33 at 302:21-303:5 ("The actual rules are

different on what some school teams can do, and what All Star teams can do.  I'm not sure how

familiar you are, but there's like -- there's All Star levels, where -- where they compete within

that level.  On a school team, it's -- they are more on the sidelines. More by division. And they

have different -- they have different sets of rules.").

68.    Because scholastic cheer teams are not permitted to compete in an All Star competition, a
       scholastic cheer team could not substitute an All Star competition for a scholastic
       competition.  (Ex. CZ, Newby Dep. 625:2-8 ("Q: Okay. And is there -- is there any point
       in the kind of Varsity world where the NCA school teams compete in competitive cheer
       with gym- sponsored teams? A: Not to my knowledge"); Ex. BG, L. Gurske Dep. 318:6-
       15 ("All Star athletes are not sideline cheerleaders. [...] And our routines are completely
       different."); Ex. BE, Minzghor Dep. 223:2-23.)

       **Plaintiffs' Response to SUF No. 68: Disputed.**

       See Resp., ¶67.

       **Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.  Plaintiffs suggest that "many athletes participate

in both All Star cheer and school cheer."  They ignore the undisputed evidence that regardless of

whether some athletes may participate in both forms of cheer, a school cheer team could not

enter an All Star cheer competition.

       Plaintiffs do not support their assertion that All Star cheer and school cheer activities "are

essentially the same" with admissible evidence.  Plaintiffs' sole support for this assertion is an

uncited Executive Summary of their expert's report.  *See* Pls.' Ex. 1 at 3.  Plaintiffs' expert's

summary of her recitation and interpretation of documents is inadmissible. Fed. R. Evid. 702,

403.  Further, Plaintiffs' citation to  Exhibit 33 directly contradicts Plaintiffs' assertion that "both

50

activities are essentially the same." *See* Pls.' Ex. 33 at 302:21-303:5 ("The actual rules are

different on what some school teams can do, and what All Star teams can do.  I'm not sure how

familiar you are, but there's like – there's All Star levels, where -- where they compete within

that level.  On a school team, it's -- they are more on the sidelines. More by division. And they

have different -- they have different sets of rules.").

69.    A cheer team literally cannot substitute a scholastic competition for an All Star
       competition, or vice versa.  (Ex. BG, L. Gurske Dep. 317:22-318:1 ("Q. Okay. Could --
       could your All Star cheer team attend sideline cheer competitions if -- A: No. Q: -- they
       wanted to? A. No."); Ex. Q, Netz Dep. 64:5-7 ("Q: Only School Cheer teams may attend
       school end-of-season events; right?  A.  Yes."); Ex. CZ, Newby Dep. 625:2-8 ("Q: Okay.
       And is there -- is there any point in the kind of Varsity world where the NCA school
       teams compete in competitive cheer with gym-sponsored teams? A: Not to my
       knowledge"); Ex. BG, L. Gurske Dep. Tr. 318:6-15 ("Q: So because you're not
       associated with a sports team, you cannot enter [...] sideline cheer? A. Correct."); Ex. BE,
       Minzghor Dep. 223:2-23.)

**Plaintiffs' Response to SUF No. 69: Disputed.**

See Resp., ¶67.

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.  Plaintiffs suggest that "many athletes participate

in both All Star cheer and school cheer."  They ignore the undisputed evidence that regardless of

whether some athletes may participate in both forms of cheer, an All Star team literally cannot

substitute an All Star cheer competition for a school cheer competition and vice-versa.

Plaintiffs do not support their assertion that All Star cheer and school cheer activities "are

essentially the same" with admissible evidence.  Plaintiffs' sole support for this assertion is an

uncited Executive Summary of their expert's report.  *See* Pls.' Ex. 1 at 3.  Plaintiffs' expert's

summary of her recitation and interpretation of documents is inadmissible. Fed. R. Evid. 702,

403.  Further, Plaintiffs' citation to  Exhibit 33 directly contradicts Plaintiffs' assertion that both

activities are essentially the same.  *See* Pls.' Ex. 33 at 302:21-303:5 ("The actual rules are

different on what some school teams can do, and what All Star teams can do.  I'm not sure how familiar you are, but there's like – there's All Star levels, where -- where they compete within that level.  On a school team, it's -- they are more on the sidelines. More by division. And they have different -- they have different sets of rules.").

70.    School cheer teams are affiliated with a school.  (ECF No. 1 at ¶¶48, 52; Ex. Q, Netz Dep. 60:20-61:2; Ex. BQ, Elza Dep. 59:24-60:2; Ex. BH, Sadlow Dep. 38:5-11, 39:2-10.)

   **Plaintiffs' Response to SUF No. 70: Undisputed for purposes of summary judgment only.**

   **Defendants' Reply:**  No response required.

71.    All Star cheer teams are affiliated with a gym.  (ECF No. 1 at ¶¶48-49, 51; Ex. Q, Netz Dep. 60:11-15; Ex. BH, Sadlow Dep. 38:5-11; Ex. BA, Newby Dep. 79:2-25; Kennedy Dep. 205:10-15.)

   **Plaintiffs' Response to SUF No. 71: Undisputed for purposes of summary judgment only.**

   **Defendants' Reply:**  No response required.

72.    All Star cheer teams are not affiliated with schools.  (Ex. BJ, Kennedy Dep. 205:10-15; Ex. BA, Newby Dep. 79:2-25.)

   **Plaintiffs' Response to SUF No. 72: Undisputed for purposes of summary judgment only.**

   **Defendants' Reply:**  No response required.

73.    Most school teams confine themselves to traditional sideline cheerleading, and as such, only a small percentage of schools that have cheer teams have attended competitions.  (ECF No. 382-6 at ¶247 (showing that ▮ to ▮ of schools that attend Varsity camps do not enter any competitions).)

   **Plaintiffs' Response to SUF No. 73: Disputed in part.**

   Undisputed that school teams include traditional sideline cheer.

   Disputed that ▮ to ▮ of Varsity Camp customers did not attend competitions.

   Defendants' percentages are incorrect because they improperly include sideline cheer data in their calculations. **Ex. 1** [Netz Rep] at 11-13; **Ex. 2** [Netz Rebuttal] at 70-71. The correct

analysis is how many School Cheer teams who attend Cheer Camps attend at least one Cheer Competition, which is a group of customers that Murphy never examines. *Id.*

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted.

Plaintiffs do not engage with Defendants' statement; instead, they assert an incoherent narrative that is irrelevant to whether the fact is disputed. By Plaintiffs' own definition, "sideline" cheer teams do not attend competitions. Thus, Plaintiffs dispute the percentage of Varsity's camps customers that do not attend competitions on the basis that it includes Varsity's camps customers that do not attend competitions. Indeed, although Plaintiffs claim that sideline cheer is not at issue in this litigation, Plaintiffs continue to seek damages for sideline cheer. *See* Maki Daubert Mot. ECF No. 391-1 at PageID 12794.

74. The goals of scholastic cheerleading are very different from those of All Star cheerleading. (Ex. BE, Minzghor Dep. 223:11-23 ("A. The primary -- the primary purpose of the sideline cheer is to support the -- the athletic team. So a lot of the cheers and stuff that they do on the sidelines are not what -- what All Stars do."); Ex. BH, Sadlow Dep. 39:2-10 ("School cheer, because it's associated with school, has other responsibilities or has multiple – multiple activities that they will provide to the school.").)

**Plaintiffs' Response to SUF No. 74: Disputed.**

*See* PSOF, ¶ 4; Resp., ¶¶ 1, 67.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs' additional narrative is irrelevant.

75. All Star competitions and scholastic competitions are judged by different standards. (Ex. BG, L. Gurske Dep. 318:3-319:4; Ex. BE, Minzghor Dep. 223:2-23.)

**Plaintiffs' Response to SUF No. 75: Disputed.**

See Resp., ¶67. Both All Star and School Competitive Cheer teams engage in routines lasting 2 minutes 30 seconds that are set to music and incorporate elements of tumbling, stunts, and gymnastics. Compare Ex. 253 *UCA All Star Rules & Regulations*, available for download at https://www.varsity.com/uca/wp-content/uploads/2022/11/22-23-UCA-All-Star-Rules.pdf, with

Ex. 254 *NCA School Competition Rules*, available for download at
https://tinyurl.com/NCARuleBook; *See* Defendants Exs. BG at 319:3-9, BE at 223:8-19.

     **Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.  Plaintiffs' reference to certain similarities

between the *activities involved in* All Star and Scholastic cheer does not create a dispute as to the

difference in their *judging* standards. *See* Defs.' Ex. BG at 319:5-10 ("Sideline school

cheerleaders compete on what's called a dead mat, where it's just the carpet bonded foam.

Whereas, with All Star, we compete on spring floor… We have a 2-minute-and-30-second

routine with a much higher and more challenging scoring rubric.")  Plaintiffs ignore the

undisputed evidence as to those differences.  Plaintiffs' cited material does not support their

assertion that All Star and School cheer teams engage in the same routines.  Plaintiffs' cited

NCA School Competition Rules and UCA All Star Rules & Regulations are undisputed evidence

that All Star and school competition routines differ substantially.  Just one example, the NCA

Rules state that "NCA Competitions comply with the NFHS and USA Cheer Safety surface

ruling that school-based programs may not compete on a spring floor."  NCA Rules at 23.  In

contrast, UCA All Star rules comply with USASF rules, and teams compete on spring floors

requiring a greater degree of athleticism.  *See* UCA Rules at 5.

76.     All Star competitions and scholastic competitions lead to separate and distinctive
     championships. (Ex. Q, Netz Dep. 62:16-19 ("Q.  And All Star Cheer teams and School
     Cheer teams also attend different end-of-season events; right?  A.  Typically, yes."),
     62:25-63:21; Ex. CZ, Newby Dep. 625:12-15; see also Ex. BR, VAR00009486 at 88-90
     (depicting different directors for Varsity's School Competitions and All Star
     competitions); Ex. BS, Berry Dep. 20:7- 13 (listing school national championships).)

     **Plaintiffs' Response to SUF No. 76: Disputed in part.**

     Undisputed that School Cheer and All Star Cheer attend different competitive
championships.

     Disputed as to use of term "scholastic competitions." See Resp., ¶1.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs' additional narrative is irrelevant.

77. All Star athletes are trained to a higher level of athleticism that would be dangerous for scholastic cheerleaders to emulate given their lack of training and practice. (Ex. BG, L. Gurske Dep. 319:16-320:7.)

**Plaintiffs' Response to SUF No. 77: Disputed.**

Disputed. School Cheer athletes perform the timed routines set to music that combine elements of gymnastics, tumbling, and dance, performed on a spring floor, just as All Star athletes do. The level of athleticism does not differ appreciably from that of All Star routines. Indeed, many cheer athletes compete for school teams and All Star teams. *See* PSOF, ¶¶1-4; *see also* **Ex. 1** [Netz Rep.] at 5-13, 15-16.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs assert that the "level of athleticism does not differ appreciably from that of All Star routines." However, none of Plaintiffs' cited material supports this proposition. Plaintiffs state without citation that School Cheer athletes perform the same routines "on a spring floor just as All Star athletes do." Plaintiffs' own undisputed evidence shows that school cheer competition rules enforced by the NFHS prohibit school-based programs from competing on spring floors. *See* Pls.' Ex. 254 NCA School Competition Rules at 23, available for download at https://tinyurl.com/NCARuleBook.

78. The vast majority of cheer competition participants attend competitions that are within a few hundred miles of their homes. (ECF No. 382-6 at ¶¶185-98 ("Varsity regular- season competitions typically draw participants from limited geographic regions", Exs. 32-40 (analyzing Varsity attendance data and demonstrating few teams travel more than a few hundred miles to attend competitions); see also ECF No. 388-3 at ¶139 ("Travel costs and travel time may be significant factors for determining the relevant antitrust market. […] [Cheer teams] may travel to various parts of the United States to participate in important events, such as the World or the Summit competitions, but would not routinely do so to attend regular season events.").)

**Plaintiffs' Response to SUF No. 78: Disputed.**

Disputed as misleading and immaterial. The relevant geographic market for Cheer Competitions is national. *See* **Ex. 1** [Netz Rep.] at 41-50; **Ex. 3** [Heeb Rep.] at ¶¶136-144; **Ex. 4** [Heeb Rebuttal] at ¶¶645-649; *see also* **Ex. 12** [Elza Dep.] at 304:23-305:24:

55

(Q. Some gyms travel across the country from various different -- across states to go to events. I mean, Indianapolis and Atlantic City are pretty far apart, correct? [Objection Omitted.] A. That's correct. Q. And so if you moved an event from Indianapolis to Atlantic City, you could still attract at least some of the same customers; is that fair? [Objection Omitted] A. Yes. That -- that's our sales strategy across the board.").

"Q. And after the acquisition of JAM, Varsity didn't need those events anymore; is that right? A. We would -- some of those events, we just moved to different weekends. We had an Atlantic City event that was always on MLK weekend. While that seems a long distance from Indianapolis, it was still competing for the same customer base. So we moved that event to a couple weekends earlier. Q. So it's fair to say that some gyms might decide to go to Indianapolis or Atlantic City on a – on any given weekend; is that fair? [Objection Omitted] A. That would be fair. Oh --

Q. Some gyms travel across the country from various different -- across states to go to events. I mean, Indianapolis and Atlantic City are pretty far apart, correct? [Objection Omitted.] A. That's correct. Q. And so if you moved an event from Indianapolis to Atlantic City, you could still attract at least some of the same customers; is that fair? [Objection Omitted] A. Yes. That -- that's our sales strategy across the board."

**Defendants' Reply:**  Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted.  Plaintiffs' additional narrative is irrelevant.  Plaintiffs' suggestion that "some gyms" cross states to travel to certain events is irrelevant to whether "the vast majority" of competition participants attend competitions within a few hundred miles of their homes. *See e.g.*, ECF No. 382-6 at ¶186 (showing that ████ of 1-day and ████ of 2-day Varsity competition participants are from within 200 miles of the competition).

79.  An in-season cheer competition that is more than a few hundred miles from cheer teams' members' homes is not a reasonable substitute for one that is within that range. Customers would not travel several hundred miles to avoid a 10% price increase in registration fees (which on average would amount to $5 to $10) in sufficient numbers to discipline such a price increase by a firm closer to the customers.  (ECF No. 382-6 at Exs. 23, 27 (showing that a 10% price increase in Varsity competition registration fees would on average amount to $5 to $10); Ex. BF, Bray Dep. 60:9-24 (stating that Stars & Stripes "tried to compete locally whenever possible" due to travel costs); Ex. BT, Foster Dep. 291:17-292:1 (same); Ex. BU, T. Gurske Dep. 211:12-14 ("Q: But you never traveled across the country as a gym, right? A: Correct."); Ex. BE, Minzghor Dep. 80:6-17 ("Q: Why do you think a parent would want to drive to a competition as opposed to flying? […] Because of the cost of air travel? A: Yes.").)

**Plaintiffs' Response to SUF No. 79: Disputed.**

Disputed. Teams can—and do—reasonably substitute between two different geographics, particularly given Varsity's nationwide market power. **Ex. 1** [Netz Rep.] at 43-47, 52-53, n.179 (re: Varsity's ███████████████████████████████████████████ ███); **Ex. 2** [Netz Rebuttal] at 39-45 & n.165; **Ex. 12** [Elza Dep.] at 304:23-305:24.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs suggest that teams can and do substitute between "different geographics" for regular season events, but they do not support (or even assert) that such substitution happens frequently enough to render a 10% price increase within the narrower geography unprofitable. Indeed, the cited testimony from Mr. Elza refers to a single event and an unspecified number of customers. Pls.' Ex. 12, Elza Dep. at 305:1-6 (testifying that "at least some of the same customers" might attend an event moved from Indianapolis to Atlantic City).

Plaintiffs' reference to ████████████████████████████████



███ *See* Exhibit 1, footnote 179.

Plaintiffs' additional narrative about market power, in addition to being unsupported, is irrelevant. The fact that Varsity offers competitions nationwide does not indicate that many consumers would travel hundreds of miles to attend them. Rather, the fact that Varsity holds events across the country suggests that customers largely prefer to attend events close to home, otherwise such geographic dispersion would not be necessary.

80.    An increase in price of All Star competitions would not lead All Star cheer teams to switch to participating in school competitions.

**Plaintiffs' Response to SUF No. 80: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Competitive Cheer athletes, whether they compete for an All Star team or a School Cheer team, do not consider sideline cheer to be an alternative to competitive cheer. But they would be likely to switch from school to All Star or vice versa in response to a significant increase in price. **Ex. 1** [Netz Rep.] at 42-43; **Ex. 2** [Netz Rebuttal] at 50-55.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs respond that the statement is "not supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue.

Plaintiffs do not controvert this fact with admissible evidence. Instead, they cite only their expert's recitation and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

81.    An increase in price of school competitions would not lead school cheer teams to switch to participating in All Star competitions.

**Plaintiffs' Response to SUF No. 81: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. *See* Resp., ¶80.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs respond that the statement is "not supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue. *See* Defs' SUF No. 80.

82.     Registration fees for Varsity cheer competitions were not higher than they would have
        been in the absence of whatever conduct Plaintiffs in this case assert is anticompetitive.

**Plaintiffs' Response to SUF No. 82: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by
evidence and thus fails to comply with Fed. R. Civ. P. 56I(1) and LR 56.1(a).

Notwithstanding, disputed. Competition fees were higher than they would have been
absent

Defendants' anticompetitive conduct, including but not limited to Varsity's
counterprogramming strategy, which raised both (1) registration prices for athletes and (2)
spectator admission fees. *See* Resp., ¶60; **Ex. 1** [Netz Rep.] at 45-47 & n. 184; **Ex. 122** at –
2197]; **Ex. 7** [Maki Rep.] at ¶¶98-101 (explaining how acquisition of JAM Brands and the ability
to raise spectator fees would lead to ████████ in additional revenue); PSOF, ¶¶ 204-206, 213.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.  Plaintiffs respond that the statement is "not

supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue.

Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have

failed to produce admissible evidence to establish a genuine issue.

Plaintiffs have not produced any evidence that Varsity increased registration fees as a

result of the alleged anticompetitive conduct.  Plaintiffs have produced no admissible evidence

that any price increases were linked to the alleged anticompetitive behavior; they cite only their

expert's recitation and interpretation of documents, which is inadmissible.  Fed. R. Evid. 702,

403.  Plaintiffs' response also references spectator fees, but this is irrelevant to Defendants'

statement, which pertains to registration fees.

Finally, Defendants incorporate their reply to Plaintiffs' response to Defendants' SUF

No. 60, as well as their responses to Plaintiffs' SUF Nos. 204-06 and 213.

83.     Under the VFP, gyms could earn and receive rebates for certain All Star competition
        registration fees from the just-completed season. (Ex. AS, Newby Decl. ¶9; see also Ex.
        Q, Netz Dep. 266:10-14 ("Q.  And you agree that Varsity's Family Plan provided All Star
        customers with discounts based on the number of events they attended and the amount

59

they spent on Varsity events; right?  A.  Correct.”); Ex. AU, VAR00020214 (2016-2017 flyer); Ex. BW, VAR00185006 (2017-2018 flyer); Ex. BX, VAR00075027 (2018-2019 flyer); Ex. AV, VAR00175267 (2019-2020 flyer).)

**Plaintiffs' Response to SUF No. 83: Undisputed.**

**Defendants' Reply:** No response required.

84.    The VFP did not provide rebates for purchases of anything other than certain All Star competition registration fees.  (Ex. AS, Newby Decl. ¶8; see also Ex. Q, Netz Dep. 271:18- 273:4 (“Q.  [S]o spending on All Star events is all that counts towards the spending thresholds on this chart; right?  A.  …[Y]es…. Q.  [Y]our statement that apparel purchases count towards the main Varsity Family Plan rebate, meaning the cash rebate, is not right; right?  A.  For the 2016- 2017 season.”); Ex. CZ, Newby Dep. 632:23-633:3 (“Q.  Are the schools eligible to participate in the Varsity family pan – plan…?  A.  No. There is no Family Plan for schools”), 633:19-22 (“Q. So put another way, the Varsity Family Plan rebate are only available to gyms that participate in All Star events; is that fair?  A.  That is fair.”); Ex. AK, Heeb Dep. 244:9-22 (“Q.  [S]chools do not participate in the VFP, do they?  A.  That’s right.”).)

**Plaintiffs' Response to SUF No. 84: Disputed.**

The VFP did provide rebates for other Varsity products. It evolved to include some combination of cash, credit for Varsity Fashion apparel, and other benefits. **Ex. 1** [Netz Rep.] at 105 & n. 429. Thus, not only did the VFP provide rebates for apparel (*See* Ex. 255 at –2441(VFP 2015-2016 flyer stating, “Earn a 10% rebate on Varsity All Star Fashion Purchases**”; Ex. 256** at – 8724), but it provided comprehensive rebates across its products, and was designed to leverage market power from one market to another. The program creates large incentives for customers to buy all of Varsity’s products exclusively from Varsity, including with “first dollar discounts,” which condition large rebates on marginal purchasing decisions [i.e., once the customer reaches the spending threshold for the discount, the rebate applies to all of a customer’s spending retroactively]. **Ex. 1** [Netz Rep.] at 105-106 & n. 434, 107-108; **Ex. 2** [Netz Rebuttal] at 3; **Ex. 3** [Heeb Rep.] at ¶97.

Varsity itself describes the VFP as a loyalty program that encourages coordinated cross-selling of fashion:



**Ex. 105** at –9926.

Varsity’s efforts to lock parents and gyms into the Varsity apparel, camp, and competition ecosystem using the VFP are well documented in the record, e.g., in internal emails likening the

VFP to "crack" and the gym customers to "crack ho's" (Ex. 257 at –2095-2096); internal emails strategizing maki"g "casual threats" to end the VFP as a way to convince gym owners to stop complaining about the program in statements online (*id.*); and a Varsity representative admitting that the program was "designed" not "ethical[ly]" so as to make it hard for the gyms "to say no to the money" (**Ex. 11** [Parrish Dep.] at 175:2 – 176:20).

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted.  Plaintiffs do not support their assertion that the VFP provided "comprehensive rebates across [Varsity's] products."

First, Plaintiffs' Exhibits 255 and 256 state only that gyms that met the minimum event attendance threshold for a VFP rebate were also eligible for a *distinct rebate*, the "Varsity All Star Fashion rebate" or "Varsity Fashion Dollars reward," equaling 10% of any apparel purchases. Gyms could qualify for this rebate regardless of the volume of their apparel spend, and the separate apparel rebate percentage did not increase based on the number of events attended or spend on events or apparel. Thus, Plaintiffs' materials do not support that the VFP provides rebates contingent on apparel spending.

Second, Plaintiffs do not produce any evidence to support their suggestion that the VFP provides rebates "across [Varsity's] products."  The undisputed fact is that there is no rebate under the VFP (or a Network Agreement) for camp registration fees, and there never has been. *See* Pls.' Resp. to Defs' SUF No. 5.

Finally, none of Plaintiffs' cited materials support that the VFP provided "other benefits" beyond cash and credit that could be used to purchase Varsity apparel.  Plaintiffs also cite their expert's recitation and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

Plaintiffs' additional narrative about alleged market power and "cross-selling" is irrelevant.

85.    The Varsity Family Plan did not provide rebates for apparel purchases or camp registration fees.  (Ex. AS, Newby Decl. ¶8; see also Ex. Q, Netz Dep. Tr. 271:18-273:4 ("Q. [S]o spending on All Star events is all that counts towards the spending thresholds on this chart; right?  A. …[Y]es…. Q. [Y]our statement that apparel purchases count towards the main Varsity Family Plan rebate, meaning the cash rebate, is not right; right?  A.  For the 2016-2017 season.").)

**Plaintiffs' Response to SUF No. 85: Disputed.**

See Resp., ¶84; *see also*, **Ex. 1** [Netz Rep.] 108-110 & n. 440.

**Defendants' Reply:**  *See* Defs.' reply to Defs.' SUF No. 84.

86.    Gyms that were parties to Varsity Network Agreements could earn and receive rebates for certain All Star competition registration fees.  (Ex. AS, Newby Decl. ¶16; see also Ex. BY, VAR00439301 ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████; Ex. BZ, VAR00439295 (same); Ex. CA, VAR00439312 (same).)

**Plaintiffs' Response to SUF No. 86: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:**  No response required.

87.    Varsity Network Agreements did not provide rebates for purchases of anything other than certain All Star competition registration fees, including, for example, rebates for apparel purchases or camp registration fees.  (Ex. AK, Heeb Dep. 259:13-16 ("Q.  So at least with respect to the network agreement loyalty program, you recognize that it is only exclusively relating to event fees, correct?  A.  Yes, that's right.").)

**Plaintiffs' Response to SUF No. 87: Disputed.**

Varsity Network Agreements explicitly require that members exclusively purchase Varsity Cheer Apparel to receive a rebate. Paragraph 6 of Varsity's Network Agreements sets forth (1) ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████ █████████████████ **" Ex. 256** at –8724. ██████████████████████████████████████████████████ *Id.*

As members only earn a rebate for complying with those terms, the agreement clearly predicates a rebate on Varsity Cheer Apparel purchases. PSOF, ¶¶ 93-94.

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted.  Although Varsity's Network Agreements are bespoke to each Network gym, the language Plaintiffs quote is representative of why Plaintiffs' assertion is not supported.  As Plaintiffs state, Network Agreement rebates were calculated by

████████████████████████████████████████████████████

████████████████████████████████████████  Pls.' Ex. 256 at -8724.  While certain gyms may have agreed to purchase certain apparel as part of their Network Agreement, Plaintiffs have produced no evidence that the size of a team's rebate was based on anything other than "regular season registration fees."  *Id.*

88. To the extent competition attendance was related to the amount of any rebate under the Varsity Family Plan, it was based solely on attendance by a gym at certain Varsity competitions during the immediately concluded season only.  (Ex. AS, Newby Decl. ¶9; see also Ex. AV, VAR00175267 (instructing that rebates can be claimed "[a]fter your last Varsity Family Plan event for the 2019-2020 competition season.").)

**Plaintiffs' Response to SUF No. 88: Disputed.**

Disputed as misleading. The VFP was designed to lock gyms into the Varsity ecosystem from one season to the next. The Family Plan is a forward-looking program that incentivizes gyms to schedule as many Varsity events in a coming season as possible and provides future discounts on apparel that must be used for the following season. *See*, Defendants Ex. AU (Varsity Family Plan brochure for 2019/2020); **Ex. 1** [Netz Rep.] at 105-106, n. 429, 108-110.

**Defendants' Reply:**  Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted.  Plaintiffs' additional narrative is irrelevant.

It is also unsupported.  Plaintiffs do not support their assertion that the VFP "locked gyms in . . . from one season to the next," as their cited materials do not suggest that the VFP rebate a gym has already received "incentivizes" that gym to attend more events the following season.  Plaintiffs cite their expert's recitation and interpretation of documents, which is inadmissible.  Fed. R. Evid. 702, 403.

In addition, although Fashion Dollars provided through the VFP by definition must be used after the season during which they were earned has ended, Plaintiffs provide no evidence to suggest that a gym must attend future Varsity events into order to use any Fashion Dollars that gym has earned.

89.  To satisfy the threshold for receiving a particular rebate under the Varsity Family Plan, a gym was not required to send all of its teams to a particular Varsity competition but instead could send a single team. (Ex. AS, Newby Decl. ¶10; see also Ex. BA, Newby Dep. 252:17-20 ("[G]yms qualify for the Family Plan. Number of event -- of events could have taken, you know, one team to that, one event to qualify.").)

**Plaintiffs' Response to SUF No. 89: Disputed.**

Disputed as misleading. In order to qualify for the VFP, All Star gyms are required to attend a minimum number of Varsity cheer competitions in a given season. **Ex. 119** at -0213; **Ex. 161** [cc Ex. 50 (VAR00097496 at –7512-7513)] This structuring highly incentivizes a gym to send more than one team and leaves little room for All Star gyms to attend non-Varsity events as teams, on average, attend seven to nine events a year. **Ex. 1** [Netz Rep.] at 105-106. The goal of the VFP was clearly to foreclose competition and lock in customers. **Ex. 225** at –9570 (Varsity agenda items include: "For every IEP they support, drop a % point" and "[o]nly allow programs to achieve the top level of VFP [Varsity Family Plan] if they are exclusive to Varsity.")

