IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| JESSICA JONES and CHRISTINA LORENZEN on Behalf of Themselves and All Others Similarly Situated,<br><br>          Plaintiffs,<br><br>v.<br><br>VARSITY BRANDS, LLC; VARSITY SPIRIT, LLC; VARSITY SPIRIT FASHION & SUPPLIES, LLC; U.S. ALL STAR FEDERATION, INC.; JEFF WEBB; CHARLESBANK CAPITAL PARTNERS LLC; CHARLESBANK EQUITY FUND VII, LIMITED PARTNERSHIP; CHARLESBANK EQUITY FUND VIII, LIMITED PARTNERSHIP; CHARLESBANK EQUITY FUND IX, LIMITED PARTNERSHIP; BAIN CAPITAL PRIVATE EQUITY, LP; BAIN CAPITAL FUND XII, L.P.; BAIN CAPITAL FUND (DE) XII, L.P.; and BAIN CAPITAL FUND (LUX) XII, SCSP,<br><br>          Defendants. | Case No. 2:20-cv-02892-SHL-tmp |

**DECLARATION OF STEVEN WEISBROT, ESQ. OF ANGEION GROUP LLC**
**RE: THE PROPOSED NOTICE PLAN**

I, Steven Weisbrot, Esq., declare under penalty of perjury as follows:

1.    I am the President and Chief Executive Officer at the class action notice and claims administration firm Angeion Group, LLC ("Angeion"). Angeion specializes in designing, developing, analyzing, and implementing large-scale, unbiased, legal notification plans.

2.    I have personal knowledge of the matters stated herein. In forming my opinions regarding notice in this action, I have drawn from my extensive class action experience, as described below.

3.    I have been responsible in whole or in part for the design and implementation of hundreds of court-approved notice and administration programs, including some of the largest and most

complex notice plans in recent history. I have taught numerous accredited Continuing Legal Education courses on the Ethics of Legal Notification in Class Action Settlements, using Digital Media in Due Process Notice Programs, as well as Claims Administration, generally. I am the author of multiple articles on Class Action Notice, Claims Administration, and Notice Design in publications such as Bloomberg, BNA Class Action Litigation Report, Law360, the ABA Class Action and Derivative Section Newsletter, and I am a frequent speaker on notice issues at conferences throughout the United States and internationally.

4. I was certified as a professional in digital media sales by the Interactive Advertising Bureau ("IAB"), and I am co-author of the Digital Media section of Duke Law's *Guidelines and Best Practices—Implementing 2018 Amendments to Rule 23* and the soon to be published George Washington Law School Best Practices Guide to Class Action Litigation.

5. I have given public comment and written guidance to the Judicial Conference Committee on Rules of Practice and Procedure on the role of direct mail, email, broadcast media, digital media, and print publication, in effecting Due Process notice, and I have met with representatives of the Federal Judicial Center to discuss the 2018 amendments to Rule 23 and offered an educational curriculum for the judiciary concerning notice procedures.

6. Prior to joining Angeion's executive team, I was employed as Director of Class Action services at Kurtzman Carson Consultants, an experienced notice and settlement administrator. Prior to my notice and claims administration experience, I was employed in private law practice.

7. My notice work comprises a wide range of class actions that include antitrust, data breach, mass disasters, product defect, false advertising, employment discrimination, tobacco, banking, firearm, insurance, and bankruptcy cases.

8. I have been at the forefront of infusing digital media, as well as big data and advanced targeting, into class action notice programs. Courts have repeatedly recognized my work in the design of class action notice programs. A comprehensive summary of judicial recognition Angeion has received is attached hereto as **Exhibit A**.

9.  Angeion is an experienced class action notice and claims administration company formed by a team of executives that have had extensive tenures at five other nationally recognized claims administration companies. Collectively, the management team at Angeion has overseen more than 2,000 class action settlements and distributed over $15 billion to class members. The executive profiles as well as the company overview are available at www.angeiongroup.com.

10. As a class action administrator, Angeion has regularly been approved by both federal and state courts throughout the United States and abroad to provide notice of class actions and claims processing services.