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs' additional narrative about incentives and the purported "goal of the VFP" is irrelevant.

In addition, Plaintiffs' suggestion that the goal of the VFP was to "foreclose customers and lock in customers" is unsupported. Plaintiffs' Exhibit 225 does not contain the quoted language. Plaintiffs may have meant to cite their Exhibit 298; even then, the document merely lists "ideas" from a "Strategy Meeting" and Plaintiffs provide no evidence that those ideas were implemented or even broadly supported within the meetings attendees, much less Varsity as a whole. Plaintiffs cite their expert's recitation and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

90.  Gyms typically have multiple All Star cheerleading teams, including as many as ten or more. (Ex. AS, Newby Decl. ¶7; see also Ex. BQ, Elza Dep. 60:11-13 ("Q. And All Star

gyms have within them different All Star teams; is that right?  A.  That's correct."); ECF
No. 382- 6 at Ex. 6 (showing that hundreds of gyms field teams at multiple levels).)

**Plaintiffs' Response to SUF No. 90: Undisputed for purposes of summary judgment
only.**

**Defendants' Reply:**  No response required.

91.    It is not unusual for gyms not to send all of their teams to the same competitions in a
       given year.  (ECF No. 386-2 at ¶93, Ex. 6 ("Most Varsity gym customers who have both
       L1- L4 and L5-L7 teams do not send both of those team types to all or most of the
       Varsity cheer competitions they attend."); Ex. CB, FUSIONELI000000424 at -424
       (explaining that Fusion Elite gym offers three cheer programs which attend different
       types and numbers of cheer competitions).)

**Plaintiffs' Response to SUF No. 91: Disputed.**

       Testimony from Varsity directly contradicts this asserted fact. *See* **Ex. 24** [Fowlkes Dep.]
at 39:18-40:1 ("[P]rograms generally take their entire program to an event…there are some
exceptions, but in the vast majority of cases, the gyms, the programs take their entire Levels 1
through whatever they have, 1 through 6, or 1 through 7, to the same event.") Fowlkes manages
Cheersport (since 2000) and Universal Spirit for Varsity, both of which run multiple cheer
events, from local events to national championships. *Id*. at 23:6-9; 32:24-33:7.

       Further, the explicit goal of the VFP was to eliminate Varsity's competition. A summary of
the "Varsity Family Plan 2.0" explains that the goal of the program was to: "Get rid of any
competitors, make it so that teams couldn't go to IEP." **Ex. 298** at -9570.

       **Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.  Plaintiffs' citation to Mr. Fowlkes' testimony

regarding "general" practices does not contradict Defendants' Statement.  Indeed, the cited

testimony supports that some gyms do not send all of their teams to the same competitions in a

given year.

       Plaintiffs' additional narrative about the "goal of the VFP" is irrelevant.  Plaintiffs do not

provide evidence that the purported "goal" of the VFP lead gyms to send all of their teams to the

same competitions.

92.    To satisfy the threshold for receiving a particular rebate under the Varsity Family Plan, a
       gym could send different teams to each competition, thereby having Varsity competitions
       constitute just one competition on that particular team's schedule.  (Ex. AS, Newby Decl.

¶11; see also Ex. BA, Newby Dep. 252:17-20 ("[G]yms qualify for the Family Plan. Number of event -- of events could have taken, you know, one team to that, one event to qualify."); Ex. AK, Heeb Dep. 239:23-240:1 ("Q. The Varsity Family Plan did not require that customers attend only Varsity competitions to qualify for rebates, correct? A. That's right.").)

**Plaintiffs' Response to SUF No. 92: Disputed.**

Undisputed that gyms could send different teams to different competitions.

Disputed because it was Varsity's explicit goal to achieve the opposite. A summary of the "Varsity Family Plan 2.0" explains that the goal of the program was to: "Get rid of any competitors, make it so that teams couldn't go to IEP. **Ex. 298** at -9569; PSOF, ¶¶ 118-119; **Ex. 1** [Netz Rep.] at 111.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs' additional narrative about Varsity's purported goal is irrelevant.

In addition, Plaintiffs' suggestion that Exhibit 298 explains the "goal" of the VFP is not supported. Rather, the quoted language is merely one of 14 bullet points listed under the header "NOTES" and Plaintiffs have provided no evidence that Varsity 2.0 was ever implemented or broadly supported within Varsity. Plaintiffs also cite their expert's recitation and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

93. A gym with more teams than the threshold for receiving a particular rebate under the Varsity Family Plan could satisfy that threshold without sending certain members of its teams to any Varsity competitions at all. (Ex. AS, Newby Decl. ¶12; see also Ex. BA, Newby Dep. 252:17-20 ("[G]yms qualify for the Family Plan. Number of event -- of events could have taken, you know, one team to that, one event to qualify."); Ex. AK, Heeb Dep. 239:23-240:1 ("Q. The Varsity Family Plan did not require that customers attend only Varsity competitions to qualify for rebates, correct? A. That's right.").)

**Plaintiffs' Response to SUF No. 93: Disputed.**

Disputed as misleading in that it ignores the significant incentives for gyms to send their teams to as many Varsity events and camps and purchase as much Varsity apparel as possible.

*See* Resp., ¶¶84, 89; PSOF, ¶¶ 120-123.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs' additional narrative about incentives is irrelevant.

Defendants incorporate their replies to Plaintiffs' responses to Defendants' SUF Nos. 84

and 89.

94.   No gym was ever required to commit to participate in the Varsity Family Plan at any
      time. (Ex. BQ, Elza Dep. 202:16-203:2 ("Q. And it's fair to say that gyms did not need
      to sign a contract with Varsity in order to be a part of the Varsity Family Plan; is that
      right? A. That is correct."), 221:9-15 ("[N]o one was forced to join the Family Plan or the
      Network.").)

      **Plaintiffs' Response to SUF No. 94: Disputed.**

      Disputed as misleading in that it ignores the significant incentives for gyms to send their
teams to as many Varsity events and camps and purchase as much Varsity apparel as possible.

      *See* Resp., ¶¶84, 89.

      **Defendants' Reply:**  Plaintiffs admit this fact in relevant part, and this fact should be

deemed admitted.  Plaintiffs' additional narrative about incentives is irrelevant.

      Defendants incorporate their replies to Plaintiffs' responses to Defendants' SUF Nos. 84

and 89.

95.   After a given season is over, a gym may, if it chooses, request whatever rebate is
      available to it under the VFP for that completed season. (See, e.g., Ex. AV, VAR00175267
      ("After your last Varsity Family Plan event for the 2019-2020 competition season, fax or
      email your completed W9 to your Varsity All Star Advisor for processing before the
      reward request deadline. . .").)

      **Plaintiffs' Response to SUF No. 95: Undisputed.**

      **Defendants' Reply:**  No response required.

96.   No gym was ever required to attend or pay a registration fee for any future competitions
      of Varsity or anyone else as a condition of receiving a rebate under the Varsity Family
      Plan. (Ex. AS, Newby Decl. ¶13; see also Ex. AV, VAR00175267 ("After your last
      Varsity Family Plan event for the 2019-2020 competition season, fax or email your
      completed W9 to your Varsity All Star Advisor for processing before the reward request
      deadline . . ."); Ex. BQ, Elza Dep. 202:16-203:2 ("Q. And it's fair to say that gyms did
      not need to sign a contract with Varsity in order to be a part of the Varsity Family Plan; is
      that right?  A.  That is correct.").)

      **Plaintiffs' Response to SUF No. 96: Disputed.**

Disputed that payment of a registration fee was not a condition of receiving a rebate.

Gyms that wish to participate in the Varsity Family Plan must pay $250,000 in registration fees to attend a specified number of Varsity events (typically six or more) <u>before</u> they can receive a Family Plan rebate. **Ex. 1** [Netz Rep.] at 105-106; **Ex. 256** at –8723-8724.

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted.  The $250,000 figure Plaintiffs cite is from a Varsity Network Agreement, not the Family Plan.  *See* Pls.' Ex. 256 at –8724.  Plaintiffs have produced no evidence that gyms must attend or pay a registration fee for a future competition in order to receive the rebate earned during the immediately preceding season. Plaintiffs cite their expert's recitation and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

97.    Varsity's Network Agreements are endorsement deals that are commonplace in sports. (Ex. BA, Newby Dep. 287:2-8, 289:2-14 ("…it is kind of like an endorsement deal, you know, Lebron wearing Nike, for example.").)

**Plaintiffs' Response to SUF No. 97: Disputed.**

Defendants fail to provide admissible evidence in support of the faulty claim that Varsity's Network Agreement is like a Nike endorsement contract for a famous athlete, and thus fail to state a material fact. Unlike an endorsement, under which a celebrity is paid by a manufacturer to endorse the manufacturer's product, the Network Agreement is an exclusively dealings contract, under which customers are forced to purchase their requirements for the sport from a company that has monopolized all relevant markets, in exchange for rebates that only serve to keep them locked in the ecosystem. Varsity's goal with the Network Agreements is to preclude customers from purchasing competitors' products. *See* **Ex. 1** [Netz Rep.] at 106-107, 104-113; **Ex. 2** [Netz Rebuttal] at 3; **Ex. 3** [Heeb Rep.] at ¶¶219-225; **Ex. 26** [Heeb Dep.] at 316:2-316:7.

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted.  Although Plaintiffs claim Defendants' have not provided admissible evidence in support of their assertion, Plaintiffs do not explain why Defendants' evidence is inadmissible.

68

Further, Plaintiffs do not controvert this fact with admissible evidence.  Instead, they cite

only their experts' recitation and interpretation of documents, which is inadmissible.  Fed. R.

Evid. 702, 403.

98.    Although in some cases Varsity's Network Agreements have required exclusivity as to
       certain Varsity apparel (often uniforms or shoes), they have never required a gym to
       exclusively use all of the Varsity products that Plaintiffs have included in their "Cheer
       Apparel" market.  (Ex. AS, Newby Decl. ¶14; see also Ex. BA, Newby Dep. at 287:9-13
       ("For a while, I think, again, it was a handful of customers that were a part of the
       Network Agreement that included the rebate, but it also included some element of
       wearing our uniforms and/or shoes.").)

       **Plaintiffs' Response to SUF No. 98: Disputed.**

       The Network Agreements expressly mandate that Members purchase all Cheer Apparel
for the entire season from only Varsity in order to receive the rebate of ▮▮ of total All Star
registration fees, effectively requiring gyms to exclusively use Varsity apparel. **Ex. 256** at –8723-
8724.

       **Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.  Plaintiffs do not support their assertion that

Network Agreements require Network gyms to purchase "all Cheer Apparel for the entire

season" exclusively from Varsity.

       First, Plaintiffs cite a single Network Agreement, even though Network Agreements are

bespoke arrangements that vary from gym to gym. *See e.g.*, Pls.' Ex. 45, Seely Dep. at 414:1-12

("Q. And the mega gyms that are these large gyms that agree to network agreements, they agreed

not only to wear Varsity uniforms exclusively but some of them agreed to wear other apparel

categories of Varsity's exclusively; correct? A. Some. Q. Some agreed to wear Varsity's practice

wear exclusively; correct? A. Some did. Some didn't. Yes. Q. Some agreed to wear Varsity

footwear, shoes, exclusively; correct? A. Some did. Some did not.").

       Second, even the single Network Agreement that Plaintiffs cite does not support their

assertion.  Plaintiffs' Exhibit 256 states that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



. *See* ECF No. 382-3 at 28, n.112; Comp. ¶ 189.

99.    To the extent competition attendance was related to the amount of any rebate under a
Varsity Network Agreement, it was attendance by one or more of a gym's teams at
certain Varsity competitions during the immediately concluded season only.  (Ex. AS,
Newby Decl. ¶16; see also Ex. BY, VAR00439301 ("Unless otherwise mutually agreed to
by the parties by June 1 of each year of this agreement, the event registration fees paid by
Member to Varsity for the aforementioned competitions during that year shall be totaled,
and Varsity shall issue a rebate to Member in accordance with the following scale . . .");
Ex. BZ, VAR00439295 (same); Ex. CA, VAR00439312 (same).)

**Plaintiffs' Response to SUF No. 99: Disputed.**

Under Varsity's Network Agreements, gyms sign up in advance for a specified term
(typically ▮▮▮▮ years or more) and commit to spend a threshold amount (typically ▮▮▮▮▮▮ or
more) on competition registration fees and purchase only Varsity apparel in each year of the
contract, in exchange for a rebate for each year that the gym satisfies the terms.  These are
forward-looking commitments: a prior season's attendance does not count toward each new
season's minimum payment threshold. **Ex. 1** [Netz Rep.] at 105-106; **Ex. 256** at –8723-8724 (a
Network agreement executed in 2019 that bound the parties for the ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮ All Star seasons, states: "Member will support Varsity by spending at least ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮ during each competitive season in registration
fees")

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.  Plaintiffs concede that Network gyms earn

rebates for "each year that the gym satisfies the terms" of their Network Agreement, which

supports Defendants' assertion that Network Agreement rebates are related to a gym's conduct

during the immediately concluded season only.

In addition, Plaintiffs' cited materials also do not support their assertion that Network

Agreements typically have terms of ▮▮▮▮ years or more and require gyms to commit to spend a

"threshold amount" of ▮▮▮▮▮▮.  Plaintiffs cite only a single Network Agreement with a term of

▮▮▮▮ seasons and a commitment to spend ▮▮▮▮▮▮ on Varsity All Star events, and they provide

no evidence that the terms of this agreement are "typical." Plaintiffs also cite their expert's

recitation and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

100.   To satisfy the threshold for receiving a particular rebate under a Varsity Network
       Agreement, a gym was not required to send all of its teams to a particular Varsity
       competition but instead could send a single team. (Ex. AS, Newby Decl. ¶17; see also,
       e.g., Ex. BY, VAR00439301 ("Member will support Varsity by ensuring that ███
       ████ will attend at least ████ competitions during each competitive season conducted
       by Varsity All Star brands."); Ex. BZ, VAR00439295 (same for ████████).)

   **Plaintiffs' Response to SUF No. 100: Disputed.**

   Disputed as misleading in that it ignores the significant incentives for gyms to send their
teams to as many Varsity events and camps and purchase as much Varsity apparel as possible.

   *See* Resp., ¶¶84, 89.

   **Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be

deemed admitted. Plaintiffs' additional narrative about incentives is irrelevant.

   Defendants incorporate their replies to Plaintiffs' responses to Defendants' SUF Nos. 84

and 89.

101.   To satisfy the threshold for receiving a particular rebate under a Varsity Network
       Agreement, a gym could send different teams to each competition, thereby having Varsity
       competitions constitute just one competition on each particular team's schedule. (Ex. AS,
       Newby Decl. ¶18; see also Ex. CF, LeTard Dep. 211:7 ("[The Varsity Network
       Agreement] was not exclusive for events.").)

   **Plaintiffs' Response to SUF No. 101: Disputed.**

   Disputed as misleading in that it ignores the significant incentives for gyms to send their
teams to as many Varsity events and camps and purchase as much Varsity apparel as possible.

   *See* Resp., ¶¶84, 89.

   **Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be

deemed admitted. Plaintiffs' additional narrative about incentives is irrelevant.

   Defendants incorporate their replies to Plaintiffs' responses to Defendants' SUF Nos. 84

and 89.

102.    A gym with more teams than the threshold for receiving a particular rebate under a Varsity Network Agreement could satisfy that threshold without sending some of its teams to any Varsity competitions at all.  (Id.)

**Plaintiffs' Response to SUF No. 102: Disputed.**

Disputed as misleading in that it ignores the significant incentives for gyms to send their teams to as many Varsity events and camps and purchase as much Varsity apparel as possible.

*See* Resp., ¶¶84, 89.

**Defendants' Reply:**  Plaintiffs admit this fact in relevant part, and this fact should be

deemed admitted.  Plaintiffs' additional narrative about incentives is irrelevant.

Defendants incorporate their replies to Plaintiffs' responses to Defendants' SUF Nos. 84

and 89.

103.    No gym was ever required to commit to participate in a Varsity Network Agreement at any time.  (Ex. BQ, Elza Dep. 221:9-15 ("[N]o one was forced to join the Family Plan or the Network."); Ex. BA, Newby Dep. 251:10-11 ("The Network Agreements were few and far between.").)

**Plaintiffs' Response to SUF No. 103: Disputed.**

Disputed as misleading in that it ignores the significant incentives for gyms to send their teams to as many Varsity events and camps and purchase as much Varsity apparel as possible.

*See* Resp., ¶84, 89.

**Defendants' Reply:**  Plaintiffs admit this fact in relevant part, and this fact should be

deemed admitted.  Plaintiffs' additional narrative about incentives is irrelevant.

Defendants incorporate their replies to Plaintiffs' responses to Defendants' SUF Nos. 84

and 89.

104.    Varsity also historically has had Network Agreements with between ██ and ██ of its gym customers each season.  (ECF No. 382-6, Ex. 51.)

**Plaintiffs' Response to SUF No. 104: Disputed.**

Plaintiffs dispute this fact as misleading because the same Exhibit also shows that fees paid by the gyms in the Network Agreement program represented between ███ and ███ of total fees received by Varsity during the same years.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs' additional narrative is irrelevant.

Plaintiffs' suggestion that it is "misleading" that between only ███ and ███ of Varsity's gym customers participated in Network Agreements each season is not supported. Defendants' statement is immaterial to their Motion because, at ███ to ███, the proportion of Varsity's gym customers who participated in a Network Agreement in any given season is too low to have substantially foreclosed competition. Even if one looks at the proportion of fees paid to Varsity that were paid by Network gyms, as Plaintiffs suggest, ███ to ███ is still too low to have substantially foreclosed competition. As a result, Plaintiffs additional narrative does not create a genuine dispute of material fact.

105.  No gym was ever required to attend or pay a registration fee for any future competitions of Varsity or anyone else as a condition of receiving a rebate under a Varsity Network Agreement. (Ex. AS, Newby Decl. ¶20; see also, e.g., Ex. BY, VAR00439301 (████████ ████████); Ex. BZ, VAR00439295 (same); Ex. CA, VAR00439312 (same); Ex. CC, VAR00439297 (same); Ex. CD, VAR00439306 (same); Ex. CE, VAR00439309 (same).)

**Plaintiffs' Response to SUF No. 105: Disputed.**

Disputed that payment of a registration fee was not a condition of receiving a rebate.

Gyms that wish to participate in the Varsity Family Plan must pay $250,000 in registration fees to attend a specified number of Varsity events (typically six or more) <u>before</u> they can receive a Family Plan rebate. **Ex. 1** [Netz Rep.] at 105-106; **Ex. 256** Newby Ex. 30, VAR00018721 at 723-724.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs have produced no evidence that gyms must attend or pay a registration fee for a future competition in order to receive the rebate earned during the immediately preceding season. Plaintiffs' Exhibit 256 states that each season Varsity will issue a rebate based on "all regular season registration fees for the *previous* competition

season." Pls.' Ex. 256 at -8724 (emphasis added). Plaintiffs also cite their expert's recitation

and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

106.   At least certain gyms that chose to avail themselves of the Varsity Family Plan or a Varsity
       Network Agreements have also attended non-Varsity events during the same season. (See,
       e.g., Ex. BG, L. Gurske Dep. 73:13-25.)

       **Plaintiffs' Response to SUF No. 106: Undisputed for purposes of summary judgment
       only.**

       **Defendants' Reply:** No response required.

107.   For the 2013-2014, 2014-2015, and 2015-2016 competition seasons, the minimum number
       of (certain) Varsity events to which a gym was required to have sent a team in order to
       receive a rebate under the Varsity Family Plan was four. (Ex. CG, VAR00322126 (2013-
       2014); Ex. CH,VAR00325318 (2014-2015); Ex. CI, VAR00233174 at -175 (2015-
       2016).)

       **Plaintiffs' Response to SUF No. 107: Undisputed for purposes of summary judgment
       only.**

       **Defendants' Reply:** No response required.

108.   For the 2013-2014, 2014-2015, and 2015-2016 competition seasons, a gym that had sent
       one or more of its teams to six or more of (certain) Varsity events did not receive any
       additional rebate as a result of attending additional competitions. (Id.)

       **Plaintiffs' Response to SUF No. 108: Disputed.**

       Defendants' Exhibits CG, CH, and CI all show that a gym's percentage rebate could
increase in two ways: by meeting thresholds for the number of events attended and by meeting
thresholds for the amount of money spent on registration fees. The rebate is applied to every
dollar spent on registration fees, so each additional dollar spent led to an additional rebate, even
if the additional spend did not move the gym into a higher rebate percentage category. Moreover,
if a gym attended more than six competitions—and by doing so moved into a higher rebate
percentage category based on total spend—then would receive a higher *percentage* rebate than if
it had only attended six competitions. Thus, even after a gym had attended six events, each
additional event attended would lead to an additional rebate for the gym owner.

       **Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material

fact with Defendants' revised statement, and this fact should be deemed admitted. Plaintiffs

misstate the clear meaning of Defendants' statement in an effort to create a dispute. The

significance of the Statement is that a gym that had sent one or more of its teams to six or more

(of certain) Varsity events did not receive a higher rebate percentage as a result of attending

additional competitions after the sixth competition, which Plaintiffs do not dispute.

109.    For the 2016-2017 and 2017-2018 competition seasons, the minimum number of (certain)
Varsity events to which a gym was required to have sent a team in order to receive a
rebate under the Varsity Family Plan was five.  (Ex. CJ, VAR00074760 at -761 (2016-
2017); Ex. BW, VAR00185006, at -007 (2017-2018).)

**Plaintiffs' Response to SUF No. 109: Undisputed for purposes of summary judgment
only.**

**Defendants' Reply:**  No response required.

110.    For the 2016-2017 and 2017-2018 competition seasons, a gym that had sent one or more
of its teams to eight or more of (certain) Varsity events did not receive any additional
rebate as a result of attending additional competitions.  (Id.)

**Plaintiffs' Response to SUF No. 110: Disputed.**

*See* Resp., ¶108.

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material

fact with Defendants'' revised statement, and this fact should be deemed admitted.  Plaintiffs

misstate the clear meaning of Defendants' statement in an effort to create a dispute. The

significance of the Statement is that a gym that had sent one or more of its teams to eight or more

(of certain) Varsity events did not receive a higher rebate percentage as a result of attending

additional competitions after the eighth competition, which Plaintiffs do not dispute.

111.    For the 2018-2019 and 2019-2020 competition seasons, the minimum number of (certain)
Varsity events to which a gym was required to have sent a team in order to receive a
rebate under the Varsity Family Plan was six.  (Ex. BX, VAR00075027 at -028 (2018-
2019); Ex. AV, VAR00175267 at -268 (2019-2020).)

**Plaintiffs' Response to SUF No. 111: Undisputed for purposes of summary judgment
only.**

**Defendants' Reply:**  No response required.

112.    For the 2018-2019 and 2019-2020 competition seasons, a gym that had sent one or more
of its teams to nine or more of (certain) Varsity events did not receive any additional
rebate as a result of attending additional competitions.  (Id.)

**Plaintiffs' Response to SUF No. 112: Disputed.**

*See* Resp.¶108.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact with Defendants' revised statement, and this fact should be deemed admitted. Plaintiffs misstate the clear meaning of Defendants' statement in an effort to create a dispute. The significance of the Statement is that a gym that had sent one or more of its teams to nine or more (of certain) Varsity events did not receive a higher rebate percentage as a result of attending additional competitions after the ninth competition, which Plaintiffs do not dispute.

113.    The Varsity Family Plan and Network Agreements do not apply to scholastic or school cheer. (Ex. AS, Newby Decl. ¶21; see also Ex. Q, Netz Dep. 269:9-17 ("Q. And schools don't participate in the Varsity Family Plan; right? A. Correct. Q. And schools don't enter into Varsity network agreements; right? A. Correct. Q. Only All Star gyms participate in those two programs; right? A. Correct."); Ex. AK, Heeb Dep. 244:9-19 ("Q. [S]chools do not participate in the VFP, do they? A. That's right.").)

   **Plaintiffs' Response to SUF No. 113: Undisputed for purposes of summary judgment only.**

   **Defendants' Reply:** No response required.

114.    Varsity has not and does not have a rebate program for scholastic or school cheer. (Ex. AS, Newby Decl. ¶21.)

   **Plaintiffs' Response to SUF No. 114: Disputed.**

   Disputed to the extent Defendants imply Varsity does not financially incentivize school cheer programs to use Varsity cheer apparel, camps, and competitions. Under Varsity's IMPACT Program, through which it has contracted with ███████ of schools, Varsity provides schools with as much as ███████ worth of merchandise and educational resources in exchange for the school's agreement to spend a minimum of ██████ each year for ███ years on Varsity products—the functional equivalent of a rebate. *See* **Ex. 162** at –5026-5028; **Ex. 258** at –9367 (as of 2017 Varsity had signed IMPACT contracts with ███ schools).

   **Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs' additional narrative is irrelevant.

In addition, Plaintiffs have not supported their assertion that the IMPACT Program is "the functional equivalent of a rebate." Plaintiffs' Exhibit 162 explicitly states that the participating school is to receive certain educational resources from Varsity immediately upon entering the program, before that school has purchased anything from Varsity in connection with the Program. Pls.' Ex. 162 at -5027 ██████████████████████████ ████████████████████████████████████████████ ████████████████████████████. Something provided "in exchange" for sales that have not yet occurred and may never occur is not a rebate. Moreover, as indicated in Plaintiffs' own cited materials, it is undisputed that the vast majority of IMPACT programs relate to Varsity's non-cheerleading businesses and do not even cover cheerleading at all. Pls.' Ex. 162 at -5019 ("Varsity Spirit is not included because it is only ████ of IMPACT sales"); *see also* Pls.' Ex. 40 at 638:1-4 ("The vast majority of Impact agreements were focused on BSN, and then a distant second was Herff Jones, and Varsity Spirit was rarely a part of an Impact agreement.")

115.    USASF" was established as a sanctioning organization for All Star cheer in or around 2004. (Ex. A, Chadwick Dep. 38:12-14.)

   **Plaintiffs' Response to SUF No. 115: Undisputed.**

   **Defendants' Reply:** No response required.

116.    The purpose and goals of USASF include the following: to provide rules for All Star cheerleading competitions, to strive for a safe environment for All Star athletes, to drive competitive excellence, and to promote a positive image for the sport of All Star cheer. (Ex. B, USASF_00032456 at -456 (Chadwick Dep., Exhibit 4); Ex. C, USASF_00028673 at -679; Ex. A, Chadwick Dep. 34:8-25 ("At the beginning . . . we were trying to create a uniform set of rules and a way to make sure people were qualified to do what they were doing such as coaching; to try and create standards for competitions; to try and create some uniform safety practices for gyms. A way to pull the industry together to support best practices from rules, from safety, from all the difference facets that came into the sport.").)

   **Plaintiffs' Response to SUF No. 116: Disputed in part.**

Undisputed that USASF provided rules for All Star competitions.

Disputed that its "purpose and goals" were to strive for a safe environment, drive competitive excellence, or promote a positive image.

Varsity created the USASF in direct response to the creation of the National All-Star Cheerleading Coaches Congress (NACCC) because it feared losing control of competitive cheer to the NACCC. *See* **Ex. 11** [Parrish Dep.] at 31:22-33:3.

After its creation, USASF acted in concert with Varsity to disadvantage Varsity's rivals and thereby maintain and enhance Varsity's dominant position in the market, including by manipulating bid and sanction rules to benefit Varsity (PSOF, ¶¶133, 134, 141); actively encouraging Varsity acquisitions (PSOF, ¶135); blocking other apparel and event producers from competing with Varsity at competitions (PSOF, ¶¶135, 139, 142); facilitating Varsity's counterprogramming strategy and foreclose competition from IEPs (PSOF, ¶136, 143); divulging strategic information to Varsity only (PSOF, ¶140); coordinating to kill proposals from IEPs (PSOF, ¶¶137, 145); rejecting IEP's requests to lessen Varsity's influence (PSOF, ¶146); and more (PSOF, ¶147). For purposes of favoring Varsity's bottom line, USASF even disregarded athlete safety standards. *See,* ¶Resp., 41.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. The purported evidence does not place USASF's purpose and goals in dispute.