11. Angeion has extensive experience administering landmark settlements involving some of the world's most prominent companies, including:

**In re: Facebook, Inc Consumer Privacy User Profile Litigation**
Case No. 3:18-md-02843-VC (N.D. Cal.)
Meta agreed to pay $725 million to settle allegations that the social media company allowed third parties, including Cambridge Analytica, to access personal information. Angeion undertook an integrated in-app notification and media campaign to a class in the hundreds of millions of individuals and processed 28.6 million claims, the most claims filed in the history of class action. In fact, during the September 7, 2023, Final Approval Hearing, U.S. District Judge Chhabria acknowledged the record number of claims filed, stating, "I was kind of blown away by how many people made claims."

**In re: Apple Inc. Device Performance Litigation**
Case No. 5:18-md-02827-EJD (N.D. Cal.)
Apple agreed to pay $310 million to settle allegations of diminished performance in iPhone 6's and 7's. Angeion's direct notification efforts were recognized as reaching 99%+ of the current and former owners of 129 million class devices. Millions of claims were processed.

**City of Long Beach, et al. v. Monsanto, et al.**
Case No. 2:16-cv-03493-FMO-AS (C.D. Cal.)
Bayer agreed to pay $650 million to settle allegations of waterbodies impaired by PCBs. Angeion's notice administration was extraordinarily successful with 99.7% of the class delivered direct notice. The claims administration includes multiple complex claims filing workflows for different funding allocations, including separate fund for "special needs" claimants.

**Beckett v. Aetna Inc.**
Case No. 2:17-cv-03864-JS (E.D. Pa.)
A consolidated data breach class action that arose from the improper disclosure of Protected Health Information by a health insurer and previous claims administrator, including confidential HIV-related information. Angeion provided specialized training

to our support team concerning the sensitive nature of the case and underlying health information. Angeion implemented robust privacy protocols to communicate with and verify the claims of the affected class members, including anonymized notice packets and allowing claimants to lodge objections under pseudonyms.

12. Additionally, and more specifically, Angeion will leverage its experience in administering the *Fusion Elite All Stars, et al., v. Varsity Brands, LLC, et al.* (the "*Fusion* Action") direct purchaser settlement to maximize administrative efficiencies in the instant Settlement.

## DATA SECURITY & INSURANCE

13. Angeion recognizes the critical need to secure our physical and network environments and protect data in our custody. It is our commitment to these matters that has made us the go-to administrator for many of the most prominent data security matters of this decade. We are ever improving upon our robust policies, procedures, and infrastructure by periodically updating data security policies as well as our approach to managing data security in response to changes to physical environment, new threats and risks, business circumstances, legal and policy implications, and evolving technical environments.

14. Angeion's privacy practices are compliant with the California Consumer Privacy Act, as currently drafted. Consumer data obtained for the delivery of each project is used only for the purposes intended and agreed in advance by all contracted parties, including compliance with orders issued by State or Federal courts as appropriate. Angeion imposes additional data security measures for the protection of Personally Identifiable Information (PII) and Personal Health Information (PHI), including redaction, restricted network and physical access on a need-to-know basis, and network access tracking. Angeion requires background checks of all employees, requires background checks and ongoing compliance audits of its contractors, and enforces standard protocols for the rapid removal of physical and network access in the event of an employee or contractor termination.

15. Data is transmitted using Transport Layer Security (TLS) 1.3 protocols. Network data is encrypted at rest with the government and financial institution standard of AES 256-bit encryption. We maintain an offline, air-gapped backup copy of all data, ensuring that projects can be administered without interruption.

16. Further, our team conscientiously monitors the latest compliance requirements, such as

GDPR, HIPAA, PCI DSS, and others, to ensure that our organization is meeting all necessary regulatory obligations as well as aligning to industry best practices and standards set forth by frameworks like CIS and NIST. Angeion is cognizant of the ever-evolving digital landscape and continually improves its security infrastructure and processes, including partnering with best-in-class security service providers. Angeion's robust policies and processes cover all aspects of information security to form part of an industry leading security and compliance program, which is regularly assessed by independent third parties. Angeion is also committed to a culture of security mindfulness. All employees routinely undergo cybersecurity training to ensure that safeguarding information and cybersecurity vigilance is a core practice in all aspects of the work our teams complete.