Plaintiffs suggest that USASF was created in direct response to the creation of the NACCC. They ignore the undisputed evidence that USASF was created for a specific purpose and with specific goals. Plaintiffs do not support their assertion that USASF's goals did not include striving for a safe environment, driving competitive excellence, and promoting a positive image. Further, Plaintiffs improperly cite to their Statement of Additional Material facts which includes legal conclusions couched as "facts" and "evidence." *See generally* Defs.' Resp. to Pls.' SOF.

117.   Pursuant to amendments to its bylaws adopted in 2005, USASF's Board of Directors is made up of representatives of competition event producers ("Eps"), gym owners/coaches, and the USASF. (Ex. D, USASF_00032454 at -454, ¶1.)

**Plaintiffs' Response to SUF No. 117: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

118. The bylaw amendments adopted in 2005 also dictated that there would be thirteen voting seats total, made up of seven EP seats filled with representatives named by seven particular Eps, two representatives named by the Chairman of USASF, and four coaches/gym owners approved by the Board and subject to reelection every two years. (Id., ¶¶4, 5, 7, 9.)

   **Plaintiffs' Response to SUF No. 118: Undisputed for purposes of summary judgment only.**

   **Defendants' Reply:** No response required.

119. In 2006, USASF's Board adopted certain bylaw amendments to protect the voice of non-Varsity members of the organization, including (1) requiring unanimous consent to replace any of the nine permanent USASF Board seats, which included non-Varsity event producers CheerSport and JAM Brands; and (2) requiring unanimous Board approval for any contracts involving Varsity. (Ex. E, VAR00351488 at -489; Ex. F, USASF_00032439 at -439; Ex. D, USASF_00032454 at -454-455, ¶¶13, 14, 16-18; Ex. A, Chadwick Dep. 121:21-122:11.)

   **Plaintiffs' Response to SUF No. 119: Disputed.**

   Disputed that the adopted amendments were "to protect the voice of non-Varsity members of the organization" (nor is that statement supported by cited evidence, in violation of Fed. R. Civ. P. 56(c)(1) and LR 56.1(a)). Disputed as misleading that CheerSport and JAM Brands are "non-Varsity event producers" as Varsity has owned both for years (Cheersport since 2012 and Jam Brands since 2015). **Ex. 118**.

   **Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue.

   Additionally, Plaintiffs' response does not refute that in 2006 Cheersport and JAM Brands were non-Varsity event producers.

120. USASF's bylaws thereafter remained unchanged through 2022. (Ex. L, Stangle Decl ¶2.)

   **Plaintiffs' Response to SUF No. 120: Undisputed for purposes of summary judgment only.**

79

**Defendants' Reply:** No response required.

121.    In or around November 2012, Varsity nominated a non-employee coach to one of its EP seats on USASF's Board.  (Ex. I, Stangle Dep. 86:7-20; Ex. J, Peterson Dep. (Day 1). 31:18-32:2; Ex. K, Fowlkes Dep. 264:20-265:5; Ex. AQ, USASF_00027831.)  In or around November 2015, Varsity acquired JAM Brands, which afforded it the ability to nominate another representative to USASF's Board.  (Ex. G, Seely Dep. (Day 1). 231:17-19; Ex. H, Webb Dep. (Day 1) 208:5-7.)  However, because Varsity had already allocated one of its EP seats to a coach/gym owner, Varsity has never had seven Varsity-employed representatives in its seven EP seats at any one time.  (See Ex. I, Stangle Dep. 86:7-20; Ex. J, Peterson Dep. (Day 1) 31:18- 32:2; Ex. K, Fowlkes Dep. 264:20-265:5; Ex. AQ, USASF_00027831.)

**Plaintiffs' Response to SUF No. 121: Disputed.**

Disputed as misleading. Since 2005, Varsity has controlled the USASF Board of Directors with no fewer than seven of 13 voting seats. **Defs' Ex. D** [Chadwick Ex. 5] at 2454. This was true in 2012, when Varsity employed USASF Board members Jim Chadwick (**Ex. 15** [Chadwick Dep.], at 41:14-19), Mike Burgess (*id*. at 81:20-21), Lance Wagers (*id*. at 81:11-82:22); Karen Halterman (*id*. at 85:18-20), Catherine Morris (*id*. at 86:13-19), Jeff Fowlkes (**Ex. 24** [Fowlkes Dep.] at 51:19-23), and Steve Peterson (**Ex. 14** [Peterson Dep.] at 275:13-15).

Varsity controls the USASF Board to this day. **Ex. 139**. With its acquisitions of CheerSport in 2012 and JAM Brands in November 2015, Varsity gained control of all seven permanent seats reserved for event producers.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted.  Plaintiffs do not genuinely dispute this fact or identify evidence to the contrary, but instead provide an additional irrelevant narrative and assert that Varsity "controlled" USASF's Board.

To the extent Plaintiffs believed this additional information was material, they would have included it in their own Statement of Additional Facts.  They cannot use their Response to Defendants' Statement of Facts to circumvent the page limits for their Statement of Additional Facts or attempt to fabricate a factual dispute where the actual facts stated by Defendants are not genuinely disputed.

122.    In addition, there was never a case where the Varsity representatives voted one way and the rest of the Board voted another.  (Ex. G, Seely Dep. (Day 1) 358:7-359:2.)

**Plaintiffs' Response to SUF No. 122: Undisputed.**

**Defendants' Reply:** No response required.

123. USASF has several committees, including a Sanctioning Committee, a Rules Committee, an Athletic Performance Committee, and more. The Sanctioning Committee has existed since 2004 and under its current charter since 2013. (Ex. M, USASF_00030535 at -535 (reflecting Board approval of committee charters); Ex. N, USASF_00056250 at -253.)

**Plaintiffs' Response to SUF No. 123: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

124. The Sanctioning Committee develops and maintains: (1) the standards by which competitions qualify for USASF Sanctioning and the process and guidelines governing compliance, and (2) the approval process and criteria for event producer memberships, including eligibility to offer bids to compete at Worlds. (Ex. N, USASF_00056250 at -253.)

**Plaintiffs' Response to SUF No. 124: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

125. Throughout its existence, the Sanctioning Committee has been composed of a representative from each EP who is eligible to award fully paid bids to Worlds. (Ex. O, Peterson Dep. (Day 2) 339:22-341:21 (agreeing that "at any point in time only Tier 1 event producers had a voting seat on the sanctioning committee"); Ex. P, USASF_00081398 at -399 (listing as one of the benefits of Tier 1 membership "[h]ave a seat to participate on the USASF Sanctioning Committee").)

**Plaintiffs' Response to SUF No. 125: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

126. Varsity did not own a majority of the EPs with seats on USASF's Sanctioning Committee until it completed its acquisition of JAM Brands in late 2015. (ECF No. 382-3 at p. 96 ("Prior to the JAM Brands acquisition [in 2015], Varsity held 16 of 35 seats on the USASF Sanctioning Committee."); Ex. Q, Netz Dep. 293:5-8.)

**Plaintiffs' Response to SUF No. 126: Undisputed.**

**Defendants' Reply:** No response required.

127. Any rule or policy voted on by USASF's Board or Sanctioning Committee prior to late 2015 was approved or disapproved before Varsity obtained the majority of seats on the Board or Sanctioning Committee, respectively. (See SUF ¶¶121, 126; Ex. Q, Netz Dep. 293:9-23, 296:3-25.)

**Plaintiffs' Response to SUF No. 127: Disputed.**

As noted in Resp., ¶121, because both Jim Chadwick and Steve Peterson were Varsity employees before they joined USASF and remained so until at least 2020, Varsity held a majority of the votes on the USASF Board from its inception through 2015 and beyond.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs do not genuinely dispute this fact or identify evidence to the contrary, but instead provide an additional irrelevant narrative.

To the extent Plaintiffs believed this additional information was material, they would have included it in their own Statement of Additional Facts. They cannot use their Response to Defendants' Statement of Facts to circumvent the page limits for their Statement of Additional Facts or attempt to fabricate a factual dispute where the actual facts stated by Defendants are not genuinely disputed.

128. USASF did not participate in any of Varsity's acquisitions. Rather, any acquisitions of EPs that Varsity made were done by Varsity unilaterally. (Ex. L, Stangle Decl. ¶3; Ex. Q, Netz Dep. 315:20-23.)

**Plaintiffs' Response to SUF No. 128: Undisputed.**

**Defendants' Reply:** No response required.

129. USASF did not alter any of its rules or policies to assist Varsity in undertaking these acquisitions or to provide Varsity some additional advantage unavailable to other members of USASF. (Ex. L, Stangle Decl. ¶4; Ex. Q, Netz Dep. 310:2-5.)

**Plaintiffs' Response to SUF No. 129: Disputed.**

There are abundant examples in the record of USASF encouraging Varsity's acquisitions and altering its policies to provide Varsity an advantage unavailable to other members of USASF. *See* Resp., ¶116.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted.

Plaintiffs suggest that "[t]here are abundant examples in the record of USASF encouraging Varsity's acquisitions and altering its policies to provide Varsity an advantage unavailable to other members of USASF." Plaintiffs do not support their assertion as none of what is discussed at Pls.' Response to Defs.' SUF No. 116 contains any evidence of USASF "altering" its rules/policies in favor of Varsity or "encouraging" Varsity's acquisitions.

Indeed, Plaintiffs concede that USASF did not participate in any of Varsity's acquisitions. *See* Pls.' Resp. to Defs.' SUF No. 128. Accordingly, this fact should be deemed admitted.

130.    USASF also hosts an end-of-season cheer competition for the top All Star cheerleading teams called "The Cheerleading Worlds" ("Worlds"). (Ex. A, Chadwick Dep. 53:20- 54:6.)

**Plaintiffs' Response to SUF No. 130: Disputed.**

The evidence shows that, while USASF is the host of the Worlds on paper, the frustration in the All Star cheerleading community that USASF cedes control and management of the Worlds to Varsity is no secret. **Ex. 198** at –5997); **Ex. 201** at –1294); **Ex. 202** at –9853); **Ex. 203** at –0810).

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted.

Plaintiffs' additional narrative is irrelevant. *See* Pls.' Ex. 198 (USASF explaining "Varsity has no part in the officiating and judges selection at Worlds. That is all people we assign."); Pls.' Ex. 201 (meeting minutes containing the hearsay complaint of one gym owner without reference to Worlds or how it is operated); Pls.' Ex. 202 (reflecting enforcement of USASF's trademark rights in "The Cheerleading Worlds."); Pls.' Ex. 203 (reflecting that USASF utilized Varsity for logistical assistance in managing registrations).

131.   Through its Sanctioning Committee, USASF promulgates criteria for cheer events which
       can provide athletes with bids to compete at Worlds, which are known as "Worlds Bid
       Events".  As part of its process for determining which events qualify as Worlds Bid
       Events, USASF created a tier-system.  (Ex. R, USASF_00027858 at -858; Ex. A,
       Chadwick Dep. 58:20- 60:5, 140:19-141:22; Ex. J, Peterson Dep. (Day 1) 49:6-20.)

       **Plaintiffs' Response to SUF No. 131: Undisputed for purposes of summary judgment
       only.**

       **Defendants' Reply:** No response required.

132.   USASF's rules regarding how which events that can award bids to Worlds are selected
       have been in place for many years.  (Ex. A, Chadwick Dep. 58:1-9 ("At some point in
       time, USF – USASF introduced a Worlds bid system, correct? A. Yes. Q. Do you recall
       when that was? A. That was – the development began at the very first Worlds […]"); Ex.
       BQ, Elza Dep. 118:20-119:1 ("Q. And [Worlds bid-giving events are] protected by the
       USASF rules; is that right? A. They're protected by the bylaws the USASF adopted 20
       years or so ago.").)

       **Plaintiffs' Response to SUF No. 132: Undisputed for purposes of summary judgment
       only.**

       **Defendants' Reply:** No response required.

133.   USASF adopted a tiered membership system for Eps in 2005 "to allow companies to tailor
       their USASF membership level to both their budgets as well as the value they perceive
       receiving from the USASF." (Ex. R, USASF_00027858 at -858.)

       **Plaintiffs' Response to SUF No. 133: Disputed in part.**

       Undisputed that USASF adopted a tiered membership.

       Disputed that the purpose was to allow companies to tailor their memberships. The
       evidence shows the system was employed to favor Varsity competitions at the expense of the
       smaller IEPs, and that Varsity intentionally sought to acquire rival Tier 1 event producers to gain
       control of the USASF Sanctions Committees and World bids system. *See, e.g.*, **Ex. 56** at -8761;
       **Ex. 55** at –0644 ("We look to acquire all the Tier I event companies . . . that give bids to the
       cheerleading . . . Worlds. There are only 42 Tier I event companies. Varsity now owns 36 of those
       Tier I companies ████████████████████."); **Ex. 292** [Peterson Ex. 17 at –9499] (Tier 1
       producers have power to grant bids).

       **Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.

Plaintiffs suggest that "[t]he evidence shows the system was employed to favor Varsity competitions at the expense of the smaller IEPs, and that Varsity intentionally sought to acquire rival Tier 1 event producers to gain control of the USASF Sanctions Committees and World bids system." They ignore the undisputed contemporaneous evidence that "[t]his rule was established in 2005 to allow companies to tailor their membership to their budget." Defs.' Ex. R.

Plaintiffs do not support their assertion that this was not USASF's purpose in 2005 in establishing the tiered system by citing to "evidence" of Varsity's unilateral acquisition strategy years later. See Pls.' Ex. 55 (internal Varsity document not involving USASF); Pls.' Ex. 56 (same); Pls.' Ex. 292 (email and attachment reflecting USASF's tiered membership system but not showing that "the system was employed to favor Varsity competitions").

134. At the inception of the tiered membership system, EPs who met the criteria for Tier 1 were permitted to offer "fully paid bids" to Worlds, while EPs who met the criteria for Tier 2 were permitted to offer "partially paid bids" to Worlds. (Ex. R, USASF_00027858 at -859.)

**Plaintiffs' Response to SUF No. 134: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

135. As the sport of All Star cheerleading grew, the number of event producers who qualified to offer Worlds Bid Events increased. (Ex. A, Chadwick Dep. 60:6-22.) By no later than 2012, USASF had adopted a rule limiting the number of Worlds Bid Events to 42, in an effort to ensure that there was an appropriate number of Worlds ids in relation to Worlds bid- eligible teams. (Ex. J, Peterson Dep. (Day 1) 55:10-56:1 ("We keep a control on the number of bids that are eligible to be awarded versus the number of Level 6 and 7 teams in the country."), 56:12-57:1 ("if there were more bids [than eligible teams", you know, it ju– -- it loses its credibility"), 57:7-24, 65:20-66:4 ("At some point, the Sanctioning Committee felt as if 42 would be the . . . maximum number of events . . . based of the number of bids being awarded and the number of teams eligible to be awarded bids."); Ex. S, VAR00319008 at -008 ("For the 2012- 2023 season, the USASF will not sanction more than 42 Cheerleading Worlds qualifying events in the US."), -010 ("The goal for Worlds bids is to be sufficiently flexible to ensure participation by as many event producers as possible while still protecting the value of Worlds bids by not giving so many that they lose meaning."). In connection with this limitation, USASF outlined in its "Approval Process & Criteria for Tier 1 and Tier 2 Event Producers and Worlds Bid Eligibility" ("Worlds Bid Criteria") that, where there were more than 42 events that

85

satisfied the other criteria to offer Worlds Bids, "[p]riority" would be given "to event producers based on their seniority as USASF members," in an effort to "recognize the contribution made by early USASF supporters whose financial support made the Worlds possible initially." (Ex. S, VAR00319008 at - 008, -010).  USASF sought to incentivize EPs to maintain their membership with USASF by prioritizing the EPs who had financially supported USASF by awarding paid bids to Worlds (of up to $25,000 per bid) for a longer duration.  (Ex. J, Peterson Dep. (Day 1) 135:4-136:9; Ex. T, USASF_00030547 at -547; Ex. A, Chadwick Dep. 175:1-15.)

**Plaintiffs' Response to SUF No. 135: Disputed in part.**

Undisputed as to all statements except that a limit was placed on number of bids. Plaintiffs dispute this fact as containing statements not supported by the evidence, including that there was "an effort to ensure that there was an appropriate number of Worlds bidsin relation to Worlds bid-eligible teams."

Abundant evidence shows that the true purpose of limiting the number of bids was to provide a financial advantage to Varsity and foreclose competitors from the market. *See, e.g.*, **Ex. 140** at –0643 (proposal to expand Worlds to include Juniors was opposed by Varsity because it would "negatively impact the Summit", a Varsity event; USASF agreed to bury it in a committee where "[i]t will die there without us having to publicly oppose it"); **Ex. 259** at –8974 ("Jeff W. wants the USASF Worlds Bid process changed to prevent small competitors from being allowed to offer Worlds Bids. He believes, and I agree (for whatever that's worth), that in some cases the ability to give Worlds Bids is keeping these companies viable and certainly driving up their value if we decide to acquire them"); **Ex. 260** at –1946] (Varsity proposal to add second bid for 200-team 2-day events and rejecting lower threshold "because others could get closer to reaching that number and effect our existing WB events").

**Defendants' Reply:**  Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted.  Plaintiffs' additional narrative is irrelevant, does not create a genuine dispute of material fact, and is unsupported by the cited evidence.

Plaintiffs suggest, without evidentiary support, that "the true purpose of limiting the number of bids was to provide a financial advantage to Varsity and foreclose competitors from the market."  They do not dispute, however, that before the Summit even existed, "[b]y no later than 2012, USASF had adopted a rule limiting the number of Worlds Bid Events to 42, in an effort to ensure that there was an appropriate number of Worlds bids in relation to Worlds bid-eligible teams."  Defs.' Ex. J.  None of the cited materials are even communications involving USASF and none contradict the contemporaneous documentation of the procompetitive purpose

86

of these rules. See Pls.' Ex. 140 (Varsity-to-Varsity communication not involving USASF);

Pls.' Ex. 259 (Varsity-to-Varsity communication not involving USASF); and Pls.' Ex. 260

(Varsity-to-Varsity communication not involving USASF).

136. This priority approach is consistent with the early policies of USASF to incentivize EP membership and support for the organization. (Ex. U, USASF_00032433 at -433 ("Unanimous vote in favor of policy that if a member company leaves the USASF, then this company is precluded from re-applying for membership of one year from the time they leave the federation. This will help to reduce the 'yo-yo' effect of applying for membership when most advantageous for a company.").)

**Plaintiffs' Response to SUF No. 136: Disputed.**

Plaintiffs dispute this fact as misleading to the extent it fails to acknowledge the competitive advantage the 42-event limitation provides to Varsity. *See* Resp., ¶135.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be

deemed admitted. Plaintiffs' additional narrative is irrelevant. Defendants incorporate their

replies to Plaintiffs' responses to Defendants' SUF No. 135.

137. In addition, by no later than 2012, USASF's Worlds Bid Criteria specified in "Guideline 3.B" that "Tier 1 and Tier 2 events will be protected, within a four week window, either side of the current bid giving event for a 200 mile radius" and "protected for a 500 mile radius from other bid giving events on the same weekend." (Ex. S, VAR00319008 at -009; see also Ex. AR, USASF_00090186 at -186 (discussing date/mileage limitation in 2010).)

**Plaintiffs' Response to SUF No. 137: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

138. Date and proximity limitations exist in other sports, and can serve legitimate, pro-competitive purposes such as spreading out events over time and throughout the country and maximizing participation and audience to the benefit of a sport as a whole. (ECF No. 382-3 at p. 79; Ex. Q, Netz Dep. 328:3-329:9.) Plaintiffs' expert, Janet Netz, conceded that Guideline 3.B can have pro-competitive effects. (Ex. Q, Netz Dep. 329:4-9.)

**Plaintiffs' Response to SUF No. 138: Disputed in part.**

Undisputed that date and proximity locations exist in other sports with pro-competitive purposes.

Disputed that Dr. Netz "conceded that Guideline 3.B can have pro-competitive effects." In her rebuttal report, Dr. Netz clarified: "I do not dispute those rules exist in other sports leagues nor that they serve legitimate, procompetitive purposes in those instances. However, the analogy is not applicable to the USASF and Varsity because other sports leagues do not allow a single event producer to gain control of the majority of events or a majority of board seats." **Ex. 2** [Netz Rebuttal] at 79-80.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be

deemed admitted. Plaintiffs' additional narrative is irrelevant.

139.   In 2008, USASF adopted, inter alia, the following change to the Tier 1 and 2 requirements:

> Tier 1 requirements for current Tier 1 members (those approved in 2007-08 or earlier) are reduced from 125 to 100 all star cheer teams.  All new Tier 1 applicants must meet the 125 all star team standard.  Tier 2 requirements for current Tier 2 members (those approved in 2007-08 or earlier) are reduced from 100 to 75 all star cheer teams.  All new Tier 2 applicants must meet the 100 all star team standard.

(Ex. T, USASF_00030547 at -547.)

**Plaintiffs' Response to SUF No. 139: Undisputed.**

**Defendants' Reply:** No response required.

140.   In August 2014, USASF's Sanctioning Committee approved the proposal that "Beginning with the 2016-17 approval process, all members applying for Tier 1 status must have 125 cheer teams at the previous year's event." (Ex. V, USASF_00055929 at -930.) This effectively eliminated the exception for Tier 1 members approved in 2007-08 or earlier. (Id.) USASF did, however, relax this standard slightly by allowing "prep" teams to count toward the 125-team minimum. (Ex. W, USASF_00026548 at -548.) Also, in 2014, USASF eliminated Tier 2 for cheerleading EPs. (Ex. X, USASF_00085198, at -198.) This decision was not fully supported by Varsity. (Id.) As USASF explained in its "General Membership Guidelines": "HEADS UP: New…in the 2016 – 2017, all event producers applying to award 2017 Cheerleading Worlds Bids will only be approved as a Tier 1 who must have a minimum of 125 All Star 'cheer' teams participating at the same prior year's competition to qualify for this tier. Tier 2 will no longer be a USASF Membership Tier Level starting in 2016 – 2017 and Partial Paid Bids will no longer be awarded." (Ex. Y, VAR00348574 at -595.)

**Plaintiffs' Response to SUF No. 140: Disputed in part.**

Undisputed that USASF approved the proposal in August 2014.

Disputed to the extent Defendants suggest Varsity did not spearhead altering USASF rules to eliminate the practice of prioritizing membership seniority. **Ex. 1** [Netz Rep.] at 72-84; *see also*, **Ex. 259** ("Jeff W. wants the USASF Worlds Bid process changed to prevent small competitors from being allowed to offer Worlds Bids. He believes, and I agree (for whatever

█████████ that in some cases the ability to give Worlds Bids is keeping these companies viable and certainly driving up their value if we decide to acquire them").

Disputed that increasing the number of teams needed for Tier 1 status did not serve to help Varsity foreclose competition, which USASF encouraged and acknowledged:

> **Ex. 135**: In March 2019, Steve Peterson (USASF) emailed Tres LeTard (Varsity) informing him that WSA, an independent event producer, would be on probation the following season, and cheering Varsity's accomplishment in getting rid of competitors: "WSA did not make 125. That is 3! [thumbs up emoji]." Mr. LeTard replied that it is "[g]etting hard out there" and Mr. Peterson completed the exchange with: "**You guys are knocking them off!** [smiley emoticon]."(emphasis added).

> **Ex. 136**: Heather Petz, owner of independent event producer ("IEP") Champion Cheer Central, reported that Varsity's conduct was making it difficult for her to reach the 125-team minimum to give Worlds bids: My numbers are down this year for our upcoming bid event due to mergers, small gyms going out of business, a lot of bids in Kentucky and Varsity putting a Summit Bid qualifier in the same building two weeks prior to my event.

> **Ex. 137**: In February 2018, another IEP explained how USASF's sanctioning and bid system makes it nearly impossible for non-Varsity event producers to obtain Worlds bids: "How will we ever be considered for WORLDS bids when current Tier 1 producers are syphoning off our customers with the bids they are already privileged to have? Man[y] of the Tier 3 producers are saying they are closing after this year. We are not the only company in jeopardy of closing our doors.

> There appears to be no way we will ever achieve Tier 1 status." Steve Peterson (USASF) forwarded this email to Varsity employees with: "**FYI...It's working** [smiley emoticon]."(emphasis added).

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs' additional narrative is irrelevant.

Of note, Plaintiffs also do not dispute that the Sanctioning Committee had a non-Varsity majority in August 2014.  See Pls.' Resp. to Defs.' SUF No. 126. The cited documents do not contradict the undisputed evidence that the proposal was not fully supported by Varsity.

141.    Despite these changes announced in 2014 and 2015 regarding Tier 2 and the 125-team minimum, very few USASF EPs were affected. (Ex. J, Peterson Dep. (Day 1) 52:14-53:12.)  Only two event producers lost their Worlds Bid Events between the 2015-2016 and 2019-2020 All Star seasons: one of which was owned by a Varsity brand EP and one of which was not.  (ECF No. 384, Orszag Report ¶73 & nn.140-143; Ex. Z, Orszag Backup Materials; Ex. AA, USASF_00019474 at -474; Ex. AB, USASF_00019528 at -528; Ex. AC, USASF_00020057 at -057).  These two event producers were replaced by

the next-qualifying events, one of which was owned by a Varsity brand EP and one of which was not. (ECF No. 384, Orszag Report ¶73 & nn.140-143; Ex. Z, Orszag Backup Materials.)  In other words, when these rule changes went  into effect, Varsity lost one Worlds Bid Event and gained one Worlds Bid Event, and a non- Varsity EP lost one Worlds Bid Event and a different non-Varsity event producer gained one Worlds Bid Event.  (Id.).

**Plaintiffs' Response to SUF No. 141: Disputed.**

Disputed that "very few USASF EPs were affected" and no competent evidence is cited in support. Non-Varsity event producers were negatively impacted by the rule changes. *See* Resp., ¶140.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted.  Plaintiffs ultimately bear the burden of proof on this issue.  Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue.

Of note, Plaintiffs do not identify any non-Varsity EPs who lost Worlds bids after this rule change.  Plaintiffs baldly claim that non-Varsity EPs were "negatively impacted," but do not point to any evidence showing how this rule resulted in any antitrust injury, or even a loss of Worlds bids by non-Varsity EPs.

142.    None of the events identified by Plaintiffs' experts that were allegedly victimized by "attack events" lost their ability to award Worlds Bids.  (ECF No. 384, Orszag Report, ¶73- 74, 80 ("[T]he empirical evidence shows that USASF, on balance, did not have any incremental effect on Varsity's control of Worlds Bid events."); Ex. Z, Orszag Backup Materials; Collective Ex. AD, USASF_00086125, USASF_00002776, USASF_00002779, USASF_00002782, USASF_00002785; ECF 382-3 at pp. 73-78 (summarizing Plaintiffs' evidence of alleged "counterprogramming".)

**Plaintiffs' Response to SUF No. 142: Disputed.**

*See* **Ex. 2** [Netz Rebuttal] at 80-81 & n. 343-346, for just one example—IEP Mardi Gras was put on probation after not meeting the team minimum, lost its Tier 1 status, and was acquired by Varsity. Varsity subsequently canceled the event it used to target Mardi Gras.

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted.  Plaintiffs' additional narrative is irrelevant as they do not dispute that the Mardi Gras event did not lose any Worlds bids.

Plaintiffs ultimately bear the burden of proof on this issue.  Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue.

Further, Plaintiffs fail to support their irrelevant narrative with admissible evidence:  they cite only their expert's recitation and interpretation of documents, which is inadmissible.  Fed. R. Evid. 702, 403.

Finally, Plaintiffs' reliance on Varsity's unilateral conduct in acquiring Mardi Gras (see Pls.' Resp. to Defs.' SUF No. 128, conceding that USASF did not participate in Varsity's acquisitions), is not material to the claims against USASF.