17. Angeion currently maintains a comprehensive insurance program, including sufficient Errors & Omissions coverage.

## SUMMARY OF THE NOTICE PLAN

18. This declaration will describe the Notice Plan that, if approved by the Court, Angeion will implement in this matter, including the considerations that informed the development of the plan and why it will provide due process to the Settlement Class.

19. The proposed Notice Plan is strategically designed to provide notice to Class Members utilizing a combination of traditional and state-of-the-art notice tactics, including: (1) Direct notice via email to all reasonably identifiable Class Members; (2) Direct notice via mail to all reasonably identifiable Class Members; (3) Digital and social media campaign ("Media Notice"); (4) Trade-specific media and publication campaign ("Trade Media & Publication Notice"); (5) posted notice in direct purchaser All Star Cheer gyms ("Posted Notice"); and (6) The issuance of a press release.

20. The Notice Plan also provides for the implementation of a dedicated Settlement Website and a toll-free telephone line where Class Members can learn more about their rights and options pursuant to the terms of the Settlement. Angeion will also monitor social media traffic regarding the Settlement to provide accurate and correct information, as appropriate.

21. As discussed in greater detail below, the Media Notice component of the Notice Plan is designed to deliver an approximate 80.35% reach with an average frequency of 3.24 times. This

number is calculated using objective syndicated advertising data relied upon by most advertising agencies and brand advertisers. It is further verified by sophisticated media software and calculation engines that cross reference which media is being purchased with the media habits of our specific Target Audience (defined below). What this means in practice is that 80.35% of our Target Audience will see a digital advertisement concerning the Settlement an average of 3.24 times each. The 80.35% reach is separate from the various other notice methods outlined above.

22. The Federal Judicial Center states that a publication notice plan that reaches 70% of class members is one that reaches a "high percentage" and is within the "norm." Barbara J. Rothstein & Thomas E. Willging, Federal Judicial Center, "Managing Class Action Litigation: A Pocket Guide or Judges," at 27 (3d Ed. 2010).

## EMAIL NOTICE

23. As part of the Notice Plan, Angeion will send notice of the Settlement via email to Class Members who have valid email addresses included in the Settlement Class data provided to Angeion. *See* **Exhibit B**.

24. Angeion follows best practices to both validate emails and increase deliverability. Specifically, prior to distributing the email notice, Angeion will subject the email addresses to a cleansing and validation process. The email cleansing process removes extra spaces, fixes common typographical errors in domain names, and corrects insufficient domain suffixes (*e.g.*, gmal.com to gmail.com, gmail.co to gmail.com, yaho.com to yahoo.com, etc.). The email addresses will then be subjected to an email validation process whereby each email address will be compared to known bad email addresses.[1] Email addresses that are not designated as a known bad address will then be further verified by contacting the Internet Service Provider ("ISP") to determine if the email address exists.

25. In addition, the email notice will be designed to avoid many common "red flags" that might otherwise cause the recipient's spam filter to block or identify the email notice as spam. For example,

---

[1] Angeion maintains a database of email addresses that were returned as permanently undeliverable, commonly referred to as a hard bounce, from prior campaigns. Where an address has been returned as a hard bounce within the last year, that email is designated as a known bad email address.

the email notice will not include attachments which are often interpreted by various Internet Service Providers ("ISP") as spam.

26. Angeion also accounts for the real-world reality that some emails will inevitably fail to be delivered during the initial delivery attempt. Therefore, after the initial noticing campaign is complete, Angeion, after an approximate 24- to 72-hour rest period (which allows any temporary block at the ISP level to expire) causes a second round of email noticing to continue to any email addresses that were previously identified as soft bounces and not delivered. In our experience, this minimizes emails that may have erroneously failed to deliver due to sensitive servers and optimizes delivery.

27. At the completion of the email campaign, Angeion will report to the Court concerning the rate of delivered emails accounting for any emails that are blocked at the ISP level. In short, the Court will possess a detailed, verified account of the success rate of the entire direct email notice campaign.

## MAILED NOTICE

28. As part of the Notice Plan, Angeion will send the notice of the Settlement to Class Members that have mailing addresses included in the Settlement Class data provided to Angeion. Notice will be sent via United States Postal Service ("USPS") first-class mail, postage pre-paid. *See* **Exhibit C**.