143.   There is no evidence that USASF ever deviated from its Worlds Bid Criteria to benefit Varsity.  In fact, the only instance where USASF deviated from its Worlds Bid Criteria was in 2020 and was to the detriment of Varsity.  In that instance, two non-Varsity EPs who had been on probation failed to satisfy the 125-team minimum and should have lost their Worlds Bid Events for the following season.  Instead, USASF granted an exception and permitted them to maintain their Worlds Bid Events.  In addition, instead of merely approving the two Varsity- owned events that had next-priority to replace these two non-Varsity events, USASF made another exception to its Worlds Bid Event process to permit two more non-Varsity EPs to hold Worlds Bid Events, bringing the number of Worlds Bid Events to 46 for the 2020-2021 season. (ECF No. 384, Orszag Report ¶80 n.157; Ex. AE, USASF_00012988; Ex. J, Peterson Dep. (Day 1) 261:9-262:24.)

**Plaintiffs' Response to SUF No. 143: Disputed.**

Disputed. USASF documents show that the only reason USASF and Varsity acquiesced to allowing the two IEPs to remain as Tier 1 (though on probation) was because of unrest among the other IEPs. As USASF's Steve Peterson put it, "In light of everything that has taken place over the past 4-5 months and the frustrations I have heard from many of our EP members, I would like to make a recommendation that we take a few steps back and allow the two Tier 1 EPs (ASC and Cheer Tech) another year as Tier 1 EPs and remain on probation." See **Defs' Ex. AE**, USASF_00012988 (italics added). One expression of that frustration came in the form of a public letter in or around October of the previous year from a group called Allstar United, calling for meetings of IEPs to organize a separate All Star organization that specifically excluded

Varsity. **Ex. 261** at –6688. The letter made Varsity nervous: ███████████
███████████████████████████████████████████████████████
███████████ *Id.* at –6690. Nonetheless, Varsity's proposed responses included:
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████ *See also* Resp.,
¶¶129, 135, 140, 141.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted. Plaintiffs ultimately bear the burden of proof on

this issue. Defendants have pointed out the absence of a genuine issue of material fact, and

Plaintiffs have failed to produce admissible evidence to establish a genuine issue.

Of note, Plaintiffs fail to identify a single instance where USASF deviated from its rules

to benefit from Varsity. The only instance discussed involved USASF allowing two non-Varsity

EPs to keep their Worlds bids even though they otherwise would not have satisfied the criteria

and offering Worlds bids to two additional non-Varsity EPs in excess of the 42-event limit, i.e.,

USASF deviating from its rules contrary to Varsity's interests. The other additional narrative in

this response has nothing to do with USASF deviating from its rules to benefit Varsity, but

discuss irrelevant and inadmissible hearsay complaints by third-parties and Varsity's own

internal documents.

144.  The Worlds Bid Guidelines set forth the criteria for roughly 42-46 Worlds Bid Events,
      which represents a small fraction of the "hundreds" of All Star cheerleading events. (Ex.
      A, Chadwick Dep. 286:6-7; Ex. AF, VAR00421095 at -095 (reflecting there were 668
      USASF- sanctioned events in the 2015-2016 season).) They had nothing to do with any
      other cheerleading event. (Ex. O, Peterson Dep. (Day 2) 539:2-25.)

      **Plaintiffs' Response to SUF No. 144: Disputed.**

      Disputed as misleading to the extent that it creates the impression that the other event
      producers were not negatively affected by Varsity's control of the USASF. *See* Resp., ¶¶129, 135,
      140, 141.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs' response does not create a genuine dispute of material fact as to the limited scope of Worlds Bid Guidelines, and this fact should be deemed admitted. Plaintiffs' additional narrative is irrelevant. Plaintiffs also do not genuinely dispute that the number of Worlds bid events constitute a small fraction of the total number of All Star competitions.

145. There is no evidence that USASF participated in any conversations with Varsity regarding setting prices for registration or spectator fees for Varsity's cheerleading competitions. (Ex. Q, Netz Dep. 315:24-316:5; Ex. L, Stangle Decl. ¶5.)

    **Plaintiffs' Response to SUF No. 145: Undisputed for purposes of summary judgment only.**

    **Defendants' Reply:** No response required.

146. USASF is not a cheer apparel manufacturer, distributor, or retailer. (Ex. L, Stangle Decl. ¶6.)

    **Plaintiffs' Response to SUF No. 146: Undisputed for purposes of summary judgment only.**

    **Defendants' Reply:** No response required.

147. In 2012, USASF first adopted its "Image Policy" (now known as the Athletic Performance Standards) to set out general rules and guidelines regarding athlete appearance at USASF-sanctioned competitions. (See Ex. AG, USASF_00088638 at -639; Ex. AH, USASF_00088659.)

    **Plaintiffs' Response to SUF No. 147: Undisputed for purposes of summary judgment only.**

    **Defendants' Reply:** No response required.

148. This policy was developed through a collaborative process involving USASF's members, including cheerleading uniform companies other than Varsity. (Ex. V, USASF_00055929 at -930 ("[T]here was a meeting of affiliate member uniform companies in March [2014] to review the policy."); Ex. A, Chadwick Dep. 450:18-451:18 ("The major players, in my mind, from the uniform was Rebel Athletic, and they were involved from the very beginning."); Ex. AI, Wright Dep. 32:6-17 (recalling that Motionwear, Rebel Athletic, GK Elite, and Glitter Stars were involved in discussions).)

    **Plaintiffs' Response to SUF No. 148: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

149.  USASF's Image Policy does not require athletes to wear apparel manufactured or sold by any particular company. (Ex. AH, USASF_00088659.)

**Plaintiffs' Response to SUF No. 149: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

150.  The purpose behind the coverage guidelines was to help legitimatize the sport and protect against athlete exploitation. (Ex. AJ, USASF_00022109; Ex. AI, Wright Dep. 32:25-33:25)

**Plaintiffs' Response to SUF No. 150: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

151.  The main guideline impacting apparel set to go into effect for the 2012-2013 season was the "Cover Up Guidelines," which stated that "Athletes with non-full top uniforms must wear a t-shirt or other suitable cover up over their uniforms unless they are in the warm-up area, traveling as a group directly to or from the warm up area, or on the performance stage." (Ex. AH, USASF_00088659 at -660-661.) This guideline only impacted athletes with "non-full top uniforms" and could be satisfied by wearing "a t-shirt or other suitable cover up" (of any brand) when outside the performance area or warm-up areas. (Id.; see also Ex. A, Chadwick Dep. 448:16-19 ("You know, changing the appearance could be as easy as the athlete putting on a T-shirt or something like that. It didn't necessarily require an entire new uniform.").)

**Plaintiffs' Response to SUF No. 151: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

152.  The Image Policy announced in 2012 also included a bow guideline set to go into effect the 2013-2014 season, which limited the size of bows cheerleaders could wear while performing. (Ex. AH, USASF_00088659 at -660-661.) This guideline could be satisfied by wearing a bow of a smaller size, from any apparel manufacturer or bow company, or by wearing no bow at all. (Id.)

**Plaintiffs' Response to SUF No. 152: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

153.    The Image Policy announced in 2012 also included an "Appropriate Uniform" section, which was not scheduled to go into effect until the 2015-2016 season, well over three years after it was announced.  (Ex. AH, USASF_00088659 at -660-661.)  This section provided as follows:

> UNIFORM TOP GUIDELINES
> Uniform tops may not include an exposed midriff (crop top) except when worn by athletes competing in Senior divisions.  Uniform tops must be secured by straps or material over at least one shoulder or around the neck (tube tops are not allowed).

(Id.)  This policy could be satisfied by any brand of uniform, so long as it was not "sexually provocative" and provided age-appropriate coverage.  (Id.; see also Ex. Q, Netz Dep. 329:25- 330:18 (agreeing that USASF's Image Policy could be satisfied by manufacturers other than Varsity).)

**Plaintiffs' Response to SUF No. 153: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

154.    In announcing the "Appropriate Uniform" policy several years before it was to go into effect, USASF considered the purchase cycle for uniforms and recognized that teams buy uniforms for use over multiple years.  (Ex. A, Chadwick Dep. 447:14-448:1.)

**Plaintiffs' Response to SUF No. 154: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

155.    USASF's Image Policy does not present a barrier to entry for apparel manufacturers.  (Ex. Q, Netz Dep. 330:22-25.)

**Plaintiffs' Response to SUF No. 155: Disputed as legal argument.**

This purported fact attempts to pass a legal judgment as a statement of fact. Such arguments are inappropriate in a statement of material facts. *See, e.g.*, *Sutton v. CHSPSC, LLC*, No. 116CV01318STAEGB, 2018 WL 3318961, at *2 (W.D. Tenn. July 5, 2018) (a concise statement of facts is "not the place" for legal argument; legal opinion or argument in the concise statement of facts is not helpful to the court).

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted.  Plaintiffs ultimately bear the burden of proof on this issue.  Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue.  Further, the

cited material fact came directly from Plaintiffs' expert's deposition testimony, and Plaintiffs do

not rebut it with any contrary evidence. See Defs.' Ex. Q, Netz Dep. at 330:22-25.

156.    USASF's Image Policy only applies to USASF-sanctioned events. It has no application
        to school cheer events, non-USASF All Star Cheer events, camps, or practices. (Ex. L,
        Stangle Decl. ¶7; see also SUF ¶41.)

        **Plaintiffs' Response to SUF No. 156: Undisputed for purposes of summary judgment
        only.**

        **Defendants' Reply:** No response required.

157.    USASF's role as a sanctioning organization is limited to the sport of All Star cheer. (Ex.
        AK, Heeb Dep. 290:8-11.)

        **Plaintiffs' Response to SUF No. 157: Undisputed for purposes of summary judgment
        only.**

        **Defendants' Reply:** No response required.

158.    USASF's members include All Star cheer athletes, coaches, gym owners, and event
        producers. (Ex. AL, Clark Dep. 27:1-28:16; Ex. AM, Wilson Dep. 44:2-11.)

        **Plaintiffs' Response to SUF No. 158: Undisputed for purposes of summary judgment
        only.**

        **Defendants' Reply:** No response required.

159.    USASF's rules and policies do not apply to School Cheer, nor do they apply to camps.
        (Ex. A, Chadwick Dep. 40:1-4; Ex. L, Stangle Decl. ¶8; Ex. CZ, Newby Dep. 632:5-9 (Q.
        And does the USASF have anything to do with those events, either in terms of owning
        the event or promoting it? A. Nothing at all to do with any school events."); Ex. BJ,
        Kennedy Dep. 209:1-9 ("Q. Do school cheerleaders' uniforms have to comply with
        USASF's rules? A. Not with the USASF. Q. Do school cheerleaders routines have to
        comply with USASF's rules? A. Not with the USASF. Q. So school cheer and All Star
        cheer are not the same thing. Right? A. In my opinion, no."); Ex. AY, Lorenzen Dep.
        191:22-202:19 (explaining that Plaintiff Lorenzen's daughter was not a USASF member,
        and Ms. Lorenzen [*sic*] has not paid money to USASF).)

        **Plaintiffs' Response to SUF No. 159: Undisputed for purposes of summary judgment
        only.**

        **Defendants' Reply:** No response required.

160.    Plaintiffs have no evidence that the alleged conduct by USASF caused any impact on
        pricing in any of the proposed markets. (Ex. AK, Heeb Dep. 302:6-9 (acknowledging

that he did not attempt to isolate what "price effects" he found "resulted from the alleged conspiracy with USASF as opposed to the other challenged conduct."); see also SUF ¶63.)

**Plaintiffs' Response to SUF No. 160: Disputed.**

USASF's concerted conduct bolstered Varsity's dominant position in the Cheer Competitions Market, which Varsity exploited to charge supracompetitive prices in all three relevant product markets. PSOF, ¶¶45, 131-147; *see also* Resp., ¶¶129, 135, 140, 141.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue.

Further, Plaintiffs suggest in response that "USASF's concerted conduct bolstered Varsity's dominant position in the Cheer Competitions Market, which Varsity exploited to charge supracompetitive prices in all three relevant product markets." Plaintiffs do not support their assertion that USASF's rules caused supracompetitive pricing with evidence. Instead, Plaintiffs cite to legal conclusions and statements not supported by the record.

161. Plaintiffs have no evidence that USASF had the specific intent that Varsity monopolize the proposed markets. For example, USASF was financially independent from Varsity during this time period. (Ex. AO, USASF_00023946 at -948 ("USASF has repaid the full balance of the start up loan to Varsity . . . and has enough working capital to remain financially independent moving forward."); Ex. AP, USASF_00051791 at -793 ("[T]he organization was able to make significant strides toward funding [an operating] reserve in 2014, with goal of fully funding the reserve in 2015."), -794 (USASF's "move [to new office space] was complete in February, 2015").) There is no evidence that USASF, as an organization, had anything to gain as a result of the alleged monopolization and supracompetitive pricing.

**Plaintiffs' Response to SUF No. 161: Disputed.**

Disputed as immaterial; specific intent is not a requisite element for any of Plaintiffs' claims. Plaintiffs have not asserted a claim for attempted monopolization or conspiracy to monopolize under Section 2 of the Sherman Act, or under any analogous state law.

Plaintiffs further dispute that the USASF has nothing to gain from Varsity monopolization and supracompetitive pricing, or that there is no evidence of such. USASF could not have

97

survived without Varsity's financial backing for much of its existence. *See, e.g.,* PSOF, ¶¶43, 196.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Even under Sherman Act section 1, Plaintiffs must show that there was "some sort of deliberately coordinated or agreed upon behavior." *See Richter Concrete Corp. v. Hilltop Basic Resources, Inc.*, 547 F. Supp. 893, 919 (S.D. Ohio 1981). Plaintiffs have the burden to prove that USASF took deliberate action or knowingly entered into agreement. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue.

162.    Jeff Webb founded Varsity in 1974. (Compl. ¶70; Ex. CR, Webb Decl. ¶3.)

**Plaintiffs' Response to SUF No. 162: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

163.    Through Varsity, Jeff Webb introduced innovations to cheerleading, including a focus on athleticism and dedicated cheer competitions. (Compl. ¶79.)

**Plaintiffs' Response to SUF No. 163: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

164.    Millions of athletes participate in cheerleading. (Compl. ¶44.)

**Plaintiffs' Response to SUF No. 164: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

165.    With some variations of his specific title, Jeff Webb was Varsity's CEO from 1974 until March 2016. (Ex. CR, Webb Decl. ¶3.)

**Plaintiffs' Response to SUF No. 165: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

166.    In December 2015, the Varsity Brands, LLC Board of Directors decided to replace Jeff Webb as CEO of Varsity Brands. (Ex. CP, Beer Dep. 98:17-101:4.; Ex. CU, Janower Dep. 38:20-39:16.)

**Plaintiffs' Response to SUF No. 166: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

167.    Effective March 2, 2016, Jeff Webb was replaced as CEO, and was subsequently given the title of Founder and Chairman of the Board of Varsity Brands. (Ex. CR, Webb Decl. ¶4.)

**Plaintiffs' Response to SUF No. 167: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

168.    After March 2, 2016, Jeff Webb was not a member of Varsity's Executive Leadership Team. (Ex. CU, Janower Dep. 118:15-119:20; Ex. CV, CB00314261 (Janower Ex. 16).)

**Plaintiffs' Response to SUF No. 168: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

169.    After March 2, 2016, Jeff Webb was not a member of Varsity's Senior Leadership Team. (Ex. CU, Janower Dep. 118:15-119:20; Ex. CV, CB00314261 (Janower. Ex. 16).)

**Plaintiffs' Response to SUF No. 169: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

170.    After March 2, 2016, Jeff Webb was not a member of Varsity's Corporate Support Group. (Ex. CX, CB00373462 (Kalvelage Ex. 5 at -498); Ex. CQ, Kalvelage Dep. 104:1-13.)

**Plaintiffs' Response to SUF No. 170: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

171.    After March 2, 2016, Jeff Webb did not possess operational authority at Varsity and he was not involved in Varsity's day-to-day business. (Ex. DH, Webb Dep. (Day 2) 260:15–261:22 (stating he "did not have actual operational authority but, you know, overall input, mostly communications . . ."), 271:21-273:11 ("once I moved from chairman and CEO to just chairman during early 2016, again, I didn't have, like, this operational authority, and I wasn't involved in, you know, making all these personnel decisions and all the strategic

decisions . . ."); Ex. CZ, Newby Dep. 652:14-653:1 (Q: "From your vantage point, how did you view Mr. Webb's role while he was chairman of the Board?  A:  "I would say more like an advisor . . ." Q: "Was [Webb] involved in day-to-day operation decisions, as far as you could tell?" A: "As far as I could tell, no.").)

**Plaintiffs' Response to SUF No. 171: Disputed.**

Jeff Webb still possessed operational authority at Varsity after March 2, 2016, because he continued to be involved in the day-to-day business affairs and strategy after that date. See PSOF, ¶¶ 153, 154, 155, 156, 157, 158, 159; *see also*, **Ex. 129**; **Ex. 173** at –8032-34; **Ex. 20** [Cota Dep.] at 78:13-21, 310:24-311:7; **Ex. 132** at –4139; **Ex. 262** at –3719; **Ex. 13** [LeTard Dep.] at 354:5-12; **Ex. 212** at –2020; **Ex. 263** at –0326 (in a May 8, 2018 Webb email to USASF President Jim Chadwick, Webb asks for a meeting to "review financial stuff for the coming year based on conversations you, John and I have been having" and suggests inviting two other USASF executives for a second meeting "on the major issues facing All Star and Cheer in general"); **Ex. 264** at –9969.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted.  Plaintiffs suggest that Mr. Webb was involved with the "day-to-day business affairs" of Varsity, but ignore the undisputed evidence that Mr. Webb did not have "operational control" at Varsity after March 2, 2016.

Plaintiffs do not support their assertion that Mr. Webb "possessed operational authority at Varsity after March 2, 2016" because none of the cited evidence supports that assertion.

172.    After March 2, 2016, Jeff Webb was not "still driving the business" for Varsity, but was in a support role for other executives. (Ex. CU, Janower Dep. 121:11-123:3; Ex. CW, CB00114878 (Janower Dep. Ex. 18) at -878 (reflecting Jeff Webb's roles projected to be continued support to Mr. Seely, supporting Project Impact, and providing advice "as requested by Seely and Nichols.")).)

**Plaintiffs' Response to SUF No. 172: Disputed.**

Disputed. *See* Resp., ¶171

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted.  Plaintiffs suggest that Mr. Webb was involved with the "day-to-day business affairs" of Varsity, but ignore the undisputed evidence that Mr. Webb was in a support role not "still driving the business" and provided advice "as requested by [Bill] Seely and [John] Nichols."

173.    After March 2, 2016, Jeff Webb operated as an advisor for Varsity and provided input to the company, primarily with respect to Varsity's communications efforts. (Ex. DH, Webb

100

Dep. (Day 2) 260:15-261:22, 271:21-273:11; Ex. CZ, Newby Dep. 652:14-23; Ex. DG, Seely Dep. 572:12-13, 573:12-22) (explaining that Jeff Webb "was just an advisor" in 2017).)

**Plaintiffs' Response to SUF No. 173: Disputed.**

Undisputed that Webb was an advisor.

Disputed that his advisory role primarily concerned communication efforts. *See* Resp., ¶171.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs suggest that Mr. Webb was involved with the "day-to-day business affairs" of Varsity, but ignore the undisputed evidence that Mr. Webb's advisory role primarily concerned communications.

174. After Jeff Webb was no longer CEO of Varsity he acted as "the face of the company," conducting "a lot of the media interviews." (Ex. DH, Webb Dep. (Day 2) 190:16-191:5, 271:24-273:11.)

**Plaintiffs' Response to SUF No. 174: Undisputed.**

**Defendants' Reply:** No response required.

175. After March 2, 2016, Jeff Webb remained available to provide "guidance" and "perspective" to the Varsity Spirit team, including advice on strategy, branding, positioning, and culture. (Ex. DH, Webb Dep. (Day 2) 271:21-273:11.)

**Plaintiffs' Response to SUF No. 175: Undisputed.**

**Defendants' Reply:** No response required.

176. After Jeff Webb was no longer CEO, responsibility for day-to-day operations of Varsity Spirit fell to two other individuals—John Nichols and, later, Bill Seely. (Ex. DA, Nichols Dep. 25:19-26:5 (serving as executive vice president July 2013 – October 2017, with responsibility for "overall operations and results of Varsity Spirit"); Ex. G, Seely Dep. 42:17- 43:1 (serving as president of Varsity Spirit from September- 2017 with responsibility to "overs[ee] Varsity's day-to-day business").)

**Plaintiffs' Response to SUF No. 176: Disputed.**

Webb was involved in day-to-day operations. See Resp., ¶171.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs suggest that Mr. Webb was involved with the "day-to-day business affairs" of Varsity, but ignore the undisputed evidence that John Nichols and Bill Seely were responsible for Varsity Spirit's overall and day-to-day operations after March 2, 2016.

177. After March 2, 2016, neither John Nichols nor Bill Seely reported to Jeff Webb. (Ex. DA, Nichols Dep. 27:2–28:8; Ex. G, Seely Dep. 43:2–7.)

**Plaintiffs' Response to SUF No. 177: Disputed.**

After March 2, 2016, both John Nichols and Bill Seely communicated frequently with Jeff Webb, reporting new developments and seeking his guidance. *See* Resp., ¶171.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs' additional narrative is irrelevant, does not create a genuine dispute of material fact, and is unsupported by the evidence. Plaintiffs ignore the undisputed evidence that John Nichols and Bill Seely did not report to Mr. Webb after March 2, 2016.

178. In July 2018, funds advised by Bain Capital acquired a majority interest in Varsity Brands. (Ex. DC, O'Rourke Dep. 17:1-23; Ex. CM, Cotton Dep. 55:22-56:4.)

**Plaintiffs' Response to SUF No. 178: Disputed as incomplete and misleading.**

The cited testimony states that "Funds *managed* and advised by Bain Capital were the acquiring entities of Varsity Brands." Defendants Ex. CM, Cotton Deposition, 56:2-4 (emphasis added).

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs' additional assertion that the funds were "managed" by Bain Capital does not create a genuine dispute of material fact.

179. After the Bain transaction in 2018, Jeff Webb was no longer a member of Varsity's Board of Directors. (Ex. DC, O'Rourke Dep. 64:10-13; Ex. CR, Webb Decl. at ¶10.)

**Plaintiffs' Response to SUF No. 179: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

180.    After July 2018, Jeff Webb held the title of Chairman of Varsity Spirit, a title that was effectively "meaningless." (Ex. CR, Webb Decl. at ¶10; Ex. DC, O'Rourke Dep. 68:4-70:8; Ex. DD, BAIN00062831 (O'Rourke Ex. 9 at -834.).

**Plaintiffs' Response to SUF No. 180: Disputed.**

Disputed that Webb's title was "meaningless" (as Defendants' own proffered evidence also disputes. *See* Defendants' Ex. DC, Deposition of Tom O'Rourke, May 4, 2022, at 70:9-14-.). No competent evidence is cited in support of this assertion and Defendants thus fail to assert a material fact.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs suggest that Mr. Webb's title was not "meaningless" but ignore the undisputed evidence that those deciding his title described it as "meaningless." *See* Defs.' Ex. CR. Plaintiffs do not support their assertion that "Defendants' own proffered evidence" disputes the asserted fact because the evidence does not dispute it.

181.    After July 2018, Jeff Webb remained focused on international cheer, worked at camps, and acted in an advisory role to the president of Varsity Spirit. (Ex. DE, BAIN00013400 (O'Rourke Ex. 8 at -400.)

**Plaintiffs' Response to SUF No. 181: Disputed.**

After July 2018, Jeff Webb continued to set strategy and business decisions for Varsity's day-to-day operations. *See* Resp., ¶171.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs suggest that Mr. Webb "continued to set strategy and business decisions" for Varsity, but ignore the undisputed evidence that he remained focused on international cheer, worked on camps, and acted in an advisory role to the President of Varsity Spirit.

Plaintiffs do not support their assertion that Mr. Webb "continued to set strategy and business decisions for Varsity's day-to-day operations," as the cited evidence does not support the assertion.

182.    After July 2018, Jeff Webb was viewed as Varsity's "culture keeper and inspiration, not perceived as [an] operator" at Varsity. (Ex. DF, BAIN00074357 (O'Rourke Ex. 22) at -357; Ex. DC, O'Rourke Dep. at 122:12-124:10, 125:8-24.)

**Plaintiffs' Response to SUF No. 182: Disputed as misleading.**

The cited quote is taken out of context. The full quote, from an email from then-newly installed CEO of Varsity Brands Adam Blumenfeld to the new owners at Bain, states, "As it relates to varsity spirit, *it's important his role is as* culture keeper and inspiration, not perceived as operator." Defs' Ex. DF, BAIN00074357 at 357 (italics added). The full quote shows that Blumenfeld said it was important to new owners that Webb not be perceived as running Varsity. As Webb told Brandon White (Managing Director, Charlesbank), his role was much more active: "I'm the face of the industry and the company and I think I can add a lot of value in international, camps, mentoring Bill, helping with strategy, etc. Bill and I compliment [*sic*] one another very well. Our offices are next to one another. We talk everyday. He's my protege and he's doing a great job." *Id.* at 358.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be

deemed admitted. Plaintiffs' additional narrative is irrelevant.

183.    Jeff Webb is the president of the International Cheer Union ("ICU"), a non-profit organization, and has held the position for approximately one decade. (Ex. CR, Webb Decl. ¶11; Ex. DH, Webb Dep. (Day 2) 13:8-25.)

**Plaintiffs' Response to SUF No. 183: Disputed as incomplete and misleading.**

Undisputed that Webb is currently serving as President of the International Cheer Union ("ICU") and has held the position for the last ten years.

Disputed insofar as the assertion implies Webb has held the position for only one decade. Webb has held the position since the ICU's inception in 2007. *See* PSOF, ¶ 162.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be

deemed admitted. Plaintiffs' additional narrative is irrelevant.

184.    The ICU cheerleading's international governing body, and is recognized as such by the International Olympic Committee ("IOC"). (Ex. CR, Webb Decl. ¶11.)

**Plaintiffs' Response to SUF No. 184: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs respond that the statement is "not supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue. As President of the ICU, Mr. Webb is a person with knowledge supporting the fact. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue.

185. After Jeff Webb left his role as Varsity's CEO, he remained the president of the ICU, and continued to focus on the growth of cheerleading internationally, and gaining recognition by the IOC. (Ex. CR, Webb Decl. ¶5; Ex. DH, Webb Dep. (Day 2) 260:15-264:10; Ex. DB, Noone Dep. (Day 2) 330:13-24.)

**Plaintiffs' Response to SUF No. 185: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

186. Effective, December 31, 2020, Jeff Webb's employment with Varsity ended. (Ex. CR, Webb Decl. ¶10.)

**Plaintiffs' Response to SUF No. 186: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

187. Jeff Webb remains the president of the ICU. (Ex. CR, Webb Decl. ¶11.)

**Plaintiffs' Response to SUF No. 187: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

188. After March 2016, Jeff Webb had limited involvement with Varsity's acquisitions. (Ex. CR, Webb Decl. ¶6.)

**Plaintiffs' Response to SUF No. 188: Disputed.**

See PSOF ¶¶ 94-100, 103, 148, 154-155.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs suggest their own SUF is a basis to

dispute the fact that Mr. Webb had limited involvement in acquisitions after March 2, 2016, but they do not identify a single acquisition with which he was involved at all, much less involved beyond a "limited" capacity. They ignore the undisputed evidence that Mr. Webb had limited involvement in acquisitions after March 2, 2016.

189.    After March 2, 2016, Jeff Webb did not identify event producers as potential targets for acquisitions. (Ex. CR, Webb Decl. ¶6.)

**Plaintiffs' Response to SUF No. 189: Disputed.**

See PSOF, ¶¶ 153-155; see also Ex. 109 at –4423.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs suggest their own SUF is a basis to dispute the fact that Mr. Webb did not identify event producers for acquisitions after March 2, 2016, but they do not identify a single acquisition of an event producer that Mr. Webb identified after March 2, 2016. They ignore the undisputed evidence that Mr. Webb did not identify potential acquisitions of event producers after March 2, 2016.

190.    After March 2, 2016, Jeff Webb did not negotiate acquisitions. (Ex. CR, Webb Decl. ¶6.)

**Plaintiffs' Response to SUF No. 190: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

191.    After March 2, 2016, Jeff Webb did not direct Varsity employees to pursue acquisitions or decline to pursue acquisitions. (Ex. CR, Webb Decl. ¶6.)