29. In administering the Notice Plan in this action, Angeion will employ best practices to increase the deliverability rate of the mailed Notices. Angeion will cause the mailing address information for members of the Class to be updated utilizing the USPS National Change of Address database, which provides updated address information for individuals or entities who have moved during the previous four years and filed a change of address with the USPS.

30. Notices returned to Angeion by the USPS with a forwarding address will be re-mailed to the new address provided by the USPS and the class member database will be updated accordingly.

31. Notices returned to Angeion by the USPS without forwarding addresses will be subjected to an address verification search (commonly referred to as "skip tracing") utilizing a wide variety

of data sources, including public records, real estate records, electronic directory assistance listings, etc., to locate updated addresses.

32. Notices will be re-mailed to Class Members for whom updated addresses were obtained via the skip tracing process.

## MEDIA NOTICE

**Programmatic Display Advertising**

33. Angeion will utilize a form of internet advertising known as Programmatic Display Advertising (internet banner advertisements) to provide notice of the Settlement to Class Members. Programmatic Display Advertising is the leading method of buying digital advertisements in the United States.[2] The media notice outlined below is strategically designed to provide notice of the Settlement to Class Members by driving them to the dedicated Settlement Website where they can learn more about the Settlement, including their rights and options.

34. To develop the media notice campaign and to verify its effectiveness, our media team analyzed data from 2022 comScore Multi-Platform/MRI Simmons USA Fusion[3] to profile the Settlement Class and arrive at an appropriate Target Audience based on criteria pertinent to this Settlement. Specifically, the following syndicated research definition was used to profile potential Class Members:

- **Leisure Activities - How Often Engaged In: Attend/Coach youth sports event**

---

[2] Programmatic Display Advertising is a trusted method specifically utilized to reach defined target audiences. Programmatic digital display ad spending in the United States exceeded $135 billion in 2023 and is forecasted to approach $180 billion in ad spending by 2025. *See* https://www.insiderintelligence.com/content/programmatic-ad-spending-set-reach-nearly-180-billion-by-2025.

[3] GfK MediaMark Research and Intelligence LLC ("GfK MRI") provides demographic, brand preference and media-use habits, and captures in-depth information on consumer media choices, attitudes, and consumption of products and services in nearly 600 categories. comSCORE, Inc. ("comSCORE") is a leading cross-platform measurement and analytics company that precisely measures audiences, brands, and consumer behavior, capturing 1.9 trillion global interactions monthly. comSCORE's proprietary digital audience measurement methodology allows marketers to calculate audience reach in a manner not affected by variables such as cookie deletion and cookie blocking/rejection, allowing these audiences to be reach more effectively. comSCORE operates in more than 75 countries, including the United States, serving over 3,200 clients worldwide.

**Participated in last 12 months** <u>and</u>
- **Who is the Parent of Children Under 18 Living in the household: Respondent**.

35. Based on the Target Audience definition used, the size of the Target Audience is approximately 8,138,000 individuals in the United States. It is important to note that the Target Audience is distinct from the class definition, as is commonplace in class action notice plans. Utilizing an overinclusive proxy audience maximizes the efficacy of the Notice Plan and is considered a best practice among media planners and class action notice experts alike. Using proxy audiences is also commonplace in both class action litigation and advertising generally.[4]

36. Additionally, the Target Audience is based on objective syndicated data, which is routinely used by advertising agencies and experts to understand the demographics, shopping habits and attitudes of the consumers that they are seeking to reach.[5] Using this form of objective data will allow the Parties to report the reach and frequency to the Court with confidence that the reach percentage and the number of exposure opportunities comply with due process and exceed the Federal Judicial Center's threshold as to reasonableness in notification programs. Virtually all professional advertising agencies and commercial media departments use objective syndicated data tools, like the ones described above, to quantify net reach. Sources like these guarantee that advertising placements can be measured against an objective basis and confirm that the reporting statistics are not overstated. Objective syndicated data tools are ubiquitous tools in a media planner's arsenal and are regularly accepted by courts in evaluating the efficacy of a media plan or its component parts. Understanding the socioeconomic characteristics, interests and practices of a target group aids in the proper selection of media to reach that target.