**Plaintiffs' Response to SUF No. 191: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

192.    After March 2, 2016, Jeff Webb was "not in . . . a position of authority to approve anything or . . . to make any operational decisions at all" and he would not "be authorizing any acquisition or declining any acquisition." (Ex. DH, Webb Dep. (Day 2) 217:14-218:18.)

**Plaintiffs' Response to SUF No. 192: Disputed.**

106

After March 2, 2016, Mr. Webb remained Chairman of the Varsity Board of Directors until July 2018. As a member of the Board of Directors it was Mr. Webb's responsibility to vote to approve or disapprove all acquisitions over ███████. PSOF, ¶¶155.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs' additional narrative is irrelevant because Plaintiffs do not identify any acquisitions requiring approval of the Varsity Board of Directors between March 2, 2016 and July 2018.

193.　After March 2, 2016, while Jeff Webb was Chairman of the Board for Varsity Brands, his authority over acquisitions was limited to that of a single board member. (Ex. CQ, Kalvelage Dep 207:24-209:7, 210:2-5.)

**Plaintiffs' Response to SUF No. 193: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

194.　The only acquisitions that required board approval were those with a purchase price above ███████. (Ex. CQ, Kalvelage Dep. 209:19-210:1.)

**Plaintiffs' Response to SUF No. 194: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

195.　After he was no longer CEO, but while Jeff Webb was Chairman of the Board for Varsity Brands, he possessed just one vote, like any other board member and had no veto power. (Ex. CQ, Kalvelage Dep. 209:4-12.)

**Plaintiffs' Response to SUF No. 195: Undisputed.**

**Defendants' Reply:** No response required.

196.　From November 2017 until Jeff Webb's employment at Varsity ended, it was extremely rare for Jeff Webb to meet with Varsity Spirit's Chief Financial Officer, Pash Nangia. (Ex. CY, Nangia Dep. 18:1-7, 21:7-17) ("There was no need for me as the CFO of Varsity Spirit to meet with Mr. [Webb] at a professional level.") Any direct communications with Jeff Webb were "absolutely casual" such as exchanging morning greetings. (Id. at 21:14-17.)

**Plaintiffs' Response to SUF No. 196: Undisputed.**

**Defendants' Reply:** No response required.

197. Jeff Webb did not participate in the creation of Varsity's rebate programs—the Varsity Family Plan or the Network Agreements. (Ex. DH, Webb Dep. (Day 2) 134:15-24.).

**Plaintiffs' Response to SUF No. 197: Disputed.**

*See* PSOF, ¶ 149.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs do not support their assertion that Mr. Webb participate in the creation of Varsity's rebate programs with evidence. The cited deposition testimony does not state that Mr. Webb participated in the creation of Varsity's rebate programs. Moreover, Plaintiffs do not controvert this fact with admissible evidence; instead, they cite only their expert's recitation and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

198. When Jeff Webb was Varsity's CEO, he was not regularly consulted regarding Varsity's rebate programs. (Ex. CZ, Newby Dep 389:1-13.) ("I don't recall speaking to Mr. Webb about proposed changes to the Family [P]lan . . . I wouldn't say 'regularly consulted.'")

**Plaintiffs' Response to SUF No. 198: Disputed as incomplete and misleading.**

Disputed; the evidence cited contradicts the fact stated. *See* Defendants' Ex. CZ at 389:10-13: "I reported to Jeff at the time, so I would have run business decisions by him to get his feedback or thoughts." *See* Defendants' Exhibits CG, CH, CI, CJ, BW, BX, AV; *see also* Defendants' Statement of Undisputed Material Facts, ¶¶107, 108, 109; *see also* PSOF, ¶ 149.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs' additional narrative is irrelevant because Plaintiffs do not identify any evidence showing that Mr. Webb was consulted regularly regarding Varsity's rebate programs.

199. Jeff Webb is "very vaguely" familiar with Varsity's network agreements. (Ex. DH, Webb Dep. (Day 2) 135:2-12.)

**Plaintiffs' Response to SUF No. 199: Disputed.**

Mr. Webb advised Mr. Newby as to how many events a gym should be required to attend to receive a rebate under the Family Plan. *See* Resp.¶198.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs do not support their assertion that Mr. Webb "advised Mr. Newby as to how many events a gym should be required to attend to receive a rebate" with evidence, as none of the evidence cited in Plaintiffs' response to Defs.' SUF No. 198 supports the assertion. Instead, Plaintiffs ignore the undisputed evidence that Mr. Webb is "very vaguely" familiar with Varsity's network agreements.

200.   Jeff Webb was not involved in decisions regarding the number of events that a particular All Star gym must attend to participate in the Varsity Family Plan. (Ex. DH, Webb Dep. (Day 2) 160:21-161:7; Ex. CR, Webb Decl. at ¶7.)

**Plaintiffs' Response to SUF No. 200: Disputed.**

Mr. Webb advised Mr. Newby as to how many events a gym should be required to attend to receive a rebate under the Family Plan. *See* Resp., ¶198.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs do not support their assertion that Mr. Webb "advised Mr. Newby as to how many events a gym should be required to attend to receive a rebate" with evidence, as none of the evidence cited in Plaintiffs' response to Defs.' SUF No. 198 supports the assertion.

201.   Jeff Webb was not involved in determining the benefits received by the gyms under the Varsity Family Plan. (Ex. CR, Webb Decl. at ¶7; Ex. DH, Webb Dep. (Day 2) 161:8-162:20.)

**Plaintiffs' Response to SUF No. 201: Disputed.**

Mr. Webb advised Mr. Newby as to the size of the rebate gyms should be entitled to under the Family Plan. *See* Resp., ¶198.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs do not support their assertion that Mr.

Webb "advised Mr. Newby as to the size of the rebate gyms should be entitled to under the

Family Plan" with evidence, as none of the evidence cited in Plaintiffs' response to Defs.' SUF

No. 198 supports the assertion.

202.    After he was no longer Varsity's CEO, Jeff Webb was not involved in the Varsity Family
        Plan or Network Agreements.  (Ex. CR, Webb Decl. ¶7; Ex. DH, Webb Dep. (Day 2)
        166:15-167:25 ("I wasn't in a position of authority at this point.").)

        **Plaintiffs' Response to SUF No. 202: Disputed.**

        Mr. Webb advised Mr. Newby as to how many events a gym should be required to attend
to receive a rebate under the Family Plan. *See* Resp., ¶198.

        **Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.  Plaintiffs do not support their assertion that Mr.

Webb "advised Mr. Newby as to how many events a gym should be required to attend to receive

a rebate" with evidence, as none of the evidence cited in Plaintiffs' response to Defs.' SUF No.

198 supports the assertion.

        Instead, Plaintiffs ignore the undisputed evidence that Mr. Webb was not involved in the

Varsity Family Plan or Network Agreements after he was no longer CEO.

203.    Jeff Webb has no knowledge of whether Varsity maintained a list of competitors' events.
        (Ex. DH, Webb Dep. (Day 2) 239:11-13.)

        **Plaintiffs' Response to SUF No. 203: Disputed.**

        Webb received at least one email that listed a competitor's events and showed Varsity's
"attack events" scheduled to be close in time and location to those of a competitor. **Ex. 150** at –
5328; PSOF ¶186.

        **Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.  Plaintiffs' citation to a single email on which Mr.

Webb was copied, and was one of eleven recipients, about a single competitor's events, does not

create a genuine dispute of material fact as to Mr. Webb's lack of knowledge of whether Varsity

maintained a list of competitors' events.

204. Jeff Webb is not aware of any strategy by Varsity to target competitors' events by placing Varsity events near the dates and locations of competitors' events. Specifically, Jeff Webb is not aware of any policy or practice by Varsity of attacking competitors' events, or any practice referred to as "attack events." (Ex. DH, Webb Dep. (Day 2) 236:20-237:14, 243:7-24.)

**Plaintiffs' Response to SUF No. 204: Disputed.**

*See* Resp., ¶203.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs' citation to a single email on which Mr. Webb was copied, and was one of eleven recipients, about a single competitor's events, does not create a genuine dispute of material fact as to Mr. Webb's lack of awareness of any policy or practice by Varsity of attacking competitors' events, or any practice referred to as "attack events."

205. Nobody ever sought Jeff Webb's recommendation about a practice of attempting to attract customers away from competitors' events to Varsity events by scheduling Varsity events close to those of Varsity's competitors. (Ex. DH, Webb Dep. (Day 2) 238:2-238:22.)

**Plaintiffs' Response to SUF No. 205: Disputed.**

*See* Resp., ¶203.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs' additional reference to a single email on which Mr. Webb was copied, and was one of eleven recipients, that included a list of a single competitor's events does not create a genuine dispute of material fact as to whether anybody ever sought Mr. Webb's recommendation about a practice of attempting to attract customers away from competitors' events to Varsity events by scheduling Varsity events close to those of Varsity's competitors.

206. After Jeff Webb was no longer CEO, he was not involved in, and did not have any control or decisions-making authority with respect to, selecting locations or dates for Varsity's cheer competitions. (Ex. CR, Webb Decl. ¶8.)

**Plaintiffs' Response to SUF No. 206: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

207.    After Jeff Webb was no longer CEO, he did not have any control or decision- making authority with respect to whether any Varsity-produced cheer competitions awarded bids for the Summit, or any other Varsity cheer competition, end-of-season or otherwise. (Ex. CR, Webb Decl. ¶8.)

**Plaintiffs' Response to SUF No. 207: Disputed.**

*See* Resp., ¶ 141, 171, 209; *see also* PSOF, ¶¶ 157, 158.

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted.  Plaintiffs suggest that their responses and their own SUF serve as a basis to dispute the fact that Mr. Webb did not have any control or decision-making authority with respect to whether any Varsity-produced cheer competitions awarded bids for the Summit, or any other Varsity cheer competition after he was no longer CEO.  None of the paragraphs to which they cite support their assertion.  They ignore the undisputed evidence that Mr. Webb lacked decision-making authority regarding Varsity competitions that could award bids after March 2, 2016.

208.    Jeff Webb has never been a member of USASF's Board of Directors or USASF's Sanctioning Committee. (Ex. CR, Webb Decl. ¶9; Chadwick Dep. 385:16-386:11.)

**Plaintiffs' Response to SUF No. 208: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

209.    Jeff Webb has never had authority over USASF's selection of events that can award bids to USASF's The Cheerleading Worlds ("Worlds"). (Ex. CR, Webb Decl. ¶9.)

**Plaintiffs' Response to SUF No. 209: Disputed.**

Disputed that Webb's unfounded statement refutes the evidence that he corresponded with USASF officials on a regular basis, either directly or indirectly through other Varsity executives concerning competition guidelines, policies and procedures, and general business strategy. **Ex. 265** at –3436]; **Ex 15** [Chadwick Dep.] at 392:4-18 (Webb was someone for

112

USASF to call on for advice on running USASF affairs), 386:12-25 ("Q. How frequently did you talk to Mr. Webb after the formal formation of USASF? A. On an as-needed basis, maybe sometimes weekly, maybe sometimes once a month or every six months. Q. Why would you need to talk to him on an as-needed basis? A. Very knowledgeable, a great advisor, seemed to be able to provide me insights that I was not able to -- to reach on my own. Q. Did you talk to him about USASF policies and procedures? A. When I needed his advice, yes.")

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs' additional narrative is irrelevant. Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue.

Of note, Plaintiffs do not identify any evidence demonstrating that Mr. Webb had authority over the USASF's selection of events that can award bids to USASF's The Cheerleading Worlds. Plaintiffs' reliance upon evidence that USASF President Jim Chadwick and others occasionally sought Mr. Webb's advice is irrelevant to the issue of Mr. Webb's lack of authority over selection of events that can award bids and does not create a genuine dispute of material fact.

210. Certain Varsity employees emailed Jeff Webb with proposals to change USASF's allocation of Worlds' bids, but those proposals were not implemented. (Ex. CF, LeTard Dep. 350:6-352:20.) (explaining that Mr. LeTard proposed a change to Jeff Webb, but it "never went to execution . . . it was just a brainstorm concept, idea.")

**Plaintiffs' Response to SUF No. 210: Disputed.**

Disputed as misleading, inaccurate, and unsupported by evidence. Defendants refer to employees (plural) that made proposals (plural) that were not implemented, but the cite to only one incident.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and

Plaintiffs have failed to produce admissible evidence to establish a genuine issue.  Of note,

Plaintiffs do not identify any proposals to change USASF's allocation of World bids that were

presented to Mr. Webb and implemented.

211.   Jeff Webb never directed any Varsity employee or USASF employee or director to
       effectuate a change in USASF's criteria for selecting events that can award bids to
       Worlds.  (Ex. CR, Webb Decl. ¶9.)

       **Plaintiffs' Response to SUF No. 211: Disputed.**

       Webb provided USASF CEO Jim Chadwick and Varsity manager Tres LeTard with input
on how World's bids should be awarded. **Ex. 15** [Chadwick Dep.] at 386:12-25, *See* **Ex. 266** at –
0541]; **Ex. 262** at –3719]; **Ex. 13** [LeTard Dep.] at 354:5-12.

       **Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.  Plaintiffs suggest that Mr. Webb "provided . . .

input on how World's bids should be awarded."  They ignore the undisputed evidence that Mr.

Webb never directed anyone at USASF or Varsity to take action to change USASF's criteria for

selecting events that can award bids to Worlds.  Plaintiffs' proffered evidence does not dispute

the asserted fact.

212.   Jeff Webb did not express opposition to non-Varsity event producers having the ability to
       award bids to Worlds.  (Ex. CS, USASF_00039789 (Chadwick Ex. 56 -789); Ex. A,
       Chadwick Dep. 485:22-486:14 (explaining that Jeff Webb expressed that he was "fine
       with adding 2 or 3 [non-Varsity] event producers to the 42 approved Worlds bid
       givers.").)

       **Plaintiffs' Response to SUF No. 212: Disputed.**

       Disputed that Webb did not express opposition.  **Ex. 132** at – 4139]; **Ex. 24** [Fowlkes
Dep.] at 215:23-25.

       **Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.  Plaintiffs suggest that Mr. Webb "express[ed]

opposition" to non Varsity events having the ability to award bids to Worlds.  However, they

ignore the undisputed evidence that Mr. Webb supported non-Varsity events being selected to

award bids to Worlds.  Moreover, Plaintiffs do not controvert this fact with admissible evidence.

Plaintiffs' Exhibit 132 is inadmissible because the witness lacked personal knowledge.

213.     USASF President Jim Chadwick occasionally sought advice from Jeff Webb because he
         viewed Jeff Webb as an expert and leader in competitive cheerleading.  (Ex. A, Chadwick
         Dep. 386:12-25 (describing Jeff Webb as "very knowledgeable, a great advisor, seemed
         to be able to provide me insights that I was not able to – reach on my own."), 390:2-16
         (seeking advice because "Jeff Webb is an expert at creating cheerleading
         competitions.").)

         **Plaintiffs' Response to SUF No. 213. Undisputed.**

         **Defendants' Reply:** No response required.

214.     USASF President Jim Chadwick was free to accept or disregard Jeff Webb's advice.  (Ex.
         A, Chadwick Dep. 492:15-493:12 (Q: "So as USASF president, you felt free to reject the
         requests from Jeff Webb?" A: "Yes.").)

         **Plaintiffs' Response to SUF No. 214: Disputed as misleading.**

         Jim Chadwick was a Varsity employee throughout his entire tenure at USASF. *See* **Ex. 15**
[Chadwick Dep.] at 41:14-19). Mr. Chadwick received a payment of approximately ▮▮▮▮▮
from the Varsity Spirit Employee Stock Ownership Plan ("ESOP") when Charlesbank purchased
Varsity in 2014. **Ex. 267** at –5726; *see also* **Ex. 15** [Chadwick Dep.] at 274:22-275).

         **Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be

deemed admitted.  Plaintiffs' additional narrative is irrelevant.

215.     Jeff Webb never told USASF President Jim Chadwick that the USASF needed to take
         action for Varsity's financial benefit.  (Ex. A, Chadwick Dep. 493:3-7.)

         **Plaintiffs' Response to SUF No. 215: Disputed.**

         Disputed that Webb did not request Chadwick act on behalf of USASF for Varsity's
financial benefit. **Ex. 212** at –2020] (September 5, 2017 email from Webb that he will let
Chadwick "know that some things are going to have to be different in that we are tired of making
our competitors successful and then having to overpay for them,"); **Ex. 263** at –0326. See also,
Resp., ¶211.

         **Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.  Plaintiffs suggest that Mr. Webb requested

USASF to act for Varsity's financial benefit, but do not cite to any material evidence supporting

their assertion. Of note, Plaintiffs do not identify a single instance in which Mr. Webb told Jim

Chadwick to take action for Varsity's financial benefit.

216.    The ICU hosts its own World Championship at Disney World, typically on back- to-back
        weekends with USASF's Worlds. (Ex. A, Chadwick Dep. 484:12-23.)

        **Plaintiffs' Response to SUF No. 216. Undisputed.**

        **Defendants' Reply:** No response required.

217.    USASF's Worlds' inclusion of international teams, and the fact that the ICU hosts a World
        Championship at the same location and back-to-back with USASF's Worlds were both
        reasons that USASF would communicate with Jeff Webb regarding issues relating to
        Worlds. (Ex. A, Chadwick Dep. 481:20-482:15, 483:14-485:10.)

        **Plaintiffs' Response to SUF No. 217: Disputed.**

        **Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material
fact. Thus, this fact should be deemed admitted. Plaintiffs do not controvert this fact with
admissible evidence, as they cite no evidence at all to dispute this fact.

218.    USASF sought Jeff Webb's input, as ICU president, regarding "USASF efforts to grow the
        sport and to coordinate with Olympic direction." (Ex. CT, USASF_00107876 (Chadwick
        Ex. 68 -878); Ex. A, Chadwick Dep. 490:9-492:10.)

        **Plaintiffs' Response to SUF No. 218. Undisputed.**

        **Defendants' Reply:** No response required.

219.    No Bain-affiliated individual was on the board of managers of BCPE Hercules GP, LLC
        until July 30, 2018. No Bain-affiliated individual has ever served on the boards of the
        Varsity Defendants. No Bain-affiliated individual has ever served as an officer of the
        Varsity Defendants. (Ex. CM, Cotton Decl. ¶6-8; *see also* Ex. CK, BAIN00067980, -983
        (providing that Josh Bekenstein, Ryan Cotton, Kim McCaslin, and Tom O'Rourke would
        become members of the BCPE Hercules GP, LLC Board of Managers on July 30, 2018);
        Ex. CL, Cotton Dep. 15:5-6.)

        **Plaintiffs' Response to SUF No. 219: Disputed as incomplete and misleading.**

        In Bain's 30(b)(6) deposition, Bain stated that the board of the holding company, BCPE
Hercules Holdings was the only board that governed the Varsity defendants. *See, e.g.*, **Ex. 21**
[Bain 30(b)(6) Dep.] at 90:22-93:14. The structure was established such that the only governing
board for the Varsity defendants was at the holding company level. *See id.* at 91:12-13 ("The
[Varsity Brands] board of directors is generally considered to be the board of the BCPE Hercules
Holdings, LP."). Thus, when asked if Bain held four seats on the "Varsity board of directors,"
Bain answered "yes." *Id.* at 90:22-91:1. *See also* **Ex. 299**.

**Defendants' Reply:** Plaintiffs admit this fact in relevant part, and this fact should be deemed admitted. Plaintiffs' additional narrative is irrelevant.

Further, Plaintiffs have altered the cited deposition testimony to assert that Varsity Brands' board of directors is the same as the board of BCPE Hercules Holdings, LP. Instead, the testimony reflects that the board of directors on which Bain had seats is the board of directors of BCPE Hercules Holdings, LP, Pls.' Ex. 21 at 91:9-13, which is consistent with the undisputed evidence cited in Defendants' SUF No. 219. Plaintiffs' broad citation to Exhibit 299 also does not support Plaintiffs' assertion.

220. Bain has never conducted a cheer competition or a cheer camp or sold cheer apparel. (Ex. CM, Cotton Decl. ¶9.)

**Plaintiffs' Response to SUF No. 220: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

221. No Bain officer or Bain-affiliated individual, including the Bain officers who served on the board of the Holding Company, had any direct involvement in any of the conduct that Plaintiffs label anticompetitive.

**Plaintiffs' Response to SUF No. 221: Disputed.**

Like Charlesbank before it, Bain was instrumental in securing financing to fund further acquisitions. For example, in 2020, Bain's "capital markets team" secured roughly $180 million in financing. *See* **Ex. 281** (David Spiller of Bain emails 10 Bain individuals, thanking "the capital markets team for getting us to a great result here." Bain's Ryan Cotton disclosed that the money could be used for additional acquisitions, stating: "Ready to go on a buying spree!" *Id.*

Bain was also intimately involved in acquisition strategy. *See, e.g.,* **Ex. 21** [Bain 30(b)(6) Dep.] at 108:18–110:2 ("There is also a regular dialogue about potential targets that [Varsity] management may want to think about acquiring."); *id.* at 109:17-109:21; **Ex. 269** at –1028 (Bain email discussing thorough review of Varsity acquisitions and putting in place "more routine review of M&A pipeline"); **Ex. 269** at –8196–97(internal Bain email discusses ways to "provide more structure and framing for Adam around M&A to help sort through and prioritize different opportunities"). Bain had control over decisions with respect to significant acquisitions. *See, e.g.*, **Ex. 21** [Bain 30(b)(6) Dep.] at 109:17-109:21 ("The management team is free to make acquisitions beneath certain thresholds without consulting the board. Above that threshold, they're required to obtain the approval of the board of directors."); **Ex. 12** [Elza Dep.] at 51:13-52:12 ("During acquisitions, our strategy was we put together on paper what we wanted to go –

companies we looking at, work with folks to get – prepare that, and that got presented to Bain and they ultimately approved those transactions.    They were – they were ultimately presented to Bain for final buy-off, yes.").

Bain was involved with and directed Varsity Brands' acquisitions. Saron Tesfalul, a Bain principal, was the "leader" of Varsity's merger efforts. *See* **Ex. 234** at –8442 (Bain Managing Director Ryan Cotton writes, "Please meet Saron Tesfalul, one of our star Principals who is leading the M&A efforts of Varsity Brands."). Indeed, Tesfalul did so without the participation of Varsity management. *See* **Ex. 235** at –1344] (Tesfalul providing communication with investment banker arranging acquisition by Varsity's Herff Jones business segment to several other Bain executives, but no Varsity executives).

During Bain's ownership of Varsity, although most of Varsity's competitors had already been acquired and Varsity enjoyed substantial monopoly power by 2018, Bain continued to execute acquisitions to eliminate nascent competitors and maintain Varsity's monopoly power. *See, e.g.*, **Ex. 236** at –6944, –6960-61 (executed asset purchase agreement for Varsity's acquisition of B2 Cheer and Dance, dated January 9, 2019); **Ex. 237** at –8668] (confirming that Varsity viewed the acquisition of B2 Cheer and Dance, a competitor in the Cheer Camps Market,



; **Ex. 238** at –1156]
(                                                                                              ).

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted.

First, Plaintiffs do not support their assertion that Bain secured "financing to fund further acquisitions."  Plaintiffs' Exhibit 281 states that proceeds from a sale of Varsity notes "will be used to pay down a portion of the company's outstanding ABL revolver balance, and to strengthen its liquidity position."  Pls.' Ex. 281 at -7152.  This was confirmed by Bain's testimony about this document.  Pls.' Ex. 21 at 73:17-74:20.  In any event, Plaintiffs' assertion is immaterial because there is no genuine dispute that Bain did not provide funding for any acquisition by Varsity related to cheerleading.  *See* Defs.' SUF No. 226.

Second, Plaintiffs do not support their assertion that Bain was "intimately involved" "in acquisition strategy."  Plaintiffs' Exhibit 269 is not a "Bain email," it is a "Board Approval request" to Varsity's board of directors regarding a potential transaction.  It reflects certain Bain

employees' discussion of that transaction in their roles as board members of Varsity, not in their roles as employees of Bain. Plaintiffs also cite pages -8196-97, but those pages do not exist in Plaintiffs' Exhibit 269. Plaintiffs may have intended to cite to Plaintiffs' Exhibit 270, which is not an "internal Bain email" as Plaintiffs assert. It is an email exchange among board members of Varsity, which included certain Bain employees, discussing a potential transaction in their roles as Varsity board members. Additionally, Plaintiffs' Exhibit 270 relates to BSN, not Varsity's cheerleading business. Pls.' Ex. 270 at -8194 (email subject line: "RE: [External] Fwd: Project Galaxy_CIM_Bain_*BSN*.pdf") (emphasis added).

Further, the cited testimony does not support Plaintiffs' assertion that Bain was "intimately involved in acquisition strategy." Instead, the testimony states that "As members of the board of directors, Bain Capital employees and members of the Bain team provided advice and counsel to the management team of Varsity Brands on their M&A strategy." Pls.' Ex. 21 at 108:18-109:3. Plaintiffs suggest there was a "regular dialogue" between Bain and Varsity about "potential targets," but the testimony instead refers to a "regular dialogue" between Varsity's management team and Varsity's board of directors. *Id.* at 109:22-110:5; *see also id.* ("[O]f course, the board provides its perspectives and advice on those targets and on that strategy; but it is the job of [Varsity Brands] management to execute M&A.").

Third, Plaintiffs do not support their assertion that Bain was "involved with and directed Varsity Brands' acquisitions." Plaintiffs' Exhibit 234 says that Saron Tesfalul was "leading the M&A efforts of Varsity Brands," but does not identify any specific acquisition, much less any specific acquisition that Plaintiffs have identified as anticompetitive. Indeed, the only potential acquisition that Plaintiffs connected to Ms. Tesfalul is the potential acquisition of a "yearbook

119

division" of a publishing company, which has nothing to do with cheerleading.  Pls.' Ex. 235 at -1345.

Finally, Plaintiffs' cited evidence regarding the acquisitions of B2 Cheer and Dance and ███████████████████ are irrelevant because Plaintiffs have not previously alleged them to be anticompetitive, and thus they do not create a genuine dispute of material fact.  *See* Defs.'Resp. to Pls.' SUF No. 191.  In any event, Plaintiffs' cited materials do not support that Bain had any involvement in either acquisition.  Plaintiffs' Exhibit 236 is an asset purchase agreement signed by a representative of Varsity Spirit; it does not reflect any involvement by Bain whatsoever.  Plaintiffs' Exhibits 237 and 238 likewise do not reflect any involvement by Bain, much less that Bain "continued to execute acquisitions to eliminate nascent competitors." In addition, Plaintiffs provide no evidence that Varsity actually acquired ████████████ ███, which it did not. *See* Pls.' Ex. 238 at -1163 (stating that the slide deck was part of a "recommendation" to proceed with the transaction).

222.   Bain had no involvement with USASF.  (Ex. CL, Cotton Dep. 123:24-124:9 ("Q. And have you had any involvement in decisions related to the USASF? A. I have not. Q. And do you know if anyone else at Bain Capital has had involvement in decisions related to the USASF? A. I don't believe that we have.").)

**Plaintiffs' Response to SUF No. 222: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:**  No response required.

223.   Bain and its individual affiliates were not involved in setting the terms of the Varsity Family Plan or negotiating Varsity Network Agreements.  (Ex. CM, Cotton Decl. ¶10; see also Ex. CL, Cotton Dep. 123:12-23 ("Q. Are you familiar with rebate or discount programs offered by Varsity Spirit to All Star Cheer or school cheer teams? A. I think some version of that as been mentioned conceptually once or twice, but I'm very far from the details. Q. Do you know if anyone else at Bain Capital may have had more involvement in those discount programs? A. I would imagine not. We tend not to involve ourselves in line pricing decisions.").)