---

[4] If the total population base (or number of class members) is unknown, it is accepted advertising and communication practice to use a proxy-media definition, which is based on accepted media research tools and methods that will allow the notice expert to establish that number. The percentage of the population reached by supporting media can then be established. Duke Law School, GUIDELINES AND BEST PRACTICES IMPLEMENTING 2018 AMENDMENTS TO RULE 23 CLASS ACTION SETTLEMENT PROVISIONS, at 56.

[5] The notice plan should include an analysis of the makeup of the class. The target audience should be defined and quantified. This can be established through using a known group of customers, or it can be based on a proxy-media definition. Both methods have been accepted by the courts and, more generally, by the advertising industry, to determine a population base. *Id.* at 56.

Declaration of Steven Weisbrot of Angeion Group, LLC re: Proposed Notice Plan
9

37. Here, the Target Audience has been reported to have the following characteristics:
    - 93.70% are ages 25-54, with a median age of 41.2 years old;
    - 56.81% are female;
    - 79.76% are married;
    - 100% have children;
    - 47.98% have received a bachelor's or post-graduate degree;
    - 66.28% are currently employed full time;
    - The average household income is $123,180; and
    - 91.19% have used social media in the last 30 days.

38. To identify the best vehicles to deliver messaging to the Target Audience, the media quintiles, which measure the degree to which an audience uses media relative to the general population, were reviewed. Here, the objective syndicated data shows that members of the Target Audience spend an average of approximately 27.2 hours per week on the internet.

39. Given the strength of digital advertising, as well as our Target Audience's consistent internet use, we recommend using a robust internet advertising campaign to reach Class Members. This media schedule will allow us to deliver an effective reach level and frequency, which will provide due and proper notice to the Settlement Class.

40. Multiple targeting layers will be implemented into the programmatic campaign to help ensure delivery to the most appropriate users, inclusive of the following tactics:
    - <u>Look-a-like Modeling</u>: This technique uses data methods to build a look-a-like audience against known Class Members.
    - <u>Predictive Targeting</u>: This technique allows technology to "predict" which users will be served by the advertisements about the Settlement.
    - <u>Context Targeting</u>: This technique uses technology and data to serve the impressions to the intended audience on sites with relevant topics and/or articles.
    - <u>Site Retargeting</u>: This technique is a targeting method used to reach potential Class Members who have already visited the dedicated Settlement Website while they browsed other pages. This allows Angeion to provide potential Class Members sufficient exposure to an advertisement about the Settlement.

41. To combat the possibility of non-human viewership of digital advertisements and to verify effective unique placements, Angeion employs Oracle's BlueKai, Adobe's Audience Manger and/or Lotame, which are demand management platforms ("DMP"). DMPs allow Angeion to learn more about the online audiences that are being reached. Further, online ad verification and security providers such as Comscore Content Activation, DoubleVerify, Grapeshot, Peer39 and Moat will

be deployed to provide a higher quality of service to ad performance.

**Social Media Notice**

42. The Notice Plan also includes a comprehensive social media campaign strategically designed to leverage the Target Audience's consistent use of social media.[6] The social media campaign will provide notice of the Settlement via leading social media platforms in the United States: Facebook, Instagram, X, and TikTok.[7]

43. The social media campaign uses an interest-based approach, which focuses on the interests that users exhibit while on these social media platforms, to engage with the Target Audience via their respective desktop sites, mobile sites, and mobile apps. Additionally, specific tactics will be implemented to further qualify and deliver impressions to the Target Audience. *Look-a-like modeling* allows the use of consumer characteristics to serve ads. Based on these characteristics, we can build different consumer profile segments to ensure the Notice Plan messaging is delivered to the proper audience. *Conquesting* allows ads to be served in relevant placements to further alert potential Class Members.

44. The social media campaign will coincide with the programmatic display advertising portion of the Media Notice and are designed to deliver approximately twenty-one (21) million impressions. To ensure that notice is being delivered to the desired Target Audience, media results are continually monitored, and real-time adjustments are made throughout the campaign. For example, Angeion adjusts for which website types, times of day, banner ad locations, and banner ad sizes are most effective. As we continue to intake data and adjust for those variables, the program continues to be optimized for effective performance.