**Plaintiffs' Response to SUF No. 223: Disputed.**

Bain was actively involved in setting the terms of the Varsity Family Plan, including the changes that were instituted in 2018. *See, e.g.*, Ex. 12 [Elza Dep.] at 56:2-57:17.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs do not controvert this fact with admissible evidence. The cited portion of Plaintiffs' Exhibit 12 is inadmissible hearsay, because Mr. Elza's testimony is not based on his personal knowledge, but instead speculates based on what he might have heard from others. Pls.' Ex. 12 at (Vol. 1) 57:13-17 ("Q. And some of that advice, you *understood*, came from higher-ups at Varsity and some came from Bain personnel; is that right? A. Yes.") (emphasis added); *see also*, *id*. at (Vol. 2) 65:16-68:11 (testifying that he did not "talk to anybody at Bain" about the Varsity Family Plan); Fed. R. Evid. 802.

224. Bain and its individual affiliates had no involvement with Varsity's Squad Credentialing Program. (Ex. CM, Cotton Decl. ¶11.)

   **Plaintiffs' Response to SUF No. 224: Undisputed for purposes of summary judgment only.**

   **Defendants' Reply:** No response required.

225. Bain and its individual affiliates had no involvement with the scheduling of Varsity's cheer competitions. (Ex. CM, Cotton Decl. ¶12.)

   **Plaintiffs' Response to SUF No. 225: Undisputed for purposes of summary judgment only.**

   **Defendants' Reply:** No response required.

226. Bain did not provide funding for any acquisition by Varsity relating to cheerleading. (Ex. CM, Cotton Decl. ¶13; see also Ex. CL, Cotton Dep. 30:15-31:3 ("Q. Would Bain Capital also provide capital for acquisitions, if necessary? A. We surely provide advice on the best way to obtain that capital. It is not always the case that our own money is the most efficient means of financing things like that. And so I think part of the strategic value we add is access to deep and wide capital markets that allow us to steer the company to the best possible, lowest cost capital solution, whatever that may be at the moment."); id. at 122:17-123:7.)

   **Plaintiffs' Response to SUF No. 226: Disputed as incomplete and misleading.**

The cited testimony does not support the asserted fact. Asked directly if Bain would provide capital for Varsity acquisitions, Mr. Cotton responded only that "We surely provide advice on the best way to obtain that capital," leaving the question unanswered. Moreover, the evidence show that Bain executives played an active role in determining what acquisitions Varsity would make, securing funding for those acquisitions, and acquiring companies relating to cheerleading in order to protect and maintain Varsity's monopoly. *See supra*, Plaintiffs' response to Bain's SUF #221.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted.  Plaintiffs assert that the cited testimony does not support SUF No. 226, but regardless, Mr. Cotton also declared that "Bain did not provide funding for any acquisition by Varsity relating to cheerleading," Ex. CM, Cotton Decl. ¶13, and Plaintiffs did not controvert his declaration.  Defendants incorporate their reply to Plaintiffs' response to Defendant's SUF No. 221.

227.    Bain has never owned, directly or indirectly, the Varsity Defendants. (Ex. CM, Cotton Decl. ¶5.)

**Plaintiffs' Response to SUF No. 227: Disputed.**

Ryan Cotton's declaration that Bain has never owned, directly or indirectly, the Varsity Defendants is directly contradicted by Bain's own filings in this case. *See, e.g.*, ECF No. 60-1 at 3 ("[A]s a matter of law, an entity such as Charlesbank or Bain is legally incapable of "conspiring" with an entity that it owns. Nor is it possible as a matter of law for an entity to "conspire" with an officer or employee of a subsidiary entity.").

Numerous sworn deposition testimony further confirm that Bain purchased Varsity, including the Varsity Defendants, in 2018: *See, e.g.*, **Ex. 43** [O'Rourke Dep.] at 17:15-18:4 ("Q. Sure. Well, let's start with the July 2018 time period. Is that when -- is that when Bain Capital acquired the Varsity Brands conglomerate? A. Around that time frame. I don't recall the specifics of when the transaction closed, but that seems about right. Q. Okay. And Bain acquired its majority stake from Charlesbank. Is that consistent with your recollection? A. Yes.");

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted.  Plaintiffs assert that Defendants' SUF No. 227 and the Cotton Declaration that supports it are contradicted by Defendants' statements in their Motion to Dismiss briefing.  Any such contradiction is irrelevant, as at the pleading stage, Bain and Charlesbank (and the Court) were required to accept the factual assertions in Plaintiffs'

Complaint as true—including Plaintiffs' incorrect statement that Bain and Charlesbank "owned" the Varsity Defendants. *See* ECF No. 1 at ¶¶ 21-22. That is no longer the case at summary judgment.

In addition, Plaintiffs' claim that "numerous" testimony from other witnesses supports their assertion that "Bain purchased Varsity" is also unsupported. Plaintiffs take a reasonable shorthand out of context and ignore that the one witness they cite made clear that it is funds managed by Bain Capital that own indirect interests in the Varsity Defendants. *See, e.g.*, Pls.' Ex. 43, O'Rourke Dep. at 46:25-47:11 ("Q. Do you recall, just the nuts and bolts, how the funds managed by Bain Capital Partners purchased the Varsity Brands conglomerate? A. I don't recall the specifics, but at a high level it would have been a combination of equity from funds managed by Bain Capital, equity from funds managed by Charlesbank, and different forms of debt financing."). Further, Plaintiffs' own counsel used "Bain" as a shorthand for the funds managed by Bain Capital. *See, e.g.*, id. at 19:16-20:17 ("Q. [D]o you recall that prior to the purchase, the acquisition by Bain in 2018, Bain had previously been interested in purchasing Varsity Brands around 2014? . . . A. Can you clarify if you mean Bain Capital or funds managed by Bain Capital[?] Q. Sure. I mean funds managed by Bain Capital.").

228.    In connection with his or her involvement with Varsity, no employee of Bain did anything that was plainly contrary to the interests of Varsity yet nonetheless advantageous to Bain.

**Plaintiffs' Response to SUF No. 228: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs respond that the statement is "not supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue.

Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have

failed to produce admissible evidence to establish a genuine issue.

229.    On July 30, 2018, BCPE Hercules Holdings, LP (the "Holding Company"), an entity
owned by certain Bain-advised funds, indirectly acquired the Varsity entities that are
Defendants in this litigation.  The entities between the Holding Company and the highest-
level Varsity Defendant are called BCPE Hercules VB Topco, Inc.; BCPE Hercules VB
Intermediate Holdings, Inc.; BCPE Hercules VB Holdings, Inc.; Hercules VB Holdings,
Inc.; and Varsity Brands Holding Co., Inc.  (Ex. CM, Cotton Decl. ¶¶3, 4.)

**Plaintiffs' Response to SUF No. 229: Disputed.**

Defendants' implied and embedded assertion that "Bain-advised funds" were the only
legal owners of BCPE Hercules Holdings, LP is vague and unclear, as Bain has declared in
filings and in numerous deposition testimony that it was Bain that acquired and owned Varsity.
*See supra*, Pls' Response to Defs' SUF # 227

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.  Defendants incorporate their reply to Plaintiffs'

response to Defendants' SUF No. 227.

230.    No acquisition Plaintiffs label anticompetitive occurred on or after July 30, 2018.

**Plaintiffs' Response to SUF No. 230: Disputed.**

After July 30, 2018, during Bain's ownership of Varsity, Bain continued to execute
acquisitions to eliminate nascent competitors, foreclose rivals, and maintain Varsity's monopoly
power. *See, e.g.*, **Ex. 236** at –6944, –6960-61 (executed asset purchased agreement for Varsity's
acquisition of B2 Cheer and Dance, dated January 9, 2019); **Ex. 237** at –8668] at –8669 (Dec.
2018) (confirming that Varsity viewed the acquisition of B2 Cheer and Dance, a competitor in
the Cheer Camps Market, as an opportunity to ███████████████████████████████
███████ Market and increase participation at Varsity's national competitions in the School Cheer
Market); *id*. ("███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████"); **Ex. 238** at –1156 (Feb. 2019) (confirming that Varsity attempted to increase its
share in the Cheer Camps Market by acquiring ███████████████████ and ███
███████████); *id.* (noting that the acquisition would provide ████████████████████████
█████████████████████████████████" and would "███████████████████████████
███████████████████").

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs have not previously alleged that the acquisitions of either B2 Cheer and Dance or ███████████████ were anticompetitive.

In addition, Plaintiffs' materials do not support that Bain was involved with either the acquisition of B2 or the contemplated-but-not-executed acquisition of ███████████ ███ let alone what Bain's motivations for the acquisitions might have been were it involved. Defendants incorporate their reply in support of SUF No. 221.

231. Charlesbank-affiliated individuals served on the board of managers of the Varsity Defendants' parent company beginning in 2014. Only one Charlesbank-affiliated individual has been on the board of managers of the Varsity Defendants' parent company since July 30, 2018. (Ex. CO, Janower Decl. ¶¶3, 6; see also Ex. CK, BAIN00067980, -983 (providing that Andrew Janower was the only "Charlesbank Manager" on the BCPE Hercules GP, LLC Board of Managers installed on July 30, 2018); Ex. CN, Janower Dep. 185:11-15.)

**Plaintiffs' Response to SUF No. 231: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

232. Charlesbank and its individual affiliates did not interact with USASF. (Ex. CO, Janower Decl. ¶8; see also Ex. CN, Janower Dep. 81:6-82:2 ("Q. Are you familiar with an entity that goes by the initials USASF? A. Vaguely, yes. Q. Were personnel who worked at USASF employees of Varsity Brands . . . or related companies? A. It's not – not something I would have been familiar with in my capacity as a director of the parent company.").)

**Plaintiffs' Response to SUF No. 232: Disputed.**

The cited evidence fails to provide support for the asserted fact.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs respond that the cited evidence "fails to provide support," but Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue.

125

233.    Charlesbank and its individual affiliates were not involved in setting the terms of the Varsity Family Plan or negotiating Varsity Network Agreements. (Ex. CO, Janower Decl. ¶9; see also Ex. CP, Beer Dep. 144:24-145:1 ("I know [the Varsity Family Plan is] like a frequent flyer-type loyalty program, but I don't know how it works.").)

**Plaintiffs' Response to SUF No. 233: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

234.    Charlesbank and its individual affiliates had no involvement with Varsity's Squad Credentialing Program. (Ex. CO, Janower Decl. ¶10.)

**Plaintiffs' Response to SUF No. 234: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

235.    Charlesbank and its individual affiliates had no involvement with the scheduling of Varsity's cheer competitions. (Ex. CO, Janower Decl. ¶11.)

**Plaintiffs' Response to SUF No. 235: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

236.    Charlesbank did not provide funding for any acquisition by Varsity relating to cheerleading. (Ex. CO, Janower Decl. ¶12; see also Ex. CN, Janower Dep. 141:9-20 ("Q. Mr. Janower, was Charlesbank involved with any of these acquisitions? A. Not -- I mean, above and beyond our capacity as directors of the corporation, not to my recollection. Q. Did Charlesbank arrange any of the financing associated with these acquisitions? A. Uh-hmm. Well, in the ordinary course of business, Charlesbank, as a private equity investor and in our capacity as Board members, we do help our companies raise capital to do things like acquisitions. ").

**Plaintiffs' Response to SUF No. 236: Disputed.**

The cited testimony directly contradicts the fact stated. Further, Charlesbank raised funding for Varsity's use, "the intent of which was to help fund acquisitions" and which resulted in considerable growth of Varsity's market share. *See* PSOF ¶¶199-201.

Charlesbank was instrumental in securing over ███████████ in financing for the express purpose of funding Varsity acquisitions. *See* **Ex. 29** [Charlesbank 30(b)(6) Dep.] at 137:25–138:03 ██████████████ ████████████████████████████████████████████ ████████████████████████████. In 2015, for example, Charlesbank secured ██████████ to fund Varsity's acquisition of Project Cloth, and ██████████ to replenish the cash used to acquire Jam Brands. *See* **Ex. 29** [Charlesbank 30(b)(6) Dep.] at 150:9–151:19; *see also* **Ex. 288** at –3480

("Company will retain firepower to complete acquisitions - Varsity Brands will retain ample acquisition capacity, with the ability to acquire over ▮▮▮▮ in EBITDA - Simultaneously plan to upsize maximum ABL capacity to ▮▮▮▮"). After Charlesbank secured the financing for Varsity's acquisitions, Charlesbank directed Varsity to use the money on acquisitions. *See* **Ex. 223** at –1047 (email from Charlesbank's Josh Beer to Varsity's new CEO, "Well, we've got the dough for our acquisitions now…let's make it sweat!").

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs suggest that the cited testimony contradicts the fact stated, but the cited testimony states that Charlesbank would "help our companies raise capital to do things like acquisitions." Ex. CN, Janower Dep. 141:9-20. Helping raise capital is not the same as providing funding.

Plaintiffs' materials do not support that Charlesbank provided funding for acquisitions. Plaintiffs cite Charlesbank testimony regarding raising funds for Varsity to use for acquisitions, but ignore the portion of that testimony wherein Mr. Janower states that "none of the capital that this email refers to was provided by Charlesbank." Pls.' Ex. 29, Charlesbank 30(b)(6) Dep. at 137:23-24. Plaintiffs appear to suggest that Charlesbank helped fund Varsity's acquisition of JAM Brands, but themselves cite testimony that "what funded the JAM Brands acquisition was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" *Id.* at 151:2-16. The referenced Project Cloth was BSN's acquisition of Lids and unrelated to Varsity's cheerleading business. *Id.* at 151:9-11.

Plaintiffs' citations to Exhibit 288 and Exhibit 223 do not create a genuine dispute of material fact, as Plaintiffs provide no evidence that either statement refers to acquisitions relating to cheerleading.

Plaintiffs' additional narrative about "considerable growth" is irrelevant.

237. Charlesbank has never conducted a cheer competition or a cheer camp or sold cheer apparel. (Ex. CO, Janower Decl. ¶7.)

**Plaintiffs' Response to SUF No. 237: Undisputed for purposes of summary judgment only.**

**Defendants' Reply:** No response required.

238. Charlesbank has never owned, directly or indirectly, the Varsity Defendants. (Ex. CO, Janower Decl. ¶5.)

**Plaintiffs' Response to SUF No. 238: Disputed.**

Andrew Janower's declaration that Charlesbank has never owned, directly or indirectly, the Varsity Defendants is directly contradicted by Charlesbank's own filings in this case. *See, e.g.*, Memorandum of Law in Support of Motion to Dismiss of Defendants Charlesbank Capital Partners, LLC, and Bain Capital Private Equity, LLC, ECF No. 60-1 at 3 ("[A]s a matter of law, an entity such as Charlesbank or Bain is legally incapable of "conspiring" with an entity that it owns. Nor is it possible as a matter of law for an entity to "conspire" with an officer or employee of a subsidiary entity.").

Deposition testimony further confirms that Charlesbank acquired Varsity, including the Varsity Defendants, in 2014: *See, e.g.*, Ex. 29 [Charlesbank 30(b)(6) Dep.] at 25:1-4 ("[I]s it fair to say that ·the first time that Charlesbank acquired an ownership interest in Varsity was in 2014? A. Correct.").

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs assert that Defendants' SUF No. 238 and the Janower Declaration that supports it are contradicted by Defendants' statements in their Motion to Dismiss briefing. Any such contradiction is irrelevant, as at the pleading stage, Bain and Charlesbank (and the Court) were required to accept the factual assertions in Plaintiffs' Complaint as true—including Plaintiffs' incorrect statement that Bain and Charlesbank "owned" the Varsity Defendants. *See* ECF No. 1 at ¶¶ 21-22. That is no longer the case at summary judgment.

In addition, Plaintiffs' claim that testimony supports their assertion that "Charlesbank acquired Varsity" is also unsupported. Plaintiffs take a reasonable shorthand out of context and ignore that testimony makes clear that it was and is funds managed by Charlesbank that owned and own indirect interests in the Varsity Defendants. *See* Pls.' Ex. 29, Charlesbank 30(b)(6)

Dep. at 18:25-19:5 ("Fund VII and Fund VIII were investors in Varsity Brands from 2014 till

2018; and Fund IX is currently an investor from the middle of 2018 through to today."); Pls.' Ex.

28, Janower Dep. at 2:5-16 ("Q. And so do you recall Charlesbank acquiring Varsity Bank in

2014? A. Yes. . . . The Charlesbank funds. . . . Charlesbank Fund 7 and Charlesbank Fund 8

made an investment in Varsity Brands in 2014."). Further, Plaintiffs' own counsel used

"Charlesbank" as a shorthand for the funds managed by Charlesbank Partners. *See, e.g.*, Pls.'

Ex. 29, Charlesbank 30(b)(6) Dep. at 24:2-4 (clarifying that "when I say 'Charlesbank,' I mean

Charlesbank generally, including any of its equity funds or any -- any of its parts").

239.  No Charlesbank officer or affiliate, including the Charlesbank officers who served on the
      board of the Holding Company, had any direct involvement in any of the conduct that
      Plaintiffs label anticompetitive.

**Plaintiffs' Response to SUF No. 239: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by
evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. There is substantial evidence showing that Charlesbank had
substantial involvement in Varsity's anticompetitive scheme, including, among other things, by
providing critical funding for Varsity to pursue its anticompetitive acquisition strategy. *See* **Ex.**
**229** (Internal Acquisition Memo that lists eight entities that were acquired from 2015 to 2018
during Charlesbank's control over Varsity, including JAM Brand and Epic); **Ex. 28** [Janower
(Individual) Dep.] at 66:12–66:19 (referring to **Ex. 285** at –1040) ("Q. And what's the second
bullet point there? A. "Added capabilities and consolidated key markets through acquisition."
QAnd why -- do you agree that that was part of the platform development at that time? A. Well,
we did -- we did make several acquisitions while we owned the company in this period."); **Ex.**
**286** (email showing that Charlesbank independently reviewed the "transaction pipeline" of
potential acquisitions for Varsity, including Jam Brands); **Ex. 213** at –1305 (Showing that
Varsity was required to seek Charlesbank's independent approval for any acquisition over ██
██, and the boards' approval (of which Charlesbank had contractually mandated control) for
any acquisition over ███████.); *See* **Ex. 287** (email showing Josh Beer of Charlesbank working
independently with Goldman Sachs to announce the acquisition of Jam Brands, which
"cement[ed] Varsity Spirit's #1 position in cheerleading," and requiring Charlesbank's "final"
signoff to act.); *See* **Ex. 29** [Charlesbank 30(b)(6) Dep.] at 137:25–138:03 ████ ██████ ██

**Ex. 29** [Charlesbank 30(b)(6) Dep.] at 150:9–151:19 (explaining that Charlesbank secured ███
████ to fund Varsity's acquisition of Project Cloth, and ████████ to replenish the cash used
to acquire Jam Brands0; **Ex. 288** at –3480 ("Company will retain firepower to complete
acquisitions - Varsity Brands will retain ample acquisition capacity, with the ability to acquire

over ██████ in EBITDA - Simultaneously plan to upsize maximum ABL capacity to ██████ ");
**Ex. 223** at –1047 (email from Charlesbank's Josh Beer to Varsity's new CEO, "Well, we've got
the dough for our acquisitions now…let's make it sweat!"); **Ex. 271** at –9166] (Kalvelage is
asked to review and approve the acquisition of Spirit Celebration, including an in-depth
explanation of how the acquisition will affect the Family Plan); **Ex. 272** at –4818 (Kalvelage
approves of the acquisition of Cheer Celebration); **Ex. 273** at –7930] (December 20, 2017
Varsity email to Charlesbank's Andrew Janower, Brandon White, and Kim Davis seeking
approval for the acquisition of Epic, a producer of Cheer Competitions and manufacturer of
Cheer Apparel, which Varsity did acquire in 2018").

Within just over three years, Varsity, with Charlesbank's funding and direction, had
acquired its largest competitors in the Cheer Competition Market, including Jam Brands, Aloha
Productions, Spirit Celebration, All Things Cheer, Mardi Gras Nationals, Jam Spirit Group, Sea to
Sky, and Epic. *See* **Ex. 289** at –9041-9042; **Ex. 229** at –5991]; **Ex. 47** [White Dep.] at 276:25-
277:16; **Ex. 282** at –7575. (Summary of Charlesbank's accomplishments while owners of Varsity
include, ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████ By the time this spree was
finished, Varsity controlled approximately 85% of the Cheer Competitions Market. **Ex. 1** [Netz
Rep. at 52]; **Ex. 85** at -6985; **Ex. 20** [Cota Dep.] at 53:15–21]; **Ex. 86** at -5236.

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.

First, Plaintiffs do not support their assertion that Charlesbank had "substantial

involvement" in Varsity's "anticompetitive acquisition strategy."  Plaintiffs' Exhibit 229 does

not indicate that Charlesbank was involved with any of the acquisitions listed in the

memorandum.  In addition, Plaintiffs cite testimony by Mr. Janower about Plaintiffs' Exhibit

285, but they ignore that, when discussing Plaintiffs' Exhibit 285, Mr. Janower clarified that it

was *Varsity Brands* who carried out the acquisitions.  Plfs.' Ex. 28, Janower Dep. at 66:23-25

("Varsity Brands, that's the company – the company, in its different divisions, made a series of

acquisitions in different divisions.").

Second, Plaintiffs' materials do not support their suggestion that Varsity was required to

seek Charlesbank's "independent approval" for acquisitions over a certain threshold.  Plaintiffs'

Exhibit 213 makes clear that it was the approval of Andrew Janower—who was acting in his

130

capacity as a member of the board of the Varsity Defendants' parent company—that was required at the time. *See* Plfs.' Ex. 213 at -1305 ("Deals between ███ - ███ will also need to go to [Andrew Janower] now.").  Similarly, Plaintiffs' Exhibits 271 and 272 show only that Neil Kalvelage approved of Varsity's proposed acquisition of Spirit Celebration in his capacity as a member of the board of the Varsity Defendants' parent company.  Likewise, Plaintiffs' Exhibit 273 shows only that Varsity sought approval of the EPIC acquisition from Andrew Janower, Brandon White, Kim Davis, Joel Schwartz, Scott Olivet, Adam Blumenfeld, and Jeff Webb, who together comprised the board of the Varsity Defendants' parent company.  Pls.' Ex. 273 at -7930 (an email with the subject line, "VB Board Approval Request: EPIC Acquisition," and the salutation "Directors,").  Plaintiffs' materials demonstrate only that Varsity sought approval for acquisitions from its own board of directors.

Third, the cited materials do not support that *Charlesbank* was "independently" involved in Varsity's "anticompetitive acquisition strategy."  Plaintiffs' Exhibits 286 and 287 reflect Charlesbank employees' discussions in their capacities as members of the board of the Varsity Defendants' holding company, not in their capacity as employees of Charlesbank.

Further, Plaintiffs' assertion that Charlesbank "provid[ed] critical funding" for Varsity's "anticompetitive acquisition strategy is also unsupported."  Defendants incorporate their reply to Plaintiffs' response to Defendants' SUF No. 236.

Finally, Plaintiffs' additional narrative about Varsity's acquisitions and market share is irrelevant.  Plaintiffs also cite their expert's recitation and interpretation of documents, which is inadmissible. Fed. R. Evid. 702, 403.

240.    In connection with his or her involvement with Varsity, no employee of Charlesbank did anything that was plainly contrary to the interests of Varsity yet nonetheless advantageous to Charlesbank.

**Plaintiffs' Response to SUF No. 240: Disputed.**

131

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs respond that the statement is "not supported by evidence," but Plaintiffs ultimately bear the burden of proof on this issue. Defendants have pointed out the absence of a genuine issue of material fact, and Plaintiffs have failed to produce admissible evidence to establish a genuine issue.

241.    In December 2014, certain Charlesbank-advised funds acquired a majority of the equity in an entity called Hercules VB Holdings, Inc. (the "Holding Company"). The Holding Company, through an intermediate downstream entity called Varsity Brands Holdings Co., Inc., indirectly acquired the Varsity entities that are Defendants in this litigation. (Ex. CO, Janower Decl. ¶¶3-4.)

**Plaintiffs' Response to SUF No. 241: Disputed.**

Defendants' implied assertion that "Charlesbank-advised funds" were the only legal owners of Hercules VB Holdings, Inc. is vague and unclear, as Charlesbank has declared in filings and in numerous deposition testimony that it was Charlesbank that acquired and owned Varsity. *See* Resp ¶238.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Defendants incorporate their reply to Plaintiffs' response to Defendants' SUF No. 238.

242.    For a brief period of time in 2017, a Charlesbank officer served as CEO of Varsity Brands. (Ex. CQ, Kalvelage Dep. 83:12-18; 163:12-16-166:19.)

**Plaintiffs' Response to SUF No. 242: Undisputed.**

**Defendants' Reply:** No response required.

243.    Charlesbank did not negotiate, direct, or fund any of the acquisitions plaintiffs label anticompetitive.

**Plaintiffs' Response to SUF No. 243: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. *See* Resp ¶239.

**Defendants' Reply:**  Defendants incorporate their reply to Plaintiffs' response to

Defendants' SUF No. 239.

244.    The proposed class period begins December 10, 2016. (Compl. ¶29; ECF No. 387, Pls.'
Motion for Class Certification, p. 1-2.)

**Plaintiffs' Response to SUF No. 244: Undisputed.**

**Defendants' Reply:**  No response required.

245.    Neither Plaintiff paid Varsity for anything in the state of Tennessee.

**Plaintiffs' Response to SUF No. 245: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by
evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Plaintiffs and the class made many purchases indirectly
through Varsity's website, which were processed in Tennessee. **Ex. 19**, (Cherasaro Depo.) at
78:19-79:25.

**Defendants' Reply:**  Plaintiffs' response does not create a genuine dispute of material

fact, and this fact should be deemed admitted.  Plaintiffs do not provide evidence that either Ms.

Jones or Ms. Lorenzen paid Varsity—directly or indirectly—in the state of Tennessee.

The only material Plaintiffs provide relates to Janine Cherasaro, a class representative in

the now-settled Fusion Elite matter, whereas Defendants' statement pertains only to the two class

representatives in this matter—Jessica Jones and Christina Lorenzen.  Further, Plaintiffs' cited

material does not even support Plaintiffs' suggestion that Ms. Cherasaro purchased items

"indirectly through Varsity's website," as it does not indicate that the products or services for

which Ms. Cherasaro paid were purchased via Varsity's website.  Finally, Plaintiffs do not

provide evidence that purchases made via Varsity's website are processed in Tennessee.

246.    Plaintiffs have not notified the attorneys general of Arizona, Connecticut, Hawaii,
Minnesota, Nevada and Utah.

**Plaintiffs' Response to SUF No. 246: Disputed.**

This assertion fails to state an undisputed material fact because it is not supported by evidence and thus fails to comply with Fed. R. Civ. P. 56(c)(1) and LR 56.1(a).

Notwithstanding, disputed. Under *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, federal procedural rules apply. 559 U.S. 393, 399–400, (2010) ("And like the rest of the Federal Rules of Civil Procedure, Rule 23 *automatically* applies in all civil actions and proceedings in the United States district courts."). Accordingly, Plaintiffs are not required to follow the procedural notification rules of the aforementioned states.

**Defendants' Reply:** Plaintiffs' response does not create a genuine dispute of material fact, and this fact should be deemed admitted. Plaintiffs' additional narrative is irrelevant.