---

[6] As reported in paragraph 37 herein, 91.19% of the Target Audience have used social media in the last thirty (30) days.

[7] In the United States in 2023, Facebook had a reported 243.58 million users, and Instagram had a reported 150.99 million users, X/Twitter had a reported 95.4 million users, and TikTok had approximately 102.3 million users. *See*
https://www.statista.com/statistics/408971/number-of-us-facebook-users
https://www.statista.com/statistics/293771/number-of-us-instagram-users
https://www.statista.com/statistics/242606/number-of-active-twitter-users-in-selected-countries
https://www.statista.com/statistics/1100836/number-of-us-tiktok-users

**Paid Search Campaign**

45.     The Notice Plan also includes a paid search campaign on Google to help drive Class Members who are actively searching for information about the Settlement to the dedicated Settlement Website. Paid search ads will complement the programmatic and social media campaigns, as search engines are frequently used to locate a specific website, rather than a person typing in the URL. Search terms would relate to not only the Settlement itself but also the subject matter of the litigation. In other words, the paid search ads are driven by the individual user's search activity, such that if that individual searches for (or has recently searched for) the Settlement, litigation or other terms related to the Settlement, that individual could be served with an advertisement directing them to the Settlement Website.

## TRADE MEDIA & PUBLICATION NOTICE

46.     In addition to the direct notice and media notice efforts, the Notice Plan includes a strategic and multifaceted trade media and publication notice campaign that focuses on cheerleading-specific mediums to reach the cheerleading audience.[8]

47.     Notice via Inside Cheerleading will feature publication notice (one-half page black & white advertisement (*see* **Exhibit D**)), digital banner advertisements, and an e-newsletter sponsorship.

48.     Notice of the Settlement will further be disseminated via internet banner advertisements on cheerleading-focused websites such as cheerupdates.com, fierceboard.com, and cheertheory.com.

49.     Notice of the Settlement via Reddit[9] message boards will be used to further create awareness of the Settlement amongst our cheerleading audience.

## POSTED NOTICE

50.      Under the Notice Plan, a poster-size version of the short-form notice (11" x 17") will be sent to each of the All Star Cheer gyms to whom direct notice was disseminated in the *Fusion*

---

[8] Alternative, similar publications/industry websites may be utilized based on timing and availability.

[9] It has been reported that Reddit had approximately 190.77 million users in the United States in 2023. *See* https://www.statista.com/forecasts/1145591/reddit-users-in-the-united-states.

Declaration of Steven Weisbrot of Angeion Group, LLC re: Proposed Notice Plan
12

Action, along with a request to post the notice in a highly visible area where State Law Damages Class Members are most likely to view the notice. *See* **Exhibit E**.

## PRESS RELEASE

51. The Notice Plan includes the issuance of a press release to be distributed over PR Newswire (or a similar press release distribution service) to further diffuse news of the Settlement. The press release will help garner "earned media" (i.e., other media outlets and/or publications will report the story) separate and apart to supplement the notice efforts outlined herein which will lead to increased awareness and participation amongst members of the Settlement Class. *See* **Exhibit F**.

## SETTLEMENT WEBSITE & TOLL-FREE TELEPHONE SUPPORT

52. The Notice Plan will also implement the creation of a case-specific Settlement Website, where Class Members can easily view general information about this Settlement, review relevant Court documents, and view important dates and deadlines pertinent to the Settlement. The Settlement Website will be designed to be user-friendly and make it easy for Class Members to find information about this case. The Settlement Website will also have a "Contact Us" page whereby Class Members can send an email with any additional questions to a dedicated email address. Likewise, Class Members will also be able to submit a claim form online via the Settlement Website and securely upload documentation (if required).

53. The Settlement Website will be designed to be ADA-compliant and optimized for mobile visitors so that information loads quickly on mobile devices. Additionally, the Settlement Website will be designed to maximize search engine optimization through Google and other search engines. Keywords and natural language search terms will be included in the Settlement Website's metadata to maximize search engine rankings.

54. A toll-free hotline devoted to this case will be implemented to further apprise Class Members of their rights and options pursuant to the terms of the Settlement. The toll-free hotline will use an interactive voice response ("IVR") system to provide Class Members with responses to frequently asked questions and provide essential information regarding the Settlement. This hotline will be accessible 24 hours a day, 7 days a week. Additionally, Class Members will be able to

request a notice and/or claim form be mailed to them via the toll-free hotline.