Dated: October 13, 2023                    Respectfully submitted,

                                           s/ Matthew S. Mulqueen

                                           George S. Cary*
                                           Steven J. Kaiser*
                                           CLEARY GOTTLIEB STEEN & HAMILTON LLP
                                           2112 Pennsylvania Avenue, NW
                                           Washington, DC 20037
                                           Phone: (202) 974-1500
                                           Fax: (202) 974-1999
                                           gcary@cgsh.com
                                           skaiser@cgsh.com

                                           Jennifer Kennedy Park*
                                           Heather Nyong'o*
                                           CLEARY GOTTLIEB STEEN & HAMILTON LLP
                                           1841 Page Mill Road, Suite 250
                                           Palo Alto, CA 94304
                                           Phone: (650) 815-4100
                                           Fax: (202) 974-1999
                                           jkpark@cgsh.com
                                           hnyongo@cgsh.com

                                           * Admitted *pro hac vice*

                                           Matthew S. Mulqueen (TN #28418)
                                           Adam S. Baldridge (TN #23488)
                                           BAKER, DONELSON, BEARMAN, CALDWELL &
                                           BERKOWITZ

134

165 Madison Avenue, Suite 2000
Memphis, TN 38103
Phone: (901) 526-2000
Fax: (901) 577-0866
mmulqueen@bakerdonelson.com
abaldridge@bakerdonelson.com

*Attorneys for Varsity Brands, LLC; Varsity Spirit,
LLC; Varsity Spirit Fashions & Supplies, LLC;
Charlesbank Capital Partners, LLC; Bain Capital
Private Equity LP*

s/ Nicole Berkowitz Riccio

Grady Garrison (TN #008097)
Nicole Berkowitz Riccio (TN #35046)
James Andrew Roach (TN #37934)
BAKER, DONELSON, BEARMAN, CALDWELL
& BERKOWITZ
165 Madison Avenue, Suite 2000
Memphis, TN 38103
Phone: (901) 526-2000
Fax: (901) 577-0866
ggarrison@bakerdonelson.com
nriccio@bakerdonelson.com
aroach@bakerdonelson.com

*Attorneys for U.S. All Star Federation, Inc.*

s/ Brendan P. Gaffney

Paul E. Coggins*
Brendan P. Gaffney*
Kiprian E. Mendrygal*
Jennifer McCoy*
Katherine Wright
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Phone: (214) 740-8000
Fax: (214) 740-8800
pcoggins@lockelord.com
bgaffney@lockelord.com
kmendrygal@lockelord.com

135

jennifer.mccoy@lockeord.com
katie.wright@lockelord.com

* Admitted pro hac vice

Edward L. Stanton III (TN #018904)
S. Keenan Carter (TN # 023386)
BUTLER SNOW LLP
6075 Poplar Avenue, Suite 500
Memphis, Tennessee 38119
Telephone: (901) 680-7336
Fax: (901) 680-7201
Edward.Stanton@butlersnow.com
Keenan.carter@butlersnow.com

*Attorneys for Jeff Webb*

# APPENDIX A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE

JESSICA JONES et al.,

　　　　　　　Plaintiffs,

　　v.

VARSITY BRANDS, LLC et al.,

　　　　　　Defendants.

Civ. Action No. 2:20-cv-02892

**DEFENDANTS' OBJECTIONS TO PLAINTIFFS' EVIDENCE**

Defendants Varsity Brands, LLC; Varsity Spirit, LLC; Varsity Spirit Fashions & Supplies, LLC (collectively, "Varsity"); U.S. All Star Federation, Inc. ("USASF"); Jeff Webb; Charlesbank Capital Partners LLC ("Charlesbank"); and Bain Capital Private Equity ("Bain") (together with Varsity, USASF, Jeff Webb, and Charlesbank, "Defendants") hereby submit the following objections to evidence submitted by Plaintiffs Jessica Jones and Christina Lorenzen ("Plaintiffs") in support of Plaintiffs' Opposition to Defendants' Joint Motion for Summary Judgment (ECF Nos. 477, 479-84, and 488-1; together, "Plaintiffs' Opposition").

As indicated below, Defendants summarily object to Plaintiffs' numerous citations to their proffered experts' interpretation or recitation of documents and testimony, as they are inadmissible. *See* Fed. R. Evid. 702, 403; ECF No. 382-1 (Netz Daubert Mot.); 388-1 (Heeb Daubert Mot.); ECF No. 391-1 (Maki Daubert Mot.); *see also Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 510, 510 (6th Cir. 2014) ("Where an expert merely offers his client's opinion as his own, that opinion may be excluded."); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 584 (S.D.N.Y. 2018) (excluding testimony where economic expert "purport[ed] to interpret documents" because such "opinions are not the product of [his] expertise").

Defendants reserve all rights to object to all evidence submitted in connection with Plaintiffs' Opposition but not referenced in Plaintiffs' Opposition, including portions of transcripts not cited, and to object to evidence introduced at trial.

3

| No. | Pls.' Resp. to Defs.' SUF No. | Plaintiffs' Evidence | Objections |
|---|---|---|---|
| 1 | 1, 3, 4, 7, 12, 13, 14, 15, 16, 17, 18, 19, 21, 22, 23, 25, 26, 27, 28, 29, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 45, 49, 50, 51, 52, 54, 55, 56, 57, 58, 59, 60, 63, 67, 68, 69, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 84, 85, 88, 89, 92, 93, 94, 96, 97, 99, 100, 101, 102, 103, 105, 138, 140, 141, 142, 143, 144, 160, 207 | Ex. 1 [Netz Rep.]; Ex. 2 [Netz Rebuttal Rep.]; Ex. 3 [Heeb Rep.]; Ex. 4 [Heeb Rebuttal Rep.]; Ex. 5 [Aronoff Rep.]; Ex. 6 [Aronoff Rebuttal Rep.]; Ex. 7 [Maki Rep.]; Ex. 8 [Maki Rebuttal Report] | Inadmissible expert testimony. Fed. R. Evid. 702, 403; *see also Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 510, 510 (6th Cir. 2014); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 584 (S.D.N.Y. 2018). |
| 2 | 3 | Ex. 20 [Cota Dep.] at 223:11-17. | The cited testimony purports to offer an expert opinion but the witness is not qualified as an expert witness. Fed. R. Evid. 701, 702. |
| 3 | 18 | Ex. 20 [Cota Dep.] at 223:11-17. | The cited testimony purports to offer an expert opinion but the witness is not qualified as an expert witness. Fed. R. Evid. 701, 702. |
| 4 | 28 | Ex. 20 [Cota Depo] at 64:24-65:19. | The cited testimony is inadmissible for lack of foundation and personal knowledge. Fed. R. Evid. 602. |
| 5 | 41 | Ex. 11 at 70:22-71:23. | The cited testimony is inadmissible for lack of foundation and personal knowledge. Fed. R. Evid. 602. |
| 6 | 48 | Ex. 19 [Cherasaro Dep.] at 58:18-59:7. | The cited testimony is inadmissible hearsay and it lacks foundation and personal knowledge, Fed. R. Evid. 602, 802. |

| No. | Pls.' Resp. to Defs.' SUF No. | Plaintiffs' Evidence | Objections |
|---|---|---|---|
| 7 | 115 | Ex. 11 [Parrish Dep.] at 31:22-33:3 | The cited testimony is inadmissible hearsay. Fed. R. Evid. 802. Lack of personal knowledge. Fed. R. Evid. 602. Speculative. *See Simmerman v. Ace Bayou Corp.*, 2016 WL 109944 at *3 (E.D. Ky. Jan. 8. 2016). |
| 8 | 121 | Ex. 139. | Contains inadmissible hearsay. Fed. R. Evid. 802. Irrelevant as it predates the limitations period. Fed. R. Evid. 401. |
| 9 | 130 | Ex. 198. | Contains inadmissible hearsay. Fed. R. Evid. 802. |
| 10 | 130 | Ex. 201. | Contains inadmissible hearsay. Fed. R. Evid. 802. |
| 11 | 130 | Ex. 202. | Contains inadmissible hearsay. Fed. R. Evid. 802. |
| 12 | 133 | Ex. 55. | Contains inadmissible hearsay. Fed. R. Evid. 802. |
| 13 | 133 | Ex. 56. | Contains inadmissible hearsay. Fed. R. Evid. 802. |
| 14 | 140 | Ex. 136. | Contains inadmissible hearsay. Fed. R. Evid. 802. |
| 15 | 140 | Ex. 137. | Contains inadmissible hearsay. Fed. R. Evid. 802. |
| 16 | 171, 212 | Ex. 132. | Lack of personal knowledge. Fed. R. Evid. 602. Speculative. *See Simmerman v. Ace Bayou Corp.*, 2016 WL 109944 at *3 (E.D. Ky. Jan. 8. 2016). |
| 17 | 211 | Ex. 266. | Irrelevant as it predates the limitations period. Fed. R. Evid. 401. |
| 18 | 223 | Ex. 12 [Elza Dep.] at 56:2-57:17. | The cited testimony is inadmissible hearsay. Fed. R. Evid. 802. |

# APPENDIX B

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**

JESSICA JONES et al.,

               Plaintiffs,

     v.

VARSITY BRANDS, LLC et al.,

          Defendants.

**Civ. Action No. 2:20-cv-02892**

**DEFENDANTS' RESPONSES TO PLAINTIFFS' OBJECTIONS TO EVIDENCE**

7

Defendants Varsity Brands, LLC; Varsity Spirit, LLC; Varsity Spirit Fashions &

Supplies, LLC (collectively, "Varsity"); U.S. All Star Federation, Inc. ("USASF"); Jeff Webb;

Charlesbank Capital Partners LLC ("Charlesbank"); and Bain Capital Private Equity ("Bain")

(together with Varsity, USASF, Jeff Webb, and Charlesbank, "Defendants") hereby submit the

following responses to Plaintiffs Jessica Jones and Christina Lorenzen's ("Plaintiffs'") objections

to evidence submitted by Defendants in support of Defendants' Joint Motion for Summary

Judgment (ECF Nos. 466-73).

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| 1 | 115 | Ex. A – Chadwick Dep. 34:8-25. | Hearsay to the extent the witness attempts to report or describe the intent of the USASF Board of Directors or of Varsity. Fed. R. Evid. 802. Lack of personal knowledge. Fed. R. Evid. 602. Speculative. *See Simmerman v. Ace Bayou Corp.*. No. 5:14-382-DCR. 2016 WL 109944. at *3 (E.D. Ky. Jan. 8. 2016) ("Speculative testimony is inadmissible for lay and expert witnesses alike."). | This testimony is cited in SUF No. 115, which Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot. This excerpt is Mr. Chadwick's testimony regarding his recollection of the early beginnings of USASF. Mr. Chadwick was the first President and Chair of USASF from its inception until Spring 2021. Plaintiffs provide no further support for their assertion that this testimony is hearsay, lacks personal knowledge, and is speculative, but it is clearly none of those things based on Mr. Chadwick's role in USASF from its inception. As Chairman of the Board during that time, Mr. Chadwick would be the best person to speak as to the motivations or intent of the |

---

[1] Plaintiffs did not specify to which of Defendants' statements of undisputed material fact their objections relate. The statements identified in this column represent Defendants' good faith guess as to the relevant statements of fact.

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| | | | | Board. In any event, if the issue is Mr. Chadwick's use of "we," this testimony should still be considered because substituted oral testimony using "I" would be admissible. *See Wyatt v. Nissan North Am., Inc.*, 999 F.3d 400, 423-24 (6th Cir. 2021) (reversing district court's dismissal of hearsay testimony at summary judgment when substitute oral testimony would be admissible). |
| 2 | 132 | Ex. A – Chadwick Dep. 58:1-9 | Hearsay. to the extent the witness attempts to speak for "Steve." Fed. R. Evid. 802. Lack of personal knowledge. Fed. R. Evid. 602. Speculative. *See Simmerman v. Ace Bayou Corp.*. No. 5:14-382-DCR. 2016 WL 109944. at *3 (E.D. Ky. Jan. 8. 2016) ("Speculative testimony is inadmissible for lay and expert witnesses alike."). | This testimony is cited in SUF No. 132, which Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot. This testimony is Mr. Chadwick's recollection of his and Mr. Peterson's reasoning for introducing a Worlds bid system. Plaintiffs provide no further support for their assertion that this testimony lacks personal knowledge and is speculative, but it is clearly none of those things based on Mr. Chadwick's role in USASF from its inception. To the extent the issue is Mr. Chadwick's use of "Steve and I," this testimony should still be considered because substituted oral testimony using "I" would be admissible. *See Wyatt v. Nissan North Am., Inc.*, 999 F.3d 400, 423-24 (6th Cir. |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| | | | | 2021) (reversing district court's dismissal of hearsay testimony at summary judgment when substitute oral testimony would be admissible). |
| 3 | 131 | Ex. A – Chadwick Dep. 58:20-60:5 | Hearsay. to the extent the witness attempts to report or describe the intent of the USASF Board of Directors or of Varsity. Fed. R. Evid. 802. Lack of personal knowledge. Fed. R. Evid. 602. Improper expert testimony from lay witness re comparisons to professional sports. Fed. R. Evid. 701. Speculative. *See Simmerman v. Ace Bayou Corp.*. No. 5:14-382-DCR. 2016 WL 109944. at *3 (E.D. Ky. Jan. 8. 2016) ("Speculative testimony is inadmissible for lay and expert witnesses alike."). | This testimony is cited in SUF No. 131, which Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot.  This excerpt is Mr. Chadwick's testimony regarding his recollection of the intent of the Worlds bid system of USASF.  Mr. Chadwick was the first President and Chair of USASF from its inception until Spring 2021.  Plaintiffs provide no further support for their assertion that this testimony is hearsay, lacks personal knowledge, and is speculative, but it is clearly none of those things based on Mr. Chadwick's role in USASF from its inception.  As Chairman of the Board during that time, Mr. Chadwick would be the best person to speak as to the motivations or intent of the Board.  Further, to the extent that Mr. Chadwick testified that USASF developed the Worlds bid system by considering the process used in other sports, this is not "expert testimony," but rather his factual recollection. |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| 4 | 135 | Ex. A – Chadwick Dep. 60:6-22 | Hearsay. to the extent the witness attempts to report or describe the intent of the USASF Board of Directors or of Varsity. Fed. R. Evid. 802. Lack of personal knowledge. Fed. R. Evid. 602. Speculative. *See Simmerman v. Ace Bayou Corp.*. No. 5:14-382-DCR. 2016 WL 109944. at *3 (E.D. Ky. Jan. 8. 2016) ("Speculative testimony is inadmissible for lay and expert witnesses alike."). | This testimony is cited in SUF No. 135, the portion of which relates to this testimony Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot. This excerpt is Mr. Chadwick's testimony regarding his recollection of the basis for the Worlds bid system.  Mr. Chadwick was the first President and Chair of USASF from its inception until Spring 2021.  Plaintiffs provide no further support for their assertion that this testimony is hearsay, lacks personal knowledge, and is speculative, but it is clearly none of those things based on Mr. Chadwick's role in USASF from its inception. As Chairman of the Board during that time, Mr. Chadwick would be the best person to speak as to the motivations or intent of the Board.  In any event, if the issue is Mr. Chadwick's use of "we," this testimony should still be considered because substituted oral testimony using "I" would be admissible.  *See Wyatt v. Nissan North Am., Inc.*, 999 F.3d 400, 423-24 (6th Cir. 2021) (reversing district court's dismissal of hearsay testimony at summary judgment when substitute oral testimony would be admissible). |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| 5 | 119 | Ex. A – Chadwick Dep. 121:21-122:11 | Hearsay. Fed. R. Evid. 802. Lack of personal knowledge. Fed. R. Evid. 602. Speculative. *See Simmerman v. Ace Bayou Corp..* No. 5:14-382-DCR. 2016 WL 109944. at *3 (E.D. Ky. Jan. 8. 2016) ("Speculative testimony is inadmissible for lay and expert witnesses alike."). | This testimony is Mr. Chadwick's response to Plaintiffs' counsel's question as to why a particular bylaw amendment was adopted. Plaintiffs provide no support for their assertion that this testimony is hearsay, lacks personal knowledge, and is speculative, but it is clearly none of those things based on Mr. Chadwick's role in USASF from its inception. As Chairman of the Board during that time, Mr. Chadwick would be the best person to speak as to the motivations or intent of the Board. In any event, if the issue is Mr. Chadwick's use of "the Board's feeling," this testimony should still be considered because substituted oral testimony using "my feeling" would be admissible. *See Wyatt v. Nissan North Am., Inc.*, 999 F.3d 400, 423-24 (6th Cir. 2021) (reversing district court's dismissal of hearsay testimony at summary judgment when substitute oral testimony would be admissible). |
| 6 | 135 | Ex. A – Chadwick Dep. 175:1-15 | Hearsay. Fed. R. Evid. 802. Lack of personal knowledge. Fed. R. Evid. 602. Speculative. *See Simmerman v. Ace Bayou Corp..* No. 5:14-382-DCR. 2016 WL 109944. at *3 (E.D. Ky. Jan. 8. 2016) ("Speculative | This testimony is cited in SUF No. 135, the portion of which relates to this testimony Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot. This testimony is Mr. |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|-----|------|------|------|------|
| | | | testimony is inadmissible for lay and expert witnesses alike."). | Chadwick's recollection of who provided funding for the Worlds event in the early years of USASF. Plaintiffs provide no support for their assertion that this testimony is hearsay, lacks personal knowledge, and is speculative, but it is clearly none of those things based on Mr. Chadwick's role in USASF from its inception. |
| 7 | 154 | Ex. A – Chadwick Dep. 447:14-448:1 | Hearsay. Fed. R. Evid. 802. Lack of personal knowledge. Fed. R. Evid. 602. Speculative. *See Simmerman v. Ace Bayou Corp..* No. 5:14-382-DCR. 2016 WL 109944. at *3 (E.D. Ky. Jan. 8. 2016) ("Speculative testimony is inadmissible for lay and expert witnesses alike."). | This testimony is cited in SUF No. 154, which Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot. This testimony is Mr. Chadwick's recollection of USASF's consideration of the purchase cycle in developing its Image Policy. Plaintiffs provide no support for their assertion that this testimony is hearsay, lacks personal knowledge, and is speculative, but it is clearly none of those things based on Mr. Chadwick's role in USASF from its inception. |
| 8 | 217 | Ex. A – Chadwick Dep. 482:10-15 | No foundation has been laid for this testimony; lack of personal knowledge. Fed. R. Evid. 602. Speculative. *See Simmerman v. Ace Bayou Corp..* No. 5:14-382-DCR. 2016 WL 109944. at *3 (E.D. Ky. Jan. 8. 2016) ("Speculative testimony is inadmissible for lay and expert witnesses alike."). | This testimony is Mr. Chadwick's response to a question by Plaintiffs' counsel as to whether Mr. Webb's role as president of ICU was the reason to involve him on certain communications. Plaintiffs provide no support for their assertion that this testimony lacks foundation, lacks |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
|  |  |  |  | personal knowledge, and is speculative, but Mr. Chadwick's recollection as to why he contacted Mr. Webb is clearly none of those things. |
| 9 |  | Ex. A – Chadwick Dep. 482:25-483:3 | Hearsay. Fed. R. Evid. 802. Lack of personal knowledge. Fed. R. Evid. 602. Speculative. *See Simmerman v. Ace Bayou Corp.*. No. 5:14-382-DCR. 2016 WL 109944. at *3 (E.D. Ky. Jan. 8. 2016) ("Speculative testimony is inadmissible for lay and expert witnesses alike."). | This testimony is not cited in Defendants' Statement of Undisputed Facts and, accordingly, this evidentiary objection is not ripe for consideration. |
| 10 | 212 | Ex. A – Chadwick Dep. 485:22-486:14 | Hearsay. Fed. R. Evid. 802. to the extent the witness attempts to report or describe Mr. Webb's statements or thoughts; lack of personal knowledge. Fed. R. Evid. 602. Speculative. *See Simmerman v. Ace Bayou Corp.*. No. 5:14-382-DCR. 2016 WL 109944. at *3 (E.D. Ky. Jan. 8, 2016) ("Speculative testimony is inadmissible for lay and expert witnesses alike."). | This testimony refers to an exhibit dated April 16, 2019 recalling a conversation almost immediately after that conversation occurred. The statement of Mr. Webb referred to in the document does not qualify as hearsay because it is a present sense impression under Fed. R. Evid. 803(1) and a statement of Mr. Webb's then-existing state-of-mind regarding the proposal under Fed. R. Evid. 803(3). The email itself is not hearsay as it qualifies as a business record under Fed. R. Evid. 803(6). Plaintiffs provide no support for their assertions that this testimony lacks personal knowledge or is speculative, and it is clearly neither of those things as Mr. Chadwick's testimony is based on a document that he wrote. |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|-----|-------------------|----------------------|------------------------|----------------------|
| 11 | 215 | Ex. A – Chadwick Dep. 493:3-7 | Hearsay. to the extent the witness attempts to report or describe what Mr. Webb did or did not say. Fed. R. Evid. 802. | This objection is particularly frivolous. This testimony involves Mr. Chadwick testifying that Mr. Webb <u>did not</u> say something. Hearsay is defined in Fed. R. Evid. 801 as a "statement" that is offered "to prove the truth of the matter asserted." The fact that no statement was made on a particular topic does not qualify as hearsay. |
| 12 | 116 | Ex. B – USASF_000 3246 | Exhibit is unsigned. No foundation. | This document is merely cited as evidence of USASF's stated purpose at the time of its formation. For this limited purpose, an unsigned copy of USASF's bylaws is as helpful as a signed copy. In any event, "evidence at the summary judgment stage does not have to be in 'a form that would be admissible at trial.'" *Lloyd v. Midland Funding, LLC*, 639 F. App'x 301, 304-05 (6th Cir. 2016) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). To the extent necessary, Defendants can further support this exhibit at trial with testimony explaining its context and that it is identical to the signed version of USASF's original bylaws. |
| 13 | 116 | Ex. C – USASF_000 28673 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. | This document is merely cited as evidence of USASF's stated purpose at the time of its formation. |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| | | | Inadmissible hearsay under Fed. R. Evid. 802. | The Sixth Circuit has held that Rule 56 does not require documents be authenticated for purposes of summary judgment and, accordingly, Plaintiffs' objection under Rule 901 is improper. *See Magnum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017). Plaintiffs provide no support for their assertion that this document is inadmissible hearsay, but in any event, this document qualifies as a business record under Fed. R. Evid. 803(6). |
| 14 | 119 | Ex. F – USASF_000 32439 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. | This document is cited as contemporaneous evidence from a 2006 Board meeting. The documentation of particular Board vote is not hearsay under Fed. R. Evid. 803(1) and/or (6). In addition, the Board meeting minutes themselves are business records under Fed. R. Evid. 803(6). The Sixth Circuit has held that Rule 56 does not require documents be authenticated for purposes of summary judgment and, accordingly, Plaintiffs' objection under Rule 901 is improper. *See Magnum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017). |
| 15 | 177 | Ex. G – Seely Dep. 43:2-7 | Lacks relevance with regard to the purported statement of fact. Fed. R. Evid. 401, 402. | The cited testimony is probative and makes fact that Bill Seely, as Varsity Spirit's President and most- |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| | | | | senior executive, reported to an individual other than Mr. Webb during the relevant period of the case. Mr. Webb's role at Varsity during the relevant period is of consequence to determining the action. Plaintiffs' relevance objection is frivolous and unsupported. |
| 16 | 121 | Ex. I – Stangle Dep. 86:7-20 | Lacks personal knowledge. Fed. R. Evid. 602. | This testimony is cited to establish that Varsity did not have a majority of voting seats on the Board of directors on March 30, 2022. At that time, Ms. Stangle was the Executive Director of USASF and sat on its Board of Directors. Plaintiffs' objection for lack of personal knowledge is non-sensical and unsupported. |
| 17 | 121 | Ex. J – Peterson Vol. 1 Dep. 31:18-32:2 | Lacks personal knowledge. Fed. R. Evid. 602. | This testimony is cited to establish that Varsity did not have a majority of voting seats on the Board of directors on March 9, 2022. At that time, Mr. Peterson was Vice President of USASF and sat on its Board of Directors. Plaintiffs' objection for lack of personal knowledge is non-sensical and unsupported. |
| 18 | 141 | Ex. J – Peterson Vol. 1 Dep. 52:14-53:12 | Contains inadmissible hearsay. Fed. R. Evid. 802. | This testimony contains Mr. Peterson's recollection as to why he wanted to eliminate Tier 2 for The Cheerleading Worlds in 2014. To the |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| | | | | extent he refers to "feedback" that he received, this is not being offered for the truth of the matter asserted, i.e., that the feedback was correct, but rather to explain Mr. Peterson's motivations. |
| 19 | 123, 124 | Ex. N – USASF_000 56250 | Contains inadmissible hearsay. Fed. R. Evid. 802. | The portions of this exhibit that are cited are the committee charters attached to the email.  The email itself is relevant for purposes of establishing the date on which the charters were sent and not for the content contained in the email. These portions are business records and not hearsay under Fed. R. Evid. 803(6). |
| 20 | 125 | Ex. P – USASF_000 81398 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. | This testimony is cited in SUF No. 125, which Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot.  This document is USASF's Event Producer Memberships General Membership Guidelines for 2012-2013 and is a business record under Fed. R. Evid. 803(6). The Sixth Circuit has held that Rule 56 does not require documents be authenticated for purposes of summary judgment and, accordingly, Plaintiffs' objection under Rule 901 is improper. *See Magnum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017). |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| 21 | 131, 133, 134 | Ex. R – USASF_000 27858 | Contains inadmissible hearsay. Fed. R. Evid. 802. | This testimony is cited in SUF Nos. 131 and 134, which Plaintiffs do not dispute, as well as SUF No. 133, which Plaintiffs dispute in part. The cited portion of the document is not hearsay under Fed. R. Evid. 803(1), (3), and/or (6). |
| 22 | 135, 137 | Ex. S - VAR003190 08 | Contains inadmissible hearsay. Fed. R. Evid. 802. | The document is admissible, as it qualifies as a USASF business record under Fed. R. Evid. 803(6). |
| 23 | 135, 139 | Ex. T – USASF_000 30547 | Contains inadmissible hearsay. Fed. R. Evid. 802. | This testimony is cited in SUF No. 139, which Plaintiffs do not dispute, and SUF No. 135, the relevant portion of which Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot. The documentation of particular Board vote is not hearsay under Fed. R. Evid. 803(1) and/or (6). |
| 24 | 136 | Ex. U – USASF_000 32433 | Contains inadmissible hearsay. Fed. R. Evid. 802. | The cited portion of document is not hearsay under Fed. R. Evid. 803(1), (3), and/or (6). |
| 25 | 140, 148 | Ex. V – USASF_000 32433 | Contains inadmissible hearsay. Fed. R. Evid. 802. | This testimony is cited in SUF No. 148, which Plaintiffs do not dispute, and SUF No. 140, the relevant portion of which Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot. The documentation of particular Committee vote is |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| | | | | not hearsay under Fed. R. Evid. 803(1) and/or (6). |
| 26 | 140 | Ex. W – USASF_000 26548 | Contains inadmissible hearsay. Fed. R. Evid. 802. | This document is cited in SUF No. 140, the relevant portion of which Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot. The documentation of particular Committee vote is not hearsay under Fed. R. Evid. 803(1) and/or (6). |
| 27 | 140 | Ex. X – USASF_000 85198 | Contains inadmissible hearsay. Fed. R. Evid. 802. | This document is cited in SUF No. 140, the relevant portion of which Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot. This document also qualifies as a business record under Fed. R. Evid. 803(6). |
| 28 | 141 | Ex. AA – USASF_000 19474 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. | This document is cited only for the purpose of showing that the Orlando Magic event was a Varsity event and not for the truth of the matter asserted.  If necessary, other evidence can be substituted to establish this fact at trial. *See Wyatt v. Nissan North Am., Inc.*, 999 F.3d 400, 423-24 (6th Cir. 2021) (reversing district court's dismissal of hearsay testimony at summary judgment when substitute oral testimony would be admissible).  The Sixth Circuit has held that Rule 56 does not require documents |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| | | | | be authenticated for purposes of summary judgment and, accordingly, Plaintiffs' objection under Rule 901 is improper. *See Magnum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017). |
| 29 | 141 | Ex. AB – USASF_000 19528 | Exhibit supported only by counsel's affidavit. Not otherwise authenticated. Fed. R. Evid. 901. | The Sixth Circuit has held that Rule 56 does not require documents be authenticated for purposes of summary judgment and, accordingly, Plaintiffs' objection under Rule 901 is improper. *See Magnum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017). |
| 30 | 141 | Ex. AC – USASF_000 20057 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. | The Sixth Circuit has held that Rule 56 does not require documents be authenticated for purposes of summary judgment and, accordingly, Plaintiffs' objection under Rule 901 is improper. *See Magnum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017). |
| 31 | 142 | Ex. AD – Collective Discovery Docs | Exhibit supported only by counsel's affidavit. Not otherwise authenticated. Fed. R. Evid. 901. | The Sixth Circuit has held that Rule 56 does not require documents be authenticated for purposes of summary judgment and, accordingly, Plaintiffs' objection under Rule 901 is improper. *See Magnum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017). |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| 32 | 143 | Ex. AE – USASF_000 12988 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. Inadmissible character evidence by using an instance of conduct to say that USASF would never deviate from its World Bid Criteria to benefit Varsity. Fed. R. Evid. 404(a)(1). Voting to keep ASC and Cheer Tech as Tier 1 EP Members not probative or material. Fed. R. Evid. 401, 402. | The Sixth Circuit has held that Rule 56 does not require documents be authenticated for purposes of summary judgment and, accordingly, Plaintiffs' objection under Rule 901 is improper. *See Magnum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017). The documentation of particular Committee vote is not hearsay under Fed. R. Evid. 803(1) and/or (6). This document is not being offered as character evidence. It is Plaintiffs' burden to identify an instance where USASF did deviate from its Worlds Bid criteria to benefit Varsity. This evidence is probative and offered to show that in the only instance where USASF deviated, it was to the detriment of Varsity. |
| 33 | 144 | Ex. AF - VAR004210 95 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. | This document is capable of being authenticated at trial and Plaintiffs' objection is therefore not valid. Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The document is also sufficiently reliable to be admissible under Fed. R. Evid. 807. |
| 34 | 147 | Ex. AG – USASF_000 88659 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. | This document is cited in SUF No. 147, which Plaintiffs do not dispute, rendering their evidentiary |

22

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| | | | | objection at summary judgment moot.<br><br>This document is capable of being authenticated at trial and Plaintiffs' objection is therefore not valid.  Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). This document is a business record and not hearsay under Fed. R. Evid. 803(6). |
| 35 | 147, 149, 151, 152, 153 | Ex. AH – USASF_000 88659 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. | This document is cited in SUF Nos. 147, 149, and 151-153, which Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot.<br><br>This document is capable of being authenticated at trial and Plaintiffs' objection is therefore not valid.  Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  This document is a business record and not hearsay under Fed. R. Evid. 803(6). |
| 36 | 148, 150 | Ex. AI – Wright Dep. Excerpts | Contains inadmissible hearsay to the extent the witness purports to speak for the USASF Image Committee. Fed. R. Evid. 802. | This document is cited in SUF Nos. 148 and 150, which Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot.<br><br>The cited portions of Ms. Wright's testimony involve her recollection of the other participants that were on the Image Committee and why |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| | | | | the Image Committee was created, none of which is hearsay. To the extent Ms. Wright spoke "for the USASF Image Committee," it is because Plaintiffs' counsel solicited such testimony, asking "why was USASF, or should I say the Image Committee, trying to promote an athletic image?" In any event, if the issue is Ms. Wright's use of "we," this testimony should still be considered because substituted oral testimony using "I" would be admissible. *See Wyatt v. Nissan North Am., Inc.*, 999 F.3d 400, 423-24 (6th Cir. 2021) (reversing district court's dismissal of hearsay testimony at summary judgment when substitute oral testimony would be admissible). |
| 37 | 150 | Ex. AJ – USASF_000 22109 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. | This document is cited in SUF No. 150, which Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot. In addition, this document is capable of being authenticated at trial and Plaintiffs' objection is therefore not valid. Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| | | | | Plaintiffs do not explain what portion of the document they believe constitutes inadmissible hearsay, so Defendants are unable to further address this objection.  As a whole, the meeting minutes constitute business records under Fed. R. Evid. 803(6). |
| 38 | 161 | Ex. AO - USASF_000 23946 | Insufficient foundation in Nichols depo (Ex. 23). FRE 901. Inadmissible hearsay. Fed. R. Evid. 802. | This document is cited in SUF No. 161 as evidence that USASF had repaid any loan from Varsity as of November 2013, which Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot.<br><br>Plaintiffs do not explain their lack of foundation objection or why it is specific to Mr. Nichols' deposition.  There are multiple people, including Mr. Nichols who can provide substitute oral testimony that the loan was fully repaid as of November 2013.  *See Wyatt v. Nissan North Am., Inc.*, 999 F.3d 400, 423-24 (6th Cir. 2021) (reversing district court's dismissal of hearsay testimony at summary judgment when substitute oral testimony would be admissible).  Further, Mr. Nichols' statements memorialized in this document constitute a |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| | | | | business record under Fed. R. Evid. 803(6).