55. Class Members will also have the option to speak with a live operator during normal business hours.

## SOCIAL MEDIA MONITORING

56. Angeion will also monitor conversations about the Settlement taking place on Facebook, Instagram, Twitter, and Reddit. Our methodology includes an "active listening" component wherein we monitor traffic on these social media platforms for discussion of the Settlement, and actively provide notice and/or answers to frequently asked questions as appropriate.

## FRAUD DETECTION

57. Angeion has developed and deployed a real-time fraud detection system, AngeionAffirm, which is the first and only comprehensive solution to identify fraud in real time based on both state-of-the-art technology and analysis of over a decade of historical claims data. AngeionAffirm was developed to combat the rising tide of fraudulent claims in class action settlements and the increasingly sophisticated technologies and techniques used by fraudulent actors in their attempt to perpetuate fraud.[10]

58. AngeionAffirm will be implemented to detect fraudulent claim submissions in this Settlement as part of the ongoing, comprehensive anti-fraud efforts. In addition to AngeionAffirm, Angeion maintains a robust, multi-tiered detection system to identify duplicate claims submissions. By way of example, we employ an elaborate technical process to identify potential

---

[10] Key highlights of AngeionAffirm include: (1) The implementation of enhanced, machine learning based fraud prevention mechanisms on all Web Application Firewalls focused on detecting and blocking fraudulent activities even before they infiltrate the system; (2) Employing advanced artificial intelligence to identify bot and scripted browser traffic; (3) Performing proprietary behavioral analysis techniques to identify abnormal patterns that could indicate fraudulent submissions, to help ensure that claims are genuine and justifiable; (4) Analyzing a broad array of technical characteristics garnered from claimant email addresses and other digital fingerprints to determine a claim's propensity for fraud; (5) Deploying a dynamic IP monitoring system to identify and flag suspicious activities across all case engagements; (6) Analysis of over one hundred million claims, which has proven instrumental in identifying characteristics, anomalies, and known bad actors, that may signify fraudulent intent, thus ensuring only bona fide claims are approved; and (7) Utilization of multiple security measures to address the increasing scale and sophistication of cyber criminals' adaptive behavior.

claim duplication using a series of database-driven searches to find duplicate names and addresses in our claims database. As part of this process, the claimant's name and any associated nicknames are reviewed for potential duplication, as well as the corresponding standardized addresses, for purposes of claim duplication detection. Additional data points may be used depending on the information available.

## REACH AND FREQUENCY

59. This declaration describes the reach and frequency evidence which courts systemically rely upon in reviewing class action publication notice programs for adequacy. The reach percentage exceeds the guidelines as set forth in the Federal Judicial Center's Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide to effectuate a notice program which reaches a high degree of Class Members.

60. Specifically, the comprehensive media notice campaign is designed to deliver an approximate 80.35% reach with an average frequency of 3.24 times each. It should be noted that the 80.35% reach approximation is separate and apart from the direct notice efforts, trade media and publication notice, press release, social media monitoring, Settlement Website, and toll-free telephone support.

## CONCLUSION

61. The comprehensive Notice Plan outlined herein includes strategically designed notice methods to provide notice to Class Members. Specifically, notice of the Settlement will be disseminated to all reasonably identifiable Class Members via email and mail, combined with a robust, state-of-the-art media notice campaign, a multi-faceted trade media and publication notice campaign, and the issuance of a national press release. The Notice Plan also includes the implementation of a dedicated Settlement Website and toll-free hotline to further inform Class Members of their rights and options in the Settlement, complemented by social media monitoring to assist with providing consistent and correct information about the Settlement.

62. In my professional opinion, the Notice Plan described herein will provide full and proper notice to Class Members before the claims, opt-out, and objection deadlines. Moreover, it is my

opinion that the Notice Plan is the best notice that is practicable under the circumstances, fully comporting with due process, and Fed. R. Civ. P. 23. After the Notice Plan has been executed, Angeion will provide a final report verifying its effective implementation to this Court.

    I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 13, 2024

_____<br>STEVEN WEISBROT