This document is capable of being authenticated at trial and Plaintiffs' objection is therefore not valid.  Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). |
| 39 | 161 | Ex. AP – USASF_000 23946 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. | The Sixth Circuit has held that Rule 56 does not require documents be authenticated for purposes of summary judgment and, accordingly, Plaintiffs' objection under Rule 901 is improper.  *See Magnum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017).  This document qualifies as a business record under Fed. R. Evid. 803(6). |
| 40 | 121 | Ex. AQ – USASF_000 27831 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. | The relevant portions of this document qualify as a business record under Fed. R. Evid. 803(6). The Sixth Circuit has held that Rule 56 does not require documents be authenticated for purposes of summary judgment and, accordingly, Plaintiffs' objection under Rule 901 is improper.  *See Magnum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017). |
| 41 | 137 | Ex. AR – USASF_000 90186 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. | This document is cited in SUF No. 137, which Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot.  In addition, |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| | | | | the Sixth Circuit has held that Rule 56 does not require documents be authenticated for purposes of summary judgment and, accordingly, Plaintiffs' objection under Rule 901 is improper. *See Magnum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017). This document does not qualify as hearsay because it is not cited for the truth of the matter asserted, but merely as evidence that the date/mileage policy was the subject of discussion in 2010. |
| 42 | 6, 62, 159 | Ex. AY - Lorenzen Dep. Tr. Excerpts | Calls for legal conclusion and encroaches on privileged information. Fed. R. Evid. 501, 701. | This testimony is cited in SUF Nos. 6, 62, and 159. Plaintiffs do not dispute SUF Nos. 62 and 159, rendering any evidentiary objections pertaining to them at summary judgment moot. To the extent Plaintiffs' objection pertains to SUF No. 6, the testimony is admissible.<br><br>Both excerpts are proper percipient testimony regarding whether Ms. Lorenzen's daughter had attended a cheer camp, her daughter's membership status vis-à-vis USASF, and whether Ms. Lorenzen has paid money to USASF.<br><br>"Encroaches on privileged information" is not a proper objection and in any event any privilege has been waived. |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| 43 | 97 | Ex. BA - Newby Dep. Tr. Day 1 287:2-8 | Witness lacks requisite personal knowledge re sports endorsements. Fed. R. Evid. 602. Witness is lay witness lacking requisite specialized knowledge to opine re sports endorsement contracts. Fed. R. Evid. 701. | The testimony is admissible because it is based on Mr. Newby's personal knowledge of Varsity's Network Agreements. |
| 44 | 97 | Ex. BA - Newby Dep. Tr. Day 1 287:9-13 | Witness lacks requisite personal knowledge re sports endorsements. Fed. R. Evid. 602. | The testimony is admissible because it is based on Mr. Newby's personal knowledge of sports endorsements. |
| 45 | 103 | Ex. BA - Newby Dep. Tr. Day 1 251:10-11 | Witness lacks requisite personal knowledge re number of network agreements. Fed. R. Evid. 602. | The testimony is admissible because it is based on Mr. Newby's personal knowledge of the Varsity Network Agreements and the Varsity Family Plan. Mr. Newby is the General Manager of Varsity's All Star business, and he was serving as a 30(b)(6) witness on behalf of Varsity when he provided the testimony at issue. *See* Pls.' Ex. 40, Newby Dep. at 101:20-21; *id*. at 298:19-20. |
| 46 | 60 | Ex. BC - Duhon Dep. Tr. 38:13-24 | As the witness admits at 38:19. she lacks personal knowledge. Fed. R. Evid. 602. | The testimony is admissible because it was based on Mrs. Duhon's "experience as the general manager of NCA," one of Varsity's competition brands. Ex. BC, Duhon Dep. at 38:20-24. |
| 47 | 28, 42, 67, 68, 69, 74, 75 | Ex. BE - Minzghor Dep. | Lacks relevance. Fed. R. Evid. 401, 402. | This testimony is cited in SUF Nos. 28, 42, 67, 68, 69, 74, and 75. Plaintiffs do not |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| | | Tr. 136:7-16; 140:12-21. 223:2-23 | | dispute SUF No. 42, rendering any evidentiary objections pertaining to it at summary judgment moot. To the extent Plaintiffs' objection pertains to SUF Nos. 28, 67, 68, 69, 74, and 75, the testimony is admissible. Each excerpt is relevant to, among other things, Plaintiffs claims that a rival apparel manufacturer must be allowed to sell products at Varsity's events, because it demonstrates that the apparel sale process does not work the way Plaintiffs' suggest, without evidence, that it does. Fed. R. Evid. 401. |
| 48 | 28, 79 | Ex. BF - Bray Dep. Tr. 40:1-41:13; 60:9-24 | Lacks relevance. Fed. R. Evid. 401, 402. | The testimony is admissible because Ms. Bray's testimony at 40:1-41:13 is relevant to product market definition, and her testimony at 60:9-24 is relevant to geographic market definition. Fed. R. Evid. 401. |
| 49 | 45 | Ex. BG - L. Gurske Dep. Tr. 353:17-21. | Lacks relevance. Fed R. Evid. 401, 402. | The testimony is admissible because it is relevant to alleged foreclosure in the purported Cheer Apparel market. Fed. R. Evid. 401. Plaintiffs' additional narrative is irrelevant to admissibility and duplicative of their response to Defendants' SUF No. 45, |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| | | | | and Defendants respond to it there. |
| 50 | 67, 68, 69, 75, 77 | Ex. BG - L. Gurske Dep. Tr. 317:22-318:1; 318:3-319:4; 319:16-320:7. | Lacks relevance. Fed. R. Evid. 401, 402. | The testimony is admissible because each excerpt is relevant to product market definition. Fed. R. Evid. 401. Ms. Gurske was referring to competitive scholastic cheer when she testified about "sideline" cheer. *See* Ex. BG, Gurske Dep. at 319:5-8 ("Sideline school cheerleaders compete on what's called a dead mat, where it's just the carpet bonded foam. Whereas, with All Star, we compete on spring floor."). |
| 51 | 33, 35 | Ex. BH - Sadlow Dep. Tr. 40:23-25 | Witness lacks specialized knowledge to offer expert testimony. Fed. R. Evid. 701. | The testimony is admissible because it is based on Mr. Sadlow's personal knowledge of cheer apparel providers. Mr. Sadlow has served in senior and executive leadership roles in Varsity's scholastic cheer business for several years. |
| 52 | 43 | Ex. BH - Sadlow Dep. 37:10-17. 231:1-232:11. | Defendants' asserted fact is not supported by this testimony. Lacks relevance. Fed. R. Evid. 401, 402. Witness lacks personal knowledge regarding Varsity's competitors sales practices. Fed. R. Evid. 602. | This testimony is cited in SUF No. 43, the portion of which relates to this testimony Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot.<br><br>In any event, the testimony is admissible because both excerpts are relevant to alleged foreclosure in the purported Cheer Apparel market. Fed. R. Evid. 401. Mr. Sadlow's testimony is |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| | | | | based on his personal knowledge of Varsity's apparel sales process. Mr. Sadlow has served in senior and executive leadership roles in Varsity's scholastic cheer business for several years.<br><br>Plaintiffs' additional narrative is irrelevant to admissibility and duplicative of their response to Defendants' SUF No. 43, and Defendants respond to it there. |
| 53 | 70, 74 | Ex. BH - Sadlow Dep. 39:2-10. | Lacks relevance. Fed. R. Evid. 401, 402. | This testimony is cited in SUF Nos. 70 and 74. Plaintiffs do not dispute SUF No. 70, rendering any evidentiary objections pertaining to it at summary judgment moot. To the extent Plaintiffs' objection pertains to SUF No. 74, the testimony is admissible.<br><br>It is relevant to product market definition. Fed. R. Evid. 401. Mr. Sadlow testified to the characteristics of what he described as "school cheer," not sideline cheer. *See* Ex. BH, Sadlow Dep. at 39:2-10. |
| 54 | 34 | Ex. BI - Weber Dep. Tr. Excerpts | Lacks foundation. Lacks relevance. Fed. R. Evid. 401, 402. Lacks personal knowledge. Fed. R. Evid. 602. | This testimony is cited in SUF No. 34, the portion of which relates to this testimony Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot. |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| | | | | In any event, the testimony is admissible because it is based on Ms. Webers's personal knowledge and is relevant to product market definition.. Fed. R. Evid. 401. |
| 55 | 62, 72, 159 | Ex. BJ - Kennedy Dep. Tr. 205:10-15; 209:1-9 | Lacks relevance. Fed. R. Evid. 401, 402. | This testimony is cited in SUF Nos. 62, 72, and 159, which Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot.

In any event, the testimony is admissible because neither excerpt relates to sideline cheer. Ms. Kennedy's testimony at 205:10-15 is about All Star cheer and relevant to market definition. Her testimony at 209:1-9 is about the applicability of USASF rules to scholastic cheerleaders – including those who compete – and relevant to the alleged conspiracy between USASF and the other Defendants. Fed. R. Evid. 401. |
| 56 | 43 | Ex. BJ - Kennedy Dep. Tr. 46:17-47:13. | Witness lacks personal knowledge. Fed. R. Evid. 602. Testimony is speculative. Lacks relevance. Fed. R. Evid. 401, 402. | This testimony is cited in SUF No. 43, the portion of which relates to this testimony Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot.

In any event, the testimony is admissible. Ms. Kennedy testified based on her |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|-----|------|------|------|------|
| | | | | personal knowledge of Varsity's sales practices. Ms. Kennedy has served in several roles at Varsity, including Vice President of Marketing and Communications. |
| | | | | In addition, the testimony is relevant to alleged foreclosure in the purported Cheer Apparel market. Fed. R. Evid. 401. |
| 57 | 45, 61 | Ex. BK - VAR000092 93 at 329. 355. 357. | Hearsay. Fed. R. Evid. 802. | This document is cited in SUF Nos. 45 and 61, and Plaintiffs' objection appears to apply to the use of the document in connection with SUF No. 61. Plaintiffs do not dispute the portion of SUF No. 61 relevant to this document, rendering any evidentiary objections pertaining to it at summary judgment moot. |
| 58 | 45 | Ex. BL - Hill Dep. Tr. 330:5-13 | The cited testimony shows the witness lacks personal knowledge. Fed. R. Evid. 602. Lacks relevance. Fed. R. Evid. 401, 402. | The testimony is admissible because it is cited for the portion of it that is based on Mr. Hill's personal knowledge. Mr. Hill stated that he did not recall who sold commemorative merchandise at Worlds, not that he did not know what type of merchandise was sold. |
| | | | | In addition, the testimony is relevant to alleged foreclosure in the purported Cheer Apparel market. Fed. R. Evid. 401. |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| 59 | 48 | Ex. BM - VAR00233675 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. | The document is admissible because it qualifies as a Varsity business record under Fed. R. Evid. 803(6). It is also capable of being authenticated at trial and Plaintiffs' objection is therefore not valid. Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). |
| 60 | 48 | Ex. BN - VAR00302098 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. | The document is admissible because it qualifies as a Varsity business record under Fed. R. Evid. 803(6). It is also capable of being authenticated at trial and Plaintiffs' objection is therefore not valid. Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). |
| 61 | 48 | Ex. BO - VAR00147772 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. | The document is admissible, as it qualifies as a Varsity business record under Fed. R. Evid. 803(6). It is also capable of being authenticated at trial and Plaintiffs' objection is therefore not valid. Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). |
| 62 | 70 | Ex. BQ - Elza Vol 1. Dep. Tr. 59:24-60:2 | Lacks relevance Fed. R. Evid. 401, 402. | This testimony is cited in SUF No. 70, the portion of which relates to this testimony Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot. |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| | | | | In any event, this testimony is admissible because it is relevant to product market definition.  Fed. R. Evid. 401. |
| 63 | 90 | Ex. BQ - Elza Vol 1. Dep. Tr. 60:11-13. | Lacks foundation. witness lacks personal knowledge. questions and answer are vague. Fed. R. Evid. 602. Lacks relevance. Fed. R. Evid. 401, 402. | This testimony is cited in SUF No. 90, the portion of which relates to this testimony Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot.

Further, Plaintiffs did not object to the question during the deposition, and form objections not raised during the deposition are waived. Fed. R. Evid. 32(d)(3)(B).

In any event, the testimony is admissible, as it is based on Mr. Elza's personal knowledge.  Mr. Elza operated an All Star gym for two decades.  *See* Pls.' Ex 12, Elza Dep.at 30:4-23.

Mr. Elza's testimony is relevant to alleged foreclosure in the purported Cheer Competitions market. Fed. R. Evid. 401. |
| 64 | 94, 96 | Ex. BQ - Elza Vol 1. Dep. Tr. 202:16-203:2. | Appears to lack personal knowledge Fed. R. Evid. 602. | "Appears to lack personal knowledge" is not a valid objection.  Plaintiffs are merely questioning the import of undisputed facts.

Plaintiffs additional argumentative narrative is |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| | | | | irrelevant and should be disregarded. |
| 65 | 76 | Ex. BR - VAR0000094 86 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. | This testimony is cited in SUF No. 76, the portion of which relates to this testimony Plaintiffs do not dispute, rendering their evidentiary objection at summary judgment moot.

In any event, the document is capable of being authenticated at trial and Plaintiffs' objection is therefore not valid.  Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  It is also sufficiently reliable to be admissible under Fed. R. Evid. 807. |
| 66 | 79 | Ex. BU - T. Gurske Dep. Tr. Excerpts | Lacks relevance. Fed. R. Evid. 401, 402. | This testimony is admissible because it is relevant to geographic market definition. Fed. R. Evid. 401. |
| 67 | 91 | Ex. CB - FUSIONELI 000000424 | Lacks relevance. Fed. R. Evid. 401, 402. Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. Inadmissible hearsay under Fed. R. Evid. 802. | This document was authenticated by Sarah Minzghor during her deposition, *see* Pls.' Ex. 37, Minzghor Dep. at 45:13-19, and it is sufficiently reliable to be admissible under Fed. R. Evid. 807.

The document is relevant to alleged foreclosure in the purported Cheer Competitions market. Fed. R. Evid. 401. |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| 68 | 101 | Ex. CF - Le Tard Dep. Tr. 211:7 | Selective citation is incomplete and misleading: full statement reads "It was not exclusive for events. It was exclusive for uniforms." | Plaintiffs have not stated a valid evidentiary objection, and their irrelevant narrative should be disregarded. |
| 69 | 210 | Ex. CF - Le Tard Dep. Tr. 350:6-352:20. | Contains inadmissible hearsay. Fed. R. Evid. 802. | This cited portion of this document does not contain hearsay offered for the truth of the matter asserted and is thus admissible. |
| 70 | 222, 223 | Ex. CL - Cotton Dep. Tr. 123:12-23; 123:24-124:9; | Lacks personal knowledge. Fed. R. Evid. 602. Contains inadmissible hearsay to the extent that the witness purports to speak for others at Bain. Fed. R. Evid. 802. | This testimony is cited in SUF Nos. 222 and 223. Plaintiffs do not dispute SUF No. 222, rendering any evidentiary objections pertaining to it at summary judgment moot.  To the extent Plaintiffs' objection pertains to SUF No. 223, the testimony is admissible.<br><br>Mr. Cotton's testimony was based on his personal knowledge as a member of Varsity's board of directors. |
| 71 | 226 | Ex. CL - Cotton Dep. Tr. 30:15-31:3. | Lacks relevance. Fed. R. Evid. 401, 402. | This testimony is admissible, as it is relevant to refute Plaintiffs' allegations that Bain was involved in a purported anticompetitive scheme. Fed. R. Evid. 401. |
| 72 | 236 | Ex. CN - Janower 30b6 Dep. Tr. 141:9-20 | Fed. R. Evid. 401, 402. | This testimony is admissible, as it is relevant to refute Plaintiffs' allegations that Bain was involved in a purported anticompetitive scheme. Fed. R. Evid. 401. |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| | | | | Plaintiffs' additional narrative is irrelevant to their evidentiary objection and should be disregarded. |
| 73 | 166, 233 | Ex. CP - Beer Dep . Tr. 98:17-101:4; 144:24-145:1. | Lacks personal knowledge. Fed. R. Evid. 602. Contains inadmissible hearsay to the extent that the witness purports to speak for others at Charlesbank. Fed. R. Evid. 802. | This testimony is cited in SUF Nos. 166 and 233, both of which Plaintiffs do not dispute, rendering any evidentiary objections pertaining to them at summary judgment moot.

In any event, both excerpts are admissible.  Mr. Beer testified based on his personal knowledge as a member of Varsity's board of directors. |
| 74 | 212 | Ex. CS - USASF_000 39789 | Contains inadmissible hearsay to the extent it purports to report or describe statement by Mr. Webb. Fed. R. Evid. 802. | The testimony is not hearsay, because it is offered to show what was said, not for the truth of the matter asserted. |
| 75 | 172 | Ex. CU - Janower Dep. Tr. 121:11-123:3 | Lacks relevance. Fed. R. Evid. 401, 402. | Mr. Janower's testimony that Charlesbank's goal was to make it such that Mr. Webb was not "effectively driving the business" is relevant to Mr. Webb's role and responsibilities at Varsity during the relevant time period and of consequence to Plaintiffs' allegations that Mr. Webb was involved in a purported anticompetitive scheme. Fed. R. Evid. 401. |
| 76 | 168, 169 | Ex. CV - CB00314261 | Document has not been authenticated, fails to satisfy Fed. R. Evid. 901. | This document is cited in SUF Nos. 168 and 169, both of which Plaintiffs do not |

38

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| | | | Inadmissible hearsay under Fed. R. Evid. 802. | dispute, rendering any evidentiary objections pertaining to them at summary judgment moot.<br><br>In any event, the document is admissible because it qualifies as a Varsity business record under Fed. R. Evid. 803(6). It is also capable of being authenticated at trial and Plaintiffs' objection is therefore not valid. Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). |
| 77 | 172 | Ex. CW - C800114878 | Lacks relevance. Fed. R. Evid. 401, 402. | This document is admissible, as it is relevant to Mr. Webb's role and responsibilities at Varsity relevant time period and of consequence to Plaintiffs' allegations that Mr. Webb was involved in a purported anticompetitive scheme. Fed. R. Evid. 401. |
| 78 | 170 | Ex. CX - CB00373462 | The Hercules VB Holdings. Inc.. Board Minutes and Hercules Achievement Holdings. Inc. Board Minutes are unsigned and therefore lack proper indicia of authenticity. Fed. R. Evid. 901. 902. | This document is cited in SUF No. 170, which Plaintiffs do not dispute, rendering any evidentiary objections pertaining to it at summary judgment moot.<br><br>In any event, this document is admissible because it is capable of being authenticated at trial and Plaintiffs' objection is therefore not valid. Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| 79 | 171 | Ex. CZ - Newby Dep. Tr. Day 2 652:14-653:1 | Lacks personal knowledge. Fed. R. Evid. 602. | This testimony is admissible, as it is based on Mr. Newby's personal knowledge of Mr. Webb's involvement with Varsity's operations while Mr. Webb was Chairman of the Board. |
| 80 | 198 | Ex. CZ – Newby Dep. 389:1-13 | Lacks personal knowledge to the extent that the witness did not "recall speaking to Mr. Webb about proposed changes to the Family [P]lan." Also lacks personal knowledge as to whether other Varsity personnel consulted with Mr. Webb. 389:3-4. Fed. R. Evid. 602. Lacks relevance Fed. R. Evid. 401, Fed. R. Evid. 602. | Mr. Newby has personal knowledge about whether or not he spoke to Mr. Webb about a particular topic, including "proposed changes to the Family [P]lan." Plaintiffs' objection to lack of knowledge is frivolous in that regard. Moreover, as an individual "involved in the original development of the Varsity Family Plan" and who "review[ed] the plan year after year," Mr. Newby would have knowledge of whether other Varsity personnel consulted with Mr. Webb. *See* Pls.' Ex. 40 at 248:6-13. Thus, Plaintiffs' objection to knowledge is unsupported.<br><br>The cited testimony is relevant to Mr. Webb's involvement in Varsity's rebate programs and, in particular, the Varsity Family Plan. Testimony that Mr. Webb was not regularly consulted on the Family Plan is probative and offered to show Mr. Webb was not involved in changes to the Family Plan. That John Newby would "run business |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| | | | | decisions by [Mr. Webb]" during the time in which he reported to him does not render the testimony irrelevant.  Plaintiffs' objection to relevance is frivolous and unsupported. Fed. R. Evid. 401. |
| 81 | 177 | Ex. DA - Nichols Dep. 27:2 – 28:8 | Lacks relevance Fed. R. Evid. 401, 402. | The cited testimony is probative and relevant in showing that John Nichols, as Varsity Spirit's most-senior executive, reported to an individual other than Mr. Webb during the relevant period of the case.  It is relevant to Mr. Webb's role and responsibilities at Varsity during the relevant time period and of consequence to Plaintiffs' allegations that Mr. Webb was involved in a purported anticompetitive scheme. Plaintiffs' relevance objection is frivolous and unsupported.  Fed. R. Evid. 401. |
| 82 | 180 | Ex. DC – O'Rourke Dep. 68:4-70:9 | Lacks relevance. Fed. R. Evid. 401, 402. | The cited testimony is relevant to show that Mr. Webb was given a "meaningless" title, reflecting his role at Varsity during the relevant period, and of consequence to Plaintiffs' allegations that Mr. Webb was involved in a purported anticompetitive scheme.   Plaintiffs' objection is frivolous and unsupported.  Fed. R. Evid. 401. |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| 83 | 180 | Ex. DD – BAIN000628 31 | Lacks relevance. Fed. R. Evid. 401, 402. | The cited document is relevant to show that Mr. Webb was given a "meaningless" title, reflecting his role at Varsity during the relevant time period, after funds managed by Bain purchased an interest in Varsity in July 2018 and of consequence to Plaintiffs' allegations that Mr. Webb was involved in a purported anticompetitive scheme. Plaintiffs' objection is frivolous and unsupported.  Fed. R. Evid. 401. |
| 84 | 181 | Ex. DE – BAIN000134 00 | Lacks relevance. Fed. R. Evid. 401, 402. Contains inadmissible hearsay. Fed. R. Evid. 802. | The cited document is relevant to show that Mr. Webb's responsibilities at Varsity after Bain's investment in 2018 would be focused on "international – IOC – camps & adviser to Seely."  Defs.' Ex. DE at BAIN00013400.  Mr. Webb's role at Varsity during the relevant period is of consequence to Plaintiffs' allegations that Mr. Webb was involved in a purported anticompetitive scheme. Plaintiffs' objection to relevance is frivolous and unsupported.  Fed. R. Evid. 401.

This document is a business record and not hearsay under Fed. R. Evid. 803(6). |

| No. | Defs.' SUF No.[1] | Defendants' Evidence | Plaintiffs' Objections | Defendants' Response |
|---|---|---|---|---|
| 85 | 182 | Ex. DF – BAIN000743 57 | Inadmissible hearsay. Fed. R. Evid. 802. | This document is a business record and not hearsay under Fed. R. Evid. 803(6). |
| 86 | 173 | Ex. DG – Seely Dep. 572:12-13, 573:12-22 | Lacks personal knowledge. Fed. R. Evid. 602. | The cited testimony is probative to Mr. Webb's role and responsibilities at Varsity at the time. As President of Varsity Spirit in 2017, Bill Seely has personal knowledge of Mr. Webb's role and responsibilities at Varsity in 2017. |
| 87 | 175 | Ex. DH – Webb Dep. Vol. 2 272:12-273:11 | Testimony lacks relevance because Mr. Webb prefaces his testimony by saying "So a staged answer here," indicating that the testimony was rehearsed and therefore unreliable. Fed. R. Evid. 401, 402. | Plaintiffs' objection to relevance is frivolous and unsupported. An off-hand quip near the end of an 11-hour, two-day deposition does not render the testimony irrelevant or unreliable. Plaintiffs' suggestion that Mr. Webb rehearsed an answer in response to a question from opposing counsel, of which he could not have advanced knowledge, is absurd. Moreover, the cited testimony is probative to Mr. Webb's role and responsibilities at Varsity after March 2016 and during the relevant time to this case and is of consequence to allegations that Mr. Webb was involved in an anticompetitive scheme. Fed. R. Evid. 401. |